SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:  858.720.8900
Facsimile:  858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD, <br><br> Plaintiff, <br><br> v. <br><br> TELEFONAKTIENBOLAGET LM ERICSSON and ERICSSON INC. <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR:** <br><br> **(1) BREACH OF CONTRACT;** <br> **(2) PROMISSORY ESTOPPEL;** <br> **(3) DECLARATORY JUDGMENT;** <br> **(4) VIOLATION OF CALIFORNIA CARTWRIGHT ACT;** <br> **(5) VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE SECTIONS 17200 ET SEQ.;** <br> **(6) FRAUDULENT MISREPRESENTATION;  AND** <br> **(7) NEGLIGENT MISREPRESENTATION.** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff TCL Communication Technology Holdings, Ltd. ("TCL" or "Plaintiff") alleges as follows for its Complaint against Telefonaktienbolaget LM Ericsson and Ericsson Inc. (collectively "Ericsson" or "Defendants"):

## INTRODUCTION

1.     TCL brings this lawsuit against Ericsson because of Ericsson's failure to license its standards-essential patent portfolio on fair, reasonable and non-discriminatory terms (also known as "FRAND").

2.     TCL is the 5th largest mobile telecommunications vendor in the world, with products available in over 100 countries worldwide.  In the United States, TCL sells its products under the "Alcatel onetouch" brand.  Ericsson owns a portfolio of intellectual property rights, which it licenses to manufacturers like TCL.

3.     Ericsson has declared a number of its patents to be essential to the global 2G, 3G and 4G telecommunications standards established by the European Telecommunications Standards Institute ("ETSI").  In declaring its patents as essential to these standards, Ericsson made public and binding commitments to the international community to license those patents on FRAND terms.  In reliance upon Ericsson's commitment to FRAND pricing, manufacturers like TCL have made products that complied with these 2G, 3G and 4G standards.

4.     In negotiations the parties have conducted over the past several years, Ericsson has made repeated demands that violate Ericsson's FRAND commitments, including:

- Demanding rates that are far in excess of market rates.
- Discriminating against TCL and violating ETSI guidelines by demanding TCL pay higher royalty rates than comparable mobile phone manufacturers.
- Illegally bundling its 2G, 3G and 4G patents to extract additional revenue from TCL in violation of ETSI standards.

-1-

5.      In short, now that Ericsson has induced manufacturers to incorporate 2G, 3G and 4G technologies into their products with promises of FRAND pricing, it is attempting to exploit its market position to demand unreasonably high and discriminatory licensing fees from TCL.  In an effort to apply added pressure to compel TCL to accept these unreasonable terms, and despite the ongoing licensing negotiations, Ericsson has also filed infringement suits against TCL in multiple jurisdictions around the world.  As a result, TCL has no choice but to turn to the courts to establish FRAND licensing terms that will allow TCL to fairly proceed with its business.

## NATURE OF THE ACTION

6.      TCL brings this action for Ericsson's breach of its commitments to ETSI, the 3rd Generation Partnership Project ("3GPP"), and their members and affiliates – including TCL – to license intellectual property rights ("IPRs") it asserted as essential to wireless technologies known as second generation ("2G"), third generation ("3G"), and fourth generation ("4G") technologies under reasonable rates, on fair and reasonable terms, and under non-discriminatory conditions.

7.      According to ETSI IPR Policy, if an ETSI member owns IPR, including patents, that may be considered essential to a particular standard or technical specification, ETSI requests that the owner grant irrevocable licenses on FRAND terms and conditions in return for inclusion of such IPR into the standard.

8.      Clause 6 of ETSI's IPR Policy states:

When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant

-2-

1    irrevocable licenses on fair, reasonable and non-

2    discriminatory ("FRAND") terms and conditions

3         9.    If the essential IPR owner refuses to undertake the requested

4    commitment and informs ETSI of that decision, the ETSI General Assembly must

5    "review the requirement for that STANDARD or TECHNICAL SPECIFICATION

6    and satisfy itself that a viable alternative technology is available for the

7    STANDARD or TECHNICAL SPECIFICATION" that is not blocked by that IPR

8    and satisfies ETSI's requirements.  ETSI IPR Policy, cl. 8.1.1.  Absent such a viable

9    alternative, the ETSI IPR Policy requires that "work on the STANDARD or

10   TECHNICAL SPECIFICATION shall cease."  *Id.*, cl. 8.1.2.  In other words, ETSI

11   will not agree to incorporate a member's technology in a standard under

12   consideration unless the member irrevocably binds itself to granting licenses on

13   FRAND terms.

14        10.    Ericsson is a member of ETSI, and has submitted at least 23

15   ETSI IPR Licensing Declaration forms through which it has declared a large number

16   of its United States and foreign patents and patent applications as essential to the

17   standards for the 2G, 3G, and 4G technologies.  Some of these patents and patent

18   applications are assigned to either Telefonaktienbolaget LM Ericsson or Ericsson

19   Inc.  Ericsson also promised that it is "prepared to grant irrevocable licenses under  .

20   . . terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR

21   Policy."  As a 3GPP "Individual Member," Ericsson was "bound by the IPR policy"

22   of ETSI, the Organizational Partner through which Ericsson participated in 3GPP.

23   Ericsson thus intentionally induced ETSI, 3GPP, their members and affiliates, and

24   anyone implementing any of the standards, including TCL, to rely on Ericsson's

25   representation that it had granted and/or would grant licenses on FRAND terms in

26   developing, adopting and implementing the 2G, 3G, and 4G technical standards.

27   These standards have been and are implemented worldwide, including in the United

28

-3-

1    States and California, in a variety of wireless electronic devices, base stations, and

2    software that have become commonplace.

3          11.    TCL invested substantial resources in developing and marketing

4    products that implement these standards worldwide, including in the United States

5    and California, detrimentally relying on the assurances of participating IPR holders

6    – including Ericsson – that any patents identified pursuant to ETSI's IPR Policy by

7    such IPR holders would be licensed on FRAND terms, regardless of whether such

8    IPR were, in fact, used in any particular implementation.  Accordingly, TCL is a

9    third-party beneficiary of Ericsson's FRAND commitments to ETSI and 3GPP.

10         12.    After intentionally locking in the industry, including

11   implementers like TCL, Ericsson then breached its promise to ETSI and its

12   members and affiliates by refusing to provide TCL a licensing rate that is consistent

13   with Clause 6 of ETSI's IPR Policy, instead demanding royalties that are

14   discriminatory, and far higher than Ericsson otherwise could demand based only on

15   the value of its patents, as opposed to the additional value created by those patents'

16   inclusion into standards.

17         13.    TCL does not accept Ericsson's representation that any (or all) of

18   its patents that it has identified as "essential" are, in fact, necessary for the compliant

19   implementations of 2G, 3G, and 4G technologies; nor does TCL concede that the

20   particular implementations of such technologies in its products practice any Ericsson

21   patents, including those identified by Ericsson in relation to these technologies.

22   Nonetheless, TCL has relied upon the representations of Ericsson, and other

23   similarly-situated patent holders.

24         14.    Because Ericsson asserted that its patents are "essential" and

25   granted to TCL and its subsidiaries a license (subject only to confirming the

26   FRAND rate), or, in the alternative, promised that it would grant a license to any

27   such patents on FRAND terms, companies that relied on Ericsson's commitments

28

1  are entitled to receive the benefit of a fair, reasonable and non-discriminatory

2  license.

3     15. Accordingly, TCL seeks:  (i) a judicial declaration that

4  Ericsson's promises to ETSI, 3GPP, and their respective members and affiliates

5  constitute contractual obligations that are binding and enforceable by TCL; (ii) a

6  judicial declaration that Ericsson has breached these obligations by demanding

7  excessive and discriminatory royalties from TCL; (iii) a judicial decree enjoining

8  Ericsson from further demanding excessive royalties from TCL that are not

9  consistent with Ericsson's FRAND obligations; (iv) a judicial accounting of what

10  constitutes a FRAND royalty rate in all respects consistent with Ericsson's promises

11  to license its patents identified as (or alleged to be) "essential" to the 2G, 3G, and/or

12  4G standards; (v) a judicial determination of and compensation for Ericsson's

13  breach; (vi) a judicial determination that Ericsson's conduct constitutes unlawful,

14  unfair or fraudulent business acts or practices in violation of the California Unfair

15  Competition Law, Business & Professions Code section 17200 et seq. ("UCL");

16  (vii) a jury trial on all issues so triable, including as to TCL's other state law claims,

17  including those for violation of the California Cartwright Act, Business &

18  Professions Code section 16720 et seq., and fraudulent and negligent

19  misrepresentations; and (viii) and all other relief requested herein.

20           **THE PARTIES**

21     16. Plaintiff TCL maintains its principal place of business at 15/F,

22  TCL Tower, Gaoxin Nan Yi Road, Nanshan District, Shenzhen, People's Republic

23  of China ("PRC").  TCL is one of four business units of its parent, TCL

24  Corporation, also located in Shenzhen, PRC.

25     17. Established in 2004, TCL is a leading mobile and internet

26  communications device manufacturer.  TCL's mobile devices, including cellular

27  phones, are sold all over the world.  TCL sells its products under two brand names

28  depending on the market.  In the PRC, TCL products are sold under the "TCL"

-5-

1   brand.  In other markets around the world, including the United States, TCL

2   products are sold under the "Alcatel onetouch" brand.

3         18.     In 2007, TCT Mobile Limited ("TCT"), a wholly-owned

4   subsidiary of TCL, was one of the first companies in the People's Republic of China

5   ("PRC") to sign a patent license agreement with Ericsson for what Ericsson alleged

6   as standard-essential patents ("SEPs") covering the 2G standard.

7         19.     TCT Mobile (US) Inc. ("TCT US") is a fully-owned subsidiary

8   of TCL and has its principal place of business at 25 Edelman, Irvine, CA 92618.

9   TCT US is directly involved with the sale of 2G, 3G, and 4G mobile phones,

10  including sales of mobile handsets products under TCL and Alcatel onetouch brands

11  in the United States.

12        20.     TCT Mobile Inc. ("TCT Inc.") is a fully-owned subsidiary of

13  TCL and has its principal place of business at 25 Edelman, Irvine, CA 92618.  TCT

14  Inc. is responsible for, among other things, providing liaison and backup services for

15  TCT US and other Group affiliates in the USA and for United States market analysis

16  and investigation, information collection, and communications between end

17  customers and the regional sales team.

18        21.     Since 2007, TCL has been selling its mobile phones in the

19  United States.  Sales of TCL's phones have steadily increased and in 2010, Strategy

20  Analytics named TCL as one of the "fastest growing major mobile vendor[s] in the

21  world."

22        22.     In order for TCL's mobile handsets to operate, all phones rely on

23  a number of telecommunication standards that are used in most countries around the

24  world.  These standards include 2G, 3G, and the current 4G standards.

25  TCL relies on technologies described in the 2G, 3G, and 4G standards for its

26  products to operate in the marketplace.

27        23.     Upon information and belief, Telefonaktiebolaget LM Ericsson

28  is a corporation organized and existing under the laws of Sweden with its principal

-6-

COMPLAINT

place of business at Torshamnsgatan 23, Kista, 164 83 Stockholm, Sweden.  Upon information and belief, Ericsson's wholly-owned U.S. subsidiary, Ericsson Inc., is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 6300 Legacy Drive, Plano, Texas 75024. Telefonaktiebolaget LM Ericsson and Ericsson, Inc. are collectively referred to herein as "Ericsson" or "Defendants."

24.     Upon information and belief, Ericsson has offices and employees in California and regularly conducts business in California.

25.     On information and belief, prior to February 2012, Ericsson, through its joint venture with Sony Corp., produced and sold mobile handset devices throughout the United States, including California and this District.  However, in February 2012, Ericsson announced the divestiture of its entire stake in that joint venture.  On information and belief, Ericsson has made and sold and/or makes and sells base stations that are compliant with the 2G, 3G and 4G standards which are part of the cellular infrastructure throughout the United States, including California and this District.  According to Ericsson, as of the "measurements end of 2011, [it] ha[d] a 60% market share measured in LTE volumes" and is "the largest supplier of LTE base stations in the United States."

26.     In addition to its widespread sale of base stations in the United States, Ericsson also aggressively monetizes its large portfolio of IPRs – including patents declared to be essential to the 2G, 3G, and 4G telecommunications standards – by targeting companies like TCL that sell mobile handsets to consumers in the United States, and which it claims implement one or more of those patents. According to Ericsson,

> Ericsson (NASDAQ:ERIC) has the industry's strongest
> wireless IPR portfolio, comprising 27,000 granted patents that
> cover a wide range of technologies, from wireless access (2G,
> 3G and 4G) to WLAN and the whole Information and

-7-

Communications Technology (ICT) value chain. As wireless access is now being added in new types of devices, Ericsson is reorganizing its Licensing and Patent Development department with the focus on further monetizing its IPR assets.

Hans Vestberg, President and CEO of Ericsson, says: "The ICT industry is built on standardized and shared technologies, making it possible to create a global mass market for mobile telephony and mobile broadband. Today's 6 billion mobile phone subscriptions, and close to 1 billion mobile broadband subscriptions, would not be possible without this industry mentality….As we are entering the Networked Society, we will see built-in wireless access beyond traditional devices like phones, laptops and tablets, providing new services to the consumers. *This provides an interesting business opportunity for us, having this industry's strongest patent portfolio*, ***as any company or manufacturer that wants to get in there will need an agreement with Ericsson***…. Ericsson is today a net receiver of royalties and has signed more than 90 license agreements. With new devices and other industries entering the world of connectivity, Ericsson targets to grow its IPR revenues above the SEK 4.6 billion net revenue generated in 2010, as stated at the company's Capital Markets Day on November 9, 2011.

### JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §1332, because this is an action between citizens of different states and because the value of declaratory and injunctive relief sought, the value of TCL's rights that this action will protect and enforce, and the extent of the injury to be prevented exceed the amount of $75,000, exclusive of interest and costs.

-8-

28.   Defendants are subject to general personal jurisdiction in California, consistent with the principles of due process and the California Long Arm Statute, at least because Defendants maintain offices and facilities in California, have employees in California, offer their products, services and patent portfolios for sale and licensing in California and the United States, and regularly conduct business in California.  For example, in addition to its licensing activities throughout the United States, including on information and belief in this District, Ericsson claims to be the largest provider of LTE base stations in the United States such that, according to it, no other supplier "would have the capacity to replace Ericsson base stations in a commercially reasonable time" in the United States. Accordingly, Defendants transact substantial business in this District and throughout the United States, and thus voluntarily avail themselves of the laws of the United States and California so as to be subject to the jurisdiction of this Court.

29.   Defendants are also subject to specific personal jurisdiction in California.  TCT US and TCT Inc.'s principal place of business is in California and Defendants granted to TCL's subsidiaries, including, for example, at least TCT US and TCT Inc., licenses to Defendants' alleged 2G, 3G and 4G patents.  Additionally, TCL, on behalf of its subsidiaries located in California, has been involved in attempting to obtain a FRAND rate for the license that was granted by Ericsson to its alleged 2G, 3G and 4G patents.  Thus, this lawsuit arises out of Defendants' contacts with California at least with respect to its FRAND commitments, its failure to offer a FRAND rate to TCL and its subsidiaries, and its negotiations with TCL and its subsidiaries.

30.   Venue is proper in this District pursuant at least to 28 U.S.C. §§1391(a), 1391(c), and 1391(d).

## BACKGROUND INFORMATION

31.   Standard development organizations ("SDOs") are voluntary membership organizations whose participants engage in the development of industry

-9-

1  standards for the benefit of their members and affiliates, including third parties

2  implementing the standards.  SDOs and the standards they promulgate play a

3  significant role in the technology market by allowing companies to agree on

4  common technology standards so that compliant products implementing the

5  standards will work together.  Standards also lower costs for compliant products by

6  increasing product manufacturing volume and inter-brand competition, and by

7  eliminating switching costs for consumers and/or manufacturers who want to switch

8  from products, services, or components provided by one company to those provided

9  by another company.

10       32.     SDO participants enjoy significant potential benefits to having

11  their technology adopted by the SDO, independent of potential royalty income from

12  licensing their patents.  These non-income benefits can include recognition of

13  leadership in the technology, increased demand for participants' products, advantage

14  flowing from familiarity with the contributed technology potentially leading to

15  shorter development lead times, and improved compatibility with proprietary

16  products using the standard.  Participation also can lead to a steady stream of royalty

17  income, which although framed by FRAND principles, provides the benefit of

18  having one's technology more broadly adopted.

19       33.     ETSI is an independent, non-profit SDO that is responsible for

20  the standardization of information and communication technologies, including

21  mobile cellular technologies, for the benefit of its members and affiliates.

22       34.     3GPP is a collaborative activity through a group of recognized

23  SDOs in the information and communication industry, including ETSI.

24       35.     ETSI, in partnership with 3GPP, has been involved in

25  standardizing a number of 2G, 3G, and 4G mobile cellular technologies.

26       36.     New mobile cellular technologies are broadly commercialized

27  only after service providers and device manufacturers agree on compatible

28  technology specifications for related products or services.  For virtually all

-10-

successful mobile cellular technologies, that process has involved inclusive, multi-participant standards development efforts conducted under the auspices of leading SDOs, such as ETSI and 3GPP.

37.     As a practical matter, the mobile cellular technologies that are used to allow devices in a mobile cellular network to work together must be described in standards adopted by a recognized SDO, and thereby accepted by key industry members, in order to be commercially successful.  For example, in order for its cellular phone products to connect to a base station using 2G, 3G and 4G mobile cellular technologies, TCL has to use third-party communication chips that are compatible with the corresponding standards describing such mobile cellular technologies.

38.     The engineers who work on mobile cellular technologies that are adopted by the SDOs are not employees of the SDOs.  Instead, they are often employees of companies in the mobile telecommunications industry, such as Qualcomm, Samsung, Alcatel-Lucent, Nokia, Motorola, Nortel, Ericsson, TCL and others that participate in the standard-setting process.  Some of these SDO participants file for patents that cover technologies they believe are essential to implementations of the standards.

39.     In order to reduce the likelihood that implementers of their standards will be subject to abusive and anticompetitive practices by patent holders, SDOs have adopted rules, policies and procedures that address the disclosure and licensing of patents that SDO participants may assert as essential to the implementation of the standard under consideration.  These rules, policies and/or procedures are set out in the IPR Policies of the SDOs.

40.     Many IPR Policies – including those at issue in this litigation – encourage or require participants to disclose on a timely basis the IPRs, such as patents or patent applications, they believe are sufficiently relevant to standards under consideration so as to be or become essential.  These disclosures permit the

1   SDOs and their members to evaluate technologies with knowledge of disclosed IPRs
2   that may affect the costs of implementing the standard.

3          41.     IPR Policies – including those at issue in this litigation – require
4   participants claiming to own relevant patents to grant licenses for those patents with
5   any implementer of the standard on FRAND terms.

6          42.     As the United States Federal Trade Commission recently
7   explained in an analysis of its consent order against Google,

8          [SDOs] have this policy because the incorporation of patented
9          technology into a standard induces market reliance on that
10         patent and increases its value. After manufacturers implement a
11         standard, they can become "locked-in" to the standard and face
12         substantial switching costs if they must abandon initial designs
13         and substitute different technologies. This allows [standard-
14         essential patent] holders to demand terms that reflect not only
15         "the value conferred by the patent itself," but also "the
16         additional value – the hold-up value – conferred by the patent's
17         being designated as standard-essential." The FRAND
18         commitment is a promise intended to mitigate the potential for
19         patent hold-up. In other words, it restrains the exercise of
20         market power gained by a firm when its patent is included in a
21         standard and the standard is widely adopted in the market.

22         43.     Thus, IPR Policies and the members' commitment thereto
23   encourage participants and affiliates to contribute their technologies to the standards
24   and/or to implement the standards in their products with the expectation that an
25   owner of any patented technology will be prevented from demanding unfair,
26   unreasonable, or discriminatory licensing terms, and thereby be prevented from
27   keeping parties seeking to implement the standard from doing so or imposing undue
28   costs or burdens on them.  This ultimately works to the benefit of consumers, who

-12-

1   would be harmed by higher prices and less options if owners of standard-essential

2   patents were able to demand unfair, unreasonable, or discriminatory licensing terms.

3

4                    2G, 3G, and 4G Mobile Cellular Standards

5          44.    Ericsson's unlawful licensing demands pertain in part to patents

6   that it claims are "essential" to the 2G, 3G, and 4G standards.

7          45.    The mobile cellular technologies described by the 2G, 3G and

8   4G standards (collectively the "Mobile Cellular Standards") are enabling

9   technologies for mobile voice and data communications.

10

11                      2G GSM/GPRS/EDGE Technology

12         46.    2G GSM technology was a culmination of work that began in the

13  1980's as a replacement for first generation ("1G") analog cellular networks for

14  voice communications.  The first 2G cellular telecom networks were commercially

15  launched on the GSM standard in Finland in 1991.  The first GSM network became

16  operational in the United States in 1995.

17         47.    Under the auspices of the 3GPP organization, the GSM standard

18  has since been expanded to support higher bit rates and data transfer in "packet"

19  mode through the intermediary standards GPRS (General Packet Radio Services,

20  intermediate mobile system between 2G and 3G for bit rates lower than 100 kbit/s)

21  and then EDGE (Enhanced Data rates for GSM Evolution).  The introduction of

22  GPRS and EDGE into the GSM network made services such as Wireless

23  Application Protocol (WAP) access, Multimedia Message Service (MMS), e-mail

24  and World Wide Web access possible.

25

26                          3G UMTS Technology

27         48.    The need for greater transmission capacity and speed then led to

28  the adoption of 3G technology.

-13-

49.     UMTS is a 3G standard.  3G UMTS uses WCDMA (wideband CDMA), a technology used to increase the amount of data that can be exchanged on the bandwidth of mobile telecommunications.  3G mobile phones can, in addition to classic voice calls, transmit and receive data such as, for example, downloading of music and video files.  AT&T Wireless was the first operator to launch a 3G UMTS network in the United States in 2004.

50.     UMTS requires the deployment of a new physical network of antennas and needs a large number of radio-interface stations in order to provide adequate coverage.  Because of the absence to date of complete UMTS area coverage, the builders and operators of 3G mobile cellular communications systems are required to ensure maximum backward compatibility with 2G systems.  This allows users to make connections regardless of their geographic location or type of mobile phone, and especially when operating in an area where there is no 3G network.  Thus, the majority, if not all, of the marketed 3G mobile phones can also function in 2G/GSM mode (including the intermediate GPRS and EDGE standards).

51.     The UMTS standard allows UMTS systems to function with pre-existing GSM, GPRS and EDGE standards.  For example, operators may choose to keep certain basic elements of the GSM system when they add a UMTS radio interface to their infrastructure.  Thus, both the UMTS system and the GSM system are present in many current infrastructures.  From a commercial point of view, mobile phone devices utilize both the GSM and UMTS standards.

### 4G LTE Technology

52.     The need for even greater transmission capacity and speed then led to the adoption of 4G technology.

53.     LTE (Long Term Evolution) is a 4G technology based on OFDM (Orthogonal Frequency-Division Multiplexing) technology.  4G LTE technology offers increased capacity and speed as compared to the 3G technology.

-14-

54.     A 4G LTE network provides mobile ultra-broadband Internet access, for example to laptops with USB wireless modems, to smartphones, and to other mobile devices.  The first large-scale commercial 4G LTE network was launched in the United States by Verizon Wireless in 2010.

55.     Many 4G networks are also backward compatible with 2G and 3G systems. This allows users to make connections regardless of their geographic location or type of mobile phone, and especially when operating in an area where there is no 4G network.  Thus, the majority, if not all, of the marketed 4G mobile phones can also function in 3G and/or 2G modes.

## IPR Policies of ETSI and 3GPP

56.     Like other SDOs, ETSI and 3GPP have developed IPR Policies designed to ensure that investment in standard-compliant products is not wasted as a result of essential IPR being unavailable or only available under unreasonable and/or discriminatory licensing terms.  These IPR Policies generally require that the members disclose their ownership of patents or patent applications that are or likely to become essential to practice the standard and commit to licensing these patents on FRAND terms.

57.     For example, under Article 3.1 of the 3GPP, the Organization Partners requires that its IPR policies are respected by its members and that its respective members must declare "their willingness to grant licenses on fair reasonable terms and conditions on nondiscriminatory basis."  3GPP's commitment to this IPR policy is further reflected in Article 55 of the 3GPP Technical Working Procedures, which requests that each individual member should declare "at the earliest opportunity, any IPR which they believe to be essential, or potentially essential, to any work ongoing within 3GPP."

58.     ETSI's IPR Policy is set forth in Annex 6 of its Rules of Procedure.  Clause 4.1 of the ETSI IPR Policy requires ETSI members to declare all

-15-

essential IPR in a timely manner.  Clause 15 of ETSI's IPR Policy defines IPR to mean "any intellectual property rights conferred by statute law including applications therefor other than trademarks."  Therefore, market participants have a reasonable expectation that all potentially essential patents or patent applications will be disclosed to ETSI.  Clause 6.1 of ETSI's IPR Policy governs the availability of licenses to essential IPR, stating that when essential IPRs are brought to the attention of ETSI, ETSI shall immediately request an undertaking in writing that the IPR owner is prepared to grant irrevocable licenses on FRAND terms.  Clause 8 of ETSI's IPR Policy states that if an IPR owner refuses to give a FRAND commitment in accordance with Clause 6.1 of the IPR Policy prior to the publication of the standard, ETSI will select an alternative technology to incorporate into the standard, or will stop work entirely on the standard if no alternative is available. Further, if an IPR owner refuses to give a FRAND commitment in accordance with Clause 6.1 after publication of a standard, ETSI shall try to modify the standard so that the IPR in question is no longer essential, or failing that, will involve the European Commission to see what further action is required.

Ericsson's Involvement in Development of the Mobile Cellular Standards

59.     Ericsson is a member of ETSI and 3GPP, and an alleged contributor to the ETSI standard.  Upon information and belief, Telefonaktiebolaget LM Ericsson is a member of ETSI and Ericsson Inc. is a member of Alliance for Telecommunications Industry Solutions ("ATIS").  ETSI and ATIS are organizational partners of 3GPP, and Telefonaktiebolaget LM Ericsson and Ericsson Inc. are individual members of 3GPP.  Ericsson declared numerous IPRs to ETSI, including United States patents and patent applications assigned to Telefonaktiebolaget LM Ericsson and Ericsson Inc.

60.     In addition, upon information and belief, Ericsson Inc. has played a role in the 3GPP standardization process.  For example, Asok Chatterjee,

-16-

head of Ericsson's Strategic Standardization in the United States, was a chairman of the 3GPP's Project Coordination Group ("PCG") until the end of last year.  Upon information and belief, Mr. Chatterjee resides in California.  PCG is the 3GPP's highest-level steering and coordination group and is responsible for maintaining a register of IPR declarations relevant to 3GPP, received by the Organizational Partners.  Mr. Chatterjee also served as head of the ATIS delegation to the 3GPP for 11 years from 1999 to 2010, and as a delegate of the GSM association to ETSI for 15 years from 1995 to 2010.  Upon information and belief, Mr. Chatterjee was one of founders of 3GPP in 1998 and has been involved in the standardization of 2G, 3G and 4G technology while holding an executive position with Ericsson Inc.

61.     As a 3GPP "Individual Member," Ericsson is "bound by the IPR policy" of ETSI, the Organizational Partner through which Ericsson participated in 3GPP.  Ericsson declared to ETSI that a number of its patents and patent applications are or are likely to become essential to one or more of the Mobile Cellular Standards and that it is prepared to "grant irrevocable license under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR policy."

62.     Ericsson has also represented to TCL that it owns rights in a number of patents and pending applications that it asserts are or may become "essential" to one or more of the Mobile Cellular Standards.  TCL does not concede that such listed patents are either "essential" to the Mobile Cellular Standards or that such patents are practiced in the implementation of such standards in any TCL products.

63.     In reliance on declarations such as the ones submitted by Ericsson, ETSI released the Mobile Cellular Standards.  Once Ericsson disclosed that it held essential patents, absent a licensing commitment from Ericsson that it would grant licenses to these patents on FRAND terms, ETSI would have either: (1) revised the standards to employ alternative technologies, (2) stopped working on the

-17-

1  standards, or (3) taken other action to ensure the Mobile Cellular Standards would
2  be available for use by everyone on FRAND terms and conditions.

3         64.    In submitting its declarations in accordance with ETSI's IPR
4  Policy, Ericsson entered into a contract with ETSI for the benefit of ETSI members
5  and any entity that implements the Mobile Cellular Standards.  Ericsson is bound by
6  its agreements to license its patents consistent with the referenced ETSI IPR Policy.

7

8      <u>TCL's Reliance on Commitments with Respect to the Mobile Cellular Standards</u>

9         65.    TCT, a wholly-owned subsidiary of TCL, is a member of ETSI.
10  TCT has declared to ETSI a number of its patents that are or are likely to become
11  essential to the LTE standard and committed to the FRAND obligations with respect
12  to those patents.

13         66.    TCL implements the Mobile Cellular Standards by
14  manufacturing mobile phone products that are compatible with the Mobile Cellular
15  Standards.

16         67.    TCL and other companies that have participated in the
17  development of the Mobile Cellular Standards and/or implemented those standards
18  relied on Ericsson's commitments that the royalties it would seek for the license to
19  its "essential" patents would conform to the promises made by Ericsson.

20         68.    In reliance on the integrity of the SDO process and the
21  commitments made by Ericsson regarding the IPRs that it deems "essential," TCL
22  began providing its mobile phone products with the 2G, 3G and/or 4G connectivity.

23         69.    By way of example, TCL purchased and incorporated into its
24  mobile phone products communication chipsets manufactured by third-party
25  vendors such as Qualcomm, Broadcom and Mediatek that provide TCL's mobile
26  phone products with 2G, 3G and/or 4G connectivity.  TCL made its decision to
27  provide its mobile phone products with GSM, GPRS, UMTS and/or LTE
28  connectivity in reliance on, and under the assumption that, it and/or any third party

-18-

1   supplier or subsidiary could avoid patent litigation and pay for a license, on FRAND

2   terms, to any patents that Ericsson, or any other company, had disclosed as essential

3   to the Mobile Cellular Standards related to these technologies under ETSI's well-

4   publicized IPR Policy.

5

6                    Ericsson's Breach of Its Contractual Obligation to License

7                        Its Identified Patents on FRAND Terms

8          70.     Regardless of whether there exists any actual use of Ericsson

9   patent claims in any specific implementation that is compatible with the applicable

10  Mobile Cellular Standards, Ericsson has represented that it possesses patents

11  essential to such implementations.  On that basis, Ericsson was required to license

12  its identified patents in all respects consistent with its binding assurances to ETSI,

13  3GPP, and participants and implementers of the applicable Mobile Cellular

14  Standards.

15         71.     In willful disregard of the commitments it made to ETSI and

16  3GPP, Ericsson has refused to extend to TCL a FRAND rate for the license for any

17  of Ericsson's identified patents.  Instead, Ericsson is exploiting the significant

18  economic power it gained as a result of the purported inclusion of its technology

19  into the Mobile Cellular Standards by demanding royalty payments that are wholly

20  disproportionate to the royalty rate that its patents should command under any

21  reasonable royalty determination, and far in excess of any independent value they

22  would have absent their inclusion into the standards.

23         72.     For its part, TCL has negotiated in good faith with Ericsson in an

24  attempt to obtain FRAND rates for the licenses to all patents that Ericsson has

25  declared to be essential to the Mobile Communication Standards.  The most senior

26  members of TCL, including its Chief Executive Officer and Chairman, have

27  invested significant effort and time in these endeavors.  Notwithstanding TCL's

28  genuine efforts to obtain a FRAND rate, the negotiation process has been a very

-19-

long, disappointing, and frustrating one.  Despite all of the effort that TCL has exerted through the numerous negotiations to obtain FRAND rates for the alleged SEPs that Ericsson has declared before ETSI, Ericsson has never offered a rate on FRAND terms.

73.     In 2012, the negotiations over the FRAND rate for a new agreement between Ericsson and TCL intensified, including regarding the FRAND rate for products sold in the United States.  TCL unambiguously expressed its readiness to agree to a FRAND rate with Ericsson for 2G and 3G patents.  At Ericsson's request, TCL agreed to also negotiate a FRAND rate for Ericsson's alleged 4G essential patents.

74.     In the particular market segment that TCL is in, the profit margin is typically within 2% of the sales price.  Therefore, the addition of a mere 1% paid in royalty can significantly erase profit margin and competitiveness in the market place for TCL.  It is therefore essential for TCL to obtain FRAND rates for the 2G, 3G and 4G licenses that Ericsson has granted or will grant.  TCL also cannot pay unfairly higher royalty rates than any of its competitors.  A repeat of the unfair terms in the current 2G SEPs agreement with Ericsson in the ongoing FRAND rate negotiations for 2G, 3G, and 4G SEPs will have catastrophic consequences for TCL in the market place, including payment of an unfair and unreasonable royalty rate for products sold by TCL in the United States and this District.

75.     Ericsson has refused and failed to agree to a FRAND rate.  Among other unfair and unreasonable terms, Ericsson is attempting to force TCL to agree to royalties rates based on the final sales price of TCL's mobile devices, rather than the 2G, 3G or 4G chip which implements the wireless standards at issue in this case.  Improperly using the royalty base of the wireless device instead of the price of the chip violates Ericsson's FRAND commitments.

76.     Similarly, the 4G rate that Ericsson has demanded in the negotiations is not only much higher than what Ericsson publicly announced it

-20-

would offer for the 4G SEPs, but also high enough to put TCL in a discriminatory market position.  When TCL confronted Ericsson with its own publicly acknowledged rate, Ericsson groundlessly accused TCL of purposefully delaying the conclusion of a FRAND license.  Ericsson also claimed that the 4G royalty rates in its proposal are the same for everyone in the industry, and yet TCL's requests for an assurance have been ignored by Ericsson.

77.    Upon information and belief, several companies with much larger market shares in 3G and 4G shipments than TCL have never paid a single penny in royalties to Ericsson.  Nor has Ericsson approached these companies to pay a FRAND rate.  TCL is one of several implementers that Ericsson has attempted to force into non-FRAND licenses, despite its FRAND commitment to treat all market participants fairly, reasonably and non-discriminatively.  Indeed, Ericsson has initiated legal actions against TCL in, for example, Brazil, Argentina, France and Russia, in an attempt to force TCL to accept a non-FRAND rate, such as the "as-is" rate proposed by Ericsson.  These unwarranted actions have cost TCL millions of dollars, and detracted from TCL's intentions of obtaining a FRAND rate with Ericsson as expediently as possible.

78.    Ericsson also insists on a high "bundled" royalty rate for its 2G, 3G and 4G asserted essential patents.  This bundled rate is to be applied to the selling price of *all* of TCL's 2G, 3G and 4G devices.  However, upon information and belief, TCL already has alternative sources for a license to Ericsson's patents for its 3G devices, including a pass-through license from Qualcomm.  Thus, TCL has the choice of obtaining access to Ericsson's 3G patents through a third-party chip maker at a cost that is significantly less than what Ericsson insists that TCL pay for the license.

79.    TCL buys some of the 3G chips that are used in manufacturing its 3G mobile devices from Qualcomm, which has a license to Ericsson's alleged 3G essential patents that expressly extends to Qualcomm customers such as TCL.

-21-

Accordingly, TCL is the beneficiary of an alternative, cheaper source of a license to Ericsson's 3G asserted essential patents. Indeed, although TCL purchases a portion of its 3G chips from non-Qualcomm suppliers, TCL could switch from those suppliers to Qualcomm and thereby avoid paying any royalties to Ericsson for any 3G chips and devices. Nonetheless, Ericsson continues to use its market power and its 2G patents to attempt to impose a non FRAND rate for its 3G patents by bundling them with the 2G patents. TCL has requested a separate rate for Ericsson's 2G patents, which Ericsson has withheld unless and until TCL also pays for Ericsson's 3G-related patents at an inflated cost.

80.     More specifically, TCL requested a separate rate (or separate license) for Ericsson's 2G claimed essential patents, but was refused a separate, unbundled license. Not only has Ericsson refused TCL's request for separate licenses for 2G, 3G, and 4G patents, respectively, but it also has refused to offer even a discount toward a 3G license reflecting the fact that most of TCL's 3G products are already licensed through another source.

81.     Ericsson's bundled rate also fails to account for the reduced value of Ericsson's asserted essential patents to TCL's products. Many of Ericsson's alleged 2G patents have already expired and/or will expire shortly. Additionally, as smartphones have developed over the years, 2G technology has become a substantially lesser portion of the overall functionality and features of the products. Nonetheless, Ericsson has leveraged its economic power over its 2G asserted essential patents in an attempt to extort not only a higher than FRAND rate for Ericsson's assert 2G SEPs, but also a higher bundled royalty for (1) the sale of TCL's 3G-compliant products on which Ericsson is not legally entitled to any royalties, and (2) the sale of TCL's 4G-compliant products.

82.     Absent the lock-in created by Ericsson's FRAND commitments to ETSI and 3GPP, which gave Ericsson undue economic leverage to engage in a

1    patent holdup, Ericsson would not have been in a position to exploit its 2G asserted
2    essential patents to attempt to extort such unreasonable terms from TCL.

3            83.    TCL now faces a high risk of exclusion from the downstream
4    markets, including in the United States and this District, for devices that allegedly
5    utilize Ericsson's claimed essential patents.  Ericsson has already pursued
6    injunctions against TCL in other jurisdictions, and TCL is informed and believes
7    that Ericsson has sought similar exclusionary remedies against certain device
8    manufacturers and/or sellers in the United States.  TCL has incurred substantial
9    damage due to Ericsson seeking these exclusion orders against TCL.  Moreover, if
10   TCL does not acquiesce to Ericsson's unreasonable bundled rates, it and TCT US
11   run the imminent risk of being sued by Ericsson and of having their products
12   excluded from the U.S. market, despite Ericsson's FRAND commitments.

13           84.    This is precisely the type of patent hold-up that the Federal Trade
14   Commission, the United States Department of Justice and other regulatory agencies
15   around the world have warned – and continue to warn – against.  Indeed, Ericsson
16   all but touts its ability to exploit the standards markets, subsequent to intentionally
17   locking in the industry by deceptively representing that it would offer licenses on
18   FRAND terms.

19           85.    According to Ericsson's President and CEO, the fact that "[t]he
20   [Information and Communications Technology] industry is built on standardized
21   and shared technologies" provides Ericsson with "an interesting business
22   opportunity …, having this industry's strongest patent portfolio, *as any company or*
23   *manufacturer that wants to get in there will need an agreement with Ericsson*…."
24   (Emphasis added.)  Ericsson has expended significant efforts on refocusing its
25   business strategy on "further monetizing its IPR assets" to grow this revenue source,
26   which according to Ericsson earned the company SEK 4.6 billion in net revenues in
27   2010.  That amount translates into nearly three quarters of a billion U.S. Dollars for
28   just that one year.

86.     Notably, Ericsson is among hundreds of companies with purported essential patents relevant to these technologies.  If each such company with a FRAND commitment was permitted to charge such excessive royalties, the royalty burden on downstream products would leave little room for profitability and further investment in device innovation.  Not only would device manufacturers like TCL be harmed in their business, but so too would consumers, who ultimately would suffer either in terms of higher device prices or less innovation.

87.     If TCL agreed with what Ericsson has labeled as "rock bottom" rates for a smart phone royalty, TCL would be required to pay a royalty rate well in excess of 10% of the average sale price of a device for its SEPs licenses.  After adding the royalties from non-SEP patent licensors, including those needed to make a smart phone work properly, the number would be well in excess of 20% of the average sales price of a device, thereby destroying the competitiveness of TCL products in the market place.

88.     Ericsson's demands constitute a breach of its ETSI and 3GPP commitments and contractual obligations flowing therefrom and they are unlawful, unfair and/or fraudulent.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Breach Of Contract)

89.     TCL realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

90.     Ericsson entered into contractual commitments with ETSI, 3GPP and their respective members, participants, and implementers relating to the Mobile Cellular Standards.

91.     Each third party that would potentially implement the Mobile Cellular Standards was an intended beneficiary of those contracts.

-24-

92.     Ericsson has granted to TCL a license, but has refused to offer a FRAND rate.  In the alternative, Ericsson was contractually obligated to offer a license to its identified patents consistent with the applicable IPR policy of ETSI and 3GPP, including a license on FRAND terms.

93.     Ericsson breached these contracts by refusing to agree to a FRAND rate to its identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis, and by failing to provide separate rates for each of the 2G, 3G, and 4G standards.

94.     As a result of Ericsson's contractual breach, TCL has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

95.     TCL has suffered and will continue to suffer irreparable injury by reason of the acts, practices, and conduct of Ericsson alleged above until and unless the Court enjoins such acts, practices, and conduct.

## SECOND CAUSE OF ACTION

### (Promissory Estoppel)

96.     TCL realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

97.     Ericsson made a clear and definite promise to licensees through its commitments to ETSI and 3GPP that it had granted, or would grant, licenses to any essential patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

98.     The intended purpose of Ericsson's promises was to induce reliance upon this promise so that companies like TCL would produce mobile phone products compatible with the relevant standards.  Ericsson knew or should have reasonably expected to know that it would induce reliance on these promises by companies such as TCL.

99.     TCL developed and marketed its products and services in reliance on Ericsson's promises, including making its products and services compliant with ETSI and 3GPP standards, including the Mobile Cellular Standards, in various TCL product offerings.

100.    Ericsson is estopped from reneging on these promises to ETSI and 3GPP under the doctrine of promissory estoppel.

101.    TCL has been harmed as a result of its reasonable reliance on Ericsson's promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

102.    TCL has suffered and will continue to suffer irreparable injury by reason of the acts and conduct of Ericsson alleged above until and unless the court enjoins such acts, practices and conduct.

### THIRD CAUSE OF ACTION

### (Declaratory Judgment)

103.    TCL realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

104.    There is a dispute between the parties concerning whether Ericsson has offered FRAND rates for the license(s) to TCL patents consistent with Ericsson's declarations and the referenced policy of ETSI and 3GPP.

105.    The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

106.    TCL is entitled to a declaratory judgment that Ericsson has not offered license terms to TCL conforming to applicable legal requirements, including failing to offer a FRAND rate to TCL.

### FOURTH CAUSE OF ACTION

### (Violation of California Cartwright Act)

107.    TCL realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

-26-

108.   The conduct described herein violates the prohibition against trusts under the California Cartwright Act, Business and Professions Code section 16720 et. seq., including, without limitation, the prohibition against carrying out restrictions in trade or commerce, tying, etc.

109.   Ericsson knowingly entered into a binding agreement with ETSI and 3GPP, whereby those SDOs agreed to incorporate Ericsson's asserted essential patents into Mobile Cellular Standards; and Ericsson, contrary to its demonstrated intention, granted irrevocable licenses and/or agreed to grant irrevocable licenses to those technologies on FRAND terms.  Ericsson's unlawful conduct flows from these agreements.  Ericsson knew that the SDOs and implementers would detrimentally rely on Ericsson's FRAND agreements.  By virtue of the FRAND obligations it ostensibly undertook, Ericsson thus induced ETSI and 3GPP to refrain from adopting alternative technologies or revising the standards so as to avoid Ericsson's asserted essential patents.

110.   If, prior to inclusion of its IPRs in the standards at issue, Ericsson had made known its intention to withhold FRAND licenses, ETSI and 3GPP would have been required to consider alternative technologies, and to revise or even abandon the standard altogether so as to avoid Ericsson's IPRs.  Thus, Ericsson acted willfully to eliminate other viable technologies from ETSI's and 3GPP's consideration and caused them to instead adopt Ericsson's technology into the Mobile Cellular Standards.

111.   As a result of the ensuing standardization, Ericsson gained significant market power, which it would not have had absent the asserted inclusion of its patents into the Mobile Cellular Standards.  When the standards became widely adopted and thus TCL and others became locked in, Ericsson then proceeded to exploit that market power by demanding unreasonable license terms, including excessive and extortionist royalties, in violation of its agreements with ETSI and

3GPP.  These excessive royalties have raised TCL's costs and have resulted in higher prices to consumers.

112.  Among other unreasonable terms, Ericsson also has sought to bundle the licensing of its 2G-related patents to TCL's agreement to also license Ericsson's 3G and 4G-related patents, and has refused to offer a separate license or FRAND rate to its 2G-related patents or a discount for the 3G and 4G-related patents.

113.  Although Ericsson claims that both its 2G- and 3G-related patents are essential to Mobile Cellular Standards, Ericsson has a lesser degree of economic power with respect to its 3G-related patents, at least with respect to those buyers, like TCL, that have an alternative source for a license to Ericsson's 3G-related patents, including through Qualcomm.  Although Ericsson knows that its 3G-related patents are available more cheaply to TCL from sources other than Ericsson, Ericsson also knows that the only way it can force TCL to pay an inflated royalty is to use its 2G-related patents as leverage to force TCL to also take a license to its 3G-related patents.

114.  2G, 3G, and 4G-related patents are relevant to separate Mobile Cellular Standards.  For example, where 3G service is available, there is no need for 2G service.  Moreover, a consumer cannot use 3G technology if it only has a 2G device.  And, many, if not all, 3G-related patents are not necessary to the practice the 2G Mobile Cellular Standard.  3G networks are faster, and can handle more data transmission than 2G networks.  A consumer would not deem the two technologies and networks to be interchangeable.  Accordingly, 2G related patents can be and should be licensed separately from 3G and 4G-related patents.

115.  Although the 2G Mobile Cellular Standard has an ever-decreasing contribution to the overall operation of TCL's devices, that capability is nonetheless added to achieve backward compatibility in the areas where 3G or 4G networks are unavailable and thus a cellular device technically could revert to a 2G

-28-

network.  In practice, however, TCL's devices have very limited functionality in a service area with only 2G networks.  Accordingly, even if Ericsson's 2G patents arguably have any relevance to the functionality of TCL's devices, their contribution to those products is at best minimal.  As such, they would capture only a fraction of the royalties demanded by Ericsson.

116.   Ericsson is seeking to bundle its 2G and 3G patents in order to justify its inflated royalty demand which it could not otherwise justify for just its 3G-related patents based on its FRAND commitments.  In doing so, Ericsson is forcing TCL to take a license to technology that is more cheaply available to TCL from other sources, including from Qualcomm.  Ericsson is seeking millions of dollars in licensing fees from TCL for the bundled license.

117.   Ericsson is demanding a single, higher, non-FRAND bundled royalty rate, even though TCL already is licensed to the same 3G related patents through Qualcomm, and without regard to the actual value, if any, of Ericsson's patents to TCL's products.  Accordingly, Ericsson is leveraging its market power in its 2G asserted essential patents to gain leverage in a separate market for patents related to the 3G Mobile Cellular Standard where it does not otherwise possess market power to separately force TCL to take a non-FRAND license.

118.   Ericsson's demand for a higher and bundled rate for both its 2G and 3G patents also lacks any efficiency justification in light of the fact that TCL is already licensed to the same 3G patents when it uses Qualcomm chips, and can divert all of its 3G-compliant chip purchases to the latter, thus saving the higher cost of an Ericsson license.  However, because Ericsson refuses to license its 2G-related patents without the 3G patents, it is thus forcing TCL to pay for the 3G patents whether or not TCL has an alternative licensing source for those patents, and even though Ericsson has no legal right to seek royalties on the bulk of TCL's 3G-compliant devices.

-29-

119.   As a result of Ericsson's illegal conduct, TCL has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image. Consumers are also injured by reason of Ericsson's conduct because they are forced to pay higher prices that reflect the cost of Ericsson's illegal licensing practices.

120.   TCL has suffered and will continue suffer irreparable injury by reason of the acts, practices, and conduct of Ericsson alleged above until and unless the Court enjoins such acts, practices, and conduct.

## FIFTH CAUSE OF ACTION

## (Violation of California Unfair Competition Law, Business and Professions Code sections 17200 et seq.)

121.   TCL realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though full set forth herein.

122.   Ericsson's conduct as alleged herein constitutes unlawful, unfair or fraudulent acts and practices in violation of the UCL in that it violates, *inter alia*, one or more federal, state or other laws, including, without limitation, breach of its contractual commitments to ETSI, patent holdup, and fraud.  Ericsson deceived ETSI and 3GPP into adopting its technologies by ostensibly and deceptively agreeing to license its technology on FRAND terms.  After inducing those SDOs to adopt its technologies, and to refrain from considering alternatives or revising the standards to exclude Ericsson's technology, it then breached its obligations by seeking excessive and non-FRAND royalties and terms.  TCL relied to its detriment on Ericsson's FRAND agreements and thus expended significant resources to make devices that implement the Mobile Cellular Standards that allegedly include Ericsson's technology.  It is now being held at ransom and forced into accepting a non-FRAND rate and/or into accepting license agreements that reflect value well beyond what is directly attributable to Ericsson's purported technology, and reflect

SMRH:413325486

COMPLAINT

1    the additional hold-up value attributable to the asserted inclusion of those

2    technologies into the relevant standards.

3         123.   As a result of the unlawful, unfair or fraudulent acts and

4    practices of Ericsson, TCL has suffered injury in fact and has lost, and continues to

5    lose, money or property.

6         124.   The above-described, ongoing course of unlawful, unfair and/or

7    fraudulent conduct by Ericsson constitutes a continuing threat to TCL.  TCL is thus

8    entitled to injunctive relief preventing Ericsson from continuing its wrongful course

9    of conduct, and requiring Ericsson to offer TCL license terms consistent with its

10   FRAND commitments.  TCL is further entitled to additional relief including,

11   without limitation, restitution from Ericsson.

## SIXTH CAUSE OF ACTION

### (Fraudulent Misrepresentation)

14        125.   TCL realleges and incorporates by reference the allegations set

15   forth in all of the preceding paragraphs, as though fully set forth herein.

16        126.   In light of the importance of standardization to the increasingly

17   technology-driven global economy, and the need to make such technologies widely

18   available, SDOs require that members make promises and enter into agreements that

19   they will license their technology to be included in a standard on FRAND terms.

20   SDOs reasonably rely upon such promises to ensure that members that have their

21   technologies included in the standards – to the exclusion of alternatives – do not

22   later abuse their market position to exclude rivals and other implementers from

23   downstream product markets.

24        127.   Ericsson knowingly, or recklessly and without regard to its truth,

25   made a false promise to ETSI and 3GPP that it would license its technology on

26   FRAND terms so as to induce those SDOs to adopt its technology.

27        128.   Ericsson knew that absent such a promise, ETSI and 3GPP

28   would not have adopted its technology, and were obligated to search for alternatives,

-31-

1  and to revise or even abandon the standard altogether if a viable alternative could
2  not be found that avoided Ericsson's technology.

3       129.   Ericsson thus intended to induce, and did induce, ETSI and
4  3GPP to rely on Ericsson's false promise and allegedly adopt Ericsson's technology
5  into the Mobile Cellular Standards.

6       130.   ETSI, 3GPP, and other industry participants, including TCL, had
7  no knowledge of the falsity of Ericsson's promise, and reasonably and detrimentally
8  relied on Ericsson's promise to offer a FRAND rate and/or grant a FRAND license.
9  In reliance upon Ericsson's promise to offer FRAND licenses, TCL expended
10 substantial resources in research and development, manufacturing and marketing of
11 devices that comply with the Mobile Cellular Standards which allegedly incorporate
12 Ericsson's patents.

13      131.   Once the technologies were widely adopted, and the industry
14 became locked into the standards that allegedly incorporate Ericsson's patents,
15 Ericsson reneged on its promise by exploiting its new-found market power to
16 demand unreasonable and excessive royalties and terms, far in excess of the patents'
17 own value.  Indeed, Ericsson's goal is to increasingly monetize its IPRs because it
18 believes that every company that enters the markets for information and
19 communications-related technologies will have to get a license from Ericsson, or
20 face exclusion from those markets.

21      132.   As a result of Ericsson's false promises, TCL has been injured in
22 its business or property, and is threatened by imminent loss of profits, loss of
23 customers and potential customers, and loss of goodwill and product image.

24      133.   TCL has been damaged in an amount to be determined at trial,
25 and also seeks exemplary damages for Ericsson's unlawful and fraudulent conduct.

26
27
28

## **SEVENTH CAUSE OF ACTION**

### **(Negligent Misrepresentation)**

134.   TCL realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs, as though fully set forth herein.

135.   Ericsson at least negligently made a false promise to ETSI and 3GPP that it would license its technology on FRAND terms so as to induce those SDOs to adopt its technology.

136.   Ericsson knew that absent such a promise, ETSI and 3GPP would not have adopted its technology, and were obligated to search for alternatives, and revise or even abandon the standard altogether if a viable alternative could not be found that avoided Ericsson's technology.

137.   Ericsson thus intended to induce, and did induce, ETSI and 3GPP to rely on Ericsson's false promise and allegedly adopt Ericsson's technology into the Mobile Cellular Standards.

138.   ETSI, 3GPP, and other industry participants, including TCL, reasonably and detrimentally relied on Ericsson's promise to offer a FRAND rate and/or grant a FRAND license.  For example, in reliance upon Ericsson's promise to offer FRAND rates, TCL expended substantial resources in research and development, manufacturing and marketing of devices that comply with the Mobile Cellular Standards which allegedly incorporate Ericsson's patents.

139.   Once the technologies were widely adopted, and the industry became locked into the standards that allegedly incorporate Ericsson's patents, Ericsson reneged on its promise by exploiting its new-found market power to demand unreasonable and excessive royalties and terms, far in excess of the patents' own value.

140.   As a result of Ericsson's misrepresentation, TCL has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

-33-

1    141.   TCL has been damaged in an amount to be determined at trial.

2                          **PRAYER FOR RELIEF**

3           WHEREFORE, TCL prays for relief as follows:

4           A.     Adjudge and decree that Ericsson is liable for breach of contract;

5           B.     Adjudge and decree that Ericsson is liable for promissory

6    estoppel;

7           C.     Determine the FRAND rates that TCL is entitled to for each of

8    the 2G, 3G and 4G standards;

9           D.     Enjoin Ericsson from further demanding excessive royalties from

10   TCL that are not consistent with Ericsson's FRAND obligations;

11          E.     Decree that Ericsson has not offered royalties to TCL under

12   reasonable rates, with reasonable terms and conditions that are demonstrably free of

13   any unfair discrimination;

14          F.     Decree that TCL is entitled to license from Ericsson any and all

15   patents that Ericsson deems "essential" and/or has declared "essential" to the Mobile

16   Cellular Standards under reasonable rates, with reasonable terms and conditions that

17   are demonstrably free of any unfair discrimination;

18          G.     Enjoin Ericsson from forcing TCL to take a bundled license to

19   2G and 3G patents Ericsson deems essential to the Mobile Cellular Standards;

20          H.     Enter judgment against Ericsson for the amount of damages that

21   TCL proves at trial, including, as appropriate, exemplary and/or treble damages;

22          I.     Enter a judgment awarding TCL its expenses, costs, and

23   attorneys' fees under applicable laws;

24          J.     Order restitution, including, *inter alia*, restitution of any illegally

25   paid license fees paid by TCL to Ericsson for any past or present licenses that do not

26   comport with Ericsson's FRAND commitments; and

27

28
                                    -34-

1          K.      For such other and further relief as the Court deems just and
2   proper.

3

4   Dated:  March 5, 2014

5                            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

6

7                            By        /s/ *Stephen S. Korniczky*
8                               STEPHEN S. KORNICZKY
                                MARTIN R. BADER
9                               MATTHEW W. HOLDER
                                Attorneys for Plaintiff,
10                              TCL Communication Technology Holdings, Ltd.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-35-
SMRH:413325486                                              COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2         PLEASE TAKE NOTICE that TCL hereby demands a trial by jury.

3

4   Dated:  March 5, 2014

5                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

6

7                        By _____/s/ *Stephen S. Korniczky*_____

8                              STEPHEN S. KORNICZKY
                              MARTIN R. BADER
9                              MATTHEW W. HOLDER
                              Attorneys for Plaintiff
10                            TCL Communication Technology Holdings, Ltd.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:413325486                                                              COMPLAINT