SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:   858.720.8900
Facsimile:   858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT
Mobile Limited, and TCT Mobile
(US) Inc.

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.* | Case No.  8:14-CV-00341 JVS AN |
| | **PLAINTIFFS' RESPONSIVE CONTENTIONS RE FRAND TERMS TO BE ADJUDICATED** |
| Plaintiffs, | |
| v. | **[Redacted]** |
| TELEFONAKTIEBOLAGET LM ERICSSON, *et al.* | Date:      April 29, 2015<br>Time:      8:00 a.m.<br>Ctrm:     10C |
| Defendants. | The Hon. James V. Selna |
| | Complaint Filed:  March 5, 2014 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTORY COMMENTS .................................................................. 1

II.    TCL'S PRELIMINARY FRAND CONTENTIONS ..................................... 6

    A.     Proper Royalty Base .......................................................................... 6

    B.     Proper Royalty Structure .................................................................. 9

    C.     Proper Royalty Rate ....................................................................... 11

    D.     License Period ................................................................................ 16

    E.     Patents Covered by License ........................................................... 16

    F.     TCL Products Covered by License ................................................. 17

    G.     Alleged "Release Payment" ........................................................... 17

III.   CONCLUSION ................................................................................................ 18

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Apple v. Motorola*
757 F.3d 1286 (Fed. Cir. 2014)............................................................................4

*Brulotte v. Thys Co.*
379 U.S. 29 (1964) ...........................................................................................16

*Golden Bridge Tech. v. Apple Inc.*
Case No. 12-cv-04882, 2014 WL 21294501
(N.D. Cal. May 18, 2014)...................................................................................7

*In re Innovatio IP Ventures, LLC*
Case No. 11-cv-09308, 2013 WL 5593609
(N.D. Ill. Oct. 3, 2013) ....................................................................7, 12, 13, 14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*
694 F.3d 51 (Fed. Cir. 2012) ............................................................................7

*Lucent Techs., Inc. v. Gateway, Inc.*
580 F.3d 1301 (Fed. Cir. 2009)..........................................................................7

*Microsoft Corp. v. Motorola, Inc.*
No. Case No. 10-1823JLR, 2013 WL 2111217
(W.D. Wash. Apr. 25, 2013) ...........................................................9, 12, 13, 14

*Microsoft v. Motorola*
696 F.3d 872 (9th Cir. 2012)......................................................................4, 13, 14

*VirnetX, Inc. v. Cisco Sys., Inc.*
767 F.3d 1308 (Fed. Cir. 2014)..........................................................................7

<u>Other Authorities</u>

*Certain Wireless Commc'n Devices, Portable Music & Data Processing*
*Devices, Computers & Components Thereof*
Inv. No. 337-TA-745, Federal Trade Commission's Statement On The
Public Interest (June 6, 2012).............................................................................4

European Commission, Memo: Commission Sends Statement Of Objections
    To Motorola Mobility On Potential Misuse Of Mobile Phone Standard-
    Essential Patents—Questions And Answers (May 6, 2013) ..............................5

At the Rule 26(f) conference held on February 24, 2015, the Court asked the parties to submit preliminary contentions regarding the components of a FRAND license. Defendants Telefonaktiebolaget LM Ericsson and Ericsson, Inc. (collectively, "Ericsson") filed their brief on March 16, 2015. This is the responsive brief of plaintiffs TCL Communication Technology Holdings, Ltd., TCT Mobile Limited, and TCT Mobile (US) Inc. (collectively, "TCL").

## I.    <u>INTRODUCTORY COMMENTS</u>

As the parties and the Court discussed on February 24, TCL's contentions in this brief are intended to be preliminary. At a minimum, TCL needs to be able to conduct detailed discovery, as well as perform various analyses (including technical analyses) with the help of experts, before it will be in a position to convey firm contentions regarding what specific terms would comply with Ericsson's FRAND obligation. This is because what constitutes a FRAND rate is a function of the actual value of Ericsson's technology (not what Ericsson has succeeded in getting others to pay in the past), and determining the actual value of Ericsson's technology is a fact-intensive inquiry. That said, based on TCL's work to date, TCL can certainly indicate major areas of disagreement with Ericsson, as well as address the factors that will be involved in further establishing TCL's competing position.

TCL also wishes to address the purpose and result of this exercise. TCL certainly agrees there is value in understanding the parties' competing contentions regarding the components of a FRAND license, and thus TCL welcomes this exercise. However, TCL wishes to make several points so its position is clear.

First, to the extent Ericsson continues to suggest the parties should present dueling, fully-integrated licenses to the jury, and the jury's verdict (or the judgment) should embody a fully-integrated contract (which is arguably implied from Ericsson's brief, but not clear), TCL objects and disagrees for the reasons previously set forth in its prior briefing on the subject. (*See, e.g.*, Dkt. 81 at pp. 5–9.) In short, there is no basis in the pleadings for turning this case into something resembling

1   "baseball arbitration," wherein the jury must necessarily choose between competing

2   "term sheets."  Nor should the jury have to assess every term of a license between

3   the parties.  There is only one place in the pleadings where a party requests

4   imposition of a fully-integrated license agreement, and that is in connection with

5   Ericsson's promissory-estoppel claim.  (Dkt. 59 at p. 28, ¶ 59.)  Prevailing on that

6   claim will require Ericsson to establish far more than that it did not breach its

7   FRAND obligations, and/or that its most recent offer is FRAND.  In particular,

8   Ericsson would need to show detrimental reliance on a firm promise by TCL.  Also,

9   promissory estoppel is an equitable claim, and hence is not for the jury to decide.  In

10  asking the parties to submit the current briefing, TCL does not regard the Court as

11  having endorsed or adopted Ericsson's proposal that the parties submit competing

12  term sheets, and then litigate the question of breach based on those term sheets.

13          Second, the parties need not submit every license term—or even every

14  disputed license term—to the jury for a decision.  Ericsson's proposal that the

15  parties litigate every license term unnecessarily complicates this proceeding.  Every

16  term in a license is not necessarily going to be integral to a FRAND determination,

17  or of sufficient importance to the FRAND obligation (and the various legal and

18  policy issues which inform how courts interpret FRAND) to warrant use of the

19  Court's resources to litigate the issue.  For example, Ericsson has proposed ████

20  ██████████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ██████████████████████████████████████████████

23  ████████████████████████  However, does the jury and/or Court

24  need to decide how disputes under the license agreement will be resolved?  Is that

25  issue integral to a FRAND determination?  Indeed, must every license contain a

26  dispute resolution provision?  Arguably no.  Accordingly, what TCL has done in this

27  brief is focus on the aspects of a license which are fundamental to the parties'

28  FRAND dispute, and should be adjudicated.  The fact TCL may not address a

particular term in this brief should not be construed as final agreement to the term.[1]

Third, whether Ericsson's most recent offers (both of which were made *after* TCL filed this lawsuit) are FRAND is analytically distinct from whether Ericsson breached its FRAND obligation. Although TCL absolutely wants the jury and/or Court to adjudicate the FRAND terms, and will comply with those terms moving forward, that is not the only claim for relief. TCL also filed this lawsuit because it believes Ericsson's pre-litigation conduct was in breach of its FRAND obligation, and has harmed TCL. For example, TCL will show that Ericsson's prior demands were excessive and based on principles which are not consistent with the FRAND obligation. Indeed, the royalties demanded by Ericsson's have significantly decreased over the course of the parties' negotiations, which serves to demonstrate that Ericsson's earlier demands were not FRAND. Consider the following:



(Dkt. 138 at 14:4–9.)

---

[1] Lest Ericsson once again attempt to take TCL's position out of context, we will be explicit: TCL wants and intends for this case to finally resolve the parties' dispute, including on a global basis. TCL also will be bound by the jury and/or Court's decision (subject to final appeal), and will pay the adjudicated rates. Indeed, TCL previously was party to a license agreement with Ericsson, and was the very first company in China to pay a royalty for Ericsson's 2G portfolio (and, for a long time, was the only such company). For many years, TCL paid exorbitant royalties to Ericsson. TCL wanted to continue to license Ericsson's 2G technology, but Ericsson refused to give TCL a 2G-only license. TCL has always approached its negotiations with Ericsson in good faith, and wants to finally resolve its dispute with Ericsson. TCL's point in the above paragraphs is simply that there is no need to overcomplicate this case by foisting every single license term on the jury. Nor is there a basis in the pleadings for mandating that the jury or Court create, or approve, a fully-integrated contract between the parties.



- Likewise, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮ (Bader Decl., Ex. 1 at pp. 13–14; Dkt.
  138 at 14:10–12.)
- Finally, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮ (Bader Decl., Ex. 2 at p. 13; Dkt. 138 at 14:13–15.) ▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮

In addition, while the parties' negotiations have been ongoing, Ericsson has filed lawsuits against TCL, and/or sought injunctive relief against TCL (*e.g.*, to exclude TCL's products from the market), in numerous countries around the world, including France, the United Kingdom, Argentina, Russia, Brazil, and Germany. These coercive lawsuits are intended to pressure TCL to accede to Ericsson's unlawful bargaining demands.  Numerous courts and regulatory bodies agree that seeking injunctive relief against a willing licensee is inconsistent with the patent holder's FRAND obligation.  *See, e.g., Microsoft v. Motorola*, 696 F.3d 872 (9th Cir. 2012) (upholding order preventing enforcement of German injunction, because injunctive relief was inconsistent with Motorola's contractual RAND obligation); *Apple v. Motorola*, 757 F.3d 1286, 1332 (Fed. Cir. 2014) (explaining that Motorola's FRAND commitment "strongly suggest[s] that money damages are adequate to fully compensate Motorola for any infringement"); *Certain Wireless Commc'n Devices, Portable Music & Data Processing Devices, Computers & Components Thereof*, Inv. No. 337-TA-745, Federal Trade Commission's Statement On The Public

1   Interest (June 6, 2012) ("[W]e are concerned that a patentee can make a RAND
2   commitment as part of the standard setting process, and then seek an exclusion order
3   for infringement of the RAND-encumbered SEP as a way of securing royalties that
4   may be inconsistent with that RAND commitment."); European Commission,
5   Memo: Commission Sends Statement Of Objections To Motorola Mobility On
6   Potential Misuse Of Mobile Phone Standard-Essential Patents—Questions And
7   Answers (May 6, 2013) ("[T]he Commission has reached the preliminary
8   conclusion that the seeking and enforcing of an injunction for SEPs can constitute
9   an abuse of a dominant position in the exceptional circumstances of this case—
10  where the holder of a SEP has given a commitment to license these patents on
11  FRAND terms and where the company against which an injunction is sought has
12  shown to be willing to enter into a FRAND license.").

13          Thus, even if the jury or Court concludes Ericsson's most recent, post-
14  litigation offers are FRAND (TCL contends they are not, and will prove this at trial),
15  that fact does not foreclose the possibility that Ericsson's pre-litigation conduct was
16  nevertheless in breach of its FRAND obligation, and that TCL is entitled to damages
17  suffered as a result of Ericsson's breach.[2]

18

19  _____

20  [2] By trying to re-direct attention to proposals it made after TCL filed this lawsuit,
    Ericsson seeks to avoid scrutiny of its pre-litigation conduct.  However, Ericsson
21  also recognizes that its post-lawsuit conduct will be viewed with skepticism, and
    hence Ericsson misleadingly has characterized one of the two offers described in its
22  brief as occurring "on April 23, 2014, *before* TCL served Ericsson with TCL's
23  Original Complaint in this litigation."  (Dkt. 138 at 2:7–9 (emphasis added).)
    Ericsson's purpose in referring to the date of service is to suggest the April 23 offer
24  was not merely a reaction to TCL's lawsuit, but rather was something Ericsson was
25  willing to offer in the ordinary course of the parties' negotiations.  Yet this is highly
    misleading because TCL filed this lawsuit on March 5, 2014, e-mailed a courtesy
26  copy of the complaint to an executive at Ericsson on March 6, and received a
27  response from Ericsson on March 7.  (*See* Bader Decl., Ex. 3.)  Thus, Ericsson was
    well aware of TCL's lawsuit and its specific allegations long before the April 23
28  offer, notwithstanding that formal service of process did not occur until later.

## II.   TCL'S PRELIMINARY FRAND CONTENTIONS

In the following sections, TCL addresses the license terms it currently believes need to be adjudicated in this action.  It should be noted that Ericsson structured its brief by reference to ████████████████████████ ████████████████████.  Although TCL is certainly willing to negotiate a license to Ericsson for TCL's own patents, TCL is under no obligation to include such a license *in the same agreement* that reflects a license from Ericsson to TCL for Ericsson's patents, or to calculate the value of a license to TCL's patents in a way that merely offsets the value of a license to Ericsson's patents.  Moreover, TCL is not aware of any basis in the pleadings for Ericsson to insist that its license to TCL also reflect a cross-license from TCL to Ericsson.  Including a cross-license in the same agreement also introduces potential confusion regarding whether, and if so how, the value of TCL's patents is accounted for in the rates offered by Ericsson. This, in turn, would require the parties to conduct a valuation analysis with respect to TCL's patents, even though Ericsson has not prayed for a cross-license in its pleadings, or accused TCL of breaching any FRAND obligation with respect to TCL's own patents.

### A.   Proper Royalty Base

One of the major disputes between the parties is the proper base for any royalty calculation (*i.e.*, whether royalties should be calculated based on the price of the phone, or the price of the chip used in the phone, or as a flat price irrespective of the price of the phone or chip)  This is addressed by Ericsson in its section titled "Net Selling Price To Be Used For Royalty Calculation" at page 6 of its brief, and is also reflected in the royalty-rate percentages at pages 10–11 and 14 of its brief.  In short, Ericsson's position is that the royalty rate should be a percentage of the price of the end product (*e.g.*, a mobile phone).  Indeed, an Ericsson document obtained by TCL demonstrates that Ericsson deliberately seeks to license manufacturers of end products (like TCL), rather than license others further "upstream" (*e.g.*, chipset

1   manufacturers), because "*it is likely that the royalty income will be higher [that*

2   *way] since we calculate the royalty on a more expensive product.*"  (Bader Decl.,

3   Ex. 9 at p. 28 (notes to slide 26, emphasis added).)

4          TCL strongly disagrees with Ericsson's approach.  TCL's position is that

5   basing the royalty calculation on the price of the end product is improper and serves

6   to artificially increase the overall royalty burden faced by companies like TCL.

7   There is a large volume of law which informs this analysis.  In general, the royalty

8   base for a multi-component unit (such as a mobile phone), part of which happens to

9   practice a patented invention, must not be larger than the fraction of the unit's total

10  value that is directly attributable to the invention.  *See VirnetX, Inc. v. Cisco Sys.,*

11  *Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014).  Absent evidence "that the infringing

12  feature drives demand [in the end product], the royalty base must be somehow

13  apportioned to reflect the value of the patent-related feature in the absence of the

14  non-infringing features."  *Golden Bridge Tech. v. Apple Inc.*, Case No. 12-cv-04882,

15  2014 WL 21294501, at *5 (N.D. Cal. May 18, 2014), citing *Lucent Techs., Inc. v.*

16  *Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).  At a minimum, this usually

17  requires identifying the smallest-saleable patent-practicing unit ("SSPPU") within

18  the product.  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67

19  (Fed. Cir. 2012) ("[I]t is generally required that royalties be based not on the entire

20  product, but instead on the [SSPPU].").

21         The identity of the proper royalty base has been addressed in recent FRAND

22  decisions and has also been the focus of an influential industry group.  For example,

23  in the matter of *In re Innovatio IP Ventures, LLC*, Case No. 11-cv-09308, 2013 WL

24  5593609, *12–18 (N.D. Ill. Oct. 3, 2013) ("*Innovatio*"), Judge James F. Holderman

25  concluded the proper royalty base was the Wi-Fi chip that practiced the relevant

26  invention, not the end product that contained the Wi-Fi chip (such as laptops,

27  tablets, printers, etc.).  Also, the Institute of Electrical and Electronics Engineers

28  ("IEEE") recently revised its policy to indicate that a reasonable-royalty rate for a

-7-

license to a standard-essential patent should account for, among other things, the value of the patented invention within the functionality of the SSPPU, rather than the end product.  (*See* http://www.ieee.org/about/news/2015/8_february_2015.html (linking to revised IEEE Bylaws, which contain the relevant language on page 2, in the first bullet point under "Reasonable Rate").)[3]

Here, TCL's products (mobile phones) are comprised of a number of different units (*e.g.*, the outer casing, a key pad and/or touch screen, a display screen, a camera, a battery, different types of chips, etc.).  Accordingly, the royalty base must be apportioned to reflect the value of Ericsson's claimed inventions, separate from the non-infringing features of the products.  Likewise, TCL's products contain extensive functionality beyond Ericsson's claimed contributions to the 2G, 3G, or 4G standards (*e.g.*, they may be able to communicate via text message or Wi-Fi, or take pictures, or play games, or store data, among many other features).  What this means is that there is a great deal of value in TCL's products that is independent of the 2G, 3G, or 4G standards in general, and Ericsson's claimed contributions to those standards in particular.

In light of the above facts, it is improper to calculate a royalty for Ericsson's claimed contributions to the 2G, 3G, or 4G standards based on the selling price of TCL's mobile phones.  For example, under Ericsson's approach, if TCL manufactures two mobile phones with 2G capability—one that sells for $10, and one with additional functionality that sells for $100—TCL would pay Ericsson a royalty for the second phone that is *ten times greater* than the royalty for the first phone, *even if the 2G functionality in both is identical*.  That does not make sense and is unfair.  By calculating royalties based on the price of the end product,

---

[3] IEEE is a 430,000-member professional association dedicated to advancing technological innovation and standardization in industries including telecommunications.  (*See* http://www.ieee.org/index.html.)  It claims to be the world's largest technical professional society, and has an active portfolio of nearly 1,300 technical standards.  (*See* http://www.ieee.org/about/ieee_history.html.)

1   Ericsson is able to unfairly extract a portion of TCL's profits from functionality

2   unrelated to Ericsson's claimed technology.  As noted earlier, Ericsson is well aware

3   of this dynamic, and seeks to license based on the price of the end product for this

4   very reason.  (Bader Decl., Ex. 9 at pp. 25–28.)  Not surprisingly, Ericsson's

5   approach has been rejected by other courts.  *See, e.g.*, *Microsoft Corp. v. Motorola,*

6   *Inc.*, No. Case No. 10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013)

7   ("*Microsoft*") (adopting a per-unit price for the royalty, rather than a percentage rate,

8   because "if 0.8 cents per unit is a reasonable royalty rate for a $200.00 Xbox, then it

9   should be a reasonable royalty rate for an Xbox selling for $400.00 that uses the

10  patented technology in the same manner").

11          Instead of calculating royalties based on the price of the end product, the

12  royalty base should be the SSPPU (*e.g.*, the chip which practices the 2G, 3G, or 4G

13  standard).  In addition, the royalty should be calculated either as a percentage of the

14  SSPPU, or as a flat price (*e.g.*, X cents per unit).  Determining the SSPPU in this

15  case, and whether the royalty should be expressed as a percentage or flat price, will

16  require additional technical and economic analysis.

17          **B.    Proper Royalty Structure**

18          In addition to the royalty base, another major dispute between the parties is

19  the structure of the royalty rate, or what TCL has referred to previously as Ericsson's

20  improper "bundling" of the rates.  Here, Ericsson has proposed that ██████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ██████████████████████████████████████████████

24  ███████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ███████████████████████████

27          One problem with this "bundled" approach is that it does not account for

28  pass-through rights which TCL already has to Ericsson's 3G patents, and thereby

1  forces TCL to pay twice for the same license (and, by extension, enables Ericsson to

2  "double-dip" by getting paid twice for the same technology).  In particular,

3  Qualcomm (a chipset manufacturer) has already paid for a license to Ericsson's 3G

4  portfolio.  Qualcomm's licensing rights flow down to manufacturers like TCL when

5  they purchase a Qualcomm chip (*i.e.*, the smallest saleable unit) for use in their

6  products.  Thus, when TCL purchases a Qualcomm chip for use in its mobile

7  phones, it obtains licensing rights to Ericsson's 3G portfolio by virtue of

8  Qualcomm's license with Ericsson.  Because of these pass-through rights, TCL

9  should not owe Ericsson any additional royalties for 3G technology when the TCL

10 phone incorporates a Qualcomm chip.  TCL has already paid for a license to

11 Ericsson's 3G technology when it purchased the Qualcomm chip.

12        Ericsson's proposal does not fully account for TCL's pass-through rights

13 when a Qualcomm chip is used.  As addressed in its brief at page 15, Ericsson's

14 proposal claims ██████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████

22 █████████████████████████ This is unfair and unreasonable given that the primary

23 differentiator between the phones is the 3G technology and TCL is entitled to

24 receive the full benefit of the pass-through rights it obtained to Ericsson's 3G

25 technology when it purchased the Qualcomm chip.

26        TCL is also charged unreasonable royalties when it sells a phone with 4G

27 capability, and a Qualcomm chip.  In that scenario, Ericsson's proposal ██████

28 ████████████████████████████████████████████████████

-10-

1  ████████████████████████████████████████████████████

2  ███████████████.  Ericsson's proposal with respect to 4G phones is unfair because

3  █████████████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████████

5  ██████████████████████████████████████████, and (3) in

6  the case of phones featuring Qualcomm chips, TCL already has pass-through rights

7  to Ericsson's 3G portfolio, and hence should not have to pay twice for those rights.

8       For the above reasons, TCL believes the proper approach is to "unbundle" the

9  royalty rates and enable TCL to pay separately for 2G, 3G, and/or 4G technology in

10  each phone, so that TCL is not deprived of the full value of its pass-through rights.

11       **C.**     **Proper Royalty Rate**

12       The other major area of disagreement between the parties concerns the proper

13  royalty rate.  Even after the proper royalty base is determined, and TCL's pass-

14  through rights are properly accounted for, TCL believes the rates being charged by

15  Ericsson are discriminatory and not fair or reasonable.  This is particularly true in

16  light of the actual value of Ericsson's alleged inventions as compared to alternative

17  technologies that could have been adopted in the relevant standards, as well as the

18  actual value of Ericsson's alleged inventions relative to other aspects of the relevant

19  standards.

20       Ericsson has repeatedly argued that it regards the proposals it has made to

21  TCL as FRAND, primarily because it contends others in the industry have agreed to

22  similar rates.  As an initial matter, TCL rejects Ericsson's premise that whatever

23  rates it can capture in the market necessarily set the benchmark for what rates should

24  be considered FRAND.  The primary problem with Ericsson's premise is that it

25  completely ignores the obvious risk of "hold-up."  In the context of standard-

26  essential patents, "hold-up" is often defined as the risk that a patent holder will be

27  able to command much higher rates for its invention *after* the invention has been

28  incorporated into a standard, than it could have commanded *before* the invention

-11-

was incorporated into the standard, given the need for the implementer to comply with the standard. *See Microsoft*, 2013 WL 2111217, *10–12; *see Innovatio*, 2013 WL 5593609, *8–9. Such "hold-up" is fundamentally inconsistent with the accepted principle that a proper royalty for a standard-essential patent should only reflect the value of the invention itself, rather than the incorporation of the invention into the standard. *See id.* Given this dynamic, there is a substantial risk that any license agreement negotiated *after* the patent holder's invention has been incorporated into the standard will reflect some element of "hold-up value," irrespective of the fact the negotiation was conducted at arms-length. *See id.*

TCL submits that in order for the FRAND obligation to have real meaning, it must require something more than simply allowing patent holders to extract whatever rates participants in the market are willing (or are forced) to pay after the standard is adopted. Instead, a FRAND rate must be based on the actual value of the patent holder's technology. To date, TCL has not seen any evidence that Ericsson has ever engaged in a principled analysis of the value of its own technology. Rather, Ericsson has simply sought to obtain the highest royalty rate the market will bear (with the results varying from negotiation to negotiation). As more and more participants in the market succumb to Ericsson's pressure (presumably without the benefit of the analysis TCL is proposing to undertake), Ericsson then points to its own agreements as supposed evidence that its rate is FRAND. The net result is a self-serving cycle wherein Ericsson avoids scrutiny of its exorbitant rates.

One way to attempt to identify the actual value of Ericsson's claimed technology before adoption of the relevant standards is to analyze what courts and commentators have called the "*ex ante*" competitive environment, *i.e.*, the competitive environment before the patented invention was incorporated into the standard, and/or before alleged infringement by the implementer. *See Microsoft*, 2013 WL 2111217 at *13, 19; *Innovatio*, 2013 WL 5593609 at *19–20. This, in turn, can entail analyzing any alternatives which could have been incorporated into

-12-

1  the relevant standard in lieu of the patented invention, in order to determine the

2  incremental value of the patented invention relative to the alternatives.  *See id.*  As

3  Judge Holderman explained in *Innovatio*, "[t]he relevance of possible alternatives to

4  the hypothetical negotiation is obvious, as the presence of equally effective

5  alternatives to the patented technology that could have been adopted into the

6  standard will drive down the royalty that the patent holder could reasonably

7  demand."  *Innovatio*, 2013 WL 5593609 at *19.

8          Another way to attempt to identify the value of Ericsson's claimed technology

9  is to identify the aggregate royalty burden that could be charged for all standard-

10  essential patents at the SSPPU level, in order to then apportion the total royalty

11  burden amongst the standard-essential patents based on their respective

12  contributions and importance.  *See Microsoft*, 2013 WL 2111217 at *12–13, 19;

13  *Innovatio*, 2013 WL 5593609 at *9–10.  By proceeding in this fashion, one can seek

14  to avoid assigning too much value to a particular patent relative to the other

15  inventions which contribute to the standard, while also avoiding the problem of

16  "royalty stacking."  *See id.*  In his decision in *Microsoft*, Judge James L. Robart

17  described the problem of "royalty stacking" as follows: "In the context of standards

18  having many SEPs and products that comply with multiple standards, the risk of the

19  use of post-adoption leverage to exact excessive royalties is compounded by the

20  number of potential licensors and can result in cumulative royalty payments that can

21  undermine the standards."  2013 WL 2111217 at *11.

22          In order to determine a FRAND royalty by analyzing the presence and

23  viability of alternatives in the *ex ante* competitive environment, or the aggregate

24  royalty burden and the relative contribution of Ericsson's patents to the standard,

25  additional technical and economic analysis is required.  Such analysis will be

26  detailed, fact-intensive, and time-consuming.  This is a primary reason why TCL

27  will need ample time to prepare for trial (and why Ericsson wishes to rush to trial so

28  the results of this analysis will never see the light of day).

-13-

1     TCL anticipates the results of either inquiry will result in proposed royalties

2     that are far less than what Ericsson has proposed to date.  Indeed, in both the

3     *Microsoft* and *Innovatio* cases, the FRAND rates determined by the respective

4     courts were multiple orders of magnitude lower than what the licensors had

5     demanded.  *See Microsoft*, 2013 WL 2111217 at *2–4, 65 (setting FRAND rate as a

6     range of 0.555 cents to 16.389 cents per unit for one portfolio, and 3.471 cents to

7     19.5 cents per unit for a second portfolio, whereas patent holder's demand was for

8     2.25% of the end product price for each portfolio, which would have equated to

9     roughly $5.85 for an Xbox, based on an average selling price of $260); *Innovatio*,

10    2013 WL 5593609 at *3, 12 (setting FRAND rate of 9.56 cents for each Wi-Fi chip

11    used or sold, whereas patent holder's demand was for $3.39 per access point, $4.72

12    per laptop, up to $16.72 per tablet, and up to $36.90 per barcode scanner).

13    Even if the question of an appropriate royalty rate is analyzed using

14    Ericsson's preferred approach—*i.e.*, looking at Ericsson's negotiating history with

15    others—it is apparent that Ericsson's proposals to TCL have been unreasonable and

16    discriminatory.  For example, █████████████████████████████████

17    █████████████████████████████████████████████████████████

18    ████████████████████████████████ (*See* Bader Decl., Ex. 4 at

19    pp. 3–4.) ████████████████████████████████████████████████

20    ████████████████████████████████████████████████

21    █████████████████████████ (*See id.*, Ex. 5 at pp. 21–22.)  Clearly, the terms

22    Ericsson offered to Samsung were much more favorable than what Ericsson offered

23    to TCL *just two days prior*.  These differences are not inconsequential; to the

24    contrary, they will translate to tens of millions of dollars in additional royalties,

25    given the volume of phones manufactured and sold by TCL.

26    In addition, Ericsson recently entered into license agreements with several of

27    TCL's competitors on terms far more favorable than what Ericsson has offered to

28    TCL.  Even though TCL asked for production of all such licenses last June, Ericsson

-14-

1   only recently produced the licenses described below.  For example:

2   •   ██████████████████████████████████████████████
3       ██████████████████████████████████████████████████
4       ██████████████████████████████████████████████████
5       ██████████████████████████████████████████
6       ██████████████████████████████████████████████████
7       ████████████████████████████████████████████
8       ██████████████████████████████████████████
9       ████████████████████████████████████████████████
10      ████████████████████████████████████████████

11      ████   (*See* Bader Decl., Ex. 6 at pp. 11–12.)

12  •   In 2014, Ericsson entered into a license agreement with ZTE (also a large
13      phone manufacturer). ██████████████████████████████
14      ████████████████████████████████████████████
15      ██████████████████████████████████████████████████
16      ██████████████████████████████████████████
17      ██████████████████████████████████████████
18      ████████████████████████████████████████████
19      ██████████████████████████████████████████
20      ██████████████████████████████████████████
21      ████████████████████████████████████

22  •   In 2014, following litigation in the ITC and in federal court, Ericsson
23      entered into a license agreement with Samsung. ████████████████████
24      ██████████████████████████████████████████
25      ██████████████████████████████████████████████
26      ██████████████████████████████████████████████
27      ████████████████████████████████████████████   (*See* Bader
28      Decl., Ex. 8 at pp. 9–10.) ██████████████████████

1   ███████████████████████████████████████

2   ████████████████████████████████████████

3   ██████████████████████████████████████.

4       In conclusion, TCL believes a detailed analysis of Ericsson's alleged

5 standard-essential patents—both in relation to alternative technologies, and also in

6 relation to the other standard-essential patents at the SSPPU level—will demonstrate

7 that Ericsson's technology should be licensed at rates far lower than what Ericsson

8 has been demanding from the market to date. Yet even if the issue is approached by

9 looking at Ericsson's other license agreements, there is ample evidence that the rates

10 Ericsson has been seeking from TCL are unreasonable and discriminatory.

11       **D.**     **License Period**

12       The duration of any obligation to pay a royalty to Ericsson should be

13 addressed by the jury and/or Court. TCL believes the term of the license needs to

14 properly take into account certain variables that will affect the landscape moving

15 forward, such as the anticipated expiration of Ericsson's patents, and in particular

16 patents covering the much older 2G technology. TCL believes many of Ericsson's

17 2G patents have either already expired, or will be expiring soon. TCL should not be

18 required to pay a royalty for Ericsson's 2G technology, when the underlying patents

19 have expired. *See Brulotte v. Thys Co.*, 379 U.S. 29, 30–33 (1964) (holding that

20 licenses to multiple patents which "attempt to exact the same terms and conditions"

21 before and after the date the last patent expires are unenforceable *per se*).

22       **E.**     **Patents Covered by License**

23       What patents are covered by any royalty obligation also should be addressed

24 by the jury and/or Court. For example, a license could cover Ericsson's 2G, 3G, and

25 4G patent portfolios, or instead cover every patent that Ericsson owns that is

26 applicable to wireless device. In addition, a license could cover only patents that are

27 actually essential, or instead could cover patents that have been claimed by Ericsson

28 as essential to a standard (*e.g.*, in a prior declaration to ETSI). ███████████████

1 ████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 █████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ███████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ████████████████████████████

9 **F.    TCL Products Covered by License**

10    What TCL products trigger its royalty obligation also should be addressed by

11 the jury and/or Court. ████████████████████████████████████████████

12 ██████████████████████████████████ (Dkt. 138 at 5:22.) ██████

13 █████████████████████████████████████████████ TCL

14 believes it is entitled to a license for all of its products which practice the 2G, 3G,

15 and 4G standards.  Ericsson should not be able to exclude certain products from the

16 license in order to retain the ability to continue suing TCL for alleged infringement.

17    **G.    Alleged "Release Payment"**

18    Ericsson's proposed license includes a "release payment for past unlicensed

19 sales."  (Dkt. 138 at 12:1.)  TCL disputes that any such payment is owed, given

20 Ericsson's breach of its FRAND obligation and other wrongful conduct.  If

21 anything, TCL should receive a refund of the exorbitant rates Ericsson previously

22 charged for its 2G technology.  However, whether to include the parties' dispute

23 regarding a "release payment" in a jury trial regarding the FRAND determination

24 raises questions regarding the scope of the stay currently in effect.  The Court

25 previously indicated it was staying discovery as to "all matters other than FRAND."

26 (Reporter's Transcript of Proceedings, Jan. 23, 2015, at 35:14–15.)  A "release

27 payment" is seemingly nothing more than a label for damages based on past

28 infringement.  TCL understands Ericsson's infringement claims against TCL are

-17-

1  stayed (the same is true regarding TCL's infringement claims against Ericsson).  If

2  Ericsson's infringement claims are stayed, then Ericsson should not be able to

3  recover damages for alleged infringement (whether labeled a "release payment" or

4  otherwise), and certainly not without proving infringement and allowing TCL to

5  present its infringement defenses.

6  **III.    <u>CONCLUSION</u>**

7          Consistent with the parties' and the Court's discussion at the February 24

8  hearing, TCL reserves the right to amend or supplement the foregoing contentions as

9  discovery progresses, the parties work with their respective experts, and Ericsson

10 further explains its contentions.

11 Dated: April 13, 2015

12                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

13

14                        By    /s/ *Stephen S. Korniczky*

15                              STEPHEN S. KORNICZKY
                                MARTIN R. BADER
16                              MATTHEW W. HOLDER
                                Attorneys for Plaintiff,
17                              TCL Communication Technology Holdings, Ltd.,
18                              TCT Mobile Limited, and TCT Mobile (US), Inc.

19

20

21

22

23

24

25

26

27

28

SMRH:436909940.3        PLAINTIFFS' RESPONSIVE CONTENTIONS RE FRAND TERMS TO BE ADJUDICATED
                        Case No. 8:14-CV-00341-JVS-AN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 23, 2015 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.


By      /s/ *Stephen S. Korniczky*
                Stephen S. Korniczky

SMRH:436909940.3

PLAINTIFFS' RESPONSIVE CONTENTIONS RE FRAND TERMS TO BE ADJUDICATED
Case No. 8:14-CV-00341-JVS-AN