# EXHIBIT A

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

In the Matter of

**CERTAIN WIRELESS COMMUNICATIONS**          Inv. No.  337-TA-866
**EQUIPMENT AND ARTICLES THEREIN**

**ORDER NO. 62:      INITIAL DETERMINATION GRANTING JOINT MOTION TO**
**TERMINATE THE INVESTIGATION BASED ON SETTLEMENT**

(February 10, 2013)

On January 27, 2014, Complainants Samsung Electronics, Co., Ltd. and Samsung

Telecommunications America, LLC (collectively "Samsung") and Respondents Ericsson Inc. and

Telefonaktiebolaget LM Ericsson (collectively, "Ericsson") filed a joint motion to terminate the

Investigation based upon a settlement agreement. (Motion Docket No. 866-070.)  Movants filed

both confidential and public versions of their motion with confidential and redacted versions of

their terms of settlement ("Agreement") attached, respectively.  Movants represent that there are

no other agreements, written or oral, express or implied, between them concerning the subject

matter of this Investigation. (Mot. at 2.)  In support of their motion, movants argue that

termination of this Investigation will not adversely affect the public interest, the Agreement

completely resolves the disputes between Ericsson and Samsung, and it is in the interest of public

and administrative economy to grant this motion. (*Id*. at 2-3.)

On January 29, 2014, Samsung and Ericsson filed a supplement to their motion, attaching a

revised public version of the Agreement.

On January 30, 2014, the Commission Investigative Staff ("Staff") responded in support of

the motion.

The Commission's Rules permit termination of the Investigation in whole or in part with

respect to one or more respondents on the basis of a settlement. 19 C.F.R. § 210.21(b)(1). In

compliance with 19 C.F.R. § 210.21(b)(1), as noted above, movants have attached both public and

confidential versions of the Agreement, and have made a statement that they have no other

agreements concerning the subject matter of this Investigation. (*Id.*)

In the case of a proposed termination by settlement agreement,

> the parties may file statements regarding the impact of the proposed termination on
> the public interest, and the administrative law judge may hear argument, although
> no discovery may be compelled with respect to issues relating solely to the public
> interest.    Thereafter, the administrative law judge shall consider and make
> appropriate findings in the initial determination regarding the effect of the proposed
> settlement on the public health and welfare, competitive conditions in the U.S.
> economy, the production of like or directly competitive articles in the United States,
> and U.S. consumers.

19 C.F.R. § 210.50(b)(2). Movants and Staff believe that granting the joint motion would not be

contrary to the public interest. (Mot. at 2-3; Staff Resp. at 3-4.) The Administrative Law Judge,

having reviewed the Agreement, agrees. Furthermore, termination of litigation under these

circumstances as an alternative method of dispute resolution is generally in the public interest and

will conserve public and private resources.

Accordingly, it is the Initial Determination of the Administrative Law Judge that Motion

Docket No. 866-070 should be GRANTED and that the Investigation be terminated in its entirety.

This Initial Determination, along with a non-confidential copy of the Agreement,[1] is

hereby certified to the Commission.  Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination

shall become the determination of the Commission unless a party files a petition for review of the

Initial Determination pursuant to 19 C.F.R. § 210.43(a), or the Commission, pursuant to 19 C.F.R.

§ 210.44, orders on its own motion a review of the Initial Determination or certain issues herein.

**SO ORDERED.**

E. James Gildea

E. James Gildea

Administrative Law Judge

---

[1] The Commission's Rules require both confidential and public versions of agreements.  *See* 19 C.F.R. § 210.21(b)(1).
Copies of the confidential or public versions of the Agreement are attached to the respective confidential and public
versions of this Initial Determination.

PUBLIC VERSION

## PATENT LICENSE AGREEMENT

This Patent License Agreement (the "Agreement") is effective from and entered into on February 1 of 2014 (the "Effective Date") by and between TELEFONAKTIEBOLAGET L M ERICSSON, a Swedish corporation (hereinafter "Ericsson"), and SAMSUNG ELECTRONICS CO. LTD, a Korean corporation (hereinafter "Samsung").

### RECITALS

WHEREAS, Ericsson owns and controls certain patents that it believes to be essential or necessary or are useful to make, use and sell Licensed Products

and

WHEREAS, Samsung owns and controls certain patents that it believes to be essential or necessary or are useful to make, use and sell Licensed Products

and

WHEREAS, each of Samsung and Ericsson has granted a license under its patents to the other and now wish to enter into a new license agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, receipt of which is hereby acknowledged, Ericsson and Samsung hereby agree as follows:

### AGREEMENT

1. DEFINITIONS

    For the purpose of this Agreement, the capitalized terms set out in this Agreement, whether in singular or plural, shall have the following meanings.

    1.1   "Affiliate(s)" of a Party shall mean a company or other legal entity which it controls, or is controlled by or is under common control with such Party, but any such company or other legal entity shall be deemed to be an Affiliate only as long as such control exists, and for the purposes of this definition, "control" shall mean direct or indirect ownership of more than fifty percent (50%) of the outstanding voting shares or other such rights and only so long as such ownership or control exists.

    1.2   "ASIC(s)" shall mean application specific integrated circuit chips or chipsets (including firmware and/or associated software that executes on ASIC) that are designed to perform a particular function or functions.

    1.3   "Component(s)" shall mean standalone Modules, ASICs, modems, integrated circuit chips (or devices), or other standalone parts, that may be incorporated in

any product.

1.4  "Core Network Equipment" shall mean



Core Network Equipment shall not mean User Equipment, Radio Network Equipment or Components

1.5  "Ericsson Licensed Patents" shall mean

1.6  "Have Made" shall mean either Party's right to have a third party make Licensed Products, provided that (a) the Party exercising such right owns, or licenses from a party not being the third party producing in accordance with this Section, and supplies all or substantially all of the design, specifications and working drawings for the Licensed Products being made by the third party to such third party, and (b) such third party is not allowed to sell such product to other third parties.

1.7  "Implementation Patents" shall mean any and all Patents of either Party (including of its Affiliates) that would be infringed by the Licensed Products of the other Party or its Affiliates but for the licenses granted herein other than

1.8  "Licensed Product(s)" shall mean



Licensed Products, or any other product, are not licensed under this Agreement but may be subject to

covenants in Article 2.3 and 3.3 respectively.

1.9 "Module(s)" shall mean integrated circuit chip(s), chipsets (whether or not mounted on a printed circuit board) and removable cards for personal computers (e.g., PCMCIA cards) that provide communication capabilities (regardless of the transmission medium) for use in the transmission of wireless data and/or voice transmissions.

1.10 "Network Operator" shall mean a wireless communication system operator.

1.11 "Party/Parties" shall mean either Ericsson and/or Samsung, as applicable.

1.12 "Patent(s)" shall mean patents (including licensable patent applications and utility models but excluding design patents) owned, or controlled at any time during the term of this Agreement by Samsung and its Affiliates and Ericsson and its Affiliates.

1.13 "Radio Network Equipment" shall mean ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ providing wireless access between User Equipment and Core Network Equipment. Radio Network Equipment shall not include User Equipment, Core Network Equipment, and Components ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

1.14 "Sale", "Sell" or "Sold" or any similar term shall mean the delivery, or other disposal of Licensed Products in any country of the world to a third party regardless of the basis for compensation, if any, including lease, rent or similar transaction, whether as an individual item or as a component or constituent of other products, or the putting into use of the Samsung Licensed Products by Samsung, Ericsson as applicable and/or its Affiliate for any purpose other than routine testing thereof - with a Sale being deemed to have occurred upon shipment or invoicing or such putting into use, whichever shall first occur.

1.15 "Samsung Licensed Patents" shall mean ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1.16 "Standards" for the purposes herein shall mean and at any time shall mean, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ all irrespective of the transmission medium or frequency band. However, such derivations and evolutions thereof may not extend to 5G and/or any other standard.

1.17 "Standard Essential Patents or SEPs" shall mean any and all Patents of either Party (including of their respective Affiliates) that are necessarily, for technical reasons, infringed by the functionalities that correspond to any aspect of any of the Standards in the Licensed Products of the other Party but for the licenses granted herein.

1.18    "802.11" shall mean the protocols agreed by the members of the standards setting body IEEE that are applicable to 802.11x. For the purpose of clarification, the definition of 802.11x shall not include the Standards or WiMAX.

1.19    "User Equipment" shall mean



"User Equipment" shall include, without limitation,

1.20    "WiMAX" shall mean the WiMAX standard, as adopted by the WiMAX forum, based on 802.16(x) that can be used in a wide area network.

1.21    "Foundry Product(s)" shall mean a product made by either Party exclusively for a third party that is: (a) substantially based on the design and specification owned by such third party and (b) sold under such third party's brand name.

1.22    "Licensed Patent(s)" shall mean either Ericsson Licensed Patents or Samsung Licensed Patents or both as applicable.

1.23    "5G" shall mean the future standard beyond LTE and LTE-A, as adopted by the 3GPP standardization organization and that can be used in a wide area network.

1.24



1.25

1.26



PUBLIC VERSION



1.27

1.28

## 2.   LICENSE AND COVENANTS BY ERICSSON

2.1   <u>License Grant.</u> Upon payment of the license fee specified in Article 7 herein, Ericsson grants to Samsung



For avoidance of doubt,

For avoidance of doubt,



Any license hereunder granted to an Affiliate of Samsung shall terminate if such Samsung Affiliate ceases to be an Affiliate.



2.2

2.3

3.    LICENSE GRANT BY SAMSUNG



3.1    License Grant. Samsung, grants to Ericsson

For avoidance of doubts,

For avoidance of doubt,



Any license hereunder granted to an Affiliate of Ericsson shall terminate if such Ericsson Affiliate ceases to be and Affiliate.

    3.2    No Rights to Provide Foundry Services. The license or the sublicense as granted to Ericsson and its Affiliates herein do not include any right to make and sell Foundry Products.

    3.3



## 4. LIMITATIONS ON LICENSE GRANTS

    4.1    Jointly Owned Patents. With respect to Patents licensed herein, or where a covenant has been provided, which are owned by a Party jointly with others, the Parties recognize that there are countries which require the express consent of all inventors or their assignees to the grant of licenses or rights under patents issued in such countries for such jointly owned inventions. Each Party on its behalf and on behalf of its Affiliates hereby

7 / 23



PUBLIC VERSION

expressly gives such consent and shall use commercially reasonable efforts to obtain such consent from its employees and its Affiliates' employees, and from other third parties, as required to make full and effective any such licenses and rights granted to the grantee hereunder by such Party and by another licensor of such grantee.

If, in spite of such efforts, a Party is unable to obtain such consents from any such employees or third parties, the resulting inability of such Party to make full and effective its purported grant of such licenses and rights shall not be considered to be a breach of this Agreement. For the avoidance of doubt, in such a case, the licenses and rights shall be considered granted, or otherwise provided, by each Party to the maximum extent possible, and, consequently, if the other Party acquires a corresponding license from the employee or third party, such other Party shall be deemed licensed under the patent.

4.2     No Rights Against Infringers. There may be countries in which a Party hereto may have, as a consequence of this Agreement, rights against infringers of the other Party's patents licensed hereunder. Each Party hereby waives any such right it may have by reason of any third party's infringement of any such patents.

4.3     No Implied License. All rights not expressly granted by a Party are hereby expressly reserved. Furthermore, nothing in this Agreement shall be construed as a right to use or sell Licensed Products in a manner which conveys or purports to convey whether explicitly, by principles of implied license, or otherwise, any rights to any third party user or purchaser of the Licensed Products under any patent of any Party or of its Affiliates covering or relating to any combination of the Licensed Products with any other product (not licensed hereunder) where the right applies specifically to the combination and not to the Licensed Product itself.

5.     RELEASE AND DISMISSALS

Upon the receipt by Ericsson of the payment set forth in Article 7.2, each Party, for itself and its Affiliates that exist as of the Effective Date ("Present Affiliate"), hereby releases



By January 29, 2013, the parties will file a joint motion to terminate the ITC Actions, and a joint motion to dismiss without prejudice the District Court Actions, and cause their respective counsel to submit notice to such relevant judicial and governmental authorities that the Parties have settled all claims and counterclaims asserted by the Parties

and as further defined in **Appendix 3.**

6.     KNOW-HOW AND TRADE SECRETS

PUBLIC VERSION

No license or other right is granted herein to either Party by the other, directly or by implication, estoppel or otherwise, with respect to any trade secrets or know-how, and no such license or other right shall arise from the consummation of this Agreement or from any acts, statements or dealings leading to such consummation. Except as specifically provided herein, neither Party is required hereunder to furnish or disclose to the other Party any information in connection with the licenses granted or with any other rights granted herein.

7.   PAYMENTS

   7.1



PUBLIC VERSION



or,



7.2

and as further specified in this Agreement.



    7.3    <u>Payment Schedule.</u>

    7.4

    7.5    <u>Late Payments.</u>

    7.6    <u>Taxes.</u> Each Party shall pay all taxes, including but not limited to, sales taxes and value added taxes, imposed by the appropriate tax authorities, of any country in which said Party is doing business, as a result of said Party's furnishing consideration hereunder. In the event such a tax becomes payable as a result of a Party's furnishing consideration in respect of a sublicense granted to any of its Affiliates hereunder, said sublicensing Party shall be responsible for determining the amount of and paying, or causing said sublicensed Affiliate to pay, said tax. Withholding taxes, as defined in the double taxation treaty between Sweden and Republic of Korea, levied in the Republic of Korea

    7.7    <u>Bank Commission.</u> Any bank commissions, charges or fees incurred in Korea
    Any bank commissions, charges or fees incurred in Sweden

    7.8    <u>Records and Audits.</u> With respect to any year

PUBLIC VERSION



7.9

PUBLIC VERSION

8.    TERM AND TERMINATION

   8.1    Term. This Agreement shall commence on the Effective Date hereof and continue until [          ] unless otherwise terminated as permitted.

8.2 <u>Termination for Breach.</u> If either Party breaches any of the material provisions herein and fails to cure such breach within sixty (60) days after written notice specifying such breach by the other Party, the other Party may, at its option, terminate all licenses and rights granted herein with respect to the Party in breach. However, all licenses and rights granted to the other Party that is not in breach shall survive.



8.3 <u>Change of Control.</u>

8.4 <u>Acquisitions.</u> If either Party, or any of its Affiliates, acquires a new Affiliate, or the business or assets, or any portion thereof, of a company or other person (hereinafter "the Acquired Entity")

(i) In respect of Samsung or any of its Affiliates;

(ii) In respect of Ericsson or any of its Affiliates;

9. DISCLAIMERS

9.1 Nothing contained in this Agreement shall be construed as:

(a) A warranty or representation that any manufacture, sale, offer for sale, lease, use or importation will be free from infringement of patents, copyrights or other intellectual property rights of others, and it shall be the sole responsibility of the licensee Party to make such determination as is necessary with respect to the acquisition of licenses under patents and other intellectual property of third parties;

(b) A warranty or representation by either Party as to the validity, enforceability or scope of any Licensed Patent herein;



14 / 23

(c)    A warranty or representation of either Party concerning the use or fitness for any particular purpose of either Party's Licensed Patents, and neither Party assumes any liability or obligation for the infringement of any third party rights by the use of either Party's Licensed Patents or for the consequences of their invalidity, or for the inability of the other Party to use such Licensed Patents for any particular purpose, and all such warranties, representations, conditions, terms and undertakings are hereby excluded to the maximum extent permitted by law;

(d)    Limiting the rights which the Parties have outside the scope of licenses and rights granted hereunder, or restricting the right of either Party or any of its Affiliates to make, have made, use, lease, sell or otherwise dispose of any particular product or products not licensed herein;

(e)    An agreement to bring or prosecute actions or suits against third parties for infringement;

(f)    An obligation to furnish any manufacturing or technical information or assistance;

(g)    An obligation to file any patent application, or to secure any patent or patent rights, or to maintain any patent in force, or to provide copies of patent applications to the other Party or its Affiliates, or to disclose any inventions described or claimed in such patent applications;

(h)    Conferring any right to use, in advertising, publicity or otherwise, any trade name, trademark, or any contraction, abbreviation or simulation thereof; and

(i)    An obligation upon either Party to make any determination as to the applicability of any patent to any product of the other Party.

9.2    Neither Party makes any representations; extends any warranties of any kind, either express or implied; nor assumes any responsibilities whatever with respect to the manufacture, sale, offer for sale, lease, use, importation or disposition of any product or part thereof, by the other Party or any of its Affiliates or any direct or indirect supplier or vendor or other transferee of the other Party or its Affiliates.

10.    LIMITATION OF LIABILITY

IN NO EVENT WILL EITHER PARTY BE LIABLE FOR INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OR FOR LOSS OF USE OR DATA, LOST PROFITS, SAVINGS OR REVENUES OF ANY KIND, NO MATTER WHAT THEORY OF LIABILITY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

The limitation of liability provided for in this Article 10, shall not apply with respect to damages related to a breach of the obligations of Article 11, Non-Disclosure.



11.    NON-DISCLOSURE

11.1    The terms and conditions of this Agreement shall be confidential and all disclosure of information under this Agreement will be deemed to be confidential unless specifically designated as non-confidential or non-proprietary at the time of disclosure or by nature obviously is non-confidential or non-proprietary. The receiving Party can freely use, have used and/or disclose to others such non-confidential information; provided, however, nothing contained in this Article 11, shall be deemed to grant any license under any intellectual property right.

11.2    Except as provided in this Article 11, the receiving Party of such confidential information agrees to treat the same as strictly confidential and shall not divulge, directly or indirectly, to any other person, firm, corporation, association or entity, for any purpose whatsoever, confidential information so received, and shall not make use of or copy such confidential information, except for the purpose of this Contract. Such confidential information may be disclosed only to such of the employees, consultants and subcontractors of the receiving Party who reasonably require access to such information for the purpose for which it was disclosed and who have secrecy obligations to the receiving Party. This commitment shall impose no obligation upon either Party with respect to any portion of such information that:

(a)    Was known to the receiving Party prior to its receipt from the other Party;

(b)    Is known or which (through no act of failure on the part of the receiving Party) becomes generally known;

(c)    Is supplied to receiving Party by a third party which the receiving Party in good faith believes is free to make such disclosure and without restriction on disclosure;

(d)    Is disclosed by the disclosing Party to a third party generally, without restriction on disclosure; or

(e)    Is independently developed by the receiving Party without use of any confidential information provided by the disclosing Party.

11.3    The obligation of confidentiality set out in this Article 11 shall survive the termination or expiration of this Agreement for a period of fifteen (15) years.

11.4    The terms of this Agreement (but not its existence) shall be held confidential by the Parties. Notwithstanding the foregoing, the Parties may disclose the terms of this Agreement if necessary to (a) comply with a subpoena, governmental investigation, or court order, (b) to auditors and attorneys, or (c) to comply with governmental regulations, including securities laws, or stock exchange listing agreements. In

the event a Party deems it necessary to disclose the terms of this Agreement to comply with a subpoena, governmental investigation, court order, or to comply with governmental regulations including securities laws, or stock exchange agreements, that Party shall give the other Party reasonable, in accordance with the prevailing circumstances, notice in advance of any such disclosures to permit the other Party to seek appropriate protective orders or other protection to the extent applicable under relevant jurisdiction.   Notwithstanding the foregoing, either Party may issue a press release, subject to prior review, and not unreasonably objected, by the other Party.

12.    GOVERNING LAW AND DISPUTES

    12.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, USA without regard to its conflict of law rules.

    12.2    The English language shall be used in all documents and correspondence related to this Agreement.

    12.3    In the event of a dispute under this agreement, the parties shall, through their representatives, attempt to settle the dispute by amicable negotiations the dispute. If the parties fail to reach such an amicable settlement within 60 days of notice of one Party to other of the dispute, either Party may refer such differences to arbitration as provided below.

    12.4    All disputes or claims arising out of or in connection with this Agreement shall be finally settled under the Rules Judicial Arbitration and Mediation Services (JAMS) by three (3) arbitrators appointed in accordance with the said rules. The arbitral proceedings shall be conducted in the English language and shall take place in the United States.   All awards may, if necessary, be enforced by any court having jurisdiction in the same manner as a judgment in such court.

    12.5    The Parties undertake and agree that all arbitral proceedings conducted under this Article 12 shall be kept strictly confidential, and all information, documentation, materials in whatever form disclosed in the course of such arbitral proceeding shall be used solely for the purpose of those proceedings.

    12.6    Notwithstanding the aforesaid, nothing in this Article 12 shall prevent the Parties from seeking any injunctive or equitable relief by a court of competent jurisdiction.

13.    WAIVER

    Neither this Agreement nor any provision hereof may be waived without the prior written consent of the Party against whom such waiver is asserted. No delay or omission by either Party to exercise any right or power shall impair any such right or power to be construed to be a waiver thereof. Consent by either Party to, or waiver of, a breach by the other Party, whether expressed or implied, shall not constitute consent to, waiver of, or excuse for any other different or subsequent breach.

14.   ASSIGNMENT

Neither this Agreement nor any license or rights hereunder, in whole or in part, shall be assignable or otherwise transferable by any Party without the written consent of the other Party. Any attempt to do so in contravention of this Article shall be void and of no force and effect. Either Party may assign a Licensed Patent to a third party including its Affiliate provided that it secures the continued rights received by the other Party hereto, under this Agreement.

15.   SEVERABILITY

If any term, clause, provision, or part thereof, of this Agreement is invalidated or unenforceable by operation of law or otherwise, the validity or enforceability of any other term, clause or provision, shall not be affected and such invalid or unenforceable term, clause or provision shall be deemed deleted from this Agreement, and this Agreement shall continue in full force and effect. Should the case arise, the Parties shall negotiate in good faith a replacement, but legally valid, term, clause or provision that best meets the intent of the Parties.

Parties further acknowledge that this Agreement survives the unenforceability or termination of, or any dispute regarding, Article 7.9 or the "Commitment Letter" referenced in Article 7.4.   However, neither Samsung nor Ericsson will contest the enforceability of Article 7.9 or the Commitment Letter. Any breach or claimed breach of any obligation under Article 7.9 or the Commitment Letter shall not be grounds for terminating this Agreement.

16.   NOTICE

All notices, requests, demands, consents, agreements and other communications required or permitted to be given under this Agreement shall be in writing and shall be: (i) delivered personally; (ii) mailed to the Party to who notice is given, by first class mail, postage prepaid, or (iii) sent by facsimile or electronically and confirmed, properly addressed with a copy to the Party's legal department (as appropriate) as follows:

ERICSSON                          SAMSUNG



Unless otherwise specifically provided for in this Agreement, such communications shall take effect upon receipt by the addressee, provided such communications shall be deemed to have arrived upon the expiration of seven (7) days from the date of sending in case of registered or certified mail and on the day of the receipt of sender's facsimile confirmation of the transmission in case of telefax.

The above addresses and contacts can be changed by providing notice to the other Party in accordance with this Article.

17.   NEITHER PARTY BENEFITS

This Agreement is considered to be jointly drafted and neither Party shall benefit from who actually drafted the Agreement.

18.   MODIFICATION/ENTIRE AGREEMENT

This Agreement sets forth the entire understanding and agreement between the Parties as to the subject matter of this Agreement and merges and supersedes all previous communications, negotiations, warranties, representations and agreements, either oral or written, with respect to the subject matter hereof, and no addition to or modification of this Agreement shall be binding on either Party hereto unless reduced to writing and agreed upon by each of the Parties hereto.

19.   HEADINGS

All headings used in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement or any clause or provision herein.

20.   AUTHORITY

Each Party represents and warrants that it has the right to enter into this Agreement on its behalf and on behalf of its Affiliates.

Each signatory hereto warrants that they have obtained all necessary authorization and consents necessary to legally bind their respective Parties hereto and that by signing hereto, they create a binding commitment by such Party to the terms hereof.

*[Signatures on the following page.]*

**PUBLIC VERSION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN WITNESS WHEREOF, ERICSSON AND SAMSUNG HAVE CAUSED THIS AGREEMENT TO BE
EXECUTED BY THEIR AUTHORIZED REPRESENTATIVES AS OF THE DAY AND YEAR WRITTEN
BELOW.

Telefonaktiebolaget L M Ericsson  (publ)        Samsung Electronics Co. Ltd.

PUBLIC VERSION

APPENDIX 1 – PAYMENT DETAILS



PUBLIC VERSION



APPENDIX 3 – DISMISSALS OF LITIGATIONS

For the purposes of Article 5, ITC Actions shall mean:

1. Case no. '862 Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players, and Televisions, and Components Thereof, Inv. No. 337-TA-862.

2. And case no. '866 Certain Wireless Communications Equipment and Articles Therein, Inv. No. 337-TA-866.


Furthermore, for the purposes of Article 5, the three district court cases are styled as follows – these cases are dismissed by filing a Motion To Dismiss:

Ericsson Inc., and Telefonaktiebolaget LM Ericsson v. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America LLP, in the United States District Court for the Eastern District of Texas; Civil Action No. 6:12-cv-894

Ericsson Inc., and Telefonaktiebolaget LM Ericsson v. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America LLP, in the United States District Court for the Eastern District of Texas; Civil Action No. 6:12-cv-895

Ericsson Inc., and Telefonaktiebolaget LM Ericsson v. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America LLP, in the United States District Court for the Eastern District of Texas; Civil Action No. 6:13cv364

**CERTAIN WIRELESS COMMUNICATIONS**                                  **337-TA-866**
**EQUIPMENT AND ARTICLES THEREIN**


## PUBLIC MAILING LIST

Lori Hofer                              (  ) Via Hand Delivery
**LEXIS – NEXIS**                       (  ) Via Express Delivery
9443 Springboro Pike                    (◡) Via First Class Mail
Miamisburg, OH 45342                    (  ) Other: _____

Kenneth Clair                           (  ) Via Hand Delivery
**THOMSON WEST**                        (  ) Via Express Delivery
1100 13th Street, NW, Suite 200         (◡) Via First Class Mail
Washington, DC  20005                   (  ) Other: _____

2

**CERTAIN WIRELESS COMMUNICATIONS**                    337-TA-866
**EQUIPMENT AND ARTICLES THEREIN**

### PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served by hand upon, the Commission Investigative Attorney, Monisha Deka, Esq., and the following parties as indicated on        FEB 10 2014

Lisa R. Barton
Acting Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, D.C. 20436

**ON BEHALF OF COMPLAINANTS SAMSUNG ELECTRONICS CO., LTD.**
**AND SAMSUNG TELECOMMUNICATIONS AMERICA, LLC:**

D. Sean Trainor, Esq.                    (  ) Via Hand Delivery
**KIRKLAND & ELLIS LLP**               (⤳) Via Express Delivery
655 Fifteenth St., N.W.                  (  ) Via First Class Mail
Washington, D.C. 20005                   (  ) Other: _____
202-879-5000

**ON BEHALF OF RESPONDENTS ERICSSON INC.  AND**
**TELEFONAKTIEBOLAGET LM ERICSSON:**

Benjamin Levi, Esq.                      (  ) Via Hand Delivery
**McKOOL SMITH, P.C.**                  (⤳) Via Express Delivery
1999 K Street, N.W., Suite 600           (  ) Via First Class Mail
Washington, D.C. 20006                   (  ) Other: _____
202-370-8300

1