

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

TCL COMMUNICATIONS          }
HOLDINGS, LTD.,             )
                Plaintiff,  }
   vs.                      }
                            }    SACV-14-00341-JVS
TELEFONAKTIENBOLAGET LM     )
ERICSSON, et al.,           )    TRIAL DAY 7
                Defendants. }
----------------------------}

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

February 28, 2017

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    STEPHEN S. KORNICZKY
      MATTHEW W. HOLDER
 4    MARTIN BADER
      SHEPPARD MULLIN RICHTER & HAMPTON, LLP
 5    12275 El Camino Real, Suite 200
      San Diego, CA  92130-2006
 6    (858) 720-8900

 7    ALLAN W. JANSEN
      SHEPPARD MULLIN RICHTER & HAMPTON, LLP
 8    3161 Michelson Drive
      Irvine, CA  92612
 9    (949) 732-6591

10    For the Defendants:

11    JOHN S. GIBSON
      CROWELL MORING
12    3 Park Plaza, 20th Floor
      Irvine, CA  92614-8505
13    (949) 798-1330

14    TED STEVENSON
      DOUGLAS A. CAWLEY
15    MCKOOL SMITH, P.C.
      300 Cresent Ct., Suite 1500
16    Dallas, TX  75201
      (214) 978-4974
17
      LAURIE L. FITZGERALD
18    CHRISTINE M. WOODIN
      MCKOOL SMITH, P.C.
19    300 West 6th Street, Suite 1700
      Austin, TX  78701
20    (512) 692-8700

21

22

23

24

25
```

```
 1

 2                          I-N-D-E-X

 3
     PLAINTIFF'S
 4   WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS

 5    (None)

 6   PLAINTIFF'S
     EXHIBITS:                               MARKED      RECEIVED
 7
     Exhibit 77                                            44
 8
     DEFENSE
 9   WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS

10   LARS GUSTAV BRISMARK     5        9        64
     DAVID KENNEDY          119
11
     DEFENSE
12   EXHIBITS:                               MARKED      RECEIVED

13   Decalarations of Mr. Brismark                          6
     Declaration of Mr. Kennedy                           121
14

15

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 28, 2017; 9:00 A.M.  |
| 09:00 | 2  | THE CLERK:  Item No. 1, SACV 14-341-JVS, TCL                  |
| 09:00 | 3  | Communications Holdings, Ltd., versus Ericsson, et cetera,    |
| 09:00 | 4  | et al.                                                        |
| 09:00 | 5  | Counsel, please state your appearances for the               |
| 09:00 | 6  | record.                                                      |
| 09:00 | 7  | MR. HOLDER:  Good morning, Your Honor.  Matt                  |
| 09:00 | 8  | Holder for TCL.                                               |
| 09:00 | 9  | THE COURT:  Good morning.                                     |
| 09:00 | 10 | MR. KORNICZKY:  Good morning, Your Honor.  Steve              |
| 09:00 | 11 | Korniczky for TCL.                                            |
| 09:00 | 12 | THE COURT:  Good morning.                                     |
| 09:00 | 13 | MR. BADER:  Good morning, Your Honor.  Martin                 |
| 09:00 | 14 | Bader on behalf of TCL.                                       |
| 09:01 | 15 | THE COURT:  Good morning.                                     |
| 09:01 | 16 | MR. CAWLEY:  Good morning, Your Honor.  Douglas               |
| 09:01 | 17 | Cawley for Ericsson.                                          |
| 09:01 | 18 | THE COURT:  Good morning.                                     |
| 09:01 | 19 | MS. FITZGERALD:  Good morning.  Laurie Fitzgerald             |
| 09:01 | 20 | for Ericsson.                                                 |
| 09:01 | 21 | THE COURT:  Good morning.                                     |
| 09:01 | 22 | MR. STEVENSON:  Good morning, Your Honor.  Ted                |
| 09:01 | 23 | Stevenson for Ericsson.                                       |
| 09:01 | 24 | THE COURT:  Good morning.                                     |
| 09:01 | 25 | MS. WOODIN:  Good morning, Your Honor.  Christine             |

| | | |
|---|---|---|
| 09:01 | 1 | Woodin for Ericsson. |
| 09:01 | 2 | THE COURT:  Good morning. |
| 09:01 | 3 | MR. GIBSON:  Good morning, Your Honor.  John |
| 09:01 | 4 | Gibson for Ericsson. |
| 09:01 | 5 | THE COURT:  Good morning. |
| 09:01 | 6 | So we're going to proceed with Mr. Brismark this |
| 09:01 | 7 | morning? |
| 09:01 | 8 | MR. CAWLEY:  Yes, Your Honor. |
| 09:01 | 9 | THE COURT:  Okay. |
| 09:01 | 10 | Mr. Cawley. |
| 09:01 | 11 | MR. CAWLEY:  Your Honor, at this time Ericsson |
| 09:01 | 12 | would call Lars Gustav Brismark to the stand. |
| 09:01 | 13 | LARS GUSTAV BRISMARK, DEFENSE WITNESS, SWORN |
| 09:02 | 14 | THE COURT:  Mr. Cawley. |
| 09:02 | 15 | MR. CAWLEY:  Your Honor, thank you. |
| 09:02 | 16 | DIRECT EXAMINATION |
| 09:02 | 17 | BY MR. CAWLEY: |
| 09:02 | 18 | Q   Could you please state your name for the record? |
| 09:02 | 19 | A   My name is Lars Gustav Brismark. |
| 09:02 | 20 | Q   Mr. Brismark, there are several binders in front of |
| 09:02 | 21 | you, and in one you will find the witness declaration of |
| 09:02 | 22 | Lars Gustav Brismark.  Would you locate that, please? |
| 09:02 | 23 | A    (Witness complies.)  Yes. |
| 09:02 | 24 | Q   And if you will turn to page 58 of that declaration. |
| 09:03 | 25 | A    I don't seem to have it. |

6

| | | |
|---|---|---|
| 09:03 | 1 | THE COURT:  Do you want to assist him? |
| 09:03 | 2 | MR. CAWLEY:  May I approach, Your Honor? |
| 09:03 | 3 | THE WITNESS:  Now I have it. |
| 09:03 | 4 | MR. CAWLEY:  Okay. |
| 09:03 | 5 | BY MR. CAWLEY: |
| 09:03 | 6 | Q    Mr. Brismark, does your signature appear on page 58 of |
| 09:03 | 7 | your original declaration? |
| 09:03 | 8 | A    Yes, it does. |
| 09:03 | 9 | Q    And now if you would you please locate the rebuttal |
| 09:03 | 10 | witness declaration of Lars Gustav Brismark.  Well, I think |
| 09:04 | 11 | it's in the third -- I am told that it's in the third |
| 09:04 | 12 | binder. |
| 09:04 | 13 | A    Yes. |
| 09:04 | 14 | Q    And if you would please turn to page 21 of the rebuttal |
| 09:04 | 15 | declaration. |
| 09:04 | 16 | A    Got it. |
| 09:04 | 17 | Q    Does your signature appear on that page? |
| 09:04 | 18 | A    Yes, it does. |
| 09:04 | 19 | MR. CAWLEY:  Your Honor, at this time we would |
| 09:04 | 20 | like to offer Mr. Brismark's original and rebuttal |
| 09:04 | 21 | declarations. |
| 09:04 | 22 | THE COURT:  They will be received. |
| 09:04 | 23 | (Declarations of Mr. Brismark received in |
| 09:04 | 24 | evidence.) |
| 09:04 | 25 | MR. CAWLEY:  And, Your Honor, in Mr. Brismark's |

| | | |
|---|---|---|
| 09:04 | 1 | original declaration there are six exhibits which were |
| 09:04 | 2 | offered into evidence which have not been preadmitted.  They |
| 09:04 | 3 | are Exhibits 137, 4026, 4028, 4796, 4942, and 4943.  At this |
| 09:05 | 4 | time we would offer those exhibits into evidence. |
| 09:05 | 5 | MR. HOLDER:  Your Honor, I believe one of those |
| 09:05 | 6 | exhibits may have been the expert report from the other |
| 09:05 | 7 | matter where the expert had addressed Ericsson's patents. |
| 09:05 | 8 | We had objected to that exhibit, and we also objected to the |
| 09:05 | 9 | witness's testimony regarding that report on several |
| 09:05 | 10 | grounds. |
| 09:05 | 11 | MR. CAWLEY:  If Your Honor would like to take this |
| 09:05 | 12 | up now, I could give a brief summary of what those exhibits |
| 09:05 | 13 | are so counsel will know what -- |
| 09:05 | 14 | THE COURT:  That's fine. |
| 09:05 | 15 | MR. CAWLEY:  Okay.  Exhibit 137 is the e-mail |
| 09:05 | 16 | between Mr. Alfalahi and Mr. Guo which Mr. Guo was |
| 09:05 | 17 | cross-examined about that says Mr. Guo thinks the Ericsson |
| 09:05 | 18 | offer looked promising.  Exhibit 4026 is the Brazilian Court |
| 09:06 | 19 | decision at the original court level, and 4028 is the |
| 09:06 | 20 | translation of the Brazilian Court decision on appeal. |
| 09:06 | 21 | Exhibit 4796 is the Samsung ST Ericsson sales. |
| 09:06 | 22 | These are an input into the Samsung business case.  And 4942 |
| 09:06 | 23 | and 4943 are news articles about Samsung that Mr. Brismark |
| 09:06 | 24 | testified he obtained information from in formulating the |
| 09:06 | 25 | Samsung business case. |

| | | |
|---|---|---|
| 09:06 | 1 | MR. HOLDER:  We would object to 4026 and 4028, the |
| 09:06 | 2 | two documents related to the Brazilian proceeding, on |
| 09:06 | 3 | relevance grounds, on hearsay grounds.  It's not clear from |
| 09:06 | 4 | those documents exactly what the issues were or whether |
| 09:07 | 5 | those issues are the same that are before the Court. |
| 09:07 | 6 | THE COURT:  Mr. Cawley. |
| 09:07 | 7 | MR. CAWLEY:  Well, Your Honor, we believe that |
| 09:07 | 8 | they are relevant simply to show that there has been |
| 09:07 | 9 | testimony already that TCL filed litigation against Ericsson |
| 09:07 | 10 | in Brazil and we offer those merely to corroborate the |
| 09:07 | 11 | witness's testimony that they were dismissed by the |
| 09:07 | 12 | Brazilian Courts. |
| 09:07 | 13 | MR. HOLDER:  Those two documents do not relate to |
| 09:07 | 14 | the infringement actions that Ericsson filed against TCL in |
| 09:07 | 15 | Brazil.  They related to a complaint that was lodged with |
| 09:07 | 16 | the competition authority and what the competition authority |
| 09:07 | 17 | did in response. |
| 09:07 | 18 | MR. CAWLEY:  Agreed. |
| 09:07 | 19 | MR. HOLDER:  Your Honor, it's not going to be the |
| 09:07 | 20 | subject of my cross-examination to the extent you want to |
| 09:07 | 21 | take it under submission. |
| 09:07 | 22 | THE COURT:  I will receive 4026 and 4028 for the |
| 09:08 | 23 | fact of the litigation, but I am not going to accept the |
| 09:08 | 24 | truth of the content. |
| 09:08 | 25 | MR. CAWLEY:  Thank you, Your Honor. |

| | | |
|---|---|---|
| 09:08 | 1 | THE COURT:  Otherwise, what about the newspaper |
| 09:08 | 2 | articles?  I will receive them to the extent he relied upon |
| 09:08 | 3 | it but not for the content. |
| 09:08 | 4 | MR. CAWLEY:  We're not offering them for the truth |
| 09:08 | 5 | of the matter, Your Honor. |
| 09:08 | 6 | THE COURT:  Okay.  So 4942 and 4943 will be |
| 09:08 | 7 | received but not for the truth of the content.  Same with |
| 09:08 | 8 | respect to 4026 and 4028.  And 137 will be received in full |
| 09:08 | 9 | and 4796 will be received in full. |
| 09:08 | 10 | MR. CAWLEY:  Thank you, Your Honor. |
| 09:08 | 11 | THE COURT:  Okay. |
| 09:08 | 12 | (Exhibits 4026, 4028, 4942, 4943, 137, |
| 09:08 | 13 | and 4796 received in evidence) |
| 09:08 | 14 | MR. CAWLEY:  At this time we will pass |
| 09:08 | 15 | Mr. Brismark for cross-examination. |
| 09:08 | 16 | THE COURT:  Okay. |
| 09:08 | 17 | CROSS-EXAMINATION |
| 09:08 | 18 | BY MR. HOLDER: |
| 09:08 | 19 | Q    Good morning, Mr. Brismark. |
| 09:08 | 20 | A    Good morning, Mr. Holder. |
| 09:08 | 21 | Q    We spent two days together in Sweden.  It's good to see |
| 09:08 | 22 | you again here in Southern California. |
| 09:08 | 23 | A    Thank you. |
| 09:08 | 24 | Q    Sir, let's get your cross-examination binders before we |
| 09:09 | 25 | begin.  My apologies. |

| | | |
|---|---|---|
| 09:09 | 1 | Mr. Brismark, you are currently the chief IP |
| 09:09 | 2 | officer at Ericsson; correct? |
| 09:09 | 3 | A    Yes, that's correct. |
| 09:09 | 4 | Q    You've held that position since early 2016 when you |
| 09:09 | 5 | replaced Kasim Alfalahi after he left the company; correct? |
| 09:09 | 6 | A    Correct. |
| 09:09 | 7 | Q    Your responsibilities as the chief IP officer are to |
| 09:10 | 8 | handle all of the business matters related to IPR and |
| 09:10 | 9 | licensing at Ericsson; correct? |
| 09:10 | 10 | A    Yes. |
| 09:10 | 11 | Q    Before becoming the chief IP officer, you were the |
| 09:10 | 12 | vice-president of strategy and portfolio management within |
| 09:10 | 13 | IPR and licensing; correct? |
| 09:10 | 14 | A    Yes, that's correct. |
| 09:10 | 15 | Q    You held that position since 2006; right? |
| 09:10 | 16 | A    Yes. |
| 09:10 | 17 | Q    In that position you were responsible for driving IPR |
| 09:10 | 18 | strategy, patent portfolio management, and setting the |
| 09:10 | 19 | royalty rates for a license to Ericsson's standard essential |
| 09:10 | 20 | patents; correct? |
| 09:10 | 21 | A    Yes, that's correct. |
| 09:10 | 22 | Q    Before we move on to other subjects, do you recall last |
| 09:10 | 23 | Wednesday when we were discussing Ericsson's 2007 to 2010 |
| 09:10 | 24 | IPR strategy document with Mr. McLeroy? |
| 09:10 | 25 | A    Yes, I do. |

| | | |
|---|---|---|
| 09:10 | 1 | Q    Just to reorient the Court, that was the document that |
| 09:10 | 2 | discussed how, quote, "filing a patent lawsuit or simply the |
| 09:11 | 3 | threat of such a suit may be an efficient way to reach a |
| 09:11 | 4 | license agreement or at least forcing the counter-party to |
| 09:11 | 5 | the negotiation table," end quote.  Do you recall that |
| 09:11 | 6 | testimony? |
| 09:11 | 7 | A    No, not the full wording, but I do recall the document |
| 09:11 | 8 | being referenced. |
| 09:11 | 9 | MR. CAWLEY:  Let's look at Exhibit 61.  If we |
| 09:11 | 10 | could zoom in on the top, please. |
| 09:11 | 11 | BY MR. CAWLEY: |
| 09:11 | 12 | Q    You were part of the team that was responsible for |
| 09:11 | 13 | preparing this document; correct? |
| 09:11 | 14 | A    Yes. |
| 09:11 | 15 | Q    The author is Nhils Forslund, and he worked in your |
| 09:11 | 16 | organization at the time; correct? |
| 09:11 | 17 | A    That's correct. |
| 09:11 | 18 | Q    You tasked Mr. Forslund with preparing this document; |
| 09:11 | 19 | correct? |
| 09:11 | 20 | A    Yes. |
| 09:11 | 21 | Q    The purpose of this document was to formulate a |
| 09:11 | 22 | strategy for Ericsson covering all aspects of its |
| 09:11 | 23 | intellectual property rights strategy; correct? |
| 09:11 | 24 | A    Yes, that's correct. |
| 09:11 | 25 | Q    And you reviewed and approved the contents of this |

09:12    1    document; correct?

09:12    2    A    Yes, I did.

09:12    3    Q    This document, Exhibit 61, was also presented to an IPR

09:12    4    steering group within Ericsson which also reviewed and

09:12    5    approved its contents; correct?

09:12    6    A    Yes, that's correct.

09:12    7    Q    Let's talk about what we have been calling the top-down

09:12    8    approach for valuing a patent portfolio.

09:12    9              Sir, Ericsson has long argued that determining a

09:12   10    fair and reasonable royalty rate for a license to standard

09:12   11    essential patents can be determined by starting with a

09:12   12    reasonable maximum aggregate royalty burden for a license to

09:12   13    all standard essential patents and then distributing that

09:12   14    aggregate royalty burden amongst standard essential patent

09:12   15    owners based on their respective proportional share of all

09:12   16    of the standard essential patents; correct?

09:12   17    A    No.  I would disagree with that.

09:12   18    Q    Well, sir, isn't it true that Ericsson stated on its

09:13   19    website around 2008 that it believed the prevalent industry

09:13   20    interpretation of FRAND is to start with a reasonable

09:13   21    maximum aggregate royalty rate to which each patent holder

09:13   22    is entitled to a proportion according to its relative share

09:13   23    of all standard essential IPR?

09:13   24    A    I think that's correct.  I don't recall the exact

09:13   25    wordings here and now.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 09:13 | 1 | Q    Back in 2015 Ericsson arbitrated the determination of a |
| 09:13 | 2 | FRAND rate with Huawei; correct? |
| 09:13 | 3 | A    Yes. |
| 09:13 | 4 | Q    During that case Ericsson said that it believes that |
| 09:13 | 5 | fair and reasonable means that patent owners may impose |
| 09:13 | 6 | reasonable royalty terms so that patent owners are |
| 09:13 | 7 | compensated proportionally in relation to their respective |
| 09:13 | 8 | technology contributions to the standard.  Each patent owner |
| 09:13 | 9 | should limit its royalty rate in proportion to its |
| 09:14 | 10 | contribution to the total aggregate royalty that a user of |
| 09:14 | 11 | the standard can reasonably be expected to pay. |
| 09:14 | 12 | Do you recall Ericsson offering that argument to |
| 09:14 | 13 | the arbitration panel? |
| 09:14 | 14 | A    No, I don't -- it sounds reasonable, but I don't recall |
| 09:14 | 15 | that. |
| 09:14 | 16 | Q    Would you like me to show you the submission? |
| 09:14 | 17 | A    Yes, please. |
| 09:14 | 18 | MR. HOLDER:  Let's look at Exhibit 1098, please, |
| 09:14 | 19 | page 49.  Could we also look at the next page and put them |
| 09:14 | 20 | side by side, please. |
| 09:14 | 21 | BY MR. HOLDER: |
| 09:14 | 22 | Q    Sir, if you could look at the text that is highlighted |
| 09:14 | 23 | and confirm for the Court whether I have accurately |
| 09:14 | 24 | represented Ericsson's position? |
| 09:14 | 25 | A    Looks right. |

| | | |
|---|---|---|
| 09:14 | 1 | Q    Ericsson continued to advance these same principles in |
| 09:14 | 2 | its interrogatory responses in this case; correct? |
| 09:14 | 3 | A    I believe so, yes. |
| 09:15 | 4 | Q    For example, in its interrogatory responses in this |
| 09:15 | 5 | case, Ericsson explained that it has always been a strong |
| 09:15 | 6 | proponent of reasonable aggregate royalties as part of its |
| 09:15 | 7 | FRAND analysis; correct? |
| 09:15 | 8 | A    Correct. |
| 09:15 | 9 | Q    Ericsson further explained in its interrogatory |
| 09:15 | 10 | responses that its reference rates for its 2G, 3G, and 4G |
| 09:15 | 11 | standard essential patent portfolios are based on Ericsson's |
| 09:15 | 12 | policy of supporting reasonable accumulated IPR costs where |
| 09:15 | 13 | the patent owners are compensated proportionally in relation |
| 09:15 | 14 | to each of their respective patented technology |
| 09:15 | 15 | contributions to the standard; correct? |
| 09:15 | 16 | A    That sounds right, yes. |
| 09:15 | 17 | Q    You also testified in support of these same principles |
| 09:15 | 18 | when I took your deposition in December 2015; correct? |
| 09:15 | 19 | A    I think I would have done that, yes. |
| 09:15 | 20 | Q    Despite these various statements, isn't it true that no |
| 09:16 | 21 | Ericsson witness in this case has tried to present an |
| 09:16 | 22 | analysis to the Court whereby a fair and reasonable royalty |
| 09:16 | 23 | rate was determined by identifying a reasonable maximum |
| 09:16 | 24 | aggregate royalty burden for a license to all 2G, 3G, and 4G |
| 09:16 | 25 | standard essential patents and then distributing that |

| | | |
|---|---|---|
| 09:16 | 1 | aggregate royalty burden amongst standard essential patent |
| 09:16 | 2 | owners based on their respective proportional share of the |
| 09:16 | 3 | patents? |
| 09:16 | 4 | A    Yes, that's correct. |
| 09:16 | 5 | Q    With respect to royalties for mobile phones, until at |
| 09:16 | 6 | least 2015 Ericsson determined and expressed the two inputs |
| 09:16 | 7 | that we have been discussing -- the reasonable aggregate |
| 09:16 | 8 | royalty burden and the proportional share -- as a percentage |
| 09:16 | 9 | of the price of the phone; correct? |
| 09:16 | 10 | A    Would you repeat the question, please? |
| 09:17 | 11 | Q    Certainly.  With respect to royalties for mobile phones |
| 09:17 | 12 | as distinguished from personal computers or modems, until at |
| 09:17 | 13 | least 2015 Ericsson determined and expressed the two inputs |
| 09:17 | 14 | that we have been discussing -- a reasonable aggregate |
| 09:17 | 15 | royalty burden and the proportional share -- as a percentage |
| 09:17 | 16 | of the price of the phone; correct? |
| 09:17 | 17 | A    That's not correct. |
| 09:17 | 18 | Q    Well, sir, isn't it true that in 2002 when the 3G |
| 09:17 | 19 | standard was being commercialized, Ericsson and several |
| 09:17 | 20 | other companies jointly announced that they reached a mutual |
| 09:17 | 21 | understanding to license their patents essential to the 3G |
| 09:17 | 22 | standard such that the cumulative royalty rate would be at a |
| 09:17 | 23 | modest single-digit level?  Correct? |
| 09:17 | 24 | A    Yes, that's correct. |
| 09:17 | 25 | Q    And the phrase modest single digit referred to a |

| | | |
|---|---|---|
| 09:17 | 1 | percentage of the price of the phone; correct? |
| 09:17 | 2 | A    That is correct, yes. |
| 09:17 | 3 | Q    In 2008 Ericsson and numerous other companies jointly |
| 09:18 | 4 | announced that a reasonable maximum aggregate royalty level |
| 09:18 | 5 | for LTE 4G essential IPR in handsets is a single-digit |
| 09:18 | 6 | percentage of the sales price of the phone; correct? |
| 09:18 | 7 | A    Yes, that's correct. |
| 09:18 | 8 | Q    From 2009 through 2015, all of Ericsson's internal |
| 09:18 | 9 | reference price sheets calculated handset royalties as a |
| 09:18 | 10 | percentage of the price of the phone subject to the |
| 09:18 | 11 | possibility of floors and caps starting in a later year; |
| 09:18 | 12 | correct? |
| 09:18 | 13 | A    Yes, that's correct. |
| 09:18 | 14 | Q    In the Huawei arbitration in 2015, one of Ericsson's |
| 09:18 | 15 | economic experts was Dr. Jonathan Putnam; correct? |
| 09:18 | 16 | A    Yes, that's correct. |
| 09:18 | 17 | Q    And Dr. Putnam testified in that arbitration on behalf |
| 09:18 | 18 | of Ericsson in 2015 that the use of running royalty rates |
| 09:18 | 19 | calculated as a percentage of the price of the phone was |
| 09:19 | 20 | consistent with widespread industry practice; correct? |
| 09:19 | 21 | A    I don't recall. |
| 09:19 | 22 | MR. HOLDER:  Can we look at Exhibit 1587?  Let's |
| 09:19 | 23 | go back to the first page and zoom in briefly? |
| 09:19 | 24 | BY MR. HOLDER: |
| 09:19 | 25 | Q    Sir, do you recognize this as the expert report of Dr. |

| | | |
|---|---|---|
| 09:19 | 1 | Putnam submitted in June 2015 in your arbitration with |
| 09:19 | 2 | Huawei? |
| 09:19 | 3 | A    Yes, I do. |
| 09:19 | 4 | MR. HOLDER:  If we could jump ahead to paragraph |
| 09:19 | 5 | 87, please. |
| 09:19 | 6 | BY MR. HOLDER: |
| 09:19 | 7 | Q    In paragraph 87 Dr. Putnam wrote that:  "Consistent |
| 09:19 | 8 | with widespread industry practice, Ericsson has licensed its |
| 09:19 | 9 | patents based on a percentage of the sales price of the |
| 09:19 | 10 | licensed terminal unit"; correct? |
| 09:19 | 11 | A    That is correct, right.  Yes. |
| 09:19 | 12 | Q    Sir, Ericsson has also been in litigation regarding |
| 09:19 | 13 | FRAND issues with Samsung; correct? |
| 09:20 | 14 | A    We have litigated with Samsung for sure.  And whether |
| 09:20 | 15 | we came to court on litigating on FRAND issues, I am less |
| 09:20 | 16 | sure of.  I know we have a FRAND determination case pending, |
| 09:20 | 17 | but I don't think it ever went to court. |
| 09:20 | 18 | Q    Back in 2013 do you recall testifying in connection |
| 09:20 | 19 | with an ITC matter involving Samsung? |
| 09:20 | 20 | A    Yes. |
| 09:20 | 21 | Q    And in that testimony in 2013, you testified under oath |
| 09:20 | 22 | that FRAND is evaluated according to a reasonable percentage |
| 09:20 | 23 | of sales; correct? |
| 09:20 | 24 | A    Could you show me the transcript?  That would be |
| 09:20 | 25 | helpful. |

| | | |
|---|---|---|
| 09:20 | 1 | Q    I am happy to. |
| 09:20 | 2 | MR. HOLDER:  Can we look at the Samsung trial |
| 09:20 | 3 | testimony, please? |
| 09:20 | 4 | BY MR. HOLDER: |
| 09:20 | 5 | Q    Sir, you were asked here by Samsung's counsel to read |
| 09:20 | 6 | from your witness statement, and your witness statement is |
| 09:21 | 7 | quoted at line 24 as saying, quote:  "FRAND is evaluated |
| 09:21 | 8 | according to a reasonable percentage of sales." |
| 09:21 | 9 | Then you were asked to explain the basis for your |
| 09:21 | 10 | conclusion, and you did so.  Do you believe that I have |
| 09:21 | 11 | accurately characterized your testimony? |
| 09:21 | 12 | A    I see that phrase you referred to.  I haven't yet read |
| 09:21 | 13 | the full answer. |
| 09:21 | 14 | Q    Take your time. |
| 09:21 | 15 | A    (Witness reading document)  Okay.  I have read it. |
| 09:21 | 16 | Q    Have I accurately characterized your testimony in that |
| 09:21 | 17 | case? |
| 09:21 | 18 | A    I do have the word usually based on percentage in my |
| 09:22 | 19 | explanation, and I think what I have referred to there is |
| 09:22 | 20 | that it could also be a fixed dollar per unit.  But it's |
| 09:22 | 21 | usually -- I used usually being a percentage at the time |
| 09:22 | 22 | when I gave this testimony.  I think that's correct. |
| 09:22 | 23 | Q    In its interrogatory responses in this case, Ericsson |
| 09:22 | 24 | explained that back in 2010 when patent holders were |
| 09:22 | 25 | surveyed about what royalties they would charge for a |

| | | |
|---|---|---|
| 09:22 | 1 | license to their cellular standard essential patents, every |
| 09:22 | 2 | patent holder that made such a declaration announced a |
| 09:22 | 3 | royalty rate that was expressed as a percentage of the price |
| 09:22 | 4 | of the final end product; correct? |
| 09:22 | 5 | A    I think that was in 2008, but otherwise it's correct. |
| 09:22 | 6 | Q    And Ericsson referred to that survey in its |
| 09:22 | 7 | interrogatory responses in this case; correct? |
| 09:22 | 8 | A    That may be the case, yes. |
| 09:22 | 9 | Q    Would you like me to show you? |
| 09:22 | 10 | A    Please, if you like. |
| 09:22 | 11 | MR. HOLDER:  Let's look at Exhibit 131.  Let's go |
| 09:23 | 12 | back to the first page. |
| 09:23 | 13 | BY MR. HOLDER: |
| 09:23 | 14 | Q    Sir, do you see that these are Ericsson's responses to |
| 09:23 | 15 | a number of TCL interrogatories in this case? |
| 09:23 | 16 | A    Yes, I do. |
| 09:23 | 17 | MR. HOLDER:  Would you go ahead to page 16?  Let's |
| 09:23 | 18 | scroll back so we can find the interrogatory.  Zoom in there |
| 09:23 | 19 | on interrogatory number nine. |
| 09:23 | 20 | BY MR. HOLDER: |
| 09:23 | 21 | Q    TCL asked Ericsson to provide its contention on whether |
| 09:23 | 22 | the proper royalty base for a license from Ericsson to TCL |
| 09:23 | 23 | is the handset, the chipset used in the handset, a portion |
| 09:23 | 24 | of the chipset or something else, and the factual and legal |
| 09:23 | 25 | bases in support of Ericsson's contention.  Do you see that? |

| | | |
|---|---|---|
| 09:23 | 1 | A   Yes, I do. |
| 09:23 | 2 |        MR. HOLDER:  Let's go ahead to page 16. |
| 09:23 | 3 | BY MR. HOLDER: |
| 09:23 | 4 | Q   Ericsson wrote, among other things, quote: |
| 09:23 | 5 | "Accordingly, the royalty base in any patent license |
| 09:24 | 6 | agreement between Ericsson and TCL should be comprised of |
| 09:24 | 7 | the selling price at end user terminals or external modems |
| 09:24 | 8 | as those terms are defined in Ericsson's contentions for |
| 09:24 | 9 | components of a FRAND license. |
| 09:24 | 10 |        "Ericsson's contention in this regard is |
| 09:24 | 11 | consistent with every single one of its more than 180 |
| 09:24 | 12 | license agreements covering its 2G, 3G, and/or 4G standard |
| 09:24 | 13 | essential patents, as well as the third-party license |
| 09:24 | 14 | agreements produced by TCL in discovery. |
| 09:24 | 15 |        "Ericsson's contention is also consistent with |
| 09:24 | 16 | industry practice.  A 2010 review of declarations of |
| 09:24 | 17 | intended royalty rates by holders of standard essential |
| 09:24 | 18 | patents to the LTE standard found that every patent holder |
| 09:24 | 19 | that made such a declaration announced a royalty rate for a |
| 09:24 | 20 | license to its LTE standard essential patents that was |
| 09:24 | 21 | expressed as a percentage of the price of the final end |
| 09:24 | 22 | product," end quote. |
| 09:24 | 23 |        Did I read that correctly? |
| 09:24 | 24 | A   Yes, you did. |
| 09:25 | 25 | Q   Sir, Ericsson also explained in its interrogatory |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:25   1    responses in this case that the price of the end user device

09:25   2    is the most economically reasonable choice for the royalty

09:25   3    base from which to calculate royalties because the standard

09:25   4    essential technology increases and/or enables the value of

09:25   5    many aspects of the end user device; correct?

09:25   6    A    Yes, I think so.

09:25   7    Q    Sir, despite all of this history of using percentage

09:25   8    running royalty rates in all of the statements that we just

09:25   9    went through, Ericsson is now using an expert, Mr. Kennedy,

09:25   10   who is offering the Court his firm opinion that a comparable

09:25   11   license analysis performed for the purpose of evaluating

09:25   12   options A and B should be taken on a dollar-per-unit

09:25   13   comparative basis, not as a percentage of the price of the

09:25   14   phone; correct?

09:25   15   A    Correct.

09:26   16   Q    Let's go back to the statements that Ericsson made in

09:26   17   2002 and 2008 regarding establishing a reasonable aggregate

09:26   18   royalty burden.

09:26   19         You have previously testified that the FRAND

09:26   20   commitment is very helpful because it provides companies

09:26   21   with a comfort that they can make an investment in

09:26   22   developing standard compliant products; correct?

09:26   23   A    I believe that could be correct, yes.  I don't recall

09:26   24   the exact wording.

09:26   25   Q    You have also testified that Ericsson has sought to go

| | | |
|---|---|---|
| 09:26 | 1 | even farther than a basic FRAND commitment by actually |
| 09:26 | 2 | issuing press releases that tell the market about Ericsson's |
| 09:26 | 3 | way of how it intends to implement its pricing; correct? |
| 09:26 | 4 | A    Yes. |
| 09:26 | 5 | Q    In 2002 prior to the commercial release of the 3G |
| 09:26 | 6 | standard, you acknowledge that there was a desire by network |
| 09:26 | 7 | operators and companies who were contemplating investments |
| 09:27 | 8 | in 3G products for insight into the expected royalty burden |
| 09:27 | 9 | on a 3G mobile phone; correct? |
| 09:27 | 10 | A    It was actually after the commercial release of the 3G. |
| 09:27 | 11 | But otherwise, that's correct. |
| 09:27 | 12 | Q    Sir, I have read from your witness declaration, so |
| 09:27 | 13 | let's make sure our record is clear. |
| 09:27 | 14 |             MR. HOLDER:  Let's go to the rebuttal witness |
| 09:27 | 15 | declaration for Mr. Brismark. |
| 09:27 | 16 | BY MR. HOLDER: |
| 09:27 | 17 | Q    Do you see that this is your rebuttal witness |
| 09:27 | 18 | declaration? |
| 09:27 | 19 | A    Yes. |
| 09:27 | 20 | Q    Let's go to paragraph 12.  Please read to yourself the |
| 09:27 | 21 | highlighted statement in paragraph 12.  And my question to |
| 09:27 | 22 | you is:  Have I accurately characterized what you testified |
| 09:27 | 23 | in this matter? |
| 09:27 | 24 | A    Yes, you have.  I refer to the fact that NTT Docomo |
| 09:27 | 25 | actually started commercial operation in 2001 on Wideband |

| 09:27 | 1 | CDMA, so this probably referred to Ericsson's release of the |
| 09:28 | 2 | global products that we have. |
| 09:28 | 3 | Q    Okay.  "It was in response to that desire for greater |
| 09:28 | 4 | insight that Ericsson and several other companies jointly |
| 09:28 | 5 | announced that they had reached a mutual understanding to |
| 09:28 | 6 | license their patents essential to the 3G standard such that |
| 09:28 | 7 | the cumulative royalty rate would be at a modest |
| 09:28 | 8 | single-digit level"; correct? |
| 09:28 | 9 | A    Yes. |
| 09:28 | 10 | Q    Other companies in the press release were quoted as |
| 09:28 | 11 | specifically endorsing a five percent reasonable aggregate |
| 09:28 | 12 | royalty burden; correct? |
| 09:28 | 13 | A    Yes, that's correct. |
| 09:28 | 14 | Q    In the press release there was not a quote from an |
| 09:28 | 15 | Ericsson representative specifically signing on to that |
| 09:28 | 16 | five percent figure; correct? |
| 09:28 | 17 | A    That is correct. |
| 09:28 | 18 | Q    However, would you agree that five percent is |
| 09:28 | 19 | consistent with the notion of a modest single digit? |
| 09:28 | 20 | A    That would be consistent, yes. |
| 09:28 | 21 | Q    And Ericsson did sign on to the pledge regarding a |
| 09:29 | 22 | modest single digit; correct? |
| 09:29 | 23 | A    Yes. |
| 09:29 | 24 | Q    Let's talk about your statement in 2008 regarding LTE. |
| 09:29 | 25 | You would agree that in 2008 prior to the commercial release |

09:29   1   of the LTE standard, network operators and companies who

09:29   2   were contemplating investments in LTE-compliant products

09:29   3   sought insight into the expected royalty burden on an LTE

09:29   4   device; correct?

09:29   5   A    I am sure you read it right, but I don't recall it.

09:29   6   I'm sorry.

09:29   7   Q    I'm referring to your own rebuttal witness declaration

09:29   8   at paragraph 14, just for the record?

09:29   9   A    Yeah.

09:29  10   Q    Sir, it was in response to that desire for information

09:29  11   that Ericsson issued the joint statement regarding its

09:29  12   commitment to supporting a single-digit percentage of the

09:29  13   sales price as a reasonable maximum aggregate royalty level

09:29  14   for LTE essential IPR in handsets; correct?

09:30  15   A    Yes, that's correct.

09:30  16   Q    And on its website Ericsson stated that the market

09:30  17   would drive all players to act in accordance with FRAND

09:30  18   principles and to a maximum aggregate royalty level of six

09:30  19   to eight percent for handsets; correct?

09:30  20   A    That's part of the statement, yes, but -- those

09:30  21   wordings were in there, yes.

09:30  22   Q    For the last several years you and Ericsson have

09:30  23   repeatedly reaffirmed your position that a reasonable

09:30  24   aggregate royalty burden for 4G should be a single digit of

09:30  25   the sales price of the phone; correct?

| | | |
|---|---|---|
| 09:30 | 1 | A    I am sure we have referred to that a number of times |
| 09:30 | 2 | and also since then. |
| 09:30 | 3 | Q    For example, in June 2015 as part of Ericsson's |
| 09:30 | 4 | arbitration with Huawei, you personally testified under oath |
| 09:30 | 5 | that Ericsson continues to stand by its position committing |
| 09:30 | 6 | to support a single-digit aggregate royalty burden for LTE |
| 09:31 | 7 | today; correct? |
| 09:31 | 8 | A    Yes.  Subject to floors and caps, I think that's |
| 09:31 | 9 | correct. |
| 09:31 | 10 | Q    And in its 2015 interrogatory responses in this case, |
| 09:31 | 11 | Ericsson stated that its consistent position is that the |
| 09:31 | 12 | total accumulated royalties for 4G standard essential |
| 09:31 | 13 | patents should be in the single digits; correct? |
| 09:31 | 14 | A    Again, I agree, subject to floors and caps. |
| 09:31 | 15 |         MR. HOLDER:  Let's pull up the interrogatory |
| 09:31 | 16 | response, Exhibit 131.  Let's go back to the first page. |
| 09:31 | 17 | BY MR. HOLDER: |
| 09:31 | 18 | Q    Do you recognize these as Ericsson's responses to |
| 09:31 | 19 | certain TCL interrogatories?  Do you recognize these as |
| 09:31 | 20 | responses from Ericsson to TCL's interrogatories? |
| 09:31 | 21 | A    It's very hard to read on the screen, to be honest. |
| 09:31 | 22 |         MR. HOLDER:  Could you blow it up? |
| 09:31 | 23 |         THE WITNESS:  Yes, I can see that. |
| 09:31 | 24 |         MR. HOLDER:  Let's go to page 26. |
| 09:32 | 25 |         Ms. Limbaugh, if you would scroll back to find the |

09:32   1   interrogatory.

09:32   2           THE WITNESS:  It may be my age, I don't know, but

09:32   3   some of the letters look very small to me.

09:32   4           MR. HOLDER:  I'm with you.  Keep going.  Okay.

09:32   5   Let's read the interrogatory.

09:32   6   BY MR. HOLDER:

09:32   7   Q    Again, Ericsson is being asked for its contention

09:32   8   regarding the proper royalty base for a license; correct?

09:32   9   A    Yes.

09:32   10          MR. HOLDER:  Scroll ahead to page 26.

09:32   11   BY MR. HOLDER:

09:32   12   Q    Ericsson wrote:  "Ericsson has always been a strong

09:32   13   proponent of reasonable aggregate royalties as part of its

09:32   14   FRAND analysis.  Ericsson's position is that the total

09:32   15   accumulated royalties for 4G standard essential patents

09:32   16   should be in the single digits, and Ericsson has been

09:32   17   consistent in this position over time."

09:32   18          That was Ericsson's response to this interrogatory

09:33   19   among other things; correct?

09:33   20   A    That is correct.

09:33   21   Q    When I took your deposition in Sweden in December of

09:33   22   2015, you testified that "Ericsson sticks by our external

09:33   23   announcements that we believe a reasonable aggregate royalty

09:33   24   should be a single digit for handsets"; correct?

09:33   25   A    If you could show me the response?

09:33   1    Q    Absolutely.

09:33   2               MR. HOLDER:  Let's go to Volume I of

09:33   3    Mr. Brismark's deposition, page 66.

09:33   4    BY MR. HOLDER:

09:33   5    Q    So I asked you, number one:  You tried to determine

09:33   6    what the aggregate royalty burden should be for all standard

09:33   7    essential patents?  And then number two:  You tried to

09:33   8    assess what Ericsson's proportional share of that total

09:33   9    should be?

09:33   10              And your answer is, quote:  "So our policy is to

09:33   11   have a position which starts with a reasonable aggregate

09:33   12   royalty.  In that case we think that we stick by our

09:33   13   external announcements that we believe that it should be a

09:34   14   single digit for handsets in the case of LTE, for instance.

09:34   15              "And then we have a royalty which takes into

09:34   16   account that other companies also contribute to this

09:34   17   collaborative work, and our royalty represents our

09:34   18   proportional contribution to the standard.  I think that is

09:34   19   still policy."

09:34   20              MR. CAWLEY:  Your Honor, at this time for the

09:34   21   completeness rule, we will ask that the answer be completed.

09:34   22              MR. HOLDER:  Zoom out.  Let's put the next page

09:34   23   side by side.  I'm not sure if there is any confidential

09:34   24   information on the next page.

09:34   25   BY MR. HOLDER:

| | | |
|---|---|---|
| 09:34 | 1 | Q   All right, sir.  So the rest of your answer reads:  "We |
| 09:34 | 2 | have that as the overall policy.  Over time as we enter into |
| 09:34 | 3 | licensing agreements" -- |
| 09:34 | 4 | A   Please zoom in.  I cannot see anything. |
| 09:34 | 5 | Q   Starting over:  "We have that as the overall policy. |
| 09:34 | 6 | Over time as we enter into licensing agreements, we rely |
| 09:34 | 7 | more and more on the market feedback that we have received |
| 09:35 | 8 | to our patent portfolio.  So at present we have a large |
| 09:35 | 9 | number of agreements signed, for instance, in the LTE space. |
| 09:35 | 10 | So those comparable agreements would be guiding in how we |
| 09:35 | 11 | revise our pricing as we move forward." |
| 09:35 | 12 |         Have I read the complete answer? |
| 09:35 | 13 | A   Yes, you have. |
| 09:35 | 14 | Q   Sir, as a company, Ericsson thinks that it is important |
| 09:35 | 15 | that people stick by their external announcements regarding |
| 09:35 | 16 | reasonable royalties; correct? |
| 09:35 | 17 | A   As a general sense I would agree to that, yes. |
| 09:35 | 18 | Q   For example, in the Huawei arbitration, you |
| 09:35 | 19 | specifically criticized Huawei for seeking royalties for its |
| 09:35 | 20 | LTE patent portfolio that were inconsistent with its public |
| 09:35 | 21 | announcement that Huawei anticipates and supports a low, |
| 09:35 | 22 | single-digit percentage of sales prices as a reasonable |
| 09:35 | 23 | maximum aggregate royalty rate applicable to end user |
| 09:36 | 24 | devices; correct? |
| 09:36 | 25 | A   Again, I don't recall.  But if you could help me to |

| | | |
|---|---|---|
| 09:36 | 1 | remind myself, that would be good. |
| 09:36 | 2 | Q    I am happy to do so. |
| 09:36 | 3 | MR. HOLDER:  Let's go to Exhibit 1149.  Let's go |
| 09:36 | 4 | back to the first page. |
| 09:36 | 5 | BY MR. HOLDER: |
| 09:36 | 6 | Q    Do you recognize this as your witness statement from |
| 09:36 | 7 | the Huawei arbitration? |
| 09:36 | 8 | A    Yes, I do. |
| 09:36 | 9 | Q    Okay. |
| 09:36 | 10 | MR. HOLDER:  Let's jump ahead to paragraph 57. |
| 09:36 | 11 | BY MR. HOLDER: |
| 09:36 | 12 | Q    Paragraph 57 reads:  "Additionally, while I do not have |
| 09:36 | 13 | insight into how Huawei calculated its proposed payment |
| 09:36 | 14 | terms, Huawei appears to be seeking royalties for its LTE |
| 09:36 | 15 | patent portfolio that are inconsistent with its public |
| 09:36 | 16 | announcement that Huawei anticipates and supports a low, |
| 09:36 | 17 | single-digit percentage of sales prices as a reasonable |
| 09:36 | 18 | maximum aggregate royalty rate applicable to end user |
| 09:36 | 19 | devices and that Huawei's own LTE rate was not to exceed |
| 09:36 | 20 | 1.5 percent." |
| 09:36 | 21 | So you criticized Huawei for doing something that |
| 09:37 | 22 | you perceived as inconsistent with its prior public |
| 09:37 | 23 | announcement; correct? |
| 09:37 | 24 | A    That's what it says, yes. |
| 09:37 | 25 | Q    Sir, Ericsson has also criticized Qualcomm for acting |

| | | |
|---|---|---|
| 09:37 | 1 | in a way that was inconsistent with its prior public |
| 09:37 | 2 | statements regarding FRAND licensing; correct? |
| 09:37 | 3 | A    Yes, that's correct. |
| 09:37 | 4 | MR. HOLDER:  Let's put Exhibit 77 on the screen. |
| 09:37 | 5 | Can we blow it up, please.  And the bottom, the title as |
| 09:37 | 6 | well. |
| 09:37 | 7 | BY MR. HOLDER: |
| 09:37 | 8 | Q    Sir, do you recall that back in around 2008 as part of |
| 09:37 | 9 | a European commission investigation wherein Ericsson and |
| 09:37 | 10 | others were accusing Qualcomm of breaching its FRAND |
| 09:37 | 11 | promise, that Ericsson made allegations regarding Qualcomm |
| 09:37 | 12 | seeking to impose excessive and disproportionate royalty |
| 09:38 | 13 | rates on mobile handset manufacturers? |
| 09:38 | 14 | A    Yes, I do recall that. |
| 09:38 | 15 | Q    And Exhibit 77 is a joint submission by Ericsson as |
| 09:38 | 16 | well as a handful of other companies in support of its |
| 09:38 | 17 | position in that European commission investigation; correct? |
| 09:38 | 18 | A    Yes.  This is a joint paper by all these parties. |
| 09:38 | 19 | MR. HOLDER:  If we could go to page 3, section |
| 09:38 | 20 | 1.1.  Let's blow up 1.1. |
| 09:38 | 21 | BY MR. HOLDER: |
| 09:38 | 22 | Q    In this document Ericsson was criticizing the fact that |
| 09:38 | 23 | Qualcomm's royalty rates significantly exceed the fair and |
| 09:38 | 24 | reasonable rate that Qualcomm could have imposed before the |
| 09:38 | 25 | standard was set and the industry was locked in; correct? |

| | | |
|---|---|---|
| 09:38 | 1 | A    As I said, this is a joint document.  It may or may not |
| 09:38 | 2 | be Ericsson's position alone, but it was clearly the |
| 09:39 | 3 | position of all the joint parties together. |
| 09:39 | 4 | Q    Ericsson reviewed and signed off on having its name on |
| 09:39 | 5 | this document before it was submitted; correct? |
| 09:39 | 6 | A    Yes, but there's also a comment here that says that not |
| 09:39 | 7 | all of the position presented in the paper are backed by all |
| 09:39 | 8 | of the parties.  So with that caveat, I think this is |
| 09:39 | 9 | exactly what you are saying. |
| 09:39 | 10 | Q    Fair enough.  Did Ericsson believe in 2008 that |
| 09:39 | 11 | Qualcomm's royalty rates significantly exceeded the fair and |
| 09:39 | 12 | reasonable rate that Qualcomm could have imposed before the |
| 09:39 | 13 | standard was set? |
| 09:39 | 14 | A    Yes, we did. |
| 09:39 | 15 | Q    In the course of making this argument, Ericsson noted a |
| 09:39 | 16 | number of statements that Qualcomm had made in the late |
| 09:39 | 17 | 1990s regarding the royalty rates it would charge which |
| 09:39 | 18 | Ericsson thought that Qualcomm was no longer honoring; |
| 09:39 | 19 | correct? |
| 09:39 | 20 | A    Correct. |
| 09:40 | 21 | Q    Let's talk in a little more detail about what we have |
| 09:40 | 22 | called the top-down approach using a reasonable maximum |
| 09:40 | 23 | aggregate royalty burden expressed as a percentage of the |
| 09:40 | 24 | price of the phone and then apportioning that based upon |
| 09:40 | 25 | each patent's proportional share. |

| 09:40 | 1 | Ericsson believes that its reference prices are |
|---|---|---|

09:40   1          Ericsson believes that its reference prices are

09:40   2   consistent with a top-down approach; correct?

09:40   3   A    No, I don't think so.

09:40   4          MR. HOLDER:  Let's go to Exhibit 102.  Blow up the

09:40   5   caption, please.

09:40   6   BY MR. HOLDER:

09:40   7   Q    So again, these are Ericsson's responses to TCL's

09:40   8   interrogatories; correct?

09:40   9   A    Yes.

09:40   10          MR. HOLDER:  If we could go to page 8.  Scroll

09:40   11   back and look at the interrogatory.  Keep going.

09:40   12   BY MR. HOLDER:

09:40   13   Q    This interrogatory asked Ericsson to provide all of the

09:41   14   factual and legal bases for how Ericsson determined the

09:41   15   rates and terms that it offered to TCL for Ericsson's

09:41   16   patents to the accused technology, including the factual and

09:41   17   legal bases for any changes in Ericsson's offer through

09:41   18   time; correct?

09:41   19   A    That seems to be correct, yes.

09:41   20   Q    Let's go ahead to page 8.  Part of Ericsson's lengthy

09:41   21   response was that Ericsson's reference rates for its 2G, 3G,

09:41   22   and 4G standard essential patent portfolios are based on

09:41   23   Ericsson's policy of supporting reasonable accumulated IPR

09:41   24   costs where the patent owners are compensated proportionally

09:41   25   in relation to each of their respective patented technology

| | | |
|---|---|---|
| 09:41 | 1 | contributions to the standard; correct? |
| 09:41 | 2 | A    Yes, that's correct. |
| 09:41 | 3 | Q    Before Ericsson had a substantial licensing history |
| 09:41 | 4 | with its 4G patents, Ericsson started with an appropriate |
| 09:42 | 5 | aggregate royalty rate for the 4G standard and then assessed |
| 09:42 | 6 | the strength of its 4G standard essential patent portfolio |
| 09:42 | 7 | vis-a-vis other industry participants; correct? |
| 09:42 | 8 | A    Yes, that's correct. |
| 09:42 | 9 | Q    One of Ericsson's early reference price sheets for a 4G |
| 09:42 | 10 | license used a 2.5 percent royalty rate.  Do you recall |
| 09:42 | 11 | that?  It's revision D? |
| 09:42 | 12 | A    That would have been for the LTE single-mode |
| 09:42 | 13 | technology, I presume? |
| 09:42 | 14 | Q    Yes. |
| 09:42 | 15 | A    Yes, I do recall that. |
| 09:42 | 16 | Q    You have admitted that Ericsson came up with the |
| 09:42 | 17 | reference rate of 2.5 percent for its 4G patents by assuming |
| 09:42 | 18 | a 25 percent proportional share against a 10 percent |
| 09:42 | 19 | reasonable aggregate royalty; correct? |
| 09:42 | 20 | A    Yes, that would be correct. |
| 09:42 | 21 | Q    2.5 percent being one quarter of 10 percent; right? |
| 09:42 | 22 | A    Yes. |
| 09:42 | 23 | Q    Ericsson has also communicated to prospective licensees |
| 09:42 | 24 | during license negotiations that it believes it owned or |
| 09:43 | 25 | would own a 25 percent proportional share of 4G patents; |

09:43    1    correct?

09:43    2    A    I do believe we have done that from time to time, yes.

09:43    3    Q    And that 25 percent proportional share figure was based

09:43    4    on the method of counting approved technical contributions;

09:43    5    correct?

09:43    6    A    Among other things, yes, but not only.

09:43    7    Q    Ericsson is the one that developed the methodology of

09:43    8    counting approved contributions as a means of estimating the

09:43    9    strength of one's standard essential patent portfolio;

09:43   10    correct?

09:43   11    A    I know that others have used that methodology as well.

09:43   12    It may be so that Ericsson was the first company to use it.

09:43   13    I am not a hundred percent sure about that.

09:43   14    Q    Well, Ericsson certainly developed that methodology

09:43   15    before it was reflected in the paper from Signals Research;

09:43   16    correct?

09:43   17    A    Yes, that's correct.

09:43   18    Q    The reason that Ericsson developed this methodology was

09:43   19    because it thought that there were other studies in the

09:44   20    public domain that were reporting a low proportional share

09:44   21    for Ericsson, and Ericsson thought those studies were wrong

09:44   22    and were based on unreliable methods; correct?

09:44   23    A    That's correct, yes.

09:44   24    Q    So Ericsson did its own internal contribution counting

09:44   25    study and then commissioned a company called Signals

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:44   1   Research to publish a paper setting forth the results;

09:44   2   correct?

09:44   3   A    Partly correct, yes.  They also verified the

09:44   4   methodology and presented the results.

09:44   5   Q    When you say they verified the methodology, they

09:44   6   essentially redid your math and they redid the count of the

09:44   7   approved technical contributions; correct?

09:44   8   A    They verified the methodology.  That's what I meant

09:44   9   when I said so.

09:44   10   Q    Sir, Ericsson presented the Signals report in its

09:44   11   technical negotiations with prospective licensees in support

09:44   12   of the proposition that it had or would have a 25 percent

09:44   13   share of 4G patents; correct?

09:45   14   A    I would have to ask you to read it back, the question,

09:45   15   please.

09:45   16   Q    Well, let's go to your deposition, Volume I, page 94.

09:45   17   Go to line 17.

09:45   18        MR. HOLDER:  Why don't we blow up 17 through the

09:45   19   bottom of the page and then the first four lines of the next

09:45   20   page, please.  Why don't you blow up through line 7 there.

09:45   21   Okay.  We're good.

09:45   22   BY MR. HOLDER:

09:45   23   Q    So you were asked:

09:45   24        "Q    During license negotiations does

09:45   25   Ericsson make representations to prospective

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 09:45 | 1 | licensees" -- |
| 09:45 | 2 | THE WITNESS:  Sorry.  I cannot see it.  That's |
| 09:45 | 3 | better.  Thank you. |
| 09:45 | 4 | BY MR. HOLDER: |
| 09:45 | 5 | Q    So you were asked in your deposition: |
| 09:45 | 6 | "Q     During license negotiations does |
| 09:45 | 7 | Ericsson make representations to prospective |
| 09:45 | 8 | licensees regarding what percentage of the |
| 09:45 | 9 | universe of standard essential patents for 2G, 3G, |
| 09:45 | 10 | and 4G Ericsson thinks is its proportional share? |
| 09:46 | 11 | "A     I think what we have been presenting |
| 09:46 | 12 | are results based on Signals Research studies |
| 09:46 | 13 | which presents what you could call an impact on |
| 09:46 | 14 | the standard, who got their technologies accepted |
| 09:46 | 15 | into the standard specification.  That is an |
| 09:46 | 16 | information we provide in order to show Ericsson's |
| 09:46 | 17 | technology leadership and our strong influence on |
| 09:46 | 18 | the specification that is the result of the 3GPP |
| 09:46 | 19 | work." |
| 09:46 | 20 | Correct? |
| 09:46 | 21 | A    That's correct. |
| 09:46 | 22 | Q    Ericsson's methodology along with Signals did not |
| 09:46 | 23 | involve any direct analysis of patents; correct? |
| 09:46 | 24 | A    That is correct. |
| 09:46 | 25 | Q    Instead it was based on counting approved technical |

| | | |
|---|---|---|
| 09:46 | 1 | contributions to ETSI and 3GPP; correct? |
| 09:46 | 2 | A    Yes, that's correct. |
| 09:46 | 3 | Q    You would concede that a company can propose a |
| 09:46 | 4 | technical contribution to ETSI or 3GPP without actually |
| 09:47 | 5 | owning or applying for a related patent; correct? |
| 09:47 | 6 | A    Yes, that's correct. |
| 09:47 | 7 | Q    And when ETSI or 3GPP approved a proposed technical |
| 09:47 | 8 | contribution, they do not assess whether there is a related |
| 09:47 | 9 | patent; correct? |
| 09:47 | 10 | A    That is correct. |
| 09:47 | 11 | Q    An approved technical contribution may not even reflect |
| 09:47 | 12 | a patentable idea; correct? |
| 09:47 | 13 | A    Yes, that's correct. |
| 09:47 | 14 | Q    And as part of its ordinary course of business, |
| 09:47 | 15 | Ericsson does not do anything to correlate its patents with |
| 09:47 | 16 | its approved technical contributions; correct? |
| 09:47 | 17 | A    Yes, that's correct. |
| 09:47 | 18 | Q    I know you think that there is a correlation between |
| 09:47 | 19 | approved technical contributions and standard essential |
| 09:47 | 20 | patents, but you admitted when I took your deposition that |
| 09:47 | 21 | Ericsson has not provided any analysis or any technical |
| 09:47 | 22 | proof of what that correlation is; correct? |
| 09:47 | 23 | A    I would disagree with that representation. |
| 09:47 | 24 |        MR. HOLDER:  Let's go to Mr. Brismark's |
| 09:48 | 25 | deposition, Volume I, page 104 starting at the bottom, line |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

38

| | | |
|---|---|---|
| 09:48 | 1 | 24. |
| 09:48 | 2 | You testified: |
| 09:48 | 3 | "Q      Have you developed that |
| 09:48 | 4 | understanding simply by your own logic and |
| 09:48 | 5 | anecdote, or have you done any type of study to |
| 09:48 | 6 | attempt to assess whether there is in fact a |
| 09:48 | 7 | correlation? |
| 09:48 | 8 | "A      So we have discussed this |
| 09:48 | 9 | internally, and it's based on our experience that |
| 09:48 | 10 | we think that there is a correlation.  I don't |
| 09:48 | 11 | think we have provided any analysis or any |
| 09:48 | 12 | technical proof or any analysis of what that |
| 09:48 | 13 | correlation is." |
| 09:48 | 14 | BY MR. HOLDER: |
| 09:48 | 15 | Q    Going back to the top-down method, you indicated that |
| 09:48 | 16 | Ericsson came up with a reference rate of 2.5 percent for |
| 09:48 | 17 | its 4G patents back in revision D by assuming a 25 percent |
| 09:49 | 18 | proportional share against a 10 percent reasonable aggregate |
| 09:49 | 19 | royalty; correct? |
| 09:49 | 20 | A    Yes, subject to floors and caps, of course. |
| 09:49 | 21 | Q    Under a pure top-down method, if one were to stick with |
| 09:49 | 22 | the same 10 percent aggregate royalty burden but use a lower |
| 09:49 | 23 | proportional share for Ericsson, then the percentage rate |
| 09:49 | 24 | would go down accordingly; right? |
| 09:49 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 09:49 | 1 | Q    For example, under a pure top-down method, if |
| 09:49 | 2 | Ericsson's proportional share was really five percent and |
| 09:49 | 3 | not 25 percent, then applying a five percent share to a |
| 09:49 | 4 | 10 percent aggregate royalty burden would result in a |
| 09:49 | 5 | percentage rate of .5 percent; correct? |
| 09:49 | 6 | A    Yes. |
| 09:49 | 7 | Q    And we could adjust the numbers and bring that rate |
| 09:49 | 8 | down further if you assume a smaller burden and a smaller |
| 09:49 | 9 | proportional share; correct? |
| 09:49 | 10 | A    Absolutely.  Yes. |
| 09:49 | 11 | Q    As we discussed earlier, no Ericsson witness in this |
| 09:50 | 12 | case has tried to present an analysis to the Court whereby a |
| 09:50 | 13 | fair and reasonable royalty rate was determined using a pure |
| 09:50 | 14 | top-down method, starting with a reasonable aggregate |
| 09:50 | 15 | royalty burden and applying a percentage proportional share; |
| 09:50 | 16 | correct? |
| 09:50 | 17 | A    Could you repeat the question, please. |
| 09:50 | 18 | Q    Sure.  We conferred this earlier.  No Ericsson witness |
| 09:50 | 19 | in this case has presented the Court with a pure top-down |
| 09:50 | 20 | analysis of a fair and reasonable rate where you start with |
| 09:50 | 21 | a reasonable maximum aggregate royalty burden and then |
| 09:50 | 22 | apportion it based on a proportional percentage share; |
| 09:50 | 23 | correct? |
| 09:50 | 24 | A    Correct. |
| 09:50 | 25 | Q    Since 2006 you or someone working for you has been |

| 09:50 | 1 | responsible for the management of Ericsson's patent |
| 09:50 | 2 | portfolio; correct? |
| 09:50 | 3 | A     That is correct. |
| 09:50 | 4 | Q     So if any Ericsson witness was going to be the guy to |
| 09:50 | 5 | identify Ericsson's proportional share of standard essential |
| 09:51 | 6 | patents, you would have been a logical candidate to do that; |
| 09:51 | 7 | correct? |
| 09:51 | 8 | A     No.  I disagree. |
| 09:51 | 9 | Q     Well, sir, isn't it true that nowhere in your witness |
| 09:51 | 10 | declaration do you swear under oath subject to penalty of |
| 09:51 | 11 | perjury to a number that would represent Ericsson's |
| 09:51 | 12 | percentage proportional share of the universe of 2G, 3G, or |
| 09:51 | 13 | 4G standard essential patents?  Correct?  It's not in there; |
| 09:51 | 14 | right? |
| 09:51 | 15 | A     I would agree it's not in there. |
| 09:51 | 16 | Q     During license negotiations when Ericsson represented |
| 09:51 | 17 | to prospective licensees that Ericsson owned or would own a |
| 09:51 | 18 | 25 percent share of 4G standard essential patents, insofar |
| 09:51 | 19 | as you're aware, there was no oath administered when people |
| 09:51 | 20 | walked into that conference room for the negotiation or got |
| 09:51 | 21 | on the phone for the call; right? |
| 09:51 | 22 | A     I think you are right there. |
| 09:52 | 23 | Q     There is no penalty of perjury that applies in license |
| 09:52 | 24 | negotiations; is there? |
| 09:52 | 25 | A     There is no oath. |

09:52    1    Q    Let's go back to Exhibit 77, the 2008 submission that
09:52    2    Ericsson jointly made regarding Qualcomm.   In this
09:52    3    submission Ericsson and the other joint submitters made a
09:52    4    number of points regarding how the FRAND obligation should
09:52    5    be interpreted and administered; correct?
09:52    6    A    I need to ask you again to phrase your question.
09:52    7    Q    Certainly  I was just previewing where we're going.
09:52    8    Ericsson made a number of representations in this document
09:52    9    in connection with its fellow submitters regarding how the
09:52   10    FRAND obligation should be interpreted and administered;
09:52   11    correct?
09:52   12    A    Yes, that's correct.
09:52   13              MR. HOLDER:  Let's go to page 3, Section 1.2.
09:52   14    BY MR. HOLDER:
09:52   15    Q    Among other things, Ericsson and the joint submitters
09:53   16    argued that it was well understood when the FRAND obligation
09:53   17    was put in place by ETSI that the FRAND commitment was
09:53   18    intended in part to avoid violating Articles 81 and 82;
09:53   19    correct?
09:53   20    A    Yes.
09:53   21    Q    And are you aware that Articles 81 and 82 are part of
09:53   22    the European Commission treaty regarding competition law?
09:53   23    A    If someone would tell me, I would think I have heard
09:53   24    it.  I am an engineer, so it's not my area of expertise.
09:53   25    Q    Understood.  Well, are you aware that Articles 81 and

| | | |
|---|---|---|
| 09:53 | 1 | 82 of that treaty forbid applying dissimilar conditions to |
| 09:53 | 2 | equivalent transactions with other trading parties, thereby |
| 09:53 | 3 | placing them at a competitive disadvantage? |
| 09:53 | 4 | A    I have been in meetings where these articles have been |
| 09:53 | 5 | addressed.  Let's leave it at that. |
| 09:53 | 6 | Q    Does my characterization sound accurate based on your |
| 09:53 | 7 | recollection of those meetings? |
| 09:53 | 8 | A    Yes, it does. |
| 09:54 | 9 | Q    Thank you. |
| 09:54 | 10 | MR. HOLDER:  Let's go to page 6, section 1.5. |
| 09:54 | 11 | BY MR. HOLDER: |
| 09:54 | 12 | Q    In this same document Ericsson also criticized Qualcomm |
| 09:54 | 13 | for claiming the right to charge what the market will bear |
| 09:54 | 14 | ex post, meaning after the standard has been adopted, and |
| 09:54 | 15 | not merely a right to charge what is warranted by the |
| 09:54 | 16 | enhanced value of its patents; correct? |
| 09:54 | 17 | A    Yes. |
| 09:54 | 18 | MR. HOLDER:  Let's go to section 1.6, the top |
| 09:54 | 19 | part.  The first highlight, please. |
| 09:54 | 20 | BY MR. HOLDER: |
| 09:54 | 21 | Q    Ericsson also argued along with its joint submitters in |
| 09:54 | 22 | this document that there are many reasons why companies have |
| 09:54 | 23 | entered into license agreements with Qualcomm without |
| 09:54 | 24 | agreeing that they comply with Articles 81 or 82 or FRAND; |
| 09:54 | 25 | correct? |

| 09:54 | 1 | A     Yes. |
|---|---|---|
| 09:54 | 2 | MR. HOLDER:  Let's go to the bottom part of |
| 09:55 | 3 | section 1.6. |
| 09:55 | 4 | BY MR. HOLDER: |
| 09:55 | 5 | Q    Ericsson also along with its joint submitters |
| 09:55 | 6 | criticized Qualcomm for arguing that FRAND is no more than |
| 09:55 | 7 | an obligation to negotiate in good faith; correct? |
| 09:55 | 8 | A    Yes, that's correct. |
| 09:55 | 9 | MR. HOLDER:  Let's go to page 7, section 2.3. |
| 09:55 | 10 | BY MR. HOLDER: |
| 09:55 | 11 | Q    Ericsson further argued that there were viable |
| 09:55 | 12 | alternatives to the 3G solutions proposed by Qualcomm; |
| 09:55 | 13 | correct? |
| 09:55 | 14 | A    Yes.  That seems to be the case, yes. |
| 09:55 | 15 | Q    Ericsson explained that because the alternative |
| 09:55 | 16 | technology concepts were comparable -- let's go to the next |
| 09:55 | 17 | page -- the ex-ante rate for any one technology concept, the |
| 09:55 | 18 | transaction cost of licensing being near zero, should be |
| 09:55 | 19 | very low reflecting the minimal difference in value between |
| 09:56 | 20 | the WCDMA and the next best technology concept; correct? |
| 09:56 | 21 | A    That's what it reads, yes. |
| 09:56 | 22 | Q    WCDMA is a reference to 3G; correct? |
| 09:56 | 23 | A    That is correct. |
| 09:56 | 24 | Q    With respect to all of these statements Ericsson made |
| 09:56 | 25 | along with the joint submitters in this 2008 submission |

| | | |
|---|---|---|
| 09:56 | 1 | regarding Qualcomm, did Ericsson believe in good faith that |
| 09:56 | 2 | these statements were true? |
| 09:56 | 3 | A    I think we did.  Some of them were heavily pushed by |
| 09:56 | 4 | other parties in this joint group, and that's the reason for |
| 09:56 | 5 | this footnote in this document.  But Ericsson for sure stood |
| 09:56 | 6 | behind the document as a whole. |
| 09:56 | 7 | MR. HOLDER:  Your Honor, this document has not |
| 09:56 | 8 | been preadmitted.  I would ask that the Court move |
| 09:56 | 9 | Exhibit 77 into evidence as an Ericsson party admission. |
| 09:57 | 10 | MR. CAWLEY:  No objection. |
| 09:57 | 11 | THE COURT:  Seventy-seven will be received. |
| 09:57 | 12 | (Exhibit No. 77 received in evidence) |
| 09:57 | 13 | BY MR. HOLDER: |
| 09:57 | 14 | Q    Sir, you have been sitting through the entire trial; |
| 09:57 | 15 | correct? |
| 09:57 | 16 | A    Yes, that's correct. |
| 09:57 | 17 | Q    You have heard a lot of testimony and discussion about |
| 09:57 | 18 | who TCL is or is not similarly situated to; correct? |
| 09:57 | 19 | A    Yes, that's correct. |
| 09:57 | 20 | Q    For example, do you recall your counsel, Mr. Stevenson, |
| 09:57 | 21 | admitting in opening argument that Ericsson agrees that TCL |
| 09:57 | 22 | is similarly situated to HTC, LG, and Huawei? |
| 09:57 | 23 | A    Yes.  I think that's correct. |
| 09:57 | 24 | Q    But Ericsson's position in this litigation is that TCL |
| 09:57 | 25 | is not similarly situated to Apple or Samsung; correct? |

09:57  1   A    Yes, that would be correct.

09:57  2   Q    That's what Mr. Cawley was trying to show when he was

09:57  3   examining Dr. Guo from TCL; correct?

09:57  4   A    I suppose so.

09:57  5   Q    It's what Mr. Stevenson was trying to show when he was

09:57  6   examining Mr. Cistulli from TCL; correct?

09:58  7   A    That would also be correct, I suppose.

09:58  8   Q    Is that your personal view as well, that TCL is not

09:58  9   similarly situated to Apple or Samsung?

09:58  10  A    Yes.

09:58  11  Q    You have been asked about this subject of comparable

09:58  12  license agreements in various depositions; haven't you?

09:58  13  A    I have, yes.

09:58  14  Q    For example, sir, when Ericsson was in litigation with

09:58  15  Apple, the attorney for Apple asked you about the subject of

09:58  16  comparable licenses; didn't he?

09:58  17  A    I would need some help to be reminded there, I think.

09:58  18       MR. HOLDER:  Let's put Mr. Brismark's Apple

09:58  19  deposition on the screen.  Let's go to the first page so we

09:58  20  can confirm what this is.

09:58  21  BY MR. HOLDER:

09:58  22  Q    Do you recognize this as a transcript of your

09:58  23  deposition from August 2015, less than two years ago, in an

09:58  24  ITC matter involving Ericsson and Apple?

09:58  25  A    Yes.

| 09:58 | 1 | MR. HOLDER:  Let's go to page 191.  Let's blow up |
| 09:58 | 2 | the entire highlighted portion. |
| 09:59 | 3 | BY MR. HOLDER: |
| 09:59 | 4 | Q    So in this deposition you were asked by Apple's |
| 09:59 | 5 | counsel: |
| 09:59 | 6 | "Q      Of all of Ericsson's licenses, do |
| 09:59 | 7 | you have any view as to which are the best |
| 09:59 | 8 | comparables to apply to Apple?" |
| 09:59 | 9 | After some back and forth involving counsel, |
| 09:59 | 10 | starting at line 22 on page 191 you answered: |
| 09:59 | 11 | "A      The most relevant I would say is the |
| 09:59 | 12 | previous agreement between Ericsson and Apple in |
| 09:59 | 13 | 2008.  In addition to that, I would say that |
| 09:59 | 14 | agreements with companies who also sell |
| 09:59 | 15 | Smartphones would be comparable." |
| 09:59 | 16 | And you then continued by saying:  "So examples of |
| 09:59 | 17 | such agreements would be our agreement with Research In |
| 09:59 | 18 | Motion, or BlackBerry as they are called now; our agreement |
| 09:59 | 19 | with Samsung, our agreement with LG, and our agreement with |
| 09:59 | 20 | HTC, to name a few." |
| 10:00 | 21 | Did I read that correctly? |
| 10:00 | 22 | A    Yes, you did. |
| 10:00 | 23 | Q    Sir, you are aware that TCL sells Smartphone; correct? |
| 10:00 | 24 | A    Yes, I am aware of that. |
| 10:00 | 25 | Q    So TCL is comparable under the definition you gave in |

| | | |
|---|---|---|
| 10:00 | 1 | your 2015 deposition; correct? |
| 10:00 | 2 | A   I don't think so. |
| 10:00 | 3 | Q   We'll let the record speak for itself, sir. |
| 10:00 | 4 |      You also cited BlackBerry as a comparable to |
| 10:00 | 5 | Apple; correct? |
| 10:00 | 6 | A   Yes, I did. |
| 10:00 | 7 | Q   You understand that TCL is now licensed to make and |
| 10:00 | 8 | sell BlackBerry branded products; correct? |
| 10:00 | 9 | A   That is correct. |
| 10:00 | 10 | Q   One of your former colleagues is a gentleman by the |
| 10:00 | 11 | name of John Han; correct? |
| 10:00 | 12 | A   Yes. |
| 10:00 | 13 | Q   You'll have to tell me, is it Han or Han? because I've |
| 10:00 | 14 | been alternating for the last three years. |
| 10:00 | 15 | A   I think it's Han in Korean, but it's usually Han in the |
| 10:00 | 16 | U.S. |
| 10:00 | 17 | Q   I will respect the Korean, so we'll go Han.  Mr. Han |
| 10:00 | 18 | before he left Ericsson last fall was Ericsson's |
| 10:00 | 19 | vice-president of licensing; correct? |
| 10:01 | 20 | A   Correct. |
| 10:01 | 21 | Q   He is now at Qualcomm; correct? |
| 10:01 | 22 | A   That is correct. |
| 10:01 | 23 | Q   Have you read Mr. Han's deposition testimony in this |
| 10:01 | 24 | matter? |
| 10:01 | 25 | A   I have read parts of it, not all of it. |

| | | |
|---|---|---|
| 10:01 | 1 | MR. HOLDER:  Let's put Mr. Han's deposition |
| 10:01 | 2 | testimony on the screen.  For the Court's benefit, this was |
| 10:01 | 3 | designated by TCL. |
| 10:01 | 4 | BY MR. HOLDER: |
| 10:01 | 5 | Q    You see that this was Mr. Han's deposition in |
| 10:01 | 6 | January of 2016; correct? |
| 10:01 | 7 | A    Yes, that's correct. |
| 10:01 | 8 | MR. HOLDER:  Let's go to page 124.  Mr. Han was |
| 10:01 | 9 | asked about who TCL competes with in the handset market. |
| 10:01 | 10 | Have you read this testimony before? |
| 10:01 | 11 | A    I am not sure if I read this. |
| 10:01 | 12 | Q    Let's read it into the record.  Starting at line 8 on |
| 10:01 | 13 | page 124, Mr. Han was asked: |
| 10:01 | 14 | "Q      Do you agree that Huawei and TCL are |
| 10:01 | 15 | competitors in the handset market? |
| 10:01 | 16 | "A      To a certain extent, yes. |
| 10:01 | 17 | "Q      And you would agree that TCL and |
| 10:01 | 18 | Samsung are competitors? |
| 10:01 | 19 | "A      To a certain extent, yes. |
| 10:02 | 20 | "Q      And would you agree that HTC and TCL |
| 10:02 | 21 | are competitors? |
| 10:02 | 22 | "A      To a certain extent, yes. |
| 10:02 | 23 | "Q      And would you agree that LG and TCL |
| 10:02 | 24 | are competitors in the handset market? |
| 10:02 | 25 | "A      Let me cut to the chase.  I think |

| 10:02 | 1 | they are all competitors to each other when it |
| 10:02 | 2 | comes to handset players, all of them." |
| 10:02 | 3 | MR. HOLDER:  Your Honor, at this time I believe we |
| 10:02 | 4 | will be getting into matters that are trade secret.  I would |
| 10:02 | 5 | ask that the court be sealed. |
| 10:02 | 6 | THE COURT:  Very well. |
| 10:02 | 7 | (Courtroom cleared) |
| 10:02 | 8 | (The following proceedings were under seal.) |
| 10:02 | 9 | (End of sealed proceedings.) |
| 11:35 | 10 | (Courtroom reopened) |
| 11:35 | 11 | BY MR. HOLDER: |
| 11:36 | 12 | Q    Sir, you recognize that mobile phone prices are |
| 11:36 | 13 | decreasing; correct? |
| 11:36 | 14 | A    On an average that would be true.  I agree, yes. |
| 11:36 | 15 | Q    You also recognize that standards are specifically |
| 11:36 | 16 | intended to create wider choices for consumers and to reduce |
| 11:36 | 17 | prices; correct? |
| 11:36 | 18 | A    Among other things, yes. |
| 11:36 | 19 | Q    And you further recognized in your 2015 strategy |
| 11:36 | 20 | document that demand for inexpensive Smartphones is |
| 11:36 | 21 | increasing; correct? |
| 11:36 | 22 | A    Yes. |
| 11:36 | 23 | Q    As lower-priced Smartphones become more available, more |
| 11:36 | 24 | people can afford to purchase a Smartphone; right? |
| 11:36 | 25 | A    Correct. |

| | | |
|---|---|---|
| 11:36 | 1 | Q    That's a good thing; isn't it? |
| 11:36 | 2 | A    That's a good thing.  I agree. |
| 11:36 | 3 | Q    As more people can afford to purchase a Smartphone, |
| 11:36 | 4 | that leads to a wider adoption of the standard; correct? |
| 11:37 | 5 | A    It leads to wider adoption of Smartphones.  The |
| 11:37 | 6 | standard may have been adopted there before.  I don't know. |
| 11:37 | 7 | Q    Now, as the price of phones goes down, the companies |
| 11:37 | 8 | who make and sell those phones will generate less revenue |
| 11:37 | 9 | per unit; right? |
| 11:37 | 10 | A    Could you repeat that again? |
| 11:37 | 11 | Q    Certainly.  As the prices of phones go down, as each |
| 11:37 | 12 | respective phone becomes less expensive, the companies who |
| 11:37 | 13 | make and sell those phones are bringing in less money per |
| 11:37 | 14 | phone; right? |
| 11:37 | 15 | A    I don't know. |
| 11:37 | 16 | Q    Well, I'm asking you a pretty basic proposition, sir. |
| 11:37 | 17 | If a company sells a phone for $80 as opposed to a phone for |
| 11:37 | 18 | $150, it's getting less money.  I'm not talking about |
| 11:37 | 19 | profits.  I'm just talking about revenues.  The company gets |
| 11:37 | 20 | less money if it prices its phone at $80 as opposed to $150; |
| 11:38 | 21 | right? |
| 11:38 | 22 | A    Okay.  I thought you were talking about profit. |
| 11:38 | 23 | Q    No.  I'm just talking about gross revenue.  Yet |
| 11:38 | 24 | Ericsson wants a floor in place so that it can lock in a |
| 11:38 | 25 | certain minimum amount of revenue for itself per unit; |

| | | |
|---|---|---|
| 11:38 | 1 | right? |
| 11:38 | 2 | A    Correct. |
| 11:38 | 3 | Q    Ericsson's patent portfolio gives Ericsson both |
| 11:38 | 4 | offensive value and defensive value; correct? |
| 11:38 | 5 | A    That's correct, yes. |
| 11:38 | 6 | Q    Offensive value means that you license the patents in |
| 11:38 | 7 | exchange for the payment of royalties; right? |
| 11:38 | 8 | A    I would agree to that, yes. |
| 11:38 | 9 | Q    And you would also agree that monetizing its patent |
| 11:38 | 10 | portfolio is part of Ericsson's business strategy; correct? |
| 11:38 | 11 | A    Correct. |
| 11:38 | 12 | Q    Defensive value means that by having patents, Ericsson |
| 11:38 | 13 | can force others to cross-license with it, which in turn |
| 11:38 | 14 | enables Ericsson to avoid having to pay royalties to others |
| 11:38 | 15 | when Ericsson makes and sells products that may infringe |
| 11:39 | 16 | those other's patents; right? |
| 11:39 | 17 | A    I disagree with that representation. |
| 11:39 | 18 | Q    How would you characterize defensive value, sir? |
| 11:39 | 19 | A    I don't think Ericsson has the ability to force anybody |
| 11:39 | 20 | to go into an agreement with Ericsson, which I think partly |
| 11:39 | 21 | is why we are here today.  But when it comes to defensive |
| 11:39 | 22 | value, I think the value of Ericsson's patent portfolio |
| 11:39 | 23 | shows when another party is approaching Ericsson the first |
| 11:39 | 24 | time trying to extract royalties.  If that party would be an |
| 11:39 | 25 | operating company, Ericsson can use its patent portfolio for |

| | | |
|---|---|---|
| 11:39 | 1 | defensive purposes. |
| 11:39 | 2 | Q    Well, Ericsson can use its patents through a |
| 11:39 | 3 | cross-license to obtain a license to someone else's patents |
| 11:39 | 4 | without actually having to pay cash to that other party. |
| 11:39 | 5 | The consideration Ericsson can offer is a license in return |
| 11:39 | 6 | to its own patents; right? |
| 11:39 | 7 | A    Correct. |
| 11:40 | 8 | MR. HOLDER:  Let's look at Exhibit 63.  Let's go |
| 11:40 | 9 | back to the first page. |
| 11:40 | 10 | BY MR. HOLDER: |
| 11:40 | 11 | Q    Now, this is one of your internal strategy documents |
| 11:40 | 12 | from 2014; right? |
| 11:40 | 13 | A    That seems to be the case, yes. |
| 11:40 | 14 | Q    Prepared under your direction and approved by you; |
| 11:40 | 15 | correct? |
| 11:40 | 16 | A    I would agree to that. |
| 11:40 | 17 | MR. HOLDER:  Let's go to page 4 and zoom in on |
| 11:40 | 18 | that red box. |
| 11:40 | 19 | BY MR. HOLDER: |
| 11:40 | 20 | Q    What this graphic in your document shows us is that |
| 11:40 | 21 | Ericsson recognizes both that its patents have offensive and |
| 11:40 | 22 | defensive value; right? |
| 11:40 | 23 | A    Correct. |
| 11:40 | 24 | Q    And as of 2014 Ericsson recognized that the offensive |
| 11:40 | 25 | and defensive value of its portfolio was roughly equal; |

| | | |
|---|---|---|
| 11:40 | 1 | correct? |
| 11:40 | 2 | A    That is correct. |
| 11:40 | 3 | Q    And as a strategy Ericsson was looking by the year 2020 |
| 11:40 | 4 | to maintain its defensive value but double the offensive |
| 11:40 | 5 | value of its patent portfolio; correct? |
| 11:40 | 6 | A    Well, the result of this strategy would be an increased |
| 11:40 | 7 | revenue.  That is correct. |
| 11:41 | 8 | Q    I understand.  And Ericsson's insistence on a royalty |
| 11:41 | 9 | floor in this litigation is part of the strategy to protect |
| 11:41 | 10 | and grow Ericsson's revenues from the offensive value of its |
| 11:41 | 11 | patent portfolio; correct? |
| 11:41 | 12 | A    It's mainly in there to protect the value of our patent |
| 11:41 | 13 | portfolio compared to the products that it licenses. |
| 11:41 | 14 | Q    Well, you recognize that Ericsson will make more money |
| 11:41 | 15 | in royalties from TCL if you get a floor than if you don't |
| 11:41 | 16 | get a floor; right? |
| 11:41 | 17 | A    Correct. |
| 11:41 | 18 | Q    Now, in addition to the supposed intrinsic value of |
| 11:41 | 19 | Ericsson's patents, one of the other reasons you have |
| 11:41 | 20 | offered for why Ericsson wants a floor is that companies |
| 11:41 | 21 | like Ericsson need revenue from their licensing business to |
| 11:41 | 22 | be sufficiently incentivized to invest in standards; right? |
| 11:41 | 23 | A    If I've said that, I don't know.  Maybe you can help me |
| 11:41 | 24 | remind myself. |
| 11:41 | 25 | Q    Do you agree that the position of Ericsson in this case |

| | | |
|---|---|---|
| 11:41 | 1 | as conveyed including through its expert witnesses is that |
| 11:41 | 2 | Ericsson needs a floor in order to remain sufficiently |
| 11:42 | 3 | incentivized to invest in standards? |
| 11:42 | 4 | A    I think a floor is in line with our FRAND commitment, |
| 11:42 | 5 | and I think the need of the industry is to ensure that |
| 11:42 | 6 | innovators like Ericsson are sufficiently incentivized to |
| 11:42 | 7 | continue investing in the development of the standards that |
| 11:42 | 8 | everybody enjoys.  And it should be balanced, of course, |
| 11:42 | 9 | with the -- to ensure also that it's adopted widely at the |
| 11:42 | 10 | same time. |
| 11:42 | 11 | Q    One of the reasons that Ericsson has offered in support |
| 11:42 | 12 | of its demanded royalty rates from TCL is that it wants |
| 11:42 | 13 | those revenues in order to further incentivize it to invest |
| 11:42 | 14 | in standards; right? |
| 11:42 | 15 | A    I don't know we expressed it like that, so I don't |
| 11:42 | 16 | know.  I think we need a floor in order to be fairly |
| 11:43 | 17 | compensated for the value that our patent portfolio |
| 11:43 | 18 | contributes into products even if those products are priced |
| 11:43 | 19 | very low. |
| 11:43 | 20 | Q    Okay.  Sir, you have been talking about the threat |
| 11:43 | 21 | posed by supposed patent holdouts since at least 2013; |
| 11:43 | 22 | correct? |
| 11:43 | 23 | A    I am sure we have done that at least since 2013, yes. |
| 11:43 | 24 | Q    That's four years ago; right? |
| 11:43 | 25 | A    That's about four years, yes. |

| | | |
|---|---|---|
| 11:43 | 1 | Q    And yet in your witness declaration in this matter, you |
| 11:43 | 2 | explain how Ericsson is investing heavily in the 5G |
| 11:43 | 3 | standard; correct? |
| 11:43 | 4 | A    Correct. |
| 11:43 | 5 | Q    Despite the threat posed by holdouts; right? |
| 11:43 | 6 | A    Correct. |
| 11:43 | 7 | Q    In your witness declaration you note that out of the |
| 11:43 | 8 | 350 Ericsson employees working on standardization, over 200 |
| 11:43 | 9 | of them are working on the 5G standard; right? |
| 11:43 | 10 | A    I don't recall the numbers, but I am sure you are |
| 11:44 | 11 | right. |
| 11:44 | 12 | Q    Ericsson's IPR licensing business has been very |
| 11:44 | 13 | successful with outstanding growth over the five-year period |
| 11:44 | 14 | leading up to your most recent annual report; correct? |
| 11:44 | 15 | A    Correct. |
| 11:44 | 16 | Q    In your 2015 annual report, Ericsson noted that IPR |
| 11:44 | 17 | licensing is a key element of Ericsson's growth strategy |
| 11:44 | 18 | with IPR licensing revenues having more than tripled over |
| 11:44 | 19 | the last five years; correct? |
| 11:44 | 20 | A    I am sure you're reading it correctly. |
| 11:44 | 21 | MR. HOLDER:  Let's look at PDX 252. |
| 11:44 | 22 | BY MR. HOLDER: |
| 11:44 | 23 | Q    PDX 252 is a demonstrative exhibit based upon your own |
| 11:44 | 24 | internal documents as well as your annual reports that |
| 11:44 | 25 | demonstrates the history of your IPR licensing revenue from |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:45 | 1 | 2000 through 2015; correct? |
| 11:45 | 2 | A    That seems to be correct, yes. |
| 11:45 | 3 | Q    The results have been outstanding; haven't they? |
| 11:45 | 4 | A    Yes, and I am proud of being part of that organization. |
| 11:45 | 5 | Q    You should be proud of those revenues.  I'll give you |
| 11:45 | 6 | that. |
| 11:45 | 7 | A    Thank you. |
| 11:45 | 8 | Q    Within Ericsson the profit margin for your IPR |
| 11:45 | 9 | licensing business is tracked for internal purposes; |
| 11:45 | 10 | correct? |
| 11:45 | 11 | A    Sorry.  I didn't get that. |
| 11:45 | 12 | Q    Sure.  Within Ericsson the profit margin for the IPR |
| 11:45 | 13 | licensing business is tracked for internal purposes; |
| 11:45 | 14 | correct? |
| 11:45 | 15 | A    Yes.  I would say that's correct. |
| 11:45 | 16 | Q    And you concede that the profit margin for Ericsson's |
| 11:45 | 17 | IPR licensing business is vastly greater than the profit |
| 11:45 | 18 | margin for Ericsson's business as a whole; correct? |
| 11:45 | 19 | A    Correct. |
| 11:45 | 20 | Q    Within Ericsson your group touts its best in-class |
| 11:45 | 21 | margins for IPR licensing; correct? |
| 11:46 | 22 | A    I don't understand the word "touts," so help me out, |
| 11:46 | 23 | please. |
| 11:46 | 24 | Q    It's a synonym for brags.  You guys recognize that your |
| 11:46 | 25 | operating margins for IPR licensing revenue, they are best |

| | | |
|---|---|---|
| 11:46 | 1 | in class; correct? |
| 11:46 | 2 | A    We are proud of our operating margins.  If that's what |
| 11:46 | 3 | you're asking, then the response is yes. |
| 11:46 | 4 | Q    And you've characterized them as best in class; |
| 11:46 | 5 | correct? |
| 11:46 | 6 | A    They are clearly best in class within the Ericsson |
| 11:46 | 7 | company, and I think it's not a surprise that they are. |
| 11:46 | 8 | Q    Let's look at Exhibit 63.  Once again this is your 2014 |
| 11:46 | 9 | strategy document; right? |
| 11:46 | 10 | A    Correct. |
| 11:46 | 11 |         MR. HOLDER:  Let's go to page 8.  Let's blow up |
| 11:46 | 12 | that middle part. |
| 11:46 | 13 | BY MR. HOLDER: |
| 11:46 | 14 | Q    Now, on page 8 you recognize here that in 2013 your |
| 11:46 | 15 | operating profit margin for the IPR licensing business was |
| 11:46 | 16 | 88 percent; correct? |
| 11:47 | 17 | A    Correct. |
| 11:47 | 18 | Q    Let's look at Exhibit 122.  This is your 2015 strategy |
| 11:47 | 19 | document at Ericsson; right? |
| 11:47 | 20 | A    Yes. |
| 11:47 | 21 | Q    Prepared under your direction and approved by you; |
| 11:47 | 22 | right? |
| 11:47 | 23 | A    Correct. |
| 11:47 | 24 | Q    Let's go to page 15.  So now we have got 2014 results, |
| 11:47 | 25 | and for 2014 your actual operating margin for your IPR |

| 11:47 | 1 | licensing business was 89 percent; right? |
| 11:47 | 2 | A     That is correct. |
| 11:47 | 3 | Q     And the projection for 2015 was 87 percent; right? |
| 11:47 | 4 | A     That is correct. |
| 11:47 | 5 | Q     And you were projecting operating margins to stay above |
| 11:47 | 6 | 80 percent through 2020; right? |
| 11:47 | 7 | A     Correct. |
| 11:47 | 8 | Q     Now, sir, I've heard you claim that you think these |
| 11:47 | 9 | profit margin figures may be misleading because while they |
| 11:47 | 10 | include the cost of patent prosecution, licensing, and |
| 11:47 | 11 | litigation like this, they do not include Ericsson's |
| 11:47 | 12 | research and development expenses; correct? |
| 11:48 | 13 | A     Correct. |
| 11:48 | 14 | Q     The cost of R&D is accounted for in the business units |
| 11:48 | 15 | that have the product sales; right? |
| 11:48 | 16 | A     Among other things, yes. |
| 11:48 | 17 | Q     That's exactly where they should be; right? |
| 11:48 | 18 | A     They are accounted for there, yes.  That's correct. |
| 11:48 | 19 | Q     Historically one of the reasons Ericsson has invested |
| 11:48 | 20 | in R&D is to develop base station products that practice the |
| 11:48 | 21 | 2G, 3G, and 4G standards; right? |
| 11:48 | 22 | A     Among other things, yes, but also for the prospect of |
| 11:48 | 23 | developing a patent portfolio and the value of the |
| 11:48 | 24 | portfolio. |
| 11:48 | 25 | Q     Sir, isn't it true that the vast majority of Ericsson's |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:48    1    revenues are attributable to selling products and services

11:48    2    to the market, not licensing its IPR?

11:48    3    A    Absolutely.

11:48    4    Q    Ericsson's revenues from licensing its IPR is a very

11:49    5    small fraction of Ericsson's total revenues; correct?

11:49    6    A    It's significant, I would say, in its contribution.

11:49    7    It's only a few percent if you look up on the fraction as

11:49    8    compared to the overall revenue -- if that's what you're

11:49    9    referring to.

11:49   10    Q    Well, let's briefly go back to PDX 252.  This was your

11:49   11    IPR licensing revenue from 2000 to 2015; right?

11:49   12    A    Correct.

11:49   13    Q    Let's look at what this line shows when it's compared

11:49   14    to the rest of your business.  Let's go to PDX 251.  The

11:49   15    blue line that we just saw back on PDX 252 is the same blue

11:49   16    line that we see here on PDX 251; right?  That's your IPR

11:49   17    licensing revenue; correct?

11:49   18    A    Correct.

11:49   19    Q    The green line is Ericsson's total revenue; correct?

11:50   20    A    That is correct.

11:50   21    Q    And the red line is Ericsson's R&D expenses; right?

11:50   22    A    Yes.

11:50   23    Q    And this is showing the trend from 1990 through 2015;

11:50   24    correct?

11:50   25    A    Correct.

| | | |
|---|---|---|
| 11:50 | 1 | Q    Ericsson did not launch its strategy to become a net |
| 11:50 | 2 | receiver of IPR licensing royalties until around 2000; |
| 11:50 | 3 | correct? |
| 11:50 | 4 | A    Around 2000 would be correct, yes. |
| 11:50 | 5 | Q    And yet, sir, isn't it true that Ericsson was spending |
| 11:50 | 6 | millions and millions of dollars on R&D long before it ever |
| 11:50 | 7 | started becoming a net receiver of royalties? |
| 11:50 | 8 | A    Correct. |
| 11:50 | 9 | Q    We can see that on the slide here; right? |
| 11:50 | 10 | A    Correct. |
| 11:50 | 11 | Q    Ericsson's IPR licensing revenue has never come close |
| 11:50 | 12 | to matching its R&D spend; right? |
| 11:50 | 13 | A    That is correct. |
| 11:50 | 14 | Q    Ericsson's total revenue, the green line, vastly |
| 11:50 | 15 | exceeds its R&D spend; right? |
| 11:51 | 16 | A    Correct. |
| 11:51 | 17 | Q    And the lion's share of that green line is attributable |
| 11:51 | 18 | to making and selling network equipment that practiced the |
| 11:51 | 19 | 2G, 3G, and 4G standards and selling related services; |
| 11:51 | 20 | correct? |
| 11:51 | 21 | A    The last line, yes, that's true.  Yes. |
| 11:51 | 22 | Q    Sir, isn't it true that Ericsson spends the red line to |
| 11:51 | 23 | support and create the green line? |
| 11:51 | 24 | A    Among other things, yes. |
| 11:51 | 25 | Q    I was a mere history major.  I studied law.  I am not a |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 11:51 | 1 | businessman.  But you would agree with me that if Ericsson |
|---|---|---|
| 11:51 | 2 | was spending the red line to generate the blue line, |
| 11:51 | 3 | Ericsson would have gone out of business a long time ago; |
| 11:51 | 4 | right? |
| 11:51 | 5 | A    Correct. |
| 11:51 | 6 | Q    When I took your deposition, you explained that the |
| 11:51 | 7 | major reason Ericsson has been growing its licensing |
| 11:51 | 8 | revenues is the tremendous success of the technologies and |
| 11:52 | 9 | the large amount of users that benefit from those |
| 11:52 | 10 | technologies; right? |
| 11:52 | 11 | A    Correct. |
| 11:52 | 12 | Q    In your testimony in the Huawei matter, you noted that |
| 11:52 | 13 | open telecommunications standards have led to around |
| 11:52 | 14 | 7.2 billion mobile subscription in the global market; |
| 11:52 | 15 | correct? |
| 11:52 | 16 | A    That sounds about right, yes. |
| 11:52 | 17 | Q    Ericsson is seeking to further expand the royalty base |
| 11:52 | 18 | for its licensing business by targeting what is called the |
| 11:52 | 19 | internet of things; correct? |
| 11:52 | 20 | A    Correct.  As the adoption goes further, that goes also |
| 11:52 | 21 | hand in hand with the licensing program.  So that's correct. |
| 11:52 | 22 | Q    We heard about the internet of things when Mr. McLeroy |
| 11:52 | 23 | was here on Wednesday.  Do you recall that? |
| 11:52 | 24 | A    Yes. |
| 11:52 | 25 | Q    The internet of things is a term that refers to the |

| | | |
|---|---|---|
| 11:52 | 1 | wide range of devices and goods that are not necessarily |
| 11:52 | 2 | thought of as communications devices, but they nevertheless |
| 11:52 | 3 | may use cellular standards; correct? |
| 11:52 | 4 | A    Correct. |
| 11:53 | 5 | Q    Targeting those devices for a license is part of |
| 11:53 | 6 | Ericsson's growth strategy as recognized in its annual |
| 11:53 | 7 | report; correct? |
| 11:53 | 8 | A    Yes. |
| 11:53 | 9 | Q    And as we heard from Mr. McLeroy, that's what Ericsson |
| 11:53 | 10 | is doing by entering into an arrangement with Mr. McLeroy's |
| 11:53 | 11 | company called Avanci whereby Avanci will license Ericsson's |
| 11:53 | 12 | patents to companies who sell products that are part of the |
| 11:53 | 13 | internet of things with a portion of those revenues being |
| 11:53 | 14 | returned to Ericsson; correct? |
| 11:53 | 15 | A    That is our intent, yes.  Absolutely. |
| 11:53 | 16 | Q    In fact, Avanci is being run by a gentleman named Kasim |
| 11:53 | 17 | Alfalahi; right? |
| 11:53 | 18 | A    Correct. |
| 11:53 | 19 | Q    Mr. Alfalahi was Ericsson's chief IP officer before |
| 11:53 | 20 | you; right? |
| 11:53 | 21 | A    That is correct. |
| 11:53 | 22 | Q    It was Mr. Alfalahi leaving Ericsson to go and create |
| 11:53 | 23 | Avanci that enabled you to ascend to your current position; |
| 11:53 | 24 | right? |
| 11:53 | 25 | A    That sounds about right. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

63

| | | |
|---|---|---|
| 11:53 | 1 | Q    Targeting the internet of things for licensing so you |
| 11:53 | 2 | can grow your royalty base is specifically called out in |
| 11:54 | 3 | Ericsson's annual report; isn't it? |
| 11:54 | 4 | A    Sorry.  I missed that question. |
| 11:54 | 5 | Q    Targeting the internet of things for licensing so that |
| 11:54 | 6 | Ericsson can grow its royalty base and make more money is |
| 11:54 | 7 | specifically called out in Ericsson's annual report; |
| 11:54 | 8 | correct? |
| 11:54 | 9 | A    I think that is correct, yes. |
| 11:54 | 10 | Q    So even as prices fall, even if per-unit royalties |
| 11:54 | 11 | fall, you see a growing royalty base; correct? |
| 11:54 | 12 | A    The royalty base is growing, yes.  I would agree to |
| 11:54 | 13 | that. |
| 11:54 | 14 | Q    And as the royalty base grows, that helps Ericsson make |
| 11:54 | 15 | more money; correct? |
| 11:54 | 16 | A    It's a good starting point, yes.  I agree. |
| 11:54 | 17 | MR. HOLDER:  Mr. Brismark, nothing further. |
| 11:54 | 18 | Pass the witness, Your Honor. |
| 11:54 | 19 | THE COURT:  Why don't we resume after lunch.  Come |
| 11:54 | 20 | back at 1:25. |
| 11:54 | 21 | MR. CAWLEY:  Thank you, Judge. |
| 11:54 | 22 | (Recess taken at 11:54 a.m.; |
| 11:54 | 23 | proceedings resumed at 1:25 p.m.) |
| 01:25 | 24 | THE CLERK:  Sir, you are reminded that having been |
| 01:25 | 25 | previously sworn, you are still under oath.  Do you |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 01:25 | 1 | understand that? |
|---|---|---|
| 01:25 | 2 | THE WITNESS:  Yes. |
| 01:25 | 3 | THE CLERK:  Just state your name for the record, |
| 01:25 | 4 | please. |
| 01:25 | 5 | THE WITNESS:  Lars Gustav Brismark. |
| 01:25 | 6 | THE COURT:  Mr. Cawley. |
| 01:25 | 7 | MR. CAWLEY:  Thank you. |
| 01:25 | 8 | REDIRECT EXAMINATION |
| 01:25 | 9 | BY MR. CAWLEY: |
| 01:25 | 10 | Q    Good afternoon, Mr. Brismark. |
| 01:25 | 11 | A    Good afternoon. |
| 01:25 | 12 | Q    Before we get into the body of your redirect |
| 01:25 | 13 | examination, I want to clarify one point that came up during |
| 01:25 | 14 | your cross-examination. |
| 01:25 | 15 | Do you remember when you were asked questions |
| 01:25 | 16 | about whether Ericsson had ever incorporated floors and caps |
| 01:25 | 17 | into its business cases before the October 2011 Sony |
| 01:25 | 18 | Ericsson divestiture? |
| 01:25 | 19 | A    Yes. |
| 01:25 | 20 | Q    And do you recall that you testified that you believed |
| 01:25 | 21 | that it had been done before, and TCL's counsel told you |
| 01:25 | 22 | that that was not reflected in any documents that had been |
| 01:25 | 23 | produced in this case? |
| 01:25 | 24 | A    Yes, to our reference price sheets. |
| 01:26 | 25 | Q    Okay.  Let's take a look at Exhibit 5529 in this case, |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:26   1   which was produced in native format.  Does that appear to

01:26   2   be -- if we can blow up -- there you go.  Do you see floors

01:26   3   and caps in that document?

01:26   4   A    Yes.

01:26   5   Q    And let's look at the very bottom of the document.  Do

01:26   6   you see on the right-hand corner --

01:26   7   A    Yes.  It's revision B on it.  It's dated 2011, 04

01:26   8   something.

01:26   9   Q    Well let's take a look at the date and be sure because

01:26   10  I think it was alleged that we didn't produce this.  What's

01:26   11  the date of this document?

01:26   12  A    It's April 4th of 2011.

01:26   13  Q    A document which incorporates floors and caps into your

01:26   14  business case before the Sony Ericsson divestiture was

01:26   15  announced; is that correct?

01:26   16  A    Correct, to our reference price sheets.

01:27   17  Q    All right.  Now, Mr. Brismark, I want to start kind of

01:27   18  at the beginning at least in terms of Ericsson's

01:27   19  participation in FRAND.  How long has Ericsson been involved

01:27   20  in cellular standardizations?

01:27   21  A    We have been involved since the late 1980s.

01:27   22  Q    And does Ericsson currently sell properties that

01:27   23  implement the 2G, 3G, and 4G standards?

01:27   24  A    Yes, we do.

01:27   25  Q    And has Ericsson contributed innovations to all of

66

| | | |
|---|---|---|
| 01:27 | 1 | those cellular standards? |
| 01:27 | 2 | A    Yes, we have. |
| 01:27 | 3 | Q    When did Ericsson first join 3GPP? |
| 01:27 | 4 | A    3GPP, Ericsson was actually part of forming that.  And |
| 01:27 | 5 | once it was formed in 1999, Ericsson was a member of 3GPP |
| 01:27 | 6 | from the beginning. |
| 01:27 | 7 | Q    And how many Ericsson employees would you estimate have |
| 01:28 | 8 | been involved in the standardization process from that time |
| 01:28 | 9 | to the present? |
| 01:28 | 10 | A    We are talking about several thousand people that have |
| 01:28 | 11 | been involved one way or the other. |
| 01:28 | 12 | Q    And, of course, we have heard, is it correct that |
| 01:28 | 13 | Ericsson contributes technology at times to the standard? |
| 01:28 | 14 | A    Yes. |
| 01:28 | 15 | Q    And Ericsson sometimes has patents on that technology? |
| 01:28 | 16 | A    Yes. |
| 01:28 | 17 | Q    Do companies that make such contributions to the |
| 01:28 | 18 | standards make commitments to facilitate the adoption of |
| 01:28 | 19 | those standards? |
| 01:28 | 20 | A    Yes, we do. |
| 01:28 | 21 | Q    What's that commitment? |
| 01:28 | 22 | A    That would be the FRAND commitment. |
| 01:28 | 23 | Q    Does the FRAND regime involve attempting to achieve a |
| 01:28 | 24 | balance? |
| 01:28 | 25 | A    Yes, I would say so.  It's the balance between the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

01:28  1    incentive for innovators like Ericsson to further invest in

01:29  2    developing the standards and to ensure that the result of

01:29  3    that development is adopted into the market.

01:29  4    Q    Has that regime, the FRAND standardization regime, been

01:29  5    successful?

01:29  6    A    I would say it has been tremendously successful, yes.

01:29  7    Q    And how can Ericsson get a return on its investment in

01:29  8    the development of those standards?

01:29  9    A    We get a return on our investment in those standards

01:29  10   and in that development through selling products on the

01:29  11   market, services to those networks that comply with these

01:29  12   standards, and also through licensing of our technology to

01:29  13   others who are using the same standards for their products.

01:29  14   Q    We have heard a lot of testimony in this case already

01:29  15   about Ericsson and its licensing practices.  But remind us,

01:30  16   is Ericsson exclusively a one-way licensor?

01:30  17   A    No.

01:30  18   Q    Why do you say that?

01:30  19   A    Because Ericsson has from the outset invested in this

01:30  20   not only to be a licensor not only for patents but also in

01:30  21   order to be a product manufacturer that supplies products to

01:30  22   those same standards.  So we need a license for our products

01:30  23   to be sold on the market, wholly licensed by the other

01:30  24   contributors to the same standards.

01:30  25   Q    And when Ericsson advocates for FRAND policy, when it

68

| | | |
|---|---|---|
| 01:30 | 1 | engages in attempting to formulate fair and reasonable and |
| 01:30 | 2 | nondiscriminatory rates, is it affected not only as a |
| 01:30 | 3 | potential licensor but as a potential licensee? |
| 01:31 | 4 | A    Yes. |
| 01:31 | 5 | Q    Does Ericsson believe that FRAND is important? |
| 01:31 | 6 | A    Yes, very much so. |
| 01:31 | 7 | Q    Now, we heard some questions late in your |
| 01:31 | 8 | cross-examination, and it seemed that the import of the |
| 01:31 | 9 | questions was that Ericsson's success in achieving IPR |
| 01:31 | 10 | licensing revenues was somehow inappropriate.  Do you |
| 01:31 | 11 | remember those questions? |
| 01:31 | 12 | A    I remember questions to that effect, yes. |
| 01:31 | 13 | Q    Do you agree or disagree? |
| 01:31 | 14 | A    I disagree. |
| 01:31 | 15 | Q    Why? |
| 01:31 | 16 | A    Because I think anyone investing in R&D does so in |
| 01:31 | 17 | order to get a return on that investment.  And having |
| 01:31 | 18 | created the success in the marketplace that we have done and |
| 01:31 | 19 | contributed to, I think we are entitled to our fair share of |
| 01:32 | 20 | that success, being so in our products or other companies |
| 01:32 | 21 | benefiting from these technologies. |
| 01:32 | 22 | Q    We heard in that cross-examination that your |
| 01:32 | 23 | organization within Ericsson has something like an |
| 01:32 | 24 | 80 percent, or was it 88 percent, margin?  Do you remember |
| 01:32 | 25 | that? |

01:32   1    A    For our IPR and licensing business, yes.

01:32   2    Q    But we also heard that that cost basis doesn't include

01:32   3    research and development?

01:32   4    A    Correct.

01:32   5    Q    Is it the case that Ericsson spends money on R&D which

01:32   6    for various reasons never end up in a product?

01:32   7    A    Yes, that's correct.

01:32   8    Q    And even though in Ericsson's current organization,

01:33   9    current costs and profit counting reflects that the

01:33   10   licensing area has an 88 percent margin, could they choose

01:33   11   another form of accounting that more directly links the cost

01:33   12   of R&D with the returns of licensing?

01:33   13   A    Yes.  That could be done as well.

01:33   14   Q    Mr. Brismark, is it Ericsson's goal to extract every

01:33   15   possible dollar from its licensees?

01:33   16   A    No.

01:33   17   Q    Why not?

01:33   18   A    Well, first of all, we have a FRAND commitment, so we

01:33   19   are bound by that FRAND commitment.  But even more so, I

01:33   20   think we truly believe in the overall objectives to strike a

01:33   21   balance between incentive for the innovators on adoption.

01:34   22          So we have agreements with companies.  We want

01:34   23   them to be successful.  And also we will have all these

01:34   24   licensees having to renegotiate their deals, and we would

01:34   25   like to establish a good customer relation over time with

| | | |
|---|---|---|
| 01:34 | 1 | those. |
| 01:34 | 2 | Q    Are your license agreements typically time-limited? |
| 01:34 | 3 | A    Yes.  Always. |
| 01:34 | 4 | Q    What's a typical length of one of your license |
| 01:34 | 5 | agreements? |
| 01:34 | 6 | A    I would say that depends.  Typical I would say five |
| 01:34 | 7 | years or so. |
| 01:34 | 8 | Q    Do you have a number of licensees with whom you have |
| 01:34 | 9 | negotiated a series of licenses? |
| 01:34 | 10 | A    Yes. |
| 01:34 | 11 | Q    And do you believe that it is important for you to be |
| 01:34 | 12 | able to do that in the future to achieve the kind of balance |
| 01:34 | 13 | that you've described? |
| 01:34 | 14 | A    Yes, I do so. |
| 01:34 | 15 | Q    Has Ericsson ever renegotiated a license during the |
| 01:34 | 16 | term of the license and lowered the rate? |
| 01:35 | 17 | A    Yes, we have done so. |
| 01:35 | 18 | Q    Can you give us some examples? |
| 01:35 | 19 | A    Yes.  This would be in connection when we have reduced |
| 01:35 | 20 | our reference prices.  And when we have done so, we have on |
| 01:35 | 21 | a case-by-case basis gone back and reduced rates.  Examples |
| 01:35 | 22 | would be with Doro and maybe with Mobistel, a company I can |
| 01:35 | 23 | recall.  Sharp is also one of those companies. |
| 01:35 | 24 | Q    So, Mr. Brismark, how does Ericsson determine what |
| 01:35 | 25 | offers it will make in a licensing negotiation? |

| | | |
|---|---|---|
| 01:35 | 1 | A     That's where we use our reference price sheets as one |
| 01:35 | 2 | input as a reference, as it's called.  We also use the |
| 01:36 | 3 | result of technical negotiations as an input to establishing |
| 01:36 | 4 | what licensing offer we would be giving in an individual |
| 01:36 | 5 | case. |
| 01:36 | 6 | Q     Do negotiators for Ericsson have unfettered authority |
| 01:36 | 7 | to make offers? |
| 01:36 | 8 | A     No. |
| 01:36 | 9 | Q     How does that come about? |
| 01:36 | 10 | A     We have a fairly thorough systematic process where |
| 01:36 | 11 | licensing managers in my organization are responsible for |
| 01:36 | 12 | the relation with potential licensees.  They are working |
| 01:36 | 13 | together with people in other functions -- for instance, the |
| 01:36 | 14 | pricing function, and with people present in the technical |
| 01:36 | 15 | negotiations to put together a proposal.  Those proposals |
| 01:36 | 16 | are subject to internal approval before any offer goes out |
| 01:37 | 17 | to the licensee. |
| 01:37 | 18 | Q     And at the end of the process, hopefully when an |
| 01:37 | 19 | agreement has been reached with a potential licensee, is |
| 01:37 | 20 | there further review and approval and analysis required |
| 01:37 | 21 | within Ericsson before entering into that agreement? |
| 01:37 | 22 | A     Yes.  That is the case.  We have a FRAND analysis where |
| 01:37 | 23 | reference prices play an important role, and there is a team |
| 01:37 | 24 | of people putting together a business case in order to work |
| 01:37 | 25 | in the assumptions that we have at the time of signing |

| | | |
|---|---|---|
| 01:37 | 1 | agreements.  And the purpose is to ensure that we live up to |
| 01:37 | 2 | our FRAND commitment when doing so. |
| 01:37 | 3 | Q    We have seen a number of examples already, |
| 01:37 | 4 | Mr. Brismark, of license agreements that Ericsson has |
| 01:38 | 5 | entered into on a whole variety of terms.  Why at a high |
| 01:38 | 6 | level do licenses, Ericsson licenses, have different forms? |
| 01:38 | 7 | A    Well, first of all, I would like to start with saying |
| 01:38 | 8 | it's not easy to get an agreement in place.  Ericsson always |
| 01:38 | 9 | tries to be flexible to the needs of our various licensees. |
| 01:38 | 10 | Without any exception those needs differ from |
| 01:38 | 11 | company to company, and we try to as far as possible |
| 01:38 | 12 | accommodate those needs while still doing our very best to |
| 01:38 | 13 | make sure that the final agreement and the offers we give |
| 01:38 | 14 | are in line with all the other agreements that are already |
| 01:38 | 15 | in place. |
| 01:39 | 16 | Q    How do you, practically speaking, take into account the |
| 01:39 | 17 | needs of the licensee in a negotiation and an agreement? |
| 01:39 | 18 | A    I think you can see that from the agreements |
| 01:39 | 19 | themselves.  There are examples where companies have |
| 01:39 | 20 | insisted on agreeing on lump sums, and I think if -- and |
| 01:39 | 21 | lump sums themselves are large numbers of dollars. |
| 01:39 | 22 | If it's a high amount, it makes sense sometimes |
| 01:39 | 23 | for Ericsson as well to go that route because a big lump sum |
| 01:39 | 24 | also creates security for Ericsson in terms of getting a |
| 01:39 | 25 | return.  We also have examples of companies wanting to have |

| 01:39 | 1 | a cap and maybe wanting to make an initial payment in order |
| 01:40 | 2 | to reduce the cap as compared to what it otherwise would |
| 01:40 | 3 | have been.  And we have engaged in that type of negotiations |
| 01:40 | 4 | as well.  So there are different examples. |
| 01:40 | 5 | Q    Are there in fact needs that you sometimes have to |
| 01:40 | 6 | consider aside from merely compensation? |
| 01:40 | 7 | A    Yes.  There are sometimes examples of companies being |
| 01:40 | 8 | in economic difficulties where we make the assessment that |
| 01:40 | 9 | we basically sometimes stand between having to litigate with |
| 01:40 | 10 | a company that may be not successful and losing in |
| 01:40 | 11 | profitability, while on the other hand signing a short |
| 01:40 | 12 | agreement giving sort of a deal which could be put in place |
| 01:41 | 13 | for a short time and take up the negotiations again a couple |
| 01:41 | 14 | of years later when both sides know better about the future, |
| 01:41 | 15 | so to speak. |
| 01:41 | 16 | Q    What tools are available to your organization to |
| 01:41 | 17 | achieve the kind of balance that you have described? |
| 01:41 | 18 | A    The tools we have I think are related to different type |
| 01:41 | 19 | of financial structure, different type of deals where we |
| 01:41 | 20 | enter into lump-sum agreements where we need to have |
| 01:41 | 21 | assessment of future sales, which is a prediction in itself |
| 01:41 | 22 | which is very difficult to do. |
| 01:41 | 23 | It's a very volatile market, so that's difficult. |
| 01:41 | 24 | But still, lump-sum deals is one opportunity.  We can sign |
| 01:42 | 25 | deals on a percentage basis with floors and caps to protect |

| 01:42 | 1  | against high and low prices.  We can sign deals on fixed |
| 01:42 | 2  | dollar per unit. |
| 01:42 | 3  | We have signed deals where we put a requirement to |
| 01:42 | 4  | have money paid into an account in order to get access to |
| 01:42 | 5  | lower rates during the time when those accounts are filled |
| 01:42 | 6  | up, so to speak.  So we have different tools, and we try to |
| 01:42 | 7  | use them in order to find something that is positive for |
| 01:42 | 8  | both parties. |
| 01:42 | 9  | Q    Is Ericsson open to creative financial solutions in |
| 01:42 | 10 | addition to the tools that you have named? |
| 01:42 | 11 | A    As long as they make sense, they may well be creative. |
| 01:42 | 12 | That's clear. |
| 01:42 | 13 | Q    And although we'll get into this in more detail in a |
| 01:42 | 14 | few minutes, have you and has Ericsson seen over a decade |
| 01:43 | 15 | and a half an evolution about the appropriate application of |
| 01:43 | 16 | those financial tools to achieving the FRAND balance? |
| 01:43 | 17 | A    Yes, I would say so.  I mean, there has been a lot of |
| 01:43 | 18 | change over the past decade or so, and one of the important |
| 01:43 | 19 | changes that has happened is that the price spread of |
| 01:43 | 20 | products has increased more than we anticipated.  And |
| 01:43 | 21 | especially the availability of very low priced phones is |
| 01:43 | 22 | something that has happened faster than we believed. |
| 01:43 | 23 | Q    And just to illustrate your company's flexibility, |
| 01:43 | 24 | during the course of your negotiations with TCL, did they |
| 01:43 | 25 | request a particular financial tool in the potential |

| | | |
|---|---|---|
| 01:43 | 1 | agreement? |
| 01:43 | 2 | A    Yes.  It was TCL requesting that Ericsson would make an |
| 01:44 | 3 | offer based on a fixed amount and an amount on top of that |
| 01:44 | 4 | which would depend on the performance, so to speak.  So |
| 01:44 | 5 | Ericsson decided to accept TCL's request and make an offer |
| 01:44 | 6 | with that structure. |
| 01:44 | 7 | Q    Did Ericsson communicate that to TCL? |
| 01:44 | 8 | A    Yes, we did. |
| 01:44 | 9 | Q    What was their response? |
| 01:44 | 10 | A    Well, the response was what we I think heard earlier in |
| 01:44 | 11 | the trial where Mr. Guo had an e-mail response to my |
| 01:44 | 12 | predecessor, Kasim Alfalahi, that he viewed our offer to be |
| 01:44 | 13 | promising, while at the same time TCL filed a lawsuit |
| 01:44 | 14 | against Ericsson the same day. |
| 01:44 | 15 | Q    All right.  Mr. Brismark, let's get a little more |
| 01:44 | 16 | specifically into some of the questions you were asked about |
| 01:45 | 17 | your reference rates.  Does Ericsson unilaterally set FRAND |
| 01:45 | 18 | rates? |
| 01:45 | 19 | A    No. |
| 01:45 | 20 | Q    How are FRAND rates set? |
| 01:45 | 21 | A    FRAND rates in individual agreements are the result of |
| 01:45 | 22 | all the negotiations, sometimes very long negotiations and |
| 01:45 | 23 | involving many, many people with technical expertise in the |
| 01:45 | 24 | areas where we discuss these patents going in both |
| 01:45 | 25 | directions, so to speak. |

01:45    1    Q    What are the reference prices that we heard about in

01:45    2    your cross-examination?

01:45    3    A    They are references.  They are references where we make

01:45    4    sure that we have on a yearly basis or so make an update to

01:45    5    reflect the license agreements that Ericsson has within

01:45    6    their licensing program.

01:46    7    Q    We have already seen a couple of examples of your

01:46    8    written reference price rates; correct?

01:46    9    A    Yes.

01:46   10    Q    How does Ericsson formulate these reference price

01:46   11    sheets?

01:46   12    A    They are formulated and have been for some time.  As in

01:46   13    the case of handsets, they have been formulated as a

01:46   14    percentage with a floor and a cap.  We also have an example

01:46   15    of product categories where the reference rate is a fixed

01:46   16    dollar per unit, for instance, for PCs.

01:46   17    Q    And what is the basic data that is consulted by

01:46   18    Ericsson in formulating the reference price sheet?

01:46   19    A    They are based on the license agreements that we have

01:46   20    signed always when we have a sufficient number of agreements

01:46   21    in place.  As a caveat I should mention that before starting

01:47   22    up a new licensing program, we still have a reference price.

01:47   23          At that time it cannot be based on already

01:47   24    entered-into agreements, so then we need another input in

01:47   25    order to make sure that we at least make an assessment and

01:47   1    that our licensing offers are in line with our FRAND

01:47   2    commitments.

01:47   3    Q     Okay.  Thank you for that qualification.  Let me ask

01:47   4    the question this way.  What's the best data that you have

01:47   5    available that you feel to set your reference price sheets?

01:47   6    A     Our licensing agreements.

01:47   7    Q     Do you consider all of your license agreements?

01:47   8    A     Yes, we do.

01:47   9    Q     In setting the rates in the reference price sheets,

01:47   10   does Ericsson attempt to capture anything beyond the value

01:47   11   of the technology or licensing?

01:47   12   A     No.

01:47   13   Q     How often does Ericsson review and potentially revise

01:47   14   its reference price sheet?

01:48   15   A     We do that on a yearly basis, you could say, and we've

01:48   16   done so since we started using reference prices in 2009.

01:48   17   Q     Is there a particular time of year when you do that?

01:48   18   A     The approval may vary, but we usually start the

01:48   19   valuation at the end of the year before, or sometime in

01:48   20   December or January time frame would be the natural time to

01:48   21   start.

01:48   22   Q     And how long does that yearly evaluation take?

01:48   23   A     It can take anywhere from one month up to four or five

01:48   24   months, depending on the complexity of the data and the

01:48   25   amount of data.  And by data, I mean the agreements that

| | | |
|---|---|---|
| 01:48 | 1 | were signed after our last revision of the reference price |
| 01:48 | 2 | sheets. |
| 01:48 | 3 | Q    Who works on the review of the price sheet? |
| 01:49 | 4 | A    We have a permanent team called our pricing team with a |
| 01:49 | 5 | leader in that team from the portfolio management group.  In |
| 01:49 | 6 | the team we also have members from licensing, from the |
| 01:49 | 7 | patent assertion group, from our IPR policy group, and from |
| 01:49 | 8 | the strategy group.  So it's a team of around five people or |
| 01:49 | 9 | so who works with this on a continuous basis. |
| 01:49 | 10 | Q    And how many on the leadership team? |
| 01:49 | 11 | A    The leadership team has one person present in -- two |
| 01:49 | 12 | people present in the ongoing work, but ultimately the |
| 01:49 | 13 | output will be presented to my leadership team and decided |
| 01:49 | 14 | by the leadership team together. |
| 01:50 | 15 | Q    Who do you seek input from in making pricing decisions? |
| 01:50 | 16 | A    I seek input from our legal function in order to make |
| 01:50 | 17 | sure that we live up to the commitment or the contract from |
| 01:50 | 18 | the portfolio managers working on developing the portfolios, |
| 01:50 | 19 | from the assertion team being present in technical |
| 01:50 | 20 | negotiation, having the in-depth knowledge about the patents |
| 01:50 | 21 | that have been discussed there, from the licensing manager |
| 01:50 | 22 | who has the overview of the business discussion, as well as |
| 01:50 | 23 | from people working on forecasting and market analysis. |
| 01:50 | 24 | Q    And collectively how many people would you say are |
| 01:51 | 25 | involved over the course of a year in reviewing your |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 01:51 | 1 | reference price sheet? |
| 01:51 | 2 | A    Collectively it's probably 20 people or so in my |
| 01:51 | 3 | organization that are involved in one way or the other. |
| 01:51 | 4 | Q    How many hours? |
| 01:51 | 5 | A    We're talking about hundreds of hours spent on this. |
| 01:51 | 6 | Q    Has Ericsson always used a reference price sheet? |
| 01:51 | 7 | A    No.  It was first introduced as a formal document in |
| 01:51 | 8 | 2009.  I think before that we had that similar function in |
| 01:51 | 9 | place.  Then it was more in the form of a person who was |
| 01:51 | 10 | trying to maintain the overview of the different deals and |
| 01:51 | 11 | being engaged in when we were formulating offers. |
| 01:51 | 12 | Q    Now, we've seen a couple, maybe three examples of price |
| 01:52 | 13 | sheets already, so I don't want to take the time to bring |
| 01:52 | 14 | one up, but do the price sheets list or suggest various |
| 01:52 | 15 | potential formats that a license might take? |
| 01:52 | 16 | A    No. |
| 01:52 | 17 | Q    Do they, for example, sometimes refer to percentage |
| 01:52 | 18 | rates? |
| 01:52 | 19 | A    Well, they contain percentages in floors and caps as a |
| 01:52 | 20 | format, but they don't suggest any format in the ultimate |
| 01:52 | 21 | agreement by doing so. |
| 01:52 | 22 | Q    That's my next question, but let me ask it this way. |
| 01:52 | 23 | Does the format of the final agreement necessarily track the |
| 01:52 | 24 | form of the reference sheet? |
| 01:52 | 25 | A    No. |

| | | |
|---|---|---|
| 01:52 | 1 | Q    So does Ericsson sign license agreements that are |
| 01:52 | 2 | different than what's contained in the reference sheet? |
| 01:52 | 3 | A    Yes. |
| 01:52 | 4 | Q    Now, you mentioned that reference sheets might |
| 01:52 | 5 | have percentage rates, floors, or caps.  Why would a |
| 01:53 | 6 | reference sheet have a floor? |
| 01:53 | 7 | A    A floor represents the minimum value our patented |
| 01:53 | 8 | technology covers to the end product that is in question in |
| 01:53 | 9 | the price sheets. |
| 01:53 | 10 | Q    And why would a reference sheet have a cap? |
| 01:53 | 11 | A    A cap is there to recognize the fact that products may |
| 01:53 | 12 | have other features or functionality or brand value which is |
| 01:53 | 13 | not connected to the value that the patent technology |
| 01:53 | 14 | confers to the product. |
| 01:53 | 15 | Q    Do all of Ericsson's licenses have caps and floors? |
| 01:53 | 16 | A    No. |
| 01:53 | 17 | Q    Why did Ericsson introduce caps and floors? |
| 01:53 | 18 | A    Because of the same reason really, because we in our |
| 01:53 | 19 | negotiations often met the argument that the product that we |
| 01:54 | 20 | were to license had other functionalities and other features |
| 01:54 | 21 | than the connectivity, which was the main area of discussion |
| 01:54 | 22 | between Ericsson and the party, and we agreed to that.  And |
| 01:54 | 23 | when agreeing to that, we also entertained agreement that |
| 01:54 | 24 | included caps. |
| 01:54 | 25 | Q    Were you a participant in those discussions? |

01:54     1    A      Not personally, no.

01:54     2    Q      How long did Ericsson consider the possibility of

01:54     3    including caps and floors in its reference sheets?

01:54     4    A      The caps and floors were introduced in 2011, as we

01:54     5    discussed earlier, but caps were introduced into our

01:54     6    agreements earlier than that on occasion.

01:54     7    Q      You've described some of the circumstances that led

01:55     8    Ericsson to first consider a cap on the royalty.  What

01:55     9    market developments or trends led Ericsson to consider

01:55    10    including a floor?

01:55    11    A      There were several reasons for that.  I think the two

01:55    12    main reasons are the fact that we around 2005, 2006, 2007

01:55    13    saw that prices were going down in the low-end segment of

01:55    14    the market probably quicker than we believed; but also we

01:55    15    experienced that new business models started to arise.

01:55    16            Maybe this was slightly later, but we could see --

01:55    17    we could also foresee business models where certain actors

01:56    18    would have interest in providing devices with cellular

01:56    19    connectivity even without charging a dollar for it in order

01:56    20    to get return on that in other parts, like in services type

01:56    21    of business like Amazon or Google or similar type of

01:56    22    business models.

01:56    23    Q      You were asked some questions on cross-examination that

01:56    24    the availability of inexpensive phones is in most ways a

01:56    25    good thing.  Do you remember that?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 01:56 | 1 | A     Yes. |
| 01:56 | 2 | Q     And you agreed with that? |
| 01:56 | 3 | A     Yes. |
| 01:56 | 4 | Q     But does -- do inexpensive phones challenge the process |
| 01:56 | 5 | of balancing with adequate reward to the innovator who has |
| 01:56 | 6 | developed the standards that make those phones work? |
| 01:57 | 7 | A     They could. |
| 01:57 | 8 | Q     Let's be a little more specific about what we're |
| 01:57 | 9 | dealing with.  Let's talk about 2015.  What was the rate and |
| 01:57 | 10 | the floor and the cap in your 2015 reference sheet? |
| 01:57 | 11 | A     The 2015 reference sheet, the rate was a range between |
| 01:57 | 12 | 1.5 percent to 1.8 percent for LTE multimode with a floor of |
| 01:57 | 13 | $2 and a cap of $4.50. |
| 01:57 | 14 | Q     And what was your expectation of how you would |
| 01:57 | 15 | distinguish between the 1.5 versus 1.8 range? |
| 01:57 | 16 | A     The range was introduced in order to distinguish |
| 01:57 | 17 | between licensees negotiating with Ericsson in good faith, |
| 01:57 | 18 | so-called willing licensees.  And that if we were dealing |
| 01:57 | 19 | with companies engaged in holdout, we understood that we |
| 01:58 | 20 | needed a way to be able to not only go down in price but |
| 01:58 | 21 | also ultimately, if litigation is required and we have a |
| 01:58 | 22 | licensee which is not really negotiating in good faith, |
| 01:58 | 23 | Ericsson ultimately also has the possibility to go up. |
| 01:58 | 24 | Q     All right.  Assuming that we are dealing with a willing |
| 01:58 | 25 | licensee and that the 1.5 rate is going to apply, at what |

01:58    1    handset price would the floor apply?

01:58    2    A    That would be at around $130.

01:58    3    Q    And at what handset price would the cap apply?

01:58    4    A    At $300.

01:58    5    Q    Now, one of the phrases that you have told us about in

01:59    6    the FRAND commitment is that the license be

01:59    7    nondiscriminatory; correct?

01:59    8    A    Yes.

01:59    9    Q    What do you understand that requirement to mean?

01:59   10    A    My understanding is that it means that you need to

01:59   11    treat similarly situated companies in a similar way.

01:59   12    Q    You were asked some questions about companies that are

01:59   13    similarly situated.  In your view what Ericsson licensees

01:59   14    are similarly situated to TCL?

01:59   15    A    So the most similarly situated company I would say is

01:59   16    ZTE.  But in a broader view there are other companies who

01:59   17    are also similarly situated, and that would include Karbonn,

02:00   18    CoolPad, LG, HTC, BlackBerry, maybe Sharp and Huawei in that

02:00   19    group as well.

02:00   20    Q    Do you believe that Apple and Samsung are similarly

02:00   21    situated to TCL?

02:00   22    A    No, I don't.

02:00   23    Q    Why do you say that?  First of all, let's take Samsung.

02:00   24    A    Because Samsung is a totally different company to TCL

02:00   25    in many ways.  First of all, it's a huge company having a

| 02:00 | 1 | big investment of their own into 3GPP.  They are one of the |
| 02:00 | 2 | major contributors in 3GPP and the further development of |
| 02:00 | 3 | these standards as well. |
| 02:00 | 4 | It's a company that develops chipsets for cellular |
| 02:00 | 5 | as well as infrastructure, and they also have a very large |
| 02:00 | 6 | handset business.  Volume wise they are the largest in the |
| 02:01 | 7 | world.  When it comes to their brand, it's one of the most |
| 02:01 | 8 | well-known brands in the world.  So there are several |
| 02:01 | 9 | reasons why I think they are a very different company as |
| 02:01 | 10 | compared to TCL. |
| 02:01 | 11 | Q    And how about Apple? |
| 02:01 | 12 | A    Apple is the most well-known brand in the world.  They |
| 02:01 | 13 | have I think a big portion of their value in their brand. |
| 02:01 | 14 | They are selling over 200 million units per year at average |
| 02:01 | 15 | sales prices which are far, far much higher than TCL.  And I |
| 02:01 | 16 | think they also have a total ecosystem of their own with |
| 02:01 | 17 | services that come on top of the devices, so to speak. |
| 02:01 | 18 | Q    During your cross-examination TCL's lawyer showed you |
| 02:02 | 19 | that Ericsson referred to the 2008 Apple license agreement |
| 02:02 | 20 | and to the 2014 Samsung license agreement in its |
| 02:02 | 21 | interrogatory responses in this case as being relevant to |
| 02:02 | 22 | Ericsson's formulation of its offers to TCL in this case. |
| 02:02 | 23 | Do you remember that? |
| 02:02 | 24 | A    Yes. |
| 02:02 | 25 | Q    To your understanding, Mr. Brismark, is FRAND a fixed |

| | | |
|---|---|---|
| 02:02 | 1 | percentage or a range? |
| 02:02 | 2 | A    FRAND is a range. |
| 02:02 | 3 |      MR. HOLDER:  Objection, Your Honor.  I believe |
| 02:02 | 4 | this is beyond the scope of the witness's declaration.  And |
| 02:02 | 5 | it also seems to be getting into expert testimony. |
| 02:02 | 6 |      THE COURT:  Sustained. |
| 02:02 | 7 | BY MR. CAWLEY: |
| 02:02 | 8 | Q    Then let's talk about some figures you were shown.  Do |
| 02:03 | 9 | you remember when TCL's lawyer took your Huawei license rate |
| 02:03 | 10 | and applied it to phones at various price points? |
| 02:03 | 11 | A    Yes. |
| 02:03 | 12 | Q    And, of course, TCL's lawyers selected the Huawei |
| 02:03 | 13 | license to do that with; correct? |
| 02:03 | 14 | A    Yes. |
| 02:03 | 15 | Q    Would you agree that is a license with some of the |
| 02:03 | 16 | lowest rates that Ericsson has? |
| 02:03 | 17 | A    Yes, I would say so. |
| 02:03 | 18 |      MR. CAWLEY:  Your Honor, at this time I think we |
| 02:03 | 19 | will be going into some trade secret information. |
| 02:03 | 20 |      THE COURT:  Okay.  Could we excuse those that are |
| 02:03 | 21 | not covered by the protective order, please. |
| 02:03 | 22 |      (Courtroom cleared) |
| 02:04 | 23 |      (The following proceedings were under seal:) |
| 02:04 | 24 |      (End of sealed proceedings.) |
| 02:27 | 25 |      (Courtroom reopened) |

| | | |
|---|---|---|
| 02:27 | 1 | MR. CAWLEY:  May I proceed, Your Honor? |
| 02:28 | 2 | THE COURT:  You may. |
| 02:28 | 3 | BY MR. CAWLEY: |
| 02:28 | 4 | Q    Mr. Brismark, you were asked a number of questions |
| 02:28 | 5 | early on in your cross-examination about Ericsson's public |
| 02:28 | 6 | position about reasonable aggregate rates.  Do you recall |
| 02:28 | 7 | those questions? |
| 02:28 | 8 | A    Yes. |
| 02:28 | 9 | Q    Has Ericsson been dealing publicly with this issue for |
| 02:28 | 10 | a long time? |
| 02:28 | 11 | A    Sorry.  I didn't hear what you said. |
| 02:28 | 12 | Q    Has Ericsson been dealing with this issue publicly for |
| 02:28 | 13 | a long time? |
| 02:28 | 14 | A    Yes. |
| 02:28 | 15 | Q    Tell us about the minimum change/optimum impact effort |
| 02:29 | 16 | that occurred in the early 2000s. |
| 02:29 | 17 | A    So that was a joint initiative by three major |
| 02:29 | 18 | innovators at the time -- Ericsson, Motorola, and Nokia.  It |
| 02:29 | 19 | was a proposal to the ETSI IPR committee to further clarify |
| 02:29 | 20 | the ETSI IPR policy in terms of how to interpret FRAND to |
| 02:29 | 21 | also include an interpretation that FRAND should mean a |
| 02:29 | 22 | reasonable aggregate royalty burden and a compensation to |
| 02:29 | 23 | the innovators in proportion to their contribution to the |
| 02:29 | 24 | standard. |
| 02:29 | 25 | Q    Did Ericsson and the others who joined it in this |

| | | |
|---|---|---|
| 02:29 | 1 | effort request that ETSI formally revise its written |
| 02:30 | 2 | policies to require that regime under the FRAND commitment? |
| 02:30 | 3 | A    Yes, it did. |
| 02:30 | 4 | Q    Was Ericsson and those other companies successful in |
| 02:30 | 5 | persuading ETSI to do that? |
| 02:30 | 6 | A    No. |
| 02:30 | 7 | Q    Nevertheless, did Ericsson still believe that the |
| 02:30 | 8 | principles it had pursued in that effort were a part of |
| 02:30 | 9 | FRAND? |
| 02:30 | 10 | A    Yes, we do.  And I think it's still part of our policy. |
| 02:30 | 11 | Q    Does Ericsson believe that the changes it requested in |
| 02:30 | 12 | that proposal were necessary? |
| 02:30 | 13 | A    No. |
| 02:30 | 14 | Q    Did it believe they would be helpful? |
| 02:30 | 15 | A    Yes. |
| 02:30 | 16 | Q    Does Ericsson -- did Ericsson believe at that time and |
| 02:30 | 17 | has it believed in the interim and does it still believe |
| 02:30 | 18 | today that aggregate royalties should be reasonable? |
| 02:30 | 19 | A    Yes. |
| 02:30 | 20 | Q    Has Ericsson, though, ever advocated a top-down |
| 02:31 | 21 | approach to valuation to the exclusion of bilateral |
| 02:31 | 22 | negotiation? |
| 02:31 | 23 | A    No, we have not done that. |
| 02:31 | 24 | Q    You were asked about some press releases, although I |
| 02:31 | 25 | don't know if we ever saw one.  But let's look at Exhibit |

| | | |
|---|---|---|
| 02:31 | 1 | 1150, page 135. |
| 02:31 | 2 | What do we see here? |
| 02:31 | 3 | A    This is the 2002 press release relating to Wideband |
| 02:31 | 4 | CDMA. |
| 02:31 | 5 | Q    And is there a companion press release in the following |
| 02:31 | 6 | page? |
| 02:31 | 7 | A    Please help me.  Yeah, this is a press release from |
| 02:31 | 8 | 2008 relating to LTE. |
| 02:31 | 9 | Q    Several years later? |
| 02:31 | 10 | A    Yes. |
| 02:31 | 11 | Q    And did Ericsson advocate in both of these releases |
| 02:32 | 12 | that a FRAND royalty should be a modest, single-digit level? |
| 02:32 | 13 | A    In the first one we did, yes.  In the second one the |
| 02:32 | 14 | phrasing was single-digit percentage for handsets. |
| 02:32 | 15 | Q    And did these releases and other public statements |
| 02:32 | 16 | actually predict a royalty rate? |
| 02:32 | 17 | A    No. |
| 02:32 | 18 | Q    What was the average selling price of phones at the |
| 02:32 | 19 | time of the first of these releases? |
| 02:32 | 20 | A    I think in 2002 when 3G was first being introduced to |
| 02:32 | 21 | the market, the average selling price of 3G compliant |
| 02:32 | 22 | handsets were in the range between $500 and $700. |
| 02:32 | 23 | Q    Were you in court when Dr. Leonard pointed to the LTE |
| 02:33 | 24 | press release as containing a prediction that reasonable |
| 02:33 | 25 | aggregate rates would be from six to eight percent? |

| | | |
|---|---|---|
| 02:33 | 1 | A     Yes. |
| 02:33 | 2 | Q     And he suggested that that would be binding on all of |
| 02:33 | 3 | those who joined in the press release.  Do you agree or |
| 02:33 | 4 | disagree? |
| 02:33 | 5 | A     I disagree. |
| 02:33 | 6 | Q     Why? |
| 02:33 | 7 | A     I think in that particular statement around six to |
| 02:33 | 8 | eight percent, Ericsson qualifies that with that Ericsson |
| 02:33 | 9 | believes that the market will drive the aggregate to a level |
| 02:33 | 10 | of six to eight percent.  And we also go on to predict based |
| 02:33 | 11 | on our assessment of our own share of all the standard |
| 02:33 | 12 | essential patents what Ericsson's percentage would be. |
| 02:33 | 13 | But it's clear also that this is a number which is |
| 02:34 | 14 | dependent on all the participants in the market.  In order |
| 02:34 | 15 | to reach a certain number, it requires support from all |
| 02:34 | 16 | participants in the market. |
| 02:34 | 17 | Q     Around the time of the LTE-related releases in 2008, |
| 02:34 | 18 | did Ericsson support a reasonable maximum aggregate royalty |
| 02:34 | 19 | level for LTE essential IPR and handsets as a single-digit |
| 02:34 | 20 | percentage of the sales price? |
| 02:34 | 21 | A     Yes. |
| 02:34 | 22 | Q     What was the average selling price of phones around |
| 02:34 | 23 | that time? |
| 02:34 | 24 | A     I think at the time the average selling price of 3G |
| 02:34 | 25 | phones in 2008 before 4G had entered into the market was |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:34   1   somewhere between $400 and $450.  Our anticipation of LTE,
02:34   2   that would be higher, so I think we anticipated that LTE
02:35   3   when entering the market would be above $500.
02:35   4   Q    And when Sony Ericsson released its first Smartphone to
02:35   5   the LTE network, what was its price?
02:35   6   A    I think it was around $750.
02:35   7   Q    Now, Mr. Brismark, do you or Ericsson view these press
02:35   8   release and other similar statements about Ericsson's
02:35   9   commitment to a FRAND rate in the single digits in the
02:35  10   aggregate to be a commitment to license on some specific
02:35  11   terms?
02:35  12   A    No, not as a commitment.  It's a statement and it's a
02:35  13   statement of support for the standard, but I think it cannot
02:35  14   be viewed as a commitment from Ericsson.
02:35  15   Q    All right.  Let's turn to another subject that you were
02:35  16   asked about.  It's sort of the same point in a different
02:36  17   guise, and it is statements made by Ericsson and others to
02:36  18   the European Competition Commission about Qualcomm.  Do you
02:36  19   recall those questions?
02:36  20   A    Yes.
02:36  21   Q    Why did Ericsson join in this request to ask the
02:36  22   European Commission to investigate Qualcomm?
02:36  23   A    Because Ericsson along with the other complainants
02:36  24   believed that Qualcomm's licensing practices when it came to
02:36  25   Wideband CDMA could potentially upset the balance between

| | | |
|---|---|---|
| 02:36 | 1 | the parties, the innovators and the implementers. |
| 02:36 | 2 | Q    And just to skip ahead, what did the European |
| 02:36 | 3 | Competition Authority ultimately decide about Qualcomm's |
| 02:37 | 4 | licensing practices? |
| 02:37 | 5 | A    They ultimately decided to close down the case because |
| 02:37 | 6 | they could not find evidence supporting our claims. |
| 02:37 | 7 | Q    Was Qualcomm required to pay any fine or to change its |
| 02:37 | 8 | licensing practices in any way? |
| 02:37 | 9 | A    No. |
| 02:37 | 10 | Q    Now, what filings -- we saw some of them, but let's |
| 02:37 | 11 | make sure we understand what we were seeing.  What filings |
| 02:37 | 12 | did Ericsson either make or participate in in connection |
| 02:37 | 13 | with this investigation? |
| 02:37 | 14 | A    We made several filings jointly as well as individually |
| 02:37 | 15 | during the course of this investigation. |
| 02:37 | 16 | Q    All right.  Was one of them the joint filing that we |
| 02:37 | 17 | saw that was Exhibit 77? |
| 02:37 | 18 | A    Yes. |
| 02:37 | 19 | Q    Now, you made reference to something important but that |
| 02:37 | 20 | you didn't have an opportunity to see.  This is the joint |
| 02:37 | 21 | submission.  And who participated in submitting this joint |
| 02:38 | 22 | document to the commission? |
| 02:38 | 23 | A    The co-signers of this was Broadcom, Ericsson, NEC, |
| 02:38 | 24 | Nokia, Panasonic, and Texas Instruments. |
| 02:38 | 25 | Q    And who were the largest telecommunications companies |

| 02:38 | 1 | in Europe at this time? |
| 02:38 | 2 | A    That would be Ericsson and Nokia. |
| 02:38 | 3 | Q    Even though this is a joint submission, did the |
| 02:38 | 4 | complainants also make separate submissions of their own? |
| 02:38 | 5 | A    Yes. |
| 02:38 | 6 | Q    Let's turn, please, to page 3 of this document, |
| 02:38 | 7 | footnote 1.  It's pretty small, Mr. Brismark.  Do you think |
| 02:38 | 8 | you can read it? |
| 02:38 | 9 | A    Yes.  I'll try.  "Not every document referred to in |
| 02:38 | 10 | this submission has been submitted on behalf of each |
| 02:38 | 11 | complainant, and reference should be made to their |
| 02:38 | 12 | individual submissions to establish their position in |
| 02:38 | 13 | relation to the comments made herein." |
| 02:38 | 14 | Q    All right.  So in reading these documents, we will see |
| 02:39 | 15 | that there is Exhibit 77, the joint submission that contains |
| 02:39 | 16 | this footnote, but then there's other exhibits, in |
| 02:39 | 17 | particular Exhibit 79, that was Ericsson's separate |
| 02:39 | 18 | submission? |
| 02:39 | 19 | A    Correct. |
| 02:39 | 20 | Q    What concerns were the complainants expressing to the |
| 02:39 | 21 | commission about Qualcomm? |
| 02:39 | 22 | A    The complaints were related to unlawful exercise of |
| 02:39 | 23 | monopoly power. |
| 02:39 | 24 | Q    All right.  And were there two specific things that the |
| 02:39 | 25 | complainants believed that Qualcomm had done wrong? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:39     1    A     I think there were a number of things pointed out.  One

02:39     2    of them was the fact that Qualcomm had led the market to

02:39     3    believe that they would charge royalties in the low

02:40     4    single-digit range, and later on they decided to charge much

02:40     5    higher royalties than that.

02:40     6    Q     In other words, did the complainants say that Qualcomm

02:40     7    had deceived the industry?

02:40     8    A     Yes.

02:40     9    Q     What did Qualcomm tell the industry it would charge for

02:40    10    a 3G license?

02:40    11    A     Low single-digit percentage, is how I recall it.

02:40    12    Q     Is that referred to in Ericsson's separate submission?

02:40    13    A     Yes.

02:40    14    Q     Rather than take the time to actually show that on the

02:40    15    screen, it probably could end up saving everybody time if we

02:40    16    just refer to that specifically in briefing.  Did Qualcomm

02:40    17    do that, charge low single digits?

02:40    18    A     No.  In fact, they charged five to six percent, the

02:40    19    same royalties that they were charging for their own

02:40    20    standard 5G or CDMA 2000.

02:40    21    Q     And had the industry relied on Qualcomm's assurances

02:41    22    that it would charge low single-digit royalties in adopting

02:41    23    WCDMA?

02:41    24    A     Yes.

02:41    25    Q     Are you aware of any instances in which Ericsson has

| | | |
|---|---|---|
| 02:41 | 1 | even arguably deceived the industry by its statements -- for |
| 02:41 | 2 | example, that it believed that the aggregate royalty should |
| 02:41 | 3 | be in the single digits? |
| 02:41 | 4 | A    No. |
| 02:41 | 5 | Q    The second complaint made to the commission about |
| 02:41 | 6 | Qualcomm was that Qualcomm's requested royalty bore no |
| 02:41 | 7 | relationship to Qualcomm's technical contributions to the |
| 02:41 | 8 | standard; correct? |
| 02:41 | 9 | A    Yes.  That's correct. |
| 02:41 | 10 | Q    Did Qualcomm recognize, as referred to in the joint |
| 02:41 | 11 | submission, that it had committed -- that it had contributed |
| 02:42 | 12 | almost nothing to the development of WCDMA? |
| 02:42 | 13 | A    Yes.  That's correct, and such a quote is part of our |
| 02:42 | 14 | individual submission. |
| 02:42 | 15 | Q    All right.  In fact, did Ericsson actually put some |
| 02:42 | 16 | statistics on the level of Qualcomm's contribution level as |
| 02:42 | 17 | opposed to others? |
| 02:42 | 18 | A    Yes. |
| 02:42 | 19 | Q    If you could look at Exhibit 79, page 19, paragraph |
| 02:42 | 20 | 2.38. |
| 02:42 | 21 | A    (Witness complies.)  Yes. |
| 02:42 | 22 | Q    What did Ericsson tell the commission about the level |
| 02:42 | 23 | of Qualcomm's commitments to the standards under |
| 02:42 | 24 | development? |
| 02:42 | 25 | A    So could you repeat the question, please? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 02:42 | 1 | Q    Yes.  What evidence was there that Qualcomm did not |
| 02:42 | 2 | make significant contributions to the development of WCDMA? |
| 02:42 | 3 | A    So on the top of the page here, we can see that from |
| 02:43 | 4 | contributions, actual contributions to the standard |
| 02:43 | 5 | development, Qualcomm made 0.8 percent of all the |
| 02:43 | 6 | contributions in ETSI SMG-2, which was before 3GPP was |
| 02:43 | 7 | formed.  And after 3GPP was formed, the corresponding number |
| 02:43 | 8 | was 0.1 percent of the contributions coming from Qualcomm in |
| 02:43 | 9 | the TSG realm of 3GPP. |
| 02:43 | 10 | Q    And what does the same paragraph tell us about |
| 02:43 | 11 | Ericsson's level of contribution during the same period of |
| 02:43 | 12 | time? |
| 02:43 | 13 | A    For the same corresponding groups, Ericsson's |
| 02:43 | 14 | contribution to ETSI SMG-2 was 17 percent, while Ericsson's |
| 02:43 | 15 | contribution to 3GPP TSG realm was 15 percent. |
| 02:44 | 16 | Q    Do you believe that Ericsson's complaint to the |
| 02:44 | 17 | commission along with others that Qualcomm's requested rates |
| 02:44 | 18 | were unreasonable and non-FRAND due to its low contribution |
| 02:44 | 19 | to the standards technology, do you think that was a |
| 02:44 | 20 | reasonable position? |
| 02:44 | 21 | A    Yes. |
| 02:44 | 22 | Q    Do you still think that's a reasonable position? |
| 02:44 | 23 | A    Yes. |
| 02:44 | 24 | Q    Were you aware of instances in which Ericsson has |
| 02:44 | 25 | demanded anything like similar royalties with minimal |

| | | |
|---|---|---|
| 02:44 | 1 | contribution to the standard? |
| 02:44 | 2 | A    No, I have not. |
| 02:45 | 3 | Q    You were asked some questions on cross-examination |
| 02:45 | 4 | about approved contribution studies.  Do you recall those? |
| 02:45 | 5 | A    Yes. |
| 02:45 | 6 | Q    That is one of the valuation methods that was relied on |
| 02:45 | 7 | by the complainants to the commission in demonstrating |
| 02:45 | 8 | Qualcomm's lack of meaningful contribution to WCDMA; |
| 02:45 | 9 | correct? |
| 02:45 | 10 | A    That is correct, yes. |
| 02:45 | 11 | Q    But there was also a time when Ericsson relied, not in |
| 02:45 | 12 | connection with Qualcomm anymore, but relied in its |
| 02:45 | 13 | licensing program on approved contribution studies.  Is that |
| 02:45 | 14 | fair? |
| 02:45 | 15 | A    That is fair, yes. |
| 02:45 | 16 | Q    Could you explain, please, the evolution of Ericsson's |
| 02:45 | 17 | reliance on approved contribution studies based on -- or |
| 02:45 | 18 | leading to what you consider to be more reliable forms of |
| 02:46 | 19 | data today? |
| 02:46 | 20 | A    Yes.  I am happy to.  So in the example of LTE, which I |
| 02:46 | 21 | think is the relevant example here, before Ericsson started |
| 02:46 | 22 | its licensing program for LTE standard essential patents, |
| 02:46 | 23 | there were no license agreements in place.  So in order to |
| 02:46 | 24 | align our offers to a reasonable aggregate, Ericsson needed |
| 02:46 | 25 | some kind of assessment, an estimate of our share of |

02:46    1    standard essential patents.

02:46    2             Since this was before most of the patents had been

02:46    3    even granted and they were still in the application stage,

02:46    4    we wanted to have an assessment which we believed was

02:47    5    correlating to our future share of actually standard

02:47    6    essential patents but not being able to measure that

02:47    7    directly.

02:47    8             So for that purpose we looked upon various

02:47    9    companies' contribution, which technical contributions

02:47   10    actually made it into the standard.  And looking upon sort

02:47   11    of the relative contribution of different companies, our

02:47   12    assessment was that this is a good estimate of what the

02:47   13    future would look like in terms of the contribution of

02:47   14    standard essential patents as well at least for the larger

02:47   15    patent holders.

02:47   16             So this is how we started, and that formed the

02:47   17    starting offer in our license negotiations.  However, in the

02:48   18    license negotiations the main focus in those negotiations,

02:48   19    especially in our early negotiations with companies like

02:48   20    Samsung and so forth, companies also being main contributors

02:48   21    to the standard, the focus was on claim charts for the

02:48   22    patents that we deemed were standard essential on both

02:48   23    sides.

02:48   24             So ultimately the license agreements reflect the

02:48   25    result of those negotiations between two parties assessing

02:48  1   each other's patent strength rather than the study which we

02:48  2   commissioned from Signals Research.

02:48  3          So over time as we had negotiated with a larger

02:48  4   portion of all of the standard contributors in the market,

02:48  5   Ericsson gains knowledge of our proportional share of the

02:49  6   standard essential patents and relied not on the

02:49  7   contributions anymore when formulating our offers but rather

02:49  8   on the agreements that we actually signed on an arm's-length

02:49  9   basis, so to speak.

02:49  10  Q    TCL has suggested that Ericsson formulated its offer

02:49  11  option B to TCL using contribution counting.  Is that true?

02:49  12  A    No.

02:49  13  Q    What was it based on?

02:49  14  A    It was based on our agreements for LTE that we have

02:49  15  entered into prior to that option B, which at the time would

02:49  16  have been I would say well over 20 agreements.

02:49  17  Q    Do you agree that Ericsson invented approved

02:49  18  contribution counting?

02:49  19  A    I don't claim that Ericsson has invented it.  I don't

02:49  20  know whether we were the first one to use it or not.

02:49  21  Q    Are you aware of other approved contribution studies

02:50  22  besides the one by Signals?

02:50  23  A    Yes.

02:50  24  Q    What's that?

02:50  25  A    It's well known that, for instance, ABI Research,

| 02:50 | 1 | another analyst company, also tracks approved contributions. |
| 02:50 | 2 | And I am also aware of certain patent pool agents who are |
| 02:50 | 3 | looking into approved contributions when they want to assess |
| 02:50 | 4 | the portfolio strength of their members. |
| 02:50 | 5 | Q    We heard testimony from Mr. McLeroy about that and that |
| 02:50 | 6 | his company, Avanci, is doing exact that? |
| 02:50 | 7 | A    Yes.  And there's also another example, a company |
| 02:50 | 8 | called Sisvel who has a patent pool for LTE, which also used |
| 02:50 | 9 | approved contributions as one of their methods to assess |
| 02:50 | 10 | what contribution the various members had. |
| 02:51 | 11 | Q    How does Ericsson go about valuing its implementation |
| 02:51 | 12 | portfolio? |
| 02:51 | 13 | A    We have an ongoing process internally, I would say, |
| 02:51 | 14 | where we work on reviewing and developing our implementation |
| 02:51 | 15 | patent portfolio.  We develop claim charts for them, and |
| 02:51 | 16 | occasionally we also do reverse engineering in order to |
| 02:51 | 17 | understand their applicability in a potential litigation. |
| 02:51 | 18 | Q    You were asked at least a few questions on |
| 02:51 | 19 | cross-examination about the pending litigation in Texas in |
| 02:51 | 20 | which Ericsson is asserting implementation patents against |
| 02:51 | 21 | TCL.  Do you recall that? |
| 02:51 | 22 | A    Yes. |
| 02:52 | 23 | Q    What is the current status of the five implementation |
| 02:52 | 24 | patents asserted in that litigation? |
| 02:52 | 25 | A    So my understanding is that one is active and still has |

02:52    1    survived the invalidation proceedings, while four were found

02:52    2    invalid by the PTAB, and no appeals have yet been initiated.

02:52    3    Q    Did that final decision by the PTAB happen a couple

02:52    4    weeks ago?

02:52    5    A    Yes.

02:52    6    Q    And has Ericsson decided whether to appeal any of those

02:52    7    final determinations?

02:52    8    A    No decision has been made as of today.

02:52    9    Q    But at least pending some resolution of this dispute,

02:52   10    does Ericsson intend to go forward with the remaining patent

02:52   11    that was unaffected by the IPR?

02:52   12    A    Yes.

02:52   13    Q    We also heard a suggestion from TCL in your

02:52   14    cross-examination that Ericsson uses the threat of lawsuits

02:53   15    to force smaller companies to sign license agreements.  Is

02:53   16    that consistent with your experience?

02:53   17    A    No.

02:53   18    Q    Why do you say that?

02:53   19    A    Because I live in the real world, and in the real world

02:53   20    we experience more and more that the threat of litigation is

02:53   21    not as effective as you may think.  In fact, small companies

02:53   22    under advice of counsel at a fairly low cost can have

02:53   23    techniques to avoid taking a license in spite of us having

02:53   24    presented evidence of infringement and so forth.

02:54   25    Q    Let me show you an excerpt that you were shown.  Do you

02:55  1  remember being asked some questions about your answer in

02:55  2  testimony before the International Trade Commission?

02:55  3  A    Yes.

02:55  4  Q    And in this section up here, the portion that you were

02:55  5  asked to concentrate on that's usually based on a percentage

02:55  6  of sale of an end product, do you recall that?

02:55  7  A    Yes.

02:55  8  Q    But then you were asked an additional question:  But

02:55  9  basing FRAND on a reasonable percentage of sales is not

02:55  10  something that ETSI requires; is that true?  What answer did

02:55  11  you give?

02:55  12  A    That's correct, and my answer was it's true.  ETSI

02:55  13  doesn't give any guidance in terms of the business setup of

02:55  14  FRAND.

02:55  15          MR. CAWLEY:  Your Honor, I think that I missed one

02:56  16  section of confidential information, and it's the last thing

02:56  17  that I have.

02:56  18          THE COURT:  That's fine.  Why don't you cover

02:56  19  that, and we'll take a break after that.

02:56  20

02:56  21          (The following proceedings were under seal:)

02:56  22          (End of sealed proceedings.)

03:26  23          (Courtroom reopened)

03:26  24  BY MR. HOLDER:

03:26  25  Q    Sir, do you recall discussing with Mr. Cawley the fact

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:27   1    that there were certain negotiations taking place between

03:27   2    Ericsson and TCL regarding a license back in 2014 which

03:27   3    roughly coincided in time with when TCL filed this lawsuit?

03:27   4    A    Yes.

03:27   5    Q    I thought I heard you suggest that perhaps this lawsuit

03:27   6    was somehow filed in response to those negotiations in

03:27   7    Barcelona.

03:27   8              Sir, isn't it true that the filing of this lawsuit

03:27   9    coincided with the expiration of TCL'S prior 2G license with

03:27   10   Ericsson?

03:27   11   A    Yes, that's true.

03:27   12   Q    And isn't it true that when TCL filed this lawsuit, it

03:27   13   was the subject of numerous patent infringement lawsuits

03:27   14   that Ericsson had filed against TCL and its affiliates in

03:27   15   numerous countries around the world?

03:27   16   A    That is correct.

03:27   17   Q    And in those lawsuits Ericsson was seeking injunctive

03:28   18   relief against TCL and its affiliates; correct?

03:28   19   A    That is the case at least in some of them.  I am not

03:28   20   sure about all of them.

03:28   21   Q    Mr. Cawley also showed you various license agreements,

03:28   22   including some that had an effective date of 2007 and 2008,

03:28   23   and juxtaposed those license agreements with the notion that

03:28   24   TCL was engaged in unlicensed sales at the time.

03:28   25              Again, sir, with respect to 2G, isn't it the case

| | | |
|---|---|---|
| 03:28 | 1 | that TCL had a license from Ericsson for 2G sales beginning |
| 03:28 | 2 | in 2007? |
| 03:28 | 3 | A    Yes, a license that covered a portion of their 2G sets. |
| 03:28 | 4 | That's correct. |
| 03:28 | 5 | Q    There was a dispute between the parties about what |
| 03:28 | 6 | sales were covered by that license which was arbitrated and |
| 03:28 | 7 | TCL prevailed; correct? |
| 03:28 | 8 | A    That's correct.  It was arbitrated and the arbitrators |
| 03:28 | 9 | concluded that the license only covered a portion of TCL's |
| 03:29 | 10 | sales. |
| 03:29 | 11 | Q    And there was also the suggestion that TCL was engaged |
| 03:29 | 12 | in unlicensed 3G sales.  But isn't it true that TCL did not |
| 03:29 | 13 | begin meaningfully selling large amounts of 3G phones until |
| 03:29 | 14 | late 2010? |
| 03:29 | 15 | A    Which I also pointed out, I think, in my response. |
| 03:29 | 16 | Q    And TCL also did not begin meaningfully selling 4G |
| 03:29 | 17 | phones until 2013, roughly 15 months before this lawsuit was |
| 03:29 | 18 | filed; correct? |
| 03:29 | 19 | A    That may be correct.  I thought it was later than that |
| 03:29 | 20 | even. |
| 03:29 | 21 | Q    Sir, we also discussed the 2002 press release involving |
| 03:29 | 22 | the 3G standard as well as the 2008 press release regarding |
| 03:29 | 23 | the 4G standard.  Do you recall that discussion? |
| 03:29 | 24 | A    Yes. |
| 03:30 | 25 | Q    And there was some suggestion in your exchange with |

| | | |
|---|---|---|
| 03:30 | 1 | Mr. Cawley that Ericsson had in mind a certain ASP for |
| 03:30 | 2 | phones when it made those statements in the press releases. |
| 03:30 | 3 | Do you recall that? |
| 03:30 | 4 | A    Yes. |
| 03:30 | 5 | Q    Sir, isn't it true that nowhere in those press releases |
| 03:30 | 6 | did Ericsson say that its views regarding what was |
| 03:30 | 7 | reasonable for a maximum aggregate royalty burden were |
| 03:30 | 8 | contingent upon prices staying at that level?  There is no |
| 03:30 | 9 | such statements in those press releases; right? |
| 03:30 | 10 | A    That is correct. |
| 03:30 | 11 | Q    Ericsson's statements in those press releases were |
| 03:30 | 12 | focused on what was reasonable for the industry; correct? |
| 03:30 | 13 | A    Yes, having in mind what the average sales price was at |
| 03:30 | 14 | the time. |
| 03:30 | 15 | Q    Well, sir, you recognized when I cross-examined you |
| 03:30 | 16 | earlier and you have testified previously that one of the |
| 03:30 | 17 | express intended benefits of standardization is the |
| 03:31 | 18 | reduction in prices over time; correct? |
| 03:31 | 19 | A    Correct. |
| 03:31 | 20 | Q    And you continued to confirm your commitment to a |
| 03:31 | 21 | single-digit reasonable maximum aggregate royalty burden |
| 03:31 | 22 | through at least December 2015 when I took your deposition; |
| 03:31 | 23 | right? |
| 03:31 | 24 | A    Yes, and I think that's correct still today when it |
| 03:31 | 25 | comes to the average sales price on the markets, for |

| | | |
|---|---|---|
| 03:31 | 1 | instance, for LTE.  But the spread of sales prices has |
| 03:31 | 2 | increased drastically, so that calls for the floor as well |
| 03:31 | 3 | as the cap. |
| 03:31 | 4 | Q    Sir, you recognized a long time ago that prices for |
| 03:31 | 5 | phones were decreasing.  You testified to that with |
| 03:31 | 6 | Mr. Cawley.  Do you remember that? |
| 03:31 | 7 | A    Correct. |
| 03:31 | 8 | Q    And yet despite that fact, you continued to confirm |
| 03:31 | 9 | through at least December 2015 when I took your deposition |
| 03:31 | 10 | that you remained committed to a single-digit reasonable |
| 03:32 | 11 | maximum aggregate royalty burden; correct? |
| 03:32 | 12 | A    Yes, that's correct. |
| 03:32 | 13 | Q    Sir, we never suggested that your public statements |
| 03:32 | 14 | were a binding contractual commitment.  The point that you |
| 03:32 | 15 | made in those press releases is that Ericsson believed that |
| 03:32 | 16 | those aggregate royalty burdens that you were addressing |
| 03:32 | 17 | were reasonable; correct? |
| 03:32 | 18 | A    Correct. |
| 03:32 | 19 | Q    I want to go back to the issue of when the floors and |
| 03:32 | 20 | the caps were introduced into Ericsson's reference price |
| 03:32 | 21 | sheets.  You looked at Exhibit 5529 earlier.  Do you |
| 03:32 | 22 | remember that? |
| 03:32 | 23 | A    No, not particularly. |
| 03:32 | 24 | MR. HOLDER:  Let's put Exhibit 5529 on the screen. |
| 03:33 | 25 | If we could see the -- there is a date, I believe. |

| | | |
|---|---|---|
| 03:33 | 1 | THE WITNESS:  I see the date on the printout but |
| 03:33 | 2 | not in the example. |
| 03:33 | 3 | MR. HOLDER:  Is there a non-native file of this, |
| 03:33 | 4 | Ms. Limbaugh? |
| 03:33 | 5 | BY MR. HOLDER: |
| 03:33 | 6 | Q    So we will move past this. |
| 03:33 | 7 | You represented in your testimony as well as in |
| 03:33 | 8 | your witness declaration that Exhibit 5529 was Revision B of |
| 03:33 | 9 | your reference price sheet; right? |
| 03:33 | 10 | A    I don't know. |
| 03:33 | 11 | Q    Let's go to your witness statement. |
| 03:33 | 12 | MR. HOLDER:  Let's go to the rebuttal witness |
| 03:34 | 13 | declaration, please, paragraph -- let's go to paragraph 19, |
| 03:34 | 14 | please.  Blow up that portion that's highlighted, please. |
| 03:34 | 15 | BY MR. HOLDER: |
| 03:34 | 16 | Q    Your testimony in this rebuttal witness declaration was |
| 03:34 | 17 | that the 2011 reference price sheet from the spring of 2011 |
| 03:34 | 18 | was revision B; correct? |
| 03:34 | 19 | A    It's revision B of our 2011 reference price sheet. |
| 03:35 | 20 | MR. HOLDER:  If we could zoom out and go to |
| 03:35 | 21 | footnote 15. |
| 03:35 | 22 | BY MR. HOLDER: |
| 03:35 | 23 | Q    Footnote 15 is a reference to 5529, which is the native |
| 03:35 | 24 | file we were just looking at; right? |
| 03:35 | 25 | A    Okay. |

03:35  1    Q    I will represent to you, sir, that the spreadsheet we

03:35  2    saw at Exhibit 5529 was produced to us on the eve of trial.

03:35  3              MR. HOLDER:  If you could pull up Exhibit 267,

03:35  4    please.  Let's focus on the upper left-hand corner.

03:35  5    BY MR. HOLDER:

03:35  6    Q    Sir, this is Revision B of your price sheet, and it's

03:35  7    dated September 1, 2009; correct?

03:35  8    A    If I may explain, this is Revision B of the reference

03:36  9    price sheet in 2009 where it's prepared by Wakim Muvander.

03:36 10    And in the 2011 reference price sheet, that responsibility

03:36 11    had been taken over by Monica Magnusson, and she decided to

03:36 12    start with a new document number.

03:36 13              Hence the revision counting started at A again, so

03:36 14    that's why revision B here is revision B to a different

03:36 15    document as compared to the other one we saw.  I think

03:36 16    that's the background to the confusion around revision

03:36 17    letters and revision years.

03:36 18    Q    Sir, that doesn't add up in the slightest.  Let's look

03:36 19    at Exhibit 268, please.

03:36 20              THE COURT:  Questions, please.  Questions.

03:36 21              MR. HOLDER:  I apologize, Your Honor.

03:36 22              Let's look at Exhibit 268, please.

03:36 23    BY MR. HOLDER:

03:36 24    Q    You told me that Exhibit 268 was the next reference

03:37 25    price sheet in line, and it had the revision number pD1;

108

| | | |
|---|---|---|
| 03:37 | 1 | correct? |
| 03:37 | 2 | A   It says pD1 on the page, yes, but it also says |
| 03:37 | 3 | reference price sheet 2010 on the top. |
| 03:37 | 4 | Q   I understand.  And this was prepared by Mr. Muvander as |
| 03:37 | 5 | well; right? |
| 03:37 | 6 | A   Correct. |
| 03:37 | 7 | Q   And the date on this was March 2010; correct? |
| 03:37 | 8 | A   That is correct. |
| 03:37 | 9 | Q   And then let's go to Exhibit 269.  This is your |
| 03:37 | 10 | revision C; correct? |
| 03:37 | 11 | A   Can you show me who is the author of this document as |
| 03:37 | 12 | well? |
| 03:37 | 13 |         MR. HOLDER:  Zoom out. |
| 03:37 | 14 | BY MR. HOLDER: |
| 03:37 | 15 | Q   If you look in the bottom left-hand corner, this was |
| 03:37 | 16 | prepared by Ms. Magnusson; correct? |
| 03:37 | 17 | A   Yeah, that's correct. |
| 03:37 | 18 | Q   But she didn't start over again with Revision A; did |
| 03:37 | 19 | she? |
| 03:37 | 20 | A   Yes, she did, with a different document number.  Then |
| 03:37 | 21 | our document revision will start at Revision A for that |
| 03:38 | 22 | document number. |
| 03:38 | 23 | Q   Sir, is it your testimony that Ericsson has produced to |
| 03:38 | 24 | TCL in this case a Revision A and Revision B of the |
| 03:38 | 25 | reference price sheets that were created by Ms. Magnusson |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:38  1   after revision pD1 and before the Revision C that we see
03:38  2   here at Exhibit 269?
03:38  3   A    I think it's clear if you look upon the name of the
03:38  4   document in totality, there is no need to rely on only the
03:38  5   revision letter.  There is also a clear name of the document
03:38  6   stating for which year it refers to.
03:38  7   Q    Let's go to your deposition, volume two, at page 54.
03:38  8            MR. HOLDER:  Your Honor, as a party
03:38  9   representative, I would like to read Mr. Brismark's
03:38  10  testimony into the record.  This is page 54, line 2:
03:39  11           "Q      Is Exhibit 269 the first time that
03:39  12       Ericsson began using floors and caps in connection
03:39  13       with royalties for Smartphones or for mobile
03:39  14       phones in general?
03:39  15           "A      No, that's not the first time
03:39  16       Ericsson has been using the notion of a floor or a
03:39  17       cap.  But because we have done so also previously
03:39  18       in specific license agreements and it's always
03:39  19       been something that has been part of the
03:39  20       discussion, it was the first time when it was
03:39  21       introduced into the reference price sheet, though.
03:39  22           "Q      So revision C is the -- you would
03:39  23       agree that revision C is the first reference price
03:39  24       sheet that reflects the use of a floor and a cap?
03:39  25           "A      Yes.  That's my understanding.  It

| | | |
|---|---|---|
| 03:39 | 1 | may be worth just commenting that in the previous |
| 03:39 | 2 | reference price sheet, there was also a specific |
| 03:39 | 3 | product or specific circumstances where fixed |
| 03:39 | 4 | prices were used for such products.  So in general |
| 03:39 | 5 | it has existed.  Also previously, if you view the |
| 03:40 | 6 | fixed price as where the floor and the cap |
| 03:40 | 7 | coincides, the notion you could say had been used |
| 03:40 | 8 | before as well. |
| 03:40 | 9 | "Q    You're referring to the fact that |
| 03:40 | 10 | the prior reference price sheet reflects |
| 03:40 | 11 | dollar-per-unit pricing for products other than |
| 03:40 | 12 | phones? |
| 03:40 | 13 | "A    Correct.  And also in the platform |
| 03:40 | 14 | specific licenses there is a fixed per-unit fee as |
| 03:40 | 15 | well for phones as a potential alternative." |
| 03:40 | 16 | BY MR. HOLDER: |
| 03:40 | 17 | Q    One of the reasons we're focusing on when these floors |
| 03:40 | 18 | and caps came into being is the divestiture of Ericsson's |
| 03:40 | 19 | handset business in October of 2011; correct? |
| 03:40 | 20 | A    That is correct.  I understand that. |
| 03:40 | 21 | Q    Sir, when did Ericsson first contemplate the |
| 03:40 | 22 | possibility of divesting its 50 percent share in that joint |
| 03:40 | 23 | venture? |
| 03:40 | 24 | A    I don't know. |
| 03:40 | 25 | Q    Surely it was months in advance of the October 2011 |

03:40   1   press release; correct?

03:41   2   A    I would not know.  I was not part of the project that

03:41   3   were allowed to know about that activity until very shortly

03:41   4   before it actually happened.

03:41   5   Q    Corporate deals like that do not come about in a matter

03:41   6   of a week or two; correct?

03:41   7   A    That is correct.  But deals like that are kept in a

03:41   8   very small group, and I was not part of that group until

03:41   9   weeks before the actual deal.

03:41   10   Q    Mr. Cawley asked you about the notion that Ericsson

03:41   11   seeks balance and the notion that Ericsson wears two hats.

03:41   12   You testified that Ericsson in certain respects is also a

03:41   13   licensee in addition to being a licensor; correct?

03:41   14   A    Yes.

03:41   15   Q    Since 2011 Ericsson has not been a licensee with

03:41   16   respect to handsets; correct?

03:41   17   A    That is correct.

03:42   18   Q    Ericsson continues to be a licensee with respect to

03:42   19   network equipment, but network equipment is licensed under

03:42   20   separate terms than handsets; correct?

03:42   21   A    Correct.

03:42   22           MR. HOLDER:  Nothing further, Your Honor.

03:42   23           THE COURT:  Sir, I have a couple of questions if I

03:42   24   may.

03:42   25           You were asked questions about public statements

| | | |
|---|---|---|
| 03:42 | 1 | which Ericsson joined in with regard to an aggregate royalty |
| 03:42 | 2 | burden in the six to eight percent range being reasonable. |
| 03:42 | 3 | THE WITNESS:  Yes. |
| 03:42 | 4 | THE COURT:  Did you agree with that statement when |
| 03:42 | 5 | it was made? |
| 03:42 | 6 | THE WITNESS:  I believed that that could be the |
| 03:42 | 7 | outcome, but the statement was written very purposely to -- |
| 03:42 | 8 | THE COURT:  Sir, I want to know whether you |
| 03:42 | 9 | agreed. |
| 03:42 | 10 | THE WITNESS:  I agreed that the market could drive |
| 03:42 | 11 | the aggregate to a level of six to eight percent, but I |
| 03:43 | 12 | wasn't a hundred percent convinced.  One of the reasons I |
| 03:43 | 13 | wasn't a hundred percent convinced was that I knew that at |
| 03:43 | 14 | least one company had the tradition of charging very high |
| 03:43 | 15 | rates. |
| 03:43 | 16 | So if I look upon all the companies doing |
| 03:43 | 17 | licensing, even though Ericsson believed that this would be |
| 03:43 | 18 | a wanted outcome, I think that we cannot dictate it.  And I |
| 03:43 | 19 | knew that, for instance, Qualcomm was charging much higher |
| 03:43 | 20 | for -- |
| 03:43 | 21 | THE COURT:  But, sir, the press release said |
| 03:43 | 22 | nothing about the -- the public statement said nothing about |
| 03:43 | 23 | the market driving the range to six to eight percent.  It |
| 03:43 | 24 | was simply an endorsement of six to eight percent being a |
| 03:43 | 25 | reasonable aggregate royalty burden. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:43   1          THE WITNESS:  The statement with the six to

03:43   2   eight percent did state that the market would drive.  The

03:43   3   press release with the single-digit percentage for handset

03:43   4   did not mention that.  That is correct.  So those are two

03:43   5   different press releases.

03:44   6          THE COURT:  Okay. did you believe at the time the

03:44   7   single-digit statement was made that it was a reasonable

03:44   8   one?

03:44   9          THE WITNESS:  Yes.

03:44   10         THE COURT:  Okay.  We have looked at several

03:44   11  business cases -- and I don't think we need to close the

03:44   12  courtroom -- but you examined on the business case that

03:44   13  Ericsson developed with the Apple license and the Samsung

03:44   14  license.  In each of those the business cases includes a

03:44   15  projection of average selling prices?

03:44   16         THE WITNESS:  Yes, that's correct.

03:44   17         THE COURT:  And I think we saw some exceptions in

03:44   18  the Apple case, but generally the average selling prices

03:44   19  declined each year in the analysis?

03:44   20         THE WITNESS:  Yes, Your Honor.  I think Apple may

03:44   21  be the exception.

03:44   22         THE COURT:  Right.  But was that generally true in

03:44   23  your experience for licensing, that at the time you did a

03:44   24  business case, it was typically anticipated that if we look

03:44   25  at any given family, that in the out years the average

03:44  1   selling price is going to decline?

03:45  2          THE WITNESS:  For mid- and low-range phones, I

03:45  3   think that is correct.  For high-end phones, that has proven

03:45  4   not always to be the case.  So at least the decline has been

03:45  5   very different over time.

03:45  6          THE COURT:  Well, I'm not talking about the

03:45  7   historical perspective.  I'm talking about the viewpoint

03:45  8   that you took when you made the analysis for the business

03:45  9   cases.  And the assumption -- when you did the business

03:45  10  cases, obviously you don't know what's going to be in fact

03:45  11  three, four, or five years out.  You make an assumption;

03:45  12  correct?

03:45  13         THE WITNESS:  Yes.

03:45  14         THE COURT:  And generally speaking the assumption

03:45  15  was that the average selling price would decline; correct?

03:45  16         THE WITNESS:  Yes.

03:45  17         THE COURT:  Now, the same technology is

03:45  18  licensed -- take a five-year license.  The licensee gets the

03:45  19  same technology in year one, two, three, four, and five;

03:45  20  true?

03:45  21         THE WITNESS:  Yes.  That is correct.  It actually

03:45  22  is sometimes --

03:45  23         THE COURT:  Sometimes more if you require a

03:45  24  patent, but basically they're getting the same technology?

03:45  25         THE WITNESS:  Yes.  I would say so, yes, sir.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:46    1          THE COURT:  Assume a fixed royalty rate.  Let's

03:46    2   just say one percent.  And assume that the projection is for

03:46    3   any given line of product, start at 100; goes down to 90, 80

03:46    4   70, 60.  So if one percent royalty is in effect, basically

03:46    5   the licensee is getting the same technology for a

03:46    6   diminishing sum each year as you go out?

03:46    7          THE WITNESS:  Yes, that's correct.

03:46    8          THE COURT:  How does that square with your notion

03:46    9   that there ought to be a fixed amount, that the rate ought

03:46   10   to reflect a fixed amount for the value of the technology?

03:46   11          THE WITNESS:  I think it's -- if it's with the

03:46   12   notion on the floor as well as the cap, I think the impact

03:46   13   of the floor and the cap is more on outliers when it comes

03:47   14   to sales price than when it has to do with the average, the

03:47   15   whole industry.

03:47   16          THE COURT:  But if there's no express floor or

03:47   17   cap, in my hypothetical the licensee is getting the same

03:47   18   technology for a diminishing sum each year as you go out?

03:47   19          THE WITNESS:  That is correct, yes.

03:47   20          THE COURT:  Again, how does that square with your

03:47   21   notion that there ought to be -- where there's no floor or

03:47   22   cap in the license, how does that square with your notion

03:47   23   that there ought to be a set amount that the technology is

03:47   24   worth?

03:47   25          THE WITNESS:  So I would say that as an owner of

03:47  1    the technology and as a licensor, you have the right under

03:47  2    the FRAND commitment to set a minimum value.  But it's also

03:47  3    perfectly fine to follow the reduction of ASP over time.

03:47  4    That is not any breach of the FRAND commitment, but also

03:48  5    it's not a breach to ask for a minimum under which you are

03:48  6    no longer willing to follow the decrease in the price.

03:48  7              THE COURT:  So the fact that the licensee pays a

03:48  8    lesser amount in out years for the same technology because

03:48  9    of the ASP declines, that year would or could be consistent

03:48  10   with FRAND?

03:48  11             THE WITNESS:  That could be consistent with FRAND,

03:48  12   yes.

03:48  13             THE COURT:  Okay.  You have indicated that one of

03:48  14   the reasons for adopting a floor is that the particular

03:48  15   manufacturer's product might have features in addition to

03:48  16   embodying the licensed technology such that it wouldn't be

03:48  17   appropriate to charge a royalty rate on those features as

03:48  18   opposed to the technology that's added.

03:49  19             How do you determine where that point is in terms

03:49  20   of setting a cap?

03:49  21             THE WITNESS:  It's, I think -- basically it's the

03:49  22   result of a negotiation.  So I think when we have been

03:49  23   dealing with companies who themselves believe that they

03:49  24   contribute more into the product than on the connectivity,

03:49  25   it's a negotiation of what would a reasonable cap be.

03:49    1                I think our assessment is in line with the outcome

03:49    2    of such negotiations.

03:49    3                THE COURT:  Where you've negotiated a cap, is the

03:49    4    cap a product of -- simply a product of the negotiations, or

03:49    5    is there any analysis behind it at least on Ericsson's side

03:49    6    as to where value of the technology ceases and the value of

03:49    7    the features kicks in to determine the price of the product?

03:49    8                THE WITNESS:  I think you can do such an analysis,

03:50    9    and I --

03:50   10                THE COURT:  No.  Historically have you done that?

03:50   11                THE WITNESS:  Historically?  I would say the

03:50   12    answer is no.

03:50   13                THE COURT:  So historically, then, the

03:50   14    determination of the cap and where the break point is

03:50   15    between technology and additional features is a product of

03:50   16    negotiation?

03:50   17                THE WITNESS:  Correct.  Yes, Your Honor.

03:50   18                THE COURT:  Thank you.

03:50   19                Any further questions in light of the Court's

03:50   20    questions?

03:50   21                MR. HOLDER:  Nothing from TCL.

03:50   22                MR. CAWLEY:  I have just about three, Your Honor,

03:50   23    with the Court's indulgence.

03:50   24                THE COURT:  Please.

03:50   25                MR. CAWLEY:  Thank you.  First of all, just for

| 03:50 | 1 | the convenience of the Court, could we see Exhibit 1152? |
| 03:50 | 2 | BY MR. CAWLEY: |
| 03:50 | 3 | Q    Do you recognize this, Mr. Brismark, as one of the |
| 03:50 | 4 | public statements Ericsson made relating to the anticipated |
| 03:51 | 5 | royalty rate? |
| 03:51 | 6 | A    Yes, I do. |
| 03:51 | 7 | Q    And do you see the highlighted language that says, |
| 03:51 | 8 | "Ericsson believes the market will drive all players to act |
| 03:51 | 9 | in accordance with these principles and to a reasonable |
| 03:51 | 10 | maximum aggregate royalty level of six to eight percent for |
| 03:51 | 11 | handsets?" |
| 03:51 | 12 | A    Yes.  That's correct. |
| 03:51 | 13 | Q    Did I read that accurately? |
| 03:51 | 14 | A    Yes. |
| 03:51 | 15 | Q    You testified earlier that a typical term of a license |
| 03:51 | 16 | that Ericsson might enter into for standard essential |
| 03:51 | 17 | patents might be five years? |
| 03:51 | 18 | A    Correct. |
| 03:51 | 19 | Q    How does Ericsson in its typical license handle the |
| 03:51 | 20 | likelihood that additional standard essential patents will |
| 03:51 | 21 | be issued to Ericsson during that five-year term? |
| 03:51 | 22 | A    Those are included in the license, since the license is |
| 03:51 | 23 | defined as a -- scoped by licensing all of the essential |
| 03:52 | 24 | patents that Ericsson owns or has owned during the time of |
| 03:52 | 25 | the agreement. |

| | | |
|---|---|---|
| 03:52 | 1 | Q     And does the standard itself change over time? |
| 03:52 | 2 | A     Yes, it does.  It develops over time. |
| 03:52 | 3 | Q     For example, has in your opinion the LTE standard |
| 03:52 | 4 | become more valuable since release A, the initial release? |
| 03:52 | 5 | A     Yes.  I believe so. |
| 03:52 | 6 | Q     So that both in terms of additionally issued patents |
| 03:52 | 7 | and enhanced value of the standard, would it be reasonable |
| 03:52 | 8 | to assume that there is some offset of a steadily declining |
| 03:52 | 9 | value of technology? |
| 03:52 | 10 | A     No.  I think it's rather a sign that the market works |
| 03:52 | 11 | and there is competition and access to the standard out |
| 03:52 | 12 | there that is making prices go down, while I think at the |
| 03:53 | 13 | same time you can objectively argue that the value of the |
| 03:53 | 14 | technology included in those products goes up. |
| 03:53 | 15 | MR. CAWLEY:  Thank you, Your Honor.  That's all I |
| 03:53 | 16 | have. |
| 03:53 | 17 | THE COURT:  Mr. Holder. |
| 03:53 | 18 | MR. HOLDER:  Nothing further. |
| 03:53 | 19 | THE COURT:  Sir, you may step down.  Thank you. |
| 03:53 | 20 | THE WITNESS:  Thank you, Your Honor. |
| 03:53 | 21 | MS. FITZGERALD:  Ericsson calls Mr. David Kennedy. |
| 03:53 | 22 | DAVID KENNEDY, DEFENSE WITNESS, SWORN |
| 03:53 | 23 | DIRECT EXAMINATION |
| 03:54 | 24 | BY MS. FITZGERALD: |
| 03:54 | 25 | Q     Good afternoon, Mr. Kennedy. |

| 03:54 | 1 | A    Good afternoon. |
| 03:54 | 2 | Q    There are two slim binders in front of one, one with |
| 03:54 | 3 | your direct testimony and one with your rebuttal testimony. |
| 03:54 | 4 | Do you see those? |
| 03:54 | 5 | A    Yes. |
| 03:54 | 6 | Q    Can you open the binder with your direct testimony.  I |
| 03:54 | 7 | believe it's your corrected direct witness statement.  Do |
| 03:55 | 8 | you see that? |
| 03:55 | 9 | A    Yes. |
| 03:55 | 10 | Q    Can you flip to the end and verify that that is indeed |
| 03:55 | 11 | your signature? |
| 03:55 | 12 | A    It is. |
| 03:55 | 13 | Q    Can you look in the binder that has your rebuttal |
| 03:55 | 14 | testimony and do the same thing? |
| 03:55 | 15 | A    (Witness complies.)  Yes, it is. |
| 03:55 | 16 | Q    Your signature is on both documents? |
| 03:55 | 17 | A    Yes. |
| 03:55 | 18 | Q    And, Mr. Kennedy, do you have any corrections or |
| 03:55 | 19 | changes that you want to make to your testimony? |
| 03:55 | 20 | A    I do. |
| 03:55 | 21 | Q    What is that? |
| 03:55 | 22 | A    In my rebuttal statement I mentioned that Dr. Leonard |
| 03:55 | 23 | and Dr. Kakaes disagreed one hundred percent of the time in |
| 03:55 | 24 | their evaluation of which Ericsson patents were valuable. |
| 03:55 | 25 | During the testimony of Dr. Leonard, I heard him |

03:55  1    mention that I had left something out or ignored a patent.

03:55  2    So I went back to look at his data and ran the software

03:56  3    basically to sort those patents again and found that there

03:56  4    was a patent labeled public, not Ericsson but public, that

03:56  5    did not filter for me as an Ericsson patent the first time.

03:56  6    It was labeled public I believe because it was expired.

03:56  7            On that patent he and Dr. Kakaes did agree.  So I

03:56  8    would like to change my testimony that they didn't disagree

03:56  9    a hundred percent of the time.  It was 96 percent of the

03:56  10   time, based on including that patent in.  Even though it

03:56  11   expired, it doesn't change the value or the calculation that

03:56  12   it wasn't a hundred percent of the time.

03:56  13   Q    Is that your only change or correction?

03:56  14   A    Yes.  I think there was an errata sheet filed on the

03:56  15   witness declaration to clarify a misstatement I made about

03:56  16   the -- my opinion or the facts surrounding a couple of cases

03:57  17   where the Federal Circuit, where a fact had been decided,

03:57  18   and it looked like from my statement that I didn't

03:57  19   acknowledge that.  But I do.

03:57  20   Q    All right.  Thank you.

03:57  21            MS. FITZGERALD:  I'd offer Mr. Kennedy's written

03:57  22   testimony into evidence, Your Honor.

03:57  23            THE COURT:  It will be received.

03:57  24            (Declaration of Mr. Kennedy received in evidence.)

03:57  25            MS. FITZGERALD:  And I tender Mr. Kennedy for

03:57    1    cross-examination.

03:57    2            THE COURT:  Okay.

03:57    3            Mr. Holder.

03:57    4            MR. HOLDER:  Thank you, Your Honor.

03:57    5                  CROSS-EXAMINATION

03:57    6    BY MR. HOLDER:

03:57    7    Q    Good afternoon, Mr. Kennedy.

03:57    8    A    Good afternoon.

03:57    9    Q    We haven't met before.

03:57   10            You did what you have referred to -- pardon me.  I

03:57   11    always forget the binders.  Let's let you get your binders

03:57   12    there before I get into the subject.

03:57   13           (Pause in proceedings)

03:57   14    BY MR. HOLDER:

03:57   15    Q    Mr. Kennedy, as part of your expert analysis in this

03:58   16    case, you performed what you have referred to as an

03:58   17    ex-standard analysis of Ericsson's patents; correct?

03:58   18    A    Yes.

03:58   19    Q    Before we get into the details of your analysis, I

03:58   20    would like to lay some foundation.  In your witness

03:58   21    declaration you wrote that:  "In recent years some

03:58   22    commentators have suggested that to be FRAND, a license must

03:58   23    not include value derived by virtue of the fact that the SEP

03:59   24    is incorporated into the standard."

03:59   25           Do you recall writing that in your witness

| | | |
|---|---|---|
| 03:59 | 1 | declaration? |
| 03:59 | 2 | A    Yes. |
| 03:59 | 3 | Q    Sir, what commentators were you referring to when you |
| 03:59 | 4 | made that statement? |
| 03:59 | 5 | A    Well, that is what I was referring to in the errata |
| 03:59 | 6 | sheet.  I was not referring to the Federal Circuit, as you |
| 03:59 | 7 | mentioned or as TCL mentioned in its opening brief.  That |
| 03:59 | 8 | brought that wording to my attention.  It looked like I was, |
| 03:59 | 9 | but I wasn't.  So I have made that errata change. |
| 03:59 | 10 |         Commentators, there's been papers written and |
| 03:59 | 11 | there was much discussion about the ex ante, including any |
| 03:59 | 12 | value of the standard in licensing arrangements before it |
| 03:59 | 13 | was decided. |
| 03:59 | 14 |         MR. HOLDER:  Let's pull up your corrected witness |
| 03:59 | 15 | declaration and go to page 113.  If we could blow up |
| 04:00 | 16 | paragraph 127. |
| 04:00 | 17 | BY MR. HOLDER: |
| 04:00 | 18 | Q    This is the version of your witness declaration that |
| 04:00 | 19 | was corrected on Sunday, I believe; right? |
| 04:00 | 20 | A    Yes. |
| 04:00 | 21 | Q    And you refer to some commentator suggesting that a |
| 04:00 | 22 | license must not include value derived by virtue of the fact |
| 04:00 | 23 | that the patent was incorporated into the standard; right? |
| 04:00 | 24 | A    That's correct. |
| 04:00 | 25 | Q    Now, the word "then" was inserted into your witness |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 04:00 | 1 | testimony on Sunday, whereas previously it had said "for |
| 04:00 | 2 | example"; correct? |
| 04:00 | 3 | A    Yes. |
| 04:00 | 4 | Q    And so previously you were identifying the Federal |
| 04:00 | 5 | Circuit Court of Appeals as an example of a commentator that |
| 04:00 | 6 | has suggested that the value of a standard essential patent |
| 04:00 | 7 | not include value associated with incorporation into the |
| 04:00 | 8 | standard; right? |
| 04:00 | 9 | A    No, I wasn't. |
| 04:00 | 10 | Q    Sir, you wrote and submitted this witness declaration |
| 04:00 | 11 | back on January 11; right? |
| 04:00 | 12 | A    Yes. |
| 04:00 | 13 | Q    And it said, for example, to begin the second sentence, |
| 04:00 | 14 | on January 11; right? |
| 04:01 | 15 | A    Yes, it did. |
| 04:01 | 16 | Q    And it remained that way until two days ago; right? |
| 04:01 | 17 | A    Yes. |
| 04:01 | 18 | Q    Okay.  My mother was an English teacher.  She taught me |
| 04:01 | 19 | that the first sentence is called the topic sentence; right? |
| 04:01 | 20 | A    Sure. |
| 04:01 | 21 | Q    And the second sentence began with the phrase for |
| 04:01 | 22 | example, which is intended to be exemplary of the topic |
| 04:01 | 23 | sentence; right? |
| 04:01 | 24 | A    Well, like I said, it was a mistake in wording.  I |
| 04:01 | 25 | fully understand that the Court said what it did, so it was |

| | | |
|---|---|---|
| 04:01 | 1 | a mistake and I have corrected it. |
| 04:01 | 2 | Q   Who decided that the words "for example" were going to |
| 04:01 | 3 | be replaced with the word "then?" |
| 04:01 | 4 | A   I did. |
| 04:01 | 5 | Q   Was that suggested by counsel? |
| 04:01 | 6 | A   No.  I was reading in preparing and I saw that, and it |
| 04:01 | 7 | troubled me the way it worded.  And there's a previous |
| 04:01 | 8 | paragraph, too, that I changed that I think was just wrong. |
| 04:01 | 9 | Q   You're the one you wrote this witness declaration; |
| 04:01 | 10 | right? |
| 04:01 | 11 | A   Yes. |
| 04:01 | 12 | Q   Why did you choose the words "for example" in the first |
| 04:01 | 13 | instance? |
| 04:01 | 14 | A   Discussing the license must not include the value is -- |
| 04:02 | 15 | like I said, it was inartful, but I have corrected it. |
| 04:02 | 16 | Q   You understand that the Federal Circuit is not a |
| 04:02 | 17 | commentator; correct? |
| 04:02 | 18 | A   Right.  That's why I corrected it, yes. |
| 04:02 | 19 | Q   Perhaps in the eyes of the Supreme Court but no one |
| 04:02 | 20 | else; correct? |
| 04:02 | 21 | A   The law is what it is.  I am not here to offer an |
| 04:02 | 22 | opinion on that.  That was admittedly an inartful way to say |
| 04:02 | 23 | that, and that's why I corrected it when I was getting down |
| 04:02 | 24 | to studying and realizing I would be testifying sometime |
| 04:02 | 25 | this week. |

04:02   1   Q    Let's go to the prior page, paragraph 225, and look at

04:02   2   one of the other changes that you made on Sunday.  Let's

04:02   3   focus on paragraph 225.

04:02   4           Now, you write here in your corrected witness

04:02   5   declaration that one of most debated issues with FRAND

04:02   6   licensing has been whether the license price should include

04:02   7   the value that a patent gains by being adopted into an

04:02   8   industry standard.  Do you see that?

04:02   9   A    Yes.

04:02   10  Q    And the word "debated" prior to Sunday used to say

04:03   11  controversial current; right?

04:03   12  A    Yes.

04:03   13  Q    So you changed debated issues -- you changed

04:03   14  controversial current issues to debated issues; right?

04:03   15  A    Yes.  I wanted to put it in the past tense.  It has

04:03   16  been very debated, but there is no debate right now with the

04:03   17  two cases that are standing that have been ruled on by the

04:03   18  Federal Circuit.

04:03   19  Q    That's what I wanted to make clear, sir.  You are

04:03   20  certainly aware that the law is settled on this issue;

04:03   21  correct?

04:03   22  A    Yes, I am.

04:03   23  Q    The federal circuit has made clear that when dealing

04:03   24  with standard essential patents, the patentee's royalty must

04:03   25  be premised on the value of the patented feature, not on any

04:03    1    value added by the standard's adoption of the patented

04:03    2    technology; correct?

04:03    3    A    Yes.  That's in fact why I did this section.  So that's

04:03    4    why I did this analysis.

04:03    5    Q    And that was set forth by the Federal Circuit in the

04:03    6    Ericsson v. D-Link case as well as the CSIRO v. Cisco case;

04:03    7    correct?

04:04    8    A    And maybe others.  I don't recall right now how many

04:04    9    were that -- but it's certainly a decided issue in my view

04:04   10    from my reading.

04:04   11    Q    Let's talk a little bit more about the subject of

04:04   12    patent holdup.

04:04   13              MR. HOLDER:  If we could stay in the rebuttal

04:04   14    witness declaration and go to paragraph 258 on page 115.

04:04   15    BY MR. HOLDER:

04:04   16    Q    Sir, do you recall offering the opinion in your

04:04   17    testimony that patent holdup is said to occur when an SEP

04:04   18    owner makes a deliberately false promise to license its SEPs

04:05   19    on FRAND terms and then breaches that promise once its

04:05   20    technology is incorporated into the industry standard and

04:05   21    downstream OEM manufacturers have no choice but to use it?

04:05   22    A    I don't remember those exact words, but they may be my

04:05   23    exact words.

04:05   24    Q    Do you believe that the concept of patent holdup

04:05   25    entails a deliberately false promise?

04:05   1    A    If I wrote that, I believe that.  It may involve other

04:05   2    things, too.

04:05   3    Q    Are you aware that the law actually defines patent

04:05   4    holdup in a much broader way?

04:05   5    A    I am not aware of that.

04:05   6         MR. HOLDER:  Let's go to Exhibit 2606.  Let's

04:05   7    focus on the top.

04:05   8    BY MR. HOLDER:

04:05   9    Q    So this is the Federal Circuit's decision in the

04:06   10   Ericsson, Inc., v. D-Link Systems case from December of

04:06   11   2014; correct?

04:06   12   A    Yes.

04:06   13        MR. HOLDER:  If we could go to page 8.

04:06   14   BY MR. HOLDER:

04:06   15   Q    In this case the Federal Circuit explained that patent

04:06   16   holdup exists when the holder of an SEP demands excessive

04:06   17   royalties after companies are locked in to using a standard.

04:06   18   Do you see that?

04:06   19   A    Yes.

04:06   20   Q    The Federal Circuit doesn't say anything about a

04:06   21   deliberately false promise here; does it?

04:06   22   A    Not in this sentence, no.

04:06   23        MR. HOLDER:  Let's go to Exhibit 2605.

04:06   24   BY MR. HOLDER:

04:06   25   Q    Sir, do you recognize this as the decision from Judge

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 04:06 | 1 | Robart in the Microsoft v. Motorola matter from April of |
| 04:06 | 2 | 2013? |
| 04:06 | 3 | A    Yes. |
| 04:06 | 4 | MR. HOLDER:  Let's go to page 9, focusing on the |
| 04:07 | 5 | bottom highlight next to the number 55.  It states:  "The |
| 04:07 | 6 | ability of a holder of an SEP to demand more than the value |
| 04:07 | 7 | of its patented technology and to attempt to capture the |
| 04:07 | 8 | value of the standard itself is referred to as patent |
| 04:07 | 9 | holdup." |
| 04:07 | 10 | BY MR. HOLDER: |
| 04:07 | 11 | Q    Do you see that? |
| 04:07 | 12 | A    Yes. |
| 04:07 | 13 | Q    Judge Robart didn't say anything about a deliberately |
| 04:07 | 14 | false promise; correct? |
| 04:07 | 15 | A    Not in this paragraph, no. |
| 04:07 | 16 | THE COURT:  Well, sir, do you believe he says it |
| 04:07 | 17 | somewhere else? |
| 04:07 | 18 | THE WITNESS:  I just don't know. |
| 04:07 | 19 | THE COURT:  Okay. |
| 04:07 | 20 | BY MR. HOLDER: |
| 04:07 | 21 | Q    Let's talk a little bit more about your ex-standard |
| 04:07 | 22 | analysis.  Now, you understand that part of your ex-standard |
| 04:07 | 23 | analysis was stricken by the Court in response to TCL's |
| 04:07 | 24 | Daubert motion; correct? |
| 04:07 | 25 | A    Yes. |

04:07  1    Q     In particular you had tried to value Ericsson's patents

04:07  2    related to power consumption by reference to what people pay

04:08  3    for Mophie cases which also charge the battery in the phone;

04:08  4    right?

04:08  5    A     No.

04:08  6    Q     Well, you had tried to place a value on certain patents

04:08  7    by reference to Mophie battery-charging cases; right?

04:08  8    A     No.   That's not what I did.

04:08  9    Q     Well, what did you do with respect to Mophie cases,

04:08 10    sir?

04:08 11    A     As I mentioned in my statement, it was a reasonableness

04:08 12    check on the determination of the value, this ex-standard

04:08 13    value at the time the license agreement was signed of the

04:08 14    battery -- some of the technical improvements that led to an

04:08 15    increased battery life as a reasonableness check on other

04:08 16    numbers.

04:08 17    Q     And you looked at the prices that people were paying

04:08 18    for Mophie battery-charging cases as part of that analysis;

04:08 19    right?

04:08 20    A     Yes.

04:08 21    Q     And that got stricken by the Court; right?

04:08 22    A     Yes.

04:08 23    Q     You also did a, quote, unquote, reasonableness check by

04:09 24    looking at the price difference between Apple's iPhone and

04:09 25    iPod Touch; right?

| | | |
|---|---|---|
| 04:09 | 1 | A    Yes. |
| 04:09 | 2 | Q    That also got stricken by the Court; correct? |
| 04:09 | 3 | A    I believe that's the right terminology.  I'm not |
| 04:09 | 4 | certain how it's submitted.  It was excluded from my |
| 04:09 | 5 | testimony, yes. |
| 04:09 | 6 | Q    Have any of your opinions ever been excluded before in |
| 04:09 | 7 | response to a Daubert motion? |
| 04:09 | 8 | A    Yes. |
| 04:09 | 9 | Q    How many times, sir? |
| 04:09 | 10 | A    One. |
| 04:09 | 11 | Q    So let's discuss the portion of your ex-standard |
| 04:09 | 12 | analysis that remains.  In short, you started by looking at |
| 04:09 | 13 | what Dr. Parkvall from Ericsson had said regarding certain |
| 04:09 | 14 | Ericsson patents which he grouped into ten technical |
| 04:09 | 15 | clusters; right? |
| 04:09 | 16 | A    Yes. |
| 04:09 | 17 | Q    According to your witness statement, Dr. Parkvall |
| 04:09 | 18 | identified four main technical benefits that flow from the |
| 04:09 | 19 | technical clusters; right? |
| 04:09 | 20 | A    Yes. |
| 04:09 | 21 | Q    Those four benefits were improved battery life, faster |
| 04:10 | 22 | data speeds, less latency problems, and improved system |
| 04:10 | 23 | capacity; correct? |
| 04:10 | 24 | A    Correct. |
| 04:10 | 25 | Q    And you focused on those four benefits which you |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 04:10 | 1 | remained technical currencies; right? |
| 04:10 | 2 | A     Yes. |
| 04:10 | 3 | Q     To be clear, you do not have any independent technical |
| 04:10 | 4 | opinions; right? |
| 04:10 | 5 | A     That's correct. |
| 04:10 | 6 | Q     You simply rely on Dr. Parkvall with respect to the |
| 04:10 | 7 | technical matters; correct? |
| 04:10 | 8 | A     Yes. |
| 04:10 | 9 | Q     So if Dr. Parkvall is incorrect in his summary of the |
| 04:10 | 10 | benefits of each technical cluster, then you wouldn't have |
| 04:10 | 11 | any basis for using his information in connection with |
| 04:10 | 12 | formulating your opinions; correct? |
| 04:10 | 13 | A     That's correct. |
| 04:10 | 14 |           MR. HOLDER:  Let's go to Mr. Kennedy's opening |
| 04:10 | 15 | witness declaration at page 114, and look at figure 55. |
| 04:10 | 16 | BY MR. HOLDER: |
| 04:10 | 17 | Q     Sir, figure 55 in your testimony summarizes the results |
| 04:11 | 18 | of the work you did with respect to those four technical |
| 04:11 | 19 | currencies; correct? |
| 04:11 | 20 | A     Yes. |
| 04:11 | 21 | Q     With respect to just two of the four technical |
| 04:11 | 22 | currencies, you actually tried to put a monetary value on |
| 04:11 | 23 | them.  That would be the first two -- improved battery life |
| 04:11 | 24 | and faster data rates; right? |
| 04:11 | 25 | A     I did calculate an economic value, yes. |

| 04:11 | 1 | Q    For the other two technical currencies, which were less |
| 04:11 | 2 | latency and improved network performance, you did not |
| 04:11 | 3 | actually try to put a monetary value on them; correct? |
| 04:11 | 4 | A    I did not. |
| 04:11 | 5 | Q    You ultimately opined that Ericsson's share of these |
| 04:11 | 6 | two technical currencies would equal between $6 and $11 per |
| 04:11 | 7 | 4G phone; right? |
| 04:11 | 8 | A    Yes.  But with the exclusion of what has been excluded |
| 04:11 | 9 | by the Court, it would be $6.15 to about $7.20, I believe. |
| 04:12 | 10 | Q    I see.  So the delta between $7 and $11 was |
| 04:12 | 11 | attributable to what was stricken? |
| 04:12 | 12 | A    Yes. |
| 04:12 | 13 | Q    Okay.  Thank you for that clarification.  So we're |
| 04:12 | 14 | looking at $6 to $7 a phone; right? |
| 04:12 | 15 | A    Yes. |
| 04:12 | 16 | Q    You're not suggesting that these values that you came |
| 04:12 | 17 | up with have ever been the basis for any of Ericsson's |
| 04:12 | 18 | actual licensing proposals; correct? |
| 04:12 | 19 | A    Correct. |
| 04:12 | 20 | Q    You're also not aware of any Ericsson licensee ever |
| 04:12 | 21 | paying anywhere close to $6 to $7 a phone for a license to |
| 04:12 | 22 | Ericsson's 4G patents; right? |
| 04:12 | 23 | A    That's correct. |
| 04:12 | 24 | Q    So you're not proposing an actual royalty rate here. |
| 04:12 | 25 | You're just talking about what you think Ericsson's patents |

04:12    1   might be worth based on your ex-standard analysis; right?

04:12    2   A     Not exactly.

04:12    3   Q     Let's talk about your improved battery-life

04:12    4   calculation.  You rely on Dr. Parkvall's opinion that

04:12    5   Ericsson's patents related to sleep-mode solutions allow for

04:13    6   power to be consumed in a more conservative way such that

04:13    7   there is a 53 percent increase in battery life; right?

04:13    8   A     The 53 percent is the part of the calculation.  The

04:13    9   value that Dr. Parkvall has identified is greater than that.

04:13   10   That's a floor of his identified technical benefits.

04:13   11   Q     My point simply is that you used Dr. Parkvall's

04:13   12   53 percent figure to calculate the supposed value of

04:13   13   Ericsson's patents related to sleep-mode solutions; right?

04:13   14   A     Yes.

04:13   15   Q     You did that calculation by using a survey from a

04:13   16   company called International Planning and Research; right?

04:13   17   A     That's correct.

04:13   18   Q     We'll come back and we'll talk about that survey in

04:13   19   more detail later.

04:13   20           Sir, isn't it true that the 53 percent figure

04:13   21   related to battery life is the only piece of information

04:14   22   that you got from Dr. Parkvall that you actually used to

04:14   23   calculate an actual monetary value for Ericsson's patents?

04:14   24   A     I'm sorry.  Could you repeat the question?

04:14   25   Q     Certainly.  The 53-percent figure related to battery

04:14  1   life that you got from Dr. Parkvall, that's the only piece

04:14  2   of information that you actually used that you got from

04:14  3   Dr. Parkvall to calculate an actual monetary value for

04:14  4   Ericsson's patents?

04:14  5   A    Oh, I understand.  It's the only number that I got from

04:14  6   him, yes.

04:14  7   Q    Okay.  We know that you did not calculate any actual

04:14  8   monetary value with respect to the third and fourth

04:14  9   technical currencies; correct?

04:14  10  A    That's correct.

04:14  11  Q    And with respect to the second technical currency,

04:14  12  which was faster data speeds, you don't actually use any

04:14  13  information from Dr. Parkvall as a specific input in your

04:15  14  calculations; do you?

04:15  15  A    I'm sorry.  Would you repeat that again?

04:15  16  Q    With respect to the second technical currency, faster

04:15  17  data speeds, you do not actually use any information from

04:15  18  Dr. Parkvall as a specific input in your calculations;

04:15  19  correct?

04:15  20  A    That's correct.

04:15  21        MR. HOLDER:  Let's look at paragraph 249 of your

04:15  22  opening witness declaration on page 124.

04:15  23  BY MR. HOLDER:

04:15  24  Q    Now, with respect to faster data speeds, you cite

04:15  25  Dr. Parkvall for the fact that carrier aggregation, which is

04:15    1    an aspect of 4G that includes Ericsson's patents, provides

04:15    2    upwards of 80 percent of the higher user data rates than any

04:15    3    alternative solutions lacking Ericsson's patented

04:15    4    technology; right?

04:15    5    A      Yes.

04:15    6    Q    But you do not actually use that 80 percent figure in

04:15    7    any calculations; correct?

04:15    8    A      That's correct.

04:15    9    Q      Instead, you looked at a survey from International

04:15   10    Planning and Research as well as a survey from Accenture;

04:16   11    correct?

04:16   12    A      Yes.

04:16   13    Q    Those surveys both looked at what consumers would be

04:16   14    willing pay to 4G data speeds as compared to 3G data speeds;

04:16   15    right?

04:16   16    A      That's correct, yes.

04:16   17    Q      So those surveys were just comparing 3G performance to

04:16   18    4G performance; right?

04:16   19    A      Performance in terms of speed and/or specifically from

04:16   20    3G to 4G, yes.

04:16   21    Q      Those surveys were not specific to any Ericsson

04:16   22    patents; correct?

04:16   23    A      That's correct.  They were not done for the purposes of

04:16   24    this litigation.

04:16   25    Q      You then used the dollar values produced by those two

| | | |
|---|---|---|
| 04:16 | 1 | surveys.  I believe you mixed in some ASP data with respect |
| 04:16 | 2 | to the Accenture survey, and you then assigned Ericsson its |
| 04:16 | 3 | proportional share based upon the number of |
| 04:16 | 4 | Ericsson-approved technical contributions to the 4G standard |
| 04:16 | 5 | as a whole; right? |
| 04:16 | 6 | A     Yes. |
| 04:16 | 7 | Q    You didn't rely on any data from Dr. Parkvall in doing |
| 04:16 | 8 | either of those calculations; correct? |
| 04:16 | 9 | A     No financial data, no, percentages or ratios. |
| 04:17 | 10 | Q    Your valuation with respect to the faster data speed, |
| 04:17 | 11 | technical currency, was entirely based on the surveys, ASP |
| 04:17 | 12 | data, and a proportional share figure derived from |
| 04:17 | 13 | contribution counting; correct? |
| 04:17 | 14 | A     The calculation itself, yes. |
| 04:17 | 15 | Q    And that proportional share figure related to all 4G |
| 04:17 | 16 | standard essential patents; right? |
| 04:17 | 17 | A     Yes. |
| 04:17 | 18 | Q    It was not a proportional share figure that was |
| 04:17 | 19 | specific to Ericsson patents related to faster data speeds; |
| 04:17 | 20 | correct? |
| 04:17 | 21 | A     I'm sorry.  Would you repeat the question? |
| 04:17 | 22 | Q    In order to derive Ericsson's proportional share of the |
| 04:17 | 23 | value of the faster data speeds, you used a proportional |
| 04:17 | 24 | share figure based upon contribution counting; correct? |
| 04:17 | 25 | A     Oh, right.  Yes. |

| | | |
|---|---|---|
| 04:17 | 1 | Q     And that contribution counting figure was for the 4G |
| 04:17 | 2 | standard as a whole.  It was not specific to patents related |
| 04:18 | 3 | to faster data speeds; right? |
| 04:18 | 4 | A     That's correct.  Right. |
| 04:18 | 5 | Q     Let's talk further about your use of the surveys. |
| 04:18 | 6 | The surveys from International Planning and |
| 04:18 | 7 | Research and Accenture were trying to measure consumers' |
| 04:18 | 8 | willingness to pay; right? |
| 04:18 | 9 | A     Yes. |
| 04:18 | 10 | Q     And your ex-standard calculations with respect to |
| 04:18 | 11 | battery life and faster data speeds necessarily rely on the |
| 04:18 | 12 | surveys; right? |
| 04:18 | 13 | A     Yes. |
| 04:18 | 14 | Q     Without the surveys you can't calculate those values; |
| 04:18 | 15 | correct? |
| 04:18 | 16 | A     That's correct. |
| 04:18 | 17 | Q     You take away the surveys, your ex-standard analysis |
| 04:18 | 18 | that remains falls apart; right? |
| 04:18 | 19 | A     I don't think I could support that's where I got the |
| 04:19 | 20 | numbers.  So, yeah, if the surveys are out, then those |
| 04:19 | 21 | numbers would be out. |
| 04:19 | 22 | Q     So to confirm, you were not personally involved in any |
| 04:19 | 23 | of the surveys you rely upon for your ex-standard analysis; |
| 04:19 | 24 | correct? |
| 04:19 | 25 | A     That's correct.  They're historical surveys that I |

| | | |
|---|---|---|
| 04:19 | 1 | found and relied on. |
| 04:19 | 2 | Q    You didn't commission them; correct? |
| 04:19 | 3 | A    That's correct. |
| 04:19 | 4 | Q    You didn't design them; correct? |
| 04:19 | 5 | A    I did not. |
| 04:19 | 6 | Q    You didn't conduct them; correct? |
| 04:19 | 7 | A    I was not involved in any way. |
| 04:19 | 8 | Q    Where did you find them? |
| 04:19 | 9 | A    Well, I knew about Accenture and studies they had done |
| 04:19 | 10 | on willingness to pay.  I don't remember if I got it off of |
| 04:19 | 11 | their site or -- but I had asked somebody to look into |
| 04:19 | 12 | Accenture because I knew they were a global consulting firm |
| 04:19 | 13 | and had done surveys like this before. |
| 04:19 | 14 | Q    So you went looking for them? |
| 04:19 | 15 | A    Yes, I did. |
| 04:19 | 16 | Q    Okay.  Now, you understand that TCL's expert, |
| 04:19 | 17 | Dr. Itamar Simonson, has challenged the reliability of those |
| 04:20 | 18 | surveys; right? |
| 04:20 | 19 | A    Yes. |
| 04:20 | 20 | Q    You understand that Dr. Simonson is a professor of |
| 04:20 | 21 | marketing at Stanford School of Business; right? |
| 04:20 | 22 | A    Yes. |
| 04:20 | 23 | Q    Would you agree that an important part of marketing is |
| 04:20 | 24 | trying to measure and better understand what people buy, why |
| 04:20 | 25 | they choose to buy things, and how much they will on things? |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
| 04:20 | 1  | A     That sounds reasonable.                                                 |
| 04:20 | 2  | Q     Your degree is a bachelor's in business administration                 |
| 04:20 | 3  | with an emphasis in accounting; right?                                        |
| 04:20 | 4  | A     A degree in accounting.                                                 |
| 04:20 | 5  | Q     Okay.  It's actually a business administration                          |
| 04:20 | 6  | accounting degree?                                                            |
| 04:20 | 7  | A     Yes.                                                                    |
| 04:20 | 8  | Q     Okay.  Are you aware that Dr. Simonson has both an MBA                  |
| 04:20 | 9  | and a Ph.D. in marketing?                                                     |
| 04:20 | 10 | A     I'll take your word for it.  I have looked at his                       |
| 04:20 | 11 | report and his résumé, and he seemed to be -- I think he was                  |
| 04:20 | 12 | a professor and seemed to be very well educated.                             |
| 04:20 | 13 |          MR. HOLDER:  Let's make sure our record is clear.                    |
| 04:20 | 14 | Let's put Exhibit 2387 on the screen.  This is                                |
| 04:21 | 15 | Dr. Simonson's CV.                                                            |
| 04:21 | 16 | BY MR. HOLDER:                                                                |
| 04:21 | 17 | Q     Do you see, sir, that he has both a Ph.D. and an MBA in                 |
| 04:21 | 18 | marketing?                                                                    |
| 04:21 | 19 | A     Yes.                                                                    |
| 04:21 | 20 | Q     Now, you have never held any academic positions;                       |
| 04:21 | 21 | correct?                                                                      |
| 04:21 | 22 | A     No.                                                                     |
| 04:21 | 23 | Q     Are you aware that for the last 29 years, Dr. Simonson                  |
| 04:21 | 24 | has taught courses related to marketing and consumer                         |
| 04:21 | 25 | behavior at universities such as Stanford and MIT and                        |

04:21  1    Berkeley?

04:21  2    A    I wasn't sure of the years, but I did read that, that

04:21  3    he had been teaching for a long period of time.  And those

04:21  4    universities sound familiar, so I'll take your word for it.

04:21  5    Q    You have never taught any courses related to surveys or

04:21  6    studying consumer behavior; have you?

04:21  7    A    No.

04:21  8    Q    Are you aware that Dr. Simonson teaches courses

04:21  9    regarding studying consumer behavior and behavioral

04:21  10   decision-making, including survey methods for conducting

04:21  11   consumer research?

04:21  12   A    I don't know if I'm aware of that.  But when I read his

04:21  13   background, that sounds like his background.

04:21  14   Q    You have never published any articles focused on

04:21  15   surveys or the study of consumer behavior; have you?

04:22  16   A    No.

04:22  17   Q    Are you aware that Dr. Simonson has published over 60

04:22  18   such articles?

04:22  19   A    I wasn't aware of the number.

04:22  20   Q    Sir, you have never edited or written any books related

04:22  21   to consumer behavior; have you?

04:22  22   A    No.

04:22  23   Q    Are you aware that Dr. Simonson has done so?

04:22  24   A    I just don't recall.

04:22  25   Q    Sir, you have never served on any editorial boards of

04:22   1    journals which are focused on marking and consumer research;

04:22   2    have you?

04:22   3    A    No.

04:22   4    Q    Are you aware that Dr. Simonson has been an editor for

04:22   5    the Journal of Marketing Research, the Journal of Consumer

04:22   6    Psychology, the Journal of Consumer Research, and the

04:22   7    Journal of Behavioral Decision Making, among others?

04:22   8    A    I don't remember the details of the résumé, but I have

04:22   9    no reason to doubt you.

04:22   10   Q    Sir, you are not a member of any associations that

04:22   11   specifically focus on research and consumer behavior; are

04:22   12   you?

04:22   13   A    That's correct.

04:22   14   Q    Are you aware that Dr. Simonson is a member of the

04:22   15   Association for Consumer Research, the Judgment and Decision

04:23   16   Making Society, and the American Psychological Society?

04:23   17   A    I remember the last one, the psychological society, but

04:23   18   I'm not sure about the others.

04:23   19   Q    Sir, you have not won any awards in connection with

04:23   20   research related to consumer decision-making; have you?

04:23   21   A    No.

04:23   22   Q    Are you aware that Dr. Simonson won the 2016

04:23   23   Association for Consumer Research conference best-paper

04:23   24   award?

04:23   25   A    I don't remember that one.

04:23  1   Q    Are you aware that Dr. Simonson has won the Society for
04:23  2   Consumer Psychology award for distinguished scientific
04:23  3   achievement?
04:23  4   A    I just don't remember.  I read his résumé and maybe
04:23  5   that's in there, but I don't have any reason to doubt you.
04:23  6   I'll take your word for it.
04:23  7   Q    Sir, you have never been qualified to testify as an
04:23  8   expert where the focus of your opinion testimony was survey
04:23  9   methodology; correct?
04:23  10  A    Not survey methodology, no.
04:23  11  Q    Are you aware that Dr. Simonson has been qualified as
04:23  12  an expert and has offered testimony regarding consumer
04:23  13  surveys in at least 20 trials?
04:23  14  A    Again, I don't know the number, but I did see a list of
04:24  15  trials where he testified.
04:24  16  Q    Sir, you produced your CV in this case; right?
04:24  17  A    Yes.
04:24  18  Q    I will represent to you that the version of the CV that
04:24  19  was produced by Ericsson in this case is actually word
04:24  20  searchable.  The word "survey" doesn't appear in your CV;
04:24  21  does it?
04:24  22  A    I wouldn't expect it to, no.
04:24  23  Q    The word "marketing" doesn't appear in your CV; does
04:24  24  it?
04:24  25  A    I wouldn't expect it to, no.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 04:24 | 1 | Q | The word "consumer" doesn't appear in your CV; does it? |

04:24    1    Q    The word "consumer" doesn't appear in your CV; does it?

04:24    2    A    Not that I can remember, no.

04:24    3    Q    The word "behavior" doesn't appear in your CV; does it?

04:24    4    A    I wouldn't think so.

04:24    5    Q    The word "decision" doesn't appear in your CV; does it?

04:24    6    A    I don't know, but I can't think of a case where it

04:24    7    might.

04:24    8    Q    Sir, as between you and Dr. Simonson, I trust you would

04:24    9    agree that Dr. Simonson is more qualified than you are to

04:24    10   address matters related to the study of consumer behavior

04:24    11   and survey design; correct?

04:24    12   A    He seems like on paper -- I don't know him personally,

04:24    13   but he seems like on paper he has a long list of

04:25    14   qualifications and testimony in that regard.  So I don't

04:25    15   have any reason to dispute that he isn't very well qualified

04:25    16   in that area.  I just don't know.

04:25    17   Q    And, in fact, more qualified than you; correct?

04:25    18   A    Certainly on the academic side of studying surveys or

04:25    19   the methodology.  You know, mine is on the implementation

04:25    20   side and relying on it for licensing deals.

04:25    21   Q    Well, sir, you understand that Dr. Simonson has also

04:25    22   actively consulted with respect to survey design in the

04:25    23   field; right?

04:25    24   A    I think I remember that in part of his résumé.

04:25    25   Q    You have never actively designed a survey for use in

| | | |
|---|---|---|
| 04:25 | 1 | the field; have you? |
| 04:25 | 2 | A    Oh, no.  I didn't mean to indicate that I had. |
| 04:25 | 3 | Q    So again, let's be clear.  As between you and |
| 04:25 | 4 | Dr. Simonson, you would agree that Dr. Simonson is more |
| 04:25 | 5 | qualified than you are to address matters related to the |
| 04:25 | 6 | study of consumer behavior and survey design; correct? |
| 04:26 | 7 | A    I think that's a fair statement, yes. |
| 04:26 | 8 | MR. HOLDER:  Your Honor, I am at a subject matter |
| 04:26 | 9 | breaking point.  If you would like to break early, I can do |
| 04:26 | 10 | so. |
| 04:26 | 11 | THE COURT:  That's fine.  We will conclude here |
| 04:26 | 12 | for the day, then. |
| 04:26 | 13 | MR. HOLDER:  Thank you. |
| 04:26 | 14 | THE COURT:  Sir, you may step down. |
| 04:26 | 15 | Anything for the record before we conclude? |
| 04:26 | 16 | MR. HOLDER:  Not from us, sir. |
| 04:26 | 17 | THE COURT:  Okay.  Very good.  We will be in |
| 04:26 | 18 | recess. |
| 04:26 | 19 | (Proceedings adjourned at 4:26 p.m.) |
| 04:26 | 20 | *    *    * |
| 04:26 | 21 | |
| 04:26 | 22 | |
| 04:26 | 23 | |
| 04:26 | 24 | |
| 04:26 | 25 | |

04:26  1
04:26  2
04:26  3
04:26  4
04:26  5              CERTIFICATE
04:26  6
04:26  7        I hereby certify that pursuant to Section 753,
04:26  8   Title 28, United States Code, the foregoing is a true and
04:26  9   correct transcript of the stenographically reported
04:26  10  proceedings held in the above-entitled matter and that the
04:26  11  transcript page format is in conformance with the
04:26  12  regulations of the Judicial Conference of the United States.
04:26  13
04:26  14  Date:  March 1, 2017
04:26  15
04:26  16
04:26                           /s/   Sharon A. Seffens  3/1/17
04:26  17                       _____
04:26                           SHARON A. SEFFENS, U.S. COURT REPORTER
04:26  18
       19
       20
       21
       22
       23
       24
       25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER