

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

CERTIFIED TRANSCRIPT

```
TCL COMMUNICATIONS          }
HOLDINGS, LTD.,             )
               Plaintiff,  }
     vs.                    }
                            }   SACV-14-00341-JVS
TELEFONAKTIENBOLAGET LM     )
ERICSSON, et al.,           )
               Defendants.  }
----------------------------}
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

May 18, 2017

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    STEPHEN S. KORNICZKY
      MATTHEW W. HOLDER
 4    MARTIN BADER
      SHEPPARD MULLIN RICHTER & HAMPTON, LLP
 5    12275 El Camino Real, Suite 200
      San Diego, CA  92130-2006
 6    (858) 720-8900

 7    For the Defendants:

 8    JOHN S. GIBSON
      CROWELL MORING
 9    3 Park Plaza, 20th Floor
      Irvine, CA  92614-8505
10    (949) 798-1330

11    TED STEVENSON
      DOUGLAS A. CAWLEY
12    MCKOOL SMITH, P.C.
      300 Cresent Ct., Suite 1500
13    Dallas, TX  75201
      (214) 978-4974
14
      LAURIE L. FITZGERALD
15    MCKOOL SMITH, P.C.
      300 West 6th Street, Suite 1700
16    Austin, TX  78701
      (512) 692-8700
17

18

19

20

21

22

23

24

25
```

|  | 1 | SANTA ANA, CALIFORNIA; THURSDAY, MAY 18, 2017; 9:03 A.M. |
|---|---|---|
|  | 2 | THE CLERK:  Item No. 1, SACV-14-00341-JVS, TCL vs. |
| 02:54 | 3 | Ericsson, et al. |
| 09:03 | 4 | Counsel, please state your appearance for the |
| 09:03 | 5 | record. |
| 09:03 | 6 | MR. HOLDER:  Good morning, Your Honor.  Matt |
| 09:03 | 7 | Holder for TCL. |
| 09:03 | 8 | THE COURT:  Good morning. |
| 09:03 | 9 | MR. KORNICZKY:  Good morning, Your Honor.  Steve |
| 09:03 | 10 | Korniczky for TCL. |
| 09:03 | 11 | THE COURT:  Good morning. |
| 09:03 | 12 | MR. BADER:  Good morning.  Matt Bader for TCL. |
| 09:03 | 13 | THE COURT:  Good morning. |
| 09:03 | 14 | MR. STEVENSON:  Good morning, Your Honor.  Ted |
| 09:03 | 15 | Stevenson for Ericsson.  Also with us is a corporate |
| 09:03 | 16 | representative, Mr. Gustav Brismark. |
| 09:03 | 17 | THE COURT:  Good morning. |
| 09:03 | 18 | MS. FITZGERALD:  Laurie Fitzgerald for Ericsson. |
| 09:03 | 19 | THE COURT:  Good morning. |
| 09:03 | 20 | MR. GIBSON:  Good morning, Your Honor.  John |
| 09:03 | 21 | Gibson for Ericsson. |
| 09:03 | 22 | THE COURT:  Good morning. |
| 09:03 | 23 | MR. CAWLEY:  Good morning.  Douglas Cawley for |
| 09:03 | 24 | Ericsson. |
| 09:03 | 25 | THE COURT:  Good morning and welcome back.  Thank |

4

| | | |
|---|---|---|
| 09:03 | 1 | you for responding so quickly with regard to the hyperlink |
| 09:03 | 2 | issues.  I received a new thumb drive for TCL's findings of |
| 09:03 | 3 | fact and conclusions of law.  I haven't had a chance to take |
| 09:03 | 4 | a look at it.  I will do that during the break. |
| 09:03 | 5 | I better understand the nature of the hyperlinks |
| 09:03 | 6 | submitted by Ericsson, namely, that the link goes to the |
| 09:04 | 7 | document.  You look on the side.  If you want to get to the |
| 09:04 | 8 | pin site, you have got to find the pin site in the margin, |
| 09:04 | 9 | and it does takes you there.  So I understand that. |
| 09:04 | 10 | I don't recall that we had discussed time limits |
| 09:04 | 11 | for argument.  How are we going to proceed today? |
| 09:04 | 12 | MR. HOLDER:  I believe the Court had indicated |
| 09:04 | 13 | that we would have the morning.  Mr. Stevenson and I were |
| 09:04 | 14 | chatting before we began, and that was our expectation was |
| 09:04 | 15 | that the arguments would fill the morning but no further. |
| 09:04 | 16 | If it works for the Court and if it works for |
| 09:04 | 17 | Mr. Stevenson, I propose we have approximately an hour and |
| 09:04 | 18 | 20 minutes.  There would be a mid-morning break.  And then |
| 09:04 | 19 | Mr. Stevenson would have the remaining hour and 20 minutes |
| 09:04 | 20 | prior to the noon hour. |
| 09:04 | 21 | THE COURT:  Do you want a rebuttal? |
| 09:04 | 22 | MR. HOLDER:  If I have time left after going |
| 09:04 | 23 | through the questions, I would request permission to reserve |
| 09:04 | 24 | time to my hour and 20 minutes to respond to anything new |
| 09:04 | 25 | raised by Mr. Stevenson. |

09:04   1            THE COURT:  That's fine.

09:05   2            MR. STEVENSON:  The one question we just had open

09:05   3    this morning when we talked is does the Court want us to go

09:05   4    through the ten questions, or do you want to go

09:05   5    question-by-question back and forth?

09:05   6            THE COURT:  I don't want to preempt your planned

09:05   7    presentation.  There are probably more questions there than

09:05   8    can be comfortably addressed.  I will let you decide which

09:05   9    ones are significant enough to address.

09:05   10           MR. HOLDER:  I have structured my remarks relative

09:05   11   to the Court's questions.  And in terms of managing the

09:05   12   equitable split, I think it probably makes sense to not ping

09:05   13   pong between us but allow me to have my time and

09:05   14   Mr. Stevenson can have his time.

09:05   15           THE COURT:  I agree.

09:05   16           Okay, then let's proceed.

09:05   17           MR. HOLDER:  Thank you very much, Your Honor.

09:05   18           Thank you for the questions.  They were very

09:05   19   insightful, and we have spent a lot of time thinking about

09:05   20   them and being prepared to address them for the Court.

09:05   21           I have structured my comments in the order of the

09:05   22   Court's questions.  Where we have additional observations

09:06   23   that we want to bring to the Court's attention, they are

09:06   24   sprinkled throughout my subject matter.

09:06   25           Obviously if the Court has any questions for me

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:06  1   that I haven't addressed, please let me know.

09:06  2        With respect to the first question, the role of a

09:06  3   breach finding in our proceeding, the Court's question

09:06  4   assumed as a premise that the breach of contract claim has

09:06  5   been dismissed, and respectfully we disagree with that.

09:06  6        The Court clearly dismissed the damages claim in

09:06  7   response to Ericsson's Motion for Summary Judgment.  That

09:06  8   was Docket 1061.  In that same order, the Court denied

09:06  9   Ericsson's Motion for Summary Judgment with respect to no

09:06  10  liability for breach of contract.

09:06  11       In our Pretrial Conference Order, we note that

09:06  12  there is still a breach of contract claim for which specific

09:06  13  performance could be a remedy even in the absence of

09:06  14  damages.

09:06  15       I would also note that in the Pretrial Conference

09:06  16  Order Ericsson states that it wants a finding that it

09:07  17  complied with its FRAND obligation and that the terms in

09:07  18  Option A and Option B are FRAND.  So Ericsson still seems to

09:07  19  want a finding of no breach.

09:07  20       What does that means in terms of where we are?

09:07  21  Our position is if the Court finds that Option A and Option

09:07  22  B are not FRAND, the Court should call that a breach.  There

09:07  23  is nothing that should stop the Court from making that

09:07  24  finding if it concludes that Option A and Option B are not

09:07  25  FRAND.

09:07 1        The Court asked Ericsson to commit to terms that

09:07 2 it believed were FRAND.  That position was taken during

09:07 3 litigation.  If those terms are not FRAND, and especially

09:07 4 nowhere close to FRAND, the Court should certainly find that

09:07 5 Ericsson breached.

09:07 6        THE COURT:  One of the key questions is does the

09:07 7 offer itself, the ultimate offer, have to be FRAND, or can

09:07 8 one fulfill the obligations by offering something short of

09:07 9 what ultimately would be found to be FRAND?  The parties'

09:08 10 positions differ on that.

09:08 11        MR. HOLDER:  I agree the parties' positions

09:08 12 differ, but I think the parties' positions differ

09:08 13 principally with respect to the prelitigation conduct.  I

09:08 14 don't think the Court needs to delve too deeply into that.

09:08 15        I think that some of the cross-examination of Dr.

09:08 16 Ordover by Ericsson is somewhat of a red herring in the

09:08 17 sense that this Court doesn't need to announce rules that

09:08 18 would govern how a prelitigation negotiation must proceed.

09:08 19        By virtue of the FRAND contentions, the Court told

09:08 20 Ericsson during the litigation to put down its marker

09:08 21 regarding what it thought was FRAND.  If that's not FRAND,

09:08 22 then the Court should call that a breach and proceed to set

09:08 23 the terms.

09:08 24        What happened prelitigation would certainly be

09:08 25 relevant if there was still an active damage claim and we

09:08  1    were trying to trace the damages to a prior act in terms of

09:09  2    causation.  But given that there is not a damage claim, we

09:09  3    don't have to worry about tracing harm to a prelitigation

09:09  4    act.  For that reason, we don't think the Court needs to get

09:09  5    too invested in trying to figure out negotiation dynamics

09:09  6    that may have proceeded the litigation.

09:09  7          THE COURT:  One way or another, I have to answer

09:09  8    the question are A and B FRAND?

09:09  9          MR. HOLDER:  Correct.

09:09  10         THE COURT:  Regardless of how I answer -- well, if

09:09  11   I answer A and B are FRAND, end of discussion.  No breach.

09:09  12   If I conclude that A and B aren't FRAND but the FRAND

09:09  13   obligation wasn't breached in terms of the negotiations, I

09:09  14   still then need to go on to the issue of what is FRAND?

09:09  15         MR. HOLDER:  Certainly.  And TCL's position is

09:09  16   that if the Court concludes that Option A and Option B are

09:10  17   not FRAND that that would necessarily lead to a finding of

09:10  18   breach, unless perhaps one is dealing with the Dr. Teece

09:10  19   smidgen issue.  But if it's not close -- and we believe it's

09:10  20   not close -- then Option A and Option B are not FRAND, and

09:10  21   there has been a breech.

09:10  22         As the Court knows, we disagree with Ericsson's

09:10  23   position that compliance with the FRAND obligation is a

09:10  24   matter of simply negotiating in good faith, whatever that

09:10  25   means.  The terms and conditions ultimately need to be

09:10   1   FRAND.  Given that Ericsson was told to put down its marker

09:10   2   in the litigation, that can be the touchstone.

09:10   3          I want to make one thing clear, though.  We do

09:10   4   believe that by virtue of our declaratory relief claim that

09:10   5   the Court can set terms that are different than Option A and

09:10   6   Option B, even it finds that Option A and Option B are

09:10   7   FRAND.  We addressed that in the case management brief back

09:10   8   in August of 2016.  That was Docket 1064.

09:10   9          That goes back to some of the arguments from

09:11   10   Ericsson about the notion that there could be a FRAND range,

09:11   11   which we degree with insofar as the nondiscrimination

09:11   12   requirement is concerned.  The point we were making back

09:11   13   then is that if a Court were to conclude that there could be

09:11   14   a FRAND range and that A and B were within that range but

09:11   15   that there was a lower bound of the range, a Court sitting

09:11   16   in equity deciding a declaratory relief claim would not

09:11   17   necessarily be bound to simply impose Options A and B.

09:11   18          Moving on to the Court's second question, the

09:11   19   Court's second question addressed at what point in time the

09:11   20   Court should be assessing the competitive relationships.  We

09:11   21   believe the Court needs to address the nature of the

09:11   22   competitive relationships between two firms for at least the

09:11   23   period to be covered by the license.

09:12   24          Keep in mind that under the FCIPR policy, the

09:12   25   terms and conditions must be FRAND.  Those terms and

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:12  1    conditions govern a period of time, and it is during that

09:12  2    period of time where a prospective licensee like TCL could

09:12  3    suffer the effects of discrimination if the rates that they

09:12  4    are being asked to pay are worse than the terms enjoyed by

09:12  5    their competitors.

09:12  6           THE COURT:  So in other words, I should look at

09:12  7    competition after the dates of Options A and B?

09:12  8           MR. HOLDER:  It is certainly relevant.  The Court

09:12  9    should not exclude that consideration.

09:12  10          Consider, for example, a situation where it is

09:12  11   undisputed that companies A and B were not competing three

09:12  12   years ago, and consider further that it is undisputed that

09:12  13   companies A and B are competing at present and will continue

09:12  14   to compete into the future.  Assume company A has a license

09:12  15   to a given portfolio of patents that will continue for the

09:12  16   next five years.  Assume that company B has no such license

09:13  17   but wants one.

09:13  18          It would make no sense in our view to fail to

09:13  19   consider the fact that company A and company B are competing

09:13  20   and will continue to compete simply because they didn't

09:13  21   compete three years ago.

09:13  22          THE COURT:  But really isn't that a happenstance

09:13  23   of the length and complexity of this litigation?  If the

09:13  24   Court had been able to make an instantaneous decision on the

09:13  25   date Options A and B were made, the Court would only have

09:13    1    the benefit of the existing competition, and it's only the

09:13    2    happenstance of the extensive litigation that we now have

09:13    3    data after that.

09:13    4            How can a firm know what's discriminatory if the

09:13    5    conditions changed?  How they can know on the date of their

09:13    6    offer whether it's discriminatory in terms of how it affects

09:14    7    competitors?

09:14    8            MR. HOLDER:  Number one, I would say that when

09:14    9    offers are made they are made with respect to a

09:14    10   forward-looking license.  So there is inherently a component

09:14    11   of predicting the future w,hen offers are made.  There would

09:14    12   still be a need to address what the parties thought the

09:14    13   landscape would look like over the term of the license when

09:14    14   the offer was made.

09:14    15           THE COURT:  Don't we get some of that in looking

09:14    16   at Ericsson's business cases which project out four or five

09:14    17   years?

09:14    18           MR. HOLDER:  Precisely.  The other thing I would

09:14    19   note is that some of the Court's questions are coming from

09:14    20   the perspective of focusing on Ericsson's mens rea, whether

09:14    21   what Ericsson did was wrong in the making of the offer.

09:14    22           Our position is that the inquiry is not limited to

09:14    23   that.  This isn't necessarily about characterizing Ericsson

09:15    24   as a wrongdoer, although we believe as I said before if

09:15    25   Option A and Option B were not FRAND that Ericsson should be

09:15    1    deemed to have breached.

09:15    2            This is about terms and conditions and are the

09:15    3    terms and conditions FRAND?  Those terms and conditions are

09:15    4    going to be governing a future relationship.  So regardless

09:15    5    of what Ericsson's state of mind was when it made the offer,

09:15    6    the Court sitting in equity needs to take into account

09:15    7    whether those terms and conditions are going to be FRAND for

09:15    8    the contemplated license period.

09:15    9            Moreover, even though the litigation took three

09:15   10    years, at no time did Ericsson ever forsake its Option A and

09:15   11    Option B offers despite subsequent events that further

09:15   12    called them into question.  They could have been done so by

09:15   13    changing a percentage rate while nevertheless maintaining

09:15   14    the structure of the license.

09:15   15            THE COURT:  But didn't they conform with Option C?

09:15   16            MR. HOLDER:  Option C was fundamentally different.

09:15   17    Option C was a new structure, and that raised a whole new

09:15   18    set of issues.

09:15   19            I think that's different than saying, you know

09:16   20    what, we are going to lower our percentage rate because we

09:16   21    recognize that the percentage rate in Option B and Option A

09:16   22    for the follow-on sales is no longer FRAND.  They could have

09:16   23    done that.  I don't think it would have raised the same

09:16   24    amendment issues that we got into with Option C.  They chose

09:16   25    not to.

```
09:16    1              THE COURT:  Doesn't the fact that I will be
09:16    2    setting a rate going forward for five years sort of in a
09:16    3    backdoor fashion make relevant what has happened between the
09:16    4    dates of A and B and the date the Court sits in equity and
09:16    5    sets the rate?
09:16    6              MR. HOLDER:  Yes, I believe so.  Many of the
09:16    7    licenses that we have been looking at between other parties
09:16    8    and Ericsson likewise have retroactive periods that address
09:16    9    past sales at the same rate as the forward-looking sales.
09:16   10              Turning to the Court's Question 3, the Court asked
09:16   11    what criteria it should use to determine if firms are
09:16   12    similarly situated.
09:16   13              TCL's position is that the bar should be set low
09:16   14    for determining who is similarly situated.  However, it's
09:17   15    important to note that position is and always been has been
09:17   16    a package deal with our view of how the nondiscrimination
09:17   17    should be interpreted.  As Dr. Ordover explained and as Dr.
09:17   18    Teece and Mr. Kennedy largely agreed before Dr. Teece
09:17   19    started trying to define the issue in a stricter way,
09:17   20    companies who sell handsets are similarly situated.
09:17   21              Our position is that Ericsson cannot grant a
09:17   22    preferential rate to one handset maker and then refuse to
09:17   23    offer that same rate to another handset maker.  TCL is very
09:17   24    concerned by Dr. Teece's attempt to create supposed
09:17   25    strategic groups or by any exercise which purports to
```

09:17   1   identify which single company, among many, is the most

09:17   2   similarly situated to a particular licensee.

09:17   3          THE COURT:  Well, you argue that you are not

09:17   4   similarly situated to a number of small or local producers.

09:18   5   So, for your analysis, you limited the set of people not

09:18   6   simply to handset manufacturers but to a subset of those.

09:18   7          MR. HOLDER:  Well, the unpacking analysis needed

09:18   8   to address the lump sum agreements.  And most of the

09:18   9   licenses where Dr. Lynde took the position that TCL was not

09:18  10   similarly situated were running royalty rate licenses that

09:18  11   didn't need to be unpacked.

09:18  12          Like I said, there is a package deal between our

09:18  13   view of similarly situated as expressed by Dr. Ordover and

09:18  14   our view of how the nondiscrimination obligation should be

09:18  15   applied.  We think that trying to parse who is similarly

09:18  16   situated to who based upon some of these more granular

09:18  17   factors is nothing more than an invitation to discriminate.

09:18  18   Companies like Ericsson can conjure up many purported

09:19  19   distinctions in order to justify why one licensee is getting

09:19  20   a different rate than another licensee.  And we saw that in

09:19  21   this case.

09:19  22          Some of the purported distinctions offered by

09:19  23   Ericsson and Dr. Teece are particularly inappropriate.

09:19  24   Things like whether the company also has an infrastructure

09:19  25   business is irrelevant if we are talking about a handset

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:19    1    license.  Talking about whether the company participated in

09:19    2    standardization, talking about whether the company has a

09:19    3    patent portfolio of its own, talking about the R&D

09:19    4    intensity, none of those things are relevant so long as you

09:19    5    account for a cross-license value in the unpacking.  They

09:19    6    should not be playing a role, and yet Ericsson tried to make

09:19    7    them play a role, which demonstrates trying to parse this

09:19    8    issue more finely is ripe for abuse.

09:19    9           Factors like geography, product offerings, and

09:19   10    sales volumes are admittedly more rational, but they still

09:20   11    do provoke concern.  First, the market is extremely dynamic

09:20   12    and volatile with companies moving up and down in the

09:20   13    rankings, companies expanding into different geographic

09:20   14    areas, and companies altering their product lines and price

09:20   15    points.  We saw that in the evidence in this case.

09:20   16           The competitive landscape could look very

09:20   17    different in a relatively short period of time.  So how do

09:20   18    you put people into these strategic groupings when the

09:20   19    nature and shape of those groups is in flux and the

09:20   20    composition of those groups is in flux?

09:20   21           Second, how finely do you try to draw those

09:20   22    distinctions?  How much geographic overlap is needed to

09:20   23    trigger a similarly situated finding?  How much overlap in

09:20   24    product offerings is needed to trigger a similarly situated

09:20   25    finding?  It's very difficult to come up with a principal

09:20   1   basis for where to draw that line.

09:20   2          All that being said, if one does conclude that

09:21   3   finer distinctions need to be drawn between handset makers

09:21   4   as part of a similarly situated analysis, then we would

09:21   5   agree that a geographic footprint would be a relevant factor

09:21   6   to consider.

09:21   7          We would also agree that sales volumes would be a

09:21   8   relevant factor to consider but not because it would entitle

09:21   9   any licensee to a volume discount.  Ericsson did not present

09:21   10  any evidence that would justify the giving of volume

09:21   11  discounts and doing so is contrary to ETSI's stated concerns

09:21   12  about protecting medium and small sized companies.

09:21   13         Rather, companies with larger sales volumes are

09:21   14  going to have a greater incentive and they are going to have

09:21   15  a greater ability to establish a FRAND royalty rate than

09:21   16  much smaller players, such that the licenses from companies

09:21   17  with larger sales volumes are going to be more probative of

09:21   18  what should be considered FRAND.

09:21   19         The final criteria that was mentioned in the

09:21   20  Court's list was the areas of competition within a standard.

09:22   21  If what the Court meant by that was ASP, we disagree that

09:22   22  ASP would be relevant for the reasons we have addressed in

09:22   23  our briefing.  It's nothing more than an averaging of

09:22   24  revenues divided by units.  It doesn't say anything about at

09:22   25  what price specific products are offered.  If what the Court

09:22    1    meant was head-to-head competition based on specific product

09:22    2    offerings, then, yes, we agree that would be a relevant

09:22    3    factor.

09:22    4              But, again, given the volatile and dynamic nature

09:22    5    of the market, we think that such a factor would have to be

09:22    6    applied with caution and would have to be applied liberally.

09:22    7    For example, if there is some overlap in product offerings,

09:22    8    even though there may not be a lot of overlap in product

09:22    9    offerings, that should be enough to make the firms similarly

09:22   10    situated.

09:22   11              Before I move on to Question 4, I want to

09:22   12    interject an observation that is related to Question 3 but

09:22   13    goes somewhat beyond it.  It concerns the issue of who is

09:23   14    similarly situated to who, especially insofar as it relates

09:23   15    to the issue of competitive harm.

09:23   16              As we set forth in our brief, we believe that

09:23   17    Ericsson has been quite inconsistent in its positions

09:23   18    regarding who is similarly situated to who and what

09:23   19    standards should apply.

09:23   20              There is one additional aspect of inconsistency in

09:23   21    Ericsson's position that comes from the briefing in this

09:23   22    case that was not mentioned in the post-trial brief, but I

09:23   23    want to bring it to the Court's attention.  That is how

09:23   24    Ericsson has addressed this issue in the context of the

09:23   25    fight over the protective order and whether to seal the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:23   1   courtroom.

09:23   2           At the very beginning of this case in late 2014,

09:23   3   back when Judge Nakazato was still our magistrate, the

09:23   4   parties fought over whether TCL's general counsel would be

09:23   5   included under the protective order as someone who could see

09:23   6   Ericsson's licenses.  The parties briefed this issue in a

09:23   7   joint stipulation on November 6, 2014, at Docket 64.

09:24   8           At pages 14 and 15 of that stipulation, Ericsson

09:24   9   argued that its licenses are with, quote, "all of TCL's

09:24   10  competitors in the handset market," end quote.  Ericsson

09:24   11  argued that, quote, "The cellular telecommunications field

09:24   12  is an extremely competitive marketplace, and the major

09:24   13  players engage in highly competitive negotiations for

09:24   14  licenses," end quote.

09:24   15          THE COURT:  Do you have the pin site for those

09:24   16  quotations?

09:24   17          MR. HOLDER:  There are at pages 14 and 15 of

09:24   18  Docket 64.  The remaining quotes I have are likewise on

09:24   19  those same pages.

09:24   20          Ericsson's argument was that TCL's competitors,

09:24   21  quote, "would be disadvantaged in the marketplace," end

09:24   22  quote, should TCL gain access to the terms of their licenses

09:24   23  with Ericsson.  Ericsson further equated that disadvantage

09:24   24  with, quote, "competitive harm," end quote, arguing that if

09:25   25  TCL gained access to the terms of these other licenses, then

09:25   1   the licensees would be exposed to, quote, "the risk of

09:25   2   severe competitive harm," end quote.

09:25   3          Sure enough, when the question of whether to seal

09:25   4   the courtroom came up, we all saw a number of major industry

09:25   5   players, including Apple and Samsung, seeking to prevent

09:25   6   disclosure of their licenses, including to TCL.

09:25   7          We submit that there is major tension between what

09:25   8   Ericsson argued in the fight over the Protective Order in

09:25   9   2014 and what Ericsson is arguing to the Court now that the

09:25  10   rates are actually being set.

09:25  11          First, Ericsson broadly referred to its licensees

09:25  12   as consisting of TCL's competitors.  It is not credible to

09:25  13   suggest that Ericsson was not including Apple and Samsung in

09:25  14   that list.  We saw that in the interrogatory responses when

09:25  15   Ericsson talked about how they derived the rates offered to

09:25  16   TCL.

09:25  17          Second, in 2014, Ericsson confirmed that the

09:26  18   cellular telecommunications field is extremely competitive.

09:26  19   That underscores our point that there is a lot of movement

09:26  20   within that space, as well as a lot of price competition

09:26  21   within that space, such that small differences in rates

09:26  22   matter, and imposing higher costs on some but not others is

09:26  23   a cause for serious concern.

09:26  24          Third, Ericsson's arguments in 2014 about

09:26  25   competitive harm are in direct tension with Dr. Teece's

09:26  1   testimony about strategic groupings.

09:26  2          If TCL and Apple are in different strategic

09:26  3   groupings such that they don't compete, then why would it

09:26  4   cause harm to Apple for TCL to see its license with

09:26  5   Ericsson?  Why were Apple and Ericsson so keen to prevent

09:26  6   TCL from seeing their license if TCL is supposedly in a

09:26  7   different strategic grouping?

09:26  8          Now, I know there was a contractual

09:26  9   confidentiality obligation, but Ericsson's arguments went

09:27  10  much farther than that.  They didn't just talk about their

09:27  11  contractual obligation.  They talked about harm.  They

09:27  12  talked about the industry.

09:27  13         Lastly, what Ericsson said in 2014 regarding the

09:27  14  Protective Order flies in the face of Ericsson's current

09:27  15  arguments regarding nondiscrimination.  Ericsson argued that

09:27  16  other companies will be competitively harmed if TCL gets

09:27  17  access to their rates presumably because TCL could then use

09:27  18  that information to get the same rates closing that

09:27  19  competitive gap.

09:27  20         Yet Ericsson is now arguing that big difference in

09:27  21  rates between what Ericsson is asking TCL to pay versus what

09:27  22  Ericsson's licensees are paying is inconsequential and won't

09:27  23  harm TCL.  That's directly contrary to Ericsson's prior

09:27  24  position, and the inconsistency is offensive.  It's

09:27  25  offensive that Ericsson would be so cavalier regarding its

09:27  1   FRAND obligation and my client's competitive standing in the

09:28  2   marketplace.

09:28  3            So we would ask that the Court examine Ericsson's

09:28  4   statements in that document, which again is Docket 64, and

09:28  5   take them into account in addressing these issues.

09:28  6            Turning to Question 4, the Court noted in its view

09:28  7   that there were imperfections in both the top-down a

09:28  8   approach and the comparative license approach for

09:28  9   determining rates.

09:28  10           The Court asked if it should credit the results of

09:28  11  each approach, use one as a check on the other, and find a

09:28  12  rate or range of rates which reflects both approaches.

09:28  13           As we explained in our briefing, our position is

09:28  14  that the fair and reasonable component of FRAND and the

09:28  15  nondiscrimination component of FRAND can be analyzed

09:28  16  independently and then used to check each other, such that

09:28  17  if the fair and reasonable rate is lower than what others

09:28  18  are paying, the fair and reasonable rate controls and

09:28  19  vice-versa.

09:29  20           We have associated the top-down approach with the

09:29  21  fair and reasonable analysis and the comparative license

09:29  22  approach with the nondiscrimination analysis.  So we believe

09:29  23  those two approached can be used in the manner I have just

09:29  24  described.

09:29  25           We also believe that there are flaws in the

09:29   1   comparative license approach for the purpose of establishing

09:29   2   a fair and reasonable royalty, which we thoroughly addressed

09:29   3   in our brief.

09:29   4           THE COURT:  But can't an analysis of other

09:29   5   licenses be considered as to what is fair and reasonable?

09:29   6   Other licenses are certainly evidence in regular patent

09:29   7   cases as to what the royalty rate ought to be if there is

09:29   8   infringement.

09:29   9           MR. HOLDER:  I don't disagree with any of that.

09:29   10  It's simply not the holy grail that Ericsson makes it out to

09:29   11  be.  Nor should it be looked at to the exclusion of a

09:29   12  top-down analysis.

09:29   13          And I think Ericsson overstated the holdings of

09:29   14  the Federal Circuit cases on that issue.  Those cases note,

09:29   15  as the Court just mentioned, that licenses are relevant

09:29   16  evidence.  They shouldn't be disregarded.  But the federal

09:29   17  circuit in Cicero v. Cisco most certainly didn't say that

09:30   18  where there are comparable licenses a top-down approach is

09:30   19  inappropriate.  The Federal Circuit in that case actually

09:30   20  noted that within the context of standardization licenses

09:30   21  need to be approached with some caution lest they reflect

09:30   22  rates that capture holdup value.

09:30   23          THE COURT:  Well, there is a lot of discussion on

09:30   24  holdup, but do we have any discussion of actual holdup in

09:30   25  any of the Ericsson licenses that were presented at trial?

09:30   1          MR. HOLDER:  We absolutely do.  I think we should

09:30   2   start by talking about the definition of "holdup."  Holdup

09:30   3   is simply capturing value that you are not entitled to.

09:30   4          Ericsson has tried to graft onto the concept of

09:30   5   holdup, a scienter that's not there.  Ericsson wants it to

09:30   6   be about coercion.  Ericsson wants it to be about

09:30   7   misrepresentations.  The cases do not support that.

09:30   8          There is actually a cite in Ericsson's brief --

09:30   9          THE COURT:  Analytically, isn't it irrelevant what

09:30   10  your mens rea is?  If you have captured more than your

09:30   11  incremental value, that's holdup.

09:31   12         MR. HOLDER:  Precisely.  That's certainly our

09:31   13  position.  Ericsson had a cite in its brief to Dr. Bekkers,

09:31   14  our expert, as supposedly supporting the notion that the

09:31   15  definition of "holdup" includes coercion.  I would urge the

09:31   16  Court to look at that cite.  Dr. Bekkers said no such thing.

09:31   17         THE COURT:  Analytically, I don't see why in terms

09:31   18  of an economic analysis coercion should make any difference.

09:31   19  Either you took more than you were entitled to or you

09:31   20  didn't.

09:31   21         MR. HOLDER:  Agreed.  So the evidence of holdup

09:31   22  is, number one, our top-down analysis.  If you credit our

09:31   23  top-down analysis, Ericsson's rates are vastly lower than

09:31   24  what Ericsson was selling the market on in its reference

09:31   25  prices, what Ericsson got a number of folks to agree to.

09:31   1          Number two, we know that Ericsson premised certain

09:31   2   rates as well as its sales pitch to the market on the notion

09:31   3   that it had a 25 percent share of the 4G standard relative

09:31   4   to a 10 percent aggregate royalty burden.  That's how it

09:31   5   came up with its 2.5 percent rate .

09:31   6          That 25 percent figure is vastly inflated.  No

09:32   7   Ericsson witness came in and tried to support it.  No

09:32   8   Ericsson witness came in and tried to directly and

09:32   9   explicitly support any proportional share figure for

09:32   10  Ericsson.  As I am going to discuss in a moment, even if you

09:32   11  take the collective testimony of the five Ericsson engineers

09:32   12  who addressed essentiality into account, it only pushes the

09:32   13  4G proportional share up to just under 7 percent.

09:32   14         So if Ericsson was premising reference prices on a

09:32   15  25 percent share or frankly any 4G share in excess of 7

09:32   16  percent at the absolute best based on our evidence, which we

09:32   17  know they were, that's holdup.  That's absolutely evidence

09:32   18  of holdup.

09:32   19         To the extent the Court does decide that it is

09:32   20  accepting of both the top-down license and a comparative

09:32   21  license analysis in concept and is willing to use both in

09:32   22  tandem to arrive at a fair and reasonable rate but is not

09:33   23  inclined to completely accept one party's inputs while

09:33   24  completing reject the other party's inputs, then it is

09:33   25  possible to seek out and find some commonality between the

09:33   1   two approaches.

09:33   2           Towards that end, I have prepared some slides,

09:33   3   which I would like to walk through with the Court, which

09:33   4   address the top-down analysis and compare it to the results

09:33   5   of the unpacking.  When I get to the slides, I am going to

09:33   6   unfortunately have to ask to have the courtroom cleared

09:33   7   because I will be discussing some of the rates.

09:33   8           Before I do that, I do want to make a couple of

09:33   9   brief comments about the use of the top-down approach.  The

09:33   10  dismissive way in which Ericsson treated the top-down

09:33   11  approach in its post-trial brief was remarkable.  In one

09:33   12  place, I believe Ericsson actually said that it was

09:33   13  unreliable because after all it was only just estimates.  My

09:33   14  jaw just about hit my desk when I read that.

09:33   15          That's extremely disingenuous given Ericsson's

09:33   16  history with that approach.  It specifically admitted to

09:33   17  using the top-down approach in its own internal pricing.  It

09:34   18  specifically justified rates based upon a top-down approach.

09:34   19  It endorsed the top-down approach in public statements.  It

09:34   20  endorsed it in arguments to ETSI.  And it endorsed it in

09:34   21  interrogatory responses and deposition testimony in this

09:34   22  case, which are judicial admissions.

09:34   23          The only reason Ericsson is forsaking that

09:34   24  approach is because it recognizes that the results of the

09:34   25  proper top-down drive the royalty rates to levels that are

09:34  1    vastly lower than that Options A and B, and it also

09:34  2    recognizes that the use of dollar-per-unit rates, which it

09:34  3    now wants to do, is fundamentally inconsistent with the

09:34  4    top-down approach because the top-down approach has always

09:34  5    been driven by the use of percentages.

09:34  6              With that being said, I would like to walk through

09:34  7    the slides.  I will be brief, but I would ask that we

09:34  8    briefly clear the courtroom.

09:34  9              THE COURT:  Yes.

09:34  10             Do you have a set you can hand up?

09:34  11             MR. HOLDER:  Yes.  I will walk them up to Your

09:35  12   Honor.

09:35  13             (Courtroom cleared.)

09:35  14             (The following proceedings were under seal:)

09:40  15             (End of sealed proceedings.)

09:40  16             (Courtroom reopened.)

09:41  17             MR. HOLDER:  So the Court's fifth question

09:41  18   concerned what role the Georgia-Pacific factors or a

09:41  19   hypothetical negotiation should play in the analysis.

09:41  20             It's a very difficult question.  It brought me

09:41  21   back to feeling like a law student as we worked the problem.

09:41  22             There are difficult questions in many respects

09:41  23   here because the law is not entirely clear regarding how one

09:41  24   would apply the concept of a hypothetical negotiation to a

09:41  25   FRAND case like this where the focus is on establishing a

09:41   1   licensing relationship and a setting of a royalty rate for

09:41   2   that purpose on a forward-looking basis rather than setting

09:41   3   damages for past infringement.

09:41   4           In addition, none of the prior cases that have

09:41   5   addressed the use of the Georgia-Pacific factors in the

09:41   6   FRAND context have grappled with the nondiscrimination leg

09:42   7   of the analysis.  They have all been focused on fair and

09:42   8   reasonable.

09:42   9           We know that what the Federal Circuit told us

09:42   10  that the Georgia-Pacific factors are not a talisman that

09:42   11  must be used in every case.  It's not necessary to use all

09:42   12  of them.  The Federal Circuit also teaches that some of the

09:42   13  Georgia-Pacific factors are not appropriate in a case

09:42   14  involving standard essential patents and would need to be

09:42   15  adjusted, which we agree with.

09:42   16          That said, the Federal Circuit declined to create

09:42   17  a modified version of its own that must be used in all

09:42   18  standard essential patent cases.  So where does that leave

09:42   19  us?  We think that the Georgia-Pacific factors can add some

09:42   20  value in trying to establish a fair and reasonable royalty

09:42   21  for a license to standard essential patents so long as they

09:42   22  are modified in the way addressed by Judge Robart, Judge

09:42   23  Holderman, and the Federal Circuit.  However, it's not

09:43   24  mandatory that the Court use them.

09:43   25          What is most important is that the Court follow

09:43  1    the law that has been announced by the Federal Circuit.  And

09:43  2    if it regards that law as persuasive, what the District

09:43  3    Courts have said:  "regarding the valuation of standard

09:43  4    essential patents, including focusing on the incremental

09:43  5    value of the patented features separate and apart from its

09:43  6    incorporation into the standard."

09:43  7            We also think that the nondiscrimination aspect of

09:43  8    the FRAND obligation should be viewed separately from any

09:43  9    application of the Georgia-Pacific factors.  The

09:43  10   Georgia-Pacific factors have always been focused on the

09:43  11   determination of a reasonable royalty.  They did not emerge

09:43  12   from a situation where the patents were subject to a FRAND

09:43  13   obligation.

09:43  14           So rather than try to apply principles of

09:43  15   nondiscrimination via the Georgia-Pacific factors, we think

09:43  16   the nondiscrimination analysis is a separate layer which the

09:43  17   Court needs to add irrespective of what it does with the

09:43  18   Georgia-Pacific factors.

09:43  19           In terms of the notion of a hypothetical

09:44  20   negotiation and the setting of a date for such a

09:44  21   negotiation, it is unclear to what extent that is necessary

09:44  22   or appropriate given that the Court is not awarding damages

09:44  23   for past infringement but rather is establishing a

09:44  24   forward-looking licensing relationship.

09:44  25           Certainly in a traditional patent infringement

09:44   1   lawsuit, the Federal Circuit has been clear that the

09:44   2   hypothetical negotiation takes place as of the date of the

09:44   3   first infringement.  Yet that's an extremely difficult

09:44   4   concept to apply here, which I suspect partly motivated the

09:44   5   Court's question, given that we are dealing with hundreds of

09:44   6   patents across three standards with different patents coming

09:44   7   into existence at different points in time.

09:44   8           In preparing for this argument, I actually

09:44   9   reviewed a paper that was published in December of last year

09:44   10  by the Sedona Conference which addressed the Georgia-Pacific

09:44   11  factors and the hypothetical negotiation, and it actually

09:44   12  discussed a new proposed model where the date of the

09:44   13  negotiation would be the date of trial.

09:45   14          I thought there was a lot of merit to that

09:45   15  approach, especially in the context of the creation of a

09:45   16  forward-looking license.  But, admittedly, that's not yet

09:45   17  the law, and that's not consistent with what the Federal

09:45   18  Circuit has said to date, so I am reluctant to tell the

09:45   19  Court that that's what it should do.

09:45   20          In many respects -- and this is perhaps the most

09:45   21  important part of my answer to question -- we think that

09:45   22  picking a date for the hypothetical negotiation is somewhat

09:45   23  beside the point and perhaps unnecessary so long as the

09:45   24  Court relies on the right information and uses that

09:45   25  information in the right way.  In the Microsoft V. Motorola

09:45  1    case, Judge Robart did not set a date for a hypothetical

09:45  2    negotiation.  He was affirmed by the Ninth Circuit.

09:45  3         We know that federal law permits Courts to impart

09:45  4    knowledge into the minds of the hypothetical negotiators,

09:45  5    even though that knowledge comes from events occurring in

09:46  6    the future after the date of the negotiation.  It's referred

09:46  7    to as the book of wisdom rule.  Thus, so long as the right

09:46  8    information is considered and that information is used in

09:46  9    the right way, it doesn't necessarily matter when the date

09:46  10   is set.  Phrased differently, the Court can reach the same

09:46  11   result and do so correctly regardless of whether and how it

09:46  12   sets the date for any hypothetical negotiation so long as it

09:46  13   considers the evidence properly.

09:46  14        Using the evidence in the right way would include,

09:46  15   for example, assessing the quality of Ericsson's patents

09:46  16   separate and apart from their inclusion in the standard.

09:46  17   That puts us in the ex-ante environment which is consistent

09:46  18   with a more traditional first date of infringement approach.

09:46  19        Using the evidence the right way would also

09:46  20   include taking into account Ericsson's licenses which cover

09:46  21   the same period of time to be covered by TCL's license with

09:46  22   Ericsson, even though those licenses admittedly came into

09:46  23   being well after the date of first infringement in most

09:47  24   cases.  The nondiscrimination leg of the FRAND analysis

09:47  25   requires that those licenses be considered.

09:47    1          Turning to Court's Question 6, the Court notes
09:47    2    that the PSRs that were used in the unpacking analysis
09:47    3    essentially treat every SEP or contribution as having the
09:47    4    same value, and the Court asks if there is a problem with
09:47    5    that and whether any adjustments need to be make.
09:47    6          The Court's observation is correct.  The unpacking
09:47    7    analysis performed by both sides essentially valued all
09:47    8    standard essential patents equally.  Ericsson made a habit
09:47    9    out of trying to criticize Dr. Lyon for that during our
09:47   10    trial, which is quite disingenuous because Mr. Kennedy did
09:47   11    the exact same thing.
09:47   12          The fact that both sides did not attempt to
09:47   13    utilize an importance in contribution analysis in the
09:47   14    creation of the PSRs for purposes of the unpacking analysis
09:48   15    is not surprising, because that would have required
09:48   16    assessing the importance in contribution of all standard
09:48   17    essential patents industrywide, which is practically
09:48   18    speaking impossible.
09:48   19          We don't think this issue, this defect if one
09:48   20    wants to call it that, is necessarily of great concern
09:48   21    depending on how you intend to use the results of the
09:48   22    unpacking.  From our perspective, the main purpose of the
09:48   23    unpacking was to determine what others are paying for a
09:48   24    license as part of the nondiscrimination analysis.
09:48   25          Trying to use the results of the unpacking for a

09:48  1   fair and reasonable analysis is more problematic for reasons
09:48  2   that we addressed in our briefing, including this reason
09:48  3   that the Court has noted in its question.  We think that's
09:48  4   an important reason why a separate analytical look at the
09:48  5   patents needs to be undertaken, which is what we did through
09:49  6   our top-down analysis.
09:49  7        All of that being said, we note that the known
09:49  8   variations in the PSR between what Dr. Lynde did and what
09:49  9   Mr. Kennedy did not impact the results of the unpacking in a
09:49  10  major way.  For example, we know that there were big
09:49  11  differences in the proportional share figures used by the
09:49  12  parties, and that Dr. Lynde use the results of Dr. Ding's
09:49  13  industrywide essentiality analysis; whereas, Mr. Kennedy
09:49  14  based his PSRs on contribution counting, which I believe
09:49  15  showed Ericsson having a 15 percent proportional share;
09:49  16  whereas, Dr. Ding was approximately three times less.
09:49  17        Despite that big difference in the creation of the
09:49  18  PSRs, the unpacked rates between the two experts when you
09:49  19  account for other things are not that different.  So if the
09:49  20  PSRs were adjusted to account for an importance in
09:49  21  contribution analysis, it would not have a major impact on
09:50  22  the rates because the adjustments to the PSRs would be much
09:50  23  smaller than the differences that we already see given the
09:50  24  different approaches to measuring each company's
09:50  25  proportional share.

09:50  1              On that point, I would direct the Court to the
09:50  2     fourth slide in what we handed out previously.  What this
09:50  3     slide shows in the first column is Ericsson's U.S.
09:50  4     proportional share based only on TCL's essentiality
09:50  5     analysis.  It was 8 percent for 2G, 3.7 percent for 3G, and
09:50  6     4,7 percent for 4G.
09:50  7              The second column shows the adjusted value share
09:50  8     after accounting for TCL's importance in contribution
09:50  9     analysis but before accounting for the expiration of patents
09:50  10    over the term of the license, as well as the geographic
09:50  11    distribution of the patents.
09:51  12             What we see is that there is actually no change to
09:51  13    the 2G figure.  With respect to the 3G figure, the finding
09:51  14    was that Ericsson's patents were stronger than average, in
09:51  15    which case the rate went up.  The value share went up I
09:51  16    should say.  With respect to 4G, the finding was that
09:51  17    Ericsson's patents were weaker than average, so the value
09:51  18    share went down to 3.5 percent.
09:51  19             Those aren't insignificant differences, especially
09:51  20    with respect to 4G, but they are not massive, and they are
09:51  21    certainly smaller differences than we saw in the creation of
09:51  22    the proportional share.  If that didn't move the PSR much,
09:51  23    then these wouldn't move the PSR much either.
09:51  24             Turning to Question 7, Justice Birss in the
09:51  25    Unwired Planet v. Hauwei decision, as the Court noted, did

09:51    1    not give a lot of credence to the public statements that had

09:51    2    been made regarding the aggregate royalty burden.  The Court

09:52    3    asks what other evidence would provide a basis to calculate

09:52    4    the royalty burden if it were not to use the public

09:52    5    statements?

09:52    6            To begin with, I want to make clear for the record

09:52    7    that we obviously strongly disagree with Justice Birss's

09:52    8    decision to not make more use of those public statements.  I

09:52    9    would also observe that even though Justice Birss was fairly

09:52   10    dismissive of the public statements he still ultimately used

09:52   11    an aggregate royalty burden that wasn't very different from

09:52   12    the public statements.  He used 8.8 percent for 4G, and he

09:52   13    used 5 percent for 3G.  You can find that at paragraphs 476

09:52   14    and 479 of his decision.

09:52   15            As we argued in our brief, those public statements

09:52   16    were made with a specific and admitted intent to induce

09:52   17    reliance.  Ericsson made those statements at a time when it

09:52   18    had a more balanced interest given that it was still selling

09:52   19    handsets.  It made those statements in the ex-ante

09:53   20    environment before substantial lock-in had occurred by

09:53   21    virtue of standardization.  So we believe those statements

09:53   22    are highly probative.

09:53   23            I also want to emphasize that the evidence that we

09:53   24    have here goes beyond what Justice Birss was discussing.  We

09:53   25    have here evidence of Ericsson reaffirming its commitment to

09:53   1   those statements in the recent arbitration with Hauwei, in

09:53   2   its interrogatory responses in this case, and in its

09:53   3   deposition testimony in this cases.  Those admissions can be

09:53   4   found at TCL's Proposed Finding of Fact No. 100.

09:53   5        In addition, Ericsson made similar statements to

09:53   6   ETSI regarding its support for a, quote, "low level royalty

09:53   7   compensation approach" or a, quote, "minimum royalty

09:53   8   compensation approach" in connection with the development of

09:53   9   WCDMA.  Those are in the record at Exhibit 1151 and

09:53   10  Exhibit 276.

09:54   11       All that being said, the Court's question is what

09:54   12  other facts would provide a basis to calculate a total

09:54   13  aggregate royalty for a top-down approach?  Number one, it

09:54   14  cannot be emphasized enough that the inquiry should be on a

09:54   15  reasonable royalty burden.  The exercise is not about trying

09:54   16  to determine an actual royalty stack.  It's about

09:54   17  determining what royalty burden would be reasonable.

09:54   18       I suspect that Ericsson is going to point to

09:54   19  evidence suggesting that the actual stack has the potential

09:54   20  to be much higher than six to eight percent.  Any such

09:54   21  argument should be rejected because Ericsson, through

09:54   22  Mr. Brismark, is already on record as taking the position

09:54   23  that those higher figures are not reasonable.  Exhibit 1161

09:54   24  is the document where Mr. Brismark describes the aggregate

09:54   25  royalty burden estimates that came out of that NGMN study as

09:55  1    being clearly unreasonable.

09:55  2          Ericsson may also try to rely on the fact that TCL

09:55  3    is paying a higher rate under its license with Qualcomm, but

09:55  4    there has been no showing whatsoever that the rate in the

09:55  5    Qualcomm license is FRAND.  As the Court is likely well

09:55  6    aware, many industry players, including the FTC, are coming

09:55  7    after Qualcomm for charging non-FRAND rates.  As we saw in

09:55  8    Exhibit 77, Ericsson itself argued that Qualcomm's licensing

09:55  9    practices violated FRAND and that there were many reasons

09:55  10   why companies might agree to a license with Qualcomm without

09:55  11   agreeing that the rates are FRAND.

09:55  12         To directly answer the Court's question, the

09:55  13   additional facts relied on by Dr. Leonard regarding the

09:55  14   setting of the royalty burden were TCL's profit margins.

09:55  15   That is consistent with several of the Georgia-Pacific

09:55  16   factors, including Nos. 8, 12, and 13.

09:55  17         The relevant part of Dr. Leonard's discussion is

09:55  18   at paragraphs 79 to 91 in his opening declaration.  What he

09:56  19   showed using both North American performance data as well as

09:56  20   worldwide data, is that the reasonable aggregate royalty

09:56  21   burdens that he proposed would be at least half of TCL's

09:56  22   profit margins after accounting for certain overhead but

09:56  23   backing out the provisions related to IPR, and that's

09:56  24   important to emphasize.  Dr. Leonard notes that the North

09:56  25   America data he used did not include IPR provisions, and he

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:56   1   backed out the IPR provisions from the worldwide data, which

09:56   2   is addressed in paragraph 88 of his declaration.

09:56   3          What he concluded is that the reasonable aggregate

09:56   4   royalty burden should not be any higher than what he

09:56   5   proposed because a higher burden would either exhaust TCL's

09:56   6   available profits making the enterprise not worthwhile, or

09:56   7   it would force the raising of prices.

09:56   8          THE COURT:  But why should TCL's profits be the

09:56   9   benchmark?  Why should any firm's profits be the benchmark?

09:57   10          MR. HOLDER:  It's not the benchmark.  It's a

09:57   11   factor that Dr. Leonard used in taking into account the

09:57   12   reasonableness of how his reliance on Ericsson's statements

09:57   13   jived with TCL's financials.  It should not be the

09:57   14   benchmark.  It's a factor.  And it's a factor that we think,

09:57   15   under the Georgia-Pacific factors Dr. Leonard appropriately

09:57   16   used.

09:57   17          Dr. Leonard explored the aggregate royalty burden

09:57   18   issue further in his rebuttal declaration at paragraph 15,

09:57   19   and he explained that Ericsson's 4G rate of 1.5 percent

09:57   20   would imply an aggregate royalty burden between 32 and

09:57   21   43 percent given where he determined Ericsson's value share

09:57   22   was.

09:57   23          When the $2 floor was factored in, the aggregate

09:57   24   royalty burden rose to between 42 to 57 percent, which is

09:57   25   clearly unreasonable.  If you apply that to TCL's ASP of

09:58    1    $100 for a 4G phone, that would imply an aggregate royalty

09:58    2    burden of 42 to $57.  What Dr. Leonard determined -- again,

09:58    3    this is paragraph 15 of his rebuttal declaration -- was that

09:58    4    forcing TCL to raise its prices to account for such a high

09:58    5    royalty burden would result in TCL losing 87 percent of its

09:58    6    sales, which he believed demonstrated the unreasonableness

09:58    7    of the aggregate royalty burdens implied by Ericsson's own

09:58    8    approach.

09:58    9              THE COURT:  Well, it may provide a data point, but

09:58   10    wouldn't the impact on profits industrywide be a more

09:58   11    informative benchmark?  I mean, one firm's profit margins

09:58   12    can be unique for various reasons and not tell us a whole

09:58   13    lot.

09:58   14              MR. HOLDER:  I agree it would be interesting to

09:58   15    try to play out how this would impact everyone in the

09:59   16    industry.  The problem is you start getting into a quite

09:59   17    complex mosaic because you are dealing with different patent

09:59   18    owners' rates and dealing with different licensees' business

09:59   19    models.

09:59   20              So it is our view and it was Dr. Leonard's view

09:59   21    that given Ericsson's repeated firm commitment to those

09:59   22    public statements, included in its discovery responses here,

09:59   23    that's an appropriate place to start, and TCL's profit

09:59   24    margins act as a check to assess the reasonableness of that.

09:59   25              THE COURT:  But we have to keep in mind that TCL's

09:59   1   model is low profit/high volume.

09:59   2          MR. HOLDER:  The evidence showed that that is

09:59   3   essentially the reality of almost everyone in this industry

09:59   4   other than Samsung and Apple.  There was an exhibit that we

09:59   5   showed that demonstrated that at least for Smartphones,

09:59   6   Ericsson had estimated -- or at least Ericsson was relying

09:59   7   on a third-party estimate that 90 percent of the profits for

10:00   8   Smartphone sales went to Apple and Samsung.  That was noted

10:00   9   in our brief.  It was noted during the cross-examination of

10:00   10  Mr. Brismark.

10:00   11         Turning to Question 8, the Court asked about what

10:00   12  percentage of the standard is unpatented and/or based on

10:00   13  expired patents.  The Court asked the same questions about

10:00   14  Ericsson's portfolio and to what extent the approaches do or

10:00   15  do not best account for this.

10:00   16         I want to start by talking about the approaches.

10:00   17  The comparable license analysis really does not account for

10:00   18  any of these issues unless we can assume that the parties to

10:00   19  the negotiation rigorously addressed them, in which case you

10:00   20  could characterize them as baked in to the resulting terms,

10:00   21  but especially with the smaller players, it's unlikely to

10:00   22  assume that that happened.

10:00   23         The X standard analysis fails miserably in trying

10:01   24  to account for any of this.  Number one, it's based on the

10:01   25  performance differences between the 3G and 4G standards, not

10:01   1   specific patents.

10:01   2          Number two, it seeks to apportion value to

10:01   3   Ericsson based on contribution counting figures which are

10:01   4   not tied to patents.

10:01   5          Lastly, the contribution counting figures used by

10:01   6   Mr. Kennedy relate to the standard as a whole, not the

10:01   7   specific features such as sleep mode solutions that he was

10:01   8   trying to value.

10:01   9          The top-down approach by far does the best job at

10:01   10  accounting for these issues.  Number one, it accounts for

10:01   11  the fact that some of standard is not patented by starting

10:01   12  with a reasonable aggregate royalty for all standard

10:01   13  essential patents.  That aggregate royalty is not supposed

10:01   14  to correspond to the standard.  The aggregate royalty burden

10:01   15  used in the top-down analysis conceptually is tied to the

10:01   16  universe of standard essential patents.

10:01   17         The way that comes into play is that the

10:01   18  denominator was initially set by capturing all the

10:02   19  declarations through the fall of 2015, but we excluded

10:02   20  patents that had expired prior to 2009.  So that denominator

10:02   21  includes patents that expired after 2009 but before the time

10:02   22  of the analysis.  The conceptual reason for that is that

10:02   23  once those patents have expired they have essentially become

10:02   24  part of the public domain.  That denominator can't shrink,

10:02   25  because if the denominator shrinks, you are essentially

10:02   1   allowing the patent owner to appropriate portions of the

10:02   2   standard that are now part of the public domain.

10:02   3           The top-down analysis also accounts for

10:02   4   expirations and divestitures in that you are taking a

10:02   5   snapshot of the portfolio at a specific period of time.  And

10:02   6   then Dr. Leonard in his own analysis added to that by

10:02   7   specifically looking at the rate at which Ericsson's patents

10:02   8   would expire over the course of a license starting in 2014

10:03   9   through 2023.  So Dr. Leonard's rates account for the future

10:03  10   expirations of Ericsson's patents.

10:03  11           Going back to the data driven questions, we

10:03  12   certainly know that there are portions of the standard that

10:03  13   are not patented.  Dr. Kakaes addressed, for example, key

10:03  14   features of LTE that were not patented by Ericsson, such as

10:03  15   OFDMA.  It was patented at one time, but that technology is

10:03  16   quite old, and those patents would have expired by around

10:03  17   the time of the 4G standard.

10:03  18           Exhibit 335 is an article written by Dr. Bekkers

10:03  19   that addresses how before 1988 many companies that

10:03  20   participated in the 2G standard deliberately chose not to

10:03  21   patent any of their inventions.

10:03  22           Dr. Kakaes's opening declaration at paragraphs 320

10:03  23   and 321 note that as of 2009 3.5 percent of the declared

10:04  24   essential patents had expired.  But, again, that was eight

10:04  25   years ago, and it's likely that portions of the standard

10:04  1   were based on expired patents that were never even declared,

10:04  2   so they would not be a part of that figure.

10:04  3          Dr. Leonard, like I said, looked at the expiration

10:04  4   of Ericsson's patents.  His analysis can be seen by looking

10:04  5   at paragraph 57 of his declaration, which tallies the number

10:04  6   of patents Ericsson disclosed in its interrogatory response

10:04  7   as essential.  Then at paragraph 122, Table 9, he looks at

10:04  8   future expirations of Ericsson's patents, and his

10:04  9   Exhibit 1116 shows the expirations as well.

10:04  10          What Dr. Leonard found was that for 2G 20 percent

10:04  11  of the patent families identified by Ericsson had expired as

10:04  12  of January 2016, and 62.5 percent would expire by 2023.  For

10:05  13  3G, around 5 percent had expired as of January 2016, and up

10:05  14  to 39 percent would be expired by 2023.  And for 4G, 1.3

10:05  15  percent had expired as of January 2016, and 8.6 percent

10:05  16  would be expired by 2023.  Again, he took those expirations

10:05  17  into account in blending out an average rate that would

10:05  18  cover the forward-looking license given the anticipated

10:05  19  changes in Ericsson's portfolio.

10:05  20          Turning to Question 9 regarding the release

10:05  21  payment for sales since 2007, certainly ETSI's IPR policy

10:05  22  does not prohibit applying a forward-looking rate to past

10:05  23  sales, especially if agreed to by the parties.  Ericsson's

10:05  24  Option A and Option B offers explicitly state that the

10:05  25  forward-looking rate would apply to past sales.  Ericsson

10:05   1   took that position throughout the trial.

10:05   2           To some extent, it makes sense to use the

10:06   3   forward-looking rates to be set by the Court for the past

10:06   4   sales if based on our top-down analysis, because our

10:06   5   top-down method was intended to capture the value of

10:06   6   Ericsson's portfolio over that time period.  It's also

10:06   7   consistent with industry practice in that many of Ericsson's

10:06   8   other licenses apply to forward-looking rates to past sales.

10:06   9           If anything, the record would justify using a

10:06   10  lower rate for past sales in that Dr. Leonard notes various

10:06   11  practices with respect to offering discounts for past sales

10:06   12  in his declaration.  Given that our courtroom is not sealed,

10:06   13  I won't go into the details, but that discussion is at

10:06   14  paragraph 153 of his opening declaration, and he cites

10:06   15  Exhibits 1114 and 1115 in support of that.

10:06   16          Ultimately, as we stated in our brief, we don't

10:06   17  believe TCL should owe a release payment.  But if it does

10:07   18  owe one, the amount calculated by Dr. Leonard was actually

10:07   19  conservative in the sense that Dr. Leonard did not use any

10:07   20  form of blanket discount in that calculation.  He did weed

10:07   21  out patents as to which the statute of limitations would

10:07   22  have expired, but he did apply a blanket discount.

10:07   23          Lastly, turning to Question 10, I suspect that

10:07   24  this question is probably more for Ericsson than it is for

10:07   25  us.  I suspect that the Court may have recognized what we

10:07  1   argued, which is that Ericsson had a complete failure of
10:07  2   proof with respect to showing its entitlement to a floor,
10:07  3   its need for a floor, or where to set a floor.
10:07  4          I believe that we thoroughly addressed these
10:07  5   issues in our brief.  I want to save a little bit of time,
10:07  6   so I won't belabor the point.  In short, we believe that
10:07  7   there is no minimum value of Ericsson's technology such that
10:07  8   it's justifiable to make a licensee pay a minimum fixed
10:07  9   dollar per unit per device irrespective of the price of the
10:08  10  device.
10:08  11         There is nothing in the record that would enable
10:08  12  the Court to reliably identify any supposed minimum value.
10:08  13  The evidence showed that Ericsson's floors have never been
10:08  14  the function of any law of economics or any principle of a
10:08  15  mathematical equation.  Ericsson didn't even start using
10:08  16  them until around 2011 as it was exiting the handset
10:08  17  business.  They have always been optional, and they have
10:08  18  simply been a function of Ericsson trying to capture what
10:08  19  the market will bear.  A floor would also be discriminatory
10:08  20  for the reasons that we addressed in our brief.
10:08  21         There is also no evidence that anyone has ever
10:08  22  been undercompensated for its use of -- for others use of
10:08  23  their standard essential patents or underincentivized to
10:08  24  participate in the standard.  The evidence is all to the
10:08  25  contrary.  If anything, Ericsson has been overcompensated

10:08  1  given that its historic reference prices set the rates far

10:09  2  higher than a proper top-down would support.  We saw that

10:09  3  Ericsson is enjoying profit margins for its licensing

10:09  4  business in excess of 80 percent and Ericsson continues to

10:09  5  actively participate in standardization.

10:09  6         We feel like the record was overwhelming that a

10:09  7  floor would be inappropriate.  The preponderance of the

10:09  8  evidence certainly supports that conclusion.  So unless the

10:09  9  Court has any further questions, I would reserve my

10:09  10  remaining five to ten minutes to clean up any new issues

10:09  11  that we may hear from Mr. Stevenson.

10:09  12         THE COURT:  That's fine.

10:09  13         Let's take a ten-minute break, and then we will

10:09  14  hear from Mr. Stevenson.

10:09  15         (Recess.)

10:21  16         THE COURT:  Mr. Stevenson.

10:21  17         MR. STEVENSON:  Before you is a white binder that

10:21  18  contains our slides.  We tabbed the binder according to the

10:21  19  Court's Questions 1 through 10.  And then within each tab,

10:21  20  there are slides corresponding to that starting out with

10:21  21  100, 101, 103, and then when you get to tab 2, they start

10:21  22  out at 200.

10:21  23         THE COURT:  Okay.

10:21  24         MR. STEVENSON:  So if I call for slide, you know,

10:21  25  1010, that doesn't mean I have a thousand slides to go

10:21  1    through.  And there's a tab 11 for some slides that didn't

10:21  2    fit within a question neatly, but are things that I may want

10:21  3    to discuss during the argument.

10:21  4            So with that, may it please the Court.  You know,

10:21  5    it goes without saying that TCL has the burden of proof in

10:21  6    this proceeding to show A and B are not consistent with

10:21  7    FRAND, and what will be a recurring theme through my remarks

10:21  8    is that TCL hasn't met its burden.

10:21  9            But in the event the Court finds that TCL has met

10:21  10   its burden and gets to the rate-setting part of the

10:22  11   proceeding, the questions emerges, what's the methodology

10:22  12   for doing that?  The Court will be confronted with a group

10:22  13   of licenses, and there's some commonality about what

10:22  14   licenses are in the core.  There's some disputes about who

10:22  15   aren't within the core.  But the Court will have a group of

10:22  16   licenses with a series of rates and a series of terms and a

10:22  17   series of structures.  And the question becomes how does the

10:22  18   Court take that and synthesize that into at least a starting

10:22  19   point?

10:22  20           One methodology that seems to make some sense was

10:22  21   followed by Justice Birss in the UP versus Hauwei decision.

10:22  22   What he did is from the group he selected what he considered

10:22  23   to be the closest competitor, almost like the bull's eye of

10:22  24   the target.  He used that as the starting point and then

10:22  25   worked outwards concentrically to the next and the next and

10:22  1    the next comparable license to see if that adjusted the

10:22  2    bull's eye upwards or downwards or what changes needed to be

10:22  3    made.

10:22  4            In the event the Court is considering a similar

10:23  5    approach in this case, who is the bull's eye?  In other

10:23  6    words, what licensee is most similarly situated to TCL?  I

10:23  7    think it's clear that it's ZTE.  We have made that point

10:23  8    over and over again in our presentation, in our witness

10:23  9    statements, and in our papers.  ZTE is clearly the most

10:23  10   closely aligned company with TCL for purposes of a

10:23  11   comparable analysis.  They compete head to head.  They

10:23  12   compete in similar price points and similar markets in the

10:23  13   United States.

10:23  14           I have two slides, 1123 and 1124.  I'm going to

10:23  15   need to pull them up.

10:23  16           Also, Your Honor, with your permission, we have

10:23  17   turned off the monitor that faces the gallery, so I don't

10:23  18   have to ask people to leave if I do show a slide with

10:23  19   information on it that is "Attorneys' Eyes Only."  And I

10:23  20   think most of the print will be too small to be visible.  It

10:24  21   has the terms of the ZTE license on there, which we think

10:24  22   are very probative as a starting point.

10:24  23           In addition, Your Honor, we gave the Court a list

10:24  24   of what I would call dollar-per-unit unpackings, and that's

10:24  25   at slide 1001.  You will recall I used this slide during

10:24  1    cross-examination of Dr. Lynde who confirmed all the numbers

10:24  2    on this slide.  Slide 1001 shows, as you go in order through

10:24  3    the concentric rings of who is next, next, next most

10:24  4    comparable, what the net import of their deals are.

10:24  5         That raises one final point I'd like to say as a

10:24  6    meta point before getting into the Court's questions, and

10:24  7    that is, what is the unit of measure here?  The job the

10:24  8    Court has is a difficult one.  You've got to take

10:25  9    disparately structured deals -- some are lump sum.  Some are

10:25  10   running royalties.  Some have caps, floors, different

10:25  11   structures.  You have to look at them and correlate whether,

10:25  12   in fact, there is -- what's the range, and is it

10:25  13   discrimination?  That's the decision that has to be made.

10:25  14   So you need a common unit of measurement across all the

10:25  15   deals.

10:25  16        We've proposed as the unit of measurement on that

10:25  17   ruler you're going to be using dollars per unit because it's

10:25  18   the most basic consistent unit of measure.  That doesn't

10:25  19   mean once you've done that you have to as a rate-setting

10:25  20   exercise make it a dollar-per-unit rate, although we think

10:25  21   you should by way of a floor.  But when doing internal

10:25  22   comparisons, both sides' experts have used dollar per unit

10:25  23   in their unpackings make inter-license comparisons, and

10:25  24   that's a lot better than percentage per unit.

10:25  25        For instance, if I were to ask somebody, "What did

10:25  1   you pay for that car? and he told me, "Well, I paid

10:26  2   $20,000," that's much more explanatory than him telling me,

10:26  3   "Well, I paid 30 percent of my take-home salary this year,"

10:26  4   because it begs the next question as the percentage

10:26  5   unpacking does, which is, "Well, what's your salary, or

10:26  6   what's the ASP of the phone?"

10:26  7          That's why we think just as an overarching point

10:26  8   in the Court doing its work that, number one, it's a good

10:26  9   idea to start with the bull's eye.  Then as you look at the

10:26  10  bull's eye and move outwards, use as a benchmark of

10:26  11  inter-license comparison dollar-per-unit rates.

10:26  12         As a second point before I get into the questions,

10:26  13  the Court didn't have a question on what I'll call

10:26  14  discrimination proof -- nondiscrimination proof.  In the

10:26  15  formulations of what needs to be shown for

10:26  16  nondiscrimination, there has been the suggestion from the

10:26  17  experts -- TCL's expert, Dr. Lynde, as well as Dr. Teece,

10:27  18  Mr. Kennedy -- that there needs to be some showing of

10:27  19  competitive harm.  It's come up in different flavors, for

10:27  20  instance, competitive harm to TCL, or competitive harm to

10:27  21  the strategic subgroup that includes TCL, or competitive

10:27  22  harm to the market for mobile phones as a whole, or harm to

10:27  23  adoption and development of the standard, or as Justice

10:27  24  Birss in the UP/Hauwei decision explained it distortion to

10:27  25  competition.

10:27  1          But under any one of these tests, under any

10:27  2   harm-based test, whichever articulation or flavor the Court

10:27  3   believes is best, TCL has failed to meet its burden.  Here's

10:27  4   why.  TCL, in its transfer prices to its affiliates -- these

10:27  5   are the prices they charge their carrier customers -- has

10:27  6   already accounted for and reserved not just Ericsson's

10:27  7   requested royalties but royalties across the entire

10:28  8   industry.

10:28  9          THE COURT:  But isn't that a red herring?  You set

10:28  10  up a reserve for a contingency, but you don't believe that

10:28  11  that contingency should properly occur, so --

10:28  12          MR. STEVENSON:  But it's in their prices.  It's in

10:28  13  the price of their handset.  So when TCL China who

10:28  14  manufacturers the handset transfers it to the TCL USA, it is

10:28  15  at a transfer price.  Then TCL USA puts its markup on that

10:28  16  and then sells it out to, for instance, carriers.  That's

10:28  17  their bid to carriers.  So the transfer price -- and that's

10:28  18  how TCL does business across the world -- from TCL to its

10:28  19  affiliates already bakes in a royalty.  It is in the price.

10:28  20          If TCL, as it has, comes into court and says,

10:28  21  we're doing great.  We have a step-up strategy.  We're going

10:28  22  to be the number four handset vendor in the world.  Things

10:28  23  are all rosey, and its prices already reflect not just

10:29  24  Ericsson's but an aggregate of industry patent holders'

10:29  25  royalties that they're asking, then how can TCL say that it

10:29  1   would be discriminated against and caused harm if it were

10:29  2   actually forced to pay those royalties that it has already

10:29  3   put into its prices to its carrier customers and to end

10:29  4   users?  I don't think it can.

10:29  5        THE COURT:  Where is it documented -- the record

10:29  6   indicates that they set up reserves for potential royalty

10:29  7   obligations, but where does the record show that those

10:29  8   obligations were built into price?

10:29  9        MR. STEVENSON:  Those are at 1105 through 1115,

10:29 10   the slides there.  That summarizes the evidence, and I will

10:29 11   give you essentially the synopsis.

10:29 12        The controller for TCL -- her name is Judy Zu,

10:29 13   testified in deposition that TCL in its transfer prices --

10:29 14   they have basically a standard price buildup -- incorporates

10:30 15   these royalty payments in what TCL, the manufacturer,

10:30 16   charges its transfer price to its affiliates.  That was her

10:30 17   testimony.

10:30 18        In addition, Mr. Kennedy did a forensic analysis

10:30 19   of all the documents of TCL dealing with this issue and

10:30 20   confirmed that there is indeed a transfer price that embeds

10:30 21   the royalty asks of Ericsson and other patent owners.

10:30 22        Now, Ms. Zu submitted a witness statement and

10:30 23   tried to walk back this testimony.

10:30 24        Mr. Kennedy, in his witness statement, noted that

10:30 25   what she was saying was incorrect and that it was

| 10:30 | 1 | unequivocal that the transfer price is baked in, and TCL |
| 10:30 | 2 | withdrew Ms. Zu as a witness.  She never testified.  They |
| 10:30 | 3 | withdrew her witness statement. |
| 10:30 | 4 | So the status of proof on this issue is solely |
| 10:30 | 5 | from Ericsson.  TCL has never controverted it or rebutted |
| 10:30 | 6 | it.  It stands uncontroverted that the prices that TCL has |
| 10:31 | 7 | been charging in the market for its handsets include a |
| 10:31 | 8 | royalty provision, and they can't show competitive harm |
| 10:31 | 9 | because they have also taken the position they are doing |
| 10:31 | 10 | great. |
| 10:31 | 11 | Unless there are are further questions, I'm |
| 10:31 | 12 | prepared to address the Court's questions starting with |
| 10:31 | 13 | Question 1. |
| 10:31 | 14 | THE COURT:  Well, how do we know that they |
| 10:31 | 15 | wouldn't have offered a lower price if they had not the |
| 10:31 | 16 | obligation to accrue for these potential liabilities? |
| 10:31 | 17 | MR. STEVENSON:  Well, they may have offered a |
| 10:31 | 18 | lower price, but the question becomes really can TCL show |
| 10:31 | 19 | based on its history of conduct competitive harm, that it's |
| 10:31 | 20 | been harmed in the market? |
| 10:31 | 21 | The Court remembers Mr. Guo, Mr. Cistulli, the |
| 10:32 | 22 | president of TCL China, the president of TCL North America, |
| 10:32 | 23 | testifying how good TCL is doing, how their sales are |
| 10:32 | 24 | getting better, how they think they're improving.  They're |
| 10:32 | 25 | on a track to emerge as one of the top four companies in the |

10:32   1   space --

10:32   2           THE COURT:  But that doesn't rule out the

10:32   3   possibility it could have still done better.

10:32   4           MR. STEVENSON:  It doesn't rule out the

10:32   5   possibility they could have done better, but it does rule

10:32   6   out the possibility that they were being competitively

10:32   7   harmed in a way that violates the FRAND commitment and in a

10:32   8   way that this Court should take action.

10:32   9           If a company comes into court and says look at our

10:32   10  trajectory.  Look how great we're doing.  We have a step-up

10:32   11  strategy.  We think it's going to be working, and at the

10:32   12  same time is putting into its prices that it sells its price

10:32   13  products at the actual royalty ask not just for Ericsson but

10:32   14  for others, that's completely incapable I think with an

10:32   15  argument that we've been discriminated against.

10:32   16          To prove discrimination I think or any competitive

10:32   17  harm, they would have to come and say this is threatening to

10:33   18  impair our business.  This is threatening our ability to

10:33   19  compete.  We are extremely disadvantaged in the market.

10:33   20  Every word we have heard from TCL's corporate witnesses was

10:33   21  exactly to the contrary.

10:33   22          Going to Question 1, I think Your Honor's question

10:33   23  to Mr. Holder articulated correctly what the legal situation

10:33   24  is right now, that your first task is to determine whether A

10:33   25  and B are consistent with FRAND.

10:33   1           The question of breach, though, brings into

10:33   2   question good faith in negotiations.  The case law is I

10:33   3   think -- it supports the notion that a patent holder doesn't

10:33   4   have to start our negotiations with its rock bottom final

10:33   5   offer, that there can be starting a little higher and moving

10:33   6   in the right direction.  That's just the reality of

10:33   7   commercial negotiations.

10:34   8           In the context, though, of where we have a FRAND

10:34   9   contention and we can't change our offer -- you know,

10:34  10   there's no negotiation here -- I think the correct inquiry

10:34  11   is are our offers consistent with what the Court views as

10:34  12   the FRAND commitment?  I think the concept of breach or the

10:34  13   word "breach" when you would view that in the past tense as

10:34  14   to the historical negotiations has been mooted by the

10:34  15   Court's ruling on damages.

10:34  16           THE COURT:  But are you saying that in essence

10:34  17   that the claim for declaratory relief supersedes the claim

10:34  18   for specific performance?

10:34  19           MR. STEVENSON:  No, I don't think they have to

10:34  20   supersede.  I think they are both consistent.  The Court is

10:34  21   going to make a decision as to whether A and B are

10:34  22   consistent with FRAND.  If they are, they become the

10:34  23   judgment of the Court.  If they are not, the Court may do a

10:34  24   rate setting.  And the authority to do a rate setting arises

10:34  25   under the declaratory judgment jurisdiction of the Court,

| | | |
|---|---|---|
| 10:34 | 1 | and in fact maybe perhaps as well under the specific |
| 10:34 | 2 | performance remedy that is being requested. |
| 10:35 | 3 | THE COURT:  Well, if I find that the FRAND |
| 10:35 | 4 | obligation is breached, then I move on to specific |
| 10:35 | 5 | performance and under that heading determine the rate.  If I |
| 10:35 | 6 | find no breach of the FRAND obligation, I still move on to |
| 10:35 | 7 | declaratory relief and determine whether A and B are in fact |
| 10:35 | 8 | FRAND or what FRAND should be.  Either way, I have to make |
| 10:35 | 9 | the analysis of whether A and B are FRAND or not. |
| 10:35 | 10 | MR. STEVENSON:  I'm not sure about that.  The |
| 10:35 | 11 | Court doesn't need to determine whether there's been a |
| 10:35 | 12 | breach of FRAND because that gets into good faith in |
| 10:35 | 13 | negotiation.  I think we start off with what you viewed as |
| 10:35 | 14 | your second step, which is, are A and B consistent with |
| 10:35 | 15 | FRAND?  If they are, that becomes the licensing arrangement |
| 10:35 | 16 | going forward. |
| 10:35 | 17 | THE COURT:  Yes. |
| 10:35 | 18 | MR. STEVENSON:  If they are inconsistent, then |
| 10:35 | 19 | you're into rate setting where you may revise them |
| 10:35 | 20 | consistent with your declaratory judgment or specific |
| 10:35 | 21 | performance jurisdiction in the case to make them compliant |
| 10:35 | 22 | in your view with FRAND. |
| 10:36 | 23 | THE COURT:  I guess I don't get to rate setting |
| 10:36 | 24 | under the breach of contract claim unless I find a breach of |
| 10:36 | 25 | contract and move on to the remedy of specific performance. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:36  1    I think the analytic task I have here is the same regardless

10:36  2    of which legal framework you want to cabin it with.

10:36  3           MR. STEVENSON:  I think that's correct, yes.

10:36  4           THE COURT:  Okay.

10:36  5           MR. STEVENSON:  So Question 2 --

10:36  6           THE COURT:  You're not arguing that there can be

10:36  7    no breach of contract because of bad faith on TCL's part?

10:36  8           MR. STEVENSON:  No, we haven't made that -- that's

10:36  9    not a contention.  That's the historical negotiations, but

10:36  10   since those are no longer part of this case --

10:36  11          THE COURT:  Okay.

10:36  12          MR. STEVENSON:  So with regard to Question No. 2,

10:36  13   at what point should the competitive relationship be

10:36  14   measured, we think that's at the date of the FRAND

10:36  15   contentions, May 2015.  The question becomes really not just

10:36  16   how can Ericsson know what is going to happen in the future,

10:37  17   but maybe more importantly, this isn't a negotiation.  This

10:37  18   is a litigation.  We put in FRAND contention offers as of

10:37  19   May 2015, and we couldn't change them.  We tried to, and TCL

10:37  20   objected to that.

10:37  21          In a real world negotiation, as the world changes,

10:37  22   as facts change, if an offer hasn't been accepted, it can be

10:37  23   withdrawn, replaced, changed, modified.  We're not in that

10:37  24   here.  This is a litigation.  We were locked in with our

10:37  25   contentions as of May 2015.  So, in fairness, I think that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:37 | 1 | becomes the date for which competitive relationships should |
| 10:37 | 2 | be measured for the purpose of determining whether A and B |
| 10:37 | 3 | at the outset comply with FRAND. |
| 10:37 | 4 | Now, if the Court gets into rate setting, I think |
| 10:37 | 5 | it can use the book of wisdom to say, you know, looking |
| 10:37 | 6 | forward into the future, what may the parties have agreed to |
| 10:37 | 7 | understanding what may happen in the future and their |
| 10:37 | 8 | prognostication abilities.  I think that's okay.  But for |
| 10:38 | 9 | purposes of determining, for instance, whether there was |
| 10:38 | 10 | discrimination or not, I think it's inappropriate to look at |
| 10:38 | 11 | future events given that we couldn't change our offer in |
| 10:38 | 12 | reaction to future events that occurred. |
| 10:38 | 13 | Question 3, what criteria should the Court use to |
| 10:38 | 14 | to determine if firms are similarly situated?  Slide 301 |
| 10:38 | 15 | contains the testimony of Dr. Teece.  Basically, he |
| 10:38 | 16 | identified five factors:  product pricing, sales volumes, |
| 10:38 | 17 | product mix, financial condition of the licensee and cost |
| 10:38 | 18 | structures.  Of those criteria, he viewed price and volume |
| 10:38 | 19 | as the most important, and that leads to the heat maps that |
| 10:38 | 20 | we saw, which are at slide 303. |
| 10:38 | 21 | The Court will recall we spent a lot of time on |
| 10:38 | 22 | the heat map.  I think this is probably one of the most |
| 10:38 | 23 | important demonstratives in the case.  We have amended it to |
| 10:39 | 24 | add on to the heat maps the unpacking results.  What this |
| 10:39 | 25 | allows the Court to do is get a visual and pictorial |

10:39    1    determination of what's the starting point, and then

10:39    2    concentrically how would things work outward?

10:39    3            What I would observe here, though, is ZTE is the

10:39    4    closest.  CoolPad is next to it.  We know that TCL has

10:39    5    argued variously that CoolPad shouldn't count.  We shouldn't

10:39    6    include CoolPad.  They're a local king.  But they still are

10:39    7    a competitor, and TCL simultaneously is now trying to argue

10:39    8    that, well, competitors are differently -- all competitors

10:39    9    should be considered as similarly situated, and I don't

10:39   10    really know what it is.

10:39   11            From Ericsson's standpoint on the how the inquiry

10:39   12    should proceed, CoolPad sells into the largest mobile phone

10:39   13    market, which is China.  CoolPad has a step-up strategy.

10:39   14    That's slide 306, the testimony on that.  They do compete

10:40   15    head to head in the United States with TCL, and we think

10:40   16    they are appropriate to consider.

10:40   17            Likewise, for 3G, we think the Court should

10:40   18    consider Karbonn.  Again, it sells into one of the largest

10:40   19    mobile phone markets.

10:40   20            Then we get to the point of Apple and Samsung.

10:40   21    Apple and Samsung were the outliers on the heat map.  There

10:40   22    was a lot of discussion about them.  I thought the remarks

10:40   23    in closing, though, by Mr. Holder were particularly

10:40   24    illuminating, because in response to your question about,

10:40   25    well, isn't TCL a low-margin, high-volume producer, Mr.

10:40    1    Holder said, well, yeah, a lot of companies in the space are

10:40    2    except of course Apple and Samsung.

10:40    3         It seems throughout this case as we talked about

10:40    4    companies in the aggregate every time we got to Apple and

10:40    5    Samsung we made an exception for them because they have such

10:40    6    huge brand recognition.  Mr. Cistulli's testimony was

10:40    7    several hundred dollars of their pricing is due to brand

10:40    8    recognition.

10:40    9         So not only does that impact similarly situated --

10:41   10    and we don't think TCL is even close to being similarly

10:41   11    situated given that a large amount of the money Samsung and

10:41   12    Apple charge for a phone is based on brand recognition.

10:41   13    They have huge margins.

10:41   14         Secondly, and maybe more importantly, it

10:41   15    underscores why an internal ruler benchmark of percentage is

10:41   16    so incorrect.  Because if you take the percentage that you

10:41   17    unpack Apple is paying Ericsson or Samsung is paying

10:41   18    Ericsson and don't strip out how much of that is brand

10:41   19    recognition, which Dr. Lynde didn't do, what you are left

10:41   20    with is a skewed low percentage, because a lot of that

10:41   21    percentage is based on brand recognition that has nothing to

10:41   22    do with the RF interface that Ericsson's patents cover.

10:41   23         That's why the ruler in the case we contend should

10:41   24    be dollar per unit when you are measuring --

10:41   25         THE COURT:  Or strip out the brand recognition.

10:42    1           MR. STEVENSON:  If you can do that.

10:42    2           THE COURT:  We don't have that in the present

10:42    3    record.

10:42    4           MR. STEVENSON:  Right.  We don't have enough

10:42    5    information in the present record to do that across

10:42    6    everyone.  That's why looking at dollar per unit is a good

10:42    7    measure because it takes out all that.  It just says in raw

10:42    8    terms every time this company sells a phone, what's the size

10:42    9    of the check they are writing?  That's why we think that's a

10:42   10    much better measure.

10:42   11           Finally, I wanted to talk a little bit about the

10:42   12    motion practice with regard to confidentiality.  You know,

10:42   13    based on the interventions, you can see across the industry

10:42   14    how seriously the confidentiality of these licenses is

10:42   15    taken.  Certainly, many of the companies are competitors.

10:42   16    We don't deny that a lot of mobile phone companies are

10:42   17    competitors with TCL.  It doesn't mean they're similarly

10:42   18    situated.  That's a much smaller subgroup.

10:42   19           With regard to the comments and the docket entry

10:42   20    that Mr. Holder relied upon, I would observe that there's a

10:42   21    lot of sensitivity even to TCL in-house folks seeing on the

10:42   22    behalf of Ericsson licensees and Ericsson as well

10:43   23    confidential license agreements.  You know, people change

10:43   24    jobs or things get said inadvertently or on purpose.  So the

10:43   25    more the universe of people who know about the terms of

10:43  1    deals can be restricted, the less the risk is that those

10:43  2    would come out and be used detrimentally.  I think that's

10:43  3    just common business sense.

10:43  4          Question 4, the top-down approach and comparative

10:43  5    license approach, in answer to Your Honor's question, you

10:43  6    should credit the comparable licenses.  Those are the market

10:43  7    economic evidence that is by far most reliable in this case.

10:43  8          The top-down approach in our view --

10:43  9          THE COURT:  What's your response to Mr. Holder's

10:43  10   contention that the data shows or the evidence here shows

10:43  11   that there's a holdup factor in Ericsson's licenses?

10:43  12         MR. STEVENSON:  There's not a stitch of evidence

10:43  13   on holdup or that holdup infects Ericsson licenses.  These

10:44  14   are licenses that are negotiated at arm's length between

10:44  15   companies who are extremely sophisticated.

10:44  16         If you will recall the testimony of Mr. Mackelroy

10:44  17   as well as other witnesses, when these licenses are

10:44  18   negotiated, if the licensee doesn't like the rate, all they

10:44  19   have to do is not pick up the pen and sign the agreement.

10:44  20   That's where coercion comes in, because the only way someone

10:44  21   is going to enter into an economic agreement that is adverse

10:44  22   to what they think they should actually have to pay -- in

10:44  23   other words, the only reason one of these companies is going

10:44  24   to pay more is if they are somehow coerced to do it.

10:44  25         In the opening statement, I remember making this

10:44  1   point, and Your Honor said, well, isn't the threat of

10:44  2   litigation something that could coerce one of these

10:44  3   companies?  I said, you know, it is, but there's no court in

10:44  4   the world that is not going to entertain a breach of FRAND

10:45  5   suit.

10:45  6          So if Ericsson threatens litigation against a

10:45  7   company -- some of these agreements stemmed out of

10:45  8   litigation, and Ericsson was clear in its proof.

10:45  9   Mr. Mackelroy testified at all times there was an offer open

10:45  10  for a neutral adjudication either by arbitration or a court

10:45  11  overtly in those cases.  Moreover, any licensee anytime it

10:45  12  feels it is being charged too much can go into court in the

10:45  13  United States or in the UK, which just happened --

10:45  14          THE COURT:  Right, but there's a cost.

10:45  15          MR. STEVENSON:  There's a cost.  And if they spend

10:45  16  $5 million or $10 million in legal fees, that's the boundary

10:45  17  of the coercion.  It's bounded there.  But nobody is going

10:45  18  to enter into an agreement and pay $100 million more or $200

10:45  19  million more because of coercion when they could go into

10:45  20  court, hire lawyers, and get a neutral adjudication.

10:45  21          That's exactly what TCL did here.  This is exactly

10:45  22  what has played out.  Your Honor will remember when the

10:45  23  license agreement negotiations stalled Ericsson sued TCL in

10:46  24  several countries outside the United States.  When the heat

10:46  25  on those got turned up to the extent where it was looking

10:46   1    like an adjudication was going to happen, TCL filed this

10:46   2    lawsuit.  That turned off all the heat, and we're having a

10:46   3    neutral adjudication right now.

10:46   4          This is exactly why there is no holdup because

10:46   5    these type of proceedings and arbitrations, which are well

10:46   6    known to the industry, are the safeguard against some

10:46   7    egregious deal that someone pays hundreds of millions of

10:46   8    dollars too much.  It's a very small -- in the context of

10:46   9    the money that we are talking about in these deals, it's

10:46   10   less than 10 percent, less than 5 percent.

10:46   11         THE COURT:  Well, a smart businessman would look

10:46   12   at his transaction costs to go forward with litigation.  You

10:47   13   put it at $5 million to $10 million.  I wonder.  But suppose

10:47   14   a businessman says, you know, I think my litigation costs

10:47   15   would be equivalent to an additional one-tenth of a percent

10:47   16   in the rate that's on the table.  I'd just as soon not spend

10:47   17   the nonmonetary effort that goes with litigation.  I'll pay

10:47   18   you the extra 10 percent that basically reflects the

10:47   19   transaction cost of litigating.

10:47   20         MR. STEVENSON:  I understand.  But there's a flip

10:47   21   side to your hypothetical.  The answer is yes, but the

10:47   22   answer is that's half the side.  What bargaining leverage

10:47   23   does the licensee have?  The licensee has a lot more

10:47   24   bargaining leverage in these circumstances than the licensor

10:47   25   does, because the licensor always knows if they ask for too

10:47  1  much, we're going to end up in federal court or in

10:47  2  arbitration somewhere, and we're going to just have a rate

10:48  3  setting.

10:48  4          What can the licensee do?  The licensee is not

10:48  5  required to take a license.  If Ericsson makes an offer to a

10:48  6  licensee and it's perfectly FRAND, they can look at it and

10:48  7  say, well, thank you very much.  We'll see you around.  They

10:48  8  don't have to pick up the pen and sign.  Ericsson has no way

10:48  9  to coerce that licensee into having a neutral adjudication.

10:48  10  The law doesn't permit that.

10:48  11          Now, interestingly, what Justice Birss did in the

10:48  12  UK is he actually did a FRAND adjudication, and then he's

10:48  13  talking about doing an injunction if Hauwei doesn't accept

10:48  14  the adjudication.  That essentially is the way to make it a

10:48  15  bilateral situation.

10:48  16          But in negotiations -- in the testimony from

10:48  17  Mr. Mackelroy -- Mr. Delgado's witness statement was very

10:48  18  clear -- in negotiations, licensees say as part of their

10:48  19  bargaining leverage you need to give us a better deal,

10:48  20  because you know what, if we don't sign, what are you going

10:48  21  to do?  Are you going to sue us in every country around the

10:48  22  world?  And are you going to do that to the next person and

10:49  23  the next person?  Are you just going to be a litigation

10:49  24  shop?

10:49  25          So companies like Ericsson who have essential

10:49   1   patents are put in a very difficult choice, which is do you

10:49   2   capitulate to avoid litigation understanding that litigation

10:49   3   is very expensive, takes a long time, and still doesn't

10:49   4   guarantee you're going to have an enforceable agreement at

10:49   5   the end?  Do you capitulate a little bit, or do you stick to

10:49   6   your guns and go with suits?

10:49   7        So to answer Your Honor's question, if you're

10:49   8   looking at what are the bilateral negotiations between the

10:49   9   licensor and licensee, sort of the holdout versus hold-up

10:49  10   incentives and -- not incentives, but ability to effect the

10:49  11   deal, holdup is a lot less powerful that holdout.

10:49  12        THE COURT:  So you're saying there's a potential

10:49  13   litigation transaction cost that each side has to weigh in

10:49  14   coming to an agreement or not?

10:49  15        MR. STEVENSON:  Yes.  And I think the holdout side

10:49  16   of it is more extensive, and that was the testimony from the

10:49  17   witnesses who addressed it.

10:50  18        So now going beyond the comparable licenses, I'm

10:50  19   going to talk about the top-down a little bit.  The question

10:50  20   becomes, number one, can it be used analytically as a

10:50  21   primary analytical method?   number two, if it can't, can it

10:50  22   be used as a sanity check?

10:50  23        Now, conceptually, I understand -- the concept of

10:50  24   top-down is easy.  Ericsson has discussed it before in

10:50  25   negotiations and -- especially early before it had

10:50   1    comparable licenses, in the early stages of LTE, early

10:50   2    stages of 3G, when you're trying to basically start your

10:50   3    licensing program.  There's nothing wrong with the concept

10:50   4    of saying we think we have X percent of all the patents, and

10:50   5    if the rate is Y across the entire industry, our share of

10:50   6    that should be Z.  That's very easy.  There's nothing

10:50   7    difficult.

10:50   8            But for use in a litigation like this, as a

10:50   9    primary analytical methodology to drive a result, it

10:51   10   requires an accurate starting point of an aggregate -- and I

10:51   11   am going to talk about that more when I deal with Question

10:51   12   7 -- but there's very big problems there.  It requires the

10:51   13   numerator for Ericsson -- what number of patents they

10:51   14   have -- and then it requires a denominator.  And the

10:51   15   denominator, which Mr. Holder didn't talk about -- it wasn't

10:51   16   on his four-page demonstrative.  The denominator is the very

10:51   17   big problem here.  The bigger the denominator gets, the

10:51   18   smaller Ericsson's percentage share gets, and the smaller

10:51   19   the driven royalty to Ericsson is.  And I want to talk about

10:51   20   the denominator, because in my view the denominator is

10:51   21   wholly unreliable and can't even be used as a sanity check.

10:51   22           Now, let me first talk about the decision and the

10:51   23   opinion by Justice Birss in the UP/Hauwei matter, because he

10:51   24   dealt with this exact same point.  in fact, the consultants

10:52   25   at Concur IP, who did the industrywide survey under the work

10:52   1   of Dr. Ding, were the same people that had been used in the

10:52   2   UP/Hauwei case.  So Justice Birss was really dealing with

10:52   3   the same cast of characters, Dr. Kakaes and many of the same

10:52   4   consultants, who did almost exactly the same methodology.

10:52   5        In that case, Hauwei through their industry survey

10:52   6   done almost identical to this one concluded there were 1812

10:52   7   industr-wide LTE standard essential patents.  So that's the

10:52   8   whole universe across the industry, 1812.  In this case, I

10:52   9   think the number they came out with was 1792.  Very similar.

10:52   10  Justice Birss rejected it.  He found it was way

10:52   11  too high.  That's at paragraph 377 of his opinion.  He found

10:52   12  30 minutes per patent wasn't rigorous.  It was a coarse

10:53   13  estimate.  He viewed the short time as overstating and

10:53   14  having a tendency to overestimate essentiality.

10:53   15  Interestingly, in that case, he reduced the number of

10:53   16  industrywide patents in his review of the methodology from

10:53   17  the Hauwei assertion of 1812 down to 800.  So Justice Birss

10:53   18  used as his denominator 800.

10:53   19       Now, what he did I will contend was a little bit

10:53   20  arbitrary in how he cut it down.  But, interestingly, he

10:53   21  didn't use it as a primary analytical methodology, because

10:53   22  he found in addition to the problems with the denominator

10:53   23  there wasn't a good starting point, you know, for what is

10:53   24  the aggregate going in.

10:53   25       So what he did is he took that denominator and

68

10:53  1    used it to essentially back out what the aggregate royalty

10:53  2    would be across the industry at various percentage rates

10:53  3    that were advocated by the parties.  That was his sanity

10:54  4    check.  Interestingly, he used 800 as the number, and he

10:54  5    found the same problems existed there as exist here.  It's

10:54  6    almost a mirror image.  Let me go through those problems and

10:54  7    the evidence before the Court on them.

10:54  8          Number one, Concur IP, they don't meet the

10:54  9    standards established by this Court for reliability, and

10:54  10   their work shouldn't be given weight.  There were four

10:54  11   consultants.  None of them meet the definition of a "person

10:54  12   skilled in the art" based on the Court's Daubert ruling with

10:54  13   regard to Mr. Delgado, who is a patent attorney who's been

10:54  14   doing claim chart analysis, and infringement work for seven

10:54  15   years.

10:54  16         These four consultants, two of them have never

10:54  17   worked in the industry.  They've done several years of claim

10:54  18   chart work.  Two of them have had very small jobs for short

10:54  19   periods of time, and then most of their experience is claim

10:54  20   charting.  I would contend that Mr. Delgado is far more

10:54  21   qualified than any of the Concur IP consultants to do this

10:54  22   sort of work.  That's problem number one.

10:54  23         Problem number two, their work was too superficial

10:55  24   to rely on.  They spent 20 minutes per patent family.  They

10:55  25   didn't even read the patent.  Stop right there.  They didn't

10:55   1   even read the whole patent.  They didn't read the file

10:55   2   histories.  They weren't properly instructed on claim

10:55   3   construction.  They knew who their adversary was.  This is

10:55   4   all contained in the slides at 401 through 415.

10:55   5           At least in the UP/Hauwei case in the UK, the

10:55   6   judge got some solace out of the fact that the Concur IP --

10:55   7   or excuse me -- that the consultants didn't know who they

10:55   8   were working for.  in this case, they knew exactly who they

10:55   9   were working for and how their work was going to be used.

10:55   10          Dr. Ding came behind and looked at 17 percent of

10:55   11  the work, spot checked it for errors, concluded there were

10:55   12  systematic errors in the work, but then he did nothing to

10:55   13  take the systematic errors and revise the overall numbers.

10:56   14          When I compare this to the process, for instance,

10:56   15  this Court would go through if you had a three patent case

10:56   16  and you're trying to determine infringement, claim

10:56   17  construction -- I mean, look at all the work that goes into

10:56   18  into that, and still the trials are very close and very

10:56   19  highly contested.  It's just impossible to imagine someone

10:56   20  can have any degree of reliability in 20 minutes.

10:56   21          Moreover, compare this to the process Ericsson

10:56   22  went through itself with regard to Ericsson's own claim

10:56   23  charts.  It spends tens and tens and tens of hours putting

10:56   24  them together, vetting them, multiple people, before they

10:56   25  put them out in negotiations.  We have got compared to that

10:56   1   a denominator based on the work of consultants who aren't

10:56   2   skilled in the art who didn't even read the patents.

10:56   3        Finally, in this case, their own work was proven

10:56   4   unreliable when it was applied.  You remember TCL

10:56   5   established its patent strength ratios based on this Concur

10:57   6   IP work.  This is how they got their PSRs for unpacking.

10:57   7        When they got to LG and unpacking that deal, you

10:57   8   will recall Dr. Lynde used a patent strength ratio of .84.

10:57   9   What that means is he -- according that patent strength

10:57   10  ratio, LG's portfolio was actually 16 percent more valuable,

10:57   11  stronger than Ericsson's.  That's not the case, and anybody

10:57   12  in the industry will tell you that's not the case.  But the

10:57   13  economics tell you that's not the case because in the

10:57   14  cross-license agreement between LG and Ericsson, who had

10:57   15  pretty similar royalty bases, LG made a large net balancing

10:57   16  lump sum payment to Ericsson, which wouldn't happen if the

10:57   17  PSR was right.  So what happened is the model blew up for

10:57   18  Dr. Lynde.  He testified it gave nonsensical results when he

10:57   19  unpacked LG with it, and it was because the PSR was wrong.

10:58   20       Your Honor asked the question very directly can

10:58   21  you assure the Court this error doesn't affect the other

10:58   22  calculations?  That's at slide 416.  If we can pull that up.

10:58   23       "Q.  Were you able to isolate the reasons why it

10:58   24  didn't work for LG and assure yourself whatever that reason

10:58   25  was it didn't affect the other calculations?"

| | | |
|---|---|---|
| 10:58 | 1 | You will recall Dr. Lynde took a fair amount of |
| 10:58 | 2 | time to consider Your Honor's question.  Then after awhile |
| 10:58 | 3 | he said: |
| 10:58 | 4 | "A.  No, sir, I wasn't.  My understanding and my |
| 10:58 | 5 | discussions and readings was that the method was uniform, |
| 10:58 | 6 | even if not without some margin of error across the |
| 10:58 | 7 | portfolio sampled." |
| 10:58 | 8 | He couldn't explain. |
| 10:58 | 9 | So then given that Dr. Ding's work and the Concur |
| 10:58 | 10 | IP work basically was proven in one of the five or six |
| 10:58 | 11 | unpackings Dr. Lynde did to be unreliable, he did two |
| 10:59 | 12 | things.  Number one, he used contribution ratios to unpack |
| 10:59 | 13 | LG.  That was his methodology of choice, which I think |
| 10:59 | 14 | verifies and validates contribution ratios being used for a |
| 10:59 | 15 | PSR.  Number two, he didn't go back to any of those |
| 10:59 | 16 | unpackings and extract out or fix the PSR.  He just left it |
| 10:59 | 17 | the way it was, and they did nothing to fix it.  So I think |
| 10:59 | 18 | the PSR to the extent it informs the denominator is wholly |
| 10:59 | 19 | unreliable. |
| 10:59 | 20 | Now, the question becomes why would TCL use this |
| 10:59 | 21 | methodology for the PSR?  In fact, the irony of it is -- you |
| 10:59 | 22 | will remember in the testimony the PSRs calculated by Dr. |
| 10:59 | 23 | Ding are actually lower.  In other words, Ericsson is a |
| 10:59 | 24 | lower strength as compared to the licensee than the PSRs |
| 11:00 | 25 | calculated by Ericsson's approach, which is contribution |

11:00  1    ratios.

11:00  2            So the unpackings really come out a little more

11:00  3    favorable for TCL if they were to use contribution ratios.

11:00  4    Why don't they use them?  Well, it's because under the

11:00  5    contribution ratios according to Signals Ericsson has

11:00  6    between 15 and 20 percent of the patent strength in the

11:00  7    industry.  TCL has been striving as hard as it can in this

11:00  8    case not to validate the use of contribution ratios because

11:00  9    it's the death knell to their top-down, because what they

11:00 10    really want to say in the top-down is oh, Ericsson has only

11:00 11    got 6 percent or 4 percent or 7 percent.  Whichever flavor

11:00 12    you look at in whichever chart walking back incorrect

11:00 13    assumptions they give you, that's what they want.  That's

11:00 14    where they are putting their eggs.

11:00 15            But why does Dr. Lynde use contribution ratios

11:00 16    when he comes to unpacking LG when the Concur IP work blows

11:00 17    up?  Given all those problems, all the myriad of problems --

11:00 18    number one, it's no surprise that the Court in UP/Hauwei

11:01 19    rejected the use of the top-down.  It was based on the same

11:01 20    assumptions.  That's clear as day.  Number two, although the

11:01 21    Court used it as a sanity check, it cut the denominator from

11:01 22    1800 to 800.  So if the Court wishes to use this as a sanity

11:01 23    check, I would suggest something similar.

11:01 24            Now, there's also problems with the numerator.

11:01 25    I'll get into them a little bit.  They divided Kakaes by

11:01   1   Ding.  There was no quality assessment handoff.  What TCL

11:01   2   has done now in recognition of those problems is they tried

11:01   3   to walk it back.  They've given the work-around, which were

11:01   4   the demonstratives we saw today saying, well, if we relax

11:01   5   some of the assumptions and agree with Ericsson on some of

11:01   6   these arguments, here's what you get.  But they never, ever,

11:01   7   ever in those charts touched the denominator, and that's

11:01   8   what's fatal to this entire exercise.

11:01   9           Question 5, should the Court address this as a

11:02   10   hypothetical bilateral negotiation, and if so, what's the

11:02   11   date, and what do we do about Georgia-Pacific?  You know,

11:02   12   TCL argued, well, we think the date is beside the point.

11:02   13           THE COURT:  Would you agree that the

11:02   14   Georgia-Pacific approach doesn't answer the

11:02   15   nondiscrimination question?

11:02   16           MR. STEVENSON:  I agree.  No question there.

11:02   17           Let's talk about the date first.  I have a hard

11:02   18   time seeing, you know, an answer in a breach of FRAND case

11:02   19   where the Court says I'm not going to worry about the date

11:02   20   that the negotiation would have occurred.  It doesn't

11:02   21   matter.  I don't even see that in patent damages cases, so I

11:02   22   think the date is important.  And for the reasons we have

11:02   23   articulated, the date of that is May 2015.

11:02   24           Now, with regard to the Georgia-Pacific factors,

11:03   25   I'm actually more in agreement with TCL on that.  They are

74

| | | |
|---|---|---|
| 11:03 | 1 | not a talisman.  In fact, they are not mandatory for use.  I |
| 11:03 | 2 | don't think the Court needs to go there. |
| 11:03 | 3 | I don't think it's error if the Court does if it |
| 11:03 | 4 | applies them correctly.  But I think what you see in the |
| 11:03 | 5 | current at least the patent field is a lot of criticism of |
| 11:03 | 6 | Georgia-Pacific as not being that helpful.  It's a grab bag |
| 11:03 | 7 | of pretty common sense factors that are just -- you know, |
| 11:03 | 8 | use it if it's appropriate.  Look at, you know, profits and |
| 11:03 | 9 | rates in the industry and established history of licensing. |
| 11:03 | 10 | It's just sort of a checklist of relevance, but it doesn't |
| 11:03 | 11 | tell you what to do when you get there.  I think that's been |
| 11:03 | 12 | the criticism for probably as long as I have been doing this |
| 11:03 | 13 | about Georgia-Pacific and the unhappiness with it. |
| 11:03 | 14 | If the Court chooses to use it, I think that's |
| 11:03 | 15 | okay.  There are a few factors you might want to cut out, |
| 11:03 | 16 | such as four, five, and seven, but, candidly, I think the |
| 11:04 | 17 | analytical approaches that have been presented here, which |
| 11:04 | 18 | are comparable licenses, are superior to that.  I think you |
| 11:04 | 19 | would probably spend a lot of time going through factors |
| 11:04 | 20 | that are of pretty tangential relevance. |
| 11:04 | 21 | Question 6, so here we are into the PSRs and |
| 11:04 | 22 | counting every contribution equally.  The question the Court |
| 11:04 | 23 | asked is, well, does this assign value to patents merely for |
| 11:04 | 24 | being included in the standard?  The answer is I don't think |
| 11:04 | 25 | the PSR does that.  This is not a case of patent |

| | | |
|---|---|---|
| 11:04 | 1 | infringement damages for one or two or three or four |
| 11:04 | 2 | individual patents.  Rather, this is a breach of contract |
| 11:04 | 3 | case that is based on a contract under French law, and that |
| 11:04 | 4 | is evaluating licenses for a global worldwide portfolio.  So |
| 11:05 | 5 | we're not just dealing with U.S. damages law here.  We're |
| 11:05 | 6 | dealing with a global worldwide portfolio.  And this is a |
| 11:05 | 7 | valuation Your Honor has to make. |
| 11:05 | 8 | In making that valuation, number one, there's |
| 11:05 | 9 | persuasive but not really binding relevance of U.S. patent |
| 11:05 | 10 | damages law.  You would have to consider the laws of many |
| 11:05 | 11 | nations in evaluating a global portfolio. |
| 11:05 | 12 | Secondly, most importantly here, to give the Court |
| 11:05 | 13 | comfort is the PSR is not a valuation.  It's just a ratio, |
| 11:05 | 14 | and it's solely a ratio that is being used to unpack |
| 11:05 | 15 | licenses. |
| 11:05 | 16 | You know, the problem with cross-licenses is that |
| 11:05 | 17 | in any cross-license where the grant-back value to Ericsson |
| 11:05 | 18 | or just to any patent owner is non-trivial, it's a |
| 11:05 | 19 | two-variable problem.  That two-variable problem is what is |
| 11:05 | 20 | Ericsson's one-way rate, and what's the licensee's one-way |
| 11:05 | 21 | rate?  And there's actually an infinite number of solutions |
| 11:06 | 22 | there. |
| 11:06 | 23 | So what the patent strength ratio does is that |
| 11:06 | 24 | ratio takes one of the variables out of play -- that's the |
| 11:06 | 25 | licensee grant-back rate -- and replaces it with the |

11:06  1    Ericsson grant-back rate as a ratio of the licensees.  Now

11:06  2    you're in the one variable you can solve.  So used in that

11:06  3    regard, I don't think it runs afoul of any prohibition in

11:06  4    the CAFC about valuing all patents equally.

11:06  5         Now, clearly, it incorporates an assumption, which

11:06  6    is when you are looking at the ratio, Ericsson's patent

11:06  7    distribution in terms of strength is equivalent to the

11:06  8    licensee's patent distribution in terms of strength.  That's

11:06  9    probably not always true.  In fact, rigorously tested, it's

11:06  10   probably never true.

11:06  11        If Your Honor's view is, well, in relaxing that

11:06  12   assumption, that probably causes the margins of the PSR, the

11:07  13   tolerance of it, to get too big.  What's the answer?  Well,

11:07  14   I think the answer may be that you don't use the PSR based

11:07  15   on patent counts.  We used the PSR based on contribution

11:07  16   ratios.  We think that's a better way to do it for a number

11:07  17   of reasons.

11:07  18        First of all, contributions are a reasonable and

11:07  19   good proxy.  I'm not going to say they're perfect, but

11:07  20   they're a very good proxy for overall patent strength and

11:07  21   portfolio strength.  Granted, it's not a one-to-one

11:07  22   correlation between contributions and patents, but as

11:07  23   Dr. Kakaes, TCL's expert, as well as Ericsson witnesses have

11:07  24   testified, a contribution is more trustworthy because it's

11:07  25   indicative of a valuable portfolio.  At slide 601 and 602,

11:07   1    Dr. Kakaes testified that contribution ratios have been used

11:08   2    by him in the past and in an appropriate way to value a

11:08   3    portfolio.  Moreover, Dr. Lynde when he had the problem with

11:08   4    the PSR based on patents actually himself went and used

11:08   5    contribution ratios to unpack LG.

11:08   6           So the fact that TCL's own experts, both

11:08   7    Dr. Kakaes and Dr. Lynde, through his adoption of the

11:08   8    contribution ratio, have used it in this litigation, I think

11:08   9    it's entitled to be used as a reliable metric.  I think it's

11:08   10   more reliable than the patent counts of Dr. Ding, especially

11:08   11   given the problems that went into those with his

11:08   12   methodology.

11:08   13          I understand the Court's question is really more

11:08   14   purely legal, which is, are we running afoul of federal

11:08   15   circuit precedent?  No, I don't think we are.  So the last

11:08   16   question is I don't think the analysis needs to be revised.

11:08   17          So that brings us to Question 7.  The question

11:09   18   here is that in the Unwired Planet/Hauwei case Justice Birss

11:09   19   didn't give much credence to the same statements cited here

11:09   20   by TCL with regard to 6 to 8 percent.  If this Court finds

11:09   21   that those statements are not a basis to calculate the

11:09   22   starting point for the top-down, what other facts would

11:09   23   provide such a basis?

11:09   24          So let me first address some terminology.  There

11:09   25   are some nuance concepts here, but I think they become very

| | | |
|---|---|---|
| 11:09 | 1 | important in understanding economically what we are talking |
| 11:09 | 2 | about here.  One is the intrinsic value of a portfolio. |
| 11:09 | 3 | Another is the royalty rate charged for it.  And those are |
| 11:09 | 4 | different. |
| 11:09 | 5 | So, for instance, imagine that we have here before |
| 11:10 | 6 | us, you know, an owner of every single LTE essential patent |
| 11:10 | 7 | across the industry, which is one party.  We own them.  And |
| 11:10 | 8 | we ask the question, all right, what is the value conferred |
| 11:10 | 9 | by these patents?  Well, the answer to that is, well, what |
| 11:10 | 10 | would the phone do, what would the network do, better with |
| 11:10 | 11 | this patented technology than without it? |
| 11:10 | 12 | So right there the first question in intrinsic |
| 11:10 | 13 | value is you have to ask the question -- the patents as |
| 11:10 | 14 | compared to what non-infringing alternative is out there? |
| 11:10 | 15 | maybe it's 3G.  Maybe it's something of a hybrid of 3G. |
| 11:10 | 16 | Maybe it's a little worse than 3G.  But just for purposes of |
| 11:10 | 17 | discussion let's say that -- and we're valuing the portfolio |
| 11:10 | 18 | intrinsically -- this group of patents allows more |
| 11:10 | 19 | bandwidth, more reliability, more battery life, more |
| 11:10 | 20 | security, tick, tick, tick, tick, tick, than the 3G |
| 11:10 | 21 | solution.  What is that worth? |
| 11:11 | 22 | Let's say we could get industry, consumers, |
| 11:11 | 23 | everyone together, and everybody agreed, you know, it's $100 |
| 11:11 | 24 | per phone.  That's what the value of LTE over the next |
| 11:11 | 25 | noninfringing alternative across every patent in the |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:11  1    industry is.  It's $100 a phone.  Ex-ante, before

11:11  2    considering a noninfringing alternative, before

11:11  3    standardization, that's what these solutions are worth that

11:11  4    are in all these patents, $100.  That is the starting point

11:11  5    for the top-down, the intrinsic value.

11:11  6         Now, the related question is, all right, but

11:11  7    what's the royalty?  Now, if you have a patent owner,

11:11  8    whether it's one patent owner that owns all the patents in

11:11  9    the industry, or as is the case here fragmented, multiple

11:11  10   owners, you may ask the question, well, the royalty usually,

11:11  11   ordinarily, shouldn't exceed the intrinsic value.  That's

11:11  12   the whole point about lockup and not exceeding lockup value.

11:11  13   But what is the royalty?  Well, the patent owner may say,

11:12  14   charge $80 or $70 or $50.  But it's a discount to the

11:12  15   intrinsic value.

11:12  16        And the royalty that comes out is influenced by a

11:12  17   host of economic factors and, candidly, a lot of bargaining

11:12  18   factors related to enforceability, the whole issue of

11:12  19   holdout, worldwide remedies, how do you get licenses done.

11:12  20   There's a lot of factors.  So the royalty rate is the subset

11:12  21   of the intrinsic value.

11:12  22        And, finally, you've got the cost to manufacture a

11:12  23   phone.  That I think is completely different, because, of

11:12  24   course, the cost to manufacture a phone is dependent on what

11:12  25   are the costs in a competitive market, all the inputs, the

11:12   1   battery, the screen, the chip, the antenna, the software.

11:12   2   And, typically, in a competitive market, the price of a

11:12   3   phone is going to be driven by competition down to whatever

11:13   4   the incremental cost of production is plus a little bit of a

11:13   5   profit.  Those are the three concepts in this case.

11:13   6          Now, TCL presented no evidence whatsoever of the

11:13   7   intrinsic value of LTE, and I think that's fatal to the

11:13   8   top-down.  What they came with is statements Ericsson made

11:13   9   in 2008 as to predictions about where the market for

11:13  10   royalties would eventually go.  You saw a number of

11:13  11   predictions and a number of statements that were made.

11:13  12   Candidly, they are all over the map.

11:13  13          If we can have slide 706, please.  I've collected

11:13  14   them on a slide.

11:13  15          For instance, you have about six different

11:13  16   statements that were put of record in slide 706, ranging

11:13  17   from the 6 to 8 percent prediction, which in the same

11:14  18   statement, Ericsson said we think given our contributions to

11:14  19   the standard we should have a 1.5 percent royalty rate.  Of

11:14  20   course, that gets left behind in the top-down.  The joint

11:14  21   press release, single digit percentage, but then you have

11:14  22   the three MGMM surveys which predict fairly high royalties

11:14  23   in the 30s.  You've got the Spacek article, which predicts

11:14  24   14.8 percent, and that didn't even survey all standard

11:14  25   essential patent holders.

11:14   1          So which one do you choose?  My answer to Your

11:14   2   Honor is I don't think you choose any of these because I

11:14   3   think we're barking up the wrong tree.  These are

11:14   4   predictions about the royalty.  What's going to emerge after

11:14   5   the bargain in the future?  But they're not statements about

11:14   6   the intrinsic economic value of LTE as compared to the next

11:14   7   best noninfringing alternative.

11:14   8          In fact, the testimony in this case by Dr. Ordover

11:15   9   was the rate should reflect the ex-ante value of the

11:15   10  technology.  Dr. Leonard, the rate should be limited to an

11:15   11  incremental value relative to the next best alternative.

11:15   12  That's slides 702 and 703.  But none of the experts in this

11:15   13  case have actually tried to determine that value with a

11:15   14  small exception, Ericsson's X standard approach.  So the way

11:15   15  that worked is Ericsson took its portfolio -- just its

11:15   16  portfolio -- so this isn't all LTE patents.  This is not an

11:15   17  input to the top-down, but it can give Your Honor an order

11:15   18  of magnitude, which I think is very comforting.  Ericsson

11:15   19  took its patents and it divided them into buckets so that

11:15   20  noninfringing alternatives would conceptualized in an

11:15   21  easier, more manageable way function by function by

11:15   22  function, natural breaking points.

11:15   23         Dr. Parkvall and his group of engineers carefully

11:15   24  went through each bucket and they proposed for each bucket,

11:15   25  here's what the alternative that would avoid all our patents

```
11:16    1    would be.  Dr. Kakaes never rebutted that.  He went one by
11:16    2    one, but his alternative would still infringe numerous other
11:16    3    Ericsson patents.  That's not the way to do it.
11:16    4           When Dr. Parkvall finished that, he came back and
11:16    5    concluded that Ericsson's -- the functional buckets in which
11:16    6    Ericsson had patents compared to the noninfringing
11:16    7    alternative would convey certain advantages -- battery life,
11:16    8    better utilization of bandwidth, the ability to have a sleep
11:16    9    mode solution, security, other -- you know, many other
11:16   10    features, and he passed that along to Dr. Kennedy who then
11:16   11    quantified them.
11:16   12           Dr. Kennedy quantified two of the buckets
11:16   13    basically, two of the functional advantages, battery life
11:16   14    and increasing bandwidth.  There's numerous others, and he
11:16   15    put a bunch of plus signs there, but he didn't attempt to
11:16   16    quantify those, because even just looking at the two he did
11:16   17    look at, he was in the range of $42 to $49 a phone.
11:17   18           Now, again, that's just the functional buckets
11:17   19    identified by Ericsson where it had relevant patents, not
11:17   20    the overall standard as a whole.  That's the closest you
11:17   21    come in this case.  That's isn't even an input into the
11:17   22    top-down, because it doesn't go across the entire industry.
11:17   23    It's not the proper input.  And TCL never gave Your Honor
11:17   24    that.
11:17   25           So, number one, in addition to the denominator
```

11:17    1    problems, this flaw in my view prevents the top-down from

11:17    2    being used as a primary analytical methodology to come out

11:17    3    with a rate.  To the extent TCL bears the burden here and

11:17    4    they have failed in their burden, that militates in favor of

11:17    5    finding that A and B are compliant with FRAND.

11:17    6          Now, Mr. Holder made a statement -- he said, well,

11:18    7    Justice Birss in Unwired Planet/Hauwei used 8.8 percent.

11:18    8    No, he did not.  He never used that as a starting point.

11:18    9    What he did after revising the denominator of the top-down

11:18   10    to 800 is he plugged in the rate for Unwired Planet that he

11:18   11    had determined would be appropriate, and then he backward

11:18   12    used it as a sanity check.  He came out with 8.8 percent and

11:18   13    said, okay, that looks fine.  That's pretty low.  So,

11:18   14    obviously, what I've done hasn't been offensive to sanity.

11:18   15    That's how he used it there.

11:18   16          But that's very different -- that's the opposite

11:18   17    end of the telescope from using it as a primary analytical

11:18   18    methodology.  My contention would be given the lack of an

11:18   19    economically grounded starting point and the huge problems

11:18   20    with Concur IP's denominator not only can the top-down not

11:18   21    be used as an analytical methodology primarily, but I don't

11:19   22    think it even functions as a sanity check.

11:19   23          Question 8, unless the Court has follow-ups on the

11:19   24    top-down, what percentage of each standard is unpatented,

11:19   25    expired, invalid, and what percentage of Ericsson's SEPs are

| | | |
|---|---|---|
| 11:19 | 1 | impacted by that?  Then, finally, how do these approaches -- |
| 11:19 | 2 | you know, comparable market rates, top-down, and X standard |
| 11:19 | 3 | correlate? |
| 11:19 | 4 | With regard to the percentage of each standard |
| 11:19 | 5 | that is unpatented, I think the answer candidly is unknown |
| 11:19 | 6 | and unknowable.  I just don't think that anybody has even |
| 11:19 | 7 | ever tried to do that, and it would be an undertaking that |
| 11:19 | 8 | by the time it was done the standard would probably be |
| 11:19 | 9 | obsolete. |
| 11:19 | 10 | The second question is what percentage of each |
| 11:19 | 11 | standard is expired or invalid?  Assuming the thrust of this |
| 11:20 | 12 | is what percentage of the patents related to each standard |
| 11:20 | 13 | are expired or invalid, Mr. Holder gave some numbers I think |
| 11:20 | 14 | for -- at least for Ericsson related to the work of Dr. |
| 11:20 | 15 | Leonard, and I don't have a reason to quibble with those. |
| 11:20 | 16 | That deals with expiration. |
| 11:20 | 17 | Dealing with invalid -- you know, patents are |
| 11:20 | 18 | presumed valid.  So to the extent there have not been |
| 11:20 | 19 | adjudications of invalidity, the law presumes at least in |
| 11:20 | 20 | the United States that patents are valid.  I would contend |
| 11:20 | 21 | that since there was no invalidity challenge raised in this |
| 11:20 | 22 | case by TCL that invalidity should not be used as a |
| 11:20 | 23 | deduction.  More on that in moment when we get into the |
| 11:20 | 24 | comparable license analysis. |
| 11:20 | 25 | Then, finally, with regard to divestitures, the |

11:20    1    question regarding divestitures is dealt with at slide 804.

11:21    2    What you will see is most of the divestitures have occurred

11:21    3    after the comparable licenses in this case have been entered

11:21    4    into.  So, for instance, Karbonn, Sharp, ZTE licenses,

11:21    5    Apple, Hauwei, were all executed after all the divestitures.

11:21    6    The HTC and LG licenses were executed after about 90 percent

11:21    7    of the divestitures occurred, and the Samsung license was

11:21    8    executed after about 70 percent of the divestitures

11:21    9    identified by Dr. Leonard.

11:21   10            So the question becomes then, all right, what is

11:21   11    the use of the licenses, and is this baked in?  That's

11:21   12    really the question.  The answer is, yes, it is.

11:21   13            So going back to how the licenses are negotiated,

11:21   14    you know, Ericsson shows up with a stack of claim charts.

11:21   15    Obviously, they are claim charting unexpired patents they

11:21   16    still own, providing these.  The metrics are available to

11:22   17    licensees, and that's been the testimony from the witnesses.

11:22   18            The licensees are all extremely sophisticated.  I

11:22   19    mean, these companies that we've listed that you see on the

11:22   20    heat map, are almost all 3GPP members.  They have their own

11:22   21    portfolios.  They have their own legions of patent licensing

11:22   22    attorneys.  They know the law.  They are involved in

11:22   23    litigations.  They know exactly how to value patents.  They

11:22   24    know all about RAND, and many have been involved in

11:22   25    proceedings like this.  They get it.  It's an extremely

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:22  1    sophisticated market.

11:22  2          It doesn't strain any credibility to say that the

11:22  3    divestitures, the fact that some patents may not be valid --

11:22  4    I mean, everyone knows not every patent is valid.  That's

11:22  5    why the technical negotiations happen.  That's all very well

11:22  6    vetted.  It's vetted in a lot of detail.  The technical

11:22  7    evaluations also highlight the most valuable patents in the

11:22  8    portfolio.  I mean, most companies lead with their best

11:22  9    foot.

11:23  10          After all of that, a rate is agreed to, and that

11:23  11   is a market rate.  That is very solid economic piece of

11:23  12   market data that ought to be the primary avenue for the

11:23  13   Court's decision in this case.  That is the economic data in

11:23  14   this case.

11:23  15          With regard to invalidity, it's baked in.  I mean,

11:23  16   the claim charts -- the technical negotiations do that.

11:23  17   With regard to expiration, that's baked in.  Everybody

11:23  18   knows, for instance, that LTE -- I mean, it was promulgated

11:23  19   in 2008 very few patents were going to be expired.  I think

11:23  20   it was 1.3 percent currently.

11:23  21          With regard to divestitures, most of the deals

11:23  22   you've seen have occurred after those divestitures.  So I

11:23  23   don't think there's any impact of these issues on your

11:23  24   utilization of the market rate evidence to comparable

11:23  25   licenses.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:23    1           How does this impact the X standard analysis?
11:23    2     Again, it doesn't.  When Dr. Parkvall created his functional
11:24    3     groups, the buckets, he only put in there unexpired patents
11:24    4     ^still owned by Ericsson.  So each bucket is populated with
11:24    5     live Ericsson patents, and the noninfringing alternatives
11:24    6     that he then envisioned and used to measure the value would
11:24    7     have been measured against live, you know, in force Ericsson
11:24    8     patents.  So that shouldn't have an effect.
11:24    9           Now, when there was a -- after getting the
11:24   10     top-line number of what is the value at least of the
11:24   11     quantifiable buckets, Ericsson did two different ways of
11:24   12     sort of assuring the Court it wasn't exceeding its share of
11:24   13     royalties, one, by doing its percentage of contributions,
11:24   14     and the other by using the Concur IP percentages as an
11:24   15     alternative way.  The contribution numbers would not reflect
11:24   16     divestitures.  But, again, the percentages for the ratios
11:24   17     identified through the Ding and Concur IP census would.
11:25   18           Under either of those approaches, though, the
11:25   19     royalty being sought by Ericsson is less than its
11:25   20     proportional share across the industry of the benefits
11:25   21     conferred by the buckets of live Ericsson patents that were
11:25   22     estimated in the X standard approach, so that should give
11:25   23     the Court comfort, and there's in fact a pretty good margin
11:25   24     there.
11:25   25           Third, with regard to the top-down analysis, I

11:25  1    don't think these issues would affect that, but I think it's

11:25  2    flawed for a number of other reasons.  But, again, we are

11:25  3    only looking at half the equation.  While in any portfolio

11:25  4    at any given time patents are going to expire or they may be

11:25  5    divested, there's additional factors that increase the value

11:25  6    of the portfolio that we haven't talked about and that

11:26  7    aren't in the question.

11:26  8          One is additional patents are still being awarded.

11:26  9    Ericsson is continuing to get patents covering LTE and

11:26  10   additional features in those.  They come into the portfolio,

11:26  11   and they would be captured in TCL's license.  I mean, this

11:26  12   license that is under discussion for the five-year period is

11:26  13   going to capture all essential patents that come in later

11:26  14   even if they don't exist today.  So that's a plus.  That

11:26  15   goes to the plus side.

11:26  16         Again, in negotiations, the market rates, that's

11:26  17   understood by negotiating parties that you're doing let's

11:26  18   say a five-year deal.  Patents may expire.  Patents may be

11:26  19   divested, but more patents are coming in, and that's the

11:26  20   capture you bargained for.  It's the same thing going on

11:26  21   here.  That's why the market rate and comparable licenses

11:26  22   work.

11:26  23         Secondly, new features are constantly being added

11:26  24   to the standard.  For instance, there was a discussion in

11:26  25   the case about carrier aggregation.  Carrier aggregation was

| | | |
|---|---|---|
| 11:26 | 1 | not in the original LTE release 8.  It came in release 10. |
| 11:27 | 2 | It's one of the most important features in LTE for certainly |
| 11:27 | 3 | in release 10.  It was a very big deal that had a huge jump |
| 11:27 | 4 | in data rates.  Interestingly, despite that, I think Dr. |
| 11:27 | 5 | Leonard said, oh, that's a minor tweak.  I heard a lot of |
| 11:27 | 6 | shuffling in the courtroom when he said that, and I think he |
| 11:27 | 7 | saw it too, and then he sort of tried to walk that back. |
| 11:27 | 8 | The truth of the matter is when carrier |
| 11:27 | 9 | aggregation comes into the standard not only does the |
| 11:27 | 10 | standard get more valuable -- it's certainly gets more |
| 11:27 | 11 | valuable -- but, secondly, patents that weren't essential |
| 11:27 | 12 | before that read on this feature now become essential and |
| 11:27 | 13 | become part of the essential group that is licensed.  That's |
| 11:27 | 14 | going to keep happening.  We're up to release I think 13 of |
| 11:27 | 15 | LTE, and there's going to be more and more. |
| 11:27 | 16 | So any patent portfolio is in a constant state of |
| 11:27 | 17 | flux.  What captures that I think the best are the |
| 11:27 | 18 | comparable licenses, because the market negotiates for a |
| 11:28 | 19 | capture period that recognizes this, and they price it. |
| 11:28 | 20 | That's how the Court should do this as well. |
| 11:28 | 21 | Going on to Question 9, the release payment, the |
| 11:28 | 22 | question posed by the Court is should the going-forward rate |
| 11:28 | 23 | adjudicated now be used going backwards?  The answer is yes. |
| 11:28 | 24 | My first observation would be, you know, what we're really |
| 11:28 | 25 | talking about in this case is a licensing arrangement that's |

11:28   1   going to cover about 15 years.  It's going to go back to

11:28   2   about 2007 when TCL was making unlicensed 2G sales all the

11:28   3   way through 2022.  That's a 15-year span.

11:28   4        We have not heard in this case evidence from TCL

11:28   5   as to what would be FRAND for the period 2007, 2008, 2009,

11:29   6   and 2010.  I mean, that's all been more or less of a

11:29   7   historical black box.  Again, to the extent that TCL -- not

11:29   8   even to the extent.  TCL has the burden.  So if they're

11:29   9   going to contend that something isn't FRAND going backwards,

11:29  10   I think they have failed to meet their burden.

11:29  11        Moreover, rates have gone down over time.  I think

11:29  12   that is certainly true, and I'm about to show you a slide

11:29  13   that would indicate that.  That's slide 901.  But as that's

11:29  14   being pulled up, I will observe that even if rates stay

11:29  15   constant that to the extent TCL wants a discount for the

11:29  16   past it's essentially a reward for having dragged its feet

11:29  17   in negotiations.

11:29  18        Your Honor has gotten enough flavor of the

11:29  19   negotiating history to know it took a long time.  There were

11:29  20   a lot of statements that we alleged by TCL saying this looks

11:29  21   good, or we'll sign the agreement, and they never got around

11:30  22   to doing it.  If the result in this case which is certainly

11:30  23   being watched by the industry is a discount on the release,

11:30  24   companies in the future are going to say, well, let's go to

11:30  25   court because there's a court case saying we can get a

11:30   1   discount on the release.  Let's go negotiate the best deal

11:30   2   we can.  Let's try to beat the licensor down on his rate.

11:30   3   Once we think they aren't going to move any further, we

11:30   4   either just won't pick up the pen and sign forcing them to

11:30   5   sue us at which point we'll allege breach of FRAND, or we'll

11:30   6   just go file a breach of FRAND case.  And then we've the

11:30   7   ceiling on the licensor.  They aren't going to do any better

11:30   8   than that.  That's their last best offer.  If we can beat

11:30   9   that, great.  But you know what?  The longer we can drag it

11:30   10  out, if we get a discount on the release payment, that just

11:30   11  inures to our benefit.

11:30   12      I think that sort of precedent or industry

11:31   13  perception is not going to curtail litigation.  It's going

11:31   14  to give everybody an incentive to litigate and to string

11:31   15  things out, and that's the last thing this market needs in

11:31   16  my opinion.

11:31   17      THE COURT:  What you're saying using current rates

11:31   18  to measure the past sums really is a discount in and of

11:31   19  itself?

11:31   20      MR. STEVENSON:  It's a substantial discount.  This

11:31   21  slide says that.

11:31   22      If we can go to this slide here --

11:31   23      We've pulled some deals out of evidence.  I am not

11:31   24  going to go into the rates here.  I'll just leave them on

11:31   25  the slide for you.  We've pulled some deals out of the

| | | |
|---|---|---|
| 11:31 | 1 | evidence that you can see historically are in excess of what |
| 11:31 | 2 | is being requested here.  In other words, rates have gone |
| 11:31 | 3 | down. |
| 11:31 | 4 | You can pull that slide down now. |
| 11:31 | 5 | That slide is if you wish to peruse it in more |
| 11:31 | 6 | detail is slide 901. |
| 11:31 | 7 | The answer to your question is to the extent |
| 11:31 | 8 | rates -- and they have gone down.  There's already a |
| 11:32 | 9 | baked-in discount based on the fact that we're doing this in |
| 11:32 | 10 | 2015, as of May 2015 -- |
| 11:32 | 11 | THE COURT:  And you're content with that? |
| 11:32 | 12 | MR. STEVENSON:  I wouldn't say I'm content with |
| 11:32 | 13 | it, but it's our contention in this case, and we're abiding |
| 11:32 | 14 | by it.  Yes, we think the rate adjudicated for A and B |
| 11:32 | 15 | should roll backwards as -- |
| 11:32 | 16 | THE COURT:  Although conceptually, it could be a |
| 11:32 | 17 | different number. |
| 11:32 | 18 | STEVENSON:  It could be a different number.  If |
| 11:32 | 19 | Your Honor gets into rate setting -- my point was if -- we |
| 11:32 | 20 | made A and B, and we took the position in A and B in our |
| 11:32 | 21 | contentions that these rates ought to go backwards.  If Your |
| 11:32 | 22 | Honor gets into rate setting based on today based on more |
| 11:32 | 23 | future events, then Ericsson becomes less content with that. |
| 11:32 | 24 | I think the game changes, and we would ask Your Honor to |
| 11:32 | 25 | look back at the prior agreements and consider whether any |

11:32   1   adjustments to the rate as of May 2015 should not carry

11:32   2   through backwards and in fact should be a higher rate in the

11:33   3   past.  But when you ask about contentment, my answer was in

11:33   4   A and B our offer is take these rates in A and B and extend

11:33   5   them backwards, yes.

11:33   6          THE COURT:  And you're less content to the extent

11:33   7   that the Court finds that some other lower rate is really

11:33   8   FRAND?

11:33   9          MR. STEVENSON:  Right.  We would ask you then to

11:33   10  go consider based on what you determine what should happen

11:33   11  previously.

11:33   12         Could I have 903, please?

11:33   13         TCL has already basically admitted the point.

11:33   14  Counsel for TCL at one of the summary judgment hearings in

11:33   15  the case made the statement on slide 903:  "Certainly we

11:33   16  would contend that whatever rate the jury sets moving

11:33   17  forward" -- you're the jury now -- "would also be the rate

11:33   18  that would cover prior unlicensed sales.  We have always

11:33   19  assumed that's how it would ultimately work out.  So to the

11:34   20  extent we're asking for a discount now, that's a significant

11:34   21  change in position."

11:34   22         I want to also address at this juncture another

11:34   23  point.  I'm moving off topic, but this is a good place to

11:34   24  work it in, and that is how we apply FRAND and the FRAND

11:34   25  commitment to the structure of the offer as opposed to

11:34  1    rates.  We have offered at least in Option B, which I think

11:34  2    is more relevant of the two on a going-forward basis because

11:34  3    it's not tied to sales thresholds which are now candidly

11:34  4    somewhat out of date -- in Offer B, it's structured as a

11:34  5    percentage and a floor.  TCL would pay the greater of the

11:34  6    two.  There is also a cap there as well.

11:34  7         And that structure that has been used with other

11:34  8    licensees is not by itself a violation of FRAND.  Putting

11:34  9    aside the numbers, just the concept of not having a naked

11:35  10   percentage out there, having a percentage protected by a

11:35  11   floor, is standard, common, and makes good sense.

11:35  12        The good sense it makes is -- if you remember, I

11:35  13   asked a hypothetical of Dr. Lynde, which is suppose there is

11:35  14   a company out there that wants to negotiate with Ericsson,

11:35  15   and it's an on-line retailer.  They say we would like a

11:35  16   percentage rate.  We are coming out with a phone, and we

11:35  17   want a percentage rate agreement.  And they are very shrewd

11:35  18   because they know it's going to be a free phone that links

11:35  19   into their shopping network, so they're going to drive sales

11:35  20   through shopping.  They are going to give away a free phone.

11:35  21   It's a naked percentage.  They are going to pay exactly

11:35  22   zero.  They are going to give it away for $1 maybe.

11:35  23        Ericsson being equally shrewd says we are willing

11:35  24   to do a percentage deal with you, but, you know, as to what

11:35  25   we know about your business, we want a floor.  We want a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | |
|---|---|
| 11:35 | 1 |
| 11:36 | 2 |
| 11:36 | 3 |
| 11:36 | 4 |
| 11:36 | 5 |
| 11:36 | 6 |
| 11:36 | 7 |
| 11:36 | 8 |
| 11:36 | 9 |
| 11:36 | 10 |
| 11:36 | 11 |
| 11:36 | 12 |
| 11:36 | 13 |
| 11:36 | 14 |
| 11:36 | 15 |
| 11:36 | 16 |
| 11:37 | 17 |
| 11:37 | 18 |
| 11:37 | 19 |
| 11:37 | 20 |
| 11:37 | 21 |
| 11:37 | 22 |
| 11:37 | 23 |
| 11:37 | 24 |
| 11:37 | 25 |

minimum number that you can't go beneath.

I asked Dr. Lynde -- I said without getting into numbers is the licensee entitled under FRAND to dictate the structure of the offer?  He said, no, they're not.  And there is nothing in FRAND that prevents the licensor as long as the numbers are reasonable for putting a floor in.  So what we have is a structure that ipso facto itself does not violate FRAND.

Now we get to the numbers.  And TCL was arguing about the numbers that populate both the percentage and the floor.  But TCL's position is that if you get to rate setting wipe out structure.  Make the structure go away.  We just want to have a naked percentage rate.  And that's very problematic because they haven't proven that the structure -- just the concept of a floor is dictated by FRAND.  FRAND allows many different structures.

THE COURT:  But regardless of the structure, don't you have to back that up with evidence?  It seems to me a floor is justified to the extent a particular standard provides an identifiable value, for example, the X standard analysis.  But without that type of evidence, what is there not from a negotiating perspective but from a FRAND perspective to justify a floor?

MR. STEVENSON:  We have now transitioned into Question 10.  The evidence of floor is this -- first of all,

| | | |
|---|---|---|
| 11:37 | 1 | you mentioned the X standard analysis.  That tells you what |
| 11:37 | 2 | the intrinsic value of the technology at least for a portion |
| 11:37 | 3 | of these -- not across the board but at least a portion of |
| 11:37 | 4 | these. |
| 11:37 | 5 | Number two, you look at the licenses. |
| 11:37 | 6 | THE COURT:  Right.  But for a FRAND analysis, |
| 11:37 | 7 | can't a floor stand without that evidentiary support? |
| 11:37 | 8 | MR. STEVENSON:  Yes, because TCL has the burden. |
| 11:37 | 9 | It's TCL's burden of proof here and if the Court finds there |
| 11:38 | 10 | is not evidence and TCL has failed in its burden to attack |
| 11:38 | 11 | the structure of the offer.  But we came forward with |
| 11:38 | 12 | evidence anyway that we think is at least sufficient to |
| 11:38 | 13 | show -- I have three categories of evidence.  But to answer |
| 11:38 | 14 | your question, if you find there is a derth of evidence in |
| 11:38 | 15 | the record about whether the floor in this case or in |
| 11:38 | 16 | general -- without getting into the numbers, the concept of |
| 11:38 | 17 | a floor or a cap is a violation of FRAND, then the answer is |
| 11:38 | 18 | that should come to judgment before you because that's the |
| 11:38 | 19 | structure offered, and it hasn't been proven as noncompliant |
| 11:38 | 20 | with FRAND. |
| 11:38 | 21 | Getting to the evidence, I have identified three |
| 11:38 | 22 | categories of evidence that I think are useful here.  Number |
| 11:38 | 23 | one you have already alluded to, the X standard analysis by |
| 11:38 | 24 | Dr. Parkvall.  Number two, the licenses.  Two of the |
| 11:38 | 25 | licenses have express floors in them, the.CoolPad and Sharp. |

11:39   1    Those licenses at least are again comparable market evidence

11:39   2    that we think the Court can rely upon.  Third, we have

11:39   3    unpacked the comparable licenses in this case into imputed

11:39   4    dollar-per-unit royalty rates.  That's Exhibit 1001.

11:39   5        Again, I am going to try to avoid using numbers

11:39   6    here.  But what Your Honor can see in Exhibit 1001 -- and

11:39   7    you recall I used this in opening.  I also used this in

11:39   8    cross-examination of Dr. Lynde.  I think it's a very

11:39   9    important demonstrative.  It shows both for Kennedy, our

11:39  10    expert, and for Dr. Lynde the unpacking results.  Dr. Lynde

11:39  11    confirmed each one of the unpacking results on this in

11:39  12    cross-examination.  He checked each one off.

11:39  13        What you can see from this is that as far as the

11:40  14    amount of the floor, a $2 floor as requested by Ericsson is

11:40  15    certainly within the range, but there is also a minimum.  I

11:40  16    won't say the number so as not to have to clear the

11:40  17    courtroom, but there is minimum in the Kennedy unpackings

11:40  18    that Your Honor can see.

11:40  19        To the extent we're deriving inferences from

11:40  20    economic data, these are strong evidence as to what the

11:40  21    intrinsic value at sort of the lowest end of LTE -- at least

11:40  22    the Ericsson LTE patents are with regard to a handset.

11:40  23        The other piece of evidence is -- Your Honor was

11:40  24    presented with the history of the reference rates of

11:40  25    Ericsson.  There is probably a dispute here about exactly

11:40   1    what date they came in.  It probably doesn't amount to much

11:41   2    in the grand scheme of things.  But you will remember that

11:41   3    Ericsson has always had a floor, and the floor has been

11:41   4    fairly constant as a percentage of the handset.

11:41   5         So I think all of this evidence comes together to

11:41   6    give Your Honor a pretty good road map and indication of

11:41   7    where the floor should be set for TCL.

11:41   8         Now, the second question you asked is, is there

11:41   9    any evidence that any SEP holder has ever uncompensated for

11:41   10   their patents?  I think we have addressed that a bit.  We

11:41   11   talked about holdup, holdout, and the bilateral asymmetries

11:41   12   in negotiation.  The evidence of that was Mr. Mackelroy's

11:41   13   testimony and Mr. Delgado's testimony and -- in the witness

11:41   14   statements that in general holdout is a more coercive and

11:42   15   erosive threat in negotiations that forces licensors to in

11:42   16   many regards capitulate on rates to avoid have to go through

11:42   17   proceedings such as this.  So that's the evidence and

11:42   18   discussion with regard to Question 10.

11:42   19        I have a few minutes left.  I want to address a

11:42   20   couple of points that weren't in the questions.  That is the

11:42   21   license terms proposed by TCL.  This will be very brief.

11:42   22        TCL in its findings of fact and conclusions of law

11:42   23   at No. 76 has reurged that the license here include

11:42   24   implementation patents.  I thought that was water under the

11:42   25   bridge.  The Court has previously ruled in a summary

11:42  1    judgment context that this case will not result in a license

11:43  2    under implementation patents.  That is contained in the

11:43  3    Court's ruling in that regard in slides 1116 through 1118.

11:43  4          Moreover, the evidence at trial was fully

11:43  5    consistent with that.  Although TCL pointed in a subset of

11:43  6    agreements to the fact that they would also cover

11:43  7    implementation patents, keep in mind those were

11:43  8    implementation patent cross-licenses where Ericsson got

11:43  9    implementation patent cross-license rights from companies

11:43  10   who are very significant and have very significant

11:43  11   portfolios of implementation patents.

11:43  12         For TCL who doesn't have implementation patents

11:43  13   that have ever been asserted, to come in and say, well, we

11:43  14   demand something similar I don't think under the FRAND

11:43  15   contractual commitment they have the right to insist that

11:43  16   implementation patents come along with it.  No Court has

11:43  17   ever held that, and this Court has held to the contrary.

11:43  18         But, number two, they are not offering anything

11:43  19   for it because they don't have any implementation patents to

11:43  20   cross-license themselves.  So they basically want a free

11:43  21   one-way license on implementation patents as a throw-in, and

11:44  22   I think the Court should reject their attempt to do that in

11:44  23   the licensing arrangement.

11:44  24         Secondly, there is a parties issue I wanted to

11:44  25   bring to the Court's attention.  This is reflected at Slide

11:44  1    1120.  TCL states that the license and related obligations

11:44  2    shall extend to the TCL parties to this litigation and any

11:44  3    company or other legal entity they control, i.e., more than

11:44  4    50 percent voting power.

11:44  5           We did not do discovery into the entire TCL global

11:44  6    range of affiliates, but what we saw in some of the

11:44  7    injunctive briefing -- you will remember when TCL came

11:44  8    before the Court and asked for an injunction against foreign

11:44  9    litigation they had declarations from a number of

11:44  10   affiliates.  Most of the declarations said we're a

11:44  11   wholly-owned subsidiary of TCL.  A couple of them were

11:45  12   silent on that, so we don't know what the arrangement is.

11:45  13          Now, with regard to this licensing arrangement, we

11:45  14   understand it's going to be injunctive in nature.  In other

11:45  15   words, it will be a Court order to make payments on a

11:45  16   going-forward basis, and Ericsson is 100 percent comfortable

11:45  17   with that.  As the Court knows, in an injunctive context,

11:45  18   the Court has the ability and power to bind not just the

11:45  19   parties and their affiliates but those in active concert

11:45  20   with them.

11:45  21          What we don't want to have happen is a situation,

11:45  22   which I don't think would happen -- I think we would

11:45  23   immediately come to the Court and bring it up -- where this

11:45  24   was limited to 50 percent or more voting power affiliates,

11:45  25   and what happens is for some sales in some countries TCL is

11:45   1    not paying a royalty.

11:45   2            Dr. Guo's testimony was clear in this case.  He

11:45   3    believed that this case would cover the entire TCL family,

11:46   4    you know, all companies selling TCL phones anywhere in the

11:46   5    world.  We believe that.  I think the Court believes that

11:46   6    hopefully as well.  In the licensing arrangement, it should

11:46   7    be TCL and those in active concert with it who are selling

11:46   8    TCL phones.

11:46   9            Then finally there is a Blackberry issue.  During

11:46   10   this case -- actually shortly before trial, TCL announced it

11:46   11   was acquiring the assets of Blackberry and was going to take

11:46   12   over the BlackBerry franchise basically and start selling

11:46   13   BlackBerry phones.  TCL has proposed that the Court's

11:46   14   judgment only cover TCL products as defined in Option B at

11:46   15   Sections 1.7, 1.9, 1.20, and 1.25.

11:46   16           What potentially may be a little bit of a loophole

11:47   17   for TCL in there that at this juncture we don't think is

11:47   18   appropriate is Section 1.25 of Option B when read together

11:47   19   with the definition of "FRAND company" in Section 1.3 --

11:47   20   this is all reflected in slide 1121 -- would potentially

11:47   21   give rise to an argument that TCL products sold under a

11:47   22   brand owned by another company that's active in the wireless

11:47   23   communication business wouldn't have to be paid.

11:47   24           So it may be that through this TCL proposal in

11:47   25   paragraphs 72 and 73 of their proposed findings -- they

11:47  1    appear to be seeking a judgment that would exclude

11:47  2    BlackBerry-branded handsets or at least give them the

11:47  3    argument to ask for their exclusion from royalties.

11:47  4            Again, during the testimony of Dr. Guo -- and you

11:47  5    recall BlackBerry being bantied about by TCL pretty

11:47  6    significantly in this case as part of their step-up

11:48  7    strategy, and we are going to be getting into the higher ASP

11:48  8    market and the Court should consider that.  We asked Dr.

11:48  9    Guo -- and this is reflected on 1122:

11:48  10           "Q.  Do you expect, Dr. Guo, that the lawsuit and

11:48  11   the judge's decision will set a rate for your

11:48  12   Blackberry-branded phones?

11:48  13           "A.  For this part, I hope the Court will set a

11:48  14   rate which will include our BlackBerry business.

11:48  15           "Q.  And you in fact expect this case will set a

11:48  16   rate for all of TCL phones, correct?

11:48  17           "A.  Yes, correct.

11:48  18           "Q.  And you expect TCL will follow the Court's

11:48  19   decisions and enter into a license on those terms?

11:48  20           "A.  Yes.

11:48  21           "Q.  And that's true for all of TCL brand names,

11:48  22   correct?

11:48  23           "A.  It is our hope."

11:48  24           So I would hope that the Court in the perspective

11:48  25   licensing arrangement would indicate that it covers all of

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:48  1   TCL phones, including phones sold under the BlackBerry

11:48  2   brand.

11:48  3          That concludes, Your Honor, my closing remarks.

11:48  4   On behalf of Ericsson, on behalf of our whole team, we would

11:49  5   like to thank the Court and its staff for its consideration,

11:49  6   its patience, for the conduct of this proceeding.  We

11:49  7   anxiously look forward to receiving the Court's ruling.

11:49  8          THE COURT:  Thank you.

11:49  9          Mr. Holder.

11:49  10         MR. HOLDER:  Your Honor, by my count, Mr.

11:49  11  Stevenson spent I believe about 25 minutes more than I did,

11:49  12  and I would like to have a chance to --

11:49  13         THE COURT:  No, I don't think so.  I came back

11:49  14  about 10:20, so he has gone ten minutes over.

11:49  15         MR. HOLDER:  I believe I only went just a hair

11:49  16  over an hour.

11:49  17         THE COURT:  That's fine.

11:49  18         MR. HOLDER:  So do I have between now and the top

11:49  19  of the hour?

11:49  20         THE COURT:  A little more than that.

11:49  21         MR. HOLDER:  Okay.  Regarding the issue of the

11:49  22  structure of the license, I completely disagree that Dr.

11:49  23  Lynde's testimony would support the notion that TCL is

11:49  24  somehow unable to advocate to the Court that, for example,

11:50  25  the use of a floor is not FRAND and can and should be

| | | |
|---|---|---|
| 11:50 | 1 | rejected by the Court. |
| 11:50 | 2 | Dr. Lynde's testimony was that in the context of a |
| 11:50 | 3 | negotiation the prospective licensee would not necessarily |
| 11:50 | 4 | have the ability to dictate to the patent owner that it must |
| 11:50 | 5 | use a different structure than what the licensee wants. |
| 11:50 | 6 | It's completely different from whether that same licensee |
| 11:50 | 7 | could go into a Court and present a case to a Court that the |
| 11:50 | 8 | proposed structure of the patent owner is not FRAND. |
| 11:50 | 9 | And that's what we have done here.  We have |
| 11:50 | 10 | absolutely presented ample evidence that Ericsson's proposed |
| 11:50 | 11 | use of a floor is not FRAND.  We have demonstrated by |
| 11:50 | 12 | reference to other licenses that a floor would be |
| 11:50 | 13 | discriminatory.  There are other licenses that do not |
| 11:50 | 14 | contain a floor and yet use a percentage running royalty |
| 11:50 | 15 | rate. |
| 11:50 | 16 | And the lump sum licenses do not have a floor |
| 11:51 | 17 | either.  The lump sum licenses necessarily remain variable. |
| 11:51 | 18 | There is an obligation to make a lump sum payment, and the |
| 11:51 | 19 | other variable is the volume of the sales.  As those sales |
| 11:51 | 20 | grow, the effective percentage rate that is being paid by |
| 11:51 | 21 | that licensees goes down, and the opposite is true as well. |
| 11:51 | 22 | But those lump sum licenses do not reflect a floor.  In |
| 11:51 | 23 | their economic reality, they are variable in what the |
| 11:51 | 24 | effective rate is going to be. |
| 11:51 | 25 | So we have shown that a floor would be |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:51  1   discriminatory.  We have shown that a floor is not

11:51  2   reasonable.  We cited the testimony of Ericsson's own expert

11:51  3   that patented technology does not have intrinsic value such

11:51  4   that you can impose a floor, that that value is always going

11:51  5   to be a function of how the price of the product varies.

11:51  6        We have shown evidence that there has never been a

11:51  7   principle basis for Ericsson's floor.  It's simply Ericsson

11:52  8   trying to get what the market will bear.  There has never

11:52  9   been any principle behind those numbers.  All of that is

11:52  10  ample evidence that the floor is not FRAND, and it certainly

11:52  11  outweighs any evidence that Ericsson presented.

11:52  12       Ericsson made the argument just now that the

11:52  13  dollar-per-unit rates speak to the intrinsic value of

11:52  14  Ericsson's patented technology.  We completely disagree for

11:52  15  the reasons that I just explained.  Those dollar-per-unit

11:52  16  rates do not in any way, shape, or form represent a

11:52  17  considered conclusion of anyone as to what the minimum value

11:52  18  of that patented technology is.

11:52  19       There is one license that on its face has no

11:52  20  floor, and yet Ericsson has tried to unpack that license

11:53  21  into a dollar-per-unit rate.  You certainly cannot take that

11:53  22  unpacked dollar-per-unit rate and call it evidence of a

11:53  23  minimum value when on the face of the license the rate is

11:53  24  clearly indisputably a variable percentage rate, such that

11:53  25  if that licensee is selling a product at a price less than

11:53   1   its average selling price, it will necessarily be paying a

11:53   2   rate that computes in dollar-per-unit terms to a sum less

11:53   3   than the unpacked DPU rate.

11:53   4          So the unpacked DPU rate cannot be an expression

11:53   5   of minimum value.  It's not an expression of minimum value

11:53   6   in the context of a lump sum license because, as I said, the

11:53   7   lump sum license will always translate to a variable rate

11:53   8   depending on the volume of sales.

11:53   9          Jumping back to the very beginning, Mr. Stevenson

11:53   10  made the point that Ericsson's arguments regarding the use

11:54   11  of dollar-per-unit rates should be accepted.  We thoroughly

11:54   12  addressed this in our brief.  I simply want to reiterate how

11:54   13  much of an injustice that would be if Ericsson were to get

11:54   14  away with its pivot dollar-per-unit rates.  This is a gross

11:54   15  example of bait and switch, and it is a gross example of

11:54   16  moving the goalposts.

11:54   17         There was never one word coming from Ericsson

11:54   18  prior to 2015 about dollar-per-unit rates being the right

11:54   19  lens through which to view FRAND pricing for standard

11:54   20  essential patents.  Ericsson was 100 percent to the

11:54   21  contrary.

11:54   22         This shift has only occurred because of Ericsson's

11:54   23  losses and Ericsson's desire to strike deals with licensees

11:54   24  that are quite large and that put a lot of money in

11:55   25  Ericsson's pocket, and Ericsson said we will deal with the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:55   1   fallout later.  So Ericsson tried to unpack some of those

11:55   2   recent licensees to a dollar-per-unit rate because it

11:55   3   recognized that it was simply unattenable on a percentage

11:55   4   basis.  If you look at the trend, what Ericsson essentially

11:55   5   did was they sold the market on percentage rates.  They then

11:55   6   got licenses with some of the biggest players in the

11:55   7   industry who admittedly have a very high ASP, and they

11:55   8   recognized that if you translate the terms of those licenses

11:55   9   into percentage rates the rates are quite low.

11:55  10         Who are the folks who are left to be licensed?

11:55  11   Companies like TCL who have a lower ASP.  Some of the

11:55  12   deposition testimony that we lodged with the Court came from

11:55  13   Ericsson's former chief IP officer, Kasim Alfalahi who

11:56  14   preceded Mr. Brismark.  Mr. Alfalahi admitted when I took

11:56  15   his deposition that in China there are approximately 20 plus

11:56  16   4G vendors, and Ericsson through Mr. Alfalahi believed that

11:56  17   Ericsson only had licenses to four of them.  So it stands to

11:56  18   reason that those are companies with a low ASP.

11:56  19         So what Ericsson is doing is sold the market on a

11:56  20   percentage rate.  Do big deals with high ASP vendor.  They

11:56  21   know that produces a low percentage rate.  So all of a

11:56  22   sudden percentage rates isn't the right way to talk about

11:56  23   this.  We are going to take those percentage rates, convert

11:56  24   them into DPU, and then force them on the low ASP vendors.

11:56  25   That's exactly what they are doing.  It's a bait and switch.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:56 | 1 | It's moving the goalpost.  We urge the Court to reject it. |
| 11:56 | 2 | Mr. Stevenson also argued that Justice Birss used |
| 11:56 | 3 | what he called the bull's eye approach of seeking out the |
| 11:57 | 4 | most similarly situated license.  I don't think we can |
| 11:57 | 5 | confidently conclude that from a reading of the decision. |
| 11:57 | 6 | The operative paragraph where Justice Birss comes up with |
| 11:57 | 7 | his rates is so heavily redacted that it's quite difficult |
| 11:57 | 8 | to tell exactly what was going on there.  So I disagree with |
| 11:57 | 9 | Ericsson's reading of the decision.  But even if that's what |
| 11:57 | 10 | Justice Birss did, we urge the Court to reject that.  That |
| 11:57 | 11 | is an invitation to discriminate. |
| 11:57 | 12 | The notion that you could have six companies all |
| 11:57 | 13 | admittedly similarly situated and yet the licensor could |
| 11:57 | 14 | attempt to pick the one that you are most like and foist |
| 11:57 | 15 | that rate on you, even though the rest of the group may be |
| 11:57 | 16 | paying substantially different rates, is not fair.  That's |
| 11:57 | 17 | not proper.  That is ripe for abuse.  That is essentially |
| 11:57 | 18 | permitting Ericsson to pick and choose winners and get away |
| 11:58 | 19 | with whatever it wants to do. |
| 11:58 | 20 | Mr. Stevenson argued that there is evidence |
| 11:58 | 21 | reflecting that TCL's transfer price already embodies |
| 11:58 | 22 | provisions for Ericsson's royalties.  That's not entirely |
| 11:58 | 23 | correct.  What I believe the evidence actually showed is |
| 11:58 | 24 | that TCL goes into the bidding process with carriers using a |
| 11:58 | 25 | standard price, and that standard price has incorporated |

11:58    1    certain provisions.  But that standard price is essentially
11:58    2    an opening bid in what may ultimately be a negotiation with
11:58    3    the carrier.
11:58    4            So it's not true to say that the final transfer
11:58    5    price always includes that provision.  But we would admit
11:58    6    that, yes, in terms of how TCL approaches the pricing of its
11:58    7    products, it is looking at provisions given the possibility
11:58    8    that it may end up having to pay those rates.
11:58    9            THE COURT:  What you are saying is the basic
11:59   10    methodology in fact builds in potential royalty liability.
11:59   11    Whether that finds it's way into the final price is a
11:59   12    question of negotiation.
11:59   13            MR. HOLDER:  Yes.  As Mr. Kennedy noted, there are
11:59   14    accounting rules that would require that.
11:59   15            THE COURT:  Well, it seems to me there are
11:59   16    accounting rules as to what you need to do with regard to
11:59   17    your potential liability if you need to reserve.  That
11:59   18    doesn't translate into how you price your product.
11:59   19            MR. HOLDER:  Fair enough.
11:59   20            For Ericsson to make the argument that TCL's
11:59   21    prudednt reactions to Ericsson's demands can be used to
11:59   22    bootstrap Ericsson's entitlement to those demands is
11:59   23    perverse indeed.  Under Ericsson's argument, it gets to
11:59   24    demand a rate.  TCL then plans for that rate.  TCL doesn't
11:59   25    die.  Therefore, Ericsson gets the rate.  That's the

110

12:00  1  argument that Mr. Stevenson just made, and that's not

12:00  2  correct at all.

12:00  3         THE COURT:  But his argument is you have already

12:00  4  recouped it.  You haven't been harmed.  Assume that pricing

12:00  5  is according to the methodology, and the full amount of the

12:00  6  reserve accrual is reflected in the price.  If you have

12:00  7  collected that price, I think his argument is you haven't

12:00  8  been harmed because you have collected it.  There may be a

12:00  9  factual argument as to whether all that flows through, but

12:00  10  that's the argument.

12:00  11         MR. HOLDER:  What has happened if you have

12:00  12  collected the price is that your profit margin is what it

12:00  13  is, and it's different than your profit margin would be if

12:00  14  you didn't have that accrual.  However --

12:00  15         THE COURT:  In other words, you would have a

12:00  16  higher profit margin if as it turned out you didn't need to

12:00  17  spend or reserve those funds.

12:00  18         MR. HOLDER:  Correct.  If you didn't need to use

12:00  19  that accrual or if you had priced the accrual differently,

12:00  20  your profit margin would have gone up.

12:01  21         THE COURT:  So doesn't that suggest you are in

12:01  22  fact harmed if the appropriate rate is lower than what you

12:01  23  built in by way of accrual?  You have lost profit, but you

12:01  24  recognize it by getting the right price in litigation.

12:01  25         MR. HOLDER:  Precisely.  It was never Ericsson's

12:01   1   money.  It's our money.  We earned it.  We only owe them

12:01   2   what a FRAND rate is.  So to the extent we priced a product

12:01   3   using an assumption of an anticipated cost that was inflated

12:01   4   and unreasonable, that doesn't entitle them to that money

12:01   5   just because we were still profitable.  It's not their

12:01   6   money.  It's our money.  We can only owe them what is FRAND.

12:01   7           And that money is not sitting around.  So if

12:01   8   Ericsson gets its desired rates, this release payment could

12:01   9   be $100 million or more.  There was testimony that there is

12:01   10  no reserve wherein that money is sitting around in cash.  If

12:02   11  the Court adopts our rates and imposes a release payment,

12:02   12  the release payment is much lower five figures.  So we are

12:02   13  talking about the difference between the size of the check

12:02   14  that TCL has to write for that release payment.

12:02   15          Heck, yes, if it's $100 million versus

12:02   16  $25 million, that causes us harm.  Moving forward we are

12:02   17  talking about what we are going to have to pay in royalties

12:02   18  moving forward.  It's a massively greater sum if they get

12:02   19  their rates than we get our rates.  That difference is harm.

12:02   20  That difference is money that TCL could use for other

12:02   21  beneficial purposes.

12:02   22          So the proper analysis is not has TCL survived and

12:02   23  been profitable?  Dr. Ordover said what does the but for

12:02   24  world look like with the FRAND rate?  It's not did you

12:02   25  survive the non-FRAND demand.

12:02  1          Mr. Stevenson made the argument that unpacking the

12:03  2   licenses of Apple and Samsung is an exercise that needs to

12:03  3   be looked at with skepticism given the notion that Apple and

12:03  4   Samsung's pricing includes brand value.

12:03  5          THE COURT:  Do you reject the notion that their

12:03  6   prices include brand value?

12:03  7          MR. HOLDER:  I don't reject the notion that they

12:03  8   have brand value, but there is no evidence whatsoever that

12:03  9   has been offered by Ericsson as to what that brand value

12:03  10  would be.  The economic reality is that when you unpack

12:03  11  those licenses you unpack them to a percentage rate that's

12:03  12  not based on some artfully constrained notion of Apple and

12:03  13  Samsung's revenues constrained by this notion that part of

12:03  14  the price shouldn't be used in the unpacking.

12:03  15         The economic reality is they earned what they

12:03  16  earned in revenues.  Their lump sum payment is what it is,

12:03  17  and it computes to a percentage rate.  You can't

12:04  18  artificially fiddle with that by assuming that they didn't

12:04  19  make a certain sum of money that they in fact did make.

12:04  20         Even though Ericsson wants to have it a different

12:04  21  way, the reality is their own expert unpacked those licenses

12:04  22  in a way that didn't artificially constrain the revenues due

12:04  23  to this brand value concept.  He didn't do it.  If Ericsson

12:04  24  legitimately thought that that needed to be accounted for in

12:04  25  the unpacking, they should have done it through their own

12:04  1   expert, and they didn't.  There is no evidence before the

12:04  2   Court that would allow the Court to fiddle with those

12:04  3   unpacked rates given this argument regarding brand value.

12:04  4              THE COURT:  But conceptually it could have been

12:04  5   done.  I take it if it were done you would take it into

12:04  6   account in determining what the FRAND rate ought to be.

12:04  7              MR. HOLDER:  If one were to have done an unpacking

12:04  8   analysis that constrained the revenues given brand value,

12:05  9   then, yes, it would produce a different rate.  That was not

12:05  10  done here.  Nor was there evidence presented regarding how

12:05  11  the revenues could be constrained given brand value.

12:05  12             THE COURT:  Well, all 4G phones aren't equal in

12:05  13  the marketplace in part because of the functions that they

12:05  14  carry and in part because of the brand value.  Doesn't this

12:05  15  discussion go to somewhat similarly situated companies?

12:05  16             MR. HOLDER:  I agree that there are certainly

12:05  17  differences.  Those differences should not allow Ericsson to

12:05  18  give people fundamentally different terms.  There is always

12:05  19  going to be some differences.

12:05  20             I apologize.  I need to check my notes.

12:05  21             (Pause in proceedings.)

12:05  22             Mr. Stevenson made the argument that there is

12:05  23  absolutely no evidence of holdup and that all of Ericsson's

12:06  24  licenses were negotiated at arm's length.  That may be true

12:06  25  with respect to some of the licenses where the licensees had

12:06   1    substantial incentives given the volume of their sales and

12:06   2    they had substantial resources to weather the storm of

12:06   3    litigation.  It is most certainly not the case with respect

12:06   4    to all Ericsson licensees.

12:06   5          THE COURT:  But wouldn't it be true with respect

12:06   6    to the licenses that you are most interested in, namely,

12:06   7    Apple, Hauwei, Samsung?

12:06   8          MR. HOLDER:  Yes, although I would add the caveat

12:06   9    that the risk of an exclusion order is not to be trifled

12:06   10   with.  Those companies were facing that, so that certainly

12:06   11   adds pressure.  But certainly a company in the shoes of

12:06   12   Apple or Samsung have the incentive to fight for the best

12:06   13   rate, and they have the resources to explore the issue far

12:06   14   more so than many other Ericsson licensees.

12:06   15         THE COURT:  When you say an exclusion order --

12:06   16         MR. HOLDER:  An injunction.

12:06   17         Mr. Stevenson made the argument that the entire

12:07   18   industrywide essentiality analysis can and should be

12:07   19   disregarded, that Justice Birss essentially did that.  We

12:07   20   strongly disagree.  Justice Birss did not make any ruling

12:07   21   that the qualifications of the consultants from Concur IP

12:07   22   were inadequate or that the work they did should be

12:07   23   disregarded.  He noted that it was a difficult task which

12:07   24   you have finite time to do.

12:07   25         As mr. Stevenson admitted, the adjustment that

12:07  1  Justice Birss made to the denominator was quite arbitrary

12:07  2  and most certainly was not supported by substantial

12:07  3  evidence.  He truly just cut the number in half, give it a

12:07  4  mid point between Unwired Planet's position and Hauwei's

12:07  5  position.

12:07  6       Here I think the Court could look at this from the

12:07  7  perspective of a hypothetical negotiation.  Ericsson has

12:07  8  historically talked about the use of a top-down method,

12:08  9  premised its rates on a top-down method.  TCL taking that

12:08  10  lead to some extent does a top-down analysis.  Admittedly,

12:08  11  it was quite arduous, but I assure the Court we did our

12:08  12  absolute best in the utmost good faith to present reliable

12:08  13  data to the Court, and Ericsson does nothing but throw

12:08  14  stones.

12:08  15       So imagine those two parties sitting in a

12:08  16  hypothetical negotiation.  TCL is looking across the table

12:08  17  saying wait a minute, Ericsson.  You just want to criticize

12:08  18  my approach, but this is your framework.  What is your

12:08  19  denominator?  What is your numerator?  They never came up

12:08  20  with anything, and that's telling.

12:08  21       If you were to look at this through the lens of a

12:08  22  hypothetical negotiation, that would play a role, as would

12:08  23  the fact that when Ericsson had a chance to attack the

12:08  24  numerator, they only moved that needle up to at most under

12:08  25  seven percent for 4G.  They didn't move the needle any

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
| 12:08   | 1  | higher than that.  Again, that would play a role in a                |
| 12:09   | 2  | hypothetical negotiation.                                            |
| 12:09   | 3  | Regarding the Concur IP consultants, the Court's                     |
| 12:09   | 4  | ruling regarding Mr. Delgado does not apply to them.  If             |
| 12:09   | 5  | they wanted to seek a Daubert challenge, they could have and         |
| 12:09   | 6  | should have filed that motion.  They chose not to presumably         |
| 12:09   | 7  | because they made the judgment it would not have succeeded.          |
| 12:09   | 8  | All of those individuals have the requisite degrees, and             |
| 12:09   | 9  | they have substantial experience in patent analysis, even            |
| 12:09   | 10 | though admittedly they have not worked a lot in the                  |
| 12:09   | 11 | industry.  The degree and the experience analyzing patents           |
| 12:09   | 12 | qualifies them as an ordinary person skilled in the art.             |
| 12:09   | 13 | Mr. Delgado was different.  He didn't have a degree, and his         |
| 12:09   | 14 | experience was all focused on licensing, and he was relying          |
| 12:09   | 15 | heavily on engineers.                                                |
| 12:09   | 16 | I am almost done, Your Honor.                                        |
| 12:09   | 17 | Regarding the aggregate royalty burden,                              |
| 12:09   | 18 | Mr. Stevenson cleverly tried to present the evidence as              |
| 12:10   | 19 | though it were all about predictions.  Our evidence goes             |
| 12:10   | 20 | well beyond Ericsson predicting what it thinks an aggregate          |
| 12:10   | 21 | would be.  Ericsson committed to these numbers.  Ericsson            |
| 12:10   | 22 | committed to the notion that a single-digit 4G aggregate             |
| 12:10   | 23 | royalty is what is reasonable.  It committed to it when I            |
| 12:10   | 24 | took Mr. Brismark's deposition within the last 18 months.            |
| 12:10   | 25 | It committed to it in its interrogatory responses in this           |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

117

12:10  1   case.  So this is not just about predicting the future.

12:10  2   This is about commitments which should be honored.

12:10  3        Mr. Stevenson also made the argument that the

12:10  4   aggregate royalty is not evidence of the intrinsic value of

12:10  5   the patented technology.  We disagree.  Those statements

12:10  6   that were made were made in ex-ante environment before

12:11  7   lock-in had occurred such that they were about the

12:11  8   collective merit of the pool of standard essential patents.

12:11  9   And they were made with the intent to induce people to

12:11  10  gravitate to one standard solution, i.e., LTE as opposed to

12:11  11  another.  So those statements are reflective of substantial

12:11  12  players' views of what the fair and reasonable value of the

12:11  13  universe of standard essential patents would be.

12:11  14       Let me check my notes to see if I have anything

12:11  15  else to add.

12:11  16       (Pause in proceedings.)

12:11  17       It sounds highly unlikely that the Court would

12:11  18  contemplate applying a higher rate to past sales.  But in

12:11  19  the event that's in any way on the table, I would note that

12:11  20  our top-down analysis demonstrates that those higher rates

12:12  21  paid in the older licenses were not FRAND.  As the Court

12:12  22  well knows, FRAND jurisprudence has developed substantially

12:12  23  over the last five years.  That has certainly influenced the

12:12  24  way people approach these negotiations.  Those prior

12:12  25  licenses are not any greater evidence of what is FRAND than

```
12:12   1   Ericsson's demand in this case.  They got someone to agree
12:12   2   to it because they asked for it.  That doesn't necessarily
12:12   3   make it FRAND.
12:12   4          I have one final very small comment.  I would note
12:12   5   there was no attempt made to account for the fact that
12:12   6   Ericsson's portfolio is growing on a forward-looking basis
12:12   7   while there are also expirations and divestitures.  That's
12:12   8   not accurate.  Dr. Leonard did account for the prospect that
12:12   9   Ericsson would add additional patents.  It's addressed in
12:12  10   his declaration.  I think in the general vicinity of
12:13  11   paragraph 122 he made assumptions about the rate at which
12:13  12   Ericsson would gain patents while also counting the
12:13  13   anticipated expirations.
12:13  14          With that, I echo Mr. Stevenson's comments in
12:13  15   thanking the Court.  It's been a pleasure to be here, and we
12:13  16   appreciate you and your staff's hard work.
12:13  17          THE COURT:  Well, thank you.  And I thank all of
12:13  18   you for the hard work that went into the presentation today.
12:13  19   It's been very net and very focused, and I appreciate it.
12:13  20   Those questions didn't get out until Monday, so you had a
12:13  21   limited amount of time to prepare.  I thank you for the
12:13  22   efforts that went into today's presentations.
12:13  23          MR BADER:  One housekeeping issue, Your Honor, is
12:13  24   with respect to the demonstratives.  The parties have some
12:13  25   disagreement as to whether those demonstratives will be
```

12:13  1    considered part of the record and part of the evidence.

12:13  2          If Your Honor recalls, the parties had

12:13  3    demonstrative exhibit lists, and objections to those exhibit

12:14  4    lists were then lodged with the Court.  It's TCL's position

12:14  5    that to the extent that a witness or a demonstrative was

12:14  6    used with a witness either in the declarations or on

12:14  7    cross-examination and there were no objections that those

12:14  8    demonstratives are part of the record.  I'm not sure what

12:14  9    Ericsson's current position is.  We sent them an e-mail and

12:14  10   haven't heard back from them.

12:14  11         THE COURT:  They are certainly part of the record

12:14  12   for the Court to examine and appreciate the points being

12:14  13   make in the underlying evidence to support it.  So I'm not

12:14  14   sure that the Court doesn't have the benefit of the

12:14  15   demonstratives either directly or in a derivative fashion

12:14  16   because they are marshaling the evidence.  You cite a number

12:14  17   of demonstratives in your findings.

12:14  18         MR BADER:  Correct.  We would ask that they be

12:14  19   accept as evidence in the trial record to the extent that

12:15  20   they weren't objected to and presented along with the

12:15  21   witness statement.  That's all we are asking, Your Honor.

12:15  22         MR. STEVENSON:  I don't disagree.  Demonstratives

12:15  23   aren't evidence themselves.  They may contain or refer to

12:15  24   evidence.  As far as them being in the record and presented

12:15  25   as a demonstrative as part of the Court's record so that

120

| | | |
|---|---|---|
| 12:15 | 1 | they can be referred to in the case, that's fine. |
| 12:15 | 2 | The demonstratives today did contain confidential |
| 12:15 | 3 | information.  We would like the ability to redact them. |
| 12:15 | 4 | THE COURT:  Well, after I issue the final ruling, |
| 12:15 | 5 | before we do anything, I will give the parties an |
| 12:16 | 6 | opportunity to do some redactions. |
| 12:16 | 7 | THE COURT:  Anything else we ought to take |
| 12:16 | 8 | up? |
| 12:16 | 9 | MR. HOLDER:  No, Your Honor. |
| 12:16 | 10 | MR. STEVENSON:  No, Your Honor. |
| 12:16 | 11 | THE COURT:  Again, thank you for your efforts |
| 12:16 | 12 | today. |
| 12:16 | 13 | MR. HOLDER:  Thank you, Your Honor. |
| 12:16 | 14 | MR. STEVENSON:  Thank you, Your Honor. |
| 12:16 | 15 | (Whereupon, the proceedings were concluded.) |
| 12:16 | 16 | *     *     * |
| 12:16 | 17 | |
| 12:16 | 18 | |
| 12:16 | 19 | |
| 12:16 | 20 | |
| 12:16 | 21 | |
| 12:16 | 22 | |
| 12:16 | 23 | |
| 12:16 | 24 | |
| 12:16 | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
12:16    1
12:16    2
12:16    3
12:16    4
12:16    5
12:16    6
12:16    7
12:16    8
12:16    9
12:16   10
12:16   11
12:16   12
12:16   13
12:16   14
12:16   15
12:16   16
12:16   17                        CERTIFICATE
12:16   18
12:16   19           I hereby certify that pursuant to Section 753,
12:16   20    Title 28, United States Code, the foregoing is a true and
12:16   21    correct transcript of the stenographically reported
12:16   22    proceedings held in the above-entitled matter and that the
12:16   23    transcript page format is in conformance with the
12:16   24    regulations of the Judicial Conference of the United States.
12:16   25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

122

Date:  May 20, 2017


                              /s/   Sharon A. Seffens  5/20/17
                              _____
                              SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER