From April 2011 through January 2014 Samsung was licensed to Ericsson's SEPs for certain 2G and 3G units that incorporated components made by ST-Ericsson, Ericsson's former joint venture with ST Microelectronics. (Id. ¶ 124; Ex. 4796.) However, Dr. Lynde does not appear to address these licensed sales in his calculations. The Court therefore made its own calculations to determine Samsung's released revenue, and the appropriate ratios for apportioning the net balancing payments between standards. Instead of creating a blended 2G/3G rate like Dr. Lynde, the Court chose to remove the amount it calculated was for 2G, and calculate just 3G and 4G rates.

Ericsson and TCL have both unpacked the Samsung license using Ericsson's high and mid business case projections. (Ex. 4936.) TCL has additionally unpacked the license using actual IDC data for sales from 2011 through 2015, or half of the license and release period. The experts have also unpacked this license with different discount rates, excluding and including released sales, and excluding or including infrastructure payment. Issues related to the appropriate discount rate and release payment have been discussed above. The Court will also include Samsung's infrastructure revenue because it represents part of the overall value of the license that Samsung received. Both experts combine Samsung's infrastructure revenue and SEPs with Samsung's handset revenue and SEPs in calculating Samsung's revenue and the PSR, implicitly treating infrastructure revenue and patents/contributions the same as handset revenue and patents/contributions.

Ericsson Revenue: Ericsson's provides the same revenue projections for itself in the mid and high business cases. During the license and release period Ericsson made $28,843,350,789 in 3G revenue, and $49,819,274,967 in 4G revenue. During the period covered by IDC data Ericsson made $21,478,610,988 in 3G revenue, and $19,773,222,860 in 4G revenue.

Net Balancing Payments: As explained above, the Court assigned no value to the thin modem commitment. Discounted at 5% for future fixed payments, Samsung's total net balancing payment is ▇▇▇▇▇▇▇▇. For the IDC unpacking it would be half of that, or ▇▇▇▇▇▇▇.

Following Dr. Lynde's approach, the Court assumes that the net balancing payment was apportioned between standards according to the same ratio as the

licensee's revenue. (Lynde Rebuttal Decl. ¶ 71.)  As explained above, this method was not perfect, but it was superior to Kennedy's method.  Under the mid projection Samsung's net balancing payments were ██████ for 4G, ██████ for 3G, and ████ for 2G.  For the high projection, Samsung's net balancing payments were ████ for 4G██████ for 3G, and ████ for 2G.  Under the IDC unpacking, Samsung's net balancing payments ████ were allocated for 4G, ████ for 3G, and ██ for 2G.

PSR: As the Court explained above, it has adopted Dr. Lynde's PSRs, which for Samsung are 1.33 for 4G and 2.98 for 3G.

Samsung Revenue: The parties calculate Samsung's revenue based on Ericsson's mid and high business case projections, and TCL also calculates Samsung's revenue based on IDC data.  (Ex. 1273.)  Because IDC does not report on infrastructure revenue, for the IDC unpacking the Court will add Ericsson's high business case projection for Samsung's infrastructure revenue from 2011-2015.



Mid Projections:
    3G:
    4G:

High Projections:
    3G:
    4G:

IDC Data:
    3G:
    4G:

Conclusion: Having now established the necessary inputs, the Court applies the unpacking formula for each projection.  Samsung's rates based on each revenue projection are the following:

| | Mid Projection | High Projection | IDC Data |
|---|---|---|---|
| 3G: | ███████ | ██████ | ████████ |

4G:         ▮▮▮▮▮         ▮▮▮▮▮         ▮▮▮▮▮

### 3. The Huawei License.

China-based Huawei is one of the world's largest suppliers of mobile devices and infrastructure equipment. (Brismark Decl. ¶ 115.) In January 2016, after an arbitration designed to resolve a negotiating impasse, Ericsson and Huawei executed a global patent cross-license to their respective 2G, 3G, and 4G Essential Patents until December 31, 2018. (Id.; Ex. 1277 at 7.) The arbitrators determined that Huawei would pay running percentage royalty rates of ▮▮▮ for 2G and multi-mode 3G, and ▮▮▮ for multi-mode 4G. (Ex. 1277 at 18.) Because this license expressly states the running percentage royalty rate Huawei will pay for Ericsson's SEPs, it does not need to be unpacked.

### 4. The LG License.

LG Electronics is a South Korea-based electronics company that manufactures a wide range of mobile devices. (Brismark Decl. ¶ 117.) Ericsson and LG are parties to a global patent cross-license that became effective as of June 27, 2014, and will expire on ▮▮▮▮▮. (Ex. 199 at 5.) Pursuant to the license, LG agreed to (a) make cash payments of ▮▮▮▮▮ to Ericsson, plus additional cash royalties in the event that LG's sales exceeded specified thresholds, as consideration for a license under Ericsson's SEPs, (Ex. 199 at 11-12.), and (b) assign to Ericsson, or an entity selected by Ericsson, the rights to ten U.S. patent families ("LG patents"). (Ex. 198.) The license also releases LG from liability for 2G sales in 2013 and the first half of 2014, as well as all of LG's unlicensed 4G sales. (Lynde Decl. ¶ 132.) At the time of the license, Ericsson believed that all of LG's phones were manufactured with Qualcomm chipsets. (Brismark Decl. ¶ 120.) LG would therefore not have to pay Ericsson any 3G royalties because of the flow through provisions of a separate license agreement between Ericsson and Qualcomm. (Id.) Because the Court will not unpack 2G rates, only the 4G rate from the LG license needs to be unpacked.

The primary dispute between the parties in unpacking this license is the value of the ten patents LG assigned to Ericsson. Ericsson's expert Michael Pellegrino estimated that based on Ericsson's ability to license these patents to infringing companies, eight of the LG patents are worth $170,051,079 if they are

encumbered by Ericsson's existing license agreements, and $274,518,453 if they
are not encumbered by Ericsson's existing license agreements.  (Pellegrino Decl. ¶
14.)  At the time the license was signed, Ericsson internally valued the ten patents
at $125 million.  (Brismark Decl. ¶ 119.)  However, TCL's experts argued that the
ten LG patents actually had little to no value.  (Lynde Decl. ¶ 135; Wolfe Decl. ¶
17.)

The Court ultimately agrees with TCL that these patents have little value.
The Court need not address issues with Pellegrino's valuation model because the
underlying technical assumptions were all made by Ericsson.  (Pellegrino Rebuttal
Decl. ¶¶ 14, 16.)  Ericsson had Pellegrino value eight implementation patents that
it received from LG, but not the two SEPs.  (Pellegrino Decl. ¶ 78 n.26.)  Ericsson
did not provide any estimate on the value of the two SEPs and therefore waived
any argument concerning their value.  Brismark explained the process Ericsson
went through to review the value of the eight implementation patents, but at trial
Ericsson never successfully demonstrated any features from any cellphone on the
market that actually infringe the eight LG patents.  (Brismark Rebuttal Decl. ¶¶
39-43.)  For example, Ericsson alleges that technology disclosed by U.S. Patent
No. 8,078,134 - considered by Ericsson to be particularly important to the value of
the transferred patents - was "a defining feature of the iPhone when it first
launched."  (Pellegrino Decl. ¶¶ 84, 85, 257.)  If true, then the patent is invalid
because Apple released the first iPhone before the patent's priority date.  (TT Mar.
2, 2017, pp. 36:23-37:3.)  If not true, the claims do not read on products in the
marketplace.  (TT Feb. 22, 2017, p. 59:23-60:18.)  Left with no evidence that any
products on the marketplace actually infringe the eight disputed LG patents, the
Court has no basis to find that they have any value.

The remaining issue in unpacking the LG license was how to calculate the
appropriate PSR.  Dr. Lynde attempted to unpack this license using the patent
counts he had used for other licenses, but it returned results that he deemed to be
"implausible."  (TT, 2/16/17, 34:2-10.)  Dr. Lynde therefore used Kennedy's
contribution count to unpack the LG license.  (Lynde Decl. ¶ 141.)  While the
Court found that contribution counting was generally not credible, it will use
contribution counts when both parties have done so.

LG Revenue: Ericsson prepared a business case scenario for its license with
LG.  (Exs. 32, 4069.)  The Court will therefore unpack this license using the

business case estimates, as well as the IDC data.  This licenses releases LG's unlicensed 4G sales as far back as 2011, and Ericsson's business case includes LG's 4G sales data since 2011, but Kennedy only unpacks this license with data from 2013 onwards.  (Compare Ex. 4069 with Ex. 5316 at 14-16.)  Ericsson's business case for LG includes at least two different projections for LG's revenue from 2011-2017, along with discounting LG's fixed payments at both 4% and 12%.  (Ex. 4096; Ex. 32 at 1-2.)  It also appears to contain a third projection of LG's revenues that assumes a unilateral license.  (Ex 4096 ("BC"); Ex. 32 at 9.)

Kennedy stated that he found Ericsson's projections to be reasonable, but did not acknowledge that there were multiple projections or explain why he used the projection he selected.  (Kennedy Decl. ¶ 176.)  It appears he used the lowest of the three projections.  Dr. Lynde stated that he followed Kennedy in using the lowest projections, neither expert explains why they selected that projection.  (Lynde Decl. ¶ 138.)  Based on this projection, LG will earn ███████████████ in 4G revenue from 2011-2017.  Based on IDC data, LG earned $33,068,403,004 in 4G revenue from 2011-2015.



Net Balancing Payments: The LG license required LG to pay a release payment of ███████████ in June 2014, and additional payments of ███████████ ███████████████████  (Kennedy Decl. ¶ 174.)  If LG revenues exceeded certain caps, then LG would also have to pay additional royalties on that revenue.  Neither expert suggested that LG will hit those revenue caps.  The license requires LG to pay Ericsson discounted total of ███████████ as a net balancing payment.  Multiplying that number by 5/7 to account for the number of years covered by IDC data means that LG will make a discounted net balancing payment of ███████████ for the years covered by IDC data.  As explained above, the Court assigned no additional value for the ten patents that Ericsson received as part of the LG license.

Ericsson Revenue: The Court adopts Ericsson's estimates of its own nominal revenue from 2011-2017 from its business case.  (Ex. 4096 ("BC").)  Discounted as described above, Ericsson projected it will earn $33,811,399,155 over the course of the license, and $20,382,731,453 during the period covered by IDC data.

PSR: The Court adopts the PSR used by both parties of 5.14 for 4G.

Conclusion:  Having now established the necessary inputs, the Court applies the unpacking formula based on business case and IDC data.

|  | Business Case | IDC Data |
|---|---|---|
| 4G: | ██████████ | ██████████ |

### 5.  The HTC License.

HTC is a Taiwanese supplier of 3G and 4G smartphones and tablets. (Brismark Decl. ¶ 113.)  Effective December 31, 2014, Ericsson and HTC entered into a ████████ global cross-license agreement. (Ex. 1275.)  Under this agreement, Ericsson and HTC provided each other with worldwide licenses to their respective patents necessary to comply with the 2G, 3G, CDMA, WiFi, and/or 4G standards, Ericsson provided a release for HTC's unlicensed 2014 sales, and HTC paid Ericsson ██████████.  (Id.)  HTC sales of 2G products are negligible, so both experts calculated only 4G and 3G rates.

Both sides have unpacked this license according to Ericsson's high projections, and TCL has also unpacked it with the available IDC data.  (Ex. 5316 at 11 (Ericsson business case calculations); Exs. 1232, 1234 (TCL business case calculations); Exs. 1232, 1233 (TCL IDC calculations).)

HTC Revenue:  Both experts are close enough to be virtually identical for the purposes of unpacking.  According to Ericsson's business case, HTC would earn ████████████████████████████████████████ ██████████.  Based on IDC data, HTC would earn $11,653,381,244 in 4G revenue and $2,600,958,978 in 3G revenue for the two years covered by IDC data.

Net Balancing Payments:  Because the license required HTC to make its ████ ██████ payment at the beginning of the license, no discount rate needs to be applied to royalty payments.  (Kennedy Decl. ¶ 183.)  For his calculations based on IDC data, Dr. Lynde applied ██████████ of the ██████████ ump sum payment because IDC data covers two out of the ██████████ covered by the HTC license and release.  (Lynde Decl. ¶ 101.)  The Court adopts these figures for the net balancing payment.

85

Ericsson Revenue: Kennedy and Dr. Lynde agree that the Ericsson business case for HTC includes Ericsson's estimates of its own 4G revenue of around $19.6 billion from 2014-2016. The HTC business case does not contain projections for Ericsson's 3G revenue. Kennedy appears to use Ericsson's 3G revenue from the LG business case. (Ex. 5316 at 13.) Dr. Lynde provided no value for Ericsson's 3G revenue because "[t]he Ericsson Business Case for HTC did not model Ericsson 2G/3G revenues." (Exs. 1231, 1232.) However, neither expert directly addresses the relevant question, which is whether the cross-license with HTC for its 3G SEPs provided Ericsson with value that needs to be unpacked. Because Dr. Lynde determined that HTC did have 3G infrastructure SEPs, the value they added to HTC's consideration needs to be unpacked to determine Ericsson's 3G effective royalty rate. (Ex. 1239.) The Court will follow Kennedy in using Ericsson's estimates of its own 3G revenue from the LG Business case. (Ex. 4069.) According to Ericsson's business cases, from 2014-2016 it would earn $18,319,314,937 in 4G revenue, and $8,510,906,341 in 3G revenue. For the period covered by IDC data, Ericsson would earn $11,385,908,345 in 4G revenue, and $6,033,282,125 in 3G revenue.

PSR: As the Court explained above, it has adopted Dr. Lynde's PSRs. His PSRs for HTC are 13.5 for 3G and 8.31 for 4G.

Conclusion: Having now established the necessary inputs, the Court applies the unpacking formula for each projection. HTC's rates based on each revenue calculation are the following:

|     | Business Case | IDC Data |
|-----|---------------|----------|
| 3G: | ▮▮▮▮▮         | ▮▮▮▮▮    |
| 4G: | ▮▮▮▮▮         | ▮▮▮▮▮    |

### 6. The ZTE License

ZTE is a China-based vendor of mobile phones and Ericsson's competitor in the market for network infrastructure equipment. Ericsson has two separate global patent license agreements with ZTE: a 2G/3G ▮▮▮▮▮ executed in 2011 and amended in 2015, and an 4G ▮▮▮▮▮ effective on April 1, 2014, with an amendment date on July 1, 2016.[43] (Ex. 1197 (2011 2G/3G license); Ex.

[43]This last amendment was retroactive and not actually signed until October 2016.

1200 (2015 amended 2G/3G license); Ex. 1194 (2014 4G license); Ex. 4040 (2016 amended 4G license).)  The 3G license expires ███████████████ (Kennedy Decl. ¶ 153.)  Both amended licenses ultimately expire ██████████ (Ex. 1200 at 1; Ex. 4040 at 4.)  ██████████████ █████████████.  (Brismark Decl. ¶ 127.)

Ericsson prepared a business cases for both the 2015 amended 2G/3G license and the 2014 4G license.  (Ex. 4855; Ex. 4023.)  Ericsson also prepared another business case for ZTE's sales in China, which may have been used as part of negotiating the original 2014 4G license.  (Ex. 1196.)

Kennedy unpacked the 2015 amended 2G/3G license, and the 2014 4G license.  (Kennedy Decl. ¶¶ 152-53.)  He did not unpack the original 2011 2G/3G license, or the 2016 amended 4G license.  Dr. Lynde did not unpack any of the ZTE licenses.  (Lynde Decl. ¶ 145.)  Dr. Lynde provided multiple reasons for why he could not unpack the ZTE 4G licenses.  (Id. ¶¶ 145-151.)  The most persuasive reasons are that: (1) the business cases used by Ericsson and analyzed by Kennedy did not provide regional breakdowns of sales that matched the territory breakdowns in the license, (Ex. 1194 at 27); (2) the 4G license became effective on April 1, 2014, and the amended 2016 4G license became effective on July 1, 2016, replacing both the 2014 4G license, and the 2015 amended 2G/3G license; and (3) the 2014 4G license was valid for a fairly short period of time and therefore has minimal relevance to the question of ZTE's effective 4G royalty rate.  (Lynde Decl. ¶¶ 145, 151.)

Kennedy responded to some of Dr. Lynde's criticisms in his rebuttal declaration, but he did not address these issues.  (Kennedy Rebuttal Decl. ¶¶ 70-72.)  When cross-examining Dr. Lynde, counsel for Ericsson attempted to show that Ericsson's business case did provide regional breakdowns, but his questions missed the mark.  (TT (Sealed) Feb. 16, 2017, pp. 14-15.)  Ericsson's business case for the 2014 4G ZTE license clearly contains regional breakdowns, but the breakdowns do not match the regional breakdowns in the license agreement.  The license contains separate rates for China, Territory 1, and the rest of the world, which it calls Territory 2.  (Ex. 1194 at 7.)  Territory 1 includes virtually all of Europe, and countries such as the United States, Canada, Korea, and Japan.  (Id.)  For the business case to be useful in unpacking this license, the regional breakdowns in the business case would have to correspond to the regional

breakdowns in the license.  However, Ericsson's business case contained
breakdowns ZTE revenue for China, the United States and Western Europe
(combined for infrastructure, separated for handsets), and the rest of the world
(RoW).  (Ex. 4023.)  It is unclear what Ericsson's business case considers Western
Europe, but it would be hard to accept that it included countries in Asia and North
America.  By having regional breakdowns that included only part of Territory 1,
Kennedy's unpacking moved many countries from Territory 1 to Territory 2, and
therefore calculated that ZTE would pay royalties for sales in those countries at
███████ instead of ██████  The Court does not know how much Kennedy's overall
rates were impacted by relying on data that did not correspond to the territory
definitions in the license.  The Court therefore does not accept the results of
Kennedy's unpacking analysis of the 2014 ZTE 4G license.

 The Court also found it could not unpack the 2015 amended 2G/3G license.
This license required ZTE to pay ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ where the
entire functionality is provided by Qualcomm, who has pass-through rights with
Ericsson.  (Ex. 1200 at 2; Kennedy Decl. ¶ 153.)  For Option A, Option B, and
Ericsson's license agreement with LG, Ericsson agreed that if the licensee had
pass-through rights from Qualcomm it will not owe additional 3G royalties.
(Brismark Decl. ¶¶ 93, 120.)  It is unclear why Ericsson treated ZTE's devices
with pass-through rights differently than those made by LG and TCL.  It is
possible that the ██████ license for these devices was actually Ericsson's royalty
rate for its ████ SEPs in a device with ████████████████████.  This is supported by
Ericsson's reference rates from October 2015, which suggest a range of 1%-1.3%
for 2G SEPs for devices with Qualcomm chipsets.  (Ex. 59.)  It could also be that
the ██████ represents a royalty for 3G standards besides WCDMA.  Brismark does
not even mention the rate for devices with pass-through rights in his summary of
this license.  (Brismark Decl. ¶ 128.)  Kennedy unpacked the license as if the
revenue from devices with pass-through rights is 3G revenue.  (Ex. 5316 at 18.)
However, without knowing ZTE's pass-through rights it is impossible to know
whether the ██████ that ZTE must pay is actually for 2G SEPs, 3G SEPs, or
something else entirely.

 In addition, despite the 2015 amended 2G/3G license containing express
percentage rates for 3G units of ████████████, and ████████████ devices with pass-
through rights, Ericsson's preferred unpacking calculated ZTE to be paying ██████,

which is higher than Ericsson's reference rates for 3G. (Ex. 59.) However, Brismark states that Ericsson uses its reference price sheets as a starting point in its negotiations, in part specifically so that Ericsson can ensure that it complies with FRAND. (Brismark Decl. ¶ 71.) That Kennedy calculated an effective rate which is higher than the rates that Ericsson says it starts with is difficult to understand.

For these reasons, the Court does not accept Kennedy's unpacking of ZTE's 2015 amended 2G/3G license.

D.  The Terms of Offers A and B.

As explained above, the Court ordered Ericsson to file its FRAND contentions as part of this litigation. (Docket No. 120.) Ericsson eventually filed two offers, Option A and Option B. (Docket No. 138, 205.)

Under Option A, TCL would pay $30 million for its first $3 billion in handset sales for any standard, implying a 1% effective royalty rate. (Ex. 458.) For sales after $3 billion a year, TCL would pay a running percentage royalty of 0.8% for 2G GSM/GPRS, 1.1% for 2G EDGE, 1.5% for multi-mode 3G, and 2.0% for multi-mode 4G. For all running royalties (including those for external modems and personal computers), TCL would receive a 50% discount for sales in China.

Neither expert unpacks Option A's handset royalties to a percentage rate. The Court therefore unpacks Option A to determine the effective rate that TCL would have to pay because of the unique multi-standard lump sum provision that covers a fixed amount of sales and then turns into a running percentage rate per standard. If TCL sells exactly $3billion, then it will have to pay Ericsson 1%, but if it sells more or less than that, its effective rate for each standard would be somewhere between 1% and the express running royalty rate for sales after $3 billion, less the China discount. Option A does not specify how to determine which sales are part of the $3 billion. For example, if TCL sells $4 billion, does it pay $30 million for the first $3 billion in sales, the last $3 billion, or perhaps the the $3 billion with the lowest royalty rates? The Court assumes that Option A allocates the $3 billion and corresponding lump sum payment proportionally by standard according to TCL's revenue breakdown for that year. The Court also assumes that 20% of TCL's sales were in China. (Ex. 1252; see Ex. 5311.) The

Court unpacks Option A as a straight one-way license, declines to apply a discount rate, and unpacks it using TCL's actual 2014 and 2015 sales data. (Ex 1252.) TCL's net balancing payments each year per standard consists of the $30 million lump sum apportioned per standard by revenue, plus the running percentage royalty for each standard on its share of revenue over $3 billion. The Court ignores TCL's licensed 2G sales for the first quarter of 2014 because even if 100% of TCL's 2G sales from that quarter were licensed, its impact on the final results is negligible.

The Court calculates that for 2014 and 2015 combined, Option A would have required TCL to pay 1.0079% for 2G, 1.0535% for 3G, and 1.0738% for 4G.

For 2G and 3G external modems, TCL would pay 1.5% for 2G and 3G with a floor of $0.40 per product, and for 4G external modems it would pay $3 if TCL sold them for more than $60, and $2 if they sold them for less than $60. (Id. at 10.) For personal computers, TCL would pay $0.5 for GPRS, $0.75 for EDGE, $2.25 for 3G single mode, $2.75 for 3G multi-mode, and $3.5 for multi-mode 4G. (Id. at 11.)

Under Option B, for mobile phones, TCL would pay percentage running royalty rates as follows:  0.8% of the net selling price for 2G GSM/GPRS, 1.0% for 2G EDGE, 1.2% for 3G, and 1.5% for 4G with a $2.00 floor and a $4.50 cap. (Ex. 459.) For external modems, TCL would pay $0.75 per unit for 2G or 3G, and 1.5% of the net selling price for 4G with a $2.00 floor. (Id.) For personal computers, the rates are the same as the non-China rates in Option A. (Id.)

While 4G rate for Option B is expressed as a running percentage royalty, it still needs to be unpacked because 4G units that are sold for less than $133 will pay a higher effective percentage because of the $2 per-unit floor. Using TCL's actual sales data for 2014 and 2015, Dr. Lynde calculated that because of the floor TCL would expect to pay $28,696,918 on 4G royalties, based on $1,443,651,809 in total 4G revenue. (Ex. 1253.) Option B therefore unpacks to an effective 4G royalty rate of 1.9878% over 2014 and 2015. Option B's 2G GSM/GPRS and 2G EDGE rates blended by revenue per standard from 2014-2015 result in a 0.8701% blended 2G royalty rate.

1. The Effect of Post Offer A and B Licenses.

Licenses for two the six firms which the Court has identified as relevant–Apple and Huawei–came into effect after Offers A and B were made. The Apple license was executed on December 19, 2015. (Ex. 5331 at 1.) The Huawei license was executed on January 13, 2016. (Ex. 1277.) The Court finds these rates to be informative, but declines to use them for a direct comparison in the FRAND analysis for several reasons.

First, the concept of "most favor nation," or here "most favored licensee," was never part of the ETSI FRAND equation, and in fact was rejected. (Bekkers Decl. ¶ 60.) Second, as a practical matter, Ericsson could not have been expected to factor into Offers A and B rates that had yet to be determined. Third, in many instances, Ericsson's business cases projected declining ASPs, and thus a lower economic return in later years. (E.g. Ex. 4936 (Samsung Business Case); Ex. 4069 (LG Business Case); Ex. 4929 (HTC Business Case).) In some sense, Huawei and Apple are reflective of the declining returns already assumed in the licenses which the Court finds comparable.

The Court uses the Apple and Huawei rates as bench marks to test reasonableness of the license comparisons which it uses, but not as absolute standards which must be met.

E.  Competitive Harm.

Ericsson's experts suggest that discrimination must have the effect of impairing the development or adoption of standards. (Ericsson FOF, ¶ 306.) While both Dr. Teece and Dr. Lynde took this position, the Court finds that harm to the competitor firm offered discriminatory rates is sufficient. To be sure, one of the goals ETSI is to foster standardization and its resultant benefit to all firms, but that is not to the exclusion of protecting individual harmed firms. Indeed, Ericsson would engraft into the FRAND analysis the distinction which American antitrust law makes between the harm to competition, which is actionable, and mere harm to a competitor which is not. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977). The Sherman Act and its long history provide no guide to understanding ETSI's non discrimination under FRAND.

V.   Ericsson's Offers to TCL were Discriminatory

The Court found the following rates on the charts below based on each revenue source. However, Dr. Lynde's 3G rates are technically blended 2G/3G rates. The charts demonstrate two things. First, the Court's analysis and the parties' analysis were reasonably congruent. Second, the rates among firms differed, but they also in large measure showed a definable cluster.



Figure 4: Court's 4G Calculations v. Experts

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ■ Kennedy | | 0.71% | 0.54% | | 0.58% | | 0.65% | 0.36% | 0.590% |
| ■ Court | 0.321% | 0.524% | 0.413% | 0.328% | 0.499% | 0.398% | 0.662% | 0.314% | 0.590% |
| ■ Dr. Lynde | 0.38% | 0.30% | 0.40% | 0.45% | 0.56% | 0.41% | 0.69% | 0.26% | 0.590% |



Figure 5: Court's 3G Calculations v. Experts

| | | | | | | |
|---|---|---|---|---|---|---|
| ■ Kennedy | | 0.34% | 0.29% | | 0.44% | 0.49% |
| ■ Court | 0.312% | 0.493% | 0.398% | 0.424% | 0.679% | 0.490% |
| ■ Dr. Lynde | 0.28% | 0.29% | 0.34% | 0.30% | 0.44% | 0.490% |

The Court now compares rates of comparable licensees against the rates Ericsson asked TCL to pay in Option A and Option B, based on when Ericsson signed each license and offered Option A and Option B in this case.





Discrimination cannot be judged based solely on whether an offer discriminates on
the day it is made because license agreements last for multiple years.  To
determine whether a license is discriminatory, it must be compared against what
similarly situated firms are paying throughout the entire course of the proposed
license.  Figure 8 shows the years that TCL would have to pay the rates in  Option
A and Option B against the rates similarly situated are paying for those same
years.



The Court readily acknowledges that these unpackings are not perfect.
However, by any measure, Option A and Option B are radically divergent from the
rates which Ericsson agreed to accept from licensees similarly situated to TCL.
TCL has carried its burden and demonstrated that Option A and Option B are
discriminatory and do not meet FRAND terms.

## VI.   Setting a FRAND Rate.

Having found that Option A and Option B were not fair or reasonable and
were discriminatory, the Court must now set a prospective rate.  The Court begins
by looking at the combination of rates derived from the top down and comparable

license analyses.  At this stage it is important to remember that the comparable licenses unpacked to a "global" rate, while the top down analysis resulted in a U.S. rate, along with a modification for sales outside the Unite States which will also have to be added.  In order to compare rates calculated from the top down analysis and the comparable license analysis, the comparable license rates must be converted to U.S. rates.

The Court starts with the assumption that the global value of a 4G license equals the value of the license in the U.S. plus the value of the license outside the U.S. Essentially, that the whole must equal the sum of its parts.

$$Global\ Value\ of\ License$$
$$= Value\ of\ License\ in\ U.S.\ +\ Value\ of\ License\ outside\ the\ U.S.$$

Recall from above that:

$$Value\ of\ a\ license$$
$$= Licensor\ One\text{-}way\ Rate\ \times Licensee\ Revenues$$

Combining these two formulas,

$$Global\ Rate\ \times Global\ Revenues =$$
$$U.S.Rate\ \times U.S.Revenues + RoW\ Rate\ \times RoW\ Revenues$$

In the top down section the Court adopted Dr. Leonard's finding that Ericsson's patent strength outside of the United States for 4G was based on the floor set by Ericsson's patent strength in China because TCL manufactures its devices in China.  Ericsson's 4G patent strength in China is 69.80% of its U.S. patent strength.  Adding this to the above formula,

$$Global\ Rate\ \times Global\ Revenues =$$
$$U.S.Rate\ \times U.S.Revenues$$

95

$$+ U.S.Rate \times 69.80\% \times RoW\ Revenues$$

This can be restated as:

$$U.S.Rate = \frac{Global\ Rate \times Global\ Revenue}{U.S.Revenue + RoW\ Revenue} \times 69.80\%$$

The Court's unpacked rates are the global rates, and the Court uses IDC data to determine each licensee's proportion of sales in the United States. (Ex. 1273.) Based on the IDC data, the Court determined the U.S. rate below for each comparable licensee. On average, this resulted in a 30.35% increase in the licensee's rate.



**Figure 9: 4G Global and U.S. Rates**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Global Rate | 0.321% | 0.413% | 0.328% | 0.499% | 0.398% | 0.662% | 0.314% | 0.590% |
| U.S. Rate | 0.414% | 0.531% | 0.420% | 0.638% | 0.502% | 0.836% | 0.398% | 0.839% |

For 3G Ericsson's patent portfolio in China sets a global floor, except for sales in the United States and Europe. Ericsson's 3G patent portfolio in Europe is 87.90% of its U.S. portfolio, and it's China portfolio is 74.80% of its U.S. rate. Because the Court lacked the data to determine Samsung, Huawei, or HTC's sales in Europe, the Court will multiply their 3G global rates by 1.25 to create a U.S. rate. This resulted in the following U.S. rates:



Figure 10: 3G Global and U.S. Rates

| | | | | | |
|---|---|---|---|---|---|
| ■ Global Rate | 0.312% | 0.398% | 0.424% | 0.679% | 0.490% |
| ■ U.S. Rate | 0.390% | 0.497% | 0.529% | 0.849% | 0.613% |

Now that the comparable license rates are stated in the same terms as the top down rates they can be compared against each other.



In this case the comparable licenses and top down analysis act as a reasonable check on each other, with the top two rates and bottom two rates each containing one result from each analysis. In order to further narrow down the data, the Court will discard the top two and bottom two results to determine the central data points for a FRAND rate for Ericsson's 4G SEP portfolio.



The Court acknowledges that it cannot determine an appropriate FRAND royalty with exactitude. However, with abundant and largely congruent data before the Court, the Court finds that 0.45% is an appropriate FRAND for Ericsson's 4G SEP portfolio in the United States. This means that the FRAND rate for Ericsson's portfolio for the Rest of the World ("RoW") is 0.314%. Below is a chart comparing the Court's U.S. rate, the Court's RoW rate, all 4G rates, and Option A and Option B converted to a comparable U.S. rate.



Figure 13: 4G Rate Comparison

Figure 14 shows the 3G numbers previously accepted by the Court:



Here the top down analysis gave lower royalty rates than the comparable licenses analysis.  The Court questions the reliability of the 3G rates from the top down where the difference between those rate and the market derived rates differ by more than 100%.  The Court does note that 3G rates were less important to Samsung, HTC, and Huawei, who all generate substantially more 4G revenue than 3G revenue.  The top down numbers reflect a U.S. rate, and modifiers must be applied to determine rate for Europe and the RoW.  The Court adopts a 3G U.S. royalty rate of 0.30% for Ericsson's 3G SEPs.  This means that Ericsson's 3G SEP royalty rate in Europe is 0.264%, and the RoW rate is 0.224%.  These figures shown in Figure 15 below against the other 3G data points used by the Court, as well as the rates for Option A and Option B.



As explained above, the Court calculated 2G rates based on the top down analysis, but could not reliably unpack 2G rates from any comparable licenses. The Court therefore adopts its results from the top down section of 0.16% for 2G sales in the U.S., 0.12% for 2G sales in Europe, and 0.09% for 2G sales in the RoW.



Figure 17 summarizes the Court's effort to establish FRAND rates:



VII.   Determing a Release Payment for TCL's Unlicensed Sales.

Ericsson had the burden of proving that it was entitled to a release payment, and the FRAND amount of that release payment.  (E.g., Docket No. 1278 at 19-21.)  Ericsson believes the release payment should be calculated at the prospective rate set by the Court.  (Ericsson FOF, ¶ 351.)  TCL argued that it should not owe a release payment because Ericsson failed to meet its burden because it failed to provide an amount that it believed TCL owed as a release payment, and because Ericsson harassed TCL with litigation in demanding the non-FRAND rates in Option A and Option B.  (TCL COL, ¶ 74.)  Alternatively, TCL's expert Dr.

Leonard concluded that TCL owed either $17,780,024 or $23,715,192, depending on whether certain sales are time-barred. (Leonard Decl. ¶ 152.) The Court adopts Ericsson's position that the past unlicensed sales should be calculated at the prospective rate, and finds that none of TCL's sales from 2007 onwards are time-barred.

The two elements Ericsson had to prove were its entitlement to a release payment and the FRAND amount of that release payment. (E.g., Docket No. 1278 at 19-21.) Ericsson met its burden to prove that TCL made unlicensed sales. (E.g., Ex. 142.) Ericsson never proposed a dollar amount for a release payment in a witness declaration, its trial brief, or its proposed findings, but buried in Kennedy's report calculating the effective rates for Option A and Option B there are numbers that do appear to be a calculation of TCL's royalties due under Option A and Option B for each year from 2007-2014. (Ex. 5315 at 4, 8.) Although Kennedy never presented them as such, at closing arguments Ericsson's counsel argued that based on these numbers, from 2007-2014 TCL would owe $97.2 million under Option A, or $98.5 million under Option B. Because the Court has found that Option A and Option B were not FRAND, the Court cannot accept either of these totals. In addition, Kennedy's calculations are inherently flawed because they ignore the fact that TCL's 3G devices already licensed to Ericsson's 3G SEPs because they incorporate Qualcomm chipsets. Ericsson's evidence therefore does not carry its burden regarding the amount of the release payment. However, as with all cases, the Court looks to all of the evidence regardless of which side produced it. (Ninth Circuit Model Civil Instruction No. 1.6.) Here, the Court looks to other evidence in the record to calculate a FRAND release payment despite the shortcomings in Ericsson's evidence.

In order to determine the amount that TCL owes Ericsson for its past unlicensed sales, the Court must determine the appropriate revenue figures, discount them, and then apply the final rates calculated above. The Court adopts Dr. Leonard's figures for TCL's unlicensed revenue from 2007-2015. (Ex. 1124 at 5.) The Court applies the same discount rate it did to the past sales figures for comparable licensees of 0.56% to reflect the fact that TCL received the benefit of Ericsson's SEPs well before it must pay for them. The Court discounts these figures to the end of 2017 and uses the midyear convention for simplicity. Finally, the Court applies the final rates to the discounted revenue numbers concludes that

TCL must pay Ericsson $16,449,071 as a release payment for unlicensed sales from 2007-2015.

In calculating the revenue figures for each standard, the Court treats all of TCL's 3G sales as multi-mode devices that have pass-through rights to Ericsson's 3G SEPs, and thus subject to the 2G rate. The Court acknowledges that this creates a very real risk of stacking,[44] because Ericsson demanded that TCL pay 2G royalties on a 3G multi-mode devices as if they did not have 3G functionality. However, such devices do have 3G functionality, and therefore receive far less value from Ericsson's 2G SEPs because they only use 2G functionality when they cannot connect to a 3G network. Ericsson should have proposed a methodology to determine the marginal value that 2G adds to a 3G device, which would be some proportion of the 2G rate.[45] If TCL's 4G devices also have similar pass-through rights, Ericsson also should have proposed a methodology to calculate a FRAND royalty rate on a 4G device which already has 3G functionality. Kennedy's calculation of the release payments under Option A and Option B requires TCL to pay the full 3G rate in each offer for all of TCL's 3G sales. (Ex. 5315 at 4, 8.) This ignores the reality that TCL's 3G devices are already licensed to Ericsson's 3G SEPs, and ignores both the express terms of those offers the Court's grant of Ericsson's own motion for partial summary judgment that such a term is not a breach of FRAND. (Ex. 458 at 11; Ex. 459 at 9-10; Docket No. 1055 at 8.) TCL's expert Dr. Leonard acknowledged that TCL should only have to pay a proportion of the 2G rate on its 3G devices with pass-through rights, but "conservatively" included the full amount in his calculations. (Leonard Decl. ¶ 150.) Because Dr. Leonard calculated a blended 2G/3G rate, this means that in his calculations it did not matter whether TCL's devices had to pay a 2G or 3G rate. Because the Court calculated separate 2G and 3G rates, the Court's approach actually leads to a smaller payment than the FRAND amount calculated by Dr. Leonard. While there are real concerns about stacking in the future if Ericsson believes that it is entitled to the full rate for each standard all backwards-compatible devices, such concerns are not present in this case because Ericsson is only demanding multi-standard royalties on 3G devices with Qualcomm chipsets,

---

[44] Stacking in this sense is Ericsson's proposed approach of literally stacking the full price of each standard for backwards-compatible devices for devices that have 3G pass-through rights.

[45] TCL similarly failed to carry its burden on this issue in setting the prospective rate. This is why its 3G devices with pass-through rights because of Qualcomm chipsets are subject to the full 2G or 4G multi-mode royalty rate.

and the Court's calculated 2G and 3G rates are relatively low compared to the total aggregate royalties for 2G and 3G.

The FRAND amount for TCL's unlicensed sales from 2007-2015 is $16,449,071. For sales from 2016 to the commencement of the license in this case, the release payment must be calculated as described above using the Court's final rates.

## PART 5: CONCLUSIONS OF LAW

### I. Jurisdiction and Venue.

The Court has jurisdiction over these actions pursuant 28 U.S.C. §§ 1331, 1338(a), 1367(a), 2201, and 2202. In its July 28, 2014 Order, the Court explained in detail the basis for jurisdiction under 28 U.S.C. §§ 1331 and 1338. (Docket No. 39, pp. 6-8.) The facts requisite to federal jurisdiction are admitted. (Docket No. 1376, Pretrial Conference Order, pp. 1-2.)

Venue for these actions if proper under 28 U.S.C. §§ 1391(a), (c), and (d).

### II. Applicable Law.

As discussed in the background section, the ETSI IPR scheme creates a contract with third party obligations. The arrangement is governed by French law.[46] (Ex. 223, Clause 6.)

### III. Legal Principles Underlying Court's Factual Analysis.

---

[46]Federal Rule of Civil Procedure 44.1 provides that once a party gives notice of its intent to raise an issue of foreign law, it becomes the district court's responsibility to determine the relevant foreign law and apply it to the issue at hand. Fed. R. Civ. P. 44.1; Republic of the Philippines v. Marcos, 862 F.2d 1355, 1361 (9th Cir. 1988) (en banc). In making this determination, courts may consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Here the Court had the benefit of well-qualified legal experts on both sides. (See Huber Decl.; Fauvarque-Cosson Decl.; Stoffel-Munck Decl.)

The Court summarizes the legal principles which guide its factual analysis.

A.  Valuing SEPs.

"When the standard becomes widely used, the holders of SEPs obtain substantial leverage to demand more than the value of their specific patented technology."  Microsoft Corp. v. Motorola, Inc., No. C10-1823, 2013 WL 2111217, at *10 (W.D.Wash. Apr. 25, 2013)  This monopoly power can lead standard-essential patent owners to overvalue their patents and "engage in anti-competitive behavior."  Microsoft Corp. v. Motorola, Inc., 795 F.3d 1024, 1031 (9th Cir. 2015). "The tactic of withholding a license unless and until a manufacturer agrees to pay an unduly high royalty rate for an SEP is referred to as 'hold-up.'"  Id.; see also Ericsson v. D-Link, 773 F.3d at 1209.

Because of these risks, standards organizations require that patents be licensed on FRAND terms and conditions.  See Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 313-14 (3d Cir. 2007).  The FRAND obligation is designed to "encourag[e] participation in standard-setting organizations but also ensur[e] that SEPs are not overvalued." Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1332 (Fed. Cir. 2014)(overruled on other grounds by Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1349 (Fed. Cir. 2015)); In re Innovatio, 2013 WL 5593609, at *9 ("[P]atent hold-up is a substantial problem that [F]RAND is designed to prevent.").

In valuing SEPs, courts have made clear that "the patentee's royalty must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology . . . [so that] the royalty award is based on the incremental value that the patented *invention* adds to the product, not any value added by the standardization of that technology." Ericsson v. D-Link, 773 F.3d at 1232-33 (emphasis in original); Commonwealth Scientific & Indus. Research Organization v. Cisco Systems, Inc., 809 F.3d 1295, 1305 (Fed. Cir. 2015) ("CSIRO"); In re Innovatio, 2013 WL 5593609 at *9 ("The court's [F]RAND rate therefore must, to the extent possible, reflect only the value of the underlying technology and not the hold-up value of standardization.").

B.  The Non-Discrimination Obligation.

No American cases have definitively addressed the non-discrimination requirement

Testifying as an economics expert rather than an expert on French law, Dr. Teece testified that FRAND is not violated if there is a "smidgen" of a difference in rates between similarly-situated companies. He defined a "smidgen" to mean a "small difference," which would not extend to the difference between a 0.5% and 2% rate. (TT, Mar. 1, 2017, pp. 102:18-104:8.) Ericsson's French law expert Dr. Huber opined that FRAND anticipates a range of rates depending on circumstances, and that there is not necessarily a single fixed rate which satisfies FRAND. (Huber Decl. ¶¶ 36-42.)

The Court concludes there is no single rate that is necessarily FRAND, and different rates offered to different licensees may well be FRAND given the economics of the specific license. (Id.) Based on the drafting history of ETSI's IPR Policy, Dr. Huber concluded that "the drafters did not intend 'non-discriminatory' to ensure the exact same treatment or identical license terms for all licensees to the same portfolio of essential patents." (Id. ¶ 44.) Significantly, Dr. Huber was the only legal expert to opine on the meaning of non-discrimination. It necessarily follows that TCL cannot claim that anything other than the nominally lowest rate in marketplace is *per se* discriminatory.

C. The Role of Licenses in the Analysis.

Licenses are a proper measure for determining whether an offered rate meets the FRAND requirements, but not the exclusive measure. While there may flaws in the consideration of licenses, the Court does not accept TCL's seeming blanket rejection of comparable licenses. TCL also raises a question whether all or any comparable licenses are in fact fair and reasonable, and why a licensee agreeing to a rate makes it by definition fair and reasonable. TCL COL, ¶ 20; See In re Innovatio, 2013 WL 5593609 at *39 (Judge Holderman explaining that determining what is FRAND requires more "quantitative and analytical rigor" than simply deferring to the patent owner's licenses).[47]

---

[47]Elsewhere Ericsson has argued "[t]he fact that many companies have entered into WCDMA licenses with Qualcomm since 1999 does not establish that the royalties or other terms included in those licenses are fair, reasonable and non-discriminatory." (Ex. 77 at 6.)

Actual licenses to the patented technology at issue are probative as to what constitutes a fair and reasonable royalty for those patent rights because such actual licenses reflect the economic value of the patented technology in the market place. CSIRO, 809 F.3d at 1303; Ericsson v. D-Link, 773 F.3d at 1227; Apple v. Motorola, 757 F.3d at 1315.

The Court finds that by looking at an array of licenses, concerns about FRAND compliance of any particular license, asymmetric information, and litigation pressures are substantially diminished. (See Leonard Decl. ¶ 50; Leonard Rebuttal Decl. ¶ 4; Lynde Decl. ¶¶ 40-42; Ordover Decl. ¶ 48.) TCL does acknowledge that prior licenses have "some" value, especially for larger licensees with the resources to test an SEP-holder's demands. (TCL COL ¶ 29.) In the end, TCL's concerns are overblown given the substantial congruence the Court found in its 4G results between the top down and comparable licenses analyses. The fact that TCL's and Ericsson's differing approaches and the Court's assessments of them provide remarkably similar ranges convinces the Court that its final rates are FRAND.

D. Similarly Situated Firms.

For purposes of non-discrimination component of FRAND, one must look to similarly situated firms. Here those firms are: Apple, Samsung, Huawei, LG, HTC, and ZTE. None of the legal experts opined on how one would define the appropriate set of firms to assess discrimination.

E. American Case Law re Royalties.

The Court acknowledges that Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), and its progeny establish a multi-faceted test for establishing a reasonable royalty in a patent infringement case. Ericsson's approach using comparative licenses partially overlaps Georgia-Pacific. However, the Court did not find useful a full-blown Georgia-Pacific analysis in the unique context of a FRAND dispute.

IV. The FRAND Obligation.

In assessing the breach of contract claim, the parties focus on two components: the mutual duty of the parties to negotiate in good faith and the duty to offer a rate which are in fact FRAND.

The Court finds that Ericsson negotiated in good faith and did not commit a breach of contract by virtue of its conduct.  Indeed, negotiations came to an end when TCL initiated this suit shortly after it had received an offer to which it responded with signaled an initial favorable reaction.  (See Ex. 37 at 2.)

The parties take diametrically opposing positions on whether the licensor must make an offer which in fact meets all FRAND requirements.

In TCL's view, the duty under French law to negotiate in good faith is not the full extent of the FRAND duty.  (Stoffel-Munck Rebuttal Decl. ¶ 22; TT, Mar. 1, 2017, pp. 99:19-100:12.)  Rather, the contractual duty is to grant a FRAND license.  (Stoffel-Munck Rebuttal Decl. ¶ 22.)  TCL contends that this is consistent with the plain language of the policy which refers to a duty to negotiate in good faith, as well as a duty to be prepared to grant FRAND licenses.  The ETSI Guide states that one of the "rights" granted to members is "to be granted licenses" on FRAND terms.  (Id. ¶¶ 23-31 (emphasis supplied); ETSI Guide on IPR § 1.4, Ex. 224 at 4.)

In Ericsson's view, there is a range of offers which can satisfy the FRAND obligation.  The FRAND commitment does not require each offer and counter-offer exchanged during the course of negotiations to be FRAND.  Huber Rebuttal Decl. ¶¶ 29-29; cf. Ericsson v. D-Link, No. 6:10-CV-473,  2013 WL 4046225, at *25 (E.D. Tex. Aug. 6, 2013) (aff'd in part, vacated in part, rev'd in part, 773 F.3d 1201 (Fed. Cir. 2014)) (holding that, in RAND licensing under the IEEE patent policy, "both sides' initial offers should be viewed as the starting point in negotiations. Even if a court or jury must ultimately determine an appropriate rate, merely seeking a higher royalty than a potential licensee believes is reasonable is not a RAND violation"); Microsoft Corp. v. Motorola Inc., 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) ("Because the IEEE and the ITU agreements anticipate that the parties will negotiate towards a RAND license, it logically does not follow that initial offers must be on RAND terms.").  In sum, Ericsson believes there is no duty to bring good faith negotiations to conclusion

with an offer which is in fact FRAND; it need only be prepared to offer FRAND terms.

The Court concludes that it need not resolve the legal question whether the FRAND duty under ETSI requires the licensor to offer rates which are in fact FRAND. There are two reasons. First, no damages will flow from any putative breach because the Court granted partial summary judgment on TCL's damages claim, in part because the Court excluded evidence of legal expenses which had not been timely produced. (Docket No. 1061, pp. 20-21.) Second, while finding a breach would be necessary for granting specific performance under TCL's breach of contract claim, it would also be superfluous.

Both TCL and Ericsson assert claims for declaratory relief. (Docket No. 1376, Pretrial Conference Order, 3, 6.) The Declaratory Judgment Act provides that a district court may "declare the rights . . . of any interested party . . . whether or not further relief is or could be sought." 28. U.S.C. § 2201. The availability of declaratory relief depends on whether there is a live dispute between the parties, and a request for declaratory relief may be considered independently of whether other forms of relief are appropriate. Powell v. McCormack, 395 U.S. 486, 517-518 (U.S. 1969). A declaratory judgment can then be used as a predicate to further relief, including an injunction. (Id. at 499 (citing 28 U. S. C. §2202).)

TCL seeks a declaratory judgment that Ericsson has not offered TCL license terms conforming to applicable legal requirements, including failing to offer FRAND rates. (Docket No. 31, ¶113.)

Ericsson seeks a declaratory judgment that Ericsson has (a) complied with its IPR licensing declarations to ETSI, ETSI's IPR Policy, and any applicable laws during its negotiations with TCL in regard to FRAND terms for a license to Ericsson's 2G, 3G, and 4G SEPs, and (b) in fact offered to grant TCL a license to Ericsson's 2G, 3G, and 4G SEPs on FRAND terms. (Ericsson Inc v. TCL., Case No. 2:15-CV-02370, Docket No. 17, pp. 18-19.)

Just as it would on the breach of contract claim, TCL bears the burden of proof on its declaratory relief claim, as well as on Ericsson's claim for declaratory relief. (Docket No. 1074, p. 4.)

## V.  Options A and B are Not FRAND.

As suggested by its findings of fact, the Court holds that TCL is entitled to a declaration that Offers A and B are not FRAND rates.  TCL has carried its burden of showing that Options A and B are not FRAND.  For like reason, TCL is entitled to a declaration of the FRAND rates here.

Whether judged at the time the amended FRAND contentions were made in May 2015, or at the time of trial, Ericsson's offers are not fair and reasonable, and are discriminatory.  This is demonstrated not only by TCL's evidence, but also Ericsson's evidence.  In particular, as of May 2015, Ericsson had already entered into licenses with Samsung, LG, and HTC–all of whom are similarly situated to TCL–at rates substantially lower than Option A and Option B.  (TCL FOF, 40-42; TCL COL, 34-43; TT, 2/28/17, (Sealed Vol. 1) pp. 17:11-24, 20:24-23:3.)  This is true whether one uses Dr. Lynde's "business case" rate determinations, Dr. Lynde's IDC rate determinations, or Kennedy's "business case"  rate determinations.

Although the Court makes limited use of the Apple and Huawei licenses as reasonableness checks, Ericsson's proposed rates are also discriminatory vis-à-vis these firms.

Ericsson's use of floors in its rates is itself discriminatory.  In the absence of a credible showing that Ericsson's SEPs add a measurable incremental value, there is no basis for essentially discriminating on the basis of the average selling price where a floor would result in a higher effective rate for lower priced phones.  Here, the Court has rejected Kennedy's ex Standard analysis. There is no predicate in this record for floors.

## VI.  Setting FRAND Rates.

The Court finds that the following rate are supported by the record and mandated by the FRAND obligation under ETSI:



The rates which the Court adopts are both fair and reasonable and non-discriminatory.

VII.  <u>Release Payment.</u>

Ericsson is entitled to a release payment that is calculated in the same manner, and with the same rates, as the going-forward rates adjudicated here, covering all of TCL's unlicensed sales from January 1, 2007 onward.

VIII.  <u>The Elements of the Adjudicated License.</u>

The Court sets out the terms of the FRAND license adopted here.

With respect to End User Terminals (<u>i.e.,</u> handsets and tablets), so long as they are TCL Products (as defined in Option B at §§ 1.7 and 1.25), TCL shall pay as a percentage of the Net Selling Price (as defined in Option B at § 1.16) the rates

set forth in Figure 17.  In order to avoid confusion, products TCL sells under the
Blackberry brand are TCL Products.

With respect to the sale of External Modems and Personal Computers, so
long as they are TCL Products (as defined in Option B at §§ 1.9, 1.20, 1.25),  TCL
shall receive a royalty-free license because the revenues for these devices have
already been accounted for in the unpacking analysis for handsets.

The License Period shall be five years from the date of the injunction which
the Court enters.  (Docket No. 1055, p. 9.)  The license and related obligations
shall extend to the TCL parties to this litigation and any company or other legal
entity they control (i.e., more than 50% voting power).   The present record does
not permit the Court to calculate royalties for the period between the termination
of the release period and the commencement of the injunction.  In settling the form
of injunction, the parties shall meet and confer to resolve the issue, and if unable
to do so, the Court will receive additional evidence and resolve the issue.  The
royalty rates during this interim period shall be the same as adopted by the Court.

TCL's reporting and payment obligation shall be as set forth in sections 6.2
and 6.3 of Option B.  The license shall also include the terms for pass-through
rights and the terms which the which the Court previously found to not be a breach
of FRAND.  (Docket No. 1055 at 6-8.)

The FRAND amount to compensate Ericsson for TCL's unlicensed past
sales is $16,449,071.

Because the Court's final judgment will take the form of an injunction, as
opposed to a fully integrated license agreement, certain terms and conditions must
be modified or removed in order to give effect to an injunction. (See Docket No.
1055 at 9.)  The parties are directed to submit a proposed form of injunction that
conforms to the Court's findings and conclusions within thirty (30) days.

Dated: November 8, 2017

_____
James V. Selna
United States District Judge

115