1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
9  Limited, and TCT Mobile (US) Inc.

10             UNITED STATES DISTRICT COURT

11     FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12
   TCL COMMUNICATION                    Case No. SACV14−00341 JVS
13 TECHNOLOGY HOLDINGS, LTD., *et*      (DFMx)
   *al.*,                              Consolidated with CV15-02370
14
                Plaintiffs,
15                                      **PLAINTIFFS' DIRECT
         v.                             EXAMINATION BY
16                                      DECLARATION FOR EXPERT
   TELEFONAKTIEBOLAGET LM               WITNESS DR. IR. ING. RUDI
17 ERICSSON, *et al.*,                  BEKKERS**

18                Defendants.
19 ─────────────────────────────

20 TELEFONAKTIEBOLAGET LM               Place: Courtroom 10C
   ERICSSON *et al.*,                   Before Hon. James V. Selna
21
                Plaintiffs,             Discovery Cut-Off: May 23, 2016
22                                      Pre-Trial Conf.: Jan. 30, 2017
         v.                             Trial: Feb. 14, 2017
23
24 TCL COMMUNICATION
   TECHNOLOGY HOLDINGS, LTD. *et
25 al.*,
26                Defendants.
27
28

I. EXPERT QUALIFICATIONS ................................................................... 1

II. SUMMARY OF TESTIMONY .............................................................. 5

III. MOBILE STANDARDS DEVELOPMENT .................................. 10

IV. THE INTERSECTION BETWEEN PATENTS AND STANDARDS ......... 13

   A. Risks of Standardizing Patented Technologies .............................. 13

      1. Licenses unavailable ....................................................... 13

      2. Patent hold-up ................................................................. 14

      3. Cumulative licensing fee too high ................................... 14

      4. Discrimination against certain implementers ................... 14

   B. Implications of the Above Risks ................................................... 15

V. THE ETSI IPR POLICY ...................................................................... 16

   A. The ETSI Rules of Procedure Require Disclosure of Essential IPRs and a FRAND Commitment from IPR Owners, But Leave Dispute Resolution to the Parties or Courts. ................................................................ 17

   B. ETSI Dynamics and Voting Regarding the IPR Policy ................. 19

   C. Context, Rationale, Substance, and Adoption of the 1993 ETSI IPR Policy 20

      1. Context and rationale of the 1993 ETSI IPR Policy ........... 20

      2. Substance of the 1993 ETSI IPR Policy ........................... 23

      3. Adoption of the 1993 ETSI IPR Policy ............................ 24

   D. Context, Rationale, Substance, and Adoption of the 1994 ETSI IPR Policy 24

      1. Context and rationale of the 1994 ETSI IPR Policy ........... 24

      2. Substance and adoption of the 1994 ETSI IPR Policy ....... 25

VI. CONTRIBUTION COUNTING ........................................................ 27

   A. "Approved Contributions": How ETSI and 3GPP Track Input to Technical Standards ................................................................................. 27

   B. Ericsson's Use of Contribution Counting .................................... 28

   C. The Origins of Contribution Counting and the Theory of Using It to Attempt to Justify Royalty Rates .......................................................... 29

   D. The Contribution-Counting Reports Ericsson Relies on Do Not Claim That, or Show How, Approved Contributions Correlate to Essential Patents. .............. 32

E.   Ericsson's Key Assumption that Approved Contributions Correlate to Actual Patents Is Unreliable for Many Reasons. ..............................................34

   1.   Contributions are not patents and need not be patentable. .........................34

   2.   Approved contributions are often trivial......................................35

   3.   Contribution-counting studies do not discount for expired or lapsed patents. ..............................................................37

   4.   Contribution-counting studies do not consider whether once-owned patents were transferred to others...................................................37

   5.   Contributions may cover technologies patented by others........................38

   6.   Multiple contributions may relate to the same underlying technology. ......39

   7.   Value distribution is not necessarily equal between multiple submitters. .40

   8.   The value distribution of inventions, contributions, and patents is highly skewed..................................................................40

   9.   Contribution-counting studies cover only some parts of the full 3GPP standards................................................................41

   10.  Contribution-counting studies count optional parts of the standard, which are non-essential by definition. ..........................................42

F.   Contribution Counting Invites Opportunistic Behaviors. ............................42

   1.   Devoting resources to increase contribution statistics without regard to whether contributions are patentable. ...................................42

   2.   Making contributions designed to inflate contribution statistics...............44

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION ...........................47

## DECLARATION OF DR. IR. ING. RUDI BEKKERS

I, Dr. Ir. Ing. Rudi Bekkers, declare under the penalty of perjury under the laws of the United States of America that the material contained herein is true and correct and that I am competent to testify thereto.

## I.      EXPERT QUALIFICATIONS

1.      My name is Rudi Bekkers.  A copy of my CV is attached to this declaration as **Exhibit 1592**.  Since 2003 I have been a permanent faculty staff member at Eindhoven University of Technology in the Netherlands.  I am Associate Professor of the Economics of Technological Change, and group chair of the Technology, Innovation and Society group, which includes full responsibilities for the research, education, finance, and HR affairs of approximately 55 people.  Since 2001, through an agreement with the university, I have also conducted research for Dialogic innovatie en interactie, a private research and consultancy firm based in Utrecht, the Netherlands.  I hold a Ph.D. and an M.Sc. in Technology and Society from Eindhoven University of Technology, and a B.Sc. in Electrical Engineering from Hogeschool Eindhoven.

2.      My main research interest is the relationship between technological standards and intellectual property rights (IPRs).  My research in this area began in 1996 while I was preparing my doctoral thesis on the development of the Global System for Mobile communications (GSM) standard for mobile telephony.  Since then, as part of my academic and consulting work, I have continued to regularly follow and study standard-setting processes and the role of IPRs therein.

3.      I have published over a dozen academic papers and book chapters on the relationship between standards and IPRs, mostly focusing on mobile telecommunications technology.  I have also authored several technical handbooks on telecommunications technology.  My academic papers have been published in highly respected, peer-reviewed journals such as Research Policy (four times), Technological Forecasting & Social Change, Industrial & Corporate Change,

California Management Review, Technovation (twice), Telecommunications Policy (three times), the Journal of Technology Transfer (twice), and the European Intellectual Property Review.  My papers in academic journals received over 460 citations in the Elsevier Scopus database, and over 350 citations in the Thomson Reuters Web of Science (340 excluding self-citations).  Several of my working papers in this field have been accepted at high-level academic conferences and events, including the Hoover IP2 Working Group Conference at Stanford University, the U.S. National Bureau of Economic Research (NBER) conference on Standards, Patents & Innovation, the Annual Congress of the European Economic Association, the Joseph A. Schumpeter Society (ISS) bi-annual congress, the annual DRUID conference, the OECD/EPO Conference on IP Statistics for Decision Makers (IPSDM), the European Policy for Intellectual Property (EPIP) annual conference, the IEEE Standardisation and Innovation in Information Technology (SIIT) International Conference, the European Meeting on Applied Evolutionary Economics (EMAEE), and more.  Two of my books (titled *Mobile Telecommunications Standards: GSM, UMTS, TETRA and ERMES* and *Mobile Telecommunications: Regulations, Standards and Applications*, respectively) were published by Artech House, a renowned publisher in this technical area, and another three books (titled *Mobile Telecommunications: Regulations, Standards, and Applications*; *Mobile Telecommunication: European Networks*; and *GSM in Detail: Technology and Implementation of GSM, DCS 1800, and PCS 1900*, respectively[1]) were published by Wolters Kluwer, the first of which was released also as a second edition.

4.      Together with Timothy Simcoe (Boston Business School), Christian Catalini (MIT Sloan School of Management), and Arianna Martinelli (Scuola Superiore Sant'Anna, Pisa, Italy), I am involved in a multi-year effort to compile a comprehensive database of standard-essential patents disclosed at thirteen major

---

[1] Titles translated from Dutch.

Standard Development Organizations (SDOs), including ETSI.  An early version of this database was presented to the U.S. National Bureau of Economic Research (NBER) in 2012.

5.      I have also conducted a number of commissioned studies relating to mobile telecommunications standardization and patents in standards.  These include:

- The first large-scale study on patents and standards commissioned by the European Commission (DG Enterprise and Competition), conducted together with Fraunhofer-Gesellschaft of Germany, published in 2010.

- The second large-scale study on patents and standards commissioned by the European Commission (DG Enterprise and Industry), published in 2013.

- A study for the U.S. National Academy of Sciences (NAS) on commonalities and differences between standard-development organization (SDO) IPR policies, together with Andy Updegrove, published in 2012.

- Several studies for SDOs, including the European Telecommunications Standards Institute (ETSI) (a study of its members' needs and expectations commissioned by ETSI, and two studies commissioned by the Dutch ETSI members), the International Telecommunication Union (ITU) (including a handbook on patents, competition and standardization), Institute of Electrical and Electronics Engineers (IEEE) (invitation by the Board to reflect on possible improvements in IEEE IPR policy), and support for policy organizations in the field of standards, including the Organisation for Economic Co-operation and Development (OECD) and the Dutch government.

6.      Twice, I have presented my commissioned studies to the ETSI General Assembly in November 2004 (General Assembly Meeting No. ("GA #") 44) and

November 2009 (GA #54), respectively. Furthermore, a commissioned report I prepared served as input for the GA #45 meeting, and I was invited by ETSI as a guest to attend, and did attend, the GA #50 meeting in November 2007.

7.     I was the Program Chairman of the 7th International Conference on Standardization and Innovation in Information Technology (SIIT 2011) in Berlin. And I have been an invited speaker at various events in the field of patents and standards, including an opening keynote speech at the ITU "Patent Roundtable" in October 2012, which drew representatives from virtually every stakeholder in this field; and recently at the Fourth "China Competition Policy Forum" and International Symposium on Intellectual Property and Antitrust in Beijing, China from October 22 to 24, 2015, where I organized a panel session with guest IPR representatives including Christian Loyau (Director for Legal Affairs of ETSI), Dore Antoine (Senior Legal Officer of the Legal Affairs Unit of the ITU), Phil Wennblom (Director of Standards at Intel, speaking on behalf or IEEE), and Pan Feng (Assistant Secretary-General of the CCSA (China Communications Standards Association)). This session was also attended by representatives from the U.S. Department of Justice (DoJ), the U.S. Federal Trade Commission (FTC), Directorate-General for Competition of the European Union, and the three Chinese antitrust agencies, among others.

8.     I was also an invited panel member at the 10th Annual Standards, Patents & Competition: Law & Litigation in London in December 2016, an event that also featured Thomas Kramler (Head of the Digital Single Market Task Force, DG Competition at the European Commission), Dirk Weiler (Chairman of the ETSI Board and IPR Special Committee at ETSI), Konstantinos Karachalios (Managing Director, IEEE), Stuart Graham (former Chief Economist of the US Patent & Trademark Office USPTO), and many IP executives in the industry.

9.     I have also served as an appointed member of the National Academy of Sciences (NAS) for a study on patents in standards executed in 2012–2013. And,

since 2014, I have served on the IEEE-SA Europe Advisory Council, a group of five experts that is chaired by Walter Weigel, who was the Director-General of ETSI from 2006 to 2011.

10.     I am a member of IEEE and a member of ETSI.  I am also currently serving as member of the external expert board to a European Commission Joint Research Centre (ECJRC) commissioned study.  The ECJRC's terms of reference include governance and decision-making rules on IPR policies at ETSI, among others.

11.     Before providing this declaration, I served two expert reports in this case, on February 22, 2016, and April 4, 2016, respectively.  Each of those reports addressed the issues addressed in this declaration, among others.  I also provided deposition testimony in this case, on May 6, 2016.

## II.     <u>SUMMARY OF TESTIMONY</u>

12.     Technology standards play a pivotal role in many industry sectors, including mobile telecommunications.  Standards are detailed technical specifications that ensure devices made by different manufacturers are interchangeable and/or interoperable for certain purposes.  Standards can be developed by companies, firms, consortia, or, more formally, standard-development organizations, or SDOs.  The main SDOs responsible for standards development in the mobile-telecommunications industry, and relevant in this case, are the European Telecommunications Standards Institute (ETSI) and the 3rd Generation Partnership Project (3GPP).

13.     Standards in mobile telecommunications ensure that users have a free choice of phones and other devices, that all work properly with the services offered by network operators (*i.e.*, "compatibility" or "interoperability").  Standardization can also even the playing field by helping ensure different manufacturers have equal access to the technologies underlying consumer products.  By implementing standardized technology, manufacturers can build products that include well-known,

highly compatible technologies that might not otherwise be available. Standardization can also encourage innovators to contribute the results of their research and development to the standard, which can lead to patent-licensing revenue.

14.     With these benefits, however, a number of risks arise when standardized technology is patented.  This is because, while both the patent system and standard-setting organizations aim to encourage innovation, the standardization system is fundamentally inclusive, being based on commonality and equal access to technologies, whereas the patent system is fundamentally exclusive, being based on awarding temporary monopolies to enable IPR owners to exclude others from the market.  Specific risks include the risk that:

- licenses to technologies being used in a standard will be unavailable because of patent disputes;
- patent owners will charge higher royalty rates once the industry is locked in to using standardized, patented technology;
- cumulative royalty rates charged by all who own patents on standardized technologies will be too high for product sales to be reasonably profitable; and
- patent owners will discriminate against certain implementers by charging them higher royalty rates for licensing than their competitors must pay.

15.     ETSI addresses these and other risks discussed in this declaration in Annex 6 to its Rules of Procedure (the "IPR Policy"), which governs the use of patented technology in ETSI standards.  The IPR Policy requires owners of essential IPR to timely inform ETSI which of their IPRs are, or may become, essential to a standard.  They are also required to submit public statements, known as "Licensing Declarations" or "licensing commitments," indicating whether they commit to licensing their IPRs on Fair, Reasonable and Non-discriminatory ("FRAND") terms and conditions.  (Ex. 1079 at 36–37.)  If an IPR owner refuses to make this FRAND

commitment, ETSI will try to base the standard on alternative technology, so the standard does not require the patent owner's technology; and if ETSI finds no viable alternative technology, all work on the standard may cease.  (*Id.* at 38.)

16.    Ericsson has signed Licensing Declarations for the IPRs it informed ETSI are or may become essential to a standard, and has thus agreed to license these patents on FRAND terms and conditions.  When an IPR owner commits to the FRAND obligation, but still cannot agree with a potential licensee on terms to a license, ETSI leaves it to the parties to seek a resolution, including in court if necessary.  Specifically, the ETSI Guide on Intellectual Property Rights ("Guide on IPRs") (part of ETSI's "rule book," as further explained below) states that unless parties privately agree otherwise (*e.g.*, through alternative-dispute resolution), "the national courts of law have the sole authority to resolve IPR disputes."  (*Id.*, starting at 51) (ETSI Guide on IPRs) at 65.)

17.    While the IPR Policy uses the term "fair, reasonable and non-discriminatory ('FRAND')," it does not further define FRAND in its "Definitions" section.  (*Id.* at 36, 41.)  Attempts to amend the IPR Policy to further specify what the FRAND obligation entails have been unsuccessful, because ETSI's Rules of Procedure make such IPR Policy amendments difficult and there has not been consensus among ETSI's members.  The IPR Policy may be amended only through a multistage process, in which one stage requires consensus (which ETSI defines as the "absence of sustained opposition") of any party participating in the committee preparing such amendments, and another stage requires supermajority of certain type of ETSI members (*i.e.*, European "national delegations").  For this reason, despite failed attempts to further define the FRAND obligation within ETSI, it would be inaccurate and misleading to say that ETSI has "rejected" any of the attempts to do so that were proposed over the years.  In reality, ETSI's voting dynamics and approval procedures are such that a decision to do nothing on a given issue—like further specifying what the FRAND obligation entails—is not an

intentional condemnation of any "rejected" proposal so much as it reflects a lack of required consensus and/or supermajority support.

18.     To illustrate these points in the context of this case, I will explain how the ETSI IPR Policy was first adopted in 1993, in a form that included an Undertaking which members drafted in an effort to further define certain elements of the FRAND obligation, but was finally implemented in 1994 in a form that did not include the Undertaking.  Most importantly for purposes of this litigation, I will show that the obligation to license on FRAND terms was carried over into the ETSI IPR Policy as implemented in 1994, with no material change.  Accordingly, I will further demonstrate that Ericsson's expert witness, Dr. Bertram Huber, who has submitted reports in this case regarding the ETSI IPR Policy, is wrong to suggest that by not implementing the Undertaking, ETSI opened the door for its members to offer or grant licenses on *un*fair or discriminatory terms and conditions so long as they negotiate in "good faith."

19.     To the extent Ericsson witnesses are also suggesting that the framework for determining what is FRAND should always defer to the results of past negotiations, or to the licensor's demands, I will show that ETSI rules and procedures do not purport to limit the sole authority of national courts of law to exercise their authority to decide disputes over FRAND terms and conditions.

20.     Finally, I address contribution counting, which Ericsson relies on as a method of valuing its essential-patent portfolio.  Ericsson created this method in the wake of internal pressure from its employees to find a way to better market and promote Ericsson's claim to own a larger share of standard-essential patents than previous methods indicated.  It rests on the theory that the more often Ericsson's name has appeared on a technical contribution, the higher its share of essential patents should be, which may, if true, justify Ericsson demanding higher royalty rates than it could demand if it had a lower share of essential patents.  Basically, contribution counting consists of tallying and comparing how many of each

company's proposals during 3GPP meetings were "approved" for use in drafting standards. Ericsson has used the results of this exercise to claim that its share of approved contributions is a proxy for its share of standard-essential patents and the technical value Ericsson contributed to the underlying standards.

21.     Based on the facts and documents I analyzed in this case and am personally aware of from my professional experience, contribution counting is not an accurate or reliable proxy for estimating Ericsson's share of 2G, 3G, and/or 4G standard-essential patents or for the technical value Ericsson contributed to these standards. I discuss in detail specific problems and flaws with contribution counting as used by Ericsson in this case, including that (1) nobody has ever shown, or even attempted to show, that the number of approved contributions correlate in any way to the number of standard-essential patents, and (2) in fact, for several reasons, the number of approved contributions is not likely to correlate well with the number or technical value of standard-essential patents. These reasons include that contributions:

- are not patents;
- need not reflect patentable ideas;
- do not expire, lapse, or become invalid like patents do;
- can be "signed onto" by companies that did not contribute to them (for political or other reasons);
- do not all have equal technical value or merit;
- are not necessarily equally attributable to co-contributors;
- are often trivial, editorial, and/or duplicative in nature;
- often cover non-technical or optional features of standards; and
- are not bought, sold, or transferred on the marketplace (unlike patents).

22.     Consequently, approved contributions are a very broad-brush metric. The above deficiencies open the gates to opportunistic behaviors, such as submitting duplicative, trivial, and editorial contributions; teaming up with others to sign on to

as many contributions as possible; breaking what would otherwise be single technical contributions up into many smaller contributions; and (at least in the case of Ericsson) taking leadership positions and using the accompanying powers to "hijack" (or steal credit for) contributions originally submitted by others. These are not general, theoretical concerns. As I show below, the evidence I have analyzed for this case shows that Ericsson engages in these opportunistic behaviors.

## III.    MOBILE STANDARDS DEVELOPMENT

23.    In this section, I introduce the 2G, 3G, and 4G telecommunications standards as developed by ETSI and 3GPP and their predecessor organizations. I also explain the goals of standardization, and how ETSI and 3GPP facilitate standardization.

24.    The standardization system that led to these 2G, 3G, and 4G technologies is based on commonality and creating an even playing field for competition by granting the various stakeholders equal access to standardized technologies. The stakeholders in mobile-telecommunications standardization represent various and differing interests, including:

- technology developers, who have an interest in their technologies being used in the standard and obtaining monetary or non-monetary compensation, or an interest in disseminating the knowledge they develop (such as universities);

- mobile-equipment manufacturers (such as TCL) that make feature phones, smartphones, tablets, laptops, modems, mobile-to-mobile modules, or any other device that connects to a mobile network, and who are interested in technology being available and cost-effective;

- chipset manufacturers, and those who manufacture modules or other components using devices that implement the standard (such as Qualcomm);

- infrastructure manufacturers, like cellular base stations (such as

Ericsson);

- mobile-network operators, which offer services using the standard by using infrastructure products (such as Verizon and AT&T);

- end users, who seek increased functionality and performance, low prices, interoperability, and access to technology (such as individual and government consumers and businesses);

- national administrations, governmental bodies and other authorities (such as national radio-communications agencies, ministries, and regional authorities such as the European Commission); and

- advisory and consultancy companies with an interest in being well informed on the standards so they can provide services (such as market, technical, and design services and consultation).

Sometimes, organizations fall under more than one of the above categories of stakeholder (for example, organizations that both manufacture mobile equipment and research and develop new technologies).  These are called "vertically integrated" firms.

25.     Modern mobile-telecommunications standardization started with European stakeholders developing 2G in the early 1980s.  Before those days, mobile telecommunications was a small, niche market in which most countries used proprietary and closed standards—often developed by the supplier selected by the national telecommunications services operators, known as "PTTs."  Mobile-telecommunications equipment of the day could almost never be used across borders, had limited usefulness, and was costly to implement and use.  Many countries, however, wanted services based on affordable equipment that worked internationally and wanted to take advantage of the economies of scale that international markets could offer.  In 1982, working within an ETSI predecessor (called CEPT[2]), a group of European PTTs took the initiative to reach a common

---

[2] CEPT stands for "Conférence européenne des administrations des Postes et des

WITNESS DECLARATION OF DR. IR. ING. RUDI BEKKERS

standard for mobile telephony.  Stakeholders thus started working together to develop and standardize technologies through consensus and collaboration.  The result of these early efforts was the standard now known as GSM.[3]  Aiming for a large network capacity as well as affordable handsets and other equipment, the standard designers opted for a fully digital system.

26.     Whereas the technical development of GSM was initially done in CEPT, whose membership consists of PTT administrations (*i.e.*, operators), this task shifted in 1988 to the newly established ETSI, to help stakeholders besides operators participate in standardization.  Other world regions later developed their own digital mobile telephony standards, but the European GSM standard increasingly won terrain, eventually becoming the dominant "second generation" (2G) technology for mobile communications.

27.     In the 1990s, the growing demand for mobile data communications prompted a new technological generation, known as the "third generation" (3G).  The earlier success of GSM set the stage for ETSI to follow-up with a successful 3G standard.  But other standards bodies around the world were developing 3G standards too.  To prevent global fragmentation, and resulting additional costs, the relevant regional standardization bodies in the U.S., Europe, Japan, Korea, and China agreed to develop and adopt a harmonized 3G standard through the newly established Third Generation Partnership Project (3GPP).  The participating, regional standardization bodies[4] are the 3GPP "partners" and any member of these

Télécommunications."

[3] Originally standing for Groupe Spécial Mobile, the "GSM" acronym now stands for Global System for Mobile Communications.

[4] ARIB (Association of Radio Industries and Businesses, Japan), ATIS (Alliance for Telecommunications Industry Solutions, USA), CCSA (China Communications Standards Association), ETSI (European Telecommunications Standards Institute), TSDSI (Telecommunications Standards Development Society, India), TTA (Telecommunications Technology Association, Korea), and TTC (Telecommunication Technology Committee, Japan).

regional bodies can also directly participate in 3GPP's standardization activities.  In 1999, 3GPP released its "Wideband-CDMA / W-CDMA" standard, often now simply referred to as "3G," or, in Europe, "UMTS."  3GPP continually updated the standard with new releases, which have gotten almost one-thousand times faster over the years.  Subsequently, 3GPP developed a fourth generation standard (4G) known as Long Term Evolution (LTE).  LTE eventually became the world standard for 4G mobile telecommunications, further consolidating 3GPP's position as the leading mobile-telecommunications SDO.

## IV.   THE INTERSECTION BETWEEN PATENTS AND STANDARDS

28.     Standards and patents both drive innovation, but also clash.  Both the patent and standardization systems aim to support and encourage innovation and technological progress.  Yet tension often exists between these two systems.  Whereas the standardization system is based on commonality, and creating an even playing field for competition by granting stakeholders equal access to technologies, the patent system is based on awarding temporary monopolies that enable IPR holders to exclude others from implementing technologies.

### A.   Risks of Standardizing Patented Technologies

29.     Because technology standards can include patented technology, standardization and the resulting incentives necessitate formal IPR policies, including FRAND licensing requirements.  These concerns affect implementers of the standards and society as a whole.  They include the following[5]:

#### 1.   Licenses unavailable

30.     Here, the concern is that one or more owners of Standard Essential Patents (SEPs) may be unwilling to license their IPR to implementers of the standard at all.  It is especially problematic if this becomes clear only after the standard has been finalized.

---

[5] Ex. 307 (Bekkers et al. (2014)); Ex. 1153 (DoJ, FTC (2007)); Ex. 1053 (ABA (2011)); and Ex. 1060 (Kühn, Scott Morton & Shelanski (2013)).

## 2. Patent hold-up

31.     This refers to the situation where, once the patent is covered by the standard, and implementers are locked in, the patent holder charges a higher licensing fee than it could have negotiated before the technology was standardized. Early CEPT/GSM meeting minutes show that the risk of patent hold-up was a motivating factor for ETSI's IPR Policy, noting:  "A standards body such as the GSM needs to make itself aware, as far as it is reasonably possible, the extent of the IPR implications that may exist before adopting a standard," and "[o]therwise such a standard may bestow a 'windfall' monopoly position for an individual supplier. This becomes even more essential when the standard is a mandatory standard." (Ex. 1069 (CEPT, GSM Doc 122/87).)

## 3. Cumulative licensing fee too high

32.     This relates to concerns that a standard covered by a large number of essential patents might face a cumulative licensing fee that is impractically high for would-be users (*i.e.*, "royalty stacking"), even if each individual essential patent is available at a relatively low rate.  Royalty stacking defeats the purpose of standardization when it makes implementation unprofitable for those who manufacture standard-compliant products (*e.g.*, where the total royalty rates result in a sales price that exceeds the amount that users are willing to pay for the product).

## 4. Discrimination against certain implementers

33.     Absent an obligation to license on FRAND terms and conditions, patent owners could discriminate between licensees by offering some better terms and conditions than others, thereby picking market "winners" and "losers." Discrimination distorts the market, especially if categorical discrimination takes place, for instance between established manufacturers versus new entrants, or firms with vertically integrated business models versus firms that do not own essential patents, or between companies at different levels of the vertical manufacturing process.  Discrimination can also occur on an individual level, where a given

company pays higher royalty rates to a particular patent owner than other companies with which the firm competes for sales of products incorporating the same standardized technology.  Similarly, discrimination can occur where a vertically integrated manufacturer charges higher royalty rates to one direct competitor than to others.  This is especially true if competition is fierce, and firms cannot easily increase end-product prices without risking market share.  In this regard, the smaller the profit margin, the larger the effects of paying higher royalty rates.

### B.   Implications of the Above Risks

34.     The risks discussed above can have wide-ranging consequences for standards implementers, end users, and markets.  These consequences include:[6]

- Prices go up if higher royalty rates are passed on to end users, including the static deadweight loss from monopoly pricing.

- Competition goes down at the manufacturers' level, because of higher barriers to entry for implementers (*i.e.*, higher royalty rates, especially for those who do not own essential patents that they can cross-license), or reduced profitability for implementers (if higher royalty rates are not passed on to end users).  Such reduced competition can in turn increase product prices and lower consumer choice.

- Harm to other holders of standard-essential patents.  These entities may not be able to recover a reasonable or appropriate compensation for licenses to their own patents after other parties have extracted the hold-up value from the market.

- If the benefits available to innovators are disproportionately distributed to opportunistic patent owners instead of being distributed in proportion to R&D investments that led to actual technological contributions, then contributing innovators are not being optimally incentivized to develop

---

[6] Ex. 1062 (Simcoe (2012)).

technologies in the future.  Regardless of whether affected innovators are manufacturers or upstream technology developers, future long-term investments in innovation are deterred, because the balance of risk and reward is upset.

- Further adoption of the standard is jeopardized and the standardization process is undermined in the shadow of uncertainty if investments made in creating a standard are undone by problems at the implementation and licensing stage.  Unnecessary inclusion of patented technology that does not technologically benefit the standard, or which does not reward innovators in proportion to their patented technological contributions, greatly complicates standardization and impedes implementation.

35.     Given the above implications, the ETSI IPR Policy recognizes the need for a quid pro quo for contributing technology to the standard and being prepared to grant licenses.  The policy's explicit objective is to meet technical objectives while ensuring investments will not go to waste because patent licenses are either unavailable or not fairly rewarded.  (Ex. 1079 at 36.)  In the following section, I discuss the IPR Policy's relevant history, mechanics, rationale, and substance, as well as the ETSI rules, procedures, and dynamics to the extent I believe it will help the Court make an informed FRAND determination under the ETSI IPR Policy in this case.

## V.     THE ETSI IPR POLICY

36.     ETSI operates under a "rule book" known as the "ETSI Directives." These include ETSI's Statutes and the Rules of Procedure.  The Rules of Procedure ("RoP") include the IPR Policy.  (Ex. 1079 at 36–47.)  Both the Statutes and the Rules of Procedure are binding for any ETSI member.  I will first summarize what the ETSI IPR Policy says; then I will summarize its genesis, and why ETSI has not further defined the meaning of "FRAND" despite some disagreement over what precisely ETSI's "FRAND obligations" require.

A. **The ETSI Rules of Procedure Require Disclosure of Essential IPRs and a FRAND Commitment from IPR Owners, But Leave Dispute Resolution to the Parties or Courts.**

37.     The ETSI IPR Policy requires IPR owners to timely disclose which of their IPRs are, or may become, essential to a standard:

> [E]ach MEMBER shall use its reasonable endeavors, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER'S IPR which might be ESSENTIAL if that proposal is adopted.

(*Id.* at 36 (IPR Policy Clause 4.1).)

38.     When ETSI becomes aware of an Essential IPR (*e.g.*, a standard-essential patent), it asks the owner to submit a public statement, or "Licensing Declaration," that the owner will license the IPR on FRAND terms and conditions:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions . . . .

(*Id.* at 36–37 (IPR Policy Clause 6.1).)

39.     If an IPR owner refuses to commit to licensing Essential IPR on FRAND terms and conditions with respect to a standard, the IPR Policy further provides that ETSI will try to base the standard on alternative technology, so that the

standard can be practiced without using the patent owner's technology:

> Where prior to the publication of a STANDARD or a
> TECHNICAL SPECIFICATION an IPR owner informs ETSI that
> it is not prepared to license an IPR in respect of a STANDARD or
> TECHNICAL SPECIFICATION in accordance with Clause 6.1
> above, the General Assembly shall review the requirement for that
> STANDARD or TECHNICAL SPECIFICATION and satisfy
> itself that a viable alternative technology is available for the
> STANDARD or TECHNICAL SPECIFICATION which:
>
> - is not blocked by that IPR; and
> - satisfies ETSI's requirements.

(*Id.* at 38 (IPR Policy Clause 8.1.1).)

40.     If ETSI finds no viable alternative technology, the IPR Policy requires that work on the standard be stopped:  "Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease . . . ."  (*Id.* (IPR Policy Clause 8.1.2).)

41.     Ericsson and many other IPR owners have agreed to license their Essential IPR on FRAND terms and conditions.  However, if a prospective licensee believes an IPR owner is not offering to grant a license on FRAND terms or conditions, the ETSI Guide IPRs provides that courts have sole authority to resolve disputes between parties under the IPR Policy:

> [I]t should be noted that once an IPR (patent) has been granted, in
> the absence of an agreement between the parties involved, the
> national courts of law have the sole authority to resolve IPR
> disputes.

(*Id.* at 65 (Guide on IPRs § 4.3).)

## B.   ETSI Dynamics and Voting Regarding the IPR Policy

42.   Before an actual dispute arises, when two parties have different views on the meaning or interpretation of ETSI's IPR Policy, it is possible for either party to seek to amend the Policy.  But, as explained below, IPR Policy changes follow a procedure that is hard to successfully complete if the proposed amendment might change the status quo.

43.   The ETSI Statutes and Rules of Procedure governing the administration and operation of ETSI provide that IPR Policy development is a consensus-driven process.  (*Id.* at 1, 5–49.)  Any substantial changes to the ETSI IPR Policy require a two-stage process:  the first is consensus in the ETSI IPR Special Committee, and the second is voting at a specially convened meeting of the ETSI General Assembly.  (*See, e.g.*, Ex. 334 at 14) (Bekkers West (2009) (describing the IPR Special Committee).)  Company delegates attend IPR Special Committee meetings to hear about and debate proposed amendments by raising support, objections, and concerns.  As the IPR Special Committee requires consensus (a term that, within ETSI, means the absence of sustained opposition), it is a substantial hurdle for proposed amendments.  (Ex. 1079 at 129 (ETSI Technical Working Procedures §A1) (defining "consensus").)

44.   In the historically uncommon event a proposed amendment passes the IPR Special Committee, it enters into voting in a specially convened meeting of the General Assembly, ETSI's highest authority.  In a procedure known as Weighted National Voting (*id.* at 5, 9, 13, 20 (Forward to Directives; Statutes Art. 18; RoP Arts. 3.4.3, 11.2.1)), representative Heads of National Delegations vote on the proposed amendment in the General Assembly.  (*Id.* at 7–9, 12–15, 20–22, 26 (Statutes Arts. 11, 12.3, 18; RoP Arts. 3, 11, 19)).)  Prospective amendments must win a qualified majority vote of at least 71% of the total weighted votes.  (*Id.* at 21, 26, 32 (RoP Arts. 11.3, 19, Annex 3)).)  With this voting procedure, even a proposal supported by the great majority of full ETSI members could easily be unsuccessful.

While there are 41 National Delegations (all of which are European), some have a much higher voting weight than others.  In fact, 11 of the delegations hold over half of the entire voting power, because of how votes are weighted.  (*Id.* at 32–33.)

45.     Based on my knowledge and understanding of historical attempts to amend the ETSI IPR Policy under the above voting procedure, consensus is hard to achieve on any proposal that would meaningfully affect any large IPR holder's business models or revenue.  Despite numerous attempts, consensus has almost never been achieved.  For example, efforts in 2003–2005 to address issues such as further defining the meaning of FRAND ended with the Secretary of the General Assembly observing that "[t]he issue is complex with diverging views.  No consensus has been achieved within the group . . .."  (Ex. 1068 (ETSI GA/IPR06(03)02)) at 9.)  Likewise, at the meeting of the current ETSI IPR Special Committee in October 2015, several companies submitted proposals to amend the IPR Policy to further define the FRAND obligation, but none of them made it through the IPR Special Committee for a vote by the General Assembly.  (Ex. 1067 at 2–5 (ETSI/IPR(15)23_016r2).)  Eventually, the IPR Special Committee Chairman decided that the topic of defining FRAND would be put on hold for the time being and not be discussed at the next meeting.  (*Id.* at 5.)  My understanding, gained through observing, studying, and publishing on standardization in the telecommunications industry over the years, is that ETSI's voting dynamics have ensured that companies seeking more specificity on how ETSI's IPR Policy should apply in FRAND determinations have often resorted to litigation or other proceedings outside of ETSI as the best available option.

## C.     Context, Rationale, Substance, and Adoption of the 1993 ETSI IPR Policy

### 1.     Context and rationale of the 1993 ETSI IPR Policy

46.     Before ETSI adopted an IPR Policy, its predecessor organization, the European Conference of Postal and Telecommunications Administrations (CEPT),

and a Special Mobile Group (SMG) that spun out of CEPT, had identified many of the issues the IPR Policy would need to address.  When adopting the 2G telecommunications standard (*i.e.*, GSM), CEPT faced questions on whether the standard would include patented technology and, if so, on what terms.  CEPT meeting minutes from 1987 indicate that those drafting the 2G standard seriously considered the risk of what is now referred to patent hold-up:

> [I]t is reasonable for the standards body to try to negotiate the most competitive supply arrangements that it can, bearing in mind that its negotiating power only exists before the standard is adopted [....]  A standards body such as the GSM needs to make itself aware, as far as it is reasonably possible, the extent of the IPR implications that may exist before adopting a standard.  Otherwise such a standard may bestow a 'windfall' monopoly position for an individual supplier.  This becomes even more essential when the standard is a mandatory standard."

(Ex. 1069 (CEPT, GSM Doc 122/87, Oct. 1987).)

47.     At the same time, people realized it would be desirable for European stakeholders to have patents protecting GSM.  According to the minutes of a 1986 CEPT meeting:  "to have a GSM standard not protected by any patent would not be a good policy as a certain degree of protection against non-European manufacturers is required for European companies to decide to invest in the development of equipment . . . ."  (Ex. 1065 (CEPT, CEPT/CCH/GSM Ad-Hoc Meeting on Intellectual Property, London, Dec. 16–17, 1986, Annex 10) at 3.)  The CEPT Patents Panel subsequently expressed that "[u]nless an effective means is found to ensure that all European manufacturers and operators involved with the GSM standard give identical undertakings to licence IPRs, there will be a serious risk of distortion of market forces against SMEs and in favour of large multinationals."  (Ex. 1584  (CEPT, GSM Doc 88/88, Apr. 1988) at 14.)

48.     Most licenses for GSM essential patents were eventually granted on a royalty-free basis.  (Ex. 1038 at 9 (ETSI/IPR (12)12_002r2).)  Yet, some GSM licenses were withheld on discriminatory grounds.  Motorola, a key GSM patent holder, picked "winners" in the sense that it strategically used its portfolio of essential patents for GSM to benefit a select few companies (including Ericsson, Nokia, and a few others) by cross-licensing only a handful of potential implementers of the standard.  (Ex. 1051 (Iversen, E. (1999a)); Ex. 1059 (Iversen, E. (1999b)).)  Japanese firms in particular, keen to use their knowledge of product miniaturization and marketing on GSM mobile terminals, were kept out of the market for many years.  This effect profoundly favored Motorola's selected GSM licensees.  (Ex. 1054 (Bekkers, Duysters, & Verspagen (2002)).)

49.     While CEPT had already informally opened itself up to companies and other stakeholders in the GSM standardization, around 1988 to 1989, the 2G/GSM standardization was moved to the newly established ETSI.  The move to ETSI now offered formal membership and voting rights to suppliers and other interested parties.  IPR matters became ETSI's domain, and its so-called GSM-5 committee, which had been charged with IPR issues within CEPT, was joined by 'leading IPR experts' and became the ETSI Intellectual Property Rights Committee (IPRC), which initiated a five-plus year policy-drafting effort.  (Ex. 1051 at 3–4 (Iversen (1999a).)

50.     Finally, ETSI and its members did not want to merely adopt the IPR policy that many standardization bodies had adopted by that time, which had been promulgated by the International Standards Organisation (ISO).  (Ex. 1071 at 4, 6 (ETSI/GA12(92)20); Ex. 1027 at 2.)  One issue ETSI wanted to address in particular was that under the ISO policy, the "requirement [wa]s to 'negotiate' license[s]," whereas ETSI sought a "requirement [] to 'licence' not to 'negotiate'."  (Ex. 1070 at 7 (ETSI/GA15(93)3, Collective Letter 559, dated Sept. 9, 1992).)

2.      Substance of the 1993 ETSI IPR Policy

51.      The 1993 ETSI IPR Policy required all ETSI members to sign an Undertaking to license essential patents on Fair, Reasonable and Non-discriminatory (FRAND) terms and conditions.  (Ex. 1583.)  The Undertaking applied in principle to any essential patent the signing member might have hypothetically owned in the future.  The policy also included a clause which permitted patent owners to withhold licenses for specific patents if they informed ETSI and followed certain procedural conditions.  (Ex. 1051 at 6 (Iversen (1999a)).)  The Undertaking included a combination of four additional licensing provisions that would later prove to be controversial:  (1) a 180-day period to withhold licenses; (2) certain terms relating to monetary compensation (*i.e.*, requiring SEP owners to disclose the maximum royalty rate they would charge, and retroactively treat all existing licensees as a "most favoured licensee" if another licensee subsequently negotiated better terms and conditions); (3) how to define the territory in which the IPR policy would apply; and (4) arbitration provisions.  (Ex. 1072 at 4 (ETSI/GA20(94)3).)

52.      The 1993 IPR Policy was far more detailed than the IPR policies of other standard-setting organizations at the time.  (Ex. 1027 at 2.)  In the words of the Chairman of the Technical Assembly (TA) responsible for preparing a draft IPR policy for consideration by the General Assembly, the 1993 Policy and its included Undertaking were drafted "by some of Europe's best IPR experts" with the understanding that "ETSI needs to protect itself urgently from IPR complications in view of the large number of standards it is now approving."  (*Id.* at 6.)  He also noted that "most IPR owners are only too happy for their IPR to be incorporated in a standard," because "[i]t enhances the value of that IPR" and "brings royalty income."  (*Id.*)  Furthermore, he expressed serious concerns that "the growing number of IPRs and reduced transparency surrounding what IPRs were being incorporated into standards," as well as the "crucial commodity" of "interoperability" and the problems of lock-in by investment in a standardized

technology covered by IPRs, were "tilt[ing] the negotiating balance in favour of the IPR owner" such that the "'fair and reasonable' [] royalty becomes whatever anyone cares to demand." (*Id.* at 3.)

3.  Adoption of the 1993 ETSI IPR Policy

53.  Prior to the General Assembly meeting at which ETSI adopted the 1993 IPR Policy, a large majority of ETSI members (83%) had approved of the "ideas and the principles of the [1993] Policy and Undertaking." (Ex. 1052 at 7 (ETSI/GA 15 (93) 34).) Majority support grew further throughout the adoption process, and when the final text was put to individual weighed voting, it was approved by a qualifying 88.19%. (*Id.* at 23.) National Delegations approved the 1993 IPR Policy by 100%, with 16 countries voting in favour, 0 against, and 1 abstention. (*Id.*)

**D.  Context, Rationale, Substance, and Adoption of the 1994 ETSI IPR Policy**

1.  Context and rationale of the 1994 ETSI IPR Policy

54.  Although the 1993 ETSI IPR Policy and Undertaking were adopted by a strong majority, a "'minority alliance' of primarily North American manufacturers" went to war against the Undertaking. (Ex. 1051 at 6 (Iversen 1999c).) This minority alliance organized itself within a group called the Computer & Business Equipment Manufacturers Association ("CBEMA"), to challenge the 1993 IPR Policy by (1) filing a formal complaint at the European Commission alleging the policy was incompatible with European competition law, and (2) organizing an intense campaign of lobbying American politicians and instigating a potential "trade war." (*Id.*; Ex. 1581 (Bekkers 2001) at 14–21.)

55.  As explained above, decision-making at ETSI is a consensus-driven process whereby changes are not made in the face of sustained opposition to substantial issues by any important part of the concerned interest. As a result of the minority alliance's sustained pressure against the Undertaking, ETSI was not able to implement its adopted 1993 Policy and Undertaking, despite the fact it was

1 supported by a large majority of ETSI members. (Ex. 1051 at 6 (Iversen 1999c).)

2        2.    Substance and adoption of the 1994 ETSI IPR Policy

3    56.    Most importantly for purposes of this litigation, the obligation to

4 license on FRAND terms was carried over into the ETSI IPR Policy implemented in

5 1994 with no material change. Although 1994 Policy did not require ETSI members

6 to sign the 1993 Undertaking, it was very similar to the 1993 IPR Policy in all other

7 respects. For comparison, the main language of the FRAND promise from each of

8 these versions of the ETSI IPR Policy is set forth below, where differences in text

9 are *italicized*:

| **1993 ETSI IPR Policy Language**[7] | **1994 ETSI IPR Policy Language**[8] |
|---|---|
| When an ESSENTIAL IPR relating to a particular STANDARD *owned by an entity who is not a PARTY* is brought to the attention of ETSI, the Director of ETSI shall immediately request that owner to give within *90 days a signed* undertaking in writing that it is prepared to grant irrevocable licences *to PARTIES for all countries within the STANDARDS APPLICATION AREA* on fair, reasonable and non-discriminatory terms and conditions under such IPR to . . . | When an ESSENTIAL IPR relating to a particular STANDARD is brought to the attention of ETSI, the Director of ETSI shall immediately request the owner to give within *three months an* undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to *at least the following extent* . . . |

As the above comparison shows, the 1994 Policy was materially similar to the 1993

Policy, but subjected ETSI members and non-members alike to the same request by

the ETSI Director to sign a FRAND licensing declaration.

   57.    With or without a prescribed undertaking form, ETSI members shared a

common understanding that they would need to abide by "European Community

competition law and policy, external trade policy and in particular the EC

obligations under the GATT [General Agreement on Tariffs and Trade] and

Technical Barriers to Trade Agreement (TBTA), general standardisation policy, EC

---

[7] Ex. 1583 (1993 ETSI IPR Policy) at 38 (Clause 4.1).

[8] Ex. 1582 (1994 ETSI IPR Policy) at 38 (Clause 6.1).

IPR policy and EC telecommunications law and policy." (Ex. 1073 at 2 (ETSI/IPR/GA(92)4).)  In 1994, ETSI and its members adopted and implemented, nearly unanimously, a policy reflecting otherwise minor changes from the 1993 IPR Policy.  (Ex. 1082 at 18 (ETSI/GA21(94)39 Rev. 2).)

58.     Ericsson's expert Dr. Huber has suggested that by not implementing the Undertaking, ETSI opened the door for its members to offer or grant licenses on *unfair* or *discriminatory* terms and conditions so long as they negotiate in "good faith."  I strongly disagree with that.  As noted earlier, ETSI did not materially change the portion of the 1993 Policy that required ETSI members to be prepared to grant irrevocable licenses on FRAND terms and conditions.  ETSI's commitment to FRAND terms and conditions has remained unchanged throughout the history of the ETSI IPR Policy.

59.     Dr. Huber also seems to ascribe unwarranted meaning to ETSI's decision not to implement the "most favoured licensee" provision of the 1993 Undertaking.  That provision stated that licences granted shall:

> include a clause requiring the licensor to promptly notify a licensee of any licence granted by it to a third party for the same IPRs under comparable circumstances giving rise to terms and conditions that are clearly more favourable, in their entirety, than those granted to the licensee and allowing the licensee to require replacement of the terms and conditions of its licence, in their entirety, either with those of the third party licence, or with such other terms and conditions as the parties may agree.  (Ex. 1583 at 46.)

60.     Non-adoption of that provision does not indicate that ETSI members *rejected* the obligation to offer and grant non-discriminatory licenses.  The most-favoured licensee provision was materially different from a non-discrimination obligation, in that the former contemplated the re-opening and re-negotiation of

existing licenses on account of subsequent developments, whereas the latter is exclusively focused the rights of prospective licensees.  Notwithstanding the decision to not implement the "most favoured licensee" provision, ETSI's IPR Policy has always contained a non-discrimination obligation as part of the FRAND promise.  Indeed, the 1994 Policy reconfirmed that each member owning Essential IPRs had to be prepared to give an "undertaking in writing that it is prepared to grant irrevocable licences … on fair, reasonable and non-discriminatory terms and conditions."  This basic FRAND promise of the 1994 Policy remains in place to date.

## VI.   CONTRIBUTION COUNTING

61.     Ericsson has advocated in favor of measuring the relative numerical and/or technical share of its standard-essential patents against that of other standard-essential patent owners using a method called "approved contribution counting," or "contribution counting" for short.  In this section, I explain what contribution counting is, how Ericsson created it (and hired others in an effort to promulgate it), and why it is wrong to use contribution counting to measure the size or relative technical merit of a standard-essential patent portfolio compared to others within the industry.

### A.     "Approved Contributions":  How ETSI and 3GPP Track Input to Technical Standards

62.     Firms or individuals participating in the standardization process can propose specific technologies and solutions, and submit a technical document describing the proposal.  Within 3GPP, such a proposal is generally known as a "contribution."  (Ex. 312 at 13.)  If the proposal is incorporated into a draft standard, 3GPP labels it an "approved" contribution.  (*Id.* at 13–14.)  Contribution counting essentially involves sorting, counting, and comparing how many approved contributions each participating company has made to the ETSI/3GPP standardization work.

## B.   Ericsson's Use of Contribution Counting

63.   I understand Ericsson has cited contribution-counting studies as a basis "for how [it] determined the rates and terms it offered TCL for [a license to] Ericsson's patents . . . ."  (Ex. 102 (Dec. 11, 2015 Responses to TCL's Interrogatory No. 11) at 5, 9, 10).)  In particular, Ericsson has indicated that it "ties its rates to the patented technical value it provides is [*sic*] by performing an aggregation analysis on the accepted technical contributions to the standard," and that "[b]y measuring its accepted technical contributions to the standards in question, Ericsson correlates its rates to the value of the patented technology it has contributed to the industry."  (*Id* at 9.)  As the European Commission-supported NORMAPME organization later explained, Ericsson's position was not without self-interest:  not taking the actual technical benefit of patents into account, but merely using a numerical proportional distribution of the total aggregated licensing proposal would specifically be beneficial to Ericsson and the other firms that proposed and lobbied for it (Nokia and Motorola).  (Ex. 1066.)

64.   From the information I reviewed in connection with my analysis in this case, I have developed an understanding of how Ericsson appears to use contribution counting in practice, particularly when negotiating licenses to its portfolio of 2G, 3G, and 4G patents.  For example, when asked how Ericsson represents its proportional share of standard-essential patents on 2G, 3G and 4G technologies in negotiations with prospective licensees, Ericsson company witness Gustav Brismark answered that "what we have been presenting are results based on Signals Research studies which presents what you could call an impact on the standard, who got their technologies accepted into the standard specification." (Dep. of Gustav Brismark, 12/18/15, pp. 94:22–95:1.)  Along these lines, a 2013 Ericsson sales presentation titled "LTE Patent Landscape and Ericsson Position" claims that "[t]he number of adopted contributions . . . gives an indication of who will own most essential patents when the technology is standardized," and that

"minutes from standardisation workgroups" and contributions are "[c]orrelated to essential patent strength." (Ex. 1084 at 4, 6.) Ericsson claims to have a "[s]trong ability of patenting our 3GPP solutions" such that "[w]e estimate [we] have 25% of all LTE essential patents." (*Id.* at 12.) Finally, Ericsson boasts in this presentation that "recent external studies show Ericsson's strong position in the LTE patent landscape," and that this result is "100% audited by Signals Research." (*Id.* at 7–8.) Ericsson presumably references "external studies" in licensing negotiations to suggest that contribution counting is not biased in its favor or unreliable.

65.    In my opinion the above way in which Ericsson is using contribution counting as a metric for its proportional share of standard-essential patents is not supported by reliable evidence or assumptions. In addition, after explaining how Ericsson itself created the contribution counting method it relies on, I then address the most relevant problems with Ericsson's reliance on contribution counting.

## C.    The Origins of Contribution Counting and the Theory of Using It to Attempt to Justify Royalty Rates

66.    The evidence I reviewed and analyzed in this case indicates that Ericsson developed contribution counting to "counter" third-party studies reporting that Ericsson owned a lower share of essential patents than Ericsson apparently believed was accurate, and wished to portray in its licensing negotiations. Prior to Ericsson developing the method of contribution counting, several other methods were traditionally used to attempt to understand different stakeholder's relative ownership of 3G and/or LTE standard-essential patents. They included counting the number of ETSI declarations (*e.g.*, as in a 2009 report by ABI Research) and substantively analyzing the technical merits of declared-essential patents (*e.g.*, as in 2009 and 2010 reports by Fairfield Resources International, 2011 and 2012 reports by Cyber Creative Institute, and 2012 reports by Article One Partners and iRunway). These studies are summarized in the table below:

| Year | Source | Exhibit | Ericsson's Reported Share of Patents |
|------|--------|---------|--------------------------------------|
| 2009 | ABI Research | Ex. 1039 at 53 | 3% (4G) |
| 2009 | Fairfield Resources Int'l | Ex. 1043 | 18.4% (3G) |
| 2010 | Fairfield Resources Int'l | Ex. 1042 | 13.3% (4G) |
| 2011 | Jefferies LLC | Ex. 1044 | 2% (4G) |
| 2011 2012 | Cyber Creative Institute | Ex. 1040; Ex. 1041; Ex. 1035 | Declined from 9% in 2011 to 5.8% in 2012 (4G) |
| 2012 | Article One Partners | Ex. 1175 | 8% (4G) |
| 2012 | iRunway | Ex. 1036 | 1.97% (4G) |

Table 1 (PDX 21).

67.     According to internal Ericsson emails, Ericsson's employees found Ericsson's reported share of 4G patents to be frustratingly low when ABI Research ("ABI") reported in 2009 that Ericsson owned 3% of declared-essential 4G SEPs. Reacting to that report, one Ericsson employee exclaimed, "I've been needing some details about Ericsson's expected share of the LTE patents and articles like this aren't helpful!" (Ex. 1080 at 2.) Regarding a related news article, other Ericsson employees remarked, "Ericsson is not listed at all, so we are pushed on the defense by Qualcomm. I don't like that."; "The Qualcomm promotion machine seems to continue to tell colored (untrue!) stories about Qualcomm's Nr 1 position in LTE/IPR ...."; "As [another employee] points out, this is not good. [¶] Is there any way we can counter this (with actual data)? Customers will definitely ask and right now Ericsson has an unjustifiable (or at least unquantified) answer!" (Ex. 1081 at

1  1–3.)

2      68.     Ericsson's "counter" to this dilemma for its licensing program was to

3  conduct an internal contribution-counting "study," and then have a third party—

4  Signals—replicate Ericsson's work and report the results as being independently

5  audited.  A December 4, 2009 Ericsson memorandum titled "Comments on the

6  [2009] ABI report 'LTE and WiMAX Intellectual Landscapes,'" written by Ericsson

7  employee Björn Gudmundson and for an audience that included Signals, illustrates

8  that Ericsson recognized counting approved contributions as a way of showing

9  Ericsson to be "in the lead" relative to some measureable criteria:  "We clearly have

10  the highest number of 'important' contributions to the LTE standard.  Many

11  companies are measuring [the] number of contributions to 3GPP.  A consequence of

12  that is that there is inflation in number of input contributions.  Still, Ericsson is in

13  the lead.  Looking at important (approved) contributions, we are even more in the

14  lead."  (Ex. 1580 at 7.)

15      69.     Shortly after Ericsson prepared this analysis, and presumably shortly

16  after it shared the analysis with Signals, Signals issued the first in a series of reports

17  regarding contribution counting.  The Signals reports, issued from 2010 to 2015,

18  each disclose being prepared "on behalf of Ericsson," or "for Ericsson."  (Ex. 1084

19  at 7–8; Ex. 1176 (2010); Ex. 1077 (Nov. 2014); Ex. 305 (Dec. 2014); Ex. 1045

20  (2015).)

21      70.     It is misleading to suggest that the Signals reports amounted to an

22  independent third-party audit.  Instead, Mr. Brismark explained that "[t]he Signals

23  report was commissioned by Ericsson"—*i.e.*, it was paid for by Ericsson—and that

24  "[t]he first version was something which really was done after Ericsson itself had

25  conducted a[n] approved contribution study."  (Dep. of Gustav Brismark, 12/18/15,

26  pp. 96:14–24.)  He further explained, "[i]t was more in order to have a third party be

27  able to follow that basic principle and so it would be an objective study in that

28  sense. [¶]  The actual methodology was first developed by Ericsson."  (*Id.*)

Presumably, this is why the cover page of each Signals report says it was "developed for Ericsson." According to Mr. Brismark, Signals was to follow the preferred "approved contribution" methodology that Ericsson developed. This approach did not require Signals to "vet the accuracy of Ericsson's hypothesis that counting approved technical contributions is a reliable way of assessing the number of standard-essential patents owned by companies." (*Id.* at 98:12–99:11.)

71.     Additional evidence shows that Ericsson exercised complete discretion over the Signals reports, and retained complete veto power over what, if anything, Signals published. According to an agreement governing Ericsson's working relationship with Signals, Signals would provide a preliminary draft/outline for Ericsson to review, and Signals would "refrain[] from publishing specific results" without Ericsson's approval. (Ex. 1083 at 4.) In my understanding of the term, an "independent audit" does not allow for the supposedly audited party to veto the auditor's findings like this, and, more importantly, this procedure does not appear designed to, and did not, lead to a reliable contribution-counting method or study.

72.     Based on the above evidence, it is my opinion that contribution counting originated with Ericsson as a way to counter patent-based studies which reported that Ericsson owned a lower proportionate share of standard-essential patents than Ericsson preferred. To my knowledge, the notion that there is a reliable correlation between approved contributions and ownership of standard-essential patents has never been independently or academically vetted, replicated, or audited. The idea of using contribution counting to attempt to approximate proportionate share of essential-patent ownership should be viewed with great care and skepticism.

**D.     The Contribution-Counting Reports Ericsson Relies on Do Not Claim That, or Show How, Approved Contributions Correlate to Essential Patents.**

73.     Ericsson's contribution-counting methodology rests on the fundamental

assumption that the number of approved 3GPP contributions a company makes correlates to the number of standard-essential patents it owns, or the technical strength of the corresponding SEP portfolio.  If contribution counting were a valid proxy for actually determining essential-patent strength and ownership, I would expect to see evidence supporting that conclusion cited or summarized in the Signals reports.

74.     Unlike Ericsson, however, Signals openly disclaims any attempt to establish that essential-patent ownership correlates with approved contributions in any way.  For example, in its September 2010 report, Signals emphasizes that it "made no attempt to determine the number of essential patents that Ericsson owns." (Ex. 1176 at 3.)  Nor did Signals audit the technical features of the contributions it counted for patentability or patenting status.  In its December 2014 report, Signals emphasizes that "identifying essential patents that apply to 3G, LTE or both standards, falls well outside the scope of this study."  (Ex. 305 at 4.)  And in its 2015 report, Signals emphasizes that it is "not suggesting that there is a one for one dependency between the number of patents/essential patents that a company owns and the number of approved technical submissions."  (Ex. 1045 at 3.)

75.     The Signals reports also lack several key pieces of data I would expect to see in any acceptable showing that approved 3GPP contributions correlate to standard-essential patents.  First, any objective report relevant to a correlation between approved contributions and proportionate share of SEP ownership would have to account for whether the claimed correlation is between approved contributions and (1) the number of patents, or (2) the number of *essential* patents. These are two quite different things for which any valid correlation must account. Secondly, Signals does not account for patent *strength*, or the technical merits that any patented contributions add to the standard as a whole.  Patents vary considerably in technical merit and thus also value (as discussed further below).  Thirdly, Signals does not show the *fit*, or degree of possible error between the data points

(contributions) and the predicted value (proportionate ownership stake).

**E.    Ericsson's Key Assumption that Approved Contributions Correlate to Actual Patents Is Unreliable for Many Reasons.**

1.    Contributions are not patents and need not be patentable.

76.    There is no basis to assume that all approved contributions mature into standard-essential patents.  Yet the studies Ericsson relies on do not consider whether patent applications were actually filed or, if so, whether any patents were actually granted.  Even if we were to assume for the sake of argument that companies actually file for patent applications for those contributions that are finally adopted into the standard, there is no basis to assume that such patent applications led to patents being granted by the various patent offices around the world, or that the claims map to the standards in a manner the contributing company may have hoped they would.

77.    In particular, an approved contribution need not meet the criteria for patentability.  For example, it need not cover *new* technology.  Instead, it might cover *old* technology, or technology that is recycled and/or part of the publicly available prior art, or an idea that follows expectedly and logically from what is known already to those of ordinary skill in the relevant art.  Patent offices decide these issues, not ETSI or 3GPP meeting participants.

78.    Importantly, neither ETSI nor 3GPP seeks to determine whether any given technical contribution corresponds to a patent, and a company can propose a technical contribution to ETSI or 3GPP without owning or applying for a patent that covers that contribution.  (Dep. of Gustav Brismark, 12/18/15, pp. 75:6–11; 105:8–16; 106:8–11.)  Signals reported that this results in "many instances in which a submission is clearly not patentable," and that using contribution counting as a supposed proxy for measuring patent ownership suffers from the flaw that it "included all approved submissions, including those submissions that may not contain any patentable ideas."  (Ex. 1176 at 28.)

79.     These observations suggest that the total number of approved contributions would be meaningfully greater than the number of disclosed essential patents, and only a subset of approved contributions is ever included in a patent application.  The available data bear this out.  The May 2015 Signals report is based on 43,917 "approved contributions" from around 1999 to December 2014, but the full ETSI IPR database of disclosed essential patents listed "only" 14,380 patent families relating to 3G and 4G technologies, when I checked approximately one year later.  (Ex. 1045 at 8).)  Based on these figures, one can infer that at least two-thirds of all approved contributions are either not distinct enough from the others to be independently patentable, or are not patented at all.[9]

### 2.    Approved contributions are often trivial.

80.     Another flaw with the Signals studies is that they include trivial contributions, such as "change requests," in their approved-contribution counts.  (*Id.* at 7.)  Change requests are simply "temporary documents" submitted in connection with 3GPP meetings in which changes are proposed to the specification.  (Ex. 1029 at 11.)  Ericsson is by far the most frequent submitter of change requests within 3GPP.  This makes the problem with including change requests as contributions particularly acute in this litigation.  Specifically, ABI has reported that from 2009 through 2012, Ericsson had more change requests (7,954) than "approved contributions" (6,891), and more change requests than any other company:

---

[9] The full picture is most likely even less impressive.  The universe of ETSI-declared patents has a considerably broader scope than the contributions Signals counted, because (1) Signals ignores contributions in some relevant 3GPP working groups; (2) the ETSI IPR database covers a much longer time period than the period over which contributions were made; and (3) single contributions can be claimed in different ways across several patents (*e.g.*, one contribution may include several different technologies, and vice versa).

| 3GPP Change Requests, 2009 to 2012 (Top 10) | | |
|---|---|---|
| Company | Number | Rank |
| Ericsson | 7,954 | 1 |
| Huawei | 6,590 | 2 |
| ALU | 4,368 | 3 |
| ZTE | 4,060 | 4 |
| NSN | 3,997 | 5 |
| Qualcomm | 2,602 | 6 |
| CATT | 1,784 | 7 |
| Samsung | 1,516 | 8 |
| Nokia | 1,178 | 9 |
| NEC | 1,169 | 10 |

Table 2 (PDX 22). Data reproduced from *id.*

81.     TCL expert Dr. Apostolos "Paul" Kakaes has shown that Ericsson takes advantage of opportunities to submit trivial or minor change requests.  He has identified several examples of Ericsson counting trivial (*e.g.*, explanatory or typographical changes to descriptions of existing technology, such as the removal of a profanity), irrelevant (*e.g.*, relating to regulatory, 3GPP procedural, testing, or base-station parameters), and non-technical contributions as "approved contributions."  (Decl. of Dr. Apostolos K. "Paul" Kakaes) at ¶¶ 411–431.)  As he explained, "as these types of contributions are non-inventive or irrelevant to user equipment, [they] fail to provide any evidence as to the strength or essentiality of Ericsson's alleged SEPs."  (*Id.* ¶ 411.)  This issue is not limited to Ericsson by any means.  In an internal memorandum produced in this case, Ericsson employees complained that Ericsson rival "Huawei had a very high number of purely editorial fixes disguised as corrections" and submitted as contributions.  (Ex. 1076 at 1.)

However, because Ericsson and Signals have provided no data on whether trivial contributions are proportionately distributed among all contributors, it is impossible to accurately discern whether their impact favors Ericsson or can be considered to affect all contributors equally.

### 3. Contribution-counting studies do not discount for expired or lapsed patents.

82.     Ericsson has told ETSI that an appropriate FRAND analysis should consider "the remaining term of the patent" (Ex. 1078 at 4–5), but the contribution-counting studies Ericsson relies on do not consider whether or when the hypothetical associated patent rights have expired, or whether patents have lapsed (*i.e.*, the owner failed to pay the renewal or maintenance fee and thus lost exclusive rights).  In fact, none of the contribution-counting studies in this case includes any information on when any patent applications were filed, published, granted, invalidated (if so), and expired (or are set to expire).  It is thus impossible to understand which approved contributions are even relevant to a current license agreement.

### 4. Contribution-counting studies do not consider whether once-owned patents were transferred to others.

83.     Patent and patent-portfolio transfers are common in the industry, but the contribution-counting studies Ericsson relies on lack information regarding whether the contributions pertain to patents which were later sold or otherwise divested to other parties.  Ericsson is known to have divested parts of its 2G, 3G, and 4G patent portfolios to RIM, Blackberry, Sony, Unwired Planet, and PanOptis. (Dep. of Christina Petersson, 1/13/16, pp. 242:23–243:13, 295:20–296:20.)  In 2008, for instance, Ericsson sold 66 patents to the Canadian handset maker Research in Motion (now Blackberry), for a reported sum of $172 million.  (Ex. 1063 (Stasik, 2010) at 5).)  In early 2013, Ericsson sold "over 2400 patent assets," including "753 United States issued patents related to 2G, 3G and LTE technologies," to Unwired Planet.  (Ex. 1064 (Unwired Planet (Jan. 10, 2013)); Dep. of Christina Petersson,

1  1/13/16, pp. 320:1–9.)  So, even assuming Ericsson patented all of its contributions,

2  the contribution-counting studies Ericsson relies on most likely credit Ericsson for

3  contributions as to which Ericsson no longer owns any associated patent.

4          5.      Contributions may cover technologies patented by others.

5        84.      If an approved contribution indeed contains new technology that is or

6  will be patented, that technology does not necessarily belong to the company

7  submitting the contribution.  It may simply refer to any technology that the proposer

8  finds appropriate, even if it was developed and/or patented by others.  There is no

9  rule or principle that contributions must be based on your *own* technology; on the

10  contrary, the idea is that participants contribute suggestions to achieve the standard's

11  design goals, regardless of who created the technology in the first place.  The

12  converse is also true: a company might attempt to patent 3GPP contributions by

13  others.  ABI has noted, for instance, that "[s]ome companies make contributions in

14  stealth through other companies."  (Ex. 1028 at 4.)  In the context of Ericsson's

15  contribution counting, such contributions benefit the assisting contributor by making

16  its proportionate share of essential patents appear higher than it actually is, and are

17  not properly assigned to the entity or person that actually came up with the

18  underlying technology.  For example, the so-called Alpha (WCDMA, CoDIT,

19  Frames FMA-2) proposal to ETSI around 1998, which became the foundation of 3G

20  as we know it today, leaned heavily on WCDMA technologies patented by

21  Qualcomm (including the open- and closed-loop power control methods which

22  became indispensable for using CDMA in a public mobile communications

23  network).  But Qualcomm did not propose it to ETSI—Ericsson and others did.

24  (Ex. 335 (Bekkers Martinelli (2012)) at Fig. 1, 6–8; Ex. 1055 (ETSI (1998)) at 1–2,

25  7, 9.)  This meant that Qualcomm owned patents on the proposed CDMA

26  technology, but was not involved in the European standardisation activities at the

27  time of the Apha proposal.  (*Id.* at 2, 7; Ex. 334 (Bekkers West (2009))) at 8–9;

28  Ex. 335 (Bekkers Martinelli (2012)) at 8.)  Many later proposals in 3GPP RAN (*i.e.,*

"Radio Access Network") working groups continued to build on this Qualcomm technology, yet would bear the names of other companies.  (Ex. 334 (Bekkers West (2009)) at 8–9.)

6.    Multiple contributions may relate to the same underlying technology.

85.    Another problem with the contribution studies Ericsson relies on is that they do not consider the overlapping relationship between the technologies of various contributions.  Distinct contributions relating to what may amount to the same patented invention will be counted separately, especially if those contributions follow on from technologies previously adopted for the standard.  As Signals observes, "many basic concepts introduced into earlier generations of [telecommunications] technologies are frequently inherited into the next generation of technologies."  (Ex. 1045 at 6.)  Yet contribution studies count overlapping contributions multiple times and assign each to the respective submitter(s), irrespective of the fact there may be a substantially smaller number of related patents.

86.    Ericsson internal reporting indicates that at least one 3GPP leader "has noticed some companies just sending in trivial contributions and splitting text proposals into different contributions, when they can all be added in one contribution."  (Ex. 1046 at 11.)  This critique applies equally to Ericsson.  Ericsson's business records produced in this case indicate that Ericsson also has a company policy or culture of exploiting this option.  Ericsson's 2015 "Statement of Direction" or "SoD" documents on IPR Strategy show Ericsson aiming to "[g]enerate licensing income from Ericsson's patent portfolio" through means such as "reus[ing] solutions with Ericsson patents" (Ex. 1034 at 6) and "reus[ing] solutions of existing Ericsson patents in ongoing standardization" (*i.e.*, recycling old ideas).  (Ex. 1074 at 17.)  A 2013 SoD on IPR Strategy states Ericsson's objectives to "reuse and propose solutions covered by existing IPR in standard contributions."

(Ex. 1050 at 7.)  This strategy, if successful, would likely result in multiple approved standard contributions based on each "reused" or recycled patented technology, and thus exploits the opportunity for double (or triple, etc.) counting.

### 7.    Value distribution is not necessarily equal between multiple submitters.

87.    Many approved contributions come from multiple parties, not just one, with no way of discerning which company made what portion of the contribution. This occurs when companies wanting to submit an idea seek support from others, to increase the chance of a given proposal being accepted.  Such supporters often tag along as co-submitters even if, as Signals explains in its publications, they have not contributed to the idea, or to the technical analysis and simulation studies forming the basis of the contribution.  Yet the studies Ericsson relies on arbitrarily assign roughly equal credit to each contributor.  (Ex. 1176 (Signals 2010)) at 21–22; Ex. 1028 (ABI 2012)) at 6; Ex. 1029 (ABI 2013)) at 6; Ex. 1077 (Signals 2014)) at 7; Ex. 305 (Signals 2014)) at 10; Ex. 1045 (Signals 2015)) at 7.)  The data used in these studies does not indicate which parties own related patents (if any).  Simply assuming that every contribution provides an equal value to the joint proposal, and then either counting each submitter as a "full" contribution or splitting the value roughly equally ("fractional counting"), is not a satisfactory solution supported by reliable information.

### 8.    The value distribution of inventions, contributions, and patents is highly skewed.

88.    Even if we assume that contributions had a one-to-one correlation to patent applications, and that these applications always issued as patents, contribution studies also lack information on the relative value of each contribution.  As with patents, it would be foolish to assume all contributions are equally valuable without data to back that assumption.  And the distribution of value among patents is highly

skewed.[10]  Assuming for the sake of argument that the average standard-essential patent (or average approved contribution) is more valuable than the "garden variety" patents analyzed by the academic papers cited in the footnote above, there is still reason to believe that the value of these technologies is highly skewed.  This is confirmed by the strong variance in the number of forward citations that essential patents receive later on.  In a 2012 study, for example, a group of highly technically relevant essential patents were shown to have very high citations scores, with up to 632 forward citations in the Derwent Innovation Index (DII) database—a number of citations that is many orders of magnitude higher than average patents in the same technology field.  (Ex. 335 (Bekkers Martinelli (2012)) at 17.)

89.     But the contribution studies Ericsson relies on do not consider value differentiation, and instead assume that all contributions are equal.  Signals expressly acknowledges that it does not account for this issue by stating that "no attempt was made to determine the technical merits of each submission."  (Ex. 1176 at 23.)  Nothing supports the choice to treat all contributions equally, regardless of merit.

### 9.   Contribution-counting studies cover only some parts of the full 3GPP standards.

90.     As mentioned above, the contribution studies Ericsson relies on are limited to specific working groups in 3GPP standards.  (Ex. 1176 (Signals 2010)) at 22; Ex. 1028 (ABI 2012)) at 5; Ex. 1029 (ABI 2013)) at 3; Ex. 1077 (Signals 2014)) at 6; Ex. 305 (Signals 2014)) at 9; Ex. 1045 (Signals 2015)) at 6.)  Although relevant, these groups do not represent the full scope of the standards, and are thus biased towards companies focusing on these parts of the standards rather than companies contributing to other parts of the standards.  Neither Signals nor ABI

---

[10] Notable empirical papers discussing this skewed value distribution are by Gambardella et al. (2008) (Ex. 1058), Schankerman (1998) (Ex. 1089), and Schankerman & Pakes (1986) (Ex. 1061).

-41-     Case No. SACV14−00341 JVS (DFMx)/CV15-02370

1  considered the effect of this bias or adjusted results accordingly.

2          10.    Contribution-counting studies count optional parts of the

3                 standard, which are non-essential by definition.

4      91.    The contribution studies Ericsson relies on do not consider whether the

5  contribution in question relates to mandatory or optional features of the standard.

6  The problem with this approach, as Ericsson has pointed out to ETSI, is that an

7  apportionment of contributions to the standard for the purpose of negotiating

8  FRAND rates must consider "whether particular patents cover a mandatory or

9  optional feature of a standard," among other things.  (Ex. 1078 (ETSI

10  GA/IPRR06(06)12)) at 4–5.)  By including contributions to optional parts of the

11  standard, contribution-counting studies encompass non-essential technologies.

12      **F.**    **Contribution Counting Invites Opportunistic Behaviors.**

13      92.    As many of the above examples have already illustrated, contribution

14  studies are prone to opportunistic behavior.  I will show below how Ericsson is

15  uniquely positioned to take advantage of this fact by devoting resources to inflating

16  its contribution counts and influencing—even directing—the third parties who

17  publish contribution-counting studies.

18          1.    Devoting resources to increase contribution statistics without

19                regard to whether contributions are patentable.

20      93.    Contribution studies are prone to overestimating the role of companies

21  that can devote great resources to influencing standards.  Because contributions need

22  not be patentable or technical, as shown above, pouring effort and resources into the

23  standardization process is one way to create the impression that a company owns a

24  greater share of standard-essential patents than it actually does.

25      94.    A 2011 Special Report commissioned by the ETSI Board reported that

26  the cost of participation in standard-setting meetings (including travel and

27  manpower) is a barrier to participation and that "large players taking a dominant

28  position" worries smaller entities due to the opportunity for "chairmen of technical

committees, often coming from larger players, [to] hav[e] a strong influence on the committee and on decisions" and for "big players" to exploit their "difference in manpower" during standard-setting activities.  (Ex. 1056 (ETSI (2011)) at 8, 21–22.)

95.     A 2013 ABI Research report shows a strong relationship between Ericsson devoting resources to 3GPP leadership and its contribution-counting performance.  ABI suggested that leadership roles within ETSI and 3GPP and the number of approved contributions are linked, because chairmen and/or rapporteurs set the agenda, chair the discussions, and exert "technical influence" at 3GPP meetings.  (Ex. 1029 at 2–3.)  This is reflected in the data.  ABI reported that six companies, including Ericsson, are in the "top 10" for approved contributions and for chairmanships and rapporteurships.  (*Id.* at 1.)  Ericsson ranked first for chairmanships (8), rapporteurships (106), and approved contributions (13,849).  (*Id.* at 7–9.)  Companies that devote more resources to standardization activities indeed appear to get more approved contributions.

96.     Evidence shows that Ericsson devotes resources on the "mechanics" of standardization for this very reason.  An Ericsson internal initiative, which it calls the "Total Standardization Project," works toward "standardization targets," including the goals of "maintain[ing] leadership in 3GPP standardization" and "maintain[ing] the number of leadership positions [Ericsson holds] in 3GPP." (Ex. 1048 at 2.)  A 2010 Ericsson strategy presentation related to 3GPP standards shows that Ericsson dedicates resources to maximizing contribution counts in order "to keep control of the 3GPP 'agenda' and be perceived as the leader in 3GPP." (Ex. 1049 at 16.)  In that presentation, Ericsson expressed concern that "competitors will spend significant efforts and resources to ensure that we do not become as strong as we have been previously" within 3GPP.  (*Id.* at 6.)  Three full slides cover the number of Ericsson 3GPP contributions relative to others.  (*Id.* at 7–9.)  This presentation also emphasizes Ericsson's strategy to "[r]egain the lead in 3GPP"; to

"review and adjust the amount of resources and their focus areas," including budgeting and human resources; to "ensure that key people in standardization are recognized internally"; to "increase rapporteur and leadership positions" and "chairmanship and leader positions"; and to promote Ericsson's leadership in "approved/accepted contributions." (*Id.* at 2, 16, 17.)  A 2015 Ericsson strategy presentation further emphasizes the incentive to "influence, control, and take leadership in standardization efforts" and to obtain "strategic editorship and leadership positions," showing that Ericsson has been pursuing this strategy of devoting resources to the mechanics of standardization for quite some time. (Ex. 1033 at 4.)

> 2.   Making contributions designed to inflate contribution statistics.

97.   Many opportunities exist to obtain approved contributions without contributing patentable or patented technology to a 3GPP technical standard.  Some of these opportunities are rooted in the problems with assuming that approved contributions correlate to actual patents, discussed above.  Those problems need not be repeated in detail here, except it is useful to note that they allow room for firms to make contributions designed to inflate contribution-counting statistics.  In other words, companies can opportunistically inflate contribution statistics by submitting contributions that are:

- not patented or patentable;
- trivial;
- based on expired or lapsed patents;
- patented by others;
- duplicative; and/or
- optional, and not required, for practicing the standard.

98.   For instance, in 2014, a former patent-licensing professional at Ericsson, Alex Fassel, described how the fact that contribution-based studies count trivial contributions can lead to misleading statistics:  "[W]ith this method [*i.e.*,

contribution counting] becoming more widely used, its accuracy may suffer in the longer term since some standards-participants can be tempted to make numerous proposals on relatively trivial technical solutions solely to increase their 'accepted contribution rate." (Ex. 1057 (Fasell (2014)) at 2.)

99.     ETSI rules also allow companies to try to push their contributions through by voting for themselves multiple times through corporate affiliates.  A 2014 Ericsson memorandum explains how Ericsson used its umbrella of corporate affiliates to "enhance our influence at ETSI" by having multiple "ETSI memberships to choose from when register[ing for] a 3GPP meeting…." (Ex. 1031 at 6.)  The memorandum explains that Ericsson has the power to register at least eight times for each ETSI meeting.  (*Id.*)  Having up to eight individual registrations that can vote at a single ETSI meeting enhances Ericsson's power to influence voting and other decisions that drive the direction of ETSI and 3GPP.

100.     Indeed, a 2009 Ericsson memorandum reveals Ericsson's strategy of having its affiliate Ericsson LM and ST-Ericsson companies "co-sign [] contributions" to help invoke "the full weight of Ericsson's drive and support as a major player in 3GPP." (Ex. 1047 at 1, 2.)  A 2010 Ericsson memorandum similarly explains that because Ericsson Korea and LG-Ericsson are members of the Telecommunications Technology Association, Ericsson "will gain valuable voting rights in 3GPP." (Ex. 1585 at 5.)  A 2013 Ericsson memorandum provides another example of Ericsson planning to engage in this behavior:  "if it turns out that we have an important voting to take place and an additional vote is highly needed then we could consider to use the ST-Ericsson vote." (Ex. 1030 at 7.)  And a 2014 Ericsson memorandum provides another example:  "Ericsson-LG (TTA) has agreed to contribute to Ericsson's voting rights by raising the visibility of Ericsson-LG in TSGs and WGs in 3GPP." (Ex. 1032 at 7.)

101.     Another type of opportunistic behavior is companies trying to get credit for contributions they did not make.  Ericsson has referred to this as "hijacking."  In

1 | particular, in an internal Ericsson report entitled "Executive Summary of
2 | RAN3#67," Ericsson 3GPP/ETSI delegates boast in their summary of the RAN3#67
3 | meeting that: "We managed to highjack [*sic*: hijack] several contributions from
4 | other companies, where we were assigned to do the revisions, so we could have
5 | Ericsson name [*sic*] on the contribution and also made sure editorial modifications
6 | are not so much worth bringing forward just for the sake of statistics . . . ." (Ex.
7 | 1076 at 1.)  This type of behavior from Ericsson is of course regrettable, but it is
8 | also bound to happen when companies create strong incentives to inflate
9 | contribution statistics to drive the setting of royalty rates.

10 |        I declare under penalty of perjury under the laws of the United States of
11 | America that the foregoing is true and correct, and that I executed this declaration
12 | on January 11, 2017, at Vught, The Netherlands.

13
14 |                                         _____
15 |                                         Dr. Ir. Ing. Rudi Bekkers
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF EXHIBITS CITED IN WITNESS DECLARATION**

| Exhibit No. | Description |
|---|---|
| 102 | Ericsson's Supplemental Interrogatory Responses to Plaintiff's Interrogatories No. 11, 14, 16 & 24 dated 12/11/15 |
| 305 | "The Essentials of Intellectual Property, from 3G through LTE Release 12," by Signals Research Group, Dec. 2014 |
| 307 | "Patents and Standards," European Commission Report, dated 3/25/14 |
| 312 | Gupta, K. "Unpacking 3GPP Standards," Qualcomm Economics and Strategy, 3/24/15 (previously assigned Depo. Ex. 302) |
| 333 | Ericsson Press release titled "Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemen, and Japanese Manufacturers Reach a Mutual Understanding to Support Modest Royalty Rates for the W-CDMA Technology Worldwide," dated 11/6/02 |
| 334 | Telecommunications Policy 33 (2009) 80-97 publication titled "The Limits to IPR Standardization Policies as Evidenced by Strategic Patenting in UMTS," by R. Bekkers, 2008 |
| 335 | Technological Forecasting & Social Change 79 (2012) 1192-1216 publication titled "Knowledge Positions in High-Tech Markets: Trajectories, Standards, Strategies and True Innovators," by R. Bekkers, 2/15/12 |
| 1027 | ETSI Document titled, "Explanatory Note on ETSI's Intellectual Property Rights Policy and Undertaking, TO3/09/92/KHR/nk," submitted by the TA chairman, 04/02/1992 |
| 1028 | Research report titled "LTE Innovation by Company," by ABI Research, dated 2/13/12 |
| 1029 | Report titled "Standards Leadership within the 3GPP," by ABI Research, dated 6/19/13 |
| 1030 | Minutes of TSSG #13, dated 8/27/13 |
| 1031 | Minutes of TSSG #31, dated 9/9/14 |
| 1032 | Minutes of TSSG #33, dated 10/7/14 |
| 1033 | Ericsson presentation titled "SOD for Standardization: Ethernet Virtual and Deterministic Networking SOD," dated 6/17/15 |
| 1034 | Ericsson presentation titled "Future Digital Terrestrial Television: SoD for Standardization," by M. Aracena, dated 3/6/15 |
| 1035 | "Evaluation of LTE Essential Patents Declared to ETSI," by Cyber Creative Institute, June 2013 |

| Exhibit No. | Description |
|---|---|
| 1036 | "Patent & Landscape Analysis of 4G-LTE Technology," by iRunwav |
| 1037 | Proposal presentation by Ericsson, Motorola, and Nokia titled "ETSI IPR Policv Reform: Minimum Change Optimum Impact" |
| 1038 | "Status of Discussions: Overview of the Possible Scenarios, Associated Historical Information and Wording Proposals where Appropriate," ETSI IPR#12, Oct. 15-17, 2012, ETSI/IPR(12)12_002r2 |
| 1039 | Microwave Journal, Radar and Antennas, Volume 53, No. 1, Jan. 2010 |
| 1040 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI. Ver. 1.0" dated Dec. 2011 |
| 1041 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI. Ver. 2.0" dated Oct. 2012 |
| 1042 | Fairfield Resources publication titled "Review of Patents Declared as Essential to LTE and SAE (4G Wireless Standards) through June 30. 2009." dated 1/6/10 |
| 1043 | Fairfield Resources publication titled "Review of Patents Declared as Essential to WCDMA through Oct. 2008." dated 11/18/09 |
| 1044 | Jefferies publication titled "Research in Motion (RIM) Limited Patent Value; Cut Target to Salvage Value of $21 as We Wait for ONX." dated 9/21/11 |
| 1045 | Signals Research Group publication titled "The Essentials of Intellectual Property, from 3G through LTE Release 12," dated May 2015 |
| 1046 | Internal Report RAN4#70. Feb. 10-14 |
| 1047 | Ericsson internal document titled "Standardization Forum Specific Routines for the User Equipment Standardization Projects - 3GPP," 6/22/09 |
| 1048 | Ericsson presentation titled "Standardization Targets 2010: Total Standardization Proiect" 12/3/09 |
| 1049 | Ericsson draft presentation titled "Draft BNET Standardization Strategv. 6/17/10 |
| 1050 | Ericsson presentation titled "Mobile Backhaul SOD for Standardization." 2013 Revision PA4 |
| 1051 | IEEE publication titled "Standardization and Intellectual Property Rights: ETSI's Controversial Search for New IPR-Procedures," by E. Iverson. 1999 |

| Exhibit No. | Description |
| --- | --- |
| 1052 | Draft Minutes of the 15th General Assembly of ETSI, ETSI/GA15 (93) 34 |
| 1053 | ABA publication titled "Handbook on Antitrust Aspects of Standard Setting, 2nd Ed.," 2011 |
| 1054 | Research Policy 31 (2002) 1141-1162 publication titled "Intellectual Property Rights, Strategic Technology Agreements and Market Structure: The Case of GSM," by R. Bekkers, 11/6/02 |
| 1055 | "Consensus Decision on the UTRA Concept to be Refined by ETSI SMG2," ETSI SMG, Mtg. No. 24bis, Jan. 28-29, 1998, ETSI/SMG (98) 1 Annex 6 (Tdoc SMG 39/98) |
| 1056 | ETSI SR 001 544 V1.1.1 (2011-03) Technical Specification |
| 1057 | Patent Perspectives Nov. 2014 publication titled "Cellular FRAND Royalty Levels," by A. Fasell |
| 1058 | European Management Review (2008) 5, 69-84 publication titled "The Value of European Patents," by A. Gambardella, 2008 |
| 1059 | "Standardization and Intellectual Property Rights: Conflicts Between Innovation and Diffusion in New Telecommunications Systems," by E. Iverson, 2000 |
| 1060 | CPI Antitrust Chronicle March 2013 (Special Issue) publication titled "Standard Setting Organizations Can Help Solve the Standard Essential Patents Licensing Problem," by K. Kuhn, 2013 |
| 1061 | The Economic Journal, 96 (December 1986), 1052-1076 publication titled "Estimates of the Value of Patent Rights in European Countries During the Post-1950 Period," by M. Schankerman |
| 1062 | The Antitrust Bulletin, Vol. 57 No. 1/Spring 2012 publication titled "Private and Public Approaches to Patent Hold-Up in Industry Standard Setting," by T. Simcoe |
| 1063 | Royalty Rates for Telecommunications publication titled "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunications Standards," E. Stasik, Sep. 2010 |
| 1064 | Unwired Planet press release titled "Unwired Planet Strengthens Mobile Intellectual Property Portfolio with the Contribution of Complementary IP from the Industry Leader in Mobile Communications," dated 1/10/13 |
| 1065 | Report to GSM on Ad-Hoc Meeting  on Intellectual Property, Dec. 16-17, 1986 |
| 1066 | "Transparency and Predictability of IPR Treatments in ICT Standardisation - Proportionality and Mandatory Ex-Ante Disclosure of Licensing Terms," ETSI IPR#11, June 11-13, 2012. |

| Exhibit No. | Description |
|---|---|
|  | ETSI/IPR(12)11 003 |
| 1067 | Meeting Report, ETSI IPR#23, Oct. 27-29, 2015, ETSI/IPR(15)23 016r2 |
| 1068 | "Status of Recommendations Under Each "Issue" and Preparation for Reporting to GA#42," ETSI GA ahg on IPR#6, Oct. 29, 2013, ETSI GA/IPR06(03)02 |
| 1069 | "Intellectual Property Issues in GSM," CEPT/CCH/GSM, Oct. 12-16. 1987. GSM/PN PP. 24 |
| 1070 | ETSI Collective Letter No. 559, dated 9/9/92 containing Draft Minutes of the 13th General Assembly. 7/9/92 (ETSI/GA (92) 7) |
| 1071 | ETSI Minutes of the 12th General Assembly, Apr. 2-3, 1992 (ETSI/GA 12 (92) 20 Rev. 1) |
| 1072 | ETSI Minutes of the 20th General Assembly, 7/22/94 (ETSI/GA 20 (94) 3) |
| 1073 | "Explanatory Note on the Results of the Discussions with the EC Commission Over the ETSI IPR Policy and Undertaking," ETSI IPR Information Session. 7/9/92 (ETSI/IPR/GA (92) 4) |
| 1074 | Ericsson presentation titled "Media SoD for Standardization," dated 4/22/15 |
| 1076 | Executive Summary of RAN3#67, dated May 10-14, 2010 (attachment to 5/26/10 internal Ericsson email) |
| 1077 | Signals Research Group report titled "The Essentials of Intellectual Property, Part Two: Quantifying Technology Leadership in the Development of the LTE Standard through June 2014," dated Nov. 2014 |
| 1078 | "Response to Qualcomm's Contributions Opposing the Minimum Change Optimum Impact (MCOI) Approach," ETSI GA ah on IPR Review #6. Sep. 7-8. 2006. ETSI GA/IPRR06(06)12 |
| 1079 | ETSI Directives. Version 35. Dec. 2015 |
| 1080 | Email from A. Jamal to J. Lantto dated 10/8/09, subject: "LTE essential IPR," explaining why ETSI declarations are not a good measure of actual essential patent holdership |
| 1081 | Email from J. Lantto to G. Brismark, et al. dated 11/16/09, subject: "Qualcomm Takes Lead as 4G Patent Holder," showing Ericsson's frustration with studies showing Ericsson having a low share of 4G patents |
| 1082 | Minutes of the ETSI 21st General Assembly, including the Specially Convened Meeting. 22-23 November 1994. Nice. France. Document |

WITNESS DECLARATION OF DR. IR. ING. RUDI BEKKERS

| Exhibit No. | Description |
|---|---|
| | titled. "ETSI/GA21(94)39 Re v.2" |
| 1083 | Signed proposal letter from Signals Research to Ericsson re 3GPP analysis dated 7/6/10 |
| 1084 | Ericsson presentation titled "LTE Patent Landscape and Ericsson Position." dated Feb. 2013 |
| 1089 | "How Valuable is Patent Protection?  Estimates by Technology Field," by M. Schankerman, The RAND Journal of Economics, Vol. 29. No. 1 (Spring 1998) |
| 1153 | Publication titled "Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition," issued by U.S. Department Of Justice and the Federal Trade Commission, April 2007 |
| 1175 | Article One Partners publication titled "LTE Standard Essential Patents Now and in the Future." by M. Phelps |
| 1176 | Signals Research Group report titled "The Essentials of Intellectual Property: Quantifying Technology Leadership in the Development of the LTE Standard." dated Sep. 2010 |
| 1580 | Ericsson internal document titled "Comments on the ABI Report "LTE and WiMAX Intellectual Landscapes"" dated 12/4/09 |
| 1581 | Excerpts from publication titled "Mobile Telecommunications Standards: GSM, UMTS, TETRA and ERMES," by R. Bekkers, 2001 |
| 1582 | ETSI Directives. Version 007. Nov. 1994 |
| 1583 | ETSI Directives. Version 005. Mar. 1993 |
| 1584 | "Patent Panel Report." CEPT/CCH/GSM. 4/29/88. GSM Doc. /88 |
| 1585 | Document titled "Ericsson Standardization and Technical Regulation Counsel (SRC). Meeting No. 88." dated 11/10/10 |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 11, 2017, I caused to be served the PLAINTIFF'S DIRECT EXAMINATION BY DECLARATION FOR WITNESS DR. IR. ING. RUDI BEKKERS to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 11, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER

-i-

Case No. SACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. IR. ING. RUDI BEKKERS