1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
9  Limited, and TCT Mobile (US) Inc.

10              UNITED STATES DISTRICT COURT

11    FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12

13 | TCL COMMUNICATION | Case No. SACV14−00341 JVS
   | TECHNOLOGY HOLDINGS, LTD., *et* | (DFMx)
14 | *al.*, | Consolidated with CV15-02370

15 |                    Plaintiffs,
                                          | **REBUTTAL DECLARATION OF**
16 |          v.                          | **DR. IR. ING. RUDI BEKKERS**

17 | TELEFONAKTIEBOLAGET LM
   | ERICSSON, *et al.*,

18 |                    Defendants.        | Place: Courtroom 10C
                                          | Before Hon. James V. Selna
19 |  _____

20 | TELEFONAKTIEBOLAGET LM                | Discovery Cut-Off: May 23, 2016
   | ERICSSON *et al.*,                    | Pre-Trial Conf.: Feb. 1, 2017
21 |                                       | Trial: Feb. 14, 2017
   |                    Plaintiffs,
22

23 |          v.

24 | TCL COMMUNICATION
   | TECHNOLOGY HOLDINGS, LTD. *et*
25 | *al.*,

26 |                    Defendants.

27

28

SMRH:480756462

# **TABLE OF CONTENTS**

I.     EXPERT QUALIFICATIONS ........................................................................ 1

II.    I STRONGLY DISAGREE WITH DR. HUBER IN SEVERAL IMPORTANT RESPECTS REGARDING THE MEANING AND HISTORY OF THE ETSI IPR POLICY. ............................................................ 1

       A.     The ETSI IPR Policy Does Not Put Rewarding IPR Holders Above All Other Objectives—It Equally Seeks to Minimize the Risk of Wasted Investments by Standard Users ................................. 2

       B.     ETSI Did Not Intentionally Leave the Meaning of FRAND to the "Good Faith" of the Negotiating Parties, Without Any Governing Legal Constraints, Because FRAND Is "Impossible to Define." ......... 3

              1.     ETSI did not "deliberately refrain" from further defining FRAND; rather, its members tried and failed to achieve consensus. ....................................................................... 3

              2.     FRAND is not "impossible to define." ........................... 6

              3.     ETSI's FRAND obligation does not merely defer to the negotiating parties. ....................................................... 7

       C.     The Obligation to Not Discriminate Under the ETSI IPR Policy Prohibits Discriminatory Terms and Conditions, Irrespective of Who Is Targeted for Discrimination. ....................................... 9

       D.     The Fact ETSI Did Not Implement the "Most Favored Licensee" Provision of the 1993 Undertaking Is Irrelevant. ...................... 12

III.   CONTRIBUTION COUNTING IS NOT A RELIABLE PROXY FOR DETERMINING ERICSSON'S PROPORTIONAL SHARE OF ESSENTIAL PATENTS. ........................................................................ 14

       A.     Mr. Mallinson and Mr. Delgado Rely on Incorrect and Unreasonable Assumptions in Arguing There Is a Correlation Between Approved Contributions and Patents. ................................ 16

       B.     Mr. Mallinson and Mr. Delgado's Claims that Contribution Counting Is More Reliable Than, and Superior To, and Essentiality Analysis Rest on a List of False Benefits. ..................................... 17

              1.     Exhaustive and unambiguous .................................... 18

              2.     Independently approved ........................................... 19

              3.     A closed-loop system ............................................... 19

              4.     Transparent, objective, and reproducible ................... 20

              5.     Cost-effective ....................................................... 21

1

   6.  Consistent with the objectives of standardization and FRAND commitments.................................................................................21

2

IV. MR. MALLINSON'S CRITIQUES OF ESSENTIALITY ANALYSIS ARE IRRELEVANT AND MISLEADING. ...........................................................22

3

4

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION ...........................27

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:480756462

## REBUTTAL DECLARATION OF DR. IR. ING. RUDI BEKKERS

I, Dr. Ir. Ing. Rudi Bekkers, declare under the penalty of perjury under the laws of the United States of America that the material contained herein is true and correct and that I am competent to testify thereto.

## I.  EXPERT QUALIFICATIONS

1. My name is Rudi Bekkers.  My qualifications are set forth in Plaintiffs' Direct Examination by Declaration for Expert Witness Dr. Ir. Ing. Rudi Bekkers.  A copy of my CV is included as Exhibit 1592.

## II.  I STRONGLY DISAGREE WITH DR. HUBER IN SEVERAL IMPORTANT RESPECTS REGARDING THE MEANING AND HISTORY OF THE ETSI IPR POLICY.

2. In my direct examination, I described ETSI's historical origins and the adoption, implementation, and policy objectives of the ETSI IPR Policy.  I further explained that standardization, including through 3GPP and ETSI, serves primary objectives of leveling the playing field by helping ensure different manufacturers have equal access to the technologies underlying consumer products, minimizing the risk of standardized technology being unavailable because of patent disputes and/or patent-owners taking advantage of industry lock-in or discriminating against certain implementers by charging higher royalty rates, and fairly rewarding patent owners who contribute their patented ideas to a standard.  (Dkt. 1314, ¶¶ 13–15, 23–24, 28–35.)  I also explained the context, rationale, substance, and adoption of the 1993 and 1994 ETSI IPR Policies.  (*See id.*, ¶¶ 46–60.)  I additionally described how attempts to amend the ETSI IPR Policy have been mostly unsuccessful due to the high burden presented by ETSI's multistage approval process which requires consensus and/or supermajority support for any change, and defines "consensus" as the absence of sustained opposition.  (*See id.*, ¶¶ 17–18, 42–45.)

3. As set forth below, Ericsson's expert Dr. Bertram Huber has made various statements and offered various opinions regarding the meaning and history

1  of ETSI's IPR Policy, and how it should be interpreted and applied, with which I

2  strongly disagree.  I address these points in succession below.

**A.**     **The ETSI IPR Policy Does Not Put Rewarding IPR Holders Above All Other Objectives—It Equally Seeks to Minimize the Risk of Wasted Investments by Standard Users.**

4.     Dr. Huber characterizes the "primary objective" and "fundamental aim" of the ETSI IPR Policy as (1) "to ensure a balance between the objective of adequately and fairly rewarding IPR holders for the use of their IPRs in the implementation of standards, and the objective of [(2)] ensuring that standards are available to potential users in accordance with the general principles of standardization."  (Dkt. 1329, ¶¶ 33–35.)  Although these are among ETSI's objectives, the ETSI IPR Policy does not focus on rewarding IPR holders above all other concerns, and Dr. Huber leaves out a critical objective.  In particular, ETSI's IPR Policy focuses equally on "the risk to ETSI, Members, and others applying ETSI Standards and Technical Specifications, that investment in the preparation, adoption and application of Standards *could be wasted as a result of an Essential IPR for a Standard or Technical Specification being unavailable*."  (Ex. 1079 at 36 (all capitals formatted as proper nouns for readability) (emphasis added); *see also id.* at 52 (ETSI Guide on IPRs § 1.1).)

5.     As I addressed in my opening declaration, from the outset, the ETSI IPR Policy sought to address the problem where lock-in by investment in a standardized technology covered by IPRs, and the related possibility of patent holdup, were understood to "tilt the negotiating balance in favour of the IPR owner" and thereby skew royalty rates to whatever an IPR owner would care to demand. (Dkt. 1314, ¶ 52, quoting Ex. 1027 at 3.)  Indeed, those drafting the 2G standard within ETSI's predecessor organization were also wary of "bestowing a 'windfall' monopoly position for an individual supplier" by incorporating its patented technology into the standard.  (*Id.* at ¶ 46, quoting Ex. 1069.)  In view of this

SMRH:480756462

history, as well as the explicit wording of the ETSI Guide on IPRs quoted above, it is inaccurate and misleading for Dr. Huber to gloss over the ETSI IPR Policy's goals of avoiding patent hold-up and industry lock-in.

### B. ETSI Did Not Intentionally Leave the Meaning of FRAND to the "Good Faith" of the Negotiating Parties, Without Any Governing Legal Constraints, Because FRAND Is "Impossible to Define."

6.     Dr. Huber makes a number of misleading statements in his direct examination which suggest that ETSI regards FRAND as "impossible to define," and hence has deliberately refrained from defining FRAND.  (Dkt. 1329, ¶ 40 (further stating that "ETSI deliberately refrained from specifically defining FRAND," because "the intent of the drafters was to accommodate and leave room for a multiplicity of different cases").)  Dr. Huber further suggests that ETSI simply defers to the "good faith" negotiations of its members, as though whatever a patent owner can obtain through "good faith" negotiations is necessarily FRAND.  (*See id.*, ¶ 36 ("ETSI intended for [the FRAND] requirement to be flexible, in recognition of the impossibility of defining in advance the range of licensing terms . . . ETSI instead leaves 'FRAND terms and conditions' to be determined by the parties during good faith negotiations"); *see id.*, ¶ 42.)  The implication from Dr. Huber is that there are no legal constraints which govern the FRAND obligation, and/or that trying to ascertain any such legal constraints would be futile.  As addressed below, I regard Dr. Huber's statements as either incorrect or quite misleading.

#### 1. ETSI did not "deliberately refrain" from further defining FRAND; rather, its members tried and failed to achieve consensus.

7.     It is not correct to say that ETSI "deliberately refrained" from further defining FRAND, as if this was an explicit choice made by all ETSI members, or the leadership at ETSI.  On the contrary, there have been several series of intensive efforts within ETSI to further define FRAND, but those efforts have not succeeded

because of a lack of consensus across the different competing constituencies within ETSI, not because of a "choice" by ETSI or its members.

8.    In particular, there were repeated efforts within ETSI beginning around 2003, 2005, and later 2012, to further define the meaning and application of the FRAND obligation. (*See, e.g.*, Ex. 238 (ETSI/GA#42(03)20) at 8–9; Ex. 239 (ETSI/IPR(12)12_002r1) at 2–6; Ex. 240 (ETSI/IPR(12)12_023r3) at 1–2; Ex. 241 (ETSI/IPR(13)14_018r2) at 2; Ex. 242 (ETSI/IPR(15)22_014) at 2–4.)  An ETSI "Ad Hoc Group on IPR Policy Operation," an "Ad Hoc Group on IPR Review," and an "ETSI IPR Special Committee" met at length to address this issue. (*See id.*)  The 27 meetings of the last committee alone attracted a cumulative total of 1,651 participants from all around the world to places like Sofia Antipolis (ETSI's home), Geneva, Frankfurt, and San Diego.  Together, over 550 contribution documents were submitted to these meetings.

9.    The proceedings from these special IPR committees essentially reveal two main camps or "schools of thinking" among ETSI members, with these two camps disagreeing with one another on whether to further define FRAND in the ETSI IPR Policy, and, if so, how. (*See, e.g.*, Ex. 240 at 2 ("[S]ome companies say clearly that the current text is sufficient and has guided licensing negotiations between the parties well enough up to now whilst other companies are saying that this concept no longer works and are proposing changes to the text").)

10.    The first of the two camps (which proposes changes) seeks a more specific policy that would provide information that implementers of the standards (*e.g.*, manufacturers of user equipment) believe would prove useful by removing ambiguities (*e.g.*, by defining specific practices as non-FRAND, and identifying a common royalty base). (*See, e.g.*, Ex. 238 at 8–9, 19–22; Ex. 239 at 2–3.)  Practices this camp has suggested should be used as examples of non-FRAND behavior include selectively asserting patents against companies newly entering the market while giving a "free pass" or charging a "nominal fee" to other, similarly-situated

manufacturers; attempting to charge license fees for expired or invalid patents; and tying licenses for essential patents to licenses for non-essential patents. (*See, e.g.*, Ex. 238 at 8–9, 19–22.) They argue that high-level "guidance on what FRAND means," provided "in terms of principles," would make licensing negotiations more efficient and help courts and regulators "struggling with the definition of FRAND." (Ex. 239 at 2.)

11.     The second of the two camps (which resists changes) seeks to preserve the policy's status quo, such that aggrieved implementers (or patent owners) can go to the courts to resolve IPR disputes. (*See, e.g.*, Ex. 238 at 8–9, 67; Ex. 239, at 3.) This camp espouses the view that there is "no sense in such attempts [to define exemplary non-FRAND practices] as each case is different and the decision on FRAND conditions is, finally, a matter for the courts of law," and thus "ETSI should not engage itself in any judgment." (Ex. 238 at 9.) The 2012 report Dr. Huber cites (a status update on discussions of the IPR Special Committee) explains that these members maintain that "the concept of fair, reasonable and non-discriminatory license obligations reflect legal mechanisms well-established in the courts of many countries to settle patent disputes" and "potential disputes between Members related to IPR issues can only be solved in a court of law." (Ex. 239 at 5.) In their view, "[t]he Court system is generally well prepared to resolve possible disputes on what are fair, reasonable and nondiscriminatory terms and conditions on a case-by-case basis" and "[a]dopting any of the proposed changes to [the] ETSI IPR Policy with respect to the determination of royalties would be a clear overreach and interference with individual bilateral commercial negotiations and pending patent litigation of ETSI members." (*Id.* at 4.)

12.     Ultimately, the efforts within ETSI to further define FRAND were unsuccessful, because the two competing camps could not find sufficient common ground to pass any reforms. (*See, e.g.*, Ex. 238 at 8–9 (ETSI IPR ad hoc group Chairman explaining in 2003 that "[a]mong the Members represented within the

1  IPR ad hoc group two different schools of thinking appeared" and "no consensus

2  has been achieved"); Ex. 241 at 2 (ETSI IPR Special Committee Chairman

3  explaining in 2013 that "in the past no agreement could be reached on any change to

4  the policy based on these discussions" and that "it was agreed to adjourn the

5  discussion for this meeting as there was clearly no possibility to reach consensus at

6  the moment"); Ex. 242 at 2–5 (ETSI IPR Special Committee Chairman explaining

7  in 2015 that the three proposed texts offering guidance on the meaning of FRAND

8  were discussed at that meeting, considered, and not approved).)  In other words,

9  there was not a "deliberate" or "intentional" decision by ETSI to "refrain" from

10  defining FRAND, as Dr. Huber has misleadingly stated throughout his declaration.

11  Instead, there was a failure to more specifically define FRAND (despite efforts to do

12  so), and that failure was a result of a lack of consensus among the ETSI members

13  regarding whether, and if so how, to amend the IPR policy.

14                  2.      <u>FRAND is not "impossible to define."</u>

15            13.     In a similar vein, it is misleading for Dr. Huber to say that FRAND is

16  "impossible to define," or that ETSI concluded FRAND was "impossible to define."

17  (Dkt. 1329, ¶ 40.)  Dr. Huber attempts to support this point with a 2004 slide deck

18  apparently prepared by or for ETSI's then Director-General Karl Heinz-Rosenbrock

19  to present at a third-party event.  (Ex. 4646 at 7.)  Although that document contains

20  the vague bullet point noted by Dr. Huber ("Impossible to define FRAND"), that

21  statement must be understood in context.  As the last slide indicates, the presentation

22  sought to summarize a report from ETSI's ad hoc group on IPRs regarding "GA#42

23  Decisions" (*i.e.*, decisions made during the 42nd meeting of the ETSI General

24  Assembly).  (Ex. 4646 at 8.)  Those ad hoc IPR meetings took place from January

25  through October 2003.  (*See* Ex. 238 at 1 (report listing the six meetings).)  Unlike

26  the slide deck Dr. Huber relies on, the final report is the official summary of what

27  occurred during those meetings.  (*See* Ex. 238.)

28            14.     Consistent with my explanation above, the final report merely explains

that the two competing camps could not achieve consensus regarding whether to further define FRAND and, if so, how.  (*See id.* at 8–9.)  In other words, Mr. Heinz-Rosenbrock was not intending to suggest (nor could he reasonably suggest), that FRAND was "impossible to define," insofar as "impossible" means it cannot be done as a matter of law, logic, economics, etc.  Instead, he was conveying what I already demonstrated above, *i.e.*, that ETSI's members had found it "impossible" to *reach consensus* on a definition of FRAND for purposes of amending the ETSI IPR policy.  (*See also* Ex. 241 at 2 (ETSI/IPR(13)14_018r2) (the ETSI IPR Special Committee concluding in April 2013 that "there was clearly no possibility to reach consensus at the moment" regarding proposed amendments related to the FRAND commitment).)

15.    Indeed, the October 2012 report Dr. Huber relies on demonstrates that ETSI's members do not regard "FRAND" as "impossible to define" in the more literal sense of the word "impossible."  (*See* Ex. 4622.)  This report reflects the discussions of the IPR Special Committee to the effect that "[t]he absence of an agreement on a more detailed definition of FRAND or on compensation elements under the FRAND commitment *does not imply their inexistence*."  (Ex. 4622 at 6 (emphasis added).)  Thus, just because ETSI has been unable to further define FRAND in its IPR Policy does not mean ETSI believes, or that all ETSI members agree, that FRAND has no specific meaning or is not capable of any such meaning.

### 3.    ETSI's FRAND obligation does not merely defer to the negotiating parties.

16.    In the same breath that he suggests FRAND cannot be defined, Dr. Huber goes on to say that ETSI deliberately left FRAND "to be determined by the parties during good faith negotiations."  (Dkt. 1329, ¶ 36.)  The implicit, if not explicit suggestion from Dr. Huber is that FRAND means whatever the negotiating parties determine it means (and that whatever the patent owner can obtain through "good faith" negotiations must, by definition, be considered FRAND).  Again, I

strongly disagree with this.

17.     As shown above, the camp within ETSI that preferred the status quo was not arguing that FRAND means whatever the parties to a negotiation say it means.  Instead, the camp that preferred the status quo specifically recognized that in the event there are disputes over whether terms and conditions may or may not be FRAND, the parties can and should seek assistance in resolving their dispute via the legal system (*e.g.*, through the courts or arbitration).  (*See supra* at ¶ 10.)  This is specifically acknowledged in ETSI's Guide on IPRs.  (Ex. 1079 at 51 ("[I]n the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes") (ETSI Guide on IPRs § 4.3).)

18.     Indeed, one of the earliest ETSI documents that explains the thinking that motivated ETSI to draft its IPR Policy in the first place (rather than simply adopt the existing policy commonly used by other SSOs), states that ETSI did *not* want to "tilt[] the negotiating balance in favour of the IPR owner" by defining FRAND so broadly as to mean "whatever anyone cares to demand."  (Ex. 1027 at 3.)  That, ETSI understood, would lead to "[s]mall enterprises gett[ing] pushed out of the market."  (*Id.*; *see also* Ex. 2289 at 3 (same document cited by Dr. Huber at ¶ 43 n.30).)  This is directly contrary to Dr. Huber's argument that ETSI supposedly left it to the negotiating parties to define FRAND for themselves.

19.     To support his argument that the FRAND obligation is a purely "commercial" (*i.e.*, non-legal) issue to be sorted out between the parties, Dr. Huber misconstrues the IPR Policy and Guide, as well as an October 2012 ETSI meeting report.  (*See, e.g.*, Dkt. 1329, ¶ 41.)  The portions of the IPR Policy and Guide he cites for this argument do not provide support.  Although the IPR Guide says that "[s]pecific licensing terms and conditions are commercial issues between the companies," it makes that statement not as a rule of how to construe the meaning of FRAND, but to support the norm that license terms "shall not be addressed within ETSI" (*e.g.*, at ETSI meetings), because such discussions "among competitors in a

standards making process can significantly complicate, delay or derail this process." (Ex. 1079 at 64 (§§ 2.2, 4.1).)  ETSI is not interpreting its IPR Policy here as not allowing courts or other adjudicative bodies to establish and apply general principles governing FRAND obligations that are consistent with the ETSI IPR Policy and the related IPR declarations essential patent owners undertake.  Nothing in the ETSI IPR Policy or Guide supports or suggests such a constrained view.

**C.** **The Obligation to Not Discriminate Under the ETSI IPR Policy Prohibits Discriminatory Terms and Conditions, Irrespective of Who Is Targeted for Discrimination.**

20.     Dr. Huber also opines that ETSI was "particularly focused on avoiding protectionist discrimination (which might result in barriers to trade), and on barring license terms that would discriminate in favor of ETSI members and against non-members."  (Dkt. 1329, ¶ 43.)  I note what Dr. Huber does *not* say in his declaration.  He does not say that ETSI's non-discrimination obligation is somehow *exclusively* limited to concerns with discrimination based on the nationality or status of the licensee as an ETSI member or non-member.  Nor could he reasonably say such a thing, as that would not be true.

21.      First, the ETSI IPR Policy forbids discrimination period—not just discrimination based on nationality or ETSI membership.  In the most current ETSI IPR Policy, as well as its predecessors, the FRAND commitment is worded as follows:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR . . . .

(Ex. 1079 at 36–37.)  Nowhere in the policy is there any element that specifies or suggests that the non-discrimination prong of FRAND should be understood in a limited way, such as being meant to cover only discrimination based on nationality or non-membership.  If the intention of those drafting the policy would have been to limit the prohibition of discrimination to member/non-member discrimination or to regional discrimination only, they would have written that in their policy, instead of adopting the existing FRAND concept, which is not limited to or even specifically aimed at these two types of discrimination.

22.     Second, Dr. Huber's statements beg the question of what discrimination is being prohibited.  Saying that an IPR declarant is not permitted to discriminate against a prospective licensee based on the licensee's nationality, or whether the licensee is an ETSI member, merely addresses the "who" and "why" of the discrimination calculus, *i.e.*, who might be treated worse, and why.  It does not address the "what" of the discrimination calculus, *i.e.*, what terms and conditions would be considered discriminatory.  I presume Dr. Huber does not intend to suggest that ETSI members were permitted to offer discriminatory terms and conditions amongst each other, whereas discrimination against non-members was prohibited—that would be absurd.  Indeed, the documents cited by Dr. Huber demonstrate that ETSI was seeking to confirm that the same protections against discriminatory terms and conditions which would exist in favor of ETSI members would *also* extend to non-members.  (*See, e.g.*, Ex. 2289 at 5 (explaining that "ETSI members and non members are treated equally . . . Those countries that do adopt ETSI standards are treated absolutely equally with European countries as far as IPR conditions are concerned.").)

23.     Third, I disagree with Dr. Huber when he suggests that ETSI was not concerned about discrimination between similarly-situated implementers, or that the non-discrimination obligation in the ETSI IPR Policy should not be regarded as prohibiting discriminatory treatment of similarly-situated implementers.  (Dkt. 1329,

¶ 44.)  Dr. Huber's own declaration is to the contrary.  For example, he explains the following:

> In the mid-1980's, before the creation of ETSI, during the GSM standardization activities within CEPT, interested parties began discussing IPR-related issues, and in particular patents.  The state-owned network operators initially insisted that manufacturers, when being awarded a supply contract resulting from a public procurement process, grant royalty-free licenses under their relevant IPRs to all network operators in the CEPT countries *as well as all other manufacturers*.  Later, after negotiations with the manufacturers, the network operators agreed that it would be sufficient and appropriate for manufacturers to grant licenses *to other manufacturers* on [FRAND] terms and conditions.

(Dkt. 1329, ¶ 17 (emphasis added).)  Thus, from the outset, the non-discrimination prong of the FRAND obligation has been premised on the idea that patent owners cannot offer royalty terms to similarly-situated manufacturers on a discriminatory basis.  As Dr. Huber acknowledges, ETSI picked up its project of drafting an IPR Policy directly from CEPT.  (*See id.*, ¶ 18.)  There was no break in this historical chain of events where the non-discrimination obligation was narrowed to account only for nationalistic concerns and/or concerns about discriminating against non-ETSI members.

24.    Again, the documents Dr. Huber relies on also prove this point.  (Dkt. 1329, ¶ 43, n.30.)  For example, the April 1992 report from ETSI notes the benefits of being able to enforce the obligation to provide FRAND terms and conditions in arbitration.  (Ex. 2289 at 4.)  As ETSI explained, "[t]his is helpful to the smaller players in the market"—presumably because those small players would be the most likely victims of discriminatory terms and conditions, due to their lack of leverage in

a license negotiation—"[b]ut more crucially it reduces the risks for *all* those who have implemented an ETSI standard from IPR complications well into the life of the standard." (*Id.* (emphasis added); *see also id.* at 6 (noting that the non-discrimination obligation, as well as the right to arbitration, is "fully in line with EC competition law," and protects "small to medium sized concerns" to the extent a dispute arises "over the royalty rates").) Similarly, the European Commission representative affirmed to ETSI in July 1992 that "standards, including IPRs, must be available to all potential users within the Community on *equivalent or comparable terms* to those which apply as between parties to the Undertaking." (Ex. 5291 at 3 (emphasis added).)

25.    In sum, all of the evidence presented above clearly shows that the non-discriminatory prong of the ETSI FRAND commitment should be understood to have a wide scope and prohibit a variety of different forms of possible discrimination. Contrary to Dr. Huber, the non-discrimination requirement is not specifically or only intended to bar discrimination based on nationality or non-membership in ETSI. Instead, the discussion about non-discrimination against non-ETSI members has always reflected an *extension* of the prohibition on discrimination, not a defining *limitation* on that prohibition.

### D. The Fact ETSI Did Not Implement the "Most Favored Licensee" Provision of the 1993 Undertaking Is Irrelevant.

26.    Dr. Huber notes that in "adopting the 1994 ETSI IPR Policy . . . ETSI deliberately rejected the inclusion of a 'most favored licensee' requirement or any equivalent provision." (Dkt. 1329, ¶ 46.) Dr. Huber further says that "a 'most favored licensee' requirement [cannot] be read into the non-discrimination aspect of the FRAND commitment." (*Id.*, ¶ 47.) I understand that Dr. Teece uses this claim by Dr. Huber to conclude that "ETSI rejected an approach to licensing that would require offering identical licensing terms and conditions to every licensee." (Dkt. 1331, ¶ 71; *see also id.* at ¶¶ 84–85 ("If a FRAND commitment were interpreted as

equivalent to a MFL/MFN provision, a new licensee would have to be afforded the most favorable terms that were previously granted to any existing licensee.").) I believe that Drs. Huber and Teece are misleadingly conflating what are two distinct issues.

27.     It is true that there was a "most favored licensee" provision in the 1993 Undertaking, whereas that provision was not carried over into the 1994 ETSI IPR Policy which was ultimately adopted.  However, the provision in question would have required licensors "to promptly notify a licensee of any license granted by it to a third party for the same IPRs under comparable circumstances giving rise to terms and conditions that are clearly more favorable, in their entirety, and those granted to the licensee and allowing the licensee to require replacement of the terms and conditions of its license, in their entirety, either with those of the third party license, or with such other terms and conditions as the parties may agree."  (Ex. 233 at 12; Ex. 1583 at 46; *see also* Dkt. 1314, ¶ 59.)  In other words, the "most favored licensee" provision in the 1993 Undertaking addressed the re-opening and re-negotiation of *previously-executed* licenses on account of *later-executed* licenses. ETSI's members ultimately approved an ETSI IPR Policy that did not require such re-opening and re-negotiation of prior licenses.

28.     In my opinion, ETSI's ultimate rejection of the "most favored licensee" provision is irrelevant to the issues in this case.  I understand TCL is not seeking a "most favored licensee" provision, such as that which was included in 1993 ETSI IPR Undertaking (*i.e.*, a provision that would permit TCL to re-open its forthcoming license in the event another licensee receives more favorable rates from Ericsson at a future date).  Nor does the rejection of the "most favored licensee" provision have anything to do with interpretation of the non-discrimination obligation, insofar as prospective licensees are concerned.  The non-discrimination obligation in the ETSI IPR Policy remained essentially unchanged between the 1993 and 1994 versions of the IPR policy.  (Dkt. 1314, ¶ 60.)  Because the "most favored licensee" provision

and the non-discrimination obligation address two different things—the re-opening and re-negotiating of existing licenses, as opposed to the treatment of prospective licensees given the terms offered to prior licensees—there is no basis to infer that because ETSI rejected the "most favored licensee" provision, it likewise rejected the notion that standard-essential patent declarants must offer non-discriminatory terms and conditions to similarly situated licensees.

## III.   <u>CONTRIBUTION COUNTING IS NOT A RELIABLE PROXY FOR DETERMINING ERICSSON'S PROPORTIONAL SHARE OF ESSENTIAL PATENTS.</u>

29.     In my direct examination, I criticized contribution counting because, among other reasons, there is no known correlation between 3GPP contributions and standard-essential patents.  I also explained that the evidence shows Ericsson developed contribution counting to further its own licensing agenda.  (Dkt. 1314, ¶¶ 63–64.)  Indeed, the relevant contribution counting studies in this case come from Signals Research and ABI, companies that appear to have a strong business and financial relationships with Ericsson.  (*See id.* at ¶ 68–71; Dkt. 1322, ¶ 33.)  I cited several types of evidence that bolstered my understanding that Ericsson created "contribution counting" as part of its marketing strategy to "counter" third-party studies which uniformly reported that Ericsson owned a lower proportion of essential 4G patents than Ericsson had hoped to claim in support of its demands for royalties.  (*See* Dkt. 1314, ¶ 66.)  I summarized nine of those studies in Table 1 of my direct examination (PDX 21), and cited internal Ericsson emails reacting to how Ericsson was portrayed by those studies.  I additionally found that Ericsson responded by inventing "contribution counting," and then paid Signals Research to "replicate" Ericsson's "study" results and pass it off as an independent audit based on "reports" it issued in 2010, 2014, and 2015 (the "Signals Reports").  (*See id.* at ¶¶ 68–72; Exs. 305, 410, 1045.)

30.     In their direct examinations, Ericsson's experts Mr. Keith Mallinson

1  and Mr. Patricio Delgado made various statements and offered various opinions
2  regarding the purported merits of contribution counting as a proxy for essential-
3  patent analysis to determine Ericsson's proportional share of standard-essential
4  patents, with which I strongly disagree for many of the reasons stated in my direct
5  examination.  (Dkt. 1314, ¶¶ 73–101.)  For example, Mr. Mallinson claims that
6  "[b]y counting the approved contributions for contributing companies, it is possible
7  to gauge how actively companies are participating in the development of the cellular
8  standards relative to one another, and ultimately, which companies have contributed
9  the most technology to the standards."  (Dkt. 1322, ¶ 66.)  He also claims the
10 Signals Reports are "based on the propositions" that the number of approved
11 contributions a company makes indicates "how instrumental the company is to
12 developing the technology that became part of the standard" and "comparison of this
13 metric across companies allows a party to objectively determine the relative
14 inventive strength of each company in standardization, which corresponds to its
15 relative essential patent portfolio strength."  (*Id.* at ¶ 67.)  In sum, rather than
16 looking *directly* at whether patents are in fact essential to the standard, Mr.
17 Mallinson believes that participation in the standard-setting process *indirectly*
18 provides a better measurement.  Again, I disagree.

19      31.     Mr. Delgado follows suit, claiming that although patents and
20 contributions "are not directly tied" to one another, "it is not unreasonable to assume
21 that companies who contribute to the standard will be rewarded with patents
22 proportionally to how much they contribute [to the standard]," and that he "ha[s]
23 observed this correlation in licensing discussions, where companies who contribute
24 more to the standard bring more claim charts to the negotiation, and companies who
25 contribute less to the standard bring fewer claim charts to the negotiation."  (Dkt.
26 1325, ¶ 35.)  He further "assumes that sophisticated companies protect any
27 patentable inventions in those contributions in a similar manner."  (*Id.* at ¶ 34.)

28

A.   **Mr. Mallinson and Mr. Delgado Rely on Incorrect and Unreasonable Assumptions in Arguing There Is a Correlation Between Approved Contributions and Patents.**

32.    Mr. Mallinson's key assumption (that a company's share of approved contributions corresponds to its "relative inventive strength . . . in standardization") and Mr. Delgado's key assumption (that companies are "rewarded with  patents proportionally to how much they contribute") have no basis in fact for at least the following reasons, each of which I addressed in detail in my direct examination (*see* Dkt. 1314, ¶¶ 76–91):

- contributions are not patents and need not be patentable;
- approved contributions are often trivial;
- contribution-counting studies do not discount for expired or lapsed patents;
- contribution-counting studies do not consider whether once-owned patents were transferred to others;
- contributions may cover technologies patented by others;
- multiple contributions may relate to the same underlying technology;
- value distribution among contributions is not necessarily equal between multiple submitters;
- value distribution among patents is highly skewed;
- contribution-counting studies cover only some parts of the full 3GPP standard; and
- contribution-counting studies count optional parts of the standard, which are non-essential by definition.

33.    More importantly, neither Ericsson nor anyone else I am aware of has demonstrated a correlation between how actively a company participates in 3GPP meetings (or how many of the total approved contributions it made) and its

-16-

proportional share of standard-essential patents (or related SEP-portfolio strength). This is despite the fact that I would expect such companies to have a very high motivation to demonstrate such a correlation if in fact one existed.  To the contrary, however, Signals Research openly disclaims that its reports demonstrate any correlation between approved-contribution counts and essential-patent ownership. (*See id.* at ¶¶ 74–75, citing Exs. 1176 at 3, 305 at 4, 1045 at 3.)  Mr. Mallinson even acknowledges that he never investigated whether the contribution-counting studies numerically correlate approved contributions to the number of SEPs, and further testified that he "would ***not*** expect them to have a high correlation." (Ex. 2471 at pp. 292:23–293:4 (Dep. of Keith Mallinson 4/29/2016) (emphasis added).)

34.     Likewise, Mr. Delgado does not provide any facts or data to support his critical assumption that approved contributions and patents are correlated.  Instead, Mr. Delgado assumes a correlation based on his alleged personal observation that "companies who contribute more to the standard bring more claim charts to the negotiation, and companies who contribute less to the standard bring fewer claim charts to the negotiation." (Dkt. 1325, ¶ 35.)  This "observation" is obviously not the least bit scientific, and for all of the reasons I explained in my direct examination, it falls well short of demonstrating *any* correlation (much less a reliable, even moderately specific correlation) between approved contributions and the number and/or quality of SEPs owned by Ericsson or anyone else.

**B.      Mr. Mallinson and Mr. Delgado's Claims that Contribution Counting Is More Reliable Than, and Superior To, and Essentiality Analysis Rest on a List of False Benefits.**

35.     Messrs. Mallinson and Delgado each claim contribution counting is more reliable than or superior to an essentiality analysis.  Mr. Mallinson touts the following alleged benefits of contribution counting:  it is (1) exhaustive and unambiguous; (2) independently approved; (3) a closed-loop system; (4) transparent, objective, and reproducible; (5) cost-effective; and (6) consistent with

standardization objectives and FRAND commitments.  (Dkt. 1322, ¶¶ 80–88.)  Mr. Delgado also adopts Mr. Mallinson's fourth alleged benefit by asserting that contribution counting "is objective, based on public information [*i.e.*, transparent], and easily reproducible."  (Dkt. 1325, ¶ 35.)  For the extensive reasons provided in my direct examination and as reiterated below, none of these purported benefits renders contribution counting a reliable measure of SEP ownership or portfolio strength.  (Dkt. 1314, ¶¶ 73–101.)  I address each of them in turn.

### 1.   Exhaustive and unambiguous

36.     In stating that contribution counting is exhaustive and unambiguous, Mallinson says that "[f]or the SSO working groups included, it is possible to determine exact numbers of approved technical contributions."  (Dkt. 1322, ¶ 81.)  However, as I indicated in my opening witness declaration, just because contributions can be counted, does not make them a reliable proxy for SEP ownership.  (Dkt. 1314, ¶¶ 73–75.)  Moreover, contribution counting is not in fact exhaustive, because contribution-counting studies cover only some parts of the full 3GPP standards, which biases such studies in favor of companies that focus on contributing to certain parts of the standards and against companies that focus on contributing to other parts of the standards.  (*See id.* at ¶ 90.)

37.     Contribution counting is also not unambiguous, for several reasons.  One is because contribution-counting analyses assign equal credit to every company that signed onto a given contribution.  If two companies signed on, each receives an arbitrary 50% credit regardless of whether they own any technology being "contributed."  (*See* Dkt. 1314, ¶ 87; Dkt. 1322, ¶ 75.)  Further, Signals admits "companies frequently seek out co-sponsors for their submissions in order to garner enough initial support to get their submission approved," and among those who signed onto a given contribution, "it is impossible for us to distinguish between the originator of the submission and its co-sponsors."  (Ex. 1045 at 7.)  Additional ambiguities result from the facts that contributions are often trivial, do not account

1  for patent expirations and transfers of ownership, can be duplicative, have varying

2  technical merit, and involve optional (*i.e.*, non-essential) aspects of a standard.

3  (Dkt. 1314, ¶¶ 76–91; Ex. 312 (researchers opining that "there are various types of

4  technical contributions and any study entailing contributions should ideally reflect

5  their widely varying nature").)  Contribution counting is thus very ambiguous as to

6  who contributed any technology and what that technology actually is.

7            2.    <u>Independently approved</u>

8       38.    Mr. Mallinson describes this benefit as resulting from having each

9  approved contribution chosen "because it is technically superior to any competing

10  contributions" by "representatives from technology companies with major

11  incentives to select strong technology" who are subject to "institutional safeguards

12  in place to prevent abuse of the contribution process."  (Dkt. 1322, ¶ 82.)  But as I

13  previously explained, approved contributions are often trivial and non-technical in

14  nature, such as those contributions which correct typographical errors, are non-

15  inventive, or are purely editorial.  (Dkt. 1314, ¶¶ 80–81.)  Moreover, contribution

16  counting invites the opportunistic behaviors of devoting resources to increase

17  contribution statistics without regard to whether contributions are patentable, and

18  making contributions designed to inflate contribution statistics.  The evidence in this

19  case shows that Ericsson employs these tactics.  (*See id.* at 92–101 and Ex. 1076 at 1

20  (Ericsson internal report boasting that "[w]e managed to highjack [*sic*: hijack]

21  several contributions from other companies . . . so we could have Ericsson name

22  [*sic*] on the contribution").)

23            3.    <u>A closed-loop system</u>

24       39.    Mr. Mallinson argues that unlike contributions, where "3GPP controls

25  how many contributions are approved and on what basis," "ETSI … does not

26  attempt to judge which of the declared IPRs are essential, and does not track which

27  declared patent applications ultimately issue as patents."  (Dkt. 1322, ¶ 83.)

28  However, as I have previously explained, 3GPP does not control whether

contributions cover technologies patented by others; duplicative, trivial, or non-technical contributions; or merely optional (*i.e.*, non-essential) parts of the standard. (Dkt. 1314, ¶¶ 76–81, 86, 91.)  Further, contributions are not necessarily patentable at all.  (*Id.* at 76–79.)

### 4.   Transparent, objective, and reproducible

40.   Mr. Mallinson argues that because Signals Research could automate its contribution counting, that proves "it is possible for different and totally unconnected assessors to reproduce the same results given the same input data from . . . openly[]available records." (Dkt. 1322, ¶ 84.)  By contrast, he argues, "[a]ssessing essentiality or the strength of individual patents is inherently subjective" and "results among assessors will differ significantly . . . ." (*Id.*) Likewise, Mr. Delgado vaguely and without support claims that "this method is objective, based on public information, and easily reproducible." (Dkt. 1325, ¶ 35.) Yet, Ericsson had full discretion over how Signals designed its contribution-counting studies and reports on those studies, and it retained complete veto power over what, if anything, Signals published.  (*See* Dkt. 1314, ¶ 71.)  That is not what I would call a transparent or objective process.

41.   Moreover, the automated contribution counting done by Signals Research relied on "a proprietary means of automatically reviewing each document" that utilized undisclosed and non-public "keyword searches to determine whether a contribution was related to 3G or LTE or possibly another technology unrelated to cellular standards," but Signals does not explain why it chose each keyword or why other researchers might not have equally chosen a different set of keywords. (Dkt. 1322, ¶ 73.)  This process of choosing and utilizing undisclosed keywords is not an objective or transparent methodology.  Nor can it be considered reproducible among unrelated researchers.  Regardless, just because contribution counting is allegedly reproducible, does not mean is a reliable proxy for calculating a proportional share of a company's SEPs.

5.   Cost-effective

42.   Whether something is "cost-effective" is irrelevant to how accurate or reliable contribution counting is as a measure of Ericsson's proportional share of standard-essential patents.  As I explained above and in my direct examination, it is unreasonable to assume approved contributions are reliably correlated to a company's proportional share of standard-essential patents.  (Dkt. 1314, ¶¶ 76–91.) This is true regardless of cost.

6.   Consistent with the objectives of standardization and FRAND commitments

43.   Mr. Mallinson alleges that contribution counting rewards companies for participating in standardization, which is "consistent with the objectives of the ETSI IPR Policy and standardization generally."  (Dkt. 1322, ¶ 86.)  Mr. Mallinson is not an expert in the ETSI IPR Policy or "the objectives of standardization and FRAND commitments" in general.  More importantly, the ETSI IPR Policy explicitly states that "IPR holders[,] whether members of ETSI and their [affiliates] or third parties, should be adequately and fairly rewarded *for the use of their IPRs*"—*i.e.*, for the use of their *intellectual-property rights*.  (Ex. 1079, at 36 (emphasis added).)  Due to the lack of a correlation between contributions and patents discussed above and in my direct examination, contribution counting does not account for IPRs at all, and if accepted would instead reward contributions (which may not even be patented).  It would also reward the types of opportunistic behaviors designed to inflate contribution statistics Ericsson is known to engage in.  (*See, e.g.*, Dkt. 1314, ¶¶ 92–101 and Ex. 1076 at 1 (Ericsson internal report boasting that "[w]e managed to highjack [*sic*: hijack] several contributions from other companies . . . so we could have Ericsson name [*sic*] on the contribution").)  Moreover, the ETSI IPR Policy was not implemented to reward companies for simply participating in the process. That is, Ericsson is not entitled to patent royalties simply because it feels like it should get "participation credit" or "participation points."

## IV.     MR. MALLINSON'S CRITIQUES OF ESSENTIALITY ANALYSIS ARE IRRELEVANT AND MISLEADING.

44.     Mr. Mallinson disparages what he calls "patent counting" methods, including standard-essentiality analyses.  (Dkt. 1322, ¶¶ 34–55.)  He argues that all essentiality analyses "are highly subjective and inconsistent with each other," because they "have produced wildly divergent results."  (*Id.* at ¶ 34.)  He claims this "suggests that the accuracy and reliability . . . is doubtful."  (*Id.*)  Additionally, he claims to have determined that "the studies are [not] accurate and reliable measurement tools" based on a statistical test he created as "a conservative way to test agreement between the studies."  (*Id.* at ¶¶ 35–42.)

45.     As part of this analysis, Mr. Mallinson misleadingly equates and compares TCL expert Dr. Zhi Ding's essentiality analysis to a number of other third-party essentiality analyses conducted outside this case, which I summarized and described in my direct examination.  (Dkt. 1314, ¶¶ 66–67, PDX 21.)  The disclosed methods and objectives of these studies varied.  As Dr. Ding explained in his direct examination, he performed his essentiality analysis to obtain a good overall estimate of what proportion of all 2G, 3G and 4G declared-essential patents are actually essential, and what proportion of those patents belong to Ericsson. (Dkt. 1326, ¶ 13.)  His analysis was specific to the facts and objectives of this case, and he set forth his methods and objectives in great detail.  (*See id.* at ¶¶ 14, 35–73.) By contrast, the third-party essentiality analyses Mr. Mallinson compares (and that I identified in my opening witness statement) were all conducted by researchers outside this case having different methods, parameters, outcome variables, and presumably objectives.

46.     In his Figure 3 (Dkt. 1322, ¶ 17), Mr. Mallinson misleadingly paraphrases the "metric applied" in each of the above analyses and directly compares the "results" of each study to the others without making any adjustments to account for the different methodologies employed or outcome variables

determined.  (*See id.* at ¶¶ 45–49.)  The details Mr. Mallinson omitted from his chart (and did not otherwise consider or account for) reveal important differences in timing, scope, analysis, and outcome parameters that might fully explain the different "outcomes" he alleges show unreliability in the third-party studies.  Table 1, below, summarizes each of the third-party studies, including many important details Mr. Mallinson omitted:

| Report | Methodology |
|---|---|
| Fairfield Resources International, 2010<br><br>*Review of Patents Declared Essential to LTE and SAE (4G Wireless Standards) Through June 30, 2009*<br><br>(Ex. 1042.) | **Timing/Scope**:  All patents and applications declared to ETSI as essential to 3GPP Release 8 (LTE and SAE) as of June 30, 2009.<br><br>**Analysis/Outcome**:  Patent families were grouped together, and the most recently filed family member was reviewed.  Experts performed a "preliminary technical assessment" of the selected family member patent (spending an average of one hour per patent), and judged the patent as either E (essential), E*(probably essential), N*(probably not essential), or N (not essential). |
| Jefferies LLC, 2011<br><br>*Research in Motion – Limited Patent Value*<br><br>(Ex. 1044.) | **Timing/Scope**:  The methodology is unclear, but the report indicates the methodology is provided in more detail in a report called "Smartphone Patent Wars Far From Over: Deep Dive into Essential LTE Patents."  I have searched for, but have not located a copy of this report.<br><br>**Analysis/Outcome**:  Jefferies (an investment banking firm) screened tens of thousands of patents and conducted an in-depth examination of 1,400 LTE-related patents to determine their level of essentiality. |

| Report | Methodology |
|---|---|
| Cyber Creative Institute, 2011 /2012/2013<br><br>*Evaluation of LTE Essential Patents declared to ETSI*<br><br>(Exs. 1040, 1041, 1035.) | **Timing/Scope**:  Patents and patent applications declared essential to ETSI as of July, 2011 (Version 1); as of May, 2012 (Version 2); as of November, 2012 (Version 3).<br><br>**Analysis/Outcome**:  In Version 1 (Ex. 1040), after collecting the identified patents and applications, researchers reportedly (1) deleted patents that did not contain the term "LTE" in the 'Essential to projects' column; (2) deleted patent applications that were unpublished as of August 2011; (3) consolidated patents into families; (4) selected a representative patent from each family; (5) evaluated the broadest claim of each representative patent and compared it to 3GPP Release 9 (end of March, 2010 version); and (6) ranked patents as **A** (matches the standards), **B** (partially matches the standards), or **C** (does not match the standards).  In Version 2 (Ex. 1041), researchers modified the search by extracting those patents that contained the terms LTE, SAE, TS36, TS24.301, TS23.272, or TS33.401. In Version 3 (Ex. 1035), researchers extended the search in version 2.0 to those patents declared essential to ETSI and published. |
| Article One Partners, 2012<br><br>*LTE Standard Essential Patents Now and in the Future*<br><br>(Ex. 1175.) | **Timing/Scope**:  Published patent applications declared essential to 3GPP Releases 8, 9 and 10 as of November 18, 2011<br><br>**Analysis/Outcome**:  Researchers reviewed each reference and compared it with the LTE Specifications, judging it as either **A** (Highly relevant/essential to LTE), **B** (Relevant, but requires in-depth research to determine essentiality), **C** (Relevant, but unlikely to be essential to LTE), or **D** (Not believed to be related to LTE). Companies were ranked based on their ratio of '**A**' rated patents. |

| Report | Methodology |
|---|---|
| iRunway, 2012<br><br>*Patent & Landscape Analysis of 4G-LTE*<br><br>(Ex. 1036.) | **Timing/Scope**:  Researchers reportedly identified all 4G-LTE patents declared essential.  The end of the time period for which data were gathered is not clear.<br><br>**Analysis/Outcome**:  Researchers and identified "seminal" patents using a "proprietary strength analysis algorithm" and manual research.  "The top 5% of the ranked 4G-LTE patents" were deemed "seminal." |

**Table 1.**  (PDX 135.)

47.     Considering all of the varying methods employed and the different outcome variables reported in these third-party studies, the fact that they may have led to different results is not surprising and does not indicate that all, or any particular one (or, most importantly, Dr. Ding's analysis) must be unreliable.  For example, Mr. Mallinson contrasts the Fairfield (Ex. 1042) and iRunway (Ex. 1036) reports as "wildly divergent."  (Dkt. 1322, ¶ 34.)  But seen in light of the differences in their respective timing, scope, analysis, and outcome constraints listed in Table 1, it is easy to appreciate that they rest on equally divergent assumptions.  For example, whereas the time period for which data in the iRunway study were gathered is unclear, the Fairfield study applied a June 2009 cutoff date.  Whereas iRunway analyzed patents, Fairfield analyzed patents and patent applications. Whereas iRunway used a proprietary algorithm and manual research to identify "seminal" patents, Fairfield used experts to determine whether representative patent-family members were either essential, probably essential, probably not essential, or not essential.  These differences (among many others) are readily apparent from the studies and may fully explain each study's outcome and why the outcomes allegedly differ.

1   I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct, and that I executed this declaration

3   on January 27, 2017, at Vught, The Netherlands.

4

5   _____

6   Dr. Ir. Ing. Rudi Bekkers

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| 233 | ETSI IPR Policy, 1993 |
| 238 | "Report of the GA ad hoc group on ETSI's IPR Policy operation…," ETSI 42nd General Assembly Meeting, Nov. 25-26, 2003, ETSI/GA#42(03)20 |
| 239 | ETSI IPR#12 titled "Status of discussions: overview of the possible scenarios, associated historical information and wording proposals where appropriate." Oct. 15-17, 2012, ETSI/IPR(12)12_002r1 |
| 240 | "Meeting Report," ETSI IPR#12, Oct. 15-17, 2012, ETSI/IPR(12)12_023r3 |
| 241 | "Meeting Report," ETSI IPR#14, Apr. 22-24, 2013, ETSI/IPR(13)14_018r2 |
| 242 | "Meeting Report," ETSI IPR#22, Apr. 21-23, 2015, ETSI/IPR(15)22_014 |
| 305 | "The Essentials of Intellectual Property, from 3G through LTE Release 12." by Signals Research Group, Dec. 2014 |
| 312 | Gupta, K. "Unpacking 3GPP Standards," Qualcomm Economics and Strategy, 3/24/15 (previously assigned Depo. Ex. 302) |
| 410 | "The Essentials of Intellectual Property," by Signals Research Group, dated Sep. 2010 |
| 1027 | ETSI Document titled, "Explanatory Note on ETSI's Intellectual Property Rights Policy and Undertaking, TO3/09/92/KHR/nk," submitted by the TA chairman, 04/02/1992 |
| 1035 | "Evaluation of LTE Essential Patents Declared to ETSI," by Cyber Creative Institute, June 2013 |
| 1036 | "Patent & Landscape Analysis of 4G-LTE Technology," by iRunway |
| 1040 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI, Ver. 1.0" dated Dec. 2011 |
| 1041 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI, Ver. 2.0" dated Oct. 2012 |
| 1042 | Fairfield Resources publication titled "Review of Patents Declared as Essential to LTE and SAE (4G Wireless Standards) through June 30, 2009," dated 1/6/10 |
| 1044 | Jefferies publication titled "Research in Motion (RIM) Limited Patent Value; Cut Target to Salvage Value of $21 as We Wait for ONX," dated 9/21/11 |

| Exhibit No. | Description |
| --- | --- |
| 1045 | Signals Research Group publication titled "The Essentials of Intellectual Property, from 3G through LTE Release 12," dated May 2015 |
| 1069 | "Intellectual Property Issues in GSM," CEPT/CCH/GSM, Oct. 12-16. 1987. GSM/PN PP. 24 |
| 1076 | Executive Summary of RAN3#67, dated May 10-14, 2010 (attachment to 5/26/10 internal Ericsson email) |
| 1079 | ETSI Directives, Version 35, Dec. 2015 |
| 1175 | Article One Partners publication titled "LTE Standard Essential Patents Now and in the Future." by M. Phelps |
| 1176 | Signals Research Group publication titled "The Essentials of Intellectual Property, Quantifying Technology Leadership in the Development of the LTE Standard." dated Sept. 2010 |
| 1583 | ETSI Directives, Version 005, Mar. 1993 |
| 4622 | 10/15/2012 - ETSI/IPR#12 - Status of discussions: overview of the possible scenarios, associated historical information and wording proposals where appropriate |
| 4646 | ETSI - Report from GA ad hoc group - ETSI's IPR Policy operation by Karl Heinz Rosenbrock |
| 2289 | 4/2/1992 ETSI Document: ETSI/GA 12 - Explanatory Note on ETSI's Intellectual Property Rights Policy and Undertaking |
| 2471 | Transcript excerpts from the deposition of Keith Mallinson, dated 4/29/16 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the REBUTTAL DECLARATION OF DR. IR. ING. RUDI BEKKERS to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:   */s/ Kristina Grauer*
       KRISTINA GRAUER