SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT
Mobile Limited, and TCT Mobile
(US) Inc.

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*<br><br>          Plaintiffs,<br><br>    v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*<br><br>          Defendants.<br>_____<br>TELEFONAKTIEBOLAGET LM ERICSSON et al.,<br><br>          Plaintiffs,<br><br>    v.<br><br>TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD. et al.,<br><br>          Defendants. | Case No. SACV14−00341 JVS (DFMx)<br>Consolidated with CV15-02370<br><br>**PLAINTIFFS' REBUTTAL DECLARATION OF GEORGE GUO**<br><br>Place: Courtroom 10C<br>Before Hon. James V. Selna<br><br>Discovery Cut-Off: May 23, 2016<br>Pre-Trial Conf.: Feb. 1, 2017<br>Trial: Feb. 14, 2017 |

1
2

# TABLE OF CONTENTS

**Page**

3   I.     PRELIMINARY STATEMENT ................................................................ 1

4   II.    OUR INVESTMENT IN R&D ................................................................ 1

5   III.   OUR AVERAGE SELLING PRICES ("ASP") ...................................... 3

6   IV.    OUR GLOBAL AND REGIONAL MARKET SHARES ......................... 3

7   V.     MAJOR GLOBAL COMPETITORS ...................................................... 7

8          A.     Samsung ...................................................................................... 7

9          B.     HTC ........................................................................................... 11

10         C.     LG .............................................................................................. 12

11         D.     Apple .......................................................................................... 15

12         E.     Huawei ....................................................................................... 17

13         F.     ZTE ............................................................................................ 21

14  VI.    LOCAL KINGS ..................................................................................... 23

15         A.     Coolpad ...................................................................................... 23

16         B.     Karbonn ...................................................................................... 24

17         C.     Sharp .......................................................................................... 25

18         D.     Others ......................................................................................... 26

19  VII.   NEGOTIATIONS WITH ERICSSON ................................................... 26

20  VIII.  CONCLUSION ....................................................................................... 28

21  TABLE OF EXHIBITS CITED IN WITNESS DECLARATION .......................... 30

22
23
24
25
26
27
28

**DECLARATION OF GEORGE GUO**

I, GEORGE GUO, declare under penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I. PRELIMINARY STATEMENT

1. I understand that Ericsson submitted a number of opening witness declarations the same day I submitted mine. I could not review most of Ericsson's witness declarations directly because they were designated highly confidential and attorneys' eyes only. However, I have been provided a high level description of some of the testimony in those declarations that was not confidential. In this declaration, I provide rebuttal to certain points made by Ericsson's witnesses. For shorthand, I refer to Ericsson's witnesses collectively as "Ericsson."

## II. OUR INVESTMENT IN R&D

2. I have been informed that Ericsson conveys a picture of TCL Communication as investing little in R&D. Ericsson is wrong. As I said in my opening declaration, TCL has nine R&D centers around the world on three continents, and employs 3,000 engineers. In 2014, we spent about $1.5 billion Hong Kong dollars on R&D (about $191 million U.S. dollars). (Ex. 1140 at p. 82.) In 2015, we increased our R&D spend to about $1.7 billion Hong Kong dollars (about $225 million U.S. dollars). (See Ex. 456 at p. 92.) We are particularly committed to innovating 5G, the next generation of wireless technology. For example, in 2014, we partnered with ASTRI (Applied Science and Technology Research Institute) to develop 5G technologies, including D2D (device to device) communications, ultra-dense networks, and massive MIMO. Together, we unveiled our D2D solution at the Mobile World Congress in 2016. In 2015, we partnered with leading French chipmaker Sequans Communications to establish a 5G lab in France, to research the optimal use of new frequency bands and direct D2D communications, among other things.

3.     In the U.S., we operate a startup acceleration program called the ALCATEL Innovation Accelerator.  On a yearly basis, we select a small group of innovative startups to partner with.  We provide these startups with R&D, testing, engineering, and other resources.  In 2015, for example, one of the five startups we selected was Novasentis, which makes thin, light, and flexible film-based haptic sensors for wearables.  Another startup we selected was KnowRoaming, which develops virtualized SIM technology that allows users' smartphones to automatically connect to data services when traveling abroad.  In 2016, we and KnowRoaming announced the development of "Smart Roaming," a solution that integrates KnowRoaming's SIM technology into our phones.  We are very proud of how we invest in emerging technologies and innovation.

4.     I have been informed that Ericsson attempts to distinguish us from our competitors by reference to our respective R&D investments and patent portfolios.  We do not believe this is meaningful or helpful to understanding our business or identifying who our competitors are.  As I said above, we do spend significant amounts of money on R&D, and we are energetic promoters of innovation.  Companies that invest more in R&D and obtaining patents than we do likely see R&D as a means to generate licensing revenue, or gain leverage in licensing negotiations.  In other words, it is purely a business decision, driven by a specific business strategy.  We made a different business decision, to focus our R&D efforts on developing technology and making innovative, reliable and competitive products, rather than attempting to generate revenue through an IPR licensing model.  And to the extent we can keep our phones more affordable by saving on R&D, while *still* satisfying our innovation goals, we endeavor to do that too.

5.     While I am not sure what relevance it has to the case or determining the terms of a FRAND license, I am told Ericsson said we are not a member of ETSI.  Even the most cursory investigation shows this is false.  If you go to the webpage on the ETSI website titled "Current members," you will see that TCT Mobile Limited,

a plaintiff in this case, is listed right there, in an alphabetically sorted list.[1]   Even if we were not a member of ETSI, I would hope that ETSI members like Ericsson would not use this as a reason to treat us unfairly.

## III.   OUR AVERAGE SELLING PRICES ("ASP")

6.     I understand that Ericsson says we have a "low" ASP, because we purportedly invest little in R&D and do not pay to use others' patented technology. That is not true.  That our ASP may be "lower" than some of our competitors actually reflects our broad product portfolio—which includes very affordable phones (like feature phones) in addition to our more expensive phones (like high-end smartphones).  In the U.S., for example, our phones can range from $19.99 (like our Fling feature phone on Sprint's Boost Mobile) to $499 (like the BlackBerry DTEK60).  Our more expensive high-end flagships compete directly against the high-end flagships of Apple, Samsung, LG, and so on.  Having an overall ASP that may be lower than Apple's, for example, does not mean we do not compete directly with Apple.  In fact, we do—aggressively, with models going head to ahead with Apple's.  Our overall lower ASP merely reflects that we sell a broader range of products, hitting a broader range of price points.

7.     Our overall lower ASP also reflects our value.  We sell high quality phones that are more affordable and accessible to more people.  Indeed, that is what our brands mean to many consumers—value, quality, and affordability.

## IV.   OUR GLOBAL AND REGIONAL MARKET SHARES

8.     I have been informed that Ericsson attempts to distinguish us from our competitors by comparing our worldwide sales volume to our competitors' worldwide sales volumes, while ignoring our market position in specific geographic regions.  Ericsson's approach is very superficial, and shows that it misunderstands our business, our competitors, and the way we compete.  When we examine the

---

[1] *See* "Current members," http://www.etsi.org/membership/current-members (last visited Jan. 21, 2017).

health of our business, strategize next steps, and identify competitive targets, we always break our analysis down to specific regions at some point in the process. Applying a generic business strategy based only on our overall global position would not necessarily be effective in Latin America, China, the U.S., or any other specific geographic region. For example, in Latin America between 2014 and the first half of 2015, we ranked 1st in feature phones. And for mobile phones overall, we ranked 2nd (Samsung was ranked 1st, for example, while Apple was ranked 8th). Meanwhile, over that same period, we ranked 14th in China (excluding Hong Kong), behind both Samsung and Apple. Applying the same business strategy to both regions would make little sense. Different geographic regions have different demands for products (some demand more smartphones than feature phones, for example, and some demand less). The economic climate also differs across geographies. And some regions are operator markets, while others are open markets.

9.     Looking at specific regions also provides a more accurate and meaningful sense of where we are *going*, not where we *were*. For example, as my colleague Mr. Cistulli explained in his opening declaration, our market share is trending quickly upwards in the U.S. (a critical mobile phone market), having recently overtaken ZTE in sales volume. In the U.S., we are now ranked 4th in sales volume, behind only Apple, Samsung, and LG. Making conclusions about our business using only our global market share ignores our regional successes and trajectory.

10.     I also understand that Ericsson has likened us to certain local kings, which sell exclusively or almost exclusively in one country, by comparing their localized sales volumes to our global sales volumes. But this is not a meaningful or helpful comparison by itself. For example, I understand that Ericsson says we are like Karbonn because it sold about 12.8 million feature phones in 2015 (2.4% of the market), while we sold about 32 million feature phones that year (6% of the market).

But Karbonn sells those feature phones almost exclusively in one country—India. Meanwhile, our focus is more global and not exclusively in one country. We sell phones in 170 different countries throughout the world and do not currently focus on India. Accordingly, we do not focus on Karbonn as a competitor. The competitors we do focus on are those with global reach, who sell products in many geographies. Karbonn is not one of them.

11.     Another local king Ericsson has likened us to is Coolpad, because it sold about 28.7 million smartphones in 2015 (2% of the market) while we sold about 39.1 million (2.7% of the market). (Ex. 1273.) But like Karbonn, Coolpad is a local king, selling almost exclusively in one country—China. While China is where we started, our ambitions and current global reach lie far beyond just China now. As I said in my opening declaration, over 90% of our sales are now overseas outside of China. Selling tens of millions of phones on a worldwide basis requires a very different infrastructure and implicates different types of competitors and competition than selling phones in a single country. To us, Coolpad is not a global player with global infrastructure, and not in the same league as us, Apple, Samsung, LG, Huawei, or other major worldwide manufacturers with whom we compete.

12.     The same is true of Sharp. I understand that Ericsson says we are like Sharp because it sold about 4.3 million smartphones in 2013, representing about 0.4% of the market, while we sold about 16.4 million, representing about 1.6% of the market. *First*, I do not understand why Ericsson is focusing on 2013 for Sharp. So much has happened to Sharp since then. While once an electronics giant, Sharp accumulated so much debt and its future was so uncertain that Foxconn acquired Sharp in 2016, assuming a 66% stake in the company. Even before the acquisition, Sharp was never a major smartphone player and never showed signs of growth or ascendance. It sold about 5.5 million smartphones in 2007, but had dropped to 3.4 million by 2015. (Ex. 1273.) In the intervening years, its smartphone sales volume never broke 5.9 million. Compare this to us: in 2007, we sold about 3 million

smartphones, but by 2015, we had grown almost 13 times, to about 39.1 million. I provide a figure below showing these differing trends:



**Figure 1: Smartphone Sales Volume (Ex. 1273)**

13.    *Second*, Sharp is a local king. It sells its mobile phones primarily in Japan. Furthermore, I do not believe that Foxconn's acquisition of Sharp will lead to growth in Sharp's mobile phone business in the future. As I understand it, Foxconn was primarily targeting Sharp's core technologies related to producing OLED displays, not its mobile phone business. Foxconn's plan, as I understand it, is to leverage these technologies to mass produce OLED displays, to compete with other OLED display manufacturers like Samsung Display and LG Display. I do not expect Foxconn to focus on Sharp's mobile phone business. In fact, I would not be surprised if that business dwindled down to nothing in the next few years.

14.    In short, our most important competitors are the ones with the same ambitions as us—significant sales in multiple regions around the world. Our aim is to grow, expand, and deepen our global footprint. We do not achieve this by putting excessive focus on individual local kings like Karbonn, Coolpad, or Sharp.

# V.     MAJOR GLOBAL COMPETITORS

## A.     Samsung

15.     I understand that Ericsson says we are unlike Samsung because it has a greater worldwide sales volume, and a higher ASP by generation (*i.e.*, 2G, 3G, 4G). As I said above, determining whether companies compete and/or are similar based on a single factor (aggregated worldwide sales volume) without looking deeper, is highly misleading in light of competition in different geographic markets.  As a global company, an indispensable part of evaluating the health of our business and planning our strategy is to look at specific geographic regions.  For example, between 2014 and the first half of 2015, our feature phone sales volume *exceeded* that of Samsung's in Latin America.  That would not be evident by looking at aggregated worldwide sales volumes in isolation.

16.     Also, comparing Samsung's ASP to our ASP simply by generation (2G, 3G, 4G) tells an inaccurate story about our similarities and whether or not we compete.  First, it fails to separate out feature phones, which are generally the least expensive phones, and serve a different consumer market than smartphones.  If we look at 2G (including 2.5G) feature phones only, for instance, our ASP essentially converged with Samsung's in 2014 and 2015 (figure on the next page):

**Figure 2: ASP for 2G/2.5G Feature Phones (Ex. 1273)**

17.     Note also that Samsung and TCL Communication both sell 2G/2.5G feature phones, which are still a big part of our respective businesses.  Samsung sold about 64.3 million 2G/2.5G feature phones in 2015 alone.  We, meanwhile, sold about 25.2 million 2G/2.5G feature phones in 2015.

18.     Now, if we look at all smartphones except for 4G, we see our ASP approaching convergence with Samsung's in 2015 (figure on next page):

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 3: ASP for 2G/2.5G/3G Smartphones (Ex. 1273)**

13

14      19.     As for 4G smartphones, that our ASP may be "lower" than Samsung's

15    does not tell the whole story about whether we are similar and/or compete with each

16    other.  Samsung's selling prices for its 4G flagships are outliers in the industry, and

17    not representative of Samsung's entire 4G smartphone portfolio.  Samsung's Galaxy

18    S7 Edge, for example, which sells for nearly $800, skews Samsung's 4G

19    smartphone ASP upwards.  But Samsung's 4G smartphone portfolio includes many

20    "budget" 4G smartphones as well.  For example, U.S. prepaid operator MetroPCS

21    sells the Samsung Galaxy Core Prime, a 4G smartphone, for $39.99.  (Ex. 2350.)[2]

22    MetroPCS also sells the Samsung Galaxy On5, another 4G smartphone, for $59.

23    (*Id.*)  U.S. prepaid operator Virgin Mobile sells the Samsung Galaxy J3, a 4G

24    smartphone, for $79.99.  (Ex. 2351.)  And U.S. prepaid operator Boost Mobile sells

25    the Samsung Galaxy Prevail, a 4G smartphone, for $39.99.  (Ex. 2352.)  These and

26    _____

27    [2] Exhibits 5350 to 5365 are all webpages printed from the websites of prepaid

28    carriers (MetroPCS, Virgin Mobile, Boost Mobile, and Tracfone) and JD.com, on or
        about January 23, 2017.

other Samsung smartphones compete directly with respective smartphones in our 4G smartphone portfolio.  Clearly, Samsung's overall 4G smartphone ASP of $453 (according to IDC) by itself does not give enough insight into whether Samsung and TCL are similar and/or compete with each other.

20.    I also understand that Ericsson points out that Samsung has an infrastructure business, but that its revenues from that business are "insignificant."  I agree, and believe that this reflects one way in which we are particularly similar to Samsung—for both of us, mobile devices are our "bread and butter."  TCL Communication is a mobile device company.  As an organization, mobile devices are why we wake up every day and come to work.  Based on where much of Samsung's revenues are coming from, I believe Samsung views mobile devices in a similar way.

21.    I am informed that Ericsson also attempts to differentiate us from Samsung by comparing the relative sizes of our standard-essential patent portfolios.  As I said above, our respective patent portfolios are not indicative of the way our mobile phones compete in the marketplace.  When deciding whether to buy a TCL 950 or its direct competitor, the Samsung Galaxy S7 Edge, a consumer does not care one bit who has the bigger patent portfolio.  He or she is looking at the price, the size of the screen, the resolution of the camera, how much memory is available to store photos and music, and so on.  Thus, a patent portfolio is simply not relevant to identifying who we compete with.  Instead, when I see a mobile phone company with a large patent portfolio, I see not a stronger competitor necessarily, but a company that has made a business decision to build a revenue stream through licensing, or to enhance its leverage in patent licensing negotiations.

22.    In sum, we are very similar to Samsung in the ways that matter to our competitive positions in mobile devices.  We both have very broad mobile device portfolios, selling feature phones, entry-level smartphones, midrange smartphones, and high-end smartphones.  We both also sell tablets and data dongles (what my

colleague Mr. Cistulli refers to as mobile broadband devices). We sell through postpaid channels (like U.S. operators T-Mobile and Sprint) as well as prepaid channels (like U.S. operators MetroPCS and Virgin Mobile). We focus on mobile devices, even if we have other businesses. And our parent companies sell a broad range of other consumer products, like appliances. As Mr. Cistulli mentioned in his opening declaration, we are often referred to as the "Chinese Samsung."

## B.   **HTC**

23.    I understand that Ericsson says HTC sells "advanced" smartphones, while we sell "less advanced" handsets. This statement shows that Ericsson has not bothered to look closely at either our product offerings, or HTC's. In my opening declaration, I compared our high-end TCL 950 side-by-side with the high-end HTC 10. I showed that the two phones run on the exact same chipset (the Qualcomm Snapdragon 820), and that other specifications of our phone were as good as or superior to HTC's phone. Although it is true we manufacture a broader range of phones than HTC, we also manufacture "advanced" smartphones that compete directly with HTC's phones.

24.    I am also told that Ericsson says HTC's ASPs are "higher" than ours. Ericsson compares our full portfolio ASP, which includes our feature phones, against HTC's full portfolio ASP, which excludes feature phones. Such a limited comparison makes no sense, because feature phones and smartphones are apples and oranges, serving different markets. Furthermore, looking merely at HTC's overall ASP, even by generation, does not give an accurate sense of the range of HTC's handsets that compete with our handsets. For example, Virgin Mobile sells the HTC Desire 626s, a 4G smartphone, for $79.99. (Ex. 2353.) MetroPCS sells the HTC Desire 530, another 4G smartphone, for $79. (Ex. 2354.)

25.    By describing HTC's products as more "advanced" and having a "higher" ASP than ours, Ericsson seems to suggest that HTC is somehow superior to us. If this is Ericsson's intention, then it is being very misleading. Looking just at

overall sales volume, we have in fact pulled *ahead* of HTC in recent years.  In 2015, we sold 20 million more smartphones than HTC did.  The figure below shows our respective sales trends:



**Figure 4: Smartphone Sales Volume (Ex. 1273)**

## C.    <u>LG</u>

26.    I understand that Ericsson says we are similar to LG in terms of sales volume, our global reach, and our product mix (both of which include feature phones).  But Ericsson, I am told, says we are unlike LG because its ASPs are "higher" than ours.  As I said vis-à-vis Samsung, Ericsson fails to accurately consider the ASPs in a meaningful way, and thus fails to appreciate how similar our ASPs actually are.  For example, Ericsson does not break out the ASP for feature phones, which serve a different consumer market than smartphones.  Doing so would show how our feature phone ASPs are converging (figure on the next page):



**Figure 5: ASP for Feature Phones (Ex. 1273)**

27.   If we look at all smartphones except for 4G, we see our ASP converging with LG's as well:



**Figure 6: ASP for 2G/2.5G/3G Smartphones (Ex. 1273)**

28.     As for 4G smartphones, we see that LG has some outlier flagship models similar to those seen in Samsung's smartphone portfolio.  LG's flagships do not represent LG's entire 4G smartphone portfolio, which is very broad like ours. The LG V20, which sells for almost $800, skews its 4G ASP upwards.  But its portfolio also includes many 4G smartphones that are much less expensive.  For example, MetroPCS sells the LG K7 for $39, the LG Aristo for $59, and the LG K10 for $79, all 4G smartphones.  (Ex. 2355.)  Virgin Mobile sells the LG K3 for $39.99, the LG Tribute HD for $69.99, and the LG X Power for $99.99, also all 4G smartphones.  (Exs. 2356, 2357, 2358.)  Tracfone sells the LG Rebel 121G Destiny, a 4G smartphone, for $59.99.  (Ex. 2359.)  These and other LG smartphones compete directly with many smartphones in our 4G smartphone portfolio.  None of these LG "budget" smartphones are apparent from looking solely at LG's overall 4G ASP of $307 for 2015, as reported by IDC.

29.     Indeed, Ericsson's superficial overview of LG does not show how, in fact, our mobile phone sales volume converged with LG in 2015 (figure on next page):



**Figure 7: Mobile Phone Sales Volume (Ex. 1273)**

30.     I am informed that Ericsson also attempts to differentiate us from LG by comparing the relative sizes of our standard-essential patent portfolios.  I explained above with regard to Samsung that patent portfolio size is irrelevant to identifying our competitors.  The same reasoning applies to LG.

**D.     Apple**

31.     I understand that Ericsson says we are the least similar to Apple.  I am told Ericsson says one differentiating factor is Apple's "sales mix," which is over 98% "high priced" 4G smartphones.  I disagree with Ericsson's statement to the extent Ericsson is suggesting that we do not compete with Apple or offer similar premium handsets.  As Ericsson should know, we also offer 4G smartphones, like the TCL 950, the Alcatel IDOL 4S, and the BlackBerry DTEK60.  These are all premium products, with specifications as good as or superior to Apple's "high priced" 4G smartphones, such as the Apple iPhone 7 Plus.

32.     Furthermore. that Apple may focus on one category of phones, while we sell that same category *plus more*, does not mean we do not compete with Apple.

By Ericsson's rationale, we would be more similar to Apple if we simply discontinued most of our portfolio (i.e., feature phones, entry-level smartphones, and midrange smartphones).  That is not logical.

33.     In any event, Ericsson is oversimplifying Apple's story.  The market for Apple's "high priced" 4G smartphones has matured.  Apple is actively seeking to expand into emerging markets, and offering phones that are not so "high priced," like the midrange iPhone SE (launched in 2016) and the more entry-level iPhone 5s. Apple also distributes its phones now through many prepaid channels.  For example, MetroPCS sells Apple's iPhone 5s for $149.  (Ex. 2360.)  Apple also "recycles" its used iPhones back into the market as refurbished or pre-owned products.  For example, Boost Mobile sells Apple's former flagship iPhone 6, refurbished, for $199.99.  (Ex. 2361.)  These and other Apple smartphones compete directly with many smartphones in our 4G smartphone portfolio.

34.     Apple also makes its phones more affordable to consumers by now offering its own direct financing, through the Apple iPhone Upgrade Program, which was launched in late 2015.  This allows a consumer to spread the cost of Apple's phone over 24 months, so that, for example, you can get the flagship iPhone 7 Plus for about $37 per month for 24 months.  Thus, Apple's overall ASP simply does not tell the whole story.  And looking only at data up to 2015 does not give a full sense of how Apple has radically (but quietly) altered its direction in the last couple of years through inclusion of affordable smartphones, prepaid channels, and direct financing.

35.     I am informed, that Ericsson, in fact, relies on a Forbes article, dated January 8, 2014, observing these very trends.  The Forbes article says that due to saturation in the high-end smartphone market, "the iPhone maker [Apple] is facing its own growth concerns and looking to aggressively pursue growth opportunities in emerging markets."  (Ex. 4849.)  Indeed, "most [smartphone] growth is going to come from the *lower end* in emerging markets."  (*Id*. (emphasis added).)

36.     This Forbes article also confirms why we cannot simply discontinue most of our portfolio and keep only the high-end smartphones.  Having a diverse portfolio that hits a range of price points enables us to weather shifting consumer demands, adapt to economic challenges, and more quickly and effectively penetrate emerging markets.  Apple has learned this lesson itself, which is why it is now moving into the affordable smartphone market.

**E.     <u>Huawei</u>**

37.     I am told that, like some of the other companies above, Ericsson attempts to distinguish us from Huawei based on sales volume, ASP, product mix, its infrastructure business, and its standard-essential patent portfolio.  I have addressed every one of these factors above in relation to other companies, so what I say here will be a sort of recap as applied to Huawei.  For sales volume, while Huawei has a larger global sales volume than we do, I think the meaningful comparator is how we are trending.  We are both trending *up*, as shown in the figure below:



**Figure 8: Mobile Phone Sales Volume (Ex. 1273)**

38.     Moreover, as I said above, considering our respective worldwide sales volume alone does not give a full picture of our similarities.  You must look deeper than that.  While Huawei has a larger overall sales volume, we have a higher sales volume in a crucial market—the U.S. (13.4 million versus Huawei's 2.9 million in 2015).  (Ex. 1273)  Importantly, we currently have stronger relationships with U.S. operators than Huawei does.  While Huawei has the global infrastructure and heft to cultivate business from the operators, we have positioned ourselves ahead of Huawei in the important U.S. market.  But we expect that in coming years we will face increased competition from Huawei in the U.S. as Huawei pushes hard into this market.

39.     As to ASP, I am told that Ericsson does not break out ASP separately for feature phones and smartphones when comparing us to Huawei.  Ericsson acknowledges that Huawei has shifted its focus away from feature phones, yet still compares our full portfolio ASP (which includes feature phones) with Huawei's mostly smartphone portfolio.  This is not a meaningful way to understand how we are similar to and compete with Huawei.  As should be clear by now, feature phones are usually inexpensive, because they are designed to be basic.  They will always pull down ASP.  But if we look just at smartphones, and break them out by generation, our ASP is very close to Huawei's.  For example, our 2G/2.5G smartphone ASP has converged with Huawei's (figure on the next page):

Case No. SACV14−00341 JVS (DFMx)/CV15-02370
PLAINTIFFS' REBUTTAL DECLARATION OF GEORGE GUO



**Figure 9: ASP for 2G/2.5G Smartphones (Ex. 1273)**

40. As for 3G smartphones, we actually once had higher ASPs than Huawei's, but in recent years our ASPs have been very close (figure on the next page):

1

2

3

4

5

6

7

8

9

10

11

12

13



**Figure 10: ASP for 3G Smartphones (Ex. 1273)**

14    41.    As to 4G smartphones, while Huawei has a "higher" ASP than we do, what I said above regarding Samsung, HTC, LG, and Apple apply to Huawei as well.  On JD.com, a popular e-commerce website in China (like Amazon.com), Huawei sells literally over 120 model options for 4G smartphones supported by service provider China Telecom alone.  (Exs. 2362-64.)  Some sell for as high as ¥ 6,488 (about $946 U.S.).  (Ex. 2363.)  But it has many models that are much, much less expensive.  Its 4X model, for example, is ¥ 619 RMB (about $90 U.S.); its C8818 model is ¥ 648 (about $95); and its GX1 model is also ¥ 648 RMB.  (Ex. 2365.)  Huawei's 4G ASP is skewed upward by the models that are particularly expensive.

24    42.    As to product mix, Huawei has indeed shifted its focus away from feature phones, narrowing its product range to mostly smartphones.  As with Apple and HTC, we do not believe that our broader range of product offerings makes us less competitive with Huawei.  We simply offer consumers a product not offered by Huawei.  That makes us a more diversified (and effective) competitor.  Moreover,

we still have to compete directly with Huawei in the smartphone market—just because we also sell feature phones in no way diminishes how we compete in the smartphone market.

43.     As to Huawei's infrastructure business, it is true that Huawei's primary focus is its infrastructure business.  But judging by the sales trends, the success of that business is *not* coming at the expense of its mobile phone business.  As I showed above, like us, Huawei's mobile phone sales are increasing.  Contrast this with ZTE (which I discuss in further detail below), whose success in its infrastructure business does not seem positively correlated with its mobile phone business.

44.     As to Huawei's patent portfolio, as I explained above, the relative sizes of two companies' portfolios have no bearing on how their phones compete.  It only impacts how they may negotiate licenses to those portfolios.  The average consumer, when selecting a phone, does not necessarily care (or know anything) about the manufacturer's patent portfolio.  The consumer typically cares only about such things as quality, specifications, and price.

### F.     ZTE

45.     I have been informed that Ericsson says ZTE is a major manufacturer of cellular infrastructure.  This is true, and raises an interesting distinction between us and ZTE.  While we do compete with ZTE, its focus on its infrastructure business seems to reflect a shift in focus away from mobile phones.  For example, in its 2011 to 2014 annual reports, ZTE's handset business was categorized as its own business segment.  (Ex. 2366 at p. 71 (referred to as "terminal") ; Exs. 2367-69 at p. 29, respectively (referred to as "terminal" or "handset terminal").)  But in its 2015 annual report, its handset business was no longer categorized as its own category.  (Ex. 2370 at p. 33.)  Instead, handsets were incorporated into what ZTE called its "consumer business," along with "online video and set-top box products," and other consumer products and services.  (*Id.* at p. 32.)  Thus, based on the annual report, it

1  is unclear what revenue and costs are attributable to handsets alone.  Meanwhile, its

2  "carrier networks" business (*i.e.*, its cellular infrastructure business) has continued

3  to have its own category throughout the annual reports from 2011 to 2015 (only

4  these five annual reports are available on ZTE's website).

5      46.    We, meanwhile, are a mobile device business.  Our primary source of

6  revenue comes from selling mobile phones.  All of our energy and drive go into

7  manufacturing these products.  We do not manufacture carrier networks at all.  It is

8  perhaps no surprise then that we have surpassed ZTE's mobile phone sales volume

9  worldwide:



**Figure 11: Mobile Phone Sales Volume (Ex. 1273)**

23      47.    In the U.S., we caught up with ZTE in 2015, and even slightly edged it

24  out (see the figure below).  In 2015, we sold about 13.4 million units in the U.S.,

25  while ZTE sold about 13.3 million units.  And in 2016, we solidified that lead,

26  achieving a 4th place ranking in U.S. sales volume, over ZTE (at 5th).  I provide a

27  figure showing our U.S. sales trends on the next page:

28

**Figure 12: U.S. Mobile Phone Sales Volume (Ex. 1273)**

48.  We expect our lead over ZTE, both globally and in the U.S., to widen in the coming years.

## VI.  LOCAL KINGS

49.  I have been informed that Ericsson says we are similar to certain local kings.  I explain below why I disagree with Ericsson as to each of them.

### A.  Coolpad

50.  I understand that Ericsson says we are similar to Coolpad, because we both purportedly sell "cheap" handsets and have no standard-essential patents.  I disagree with Ericsson on both points.  I get the sense that in using the word "cheap," Ericsson intends to demean our products.  But our products are not "cheap," as Ericsson says.  Our products are high quality but also affordable, and accessible to many people.  When we sell smartphones with the same quality chipsets, cameras, screen size, and memory as Samsung, Apple, LG, and others, I do not see how Ericsson can say our products are "cheap."  And even though our IDOL 4S, for example, is more affordable than its competitors, it sells for over $400 U.S.,

1  which is still beyond the reach of many people in the world.  As for standard-

2  essential patents, while we do not have many, we do have some (*e.g.*, U.S. Patent

3  No. 7,359,718; U.S. Patent No. 7,778,340; U.S. Patent No. 8,031,795; and others).

4  For Ericsson to say we have *none* is simply false.

5       51.    Coolpad may have large sales volumes for a local king, but it is

6  nonetheless a local king, selling mostly in China.  We are not a local king.  We sell

7  around the world in 170 countries, in significant quantities, and have a broad

8  product portfolio.  I do not mean to say that we pay no attention to Coolpad, because

9  we do.  But, we do *not* consider it a major, global competitor.

10       **B.**    **Karbonn**

11       52.    I understand Ericsson says that like Karbonn, we sell "less advanced"

12  and "low retail ASP" handsets.  This reflects a total ignorance and lack of

13  appreciation of our product portfolio.  On our Chinese website, for example, the

14  very first phone we showcase to consumers is our TCL 950.[3]   It is every bit as

15  "advanced" as the Apple iPhone 7 Plus, the Samsung Galaxy Edge S7, the LG G5,

16  and so on.  Ericsson seems to focus in on one segment of our portfolio (like feature

17  phones) to call us "less advanced," to the exclusion of all our other products.

18  Furthermore, as I explained at length above, we do not have "low retail ASP"

19  handsets.  Instead, we have a broad product portfolio ranging from very affordable

20  (feature phones) to more expensive (high-end smartphones), and our most

21  affordable products contribute to an overall lower ASP.  Our lower ASPs also reflect

22  our superior value.

23       53.    We and Karbonn are in fact two very different companies.  Karbonn is

24  clearly a local king.  It sells almost exclusively in India, where we do not really

25  focus our efforts or intend to anytime soon.  Accordingly, we do not consider

26  Karbonn an important competitor.  We also have a much more diversified and

27  

28  
[3] *See* TCL, http://www.tclmobile.com.cn/index.php/Goods  (last visited Jan. 20, 2017).

balanced product mix than Karbonn.  For example, in 2015, Karbonn sold about 12.8 million feature phones, and 2.9 million smartphones.  In other words, over 80%, or *most*, of Karbonn's sales were of feature phones in India.  By contrast, we sold 32.2 million feature phones (worldwide), and 39.1 million smartphones (worldwide).  In other words, about 45% of our sales were of feature phones.  Our mix of products is closer to Samsung's (18% feature phones) and LG's (17% feature phones) than it is to Karbonn's.  Finally, while our smartphone sales are trending upward, consistent with our "step up" business strategy (which I described in my opening declaration), Karbonn's smartphone sales are trending downwards:



**Figure 13: Smartphone Sales Volume (Ex. 1273)**

**C.**     **Sharp**

54.     I understand that while Ericsson says we are similar to Sharp, Ericsson admits that Sharp sells a small number of handsets almost exclusively in Japan. This only confirms my point about Sharp being a local king.  While its smartphone sales were already trending downward, Sharp's acquisition by Foxconn last year

1   makes the future of its mobile phone business very uncertain.  We do not perceive

2   Sharp as an individual competitive threat to our business.

3   **D.   Others**

4   55.   I have been informed that Ericsson also says we are similar to a number

5   of very small local kings, namely:  Doro, Audioline, Beafon, Binatone, Emporia,

6   Mobistel, and Bullitt.  Other than Bullitt, I explained in my opening declaration why

7   we do not focus individually on any of these local kings.  As I said then, while in the

8   aggregate they impact competition, individually we do not consider them important.

9   56.   As for Bullitt, before preparing this rebuttal, I do not recall having ever

10   heard of it.  If I had, the company did not leave any lasting impression on me.  I now

11   understand, after reviewing some information on the company, that Bullitt is a U.K.

12   company that manufactures mobile phones for a few British brands:  Ministry of

13   Sound (record label), JCB (manufacturer of heavy industrial and agricultural

14   vehicles), and Ted Baker (fashion company).  Bullitt also manufactures mobile

15   phones for a few more global brands:  Kodak, Caterpillar, and Land Rover.  Other

16   than Caterpillar, none of these brands' sales were significant enough to be reported

17   by IDC between 2007 and 2015.  (Ex. 1273.)  For Caterpillar, it started selling

18   phones in 2013, and as of 2015, had sold about 400,000 phones, none of which were

19   in the U.S.  The Caterpillar brand phones appear to serve a very niche market—

20   workers in "harsh" environments.  The phones are marketed as "rugged," with

21   "thermal imaging" technology, and waterproof enough to withstand depths of up to

22   five meters.  We consider Bullitt (including its brands) to be a local king.  We do not

23   focus on it individually, and it is not an important competitor.

24   **VII.   NEGOTIATIONS WITH ERICSSON**

25   57.   I understand that Ericsson has described a meeting I had with Kasim

26   Alfalahi in February 2014 at the Mobile World Congress in Barcelona, where we

27   discussed a licensing proposal from Ericsson.  I understand that Ericsson has also

28   presented to the Court an email that I wrote to Mr. Alfalahi on March 5, 2014,

1   saying that his proposal looked "promising."  I understand that Ericsson also points

2   out that the same day, we initiated this action against Ericsson.  I believe the way

3   Ericsson has framed these events paints a very inaccurate and misleading picture of

4   what happened.  This is particularly concerning because Ericsson in fact knows

5   what actually happened, because its lawyer asked me about it at my deposition

6   exactly one year ago (on January 27, 2016).

7       58.     As I explained at my deposition, Mr. Alfalahi sent me an unexpected

8   request to meet with him in Barcelona, which I accepted.  At the meeting, he

9   proposed a lump sum payment approach, which TCL Communication had

10  previously proposed but Ericsson had rejected.  His willingness to revisit such an

11  approach was "promising" to me, as I said in my email.  But that was not the same

12  as saying, "I agree," or "It's a done deal."  To the contrary, in that same email, I

13  indicated we would still need to "form a team" to "start the detail[ed] negotiation"

14  with Ericsson's team.  (Ex. 137.)  Licensing negotiation is a team effort.  I could

15  not, on my own, decide to consummate a deal on behalf of TCL Communication just

16  by having one conversation with Mr. Alfalahi.

17      59.     In any event, I did not write the email to Mr. Alfalahi on March 5, 2014

18  knowing that the same day, TCL Communication would file this lawsuit.  I had and

19  have an extremely high level, broad role at this company.  I knew that we were

20  preparing for the prospect of litigation with Ericsson (especially given that TCT's

21  prior 2G license with Ericsson was expiring in early March 2014), but was not

22  plugged in to exactly what day we would file a lawsuit.  I also do not see why the

23  timing matters, or how the filing of our lawsuit should somehow reflect badly on my

24  efforts and willingness to meet with Mr. Alfalahi and negotiate with him.  Ericsson

25  itself continued to negotiate with us even as it was suing us in eleven different

26  lawsuits in at least six different countries around the world (while also seeking, and

27  in some cases obtaining, injunctions against us).  For Ericsson to imply that I was

28  insincere to negotiate with Mr. Alfalahi in Barcelona, or to call a proposal

"promising," simply because TCL Communication was making preparations for litigation, is very hypocritical.  When Mr. Alfalahi met with me in Barcelona, I did not suggest to him that his proposal was insincere, or that his efforts to negotiate were insincere, based on Ericsson's lawsuits against us.

60.     Also, saying that we "sued" Ericsson while negotiating, without more, seems to suggest that our lawsuit is not consistent with our negotiations.  But it is.  We filed this lawsuit to resolve the parties' dispute over what constitutes FRAND terms and conditions.  The negotiations had been going on for years, Ericsson had already filed many injunction suits against us around the world, and the expiration of our existing 2G license was looming (although we offered to continue paying the rate in our 2G license after its expiration).  We just wanted a third party—the Court—to intervene and assist.  That Mr. Alfalahi reached out to me with a proposal in Barcelona (something I did not expect and had not planned) is beside the point.

## VIII.   CONCLUSION

61.     My overall goal in this declaration was to rebut Ericsson's inaccurate and misleading characterizations of who we supposedly compete with (or not), and who we are supposedly similar to (or not).  I believe that Ericsson has evaluated the "numbers" very superficially.  This includes Ericsson superficially considering only some figures at the exclusion of others or grouping the figures in certain ways, which create artificial gaps between us and our competitors (like Samsung, Apple, and LG).  They do the converse with local kings (like Coolpad, Karbonn, and Sharp), creating artificial similarities.  Ericsson also focuses on aspects of the industry, like relative sizes of patent portfolios, that have nothing to do with how our phone models compete with those of our competitors.  In this declaration, I endeavored to provide a more accurate and meaningful view of the nature of our competition with others.

62.     I believe that Ericsson has also conveyed an image of us that is totally contrary to who we are.  We innovate, we compete aggressively, and we sell high

1  quality phones that span from more affordable to more expensive.  For every phone
2  model that Samsung, Apple, LG, HTC, Huawei, or ZTE put on the market—at every
3  price point—we have a competing model.  We sell a range of products, from very
4  basic phones to very advanced phones, through postpaid operators, prepaid
5  operators, and on the open market.  We serve individual consumers, as well as
6  enterprise and government sectors, through multiple brands, including TCL, Alcatel,
7  and BlackBerry.  We have a diverse, robust portfolio of products.  Based on what I
8  learned, I believe Ericsson has placed unfair, inaccurate labels on us to rewrite our
9  story.  I hope in this declaration I have shown what our real story is.

10
11        I declare under penalty of perjury under the laws of the United States of
12  America that the foregoing is true and correct.
13        Executed on January 27, 2017, at Los Altos Hills, California.

14
15                                            _____
16                                            George Guo

17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF EXHIBITS CITED IN WITNESS DECLARATION**

| Exhibit No. | Description |
| --- | --- |
| 137 | Email chain dated Mar. 5, 2014 with subject line, "Meeting in Barcelona" |
| 456 | TCL Communication 2015 annual report |
| 1140 | TCL Communication 2014 annual report |
| 1273 | Spreadsheet titled "IDC WW Quarterly Mobile Phone Tracker, 2015 Q4 Historical Release," dated Feb. 12, 2016 |
| 2350 | MetroPCS webpage of Samsung Phones, at the URL: https://www.metropcs.com/shop/phones (filter by "Samsung") |
| 2351 | Virgin Mobile webpage for Samsung Galaxy J3, at the URL: https://www.virginmobileusa.com/#!/shop/phones/samsung-galaxy-j3-2016-phone/features/ |
| 2352 | Boost Mobile webpage of Samsung Phones, at the URL: https://www.boostmobile.com/#!/shop/phones/@Samsung/ |
| 2353 | Virgin Mobile webpage for HTC Desire 626s, at the URL: https://www.virginmobileusa.com/#!/shop/phones/htc-desire-626s-phone/features/ |
| 2354 | MetroPCS webpage of HTC Phones, at the URL: https://www.metropcs.com/shop/phones (filter by "HTC") |
| 2355 | MetroPCS webpage of LG Phones, at the URL: https://www.metropcs.com/shop/phones (filter by "LG") |
| 2356 | Virgin Mobile webpage for LG K3, at the URL: https://www.virginmobileusa.com/#!/shop/phones/lg-k3/features/ |
| 2357 | Virgin Mobile webpage for LG Tribute, at the URL: https://www.virginmobileusa.com/#!/shop/phones/lg-tribute-hd/features/ |
| 2358 | Virgin Mobile webpage for LG X Power: https://www.virginmobileusa.com/#!/shop/phones/lg-x-power/features/ |

| 2359 | Tracfone webpage of Phones, at the URL:<br><br>http://www.tracfone-orders.com/bpdirect/tracfone/Start.do?action=view&zip=94122&locale=en&siteType=TR&market=COGSM5&gotoPhonelist=true&productFamily=Phones&AID=&_ga=1.111044748.864211765.1485468811&city=null&state=null |
|---|---|
| 2360 | MetroPCS webpage of Apple Phones, at the URL:<br><br>https://www.metropcs.com/shop/phones (filter by "Apple") |
| 2361 | Boost Mobile webpage of Apple Phones, at the URL:<br><br>https://www.boostmobile.com/#!/shop/phones/@Apple%C2%AE/ |
| 2362 | JD.com webpage of Huawei 4G phones (page 1 of 3), at the URL:<br><br>http://list.jd.com/list.html?cat=9987,653,655&ev=exbrand%5F8557%402943%5F74712&sort=sort_rank_asc&trans=1&JL=3_网络_电信4G#J_crumbsBar |
| 2363 | JD.com webpage of Huawei 4G phones (page 2 of 3), at the URL:<br><br>http://list.jd.com/list.html?cat=9987,653,655&ev=exbrand_8557%402943_74712&page=2&sort=sort_rank_asc&trans=1&JL=6_0_0#J_main |
| 2364 | JD.com webpage of Huawei 4G phones (page 3 of 3), at the URL:<br><br>http://list.jd.com/list.html?cat=9987,653,655&ev=exbrand%5F8557%402943%5F74712&page=3&sort=sort_rank_asc&trans=1&JL=6_0_0#J_main |
| 2365 | JD.com webpage of Huawei 4G phones 500-999 RMB, at the URL:<br><br>http://list.jd.com/list.html?cat=9987,653,655&ev=exbrand%5F8557%40exprice%5FM500L999&sort=sort_rank_asc&trans=1&JL=3_价格_500-999#J_crumbsBar |
| 2366 | ZTE 2011 Annual Report |
| 2367 | ZTE 2012 Annual Report |
| 2368 | ZTE 2013 Annual Report |
| 2369 | ZTE 2014 Annual Report |
| 2370 | ZTE 2015 Annual Report |

PLAINTIFFS' REBUTTAL DECLARATION OF GEORGE GUO

| 4849 | Forbes article titled, "Samsung's Weak Earning Forecast Heightens Smartphone Worries Even As Chipset Prices Soar," dated Jan. 8, 2014 |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the PLAINTIFFS' REBUTTAL DECLARATION OF GEORGE GUO to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER