SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT Mobile
Limited, and TCT Mobile (US) Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants. <br>_____ <br><br> TELEFONAKTIEBOLAGET LM ERICSSON *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD. *et al.*, <br><br> Defendants. | Case No. SACV14−00341 JVS (DFMx) Consolidated with CV15-02370 <br><br> **PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. ANDREW WOLFE** <br><br> Place: Courtroom 10C Before Hon. James V. Selna <br><br><br> Pre-Trial Conf.: Jan. 30, 2017 Trial: Feb. 14, 2017 |

# **TABLE OF CONTENTS**

Page

I.   EXPERT QUALIFICATIONS ................................................................... 1

II.  SUMMARY OF TESTIMONY ................................................................ 4

III. TECHNICAL VALUATION METHODOLOGY ......................................... 6

    A.   Determine the Relevant Technical Market ........................................ 6

    B.   Determine If Products Infringe the Patent Claims ............................ 6

    C.   Determine Availability of Alternate Technologies or Design
        Arounds ......................................................................................... 7

    D.   Determine Usefulness of Claimed Features ...................................... 8

IV.  THE LG PATENTS HAVE LITTLE TO NO TECHNICAL VALUE
     BECAUSE THE CLAIMED FEATURES ARE NOT WIDELY
     IMPLEMENTED, OFFER LITTLE ADVANTAGE OVER POSSIBLE
     DESIGN AROUNDS, AND/OR ARE NOT GENERALLY USEFUL. .......... 8

    A.   U.S. Patent No. 8,078,134 ............................................................. 9

        1.   Overview and representative claims ........................................ 9

        2.   Prosecution history .............................................................. 11

        3.   The charted claims of the '134 Patent neither read on nor
            provide value to iPhone technology. ...................................... 11

        4.   The representative claims of the '134 Patent neither read
            on nor provide value to Samsung phone technology ............... 14

    B.   U.S. Patent No. 8,095,888 ........................................................... 18

        1.   Overview and representative claim ........................................ 18

        2.   Prosecution history .............................................................. 19

        3.   The charted claim of the '888 Patent neither reads on nor
            provides value to iPhone technology. .................................... 20

        4.   The representative claim of the '888 Patent neither reads
            on nor provides value to Samsung phone technology. ............ 23

    C.   U.S. Patent No. 8,300,017 ........................................................... 24

        1.   Overview and representative claim ........................................ 24

        2.   Prosecution history .............................................................. 25

        3.   The charted claim of the '017 Patent neither reads on nor
            provides value to iPhone technology. .................................... 26

4.      The representative claim of the '017 patent neither reads on nor provides value to Samsung phone technology. ...............27

D.   U.S. Patent No. 8,593,415............................................................28

1.      Overview and representative claim ...............................28

2.      Prosecution history ..........................................................29

3.      The charted claim(s) of the '415 Patent neither reads on nor provides value to iPhone technology. ...................................30

4.      The representative claim of the '415 Patent provides no value to Samsung phone technology. ...........................................30

E.   U.S. Patent No. 8,549,426............................................................32

1.      Overview and representative claim ...............................32

2.      Prosecution history ..........................................................33

3.      The charted claim of the '426 Patent provides no value to iPhone or Samsung phone technology. ....................................34

F.   U.S. Patent No. 8,092,253............................................................35

1.      Overview and representative claim ...............................35

2.      Prosecution history ..........................................................36

3.      The charted claim of the '253 Patent neither reads on nor provides value to iPhone technology.........................................37

4.      The representative claim of the '253 Patent neither reads on nor provides value to Samsung phone technology. ...............38

G.   U.S. Patent No. 7,957,770............................................................39

1.      Overview and representative claims................................39

2.      Prosecution history ..........................................................40

3.      The representative claims of the '770 Patent neither read on nor provide value to iPhone technology. ...............................41

4.      The representative claims of the '770 Patent provide no value to Samsung phone technology. ...........................................43

H.   U.S. Patent No. 8,326,377............................................................43

1.      Overview and representative claim ...............................43

2.      Prosecution history ..........................................................45

3.      The representative claim of the '377 Patent neither reads on nor provides value to iPhone technology. ............................46

4.    The representative claim of the '377 Patent neither reads
on nor provides value to Samsung phone technology. ............... 46

V.    CONCLUSION ................................................................................. 46

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION .......................... 48

# DECLARATION OF DR. ANDREW WOLFE

I, Dr. Andrew Wolfe, declare under the penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.   EXPERT QUALIFICATIONS

1.     I have more than 30 years of experience as a computer architect, computer system designer, personal computer graphics designer, educator, and executive in the electronics industry.  My qualifications are detailed in my *Curriculum Vitae*.  (Ex. 1600.)

2.     In 1985, I earned a B.S.E.E. degree in Electrical Engineering and Computer Science from The Johns Hopkins University.  In 1987, I received an M.S. degree in Electrical and Computer Engineering from Carnegie Mellon University.  In 1992, I received a Ph.D. in Computer Engineering from Carnegie Mellon University.  My doctoral dissertation proposed a new approach for the architecture of a computer processor.

3.     In 1983, I began designing touch sensors, microprocessor-based computer systems, and I/O (input/output) cards for personal computers as a senior design engineer for Touch Technology, Inc.  During the course of my design projects with Touch Technology, I designed I/O cards for PC-compatible computer systems, including the IBM PC-AT, to interface with interactive touch-based computer terminals that I designed for use in public information systems.  I continued designing and developing related technology as a consultant to the Carroll Touch division of AMP, Inc., where in 1986 I designed one of the first custom touch-screen integrated circuits.  I designed the touch/pen input system for the Linus WriteTop, which many believe to be the first commercial tablet computer.

4.     From 1986 through 1987, I designed and built a high-performance computer system as a student at Carnegie Mellon University.  From 1986 through early 1988, I also developed the curriculum, and supervised the teaching laboratory, for processor design courses.

5.     In the latter part of 1989, I worked as a senior design engineer for ESL-TRW Advanced Technology Division.  While at ESL-TRW, I designed and built a bus interface and memory controller for a workstation-based computer system, and also worked on the design of a multiprocessor system.

6.     At the end of 1989, I (along with some partners) reacquired the rights to the technology I had developed at Touch Technology and at AMP, and founded The Graphics Technology Company.  Over the next seven years, as an officer and a consultant for The Graphics Technology Company, I managed the company's engineering development activities and personally developed dozens of touch screen sensors, controllers, and interactive touch-based computer systems.

7.     I have consulted, formally and informally, for a number of fabless semiconductor companies.  In particular, I have served on the technical advisory boards for two processor design companies: BOPS, Inc., where I chaired the board, and Siroyan Ltd., where I served in a similar role for three networking chip companies—Intellon, Inc., Comsilica, Inc., and Entridia, Inc.—and one 3D game accelerator company, Ageia, Inc.

8.     I have also served as a technology advisor to Motorola and to several venture capital funds in the U.S. and Europe.  Currently, I am a director of Turtle Beach Corporation, providing guidance in its development of premium audio peripheral devices for a variety of commercial electronic products.

9.     From 1991 through 1997, I served on the Faculty of Princeton University as an Assistant Professor of Electrical Engineering.  At Princeton, I taught undergraduate and graduate-level courses in Computer Architecture, Advanced Computer Architecture, Display Technology, and Microprocessor Systems, and conducted sponsored research in the area of computer systems and related topics.  I was also a principal investigator for DOD research in video technology and a principal investigator for the New Jersey Center for Multimedia Research.  From 1999 through 2002, while a Consulting Professor, I taught a

Computer Architecture course to both undergraduate and graduate students at Stanford University. At Princeton, I received several teaching awards, both from students and from the School of Engineering. I have also taught advanced microprocessor architecture to industry professionals in seminars sponsored by the Institute of Electrical and Electronics Engineers ("IEEE") and Association for Computing Machinery ("ACM"). I am currently a lecturer at Santa Clara University teaching courses on Computer Organization and Architecture, electronics, and embedded computing.

10.     From 1997 through 2002, I held a variety of executive positions at a publicly-held fabless semiconductor company originally called S3, Inc. and later called Sonicblue Inc. I held the positions of Chief Technology Officer, Vice President of Systems Integration Products, Senior Vice President of Business Development, and Director of Technology, among others. At the time I joined S3, the company supplied graphics accelerators for more than 50% of the PCs sold in the United States. At S3 I supervised the design of several PC graphics accelerators.

11.     I have published more than 50 peer-reviewed papers in computer architecture and computer systems and IC design. I also have chaired IEEE and ACM conferences in microarchitecture and integrated circuit design and served as an associate editor for IEEE and ACM journals. I served on the IEEE Computer Society Awards committee. I am a Senior Member of IEEE and a Member of ACM. I am a named inventor on at least 51 U.S. patents and 28 foreign patents, which are listed in my curriculum vitae. (*Id*. at pp. 4-5.)

12.     In 2002, I was the invited keynote speaker at the ACM/IEEE International Symposium on Microarchitecture and at the International Conference on Multimedia. From 1990 through 2005, I have also been an invited speaker on various aspects of technology and the PC industry at numerous industry events including the Intel Developer's Forum, Microsoft Windows Hardware Engineering Conference, Microprocessor Forum, Embedded Systems Conference, Comdex, and

Consumer Electronics Show, as well as at the Harvard Business School and the University of Illinois Law School.  I have been interviewed on subjects related to computer graphics and video technology and the electronics industry by publications such as the Wall Street Journal, New York Times, Los Angeles Times, Time, Newsweek, Forbes, and Fortune as well as CNN, NPR, and the BBC.  I have also spoken at dozens of universities including MIT, Stanford, University of Texas, Carnegie Mellon, UCLA, University of Michigan, Rice, and Duke.

13.    I have also served as an expert witness and testified in a number of litigation matters.  A list of cases in which I have testified (in deposition or at trial) in the last four years is provided in my *curriculum vitae*.  (*Id*. at pp. 6-7.)

## II.    **SUMMARY OF TESTIMONY**

14.    I have been asked by TCL Communication Technology Holdings LTD., TCT Mobile Limited, and TCT Mobile (US), Inc. (collectively, "TCL") to provide my opinions with respect to the valuation of eight non-standard essential patents which I understand LG Electronics transferred to Ericsson and others in 2014 (the "LG Patents").  On November 4, 2016, I submitted an expert report in which I rebutted the opinions of Ericsson's witness, Michael J. Pellegrino, with respect to his valuation of the LG Patents.

15.    I understand that, as part of its SEP license with LG, Ericsson claims to have acquired title to the eight LG Patents as partial consideration for the SEP license granted to LG.  I also understand that Ericsson claims to have attributed $125 million to the value of the LG patent portfolio.  Here in this litigation, Mr. Pellegrino has opined that the LG patents are worth $275 million (unencumbered) or $170 million (encumbered).  In my expert opinion, the LG Patents have little to no value.

16.    Mr. Pellegrino's valuation opinion, as discussed in his expert report, is based, in large part, on the LG Patents being technically important.  His conclusion that the LG Patents are technically important is based on his summary of their

respective general disclosures (*e.g.*, some of the patents are directed to touch screen and/or display technology, and allegedly all of the major mobile phone handsets incorporate touch screen displays, therefore the patents are valuable).  Specifically, Mr. Pellegrino has generally characterized the LG Patents as follows:

| Patent No. | Claimed Features |
|---|---|
| 7,957,770 | Providing tactile feedback, including different levels of tactile feedback, to the user while the user interacts with the device (e.g., when the device is in a muted state) |
| 8,078,134 | Maintain the order of display elements in two regions of the display and rotate those display elements in response to the device being rotated. |
| 8,092,253 | A coaxial cable capable of carrying multiple signals and providing a grounding capability. |
| 8,095,888 | Couples touch to the selective display/manipulation of a web page's content dynamically based on user interaction (e.g., show/resize display content based on touch interaction). |
| 8,300,017 | Scrolling of a screen's contents (e.g., scrolling speed and direction) based on the nature of the touch interactions provided by the user. |
| 8,326,377 | A device that includes a structurally sound, light permeable button and structural support to a touch screen. |
| 8,549,426 | Intelligent device control of multimedia features when the user inserts an earphone into the device's earphone jack or removes an earphone from the device's earphone jack. |
| 8,593,415 | Coupling touch interface to device movement to enable different device behaviors (e.g., press a zoom button on the device and shake it lightly to zoom in a small amount or strongly to zoom in a large amount). |

Table 1 (PDX 14.)

17.    Mr. Pellegrino then assumes that products in the marketplace practice the features claimed by the LG Patents because the LG Patents generally disclose technologies used by some Apple and Samsung devices.  But Mr. Pellegrino never performed a claim by claim analysis to determine if features ***claimed*** by the LG

1  Patents are actually implemented by those devices, or any other mobile phones in

2  the marketplace.  The only value in owning a patent is necessarily related to the

3  right to exclude others from the practice of the patent's claims.  Thus, the value of a

4  patent must be tied to the value of the claimed inventions.  I have conducted a

5  proper claim-by-claim analysis comparing the LG Patents to products in the

6  marketplace, and my analysis demonstrates that the LG Patents have little to no

7  value.

8  **III.   TECHNICAL VALUATION METHODOLOGY**

9       **A.   Determine the Relevant Technical Market**

10       18.   In his expert report, Mr. Pellegrino compared the LG Patents to the

11  Apple iPhone and the Samsung Galaxy mobile handsets, presumably because these

12  are often the two most popular handsets on the market.  Several claim charts

13  produced by Ericsson also compare one or more of the Apple iPhone 3G, 3GS, 4,

14  4s, 5, and 5s, and the Samsung Galaxy S3, S4, Note II, Note 3, and Epic 4G to

15  various claims of the LG Patents. ("the LG Claim Charts").  (Ex. 4513 at pp. 1-66.)

16  In my opinion, the technical value of the LG Patents may be evaluated by

17  comparing specific products within the Apple iPhone and Samsung Galaxy mobile

18  device product lines to the claims of the LG Patents.  In many cases, the LG Patents

19  are directed towards software related features.  In those cases, comparison of the

20  Apple iOS or the Android mobile phone operating systems to the claims of the LG

21  Patents may be sufficient to determine the technical value of the respective patent.

22  Accordingly, I have compared claims of each of the LG Patents to both Apple

23  iPhone and the Samsung Galaxy products, and/or their respective Apple iOS and

24  Android operating systems to determine whether the respective product infringes

25  one or more of the LG Patents.

26       **B.   Determine If Products Infringe the Patent Claims**

27       19.   To derive value for any of the LG Patents through litigation, or the

28  threat of litigation, Ericsson would first need to demonstrate that an accused product

or method infringes at least one claim of that patent.  I have been advised that, under U.S. law, infringement of a claim is determined by comparing each limitation of the claim with the accused product or process.  *See Int'l Visual Corp. v. Crown Metal Mfg. Co., Inc.*, 991 F.2d 768, 772 (Fed. Cir. 1993).  Infringement may be either literal or under the doctrine of equivalents.  To establish literal infringement, every limitation set forth in a patent claim must be found in an accused product or process.  *Seal-Flex, Inc. v. Athletic Track & Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999).  Infringement under the doctrine of equivalents ("DOE") requires that "the difference between the claimed invention and the accused product [be] insubstantial," which may be established by "showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009); *see also Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 36 (1997).  ("The known interchangeability of substitutes for an element of a patent is one of the express objective factors bearing upon whether the accused device is substantially the same as the patented invention.")  Accordingly, for each of the LG Patents to have value, every element from at least one claim of that patent must be found in one or more mobile phone devices (either literally or under the DOE).

### C.   Determine Availability of Alternate Technologies or Design Arounds

20.     A key driver for the value of intellectual property is whether a third party can design around the key protections for the intellectual property, while retaining the benefits of the utility described in the intellectual property. Accordingly, even where current mobile devices in the market may infringe one or more claims of one of the LG Patents, a reasonable determination of the respective patent's value should necessarily include an analysis of possible non-infringing

alternatives to that claim.  The relative value of the claimed solution decreases in relation to the equivalence in functionality and cost of implementing the non-infringing alternative as compared with the claimed solution.  Thus, even if a product would infringe one of the claims of the LG Patents, the patent may still have little to no value if there exists a non-infringing alternative with equivalent functionality and implementation cost.  Moreover, a patent has minimal value if the prior art or another non-infringing alternative is equally accepted in the market or has little or no impact on product sales or cost.

### D.    Determine Usefulness of Claimed Features

21.    Utility of inventions claimed by the each of the LG Patents is an important factor in determining that patent's technical value.  Thus, even where mobile devices in the market may infringe one or more claims of one of the LG Patents and no reasonable non-infringing alternative exists, the usefulness of the claimed invention must also be considered in determining the patent's value. Usefulness of the invention must be considered in view of novel claimed features, and not from the general description of the patented technology.  Accordingly, in my analysis below, I consider the usefulness of particular mobile device features allegedly covered by one or more claims of each of the LG Patents from the perspective of claim elements as they are compared to previous technologies (e.g., a claim limitation may have been added during prosecution to distinguish the claim from a prior art solution).

## IV.    THE LG PATENTS HAVE LITTLE TO NO TECHNICAL VALUE BECAUSE THE CLAIMED FEATURES ARE NOT WIDELY IMPLEMENTED, OFFER LITTLE ADVANTAGE OVER POSSIBLE DESIGN AROUNDS, AND/OR ARE NOT GENERALLY USEFUL.

22.    In response to Mr. Pellegrino's opinions, I have conducted a technical analysis of the LG Patents, consistent with the above approach and protocols.  The results of my analysis are described below on a patent-by-patent basis.  As indicated

earlier, I conclude that the LG patents have little to no value.

**A.   U.S. Patent No. 8,078,134**

1.   Overview and representative claims

23.   U.S. Patent 8,078,134 ("the '134 Patent") entitled "Mobile terminal and method of controlling operation of the mobile terminal" was filed on May 11, 2009, claiming an earlier February 2, 2008 priority date and assigned to LG Electronics. (Ex. 202.)  LG assigned the '134 Patent to Telefonaktiebolaget LM Ericsson on February 25, 2015.  (Ex. 1620 at p. 1.)

24.   The patent describes a mobile terminal with a display, an acceleration sensor, and a controller that alters the display in specific ways in response to rotating the display.  The bulk of the patent explains how to perform rotation of two display regions between a side-by-side and top-bottom orientation.  (Ex. 202 at pp. 7-11, 14, FIGS. 6-10, 13.)  This embodiment of the patent is claimed, for example, in apparatus claim 16.  Claim 1 is a corresponding method claim.  Both claims were amended during Re-Examination of the '134 Patent, and have similar scope.  Claim 18 describes a slightly different embodiment whereby after rotation, only one of the display region's content is displayed in a scaled-up manner.  The remaining claims are narrower in scope.

25.   Claim 16 and claim 18 are representative claims.  Claim 16 reads as follows:

>16.   A mobile terminal comprising:
>
>a display module for displaying first content and second content;
>
>an acceleration sensor for providing measurement data on a direction of gravitational acceleration of the mobile terminal; and
>
>a vibrator coupled to the terminal body and configured to allow tactile detection by a user; and
>
>a controller configured to display the first content *at a first region of the display module* and the second content *at a second region of the display module* in line vertically and to rotate the first content and the second content when the measurement data indicate that the mobile

terminal has been rotated to a first position while uniformly maintaining a display direction of the display module, *wherein total area of the first region is substantially the same as total area of the second region*, and configured to display the first content and the second content in line horizontally and to rotate the first content and the second content when the measurement data indicate that the mobile terminal has been rotated to a second position while uniformly maintaining the display direction of the display module,

*wherein the mobile terminal has a widthwise edge and a lengthwise edge longer than the widthwise edge, the first position is a vertical position of the mobile terminal when the lengthwise edge is approximately perpendicular to the ground, and the second position is a horizontal position of the mobile terminal when the lengthwise edge is approximately parallel to the ground,*

*when the mobile terminal is rotated clockwise from the vertical position to the horizontal position, the first content and the second content are rotated counterclockwise and the first content and the second content are switched in region position such that the first content is displayed at the second region and the second content is displayed at the first region, and*

*when the mobile terminal is rotated counterclockwise from the vertical position to the horizontal position, the first content and the second content are rotated clockwise and the first content and the second content are maintained in region position such that the first content continues to be displayed at the first region and the second content continues to be displayed at the second region.*

(*Id*. at p. 28, Claim 16.)

26.     Claim 18 reads as follows:

18.     A mobile terminal comprising:

a display module having a first display region and a second display region;

an acceleration sensor for providing measurement data on a direction of gravitational acceleration of the mobile terminal; and

a controller configured to display first content and second content in the first display region and the second display region,

wherein the controller is configured to scale up either the first content or the second content and to display the scaled-up content in a combined area of the first display region and the second display region while uniformly maintaining the display direction of the display module, if the measurement data indicates the mobile terminal has been rotated.

(*Id*. at pp 25-26, Claim 18.)

        2.   <u>Prosecution history</u>

    27.   The initial prosecution of the '134 Patent was uneventful.  There were no rejections and the claims were allowed as originally drafted and the patent issued on December 13, 2011.  (Ex. 4438 at p. 16.)  On September 11, 2013, an *ex parte* reexamination petition was filed challenging the '134 Patent.  (Ex. 1621 at p. 588.)  As a result, claims 1, 5, 8-10, 16, 17, 21-38 of the '134 Patent were amended to avoid cited prior art references and a Re-Examination Certificate was issued on June 19, 2014.  (*Id*. at p. 1.)  Specifically, claims 1 and 16 were amended as reflected *supra* in section IV.A.1 (the italicized portions of the claim were added during the Re-Examination process).  Notably, the LG claim charts reviewed by Ericsson as part of its decision to purchase the '134 Patent erroneously analyze claims prior to the reexamination and do not include or address these amendments to claim 16, and are therefore incomplete.  (Ex. 4513 at pp. 42-45.)

        3.   <u>The charted claims of the '134 Patent neither read on nor provide value to iPhone technology.</u>

    28.   The only technical analysis that I am aware of regarding the '134 Patent that appear to have been part of the initial evaluation process of the LG Patents and produced by Ericsson consists of a set of cursory infringement charts for claims 16 of the '134 patent with respect to the Samsung Galaxy Note II and claim 18 with respect to the Samsung Galaxy Note 3 phones.  (*Id*.)  I am unaware of any infringement analysis with respect to the Apple iPhone.  Since LG clearly considered the iPhone with respect to other patents in this presentation and it was

well known at the time that the iPhone was the most profitable mobile phone, the most reasonable conclusion is that LG was unable to find any infringing features present in the iPhone.

29.     Claim 16 requires that two windows displayed on the phone be repositioned when the phone is rotated such that each display window is in the same location on the display after rotation but the orientation of the content within each window has been rotated.  (Ex. 202 at p. 9, FIG. 8.)



(*Id.*)

30.     I have examined a variety of applications using an iPhone 5s model ME342LL/A running iOS 9.3.2.  While I cannot examine every possible application and usage scenario, I have not found any applications on this iPhone that rotate the screen in the manner identified in claim 16.  Many applications simply reformat the screen as a whole when rotated without regard to independently rotating two content

objects as described in the '134 Patent.  Reformatting the screen as a whole is therefore an acceptable design around, if in fact there exists some application that practices claim 16 (which I have not seen).  The narrowing amendment to claim 16 makes it clear that the scope of this claim is not substantially broader than the disclosed embodiment.

31.    Claim 18 describes a different embodiment in which two content elements are displayed in first and second regions of a display respectively and then, in response to rotation, one of the elements is scaled up and displayed in a combined area of the first and second region.  Ericsson has not identified any evidence that iPhones practice this claim.  As with claim 16, no iPhone allegations appear in the LG claim charts.

32.    At the time of the iPhone introduction in 2007, prior to the priority date of the '134 Patent, the iPhone had the ability to scale up a content item in response to phone rotation and display the scaled-up content in a combined area that previously displayed that content and a second content item.  I have personal knowledge that the iPhone operated in this manner as of its launch in 2007.  An example of how these features worked can be seen in the original iPhone launch presentation.  (Ex. 1622 at 32:37-34:11, 18:23-18:30.)  I have examined a variety of applications using an iPhone 5s model ME342LL/A running iOS 9.3.2.  I do not see any meaningful difference between the way that this iPhone scales up and displays content in response to rotation as compared to the 2007 iPhone.  Accordingly, if claim 18 is broad enough to include the recent or current iPhone rotation capabilities then there is no reason to believe that the claim is valid.  If the claim is narrower, then there is no reason to believe that it is practiced by the iPhone.

33.    Even if, *arguendo*, the specialized forms of rotation display management claimed by the '134 Patent were practiced by the iPhone, they are not important features.  Instead, the important features of the iPhone with respect to screen rotation are the ability to automatically rotate the screen in response to

changes in orientation and the ability to notify applications of this event such that the screen can be redrawn in the manner best suited for the individual application. These features are not claimed by the '134 Patent, and clearly predate the priority date of the '134 Patent.

34.     For the reasons stated above, it is my opinion that the '134 Patent has little to no value with respect to Apple iPhone mobile devices.

> 4.     <u>The representative claims of the '134 Patent neither read on nor provide value to Samsung phone technology.</u>

35.     LG apparently provided Ericsson with infringement charts for claim 16 of the '134 Patent with respect to the Samsung Galaxy Note II and claim 18 with respect to the Samsung Galaxy Note 3 phones.  (Ex. 4513 at pp. 42-45.)  These charts lack critical information necessary to validate their accuracy.  For example, the charts do not disclose what version of Android is being used on either phone. The application software running on each of the phones is not identified.  The specific steps involved in setting up the two content areas on the display are not disclosed.  Furthermore, the additional limitations in the reexamined claim 16 are not addressed.

36.     The LG charts for the Samsung Galaxy Note 2 phone appear to use a Samsung-specific feature called "Multi-Window" that is supported on a subset of Samsung Android phones.  (*Id*.)  The appearance that the content is being rotated is an illusion tied to the specific content illustrated in the chart and the inability to precisely measure or review that content.  In general, the Multi-Window mode allows two applications to run concurrently, each using part of the display.  Each application is informed that it has access to a virtual display of a certain size.  In this manner, one application can use the top of the display while another uses the bottom of the display.  The display need not be split evenly and the top and bottom windows can be of substantially different sizes.  When the display is rotated, each application is instead assigned one side of the display for its use.  Since these

windows are seldom square (and likely never both square because it is common for modern smartphones to use a 16:9 screen aspect ratio), the applications are informed of their new display windows and they redraw their output in an application-specific manner to fit the new window.  The old content is never rotated.  Instead, newly rendered content is displayed in the display windows when the display is rotated.  In general, the altered display window shape results in a completely new display customized for the new display area.  In some circumstances the new windows may generally resemble a rotated version of the original content, but this would be coincidental.  Accordingly, the "Multi-Window" feature does not display scaled up versions of "the first content or the second content . . . in a combined area of the first display region and the second display region," as required by the claims, but instead displays newly rendered content.  As such, the "Multi-Window" feature does not read on claim 18 as alleged in the LG claim charts, and does not infringe the patent.

37.     I have initiated two applications using Multi-Window on the Samsung Galaxy Note 3 and on the Samsung Galaxy Note II.  When the phone is rotated, it clearly redraws the screen using the new screen window dimensions.  The content of each window, treated as a whole, is not the same.  In any case, the displays in those windows have not simply been rotated as in the '134 Patent.  It is clear to a reader of the '134 Patent that it is the actual previous content of the window that must be rotated and redisplayed, not just similar content based on the same application.

Case No. SCACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. ANDREW WOLFE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Galaxy Note 3 (PDX 15.)

16
17
18
19
20
21
22
23
24
25
26
27
28





Galaxy Note II (PDX 16.)

38.     Claim 16 is also quite narrow and easily designed around.  For example, Claim 16 requires that upon a clockwise rotation the top window must be rotated to be displayed on the left and the bottom window must be rotated and displayed on the right (as illustrated in '134 Patent, Fig. 8).  The simple design around is to display the former top window in the right and the former bottom window on the left.  There is no evidence to support any consumer preference for one configuration over the other and no reason to believe that one particular choice is preferable.

39.     Moreover, Claim 18 is likely invalid with respect to the original iPhone.  At the time of the iPhone introduction in 2007, prior to the priority date of the '134 Patent, the iPhone had the ability to scale up a content item in response to phone rotation and display the scaled-up content in a combined area that previously displayed that content and a second content item.  I have personal knowledge that the iPhone operated in this manner as of its launch in 2007.  An example of how these features worked is illustrated in the original iPhone launch presentation.  (Ex. 1622, at 32:37-34:11, 18:23-18:30.)  Even if *arguendo* the screen rotation and scaling mechanism in the original iPhone did not anticipate claim 18, it is an acceptable design around for claim 18.

40.     Finally, the specialized forms of rotation display management claimed by the '134 Patent are not important features of the Samsung phones.  The important features of the Samsung Phones with respect to screen rotation are the ability to automatically rotate the screen in response to changes in orientation and the ability to notify applications of this event such that the screen can be redrawn in the manner best suited for the individual application.

41.     For the reasons stated above, it is my opinion that the '134 Patent has little to no value with respect to Samsung Galaxy mobile devices.  Moreover, the LG claim chart discussed above refers to features specific to Samsung Galaxy mobile devices.  I would not expect to find these same features in any other

Android-based phones, nor has Ericsson put forward any evidence of any other phone that would practice these features.

42.     In sum, for the reasons stated above, it is my opinion that the '134 Patent has little to no technical value.

**B.     U.S. Patent No. 8,095,888**

1.     Overview and representative claim

43.     U.S. Patent 8,095,888 ("the '888 Patent") entitled "Mobile terminal and image control method thereof" was filed on March 12, 2009, claiming a July 29, 2008 priority date, and assigned to LG Electronics.  (Ex. 204 at pp. 1-32.)  On July 31, 2015, LG assigned the '888 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '888 Patent was never assigned to Ericsson.

44.     The '888 Patent describes a specific method of interacting with a web page, and a mobile terminal apparatus with the capability to perform the functions described in this method.  Only one mode of operation described by the patent is actually claimed.  The method and apparatus claims require sensing the orientation of a mobile device (*e.g.*, a smart phone), accessing a web page, and presenting that web page on the display according to the sensed orientation.  In practice, this would be a portrait or landscape presentation in response to the corresponding orientation.  A user would then touch one of the images presented in the web page in order to change its size.  Objects outside of the original border of the image would be moved in order to conform to the new image border.  These objects could include text as indicated in dependent claims 4 and 11.

45.     Claim 1, an apparatus claim, is a representative claim.  Claim 8, the only other independent claim, is a corresponding method claim.  All of the other claims are narrower in scope.  Claim 1 reads as follows:

1.     A mobile terminal, comprising:

a wireless communication unit configured to connect to the Internet to receive a web page;

a display unit configured to display the web page;

a sensing unit configured to sense an orientation of the mobile terminal; and

a controller configured to:

present the web page according to the orientation of the mobile terminal;

change a size of an image on the web page presented on the display unit in response to a touch applied to effect a change in the size of the image;

reconfigure a boundary of the image displayed on the web page presented on the display unit according to the change in the size of the image; and

move objects positioned adjacent to the boundary of the image on the web page presented on the display unit toward the boundary of the image.

(Ex. 204 at p. 31, Claim 1.)

### 2. Prosecution history

46.     During prosecution, claims 1-4, 7, 11-14, and 17 were initially rejected as anticipated by U.S. Publication 2009/0021790 to Krovitz.  (Ex. 4442 at p. 47.) The Applicant amended claim 1 and argued that Krovitz fails to teach that the controller is configured to present the web page according to the orientation of the mobile terminal and change the size of an image on the web page presented on the display in response to a touch applied to effect a change in the size of the image. (*Id.* at 37-39.)  The claims were allowed pursuant to this amendment.  (*Id.* at 14-15.)

47.     It is completely unclear what the point of novelty in claim 1. Certainly mobile smartphones configured to connect to the internet to receive a web page, such as the iPhone, were well known at the time of the filing of the '888

Patent.  At that time an iPhone would include a display to display the web page and an orientation sensor to distinguish whether the phone was being held in the portrait or landscape orientation.  I have personal knowledge that the iPhone operated in this manner as of its launch in 2007.  An example of how these features worked is illustrated in the original iPhone launch presentation.  (Ex. 1622 at 33:02-33:40.)  Smartphones prior to the filing of the '888 Patent, like the iPhone, displayed web pages according to the orientation of the phone when the orientation had not been locked.  (*Id.*)  Furthermore, the browsers used on smartphones prior to the filing of the '888 Patent followed the HTML standards, incorporating at least the features of HTML 4.0 which was published in 1998.  HTML contemplates flowing text around the boundaries of an image.  (Ex. 1625 at pp. 185-87, § 15.1.3.)  In ordinary HTML, the image size is established when the page is rendered and if the image size were to be altered, the page would be re-rendered, reflowing the text around the new image boundary.  Additionally, at the time of the iPhone introduction in 2007, the iPhone would redraw a web page to match the phone's orientation, change the size of an image in response to double-tapping on that image, change the boundary of that image on the display, and move text and other objects on the display to surround the resized image.  I have personal knowledge that the iPhone operated in this manner as of its launch in 2007.  An example of how these features worked is illustrated in the original iPhone launch presentation.  (Ex. 1622 at 41:38-42:38.)

3. The charted claim of the '888 Patent neither reads on nor provides value to iPhone technology.

48. The only technical analysis that I am aware of regarding the '888 Patent and produced by Ericsson consists of a set of cursory infringement charts for claims 1-4 of the '888 Patent with respect to the Apple iPhone 4, 4s, 5, and 5s and the Samsung Galaxy S3, S4, Note II, and Note 3 phones that appear to have been part of the initial evaluation process of the LG Patents.  (Ex. 4513 at pp. 42-45.)

49. As an initial matter, the analysis presented in these charts is incomplete

1   and highly flawed.  For example, the charts purport to identify elements of

2   dependent claims 2, 3, and 4 with respect to the Samsung Galaxy S3, S4, Note II,

3   and Note 3 but does not identify any of the elements of the base independent claim 1

4   with respect to these phones.  Moreover, the screen shots shown for these claims do

5   not appear to be from Samsung phones but instead from Apple phones.  (*Id.*)

6        50.    While the LG chart discloses the web site that was displayed in the

7   chart (m.naver.com) it does not disclose the date in which the test was performed

8   nor the reason that this web site was selected.  The chart also does not identify

9   which operating system version is being used nor which browser software.

10  Moreover, there is no evidence that this test was performed in the United States or

11  that the pictured web site provided the same content in the United States.  On

12  October 10, 2016, when I tested m.naver.com on a Samsung Galaxy Note II and

13  Samsung Galaxy Note 3, it did not operate as alleged.  Photographs of one of those

14  tests are shown below.

15

16

17

18

19

20

21

22

23

24

25

26

27

 

(PDX 17.)

28       51.    The disclosure in the chart with respect to the claim element "change a

size of an image on the web page presented on the display unit in response to a touch applied to effect a change in the size of the image" is not well supported in the chart.  The chart merely alleges that if a specific portion of the illustrated image is touched then the size of the image will change.  There is no explanation as to how or why, and nothing to demonstrate that this actually happens.

52.    Touching the corner of a web-site image on an iPhone does not ordinarily change the size of the image.  This is true whether one performs a simple touch or a gesture like a drag or tap.  The details of the particular image shown are not readable on the production, but I believe that the only way in which touching the image as shown in the chart could change the apparent size of that image is if the point being touched is actually a selection control for asking that a smaller version of the image be selected and that the screen is redrawn.

53.    LG's analysis is problematic in many ways.  If, in fact, the m.naver.com web page actually operated as illustrated in the chart on some undetermined date, then the alleged functionality is part of that web site and not part of the iPhone.  It is almost certain that the identified functionality would involve re-fetching and re-drawing at least a portion of the web page.  There is no evidence that the phone itself or any controller on the phone changes the size of an image.  Moreover, in my opinion, this particular web site is most likely just using ordinary HTML.  It would have operated in exactly the same way if it had been accessed by a 2007 iPhone produced prior to the filing of the '888 Patent.  It appears no different than the prior art.

54.    Additionally, there is no evidence that this functionality appears on anything other than one particular web site on one particular day.  I attempted to duplicate the claimed "change a size of an image" functionality on several web sites using an iPhone 5s model ME342LL/A running iOS 9.3.2 and the Safari browser.  I did not find the claimed behavior to be present on, for example, the main pages of the New York Times, Ebay, Amazon, or CNN.  I also accessed m.naver.com and did

1   not find any of the claimed "change a size of an image" functionality to be present.

2   If this functionality exists on any web sites, it is not commonplace.

3       55.    Given that the alleged functionality is, at most, a feature of a particular

4   web site and not particular phones, it is not clear how a phone manufacturer would

5   be interested in licensing this patent.  In my opinion, a phone manufacturer

6   presented with the evidence in the LG claim chart would respond by simply

7   informing Ericsson that the accused functionality in the phone is merely a direct

8   implementation of the 1998 HTML standard and could not be infringing.  Moreover,

9   it appears that if this functionality is provided by web sites, it is uncommon and

10  unimportant.  For the reasons stated above, it is my opinion that the '888 Patent has

11  little to no value with respect to iPhone mobile devices.

12      4.    <u>The representative claim of the '888 Patent neither reads on nor</u>

13  <u>provides value to Samsung phone technology.</u>

14      56.    There is no analysis of the elements of claim 1 for any Samsung phones

15  in the LG chart, however, I have examined a Samsung Galaxy Note 3 Model SM-

16  N900V running Android 5.0 and the Chrome browser.  I looked at the same web

17  sites including m.naver.com and did not find the claimed "change a size of an

18  image" functionality.

19      57.    Accordingly, it is my opinion that the '888 Patent has little to no value

20  with respect to Samsung Galaxy mobile devices for at least the same reasons as my

21  analysis above with respect to the iPhone.  Moreover, because the '888 Patent is

22  directed towards functionality of the web browser of the mobile device vis-à-vis

23  controlling how content is displayed on the mobile device display, the '888 Patent

24  would also likely have little to no value with respect to any other mobile device that

25  uses the Android operating system.

26      58.    In sum, for the reasons stated above, it is my opinion that the '888

27  Patent has little to no technical value.

28

C.      **U.S. Patent No. 8,300,017**

1.      Overview and representative claim

59.     U.S. Patent 8,300,017 ("the '017 Patent") entitled "Mobile electronic apparatus with touch input device and display method using the same" was filed on June 22, 2007, claiming a January 20, 2007 priority date, and assigned to LG Electronics.  (Ex. 205 at pp. 1-17.)  On July 31, 2015, LG assigned the '017 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '017 Patent was never assigned to Ericsson.

60.     The patent describes a method of scrolling an image on a mobile, touch-input display device that requires very specific mechanisms and responses.  It does not correspond with the commonly used techniques for scrolling on a mobile phone.

61.     The claims of the '017 Patent require that one can touch a specific position on data information displayed behind a touch screen.  At least a portion of that data information is then scrolled based on the position of the touch input.  The display must include a reference position and the speed of the movement of the scrolling is determined based on the distance between this reference position and the position of the aforementioned touch.  Additionally, the direction of the movement of the data is determined with respect to the position of this touch.

62.     Claim 17 is an apparatus claim and is representative.  Claim 1, the only other independent claim, is a corresponding method claim.  All of the other claims are narrower in scope.  Claim 17 is as follows:

17. A mobile terminal, comprising:

a display unit comprising a touch screen for:

displaying data information in a display area of the touch screen; and

receiving a touch input at a position of the data information displayed in the display area of the touch screen; and a controller for:

scrolling the displayed data information in response to the touch input, the scrolling comprising controlling movement of at least a portion of the data information in the display area according to the position of the touch input; and

causing the display unit to display new data information in the display area when the displayed data information is scrolled, wherein the new data information has a continuity with the data information displayed in the display area before the scrolling,

wherein the data information displayed in the display area is distinguishable from graphic icons and menu icons displayed in the display area,

wherein the display area comprises a reference position,

wherein a speed of the movement of the at least the portion of the data information is determined based on a distance between the position of the touch input and the reference position, and

wherein a direction of the movement of the at least the portion of the data information is determined according to the position of the touch input with regard to the position.

(Ex. 205 at p. 17, Claim 17.)

### 2. Prosecution history

63.    The claims of the '017 Patent were initially rejected as anticipated by prior art through two rounds of prosecution.  (Ex. 1626 at pp. 62-64, 101-04, 149-52, 181-84.)  The last rejection before allowance was over U.S. Publication 2004/008727 to Kamiya.  (*Id*. at 62-64.)  To overcome that rejection, the applicant amended claim 18 (issued as claim 17) to require, among other things, that scrolling speed and movement be based on the distance between a reference point and the position of the touch.  (*Id*. at 43.)  Most of the scrolling aspects of this claim were disclosed in the prior art, including for example, U.S. Patent RE43,931 owned by Ericsson.  (Ex. 1627 at pp. 1-18.)

Case No. SCACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. ANDREW WOLFE

3.     <u>The charted claim of the '017 Patent neither reads on nor provides value to iPhone technology.</u>

64.     The touch-based scrolling technique claimed in the '017 Patent is not the common technique that is used on phones. In an ordinary touch-screen phone, scrolling is performed according to motion of touch input and not the specific position of the input. In fact, the common phone scrolling technique allows for any position within a window without distinguishing one position from another. No reference position as per the claim generally exists. The speed of the scrolling corresponds to the speed of the user motion, not the position of the touch or the distance from a reference position. The direction of scrolling is likewise based on the direction of motion and not on the position of the touch input.

65.     This ordinary form of touchscreen scrolling not only constitutes an acceptable design around for this patent, but based on its prevalence in the market is the preferred option over the '017 Patent's technique.

66.     Also, in my opinion, LG has misinterpreted the claims in its claim charts and has attempted to chart an unclaimed embodiment. While the patent describes embodiments that use both a reference point and a reference line, the claims require a reference position. The '017 Patent only describes points as having a position. Moreover, a person of ordinary skill would read the claimed position to refer to a point in the context of these claims. In contrast, a line requires more than one position to describe. Thus, the '017 Patent is very narrow and generally unimportant.

67.     The only technical analysis that I am aware of regarding the '017 Patent and produced by Ericsson consists of a set of cursory infringement charts for claims 17, 23, 25, and 26 of the '017 Patent with respect to the Apple iPhone 4, 4s, 5, and 5s. (Ex. 4513 at pp. 51-57.) These charts are flawed in many ways.

68.     First, the charts appear to show an iPhone running some application. The version of the iOS operating system is not identified, nor is the specific phone

model or the application in use.  These are static images that do not in any way show what actions are causing scrolling to occur, the speed at which the scrolling occurs, or the factors that impact the amount, direction, or speed of scrolling.  At most they merely show that scrolling can occur.  Second, the LG charts do not identify a reference position nor provide any evidence that one exists.  Numerous claim limitations such as "according to the position of the touch input", "a reference position", and "distance between the position of the touch input and the reference position" are not specifically addressed.

69.     I have used every iPhone model including the iPhone 4, 4s, 5, and 5s and have never encountered an application that scrolls in the manner described in claim 17 of the '017 Patent.  I specifically tested an iPhone 5s model ME342LL/A running iOS 9.3.2 in preparing my expert report and was unable to identify any application that behaved in this manner.  In ordinary use, an iPhone does not scroll in response to a point on the displayed data being touched.  It scrolls in response to motion of the finger using what is commonly called a "drag" gesture.  There is no reference position.  The location of the touch does not determine the amount, speed, or direction of scrolling.  Scrolling is a feature that tends to be highly standardized between all applications within a given phone.  There is no reason to believe that Apple would change its current scrolling method to the one described in the '017 Patent.  For the reasons stated above, it is my opinion that the '017 Patent has little to no value with respect to iPhone mobile devices.

4.     <u>The representative claim of the '017 patent neither reads on nor provides value to Samsung phone technology.</u>

70.     The LG claim charts produced by Ericsson do not provide any allegations or analysis with respect to any Samsung phones.  I have used many Android phones including Samsung phones and have not encountered anything that operates as described in the '017 Patent's claims.  Like the iPhone, the Samsung phones scroll in response to motion of the finger using what is commonly called a

1  "drag" gesture.  There is no reference position.  The location of the touch does not

2  determine the amount, speed, or direction of scrolling.  Scrolling is a feature that

3  tends to be highly standardized between all applications within a given phone.

4  There is no reason to believe that Samsung would change its current scrolling

5  method to the one described in the '017 Patent.

6       71.    For the reasons stated above, it is my opinion that the '017 Patent has

7  little to no value with respect to Samsung mobile devices.  Moreover, because the

8  '017 Patent is directed towards functionality of the operating system of the mobile

9  device vis-à-vis controlling how content is displayed on the mobile device display,

10  the '017 Patent would also likely have little to no value with respect to any other

11  mobile device that uses the Android operating system.

12       72.    In sum, for the reasons stated above, it is my opinion that the '017

13  Patent has little to no technical value.

14      **D.**    **U.S. Patent No. 8,593,415**

15          1.    Overview and representative claim

16       73.    U.S. Patent 8,593,415 ("the '415 Patent") entitled "Method for

17  processing touch signal in mobile terminal and mobile terminal using the same" was

18  filed on March 10, 2010, claiming a June 19, 2009 possible priority date, and

19  assigned to LG Electronics.  (Ex. 208 at pp. 1-40.)  On July 31, 2015, LG assigned

20  the '415 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my

21  understanding that the '415 Patent was never assigned to Ericsson.

22       74.    The patent describes a method of shaking a phone or tablet while a

23  touchscreen is being touched in order to perform actions.

24       75.    Claim 10 is an apparatus claim and is representative.  Claim 1, the only

25  other independent claim, is a corresponding method claim.  All of the other claims

26  are narrower in scope.  Claim 10 is as follows:

27         10.  A mobile terminal for processing a user input, the terminal
          comprising:

28

a touch screen configured to receive a touch input and display data;

a movement detection sensor configured to detect movement of the mobile terminal; and

a controller configured to

receive a touch input on a potion [sic] of the data on the touch screen;

change a size of the data based on an area where the touch input is received when the movement detection sensor detects the movement of the mobile terminal while the touch input on the portion of the data is maintained, and

control the touch screen to display the size-changed data.

(Ex. 208 at p. 40, Claim 10.)

76.     In the context of the '415 Patent, it's my opinion that this claim would likely be narrowly construed.  The only movement disclosed in the '415 Patent is a shaking movement and the patent consistently describes the invention in terms of a shaking motion, beginning with the abstract and including disclosure of 20 different embodiments that all use a shaking motion.  (*Id*. at 1-40.)

2.     Prosecution history

77.     During prosecution, claims 1-7, 9-17, and 20 were rejected as obvious over U.S. Publication 2010/0066688 to Jeon.  (Ex. 1628 at pp. 89-92.)  Jeon discloses controlling functions of a mobile phone (*i.e.*, refreshing a web page) by touching the screen and then tilting the phone.  (*Id*.)  The Applicant amended claim 11 (issued as claim 10) to specify that the function controlled is changing the size of displayed data on the screen.  The applicant amended the claim and argued that Jeon does not explicitly disclose a contemporaneous touch with the movement.  (*Id*. at 73, 77-81.)  The Examiner did not cite any more references against claim 11, and the claim was allowed.  (*Id*. at 52.)

3.    The charted claim(s) of the '415 Patent neither reads on nor provides value to iPhone technology.

78.    The only technical analysis that I am aware of regarding the '415 Patent and produced by Ericsson consists of a set of cursory infringement charts for claims 10, 14, 15, and 16 of the '415 Patent with respect to the Samsung Galaxy Note II, Note 3, S3, S4, and Tab 10.1.  (Ex. 4513 at pp. 35-40.)  No charts were produced with respect to Apple products.

79.    The iPhone does not use the technology claimed in the '425 Patent, or anything like it.  The iPhone uses a 2-finger pinch-to-zoom gesture that predates the '415 Patent.  I have personal knowledge that the iPhone operated in this manner as of its launch in 2007.  An example of how these features worked is illustrated in the original iPhone launch presentation.  (Ex. 1622 at 33:15-33:39.)  This has been highly acclaimed and is generally used by iPhone users.  Apple has no need for any phone-motion gesture for zooming, they already have an excellent non-infringing solution.  For the reasons stated above, it is my opinion that the '415 Patent has little to no value with respect to iPhone mobile devices.

4.    The representative claim of the '415 Patent provides no value to Samsung phone technology.

80.    At least some subset of Samsung phones do have an optional 2-finger tilt-to-zoom functionality.  This is what is accused in the LG claim charts produced by Ericsson.  (Ex. 4513 at pp. 35-40.)  On the Galaxy Note 3 that I examined, it was disabled by default.  This is consistent with the LG claim chart that indicates a need to enable this feature.

81.    The Galaxy Note 3 indicates that this feature only works with two applications, the Gallery photo viewer and the built-in Samsung browser.  The commonly used Chrome browser that is provided on the phone and is ordinarily the Android browser does not support the feature.  I also found that only a limited set of web pages in the Samsung browser worked with this feature.



(PDX 18.)

82.    Unlike this very limited optional zooming feature, the pinch-to-zoom feature was enabled by default and usable on every application that I tried that supported zooming.  It is not only an acceptable design-around, but clearly the preferred solution.

83.    The tilt-to-zoom feature is also of questionable utility since it requires pointing the display away from your eyes each time you use it.

84.    Although LG accused this tilt-to-zoom capability, for the reasons explained above, it is likely that this is not actually within the scope of the '415 Patent's claims.  Specifically, as discussed above, the '415 Patent specification describes movements, as recited by the claims, as "shaking".  For example, Figures 3 and 17 of the '415 Patent, and their corresponding written descriptions, describe how zooming is implemented in response to touch and "shaking."  (Ex. 208 at pp. 4, 20, 33, 34, 37, 12:62-13:26, 20:11-53, FIGS. 3, 17.)  The patent describes the sensor technology used to detect the "movements" as a "shaking detection sensor [that] detects the shaking of the terminal to generate a shaking detection signal." (*Id*. at p. 35, 15:29-45.)  There is no disclosure in the '415 Patent of how tilting detection

would even be implemented.  Accordingly, the phrase "detecting movement of the mobile terminal" as recited by the claims should be interpreted as "detecting shaking of the mobile terminal."  But, as discussed above, the LG claim charts only identify "tilt-to-zoom" capability, and not a shake-to-zoom capability.  Notably, the charted Samsung phone does not have such a capability, nor do any other smartphones on the market of which I am aware.

85.     In any case, the tilt-to-zoom capability is a trivial feature with limited utility that is eclipsed by the more common pinch-to-zoom solution present in these phones.  It has little apparent value to users or to Samsung.

86.     For the reasons stated above, it is my opinion that the '415 Patent has little to no value with respect to Samsung mobile devices.  Moreover, the LG claim chart discussed above refers to features specific to Samsung Galaxy mobile devices. I would not expect to find these same features in any other Android-based phones, nor has Ericsson put forward any evidence of any other phone that would practice these features.

87.     In sum, for the reasons stated above, it is my opinion that the '415 Patent has little to no technical value.

**E.     U.S. Patent No. 8,549,426**

1.     Overview and representative claim

88.     U.S. Patent 8,549,426 ("the '426 Patent") entitled "Apparatus and method for configuring an on-screen image in a mobile telecommunication handset upon connection of earphone" was filed on June 23, 2006, claiming a June 24, 2005 priority date, and assigned to LG Electronics.  (Ex. 207 at 1-8.)  On July 31, 2015, LG assigned the '426 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '426 Patent was never assigned to Ericsson.

89.     The patent is directed towards launching a multimedia application when a headphone is plugged into a mobile device and also to stopping the display of a multimedia application and continuously displaying a single image in response

to removal of a headphone.  (Ex. 207 at 1-8.)  Claims 1, 11, 19, and 25 are the independent claims.  I am unaware of any phones that practice claims 1, 11, or 19 and I am also unaware of any allegations that any phones practice these claims or any analysis from LG or Ericsson related to these claims.  Claim 25 is a representative claim regarding headphone removal.  Claim 25 reads as follows:

> 25.   A mobile device, comprising:
>
> a transceiver configured to send and receive signals via a wireless communication network;
>
> a display configured to display information;
>
> a connector configured to connect an earphone to the mobile device for outputting an audio component of a multimedia application; and
>
> a processor configured to:
>
> control the earphone to output audible data and control the display to output visual data when the multimedia application is performed;
>
> detect removal of the earphone from the connector while performing the multimedia application;
>
> stop performing the multimedia application and cause the display to display one image from the visual data in response to detecting removal of the earphone; and
>
> control the display to continuously display the one image until further user interaction is performed after stopping the performing the multimedia application,
>
> wherein the output audible data and visual data are from a same multimedia content that is reproduced when the multimedia application is performed; and
>
> the visual data comprises video data.

(Ex. 207 at 8, Claim 25.)

### 2.   Prosecution history

90.   Prosecution of the '426 Patent was drawn out over three rounds, with a

Request for Continued Examination filed after a final office action in the first two rounds.  (Ex. 1629 at pp. 211, 377.)  The last office action rejected claim 35 over U.S. Patent 7,215,975 to Sharpe and U.S. Patent 6,845,408 to Lemke.  (*Id*. at 89-94.) Sharpe discloses changing the functionality of the phone when earphones are connected.  (*Id*.)  However, Sharpe does not explicitly disclose reacting to the removal of the earphones.  (*Id*. at 90.)  The Examiner combined Lemke to cure the deficiency.  (*Id*.)  Lemke discloses software that controls functions of an electronic device (*e.g.*, a mobile phone) in response to connection of a peripheral device (*e.g.*, plugging in headphones).  (*Id*.)  In response, the Applicant amended claim 35 to narrowly require the step of displaying an image from the visual data when the headphones are removed.  (*Id*. at 24-25.)

91.    As amended, claim 35 (issued as claim 25) includes a limitation "control the display to continuously display the one image until further user interaction is performed."  (*Id*.)  This limitation is not disclosed anywhere in the '426 Patent specification.  (Ex. 207 at 1-8.)  The specification discloses continuously displaying an image component of a selected multimedia application but does not disclose terminating this display upon a further user interaction.  (*Id*.) The specification also discloses displaying an on-screen image for a predetermined time, but this also does not terminate upon a further user interaction.  (*Id*.)  The specification is quite sparse in general and there is no indication that the inventor was in possession of this claim limitation.  The alleged invention of claim 25 is never described by anything more than a single sentence which is repeated in substantially the same form four times in the specification.  The remainder of the specification describes other claims and is of little use in understanding or disclosing claim 25.

3.    The charted claim of the '426 Patent provides no value to iPhone or Samsung phone technology.

92.    The features related to claim 25 are at most trivial features in Apple and

Samsung phones.  I cannot identify any marketing, promotion, or other discussion of this feature.  It is not clear if a significant number of customers are aware of the presence of this feature.

93.     There is no evidence that customers attribute any value to this feature and it is not clear they would have any reason to do so.  A user is aware that the headphone has become unplugged; the sound stops.  A user can immediately correct the situation.  If a few seconds of video are missed, the video can be rewound.  In general, every video application that allows for pause and resume also allows a user to go back and repeat a missed segment.  Netflix and Amazon even include a simple button to go back 10 seconds at a time on an Apple device.  An unplugged headphone is an occasional event that is inconsequential.  This is a solution to a problem that is not very important.  There are many features of mobile phones that are important to customers.  This is certainly not one of them.

94.     Moreover, there are many simple design-arounds.  For example, one simple design around is to simply put up a frame that says "paused" or "headphone unplugged" when the headphone is removed rather than one image from the visual data.  The name of the multimedia title can also be displayed.  Since these design arounds would be implemented using minor changes to software (as opposed to hardware), they would not impose any material additional cost to the phone.  For the reasons stated above, it is my opinion that the '426 Patent has little to no value with respect to Apple iPhone and Samsung mobile devices.

95.     In sum, for the reasons stated above, it is my opinion that the '426 Patent has little to no technical value.

**F.     U.S. Patent No. 8,092,253**

1.     Overview and representative claim

96.     U.S. Patent 8,092,253 ("the '253 Patent") entitled "Communication terminal" was filed on August 3, 2010, claiming a November 7, 2007 possible priority date, and assigned to LG Electronics.  (Ex. 203 at 1-17.)  On July 31, 2015,

LG assigned the '253 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '253 Patent was never assigned to Ericsson.

97.     The patent describes a particular way of positioning components within a phone and connecting them with a coaxial cable.  (Ex. 203 at 1-17.)  Claim 1 is an apparatus claim and is representative.  Claim 1 is as follows:

> 1.     A communication terminal comprising
>
> a case having a plurality of inner surfaces;
>
> a wireless communication unit provided in a lower part of the case;
>
> a printed circuit board (PCB) part provided in an upper part of the case; and,
>
> a coaxial cable including a first connecting wire; an inner insulating layer configured to enclose at least a part of the first connecting wire; a second connecting wire configured to enclose at least a part of the inner insulating layer; and an outer insulating layer configured to enclose at least a part of the second connecting wire and to expose a portion of the second connecting wire;
>
> wherein the coaxial cable connects the wireless communication unit and the PCB part, and wherein one of the inner surfaces of the case includes a plurality of fixing portions at predetermined intervals to fix the coaxial cable thereto and wherein the second connecting wire is connected to a grounding part provided in the case.

(Ex. 203 at 16, Claim 1.)

2.     Prosecution history

98.     The claims of the '253 Patent were allowed on first review at the patent office.  (Ex. 4444.)  In my opinion, this reflects a lack of information during the review of the patent.  The apparatus claimed in claim 1 is commonplace and ordinary at the time of the '253 Patent's parent's filing.  Specifically, mobile phones generally have cases with a plurality of inner surfaces and one or more antennas and PCBs (printed circuit boards).  In many mobile phones, the antenna is affixed to a lower part of the case and the PCB is located in an upper part.  This would not have

1   been novel, and is entirely arbitrary in that the location of the antenna at either the

2   top or bottom of the case does not affect the performance of the mobile phone.

3   Furthermore, coaxial cables have been the most common way to connect antennas

4   since the earliest days of radio communications

5       99.   Nothing about claim 1 would have been novel at the time.  For

6   example, Ericsson had filed its own patent (U.S. Patent 5,809,403) in 1996 on a

7   coaxial cable assembly for a portable phone.  (Ex. 1630 at pp. 1-12.)  This patent

8   discloses a case (main housing 12 and flip cover 14) that has a plurality of inner

9   surfaces.  (*Id.*)  It includes antenna element 34 which is a wireless communication

10   unit provided in a lower part of the case.  (*Id.* at pp. 2-5, 9, 3:40-55, FIGS. 1-4.)  It

11   includes RF circuitry on a PCB in the upper part of the case.  (*Id.* at p. 9, 4:11-31.)

12   A coaxial cable (104, 106, 108) connects the PCB with the antenna (wireless

13   communications unit) as claimed.  (*Id.*, 10, 10-12, 6:4-20, Claims 1-32.)  Fixing

14   devices (*e.g.*, cable restraints) are present to fix the cable to the case.  (*Id.*)  The long

15   limitations in claim 1 that describe the structure and connection of the claimed

16   coaxial cable merely describe the ordinary coaxial cable connected in the ordinary

17   way.  (*Id.*)  Accordingly, the '403 Patent discloses nearly all of the same features as

18   the '253 Patent.

19           3.   <u>The charted claim of the '253 Patent neither reads on nor</u>

20               <u>provides value to iPhone technology.</u>

21       100.   The only technical analysis that I am aware of regarding the '253

22   Patent and produced by Ericsson consists of a set of cursory infringement charts for

23   claim 1 of the '253 Patent with respect to the Samsung Epic 4G.  (Ex. 4513 at pp.

24   58-61.)  No charts were produced with respect to Apple products.  There is no

25   evidence that this is a common configuration among phones.  Many recent phones,

26   such as the iPhone 6, place the PCB on one side.

27       101.   There are many simple design arounds to this patent such as placing the

28   PCB or the antenna in a different location within the phone case.  Such minor

1  changes would result in equivalent functionality to the mobile device without

2  imposing additional costs to implement.

3      102.   For the reasons stated above, it is my opinion that the '253 Patent has

4  little to no value with respect to Apple iPhone mobile devices.

5          4.   The representative claim of the '253 Patent neither reads on nor

6               provides value to Samsung phone technology.

7      103.   LG's analysis of the Samsung Epic 4G in the claim charts LG provided

8  to Ericsson is incorrect.  (Ex. 4513 at pp. 59-61.)  Claim 1 requires a case having a

9  plurality of inner surfaces wherein one of the inner surfaces of the case includes a

10  plurality of fixing portions at predetermined intervals to fix the coaxial cable

11  thereto.  The Samsung Epic 4G is not configured this way.  The Samsung Epic 4G

12  does have a case with a plurality of inner surfaces, but the coaxial cable is not fixed

13  to any of these inner surfaces.  Instead, the Epic 4G includes an internal skeleton or

14  frame that provides the primary structure for the phone.  The case is fitted around

15  this internal skeleton using screws and tension clips.  The coaxial cable between the

16  radio board and the antenna board is fixed to this internal skeleton using retention

17  clips formed into the skeleton.  It is not attached to the case.  In fact the case can be

18  removed without disturbing the coaxial cable at all.  This can be seen in the

19  photographs below.

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



(PDX 19.)



(PDX 20.)

104.   For the reasons stated above, it is my opinion that the '253 Patent has little to no value with respect to Samsung, or any other mobile devices.

**G.     U.S. Patent No. 7,957,770**

1.     Overview and representative claims

105.   U.S. Patent 7,957,770 ("'770 Patent") entitled "Mobile communication

terminal for providing tactile interface" was filed on December 12, 2007, claiming a December 13, 2006 possible priority date, and assigned to LG Electronics.  (Ex. 201 at pp. 1-13.)  On July 7, 2014, LG assigned the '770 Patent to Ericsson.  (Ex. 1632.)

106.   The patent describes a mobile device that vibrates in response to touch input independent of whether the vibrator is set to respond to other events in the phone.  (Ex. 201 at pp. 1-13.)  Claims 1 and 7 are apparatus claims and are representative.

> 1. A mobile terminal configured for use in wireless communication, the mobile terminal comprising
>
> a terminal body configured to house a mobile communication module to engage in the wireless communication
>
> a touch input device disposed in the terminal body, the touch input device comprising a touch detection area configured to recognize an external contact;
>
> a vibrator coupled to the terminal body and configured to allow tactile detection by a user; and
>
> wherein the controller causes the vibrator to vibrate in response to detecting the external contact on the touch detection area independent of whether the mobile terminal is set in a vibration mode and further causes the vibrator to vibrate in response to other mobile terminal functions received independent of the touch input device which comprise at least incoming and outgoing calls, messages, an alarm or a game when the mobile terminal is set in the vibration mode
>
> 7. The mobile terminal of claim 1, wherein the controller causes the vibrator to vibrate at one of a plurality of intensities and durations in response to different touch locations.

(Ex. 201 at 13, Claims 1, 7.)

### 2.   Prosecution history

107.   During prosecution, the claims were initially rejected as anticipated by U.S. Publication 2007/0080951 to Maruyama.  (Ex. 4441 at pp. 162-65.)  In

1  response, Applicant amended claim 1 to require that the mobile phone provide

2  vibration feedback even if the phone is not set to vibration mode, and provide

3  vibrator response to other mobile terminal functions independent of the touch input

4  to the device.  (*Id.* at pp. 18-19, 57.)  This appears to be the only novel feature over

5  the cited prior art.

6         3.      The representative claims of the '770 Patent neither read on nor

7                 provide value to iPhone technology.

8         108.   LG did not provide any technical analysis of the '770 Patent or identify

9  any allegedly infringing products.  There is no evidence identified in Mr.

10 Pellegrino's report that Ericsson ever performed any technical analysis of the '770

11 Patent or identified any allegedly infringing products.

12        109.   Vibratory feedback in response to input is a form of haptic feedback

13 and is well known in the industry.  For example, application WO1992000559A1,

14 published in 1992, discloses a touch panel that vibrates in response to touch input.

15 (Ex. 1633 at 1-21.)  Immersion Technologies, which commercialized haptic

16 feedback technologies in the 1990s, has an extensive patent portfolio disclosing

17 vibratory feedback including U.S. Patents 6,300,936, 6,429,846, 7,336,260,

18 7,592,999, 7,808,488, 7,969,288, 7,982,720, 8,031,181, 8,059,105, 8,749,507, and

19 8,773,356.  The Immersion patents clearly disclose the concepts of the '770 Patent.

20        110.   For example, Immersion's 7,336,260 patent ("the '260 Patent")

21 discloses a mobile phone for use in wireless communications.  (Ex. 1634 at pp. 6,

22 18, 8:26-37, FIG. 3.)  Like any ordinary mobile phone it includes a body that houses

23 a mobile communications module for wireless communications.  The phone

24 includes a touch input device for detecting touch from an external contact.  (*Id.*, at

25 pp. 6, 8, 10, 16, 18, 3:14-43; 8:26-37, FIGS. 3, 5, 7, and 11.)  The phone includes a

26 vibrator for tactile feedback.  (*Id.* at pp. 5, 10, FIGS. 2, 7.)  It includes a controller to

27 control the touch input and vibrator.  (*Id.*)  The controller causes the vibrator to

28 vibrate in response to detecting the appropriate touch without regard to whether the

1  vibrator is enabled for other functions.  (*Id.* at p. 11, FIG. 8.)



FIG.3

FIG.8

19  (*Id.*)

20      111.   Moreover, the Immersion technology and patents were well known in

21  the field yet were not disclosed or found by the examiner in the '770 Patent's

22  prosecution.  In my opinion, it is unlikely that the '770 Patent claims are valid and

23  almost certain that if any '770 Patent claims are valid, the differences over the prior

24  art are not commercially interesting.

25      112.   Vibration feedback is not a core feature of any iPhone.  I have

26  examined the iPhone 5s that was the flagship model at the time of the LG and

27  Ericsson analysis.  I have not found any feature that corresponds to any of the '770

28  Patent claims in that phone.  For example, none of the ordinary functions of the

iPhone 5s causes the vibrator to vibrate in response to detecting an external contact on a touch detection area.  For the reasons stated above, it is my opinion that the '770 Patent has little to no value with respect to Apple iPhone mobile devices.

### 4. The representative claims of the '770 Patent provide no value to Samsung phone technology.

113.   Vibration feedback is not a core feature of any Samsung phone.  The iPhone has shown that customers are more than willing to accept a phone without this feature.  Specifically, as discussed above, none of the ordinary functions of the iPhone 5s causes the vibrator to vibrate in response to detecting an external contact on a touch detection area.  Accordingly, the iPhone user interface is a non-infringing alternative to the vibration feedback feature.  For the reasons stated above, it is my opinion that the '770 Patent has little to no value with respect to Samsung mobile devices.

114.   In sum, for the reasons stated above, it is my opinion that the '770 Patent has little to no technical value.

### H. U.S. Patent No. 8,326,377

#### 1. Overview and representative claim

115.   U.S. Patent 8,326,377 ("the '377 Patent") entitled "Input device and mobile device having the same" was filed on August 28, 2007, claiming a March 16, 2007 possible priority date, and assigned to LG Electronics.  (Ex. 206 at pp. 1-12.)  On July 31, 2015, LG assigned the '377 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '377 Patent was never assigned to Ericsson.

116.   The patent describes a very specific structure for a light-permeable button on a mobile device that is composed of both mineral and non-mineral components.  (Ex. 206 at pp. 1-12.)  The specification appears to define a mineral material as "one of a ceramic material, a glass material, a crystalline material, and combinations thereof." (*Id.* at p. 8, 1:43-45.)  Non-mineral materials are defined as

"Poly Methyl Methacrylate (PMMA), Polycarbonate (PC), or other suitable
materials." (*Id*. at p. 10, 5:22-23.)  A person of ordinary skill would likely
understand the term "mineral" in these claims to refer to inorganic materials and
"non-mineral" to refer to organic materials.  Claim 1, an apparatus claim, is a
representative claim.

> 1.      A mobile device comprising:
>
> a body including a case;
>
> an input device located in the body, the input device including:
>
> at least one button unit formed of a light permeable material, the button
> unit having a perimeter;
>
> a button support member connected to the at least one button unit, the
> button support member extending beyond the perimeter of the at least
> one button unit, and the button support member being formed of a non-
> mineral material;
>
> a sensor corresponding to the at least one button unit, the sensor being
> located in the body;
>
> a display module located to be spaced from the sensor in a lengthwise
> direction of the main body, the display module having a screen visible
> from the exterior of the body;
>
> a window formed of a mineral material being a light permeable
> material, the window being located opposite the display module, the
> window having a front surface defining an exterior of the mobile
> device, and the window having a rear surface opposite the front
> surface;
>
> a window support member connected to the window and contacting a
> portion of the body to prevent the window from being separated from
> the body, the window support member being formed of a material
> different than the window; and
>
> an adhesive layer connecting the window to the window support
> member, the adhesive layer being located between the rear surface of
> the window and the window support member,

Case No. SCACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. ANDREW WOLFE

wherein the window support member is formed along edges of the window and has a through hole configured to face the display module, and

wherein the window is disposed at the through hole such that the front surface of the window is exposed to the outside of the mobile device, the window support member is configured to support the rear surface of the window by having a portion of the window support member disposed beneath the rear surface, and the window support member is directly mounted at the case.

(*Id*. at p. 11, Claim 1.)

117.    The claims of the '377 Patent describe physical buttons (often called "hard buttons" on phones) that are based on mechanical switches and are also light permeable.

2.    Prosecution history

118.    During prosecution, the claims were repeatedly rejected as obvious over U.S. Publication 2004/0253998 to Dunleavy in view of four other references (WO 2003/021922 to Schon, U.S. Publication 2007/0202933 to Tolbert, U.S. Patent 5,804,780 to Bartha, and U.S. Publication 2008/0019502 to Emmert).  (Ex. 4445 at pp. 50-57, 250-55, 278-82.)  Applicant responded by narrowing the claim and arguing that the cited prior art does not "teach a window support member that is configured to support the rear surface of the window by having a portion of the window support member disposed beneath the rear surface," and "an adhesive layer connecting the window to the window support member, the adhesive layer being located between the rear surface of the window and the window support member." (*Id*. at pp.  36-39, 198-200, 262-64.)  Following that argument by the Applicant identifying these very narrow limitations of the claims as being allegedly novel, the application was allowed.  (*Id*. at pp. 14-15.)  Thus, the claim requires an adhesive layer connecting the windows to the window support member (in addition to all of the other limitations for the button).

3.    The representative claim of the '377 Patent neither reads on nor provides value to iPhone technology.

119.   I have examined the iPhone 5s as part of preparing this report and am generally familiar with the Apple products at the time.  The only button present in the display is the "home" button and it is not a light-permeable button.  Accordingly, the claims of the '377 Patent do not read on Apple iPhone devices.  For the reasons stated above, it is my opinion that the '377 Patent has little to no value with respect to Apple iPhone mobile devices.

4.    The representative claim of the '377 Patent neither reads on nor provides value to Samsung phone technology.

120.   LG did not provide any technical analysis of the '377 Patent or identify any allegedly infringing products.  There are many simple design arounds to this patent such as using an opaque button, using a metal button support member, or using a soft button that requires none of this structure.  I have examined the Galaxy Note II and Galaxy Note 3 as part of preparing this report.  The buttons that are present are either not light permeable or are soft buttons that have no button unit.  Accordingly, the claims of the '377 Patent do not read on Samsung Galaxy Note II and Galaxy Note 3 devices.  For the reasons stated above, it is my opinion that the '377 Patent has little to no value with respect to Samsung mobile devices.

121.   In sum, for the reasons stated above, it is my opinion that the '377 Patent has little to no technical value.

## V.    **CONCLUSION**

122.     It is my opinion that the LG Patents have little to no value because a careful claim-level analysis of each of the LG Patents reveals that neither Apple nor Samsung mobile devices available in the market would infringe the claims of the LG Patents, there are straight-forward and cost-equivalent design arounds to the claims, and/or the novel features of the claims provide little utility to mobile devices.  Moreover, it is my opinion that any reasonable analysis of the LG Patents,

1 | as of the time they were transferred from LG to Ericsson, would have resulted in the

2 | same conclusion.

3 |

4 |      I declare under penalty of perjury under the laws of the United States of

5 | America that the foregoing is true and correct.

6 |      Executed on January 11, 2017, at Los Gatos, California.

7 |

8 |              By

9 |                           Andrew Wolfe

**TABLE OF EXHIBITS CITED IN WITNESS DECLARATION**

| Exhibit No. | Description |
|---|---|
| 201 | U.S. Patent No. 7,957,770 |
| 202 | U.S. Patent No. 8,078,134 |
| 203 | U.S. Patent No. 8,092,253 |
| 204 | U.S. Patent No. 8,095,888 |
| 205 | U.S. Patent No. 8,300,017 |
| 206 | U.S. Patent No. 8,326,377 |
| 207 | U.S. Patent No. 8,549,426 |
| 208 | U.S. Patent No. 8,593,415 |
| 1600 | Curriculum Vitae of Andrew Wolfe |
| 1620 | Patent Abstract of Title re U.S. Patent Application No. 12/463,980 |
| 1621 | File History for U.S. Patent 8,078,134 |
| 1622 | Steve Jobs Speech:  Apple iPhone Launch Video - https://www.youtube.com/watch?v=9hUIxyE2Ns8 |
| 1623 | U.S. Patent and Trademark Office Assignment Records for assignments made by LG Electronics to Optis Cellular -- Reel 036503 / frame 0302 |
| 1625 | HTML 4.0 Standard Specification, W3C |
| 1626 | File History for U.S. Patent 8,300,017 |
| 1627 | U.S. Patent  RE43,931 |
| 1628 | File History for U.S. Patent 8,593,415 |
| 1629 | File History for U.S. Patent 8,549,426 |
| 1630 | U.S. Patent No. 5,809,403 |
| 1632 | Patent Abstract of Title re U.S. Patent Application No. 11/955,300 |
| 1633 | PCT Application No. WO 92/00559 |
| 1634 | U.S. Patent No. 7,336,260 |
| 4438 | 5/11/2009 - File History for Patent No. 8,078,134 |
| 4441 | 12/12/2007 - File History for Patent No. 7,957,770 |
| 4443 | 12/4/2012 - US Patent No. 8,326,377 B2 |

Case No. SCACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. ANDREW WOLFE

| 4444 | 8/3/2010 - File History for Patent No. 8,092,253 |
|------|--------------------------------------------------|
| 4445 | 8/28/2007 - File History for Patent No. 8,326,377 |
| 4513 | LG Claim Chart Presentation |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA  92130.

On January 11, 2017, I caused to be served the PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. ANDREW WOLFE to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION:  I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nick Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 11, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER

Case No. SCACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. ANDREW WOLFE