SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT Mobile
Limited, and TCT Mobile (US) Inc.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants. <br> _____ <br><br> TELEFONAKTIEBOLAGET LM ERICSSON *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD. *et al.*, <br><br> Defendants. | Case No. SACV14−00341 JVS (DFMx) Consolidated with CV15-02370 <br><br> **PLAINTIFFS' REBUTTAL DECLARATION OF EXPERT WITNESS DR. ANDREW WOLFE** <br><br> Place: Courtroom 10C <br> Before Hon. James V. Selna <br><br><br> Pre-Trial Conf.: Feb. 1, 2017 <br> Trial: Feb. 14, 2017 |

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF TESTIMONY ................................................................. 1

II. TECHNICAL VALUATION METHODOLOGY ......................................... 5

    A. Determine the Relevant Technical Market ................................. 5

    B. Determine If Products Infringe the Patent Claims ................... 6

    C. Determine Availability of Alternate Technologies or Design Arounds ......................................................................................... 7

    D. Determine Usefulness of Claimed Features ............................. 7

III. MR. PELLEGRINO FAILED TO PROPERLY EVALUATE THE TECHNICAL OR LEGAL STRENGTH OF THE LG PATENTS ................ 8

    A. U.S. Patent No. 8,078,134 ......................................................... 9

    B. U.S. Patent No. 8,095,888 ....................................................... 12

    C. U.S. Patent No. 8,300,017 ....................................................... 14

    D. U.S. Patent No. 8,593,415 ....................................................... 17

    E. U.S. Patent No. 8,549,426 ....................................................... 18

    F. U.S. Patent No. 8,092,253 ....................................................... 20

    G. U.S. Patent No. 7,957,770 ....................................................... 22

    H. U.S. Patent No. 8,326,377 ....................................................... 23

IV. MR. DELGADO'S TESTIMONY REGARDING THE EVALUATION OF THE LG PATENTS IS NOT RELEVANT TO DETERMINING THEIR VALUE. ...................................................... 25

V. AT THE TIME IT ACQUIRED THE LG PATENTS, ERICSSON ALREADY OWNED PATENTS COVERING THE SAME TECHNOLOGY. ........................................................................... 28

VI. CONCLUSION ............................................................................... 30

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION .......................... 32

## REBUTTAL DECLARATION OF DR. ANDREW WOLFE

I, Dr. Andrew Wolfe, declare under the penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.   <u>SUMMARY OF TESTIMONY</u>

1.      I have been asked by TCL Communication Technology Holdings LTD., TCT Mobile Limited, and TCT Mobile (US), Inc. (collectively, "TCL") to submit this rebuttal declaration in response to the testimony of Michael J. Pellegrino (Dkt. 1323) and Patricio Delgado (Dkt. 1325) with respect to the valuation of eight non-standard essential patents which I understand LG Electronics transferred to Ericsson and others in 2014 (the "LG Patents").  On January 10, 2017, I submitted direct testimony by declaration with respect to the valuation of the LG Patents (Dkt. 1324).  My qualifications are described in that opening statement.

2.      Mr. Pellegrino opines on the value the LG Patents, which were allegedly transferred by LG Electronics, Inc. ("LG") to Telefonaktiebolaget LM Ericsson (together with Ericsson, Inc., "Ericsson") as partial consideration for the SEP license Ericsson granted to LG.  I understand that Ericsson claims to have attributed $125 million to the value of the LG patent portfolio.  Mr. Pellegrino now argues that the LG patents are worth $275 million (unencumbered) or $170 million (encumbered).

3.      Mr. Pellegrino's valuation is attributable, in large part, to the patents allegedly being technically important.  He bases his opinion on respective high-level and very general disclosures of the transferred patents (*e.g.*, some of the patents are directed to touch screen and/or display technology, and allegedly all of the major mobile phone handsets incorporate touch screen displays, so the patents are valuable).  In my expert opinion, Mr. Pellegrino's conclusions are irreparably flawed for many reasons.  First, Mr. Pellegrino admits he is not an expert in any technology relevant to the LG Patents.  Specifically, he testified at his deposition that he is not a technical expert in matters of electrical engineering or wireless

communications technologies.  (Deposition of Michael Pellegrino, Transcript, April 22, 2016 ("Pellegrino Dep. Tr.") at 7:13-18.)  It is my also understanding that Mr. Pellegrino did not perform an independent analysis to evaluate the legal strength of the LG Patents, and also doesn't claim to have the expertise to do so.  (*Id*.)  Thus, he had no ability to independently evaluate the technical merits of the LG patents, nor does he have the ability to analyze the legal strength of the LG patents.

4.     Second, despite not having any appropriate technical or legal background, Mr. Pellegrino states that his goal was to provide an independent analysis of the LG Patents.  However, even here he completely fails to compare any of the *claims* of the LG Patents to any mobile phones to determine if the patented features are actually practiced in the industry.  Instead, Mr. Pellegrino relies almost entirely on Ericsson's representations that the LG Patents are valuable, eluding in conclusory fashion to purported "significant" resources Ericsson allegedly devoted to evaluating the LG patents before purchasing them.  But the only value in owning a patent is necessarily related to the right to exclude others from the practice of the patent's claims.  Thus, the value of a patent must be tied to the value of the claimed inventions.  As a result, Mr. Pellegrino's failure to conduct any analysis of the claims of the LG Patents is conclusory, technically deficient, and fatal to his analysis.  Indeed, a proper claim-by-claim analysis reveals that the LG Patents have little to no value, at least for the reasons I describe in my opening witness declaration, and as further described below.

5.     Third, in attributing very significant value to the LG Patents Mr. Pellegrino has assumed that Ericsson generally exercised reasonable judgement in selecting the LG Patents.  (Dkt. 1323 at ¶ 29.)  He has anecdotally referred to Ericsson's own assertions as to the amount of effort employed in selecting the LG Patents and the quality of the engineers involved, but has not identified any documentation in support thereof, nor has he investigated or addressed the details of the process.  (*Id*. at ¶¶ 71-76.)  For example, Mr. Pellegrino does not state that the

engineers (or anyone else involved) investigated the validity of any of the LG Patents by comparing the claims to prior art or confirming that the claims meet all of the requirements of 35 U.S.C. § 112 (*i.e.*, to ensure the patents are valid).  Mr. Pellegrino does not state that the engineers evaluated the veracity or the quality of the analysis provided in the LG claim charts.  Indeed, Mr. Pellegrino did not even review or consider any of those LG claim charts in reaching his opinions as to Ericsson's technical assessment of the LG Patents' value, but instead, "just took [Ericsson's representative's] word for it."  (Pellegrino Dep. Tr. at 65:19-66:18.)  This reliance on Ericsson's representatives runs contrary to Mr. Pellegrino's assertion that "the point of [his report] was to come to an ***independent*** value conclusion," without relying on analysis from Ericsson's employees.  (*Id*. at 139:13-140:3 (emphasis added).)

6.     Fourth, Mr. Pellegrino has not identified the actual engineers involved in Ericsson's internal assessment of the LG patents, nor does he appear to have investigated the team's technical qualifications or their experience in evaluating the patents.  (*See id* at 169:23-170:19 (explaining that Mr. Pellegrino did not review the credentials or qualifications of any of the 14 Ericsson employees who reviewed the LG Patents, with the exception of Mr. Sagfors who did not provide information relevant to the LG Patents).)  Indeed, Mr. Pellegrino admits that he did not speak with the Ericsson employees who were involved in the actual valuation of the LG Patents.  (*Id*. at 138:1-5; 167:17-168:12.)  He does not identify any reports or other analysis produced by the evaluation team, nor even a single email concluding that the LG Patents have significant value.  He also apparently has not considered any negative assessments or concerns expressed during the evaluation process nor determined if these exist.

7.     Fifth, Mr. Pellegrino does not discuss or appear to rely upon the specific process used in selecting these patents as a part of the license negotiation.  For example, it is not clear whether or not an effective value was placed on the

patents to be selected before any patents had been reviewed or chosen.  Mr. Pellegrino's analysis appears to establish the value of the LG Patents at the time they were acquired as a cash-equivalent that reduced the other compensation in the agreement by a like amount; however, I am not aware of any evidence that this is the case.  Mr. Pellegrino has not identified any evidence that the evaluation or selection of the LG Patents was anything more than peripheral to the LG licensing agreement or that the process established a substantial value for the LG Patents.

8.      Sixth, Mr. Pellegrino does not seem to have considered any contemporaneous valuation of the LG Patents.  I am not an accountant and do not provide expert opinions on accounting practices, but I am an experienced business person who has been responsible for acquisition, licensing, and sale of patents in a public company.  It is my understanding that when a patent portfolio is acquired, at least in the United States, ordinary accounting practice would require establishing an asset value at the time for purposes of depreciation and/or amortization.  This would be useful information in establishing a value for the LG Patents.

9.      Seventh, Mr. Pellegrino relies on the testimony of Mr. Delgado with respect to the level of effort expended in analysis of the LG patents selected.    In turn, Mr. Delgado testifies that he relied on and worked with several other Ericsson employees and engineers from Parsa Wireless between October 2013 and January 2014 to evaluate the LG Patents.  In particular, between December 2013 and January 2014, Mr. Delgado and four other Ericsson employees purportedly evaluated a final batch of patents that ultimately were transferred by LG to Ericsson. However, neither Mr. Delgado nor any of the four other Ericsson employees in that evaluation team (most of whom were patent attorneys with undergraduate degrees in mechanical engineering) have identified any specific expertise with respect to the technologies claimed by the LG Patents.

10.      Moreover, although Mr. Delgado testifies that the team performed significant analyses and assessments of the LG Patents, the results of which Mr.

Delgado allegedly reported to "the highest level of management within Ericsson's IPR & Licensing group," Mr. Delgado fails to cite to, consider, or identify any actual work product created by that internal patent evaluation team.  I understand that Ericsson has not produced any of the team's analyses, conclusions, or assessments.  Most importantly, just like Mr. Pellegrino, Mr. Delgado fails to explain how the claims of the LG Patents map to any products in the marketplace, and fails to consider possible design arounds to those claimed technologies. Accordingly, Mr. Delgado's testimony does not change my opinion, as stated in my opening witness declaration, that the LG Patents have little to no value.

11.     Finally, both Mr. Pellegrino and Mr. Delgado testified that the LG Patents were particularly valuable to Ericsson to fill technology gaps in its portfolio. However, I have found no evidence that this is true.  To the contrary, a search of Ericsson's patent portfolio reveals that it owns over 2,000 patents relating to the same general technologies disclosed by the LG Patents.

## II.     TECHNICAL VALUATION METHODOLOGY

### A.     Determine the Relevant Technical Market

12.     Mr. Pellegrino compared the LG Patents to the Apple iPhone and the Samsung Galaxy mobile handsets, presumably because these are often the two most popular handsets on the market.  (Dkt. 1323 at ¶¶ 80-83, Pellegrino Demonstratives 4, 5.)  Several claim charts created by LG and subsequently produced by Ericsson also compare one or more of the Apple iPhone 3G, 3GS, 4, 4s, 5, and 5s, and the Samsung Galaxy S3, S4, Note II, Note 3, and Epic 4G to various claims of the LG Patents ("the LG Claim Charts").  (Ex. 4513 at pp. 1-66.)  As I stated in my opening declaration, the technical value of the LG Patents may be evaluated by comparing specific products within the Apple iPhone and Samsung Galaxy mobile device product lines to the claims of the LG Patents.  In many cases, the LG Patents are directed towards software related features.  In those cases, comparison of the Apple iOS or the Android mobile phone operating systems to the claims of the LG Patents

1    may be sufficient to determine the technical value of the respective patent.

2    ## B.    Determine If Products Infringe the Patent Claims

3     13. Mr. Pellegrino testifies that the value of the LG Patents relates to

4    Ericsson's ability to assert the LG Patents against would-be infringers.  (Dkt. 1323

5    at ¶¶ 257, 267-69, 274.)  In determining the technical feasibility of asserting the LG

6    patent portfolio, Mr. Pellegrino compares the general technologies discussed in

7    each LG patents with the presence of those general technologies in the Apple

8    iPhone and Samsung Galaxy mobile devices.  (*Id.* at ¶¶ 80-83.)  But such a high-

9    level analysis is grossly insufficient to determine whether an LG patent would or

10   could be asserted in a patent infringement lawsuit against a would-be infringer.

11    14. As an initial matter, Mr. Pellegrino admitted that he is not a technical

12   expert in matters of electrical engineering or wireless communications

13   technologies.  (Pellegrino Dep. Tr. at 7:13-18.)  In my opinion, expertise in

14   electrical engineering and wireless communications is required to understand the

15   core technologies claimed by the LG Patents and to understand what the claims

16   would mean to a person of ordinary skill in the art.  For example, by Mr.

17   Pellegrino's own admission, several of the LG Patents relate to mobile device

18   display technology.  Expertise in electrical engineering is required to understand

19   this technology and how the claims of the LG Patents might read on third-party

20   products.  Mr. Pellegrino does not have this expertise.

21    15. Moreover, Mr. Pellegrino's analysis is grossly incomplete.  To derive

22   value for any of the LG Patents through litigation, or the threat of litigation,

23   Ericsson would first need to show that an accused product or method infringes at

24   least one claim of that patent.  As I discussed in my opening witness declaration, I

25   have been advised that, under U.S. law, infringement of a claim is determined by

26   comparing each limitation of the claim with the accused product or process.  *See*

27   *Int'l Visual Corp. v. Crown Metal Mfg. Co., Inc.*, 991 F.2d 768, 772 (Fed. Cir.

28   1993).  Accordingly, for the LG Patents to have value, every element from at least

one of the LG Patent claims must be found in one or more mobile phone devices. Mr. Pellegrino has only provided analysis of the Apple and Samsung mobile phone devices, presumably as a proxy for the mobile device market as a whole.

### C. Determine Availability of Alternate Technologies or Design Arounds

16.    Mr. Pellegrino asserts that a "key driver for the value of intellectual property is whether a third party can design around the key protections for the intellectual property, while retaining the benefits of the utility described in the intellectual property." (Dkt. 1323 at ¶ 270.) I agree with this statement. Accordingly, even where current mobile devices in the market may infringe one or more claims of one of the LG patents, a reasonable determination of the respective patent's value should necessarily include an analysis of possible non-infringing alternatives to the LG Patent claim. The relative value of the claimed solutions decreases in relation to the equivalence in functionality and cost of implementing the non-infringing alternative as compared with the claimed solution. Thus, even if a product would infringe one of the LG Patent's claims, the patent may still have little to no value if there exists a non-infringing alternative with equivalent functionality and implementation cost. Moreover, a patent has minimal value if the prior art or another non-infringing alternative is equally accepted in the market or has little or no impact on product sales or cost.

### D. Determine Usefulness of Claimed Features

17.    Mr. Pellegrino opines that "Utility of inventions" covered by the LG Patents is an important factor in determining the property's technical value. (Dkt. 1323 at ¶ 257.) I agree with this point. However, Mr. Pellegrino goes on to argue that the LG Patents "have become a defining feature of the cellular telephones," and refers to single-sentence descriptions of the "General Subject Matter Area" of the LG Patents in support of his statement. (*Id*.) This analysis is grossly deficient as it does not account for the specific claimed features in each patent that may arguably

be novel in view of pre-existing solutions (*i.e.*, the actual inventive aspect of the patent).

18.     Particularly, even where mobile devices in the market may infringe one or more claims of one of the LG Patents and no reasonable non-infringing alternative exists, the usefulness of the patent's invention must also be considered in determining its value.  Usefulness of the invention must be considered in view of novel claimed features, and not from the general description of the patented technology.  Accordingly, in my analysis below, I consider the usefulness of particular mobile device features allegedly covered by one or more LG Patent claims from the perspective of limitations of the claims as they are compared to previous technologies (*e.g.*, a claim limitation may have been added during prosecution to distinguish the claim from a prior art solution).

19.     Utility of inventions claimed by the each of the LG Patents is another important factor in determining that patent's technical value.  Thus, even where mobile devices in the market may infringe one or more claims of one of the LG Patents and no reasonable non-infringing alternative exists, the usefulness of the claimed invention must also be considered in determining the patent's value.  Usefulness of the invention must be considered in view of novel claimed features, and not from the general description of the patented technology.  Accordingly, in my analysis below, I consider the usefulness of particular mobile device features allegedly covered by one or more claims of each of the LG Patents from the perspective of claim elements as they are compared to previous technologies (*e.g.*, a claim limitation may have been added during prosecution to distinguish the claim from a prior art solution).

## III.   <u>MR. PELLEGRINO FAILED TO PROPERLY EVALUATE THE TECHNICAL OR LEGAL STRENGTH OF THE LG PATENTS.</u>

20.     Mr. Pellegrino's valuation of the LG Patents depends heavily on a technical analysis of the patents and their claims as they relate to products in the

marketplace.  In general, Mr. Pellegrino's analysis is fatally flawed because it focuses on the general technology to which the patents relate, as opposed to the actual claim language of the patents.  Such an analysis is akin to saying that a car would infringe a patent that claims automobile tires comprising a special type of rubber and with special groove patterns, merely because all cars have tires.  Instead, the proper analysis in that example would require actually comparing the rubber and groove patterns of each tire to the specific patent claims.  Here, Mr. Pellegrino did not map the claims of the LG Patents to products in the marketplace, he did not sufficiently consider possible design arounds to the claimed inventions, and he did not analyze the actual utility of each claimed feature above and beyond the general technology disclosed by the patent.  I discuss below the flaw in Mr. Pellegrino's analysis with respect to each of the LG Patents.  A proper analysis of each of these patents, such as the analysis I performed and discuss in my opening witness declaration, reveals that the LG Patents claim features that are not readily incorporated by mobile phones in the marketplace, that have easy and cost-equivalent design arounds, and/or that are simply not useful.  Accordingly, the LG Patents have minimal to no value.

### A.   U.S. Patent No. 8,078,134

21.     As discussed in my opening witness declaration, U.S. Patent 8,078,134 ("the '134 Patent") entitled "Mobile terminal and method of controlling operation of the mobile terminal" was filed on May 11, 2009, claims an earlier February 2, 2008 priority date, and was assigned to LG Electronics.  (Ex. 202.)  LG assigned the '134 Patent to Telefonaktiebolaget LM Ericsson on February 25, 2015.  (Ex. 1620 at 1.)

22.     The patent describes a mobile terminal with a display, an acceleration sensor, and a controller that alters the display in specific ways in response to rotating the display.  The bulk of the patent explains how to perform rotation of two display regions between a side-by-side and top-bottom orientation.  (Ex. 202 at pp. 7-11, 14, FIGS. 6-10, 13.)  This embodiment of the patent is claimed, for example,

in apparatus claim 16.  (Ex. 1621 at p. 3.)  Claim 18 describes a slightly different embodiment whereby, after rotation, only one of the display region's content is displayed in a scaled-up manner.  (Ex. 202 at p. 25.)

23.     The '134 Patent was the subject of a reexamination that concluded with a June 19, 2014 reexamination certificate.  (Ex. 1621 at p. 1.)  Mr. Pellegrino inexplicably asserts that "the '134 patent survived the reexamination process with only minor modifications."  (Dkt. 1323 at ¶ 104.)  In fact, more than 200 additional words were added to the original 146-word claim 16.  (Ex. 1621 at p. 3.)  This additional language substantially narrows the claim scope with at least three new limitations and would not be considered a minor modification under any reasonable interpretation.  While claim 18 was not amended during the re-examination process, for the reasons I discuss in my opening witness declaration, claim 18 should be attributed little to no value.

24.     As I discussed in my opening witness declaration, the '134 Patent has minimal to no value when evaluated in the context of mobile devices available in the market.  First, after careful analysis of at least the Apple iPhone and Samsung Galaxy devices, I have not found any mobile device application that practices representative claim 16 of the '134 Patent.  That claim requires that two windows displayed on the phone be repositioned when the phone is rotated such that each display window is in the same location on the display after rotation but the orientation of the content within each window has been rotated.  But, the mobile device applications that I analyzed simply reformat the screen as a whole when the phone is rotated, resulting in the creation of new content within the rotated windows.  Second, and just as important, the ability to rotate content displayed on the phone in response to rotation of the phone was available in the first iPhone released in early 2007, before the priority date of the '134 Patent.  Thus, to the extent that features recited by claims of the '134 Patent read on mobile devices in the market, those claims are either invalid because they are not novel, or the

rotation capabilities of the first generation iPhone provide an acceptable design around.  Thus, as I stated in my opening witness statement, it is my opinion that the '134 Patent has minimal to no value.

25.     In stark contrast to my analysis of the *claims* of the 134 Patent, Mr. Pellegrino's overall analysis of the LG Patents appears to rely heavily on the assumed importance of the '134 Patent.  (Dkt. 1323 at ¶ 257.)  In particular, Mr. Pellegrino focuses on the embodiments related to claim 16 and its alleged stature as a defining feature of the iPhone "when it first launched."  (*Id.* at ¶¶ 84-85, 257.)  If, in fact, Mr. Pellegrino is correct, then the patent is invalid since the iPhone first launched in 2007, before the priority date of the '134 Patent.  I have personal knowledge of the iPhone's functionality at the time of its introduction in 2007, and even watched a streamed video of Apple's CEO, Steve Jobs, introduce the iPhone in January of 2007 on the day of the event.  Ex. 1622 is a video that accurately portrays that launch event.  Notably, as can be seen in the video, Apple included screen rotation capability in the original 2007 iPhone.  (Ex. 1622 at 32:37-34:11 and 18:23-18:30.)  Mr. Pellegrino has not identified any specific value attributable to claim 18.

26.     Additionally, Mr. Pellegrino attributes great value to the '134 Patent based on its field of endeavor, *i.e.*, screen rotation.  (Dkt. 1323 at ¶¶ 84-92.)  In particular, he compares the '134 Patent generally to U.S. Patent 6,956,564.  (*Id.*)  While it may be reasonable to compare patents in similar fields of endeavor, Mr. Pellegrino does not appear to incorporate the fact that the '564 patent had a priority date  of 1997, approximately 10 years prior to the launch of the iPhone as compared to the '134 Patent's 2008 priority date, which was ***after*** the launch of the iPhone.  (Ex. 2371.)  Apple (and others) would presumably put little or no value on a patent that was filed after Apple had already sold the patented technology.  If, in fact, the earlier patent was an effective barrier to implementing screen rotation while the latter patent was not, the value of the two patents would be completely unrelated

despite similarities in the general subject matter.

27.     Mr. Pellegrino's opinions also appear to depend on the assumption that there is pervasive use of the '134 Patent.  (Dkt. 1323 at ¶¶ 84-92, 257, 272.)  There is no evidence that this is so.  Mr. Pellegrino grossly conflates use of screen rotation in general with practicing the '134 Patent's claims.

28.     It is my understanding that Mr. Pellegrino did not perform a technical review of each patent's claims individually or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is also my understanding that Mr. Pellegrino did not perform independent analysis to evaluate the legal strength of the LG Patents.  (*Id*.)  The only analysis he identified (but did not review) appears to be tied to the LG claim charts, which were apparently prepared prior to amendment of the '134 Patent's claims.  Regardless, Mr. Pellegrino did not review or consider any of those LG claim charts in reaching his opinions as to Ericsson's technical assessment of the LG Patent's value, but instead, "just took [Ericsson's representative's] word for it." (*Id*. at 65:19-66:18.)  In sum, Mr. Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '134 Patent has any value whatsoever.

29.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '134 Patent has little to no value.

**B.   U.S. Patent No. 8,095,888**

30.     As discussed in my opening witness declaration, U.S. Patent 8,095,888 ("the '888 Patent") entitled "Mobile terminal and image control method thereof" was filed on March 12, 2009, claims a July 29, 2008 priority date, and was assigned to LG Electronics.  (Ex. 204 at pp. 1-32.)  On July 31, 2015, LG assigned the '888 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '888 Patent was never assigned to Ericsson.

31.     The '888 Patent describes a specific method of interacting with a web page and a mobile terminal apparatus with the capability to perform the functions

described in this method.  Only one mode of operation described by the patent is actually claimed.  The method and apparatus claims require sensing the orientation of a mobile device (*e.g.*, a smart phone), accessing a web page, and presenting that web page on the display according to the sensed orientation.  (Ex. 204 at pp. 31-32.)  In practice, this would be a portrait or landscape presentation in response to the corresponding orientation.  A user would then touch one of the images presented in the web page in order to change its size.  Objects outside of the original border of the image would be moved in order to conform to the new image border.  These objects could include text as indicated in dependent claims 4 and 11.  (*Id*. at p. 31.)

32.     As I discussed in my opening witness declaration, the '888 Patent has minimal to no value when evaluated in the context of mobile devices available in the market.  First, after careful analysis of at least Apple iPhone and Samsung Galaxy devices, I have not found any mobile device application that practices representative claim 1 of the '888 Patent.  That claim requires that the mobile phone resize an image displayed within a web page in response to a touch by the user, and then reposition objects positioned adjacent to the image to compensate for the resized image.  But, the mobile device applications that I analyzed do not resize images within a web page in response to a touch by the user, and thus do not actually perform the limitations recited by the claim.  Second, and more importantly, the ability to flow text around an image within a web page are features of the HTML standard that were available in any ordinary web browser well before the priority date of the '888 Patent.  Indeed, this functionality was available in the first generation iPhone released in early 2007, also before the priority date of the '888 Patent.  Thus, to the extent that features recited by claims of the '888 Patent read on the mobile device in the market, those claims are either invalid because they are not novel, or the web browser capabilities of the first generation iPhone provide an acceptable design around.  Thus, it is my opinion that the '888 Patent has minimal to no value.

33.     Again, in stark contrast to my analysis of the claims of the '888 Patent, Mr. Pellegrino bases his opinion, in part, on an assumption that the '888 Patent has "become a defining feature for cellular telephones." (Dkt. 1323 at ¶ 257.)  I do not find any evidence to support such a conclusion.  Based on the evidence to date, the claimed invention of the '888 Patent is not a feature of telephones at all, much less an important feature.  It is my understanding that Mr. Pellegrino did not perform a technical review of the '888 Patent claims or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is also my understanding that Mr. Pellegrino did not perform independent analysis to evaluate the legal strength of the LG Patents.  (*Id.*)  Mr. Pellegrino acknowledges that the '888 Patent suffers from an elevated risk of invalidity due to the limited nature of the prosecution history, which I certainly agree with.  (Dkt. 1323 at ¶ 111.) Furthermore, Mr. Pellegrino did not review or consider the LG claim charts relating to the '888 Patent in reaching his opinions as to Ericsson's technical assessment of the LG Patents' value, but instead, "just took [Ericsson's representative's] word for it." (Pellegrino Dep. Tr. at 65:19-66:18.)  In sum, Mr. Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '888 Patent has any value whatsoever.

34.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '888 Patent has little to no value.

## C.     U.S. Patent No. 8,300,017

35.     As discussed in my opening witness declaration, U.S. Patent 8,300,017 ("the '017 Patent") entitled "Mobile electronic apparatus with touch input device and display method using the same" was filed on June 22, 2007, claims a January 20, 2007 priority date, and was assigned to LG Electronics.  (Ex. 205 at pp. 1-17.) On July 31, 2015, LG assigned the '017 Patent to Optis Cellular Technology, LLC. (Ex. 1623 at pp. 1-2.)  It is my understanding that the '017 Patent was never assigned to Ericsson.

36.     The patent describes a method of scrolling an image on a mobile, touch-input display device that requires very specific mechanisms and responses. (Ex. 205 at pp. 1-17.)  It does not correspond with the commonly used techniques for scrolling on a mobile phone.  The claims of the '017 Patent require that one can touch a specific position on data information displayed behind a touch screen.  (*Id.* at pp. 16-17.)  At least a portion of that data information is then scrolled based on the position of the touch input.  The display must include a reference position and the speed of the movement of the scrolling is determined based on the distance between this reference position and the position of the aforementioned touch.  (*Id.*)  Additionally, the direction of the movement of the data is determined with respect to the position of this touch.  (*Id.*)

37.     As I discussed in my opening witness declaration, the '017 Patent has minimal to no value when evaluated in the context of mobile devices available in the market.  Specifically, after careful analysis of at least Apple iPhone and Samsung Galaxy devices, I have not found any mobile device application that practices representative claim 17 of the '017 Patent.  That claim requires that the mobile phone scroll content on the display in response to touching a particular position on the display, wherein the direction and speed of the scroll are determined according to the position of the touch input.  But, the mobile device applications that I analyzed do not scroll content in this manner.  Instead, scrolling generally involves a dragging or swiping motion on the display.  Notably, scrolling in response to dragging (i.e., the normal behavior for mobile device application) has been well known in the industry well before the priority date of the '017 Patent, including for example in the first generation iPhone.  Thus, it is my opinion that the '017 Patent has minimal to no value.

38.     In stark contrast to my review of the *claims* of the '017 Patent, Mr. Pellegrino's analysis is based on a characterization of the '017 Patent is unreasonably broad.  (Dkt. 1323 at ¶¶ 63, 64, 79.)  Mr. Pellegrino appears to

conflate touch-based scrolling in general with the narrow and unusual approach described and claimed in the '017 Patent.  Other than this general relationship to scrolling, Mr. Pellegrino has not identified any specific reason why this patent would be valuable.  It is my understanding that Mr. Pellegrino did not perform a technical review of each patent's claims individually or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is also my understanding that Mr. Pellegrino did not perform independent analysis to evaluate the legal strength of the LG Patents.  (*Id.*)  Furthermore, Mr. Pellegrino did not review or consider the LG claim charts relating to the '017 Patent in reaching his opinions as to Ericsson's technical assessment of the LG Patents' value, but instead, "just took [Ericsson's representative's] word for it."  (*Id.* at 65:19-66:18.)

39.      The touch-based scrolling technique claimed in the '017 Patent is not the common technique that is used on phones.  In an ordinary touch-screen phone, scrolling is performed according to motion of touch input and not the specific position of the input.  In fact, the common phone scrolling technique allows for any position within a window without distinguishing one position from another.  No reference position as per the claim generally exists.  The speed of the scrolling corresponds to the speed of the user motion, not the position of the touch or the distance from a reference position.  The direction of scrolling is likewise based on the direction of motion and not on the position of the touch input.  This ordinary form of touchscreen scrolling not only constitutes an acceptable design around for this patent, but based on its prevalence in the market is the preferred option over the '017 Patent's technique.

40.      Mr. Pellegrino's generalized approach is incorrect.  As discussed in my opening witness declaration, the '017 Patent generally relates to scrolling and has little or no value in view of well-accepted design arounds used throughout the market.  In sum, Mr. Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '017 Patent has any value whatsoever.

41.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '017 Patent has little to no value.

**D.     U.S. Patent No. 8,593,415**

42.     As discussed in my opening witness declaration, U.S. Patent 8,593,415 ("the '415 Patent") entitled "Method for processing touch signal in mobile terminal and mobile terminal using the same" was filed on March 10, 2010, claims a June 19, 2009 possible priority date, and was assigned to LG Electronics.  (Ex. 208 at pp. 1-40.)  On July 31, 2015, LG assigned the '415 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '415 Patent was never assigned to Ericsson.  The patent describes a method of shaking a phone or tablet while a touchscreen is being touched in order to perform actions.

43.     As I discussed in my opening witness declaration, the '415 Patent has minimal to no value when evaluated in the context of mobile devices available in the market.  First, a careful claim-level analysis reveals that the Apple iPhone does not infringe the claims of the '415 Patent.  Specifically, representative claim 10 requires that the mobile phone resize displayed data in response to moving the mobile phone while touching an area on the display.  But, the iPhone does not behave in this manner.  Instead, data displayed on the iPhone is generally resized in response to a two-finger pinching motion.  Second, while my analysis of the Samsung Galaxy Note 3 revealed that a limited set of applications do appear to resize data on the display using a tilt-to-zoom feature, this functionality provides little value to the phone because there are generally accepted design arounds (*e.g.*, two-pinch zooming, which is also available on Samsung devices), and because the feature provides little to no utility to the user.  Indeed, the tilt-to-zoom feature is not enabled by default on Samsung devices and is not even usable on most applications that run on the phone.  Thus, it is my opinion that the '415 Patent has minimal to no value.

44.     Mr. Pellegrino has not identified any reason why the '415 Patent would have any substantial value other than its general relationship to touchscreens.  It is

my understanding that Mr. Pellegrino did not perform a technical review of each patent's claims individually or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is also my understanding that Mr. Pellegrino did not perform an independent analysis to evaluate the legal strength of the LG Patents.  (*Id.*)  Furthermore, Mr. Pellegrino did not review or consider the LG claim charts relating to the '415 patent in reaching his opinions as to Ericsson's technical assessment of the LG Patents' value, but instead, "just took [Ericsson's representative's] word for it."  (*Id.* at 65:19-66:18.)  In sum, Mr. Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '415 Patent has any value whatsoever.

45.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '415 Patent has little to no value.

### E.     U.S. Patent No. 8,549,426

46.     As discussed in my opening witness declaration, U.S. Patent 8,549,426 ("the '426 Patent") entitled "Apparatus and method for configuring an on-screen image in a mobile telecommunication handset upon connection of earphone" was filed on June 23, 2006, claims a June 24, 2005 priority date, and was assigned to LG Electronics.  (Ex. 207 at 1-8.)  On July 31, 2015, LG assigned the '426 Patent to Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that the '426 Patent was never assigned to Ericsson.

47.     The patent is directed towards launching a multimedia application when a headphone is plugged into a mobile device and also to stopping the display of a multimedia application and continuously displaying a single image in response to removal of a headphone.  (Ex. 207 at 1-8.)  Claims 1, 11, 19, and 25 are the independent claims.  I am unaware of any phones that practice claims 1, 11, or 19 and I am also unaware of any allegations that any phones practice these claims or any analysis from LG or Ericsson related to these claims.

48.     As I discussed in my opening witness declaration, the '426 Patent has

minimal to no value when evaluated in the context of mobile devices available in the market.  Representative claim 25 of the '426 Patent requires the mobile phone to stop playback of a multimedia application and display an image in response to removing earphones from the phone's earphone jack.  There is no evidence that customers attribute any value to this feature, and there are clearly acceptable design arounds.  For example, a user does not need to see an image to know that the earphones have become disconnected because the sound has stopped, and can easily just plug the earphones back into the earphone jack when this happens.  In general, every video application allows a user to easily go back and repeat a missed segment.  Moreover, merely pausing the multimedia playback without displaying an image from that video on the screen would be a simple design around that would accomplish the same result with no discernable difference to the user.  For example, one could display the word "pause" instead.  Thus, it is my opinion that the '426 Patent has minimal to no value.

49.     Mr. Pellegrino has not identified any specific reason why this patent would be valuable.  It is my understanding that Mr. Pellegrino did not perform a technical review of each patent's claims individually or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is also my understanding that Mr. Pellegrino did not perform independent analysis to evaluate the legal strength of the LG Patents.  (*Id*.)  Furthermore, Mr. Pellegrino did not review or consider the LG claim charts relating to the '426 Patent in reaching his opinions as to Ericsson's technical assessment of the LG Patents' value, but instead, "just took [Ericsson's representative's] word for it."  (*Id*. at 65:19-66:18.)

50.     Mr. Pellegrino mischaracterizes the invention described in the '426 Patent.  Mr. Pellegrino alleges that, "[i]n practical terms, the patent discloses inventions that allow for intelligent device control of multimedia features when the user inserts an earphone into the device's earphone jack or removes an earphone from the device's earphone jack (*e.g.*, pause video playback when the user unplugs

1   the earphone, resume video playback when the user plugs in the earphone, etc.)."

2   (Dkt. 1323 at ¶¶ 67, 68.)  In fact, the '426 Patent neither discloses or claims the

3   ability to resume video playback when the user plugs in the earphone.  The patent

4   does disclose launching preset applications (Ex. 207 at p. 5, 2:61-65) but never

5   discloses resuming playback of a video from the point at which it was paused.

6        51.     Moreover, as explained in my opening witness statement, there are

7   numerous trivial design-arounds for claim 25, such as displaying the word "paused"

8   when the headphone jack is removed.  In sum, Mr. Pellegrino's "analysis" is wholly

9   insufficient and superficial, and fails to demonstrate that the '426 Patent has any

10  value whatsoever.

11       52.     For the reasons stated above and in my opening witness declaration, it

12  is my opinion that the '426 Patent has little to no value.

13       **F.    U.S. Patent No. 8,092,253**

14       53.     As discussed in my opening witness declaration, U.S. Patent 8,092,253

15  ("the '253 Patent") entitled "Communication terminal" was filed on August 3, 2010,

16  claims a November 7, 2007 possible priority date, and was assigned to LG

17  Electronics.  (Ex. 203 at 1-17.)  On July 31, 2015, LG assigned the '253 Patent to

18  Optis Cellular Technology, LLC.  (Ex. 1623 at pp. 1-2.)  It is my understanding that

19  the '253 Patent was never assigned to Ericsson.  The patent describes a particular

20  way of positioning components within a phone and connecting them with a coaxial

21  cable.  (Ex. 203 at pp. 1-17.)

22       54.     As I discussed in my opening witness declaration, the '253 Patent has

23  minimal to no value when evaluated in the context of mobile devices available in the

24  market.  Specifically, after careful analysis of at least Apple iPhone and Samsung

25  Galaxy devices, I have not found any mobile device that practices representative

26  claim 1 of the '253 Patent.  That claim requires connection of the mobile device

27  antenna (*i.e.*, a coaxial cable) to a plurality of fixing portions and a grounding part of

28  the mobile phone case.  But, there is no evidence that mobile devices in the market

1   are constructed in this manner.  For example, my analysis of a Samsung Galaxy

2   Epic 4G reveals that the antenna is actually affixed to an internal skeleton located

3   inside the mobile device, and not directly to the case itself as required by the claims.

4   To the extent that any mobile devices in the marketplace do practice the '253 Patent

5   claims (I am not aware of any), the internal skeleton configuration of the Epic 4G

6   would clearly provide an acceptable design around.  Thus, it is my opinion that the

7   '253 Patent has minimal to no value.

8       55.     Mr. Pellegrino has not identified any reason why the '253 Patent would

9   have any substantial value.  It is my understanding that Mr. Pellegrino did not

10  perform a technical review of each patent's claims individually or map those claims

11  to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is

12  also my understanding that Mr. Pellegrino did not perform independent analysis to

13  evaluate the legal strength of the LG Patents.  (*Id*.)  Furthermore, Mr. Pellegrino did

14  not review or consider the LG claim charts relating to the '253 Patent in reaching his

15  opinions as to Ericsson's technical assessment of the LG Patents' value, but instead,

16  "just took [Ericsson's representative's] word for it."  (*Id*. at 65:19-66:18.)

17      56.     Mr. Pellegrino appears to assume that the invention of the '253 Patent

18  is a coaxial cable.  (Dkt. 1323 at ¶¶ 59, 60, 79.)  But Ericsson knew or should have

19  known that a coaxial cable for connecting an antenna in a phone was not novel.  An

20  ordinary coaxial cable connects multiple signals (as applied in the LG analysis

21  where one is ground) and provides a grounding capability.  The disclosed preferred

22  embodiment (Ex. 203 at pp. 5, 7, FIGS. 4, 6) and the accused embodiment both use

23  simple coaxial cables with a center conductor and a ground shield.  (Ex. 4513 at pp.

24  60-62.)  But the claims also require that the coaxial cable is fixed to an inner surface

25  of the case.  (Ex. 203 at pp. 16-17.)  But, as I discuss in my opening witness

26  declaration, neither the Apple iPhone nor the Samsung Epic 4G are constructed in

27  such a manner.  It is clear that Mr. Pellegrino never bothered to determine if these

28  mobile devices actually practice the patent claims (they do not).  In sum, Mr.

Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '253 Patent has any value whatsoever.

57.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '253 Patent has little to no value.

## G.     U.S. Patent No. 7,957,770

58.     As discussed in my opening witness declaration, U.S. Patent 7,957,770 ("'770 Patent") entitled "Mobile communication terminal for providing tactile interface" was filed on December 12, 2007, claims a December 13, 2006 possible priority date, and was assigned to LG Electronics.  (Ex. 201 at pp. 1-13.)  On July 7, 2014, LG assigned the '770 Patent to Ericsson.  (Ex. 1632.)

59.     The patent describes a mobile device that vibrates in response to touch input independent of whether the vibrator is set to respond to other events in the phone.  (Ex. 201 at pp. 1-13.)

60.     As I discussed in my opening witness declaration, the '770 Patent has minimal to no value when evaluated in the context of mobile devices available in the market.  First, a careful claim-level analysis reveals that the Apple iPhone does not infringe the claims of the '770 Patent.  Specifically, representative claim 1 requires that the mobile phone vibrate in response to a touch.  But, the iPhone I analyzed does not behave in this manner.  Second, vibration feedback is not a core feature of any Samsung phone, and easy design arounds exist.  For example, the popularity of the iPhone has shown that users are willing to accept auditory, as opposed to vibratory feedback in response to external contact with the display.  The iPhone user interface is clearly a non-infringing alternative to the vibration feedback feature of the '770 Patent.  Thus, it is my opinion that the '770 Patent has minimal to no value.

61.     Mr. Pellegrino has not identified any reason why the '770 Patent would have any substantial value.  It is my understanding that Mr. Pellegrino did not perform a technical review of each patent's claims individually or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is

also my understanding that Mr. Pellegrino did not perform independent analysis to evaluate the legal strength of the LG Patents. (*Id*.) There is no evidence identified by Mr. Pellegrino that Ericsson ever performed any technical analysis of the '770 Patent or identified any allegedly infringing products. Mr. Pellegrino focuses on aspects of dependent claims 7 and 15 in his description of the novelty of the patent. (Dkt. 1323 at ¶¶ 55, 56, 79.) Those claims require the "controller causes the vibrator to vibrate at one of a plurality of intensities and durations in response to different touch locations." (Ex. 201 at p. 13, Claims 7, 15.)

62.     Mr. Pellegrino never actually analyzed whether those claimed features are practiced by mobile devices in the marketplace. Moreover, as discussed in my opening witness declaration, vibratory feedback features claimed by the '770 Patent were disclosed in patents owned by Immersion Technologies over 15 years prior to the priority date of the '770 Patent. Thus, those Immersion Patents either render the claims of the '770 Patent invalid, or at least provide a viable non-infringing alternative to the '770 Patent. To the extent that any of the '770 Patent's claims are valid, the differences over the prior art are not commercially interesting. In sum, Mr. Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '770 Patent has any value whatsoever.

63.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '770 Patent has little to no value.

**H.     U.S. Patent No. 8,326,377**

64.     As discussed in my opening witness declaration, U.S. Patent 8,326,377 ("the '377 Patent") entitled "Input device and mobile device having the same" was filed on August 28, 2007, claims a March 16, 2007 possible priority date, and was assigned to LG Electronics. (Ex. 206 at pp. 1-12.) On July 31, 2015, LG assigned the '377 Patent to Optis Cellular Technology, LLC. (Ex. 1623 at pp. 1-2.) It is my understanding that the '377 Patent was never assigned to Ericsson.

65.     The patent describes a very specific structure for a light-permeable

button on a mobile device that is composed of both mineral and non-mineral components.  (Ex. 206 at pp. 1-12.)  The specification appears to define a mineral material as "one of a ceramic material, a glass material, a crystalline material, and combinations thereof."  (*Id*. at p. 8, 1:43-45.)  Non-mineral materials are defined as "Poly Methyl Methacrylate (PMMA), Polycarbonate (PC), or other suitable materials."  (*Id*. at p. 10, 5:22-23.)  A person of ordinary skill would likely understand the term "mineral" in these claims to refer to inorganic materials and "non-mineral" to refer to organic materials.

66.    As I discussed in my opening witness declaration, the '377 Patent has minimal to no value when evaluated in the context of mobile devices available in the market.  First, a careful analysis of at least Apple iPhone and Samsung Galaxy devices reveals that these devices do not read on the '377 Patent claims.  Specifically, representative claim 1 requires incorporation of a light permeable button on the mobile device display.  But, none of the Apple or Samsung mobile devices I analyzed incorporate a light permeable button.  Moreover, there are many simple acceptable design arounds, such as an opaque button, or a soft button that do not require any structure required by the '377 Patent claims.  Thus, it is my opinion that the '377 Patent has minimal to no value.

67.    Mr. Pellegrino has not identified any reason why the '377 Patent would have any substantial value.  It is my understanding that Mr. Pellegrino did not perform a technical review of each patent's claims individually or map those claims to specific devices that sell in the market.  (Pellegrino Dep. Tr. at 117:12-24.)  It is also my understanding that Mr. Pellegrino did not perform independent analysis to evaluate the legal strength of the LG Patents. (*Id*.)  Mr. Pellegrino acknowledges that the invention of the '377 Patent is quite narrow and specialized.  (Dkt. 1323 at ¶¶ 65, 66.)  There is no evidence identified in Mr. Pellegrino's report that Ericsson ever performed any technical analysis of the '377 Patent or identified any allegedly infringing products.  There are many simple design arounds to this patent such as

using an opaque button, using a metal button support member, or using a soft button that requires none of this structure.  In sum, Mr. Pellegrino's "analysis" is wholly insufficient and superficial, and fails to demonstrate that the '377 Patent has any value whatsoever.

68.     For the reasons stated above and in my opening witness declaration, it is my opinion that the '377 Patent has little to no value.

## IV.   MR. DELGADO'S TESTIMONY REGARDING THE EVALUATION OF THE LG PATENTS IS NOT RELEVANT TO DETERMINING THEIR VALUE.

69.     Mr. Delgado testifies as to the patent evaluation process that ultimately led to Ericsson's selection of the LG Patents.  That process purportedly included two rounds of evaluation.  In the first round of evaluation, which started in October 2013, Mr. Delgado purportedly worked with two other Ericsson employees and Parsa Wireless to evaluate a first set of ten LG implementation patents.  (Dkt. 1325 at ¶¶ 50, 53.)  Mr. Delgado testifies that the team analyzed "the patent claims and any claim charts that LG provided, as well as the patent prosecution histories, claim construction issues, infringement issues, facially-evident validity issues (*e.g.*, 35 USC 112), and formality-related issues such as proper assignments and up-to-date maintenance fee payments."  (*Id*. at ¶ 53.)  He also testifies that the team "compared the implementation patents to popular smartphones on the market, including Samsung, Apple, Nokia, Motorola, HTC, and Google smartphones."  (*Id*.)  However, Mr. Delgado fails to provide any detailed analysis, conclusions from that analysis, or assessments showing how the team actually evaluated "infringement issues," what they actually concluded, or how they compared the patents to products in the marketplace.  Instead, as an example, Mr. Delgado cites a claim chart created by LG and a section of a spreadsheet prepared by Parsa Wireless with qualitative and conclusory rankings of the first set of implementation patents (which Ericsson declined to accept from LG).  (*Id*. at ¶¶ 55, 56.)  No actual work product from the

team of Ericsson employees was produced showing claim-level patent mappings to products in the marketplace, or any other analysis or assessment that the team purportedly performed.  Accordingly, I cannot evaluate the accuracy of Ericsson's claim mappings to products in the marketplace, to the extent any such mappings were done at all.  Moreover, the team apparently did not consider whether any of the claimed technologies would be susceptible to easy design arounds, or were even useful in the marketplace, which would have been necessary to fully evaluate the value of those patents.

70.     Mr. Delgado testifies that only three of the ten implementation patents from the first round of analysis "looked promising."  (*Id.* at ¶ 58.)  Accordingly, Ericsson performed a second round of analysis, this time without Parsa's help.  (*Id.* at ¶ 59.)  In the second round of evaluation, which started in December 2013 and concluded in January 2013, Mr. Delgado purportedly worked with four other Ericsson employees to evaluate a second batch of LG implementation patents.  (*Id.* at ¶¶ 58, 59.)

71.     Mr. Delgado testifies that the patent evaluation team performed the same types of analyses and assessments on the second batch of patents as were performed in the first round of evaluation.  (*Id.* at ¶ 60.)  However, just as with his testimony of the first round of patent evaluation, Mr. Delgado fails to cite any detailed analyses, conclusions, or assessments showing how the team actually evaluated "infringement issues," or compared the patents to products in the marketplace.  Despite the team's allegedly comprehensive analysis, neither Mr. Delgado nor Mr. Pellegrino has identified substantive records created as a result of Ericsson's independent analysis.  Accordingly, I cannot evaluate the accuracy of Ericsson's claim mappings to products in the marketplace, to the extent any such mappings were done at all.  Additionally, Mr. Delgado does not describe any effort to assess design-around alternatives.

72.     Mr. Delgado further testifies that he reported the results of the second

round of patent evaluation to "the highest level of management within Ericsson's IPR & Licensing group." (*Id*. at ¶ 65.)  However, he does not cite to any documentary evidence of those results or explain what exactly was reported to Ericsson management.

73.     Additionally, Mr. Delgado does not describe any effort to quantify the value of the second batch of implementation patents.  Instead, he merely describes the *process* as allegedly selecting "which of the patents offered by LG would provide the most value to Ericsson." (*Id*. at ¶ 65.)

74.     Notably, Mr. Delgado's descriptions of each of the implementation patents evaluated amount to one-line generalizations of the technology disclosed in those patents while ignoring the patent ***claims***.  For example, Mr. Delgado alleges that claim 20 of the '377 Patent reads "on smartphones incorporating glass (such as Gorilla glass) in a certain manner for their screens, which was the technology trend for newer smartphones." (*Id*. at ¶ 57.)  While Gorilla glass may be a feature of some newer smartphones, claim 20 recites seven very detailed and distinct claim elements, including a requirement for a window support member with a through hole and an adhesive layer connecting the window to the window support member such that the window is disposed at the through hole.  (Ex. 206, at pp. 11-12, Claim 20.)  But, Mr. Delgado fails to explain how these claim limitations are actually incorporated in any mobile device in the market.  Notably, most smartphones available in the market incorporate a single glass screen at the front surface of the device, and do not include a window support member with a through hole, as required by claim 20.  Mr. Delgado's generalizations of the technology ***disclosed***, but not necessarily ***claimed***, by the LG Patents is not relevant to determining the value of those patents.  As I have previously testified, the only value in owning a patent is necessarily related to the right to exclude others from the practice of the patent's ***claims***.

75.     It is clear from my prior testimony that, when a proper claim-level

analysis of the LG Patents is performed, any conclusion that these patents have substantial value is highly flawed.  Each of the patents has one or more substantial deficiencies.  Ericsson has not identified any shortcomings in my analysis nor identified any evidence that these issues were addressed in Ericsson's initial analysis or that any other conclusions were reached at that time.

76.     In sum, just as was the case with Mr. Pellegrino, Mr. Delgado fails to explain how the claims of the LG Patents map to any products in the marketplace or consider possible design arounds to those claimed technologies.  Accordingly, Mr. Delgado's testimony does not change my opinion, as stated in my opening witness declaration, that the LG Patents have little to no value.

## V.     AT THE TIME IT ACQUIRED THE LG PATENTS, ERICSSON ALREADY OWNED PATENTS COVERING THE SAME TECHNOLOGY.

77.     Mr. Pellegrino argues that the LG Patents were particularly valuable to Ericsson to cover important mobile device technologies present in the Apple iPhone and Samsung Galaxy lines of mobile device.  (Dkt. 1323 at ¶¶ 79-85.)  Similarly, Mr. Delgado testified that Ericsson was not interested in acquiring patents directed towards technologies for which "Ericsson already held a robust portfolio."  (Dkt. 1325 ¶ 57.)  But, these criteria, as explained by Mr. Delgado and Mr. Pellegrino, do not comport with Ericsson's actual decision to acquire the LG Patents.  Specifically, at the time it was considering whether to acquire the LG patents, Ericsson already owned hundreds, if not thousands of patents that disclose and/or claim the same general technologies as disclosed in the LG Patents.

78.     For example, Mr. Pellegrino argues that the '415 Patent, '017 Patent, and '770 Patent are valuable because they are generally directed towards touch screen technology, and both the Apple iPhone and Samsung Galaxy S4 utilize touch screens.  (*Id.* at ¶¶ 79-83.)  However, a search of patents owned by Ericsson with priority dates earlier than 2007 identified 2,211 patents that are directed to general

1  display technology, 1,264 patents that are directed towards mobile device display

2  technology, and 238 patents that are directed towards touch screen technology.

3  Accordingly, Ericsson already owned at least 238 patents directed towards touch

4  screens with priority dates earlier than the '415 Patent, the '017 Patent, and the '770

5  Patent.  Mr. Pellegrino does not identify any features claimed in the '415 Patent, the

6  '017 Patent, or the '770 Patent that would provide any particular value over the 238

7  patents Ericsson already owned relating to touch screen technology in mobile

8  devices.  (Ex. 2372 at p. 1.)

9       79.    Mr. Pellegrino also suggests that the '134 Patent is valuable because it

10  is broadly directed towards "basic device operation."  (Dkt. 1323 at ¶¶ 79-92.)

11  However, as discussed above, Ericsson already owned thousands of patents directed

12  towards general mobile device operation at the time it acquired the LG Patents.  Even

13  assuming Ericsson was interested in patents related to mobile device display

14  technologies, Ericsson already owned 1,264 patents directed towards such

15  technology as of the date it acquired the LG Patents.

16      80.    Mr. Pellegrino also suggests that the '426 Patent is valuable as being

17  directed towards headphone jack technology.  However, as I discussed in my

18  opening witness declaration, the '426 Patent actually relates to the display of

19  information on a mobile device screen in response to an input from a user (*e.g.*,

20  removal of the headphone jack).  Accordingly, the '426 Patent would fall into the

21  category of mobile device display patents that I have identified above, and Ericsson

22  already owned 1,264 patents directed towards such technology as of the date it

23  acquired the LG Patents.

24      81.    Mr. Pellegrino further suggests that the '253 Patent is valuable as being

25  broadly directed towards coaxial antenna technology for mobile devices.  (Dkt. 1323

26  at ¶¶ 79-83.)  However, a search of patents owned by Ericsson with priority dates

27  earlier than 2007 identified 27 patents alone relating to coaxial antenna technology.

28  (Ex. 2373 at pp. 1-33.)  Mr. Pellegrino does not identify any features claimed in the

'253 Patent that would provide any particular value over the 27 patents Ericsson already owned relating to coaxial antenna technology in mobile devices.

82.     Mr. Pellegrino further suggests that the '888 Patent is valuable as being broadly directed towards web browser technology.  (Dkt. 1323 at ¶¶ 79-83.)  However, a search of patents owned by Ericsson with priority dates earlier than 2007 identified 53 patents relating to web browser technology on a mobile device.  (Ex. 2374 at p. 1.)  Mr. Pellegrino does not identify any features claimed in the '888 Patent that would provide any particular value over the 53 patents Ericsson already owned relating to web browser technology in mobile devices.

83.     In view of the above analysis, I find Mr. Pellegrino's analysis of value based on purported technology gaps in Ericsson's then-existing patent portfolio to be wholly unfounded.  If anything, a comparison of the LG Patents to the over 2,000 patents relating to the same general technologies described by Mr. Pellegrino and Mr. Delgado that Ericsson already owned at the time it acquired the LG Patents highlights the minimal value of the LG Patents.

## VI.   **CONCLUSION**

84.     It is my opinion that the LG Patents have little to no value because a careful claim-level analysis of each of the LG Patents reveals that mobile devices available in the market would not infringe the claims of the LG Patents, there are straight-forward and cost-equivalent design arounds to the claims, and/or the novel features of the claims provide little utility to mobile devices.  Neither Mr. Pellegrino's nor Mr. Delgado's testimony changes this opinion because: (1) neither witness cited any analysis, such as a claim-level comparison of the patents to technologies in the market, that demonstrates any value attributable to the technologies claimed by the LG Patents, nor are Mr. Pellegrino and Mr. Delgado qualified to offer such opinions; and (2) their testimony implying that the LG Patents fill gaps in Ericsson's patent portfolio is unsupported in view of the fact that Ericsson already had a large number of patents directed towards the same

1   technology fields.  Accordingly, it is my opinion that a reasonable analysis of the

2   LG Patents, as of the time they were transferred from LG to Ericsson, reveals that

3   the LG Patents have little to no value.

4

5        I declare under penalty of perjury under the laws of the United States of

6   America that the foregoing is true and correct.

7

8        Executed on January 26, 2017, at Los Gatos, California.

9

10

11  By _____

    Andrew Wolfe

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF EXHIBITS CITED IN WITNESS DECLARATION**

| Exhibit No. | Description |
|---|---|
| 201 | U.S. Patent No. 7,957,770 |
| 202 | U.S. Patent No. 8,078,134 |
| 203 | U.S. Patent No. 8,092,253 |
| 204 | U.S. Patent No. 8,095,888 |
| 205 | U.S. Patent No. 8,300,017 |
| 206 | U.S. Patent No. 8,326,377 |
| 207 | U.S. Patent No. 8,549,426 |
| 208 | U.S. Patent No. 8,593,415 |
| 1620 | Patent Abstract of Title re U.S. Patent Application No. 12/463,980 |
| 1621 | File History for U.S. Patent 8,078,134 |
| 1622 | Steve Jobs Speech:  Apple iPhone Launch Video - https://www.youtube.com/watch?v=9hUIxyE2Ns8 |
| 1623 | U.S. Patent and Trademark Office Assignment Records for assignments made by LG Electronics to Optis Cellular -- Reel 036503 / frame 0302 |
| 1632 | Patent Abstract of Title re U.S. Patent Application No. 11/955,300 |
| 2371 | U.S. Patent 6,956,564 |
| 2372 | TotalPatent Search Results –Touch Screen Patents |
| 2373 | TotalPatent Search Results – Antenna Patents |
| 2374 | TotalPatent Search Results –Web Browser Patents |
| 4513 | LG Claim Chart Presentation |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the PLAINTIFFS' REBUTTAL DECLARATION OF EXPERT WITNESS DR. ANDREW WOLFE to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawlev@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:   */s/ Kristina Grauer*
      KRISTINA GRAUER