1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
9  Limited, and TCT Mobile (US) Inc.

10                 UNITED STATES DISTRICT COURT

11      FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12  TCL COMMUNICATION                | Case No. SACV14−00341 JVS (DFMx)
13  TECHNOLOGY HOLDINGS, LTD.,        | Consolidated with CV15–02370
    et al.
14                                    |
                   Plaintiffs,        | **PLAINTIFFS' DIRECT**
15        v.                          | **EXAMINATION BY**
                                      | **DECLARATION**
16  TELEFONAKTIEBOLAGET LM            | **FOR EXPERT WITNESS**
    ERICSSON, et al.                  | **DR. ZHI DING**
17
                   Defendants.        |
18  _____ |

19  TELEFONAKTIEBOLAGET LM            | Place:  Courtroom 10C
20  ERICSSON, et al.,                 | Before Hon. James V. Selna
21                 Plaintiffs,        |
                                      | Discovery Cut-Off:  May 23, 2016
22        v.                          | Pre-Trial Conf.:  Jan. 30, 2017
                                      | Trial:  Feb. 14, 2017
23  TCL COMMUNICATION                 |
    TECHNOLOGY HOLDINGS, LTD.,        |
24  et al.,                           |
25                 Defendants.        |

26

27

28

**TABLE OF CONTENTS**

**Page**

I.    CREDENTIALS AND QUALIFICATIONS ....................................................1

    A.    Education.............................................................................................1

    B.    Relevant Work Experience ................................................................1

II.   SUMMARY OF TESTIMONY ....................................................................4

    A.    Overview of Technical Analysis I Performed ....................................4

    B.    Summary of Results ...........................................................................7

III.  BACKGROUND ..........................................................................................10

    A.    Standards-Setting Organizations, 3GPP, and ETSI ..........................10

    B.    Declaring Patents to ETSI That May Be or May Become "Essential" .........................................................................................12

IV.   INDUSTRY-WIDE PATENT ESSENTIALITY ANALYSIS OF 2G, 3G, AND 4G USER EQUIPMENT PATENTS ........................................16

    A.    Objectives and Summary of Approach ..............................................16

    B.    Team Qualifications ...........................................................................17

    C.    The Patent Census .............................................................................18

    D.    Identification of Declared-Essential User Equipment Families ..........18

    E.    Essentiality Analysis Protocol ..........................................................22

    F.    Principle of Neutrality and Objectivity..............................................25

    G.    Quality Control and Accuracy Assessment ......................................25

    H.    Accuracy Direction Analysis ............................................................28

    I.    Significance of the Industry-Wide Essentiality Analysis ....................29

    J.    Overall Results of the Industry-Wide Essentiality Analysis ...............30

V.    CONCLUSION .............................................................................................41

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION ...........................43

## DECLARATION OF DR. ZHI DING

I, Dr. Zhi Ding, declare under penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.   CREDENTIALS AND QUALIFICATIONS

1.    My name is Zhi Ding.  I am presently serving as Professor in the Department of Electrical and Computer Engineering at University of California, Davis, California, a position I have held since my appointment on July 1, 2000.  I am also a private technical consultant on various information related technologies.  I have more than 26 years of research experience on a wide range of topics related to data communications and signal processing.

### A.   Education

2.    I received a Ph.D. in Electrical Engineering from Cornell University, New York (1990); a Master of Applied Science degree in Electrical Engineering from University of Toronto, Canada (1987); and a Bachelor's degree in Wireless Engineering from Nanjing Institute of Technology (later renamed Southeast University), China (1982).

### B.   Relevant Work Experience

3.    My professional responsibilities as a Professor at University of California, Davis, include classroom instruction on various topics of communications systems and signal analysis, as well as supervising undergraduate and graduate students' research and development efforts on various topics related to digital communications.  I have directly supervised such research and development work ranging from signal detection to wireless networking.  As the chief academic advisor, I have also directly supervised the completion of 18 Master's theses and 25 Ph.D. dissertations on various topics related to digital communications.  I have served full time as a faculty member at three major research universities in the United States over the past 26 years, including Auburn University from 1990 to 1998, University of Iowa from 1999 to 2000, and University of California, Davis,

1   from 2000 to present.

2       4.      Since 1990, I have been selected as the principal investigator of

3   multiple highly competitive federal and local research grants, including sixteen

4   major research projects supported by the National Science Foundation and two

5   research projects funded by the U.S. Army Research Office.  These competitive

6   research projects focused on developing more efficient and effective digital

7   communications transceivers, networks, and signal processing tools.  I have also

8   participated in three large-scale projects supported by the Defense Advanced

9   Research Projects Agency (DARPA) with teams of researchers.  I have applied for,

10  and received support from, other federal, state, and industry sponsors.

11      5.      I have published over 160 peer-reviewed research articles in premier

12  international journals, in addition to over 200 publications at top international

13  conferences on communications and signal processing.  I also authored two books

14  on communications technologies.  My most recent book, co-authored with B.P.

15  Lathi, is entitled, "Modern Digital and Analog Communication Systems," 4th

16  edition, and was published by the Oxford University Press in 2009.  This book has

17  been widely adopted as an introductory textbook to communications systems.

18      6.      I am a Fellow of the Institute of Electrical and Electronics Engineers

19  (IEEE), and was elected in January 2003 for contributions made in signal processing

20  for communications.  The IEEE is the world's largest professional society of

21  engineers, with over 400,000 members in more than 160 countries.  The IEEE has

22  led the development of many standards for modern digital communications and

23  networking, most notably, the IEEE 802 series of network standards.  The IEEE

24  Grade of Fellow is conferred by the Boards of Directors upon a person with an

25  extraordinary record of accomplishments in any of the IEEE fields of interest.  The

26  total number selected in any one year does not exceed one-tenth percent of the total

27  voting Institute membership.

28      7.      I have served the IEEE in the following capacities.

- General Chair of the 2016 IEEE International Conference on Acoustics, Speech, and Signal Processing, the flagship conference of the IEEE Signal Processing Society.

- Chair of the Steering Committee for the IEEE Transactions on Wireless Communications.

- Distinguished Lecturer of the IEEE Communications Society from January 2008 to December 2009.

- Technical Program Chair of the 2006 IEEE Globecom, one of two flagship annual IEEE Communication Society conferences.

- Distinguished Lecturer of the IEEE Circuits and Systems Society from 2004 to 2005.

- Associate Editor of the IEEE Transactions on Signal Processing from 1994 to 1997 and 2001 to 2004.

- Member of the IEEE Statistical Signal and Array Processing for Communications Technical Committee from 1993 to 1998.

- Member of the IEEE Signal Processing for Communications Technical Committee from 1998 to 2004.

8.     In 2012, I received the annual Wireless Communications Technical Committee Recognition Award from the IEEE Communications Society, a peer award given to a person with a high degree of visibility and contribution in the field of "Wireless and Mobile Communications Theory, Systems, and Networks."

9.     I have also served as a technical consultant for the telecommunications industry.  For example, in 1995, I consulted for Analog Devices, Inc., on the development of first generation DOCSIS cable communications systems.  I have also consulted for other companies, including Nortel Networks, NEC US Laboratories, and Futurewei.  I worked as a visiting faculty research fellow at NASA Glenn Research Center in 1992 and at U.S. Air Force Wright Laboratory in 1993.  I have served on multiple review panels of the National Science Foundation

to evaluate competitive research proposals in the field of communications.  I have also reviewed a large number of research proposals at the request of the National Science and Engineering Research Council (NSERC) of Canada as an expert panelist from 2010 to 2013, and also at the request of the Research Grant Council (RGC) of Hong Kong as an external reviewer.

10.    I have served as expert witness or consulting expert on a number of matters related to intellectual property, especially in the arena of wireless communications, including cellular communications and Wi-Fi technologies in particular.  From my prior experience, I have developed a strong sense of and expertise in what it means for a patent to be standard essential, particularly with respect to the 2G, 3G, and 4G cellular standards and associated technologies such as Wi-Fi.  For example, since 2007, I have been engaged in extensive expert work on various litigations involving alleged cellular and Wi-Fi SEPs.  In connection with my work on the present litigation, I applied such knowledge and expertise when analyzing the essentiality of select patents, as described in further detail below.

11.    Further experience is presented in my *curriculum vitae*.  (Ex. 1579.)

## II.    SUMMARY OF TESTIMONY

### A.    Overview of Technical Analysis I Performed

12.    I understand that one purpose of my engagement is to assist in a setting a royalty rate for a license to certain of Ericsson's patents that Ericsson is obligated to license on Fair, Reasonable, and Non-Discriminatory (FRAND) terms.  Ericsson alleges these patents are essential to the 2G, 3G, and/or 4G standards.  I understand that the total number of 2G, 3G, and 4G standard essential patents (SEPs), as well as Ericsson's proportional shares of those SEPs, can be components used in determining FRAND royalty rates.

13.    To assist in the determination of the FRAND royalty rates, this Witness Declaration provides certain analytical data relating to Ericsson's proportional share of industry-wide 2G, 3G, and 4G SEPs.  Specifically, the purpose the analysis was

to determine:  (1) the total number of industry-wide 2G, 3G, and 4G patents relating to User Equipment (UE) that were *declared* essential to ETSI—*i.e.*, patents that "may be or may become essential," (2) the total number of 2G, 3G, and 4G patents that are *actually* essential to the standards based on a technical evaluation, and (3) the respective distributions of these total numbers of patents across assignees, including Ericsson.

14.     I understand generally that other TCL experts are using the data and analysis presented in this Witness Declaration in connection with calculating FRAND rates for Ericsson's alleged 2G, 3G, and 4G SEPs.  For example, I understand that Dr. Gregory Leonard, one of TCL's economic experts, has opined on the proper *ex ante* FRAND royalty rate for a license to Ericsson's patents based upon an apportionment of the total aggregate royalty burden for all SEPs for each of the 2G, 3G, and 4G standards.  In this regard, I understand generally that Dr. Leonard uses the results of my essentiality analysis of industry-wide UE patents as one input for determining Ericsson's value share of all SEPs for each standard at issue.  This industry-wide patent analysis and its results are presented herein and in Section VI of the Witness Declaration of TCL expert Dr. Apostolos (Paul) Kakaes ("Kakaes Witness Declaration").

15.     In connection with the above, first, a Patent Census was conducted and overseen by Dr. Kakaes.  In my understanding, the Patent Census involved extracting information from a database of patent declarations maintained by the European Telecommunications Standard Institute (ETSI), a key international cellular standards body.  These patent declarations are often called IPR declarations. According to ETSI Policy, IPR declarations inform ETSI that the declarants believe (or believed) that the identified patents or applications "may be or may become essential" to the 2G, 3G, and/or 4G standards.  (Ex. 223 at pp. 9–11.)  For convenience, I will refer to such patents and applications as "declared-essential patents," "patents that have been declared as being essential," or the like.  It should

1  be noted (and is well accepted) that just because a patent is declared essential does

2  not mean that it is actually essential.

3       16.    Using the information extracted from the ETSI database, the Patent

4  Census identified 153,880 patents and published applications belonging to 20,156

5  patent families that were either explicitly or implicitly declared to ETSI as being

6  essential to the 2G, 3G, and/or 4G standards.  (Ex. 1336.)  Of these families, a

7  subset of families directed to UE[1] (as compared to patents directed to Network

8  Equipment only) was then identified for further analysis.

9       17.    Next, these UE patent families were analyzed to determine which

10  families are actually "essential" to the standards that are identified in the

11  corresponding ETSI IPR declarations.  I will refer to this as the "Industry-Wide

12  Essentiality Analysis" or simply the "Essentiality Analysis."  Due to the significant

13  number of patents involved in this analysis, I worked with and actively supervised a

14  team of engineers from Concur IP Consulting Pvt. Ltd. ("Concur IP") that TCL's

15  counsel in this litigation commissioned to assist me.

16       18.    Of the 20,156 declared-essential patent families identified in the Patent

17  Census, 7,016 families were determined to include at least one active patent (*i.e.*,

18  that had not expired as of January 1, 2009) that was published in English and

19  directed to User Equipment.  In order to form an accurate patent landscape without

20  analyzing every single declared-essential patent directed to User Equipment, Concur

21  IP then randomly sampled 33% of these 7,016 families across assignees and

22  standards to analyze whether or not each family is essential to the 2G, 3G, or 4G

23  standards.  Thus, Concur IP reviewed 2,600 patent families (a statistically

24  significant subset).  (Ex. 1594.)  To maintain objectivity and fairness throughout the

25  entire process, the randomness of the sampling was independent of the patent owner,

26  the specific cellular technologies, and the declared technical standard.

27  ───────────────

[1] "User Equipment" as used herein can refer to a mobile phone, cellular phone,
28  smartphone, mobile station, wireless terminal, etc.

19.     The random sampling approach enabled us to evaluate each major patent owner's market share of UE patent families that are actually essential to the cellular wireless standards.  During the course of Concur IP team's Industry-Wide Essentiality Analysis of the 2,600 patent families, I checked the team's results for accuracy by further randomly sampling 442 (17%) of the patent families that Concur IP analyzed.  Based on this statistically significant sample, I was able to determine an accuracy rate and confidence level for the Essentiality Analysis as a whole, and also to provide timely feedback to the team members regarding their analysis.

**B.     Summary of Results**

20.     The Essentiality Analysis demonstrates that Ericsson's proportional share of SEPs declined from 2G to 3G to 4G.  Ericsson's proportional shares of essential 2G, 3G, and/or 4G UE families and its standing among the top 15 assignees is shown below on the following pages in **Figures 1A to 1C**.

21.     For 2G, Ericsson owns 10% of the industry-wide, essential UE patent families (*see* **Figure 1A**).  For 3G, Ericsson's ownership declined to 7% of the industry-wide, essential UE patent families (*see* **Figure 1B**).  For 4G, Ericsson's ownership further declined to 6% of the industry-wide, essential UE patent families (*see* **Figure 1C**).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Figure 1A (PDX 32):  Top 15 Holders of Actually Essential 2G UE Patent Families.**

1

## Figure 1B (PDX 33):  Top 15 Holders of

2

## Actually Essential 3G UE Patent Families.



3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 1C (PDX 34):  Top 15 Holders of**

**Actually Essential 4G UE Patent Families.**



## III.   BACKGROUND

### A.   Standards-Setting Organizations, 3GPP, and ETSI

22.    Cellular technologies have evolved over the years since first being introduced commercially in the early 1980s.  Mostly a luxury item, the first generation (1G) systems were commercially replaced in the 1990s by the more advanced 2G cellular systems, including GSM, GPRS, and EDGE.  The 3G (UMTS) and 4G (LTE) standards were later developed, as even more advanced cellular technologies deployed after the year 2000.  The 2G, 3G, and/or 4G standards are still used in various markets worldwide and have varying commercial values.

23.    There are a number of vendors and manufacturers of base stations and User Equipment (*e.g.*, mobile terminal devices) in mobile cellular communications. Analogous to electricity power plugs and power outlets, mobile terminal devices manufactured by one company need to communicate with base stations and

infrastructure manufactured by different companies in different areas.  This requirement is a fundamental need that is commonly referred to as "interoperability."  To ensure interoperability, different manufacturers must agree to a common set of protocols that will enable the devices to communicate with one another.  To define protocols that various manufacturers agree to follow, the industry often forms, and relies on, standards setting organizations (SSOs).

24.     For the convenience of cellular users when they travel, it is highly desirable for cellular standards to ensure global, international interoperability across national boundaries.  While cellular SSOs were initially fragmented in the earlier years, by the 1990s, the "Third Generation Partnership Project" (3GPP) became a *de-facto* international SSO in order to develop standards for what was already widely referred to as "3G."  Even though 3GPP, strictly speaking, is not an SSO, it has become one from a practical perspective.  This is because 3GPP develops Technical Specifications that are routinely adopted by the various national standards setting bodies, including ETSI.

25.     3GPP consists of multiple Technical Specification Groups (TSGs), each of which has a number of Working Groups, and addresses the technical subject matter hierarchically in a logical and consistent matter.  The Working Groups are formed by individuals who represent any member company of at least one of the 3GPP Organizational Partners (which include ETSI).  Based on technical contributions from various technology companies (or their representatives), each Working Group evaluates whether a technical contribution should be included in a Technical Specification.  The Technical Specification (TS) can be, and often is, amended to correct prior errors, remove outdated features, clarify prior language, or add new features.  Each Technical Specification that is published is then assigned a version number.  For example, TS 36.213 is a published Technical Specification that covers one specific topic area of "Physical layer procedures" in LTE and has multiple evolving versions, such as 8.3.0, 9.4.5, 12.0.0, etc.

26.     **Figure 2** below shows a typical title of a Technical Specification (in this case, 3GPP TS 36.213), including its version number (10.2.0).

**Figure 2:    Example of 3GPP Technical Specification Title.**

> **LTE;**
> **Evolved Universal Terrestrial Radio Access (E-UTRA);**
> **Physical layer procedures**
> **(3GPP TS 36.213 version 10.2.0 Release 10)**

27.     As shown in **Figure 2**, the Technical Specification title includes a 3-field value representing a version number ("10.2.0" in this example).  The first number in the 3-field value ("10" in the example above) corresponds to the "Release Version."  New releases introduce new functionality and may even remove outdated functionality.  The second number in the 3-field value ("2" in the above example) is known as the technical version field and is incremented each time a technical change is made as a result of incorporating one or more approved "Change Requests."  The Change Request procedure is used by 3GPP to create revised versions of 3GPP specifications after approvals and publications of earlier versions.  3GPP uses a Change Request procedure to (among other things):  (1) add a new feature; (2) correct, clarify, and/or enhance an existing feature of a release still under development; (3) correct an error; or (4) remove an outdated feature.  The third number in the 3-field value ("0" in the above example) indicates the editorial version field.  The editorial version field is incremented each time a non-technical change is made to the specification, for example, to correct trivial typographical errors.

**B.     Declaring Patents to ETSI That May Be or May Become "Essential"**

28.     SSOs often adopt intellectual property rights (IPR) policies that require certain members to declare patents and patent applications relevant to the standards in a timely manner.  For example, the 3GPP partner member ETSI has such an IPR

1  policy requirement.  (*See, e.g.*, Exs. 223 at pp. 1 (§ 4.1), 9–11; *see also* Ex. 224.)

2  ETSI provides a basic form for declaring patents essential.  (*See, e.g.*, Ex. 223 at pp.

3  9–11.)  By completing the ETSI form used at the time I prepared my February 1,

4  2016 Expert Report, the declarant informs ETSI that the listed patents "may be or

5  may become ESSENTIAL in relation to at least" the following information the

6  declarant can identify:

7          (1)     project or standard names (*e.g.*, 2G, 3G, or 4G);

8          (2)     ETSI work items or standard numbers (*e.g.*, technical

9                   specification numbers, such as TS 36.213);

10          (3)     "illustrative specific part[s] of the standard (*e.g.*,

11                   Section[s])"; and

12          (4) version numbers for any such standards (*e.g.*, V.3.5.0).

13  (Ex. 223 at pp. 10, 11.)

14       29.    In light of the above, there are a number of reasons why simply

15  counting the number of patent declarations can be an unreliable metric for

16  evaluating the true strength of a patent portfolio.  First, the declaration process is

17  self-policing because ETSI does not scrutinize declarations to ensure that the

18  declared patents are truly essential to any ETSI standards.  Furthermore, per ETSI's

19  IPR Policy, declarations should be filed when the patents "may be or may become

20  ESSENTIAL."  (*See e.g.*, Ex. 223 at p. 9.)

21       30.    Second, another important consideration with respect to whether any

22  particular declared patent is actually essential lies in the SSO's documentation

23  process.  In particular, a patented invention may involve a technical feature that

24  initially becomes the basis for a feature in an earlier version of a Technical

25  Specification.  In later versions or releases of the Technical Specification, however,

26  such a feature may be removed for reasons such as lack of use, conflict with other

27  features, or inefficiencies.  Similarly, a technical change made during the drafting

28  process of the Technical Specification or as a result of modifications to the

1  Technical Specification may also change the essentiality of a declared-essential

2  patent.  Such changes may occur as a result of 3GPP's Change Request (CR)

3  procedure that is used to generate revised versions of standards after initial approval,

4  as mentioned above.  (*See* Section III.A, *supra*.)

5      31.    An example of the above concept is Technical Specification 3GPP TS

6  25.212, which includes a compressed mode transmission through which higher rate

7  data are sent during a compressed time duration in each uplink or downlink data

8  frame.  Here, 3GPP TS 25.212 V6.0.0 initially specified such a compressed mode

9  transmission, for example as shown below in **Figure 3**.  Specifically, as shown

10  below in § 4.4.3.1, compressed mode transmission can be effected by puncturing of

11  error correction codes in V6.0.0 in 3GPP TS 25.212 V6.0.0.  (Ex. 1595 at p. 55.)

12

13      **Figure 3:  Compressed Mode by Puncturing.**

14

### 4.4.3    Transmission time reduction method

When in compressed mode, the information normally transmitted during a 10 ms frame is compressed in time. The mechanisms provided for achieving this are puncturing, reduction of the spreading factor by a factor of two , and higher layer scheduling. In the downlink, all methods are supported while compressed mode by puncturing is not used in the uplink. The maximum idle length is defined to be 7 slots per one 10 ms frame. The slot formats that are used in compressed frames are listed in [2].

### 4.4.3.1    Compressed mode by puncturing

Rate matching is applied for creating a transmission gap in one or two frames. The algorithm for rate matching as described in subclause 4.2.7 is used.

21

22      32.    Incidentally, Ericsson is the assignee of the P05860 patent family

23  related to this feature.  The representative patent for P05860 is U.S. Patent No.

24  5,883,899 ("the '899 Patent"), which is specifically directed to compressed mode

25  CDMA transmission.  (Ex. 1320 at p. 13, 11:6–25.)  Claim 1 of Ericsson's '899

26  Patent appears relevant to the compressed mode by increasing the code rate, and in

27  my opinion would at one time have been essential to 3G, specifically to the

28  compressed mode transmission feature in 3GPP TS 25.212 V6.0.0 shown above.

1    Nevertheless, 3GPP subsequently removed the "compressed mode by puncturing"

2    feature from the standard, as shown below in **Figure 4**.  (Ex. 1280 at p. 1.)

3

4    **Figure 4 (PDX 35):  Proposal for Removing Compressed Mode by Puncturing.**



**TSG-RAN Meeting #27**                                                        **RP-050144**

**Tokyo, Japan 9 – 11 March 2005**

Based on the initial analyses [6-9], further discussion after the working group meeting, and RAN#27 discussions, the following set of features could be removed from the specifications.

☐  Compressed mode by puncturing
–  The feature is not used in real networks. Furthermore, as compressed mode by puncturing is only applicable for fixed positions in DL, it not expected to be the best way of handling compressed mode measurements with future services.

☐  CPCH
–  The feature is optional and not used in real networks.

14        33.    Subsequent to 3GPP's decision to remove "compressed mode by

15   puncturing," Change Request number CR 218 (R1-050525) (Ex. 1282) was issued

16   and incorporated into 3GPP TS 25.212 V6.4.0 (Ex. 1281).  As a result, the feature of

17   compressed mode by puncturing was omitted from 3GPP TS 25.212 V6.5.0 and all

18   subsequent releases and versions.  (*See, e.g.*, Ex. 1279.)  Thus, the '899 Patent,

19   which previously could have been considered essential, is now no longer relevant to

20   this part of the standard, and is non-essential.

21        34.    In summary, patent declarations merely provide information about the

22   landscape of patents each company has that it believed may be or may become

23   essential.  The declarations do not conclusively show that such patents are, in fact,

24   standard essential.  For at least this reason, consistent with well-accepted industry

25   views (*see, e.g.*, Ex. 1035 at p. 4; Ex. 1040 at p. 4), my opinion is that an analysis of

26   whether declared-essential families are *actually* essential to the 2G, 3G, or 4G

27   standards presents a more objective and accurate landscape than just surveying the

28   number and ownership distribution of declared-essential patents.

## IV.   INDUSTRY-WIDE PATENT ESSENTIALITY ANALYSIS OF 2G, 3G, AND 4G USER EQUIPMENT PATENTS

### A.   Objectives and Summary of Approach

35.     As explained in Section III above, patent declarations alone often cannot reliably be used as a measure to determine the true landscape of 2G, 3G, and/or 4G SEPs.  To address this issue, TCL's counsel engaged a team of engineers at Concur IP.  Dr. Paul Kakaes and I directed this team to assist me in analyzing industry-wide 2G, 3G, and 4G declared-essential patent families directed to User Equipment to determine if the patents are *actually* essential (*i.e.*, the Industry-Wide Essentiality Analysis).

36.     The first step in our analysis begins with the Patent Census.  The Patent Census was conducted by a team at Ernst & Young India and overseen by Dr. Kakaes, as discussed in more detail in his concurrently submitted Witness Declaration.  (*See, e.g.*, Sections VI.A–B.)  In my understanding, the Patent Census involved gathering data from ETSI's IPR database and the INPADOC database,[2] and using the gathered data to determine the total number of patent families declared essential to the 2G, 3G, and 4G standards, as well as the distribution of these families across assignees of patent families.  Next, Concur IP classified these declared-essential families into UE Families (*i.e.*, patent families relevant to User Equipment, such as cellphones, by virtue of including a patent with a claim directed to UE) and non-UE Families (*i.e.*, those patent families that are *not* relevant to User Equipment, such as patents directed to network equipment such as base stations).

37.     The UE Families were then randomly sampled across assignees and standards to generate a statistically-significant subset of 33% of all UE Families.  Concur IP analyzed this sample set of UE Families to determine which patent families are actually essential.  Over the course of the Industry-Wide Essentiality

---

[2] The INTernational PAtent DOcumentation Center is an international patent database produced and maintained by the European Patent Office.

Analysis, I randomly chose 442 (17%) of Concur IP's essentiality determinations to review personally in order to assess the accuracy of Concur IP's work.  In connection with this review, I regularly assessed the results of Concur IP's essentiality determinations and provided feedback to the Concur IP team based on my assessments.  I then determined an accuracy rate for Concur IP's determinations.  Based on my analysis of the sample set of UE Families, I also determined essentiality ratios for the industry.  By extrapolation, I used these ratios to estimate the respective and total numbers of essential 2G, 3G, and 4G UE Families as a whole, as well as individually for the top assignees in the wireless industry.

### B.   Team Qualifications

38.   In connection with our team's work on the Industry-Wide Essentiality Analysis, I worked closely and interactively with Mr. Sachin Sinha and the Concur IP team he led.

39.   Mr. Sinha holds a Bachelor of Technology in Electronics and Communications Engineering.  He has over nine years of experience in IP consulting services performing patent evaluation, analysis, and research, in addition to over one year experience working with one of the largest telecommunications operators in India.  His primary expertise is mapping patents to products and technical standards, particularly cellular communications standards, to determine potential infringement or essentiality.  In the past, he has led some of the most comprehensive studies on cellular SEPs.  Major companies have relied upon these studies for important business decisions, patent negotiations, and international arbitrations.  Mr. Sinha's *curriculum vitae* provides additional information regarding his qualifications and relevant experience.  (Ex. 1598.)

40.   The qualifications of the remaining Concur IP team members are discussed in Dr. Kakaes's Witness Declaration.  (*See, e.g.*, Section VI.A.)

C.    **The Patent Census**

41.    As mentioned, the first step in our analysis of a true or actual SEP landscape started from the Patent Census overseen and supervised by Dr. Kakaes. Dr. Kakaes's opinions concerning the Patent Census are set forth in detail in the Kakaes Witness Declaration.  (*See, e.g.*, Sections VI.A–B.)  The Patent Census involved obtaining information from ETSI's IPR database regarding all patents declared essential to 2G, 3G, and/or 4G.  My understanding is that this information was obtained as of September 15, 2015, using the "extract" feature of the ETSI database.  Based on this information, the Patent Census identified 153,880 patents and patent applications either explicitly or implicitly declared as essential.  Patents and patent applications are implicitly declared essential by virtue of being members of a family that was otherwise explicitly declared (*e.g.*, another patent in the family was declared essential).

42.    Expiration dates and jurisdiction of the patents were determined.  In addition, the information and data gathered during the Patent Census was used to assess which of the 2G, 3G, and/or 4G standards were indicated in the IPR declaration as being relevant to the declared patents.  The information and data was then used to group the declared-essential patents into 20,156 families.  (Ex. 1594.) Among these patent families, 11,469 families were found to have at least one granted patent that is still active (*i.e.*, not expired as of January 1, 2009) and was published in English.  (*Id.*)

D.    **Identification of Declared-Essential User Equipment Families**

43.    For the Industry-Wide Essentiality Analysis, Concur IP's team of engineers and I began by assessing the 11,469 declared-essential families identified in the Patent Census to determine how many of these families include a claim directed to User Equipment (*i.e.*, how many of these families are UE Families, as defined above).  This involved reviewing patents issued in English within each of the 11,469 declared-essential families until a "Pure UE Claim" was found.  For

purposes of this analysis, a Pure UE Claim was defined as an independent claim in an issued patent that has all the limitations performed solely by User Equipment.

44.    Once a Pure UE Claim was found within a patent family, the family was tagged as a UE Family.  If all the patents that were published or issued in English within a family were reviewed and no Pure UE Claim was found, the family was tagged as a "Non-UE Family."  **Table 1** illustrates the number and percentage of UE and Non-UE Families declared essential to the 2G, 3G, and/or 4G standards.

**Table 1 (PDX 36):  UE vs. Non-UE 2G, 3G, 4G Families.[3]**

| No. of Families | 2G | % of Total | 3G | % of Total | 4G | % of Total |
|---|---|---|---|---|---|---|
| **UE** | 1,182 | 49 | 2,947 | 57 | 5,024 | 66 |
| **Non-UE** | 1,216 | 51 | 2,181 | 43 | 2,614 | 34 |
| **Total** | 2,398 | 100 | 5,128 | 100 | 7,638 | 100 |

45.    Out of the 11,469 declared-essential families we reviewed according to the above process, we identified 7,016 declared-essential families that are UE Families.  In order to form an accurate patent landscape without analyzing every single one of these patent families, one third (33.3%) of UE Families within each cellular standard (*i.e.*, 2G, 3G, and 4G, respectively) were randomly selected to review to determine if they are actually essential to the 2G, 3G, or 4G standards.  Thus, a total of 2,600 randomly selected UE Families were analyzed.  Given the large number of families in the 33% sample (*i.e.*, 2,600 UE Families), it is my opinion that the overall essentiality ratios we calculated for 2G, 3G, and 4G are accurate and reliable for the purposes of the Industry-Wide Essentiality Analysis.

---

[3] A number of the declared-essential patent families pertain to multiple standards.  Thus, the sum of the numbers in **Table 1** is greater than the 11,469 patent families discussed herein.

46.     The random selection was made separately for each of the 2G, 3G, and 4G standards using the "RAND" function in Microsoft Excel.  (*See* Ex. 1594.)  Also, the random selection was made for each of the top 15 UE Family assignees (see **Table 2** below).  Outside of the top 15 assignees, all remaining UE Families were grouped together (*e.g.*, labeled as "others" in **Table 2** and **Figure 5** below on the following page), and one third of those were randomly sampled for each of the 2G, 3G, and 4G standards.  **Table 2** shows the numbers of UE Families for each standard for each of the top 15 assignees (and the "others"), as well as the corresponding number of families representing the 33.3% random selection.

**Table 2 (PDX 37):  UE Families for Top 15 Assignees.**

| Company | All UE Families | GSM (2G) | 33% Sample Size | UMTS (3G) | 33% Sample Size | LTE (4G) | 33% Sample Size |
|---|---|---|---|---|---|---|---|
| QUALCOMM | 988 | 175 | 58 | 520 | 173 | 654 | 218 |
| SAMSUNG | 725 | 19 | 6 | 157 | 52 | 649 | 216 |
| NOKIA | 608 | 224 | 75 | 339 | 113 | 414 | 138 |
| **ERICSSON** | **485** | **107** | **36** | **199** | **66** | **311** | **104** |
| INTERDIGITAL | 464 | 87 | 29 | 267 | 89 | 286 | 95 |
| GOOGLE | 431 | 80 | 27 | 164 | 55 | 321 | 107 |
| LG | 412 | 23 | 8 | 146 | 49 | 293 | 98 |
| NTT | 257 | 21 | 7 | 74 | 25 | 205 | 68 |
| HUAWEI | 242 | 51 | 17 | 99 | 33 | 191 | 64 |
| BLACKBERRY | 178 | 86 | 29 | 101 | 34 | 132 | 44 |
| PANASONIC | 176 | 9 | 3 | 47 | 16 | 143 | 48 |
| NEC CORP | 152 | 22 | 7 | 66 | 22 | 109 | 36 |
| SHARP | 145 | 0 | 0 | 8 | 3 | 145 | 48 |
| APPLE | 131 | 23 | 8 | 37 | 12 | 118 | 39 |
| TEXAS INSTRUMENTS | 124 | 1 | 0 | 23 | 8 | 94 | 31 |
| OTHERS | 1,588 | 254 | 85 | 700 | 233 | 959 | 319 |
| **ALL** | **7,106** | **1,182** | **395** | **2,947** | **983** | **5,024** | **1,673** |

47.     To provide further insight into the numbers shown in **Table 2**, **Figure 5** below is a Venn diagram describing the relationship among various UE Families as they relate to different cellular standards.  As shown in **Figure 5**, among the total 7,106 UE Families, there are 303 patent families declared only to 2G.  Similarly, 1,404 patent families were declared only to 3G, while 3,613 patent families were declared only to 4G.  There were 711 patent families declared to 2G, 3G, *and* 4G. Moreover, 150 patent families were declared to 2G and 3G only; 682 patent families were declared to 3G and 4G only; and 18 patent families were declared to 2G and 4G only.  There were also 225 patent families that are unrelated to the cellular standards at issue in this case ("None").  This is all represented graphically in **Figure 5** below.

**Figure 5 (PDX 38):  Distribution of Declared-Essential UE Families Across 2G, 3G, and 4G.**



1          **E.**     **Essentiality Analysis Protocol**

2        48.    The goal of the Essentiality Analysis is to determine whether the

3  declared-essential UE Families are actually essential.  The primary task that needed

4  to be undertaken to complete the Essentiality Analysis was to compare the claims of

5  patents in the UE Families to the relevant 2G, 3G, and/or 4G standard specifications,

6  and determine whether the standard specification requires all the elements of at least

7  one Pure UE Claim.  If it did, the family was deemed "essential."

8        49.    The determination of whether a family was deemed essential was based

9  on "technical" essentiality as opposed to "commercial" essentiality.  This matches

10  the official ETSI IPR policy definition of "essential" set forth below.

11            "ESSENTIAL" as applied to IPR means that it is not

12            possible on technical (but not commercial) grounds, taking

13            into account normal technical practice and the state of the

14            art generally available at the time of standardization, to

15            make, sell, lease, otherwise dispose of, repair, use or

16            operate EQUIPMENT or METHODS which comply with

17            a STANDARD without infringing that IPR.  For the

18            avoidance of doubt in exceptional cases where the

19            STANDARD can only be implemented by technical

20            solutions, all of which are infringements of IPRs, all such

21            shall be considered ESSENTIAL.

22  (Ex. 223 at p. 7.)

23        50.    If the standard specification did not require all elements of at least one

24  Pure UE Claim in the patent family, the family was deemed non-essential.  We

25  restricted our review process to English language patents, as such patents would not

26  require language translations that could potentially lead to difficulties or

27  inaccuracies in our Essentiality Analysis due to inaccurate, ambiguous, or non-

28  standard translation of technical terms.

51.     For a given UE Family, patents were reviewed in the following order:

  (1) Patents issued by the United States Patent and Trademark Office;

  (2) Patents issued by the European Patent Office; and

  (3) Any English-language issued patent.

52.     The team at Concur IP studied the standard specifications and/or sections listed in the ETSI IPR declarations to determine whether the patents were essential.  In case a declared standard specification referred to another specification, Concur IP also considered that specification to determine essentiality.  So that I could more closely oversee Concur IP's analysis and review, and provide feedback related to the same (*see, e.g.*, Section IV.G–H below), Concur IP recorded the following information with respect to the Essentiality Analysis, and shared it with me on a regular basis.  (*See also* Ex. 1594; Ex. 551 at pp. 3–4.)

  (1) Representative UE claim;

  (2) Essentiality to GSM (individual patent);

  (3) Essentiality to UMTS (individual patent);

  (4) Essentiality to LTE (individual patent);

  (5) Relevant standard specification number;

  (6) Relevant sections and excerpts from standard specification;

  (7) Link to standard specification;

  (8) Concur IP comment;

  (9) Essentiality to GSM (Family wise);

  (10) Essentiality to UMTS (Family wise); and

  (11) Essentiality to LTE (Family wise).

53.     By way of example, according to the Essentiality Analysis process described above, Concur IP analyzed patent family number 2900, which includes 16 patents.  Concur IP started by first reviewing U.S. Patent No. 8,351,347 ("the '347

Patent"). (Ex. 1286.) Concur IP identified claim 1 as a Pure UE Claim, and selected it as a representative claim for purposes of the Essentiality Analysis.

54.   Claim 1 is directed to a method for transmitting a sounding reference signal (SRS) from a UE in a wireless communications system. Specifically, the claim requires the UE transmitting to a base station a first SRS triggered by a higher layer and a second SRS trigged by a downlink control information (DCI). The claim further requires that if both transmission of the first SRS and transmission of the second SRS are expected to occur in a common subframe, then the UE transmits only the second SRS to the base station.

55.   The family for the '347 Patent was declared essential to LTE, and specifically to 3GPP TS 36.211, 3GPP TS 36.212, and 3GPP TS 36.213. Upon review of these Technical Specifications, Concur IP identified 3GPP TS 36.213 to be the most relevant specification. 3GPP TS 36.213 requires transmission of SRS based on two types of triggers (trigger type 0: higher layer signaling; and trigger type 1: DCI formats 0/4/1A for FDD and TDD). (Ex. 1322 at p. 137 (§ 8.2).) As shown in **Figure 6** below, 3GPP TS 36.213 V12.7.0 also requires that if both trigger type 0 and trigger type 1 SRS transmissions would occur in the same subframe in the same serving cell, then the UE shall only transmit the trigger type 1 SRS transmission. (*Id.*)

**Figure 6:  UE Sounding Procedure.**

| Release 12 | 136 | 3GPP TS 36.213 V12.7.0 (2015-09) |
|---|---|---|

## 8.2      UE sounding procedure

A UE shall transmit Sounding Reference Symbol (SRS) on per serving cell SRS resources based on two trigger types:

- trigger type 0: higher layer signalling

- trigger type 1: DCI formats 0/4/1A for FDD and TDD and DCI formats 2B/2C/2D for TDD.

In case both trigger type 0 and trigger type 1 SRS transmissions would occur in the same subframe in the same serving cell, the UE shall only transmit the trigger type 1 SRS transmission.

56.     Because all the limitations of claim 1 appear to be met by 3GPP TS 36.213, Concur IP found the family essential to LTE.

**F.     Principle of Neutrality and Objectivity**

57.     A primary principle guiding the Industry-Wide Essentiality Analysis was maintaining and ensuring neutrality.  That is, all patents were selected, reviewed, and treated equally regardless of ownership, declared Technical Specification, and other factors.  The Concur IP team members were strictly instructed to follow this principle.  I also followed the same principle when reviewing Concur IP's findings regarding essentiality.

58.     Another principle guiding the Industry-Wide Essentiality Analysis was objectivity.  The Concur IP team members were instructed to base their analysis and conclusions strictly on careful comparison between the patent claims and the relevant standard specifications (*e.g.*, as identified in ETSI IPR Declarations for the patents).  I followed the same principle.  Information not related to the patent claims and the relevant standards, such as patent ownership, was intentionally ignored in order to ensure neutrality.

**G.     Quality Control and Accuracy Assessment**

59.     Concur IP followed the above-described process in analyzing each of the randomly selected 2,600 UE Families.  I supervised Concur IP's work by communicating with the team regularly, and by reviewing results on a regular basis.  I provided feedback during regularly scheduled conference calls, conferred with the team when questions arose, and spent many hours checking the essentiality determinations of the analysis after the team completed its initial review.  For example, throughout the process, if Concur IP had any doubt about any aspect of the Industry-Wide Essentiality Analysis, such cases were elevated to my attention and marked for my review to be discussed during our regularly scheduled conference calls that often included Dr. Kakaes and always included counsel for TCL.  (*See, e.g.*, Ex. 551 at p. 4.)

60.     For quality control and accuracy assessment purposes, Concur IP recorded useful information, such as the representative claims analyzed, the relevant sections of the standard specification, and a comment from the Concur IP reviewer on the reason for the essentiality determination.  Using this information, a qualified expert (such as myself or others) knowledgeable of the cellular standards could then efficiently check the results, or a sample of the results, for correctness.  This is in fact what I did.

61.     Nonetheless, determining the essentiality of a particular patent or family can be technically complex and challenging.  First, the claimed invention may be a single step or a process among several hundreds or even thousands of functionalities and steps described in a single standard document.  Second, the patent declarant may list any number of standard documents as being relevant, and each of these may contain hundreds, sometimes thousands, of pages of elaborate technical descriptions.

62.     For example, the declaration for patent family 18410 (which includes U.S. Patent No. 7,760,698) cited four standard documents for essentiality:  TS 25.308 (8.4.0), TS 25.211 (8.3.0), TS 25.213 (8.3.0), and TS 25.101 (8.0.0).  (Ex. 1457.)  In certain instances, it can be very challenging even for skilled experts to isolate the many functionalities or capabilities in the multiple standard documents to the claim elements themselves.  Moreover, certain claim language may be broad and/or ambiguous, requiring reviewers to interpret phrases and terms to the best of their knowledge.  As a result, it is generally anticipated that a small fraction of essentiality determinations may be inaccurate.

63.     Nevertheless, the random sampling of the UE Families means that the same potential inaccuracies in the essentiality determinations would apply to all the patent families our team analyzed and reviewed, irrespective of the patent owners, the underlying technologies and standards, and other factors.  As a result, any errors do not favor one owner/company or another, and therefore should not affect the

1    overall conclusion of the Industry-Wide Essentiality Analysis.

2        64.    I implemented a particular quality control procedure to sample and

3    check at least 15% of Concur IP's essentiality determinations for accuracy.  If my

4    own essentiality analysis for a given patent family that I checked was in agreement

5    with Concur IP's essentiality determination, I would then mark the determination as

6    accurate.  If, however, I identified a discrepancy, then Concur IP and I would jointly

7    reexamine the claims and the relevant standard sections to resolve the discrepancy

8    and converge on the patent family's essentiality or non-essentiality to the relevant

9    standard.  If Concur IP's original essentiality determination was amended after the

10   joint re-examination and convergence process, then I marked the original

11   determination as inaccurate.

12       65.    In the event of discrepancy, I noted any differences and also monitored

13   the direction of error—*i.e.*, changes from essential to non-essential or from non-

14   essential to essential.  As an example, the Concur IP team analyzed patent family

15   20130 as part of the Industry-Wide Essentiality Analysis.  This patent family

16   contains EP Patent No. 0,932,141 B1.  (Ex. 1287.)  The invention for this patent

17   family relates to the encoding of different types of audio signals—*e.g.*, speech,

18   music, background—into digital form for transmission by cellular UE devices.

19   Representative claim 1 (shown below in **Figure 7**) was identified as a Pure UE

20   Claim.  (Ex. 1287 at p. 11.)

21

22              **Figure 7:  Claim 1 of EP No. 0,932,141 B1.**

23   1.   Method for signal controlled switching between audio coding schemes comprising:

24

25        receiving input audio signals;
          classifying a first set of the input audio signals as speech or non-speech signals;
26        coding the speech signals using a time domain coding scheme; and
          coding the non-speech signals using a transform coding scheme.
27

28

66.     Concur IP initially evaluated this claim against the three disclosed 3GPP standard documents (TS 26.411, TS 26.442, and TS 26.445) and determined that:  "The patent discusses a method and device for coding audio signals.  At least the claim element 'coding the speech signals using a time domain coding scheme' is not required by the cited standard.  Hence the patent is unlikely to be essential."  (Ex. 1594.)

67.     During my review, I determined based on analyzing 3GPP TS 26.445 V12.4.0 that Section 4.4.1, and in particular Figure 1 of 3GPP TS 26.445, does in fact describe a "classification based encoder" that meets the limitations of claim 1. Once I identified this discrepancy, I worked with Concur IP to resolve it, and we ultimately agreed that this patent family was in fact likely to be essential to the declared standard.  I therefore marked Concur IP's essentiality determination for this family as "inaccurate" (moving from non-essential to essential) in my accuracy check analysis.

**H.     Accuracy Direction Analysis**

68.     As explained above, in order to assess the accuracy of the Industry-Wide Essentiality Analysis, my goal was to sample and select at least 15% of Concur IP's essentiality determinations for secondary review.  I surpassed this goal by personally reviewing a randomly chosen subset of 442 (17%) of the 2,600 UE patent families Concur IP analyzed for essentiality.  Given that Concur IP's original selection was random, the subset of 442 families I reviewed also exhibits a random pattern.

69.     Upon further reexamination and discussion with our team, a total number of only 42 determinations from among the subset of 442 UE patent families I reviewed were eventually marked as inaccurate, representing an error rate of only 9.5%.

70.     More specifically, among the 442 families I reviewed, Concur IP found 305 families non-essential.  My review of these 305 families identified only 36

1  inaccuracies, an error rate of only 11.8%.  I then marked these 36 families

2  (originally determined to be non-essential) as essential in my final analysis result.

3     71.    In the reverse direction, Concur IP initially determined 137 of the 442

4  families to be essential.  My review identified that 6 of the 137 determinations were

5  inaccurate, an error rate of only 4.38%.  I then marked these six families (originally

6  determined to be essential) as non-essential in my final analysis results.

7     72.    By comparison, there is a higher percentage of under-determinations

8  (*i.e.*, incorrect determinations that families are not essential) versus over-

9  determinations (*i.e.*, incorrect determinations that families are essential).  Such

10  results should not be surprising, as a more experienced evaluator would tend to have

11  a broader view and more familiar knowledge of the many declared standard

12  documents.  Therefore, for patent claims that either may use less common

13  terminologies or often require more complex claim construction, a more

14  experienced evaluator (like myself or others) would be more likely to identify

15  matching technologies and Technical Specifications for the claims and thereby deem

16  the patent essential instead.  The earlier example of the patent family 20130 (for EP

17  Patent No. 0,932,141 B1) showed one such change from non-essential to essential

18  upon my review.

19     I.     **Significance of the Industry-Wide Essentiality Analysis**

20     73.    The Industry-Wide Essentiality Analysis and the accuracy direction

21  analysis results described above are statistically significant at least because of the

22  large sample size (*i.e.*, 2,600 UE Families), and the fact that they are based on the

23  above-described principles of neutrality and objectivity.  As explained above, the

24  random sampling of UE Families, the focus on patents issued in English, the

25  approach for establishing standard essentiality, and the quality control and accuracy

26  assessment, constituted a fair, reasonable, and technically sound process for

27  assessing the landscape of a company's contribution and position in terms of

28  essential patents (as compared to patents merely declared as essential).  Relative to

1  simply surveying self-declared patents, such analysis forms a much stronger

2  foundation for objectively determining the true strength of a given company's

3  cellular patent portfolio from an essentiality perspective.

4        **J.**      **Overall Results of the Industry-Wide Essentiality Analysis**

5        74.     The overall results of the Industry-Wide Essentiality Analysis are

6  depicted below (on the following page) in **Table 3**.  For each of the top 15 SEP

7  owner companies, as well as for all declared-essential families owned by "others,"

8  **Table 3** lists:

9              (1)      The number of declared-essential UE Families;

10             (2)      The number of UE Families evaluated in the Industry-

11                     Wide Essentiality Analysis;

12             (3)      The number of UE Families determined to be essential

13                     according to the Industry-Wide Essentiality Analysis;

14             (4)      The essentiality ratio—*i.e.*, the ratio of evaluated UE

15                     Families found essential to the total evaluated UE

16                     Families for each company; and

17             (5)      The number of estimated essential UE Families by

18                     extrapolation using the corresponding essentiality ratios.

19

20

21

22

23

24

25

26

27

28

**Table 3 (PDX 39): Essentiality Ratio Analysis of 2G, 3G, and 4G UE Families.**

| Company | Families Declared Essential | Families Evaluated | Essential Families | Essentiality Ratio | Estimated Essential Families by Extrapolation |
|---|---|---|---|---|---|
| QUALCOMM | 988 | 380 | 111 | 29.2% | 289 |
| SAMSUNG | 725 | 257 | 78 | 30.4% | 220 |
| NOKIA | 608 | 247 | 108 | 43.7% | 266 |
| **ERICSSON** | **485** | **159** | **58** | **36.5%** | **177** |
| INTERDIGITAL | 464 | 184 | 75 | 40.8% | 189 |
| GOOGLE | 431 | 161 | 32 | 19.9% | 86 |
| LG | 412 | 145 | 86 | 59.3% | 244 |
| NTT | 257 | 87 | 29 | 33.3% | 86 |
| HUAWEI | 242 | 95 | 43 | 45.3% | 110 |
| BLACKBERRY | 178 | 73 | 40 | 54.8% | 98 |
| PANASONIC | 176 | 56 | 15 | 26.8% | 47 |
| NEC CORP | 152 | 57 | 23 | 40.4% | 61 |
| SHARP | 145 | 49 | 19 | 38.8% | 56 |
| APPLE | 131 | 49 | 12 | 24.5% | 32 |
| TEXAS INSTRUMENTS | 124 | 39 | 23 | 59.0% | 73 |
| OTHERS | 1,588 | 562 | 219 | 39.0% | 619 |
| **ALL** | **7,106** | **2,600** | **971** | **37.3%** | **2,654** |

75.   To arrive at these overall results from the findings of the Industry-Wide Essentiality Analysis, extrapolation was used to estimate the total number of essential UE Families each company owns.  Because the 33% sampling and selection of the 2,600 UE Families captured such a large set of patent families for analysis, it can reasonably be anticipated that the determined essentiality ratios are statistically very close to the true essentiality ratio of each company's entire UE Family portfolio.  Thus, the essentiality ratios can be used to reasonably estimate the total number of each company's essential UE Families (*i.e.*, by multiplying the essentiality ratios by the numbers of its declared-essential UE Families).

76.     The overall results of the Industry-Wide Essentiality Analysis show essentiality ratios varying from company to company and ranging from as low as 19.9% to as high as 59.3%.  In total, 971 out of the analyzed 2,600 UE Families were found to be essential, representing an average essentiality ratio of 37.3% for the industry.  Ericsson ranks slightly below average with a 36.5% essentiality ratio, and ranks at number seven among the top 15 holders.

77.     **Table 4** below illustrates more specifically the essentiality ratio analysis for the 2G UE Families.  As shown, Ericsson's essentiality ratio for 2G is 41.7%, slightly above the overall average of 37.7% for 2G-related UE technologies.

**Table 4 (PDX 40):  Essentiality Ratio Analysis of 2G UE Families.**

| Company | Families Declared Essential | Families Evaluated | Essential Families | Essentiality Ratio | Estimated Essential Families By Extrapolation |
|---|---|---|---|---|---|
| NOKIA | 224 | 75 | 43 | 57.3% | 128 |
| QUALCOMM | 175 | 58 | 17 | 29.3% | 51 |
| **ERICSSON** | **107** | **36** | **15** | **41.7%** | **45** |
| INTERDIGITAL | 87 | 29 | 7 | 24.1% | 21 |
| BLACKBERRY | 86 | 29 | 12 | 41.4% | 36 |
| GOOGLE | 80 | 27 | 6 | 22.2% | 18 |
| HUAWEI | 51 | 17 | 8 | 47.1% | 24 |
| NTT | 21 | 7 | 1 | 14.3% | 3 |
| NEC CORP | 22 | 7 | 3 | 42.9% | 9 |
| APPLE | 23 | 8 | 1 | 12.5% | 3 |
| LG | 23 | 8 | 2 | 25.0% | 6 |
| SAMSUNG | 19 | 6 | 3 | 50.0% | 10 |
| PANASONIC | 9 | 3 | 1 | 33.3% | 3 |
| TEXAS INSTRUMENTS | 1 | 0 | 0 | NA | NA |
| SHARP | 0 | 0 | 0 | NA | NA |
| OTHERS | 254 | 85 | 30 | 35.3% | 90 |
| **ALL** | **1,182** | **395** | **149** | **37.7%** | **446** |

1    78.    The pie chart in **Figure 8A** below depicts the top 15 patent holders of

2    declared-essential UE Families for 2G based on the Patent Census.

3

4    **Figure 8A (PDX 41):  Top 15 Holders of Declared-Essential UE Patent Families**

5    **for 2G Based on Patent Census.**



1    79.    The pie chart in **Figure 8B** below depicts the top 15 patent holders of

2  essential UE Families for 2G only.

3    80.    Ericsson's share of essential UE Families changed marginally from 9%

4  to 10% for 2G based on the Industry-Wide Essentiality Analysis.  Given that

5  Ericsson's essentiality ratio is close to that of the overall industry, this result is

6  expected.

7

8    **Figure 8B (PDX 42):  Top 15 Holders of UE SEPs for 2G**

9    **Based on Essentiality Analysis.**

10



81.     Similarly, the next set of results from **Table 5** and **Figures 9A** and **9B** below (on the following pages) show the results for 3G UE Families.  As shown in **Table 5,** Ericsson's essentiality ratio for 3G is 40.9%—again, only marginally above the overall average of 39.6% for 3G-related UE Families.

**Table 5 (PDX 43):  Essentiality Ratio Analysis of 3G UE Families**

| Company | Families Declared Essential | Families Evaluated | Essential Families | Essentiality Ratio | Estimated Essential Families by Extrapolation |
|---|---|---|---|---|---|
| QUALCOMM | 520 | 173 | 37 | 21.4% | 111 |
| NOKIA | 339 | 113 | 50 | 44.2% | 150 |
| INTERDIGITAL | 267 | 89 | 38 | 42.7% | 114 |
| **ERICSSON** | **199** | **66** | **27** | **40.9%** | **81** |
| GOOGLE | 164 | 55 | 10 | 18.2% | 30 |
| SAMSUNG | 157 | 52 | 24 | 46.2% | 72 |
| LG | 146 | 49 | 34 | 69.4% | 101 |
| BLACKBERRY | 101 | 34 | 23 | 67.6% | 68 |
| HUAWEI | 99 | 33 | 14 | 42.4% | 42 |
| NTT | 74 | 25 | 7 | 28.0% | 21 |
| NEC CORP | 66 | 22 | 10 | 45.5% | 30 |
| PANASONIC | 47 | 16 | 2 | 12.5% | 6 |
| APPLE | 37 | 12 | 5 | 41.7% | 15 |
| TEXAS INSTRUMENTS | 23 | 8 | 5 | 62.5% | 14 |
| SHARP | 8 | 3 | 2 | 66.7% | 5 |
| OTHERS | 700 | 233 | 101 | 43.3% | 303 |
| **ALL** | **2,947** | **983** | **389** | **39.6%** | **1,166** |

82.     The pie chart in **Figure 9A** below depicts the top 15 patent holders of declared-essential UE Families for 3G based on the Patent Census.

**Figure 9A (PDX 44):  Top 15 Holders of Declared-Essential UE Patent Families for 3G Based on Patent Census.**



83.     The pie chart in **Figure 9B** below depicts the top 15 patent holders of essential UE Families for 3G.

84.     Ericsson's share of essential UE Families remains nearly unchanged at 7% for 3G based on the Industry-Wide Essentiality Analysis.  Given that Ericsson's essentiality ratio is close to that of the overall industry, this result is expected.

**Figure 9B (PDX 45):  Top 15 Holders of UE SEPs for 3G**

**Based on Essentiality Analysis.**



85.     Similarly, the next set of results from **Table 6** and **Figures 10A and 10B** below (on the following pages) show the results for 4G UE Families. Ericsson's essentiality ratio for 4G is 34.6%—just below the corresponding overall industry average of 35.7% for 4G-related UE Families.

**Table 6 (PDX 46):  Essentiality Ratio Analysis of 4G UE Families.**

| Company | Families Declared Essential | Families Evaluated | Essential Families | Essentiality Ratio | Estimated Essential Families by Extrapolation |
|---|---|---|---|---|---|
| QUALCOMM | 654 | 218 | 76 | 34.9% | 228 |
| SAMSUNG | 649 | 216 | 57 | 26.4% | 171 |
| NOKIA | 414 | 138 | 58 | 42.0% | 174 |
| GOOGLE | 321 | 107 | 21 | 19.6% | 63 |
| **ERICSSON** | **311** | **104** | **36** | **34.6%** | **108** |
| LG | 293 | 98 | 55 | 56.1% | 164 |
| INTERDIGITAL | 286 | 95 | 40 | 42.1% | 120 |
| NTT | 205 | 68 | 24 | 35.3% | 72 |
| HUAWEI | 191 | 64 | 26 | 40.6% | 78 |
| SHARP | 145 | 48 | 18 | 37.5% | 54 |
| PANASONIC | 143 | 48 | 12 | 25.0% | 36 |
| BLACKBERRY | 132 | 44 | 23 | 52.3% | 69 |
| APPLE | 118 | 39 | 8 | 20.5% | 24 |
| NEC CORP | 109 | 36 | 14 | 38.9% | 42 |
| TEXAS INSTRUMENTS | 94 | 31 | 18 | 58.1% | 55 |
| OTHERS | 959 | 319 | 112 | 35.1% | 337 |
| **ALL** | **5,024** | **1,673** | **598** | **35.7%** | **1,796** |

86.     The pie chart in **Figure 10A** below depicts the top 15 patent holders of declared-essential UE Families for 4G based on the Patent Census.

**Figure 10A (PDX 47):  Top 15 Holders of Declared-Essential UE Patent Families for 4G Based on Patent Census.**



87.     The pie chart in **Figure 10B** below depicts the top 15 patent holders of essential UE Families for 4G only.  Ericsson's share of essential UE Families remains nearly unchanged at 6% for 4G based on the Industry-Wide Essentiality Analysis.  Given that Ericsson's essentiality ratio is close to that of the overall industry, this result is expected.

**Figure 10B (PDX 48):  Top 15 Holders of Declared-Essential UE Patent Families for 4G Based on Essentiality Analysis.**



## V.    <u>CONCLUSION</u>

88.    Based on my active involvement in and oversight of the Industry-Wide Essentiality Analysis, it is my opinion that the analysis itself as well as its results are both technically sound and reliable.  I calculated an accuracy rate for the Industry-Wide Essentiality Analysis based on my personal review and analysis of 442 (17%) of the 2,600 patent families Concur IP analyzed.  In addition to the strict instructions I provided Concur IP regarding neutrality, the high percentage and directional characteristics of this accuracy rate confirm my opinion that the analysis above is accurate and also neutral with respect to patent holders, including Ericsson.  The Industry-Wide Essentiality Analysis shows that Ericsson's proportional shares of actually essential UE Families has declined from 10% for 2G to 7% for 3G, and has further declined to 6% for 4G.

1       I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct, and that I executed this Witness

3 Declaration at _DAVIS, CA 95618, USA_ .

4

5 

6 ———————————————————          JAN. 11, 2017

           Dr. Zhi Ding          Date Executed

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

2

3

| Exhibit No. | Description |
|---|---|
| Ex. 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| Ex. 224 | ETSI Guide on Intellectual Property Rights, pp. 51-70 (IPRs), Version #94, Sep. 19, 2013 |
| Ex. 551 | Document titled "Protocol for Essentiality Analysis" |
| Ex. 1035 | "Evaluation of LTE Essential Patents Declared to ETSI," by Cyber Creative Institute, June 2013 |
| Ex, 1040 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI, Ver. 1.0" dated Dec. 2011 |
| Ex. 1279 | 3GPP TS 25.212 V6.5.0 (2005-06) Technical Specification |
| Ex. 1280 | "Feature Clean Up, Way Forward," TSG-RAN Meeting #27, Mar. 9-11, 2005, RP-050144 |
| Ex. 1281 | 3GPP TS 25.212 V6.4.0 (2005-03) Technical Specification |
| Ex. 1282 | 3GPP TSG-RAN1 Meeting #41, May 9-13, 2005, Tdoc R1-050525 |
| Ex. 1286 | U.S. Patent No. 351,347 |
| Ex. 1287 | EP No. 932,141 |
| Ex. 1320 | U.S. Patent No. 5,883,899 |
| Ex. 1322 | ETSI TS 136 213 V12.7.0 (2015-10) |
| Ex. 1336 | Spreadsheet titled "Census" |
| Ex. 1457 | ETSI IPR Information Statement and Licensing Declaration by Alcatel dated 4/26/11 |
| Ex. 1579 | Expert/Consultant Curriculum Vitae of Professor Zhi Ding |
| Ex. 1594 | Exhibit C to Expert Report of Zhi Ding: spreadsheet for industry-wide patent essentiality analysis of 2G, 3G, and 4G patents |
| Ex. 1595 | 3GPP TS 25.212 V6.0.0 (2003-12) Technical Specification |
| Ex. 1598 | Curriculum Vitae of Sachin Sinha |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA  92130.

4

5

6

7

On January 11, 2017, I caused to be served the **PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. ZHI DING** to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

8

9

10

BY EMAIL OR ELECTRONIC TRANSMISSION:  I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

11

12

13

14

15

16

17

18

19

20

John Gibson
jgibson@crowell.com
Samrah R Mahmoud
smahmoud@crowell.com
Robert B McNary
rmcnary@crowell.com
Mark A Klapow
mklapow@crowell.com
Christie L. Stahlke
cstahlke@crowell.com
Jennifer Van Dusen
jvandusen@mckoolsmith.com
Nicholas Mathews
nmathews@mckoolsmith.com

Theodore Stevenson, III
tstevenson@mckoolsmith.com
Laurie L. Fitzgerald
lfitzgerald@mckoolsmith.com
Ashley Moore
Amoore@mckoolsmith.com
Blake H. Bailey
bbailey@mckoolsmith.com
Christine Michelle Woodin
cwoodin@mckoolsmith.com
David Sochia
dsochia@mckoolsmith.com
Douglas Cawley
dcawley@mckoolsmith.com

21

22

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

23

24

Executed on January 11, 2017, at San Diego, California.

25

26

By:  */s/ Kristina Grauer*
KRISTINA GRAUER

27

28