1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
9  Limited, and TCT Mobile (US) Inc.

10              UNITED STATES DISTRICT COURT

11     FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12
   TCL COMMUNICATION                    | Case No. SACV14−00341 JVS (DFMx)
13 TECHNOLOGY HOLDINGS, LTD.,           | Consolidated with CV15−02370
   *et al.*
14                                      |
              Plaintiffs,               | **PLAINTIFFS' DIRECT**
15                                      | **EXAMINATION BY**
         v.                             | **DECLARATION**
16                                      | **FOR EXPERT WITNESS**
   TELEFONAKTIEBOLAGET LM               | **DR. NIKIL JAYANT**
17 ERICSSON, *et al.*                   |
18            Defendants.               |
                                        |
19 _____   |
                                        |
20                                      | Place:  Courtroom 10C
   TELEFONAKTIEBOLAGET LM               | Before Hon. James V. Selna
21 ERICSSON, *et al.*,                  |
                                        | Discovery Cut-Off:  May 23, 2016
22            Plaintiffs,               | Pre-Trial Conf.:  Jan. 30, 2017
                                        | Trial:  Feb. 14, 2017
23       v.                             |
24 TCL COMMUNICATION                    |
   TECHNOLOGY HOLDINGS, LTD.,           |
25 *et al.*,                            |
26            Defendants.               |
27
28

# TABLE OF CONTENTS

**Page**

I.   CREDENTIALS AND QUALIFICATIONS ....................................................1

    A.   Educational Background and Carrier History........................................1

    B.   Publications and Patents.........................................................................2

    C.   Other Relevant Qualifications and Information.....................................3

II.  PURPOSE AND SUMMARY OF TESTIMONY ...........................................4

III. BACKGROUND ON SPEECH CODING TECHNOLOGY .........................11

    A.   Overview of Speech Coding Systems...................................................11

    B.   Implementation of Speech Coding Technologies ................................12

    C.   Foundational Developments Preceding AMR Speech Coding.............14

    D.   AMR Speech Coding ...........................................................................16

    E.   Ericsson's Speech Coding Patents Do Not Cover the
          Fundamental Building Blocks Used in AMR. ......................................17

IV.  ANALYSIS OF ERICSSON'S SPEECH CODING PORTFOLIO ..............20

    A.   Objective and Process of Analysis.......................................................20

    B.   Essentiality, Importance, and Contribution of Ericsson's Patents........27

V.   DEVELOPMENT OF THE ETSI AMR-NB SPEECH CODEC ..................68

VI.  ERICSSON HAS NOT SHOWN ITS SEPS COVER AMR-WB.................74

VII. CONCLUSION ............................................................................................76

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION .........................78

# DECLARATION OF DR. NIKIL JAYANT

1

2        I, Dr. Nikil Jayant, declare under penalty of perjury that the material

3 contained herein is true and correct and that I am competent to testify thereto.

4 **I.      CREDENTIALS AND QUALIFICATIONS**

5        1.      My name is Nikil Jayant.  In addition to the below, my experience and

6 qualifications are set forth in my *curriculum vitae.*  (Ex. 303.)

7        **A.      Educational Background and Carrier History**

8        2.      I received my Bachelor of Science in Physics and Mathematics from

9 Mysore University, India in 1967.  In 1970, I received a Ph.D. in Electrical

10 Communications from the Indian Institute of Science, which is widely considered as

11 India's finest institution in science.  My doctoral studies focused on digital

12 communications.  The title of my Ph.D. Thesis was "Data Communications in the

13 presence of Atmospheric Noise Bursts."  As part of my doctoral program, I was at

14 Stanford University for one year, as a Research Associate.

15        3.      In 1968, I began work at Bell Laboratories as a member of the technical

16 staff in the Acoustics Research Department, where I conducted research in the field

17 of digital coding and transmission of information signals, including a family of ITU

18 (International Telecommunications Union) international standards for network

19 telephony at 16–32 kbit/s.  During this time, I also worked on pioneering algorithms

20 for speech enhancement, speech encryption, packet voice, and vector quantization.

21        4.      From 1982 through 1995, I created and directed the Digital Voice

22 Coding Group, Signal Processing Research Department, and the Advanced Audio

23 Technology Department, all at Bell Laboratories.  I was responsible for, among

24 other things, research in speech coding in support of applications in digital

25 telephony and voice storage.  In these roles, I was involved in advancing

26 communications signal processing leading to new technologies such as ITU

27 standards for high-quality audio communications (based on Sub-band coding and

28 ADPCM) and new U.S. government standards and terminals for secure voice (based

on LPC and CELP).  In 1995, I was appointed Director, Multimedia Communications Research Laboratory, Bell Laboratories at Lucent.  In this position, I continued to oversee fundamental research to support national and international coding standards for speech, audio, and video communications.

5.      Since 1998, I have been affiliated with the Georgia Institute of Technology, first as John Pippin Chair Professor of Electrical and Computer Engineering, and most recently as Professor Emeritus.  I oversee and direct the research of my students, which has addressed problems in information networks, wireless systems, signal compression, and multimedia signal processing.  At Georgia Tech, I also created and led cross-disciplinary research programs in communications, computing, and content processing, and was responsible for relating these to economic development in the State of Georgia.

6.      Since 2013, I have served as an Adjunct Professor at the University of California, Santa Barbara.  Here, my responsibilities include teaching a special topics graduate course on Multimedia Communications.

7.      In my University roles, I have partnered extensively with the telecommunications industry, working with Alcatel-Lucent, Cox Communications, HP, Nortel, Motorola, IBM, Cisco, and other corporations to develop advanced technologies for broadband communications in wired and wireless networks.  I have also led a National Research Council study group to promote universal broadband access at national, state, and local levels.

**B.      Publications and Patents**

8.      I have written and/or edited five books and almost 200 journal and conference papers, most of which focus on signal processing and compression.  I am the author of "Waveform Quantization and Coding" (IEEE Reprint Press, 1976); "Digital Coding of Waveforms" (with P. Noll, Prentice Hall, 1984); "Signal Compression" (World Scientific, 1997); "Broadband:  Bringing Home the Bits" (Committee Chair, National Academies Press, 2002); and "Broadband Last Mile

1   Technologies" (Marcel Dekker / CRC Press, 2005).

2       9.      I have also contributed chapters to several books, including "Recent

3   advances in speech coding" (McGraw Hill Year Book, 1992).  A complete list of my

4   publications is contained in my *curriculum vitae*.  (Ex. 303.)

5       10.     I am a named inventor on nearly 40 patents or patent applications,

6   including the following inventions for high-quality compression and enhancement

7   of speech signals:

8   - Jayant, N. S., "Adaptive differential pulse code modulation," U.S.
9     Patent No. 4,513,426, April 23, 1985;

10  - Jayant, N. S. and Ramamoorthy, V., "Predictive communication system
11    filtering arrangement," U.S. Patent No. 4,617,676, October 14, 1986;

12  - Cox, R. V., Chen, J.-H., and Jayant, N. S., "Tunable post-filter for
13    tandem coders," U.S. Patent No. 5,694,519, December 1997; and

14  - Chen, J.-H., Cox, R. V., and Jayant, N. S., "Tunable perceptual
15    weighting filter for tandem coders," U.S. Patent No. 6, 144,935,
16    November 7, 2000.

17  **C.      Other Relevant Qualifications and Information**

18      11.     I have given numerous invited and keynote lectures, including as an

19  IEEE Lecturer on Digital Audio at the International Conference on Acoustics,

20  Speech, and Signal Processing Meeting (1993), at the IEEE Speech Coding

21  Workshop (Toronto, 1994), and as the Keynote, IEEE Signal Processing Society

22  Meeting (Seattle, 1998).

23      12.     I was the First Editor-in-Chief, IEEE Signal Processing Magazine

24  (1984–86); the Editor, IEEE-CRC Handbook on Signal Processing, Section on

25  *Digital Audio* (1998, 2011); and the organizer and/or chair of numerous IEEE

26  conference sessions, including *Information Retrieval:  A System View* at the Third

27  International Symposium on Information and Signal Processing and Analysis

28  (Rome, 2003).

13.     I was elected as a Fellow of the IEEE in 1982 "for contributions to adaptive quantization and speech communication" and as a Member of the National Academy of Engineering in 1996 "for contributions to the compression of speech, audio and image signals."  I have also been recognized with numerous other awards and honors, including as an IEEE Distinguished Lecturer in 2000 and with the IEEE Third Millennium Medal (2000) "for contributions to Signal Processing."

## II.     PURPOSE AND SUMMARY OF TESTIMONY

14.     I understand that one purpose of my engagement is to assist in the determination of a royalty rate for a license to certain patents that Ericsson is obligated to license on Fair, Reasonable, and Non-Discriminatory ("FRAND") terms.  Ericsson alleges these patents are "essential" to 2G, 3G, and/or 4G standards.[1]  I understand the technical value of these patents can be a component used in determining FRAND royalty rates, and that TCL expert Dr. Gregory Leonard uses the results of my analysis to calculate a FRAND rate for a license to Ericsson's patents.

15.     To assist in the determination of the FRAND royalty rates, I analyzed the scope and technical value of the patents that Ericsson has alleged are standard essential patents (SEPs) in this case.  In particular, I performed a detailed technical analysis of 12 Ericsson SEPs that it alleges cover the 2G and 3G standards governing speech communications and primarily adaptive multi-rate (AMR) speech coding.

16.     For each of these patent families, I first performed a detailed analysis to determine whether the patents are "essential" to the standards as alleged by

---

[1] In this Witness Declaration, I use the term "essential" or "actually essential" in the sense that no evidence was identified that would preclude a finding that the patents (or corresponding patent families) are "essential" under ETSI's IPR Policy.  That is, there is no apparent reason to exclude the patent from being essential.  Thus, such a patent has effectively passed a screen to exclude non-essential patents.

Ericsson.  My essentiality analysis focused on the standards cited in Ericsson's claim charts, and also accounted for additional information, such as Ericsson's comments in the claim charts, and the patents' file histories (where available).

17.    To determine the *ex ante* value of Ericsson's alleged speech coding SEPs, I further analyzed the Importance (or technical value) of the patented technology and its Contribution to the standards, taking into account prior generations of the standards and other alternatives that were available at the time the technology was adopted or incorporated into the standards.  My Importance and Contribution analysis involved determining an accused technology (*i.e.*, the broader technology implicated by the claim charts for Ericsson's alleged SEPs) and a key feature for each of the patent families I found to be essential.  The key feature is the technical feature in the standard (or a subset thereof) that is mapped to key claim limitations in Ericsson's claim chart for the patent family.  I will discuss the details of my analysis with illustrative examples later in this Witness Declaration.

18.    I determined a numerical rank for each of the Essentiality, Importance, and Contribution metrics based on my patent-by-patent analysis of the claims Ericsson charted in a claim chart.  I set the "Essentiality Rank" to "1," "2," or "3."  I also set the "Importance Rank" to "1," "2," or "3."  I set the "Contribution Rank" to "1," "2," "3," or "4."  The scales for these ranks and their meanings are shown in **TABLE 1** below (on the following page) and explained below.

| Metric | Rank | Meaning |
|---|---|---|
| **Essentiality** | **1** | No evidence was identified that would preclude a finding that the patent is "essential" under ETSI's IPR Policy |
| | **2** | The patent, under a proper claim construction, is not "essential" under ETSI's IPR Policy. |
| | **3** | The patent is not "essential" under ETSI's IPR Policy under any reasonable claim construction. |
| **Importance** | **1** | The accused technology/key feature for the patent family is important (or technically valuable) to the standard. |
| | **2** | The accused technology/key feature is moderately important (or of moderate technical value) to the standard. |
| | **3** | The accused technology/key feature is at best only marginally important (or of marginal technical value) to the standard. |
| **Contribution** | **1** | No viable alternatives to the key feature were identified for purposes of this analysis. |
| | **2** | The key feature provided a moderate improvement to the standard relative to the alternative. |
| | **3** | The key feature provided a marginal improvement to the standard relative to the alternative. |
| | **4** | The key feature provided no improvement to the standard relative to the alternative. |

**TABLE 1 (PDX 49)**

19.    With respect to Essentiality, a SEP family determined to be *not* essential (*i.e.*, patent families to which I assigned an Essentiality Rank of "3") provides no intrinsic technical value to the standard.  For example, I found Ericsson's P07669 patent family to be not essential and assigned it an Essentiality Rank of "3," notwithstanding the attempt in Ericsson's claim chart to read this patent family on the standard by (1) paraphrasing the standard, (2) relying on

1  additional commentary, and (3) incorrectly annotating the standard itself.  (*See*

2  Section IV.B.1.a.)

3      20.    As shown in **TABLE 2** below (on the following page), I found 2 out of

4  12 patent families to be non-essential and assigned these families an Essentiality

5  Rank of "3." I found at least one charted claim of each of the remaining 10 patent

6  families to be essential and assigned these families an Essentiality Rank of "1."

7      21.    Where I did not locate any evidence that would preclude a finding that

8  a patent is "essential" under ETSI's IPR Policy (corresponding to an Essentiality

9  Rank of "1"), the combination of the Importance and Contribution Ranks provides

10  the intrinsic technical value of the patented technology.

11      22.    The Importance analysis considers the technology's importance relative

12  to, for example, a corresponding technology in a previous standard or to a well-

13  known prior art technology. For example, Ericsson's P10991 patent family relates

14  to perturbing comfort noise created at a listener's handset (*i.e.*, at the decoder side)

15  based on background noise variations occurring at a talker's handset (*i.e.*, at the

16  encoder side), using parameters computed at the decoder. (Section IV.B.2.b, *infra*.)

17  Before the development of the relevant AMR standard, however, the International

18  Telecommunications Union (ITU) G.729 standard included a comfort noise

19  generation algorithm that used adaptive averaging at the decoder in order to address

20  the extent to which the background noise is stationary or nonstationary. (Exs. 1303,

21  1304.) Accordingly, G.729 already addressed the very problem allegedly solved by

22  the key feature of the P10991 patent family, before the key feature was included in

23  the AMR standard. As described in further detail below, the key feature thus at best

24  represents a resource tradeoff in terms of assigning a greater calculation and

25  selection responsibility at the decoder. I thus assigned the P10991 patent family an

26  Importance Rank of "3."

27      23.    As shown in **TABLE 2** below, of those families with an Essentiality

28  Rank of "1," I found three families to have an Importance Rank of "1," one family

to have an Importance Rank of "2," and six families to have an Importance Rank of "3."

| Ericsson Family | Standard | Essentiality | Importance | Contribution |
|---|---|---|---|---|
| P04817 | 2G | 1 | 1 | 3 |
| P07288 | 2G | 1 | 1 | 4 |
| P07669 | 3G | 3 | — | — |
| P07782 | 2G | 3 | — | — |
| P09085 | 2G, 3G | 1 | 3 | 4 |
| P09286 | 2G, 3G | 1 | 3 | 4 |
| P10310 | 2G, 3G | 1 | 3 | 3 |
| P10334 | 2G, 3G | 1 | 3 | 4 |
| P10335 | 2G, 3G | 1 | 2 | 3 |
| P10774 | 2G, 3G | 1 | 3 | 4 |
| P10991 | 2G, 3G | 1 | 3 | 3 |
| P10992 | 2G, 3G | 1 | 1 | 1 |

**TABLE 2 (PDX 50)**

24.    The Contribution analysis considers the technology's contribution to the standard, relative to alternative technical solutions that were available at the time the patented technology was adopted into the standard.  For example, Ericsson's P09085 patent family relates to producing a decoded speech signal from an original coded signal using soft adaptability based on previous information from the coding. (Section IV.B.3.a, *infra*.)  Before this key feature was included in the AMR standard, however, EP Publication No. 0,654,909 to Hosoda et al. ("Hosoda") taught a CELP encoder/decoder that uses a code vector conversion circuit to filter a codebook output in order to synthesize high-quality reproduced voice signals at low encoding speeds.  (Ex. 1298 at p. 15, FIG. 3.)  Unlike the key feature, which applies soft adaptability at the 5 msec level based on previous values of adaptive and fixed

codebook gains, Hosoda's code vector conversion circuit continuously adapts to the speech waveform at the 20 msec level.  (*Id.* at 9 (equation (6)).)

25.    Hosoda's approach is advantageous in that adapting at the 20 msec level reduces computing overhead, and may provide a more stable environment by ignoring transients that would be present at the 5 msec level.  Further, much of the advantage of performing the adaptation more frequently (per the key feature) can be obtained by performing the adaptation frequently enough (*e.g.*, per Hosoda's teachings).  Accordingly, the key feature provided no net improvement to the standard over the available alternative presented in Hosoda.  I thus assigned the P10991 patent family a Contribution Rank of "4."

26.    As shown in **TABLE 2** above, of those families with an Essentiality Rank of "1," I found one family to have a Contribution Rank of "1," four families to have a Contribution Rank of "3," and five families to have a Contribution Rank of "4."

27.     The information from **TABLE 2** and the mapping between the Importance and Contribution Ranks for these 10 patent families are illustrated below in **FIGURE 1**.  All but one of the families provided at best only a marginal improvement to the standard relative to alternatives that were available at the time the standards were being adopted.



**FIGURE 1 (PDX 51)**

# III.   BACKGROUND ON SPEECH CODING TECHNOLOGY

## A.   Overview of Speech Coding Systems

28.     Today, speech coding generally refers to the notion of speech compression—the conversion of a digitized speech signal into a different digital signal with a lower bit rate.  The architectural chain of a speech codec (coder-decoder) generally includes basic building blocks for input/output, sampling and quantization, and coding and decoding (often termed compression and decompression).  (*See, e.g.*, Section III.B, *infra* (FIG. 2).)  For example, a microphone takes an analog speech signal as input.  Next, an analog-to-digital converter (ADC) samples and quantizes the analog speech signal.  Sampling might occur, for example, at a frequency of 8 kHz (kilohertz) with each sample quantized into an 8-bit representation.  The resulting digital code is then encoded and transmitted at a bit rate of 8 kHz * 8 = 64 kbit/s (kilobits per second), or 64,000 bits per second.  At the receiving terminal, the transmitted signal is decoded and fed to a digital-to-analog converter (DAC) before playback through a speaker.

29.     Speech compression generally refers to representations of the speech signal at bit rates lower than 64 kbit/s.  The design of speech compression systems involves a tradeoff along four dimensions:  (1) speech quality, (2) encoding bit rate, (3) complexity in encoding-decoding, and (4) communication delay.

30.     The quality–bit rate tradeoff is intuitive in that one expects a compressed or more compact representation to involve a loss in speech quality.  Sophistication in coding is addressed to minimizing artifacts in compression, and in measuring these artifacts based on models of speech perception (rather than simple measures like instantaneous differences between corresponding amplitudes in input speech and coded speech).  The complexity dimension comes in because, relative to the sample-and-A/D conversions mentioned earlier, sophisticated coding algorithms perform more complex operations that exploit statistical redundancy and perceptual irrelevancy.  The delay dimension comes in because such coding mechanisms

1  necessarily operate on long time-windows of speech (*e.g.*, tens of milliseconds long)

2  rather than samples spaced 8 kHz (or 1/8th of a millisecond) apart (and hence the

3  delay).

4        31.    The four dimensions of speech coder performance described above are

5  quite fundamental.  In addition, as digital speech communications technologies

6  became more pervasive over time, several other performance attributes became

7  more popular—among them, increased adaptivity to different kinds of speech

8  sounds, increased ability to adapt bit rate based on network environment and user

9  expectation, increased ability to handle non-speech events like silences and

10  background music, and tolerance to transmission bit errors and packet losses.

11        **B.**    **Implementation of Speech Coding Technologies**

12        32.    For context, I now provide background on how speech coding

13  technology (including the technologies pertaining to Ericsson's speech coding

14  patents I analyzed) generally fits into and is implemented in a wireless

15  communications system.

16        **FIGURE 2** below (on the following page) illustrates a simplified

17  schematic diagram of the end-to-end chain in a digital speech communications

18  system, beginning with speech capture (at the microphone) and ending with speech

19  playback (at the speaker).  A central function of designing a favorable quality-

20  versus-bit rate tradeoff belongs to the speech codec (speech encoder and speech

21  decoder).  In the context of imperfect channels (*e.g.*, as reflected in bit errors), the

22  channel codec (channel encoder and channel decoder) maximizes received speech

23  quality at the expense of increased overall bit rate.

24

25

26

27

28

**FIGURE 2 (PDX 52)**

33.     The "RF Modem" / "Multiple Access" block in **FIGURE 2** connects the (single) speech communication link to the rest of the (*e.g.*, 2G, 3G) wireless network.  In the context of the overall multi-user network, the service provider (or network operator) manages the overall resources and network capacity, as well as the portion of these resources and capacity that is allocated to a single pair of users. At the scientific and technical level, this is a dynamic system with dimensions of adaptation at several levels.  Particularly in the speech context, these levels (and associated criteria) correspond to the speech state, the channel state (of a wireless link), and the overall network state (*e.g.*, as reflected by network congestion).

34.     One example of using the speech state is the function of VAD (voice activity detection).  In the absence of speech activity (usually at least 50% of the time in bidirectional speech communication), transmission resources can be conserved using the so-called technique of DTX (discontinuous transmission).

1  During these times, the receiver (with help from the transmitter) creates and

2  reproduces comfort-noise at the speaker, so that the receiving party does not get the

3  impression of a disconnected link.

4       35.    The tools to provide adaptive speech communication (as broadly

5  defined above) typically include computer algorithms for management and coding

6  (at the network level and in the channel codec), and signal-processing algorithms (at

7  the speech processing level or at the so-called physical layer level that handles the

8  signal-to-RF-channel noise problem).  Depending on the nature of the analytical tool

9  employed, the platform for implementing these tools can be a microcomputer or a

10  digital signal processor.  Today's implementations of these platforms in phones

11  typically show up as a systems on a chip or systems in/on a package.

12      **C.**     **Foundational Developments Preceding AMR Speech Coding**

13       36.    In the early 1980s, the analysis-by-synthesis class of codecs began to

14  gain prominence as a bit-rate efficient solution that was also efficient in its speech

15  quality.  Unlike the preceding rigid vocoder model with only two classes of

16  excitation, with analysis-by-synthesis, speech is represented by an elastic excitation

17  model with more excitation alternatives.  This necessarily increased the bit rate from

18  the range of 2.4 kbit/s to 4.8 kbit/s known for vocoders, and a powerful perceptual

19  model would result in bit rates such as 16 kbit/s in so-called waveform coders.

20       37.    Analysis-by-synthesis involved segmenting the original speech signal

21  and applying a linear predictive analysis.  The determined linear predictive coding

22  (LPC) parameters were then fed into a synthesis filter in a local decoder to produce

23  a synthetic speech signal in conjunction with a candidate excitation.  The challenge

24  was to choose the best excitation sequence—one that would be custom-tailored to

25  the speech segment—of a large number of alternative candidates for each segment

26  in real-time.  With analysis-by-synthesis, the transmitted LPC parameters and

27  excitation parameters, and hence a compressed speech signal, are reconstructed at

28  the receiving side using a remote decoder equivalent to the local decoder on the

1  transmitting side.

2  38. As mentioned earlier, an analysis-by-synthesis codec can achieve a low

3  bit rate by de-emphasizing perfect waveform matching. The need for sub-16 kbit/s

4  coding with analysis-by-synthesis, however, meant that certain design constraints

5  were fundamental, such as limiting the number of excitation sequences from which

6  to select the best fit for a given speech segment under analysis.

7  39. A breakthrough application of the analysis-by-synthesis technique

8  came in 1984 with the use of a stochastic excitation codebook combined with the

9  intuitive frequency-weighted error criterion, for optimizing the excitation for a given

10  spectral envelope. This new type of codec was called Code Excited Linear

11  Prediction (CELP). In an early example, the dictionary of candidate excitation

12  sequences, called the codebook, stored 1024 sequences of 40 samples each.

13  Codebooks of this type are called stochastic or fixed codebooks. During the

14  analysis-by-synthesis loop, an exhaustive search of the codebook is used to locate

15  the sequence giving the minimum perceptually weighted error. In 1984, however,

16  the computational complexity of CELP was far beyond the capability of mobile

17  handset hardware.

18  40. With the complexity of the CELP approach hampering its commercial

19  viability for the time being, development began on the GSM full-rate standard

20  speech codec, which was completed in 1988. It was one of the first speech coders

21  ever standardized for public digital mobile telephony. The standardized GSM full-

22  rate codec comprised three main portions: (1) linear prediction; (2) long-term

23  prediction (a pitch prediction filter); and (3) regular pulse excitation, a simple form

24  of CELP-like excitation. (*See* Ex. 1315 at p. 14.)

25  41. Beginning in the late 1980s, several developments advanced CELP

26  techniques to practical implementation for mobile applications. One such

27  development was the use of an adaptive codebook for the pitch contribution to take

28  advantage of the past excitation samples and LPC parameters. Another innovation

was the addition of an adaptive post-filter, which improved the quality of the synthetic output speech by attenuating coding noise in the inter-formant spectral regions of the speech signals. Further, a periodicity enhancement was added for the fixed codebook excitation signal to remove waveform discontinuities introduced by the short-term synthesis filter.

42. The IS-96 standard speech coder for CDMA was adopted by the U.S. Telecommunications Industry Association (TIA) in 1993. The IS-96 codec was known as QCELP, for Qualcomm CELP. It was one of the first mainstream codecs to implement a variable bit rate, operating at 8, 4, 2, and 1 kbit/s. (*See, e.g.*, Ex. 1315 at p. 28; *see also* Ex. 1309 at p. 14, TAB. 1 (describing variable rate coder using these bit rates).)

43. In 1995, ITU-T (International Telecommunication Union, Telecommunication Standardization Sector) adopted the G.729 standard 8 kbit/s CS-ACELP codec—a Conjugate Structure Algebraic CELP. (*See, e.g.*, Ex. 1315 at pp. 10–12.) One of the most innovative features of this codec was the algebraic structure of the fixed codebook. Instead of a codebook that explicitly stored excitation sequences, pulse sequences could be generated on the fly. Because only a few of the pulse positions have amplitudes of +1 or −1, the majority of the pulse positions have zero values. This made for a very computationally efficient way to reduce storage and search requirements.

44. The ACELP coding design of G.729 has subsequently been utilized by several other standard codecs. For example, in the fall of 1995, the European Telecommunications Standards Institute (ETSI) issued an ACELP-based enhanced full-rate (EFR) speech codec for GSM that operated at 12.2 kbits/s. (*See, e.g.*, Ex. 1315 at p. 18.)

## D. AMR Speech Coding

45. Following the standardization of the GSM-EFR coder, the ETSI Speech Expert Group studied additional strategies for improving end-to-end performance of

speech services in GSM networks.  In this regard, ETSI's Speech Quality Strategy Group ultimately recommended the development of a multi-rate codec, finding that such an "adaptive solution will combine the performance advantages of a wireline halfrate codec and a robust EFR codec and as such will be easier to market than either individually."  (Ex. 1589 at p. 5.)

46.    Unlike previous GSM speech codecs that operate at a fixed rate with a fixed level of error protection, an AMR system adapts to local radio channel and traffic conditions and selects the optimum channel (half- or full-rate) and codec mode (speech and channel bit rates) to deliver the "best" combination of speech quality and capacity.  That is, AMR exploits implied performance compromises between the best clear channel performance and robustness to channel errors by adapting the speech and channel coding rates according to the quality of the radio channel.

47.    The AMR codec was to operate in two channel modes, full-rate and half-rate, such that in each mode the codec speech and channel bit-rates can be varied rapidly (several times a second) to track the channel error rates or C/I (channel-interference level) of the channel nearly instantaneously.  Each codec mode provides a different level of error protection through a dedicated distribution of the available gross bit rate (22.8 kbit/s in Full-Rate and 11.4 kbit/s in Half-Rate) between source coding and channel coding.

**E.    Ericsson's Speech Coding Patents Do Not Cover the Fundamental Building Blocks Used in AMR.**

48.    As discussed above, one development in digital cellular telephony was the technology for high quality coding of speech at low bit rates.  CELP provided a scalable platform for such coding, making possible a graceful trade-off between bit rate and speech quality.  The overall system solution for digital speech communication evolved along several dimensions, including:  (1) providing a choice of bit rate(s) based on considerations of network capacity and/or signal-to-channel-

1   noise ratio; (2) maximizing speech quality at a given bit rate; and (3) utilizing
2   speech activity profiles to disable transmission and/or create comfort noise during
3   silences.  As discussed below, most of Ericsson's speech coding patent families I
4   analyzed can be categorized along these dimensions.

5            49.      First, the selection of bit rate(s) (*e.g.*, as in Ericsson's P07288 and
6   P07782 patent families) is generally governed by one or both of the current speech
7   signal characteristics and the current state of the network or communication channel.
8   Practically, however, the most actionable cue for selecting bit rate is the network or
9   channel state, given that the scenario in question is a multi-user, varying-capacity
10  network.  The varying capacity can be expressed as the network bandwidth available
11  to a given user, and dictates the aggregate bit rate per user.  That rate, in turn,
12  represents the total of source-coding bit rate (as used by speech compression coding)
13  and channel coding bit rate (as used by error-protection coding).

14           50.      Second, maximizing speech quality at a given bit rate is very much a
15  task posed to a speech coding expert.  In addition to utilizing the foundational
16  innovations of CELP and ACELP, there is an opportunity to fine-tune such coding
17  with the goal of improving speech quality.  Many attempts at such fine-tuning have
18  tended to be empirical at least in the sense that the designs are based on speech
19  quality tests that are informal, subjective, or not adequately reflective of perceived
20  speech quality.  They are also empirical in the sense that they may be
21  interchangeable approaches to refinement and not necessarily grounded in a well-
22  defined common theory.

23           51.      Examples of such approaches are many.  In the case of Ericsson's
24  alleged speech coding SEPs, a class of such examples involves attempts to optimize
25  the fixed codebook excitation vector (*e.g.*, as in Ericsson's P09085, P09286,
26  P10310, P10334, and P10335 patent families).  Such optimization is typically
27  related to managing pulse positions in the code vector, deciding on the best code
28  vector gain, or modifying code vector's spectral characteristics.  The tendency in

these approaches has been to use information that is already present in the (A)CELP codec, and to derive additional intelligence about speech signal dynamics to enable adaptations attempting to provide greater speech quality or naturalness.

52.     Third, with respect to utilizing activity profiles of signals (*e.g.*, speech, audio, etc.) in order to conserve transmission resources and/or create comfort noise (*e.g.*, as in Ericsson's P07669, P10991, and P10992 patent families), the fact that simultaneous talking is atypical in bidirectional telephony is well-known.  The typically consequent property of 50% inactivity is directly usable for conserving transmission resources such as bandwidth or power in so-called systems for discontinuous transmission (DTX).  The careful definition of silences, however, can be a challenging issue.  In particular, categorizing periods of speech onsets and slow speech decays as silences may result in unnatural or perceptually undesirable results for the listener.

53.     To this end, several algorithms have been proposed that use instantaneous criteria related to speech activity (*e.g.*, measurements of signal energy or signal-to-noise ratio), as well as criteria with memory (*e.g.*, time-averages) in these measurements and hysteresis loops, in overall voice activity detection (VAD). As with speech coding optimization, VAD optimization can be empirically-based, and gains in new algorithms can be uncertain unless they are backed by extensive testing.  The VAD design is also integral to controlling comfort noise in the idle-channel state.  Once comfort noise is turned on, it should be optimized to reflect noise that characterizes the contemporary communication channel, and once again, there are many approaches to accomplishing this.  However, these variations are all based on fundamental knowledge of signal processing and statistics.

54.     As some of the intricate algorithms in dimensions (1) and (2) mentioned above—*i.e.*, choice of bit rate or bit rates and maximizing speech quality at a given bit rate—are fine-tuned, there is a risk of over-modeling the speech or the environment, and of creating an algorithm that may not be consistent or robust

across the many various scenarios that may arise.  In fact, in these cases, it may be preferable to use a well-established methodology in general signal processing, as opposed to one that appears to be speech-tuned or empirically-derived.  Specific examples of some such speech-tuned or empirically-derived methodologies (*i.e.*, in Ericsson's alleged SEP families) are discussed later in this Witness Declaration and/or in my Appendices.  (Ex. 1638.)  The technologies surveyed at a high-level with respect to (1), (2), and (3) above are a speech-specific and speech-related subset of the scope discussed above in connection with **FIGURE 2**.  (Section III.B, *supra*.)

55.    The above contextual background is meant to assist the reader in understanding my analysis of the Essentiality, Importance, and Contribution of Ericsson's speech coding portfolio, examples of which are provided below in Section IV.  (*See also* Ex. 1638.)

## IV.    ANALYSIS OF ERICSSON'S SPEECH CODING PORTFOLIO

56.    I performed an in-depth technical analysis of certain speech coding patents Ericsson alleges are essential to the 2G and 3G standards.  My understanding is that as of November 12, 2015, as part of this litigation, Ericsson had identified a number of patent families it contends are Essential to the 2G, 3G, and/or 4G standards and had designated these patents families as being relevant to UE (*i.e.*, User Equipment such as cell phones or smartphones) or UE/NB (*i.e.*, User Equipment or Network Equipment).  (Ex. 1577.)  My analysis focused on determining the technical value of 12 of these patent families that are related to speech coding.  I was provided claim charts prepared by Ericsson that purport to map patents in these families to portions of the 2G and 3G standards related to speech coding.

### A.    Objective and Process of Analysis

57.    An overarching goal of my analysis is to evaluate, for each charted claim, the intrinsic technical value of the patented technology in the standards, apart

1  from the value associated with the technology being incorporated into the standards.

2  By "the patented technology in the standards," I mean the technical feature in the

3  standards that Ericsson has, in a claim chart, mapped to one or more claim

4  limitations of a patent in the 12 speech coding families I analyzed.  For each family

5  I analyzed, I evaluated each charted claim with respect to standards to which

6  Ericsson has asserted the claim is Essential.  I analyzed only the charted claims.

7       58.    My analysis primarily entails an evaluation of the following three

8  metrics of technical value of a patent family:  (1) Essentiality, (2) Importance, and

9  (3) Contribution.  These three metrics and the methodologies used to analyze them

10  and assess the related ranks are explained in detail below.  My analysis of

11  Essentiality, Importance, and Contribution used the same methodology used by Dr.

12  Kakaes and described in his concurrently submitted Witness Declaration.

13                 1.     Approach for Essentiality Analysis

14       59.    The purpose of the Essentiality analysis is to assess Ericsson's

15  contentions regarding the essentiality of its patent families, as well any evidence

16  relating to the same, and to provide an Essentiality Rank that reflects my

17  assessment.  The Essentiality Rank is provided on a scale of 1 to 3, as further

18  explained below.

19       60.    The Essentiality analysis was informed by ETSI's definition of

20  "ESSENTIAL," as contained in the ETSI Rules of Procedure, 18 November 2015,

21  Annex 6:  ETSI Intellectual Property Rights Policy, § 15-6.  (Ex. 223 at p. 7.)  In

22  particular, my understanding is that:

23            "ESSENTIAL" as applied to IPR means that it is not

24            possible on technical (but not commercial) grounds,

25            taking into account normal technical practice and the

26            state of the art generally available at the time of

27            standardization, to make, sell, lease, otherwise dispose

28            of, repair, use or operate EQUIPMENT or METHODS

which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(*Id.*)

61.     Thus, I understand an Essentiality determination under ETSI's IPR Policy depends on an underlying infringement determination and related legal principles. For example, it is my understanding that to prove infringement of a patent by an accused device or process, a patent owner must establish that each and every claim limitation of the patent is implemented by the accused device or process. Likewise, I understand that infringement is not established if even a single claim limitation is not implemented by the accused device or process.

62.     I also understand there is a concept in patent law known as the "person of ordinary skill in the art" (POSITA). I understand that this concept refers to a person who is trained in the relevant technical field of a patent without possessing extraordinary or otherwise exceptional skill. I further understand that factors such as the education level of those working in the field, the sophistication of the technology, the types of problems encountered in the art, prior art solutions to those problems, and the speed at which innovations are made, may help establish the level of skill in the art.

63.     In my opinion, a POSITA in the scope of the relevant patents I analyzed would have at least a bachelor's degree in electrical engineering, or a related discipline, with at least three to four years of practical or research experience in the field of digital signal processing for speech or audio applications. Alternatively, the POSITA would have at least a master's degree in electrical engineering, or a related discipline, with at least two to three years of practical or research experience in the field of digital signal processing for speech or audio

applications.  A person having a Ph.D. in the field of electrical engineering or a related discipline would also qualify as a POSITA, with the Ph.D. research typically being equivalent to direct practical experience.

64.     My analysis and opinions account for this level of education and experience attributable to one of ordinary skill in the art relevant to the patents I analyzed.  As reflected in my qualifications above (see Section I), I am qualified to testify and opine as to what a POSITA would have known or understood with respect to the speech coding technologies and standards at issue here as of the relevant dates of the patents and standards at issue in this Witness Declaration.

65.     Additionally, it is my understanding that claim terms or phrases are given their plain and ordinary meaning as would have been understood by a POSITA at the time of the invention when read in the context of the patent specification and prosecution history.  I also understand that there are two exceptions to this general rule:  (1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.  I applied these principles when construing claim terms or phrases in connection with my analysis.

66.     In accordance with the ETSI definition of "essential" and the various legal principles discussed above, for each limitation of a charted claim, I analyzed whether the limitation is "required" by the standard—*i.e.*, whether implementing a feature in the standard necessarily infringes or reads on the limitation.

67.     Specifically, I ranked the Essentiality of a charted claim a "1" if I did not see any evidence precluding a finding that the claim is "ESSENTIAL" under ETSI's IPR Policy.  I ranked the Essentiality of a charted claim a "2" if, under a proper claim construction, I found that the claim is not "ESSENTIAL" under ETSI's IPR Policy.  Finally, I ranked the Essentiality of a charted claim a "3" if I found that the claim is not "ESSENTIAL" under ETSI's IPR Policy under any reasonable claim construction.  (*See* Section, II, TAB. 1, *supra*.)

68.     Additionally, in determining whether or not a technical feature in the standards cited in one of Ericsson's claim charts infringes or reads on a charted claim limitation, I focused my analysis primarily on Ericsson's contentions in the claim chart (*i.e.*, Ericsson's mapping of claim limitations to cited standards and Ericsson's related comments).  If I found no evidentiary or technical support for Ericsson's contentions for at least one claim limitation, or if I found that Ericsson's contentions were otherwise flawed, I ranked the Essentiality a "3" or "2," depending, respectively, on whether the claim was not Essential under (a) any reasonable interpretation or (b) a proper construction.

2.      Approach for Importance Analysis

69.     The second metric I evaluated in connection with my analysis is the Importance (or technical value) of Ericsson's patent families with respect to the relevant standards.  The purpose of the Importance analysis is to determine the overall importance or technical value of an "accused technology" and a "key feature" (as defined below) to the relevant (*e.g.*, 2G and/or 3G) standard, and to provide an Importance Rank based on the same.

70.     The Importance Rank is provided on a scale of 1 to 3, where "1" means that the accused technology/key feature is important (or technically valuable) to the standard; "2" means that the accused technology/key feature is moderately important (or of moderate technical value) to the standard; and "3" means that the accused technology/key feature is at best only marginally important (or of marginal technical value) to the standard.  (*See* Section, II, TAB. 1, *supra*.)

71.     The Importance analysis began with identifying an accused technology for the patent—*i.e.*, the technology to which the standards cited in Ericsson's claim chart are generally directed.  Examples of accused technologies in the speech coding context include an AMR encoder or decoder.

72.     The next step was to identify one or more key limitations of the patent claim at issue.  Key claim limitations were determined by considering what the

patent describes as the heart of the invention.  The key claim limitations are also circumscribed by the arguments and amendments Ericsson used to overcome prior art, and/or the reasons identified by the examining patent office as the patentable subject matter (*e.g.*, in a notice of allowance).

73.    Once the key claim limitations were identified, the next step was to identify the key feature in the standard that corresponds to the key claim limitations. The key feature is the technical feature in the cited standard (or a subset thereof) that is mapped to the key claim limitations in Ericsson's claim chart.  Examples of key features include:  (1) an anti-sparseness filtering operation that uses circular convolution to reduce sparseness of a codebook output, before speech synthesis (Ex. 1638 at p. 54 (P09286)); and (2) using first and second differences to adapt the fixed codebook gain, where the first difference is based on waveform matching and the second difference is based on energy matching (Ex. 1638 at pp. 83–84 (P10310)).

74.    Once the accused technology/key feature was identified, I assessed its overall value to the standard.  In connection with this assessment, I considered the technical feature that was in the standard prior to the adoption of the key feature, if that information was available to me.  If such a prior technical feature in the standard was identified, I assessed the incremental improvement (or technical value) the key feature provided over the prior technical feature.  On other hand, if no such prior technical feature existed or was available to me, I assessed the incremental improvement the key feature provided over other well-known prior art technical features available at the time the standard was adopted, such as the ones identified in the background section of the patent at issue or in prior related standards.  If there were no well-known prior art technical features, I assessed the Importance of the key feature by considering the impact of removing the key feature from the standard, in terms of performance degradation and implementation cost.

75.    I also considered a number of other factors in the overall Importance assessment, including:  (1) the importance of the underlying accused technology to

the standard; (2) whether the accused technology/key feature is optional to the standard; and (3) how widely the accused technology/key feature is deployed in major markets.

### 3.    Approach for Contribution Analysis

76.    The third metric that I evaluated in connection with my analysis is the Contribution of Ericsson's patent families to the standard.  The purpose of the Contribution analysis is to determine a level of improvement, if any, the key feature for the patent provided to the relevant standard (*e.g.*, 2G and/or 3G) relative to alternatives that were available when the key feature was adopted into the standard. The Contribution analysis also entails providing a Contribution Rank on a scale of 1 to 4, where "1" means that, for the purposes of my analysis, no viable alternatives to the key feature were identified; "2" means that the key feature provided a moderate improvement to the standard relative to the alternative; "3" means that the key feature provided a marginal improvement to the standard relative to the alternative; and "4" means that the key feature provided no improvement to the standard relative to the alternative.  (*See* Section, II, TAB. 1, *supra*.)

77.    The Contribution analysis began with identifying alternatives to the key feature that were available at the time the standard was adopted (*i.e.*, consistent with an *ex ante* analysis).  The sources of alternatives that I considered include:  (1) written contributions (*e.g.*, Tdocs and Change Requests) submitted to ETSI or a 3GPP working group; (2) prior art technical solutions identified in the patent at issue (*e.g.*, Applicant-admitted prior art); (3) prior art references cited during patent prosecution; (4) any technical solutions that were known in the art as evidenced by patent and non-patent literature; and (5) any other technical solutions that would have been known to a POSITA and that could have served as alternatives to the key feature.

78.    In the majority of cases, the alternatives were "non-infringing alternatives," meaning that the alternative technical solutions do not read on the

1  charted claim at issue.  In some cases, however, the alternatives were the same or

2  effectively identical to the key feature, and, in some cases, likely read on the

3  Ericsson claim at issue.  In these cases, one relevant issue was whether such "prior

4  art" alternatives were known before the earliest effective priority date of Ericsson's

5  patent at issue.  If so, I gave the key feature a Contribution Rank of "4," because the

6  key feature was already known in the art.  In such cases, even if the key feature

7  represented a marginal, moderate, or significant improvement to the standard, my

8  understanding is that any value associated with that improvement is attributable to

9  the prior art, and not to Ericsson's patent.

10       **B.     Essentiality, Importance, and Contribution of Ericsson's Patents**

11       79.    I will now provide examples that illustrate my analysis and ranking of

12  the Essentiality, Importance, and Contribution for representative patents in

13  Ericsson's speech coding families.  Following these examples is a summary of my

14  results for Ericsson's 12 speech coding patent families I analyzed, as shown in detail

15  in my Appendices.  (Ex. 1638.)

16            1.    Essentiality Analysis of Ericsson's Alleged SEPs

17       80.    I found 2 out of 12 of Ericsson's speech coding families that it contends

18  are standard essential to be non-essential under any reasonable claim construction.

19  Thus, I assigned these two patent families (*i.e.*, P07669 and P07782) an Essentiality

20  Rank of "3."

21            *a.    Ericsson's P07669 patent family is not essential.*

22       81.    Ericsson's P07669 patent family relates to the enabling/disabling of

23  discontinuous transmission of speech.  In my understanding, the only charted claim

24  for this family is claim 1 of U.S. Patent No. 5,737,695 ("the '695 Patent").  The '695

25  Patent is entitled "Method and Apparatus for Controlling the Use of Discontinuous

26  Transmission in a Cellular Telephone," was filed December 21, 1996, and granted

27  April 7, 1998.  (Ex. 388.)

28       82.    According to the Background of the Invention of the '695 Patent, "[t]o

1   conserve battery power and decrease interference on cellular telephone radio

2   frequencies, cellular telephones are frequently equipped to operate in a

3   discontinuous transmission mode.  When the cellular telephone is not operating in

4   discontinuous mode, the transmitter of the cellular telephone is always transmitting

5   regardless if speech is present or not.  When operating in discontinuous mode,

6   however, the cellular telephone transmitter is active only during periods when

7   speech is present and is otherwise disabled unless the cellular telephone transmits

8   data for messages and signaling."  (Ex. 388 at p. 6, 1:15–24.)

9       83.    "To detect the presence of speech, cellular telephones employ Voice

10  Activity Detectors (VAD) which are well known in the industry.  The voice activity

11  detector detects the presence or absence of speech.  The sound from the microphone

12  can be digitized prior to measurement by the voice activity detector.  The output of

13  the voice activity detector sets and clears a binary flag which activates and

14  deactivates the transmitter in the cellular telephone.  When the transmitter is

15  switched off a speech decoder in the base station can insert comfort noise to ensure

16  that the person on the other end of the telephone call hears background noise and not

17  silence which may cause concern as to whether the call has been terminated."  (Ex.

18  388 at p. 6, 1:25–37.)

19      84.    Discontinuous transmission may cause a problem in noisier

20  environments, because in such environments "the actual background noise

21  transmitted during periods of speech differs greatly from the synthesized

22  background noise creating an unpleasant experience for the listener."  (Ex. 388 at p.

23  6, 1:51–55.)  The '695 Patent thus notes that "[i]t would be advantageous . . . to

24  devi[s]e a method and apparatus allowing the use of discontinuous transmission in

25  quiet environments while disabling the use of discontinuous transmission in noisy

26  environments."  (*Id.* at 6, 1:56–59.)

27

28

85.     **FIGURE 3 of the '695 Patent** (shown below on the following page) illustrates a flow diagram for the method of controlling the use of discontinuous transmission recited in claim 1.  As shown, "sound entering the microphone 110 [shown in Figure 2], which frequently has been digitized by the analog to digital converter 105 [shown in Figure 2], is input to the voice activity detector 106 (step 300)."  (Ex. 388 at p. 7, 4:25–28.)  "The voice activity detector 106 determines whether the sound entering the microphone 110 is indicative of speech (step 310)." (*Id.* at 7, 4:29–31.)  "If the voice activity detector 106 indicates that speech is present, the voice activity detector 106 continues to evaluate the sound input to the microphone 110 until the voice activity detector 106 detects the absence of speech." (*Id.* at 7, 4:31–34.)  "Once the sound is determined to be non-speech, the energy detector 120 measures the energy level of noise entering the microphone 110 (step 311)."  (*Id.* at 7, 4:34–37.)  "The comparator 150 compares the measured energy level with the threshold value (step 330)."  (*Id.* at 7, 4:39–40.)  "If the measured energy level is determined to be less than or equal to the threshold value (step 340) the controller 140 enables discontinuous transmission (step 320).  Otherwise, the controller 140 disables discontinuous transmission (step 350).  (*Id.* at 7, 4:41–45.)





**FIGURE 3 of the '695 Patent**

86.     Claim 1 of the '695 Patent is reproduced below.

> **1. A method for controlling the use of discontinuous transmission in a cellular telephone comprising the steps of:**
> detecting the presence or absence of speech input to a microphone of the cellular telephone;
> measuring an energy level of sound input to the microphone of the cellular telephone when speech is absent;
> comparing the measured energy level against a threshold value, the threshold value representing a maximum energy level of background noise allowable for use of discontinuous transmission;
> enabling discontinuous transmission when the comparison indicates that the measured energy level is at or below the threshold value; otherwise
> disabling discontinuous transmission when the comparison indicates that the measured energy level is greater than the threshold value.

(Ex. 388 at p. 8, 6:18–33.)

87.     Ericsson alleges that the P07669 patent family is essential to 3G.  In its claim charts, Ericsson attempts to map the limitations of claim 1 of the '695 Patent to 3GPP TS 26.094 v.6.0.0 §§ 3.3.5 and 3.3.5.1.  (*See, e.g.*, Ex. 387.)

88.     I have assigned the P07669 patent family an Essentiality Rank of "3" because practicing the standard with user equipment does not require at least the following limitations of claim 1 under any reasonable interpretation:

- "comparing the measured energy level against a threshold value, the threshold value representing a maximum energy level of background noise allowable for use of discontinuous transmission"; and
- "enabling discontinuous transmission when the comparison indicates that the measured energy level is at or below the threshold value; otherwise
- disabling discontinuous transmission when the comparison indicates that the measured energy level is greater than the threshold value."

(Ex. 388 at p. 8, 6:18–33.)

89.     Specifically, the Essentiality Rank is "3" because Ericsson's claim chart fails to distinguish between the use of energy and SNR (signal-to-noise ratio) in terms of the VAD decision.  Claim 1 requires "measuring an energy level," "comparing the energy level against a threshold value . . . representing a maximum energy level of background noise allowable for use of discontinuous transmission," and enabling/disabling discontinuous transmission based on the comparison.  By contrast, the standard requires comparing input frame power against a threshold for controlling a VAD hangover decision, and adding hangover or not based on the comparison.

90.     Ericsson's claim chart merely paraphrases the standard, and fails to demonstrate the relationship between hangover, the initial VAD decision (vrad_reg), and the final decision regarding VAD, on the one hand, and DTX on the other hand. (*See, e.g.*, Ex. 1288 at pp. 15–19.)  The claim chart also conflates SNR and energy, even though these are not equivalent.  (*See id.*)  As explained in Section III.E above, misclassification of speech onsets and speech decays as silences are undesirable events, and avoiding these results calls for careful design.

91.     In this context, and further to concerns mentioned above, there is also no valid intermediate VAD decision described in the '695 Patent—*i.e.*, there is no VAD decision that is later reinforced or confirmed.  The standard clearly specifies an intermediate VAD decision, and one that is based on a signal-to-noise ratio, as shown below (on the following page) in **FIGURE 3**.   As shown in **FIGURE 3**, the standard clearly distinguishes between signal properties and noise properties, and the ratio between the same.  (*Compare* Ex. 386 at p. 12, § 3.3.5 (see below comparison of snr_sum to vad_thr), *with id.* (calculating noise level, shown further below in equation 3.9).)

---

## 3        Technical Description of VAD Option 1

\* \* \*

## 3.3        Functional description

\* \* \*

## 3.3.5        VAD decision

\* \* \*

The variable vadreg indicates intermediate VAD decision and it is calculated as follows:

if (snr_sum > vad_thr)

vadreg = 1

else

vadreg = 0

\* \* \*

Average level of background noise is calculated by adding noise estimates at each band:

$$noise\_level = \sum_{n=1}^{9} bckr\_est[n] \qquad (3.9)$$

**FIGURE 3 (PDX 53)**

92.     The standard also describes maintaining speech tails without cutting them off prematurely (using the hangover), and it lets the intermediate VAD decision influence the noise level update.  (*See, e.g.*, Ex. 386 at p. 12, § 3.3.5.2.) That is, the standard describes a smart balance between signal and noise.

93.     By contrast, as discussed above, the '695 Patent disconnects speech and noise by not using SNR and instead using energy.  To attempt to read on the standard, Ericsson (1) paraphrases the standard, (2) relies on additional commentary, and (3) incorrectly annotates the code itself (*e.g.*, by adding "/\* 'DTX disabled' \*/" to the pseudocode).  (*See also* Ex. 387 at pp. 3–4 (excerpt highlighted in **FIGURE 4** below on the following page).)

```
3         Technical Description of VAD Option 1
3.3       Functional description
3.3.5     VAD decision
3.3.5.1   Hangover addition
[...]

if (vadreg == 1){
    burst_count = burst_count + 1
        if (burst_count >= burst_len){
            hang_count = hang_len
        }
        VAD_flag = 1
}  else {
    /* vad_reg ==  0 */
    burst_count = 0
        if (hang_count > 0){
            hang_count = hang_count −
            VAD_flag=1       /* "DTX disabled" */
        }
}
```

**FIGURE 4**

94.    Accordingly, there is at least no claimed comparing or enabling/disabling in the standard, and the Essentiality Rank for P07669 is "3."

    *b.   Ericsson's P07782 patent family is not essential.*

95.    Ericsson's P07782 patent family relates to an adaptive multi-rate speech encoder, and more specifically to a source/channel encoding mode.  The charted claims for this family include claim 1 of U.S. Patent No. 6,163,577 ("the '577 Patent").  The '577 Patent is entitled "Source/channel Encoding Mode Control Method and Apparatus," was filed April 25, 1997, claims priority to a foreign application filed April 26, 1996, and granted December 19, 2000.  (Ex. 1296.)

96.    According to the Background of the '577 Patent, some "[s]peech and

channel encoding schemes in cellular . . . systems . . . use static allocation of source and channel encoding bit rate as well as static allocation of source and channel encoding algorithm.  That is, regardless of the changing character of the speech signal and the changing radio conditions an allocated source/channel encoding mode will be maintained for the duration of a call." (Ex. 1296 at p. 7, 1:10–17.) "However, for certain input source signals the allocated source encoding bit rate may not be sufficient, or the source encoding algorithm may not be adequate, to encode the signal with the desired high quality.  Furthermore, when radio conditions become poor the received speech quality will also be[] poor, since the protection provided by the channel encoding will be insufficient.  Thus, the static mode allocation is a limiting factor with respect to the range of conditions over which the speech transmission service can offer acceptable quality." (*Id.* at 7, 1:18–27.)

97.     "Accordingly," the Summary of the Invention describes, "it is an object of the present invention to provide a source/channel encoding mode control method in a digital radio communication system, which method dynamically adapts, within the same total gross bit rate, the encoding mode to the current type of source signal and the current radio conditions." (Ex. 1296 at p. 7, 1:37–44.)  **FIGURE 8 of the '577 Patent** (shown below on the following page) illustrates a flow diagram for the source/channel encoding mode control method recited in claim 1.  (*Id.* at 5.)



**FIGURE 8 of the '577 Patent**

98.     As shown in Figure 8, "[i]n step 20 the source signal type of the current frame is determined." (Ex. 1296 at p. 8, 4:48–50.) "Step 22 restricts the source/channel encoding to an encoding class compatible with that type of source signal." (*Id.* at 8, 4:50–51.) "Step 24 determines the quality measure received on control channel CTRL." (*Id.* at 8, 4:52–53.) "Step 26 determines whether this quality measure requires normal encoding with room for a control channel or very robust encoding without a control channel. In the first case the algorithm proceeds to step 28, where the quality of speech received at the transmitting end is determined. A corresponding quality measure will be transmitted on the control

channel CTRL to the receiver.  In step 30 an encoding mode with such a control channel is selected within the determined class of encoding modes.  On the other hand, if very robust encoding is required step 32 selects an encoding mode without control channel within the determined class of encoding modes." (*Id.* at 8, 4:53–64.)

99.    Claim 1 of the '577 Patent is reproduced below.

> **1**. A source/channel encoding mode control method in a digital radio communication system having a radio link from a transmitter to a receiver, comprising the steps of:
>
> determining a current type of source signal to be encoded and transmitted on the radio link;
>
> restricting encoding to a class of source/channel encoding modes compatible with the determined type of source signal, each mode in the class being defined by a different mix of source signal encoding and channel protection but the same total available gross bit rate;
>
> determining a quality measure for previously transmitted signals that have been received and decoded at the receiver; and
>
> selecting, based on the quality measure, a source/channel encoding mode from the class that is likely to give the best received and decoded signal at the receiver.

(Ex. 1296 at p. 9, 6:2–17.)

100.    Ericsson alleges the P07782 patent family to be essential to 2G.  In its claim chart, Ericsson attempts to map the limitations of the '577 Patent to the following standards:

- 3GPP TS 26.093 v.7.0.0 §§ 3.1, 4, 4.1, 5.1.1, 5.1.2.1;
- 3GPP TS 26.094 v.7.0.0 § 3.2;
- 3GPP TS 45.003 v.7.4.0 §§ 2.1, 3.9, 3.9.4, 3.9.4.1, 3.9.4.2, 3.9.4.3, 3.9.4.4; and
- 3GPP TS 45.009 v.7.0.0 §§ 1, 2, 3.1.1, 3.3.3.1.

(*See, e.g.*, Ex. 389.)

101.   I have assigned the P07782 patent family an Essentiality Rank of "3" because practicing the standard with user equipment does not require at least the following limitations of claim 1 of the '577 Patent under any reasonable interpretation:

- "determining a current type of source signal to be encoded and transmitted on the radio link"; and

- "restricting encoding to a class of source/channel encoding modes compatible with the determined type of source signal."

(Ex. 1296 at p. 9, 6:2–17.)

102.   Specifically, the Essentiality Rank is "3" because the claim requires determining a current type of source signal (*e.g.*, voiced vs. unvoiced), and the claim also requires restricting encoding to a class of source/channel encoding modes compatible with the determined type of source signal.  Further, claim 1 requires a codec mode adaptation that is based both on the previous quality measure *and* the current type of source signal (or speech state) within the same gross bit rate.  The previous quality measure is measurable without knowing the previous state (*e.g.*, voiced/unvoiced), but either by a previous SNR or by an error event that the previous speech suffered.  In the standard, this is measured by the channel error detector characteristic (code parity).  (*See, e.g.*, Ex. 1306 at pp. 48–49, § 3.9.4.3.)

103.   For example, during prosecution of the '577 Patent, Ericsson argued that "the present invention relates to a method of dynamically adapting the coding of digital data to *both* the current radio conditions *and* the current source signal (voiced or unvoiced, for example)."  (*See, e.g.*, Ex. 390 at p. 142 (see **FIGURE 5** below on the following page).)

According to an exemplary embodiment, the present invention relates to a method of dynamically adapting the coding of digital data to ==both the current radio conditions and the current source signal== (voiced or unvoiced, for example). The current <u>type of source signal to be encoded</u> determines a suitable class of source/channel encoding modes, while the current radio conditions determine a specific mode in that class. This dynamic adaptation is performed within the same gross bit rate, so that handoff (a slow operation) does not have to be performed. Keeping the gross bit rate fixed, the present dynamic adaptation may be performed on a speech frame by speech frame basis.

**FIGURE 5**

104.   The standard does not require the above restrictions of the claims. Rather, as shown below in **FIGURE 6**, the encoding modes in the standard correspond to bitrates, and the bitrate is defined in § 3.9.4.3 and is set by a quality measure.  (*See, e.g.*, Ex. 1306 at pp. 48–49, § 3.9.4.3.)

### 3.9.4.3    Parity for speech frames

The basic parameters for each codec mode for the first encoding step are shown below:

| Codec mode | Speech encoded bits ($K_d$) | CRC protected bits ($K_{d1a}$) | Number of bits after first encoding step ($K_u = K_d + 6$) |
|---|---|---|---|
| TCH/AFS12.2 | 244 | 81 | 250 |
| TCH/AFS10.2 | 204 | 65 | 210 |
| TCH/AFS7.95 | 159 | 75 | 165 |
| TCH/AFS7.4 | 148 | 61 | 154 |
| TCH/AFS6.7 | 134 | 55 | 140 |
| TCH/AFS5.9 | 118 | 55 | 124 |
| TCH/AFS5.15 | 103 | 49 | 109 |
| TCH/AFS4.75 | 95 | 39 | 101 |

**FIGURE 6**

105.   Furthermore, in the standard, the codec mode adaptation does not depend on the current type of source signal, but rather depends on the quality of the previous speech signal.  Therefore, the first determining step and the restricting step are both missing from the standard, which selects the codec mode based only on the channel quality (and this does not depend on the current type of source signal).

106.   Accordingly, there is at least no claimed "determining a current type of source signal" and "restricting encoding to a class."  I therefore assigned the P07782 patent family an Essentiality Rank of "3."  The same reasoning applies to the other charted patents in the P07782 Family.

2.   <u>Importance Analysis of Ericsson's Alleged SEPs</u>

107.   As mentioned above, non-essential patent families do not add value to the standard.  For this reason, I performed an Importance and Contribution analysis for only those families I found to include at least one essential patent (*i.e.*, with an Essentiality Rank of "1" or "2").

108.   For the 10 speech coding families I analyzed for Importance, I found three families to have an Importance Rank of "1," one family to have an Importance Rank of "2," and six families to have an Importance Rank of "3."  Here I provide, by way of example, my analysis for two of Ericsson's Families (*i.e.*, P10310 and P10991).  The analysis for the remaining eight families is contained in my Appendices.  (Ex. 1638.)

a.   *Ericsson's P10310 patent family is at best marginally important to the standard.*

109.   Ericsson's P10310 patent family relates to an adaptive multi-rate speech encoder (which is the accused technology for this family), and more specifically to using waveform and energy matching to approximate an original speech signal.  The charted claims for this family include claim 15 of EP No. 1,114,414 (the EP '414 Patent").  The EP '414 Patent is entitled "An Adaptive Criterion for Speech Coding," was applied for on August 6, 1999, and claims

1  priority to September 1, 1998. (Ex. 1300.)

2      110.  According to the Background of the Invention of the EP '414 Patent,

3  "[m]ost modern speech coders are based on some form of model for generation of

4  the coded speech signal. The parameters and signals of the model are quantized and

5  information describing them is transmitted on the channel. The dominant coder

6  model in cellular telephony applications is the Code Excited Linear Prediction

7  (CELP) technology." (Ex. 1300 at p. 2, ¶ 2.) "The conventional encoding

8  procedure" used in conventional CELP codecs "is referred to as linear prediction

9  analysis-by synthesis (LPAS)." (*Id.* at 2, ¶ 4.) Conventionally, "LPAS coders

10  employ waveform matching in a weighted speech domain, *i.e.*, the error signal is

11  filtered with a weighting filter." (*Id.* at 2, ¶ 5.)

12      111.  "The waveform matching procedure described above is known to work

13  well, at least for bit rates of say 8 kb/s or more. However, when lowering the bit

14  rate, the ability to do waveform matching of non-periodic, noise-like signals such as

15  unvoiced speech and background noise suffers. For voiced speech segments, the

16  waveform matching criterion still performs well, but the poor waveform matching

17  ability for noise-like signals leads to a coded signal with an often too low level and

18  an annoying varying character (known as swirling)." (Ex. 1300 at p. 2, ¶ 6.)

19      112.  "For noise-like signals, it is well known in the art that it is better to

20  match the spectral character of the signal and have a good signal level (gain)

21  matching." (Ex. 1300 at p. 2, ¶ 7.) "The different criteria above have been

22  employed in conventional multi-mode coding where different coding modes (*e.g.*,

23  energy matching) have been used for unvoiced speech and background noise. . . . A

24  drawback with this approach is the need for mode decision, for example, choosing

25  waveform matching mode (Equation 1) for voiced speech and choosing energy

26  matching mode (Equations 2 or 3) for noise-like signals like unvoiced speech and

27  background noise. The mode decision is sensitive and causes annoying artifacts

28  when wrong. Also, the drastic change of coding strategy between modes can cause

1    unwanted sounds."  (*Id.* at 3, ¶ 9.)

2        113.   The EP '414 Patent describes that "[i]t is therefore desirable to provide

3    improved coding of noise-like signals at lowered bit rates without the

4    aforementioned disadvantages of multi-mode coding.  The present invention as

5    claimed in claims 1–27 advantageously combines waveform matching and energy

6    matching criteria to improve the coding of noise-like signals at lowered bit rates

7    without the disadvantages of multi-mode coding."  (Ex. 1300 at p. 3, ¶¶ 10–11.)

8    **FIGURE 5 of the EP '414 Patent** (shown below) "is a block diagram

9    representation of an exemplary portion of a CELP speech encoder according to the

10   invention."  (*Id.* at 6, ¶ 37; *see also id.* at 19.)



**FIGURE 5 of the EP '414 Patent**

27       114.   "The encoder portion of FIG. 5 includes a criteria controller 51 having

28   an input for receiving the uncoded speech signal, and also coupled for

communication with the fixed and adaptive codebooks 61 and 62, and with gain quantizer codebooks 50, 54 and 60." (Ex. 1300 at p. 6, ¶ 37.)  "The criteria controller 51 is capable of performing all conventional operations associated with the CELP encoder design of FIG. 2, including implementing the conventional criteria represented by Equations 1–3 and 10 above [*i.e.*, energy and waveform matching], and performing the conventional operations described in Steps 1–4 above [*i.e.*, related to waveform matching]." (*Id.* at 6, ¶ 37.)  "In addition to the above-described conventional operations, criteria controller 51 is also capable of implementing the operations described above with respect to Equations 4–9 and 11– 16." (*Id.* at 6, ¶ 38.)  Equations 4–9 and 11–14 relate to energy and waveform matching, where "[t]he present invention combines waveform and energy matching criteria into one single criterion DWE.  The balance between waveform matching and energy matching is softly adaptively adjusted by weighting factors" as described in these equations.  (*Id.* at 3, ¶ 11.)

115.   Ericsson alleges the P10310 patent family to be essential to 2G and 3G. In its claim chart, Ericsson attempts to map the limitations of claim 15 of the EP '414 Patent to 3GPP TS 26.090 v.6.0.0 §§ 4.3 and 5.8.2.  (*See, e.g.*, Ex. 1307.)

116.   Based on the patent specifications and the file histories of the patents in the P10310 Family, the key claim limitations of claim 15 of the EP '414 Patent are:

- "said controller further for determining at least one of said parameters (DWE) based on first and second differences between the original speech signal and the further signal,
- wherein said first difference (DW) is a difference between a waveform associated with the original speech signal and a waveform associated with the further signal, and
- wherein the second difference (DE) is a difference between an energy parameter derived from the original speech signal and a corresponding energy parameter associated with the further signal."

(Ex. 1300 at p. 8, 8:22–34.)

117.   These key claim limitations correspond to the following key feature in the standard as mapped by Ericsson:  using first and second differences to adapt the fixed codebook gain, where the first difference is based on waveform matching and the second difference is based on energy matching.  The key feature corresponds to the portion of the standard shown in **FIGURE 7** below.  (Ex. 1312 at pp. 39–40, § 5.8.2.)

## 5      Functional description of the encoder

\* \* \*

## 5.8      Quantization of the adaptive and fixed codebook gains

\* \* \*

## 5.8.2      Quantization of codebook gains

\* \* \*

**7.95 kbit/s mode**

\* \* \*

An adaptor based on the coding gain in the adaptive codebook decides if the coding gain is low. If this is the case, the correction factor codebook is searched once more minimizing a modified criterion in order to find a new quantized fixed codebook gain. The modified criterion is given by:

$$E_{\mathrm{mod}} = (1-\alpha) \cdot \|\mathbf{c}\|^2 \cdot \left(g_c - \hat{\gamma}_{gc} \cdot g_c'\right)^2 + \alpha \cdot \left(\sqrt{E_{res}} - \sqrt{E_{exc}}\right)^2 \tag{60}$$

where $E_{res}$ and $E_{exc}$ are the energy (the squared norm) of the LP residual and the total exictation, respectively.

**FIGURE 7 (PDX 54)**

118.   I have assigned the P10310 patent family an Importance Rank of "3," meaning that the accused technology/key feature has at best marginal technical value or importance to the 2G/3G standard.  The accused technology of an AMR encoder is technically valuable, and is important in providing a more robust speech coding solution than conventional fixed-rate speech coding.  Nevertheless, the key feature—*i.e.*, using waveform matching and energy matching to adapt the fixed codebook gain at the 7.95 kbit/sec rate —is at best marginally important to the 2G/3G standard.

119.   Of the eight bit rates in the standard, the key feature is used *only* in the 7.95 kbit/sec bit rate.  (*See, e.g.*, Ex. 1312 at p. 40, § 5.8.2.)  The 7.95 kbit/sec bit rate is neither the highest nor the lowest bit rate mode.  The EP '414 Patent teaches that "when lowering the bit rate [below 8 kb/s], the ability to do waveform matching"—which is part of the key feature—"suffers".  (Ex. 1300 at p. 2, ¶ 6.) Below the 7.95 kbit/sec bit rate, "the *poor waveform matching* ability for noise-like signals leads to a coded signal with an often too low level and an annoying varying character (known as swirling)." (*Id.* (emphasis added).)  It is thus not surprising that the standard does not use waveform matching per the key feature below the 7.95 kbit/sec bit rate mode.  Indeed, the key feature is missing from the 5.95 kbit/sec, 5.6 kbit/sec, and 4.75 kbit/sec bit rates, as well as from bit rates higher than 7.95 kbit/sec.  (Ex. 1312 at pp. 39–40, § 5.8.2.)

120.   Moreover, in allowing the related U.S. Patent No. 6,192,335 ("the US '335 Patent) in the P10310 Family, the Patent Office noted that Ericsson admitted the use of energy matching to adapt the fixed codebook gain was known in the prior art.  (Ex. 1305 at p. 101 ("Applicant's admitted prior art teaches taking a difference between an original speech signal and a representation of the original signal (Equation 1) . . . .").)

121.   The EP '414 Patent also teaches in the "Background of the Invention" that both energy and waveform matching were well known in the art.  "[I]t [wa]s well known in the art that it is better to match the spectral character of the signal and have good signal level (gain) matching." (Ex. 1300 at p. 2, ¶ 7; *see also id. at* 3 (Eq. 2).)  The "*conventional* encoding procedure . . . referred to as linear prediction analysis-by-synthesis (LPAS) . . . employ[ed] waveform matching . . . ." (*Id.* at 2, ¶¶ 4–5 (emphasis added); *see also id.* (Eq. 1).)

122.   Relative to the admitted prior art of using energy matching or waveform matching, the performance improvement due to the empirical procedure of combining energy and waveform matching at only the 7.95 kbit/sec bit rate is

1    marginal.  Accordingly, the importance or technical value of the accused

2    technology/key feature is marginal at best, and the Importance Rank for P10310 is

3    "3."  The same reasoning applies to the other charted patents in the P10310 Family.

4              *b.    Ericsson's P10991 patent family is at best marginally*

5                    *important to the standard.*

6         123.   Ericsson's P10991 patent family relates to an adaptive multi-rate

7    speech decoder (which is the accused technology for this family), and more

8    specifically to a particular technique for generating comfort noise.  The charted

9    claims for this family include claims 11 and 17 of U.S. Patent No. 7,124,079 ("the

10   US '079 Patent").  The US '079 Patent is entitled "Speech Coding with Comfort

11   Noise Variability Feature for Increased Fidelity," was filed September 8, 1999,

12   claims priority to November 23, 1998, and granted October 17, 2006.  (Ex. 1302.)

13        124.   For speech codecs using "conventional Discontinuous Transmission

14   (DTX) schemes, the transmitter stops sending coded speech frames when the

15   speaker is inactive.  At regular or irregular intervals . . . , the transmitter sends

16   speech parameters suitable for generation of comfort noise in the decoder.  These

17   parameters for comfort noise generation (CNG) are conventionally coded into what

18   is sometimes called Silence Descriptor (SID) frames.  At the receiver, the decoder

19   uses the comfort noise parameters received in the SID frames to synthesize artificial

20   noise by means of a conventional comfort noise injection (CNI) algorithm."  (Ex.

21   1302 at p. 8, 1:63–2:7.)

22        125.   "When comfort noise is generated in the decoder in a conventional

23   DTX system, the noise is often perceived as being very static and much different

24   from the background noise generated in active (non-DTX) mode.  The reason for

25   this perception is that DTX SID frames are not sent to the receiver as often as

26   normal speech frames."  (Ex. 1302 at p. 8, 2:8–14.)  "Because the decoder does not

27   receive new comfort noise parameters as often as it normally receives speech

28   parameters, the comfort noise parameters which are received in the SID frames are

typically interpolated . . . to provide a smooth evolution of the parameters in the comfort noise synthesis." (*Id.* at 8, 2:32–37.)  "As a result, the generated comfort noise $s_c(n)$, will be perceived as highly stationary ('static'), regardless of whether the background noise $s(n)$ at the encoder end (see FIG. 1) is changing in character." (*Id.* at 8, 2:41–45.)  According to the US '079 Patent, "[i]t is therefore desirable to avoid the aforementioned disadvantages associated with conventional comfort noise generation." (*Id.* at 8, 2:58–60.)

126.   "According to the invention, conventionally generated comfort noise parameters are modified based on properties of actual background noise experienced at the encoder.  Comfort noise generated from the modified parameters is perceived as less static than conventionally generated comfort noise, and more similar to the actual background noise experienced at the encoder." (Ex. 1302 at p. 8, 2:61–67.)

127.   **FIGURE 3 of the '079 Patent** (shown below on the following page) "illustrates a comfort noise parameter modifier 30 for modifying comfort noise parameters according to the invention.  In the example of FIG. 3, the modifier 30 receives at an input 33 the conventional interpolated comfort noise parameters[.] . . ." (Ex. 1302 at p. 9, 3:29–33; *see also id.* at 3.)



**FIGURE 3 of the US '079 Patent**

128.   "The modifier 30 also receives at input 31 spectrum and energy
parameters associated with background noise experienced at the encoder.  The
modifier 30 modifies the received comfort noise parameters based on the
background noise parameters received at 31 to produce modified comfort noise
parameters at 35.  The modified comfort noise parameters can then be provided, for
example, to the comfort noise synthesis section 25 of FIG. 2 for use in conventional
comfort noise synthesis operations.  The modified comfort noise parameters
provided at 35 permit the synthesis section 25 to generate comfort noise that
reproduces more faithfully the actual background noise presented to the speech
encoder."  (Ex. 1302 at p. 9, 3:37–46; *see also id.* at 3.)



**FIGURE 4 of the US '079 Patent**

129.  **FIGURE 4 of the US '079 Patent** above "illustrates an exemplary embodiment of the comfort noise parameter modifier 30 of FIG. 3.  The modifier 30 includes a variability estimator 41 coupled to input 31 in order to receive the spectrum and energy parameters of the background noise.  The variability estimator 41 estimates variability characteristics of the background noise parameters, and outputs at 43 information indicative of the variability of the background noise parameters.  The variability information can characterize the variability of the parameter about the mean value thereof, for example the variance of the parameter, or the maximum deviation of the parameter from the mean value thereof."  (Ex. 1302 at p. 9, 3:47–58.)  "The information output at 43 from the estimator 41 is input to a combiner 45 which combines the output information at 43 with the interpolated comfort noise parameters received at 33 in order to produce the modified comfort noise parameters at 35."  (*Id.* at 9, 4:6–11; *see also id.* at 3.)

"The combiner of FIG. 4 operates to combine the scaled output xp(k) with the conventional comfort noise parameters."  (Ex. 1302 at p. 10, 5:35–37.)

"The scaled output xp(k) . . . can thus be considered to be a perturbing signal which is used by the combiner 45 to perturb the conventional comfort noise parameters received at 33 in order to produce the modified (or perturbed) comfort noise parameters to be input to the comfort noise synthesis section 25 (see FIGS. 2–4)." (*Id.* at 10, 5:41–46.)  "The conventional comfort noise synthesis section 25 can use the perturbed comfort noise parameters in conventional fashion." (*Id.* at 10, 5:47–49; *see also id.* at 3.)

130.   According to the US '079 Patent, "FIG. 7 [shown below on the following page] illustrates the above-described . . . operations which can be performed by the modifier embodiments of FIGS. 3–5.  It is first determined at 71 whether the available spectrum and energy parameters (*e.g.*, in buffer 37 of FIG. 3) are associated with speech or background noise.  If the available parameters are associated with background noise, then properties of the background noise, such as mean variability and time variability are estimated at 73.  Thereafter at 75, the interpolated comfort noise parameters are perturbed according to the estimated properties of the background noise.  The perturbing process at 75 is continued as long as background noise is detected at 77.  If speech activity is detected at 77, then availability of further background noise parameters is awaited at 71."  (Ex. 1302 at p. 10, 6:51–64; *see also id.* at 5.)



**FIGURE 7 of the US '079 Patent**

131.   Ericsson alleges the P10991 patent family to be essential to 2G and 3G. In its claim charts, Ericsson attempts to map the limitations of the US '079 Patent to 3GPP TS 26.092 v.6.0.0 §§ 1, 5, 6.1, and 3GPP TS 26.073 v.6.0.0.  (*See, e.g.*, Ex. 1308.)

132.   Based on the patent specifications and the file history I reviewed for the patents in the P10991 Family, the key claim limitations are:

- "calculating, at the speech decoder, variability information indicative of how the background noise parameter values vary relative to the calculated mean value of the background noise parameter values;

- in response to the variability information, perturbing the interpolated comfort noise parameter values by the speech decoder to produce comfort noise parameter values."

(Ex. 1302 at pp. 11–12, 8:45–9:3)

133.   These key claim limitations correspond to the following key feature in the standard:  perturbing comfort noise based on background noise variations using parameters computed at the decoder.  The key feature corresponds to the portion of the standard shown in **FIGURE 8** below.  (Ex. 1317 at pp. 9–10, § 6.1.)

---

6.1    Averaging and decoding of the LP and energy parameters

* * *

In order to achieve a comfort noise that is less static in appearance the LSF vector is slightly perturbed for each frame by adding a small component based on parameters variations computed in the hangover period. The computation of the perturbation is made by computing the mean LSF vector from the matrix $\vec{F}$, this mean vector is then subtracted from each of the elements of $\vec{F}$ forming a new matrix $f$. For every frame a mean removed LSF vector is randomly choosen from $f$ and added to the interpolated LSF vector.

---

**FIGURE 8 (PDX 55)**

134.   I have assigned the P10991 patent family an Importance Rank of "3," meaning that the accused technology/key feature has at best marginal technical value or importance to the 2G/3G standard.  The accused technology of an AMR decoder is technically valuable, and is important in providing a more robust speech coding solution than conventional fixed-rate speech coding.  Nevertheless, the key feature—*i.e.*, perturbing comfort noise based on background noise variations using parameters computed at the decoder—is at best marginally important to the 2G/3G standard.

135.   Although the prior ITU standard G.729 did not explicitly include the notion of "perturbation," it did include comfort noise generation.  In particular, G.729 describes that "[a]n adaptive DTX algorithm enables further bit rate reduction

for the case of stationary background noise while maintaining an adequate amount of information about the noise." (*See, e.g.*, Ex. 1303 at p. 9 (hereinafter "Benyassine").) The specific adaptation of the key feature—the so-called "perturbation" aspect—is empirical, and its subjective value does not appear to be well-calibrated (*e.g.*, using subjective quality scores), particularly relative to existing comfort noise generation techniques.

136. According to the G.729 standard, when there is no speech being transmitted/received, the otherwise inactive decoder generates an output signal that, ideally, is perceptually equivalent to the background noise at the encoder. (*See, e.g.*, Ex. 1303 at p. 4.) This is commonly referred to as "comfort noise." (*Id.*) During a silence insertion description (SID), some information is injected, but not too frequently (for resource reasons)—thus, the receiver takes cues from the transmitter but does the heavy lifting in terms of processing in order to decrease the number of bits that must be sent across the channel. (*Id.*)

137. The purpose of the decoder adapting the comfort noise as represented by the encoder is to fill in missing portions or nuances of the comfort noise that were compressed out by or not transmitted from the encoder. (*See, e.g.*, Ex. 1303 at p. 4.) Performing this perturbation in response to variability information in the background noise characteristics seeks to better mimic the background noise at the encoder, and thus avoid the perceptually unpleasant effect of the signal energy level suddenly dropping off. (*Id.*)

138. Both AMR and G.729 use some part of the intelligence at the decoder—*i.e.*, G.729 did adaptive averaging at the decoder based on a stationarity measuring, and also compared averages at the decoder. For example, Benyassine explains that for comfort noise generation, "[t]he excitation signals from the G.729(A) excitation sources are a random adaptive excitation and a random ACELP excitation." (Ex. 1303 at p. 6.) As described above and in Benyassine, G.729 included effective comfort noise generation. In fact, the comparison of six-frame

and two-frame averages in G.729 directly addresses the extent to which the background noise is stationary or nonstationary, and accounts for it. (*Id.* at 5.)  This is the very problem mentioned in the US '079 Patent and allegedly solved by the perturbation feature.  The excitation adaptation in G.729 additionally tunes the adjustment of comfort noise (*id.* at 6), a property already obtained by the spectral adaptation process G.729 describes (*id.* at 5).  The technique of the key feature, at best, represents a resource tradeoff in terms of assigning a greater calculation and selection responsibility to the decoder.

139.   With respect to claim 17, the above applies with equal force to calculating differences between the mean value and at least some of the background noise parameter values to produce mean-removed values of the background noise parameter.  Again, the stationarity-tracking procedure of G.729 based on 2-frame and 6-frame averages solves this very problem.  (Ex. 1303 at p. 5.)

140.   Accordingly, the Importance or technical value of the accused technology/key feature of the P10991 Family is marginal at best, and the Importance Rank is "3."  The same reasoning applies to the other charted patents in the P10991 Family.

### 3.   Contribution Analysis of Ericsson's Alleged SEPs

141.   For the 10 speech coding families I analyzed for Contribution, I found one to have a Contribution Rank of "1," four to have a Contribution Rank of "3," and five to have a Contribution Rank of "4."  Here I provide, by way of example, my analysis for Ericsson's P09085 and P10310 patent families.  The analysis for the remaining eight families is contained in my Appendices.  (Ex. 1638.)

### a.   *Ericsson's P09085 patent family provides no improvement to the standard relative to available alternatives.*

142.   Ericsson's P09085 patent family relates to an adaptive multi-rate speech decoder (which is the accused technology for this family), and more specifically to producing a decoded speech signal from a coded representation of an

original speech signal using soft adaptability based on previous information from the coding.  The charted claims for this family include claims 28 and 40 of U.S. Patent No. 6,058,359 ("the US '359 Patent").  The US '359 Patent is entitled "Speech Coding Including Soft Adaptability Feature," was filed March 4, 1998, and granted May 2, 2000.  (Ex. 1297.)

143.   According to the Background of the Invention of the US '359 Patent, "[m]ost conventional speech coders apply the same coding method regardless of the local character of the speech segment to be encoded."  (Ex. 1297 at p. 10, 1:10–12.) "It is, however, recognized that enhanced quality can be achieved if the coding method is changed, or adapted, according to the local character of the speech."  (*Id.* at 10, 1:12–15.)

144.   "According to the present invention, a speech coding (encoding or decoding) procedure can be adapted without rigid classifications and the attendant risk of severe degradation of the coded speech signal, and without requiring transmission of overhead bits to describe the selected adaptation.  The adaptation is based on parameters already existing in the coder (encoder or decoder) and therefore no extra information has to be transmitted to describe the adaptation.  This makes possible a completely soft adaptation scheme where an infinite number of modifications of the coding (encoding or decoding) method is possible. Furthermore, the adaptation is based on the coder's characterization of the signal and the adaptation is made according to how well the basic coding approach works for a certain speech segment."  (Ex. 1297 at p. 10, 1:49–62.)

145.   **FIGURE 2 of the US '359 Patent** (shown below on the following page) includes softly adaptive control 19 that "select[s] a desired level of modification of the coded signal estimate . . . ."  (Ex. 1297 at p. 11, 3:51–55; *see also id.* at 2.)

**FIGURE 2 of the US '359 Patent**

146.   Ericsson alleges the P09085 patent family to be essential to 2G and 3G. In its claim charts, Ericsson attempts to map the limitations of the US '359 Patent to 3GPP TS 26.090 v.6.0.0 §§ 6 and 6.1.  (*See, e.g.*, Ex. 1310.)

147.   Based on the patent specifications and the file histories of the patents in the P09085 Family I analyzed, the key claim limitation of the US '359 Patent is:

- "a decoder coupled between said input and said output for selectively performing on said coded representation either a decoding operation or an adaptation of said decoding operation to produce said speech signal."

(Ex. 1297 at p. 15, 11:18–38.)

148.   This key claim limitation corresponds to the following key feature in the standard:  a speech decoder with soft adaptability (post-processing using different impulse responses for adaptive modification of a fixed codebook vector) based on previous information from the coding (previous values of adaptive and fixed codebook gains).

149.   The key feature corresponds to the portion of the standard shown in **FIGURE 9** below.  (Ex. 1312 at p. 44, § 6.1.)

5) **Anti-sparseness processing (7.95, 6.70, 5.90, 5.15, 4.75 kbit/s modes):** An adaptive anti-sparseness post-processing procedure is applied to the fixed codebook vector $c(n)$ in order to reduce perceptual artifacts arising from the sparseness of the algebraic fixed codebook vectors with only a few non-zero samples per subframe. The anti-sparseness processing consists of circular convolution of the fixed codebook vector with an impulse response. Three pre-stored impulse responses are used and a number $impNr = 0,1,2$ is set to select one of them. A value of 2 corresponds to no modification, a value of 1 corresponds to medium modification, while a value of 0 corresponds to strong modification. The selection of the impulse response is performed adaptively from the adaptive and fixed codebook gains. The following procedure is employed:

if $\hat{g}_p < 0.6$ then
   $impNr = 0;$
else if $\hat{g}_p < 0.9$ then
   $impNr = 1;$
else
   $impNr = 2;$

Detect onset by comparing the fixed codebook gain to the previous fixed codebook gain. If the current value is more than twice the previous value an onset is detected.

If not onset and $impNr = 0$, the median filtered value of the current and the previous 4 adaptive codebook gains are computed. If this value is less than 0.6, $impNr = 0$.

If not onset, the $impNr$-value is restricted to increase by one step from the previous subframe.

If an onset is declared, the $impNr$-value is increased by one if it is less than 2.

**FIGURE 9**

I have assigned the P09085 patent family a Contribution Rank of "4," meaning that the key feature provides no improvement to the 2G/3G standard relative to available alternatives.

150.   A first alternative is described in EP Publication No. 0,654,909 to Hosoda et al. ("Hosoda").  (Ex. 1298.)  Hosoda was filed June 10, 1993, and published December 22, 1994.  (*Id.*)

151.   Hosoda teaches a CELP encoder/decoder system that uses a code vector conversion circuit to filter the output of a pulse-like (sparse) codebook consisting of isolated impulses, in order to synthesize high-quality reproduced voice

1   at low encoding speeds.  **FIGURE 3 of Hosoda** below shows the code vector

2   conversion filter (328).  (Ex. 1298 at p. 15.)

3



**FIGURE 3 of Hosoda**

17       152.   The codebook gains used in the US '359 Patent for soft-adaptability

18   were routinely available in CELP coders, so that a person of ordinary skill in the art

19   could have easily used them in the AMR standard for soft-adaptation purposes

20   without an undue leap.

21       153.   Unlike the key feature that adapts based on previous values of adaptive

22   and fixed codebook gains, Hosoda's code vector conversion circuit continuously

23   adapts to the speech waveform.  (*See, e.g.*, Ex. 1298 at p. 9 (equation (6)).)

24   Therefore, with respect to the US '359 Patent, Hosoda describes a viable non-

25   infringing alternative for performing soft adaptability.

26       154.   The formant structure of speech changes much more slowly than the

27   excitation structure.  The formant structure typically needs to update every 20 msec,

28   while the excitation is typically updated every 5 msec.  To the extent Hosoda uses

existing formant structure in the decoder (as opposed to previous values), it covers the adaptation of the four subframes of the excitation. Forty samples is 5 msec—so the alleged feature of the US '359 Patent adapts every 5 msec. By contrast, Hosoda's solution adapts every 20 msec. Speech comes in frames—as long as adaptation occurs periodically and frequently enough, there is still much of the advantage relative to performing the adaption more frequently per the key feature. Furthermore, the less frequent adaptations taught in Hosoda would require less computing overhead.

155. Basing the standardized anti-sparseness post-processing procedure on the previous value of the gain (as the key feature does) helps relegate the anti-sparseness processing to speech onset scenarios, such that anti-sparseness processing is not used where it is not particularly needed, namely, for voiced speech. (*See, e.g.*, Ex. 1297 at p. 11, 3:36–41 ("If the adaptive codebook gain AG is high, then the coder is utilizing the adaptive codebook component heavily, so the speech segment is likely a voiced speech segment, which is typically processed acceptably by the CELP coder with little or no adaptation of the coding process.").)

156. It is beneficial to avoid overreacting to speech onset by applying too much anti-sparseness processing to voiced speech. Speech onsets can indicate onset of voiced or unvoiced speech. Tying to the previous values helps the coder determine whether onset is leading to unvoiced speech rather than voiced speech, or vice versa. The benefit of using previous values, per the key feature, is that the coder can better avoid falsely detecting the onset of voiced speech and then apply anti-sparseness processing, which would not be beneficial. The key feature therefore applies a somewhat finer microscope than Hosoda's system—*i.e.*, by adapting every 5 msec—but this approach provides no net advantage relative to adapting every 20 msec as is taught with respect to Hosoda's system.

157. Responding to speech characteristics at the 20 msec rather than the 5 msec level is a more conventional approach for LPC-based adaptation, as taught in

Hosoda, and was well understood.  Further, adapting at the 20 msec level may provide a more stable environment, because transients present at the 5 msec level would be ignored in this case.

158.   Advantages of using a speech coder like the one Hosoda describes include that a 20 msec segment can be categorized as locally stationary and therefore robust, and previously tested speech processing algorithms can be confidently applied.  By contrast, in the standardized 5 msec adaptation, such algorithms were not available, and the standard does not have the ability to optimize for the 20 msec scenario—rather, it is limited to adapting at the 5 msec level.  (*See, e.g.*, Ex. 1312 at p. 16, § 4.4 ("Then, at each 40-sample subframe: - the excitation is constructed by adding the adaptive and innovative codevectors scaled by their respective gains; - the speech is reconstructed by filtering the excitation through the LP synthesis filter.").)

159.   Given Hosoda's teachings, yet another non-infringing alternative to the US '359 Patent would be to adapt at the 5 msec level but using information updated at the 20 msec level, thus presenting a compromise between the key feature of the P09085 Family and the system of Hosoda.

160.   Accordingly, the key feature provides no net improvement over the available non-infringing alternative presented in Hosoda, and the Rank is "4."

161.   Another alternative is described in U.S. Patent No. 5,664,055 to Kroon ("Kroon").  Kroon was filed June 7, 1995, and granted September 2, 1997.  (Ex. 1299.)

162.   Kroon teaches "[a] speech coding system employing an adaptive codebook model of periodicity [that] is augmented with a pitch-predictive filter (PPF)."  (Ex. 1299 at p. 1, Abstract.)  Kroon's "PPF has a delay equal to the integer component of the pitch-period and a gain which is adaptive based on a measure of periodicity of the speech signal."  (*Id.*; *see also id.* at 8, 3:20–22.)  Kroon's "adaptive PPF gain enhances PPF performance in that the gain is small when the

speech signal is not very periodic and large with the speech signal is highly periodic. This adaptability avoids the 'buzzyness' problem." (*Id.* at 8, 3:22–56, 9, 5:24–28.) Generally speaking, when pitch period is very small, higher granularity processing is beneficial.  When there is frame erasure, lower granularity is sufficient.

163.   Just like the key feature, Kroon discloses that its PPF uses a previous value of adaptive codebook gain to perform an adaptation of fixed codebook output, as shown in **FIGURE 10** below.  (Ex. 1299 at p. 17, 21:33–64.)

components to improve the synthesized speech quality. **Here the filter**

$$P(z)=1/(1-\beta z^{-T}) \qquad (46)$$

**TABLE 7**

Structure of fixed codebook C.

| Pulse | Sign | Positions |
|-------|------|-----------|
| i0 | s0 | 0, 5, 10, 15, 20, 25, 30, 35 |
| i1 | s1 | 1, 6, 11, 16, 21, 26, 31, 36 |
| i2 | s2 | 2, 7, 12, 17, 22, 27, 32, 37 |
| i3 | s3 | 3, 8, 13, 18, 23, 28, 33, 38 |
|  |  | 4, 9, 14, 19, 24, 29, 34, 39 |

is used, where T is the integer component of the pitch delay of the current subframe, and $\beta$ is a pitch gain. The value of $\beta$ is made adaptive by using the quantized adaptive code-book gain from the previous subframe bounded by 0.2 and 0.8.

$$\beta=\hat{g}_p^{(m-1)}, \ 0.2\leqq\beta\leqq0.8. \qquad (47)$$

This filter enhances the harmonic structure for delays less than the subframe size of 40. This modification is incorporated in the fixed codebook search by modifying the impulse response h(n), according to

$$h(n)=h(n)+\beta h(n-i), \ n=T, \ . \ . \ , \ 39. \qquad (48)$$

**FIGURE 10 (PDX 56)**

164.   At the time the key feature was adopted, Kroon's PPF was already part

of the ITU G.729 standard.  (Ex. 1299 at pp. 10–23, 7:20–34:66; *see also* Ex. 1304.)  Also before the adoption of the key feature, another speech coding standard, ETSI 06.20 v.4.0.0, § 4.2, utilized an adaptive PPF.  (*See, e.g.*, Ex. 1289 at pp. 36–42.)

165.   Accordingly, the key feature provides no net improvement over the available alternative disclosed in Kroon, and the Contribution Rank is "4."

166.   The above reasoning applies to the other charted claims in the P09085 Family.

<blockquote>

b.   *Ericsson's P10310 patent family provides a marginal improvement to the standard relative to available alternatives.*

</blockquote>

167.   As described above in connection with my Importance Analysis Example 1, Ericsson's P10310 patent family relates to an adaptive multi-rate speech encoder.  A more detailed introduction to P10310 is provided above.  (Section IV.B.3.a, *supra*.)

168.   As mentioned previously, the key claim limitations of the EP '414 Patent in the P10310 patent family are:

- "said controller further for determining at least one of said parameters (DWE) based on first and second differences between the original speech signal and the further signal,

- wherein said first difference (DW) is a difference between a waveform associated with the original speech signal and a waveform associated with the further signal, and

- wherein the second difference (DE) is a difference between an energy parameter derived from the original speech signal and a corresponding energy parameter associated with the further signal."

(Ex. 1300 at p. 8, 8:22–34.)

169.   These key claim limitations correspond to the following key feature in the standard:  using first and second differences to adapt the fixed codebook gain,

where the first difference is based on waveform matching and the second difference is based on energy matching.  The key feature corresponds to the portion of the standard shown in **FIGURE 11** below.  (Ex. 1312 at p. 40, § 5.8.2.)

## 5      Functional description of the encoder

\* \* \*

## 5.8      Quantization of the adaptive and fixed codebook gains

\* \* \*

## 5.8.2      Quantization of codebook gains

\* \* \*

**7.95 kbit/s mode**

\* \* \*

An adaptor based on the coding gain in the adaptive codebook decides if the coding gain is low. If this is the case, the correction factor codebook is searched once more minimizing a modified criterion in order to find a new quantized fixed codebook gain. The modified criterion is given by:

$$E_{\text{mod}} = (1 - \alpha) \cdot \|\mathbf{c}\|^2 \cdot \underbrace{\left(g_c - \gamma_{gc} \cdot g_c'\right)^2}_{1^{\text{st}} \text{ difference}} + \alpha \cdot \underbrace{\left(\sqrt{E_{res}} - \sqrt{E_{exc}}\right)^2}_{2^{\text{nd}} \text{ difference}} \quad (60)$$

where $E_{res}$ and $E_{exc}$ are the energy (the squared norm) of the LP residual and the total excitation, respectively.

**FIGURE 11 (PDX 57)**

170.   I have assigned the P10310 patent family a Contribution Rank of "3," meaning that the key feature provides a marginal improvement to the standard relative to available non-infringing alternatives.  One such alternative was described in a June 1992 IEEE article, "Techniques for Improving the Performance of CELP-Type Speech Coders," by Gerson et al.  (Ex. 1301 (*hereinafter* "Gerson").)

171.   Gerson teaches techniques for improving the performance of CELP-type speech coders while maintaining a reasonable computational complexity.  (Ex. 1301 at p. 1, Abstract.)  Gerson addresses the overall issue of gain-shaped vector quantization (GSVQ), whereas the Ericsson's P10310 is directed to noise-like signals.  (*Id*.)  The key feature takes a piecemeal approach to handling noise-like signals in speech communication.  By contrast, Gerson teaches a more unified

approach following well-known principles in GSVQ.  In particular, Gerson addresses the codebook gain problem by "providing different quantization codebooks for each [voicing] mode, as shown in **FIGURE 12** below.  (Ex. 1301 at p. 6.)

Each voicing mode has a corresponding gain quantizer. This allows the gain quantizer to be optimized for each voicing mode (see Section VI). Providing different quantization codebooks for each mode results in an improvement in the performance of the gain quantizer for a fixed-size gain codebook.

**FIGURE 12**

172.   As part of the above unified GSVQ approach, Gerson naturally addresses the needs of the noise-like signals in speech, whether in the voiced or unvoiced categories.  For example, Gerson teaches that "[t]he high degree of subframe-to-subframe correlation among the lags, . . . is evidence for voiced speech frames and is efficiently exploited by the delta coding scheme described . . . .  To improve the coder's performance for unvoiced speech, the long-term predictor may be deactivated, and the LTP bits reallocated to an additional codebook excitation." (*See, e.g.*, Ex. 1301 at p. 5.)  Gerson's approach does not use the claimed first and second differences, but rather uses different codebooks for each voicing mode.

173.   Indeed, the key feature is reminiscent of the older concept of GSVQ. (*See, e.g.*, Ex. 1313 at pp. 10–11.)  In GSVQ, the codevector selected out of a codebook (dictionary) is one that matches the input both in shape (waveform) and in gain (energy). (Ex. 1291 at p. 4 ("Better results can be obtained if each code book vector x$i$ is adjusted to each respective input vector x with an individually optimized *gain factor gi* derived from x and x$i$.  This method is termed *gain–shape* vector

quantization.").)  That selection would therefore achieve the results of the algorithm described in the patent, but using a different approach.  The exact flowchart for the GSVQ search, and/or the explicit or implied value of the patent parameter α, would have been design choices for a person having ordinary skill of the art (who would have had knowledge of GSVQ).  Furthermore, GSVQ could have addressed the multimode coding issue described the EP '414 Patent.  The general and elastic capabilities of GSVQ were also described by Gersho, Wang, and Zeger.  (Ex. 1313 at pp. 10–11.)

174.   Thus, Gerson presented a viable non-infringing alternative.  At best, the key feature may provide a marginal net improvement relative to Gerson's technique by being more easily implemented, due to its dealing with more simply calculated differences.  On the other hand, the effect of such simplification on reproduced quality of an input signal (whether it be speech or noise) can be significant and detrimental to the very task at hand.

175.   Accordingly, the key feature provides a marginal net improvement over the available non-infringing alternative disclosed in Gerson, and the Contribution Rank for P10310 is "3."  The same reasoning applies to the other charted claims in the P10310 Family.

### 4.      Results for Essentiality, Importance, and Contribution Analysis

176.   The results of my Essentiality, Importance, and Contribution analysis for 12 of Ericsson's speech coding patent families are summarized in **TABLE 3** below.  In short, two of Ericsson's speech coding families are not essential under any reasonable claim construction, and all but one of the essential families provided at best only a marginal improvement to the standard relative to available alternatives.

| Ericsson Family | Standard | Essentiality | Importance | Contribution |
|---|---|---|---|---|
| P04817 | 2G | 1 | 1 | 3 |
| P07288 | 2G | 1 | 1 | 4 |
| P07669 | 3G | 3 | — | — |
| P07782 | 2G | 3 | — | — |
| P09085 | 2G, 3G | 1 | 3 | 4 |
| P09286 | 2G, 3G | 1 | 3 | 4 |
| P10310 | 2G, 3G | 1 | 3 | 3 |
| P10334 | 2G, 3G | 1 | 3 | 4 |
| P10335 | 2G, 3G | 1 | 2 | 3 |
| P10774 | 2G, 3G | 1 | 3 | 4 |
| P10991 | 2G, 3G | 1 | 3 | 3 |
| P10992 | 2G, 3G | 1 | 1 | 1 |

**TABLE 3 (PDX-50)**

177. The information from **TABLE 3** above and the mapping between the Importance and Contribution Ranks for these 10 families are shown below in **FIGURE 13**.  As shown, all but one of these families provided at best only a marginal improvement to the standard relative to alternatives that were available at the time the standards were being adopted.



**FIGURE 13 (PDX 51)**

1  ## V.  DEVELOPMENT OF THE ETSI AMR-NB SPEECH CODEC

2  178.  ETSI standardized the Adaptive Multi-Rate Narrow-Band (AMR-NB)

3  speech codec in or around February of 1999.  (*See, e.g.*, Ex. 1290; Ex. 1315 at p.

4  20.)  Like the GSM-EFR coder, the AMR-NB codec is based on ACELP.  Because

5  Ericsson has cited the standardized AMR-NB codec in relation to a number of its

6  speech coding patent families, including those for which Ericsson has provided

7  claim charts, I will briefly discuss the history of the ETSI AMR standards (later

8  adopted by 3GPP).

9  179.  As mentioned (Section III.D, *supra*), following the standardization of

10  the GSM-EFR coder, the ETSI Speech Expert Group studied additional strategies

11  for improving performance of speech services in GSM networks, ultimately

12  recommending an AMR solution.  (Ex. 1314.)  A target date was set for completion

13  of the AMR codec in time for inclusion in the GSM Release '98 standard.  ETSI

14  deemed this a very aggressive schedule.  (*Id.* at 7.)

15  180.  It was recommended that candidate AMR codecs be tested by a

16  combination of static and dynamic tests spanning a Qualification Phase and

17  Selection Phase.  In the Qualification Phase, the most promising codecs would be

18  qualified to enter the Selection Phase.  Each phase would rely on pre-defined test

19  conditions and comparisons to existing speech codecs.  Ericsson recognized that

20  "[t]here are a number of competing technologies for future systems, as well as for

21  future speech services," and that "[t]he existing GSM-EFR speech coder provides

22  very high quality on the fullrate channel, and represents state of the art technology."

23  (Ex. 1295 at p. 1.)

24  181.  The Qualification Phase involved testing and analysis of 11 codec

25  candidates submitted by Alcatel/BT/Cellnet/Rockwell, Ericsson, Lucent, Mobile

26  VCE, Motorola, NEC, Nokia, Nortel/FT, Philips, Siemens, and Texas Instruments.

27  "[A]nalysis was carried out of the technical descriptions (high level descriptions of

28  codec proposals, compliance to design constraints) and the listening test results

(comparison to performance requirements, comparison against qualification rules). The codec proposals were debated and recommendations were made on the candidates to go forward to the Selection Phase." (Ex. 1292 at p. 1.)  In order to qualify for the Selection Phase, codecs had to comply with previously agreed qualification rules for speech performance. (*Id.* at 2.).

182.   The results of the Qualification Rules were announced in June 1998. (Ex. 1292 at p. 1.)  Altogether, 9 of the 11 codec candidates met the Qualification Rules for speech quality, as shown below in **FIGURE 14**. (*Id.* at 3.)  NEC's codec passed all but two (out of 56) of the individual test requirements.  Overall, the important case of HR (half-rate) channel with background noise was the most challenging condition and resulted in most of the failures.  Ericsson's codec failed five of the individual test requirements under this condition. (*Id.* at 3.)

| *Qualification Tests Summary*<br>Organization | #FR Modes<br>Tested | #HR Modes<br>Tested | FR<br>Failures | HR<br>Failures | Rule 2a | Rule 2b |
|---|---|---|---|---|---|---|
| *Alcatel_BTL_Cellnet_Rockwell* | 3 | 3 | 0 | 6 | Not Eliminated | Not Eliminated |
| *Ericsson* | 3 | 4 | 0 | 5 | Not Eliminated | Not Eliminated |
| *Lucent Technologies* | 2 | 2 | 1 | 9 | Not Eliminated | Not Eliminated |
| *Mobile VCE Ltd./University of Surrey* | 4 | 3 | 3 | 4 | Not Eliminated | Not Eliminated |
| *Motorola, Inc* | 2 | 2 | 2 | 7 | Not Eliminated | Not Eliminated |
| *NEC* | 3 | 3 | 0 | 2 | Not Eliminated | Not Eliminated |
| *Nokia AMR* | 3 | 3 | 0 | 7 | Not Eliminated | Not Eliminated |
| *Nortel/FT* | 4 | 4 | 2 | 8 | Eliminated | Not Eliminated |
| *Philips AMR Fixed Point* | 4 | 4 | 6 | 13 | Eliminated | Eliminated |
| *Siemens* | 4 | 2 | 1 | 7 | Not Eliminated | Not Eliminated |
| *Texas Instruments* | 2 | 2 | 2 | 11 | Not Eliminated | Not Eliminated |

**FIGURE 14**

183.   SMG11 recommended five codec candidates for the Selection Phase: (1) Alcatel/BT/Cellnet/Rockwell, (2) Ericsson, (3) Lucent, (4) NEC, and (5) Nokia.

184.   In the Selection Phase, the codec proponents were:  (1) ABCFNR (Alcatel/BT/Cellnet/France-Telecom/Nortel/Rockwell), (2) ENS1 (Ericsson/Nokia/Siemens 1), (3) ENS2 (Ericsson/Nokia/Siemens 2), (4) Lucent, and

(5) NEC.  (Ex. 378 at p. 1.)  The results of the Selection Phase were provided in October 1998.  (Ex. 378 at p. 1.)  Selection was based on meeting design constraints, speech quality performance criteria, and Figures of Merit for speech quality performance used to differentiate between the candidates.

185.   As in the Qualification Phase, the codec candidates in the Selection Phase failed to a greater or lesser extent in HR mode under background noise and at low channel-to-interference (C/I).  These conditions account for the majority of the failures.  (Ex. 378 at p. 4.)  Rockwell expressed concern about the half-rate performance, arguing that the existing GSM-HR codec was already better than the leading AMR candidates.  (Ex. 1293 at p. 3.)  The Rockwell analysis relied on previously published interoperability test results for the GSM-HR codec, and concluded that "there is no indication that [Ericsson, Nokia, and Siemens's] ENS1 candidate . . . will deliver a performance better than that of the current GSM HR under background noise conditions.  It is even possible that the performance is worse than that of the GSM HR."  (*Id.*)

186.   According to the Selection Phase results, "[b]ased on the analysis of the speech quality results alone, there was consensus in SMG11 that [Ericsson, Nokia, and Siemens's] codec C (ENS1) provided the best overall results, showing consistently better performance in a number of areas.  Codec C was followed by [the ABCFNR consortium's] codec E.  Codec E was better than or equal to codec C in some specific regions notably the conditions of combined background noise and C/I from 10dB to 4dB."  (Ex. 378 at p. 4.)  "SMG11 agreed to recommend the ENS1 codec proposed by Ericsson, Nokia and Siemens."  (*Id.* at 4.)  Ericsson characterized the ENS1 codec as "based on proven technology used in the GSM EFR codec as well as in the IS-136 EFR codec (IS-641) . . . ."  (Ex. 1294 at p. 1.)

187.   "The second most preferred candidate was that from the ABCFNR consortium.  The overall quality of this codec was less good than that of the ENS1 codec.  However, in the event that major problems are encountered in meeting the

conditions outline above for ENS1, the ABCFNR codec can be considered as a *viable secondary option*." (Ex. 378 at p. 5 (emphasis added).)

188.  In early 1999, the ENS1 codec was formally standardized in the ETSI GSM Standard.  Largely unchanged from this time period, the AMR-NB continues to be part of the 3GPP standards today.

189.  Having put the choice of including Ericsson, Nokia, and Siemens's codec submission to the AMR standard into context, some additional observations regarding the results of the AMR codec Selection Phase are appropriate.  First, as expected in connection with the subjective test results, for mobile telephony, "the HR channel with background noise was the most challenging condition especially under low C/I (high error) conditions." (Ex. 378 at p. 3.)  Under such conditions, as shown in **FIGURE 15** below, the ENS1 codec performed worse than the ABCFNR codec.  (Ex. 378 at pp. 9, 13.)



**FIGURE 15**

190.   In addition, at a higher level, comparisons based on mean quality numbers should be supplemented by reports on standard deviation.  A codec with a slightly lower mean score can in fact be *better*, in the sense of being more robust, if it displays a smaller standard deviation across several test conditions (speakers, listeners, and test conditions), or if it performs better than in worst case scenarios such as those for bit rate and background music.  This illustrates that even where several viable options exist, standards ultimately select a "winner" based on a number of factors, including in the example of AMR, timeliness as well as mean-value or majority-of-conditions criteria.  This was indeed the case with the AMR standardization process.

191.   A second observation worth noting here is the distinction between speech intelligibility and speech quality.  Unlike synthesis vocoders, the next generation of speech coders (including the AMR candidates described above, and typically those based on analysis-by-synthesis) exhibit very high values of speech intelligibility.  In terms of speech quality, such coders exhibit significant degrees of context-dependency, and it is not easy to characterize whether or not quality rankings and differences (*e.g.*, as shown in **FIGURE 16** below on the following page) are statistically significant, even if the testing methodology is well-designed.  (*See* Ex. 378 at p. 9.)

**FIGURE 16**

192.   Having performed a detailed analysis of the 12 Ericsson speech coding patent families described above, most of which Ericsson asserts are Essential to the AMR-NB standard, my opinion is that none of these patent families cover the foundational speech coding technologies discussed above in Section III.A–C (*e.g.*, analysis-by-synthesis, CELP, the algebraic codebook).

193.   Rather, in the context of my Essentiality, Importance, and Contribution analysis of Ericsson's speech coding patents, it is important to realize that Ericsson's overall contribution to AMR-NB is a result of collecting a number of tricks-of-the-trade into a single, specific implementation, what I refer to here as a "black box."  As described above with respect to the AMR codec competition, in addition to Ericsson, others submitted their own specifically implemented codecs, or "black boxes."  Though Ericsson's AMR-NB codec was ultimately selected for

1  inclusion in the standard, ETSI considered another codec (*i.e.*, the ABCFNR

2  consortium's codec) to be a viable secondary option.

3  **VI.   ERICSSON HAS NOT SHOWN ITS SEPS COVER AMR-WB**

4       194.   In my opinion, Ericsson has not shown its alleged speech coding SEPs

5  cover any standards governing AMR-WB (wideband AMR).  Ericsson's claim

6  charts for the 12 patent families discussed above are limited to the standards

7  governing GSM EFR and AMR-NB (narrowband AMR).  Below, I discuss

8  examples of important differences between narrowband and wideband speech.

9  Based on at least these differences, it is my opinion that Ericsson's AMR-NB claim

10  charts do not prove that its patent families cover any AMR-WB standards.  This

11  should be considered when determining the technical value of Ericsson's SEP

12  portfolio at issue in this case.

13       195.   The technology for compressing music (*e.g.*, as reflected in ISO-MPEG

14  standards) has evolved independently from the technology for compressing speech

15  (as reflected, *e.g.*, in ITU and 3GPP standards).  While speech compression has

16  leveraged LPC technology and the analysis-by-synthesis version of it, music coding

17  (in the absence of a universal signal production model as in speech) has relied more

18  on the perceptual liberties afforded in human hearing and the actionable part of it

19  called masking.

20       196.   Telephone speech has been based for many years on an input

21  bandwidth slightly below 4 kHz, which in turn permits a sampling rate of 8 kHz.  By

22  contrast, high-quality music generally requires a signal bandwidth of 20 kHz and a

23  sampling rate exceeding 40 kHz (44.1 kHz on a CD, 48 kHz in a DAT).  Lower

24  bandwidths have been used in FM and AM radio.  In standards for digital audio

25  coding, there has been an attempt to capture music in its AM-radio kind of fidelity

26  using sampling rates of 16 or 12.8 kHz, instead of the 8 kHz in telephone speech,

27  and an input bandwidth of 8 kHz or lower.  Such bandwidth for input audio can be

28  useful for appreciating a low-pass-filtered version of music.  In the case of speech,

1   the benefit from going from under 4 kHz to a wideband signal bandwidth of, for

2   example, 7 kHz, is significant.

3       197.   The first attempt to compress 8 kHz audio (in a universal form where

4   the input can be either speech or music) was in the ITU G.722 standard and used

5   sub-band ADPCM technology.  (*See, e.g.*, Ex. 1315 at pp. 13–14.)  Following the

6   successes of CELP coding in narrow-band speech coding, the CELP architecture has

7   been extended to include wideband-speech coding.  In this regard, respective multi-

8   rate coders are known by the names AMR-NB and AMR-WB.  (*See, e.g.*, Ex. 1315

9   at pp. 20–27.)

10      198.   Although CELP is a common aspect of AMR-NB and AMR-WB, the

11  extension from NB to WB capability is not straightforward, for many reasons

12  related to speech production as well as speech perception.  One of these reasons is

13  that WB speech not only has a broader input spectrum, but also a larger dynamic

14  range than NB speech.  This has implications in perception as well as in accurate

15  parameter-computing, as in LPC analysis.  Further, as the WB speech includes

16  noise-like, higher-frequency signals, traditional speech processing algorithms for

17  speech-and-background noise discrimination are also not likely to apply in a

18  straightforward fashion.  The issue of perceptual noise weighting in the closed-loop

19  architecture of CELP is another area where traditional speech processing algorithms

20  are also not likely to apply in a straightforward fashion.

21      199.   As in ITU G.722, the fundamental concern in AMR-WB is the

22  provision of higher-quality speech.  Attempts to compress music are substantially

23  similar.  The concern of not ignoring background music present during speech

24  conversations (*e.g.*, as related to Ericsson's P10992 patent family) is a very specific

25  scenario.  Here, the function of the speech coding system has less to do with trying

26  to compress that music in an appropriate way, but more to do with avoiding

27  mistaking the low-level music for background noise (and thus ignoring it).  In this

28  sense, the perceptual information related to the background music becomes more of

1  a concern for optimizing VAD.

2          200.   In summary, given these important differences between AMR-NB and

3  AMR-WB, it is my opinion that Ericsson has not shown its alleged speech coding

4  SEPs cover any standards governing AMR-WB.

5  **VII.   <u>CONCLUSION</u>**

6          201.   Two of Ericsson's speech coding families are not essential under any

7  reasonable claim construction, and all but one of Ericsson's essential speech coding

8  families provided at best only a marginal improvement to the standard relative to

9  available alternatives.  Additionally, other viable speech codecs were available at

10 the time ETSI standardized the AMR narrowband codec, and some such codecs

11 performed better than Ericsson's under certain important test conditions.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1         I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct, and that I executed this Witness

3 Declaration at    Santa Fe, New Mexico    .

4

5 _____      January 11, 2017 _____

6          Dr. Nikil Jayant           Date Executed

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| Ex. 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| Ex. 303 | Curriculum Vitae of Dr. Nikil Jayant |
| Ex. 378 | "Results of AMR Selection Phase," ETSI/TC/SMG#27, Oct. 12-16, 1993, Tdoc. SMG 562/98 |
| Ex. 386 | 3GPP TS 26.094 v6.0.0 (2004-12) Technical Specification |
| Ex. 387 | Claim chart for claim 1 of U.S. Patent No. 5,737,695 |
| Ex. 388 | U.S. Patent No. 5,737,695 |
| Ex. 389 | Claim chart for claim 1 of U.S. Patent No. 6,163,577 |
| Ex. 390 | File History for U.S. Patent No. 6,163,577 |
| Ex. 1288 | LG negotiation presentation titled "Ericsson WCDMA Patent Analysis," dated 9/22/16 |
| Ex. 1289 | LG negotiation presentation titled "Ericsson GSM & GPRS Patent Analysis," dated 9/22/06 |
| Ex. 1290 | GSM 06.90 V7.0.0 (1999-02) |
| Ex. 1291 | "Digital Speech Transmission," by P. Vary, 2006 (pp. 236-237) |
| Ex. 1292 | "Results of AMR Qualification Phase," ETSI TC SMG Meeting #26, June 22-26, 1998, Tdoc SMG 368/98 |
| Ex. 1293 | "Performance Comparison Between GSM Half-Rate and AMR Candidates Under Background Noise Conditions," ETSI/TC/SMG#27, Oct. 12-16, 1998, Tdoc SMG 590/98 |
| Ex. 1294 | "Selection of AMR Codec," ETSI/SMG#27, Oct. 12-16, 1998, SMG Tdoc 597/98 |
| Ex. 1295 | "AMR Compatibility and Deliverables," ETSI/SMG#23, Oct. 13-17, 1997, SMG Tdoc 837/97 |
| Ex. 1296 | U.S. Patent No. 6,163,577 |
| Ex. 1297 | U.S. Patent No. 6,058,359 |
| Ex. 1298 | EP No. 654,909 |
| Ex. 1299 | U.S. Patent No. 5,664,055 |
| Ex. 1300 | EP No. 1,114,414 |
| Ex. 1301 | "Techniques for Improving the Performance of CELP-Type Speech Coders," by I.A. Gerson.  IEEE Journal on Selected Areas In Communications, Vol. 10, No. 5, June 1992 |
| Ex. 1302 | U.S. Patent No. 7,124,079 |

| Exhibit No. | Description |
|---|---|
| Ex. 1303 | IEEE Communications Magazine publication titled "ITU-T Recommendation G.729 Annex B: A Silence Compression Scheme for Use with G.729 Optimized for V.70 Digital Simultaneous Voice and Data Applications," by A. Benyassine , Sept. 1997 |
| Ex. 1304 | "Coding of Speech at 8 kbit/s Using Conjugate- Structure Algebraic-Code-Excited Linear- Prediction (CS-ACELP)," International Telecommunication Union, Recommendation, G.729, Mar. 1996 |
| Ex. 1305 | File History for U.S. Patent No. 6,192,335 |
| Ex. 1306 | 3GPP TS 45.003 V7.4.0 (2008-02) Technical Specification |
| Ex. 1307 | Claim chart for claim 14 of EP No. 1,114,414 |
| Ex. 1308 | Claim chart for claim 11 of U.S. Patent No. 7,124,079 |
| Ex. 1309 | PCT International Publication No. WO 92/22891 |
| Ex. 1310 | Claim chart for claim 28 of U.S. Patent No. 6,058,359 |
| Ex. 1312 | 3GPP TS 26.090 V6.0.0 (2004-12) Technical Specification |
| Ex. 1313 | "Vector Quantization Techniques in Speech Coding," by A. Gersho, pp. 59-84 |
| Ex. 1314 | "Adaptive Multi-Rate (AMR) Study Phase Report, Version 1.0, ETSI TS SMG Meeting No. 23, Oct. 13-17, 1997, Tdoc 97-740 |
| Ex. 1315 | "Digital Speech Transmission," by P. Vary, pp. 569-596 |
| Ex. 1317 | 3GPP TS 26.092 V6.0.0 (2004-12) Technical Specification |
| Ex. 1577 | Revised Annex A to Ericsson's Objections and Fourth Supplemental Responses to TCL's Interrogatory Nos. 5 and 6, dated 11/12/15 |
| Ex. 1589 | "SMG Speech Quality Strategy Group Report on GSM Speech Quality," 6/24/96, ETSI TC-SMG, Jun. 24-28, 1996, Tdoc SMG#19 447/96 |
| Ex. 1638 | Errata Exhibit 1:  Corrected Appendices to Expert Report of Dr. Nikil Jayant, dated 2/1/16 |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA  92130.

On January 11, 2017, I caused to be served the **PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. NIKIL JAYANT** to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION:  I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 11, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER