1 SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
2 skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
3 mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
4 mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
5 San Diego, California 92130-2006
Telephone: 858.720.8900
6 Facsimile: 858.509.3691

7 Attorneys for TCL Communication
Technology Holdings, Ltd., TCT Mobile
8 Limited, and TCT Mobile (US) Inc.

9

10                    UNITED STATES DISTRICT COURT

11      FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12 TCL COMMUNICATION             | Case No. SACV14−00341 JVS (DFMx)
   TECHNOLOGY HOLDINGS, LTD.,    | Consolidated with CV15-02370
13 et al.,

14                Plaintiffs,     | **PLAINTIFFS' DIRECT**
                                  | **EXAMINATION BY**
15         v.                     | **DECLARATION OF EXPERT**
                                  | **WITNESS DR. GREGORY K.**
16 TELEFONAKTIEBOLAGET LM         | **LEONARD**
   ERICSSON, et al.,
17
                Defendants.       | Place: Courtroom 10C
18 _____ | Before Hon. James V. Selna

19 TELEFONAKTIEBOLAGET LM
   ERICSSON et al.,
20
                                  | Pre-Trial Conf.: Jan. 30, 2017
21                Plaintiffs,     | Trial: Feb. 14, 2017

22         v.

23                                | **PUBLIC REDACTED VERSION**
   TCL COMMUNICATION
24 TECHNOLOGY HOLDINGS, LTD. et
   al.,
25                Defendants.

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.     EXPERT QUALIFICATIONS ........................................................................ 1

II.    SUMMARY OF TESTIMONY ..................................................................... 2

III.   BACKGROUND OF PARTIES AND CELLULAR STANDARDS ............. 4

    A.   TCL ...................................................................................................... 4

    B.   Ericsson ............................................................................................... 5

    C.   Cellular Standards at Issue .................................................................. 5

IV.    Economic Framework for Determining FRAND Royalties ........................... 7

    A.   The Royalty for a SEP Should Not Include the Value Created by Standardization............................................................................................. 7

    B.   Fair and Reasonable Rates Are Determined by the *Ex Ante* Value of SEPs Over Alternatives. ............................................................... 10

       1.   Consideration of *ex ante* alternatives.......................................... 10

       2.   FRAND requires apportioning the value of Ericsson's SEPs, which only apply to one component of an end product. ........................................................................................ 13

    C.   Top Down Approach............................................................................. 14

    D.   Royalty Rates in Past Licenses Are Not Necessarily FRAND............. 15

       1.   Comparable licenses may include a broader set of patents....... 16

       2.   Asymmetric information and the litigation endgame influences the final terms of licenses.......................................... 17

V.     Economic Assessment of the Technical Analysis of Ericsson's SEP Portfolio........................................................................................................ 19

VI.    Application of Top-Down Approach to Ericsson's SEP Portfolio ................ 25

    A.   Aggregate Royalty Burden ................................................................. 28

       1.   Aggregate royalty burden based on Ericsson's public statements................................................................................... 30

2.   The aggregate royalty burdens proposed by Ericsson are reasonable in light of TCL's profit margin on the products at issue.................................................32

B.   Apportionment of the Royalty Burden .................................................37

1.   Ericsson's SEPs represent a small fraction of the SEPs necessary to implement the standards at issue. .........................37

2.   Apportionment of royalty burden in the U.S.............................43

a.   *Apportionment based on the technical analysis of Ericsson's SEPs*.................................................43

b.   *Apportionment based on a forward-citation analysis of Ericsson's SEPs*.................................................48

c.   *Summary of results* .........................................................52

3.   Accounting for changes in Ericsson's SEP portfolio over time .................................................52

4.   Adjustments for Ericsson's weaker portfolio outside the U.S. .................................................57

C.   Calculation of FRAND Royalties for Ericsson's SEPs .......................59

1.   Fair and reasonable royalty rate for 4G .....................................59

2.   Fair and reasonable royalty rate for 2G/3G .............................60

D.   Comparison of FRAND Royalties Under the Top Down Approach and Ericsson's Offers .........................................................62

E.   Past Release.................................................63

VII.   CONCLUSION .................................................68

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION.........................70

## DECLARATION OF DR. GREGORY K. LEONARD

1.      I, Dr. Gregory K. Leonard, declare under the penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.      EXPERT QUALIFICATIONS

2.      I am an economist and partner at Edgeworth Economics, 333 Bush Street, Suite 1450, San Francisco, CA 94104.  I received an Sc.B. in Applied Mathematics-Economics from Brown University in 1985, and a Ph.D. in Economics from the Massachusetts Institute of Technology in 1989.  Prior to joining Edgeworth Economics, I was, at various times, a senior vice president with NERA Economic Consulting, a senior vice president with Lexecon Inc., a founding member and director of Cambridge Economics, Inc., and an assistant professor of economics at Columbia University.

3.      My specialties within economics are applied microeconomics, the study of the behavior of consumers and firms, and econometrics, which is the application of statistical methods to economics data.  I have published over sixty papers in scholarly and professional journals.  My publications are listed on my curriculum vitae, Ex. 315.  Many of these papers address issues in industrial organization, demand for products, intellectual property, and econometrics, including publications in the Journal of Industrial Economics, the RAND Journal of Economics, the Journal of Econometrics, the Berkeley Journal of Technology and Law, and the Columbia Science and Technology Law Review.  I have published numerous papers addressing issues related to standard essential patents and FRAND royalties, including a paper entitled "Determining RAND Royalty Rates for Standard-Essential Patents" in *Antitrust*.  Ex. 1128.

4.      I am a senior editor of the Antitrust Law Journal and have served as a referee for numerous professional journals.  I have given invited lectures on intellectual property and antitrust issues at the Federal Trade Commission (FTC),

the United States Department of Justice (DOJ), the Directorate General Competition for the European Commission, the Fair Trade Commission of Japan, and China's Supreme People's Court and Ministry of Commerce. I have been retained by the DOJ to consult on antitrust matters.

5. In 2009, I was invited to speak at a session of the FTC's hearings on the "Evolving IP Marketplace" concerning the calculation of patent damages. In the report that the FTC subsequently issued, my views on damages calculation were cited extensively. Ex. 1141. In 2007, I served as a consultant to and testified before the Antitrust Modernization Commission, which was tasked by Congress and the President to make recommendations for revising the antitrust laws of the United States.

6. I have served as an expert witness and testified in a number of litigation matters. A list of cases in which I have testified (in deposition or at trial) in the last four years is provided in my curriculum vitae. Ex. 315. My hourly rate is $800.

## II. <u>SUMMARY OF TESTIMONY</u>

7. I have been asked by counsel for TCL Communications Technology Holdings, LTD., TCT Mobile Limited and TCT Mobile (US) Inc. (collectively, "TCL") to determine a fair and reasonable royalty for the portfolio of patents essential to certain cellular communication standards owned by Telefonaktiebolaget LM Ericsson and Ericsson Inc. (collectively, "Ericsson").

8. The calculation of a fair and reasonable royalty rate for standard essential patents (SEPs) should be limited to the incremental value of the patented technologies relative to the next best alternative technology that was available at the time the standard was set (the "*ex ante* value"), and should not capture the value of other technologies, contributions, and efforts (*e.g.*, product development) that contributed to the value of standard-compliant products. One way to accomplish this is to start with the appropriate aggregate royalty burden for all SEPs for a given standard and then distribute this aggregate royalty burden among the SEPs

according to their relative values.  I refer to this methodology as the "top-down" approach.  Ericsson, along with other industry participants, has publicly endorsed this approach on a number of occasions in submissions to standard setting organizations and public statements.  In particular, Ericsson has advocated for a maximum aggregate royalty burden and proportional distribution of royalties based on patent value.

9.    My top-down analysis begins with assessing the proper aggregate royalty burden for the standards-at-issue.  Prior to the widespread adoption of the 4G standard, Ericsson publicly advocated for a reasonable maximum aggregate royalty burden for all LTE essential IPR in handsets of "a single-digit percentage of the sales price."  Ex. 1146, p. 1; Ex. 1150, p. 136-7.  Specifically, Ericsson stated the maximum aggregate royalty level in accordance with FRAND principles is 6-8% of the price of the handset.  Ex. 1149, p. 31; Ex. 1152, p. 1.  For 3G, Ericsson also joined other SEP owners to advocate a "modest single digit" aggregate royalty rate for WCDMA technology, which was intended to keep the cumulative royalty rate at or below 5%.  Ex. 333; Ex. 1150, p. 135.  Based on Ericsson's own public statements, in my top-down analysis I use aggregate royalty burdens of 5% for 2G/3G, and 6% for 4G.

10.    After determining the appropriate aggregate royalty burden, the next step in the top-down analysis is to determine Ericsson's proportional share of the royalty burden based on the relative strength of its SEP portfolio.  A team of technical experts, led by Dr. Apostolos "Paul" Kakaes, analyzed the essentiality, importance to the standard, and contribution over alternative technologies of the patent families Ericsson alleged to be essential to the 2G, 3G, and 4G standards.  This analysis showed that only a small number of Ericsson's alleged SEPs made substantive contributions to the standards-at-issue.  Based on the results of the technical analysis, I determined that Ericsson's proportional share of the total value of all SEPs is 3.5% for 4G, 4.8% for 3G, and 8.0% for 2G.

11.     Finally, I calculate the appropriate fair and reasonable royalty rate by taking the royalty burden for each standard and then applying Ericsson's value share based on the technical analysis.  A further adjustment is made to account for variations in Ericsson's portfolio strength across regions.  Under this top-down approach, a fair and reasonable royalty for Ericsson's SEPs is 0.16 percent of the price of the handset for 4G, and 0.21 percent of the price of the handset for 2G/3G. A summary of the results of my top-down analysis is provided in Table 1 (PDX 2).

**Table 1 - Summary of Top Down Analysis**

| Standard | Aggregate Royalty Burden | Worldwide Royalty Rate |
|----------|--------------------------|------------------------|
| 4G | 6% | 0.16% |
| 2G/3G | 5% | 0.21% |

**Note**:     See Exhibits 1117 and 1721.

## III.     BACKGROUND OF PARTIES AND CELLULAR STANDARDS

### A.     TCL

12.     TCL Communication Technology Holdings Ltd. was founded in March 1999 and is a global mobile terminal manufacturer based in Shenzen, China. Ex. 1129, "Company Profile," TCL Communications Technology Holdings Limited.  The company sells products that rely on the 2G, 3G, and 4G standards, and also owns or licenses 2G, 3G, and 4G patented technologies.  Its products are sold in over 170 countries in the Americas, Europe, Middle East, Africa, and Asia-Pacific under several brand names, including TCL, Alcatel OneTouch, and now BlackBerry.  In China, its products are sold under the "TCL" brand and in many other places, including the United States, they are sold under the "Alcatel OneTouch" and BlackBerry brands.  TCL has built global partnerships with operators such as Vodafone and Orange, as well as retail chains such as BestBuy and Walmart.  Its global sales network covers six regions and it has nine R&D centers in Silicon Valley, Paris, Hong Kong and China.  TCL Communication owns

a global factory in Huizhou, China, with capacity reaching 120 million units per year.  This factory commenced operations on September 28, 2013.

13.     TCT Mobile (US) Inc. and TCT Mobile Inc. are wholly owned subsidiaries of TCL and directly sell 2G, 3G, and 4G mobile phones under the TCL and Alcatel OneTouch brands in the United States.   TCL has been selling mobile phones in the United States since 2007.

### B.     Ericsson

14.     Founded in 1876 and headquartered in Sweden, Telefonaktiebolaget LM Ericsson and its wholly owned U.S. subsidiary Ericsson Inc. offer networking and cellular infrastructure equipment, software, and support.  Ex. 1278.  Ericsson operates in four business segments:  Networks, Global Services, Support Solutions and Modems.  According to Ericsson, it owns 37,000 granted patents, including patents declared essential to the 2G, 3G, and 4G telecommunications standards.

15.     Ericsson formerly produced and sold mobile handset devices in the United States through a joint venture with Sony under the Sony Ericsson brand, but divested its stake in this venture in February 2012.  Ex. 1113, p. 70.

### C.     Cellular Standards at Issue

16.     A standard is a technical specification typically developed and published by a Standard Setting Organization ("SSO").  An SSO is typically composed of representatives from companies and other organizations that participate in the relevant industry.  Standard-setting efforts usually arise when interoperability among the products of different manufacturers in an industry is important, there exists more than one available technical alternative for product offerings, and none of these alternatives have become dominant in the market. Standards benefit consumers by, among other things, improving product quality through interoperability and reducing product prices through lower costs as a result of economies of scale and increased competition.  Standards also benefit manufacturers and patent owners by increasing the size of the market.

17.    The standards at issue in this case relate to cellular technology that rely on radio waves to transmit and receive signals between mobile devices and network infrastructure.  Over the years, these standards have been developed in a progression, starting with the first generation known as "1G," which was followed by "2G," "3G," and the most recent standard known as "4G/LTE," with "5G" still being in research and development.  The cellular standards at issue here include 2G to 4G/LTE standards.

18.    The first widespread use of mobile phones began in the early 1980s with 1G cellular standards.  In the late 1980s, 2G standards were developed using digital technology, which provided improvements in voice quality, system capacity, and security and the ability to integrate voice and data services.  In Europe, GSM was the dominant 2G standard.  GSM supported basic data services including GPRS and EDGE.  In the United States, CDMA, which became standardized as IS-95 and commercialized as CDMAOne, was used by several major carriers in the mid to late 1990s.

19.    In the mid to late 1990s, supporters of GSM-based standards deployed the new UMTS 3G standard, based on the GSM core network with an enhanced CDMA air interface known as WCDMA.  WiMAX (Worldwide Interoperability for Microwave Access) was standardized by IEEE in 2004 under IEEE 802.16 and commercially used by Sprint in the United States.  Other 3G standards include CDMA2000 and TD-SCDMA.

20.    Around 2006, 3GPP started developing a single wireless standard for use worldwide known as LTE (Long Term Evolution).  This standard was first released in 2008 (also known as Release 8) and became commercially available in the United States through MetroPCS in 2010.  Although LTE was marketed as a 4G technology, as of March 2008 it did not meet the requirements decided by the International Telecommunications Union-Radio (ITU-R) for 4G networks (such as having download rates as high as 1Gbit/s etc.).  The cellular industry had embraced

LTE as the next generation after 3G due to its upgrades, but an assessment of existing 4G-LTE services by ITU-R in October 2010 determined several of them to be 4G non-compliant. In 2011, LTE went through a major upgrade in its functionalities and was released as LTE-Advanced or Release 10. LTE-Advanced was designated 4G technology by 3GPP.

## IV. Economic Framework for Determining FRAND Royalties

21. In the standard development process, there are often alternative technologies for solving a given technical problem. Typically, only one of the alternatives is chosen for inclusion in the standard. Thus, a chosen technology may be "standard essential" only in the sense it happened to be chosen for inclusion in the standard, not necessarily because it was "better" than the alternative technologies that could have been chosen instead.

22. Companies, including those with patented technologies, agree to participate in SSOs and suggest inclusion of their own technology in a given standard for several reasons, such as: (1) wanting standardization to increase the available market for their own products, (2) wanting their technology included in the standard because they will have a competitive advantage if the standard uses technology they already know how to implement, or (3) wanting their technology included in the standard because they want to earn royalties from licensing related patents.

### A. The Royalty for a SEP Should Not Include the Value Created by Standardization.

23. In setting a royalty rate for SEPs, it is important to avoid capturing the value associated with standardization rather than the value of the incremental improvement of the patented technology. Once a standard is set, the industry is typically "locked-in" to the specific technologies chosen by the SSO for inclusion in the standard. Ex. 1130, p. 2; Ex. 1153, pp. 41-42. After the substantial time required for members of the SSO to set the standard, producers invest significant

resources in designing, manufacturing, and marketing products that are compliant with the standard.  The industry would face substantial switching costs if some aspect of the standard had to change.  Absent the constraints of a FRAND licensing commitment, individual SEP owners could exploit the increased market power gained by having their technology locked-in to the standard to extract royalties far in excess of the value contributed by their SEPs.

24.     In determining a FRAND royalty, it is important that the lock-in or hold-up value be excluded from the royalty.  Such value is not due to the contribution of the patented technology to the standard, but instead to the nature of the standardization process itself, as well as the prospective licensee's desire and need to maintain interoperability under the standard and, for revisions, to maintain backwards compatibility.  Awarding a SEP royalty that includes lock-in/hold-up value or other value associated with the act of standardization itself "can overcompensate patentees, raise prices to consumers who lose the benefits of competition among technologies, and deter innovation by manufacturers facing the risk of hold-up."  Ex. 1141, p. 11.  As the Federal Circuit has stated in *Ericsson, Inc. v. D-Link Systems, Inc*, 773 F. 3d 1201 (Fed. Cir. 2014):  "The patentee's royalty [for the SEP] must be premised on the value of the patented feature, not any value added by the standard's adoption of the patented technology."  As will be described in greater detail below, insuring that a FRAND royalty does not incorporate hold-up requires that the value of the product and the standard be apportioned to the specific SEPs.

25.     It would be poor policy to allow a FRAND royalty to be based on "hold up" or "lock-in" value because that would result in lower returns to product development, decreased competition in the marketplace, and harm to consumers. Hold-up results in royalties that (a) are "far in excess of the patent holder's true economic contribution," (b) "act as a tax on new products incorporating the patented technology," (c) "overcompensate[] patentees," (d) "raise prices to

consumers who lose the benefits of competition among technologies," (e) "deter innovation by manufacturers facing the risk of hold-up," and even (f) "undermine the standard-setting process" itself.  Ex. 1148; Ex. 1141, pp. 11, 13, 28.

26.     To mitigate the potential hold-up problem, SSOs often require their members to offer to license patents they believe to be essential to the standard on fair, reasonable, and non-discriminatory, or "FRAND" terms.  For example, the European Telecommunications Standards Institute ("ETSI") is the standard setting organization responsible for the standards at issue in this case.  In support of its standard setting efforts, ETSI established an Intellectual Property Rights ("IPR") Policy requiring members to disclose IPR which might be essential to its standards, and be "prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions."  Ex. 1145, ETSI IPR Policy, § 6.1.  The requirement that SEPs be licensed on FRAND terms is, in part, aimed at addressing the problem of patent hold-up.  One objective specified by ETSI's IPR Policy is to "reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."  Ex. 1145, §§ 3.1-3.3.  Companies rely on the FRAND commitment in making their decision to participate in the standards-setting process and to make investments in commercializing the standardized technology.  Were it not for the FRAND assurance, the risks involved in investing in developing standard-compliant products would be substantially higher, which in turn would decrease the incentives for companies to make such investments.

27.     Ensuring that a royalty for a standard essential patent meets the "reasonable" prong of FRAND requires that the royalty reflect the inherent economic value of the underlying patented technology at issue and not the hold-up or lock-in value.  In addition, a FRAND royalty for a SEP must recognize that

standards may comprise tens, hundreds, or even thousands of patented inventions and that the overall royalty amount for all patents essential to practicing a given standard must be economically feasible for entities that make compliant products. Such a royalty must appropriately compensate the patent owner, but also must not overcompensate the patent owner. A royalty that reflects the inherent value of the underlying technology and the overall royalty burden of SEPs on the standard therefore accomplishes the dual goals of being free of hold-up value while providing patent owners with the appropriate incentives to invest and contribute to technological standards.

**B.** **Fair and Reasonable Rates Are Determined by the _Ex Ante_ Value of SEPs Over Alternatives.**

28. Any method used to determine an appropriate FRAND royalty must ensure hold-up value is excluded from the royalty. There are at least two well-known principles that should be taken into account, either explicitly or implicitly, to ensure hold-up value is excluded. First, in setting a FRAND royalty it is important to consider the _ex ante_ alternatives, as the value of the SEP should be limited to the incremental technological improvement over available alternatives at the time the standard was set. Second, it is important to recognize that the technology embodied in a SEP may be limited to a particular component of a final product, and the FRAND royalty should not capture benefit of the device not related to the patented feature or function.

1. Consideration of _ex ante_ alternatives

29. As a conceptual economic matter, the FRAND royalty for a SEP is capped by the inherent economic value the patented technology generates relative to the next best alternative technology available at the time the standard was set. Thus, the FRAND royalty for a given patent should be capped by the specific economic benefits brought by the use of the patented technology relative to what could be achieved with the next-best, non-infringing alternative at the point in time

of inclusion in the standard.  The FRAND royalty for a given patent should not be based on benefits that could as well have been obtained using an available alternative technology, nor should the FRAND royalty for a given patent be based on the benefits generated by a wider set of technologies or by the standard as a whole.

30.    The same basic definition of FRAND applies whether licensing a single essential patent, a set of essential patents, or a portfolio of essential patents.  A royalty for a portfolio of essential patents is FRAND if it is commensurate with the economic value provided to the licensee by the set of patented technologies relative to the set of next best alternative technologies, and does not include any hold-up value.  FRAND, therefore, seeks to put the parties in the same position they would have been prior to any lock-in.

31.    Economists recognize that value varies widely across patents and the value of a given patent depends on the availability of technological substitutes. The differences in value that can exist even among patents declared "essential" is well documented:

> The literature clearly establishes that the distribution of patent value is highly skewed, with some patents worth a considerable amount (either commercially or in terms of generating follow-on research) while others are worth next to nothing (e.g., Scherer, et al. 1959; Pakes, 1986; Scherer and Harhoff, 2000). Even among complementary patents declared "essential" for a standard, the value of a given patent's contribution can vary substantially depending on the component involved and the available alternative technologies (Layne-Farrar, Padilla, and Schmalensee, forthcoming).  For example, if an essential patent has a number of technologically close substitutes, its ultimate selection to the standard is largely happenstance.  One of the

> competing technologies could just as easily have been chosen. Under these circumstances, the included patent arguably contributed less value to the standard than other essential patents that faced no viable substitutes during the standard's development.

Ex. 1618 at p. 14.

32. Two types of alternatives should be considered. First, there may have been substitute technologies that could have been adopted in the standard instead of the patented technology in question. During the standard-setting process, technical committees often consider alternative technologies for a given aspect of the standard. In some cases, equally good alternatives may have existed at the time of the standard setting process, but only one of the available technologies is chosen. In other cases, it might be the case that a good, but not perfect, substitute technology existed. In either instance, the inherent value of the patented technology is limited because of the availability of the alternative technology. Second, a feasible alternative may have been to drop the specific patented technology from the standard altogether. This necessarily places an upper bound on a FRAND royalty since, in a negotiation, the technology would have been dropped from the standard had the patent holder demanded a royalty beyond this amount.

33. Here, it is important to note these amounts represent the *maximum* royalty a rational licensee would agree to in a negotiation. In economic terms, negotiations typically result in dividing the "gains to trade" such that both parties are better off by reaching an agreement. An award of a royalty equal to the total value of the patented technology would exhaust the benefits of adopting the technology and would leave licensees no better off than if they were to choose an alternative.

2.   FRAND requires apportioning the value of Ericsson's SEPs, which only apply to one component of an end product.

34.     The second principle important for avoiding the inclusion of hold-up value in a FRAND royalty is to recognize that the technology of the asserted patent may be limited to a component of the defendant's product.  A royalty, whether FRAND or otherwise, should not reward a patent owner for benefits that are not related to the specific patented feature or function.  An analysis that focuses on the revenues or profits of an end product containing many functionalities (and perhaps other standards) beyond those of the asserted patents risks incorrectly attributing too much value to the asserted patents.

35.     Even before considering the many other technologies implemented in a standard, the value of the product must be apportioned to account for the other features, because a reasonable royalty must separate the value of the alleged infringing features from the value of all other features.  Here, the products at issue are mobile handsets, including feature phones and smartphones.  I understand Ericsson's SEPs at issue are primarily embodied in the baseband chip level, and therefore apportionment of the royalty base should reflect the fact that Ericsson's SEPs are embodied in a single component of a complex product.

36.     In addition, Ericsson's SEPs represent minor contributions to aspects of features of the 2G, 3G, and LTE cellular standards at issue.  These standards require a large number of other patented and unpatented technologies to achieve their overall functionality.  The determination of a FRAND royalty must explicitly recognize the existence of many technologies that are necessary to practice the standard, as well as the resulting danger of royalty stacking.  The problem of "royalty stacking" arises from the fact that multiple patents apply to the cellular standards, the chipset components that implement those standards, and TCL's end products.

37.     Any manufacturer must consider the aggregated (or stacked) royalties

of the individual patent holders.  If each patent holder charged even a moderately excessive royalty, the total royalty for the product would be grossly excessive. Royalty stacking aggravates the patent hold-up issue in the context of standards because standards are likely to be "characterized by patent thickets, resulting in standard-compliant products being covered by hundreds, if not thousands, of patents." Ex. 1148, p. 26.  A FRAND royalty must take into consideration the fact that a licensee may be required to pay royalties to multiple other patent owners.

38.    As an economic matter, a FRAND royalty rate for Ericsson's SEPs must apportion the total value of the SEPs to the standards at issue, as well as unpatented features of the standard.  Failure to account for this in the determination of a FRAND royalty would incorrectly reward Ericsson value that should be assigned to other SEPs or unpatented features of the standard.  This apportionment principle is applicable even when there are licenses that apply a royalty to the price of an end product.  If Ericsson's royalty offers and the royalties that Ericsson has negotiated in its existing licenses inappropriately include the value of standardization, an independent assessment of the FRAND royalty is necessary, *i.e.*, a FRAND royalty should not be based on Ericsson's offers or existing licenses.

### C.    Top Down Approach

39.    As discussed above, the calculation of a FRAND royalty should account for other technologies, contributions, and efforts (*e.g.*, product development) that contributed to an accused product.  In that way, the FRAND royalty is properly limited to the benefits provided by the patents and does not incorrectly misappropriate value that was actually due to other technologies, contributions, and efforts.  One way to do this is to start with the appropriate aggregate royalty burden for all SEPs and then distribute this aggregate royalty burden among the SEPs according to their relative values.  I now turn to a description of this top-down approach.

40.    The approach begins by identifying a reasonable aggregate royalty

burden for the standard.  That value is then apportioned to a SEP holder based on the value of its portfolio relative to all other SEP holders' share of the value of the standard.  The SEP holder's share should reflect the specific contributions of its patents and the value brought by their use.

41.     The general framework of the top-down approach, where an appropriate aggregate royalty is apportioned among SEP holders, has been endorsed by Ericsson.  In particular, Ericsson has stated that it "believes FRAND should mean reasonable accumulated IPR costs [*e.g.*, the aggregate royalty burden] where the patents owners are compensated proportionally in relation to each of their respective technology contributions to the standard."  Ex. 1149 at p. 22.  Further, Ericsson has stated that "a FRAND royalty rate will reflect the added value that the licensed technology brings to the end user."  *Id*.

42.     The top-down approach avoids incorrectly assigning hold-up value to SEPs as well as royalty stacking, while still providing incentives to innovate.  It is also consistent with the legal concept of apportionment and was specifically used in *In re Innovatio IP Ventures, LLC Patent Litigation*, Case No. 1:11–cv–09308, 2013 WL 5593609 (N.D. Ill. September 27, 2013)—I served as an expert witness on behalf of the manufactures in this case.  In that case, the court commented on the advantages of the top-down approach, including that it "accounts for both the principle of non-discrimination and royalty stacking concerns in RAND licensing," apportions to the value of the patented feature "without relying on information about other licenses that may or may not be comparable to accomplish the apportionment," does not apportion the value of patented features solely on the numerical proportionality of the patents to all patents essential to the standard, and "provides some quantitative and analytical rigor to the RAND analysis."  *Id.* at *39.

**D.     Royalty Rates in Past Licenses Are Not Necessarily FRAND.**

43.     I understand Ericsson contends the best measure of the value of its SEPs is the past license agreements signed with other handset vendors.  Although I

WITNESS DECLARATION OF DR. GREGORY K. LEONARD

agree comparable licenses can be a useful measure of the economic value of a patent or patent portfolio, as I will discuss, certain challenges arise in the context of standard setting in general and with Ericsson's licenses more specifically.

        1.   <u>Comparable licenses may include a broader set of patents.</u>

44.    One of the issues that arises in trying to establish a FRAND royalty based on a review of other licenses is that these other licenses may cover a different set of rights than the hypothetical license under consideration.  This matter deals with the terms of a license to Ericsson's SEP families that are essential to the 2G, 3G and 4G standards.  Yet, many of Ericsson's licenses provide rights under a larger set of patents than just the 2G/3G/4G Ericsson SEPs and cover a wider set of the licensee's products than just smartphones.

45.    For example, over time Ericsson has assigned and continues to assign 2G, 3G and 4G SEPs to other entities.  As shown in Ex. 96, Ericsson is contracted to annually transfer a tranche of patents to Unwired Planet until at least 2018.  Just within the last few years, since 2013, Ericsson has transferred at least 200 U.S. declared SEPs to InterDigital, Optis Wireless LLC, Unwired Planet, and Wi-Fi One.  Ex. 1126 is a list of the declared essential patents Ericsson has assigned to these entities based on the U.S. Patent and Trademark Office's Patent Assignment Database.  Ericsson's other licenses may cover patents Ericsson has since transferred to other entities.  Allowing Ericsson to charge royalties for patents it no longer owns may result in double recovery that violates Ericsson's FRAND commitment.

46.    Similarly, Ericsson's other licenses may not be relevant because Ericsson licenses include SEPs to other standards which are not at issue in this matter.  For example, the 2014 Ericsson-Samsung License, Ex. 1276, implicitly covers not only cellular SEPs, but also grants Samsung use of Ericsson's Wi-Fi SEPs for a wider range of products (*e.g.*, Wi-Fi-only tablets).  As illustrated by Dr. Lynde's summary of Ericsson's License Agreements, Ex. 1219, Ericsson's licenses

with HTC, Apple, and LG all include additional standards not covered under the hypothetical license between TCL and Ericsson.

47.     Ericsson's licenses also may not be good benchmarks because they include "implementation" patents that are not at issue in this matter.  For example, Ericsson's license agreements with Samsung and LG both include licenses to Ericsson's implementation patents.  Ex. 1276, para. 1.5 (defining "Ericsson Licensed Patents" as "all SEPs and Implementation Patents owned or controlled by Ericsson."); Ex. 199, para. 1.12 (defining "Ericsson Licensed Patents" as "all Ericsson Standard Essential Patents and Ericsson Implementation Patents.").  Similarly, Ericsson's license agreement with HTC includes a covenant not to sue based on Ericsson's implementation patents.  Ex. 1275, paras. 1.19, 2.5.1.  In sworn testimony, Ericsson has previously claimed its handset implementation patents are worth up to 0.2 percent of the selling price of the handset.  *See* Ex. 1586, p. 22.

48.     In principle, to the extent a license covers a greater set of patent rights or a wider set of products, some portion of the licensee's payment or effective royalty rates must be apportioned between the SEPs at issue in this matter and those additional rights.  One advantage of my top-down approach is that it provides an independent approach for evaluating the hypothetical license specific to the precise set of SEPs to be licensed, without potential inaccuracies resulting from the differing rights in Ericsson's past licenses.

       2.    <u>Asymmetric information and the litigation endgame influences the final terms of licenses.</u>

49.     In addition to the differing scope, Ericsson's licenses may not be the best metric for evaluating the fair and reasonable value of Ericsson's patents because such licenses are often agreed to by parties who have asymmetric information.  As a general matter, a prospective licensee does not know the royalty rates other licensees have paid because such patent licenses are covered by confidentiality and non-disclosure agreements.  Indeed, as shown by the

comparable license analysis performed by Dr. Lynde, the effective royalty rates paid by licensees to Ericsson varies quite widely.  Apple, for example, pays an effective royalty rate of ▮▮▮▮▮ while some of its competitors pay significantly greater than this amount.

50.    One likely explanation for the disparity in licensing rates is gamesmanship intended to influence future negotiations or litigation.  After a standard has been set, patent holders have an incentive to seek early licenses at relatively high rates that can be used to influence future licensing negotiations. Indeed, a common strategy of licensors is to target small prospective licensees that lack the resources or financial incentive to vigorously defend against infringement litigation, or that for other reasons are at a disadvantage in licensing negotiations. Once secured, these licenses may then be used by the licensor to establish standard "reference rates" which the licensor then attempts to use to extract high rates from later licensees.  This precise phenomenon was described by A. Douglas Melamed, then-general counsel of Intel Corporation, in testimony before Congress in July 2013, Ex. 1095, p. 13:

> Although companies like Intel have the financial means to defend themselves against FRAND violators, the costs of doing so are substantial, running in the millions of dollars for each case.  Smaller standard implementers often do not have the resources to wage such a fight and thus are left with the choice of paying excessive royalties or ceasing to make their standard-compliant products.  To make matters worse, SEP holders that breach their FRAND commitments use the existence of licenses extracted from smaller entities that lack the means to challenge the SEP holders' FRAND violations as benchmarks and claim that they must charge the same extortionate rate to everyone else

because FRAND requires them to license on nondiscriminatory terms.

51.    Further, many of Ericsson's license agreements resulted from negotiations or litigation where Ericsson may have used the threat of an injunction to extract supra-competitive rates.  Economists generally agree that the threat of injunction increases the likelihood of hold-up.  The U.S. Federal Trade Commission has warned that "hold-up in a standard setting context can be particularly acute" where "design-around, at any cost, may not be an option," noting that "the balance of hardships may support denial of the injunction."  Ex. 1141, pp. 240-241.  While the threat of an injunction in the U.S. has decreased, SEP holders may still pursue injunctions in other jurisdictions or exclusionary relief before the U.S. International Trade Commission.  Ericsson, for one, has pursued injunctions against prospective licensees in a number of jurisdictions, including U.S.I.T.C. investigations against Samsung and Apple seeking exclusion orders. Generally, the determination of FRAND royalties in the U.S. has excluded licenses that were not negotiated under FRAND conditions or for other reasons may not be compliant with the parties' FRAND obligations.

52.    The above considerations, as well as the differences in scope between existing licenses and the hypothetical license, present challenges for determining a FRAND royalty for Ericsson's SEP portfolio based on existing licenses alone.  This suggests that alternative independent methods may assist the Court in determining the FRAND royalty rate for TCL.

## V.    Economic Assessment of the Technical Analysis of Ericsson's SEP Portfolio

53.    As discussed above, a FRAND royalty should be based on the *ex ante* value of the patented technology's contribution and not the value that comes from standardization.  For a portfolio of SEPs, a FRAND royalty should reflect the *ex ante* value of the patents in the portfolio.  One of the challenges in this matter is

that Ericsson owns hundreds of patents which it claims are essential to three generations of cellular standards.  To my knowledge, Ericsson has never performed or put forth any comprehensive patent-by-patent technical or economic analysis of its SEP portfolio.  Unlike recent FRAND royalty cases or a typical patent infringement litigation where only a handful of patents are at issue, this matter requires making an assessment of the economic value of a large portfolio of patents.

54.     One potential approach for measuring the value of an entire portfolio is to consider the number of patents in the portfolio.  Such a "patent count" measure, however, is likely a poor indicator of the economic value of the portfolio.  Economic studies have shown that patent values vary widely, including among SEPs.  In economic terms, patent values are highly skewed, such that the majority of patent value is made up by a relatively small number of patents and conversely, the vast majority of patents have little to no value.  As such, the number of patents often does not provide an indication of the quality of the individual patents underlying the portfolio.

55.     As with the determination of a reasonable royalty in a patent damages case, the determination of a FRAND royalty for a portfolio should be tied to the specific contributions of the patents within a portfolio.  With this goal in mind, TCL retained independent technical experts, overseen by Dr. Kakaes, to perform a patent-by-patent analysis of Ericsson's claimed SEPs.  This analysis was structured to align the characteristics of a patent with factors that determine the economic value of a patent.  Prior to beginning the technical analysis, I discussed with Dr. Kakaes factors that determine the *ex ante* value of a SEP, including:

- Issued patents.  Ericsson's list of declarations includes both issued patents as well as patent applications.

- Handset-related patents.  Cellular technical standards cover both networking equipment, such as base stations used to transmit voice and

Case No. SACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. GREGORY K. LEONARD

data communications from cell towers, and user handset equipment, *i.e.*, mobile phones.  Ericsson has classified its patents according to three categories:  (1) patents relating to user equipment, most often mobile handsets (UE); (2) networking equipment, in particular network base stations (NB); and (3) patents related to evolved packet core (EPC), which relate to core network products, not user equipment.  In many cases, Ericsson claims a patent may relate to two or more categories.

- <u>Essentiality</u>.  A large percentage of patents declared essential to cellular standards are not actually essential once the claims of a patent are evaluated and compared to the technical specifications of the standard.  In this matter, Ericsson has claimed hundreds of patents are essential to the 4G, 3G and 2G standards.  TCL's technical experts evaluated the claims of Ericsson's patents to determine whether those patents were, in fact, essential to the standard.  Patents were classified into three categories:  (1) likely essential; (2) possibly essential, but the determination was ambiguous because the determination of essentiality depends on the claim construction; and (3) likely not essential.

- <u>Importance of the feature</u>.  The cellular standards encompass a large number of features which vary in importance and value to the standard as a whole.  This factor considers the feature of the standard to which the patent relates.  This is distinct from the specific claims of the patent or the incremental technical contribution of the patent over alternatives.  For each evaluated patent, the feature of the standard to which the patent related was classified as:  (1) very important; (2) moderately important; and (3) marginally important.

- <u>Contribution of the patented technology</u>.  The economic value of a patent is defined by the incremental value provided by the technology

over alternatives.  This factor focuses on the *ex ante* alternatives to the technology that were or could have been available prior to standardization.  Each patent was ranked on a scale of one to four based on its contribution over alternatives:  (1) significant improvement; (2) moderate improvement; (3) marginal improvement; and (4) no improvement.

56.    As a preliminary step, I consider only patents that meet the first three criteria:  issued patent families that relate to handsets that have been determined to be essential by technical analysis.  However, the composition of Ericsson's portfolio will change over the term of the license as patents expire and patents in application become issued patents.  I later consider the effect of newly-issued patents and patent expirations over the course of a five- and ten-year license.  Non-handset patents can also be removed from consideration.  TCL is a handset manufacturer and does not manufacture networking equipment.

57.    A summary of the first three factors is shown in Table 2 (PDX 3), which is based on Dr. Kakaes's report and the summary in Ex. 1116.  Consider first 4G, where Ericsson has alleged 207 patent families are essential.  Based on Ericsson's own designation, only 152 families relate to handsets.  Of the 152 families that relate to handsets, Ericsson has provided claim charts to the standard for only 127 of these families.  A little less than half of these patents have been determined to not be essential, leaving 74 families found likely to be essential to a standard.  Even conservatively assuming all the "potentially" essential patents were in fact essential, Ericsson would have 81 SEP families for 4G relating to handsets.  This shows that 46 of Ericsson's claimed 4G SEPs play no role in the context of determining a FRAND royalty rate.

**Table 2 - Ericsson's Worldwide Essential Handset SEP Families**

| Classification | 4G | 3G | 2G |
|---|---|---|---|
| **Ericsson's SEP Families** | | | |
| Ericsson Claimed SEP Families | 207 | 97 | 59 |
| Handset-Related | 152 | 64 | 48 |
| Claim-Charted | 127 | 51 | 41 |
| **Essentiality Determination of Claim-Charted** | | | |
| **Patents Based on Technical Analysis** | | | |
| 1 – Likely Essential | 74 | 33 | 29 |
| 2 – Ambiguous, depends on claim construction | 7 | 2 | 1 |
| 3 – Likely non-essential | 46 | 16 | 11 |

**Source:** Ericsson's claimed SEP families and handset designation ("UE") as given in Ex. 1577, "Revised Annex A," November 12, 2015, Ericsson's Objections and Fourth Supplemental Response to TCL's Interrogatory Nos. 5 and 6. The number of Ericsson patents that have been claim charted and the essentiality determination ranking are based on the technical analysis overseen by Dr. Kakaes (Ex. 1116, "EIC Rankings").

58.     The next step of the technical analysis evaluated the importance of the feature to the standard and the specific contributions of the patent over alternatives. The economic value of a patent depends on both factors. Patents that relate to a relatively important feature will not be valuable if they provided little or no incremental value over alternatives. Similarly, a patent might have provided some benefit over alternatives, but only relates to a minor feature of the standard. All else being equal, such patents will be worth less than patents that provide some benefit over alternatives but relate to more important features of the standard.

59.     The table illustrated in Table 3 (PDX 4) summarizes the results of the technical analysis of the importance and contribution of Ericsson's SEPs for the 2G, 3G and 4G standards. This analysis shows that, even within the subset of Ericsson's essential handset patents, the value of Ericsson's SEPs varies widely, and the majority of Ericsson's SEPs relate to relatively unimportant features of the standard or make only marginal or no contributions over alternatives.

**Table 3 - Importance and Contribution of Ericsson's Worldwide Essential Handset SEPs for the 2G, 3G and 4G Standards**

| | | Importance | | |
|---|---|---|---|---|
| | | 1 Very | 2 Moderate | 3 Marginal |
| **4G** | 1 – Significant | 2 | 0 | 0 |
| Contribution | 2 – Moderate | 0 | 2 | 0 |
| | 3 – Marginal | 3 | 8 | 15 |
| | 4 – None | 8 | 12 | 36 |
| **3G** | 1 – Significant | 3 | 0 | 0 |
| Contribution | 2 – Moderate | 0 | 2 | 0 |
| | 3 – Marginal | 2 | 2 | 1 |
| | 4 – None | 3 | 4 | 19 |
| **2G** | 1 – Significant | 3 | 0 | 0 |
| Contribution | 2 – Moderate | 0 | 1 | 0 |
| | 3 – Marginal | 2 | 3 | 5 |
| | 4 – None | 4 | 3 | 10 |

**Source:** Based on the technical analysis overseen by Dr. Kakaes ("EIC Rankings.xls," Ex. 1116).

**Notes:** Based on Ericsson's worldwide handset SEP families for each standard. Red-outlined cells highlight the number of Ericsson handset SEPs that were ranked highly for both importance and contribution. Rankings for Ericsson's U.S. SEPs in 2015 are given below in Table 5 (PDX 6).

60.     This analysis confirms the findings in the economic research that the majority of value is held by only a small handful of patents. Only a relatively small number of Ericsson's claimed SEPs provide significant improvements over alternatives and also relate to important features of the standard. Similar results hold for the 2G and 3G standards. This is consistent with the overall findings of Dr. Kakaes that the key LTE distinguishing features pointed to by Dr. Parkvall

were developed by others before LTE was standardized, and none of Ericsson's purported SEPs cover them.  At best, some of Ericsson's purported SEP families address incremental solutions to narrow issues related to some of these features.

## VI.   Application of Top-Down Approach to Ericsson's SEP Portfolio

61.    I now turn to the calculation of a FRAND royalty for Ericsson's SEP portfolio using a top-down approach.  As discussed above, the top-down approach involves first determining the aggregate royalty burden for the standard as a whole. Here, I begin with the range of *ex ante* expectations of the aggregate royalty burden (which were generally in the single digit percentage range, applied to the price of the phone).  I have also analyzed TCL's profit on handsets.  Based on my analysis, I calculate the proper royalty rate for Ericsson's SEPs under two scenarios.  In the first, I assume the aggregate royalty burden is 6 percent of the price of the phone for the 4G standard and 5 percent of the price of the phone for the 2G/3G standards. Under the second scenario, I assume the aggregate royalty burden is 8 percent of the price of the phone for the 4G standard, the high end of the range provided by Ericsson's public statements.

62.    The second step involves apportioning the aggregate royalty burden among all SEP holders, and to Ericsson's SEP portfolio in particular, to arrive at a fair and reasonable royalty rate for Ericsson's portfolio.  I rely upon the results of the technical analysis to make conservative assumptions regarding where Ericsson's patents fall in the value distribution of all SEPs for the relevant standard. I also calculate the apportionment based on a forward patent citation analysis.  The results of the forward citation analysis corroborate the apportionment to Ericsson based on the technical analysis.

63.    I adopt this approach for the 4G standard and 2G/3G standards in the U.S. over the term of a hypothetical license of five or ten years, accounting for the expiration of Ericsson's patents.  In order to arrive at the worldwide blended 2G/3G rates, I projected TCL's 2G, 3G, and 4G sales data over ten years starting with

TCL's actual sales by standard for 2014 and 2015 from data produced by TCL, Ex. 142.  Ex. 1120 is an exhibit I prepared with TCL's actual phone sales in 2014 to 2015 and projected sales from 2016 to 2023.  *See also* Ex. 1601.  Sales are grown over time based on the average growth rate from analyst reports released after October 20, 2015, which was the date of TCL's 2015 Q3 results announcement, Ex. 1108.  At the time of my expert report, these were the most recent TCL revenue projections:  Ex. 1110, Nomura, TCL Communication Technology, "Attractive Valuation," October 21, 2015;  Ex. 1109, JP Morgan, TCL Communication Technology, "More challenges balancing volume growth against product mix; Stay neutral," October 20, 2015; Ex. 1111, Yuanta, TCL Communication, "Still looks uninspiring," October 21, 2015.  *See also* Exs. 1097, 1132 to 1138.  This estimate is conservative given that actual TCL device revenues declined between 2014 and 2015.

64.     The average selling price for handsets for a given standard tends to decline over time.  For example, TCL's worldwide average selling price for LTE handsets declined from $231.04 in 2013 to $97.30 in 2015.  TCL's 2G/3G blended worldwide handset ASP declined from $46.12 in 2013 to $37.53 in 2015.  Ex. 142. Average selling prices will decline over the term of the hypothetical license, between 2015 and 2023.  I take the 6.7 percent yearly decline in TCL's worldwide retail ASPs across standards between 2007 and 2015 to estimate prices going forward.  This growth rate is derived from retail ASP data from IDC between 2007-2015.  *See* Ex. 1139, "WW Mobile Phone Tracker," IDC, 2015.  This price decline is lower than both the 35 percent yearly decline in TCL's handset LTE ASPs and the 10 percent yearly decline in its 2G/3G blended handset ASPs for the 2013-2015 period.

65.     The share of TCL's sales to the U.S. has increased since 2009, when the company first entered the U.S. market.  Ex. 1139.  For example, in 2009 1.6 percent of TCL's sales volume were to the U.S. compared with 20.7 percent in the

first half of 2015.  *Id.*  This represents a per year decline of 3.5% in the share of non-U.S. sales volume over this period.  Similarly, the share of non-U.S. revenue has declined by 3.3% per year over the same period.  *Id.*  I assume these trends will continue in projecting revenue and volume over the 2016-2023 period.

66.    I also estimate that the share of LTE sales out of total device sales will increase over time.  For example, the LTE share of TCL's device sales volume increased from 0.2% in 2013 to 17% in 2015.  Ex. 142; Ex. 1108.  In a November 2015 report, Research and Markets forecasted that worldwide LTE device sales will increase by a CAGR of 26% between 2015 and 2020.  Ex. 1112, "Global LTE Consumer Devices Market Forecast and Opportunities Report 2015-2020 – Rapid Growth in Mobile based Products & Services," Research and Markets, November 30, 2015.  This is comparable to the 26.5% growth in LTE mobile subscriptions from 2015-2021 estimated by Ericsson.  Ex. 1097, "Ericsson Mobility Report," Ericsson AB, November 2015.  Note that I conservatively apply this rate to TCL's LTE sales shares in the U.S. and the rest of the world despite its inclusion of LTE based Machine-to-Machine ("M2M") technologies.  I split sales volume by standard based on these share estimates for the 2016-2023 period.

67.    I then use the shares of LTE and 2G/3G devices sold in each region (*i.e.*, U.S. and non-U.S.) to derive blended ASPs for each region and year.  I use these estimates along with my estimates of revenue in the U.S. and the rest of the world to calculate total TCL sales volume in each region and year for the 2016-2023 period.  As illustrated in Ex. 1121, TCL sold at most only a small percentage of 2G phones in 2014 in the U.S.  Outside of the U.S., TCL's 2G sales are expected to decline over time; I therefore calculate a blended FRAND royalty based on the weighted average of the portfolio strength of Ericsson's 2G and 3G portfolio.  The 2G/3G blended rate is based on the weighted average of Ericsson's 2G and 3G shares, and can be unpacked to calculate separate rates for 2G and 3G.  In order to arrive at a worldwide FRAND royalty for Ericsson's portfolio, I adjust the U.S. rate

to account for differences in the selling price of TCL's phones and the varying strength of Ericsson's SEP portfolio across regions.

68.     As explained in more detail below, I conclude that under the top-down approach, a fair and reasonable royalty for Ericsson's SEPs is 0.16 percent of the price of the handset for 4G, and 0.21 percent of the price of the handset for 2G/3G. *See* Table 1 (PDX 2).

### A.   Aggregate Royalty Burden

69.     The dual goals of standard setting organizations are to encourage participation in the SSO by patent owners and to promote the widespread adoption of the standard by implementers (many of whom may also be patent owners) and, ultimately, end users of devices that practice the standard.  For the standard to succeed, cumulative royalty rates must be at a level to attract implementers, while compensating individual SEP holders with royalties that are commensurate with the value added by their patented inventions.  If cumulative royalty rates are too high, implementers would be deterred from investing in product development and/or the price on end-user products would increase.  Sales of standards-compliant products would then be lower.

70.     These basic principles have been embraced by SEP holders, including Ericsson, NTT DoCoMo, Nokia, and Siemens.  For example, in a 1997 statement to ETSI regarding 3G standards, Ericsson advocated low royalty rates, in particular favoring "a low level royalty compensation approach" in order to support the "healthy growth of the telecommunications industry."  Ex. 1151, "Information Copy of Ericsson IPR Statement," December 1997, p. 2.  In 2002, Nokia stated that "we believe that it is of utmost importance for the mobile communication industry that the cumulative royalty cost of WCDMA is maintained at a healthy level" that "encourages greater growth and innovation in the industry."  Ex. 1088, "Nokia advocates industry-wide commitment to 5% cumulative IPR royalty for WCDMA," Press Release, May 8, 2002.  Similarly, the networking manufacturing company

Siemens expressed the desire to have cumulative royalty rates strike a balance
between the interest of SEP holders and the growth of the industry:

> It is of the utmost importance for the mobile communication
> industry and in the interest of both licensors and licensees that
> the cumulative royalty cost of W-CDMA is maintained at a
> competitive level which encourages both greater growth and
> innovation in the industry… As we – the major IPR holders –
> make our patents available we ensure that W-CDMA stays an
> open and globally acceptable technology.

Ex. 333, "Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemens, and
Japanese manufacturers reach a mutual understanding to support modest royalty
rates for the W-CDMA technology worldwide," Press Release, November 6, 2002;
*see also* Ex. 333.  The companies joining the press release in Ex. 333 claimed that
"these companies together own the clear majority of the essential Intellectual
Property Rights (IPR) relevant to the W-CDMA standard . . . ."  (*Id.*)

71.     Conversely, industry participants have expressed concerns that
cumulatively high rates would hinder adoption of the standards.  In 2006, along
with SEP owners Motorola and Nokia, Ericsson noted in a policy proposal to ETSI
that "cumulative royalties are perceived to be uncertain and often too high, possibly
even prohibitive."  Ex. 83, ETSI GA/IPR02(06)05, Expanded Proposal for IPR
Policy Reform, February 2006 at p. 3.

72.     The same principles were expressed for the LTE standard.  Ericsson
itself noted that "prior to the commercial release of the LTE standard, there was a
desire by network operators and companies who were contemplating investments in
LTE-compliant products for insight into the expected royalty burden on an LTE
device."  Ex. 1149, Witness Statement of Lars Gustav Bismark, pp. 33-34.  To
provide more clarity into expected royalties, industry participants including
Ericsson have advocated incorporating "aggregate reasonable principles" and

"proportionality" into ETSI's IPR licensing policy.  Ex. 1142, "Proposal for IPR Policy Reform," ETSI GA on IPR Review #1, Jan. 10-11, 2006, ETSI GA/IPRR01(06)08, p. 3.  In particular, Ericsson proposed the following concerning FRAND royalties:

> . . . in the aggregate the terms are objectively commercially reasonable taking into account the generally prevailing business conditions relevant for the standard and applicable product, patents owned by others for the specific technology, and the estimated value of the specific technology in relation to the necessary technologies of the product.

Ex. 83, p. 4.  For this reason, SEP holders and implementers have at various points in time attempted to arrive at a consensus regarding aggregate royalty rates.  Next, I turn to Ericsson's specific public statements regarding the appropriate aggregate royalty burden for the 3G and 4G standards.

1.     Aggregate royalty burden based on Ericsson's public statements

73.     In my opinion, the appropriate aggregate royalty burden for the top-down analysis is 5% for the 2G/3G standards and 6% for the 4G standard.  This opinion is based primarily on public statements made by Ericsson, many joined by other key firms in the industry, at the times the standards were adopted evidencing a consensus among major SEP holders regarding the appropriate aggregate royalty burden.

74.     At the time 3G was first being commercialized in 2002, Nokia, NTT DoCoMo, Siemens, and Ericsson (which at that time were both SEP holders and implementers) announced that they reached a "mutual understanding" to license their patents essential to the WCDMA standard such that the cumulative royalty rate for WCDMA technology would be "at a modest single digit level."  Ex. 333; Ex. 1150, Appendix 10 at p. 135.  Nokia in particular advocated a 5 percent cumulative royalty rate:

> Highlighting the fact that WCDMA technology has been adopted by the vast majority of mobile operators worldwide and is fast emerging as the global standard of choice for 3G, Nokia is advocating an industry-wide commitment that royalty rates for the 3G technology should not exceed 5% cumulatively.  Under this proposal no manufacturer should pay more than 5% royalties covering all essential WCDMA patents from all patent holders.

Ex. 1088, "Nokia advocates industry-wide commitment to 5% cumulative IPR royalty for WCDMA," Press Release, May 8, 2002.

75.     In the press release issued by Ericsson in support for this initiative for reasonable cumulative royalty rates, NTT DoCoMo advocated rates below five percent:  "This initiative is meaningful for promoting the W-CDMA services by keeping cumulative royalty rate below 5%."  Ex. 333; Ex. 1150, Appendix 10 at p. 135.

76.     In 2008, numerous wireless industry participants began advocating cumulative royalty rates for the LTE standard as well.  Alcatel-Lucent, NEC, NextWave Wireless, Nokia, Nokia Siemens Networks, Ericsson, and Sony Ericsson announced that a "reasonable maximum aggregate royalty level for LTE essential IPR in handsets is a single-digit percentage of the sales price."  A copy of Ericsson's press release is found in Ex. 1150.  Ex. 1150, Appendix 10 at pp. 136-137; *see also* Ex. 1146.  Ericsson also publicly proposed a more specific target, in particular that "the market would drive all players to act in accordance with FRAND principles and to a maximum aggregate royalty level of 6-8 percent for handsets."  Ex. 1149, pp. 34-35; Ex. 1152.  Ericsson made this statement in conjunction with its claim that it "projected it would hold 20-25 percent of all LTE standard essential patents."  As I will discuss, Ericsson over-estimated its share of the value of the standard.  However, the determination of the aggregate royalty burden and Ericsson's share of the standard are two separate issues.

77.     These statements and the context in which they were made should be given weight in consideration of a FRAND royalty for at least two reasons.  First, many of these statements were made prior to, or around, the time the respective standards were being set.  They reflect the *ex ante* expectations of what the aggregate royalty burden should be, taking into account the expected effects on adoption of the standard and the "growth of the telecommunications industry" as a whole.  As noted by Ericsson itself, the intent was to provide insight and incentives for manufacturers to make investments in products implementing the standard, *i.e.*, before any lock-in to the standard had occurred.  In the absence of other considerations, increasing the aggregate royalty burden above this amount after a standard has been set and implementers are locked-in is the definition of hold-up.

78.     Second, many of the entities making these statements were both SEP holders and manufacturers and thus had an incentive to strike a balance between the compensation to patent holders with the contributions made by manufacturers.  From 2001 through 2011, including at the time Ericsson gave the range of an expected 6 to 8 percent royalty burden on LTE, it owned a 50 percent stake in the Sony-Ericsson joint venture that sold mobile phones.  *See* Ex. 1177, "Sony Buys Ericsson Stake in Handset Joint Venture," *Wall Street Journal*, October 28, 2011.  As I discuss below, these incentives change once the standard has been adopted, particularly for SEP holders who are non-practicing entities or who have limited sales of standards-compliant products.  Accordingly, these pre-adoption public representations by Ericsson and others are the best evidence regarding an appropriate aggregate royalty burden that does not reflect the value of standardization itself.

2.     The aggregate royalty burdens proposed by Ericsson are reasonable in light of TCL's profit margin on the products at issue.

79.     The evidence discussed above indicates industry expectations were that

WITNESS DECLARATION OF DR. GREGORY K. LEONARD

the aggregate FRAND royalty burden would be a "single-digit percentage" with specific figures of 5 percent or lower for 3G standards, and 6 to 8 percent for the LTE standard.  I now consider additional evidence relevant to the determination of the appropriate aggregate FRAND royalty burden.

80.    One way to evaluate whether Ericsson's public pronouncements regarding the aggregate royalty burden are reasonable is to analyze TCL's accused products.  The basic apportionment principle endorsed by the Federal Circuit with respect to both non-SEPs and SEPs is that one starts with the value of a product that incorporates the patents at issue and then apportions that value between those patents (here, the set of SEPs) and other factors that contributed to the product value.

81.    Handset manufacturers undertake many different efforts to bring mobile phone products to market, including incurring the risk and expense of upfront investments in R&D and product development, manufacturing facilities, and supply chain logistics.  For example, as described in Ex. 1131, TCL invested in the design and construction of a global manufacturing facility with a maximum output of 120 million handsets to "streamline the production process flow, and further improve[] its production efficiency and capacity in order to meet the huge market demand for TCL products."  Ex. 1131, "TCL Communication Commences the Operation of New Global Manufacturing Facility in Huizhou; Celebrates the 300 Millionth handset- the Flagship Device, HERO; Taking Production Efficiency and Production Capacity to the Next Level," TCL Press Release, September 29, 2013; see also Ex. 1140 at p. 5.

82.    Handset manufacturers such as TCL also contribute their own intellectual property (e.g., patents or trade secrets) and promote their products, often leveraging their brand names.  In addition, other factors contribute to the value of a handset, such as other standards (for example, Wi-Fi, Bluetooth, and NFC), other patented technologies, and other inputs that are necessary to the

operation of the device (*e.g.*, the Android operating system).

83.     Failure to apportion value to these other factors would overcompensate Ericsson at the expense of manufacturers, other contributors to value, other SEP holders, and consumers.  Indeed, this was a concern prior to the rapid growth in smartphones.  In 2006, prior to the first Apple iPhone, Ericsson noted the risk associated with royalty stacking given the "increasing tendency for multi-function, multi-technology products [which] means that there are even more patents covering the end product . . . ." Ex. 83, ETSI GA/IPR02(06)05, Expanded Proposal for IPR Policy Reform, February 2006 at p. 3.  At the time, advanced mobile phones offered features such as the ability to play MP3 files or access corporate emails, but the appeal of such products to consumers (as opposed to business users) was limited.  Ten years later, today's smartphones are complex computing devices that enable a wide range of additional features.  They play music files but also allow consumers to run apps that stream music anywhere.  They connect to corporate email and email services (*e.g.*, Gmail), as well as run social network applications (*e.g.*, Facebook, What's App).  They incorporate large multi-touch screens that enable high-quality video and easy control for games and other applications, high resolution cameras for photos and videos, integrated payment systems that allow consumers to pay merchants using their phones, creation and editing of business documents, and numerous other functions.  There may be synergies between these functionalities and the cellular standards at issue in this matter.  But this synergy requires both contributions.  The value of TCL's handsets must be apportioned among the technologies behind all of these features, in addition to the efforts expended by TCL itself.

84.     Consider TCL's profit margin on its sales of LTE and 3G handsets in the U.S. in 2015.  Ex. 1123 summarizes TCL's profit margin on its sales of handsets in North America, based on its internally reported revenues and expenses in Ex. 1100, Ex. 1101, and Ex. 1099.  Overall, TCL's average net selling price was

$62.44, incurring standard manufacturing costs of $53.24 per phone.  Thus, TCL's gross profit margin, before accounting for any operating costs, such as R&D, sales, marketing or other operating costs, was 14.7 percent.  These TCL documents allow me to break the gross margin out separately by standard.  Ex. 1123 is a summary I prepared mapping each TCL phone model sold in the U.S. to the respective standard.  In the U.S., nearly 100 percent of its sales in 2015 were for 3G or LTE standard phones.  For its LTE phones, TCL's average net selling price was $100.67 with an average gross margin of 11.7 percent.  For 3G, TCL's average net selling price was $50.78 with a gross profit margin equal to 16.6 percent. These figures are conservative as they exclude provisions and accruals listed in TCL's profit and loss statements.  Ex. 1100, "OL NA"; Ex. 1123.  The actual profits would be lower if provisions and accruals were not excluded.

85.    TCL also incurs operating costs that support and are incremental to these sales, as shown in the "OL NA" tab in TCL's in its North American financial data, Ex. 1100.  TCL's regional financials include structural and marketing expenses.  Even using conservative estimates of these expenses reduces the profit margin that TCL earns on these sales to no more than 5.0 percent for LTE and 9.9 percent for 3G phones, or 8.1 percent on average.  *See* Ex. 1123.

86.    Research and development expenses are part of long-run investments that companies make with the expectation they will recover them over time plus at least a competitive rate of return.  Manufacturers incur research and development expenses in advance of sales.  In the long run, in order for TCL to at least break even, it would have to earn enough profits to cover these R&D costs.  R&D expenses are recorded in TCL's worldwide financials.  Ex. 1099.  In 2014, TCL's R&D expenses averaged 4.8 percent of its overall revenues.  TCL's R&D expenses as a percentage of overall revenues for the last three years was 4.8 percent, 5.5 percent and 6.1 percent for 2014, 2013 and 2012, respectively.  *See* Ex. 1099.

87.    The low profit margin TCL earns on its sales supports an aggregate

WITNESS DECLARATION OF DR. GREGORY K. LEONARD

royalty burden for TCL that is at the low end of the *ex ante* expectations of a single-digit percentage for both the 3G and LTE.  A 6 percent royalty on LTE and a 5 percent royalty on 3G would result in over 50 percent of TCL's profits being apportioned to the SEPs (pre-R&D).  It also rules out as reasonable for TCL more recent positions taken by Ericsson and certain other SEP holders who now claim the aggregate royalty burden should be 10 percent or greater.  Such a high aggregate royalty burden would exhaust TCL's profits and/or require an increase in the price of TCL handsets to TCL's customers, which would reduce demand for the products given the intense competition TCL faces from other handset manufacturers.

88.     I reach a similar conclusion when examining TCL's profit margin on a worldwide basis.  Consider TCL's profits on a worldwide basis in 2013 and 2014, after taking out the IPR allocation.  Here, I rely on TCL's internal summary of handset and tablet sales that include the IPR provisions, Ex. 1588.  These IPR provisions include royalties TCL is paying to existing licensors, including Qualcomm.  My calculations regarding TCL's worldwide profit margins are shown in Ex. 1127.

89.     For example, in 2014, TCL's gross profit margin, after accounting for cost of sales, which includes its IPR provision, was 16.6 percent.  TCL's overall IPR allocation during this year was 6.8 percent, which would imply a gross margin without the IPR allocation equal to 23.4 percent.  I note this is comparable to TCL's 2014 audited financials—the 19.3 percent gross profit shown in TCL's 2014 Annual Report plus the 3.9 percent IPR provision for Qualcomm implied by internal TCL documents results in a 23.2 percent gross profit margin.  The 3.9 percent is calculated by dividing the total IPR provision for Qualcomm shown in the "FR vs SC" tab in Ex. 1588 by TCL's 2014 total sales as reported in its Annual Report.  *See* Ex. 1140, TCL Annual Report 2014.

90.     In addition, TCL must incur other costs to make these sales.  In 2014,

for example, it incurred R&D expenses equal to approximately 4.3 percent of revenue and selling, marketing, and distribution costs equal to 7.9 percent of revenue.  Ex. 1588.  After accounting for just these costs, TCL operating margin was equal to 11.3 percent.  Even ignoring TCL's other operating costs, including general and administrative expenses and other provisions, a 5 to 6 percent aggregate royalty burden would result in an allocation of nearly 50 percent of the handset profits just for SEPs to cellular standards.  A similar conclusion can be reached for 2013, where TCL's operating profit margin accounting for direct operating costs (*i.e.*, R&D and sales and marketing) was 9.5 percent.  Again, a 5 to 6 percent aggregate royalty burden would consume a large portion of TCL's profits, before accounting for TCL's other operating costs.  As discussed above, this only accounts for cellular SEPs, and does not allocate any of TCL's profit margin to SEPs to other standards, implementation patents, or the other valuable components of smartphones or TCL contributions.

91.     Using TCL's handsets as the royalty base, the above analysis indicates that the aggregate royalty burden should be at the low-end of industry *ex ante* expectations of the aggregate royalty burden.  Moreover, consideration of TCL's profit margins shows that, even at the lower bound of 5 percent for 3G and 6 percent for LTE, the aggregate royalty burden would be greater than 50 percent of TCL's profits, even before accounting for royalty payments for SEPs for other standards, royalty payments for other patents, and other factors such as TCL's know-how and brand name.  Therefore, I conservatively adopt a 5 percent aggregate royalty burden for TCL's sales of 2G/3G phones, while I adopt a 6 percent aggregate royalty burden for TCL's sales of LTE phones.

**B.     Apportionment of the Royalty Burden**

1.     Ericsson's SEPs represent a small fraction of the SEPs necessary to implement the standards at issue.

92.     Having addressed the aggregate royalty burden for the SEPs to the

standards at issue, I now turn to how the royalty burden should be apportioned among SEP holders and to Ericsson's SEP portfolio in particular.  Ericsson's share of the royalty burden will depend on the number and quality of its SEPs relative to all other SEPs.  I refer to this as Ericsson's "value share" of each of the standards at issue.

93.    Ericsson has previously endorsed the view that a FRAND rate should "reflect the added value that the licensed technology brings to the end user." Ex. 1098, p. 49.  Ericsson has further explained that to determine a FRAND rate, "each patent owner should limit its royalty rate in proportion to its contribution to the total aggregate royalty that a user of the standard can reasonably be expected to pay." *Id.*, p. 50.

94.    Ericsson's SEPs represent only a small fraction of the total number of SEPs necessary to implement the standards at issue.  Hundreds of companies have declared patents essential to the 4G, 3G and 2G standards, representing thousands of individual patents.  As with Ericsson's claimed SEPs, other companies' declared essential patents to a standard may not relate to handsets or may not actually, upon technical evaluation, be essential to the standards.  Dr. Kakaes's technical analysis, specifically the patent census, evaluated a sample of 33 percent of all handset-related patent families declared essential to each of the standards.  This sample of patents was then analyzed to determine whether their patent claims actually mapped to the specification of the standard.  From this sample, I estimate the total number of actually essential SEP families for each standard, as shown in Table 4 (PDX 5).  In addition to the estimate of the total number of essential handset patent families based on the patent census, this table shows the number of Ericsson handset SEP families determined essential by Dr. Kakaes's technical analysis and a calculation of Ericsson's share of all SEPs in Ex. 1116.  I note that Dr. Kakaes evaluated all SEPs for which Ericsson provided a claim chart, but there were a number of uncharted patents.  Accordingly, I calculate Ericsson's total number of

essential families by applying Ericsson's essentiality ratio (essential patents ÷ (essential + non-essential patents)) to Ericsson's claimed SEPs that were not claim charted.  These figures relate to SEP families with a U.S. patent.  In calculating a worldwide FRAND rate for Ericsson's portfolio, I first calculate Ericsson's share for each standard in the U.S., and then make adjustments to account for regional differences in Ericsson's portfolio strength.

**Table 4 - Ericsson's Share of U.S. SEP Families, 2015**

| Classification | 4G | 3G | 2G |
|---|---|---|---|
| **Estimated Essential Patent Families** | | | |
| Worldwide Number of Handset Patent | 5,024 | 2,947 | 1,182 |
| Sample | 1,673 | 983 | 395 |
| Percent | 33% | 33% | 33% |
| | | | |
| **U.S. Essential Patent Families** | | | |
| Determined Essential U.S. Patents | | | |
| Families from Sample[2] | 557 | 359 | 138 |
| **Estimated Total Essential[3]** | **1,673** | **1,076** | **413** |
| | | | |
| **Ericsson's Essential Patent Families** | | | |
| Determined Handset Essential Families[4] | 69 | 33 | 28 |
| Estimated Ericsson Share | 4.1% | 3.1% | 6.8% |
| | | | |
| Upward Adjustment for Ericsson's Non- | | | |
| Claim-Charted Patents[5] | 78 | 40 | 33 |
| **Share** | **4.7%** | **3.7%** | **8.0%** |

**Sources:**

[1] Estimated total number of worldwide essential patent families taken from Kakaes Report, Table at p. 76.

[2] Technical analysis of SEP survey for U.S. patent families (Ex. 1594, "SEP Survey Final," Exhibit C to Expert Report of Zhi Ding).

[3] Total essential patents estimated by dividing the number of essential patents in the sample by the sampling percentage.

[4] Based on the technical analysis overseen by Dr. Kakaes (Ex. 1116). Determined essential patents based on Ericsson's claimed patents. In this calculation, only claim-charted patents that were determined to be essential are considered. Note that the share of Ericsson's SEPs given on p. 78 of the Kakaes Report are based on all patents that have been declared by Ericsson's as essential, including those not claimed as essential in this matter.

[5] Ericsson's estimated total essential families based on the estimated number of non-claim charted patents that are essential. Calculated by applying Ericsson's essentiality ratio (essential patents ÷ (essential + non-essential patents) to Ericsson's claimed SEPs that were not claim charted.

95.     Comparing the number of Ericsson's handset patent families determined to be essential under the technical analysis to the estimated total number of essential patents, I conclude Ericsson holds only a small share of the total number of SEP families for each standard. Specifically, I calculate that Ericsson has a 4.7 percent share of all 4G SEPs, a 3.7 percent share of all 3G SEPs,

1 and an 8.0 percent share of all 2G SEPs.

2    96.    This analysis provides a starting point for evaluating the value of the

3 handset SEPs in Ericsson's portfolio.  In particular, a FRAND royalty for the

4 *average* SEP is necessarily only a tiny fraction of the overall royalty burden given

5 the large number of patents necessary to implement these standards, and given that

6 the total royalty must be divided among all standard essential patents.  Because the

7 FRAND royalty for the average SEP must be small, when presented with a

8 particular SEP, the appropriate starting point for evaluating its FRAND royalty is

9 the FRAND royalty for an average SEP.  If the patent were shown to have

10 contributed features with above average value to the standard (relative to what

11 could have been achieved with alternative technologies) it would be appropriate to

12 revise the FRAND royalty upward from the average.  Similarly, if the patent were

13 shown to be less important than the average SEP, the FRAND royalty assessment

14 should be revised downward.

15    97.    Along the same lines, Ericsson's share of the royalty burden depends

16 on where its patents fall in the value distribution of all SEPs.  The economic

17 literature indicates that the distribution of patent values is highly skewed, with most

18 patents being worth very little and a few patents being more valuable.  This is

19 consistent with the summary of the technical analysis of Ericsson's SEP portfolio

20 discussed above, which showed that only a handful of Ericsson's patents were

21 ranked highly on importance of the feature and contribution of the patent.

22    98.    A number of empirical economic studies have estimated the

23 distribution of patent value for large groups of patents.  These studies found the

24 value of all patents can be plotted as a normal distribution (sometimes referred to as

25 a "bell curve"), and a small number of patents account for the majority of the total

26 value of patents (*i.e.*, the curve is asymmetrical with most of the value weighted

27 toward a small set of patents).

28    99.    The distribution adopted in the *Innovatio* decision was based on the

values given for the electronics industry taken from Ex. 1089, Mark Schankerman, "How Valuable is Patent Protection?  Estimates by Technology Field," *The RAND Journal of Economics,* Vol. 29, No. 1 (1998), based on the mean and standard deviation of a log-normal distribution for "Electronics (excluding Japan)" industry in Table 5 (pp. 18-19).  The Schankerman study found that the distribution of patents value is as follows:

- The top 10 percent of patents (*i.e.*, the 90th to 100th percentile of patents) make up approximately 84 percent of total value.

- The next 10 percent of patents (the 80th to 90th percentiles) make up approximately 8 percent of the value.

- Each successive group of patents makes up a smaller and smaller portion of the total value.  For example, collectively, the bottom-ranked 50 percent of patents contribute only 1 percent of the total value.

100.   For this analysis, I modeled the distribution of value for SEPs related to the standards at issue based on the findings of the wider set of studies of the distribution of patent values.  In more technical terms, I approximate the distribution of SEP values based on a log-normal distribution with a skewness parameter equal to the median value from the empirical economic studies, as reported by Ex. 319, Jonathan D. Putnam, "What (Exactly) Are Patents Worth at Trial?: The 'Smartphone War' Example," Working Paper, Charles River Associates, 6 April 2012.  Adopting the median value of the "sigma" parameter of 1.67 from the study:

- The top 10 percent of patents (*i.e.*, the 90th to 100th percentile of patents) make up approximately 65 percent of total value.

- The next 10 percent of patents (the 80th to 90th percentiles), make up approximately 14.6 percent of the value.

- Each successive group of patents makes up a smaller and smaller portion of the total value.  For example, collectively, the bottom-ranked 50 percent of patents contribute only 4.8 percent of the total value.

101.   This distribution is similar to the distribution adopted by the court in *Innovatio*, but is somewhat less skewed.  Under this analysis, the top 10% of patents receive 65% of the value.  Using a more skewed distribution (such as the one used in *Innovatio*), or a less skewed distribution does not substantially alter my conclusions.

102.   Using this distribution, the aggregate royalty burden for each standard can be apportioned to Ericsson's SEP portfolio based on the quality of the patents in its portfolio.  I adopt two approaches for making this assessment.  The first approach (my primary approach) is based on the technical analysis of Ericsson's SEP portfolio; the second approach, which I use as a "check" on the first approach, is based on a forward patent citation analysis.

### 2.   Apportionment of royalty burden in the U.S.

#### a.   *Apportionment based on the technical analysis of Ericsson's SEPs*

103.   The technical analysis of Ericsson's SEP portfolio as summarized above showed that the majority of Ericsson's patents did not make significant contributions over alternatives or were related to less important features of the standard.  A reasonable conclusion based on this analysis is that, on average, Ericsson's SEPs do not contribute more value than the average SEP within each standard.

104.   A conservative estimate of Ericsson's share of the total SEP value can be made based on the technical analysis performed by Dr. Kakaes.  The technical analysis showed that the absolute value of the majority of Ericsson's SEPs— those ranked as low importance or low contributions—is low and in some cases zero.  For each standard, only a handful of patents made more substantive contributions

and were related to important features of the standard.  Such patents would be expected to be Ericsson's most valuable patents and appear closer to the top of the value distribution of all SEPs.  However, given the large number of SEPs for each standard, even Ericsson's top SEPs in each standard would make up only a fraction of the most valuable SEPs.

105.   I focus on the results of the technical assessment of contribution, which closely aligns with the economic value of the patent—*i.e.*, the value of the patent over alternatives.  For this scenario, I adopt the conservative assumption that all Ericsson SEP families that make significant or moderate improvements (ranked 1 or 2 under the technical analysis) fall within the top 10 percent of all SEPs for a standard.  The remaining patents, those that provided a marginal or no contribution (a contribution ranking of 3 or 4), are assumed to fall within the bottom 90 percent of the patent value distribution.

106.   The notion that Ericsson's SEPs make up only a fraction of the most valuable patents is supported by additional evidence.  First, although Ericsson owns a number of patents that make "significant" or "moderate" improvements, this will be true for other SEP holders as well.  For example, it is well known that Qualcomm holds the foundational technology for patents that relate to the CDMA-based standards.  *See* Ex. 1087, Rudi Bekkers et al., "An Empirical Study on the Determinants of Essential Patent Claims in Compatibility Standards," *Research Policy*, Vol. 40, No. 7, 2011, pp. 7-8.  Other SEP holders have also claimed to own patents on valuable components of the various standards.  Nokia, for example, has claimed it holds patents that are "fundamental" to the technologies for 2G-GSM and 3G-WCDMA.  Early on, Nokia claimed it owned 25 percent of 3G-WCDMA patents.  Second, the conclusion is corroborated by the citation analysis, discussed below, which shows that while Ericsson owns a number of highly-cited patents—an indication of a valuable patent—so do many other SEP holders such as Qualcomm, Nokia, and InterDigital, among others.

107.   Ericsson's share of the SEP value under this conservative assumption can be calculated using the estimate of the total number of SEP families for each standard.  First, in order to calculate a FRAND royalty for the U.S., I limit my analysis to only U.S. patents.  I then take the mapping described above based on the contribution rankings for these U.S. patents, which are summarized in Table 5 (PDX 6).  The red-outlined cells highlight the number of Ericsson handset SEPs that were ranked highly for both importance and contribution.

**Table 5 - Importance and Contribution of Ericsson's**

**U.S. Essential Handset SEPs for the 2G, 3G and 4G Standards in 2015**

| | | Importance | | |
| | | 1 Very | 2 Moderate | 3 Marginal |
|---|---|---|---|---|
| **4G** | | | | |
| Contribution | 1 – Significant | 2 | 0 | 0 |
| | 2 – Moderate | 0 | 2 | 0 |
| | 3 – Marginal | 3 | 7 | 13 |
| | 4 – None | 7 | 8 | 31 |
| **3G** | | | | |
| Contribution | 1 – Significant | 3 | 0 | 0 |
| | 2 – Moderate | 0 | 2 | 0 |
| | 3 – Marginal | 2 | 2 | 1 |
| | 4 – None | 3 | 3 | 17 |
| **2G** | | | | |
| Contribution | 1 – Significant | 2 | 0 | 0 |
| | 2 – Moderate | 0 | 1 | 0 |
| | 3 – Marginal | 1 | 3 | 5 |
| | 4 – None | 3 | 1 | 9 |

**Source:** Based on the technical analysis overseen by Dr. Kakaes (Ex. 1116, "EIC Rankings.xls").

**Notes:** Based on Ericsson's U.S. handset SEP families for each standard. Red-outlined cells highlight the number of Ericsson handset SEPs that were ranked highly for both importance and contribution. Table 3 above considered Ericsson's worldwide patent families, while this table is limited to U.S. families in 2015.

108. The calculation of Ericsson's share of the total SEP value is given in Table 6 (PDX 7). Consider, by way of example, Ericsson's LTE SEPs. There, the total estimated number of U.S. essential handset SEPs is 1,673. The top 10 percent of patents would represent approximately 167 patents. The technical analysis found that only 4 of Ericsson's patents were ranked highly for contribution. Ericsson's patents in the top 10 percent would be assumed to capture 4/167 of the

value of the top 10 percent of patents.  Based on the distribution of patent values from the economic literature discussed above, the top 10 percent of patents receive 65 percent of the aggregate value.  Ericsson's share of the aggregate value for its patents in the top 10 percent of patents, its "value share," is therefore equal to $(4/167)*65\% = 1.6\%$.  The analogous set of calculations can be performed for Ericsson's SEP families in the bottom 90 percent of patents, resulting in an aggregate value for those patents of 1.3% percent.  Summing the value share for all of Ericsson's patents results in a total value share of its SEP portfolio of 3.1 percent.  Finally, I make an adjustment to account for those patents for which Ericsson has not provided claim charts.  This results in an adjusted value share of 3.5 percent.

WITNESS DECLARATION OF DR. GREGORY K. LEONARD

**Table 6 – Ericsson's U.S. Share of Value for Each Standard in 2015 Based on Technical Analysis**

| Classification | 4G | 3G | 2G |
|---|---|---|---|
| Estimated Total U.S. Handset SEP Families[1] | 1,673 | 1,076 | 413 |
| **Top 10%[2]** | | | |
| Number of Patents in Top 10% | 167 | 108 | 41 |
| Number of Ericsson Patents in Top 10% | 4 | 5 | 3 |
| Share of Value of Top 10% of Patents | 65% | 65% | 65% |
| Value Share of Ericsson's SEPs in Top 10% | 1.6% | 3.0% | 4.8% |
| **Bottom 90%** | | | |
| Number of Patents in Bottom 90% | 1,506 | 968 | 372 |
| Number of Ericsson Patents in Bottom 90% | 65 | 27 | 21 |
| Share of Value for Bottom 90% of Patents | 35% | 35% | 35% |
| Value Share of Ericsson's SEPs in Bottom 10% | 1.5% | 1.0% | 2.0% |
| **Value Share of Ericsson's SEP Portfolio** | 3.1% | 4.0% | 6.7% |
| **Adjusted Value Share Accounting for Uncharted Patents[3]** | 3.5% | 4.8% | 8.0% |

**Sources:**
[1] U.S. handset SEP families based on U.S. families from SEP Survey.  Ex. 1594.
[2] Ericsson's U.S. patent families with contribution ranking of 1 or 2 based on the essentiality determination based on the technical analysis overseen by Dr. Kakaes (Ex. 1116, "EIC Rankings.xls").
[3] Ericsson's uncharted patents are assumed to be essential at the same proportion as the claim-charted patents analyzed under the technical analysis.  They are then assigned the average value of the SEPs in the portfolio.

> b.    *Apportionment based on a forward-citation analysis of Ericsson's SEPs*

109.    The above analysis considers the patent-by-patent technical analysis of Ericsson's SEP portfolio.  As discussed earlier, I adopted a number of conservative assumptions regarding the quality of Ericsson's SEP portfolio and where its SEPs fall within the distribution of SEP values.  Here, I consider a second approach based on another economic measure of the quality of a patent portfolio—patent citations.

110.    Economists have attempted to identify observable characteristics of a patent that can provide reliable indicators of the patent's value.  The most widely

accepted such indicator among economists is the number of "forward citations" the patent receives.  A citation analysis allows me to directly compare Ericsson's handset SEP portfolio to all handset SEPs based on the sample from the technical analysis.

111.   A patent receives a forward citation when it is cited as prior art by another patent issued at a later point in time.  The economic logic behind forward citations being an indicator of patent value is that a patent that is more important and valuable would be expected to generate a greater number of future innovations that then cite back to the patent in question.  The positive relationship between forward citations and patent value has been confirmed by empirical economics research.  *See, e.g.*, Ex. 1104, Harhoff, et al., "Citations, Family Size, Opposition and the Value of Patent Rights," *Research Policy* 32(8) (2003): pp. 1-20; Ex. 1105, Harhoff, et al., "Citation Frequency and the Value of Patented Inventions," *Review of Economics and Statistics* Vol. 81(3) (1999): pp. 1-5; Ex. 1102, Adam Jaffe and Manuel Trajtenberg, Patents, Citations and Innovations: A Window on the Knowledge Economy (Cambridge: MIT Press), 2002; Ex. 1089, Mark Schankerman, "How valuable is patent protection? Estimates by technology field," *RAND Journal of Economics*, Vol. 29(1) (1998), pp. 1-32 and Technical Appendix; and Ex. 1103, Manuel Trajtenberg, "A Penny for Your Quotes: Patent Citations and the Value of Innovations," *Rand Journal of Economics* Vol. 21(1) (Spring 1990): pp. 1-16.  Forward citations are commonly used by economists as an indicator of a patent portfolio's relative worth.

112.   I focus my forward-citation analysis on U.S. patents for three reasons.  First, given the legal structure governing patents in the United States, applicants seeking a U.S. patent have a strong incentive to cite all relevant existing patents that might be construed as prior art.  Second, by focusing on a single jurisdiction, I avoid double counting of what is essentially the same patent issued in different jurisdictions.  Third, I will perform my top-down analysis to determine a FRAND

royalty for the U.S., which will then be adjusted based on Ericsson's regional patent strength.

113.   As before, I analyze Ericsson's portfolio as of 2014, considering issued patents that were still active.  I pulled information from the U.S. Patent and Trademark Office regarding the number of forward citations each patent has received to date.  I analyze the total number of citations excluding those that are "self-citations," which are situations in which a patent is cited by a second patent that has the same assignee.

114.   Most of the patents have not reached their expiration date and thus may receive additional citations in the future.  It would not be appropriate to compare, for example, the forward citations received by a patent near the end of its life to the forward citations received by a patent that is near the beginning of its life, because the "young" patent would be expected to receive more forward citations in the future, while the "old" patent would be unlikely to receive many more citations.  Therefore, it is important to account for differences in age (and thus remaining life) of the patents before comparing their number of citations.

115.   To account for differences in patent age, I predicted the lifetime number of forward citations for those patents that had not yet reached the end of their lives.  The following example illustrates the approach I used to make these predictions:  Suppose a patent issued three years ago has received nine citations.  What is its likely number of lifetime citations?  Suppose further that, on average, 10% of the citations received by a patent in its first four years since issuance came in the fourth year.  This would suggest the patent with nine citations in the first three years since issuance would be predicted to receive an additional citation in its fourth year.  This process can be repeated for years five through 20 to predict the total number of lifetime citations.

116.   The results of this analysis for the 4G standard are shown in Table 7 (PDX 8), which compares the forward-citations to Ericsson's SEP portfolio to the

estimates based on the sample of 4G SEPs from the technical analysis.  In
particular, I begin with the set of SEPs for both Ericsson and the sample of patents
that were found to be essential and relate to handsets.  For the purpose of this
analysis, I consider U.S. patents issued before January 1, 2015.  For all other SEP
holders, the sample of 4G patents analyzed is used to estimate the aggregate values
for the universe of patents.

**Table 7 - SEPs, Actual and Predicted Citations,
and Value Share for Ericsson for the 4G Standard**

| | Actual Citations to Date | Share of Actual Citations | Predicted Lifetime Citations | Share of Predicted Citations | Value Share |
|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) |
| **4G Standard** | | | | | |
| Ericsson | 887 | 4.6% | 4,581 | 4.2% | 4.0% |
| All Others | 18,606 | 95.4% | 103,942 | 95.8% | 96.0% |
| **3G Standard** | | | | | |
| Ericsson | 1,349 | 5.2% | 3,394 | 4.9% | 5.7% |
| All Others | 24,534 | 94.8% | 65,608 | 95.1% | 94.3% |
| **2G Standard** | | | | | |
| Ericsson | 763 | 10.2% | 1,768 | 8.6% | 8.1% |
| All Others | 6,707 | 89.8% | 18,902 | 91.4% | 91.9% |

**Source:** Calculations are based on U.S. handset SEPs for 2014 that were found to be
essential under the technical analysis.  Figures for "all others" based on the
sample of handset SEPs found to be essential under the technical analysis,
adjusted to account for the sample size.

117.   In this demonstrative, column (a) gives the number of forward citations
received to date by the patents; column (b) gives the patent holder's share of the
estimated total number of forward citations received by all of the patent holders for
that particular standard; column (c) of the table shows the predicted number of
lifetime citations for Ericsson and all other SEP holders; and column (d) gives each
patent holder's share of total predicted lifetime citations across all the listed patent
holders.  Based on my forward-citation analysis, Ericsson has a 4.0 percent share of
the 4G standard, a 5.7 percent share of the 3G standard, and an 8.1 percent share of

1     the 2G standard.

2                              *c.       Summary of results*

3          118.   The different approaches described above lead to the conclusion that

4     Ericsson's share of the total SEP value falls within a relatively narrow range.  For

5     example, for 4G, assuming Ericsson's handset SEPs are of average value, its share

6     of the standard is 4.7 percent (*i.e.*, its share based on counts of handset SEPs),

7     which is only slightly more than the 3.5 percent value share based on the technical

8     analysis.  These results for 4G, as well as 3G and 2G, are shown in Table 8 (PDX

9     9).

**Table 8 - Summary of Ericsson's Share of the Standard Value
Based on Technical Analysis and Citation Analysis**

| Essential Handset SEPs | 4G | 3G | 2G |
|---|---|---|---|
| Average Value (Share of Essential Handset SEPs) | 4.7% | 3.7% | 8.0% |
| Technical Analysis (Value Share) | 3.5% | 4.8% | 8.0% |
| Citation Analysis (Value Share) | 4.0% | 5.7% | 8.1% |

16         119.   In this matter, Ericsson may dispute the conclusions from the technical

17    analysis regarding the determination of essentiality.  A top-down analysis,

18    however, compares the value of Ericsson's SEP portfolio *relative* to all other SEP

19    holders.  Mathematically, the calculation of Ericsson's share compares its portfolio

20    (the numerator) relative to all other SEP holders (along with Ericsson's SEPs, the

21    denominator).  As a result, even if the scope for determining essentiality were

22    broadened, such that a larger number of Ericsson's patents were deemed to be

23    essential, the same broader criteria would likely increase the total number of

24    handset patents deemed to be SEPs.  Thus, under a broader definition, Ericsson's

25    share of the value would not necessarily increase and could, in fact, decrease.

26         3.     <u>Accounting for changes in Ericsson's SEP portfolio over time</u>

27         120.   Another consideration in determining a FRAND royalty is accounting

28    for changes in Ericsson's SEP portfolio over the term in which TCL would be

expected to pay royalties.  A large number of Ericsson's SEPs are expected to expire over the next five to ten years.  TCL should not pay royalties on patents that have expired.  On the other hand, Ericsson has a number of patents in application that it has declared essential, and Ericsson will likely be granted patents for at least some of its applications.  As a matter of industry practice, licenses covering essential patents to a standard typically cover patents issued during the term of the license.  I consider the expected changes in the strength of Ericsson's SEP portfolio over the term of the hypothetical license, either five or ten years.

121.   To account for the expected expiration of patents in Ericsson's SEP portfolio, I begin with the set of Ericsson's handset SEPs that were determined to be essential to each of the standards beginning in 2014.  For each year thereafter, patents that have expired are removed from the list of Ericsson's SEPs for each standard.  All else equal, the FRAND royalty for Ericsson's SEPs will decrease over time as patents expire.

122.   The number of Ericsson's current SEPs over a ten-year term are given in the Table 9 (PDX 10) for each standard.  In general, Ericsson's portfolio is expected to decline over time.  More than half of Ericsson's essential patents to the 2G and 3G standard are expected to expire by 2023, while approximately 11 patents will expire for LTE.

**Table 9 - Ericsson's SEP Portfolio by Standard Accounting for Expirations, 2014 to 2023**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| **LTE Standard** | | | | | | | | | | |
| Essential Handset | 61 | 69 | 69 | 69 | 69 | 65 | 63 | 62 | 62 | 59 |
| Expiring Patents | 0 | 0 | 0 | 0 | 4 | 2 | 1 | 0 | 3 | 1 |
| | | | | | | | | | | |
| **3G Standard** | | | | | | | | | | |
| Essential Handset | 32 | 32 | 32 | 31 | 29 | 21 | 15 | 13 | 13 | 10 |
| Expiring Patents | 1 | 0 | 1 | 2 | 8 | 6 | 2 | 0 | 3 | 0 |
| | | | | | | | | | | |
| **2G Standard** | | | | | | | | | | |
| Essential Handset | 26 | 24 | 24 | 23 | 22 | 13 | 7 | 7 | 7 | 6 |
| Expiring Patents | 2 | 0 | 1 | 1 | 9 | 6 | 0 | 0 | 1 | 1 |

**Sources**: Ericsson's claimed SEP families designated as handsets. *See* Ex. 1577, "Revised Annex A," November 12, 2015, Ericsson's Objections and Fourth Supplemental Response to TCL's Interrogatory Nos. 5 and 6. Essentiality based on technical analysis of handset SEPs.

**Notes**: Essential handset patents for 2014 exclude patents issued in 2015. Expired patents reflect the number of patents that expire in that calendar year.

123.   The expiration of Ericsson's patents can be accounted for within the framework of the top-down approach by calculating the change in Ericsson's value share over time. As patents expire, Ericsson's share of the value of the standard will fall, all else equal. How much its share falls will depend on the quality of those patents that expire. When more valuable patents expire—*e.g.*, those with significant or moderate improvements—the reduction in its share will be larger than when its "average" patents expire.

124.   Over the term of the license, Ericsson may also receive additional patents that are essential to the standards at issue. For the purpose of my analysis, I assume the hypothetical license would cover Ericsson's newly-issued SEPs over the term of the license. However, while Ericsson may continue to receive new SEPs to the standards, this will also be true for other SEP holders. Setting aside patents that expire, this means Ericsson's share of active SEPs will not necessarily increase over time.

125.   One additional factor must be considered in the calculation of Ericsson's value share over time related to Ericsson's and other SEP holder's expired patents.  In particular, the share of the total SEP value apportioned to a given SEP holder must take into account a basic economic principle regarding the purpose of the patent system.  Governments grant patent holders exclusive use over a technology, but that right is limited to a finite period of time.  Under the current system in the U.S., this is 20 years from date of filing.  Once a patent expires, the patent holder loses exclusivity and the technology claimed by the patent goes into the public domain.  The value of that technology does not, however, disappear. Indeed, the express intent of the patent system is to transfer that value to the public. As patents expire, consumers and the public should benefit from the free use of the technology associated with expired patents.  Expired patents can be accounted for in the context of the top-down approach by apportioning the part of the aggregate royalty burden associated with expired patents to the public, which is consistent with the express intent of the patent system.

126.   I account for expired patents and newly issued patents by adjusting Ericsson's value share over the term of the license.  Under this approach, Ericsson's value share in each year is calculated removing patents that expire from the numerator of the share calculation.  However, for the reasons described above, Ericsson's and other SEP holder's expired patents that are in the public domain still factor into the calculation of the denominator in the share calculation.

127.   Expectations of the number of new handset SEPs that Ericsson will receive depends on the standard.  The 2G and 3G standards are mature and nearing the end of their lifecycles.  The 2G GSM standard, for example, was established in 1991.  Many of the foundational 2G patented technologies have expired or will expire over the course of the term.  Although Ericsson still claims new patents to these standards, these are presumably incremental improvements to the 2G systems already in place.  Ericsson's rate of new patents for these standards is

conservatively projected forward over the term of the hypothetical license based on its recent historical growth rate.  For 3G, I take the average growth rate of families within that standard over the past three years (2013-2015).  For 2G, I take the growth rate of families within that standard for the most recent year (2015).

128.   The 4G standard, first adopted around 2010, is relatively young, and Ericsson continues to receive new patents.  Here, I assume the same patenting rate for 4G at approximately the same point in the lifecycle as 3G, again projecting over the term of the license.  This accounts for the expected increase in patents in the short term and the expected decrease over the long term.  I assume the quality of newly issued patents equals the average quality of Ericsson's existing handset SEPs.

129.   Commercialization of the 3G standard began in 2002, while commercialization of the 4G standard began in 2010, meaning the 3G standard in 2007 was at a similar point in its lifecycle as 4G was in 2015.  I therefore take the average growth rate of 3G families in our sample between 2007 and 2015, and apply that rate to estimate the number of newly issued 4G families in each year after 2015.  Based on this methodology, my model grants 30 newly issued families to Ericsson over the next three years (2016-2018).

130.   While Ericsson may be issued additional patents, so will other SEP holders.  Other SEP holders are assumed to receive additional patents under the same methodology adopted for Ericsson.  For this reason, Ericsson's value share over time is not particularly sensitive to the assumption of rate and quality of newly issued patents because the same assumptions affect both the numerator and denominator of the share calculation.

131.   I adjust Ericsson's value share over time taking into account expirations and newly issued patents.  Exhibit 1119 shows the change in Ericsson's value share over time.  For example, Exhibit 1119 shows Ericsson's value share for LTE in the U.S. over a nine-year period.  This analysis shows that Ericsson's share

of the value of each standard decreases over time.  Under the technical analysis for LTE, Ericsson's value share in 2015 is 3.5 percent.  By the end of a ten-year license in 2023, this falls to 3.2 percent.  Ericsson's SEPs are older for 2G and 3G, so its share falls faster for these standards.

### 4. Adjustments for Ericsson's weaker portfolio outside the U.S.

132.   The above analysis of Ericsson's SEP portfolio for each standard considered Ericsson's handset SEP families in the U.S., which would apply to U.S. sales.  A fair and reasonable royalty outside of the U.S. would start with the U.S. FRAND royalty, but make adjustments to account for the differences in the strength of Ericsson's SEP portfolio across jurisdictions.  In general, Ericsson's portfolio is weaker outside of the U.S.  If Ericsson does not patent the same technology in other regions then that technology remains, in effect, in the public domain in those jurisdictions.  Note that it does not matter whether other SEP holders are stronger or weaker in other jurisdictions.  All of the technologies incorporated into the standard should be counted in the share calculation (in the denominator), whether or not they are patented.  As discussed previously, the determination of FRAND royalties requires that the unpatented features of the standard be apportioned.  A FRAND royalty for Ericsson's SEPs outside of the U.S. should be proportionally related to Ericsson's portfolio strength in each region.

133.   To account for this, I compare Ericsson's SEP families across regions that correspond to the regional breakdown of TCL's sales.  For a breakdown of TCL's proportional sales by region, I relied on TCL's financial reports, Exs. 1106, 1107, and 1108, and corroboration by publicly available mobile phone industry sales reports by IDC.  Ex. 1139, "WW Mobile Phone Tracker," IDC, 2015. Because the quality of Ericsson patents may also vary across regions, in principle, Ericsson could maintain a larger share of the value of its portfolio if it only patents its strongest patents across regions.  For each region, I take the value share of the

1   U.S. equivalent patent based on Dr. Kakaes's technical analysis of Ericsson's SEPs.

2   Based on this methodology, I calculate the relative value of Ericsson's SEP

3   portfolio in each region relative to the U.S.  In Europe, I consider all EP and

4   national patents.  For other regions, I conservatively count the country with the

5   highest value share based on the technical analysis.  Ex. 1122 shows my

6   calculations regarding the relative strength of Ericsson's SEP portfolio by region.

7       134.   These results are summarized for LTE in Table 10 (PDX 11).  As the

8   table shows, Ericsson's SEP portfolio in the Middle-East and Africa ("MEA") and

9   Latin American are particularly weak, less than half the value of Ericsson's U.S.

10  portfolio.  In principle, Ericsson could enforce its SEPs in the country in which the

11  accused products are manufactured, which for TCL is China.  I therefore adopt

12  China as the lower bound of the value in any region.  The average value of

13  Ericsson's SEP portfolio outside of the U.S. can be calculated by weighting

14  Ericsson's relative portfolio strength by TCL's sales in each region, as shown in the

15  following table.  Based on the technical analysis, Ericsson's LTE portfolio outside

16  of the U.S. is 70.1 percent the value of Ericsson's SEP portfolio in the U.S.  The

17  analogous regional adjustment calculation for 2G and 3G are given in Exhibit 1122.

18

19

20

21

22

23

24

25

26

27

28

**Table 10 – Ericsson's Portfolio Strength across Regions
Relative to the U.S. for the LTE Standard**

| Classification | TCL 2015 Sales | Ratio to U.S. |
|---|---|---|
| **U.S./North America** | 19.1% | 100% |
| **ROW** | | |
| Europe | 24.4% | 61.1% |
| APAC | 2.9% | 76.7% |
| China | 8.8% | 69.8% |
| MEA | 13.0% | 41.1% |
| Latin America | 31.8% | 41.6% |
| **Ex-U.S. Weighted Average** | | 51.7% |
| **Ex-U.S. Weighted Average, China Lower-Bound** | | 70.1% |

**Notes:** See Exhibit 1122.

**C.      Calculation of FRAND Royalties for Ericsson's SEPs**

135.    I now turn to the calculation of FRAND royalties under the top-down approach, using the various inputs addressed in the preceding sections.  I first calculate FRAND royalties for the LTE and 2G/3G standards in the U.S. by taking the royalty burden for each standard and then applying Ericsson's value share based on the technical analysis.  I then calculate FRAND royalties for the rest of the world accounting for differences in selling prices of TCL's phones and differences in the strength of Ericsson's SEP portfolio across regions.

**1.      Fair and reasonable royalty rate for 4G**

136.    I previously discussed the expected aggregate royalty burden for the LTE and 2G/3G standards.  In each year of the hypothetical license, I calculate Ericsson's share of the total SEP value, adjusted over time to account for expiration of its patents and expected new patents.  The aggregate royalty burden in each year is apportioned to Ericsson's SEP portfolio by multiplying the royalty burden by Ericsson's share of the total SEP value.

137.    For 4G, I determined that the appropriate aggregate royalty burden was

6 percent of the selling price of the handset, based on Ericsson's public statements regarding the aggregate royalty burden and TCL's profit margin.  Exhibit 1722 shows the calculations I performed to determine the appropriate royalty rate for Ericsson's 4G SEP portfolio under the 6 percent aggregate royalty burden.  *See also* Ex. 1118.  As illustrated in Ex. 1722, Ericsson's value share of all U.S. SEPs is 3.47 percent, weighted over the course of a five year license.  This results in a 0.21% royalty rate for Ericsson's 4G SEPs in the U.S.

138.   Accounting for the relative weakness of Ericsson's portfolio outside the U.S., Ericsson's value share of all ex-U.S. SEPs is 2.45 percent, weighted over the course of a five-year license.  This results in a 0.15% royalty rate for Ericsson's 4G SEPs outside the U.S.

139.   A single weighted-average royalty can be calculated to arrive at a single FRAND royalty that applies to TCL's sales over the five-year term of the license.  The blended worldwide rate, which is the weighted average of the U.S. and ex-U.S. royalty rates, is 0.16% for 4G.

140.   While I maintain that 6 percent is the appropriate aggregate royalty burden, for the sake of argument I will also perform the same calculations based on the top-end of the 6 to 8 percent range of Ericsson's *ex ante* statements regarding the aggregate royalty burden (*i.e.*, 8 percent, rather than 6 percent).  Using the same approach that I adopted with respect to the 6 percent aggregate royalty burden, I apply the value share for Ericsson's SEPs that I derived from the technical analysis, equal to 3.47 percent, and multiply it by the 8 percent aggregate royalty burden.  After accounting for regional differences in Ericsson's portfolio strength, this results in a worldwide blended royalty rate of 0.22 percent for Ericsson's 4G SEPs.  These results are shown in Exhibit 1124, Exhibit 1G.

2.     Fair and reasonable royalty rate for 2G/3G

141.   For the 2G and 3G standards, I determined that the appropriate aggregate royalty burden was 5 percent of the selling price of the handset, based on

Ericsson's public statements regarding the aggregate royalty burden and TCL's profit margin.  Exhibit 1722, Exhibit 2B shows the calculations I performed to determine the appropriate royalty rate for Ericsson's 2G and 3G SEP portfolio under the 5 percent aggregate royalty burden.  *See also* Ex. 1118.

142.   As illustrated in Ex. 1722, Ericsson's value share of all U.S. 2G/3G SEPs is 4.78 percent, weighted over the course of a five-year license.  This results in a 0.24 percent royalty rate for Ericsson's 2G/3G SEPs in the U.S.  This rate reflects the blended rate for TCL's combined 2G/3G sales.  It is the sales-weighted average of the individual 2G and 3G rates, which can be unpacked to calculate separate 2G and 3G rates.  For example, in 2015, Ericsson's share was 8.0 percent for the 2G standard and 4.8 for the 3G standard, which implies separate rates of 0.40 percent and 0.24 percent, respectively (*i.e.*, Ericsson's share multiplied by the 5 percent royalty burden).  The blended rate reflects the fact that TCL's sales of 2G phones were minimal in the U.S., and effectively zero after 2014.  The individual rates can also be calculated for TCL's sales outside of the U.S., after adjusting for the regional patent strength.  There, the blended 2G/3G rate reflects the lower ASP for 2G phones, 2G's declining share of TCL's sales and the expiration of 2G patents over time.  Accounting for the relative weakness of Ericsson's portfolio outside the U.S., Ericsson's value share of all ex-U.S. 2G/3G SEPs is 4.17 percent, weighted over the course of a five-year license.  This results in a 0.21% royalty rate for Ericsson's 2G/3G SEPs outside the U.S.

143.   A single weighted-average royalty can be calculated to arrive at a single FRAND royalty that applies to TCL's sales over the five-year term of the license.  The blended worldwide rate, which is the weighted average of the U.S. and ex-U.S. royalty rates, is 0.21% for 2G/3G.

144.   A summary of the fair and reasonable royalties—expressed as a percentage of the sale price of the device—is provided in Table 1 (PDX 2), which shows that the blended worldwide rate for a license to Ericsson's SEP portfolios is

0.16 percent for 4G and 0.21 percent for 2G/3G.

### Table 1 - Summary of Top Down Analysis

| Standard | Aggregate Royalty Burden | Worldwide Royalty Rate |
|----------|--------------------------|------------------------|
| 4G | 6% | 0.16% |
| 2G/3G | 5% | 0.21% |

**Note**:     See Exhibits 1117 and 1721.

**D.     Comparison of FRAND Royalties Under the Top Down Approach and Ericsson's Offers**

145.    I now consider the total amount TCL would be expected to pay over a five-year period based on the above fair and reasonable royalty rates and the amount it would have paid under Ericsson's offers, as illustrated in Table 11 (PDX 12).  In particular, as of May 2014, Ericsson's "unilateral FRAND rates" were 1.5 percent for 2G technologies, 1.75 percent for 3G and 2 percent for 4G.  Ex. 1143, "RE: Ericsson & TCL Agreement," Email from John Han to Harry AU, Per Arvidsson, May 23, 2014.

**Table 11 - Present Value of the Royalties that TCL Would Pay under Top-Down Approach and under Ericsson's Proposed Rates over a Five-Year License**

| Scenario | 4G | 2G/3G | Total |
|---|---|---|---|
| **Present Value of TCL's Sales** | $4,449,933,790 | $7,708,390,971 | $12,158,324,761 |
| **5%/6% Royalty Burden** | | | |
| Rate | 0.16% | 0.21% | |
| Amount | $7,243,730 | $16,563,974 | $23,807,704 |
| **Ericsson's May 2014 Offer** | | | |
| Rate | 2% | 1.5%-1.75% | |
| Amount | $88,998,676 | $132,492,487 | $221,491,163 |

**Note:** See Exhibits 1117 and 1721.  Rates from Ericsson's offer based on Ex. 1143, ERIC_TCL00106859, "RE: Ericsson & TCL Agreement," Email from John Han to Harry AU, Per Arvidsson, May 23, 2014.  A blended rate for 2G/3G is calculated based on TCL's proportion of 2G and 3G sales over the term of a five-year license.

146.    Over the course of a projected five-year license, TCL would be expected to pay a total of $23,807,704 under the fair and reasonable royalty rates I calculated.  Under the unilateral royalty rates Ericsson proposed to TCL prior to this lawsuit, TCL would be expected to pay $221,491,163 over the course of a five-year license—almost ten times more.  Ericsson's proposed royalty rates greatly exceed the fair and reasonable royalty rates based on the technical value of Ericsson's SEP portfolio.

**E.    Past Release**

147.    Next, I apply the results of my top-down approach to calculate the royalty payments for TCL's past sales, including through the end of 2015 (I understand TCL's sales data for 2016 is not part of the evidentiary record in the case, given that discovery closed in the first half of 2016).  I calculate the amount of the past release in the following steps.

148.    First, I consider the term of the release.  In their negotiations, Ericsson

and TCL considered a past release from 2007 to 2013.  *See, e.g.*, Ex. 136.  A FRAND royalty for Ericsson's portfolio should take into account both (a) potential limitations on the legal recovery of royalties, such as statutes of limitations, which vary by jurisdiction, and (b) the strength of Ericsson's SEP portfolio in those jurisdictions.  As discussed above, Ericsson's SEP portfolio strength outside the U.S. and Europe is substantially weaker relative to its portfolio strength in the U.S. and Europe, but Ericsson could still assert its portfolio in the country where products are manufactured.  As a result, I conservatively used the strength of Ericsson's Chinese SEP portfolio as a lower bound on the royalty rate Ericsson could charge outside of the U.S. and Europe.  For the purpose of determining a past release, I consider TCL's sales in the U.S. and Europe from 2007 to 2015.  For the rest of the world, I consider the FRAND royalty that would apply in China.  I understand a two-year statute of limitations applies for sales in China, and therefore consider TCL's sales from 2012 to 2015.  *See* Ex. 1096, Guangliang Zhang, "Remedies for Patent Infringement: Comparative Study of U.S. and Chinese Law," 1 J. Marshall Rev. Intell. Prop. L. p. 31 (2001).

149.   Next, I consider the scope of the licensed products covered by the release payment.  Several factors must be taken into account in determining the amount of past sales.  One question is the effect of TCL's prior 2G license agreement with Ericsson and whether any sales from the period covered by that license are covered by the release.  I understand the 2007 license agreement between TCL and Ericsson covered sales of products compliant with certain 2G standards (GSM and GPRS) outside of China.  Ex. 65, 2007 Ericsson-TCT Patent License Agreement.  For the purpose of the past release, I calculate TCL's 2G products sales excluding 2G sales for which it has already paid royalties.  I also exclude TCL's sales of 2G handsets in China, consistent with the scope of the prior license.  I understand there may not be agreement between the parties regarding whether TCL would owe any additional monies to Ericsson in connection with non-

China 2G sales that preceded the expiration of the prior 2G license, but were not the basis of royalty payments to Ericsson pursuant to that license.  As a result, I have calculated the release payment with and without these prior 2G sales.

150.   In addition to the issues regarding the prior 2G license, there is also a question of whether TCL has pass-through rights for certain 3G sales using Qualcomm chipsets.  I understand customers of Qualcomm chipsets receive certain pass-through rights to various SEP holders' 3G portfolios, including Ericsson's 3G portfolio.  *See* Ex. 1274, Qualcomm's summary of third party rights, which shows that Qualcomm customers receive rights for Ericsson's SEPs for CDMA2000 and WCDMA applications.  Ex. 1274, "Summary of Third Party Rights Benefiting Customers of Qualcomm's MSMs and Software," November 2008, p. 3; Ex. 1521. TCL purchases chipsets from Qualcomm, including 3G chipsets.  Therefore, TCL's sales of 3G phones that incorporate Qualcomm chipsets should be excluded from the determination of royalties owed on its sales of 3G products.  I understand Ericsson has claimed TCL would still be obligated to pay royalties for its 2G SEPs for 3G phones that are backward compatible with 2G.  At a minimum, this would imply that the royalty on 3G phones with Qualcomm chipsets should be reduced. This is because the value to 3G customers would be expected to come primarily from usage on 3G networks, though they derive some value when the phone falls back onto a 2G network.  TCL would pay no royalties on the 3G portion of the value of a 3G phone with a Qualcomm chipset, and then a proportional amount on the 2G portion of the value of a 3G phone.  I conservatively include TCL's 3G sales with Qualcomm chipsets in the sales base for the purpose of a past release.

151.   I calculate TCL's covered sales by region taking into account the term and licensed products, as shown in Exhibit 1124 at Exhibits 1e-1f.  I next consider the FRAND royalty rate that is applicable to each standard and region under a top-down approach.  Previously, I calculated fair and reasonable royalty rates for Ericsson's portfolios based on a top-down approach that relied on its share of the

value of SEPs for each standard, taking into account the expected changes in its portfolio over time, including expiration of patents in its portfolio as well as expected growth from newly-issued patents.  For past sales, I consider Ericsson's share of SEP value in 2014.  In principle, Ericsson would not receive royalties on technologies before a patent is granted.  My calculation conservatively includes Ericsson's SEPs as of 2014, even though many of its patents issued between 2007 and 2013.

152.   In Ex. 1723 at Exhibit 1a, I consider an aggregate royalty burden based on the *ex ante* expectations of a royalty burden, equal to 5 percent for 2G and 3G, and 6 percent for LTE.  *See also* Ex. 1124.  I calculate Ericsson's royalty rate in the U.S. by multiplying the aggregate royalty burden by Ericsson's share of SEP value.  Then, I calculate the royalty rate across regions based on Ericsson's relative SEP portfolio strength in each region.  To calculate TCL's royalties for a past release, I multiply the royalty rate from above by TCL's covered sales in each region and standard.  Using the *ex ante* aggregate royalty burdens of 5 and 6 percent, the total royalties for TCL's past sales is $23,715,192.  The portion of this sum attributable to TCL's non-China 2G sales which preceded the expiration of the prior 2G license, but were not the basis of royalty payments to Ericsson pursuant to that license, is $5,935,168.  If this latter sum is excluded, the total royalties would be $17,780,024.

153.   The results from the top-down approach above can be compared to the proposed payment terms for a past release the parties considered during their licensing negotiations.  I understand Ericsson claims it offers a discount on past sales.  *See, e.g.*, Ex. 1114; Ex. 1115 ("Ericsson Licensing Package" includes a "Release Discount Offer").  Such discounts are justified under a FRAND analysis given, for example, that recovery of past royalties may be subject to statute of limitations, or may reflect differences over time in Ericsson's portfolio.  Above, I accounted for the effect that a statute of limitations has on TCLs sales and made conservative assumptions regarding the value of Ericsson's SEP portfolio.  I also

take these factors into account when evaluating Ericsson's offers.

154.   I understand Ericsson has made two substantive proposals regarding past sales.  Although TCL and Ericsson exchanged several offers containing the two proposals, I discuss the most recent offers containing the two proposals of $20 million and $10 million payments respectively.  First, I address Ericsson's July 28, 2012 offer, which included a release payment of $20 million.  Ex. 136.  The payment covers sales prior to the effective date of the agreement but no earlier than January 1, 2007.  Next, I analyzed Ericsson's July 2, 2013 offer, wherein Ericsson proposed that TCL pay $10 million for a past release covering certain sales. Ex. 284; *see also* Ex. 1488.  I understand the proposed past release in this offer excluded single-mode 2G sales.  *See* Ex. 1491, § 5.1 ("With the exclusion that Ericsson is not releasing TCL or any of its past or present Affiliates for products which are 2G single mode, i.e., such products that are compliant with 2G and not compliant with 3G, 4G or Future standards from all its claims…").  Although this sales base differs from the sales base upon which I calculated the past release above, it results in a similar royalty rate.  The distinction between the two offers appears to reflect the scope of licensed sales:  Ericsson's 2012 offer included a release as to both TCL's unlicensed Chinese 2G sales as well as other 2G sales, while the 2013 offer excluded all single-mode 2G sales.

155.   Ericsson's proposed blended royalty rate for past sales can be calculated from its proposed payments.  A blended rate is equal to Ericsson's lump-sum offer divided by TCL's past sales covered under the agreement.  As shown in Exhibit 1124 at Exhibit 1e, TCL only began manufacturing 4G products in 2013, so a blended rate primarily reflects TCL's 3G sales.  Under the July 2012 offer, this results in an effective royalty rate of 0.74 percent or a per-unit rate of $0.27.  Under the July 2013 offer, this results in an effective royalty rate of 0.98 percent or a per-unit rate of $0.85.

156.   A comparison of the effective blended royalty rates from Ericsson's

offers to the top-down approach royalties are shown in Table 12 (PDX 13).  I take Ericsson's proposed rates from July 2012 and July 2013 and calculate the blended rate as it would apply to past sales.  *See* Ex. 1125.  This shows that Ericsson's proposed rates were substantially greater than the effective royalty rate based on the lump-sum for a past release, meaning Ericsson was offering a substantial discount in connection with the royalties to be paid for a past release.

**Table 12 - Summary of Past Release Terms Based on the Top-Down Approach and Ericsson's Offers**

| Scenario | Payment | % Royalty |
|---|---|---|
| **Top-Down Approach (2007-2015)** | | |
| Ex-Ante Expectations (5%-6% Royalty Burden) | $23,715,192 | 0.23% |
| **Ericsson's Offers** | | |
| July 2012 (2007-Mar. 2012) | $20,000,000 | 0.74% |
| July 2013 (2007-Mar. 2013) | $10,000,000 | 0.98% |
| **Ericsson's Proposed Rates (Blended)** | | |
| July 2012 | N/A | 1.42% |
| July 2013 | N/A | 1.37% |

**Sources:**  *See* Exhibits 1124, 1125, 1723.

# VII.  CONCLUSION

157.  In summary, I determined a royalty rate for Ericsson's 2G/3G and 4G SEP portfolios using a top-down analysis.  This approach, which has been endorsed by Ericsson, begins with assessing the proper aggregate royalty burden for the standards-at-issue.  Based on Ericsson's public statements around the time the standards were adopted, the appropriate aggregate royalty burdens for the top-down analysis are 6 percent for 4G and 5 percent for 2G/3G.  Next, I determined Ericsson's share of the aggregate royalty burden based on its proportional share of the value of all SEPs for each standard, relying on a technical analysis performed by Dr. Kakaes.  Ericsson's proportional share of the total value of all SEPs is 3.5%

for 4G, 4.8% for 3G, and 8.0% for 2G.  After accounting for changes over time and regional variances in Ericsson's SEP portfolio, I calculate the fair and reasonable royalty rate by taking the royalty burden for each standard and applying Ericsson's value share.  Using the approach described above, I conclude that a fair and reasonable royalty for Ericsson's SEPs is 0.16 percent of the price of the handset for 4G and 0.21 percent of the price of the handset for 2G/3G.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on January 11, 2017, in San Francisco, CA.


_____
Dr. Gregory K. Leonard

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| 65 | License Agreement dated between TCL Mobile Communication (HK) and Ericsson dated 3/6/07 |
| 83 | Document titled "Expanded Proposal for IPR Policy Reform,", ETSI GA/IPR02(06)05, dated Feb. 22-23, 2006 ["ETSI Proposal, 2006"] |
| 96 | Master Sale Agreement between Unwired Planet ("UP") and Ericsson dated January 10, 2013 |
| 136 | Email from K. Alfalahi to R. Tu dated 7/28/12, subject: "20120727 Ericsson TCL GPLA" re setting up meeting to discussing licensing and enclosing draft license agreement (attached) ("Offer 6") |
| 142 | TCL spreadsheet providing sales by standard and revenue summary from 07Q1-15Q4 |
| 199 | License Agreement between LG Electronics and Ericsson dated 6/27/14 |
| 284 | Email from R. Tu to K. Alfalahi dated 7/2/13, subject: 20130702 Ericsson TCL GPLA…," re further license negotiations ("Offer 14") |
| 315 | Curriculum Vitae of Gregory Leonard |
| 319 | "What (Exactly) Are Patents Worth at Trial?:  The "Smartphone War" Example," J. Putnam, 4/6/12 |
| 333 | Ericsson Press release titled "Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemen, and Japanese Manufacturers Reach a Mutual Understanding to Support Modest Royalty Rates for the W-CDMA Technology Worldwide," dated 11/6/02 |
| 526 | TCL spreadsheet titled "IPR Reconciliation Dec 14_4 Jan," Tab: FR vs SC |
| 1087 | Research Policy 40 (2011) 1001-1015 "An Empirical Study on the Determinants of Essential Patent Claims in Compatibility Standards," by R. Bekkers, dated 11/4/09 |
| 1088 | Nokia press release titled "Nokia Advocates Industry-Wide Commitment to 5% Cumulative IPR Royalty for WCDMA," dated 5/8/02 |
| 1089 | "How Valuable is Patent Protection?  Estimates by Technology Field," by M. Schankerman, The RAND Journal of Economics, Vol. 29, No. 1 (Spring 1998) |
| 1095 | Prepared Statement for the Record of Intel Corporation for the |

| | | |
|---|---|---|
| | | Senate Committee on the Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights, prepared by A.D. Melamed, 7/30/13 |
| | 1096 | The John Marshall Law School publication titled "Remedies for Patent Infringement: A Comparative Study of U.S. and Chinese Law," 2001 |
| | 1097 | Ericsson Mobility Report, dated Nov. 2015 |
| | 1098 | Ericsson's Opening Brief from Huawei Arbitration, No. 01-14-0002-2610 |
| | 1099 | Spreadsheet containing TCT's financial result from 2005 to 2015 |
| | 1100 | Spreadsheet titled "TCT North America Quarterly Net ASP Analysis for 2015" |
| | 1101 | Spreadsheet reflecting TCL global sales and profit |
| | 1102 | "Patents, Citations & Innovations," A. Jaffe, 2002 |
| | 1103 | "A Penny for your Quotes: Patent Citations and the Value of Innovations," M. Trajtenberg, RAND Journal of Economics, Vol. 21, No. 1, Spring 1990 |
| | 1104 | "Citations, Family Size, Opposition and Value of Patent Rights," D. Harhoff, et al., July 2002 |
| | 1105 | "Citation Frequency and the Value of  Patented Inventions," D. Harhoff, et al., Aug. 1999 |
| | 1106 | TCL Q1 2015 Results Presentation, 4/23/15 |
| | 1107 | TCL 2015 Interim Results Presentation, 8/12/15 |
| | 1108 | TCL Q3 2015 Results Presentation, 10/20/15 |
| | 1109 | JP Morgan publication titled "TCL Communication Technology: More Challenges Balancing Volume Growth Against Product Mix; Stay Neutral," dated 10/20/15 |
| | 1110 | TCL Communication Tech. Valuation, prepared by Nomura, dated 10/21/15 |
| | 1111 | TCL Communication Company Updated, prepared by Yuanta, dated 10/21/15 |
| | 1112 | Research and Markets publication titled "Global LTE Consumer Devices Market Forecast and Opportunities Report 2015-2020 - Rapid Growth in Mobile Based Products & Services," dated 11/30/15 |
| | 1113 | Ericsson 2013 annual report |
| | 1114 | Email from J. Liaw of HTC to K. Alfalahi dated 12/11/03, subject: "RE: License Agreement between Ericsson and HTC" discussing license negotiations |
| | 1115 | Ericsson Licensing Package |

WITNESS DECLARATION OF DR. GREGORY K. LEONARD

| 1116 | Appendix C to Supplemental Expert Report of Dr. Gregory K. Leonard (EIC Rankings) |
| 1117 | Exhibit 1 to Supplemental Expert Report of G. Leonard |
| 1118 | Exhibit 2a-b to Supplemental Expert Report of G. Leonard |
| 1119 | Exhibit 3a-d to Supplemental Expert Report of G. Leonard |
| 1120 | Exhibit 5 to Supplemental Expert Report of G. Leonard |
| 1121 | Exhibit 6 to Supplemental Expert Report of G. Leonard |
| 1122 | Exhibit 7 to Supplemental Expert Report of G. Leonard |
| 1123 | Exhibit 8a-b to Supplemental Expert Report of G. Leonard |
| 1124 | Exhibit 1a-g to Rebuttal Expert Report of G. Leonard |
| 1125 | Exhibit 2a-d to Rebuttal Expert Report of G. Leonard |
| 1126 | Exhibit 3 to Rebuttal Expert Report of G. Leonard |
| 1128 | Antitrust, Vol. 29, No. 1 publication titled "Determining RAND Royalty Rates for Standard-Essential Patents," by G. Leonard, 2014 |
| 1129 | Company Profile page from TCL website |
| 1130 | Justice News publication titled "Antitrust Enforcement and Standard Setting: The VITA and IEEE Letters and the "IP2" Report," May 10, 2007 |
| 1131 | TCL press release titled "TCL Communication Commences the Operation of New Global Manufacturing Facility in Huizhou; Celebrates the 300 Millionth handset- the Flagship Device, HERO; Taking Production Efficiency and Production Capacity to the Next Level," 9/29/13 |
| 1132 | CIMB publication titled "TCL: Growth in a Highly Competitive Market," 10/20/15 |
| 1133 | BNP Paribas Securities publication titled "Execution in Focus During Downturn" providing TCL Communication stock data and financial information as of 10/21/15 |
| 1134 | CCB International publication titled "TCL Communication: Wilting in the Heat," 10/22/15 |
| 1135 | DBS Vickers publication titled "Disappointing 3Q15 Results," dated 10/22/15 re TCL revenue |
| 1136 | CMS Company Report on TCL Comm dated 10/22/15 |
| 1137 | Haitong publication titled "Attractive Valuation and Yield Limit Downside Risk Despite Lack of Catalysts," dated 11/25/15 re TCL revenue |
| 1138 | Sunwah Kingsway publication titled "TCL Communication Technology Holdings Limited: Look Out for 2016 Catalysts," 12/14/15 |

| 1139 | Spreadsheet titled "IDC WW Quarterly Mobile Phone Tracker, 2015 Q2 Historical Release," dated 8/7/15 |
|------|------|
| 1140 | TCL 2014 annual report |
| 1141 | "The Evolving IP Marketplace," issued by the Federal Trade Commission, dated Mar. 2011 |
| 1142 | "Proposal for IPR Policy Reform," ETSI GA ahg on IPR Review #1, Jan. 10-11, 2006, ETSI GA/IPRR01(06)08 |
| 1143 | Email from J. Han to H. Au, et al., dated 5/23/14, subject: "Ericsson & TCL Agreement," re history of negotiations |
| 1145 | ETSI Rules of Procedure, 3/19/14, Annex 6: ETSI Intellectual Property Rights Policy, pp. 35-46 |
| 1146 | Ericsson's press release titled "Wireless Industry Leaders commit to framework for LTE technology IPR licensing," dated 4/14/08 |
| 1148 | "Patent Holdup and Royalty Stacking," by M. Lemley & C. Shapiro |
| 1149 | Witness Statement of G. Brismark from Huawei Arbitration, No. 01-14-0002-2610 |
| 1150 | License Agreement between IDTP Holdings and Ericsson dated 6/25/14 |
| 1151 | "Information Copy of Ericsson IPR Statement," ETSI SMG #23, Dec. 15-19, 1997, ETSI/SMG Tdoc 908/97 (Ericsson stating it support low level royalty compensation approach) |
| 1152 | Wayback Machine website displaying webpage of Ericsson's "Licensing Programs" website, archived July 19, 2008 |
| 1153 | Publication titled "Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition," issued by U.S. Department Of Justice and the Federal Trade Commission, April 2007 |
| 1177 | Wall Street Journal publication titled "Sony Buys Ericsson Stake in Handset Joint Venture," S. Grundberg, 10/28/11 |
| 1219 | Schedule 7A titled "Summary of Ericsson License Agreements with TCL and Similarly Situated Companies," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1274 | Correspondence from Qualcomm to TCL re Third-Party IP Rights available to customers of Qualcomm's ASICs and associated software, dated 6/14/11 |
| 1275 | License Agreement between HTC Corporation and Ericsson dated 12/31/14 |
| 1276 | License Agreement  between Samsung and Ericsson dated 2/1/14 |
| 1278 | Ericsson 2014 annual report |
| 1488 | Draft License Agreement between TCL and Ericsson dated 3/1/13 |

|  | ("Offer 11") (attachment to 5/10/13 email from M.N. och Dag to T. Lim) |
|---|---|
| 1491 | Clean draft License Agreement between TCL and Ericsson dated 3/1/13 ("Offer 12") (attachment to 6/5/13 email from R. Tu to H. Au) |
| 1521 | Correspondence from L. McLeroy to B. Lee dated 6/18/15 in response to Mr. Lee's letters |
| 1577 | Revised Annex A to Ericsson's Objections and Fourth Supplemental Responses to TCL's Interrogatory Nos. 5 and 6, dated 11/12/15 |
| 1586 | Rebuttal Witness Statement of John Han, dated 8/27/13 re Investigation No. 337-TA-862 |
| 1588 | IPR Reconciliation spreadsheet, Jan. 2014 - Dec. 2014 [NATIVE] |
| 1594 | Exhibit C to Expert Report of Zhi Ding: spreadsheet for industry-wide patent essentiality analysis of 2G, 3G, and 4G patents |
| 1598 | Curriculum Vitae of Sachin Sinha |
| 1601 | Spreadsheet titled "TCL Sales Projection by Standard, 2014-2023" |
| 1618 | International Journal of Industrial Organization 29 (2011) 294-303 publication titled "To Join or Not to Join: Examining Patent Pool Participation and Rent Sharing Rules," by A. Layne-Farrar, 1/7/08 |
| 1721 | Updated Exhibit 1 to the Supplemental Expert Report of G. Leonard |
| 1722 | Updated Exhibit 2a-2b to the Supplemental Expert Report of G. Leonard |
| 1723 | Updated Exhibit 1a to the Rebuttal Expert Report of G. Leonard |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA  92130.

On January 11, 2017, I caused to be served the PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION OF EXPERT WITNESS DR. GREGORY K. LEONARD to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION:  I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nick Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 11, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER