1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
2  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
3  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
4  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
5  San Diego, California 92130-2006
   Telephone: 858.720.8900
6  Facsimile: 858.509.3691

7  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
8  Limited, and TCT Mobile (US) Inc.

9

10              UNITED STATES DISTRICT COURT

11      FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| 12  TCL COMMUNICATION<br>    TECHNOLOGY HOLDINGS, LTD., *et*<br>13  *al.*, | Case No. SACV14−00341 JVS (DFMx)<br>Consolidated with CV15-02370 |
| 14              Plaintiffs, | **PLAINTIFFS' REBUTTAL**<br>**DECLARATION OF EXPERT** |
| 15         v. | **WITNESS DR. GREGORY K.**<br>**LEONARD** |
| 16  TELEFONAKTIEBOLAGET LM<br>    ERICSSON, *et al.*, | |
| 17              Defendants. | Place: Courtroom 10C<br>Before Hon. James V. Selna |
| 18  _____ | |
| 19  TELEFONAKTIEBOLAGET LM<br>20  ERICSSON *et al.*, | Pre-Trial Conf.: Feb. 1, 2017<br>Trial: Feb. 14, 2017 |
| 21              Plaintiffs, | |
| 22         v. | **PUBLIC REDACTED VERSION** |
| 23  TCL COMMUNICATION<br>24  TECHNOLOGY HOLDINGS, LTD. *et*<br>25  *al.*, | |
| 26              Defendants. | |

27

28

# TABLE OF CONTENTS

Page

I.    PAST LICENSES ARE NOT THE BEST BENCHMARK FOR DETERMINING A FAIR AND REASONABLE RATE IF THEY WERE NOT NEGOTIATED UNDER FRAND CONDITIONS ..................... 1

II.   THE USE OF DOLLAR-PER-UNIT RATES, OR A DOLLAR-PER-UNIT FLOOR, IS INCONSISTENT WITH ERICSSON'S CURRENT LICENSES. ................................................................................................ 3

III.  MR. KENNEDY'S "EX-STANDARD" ANALYSIS IS DEEPLY FLAWED. ...................................................................................... 8

      A.   Summary of Mr. Kennedy and Dr. Parkvall's Calculations and Analyses. .............................................................................. 10

      B.   Dr. Parkvall Does Not Consider Non-Infringing Alternatives that Were Available Prior to Standardization, and Therefore Mr. Kennedy's Analysis Does Not Represent an *Ex-Ante* Valuation of Ericsson's SEPs. .............................................................. 12

      C.   Mr. Kennedy's Valuation of Ericsson's SEPs Based on Certain Features Suffers from Several Fundamental Flaws. ............................ 18

           1.   Battery Life ............................................................... 18

                a.   Mr. Kennedy's calculations .............................. 18

                b.   Mr. Kennedy's analysis seeks to capture the value of the standard as a whole ................................. 19

                c.   Mr. Kennedy fails to apportion the value of increased battery life to other economic factors necessary to realize that value. ......................... 19

                d.   The economic evidence relied upon by Mr. Kennedy does not reflect customers of TCL's smartphones and suffers from other deficiencies. ............ 22

2. Data Speeds .................................................................... 25

3. Delays in Connection/Latency Link and System Capacity/Network Performance ................................. 27

D. There Is Overlap Among the Technology Currencies that Mr. Kennedy Analyzes. ................................................... 29

E. The Top-Down Approach Provides An Independent Economic Assessment of a FRAND Royalty Rate That Is Free From Hold-Up. .................................................................................... 30

IV. DR. TEECE AND MR. KENNEDY'S ANALYSIS OF THE "VALUE OF 4G" IMPROPERLY CAPTURES THE VALUE OF THE STANDARD. ............................................................................ 31

A. Mr. Kennedy and Dr. Teece's Framework Is Fundamentally Flawed Because It Fails to Apportion Value to Other Economic Factors that Are Necessary to Realize the Value of Cellular Functionality ..................................................................... 33

B. Mr. Kennedy's and Dr. Teece's Analyses of Apple's iPhones Are Not Specific to TCL's Products, Nor Are They Representative of the Mobile Phone Industry ....................... 46

C. Mr. Kennedy's Estimates of Ericsson's Share of 3G and 4G Value .................................................................................. 48

V. MR. KENNEDY'S ANALYSIS OF TCL'S IPR PROVISIONS AND THE AGGREGATE ROYALTY BURDEN ................................ 55

A. The Aggregate Royalty Burdens Are Reasonable in Light of TCL's Profit Margins ......................................................... 55

B. There Is No Economic Basis for Mr. Kennedy's Comparison of TCL's Payments for a License to Alcatel's Brand Name to a FRAND Royalty for Ericsson's SEPs .................................. 59

VI. RELEASE PAYMENT ............................................................ 60

VII.   CONCLUSION ................................................................................. 61

TABLE OF EXHIBITS ............................................................................. 63

## DECLARATION OF DR. GREGORY K. LEONARD

I, Dr. Gregory K. Leonard, declare under the penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.   PAST LICENSES ARE NOT THE BEST BENCHMARK FOR DETERMINING A FAIR AND REASONABLE RATE IF THEY WERE NOT NEGOTIATED UNDER FRAND CONDITIONS

1.      Mr. Kennedy claims that "analyzing comparable licenses (the market approach) is the best methodology for estimating a range for FRAND royalty rates for a license to a SEP portfolio." (Dkt. 1333, ¶¶ 70-78.)  First, Mr. Kennedy contends "the royalty rates that emerge from bilateral negotiations reflect the parties' combined assessment of the contemporaneous market conditions (price points, competition from new entrants and new products, etc.)." (*Id.*, ¶ 72.)  Next, Mr. Kennedy contends that bilateral negotiations provide the best source of "technical information relevant to determining an appropriate range of FRAND royalty rates for a patent portfolio." (*Id.*, ¶¶ 70, 73.)  Mr. Kennedy also contends that Ericsson's licensing rates "self-update as new licenses are consummated over time." (*Id.*, ¶ 74.)  Finally, Mr. Kennedy contends that Ericsson's licenses represent "an industry-wide assessment of the value of Ericsson's SEP portfolios." (*Id.*, ¶ 75.)

2.      I discussed the problems with using Ericsson's past license agreements as the primary or only measure of the fair and reasonable value of Ericsson's SEP portfolio in detail in my opening witness declaration. (Dkt. 1317, ¶¶ 43-52.)  I recount a few of the salient points below.

3.      Ericsson's past licensing agreements are not the best benchmark because they are not necessarily FRAND.  Ericsson's past licenses may reflect some degree of hold-up value, capturing value above the *ex ante* technical value of Ericsson's SEPs based on the market power conferred by including those patents in the standard.  This conclusion is supported by the analysis of Dr. Lynde, which

shows that certain licensees received substantially more favorable rates than others. Moreover, Ericsson has pursued injunctions in a number of jurisdictions—either in district courts, by seeking exclusion orders at the U.S. International Trade Commission, or by seeking injunctions in foreign suits—against potential licensees who try to challenge Ericsson's royalty rates. (Dkt. 1317, ¶ 51.)

4.    Past licenses are not the best benchmark because the parties to those agreements often have asymmetric information, with the licensor knowing details of the licenses it has previously signed, while this same information is withheld from the prospective licensee. Such concerns might be mitigated to the extent a licensee chooses to litigate against Ericsson and gains discovery into Ericsson's licensing practices. This is also borne out by Dr. Lynde's comparable license analysis, where Apple, for example, pays an effective royalty rate of ▇▇▇▇ while some of its competitors who did not litigate against Ericsson pay significantly more than this amount. Yet even litigation may not be sufficient to remedy the asymmetry of information when the parties eventually choose to enter into a settlement agreement. For example, I am not aware of any of Ericsson's licensees, including the other licensees who litigated against Ericsson, being provided a full list of Ericsson's allegedly essential patents (as opposed to merely declared essential patents or representative claim charts) such as the list Ericsson was required to provide in this litigation (in response to TCL's interrogatories). Along with TCL's technical experts, I used this full set of alleged SEPs for each standard to perform a full technical assessment of the essentiality, importance, and contribution of Ericsson's SEPs (the my top-down analysis) in order to determine a fair and reasonable rate. I am certainly unaware of any of Ericsson's licensees having done such a complete technical analysis as was done in this case.

5.    Given that Ericsson licenses Apple at an effective royalty rate of ▇▇▇ for LTE (or, ▇▇▇ under Mr. Kennedy's analysis), and Ericsson is still seeking a 1.5% royalty rate from TCL, Mr. Kennedy's contention that licenses "self-update" is

1  demonstrated to be incorrect.  Moreover, Mr. Kennedy's own analysis in Figures

2  22-25 show that the licensing rates charged by Ericsson vary substantially from

3  licensee to licensee, and do not follow a "self-updat[ing]" trend.

4      6.      Similar to Mr. Kennedy, Dr. Teece states that "if an owner of essential

5  patents is prepared to grant a license under terms and conditions that are within the

6  range of those previously agreed to by other similarly-situated licensees, one can

7  conclude that the patent owner has satisfied its FRAND commitment."  (Dkt. 1331,

8  ¶ 65.)  Again, I disagree.  As described above, existing licenses may reflect hold-up

9  value, an outcome that is inconsistent with Ericsson's FRAND obligation.

10  Likewise, the "range" of rates referenced by Dr. Teece may represent the result of

11  successful discrimination on the part of the SEP owner, with some licensees paying

12  much more than others—in that case, it may also be inconsistent with FRAND to

13  offer a new licensee the same discriminatory rates.

14  **II.  THE USE OF DOLLAR-PER-UNIT RATES, OR A DOLLAR-PER-**

15  **UNIT FLOOR, IS INCONSISTENT WITH ERICSSON'S CURRENT**

16  **LICENSES.**

17      7.      Ericsson claims its existing licensees "would not accept TCL being

18  granted preferential royalty rates in this litigation via a low percentage per-unit rate

19  on its low-ASP mobile phones."  (Dkt. 1333, ¶ 87.)  First, a fair, reasonable, and

20  non-discriminatory royalty rate should not be determined by asking what TCL's

21  direct competitors would like it to pay.  Indeed, it would be no surprise if these

22  competitors would want TCL to pay a higher effective rate than they are paying.

23  Rather, a fair and reasonable royalty rate for Ericsson's SEPs should be determined

24  by the *ex ante* value of those patents over available alternatives.  If a fair and

25  reasonable rate for TCL is less than Ericsson's existing licensees are paying, it

26  suggests that Ericsson may be overcharging its existing licensees.  Therefore, TCL

27  should not be charged the same rate as those licensees.

28      8.      Second, I understand that a dollar-per-unit rate or floor is inconsistent

with the actual terms of Ericsson's other licenses.  For example, Ericsson's license with Huawei is based on a ███████████████████████████████████ ███████████.  Under this license, there is ████████████████████████████ ███████████████████  For example, in 2015, the retail ASP for Huawei's 3G smartphones sold in the U.S. was $43; a rate of ███████████ would result in a payment of ███████ per unit—there is ███████████████████████████████████ (*See* Ex. 1000.)  Nor is it consistent with Ericsson's licenses where the licensee makes a lump sum payment.  For example, under the 2014 Ericsson-Samsung License, Samsung pays a lump sum amount, and there █████ per-unit floor on the royalties that it pays for its low-end phones.

9.      Mr. Kennedy gives a particular example of a Licensee A with an ASP of $1,000 and Licensee B with an ASP of $100, and concludes that Licensee A would pay ten times more on a dollar-per-unit basis under a 2% of ASP royalty rate. (Dkt. 1333, ¶ 82.)  But another way to look at this hypothetical is with a $2.00 per unit rate.  In that scenario, Licensee A could sell 1 unit to earn $1000 in revenue, but only pay $2.00 in royalties.  Licensee B, on the other hand, would sell 10 units to make the same $1000 in revenue from handset sales, but pay $20.00—*ten times more* than Licensee A would pay.  Importantly, consumers who purchase low-cost smartphones get less value from cellular features than consumers who purchase high-end premium smartphones such as the iPhone, and manufacturers of low-end smartphones earn less profits than high-end premium smartphone manufacturers such as Apple.  Given that they earn less profit per phone, manufacturers of low-cost smartphones should pay a lower per unit royalty per phone.

10.     Mr. Kennedy says he views "standardized technology as an input to a mobile phone, just like any other input," and therefore a SEP license should have "a fixed dollar per unit cost."  (Dkt. 1333, ¶¶ 79-82.)  but, SEPs are not a battery or component; they are not manufactured parts.  Mr. Kennedy's contention also directly contradicts Ericsson's public position on the appropriate methodology for

calculating FRAND royalty rates for its SEPs.  As I described in my opening declaration, Ericsson has publicly advocated for setting FRAND royalty rates as a "single digit percentage of the sales price" of the handset in the aggregate, with each SEP owner receiving a proportional share of that percentage rate.  (*See* Ex. 1150, p. 136.)  Ericsson's witnesses have affirmed this position, both during its recent dispute with Huawei, and in testimony during this case.  (*See* Brismark Dep. Tr. at 66:4-18.; Ex. 1587 at p. 47 ("Consistent with ***widespread industry practice***, Ericsson has licensed its patents based on a percentage of the sales price of the licensed terminal unit."). (Emphasis added).)

11.     An analysis performed by one of TCL's other experts, Dr. Matthew Lynde, shows that the effective royalty paid by Ericsson's licensees varies quite widely.  Apple, for example, pays an effective royalty rate of ▉ percent, while some of its competitors pay ▉▉▉▉▉▉▉▉▉ this amount.  (Dkt. 1318 at pp. 53-54.)  Indeed, even the dollar-per-unit rates calculated by Mr. Kennedy show a large variety of per-unit outcomes.  (Dkt. 1333 at p 46.)  Mr. Kennedy's calculations show a range of dollar-per-unit royalties between ▉▉▉▉▉▉▉ for 4G, between ▉▉▉▉▉▉ for 3G, and between ▉▉▉▉▉▉▉ for GSM/GPRS.  Mr. Kennedy's own results demonstrate the falsity of the claim that there is some sort of fixed dollar-per-unit royalty applicable to all of Ericsson's licensees.  Mr. Kennedy puts forward no principled methodology for determining what an appropriate dollar-per-unit royalty would be for Ericsson's SEPs absent his comparison of Ericsson's existing licenses.  As described above, those licenses may reflect hold-up value, and Mr. Kennedy never ties his alleged dollar-per-unit rates to an objective measure of the value of Ericsson's SEPs (nor is there any evidence Ericsson did so in calculating its reference prices).

12.     Indeed, Mr. Kennedy's argument about a rigid dollar-per-unit equivalency requirement is also belied by the wide range between the "floor" and "cap" of Ericsson's reference price sheets (and the lack of any floor or cap in the 2G

and 3G rates offered to TCL under Option B).  Under Ericsson's first reference price sheets that include a floor and cap for 4G, high ASP smartphone manufacturers would have paid $8 while low ASP smartphone manufacturers would have paid $2.50.  (Ex. 269.)  This shows that even under Ericsson's own pricing structure (which is not necessarily reflective of the actual rates paid by Ericsson's licensees, and is certainly not reflective of what is FRAND), dollar-per-unit royalties are not equal across high ASP phones and low ASP phones and, indeed, the royalty rate for low ASP phones is substantially lower than for high ASP phones.  I also note that Ericsson has lowered both the floors and caps over time based on alleged "market feedback."  (Exs. 270, 271, 59.)  Based on the results of the top-down analysis performed in light of a technical evaluation of Ericsson's SEPs, the rates shown in Ericsson's reference price sheets are inconsistent with the *ex ante* value of Ericsson's SEPs.

13.     Further, Mr. Kennedy's argument regarding a rigid dollar-per-unit equivalency requirement is at odds with Ericsson's practice of divesting sets of its SEPs to third-party licensing entities.  (Dkt. 1317, ¶ 45.)  Ericsson is continually divesting patents (through at least 2018 to Unwired Planet) and has divested a significant number of patents since it introduced a "floor."  To claim TCL should be tied to the same dollar-per-unit rates as agreements which may cover a different set of patents (including divested patents) would put TCL at a significant disadvantage. This is especially true because TCL may be required to sign a license with the companies to which Ericsson assigned its divested patents, resulting in a much higher royalty burden to TCL and in effect allowing Ericsson to be double-compensated for the same SEPs.  (Dkt. 1317, ¶ 45; Ex. 1126.)

14.     In addition, the dollar value brought by the use of cellular SEPs varies across consumers and manufacturers.  TCL's product line includes budget smartphones as well as higher-end models, and its target consumers are more price-sensitive on average than consumers for premium smartphones, such as Apple's

iPhone.  For example, Apple users spend nearly four times as much on apps as Android users.  (*See* Ex. 2490, "Apple's Users Spend 4X as Much as Google's," Fortune, June 27, 2014.)  This is reflected at least in part by the greater dollar profit per unit that Apple earns on the sale of iPhones, compared to the dollar profit per unit that TCL earns on its budget smartphones.  For example, the cost of manufacturing an iPhone SE is $160, and is priced at $399, which means the gross profit margin for iPhone SE is 60%.  (*See* Ex. 2491, "Here's What Apple Pays to Build the iPhone SE," Fortune, April 4, 2016; Dkt. 1331 at p. 77.)

15.     Finally, the aggregate royalty burden implied by Ericsson's proposed per unit "floor" would range from $43 to $57 dollars for an LTE phone.[1]  Note that under Ericsson's proposed fixed per-unit rates, TCL's royalties would not change even as the cost of other components and the price of its smartphones fell.  Such an aggregate royalty burden would result in a substantial increase in the price of TCL's LTE phones, which I calculated to average $90.35 over the term from 2014 to 2018 worldwide.  (Ex. 1722.)  If TCL were to attempt to increase prices by approximately 50 percent (to account for the higher aggregate royalty burden), basic economics suggests that it would lose a substantial portion of its sales to competitors.  For example, given its approximate 20 percent gross margin, under the Bertrand competition model (which describes competition where manufacturers compete on price) TCL's elasticity of demand (the percentage change in quantity demanded in

---

[1] Ericsson's May 2015 offer of a 1.5 percent rate would imply an aggregate royalty burden of between 32 percent and 43 percent based on my estimates of Ericsson's US share of the 4G SEPs.  Since, however, Ericsson's proposal includes a $2 "floor," the effective royalty rate under that proposal would be 2 percent based on TCL's average selling price of 4G phones in 2015 of $100.67.  In my opening witness declaration, I calculated Ericsson's share of 4G SEP value in the US ranged from 3.5 percent based on the technical analysis, 4.0 based on the citation analysis and 4.7 percent based on patent counts.  Thus, Ericsson's May 2015 offer would imply an aggregate royalty burden of between 42 percent and 57 percent, or $43 to $57.

1   response to a one percent change in price) would be about -5.  With a 50 percent

2   price increase, a -5 elasticity of demand, and a constant elasticity demand curve,

3   TCL could expect to lose 87 percent of its sales.  Such floors or dollar-per-unit

4   minimums would place upward pressure on the price of budget smartphones that

5   reach the largest segment of the market, impeding the adoption of the standard.  This

6   would have a particular damaging effect on low-income consumers, such as those in

7   developing markets where the price of mobile phones must be sufficiently low to be

8   affordable to most consumers.

9   **III.   MR. KENNEDY'S "EX-STANDARD" ANALYSIS IS DEEPLY**

10  **FLAWED.**

11      16.   Mr. Kennedy claims to evaluate the "ex-standard" value of Ericsson's

12  cellular SEP portfolio, which he then uses to assess whether Ericsson's offers have

13  been consistent with its FRAND obligations.  (Dkt. 1333, ¶¶ 225-229.)

14      17.   As an initial matter, Mr. Kennedy contends that "[o]ne of the most

15  controversial current issues with FRAND licensing is whether the license price

16  should include the value that a patent gains by being adopted into an industry

17  standard."  (Dkt. 1333, ¶225.)  I do not believe there is any controversy (outside of

18  Ericsson's retained experts, apparently) regarding the proposition that the royalty for

19  a SEP should *not* include any value gained by its adoption into the standard.  I

20  understand that my interpretation is consistent with current case law.  For example,

21  in *Ericsson v. D-Link* the Federal Circuit stated that "a royalty award for a SEP must

22  be apportioned to the value of the patented invention (or at least to the approximate

23  value thereof), not the value of the standard as a whole."  *Ericsson, Inc. v. D-Link*

24  *Systems, Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("We further hold that district

25  courts must make clear to the jury that any royalty award must be based on the

26  incremental value of the invention, not the value of the standard as a whole or any

27  increased value the patented feature gains from its inclusion in the standard.").

28  Similarly, in addressing the risk of hold-up associated with standard-essential

patents, the U.S. Federal Trade Commission ("FTC") recommended that "[c]ourts should cap the royalty at the incremental value of the patented technology over alternatives available at the time the standard was chosen."  (Ex. 1141 at pp. 28-29.) The FTC explained that this was an attempt to avoid a situation where "a firm with a patent reading on the technology can demand a royalty that reflects not only the value of the technology compared to alternatives, but also the value associated with investments made to implement the standard."  (*Id.*)

18.     Mr. Kennedy incorrectly asserts that "[s]everal of TCL's experts have suggested, without concluding, that Ericsson is engaging in 'patent hold-up' to demand royalties in excess of the intrinsic value of Ericsson's standardized patented technology."  (Dkt. 1333, ¶ 226.)  Contrary to Mr. Kennedy's claimed understanding, in my opening witness declaration (along with my expert reports in this case), I concluded that Ericsson *is*, in fact, demanding royalties far in excess of the intrinsic value of its SEPs.  (*See* Dkt. 1317 at pp. 62-63 ("Ericsson's proposed royalty rates greatly exceed the fair and reasonable royalty rates based on the technical value of Ericsson's SEP portfolio.").)  This was a conclusion, not only a "suggestion."

19.     Mr. Kennedy also contends that "the rate to be set in this matter is by a neutral tribunal, so there can be no hold-up…."  (Dkt. 1333, ¶ 226.)  Mr. Kennedy is correct that my top-down analysis sought to provide the Court with royalty rates for Ericsson's SEPs that are free from hold-up value.  To the extent the Court adopts this approach, then in my opinion the resulting license will not contain any hold-up value.  However, Ericsson has argued that its Option A and Option B offers to TCL are FRAND.  My analysis shows that these offers far exceed fair and reasonable rates, so that they include hold-up value.  Moreover, to the extent Ericsson contends its licenses are the best evidence for setting a FRAND rate, these may also include hold-up for the reasons discussed above.  Dr. Lynde's licensing analysis confirms this conclusion, because many of Ericsson's licensees are being charged

1  substantially higher rates than other licensees.  Thus, if Ericsson's Option A or

2  Option B are accepted, then in my opinion the resulting license will reflect hold-up

3  value.

4       20.    Mr. Kennedy further claims that his "ex-standard" analysis is an

5  attempt to measure the incremental value of Ericsson's SEPs "which does not

6  include the value resulting from incorporation of the patented technology into the

7  standard…."  (Dkt. 1333, ¶ 227.)  As described in detail below, Mr. Kennedy has it

8  completely backwards, in that Mr. Kennedy's "ex-standard" analysis was actually

9  an attempt to capture the value of the standardized technology instead of the

10  inherent value of Ericsson's patents apart from any increased value the patented

11  feature gains from its inclusion in the standards.  As a result, Mr. Kenney's analysis

12  is not an appropriate metric for valuing Ericsson's SEPs.

13       21.    More to the point, Mr. Kennedy does not purport to determine a fair

14  and reasonable royalty rate that TCL must pay Ericsson based on the results of this

15  "ex-standard" analysis.  Because it is not used by Mr. Kennedy to determine a

16  FRAND rate determination, and is at odds with Ericsson's existing licenses and

17  public statements regarding appropriate aggregate royalty terms, Mr. Kennedy's

18  "ex-standard" analysis is incorrect and irrelevant.

19      **A.**     **Summary of Mr. Kennedy and Dr. Parkvall's Calculations and**

20          **Analyses.**

21       22.    Mr. Kennedy performs a set of calculations that claim to measure the

22  value of Ericsson's SEPs based on what he claims to be Ericsson's contributions to

23  four "technical currencies": (1) battery life; (2) data rates; (3) delays in

24  connection/latency; and (4) system capacity/network performance.  (Dkt. 1333,

25  ¶¶ 225-272.)  Mr. Kennedy argues that these technical currencies provide benefits

26  "to cellular carriers and mobile phone end users that are produced directly by the

27  Ericsson innovations in the technical clusters."  (*Id.*, ¶ 233.)  In this analysis, Mr.

28  Kennedy attempts to assess the value of certain features of the standards, which he

1  then apportions to Ericsson's SEPs.

2      23.    Mr. Kennedy's analysis suffers from several fundamental flaws which

3  render his calculations unreliable.  First, Mr. Kennedy's analysis relies on Dr.

4  Parkvall's assessment of the technical value of Ericsson's SEPs.  Dr. Parkvall's

5  analysis, however, is fundamentally flawed.  As pointed out by TCL's technical

6  expert, Dr. Apostolos "Paul" Kakaes, Dr. Parkvall fails to consider the actual claims

7  for any of Ericsson's individual SEPs (which lay out the alleged invention covered

8  by the SEPs) and how the features of the standard map to those claims.  Rather, Dr.

9  Parkvall relies on general statements regarding what Ericsson contributed to the

10  standard with lists of patents allegedly covering some features of those

11  contributions, while being silent on the methodology that apparently was applied in

12  classifying Ericsson's SEPs into these technical categories.  Moreover, Dr. Parkvall

13  does not consider non-infringing alternatives to Ericsson's specific patented

14  technology, but instead, for example, recites advantages of the 4G standard as

15  compared to the 3G or 2G standard.  (See, e.g., Dkt. 1332, ¶ 158.)  Mr. Kennedy's

16  analysis therefore does not represent an *ex ante* valuation of Ericsson's SEPs, but

17  instead incorporates the value of standardization, contrary to sound economics and

18  U.S. case law.

19      24.    Second, Mr. Kennedy's framework for evaluating the purported value

20  of the individual features fails to apportion for the many other economic factors that

21  contribute to the value of the features in question, incorrectly attributing the entire

22  value of those features to cellular SEPs alone.  Similarly, the economic evidence

23  that Mr. Kennedy relies upon is not specific to TCL's line of smartphones and

24  feature phones, and suffers from other deficiencies.

25      25.    Below I address in greater detail the economic aspects of Dr. Parkvall's

26  technical analysis, before turning to Mr. Kennedy's valuation calculations and

27  evidence.

28

**B.**     **Dr. Parkvall Does Not Consider Non-Infringing Alternatives that Were Available Prior to Standardization, and Therefore Mr. Kennedy's Analysis Does Not Represent an *Ex-Ante* Valuation of Ericsson's SEPs.**

26.     Mr. Kennedy's assessment of the value of Ericsson's SEPs for the four "technical currencies" relies on the technical analysis performed by Dr. Parkvall. Yet Dr. Parkvall does not evaluate Ericsson's SEPs individually.  He evaluates Ericsson's SEPs within ten "technical clusters," which Mr. Kennedy maps to the four "technical currencies."  (Dkt. 1333, ¶¶ 231-233.)  As a preliminary matter, I understand from Dr. Kakaes that Dr. Parkvall improperly classifies the patents at issue into technical categories in such a way that it overstates the breadth and technical merit of Ericsson's alleged SEPs.

27.     Although Mr. Kennedy labels his analysis as an "ex-standard" assessment, Dr. Parkvall does not analyze specific non-infringing alternatives to the patents in Ericsson's SEP portfolio.  Instead, Dr. Parkvall asserts that the improvements to various technology clusters within the standards (*i.e.,* the benefits of the entire standard) could not be achieved without Ericsson's SEPs.  He claims that "[t]he standard is an entire set of functions that interrelate and work together, such that if one detail is changed, it may cause a chain reaction across the whole system.  The result may be that the system does not function at all, or functions in a severely degraded way."  (Dkt. 1332, ¶ 70.)  Dr. Parkvall's assertion that Ericsson's patented technologies could not be removed without affecting other parts of the standard is key to his conclusions.  (*See* Dep. of Dr. Parkvall, May 20, 2016, p. 129:14-18 ("…all these kind of pieces of the standard are all related in one way or another.  It's very hard to take away one piece without any impact whatsoever on some other piece.").)  However, instead of analyzing the specific technical contributions brought by the use of Ericsson's specific patents (on a patent-by-patent basis), Dr. Parkvall instead focuses on the features of the standard to which

1    Ericsson's SEPs relate.  As a result, the only non-infringing alternatives that

2    Dr. Parkvall considers are features of previous versions of a standard, other general

3    technological alternatives to a given feature, and technologies embodied by other

4    commercial standards, such as Wi-MAX.  For example, in assessing the "value and

5    importance" of Ericsson's 4G patented technologies pertaining to "Connection

6    Establishment" solutions (one of the ten "technical clusters"), Dr. Parkvall

7    concludes that the only "alternative" would be to revert all the way back to

8    technologies used in 2G:

9              One potential alternative to Ericsson's 4G Connection

10             Establishment patents would be to implement a cellular

11             network using 2G Connection Establishment technologies.

12             Because Ericsson has a large number of Connection

13             Establishment patents that cover 3G and/or 4G Connection

14             Establishment technologies, it would not be possible to create a

15             next best non-infringing alternative that uses existing 3G or 4G

16             Connection Establishment technologies.

17   (Dkt. 1332, ¶ 158.)

18        28.    Dr. Parkvall's technical assessment is inconsistent with the economic

19   and legal principles for determining a FRAND royalty.  As discussed in my opening

20   declaration, economists generally agree that a fair and reasonable rate should reflect

21   the *ex ante* value of the specific patented technologies at issue and should not

22   include the value of standardization itself.  (*See* Ex. 2492, Mark A. Lemley and Carl

23   Shapiro, "A Simple Approach to Setting Reasonable Royalties for Standard-

24   Essential Patents," *Berkeley Technology Law Journal*, Vol. 28, No. 2 (2013), p.

25   1140; *see also* Ex. 455, p. 7.)  Further, a FRAND royalty rate should not exceed the

26   value of the patented technical contribution over the alternative technologies

27   available at the time the standard was set.  This view has been endorsed by the

28   courts.  *See Ericsson, Inc. v. D-Link Systems, Inc.*, 73 F.3d 1201, 1232-35 (Fed. Cir.

2014); *Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1226 (Fed. Cir. 2014); *Commonwealth Scientific and Industrial Research Organisation v. Cisco Systems, Inc.*, 809 F.3d 1295, 1304-5 (Fed. Cir. 2015) ("We therefore reaffirm that reasonable royalties for SEPs generally — and not only those subject to a RAND commitment — must not include any value flowing to the patent from the standard's adoption.").

29.     Dr. Parkvall disregards the pre-standardization technical alternatives addressed by Dr. Kakaes in his opening report.  The sole basis for doing so is his claim that Ericsson's SEPs are integral to the various technology buckets he analyzes.  Yet Dr. Parkvall fails to support the assertion that Ericsson's SEP technologies cannot be evaluated independently from the technology clusters relied upon by Mr. Kennedy.  As a result, under Mr. Kennedy and Dr. Parkvall's approach, it is difficult to isolate the importance of any individual patents.  Dr. Kakaes, however, provides examples of specific alternatives to Ericsson's individual SEPs. For example, I understand that for Ericsson's patent family P10808, Dr. Kakaes proposed an alternative, U.S. Patent No. 5,841,768 ("Ozluturk") as a non-infringing alternative to these key accused features, which Mr. Parkvall did not address. (Kakaes Rebuttal Declaration, Section III.D.3.)

30.     The *ex ante* value of Ericsson's SEPs should be considered by comparing Ericsson's SEPs to the next-best alternatives that were available at the time of standardization, not to the value of the prior standard-generation.  Mr. Kennedy and Mr. Parkvall claim that some alternatives may have been patented by Ericsson or other SEP holders.  Mr. Kennedy has argued in this case that there "*may not have been any feasible non-infringing alternatives, (1) given the size and breadth of Ericsson's declared patent portfolio and (2) given that any/all of Ericsson's declared patents not determined to be actually essential represent potentially infringing alternatives.*"  (Kennedy Report, ¶ 293 (emphasis added).) These arguments are not grounded in the facts of the case or economic theory.

31.     First, I understand from Dr. Kakaes that, as a general matter, the

technical analysis that he oversaw considered non-infringing alternatives that were not owned by Ericsson.  For example, as explained by Dr. Kakaes, the alternative to Ericsson's P10808 discussed above was not owned by Ericsson.  Second, the economic framework for assessing the *ex-ante* value of a SEP is to consider the competition that would have occurred prior to standardization.  (Ex. 2492, Joseph Farrell, et al., "Standard Setting, Patents and Hold-Up," Antitrust Law Journal (2007).)  As noted in my direct witness declaration, absent lock-in, rational licensees would never pay any more than the value that is added by incorporating the technology relative to the available non-infringing alternatives.  During the standard setting process, technical committees often consider alternative technologies for a given aspect of the standard.  In some cases, good alternatives may have existed at the time of the standard setting process but, by the very nature of the standard setting process, only one of the available technologies is chosen.  In other cases, it might be the case that a good, but not perfect, substitute technology existed.  In either instance, the inherent value of the patented technology is limited because of the availability of the alternative technology.  Prior to standardization, competition between competing alternatives technologies—even if all such competing technologies were patented—would drive royalty rates down to the incremental benefits of one patent over the alternative.  Thus, it is irrelevant to my economic analysis that potential non-infringing alternatives may have been patented by others. The point is that competition between alternatives has the effect of driving down royalty rates.

32.     Dr. Parkvall's analysis is not tied to the specific patents in Ericsson's portfolio, which allows him to gloss over any specific contributions brought by the use of Ericsson's SEPs (or his failure to demonstrate any such contributions). Consider, for example, that Dr. Parkvall's analysis is independent of any determination of the essentiality, validity, infringement or importance of Ericsson's patents, despite the fact that:

▪ **Many of Ericsson SEPs are not actually essential.**  By his own acknowledgement, Dr. Parkvall's assessment does not take into account the essentiality of Ericsson's declared SEPs.  (Dep. of Dr. Parkvall, p. 106:8-13 ("Q. Okay. So your opinions contained in the report are not at all related to whether or not the patents are essential? A. I don't have an analysis on whether patents are essential or not in my report.").)  For example, Dr. Parkvall lists patent family P06697 under the connection establishment "technical cluster."  (Dkt. 1332, ¶ 154.)  Dr. Kakaes and Dr. Jayant, however, concluded that this technology was not essential to the 4G standard.  (Dkt. 1334 at p. 142.)  Across all of Dr. Parkvall's technical clusters, 33 percent of patents identified have been deemed not essential by Dr. Kakaes and Dr. Jayant.  (Ex. 1116.)

▪ **Many of Ericsson's SEPs may be invalid or non-infringed.** Although I understand this case is not intended to evaluate the validity and infringement of Ericsson's SEPs, it would be expected that at least some of Ericsson's SEPs would be determined to be invalid or not infringed.  (*See* Ex. 2494, John R. Allison and Mark A. Lemley, "Empirical Evidence of the Validity of Litigated Patents," AIPLA Quarterly Journal, Vol. 26, No. 3.)  The percentage of valid patents may differ by industry.

▪ **The majority of Ericsson's patents represent minor improvements.** This conclusion is supported by the technical analysis performed by Dr. Kakaes, as summarized in my direct witness declaration.  This analysis shows that the vast majority of Ericsson's SEPs related to minor features of the standard or represented minor improvements over non-infringing alternatives that were available at the time.  Yet Dr. Parkvall's analysis fails to even attempt to make any distinction among

1           Ericsson SEPs, effectively assuming that there were no *ex ante* non-

2           infringing alternatives to any of Ericsson's patents.

3       33.    Because Dr. Parkvall's analysis is not tied to the specific patents in

4 Ericsson's portfolio, his conclusions are independent of any assessment of

5 Ericsson's patents.  For example, if it were determined that certain Ericsson patents

6 were invalid, Dr. Parkvall's results would not change because his conclusions are

7 based on the assumption that all of Ericsson's patents are necessary to a given

8 technical cluster.

9       34.    Because Dr. Parkvall's technical analysis is not tailored to the patents

10 in Ericsson's SEP portfolio, his analysis violates the economic principles that a fair

11 and reasonable royalty rate should be based on an *ex ante* assessment of Ericsson's

12 essential patents, rather than feature sets or the fact of standardization.  It would also

13 violate the principles expressed by the Federal Circuit that the "royalty rate for SEPs

14 must be apportioned to the value of the patented invention" and specifically

15 apportioned "from all of the unpatented features reflected in the standard."

16 *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d at 1232.  Such apportionment is

17 necessary "to ensure that the royalty award is based on the incremental value that

18 the patent invention adds to the product, not any value added by the standardization

19 of that technology."  *Id.*; *see also Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F .3d at

20 1326-27.  Dr. Parkvall fails to do this.  Indeed, his approach explicitly circumvents

21 any specific analysis of the technical contributions brought by the use of Ericsson's

22 patented technologies themselves.  As I will discuss in greater detail, Mr. Kennedy's

23 approach—valuing a feature of the standard as a whole and then apportioning that

24 value to Ericsson's SEPs—does not remedy the deficiency of this approach.  It

25 would allow Ericsson to collect on the value that comes from standardization, rather

26 than its specific technological contributions to the standard.

27

28

C.      **Mr. Kennedy's Valuation of Ericsson's SEPs Based on Certain Features Suffers from Several Fundamental Flaws.**

1.      Battery Life

a.      *Mr. Kennedy's calculations*

35.     I now turn to Mr. Kennedy's analysis of the alleged value of Ericsson's SEPs as they relate to the four "technical currencies." Mr. Kennedy's first "technical currency" is handset battery life. (Dkt. 1333, ¶¶ 235-247.) He begins by taking an estimate of the technical benefit that Dr. Parkvall attributes to the use of Ericsson's SEPs, which Mr. Kennedy translates to a 53 percent increase in battery life. Mr. Kennedy then calculates the incremental value associated with a 53 percent increase in battery life using two approaches.

36.     In the first approach, he relies on a 2012 survey performed by International Planning and Research of consumers' willingness to pay for increased battery life, which he claims results in an average willingness to pay of $5 for 1 additional hour of talk time. Starting from a "base level" of 6 hours of talk time, he calculates that Ericsson's technology would add 3.18 hours to a handset starting from the base level. At $5 per hour, Mr. Kennedy calculates that the average consumer would be willing to pay $15.89 for the 53 percent increase in battery life. Mr. Kennedy then apportioned the $15.89 based on Ericsson's alleged 15.9 percent "approved contribution" share to the 4G standard based on the 2010 Signal's Research Group Report, and also the 6.0 percent share of 4G patents calculated by Dr. Ding. This results in a valuation of Ericsson's contributions to increased battery life of $2.32 using the Signal's Research share measure and $0.95 using Dr. Ding's patent shares.

37.     Under his second approach, Mr. Kennedy uses the prices of battery charger phone cases produced by Mophie as a proxy for the value that consumers place on additional battery life. Based on the battery capacities and prices of these cases, he calculates the average willingness to pay for an additional 1,000 mAh to be

$38.47. Taking the average battery capacity of six TCL 4G handset models, Mr. Kennedy estimates that the average willingness to pay for a 53 percent increase in the battery life of TCL's phones is $42.48. Mr. Kennedy again apportions this amount by both the alleged 15.9 percent "approved contribution" share from the 2010 Signal's Research Group Report, and the 6.0 patent share calculated by Dr. Ding. This results in a valuation of Ericsson's contributions to increased battery life of $6.20 using the Signal's Research share measure and $2.55 using Dr. Ding's patent shares.

> **b.      *Mr. Kennedy's analysis seeks to capture the value of the standard as a whole***

38.      Mr. Kennedy's analysis is fundamentally flawed because it ignores available alternatives and seeks to capture the value of the standard as a whole. As described previously, a fair and reasonable royalty rate should be determined based on the incremental value of Ericsson's SEPs relative to the available alternatives before the standards were set.

39.      The starting point for Mr. Kennedy's analysis—the testimony of Dr. Parkvall—failed to evaluate any alternatives. Rather than consider alternatives available at the time the 4G standard was set, Dr. Parkvall's "alternative" eliminated these features from the standard entirely. (Dkt. 1332, ¶¶ 181-182 ("The 4G alternative to using Ericsson's patented 4G technology would be a significantly de-featured 4G system.").) Such an approach attempts to capture the value of the standard as a whole, not the incremental value of the technology over alternatives.

> **c.      *Mr. Kennedy fails to apportion the value of increased battery life to other economic factors necessary to realize that value.***

40.      Mr. Kennedy's framework for analyzing the alleged value of additional battery life is fundamentally flawed because it fails to apportion for all of the other economic contributions that are necessary to realize that value. In particular, that value must be apportioned among:

■ **Other improvements in battery technologies.** At the most basic level, mobile phones require a certain minimum level of battery life in order to function. Some portion of the value of battery technologies must be apportioned to those fundamental enabling technologies. Moreover, cellular standards are not the only innovations that have contributed to an increase in battery life. Battery technologies have advanced in tandem with the evolution of smartphones, increasing in capacity, density and efficiency. For example, the original Apple iPhone contained a 1400 mAh Lithium-ion battery, while the newest iPhone 7 modes contain 1960 mAh Li-Po to 2900 mAh Li-Po batteries. (Ex. 2495.) The design of batteries affects not only battery life, but the design of the phone, how quickly it recharges, and the number of recharges that a battery can sustain over the life of a phone. For example, Lithium polymer batteries can be made thinner than lithium ion batteries, which allows cell phone manufacturers to make smaller and lighter phones. (*See* Ex. 2496.) The value of increased battery life within a smartphone must be shared with other patented and unpatented improvements in battery life.

■ **Other factors that contribute to increased battery life.** Nor can the increase in battery life be solely attributable to just the battery itself. Numerous features of today's smartphones have an impact on battery life, including the application processor, communications chipsets (*e.g.*, the baseband chipset, as well as Wi-Fi, Bluetooth, NFC, and GPS chipsets) and other hardware designs of the phone (*e.g.*, how much power the touch screen draws). (*See* Ex. 2497.) In addition, Apple and Google design their operating systems and application platforms to optimize battery life. For example, both the

Android and Apple operating systems have been designed to reduce battery life ("Doze" for Android, "Low Power Mode" for Apple). (*See* Ex. 2498; Ex. 2499.)

- **Other features of smartphones.**  As with cellular connectivity generally, increased battery life does not generate value to smartphone consumers in and of itself.  In order to fully realize that value, it must be used in conjunction with the other features of a smartphones from which consumers derive value, including the quality of the screen, the speed of the application processor, the use of GPS-based services, etc.  As described previously, evaluating the incremental value of an individual feature without considering the interaction or synergies with other features overestimates the value of any one feature.  For example, if there were just 10 other features with incremental value that also ranged from $15.89 to $42.48 (the range of Mr. Kennedy's estimates of the value of increased battery life), aggregate value of those features would between $158.90 and $423.80, values well in excess of the average price of TCL's smartphones.  Indeed, the survey that Mr. Kennedy relies upon did not just measure battery life, but twelve other features: (1) the resolution of the screen; (2) the screen size; (3) the camera type (back only, or front and back); (4) video recorder, including the resolution of the video; (5) the size of installed memory; (6) whether the phone has a removable battery; (7) the ability to expand memory; (8) data speed; (9) the type of keyboard (virtual or physical); (10) turn-by-turn audible GPS navigation; (11) the operating system; and, (12) voice-assisted control.  (Ex. 4858.)  Just as the value of these features cannot be realized without some base

battery life, the value of additional battery life also depends on these other features.

    d.    *The economic evidence relied upon by Mr. Kennedy does not reflect customers of TCL's smartphones and suffers from other deficiencies.*

41.    As with his analysis of the value of cellular connectivity, the evidence that Mr. Kennedy relies upon does not reflect the specific value of battery life to customers who shop for and purchase the range of smartphones offered by TCL. The evidence he relies upon also suffers from other deficiencies.

42.    Consider first the 2012 International Planning and Research Study that Mr. Kennedy uses to assess the incremental willingness to pay for additional talk time. As noted above, this study analyzes a number of additional features, only one of which relates to increased battery life. As a preliminary matter, the design of the study does not take into account how the value to consumers of these features may interact. For example, a consumer may only be willing to pay for additional battery life if the smartphone can provide turn-by-turn GPS directions. Similar conclusions can be made for the other features analyzed in the study.

43.    Even taking the willingness to pay calculations from the study at face value, the study makes it clear that there is a wide range of consumers' preferences over the value of the various features. Mr. Kennedy relies on the "average" willingness to pay measure for battery life, but that value is likely to vary greatly across consumers. (Dkt. 1333, ¶240.) The data from this study is not available, but the presentation shows that the range of consumer valuations for the other features varies widely. For example, the "average willingness to pay" for a "very high" screen resolution (720 by 1280) was equal to $32.20, but the presentation suggests that the responses for just six respondents varied between $0 and $42. (Ex. 4858, pp. 16, 19.) Similarly, the "average willingness to pay" for 32 GB of installed memory was $58, but the variation of individual preferences varied from $0 and

$147.  These considerations are important for budget smartphone consumers in particular, who have less disposable income.  All else being equal, such consumers are likely to place lower absolute value on better features, such as battery life.  Mr. Kennedy's analysis does not reflect the value of battery life to customers of less expensive smartphones.

44.    In addition, a product manufacturer is not able to capture all of a consumer's willingness to pay for a product or feature in most cases.  Indeed, "consumer surplus," which is the value consumers get from a product above the price they pay for it, is positive for almost every product.  Because the additional price that a smartphone manufacturer could charge for battery life will be only a fraction of a consumer's willingness to pay for battery life, Mr. Kennedy made a fundamental error in economics by assuming that the value to TCL (a smartphone manufacturer) would be the entirety of a consumer's willingness to pay, even though TCL could not capture the entirety of the willingness to pay with its prices.

45.    Nor do Mr. Kennedy or Dr. Parkvall provide any justification for adopting the 6-hour talk time base value from the 2012 International Planning and Research study as the starting point for calculating the alleged 53 percent increase over alternatives.  Since there is no justification for this arbitrary decision, Mr. Kennedy's attempts to quantify the value of Ericsson's alleged improvement over the prior art are completely unsupported.

46.    Another critical issue with this 2012 study is that it fails to reflect the evolution of battery life over time.  As discussed above, battery technologies themselves have advanced, allowing manufacturers to incorporate larger capacity and more efficient batteries into smartphones.  These advancements (as well as changes which enable smartphones to use less power) are themselves substitutes for the supposed Ericsson technologies.  A 2012 survey of consumer preferences fails to take into account these changes.  Even under an *ex ante* analysis, the value of a patented technology would take into account *expected* changes in battery

1   technologies that could results in additional battery life.

2       47.     Consider next the price of Mophie battery cases that Mr. Kennedy

3   analyzes.  Based on the price of certain Mophie-branded battery phone cases, Mr.

4   Kennedy calculates that the willingness to pay for increased battery life is $42.48 for

5   a subset of TCL phones.  (Dkt. 1333, ¶ 246.)  Yet, the relatively small number of

6   consumers who choose to purchase the Mophie battery cases are not representative

7   of the average consumer, let alone consumers of lower-priced smartphones.  As

8   described above, consumers of Apple's iPhones as well as consumers for other

9   premium smartphones are less price sensitive in general, and therefore will, on

10  average, be willing to pay more for incremental improvements.  For example, a

11  study found that the median annual income for U.S. iPhone users is $85,000, which

12  is 40 percent higher than Android phone users' median annual income.  (*See* Ex.

13  2500.)  Mr. Kennedy's analysis based on the preferences of these consumers

14  therefore overestimates the value of increased battery life for the average

15  smartphone consumer.

16      48.     Nor are customers who purchase Mophie battery cases representative of

17  smartphone consumers as a whole.  At best, the price of a Mophie battery case

18  reflects the value of increased battery life to a certain niche of consumers, *i.e.*, those

19  who require substantially more battery life than the average consumer.  The

20  particular consumers who choose to buy the expensive Mophie battery cases are

21  those with the greatest willingness to pay for extra battery life (*i.e.*, a willingness to

22  pay that exceeds the price an average consumer would pay for battery life).  Such

23  consumers are not representative of the average consumer, who has a substantially

24  lower willingness to pay for battery life (and thus chose not to buy an expensive

25  battery case).  Indeed, the price of the Mophie battery cases that Mr. Kennedy

26  analyzes ($59.95 to 99.95) exceeds the price of many of TCL's smartphones.  (Ex.

27  1119.)

28

2.   Data Speeds

49.     Mr. Kennedy's second "technical currency" is data speeds.  Mr. Kennedy uses two sources to calculate Ericsson's contribution to the value of improved data speeds provided by 4G technology.  (Dkt. 1333, ¶¶ 248-257.)  Under one approach, Mr. Kennedy cites findings from a 2012 International Planning and Research study, Ex. 4858, that consumers would be willing to pay an additional $33 for increased 4G speed over 3G speed.  (*Id.*, ¶ 252.)  Apportioning this total value by both the 15.9 percent "approved contribution" share from the 2010 Signals Research Group Report, as well as Dr. Ding's 6 percent patent share, he calculates that Ericsson's share of the willingness to pay for 4G over 3G speed ranges from $1.98 to $4.82.

50.     Under a second approach, Mr. Kennedy calculates the weighted average willingness to pay for 4G over 3G speed to be 8.3 percent based on the results of a 2013 Accenture Web Watch study, Ex. 4845.  (Dkt. 1333, ¶ 253.)  He apportions the 8.3 percent by both the alleged 15.9 percent "approved contribution" share from the 2010 Signal's Research Group Report, and also by the 6.0 percent patent shares calculated by Dr. Ding.  This results in an alleged willingness to pay for 4G speeds equal to 1.21 percent of a phone price using the Signals Research Report contribution shares, and 0.5 percent of the price of a phone using the patent share calculated by Dr. Ding.  Mr. Kennedy then applies these percentages to the average selling price in 2012 for 3G handsets (across all vendors) to calculate a dollar value of Ericsson's contributions to the value of increased data rates ranging from $1.57 to $3.83.  Mr. Kennedy's analysis of the value associated with the increase in data speeds suffers from the same flaws as his valuation of incremental battery life.  Moreover, both approaches are capturing the value of the entire standard (*i.e.,* 4G compared to 3G), not the ex ante value of Ericsson's SEPs.  Like his incremental battery life analysis, Mr. Kennedy fails to apportion to other features that also contribute to the value that consumers derive from increased data speeds.

Mr. Kennedy calculates consumers' "willing[ness] to pay for the increased speed of
4G over 3G" to be $33.  (Dkt. 1333, ¶ 252.)  Again, neither he nor Dr. Parkvall have
linked this increase in speed to Ericsson's specific patented technologies.  Mr.
Kennedy again mistakenly equates consumer willingness to pay with the price that a
manufacturer could charge when, in fact, the latter is less than the former and the
latter is the relevant quantity.

51.     Even setting these issues aside, other technical factors have contributed
to the increase in data speeds, such as the speed of the application processor or the
operating system.  For example, according to a 2013 Price Waterhouse Coopers
report, "the average speed realized within each generation of technology can
improve through the optimization of handsets, base stations and air interface
protocols."  (Ex. 2501.)  As with increased battery life, the benefits of increased data
speeds cannot be realized without other features of a phone.  For example,
consumers may value increased data speeds that allow them to download or stream
music and videos to their phones, but the value of that experience depends in part on
the size and resolution of the screen, the internal storage size, the speed of the
application processor, the software that plays the streams, etc.  Mr. Kennedy's
failure to account for these other economic contributions overestimates the value of
these individual features.

52.     The evidence that Mr. Kennedy relies upon also does not reflect the
value of increased speeds to consumers of TCL's smartphones.  As with the
assessment of battery life, the 2012 study that Mr. Kennedy relies upon only
considers the average value that consumers place on additional data download
speeds, even though that valuation varies considerably among consumers, and in
particular would be expected to be lower for consumers of lower-priced
smartphones.

53.     Mr. Kennedy also relies upon a 2013 Accenture study regarding the
"amount customers would be willing to pay for the increased speed of 4G over 3G."

(Dkt. 1333, ¶ 253.)  Again, at best, the results of this study pertain to the difference between 3G and 4G, and is not tied to the contributions of Ericsson's specific patented technologies.  The study also appears to include Wi-Fi when considering network speed.  (Ex. 4845, p. 4 ("… speed matters and mobile Internet users are willing to pay more for faster Internet connections.  The speed of mobile Internet connection is important to 97 percent of users of mobile Internet, and the importance of speed does not depend on the consumer's preferred means of connection (3G, 4G or Wi-Fi).").)  Nor does the study specifically measure the value to consumers of 4G speeds as they relate to smartphones, as the study appears to reflect the service fees charged by mobile providers and not the price of a 4G phone.  The summary of the report is targeted at "communication service providers" ("CSPs") and the results that Mr. Kennedy relies on relate to the "cost of 4G mobile internet" that customer would be willing to pay.  (Ex 4845.)  There is no economic basis—and indeed Mr. Kennedy provides none—to assume that the results of a study of mobile service provider fees apply to the price of 3G phones, as Mr. Kennedy does.

54.     Finally, I note that the study also reveals that the willingness to pay for 4G speeds varies considerably among the survey respondents.  The study baseline was a 10 percent increase in speed.  Overall, 37 percent of respondents indicated that they were not willing to pay anything for this increase in speed, and 24 percent of respondents in the survey were in the low income category.  (Ex 4845, pp. 6, 15.)

### 3.     Delays in Connection/Latency Link and System Capacity/Network Performance

55.     Mr. Kennedy also analyzes the importance of delays in connects/latency and system capacity/network performance, focusing primarily on their impact on content providers, online stores, and carriers.  (Dkt. 1333, ¶¶ 258-272.)  However, he does not perform a quantitative valuation of Ericsson's contribution for these "technical currencies."

56.     Nonetheless, his assessments suffer from the same deficiencies as his

other analyses.  For the first category (Delays in Connection/Latency Link), Mr. Kennedy points to statistics related to "page load times," which he claims is "regularly highlighted by customers as one of their main sources of frustration with mobile networks" and which he attempts to link to reduced sales by online retailers. (Dkt. 1333, ¶ 261.)  Mr. Kennedy takes a figure from an analysis from an online blog that claimed that the cost of abandoned shopping carts for online retailers was estimated to be $18 billion.  (Dkt. 1333, ¶ 262.)  Mr. Kennedy concludes from this figures that "if 18% of online shoppers will abandon their shopping cart if pages are too slow" it would "correlate to more than $3 billion in lost sales (across US ecommerce site) due to poor performance."  (Dkt. 1333, ¶ 263.)

57.     This study is not a reliable measure, qualitatively or otherwise, for evaluating Ericsson's contributions to the cellular standards as a whole, let alone for the value to TCL of Ericsson's SEPs.  First and foremost, at best, the study relates to the value of mobile online shopping.  Mr. Kennedy fails to explain the link or relevance of this study as it relates to mobile phone manufacturers, such as TCL. Nor are the statistics that Mr. Kennedy cites reliable.  The blog author's calculation implausibly assumes that the entire value in abandoned shopping carts represents lost revenue.  "Abandoned" shopping carts do not necessarily represent lost revenue, as some customers may never purchase a product, while others may purchase a product from another retailer—which the blog that Mr. Kennedy relies upon specifically notes.  Nor can this figure be extrapolated to the value of online shopping on mobile networks, since consumers could finish their purchase on a Wi-Fi network, or on a home or work computer.

58.     Similarly, for the second category (System Capacity/Network Performance), Mr. Kennedy points to a study conducted by Ericsson that claims to show that "network performance is the principal driver behind subscriber loyalty to cellular carriers."  (Dkt. 1333, ¶¶ 266-272.)  Again, Mr. Kennedy fails to explain the link or relevance of this study as it relates to mobile phone manufacturers like TCL.

1    Even setting this issue aside, the study (a) is not specific to Ericsson's SEPs; (b)

2    fails to apportion among other factors that interact and create synergies with

3    network performance; and (c) is not specific to TCL's phones or customers.  While

4    the Ericsson study claims that "network performance" was one of the drivers of

5    customer loyalty, it also shows that nine other aspects also drive customer loyalty,

6    including "value for money," "ongoing communications," "tariff plans offered,"

7    "customer support," "account management," "billing and payment," handset/devices

8    offered," "initial purchase" and "loyalty rewards."  (Ex. 4834.)  While Ericsson

9    claims that "network performance is the "principle" driver, it still does not drive the

10   entire value:  only 19 percent of the value, less than 1/5th, is attributable to "network

11   performance" while the remaining 81 percent is attributable to the other features.

12   (*See also* Ex. 4845, pp. 6, 15.)

### D. There Is Overlap Among the Technology Currencies that Mr. Kennedy Analyzes.

15   59.    Another related flaw in Mr. Kennedy's analysis of features is that he

16   assumes that the value of individual features can be summed in order to calculate the

17   aggregate value of the features combined.  After apportioning the value of the

18   features to Ericsson's SEPs (based on the Signal Report's contributions analysis or

19   Dr. Ding's patent shares), he calculates that the total value per handset for increased

20   battery life and increased data rates is equal to $6.15 to $11.02.  (Dkt. 1333 at

21   pp. 19-20.)  Mr. Kennedy also suggests that the value is greater if the other two

22   technical currencies were added to these amounts.

23   60.    Setting aside all of the other problems with Mr. Kennedy's analysis, as

24   with Mr. Kennedy's feature analysis, this fails to account for synergies between the

25   features.  Battery life, for example, interacts with both delays in connection time

26   (with longer delays reducing battery life) and system capacity and network

27   performance (which would also reduce battery life).  Similarly, consumers'

28   willingness to pay for 4G speed over 3G speeds depends in part on both delays in

connection time and network performance.  Thus, even within a standard, the values of individual features are not necessarily "additive" and may require apportionment of synergies.

**E.**     **The Top-Down Approach Provides An Independent Economic Assessment of a FRAND Royalty Rate That Is Free From Hold-Up.**

61.     Mr. Kennedy contends that "TCL's experts have made no attempt to independently value Ericsson's SEPs, separate and apart from any value associated with the incorporation of those SEPs into the cellular standards."  (Dkt. 1333, ¶ 226.)  This is fundamentally incorrect, and Mr. Kennedy has it backwards.  The top-down approach disclosed in my direct witness declaration is specifically designed to independently value Ericsson's SEPs to determine the *ex ante* value absent standardization.

62.     The top-down approach is consistent with economic theory and U.S. case law.  (Ex. 2502,  "The Shapely Value," Chapter 53, Handbook of Game Theory with Economic Applications, 2002, vol. 3; *see also* Ex. 2503, Daniel G. Swanson and William J. Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power," *Antitrust Law Journal* (2005).)  Indeed, it is the same approach adopted by the district court in *Innovatio*, which specifically noted that "the top-down approach best approximates the RAND rate that the parties to a hypothetical ex ante negotiation most likely would have agreed upon in 1997, before Innovatio's patents were adopted into the standard."  (*In re Innovatio IP Ventures, LLC Patent Litigation*, Case No. 1:11–cv–09308, 2013 WL 5593609 (N.D. Ill. September 27, 2013).)

63.     In my opening declaration, I calculated a fair and reasonable royalty rate for Ericsson's SEPs starting with *ex ante* statements made by Ericsson and other SEP owners/manufacturers that the aggregate royalty burden for 3G would be 5% and for 4G would be between 6 and 8 percent.  These calculations provide a basis for assessing the *ex ante* expectations of the value of SEPs to the standards.  This is

the only *ex ante* calculation that has been presented in this case.

64.     In the top-down approach, my apportionment of the aggregate royalty burden was specifically tailored to calculate the *ex ante* value of Ericsson's SEPs at issue in this case.  I calculated Ericsson's share of cellular SEPs for the 2G, 3G and 4G standards based on the essentiality, importance of the technology, and contribution over available alternatives at the time the standard was set for each of Ericsson's specifically identified SEPs.  I also evaluated the "value share" of Ericsson's SEPs based on economic measures of the quality of the specific patents in its portfolio under two approaches:  one based on a citation analysis and another based on Dr. Kakaes's technical analysis.  The results of these three approaches generally corroborated each other.

## IV.     DR. TEECE AND MR. KENNEDY'S ANALYSIS OF THE "VALUE OF 4G" IMPROPERLY CAPTURES THE VALUE OF THE STANDARD.

65.     Mr. Kennedy calculates the alleged value of 4G cellular connectivity in Apple products by comparing the price of the iPhone 5C to the 5th Generation iPod Touch.  (Dkt. 1333, ¶¶ 273-279.)  Mr. Kennedy determined that the price difference between the two devices, and therefore the value to consumers of 4G technology, is $251.  (*Id.*)  Ericsson's proportional share of this value, according to Mr. Kennedy, is $39.91 or 8.9% of the price of Apple's iPhone 5C.  Mr. Kennedy describes this analysis as a "sanity check" on his prior analysis.  (*Id.*)

66.     This calculation is similar to a calculation put forward by Dr. Teece who also claims to calculate the value of cellular connectivity for a wider set of Apple iPhone models, though his analysis differs somewhat from Mr. Kennedy's.  (Dkt. 1331, ¶¶ 165-179.)  In particular, he calculates difference in price and profit between four iPhone models relative to the Sixth Generation iPod Touch model.  Because the iPhone models and iPod Touch offer similar specifications in some respects, Dr. Teece claims that these products represent a "natural experiment" that can be used to assess the implicit value that consumers place on cellular

communications.  After attempting to control for differences in screen size, Dr. Teece estimates the difference in profit that Apple earns between certain iPhone models and an iPod Touch.  Although there are many other flaws with this approach (as I will discuss below), I note that Dr. Teece attempts to adjust the price differential for differences in screen size using the difference in screen sizes of the iPhone 6 and the iPhone 6 Plus as a benchmark for his hedonic price calculations. However, Dr. Teece performs this calculation using the difference in screen diagonal measurement instead of screen area, which generates a higher dollar amount for the value of a larger screen using the same methodology (and thus lower price and profit differentials).  Dr. Teece provides no support for using the screen area rather than the screen diagonal measurement.

67.     Dr. Teece further notes that "[i]t is not economically appropriate to attribute all of the price differential to the difference in cellular capability" and that *one* major difference is the screen.  (*Id., ¶* 170.) This is the only difference for which he adjusts the price differential between the iPhone and iPod products.  Dr. Teece also notes that there are additional differences between the products, such as GPS and the screen contrast, but that he does not have the data necessary to control for these differences—so he just ignores them.  (Dkt. 1331, ¶ 178.)  He also notes that the processor and camera sizes vary across the iPhone models and that one could use hedonic pricing to calculate the value of the difference in sizes, but he does not perform this calculation.  During his deposition, Dr. Teece admitted that he did not control for a number of differences among the Apple products, including battery life, weight or materials used, display resolution, fingerprint sensors in the iPhone, Apple Pay technology, processor speeds, or the presence of GPS in the iPhone 6 but not in the iPod Touch, which includes the inability of the iPod Touch to provide turn-by-turn directions.  (Teece Dep. Tr. at 290:11-293:7.)  Dr. Teece testified in his deposition that, at best, this methodology is a "good rough approximation."  (*Id.* at 290:21-24.)  Using this "rough approximation," Dr. Teece calculates the difference

1  in profit between the iPhone models and an iPod Touch model to range from $175

2  to $346, or approximately 31.7 percent to 53.4 percent of the price of an iPhone.

3      68.     Before proceeding to address the many flaws in Mr. Kennedy and Dr.

4  Teece's analysis, I would note at the outset that their claimed "sanity check" is

5  directly contradicted by Ericsson's statements regarding the proper way to value 4G

6  SEPs.  As I discussed in my opening declaration, Ericsson publically advocated for

7  a 6-8 percent aggregate royalty burden for all LTE SEP owners around the time the

8  standard was adopted.  (Ex. 1149, p. 31; Ex. 1152, p. 1.)  Neither of Ericsson's

9  economic experts, nor Ericsson itself to my knowledge, has advocated for anything

10  approaching an aggregate royalty burden in the 30-50 percent range, nor an 8

11  percent royalty for Ericsson (figures that are implied by Mr. Kennedy and Dr.

12  Teece's calculations, given the high ASP of an iPhone).  Indeed, Dr. Teece admits

13  this analysis is not applicable beyond Apple, stating "it does not make economic

14  sense to assume that the dollars-per-unit benefit of adding cellular capacity is the

15  same for other cellphone manufacturers as it is for Apple."  (Dkt. 1331, ¶ 179.)  As

16  we know, however, Apple is not paying Ericsson an 8% royalty, but rather is paying

17  a rate of ▮▮▮▮ (or ▮▮▮% if one accepts Mr. Kennedy's calculations instead).

18      **A.     Mr. Kennedy and Dr. Teece's Framework Is Fundamentally**

19          **Flawed Because It Fails to Apportion Value to Other Economic**

20          **Factors that Are Necessary to Realize the Value of Cellular**

21          **Functionality**

22      69.     Both Mr. Kennedy and Dr. Teece rely on the price/profit differential

23  between iPhone and iPod Touch models to estimate the "value of cellular

24  connectivity."  While Mr. Kennedy claims that the value of cellular connectivity"

25  represents the "ex-standard" value, his analysis does nothing more than attempt to

26  capture the value of the standard itself.  As I explain in greater detail below, Mr.

27  Kennedy and Dr. Teece's analyses are not specifically addressed to the value of any

28  of Ericsson's patented technologies.  To the extent these analyses are relevant to the

value of any specific technology, they are still not a reliable metric for valuing Ericsson's SEPs because they allegedly look at the *ex post* value of cellular connectivity (*i.e.,* the value of 4G as a whole to the iPhone) rather than the *ex ante* value of Ericsson's SEPs prior to adoption of the standard.

70.     While their approaches differ slightly, Mr. Kennedy and Dr. Teece reach similar conclusions:  the value that should be attributed to cellular connectivity for an iPhone is hundreds of dollars and a large percentage of the price of an iPhone.  After apportioning this value, Mr. Kennedy arrives at a dollar value for Ericsson's SEPs of $39.91 based on his preferred measure (Ericsson's "contributions") and $16.32 based Dr. Ding's calculation of Ericsson's share of SEPs.  As a preliminary matter, there are additional differences (*i.e.*, differences other than cellular connectivity) between the iPhone and iPod touch models that both Mr. Kennedy and Dr. Teece analyze.  For example, the iPhone models incorporate GPS functionality, while the non-cellular iPod Touch models do not. Map and other navigation services are among the most widely used mobile phone features.  For example, as of February 2012, almost 74% of smartphone owners get real-time location-based information enabled by GPS on their phones; as of 2015, almost 3 billion mobile applications currently in use rely on positioning information. (*See* Ex. 2504, ("Three-Quarters of Smartphone Owners Use Location-Based Services," Pew Research Center, May 11, 2012); Ex. 2505, ("GNSS Market Report", Issue 4, European Global Navigation Satellite Systems Agency, March 2015.)  Some of the iPhone's important additional features include NFC, location services, fingerprint sensor, better screen contrast and resolution, and Apple Pay technology.  While Dr. Teece at least acknowledges some of these differences (although he does not adjust for them), Mr. Kennedy does not acknowledge them.

71.     Mr. Kennedy and Dr. Teece's methodology, however, suffers from a more fundamental conceptual flaw.  Without accounting for the interaction among features, a single-feature analysis has no economic meaning in the context of highly

1   complex products that incorporate many fundamental and complementary

2   technologies.  Mr. Kennedy and Dr. Teece's incremental value calculation fails to

3   apportion the value of the iPhone among the many other contributions that have

4   made iPhone a success and are a prerequisite for Apple to earn the supposed profit

5   on "cellular connectivity."  In economic terms, Mr. Kennedy and Dr. Teece have

6   failed to account for "synergies" between the cellular connectivity and many other

7   features in the smartphone that work together with cellular connectivity to create

8   valuable services for users.  (*See* Ex. 2503 (Swanson, Daniel G., and William J.

9   Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards

10   Selection, And Control of Market Power." *Antitrust Law Journal* Vol. 73, No. 1

11   (2005), p 1-58); *see also* Ex. 2506 (Geradin, Damien, and Anne Layne-Farrar,

12   "Patent Value Apportionment Rules for Complex, Multi-Patent Products." *Santa*

13   *Clara Computer & High Tech,* LJ. 27 (2010), pp. 763-775).)

14   72.   Part of what Mr. Kennedy and Dr. Teece term the "value of cellular

15   connectivity" or the "value of 4G" should, in fact, be apportioned to these other

16   features.  Apple's iPhones bring together a number of necessary features beyond

17   cellular connectivity—including Wi-Fi connectivity, Bluetooth, a high-resolution

18   touch screen, GPS and navigation, a fast processor, a camera, a fingerprint sensor,

19   the iOS operating system, thousands of Apple and third-party applications, the

20   reputation and status associated with the Apple brand, etc.—as well as a myriad of

21   other standards and features that must share the total value associated with an

22   iPhone.  Even if Apple iPhone customers were willing to pay hundreds of dollars for

23   cellular connectivity, those customers would also likely be willing to pay significant

24   amounts of money for other fundamental features of iPhones that are used in

25   conjunction with cellular connectivity.  Put differently, the "value of cellular

26   connectivity" that Mr. Kennedy and Dr. Teece calculate cannot be realized without

27   interaction with the other features of an iPhone.  Thus, the "value of cellular

28   connectivity" that they calculate must be apportioned among all these features and

1    contributions.

2          73.    One of the key conclusions from the analysis that follows is that,

3    although Mr. Kennedy and Dr. Teece attempt to "control" for differences in features

4    between an iPhone and an iPod Touch, they fail to remedy the apportionment

5    problem.  It is not possible to purchase an iPhone that has only cellular connectivity

6    but excludes all of the features that the iPod does not have.  Thus, Mr. Kennedy and

7    Dr. Teece do not have any evidence of what users would pay just to have cellular

8    connectivity.  Instead, in comparing the iPhone to the iPod Touch, Mr. Kennedy and

9    Dr. Teece identify what users would pay to have cellular connectivity *and* all the

10   other features that combine with that cellular connectivity to generate value.  Mr.

11   Kennedy and Dr. Teece still need to apportion the iPhone/iPod Touch difference

12   among not only cellular SEPs, but all of the other features that are used in

13   conjunction with cellular connectivity, as well.  Instead, Mr. Kennedy and Dr. Teece

14   fail to apportion any of the iPhone/iPod Touch difference to these other features.

15   Thus, their approach is fundamentally flawed as a matter of economics.

16          74.    **Example 1: Two "Blocking Patents."**  To better understand how

17   multiple features of a complex product interact and generate synergies, consider a

18   simple model of two "blocking" patented technologies, patent A and patent B,

19   where there are no non-infringing alternatives for either technology.  By "blocking"

20   in this context, both A and B are "necessary" such that a manufacturer could not

21   earn profits without using both patent A and B.  In this case, calculating the

22   incremental profit for A would be 100% of the profit on the product since the

23   manufacturer cannot sell the product without making use of A; likewise, the

24   incremental profit for B is also the 100% of the profit on the product.  But, it would

25   be incorrect to attribute 100% of the value to either patented technology.  In this

26   example, there are only two patented technologies.  In addition, some portion of the

27   value from selling the product must also be allocated to compensate the

28   manufacturer for its contributions, such as product development, brand name, etc.

For example, if a patent holder held a blocking patent for the iPhone's touch screen—without which Apple could not sell iPhones and the value of the iPhone would be 0—it would be incorrect to assign 100% of the profit of the phone to such a patent.

75.    **Example 2: Two Fundamental Technologies.**  Example 1 is stylized in that both patented technologies are "blocking."  Mr. Kennedy and Dr. Teece estimate the *incremental* value of the cellular connectivity for an iPhone, but nonetheless find that a substantial portion—31.7 percent to 55.8 percent of the price of an iPhone—should be allocated to cellular connectivity.  The example above can be extended to "fundamental" patented technologies.

76.    Consider now an example where A and B generate incremental profits:

- ▪ If the manufacturer uses A and B, it earns a profit of $300.
- ▪ If the manufacturer uses A but not B, it earns a profit of $100.
- ▪ If the manufacturer uses B but not A, it earns a profit of $100.

In this case, the incremental profit associated with A is $200, equal to the difference in the price with A ($300) and without A ($100).  Similarly, the incremental profit of patented technology B is $200.

77.    It would be incorrect to attribute $200 solely to A or B for two reasons. First, such an allocation fails to account for synergies, which can be seen by the fact that the sum of the incremental value of A and the incremental value of B would be $400, or greater than profit that the manufacturer earns on the phone.  Instead, A and B must share the value that they generate by being used together.  Second, it would be incorrect to attribute 100% of the value solely of the product between only A and B—*e.g.*, $150 each—since some of the profit must also be apportioned to the manufacturer for its contributions such as product development efforts and brand name.

78.    This example is not hypothetical in the context of a smartphone, as there are a number of valuable technologies and contributions upon which Apple's

iPhones rely.  One set of patented technologies relate to the GPS and navigation features that are incorporated into Apple's iPhones, as well as most of today's smartphones.  In order to realize the value of cellular connectivity, Apple must offer its iPhones with these GPS and navigation features.  One recent study, for example, showed that "67% of smartphone owners use their phone at least occasionally for turn-by-turn navigation while driving, with 31% saying that they do this 'frequently.'"  (Ex. 2507 ( "US Smartphone Use in 2015," Pew Research Center, April 1, 2015, p. 6).)  Consumers not only benefit from having such navigation features integrated into one device, but they benefit from the synergies that are created by the interaction with cellular connectivity and navigation features—*e.g.*, locating restaurants near a user's location, reading Yelp reviews, etc.  (Maps and navigation are hardly the only features in a smartphone that interact with cellular connectivity.  Moreover, the value of Apple's contributions such as product development are well-known.  I discuss this in greater detail below.)

79.     In the context of Example 2 above, Dr. Teece and Mr. Kennedy's analyses are equivalent to analyzing the incremental value of A (cellular technologies) without considering the synergies that are created by their use with technology B (GPS and navigation features).  Mr. Kennedy and Dr. Teece fail to consider that the incremental value of a cellular-enabled iPhone is not possible without having GPS and navigation functionality (and, as discussed below, the many other features of an iPhone and Apple's contributions).

80.     Another set of patented technologies are those that relate to the 802.11 Wi-Fi standards that are incorporated into both iPhones and iPod Touches.  Wi-Fi is both a complement and a substitute for cellular connectivity, and is a valuable technology for iPhone customers.  For example, one study from 2012 found that over 63.4 percent of smartphone originated traffic in the U.S. was on a Wi-Fi network, larger than the traffic originated on cellular networks.  This figure ranged from 51.1 percent (Singapore) to 82.2 percent (Spain) in other regions.  (Ex. 2508

("Understanding Today's Smartphone User: Demystifying Data Usage Trends on Cellular & Wi-Fi Networks," White Paper, 2012, *Informa Telecoms & Media*).) Wi-Fi usage was even greater for iPhone users, which in a related study showed that globally, 82 percent of the traffic for iPhone users was on Wi-Fi networks. *Id.*

81.     Mr. Kennedy's and Dr. Teece's analysis overestimates the value of cellular connectivity relative to other features. Consider, by way of example, the hypothetical where the incremental value of Wi-Fi is as valuable as cellular connectivity—which is at least suggested by the fact that consumers rely on Wi-Fi networks more than cellular networks. Under Mr. Kennedy's analysis, the incremental value of cellular connectivity was 55.8 percent. If the incremental value of Wi-Fi were also this amount, then the sum of the incremental value of cellular and the incremental value of Wi-Fi would exceed 100 percent of the price of an iPhone, before even accounting for costs. Similarly, Dr. Teece finds that the value of cellular may exceed 50 percent of the price of the phone. Again, if consumers value Wi-Fi as much as their cellular connection, the total value of cellular and Wi-Fi would be greater than 100 percent of price of the phone. As Example 2 showed, it would be incorrect to assign 100 percent of the incremental value to either technology because this would fail to account for the synergies between cellular connectivity and Wi-Fi connectivity. Apple can only sell the number of iPhones at the price that it does by incorporating both features. Moreover, some portion of the overall profit must be allocated to Apple itself.

82.     **Example 3: Many Valuable Technologies.** The previous example illustrates that Mr. Kennedy and Dr. Teece's methodologies are inherently unreliable even under the assumption that there are only two sets of technologies driving the value of an Apple iPhone. Yet, this analysis does not even begin to account for other valuable features that are incorporated into iPhones, nor Apple's own contributions.

83.     Consider now the example of a product with ten valuable features,

whereby:

- The profit of the product with ten patented features (F1 to F10) is equal to $300.
- The incremental profit without any one feature is $100, such that incremental profit associated with F1 = $200, F2 = $200, etc.

84.    As in the case of the two-patented-feature product from Example 2, the incremental profit for any one feature has no economic meaning in the context of valuing one feature, and in this case the sum of the incremental profits ($2,000 for all ten features) would exceed the $300 profit of the entire product.  Accounting for synergies among all the features would result in the value of any one feature that was only a fraction of the $200 incremental value associated with anyone feature. For example, dividing the 10 features up equally would assign $30 of value to each of the features.  (Again, this does not yet account for the manufacturer's contributions.)  This example shows that the value of a complex product cannot be apportioned by examining the incremental value associated with any one feature but instead must be shared among all the features of the phone.

85.    The value of cellular connectivity depends on the interaction with a number of necessary or important features of smartphones.  These include:

- **Wi-Fi.**  As noted above, smartphone users rely on Wi-Fi just as much as a cellular connection for downloading data.  Wi-Fi allows faster downloads without the incurring data costs, as well as interacting with other features.  For example, Wi-Fi functionality also assists in pin-pointing a user's locations, aiding in location-based services and navigation.  This is because hybrid positioning systems find the location of a mobile device using several different positioning technologies, including GPS, cell tower signals, and Wi-Fi.  In addition, Wi-Fi functionality can especially improve the accuracy of indoor location.  (Ex. 2509; Ex. 2510.)  Thus, WiFi is a

complement to cellular connectivity, increasing the overall value of a smartphone that contains both.

- **GPS & navigation features**.  As noted above, GPS and navigation features have become increasingly important to smartphone users, replacing standalone GPS devices.  These navigation features also interact with cellular capabilities, for example, tracking traffic and identifying and providing directions to restaurants, gas stations, coffee shops, etc.

- **Bluetooth connectivity**.  Bluetooth is the most widely adopted wireless connectivity technology that is mainly used to establish a wireless inter-device connection.  Some common usages include connecting to speakers in the home or in a car, headphones, home automation devices, personal monitoring and tracking devices, and remote access control.  As with GPS, Bluetooth connectivity interacts with cellular connectivity (*e.g.*, streaming music over an LTE connection to the phone, and then to a Bluetooth enabled headset or speaker).  Bluetooth continues to evolve with the newest iteration of the standard, Bluetooth v4.0, enabling new low-power devices for a "growing ecosystem of connected devices enabling simple data transfer."  (Ex. 2511, "Bluetooth," ABI Research.)  Bluetooth usage has increased from 59 percent in 2012 to 78 percent in 2016.  (Ex. 2512, "Consumer Awareness and Preference of Bluetooth Technology at All-Time High, Demand for IoT Connectivity Soars," Bluetooth Special Interest Group, April 26, 2016.)

- **NFC.**  Near Field Communications ("NFC") is a form of contactless communication between devices using electromagnetic radio fields.  NFC enables using contactless payments using a smartphone,

exchanging digital content between devices, controlling appliances, or reading NFC-enabled tag types to tap for special offers at store. NFC usage has also been increasing.  As of 2015, all of the leading smartphone manufacturers, representing 275 or more models, supported NFC, and in total, one billion NFC-enabled handsets have been shipped worldwide.  (Ex. 2513, "NFC Adoption in Retail," Smart Technology Solutions, May 27, 2015.)  By 2017, the installed base of NFC-capable mobile phones is expected to reach 2.1 billion. (Ex. 2514, "One in Three Mobile Phones to Come with NFC by 2017," NFC Forum, June 5th, 2013.)  In the U.S. alone, the value of transactions conducted via NFC handsets is expected to grow to $45 billion in 2017.  (Ex. 2515, "Strategy Analytics: Mobile NFC Payments Growth (Finally) on the Horizon," Strategy Analytics, March 9, 2016.)

- **Camera and photography capabilities.**  Another valuable feature of the Apple iPhone is its high-quality camera and photographic capabilities.  Indeed, the camera has become an integral part of today's smartphones, a "necessary" feature without which at least some consumers would consider the device "practically useless." For example, one marketing survey on "millennials" (consumers 18 to 34 years old), noted "72% of US millennial smartphone users said their device's camera function was indeed very important to them. It's so imperative in fact, that almost a third of respondents said they would immediately get it fixed because without it, the device is practically useless.  Another 29% would take the opportunity to get a new phone—again, immediately."  (Ex. 2516, "Millennials Rely Heavily on Smartphone Camera Functionality, Not just for Selfies," October 21, 2015.)  Consumers rely on a smartphone's camera to

take photos and videos, which can be shared via messaging services, posted to social media, or backed up through cellular connectivity. Again, value associated with the cellular connectivity of an iPhone cannot be fully realized without these camera and photographic capabilities.

- **Apple's high-resolution touch screen.**  Another **"**necessary**"** feature of the iPhone is its screen size.  Although Dr. Teece attempts to account for incremental differences in screen size, this does not capture the entire value that iPhone users get from the high-resolution touch screen incorporated into Apple's iPhones.  Like the camera, the touch screen itself is a "necessary" feature of an iPhone which not only reflects Apple's own proprietary designs and technologies, but that of others as well.  The "value of cellular connectivity" that Dr. Teece claims to calculate could not exist without, among other things, the touch screen.  Moreover, in order to compete with rivals such as Samsung's Galaxy products, Apple must continue to invest in R&D to keep the iPhone in the premium segment of the market.  As with the other features of Apple's iPhone, the value consumers derive from the screen is integrated with the other features of the phone, including cellular connectivity. Watching videos (*e.g.*, YouTube), playing games, and video chat are just some of the features that interact with the cellular connectivity features.

- **Apple's iOS operating system.**  Another consideration is Apple's iOS operating system, which is a key differentiating feature for its customers.  iPhone consumers have chosen the iPhone, in part, because of differences with the Android or other mobile operating systems.  And consumers are willing to pay for the iPhone to be able

> to use the many features that its platform allows, including the multitude of applications that run on Apple's iPhones and use cellular connectivity, including email, internet and chat applications, streaming music, playing games, checking the weather, etc.

86.     As this non-exhaustive list shows, an Apple iPhone integrates numerous features whose value can only be fully realized when used with other features of the Apple iPhone.  Mr. Kennedy and Dr. Teece's approaches only analyze one feature, cellular connectivity, but that value cannot be realized without the synergies that are created with these other features.  For example, consider a no-name manufacturer selling a phone that had just cellular functionality without GPS, Wi-Fi, a screen, a camera, an applications processor, an operating system, applications, etc.  Such a phone could not be sold at a price anywhere near what Dr. Teece and Mr. Kennedy maintain is the "value of cellular functionality."  Apple, in contrast, can obtain the incremental price on the iPhone over the iPod touch only because it combines cellular functionality with all of those other features and contributions.

87.     Thus, some portion of the value of cellular connectivity that Mr. Kennedy and Dr. Teece calculate must be allocated for the other factors that contribute to the success of the iPhone.  Some of these features may be covered by patents, either related to other non-cellular SEPs or implementation patents.  Table 1 (PDX-136) shows estimates of the number of patents to other standards or, more generally, patents that may relate to other features of Apple's iPhone and other smartphones.  As an economic matter, some of the value of an iPhone must be apportioned to these technologies, even in the case where certain technologies are royalty-free (*e.g.*, Bluetooth)—otherwise it would allow Ericsson to expropriate the value that is created by these other technologies.  Just as there has been no final determination of the essentiality, validity and infringement of Ericsson's SEPs in this matter, we do not know how many of the indicated SEPs are actually essential,

or more generally, how many patents for each feature may be valid and infringed. Nonetheless, Apple faces continuous patent infringement litigation for both SEPs and implementation patents.  Patent values vary widely, and therefore at least some value of these patents likely contributed to the value of a smartphone and what Mr. Kennedy and Dr. Teece call the "value of cellular connectivity."  Further still, some of the value of an iPhone must be apportioned to Apple's contributions and efforts, such as research and development, as well as its own intellectual property such as its (non-SEP) patents, brand, copyrights, trademark and trade secrets.

**Table 1.  Non-Exhaustive List of Patented Technologies Related to Apple's iPhone and Smartphone Features**

|  | Counts | Patent Strength Measure, Source (Year) |
|---|---|---|
| **Standards** | | |
| Wi-Fi (802.11n only) | 3,375 | US Patents, Sunlight Research, 2012 |
| Bluetooth | 1,000+ | WW Families, Innography (2016) |
| NFC | 2,733 | WW Families, Patseer (2012) |
| Audio/Photo/Video | 400+ | US Patents, Sisvel, MP3 Licensing, Law 360, Microsoft Corp. v. Motorola Inc. (2013) |
| **Implementation Patents** | | |
| GPS and navigation-related patents | 3,869 | Us Patents, Relecura (2012) |
| Camera-related patents | 5,300+ | WW Families, PatBase (2016) |
| Screen-related patents | 600+ | WW Families, PatBase (2016) |
| Apple patents (non-cellular) | 2,400+ | US Patents, PatBase (2016) |
| **Estimate of mobile phone related patents** | 250,000 | US Patents, RPX (2011) |

Sources:   See Ex. 1120.

88.     In sum, Mr. Kennedy and Dr. Teece's calculations have no economic meaning in the context of assessing a FRAND royalty for Ericsson's SEP portfolio. They both incorrectly attribute hundreds of dollars of incremental value to cellular functionality (and thus cellular SEPs) alone, but fail to account for the synergies. Although Mr. Kennedy attempts to account for other cellular SEPs—which is also flawed as a matter of economics, for reasons that I will discuss—his failure to acknowledge synergies, let alone account for them, renders Mr. Kennedy's calculation of the value of Ericsson's SEPs unreliable.  This failure to account for

synergies grossly overestimates the value that should be apportioned among the cellular SEPs, and thus dividing this grossly overstated value among the cellular SEPs would substantially overcompensate Ericsson.  In the context of standard setting, this violates the SEP holder's FRAND obligation, since it would allow the SEP holder to expropriate the value of other patented and unpatented features of an iPhone or Apple's contributions.

> **B.** **Mr. Kennedy's and Dr. Teece's Analyses of Apple's iPhones Are Not Specific to TCL's Products, Nor Are They Representative of the Mobile Phone Industry**

89.    In addition to the fatal flaws in Mr. Kennedy's and Dr. Teece's estimates of the "value of cellular connectivity" that I have described above, their calculations are further fundamentally flawed for a second reason:  Apple's iPhones are neither representative of the mobile phone industry as a whole, nor of each of the mobile phones that TCL sells, which include high-end, mid-range, and budget handsets.  Moreover, consumers who purchase iPhones may have different motivations than consumers who purchase TCL mobile phones.  Indeed, as Dr. Teece admits, the value of cellular functionality (and the value of other features on a smartphone) is likely to vary across consumers.  (Dkt. 1331, ¶ 166 ("consumers differ in the (subjective) valuation they place on cellular capability.").)

90.    Courts have rejected such "feature-factor" apportionments that were not specific to or even representative of the products-at-issue.  In *In re Innovatio,* for example, Innovatio's expert adopted similar methodology as Mr. Kennedy and Dr. Teece, comparing the price of products with and without a feature, in that case, Wi-Fi.  *See In re Innovatio IP Ventures, LLC Patent Litig.,* Case No. 11C9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013).  Based on this analysis, the expert compared "the prices of firewalls with Wi-Fi compared to otherwise identical [products] without Wi-Fi" and determined 20 percent to 50 percent of the price was attributable to Wi-Fi.  This, according to Innovatio's expert, represented "the price that a

1  consumer would be willing to pay for the Wi-Fi feature, all else remaining

2  constant." *Id.* at p. 40.  Judge Holderman noted the deficiency in Innovatio's

3  expert's determination of the "feature factor" for Wi-Fi:

> The problem … is that [the expert] obtained the price data
> merely by searching the internet for list prices on nine select
> products (out of hundreds of accused products in this case) from
> a single retailer … That data is inherently unreliable, as the list
> prices available for one retailer on the internet for a handful of
> products may not be reflective of the actual prices that the
> Manufacturers have charged for all of their accused products.
> One problem, for example, is that past pricing data may differ
> from the current prices Mr. Bergey found on the internet.  The
> unreliability of the data is confirmed by the lack of precision in
> Mr. Bergey's resulting feature factor, which ranged from 20% to
> 50%, a significant difference.

16  *Id.*

17     91.    Mr. Kennedy and Dr. Teece's analyses suffer from the same

18  deficiencies.  Their calculations of the value of cellular connectivity are focused on

19  one company's products:  Apple's iPhones.  Not only do iPhones fail to be

20  representative of the industry as a whole, they are not representative of each and

21  every phone that TCL manufacturers and sells.  As was the case in *Innovatio*, the

22  unreliability of the approach is evident when considering the wide range of values

23  for cellular connectivity that Mr. Kennedy and Dr. Teece calculate, from 31.7

24  percent to 55.8 percent of the price of an iPhone.  (Dkt. 1331, ¶ 178; Dkt. 1333, ¶

25  274.)

26     92.    Mr. Kennedy's and Dr. Teece's calculations based on Apple iPhone

27  models make no economic sense when applied to TCL or other handset

28  manufacturers.  In the past, Apple primarily sold handsets in the high-end

smartphone segment.  Apple iPhones are a "luxury good," targeting customers with greater disposable income and who are less price-sensitive than the average consumer.  TCL, on the other hand, sells a range of products, including budget smartphones.  Indeed, the price of the iPhone that Mr. Kennedy relies upon is $450, while the price of the iPhones that Dr. Teece examines range from $399 to $749.  In comparison, the average selling price of TCL's LTE phones in 2015 was only $100.67, only one-quarter the price of the lowest-priced iPhone considered by Mr. Kennedy or Dr. Teece.  The average selling price of TCL's 3G phones in 2015 was $50.78.  (Dkt. 1317, ¶ 84.)  In other words, the valuation of cellular connectivity alone, which Mr. Kennedy calculates to be $251, exceeds the average selling price of TCL's phones.  Thus, it is impossible for the "value of cellular connectivity," as defined by Mr. Kennedy, to be $251 for a TCL phone.

93.     Nor are Mr. Kennedy's and Dr. Teece's calculations applicable to the industry as a whole.  For example, although Samsung sells certain premium smartphones (e.g., the Galaxy S and Galaxy Note) that compete closely with Apple iPhone models, it also sells a wider range of smartphones and feature phones.  Indeed, Mr. Kennedy's analysis shows that the average selling price of Samsung's 3G and LTE is expected to be $243.14 between 2011 and 2020.  (Ex. 5316.)  Again, Mr. Kennedy's supposed "value of cellular connectivity" exceeds the average selling price of Samsung's phones, and hence cannot be a reliable measure.

## C.     Mr. Kennedy's Estimates of Ericsson's Share of 3G and 4G Value

94.     I now turn to Mr. Kennedy's estimate of the value of Ericsson's portfolio based on the apportioned value of cellular connectivity.  Mr. Kennedy multiplies the alleged $251 aggregate value of cellular connectivity by Ericsson's "share of 3G and 4G technology."  (Dkt. 1333, ¶275.)  Mr. Kennedy's preferred estimate of Ericsson's share of 3G and 4G value comes from a 2010 research report by Signals Research Group, which claims that Ericsson's "share of contributions" to ETSI working groups related to the development of LTE was 15.9 percent.  Using

this figure, Mr. Kennedy calculates the valuation of Ericsson's 3G and 4G SEPs to be $39.91 (*i.e.*, $251 × 15.9% = $39.91).  Mr. Kennedy also presents an alternative calculation (which he states he does not agree with) based on Dr. Ding's 6.5 percent estimate of Ericsson's share of LTE SEPs (6.5%), which results in a value of $16.32 of Ericsson's 3G and 4G SEPs.

95.     For all the reasons described above, Mr. Kennedy's $251 starting value for all cellular connectivity is fundamentally flawed because it fails to apportion value to other factors that should share the value with cellular connectivity, and the calculation is not specific to TCL's products.

96.     Mr. Kennedy's determinations regarding Ericsson's share of the 3G and 4G technologies are also fundamentally flawed.  I begin by noting that Dr. Ding's calculation of a 6.5 percent share for Ericsson is based solely on counting actually essential patents, but does not account for the value or strength of the patents.  Thus, Mr. Kennedy's calculation is necessarily overstated.  As I calculated in my opening declaration, if Ericsson's 4G SEPs are of average value, Ericsson's share of 4G SEPs based on its list of essential patents is 4.7 percent.  (Dkt. 1317, Table 8.)  This value share figure is therefore the only measure tied to the strength of Ericsson's asserted essential patents in this matter, and the correct measure to use in performing a top-down apportionment of the aggregate value of the 4G SEPs to Ericsson's SEPs.

97.     Mr. Kennedy's share measure, based on the Signals Research study, is also fundamentally flawed.  This measure is based on estimates of companies' "contributions" to standard setting committees.  Yet "contributions" are not necessarily linked to a company's patented technologies, nor do "contributions" provide any indication of the economic importance or value of the SEPs in a company's portfolio.  For example, the 2010 Signals Research study notes that contributions are a measure of "leadership" within the standard setting committees and specifically not the patents within a portfolio:  "While the results of such an

exercise would not provide specific information about the ownership of essential LTE patents, the results would identify the companies most heavily involved in developing the standard." (Ex. 410, p. 20.)

98.     In order to justify the use of "contributions," Ericsson and its witnesses claim that such contributions are linked to the value of a SEP portfolio. This claim, however, is an unsupported assertion and not based on any empirical evidence. Mr. Mallinson, for example, attempts to draw the conclusion that such contributions show "which companies have contributed the most technology to the standards." (*Id.*) This is an unsupported *ipse dixit* assertion. Mr. Mallinson does not provide any empirical evidence as support. At best, Mr. Mallinson's assertion is a hypothesis, one that has not been tested. This is evident from the Signals Research study (which was sponsored by Ericsson), which only notes that such a connection might be "logical." (Ex. 410, p. 20 ("it would be logical to assume that companies who make technical submission in these standards meetings do so with the belief that the acceptance of their submission would be in their best interest.").) Signals Research recognizes that this would only be an assumption, but even so does not specify that the "best interest" would be related to patents. As I show below, such a measure is not tied to the specific patents within Ericsson's SEP portfolio.

99.     Nor is there any supporting evidence that Ericsson or its experts have presented that demonstrates that Ericsson owns a disproportionate share of valuable SEPs. For example, based on my measure of patent counts, Ericsson's share of LTE SEPs was 4.7 percent, yet based on "approved contributions," Ericsson's SEPs would account for more than three times this percentage—15.9 percent—of the claimed LTE SEP value. It is striking that despite making this claim that its SEPs are so disproportionately valuable, Ericsson is unable to point to even a single one of its SEPs and explain how it provides a valuable feature that could not be achieved using alternative technologies. In fact, the economic evidence suggest that Ericsson's SEPs may be, on average, less valuable than other SEPs for the 2G, 3G

and 4G standards. (Dkt. 1317, Table 8.)  My forward citation analysis showed that Ericsson's share of 4G value was 4.0 percent, less than its share of 4G SEPs.  (*Id.*)  Unlike "approved contributions," the use of forward citations as an indicator of patent value is supported by a body of empirical economic research that establishes a link between forward citations and value.  (*Id.*)  I also calculated Ericsson's share of the value of 4G SEPs based on a detailed technical analysis performed by Dr. Kakaes.  Adopting conservative assumptions, Ericsson's share of 4G SEP value was 3.5 percent, again lower than its share of SEPs.  At a minimum, both analyses showed that there was no evidence that the patents in Ericsson's 4G SEP portfolio were substantially more valuable, on average, than other 4G SEPs.  (*Id.*)

100.   As a measure of value, counting "approved contributions" is fundamentally flawed because the measure is not tied to the specific patents in Ericsson's SEP portfolio.  As an economic matter, which I understand is consistent with current case law, reasonable royalties and FRAND royalties must be tied to the specific patents-at-issue.  For example, the Federal Trade Commission has declared: "In an actual negotiation and, therefore, a hypothetical negotiation, the maximum amount a licensee would pay depends upon the economic value of the patented invention, meaning the incremental value of the invention compared to alternatives." (Ex. 1141, p. 20, 22 ("Courts should recognize that when it can be determined, the incremental value of the patented invention over the next-best alternative establishes the maximum amount that a willing licensee would pay in a hypothetical negotiation.").)  In the context of standard-essential patents, in *Ericsson v. D-Link* the Federal Circuit stated "a royalty award for a SEP must be apportioned to the value of the patented invention (or at least to the approximate value thereof), not the value of the standard as a whole."  *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F .3d 1201, 1233 (Fed. Cir. 2014) ("We further hold that district courts must make clear to the jury that any royalty award must be based on the incremental value of the invention, not the value of the standard as a whole or any increased value the

patented feature gains from its inclusion in the standard."). In this context, consider:

- **"Approved contributions" do not account for patents that Ericsson has divested or transferred.** Ericsson has divested a substantial portion of its cellular SEP portfolio to companies such as Unwired Planet, Optis Wireless Technologies, and PanOptis. Exhibit 3 shows the number of declared Ericsson SEPs to the 2G, 3G, and 4G standards that have been assigned to these entities. In some cases, Ericsson has already received monetary compensation for its patents, while in other cases, such as the Unwired Planet transaction, it receives a portion of future licensing revenues. For example, pursuant to the sales agreement between Ericsson and Unwired Planet, Ericsson will transfer the patent portfolio to Unwired Planet in exchange for a revenue share from licensing revenue of the combined portfolio, ██████████████ ███████████ Ex. 94.) I am not aware of any analysis that Ericsson, Mr. Mallinson, or Mr. Kennedy have performed to account for these divestitures in their calculations. Thus, even if Ericsson's "contribution" share was linked to the value of its portfolio at the time the contributions were made, some portion of that value would need to be assigned to those patents Ericsson has divested. Failure to apportion this value would allow Ericsson to "double dip" and collect the royalties on those patents twice. Attempting to collect royalties on patents that it no longer owns also violates its FRAND commitment.

- **"Contributions" do not necessarily reflect technologies that are patented.** Indeed, the Signals Research report notes that "We can't conclusively state that a company's ability to get submissions accepted by its peers in the 3GPP standards body has a direct

correlation to its LTE patent strength, just as we cannot conclude that a company that seldom contributes to the 3GPP standardization process does not have any essential LTE patents." (Ex. 410, p. 27.) Other studies of contributions also note that there may only be an "indirect" link between contributions and patents. (Dkt. 1314, ¶ 95; Ex. 1029, pp. 2-3.) As noted by Dr. Bekkers, only a "subset of approved contributions is ever included in a patent application," conservatively estimating that at least two thirds of contributions "are either not distinct enough from the others to be independently patentable, or are not patented at all." (Dkt. 1314, ¶ 79.) Ericsson was asked by TCL to identify all approved technical contributions corresponding to each of the patents asserted to be essential in this case. Ericsson provided a list of only 30 approved contributions which are allegedly covered by 21 essential patents. (Ex. 2520, Ericsson's Supplemental Objections and Responses to Plaintiffs' Fourth Set of Interrogatories (No. 35), p. 120.)

▪ **A given company's "contributions" may not reflect patented technologies that it owns.** As noted by Dr. Bekkers, the goal of "contributions" is to advance a standard's design goals, such that it does not even necessarily cover technologies patented by the submitter. (Dkt. 1314, ¶ 84.) In some cases, for example, multiple parties submit "contributions" together, such that any one "contribution," then, cannot always be directly tied to technology patented by the submitter or submitters of that "contribution." (*Id.*) "Contributions" based on the patents owned by one company may also be submitted in "stealth" by another.

▪ **Companies can accumulate "contributions" that have nothing to do with the economic value of a patent or patents within its**

**portfolio.**  "Contributions" may reflect minor features or changes rather than technical improvements to a standard.  For example, the Signals Research report included "change requests," which are used to correct previous "contributions."  Ericsson is the most frequent submitter of "change requests" and, according to the ABI Research data, Ericsson had more "change requests" than "approved contributions."  For example, in the ABI research report, Ericsson had 7,954 "change requests" and 6,891 "approved contributions. (Dkt. 1314, ¶ 80.)  Moreover, I understand that Ericsson treats contributions that are trivial, irrelevant, or non-technical as "approved contributions" for the purposes of this case.  (Dkt. 1334, ¶¶ 425, 428, 438–40.)  According to Dr. Bekkers, there are several examples of "Ericsson counting trivial (*e.g.*, explanatory or typographical changes to descriptions of existing technology, such as the removal of a profanity), irrelevant (*e.g.*, relating to regulatory, 3GPP procedural, testing, or base-station parameters), and non-technical contributions as 'approved contributions.'"  (Dkt. 1314, ¶ 81.)  "Contributions" may also wrongly attribute the value of a standard to individual contributors.  Many "contributions" are submitted by multiple parties regardless of which party, if any, owns the related technology.  Splitting the value of this technology equally across parties based on a count of "contributions" assumes that each party provides equal value to the joint proposal.  This approach inaccurately attributes value of a technology to parties that have no claim on that technology.

101.   These deficiencies show that using contributions as a measure of value is inherently unreliable.  Such a general measure is not tied to economic value, is not tied to patented technologies or Ericsson's patents, and fails to account for patents

1   that Ericsson no longer owns or has otherwise not asserted as essential in this

2   matter.

3   **V.    MR. KENNEDY'S ANALYSIS OF TCL'S IPR PROVISIONS AND**

4   **THE AGGREGATE ROYALTY BURDEN**

5       102.   Mr. Kennedy says "TCL has argued that it cannot afford to pay the

6   royalties requested by Ericsson and remain profitable and that, as a result, the

7   royalties requested by Ericsson in Option A and B are not FRAND."  (Dkt. 1333,

8   ¶¶ 280-282.)  That is not my opinion.  My opinion is that Ericsson's Option A and B

9   offers to TCL are not FRAND because they are inconsistent with Ericsson's *ex ante*

10  statements regarding the appropriate maximum aggregate royalty rates for the

11  standards-at-issue, and are in excess of the value of Ericsson's SEPs relative to the

12  available alternatives before the standards were set, irrespective of what TCL can or

13  cannot "afford" to pay.

14      **A.    The Aggregate Royalty Burdens Are Reasonable in Light of TCL's**

15      **Profit Margins**

16      103.   In his declaration, Mr. Kennedy argues that TCL's audited financials

17  include an "IPR Provision" that includes both royalties paid to current licensors

18  (*e.g.*, Qualcomm), as well as amounts that may be paid to prospective licensors,

19  such as Ericsson.  (Dkt. 1333, ¶ 281.)  Mr. Kennedy argues that "TCL's IPR

20  Provision is relevant to the FRAND inquiry because it shows *inter alia* that TCL is

21  capable of being a growing, successful mobile phone company while paying the

22  royalties that Ericsson is seeking."  (*Id.*, ¶ 320.)  Further, he claims that TCL has

23  demonstrated that it is "capable of succeeding" in the marketplace and, in fact,

24  makes "healthy" profit margins.  (*Id.*, ¶ 321.)  Mr. Kennedy begins with TCL's

25  audited financials, claiming that TCL's cost of sales already includes the full IPR

26  provision, including payments to current licensors and prospective licensors, such as

27  Ericsson.  Mr. Kennedy references TCL's company-wide gross profit margin (which

28  include more than just TCL's sales of handset) in 2013, 2014 and 2014, which were

equal to 19.0, 19.3 and 21.1 percent, respectively.  (*Id.*, Figure 67, p. 161.)  Mr. Kennedy claims that these gross margins already include all IPR provisions.  Mr. Kennedy then references TCL's net profit margins, which were equal to 1.6 percent, 3.6 percent and 3.7 percent in 2013, 2014 and 2015 respectively.  (*Id.*)  Mr. Kennedy claims that net profit margins already incorporate payments to Ericsson.

104.   Setting aside Mr. Kennedy's assertion, whether or not TCL is "capable of succeeding" while paying Ericsson's demanded rates is not relevant to the determination of the FRAND rate for Ericsson's SEP portfolio.  A FRAND rate should be based on the actual value of its portfolio to TCL, not whether TCL can make a positive profit after paying Ericsson's demanded rates.  Of course, the value of Ericsson's SEPs may be related to the profit TCL earns on its phones.  But, the profits TCL earns on the sales of its phones must be apportioned across all of the factors that contribute to its success, including TCL's contributions and the costs it incurs, which include its sales and marketing, research and development, and other operating costs, not to mention other SEPs for the various standards incorporated in the handset, other technologies, etc.

105.   In my opening declaration, I showed that an aggregate royalty burden between 5 percent and 6 percent would allocate a substantial portion of TCL's operating profits to cellular SEPs.  (Dkt. 1317, ¶¶ 79-90.)  I began by considering TCL's gross margins after taking into account the IPR allocation that TCL internally allocated for potential payments to Qualcomm, Ericsson and other SEP holders.  That analysis showed that TCL's gross margin in 2014 *after* removing the IPR allocation was 23.4 percent.[2]  Then, after accounting for certain of TCL's

_____

[2] I have also validated this against TCL's audited financials.  Even assuming that Mr. Kennedy is correct, I calculate TCL's gross margin to be 26.1 percent in 2014 after adding back handset and tablet IPR expense—similar to the 23.4 percent based on TCL's internal financial records.  I also note that the data in TCL's audited

operating cost, I showed that TCL's operating margin was equal to 11.3 percent in 2014. The same set of calculations performed for 2013 resulted in an operating margin of 9.5 percent.[3] This analysis shows that a 5 to 6 percent royalty burden would be near or above 50 percent of these conservative estimates of TCL's operating cost. (Dkt. 1317, ¶ 90; Ex. 1127.)

106. To begin with, the analysis that I conducted in my opening declaration (as described in the previous paragraph) explicitly removed the IPR Provision from my estimates of TCL's operating profit. Thus, Mr. Kennedy's analysis does not alter my opinion that a 5 to 6 percent royalty burden would take up a substantial portion of TCL's operating profit.

107. Even assuming Mr. Kennedy is correct and that TCL's audited financials reflect royalties for both current and prospective licenses, an aggregate royalty burden of 5 or 6 percent would still account for a significant portion of TCL's profits. For example, I calculate TCL's 2014 net profit margin before accounting for any IPR by taking the 3.6 percent 2014 net profit cited by Mr. Kennedy and adding the 6.8 percent total IPR from my own calculations. This results in a net profit margin of 10.4 percent. The analogous set of calculations for 2013 and 2015 result in a net profit margin of 7.6 and 10.0 percent, respectively.[4] In each case, the aggregate royalty burden of 5 or 6 percent would make up a substantial portion of TCL's profits.

108. According to FRAND principles, any apportionment of the aggregate

---

financial reports includes more than just handset and tablet sales. (*See* Ex. 1140, TCL Annual Report 2014.)

[3] I have also performed the same set of calculations using data from the first three quarters of 2015, resulting in an operating margin equal to 6.6 percent. (*See* Ex. 1101.)

[4] I calculate TCL's IPR expense on handsets and tablets for 2013 and 2015 to be 6 and 6.3 percent, respectively. (*See* Ex. 1101, 1127.)

royalty burden should take into account the relative value of each technology's contribution to the value of TCL's handsets.  Regardless of whether or not TCL can afford to pay royalties, these royalties should be consistent with the value contributed by the associated technology.  Mr. Kennedy's focus on the affordability of Ericsson's proposed rates ignores this principle.  For example, he cites an internal TCL document to show that its 2013 - 2014 IPR provisions are comparable to Ericsson's "Option B" license offer as evidence that TCL is "capable" of being profitable while paying royalties proposed by Ericsson.  (Dkt. 1333, ¶ 326.)  The "Option B" offer includes a 1.2 percent royalty rate for 3G and a 1.5 percent royalty rate with a $2 floor and $4.50 cap for 4G.  (*Id.*, ¶¶ 324-325 and Figure 66.)  In my opening declaration, I rely on a technical analysis of Ericsson's 3G and 4G SEP portfolios to calculate that its 3G and 4G SEPs account for 4.8 and 3.5 percent of the value of each standard, respectively.  (Dkt. 1317, Table 6.)  In comparison, Ericsson's "Option B" offered rates would account for approximately a quarter of the 5 or 6 percent aggregate royalty burden for 3G and 4G SEPs, far in excess of Ericsson's actual technological contribution.  Applying Ericsson's value shares to the rates in the "Option B" offer also results in an implied aggregate royalty burden of 25 percent for 3G and 43 percent for 4G, 5 to 7 times the 5 and 6 percent aggregate royalty burdens long advocated by industry participants, including Ericsson.  Putting aside the fact that these aggregate royalty burdens would far exceed TCL's profit margins, they ultimately illustrate that Ericsson's offered rates far exceed what would be fair and reasonable given their contribution to the technology at issue in this matter.

109.   Mr. Kennedy further argues that TCL would not be harmed by being caused to make payments to Ericsson under its two offers.  In fact, he claims TCL would earn "windfall" profits.  (Dkt. 1333, ¶¶ 323, 328.)  Mr. Kennedy's argument is absurd.  Although Mr. Kennedy attempts to equate the royalties that TCL should pay for Ericsson's SEPs to the price that TCL pays for a component input, it is the

1   very "price" of Ericsson's SEPs—*i.e.*, a FRAND royalty—that is the center of this

2   dispute.  To see the flaw in Mr. Kennedy's argument, consider an antitrust price-

3   fixing example.  Suppose that Company A is a downstream manufacturer that

4   requires a key component for the production of a final good.  Suppose now that

5   upstream component manufacturers collude to fix the price of that component,

6   raising it above competitive levels to a monopoly level.  In this example, the

7   downstream manufacturer, Company A, pays a supra-competitive price for the

8   component.  Nonetheless, Company A would still make a profit on the final product

9   even though it is paying supra-competitive prices for its components.  It would just

10   make less of a profit than it otherwise would make.  It makes no sense to argue, as

11   Mr. Kennedy does, that because Company A has paid or recorded on its books the

12   supra-competitive price, that this reflects the price it should continue to pay.  Nor

13   does it make any sense to claim that if Company A were refunded the overcharge

14   (*i.e.*, the difference between the supra-competitive price and the but-for competitive

15   price), that A would reap "windfall profits."  Instead, any "profit" that it earned

16   would be the amount to which it was entitled had it been charged a lawful,

17   competitive price in the first place.

18       **B.**    **There Is No Economic Basis for Mr. Kennedy's Comparison of**

19              **TCL's Payments for a License to Alcatel's Brand Name to a**

20              **FRAND Royalty for Ericsson's SEPs.**

21       110.   Mr. Kennedy also points to additional evidence that he claims supports

22   Ericsson's offers as reasonable.  (Dkt. 1333, ¶ 333.)  Mr. Kennedy points to the

23   royalties that TCL pays Alcatel for the use of the Alcatel brand name, which Mr.

24   Kennedy attempts to equate to Ericsson's SEPs, arguing that "TCL is willing to pay

25   1-2% for branding, but is unwilling to pay Ericsson 1-2% for inventing some of the

26   standardized patented technology that TCL uses in its products." *Id.*

27       111.   There is no reason in economics or business analysis to think that the

28   value of Ericsson's patents is equal to the value of the Alcatel brand name.  Yet, Mr.

Kennedy just assumes equal values.  He does not perform any economic analysis of the value of Alcatel's brand, or how it compares to the *ex ante* value of Ericsson's SEPs.  However, the Alcatel-brand royalty brings out an important distinction between a license covering the use of a brand name and the license covering SEPs. I understand that TCL licenses the Alcatel brand name.  At the time TCL was negotiating a royalty to pay for the Alcatel brand, it would have had the option to walk away from the negotiating table if the royalty were too high.  This is not the case with Ericsson, as TCL does not have any option to walk away from the negotiating table because it is locked into the standard, and therefore subject to being held-up by Ericsson.  Simply being willing to pay a certain price for one good does not mean that TCL should pay the same price for another good without consideration of the latter's value.  As shown above, a 1-2% royalty would exceed the value of Ericsson's contribution to 3G and 4G standards.

## VI.   RELEASE PAYMENT

112.   Mr. Kennedy states that Ericsson's Option A and B offers specify a release payment, claiming that "[a] release payment is a payment made by a licensee to compensate the patent owner for the licensee's unlicensed sales prior to the effective date of the license." (Dkt. 1333, ¶¶ 26-28.)  While it is true licenses often specify a release payment, Mr. Kennedy ignores several important considerations that must be taken into account.

113.   First, as explained in greater detail in my opening witness declaration, Ericsson's Options A and B offers do not specify fair and reasonable rates.  To the extent a release payment is appropriate, a fair and reasonable royalty for Ericsson's SEPs should be determined based the *ex ante* expectations regarding the aggregate royalty burden, equal to 5 percent for 2G and 3G, and 6 percent for LTE and Ericsson's value share of SEPs at that time.  (Dkt. 1317, ¶ 152.)  As illustrated in Ex. 1723, this results in a royalty rate of 0.25% for 2G/3G and 0.16% for 4G over the release period.  These rates are far lower than the rates discussed by Mr.

Kennedy.

114.    Moreover, Mr. Kennedy's discussion of a release payment fails to account for potential limitations on the legal recovery of royalties, such as statutes of limitations.  (Dkt. 1317, ¶ 148.)  There is no justification from Mr. Kennedy for why a licensee would pay a release payment for sales that Ericsson could not otherwise legally recover for under an applicable statute of limitations.

115.    Further, Mr. Kennedy's release payment discussion fails to account for Ericsson's practice of discounting those release payments.  (Dkt. 1317, ¶ 153; *see also* Ex. 1114, 1115.)  My analysis of Ericsson's past release payment terms shows that Ericsson granted substantial discounts in connection with the royalties to be paid for a past release—approximately 30 to 50 percent.  (Dkt. 1317, ¶ 156; PDX-13.)

## VII.    CONCLUSION

116.    A fair and reasonable royalty rate for Ericsson's SEPs should be limited to the incremental value of the patented technologies relative to the next best alternative technology that was available at the time the standard was set, and should not capture the value of other technologies, contributions, and efforts that contributed to the value of standard-compliant products.  The two metrics Ericsson's experts look at to "value" its patents are insufficient to determine a fair and reasonable rate.  The comparable licenses analysis does not address the degree to which Ericsson's existing licenses may include hold-up value, and the "ex-standard" analysis seeks to capture the value of the standard as a whole.  In contrast, my top-down analysis determined a fair and reasonable royalty for Ericsson's SEPs based on Ericsson's own public statements regarding the appropriate aggregate royalty burdens for the standards and Ericsson's proportional value share for each standard determined by a rigorous technical analysis of the essentiality, importance, and contribution of Ericsson's SEPs.

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct, and that I executed this declaration on

3    January 27, 2017, in San Francisco, CA.

4

5

6    _____

7    Dr. Gregory K. Leonard

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 59 | Reference Price Sheet dated 3/30/15 [Rev. F] |
| 94 | Document titled "Update to Project Cluster PM - 121218" |
| 269 | Reference Price Sheet dated 6/25/12 [Rev: C] |
| 270 | Reference Price Sheet dated 4/17/13 [Rev. D] |
| 271 | Reference Price Sheet dated 3/9/14 (Rev. E) |
| 410 | Document titled "The Essentials of Intellectual Property," by Signals Research Group, dated Sep. 2010 |
| 455 | The Antitrust Source publication titled "Implementing the FRAND Commitment," J. Ordover, et al., Oct. 2014 |
| 1000 | IDC Worldwide Mobile Phone Tracker 2016Q2 Historical Release |
| 1029 | Report titled "Standards Leadership within the 3GPP," by ABI Research, dated 6/19/13 |
| 1101 | Spreadsheet reflecting TCL global sales and profit |
| 1114 | Email from J. Liaw of HTC to K. Alfalahi dated 12/11/03, subject: "RE: License Agreement between Ericsson and HTC" discussing license negotiations |
| 1115 | Ericsson Licensing Package |
| 1116 | Appendix C to Supplemental Expert Report of Dr. Gregory K. Leonard   (EIC Rankings) |
| 1119 | Exhibit 3a-d to Supplemental Expert Report of G. Leonard |
| 1120 | Exhibit 5 to Supplemental Expert Report of G. Leonard |
| 1126 | Exhibit 3 to Rebuttal Expert Report of G. Leonard |
| 1127 | Exhibit 6 to Rebuttal Expert Report of G. Leonard |
| 1140 | TCL 2014 annual report |

| Exhibit No. | Description |
|---|---|
| 1141 | "The Evolving IP Marketplace," issued by the Federal Trade Commission, dated Mar. 2011 |
| 1149 | Witness Statement of G. Brismark from Huawei Arbitration, No. 01-14-0002-2610 |
| 1150 | Patent Sale and Grant-Back License Agreement between IDTP Holdings and Ericsson dated 6/25/14 |
| 1152 | Wayback Machine website displaying webpage of Ericsson's "Licensing Programs" website, archived July 19, 2008 |
| 1587 | Expert Report of Jonathan D. Putnam, dated 6/19/15 re Arbitration No. 01-14-0002-2610, Ericsson v. Huawei |
| 1722 | Updated Exhibit 2a-2b to the Supplemental Expert Report of G. Leonard, dated 6/10/16 |
| 1723 | Updated Exhibit 1a to the Rebuttal Expert Report of G. Leonard, dated 6/10/16 |
| 2490 | Fortune publication titled "Apple's Users Spend 4X as Much as Google's," 6/27/14 |
| 2491 | Fortune publication titled "Here's What Apple Pays to Build the iPhone SE," 4/4/16 |
| 2492 | Technology Law Journal, Vol. 28, No. 2, publication titled  "A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents," by M.Lemley, 2013 |
| 2494 | AIPLA Quarterly Journal, Vol. 26, No. 3, publication titled "Empirical Evidence of the Validity of Litigated Patents," by J. Allison and M. Lemley |
| 2495 | Webpage from Phonearea.com website re: Apple iPhone vs Apple iPhone 7 - Phone specs comparison |
| 2496 | The Mobile Indian publication titled "Understanding Cell Phone Batteries," 6/18/12 |

| Exhibit No. | Description |
| --- | --- |
| 2497 | Electronic Design publication titled "What Drains the Smart-Phone Battery?" 1/7/13 |
| 2498 | Webpage from developer.android.com website titled "Optimizing for Doze and App Standby," Android Developers |
| 2499 | Webpage from Apple Support website titled "About iPhone Low Power Mode on your iPhone" |
| 2500 | ComScore publication titled "The U.S. Mobile App Report," Aug. 2014 |
| 2501 | Price Waterhouse Coopers publication titled "Mobile Technologies Index: Device Connectivity Speed: One Half of an Equation," 2013 |
| 2502 | Handbook of Game Theory with Economic Applications, Ch. 53 titled "The Shapely Value," 2002 |
| 2503 | Antitrust Law Journal Publication titled "Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power," by D. Swanson, 2005 |
| 2504 | Pew Research Center publication titled "Three-Quarters of Smartphone Owners Use Location-Based Services," 5/11/12 |
| 2505 | Publication titled "GNSS Market Report, Issue 4," dated Mar. 2015 |
| 2506 | Santa Clara Computer & High Tech, LJ. 27, publication titled "Patent Value Apportionment Rules for Complex, Multi-Patent Products," by G. Damien, 2010 |
| 2507 | Pew Research Center publication titled "US Smartphone Use in 2015," 4/1/15 |
| 2508 | Informa Telecoms & Media White Paper titled "Understanding Today's Smartphone User: Demystifying Data Usage Trends on Cellular & Wi-Fi Networks," 2012 |
| 2509 | Wi-Fi Planet publication titled "Skyhook Announces New Hybrid Positioning System," 6/30/08 |

| Exhibit No. | Description |
|---|---|
| 2510 | MIT Technology Review publication titled "Mobile Wi-Fi Trick Gives Devices Super-Accurate Indoor Location Fixes," 10/16/15 |
| 2511 | Webpage from ABIResearch.com website titled "Bluetooth" |
| 2512 | Webpage from Bluetooth.com website titled "Consumer Awareness and Preference of Bluetooth Technology at All-Time High, Demand for iot Connectivity Soars," Bluetooth Special Interest Group, April 26, 2016 |
| 2513 | Smart Technology Solutions publication titled "NFC Adoption in Retail," 5/27/15 |
| 2514 | NFC Forum publication titled "One in Three Mobile Phones to Come with NFC by 2017," 6/5/13 |
| 2515 | Strategy Analytics publication titled "Strategy Analytics: Mobile NFC Payments Growth (Finally) on the Horizon," by N. Pate, 3/9/16 |
| 2516 | eMarketer publication titled "Millennials Rely Heavily on Smartphone Camera Functionality, Not just for Selfies," 10/21/15 |
| 2520 | Ericsson's First Supplemental  Responses to Plaintiffs' Fourth Set of Interrogatories (No. 35), dated 11/9/15 |
| 4834 | Ericsson Consumer Lab, Keeping smartphone users loyal; assessing the impact of network performance on consumer loyalty to operators (June 2013) |
| 4845 | Accenture, Mobile Web Watch 2013:  The New Persuaders |
| 4858 | International Planning & Research, Smartphone Feature Analysis |
| 5316 | Kennedy Exhibit 3.3 |

Case No. SACV14−00341 JVS (DFMx)/CV15-02370
PLAINTIFFS' REBUTTAL DECLARATION OF DR. LEONARD

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the PLAINTIFFS' REBUTTAL DECLARATION OF EXPERT WITNESS DR. GREGORY K. LEONARD to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| | David Sochia |
| | dsochia@mckoolsmith.com |
| | Douglas Cawley |
| | dcawley@mckoolsmith.com |
| | Nicholas Mathews |
| | nmathews@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER