1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
    STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3   skorniczky@sheppardmullin.com
    MARTIN R. BADER, Cal. Bar No. 222865
4   mbader@sheppardmullin.com
    MATTHEW W. HOLDER, Cal. Bar No. 217619
5   mholder@sheppardmullin.com
    12275 El Camino Real, Suite 200
6   San Diego, California 92130-2006
    Telephone: 858.720.8900
7   Facsimile: 858.509.3691

8   Attorneys for TCL Communication
    Technology Holdings, Ltd., TCT Mobile
9   Limited, and TCT Mobile (US) Inc.

10

11              UNITED STATES DISTRICT COURT

12      FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

13

14  TCL COMMUNICATION                 Case No. SACV14−00341 JVS (DFMx)
    TECHNOLOGY HOLDINGS, LTD., *et*    Consolidated with CV15-02370
15  *al.*,

16              Plaintiffs,           **PLAINTIFFS' DIRECT
                                      EXAMINATION BY
17          v.                        DECLARATION FOR EXPERT
                                      WITNESS MATTHEW R. LYNDE,
18  TELEFONAKTIEBOLAGET LM            Ph.D.**
    ERICSSON, *et al.*,
19
                Defendants.           Place: Courtroom 10C
20  _____  Before Hon. James V. Selna

21  TELEFONAKTIEBOLAGET LM
22  ERICSSON *et al.*,                Discovery Cut-Off:  May 23, 2016
                                      Pre-Trial Conf.:  Jan. 30, 2017
23              Plaintiffs,           Trial:  Feb. 14, 2017

24          v.
                                      **PUBLIC REDACTED VERSION**
25  TCL COMMUNICATION
26  TECHNOLOGY HOLDINGS, LTD. *et
    al.*,
27              Defendants.

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   PERSONAL BACKGROUND AND ASSIGNMENT ................................... 1

    A.   Educational Background .................................................................... 1

    B.   Professional Background and Qualifications ......................................... 2

    C.   Assignment in this Matter ................................................................. 3

II.   SUMMARY OF TESTIMONY ........................................................ 5

III.   BACKGROUND ON STANDARD SETTING ORGANIZATIONS, ETSI, AND THE FRAND COMMITMENT ........................................ 9

    A.   Standard Setting Organizations and ETSI ............................................ 9

    B.   The FRAND Commitment .............................................................. 11

IV.   IMPORTANT CONSIDERATIONS IN EVALUATING COMPLIANCE WITH THE FRAND REQUIREMENT ............................. 13

    A.   Consummated Licenses May Not Be FRAND and Are Not Necessarily Instructive in Assessing the "Fair and Reasonable" Value of the Licensed Technology. ...................................................... 13

    B.   The Obligation to Not Discriminate Is Designed to Prevent the Prospective Licensee from Being Competitively Disadvantaged in the Marketplace ........................................................................ 15

V.   BACKGROUND ON WIRELESS COMMUNICATION STANDARDS AND THE WIRELESS COMMUNICATIONS MARKET ................................................................................. 16

    A.   The Standards at Issue .................................................................... 16

    B.   The Wireless Communications Market - Participants and Prices ........ 18

VI.   BRIEF BACKGROUND ON THE PARTIES AND ERICSSON'S SEPS ........................................................................................ 22

    A.   The TCL Plaintiffs ........................................................................ 22

    B.   The Ericsson Defendants ................................................................ 25

    C.   Determining the Essentiality of Ericsson's SEPs ................................. 25

VII.   THE EFFECTIVE ONE-WAY RATES BEING PAID BY TCL'S
       COMPETITORS FOR A LICENSE TO ERICSSON'S SEPS ..................... 27

       A.    Identification of the Licensees Similarly Situated to TCL ................. 27

       B.    Unpacking Ericsson's SEP Licenses to Determine the Effective
             One-Way Rates ..................................................................... 29

             1.    The individual components of an effective one-way rate
                   calculation ................................................................. 29

             2.    The formula used to calculate effective one-way rates ............. 31

       C.    Calculation of Effective One-way Rates Based on the Projections
             from Ericsson's Business Cases ................................................ 33

       D.    Calculation of One-way Effective Rates Based on IDC Data ............. 35

       E.    Determination of the Effective One-way Rates Being Paid by the
             Licensees Most Similarly Situated to TCL ................................... 36

             1.    The Apple effective one-way rate for a license to
                   Ericsson's 4G SEPs .................................................... 36

             2.    The Samsung effective one-way rates for a license to
                   Ericsson's 2G, 3G and 4G SEPs ................................... 39

             3.    The HTC effective one-way rates for a license to
                   Ericsson's 2G, 3G and 4G SEPs ................................... 43

             4.    The Huawei effective one-way rates for a license to
                   Ericsson's 2G, 3G and 4G SEPs ................................... 45

             5.    The LG effective one-way rates for a license to Ericsson's
                   2G, 3G and 4G SEPs ................................................. 46

             6.    There is not sufficient data to calculate reliable effective
                   one-way rates for ZTE's license to Ericsson's 2G, 3G and
                   4G SEPs. ................................................................. 50

       F.    Summary of the Effective One-way Rates of the Licensees Most
             Similarly Situated to TCL ..................................................... 53

       G.    Other Ericsson Licensees Are Not Similarly Situated to TCL. .......... 55

             1.    Sharp is not similarly situated to TCL. ........................... 55

             2.    Ericsson's so-called "Pure Play Licensees" are also not
                   similarly situated to TCL. ........................................... 56

VIII.  THE ECONOMIC TERMS ERICSSON HAS OFFERED TCL FOR A
       LICENSE TO ERICSSON'S SEPS ARE DISCRIMINATORY IN
       VIOLATION OF ERICSSON'S FRAND COMMITMENT. ...................... 57

A.    Ericsson's Reference Prices ...................................................... 57

B.    Ericsson's Offers to TCL ....................................................... 59

C.    Ericsson's Offers to TCL Are Not FRAND. ........................................ 62

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION ............................ 67

# DECLARATION OF DR. MATTHEW LYNDE

I, Dr. Matthew R. Lynde, declare under penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.    PERSONAL BACKGROUND AND ASSIGNMENT

### A.    Educational Background

1.    My name is Matthew R. Lynde, Ph.D.  I am an economist and a Senior Vice President of Cornerstone Research, an economic and financial consulting firm with offices in San Francisco, Menlo Park, Los Angeles, Chicago, Washington, New York, Boston, and London.  My work address is Two Embarcadero Center, San Francisco, CA 94111.

2.    I have over 35 years of experience as a practicing applied economist in academia, government, and business.  In 1979, I earned a B.A. in economics from the University of California at Berkeley.  As an undergraduate at Berkeley, I studied electrical engineering as well as economics.  I also studied at the Université de Poitiers in France.  After receiving my B. A. degree in economics, I worked as an economic analyst for the federal government in Washington D.C., attached to the President's Council on Wage and Price Stability.  Later, I became employed at the Brookings Institution, where I worked on studies related to small business formation and its importance to innovation and employment growth.

3.    In 1988, I was awarded a Ph. D. in Economics from the University of California at Berkeley.  The dissertation research for my Ph.D. concerned an empirical, econometric investigation of the impact of technological innovation on international competition.  The research, parts of which were published, supports a growing body of results indicating the importance of technological differences between economies that helps explain as much, or more, of the pattern of trade than do relative resource differences.  At that time, and continuing to today, Berkeley was a center for research on the economics of innovation, and on the interaction of industrial organization and patent system public policies.

**B.**      **Professional Background and Qualifications**

4.      Following my doctorate, I was on the faculty of the City University of New York, where I continued my research on innovation economics, and also taught courses on microeconomics, trade, corporate finance, and econometrics.  I also taught intersession courses at the Universidad Interamericana de Puerto Rico.

5.      In 1992, I joined Price Waterhouse in New York as a senior economist. I worked on litigation support assignments, including coordinating valuation matters across practices and with the London office.  As a partner in the firm, I was responsible for leading the Intellectual Property practice in San Francisco and Menlo Park.

6.      In 2001, I joined Cornerstone Research as the founding partner of its San Francisco office.  I have served the firm as head of that office and in various managerial functions, as well as heading up the Intellectual Property practice for a number of years.  I have served on the advisory boards of both Berkeley Law's Center for Law and Technology and Stanford Law's Program in Law, Science, and Technology.  I spearheaded Cornerstone Research's research efforts as one of the founding supporters of the Stanford Intellectual Property Clearinghouse in conjunction with Professor Mark Lemley, and served as an advisor to its primary descendant, the LexMachina intellectual property database firm.

7.      As a consultant and expert witness, I specialize in the applied economic, financial, and statistical analyses of complex business and regulatory matters.  Since 1992, I have been involved in advising clients on securities valuation, antitrust, and intellectual property valuation and licensing issues, as well as supporting experts and providing expert analysis of damages and liability questions in complex commercial litigation, including contract, securities, antitrust and intellectual property issues.

8.      I have testified as an expert witness in both state and federal courts, in deposition and trial, on patent, copyright, trademark, and trade secret damages,

contract breach damages, false advertising and securities fraud damages, and unfair competition/antitrust liability and damages.  I have served as, and also supported, expert witnesses on economic issues in Tokyo District Court and the International Court of Arbitration in Paris and Geneva.

9.     In the course of my work, I have had occasion to analyze the economic terms and conditions of many thousands of license agreements.  In licensing consultation, I have advised clients in computer, information technology, and telecommunications industries about portfolio management, exploitation and implementation strategies, valuation methods, royalty structures and rates, compliance with the FRAND obligation, and patent pool structures and rates.

10.    I have been an invited speaker at a number of legal seminars on the subject of patent damages, reasonable royalties, and the FRAND obligation.  I was admitted to membership in the Licensing Executive Society in 1997 and have been an active member of that organization.  I am also a member of the American Economic Association, the National Association of Business Economists, and the American Statistical Association.  My curriculum vitae, including publications within the last ten years, and testimony given in at least the last four years, is provided with this Witness Declaration.  (Ex. 429.)

11.    My analysis is supported by colleagues at Cornerstone Research. Neither my compensation, nor that of Cornerstone Research, is dependent on the outcome of this matter.

### C.     <u>Assignment in this Matter</u>

12.    I understand the plaintiffs in the above-captioned matter, TCL Communication Technology Holdings, Ltd., TCT Mobile Limited, and TCT Mobile (US) Inc. (collectively "TCL"), have asserted in their Complaint that defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc. ("Ericsson") have breached their legal obligation to offer fair, reasonable, and non-discriminatory ("FRAND") licensing terms for the standard-essential patents ("SEPs") Ericsson has declared as

essential to the global second generation ("2G"), third generation ("3G") and fourth generation ("4G" or "LTE") standards established by the European Telecommunications Standards Institute ("ETSI").  As a remedy for Ericsson's asserted breach, I understand TCL has asked this Court to determine and declare the terms of a FRAND license to Ericsson's SEPs.  This Witness Declaration is intended to assist the Court in that endeavor.

13.     I have been asked to study the economic issues in the above-captioned matter, and to render an expert opinion as to whether, from an economic point of view, the terms Ericsson offered to TCL were compliant with its FRAND obligation.  In particular, I have been asked to consider whether two alternative offers Ericsson has made to TCL for a license to Ericsson's SEPs, designated Option A and Option B, include economic terms that are compliant with Ericsson's obligation to offer TCL a FRAND license to Ericsson's 2G, 3G and 4G SEPs.

14.     As a necessary predicate to developing my opinions on the question of whether Option A or Option B comply with Ericsson's FRAND obligation, I have analyzed Ericsson's licenses for its 2G, 3G, and 4G SEPs.  I have undertaken the task of "unpacking" SEP cross-license agreements between Ericsson and companies that are similarly situated to TCL.  The economic exercise of unpacking SEP license agreements involves analyzing, among other things, the form of the payment (*e.g.*, the use of lump payments and/or running royalties), the duration of the period covered by the license, and any other consideration exchanged in the license, in order to calculate the effective one-way rates (by standard generation) being paid by Ericsson's licensees.  Determining these effective one-way rates will allow me to assess Ericsson's Option A and Option B offers to TCL relative to the rates being paid by similarly-situated Ericsson licensees and, as a consequence, evaluate whether Ericsson's Option A and Option B offers are FRAND.

15.     The methods I apply stem from the scientific literature of applied microeconomics, including literature concerning industrial organization, bargaining

theory, and the role of patents and licensing in innovation-led economic growth. These are the same methods that I have used, and that economists generally use, in conducting economic research, analyzing policy, or advising private clients outside of any dispute setting.

16.     I base my opinions upon an independent review of the documents the parties produced in this case, my own research, and past professional experience. This Witness Declaration represents the results of my examination of those documents, as well as the results of my research regarding the markets, products, and industry participants, and sets forth my opinions.

17.     I have also conducted interviews with TCL's technical experts, Dr. Apostolos "Paul" Kakaes and Dr. Zhi Ding, and interviews with TCL employees Mr. Steve Cistulli and Dr. George Guo.  I understand all of these individuals are also submitting Witness Declarations in this matter.  I have had an opportunity to review their Witness Declarations and consider the facts and analysis presented therein.  I have also reviewed the Witness Declarations of TCL experts Dr. Rudi Bekkers, Dr. Janusz Ordover, and Dr. Gregory Leonard, and considered their opinions and, in some cases, their supporting materials.

18.     I have also reviewed the expert reports submitted by Ericsson experts Dr. David Teece, Mr. David Kennedy, and Mr. Michael Pellegrino.  However, at this point I do not know if they will be addressing all of the opinions and methodologies set forth in their expert reports in their Witness Declarations.  To the extent they, or other Ericsson employees and experts, submit Witness Declarations that address facts and issues not addressed in this report, I reserve the right to comment on, or rebut, their opinions and methodologies.

## II.   <u>SUMMARY OF TESTIMONY</u>

19.     To evaluate whether Ericsson's Option A and Option B offers are FRAND, I first identified the Ericsson licensees that are similarly situated to TCL.  I then determined the effective one-way royalty rates (by standard) these licensees are

paying Ericsson, and compared those rates to what Ericsson offered TCL. I find that the effective one-way royalty rates being paid by the similarly-situated licensees are much lower than the one-way royalty rates set forth in Option B (and also much lower than the implied cross-license rates set forth in Option A). I then show the difference in dollar amount between what TCL would have paid Ericsson in 2014 and 2015 using the royalty rates set forth in Option B, as compared to what TCL would have paid Ericsson using the effective one-way rates being paid by the similarly-situated licensees.[1] I find that TCL would have paid a significantly greater dollar amount under Option B than it would have paid using the effective one-way rates being paid by similarly-situated licensees. I also evaluate the burden that would be imposed on TCL by Ericsson's Option A and Option B offers relative to the burden carried by each similarly-situated licensee under its own license terms with Ericsson, by comparing total royalty payments to total revenues for those licensed products. I find that Option A and Option B would cost TCL a much greater percentage of its licensed product revenues than the percentage burden being incurred by TCL's competitors. I briefly outline my analysis below.

20.     Based on global sales volumes and trends, the timing of the license, and the need for a license to Ericsson's 4G SEPs, I find that Apple Inc. ("Apple"), Samsung Electronics Co. Ltd ("Samsung"), HTC Corporation ("HTC"), Huawei Technologies Co. Ltd. ("Huawei"), LG Electronics Inc. ("LG"), and ZTE Corporation ("ZTE") are the handset manufacturers (*i.e.*, makers of mobile phones and tablets) which are most similarly situated to TCL.

21.     Each of these companies signed a cross-license agreement with Ericsson. With the exception of Huawei, I had to unpack each license to determine the effective one-way rates being paid by the licensee for its license to Ericsson's 2G, 3G, and 4G SEPs. I did this for the Apple, Samsung, and HTC licenses using

---

[1] I performed the same calculation with respect to Option A in my rebuttal expert report, but the Court struck it in its order dated January 4, 2017.

the results of a patent essentiality analysis performed by Dr. Ding.  For reasons I discuss below, I did this for the LG license using the results of an Ericsson-commissioned report from Signals Research Group, which used the number of approved technical contributions by company as a proxy for patent strength.  It was not necessary to unpack the Huawei cross-license with Ericsson, because the Huawei license includes specific one-way percentage royalty rates (as a result of an arbitration between Ericsson and Huawei).  I was unable to calculate effective one-way rates (by standard) for the ZTE license due to the absence of required information.  The results of my effective one-way rate analysis are reported in the table below:

**Effective One-Way Rates for Similarly Situated Licensees**

| Standard | Apple | Samsung | HTC | LG | Huawei |
|---|---|---|---|---|---|
| 2G/3G | N/A | ██████ | ████ | ████ | ██████ |
| 4G | ████ | ██████ | ████ | ████ | ██████ |

Note:

All rates are expressed as a percentage of net selling price (NSP).

The one-way rates signified with one asterisk (*) were determined by a three person panel of arbitrators who presided over Ericsson's FRAND dispute with Huawei (the "Huawei Tribunal").

The one-way rates signified with two asterisks (**) were determined by my effective one-way rate analysis using the Ericsson business case sales data and projections.

The one-way rates signified with three asterisks (***) were determined by my effective one-way rate analysis using reported sales data from a third-party organization called International Data Corporation (IDC).

The one-way rates were determined using a patent essentiality analysis performed by Dr. Ding to calculate a Portfolio Strength Ratio ("PSR"), except the LG one-way rates, which were determined using a PSR calculated from data included in a Signals Research Group report commissioned by Ericsson.

22.     Based on the rates set forth in the above table, it is my opinion that Option A and Option B are not FRAND.  To further support my opinion, I have also

1  prepared a table which illustrates the total royalties TCL would have paid in 2014

2  and 2015 under Option B (using TCL's actual sales), compared to the total royalties

3  TCL would have paid in 2014 and 2015 (again, using actual sales data) using the

4  one-way effective royalty rates I calculated for Apple, Samsung, HTC, and LG, as

5  well as the one-way rates being paid by Huawei.

**TCL Expected Royalty Payments for 2014 and 2015 Under Various Scenarios
(2014 and 2015 Sales, Based on Ericsson Business Cases and TCL Sales Data)
($ Millions)**

| Standard | Similarly Situated Licensees | | | | Huawei Rates | Option B Rates |
| | Lynde Calculated One-Way Rates | | | | | |
| | Apple Rates | Samsung Rates | HTC Rates | LG Rates | | |
|---|---|---|---|---|---|---|
| **2G** | | | | | | $6.5 |
| **3G** | | | | | | $51.5 |
| **4G** | | | | | | $28.7 |
| **Total** | | | | | | $86.7 |

Note:

The royalty payments cover sales during 2014 to 2015.

These calculations are based on TCL-produced sales data and on the one-way effective royalty rates I calculated using the Ericsson business case sales data and projections (except for the calculation using the Huawei rates, which uses the rates specifically stated in Ericsson's license with Huawei).

I use the one-way 4G rate calculated for Apple to determine TCL's expected royalty payments for its 2G, 3G, and 4G sales.

23.    From the above table, it is apparent TCL would pay between ████

████████████ in dollars) if the Option B rates were applied, than what TCL

would pay if it were to use the effective one-way rates I calculated for the similarly-

situated licensees, as well as the rates being paid by Huawei.  Based upon the

calculations I have performed, as summarized in the table above, it is my opinion

that Ericsson's Option B offer is not FRAND.

24.    Using the same source of data (Ericsson business case sales data and

projections, and actual TCL sales data), and again for a two-year period, I have also

prepared a table which compares the royalty burden that would be imposed on TCL

by Ericsson's Option A and Option B offers to the royalty burden imposed on each similarly-situated licensee.  This comparison calculates the estimated royalty payments made by each respective licensee in 2014 and 2015 as a percentage of the total revenues from licensed products for each respective licensee in the same time period.

**Comparison of Royalty Payments as a Percentage of Total Revenue**
**(2014 and 2015 Sales, Based on Ericsson Business Cases and TCL Sales Data)**

| Year | Ericsson Licensee | | | | TCL | |
| | Apple | Samsung | HTC | LG | Option A | Option B |
|---|---|---|---|---|---|---|
| **2014** | | | | | 1.06% | 1.27% |
| **2015** | | | | | 1.05% | 1.47% |
| **Total** | | | | | 1.05% | 1.36% |

25.    As the above table shows, these Ericsson licensees paid much less, as a percentage of their respective revenues, than TCL would have been expected to pay under Option A or Option B.  In particular, the relative royalty burden incurred by these other licensees was anywhere from ███████████████████ than the royalty burden TCL would have incurred under Option A or Option B.  Based upon the calculations I have performed, as summarized in the table above, it is my opinion that Option A and Option B offers are not FRAND.

III.    **BACKGROUND ON STANDARD SETTING ORGANIZATIONS, ETSI, AND THE FRAND COMMITMENT**

A.    **Standard Setting Organizations and ETSI**

26.    By way of background, and as used in this Declaration, a standard is "any set of technical specifications that either provides, or is intended to provide, a common design for a product or process."  (Ex. 1267 at p. 9.)  Standard Setting Organizations ("SSOs"), also referred to as Standard Development Organizations ("SDOs"), permit the creation of standard technologies to facilitate the development of products that can work together.  (Ex. 1267 at pp. 11-16.)  One of TCL's other

expert witnesses, Dr. Ordover, will address SSOs and the development of standards in more detail in his Witness Declaration.  In the interest of avoiding unnecessary repetition, I refer the Court to these opinions by Dr. Ordover to provide additional context for my analysis and opinions.

27.     Briefly, SSOs implement Intellectual Property Rights ("IPR") policies that establish procedures to address the disclosure and licensing of patents by their members.  SSOs typically request disclosure of the existence of any patents that are, or might be, essential to a particular standard.  As part of the disclosure process, SSOs require the patent owner to agree that it will license such patents on FRAND terms and conditions.

28.     From an economic viewpoint, such IPR policies are meant (1) to protect the investments made by patent owners and assure a fair return for the development of essential technology, and (2) to protect the technology investments made by industry participants relying on established standards in the development of their products, thereby (3) mitigating the risk of infringing on SEPs.

29.     The particular risks that require mitigation are:  (1) SEP holders are given the opportunity to exert undue leverage because of *ex post facto* "hold up," and thereby charge an excessive royalty; (2) the total royalty stack for separate licenses to all essential patents declared by industry participants is so large as to make the products embodying the technology commercially unfeasible (and thus prevent widespread adoption of the standard, resulting in no royalties for any patent holders); and (3) a prospective licensee is discriminated against by having to pay a higher royalty for access to the essential technology than its competitors.  Such price discrimination might otherwise be considered profit maximizing for an individual patent holder, but as with royalty stacking, it would threaten the commercial viability of the standard and therefore all of the patent holders' royalty revenues.

30.     One of the entities of interest in this matter is an organization called 3GPP, which is a group of seven telecommunications SSOs (ARIB, ATIS, CCSA,

ETSI, TSDSI, TTA, and TTC).  ETSI (the SSO of importance in this matter) is an independent, non-profit SSO officially recognized by the European Standards Organization.  ETSI produces "globally applicable Standards for Information and Communication Technologies (ICT), including fixed, mobile, radio, converged, broadcast and Internet technologies."  ETSI has over 700 members (including Ericsson and TCL) and includes in its membership manufacturers, network operators, service providers, administrations, universities and research bodies, user organizations, and consultancies.  Since its founding in 1988, ETSI has produced approximately 37,000 standards, specifications, reports, and guides.

## B.   The FRAND Commitment

31.    During the development of a standard, members must inform ETSI if they hold any essential (or potentially essential) IPR.  A detailed explanation of the concept of "essentiality," and how it is determined, is set forth in the Declarations of Dr. Ding, Dr. Kakaes and Dr. Leonard, and which I will not repeat here.  ETSI's IPR policy requires members to be prepared to grant irrevocable licenses to essential patents on FRAND terms and conditions.

32.    The FRAND commitment has two distinct components.  The "fair and reasonable" component is usually left undefined by each SSO (although some IPR policies may specify that a royalty-free license would be acceptable).  Economists generally agree that "fair and reasonable" licensing terms should be based on the *ex ante* intrinsic value of the patented technology, compared to the next best alternative existing at or near the time the standard is set.  A detailed description of the concept of *ex ante* intrinsic value, and how that is determined, is set forth in Dr. Leonard's Declaration, which I will not repeat here.

33.    After a standard is developed and accepted by the SSO, users rely on the standard and make standard-specific investments.  By investing in the technology covered by the standard, these implementers increase their cost of switching to an alternative technology.  Ultimately, this creates hold-up power for

the patent owner.  Royalty rates negotiated at this point (*ex post* adoption of the standard) could reflect hold-up power, because all implementers are now locked into the standard with no flexibility to choose, or use, non-infringing alternatives to the standard.  It is important to understand how hold-up, if present, can impact potential licensees, who have neither the motivation (because of lack of market presence) or the economic viability (*i.e.*, staying power) to effectively respond to hold-up.

34.     In addition, since there are usually a number of different companies holding essential patents, there is a potential coordination problem in that the aggregate royalty demand will be higher than what a monopolist holding all of the patents would have charged (while presumably avoiding a commercial infeasible total royalty).  This leads to the possibility that the royalty stack of all the patent royalties combined will become excessive.  This dynamic has been referred to in the economic literature as the "Cournot Complements Problem," named after early 1800s French engineer Augustin Cournot.  An excessive total royalty stack could threaten the commercial viability of any products made under the standard.  Such a result would harm all patent holders, as well as implementers, not to mention the consumers of such products.

35.     Licensing technology at FRAND rates based on the *ex ante* intrinsic value of the technology, and not the value created by the inclusion of the technology in a standard, explicitly avoids the problem of hold-up.  Royalty stacking would also be at least partially avoided, since each patented technology would only command a royalty equal to its incremental value over technologies not included in the standard.

36.     "Non-discriminatory" is the second component of the FRAND commitment.  When applied horizontally at each stage of commercial utilization, it ensures no party is materially disadvantaged with respect to its competitors.  In particular, it is intended to prevent a patent owner from forcing a prospective licensee to pay a higher royalty rate than the rate being paid by competing implementers for access to the same intellectual property rights.  As with the royalty

stacking issue, individual patent holders may have an incentive to discriminate on price, but such discrimination between horizontal downstream competitors could threaten the commercial viability of the standard, as well as the incentive for implementers, who have their own patents, to contribute those patents to the standard.

37.    The issue of SSO patent policies, the FRAND commitment and FRAND licensing practices has received significant attention from academics, regulators, and the courts, as allegations of abuse of the SSO processes by patent holders claiming SEPs have been on the rise in both the U.S. and abroad.  This case represents a recent example of increased scrutiny surrounding the obligation to license essential IPR on FRAND terms and conditions.

## IV.   IMPORTANT CONSIDERATIONS IN EVALUATING COMPLIANCE WITH THE FRAND REQUIREMENT

### A.   Consummated Licenses May Not Be FRAND and Are Not Necessarily Instructive in Assessing the "Fair and Reasonable" Value of the Licensed Technology.

38.    As stated earlier, I have read the expert reports submitted by Ericsson's experts Dr. Teece and Mr. Kennedy, and I expect they will be submitting witness declarations in this matter, which will contain similar opinions.  I do not agree with several of their opinions, including that the range of effective one-way royalty rates being paid by Ericsson's current licensees, however calculated, constitute the bounds within which a one-way FRAND-compliant royalty rate would necessarily be found.  Nor do I agree with their opinions that whatever royalty rate Ericsson is able to convince a new licensee to pay will necessarily result in an expansion of a supposed "FRAND range."

39.    The reason for my opinions in this respect is that license agreements may still be tainted with various degrees of hold-up.  Apart from some objective criterion, or some adjudicated rate findings (*e.g.*, the Ericsson/Huawei arbitration),

the licensee would not actually know if its rates are FRAND.  As Dr. Ordover has pointed out in his expert reports and Witness Declaration, the problem with these license agreements is much more likely to be hold-up by the licensor, as opposed to hold-out by the licensee.

40.     Because potential licensees have already incurred the significant cost involved in implementing a standard, they are under great pressure to take a license to practice a SEP (or, as in this case, a portfolio of SEPs).  For implementers of a standard, there is a higher risk of actually infringing a claimed SEP, and therefore a higher exposure to litigation and subsequent liability (including a possible injunction).  Obviously, the holder of the SEP knows the implementer has engaged in this developmental activity and incurred these costs, and thus is in a position to exert considerable pressure in the negotiation phase leading up to the eventual SEP license.  The magnitude of the transaction costs and risk likely compels many smaller implementers to simply accept the SEP owner's "rack rate" – in the case of Ericsson, its annual "Reference Price Sheet Rate" – because any potential savings from obtaining a lower rate would quickly be overwhelmed by the transaction costs associated with obtaining the lower rate.

41.     To the extent the historical record reveals a variety of effective one-way rate outcomes in the patent holder's various SEP licenses, at least part of that range may be due not to specific differences in the counterparties or their circumstances, but instead to the absence of information about other agreements, the identity and/or value of the SEPs, or any objective benchmarks.  Because of this lack of transparency, unfortunately some parties simply make worse deals than others and do not know about it.  Certainly, the patent holder lacks the incentive to inform prospective licensees of the precise rates others licensees have paid.

42.     Further, from my review of the documents produced and depositions taken in this matter, I observe that in SEP licensing, actual license terms are deliberately maintained as highly confidential, so that no competitor and/or licensee

knows what others are actually paying.  Nor is any public information available on such rates.  Thus, there is no check, apart from litigation, on whether offered rates are FRAND (in terms of the *ex ante* intrinsic value of each patented technology, and the absence of discrimination between horizontal competitors).  Therefore, such earlier licenses should not necessarily be taken as evidence of a FRAND rate. Inferring FRAND compliance from earlier licenses would involve, to some degree, circular reasoning (*i.e.*, the notion that because someone agreed to these royalty rates, then these royalty rates must be FRAND).

43.    In fact, basic economics would support the conclusion that monopolies which possess market power would tend to maximize their profits by exercising that market power, unless otherwise constrained.  To the extent the standardization of a patented technology has granted a patent holder any such excess market power, the essential patent holder would tend to "charge what the market will bear" – unless constrained by its FRAND commitment.  Monopolies with market power in other industries do this all the time, and the fact all of those consummated transactions may contain monopoly premia is a standard result in economics.

**B.     The Obligation to Not Discriminate Is Designed to Prevent the Prospective Licensee from Being Competitively Disadvantaged in the Marketplace.**

44.    While the "FR" (or fair and reasonable) portion of the FRAND commitment is meant to prevent hold up and royalty stacking, the "ND" (or non-discrimination) portion imposes a further constraint on the SEP holder.  The economic purpose of the ND portion of the FRAND commitment is to encourage the success of the standard by making sure that horizontal downstream competitors (*i.e.*, device manufacturers or "implementers") are not disadvantaged by paying a higher effective royalty than their competitors.

45.    In determining the firms that compete with TCL for the sale of 2G, 3G, and 4G handsets, Dr. Ordover has identified various criteria to be considered, as

WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

follows:  (1) the similarity of the manufacturing technology; (2) the same product market (*i.e.*, roughly equivalent handsets with exactly equivalent standardized cellular connectivity); and (3) the same geographic market (*i.e.*, worldwide or localized).  Economically, these criteria must be evaluated not just from actual sales evidence, but also by the potential entry into the market (current and future) of additional implementers, as cost effective potential entry into the market provides a meaningful check on market power by current participants.

## V.   BACKGROUND ON WIRELESS COMMUNICATION STANDARDS AND THE WIRELESS COMMUNICATIONS MARKET

46.     As discussed above, standards are essential to facilitating communication between different devices (including handsets) and in ensuring the interoperability of technologies.  Below, I briefly discuss wireless telecommunications standards, including the 2G, 3G, and 4G standards at issue in this case, as well as the wireless telecommunications market.

### A.   The Standards at Issue

47.     The standards associated with the mobile telecommunications industry have evolved over several decades.  The principal changes have centered around data transfer speeds, security, bandwidth usage, and improvements in power consumption.  It is necessary to have some understanding of the different standards, because different royalties have evolved as the standards have matured.  It is also important to understand the scope of different standards as part of the process of assessing what other similarly-situated licensees are paying for a license.

48.     The first standard of interest in this case that was defined and developed for commercial purposes is the 2G standard.  It was called the Global Systems for Mobile Communications ("GSM") standard.  This was Europe's first digital standard, meant to promulgate cellular compatibility throughout the continent.  IS-95 Code Division Multiple Access ("CDMA"), a competing 2G standard, was also adopted during this time period.  As technology improved, 2.5G

standards, such as General Packet Radio Service ("GPRS") and Enhanced Data Rates for GSM Evolution ("EDGE"), were defined and developed.

49.     The next standard of interest in this case, the 3G standard, was characterized by high transmission rates and the support of multimedia services. Voice and non-voice data could be transferred simultaneously.  Along with the 3G services came features such as Mobile TV, location-based services, and GPS.

50.     Data speeds and capabilities continued to increase with the introduction of the 4G standard, which is currently facilitated by the 3GPP Long-Term Evolution ("LTE") standard.  The success of 4G technology has led to predictions that demand for hard wired broadband services will decline (just as use of land-line phones plummeted with the introduction of cell phones).

51.     The table below provides a high-level summary of the standards that fall under the various generations and are of interest in this case.  While these standards are also discussed in numerous other Witness Declarations in this case, I provide this table as a convenient reference point, when evaluating the technologies that were the subject of existing Ericsson license agreements and what technologies are covered by Ericsson's Option A and Option B offers to TCL.

**Table 1 (PDX 23)**
**Summary of Wireless Standards by Generation**

| Generation | Standard/Air Interface Technology |
|---|---|
| 2G | CDMA IS-95 a/b<br>GSM<br>TDMA<br>PDC<br>iDEN |
| 2.5G | CDMA2000 1xRTT<br>GPRS<br>EDGE |
| 3G | UMTS/WCDMA<br>HSPA<br>CDMA EV-DO<br>TD-SCDMA<br>TD-HSPA |
| 4G | FD-LTE<br>TD-LTE<br>TD/FD-LTE<br>FD-LTE Advanced<br>TD/FD-LTE Advanced<br>WiMAX |

Source: "IDC's Worldwide Mobile Phone Tracker Taxonomy, 2015," IDC, 10/15. (Ex. 1269 at pp. 8-9)

### B.   The Wireless Communications Market - Participants and Prices

52.    The major groups that make up the wireless telecommunications market include cellular carriers, infrastructure manufacturers, and handset manufacturers. This case concerns handset manufacturers (*i.e.*, manufacturers of feature phones and smart phones, and in some cases tablets). The high level of competition in the handset market pushes manufacturers to continue evolving and innovating, both by improving handset quality and reducing manufacturing costs and prices. Though actual handset offerings are differentiated, various handsets (whether feature phones or smartphones) are substitutable for one another as customers value handsets along multiple dimensions (*e.g.*, price, durability, features, and ease of use).

53.    Some of the key players in the handset market today are those with both strong feature phone and smartphone portfolios. As discussed in more detail in

Section VII. below, several of these key players have entered into agreements with Ericsson to license Ericsson's 2G, 3G, and 4G SEPs, including: Apple, Samsung, HTC, Huawei, LG, and ZTE. Other entities, far more removed from the markets where TCL is active, have also executed licenses to Ericsson's SEPs, but for the reasons discussed later, they are not similarly situated to TCL for purposes of determining the terms and conditions of a FRAND license to Ericsson's SEPs.

54.     In an effort to identify the firms which are similarly situated to TCL, it is important to consider the worldwide market. TCL competes in the worldwide market for the sale of handsets that practice the 2G, 3G and 4G standards, either individually or in various combinations. There are several third-party organizations which track handset sales both worldwide and in the U.S. One of the most recognized is an organization called International Data Corporation ("IDC"). To obtain an understanding of where TCL is positioned in terms of handset sales in both the world and U.S. markets, I have reviewed and analyzed the IDC Worldwide Quarterly Mobile Phone Tracker (Ex. 1273), which covers the period of time from the first quarter of 2007 to the fourth quarter of 2015 (*i.e.*, 1Q 2007 to 4Q 2015). Because TCL and Ericsson were involved in negotiating the terms of a license to Ericsson's SEPs in 2013 to 2014, and all of the other companies mentioned in the prior paragraph entered into SEP license agreements with Ericsson in 2014 and 2015, I have focused on, and compiled sales data for, these organizations from IDC for the period of time ranging from the beginning of 1Q 2013 through 4Q 2015. I designated these compilations of sales as Schedules 3A to 3F to my opening expert report in this matter. (Exs. 1210, 1211, 1212, 1213, 1214, 1215.)

55.     Schedule 3A (Ex. 1210) provides a summary of the top vendors' worldwide quarterly mobile phone unit sales for 1Q 2013 through 4Q 2015. Over almost the entire period of time 1Q 2013 to 4Q 2015, TCL was solidly in third place in feature phone unit sales on a worldwide basis. Schedule 3A (Ex. 1210) also illustrates that TCL smartphone sales grew from 1.532 million units in 1Q 2013 to

10.775 million units in 4Q 2015, approximately a 700% increase in smartphone unit sales.

56.     Schedule 3A (Ex. 1210) also illustrates that by the 4Q 2015 TCL was solidly in seventh place in combined feature phone and smartphone unit sales with 19.987 million units sold, ahead of LG (18.296 million units sold), ZTE (16.595 million units sold), and HTC (4.892 million units sold).

57.     Schedule 3B (Ex. 1211) illustrates that in the feature phone market from 1Q 2013 to 4Q 2015, Samsung was the number two player with an average worldwide unit-based market share of 14.2% (behind Nokia and later Microsoft's average share of 23.3%), while TCL held the number three spot with a 4.8% average market share.  LG's average worldwide feature phone unit market share was 2.5%, and ZTE had an average share of 1.7%.  While Huawei, HTC, and Sharp sold some feature phones, their sales represented less than a 1% unit-based market share during this time period.

58.     Schedule 3B (Ex. 1211) also illustrates that Samsung is the leader in worldwide smartphone unit sales market share, having an average market share of 25.4% during this time period.  Apple had an average unit market share of 15.4%, while Huawei, LG, ZTE, and HTC had average shares of 6.1%, 4.4%, 3.4%, and 1.7%, respectively.  TCL's smartphone unit market share grew from 0.7% in 1Q 2013 to a high of 3.6% in 4Q 2014 – a growth of over 500%, with an average share of 2.5% during this time period.  Sharp is not a top-15 contender in worldwide smartphone unit sales.  Sharp had an average unit market share of less than 1%.

59.     Lastly, Schedule 3B (Ex. 1211) illustrates that in combined feature phone and smartphone unit sales for the period of time 1Q 2013 to 4Q 2015, TCL was solidly in seventh place in combined unit sales (3.3%), ahead of ZTE (2.8%) and HTC (1.1%), and just behind LG (3.8%).

60.     Schedule 3C (Ex. 1212) provides a summary of the top vendors' worldwide feature phone and smartphone revenues.  In feature phones, TCL was

fifth in total revenue from 1Q 2013 to 4Q 2015, ahead of ZTE, well ahead of Huawei, and just behind LG, which was in third place.  TCL's revenues grew from $219.3 million in 1Q 2013 to $1.237 billion in 4Q 2015, a 564% increase.  In combined feature phone and smartphone revenues, TCL went from $486.6 million in 1Q 2013 to $1.412 billion in 4Q 2015, a 290% increase in only two years.  By contrast, Samsung went from $29.233 billion in 1Q 2013 to $27.269 billion in 4Q 2015, a 6.8% decline, and HTC went from $2.011 billion in 1Q 2013 to $1.503 billion in 4Q 2015, a 25.3% decline.

61.    Schedule 3D (Ex. 1213) illustrates revenue-based market share for feature phones and smartphones over the same period.  During that period, TCL had a total revenue-based market share of 4% for feature phones, and saw its revenue-based market share for smartphones increase by over 300%.  On a combined basis, for feature phones and smartphones, TCL saw its revenue-based market share almost double.

62.    Schedule 3E (Ex. 1214) reflects the retail average selling price ("ASP") for feature phones and smartphones over the same period.  For TCL, it saw its feature phone ASP go from $43.16 in 1Q 2013 to $19.00 in 4Q 2015, a 56% decrease.  In 4Q 2015, the TCL feature phones ASP was slightly more than the ZTE feature phone ASP, and close to the Samsung feature phone ASP.  Samsung had experienced a feature phone ASP decline from $73.12 in 1Q 2013 to $24.51 in 4Q 2015, a 66.5% decline in price.  For smartphones, TCL's ASP went from $143.09 in 1Q 2013 to $114.82 in 4Q 2015, which was close to the ZTE ASP for smartphones in 4Q 2015 of $131.44.

63.    Finally, Schedule 3F (Ex. 1215) traces the decline in ASP of mobile phones by standard generation from 2013 to 2015.  For each generation, there was a significant drop in ASP.  For example, for 2G phones the ASP went from $25.66 in 2013 to $20.09 in 2015, a 22% decline; for 3G phones the ASP went from $220.36 in 2013 to $118.05 in 2015, a 46% decline; and for 4G phones the ASP went from

$622.35 in 2013 to $380.75 in 2015, a 39% decline.  In all cases, each generation of phone was experiencing a substantial reduction in ASP over this three year period.

## VI.   BRIEF BACKGROUND ON THE PARTIES AND ERICSSON'S SEPs

### A.   The TCL Plaintiffs

64.    TCL Communication Technology Holdings Limited ("TCL"), one of the three plaintiffs in this case, is a global mobile vendor headquartered in China.  It is a subsidiary of TCL Corporation.  TCL is the parent of TCT Mobile Limited and TCT Mobile (US) Inc., the other plaintiffs in this case.

65.    TCL designs, manufactures, and markets a large portfolio of mobile and internet products sold in over 160 countries under several brands, including TCL, Alcatel OneTouch and now Blackberry.  (*See* http://www.marketwired.com/press-release/blackberry-secures-global-smart-phone-software-brand-licensing-agreement-with-tcl-communication-nasdaq-bbry-2183632.htm.)  Examples of TCL handsets that practice the 2G, 3G, and 4G standards include the OneTouch Hero, OneTouch IDOL X+, and IDOL 2.  A much more detailed description of TCL's handset offerings is set forth in the Witness Declarations of Dr. Guo and Mr. Cistulli.

66.    TCL has grown its handset business rapidly over the last several years.  As a testament to its growth, in the fourth quarter of 2014, Gartner, Inc. ("Gartner"), a telecommunications research firm, ranked TCL fourth among global phone manufacturers and seventh among global smartphone manufacturers.  (Ex. 1268 at pp. 4-5.)  IDC had similar global rankings for TCL's handset unit sales in the same time period.  (Ex. 1719.)

67.    To understand TCL's growth, I have prepared a series of schedules. The first series was derived from publically available material published by IDC. (Ex. 1273.)  These schedules provide a useful tool when comparing TCL's sales to other companies, *i.e.*, Apple, Samsung, LG, HTC, etc., and evaluating the economic impact on TCL of Ericsson's Option A and Option B offers as a part of determining

1    whether those offers are FRAND.

2         68.    Schedules 1A, 1B and 1C (Exs. 1201, 1202 and 1203) are annual

3    summaries of TCL feature phone and smartphone unit sales, revenue, and ASPs

4    from the second half of 2009 through 2015.  Of importance, TCL's 3G smartphone

5    unit phone sales expanded from 1.783 million units in 2010 to 27.982 million units

6    in 2015, a 1,469 % increase; and TCL's 4G smartphone unit phone sales expanded

7    from approximately 65,000 units in 2013 to 11.074 million units in 2015, a 16,842%

8    increase.

9         69.    Schedules 1D, 1E and 1F (Exs. 1204, 1205 and 1206) are quarterly

10   summaries of TCL feature phone and smartphone unit sales, revenue, and ASPs

11   from 1Q 2013 through 4Q 2015.  This time period is particularly relevant to this

12   case, because it was during this time period that TCL and Ericsson were negotiating

13   for a license to Ericsson's SEPs, and other handset manufacturers (*e.g.*, Apple and

14   Samsung) signed SEP licenses with Ericsson.

15        70.    I prepared a similar set of schedules based upon TCL sales data

16   produced in this matter for the period of time 3Q 2009 to 4Q 2015.  (Ex. 142.)  I

17   have designated these sales summaries as Schedules 2A, 2B and 2C (Exs. 1207,

18   1208 and 1209).  These are summaries of TCL sales by standard generation, and

19   cover both handsets and tablets.  Again, these summaries illustrate the dramatic

20   growth of TCL in each generation over this six-year period.

21        71.    As TCL has matured in the market as a handset provider, it has moved

22   further into the smartphone market and, in particular, into the 4G market.  From

23   2013 to 2015, TCL's 4G handset sales grew from around 91,500 units in 2013 to

24   9.107 million units in 2015.  At the same time, TCL's 4G handset ASP was

25   declining from $231.04 in 2013 to just $97.30 in 2015.  TCL's declining ASP is

26   very similar to the general worldwide handset market, particularly as it applies to 4G

27   handsets.

28        72.    Some general observations are derivable from the Schedules (*e.g.*,

Schedules 1A to 1F).  From 1Q 2013 all the way through 4Q 2015, IDC almost uniformly ranked TCL third in feature phone unit sales.  From a modest start in 1Q 2013, where TCL ranked thirteenth in smartphone unit sales, it rose to seventh by 4Q 2014, trailing only Samsung, Apple, Huawei, LG and two other organizations (Lenovo and Xiaomi), whose sales were principally in non-U.S. markets.  In 2015, based on considerations that included sales volume, market share, and brand awareness, IDC ranked TCL in the "2015-2016 Global Smart Phone Brands Top 15" (eighth place).  (Ex. 1719.)

73.     From these sales summaries, based on an evaluation of the world markets where TCL competes, growth of total sales, growth of sales by standard, product offerings, total product sales and pricing, I agree with Dr. Ordover (and Dr. Teece and Mr. Kennedy, in part) that at least the following companies are direct competitors to TCL:  Apple, Samsung, Huawei, LG, HTC, and ZTE.  Where I differ with Dr. Teece and Mr. Kennedy, however, is that I find these companies to be the most similarly situated to TCL, such that their recent licenses with Ericsson are the most relevant licenses for purposes of evaluating whether Ericsson has complied with its FRAND obligation vis-à-vis TCL.

74.     To gain a further understanding of TCL's competitors, I spoke with Mr. Cistulli (President and General Manager for Alcatel North America) and Dr. Guo (until recently the Chief Executive Officer for TCL Communication).  During my conversations with Mr. Cistulli and Dr. Guo, I confirmed that TCL's focus is on directly competing with the top five to six handset manufacturers:  Apple, Samsung, LG, HTC, Huawei, and ZTE.  TCL believes it directly competes with these companies in regards to product offerings, pricing, and geographic areas served.  In particular, TCL competes with these companies on products at all levels (*e.g.*, entry level, mid-level and high-end).  I understand that a more detailed explanation of the competition in the markets for handsets, and TCL's present position and goals for the future, is set forth in the Witness Declarations of Dr. Guo and Mr. Cistulli.

## B.   The Ericsson Defendants

75.   Telefonaktiebolaget LM Ericsson and its wholly-owned U.S. subsidiary Ericsson Inc. (collectively, "Ericsson") comprise a Swedish multinational company that provides communications technology and services.  (Ex. 1278 at p. 3.)  Ericsson provides network infrastructure for 2G, 3G, and 4G networks, among others, through its Networks business segment.  Ericsson previously sold handsets but has completely withdrawn from the handset market.  Other Ericsson business segments include Global Services, Support Solutions, and Modems.  (Ex. 1278 at p. 30.) Ericsson also maintains an IPR licensing business that provides companies with access to Ericsson's technology and patents, including patents it has declared essential to the 2G, 3G, and 4G standards.  (Ex. 1278 at p. 29.)

## C.   Determining the Essentiality of Ericsson's SEPs

76.   As part of my effort to unpack Ericsson's cross-licenses with similarly-situated organizations in order to determine the effective one-way royalty rates being paid by these organizations, I have relied upon TCL technical expert Dr. Ding to establish the number of patent families Ericsson and others have that are actually essential to the respective standards.  (For simplicity below, I often refer to these patent families as patents.)  As will be explained later, the number of actually essential patents held by an organization impacts the determination of a portfolio strength ratio, which can then be used to calculate the effective one-way rate in a cross-license.

77.   I understand Dr. Ding (and also Dr. Kakaes) have identified the number of patent families industry players have declared essential to a standard.  They have then analyzed a representative number of those declared essential patents to determine which patents are actually essential to the standard.  From their analysis they were able to calculate an "essentiality ratio," on a company-by-company basis, by dividing the number of actually essential patents by the number of declared essential patents.

78.     Based upon the opinions and expert reports submitted by Dr. Ding, I prepared a schedule which lists the total number of 2G, 3G and 4G End-User Terminal ("UE") patent families that were studied and declared essential to ETSI by several companies, including Samsung, LG, Huawei, Apple, and ZTE.  UE patent families are relevant to handset devices (either mobile phones or tablets), as distinguished from infrastructure equipment.  I have marked the list as Schedule 9A.  (Ex. 1225.)  A total of 7,106 UE patents were declared essential to the 2G, 3G and 4G standards.  Qualcomm has the highest number of declared essential UE patents, Samsung is second, Ericsson is fourth, LG is seventh and Huawei is ninth.

79.     Based upon the analysis and the opinions of Dr. Ding, I have also prepared a list of the number of UE patents found to be actually essential to the 2G standard, and for each company I tabulated an "essentiality ratio," which was calculated by dividing the number of actually essential patents by the number of declared essential patents.  (Ex. 1226.)  Ericsson had the third-highest number of patents declared essential to the 2G standard – 107 patents.  Dr. Ding found that 45 of the patents Ericsson declared in connection with the 2G standard were actually essential, resulting in an essentiality ratio of 41.67% (*i.e.*, 45/107).

80.     Based upon the analysis of Dr. Ding, I have also prepared a list of the number of UE patents found to be actually essential to the 3G standard, and for each company I tabulated an essentiality ratio using the formula described above.  (Ex. 1227.)  Ericsson had the fourth highest number of patents declared essential to the 3G standard – 199 patents.  Dr. Ding found that 81 of the patents Ericsson declared essential to the 3G standard were actually essential, resulting in an essentiality ratio of 40.91% (*i.e.*, 81/199).

81.     Based upon the analysis of Dr. Ding, I have also prepared a list of the number of UE patents found to be actually essential to the 4G standard, and for each company I tabulated an essentiality ratio using the formula described above.  (Ex. 1228.)  Ericsson had the fifth highest number of patents declared essential to the 4G

WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

standard, numbering 311 patents.  Dr. Ding found that 108 of the patents Ericsson declared essential to the 4G standard were actually essential, resulting in an essentiality ratio of 34.62% (*i.e.*, 108/311).

82.     Because Ericsson and other organizations also make infrastructure equipment, I have also considered the number of infrastructure patents declared essential to the 3G and 4G standards, and compared that number, on a company-by-company basis, to the number of patents Dr. Ding calculated to be actually essential. I have done so as part of my unpacking analysis with respect to those Ericsson cross-licenses where the other party owned a material number of infrastructure patents to which Ericsson required a license.  This was accomplished by multiplying the essentiality ratio determined from the UE analysis by the number of infrastructure patents declared essential by each respective company.  This approach (as confirmed by Dr. Ding) was based on the assumption that there would be no material difference in the essentiality ratios for declared patents related to UE and infrastructure.  The results of the infrastructure essentiality analysis is set forth in my Second Updated Schedule 11E.  (Ex. 1239.)

## VII.   THE EFFECTIVE ONE-WAY RATES BEING PAID BY TCL'S COMPETITORS FOR A LICENSE TO ERICSSON'S SEPS

### A.     Identification of the Licensees Similarly Situated to TCL

83.     As shown in Schedules 7A, 7B, and Updated Schedule 7B.1, Ericsson has entered into a number of agreements to license its 2G, 3G, and 4G SEPs.  (Ex. 1219, 1220.)  As part of the process of determining whether Ericson has complied with its obligation to not discriminate in the terms and conditions offered to TCL, it is important to identify the Ericsson licensees that are similarly situated to TCL, and examine the terms and conditions of their licenses with Ericsson.  In evaluating which Ericsson licensees are similarly situated to TCL, it is important to consider (1) the markets predominately serviced by these Ericsson licensees, (2) their product offerings in those markets, and (3) the commercial success they have experienced.

1   Because TCL requires a license to Ericsson's 4G SEPs, it is also important to

2   identify those agreements that included a license to Ericsson's 4G SEPs.

3       84.    As discussed above, TCL has become a major player in the handset

4   market, including the 4G handset market.  As a result, and from the schedules and

5   analysis described previously, it is my opinion that TCL is most similarly situated to

6   Apple, Samsung, HTC, Huawei, LG, and ZTE, as these are companies with licenses

7   to Ericsson's SEPs, who compete most directly with TCL in the handset market.

8   Moreover, Ericsson has entered into licenses with these companies in the last

9   several years that included licenses to Ericsson's 4G handset SEPs, making them

10  more relevant to the rates TCL should receive.[2]

11      85.    To confirm that these licensees were the most similarly situated to

12  TCL, I also examined Ericsson's licenses with other companies during 2014 and

13  2015 (as there were no 2016 4G licenses at the time of my earlier reports).  As

14  shown in Schedule 7C (Ex. 1221), most of these other licensees are small companies

15  with limited or no handset sales, very limited geographic scope, and/or no 4G sales.

16  Each company generally agreed to pay the much higher royalty rates set forth in one

17  of Ericsson's Reference Price Sheets.  A discussion of the Ericsson Reference Price

18  Sheets follows later in this Witness Declaration.  Mr. Kennedy has called these other

19  Ericsson licensees "Pure Play Licensees" (because they typically do not include

20  "meaningful grant-back value to Ericsson").  At this time, I do not know if Mr.

21  Kennedy plans to discuss these other licensees in a witness declaration.  However,

22  because these licensees had limited or no handset sales, had a limited geographical

23  scope to their sales, and/or had no 4G sales, it is my opinion that they are not

24  _____

25  [2] Recently (effective June 30, 2016), Ericsson entered into a cross-license with
    Microsoft, which included a license to Ericsson's 4G SEPs.  However, this
26  Ericsson/Microsoft license was not produced by Ericsson to TCL until December
27  2016.  Because of this late production and the fact no discovery has been taken on
    this license, I have not considered its terms in evaluating whether Microsoft is
28  similarly situated to TCL.

similarly situated to TCL, whereas Apple, Samsung, HTC, Huawei, LG, and ZTE are the most similarly situated.

**B.      Unpacking Ericsson's SEP Licenses to Determine the Effective One-Way Rates**

86.      Most of Ericsson's SEP licenses with the companies similarly situated to TCL happen to be cross-licenses in which Ericsson derives some value from the licensee's patents, and the licensee derives some value from Ericsson's patents.  In most of these cross-licenses, the licensee pays one, or several, time-spaced lump sum payments to Ericsson over the term of the license.  To determine the effective one-way rates being paid by each licensee for a license to Ericsson's SEPs (on a standard-by-standard basis), I have engaged in the process of unpacking these SEP licenses.  That specific process is described below.

1.      The individual components of an effective one-way rate calculation

87.      As discussed in detail below, the effective one-way rate calculation relies on three principle pieces of data:  (1) the net balancing payment agreed to in the cross-license agreement (*i.e.*, the lump sum payment(s) owed by the Ericsson licensee), (2) the revenues earned by each party selling products that use the standards, and (3) the relative strength of each party's patent portfolio.

88.      The first component of the effective one-way rate calculation, also called the net balancing payment, comes directly from the cross-license agreement between Ericsson and the licensee.

89.      The data for the second component of the effective one-way rate calculation – Ericsson's and the licensee's respective revenues – have been gathered from two sources.  The first source of revenue data are the internal Ericsson "business cases" prepared by Ericsson for the Apple, Samsung, HTC, LG, and ZTE licenses (Ericsson did not produce a business case for the Huawei license).  These business cases generally contain historical sales information, as well as projections,

for both the licensee's and Ericsson's relevant product revenues for the term of the license.  The projections are obtained from a third-party organization called Strategy Analytics, another well-known provider of such information.  In each Ericsson business case, there are typically several "scenarios" for the projections:  a "high" scenario, a "medium" scenario, and a "low" scenario, reflecting different future sales expectations.  (Ex. 1179.)  Of note, the business cases are not shared with the licensee.  They are only obtained through document discovery in litigation and are uniformly marked with a level of confidentiality that prevents them from being shared with the negotiators for the potential licensee.

90.     The second source of revenue data comes from an IDC report, which provides reported handset sales, revenues and ASPs through December 31, 2015.  (Ex. 1273.)  While the projections data in the Ericsson business cases allows me to calculate the effective one-way rate Ericsson expected to receive at the inception of the license, the IDC data allows me to calculate the effective one-way rate that has actually been paid from the inception of each license (generally 2014 or 2015) through the end of 2015, based on actual reported sales data.  I note that the IDC data does not contain infrastructure revenue data, so when necessary I use the Ericsson business cases for infrastructure revenues.

91.     The third component of the effective one-way rate calculation is called a portfolio strength ratio ("PSR").  The PSR compares the strength of Ericsson's SEP portfolio to the licensee's SEP portfolio, on a standard-by-standard basis.  There are various approaches to determining the PSR, including (1) determining the PSR based upon the number of actually essential patents (using Dr. Ding's analysis), and (2) determining the PSR based upon a methodology called "contribution counting," which involves tabulating technical contributions to the standard by each party to the cross-license.  A detailed description of the contribution counting methodology is contained in the Witness Declaration of Dr. Bekkers.  It is my opinion that using the number of actually essential patents, as determined by Dr.

1  Ding, is the preferred way to determine the PSR, and I have used that approach

2  wherever possible.

3            2.        The formula used to calculate effective one-way rates

4            92.       The formula I use to unpack Ericsson's cross-licenses – which, I note,

5  is the same formula used by Ericsson's expert Mr. Kennedy – sets the net balancing

6  payment ("NBP" in the graphic below) equal to the difference between the one-way

7  payments that would have been made under individual one-way licenses on a

8  standard-by-standard basis. Each of these "one-way" payments is calculated by

9  multiplying the licensee's revenues by the one-way rate charged by the licensor.

10  Although the net balancing payment, Ericsson's product revenues by standard, and

11  the licensee's product revenues by standard are all known and/or can be projected,

12  the effective one-way rates of both Ericsson and the licensee are not known. This

13  creates one equation with two unknowns:

14

15        *NBP = [Licensee payment to Ericsson] – [Ericsson payment to Licensee]*

16

17  A further refinement of the above equation is expressed as follows:

18

19        *NBP = [Ericsson one-way rate] x [Licensee product sales] –*

20              *[Licensee one-way rate] x [Ericsson product sales]*

21

22            93.       In the above equation, both the Licensee one-way rate and the Ericsson

23  one-way rate are not known. To address this issue, I assume the ratio between the

24  licensee's effective one-way rates and Ericsson's effective one-way rates reflects the

25  relative strengths of each party's patent portfolio. More specifically, the ratio of

26  one-way 2G/3G rates should equal the ratio of 3G standard-essential patent

27

28

families,[3] and the ratio of one-way 4G rates should equal the ratio of 4G standard-essential patent families (the "4G PSR"):

$$2G/3G\ PSR = \frac{Ericsson\ 3G\ SEPs}{Licensee\ 3G\ SEPs} = \frac{Ericsson\ one\text{-}way\ 2G/3G\ rate}{Licensee\ one\text{-}way\ 2G/3G\ rate}$$

$$4G\ PSR = \frac{Ericsson\ 4G\ SEPs}{Licensee\ 4G\ SEPs} = \frac{Ericsson\ one\text{-}way\ 4G\ rate}{Licensee\ one\text{-}way\ 4G\ rate}$$

94.     If the licensee only manufactures handsets, then only Ericsson's handset SEPs should be used in the numerator.  However, if the licensee manufactures both handsets and infrastructure equipment, then Ericsson's handset and infrastructure SEPs, if determinable, are combined and used in the numerator. Similarly, since Ericsson no longer produces handsets, but does produce infrastructure equipment, only the licensee's infrastructure SEPs should be used in the denominator.

95.     Using this assumption, solving for Ericsson's one-way rate is straightforward:

$$NBP = [Ericsson\ one\text{-}way\ rate \times Licensee\ Revenues]$$

$$- \left[\frac{Ericsson\ one\text{-}way\ rate}{PSR} \times Ericsson\ Revenues\right]$$

In sum, the Ericsson one-way rate, by standard, is calculated as follows:

---

[3] This "2G/3G PSR" excludes 2G patents, which are less important and more likely to have expired.  I note that Ericsson's expert, Mr. Kennedy, also calculated combined 2G/3G effective rates.

$$Ericsson\ one\text{-}way\ rate$$
$$= \frac{NBP}{Licensee\ Revenues - \left(\frac{1}{PSR} \times Ericsson\ Revenues\right)}$$

96.     It is important to note that if the net balancing payment covers more than one standard, then the net balancing payment must be apportioned across the multiple standards.  I accomplish this by using proportions of 2G, 3G, and 4G sales revenue.

**C.    Calculation of Effective One-way Rates Based on the Projections from Ericsson's Business Cases**

97.     As noted earlier, I calculate effective one-way rates in two ways: (1) using sales data and projections from the Ericsson business cases, and (2) using reported sales data from IDC.  The unpacking equation used is the same, but the sales data source differs.

98.     Using sales and projections data from the Ericsson business cases, I calculate the effective one-way rates that would have been expected at the time the license was effective.  For this calculation, I use the net present value of the royalty payments, the licensee's sales projections, and Ericsson's sales projections.  Royalty payments and sales projections are discounted back to the effective date of the license.  Each of these components is then added to the unpacking equation to calculate effective one-way rates.

99.     I understand that Ericsson's designated expert, Mr. Kennedy, has also undertaken an unpacking analysis of the same Apple, Samsung, HTC, LG, and ZTE cross-license agreements with Ericsson, also using Ericsson's business cases.  I have reviewed the expert report Mr. Kennedy submitted in this matter and observe that, while Mr. Kennedy uses the same equation described earlier, in many cases he uses different assumptions in his unpacking calculations.  I have responded to Mr. Kennedy's expert report in my rebuttal expert report, which comments on and critiques Mr. Kennedy's unpacking analysis.  I do not know if Mr. Kennedy will

modify any of his opinions in response to my rebuttal report, but I note that his one-way effective rate calculations differ from mine because of, at least, the following reasons:

- Mr. Kennedy uses "discounted units" in his future sale projections to produce dollar-per-unit rates. This significantly increases the Ericsson effective one-way rates, when expressed in dollar per unit terms. I note that "discounting" units, rather than revenues, is a practice not supported by any recognized professional literature in economics or finance.

- Mr. Kennedy's PSR is derived from the contributions counting analysis set forth in the report from Signals Research Group, which was sponsored by Ericsson. (Ex. 410.) This analysis uses the number of approved technical contributions to ETSI as a proxy for the strength of a company's patent portfolio. As stated, I have used Dr. Ding's analysis of the number of actually essential patents whenever possible.

- Mr. Kennedy's apportionment factors (used to divide lump sum payments into 4G and non-4G portions) are calculated using reasoning I find circuitous, in that Mr. Kennedy assumes a percentage-of-revenue royalty rate in the process of calculating another percentage-of-revenue royalty rate, which is then used for apportioning.

- Mr. Kennedy chooses to calculate net present values of royalty payments using discount rates that are much lower than the ones Ericsson uses in its own business cases (and lower than the ones I use, which are consistent with the discount rates used by Ericsson). These lower discount rates increase the effective one-way royalty rates.

- Mr. Kennedy includes released sales and release payments into his effective one-way rate calculations.

- For the Samsung and ZTE calculations, Mr. Kennedy uses projection

scenarios from the Ericsson business cases (lower projected future sales) that operate to increase the Ericsson effective one-way rates. Using more appropriate projection scenarios reduces the effective one-way rates.

- Mr. Kennedy inconsistently includes infrastructure revenues in his one-way effective rate calculations. In particular, he includes infrastructure revenues for the ZTE analysis, and yet excludes them from the Samsung analysis, even though both companies sell infrastructure equipment.

100. Generally, I do not think Mr. Kennedy's assumptions (and the results of applying those assumptions) are appropriate. However, the use of Mr. Kennedy's improper assumptions and resulting methodologies, other than the discounting of both future revenues and unit sales (bullet 1 above), does not have a material impact on the eventual effective one-way rate determinations (the impact is less than 0.10% in the stated rates, and generally less than 0.05%). Of note, if I were to include released sales in my effective one-way rate calculations (as Mr. Kennedy did), the result is that my effective one-way rates *go down*. I reserve the right to further comment on, and demonstrate, the impact of Mr. Kennedy's assumptions and methodologies on my calculations, if implemented by Mr. Kennedy in a witness declaration.

**D.  Calculation of One-way Effective Rates Based on IDC Data**

101. Because the IDC data provides reported sales data for 2014 and 2015, I can also calculate the actual one-way effective rate of each license from the effective date of the license through December 31, 2015. Therefore, the "licensee revenues" variable is based on IDC sales data from the effective date of the license through December 2015. The "Ericsson revenues" variable, however, is based on Ericsson's infrastructure sales projections found in its business cases, as IDC does not provide infrastructure sales numbers. Both revenues and royalty payments are

1   discounted back to the effective date of the license.  Finally, I add the remaining

2   components of the unpacking equation, including the PSRs, to calculate the one-way

3   effective rates based on reported sales data from IDC.

    **E.**    **Determination of the Effective One-way Rates Being Paid by the Licensees Most Similarly Situated to TCL**

        1.    <u>The Apple effective one-way rate for a license to Ericsson's 4G SEPs</u>

8   102.   On December 19, 2015, Ericsson and Apple entered into a global patent

9   cross-license agreement to settle their pending litigations.  (Ex. 258.)  Ericsson and

10   Apple granted one another worldwide licenses to their respective SEPs needed to

11   practice the 2G, 3G, and 4G standards (as well as standards relating to WiFi, MPEG,

12   and other audio/video technology).  In exchange for these rights, Apple agreed to

13   pay Ericsson a one-time, lump sum royalty of ███████ , in addition to royalty

14   payments that were to take the form of either six annual payments of ███████

15   (beginning in 2016), or ████████████ .  According to the most

16   recent deposition testimony from Mr. Gustav Brismark (Ericsson's Chief IP

17   Officer), Apple has thus far elected the lump sum payment option.  (Dep. of Gustav

18   Brismark, 5/18/16, p. 181:10-16.)

19   103.   I understand the December 2015 license begins at the expiration of the

20   prior Apple license (January 2015), effectively creating a seamless license for

21   Apple's prior sales.  I also understand that, in addition to future sales, the ███████

22   release payment covers Apple's prior 4G, IS-95, CDMA2000, EV-DO, and WiFi

23   sales, none of which were covered by the prior license, as well as all 2015 sales.

        *a.*    *The Apple effective one-way rate using the Ericsson business case data and projections*

26   104.   Using the Ericsson business case for its 2015 license with Apple (Ex.

27   259), I was able to determine an effective one-way royalty for Apple's license to

28   Ericsson's 4G SEPs.

105.   As part of my analysis, I addressed the ███████ lump sum payment made by Apple to Ericsson.  According to Mr. Brismark, this payment "covers both past and future payments," as well as other releases and covenants.  (Dep. of Gustav Brismark, 5/18/16, pp. 183:3-15.)

106.   To determine the portion of the ██████ payment that covers past sales (*i.e.*, all 2015 sales and 4G sales prior to 2015), I referred to deposition testimony from Mr. Brismark.  I understand that Apple continued to pay the ████ ██ rate for all of its sales (even those compliant with 4G) through 2014.  However, according to Mr. Brismark, Apple still owed an incremental amount for the 4G sales, which he valued at ██████ per unit.  (Dep. of Gustav Brismark, 5/18/16, p. 184:10-20.)  I calculated the release payment for 3G sales ████████, per the previous license agreement, times the 3.97 million 3G units sold in 2015, for a total of ████████ and the release payment for 4G sales ████████, times the ██████████ 4G units sold in 2015, plus an incremental royalty of ██████████ times the 312.64 million 4G units sold between 3Q 2012 and 4Q 2014 under the previous license, for a total of ██████████.  The remainder of the ██████ ██████████ therefore covered future sales.

107.   Using the same formula and approach described above, I determined the net balancing payments, revenues, and portfolio strengths of the 4G SEPs licensed by Ericsson and Apple, and calculated the effective one-way royalty rates for Apple's 4G sales.

108.   More specifically, I first calculated the present value of the net balancing payment.  This comprised ██ annual payments of ████████ (spanning 2016 through ████ plus the portion of the ██████ upfront payment that covered future sales ██████████  These payments were discounted (to account for the time value of money) using the 10% rate specified by Ericsson in its business case (Ex. 259) for the Apple license.  This produced a total net balancing payment of ██████████

109.   Next, I calculated the Ericsson/Apple 4G PSR.  Because Apple only required a license to Ericsson's handset patents (Apple does not make or sell infrastructure equipment), the numerator of the PSR was the count of Ericsson's actually essential handset SEPs from Dr. Ding's analysis, or 108.  Because Ericsson only required a license to Apple's infrastructure patents (Ericsson does not make or sell handsets), the denominator of the PSR was the count of Apple's actually essential infrastructure SEPs, or 29.  This yielded a 4G PSR of 3.72 (*i.e.*, 108/29).

110.   I also calculated the net present value of Apple's projected handset revenues over the term of its license ▉▉▉▉▉▉▉ and the net present value of Ericsson's projected infrastructure revenues over the term of the license ▉▉▉▉ ▉▉▉▉  As discussed previously, the (undiscounted) revenue projections came from the Ericsson business case, and I used the 10% discount rate found in the same business case to calculate the present value.  Like Mr. Kennedy, I chose to use the "medium" projections scenario (labeled "market scenario 2").

111.   Finally, I inserted these numbers into the Ericsson one-way rate equation:

$$Ericsson\ one\text{-}way\ rate = \frac{Net\ Balancing\ Payment}{Licensee\ Revenues - \left(\frac{1}{PSR} \times Ericsson\ Revenues\right)}$$

$$Ericsson\ one\text{-}way\ rate = \frac{\blacksquare}{\blacksquare - \left(\frac{1}{3.72} \times \blacksquare\right)} = \blacksquare$$

112.   The details of the above calculations are set forth in my Updated Schedules 11F.1, 11F.2, and 11F.3.  (Exs. 1240, 1241 and 1242.)  From my assumptions and calculations, it is my opinion that Apple's effective one-way royalty rate for a license to Ericsson's 4G SEPs is ▉▉▉

b.     The Apple effective one-way for a license to Ericsson's 4G SEPs using IDC data

113.   The Apple license was effective December 19, 2015.  The IDC data I have used in my calculations ends on December 31, 2015, about twelve days later. Therefore, there is insufficient IDC sales data to determine an effective one-way 4G rate using the IDC data.  As a result, I only calculate an effective one-way 4G rate for Apple using the Ericsson business case data and projections.

2.     The Samsung effective one-way rates for a license to Ericsson's 2G, 3G and 4G SEPs

114.   On February 1, 2014, Ericsson and Samsung entered into a global patent cross-license agreement, under which both parties provided one another with worldwide licenses to their respective SEPs and implementation patents.  (Ex. 1276.)  The licensed SEPs include any patents necessary for compliance with the 2G, 3G, and/or 4G standards.  Both parties also provided one another with a covenant not to assert patents infringed by products with 5G, WiMAX, or 802.11 functionality.  In exchange for these rights, Samsung agreed to pay Ericsson a one-time, lump sum release payment of ██████████ for Samsung sales ████████████ ████████████████████████████████████████████████████████████ as well as annual royalty payments for future sales.  (Dep. of Kasim Alfalahi, 1/12/16, p. 203:5-15.)  For each ████ royalty payment, Samsung has the choice of paying either ███████████ or per-unit royalties of ███ for 2G-compliant products, ██ for 3G-compliant products, and ██ for 4G-compliant products.  From reviewing the documents produced by Ericsson, I understand that for 2014 and 2015, Samsung chose the annual ██████ ████████ lump sum payment option.  (Ex. 1199.)

115.   Ericsson has asserted that "additional consideration" exists which should be added to the net balancing payment for the purpose of calculating one-way effective rates for Samsung's license to the Ericsson SEPs.  Adding additional

1  consideration in the form of dollars would operate to increase Samsung's effective

2  one-way rates for a license to the Ericsson SEPs.  Ericsson has argued, for example,

3  that it received valuable and additional compensation from Samsung in the form of a

4  "thin modem commitment" (Samsung agreed to purchase thin modems from

5  Ericsson), and an agreement by Samsung to dismiss an ITC claim, among other

6  considerations.  As an initial observation, Ericsson has not shown (or even offered

7  to show) any amount that should be added to the net balancing payment as a result

8  of the agreement by Samsung to dismiss its ITC claim.

9        116.   In addition, in the business case Ericsson prepared as a part of the

10  Samsung negotiation (Ex. 33), Ericsson attributed a value of ███████ to the

11  Samsung thin modem commitment.  Again, Ericsson has not supported this ███

12  ███ with any evidence, including detailed accounting records.  Moreover, when

13  questioned at his deposition regarding the value Ericsson attributed to this thin

14  modem commitment, Mr. Brismark, the chief architect of the Ericsson business

15  cases, admitted that Samsung did not "buy [the thin modems] in line with our

16  expectations."  (Dep. of Gustav Brismark, 5/18/16, pp. 130:14-132:4.)  When

17  questioned further, Mr. Brismark refused to answer any questions directed at

18  determining the value Ericsson placed on this thin modem commitment, and

19  asserted the attorney-client privilege as the basis for his refusal.  (Dep. of Gustav

20  Brismark, 5/18/16, pp. 132:4-135:12.)  It is my opinion that attributing zero value to

21  the Samsung thin modem commitment would be entirely appropriate given the

22  failure on the part of Ericsson to offer any documentary or testimonial evidence in

23  support of an alternative valuation.

24        117.   I further observe that in evaluating the Samsung license, the Huawei

25  Tribunal noted that Ericsson also contended that "additional considerations,"

26  including the thin modem commitment, should affect the effective royalty rate

27  calculations being undertaken by the arbitrators.  (Ex. 58 at pp. 116-120.)

28  Eventually, the Huawei Tribunal found that the only appropriate adjustment to the

Samsung effective rate calculations involved including ███████ s the value Ericsson received from Samsung's thin modem commitment.  (Ex. 58 at p. 120.) Although I am not aware of Ericsson providing any support for that figure, to be conservative I include the ███████ in my effective one-way rate calculation for Samsung.

> a. *The Samsung effective one-way rates using Ericsson's business case data and projections*

118.   For my analysis of the Samsung license, I used the "high" projections scenario from the Ericsson business case for Samsung.  (Ex. 33.)  Ericsson's business case did not provide guidance as to the scenario Ericsson believed was most likely at the time of the agreement in February 2014.  However, the high scenario was consistent with the projections from Strategy Analytics (Ex. 1179), a well-known market research service that Ericsson's business cases frequently rely upon.  I also understand that the Huawei Tribunal concluded the high scenario was the most appropriate scenario in their effective one-way rate analysis of the same Ericsson business case for Samsung.  (Ex. 58 at p. 114.)

119.   Because Samsung sells both handsets and infrastructure equipment and Ericsson only sells infrastructure equipment, I have calculated the PSR in a slightly different way than Apple, which does not sell infrastructure equipment.  Namely, I adjust the PSRs (by standard) to take into account the number of Ericsson handset and infrastructure SEPs for the numerator, and the number of Samsung infrastructure SEPs for the denominator.  Previously, before considering Mr. Kennedy's analysis and opinions in his expert report, I calculated the PSRs (again by standard) to only take into account the Ericsson handset SEPs for the numerator and the Samsung infrastructure SEPs for the denominator.  Using this earlier calculation of the PSRs by standard has a minor impact on the final determination of effective one-way rates.  I also made an additional adjustment to my original one-way rate calculation for Samsung.  In particular, upon further review of Mr.

Kennedy's expert report, I learned that the Ericsson/Samsung license excludes CDMA sales, so I removed those sales from my prior calculations.  As shown in Updated Schedules 11D.1 to 11D.4 (Exs. 1235, 1236, 1237, 1238), I have adjusted the calculations in Schedules 11D.1 to 11D.4 of my original expert report to reflect both of these changes.  As detailed later, in my opinion these adjustments do not have a significant impact on the resulting effective rate calculations.

120.   After I became aware of the methodology Mr. Kennedy employed in evaluating Ericsson's license with ZTE, I asked Dr. Ding to determine the number of Ericsson's infrastructure SEPs, so that I could update my analysis of the Ericsson effective one-way rates for Ericsson's license with Samsung.  I had previously asked Dr. Ding to calculate the number of HTC, LG, Samsung, and Apple infrastructure SEPs because, in each of those cases, Ericsson would have a royalty obligation to those entities for its infrastructure sales, as a part of their respective cross-licenses. Based upon the information provided by Dr. Ding, I prepared a Second Updated Schedule 11E.  (Ex. 1239.)

121.   From the Second Updated Schedule 11E, Samsung had 84 3G infrastructure SEPs and 198 4G infrastructure SEPs, whereas Ericsson had 169 3G infrastructure SEPs and 156 4G infrastructure SEPs.  Because Samsung sells handsets (but Ericsson does not) it was necessary to include Ericsson's handset SEPs into the calculation of a PSR.  Ericsson had 81 3G handset SEPs and 108 4G handset SEPs.  In sum, the 3G PSR was calculated as:  $[81 + 169]/84 = 2.98$, and the 4G PSR was calculated as:  $[108 + 156]/198 = 1.33$.

122.   Using the unpacking equation described above, and the sales and projections from Ericsson's business case for Samsung, as well as the PSRs identified above, I calculated an effective one-way rate of ▮▮▮▮ for a license to Ericsson's 2G/3G SEPs, and ▮▮▮▮ for a license to Ericsson's 4G SEPs.  (Exs. 1236 and 1238.)  When I instead use the PSR I previously calculated (which did not consider Ericsson's infrastructure SEPs), and also include CDMA sales, the

1 effective one-way rates are ██████ for a license to Ericsson's 2G/3G SEPs, and

2 ██████ for a license to Ericsson's 4G SEPs.

       *b.*    *The Samsung effective one-way rates using IDC data*

4     123.   Using the unpacking equation described above, and actual sales data

5 from IDC, as well as the PSR which accounts for Ericsson's infrastructure SEPs, I

6 calculated effective one-way royalty rates of ██████ for a license to Ericsson's

7 2G/3G SEPs, and ██████ or a license to Ericsson's 4G SEPs.  (Exs. 1235, 1237.)

8 When I instead use the PSR I previously calculated (which did not consider

9 Ericsson's infrastructure SEPs), and also include CDMA sales, the effective one-

10 way rates are ██████ for a license to Ericsson's 2G/3G SEPs, and ██████ for a license

11 to Ericsson's 4G SEPs.

       3.   <u>The HTC effective one-way rates for a license to Ericsson's 2G,

13     3G and 4G SEPs</u>

14     124.   Effective December 31, 2014, Ericsson and HTC entered into a two-

15 year global ██████ agreement.  (Ex. 1275.)  Under this agreement, Ericsson

16 and HTC provided ██████ with worldwide licenses to ██████ patents

17 necessary to comply with the 2G, 3G, CDMA, WiFi, and/or 4G standards.  For any

18 non-essential patents, Ericsson also provided HTC with a covenant not to sue.  HTC

19 agreed to pay Ericsson a one-time, lump sum royalty of ██████.  Though not

20 modeled as such in Ericsson's business case (Ex. 30), the ██████ payment

21 ostensibly covers both sales made during the term of the license (2015 to 2016), as

22 well as the released 2014 sales.  ██████████████████████

23 ██████████████████████

24     125.   Similar to Samsung, Ericsson has claimed it received "additional

25 consideration" that should be added to the net balancing payment in the HTC

26 license, as a result of ██████████████████████ which

27 HTC then used in the Ericsson/HTC license negotiations.  In its business case for

28 the HTC license, Ericsson identified ██████████████████████

1  infrastructure patents which HTC had purchased from the third parties.  (Ex. 58 at

2  pp. 130-132.)  Also similar to the situation with Samsung, Ericsson has failed to

3  provide any proof supporting ███████████████████████████████

4  ███████████████████████████████████████████████████████

5  ██████████████████ (Ex. 58 at p. 132.)  It is my opinion that there is no basis for

6  attributing ████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ████████████████████████████

9            *a.*      *The HTC effective one-way effective rates using Ericsson*

10                      *business case data and projections*

11        126.   For my effective one-way rate analysis and calculations, I used the

12  "high" projections scenario from the Ericsson business case for HTC.  (Ex. 30.)

13  Mr. Kennedy also used the high projections scenario in his analysis.  Because HTC

14  does not sell infrastructure equipment, the PSRs are calculated by dividing the

15  number of Ericsson handset SEPs (by standard) by the number of HTC

16  infrastructure SEPs (by standard).  For 3G, the PSR is calculated to be ████  and

17  for 4G the PSR is calculated to be ████  (Exs. 1231, 1232.)

18        127.   Using the unpacking equation and the sales and projections provided in

19  Ericsson's business case for HTC, I calculated effective one-way royalty rates of

20  ██████  or a license to Ericsson's 2G/3G SEPs, and ██████ for a license to Ericsson's

21  4G SEPs.  (Exs. 1232, 1234.)

22            *b.*      *The HTC effective one-way rates using IDC data*

23        128.   Using the unpacking equation described above, and the 2014 to 2015

24  sales data from IDC, I calculated effective one-way royalty rates of ██████ for a

25  license to Ericsson's 2G/3G SEPs, and ██████ for a license to Ericsson's 4G SEPs.

26  (Exs. 1231, 1233.)

27

28

4.   The Huawei effective one-way rates for a license to Ericsson's 2G, 3G and 4G SEPs

129.   In December 2014, Ericsson and Huawei entered into a global patent cross-license agreement that would be effective November 20, 2014.  (Ex. 1272.) Under this original agreement, Ericsson and Huawei provided each other with worldwide licenses to their respective SEPs necessary to comply with the 2G, 3G, 4G, and WiFi (but not TD-SCDMA) standards.  Ericsson and Huawei also agreed to mutual releases for any infringement (or alleged infringement) that took place between January 1, 2013 and November 20, 2014 (subject to a release payment).

130.   Although the parties entered into the cross-license agreement, there were a number of open, disputed terms which they agreed would be determined via arbitration.  On December 31, 2015, the Tribunal overseeing the arbitration issued a Final Award.  (Ex. 58.)  ██████████████████████ ████████████████████████████████████████████ █████████████████████████████████  The Tribunal arrived at these rates by analyzing Ericsson's cross-licenses with Samsung, HTC, and LG, which the Tribunal determined were similarly-situated to Huawei, for the purpose of calculating the effective one-way rates being paid by these other licensees.  (Ex. 58 at p. 134.)  The Tribunal made a separate determination of the royalties Huawei owed Ericsson for Huawei's sales of infrastructure equipment.  (Ex. 58 at pp. 151-166.)

131.   In mid-January 2016, Ericsson and Huawei executed an updated global patent license agreement which reflected the rates determined by the Tribunal, as well as other issues resolved by the Tribunal.  (Ex. 1277.)  Thus, Huawei's one-way royalty rates are not effective rates determined via an unpacking exercise, but rather are the rates specifically stated in the license agreement: ██████ for a license to Ericsson's 2G/3G SEPs, and ██████ for a license to Ericsson's 4G SEPs.

5.    The LG effective one-way rates for a license to Ericsson's 2G, 3G and 4G SEPs

132.   In June 2014, Ericsson and LG entered into a global patent cross-license agreement.  (Ex. 199.)  ███████████████████████████████████████ ███████████████████████████████████████████████████ These licenses cover the SEPs necessary for compliance with the 2G, 3G, CDMA, and/or 4G standards.  Regarding patents necessary for compliance with the WiFi standard, both parties provided one another with a covenant not to assert.  In exchange for the rights granted under this agreement, LG agreed to pay Ericsson a release payment of ███ million and annual guaranteed payments of ███ million in the second half of 2014, ███ million in both 2015 and 2016, and ███ million in 2017.  I understand the release payment covers 2G and 3G sales from the expiration of the previous license to the effective date of the current license (*i.e.*, sales in 2013 and the first half of 2014), as well as all of LG's 4G sales prior to the effective date of the current license.  In the event LG's annual net sales exceed the annual caps stated in the agreement (starting at ███ billion in 2014), LG agreed to pay additional royalty payments based on its annual net sales.

a.    *Ericsson's contentions regarding additional consideration from LG*

133.   Again, Ericsson has claimed that certain additional considerations should be added to the amounts LG paid Ericsson under the terms of this agreement. Namely, Ericsson has asserted that LG's transfer of 10 patent families to Ericsson, which Ericsson says it contemporaneously valued at $125 million, should be added to the consideration Ericsson received from LG for a license to Ericsson's SEPs.  In addition, Ericsson has also asserted that the Ericsson/LG joint licensing business through PanOptis, which Ericsson valued at ███████ should also be added as additional consideration Ericsson received from LG for a license to Ericsson's SEPs. Under the PanOptis agreement, both Ericsson and LG would transfer patents to

1  PanOptis and PanOptis would license those patents to the industry.  After the patents

2  were licensed by PanOptis, Ericsson would share in the proceeds with LG (and

3  PanOptis.)  Again, Ericsson did not provide any evidence during discovery in this

4  matter to support the $125 million value placed on the patents transferred from LG

5  to Ericsson, nor the ███████████████████████████████████████

6  with LG, via the PanOptis joint licensing agreement.

7       134.   Of note, Ericsson presented evidence at its arbitration with Huawei

8  arbitration regarding these two transactions.  (Ex. 58 at pp. 124-128.)  The Huawei

9  Tribunal considered these transactions and determined there was no basis to take

10  either of them into account in calculating the effective one-way rates for a license by

11  LG to the Ericsson SEPs.  (Ex. 58 at pp. 126, 128.)  I understand Huawei's technical

12  expert Dr. Kakaes determined none of the 10 patent families transferred from LG to

13  Ericsson were essential to the standards in question, and their technical contribution

14  was minimal.  (Ex. 58 at p. 125.)  On the basis of that evidence, the Tribunal placed

15  zero value on the transferred LG patents.

16       135.   In the instant matter, Ericsson put forward the expert report of Mr.

17  Pellegrino to provide a valuation of the transferred LG patents.  In his report, Mr.

18  Pellegrino only provided a value for 8 of the 10 transferred patents.  I found Mr.

19  Pellegrino's valuation of the transferred LG patents to be flawed, unsupported, and

20  unreliable.  As a result I find there is inadequate support for putting a non-zero value

21  on the transferred LG patents.  I reserve the right to more specifically explain my

22  conclusion that Mr. Pellegrino's valuation methodologies and resulting opinions are

23  flawed, unsupported, and unreliable, if Ericsson provides a witness declaration from

24  Mr. Pellegrino.

25       136.   I also understand the PanOptis deal was signed eight months before the

26  LG/Ericsson license and Ericsson has neither demonstrated a connection between

27  the LG/Ericsson license and the PanOptis deal, nor has it offered evidence on the

28  valuation amount.  To date, I understand that Ericsson has not provided any context

1    for the value of the PanOptis deal in the LG business case.  Likewise, Ericsson

2    presented no evidence on the value of any grant-back from PanOptis of essential and

3    implementation patents.  I am not aware of Ericsson providing additional evidence

4    in this case with regard to the PanOptis deal.  As such, in my view, the ████████

5    ██████████████████████████████ on this transaction is reasonable.  (Ex. 58 at pp.

6    126, 128.)  It is my opinion that no value should be attributed to the joint licensing

7    agreement between Ericsson and LG through PanOptis.

8          137.   In summary, based on the above information, there is no basis to take

9    into account any additional considerations under the Ericsson/LG license when

10   calculating LG's effective one-way rates for a license to Ericsson's SEPs, and as a

11   result I do not include any additional consideration in my analysis.

12              *b.*      *The LG effective one-way rates using Ericsson business*

13                     *case data and projections*

14          138.   Unlike the Ericsson business case for Samsung, the Ericsson business

15   case for LG (Ex. 32) did not classify sales projections as "high" or "low."  Initially,

16   as described below, I was unable to calculate effective one-way rates agreed to by

17   LG for a license to the Ericsson SEPs.  Ultimately, as part of my rebuttal to Mr.

18   Kennedy's analysis, I used the same projections he did, which were the lowest of the

19   projections provided in the Ericsson business case for LG, and an alternative

20   methodology to calculate PSRs (by standard) to determine the effective one-way

21   rates for LG's license to Ericsson's SEPs.

22          139.   Using the unpacking equation and projections from Ericsson's business

23   case for LG, as well as the counts of actually essential patents held by Ericsson and

24   LG (as determined by Dr. Ding), I initially calculated a negative effective one-way

25   rate to be paid by LG for a license to Ericsson's SEPs.  This implied that LG would

26   owe no further cash royalties to Ericsson.  As a result, in my opening expert report,

27   the rates stated for LG were the net two-way rates.

28          140.   Because I was unable to calculate effective one-way rates for LG's

1   license to Ericsson's SEPs using the Ericsson business case and Dr. Ding's count of

2   actually essential patents, I decided to use an alternative methodology.  As I

3   indicated earlier, there are other methods and data that may be employed to calculate

4   PSRs.  One of the methods and data sources I referred to earlier is called

5   contribution counting.  The details of the contribution counting methodology are

6   explained in detail in the Witness Declaration of Dr. Bekkers.  Briefly, one identifies

7   a relevant "working group" within the SSO and then counts the number of approved

8   technical contributions per standard submitted by industry participants.  These

9   technical contributions can take various forms, from detailed specifications to the

10  correction of typographical errors.

11      141.   One source of contribution counting data is a report (commissioned by

12  Ericsson) publically available from an organization called Signals Research Group.

13  (Ex. 410.)  If I calculate PSRs using the contribution counting data included in the

14  Signals Research Group report, I calculate effective one-way royalty rates of ██████

15  for LG's license to Ericsson's 2G/3G SEPs, and ██████ for LG's license to

16  Ericsson's 4G SEPs.  (Exs. 1247, 1248.)

17                    *c.*      *The LG effective one-way rates using IDC data*

18      142.   Using the unpacking equation discussed above, the IDC sales data from

19  3Q 2014 through 4Q 2015 (the time from the effective date of the LG license to the

20  end of 2015), and Dr. Ding's count of actually essential patents, again I calculate a

21  negative one-way rate for LG, which implies LG would owe no further cash

22  royalties to Ericsson.  However, if I use the unpacking equation discussed above, the

23  same IDC sales data described above, but PSRs calculated using the contributions

24  counting data from the Signals Research Group report (Ex. 410), I calculate

25  effective one-way royalty rates of ██████ or LG's license to Ericsson's 2G/3G

26  SEPs, and ██████ or LG's license to Ericsson's 4G SEPs.  (Ex. 1245, 1246.)

27

28

6.  There is not sufficient data to calculate reliable effective one-way rates for ZTE's license to Ericsson's 2G, 3G and 4G SEPs.

143.  Effective April 1, 2014, Ericsson and ZTE entered into a █████████ global patent cross-license agreement for their respective 4G SEPs.  (Ex. 1194.) Previously, effective July 1, 2011, Ericsson and ZTE had entered into a █████████ cross-license for their respective 2G and 3G SEPs.  (Ex. 1197.)  This 2011 agreement was amended on October 1, 2015, to extend the license until the end of █████ (Ex. 1200.)

144.  The April 2014 license with ZTE is a very complicated agreement that is made up of fixed quarterly payments, plus running royalties that vary based on the standard(s), the product, and the region into which the products are sold.  (Ex. 1194.)  Under the April 2014 agreement, the licensed SEPs include any patents necessary to comply with the 2G, 3G, and/or 4G standards.  In exchange for this license, ZTE agreed to pay Ericsson a release payment of ██████████ plus fixed quarterly royalty payments of ██████████████████ per year), and running royalties of (1) ██████████ f net selling price for handsets sold in "Territory 1" (which includes the U.S. and most other developed counties) and compliant with *only* 4G, and (2) ███████ of net selling price for handsets sold in Territory 1 and compliant with *at least* 4G (*i.e.*, handsets that are also compatible with 2G and/or 3G standards).  The agreement also defined a "Territory 2," which were less developed countries.  China sales were not included in Territory 1 or Territory 2.

145.  As I indicated in my expert reports (both opening and rebuttal), Ericsson did not produce sufficient information to calculate the effective one-way royalty rates under its license with ZTE.  In particular, Ericsson produced two Ericsson business cases for ZTE.  (Exs. 35, 1196.)  Ericsson did not indicate which business case was actually used in the negotiations leading up to the executed license.  Additionally, neither business case included the appropriate regional components required to analyze the 4G license (Exs. 35, 1196, 1194)*,* which divided

1   sales into the three regions described earlier.  The IDC data I relied upon in my

2   initial expert report similarly did not have the appropriate regional components

3   required to analyze the license, as its regional break-out was limited to the U.S. sales

4   and "the rest of the world" sales.  (Ex. 1273.)  The "rest of the world" number

5   included sales in all other countries, as well as China.

6       146.   Mr. Kennedy purports to calculate effective one-way royalty rates for

7   ZTE.  However, as discussed below, Mr. Kennedy's analysis for ZTE contains a

8   number of errors that should have precluded him from determining effective one-

9   way royalty rates.  Indeed, it appears that Mr. Kennedy uses the lack of information

10  described above to selectively choose data that is most convenient for his analysis.

11  Specifically, Mr. Kennedy uses lower ZTE revenue numbers whenever possible,

12  which leads to calculations of higher effective royalty rates.

13      147.   Mr. Kennedy calculates ZTE's non-4G effective one-way royalty rate

14  as ███ and its 4G effective one-way royalty rate as ███ (Kennedy Rebuttal

15  Report, Exhibit 3.3.1.)  However, I note that Mr. Kennedy's calculated non-4G rate

16  of ███ s *higher* than the multi-mode 3G rate of 1.2% to 1.5% specified in

17  Ericsson's March 2015 Reference Price Sheet (Rev. F) (Ex. 59), and *higher* than the

18  1.2% 3G rate specified in the October 2015 Amendment.  (*Id.*)  The possibility that

19  ZTE would have paid effective royalty rates that are higher than Ericsson's

20  Reference Prices is unlikely, and casts doubt on the reliability of Mr. Kennedy's

21  calculations.  In addition, the fact that Mr. Kennedy's calculated rates should be so

22  close to Ericsson's Reference Price Sheet rates is suspect, given that the 4G license

23  ████████████████████████████████████████████████

24  (Ex. 1194), and Ericsson projected such sales to increase from 33% of total handset

25  sales in 2012 to 43% by 2017.  (Ex. 35 at p. 4.)  Because a substantial portion of

26  ZTE's sales occurred, or were to occur in China, Mr. Kennedy's rate analysis

27  appears to imply an even higher effective one-way 4G rate, which again casts doubt

28  on the reliability of his calculations.

148. There are several possible reasons why Mr. Kennedy's calculated rates for ZTE are so high. First, the Ericsson business case for ZTE which Mr. Kennedy choose to rely upon provides two sets of projections: "Reference" and "Revised." (Ex. 35; *see also* Kennedy Rebuttal Report, Exhibits 3.3.15 and 3.3.16.) It appears the primary difference between these projections is that the "Revised" projections contain lower estimates for 4G sales than do the "Reference" projections. Mr. Kennedy chooses to use the "Revised" projections (*i.e.*, "Handset Revised" and "Infra Revised"), which leads to calculations of higher effective royalty rates. (Kennedy Rebuttal Report, Exhibits 3.3.15 and 3.3.16.)

149. Second, the Ericsson business case Mr. Kennedy chooses to rely on does not provide projections for the full length of the license. For example, the handset and infrastructure sales projections for ZTE end in ███ and the infrastructure sales projections for Ericsson end in ███ (Ex. 35.) The 2014 4G license, however, expires in ███ and the 2011 non-4G license expires (as amended) in ███ (Exs. 1194, 1200.) To continue the analysis, Mr. Kennedy has to assume projections for the missing years. Instead of acknowledging that Ericsson's projections for ZTE assumed a growth in sales, Mr. Kennedy instead chooses to model the missing years of projections by assuming zero growth in revenues. (Kennedy Rebuttal Report, Exhibit 3.3.18.) This, too, leads to calculations of higher effective royalty rates.

150. Third, the Ericsson business case Mr. Kennedy chooses to rely on includes sales revenue for dongles and tablets in its total royalty payment calculation. Mr. Kennedy, however, excludes these revenues. This reduces the royalty base (which appears in the denominator of the effective one-way rate calculation), and thus leads to calculations of higher effective royalty rates.

151. I should also note that in December 2016, Ericsson produced an "Amended and Restated" Ericsson/ZTE global patent license agreement (Ex. 4040) having an effective date of July 1, 2016, and an expiration date of ███

1   ████ as well as a business case (Ex. 4044) which may be related to this new license

2   agreement.  Because of Ericsson's late production, I understand fact discovery

3   regarding the terms and conditions of this new agreement and business case has not

4   been undertaken.  However, I have several observations.  First, this amended and

5   restated license agreement "amends, expands and restates" the earlier "Original

6   GPLA" effective April 1, 2014.  (Ex. 1194.)  I understand, therefore, that the

7   original ZTE license agreement is no longer in effect as it has been amended,

8   expanded and restated "in its entirety."  Second, this new license agreement appears

9   to cover 2G, 3G and 4G SEPs, and provides a fully paid-up license to 2G, 3G, and

10  4G handsets sold in China.  (Ex. 4040 at p. 12.)  According to the new business case

11  (Ex. 4044), China sales are broken out and appear to be ███████████████

12  ████████████  Because this new license agreement appears to completely replace

13  the earlier agreement, this provides an additional reason why the terms of the now-

14  replaced license agreement are not relevant for my opinions.

15       **F.**     **Summary of the Effective One-way Rates of the Licensees Most**

16              **Similarly Situated to TCL**

17       152.   As discussed above, Ericsson has licensed its 2G, 3G, and 4G SEPs to

18  the companies that in my opinion are the most similarly situated with TCL.  The

19  table below illustrates the effective one-way royalty rates for these other Ericsson

20  licensees:

21

22

23

24

25

26

27

28

**Table 2 (PDX 24)**

**Comparison of Effective One-Way Percentage
Royalty Rates for Similarly-Situated Licensees**

| Standard | Ericsson Licensee (Agreement Effective Date) | | | | |
|---|---|---|---|---|---|
| | Apple (12/19/15) | Samsung (2/14/14) | HTC (12/31/14) | Huawei (11/20/14) | LG (6/27/14) |
| 2G/3G | N/A | ■ | ■ | ■ | ■ |
| 4G | ■ | ■ | ■ | ■ | ■ |

Note:

All rates are as a percentage of NSP/ASP.

Rates signified with one asterisk (*) were determined by the Huawei Tribunal.

Rates signified with two asterisks (**) were determined by my one-way rate analysis using the Ericsson Business Case data.

Rates signified with three asterisks (***) were determined by my one-way rate analysis using IDC data for the period 2014-2015.

Source:  Ericsson/Huawei Updated License (Ex. 1194); Huawei Arbitration Final Award (Ex. 58); Schedules 11C.1, 11.C.2 (Exs. 1231, 1232); Updated Schedules 11D.1, 11D.2, 11F.1 (Exs. 1235, 1236, 1240); Rebuttal Schedules 4A.1, 4B.1 (Exs. 1247, 1248).

153.   With respect to licensing Ericsson's 2G/3G SEPs, the table above demonstrates that if the Ericsson business case sales data and projections are used to unpack the Samsung, HTC, and LG licenses, and the actual royalty rates in Huawei's license are applied, the effective one-way rates being paid by the companies that are most similarly situated to TCL are from ■■■■■■■■ If IDC data is used to unpack the Samsung, HTC, and LG licenses, the effective one-way rates are from ■■■■■■■

154.   With respect to licensing Ericsson's 4G SEPs, the table above demonstrates that if Ericsson business case sales data and projections are used to unpack the Apple, Samsung, HTC, and LG licenses with Ericsson, and the actual royalty rates in Huawei's license are applied, the effective one-way rates being paid by the companies that are most similarly situated to TCL are from ■■■■■■■

1   If IDC data is used to unpack the Samsung, HTC, and LG licenses (Apple is

2   excluded because there was insufficient IDC data to calculate Apple's effective one-

3   way rate), the effective one-way rates are from ███████████████

**G.  Other Ericsson Licensees Are Not Similarly Situated to TCL.**

1.   Sharp is not similarly situated to TCL.

6   155.   Effective April 1, 2015, Ericsson and Sharp entered into a █████ year

7   global patent cross-license agreement for their respective SEPs.  (Ex. 1195.)  Under

8   the worldwide licenses granted in this agreement, the licensed SEPs include any

9   patents necessary to comply with the 2G, 3G, and/or 4G standards.  In exchange for

10   this license, Sharp agreed to pay Ericsson running royalties of █████ of net selling

11   price for 3G products and █████ of net selling price for 4G products, ████████

12   ███████████████

13   156.   As noted above in my market description in Section V., Sharp is a very

14   small player in the worldwide handset market, and as a result TCL is not similarly

15   situated to Sharp.  For example, Sharp did not even make the top-25 in combined

16   feature phone and smartphone unit sales for the period of time 1Q 2013 to 4Q 2105.

17   (Ex. 1210.)  Instead, as expressed above, it is my opinion that TCL is much more

18   similarly situated to other companies, such as Apple, Samsung, HTC, Huawei, LG,

19   and ZTE.  A more detailed discussion of Sharp's market presence is contained in the

20   Witness Declarations of Dr. Guo and Mr. Cistulli, upon which I rely in support of

21   my opinions.

22   157.   In addition, Sharp's unique circumstances help explain why it may

23   have agreed to these high royalty rates for a license to Ericsson's SEPs.  In

24   particular, Sharp, at the time of its licensing negotiations with Ericsson, was

25   experiencing a severe decline in profitability and was looking to spin-off its LCD

26   panel business, which includes LCD panels for smartphones.  (Ex. 1182.)

27   Moreover, Sharp's banks, who were holding $5 billion in loans, were pressuring

28   Sharp to make a quick deal.  (Ex. 1183.)  Eventually, Foxconn – the world's largest

maker of panels for iPhones – acquired a two-thirds stake in Sharp, after slashing its original offer.  (Exs. 1184, 1185, 1186.)  Apparently, one of the reasons Foxconn was interested in acquiring Sharp's panel business was to focus on China's clean-energy revolution and *not* on an effort to build the smartphone business.  (Ex. 1186.) For these reasons, including the testimony of Dr. Guo and Mr. Cistulli, it is my opinion that Sharp is not similarly situated to TCL, and the terms of its license agreement with Ericsson are not informative of whether Ericsson has complied with its FRAND obligation relative to TCL.

> ## 2. Ericsson's so-called "Pure Play Licensees" are also not similarly situated to TCL.

158.   Ericsson has also entered into numerous agreements with smaller market players.  As stated earlier, Mr. Kennedy has called these licenses "Pure Play" licenses, apparently because they generally do not include "meaningful grant-back value to Ericsson."  However, as Mr. Kennedy himself acknowledges, to the extent these licenses are relevant at all, they would be limited to the 2G and 3G rates, because none of these Pure Play licensees appears to have "meaningful" 4G sales. (Kennedy Rebuttal Report, p. 40.)  In contrast, TCL is dramatically increasing sales of its 4G handsets, and clearly requires a license covering Ericsson's 2G, 3G and 4G SEPs.

159.   Mr. Kennedy also does not explain why his Pure Play licensees are "comparable" to TCL, even though each of these licensees and their businesses are vastly different from TCL and its operations (especially in terms of the variety of product offerings, the regions targeted, sales volumes, the associated impact of the low sales volumes on the licensee's willingness to negotiate or litigate for a lower rate, and whether a 4G license was necessary, requested or offered, etc.).  I reserve the right to further address these Pure Play licenses, or licensees, if Mr. Kennedy or Ericsson continue to assert they are relevant to a determination of the economic terms of a SEP license between Ericsson and TCL.

## VIII. <u>THE ECONOMIC TERMS ERICSSON HAS OFFERED TCL FOR A LICENSE TO ERICSSON'S SEPS ARE DISCRIMINATORY IN VIOLATION OF ERICSSON'S FRAND COMMITMENT.</u>

160.   Based on the non-discriminatory portion of the FRAND obligation, the royalty rates that Ericsson has proposed to TCL are not FRAND.  As discussed below, these rates vastly exceed the effective one-way rates Ericsson granted to other similarly-situated companies.

### A. <u>Ericsson's Reference Prices</u>

161.   Ericsson has stated that it uses its Reference Price Sheets as a starting point for all of its negotiations for licenses to its SEPs.  The 2G, 3G, and 4G rates in Ericsson's Reference Price Sheets have evolved over time.  For example, Ericsson has mostly lowered the rates, and also added per-unit royalty floors and caps.  Table 3 below provides a summary of some of Ericsson's Reference Prices for end user terminals, which include handsets.

**Table 3 (PDX 25)**

**Summary of Ericsson's Reference Price Sheet
2G, 3G, and 4G Rates for End User Terminals**

| Standard | Ericsson Reference Price Sheet Revision (Date) | | | | |
|---|---|---|---|---|---|
| | Rev. A & B (9/1/09) | Rev. C (6/25/12) | Rev. D (4/17/13) | Rev. E (3/9/14) | Rev. F (3/30/15) |
| GSM/GPRS/EDGE (2G)<br>  Floor<br>  Cap | 2.00% NSP | 2.00% NSP<br>$0.75<br>$5.00 | 1.75% NSP<br>$0.75<br>$4.00 | 1.50% NSP<br>$0.75<br>$4.00 | 1.0%-1.3% NSP<br>$0.40<br>$1.50 |
| WCDMA/HSPA MM (3G)<br>  Floor<br>  Cap | 2.00% NSP | 2.00% NSP<br>$2.00<br>$6.00 | 2.00% NSP<br>$1.50<br>$5.00 | 1.75% NSP<br>$1.50<br>$5.00 | 1.2%-1.5% NSP<br>$0.75<br>$3.00 |
| LTE MM (4G)<br>  Floor<br>  Cap | 2.00% NSP | 3.00% NSP<br>$3.50<br>$8.00 | 3.00% NSP<br>$3.00<br>$7.00 | 2.00% NSP<br>$2.50<br>$6.00 | 1.5%-1.8% NSP<br>$2.00<br>$4.50 |

Note:

These rates are based on the Global Patent License Agreement rates for end user terminals (i.e., phones, smartphones, tablets, etc.) in the Reference Price Sheets.

The royalty is determined by multiplying the specified rate by the net sales price, or NSP, of the end user terminal, subject to per unit floors and caps.  MM refers to multi-mode, which I understand would include the identified standard as well as prior generation standards.  Schedule 6A provides a summary of the reference rates for all of the standards.

Source:  Schedule 6A (Ex. 1216); Ericsson Reference Price Sheets 2009-2015 (Revisions A to F) (Exs. 1193, 267, 269, 270, 271, and 59).

162.   As Table 3 clearly illustrates, over time there has been an overall decline in Ericsson's 2G, 3G, and 4G reference prices.  There is nothing to support the notion that the delineated Ericsson reference prices, in any of the Reference Price Sheets, are necessarily FRAND.  These reference prices were established unilaterally, and internally, by Ericson.  Indeed, Ericsson has never published these reference prices for public scrutiny of whether they are FRAND.  At all times Ericsson has maintained these reference prices as  confidential information, most notably during license negotiations.  (Dep. of Gustav Brismark, 12/18/15, pp. 182:23-183:2.)  Next, I discuss Ericsson's offers to TCL for a license to its 2G, 3G, and 4G SEPs.

## B. Ericsson's Offers to TCL

163.   Ericsson has made multiple offers to TCL for a license to its 2G, 3G, and 4G SEPs, dating back to April 2008, when it offered a 3G license at a rate of 2% of NSP.  All of Ericsson's offers, starting with its second offer in July 2011 up through March 2014 (when TCL filed suit in this case), were similar in nature.  As shown in Table 4 below, they were all cross-licenses, in which Ericsson requested running royalties that were always expressed as a percentage of the net selling price of TCL handsets.

**Table 4 (PDX 26)**

**Summary of Select Ericsson Cross-License Offers to TCL**
**2G, 3G, and 4G Rates for End User Terminals Prior to March 2014**

| Standard | Date of Offer | | | | |
|---|---|---|---|---|---|
| | **7/25/11** | **3/14/12** | **7/23/12** | **3/25/13** | **7/2/13** |
| GSM (2G) | 1.19% NSP | 1.10% NSP | 1.10% NSP | 1.10% NSP | 1.10% NSP |
| GSM/GPRS/EDGE (2G) | 1.69% NSP | 1.75% NSP | 1.50% NSP | 1.50% NSP | 1.50% NSP |
| WCDMA (3G)<br>Floor<br>Cap | 2.00% NSP<br>$2.00<br>$6.00 | 2.00% NSP<br>$1.75<br>$6.00 | 1.50% NSP | 1.50% NSP | 1.50% NSP |
| WCDMA/HSPA (3G)<br>Floor<br>Cap | 2.00% NSP<br>$2.00<br>$6.00 | 2.00% NSP<br>$2.00<br>$6.00 | 1.50% NSP | 1.50% NSP | 1.50% NSP |
| LTE (4G)<br>Floor<br>Cap | N/A | N/A | N/A | 3.00% NSP<br>$3.50<br>$8.00 | 3.00% NSP<br>$2.50<br>$7.00 |
| Release Payment | N/A | $20M | $20M | $10M | $10M |

Note:

For offers that are not shown, generally the offered rates were the same as the prior offer.  Ericsson's July 2011 offer did not include GPRS.  The 4G floors for Ericsson offers were $3.00 in May 2013 and $2.50 in June and July 2013.

Source:  Updated Schedule 8A (Ex. 1222)

164.   As noted in Table 4 above, by March 2013, the proposed rate for 3G devices was 1.50%, and the rate for 4G devices was 3.00%.  Proposed rates for GSM and GSM/GPRS/EDGE were 1.10% and 1.50%, respectively, and remained at

these levels in later offers.

165.   Starting in 2015, in addition to making cross-license offers to TCL, Ericsson also proposed terms for a one-way license to its 2G, 3G, and 4G SEPs.  In March 2015, Ericsson offered TCL a cross-license ("Option A") to its 2G, 3G, and 4G SEPs, under which TCL would pay $30 million in annual lump sum payments, which would cover TCL sales of end user terminals up to a threshold level of $3 billion (implying a minimum blended royalty of 1%, assuming TCL's sales reached the $3 billion threshold), and additional royalties if sales exceeded $3 billion.  In particular, for sales exceeding $3 billion, Ericsson proposed rates of 0.8% of NSP for end user terminals compliant with GSM or GPRS (but not EDGE, WCDMA, HSPA, or 4G), 1.1% of NSP for products compliant with EDGE (but not WCDMA, HSPA, or 4G), 1.5% of NSP for products compliant with WCDMA or HSPA (but not 4G), and 2.0% of NSP for products compliant with 4G.  This initial March 2015 cross-license offer was eventually modified in May 2015 to include a royalty rate for personal computers.  (Ex. 458.)  In all other respects, this license cross-license offer had terms essentially identical to its March 2015 cross-license offer.  The May 2015 Option A license offer is the Ericsson offer I have been asked to analyze and provide an opinion regarding whether it is FRAND compliant.

166.   On the same two dates Ericsson provided TCL with its cross-license Option A offers (March and May, 2015), Ericsson also proposed one-way license offers ("Option B") at rates of 0.8% of NSP for end user terminals compliant with GSM or GPRS (but not EDGE, WCDMA, HSPA, or 4G), 1.0% of NSP for products compliant with EDGE (but not WCDMA, HSPA, or 4G), 1.2% of NSP for products compliant with WCDMA or HSPA (but not 4G), and 1.5% of NSP for products compliant with 4G (with a floor of $2.00 and a cap of $4.50).  (Ex. 459.)  Again, the May 2015 Option B license offer had terms essentially identical to Ericsson's March 2015 Option B one-way license offer, except personal computers were added to the scope of licensed products.  The May 2015 Option B license offer is the Ericsson

offer I have been asked to analyze and provide and opinion regarding whether it is FRAND compliant.

167.   In an effort to evaluate whether Ericsson has complied with its FRAND obligation, I have prepared a table (below) which compares several of Ericsson's earlier offers to TCL (prior to the filing of this suit) to Ericsson's May 2015 Option A and Option B license offers.

**Table 5 (PDX 27)**

**Summary of Select Ericsson Offers to TCL**
**2G, 3G, and 4G Rates for End User Terminals**

| Standard | Date of Offer | | | | |
|---|---|---|---|---|---|
| | Cross 7/25/11 | Cross 3/14/12 | Cross 7/2/13 | Option A Cross 5/15[*] | Option B One-Way 5/15[**] |
| GSM (2G) | 1.19% NSP | 1.10% NSP | 1.10% NSP | 0.80% NSP | 0.80% NSP |
| GSM/GPRS/EDGE (2G) | 1.69% NSP | 1.75% NSP | 1.50% NSP | 1.10% NSP | 1.00% NSP |
| WCDMA (3G)<br>Floor<br>Cap | 2.00% NSP<br>$2.00<br>$6.00 | 2.00% NSP<br>$1.75<br>$6.00 | 1.50% NSP | 1.50% NSP | 1.20% NSP |
| WCDMA/HSPA (3G)<br>Floor<br>Cap | 2.00% NSP<br>$2.00<br>$6.00 | 2.00% NSP<br>$2.00<br>$6.00 | 1.50% NSP | 1.50% NSP | 1.20% NSP |
| LTE (4G)<br>Floor<br>Cap | N/A | N/A | 3.00% NSP<br>$2.50<br>$7.00 | 2.00% NSP | 1.50% NSP<br>$2.00<br>$4.50 |
| Release Payment | N/A | $20M | $10M | TBD | TBD |

Note:

For offers that are not shown, generally the offered rates were the same as the prior offer.  Ericsson's July 2011 offer did not include GPRS.

[*] The rates outlined in the Option A cross-license apply only to TCL sales of licensed products exceeding the threshold value of $3 billion in a fiscal year.  These additional royalties would be paid on top of $30 million annual lump sum royalty payments.  The lump sum payment implied a minimum one-way blended royalty of 1%, which would have been higher if TCL's sales did not reach the $3 billion threshold.  TCL was also given the option to choose between two release payment structures.

[**] The release payment in the Option B one-way license was to be based on a percentage of revenue from sales prior to the Effective Date.

Source:  Updated Schedule 8A (Ex. 1222); Ericsson 5/15 Option A offer (Ex. 458); Ericsson 5/15 Option B offer (Ex. 459).

168.   As Table 5 clearly demonstrates, the rates Ericsson was offering TCL prior to March 2014, when TCL filed its lawsuit, were quite high.  Since that time, Ericsson has offered TCL lower rates for a license to its 2G, 3G, and 4G SEPs (Option A and Option B compared to the pre-lawsuit rates), but, as I discuss below, these Option A and Option B rates still do not comply with Ericsson's FRAND commitment.

## C.      Ericsson's Offers to TCL Are Not FRAND.

169.   The data clearly demonstrates that Ericsson's Option A and Option B offers to TCL are not FRAND, and were not FRAND when they were made.  As shown in Table 6 below, when one compares Ericsson's offers to the effective one-way royalty rates I calculated for the licensees similarly situated to TCL, the differences are stark.  As stated earlier, for 2G/3G sales, the effective one-way rates being paid by TCL's competitors are from ███████████ and yet Ericsson offered TCL one-way rates between 0.8% and 1.2%.  For 4G sales, the effective one-way rates being paid by TCL's competitors are from ██████████ and yet Ericsson offered TCL a one-way rate of 1.5%, with a floor of $2.00.

WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

**Table 6 (PDX 28)**

**Comparison of Ericsson Licensees' Effective One-Way Percentage Royalty Rates with Ericsson's Offer to TCL Under Option B**

| Standard | Ericsson Licensee | | | | | TCL Option B (5/15/15) |
|---|---|---|---|---|---|---|
| | Apple (12/19/15) | Samsung (2/14/14) | HTC (12/31/14) | Huawei (11/20/14) | LG (6/27/14) | |
| 2G/3G | | ■ | ■ | | ■ | ■ |
| 4G | ■ | ■ | ■ | ■ | ■ | ■ |

Note:

The Huawei one-way rates are directly from its updated agreement with Ericsson.

A "*" indicates the one-way rates calculated from the Ericsson Business Cases for Apple, Samsung (High), HTC, and LG.

A "**" for Samsung indicates the one-way rates calculated using the medium Business Case.

For Samsung, HTC, and LG the rates displayed without a "*" or "**" were calculated using IDC data.

The 2G and 3G rates offered by Ericsson under Option B were:  0.8% for GSM, 1.0% for GSM/GPRS/EDGE, and 1.2% for WCDMA.  (Ex. 459.)

In its May 2015 cross-licensing offer, Option A, Ericsson offered TCL specified royalties in the form of $30 million annual lump sum payments for sales up to $3 billion (resulting in an implied rate of 1.0%, assuming the full $3 billion in sales), with additional royalties due for sales exceeding $3 billion (e.g., 0.8% for GSM/GPRS, 1.1% for EDGE, 1.5% for WCDMA, and 2% for 4G.  (Ex. 458.)  These additional running royalty rates are even higher than the Option B rates.

Source:  Ericsson/Huawei Updated License (Ex. 1277); Huawei Arbitration Final Award (Ex. 58); Schedules 11C.1, 11.C.2 (Exs. 1231, 1232); Updated Schedules 11D.1, 11D.2, 11F.1 (Exs. 1235, 1236 and 1240); Rebuttal Schedules 4A.1, 4B.1, 9A (Exs. 1245, 1247, 1225); Option A (Ex. 458); Option B (Ex. 459).

170.   These differences in rates would have a substantial real-world impact on the total royalties TCL would have to pay Ericsson.  For example, Table 7 (below) illustrates the differences in the total royalty payments TCL would have paid in 2014 and 2015 using the effective percentage rates being paid by its competitors, as compared to the rates in Ericsson's Option B offer.[4]

---

[4] I performed the same calculation with respect to Option A in my rebuttal expert report, but the Court struck it in its order dated January 4, 2017.

**Table 7 (PDX 29)**

**TCL Expected Royalty Payments for 2014 and 2015 Under Various Scenarios ($ Millions)**

| Standard | Similarly Situated Licensees | | | | | Option B Rates |
|---|---|---|---|---|---|---|
| | Lynde Calculated One-Way Rates | | | | | |
| | Apple Rates | Samsung Rates | HTC Rates | LG Rates | Huawei Rates | |
| 2G | ■ | ■ | ■ | ■ | ■ | $6.5 |
| 3G | | | ■ | ■ | ■ | $51.5 |
| 4G | | | | | | $28.7 |
| Total | | | | | | $86.7 |

Note:

The royalty payments cover sales during 2014 to 2015.

These calculations are based on TCL-produced sales data and on the one-way effective royalty rates I calculated using the Ericsson business case sales data and projections (except for the calculation using the Huawei rates, which uses the rates specifically stated in Ericsson's license with Huawei).

I use the one-way 4G rate calculated for Apple to determine TCL's expected royalty payments for its 2G, 3G, and 4G sales.

Source:  Schedule 12B (Ex. 1244); Rebuttal Schedules 12A and 12B (Exs. 1255 and 1256).

171.   As Table 7 demonstrates, the royalties TCL would have paid Ericsson under Option B based on TCL's actual sales in 2014 and 2015 are ■ more (in dollars) than the royalties TCL would have paid Ericsson under the effective one-way royalty rates enjoyed by TCL's competitors.  In my opinion, this clearly illustrates that Ericsson's Option B offer to TCL was and is discriminatory, and hence not FRAND-compliant, when compared to the effective one-way rates being paid by those Ericsson licensees that are similarly situated to TCL.

172.   Yet another way to demonstrate the discriminatory nature of Ericsson's Option A and Option B offers to TCL, as well as the real-world impact the offers would have on TCL, is to examine the percentage of each licensee's revenue for licensed products that Ericsson receives as royalty payments from that licensee, as compared to the percentage of TCL's licensed revenues that Ericsson would receive as royalty payments from TCL under Option A or Option B.  Tables 8 and 9 below

1 summarize these findings, with Table 8 (below) using data from Ericsson's business

2 cases and actual TCL sales data, and Table 9 (below) using data from IDC.

**Table 8 (PDX 30)**

**Comparison of Royalty Payments as a Percentage of Revenue**
**(2014 and 2015 Sales, Based on Ericsson Business Cases and TCL Data)**

| Year | Ericsson Licensee | | | | TCL | |
| | Apple | Samsung | HTC | LG | Option A | Option B |
|---|---|---|---|---|---|---|
| 2014 | | | | | 1.06% | 1.27% |
| 2015 | | | | | 1.05% | 1.47% |
| Combined | | | | | 1.05% | 1.36% |

Source:  Rebuttal Schedules 11B, 11D, 11E, 11F (Exs. 1250, 1252, 1253, 1254)

**Table 9 (PDX 31)**

**Comparison of Royalty Payments as a Percentage of Revenue**
**(2014 and 2015 Sales, Based on IDC Data)**

| Year | Ericsson Licensee | | | | | TCL | |
| | Apple | Samsung | HTC | Huawei | LG | Option A | Option B |
|---|---|---|---|---|---|---|---|
| 2014 | | | | | | 1.13% | 1.21% |
| 2015 | | | | | | 1.18% | 1.31% |
| Combined | | | | | | 1.16% | 1.26% |

Source:  Rebuttal Schedules 11A, 11C, 11D, 11E, 11F (Exs. 1249, 1251, 1252, 1253, 1254)

20     173.   As shown in Table 8 (above), using the Ericsson business case data for

21 Apple, Samsung, HTC, and LG (Ericsson did not provide a business case for

22 Huawei), as well as the TCL actual sales data for 2014 and 2015, I find that the total

23 royalties paid by Apple, Samsung, HTC and LG ranged from ██████████ of

24 their revenues for licensed products.  In contrast, Ericsson's May 2015 offers (*i.e.*,

25 Option A and Option B) would have cost TCL between 1.05% and 1.36% of its

26 licensed revenues.  For the combined two-year period 2014-2015, Apple paid ████

27 of its revenue for licensed products, whereas TCL would pay between 1.05% and

28 1.36% of its licensed revenue, approximately ██████████ under Option A and

WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

1  nearly ████████ under Option B.  For Samsung and LG, TCL would pay

2  between ████████████████ and for HTC between ████████████████

3  ████

4        174.   Alternatively, as shown in Table 9 (above), using the IDC sales data as

5  the source for 2014 and 2015 sales, I find that the total royalties paid by Apple,

6  Samsung, HTC, Huawei, and LG under their licenses with Ericsson are between

7  ████ and ████ of their licensed 2G, 3G, and 4G handset revenues.  On the other

8  hand, Option A and Option B would have cost TCL between 1.16% and 1.26% of its

9  revenues.  For the combined two-year period 2014-2015, Apple paid ████ of its

10 revenue for licensed products, whereas TCL would pay between 1.16% and 1.26%

11 of its licensed revenue, approximately ████████ than under Option A and

12 Option B.  For Samsung, HTC, and LG, TCL would pay between ████████

13 ████ and for Huawei, around ████████

14       175.   It is my opinion that the analysis and summarization set forth in Tables

15 8 and 9 demonstrate that Ericsson's Option A and Option B offers to TCL were and

16 are discriminatory, and hence not FRAND-compliant, when compared to the

17 effective one-way rates being paid by those Ericsson licensees that are the most

18 similarly situated to TCL.

19

20       I declare under penalty of perjury under the laws of the United States of

21 America that the foregoing is true and correct.

22       Executed on January 11, 2017, at _____San Francisco_____.

23

24                                    Matthew R. Lynde, Ph.D.

25

26

27

28

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| 30 | Strategy Analytics spreadsheet titled "Global Handset Shipments Forecast by Vendor by Quarter: 2000 to 2015," dated Dec. 2014 (ERIC_TCL00115359) |
| 32 | LG Business Case spreadsheet (ERIC_TCL00115357) |
| 33 | Samsung Business Case spreadsheet (ERIC_TCL00115360) |
| 35 | ZTE Business Case spreadsheet (ERIC_TCL00115358) |
| 58 | Final arbitration award between Ericsson and Huawei, dated 12/31/15 (ERIC_TCL00760668-ERIC_TCL00760848) |
| 59 | Reference Price Sheet dated 3/30/15 [Rev. F] (ERIC_TCL00117038) |
| 142 | TCL spreadsheet providing sales by standard and revenue summary from 07Q1-15Q4 (TCL_ERIC_CDCA1278885-TCL_ERIC_CDCA1278887) |
| 199 | License Agreement between LG Electronics and Ericsson dated 6/27/14 (ERIC_TCL00111387-ERIC_TCL00111409) |
| 258 | License Agreement between Apple and Ericsson dated 12/19/15 (ERIC_TCL00762392-ERIC_TCL00762424) |
| 259 | Apple Business Case (ERIC_TCL00767910) |
| 267 | Reference Price Sheet dated 9/1/09 [Rev. B] (ERIC_TCL00117049) |
| 269 | Reference Price Sheet dated 6/25/12 [Rev: C] (ERIC_TCL00120726-ERIC_TCL00120729) |
| 270 | Reference Price Sheet dated 4/17/13 [Rev. D] (ERIC_TCL00249971-ERIC_TCL00249976) |
| 271 | Reference Price Sheet dated 3/9/14 (Rev. E) (ERIC_TCL00308320) |

| Exhibit No. | Description |
|---|---|
| 410 | Signals Research Group report titled "The Essentials of Intellectual Property: Quantifying Technology Leadership in the Development of the LTE Standard," dated Sep. 2010 (ERIC_TCL00116726-ERIC_TCL00116760) |
| 429 | Curriculum Vitae of Matthew R. Lynde |
| 458 | Ericsson's FRAND Offer to TCL (Cross-License) dated 5/8/15 ("TCL Option A") |
| 459 | Ericsson's FRAND Offer to TCL (One-Way License) dated 5/8/15 ("TCL Option B") |
| 1179 | Strategy Analytics publication titled "Global Handset Shipments Forecast by Vendor by Quarter: 2000 to 2014," Dec. 2013 (TCL_ERIC_CDCA1542193-TCL_ERIC_CDCA1542205) |
| 1182 | Phone Arena publication titled "Sharp Looking to Spin Off its Smartphone and Tablet LCD Panels Business Unit," dated 4/5/15 (TCL_ERIC_CDCA1547658) |
| 1183 | Wall Street Journal publication titled "Sharp Pressed to Find Investors in Smartphone Display Business," by E. Pfanner, dated 9/25/15 (TCL_ERIC_CDCA1547659-TCL_ERIC_CDCA1547662) |
| 1184 | Wall Street Journal publication titled "Reasons Why Foxconn Wants Sharp," by E. Dou, dated 2/24/16 (TCL_ERIC_CDCA1547663-TCL_ERIC_CDCA1547665) |
| 1185 | Reuters publication titled "Foxconn Agrees to Buy Sharp After Slashing Original Offer," by M. Yamazaki, 3/30/16 (TCL_ERIC_CDCA1547666-TCL_ERIC_CDCA1547669) |
| 1186 | Technology Review publication titled "Foxconn Wants to Become a Global Force in Clean Energy," by R. Martin, 4/6/16 (TCL_ERIC_CDCA1547670-TCL_ERIC_CDCA1547672) |
| 1193 | Reference Price Sheet dated 8/25/09 [Rev. A] (ERIC_TCL00117048) |
| 1194 | License Agreement between ZTE and Ericsson dated 4/1/14 (ERIC_TCL00110820-ERIC_TCL00110846) |
| 1195 | License Agreement between Sharp and Ericsson dated 4/1/15 (ERIC_TCL00387840-ERIC_TCL00387861) |

| Exhibit No. | Description |
|---|---|
| 1196 | ZTE Business Case spreadsheet (China) (ERIC_TCL00499840) |
| 1197 | License Agreement between ZTE and Ericsson dated 7/1/11 (ERIC_TCL_EDTXIP00049647-ERIC_TCL_EDTXIP00049667) |
| 1199 | Ericsson Royalty Payment Schedule for Samsung (ERIC_TCL00485324) |
| 1200 | Amendment to license agreement between ZTE and Ericsson dated 10/1/15 (ERIC_TCL00488830-ERIC_TCL00488832) |
| 1201 | Schedule 1A titled "TCL Worldwide Annual Mobile Phone Unit Sales by Technology (Based on IDC Sales Data), 2009 – 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1202 | Schedule 1B titled "TCL Worldwide Annual Mobile Phone Revenue by Technology (Based on IDC Sales Data), 2009 – 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1203 | Schedule 1C titled "TCL Worldwide Annual Mobile Phone Average Sales Price by Technology (Based on IDC Sales Data), 2009 – 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1204 | Schedule 1D entitled: "TCL Worldwide Quarterly Mobile Phone Unit Sales by Technology (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1205 | Schedule 1E entitled: "TCL Worldwide Quarterly Mobile Phone Revenue by Technology (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1206 | Schedule 1F titled "TCL Worldwide Quarterly Mobile Phone Average Sales Price by Technology (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1207 | Schedule 2A titled "TCL Handset and Tablet Unit Sales by Generation (Based on TCL Sales Data), 3Q 2009 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Exhibit No. | Description |
|---|---|
| 1208 | Schedule 2B titled "TCL Handset and Tablet Revenues by Generation (Based on TCL Sales Data), 3Q 2009 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1209 | Schedule 2C titled "TCL Handset and Tablet ASPs by Generation (Based on TCL Sales Data), 3Q 2009 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1210 | Schedule 3A titled "Worldwide Quarterly Mobile Phone Unit Sales by Vendor Group (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1211 | Schedule 3B titled "Worldwide Quarterly Mobile Phone Unit Market Share by Vendor Group (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1212 | Schedule 3C entitled: "Worldwide Quarterly Mobile Phone Revenue by Vendor Group (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1213 | Schedule 3D entitled: "Worldwide Quarterly Mobile Phone Revenue Market Share by Vendor Group (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1214 | Schedule 3E entitled: "Worldwide Quarterly Mobile Phone Average Sales Price by Vendor Group (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1215 | Schedule 3F titled "Worldwide Quarterly Mobile Phone Average Sales Price by Generation (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1216 | Schedule 6A entitled: "Ericsson's Reference Price Sheet Rates for 2G, 3G, and 4G End User Terminals," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1219 | Schedule 7A titled "Summary of Ericsson License Agreements with TCL and Similarly Situated Companies," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |

| Exhibit No. | Description |
|---|---|
| 1220 | Schedule 7B titled "Summary of Other Ericsson License Agreements," Expert Report of Matthew R. Lynde, submitted February 22, 2016; and Updated Schedule 7B.1, entitled: "Summary of iBall (Best IT World) and Ericsson License Agreement," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1221 | Schedule 7C entitled: "Ericsson Licenses Including 4G to Select Other Companies in 2014 and 2015 (Include License to End User Terminals)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1222 | Updated Schedule 8A titled "Ericsson's Offers to TCL, Rates for 2G, 3G, and 4G End User Terminals," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1225 | Schedule 9A titled "Patent Families Declared Essential to ETSI for End-User Terminals," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1226 | Schedule 9B titled "Analysis of Patent Families Found Essential to the GSM (2G) Standard for End-User Terminal Products," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1227 | Schedule 9C titled "Analysis of Patent Families Found Essential to the UMTS (3G) Standard for End-User Terminal Products," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1228 | Schedule 9D titled "Analysis of Patent Families Found Essential to the LTE (4G) Standard for End-User Terminal Products," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1231 | Schedule 11C.1 titled "HTC Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1232 | Schedule 11C.2 entitled: "HTC Effective One-Way Royalty Rate Calculation (Based on Business Case Projections)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1233 | Schedule 11C.3 entitled: "Calculations Underlying Effective Royalty Rate Calculations for HTC (Based on IDC Sales Data), 1Q 2014 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |

1

| Exhibit No. | Description |
|---|---|
| 1234 | Schedule 11C.4 titled "Calculations Underlying Effective Royalty Rate Calculations for HTC (Based on Business Case Projections), 1Q 2014 – 4Q 2016," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1235 | Updated Schedule 11D.1 titled "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1236 | Updated Schedule 11D.2 titled "Samsung Effective One-Way Royalty Rate Calculation (Based on High Business Case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1237 | Updated Schedule 11D.3 titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on IDC Sales Data), 1Q 2014 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1238 | Updated Schedule 11D.4 titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on High Business Case Projections), 1Q 2014 – 4Q 2020," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1239 | Second Updated Schedule 11E titled "Estimated Number of Essential Infrastructure Patent Families," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1240 | Updated Schedule 11F.1 titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on Business Case Projections)," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1241 | Updated Schedule 11F.2 titled "Calculations Underlying Effective LTE Royalty Rate Calculations for Apple (Based on Business Case Projections), 1Q 2016 – 4Q 2021," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1242 | Updated Schedule 11F.3 titled "Summary of Apple Released Sales Prior to 2016 (Based on IDC Sales Data), 3Q 2012 – 4Q 2015," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |

| Exhibit No. | Description |
|---|---|
| 1244 | Schedule 12B titled "TCL Expected Royalty Payments to Ericsson for 2014 and 2015 Sales Based on Huawei Tribunal Determined Rates," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1245 | Rebuttal Schedule 4A.1 entitled: "LG Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1246 | Rebuttal Schedule 4A.2 entitled: "Calculations Underlying Effective Royalty Rate Calculations for LG (Based on IDC Sales Data), 3Q 2014 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1247 | Rebuttal Schedule 4B.1 entitled: "LG Effective One-Way Royalty Rate Calculation (Based on Business Case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1248 | Rebuttal Schedule 4B.2 entitled: "Calculations Underlying Effective Royalty Rate Calculations for LG (Based on Business Case Projections), 3Q 2014 – 4Q 2017," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1249 | Rebuttal Schedule 11A entitled: "Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1250 | Rebuttal Schedule 11B entitled: "Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson (Based on Business Case Projections and TCL Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1251 | Rebuttal Schedule 11C titled "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by Huawei (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1252 | Rebuttal Schedule 11D titled "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by TCL Under Option A," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |

| Exhibit No. | Description |
|---|---|
| 1253 | Rebuttal Schedule 11E titled "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by TCL Under Option B," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1254 | Rebuttal Schedule 11F entitled: "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by Apple," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1255 | Rebuttal Schedule 12A entitled: "TCL Expected Royalty Payments to Ericsson for 2014 and 2015 Sales Based on Select Ericsson Offers," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1256 | Rebuttal Schedule 12B entitled: "TCL Expected Royalty Payments to Ericsson for 2014 and 2015 Sales Based on Lynde Calculated One-Way Rates," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1267 | "Intellectual Property Rights and Standard-Setting Organizations," by M. Lemley, 2002 (TCL_ERIC_CDCA0003641-TCL_ERIC_CDCA0003733) |
| 1268 | Gartner publication titled "SWOT: TCL Communications, Mobile Devices, Worldwide," 5/7/15 (TCL_ERIC_CDCA0909952-TCL_ERIC_CDCA0909965) |
| 1269 | IDC's Worldwide Mobile Phone Tracker Taxonomy, 2015 (TCL_ERIC_CDCA1331766-TCL_ERIC_CDCA1331797) |
| 1272 | License Agreement between Huawei and Ericsson dated 11/20/14 (ERIC_TCL00489472-ERIC_TCL00489502) |
| 1273 | Spreadsheet titled "IDC WW Quarterly Mobile Phone Tracker, 2015 Q4 Historical Release," dated 2/12/16 (TCL_ERIC_CDCA1357001) |
| 1275 | License Agreement between HTC Corporation and Ericsson dated 12/31/14 (ERIC_TCL00116288-ERIC_TCL00116314) |
| 1276 | License Agreement  between Samsung and Ericsson dated 2/1/14 (ERIC_TCL00111459-ERIC_ TCL00111481) |

1

| Exhibit No. | Description |
|---|---|
| 1277 | License Agreement between Huawei and Ericsson dated 1/13/16 (ERIC_TCL00762293-ERIC_TCL00762324) |
| 1278 | Ericsson 2014 Annual Report (ERIC_TCL00115102-ERIC_TCL00115281) |
| 1719 | TCL Press Release titled "TCL Communication Announces Shipment Figures of Handsets and Other Products for December," dated 1/8/16 |
| 4040 | 7/1/2016 Ericsson/ZTE License (ERIC_TCL00815981 - ERIC_TCL00816006) |
| 4044 | ZTE Business Case (2016) NATIVE VERSION (ERIC_TCL00816054) |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## CERTIFICATE OF SERVICE

2

3

    At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA  92130.

4

5

6

7

    On January 11, 2017, I caused to be served the PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS MATTHEW R. LYNDE, Ph.D. to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

8

9

10

    BY EMAIL OR ELECTRONIC TRANSMISSION:  I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

11

12

13

14

15

16

17

18

19

20

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

21

22

23

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

24

Executed on January 11, 2017, at San Diego, California.

25

        By:  */s/ Kristina Grauer*
              KRISTINA GRAUER

26

27

28