1

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations

2

STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com

3

MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com

4

MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com

5

12275 El Camino Real, Suite 200
San Diego, California 92130-2006

6

Telephone: 858.720.8900
Facsimile: 858.509.3691

7

8

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT Mobile
Limited, and TCT Mobile (US) Inc.

9

10

11

UNITED STATES DISTRICT COURT

12

FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

13

14

TCL COMMUNICATION
TECHNOLOGY HOLDINGS, LTD., *et al.*,

15

16

Plaintiffs,

17

v.

18

TELEFONAKTIEBOLAGET LM
ERICSSON, *et al.*,

19

Defendants.

20

21

TELEFONAKTIEBOLAGET LM
ERICSSON *et al.*,

22

23

Plaintiffs,

24

v.

25

TCL COMMUNICATION
TECHNOLOGY HOLDINGS, LTD. *et al.*,

26

27

Defendants.

28

Case No. SACV14−00341 JVS (DFMx)
Consolidated with CV15-02370

**PLAINTIFFS' REBUTTAL DECLARATION OF EXPERT WITNESS MATTHEW R. LYNDE, Ph.D.**

Place: Courtroom 10C
Before Hon. James V. Selna

Discovery Cut-Off:  May 23, 2016
Pre-Trial Conf.:  Feb. 1, 2017
Trial: Feb. 14, 2017

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

**Page**

I.  ASSIGNMENT AND SUMMARY OF OPINIONS ................................... 1

II. REBUTTAL TO MR. KENNEDY AND DR. TEECE'S COMPARABLE LICENSE ANALYSIS ...................................... 2

    A.  Mr. Kennedy and Dr. Teece's Opinion that Ericsson's Licenses Indicate a FRAND "Range" Is Incorrect. .......................... 2

    B.  Mr. Kennedy and Dr. Teece's Determination of Which Licensees Are Most Similarly Situated Is Flawed and Unreliable. ..................... 3

        1.  Ericsson's "two-way licenses" ................................... 6

            a.  Apple ................................................ 6

            b.  Samsung ........................................... 8

            c.  LG .................................................. 9

            d.  HTC ............................................... 11

            e.  ZTE ............................................... 12

            f.  Sharp .............................................. 13

        2.  Ericsson's "one-way" (formerly "Pure Play") licenses ............. 14

            a.  Huawei ............................................ 14

            b.  Yulong (Coolpad) ................................. 15

            c.  Karbonn ........................................... 17

            d.  Doro .............................................. 18

            e.  Other one-way licensees ........................... 20

                (1)  Audioline ................................... 20

                (2)  Bea-fon .................................... 21

                (3)  CAT (Bullitt) .............................. 22

                (4)  Binatone ................................... 22

                (5)  Emporia ................................... 23

                (6)  Mobistel ................................... 24

         3.  Conclusion regarding licensees most similarly situated to TCL ..................................................... 25

    C.  Mr. Kennedy's Decision to Convert Every Royalty into a Dollar-

REBUTTAL WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

Per-Unit Rate for Comparison Purposes Is Improper. ........................... 26

D.   Mr. Kennedy's Calculation of the "Effective Rates" Under the
     Two-Way Licenses Is Flawed and Unreliable. ..................................... 29

     1.   Mr. Kennedy's use of Ericsson's approved contribution
          counting method to create a Portfolio Strength Ratio is
          suboptimal. ................................................................................. 29

     2.   Mr. Kennedy's "apportionment factors" calculations are
          based on circuitous reasoning. .................................................. 31

     3.   Mr. Kennedy's decision to account for "differential risk"
          diverges from the methods Ericsson uses in its business
          cases. ......................................................................................... 33

     4.   Mr. Kennedy includes all released sales and release
          payments, even though some only apply to past events. ............. 34

     5.   Mr. Kennedy chooses to use projection scenarios from the
          Ericsson business cases that would lead to higher royalty
          rate calculations. ...................................................................... 36

E.   Mr. Kennedy's Calculation of the "Effective Rates" Under the
     One-Way Licenses Is Flawed. ............................................................ 36

F.   Mr. Kennedy Improperly Unpacks Ericsson's Option A and
     Option B Offers. ................................................................................ 37

G.   Mr. Kennedy Improperly Compares My Illustrative One-Way
     Dollar-Per Unit Rates for Select Ericsson Licensees with His
     Determined Dollar-Per Unit Rates. .................................................... 38

III.   **MR. PELLEGRINO'S VALUATION OF THE TRANSFERRED
       LG PATENTS IS HIGHLY FLAWED AND UNRELIABLE.** ................ 39

A.   Mr. Pellegrino Assumes (Without Basis) that the Transferred LG
     Patents Are in High Demand and Have No Competing
     Alternatives. ...................................................................................... 40

B.   Mr. Pellegrino's Valuation Methodology Is Unsupported and
     Unreliable. ........................................................................................ 42

IV.   **CONCLUSIONS REGARDING ERICSSON'S BREACH OF ITS
      FRAND OBLIGATION** ............................................................................ 44

## REBUTTAL DECLARATION OF DR. MATTHEW R. LYNDE

I, Dr. Matthew R. Lynde, declare under penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.    ASSIGNMENT AND SUMMARY OF OPINIONS

1.    Counsel for TCL have asked me to address and respond to certain opinions of Ericsson's experts as outlined in their witness declarations, including: Mr. David Kennedy, Ericsson's financial licensing expert (Dkt. 1333); Dr. David Teece, Ericsson's expert with regard to the economics of FRAND licensing (Dkt. 1331); and Mr. Michael Pellegrino, Ericsson's valuation expert with regard to the LG patents acquired by Ericsson (Dkt. 1323).  As discussed below and in my original Witness Declaration (Dkt. 1318), I have also considered the witness declarations of other TCL experts (*i.e.*, Dr. Rudi Bekkers, Dr. Janusz Ordover, Dr. Gregory Leonard, Dr. Apostolos "Paul" Kakaes, Dr. Zhi Ding, and Dr. Andrew Wolfe) and fact witnesses (*i.e.*, Dr. George Guo and Mr. Steve Cistulli).

2.    In general, I maintain the opinions in my original Witness Declaration as supplemented below.  As discussed below, I disagree with Mr. Kennedy and Dr. Teece's opinion that Ericsson's licenses indicate a FRAND "range."  I also disagree with their conclusion that TCL is not similarly situated to Apple, Samsung, LG, HTC, and Huawei.  TCL directly competes with all of these companies in many markets, and at many price points, through a wide variety of product offerings.  I also disagree that TCL is similarly situated to Sharp, Coolpad, or Karbonn, as these companies primarily compete in very limited markets (Japan, China, and India, respectively), and their sales volumes are nowhere near TCL's sales volumes.  I further disagree with Mr. Kennedy's exclusive reliance on dollar-per-unit rates. SEP licenses are not like hard-good components in a mobile phone, and I understand that Ericsson has never tried to price them that way until now.  Indeed, the wide variety in Mr. Kennedy's own dollar-per-unit rate calculations demonstrates that there is not a fixed dollar-per-unit value for a SEP license, the same way there might

1   be for a battery, for example.  As I discuss below, although we agree on the same

2   formula, there are many flaws in how Mr. Kennedy has unpacked Ericsson's

3   licenses (although most do not have a significant impact on the resulting rates).

4   Finally, Mr. Pellegrino's attempt to value the patents transferred by LG is flawed

5   and unreliable.

6   **II.**     **REBUTTAL TO MR. KENNEDY AND DR. TEECE'S COMPARABLE**

7   **LICENSE ANALYSIS**

8       **A.**     **Mr. Kennedy and Dr. Teece's Opinion that Ericsson's Licenses**

9          **Indicate a FRAND "Range" Is Incorrect.**

10       3.     Mr. Kennedy and Dr. Teece have suggested that if another company

11   has agreed to pay certain terms, as demanded by Ericsson, then those terms are

12   FRAND (in other words, that Ericsson's licenses create a FRAND "range").  (Dkt.

13   1333, ¶ 71; Dkt. 1331, ¶ 104.)  I disagree with this.  Although I agree that executed

14   licenses are instructive in establishing what similarly-situated licensees have paid

15   for a license to Ericsson's SEPs, for the purpose of evaluating what royalty rates

16   would be non-discriminatory, executed licenses do not necessarily establish the fair

17   and reasonable value of the Ericsson SEP portfolio, because executed licenses are

18   the result of negotiations where only one of the parties (*i.e.*, Ericsson) knows the

19   rate other entities are paying for a license to the Ericsson SEP portfolio, and that rate

20   can include hold-up value (as described in detail by Dr. Ordover).  This lack of

21   transparency often results in one or more licensees simply making a bad deal (*i.e.*,

22   paying more than the portfolio is worth, or more than its competitors are paying).  I

23   observe that the licensees who challenged Ericsson's royalty rate demands in

24   litigation or arbitration (and thus had far greater access to information about

25   Ericsson's other licenses, licensing strategy, and other relevant information), such as

26   Apple, Samsung and Huawei, ██████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ██████   The issues resulting from having only one entity in possession of all of the

1   necessary information (*i.e.*, Ericsson) are compounded by the lack of motivation,

2   market presence, or ability to challenge Ericsson's SEP royalty demands, and by

3   Ericsson's motivation to maximize its profits, notwithstanding the non-

4   discrimination prong of the ETSI IPR Policy.

5       **B.    Mr. Kennedy and Dr. Teece's Determination of Which Licensees**

6           **Are Most Similarly Situated Is Flawed and Unreliable.**

7       4.      As discussed in my Witness Declaration, I determined that

8   manufacturers of feature phones and smartphones that were significant players in

9   the global telecommunications market, and that entered into licenses with Ericsson

10  in 2014 and 2015 which included a license to Ericsson's 4G SEPs, were the most

11  similarly situated to TCL.  Based on these factors, I found that Apple, Samsung,

12  HTC, Huawei, LG, and ZTE are the handset manufacturers most similarly situated

13  to TCL.  (Dkt. 1318, ¶ 20.)  In addition to my own analyses and research on TCL's

14  handsets,[1] the testimony of Dr. George Guo (until recently the Chief Executive

15  Officer for TCL Communication) and Mr. Steve Cistulli (President and General

16  Manager for Alcatel North America) provide additional support with regard to TCL

17  and its competitive position related to these other major players in the global

18  telecommunications market.  (Dkt. 1315, 1316, 1412, 1413.)

19      5.      Mr. Kennedy identifies what he considers "comparable Ericsson

20  licenses" using three criteria:  "(i) the licensee supplies mobile phones; (ii) the

21  licensee's sales of mobile phones are sufficiently significant to be reported by third-

22  party market analyst IDC . . . ; and (iii) the license became effective within the 2013

23  to 2016 time frame."  (Dkt. 1333, ¶¶ 8, 94.)  Mr. Kennedy identified the following

24  licensees that met his "comparable" criteria:  Apple, Audioline, Bea-fon, Binatone,

25  Bullitt/CAT, Coolpad/Yulong, Doro, Emporia, HTC, Huawei, Karbonn, LG,

26  Mobistel, Samsung, Sharp, and ZTE.  (Dkt. 1333, ¶ 95.)  He then breaks his

27

28  [1] *See e.g.*, Exs. 1189, 1190, 1191.

comparable licenses into two groups:  (1) "Two-Way Licenses;" and (2) "One-Way Licenses" (which he previously referred to in his rebuttal expert report as "Pure Play Licenses").

6.      Mr. Kennedy currently defines his Two-Way Licenses in his witness declaration as those that "typically compensate Ericsson with cash payments and with grant back (*i.e.*, cross license) value."[2]  (Dkt. 1333, ¶ 101.)  According to Mr. Kennedy the following licensees entered into two-way licenses with Ericsson:  Apple, Samsung, LG, HTC, ZTE, and Sharp.  (Dkt. 1333, pp. 76-100.)  As discussed in my Witness Declaration, I also analyzed these agreements to determine which of these licensees were the most similarly situated to TCL.

7.      Mr. Kennedy currently defines his One-Way Licenses as those "licensees [that] do not own a portfolio of patents that confers meaningful grant back value to Ericsson" where "the licensee typically compensates Ericsson for the license with cash payments only."[3]  (Dkt. 1333, ¶ 101.)  Mr. Kennedy categorized the following Ericsson licensees as one-way licensees:  Huawei, Coolpad, Karbonn, Doro, Audioline, Bea-fon, Bullitt, Binatone, Emporia, and Mobistel.[4]  (Dkt. 1333, pp. 100-112.)

8.      Mr. Kennedy has not done any analysis to assess whether, and to what

---

[2] In his rebuttal expert report, Mr. Kennedy described his Two-Way Licenses as license agreements that "are more current (*i.e.*, circa 2013-2015) and cover relatively large comparable licensees including Samsung, HTC, LG, Sharp, ZTE, Apple, and Huawei and are cross licenses which require a two-way model to unpack them." (Kennedy Rebuttal Expert Report, ¶ 138.)

[3] In his rebuttal expert report, Mr. Kennedy described his Pure Play Licenses as license agreements that are "less complex license agreements" that "are largely relevant with respect to 2G/3G royalty rates because none of these Pure Play licensees appears to have meaningful 4G sales." (Kennedy Rebuttal Expert Report, ¶ 140.)

[4] I note that Mr. Kennedy changed his classification of the Huawei license from a two-way license in his rebuttal expert report to a one-way license in his witness declaration.

degree, any of his identified comparable licensees is similarly situated to TCL. Instead, Mr. Kennedy relies on Dr. Teece's conclusion that ZTE, Sharp, Coolpad and Karbonn are the companies most similarly situated to TCL, and thus these licenses "would be more relevant to [Mr. Kennedy's] analysis of Ericsson's Option A and Option B offer[s] than Ericsson's licenses" with companies like Apple, Samsung, LG, HTC, and Huawei.  (Dkt. 1333, ¶ 9; Dkt. 1331, ¶ 125.)

9.     Before addressing each specific licensee, I note several fundamental problems in Mr. Kennedy and Dr. Teece's analysis.  First, Mr. Kennedy attempts to simplify the scope of the inquiry by arbitrarily attempting to dismiss (or at least lessen the importance of) license agreements that were executed after May 2015, the date of Ericsson's Option A and Option B offers to TCL.  However, in evaluating whether the Option A and Option B offers would operate to discriminate against TCL (and thus violate Ericsson's FRAND obligation), it is important to consider the economic impact that would result from implementing Ericsson's offers during the entire time period covered by Ericsson's other licenses, as well as Option A and Option B.  This is what I have done in my analysis of those licensees that I found to be similarly situated to TCL.  I also understand that Ericsson continues to assert that Option A and Option B are FRAND today, thus the licenses executed after May 2015 are just as relevant (if not more) than those executed before May 2015.

10.     Second, Dr. Teece is inconsistent in how he uses data regarding the sales of TCL versus the other licensees.  In particular, in his Figure 13, Dr. Teece uses 2015 IDC data to report the sales of Ericsson's other licensees, but uses TCL's actual unit sales data to report TCL's sales.  This greatly biases Dr. Teece's analysis, in that it results in his understating TCL's unit sales by more than 15 million units (*i.e.*, 71.2 million units using IDC data as compared to 56 million units using TCL actual sales data).  (Ex. 1201 [Lynde Schedule 1A]; Dkt. 1331, Figure 13.)  It is improper to use a different data source for the TCL unit sales, especially when such data was readily available from IDC, and the IDC data was used to analyze unit

1  sales for the other licensees.  In addition, the IDC data was used for TCL in all of

2  Dr. Teece's other comparisons with the Ericsson licensees that he examined.  As a

3  result, Dr. Teece's discussions comparing TCL unit sales from an alternative source

4  with the unit sales of other Ericsson licensees are inaccurate and misleading.

5      11.     Third, Dr. Teece also puts considerable weight on ASPs in his

6  determination of which Ericsson licensees are similarly situated to TCL.  According

7  to Dr. Teece, "TCL's strategy has been to focus on selling low-priced phones,"

8  specifically claiming that TCL "sells less-advanced, low retail ASP handsets" or

9  "cheap handsets."  (Dkt. 1331, ¶¶ 123, 127, 128.)  However, as discussed in detail in

10 the original and rebuttal Witness Declarations of Dr. Guo and Mr. Cistulli, TCL has

11 a very broad portfolio of product offerings ranging from feature phones and entry-

12 level smartphones, to midrange and high-end smartphones, as well as tablets and

13 mobile broadband devices.  (*See generally*, Dkt. 1315, 1316, 1412, 1413.)  Thus,

14 much of Dr. Teece's characterization of TCL's products and associated ASPs

15 (especially as compared to select Ericsson licensees) is misleading and quite

16 different from TCL's actual business model, as described by Dr. Guo and Mr.

17 Cistulli in their Witness Declarations.

18     12.     For the reasons discussed below, I disagree with Mr. Kennedy and Dr.

19 Teece's determination of which licensees are similarly situated to TCL.

20          1.     Ericsson's "two-way licenses"

21               a.     *Apple*

22     13.     According to Dr. Teece, "Apple may be the least similarly situated

23 company to TCL."  (Dkt. 1331, ¶ 135.)  This is a new conclusion that was not

24 discussed in his rebuttal expert report and appears to entirely be based on his new

25 analyses.  Dr. Teece seems to reach this conclusion based on: (1) Apple selling

26 "high-priced consumer products"; (2) Apple's handset unit sales (*i.e.*, 230 million

27 units); (3) Apple's sales mix (*i.e.*, "[o]ver 98% of Apple's sales are high-priced 4G

28 iPhones, whereas only about 16% of TCL's sales are 4G handsets"); and (4) the

1   notion that TCL's 4G handsets "are very low-priced phones." (Dkt. 1331, ¶ 135.)

2       14.   However, Dr. Teece ignores that based on TCL's global sales volumes

3   and trends, as well as its current and future product offerings and business plans,

4   TCL in fact directly competes with Apple. The witness declarations of Dr. Guo and

5   Mr. Cistulli discuss such direct competition.

6       15.   As explained by Dr. Guo and Mr. Cistulli, TCL and Apple compete

7   head to head in at least the U.S., Latin America, Central & Eastern Europe, and the

8   Middle East & Africa. (Dkt. 1315, ¶¶ 62-70; Dkt. 1316, ¶¶ 84-91.) In Latin

9   America, TCL sold nearly twice as many smartphones as Apple between 2014 and

10   the first half of 2015 (19.8 million smartphones sold by TCL, versus 10.5 million

11   smartphones sold by Apple). (Dkt. 1316, ¶ 51, Fig. 11; Ex. 1010.) TCL ranked 4th

12   in Latin America by smartphone sales volume during that period, while Apple

13   ranked 6th. (Dkt. 1316, ¶ 51, Fig. 11; Ex. 1010.) In the U.S., TCL has strong

14   relationships with the carriers, just as Apple does, in both prepaid channels (like

15   Cricket) and postpaid channels (like T-Mobile).[5] (Dkt. 1315, ¶¶ 64-69.)

16       16.   Dr. Guo and Mr. Cistulli further testified that in every smartphone

17   category, TCL and Apple have models that compete directly against each other. For

18   example, in the entry level, Apple sells its iPhone 5s for $149 through prepaid

19   carrier MetroPCS. (Dkt. 1413, ¶ 33].) In the midrange, Apple sells its iPhone SE

20   for $299 through prepaid carrier MetroPCS. (Ex. 2360.) And in the high end,

21   Apple sells its iPhone 7 Plus for over $700, through prepaid and postpaid carriers.

22   (Dkt. 1315, ¶ 64; Ex. 2360.) Apple also sells its phones in the "open market" (*i.e.*,

23

24

[5] A "prepaid" carrier is one that offers service plans where the customer pays for
25   service (*i.e.*, voice, texts, and/or data) in advance of use. Examples of prepaid
26   carriers in the U.S. are MetroPCS, Cricket, and Tracfone. Meanwhile, a "postpaid"
27   carrier is one that bills a customer (called a "subscriber") at the end of each billing
cycle for the service used by the customer during the billing period. Examples of
28   postpaid carriers in the U.S. are T-Mobile, Sprint, AT&T, and Verizon.

through retail channels rather than carriers), like at Best Buy.[6]  TCL has a smartphone model that competes with Apple's iPhone in every one of these categories.  The TCL 950, Alcatel IDOL 4S, and BlackBerry DTEK60, for example, are all high-end phones, with specifications similar or superior to Apple's iPhone 7 Plus.[7]  (Dkt. 1315, ¶¶ 9, 10; Dkt. 1316, ¶ 85.)

17.     Furthermore, my analysis of TCL's sales data demonstrates TCL's broad product mix and upward sales trends in relation to handset manufacturers such as Apple.  (Dkt. 1316, ¶¶2, 5-6, 31,84-91 and § VII.A generally; Dkt. 1413, ¶¶ 31-36; Dkt. 1315, ¶¶ 3, 5, 7, 9, 12, 24, 40, 60, 62-70; Dkt. 1318, ¶¶ 55-61.)  In addition, Dr. Ordover finds that "TCL is competitively similarly situated" to Apple.  (Dkt. 1319, ¶¶ 6, 61, 67.)  As a result, I maintain my original opinion that Apple is similarly situated to TCL.

b.     *Samsung*

18.     Dr. Teece opines that "Samsung is not very similarly situated to TCL." (Dkt. 1331, ¶ 132.)  Dr. Teece appears to reach this conclusion based on:  (1) Samsung's handset unit sales (*i.e.*, 385 million units); (2) Samsung's sales mix (*i.e.*, "[o]ver half of Samsung's sales are 4G handsets"); (3) Samsung sells higher priced handsets as compared with TCL; (4) Samsung's infrastructure sales; and (5) Samsung's "significant standard essential patent portfolio."  (Dkt. 1331, ¶ 132.)

19.     However, Dr. Teece again ignores that based on TCL's global sales volumes and trends, as well as its current and future product offerings and business plans, TCL in fact directly competes with Samsung.  The witness declarations of Dr. Guo and Mr. Cistulli discuss such direct competition.

---

[6] *See* iPhone, http://www.bestbuy.com/site/mobile-cell-phones/iphone/pcmcat305200050000.c?id=pcmcat305200050000 (last visited Jan. 26, 2017).

[7] As Dr. Guo and Mr. Cistulli explained in their respective Witness Declarations, TCL acquired a license to the BlackBerry brand in December of 2016.

20.    As explained by Dr. Guo and Mr. Cistulli, TCL competes aggressively with Samsung in many geographic regions, including Latin America, the U.S., China, and Europe.  (Dkt. 1316, ¶¶ 77-82; Ex. 1010.)  In Latin America, TCL's feature phones sales volume was about three times that of Samsung's (17.9 million feature phones sold by TCL, versus 6.5 million feature phones sold by Samsung).  (Dkt. 1316, ¶ 42, Fig. 12.)  In the U.S., TCL is ranked 4th in sales volume, while Samsung is ranked 2nd.  (Dkt. 1315, ¶ 3.)  Only LG stands between TCL and Samsung in terms of U.S. sales volume.  (*Id.*)

21.    Dr. Guo and Mr. Cistulli further testified that in every phone category, TCL and Samsung have models that compete directly against one another.  For example, like TCL, Samsung sells many feature phones, such as its Gusto 3 for $49.99 on Verizon's prepaid channel.  (Dkt. 1315, ¶ 75.)  The J series, A series, and S series are, respectively, Samsung's smartphones in the entry level, midrange, and high end.  (*Id.*, ¶ 72.)  For smartphones, TCL similarly has its POP series (entry level), PIXI series (midrange), and its IDOL series (high end).  (*Id.*, ¶¶ 30-32.)  Like Samsung, TCL sells in prepaid and postpaid channels, and in the open market.

22.    Furthermore, my analysis of TCL's sales data demonstrates TCL's broad product mix and upward sales trends in relation to handset manufacturers such as Samsung.  (Dkt. 1316, ¶¶ 2, 5-6, 31, 77-83 and § VII.A generally; Dkt. 1413, ¶¶ 15-22; Dkt. 1315, ¶¶ 3, 5, 7, 8, 10, 12, 24, 40, 47, 60, 71-77; Dkt. 1318, ¶¶ 55-61.)  In addition, Dr. Ordover finds that "TCL is competitively similarly situated" to Samsung.  (Dkt. 1319, ¶¶ 6, 61, 66, 67.)  As a result, I maintain my original opinion that TCL is similarly situated to Samsung.

c.    *LG*

23.    Dr. Teece acknowledges that "LG is a similar company to TCL based on sales volume and global market."  (Dkt. 1331, ¶ 134.)  He also acknowledges that LG, like TCL, sells feature phones.  (*Id.*)  Dr. Teece attempts to distinguish LG from TCL by asserting that the two companies are "not similar in terms of ASP or patent

holdings." (*Id.*)  This is a new conclusion that was not discussed in his rebuttal expert report and appears to be entirely based on his new analyses.  In any event, I understand from Dr. Guo that LG's and TCL's ASPs are similar, contrary to what Dr. Teece asserts.  For example, the two companies' ASP for feature phones have nearly converged in the last couple of years.  In 2010, LG's feature phone ASP was $157 while TCL's was $56, a difference of over $100.  (Dkt. 1413, ¶ 26, Fig. 5.)  By 2015, however, LG's feature phone ASP had dropped to $45, while TCL's decreased to $21, narrowing the difference in ASP to only $24.  (*Id.*, ¶ 26, Fig. 5.)  Similarly, for 2G and 3G smartphones (combined), LG's ASP in 2011 was $350 while TCL's was $215, a difference of $135.  (*Id.* ¶ 27, Fig. 6.)  In 2015, LG's ASP for 2G/3G smartphones was $143, while TCL's was $98, a difference of only $45.  (*Id.*)  TCL believes its ASP and LG's ASP in various phone categories are likely to converge.

24.    As for the relative sizes of the "patent holdings" of LG and TCL, in my opinion, this is not relevant to determining whether LG's phones compete in the marketplace with TCL's (likewise with respect to any other company's patent holdings, *e.g.*, Samsung).  The end consumer is not typically contemplating the size of LG's "patent holdings" when deciding whether to buy its phone or a similar phone from TCL.  He or she is instead thinking about the competing phones' respective specifications, quality, and so on.  In their testimony, Mr. Cistulli and Dr. Guo in fact provided comparisons of the specifications of LG phones and TCL phones, model-by-model across different phone categories, showing how similar they are.  (Dkt. 1315, ¶¶ 79-81 (comparing the Alcatel IDOL 4S to the LG V20, the Alcatel POP 4S to the LG X Power, and the Alcatel PIXI 4 to the LG K7); Dkt. 1316, ¶ 96 (comparing the TCL 950 to the LG G5).)

25.    Furthermore, my analysis of TCL's sales data demonstrate TCL's broad product mix and upward sales trends in relation to handset manufacturers such as LG.  (Dkt. 1316, ¶¶ 2, 5-6, 31,95-100 and § VII.A generally; Dkt. 1413, ¶¶ 26-30;

Dkt. 1315, ¶¶ 3, 5, 12, 24, 40, 60, 78-83; Dkt. 1318, ¶¶ 55-61.)  In fact, in 2015 TCL and LG each sold around 71 million handsets, not the 56 million handsets for TCL that Dr. Teece uses (based on a different data source).  (Ex. 1201 [Lynde Schedule 1A]; Ex. 1210 [Lynde Schedule 3A]; *see also* Dkt. 1331, Figure 13.)  In addition, Dr. Ordover also finds that "TCL is competitively similarly situated" to LG.  (Dkt. 1319, ¶¶ 6, 61, 66, 67.)  As a result, I maintain my original opinion that LG is similarly situated to TCL.

d.    *HTC*

26.     Dr. Teece acknowledges that "HTC is similar to TCL based on total volumes."  (Dkt. 1331, ¶ 133.)  But he opines that HTC and TCL are not similar based "on product mix or ASP."  Again, this is a new conclusion that was not discussed in his rebuttal expert report and seems to be based on his new analyses. As to "product mix," Dr. Teece opines that unlike TCL, "HTC mostly sells high-priced, advanced smartphones rather than less advanced handsets," and "over 75% of its handset sales are 4G units."  (Dkt. 1331, ¶ 133.)  But as Mr. Cistulli and Dr. Guo testified, TCL's 4G flagship phones are very "advanced."  (Dkt. 1315, ¶ 8; Dkt. 1316, ¶ 4.)  Dr. Guo also showed how TCL's flagship 950 model has a larger display, higher camera resolution, larger memory, and the same chipset (the Qualcomm Snapdragon 820) as the high-end HTC 10.  (Dkt. 1316, ¶ 105.)  Finally, in my opinion, the fact that HTC does not sell feature phones has no bearing on whether HTC competes with TCL in smartphones.  In fact, according to Dr. Guo and Mr. Cistulli, TCL's smartphones compete head-to-head with HTC's smartphones, from entry level up through high end, in carrier channels and in the open market.  (Dkt. 1315, ¶ 89 (comparing Alcatel IDOL 4 to HTC Desire 626s, both sold through U.S. prepaid carrier Cricket); Dkt. 1316, ¶ 105 (comparing TCL 950 to HTC 10, both sold on Chinese e-commerce website JD.com).)

27.     As for ASP, Dr. Teece opines that "HTC's retail ASPs are 130% to 160% higher than TCL[']s," making HTC "a mid-to-high range ASP manufacturer."

1  (Dkt. 1331, ¶ 133.)  But he appears to include TCL's feature phones in his

2  calculation of TCL's ASPs.  (*See id.*, Figs. 9, 10.)  This is erroneous, in my opinion,

3  because HTC sells no feature phones.  Thus, to get a potentially meaningful

4  comparison of the two companies' ASPs, Dr. Teece would have had to compare

5  only TCL's smartphones to HTC's smartphones.  HTC sells a broad range of

6  products, just as TCL does.  As Dr. Guo explains, for example, HTC sells phones as

7  inexpensive as $79 though prepaid carriers Virgin Mobile and MetroPCS.  (Dkt.

8  1413, ¶ 24.)

9      28.      Once again Dr. Teece ignores that based on TCL's global sales

10  volumes and trends, as well as its current and future product offerings and business

11  plans, TCL in fact directly competes with HTC.  As noted above, the witness

12  declarations of Dr. Guo and Mr. Cistulli provide specific examples of such direct

13  competition, and my analysis of TCL's sales data demonstrate TCL's evolving

14  product mix and sales trends in relation to handset manufacturers such as HTC.

15  (Dkt. 1316, ¶¶ 5-6, 104-105 and § VII.A generally; Dkt. 1413, ¶¶ 23-25; Dkt. 1315,

16  ¶¶ 12, 40, 60, 88-90; and Dkt. 1318, ¶¶ 55-61.)  In addition, Dr. Ordover finds that

17  "TCL is competitively similarly situated" to HTC.  (Dkt. 1319, ¶¶ 6, 61, 67.)  As a

18  result, I maintain my original opinion that HTC is similarly situated to TCL.

19                              e.      *ZTE*

20      29.      According to Dr. Teece, "ZTE is a very similarly situated company to

21  TCL based on total volumes, ASPs, global sales, and sales mix."  (Dkt. 1331, ¶

22  126.)  Dr. Teece appears to reach this conclusion based on:  (1) ZTE's position as a

23  top-ten handset manufacturer, like TCL; (2) ZTE's handset unit sales (*i.e.*, 57.6

24  million units in 2015); (3) ZTE's sales mix (*i.e.*, ZTE allegedly sells a similar

25  number of 3G units as TCL, however Dr. Teece provides no support for this point);

26  (4) ZTE's handset retail ASPs are similar to TCL's; and (5) ZTE is different as it

27  "has a significant standard essential patent portfolio and it is a major manufacturer

28  of cellular infrastructure."  (Dkt. 1331, ¶ 126.)

30.     I agree with Dr. Teece that TCL is similarly situated to ZTE.  The witness declarations of Dr. Guo, Mr. Cistulli, and Dr. Ordover, as well as my prior analyses, provide additional support in this regard.  (Dkt. 1316, ¶¶ 2, 5-6, 101-103, and § VII.A generally; Dkt. 1413, ¶¶ 45-48; Dkt. 1315, ¶¶ 3, 12, 60, 84-87; Dkt. 1319, ¶¶ 6, 61, 66, 67; Dkt. 1318, ¶¶ 55-61.)  However, as I explained in detail in Section VII.E.6 of my original Witness Declaration, there is not sufficient data to calculate reliable effective one-way rates for ZTE's license to Ericsson's 2G, 3G, and 4G SEPs.  Thus, while I maintain my original opinion that TCL is similarly situated to ZTE, given the inability to calculate reliable one-way rates due to insufficient data, this license is of limited value.

f.     *Sharp*

31.     Dr. Teece identifies Sharp as a "more 'similarly situated' Ericsson licensee[]" claiming that "Sharp and TCL sell a relatively similar mixture of smartphones and feature phones."  (Dkt. 1331, ¶¶ 125, 129.)  This is a not a new conclusion, however, Dr. Teece's rationale for this opinion is now focused on product mix (which is based on his new analyses) and has changed since his rebuttal expert report (where he focused on market share).  (Teece Rebuttal Expert Report, ¶¶ 127, 212.)  Besides the "relatively similar mixture of smartphones and feature phones," Dr. Teece acknowledges that:  (1) "Sharp sells a small number of handsets almost exclusively in Japan" (*i.e.*, a total of 4.5 million units in 2015, of which 60% were 4G units); and (2) "Sharp sells mostly higher-ASP, advanced handsets."  (Dkt. 1331, ¶ 129.)

32.     Again Dr. Teece ignores that based on TCL's global sales volumes and trends, as well as its current and future product offerings and business plans, TCL does ***not*** directly compete with Sharp.  In Section VII.G.2 of my original Witness Declaration, I discussed why Sharp is not similarly situated to TCL.  In particular, Sharp is ranked nowhere near TCL in terms of sales volume; Sharp sells almost exclusively in Japan; and at the time of the Ericsson/Sharp license, Foxconn had

1   acquired a majority stake in Sharp for the apparent purpose of focusing on China's

2   clean-energy revolution and *not* as part of an effort to build the smartphone

3   business.  (Dkt. 1318, ¶¶ 156, 157.)  In addition, the witness declarations of Dr. Guo

4   and Mr. Cistulli provide specific examples of why TCL does not consider Sharp to

5   be a direct competitor.  (Dkt. 1316, ¶ 108; Dkt. 1315, ¶ 96; Dkt. 1413, ¶ 12-13; Dkt.

6   1412, ¶ 19.)  Based on this information, I maintain my original opinion that Sharp is

7   not similarly situated to TCL.

8              2.    Ericsson's "one-way" (formerly "Pure Play") licenses

9   33.    Below I discuss Mr. Kennedy and Dr. Teece's analyses and

10  conclusions regarding whether these "one-way" licensees (*i.e.*, Huawei, Coolpad,

11  Karbonn, Doro, Audioline, Bea-fon, Bullitt, Binatone, Emporia, and Mobistel) are

12  similarly situated to TCL, as well as my own opinion regarding these Ericsson

13  licensees.

14             a.    *Huawei*

15  34.    According to Dr. Teece, "Huawei and TCL are both based in China, but

16  the two companies are not very similarly situated."  (Dkt. 1331, ¶ 136.)  This is a

17  new conclusion that was not discussed in his rebuttal expert report and appears to

18  entirely be based on his new analyses.  Dr. Teece seems to reach this conclusion

19  based on:  (1) Huawei's handset sales (*i.e.*, 108 million units sold worldwide in

20  2015, making it the third largest handset manufacturer); (2) Huawei's product mix

21  (*i.e.*, "less than 1% of Huawei's sales are feature phones and over 75% of its sales

22  are 4G smartphones"); (3) Huawei's retail ASPs are higher than TCL's; and (4)

23  "Huawei is the largest cellular infrastructure manufacturer in the world and has a

24  major standard essential patent portfolio."  (Dkt. 1331, ¶ 136.)

25  35.    Dr. Teece again ignores that based on TCL's global sales volumes and

26  trends, as well as its current and future product offerings and business plans, TCL in

27  fact does directly compete with Huawei.  The witness declarations of Dr. Guo and

28  Mr. Cistulli discuss such direct competition.  As they explain, TCL and Huawei

compete directly in many geographic regions around the world, such as in Latin America, the Middle East & Africa, and Europe. For example, in Latin America, TCL sold about 19.8 million smartphones from 2014 through the first half of 2015, while Huawei sold about 11.4 million smartphones over that same period. (Dkt. 1316, ¶ 93; Ex. 1010.) Huawei's 4G smartphone portfolio hits a broad spectrum of price points, as does TCL's. (Dkt. 1413, ¶ 41 (showing, for example, certain Huawei 4G smartphones offered on JD.com for less than $100 U.S.).) And as to ASP, Dr. Teece again includes feature phones in TCL's ASPs when comparing them to Huawei's ASPs, even though he acknowledges Huawei sells very few feature phones. In fact, TCL's ASPs are very close to Huawei's ASPs when smartphones are considered separately from feature phones. For example, for 2G smartphones (including 2.5G) in 2015, TCL's ASP was $137 while Huawei's was $141. (Dkt. 1413, ¶ 39, Fig. 9; Ex. 1273.) In 2014, the two companies' ASPs were in fact *identical*. (Dkt. 1413, ¶ 39, Fig. 9; Ex. 1273.)

36.    Furthermore, my analysis of TCL's sales data demonstrate TCL's broad product mix and upward sales trends in relation to handset manufacturers such as Huawei. (Dkt. 1316, ¶¶ 5-6, 92-94 and § VII.A generally; Dkt. 1413, ¶¶ 37-44; Dkt. 1315, ¶¶ 12, 60, 91-93; and Dkt. 1318, ¶¶ 55-61.) In addition Dr. Ordover also finds that "TCL is competitively similarly situated" to Huawei. (Dkt. 1319, ¶¶ 6, 61, 66-67.) As a result, I maintain my original opinion that Huawei is similarly situated to TCL.

b.    *Yulong (Coolpad)*

37.    Coolpad's wholly-owned subsidiary, Yulong Computer Telecommunications Scientific (Shenzhen) Co. Ltd., entered into a license with Ericsson with regard to their respective 2G/3G/4G patents in January/February 2014 (effective January 1, 2013). (Exs. 2420, 4773.) The 3G and 4G rates under this agreement were consistent with Revision C of Ericsson's Reference Price Sheet (June 25, 2012): ███ of NSP for 2G, ███ for 3G, ███ for single-mode 4G, and

1  ████ for multi-mode 4G ██████████████   (Ex. 1216 [Lynde
2  Schedule 6A]; Ex. 4773.)

3       38.    The Coolpad subsidiary that entered into this license "mainly provides
4  its Coolpad products for enterprises, government, and mobile operators as well as
5  individual consumers in the PRC [People's Republic of China]."  (Ex. 2420; Ex.
6  2390 at pp. 5, 10, 14, 84; Ex. 2389 at p. 80.)  Both Mr. Kennedy and Dr. Teece
7  acknowledge that Coolpad handsets are "sold almost exclusively in China."  (Dkt.
8  1331, ¶ 60; Dkt. 1333, ¶ 204.)  In 2015, Coolpad sold approximately 28.7 million
9  handsets (with 4G sales of 25.1 million, and only 942,000 total U.S. unit sales),
10  while TCL sold around 71.2 million handsets (with 34.9 million 3G sales and 11.1
11  million 4G sales, and 13.4 million U.S. sales).  (Ex. 1201 [Lynde Schedule 1A]; Ex.
12  2438 [Lynde Rebuttal Schedule 1J]; and Ex. 1273.)  As I discuss below, Coolpad's
13  sales are higher than those of Mr. Kennedy's other one-way licensees (with the
14  exception of Huawei), but the fact that Coolpad primarily sells its handsets in
15  mainland China makes this company not sufficiently similarly situated to TCL,
16  which sells its handsets worldwide.

17       39.    Dr. Teece opines that "CoolPad is also a similarly situated company to
18  TCL based on ASP and unit volumes."  (Dkt. 1331, ¶ 127.)  This is a new
19  conclusion that was not discussed in his rebuttal expert report and seems to be based
20  on his new analyses.  Dr. Teece appears to reach this conclusion based on:  (1)
21  Coolpad handset sales (*i.e.*, 29 million units sold in 2015, with sales "mostly in
22  China" but some U.S. sales); (2) Coolpad's product mix (*i.e.*, "all of [Coolpad's]
23  sales are smartphones, and nearly 90% of its sales are 4G technology"); (3)
24  Coolpad's retail ASPs (according to Dr. Teece "[l]ike TCL, [Coolpad] sells cheap
25  handsets; CoolPad has some of the lowest retail ASPs"); and (4) "CoolPad has no
26  standard essential patents."  (Dkt. 1331, ¶ 127.)

27       40.    It is unclear how Dr. Teece reaches his conclusion that Coolpad is more
28  similarly situated to TCL given his own discussion and acknowledgement that its

sales are "mostly in China," whereas TCL competes on a global basis. Contrary to Dr. Teece's claim that TCL sells "cheap" handsets, as explained by Dr. Guo and Mr. Cistulli, TCL's handsets are not cheap and a number of them have features and functionalities allowing them to compete with the handsets offered by Apple, Samsung, LG, Huawei, HTC and ZTE. (Dkt. 1316, ¶¶ 76-105; Dkt. 1315, ¶¶ 60-93.) In addition, TCL does not consider Coolpad to be a major global competitor, and at most is a very limited competitor in the U.S. (Dkt. 1413, ¶ 11; Dkt. 1412, ¶¶ 17-18; *see also*, Dkt. 1316, ¶ 109; Dkt. 1315, ¶¶ 95, 97.) Given all of this information, I maintain my opinion that Coolpad is not similarly situated to TCL.

### c.  *Karbonn*

41.    Karbonn Mobiles is an India-based joint venture between Jaina Group and UTL Group. (Ex. 2429; *see also*, Dkt. 1333, ¶ 212.) In December 2014 (effective January 1, 2013), both Jaina and UTL entered into 2G/3G license agreements with Ericsson in which rates payable to Ericsson were divided into two tiers by sales geography:  a non-India tier, and an India tier, with lower rates. (Ex. 4000 at pp. 22-24; Ex. 4919 at pp. 22-24; *see also*, Dkt. 1333, ¶ 213.) In March 2015 (effective January 1, 2013), Jaina entered into an amendment to the original license. (Ex. 4905.) This amendment removed the discount for India and contained rates consistent with the rates in Ericsson's Reference Price Sheet (Revision F): 0.8% of NSP for GSM, 0.8% for GSM/GPRS (increasing to 1% on April 1, 2015), 1% for GSM/GPRS/EDGE and 3G (increasing to 1.1% on April 1, 2014, and increasing again to 1.3% on April 1, 2015). (Ex. 1216 [Lynde Schedule 6A]; Ex. 4905 at p. 2.) In 2015, Karbonn sold around 15.7 million 2G/3G handsets (14 million of which were 2G) and 11,464 4G handsets, while TCL sold more than 60 million 2G/3G handsets and 11.1 million 4G handsets. (Ex. 1201 [Lynde Schedule 1A]; Ex. 2437 [Lynde Rebuttal Schedule 1I].) It appears that Karbonn currently

1  sells and markets its handsets solely in India.[8]

2      42.    Despite Karbonn's historical focus on mostly 2G (and some 3G)

3  handsets in the Indian market, Dr. Teece claims "Karbonn is similarly situated to

4  TCL based on total sales volumes, product-mix, and ASPs."  (Dkt. 1331, ¶ 128.)

5  This is a new conclusion that was not discussed in his rebuttal expert report and

6  appears to be based on his new analyses.  Dr. Teece seems to reach this conclusion

7  based on:  (1) Karbonn handset sales (*i.e.*, 16 million units, with sales "almost

8  exclusively in India"); (2) Karbonn's product mix (*i.e.*, "about 80% of Karbonn's

9  sales are feature phones," while 45% of TCL's are feature phones); and (3)

10  Karbonn's retail ASPs (*i.e.*, "Karbonn sells less-advanced, low retail ASP

11  handsets").  (Dkt. 1331, ¶ 128.)

12      43.    It is unclear how Dr. Teece reaches his conclusion that Karbonn is

13  similarly situated to TCL given his own discussion and acknowledgement that its

14  sales are "almost exclusively in India."  This admission, along with the fact that the

15  majority of Karbonn's sales are of 2G handsets, necessarily impact the retail ASPs

16  upon which Dr. Teece compares Karbonn and TCL.  In addition, as noted above,

17  Karbonn's license with Ericsson does not include 4G, and TCL requires a 4G

18  license.  In addition, TCL does not consider Karbonn to be a major, important

19  competitor in part due to its limited geographic reach and product mix.  (Dkt. 1413,

20  ¶10; Dkt. 1412, ¶16; *see also* Dkt. 1316, ¶ 109.)  Given all of this information, I

21  maintain my opinion that Karbonn is not similarly situated to TCL.

22                          d.    *Doro*

23      44.    Doro is a small mobile phone company based in Sweden.  In May/June

24  2014 (effective July 1, 2013), Ericsson and Doro amended their July 2007 2G patent

25  license and their October 2009 3G patent license, and entered into a new global

26  patent license for 4G SEPs.  (Exs. 4791, 4738, 4739.)  The rates under these

27

28  [8] Exs. 2428, 2429.

agreements were the same as those in Ericsson's Reference Price Sheet (Revision E), namely 1.25% of NSP for GSM or GPRS, 1.5% for GSM/GPRS/EDGE, 1.75% for multi-mode 3G, and 2% for 4G (with a 4G floor and cap of SEK 15 and SEK 40).  (Ex. 1216 [Lynde Schedule 6A]; Ex. 4791 at p. 2; Ex. 4738 at p. 2; Ex. 4739 at p. 11.)  In 2015, Doro sold around 2.6 million handsets, of which only 19,500 were 4G, and only around 250,000 went to U.S. customers.  (Ex. 2435 [Lynde Rebuttal Schedule 1E].)  This was significantly lower than TCL's sales of 71.2 million 2G, 3G and 4G handsets.  (Ex. 1201 [Lynde Schedule 1A].)  Doro markets its handsets as "fantastically simple cellphones for everyone," and currently offers only two handset models:  a 3G flip phone (Doro PhoneEasy 626) and a 4G smartphone (Doro 824).[9]

45.    Dr. Teece opines that "Doro is similar to TCL based on product-mix, but sells its phones at higher ASPs."  (Dkt. 1331, ¶ 138.)  This is a new conclusion that was not discussed in his rebuttal expert report and appears to be based on his new analyses.  Dr. Teece notes that:  (1) Doro is a small handset manufacturer (*i.e.*, 2.5 million units in 2015) that specializes in selling phones to seniors; and (2) "[l]ike TCL, it sells mostly less advanced handsets.  (Dkt. 1331, ¶ 138.)

46.    It is not clear how Dr. Teece reaches his conclusion that Doro is similarly situated to TCL given his own discussion, and acknowledgement, that Doro is a small handset supplier with very low sales of specialized handsets.  In fact, Doro only offers two handset models that it markets as "fantastically simple cellphones for everyone."  As discussed in the Witness Declarations of Dr. Guo and Mr. Cistulli, TCL's handsets would not be classified as "simple" and actually have features and functionalities allowing them to compete with the handsets offered by Apple, Samsung, LG, Huawei, HTC and ZTE.  (Dkt. 1316, ¶¶ 76-105; Dkt. 1315, ¶¶ 60-93.)  Moreover, TCL does not consider Doro to be a major competitor.  (Dkt.

---

[9] *See, e.g.,* Exs. 2421, 2422, 2423, 2424.

1316, ¶¶ 7, 110; *see also* Dkt. 1412, ¶15.)  Given all of this information, I maintain my opinion that Doro is not similarly situated to TCL.

e.     *Other one-way licensees*

47.     Dr. Teece did not analyze or discuss any other of Mr. Kennedy's comparable licensees.  Mr. Kennedy also did not provide any assessment with regard to whether any of his other comparable licensees were similarly situated to TCL.  Below I provide a brief discussion of each of the identified licensees, along with support for my conclusion regarding why these licensees are not similarly situated to TCL.

(1)     Audioline

48.     In October/November 2014 (effective July 1, 2014), Ericsson and Audioline amended their April 2011 2G patent license and also entered into a new global patent license for 3G and 4G SEPs.  (Ex. 4920; Ex. 2459.)  The rates under these agreements were the same as those in Ericsson's Reference Price Sheet (Revision E), namely, 1.25% of the net sales price ("NSP") for GSM or GSM/GPRS, 1.5% for GSM/GPRS/EDGE (and single-mode 3G), 1.75% for multi-mode 3G, and 2% for 4G, but with a 4G floor and cap of €2.00 and €4.50.  (Ex. 1216 [Lynde Schedule 6A]; Ex. 4920 at p. 2; Ex. 2459.)  As noted in Ex. 1221 [Lynde Schedule 7C], while this 2014 license included a 4G license, Audioline sold no 4G handsets, and had very limited handset sales overall (less than 290,000 units between 3Q 2012 and 4Q 2015).  In addition, none of Audioline's handset sales included sales to the U.S.  (Ex. 2430 [Lynde Rebuttal Schedule 1A].)  For comparison, 2015 IDC data shows that TCL sold more than 60 million 2G and 3G handsets and 11 million 4G handsets, whereas Audioline sold 52,000 2G and 3G handsets and zero 4G handsets.  (Ex. 1201 [Lynde Schedule 1A]; and Ex. 2430 [Lynde Rebuttal Schedule 1A].)  Due to its low sales, Audioline would have little incentive to negotiate or litigate for a lower rate as the transaction costs would outweigh the cost of paying the reference rates.  Moreover, Audioline had a limited

selection of mobile handsets available for sale, further constraining its ability to compete with a handset manufacturer like TCL.[10]  In addition, TCL does not consider Audioline to be a major competitor.  (Dkt. 1316, ¶¶ 7, 106-107; *see also* Dkt. 1412, ¶15.)  I find that Audioline is not similarly situated to TCL.

(2)   Bea-fon

49.     In June 2014 (effective January 1, 2014), Ericsson and Bea-fon Mobile amended their October 2011 2G patent license and also entered into a new global patent license for 3G and 4G SEPs.  (Exs. 4702, 4703.)  The rates under these agreements were the same as those in Revision E of Ericsson's Reference Price Sheet, specifically 1.25% of NSP for GSM or GSM/GPRS, 1.5% for GSM/GPRS/EDGE, 1.75% for multi-mode 3G, and 2% for 4G (4G floor of €2.50; cap of €6.00).  (Ex. 1216 [Lynde Schedule 6A]; Ex. 4702 at p. 2; and Ex. 4703 at p. 11.)  As noted in Ex. 1221 [Lynde Schedule 7C], while this 2014 license included a 3G and 4G license, Bea-fon did not sell 3G or 4G units, and had limited handset sales overall (less than 365,000 units between 1Q 2012 and 4Q 2015.  In addition, like Audioline, none of Bea-fon's handset sales included sales to the U.S.  In 2015, Bea-fon sold 196,000 2G handsets, while TCL sold 25 million 2G handsets (in addition to 35 million 3G handsets and 11 million 4G handsets).  (Ex. 1201 [Lynde Schedule 1A]; Ex. 2431 [Lynde Rebuttal Schedule 1B].)  Similar to Audioline, due to its relatively low sales, Bea-fon would have little incentive to negotiate or litigate for a lower rate since the costs associated with those actions would outweigh the cost of paying the reference rates.  Furthermore, Bea-fon's very limited handset offerings constrain its ability to compete with TCL and other major handset manufacturers.  (Exs. 2462, 2463.)  In addition, TCL does not consider Bea-fon to be a major competitor.  (Dkt. 1316, ¶¶ 106-107; *see also* Dkt. 1412, ¶ 15.)  I find that Bea-fon is not similarly situated to TCL.

---

[10] Exs. 2388, 2392, 2393.

1

(3)     CAT (Bullitt)

2        50.     Since 2012, Bullitt Mobile has held the global license for the phones

3   and accessories of Caterpillar ("CAT").  (Dkt. 1333, ¶ 222; Ex. 2417.)  In May/June

4   2014 (effective January 1, 2014), Ericsson and Bullitt Group amended their July

5   2012 2G/3G patent license, and entered into a new global patent license for 4G

6   SEPs.  (Exs. 4732, 4733.)  The rates under these agreements were the same as those

7   in Ericsson's Reference Price Sheet (Revision E), with the addition of some new

8   floors and caps: 1.25% of NSP for GSM or GPRS (with floor of $0.50 and cap of

9   $3), 1.5% for GSM/GPRS/EDGE (with floor of $0.75 and cap of $4), 1.5% for

10  single-mode 3G (with floor of $1.25 and cap of $5), 1.75% for multi-mode 3G (with

11  floor of $1.50 and cap of $5), and 2% for 4G (with a 4G floor and cap of $2.50 and

12  $6).  (Ex. 1216 [Lynde Schedule 6A]; Exs. 4732, 4733.)  In 2015, CAT sold around

13  399,000 handsets (with zero sales to U.S. customers), of which 128,000 were 4G.

14  (Ex. 2461 [Lynde Rebuttal Schedule 1F].)  Again, these numbers are significantly

15  lower than TCL's sales of 71.2 million 2G, 3G, and 4G handsets.  (Ex. 1201 [Lynde

16  Schedule 1A].)  Due to its low sales, CAT would have little incentive to negotiate or

17  litigate for a lower rate as the transaction costs would outweigh the cost of paying

18  the reference rates.  CAT markets its limited handset offerings (2 feature phones and

19  3 smartphones) as durable "rugged phones," with certain handsets including unique

20  features such as thermal imaging, underwater cameras, "glove on and wet-finger

21  tracking technology," and "resistan[ce] to dust, high temperatures and multiple 6ft

22  drops onto concrete."[11]  In addition, TCL does not consider Bullitt to be a major

23  competitor.  (Dkt. 1413, ¶ 56; *see also* Dkt. 1412, ¶ 15.)  CAT is not similarly

24  situated to TCL.

25

(4)     Binatone

26       51.     In May/June 2014 (effective April 1, 2014), Ericsson and Binatone

27  _____

28  [11] Exs. 2417, 2418, 2419.

Electronics amended their April 2011 2G patent license and also entered into a new global patent license for 3G and 4G SEPs.  (Exs. 4729, 4688.)  The rates under these agreements were the same as those in Ericsson's Reference Price Sheet (Revision E):  1.25% of NSP for GSM or GSM/GPRS, 1.5% for GSM/GPRS/EDGE, 1.75% for multi-mode 3G, and 2% for 4G (with the 4G floor and cap of $2.50 and $6.00).  (Ex. 1216 [Lynde Schedule 6A]; Ex. 4729 at p. 2; Ex. 4688 at p. 11.)  While this 2014 license included a 3G and 4G license, Binatone did not sell 3G or 4G units, and sold only around 65,000 handsets total across 2014 and 2015.  (Ex. 1221 [Lynde Schedule 7C]; Ex. 2432 [Lynde Rebuttal Schedule 1C].)  In addition, like Audioline and Bea-fon, none of Binatone's handset sales included sales to the U.S.  The company's 42,000 2G handset sales in 2015 were orders of magnitude smaller than TCL's sales of 25 million 2G handsets (plus the 35 million 3G handsets and 11 million 4G handsets).  (Ex. 1201 [Lynde Schedule 1A]; and Ex. 2432 [Lynde Rebuttal Schedule 1C].)  Due to its low sales, Binatone would have little incentive to negotiate or litigate for a lower rate as the transaction costs would outweigh the cost of paying the reference rates.

52.     I understand Binatone also develops and markets AEG branded phones (including AEG GSM mobile handsets) under license in Europe.  (Ex. 2411.)  In 2015, however, all of AEG's sales were 2G handsets, and totaled around 40,000 units, none of which were sold in the U.S.  (Ex. 2433 [Lynde Rebuttal Schedule 1C.1].)  Moreover, the handset offerings of both Binatone and AEG were limited compared to TCL's handset offerings.[12]  In addition, TCL does not consider Binatone or AEG to be major competitors.  (Dkt. 1316, ¶¶ 107, 110; *see also* Dkt. 1412, ¶ 15.)  As a result, Binatone (even including AEG) is not similarly situated to TCL.

(5)     Emporia

---

[12] *See e.g.*, Exs. 1189, 1190, 1191, 2412, 2413, 2414, 2415, 2416.

53.     In April/May 2015 (effective January 1, 2015), Ericsson and Emporia Macao amended their January 2013 2G and 3G patent license, and entered into a new global patent license for 4G SEPs.  (Exs. 4021, 4934.)  The rates under these agreements were consistent with Ericsson's Reference Price Sheet (Revision F), namely 1.1% of NSP for GSM or GSM/GPRS, 1.3% for GSM/GPRS/EDGE and single-mode 3G, 1.5% for multi-mode 3G, and 1.8% for 4G (with a 4G floor and cap of $2 and $4.50).  (Ex. 1216 [Lynde Schedule 6A]; Ex. 4021 at p. 2; Ex. 4934 at p. 11.)  I was unable to locate evidence of handset sales for Emporia Macao (which is based in Macao and is the signatory to the Ericsson licenses) in the IDC data, but it appears that Emporia Macao is a subsidiary of Emporia Telecom ("Emporia"), a company specializing in mobile communications for older people.[13]  In 2015, Emporia sold approximately 388,000 2G/3G handsets (44,000 of which were 3G, none of which were 4G and none of which were to U.S. customers), while TCL sold more than 60 million 2G/3G handsets (11.1 million were 4G handsets).  (Ex. 1201 [Lynde Schedule 1A]; Ex. 2436 [Lynde Rebuttal Schedule 1H].)  In addition, due to its relatively low sales, Emporia would have little incentive to negotiate or litigate for a lower royalty rate, as the transaction costs in my opinion would most likely outweigh the cost of paying the reference rates.  Like Doro, Emporia markets its handsets as "simple to use" and focuses on the senior citizen market.[14]  Moreover, TCL does not consider Emporia to be a major competitor.  (Dkt. 1316, ¶ 110; se*e also* Dkt. 1412, ¶ 15.)  It is my opinion that Emporia is not similarly situated to TCL.

### (6)     Mobistel

54.     In April/May 2014 (effective January 1, 2014), Ericsson and Mobistel amended their October 2013 2G and 3G patent license and entered into a new global

---

[13] Exs. 2425, 2426, 2427.

[14] *See, e.g.*, Exs. 2425, 2426, 2427.

patent license for 4G SEPs.  (Exs. 4750, 4751.)  The rates under these agreements were the same as those in Revision E of Ericsson's Reference Price Sheet:  1.25% of NSP for GSM or GPRS, 1.5% for GSM/GPRS/EDGE, 1.75% for multi-mode 3G (1.5% for single-mode 3G), and 2% for 4G (with the 4G floor and cap of €2.00 and €4.50).  (Ex. 1216 [Lynde Schedule 6A]; Exs. 4750, 4751.)  While this 2014 license included a 4G license, Mobistel did not sell 4G units and had total handset sales of less than 467,000 units across 2013 to 2015.  (Ex. 1221 [Lynde Schedule 7C].)  In addition, all of Mobistel sales were 3G handsets and did not include U.S. sales.  (Ex. 2434 [Lynde Rebuttal Schedule 1D].)  Comparing Mobistel's 3G handset sales in 2015 of around 106,000 to TCL's 35 million 3G handset sales demonstrates the vast difference between these companies on just the basis of 3G sales alone.  (Ex. 1201 [Lynde Schedule 1A]; Ex. 2434 [Lynde Rebuttal Schedule 1D].)  Based on its relatively low sales, Mobistel also would have little incentive to negotiate or litigate for lower rates because the transaction costs would outweigh the cost of paying the reference rates.

55.    According to Mobistel's website, "Since 2003, MOBISTEL has grown as the global leading company that provides mobile handset products which is particularly aimed to GSM mobile phone."  (Ex. 2394.)  Mobistel currently offers one GSM feature phone and 14 smartphones, of which only four (released in late 2015 and June 2016) have 4G capabilities (*i.e.*, Mobistel Cynus E7, F7, F9, and F10 smartphones).[15]  In addition, TCL does not consider Mobistel to be a major competitor.  (Dkt. 1316, ¶ 107; *see also* Dkt. 1412.)  I conclude that while Mobistel has a larger variety of smartphone offerings compared to some of the other one-way licensees, it still is not similarly situated to TCL, because its presence in the handset market is limited.

3.    Conclusion regarding licensees most similarly situated to TCL

---

[15] Exs. 2395-2410.

56.     There is nothing in Mr. Kennedy and Dr. Teece's witness declarations that leads me to change my conclusions with respect to those companies and licenses that are the most similarly situated to TCL.  Namely, it is my opinion that TCL is most similarly situated to Apple, Samsung, HTC, Huawei, LG, and ZTE.  I believe that Dr. Teece's opinion that TCL is not similarly situated to Apple, Samsung, HTC, Huawei, and LG, and instead is similarly situated to Sharp, Coolpad, and Karbonn, is flawed given the fact these other companies have substantially less sales than TCL, do not directly compete with TCL on a global basis (including here in the U.S.), and are not regarded as meaningful global competitors by TCL.

## C.     Mr. Kennedy's Decision to Convert Every Royalty into a Dollar-Per-Unit Rate for Comparison Purposes Is Improper.

57.     Throughout Mr. Kennedy's witness declaration, instead of presenting running royalties as a percentage of net sales price ("NSP") as specified in the Ericsson Reference Price Sheets and many of Ericsson's license agreements, he instead calculates dollar-per-unit rates.  (*See*, *e.g.*, Ex. 5316 at p. 1.)  In fact, he insists that FRAND royalty rates must be evaluated on a dollar-per-unit basis.  (Dkt. 1333,  ¶11.)

58.     Mr. Kennedy's position does not properly account for the fact that historically Ericsson's offers to TCL, many of Ericsson's licenses, and Ericsson's Reference Price Sheets all have primarily involved percentage-of-NSP rates for handsets.  (Exs. 458, 459 [Options A and B]; Exs. 59, 271, 1198 [Ericsson Reference Price Sheets]; Exs. 1219, 1220 [Lynde Schedules 7A and 7B].)  While dollar-per-unit rates for handsets occasionally appear (primarily as floors and caps for 4G sales), only certain of Ericsson's offers to TCL contained a per-unit floor and cap (*e.g.*, Option A did not contain a floor or cap).  (Ex. 1222 [Lynde Updated Schedule 8A]; Ex. 458 pp. 9-10 [TCL Option A].)  Ericsson has a long and, until recently, consistent history of requesting royalties as a percentage-of-NSP.  (Dkt.

1   1319, ¶ 75.)  Ericsson maintained this position at the Huawei Arbitration in 2015,

2   discussing the "well-established industry practice of calculating royalties based on

3   the price of the end user device."  (Dkt. 1319, ¶ 75; Ex. 1154 at p. 29.)  Further, the

4   Huawei Tribunal ████████████████████████████████████████████████████

5   ████████████  (Ex. 58 at p. 178.)  Consequently, Ericsson's switch to a dollar-per-

6   unit licensing basis for TCL, who is seeking to compete (in part) in the lower price

7   segment, would result in much higher effective rates than those paid by Huawei (and

8   others).

9        59.    Further, for lower-price handsets, a dollar-per-unit royalty would

10   become an increasingly burdensome cost and risk as prices in that highly

11   competitive segment have been in decline.  (Ex. 1209 [Lynde Schedule 2C].)  This

12   is true for all handset manufacturers who have, or will have, lower-priced products.

13   As prices decline and converge (which is the normal trend for all electronics),

14   manufacturers who face dollar-per-unit royalties would suffer an even greater

15   disadvantage in comparison with competitors whose licenses with Ericsson use

16   percentage royalty rates or lump sum payments.  It is likely that this is part of the

17   reason why Ericsson chose to switch from percentage royalties to dollar-per-unit

18   royalties for TCL following the Huawei Tribunal Award.  (For example, in the case

19   of TCL handsets, a $2.00 per unit rate would have amounted to 0.82% of the

20   average sales price of a 4G handset in 3Q 2013 ($245.04), but 1.88% of the average

21   sales price in 4Q 2015 ($106.28) – nearly 2.3 times the initial effective rate.  (Ex.

22   1209 [Lynde Schedule 2C].)

23        60.    A main focus of Mr. Kennedy's attempt to justify his use of dollar-per-

24   unit rates now appears to be based on the notion that a SEP license is equivalent to

25   buying a component (*e.g.*, battery) for use in a handset, such that the SEP license

26   should have a fixed dollar value, just as the battery has a fixed dollar value.  (I note

27   that Mr. Kennedy has substantially expanded on this argument relative to what was

28   in his rebuttal expert report.)  I disagree with Mr. Kennedy, and such thinking

1  oversimplifies the value of such intellectual property.  The very nature of many of

2  the other components of a handset, whose own values are amplified by the SEPs,

3  makes this clear.  For example, text messaging and camera features are more

4  valuable when combined with 2G, 3G, and 4G functionality, which in turn often

5  allows a manufacturer to command a higher price for a handset.  Indeed, I

6  understand Ericsson itself has long advocated using the price of the handset as the

7  royalty base (rather then the fixed price of the chipset), precisely because the value

8  its SEPs allegedly bring to the handset is best measured by the price of the handset,

9  which is inherently variable across manufacturers and product lines.  (Ex. 2460 at

10  8:14-26 (Ericsson's Responses to Plaintiff's Second Set of Interrogatories, No. 9).)

11      61.    The trends in Ericsson's historical Reference Price Sheets over time

12  further demonstrate that Ericsson did not believe that SEPs should have a fixed

13  dollar per-unit cost.  Not only are all the reference prices based on a percentage-of-

14  revenue, but also the dollar-per-unit floors and caps decrease in each successive

15  Reference Price Sheet.  For example, between Revision C (June 2012 Reference

16  Price Sheet) and Revision F (March 2015 Reference Price Sheet), the 4G floor fell

17  from $3.50 to $2.00, and the cap fell from $8.00 to $4.50.  (Exs. 59, 269)  This

18  variability is not consistent with the notion that a license to Ericsson's SEP portfolio

19  should have a fixed cost; rather, it is consistent with Ericsson trying to secure certain

20  revenues.

21      62.    Mr. Kennedy's own 4G dollar-per-unit calculations illustrate a wide

22  variation in the supposed value of Ericsson's SEPs, which is likewise inconsistent

23  with his theory that a license to those SEPs should have a fixed dollar value.  In

24  particular, Mr. Kennedy's calculations range from slightly more than a ███ for

25  one Ericsson licensee (i.e., ███████████) to almost ████████ for another

26  Ericsson licensee (i.e. ███████████.  If a "component" is essentially identical

27  for different but similarly-situated customers, then its market value to those

28  customers should be substantially the same for each customer.  This would be

especially true if identical "components" were supplied in a competitive market. But the disparities in "component" prices per unit that Mr. Kennedy posits would argue against this being the case. Instead, the disparity of "component" prices for identical patent rights, as seen in Mr. Kennedy's calculations, would be consistent with price discrimination wherein a party with market power seeks the profit maximizing price from each customer.

63. For all these reasons, it is my opinion that neither Mr. Kennedy nor Ericsson has provided a suitable explanation regarding why Ericsson's offers to TCL (as compared with Ericsson's licenses to select licensees) should be evaluated on a dollar-per-unit basis when they can easily be evaluated (especially with regard to Option B) on a percentage-of-revenue basis.

### D. Mr. Kennedy's Calculation of the "Effective Rates" Under the Two-Way Licenses Is Flawed and Unreliable.

64. At a high level, Mr. Kennedy's approach to the calculation of effective one-way rates is similar to my own, in that he acknowledges using the same "unpacking equation" for this calculation that I used in my Witness Declaration. (Dkt. 1333, ¶¶ 110-111.) Mr. Kennedy's choice of inputs to this equation, however, is flawed.

1. Mr. Kennedy's use of Ericsson's approved contribution counting method to create a Portfolio Strength Ratio is suboptimal.

65. As discussed in my original witness declaration, the portfolio strength ratio ("PSR") is an important component in calculating the effective one-way royalty rate from a cross-license. (Dkt. 1318, ¶¶ 91-96; Exs. 1231, 1232, 1235, 1236 [Lynde Schedules 11C.1, 11C.2; Lynde Updated Schedules 11D.1, and 11D.2].) In approximating the relative strengths of the portfolios of the two parties in question, the PSR also serves as a proxy for the ratio between the effective one-way licensing rates of the parties. Consequently, it is important to use reliable and unbiased data as inputs into the PSR calculation.

66.     Mr. Kennedy relies on an approved contributions analysis (from the Signals Report) to construct his portfolio strength ratio.  (Dkt. 1333, ¶ 122.) However, Mr. Kennedy fails to mention that the Signals Report (1) was commissioned and paid for by Ericsson; (2) used and merely repeated a methodology created by Ericsson; and (3) was not independent in the sense that it did not verify the accuracy of Ericsson's hypothesis that counting approved technical contributions is a reliable way of assessing SEP ownership, and was subject to Ericsson's ultimate veto.  (Dep. of Gustav Brismark, 5/18/16, pp. 96-99; Ex. 1083 at p. 4.)

67.     Whether or not Ericsson's commissioning of the Signals Report yielded an objective result (it did not), a contribution counting analysis also suffers from the following drawbacks:

- Approved contributions do not necessarily cover new technology, meet patentability criteria or "non-obviousness" criteria, or even correspond to a patent in the first place.  (Dkt. 1314, § VI.E.)

- The Signals Report contributions analysis is not based on actual patents, or whether such patents are essential.  Handset manufacturers do not need to license every patent compatible with a standard, but rather only those that are determined to be standard-essential.  Consequently, any exercise to determine royalty rates for SEPs should consider the essentiality of the actual patents.

- The Signals Report contributions analysis is not specific to the patents at issue in this case.  Ericsson's offers to TCL (including Option A and Option B) specifically concern patents that are essential to select standards (in particular, GSM, GPRS, EDGE, UMTS, WCDMA, and LTE).  (Exs. 458, 459.)  Ericsson's portfolio, and presumably the contributions submitted for analysis, are wider than the patents that read on these standards.  (Ex. 1278 at pp. 7, 29.)  Furthermore, a licensee's portfolio of

handset patents or contributions is relatively useless to Ericsson, which exited the handset business in 2012.  (Ex. 1177 at p. 1; Ex. 4370 at pp. 5, 7, 39, 60; Ex. 4371 at p. 40.)

68.     Conversely, as I discussed in my original witness declaration, the analyses by Drs. Ding and Kakaes sought to determine those patent families that were truly essential to a standard from those patent families declared potentially essential to a standard.  Their analyses provided counts of the relevant standard-essential patent families, thus meeting the criteria discussed above.  (Dkt. 1318, § VI.C.)  PSRs calculated from this data are preferable, as they are more relevant to the current proceedings, and focused on those patents (or patent families) actually determined to be essential to a standard.

69.     Although I disagree with Mr. Kennedy's decision to use a PSR based on the Signals Report, there is ultimately little impact on the calculated effective royalty rate if one uses the data from the Signals Report as opposed to the data from the patent analyses prepared by Drs. Ding and Kakaes.  Specifically, as shown in Lynde Rebuttal Schedule 3A, my non-LTE royalty rates for HTC and Samsung essentially do not change.  (Ex. 2439 [Lynde Rebuttal Schedule 3A].)  Similarly, Lynde Rebuttal Schedule 3B shows that using the Signals Report to calculate the PSR actually lowers the LTE rates for HTC by between 0.02% and 0.06% (*i.e.*, from ████████████ using the IDC data, and from ████████████ using the Ericsson Business Case data).  (Ex. 2440 [Lynde Rebuttal Schedule 3B].)  For Samsung, the LTE rate also falls, albeit by less than 0.01% (*i.e.*, from ████████████ using the IDC data, and from ████████████ using the Ericsson business case data).

### 2.  Mr. Kennedy's "apportionment factors" calculations are based on circuitous reasoning.

70.     Several of Ericsson's recent licenses with similarly-situated licensees (*e.g.*, Samsung, HTC, and LG) feature lump sum payments.  Because these licenses cover several standards, an effective royalty rate analysis needs to present and

support a method for apportioning the lump sum payments across standards.

71.     Ideally, this method draws from available data – projected revenues, projected sales, or negotiated and agreed-upon royalty rates – as I have done in my analyses.  (*See e.g.*, Exs. 1231, 1232, 1233, 1234 [Lynde Schedules 11C.1 to 11C.4]; Exs. 1235, 1236, 1237, 1238 [Lynde Updated Schedules 11D.1 to 11D.4].) Mr. Kennedy's method, however, does not do this.  Instead, he improperly assumes one percentage-of-revenue royalty rate in the process of calculating another percentage-of-revenue royalty rate.  Specifically, Mr. Kennedy uses the percentage-of-revenue rates displayed in the Ericsson business cases for Samsung, HTC, and LG – rates that are not in the actual license agreements.  Then, he calculates expected total royalty payments, based on business case projections, using these percentage-of-revenue rates.  The ratio between LTE royalties and total royalties becomes the "LTE apportionment factor," and the ratio between non-LTE royalties and total royalties becomes the "non-LTE apportionment factor."  These ratios are then used to separate the lump sum payments into LTE and non-LTE portions, and Mr. Kennedy proceeds with unpacking the two-way licenses to calculate one-way effective royalty rates for LTE and non-LTE.  (Ex. 5316 at pp. 5, 8, 12, 15 [Kennedy Rebuttal Report, Exhibits 3.3.3, 3.3.5, 3.3.9, and 3.3.12].)

72.     In his witness declaration, and without any stated support, Mr. Kennedy now attributes this methodology to Ericsson.  (Dkt. 1333,¶¶ 130-131.)  Mr. Kennedy uses the percentage-of-revenue rates from Ericsson's business cases to apportion the lump sum payments in Ericsson's licenses.  Mr. Kennedy claims that this apportionment is an Ericsson practice.  However, it is not.  Ericsson does not apportion their lump sum royalties in this manner.  If this had been the case, one would have expected Ericsson to modify the percentage-of-revenue rates in different projection scenarios.  (*See, e.g.,* Ex. 4929.)

73.     Again, though, Mr. Kennedy's flawed approach is ultimately not particularly impactful in terms of the resulting rates.  In particular, Mr. Kennedy

calculates apportionment factors that are reasonably close (within 1 to 4 percentage points) to the ones I determined in my original report.  (Ex. 2441 [Lynde Rebuttal Schedule 5]; *see also* Exs. 1231, 1232, 1233, 1234 [Lynde Schedules 11C.1 to 11C.4]; Exs. 1235, 1236, 1237, 1238 [Lynde Updated Schedules 11D.1 to 11D.4].)

### 3.   Mr. Kennedy's decision to account for "differential risk" diverges from the methods Ericsson uses in its business cases.

74.    In creating business cases to value several of its recent two-way licenses, Ericsson provided insight into certain of its practices and perspectives at the time of each license negotiation.  For example, the discount rates used by Ericsson in each business case indicate the size of the risk that Ericsson believed was associated with each licensee.  Mr. Kennedy, on the other hand, appears to indicate that Ericsson's valuation practices are flawed and incorrect, because he often deviates from the discount rates used in the Ericsson business cases.

75.    For example, in the Apple business case, Ericsson discounts the annual ███████ lump sum payments by ███ in a Net Present Value ("NPV") calculation.  (Ex. 4946; Ex. 5316 at p. 24.)  Mr. Kennedy instead chooses a discount rate of ████ as he appears to believe that his choices regarding license valuation are better and more informed than those of Ericsson's licensing personnel.  (Ex. 5316 at p. 24; Ex. 4946.)  Mr. Kennedy's valuation appears to disregard information from the Ericsson business cases (and Ericsson's employees with licensing responsibilities) when the information is inconvenient for him, while he nevertheless accepts such information when it is helpful for him.

76.    While I maintain the opinions set forth in my original witness declaration, I note that, as shown in the Lynde Rebuttal Schedule 6 series, adjusting my analysis of the Samsung and Apple licenses to accommodate Mr. Kennedy's lower discount rate on the lump sum payments does not substantially impact the calculated one-way rates.  (Exs. 2442 - 2450 (Lynde Rebuttal Schedules 6A, 6B, 6C, 6D, 6E, 6F, 6G, 6H, 6I).)  The change in the effective one-way 4G royalty rate for

1  Apple is 0.04% (the rate increases from ████████████. (Ex. 2442 [Lynde

2  Rebuttal Schedule 6A].)  The change for both LTE and non-LTE rates for Samsung

3  using the IDC data is 0.01% (*i.e.*, the non-LTE rate increases from ████████

4  and the LTE rate increases from ████████████ (Ex. 2445 [Lynde Rebuttal

5  Schedule 6D].)  Using the business case data, the non-LTE rate for Samsung

6  increases from ████████████ while the LTE rate increases from ████████████

7  (Ex. 2448 [Lynde Rebuttal Schedule 6G].)

8           4.    Mr. Kennedy includes all released sales and release payments,

9                 even though some only apply to past events.

10  77.    In certain of its license agreements, Ericsson provided the licensee with

11  a release for its past unlicensed sales in exchange for a release payment.  In other

12  agreements, Ericsson incorporated the release payment into the payment otherwise

13  due for future sales.  Mr. Kennedy chose to include all released sales and release

14  payments in his analyses, even when a license agreement or deposition testimony

15  explicitly identified them as payments for past events.  In my opinion, such

16  payments (and their associated sales) are not relevant for a going-forward analysis.

17  For this reason, I do not include these quantities in my Apple, Samsung, and LG

18  analyses.  (The payment for the HTC license, on the other hand, could not be split

19  into a release payment and other payments, and so I find it necessary to include

20  HTC's past sales in the HTC analysis.)

21  78.    Effective royalty rates calculated based on projections are

22  fundamentally different from effective royalty rates calculated based on past sales,

23  for several reasons.  For example, there is no risk or uncertainty associated with past

24  sales.  In addition, the telecommunications industry has been rapidly evolving, so

25  combining the known and the unknown into a single rate may obscure information.

26  Furthermore, released sales with separate release payments already indicate that the

27  licensee and licensor have calculated an appropriate, separate rate for the released

28  sales.

79.     Most importantly, however, by excluding released sales and release payments, my calculations are actually conservative.  For example, the Ericsson/Samsung license included a one-time, lump sum royalty of ███████ and annual royalty payments.  (Ex. 1276 at pp. 9-11.)  The ██████████ payment, explicitly identified as a release payment, was to cover Samsung's sales between March 31, 2011, the expiration date of the previous license, and February 1, 2014, the effective date of the current license.  (Ex. 1276 at pp. 1, 10-11.)  As shown in the Lynde Rebuttal Schedule 7 series, for illustrative purposes I adjusted my original calculations to include Samsung's released sales and the release payment as inputs to my effective one-way royalty rate calculations.  (Exs. 2451 - 2456 [Lynde Rebuttal Schedules 7A, 7B, 7C, 7D, 7E, 7F].)  These adjustments had very little impact on my effective one-way LTE rate for Samsung, changing the rate from ███████████ using the IDC data and from ██████████ using the business case projections.  (Exs. 2451, 2454 [Lynde Rebuttal Schedules 7A and 7D].)  The impact of these adjustments on my effective one-way non-LTE rate for Samsung *reduced* the rate from ██████████ using the IDC data and from ██████████ using the business case projections.  (Exs. 2451, 2454 [Lynde Rebuttal Schedules 7A and 7D].)

80.     Likewise, for Apple, Mr. Brismark (Ericsson's Chief Intellectual Property Officer) indicated that Apple's ████████ upfront payment "covers both past and future payments" as well as other releases and covenants.  (Dep. of Gustav Brismark, 5/18/16, pp. 183-184; Ex. 258 at pp. 13, 15.)  In Lynde Rebuttal Schedule 8A, I have prepared an illustrative analysis of the effective Apple rates that includes released sales and the portion of the ████████ payment that is relevant to past and future 4G sales.  (Ex. 2457 [Lynde Rebuttal Schedule 8A].)  This analysis demonstrates that, as with Samsung, including the released sales and the release payment has relatively little impact on the effective LTE royalty rate.  In fact, using Mr. Kennedy's preferred method results in a *lowering* of the LTE rate from ██████

1　██████

2　　　　5.　Mr. Kennedy chooses to use projection scenarios from the

3　　　　　　Ericsson business cases that would lead to higher royalty rate

4　　　　　　calculations.

5　　　81.　In its business cases, Ericsson typically included three scenarios:  a low

6　case, a medium case, and a high case (sometimes named "Scenario 1," "Scenario 2,"

7　and "Scenario 3").  Interestingly, only the licensee's sales varied across the low,

8　medium, and high scenarios, while Ericsson's projected sales remained the same.

9　　　82.　Mr. Kennedy chooses to use the medium (or "mid") business case for

10　Samsung.  (Dkt. 1333, ¶ 169.)  As discussed in my original witness declaration, I

11　used the high business case for Samsung as the Ericsson business case did not

12　provide any guidance as to the most likely scenario, and the high scenario was

13　consistent with Strategy Analytics' contemporaneous, independent projections from

14　that time period.  (Dkt. 1318, ¶ 118.)  Using the medium business case projections

15　for Samsung as inputs into my analysis biases the rates upwards (*i.e.*, my calculated

16　effective one-way rate for 4G increases from ██████████ and the 2G/3G rate

17　increases from ████████).  (Ex. 2458 [Lynde Rebuttal Schedule 9A].)  I note

18　that these rates are ████████ than the one-way rates being paid by Huawei, as well

19　as the effective one-way rates I calculated for HTC.  (PDX 28.)

20　　**E.**　**Mr. Kennedy's Calculation of the "Effective Rates" Under the**

21　　　　**One-Way Licenses Is Flawed.**

22　　　83.　As discussed below, Mr. Kennedy's method to determine the wholesale

23　prices for his one-way licensees ignores available information.  Analyzing such

24　licenses requires data on handset unit sales, revenues, and prices.  Many sources,

25　such as IDC, only have access to (and consequently report) *retail* unit sales and

26　retail prices.  However, many of Ericsson's license agreements charge royalties

27　based on percentages of the net selling price, which is generally based on the selling

28　price charged by the licensee (*i.e.*, often the *wholesale* price).  For this reason, Mr.

Kennedy explains that he attempts to convert the revenues and prices reported from such data sources (in particular, IDC) into wholesale revenues and prices.  (Dkt. 1333, ¶¶ 104-105.)

84.     Although the idea behind this adjustment is logical, Mr. Kennedy's actual adjustment is imprecise.  Mr. Kennedy assumes a single wholesale "markup" factor to adjust handset prices, regardless of the type of handset, smartphone or feature phone.  (Ex. 5313 at pp. 6-10 [Kennedy Rebuttal Expert Report, Exhibit 2.3.2].)  In his rebuttal expert report, Mr. Kennedy previously calculated a smartphone-specific markup using one source (Counterpoint), and a total handset industry markup using a different source (Strategy Analytics), but then only used the Strategy Analytics total handset data for his markup.  (Ex. 5313 at p. 26 [Kennedy Rebuttal Expert Report, Exhibit 2.3.6].)  In his witness declaration, Mr. Kennedy now only discusses the Strategy Analytics data.  (Dkt. 1333, ¶ 105.)

85.     Mr. Kennedy uses his wholesale markup to calculate his "effective dollar-per-unit rates" for the one-way licenses.  (Ex. 5313 at pp. 6-10, 21-26; Ex. 5314 at p. 3; Ex. 5317 at pp. 1-2 [Kennedy Rebuttal Expert Report, Exhibits 2.3.2, 2.3.5, 2.3.6, 3.1.3, 3.4.1].)  However, as discussed above, it is my opinion that none of these one-way licensees or licenses (with the exception of Huawei) are similarly situated to TCL.  Even if they were similarly situated to TCL (they are not), the actual royalty rates specified in their respective licenses are percentage-of-revenue royalty rates, and thus it is not necessary to attempt to convert them into dollar-per-unit rates.

F.     **Mr. Kennedy Improperly Unpacks Ericsson's Option A and Option B Offers.**

86.     As discussed in my original Witness Declaration, Ericsson's Option A offer consisted of a $30 million annual lump sum payment for five years, plus running royalties on any TCL sales that exceed $3 billion.  (Dkt. 1318, ¶ 165.)  Mr. Kennedy's analysis of Option A is flawed in several respects.  (Dkt. 1333, ¶¶ 142-

148.)  First, he includes released sales, which, as I discussed above for the two-way licenses, is incorrect.  Second, Mr. Kennedy continues to use a variety of discount rates, despite evidence that ██████████████████████████ ████  (Dkt. 1333, ¶ 148).

87.    As noted in my original Witness Declaration, Ericsson's Option B offer is based on a percentage-of-revenue royalty.  (Dkt. 1318, ¶ 166.)  Since this is a percentage-of-revenue royalty there is no need for Mr. Kennedy to unpack this royalty rate, as it is clearly specified in the agreement.  However, Mr. Kennedy instead chooses to conduct his unpacking analysis, which suffers from the same issues I discuss above for the Option A analysis.  In addition, I note that Mr. Kennedy's dollar-per-unit rates for 3G and 4G under Option B in his witness declaration have increased from the rates specified in his rebuttal expert report.  Specifically, Mr., Kennedy's dollar-per-unit rates under Option B are now $0.69 (previously $0.67) for 3G and $1.92 (previously $1.89) for 4G, with a dollar-per-unit rate for EDGE of $0.36 (previously $0.37).  (Dkt. 1333,  Figure 36; Kennedy Expert Rebuttal Expert Report, pp. 64-67.)  Mr. Kennedy offers no explanation for these changes.

**G.    Mr. Kennedy Improperly Compares My Illustrative One-Way Dollar-Per Unit Rates for Select Ericsson Licensees with His Determined Dollar-Per Unit Rates.**

88.    In his Figure 6, Mr. Kennedy attempts to compare his calculated 4G dollar-per-unit rates for selected licensees (*e.g.*, Samsung, LG, HTC, Sharp, Apple, and Huawei), as well as the illustrative dollar-per-unit rates I calculated for these licensees, with his calculated dollar-per-unit rates for Option A and Option B.  As noted above, there are a number of issues with Mr. Kennedy's dollar-per-unit calculations for both the Ericsson licensees and Option A and Option B.  However, Mr. Kennedy's haphazard approach for choosing from the illustrative dollar-per-unit rates I calculated demonstrates the fallacy in his summary table, in that Mr.

1  Kennedy has inconsistently cherry-picked certain rates in an attempt to make his
2  own dollar-per-unit analysis seem reasonable.

3      89.   First, neither the methodology I used to calculate the dollar-per-unit
4  royalties, nor the data, nor the underlying assumptions are consistent across the
5  dollar-per-unit royalty rates Mr. Kennedy chose to present.  For example, the
6  Samsung and Sharp royalty rates are from Lynde Schedule 11A, which used one-
7  year of IDC data to demonstrate the percentage-of-revenue rate actually paid in
8  2015 for two-way licenses (it does *not* unpack an effective one-way rate.  (Ex. 1229
9  [Lynde Schedule 11A].)  The Huawei royalty rate, from Lynde Schedule 11B, is
10 based on the one-way rates from Huawei's license agreement and IDC data.  (Ex.
11 1230 [Lynde Schedule 11B].)  Alternatively, the HTC royalty rate is from Lynde
12 Schedule 11C.2, which relies on Ericsson's business case projections and a PSR
13 based on patent family counts to unpack a one-way rate for HTC.  (Ex. 1232 [Lynde
14 Schedule 11C.2].)  The LG royalty rate is from Lynde Rebuttal Schedule 4A.1,
15 which uses 1.5 years of IDC data and a PSR based on a contributions analysis to
16 unpack a one-way rate for the 3.5-year license.  (Ex. 1245 [Lynde Rebuttal Schedule
17 4A.1].)  Finally, the Apple royalty rate is from Rebuttal Schedule 8A, which relies
18 on Ericsson's business case projections and a PSR based on patent family counts to
19 unpack a one-way rate.  (Ex. 2457 [Lynde Rebuttal Schedule 8A].)  Notably, the
20 Apple royalty calculation that Mr. Kennedy chose was simply an illustrative royalty
21 that I prepared to demonstrate the effect of adding the release payment and released
22 sales on the one-way rate.  It was not a method that I endorsed.

23 ### III.  MR. PELLEGRINO'S VALUATION OF THE TRANSFERRED LG
24 PATENTS IS HIGHLY FLAWED AND UNRELIABLE.

25     90.   As briefly discussed in my original Witness Declaration, I found Mr.
26 Pellegrino's valuation of the transferred LG patents to be flawed, unsupported, and
27 unreliable, and as a result I determined there was inadequate support for putting a
28 non-zero value on these patents.  (Dkt. 1318, ¶ 135.)  In response to Mr. Pellegrino's

witness declaration, below I provide additional information in support of my conclusion.

### A. Mr. Pellegrino Assumes (Without Basis) that the Transferred LG Patents Are in High Demand and Have No Competing Alternatives.

91.     In his witness declaration, Mr. Pellegrino estimates the value of certain LG patents that were transferred to Ericsson as part of the Ericsson/LG license agreement. (Dkt. 1323, ¶ 2.) The value of the transferred LG patents is important because it could provide a potential offset to the royalty that LG pays Ericsson under the license. In the context of this case, the effective royalty rates that LG pays Ericsson for a license to the Ericsson SEP portfolio (if calculated correctly) can be one benchmark with regard to a potential non-discriminatory royalty rate that TCL may pay Ericsson. I understand that Mr. Pellegrino's valuation is Ericsson's first attempt to introduce expert analysis establishing a non-zero value for these patents. (Ex. 58 at pp. 125-126.)

92.     Ideally, such a patent valuation would begin with a study of the supply and demand in the market for this specific patented technology, as these two basic economic forces determine the value of every good and service. (Ex. 2391 at p. 284.) The higher the demand for the patented technology, the higher the price. The lower the supply of alternatives to this patented technology (other patents that provide similar functionality), the higher the price. Conversely, if the patents are not infringed, and or there are readily available alternatives, the lower the price.

93.     Mr. Pellegrino bypasses this step and instead *assumes* that the transferred LG patents are in high demand (and that the entire smartphone market infringed the LG transferred patents). (Dkt. 1323, ¶ 10; *see also id.*, ¶¶ 2, 79, 85-92.) Mr. Pellegrino also compares the alleged technology of the transferred LG patents to technology he believes is practiced by current smartphones in an effort to demonstrate demand for the transferred LG patents. (*See id.*, ¶¶ 70-84.) In fact, Mr.

Pellegrino never analyzes whether any of the patent claims are actually implemented, which I understand is partly because LG only provided claim charts for some of the transferred patents, and also because the LG patent claim charts are insufficient to establish that the patents are infringed.  (Dkt. 1324.)  I further understand that, generally, Ericsson has not pursued patent infringement suits for the technology practiced by the transferred LG patents (with the exception of asserting one of these patents against Apple), indicating, for the most part, that either the alleged technology referenced by Mr. Pellegrino does not infringe the transferred LG patents, or the patents are not worth attempting to enforce.  (Dkt. 1324, ¶¶ 27, 46, 63, 77, 90, 98, 107, 118.)  Rather than illustrating demand for the transferred LG patents via this comparison, Mr. Pellegrino actually demonstrates that other patents providing similar technology exist in the marketplace, which reduces the market power of the transferred LG patents.  (Dkt. 1323, ¶¶ 70-84.)

94.    Moreover, in his witness declaration, Dr. Andrew Wolfe (TCL's technical expert with regard to the transferred LG patents), has further outlined the deficiencies in Mr. Pellegrino's "valuation" of the transferred LG patents from a technical standpoint.  In particular, Dr. Wolfe found that the "LG patents have little to no technical value because the claimed features are not widely implemented, offer little advantage over possible design-arounds, and/or are not generally useful." (Dkt. 1324, § IV.)  I also understand that Dr. Wolfe found that six of the eight LG transferred patents were never assigned to Ericsson, so it is unclear that, even if these patents had any value, which I understand they did not, Ericsson would have been the beneficiary.  (*See id.*, ¶¶ 43, 59, 73, 88, 96, 115.)

95.    As discussed above, these issues alone demonstrate that Mr. Pellegrino's valuation and conclusions regarding the transferred LG patents are flawed, and that in fact these patents have little to no value.

**B.      Mr. Pellegrino's Valuation Methodology Is Unsupported and Unreliable.**

96.      After discussing the supposed position of the transferred LG patents in the marketplace, Mr. Pellegrino next attempts to conduct a complicated, multi-faceted, and unsupported analysis to value these patents.  As discussed below, his analysis is based on unsupported assumptions and incorrect modeling choices, making its results unreliable.

97.      Mr. Pellegrino relies on many unsupported assumptions to construct his valuation of the transferred LG patents, including assumptions on the remaining economic life of the transferred LG patents, revenue timing, licensee licensing order, and revenue forecasts.  (Dkt. 1323, ¶¶ 310-319, 354-383.)

98.      Mr. Pellegrino indicates that the length of time over which intellectual property ("IP") may be exploited for profit can affect the value of the IP.  Mr. Pellegrino further explains that, to determine whether a hypothetical buyer would be able to exploit these patents, he must consider whether functional or economic obsolescence would affect the patents as well as the very nature of the transferred LG patents.  (Dkt. 1323, ¶¶ 313-14.)  Both functional obsolescence and the nature of the transferred LG patents, as defined by Mr. Pellegrino, rely on the idea that there are no substitutes to the technology provided by those patents.  Dr. Wolfe addresses these issues in his witness declaration.  (Dkt. 1324, ¶¶ 20-21.)  In fact, as described above, Mr. Pellegrino actually points to non-infringing smartphones that utilized the same technology, indicating the immediate availability of potential substitutes.  Economic obsolescence, on the other hand, occurs when the use of the IP provides an inadequate return on investment.  (Dkt. 1323, ¶ 314.)  In my opinion, it is important to establish market demand for the transferred LG patents, which Mr. Pellegrino has not done (instead, he has just assumed it).

99.      Mr. Pellegrino also explains that constraints on Ericsson's revenue-generating ability related to the transferred LG patents would affect the value of

1  these patents.  (*See id.*, ¶ 354.)  To incorporate this consideration into his valuation

2  analyses, Mr. Pellegrino assumes that Ericsson would pursue licensees to the

3  transferred LG patents immediately, that the sales process would last one month,

4  and that the licensee would "most likely" spend one month considering the license

5  agreement.  (*See id.*, ¶ 356.)  However, Mr. Pellegrino provides no support for any

6  of these assumptions.  Further, as of the writing of this witness declaration (more

7  than 2.5 years after the effective date of the Ericsson/LG license), I understand that

8  Ericsson has not produced any license agreements which individually license any of

9  the transferred LG patents.

10       100.   Mr. Pellegrino further states that "larger licensees will drive a higher

11  value if they execute license agreements before smaller licensees."  (Dkt. 1323,

12  ¶ 359.)  After confirming with Ericsson that representatives would approach larger

13  potential licensees first, Mr. Pellegrino concludes (without any basis) that these

14  larger potential licensees would also sign licenses first.  Again, this is based on no

15  other evidence than Ericsson's acknowledgement that, in the hypothetical scenario

16  in which they would seek licensees for the transferred LG patents, it would make

17  sense to focus on the licensee's size.

18       101.   As another part of his analysis of the transferred LG patents' revenue

19  generating abilities, Mr. Pellegrino claims to have considered the royalty rate that

20  Ericsson could expect to charge.  (Dkt. 1323, ¶¶ 363-383.)  "There is no established

21  royalty rate for the LG Patents that I could use as a proxy," Mr. Pellegrino writes.

22  (*Id.*, ¶ 376.)  He then arbitrarily chooses a royalty range of 0.25% to 0.50% of ASP,

23  which he attempts to justify by noting the following:

24        •   If Apple, Samsung, ZTE, Alcatel, Motorola, Huawei, Nokia, HTC,

25          Blackberry, Kyocera, Pantech, and Sony all license the transferred LG

26          patents at 0.33% of ASP, on average, they would pay $0.94 per phone

27          in 2015.  (Dkt. 1323, ¶¶ 376-377.)

28

- Dividing Ericsson's unsupported $125 million valuation of the transferred LG patents (the very number that Mr. Pellegrino was hired to calculate) by LG's projected sales of 122.2 million units from 2009 to 2017, produces a result of $1.02 per phone. (*See id.*, ¶ 378.)
- The $0.94 royalty per phone in 2015 (based on Mr. Pellegrino's unsupported 0.33% of ASP rate assumption above) is close to a $1.02 per LG phone average over 2009 to 2017 (based on Ericsson's unsupported $125 million valuation).
- Therefore, Mr. Pellegrino concludes, a royalty rate of 0.33% of ASP is a reasonable assumption to use in his valuation analysis.

102.   Recall that Ericsson retained Mr. Pellegrino to "independently" value the transferred LG patents, because Ericsson had not provided evidence to support its $125 million valuation in either its LG business case or the Huawei Arbitration. Instead, Mr. Pellegrino assumes that Ericsson's $125 million valuation was reasonable, and uses this valuation to justify his own assumption of a royalty rate of 0.33% of ASP.  Interestingly, this unsupported assumption then leads to an overall valuation by Mr. Pellegrino of $274 million in the unencumbered scenario and $170 million in the encumbered scenario, which itself indicates that Mr. Pellegrino's initial assumptions were incorrect.  (Dkt. 1323, ¶ 14.)

103.   As discussed above, the multitude of errors and unsupported assumptions present in Mr. Pellegrino's valuation analysis demonstrate that his conclusions with regard to the transferred LG patents are highly flawed and unreliable.  As a result, I maintain my original opinion that there is no evidence to support placing a non-zero value on the transferred LG patents.

## IV.   CONCLUSIONS REGARDING ERICSSON'S BREACH OF ITS FRAND OBLIGATION

104.   As discussed in detail in Section IV.A of my original Witness Declaration, I do not agree with the opinions of Mr. Kennedy and Dr. Teece that the

1   range of effective rates being paid by Ericsson's current licensees, however

2   calculated, constitute the bounds within which a FRAND compliant rate would

3   necessarily be found.  (Dkt. 1331, ¶¶ 10, 65; Dkt. 1333, ¶¶ 1, 13, 21, 52, 66, 70-71.)

4   Nor would I agree with Mr. Kennedy's assertion that what constitutes a FRAND

5   rate should be defined by reference to the entire "range" of Ericsson's prior license

6   agreements.  (Dkt. 1333, ¶ 74.)

7       105.   Nothing in the witness declarations of Mr. Kennedy, Dr. Teece, or Mr.

8   Pellegrino has led me to change my opinion that Ericsson's Option A and Option B

9   offers to TCL are not FRAND.  As I indicated in my original Witness Declaration,

10  the objective evidence that I have reviewed for the purposes of determining whether

11  Option A and Option B are FRAND comes from Ericsson's actual licensing history

12  for the most similarly-situated licensees.  Below I provide a high-level summary of

13  some of the analyses that I have performed to help me reach this conclusion.

14      106.   The table below (PDX 28) below compares the rates in Ericsson's

15  Option B offer with the one-way equivalent effective rates I was able to calculate for

16  the similarly-situated licensees.

17

18

19

20

21

22

23

24

25

26

27

28

**PDX 28 (Table 6 in Dkt. 1318)**

**Comparison of Ericsson Licensees' Effective One-Way Percentage Royalty Rates with Ericsson's Offer to TCL Under Option B**

| Standard | Ericsson Licensee | | | | | TCL Option B (5/15/15) |
| | Apple (12/19/15) | Samsung (2/14/14) | HTC (12/31/14) | Huawei | LG (6/27/14) | |
|---|---|---|---|---|---|---|
| 2G/3G | | | | | | 0.8% - 1.2% |
| 4G | | | | | | 1.5% |

Note:

The Huawei one-way rates are directly from its updated agreement with Ericsson.

A "*" indicates the one-way rates calculated from the Ericsson Business Cases for Apple, Samsung (High), HTC, and LG.

A "**" for Samsung indicates the one-way rates calculated using the medium Business Case.

For Samsung, HTC, and LG the rates displayed without a "*" or "**" were calculated using IDC data.

The 2G and 3G rates offered by Ericsson under Option B were:  0.8% for GSM, 1.0% for GSM/GPRS/EDGE, and 1.2% for WCDMA.  (Ex. 459.)

In its May 2015 cross-licensing offer, Option A, Ericsson offered TCL specified royalties in the form of $30 million annual lump sum payments for sales up to $3 billion (resulting in an implied rate of 1.0%, assuming the full $3 billion in sales), with additional royalties due for sales exceeding $3 billion (e.g., 0.8% for GSM/GPRS, 1.1% for EDGE, 1.5% for WCDMA, and 2% for 4G.  (Ex. 458.)  These additional running royalty rates are even higher than the Option B rates.

Source:  Ericsson/Huawei Updated License (Ex. 1277); Huawei Arbitration Final Award (Ex. 58); Schedules 11C.1, 11.C.2 (Exs. 1231, 1232); Updated Schedules 11D.1, 11D.2, 11F.1 (Exs. 1235, 1236 and 1240); Rebuttal Schedules 4A.1, 4B.1, 9A (Exs. 1245, 1247, 1640); Option A (Ex. 458); Option B (Ex. 459).

107.   These rate differences would have a substantial real-world impact on the total royalties TCL would have to pay Ericsson.  The table below (PDX 29) illustrates the differences in the total royalty payments TCL would have paid in 2014 and 2015 under Ericsson's Option B as compared to the effective percentage rates being paid by its competitors.

1

2

**PDX 29 (Table 7 in Dkt. 1318)**

**TCL Expected Royalty Payments for 2014 and 2015 Under Various Scenarios ($ Millions)**

| Standard | Similarly Situated Licensees | | | | | Option B Rates |
| | Lynde Calculated One-Way Rates | | | | Huawei | |
| | Apple | Samsung | HTC | LG | | |
|---|---|---|---|---|---|---|
| 2G | | | | | | $6.5 |
| 3G | | | | | | $51.5 |
| 4G | | | | | | $28.7 |
| Total | | | | | | $86.7 |

Note:

The royalty payments cover sales during 2014 to 2015.

These calculations are based on TCL-produced sales data and on the one-way effective royalty rates I calculated using the Ericsson business case sales data and projections (except for the calculation using the Huawei rates, which uses the rates specifically stated in Ericsson's license with Huawei).

I use the one-way 4G rate calculated for Apple to determine TCL's expected royalty payments for its 2G, 3G, and 4G sales.

Source: Schedule 12B (Ex. 1244); Rebuttal Schedules 12A and 12B (Exs. 1255 and 1256).

108.   As shown in this table, the royalties TCL would have paid Ericsson under Option B based on TCL's actual sales in 2014 and 2015 are approximately ▮▮▮▮▮▮▮ (in dollars) than the royalties TCL would have paid Ericsson under the effective one-way royalty rates enjoyed by TCL's competitors.  In my opinion, this demonstrates that Ericsson's Option B offer to TCL was and is discriminatory, and hence not FRAND-compliant, when compared to the effective one-way rates being paid by the Ericsson licensees that are similarly situated to TCL.

109.   Another way to illustrate the discriminatory nature of Ericsson's Option A and Option B offers to TCL, as well as the real-world impact the offers would have on TCL, is to examine the percentage of each licensee's revenue for licensed products that Ericsson receives as royalty payments from that licensee, as compared to the percentage of TCL's licensed revenues that Ericsson would receive as royalty

payments from TCL under Option A or Option B.  The tables below (PDX 30 and 31) provide a summary of these findings.

**PDX 30 (Table 8 in Dkt. 1318)**

**Comparison of Royalty Payments as a Percentage of Revenue**
**(2014 and 2015 Sales, Based on Ericsson Business Cases and TCL Data)**

| Year | Ericsson Licensee | | | | TCL | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | Option A | Option B |
| 2014 | | | | | 1.06% | 1.27% |
| 2015 | | | | | 1.05% | 1.47% |
| Combined | | | | | 1.05% | 1.36% |
| Source:  Rebuttal Schedules 11B, 11D, 11E, 11F (Exs. 1250, 1252, 1253, 1254) | | | | | | |

**PDX 31 (Table 9 in Dkt. 1318)**

**Comparison of Royalty Payments as a Percentage of Revenue**
**(2014 and 2015 Sales, Based on IDC Data)**

| Year | Ericsson Licensee | | | | TCL | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | Option A | Option B |
| 2014 | | | | | 1.13% | 1.21% |
| 2015 | | | | | 1.18% | 1.31% |
| Combined | | | | | 1.16% | 1.26% |
| Source:  Rebuttal Schedules 11A, 11C, 11D, 11E, 11F (Exs. 1249, 1251, 1252, 1253, 1254) | | | | | | |

110.   As shown in PDX 30, using the Ericsson business case data for Apple, Samsung, HTC, and LG (as Ericsson did not provide a business case for Huawei), and TCL's actual sales data for 2014 and 2015, I find that the total royalties paid by Apple, Samsung, HTC and LG ranged from ███████████ of their revenues for licensed products.  However, Ericsson's May 2015 offers (*i.e.*, Option A and Option B) would have cost TCL between 1.05% and 1.36% of its licensed revenues.  Under this analysis, Apple paid ██████ of its revenue for licensed products, whereas under Option A and Option B TCL would pay between 1.05% and 1.36%, respectively, of its licensed revenue (*i.e.*, around ███████████ under Option A and almost 10 times more under Option B).  For Samsung and LG, TCL would pay between ████████

1   ████████████████ and for HTC between ███████████████

2   111.   Alternatively, as shown in PDX 31, using the IDC sales data as the

3   source for 2014 and 2015 sales, I find that the total royalties paid by Apple,

4   Samsung, HTC, Huawei, and LG under their licenses with Ericsson are between

5   ████████████ of their licensed 2G, 3G, and 4G handset revenues.  In contrast,

6   Option A and Option B would have cost TCL between 1.16% and 1.26% of its

7   revenues.  Under this analysis Apple paid ████ of its revenue for licensed

8   products, whereas TCL under Option A and Option B would pay between 1.16%

9   and 1.26% of its licensed revenue, around ██████████ For Samsung, HTC, and

10   LG, TCL would pay between ████████████████ and for Huawei, around

11   ███████████

12   112.   It is my opinion that the analysis and summarization set forth in my

13   original Witness Declaration and this Rebuttal Witness Declaration demonstrate that

14   Ericsson's Option A and Option B offers to TCL were and are discriminatory, and

15   as a result not FRAND-compliant, when compared to the effective one-way rates

16   being paid by those Ericsson licensees that are the most similarly situated to TCL.

17

18   I declare under penalty of perjury under the laws of the United States of

19   America that the foregoing is true and correct.

20

21   Executed on January 27, 2017 at  San Francisco, CA.

22

23   _____

24   Matthew R. Lynde, Ph.D.

**TABLE OF EXHIBITS CITED IN REBUTTAL WITNESS DECLARATION**

| Exhibit No. | Description |
|---|---|
| 58 | Final arbitration award between Ericsson and Huawei, dated 12/31/15 |
| 59 | Reference Price Sheet dated 3/30/15 [Rev. F] |
| 258 | License Agreement between Apple and Ericsson dated 12/19/15 |
| 269 | Reference Price Sheet dated 6/25/12 [Rev: C] |
| 458 | Ericsson's FRAND Offer to TCL (Cross-License) dated 5/8/15 ("TCL Option A") |
| 459 | Ericsson's FRAND Offer to TCL (One-Way License) dated 5/8/15 ("TCL Option B") |
| 1010 | Spreadsheet re IDC Device Shipments by Region, 2014Q1 to 2015Q2 |
| 1083 | Signed proposal letter from Signals Research to Ericsson re 3GPP analysis dated 7/6/10 |
| 1154 | Ericsson's Second Pre-hearing Submission, Ericsson/Huawei Arbitration No. 01-14-0002-2610 |
| 1177 | Wall Street Journal publication titled "Sony Buys Ericsson Stake in Handset Joint Venture," S. Grundberg, 10/28/11 |
| 1189 | Webpage from Alcatel website displaying phones available for purchase (TCL smartphone comparison) |
| 1190 | Webpage from DeviceSpecifications displaying TCL mobile devices announced from 2013-2016 and other TCL news |
| 1191 | Webpage from Specout by GRAPHIQ website displaying specs for TCL mobile phones (TCL smartphone comparison) |
| 1201 | Schedule 1A titled "TCL Worldwide Annual Mobile Phone Unit Sales by Technology (Based on IDC Sales Data), 2009 – 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1209 | Schedule 2C titled "TCL Handset and Tablet ASPs by Generation (Based on TCL Sales Data), 3Q 2009 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1210 | Schedule 3A titled "Worldwide Quarterly Mobile Phone Unit Sales by Vendor Group (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1216 | Schedule 6A entitled: "Ericsson's Reference Price Sheet Rates for 2G, 3G, and 4G End User Terminals," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |

| 1219 | Schedule 7A titled "Summary of Ericsson License Agreements with TCL and Similarly Situated Companies," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
|---|---|
| 1220 | Schedule 7B titled "Summary of Other Ericsson License Agreements," Expert Report of Matthew R. Lynde, submitted February 22, 2016; and Updated Schedule 7B.1, entitled: "Summary of iBall (Best IT World) and Ericsson License Agreement," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1221 | Schedule 7C entitled: "Ericsson Licenses Including 4G to Select Other Companies in 2014 and 2015 (Include License to End User Terminals)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1222 | Updated Schedule 8A titled "Ericsson's Offers to TCL, Rates for 2G, 3G, and 4G End User Terminals," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1229 | Schedule 11A titled "Effective Two-Way Royalty Rates Based on 2015 IDC Sales Data and Royalty Payments," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1230 | Schedule 11B titled "Per Unit Royalty Rates Based on 2015 IDC Sales Data and Huawei Tribunal Determined Rates," Expert Report of Matthew R. Lynde, submitted February 22, 2016 [Redacted] |
| 1232 | Schedule 11C.2 entitled: "HTC Effective One-Way Royalty Rate Calculation (Based on business case Projections)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1231 | Schedule 11C.1 titled "HTC Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1232 | Schedule 11C.2 entitled: "HTC Effective One-Way Royalty Rate Calculation (Based on business case Projections)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1233 | Schedule 11C.3 entitled: "Calculations Underlying Effective Royalty Rate Calculations for HTC (Based on IDC Sales Data), 1Q 2014 – 4Q 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1234 | Schedule 11C.4 titled "Calculations Underlying Effective Royalty Rate Calculations for HTC (Based on business case Projections), 1Q 2014 – 4Q 2016," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |

| 1235 | Updated Schedule 11D.1 titled "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1236 | Updated Schedule 11D.2 titled "Samsung Effective One-Way Royalty Rate Calculation (Based on High business case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1237 | Updated Schedule 11D.3 titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on IDC Sales Data), 1Q 2014 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1238 | Updated Schedule 11D.4 titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on High business case Projections), 1Q 2014 – 4Q 2020," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1239 | Second Updated Schedule 11E titled "Estimated Number of Essential Infrastructure Patent Families," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1240 | Updated Schedule 11F.1 titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on business case Projections)," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1244 | Schedule 12B titled "TCL Expected Royalty Payments to Ericsson for 2014 and 2015 Sales Based on Huawei Tribunal Determined Rates," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1245 | Rebuttal Schedule 4A.1 entitled: "LG Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1247 | Rebuttal Schedule 4B.1 entitled: "LG Effective One-Way Royalty Rate Calculation (Based on business case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1249 | Rebuttal Schedule 11A entitled: "Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |

| 1250 | Rebuttal Schedule 11B entitled: "Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson (Based on business case Projections and TCL Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
|---|---|
| 1251 | Rebuttal Schedule 11C titled "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by Huawei (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1252 | Rebuttal Schedule 11D titled "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by TCL Under Option A," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1253 | Rebuttal Schedule 11E titled "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by TCL Under Option B," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1254 | Rebuttal Schedule 11F entitled: "Calculations Underlying Implied 2014 & 2015 Percent of Revenue Royalties Paid to Ericsson by Apple," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1255 | Rebuttal Schedule 12A entitled: "TCL Expected Royalty Payments to Ericsson for 2014 and 2015 Sales Based on Select Ericsson Offers," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1256 | Rebuttal Schedule 12B entitled: "TCL Expected Royalty Payments to Ericsson for 2014 and 2015 Sales Based on Lynde Calculated One-Way Rates," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1273 | Spreadsheet titled "IDC WW Quarterly Mobile Phone Tracker, 2015 Q4 Historical Release," dated 2/12/16 |
| 1276 | License Agreement  between Samsung and Ericsson dated 2/1/14 |
| 1278 | Ericsson 2014 annual report |
| 1640 | Rebuttal Schedule 9A entitled: "Samsung Effective One-Way Royalty Rate Calculation (Based on Business Case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2360 | MetroPCS Webpage of Apple Phones |
| 2388 | Webpage from Audioline website advertising mobile phones and related products |
| 2389 | Coolpad 2014 Annual Report |

| 2394 | Screenshots taken of Mobistel website proving company information |
|---|---|
| 2411 | "About Us" tab from Binatone company website |
| 2412 | Webpage from AEG website comparing mobile phone technical specs. For M1500, M1220 and M1250 models |
| 2417 | Webpage from CAT website displaying phone models |
| 2418 | Webpage from CAT website displaying smartphones for sale with pricing |
| 2420 | "About Us" tab from Coolpad company website |
| 2421 | Webpage from Doro website displaying the Doro 824 mobile phone |
| 2388 | Webpage from Audioline website advertising mobile phones and related products |
| 2389 | Coolpad 2014 Annual Report |
| 2390 | Coolpad 2015 Annual Report |
| 2391 | "Intermediate Microeconomics, 4th Ed.," by H. Varian, p. 284 |
| 2392 | Webpage from Amazon website advertising Alcatel phones for purchase in Europe |
| 2393 | English translation of webpage from Audioline website advertising mobile phones and related products |
| 2394 | Screenshots taken of Mobistel website proving company information |
| 2395 | Brochure for Mobistel 'Cynus E5' mobile phone |
| 2396 | Brochure for Mobistel 'Cynus E7' mobile phone |
| 2397 | Brochure for Mobistel 'Cynus F10' mobile phone |
| 2398 | Brochure for Mobistel 'Cynus F4' mobile phone |
| 2399 | Brochure for Mobistel 'Cynus F5' mobile phone |
| 2400 | Brochure for Mobistel 'Cynus F6' mobile phone |
| 2401 | Brochure for Mobistel 'Cynus F7 4G' mobile phone |
| 2402 | Brochure for Mobistel 'Cynus F8' mobile phone |

| 2403 | Brochure for Mobistel 'Cynus F9 4G' mobile phone |
| 2404 | Brochure for Mobistel 'Cynus T5' mobile phone |
| 2405 | Brochure for Mobistel 'Cynus T6' mobile phone |
| 2406 | Brochure for Mobistel 'Cynus T7' mobile phone |
| 2407 | Brochure for Mobistel 'Cynus T8' mobile phone |
| 2408 | Brochure for Mobistel 'Cynus E4' mobile phone |
| 2409 | Brochure for Mobistel 'Cynus EL800' mobile phone |
| 2410 | Screenshots from Mobistel company website displaying all Mobistel phones |
| 2411 | "About Us" tab from Binatone company website |
| 2412 | Webpage from AEG website comparing mobile phone technical specs. For M1500, M1220 and M1250 models |
| 2413 | Webpage from AEG website comparing mobile phone technical specs. For Voxtel M405, M311 and M320 models |
| 2414 | Webpage from AEG website comparing mobile phone technical specs. For Voxtel M800, M410 and SM420 models |
| 2415 | Webpage from AEG website comparing mobile phone technical specs. For Voxtel SM315, SM420 and SM250 models |
| 2416 | Webpage from HKTDC website displaying Binatone products for sale |
| 2417 | Webpage from CAT website displaying phone models |
| 2418 | Webpage from CAT website displaying smartphones for sale with pricing |
| 2419 | Webpage from CATE website providing details on the CAT S50C Smartphone |
| 2420 | "About Us" tab from Coolpad company website |
| 2421 | Webpage from Doro website displaying the Doro 824 mobile phone |
| 2422 | Webpage from Doro website displaying the Doro 824 SmartEasy (Consumer Cellular) mobile phone |
| 2423 | PCMagazine.com review of the Doro 824 SmartEasy, 4/22/16 |

| 2424 | Webpage from Doro website displaying the Doro PhoneEasy 626 mobile phone |
| 2425 | InformationWeek publication titled "Emporia Telecom: Mobile Phones for Elderly Users," dated 3/1/12 |
| 2426 | Guiding Tech. publication titled "Top 3 Cell Phones for Senior Citizens (in the U.S.)" |
| 2427 | "History" tab from Emporia company website |
| 2428 | Screen shot of Youtube website displaying video titled "Karbonn Mobiles Brand Journey" |
| 2429 | "Company" tab from Karbonn Mobiles company website |
| 2430 | Schedule 1A titled "Audioline Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 3Q 2012 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2431 | Rebuttal Schedule 1B titled "Bea-fon Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 1Q 2012 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2432 | Rebuttal Schedule 1C titled "Binatone Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 1Q 2014 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2433 | Rebuttal Schedule 1C.1 titled "AEG Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 1Q 2011 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2434 | Rebuttal Schedule 1D titled "Mobistel Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 1Q 2013 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2435 | Rebuttal Schedule 1E titled "Doro Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 1Q 2008 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 2436 | Rebuttal Schedule 1H titled "Emporia Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 3Q 2010 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |

| 2437 | Rebuttal Schedule 1I titled "Karbonn (Jaina) Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 2Q 2009 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
|---|---|
| 2438 | Rebuttal Schedule 1J titled "Coolpad Worldwide Quarterly Mobile Phone Sales (Based on IDC Sales Data), 1Q 2007 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2439 | Rebuttal Schedule 3A titled "Sensitivity of Effective One-Way 2G/3G Royalty Rates to Portfolio Strength Ratios," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2440 | Rebuttal Schedule 3B entitled: "Sensitivity of Effective One-Way 4G Royalty Rates to Portfolio Strength Ratios," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2441 | Rebuttal Schedule 5 titled "Apportionment Factors Used to Divide Lump Sum Royalty Payments Into Non-LTE and LTE Portions," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2442 | Rebuttal Schedule 6A titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on Medium Business Case Projections, Using Kennedy Discount Rate on Lump Sum Royalty) [Compares Rebuttal Schedule 6B with Updated Schedule 11F.1]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2443 | Rebuttal Schedule 6B titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on Medium Business Case Projections, Using Kennedy Discount Rate on Lump Sum Royalty)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2444 | Rebuttal Schedule 6C titled "Calculations Underlying Effective LTE Royalty Rate Calculations for Apple (Based on Medium Business Case Projections, Using Kennedy Discount Rate on Lump Sum Royalty), 1Q 2016 – 4Q 2021," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 2445 | Rebuttal Schedule 6D titled "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data, Using Kennedy Discount Rate on Lump Sum Royalty) [Compares Rebuttal Schedule 6E with Updated Schedule 11D.1]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, |

| | | |
|---|---|---|
| 1 | | 2016. |
| 2 | 2446 | Rebuttal Schedule 6E entitled: "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data, Using Kennedy Discount Rate on Lump Sum Royalty)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 5 | 2447 | Rebuttal Schedule 6F entitled: "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on IDC Sales Data, Using Kennedy Discount Rate on Lump Sum Royalty), 1Q 2014 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 9 | 2448 | Rebuttal Schedule 6G entitled: "Samsung Effective One-Way Royalty Rate Calculation (Based on High Business Case Projections, Using Kennedy Discount Rate on Lump Sum Royalty) [Compares Rebuttal Schedule 6H with Updated Schedule 11D.2]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 13 | 2449 | Rebuttal Schedule 6H titled "Samsung Effective One-Way Royalty Rate Calculation (Based on High Business Case Projections, Using Kennedy Discount Rate on Lump Sum Royalty)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 16 | 2450 | Rebuttal Schedule 6I titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on High Business Case Projections, Using Kennedy Discount Rate on Lump Sum Royalty), 1Q 2014 – 4Q 2020," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 20 | 2451 | Rebuttal Schedule 7A titled "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data) [Compares Rebuttal Schedule 7B with Updated Schedule 11D.1]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 23 | 2452 | Rebuttal Schedule 7B titled "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data, Including Released Sales and Release Payments)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| 26 | 2453 | Rebuttal Schedule 7C titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on IDC Sales Data, Including Released Sales and Release Payments), 2Q 2011 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, |

| | | |
|---|---|---|
| | | submitted November 4, 2016. |
| | 2454 | Rebuttal Schedule 7D titled "Samsung Effective One-Way Royalty Rate Calculation (Based on High Business Case Projections) [Compares Rebuttal Schedule 7E with Updated Schedule 11D.2]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| | 2455 | Rebuttal Schedule 7E titled "Samsung Effective One-Way Royalty Rate Calculation (Based on High Business Case Projections, Including Released Sales and Release Payments)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| | 2456 | Rebuttal Schedule 7F titled "Calculations Underlying Effective Royalty Rate Calculations for Samsung (Based on High Business Case Projections, Including Released Sales and Release Payments), 2Q 2011 – 4Q 2020," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| | 2457 | Rebuttal Schedule 8A titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on Medium Business Case Projections) [Compares Rebuttal Schedule 8B with Updated Schedule 11F.1]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| | 2458 | Rebuttal Schedule 9A titled "Samsung Effective One-Way Royalty Rate Calculation (Based on Business Case Projections) [Compares Rebuttal Schedule 9B with Updated Schedule 11D.2]," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016. |
| | 2459 | License Agreement between Audioline and Ericsson dated 7/1/14 (3G/4G) |
| | 2460 | Ericsson's Responses to Plaintiff's Second Set of Interrogatories to Defendants, dated 4/20/15 |
| | 2461 | Rebuttal Schedule 1F titled "CAT (Bullitt) Quarterly Mobile Phone Sales (Based on IDC Sales Data), 3Q 2013 – 4Q 2015," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| | 2462 | Webpage from Bea-fon website advertising mobile phones and related products |
| | 2463 | "About Us" tab from Bea-fon company website |
| | 4000 | 01/01/2013 Ericsson/Jaina Marketing License |
| | 4201 | Ericsson Claim Chart for US-8,705,466 (Internal ref: P26071 |

REBUTTAL WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

| | US2) |
|---|---|
| 4370 | Ericsson Annual Report 2011 |
| 4688 | 4/1/2014 - Ericsson/Binatone License |
| 4702 | 1/1/2014 - Ericsson/Beafon License Amendment No. 1 |
| 4703 | 1/1/2014 - Ericsson/Beafon License |
| 4729 | 4/1/2014 - Ericsson/Binatone License Amendment No. 1 |
| 4732 | 1/1/2014 - Ericsson/Bullit License Amendment No. 1 |
| 4738 | 7/1/2013 - Ericsson/Doro 3G License Amendment No. 1 |
| 4750 | 1/1/2014 - Ericsson/Mobistel License Amendment No. 1 |
| 4773 | 01/01/2013 - Ericsson/Yulong License |
| 4791 | 7/01/2013 -Ericsson/Doro 2G License Amendment No. 1 |
| 4919 | 1/1/2013 - Ericsson/United Telelinks License |
| 4905 | 3/27/2015 - Ericsson/Jaina Marketing License Amendment |
| 4920 | 7/1/2014 - Ericsson/Audioline License Amendment No. 1 |
| 4929 | Final Business Case for Ericsson/HTC License (2014) NATIVE VERSION |
| 4934 | 1/1/2015 Ericsson/Emporia LTE License |
| 4946 | Final Business Case for Ericsson/Apple License (2016) NATIVE VERSION |
| 5313 | Kennedy Exhibit 2.3 |
| 5316 | Kennedy Exhibit 3.3 |
| 5317 | Kennedy Exhibit 3.4 |

REBUTTAL WITNESS DECLARATION OF DR. MATTHEW R. LYNDE

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the PLAINTIFFS' REBUTTAL DECLARATION OF EXPERT WITNESS MATTHEW R. LYNDE, Ph.D. to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| | David Sochia |
| | dsochia@mckoolsmith.com |
| | Douglas Cawley |
| | dcawley@mckoolsmith.com |
| | Nicholas Mathews |
| | nmathews@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:   */s/ Kristina Grauer*
         KRISTINA GRAUER