1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
2  A Limited Liability Partnership
   Including Professional Corporations
3  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
9  Limited, and TCT Mobile (US) Inc.

10              UNITED STATES DISTRICT COURT

11    FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12

| | |
|---|---|
| 13 TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | Case No. SACV14−00341 JVS (DFMx) Consolidated with CV15-02370 |
| 14 | |
| 15 Plaintiffs, | **PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. JANUSZ A. ORDOVER** |
| 16 v. | |
| 17 TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, | |
| 18 Defendants. | |
| 19 _____ | Place: Courtroom 10C Before Hon. James V. Selna |
| 20 TELEFONAKTIEBOLAGET LM ERICSSON *et al.*, | Pre-Trial Conf.: Jan. 30, 2017 Trial: Feb. 14, 2017 |
| 21 | |
| 22 Plaintiffs, | **PUBLIC REDACTED VERSION** |
| 23 v. | |
| 24 TCL COMMUNICATION | |
| 25 TECHNOLOGY HOLDINGS, LTD. *et al.*, | |
| 26 Defendants. | |

27

28

1

# TABLE OF CONTENTS

2

3

**I.  EXPERT QUALIFICATIONS** ........................................................................ **1**

4

**II.  SUMMARY OF TESTIMONY** ..................................................................... **2**

5

**III. PATENTS, STANDARD SETTING, AND OPPORTUNISM** ...................... **4**

6

A.  Benefits of Standardization ........................................................................ 5

7

B.  The Need to Constrain Market Power that Arises from Inclusion in a Standard ...... 7

8

    1.  Hold-up ................................................................................................ 10

9

    2.  Royalty stacking ................................................................................ 14

10

C.  Standard Setting Organization IPR Policies Are Intended to Protect Against Opportunism and Promote Innovation. ........................................ 19

11

12

**IV. THE MEANING OF FRAND** ..................................................................... **22**

A.  SEP Owners Must Offer Licensees Fair and Reasonable Terms ............ 24

13

B.  SEP Owners Must Offer Licensees Non-Discriminatory Terms ............. 28

14

C.  Competing Firms Are Similarly Situated Licensees ................................ 29

15

D.  The FRAND Commitment Requires Offers to Be Fair, Reasonable, and Non-Discriminatory. ........................................................................... 31

16

17

**V.  ERICSSON'S ACTIONS ARE INCONSISTENT WITH THE FRAND COMMITMENT.** ......................................................................... **32**

18

A.  Ericsson's Discriminatory Offers to TCL ............................................... 32

19

B.  Dollar-Per-Unit Benchmarks Are Inconsistent with Ericsson's FRAND Commitment. .............................................................................. 36

20

    1.  Ericsson's proposed dollar-per-unit analysis would be discriminatory. ..... 36

21

    2.  SEP owners are not guaranteed a minimum return on investment. ........ 39

22

C.  The Value of the Communications Technology as a Whole, or of "Cellular Connectivity," Is Not a Relevant Benchmark for the Value of Ericsson's SEPs .... 42

23

24

**VI. CONCLUSION** ........................................................................................... **43**

25

**TABLE OF EXHIBITS CITED IN WITNESS DECLARATION** .................. **46**

26

27

28

## DECLARATION OF DR. JANUSZ A. ORDOVER

I, Dr. Janusz A. Ordover, declare under the penalty of perjury that the material contained herein is true and correct and I am competent to testify thereto.

## I.  EXPERT QUALIFICATIONS

1.  I am an Emeritus Professor of Economics and a former Director of the Masters in Economics Program at New York University where I began teaching in 1973.  I previously served as the Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice.  While at the Antitrust Division, I served on the White House de-regulation task force, guided economic analyses of antitrust enforcement and acted as a liaison between the Justice Department and various regulatory agencies.  At the Division, I was one of the main drafters of the 1992 Horizontal Merger Guidelines.  I have served as an advisor to the Organization for Economic Cooperation and Development (OECD) in Paris, the World Bank, and the Inter-American Bank for Development on matters of privatization, regulation, international trade policy, and competition policy.  I have advised the governments of Poland, Czech Republic, Russia, Hungary, Argentina, and others on regulation and competition matters, as well as on privatization strategies.  I was voted Economist of the Year 2010 by Global Competition Review, and was named Competition Economist of the Year in 2015 and 2016.

2.  I have published scores of papers in academic journals and book chapters on various topics in antitrust, including the licensing of intellectual property and the economics of FRAND commitments.  Regarding the FRAND commitment, I published an article in Antitrust Source titled "Implementing the FRAND Commitment."  Ex. 455, Janusz Ordover & Allan Shampine, "Implementing the FRAND Commitment," *Antitrust Source*, American Bar Association, October 2014. I also recently published an article in CPI Chronicles titled "FRAND and the Smallest Saleable Unit."  Ex. 1174, Joseph Kattan, Janusz Ordover & Allan Shampine, "FRAND and the Smallest Saleable Unit," *CPI Chronicles*, September

2016.  A complete list of my publications can be found in my *curriculum vitae*, Ex. 451.

## II.   <u>SUMMARY OF TESTIMONY</u>

3.     I understand this case relates to allegations that Ericsson breached its commitment to license its standard-essential patent portfolio on fair, reasonable, and non-discriminatory ("FRAND") terms, and the parties have asked the Court to determine the proper royalty rate for Ericsson's 2G, 3G, and 4G standard-essential patents ("SEPs").  I have been asked by counsel for TCL to explain the economics of the FRAND commitment and how that commitment should be interpreted from the economic perspective to address the concerns arising from the inclusion of patented technology in a standard, including hold-up, royalty stacking, and discrimination.

4.     The incorporation of intellectual property ("IP") into a standard can, once the standard is adopted, provide the owner of the IP with incremental market power that it would not have absent the inclusion of the IP in the standard.  Absent constraining factors, this creates the potential for IP owners to abuse this incremental market power to extract more value from licensees than would have been possible prior to standardization.  Standard-setting organizations ("SSOs") such as the European Telecommunications Standards Institute ("ETSI"), the SSO at issue in this case, require members to commit to license SEPs on FRAND terms.  Such FRAND commitments, appropriately defined, can mitigate the deleterious economic consequences of opportunistic behavior that can be facilitated by standard setting, maintain powerful incentives for firms to participate in the process of standard setting, and promote broad adoption of the standard.

5.     In my testimony, I explain that the FRAND commitment has two related but distinct requirements:  licensing terms must be "fair and reasonable" and they must be "non-discriminatory."  A royalty rate is "fair and reasonable" if it does not reflect the incremental market power bestowed on the IP owner by the collective action of the SSO participants to include the IP in the standard, but instead reflects

only the *ex ante* value of the IP.  The *ex ante* value of the patent reflects the value of the patented technology relative to alternatives available at the time of standardization and not the value that would be conferred *ex post* by its inclusion in the standard.  A fair and reasonable royalty reflects only this quality premium. Furthermore, given that one purpose of the FRAND commitment is to facilitate adoption of the standard, a fair and reasonable rate cannot result in aggregate royalties that would impede adoption of the standard or make supplying the end product commercially infeasible.  One approach previously endorsed by Ericsson is to determine an aggregate royalty burden for all SEPs in the pertinent standard, and then to apportion that total royalty among SEP declarants.

6.     Separately, once a SEP owner licenses its patent(s), the "non-discriminatory" prong becomes operative and offers to future licensees must be evaluated in light of the existing licenses.  The non-discrimination requirement is aimed at fostering a level playing field among downstream competitors.  In contrast to an individual, arms-length commercial negotiation, the non-discrimination requirement dictates that when one firm obtains a particular set of licensing terms from a declared SEP holder, other "similarly situated" firms (*e.g.*, firms that rely on similar technologies and are competing with each other) should be able to choose from that same menu of terms, such as offering the same one-way royalty rates.  TCL is competitively similarly situated to firms such as Apple, Huawei, Samsung, LG, and HTC, for example, and thus entitled to "non-discriminatory" rates (*i.e.*, the same economic deal).  Because Ericsson has granted these firms that directly compete with TCL preferential licenses relative to some of their competitors, these licenses set the relevant benchmark.  Under an economic interpretation of the non-discrimination requirement, TCL should not be competitively disadvantaged relative to any of those firms.

7.     After setting forth the economic framework underlying the FRAND commitment, I discuss Ericsson's offers to TCL in light of the royalties paid to

1   Ericsson by Samsung, HTC, LG, Huawei, and Apple.  I find the rates Ericsson is

2   offering to TCL are ███████████████ higher than the rates being paid by these

3   Ericsson licensees, which indicates that Ericsson is not complying with the "non-

4   discriminatory" prong of the FRAND commitment.  Again, one of the purposes of

5   the non-discrimination provision is to prevent a licensor from providing preferential

6   deals to one firm, or a few firms, while charging other firms higher rates that can

7   disadvantage them competitively.  For competing firms, the rates should not be

8   substantially different.  New licensees should receive no less favorable terms than

9   any "similarly situated" licensee (or licensees) that received preferential rates.

10  **III.   PATENTS, STANDARD SETTING, AND OPPORTUNISM**

11        8.     Standards deliver economic benefits to innovators, firms that implement

12  the standards, and consumers.  Standards can also impose costs on these same

13  constituencies, some of which stem from opportunistic behavior by owners of patents

14  that cover or are declared to cover various technologies necessary to practice a

15  standard.  SSOs have adopted intellectual property rights ("IPR") policies to reduce

16  those costs.  When properly designed, implemented, and adhered to, the IPR policies

17  of SSOs benefit all of the constituencies.  Innovators receive the opportunity to have

18  their technology incorporated into the standard and to receive compensation for its

19  use in devices that operate using the standard.  Firms that implement the standard

20  receive assurance that they will always have access to the standard-essential patents

21  and will not be exploited by patent holders or disadvantaged relative to their

22  competitors if they invest in implementing the standard or developing innovative

23  products that may operate with the standard.  As the standard becomes more widely

24  adopted and used, patent holders receive greater total compensation and consumers

25  and firms benefit from continued innovation, reduced costs, and other efficiencies

26  from widespread interoperability and economies of scale and scope enabled by the

27  standard.  In contrast, breaches of IPR policies can chill future standard-setting

28  efforts, thus denying to innovators, firms, and consumers the many benefits of

standard setting.

### A.   Benefits of Standardization

9.     Standards are established through a variety of mechanisms. Compatibility standards are commonly adopted in industries in which complementary products or components, manufactured by different firms, must interoperate, interface, or communicate with each other.  When many companies produce components that must interoperate in a complex system, the collaboration of industry participants is often the most efficient way to establish the requisite standards.  This collaboration often takes place in the context of formal SSOs that promulgate standards and set participation rules for their members.  The telecommunications industry has benefited from increased interoperability across devices and networks, and the 2G, 3G, and 4G cellular communications standards at issue in this case are examples of compatibility standards.

10.    Compatibility standards benefit firms and consumers because, by establishing an accepted mode of interoperation, they allow investment in a common technology, thereby lowering costs due to economies of scale and enlarging the overall market.  This can be particularly important in industries, like telecommunications, exhibiting "network effects," in which the value of a product to any user increases with the total number of users.  In such industries, a standard acts as a signal to the consumer that other consumers will also be purchasing standard-compliant products and, therefore, the consumer will enjoy the benefits of network economies.

11.    A standard thus encourages earlier adoption of new products and promotes the realization of network benefits.  In addition, the setting of a compatibility standard that is open—*i.e.*, accessible to all who wish to practice the standard, albeit not necessarily for free, including access to any necessary intellectual property rights on FRAND terms—creates incentives for implementers to differentiate their products in other dimensions or on top of the common base enabled

by the standard.  That is, it creates incentives for downstream innovation. Importantly, open standards allow firms that may not have participated in the development of the standard or that are not members of the SSO—including new entrants—to compete in the downstream markets for products that implement the standard.

12.    Besides ensuring compatibility among products that comprise a "system," such as a mobile handset, standards enable firms to better exploit scale economies in design and production, which tends to lower costs and is therefore conducive to lower prices.

13.    SEP holders obtain a variety of benefits from participation in the standard setting process.  For example, because of inclusion in the standard, the volume of sales upon which royalties can be obtained is likely greater as compared to non-inclusion or to a situation where particular IP is not deemed essential.  Furthermore, participation in the standard setting process itself may be a useful indicator of a firm's technical expertise.  For example, in 1999, Ericsson averred to its prominence in the standard setting process.  *See* Ex. 1171, Ericsson Annual Report 1999, p. 16 ("In next-generation (3G) systems, Ericsson has been driving development for some time and is the only supplier able to offer 3G systems in accordance with all currently established 3G variants"); p. 27 ("One of the reasons why Ericsson is the world leader in mobile systems is that Ericsson is the only company able to offer mobile systems according to all existing standards.  This has applied to first- and second-generation systems and is now also true for third-generation systems.  Ericsson has long been one of the principal drivers behind the development of third-generation (3G) mobile communications.").

14.    It is widely agreed that compatibility standards also generate a broad range of economic benefits for consumers.  For example, compatibility standards expand the set of products available to consumers since, without such standards, some products would not be economically feasible.  Also, consumers benefit from the

differentiation of product, competition, and follow-on innovation discussed above that is enabled by standardization of the underlying technology.  For example, firms like TCL that invest and innovate in the development and provision of low cost standard-compliant mobile handsets help put such products within reach of the millions of customers around the globe for whom more expensive handsets may simply be unaffordable.  *See, e.g.*, Ex. 456, TCL Communication Technology Holdings Limited 2015 Annual Report ("TCL 2015 Annual Report"), p. 5 ("In 2015, with the increased construction of new 3G and 4G networks worldwide, growth momentum of handset businesses shifted to emerging markets.  Cost-competitive entry-level smartphones also sped up the pace of replacement of feature phones, driving local demand for smart devices.").

15.    These benefits of standardization can be reduced or undermined, however, if firms contributing intellectual property to a standard are allowed to exploit the unmeritorious market power (market power created by the standard-setting process itself) by, for example, restricting access to the declared SEPs or charging non-FRAND rates.  Realization of the benefits of standards thus requires protection of the process by which standards are set and implemented.

**B.    The Need to Constrain Market Power that Arises from Inclusion in a Standard**

16.    Although it offers clear benefits, collaborative standard setting can also raise antitrust concerns.  For example, collaborative standard-setting has the potential to empower any individual firm that has IPR over one or more technologies that are declared essential to the standard to block other firms from practicing the standard or to raise significantly their costs of doing so.  A patent is a form of IPR that gives the inventor or patent holder certain benefits in exchange for publicly disclosing the invention, generally by granting an exclusive period of time during which an inventor or patent holder can exploit an invention for commercial gain.  Outside of the standard-setting context, the extent to which a patent holder will be able to profit

1   from an invention is limited by competition from alternative, non-infringing

2   technologies or products.  Thus, even though a patent gives its owner the right to

3   exclude unauthorized users, it does not necessarily confer monopoly power because

4   constraining, non-infringing alternatives may be available.  As I explain in more

5   detail, incorporation of patents into a standard artificially removes competition from

6   those alternatives and provides the patent-holder with incremental market power that

7   can be exploited.  This incremental market power is due to the elimination of

8   alternatives following incorporation of the patents into the standard, not the inherent

9   technical value of the patents (*i.e.*, the contribution of the patented technology

10  relative to the alternatives—the *ex ante* value).

11      17.   Often, as is the case here with ETSI, a declaration of essentiality to the

12  standard is made by the IPR holder, and SSOs do not generally determine the validity

13  of the IP or whether the declared IP actually is essential to the standard.  Absent rules

14  that constrain the exercise of market power gained by a self-declaration of a patent as

15  a SEP, a firm exploiting that market power would undermine the ability of the SSO to

16  promulgate open standards, diminish firms' incentives to invest in innovation related

17  to standards-based products, and raise end product prices.  Ultimately, such conduct

18  harms consumers.

19      18.   Owners of SEPs gain the power to exclude or exploit because the process

20  of standardization transforms what may have been only marginally valuable IP into

21  essential IP needed by all firms that intend to manufacture, use, or sell standard-based

22  products.  The U.S. Department of Justice and Federal Trade Commission have

23  recognized the potential for SEP owners to abuse the power gained through

24  standardization.  *See, e.g.*, Ex. 1141, "The Evolving IP Marketplace," Federal Trade

25  Commission, March 2011, pp. 28-29; Ex. 1153, U.S. Department of Justice and

26  Federal Trade Commission, "Antitrust Enforcement & Intellectual Property Rights:

27  Promoting Innovation and Competition," April 2007, pp. 41-42; Ex. 1165, U.S.

28  Department of Justice Business Review Letter, February 2, 2015, note 28 (citing *In re*

1    *Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *43

2    (N.D. Ill. Oct. 3, 2013) and *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013

3    WL 2111217, at *100 (W.D. Wash. Apr. 25, 2013) – "litigated cases demonstrate the

4    potential for hold up when owners of RAND-encumbered standards-essential patents

5    make royalty demands significantly above the adjudicated RAND rate."); Ex. 1164,

6    Third Party United States Federal Trade Commission, "Statement on the Public

7    Interest," Inv. No. 337-TA-745, June 6, 2012, p. 3.  Whereas the IP controlled by the

8    owner of a future SEP may have faced competition from alternative technologies *ex*

9    *ante* (that is, before the standard is set), it faces no competing alternatives that are

10   compatible with implementation of the standard *ex post* (that is, after the standard is

11   set).  The effect is that the competitive constraints on the SEP owner's licensing

12   behavior are lessened after standardization and perhaps even eliminated.  This

13   elimination of alternatives confers latent market power on SEP owners relative to the

14   pre-standard situation wherein alternatives (including the option of not including the

15   relevant functionality at all) are potentially available in the technology market(s) and

16   can constrain the licensing behavior of the SEP owner.

17   19.    Once a standard is set, and especially as manufacturers invest in and

18   begin manufacturing products that can use or operate with the standard, it can be

19   infeasible to revise the standard in order to avoid a SEP.  Revising a standard can be

20   very costly to the industry implementing that standard because it may involve

21   breaking the compatibility and interoperability that the standard provides.  Thus,

22   changing a standard to eliminate a SEP whose owner attempts to exercise market

23   power is generally not feasible.  In sum, once an industry has adopted a particular

24   standard, there are no alternative technologies that can implement a given

25   functionality within the wording of the standard.  To prevent the exploitation of the

26   SEP owner's market power in this situation, there must be other constraints on the

27   SEP owner's licensing behavior, such as obligations to license on FRAND terms.

28

### 1.   Hold-up

20.     If firms whose technologies compete for inclusion in the standard licensed their technologies before standardization, *i.e.*, before costs were sunk by the SSO in the creation of the standard and by manufacturers in the production of goods that comply with the standard, then the risk that SEP owners would be able to exercise market power that flows from the inclusion in the standard would be removed or diminished.  Although some standard implementers may have obtained some of the required licenses prior to standardization (*e.g.*, some firms enter into broad cross-licenses that cover access to not only current but also future patents), most or all implementers must negotiate at least some of the necessary licenses only after – sometimes years after – a standard has been developed.  The *ex post* relaxation of competitive constraints on the SEP owner through the elimination of alternatives, together with the *ex post* negotiation of licenses, gives rise to the possibility that a SEP owner will act opportunistically and "hold up" some or all standard implementers by extracting higher royalties *ex post* than it could have bargained for *ex ante*.  Ex. 1141, pp. 199- 200 ("A definition of RAND based on the ex ante value of the patented technology at the time the standard is set is necessary for consumers to benefit from competition among technologies to be incorporated into the standard."); Ex. 1170, Commissioner Edith Ramirez, Opening Remarks, Federal Trade Commission Conference, "Tools to Prevent Patent 'Hold-up'," June 21, 2011, p. 12.

21.     Such hold-up power stems from the fact that implementers have sunk costs into the development of the standard and of standard-based products, and such costs would be unrecovered if they were to exit the market.  Although the *ex ante* framework is the appropriate one to use in assessing licensing conduct and royalty rates, there are practical constraints to using that approach in the real world where the rates are assessed *ex post*, after the standard has been adopted and the implementers have already sunk costs into developing and building products that implement the IP

at issue.  The key, therefore, is to find a reasonable surrogate for what the rates would have been *ex ante* when the self-declared SEP would have competed with alternatives for inclusion in the standard, and market power from the self-declared SEP would have been constrained in the bargaining/negotiating environment by alternative technologies.  I discuss appropriate surrogates in paragraphs 32 to 34 of this declaration.

22.    Generally, SSOs do not prevent their participants from seeking some royalties on their SEPs.  However, it is worth noting that such an outcome is not inevitable.  For example, several very successful standards, including Bluetooth and standards developed by the World-wide Web consortium (W3C), have been based on a royalty-free model.  *See* Ex. 1168, Bluetooth SIG Membership Benefits; Ex. 1167, "W3C Patent Policy," February 5, 2004.  Because of the potential absence of competitive constraints on the exercise of market power after the standard is set, there is a need to ensure that SEP owners do not charge royalties that are excessive relative to a reasonable benchmark or impose other onerous licensing terms on firms whose products practice the standard, without undermining innovators' incentives to participate in the SSO.  FRAND commitments are an important tool that prevents SEP holders from realizing excessive royalties, assuming, of course, that the commitments are not breached.

23.    Basic economics suggests therefore that it is reasonable to define non-FRAND royalties as including those royalties that an owner of a SEP could not successfully demand before the standard is set but that it could successfully demand after the standard is set (*i.e.*, a royalty level enabled only by the inclusion of the SEP in the standard).  This is the approach adopted by the court in *Ericsson, Inc. v. D-Link Systems, Inc.,* 773 F. 3d 1201 (Fed. Cir. 2014).  It was also adopted by the FTC; in its 2011 report, the FTC recommended that courts should adopt an *ex ante* framework when valuing standard essential patents subject to a FRAND commitment.  Ex. 1141, p. 200 ("Courts should cap the royalty at the incremental value of the patented

technology over alternatives available at the time the standard was defined.").

24. A SEP owner's incremental market power is attributable to the fact that standardization eliminates direct licensing competition among technologies that could have been included in the standard and locks the implementers into a given technology, and not to the intrinsic value of the technology itself. A particular technology included in the standard could be superior to the excluded technologies, but such value can be obtained independent of being adopted into the standard. An efficient reward for the technology reflects its comparative advantage *vis-à-vis* the next best technology. That is, an efficient reward reflects the technology's *ex ante* value rather than *ex post* pricing power attributable to the elimination of competition. For example, if including technology A in the standard would save manufacturers $0.10 per unit in costs relative to technology B, a royalty of $0.10 per unit or less would be consistent with technology A's *ex ante* value.

25. In addition, it may be easier for a SEP owner to hold-up a licensor with respect to a higher cost final product than to a component which actually practices the standard. A large royalty payment and the associated royalty stack on a single component (such as a chip) may be more readily perceived as being inconsistent with FRAND principles than when the same stack is compared to the much higher overall cost of the final product that embodies many components. Indeed, an internal Ericsson presentation on the merits of different licensing strategies discusses one of the benefits of assessing a royalty "as late in the value chain as possible": "One big advantage with this strategy is also that it is likely that the royalty income will be higher since we calculate the royalty on a more expensive product." Ex. 275, "Licensing," Tomas Dannelind, Director Technology Licensing, Ericsson AB, p. 26. Such a practice is consistent with an attempt to hold-up innovations in features and functionality beyond the standard rather than obtaining compensation for the value of the patented technology embodied in the SEPs. If the price of the final product, such as a handset, is used as the base for calculating a royalty rate, it is important that the

rate set reflects as closely as possible only the contributions of the patented technology, not the incremental value of unrelated components and features of the final product.

26.     The exercise of a SEP owner's standard-enabled, incremental market power in technology markets is harmful to competition in downstream markets for products embodying the standard because it can deter entry, dampen innovation incentives, and raise the price of products in those downstream markets.  These downstream reductions in output and innovation and elevation of prices harm consumers.  In addition, because of the "ecosystem" of complementary products built around a standard-based product, a declared SEP owner's exercise of its incremental market power can adversely affect competition in the entire ecosystem, and inhibit the development, manufacture, and sale of standards-based products due to concerns about future exercise of market power by the declared SEP owner against the implementers.  Moreover, when implementers of a standard are not adequately protected against future hold-up, the evolution of the standard itself may be distorted, with a proprietary technology being less likely to be included, regardless of merit, out of fear of the impact of granting market power to the technology's owner.  Distortions in the standard will have detrimental effects on both the standard and the evolution of the ecosystem surrounding the standard.

27.     I note that when injunctive relief or exclusion orders are sought by the licensor, such tactics can exacerbate the potential abuses discussed above (and even the threat of an injunction may impact negotiations).  The IEEE, for example, has modified its IPR policy to clarify that comparable existing licenses should not include those "obtained under the explicit or implicit threat of" injunction.  Ex. 1165, U.S. Department of Justice Business Review Letter, p. 12.

28.     Licensees generally have little visibility into the terms offered to other licensees and so may have difficulty detecting discrimination.  That difficulty in detection does not mean an absence of efforts to engage in hold-up, however.  Just

because there might be paucity of evidence on hold-up behavior by SEP holders does not imply that hold up is either rare or non-existent.  Indeed, courts in other cases have ruled that hold-up has occurred.  For example, in *Microsoft v. Motorola,* the court evaluated whether the 2.25 percent rate demanded by Motorola from Microsoft was itself reasonable.  Judge Robart not only found that it was not reasonable, but also concluded that a reasonable value for Motorola's patents was between 1/24th and 1/29th of what Motorola was demanding.  Judge Robart's findings contradict Ericsson's claims that there is no evidence that SEP holders attempt to engage in hold-up.

### 2.   Royalty stacking

29.   The harm that results from the exploitation of market power by those who hold standard-essential IP is especially severe when many patents are essential to a standard or when many standards are embodied in the final product.  This is the reflection of the well-known "Cournot complements" problem, also referred to  in this context as "royalty stacking."  The "Cournot complements" problem is described in detail in "Patent Hold-Up and Royalty Stacking," Ex. 1148, where Lemley and Shapiro demonstrate that owners of complementary components and technologies that comprise a system have inexorable incentives to overprice the components, relative to what a monopolist over all the components would charge.  Ex. 1148, Mark A. Lemley and Carl Shapiro, "Patent Hold-Up and Royalty Stacking," *Texas Law Review*, 2007, pp. 20-27.

30.   When multiple IP owners hold standard-essential patents, each standard-essential patent holder will charge the profit-maximizing price for its IP without sufficient regard for its impact on the total cost of the IP to the firms that implement that standard.  But when each owner of an essential input independently charges a supra-competitive price, the downstream implementer's costs are raised above the level it would obtain if all of the relevant IP were in the hands of a single firm.  This Cournot complements or royalty stacking problem is more acute the larger is the

1    number of essential patent owners in a particular standard and the more standards

2    there are in a particular product.  Thus, where there are multiple standards and

3    multiple patent holders within a standard, it is especially important to constrain

4    individual firms' market power so that, in the aggregate, the royalty burden they

5    impose does not undermine the standard and does not harm downstream innovation

6    and consumers.

7         31.    Ericsson has previously advocated for a maximum aggregate royalty

8    burden for SEPs.  For example, Lars Gustav Brismark, who I understand is now

9    Ericsson's Chief IP Officer (and was formerly Ericsson's Vice President of Strategy

10   and Portfolio Management, IPR, and Licensing), has stated that "Ericsson has always

11   been a strong proponent of reasonable aggregate royalties as part of its FRAND

12   analysis.  Ericsson's position is that the total accumulated royalties for 4G standard

13   essential patents should be in the single digits, and we have been consistent in this

14   position over time."  Ex. 1149, p. 33.  On its public website regarding its Licensing

15   Program, Ericsson also stated that a reasonable maximum aggregate royalty burden

16   for LTE handsets should be 6-8 percent of the handset price.  Ex. 1152, Ericsson

17   Licensing Programs ("Ericsson believes the market will drive all players to act in

18   accordance with these principles and to a reasonable maximum aggregate royalty

19   level of 6-8% for handsets.").  This is consistent with Ericsson's other public

20   statements wherein it espoused the view that a maximum aggregate royalty burden on

21   handsets should be in the single digits. Ex. 1150 at pp. 136-137, Wireless Industry

22   Leaders Commit to Framework For LTE Technology IPR Licensing, April 14, 2008

23   ("Specifically, the companies support that a reasonable maximum aggregate royalty

24   level for LTE essential IPR in handsets is a single-digit percentage of the sales

25   price.").  The stated purpose was to promote "the successful widespread adoption of

26   the LTE standard."  *Id.* ("'The adoption of this initiative will reassure operators of the

27   early widespread adoption of LTE technology throughout the consumer electronics

28   industry,' Ericsson's Senior Vice President, General Manager and Chief Technology

1    Officer Hakan Eriksson said. 'It also confirms Ericsson's longstanding commitment

2    to the FRAND principles as fundamental to the industry.'").

3          32.     In 2008, Ericsson, together with other chipset and handset manufacturers,

4    advocated for transparency and predictability of licensing costs for the LTE standard

5    through a "[c]ommitment to a reasonable maximum aggregate value that enables a

6    reasonable rate of return on investments in the development and adoption of these

7    technologies." *See* Ex. 1160, Communications Plan, p. 1.  One goal of the initiative

8    was to promote the adoption of LTE, which Ericsson and the others believed would

9    be slowed if royalties were uncertain or excessive:

10                 It is hoped that this initiative will provide the needed transparency

11                 to encourage consumer electronics manufacturers to execute on

12                 their plans to integrate LTE technology into products.  By keeping

13                 overall product costs at a reasonable, transparent level, consumer

14                 electronics manufacturers can offer products at competitive prices

15                 and end users get access to the benefits of LTE technology.

16   *Id.*, p. 4.

17         33.     Ericsson made similar statements regarding a "modest single digit"

18   maximum aggregate royalty burden for 3G technologies, and suggested a targeted

19   cumulative royalty burden of 5 percent:

20                 Industry leaders NTT, DoCoMo, Ericsson, Nokia, and Siemens

21                 today reached a mutual understanding to introduce licensing

22                 arrangements whereby essential patents for W-CDMA are licensed

23                 at rates that are proportional to the number of essential patents

24                 owned by each company.  The intention is to set a benchmark for

25                 all patent holders of the W-CDMA technology to achieve fair and

26                 reasonable royalty rates.  The companies together own the clear

27                 majority of the essential Intellectual Property Rights (IPR) relevant

28                 to the W-CDMA standard selected already by about 110 operators

worldwide.  This arrangement would enable the cumulative royalty rate for W-CDMA to be at a modest single digit level.

Ex. 1150, p. 135.  This joint press release also declared "[t]his initiative is meaningful for promoting the W-CDMA services by keeping cumulative royalty rate below 5%." *Id.* Ericsson has made similar statements to ETSI regarding minimizing the royalty compensation for WCDMA.  *See* Ex. 1151, p. 2 (with respect to WCDMA and TD/CDMA, "Ericsson favors a low level royalty compensation approach."); Ex. 276, p. 1 ("To ensure rapid growth and availability of WCDMA to realise next-generation services cost effective worldwide, the companies jointly also favour a minimum royalty compensation approach.").

34.    Empirical studies have found that the aggregate licensing fees vastly exceed the "reasonable" levels suggested by Ericsson and other industry participants.  For example, Mr. Brismark acknowledged that third parties estimate the aggregate running royalty burden for LTE devices to be between 29 and 37 percent of the retail price of a handset.  Ex. 1149, pp. 35-36 (referring to NGMN reports Ex. 1172, Ex. 1173, and Ex. 1155).  Dr. Weinstein, witness for Ericsson in prior litigation with Samsung, calculated that the total aggregate royalty burden for all LTE patents was 35.92 percent of the selling price of the handset.  Ex. 1157, Rebuttal Witness Statement of Roy Weinstein (FRAND), p. 16.  These totals demonstrate how royalty rates can accumulate to high levels consistent with royalty stacking concerns expressed in the literature and by industry participants.

35.    Mr. Brismark claims that, after accounting for cross-licensing, actual rates are lower.  Even if his statement were true, that would not establish that the underlying one-way rates are reasonable.  Moreover, the proposed license at issue in this case is not a cross-license.  Mr. Brismark also claims that the mobile telephony industry has been "successful," therefore royalty stacking must not have had a negative impact on the acceptance of the standard or the success of the industry (or that whatever the impact might have been, it demonstrably has not been sufficient to

derail the standard).  Mr. Brismark's assertion makes no economic sense.  There are many industries that experienced price fixing, for example, that have been successful, but that does not mean price fixing is not harmful:  it is harmful relative to the but-for world free of such price fixing.  Mr. Brismark himself makes these points in a letter to T-Mobile in 2008:

> We agree that the cumulative results of the ttp-process in NGMN are *clearly unreasonable* and therefore not in line with FRAND commitments given.  To attract new companies, without IPR of their own and thus having no cross-licensing effect, it is important to secure reasonable maximum aggregate royalty rates in LTE.

Ex. 1161, p. 1 (emphasis added).

36.  I also understand Ericsson has divested patents (comprising about 130 patent families) to other entities since the beginning of 2013, according to Mr. Brismark.  Ex. 1149, pp. 39-40.  In filings before ETSI, Ex. 1142, Ericsson, along with Motorola and Nokia, has explained that royalty stacking problems can arise through the acquisition of patents by non-practicing entities, such as those entities to which Ericsson has divested certain of its own patents:

> Also, the increasing tendency for multi-function, multi-technology products means there are ever more patents covering the end product, giving rise to the phenomenon of so-called 'royalty stacking'.  Overall, cumulative royalties are perceived to be uncertain and often too high, possibly even prohibitive.  The application of FRAND at the cumulative royalty level as well as at the individual patent owner level can be difficult to achieve.  Also open standardization is increasingly attracting participants that possess patents but do not themselves manufacture standards-compliant products.  While attracting technical contributions from such entities is in itself to be encouraged it also poses a risk of

> pushing up royalties in an unlimited way because such patent
> owners are merely licensors and as such are not constrained in
> their royalty claims.  Manufacturers, on the other hand, are
> generally both licensors AND licensees and being on both sides of
> the licensing fence has a natural balancing effect in royalty setting.

Ex. 1142, Ericsson, Motorola, Nokia, "Proposal for IPR Policy Reform," ETSI GA / IPPR01/06/08, p. 2.

### C. __Standard Setting Organization IPR Policies Are Intended to Protect Against Opportunism and Promote Innovation.__

37.    SSOs typically impose IPR rules on their participants to protect against (or minimize the likelihood of) opportunistic, anticompetitive behavior by owners of standard-essential IP.  Such opportunistic behaviors expropriate at least a portion of an implementer's returns from sunk investments in innovation.  If an implementer or potential implementer anticipates that there is a material risk of opportunistic behavior, its incentives to engage in innovative activities will be reduced or possibly even eliminated, particularly when the opportunistic SEP holder seeks to hold up the implementer for all or a large part of the profits from the implementer's innovations, complementary products, or services.  By protecting against opportunistic behavior, SSO rules pertaining to IPR provide an environment that promotes investment, innovation, and technological progress.

38.    ETSI's IPR Policy requires that SSO participants disclose their relevant IPR during the development of a standard and also requires that the SSO request that members that have patents potentially essential for the practice of a standard promise to license those patents on FRAND terms and conditions to anyone practicing the standard:

> When an ESSENTIAL IPR relating to a particular STANDARD or
> TECHNICAL SPECIFICATION is brought to the attention of
> ETSI, the Director-General of ETSI shall immediately request the

> owner to give within three months an irrevocable undertaking in
> writing that it is prepared to grant irrevocable licences on fair,
> reasonable and non-discriminatory [FRAND] terms and conditions
> under such IPR…  The above undertaking may be made subject to
> the condition that those who seek licences agree to reciprocate.

Ex. 1383, ETSI IPR Policy, § 6.1, pp. 1-2.

39.     The use of the word "essential" in both the disclosure and FRAND clauses of ETSI's IPR Policy is relevant to the issues in this case.  ETSI defines "essential" as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on
> technical (but not commercial) grounds, taking into account
> normal technical practice and the state of the art generally
> available at the time of standardization, to make, sell, lease,
> otherwise dispose of, repair, use or operate EQUIPMENT or
> METHODS which comply with a STANDARD without infringing
> that IPR.  For the avoidance of doubt in exceptional cases where a
> STANDARD can only be implemented by technical solutions, all
> of which are infringements of IPRs, all such IPRs shall be
> considered ESSENTIAL.

Ex. 1383, ETSI IPR Policy, §15.6, pp. 6-7.

40.     Although ETSI defines what it means by "essential," it does not make any attempt (nor, in general, do any SSOs) to ascertain whether the patents declared as "essential" to a standard are valid and enforceable, or whether they are, in fact, technically essential.  Which patents are deemed "essential" to a particular standard is self-proclaimed by the SSO member that declares its patents to be "essential" to the standard.  I understand TCL claims (and TCL's technical experts Dr. Paul Kakaes and Dr. Nikil Jayant opine) that many of Ericsson's assertions that its patents are actually standard essential are incorrect.

41.     By protecting against opportunistic behavior, these IPR rules encourage participation in the standard-setting process and promote innovation and technological progress, to the benefit of consumers.  Dr. Rudi Bekkers (also a TCL expert witness in this matter) and others provide an interesting historical perspective on the matter in a 2002 paper, describing how control of the GSM standard was transferred to ETSI in part because of concerns about hold-up.  Ex. 1166, Rudi Bekkers, Bart Verspagen and Jan Smits, "Intellectual property rights and standardization: the case of GSM," *Telecommunications Policy*, 2002.

42.     Ericsson itself has brought claims that it was being held-up by a patent holder—Qualcomm—failing to meet its FRAND commitment.  Ex. 1169, Ericsson Press Release, November 24, 2009.  This demonstrates that the concern about opportunism and its impact on innovation is not just theoretical.  Ericsson argued in the Qualcomm matter that a SEP holder (Qualcomm) behaved opportunistically in an attempt to extract excess royalties, and that the SEP holder had successfully held up firms by forcing them to enter into licenses that were not compliant with FRAND. For example, in a joint submission to the EU, Ericsson and other chipset and handset manufacturers argued Qualcomm was engaging in hold-up regarding its patents that it declared to be essential to the WCDMA (3G) standard:

> It is clear from Qualcomm's own statements and admissions that Qualcomm uses its ex post hold-up power to obtain high royalties and extract other concessions from its licensees.  There are many reasons why companies have entered into such agreements without agreeing that they comply with Articles 81 or 82 (or FRAND).

Ex. 77, "Qualcomm's Breaches of FRAND Promises: The Convergence of Evidence Shows that Qualcomm's Royalties are Excessive," joint submission by Broadcom, Ericsson, NEC, Nokia, Panasonic, and Texas Instruments, June 27, 2008, Case COMP/C-1/39.247 and others – Qualcomm, p. 6.

43.     Ericsson and its fellow complainants stated "Qualcomm cannot be

1   allowed to get away with setting royalty rates that are discriminatory, as well as

2   completely disproportionate, excessive and unreasonable."  In particular, Ericsson

3   stated that under a FRAND commitment, a firm "cannot charge whatever royalties

4   the 'market will bear,'" and that "they have to take into account that the aggregate

5   royalties payable by mobile wireless device manufacturers to all essential patent

6   owners must be reasonable having regard to well accepted industry practice, as

7   reflected in the 2002 press release issued by a number of leading WCDMA essential

8   patent holders."  Ex. 1156, p. 7.  The press release in question, Ex. 1150, states that

9   Ericsson and others reached "a mutual understanding to support modest royalty rates"

10  with a target cumulative rate of under 5 percent. Ex. 1150, pp. 135-136, Ericsson

11  Press Release, "Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemens, and

12  Japanese manufacturers reach a mutual understanding to support modest royalty rates

13  for the W-CDMA technology worldwide," November 6, 2002 (also stating "[t]his

14  initiative is meaningful for promoting the W-CDMA services by keeping cumulative

15  royalty rate below 5%.").

16  44.    As indicated by Ericsson in its claims against Qualcomm, these rules also

17  address the fact that SSO participants might be concerned not just about the

18  immediate impact of patent hold-up, but also about being placed at a competitive

19  disadvantage *vis-à-vis* some rivals that may gain access to declared SEPs on

20  preferential terms, or the risk to the profitability of their own investments built on top

21  of a standard if they are subsequently held up.  The incentive for such innovation is

22  strengthened if innovative implementers do not fear they will be held up or

23  discriminated against by holders of declared SEPs.

24  **IV.   THE MEANING OF FRAND**

25  45.    Neither ETSI nor any other SSO has, to my knowledge, precisely defined

26  all of the specific terms that might go into a FRAND license.  There are, however,

27  certain basic economic principles bearing on the economic concerns addressed by

28  FRAND that provide guidance as to FRAND licensing.  Consistent with the

economic principles that I have discussed, the key objectives of FRAND commitments are to mitigate the deleterious economic consequences of opportunistic behavior that can be facilitated by standard-setting, maintain powerful incentives for firms to participate in the process of standard-setting, and promote a broad adoption of the standard. Starting with these predicates, economic principles can provide a reasonably tight range for where the FRAND rate and other licensing terms would fall and also rule out certain royalty rates and license terms as clearly running afoul of FRAND precepts.

46.    The FRAND commitment has two related but distinct requirements: licensing terms must be "fair and reasonable" and "non-discriminatory." It is sometimes said that "FRAND must be a range." To be clear, there could be a range of reasonable rates, as that simply requires that the rates do not reflect the hold-up value. For example, if a SEP holder's IP produced a $1 per unit savings relative to unpatented technology that could be included in a standard, then the SEP holder and licensees would negotiate about how to split that $1. An effort to charge more than $1 would be an exercise in hold-up made possible by the elimination of the alternative unpatented technology once the standard has been set. Any rate of $1 or less, thus, may be "reasonable." As explained in greater detail below, however, once a license has been set, then the non-discriminatory requirement becomes operative. At that point, it is proper to evaluate subsequent licenses in light of the existing licenses.

47.    To the extent that the terms of the licenses signed by an IP owner exceed the "fair and reasonable" levels for its SEPs, that is a separate issue from the "non-discrimination" requirement of FRAND. For example, rates can be non-discriminatory but nonetheless unreasonable, and would then not be compliant with the FRAND commitment. I assume in the example above that the existing licenses are at rates that meet the "reasonable" requirement, but I understand that Dr. Leonard's analysis finds that is not the case with respect to Ericsson's SEP portfolios,

1   *i.e.*, that the rates Ericsson's licensees are paying are not, in fact, "reasonable."  In

2   that case, given my interpretation of the fair and reasonable prong of FRAND, the

3   rate charged to TCL ought to be set at the level that reflects the *ex ante* incremental

4   contribution of the Ericsson IP to the standard, even if some of TCL's competitors

5   may have agreed to pay higher rates.

6       48.    I understand that Ericsson advocates for an analysis focused almost

7   entirely on a subset of its existing licenses.  Although existing historical licenses may

8   provide some useful evidence with respect to the non-discriminatory requirement of

9   FRAND, rates negotiated after a standard has been established may already reflect

10  hold-up value, particularly if the threat of injunctive relief was present during those

11  negotiations.  Moreover, licensees generally have little visibility into the terms

12  offered to other licensees and so may have difficulty detecting discrimination.  This

13  may be a reason to give more weight to licenses associated with litigation or

14  arbitration, as the discovery process can provide important information that otherwise

15  would not be available to the licensees and potentially bring to light discriminatory

16  behavior that might otherwise have gone undetected.  Thus, when assessing whether

17  a license is FRAND-compliant, it is important to consider both aspects of the

18  FRAND requirement—"fair and reasonable" as well as "non-discriminatory."

19      **A.**    **SEP Owners Must Offer Licensees Fair and Reasonable Terms.**

20      49.    A "fair and reasonable" royalty should reflect only the *ex ante* value of

21  the patented technology, not the market power bestowed on the IP owner by the

22  collective action of the SSO participants to include the IP in the standard.  The *ex*

23  *ante* value of the IP (prior to the setting of the standard) would reflect the value of the

24  patented technology relative to alternatives and not the value that would be conferred

25  *ex post* by its inclusion in the standard.  If the patented technology offers an

26  incremental benefit to the standard compared to an alternative technology, then the

27  fair and reasonable royalty would reflect only this quality premium.  If the SSO

28  would have eliminated a feature rather than include the IP in the standard, or if a

comparable alternative solution was available, then the *ex ante* value of the IP might well be very low and potentially zero.

50.     As an example, if there are four competing alternatives, each of which would reduce costs by 10 cents, and one of the competing alternatives is not patented, then the appropriate royalty would be zero, because the non-patented alternative can always be used, and the patented alternatives offer no additional incremental value. Now assume that any one of the three patented alternatives would reduce costs by 12 cents, and the non-patented alternative would reduce costs by 10 cents.  In this stylized, competitive market, the royalty would clearly be no more than 2 cents, since the non-patented alternative can be used with no royalty.  However, the royalty is likely to be less than 2 cents because of competition between the patented alternatives.  That competition could drive the royalty close to, or even to, zero.  To be clear, I am not suggesting the SEP owner is not entitled to remuneration based on the value of its invention (although I am claiming the remuneration to which it is entitled is not related to the costs it incurred in the invention process – the patent system does not provide any guaranteed returns).  I am simply pointing out that if an equally good, or almost as good, alternative is available for free, then the SEP owner can command no more than its competitive comparative advantage over the free technology.  In the latter example, that would be at most 2 cents.

51.     In principle, a fair and reasonable royalty would be the outcome of a negotiation between an IP owner and a potential licensee that took place before a standard was set (*ex ante*).  Although the exact royalty would be determined by the bargaining process between the two parties, a fair and reasonable royalty would fall somewhere in the range between the minimum a willing licensor would accept and the maximum a willing licensee would be willing to pay *ex ante*.  The minimum royalty is defined by the licensor's reservation price:  the smallest amount the licensor would be willing to accept rather than not include the patent in the standard. The maximum royalty a licensee would be willing to pay is the *ex ante* value of the

1   patented technology relative to alternatives.  A royalty demand exceeding this

2   maximum would cause the potential licensee to turn to the next best alternative.  This

3   same analysis helps in understanding the SSO's decision of whether to include in the

4   standard a technology an SSO member has declared to be essential for that

5   technology.  If the royalty demand of the IPR owner exceeds the *ex ante* value of the

6   IPR, then the SSO would turn to its next best alternative and exclude the

7   "overpriced" IPR from the standard.  Again, this is all *ex ante* where there are still

8   potential alternatives.  In that setting the standard is not yet fixed and substitution is

9   still possible.

10       52.     The primary concern in this instance is that, given that one purpose of

11   FRAND commitments is to facilitate adoption of the standard, a fair and reasonable

12   rate to individual IP owners cannot result in aggregate royalties that would impede

13   the adoption of the standard or make supplying the end product commercially

14   infeasible.  For example, if each declared SEP holder demanded a royalty of three

15   percent of the final product's current price for each patent, but there were 50 SEP

16   holders, the demanded royalties would be 150 percent of the current price.  It is

17   reasonable to conclude that many consumers would likely be unwilling to pay for the

18   product once its price reflected the cost of all the license fees and, in turn, few firms

19   would be willing to produce the good or practice the standard.  Thus a fair and

20   reasonable royalty offered by any one declared SEP holder must bear in mind the

21   declarations made by other SEP holders.

22       53.     The first consideration in evaluating whether a royalty is FRAND is the

23   rate itself.  As discussed above, the royalty rate that a SEP owner may earn should

24   reflect the difference between the value of the product using the standard with the

25   SEP versus using a hypothetical version of the standard containing an alternative to

26   the SEP or omitting the SEP-related functionality.  This difference is likely to be

27   small for IP that is not necessary to make the standard-based product possible or

28   commercially attractive.  In fact, many SEPs add only a small, if any, incremental

1    value to the final product(s) embodying the standard, as compared to what the

2    product's value would be with some other IP or with the feature implemented by the

3    SEP removed altogether.  A royalty demand exceeding this maximum would cause

4    the potential licensee to turn to the next best alternative (including the possible

5    elimination of the feature) before the standard is "frozen."

6        54.    One approach to judging whether a proposed (and disputed) royalty is

7    fair and reasonable entails examining the total burden on the final product (or on the

8    component embodying the standard) that would arise if all of the SEP owners tried to

9    impose the same (or similar) licensing terms.  This approach constrains the total

10   royalty demands of all SEP holders so that products do not become commercially

11   infeasible.  The first step is to determine a maximum reasonable aggregate royalty

12   burden for all the SEPs for a given standard, and then to apportion that total royalty

13   among SEP declarants.  As I discussed above, Ericsson itself endorsed this solution.

14   *See* Section III.B.2.  Specifically, Ericsson advocated that the determination of a

15   FRAND royalty rate should start with the determination of "aggregate reasonable

16   terms" which are objectively commercially reasonable followed by a determination

17   of the patent owner's proportional contribution out of all essential patents.  Ex. 83,

18   "Expanded Proposal for IPR Policy Reform," ETSI GA/IPPR02(06)05, §6.1, p. 4.

19       55.    As I have discussed, whatever its claimed position today, Ericsson is on

20   record expressing concern about royalty stacking in this industry.  Public

21   announcements by Ericsson, together with a number of other firms claiming to hold

22   the majority of the declared standard-essential patents for the standards at issue in

23   this case, about the appropriate maximum aggregate royalty burdens for the

24   WCDMA (3G) and LTE (4G) standards and what Ericsson regarded as its share, are

25   consistent with the allocation approach.  Ex. 333 (WCDMA); Ex. 1146 (LTE);

26   Ex. 1152 (LTE).

27       56.    In sum, a fair and reasonable royalty is capped by the maximum amount

28   that a licensee would have been willing to pay before the IP was included in the

standard and while alternatives constrained the IP owner.  Ericsson's public statements regarding the maximum aggregate royalty burden, along with a comprehensive technical analysis regarding the value of Ericsson's SEPs like that performed by Dr. Kakaes, provide a sound starting place for analyzing whether the offered royalty rates offered by Ericsson to TCL are fair and reasonable.

**B.   SEP Owners Must Offer Licensees Non-Discriminatory Terms.**

57.   Although there may be a range of rates that are fair and reasonable, once a SEP owner signs licensing agreements the non-discriminatory requirement of the FRAND commitment becomes pertinent for the examination and calculation of license fees going forward.  The non-discrimination requirement of the FRAND commitment is aimed at fostering a level playing field among competitors.  This is true not only for manufacturers that participate in the standard setting process but also for later entrants who do not participate in the standard setting process but who nevertheless may, if assured of a level playing field, provide effective competition to the benefit of consumers.

58.   The FRAND commitment means that when one firm obtains a particular set of licensing terms from a declared SEP owner, other similarly situated firms should be able to choose from that same menu of terms, such as being offered the same one-way royalty rates.  Non-discrimination provisions reduce the risk that SEP owners will be able to use hold-up power to impede rivals in downstream markets and/or expropriate a portion of returns earned by firms that are successful innovators in non-standardized technology and product features in the relevant product market(s).

59.   Once a SEP owner licenses its patent, the non-discriminatory requirement becomes operative.  At that point, it makes economic sense to evaluate subsequent offers in light of the existing licenses.  Is a SEP owner competitively disadvantaging one firm relative to a directly competing firm?  For example, if the first licensee obtains the rate of 0.25% of the ASP, that sets a benchmark for non-discriminatory

rates for subsequent similarly situated licensees, *i.e.*, firms that sell competing products, and those competing firms should also be offered a rate no higher than 0.25%.  That is, the "non-discrimination" requirement of FRAND by its nature involves comparisons between licensees.  A firm can only be discriminated relative to some other firm's license.  The "fair and reasonable" requirement may cover a range, but if one firm is at the top end of the range and another is at the bottom, the discrimination between the two is problematic for the firm receiving the less favorable terms, and would be in violation of the non-discrimination requirement. *See, e.g.*, Ex. 1578, Allan Shampine, "Applying the Non-Discrimination Requirement of FRAND When Rates Change," *Antitrust Source*, American Bar Association, August 2016, p. 4.

60.     Also, if some licensees have obtained preferential rates, the fact that some other group of otherwise similarly-situated licensees pays a higher rate does not make an offer of that higher rate non-discriminatory.  For example, if a single firm received a preferential rate of 0.25%, the fact that several other firms paid a rate of 1% would not make an offer for 1% to a potential licensee non-discriminatory.  New licensees should receive no less favorable terms than any "similarly situated" licensee (or licensees) that received preferential rates.

C.     **Competing Firms Are Similarly Situated Licensees.**

61.     The bottom line in evaluating non-discrimination is that licensors cannot disadvantage one firm vis-a-vis another that resides in the same competitive space.  It makes economic sense that firms that rely on similar technologies and are competing with each other are similarly situated.  It is also consistent with the underlying economic concerns that strategic licensing practices and discrimination may place some competing firms at a disadvantage relative to others.  I note that TCL produces a range of handsets that directly compete with handsets manufactured by Samsung, HTC, LG, Huawei, Apple, and others.  That is, TCL is competitively "similarly situated" to these firms and should not be competitively disadvantaged relative to

those firms.  As discussed below, Ericsson has granted certain firms that directly compete with TCL preferential licenses relative to some of their competitors, and these preferential licenses set the relevant benchmark.

62.     While Ericsson has indicated that these firms are similarly situated, it has also advocated a complex set of factors for evaluating whether two licensees are "more or less" similarly situated, including selling price, financial condition, cost structure, product mix, and volume of sales.  Ericsson does not explain why these factors should justify rate differences nor does it explain the extent of rate differences that might be consistent with the differences in these factors.  For example, Ericsson does not explain in any economically sensible manner how the large differences in rates Ericsson charges its existing licensees would be justified under FRAND due to differences in these factors.  Ericsson is demanding that TCL pay substantially higher rates for the same type of handsets, at the same or similar price points, that its competitors are selling.  This is discriminatory under my interpretation of the economic meaning of the FRAND commitment.

63.     Ericsson has also contended that firms that have "significant involvement in technology development and standardization" may not be entirely similarly situated to firms that do not and as such should perhaps receive more favorable terms.  Such a position would undermine the fundamental purposes of FRAND and would allow strategic behavior such as exclusion of or discrimination against entrants.  It is highly beneficial to the evolution of the standard to have a growing number of firms implement the standard.  This increases the chances of wide adoption and survival of the standard, and creates incentives for the development of new and improved releases of the standard.  That in itself is an important contribution of the late entrants to the ongoing success of the standard.  The fact that a firm is an SSO participant may mean that firm has IP to cross-license, but the total consideration paid by the licensee—whether paid through the value of the cross-license or through a one-way royalty rate—should <u>not</u> vary based on the means used to pay for access to SEPs.  In

1  particular, this interpretation would free SSO members to discriminate against non-

2  members, which is clearly a competitive concern.

3      **D.    The FRAND Commitment Requires Offers to Be Fair, Reasonable,**

4            **and Non-Discriminatory.**

5      64.    Ericsson has taken the position that a SEP holder has no obligation to

6  make FRAND compliant offers to potential licensees during negotiations or,

7  alternatively, that FRAND commitments require only "good faith" negotiation.  From

8  an economic perspective, allowing non-FRAND compliant offers is problematic in

9  several respects.  First, a licensee should be able to challenge whether a SEP holder is

10 complying with its FRAND commitment without having to first consent to an offer

11 that it regards as non-FRAND.  If offers could not be challenged as not being

12 compliant with FRAND, then the ability of licensees to enforce a FRAND

13 commitment would be undermined.  Second, offers are presumably made with the

14 expectation (or hope) they might be accepted.  If a SEP holder makes a non-FRAND

15 compliant offer that the licensee accepts—perhaps because the licensee does not

16 know that other firms are paying lower rates due to the fact that the other licenses are

17 not public, or because litigation costs are too high to make challenging the offer

18 worthwhile—it is implausible that the SEP holder would subsequently inform the

19 licensee it was paying "too much" and lower the royalty rate.  Allowing non-FRAND

20 compliant offers would encourage SEP holders to make such offers in the hope some

21 licensees would agree to the non-FRAND compliant rates.

22      65.    Further, the FRAND commitment must be defined so that courts can

23 determine whether the commitment is being honored or not.  Also, a FRAND

24 commitment should be defined to address the potential anticompetitive problems

25 raised by the standard setting process.  For example, if FRAND were interpreted to

26 require only "good faith" negotiations, then, almost by definition, virtually any

27 outcome of a bilateral negotiation could be deemed to meet the FRAND criteria.

28 Such an interpretation would be economically vacuous.  The patent holder would

have the incentive to exploit whatever ability it may have to exercise hold-up, and a nebulous "good faith" requirement would provide no practical barrier to the ability to do so.

## V.   ERICSSON'S ACTIONS ARE INCONSISTENT WITH THE FRAND COMMITMENT.

### A.   Ericsson's Discriminatory Offers to TCL

66.    As discussed above, the approach of considering firms to be similarly situated when they are competitors using similar technologies is economically sensible and consistent with the underlying economic concern that strategic action and discrimination by SEP holders may place some competing firms at a disadvantage relative to others.  I note that TCL produces a range of handsets that compete with Samsung, HTC, LG, Huawei, and Apple.  For example, Strategy Analytics notes in its December 2014 handset forecast that as Nokia declines, "Samsung, TCL-Alcatel, ZTE and microvendors from India and other emerging markets will fill in the vacuum," and that it expects "TCL-Alcatel to achieve the seventh place in terms of global handset volumes in 2015, with a 4% share of the market.  The vendor's strategy revolves around supplying low-cost 2G and 3G handsets to emerging markets, but its recent re-branding efforts and rejuvenated product designs have put it on the path to becoming one of the leading smartphone vendors globally in 2014 and 2015." Ex. 1593, pp. 1-3.  Strategy Analytics explains further that "TCL-Alcatel has been operating what it calls a 'step-up' product strategy for the past 8 years.  It started at the very low end of the handset market and it has been gradually stepping up its product quality every year and the program so far is being executed very effectively." Ex. 1158, p. 4.  This strategy poses "a particular threat to Samsung, Nokia, LG, Huawei, ZTE, Lenovo and others." Ex. 1163, p. 2.

67.    With respect to Huawei, specifically, Strategy Analytics' review of Huawei's 2014 sales credited its relatively weak North American sales to increased competition from TCL. Ex. 1159, pp. 1-4.  Similarly, Strategy Analytics' review of

TCL's 2014 sales discusses increased competition from Huawei and LG.  Of course, TCL's ability to continue to expand its sales in higher-end handsets will depend, in part, on its ability to obtain competitive and non-discriminatory licensing terms. There is also competition between the firms with respect to lower-end phones.  For example, Strategy Analytics notes that while TCL sells a large number of "feature phones" (lower-end handsets), Samsung sells even more.  Ex. 1162, pp. 1-2.  Thus, it is clear TCL is competitively "similarly situated" to firms such as Huawei, Samsung, LG, HTC, and Apple, and should not be competitively disadvantaged relative to those firms.

68.    I understand that TCL has engaged a licensing expert, Dr. Matthew Lynde, to evaluate the relevant comparable licenses in detail.  I do not undertake such an analysis here.  Rather, I rely on the findings made by Dr. Lynde.  I conclude that the rates offered by Ericsson to TCL are substantially higher than the effective rates paid to Ericsson by Samsung, HTC, LG, Huawei, and Apple, and are therefore in violation of the non-discrimination requirement of Ericsson's FRAND commitment. Table 1 (PDX 1) is a demonstrative from Dr. Lynde summarizing the total royalties payments for 2014 and 2015 under the royalty rates Ericsson has offered to TCL for the 2G, 3G, and 4G standards at issue in this litigation, as compared to the total royalties using the effective one-way rates paid by Apple, Samsung, HTC, LG, and Huawei.

| Standard | Similarly Situated Licensees | | | | | Ericsson Offers |
| | (Lynde Calculated One-Way Rates) | | | | | |
| | Apple Rates | Samsung Rates | HTC Rates | LG Rates | Huawei Rates | Option B |
|---|---|---|---|---|---|---|
| 2G | | | | | | $6.5 |
| 3G | | | | | | $51.5 |
| 4G | | | | | | $28.7 |
| Total | | | | | | $86.7 |

Notes:

The royalty payments cover sales during 2014 to 2015.

These calculations are based on TCL-produced sales data and on the one-way effective royalty rates Dr. Lynde calculated using the Ericsson business case sales data and projections (except for the calculation using the Huawei rates, which uses the rates specifically stated in Ericsson's license with Huawei).

Dr. Lynde used the one-way 4G rate calculated for Apple to determine TCL's expected royalty payments for its 2G, 3G, and 4G sales.

69.    Dr. Lynde's findings show that the rates offered by Ericsson to TCL are substantially higher than the effective rates paid by Samsung, HTC, LG, Huawei and Apple, and I conclude that the rates offered by Ericsson to TCL are therefore in violation of the non-discrimination requirement of Ericsson's FRAND commitment.

70.    Ericsson's offers to TCL imply that TCL would have paid roughly $87 million in royalties under "Option B" for 2014 and 2015.  By contrast, if TCL paid the rates that are in Huawei's current license, TCL would have paid roughly ▮▮▮▮ ▮▮▮▮ over the same period, or roughly ▮▮▮▮ of the amount implied by the rates set forth in Ericsson's FRAND Contentions in this case.  If TCL paid the rates paid under Samsung's current license, TCL would have paid roughly ▮▮▮▮ or about a ▮▮▮▮ of the amount implied by the rates found in Ericsson's FRAND contentions.  These differences indicate that Ericsson is not complying with the non-discrimination requirement of its FRAND commitment.

71.     I note that Ericsson's FRAND Contentions in this case also contained a lump sum component ("Option A") similar to the $30 million per year lump sum payment Ericsson's offer to TCL prior to the start of this case.  While my analysis focuses on Option B, I also analyzed the reference rates that provided Ericsson's alleged basis for the lump sum offer and determined that these rates similarly were not compliant with Ericsson's FRAND commitment.  *See, e.g.,* Ex. 1143, John Han Letter, May 23, 2014, p. 1 ("Ericsson's offer to TCL for taking a license under our 2G/3G/4G portfolios are based on the following FRAND rates:  2G (GSM/GPRS/EDGE) – 1.5%; 3G (Multimode (MM)) – 1.75%; and 4G (Single Mode (SM) / MM) – 2%.  These are Ericsson's unilateral FRAND rates.").

72.     I further note that although there is disagreement among the experts in this case regarding the effective royalty rates in some two-way licenses, there is no dispute as to the terms in the Huawei license.  The Huawei license is very recent, granted to a firm that directly competes with TCL.  Moreover, that license was set after arbitration intended to address concerns about FRAND violations of the kind this litigation addresses.  Ericsson's experts in this case have not provided any economically sensible explanation as to why TCL should pay a higher royalty rate than Huawei pays.  Furthermore, I understand that all of the experts in this litigation agree that Apple, for example, secured licensing terms from Ericsson that are ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For example, Dr. Lynde determined that Apple pays Ericsson a rate of ▮▮▮ for LTE, compared to the ▮▮▮ rate paid by Huawei.  I also understand that Mr. David Kennedy, Ericsson's licensing expert, has calculated Apple's one-way rate for LTE to be ▮▮▮, which is ▮▮▮▮▮▮▮▮ the ▮▮▮ rate paid by Huawei.  Ex. 128, p. 56, Exhibit 3.3.1.  Again, one of the purposes of non-discrimination is to prevent a licensor from providing preferential deals to a select few firms, while charging other firms much higher rates.  For competing firms, the rates should not be substantially different.

73.     While the royalty rates Ericsson has offered to TCL are clearly

Case No. SACV14−00341 JVS (DFMx)/CV15-02370
WITNESS DECLARATION OF DR. JANUSZ A. ORDOVER

discriminatory, as I noted above it is also important to evaluate whether the rates are fair and reasonable. Dr. Leonard's top-down quantitative analysis demonstrates that Ericsson's royalty demands are unreasonable in the economic sense inasmuch as they are consistent with hold-up.

**B. Dollar-Per-Unit Benchmarks Are Inconsistent with Ericsson's FRAND Commitment.**

1. Ericsson's proposed dollar-per-unit analysis would be discriminatory.

74. Ericsson has advocated for the conversion of all royalty rates paid by Ericsson's existing licensees which are based on a percentage of the selling price into "dollar-per-unit" form as a benchmark for determining whether its offers to TCL are FRAND. Conceptually, I agree that royalties expressed in different forms could all be compliant with FRAND in some circumstances, and conversely, royalties of any form could be inconsistent with FRAND obligations. However, the fundamental concern here is not with the royalty structure in the abstract, but with discrimination resulting from Ericsson attempting to switch between royalty structures to suit its own purposes.

75. As I noted previously, Ericsson has discussed royalties expressed as a percentage of the ASP since the time the 3G and 4G standards were first adopted. *See, e.g.*, Ex. 1150, pp. 135-137 ("Specifically, the companies support that a reasonable maximum aggregate royalty level for LTE essential IPR in handsets is a single-digit percentage of the sales price."); Ex. 1152 ("Ericsson believes the market will drive all players to act in accordance with these principles and to a reasonable maximum aggregate royalty level of 6-8% for handsets. Ericsson's fair royalty rate for LTE is therefore expected to be around 1.5% for handsets."). During its arbitration with Huawei, Ericsson stated there was a "well-established industry practice of calculating royalties based on the price of the end user device." Ex. 1154, Ericsson's Second Pre-Hearing Submission, pp. 29-30. Ericsson's economic expert

1   in the arbitration testified that "[c]onsistent with widespread industry practice,

2   Ericsson has licensed its patents based on a percentage of the sales price of the

3   licensed terminal unit."  Ex. 1587, Expert Report of Putnam, p. 47 at ¶ 87. ███

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   Ex. 58, Huawei Arbitration Final Award, pp. 136-137 at ¶¶ 396-403; *see also*

8   Ex. 1277, Jan 12, 2016 Huawei-Ericsson Global Patent License Agreement, p. 18.

9       76.    Ericsson is now seeking to change the basis on which it determines

10  royalties in a way that would allow it to obtain greater payments from TCL than

11  under Ericsson's long-standing prior practice and prior licensing proposals made to

12  TCL.  There is no question Huawei pays only ███████████ of the selling price on its

13  4G phones at all price points, whether they are a high-end smartphone or a budget

14  phone.  Ericsson has not offered any convincing economic rationale for discarding

15  the existing licensing practices in favor of a new payment benchmark designed to

16  allow Ericsson to extract higher payments from manufacturers of low-cost handsets

17  as compared to the "percentage of price" formula.

18      77.    A SEP holder cannot evade its FRAND requirement by shifting from one

19  royalty structure to another.  Regardless of whether the Huawei license resulted from

20  a negotiation or arbitration, the fact is the parties asked for rates to be set as a

21  percentage of the selling price. ████████████████████████████

22  ████████████████████████████████████ For these Huawei

23  handsets that compete directly with TCL's handsets, Huawei is paying royalty rates

24  substantially below what Ericsson is demanding from TCL.

25      78.    For example, as of September 27, 2016, Google Shopping lists a Huawei

26  M835 (3G) handset available new for $99.99, and a Huawei Valiant (3G) handset

27  available for $69.97 (including shipping).  Similarly, one can obtain through Amazon

28  a Huawei Honor Holly 2 Plus (4G) in India for $129.  The royalty on the M835

1 would be roughly ▇▇▇ on the Valiant ▇▇▇ and on the Holly 2 ▇▇▇ TCL offers

2 handsets in this range as well.  For similarly priced handsets, Ericsson's May 23,

3 2014 letter from Mr. John Han asked for royalties ▇▇▇▇▇▇▇▇ –

4 roughly $1.75, $1.22 and $2.58, respectively.  Ericsson's May 11, 2015 FRAND

5 contentions asked for royalties ▇▇▇▇▇▇ – roughly $1.20, $0.84 and

6 $1.94, respectively.  Charging TCL rates ▇▇▇▇▇ higher than the rates

7 charged to its competitors would be clearly discriminatory and inconsistent with

8 Ericsson's FRAND commitment, according to the principles advocated in my expert

9 reports.

10         79.    The "race to the bottom" described by Ericsson's experts in this case only

11 arises if licensors can move back and forth between licensing methodologies.

12 Historically, Ericsson has predominantly used percentage-royalty licensing.  In fact,

13 its proposal to switch between methodologies creates the risk of triggering a "race to

14 the top" that could raise rates to all licensees.  That is, Ericsson wants to apply

15 Huawei's average dollar-per-unit rate (calculated based on the percentage royalty

16 rates in Huawei's license and the average selling price of Huawei's phones) to TCL,

17 although TCL has a lower average selling price, and Huawei is currently paying a

18 lower dollar-per-unit rate on the units that compete with TCL's low-cost units.  If

19 Ericsson succeeds at obtaining such rates, Ericsson can then switch gears and claim

20 to new licensees with high average selling prices that since TCL is paying a high

21 percentage royalty rate, FRAND mandates that the same percentage rates should

22 apply.  This can lead to continuous increases in payments by licensees and is the

23 reverse of the "race to the bottom" posited by Ericsson's experts.

24         80.    The bottom line is that whatever the relative merits of percentage

25 royalties *versus* dollar-per-unit royalties, through at least the end of 2015 Ericsson

26 licensed the vast majority of its existing licensees based on either on "a percentage of

27 selling price" royalty basis, or by reference to a percentage royalty basis.  While

28 some of Ericsson's licenses are on a lump-sum basis, Ericsson has produced

"business cases" associated with many of those licenses in which Ericsson calculates the lump-sum based on forecasted sales and a percentage royalty. *See, e.g.*, Ericsson's Supplemental Response to Interrogatory No. 10 (July 29, 2015). Ericsson cannot evade its non-discrimination commitment by now refusing to offer similar terms to other manufacturers, including TCL.

### 2. SEP owners are not guaranteed a minimum return on investment.

81. To support its arguments for the use of dollar-per-unit benchmarks in its FRAND rate analysis, Ericsson claims that IP holders need to earn a minimum assured return on investment in research and development that results in a standard-essential technology. Ericsson's analysis is flawed and incomplete; in particular, it fails to consider the important benefits accruing to IP holders from having their IP incorporated into a standard. I have discussed those benefits at length in my published work. *See* Ex. 1174.

82. The rate of return on investment in the development of the IP that ends up being included in the SEPs (or on a more broadly defined R&D program) depends both on costs associated with the relevant SEPs and on the revenues generated by the investment over its lifetime, all appropriately adjusted for risk. There is no evidence with which I am familiar—and Ericsson's witnesses adduce none—that the investments associated with the developments of the SEPs in the telecommunications field are especially large, sunk, risky, or are persistently "undercompensated." In fact, such investments are often undertaken by manufacturers that benefit from their R&D investments both directly (by embedding them in their downstream products, potentially ahead of their rivals) and indirectly (through licensing and/or cross-licensing). For example, Ericsson has attempted to quantify the "defensive value" of its portfolio. *See* Ex. 1553, Ericsson's IPR Strategy 2007-2010, p. 4.

83. Having a SEP incorporated into a standard can confer substantial benefits on SEP holders by expanding demand for patents to every manufacturer and sale of the product covered by patents for which otherwise no or little demand may exist.

1    That is, in the context of standards that achieve commercial adoption, a SEP cannot

2    be replaced by a superior (or a cheaper) patent, until the time the existing standard is

3    superseded by a new one (and even then, newly adopted standards are often

4    backward compatible), which assures the SEP holder of a market for its IP—a market

5    that in the case of handsets is very large indeed.  Many IP holders also manufacture

6    standard-compliant devices and thus benefit from increased demand for those devices

7    through their own sales as well as licensing revenues as the standard spreads.

8        84.    Absent incorporation into the standard, the SEP holder's opportunities for

9    its IP would likely be less attractive, and, in fact, there might be no demand to license

10   that IP at all.  For example, in one paper Dr. Mark Schankerman found that most

11   patents have little commercial value.  Ex. 1089, Mark Schankerman, "How Valuable

12   Is Patent Protection?  Estimates by Technology Field," 29 RAND Journal of

13   Economics 1 (1998), pp. 18-19.

14       85.    It is important to keep in mind that the FRAND commitment helps

15   preserve the benefits of competition between technologies prior to the standard being

16   set, and helps prevent SEP holders from exploiting the additional market power

17   created through the elimination of that competition from the standard setting process.

18   There is no evidence I have seen that shows that the constraints on license royalties

19   from FRAND restrictions are more onerous than the undisputed benefits that a SEP

20   holder derives from the inclusion of its patents in a standard and the concomitant

21   flow of revenues (including the reduction in direct licensing expenses through cross-

22   licensing).  In particular, in industries such as wireless telecommunications, SEP

23   holders gain a guaranteed pool of licensees for their IP that otherwise may not have

24   used the patents at all.  In a market in which nearly a billion and a half of standard-

25   compliant handsets are sold annually, this is a hugely valuable benefit.  Ericsson

26   benefits from this greatly expanded market for standard-complaint products, and

27   Ericsson has not put forward any convincing economic evidence that a guaranteed

28   minimum licensing rate (such as a dollar-per-unit benchmark) is necessary to

adequately compensate Ericsson.

86.     Under Ericsson's framework, SEP holders gain all of the benefits of inclusion in the standard and elimination of competing alternatives from consideration, and in return agree only to the requirement that they license all willing licensees.  Ericsson's position in no way provides a reasonable balance between the interests of the SEP owners and the interests of the implementers of the relevant standards.  Firms that implement the standard, and innovate with respect to devices using the standard, are as critical to the adoption and evolution of the standard as firms that contribute IP to the standard.  That is particularly the case when the IP at issue contributes little if anything to the value of the standard beyond what alternative IP would have contributed.  Indeed, Ericsson's experts have noted repeatedly that the interests of the implementers and the innovators, some of whom are both, must be "balanced," and also that ETSI itself has expressed the need to balance these interests.  Ex. 1383, ETSI IPR Policy (2014), p. 1 at §3.1 ("In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable.  In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.").  Low-cost products are particularly important in speeding the adoption and penetration of a standard, provide significant benefits to consumers, and increase the number of royalty-generating devices.

87.     There is no economic basis to Ericsson's claim that the licensing rates advocated by TCL pose an existential threat to the telecommunications industry and Ericsson's participation in the research and development toward future standards.  The value of the licensed IP does not flow from the amount of R&D expenditures

1  devoted to its development.  Rather, that value flows from the contribution to the

2  quality of the standard, relative to alternative IP, including IP already in the public

3  domain.  What the licensees are paying for, or should be paying for under the *ex ante*

4  interpretation of FRAND, is the value of the licensor's output (IP) to their operations,

5  considering the competing alternatives to that IP.  Of course, the licensor may choose

6  not to innovate if it does not expect to earn a return on its innovation.  However,

7  Ericsson offers no evidence that the innovators in the mobile communications eco-

8  system are earning insufficient returns in their investments.  Neither does Ericsson

9  offer any evidence that it is undercompensated for its innovations in the mobile

10 telecommunications space.

11        C.     **The Value of the Communications Technology as a Whole, or of**

12               **"Cellular Connectivity," Is Not a Relevant Benchmark for the Value**

13               **of Ericsson's SEPs.**

14        88.    Ericsson attempts to justify high cumulative royalty rates by pointing to

15 alleged market evidence as to the value of cellular connectivity, specifically the

16 difference in retail price between Apple products that include cellular connectivity

17 and allegedly comparable products that do not include cellular connectivity.  I note

18 that Ericsson itself has repeatedly proposed single digit cumulative royalty caps and

19 indicated that royalty stacking is a problem in the industry.  This is "market

20 evidence" from Ericsson itself that is consistent with the top-down analysis

21 performed by Dr. Leonard to determine the appropriate rates for Ericsson's licenses

22 at issue here.  More generally, Ericsson's argument not only misses the point but

23 actually reinforces the concerns about hold-up.

24        89.    No matter what is the appropriate FRAND rate for Ericsson's SEPs, it is

25 certainly much lower than the "value of cellular connectivity," defined by Ericsson's

26 experts as the price differential between products with and without cellular

27 connectivity.  Even if all of the price difference were attributable to the cellular

28 technology as a whole, only a share (potentially a miniscule one) of that difference

could be attributed to any individual SEP holder's patents (particularly where multiple cellular standards are involved). Unless Ericsson can show that the price difference is attributable specifically to its SEPs, and, in particular, to the advantages its SEPs conferred over alternative technologies that were available for standardization *ex ante*, then it is seeking to appropriate value that is not attributable to the incremental value its SEPs provided over available alternatives. As a result, this price gap is uninformative about the incremental value that should accrue to any individual SEP holder.

90. From the standpoint of determining appropriate license fees under the FRAND commitment, the relevant question is not how much higher is the price for the mobile device with and without cellular connectivity, but whether there would be any difference in price if the versions of cellular standards at issue used an alternative to the patented technology. It is my understanding that some version of cellular connectivity would likely be available even if the standards did not embody the particular SEPs at issue in this litigation.

91. To illustrate, and focusing just on the LTE standard, assume that an alternative technology would have resulted in a version of LTE that would lead to a reduction in costs that translated to a 0.25 percent reduction in the market price of an average handset. This means that in the *ex ante* setting, the included SEPs would have commanded at most 0.25 percent of the ASP in license fees. Put another way, while the price difference between two handsets with and without LTE may be quite large because end-users highly value LTE cellular capability, it is not generally likely (or even plausible) that all of that difference is uniquely attributable to a given SEP.

## VI. **CONCLUSION**

92. From an economic perspective, the key objectives of FRAND requirements are to mitigate the deleterious economic consequences of opportunistic behavior that can be facilitated by standard-setting, maintain powerful incentives for firms to participate in the process of standard-setting, and promote a broad adoption

1    of the standard.  The FRAND commitment imposes two related but distinct

2    requirements.

3         93.    First, the terms of a license must be fair and reasonable.  In particular, the

4    royalty rate should not exceed the *ex ante* value of the patented technology at the

5    time the standard was set, and collectively the royalty rates for SEPs should not

6    impede adoption of the standard or make supplying the end product commercially

7    infeasible.  Consistent with Ericsson's own prior proposals, one approach for

8    constraining the total royalty demands is to first determine a maximum aggregate

9    royalty burden for all IPR incorporated into a standard, and then apportion that

10   aggregate burden across SEP owners.  Dr. Leonard, with the assistance of TCL's

11   technical experts, has determined fair and reasonable royalty rates for Ericsson's

12   SEPs under this framework.

13        94.    Second, the terms of a license must be non-discriminatory.  Once a SEP

14   owner licenses his patent(s), offers to future licensees must be evaluated in light of

15   the existing licenses.  In assessing non-discrimination, the question becomes:  is a

16   SEP owner competitively disadvantaging one firm relative to a directly competing

17   firm?  I have compared Ericsson's licensing offers to TCL to the one-way effective

18   royalty rates embodied in Ericsson's existing licensing agreements with Samsung,

19   HTC, LG, Huawei, and Apple, as determined by Dr. Lynde.  I find the rates Ericsson

20   is offering to TCL are ██████████ higher than the rates being paid by these

21   competing firms, which clearly violates the "non-discriminatory" prong of Ericsson's

22   FRAND commitment.  Ericsson has granted firms that directly compete with TCL

23   more favorable licensing terms, and these more favorable licenses set the relevant

24   benchmark.  That is, TCL is competitively "similarly situated" to these firms and

25   should not be competitively disadvantaged relative to those firms.

26

27

28

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on January 11, 2017.


_____
Dr. Janusz A. Ordover

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| 58 | Final arbitration award between Ericsson and Huawei, dated 12/31/15 |
| 77 | "Qualcomm's Breaches of FRAND Promises," Joint Submission - Case COMP/C-3/39.247 and Others, dated 6/27/08 |
| 83 | Document titled "Expanded Proposal for IPR Policy Reform,", ETSI GA/IPR02(06)05, dated Feb. 22-23, 2006 ["ETSI Proposal, 2006"] |
| 128 | Schedules from Rebuttal Expert Report of David Kennedy |
| 275 | Ericsson presentation titled "Licensing," by T. Dannelind, date 11/25/09 |
| 276 | "IPR Licensing Policy Statement for WCDMA," ETSI SMG #24 bis, dated Jan. 28-29, 1998, Tdoc SMG 7/98 |
| 333 | Ericsson Press release titled "Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemen, and Japanese Manufacturers Reach a Mutual Understanding to Support Modest Royalty Rates for the W-CDMA Technology Worldwide," dated 11/6/02 |
| 451 | Curriculum Vitae of Janusz A. Ordover |
| 455 | The Antitrust Source publication titled "Implementing the FRAND Commitment," J. Ordover, et al., Oct. 2014 |
| 456 | TCL 2015 annual report |
| 1089 | "How Valuable is Patent Protection? Estimates by Technology Field," by M. Schankerman, The RAND Journal of Economics, Vol. 29, No. 1 (Spring 1998) |
| 1141 | "The Evolving IP Marketplace," issued by the Federal Trade Commission, dated Mar. 2011 |
| 1142 | "Proposal for IPR Policy Reform," ETSI GA ahg on IPR Review #1, Jan. 10-11, 2006, ETSI GA/IPRR01(06)08 |
| 1143 | mail from J. Han to H. Au, et al., dated 5/23/14, subject: "Ericsson & TCL Agreement," re history of negotiations |
| 1146 | Ericsson's press release titled "Wireless Industry Leaders commit to framework for LTE technology IPR licensing," dated 4/14/08 |
| 1148 | "Patent Holdup and Royalty Stacking," by M. Lemley & C. Shapiro |
| 1149 | Witness Statement of G. Brismark from Huawei Arbitration, No. 01-14-0002-2610 |
| 1150 | License Agreement between IDTP Holdings and Ericsson dated 6/25/14 |

| Exhibit No. | Description |
|---|---|
| 1151 | "Information Copy of Ericsson IPR Statement," ETSI SMG #23, Dec. 15-19, 1997, ETSI/SMG Tdoc 908/97 (Ericsson stating it support low level royalty compensation approach) |
| 1152 | Wayback Machine website displaying webpage of Ericsson's "Licensing Programs" website, archived July 19, 2008 |
| 1153 | Publication titled "Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition," issued by U.S. Department Of Justice and the Federal Trade Commission, April 2007 |
| 1154 | Ericsson's Second Pre-hearing Submission, Ericsson/Huawei Arbitration No. 01-14-0002-2610 |
| 1155 | Third NGMN IPR Report dated 4/20/09 |
| 1156 | Draft Memorandum for the EU Commission titled "Why Qualcomm's practices constitute a breach of Article 82 EC Treaty" |
| 1157 | Rebuttal Witness Statement of Roy Weinstein (FRAND) re Inv. 337-TA-862 |
| 1158 | Strategy Analytics publication titled "Value Share: Global Handset Revenue, ASP and Profit in Q1 2014" dated May 2014 |
| 1159 | Strategy Analytics publication titled "Q4 '14: Huawei: Handset Shipments, Revenues & ASP Hit Record Levels," dated 2/16/15 |
| 1160 | Document titled "IPR Licensing Framework and Commitment for LTE" |
| 1161 | Email from G. Brismark to U. Janssen dated 3/13/08, subject: "NGMN IPR," discussing concerns over NGMN IPR process |
| 1162 | Email from Strategy Analytics to N. El-Amrani, subject: "SA Insight: Q1 '14: TCL-Alcatel: Overtakes Motorola to Become Top 6 Vendor in US," dated 5/9/14 |
| 1163 | Email from N. El-Amrani to M. Hellman, subject: "SA Insight: Samsung, Huawei & TCL-Alcatel Shine as Global Smartphone Shipments Reach Quarter-Billion Units in Q3 2013," dated 11/1/13 |
| 1164 | Third Party United States Federal Trade Commission, "Statement on the Public Interest," Inv. No. 337-TA-745, June 6, 2012 |
| 1165 | Correspondence from U.S. Department of Justice, Antitrust Division dated 2/2/15 providing business review letter |
| 1167 | "W3C Patent Policy," Feb. 5, 2004 |
| 1168 | Bluetooth.com webpage "Why and How to Become a Bluetooth SIG Member" |
| 1169 | Ericsson press release titled "After Success in Korea and Japan, |

| Exhibit No. | Description |
|---|---|
| | Ericsson Withdraws its Complaint with the European Commission," dated 11/24/09 |
| 1170 | Federal Trade Commission presentation titled "Tools to Prevent Patent Holdup," dated 6/21/11 |
| 1171 | Ericsson 1999 annual report |
| 1172 | First NGMN IPR Report dated 10/26/07 |
| 1173 | Second NGMN IPR Report dated 2/19/08 |
| 1174 | CPI Antitrust Chronicles, Vol. 1 publication titled "FRAND and the Smallest Saleable Unit," by J. Kattan, J. Ordover & A. Shampine, Sep. 2016 |
| 1277 | License Agreement between Huawei and Ericsson dated 1/13/16 |
| 1383 | ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights, dated 11/19/14 |
| 1553 | Ericsson internal document titled "Ericsson's IPR Strategy 2007-2010," dated 11/16/15 |
| 1578 | The Antitrust Source, American Bar Association publication titled "Applying the Non-Discrimination Requirement of FRAND When Rates Change," by A. Shampine, dated Aug. 2016, p. 4. |
| 1587 | Expert Report of Jonathan D. Putnam, dated 6/19/15 re Arbitration No. 01-14-0002-2610, Ericsson v. Huawei |
| 1593 | Strategy Analytics publication titled "Global Handset Shipments Forecast by Vendor by Quarter: 2000 to 2014," Dec. 2013 |

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 11, 2017, I caused to be served the PLAINTIFF'S DIRECT EXAMINATION OF DR. JANUSZ A. ORDOVER to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 11, 2017, at San Diego, California.

By:   */s/ Kristina Grauer*
KRISTINA GRAUER