1    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     STEPHEN S. KORNICZKY, Cal. Bar No. 135532
2    skorniczky@sheppardmullin.com
     MARTIN R. BADER, Cal. Bar No. 222865
3    mbader@sheppardmullin.com
     MATTHEW W. HOLDER, Cal. Bar No. 217619
4    mholder@sheppardmullin.com
     12275 El Camino Real, Suite 200
5    San Diego, California 92130-2006
     Telephone: 858.720.8900
6    Facsimile: 858.509.3691

7    Attorneys for TCL Communication
     Technology Holdings, Ltd., TCT Mobile
8    Limited, and TCT Mobile (US) Inc.

9              UNITED STATES DISTRICT COURT

10    FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

11

12   TCL COMMUNICATION                  Case No. SACV14−00341 JVS (DFMx)
     TECHNOLOGY HOLDINGS, LTD., *et*    Consolidated with CV15-02370
13   *al.*,

14          Plaintiffs,                 **PLAINTIFFS' REBUTTAL
                                        DECLARATION OF EXPERT
15          v.                          WITNESS DR. JANUSZ A.
                                        ORDOVER**
16   TELEFONAKTIEBOLAGET LM
     ERICSSON, *et al.*,
17                                      Place: Courtroom 10C
            Defendants.                 Before Hon. James V. Selna
18   _____

19   TELEFONAKTIEBOLAGET LM             Pre-Trial Conf.: Feb. 1, 2017
     ERICSSON *et al.*,                 Trial: Feb. 14, 2017
20

21          Plaintiffs,                 **PUBLIC REDACTED VERSION**

22          v.

23

24   TCL COMMUNICATION
     TECHNOLOGY HOLDINGS, LTD. *et*
25   *al.*,

26          Defendants.

27

28

# TABLE OF CONTENTS

I.   DR. TEECE'S ANALYTICAL FRAMEWORK REGARDING THE ECONOMICS OF THE FRAND COMMITMENT IS ECONOMICALLY VACUOUS. ..................................................................................... 1

   A.   Dr. Teece Improperly Minimizes the Contributions of Standard Implementers that Benefit Consumers and IP Holders. ............................. 2

   B.   Dr. Teece Fails to Consider the Benefits to IP Holders from Incorporation of Their IP into a Standard. .......................................................... 5

   C.   TCL's R&D Intensity is Irrelevant. ............................................................... 7

   D.   Dr. Teece Mischaracterizes My Views on Cross-Licensing and "Most Favored Licensees" ........................................................................... 8

   E.   Ranges of Royalties in FRAND ................................................................. 10

   F.   Dr. Teece's Approach to FRAND Is Economically Vacuous ................... 14

   G.   Summary ...................................................................................................... 18

II.  TCL IS NOT A "HOLD-OUT" ........................................................................ 20

III. SIMILARLY SITUATED LICENSEES AND NON-DISCRIMINATION 23

IV.  THE VALUE OF THE COMMUNICATIONS TECHNOLOGY AS A WHOLE IS NOT A RELEVANT BENCHMARK FOR THE VALUE OF ERICSSON'S SEPS. ........................................................................................ 27

V.   DOLLAR-PER-UNIT RATES ........................................................................ 29

VI.  HARM TO COMPETITION ........................................................................... 32

VII.      CONCLUSION ........................................................................................ 33

TABLE OF EXHIBITS ....................................................................................... 35

## DECLARATION OF DR. JANUSZ A. ORDOVER

I, Dr. Janusz A. Ordover, declare under the penalty of perjury that the material contained herein is true and correct and I am competent to testify thereto.

## I.   DR. TEECE'S ANALYTICAL FRAMEWORK REGARDING THE ECONOMICS OF THE FRAND COMMITMENT IS ECONOMICALLY VACUOUS.

1.      Dr. Teece's description of the economics of standard setting and innovation is incomplete, and his descriptions of how FRAND terms should be determined are too vague to be of practical use.  (Dkt. 1331, ¶ 10.)

2.      Dr. Teece correctly describes the economic contributions of standards implementers to the success of a standard, but, inexplicably, he does not acknowledge the benefits to IP holders of being included in a standard or the importance of alternative IP available before a standard is set.  (Dkt. 1331, ¶¶ 35-38.)  In particular, he focuses on the R&D costs incurred by IP holders while acknowledging neither the monetary benefits to the IP holder from being included in a standard, nor the basic economic concept that a patent's value is determined not by the amount of money expended in developing the IP, but rather by the contribution of the IP in relationship to its next best alternative.

3.      These omissions lead Dr. Teece to several erroneous conclusions. First, his conclusion that standards implementers that have not contributed IP to the standard make no valuable contribution to IP holders except through the payment of royalties is flawed.  (*See, e.g.,* Dkt. 1331, ¶¶ 39-40.)  Second, his conclusion that IP holders are only compensated through the payment of royalties, and that to promote innovation those royalties should cover the expected cost of R&D, is also flawed.  (Dkt. 1331, ¶¶ 42-44.)  Finally, his conclusion that promoting innovation requires that royalties cover the cost of R&D without regard to the economic value of the IP generated by the R&D is likewise flawed.  (*Id.*)  I will elaborate on these points below.

4.　　In addition, in describing how one could determine whether an IP holder has complied with its FRAND commitment, Dr. Teece offers only a vague two-step test:  first, has the IP holder been willing to negotiate in good faith to achieve FRAND license terms, and second, are the offered license terms in the range of previously accepted license terms, which, according to Dr. Teece, by definition would make them FRAND?  (Dkt. 1331, ¶¶ 64, 65.)  As addressed below, I regard Dr. Teece's approach as economically vacuous and unhelpful.  If accepted, it would render the FRAND obligation meaningless.

5.　　Finally, Dr. Teece no longer offers an independent definition of "non-discriminatory," but instead simply adopts Dr. Huber's definition.[1]  In my opinion, Dr. Huber's definition is so narrow as to make no economic sense given the economic concerns raised by the standard-setting process.

## A.　　Dr. Teece Improperly Minimizes the Contributions of Standard Implementers that Benefit Consumers and IP Holders.

6.　　Dr. Teece acknowledges that firms that invest and innovate in the development and provision of low-cost standard compliant mobile handsets help disseminate the standard.  (Dkt. 1331, ¶¶ 47, 52.)  These companies put standard-compliant products within reach of the millions of customers around the globe for whom more expensive handsets may simply be unaffordable.  The strategies of

---

[1] To see the important distinction between Dr. Teece's new position and his prior report, compare his Expert Report, ¶ 72 ("A non-discriminatory licensing process requires that the patent holder not stack the deck against a particular licensee by responding very differently – in a discriminatory way – to circumstances in the licensing negotiation.") to his Witness Declaration, Dkt. 1331, ¶ 76 ("A non-discriminatory licensing process requires that the patent holder not stack the deck against a particular licensee by responding very differently to circumstances in the licensing negotiation *for impermissible reasons.*") (emphasis added.).  Apparently Dr. Teece now holds that it is consistent with FRAND to "stack the deck" against any implementer as long as that discrimination is not based on nationality or ETSI membership.

these low-cost implementers make the standard more attractive by increasing the total number of products using the standard, which benefits consumers and SEP owners alike. Moreover, these less expensive handsets impose valuable competitive discipline on the vendors of more costly handsets, which further benefits consumers and spurs innovation in mobile telecommunications.

7.     Innovation in providing low-cost standard-compliant devices to consumers is an important aspect of promoting a standard. Dr. Teece's claims that efforts by implementers to provide low-cost products could be harmful by facilitating "hold-out" are incorrect both as a matter of economics and empirics. (Dkt. 1331, ¶¶ 48, 52, 58.) I discuss the "hold-out" argument further below, but here I note that low-cost products benefit not only consumers but also firms that contributed their IP to the standard, due to broader dissemination of the standard. Moreover, Dr. Teece's position makes no economic and public policy sense because it does not offer any meaningful guidance that would assist the fact-finder in determining whether the patent-holder is "adequately" compensated for its IP.

8.     As I have previously explained, firms that implement the standard, and innovate with respect to devices using the standard, are as critical to the adoption and evolution of the standard as firms that contribute IP to the standard, especially in light of the fact that some of the "essential" IP might be of only minor incremental value to the standard. Even if one were to accept Dr. Teece's view that low-cost providers contribute little to the standard, Dr. Teece's position would be incomplete because he does not similarly account for evidence that Ericsson itself contributes less than what it has claimed to the standards at issue in the litigation. (*See, e.g.*, Dkt. 1317, 1334.) Dr. Teece has not indicated whether Ericsson's interests would be less worthy of protection if Ericsson's SEPs have less technical merit than is claimed by Ericsson. Such considerations, although implied by Dr. Teece's opinions about low-cost providers, expose the flaw in his opinion. As I explained in my initial declaration, when SEPs are valued at their *ex ante*

incremental value to the standard, the interests of the SEP owner are neither under- or overvalued.  (Dkt. 1319, ¶¶ 81-87.)

9.     Dr. Teece's claim that "TCL stood on the sidelines and did not contribute any technology" is particularly inapposite.  (Dkt. 1331, ¶ 39.)  As I observe above, it is highly beneficial to the evolution of the standard to foster a dynamic standard-based ecosystem in which a growing number of firms implement the standard.  This ensures the chances of wide adoption and survival of the standard, and creates incentives for the development of new and improved releases of the standard.  That in itself is an important contribution of the later entrants to the ongoing success of the standard.  Dr. Teece acknowledges as much, but fails to concede that such contributions from low-cost entrants are of monetary value to the SEP holder.  (Dkt. 1331, ¶ 46 ("Open standards enable late-comer implementers to enter the downstream product market without having to make risky investments in developing a technology that may never gain public acceptance.  This is not a problem—in fact, this is one of the purposes of collaborative standardization— unless the late-comer implementer refuses to pay for the standardized technology.").)  In addition, Dr. Teece acknowledges that TCL is currently participating in the standard setting process for 5G and working to contribute IP to that standard.  (Dkt. 1331, ¶ 39.)  TCL has made investments in developing technology that builds on the 4G standard as a transition path toward the 5G standard.  (*See*, *e.g.*, Dkt. 1316, ¶35 (Dr. George Guo explains that "[i]n 2015, for example, we partnered with leading French chipmaker Sequans Communications to establish a 5G research lab in France.").)  There is no basis for Dr. Teece's suggestion that TCL is a "free-rider" on the research and development efforts of early participants.  (Dkt. 1331, ¶¶ 45-54.)  To the contrary, the available evidence indicates that since its entry, TCL has made important contributions to both the spread and development of wireless standards.  In any case, TCL has always been willing to pay FRAND license fees for the right to use standard-essential IP.  As

such, Dr. Teece's characterization is wrong as a factual matter.

## B.   Dr. Teece Fails to Consider the Benefits to IP Holders from Incorporation of Their IP into a Standard.

10.   Dr. Teece's discussion of the need of IP holders to earn returns on their investments is flawed and incomplete because it fails to consider the important benefits accruing to IP holders from having their IP incorporated into a standard.  I have discussed those benefits at length in my academic writing.  (*See, e.g.*, Ex. 1174, Joseph Kattan, Janusz Ordover & Allan Shampine, "FRAND and the Smallest Saleable Unit," CPI Chronicles, September 2016.)  Here I briefly summarize the salient points.  The rate of return on investment in the development of the IP that succeeds in being included in the SEPs depends both on the costs associated with developing the relevant SEPs, and also on the revenues generated by the investment over the lifetime of the relevant SEPs, all appropriately adjusted for the cost of capital and risk.  There is no evidence with which I am familiar—and neither Dr. Teece nor Mr. Kennedy adduce any such evidence—that the investments associated with the developments of the SEPs in the telecommunications field are especially large, sunk, risky, or are persistently "undercompensated."  In fact, such investments are often undertaken by equipment manufacturers that benefit from their R&D investments both directly (by embedding them in their downstream products, potentially ahead of their rivals) and indirectly (through licensing and/or cross-licensing).

11.   Having IP incorporated into a standard can confer substantial benefits on a SEP holder by expanding demand for patents for which little or no demand may otherwise exist.  That is, in the context of standards that achieve commercial adoption, a SEP cannot be replaced by a superior (or a cheaper) IP, until the time the existing standard is superseded by a new one, which assures the SEP holder of a guaranteed market for its IP—a market that in the case of mobile handsets is very large indeed.  (Many IP holders also manufacture standard-compliant devices and

so benefit from increased demand for those devices through their own sales as well as from licensing revenues from their SEPs.)  Absent incorporation into the standard, the SEP holder's opportunities for its IP would likely be less attractive, and, in fact, there might be no demand at all.  (It is important to keep in mind that the FRAND commitment helps preserve the benefits of competition between technologies prior to the standard being set, and helps prevent SEP holders from exploiting the additional market power created through the elimination of that competition from the standard setting process.)  There is no evidence that I have seen that shows that the voluntarily-agreed to constraints on license royalties from FRAND restrictions outweigh the pecuniary and non-pecuniary benefits that a SEP holder derives from the inclusion of its patents in a standard and the concomitant flow of revenues (including the reduction in direct licensing expenses through cross-licensing).  In particular, in industries such as wireless telecommunications, SEP holders gain a guaranteed pool of licensees for their IP that otherwise may not have used the patents at all.  In a market in which nearly a billion and a half standard-compliant handsets are sold annually, this is a hugely valuable benefit, which Dr. Teece seems to ignore.

12.   Under Dr. Teece's incorrect framework, SEP holders gain all of the benefits of inclusion in the standard and elimination of competing alternatives from consideration, and in return agree only to the requirement that they "show[] a willingness to negotiate in good faith towards a FRAND license on free-market terms."  (Dkt. 1331, ¶ 64.)  Dr. Teece argues there should be no constraint on these "free-market terms," other than that they "are within the range of those previously agreed to by other similarly situated licensees."  (*Id.*, ¶65.)  Thus, that range could include any amount that the SEP holder has been able to obtain from other licensees, including what could be extracted under threat of injunction.  Dr. Teece's position in no way provides a reasonable balance between the interests of the different parties.  (*See* Dkt. 83, p. 3 ("As an overall principle, FRAND must

balance the interests of both the developers and users of the technology."); Ex. 223, p. 1 ("the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.").)

## C. **TCL's R&D Intensity is Irrelevant.**

13.    My analysis shows there is no economic basis for Dr. Teece's claim that because TCL's R&D intensity is allegedly lower than that of Ericsson or other implementers, it should therefore pay more for a license to Ericsson's SEPs.  (Dkt. 1331, ¶¶ 55-57.)  Generally speaking, economics and business logic indicate that R&D intensity is not relevant for gauging how much a licensee will (or should) pay for a license.  As I have explained before, the value of the licensed IP does not flow from the amount of R&D expenditures devoted to its development.  Rather, that value flows from the contribution to the quality of the standard, relative to alternative IP, including IP already in the public domain.  That is, Dr. Teece improperly confuses inputs with outputs.  What the licensees are paying for, or should be paying for under the *ex ante* interpretation of FRAND, is the value of the licensor's output (IP) to their operations, considering the competing alternatives to that IP.  Because it depends on future conditions (including the development of lower cost or higher quality alternatives by rivals), R&D investment is inherently risky.  This risk does not justify a call for any minimum level of compensation that makes the investment profitable or even break-even.  For example, Dr. Teece notes that WiMAX lost out to LTE and the developers of WiMAX were therefore not compensated to the same extent (or at all) as were the LTE developers.  (Dkt. 1331, ¶ 44 ("… LTE won the competition over WIMAX due to LTE's more effective technology and broader support in the industry.  Other developers placed resources into WIMAX and presumably did not see the same returns.").)  This is precisely the dynamic that leads to efficient investment.  Of course, the licensor may choose not to innovate if it does not expect to earn a return on its innovation over the

anticipated life of the IP.  Dr. Teece claims that low royalty rates will depress innovation and lead to a downward spiral.  (Dkt. 1331, ¶ 51 ("… artificially low rates drive down innovation and reduce competition in a spiral of lower royalty payments and reduced incentives to innovate, reduced competition, and higher prices.").)  However, Dr. Teece offers no evidence that the innovators in the mobile communications eco-system are earning insufficient returns on their investments.  Nor does Dr. Teece offer any evidence that Ericsson is under-compensated for its innovations in the mobile telecommunications space.

14.    Be that as it may, even if one just considers the alleged difference in the R&D budgets of Ericsson and TCL (and even if one ignores that the level of the license fee should be linked to the expected value of the IP relative to the alternatives), it is clear that the metric proposed by Dr. Teece as a guide to FRAND licenses makes no economic sense.  This is so for several reasons.  For example, (a) the licensor's total R&D budget may be much larger than the licensee's because the former's R&D program addresses many different products and technologies, and not only the technology at issue; (b) the licensor may be inefficient (or unlucky) in its R&D operations and strike a large number of "dry" holes resulting in high expenditures and low output of commercially valuable innovations; and (c) because of the problem noted in point (a) above, the licensor's R&D expenditures on the technology at issue might be low, even assuming that these expenditures can be reliably identified from accounting data.

### D.    Dr. Teece Mischaracterizes My Views on Cross-Licensing and "Most Favored Licensees"

15.    Dr. Teece's focus on TCL's lower R&D expenditures is perhaps rooted in the idea that a licensee that spends more on R&D and develops valuable IP can cross-license it and pay lower monetary license fees.  This is neither new nor controversial.  What Dr. Teece fails to make clear is that the *net* value that Ericsson obtains from licensing its SEPs should not be higher, or lower, because (after

taking into account the possible savings in transaction costs) of cross-licenses from the licensee.  That is, a licensee may pay for the SEPs in different ways, including monetary payments or cross-licensing of its valuable IP.  However, the pecuniary value of the consideration received by the licensor should not be discriminatory.  The fact that one firm pays in cash and the other through licensing of its IP should not disadvantage one relative to the other.  (Indeed, the Federal Trade Commission in its recent complaint against Qualcomm states that demanding cross-licenses from licensees without adjusting the pecuniary license rates to reflect the value being granted through the cross-licenses would be evidence of a FRAND violation. *Federal Trade Commission v. Qualcomm Inc.*, Case No. 5:17-cv-00220, ¶ 77(d) (N.D. Cal. January 17, 2017).)

16.     More generally, comparisons of royalty rates across licenses–-however those licenses are structured–-are critical to enforcement of FRAND commitments. It is my understanding that analytical tools have been developed by economists and licensing practitioners that can assist fact-finders in this task.  A non-discrimination requirement is only enforceable to the extent it is possible to compare different licenses.  If one were to say that firms with cross-licenses could not have their licenses compared with firms without cross-licenses, then it becomes simple to discriminate between those groups.  Similarly, if cross-licenses are deemed idiosyncratic and not comparable one to another, then again, this would make it simple to discriminate between licensees.

17.     Dr. Teece claims that the approach I have offered would "effectively impose a most-favored licensee regime," that "parties come to the negotiating table with different assets to trade," and that my approach "would effectively prevent owners of standard essential patents from engaging in mutually-beneficial cross-licensing arrangements ..."  (Dkt. 1331, ¶ 84.)  Dr. Teece's claim that I advocate for a most-favored licensee regime that would prevent cross-licensing or use of different licensing regimes or methods of compensation is incorrect and

mischaracterizes my position.  The FRAND commitment imposes a non-discrimination requirement that constrains the rates a licensor can charge different licensees, but it does not operate in the fashion Dr. Teece suggests.  In particular, as I explained previously, whether a firm has IP to cross-license or not, "the total consideration paid by the licensee—whether paid through the value of the cross-license or through a one-way royalty rate—should <u>not</u> vary based on the means used to pay for access to SEPs."  (Dkt. 1319, ¶ 63.)

18.     My position is that when an IP owner signs a SEP license, the non-discrimination requirement of FRAND imposes a constraint on the rates that can be charged to future licensees.  I take no position on the rights of prior licensees to renegotiate their rates, as I understand this is outside the scope of this case.  In any event, the absence of an explicit most-favored nation clause of some sort in the ETSI IPR Policy does not change the obligation of IP owners to offer non-discriminatory terms to future licensees.

19.     In a related matter, Dr. Teece's claim that non-discrimination does not require a level playing field among competitors "with regard to monetary payments" is misleading, inaccurate, and plainly a red herring.  (Dkt. 1331, ¶ 81.)  Dr. Teece discusses the fact that licensees have made royalty payments in different forms, including cross licenses, and objects to a simplistic equalizing of "actual monetary IP costs."  (Teece Rebuttal Report, ¶79; Dkt. 1331, ¶¶ 81-83.)  However, the non-discrimination requirement ensures a level playing field among competitors with respect to the value they convey for access to the SEPs under the FRAND umbrella.  The form of payment is irrelevant.  The key point is that the SEP holder cannot evade its obligation not to discriminate between licensees simply by engaging in cross-licensing with some of them.

### E.     Ranges of Royalties in FRAND

20.     Dr. Teece cites to the decision in *Microsoft v. Motorola* as evidence that "a very wide range of [licensing] terms can still be non-discriminatory."

(Dkt. 1331, ¶ 70.)  I disagree with Dr. Teece's conclusion, as I explain further below.  In my view, Judge Robart's decision in *Microsoft v. Motorola* does not support Dr. Teece's positions on the issue of non-discrimination.  In particular, I do not find anything in the opinion that would support Dr. Teece's position that discrimination is permissible so long as it is not rooted in nationality or ETSI membership.  It is my understanding that one of the central questions in that case was not whether the terms offered by Motorola to Microsoft exceeded what other firms were paying Motorola for the same license (*i.e.*, discrimination), but rather whether the 2.25 percent rate demanded by Motorola from Microsoft was itself reasonable given the relevant value of the technology covered by the patents (*i.e.*, whether the proposed rate was fair and reasonable).  *See Microsoft v. Motorola*, No. C10-1823JLR, 2013 WL 2111217, *2 (W.D.Wash. Apr. 25, 2013).  Judge Robart not only found that it was not, but further found that a reasonable value for Motorola's patents was far below what Motorola was demanding.  (*See, e.g.*, Ex. 1165 (U.S. Department of Justice Business Review Letter, February 2, 2015, note 28, noting RAND rate of $0.03471 per unit as compared to Motorola's demand of $6 to $8 per unit).)  This finding is clearly inconsistent with Dr. Teece's claims that there is no evidence that SEP holders attempt to engage in hold-up.  (Dkt. 1331, ¶ 160.)  Indeed, this ruling evidences that SEP holders may have potent hold-up incentives because it demonstrates a gross disparity between the rates demanded by the licensor and the FRAND-compliant rates as determined by the court.  (*See, e.g.*, Ex. 1165 (U.S. Department of Justice Business Review Letter, February 2, 2015, note 28, citing *Innovatio* and *Microsoft v. Motorola* – "litigated cases demonstrate the potential for hold up when owners of RAND-encumbered standards essential patents make royalty demands significantly above the adjudicated RAND rate.").)  If Dr. Teece means that this opinion supports the idea that FRAND is a range, I discuss that concept below.

21.     Dr. Teece may be conflating the FRAND requirement that licenses

should be (i) reasonable, and (ii) non-discriminatory.  To be clear, there could be a range of "reasonable" rates, as that simply requires that the rates do not reflect the hold-up value.  For example, if a SEP holder's IP leads to a 1 percent per unit quality improvement or cost savings relative to unpatented technology that could be included in a standard, then the SEP holder and licensees would negotiate about how to split that 1 percent.  An attempt to charge more than 1 percent would entail hold-up made possible by the elimination of the alternative unpatented technology once the standard has been set.  Any rate of 1 percent or less is thus "reasonable."  However, once a license has been set, the non-discriminatory requirement becomes operative.  At that point, the economically sound approach is to evaluate subsequent licenses against the backdrop of the existing licenses (assuming the existing licenses satisfy the "reasonable" requirement).  For example, if the first licensee pays the rate of 0.25 percent of the ASP, that sets a benchmark for non-discriminatory rates for subsequent similarly-situated licensees.  That is, the "non-discrimination" provision of FRAND by its nature mandates comparisons among licensees.  A firm can only be discriminated against relative to some other firm's license.  "'[F]air and reasonable' may cover a range, but if one firm is at the top end of the range and another is at the bottom, the discrimination between the two is problematic for the firm receiving the less favorable terms."  (Ex. 1578, p. 4.) Thus, with respect to ensuring a level playing field among competitors, the fact that some existing licensees are already handicapped relative to other existing competing licensees simply means that Ericsson has succeeded in discriminating against some firms.  The fact that Ericsson has discriminated against existing licensees does not immunize continuous efforts to discriminate against other potential licensees.  Rather than being tied to Ericsson's discriminatory licenses, new licensees should receive no less favorable terms than any similarly-situated licensee that received preferential rates.

22.    Mr. Kennedy references Dr. Teece's discussion of FRAND and claims

that so long as the rates being offered are within the range consistent with other "comparable" licenses, then the proposed rates are non-discriminatory.  (Dkt. 1333, ¶¶ 67-68.)  Mr. Kennedy points to the range of licensee rates (primarily for licenses signed before May 2015) and claims that the rates being offered to TCL are within that range and therefore must be FRAND.  (Dkt. 1333, ¶¶ 10, 21-22.)  Dr. Teece takes the same position (although it is unclear given his new position on non-discrimination whether he is saying the range demonstrates reasonableness or non-discrimination).  (Dkt. 1331, ¶ 10g.)  However, even setting aside the other concerns I have raised, this approach fails to consider how that range was established and whether all of the licenses are compliant with FRAND.  That is, Mr. Kennedy presumes that each of those licenses complies with FRAND, but his own evidence suggests otherwise.  A review of Mr. Kennedy's timelines of licensing negotiations shows that Ericsson repeatedly gave new licensees terms that, according to his own analysis, were higher than the highest rates in prior licenses.  This is evidenced in, for example, Mr. Kennedy's charts from his Rebuttal Report for "pure play" 4G and two-way 3G license rates, which show his estimates of royalty rates for different licensees.  Mr. Kennedy's calculations demonstrate that the "range" repeatedly expands, with new licensees paying substantially higher rates than prior licenses signed just a few months prior (sometimes 50% higher, and sometimes nearly three times higher).  (Kennedy Rebuttal Report, pp. 61, 65.)

23.     To be clear, I do not endorse Mr. Kennedy's calculations.  I simply reference them to show that Mr. Kennedy and Dr. Teece's positions are inconsistent both with each other (because Mr. Kennedy's evidence shows new licenses repeatedly being outside the range of prior licenses) and with FRAND (because their approach appears to not prevent any discrimination).  According to Mr. Kennedy and Dr. Teece's logic, Ericsson discriminated against later licensees that paid higher rates than those paid by existing licensees.  It does not make

Ericsson's rates to TCL non-discriminatory just because these rates are not higher than the discriminatory rates that Ericsson obtained from earlier licensees.

24.     On the other hand, if the prior expansions of the purported range were consistent with FRAND, which Mr. Kennedy and Dr. Teece apparently claim they were, then it is not clear what limiting factor their approach offers, since presumably the range could continue to be expanded, simply by demanding higher rates from new licensees.  That is, under Mr. Kennedy's and Dr. Teece's interpretation of FRAND, it appears that a signed license could never be discriminatory because any new license—no matter what its royalty rate—would simply define a new boundary of the "range."  It is important to note that Dr. Leonard's analysis indicates that many licensees are paying rates that are both discriminatory and unreasonable according to his methodology.  Either is a sufficient basis for those rates not to be FRAND-compliant.

## F.     Dr. Teece's Approach to FRAND Is Economically Vacuous

25.     Dr. Teece's interpretation of FRAND is so economically vacuous as to render it nearly meaningless.  Like Dr. Huber, Dr. Teece suggests that complying with FRAND is process-oriented and requires only that the SEP holder negotiate with prospective licensees in "good faith," which neither of them defines in any detail, beyond Dr. Huber's claimed equivalence between "good faith" and an alleged ETSI requirement that negotiations be "friendly." (Dkt. 1331, ¶ 64; Dkt. 1329, ¶ 37.)  Stated differently, for Dr. Huber and Dr. Teece, FRAND is an elastic concept that imposes almost no restrictions on the permissible licensing terms while forcing the standard implementer to accept the licensor's terms for fear of being evicted from the market under some inchoate claim that it has not bargained "in good faith."  Dr. Teece's interpretation of FRAND does not address any of the economic concerns regarding market power gained by SEP owners through standard setting.

26.     I have already noted that the U.S. Department of Justice and Federal

Case No. SACV14–00341 JVS (DFMx)/CV15-02370
REBUTTAL DECLARATION OF DR. JANUSZ A. ORDOVER

Trade Commission disagree with Dr. Teece's and Dr. Huber's interpretation of FRAND, as did the court in *Ericsson Inc. v. D-Link*.  Dkt. 1319, ¶¶ 18, 20, 23.  Just recently, the Federal Trade Commission filed a suit against Qualcomm alleging violation of Qualcomm's FRAND commitment in which the Commission reiterates (consistent with my opinion here) that FRAND requires preventing the exercise of market power gained through the standardization process (hold-up):

> Standardization can also present competitive risks. Standard-setting participants often hold patents covering technologies that are incorporated into a standard. Once a standard incorporating proprietary technology is adopted, the potential exists for opportunistic patent holders to insist on patent licensing terms that capture not just the value of the underlying technology, but also the value of standardization itself. To address this "hold-up" risk, SSOs often require patent holders to disclose their patents and commit to license standard-essential patents ("SEPs") on fair, reasonable, and non-discriminatory ("FRAND") terms. Absent such requirements, a patent holder might be able to parlay the standardization of its technology into a monopoly in standard-compliant products.
>
> By making a FRAND commitment, a patent holder accepts the benefits of participating in standards development and of seeking incorporation of its patented technologies into a standard, but agrees in exchange not to exercise any market power resulting from its patents' incorporation into that standard.

(Ex. 2529, *FTC v. Qualcomm*, ¶¶ 49-50.)

27.   Dr. Teece's interpretation of the FRAND commitment also seems to make no economic sense given the way the term "non-discriminatory" is used.  In

my view, "non-discriminatory terms and conditions" should mean non-discriminatory terms and conditions.  That is, contrary to Dr. Teece, just because the parties reached the licensing terms via some undefined "good faith" negotiations, this does not make those terms non-discriminatory within the meaning of FRAND.  Dr. Teece's witness statement goes farther than his expert report, and he now maintains that any degree of discrimination is permissible so long as it is not based on licensee's nationality or ETSI membership.  (Dkt. 1331, ¶¶ 76-77.)  To the contrary, the fact that the actual terms and conditions for similarly-situated firms are substantially different is, by definition, discriminatory, and I disagree with Dr. Teece's claim that a requirement not to discriminate actually means discriminate any way you want except according to nationality or ETSI membership.

28.     The overarching conclusion from my economic analysis of FRAND regarding non-discrimination is that the non-discrimination requirement of FRAND means licensors cannot disadvantage one firm vis-a-vis another firm that occupies the same competitive space.  As previously discussed, it makes economic sense that firms that rely on similar technologies and are competing with each other are similarly situated for the purpose of gauging non-discrimination under FRAND.  This is consistent with the underlying economic concerns that strategic licensing practices and discrimination may place some competing firms at a disadvantage relative to others.  I note that TCL produces a range of handsets that directly compete with handsets manufactured by Samsung, HTC, LG, Huawei, Apple, and others.  (Dkt. 1319, ¶¶ 66-67.)  Because Ericsson has granted certain firms that directly compete with TCL preferential licenses relative to some of their competitors, these licenses set the relevant benchmark.  (Dkt. 1318, p. 7.)  I further note that although there is disagreement among the experts regarding the effective royalty rates in some two-way licenses, there is no dispute as to the terms in the Huawei license.  The Huawei license is very recent and has been granted to a firm

that directly competes with TCL.  Moreover, that license was set after arbitration intended to address concerns about FRAND violations of the kind that this litigation addresses.  Mr. Kennedy and Dr. Teece have not provided any economically sensible explanation as to why TCL should pay a higher royalty rate than Huawei pays.  Furthermore, I understand that even Ericsson's licensing expert (Mr. David Kennedy) agrees that ▮▮▮ for example, secured licensing terms from Ericsson that are even more favorable than what ▮▮▮ obtained.  Again, one of the purposes of non-discrimination is to prevent a licensor from providing preferential deals to one, or a few, firms, while charging other firms much higher rates.  For competing firms, the rates should not be substantially different.

29.  I also disagree with Dr. Teece's position that offers need not comply with the FRAND requirements.  Any offer is generally made with some expectation that it might be accepted, or with a hope of affecting the other side's bargaining strategy.  Otherwise, it would not make sense to make such an offer.  If a licensee were to accept an offer that the SEP holder knew was not FRAND compliant, it seems unlikely in such an event that the SEP holder would have any economic incentive to inform the licensee that they were, in fact, entitled to more favorable terms.[2]  Thus, explicitly allowing offers that the licensor knows are non-FRAND compliant would increase the likelihood of non-FRAND compliant licensing outcomes (which also bears on Dr. Teece's claims about the range of existing licenses establishing the boundaries of reasonableness for FRAND).

---

[2] For further discussion of some of the economics of bargaining in such situations, see Ex. 2530, Janusz Ordover & Ariel Rubinstein (1986), "A Sequential Concession Game with Asymmetric Information," *Quarterly Journal of Economics* 101(4); and Ex. 2531, Ariel Rubinstein (1985), "Choice of Conjectures in a Bargaining Game with Incomplete Information," in Alvin E. Roth, ed., *Game-Theoretic Models of Bargaining*, Cambridge: Cambridge University Press.

### G.   Summary

30.   To summarize, Dr. Teece, Mr. Kennedy and Dr. Huber adopt the following framework, relying primarily on Dr. Huber for its basis.  First, they maintain that the "non-discriminatory" requirement of FRAND only sets forth two forms of "impermissible" discrimination:  discrimination based on nationality and discrimination based on ETSI membership.  All other forms of discrimination are allowed.  Second, they maintain that the "reasonable" requirement implies only a willingness to negotiate in "good faith," which apparently means engaging in "friendly" negotiations.  Dr. Teece and Mr. Kennedy claim that so long as the terms of a new license are within the range of the terms of existing licenses, then the new license complies with the FRAND requirement.  Since their new definition of "non-discriminatory" requires no such thing, presumably this claim is based on whether the rates are "reasonable."[3]  That is, they presume that any prior negotiated licenses must have been negotiated in "good faith" and that the results are therefore compliant with the FRAND commitment.  These positions are internally contradictory and economically vacuous.  If accepted, they would render the FRAND obligation economically meaningless and unable to address the economic concerns raised by myself and regulatory authorities such as the Department of Justice and Federal Trade Commission.

31.   As I have described above, the idea that existing licenses can define a safe harbor of FRAND compliant activity does not provide sound or sufficient economic basis.  To see the difficulty with the approach proposed by Ericsson's experts, assume that the first license has already been granted and then consider the

---

[3] Dr. Teece states in paragraph 10(g) that "[n]ondiscrimination in FRAND licensing requires no more than offering a licensee market based terms within the range of terms agreed to with similarly situated licensees."  This contradicts his new position, based on Dr. Huber, that non-discrimination requires no such thing.  (Dkt. 1331, ¶¶ 76-77.)

second license that was granted.  Assume that it differs from the first.  Presumably, if the rates therein are lower than the rates in the first, it would be deemed "reasonable."  But what if those rates are higher?  Dr. Teece offers no methodology or procedure for how would one determine whether the new, higher rate is reasonable within the meaning of FRAND.  Assume next that a third license is granted, and it falls outside the existing range.  As I described above, this pattern is consistent with Ericsson's licensing practices.  Since new licenses have regularly expanded the range of agreed licenses, Dr. Teece cannot claim that the current range has any bearing on what the FRAND rates ought to be.  Nor is there any basis to assume that simply because a license was concluded, that the negotiations must have been in "good faith."  For example, license terms are generally subject to confidentiality restrictions, and a new licensee may have little ability to know if it is being treated poorly relative to other licensees (although Dr. Teece also claims that is irrelevant because Ericsson is free to discriminate and charge the new licensee any rate as long as it does not tie the rates specifically to licensee's nationality or ETSI membership).  The threat of injunctions may cause licensees to agree to non-FRAND compliant licenses, and which is consistent with Dr. Leonard's analysis supporting the conclusion that Ericsson's licenses are generally not FRAND compliant.  (Dkt. 1319, ¶ 27; Dkt. 1317, ¶¶ 11, 38.)

32.     The collective position of Ericsson's witnesses, therefore, is that FRAND imposes no practical restrictions.  Ericsson can, in its view, discriminate freely between licensees on nearly any basis and to whatever degree it wishes, and it must only negotiate in a "good faith" and (possibly) "friendly" fashion.  This approach to FRAND ignores the fundamental economic concerns associated with the removal of competition through the standard-setting process–-concerns that have been articulated most recently by the FTC in its complaint against Qualcomm–-and is economically vacuous.

## II.   <u>TCL IS NOT A "HOLD-OUT"</u>

33.   Dr. Teece argues that when a "late-comer refuses to contribute to [*i.e.*, pay license fees for] the very substantial investment in technology that becomes standardized, these 'free-riders' or 'hold-outs' seriously risk harming innovation and competition in the mobile communications sector ...."  (Dkt. 1331, ¶ 48.)  I disagree.  Dr. Teece's discussion assumes that the "hold-out" or "free-rider" never pays royalties.  Irrespective of the general validity of this claim, it is clearly not applicable to the instant litigation.  TCL paid royalties to Ericsson under its 2G license, and TCL has agreed to pay the rates determined by the Court.

34.   Dr. Teece intimates that a "hold-out" might also be "rewarded with delayed payments and lower rates by virtue of complex legal wranglings."  (Dkt. 1331, ¶ 53.)  Again, this characterization does not apply to TCL.  Indeed, I understand that TCL filed this litigation specifically to resolve its disputes with Ericsson regarding what constitutes a FRAND royalty rate, and thus obtain a license to Ericsson's IP.  As discussed above, TCL is not objecting to paying FRAND-compliant royalties to Ericsson; rather, TCL has only objected to demands for unreasonable and discriminatory terms and conditions.

35.   Dr. Teece provides no explanation for how delay might benefit TCL.  There is no way that TCL can "run out the clock" on Ericsson's patents except for the statute of limitations.  If negotiations between the parties dragged on to the point where "running out the clock" became relevant, such a strategy might be very costly for TCL as it might end up having to defend against many infringement claims as Ericsson could file multiple cases to preserve its rights (as Ericsson indeed did).  That is, TCL must expect that the licensing dispute will ultimately end up in court and it will have to pay historical damages, besides incurring litigation costs.  As far as I am aware, litigation costs are no less onerous for licensees than patent holders, and some commentators have suggested the reverse may be true.  (Ex. 2533, Greg Leonard, "Reflections on the Debates Surrounding Standard-

Essential Patents," Antitrust Source, American Bar Association, August 2015, pp. 8-9.)  Thus, given that both firms would incur significant litigation costs—costs at least as significant to TCL as to Ericsson—there is no sound economic reason why TCL would have incentives to engage in delay for delay's sake (or litigation for litigation's sake).  The key point here is that since TCL is not insolvent, any valid claim will eventually be paid.

36.     In my view, a potential licensee that litigates to protect its rights under FRAND is not a "hold-out."  If a licensee could not litigate to protect its rights under FRAND, then FRAND would only protect licensors' interests and encourage further hold-up.  A licensee receives no meaningful protection if the licensor's commitment to license on FRAND terms cannot be enforced.  Attempts to enforce that commitment are generally consistent with that commitment.  In particular, I understand that TCL has sued because, in its view, Ericsson has not met its obligations under FRAND.  When there is a licensing dispute between the parties, the court will determine the appropriate license fee.  The mere acts of refusing to accept terms that TCL views as unreasonable and discriminatory, and suing to enforce its rights, do not paint TCL as a "hold-out" as claimed by Dr. Teece.  In fact, my economic analysis establishes that the ability to enforce one's rights under FRAND is a critical part of the FRAND framework.  As I have previously written, either party should be able to go to court at any time to enforce its rights under FRAND.  (Ex. 455, Janusz Ordover & Allan Shampine, "Implementing the FRAND Commitment," Antitrust Source, American Bar Association, October 2014.)  Dr. Teece warns that free riding can "destroy[] the balance between innovator and implementer" and opines that an IP holder may have no recourse but to spend money to assert its patent rights in the Courts.  (Dkt. 1331, ¶¶ 53-54.)  But he offers no opinion on whether exploitation of potential licensees through non-FRAND rates may similarly "destroy[] the balance" and does not explain why and how a potential licensee's efforts to protect its rights "compromises" the standard-

setting process.

37.    Dr. Teece claims that it is TCL that is being "unfair and unreasonable" and is seeking to deny Ericsson a fair return on its IP.  He goes so far as to claim that TCL's alleged behavior poses an existential threat to the industry and Ericsson. (Dkt 1331, ¶ 45.)  As already noted, TCL does not object to paying royalties for IP that it is using, but it does object to paying discriminatory and unreasonable royalties, or what I termed "un-FRAND royalties."  Indeed, I understand that TCL had a license to Ericsson's 2G patent portfolio, and was one of the first Chinese companies to take such a license.  (Ex. 64; Deposition of Kasim Alfalahi, January 12, 2016 ("Alfalahi Deposition Transcript"), pp. 154-155 ("Q.· Would you agree that TCL was one of the very first Chinese companies to enter into a·2G license with Ericsson?  A. I would say yes, they were early, yes.").)  Dr. Teece's further suggestion that TCL, "a market entrant that had not contributed to that innovation," should somehow be required to pay higher royalties than SEP holders that are also implementers is also without economic basis.  (Dkt. 1331, ¶ 40 ("As a market entrant *that had not contributed to that innovation*, TCL should have expected to pay IPR royalties to the companies that created the technology once TCL began manufacturing standard-compliant phones.") (emphasis added).)  Indeed, one of the important functions of FRAND is to prevent discrimination by SEP holders against non-SEP holders.  Dr. Teece's views on discrimination would prohibit discrimination based on ETSI membership, but permit it against non-SEP holders.

38.    Dr. Teece also fails to address TCL's business concerns about being held-up and disadvantaged relative to its competitors.  As Dr. Teece notes, TCL's business model is partly to develop low-cost devices, and paying higher license fees than its rivals who sell competing devices is a significant concern both to TCL and more generally from the standpoint of maintaining a healthy and competitive marketplace for mobile phones.

## III.   **SIMILARLY SITUATED LICENSEES AND NON-DISCRIMINATION**

39.     Dr. Teece's conclusions about similarly-situated licensees are nonsensical and inconsistent with his prior report.  In his rebuttal report submitted in this matter, Dr. Teece opined that all handset manufacturers are similarly situated.  As Dr. Teece noted at the time, that position is consistent with my own – that firms are similarly situated when they are competitors using similar technologies.[4]  Although firms may focus their business activities in particular geographic regions, the major handset producers (of which TCL is certainly one) are global firms that utilize standards to develop products for wide distribution.

40.     Dr. Teece has also suggested that some handset manufacturers are "more or less similarly situated" to each other based on a number of factors, including selling price, financial condition, cost structure, product mix, and volume of sales.  (Teece Rebuttal Report, ¶ 108.)  In his rebuttal report, Dr. Teece opined that, based on these factors, ZTE, Sharp, Karbonn, and Yulong (Coolpad) are more similarly situated to TCL than are other handset licensees such as Samsung, HTC, LG, and Huawei.  Still, Dr. Teece opined that it makes sense to consider Ericsson's licenses with Samsung, HTC, LG, and Huawei as comparators.  (*Id.*, ¶ 127.) Despite his prior statements, in his witness declaration Dr. Teece now opines that only ZTE, Sharp, Karbonn, and Yulong (Coolpad) should be considered as comparators.  (Dkt. 1331, ¶ 125.)  Mr. Kennedy then accepts Dr. Teece's claims

---

[4] Teece Rebuttal Expert Report, ¶97 ("In my opinion, 'similarly situated' firms are those that offer similar (not necessarily identical/fungible/commodity) products at a similar level of the 'value chain.' Prof. Ordover, Dr. Leonard and Dr. Lynde appear to agree with me on this point as well.").)  Dr. Teece cites to my report as evidence that we agree; the full citation from my report explains the rationale for defining similarly-situated firms in this way: "The Tribunal's approach of considering firms to be similarly situated when they are competitors using similar technologies is economically sensible and consistent with the underlying economic concerns that strategic action and discrimination may place some competing firms at a disadvantage relative to others."  (Ordover Expert Report, ¶ 62).

respecting which licenses should be examined although, for Mr. Kennedy "comparable" licensees also include Apple, Samsung, Huawei and the others I have discussed.  (Dkt. 1333, ¶ 8.)  Moreover, Mr. Kennedy states that, whether they are "more similarly situated" or not, *all* of the comparable licenses provide useful information.  (Dkt. 1333, ¶¶ 94-95.)  Dr. Teece and Mr. Kennedy's efforts to ignore the Apple, Samsung, Huawei, and other licenses are inconsistent with their statements that these are comparable licenses and contain useful and relevant information.

41.    Dr. Teece does not explain why the factors he identifies should justify rate differences, or what degree of rate differences might be justified based on differences in these factors.  In particular, Dr. Teece does not explain in any economically sensible manner how the large differences in observed rates between the firms he claims are similarly situated could nonetheless be justified under FRAND due to differences in his factors, even assuming that all of his factors should be relevant to comparisons of licenses under FRAND.

42.    My fundamental point is that firms like Huawei, Apple, and Samsung are selling handsets at the same price points as TCL, and are paying rates that are much lower than what Ericsson is demanding from TCL.  Dr. Teece offers no economically sensible explanation as to why such a difference should be allowed under the "non-discrimination" requirement of FRAND.  Instead, he claims that *any* degree of discrimination is permissible so long as it is not tied to nationality or ETSI membership.  That claim is fundamentally inconsistent with the entire discussion of "similarly situated," which is premised on the idea that similarly-situated firms should pay similar rates.  Even within his discussion about firms being "more or less" similarly situated, he does not explain why a firm such as Huawei should be afforded a substantially lower rate on handsets at the same price point and competing directly with TCL's handsets.

43.    The firms I have discussed above directly compete with TCL's

1   products, and I understand there is no dispute that the firms highlighted by Dr.

2   Teece (*i.e.*, Sharp, Karbonn, and Yulong) pay ███████████████ royalty rates

3   than Samsung, Apple, Huawei and others.  As I have previously discussed, the fact

4   that Ericsson has succeeded in discriminating against some firms in the past, or

5   charged them unreasonable rates while granting others preferential treatment, does

6   not provide any justification for further attempts to discriminate or charge

7   unreasonable rates.

8          44.    Dr. Teece also opines that "technological capabilities and the long term

9   involvement of firms such as Samsung, HTC and LG in the standards-based

10  innovation ecosystem" may render those firms not similarly situated to firms that

11  do not have such capabilities and involvement.  (Dkt. 1331, ¶¶ 94-95.)  As I

12  discussed above, such a position would undermine the fundamental purposes of

13  FRAND, and would allow strategic behavior such as exclusion of or discrimination

14  against entrants.  As I have previously explained, the fact that a firm is an SSO

15  participant may mean that firm has IP to cross-license, but the value paid by the

16  licensee should <u>not</u> vary based on the means used to pay for access to SEPs.  In

17  particular, Dr. Teece's interpretation would free SSO members to discriminate

18  against non-members, which is clearly a competitive concern.  (Indeed, even within

19  Dr. Teece's framework, this position appears contradictory to his new position that

20  discrimination based on ETSI membership is impermissible.)

21         45.    Dr. Teece states that Huawei is not similarly situated because it is a

22  major manufacturer of infrastructure equipment and has a portfolio of SEPs.  (Dkt.

23  1331, ¶ 136.) ████████████████████████████

24  █████████████████████████████████████

25  █████████████████████████████████████

26  █████████████████████████████████████

27  (Ex. 58, pp. 134-138.)  Furthermore, I understand that the arbitration commenced

28  specifically because Huawei claimed Ericsson was engaging in discriminatory

behavior and violating its FRAND commitment (by insisting upon the same 2015 reference prices Ericsson contends are FRAND in this case).  Thus, the Huawei rates—which are one-way rates for handsets for a firm that directly competes with TCL and which were set based specifically on an analysis of Ericsson's FRAND obligations and of prior licenses—seems highly relevant, contrary to Dr. Teece's claim.  It seems very peculiar, therefore, to disregard in the instant litigation a benchmark that was established in response to the very same concerns raised here by TCL.  More generally, to the extent that firms that litigate to enforce their rates are obtaining lower rates from Ericsson, that suggests that Ericsson is engaging in hold-up and/or discrimination against the other firms.

46.     Dr. Teece also suggests that the Huawei license is irrelevant because it was instituted after the offers to TCL.  Again, Dr. Teece previously acknowledged that Huawei and TCL are similarly situated, and he does not dispute that Huawei is currently paying Ericsson license fees for SEPs that are substantially lower than what Ericsson is demanding from TCL.  (Teece Rebuttal Report, ¶¶ 101-102 ("Thus, in this case I would compare TCL with all of Ericsson's handset licensees.").)

47.     As another element of his effort to undermine the relevance of the Huawei license, Dr. Teece adopts a new position that the "non-discriminatory" requirement applies only at the time of Ericsson's offer to TCL.  (Dkt. 1331, ¶ 79.) This seems to contradict another of his positions that offers need not be FRAND compliant.  (Teece Rebuttal Report, ¶ 95.)  As I have already pointed out, there is no basis for him to assume that the existing range of license terms is FRAND compliant.  But his use of this position to reject the importance of the Huawei license is particularly inapposite.  Dr. Teece ignores the obvious reason *why* Huawei did not have a license in place for comparison in earlier years—Huawei was engaged in its own legal dispute with Ericsson during the course of TCL's negotiations with Ericsson. ██████████████████████

1

2 ████████████████████████ If Ericsson had not attempted to discriminate against

3 Huawei, then Huawei's current license would have been available as a benchmark

4 years ago.  Dr. Teece's effort to ignore that benchmark because the legal process

5 had not played itself out during TCL's negotiations is economically nonsensical.

## IV. THE VALUE OF THE COMMUNICATIONS TECHNOLOGY AS A WHOLE IS NOT A RELEVANT BENCHMARK FOR THE VALUE OF ERICSSON'S SEPS.

9        48.     Dr. Teece claims that the value of cellular connectivity, as measured by

10 the difference in selling price between two Apple handsets with and without

11 cellular capabilities, demonstrates that a cumulative royalty rate in the single digits

12 would undervalue cellular technology.  (Dkt. 1331, ¶ 179.)  As I showed in my

13 opening declaration, Ericsson itself has repeatedly proposed single-digit cumulative

14 royalty caps and indicated that royalty stacking is a problem in the industry.  (Dkt.

15 1319, ¶¶ 31-33, 35.)  Thus, Dr. Teece fails to address Ericsson's own public

16 statements when the standard was being set, which advocated for single-digit

17 cumulative royalties and claimed that market forces would push towards

18 cumulative royalties of 6 to 8 percent.  However, more generally, Dr. Teece's

19 argument not only misses the point but actually reinforces the concerns about hold-

20 up, as I explain next.

21        49.     No matter what is the appropriate FRAND rate for Ericsson's SEPs, it

22 is certainly much lower than the "value of cellular connectivity" discussed by Dr.

23 Teece in his comparison of price differences between Apple's iPhone and iPod

24 Touch products.  (Dkt. 1331, ¶ 178.)  Thus, even if all of the price difference

25 between mobile products with and without cellular connectivity is attributable to

26 that technology as a whole, only a share (potentially a miniscule one) of that

27 difference could be attributed to any individual SEP holder's patents (particularly

28 where multiple cellular standards and other complementary technologies are

involved).  Unless the SEP holder can show that the full difference is attributable specifically to its SEPs and, if so, to the advantages that its SEPs conferred over alternative technologies in existence prior to standardization, then it is seeking to appropriate value that is not attributable to the incremental value that its SEPs provided over available alternatives.  As a result, this price gap is uninformative about the incremental value that should accrue to any individual SEP holder.  (Ex. 1174, pp. 46-47.)

50.     From the standpoint of determining appropriate license fees under FRAND, the relevant question is not how much higher the retail price of the mobile device with cellular connectivity is compared to one without cellular connectivity. Rather, one relevant question is whether there would be any change in this alleged difference in prices if the cellular standards at issue used an alternative Ericsson's technology.  It is my understanding that some version of cellular connectivity would likely be available even if the standards did not embody the particular SEPs at issue in this litigation.  (Dkt. 1334, ¶¶ 441-501 ("These key distinguishing features of LTE were well known before standardization of LTE, and were developed by companies other than Ericsson.").)

51.     To illustrate, and focusing just on the LTE standard, assume that an alternative technology would have resulted in a version of LTE that would lead to a one dollar reduction in the market price of an average handset due to lower benefit to consumers.  This means that in the *ex ante* setting, the included SEPs would have commanded at most one dollar per handset in license fees.  Importantly, the same maximum fee could be negotiated independently of the base to which the fee applies; that is, whether the fee would be paid on the per handset basis or per chipset basis it still would be capped by one dollar.  This is because if the chipset is the smallest saleable unit that embodies the pertinent feature of the standard as reflected in the SEP-holder's IP, that chipset could command a price premium relative to other chipset(s) that also enabled LTE cellular capability, but relied on

other IP to implement it.  Put another way, while the price difference between two handsets (chipsets) with and without LTE may be quite large because end-users highly value LTE cellular capability, it is not generally likely (or even plausible) that all of that difference is uniquely attributable to a given SEP.

## V.   DOLLAR-PER-UNIT RATES

52.    Mr. Kennedy suggests that royalty rates are appropriately set on a dollar-per-unit basis because, for example, the benefit provided by the SEPs does not vary based on the ASP of the handset.  (Dkt. 1333, ¶¶ 79-83.)  As I have pointed out previously, this position is in tension with Ericsson's own historical practices.  That is, Ericsson has a long-standing practice of charging royalties based on a percentage of handset prices.

53.    As I have explained, the fundamental concern here is not with the royalty structure in the abstract, but with discrimination that would result from Ericsson attempting to switch between royalty structures.  Ericsson has not offered any convincing economic rationale for discarding the existing licensing practices in favor of a new payment benchmark designed to allow Ericsson to obtain higher payments from manufacturers of low-cost handsets as compared to the "percentage of price" formula.  That is, a SEP holder cannot evade its FRAND non-discrimination requirement by shifting from one royalty structure to another. (Dkt. 1319, ¶¶ 74-80.)

54.    I understand that Ericsson may also argue that even if TCL were licensed on the same percentage royalty basis on which other firms such as Huawei are licensed, that TCL should be forced to pay a floor (or a minimum) rate. (Dkt. 1333, pp. 8-11, 58, (discussions of Option B offer to TCL with floors).)  As discussed above, Huawei currently pays ███████████████████████ ███████████████████████████                              Ericsson's proposal would result in TCL paying substantially more for its similarly priced phones.  To illustrate, on a $100 LTE handset, Huawei now pays roughly ██████   TCL would

1    pay ███████████ for the same handset under Ericsson's offers, which is

2    consistent with Mr. Kennedy's calculations of "implied dollar per-unit rates" which

3    show Huawei paying an average of ████ for LTE, while TCL would pay ██████

4    (Dkt. 1333, p. 9.)  This is clearly discriminatory.  Both TCL and Huawei sell

5    handsets at comparable low price points.  Unquestionably, royalties on Huawei's

6    handsets are ██████████████████ nor is there any question that Huawei is

7    paying ████████████████████████████████

8    ████████████████████

9       55.    The apparent rationale proposed for such a floor is that absent a floor,

10   Ericsson will be "undercompensated" for its investments in the IP included in the

11   standard.  (Dkt. 1333, ¶ 37.)  There is no economic or empirical basis for such a

12   claim, however.

13      56.    First, inventors are not entitled to a guaranteed return on R&D

14   expenses, nor, from an economic perspective, should they be; the *ex ante*

15   framework provides for the normal return that a patent holder would obtain in the

16   presence of the existing competition, before that competition is eliminated or

17   reduced through the standard-setting process.  The patent system itself provides no

18   guarantees of even positive returns, and the majority of patents are never

19   commercialized.  (Ex. 2532, Roger Blair & Thomas Cotter, Intellectual Property:

20   Economic and Legal Dimensions of Rights and Remedies, Cambridge University

21   Press, 2005, p. 19; *see also* Ex. 1089, Mark Schankerman, "How valuable is patent

22   protection?  Estimates by technology field," 29 RAND Journal of Economics 1

23   (1998), p. 93 (noting that most patents have little commercial value).)  The returns

24   contemplated by the patent system are those that the innovator can obtain in

25   competition with existing alternatives and other innovators.  The patent system

26   does not contemplate returns based on the elimination of that competition through

27   collective action and standard setting.  Dr. Teece himself notes that R&D is a risky

28   investment, and gives an example that WiMAX was an unsuccessful competitor to

LTE and that firms that invested in R&D for WiMAX likely received lower returns (if any).  (Dkt. 1331, ¶¶ 38, 44.)  This is a normal part of the competitive process.  Within the FRAND context, firms should not be allowed to exercise market power unrelated to the technical merit of their inventions in order to gain greater returns.

57.     Second, TCL has submitted evidence that Ericsson's SEPs are not of great technical value relative to the alternatives that were available at the time the standards were set.  (Dkt. 1334.)  Consequently, there is no reason to give any credence to Ericsson's claim that it is somehow entitled to earn at least ███ per handset on millions of handsets that include its IP.

58.     Third, claims that Ericsson is somehow entitled to a minimum return of ███ per handset, regardless of the handset, is in tension with the need to account for the interests of the implementers of the relevant standards.  Ericsson has not provided any economic and public policy rationale why it is entitled to a guaranteed return when other firms are not.  There is risk on both sides, with implementers also playing an important role in ensuring the success of a standard, as I have explained in detail above.

59.     Fourth, claims that firms like Ericsson would not be incentivized to undertake R&D or engage in standard setting absent a guaranteed minimum return are demonstrably incorrect and inapposite as a matter of economics.  As I have discussed previously, the patent system does not guarantee any return to the innovator, and the majority of patents are never commercialized.  Firms undertake R&D in the hope of coming up with a valuable innovation, but there is no guarantee that they will do so.  Nonetheless, firms continue to engage in R&D.  Despite the stated concerns of Dr. Teece and Mr. Kennedy regarding falling royalty rates and alleged hold-out, it is notable that Ericsson's employees have testified that "Ericsson is investing heavily in the fifth generation of cellular standards, known as '5G.'"  (*See, e.g.*, Dkt. 1328, ¶ 33.)

60.     A FRAND commitment, properly implemented, will compensate a SEP

holder based on the actual value of the innovation and not for attempts to hold-up firms implementing the standard.  As I have discussed earlier, the inclusion of patented technology in a standard also brings substantial benefits to the patent holder, including a guaranteed market for their patents (to the extent the standard is successful), and likely expanding the number of firms and products and the volume of those products using the patented technology compared to what might have been possible outside of the standard.

## VI.   HARM TO COMPETITION

61.     Dr. Teece claims that rapid growth in the telecommunications industry is inconsistent with "hold up" by holders of standard essential patents.  (Dkt. 1331, ¶ 160.)  As I have previously pointed out, there are many industries in which firms colluded yet have been successful in terms of growth and innovation.  That does not mean price fixing is not harmful; it is harmful relative to the but-for world free of such price fixing.  (Dkt. 1319, ¶ 35.)  That is, a firm which exercises market power and makes supra-competitive profits is always cognizant that raising prices constrains demand and (at some point) can be counter-productive.  Simply stated: even a monopolist does not want to kill the proverbial golden goose.  There have been a number of legal findings of FRAND violations in telecommunications, including the *Microsoft v. Motorola* case cited by Dr. Teece.  As noted earlier, the FTC just filed a lawsuit against Qualcomm alleging that competition and the competitive process have been harmed by Qualcomm's alleged FRAND violations.  (Ex. 2529, *FTC v. Qualcomm,* ¶ 9 ("Qualcomm's conduct has harmed competition and the competitive process.  At a time when cellular technologies are expanding to new and varied applications, Qualcomm's practices threaten further consumer harm in an industry in which competition and innovation are vitally important.").)  This is so in spite of the rapid growth in the mobile telecommunications sector that Dr. Teece discusses.

62.     Ericsson's conduct impacts competition in at least two ways.  First, its

attempt to exercise hold-up is, by definition, an exercise of market power gained
through the collective action of standard setting (as explained by the Federal Trade
Commission and others).  Second, to the extent a given licensee was disadvantaged
(or advantaged) relative to competitors because of discriminatory royalty rates or
other violations of FRAND commitments, that market would be distorted by that
discrimination, with the associated potential harm to competition.  Dr. Teece
suggests that if a firm such as TCL litigates to prevent an exercise of hold-up, then
there is no economic harm or antitrust concern because the hold-up has not actually
occurred.  (Dkt. 1331, ¶ 154.)  Dr. Teece's suggestion makes no sense as public
policy because it would imply that firms could never seek to prevent antitrust
violations in their incipiency, only to recover damages *ex post*.  Dr. Teece also
suggests that there cannot be a distortion to competition or harm to TCL because
the rates offered to TCL "are similar to" rates "being paid by *some* of the
companies that are most similarly situated to TCL."  (Dkt. 1331, ¶ 155 (emphasis
added).)  However, Dr. Teece's own statement highlights the distortions being
created through discriminatory pricing.  Suppose there are five otherwise identical
firms in a market.  One receives a royalty rate of 10%, and then another receives a
royalty rate of 1%.  The licensor then demands 10% from each of the next three.
Dr. Teece suggests there would be no distortion of competition because "some" of
the other firms are paying the 10% rate.  That is incorrect.  I further note that there
is nothing in Dr. Teece's approach to FRAND that would prevent this situation
from occurring.

## VII.  CONCLUSION

63.    The interpretation of the FRAND commitment offered by Ericsson's
experts is so economically vacuous as to render it virtually meaningless.  They
argue that the FRAND obligation confers hardly any obligations at all.  Under any
economically sensible interpretation, the FRAND commitment imposes two related
but distinct requirements: (i) the terms of a license must be fair and reasonable (i.e.,

the royalty rates should not exceed the *ex ante* value of the patented technology over alternatives at the time the standard was set), and (ii) the terms of a license must be non-discriminatory (licensors cannot disadvantage one firm vis-a-vis another competing firm).  Accordingly, TCL should receive royalty rates that are no less favorable than the rates being paid by any of its competitors (here, I understand both TCL and Ericsson's licensing experts have determined that ███ is paying the lowest effective rates).In addition, Dr. Leonard has calculated maximum fair and reasonable rates applicable in this case (which I understand are lower than the effective rates being paid by ████).  TCL should not have to pay rates any higher than what is fair and reasonable, based on the *ex ante* value of the patented technology relative to alternatives at the time the standard was set.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on January 27, 2017, in New Canaan, Connecticut.

_____
Dr. Janusz A. Ordover

1

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 58 | Final arbitration award between Ericsson and Huawei, dated 12/31/15 |
| 64 | License Agreement between Ericsson and T&A Mobile Phones, dated 3/6/07 |
| 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| 455 | The Antitrust Source publication titled "Implementing the FRAND Commitment," J. Ordover, et al., Oct. 2014 |
| 1089 | "How Valuable is Patent Protection?  Estimates by Technology Field," by M. Schankerman, The RAND Journal of Economics, Vol. 29, No. 1 (Spring 1998) |
| 1165 | Correspondence from U.S. Department of Justice, Antitrust Division dated 2/2/15 providing business review letter |
| 1174 | CPI Antitrust Chronicles, Vol. 1 publication titled "FRAND and the Smallest Saleable Unit," by J. Kattan, J. Ordover & A. Shampine, Sep. 2016 |
| 1578 | The Antitrust Source, American Bar Association publication titled "Applying the Non-Discrimination Requirement of FRAND When Rates Change," by A. Shampine, dated Aug. 2016. |
| 2529 | Complaint for Equitable Relief re: Federal Trade Commission v. Qualcomm, Inc., Case No. 5:17-cv-00220, Dkt. 1 (N.D. Cal. January 17, 2017) |
| 2530 | Quarterly Journal of Economics 101(4) publication titled "A Sequential Concession Game with Asymmetric Information," by J. Ordover and A. Rubinstein, 1986 |
| 2531 | Publication titled "Game-Theoretic Models of Bargaining," excerpt of Ch. 6, "Choice of Conjectures in a Bargaining Game with Incomplete Information," by A. Rubinstein, 1985 |
| 2532 | Publication titled "Intellectual Property: Economic and Legal |

| | | |
|---|---|---|
| | | Dimensions of Rights and Remedies," by R. Blair and T. Cotter, 2005 |
| | 2533 | Publication titled "Intellectual Property: Economic and Legal Dimensions of Rights and Remedies," by R. Blair and T. Cotter, 2005 |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the PLAINTIFFS' REBUTTAL DECLARATION OF EXPERT WITNESS DR. JANUSZ A. ORDOVER to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
     KRISTINA GRAUER