1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2    Including Professional Corporations
   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3  skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8  Attorneys for TCL Communication
   Technology Holdings, Ltd., TCT Mobile
9  Limited, and TCT Mobile (US) Inc.

10                 UNITED STATES DISTRICT COURT

11     FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12
   TCL COMMUNICATION                    Case No. SACV14−00341 JVS (DFMx)
13 TECHNOLOGY HOLDINGS, LTD.,
   *et al.*,                            Consolidated with CV15–02370 JVS
14
                 Plaintiffs,            **PLAINTIFFS' DIRECT**
15                                       **EXAMINATION BY**
          v.                             **DECLARATION FOR EXPERT**
16                                       **WITNESS**
   TELEFONAKTIEBOLAGET LM                **DR. APOSTOLOS (PAUL) KAKAES**
17 ERICSSON, *et al.*,
18               Defendants.
19
   _____
20 TELEFONAKTIEBOLAGET LM                Place:  Courtroom 10C
   ERICSSON, *et al.*,                   Before Hon. James V. Selna
21
                 Plaintiffs,            Discovery Cut-Off:  May 23, 2016
22                                      Pre-Trial Conf.:  Jan. 30, 2017
          v.                           Trial:  Feb. 14, 2017
23
24 TCL COMMUNICATION
   TECHNOLOGY HOLDINGS, LTD.,
25 *et al.*,
26               Defendants.
27
28

1

# **TABLE OF CONTENTS**

2

**Page**

I.  CREDENTIALS AND QUALIFICATIONS ...................................................... 1

II. SUMMARY OF TESTIMONY ....................................................................... 3

    A.    Technical Analysis of Ericsson's 2G, 3G and 4G SEPs ...................... 3

        1.    Overview of the Process of Analyzing Ericsson's 2G, 3G and 4G SEPs ............................................................................ 4

        2.    Summary of the Results of the Technical Analysis of Ericsson's 2G, 3G and 4G SEPs ......................................... 9

    B.    Industry-Wide Essentiality Analysis of 2G, 3G, and 4G User Equipment Patents .............................................................................. 15

        1.    Overview of the Process of the Industry-Wide Essentiality Analysis of 2G, 3G and 4G SEPs ............................................ 15

        2.    Results of the Industry-Wide Essentiality Analysis ................... 19

    C.    Overview of Other Technical Analyses I Performed ........................... 20

        1.    Industry-Wide 2G, 3G and 4G Infrastructure Family Analysis ...................................................................................... 21

        2.    Correlation Between Ericsson's SEPs and Purportedly Approved Contributions ............................................................. 21

        3.    LTE's Key Distinguishing Features ........................................... 21

III. BACKGROUND ON THE 2G, 3G AND 4G STANDARDS ......................... 22

    A.    Evolution of Cellular Communications ............................................... 22

    B.    The 2G Standard .................................................................................. 23

        1.    GSM ............................................................................................ 24

        2.    GPRS & EDGE ......................................................................... 25

        3.    CDMA and IS-95 ...................................................................... 26

    C.    The 3G Standard .................................................................................. 27

    D.    The 4G Standard ("LTE") ................................................................... 29

IV. BACKGROUND ON ETSI AND STANDARDIZATION ............................ 33

A. Background on ETSI ....................................................................... 33

B. 3GPP—An International Cellular Technology Body ........................... 33

C. Declaring Patents to ETSI That "Are or May Be Essential" ............... 34

D. 3GPP Working Group Structure and Practices ................................. 38

V.  ANALYSIS OF ERICSSON'S 2G, 3G and 4G SEP PORTFOLIO ............ 41

A. Objective and Process of the Patent-By-Patent Analysis .................... 41

    1. Essentiality Analysis .................................................................. 46

    2. Importance Analysis .................................................................. 49

    3. Contribution Analysis ................................................................ 51

B. Essentiality Analysis of Ericsson's Alleged SEPs ............................. 52

    1. Patent Family P10628 Is Not Essential to 2G. ............................ 52

    2. Patent Family P08430 Is Not Essential to 3G. ............................ 59

    3. Patent Family P21428 Is Not Essential to 4G. ............................ 62

    4. Patent Family P33858 Is Not Essential to 4G. ............................ 67

    5. Essentiality Analysis Results ...................................................... 72

C. Importance Analysis of Ericsson's Alleged SEPs .............................. 75

    1. Patent Family P06553 Is at Best Marginally Important to
    2G........................................................................................... 75

    2. Patent Family P14596 Is at Best Marginally Important to
    2G, 3G, and 4G. ...................................................................... 79

    3. Patent Family P33108 Is Moderately Important to 4G. ............. 82

    4. Patent Family P38458 Is at Best Marginally Important to
    3G........................................................................................... 87

    5. Importance Analysis Results ...................................................... 92

D. Contribution Analysis of Ericsson's Alleged SEPs ........................... 96

    1. Patent Family P08153 Provides No Improvement to 3G
    Relative to Available Alternatives............................................... 97

    2. Patent Family P31988 Provides No Improvement to 4G
    Relative to Available Alternatives............................................. 101

    3. Patent Family P23893 Provides No Improvement to 4G
    Relative to Available Alternatives............................................. 106

4.   Patent Family P33108 Provides No Improvement to 4G Relative to Available Alternatives..............................................113

5.   Patent Family P25336 Provides No Improvement to 3G Relative to Available Alternatives..............................................116

6.   Patent Family P28747 Provides No Improvement to 4G Relative to Available Alternatives..............................................122

7.   Contribution Analysis Results ..................................................130

E.   Overall Results of the SEP Analysis........................................133

F.   Review of Uncharted Ericsson Patent Families.......................150

VI.   INDUSTRY-WIDE ESSENTIALITY ANALYSIS OF 2G, 3G and 4G USER EQUIPMENT PATENTS .................................................151

A.   Objective and Team ..................................................................151

B.   Step 1—Patent Census .............................................................154

1.   Patent Census Process...............................................154

2.   The Patent Census Shows Ericsson's Share of Declared-Essential 2G, 3G, and 4G Families is Relatively Small...........164

C.   Step 2—Industry-Wide Essentiality Assessment ...................171

1.   Essentiality Assessment Process ..............................172

2.   The Essentiality Assessment Results Confirm Ericsson's Relatively Small Share of User Equipment SEPs. ...................174

D.   OVERALL ASSESSMENT OF ERICSSON'S ALLEGED SEP PORTFOLIO.......................................................................184

VII.   INDUSTRY-WIDE 2G, 3G and 4G INFRASTRUCTURE FAMILY ANALYSIS ................................................................................198

VIII.   ERICSSON'S RELIANCE ON "APPROVED CONTRIBUTIONS" AS A MEASURE OF PATENT STRENGTH .............................202

A.   Correlation Methodology..........................................................203

B.   There Is Little or No Correlation Between Approved Contributions and Issued Patents.............................................208

C.   Technical Analysis of Sample TDocs Identified By Ericsson Shows a Lack of Support Regarding the Strength of Ericsson's Portfolio...................................................................................210

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1          1.    TDoc C1-060692 .................................................................211

2          2.    TDoc C4-080437 .................................................................211

3          3.    TDoc R1-092936 .................................................................213

4          4.    TDoc R1-145035 .................................................................213

5          5.    TDoc R3-092069 .................................................................213

6          6.    TDoc R4-060634 .................................................................214

7          7.    TDoc R4-070399 .................................................................214

8          8.    TDoc R4-080606 .................................................................214

9          9.    TDoc R4-081184 .................................................................215

10         10.   TDoc R4-091848 .................................................................215

11         11.   TDoc R4-093006 .................................................................215

12         12.   TDoc R4-121802 .................................................................215

13         13.   TDoc R1-051450 .................................................................216

14         14.   TDoc R1-051451 .................................................................216

15         15.   TDoc R1-061351 .................................................................216

16  IX.   LTE'S KEY DISTINGUISHING FEATURES WERE NOT DEVELOPED BY ERICSSON, AND WERE WELL-KNOWN BEFORE STANDARDIZATION OF LTE (4G) .........................217

19     A.    OFDM in Downlink (DL), DFT-spread OFDM in Uplink(UL) for Multiple Access (MA).........................................................220

20     B.    Fractional Pathloss Compensation for Uplink Power Control ..........222

21     C.    Channel Dependent Scheduling in Time and Frequency Domain......224

22     D.    Horizontal Encoding (Multiple Codewords) and Closed Loop with Precoding for MIMO Scheme.......................................................228

24     E.    Fine Granularity (1-2 dB Apart) for Modulation and Coding Scheme Granularity..................................................................232

25     F.    Incremental Redundancy for Hybrid ARQ II .....................................235

26     G.    1-ms Subframes for Frame Duration (CQI Delay) ..............................237

27     H.    Relatively Low Overhead (While Control Channels are Robust) for Overhead/Control Channel Efficiency (OH/CCH Eff)................240

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

X.     CONCLUSION .......................................................................241

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION ........................245

## DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

I, Dr. Apostolos (Paul) Kakaes, declare under the penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.    CREDENTIALS AND QUALIFICATIONS

1.    My name is Apostolos (Paul) Kakaes.  A copy of my CV is included with this Witness Declaration as Exhibit 461.  During the past 35 years, I have been part of the community of engineers that have contributed to the astounding growth of the mobile communications industry.  I hold a Ph.D. in Electrical Engineering from Polytechnic Institute of New York, and a M.Sc. and a B.Sc. in Applied Mathematics with a minor in Electrical Engineering from the University of Colorado.  From 1982 until 1987, I worked for the famous AT&T Bell Laboratories, focused on designing and long term planning of voice and data networks.  Since 1988, I have provided consulting services related to the mobile communications industry through my company, Cosmos Communications Consulting Corporation. From 1987 until 1994, I was on the faculty of the Department of Electrical Engineering and Computer Science at The George Washington University in Washington, D.C., where I taught mostly graduate level courses in communication engineering.

2.    As part of my consulting and teaching work, I have developed hundreds of courses over the years on various technical aspects of mobile communications.  By definition, this new, previously non-existent technology was not taught in University courses, as it was too new.  In fact, I developed the first course on mobile communications taught at The George Washington University. My consulting services included developing courses for the companies that were at the forefront of this developing technology.  In addition, my consulting work has included assisting company executives make deployment plans, taking into consideration various elements of the industry, including the strengths and

weaknesses of the technology, economics, and user-value, among others.  As such, I developed a deep understanding of almost all aspects of a given technology, its features, added value, and the like.  Having developed hundreds of courses over the years and taught thousands of engineers (and non-engineers alike), I have a solid understanding and knowledge of the technical developments in mobile communications and how their importance fits in the larger puzzle of a rapidly developing technology.

3. In addition to deployment and implementation issues presented to company executives, I have provided consulting services to company leaders on the issues involved in migrating from one telecommunications technology to the next, including from 1G to 2G, from 2G to 3G, and from 3G to 4G.  The decision to move on and abandon a company's successful technology is not easy.  In some ways, change is more difficult than the status quo.  However, the status quo can lead to stagnation.  As part of this work, I had to develop a deep understanding (and convey it to the appropriate executives) of the strengths that a new "generation" was bringing to the table, as well as the transition issues and costs that invariably came with a decision to implement it.  In other words, I developed a deep understanding of the entirety of each system that we broadly refer to as 1G, 2G, 3G, or 4G.

4. Over the years, I also gained experience with intellectual property matters, and specifically with patents in the communication engineering and mobile communications field.  I have served as an expert witness in a number of cases and testified in a number of trials and hearings, many of which involved what are referred to as "Standard Essential Patents," or SEPs.  Through my expert witness work, I have developed a comprehensive understanding of what it means for a patent to be found "essential" with respect to a given standard, for a patent to not be found invalid, how to determine the scope and content of "prior art" in the telecommunications field, and how to identify whether a product infringes a given claim of a patent.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

5.      Outside of my litigation consulting work, I have also advised a number of companies on broader intellectual property and patent issues.  I have analyzed large and small patent portfolios on behalf of companies that were interested in acquiring some or all of a given portfolio.  In some cases, my analysis led the companies to rethink the acquisition, where others led to a "deal," in some cases a multi-billion dollar deal.  I have also performed portfolio analysis for the purposes of reaching licensing agreements.  In some cases, the portfolio consisted of a relatively small number of patents, often accompanied by infringement claim charts. In other cases, the portfolio included a very large number of patents.  Large or small, the technical analysis included a determination of the strength of the portfolio from both a technical and an economic perspective.

6.      Throughout my career, I have worked in conjunction with individuals with broad backgrounds not just in technology, but also law, business, economics, and other areas related to the mobile communications industry.  Moreover, I have analyzed thousands of patents, many declared as "Standards Essential," and often ones that were not so declared.  Accordingly, my experience has enabled me to obtain a strong understanding of mobile communications technologies, of the standards and the standardization process related to those technologies, and of the economic and business environment in which those technologies are implemented, used, and licensed.

## II.    SUMMARY OF TESTIMONY

### A.    Technical Analysis of Ericsson's 2G, 3G and 4G SEPs

7.      I understand that one purpose of my engagement is to assist in the determination of a royalty rate for a license to certain patents which Ericsson is obligated to license on Fair, Reasonable, and Non-Discriminatory ("FRAND") terms.  Ericsson alleges these patents are essential to the certain cellular communications standards known generally as the Second, Third, and/or Fourth Generation standards (*i.e.*, 2G, 3G, and/or 4G).  I understand the technical value of

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

Ericsson's 2G, 3G, and 4G patents can be a component used in determination of this FRAND rate. I generally understand Dr. Gregory Leonard, one of TCL's economic experts, uses the results of my technical analysis of Ericsson's 2G, 3G, and 4G SEP to determine a FRAND royalty rate for a license to Ericsson's patents.

1. Overview of the Process of Analyzing Ericsson's 2G, 3G and 4G SEPs

8. To assist in the determination of the FRAND royalty rate, Dr. Nikil Jayant and I analyzed the scope and technical value of Ericsson's alleged SEPs. I will refer to this analysis as the "SEP Analysis." As part of the SEP Analysis, Dr. Jayant and I performed a detailed study of Ericsson's 2G, 3G, and 4G patents belonging to 192 patent families for which Ericsson produced claim charts. For each of these patent families, we performed a detailed essentiality analysis to determine whether the patents were essential to the cited standards as alleged by Ericsson. The essentiality analysis focused on the standards cited by Ericsson's claim charts, and also accounted for additional information, such as Ericsson's comments in the claim charts and the patent's file history, where available.

9. In addition, Dr. Jayant and I analyzed the patented technology's importance and contribution to the standards, taking into account prior generations of the standards and other alternatives to the patented technology that were available at the time the patented technology was adopted or incorporated into the standard. The purpose of the Importance and Contribution analysis is to determine the patented technology's intrinsic technical value prior to its adoption into the standard, apart from the value associated with the technology being incorporated into the standard.

10. The Importance and Contribution analysis required us to determine an accused technology and key feature for each of Ericsson's patent families that were found to be essential. The key feature is the technical feature in the cited standard (or a subset thereof) that is mapped to key claim limitation(s) in Ericsson's claim

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

chart.  The details of the SEP Analysis for the 192 analyzed Ericsson patent families are presented in a series of Appendices attached to this Witness Declaration and another series of Appendices attached to a separate Witness Declaration submitted by Dr. Jayant.  (Exs. 1638 and 1639.)  I will discuss the details of my analysis with illustrative examples later in this Witness Declaration.

11.    For each of the three metrics of Essentiality, Importance, and Contribution, a numerical rank was determined on a patent claim-by-patent claim basis.  The "Essentiality Rank" was set to "1," "2," or "3."  An Essentiality Rank of "1" means no evidence was identified that would preclude a finding that the patent is "essential" under ETSI's IPR Policy.  An Essentiality Rank of "2" means that the patent, under a proper claim construction, is not "essential" under ETSI's IPR Policy.  An Essentiality Rank of "3" means the patent is not "essential" under ETSI's IPR Policy under any reasonable claim construction.

12.    The "Importance Rank" was also set to "1," "2," or "3."  An Importance Rank of "1" means the accused technology/key feature for the patent claim is important (or technically valuable) to the standard.  An Importance Rank of "2" means the accused technology/key feature is moderately important (or of moderate technical value) to the standard.  And an Importance Rank of "3" means the accused technology/key feature is at best only marginally important (or of marginal technical value) to the standard.

13.    The "Contribution Rank was set to "1," "2," "3," or "4."  A Contribution Rank of "1" means no viable alternatives to the key feature were identified for purposes of this analysis.  When one or more viable alternatives were identified, the patent claim was ranked vis-à-vis each alternative.  A Contribution Rank of "2" means the key feature provided a moderate improvement to the standard relative to the specific alternative.  A Contribution Rank of "3" means the key feature provided a marginal improvement to the standard relative to the specific alternative.  And a Contribution Rank of "4" means the key feature provided no

1    improvement to the standard relative to the specific alternative.

2       14.     Although the rankings are assigned on a patent claim-by-patent claim

3    basis, to be conservative, the overall rankings for a given Ericsson SEP Family are

4    based on the "best" ranked patent claim among the set. The Essentiality,

5    Importance, and Contribution Ranks and their meanings are summarized in Table 1

6    below:

| Metric | Ranking | Explanation |
|---|---|---|
| **Essentiality** | **1** | No evidence was identified that would preclude a finding that the patent is "essential" under ETSI's IPR Policy. |
| | **2** | The patent, under a proper claim construction, is not "essential" under ETSI's IPR Policy. |
| | **3** | The patent is not "essential under ETSI's IPR Policy under any reasonable claim construction. |
| **Importance** | **1** | The accused technology/key feature for the patent family is important (or technically valuable) to the standard. |
| | **2** | The accused technology/key feature is moderately important (or of moderate technical value) to the standard. |
| | **3** | The accused technology/key feature is at best only marginally important (or of marginal technical value) to the standard. |
| **Contribution** | **1** | No viable alternatives to the key feature were identified for purposes of this analysis. |
| | **2** | The key feature provided a moderate improvement to the standard relative to the alternative. |
| | **3** | The key feature provided a marginal improvement to the standard relative to the alternative. |
| | **4** | The key feature provided no improvement to the standard relative to the alternative. |

**Table 1: Summary of the Essentiality, Importance, and Contribution Ranks (PDX 58)**

6

15.     The rankings for the three metrics for a given Ericsson SEP family provide an indication of the intrinsic technical value of the family's patented technology to the applicable standard.  For example, a SEP family determined to be *not* essential (corresponding to an Essentiality Rank of "2" or "3") provides no intrinsic technical value to the standard.

16.     Where I did not locate any evidence that would preclude a finding that the patent is "essential" under ETSI's IPR Policy (meaning I assigned an Essentiality Rank of "1"), the combination of the Importance and Contribution Ranks provides the intrinsic technical value of the patented technology.  More specifically, the Importance analysis considers the technology's importance relative to, for example, a corresponding technology in a previous version of the standard or, in absence of such a corresponding technology, relative to a well-known prior art technology.  And the Contribution analysis considers the technology's contribution relative to alternative technical solutions that were available at the time of the adoption of the patented technology into the standard.  To  be conservative, I also conducted the Contribution and Importance analysis for any patent family that I gave an Essentiality Rank of "2," even though under a proper claim construction I found the patent to be not essential.

17.     In general, Dr. Jayant and I did not perform the Importance and Contribution analysis for most of the patent family/standard pairs that were given an Essentiality Rank of "3."  This is because family/standard pairs with a rank of "3" are not essential to any of the 2G, 3G, or 4G standards, and therefore their Importance and Contribution are irrelevant to analyzing the technical value of Ericsson's alleged SEP portfolio.  In some instances during the analysis, however, we did proceed to evaluate the Importance and Contribution of non-essential family/standard pairs if the evidence or reasoning supporting this evaluation was readily available or we found the lack of Importance or Contribution was particularly worth pointing out.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

18.     The process for the SEP Analysis is illustrated in Figure 1 below.



**FIGURE 1: SEP Analysis (PDX 59)**

19.     As discussed above, Dr. Jayant and I analyzed a total of 192 patent families that Ericsson contends are standard essential and for which it produced claim charts.  For each of these 192 families, we analyzed each charted claim for the standard or standards to which Ericsson asserted the claim is essential.  For example, Ericsson identified the patent family P08333 as being essential to both the 3G and 4G standards.  Thus, patent family P08333 consisted of two family/standard pairs, P08333_3G and P08333_4G.  For this patent family, I performed the SEP Analysis for each charted claim that Ericsson asserted is essential to the 3G standard, and I separately performed the SEP Analysis for each charted claim that Ericsson asserted is essential to the 4G standard.

20.     Because Ericsson asserts that a number of its patent families are essential to multiple standards, the 192 charted patent families resulted in a total of 219 family/standard pairs.  Each family/standard pair may contain multiple charted

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

claims, and Dr. Jayant and I performed the SEP Analysis with respect to each one of the charted claims for each of the 219 family/standard pairs.

        2.    <u>Summary of the Results of the Technical Analysis of Ericsson's 2G, 3G and 4G SEPs</u>

21.    The results of the SEP Analysis are summarized below.  Of Ericsson's 219 family/standard pairs, 73 pairs (or about 33%) received an Essentiality Rank of "3," meaning the claim is not "essential" under any reasonable interpretation of the claim.  Of the remaining 146 family/standard pairs, 10 pairs received an Essentiality Rank of "2," meaning under a proper construction the claim is not essential, and the other 136 pairs received an Essentiality Rank of "1," meaning I did not see any evidence precluding a finding that the claim is essential.    The breakdown of the Essentiality results is presented in Figure 2 below.



**FIGURE 2 (PDX 60)**

22.    For the 146 family/standard pairs which received an Essentiality Rank

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

of "1" or "2," Dr. Jayant and I further provided a ranking for Importance and Contribution.  With respect to Importance, 80 pairs received an Importance Rank of "3," meaning the key feature of the claim is, at best, of marginal technical value or importance to the relative standard.  Another 37 pairs received an Importance Rank of "2," meaning the key feature of the claim is of moderate technical value or importance to the relative standard.  The remaining 29 pairs received an Importance Rank of "1," meaning the key feature of the claim is technically valuable or important to the relevant standard.  The breakdown of the Importance results is presented in Figure 3 below.



**Importance Ranks for 2G, 3G, and 4G Family/Standard Pairs**

FIGURE 3 (PDX 61)

23.    With respect to Contribution, 92 of the 146 family/standard pairs that received an Essentiality Rank of "1" or "2" received a Contribution Rank of "4," meaning the key feature of the claim provides no improvement to the relative

standard relative to at least one available alternative.  Of the remaining

family/standard pairs, 41 pairs received a Contribution Rank of "3," meaning the

key feature of the claim provides marginal improvement to the standard relative to

at least one available alternative, and five pairs received a Contribution Rank of "2,"

meaning the key feature of the claim provides moderate improvement to the

standard relative to at least one available alternative.  The remaining eight pairs

received a Contribution Rank of "1," meaning no viable alternatives were identified

at the time of the analysis.  The breakdown of the Contribution results is presented

in Figure 4 below.



**Contribution Ranks for 2G, 3G, and 4G Family/Standard Pairs**

**FIGURE 4 (PDX 62)**

24.    The combined Importance and Contribution results are graphically

presented in Figure 5 below.  To be conservative (*i.e.*, in Ericsson's favor), Figure 5

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

also includes expired patents, as well as 10 family/standard pairs with an
Essentiality Rank of "2" even though these pairs are not essential to the standards
under a proper claim construction.  Similarly, Figure 5 also includes patent families
with patents that I believe are invalid in view of prior art.  Nonetheless, since Dr.
Jayant and I did not conduct a full-blown invalidity analysis, I gave Ericsson a
benefit of the doubt on those families.  Accordingly, Figure 5 presents a
conservative representation of Ericsson's 2G, 3G and 4G SEP families in the
technical value scale, ranging from valuable (the green bubble) to not valuable (the
red bubbles).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**FIGURE 5 (PDX 63)**

26   25.   As shown in Figure 5, only eight (or 3.7%) of the 219 family/standard

27 pairs directed to the 2G, 3G, and/or 4G standards have an Importance Rank of "1"

28 and a Contribution Rank of "1."  These eight family/standard pairs (represented by

13

the green bubble) are directed to accused technologies and key features that are technically valuable to the relevant standards and those key features are also technically valuable to the relevant standards relative to alternatives that were available at the times the key features were adopted into the standards.  Even though these eight family/standard pairs are technically valuable, they were determined to still be addressing and solving modular problems contained within specific functions, such that the corresponding technical solutions would not materially impact other problems and associated solutions in the respective standards.  This is consistent with the reality that most 2G, 3G, and 4G SEPs (with only an exception of a handful of fundamental patents that radically changed the technological landscape) address incremental solutions in a narrow aspect of a given technology, and I did not find any fundamental patents that radically changed the technological landscape in Ericsson's 2G, 3G, and/or 4G SEP portfolios.

26.    Furthermore, of the 219 family/standard pairs, only five (or 2.3%) of the 219 family/standard pairs having an Importance Rank of "2" and a Contribution Rank of "2" (represented by the yellow bubbles) are directed to accused technologies and key features that are of moderate technical value or importance to the relevant standards, and that provide moderate improvements to the standards relative to alternatives that were available at the times the key features were adopted into the standards.

27.    The remaining 206 (or 94%) of Ericsson's 2G, 3G, and/or 4G family/standard pairs are not technically valuable.  First, 73 of these 219 family/standard pairs (or 33.3%) have an Essentiality Rank of "3" and thus are not essential to the 2G, 3G, and 4G standards under any reasonable claim construction. Second, of the remaining 146 family/standard pairs with an Essentiality Rank of "1" or "2," 133 pairs (or 60.7%) (represented by the red bubbles) are directed to accused technologies or key features that are of little or no importance to the relevant standards and/or provide at best marginal improvements to the standards relative to

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

alternatives that were available at the time that the respective key feature(s) were adopted into the standards.  Therefore, the vast majority of the 219 2G, 3G, and 4G family/standard pairs that Ericsson alleges are SEPs provided little to no intrinsic technical value to the standards.

**B.**  **Industry-Wide Essentiality Analysis of 2G, 3G, and 4G User Equipment Patents**

28.  Dr. Zhi Ding and I, supported by a team of engineers at Concur IP and Ernst & Young India, also conducted what I refer to as an "Industry-Wide Essentiality Analysis" of the global landscape of patents that are declared essential to the 2G, 3G, and 4G standards and are directed to User Equipment ("UE").  Unlike the SEP Analysis described above, which focused only on Ericsson's SEPs, the Industry-Wide Essentiality Analysis addressed patents declared to ETSI by all parties.  For reasons discussed below, the Industry-Wide Essentiality Analysis was conducted separately from the SEP Analysis, although both inquires addressed the essentiality of Ericsson's SEPs.  I understand that Dr. Leonard uses the results of the SEP Analysis (described above), as well as the results of the Industry-Wide Essentiality Analysis (described below), to determine Ericsson's value share of all SEPs for each of the 2G, 3G, and 4G standards.

1.  Overview of the Process of the Industry-Wide Essentiality Analysis of 2G, 3G and 4G SEPs

29.  As a first step, the Industry-Wide Essentiality Analysis included what I will refer to as the "Patent Census."  In the Patent Census, we obtained basic information on the patents held by all assignees and declared to ETSI for the 2G, 3G, and 4G standards.  This basic information gathered in connection with the Patent Census includes how many patents are declared as being essential, the distribution of these patents across assignees, the patents' expiration dates, geographic coverage, as well as other information.

30.  The Patent Census involved extracting information from a database of

15

1  patent declarations (or IPR declarations) maintained by the European

2  Telecommunications Standard Institute (ETSI), a key international cellular

3  standards body.  According to ETSI Policy, these IPR declarations inform ETSI that

4  the declarants believe (or believed) that the identified patents or applications may be

5  or may become essential to at least the listed ETSI Work Items, Standards, and/or

6  Technical Specifications in the IPR declarations.  (Ex. 223 at p. 1.)  For

7  convenience, I will refer to such patents and applications as "declared-essential

8  patents," "patents that have been declared as being essential," or the like.  Based on

9  this information, the declared essential 2G, 3G, and 4G patents were grouped into

10  corresponding industry-wide patent families associated with different assignees.

11  This data provides information regarding Ericsson's relative position among all

12  assignees with respect to all declared-essential 2G, 3G, and 4G patents.  The process

13  for the Patent Census analysis is illustrated in Figure 6 below.



**FIGURE 6: Patent Census Process (PDX 64)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

31.    The Patent Census demonstrates that as of September 15, 2015, there were over 153,000 patents and/or patent applications declared essential to the 2G, 3G, and 4G standards.  These patents were organized into 11,469 families that have at least one granted patent that is still active (*i.e.*, non-expired) and was published in English—I will refer to these as "relevant" families.

32.    After the team at Ernst & Young identified the declared-essential families in connection with the Patent Census, Concur IP analyzed these 11,469 declared-essential families and identified a total of 7,106 "relevant" families that have a claim directed to UE.  The families were organized on a generation basis, separately for 2G, 3G, and 4G.  In some instances, a relevant family was declared essential to more than one generation, and therefore was identified as being relevant to all generations to which it was declared.

33.    Once the industry-wide declared-essential patents were narrowed down to those relevant to UE, the next step was to perform an Essentiality Assessment. The Essentiality Assessment involved determining which of the declared-essential UE families includes a claim that is essential to the 2G, 3G, and/or 4G standards. The Essentiality Assessment also involved determining, for each of the 2G, 3G, and 4G standards, ratios of (1) essential patents to (2) declared-essential patents for each assignee.  These ratios are also referred to as "essentiality ratios."  As I did with Ericsson's SEPs, with respect to the industry-wide 2G, 3G, and 4G patents, I use the term "essential" in the sense that no evidence was identified that would preclude a finding that the patents (or corresponding patent families) are "essential" under ETSI's IPR Policy.

34.    In order to conduct the Essentiality Assessment, we first identified a statistically significant, random sampling of the UE families to analyze. Specifically, within each technology (*i.e.*, 2G, 3G, 4G), one-third (2,600 families total) of the 7,106 relevant UE families were randomly selected separately for each of the top 15 assignees.  For the randomly selected 33% of UE families per each of

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

the assignees, the Essentiality Assessment primarily involved a comparison between a patent's claims and the relevant cellular standard specifications.

35.     As noted earlier, there is some overlap between this Industry-Wide Essentiality Analysis and SEP Analysis discussed above in Section II.A. Specifically, the sampled set of industry-wide declared-essential patent families included 33% of Ericsson's 2G, 3G, and 4G declared-essential UE families, and, as a result, 55 of Ericsson's SEP family/standard pairs were analyzed independently on the one hand by Dr. Jayant or me (as part of the SEP Analysis), and on the other hand by the Concur IP team and Dr. Ding (as part of the Essentiality Assessment). The main difference between these two separate projects is that the Concur IP team performed the Essentiality Assessment based primarily on a comparison between patent claims and declared standards identified in IPR declarations submitted to ETSI.  By contrast, Dr. Jayant and I analyzed the essentiality of Ericsson alleged SEPs based primarily on the mapping of patent claims and cited standards set forth in Ericsson's claim charts as well as any additional information Ericsson provided regarding its essentiality contentions (*e.g.*, comments in the claim charts).  In addition, Dr. Jayant and I considered the file histories of the patents in determining the scope of the claims, whereas the Concur IP team did not.  The overall differences in the essentiality determinations between the two studies are discussed below in detail in Section VI.C.2.e.  In my opinion, these differences were not surprising, ultimately insignificant, and often favored Ericsson.

36.     The Industry-Wide Essentiality Analysis and particularly the Essentiality Assessment allowed us to determine, on an assignee-by-assignee basis, the total estimated number of essential 2G, 3G, and 4G industry-wide SEP families directed to User Equipment.  The process for the Essentiality Assessment is illustrated in Figure 7 below.

**Identify** for each patent family
whether at least one claim is
directed to a UE (e.g., a handset)

**Randomly Sample**
industry 2G/3G/4G patent
families (gathered from the
Patent Census)

**Analyze** sample patent families:
Is there a UE-directed claim that
is essential in the family?

**Estimate** the total numbers of
essential 2G, 3G, and 4G
industry-wide SEP families held
by different assignees

**FIGURE 7: Essentiality Assessment (PDX 65)**

2.    Results of the Industry-Wide Essentiality Analysis

37.    The Patent Census surveying declared-essential patents shows that

Ericsson's patent portfolio has experienced a relative decline over time.  Even

though Ericsson's absolute number of patent families continues to grow, the relative

strength of Ericsson's portfolio as compared to the industry has declined.

38.    For 2G, the total number of declared-essential patent families was

2,398, of which 1,182 families, or about 49%, were UE families.  Of those 1,182 UE

families, Ericsson was ranked third among all assignees with 107 families, or about

9% of all UE families declared essential to the 2G standard.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

39.     For 3G, the total number of declared-essential patent families was 5,127, of which 2,947, or about 57%, were UE families.  Of those 2,947 UE families, Ericsson was ranked fourth among all assignees with 199 families, or about 7% of all UE families declared essential to the 3G standard.

40.     For 4G, the total number of declared families was 7,638, of which 5,024, or about 66%, were UE families.  Of those 5,024 UE families, Ericsson was ranked fifth among all assignees with 311 families, or about 6% of all UE families declared essential to the 4G standard.

41.     As can be seen, Ericsson's relative strength has declined from 9% for the 2G standard, to 7% for 3G, and down to 6% for 4G.  There are three primary reasons for Ericsson's relative decline.  First, the expiration of a substantial number of Ericsson's patents due to age.  Second, Ericsson has divested a substantial number of patents to other entities.  Third, other companies have increased their patenting efforts over time, resulting in more competition to Ericsson.

42.     The Industry-Wide Essentiality Assessment also revealed no surprises, in that Ericsson's proportional share of the total set of essential UE patent families was found to be consistent with its share of all declared-essential patent families.  In particular, for 2G, Ericsson's fraction of essential UE patent families was found to be about 10%, just slightly higher than Ericsson's 9% share of all 2G declared-essential UE families.  For 3G, Ericsson's fraction of essential UE families was found to be about 7%, basically the same as Ericsson's 7% share of all 3G declared-essential UE families.  For 4G, Ericsson's fraction of essential 4G UE families was found to be about 6%, basically the same as Ericsson's 6% share of all declared-essential UE families.

## C.    Overview of Other Technical Analyses I Performed

43.     I also performed the following additional technical analyses, and provide the related results and/or opinions in this Witness Declaration.

1             1.     Industry-Wide 2G, 3G and 4G Infrastructure Family Analysis

2        44.    I conducted what I refer to as the Industry-Wide Essentiality Analysis

3 of the global landscape of patents that are declared essential to the 2G, 3G, and 4G

4 standards and are directed to infrastructure equipment (*e.g.*, a base station or core

5 network).  In Section VII below, I discuss this analysis and provide the numbers of

6 overall infrastructure families declared essential to the 2G, 3G, and/or 4G standards,

7 for each of Samsung, LG, HTC, ZTE, Apple, and Ericsson.  I understand this

8 analysis is used by Dr. Lynde in calculating effective rates that other Ericsson

9 licensees are paying for a license to Ericsson's 2G, 3G, and 4G patents.

10            2.     Correlation Between Ericsson's SEPs and Purportedly Approved

11                 Contributions

12        45.    I understand Ericsson has taken the position that counting approved

13 technical contributions can serve as an indicator of "the value of the patented

14 technology [a company] has contributed to the industry" (Dec. 11, 2015 Responses

15 to TCL's Interrogatory No. 11, at 8), "who will own most essential patents when the

16 technology is standardized," and "essential patent strength."  (*See* Ex. 1084 at pp. 4–

17 6.)  In other words, Ericsson claims that approved contributions correlate to its

18 proportional share of standard-essential patents.  In Section VIII below, I discuss

19 this analysis and provide my technical opinion as to why Ericsson's approved

20 contributions are, at best, only weakly correlated to its SEPs.

21            3.     LTE's Key Distinguishing Features

22        46.    LTE contains a number of key distinguishing features that differ in

23 many ways from technologies employed in earlier 3GPP standards (such as 2G and

24 3G) and other contemporaneous cellular technologies.  I understand Ericsson's

25 witnesses intend to argue that Ericsson made significant and valuable contributions

26 to 4G LTE.  For example, in his rebuttal report, Dr. Parkvall cites a paper written by

27 Ericsson engineers that identifies eight specific LTE key features that purportedly

28 distinguish LTE over WiMAX to support his argument that a system without

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

Ericsson's LTE technologies (*e.g.*, Link Adaptation) would translate to "reduced user throughput by 7%." I also understand Mr. Kennedy relies on Dr. Parkvall's analysis to calculate the value of Ericsson's 4G portfolio.

47.     In Section IX below, I discuss my analysis of these key LTE distinguishing features and provide my opinion that those features were well known before standardization of LTE and developed by companies other than Ericsson. This fact not only shows that Ericsson improperly attempt to take credit for the technical value of these well-known features developed by others, but also supports (and explains) my finding that 77 (or 95%) out of 85 of Ericsson's 4G family/standard pairs with an Essentiality Rank of "1" or "2" provide little to no intrinsic technical value to the standard. (*See* Section V, *infra*.)

## III.    BACKGROUND ON THE 2G, 3G AND 4G STANDARDS

### A.    Evolution of Cellular Communications

48.     Driven by the need for increasing performance (such as increased data throughput, improved quality of service, greater security, better coverage and access to new services, including data connectivity and video streaming), cellular communications systems have continued to evolve since inception. These cellular communications systems are known generally as First, Second, Third and Fourth Generation systems (1G, 2G, 3G and 4G, respectively). Each new generation of wireless telecommunications technology has resulted in an increase in system throughput and efficiency, allowing increasingly higher data rates and system performance to be realized.

49.     All of these cellular evolutions are based on well-known communication technologies. Table 2 below provides the underlying core technologies used by the more recent cellular systems (2G, 3G, and 4G), and highlights the approximate decade the various technologies were first introduced as compared to the time the standard was developed.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Cellular Generation | Principle Technology | Time of Standard | Time of Technology |
|---|---|---|---|
| 2G / GSM | TDMA | The 1980s | The 1940s[1] |
| 3G / UMTS | CDMA | The 1990s | The 1950s[2] |
| 4G / LTE | OFDMA | The 2000s | The 1960s[3] |

**TABLE 2: Core Technologies Used in Cellular Systems**

50.    While these core communication technologies used in modern cellular networks were developed decades ago, they only started to benefit consumers when other enabling technologies became available.  Without advanced integrated circuits, mobile terminals are expensive, bulky and unreliable.  Without high density battery technology, the mobile processors do not have the power to execute complex algorithms needed for broadband communications and computationally demanding applications.  Similarly, without high-resolution, sensitive and strong touch screens, mobile terminals cannot interact with users efficiently and effectively.

51.    Today, commercial telecommunications equipment often supports several cellular generations.  For example, current telecommunications equipment often supports the latest standard (*e.g.*, 4G) plus older standards (*e.g.*, 3G and 2G).  Such equipment is called "multi-mode" equipment.

**B.    The 2G Standard**

52.    The first widespread use of mobile phones began in the late 1970s and into early 1980s with analog systems, generally referred to as "1G."  From the viewpoint of a typical consumer experience today, these systems were relatively

---

[1] For example, in 1946, U.S. Patent 2,405,165 titled "Communication System" was issued to Alfred Schroeder of RCA.  This disclosed a system of multiple stations, where "each station [has] assigned thereto a portion of the time interval between recurring synchronization pulses."  (Ex. 1603.)

[2] For example, in 1950, MIT's Project Hartwell showed that several noise modulated systems, using wide-band carriers could operate simultaneously in the same band with little effect on each other.  (Ex. 1604.)

[3] For example, Bell Labs was researching OFDM in 1965.  (Ex. 1332 at pp. 1–22.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

basic, supporting just a few analog signal (as opposed to digital signal) capable of carrying voice calls.  AMPS (Advanced Mobile Phone System) was probably the most successful 1G system, and was widely deployed in the USA in the 1980s.  However, there were many other regional and national systems in operation around the world at that time, leading to a fragmented market with individual regions having their own vendors and standards which were incompatible with one another.  Today, none of these systems are commercially operational.

53.     In the late 1980s, the cellular industry moved towards a second generation of mobile telephony, based on digital technology.  Such systems introduced a number of important benefits over the previous analog 1G systems, such as improved voice quality, increased system capacity, increased system security, and the ability to integrate voice and data services.

54.     For the first time, SMS (Short Messaging Service, *i.e.*, "texting" or "texts") and basic data services became available.  But there were divergent views on how to effectuate these benefits.  Thus, there were a number of different standards considered to be 2G, including GSM, GPRS & EDGE, and CDMA & IS-95.

1.     <u>GSM</u>

55.     In Europe, a system called GSM (Global System for Mobile Communications, originally referred to as Groupe Spécial Mobile) evolved to become the dominant world-wide 2G standard.

56.     GSM incorporated a number of technical advances over previous cellular systems.  GSM introduced digital voice coding, which digitized voice calls and allowed better call quality.  GSM also adopted for the air interface protocol the well-known Time Division Multiple Access (TDMA) scheme.  TDMA operates by defining a number of time slots, and allocating the repetitive occurrence of a different time slot to each user.  As shown below in Figure 8, User l's cellphone is assigned the repetitive occurrence of Time Slot 1, User 2's cellphone is assigned the

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

repetitive occurrence of Time Slot 2, and User n's cellphone is assigned to the repetitive occurrence of Time Slot n. The collection of Time Slots for all users are carried within a single frequency.



**FIGURE 8: Example Time Division Multiple Access (TDMA) System**

2.   GPRS & EDGE

57.   Over the years, the functionality of GSM has been extended to support improved data services. These enhancements include a data service called GPRS (General Packet Radio Services), which introduced relatively low speed packet data support in addition to GSM voice services and then existing GSM circuit-switched data services. GPRS was then extended to a technology called EDGE (Enhanced Data rates for GSM Evolution), which is also often referred to as Enhanced GPRS, or EGPRS, which further increased the supported data rates.

58.     GSM and these newer variants are still in use today.  They can support voice service and user data rates with low to moderate data transmission speed.  However, their importance has been quickly diminishing on a global basis as network operators move to "next generation" systems providing higher data rates for transmission of information much more efficiently, which  benefits both the network operators and end users.

### 3.     CDMA and IS-95

59.     Despite the availability and widespread, global adoption of GSM, the technology was not (at least initially) widely commercialized in the United States.  In the United States, a different Second Generation (2G) technology, based on a different wireless air interface named Code Division Multiple Access (CDMA), was being strongly championed by Qualcomm.  Qualcomm eventually succeeded in getting its technology standardized.  The corresponding standard is called IS-95.

60.     At a very basic level, CDMA operates by assigning each user a unique identifier, a "spreading code," which is used to "spread" all the digital data transmitted to or from that user.  Because each user has a unique spreading code, a user need not be assigned a specified time slot as is required with TDMA.  With CDMA, multiple users can communicate at the same time (*i.e.,* simultaneously) using the same frequency by transmitting messages that have been spread using different "spreading codes."  Such a CDMA transmission is shown pictorially below in Figure 9, where User l's cellphone communicates using messages or data all identified uniquely with Code 1, User 2's cellphone uses Code 2 for all its data, and so forth for each user.  This allows all users to communicate simultaneously along the entire available frequency spectrum ($F_1$).

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**Figure 9: Example Code Division Multiple Access (CDMA) System**

61.   Despite many early technical setbacks and much skepticism from the GSM industry, Qualcomm's CDMA technology was standardized as IS-95, and commercialized under the name CDMAOne.  It became widely deployed by several carriers in the U.S. in the mid to late 1990s, after initially being successfully deployed in South Korea.

### C.   The 3G Standard

62.   In the mid to late 1990s, the cellular industry started a push towards a newer, more advanced system, able to support more users with improved reliability and better handling of data services.

63.   Originally the hope was to adopt a single, global standard.  However, over time, it became apparent that diverging regional interests would prevent a single system from being adopted.  On the one hand, supporters of the GSM-based standards pushed to have a system based on the GSM core network, but with an enhanced Radio Access Network incorporating a new CDMA-based air interface known as WCDMA (Wideband CDMA).  This standard is known as Universal Mobile Telecommunications System, or "UMTS."  On the other hand, supporters of

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

the IS-95 family of standards pushed to enhance the existing IS-95 core network and CDMA air interface, to develop a new standard known as CDMA2000. A high level illustration of these standards and their later evolutions is shown below in Figure 10. For the sake of brevity and also because UMTS is the only 3G technology at issue in this case, I will only discuss 3G UMTS.



**FIGURE 10: Evolution of the 2G and 3G Digital Cellular Standards**

64.    UMTS was designed to be an extension to the popular and successful 2G GSM standard, but enhanced to include an improved CDMA air interface, known as Wideband CDMA (WCDMA).

65.    The first UMTS standard developed by 3GPP was called Release 99, and was followed by a minor "cleanup" revision called Release 4. The first major upgrade came in 2002 with Release 5, including a new feature called HSDPA (High Speed Downlink Packet Access), which was followed by Release 6 in and around early 2005 which introduced HSUPA (High Speed Uplink Packet Access). Together HSDPA and HSUPA (which combined is known as HSPA, or High Speed Packet Access) enhanced the download and upload speeds as compared to the

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

original baseline specification.  In 2007, Release 7 included an enhancement named HSPA+ (High Speed Packet Access Evolution), which includes a number of technical modifications to support even higher data rates.  More recent releases have improved functionality further.

66.     UMTS, as improved through the various releases, remains in widespread use around the world today.

### D.     The 4G Standard ("LTE")

67.     For the first time in the evolution of cellular standards, the global cellular industry converged to a single wireless standard for use worldwide in the late 2000s:  LTE (Long Term Evolution).  This standard was developed by 3GPP, and it provides a natural evolutionary path for both UMTS and CDMA2000 network operators and their customers.  Similar to the earlier generations, LTE also continues to evolve, including advances such as LTE-Advanced.

68.     A visual roadmap of the main cellular standards and how they have evolved is shown in Figure 11 below.[4]



**FIGURE 11: Evolution of the Digital Cellular Standards**

---

[4] For explanation of "WiMAX," see Section IX below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

69.     Work began in earnest on developing LTE around 2006, under the
leadership of 3GPP.  The first technical specifications, known as Release 8, were
released in 2008.  Release 8 includes some functionality that can, in theory, support
downlink data rates of about 300 Mbps and uplink data rates of about 75 Mbps.

70.     In 2011, a major upgrade to LTE was released, referred to as Release
10, incorporating many features of what was known as LTE-Advanced.  This
upgrade includes a number of major technical enhancements to considerably
increase LTE functionality.  Commercial deployments of LTE-Advanced are in
progress today.

71.     4G LTE standards consist of two major "alternatives":  Frequency
Division Duplex (or FDD) and Time Division Duplex (or TDD).  While the
development of LTE-FDD and LTE-TDD has been harmonized by 3GPP, there are
significant differences between the two.

72.     While the number of FDD as compared to TDD networks has varied
over time and location, it is clear that there are a lot more FDD networks globally
than TDD networks.  A full marketing analysis is beyond the scope of this Witness
Declaration, but it is revealing to consider what the LTE standards allow in terms of
allocated spectrum.  While the allocated spectrum changes with time and location,
the most recent relevant LTE standard provides some insight.  The table below is
from 3GPP TS 36.101, version 13.2.1 (January 2016), and it provides the worldwide
set of available Operating Bands.  Once again, to be clear, not all Operating Bands
are available everywhere.  In fact, I know of no place in the world where all bands
are available.  This table is merely intended to show that FDD dominates TDD
overall.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

## 5.5     Operating bands

E-UTRA is designed to operate in the operating bands defined in Table 5.5-1.

### Table 5.5-1 E-UTRA operating bands

| E-UTRA Operating Band | Uplink (UL) operating band BS receive UE transmit | | Downlink (DL) operating band BS transmit UE receive | | Duplex Mode |
|---|---|---|---|---|---|
| | $F_{UL\_low}$ – $F_{UL\_high}$ | | $F_{DL\_low}$ – $F_{DL\_high}$ | | |
| 1 | 1920 MHz – | 1980 MHz | 2110 MHz – | 2170 MHz | FDD |
| 2 | 1850 MHz – | 1910 MHz | 1930 MHz – | 1990 MHz | FDD |
| 3 | 1710 MHz – | 1785 MHz | 1805 MHz – | 1880 MHz | FDD |
| 4 | 1710 MHz – | 1755 MHz | 2110 MHz – | 2155 MHz | FDD |
| 5 | 824 MHz – | 849 MHz | 869 MHz – | 894MHz | FDD |
| 6[1] | 830 MHz – | 840 MHz | 875 MHz – | 885 MHz | FDD |
| 7 | 2500 MHz – | 2570 MHz | 2620 MHz – | 2690 MHz | FDD |
| 8 | 880 MHz – | 915 MHz | 925 MHz – | 960 MHz | FDD |
| 9 | 1749.9 MHz – | 1784.9 MHz | 1844.9 MHz – | 1879.9 MHz | FDD |
| 10 | 1710 MHz – | 1770 MHz | 2110 MHz – | 2170 MHz | FDD |
| 11 | 1427.9 MHz – | 1447.9 MHz | 1475.9 MHz – | 1495.9 MHz | FDD |
| 12 | 699 MHz – | 716 MHz | 729 MHz – | 746 MHz | FDD |
| 13 | 777 MHz – | 787 MHz | 746 MHz – | 756 MHz | FDD |
| 14 | 788 MHz – | 798 MHz | 758 MHz – | 768 MHz | FDD |
| 15 | Reserved | | Reserved | | FDD |
| 16 | Reserved | | Reserved | | FDD |
| 17 | 704 MHz – | 716 MHz | 734 MHz – | 746 MHz | FDD |
| 18 | 815 MHz – | 830 MHz | 860 MHz – | 875 MHz | FDD |
| 19 | 830 MHz – | 845 MHz | 875 MHz – | 890 MHz | FDD |
| 20 | 832 MHz – | 862 MHz | 791 MHz – | 821 MHz | FDD |
| 21 | 1447.9 MHz – | 1462.9 MHz | 1495.9 MHz – | 1510.9 MHz | FDD |
| 22 | 3410 MHz – | 3490 MHz | 3510 MHz – | 3590 MHz | FDD |
| 23 | 2000 MHz – | 2020 MHz | 2180 MHz – | 2200 MHz | FDD |
| 24 | 1626.5 MHz – | 1660.5 MHz | 1525 MHz – | 1559 MHz | FDD |
| 25 | 1850 MHz – | 1915 MHz | 1930 MHz – | 1995 MHz | FDD |
| 26 | 814 MHz – | 849 MHz | 859 MHz – | 894 MHz | FDD |
| 27 | 807 MHz – | 824 MHz | 852 MHz – | 869 MHz | FDD |
| 28 | 703 MHz – | 748 MHz | 758 MHz – | 803 MHz | FDD |
| 29 | N/A | | 717 MHz – | 728 MHz | FDD[2] |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 30 | 2305 MHz | – | 2315 MHz | 2350 MHz | – | 2360 MHz | FDD |
| 31 | 452.5 MHz | – | 457.5 MHz | 462.5 MHz | – | 467.5 MHz | FDD |
| 32 | | N/A | | 1452 MHz | – | 1496 MHz | FDD[2] |
| 33 | 1900 MHz | – | 1920 MHz | 1900 MHz | – | 1920 MHz | TDD |
| 34 | 2010 MHz | – | 2025 MHz | 2010 MHz | – | 2025 MHz | TDD |
| 35 | 1850 MHz | – | 1910 MHz | 1850 MHz | – | 1910 MHz | TDD |
| 36 | 1930 MHz | – | 1990 MHz | 1930 MHz | – | 1990 MHz | TDD |
| 37 | 1910 MHz | – | 1930 MHz | 1910 MHz | – | 1930 MHz | TDD |
| 38 | 2570 MHz | – | 2620 MHz | 2570 MHz | – | 2620 MHz | TDD |
| 39 | 1880 MHz | – | 1920 MHz | 1880 MHz | – | 1920 MHz | TDD |
| 40 | 2300 MHz | – | 2400 MHz | 2300 MHz | – | 2400 MHz | TDD |
| 41 | 2496 MHz | | 2690 MHz | 2496 MHz | | 2690 MHz | TDD |
| 42 | 3400 MHz | – | 3600 MHz | 3400 MHz | – | 3600 MHz | TDD |
| 43 | 3600 MHz | – | 3800 MHz | 3600 MHz | – | 3800 MHz | TDD |
| 44 | 703 MHz | – | 803 MHz | 703 MHz | – | 803 MHz | TDD |
| 45 | 1447 MHz | – | 1467 MHz | 1447 MHz | – | 1467 MHz | TDD |
| 46 | 5150 MHz | – | 5925 MHz | 5150 MHz | – | 5925 MHz | TDD[8,9] |
| ... | | | | | | | |
| 64 | | | | Reserved | | | |
| 65 | 1920 MHz | – | 2010 MHz | 2110 MHz | – | 2200 MHz | FDD |
| 66 | 1710 MHz | – | 1780 MHz | 2110 MHz | – | 2200 MHz | FDD[4] |
| 67 | | N/A | | 738 MHz | – | 758 MHz | FDD[2] |

NOTE 1: Band 6 is not applicable
NOTE 2: Restricted to E-UTRA operation when carrier aggregation is configured. The downlink operating band is paired with the uplink operating band (external) of the carrier aggregation configuration that is supporting the configured Pcell.

NOTE 3: A UE that complies with the E-UTRA Band 65 minimum requirements in this specification shall also comply with the E-UTRA Band 1 minimum requirements.
NOTE 4: The range 2180-2200 MHz of the DL operating band is restricted to E-UTRA operation when carrier aggregation is configured.
NOTE 5: A UE that supports E-UTRA Band 66 shall receive in the entire DL operating band
NOTE 6: A UE that supports E-UTRA Band 66 and CA operation in any CA shall also comply with the minimum requirements specified for the DL CA configurations CA_66B, CA_66C and CA_66A-66A.
NOTE 7: A UE that complies with the E-UTRA Band 66 minimum requirements in this specification shall also comply with the E-UTRA Band 4 minimum requirements.
NOTE 8: This band is an unlicensed band restricted to licensed-assisted operation using Frame Structure Type 3
NOTE 9: In this version of the specification, restricted to E-UTRA DL operation when carrier aggregation is configured.

(*See* Ex. 1619 at pp. 29–31.)

74.     As one can see, the LTE Operating Bands are overwhelmingly FDD. As it turns out, the country/region with the largest TDD presence as compared to other countries/regions is China, with China Mobile being the largest LTE TDD operator.  While the interest in TDD has grown over time since its original deployments, it remains a much smaller portion of LTE deployment overall as compared to FDD.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

## IV.   BACKGROUND ON ETSI AND STANDARDIZATION

### A.   Background on ETSI

75.   In 1989, the responsibility for continued evolution of the GSM standard was transferred to the European Telecommunications Standards Institute (ETSI), an organization that consisted of many companies in the telecommunications industry in Europe and beyond.  ETSI had (and today still has) a hierarchical structure, with the fundamental unit being a Working Group.  Each Working Group was responsible for a specific set of technical aspects of the standards, and their work eventually led to the formation of the standards.  Participation in a Working Group was left up to companies that were members of ETSI.  Any member company could send individuals to participate in a Working Group.  These individuals often identified issues that needed to be resolved and proposed features to the same.  The Working Group would then deliberate over issues and/or proposed features in regularly scheduled Working Group meetings held in cities around the world.

### B.   3GPP—An International Cellular Technology Body

76.   Even though 3GPP is not a standards-setting organization in a formal sense, from a practical perspective, it is.  3GPP develops Technical Specifications that are then typically adopted by the respective standards-setting bodies of a given country.  At the core of 3GPP's organization lies the seven "Organizational Partners," each of which is a Standards-Setting Organization (SSO) in a specific country.  The seven organizational partners and their respective standards-setting countries/regions are:  (1) ARIB (Japan), (2) ATIS (USA), (3) CCSA (China), (4) ETSI (Europe), (5) TSDSI (India), (6) TTA (Korea), and (7) TTC (Japan).

77.   3GPP employs a model similar to the ETSI model discussed above—a hierarchical structure, with Working Groups being the source of technical contributions, some of which are ultimately included in Technical Specifications.  In addition, there are several Technical Specification Groups, each having a number of Working Groups and covering technical subject matter that is defined and follows a

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   logical, hierarchical structure.

2       78.    It is up to each Organizational Partner to accept the Technical

3   Specification as a standard.  The Working Groups, much as in ETSI, are made up of

4   individuals who work in any company that is a member of at least one 3GPP

5   Organizational Partner.  Deliberations take place, contributions are analyzed, and

6   consensus typically emerges, leading to a Technical Specification.  These Technical

7   Specifications can be and often are amended to correct prior errors, clarify prior

8   language, introduce new features, or delete previously agreed-upon features.

9       79.    Technical Specifications are assigned a version number.  For example,

10  TS 36.211 is a Technical Specification that covers one specific broad topic area in

11  LTE.  It has several version numbers such as 8.0.0, 9.4.5, 12.0.0, etc.  The first value

12  in such a 3-field version number (8, 9, and 12 in these examples) corresponds to the

13  "Release."  Roughly speaking, the second value (0, 4, and 0, respectively in the

14  examples) is a representation of the evolutionary process within a given release.

15  Lastly, the third value (0, 5, and 0, respectively in the examples) represents minor

16  typographical or stylistic changes to the given standard.  Thus, version 9.4.6 of a

17  given Technical Specification can be expected to have minor corrections to version

18  9.4.5 of the same Technical Specification.

19      80.    Standards are constantly evolving, and new releases introduce new

20  functionality.  Thus, Release 12 will have new functionalities and capabilities that

21  Release 11 did not.  Release 11, in turn, will have new functionalities and

22  capabilities that Release 10 did not have, and so on.

23      **C.    Declaring Patents to ETSI That "Are or May Be Essential"**

24      81.    SSOs often have intellectual property rights (IPR) policies that require

25  certain members to identify patents and patent applications relevant to the standards

26  in a timely manner.  For example, ETSI has such an IPR policy.  (*See, e.g.*, Ex. 223

27  at pp. 1 (§ 4.1), 2 (§ 6.4); *see also* Ex. 224.)

28      82.    I understand that TCL's other experts will provide more background on

---

34

the reasons behind these IPR policies, as well as their implications.  This Witness Declaration discusses the information provided by patent declarations (or IPR declarations) submitted in connection with ETSI's IPR policy, and how that information can be used to assess patent portfolio strength.

83.     Patent declarations to ETSI consist of a fairly simple form.  (*See, e.g.*, Ex. 223 at pp. 9–11.)  ETSI's form requests certain basic information about the declared patents, such as: (1) the ETSI Project to which the patents pertain (*e.g.*, UMTS), (2) the Technical Specifications or standards relevant to the patents (*e.g.*, 3GPP TS 25.215), (3) the patent numbers, and (4) geographic information for the patents.  (*See, e.g.*, Ex. 223 at p. 11.)  The ETSI form available at the time I prepared my opening expert reports also requests the declarant to point out the "illustrative specific part of the standard" that is related to the declared patents.  (*Id.*)  Earlier versions of the ETSI form did not include this request.  An example of a completed ETSI declaration from TCL is shown below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**ETSI** ⬡         REÇU 2.2 NOV. 2013         Page 2 (version 7)

ETSI Rules of Procedure, 20 March 2013

## IPR INFORMATION STATEMENT AND LICENSING DECLARATION

**IPR HOLDER / ORGANISATION ("Declarant")**

| Legal Name: | TCL Communication Technology Holdings Limited |
|---|---|

**CONTACT DETAILS FOR LICENSING INFORMATION:**

| Name and Title: | Vivian LAU |
|---|---|
| Department: | Licensing |
| Address: | Rooms 1910-12A, Tower 3, China HK City, 33 Canton Road, Tsimshatsui, Kowloon, Hong Kong |

| Telephone: | 852-31802888 | . | Fax: | 852-31802800 | ... |
|---|---|---|---|---|---|
| Email: | vivian.lau@tcl.com | | URL: | | |

**IPR INFORMATION STATEMENT**

In accordance with Clause 4.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby informs ETSI that it is the Declarant's and/or its AFFILIATES' present belief that the IPR(s) disclosed in the attached *IPR Information Statement Annex* may be or may become ESSENTIAL in relation to at least the ETSI Work Item(s), STANDARD(S) and/or TECHNICAL SPECIFICATION(S) identified in the attached *IPR Information Statement Annex.*

The Declarant and/or its AFFILIATES *(check one box only):*

☒ are the proprietor of the IPR(s) disclosed in the attached *IPR Information Statement Annex.*

☐ are not the proprietor of the IPR(s) disclosed in the attached *IPR Information Statement Annex.*

**IPR LICENSING DECLARATION**

In accordance with Clause 6.1 of the ETSI IPR Policy the Declarant and/or its AFFILIATES hereby irrevocably declares the following *(check one box only, and subordinate box, where applicable):*

☒ To the extent that the IPR(s) disclosed in the attached *IPR Information Statement Annex* are or become, and remain ESSENTIAL in respect of the ETSI Work Item, STANDARD and/or TECHNICAL SPECIFICATION identified in the attached *IPR Information Statement Annex,* the Declarant and/or its AFFILIATES are (1) prepared to grant irrevocable licences under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy; and (2) will comply with Clause 6.1bis of the ETSI IPR Policy.

  ☒ This irrevocable undertaking is made subject to the condition that those who seek licences agree to reciprocate **(check box if applicable).**

☐ The Declarant and/or its AFFILIATES are not prepared to make the above IPR Licensing Declaration (reasons may be explained in writing in the attached *IPR Licensing Declaration Annex*).

The construction, validity and performance of this IPR information statement and licensing declaration shall be governed by the laws of France.

Terms in ALL CAPS on this form have the meaning provided in Clause 15 of the ETSI IPR Policy.

**SIGNATURE**

By signing this IPR Information Statement and Licensing Declaration form, you represent that you have the authority to bind the Declarant and/or its AFFILIATES to the representations and commitments provided in this form.

| Name of authorized person: | Stephen CHIANG |
|---|---|
| Title of authorized person: | General Counsel |
| Place, Date: | Hong Kong , 18 November 2013 |
| Signature: | |

*Please return this form duly signed to: ETSI Director-General*
*ETSI - 650, route des Lucioles – F-06921 Sophia Antipolis Cedex – France / Fax. +33 (0) 4 93 65 47 16*

26   (Ex. 12 at p. 1.)
27
28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| STANDARD, TECHNICAL SPECIFICATION or ETSI Work item | | | | Proprietor | Application No. | Publication No. |
|---|---|---|---|---|---|---|
| Project or Standard name | Work Item or Standard No. | Illustrative Specific part of the standard (e.g. Section) | Version (V.X.X.X) | | | |
| * * * | | | | | | |
| LTE | ETSI TS 36.355 | 6.5.3 | v 11.4.0 | TCL Communication Technology Holdings Limited | | US 7,359,718 |

(Ex. 12 at p. 2)

84. As shown by this example, multiple patents and/or patent applications can be listed on a single form. Patents (or patent applications) can be (and often are) declared more than once in different forms. This can happen if, for example, ETSI publishes a new standard specification and the declarant determines that its patent is relevant to the new specification.

85. The declaration process is self-policing. That is, ETSI does not scrutinize declarations to ensure that the declared patents are actually essential to any standards. Furthermore, ETSI's IPR Policy requires that any patents that "may be or may become ESSENTIAL" should be declared. (*See* Ex. 223 at p. 2 (§ 6.4.) Thus, declarations do not conclusively show that the patents are in fact

1  standard-essential, at least because declarations are self-initiated and not reviewed

2  by the SSO.

3      **D.    3GPP Working Group Structure and Practices**

4      86.    The nature and practices of 3GPP's Working Groups show that most

5  standardized features are incremental and modular.  First, based on both my long

6  career in the technology sector and my experience with thousands of 2G, 3G, and

7  4G SEPs that I personally analyzed, I can say with confidence that most 2G, 3G, and

8  4G SEPs (with only an exception of a handful of fundamental patents that radically

9  changed the technological landscape) address incremental solutions in a narrow

10  aspect of a given technology.  Furthermore, these solutions (and the corresponding

11  patents, as the case may be) are typically modular in that they can be replaced with

12  alternative solutions without materially impacting other parts of the standards or

13  related systems.  The way 3GPP is structured to handle technical proposals reflects

14  this reality.

15      87.    As discussed above, 3GPP's work is structured around the concept of a

16  Working Group.  The Working Group constitutes the fundamental unit of a broader

17  hierarchical structure, as explained in the 3GPP Working Procedures document.

18  (*See* Ex. 1458 at pp. 8–28.)  As such, most if not all aspects of technology that have

19  to be developed for cellular standards are allocated to the appropriate Working

20  Group for deliberation and decision typically with respect to one or two specific

21  standard sections.  That is not to say technologies never affect multiple standards or

22  sections within a standard, and sometimes a coordination effort is needed across

23  different Working Groups.  However, for the most part, the problems, issues, and

24  related solutions are largely self-contained, and submissions are made to specific

25  Working Groups to address these technical issues.  These submissions are

26  deliberated within the Working Group, and decisions are made within the Working

27  Group based on the deliberations, as described above.

28      88.    In the relatively few occasions where a particular solution proposed for

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

one standard section or topic impact other standard sections or topics that are under the purview of another Working Group, the members of the other Working Group are notified, and a joint decision is made, usually requiring coordination and possibly only very minor modifications to other sections of the standard.  In sum, while it is *possible* that any one solution to any one topic/standard section may affect another topic/standard, it is far more common that it does not, and even in relatively rare cases where it does, the solution's impact can be easily addressed with minimal modifications to other parts of the standard.

89.    The meeting minutes of various 3GPP Working Group meetings illustrate these principles.  Specifically, a typical Working Group meeting considers numerous written contributions or proposals (*e.g.*, "TDocs" and "Change Requests") submitted by companies.  The Working Group usually proceeds by separately discussing one technical topic and often multiple sub-topics for a particular standard or sometimes standards.  For each technical topic, the Working Group considers a group of related TDocs addressing the topic.  After deliberation and hopefully resolution with respect to a particular technical topic, the Working Group then moves on to the next topic and discusses another group of TDocs related to that topic.  The Working Group thus proceeds until all the individual topics are covered. It would be a rare case indeed for the Working Group to consider and discuss all of the different groups of TDocs and related topics all at the same time.

90.    Accordingly, the way 3GPP Working Groups handle technical proposals demonstrates that most contributions (and related patents, if any) address incremental solutions directed to narrow aspects of a given technology.

91.    A particular example illustrating this concept is the minutes of 3GPP TSG RAN1 Meeting #63.  (Ex. 1411.)  The meeting minutes are organized into sections and subsections, each covering a specific aspect of the technology (in addition to some administration-related sections).  Thus, for example, § 6.2 covers issues related to Carrier Aggregation and consists of several subsections.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

Subsection 6.2.1 covers issues related to the PUCCH (Physical Uplink Control CHannel).  Specifically, § 6.2.1 is further broken down to a number of subsections. Subsection 6.2.1.1 relates to "Remaining details for A/N" and covers 36 TDocs that were presented, discussed, and acted upon accordingly, as well as 18 TDocs that were "Not formally treated in plenary session."  (Ex. 1411 at pp. 14-20.)  Each of these TDocs addresses a very specific aspect of the standard.

92.     In a similar manner, § 6.2.1.2 relates to "Periodic PMI/CQI/RI" and covers 11 TDocs that were presented, discussed, and acted upon accordingly, as well as eight more TDocs that were not.  (Ex. 1411 at pp. 20–24.)  Each of these TDocs is relevant to a specific, narrow issue related to periodic reporting of the Precoding Matrix Indicator (PMI), the Channel Quality Indicator (CQI), and/or the Rank Indicator (RI).  (*Id.* at 20–24.)  The meeting minutes reflect no consideration or analysis of all of these TDocs combined as one unit.  Rather, as shown by the minutes, each of the TDocs was considered individually in turn.

93.     Subsection 6.2.1.3 is titled "Other" and consists of one TDoc that was analyzed and 11 that were "[n]ot formally reviewed during the plenary session." (Ex. 1411 at pp. 24–25.)  But "[c]ompanies [were] encouraged to check the proposals . . . and aim for a single converged proposal."  (*Id.* at 24.)  Section 6.2.2, covers the topic of "UL [Uplink] Power Control," as well as 24 TDocs that were acted upon and 16 TDocs that were not considered.  Similarly, § 6.2.3 covers the topic of "UCI [Uplink Control Information] on PUSCH [Physical Uplink Shared CHannel]," as well as 24 TDocs that were acted upon and 19 that were "[n]ot treated."  (*Id.* at 32–40.)  Finally, § 6.2.4 is titled "Other," and covers six TDocs that were "[n]ot treated."  (*Id.* at 40.)

94.     The above example demonstrates how 3GPP Working Groups do not consider or analyze TDocs directed to different topics as a single group.  By extension, patents covering these topics should likewise not be analyzed as a single group.  For at least this reason, to the extent a solution can have an impact on

another part of the standard (whether within the same or in another Technical Specification), the correct way to analyze the impact on the other part of the standard is to analyze the specific solution and the associated patent, if one exists, at the time the standard was being implemented.  To lump together numerous proposed solutions or patents and simultaneously consider the potential impact of including the same in the standard is unnecessary and unworkable from an engineering standpoint, and would indeed be atypical within 3GPP.

## V.      ANALYSIS OF ERICSSON'S 2G, 3G and 4G SEP PORTFOLIO

### A.      Objective and Process of the Patent-By-Patent Analysis

95.      I performed an in-depth technical analysis of the patents Ericsson alleges are essential to the 2G, 3G and 4G standards.  My understanding is that as of November 12, 2015, and as part of this litigation, Ericsson had identified 235 patent families that it contends are essential to the 2G, 3G, and/or 4G standards, and had designated these patent families as being relevant to UE (*i.e.*, User Equipment such as cell phones or smart phones) or UE/NB (*i.e.*, User Equipment and network equipment).  (*See* Ericsson's Objections and Fourth Supplemental Responses to TCL's Interrogatory Nos. 5 and 6, Revised Annex A.)  My analysis focused on determining the technical value of these 235 patent families.  An overarching goal of the SEP Analysis is to evaluate, for each charted claim, the intrinsic technical value of the patented technology in the standard, apart from the value associated with the technology being incorporated into the standard.

96.      The 235 relevant patent families fall into two categories.  The first category includes those patent families for which Ericsson provided TCL with claim charts purportedly demonstrating Ericsson's contention for how the patent families cover the standard(s).  My understanding is that Ericsson produced claim charts for only 192 of the 235 patent families, which I shall refer to as "the 192 charted patent families."  For those 192 charted patent families, an in-depth technical analysis was conducted to determine the Essentiality, Importance, and Contribution ("the SEP

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

Analysis") of the patents, which are three separate metrics of technical value.  I personally performed this analysis for 180 of the 192 charted patent families directed to the air interface, location services, and security, while Dr. Jayant, who is a renowned expert in speech coding, analyzed the remaining 12 charted patent families directed to speech coding.  Although Dr. Jayant is submitting his own separate Witness Declaration discussing his analysis of those 12 patent families, my overall assessment of Ericsson's alleged SEP portfolio includes the results of Dr. Jayant's SEP Analysis.

97.    Of the 192 charted families, Ericsson alleged that 167 are directed to a single standard generation:  26 are directed to the 2G standard, 30 are directed to the 3G standard, and 111 are directed to the 4G standard.  For the remaining 25 patent families, nine are directed to both the 2G and 3G standards, 10 are directed to both the 3G and 4G standards, four are directed to both the 2G and 4G standards, and two are directed to all three standards.  Figure 12 below illustrates the distribution of the 192 charted families across the 2G, 3G, and 4G standards.



**FIGURE 12 (PDX 66)**

98.     As I discussed above in Section V.A, because Ericsson asserted that a number of its patent families are essential to multiple standards, the 192 charted patent families for which the SEP Analysis was conducted resulted in a total of 219 family/standard pairs.  Each family/standard pair may contain multiple charted claims, and I conducted the SEP Analysis with respect to each one of the charted claims from each family/standard pair.  For example, Ericsson identified the patent family P08333 as being essential to both the 3G and 4G standards.  (I note that Ericsson assigns a unique code to each of its patent families, in this instance using the code P08333.)  In other words, patent family P08333 consisted of two

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

family/standard pairs, P08333_3G and P08333_4G. Ericsson further produced seven

claim charts for the P08333 patent family listed in Table 3 below.

| No. | Standard | Patent | Claims | Starting Bates No. |
|-----|----------|--------|--------|--------------------|
| 1 | 3G | IN 213,467 | 1 | ERIC_TCL00191429 |
| 2 | 3G | U.S. 5,991,330 | 1 | ERIC_TCL00191436 |
| 3 | 3G | U.S. 5,991,330 | 1, 6 | ERIC_TCL00105852 |
| 4 | 3G | U.S. 5,991,330 | 1 | ERIC_TCL00191440 |
| 5 | 4G | EP 992,122 | 1 | ERIC_TCL00191426 |
| 6 | 4G | U.S. 5,991,330 | 6 | ERIC_TCL00105088 |
| 7 | 4G | U.S. 5,991,330 | 6 | ERIC_TCL00191431 |

**TABLE 3 (PDX 67)**

99.    When a claim is charted in only one claim chart, as is the case with

claim 1 of Indian Patent No. 213,467 and claim 1 of European Patent No. 992,122, I

analyzed Ericsson's contentions provided in the claim chart.  However, when the

same claim is charted in multiple claim charts, as is the case with claims 1 and 6 of

U.S. Patent No. 5,991,330, I analyzed Ericsson's contentions in one of the multiple

claim charts after verifying that Ericsson's contentions in those claim charts are

identical or substantively similar.  If the claim charts are not identical or

substantively similar, I attempted to select the claim chart with the most complete

citations to standards, as well as the most complete set of Ericsson's comments.

100.    In some cases, a family/standard pair contains multiple charted claims

from one patent or from multiple patents.  Therefore, a family/standard pair may

have multiple sets of Essentiality/Importance/Contribution, or "EIC," ranks.  In such

cases, taking a conservative approach, the overall rank for the family/standard pair is

chosen as the "best" ranked patent claim among the set.  I identified the "best"

ranked patent claim by selecting the patent claim with the best Essentiality Rank

first.  For example, if a patent family has two charted claims, one with an

Essentiality Rank of 1 and the other with an Essentiality Rank of 3, I chose the

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

charted claim with the Essentiality Rank of 1 as the best ranked patent claim, and would assign the EIC ranks of that charted claim as the overall rank for the family/standard pair.  If two or more charted claims have the same Essentiality Rank, I would select the charted claim with the best Contribution Rank.  If both Essentiality and Contribution Ranks for two or more charted claims are the same, then the charted claim with the best Importance Rank is selected.

101.   The Appendices accompanying this Witness Declaration contain my analysis with respect to each of the 199 family/standard pairs of the 180 charted patent families for which I performed the SEP Analysis.  The analysis set forth in the Appendices is incorporated herein by reference.  The analysis performed by Dr. Jayant with respect to the 20 family/standard pairs of the 12 charted patent families directed to speech coding accompanies his Witness Declaration.

102.   The SEP Analysis we performed is the most comprehensive analysis that I am aware of for a portfolio of the size of Ericsson's.  Thus, in addition to Dr. Jayant, a number of other experts helped me during various steps of the SEP Analysis.  These experts (names and affiliations listed in Table 4 below) are professors from major U.S. universities and are prominent experts in their respective wireless communication fields.  (*See* Ex. 1460, Ex. 1461, Ex. 1462, Ex. 1463, Ex. 1464, Ex. 1465, Ex. 1466, Ex. 1467, Ex. 1468, Ex. 1579.)

| EXPERT | AFFILIATION |
| --- | --- |
| Zhi Ding, Ph. D. | Department of Electrical and Computer Engineering, University of California at Davis |
| Matthew Valenti, Ph. D. | Department of Computer Science & Electrical Engineering, West Virginia University |
| Gordon Stuber, Ph. D. | School of Electrical and Computer Engineering, Georgia Institute of Technology |
| Shuguang Cui, Ph. D. | Department of Electrical and Computer Engineering, Texas A&M University |
| Alexander Vardy, Ph. D. | Department of Electrical and Computer Engineering, University of California, San Diego |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Babak Hassibi, Ph. D. | Department of Electrical Engineering, California Institute of Technology |
|---|---|
| Michael Buhrer, Ph. D. | Department of Electrical and Computer Engineering, Virginia Polytechnique Institute and State University |
| Young-Han Kim, Ph. D. | Department of Electrical and Computer Engineering, University of California, San Diego |
| Liuquing Yang, Ph. D. | Department of Electrical & Computer Engineering, Colorado State University |
| Faramarz Fekri, Ph. D. | School of Electrical and Computer Engineering, Georgia Institute of Technology |

## TABLE 4 (PDX 68)

103.   These experts spent significant time performing an initial Essentiality, Importance, and Contribution analysis of their assigned families.  I used this analysis as a starting point for my own independent analysis and conclusions as set forth in the Appendices.  These experts provided a second set of eyes, and in the process provided valuable input that substantially increased the overall reliability of my analysis and conclusions.

### 1.   Essentiality Analysis

104.   The purpose of the "Essentiality" metric is to assess Ericsson's contentions and any related evidence regarding whether Ericsson's patents that are essential to the 2G, 3G, and/or 4G standard.

105.   ETSI's IPR Policy defines essential as follows.

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing

46

1    that IPR.  For the avoidance of doubt in exceptional cases
2    where a STANDARD can only be implemented by
3    technical solutions, all of which are infringements of
4    IPRs, all such IPRs shall be considered ESSENTIAL.
5  (Ex. 223 at p. 7.)

6    106.   Consistent with this definition, I was informed by counsel that the
7  Essentiality analysis is related to patent infringement in the sense that a claim is
8  essential to a standard if a product or process compliant with the standard
9  necessarily infringes the claim.  Conversely, a claim is not essential to a standard if
10  a product or process can comply with the standard without infringing the claim.

11    107.   Moreover, counsel informed me of various legal principles relevant to
12  determining infringement.  I have applied these legal principles in arriving at my
13  conclusions.  I understand that a determination of patent infringement based on
14  standards generally involves two steps.  First, a claim is construed.  Then, the
15  construed claim is compared to the relevant standard or standards to determine
16  whether every claim limitation is required by the standard(s) such that any standard-
17  compliant device or process necessarily infringes the claim.  I have applied these
18  same steps in the Essentiality analysis.

19    108.   Further, I understand there is a concept in patent law known as the
20  "person of ordinary skill in the art."  I understand that this concept refers to a person
21  who is trained in the relevant technical field of a patent without possessing
22  extraordinary or otherwise exceptional skill.  I further understand that factors such
23  as the education level of those working in the field, the sophistication of the
24  technology, the types of problems encountered in the art, prior art solutions to those
25  problems, and the speed at which innovations are made may help establish the level
26  of skill in the art.

27    109.   Taking into account these factors, it is my opinion that a person of
28  ordinary skill in the relevant art for the purposes of analyzing the essentiality of

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

Ericsson's 2G, 3G, and 4G SEP portfolio would have a bachelor's degree in electrical engineering or computer science or a related field, with one or two years of relevant industry experience, or a master's degree in electrical engineering or computer science or a related field.  In addition, a person of ordinary skill in the art would have had a working understanding of cellular transmission protocols.  As reflected in my qualifications above, I am more than qualified as a person of ordinary skill in the art as of the relevant dates of the patents at issue in the SEP Analysis.

110.   It is my understanding that claim terms or phrases are given their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention when read in the context of the specification and prosecution history.  I also understand that there are two exceptions to this general rule.  One exception is when a patentee sets out a definition and acts as his own lexicographer.  The other is when the patentee disavows the full scope of a claim term either in the specification or during prosecution.  I applied these principles when construing claim terms or phrases in connection with the Essentiality analysis.

111.   I have also been informed by counsel that to prove infringement of a patent by an accused device or process, a patent owner must establish that each and every claim limitation of the patent is implemented by the accused device or process.  Likewise, I have also been informed that infringement is not established if even a single claim limitation is not implemented by the accused device or process.  With respect to divided infringement, I have been informed that there is no infringement unless a single actor implements each and every claim limitation or performs some of the limitations and directs or controls another to implement the remaining limitations.

112.   In accordance with the ETSI definition and the various legal principles discussed above, for each limitation, or set of limitations, of a charted claim, I

1   analyzed whether the limitation is, or whether the limitations are, "required" by the

2   standard.  In other words, whether implementing a technology solution in the

3   standard necessarily infringes or reads on the limitation or set of limitations.

4          113.  In determining an "Essentiality" metric, I ranked the Essentiality of a

5   charted claim a "1" if I did not see any evidence precluding a finding that the claim

6   is "essential" under ETSI's IPR Policy.  I ranked the Essentiality of a charted claim

7   a "2" if, under a proper claim construction, I found that the claim is not "essential"

8   under ETSI's IPR Policy.  Finally, I ranked the Essentiality of a charted claim a "3"

9   if I found that the claim is not "essential" under ETSI's IPR Policy under any

10  reasonable claim construction.

11                    2.    Importance Analysis

12         114.  The second metric that I evaluated in connection with the SEP Analysis

13  is the "Importance" (or technical value) of the claim with respect to the standard.

14  The purpose of the Importance analysis is to determine the overall importance or

15  technical value of an "accused technology" and a "key accused feature" (as defined

16  below) to the relevant 2G, 3G, or 4G standard, and to provide an Importance Rank

17  based on the same.

18         115.  The Importance Rank is on a scale of one ("1") to three ("3"), where a

19  rank of 1 means that the accused technology/key accused feature is important (or

20  technically valuable) to the standard; a rank of 2 means that the accused

21  technology/key accused feature is moderately important (or of moderate technical

22  value) to the standard; and a rank of 3 means that the accused technology/key

23  accused feature is at best only marginally important (or of marginal technical value)

24  to the standard.

25         116.  The Importance analysis begins with identifying an accused

26  technology, *i.e.*, the technology to which the standards cited in the claim chart are

27  generally directed.

28         117.  The next step is to identify one or more key limitations of the patent

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

claim at issue.  Key claim limitations are determined by considering what the patent described in the patent specification as the heart of the invention.  The key claim limitations are also circumscribed by the arguments and amendments the Applicant used to overcome prior art, and/or the reasons identified by the patent office (*e.g.*, in a notice of allowance) as the patentable subject matter.

118.   Once the key claim limitation is identified, the next step is identifying a key accused feature in the standard that corresponds to the key claim limitation.  As used herein, the key accused feature (or simply, key feature) is the technical feature in the cited standard (or a subset thereof) that is mapped to the key claim limitation in Ericsson's claim chart.

119.   Once the accused technology/key accused feature was identified, I assessed its overall value to the standard.  In connection with this assessment, I considered the technical solution that was in the standard prior to the adoption of the accused key feature, if that information was available to me.  If such a prior technical solution in the standard was identified, I assessed the incremental improvement (or technical value) of the key accused feature over the prior technical solution.  On other hand, if no such prior technical solution existed or was available to me, I assessed the incremental improvement of the key accused feature over other well-known prior art.  Examples of well-known prior art include technology identified in the background section of the patent at issue, or prior related standards. If I did not identify any well-known prior art, I assessed the Importance of the key accused feature by considering the impact of removing the key accused feature from the standard, in terms of performance degradation and implementation cost.

120.   Where appropriate, I also considered a number of other factors in the overall Importance assessment, including:  (1) the importance of the underlying accused technology to the standard; (2) whether the accused technology is optional to the standard; and (3) how widely the accused technology/key accused feature is deployed in major markets.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

### 3.   Contribution Analysis

121.   The third metric that I evaluated in connection with the SEP Analysis is the "Contribution" to the standard.  The purpose of the Contribution analysis is to determine a level of improvement, if any, of the key feature to the relevant 2G, 3G, or 4G standard relative to viable alternatives that were available at the time the key accused feature was adopted into the standard.  The Contribution analysis entails providing a Contribution Rank on a scale of one ("1") to four ("4"), where a rank of 1 means that no viable alternatives to the key accused feature were identified; a rank of 2 means that the key accused feature provided a moderate improvement to the standard relative to the alternative; a rank of 3 means that the key accused feature provided a marginal improvement to the standard relative to the alternative; and a rank of 4 means that the key accused feature provided no improvement to the standard relative to the alternative.

122.   To begin the Contribution analysis of a patent, I identified any viable alternatives to the key feature of the patent.  The sources of alternatives that I considered include:  (1) written contributions submitted to ETSI or a 3GPP working group (*e.g.*, TDocs and Change Requests (CRs)); (2) prior art technical solutions identified in the patent at issue (*e.g.*, Applicant-admitted prior art); (3) prior art references cited during patent prosecution; (4) any technical solutions that were known in the art as evidenced by patent and non-patent literature; and (5) any other technical solutions that would have been known to a person of ordinary skill in the art and that could have served as alternatives to the key accused feature.

123.   In the majority of cases, the alternatives were "non-infringing alternatives," meaning that the alternative technical solutions do not read on the charted claim at issue.  For such non-infringing alternatives, I also determined whether the alternative was "available," such that the alternative could have been considered for inclusion in the standard.  In this regard, none of Ericsson's patents, technical proposals (*e.g.*, Tdocs, change requests, etc.), or publications (*e.g.*, books,

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   articles, papers, etc.) formed a basis for any of the non-infringing alternatives I

2   proposed.

3        124.   In some cases, however, the alternatives were the same or effectively

4   identical technical solutions as the key accused feature, and, in some cases, likely

5   read on the claim at issue.  In these cases, I determined whether such "prior art"

6   alternative was known before the earliest effective priority date of Ericsson's patent

7   at issue.  If so, I gave the key accused feature a Contribution Rank of a "4," because

8   the key accused feature was already known in the art.  As such, even if the key

9   accused feature represented a marginal, moderate, or significant improvement to the

10  standard, any value associated with that improvement value is attributable to the

11  prior art, not Ericsson's patent.

### B.   Essentiality Analysis of Ericsson's Alleged SEPs

13       125.   Other than those patent families reviewed by Dr. Jayant, I reviewed

14  each and every patent family that Ericsson alleges is essential to the 2G, 3G, and/or

15  4G standard to determine if the patent family was actually essential to the standard.

16  As stated above, this included reviewing 199 family/standard pairs corresponding to

17  180 charted patent families.  In this section, I provide a number of examples of my

18  Essentiality analysis to help illustrate how the Essentiality metric was determined.  I

19  then provide a summary of the results of the analysis.  The Essentiality analysis for

20  the remaining family/standard pairs is contained in the Appendices attached hereto

21  as Exhibit 1639.

#### 1.   Patent Family P10628 Is Not Essential to 2G.

23       126.   Ericsson alleges that the P10628 patent family is essential to the 2G

24  standard.  In its claim charts, Ericsson attempts to map the limitations of Claim 1 of

25  U.S. Patent No. 6,597,911 ("the '911 Patent") to the 2G standard.  (*See, e.g.*, Ex.

26  1358.)  The '911 Patent is titled "System, Method, and Apparatus for Cell Searching

27  in a Next Generation Overlay of a Preexisting Network," was filed May 28, 1999,

28  and was issued July 22, 2003.  (Ex. 1605.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

a.    *Tutorial on Inter-RAT Handover*

127.    The P10628 Family relates to "handover" or "hand-off" of UEs between different communication networks, such as between a 2G network and a 3G network.  (*See generally* Ex. 1639 at p. 264.)  This is generally referred to as Inter-Radio Access Technologies, or "Inter-RAT," handover.  As explained in the '911 Patent, a network comprises cells, each "associated with a base station [] which provides telephone service to mobile stations [] using traffic channels."  (Ex. 1605 at p. 6, 1:14–27.)  "Each cell [] is also associated with a control channel."  (*Id.* at 6, 1:27–28.)

128.    When a UE is "engaged in a call," or in use, "not only must the [UE's] presence within the coverage area of the new cell [] be detected, confirmed and registered, but also the communications link with the [UE] carrying the telephone call must be switched from one base [] station in the prior cell [] to another base station [] in the new cell [] as the [UE] moves and responsibility for the link is transferred to that new call[.]"  (Ex. 1605 at p. 6,1:37–46.)  This process is referred to as "handover" or "hand-off."  (*Id.* at 6, 1:47–48.)

129.    Under the 2G standard, the moving UE "make[s] signal strength measurements within the current cell [], as well as with respect to neighboring cells[].  The channels measured by the [UE] are identified in a list provided to the [UE] by the cellular network [].  The listed channels include handover measurement channels (usually the control channel) for cells []which are potential targets for a handover.  The measurements are reported back to the serving base station[].  At the same time, the serving base station [] measures signal strength of received [UE] transmissions.  These [UE] and base station [] measurements are processed by a base station controller (BSC) [] to determine whether a handover is needed, and also to identify to which cell such handover should be made."  (Ex. 1605 at p. 6, 1:53–67.)

130.    As explained in the '911 Patent, "[t]ransition from a preexisting cellular

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

network [] to a next generation network is often performed in an overlay fashion."
(Ex. 1605 at p. 6, 2:22–24.)  That is, "the next generation network is gradually
deployed alongside the preexisting cellular network."  (*Id.* at 6, 2:24–25.)  To
promote acceptance of the new network, "network operators often market[ed] dual-
mode [UEs]" capable of utilizing both networks.  (*Id.* at 6, 2:38–42.)

131.   The following modified figure from the '911 Patent illustrates a dual-
mode UE capable of working with two different networks.  The figure has been
modified to identify the "preexisting cellular network" as a 2G network and the
"next generation network" as a 3G network.



'911 Patent, Fig. 2

**FIGURE 13**

132.   As explained in the '911 Patent, "[a]s a subscriber having a [UE]
moves from outside the service area of the next generation service area to within the
service area, it is desirable for the [UE] to deregister with the preexisting cellular
network [] and register with the next generation network, notwithstanding the fact
that the [UE] is also within the service area [] of the preexisting cellular network[.]"
(Ex. 1605 at p. 6 2:49–56.)  "[W]hen the subscriber is engaged in a call, a handover
operation must be performed with a cell of the next generation network.  Present
networks, however, do not provide for inclusion of handover measurement channels
for cells in different generation networks."  (*Id.* at 6, 2:59–64.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

b.    *Ericsson's Inter-RAT Handover Scheme*

133.   The P10628 Family is directed to an inter-RAT handover between first and second service areas (*e.g.*, handover from 2G to 3G).  Charted Claim 1 of the '911 Patent is reproduced below.

> **1**. In a mobile telecommunications system comprising a preexisting cellular network associated with a first service location area and a first plurality of cells, each of said first plurality of cells being served by a particular one of a first plurality of base stations, and a next generation cellular network associated with a second service location area and a second plurality of cells, each of said second plurality of cells being served by a particular one of a second plurality of base stations, said second service location area partially overlapping said first service location area, a method for performing a handover for a mobile station served by a particular one of said first plurality of base stations, said method comprising the steps of:
> > receiving a cell neighbor list from said particular one of said first plurality of base stations serving said mobile station at said mobile station upon entering said second service location area, said cell neighbor list including an indicator identifying at least one of said second plurality of base stations; and
> > measuring the signal strength of a handover measurement channel associated with said at least one of said second plurality of base stations identified by said indicator by said mobile station.

134.   Ericsson's inter-RAT handover scheme is illustrated in Figure 14 below.



**FIGURE 14**

135.   Claim 1 requires the UE to receive a cell neighbor list from the 2G base station "upon entering" the 3G network service area.  (*See* Figure 15, below.)  The list identifies a new 3G base station for the UE to connect to.



**FIGURE 15**

136.   According to Claim 1, after receiving the list, the UE can now identify the 3G base station and conduct 3G signal strength measurements to send to the base

56

station controller (BSC) so that a handover decision may be made, as illustrated in
Figure 16 below.



**FIGURE 16**

   *c.* *The 2G Standard Does Not Require Ericsson's Inter-RAT*
     *Handover Scheme.*

 137. Based on the patent specification, the file history and the technical
specifications cited by Ericsson, the Essentiality Rank of Claim 1 is "3," because
practicing the 2G standard with the UE does not require at least the following
limitation of Claim 1 under any reasonable interpretation: "receiving a cell neighbor
list from said particular one of said first plurality of base stations serving said
mobile station at said mobile station ***upon entering*** said second service location
area." This claim limitation formed the basis for the Notice of Allowance during
prosecution.

 138. In particular, Ericsson's argument to the patent office relied heavily on
the alleged lack of disclosure in the prior art that the handover process "begins ***when***
the mobile station enters the service location area of one of the networks," as shown
in the following excerpts from applicants' August 2, 2002 Office Action Response.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

5,974,319).   Applicant has amended independent Claims 1 and 8 to more particularly point out that the present invention is directed to a handover process within a system where the service location area of a next generation network partially overlaps the service location area of a preexisting cellular network, such that the handover process begins when the mobile station enters the service location area of the next generation network.   Support for these amendments can be found on page 9, lines 14-18, page 10, lines 2-8 and page 10, lines 9-22 of the present application.

lines 31-36).   Although Kotzin et al. does discuss overlapping systems in the context of prior art solutions, Kotzin et al. only discusses systems that provide full overlap between two networks in order to perform handovers, and does not discuss the situation where a handover process begins when the mobile station enters the service location area of one of the networks.   For example, on col. 3, lines 24-27, Kotzin et al. states that such prior art solutions assumed overlap between the portions (*see* col. 3, lines 24-27).

Therefore, Applicant respectfully submits that Kotzin et al. does not disclose or suggest a handover process within a system where the service location area of a next generation network partially overlaps the service location area of a preexisting cellular network and begins when the mobile station enters the service location area of the next generation network, as is now claimed in Claims 1 and 8.

(Ex. 1329 at pp. 61–62.)

139.   Ericsson's claim chart appears to suggest that the MEASUREMENT INFORMATION message meets this limitation.  (Ex. 1358 at p. 1.)  The claim chart does not point to any specific portion of the standard that requires this message to be sent "***upon entering*** the second service location area."

140.   In fact, the MEASUREMENT INFORMATION message is sent by the "preexisting cellular network" whenever the preexisting (*e.g.*, 2G) cellular network

58

determines to send this information.  Specifically, there is no requirement in the 2G standard that the message be sent "***upon entering*** the second service location area." In other words, the cited portion of the standard specifies a handover  that operates the same way as in the prior art Ericsson distinguished during prosecution.  (*See, e.g.*, Section V.A.I above (discussing disavowal).)

141.   Thus, I found that the P10628 Family is not essential to practicing the 2G standard.

2.    Patent Family P08430 Is Not Essential to 3G.

142.   Ericsson alleges that the P08430 patent family is essential to the 3G standard.  In its claim charts, Ericsson attempts to map the limitations of Claim 8 of U.S. Patent No. 6,185,244 ("the '244 Patent") to the 3G standard.  (*See, e.g.*, Ex. 422.)  The '244 Patent is titled "Cell Searching in a CDMA Communications System," was filed August 5, 1998, and was issued February 6, 2001.  (Ex. 1369.)

*a.    Tutorial on Cell Searching*

143.   The P08430 Family is directed to cell synchronization (*i.e.*, synchronization between a UE and a base station in a cellular network).  This is also known as "cell search."  (*See generally* Ex. 1639 at p. 171.)

144.   "Before any radio frequency communications or information transfer between a base station and a mobile station of the spread spectrum communications can occur, the mobile station must find and synchronize itself to the timing reference of that base station.  This process is commonly referred to as 'cell searching.'"  (Ex. 1369 at p. 11, 2:31–35.)

*b.    Ericsson's Cell Searching Scheme*

145.   Claim 8 of the '244 Patent recites a specific cell searching method (shown below).

59

**8.** A method for a mobile station to decode an identifying code transmitted from a base station in a CDMA cellular communications system, comprising the steps of:

receiving a plurality of consecutive symbols comprising said identifying code;

determining whether said received plurality of consecutive symbols comprises a valid code word; and

if said received plurality of consecutive symbols does not comprise a valid code word, cyclically shifting said received plurality of consecutive symbols by a predetermined amount, and returning to the determining step;

if said received plurality of consecutive symbols comprises a valid code word, outputting a number of cyclical shifts made to obtain said valid code word and a message associated with said valid code word.

146.   As illustrated in Figure 6 of the '244 Patent (below), in the claimed method, a UE receives a "plurality of consecutive symbols comprising [an] identifying code" and determines whether the identified code is a valid code word. If the identified code is invalid, the received symbols are cyclically shifted by a predetermined amount and determining whether the cyclically-shifted symbols comprise a valid code word.  If the code word is valid, the number of how many cyclical shifts were required is outputted along with a message associated with the valid code word.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



*FIG. 6*

    *c.*  *The 3G Standard Does Not Require Ericsson's Cell*

        *Searching Scheme.*

   147. Based on the patent specification, the file history, and the technical

specifications cited by Ericsson, Claim 8 of the '244 Patent is not essential to the 3G

standard.  As shown below, the only portion of the standard pointed to in Ericsson's

claim chart does not require any of the limitations of Claim 8.  For example, the

cited portion of Annex C below does not require the claimed steps including  "…

cyclically shifting said received plurality of consecutive symbols by a predetermined

amount …."

> **Annex C (Informative):**
> **Cell search procedure**
> During the cell search, the UE searches for a cell and determines the downlink scrambling code and
> frame synchronisation of that cell. […]

(Ex. 422 at p. 2.)

   148. As shown below, Ericsson attempts to explain how the cited portion of

the standard maps to Claim 8—but Ericsson's "explanation" fails to bridge the gap

between the claimed steps and the above-identified statement in Annex C.

1

2

3

> *[**Ericsson comment**: Although this section is informative, the UE would need to perform these steps in order to establish communication with the network.*
> *The UE needs to cyclically shift the result of consecutive secondary SCH correlations in order to find a valid code-word, and hence the frame timing.]*

4

(Ex. 422 at p. 2.)

5

6   149.   Ericsson's claim chart provides no evidence to support the conclusory

7   comments that the "UE would need to perform these steps in order to establish

8   communication with the network" and the "UE needs to cyclically shift the result of

9   consecutive secondary SCH correlations in order to find a valid code-word, and

10   hence the frame timing."   In addition, the cited Annex C is merely "Informative,"

11   *i.e.*, not required.   Therefore, Annex C cannot support Ericsson's assertion of

12   essentiality.   As shown below, under the ETSI Drafting Rules, features in

13   "Informative" sections are by definition not required in order to comply with the 2G,

14   3G, or 4G standards.

15

16   ## 2.13.2               Informative annexes

17   For reasons of convenience it may be decided to place some part of the informative text in an annex.

18   Informative annexes give additional information intended to assist the understanding or use of the ETSI deliverable and shall not contain provisions to which it is necessary to conform in order to be able to claim compliance with the ETSI deliverable. Their presence is optional and their status (except for EGs, TRs and SRs, see note in clause

19   2.13) shall be indicated in the heading of the annex.

20

21   shall not contain provisions to which it is necessary to conform in order to be able to claim compliance

22   (Ex. 404 at p. 12.)

23

24   3.   Patent Family P21428 Is Not Essential to 4G.

25   150.   Ericsson alleges that the P21428 patent family is essential to the 4G

26   standard.   In its claim charts, Ericsson attempts to map the limitations of Claim 1 of

27   U.S. Patent No. 8,285,294 ("the '294 Patent") to the 4G standard.   (*See, e.g.*, Ex.

28   363.)   The '294 Patent is titled "Technique for Performing a Random Access

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1  Procedure Over a Radio Interface," was filed October 20, 2006, and was issued
2  October 9, 2012.  (Ex. 362.)

3              *a.*      *Tutorial on Random Access Procedure*

4              151.   The P21428 Family is directed to a random access procedure.  (*See*
5  *generally* Ex. 1639 at p. 634.)  As explained in the '294 Patent, a "mobile terminal
6  has to perform a random access procedure in order to get access over the radio
7  interface to the wireless network."  (Ex. 362 at p. 10, 2:13–15.)  During the random
8  access procedure, the UE sends synchronization information to the base station
9  within a Random Access Channel (RACH).  (*Id.* at 10, 2:25–38, 60–65.)

10             152.   The '294 Patent identifies that "[t]here is a need for a technique for
11 performing a random access procedure over a radio interface, which allows to
12 flexibly provide time and/or frequency resources to the random access procedure."
13 (Ex. 362 at p. 11, 3:16–19.)  In this regard, the '294 Patent discloses that "instead of
14 being prepared to receive access bursts over the entire available bandwidth [*i.e.*, 20
15 MHz], the bandwidth component 150 may set the access bandwidth to a smaller
16 value, such that only a fraction of the available transmission bandwidth may be used
17 for receiving access bursts.  For example, the access bandwidth may be set to the
18 minimum system bandwidth which has to be supported by equipment conforming to
19 the 3GPP LTE standard, *i.e.*, 1.25 MHz."  (*Id.* at 13, 8:66–9:8.)

20             *b.*      *Ericsson's Random Access Scheme*

21             153.   The '294 Patent is directed to a method of performing the random
22 access procedure that allows setting flexible access bandwidths.  The method is
23 recited in Claim 1, shown below.

24
25
26
27
28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

> **1.** A method in a mobile terminal of performing a random access procedure over a radio interface, the method comprising:
>
> selecting an access time slot for transmission of an access burst over the radio interface; and
>
> setting one of a first access bandwidth or a second access bandwidth for a transmission channel for transmission of the access burst,
>
> wherein the set access bandwidth of the transmission channel is set smaller than an available system transmission bandwidth for uplink channels associated with the radio interface, and
>
> wherein the set access bandwidth corresponds to an access bandwidth for an access filter applied in a base station during the access time slot to receive the access burst.

154.   As recited in Claim 1, an access time slot for transmission of an access burst is selected, and then a first or second access bandwidth for a transmission channel is set for transmitting the access burst.  The claim requires first and second access bandwidths that are different from one another in order to provide resources for random access in a flexible way.  (*See, e.g.*, Ex. 362 at p. 15, 12:55–67.)  As the '294 Patent teaches, the first access bandwidth may be 20 MHz, and the second access bandwidth may be 1.25 MHz.  (Ex. 362 at p. , 8:66–9:8.)  This example is illustrated below in Figure 17.



**FIGURE 17 (PDX 69)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1
2

        c.     *The 4G Standard Does Not Require Ericsson's Random Access Scheme.*

3      155.   Based on the patent specification, the file history and the technical

4 specifications cited by Ericsson, the Essentiality Rank of Claim 1 is "3," because

5 practicing the 4G standard with a UE does not require at least the following

6 limitation under any reasonable interpretation:  "setting one of a first access

7 bandwidth or a second access bandwidth."

8      156.   Ericsson's claim chart for P21428 points to the TDD-LTE case where

9 there can be 5 different formats for the random access preamble, specifically

10 preamble formats 0–4.  Ericsson's claim chart maps the "first access bandwidth" to

11 formats 0–3 and the "second access bandwidth" to format 4.  (Ex. 363 at p. 5.)  First,

12 this mapping fails at least because regardless of which of these formats is selected,

13 the access bandwidth is the same.  (*See, e.g.*, Ex. 371 at p. 43 ("Each random access

14 preamble occupies a bandwidth corresponding to 6 consecutive resource blocks for

15 both frame structures.").)  As this clearly shows, in all formats, the access

16 bandwidth is the same—6 consecutive resource blocks.  Because each resource

17 block is 180 kHz, the access bandwidth is always 6*180 kHz = 1,080 kHz = 1.08

18 MHz.  Even though the guard band is 1,080 kHz – 1,049 kHz = 31 kHz in the first

19 case, and 1,080 kHz – 1,043 kHz = 37 kHz in the second case, the access bandwidth

20 is still just 1.08 MHz.

21      157.   Second, Ericsson's position is that the first access bandwidth, for

22 formats 0–3, is 1,049 MHz, and that the second access bandwidth, for format 4, is

23 1,043 MHz (*i.e.*, Ericsson does not count the guard bands in calculating the access

24 bandwidths).  (Ex. 363 at p. 5.)  Ericsson's position is wrong for several reasons.

25 For example, shown below in Figure 18, the relatively miniscule difference between

26 the first and second access bandwidths as alleged by Ericsson is clearly not what the

27 patent teaches.  That is, contrary to the patent's teachings that the first access

28 bandwidth may be 20 MHz and the second access bandwidth may be 1.25 MHz,

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   under Ericsson's position there is basically no difference between the first and
2   second access bandwidths.



**FIGURE 18 (PDX 70)**

21      158.   In contrast to the method recited in Claim 1, the accused standard
22   always uses 6 RBs.  That is, a bandwidth provided for random access requests is not
23   flexible—it is always 1,080 kHz irrespective of which of the accused random access
24   preamble formats is selected.  This is further confirmed by the patent's specification,
25   which recites "the available bandwidth not used for the RACH is used for the
26   transmission of other data instead, for example user data and/or control data."  (Ex.
27   362 at p. 15, 11:42–44.)  As discussed above, however, the standard explicitly does
28   not allow such usage, as it is always 6 RBs that are allocated to the RACH.  Thus,

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

the claimed invention is not essential to practicing the 4G standard.

4.   Patent Family P33858 Is Not Essential to 4G.

159.   Ericsson alleges that the P33858 patent family is essential to the 4G standard.  In its claim charts, Ericsson attempts to map the limitations of Claim 53 of U.S. Patent No. 8,750,808 ("the '808 Patent") to the 4G standard.  (*See, e.g.*, Ex. 1361.)  The '808 Patent is titled "Configuration of Reference Signal Transmission Bandwidth," was filed January 12, 2012, and was issued June 10, 2014.  (Ex. 1376.)

a.   *Tutorial on Positioning and Related Reference Signal Measurement*

160.   The P33858 Family is directed to UE positioning and related reference signal measurements in a wireless network.  (*See generally* Ex. 1639 at p. 1356.)

161.   Figure 3 of the '808 Patent (reproduced below) depicts a particular wireless network in which the UE (36) measures reference signals transmitted by cells (*e.g.*, 42-1) that neighbor a serving cell (42-5) of the UE, for example to determine the UE's position.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



(RF) front end. **For example, if the serving-cell bandwidth (BW) is 5 MHz, then the UE will likewise configure its RF BW to 5 MHz. This approach has several advantages.** For

glitch. The glitch occurs either when the **UE extends its bandwidth (e.g. from 5 MHz to 10 MHz)** or when it shortens its

**FIGURE 19 (PDX 71)**

163.   As explained in the '808 Patent, "the UE measures the timing differences for downlink reference signals received from multiple distinct locations or neighboring cells." (Ex. 1376 at p. 10, 3:12–14.)  "[T]he UE has to reconfigure the receiver to enable measurements of cells with a larger bandwidth, which may be necessary to meet" accuracy requirements.  This proves problematic because configuring a receiver to a larger bandwidth, to meet measurement accuracy requirements for cells with that larger bandwidth, may degrade measurement quality in other cells with either a smaller associated measurement bandwidth or with a smaller cell bandwidth." (*Id.* at 12, 8:9–18.)

b.       *Ericsson's Reference Signal Measurement Scheme*

164.   The '808 Patent aims to "advantageously address degradations to the quality of reference signal measurements and/or to the quality of serving cell data reception that would otherwise result from a wireless device measuring different cells' reference signals over different bandwidths." (Ex. 1376 at p. 12, 8:39–43.) Claim 53 (reproduced below) recites a method of measuring reference signals using assistance data obtained by the UE.

> **53.** A wireless device configured to measure reference signals transmitted by a cell that neighbors a serving cell of the wireless device, the wireless device comprising a radio interface and one or more processing circuits configured to:
>    obtain assistance data that indicates a reference-signal bandwidth over which the wireless device is to measure said reference signals; and
>    if the reference-signal bandwidth indicated in the assistance data is larger than a serving-cell bandwidth, actually measure said reference signals over the serving-cell bandwidth rather than the reference-signal bandwidth indicated in the assistance data.

165.   As illustrated in Figure 7 of the '808 Patent below, the UE maintains assistance data indicating a reference-signal bandwidth that the UE is to measure.  If the reference-signal bandwidth indicated by the assistance data (*e.g.*, 10 MHz) is greater than the serving-cell bandwidth (*e.g.*, 5 MHz), then the UE measures the reference signals over the serving-cell bandwidth (5 MHz) instead of the reference-signal bandwidth (10 MHz).

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



       c.     *The 4G Standard Does Not Require Ericsson's Reference Signal Measurement Scheme.*

166.   Based on the patent specification, the file history, and the technical specifications cited by Ericsson, I determined that Claim 53 of the '808 Patent is not essential to the 4G standard.  Specifically, I found that the 4G standard does not require at least the limitation "if the reference-signal bandwidth indicated in the assistance data is larger than a serving-cell bandwidth, actually measure said reference signals over the serving-cell bandwidth rather than the reference-signal bandwidth indicated in the assistance data" under any reasonable interpretation of the claim.

167.   With respect to this claim limitation, Ericsson's claim chart relies on Table 9.1.10.1-1 of technical specification 36.133 (reproduced below).

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Table 9.1.10.1-1: RSTD measurement accuracy | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Parameter | Minimum PRS bandwidth which is minimum of serving cell channel bandwidth and the PRS bandwidths of the reference cell and the measured neighbour cell i Note 4 [RB] | Minimum number of available measurement subframes between the reference cell and the measured neighbour cell | Unit | Accuracy [Ts] | Conditions[1,5,6] | | | | |
| | | | | | Bands 1, 4, 6, 10, 11, 18, 19, 21, 23, 24, 33, 34, 35, 36, 37, 38, 39, 40 | Bands 2, 5, 7, 41 | Band 25 | Bands 3, 8, 12, 13, 14, 17, 20, 22 | Bands 9, 42, 43 |
| | | | | | Io | Io | Io | Io | Io |
| RSTD for (PRS Ês/Iot)$_{ref}$ ≥ -6dB and (PRS Ês/Iot$_i$) ≥ -13dB | ≥6 | 6 | $T_s$ | ±15 | -121dBm /15kHz … -50dBm/ BW$_{Channel}$ | -119dBm /15kHz … -50dBm/ BW$_{Channel}$ | -117.5dBm /15kHz … -50dBm/ BW$_{Channel}$ | -118dBm /15kHz … -50dBm/ BW$_{Channel}$ | -120dBm /15kHz … -50dBm/ BW$_{Channel}$ |
| | ≥25 | ≥2 | | ±6 | | | | | |
| | ≥50 | ≥1 | | ±5 | | | | | |

Note 1:   When in dBm/15kHz, the minimum Io condition is expressed as the average Io per RE over all REs in an OFDM symbol.
Note 2:   Ts is the basic timing unit defined in TS 36.211 [16].
Note 3:   PRS bandwidth is as indicated in *prs-Bandwidth* in the OTDOA assistance data defined in [24].
Note 4:   The serving cell, the reference cell, and the measured neighbour cell i are on the same carrier frequency.
Note 5:   The minimum condition level is increased by Δ>0, when applicable, as described in Section B.4.2.
Note 6:   The Io is defined in PRS positioning subframes. The same Io range applies to PRS and non-PRS symbols. Io levels are different in PRS and non-PRS symbols within the same subframe.

(*See* Ex. 1371 at p. 133.)

168.   However, this Table specifies nothing more than a required accuracy for the reference signal time difference ("RSTD") measurement. Specifically, according to Table 9.1.10.1-1, the RSTD accuracy requirement depends on the minimum PRS bandwidth among the serving-cell bandwidth, the PRS bandwidth of the reference cell, and the PRS bandwidth of the neighboring cell.

169.   Nevertheless, Table 9.1.10.1-1 does not specify over what bandwidth the UE must *actually measure* the reference signals. For example, if the reference signal bandwidth (*e.g.*, 10 MHz) is larger than the serving-cell bandwidth (*e.g.*, 5 MHz), the Table does not require the UE to *actually measure* the reference signals over the serving-cell bandwidth (*e.g.*, 5 MHz), as required by Claim 53. Rather, Table 9.1.10.1-1 merely specifies that whichever bandwidth is used, the RSTD accuracy must satisfy the applicable value (*e.g.*, at least 6 if the minimum of the three bandwidths is the serving-cell bandwidth). In other words, even in the claimed situation where the serving-cell bandwidth is the minimum bandwidth, the Table does not show or require that the accuracy requirement can be achieved only by actually measuring the reference signals over the serving-cell bandwidth (*e.g.*, 5

71

MHz), as opposed to over some *other* bandwidth (*e.g.*, 7 MHz).

170. Thus, I found the claimed invention is not essential to practicing the 3G standard.

### 5. Essentiality Analysis Results

171. Figure 20 below illustrates the breakdown of the Essentiality Ranks for all family/standard pairs that Ericsson considers essential to the 2G, 3G, and/or 4G standards, including expired patents. As shown in the figure, of the 219 family/standard pairs directed to the 2G, 3G, and/or 4G standards, only 136 are essential to the standards.



**Essentiality Ranks for 2G, 3G, and 4G Family/Standard Pairs**

**FIGURE 20 (PDX 72)**

172. Figure 21 below illustrates the breakdown of the Essentiality Ranks for all family/standard pairs that Ericsson considers essential to the 2G standard, including expired patents.[5] As shown in the figure, of the 41 family/standard pairs

---

[5] As used in connection with Ericsson's SEPs, "expired patents" refers to patents that expired as of February 1, 2016, when my original Expert Report was served.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

directed to the 2G standard, only 29 are essential to the standard.



**Essentiality Ranks for 2G Family/Standard Pairs**

**FIGURE 21 (PDX 73)**

173.   Figure 22 below illustrates the breakdown of the Essentiality Ranks for all family/standard pairs Ericsson considers essential to the 3G standard, including expired patents.  As shown in the figure, of the 51 family/standard pairs directed to the 3G standard, only 33 are essential to the standard.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

**Essentiality Ranks for 3G Family/Standard Pairs**



**FIGURE 22 (PDX 74)**

174.   Figure 23 below illustrates the breakdown of the Essentiality Ranks for all family/standard pairs Ericsson considers essential to the 4G standard, including expired patents.  As shown in the figure, of the 127 family/standard pairs directed to the 4G standard, only 74 are essential to the standard.



**FIGURE 23 (PDX 75)**

C.   **Importance Analysis of Ericsson's Alleged SEPs**

175.   For any patent family that I gave an Essentiality Rank of "1" or "2," I also analyzed the importance of the accused technology/key accused feature to the 2G, 3G or 4G standard.  In this section, I provide several examples of my Importance analysis to help illustrate how the Importance metric was determined, and also to provide examples of the rankings.  I then provide a summary of the results of the analysis.  Here I provide, by way of example, my analysis for Ericsson's P06553_2G, P14596_2G, P14596_3G, P14596_4G, P23893_4G, P33108_4G, and P38458_3G family/standard pairs.  The analysis for the remaining family/standard pairs is contained in the Appendices attached hereto as Exhibit 1639.

1.   Patent Family P06553 Is at Best Marginally Important to 2G.

176.   Ericsson alleges that the P06553 patent family is essential to 2G.  Through its claim chart, Ericsson attempts to map the limitations of Claim 1 of U.S.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1  Patent No. 5,987,139 ("the '139 Patent") to 3GPP TS 03.20 v.8.0.0 §§ 4.2, C.1.

2  (*See, e.g.*, Ex. 1415.)

3                  *a.      Ericsson's Ciphering Scheme*

4         177.   The P06553 Family relates to a specific way of encrypting or

5  "ciphering" information sent between a phone and the network.  (*See generally* Ex.

6  1321.)  Based on the patent specification and the file history, I determined the key

7  limitation of Claim 1 of the '139 Patent to be "for each time slot used for

8  transmission of said information, modifying said first encryption key in dependence

9  on an ordinal number of the time slot so as to obtain a modified encryption key."

10  Ericsson attempts to map this key limitation to the following key accused feature in

11  the 2G standard:  Using time slot number to modify a ciphering key (Kc) to generate

12  a slot-dependent key (Kcn).  This key accused feature corresponds to the following

13  section of the accused 2G standard.

14
15  **4      Confidentiality of signalling information elements, connectionless data and user
        information elements on physical connections**
16  **4.2      The ciphering method**
    […]
17  […] Kcn is derived from Kc as follows:
18        Let BN denote a binary encoding onto 64 bits of the timeslot number "n" (range 0-7). Bit "i" of
        Kcn, Kcn(i), is then calculated as Kc(i) xor (BN<<32(i)) ("xor" indicates: "bit per bit binary
        addition" and "<<32" indicates: "32 bit circular shift"), the number convention being such that
19        the lsb of Kc is xored with the lsb of the shifted BN.
    […]
20
21  (Ex. 1431 at p. 28.)

22         178.   The charted US '139 Patent and the section of the accused 2G GSM

23  standard both point to the use of this ciphering scheme in what is called High-Speed

24  Circuit Switched Data (HSCSD).

25

26

27

28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

(Ex. 1418 at p. 6, 1:36–44.)



(Ex. 1431 at p. 28.)

179.   None of the '139 Patent, the accused 2G standard, or Ericsson's corresponding claim chart mentions a technology other than HSCSD in connection with the claimed ciphering scheme.

b. *Ericsson's Ciphering Scheme Is at Best Marginally Important to 2G.*

180. I assigned an Importance Rank of "3" to Ericsson's patent family P06553, meaning that the key accused feature corresponding to Ericsson's ciphering scheme is, at best, of marginal technical value or importance to the 2G standard. As explained above, the accused feature was used only for HSCSD in 2G, and the HSCSD technology was introduced in the 2G standard prior to the introduction of enhanced, packet-based 2G systems—*i.e.*, GPRS and EDGE. (*See* Section III.B.2, *supra*.) The HSCSD technology was not adopted in many markets, if any. Instead, handset manufacturers primarily went straight to GPRS and EDGE solutions, limiting HSCSD to just a few HSCSD-capable handsets. (*See* Ex. 1616 at pp. 4–5.)

181. Moreover, HSCSD was highly inefficient. The technology utilizes scarce radio resources, as the time slots are constantly allocated (even when no data is transmitted) in accordance with circuit-switched technology. This inefficiency was compounded with the higher cost network operators would have to charge for HSCSD as circuit switching for data (which is what HSCSD is), thus further negatively impacting the popularity of HSCSD. (*See id*.) Given the advantages and availability of 2G GPRS and EDGE, it is not surprising that HSCSD never took off. Indeed, this is confirmed by ETSI's own assessment of this inefficient technology, shown in the excerpt below. Accordingly, the Importance of Ericsson's ciphering scheme to 2G is marginal at best and, therefore, I assigned it an Importance Rank of "3."

# High Speed Circuit Switched Data ==(HSCSD)==

Overview | Standards

The standard GSM™ circuit-switched connection offers a data rate much too low for sophisticated web browsing and the transfer of large files, and as early as Release 96 (on 3GPP website) of the GSM specifications it was realized that a significant increase in speed could be obtained by aggregating two or more channels into a single, grouped, circuit-switched connection.

* * *

Since the four channels are tied up in a circuit-switched connection, the network operator is likely to charge an ==HSCSD== call at a considerably higher rate than a simple, single channel call, and the service ==was never enormously popular. HSCSD has been largely replaced by the General Packet Radio Service (GPRS) and Enhanced Data rates for Global Evolution (EDGE), which are more versatile, offer higher data rates, and are more economical.==

(Ex. 1417.)

> 2. Patent Family P14596 Is at Best Marginally Important to 2G, 3G, and 4G.

182. Ericsson alleges the P14596 patent family is essential to 2G, 3G, and 4G. In its claim chart, Ericsson attempts to map the limitations of Claim 10 of U.S. Patent No. 7,181,218 ("the '218 Patent") to certain sections of the 2G, 3G, and 4G standards, including 3GPP TS 25.331 v. 8.16.0 §§ 8.3.6, 8.3.6.1, 8.3.6.3, 10.1, 10.2, 10.2.16a, 10.3.3.48. (*See, e.g.*, Ex. 1429 at p. 135.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

### a.   Tutorial on Inter-RAT Handover Messaging

183.   The P14596 Family generally relates to inter-RAT handover.  (*See generally* Ex. 1639 at p. 470; Ex. 1639 at p. 475; Ex. 1639 at p. 480.)  An inter-RAT handover is a process wherein the UE switches from a first radio access system having a first radio access technology (*e.g.*, 2G GSM) to a second radio access system having a second radio access technology (*e.g.*, 3G UMTS).  (*See* Ex. 1617 at p. 7, 1:32–36.)  According to the '218 Patent, "[i]nter-RAT handover is normally initiated when the quality of a downlink radio connection of the first radio access network falls below a certain level." (*Id.* at 7, 1:36–41.)

184.   In the inter-RAT handover procedure, a handover command message is sent to the UE to provide the UE with details of the radio resources to be used after the handover.  (*See* Ex. 1617 at p. 7, 1:42–47.)  For example, when the UE is switching from a 2G network to a 3G network, a handover message is sent by a base station controller of the 2G network to the UE.  (*Id.* at 7, 1:47–56.)  According to the '218 Patent, the purported invention is "a technique for facilitating transmission of additional parameters in a handover command message in conjunction with inter-RAT handover without appreciably lengthening the handover command message." (*Id.* at 8, 3:36–40.)

### b.   Ericsson's Inter-RAT Messaging Scheme

185.   Based on the patent specification and the file history, the key limitation of Claim 10 of the '218 Patent is "deriving from the first parameter a value of second parameter pertinent to inter-network handover." (Ex. 1617 at p. 12, cl. 10.) This key claim limitation is illustrated in Figure 4 of the '218 patent below, where the first parameter is the Serving-Radio Network Temporary Identifier (S-RNTI 2) of information element 4-2, and the second parameter, which is derived from the first parameter, is an information element which facilitates distribution of load and transmission of traffic in the radio access network (*e.g.*, a Default DPCH Offset Value).  (*See id.* at 10, 8:28–34.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



186.   According to the '218 Patent, "the second parameter (P2, *e.g.*, the Default DPCH Offset Value) is derived from the first parameter (P1, *e.g.*, S-RNTI 2) using the Expression P2=(P1 mod C1)*C2, wherein C1 is a first constant and C2 is a second constant."   (Ex. 1617 at p. 10, 8:40-43.)

187.   This key claim limitation corresponds to the following key accused features in the 2G, 3G, and 4G standards:  UE transmits measurement report and receives handover command message to obtain first parameter from which to derive the value of a second parameter, namely, the default DPCH offset value.  (Ex. 1639 at p. 471; Ex. 1639 at p. 476; Ex. 1639 at p. 482.)

        *c.*     *Ericsson's Inter-RAT Handover Messaging Scheme Is at Best Marginally Important to 2G, 3G, and 4G.*

188.   I assigned an Importance Rank "3" to Ericsson's patent family P14596, meaning that the key feature is, at best, of marginal technical value or importance to the 2G, 3G, and 4G standards.  Before introduction of the key feature, the 3GPP TS 25.331 standard allowed either having the DPCH offset value of zero or explicitly including a different value in a handover command message.  (*See* Ex. 1613 at p. 205.)  In other words, the key feature relates to deducing the DPCH offset value

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   from another transmitted parameter without direct transmission of the DPCH offset

2   value itself.  Using an explicit value that is included in a handover command

3   message was well-known and could provide additional flexibility at the relatively

4   small expense of including only nine additional bits in the message.  There are at

5   least 109 bits associated with mandatory Information Elements (IEs) of a handover

6   command message used in 2G, 3G, and 4G standards.  (*See* Ex. 1614 at pp. 546–

7   548.)  In addition, there are even a larger number of bits associated with IEs that are

8   optional.  So, nine additional bits represent a negligibly small number of additional

9   bits that could be transmitted to maintain flexibility even if the key feature were

10  removed.  Accordingly, the Importance of Ericsson's inter-RAT handover

11  messaging scheme to the 2G, 3G, and 4G standards is marginal at best and,

12  therefore, I assigned it an Importance Rank of "3."

13          3.      Patent Family P33108 Is Moderately Important to 4G.

14  189.   Ericsson alleges that the P33108 patent family is essential to 4G.

15  Through its claim chart, Ericsson attempts to map the limitations of Claim 1 of U.S.

16  Patent No. 8,582,518 ("the '518 Patent") to the sections of the 4G LTE standard

17  shown below.  (*See, e.g.*, Ex. 1360.)

18      •   3GPP TS 36.213 v. 10.12.0 §§ 5.1.2.1, 10.1.1; and

19      •   3GPP TS 36.331 v. 10.12.0 § 6.3.2.

20          a.      *Tutorial on PUCCH Power Control*

21  190.   The P33108 Family relates to PUCCH (Physical Uplink Control

22  CHannel) uplink power control.  (*See generally* Ex. 1639 at p. 1336.)  "Uplink

23  power control for LTE is the set of algorithms and tools by which the transmit

24  powers for different uplink physical channels and signals are controlled to ensure

25  that they, to the extent possible, are received with sufficient power . . . ."  (Ex. 1416

26  at p. 31.)  As illustrated in Figure 24 below, this means that the transmission should

27  be received with sufficient power to allow for proper demodulation of the

28  corresponding information, but the transmit power should also not be unnecessarily

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

high, as that would cause interference to other transmissions in the same or other cells.  (*Id.*)



**FIGURE 24 (PDX 76)**

191.   In LTE, the PUCCH is an uplink control channel used by the UE to send hybrid ARQ (HARQ) acknowledgments, indicating to the base station whether downlink transport blocks were successfully received or not; to send channel-state reports (*e.g.*, CQI reports) aiding downlink channel-dependent scheduling; and for requesting resources for transmitting uplink data.  (Ex. 1416 at p. 159.)  Ericsson's purported invention relates to a scheme for controlling the transmission power for the PUCCH channel.

> b.   *Ericsson's PUCCH Power Control Scheme*

192.   Based on the patent specification and the file history, the key limitations of Claim 1 of the '518 Patent are "instructing the UE to apply a value for

$h(n_{CQI}, n_{HARQ})$ that depends on $n_{HARQ}$ according to the following linear function of $n_{HARQ}$ as a value for $h(n_{CQI}, n_{HARQ})$:  $h(n_{CQI}, n_{HARQ}) = (n_{HARQ} / \alpha) + \beta$, wherein '$\alpha$' is a non-zero integer constant and $|\beta| < 1$"; and "wherein $h(n_{CQI}, n_{HARQ})$ is a first power control parameter based on the PUCCH format and affecting the transmit power of the PUCCH signal."  This equation for $h(n_{CQI}, n_{HARQ})$ is depicted in Figure 25 below:

$$h(n_{CQI}, n_{HARQ}) = \frac{n_{HARQ}}{\alpha} + \beta,$$

Non-zero integer

Absolute value < 1.0

**FIGURE 25**

193.   These key claim limitations correspond to the following key accused feature in the 4G LTE standard:  A specific formula for one variable in the power control function for PUCCH format 1b[6] and format 3, wherein the variable has a linear dependence on the number of HARQ bits scaled by a non-zero integer and added to a number with an absolute value less than one.  This key accused feature corresponds to the section of the accused 4G standard shown below.[7]

---

[6] Format 1b is relevant only under some conditions.

[7] For brevity, only the case of Format 3 is shown.  The relevant instances of Format 1b are not shown here.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

○ For PUCCH format 3

■ If the UE is configured by higher layers to transmit PUCCH on two antenna ports, or if the UE transmits more than 11 bits of HARQ-ACK/SR

$$h(n_{CQI}, n_{HARQ}, n_{SR}) = \frac{n_{HARQ} + n_{SR} - 1}{3}$$

■ Otherwise

$$h(n_{CQI}, n_{HARQ}, n_{SR}) = \frac{n_{HARQ} + n_{SR} - 1}{2}$$

(Ex. 1433 at p. 17.)

c.    *Ericsson's PUCCH Power Control Scheme Is Moderately Important to 4G.*

194.    I assigned an Importance Rank of "2" to Ericsson's patent family P33108, meaning that the accused technology/key feature is of moderate technical value or importance to the 4G standard.

195.    A prior version of the 4G LTE standard (*i.e.*, the version before adoption of Ericsson's purported ACK/NACK reporting scheme in LTE) used either no adjustment (h = 0) or a logarithmic function for PUCCH power control. (*See, e.g.,* Ex. 1435 at pp. 12–14.) Ericsson's PUCCH power control scheme using the linear function defined in Claim 1 of the '518 Patent purports to have an improved fit to the signal-to-noise ratio (SNR) required to achieve a desired SNR number based on the number of HARQ (ACK/NACK) bits ("the SNR target increment values"). This is illustrated in Figure 26 below. (*See, e.g.*, Ex. 1445 at p. 10.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 26**

196.   Figure 26 above illustrates how Ericsson's linear function with α = 2 and β = –0.5 (the red line) fits the PUCCH plots representing the target SNR increment values (the first three lines on the legend).  (*See* Ex. 1445 at p. 10.) Figure 26 shows that Ericsson's power control scheme (the red line) performs better than the power control scheme used in the prior version of the LTE (the blue line) for the number of ACK/NACK bits (x-axis) less than 6, but both power control schemes provide comparable fits for the number of A/N bits between about six and 11 and also equal to one (the shaded regions).  Accordingly, the importance of Ericsson's PUCCH power control scheme to the 4G LTE standard is moderate compared to the PUCCH power control scheme used in the previous standard and, therefore, I assigned it an Importance Rank of "2."

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1     4. Patent Family P38458 Is at Best Marginally Important to 3G.

2   197. Ericsson alleges that the P38458 patent family is essential to 3G.  In its

3 claim chart, Ericsson attempts to map the limitations of Claim 1 of U.S. Patent No.

4 9,100,069 ("the '069 Patent") to the following section of the 3G standard:  3GPP TS

5 25.212 v. 11.4.0 § 4.7.3E1.2.  (*See, e.g.*, Ex. 1365.)

6     *a.* *Tutorial on Channel Coding, Including Puncturing and*

7       *HS-DPCCH*

8   198. The P38458 Family relates to channel coding of control information

9 generated by a mobile terminal (UE) and in particular to a specific puncturing

10 scheme used in conjunction with using convolutional coding for control information

11 sent on the HS-DPCCH.  (*See generally* Ex. 1639 at p. 1430.)

12   199. Channel coding (or "Error Control Coding"), along with the associated

13 channel decoding, is a technique used for combating errors that occur in data

14 transmission over noisy communication channels.  The key idea is that the sender

15 "encodes" a message in an agreed-upon redundant way, referred to as "an error-

16 correcting code."  The redundancy allows the receiver to determine that certain

17 errors have occurred and to correct those errors without retransmission.  Not all

18 errors can be identified and/or corrected.  In general, the more redundancy there is

19 and the more intelligently said redundancy is used, the more errors can be identified

20 and corrected.  Of course, such improved performance in terms of the ability to

21 identify and correct errors comes at a price of more bits needing to be transmitted

22 and/or more complexity.

23   200. A convolutional code is a well-known and widely used type of error-

24 correcting code.  (*See, e.g.*, Ex. 1448.)  A convolutional code generates "parity bits"

25 to create such redundancy in the data.  It is not uncommon for the result of a

26 convolutional coder to be a number of bits M, *e.g.*, 44, while the existing channel

27 structures are not well suited to transmit said number M of bits.  However, said

28 existing channel structures may be very well suited to transmit a somewhat smaller

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   number of bits N, *e.g.*, 40.  In such cases, a procedure known as "puncturing" is also

2   applied to the encoded data (in the above example, the 44 bits) to remove some of

3   the parity bits (4 bits in the example), resulting in 40 bits (and a weaker code, *i.e.*,

4   one that is capable of correcting a smaller number of errors) that "fits well" within

5   the existing transmission capabilities.

6       201.   Such compromises are well known and have been used in the prior art,

7   including in an earlier version of the same Technical Specification TS 25.212 cited

8   for the P38458 Family.  For example, the combination of convolutional coding and

9   associated puncturing was used for HS-SCCH.  (Ex. 179 at p. 71.)  Indeed, various

10  different coding schemes (some including puncturing, others not needing it) are used

11  in a variety of channels as detailed in a large number of sections of the relevant TS

12  25.212 standard.  (*See, e.g.*, *id.* at 10-72, §§ 4.2, 4.5, 4.6, 4.7, 4.8, 4.9, 4.10 (each

13  covering one or more coding schemes used in one or more channels).)  One such

14  channel is the HS-DPCCH.

15      202.   Specifically, HS-DPCCH is a control channel used for carrying uplink

16  control information in conjunction with using High Speed Downlink Packet Access

17  ("HSDPA"), which is an extension for enhanced downlink-data performance

18  provided in an enhanced version (Release 5) of 3GPP.  (Ex. 1451 at pp. 136–183.)

19  A key characteristic of HSDPA is the use of *Shared-Channel Transmission*.  (*Id.* at

20  137.)  The basic HS-DSCH structure is illustrated in the figure below.  The use of

21  shared-channel transmission implemented through the *High-Speed Downlink Shared*

22  *Channel* (HS-DSCH) enables the possibility of rapidly allocating a large fraction of

23  the downlink resources for transmission of data to a specific user.  (*Id.*)  As shown

24  in the figure below, downlink data for different users (User #1, User #2, User #3,

25  User #4) are allocated or scheduled with different channelization codes on 2-ms

26  Transmission Time Intervals (TTIs).

27

28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 8.1  Time- and code-domain structure for HS-DSCH.**

(Ex. 1451 at p. 138.)

203.   For the operation of HS-DSCH, the UE needs to send to the base station various types of information, including CQI reports for indicating instantaneous downlink channel conditions at the UE, and such control information is carried on the uplink *High-Speed Dedicated Physical Control Channel* (HS-DPCCH).  (Ex. 1381 at p. 23, 5:52–59.)

204.   The details of the coding schemes used for the HS-DPCCH, including the puncturing schemes, are detailed in one of the above-mentioned Section 4.7, titled "Coding for HS-DPCCH."  (Ex. 1379 at p. 98–134.)

205.   Figure 6 of the '069 Patent below illustrates a puncturing pattern purportedly created using a puncturing scheme from a previous version of the 3G standard (3GPP TS 25.212 v. 10.2.0).  In this example, the boxes marked with "X" represent punctured parity symbols.

FIG. 6

b.   *Ericsson's Puncturing Scheme*

206.   Based on the patent specification and the file history, the key limitation of Claim 1 of the '069 Patent is "the predefined puncturing pattern is rotationally

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1  symmetric puncturing pattern, wherein for each bit n included in the puncturing

2  pattern there exists another bit n' that is also included in the puncturing pattern,

3  wherein n' = N + 1 − n, where N is the bit length of Z1."  This limitation was the

4  only novel aspect of Claim 1.  (*See* Ex. 1380 at pp. 188–199 (rejecting the claims

5  that did not contain the specific puncturing pattern); *see also* pp. 218–221.)

6     207.   The claimed symmetric puncturing pattern is illustrated in Figure 7 of

7  the 'US 069 Patent reproduced below:

8
9
10



FIG. 7

13     208.   Through its claim chart, Ericsson attempts to map this key claim

14  limitation to the portion of the accused 3G standard shown below.

15  **4.7.3E1.2.7 Rate matching for composite number of transport blocks**
16  **preferred, precoding control indication and channel quality**
17  **indication bits**

18  In case a type A CQI needs to be reported, from the input sequence $d_0, d_1, \ldots, d_{43}$ the bits $d_0, d_2, d_{41}, d_{43}$ are punctured to obtain the output sequence $b_0, b_1, \ldots, b_{39}$.

19
20  (*See, e.g.*, Ex. 1365 at p. 4; Ex. 1379 at p. 117.)

21     209.   As explained in the relevant Appendix to my opening report (*See*, e.g.

22  Ex. 1639 at p. 1430.), however, I determined the Essentiality Rank for Claim 1 of

23  the '069 Patent to be "3," meaning the claim is ***not essential*** to the 3G standard

24  under any reasonable claim construction.  This is because Ericsson's claim chart

25  cites to a specific way of generating the correct 40-bit output sequence in the

26  standard, but there are other ways to generate the 40-bit sequence that would comply

27  with the standard without employing the claimed steps.  Thus, under ETSI's

28  definition of "ESSENTIAL," the claim is not essential.  (*See* Ex. 223 at p. 7.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

c. *Ericsson's Puncturing Scheme Is at Best Marginally Important to 3G.*

210.   Even if Claim 1 is assumed to be essential to the accused 3G standard (which it is not), I assigned an Importance Rank of "3" to Ericsson's patent family P38458, meaning that the key accused feature (*i.e.*, the symmetric puncturing pattern) is, at best, of marginal technical value or importance to the 3G standard. The accused symmetric puncturing pattern is only used in one of a plethora of coding options for the HS-DPCCH.  (Ex. 1379 at pp. 98–112.)  Many of those coding options do not employ the claimed convolutional encoding and/or the symmetric puncturing pattern.  In particular, the claimed symmetric puncturing pattern is at best relevant to "Type A" within subsection 4.7.3E1.2.7.  As shown below, however, in the very ***same subsection***, a "Type B" coding scheme uses a puncturing pattern that does not meet the claimed symmetric puncturing pattern.

4.7.3E1.2.7 Rate matching for composite number of transport blocks preferred, precoding control indication and channel quality indication bits

In case a type A CQI needs to be reported, from the input sequence $d_0, d_1, ..., d_{43}$ the bits $d_0, d_2, d_{41}, d_{43}$ are punctured to obtain the output sequence $b_0, b_1, ..., b_{39}$.

In case a type B CQI needs to be reported, from the input sequence $d_0, d_1, ..., d_{50}$ the bits $d_0, d_2, d_3, d_4, d_6, d_{44}, d_{45}, d_{46}, d_{47}, d_{48}, d_{50}$ are punctured to obtain the output sequence $b_0, b_1, ..., b_{39}$.

(Ex. 1379 at p. 117.)

211.   The Type A coding scheme takes 44 bits (*i.e.*, $d_0, d_1, ..., d_{43}$) and punctures four bits (*i.e.*, $d_0, d_3, d_{41}, d_{43}$) to obtain the ***symmetric*** puncturing pattern illustrated in Figure 9 of the '069 Patent below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

FIG. 9

212.   The Type B coding scheme, on the other hand, takes 51 bits (*i.e.*, $d_0$, $d_1$, ..., $d_{50}$) and punctures 11 bits (*i.e.*, $d_0$, $d_2$, $d_3$, $d_4$, $d_6$, $d_{44}$, $d_{45}$, $d_{46}$, $d_{47}$, $d_{48}$, $d_{50}$) to obtain the non-symmetric puncturing pattern illustrated in Figure 27 below:



**FIGURE 27: Type B Puncturing Scheme**

213.   In sum, the accused 3G standard discloses other well-known non-symmetric puncturing schemes with performance comparable to that of the key accused feature.   Accordingly, the key accused feature (*i.e.*, the symmetric puncturing pattern) is at best of marginal technical value or importance to the 3G standard and, therefore, I assigned it an Importance Rank of "3."

     5.   Importance Analysis Results

214.   Figure 28 below illustrates the breakdown of the Importance Ranks for all family/standard pairs Ericsson considers essential to the 2G, 3G, and 4G standards, including expired patents.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

**Importance Ranks for 2G, 3G, and 4G Family/Standard Pairs**



**FIGURE 28 (PDX 77)**

17    215.   Figure 29 below illustrates the breakdown of the Importance Ranks for

18  all family/standard pairs Ericsson considers essential to the 2G standard, including

19  expired patents.

20

21

22

23

24

25

26

27

28



**FIGURE 29 (PDX 78)**

216.   Figure 30 below illustrates the breakdown of the Importance Ranks for all family/standard pairs Ericsson considers essential to the 3G standard, including expired patents.



**FIGURE 30 (PDX 79)**

217.   Figure 31 below illustrates the breakdown of the Importance Ranks for all family/standard pairs Ericsson considers essential to the 4G standard, including expired patents.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Importance Ranks for 4G Family/Standard Pairs**

**FIGURE 31 (PDX 80)**

D.    <u>Contribution Analysis of Ericsson's Alleged SEPs</u>

218.   For any patent family that I gave an Essentiality Rank of "1" or "2," I also analyzed the contribution of the key accused feature to the 2G, 3G or 4G standard relative to available alternatives.  In this section, I provide a number of examples of my Contribution analysis to help illustrate how the Contribution metric was determined, and also to provide examples of the rankings.  I then provide a summary of the results of the analysis.  Here I provide, by way of example, my analysis for Ericsson's P08153_3G, P31988_4G, P23893_4G, P33108_4G, P25336_3G, and P28747_4G Family/Standard pairs.  The analysis for the remaining family/standard pairs is contained in the Appendices attached hereto as Exhibit 1639.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1.   <u>Patent Family P08153 Provides No Improvement to 3G Relative to Available Alternatives.</u>

219.   Ericsson alleges that the P08153 patent family is essential to 3G.  In its claim chart, Ericsson attempts to map the limitations of Claim 9 of U.S. Patent No. 6,073,005 ("the '005 Patent") to the sections of the 3G standard below.  (*See, e.g.*, Ex. 1363.)

- 3GPP TS 22.101 v. 9.0.0 §§ 10.1, 10.1.1;
- 3GPP TS 24.008 v. 9.0.0 § 4.4.4.6; and
- 3GPP TS 25.331 v. 9.0.0 § 8.1.1.5, 10.3.1.11.

a.   *Ericsson's Emergency Calling Scheme*

220.   The P08153 Family relates to emergency calling procedures.  (*See generally* Ex. 1639 at p. 131.)  As discussed in the '005 Patent, the best known emergency number in the United States is 9-1-1, but there are other emergency numbers in different regions in the United States and in other countries.  (Ex. 1422 at p. 8, 4:59–5:5.)  The US '005 Patent alleges that it would be desirable for ***the mobile terminal*** to evaluate a dialed number input by user (*e.g.*, 9-1-1) to identify emergency call placement and make the emergency call even while the user is in a region or country where a different emergency number is used.  (*See id.* at 9, 5:18-27.)  The P08153 Family purportedly addresses this problem with a specific emergency calling scheme.

221.   Based on the patent specification and the file history, the key limitation of Claim 9 of the '518 Patent is "comparing a dialed number with emergency call numbers stored in a group in said [radio communication] data base [of emergency call numbers, wherein said emergency call numbers are grouped by country] associated with said received identification [of a country in which said radio communication device is currently operating]...."  (*See* Ex. 1422 at p. 10, cl. 9.)  This key claim limitation corresponds to the following key accused feature in the 3G standard:  Recognition of an emergency number by the mobile handset and placing

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

the emergency call.  This key accused feature corresponds to the portion of the accused 3G standard shown below.

**10    Emergency Calls**
**10.1    General requirements**
**10.1.1    Identification of emergency numbers**
The ME shall identify an emergency number dialed by the end user as a valid emergency number and initiate emergency call establishment if it occurs under one or more of the following conditions. [...]
a)  112 and 911 shall always be available. These numbers shall be stored on the ME.
b)  Any emergency call number stored on a SIM/USIM when the SIM/USIM is present.
c)  000, 08, 110, 999, 118 and 119 when a SIM/USIM is not present. These numbers shall be stored on the ME.
d)  Additional emergency call numbers that may have been downloaded by the serving network when the SIM/USIM is present.

(Ex. 1576. at pp. 18–19.)

222.   Ericsson's emergency calling scheme is illustrated by way of example in Figure 32 and Figure 33 below:




**FIGURE 32: First Illustration of Ericsson's Emergency Calling Scheme (PDX 81)**

223.   By way of example, suppose a user who resides the United States, where the emergency number is 9-1-1, travels to the UK, where the emergency number is 9-9-9.  (*See* Ex. 1422 at p. 9, 5:18–21.)  According to the P08153 Family, the user's Mobile Terminal includes a database or look-up table for storing the

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

emergency call numbers and information about the corresponding countries.  (*See id.* at 9, 5:6–13.)  The ***mobile terminal*** can also determine its current location (*e.g.*, the UK) by reading the country code sent on a broadcast channel of the cellular network in which it is operating.  (*See id.* at 9, 5:28–30.)

224.   Figure 33 below illustrates how emergency calls are made under Ericsson's scheme.  When the user inputs a number, the mobile terminal can compare that number with the emergency number from the user's home country (*e.g.*, 9-1-1) and, if a match is found, the mobile terminal uses the current country code where the user is located to index the mobile terminal's database or look-up table and substitute the correct emergency number (*e.g.*, 9-9-9) based on the user's location.  (*See id.* at 9, 5:39–53.)  The call is then made using the substituted emergency number.



**FIGURE 33: Second Illustration of Ericsson's Emergency Calling Scheme (PDX 82)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

   b.   *Ericsson's Emergency Calling Scheme Provides No Improvement to 3G Relative to Available Alternatives.*

225.   I assigned a Contribution Rank of "4" to Ericsson's patent family P08153, meaning that the key accused feature corresponding to Ericsson's emergency calling control scheme provides no improvement to the 3G standard relative to available alternatives.

226.   For example, U.S. Patent No. 5,602,901 assigned to Motorola ("the Motorola Patent") discloses an emergency calling scheme involving receiving information regarding mobile terminal, and determining, based on that location, what emergency number to dial.  (Ex. 1421.)

227.   Under Motorola's alternative emergency calling scheme, the emergency number is determined at ***the network*** rather than at the mobile terminal. Here, the emergency call numbers are stored on the network side, for example, in the data storage means 166 of the emergency service unit 160, as shown in Figure 3 of the Motorola Patent below.



228.   To store an emergency call number database on the network rather than locally on the mobile terminal is a highly viable and modular alternative solution. The only difference from Ericsson's solution is the location of the emergency call number database/look-up table.  In fact, storing the emergency call number database

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

on the network is advantageous because doing so allows for greater flexibility.  For example, emergency call numbers can be easily changed/updated.  Accordingly, the key feature provides no net improvement to the 3G standard compared to Motorola's alternative solution and, therefore, I assigned it a Contribution Rank of "4."

2.  Patent Family P31988 Provides No Improvement to 4G Relative to Available Alternatives.

229.   Ericsson alleges that the P31988 patent family is essential to 4G.  In its claim chart, Ericsson attempts to map the limitations of Claim 27 of U.S. Patent No. 8,965,414 ("the '414 Patent") to the sections of the 4G LTE standard shown below. (*See, e.g.*, Ex. 1427.)

- 3GPP TS 36.331 v. 10.16.0 §§ 5.5.1, 5.5.7.1, 6.2.2, 6.3.5, 6.5.1.1 6.5.1.2;

- 3GPP TS 36.355 v. 10.12.0 §§ 3.1, 5.2.1, 5.3.1;

- 3GPP TS 36.133 v. 10.18.0 § 8.1.2.1; and

- 3GPP TS 36.305 v. 10.5.0 § 7.1.2.5.

a.  *Tutorial on OTDOA and Inter-Frequency Measurements of Position Reference Signals*

230.   The P31988 Family generally relates to a way of determining a mobile terminal's location in a 4G LTE network, called "Observed Time Difference of Arrival" (OTDOA) standardized by 3GPP and more specifically to inter-frequency measurements of position reference signals in OTDOA.  (*See generally* Ex. 1639 at p. 1287.)

231.   As described in the Background of the '414 Patent, with OTDOA, a mobile terminal measures the timing differences for downlink references signals received from multiple distinct locations (*e.g.*, base stations).  (Ex. 1425 at p. 12, 3:24–29.)  For each measured neighbor cell, the mobile terminal (UE) measures a Reference Signal Time Difference (RSTD), which is the relative timing difference

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

between a neighbor cell and the reference cell.  The UE measures the timing of the received downlink reference signals using assistance data received from a Location Services (LCS) server, and the resulting measurements are used to locate the UE in relation to the neighboring cells.

232.   As illustrated in Figure 3 of the '414 Patent below, the UE's position estimate is found as the intersection 430 of hyperbolas 440 corresponding to the measured RSTDs.  (*See* Ex. 1425 at p. 12 , 3:51–58.)



Fig. 3

233.   The RSTD measurement is of two types:  (1) an intra-frequency RSTD measurement and (2) an inter-frequency RSTD measurement.  The inter-frequency RSTD measurement is performed when at least one of the reference cell *i* and the neighbor cell *j* is on a different carrier frequency as the cell serving the mobile terminal.  (*See* Ex. 1425 at p. 12 4:37–48; p. 14, 8:49–54.)  Ericsson's purported invention is directed to a specific way to perform the inter-frequency RSTD

1  measurement for OTDOA.

2           *b.*     *Ericsson's OTDOA Inter-Frequency Measurement Scheme*

3                *and the Accused Feature in the Standard.*

4     234.  Based on the patent specification and the file history, the key limitation

5  of Claim 27 of the '414 Patent is "wherein said transmitted indication includes

6  ***information about timing of occurrence of reference signals*** to be used for said

7  inter-frequency measurement." This limitation is illustrated in Figure 34 below:



**FIGURE 34: Illustration of the Key Claim Limitation (PDX 83)**

23     235.  Through its claim chart, Ericsson attempts to maps this key claim

24  limitation to the following key accused feature in the 4G standard:  Configuring

25  measurement gaps for performing inter-frequency measurements.  This key accused

26  feature corresponds to the portion of the accused 4G standard shown below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

> **measPRS-Offset**
> Indicates the requested gap offset for performing inter-frequency RSTD measurements. It is the smallest subframe-offset from the beginning of subframe 0 of SFN=0 of the serving cell of the requested gap for measuring PRS positioning occasions in the carrier frequency *carrierFreq* for which the UE needs to perform the inter-frequency RSTD measurements. The PRS positioning occasion information is received from upper layers. The value of *measPRS-Offset* is obtained by mapping the starting subframe of the PRS positioning occasion in the measured cell onto the corresponding subframe in the serving cell and is calculated as the serving cell's number of subframes from SFN=0 mod 40.
> The UE shall take into account any additional time required by the UE to start PRS measurements on the other carrier when it does this mapping for determining the *measPRS-Offset*.
> NOTE:   Figure 6.2.2-1 illustrates the *measPRS-Offset* field.

(Ex. 1440 at p. 118.)

236.   For the reasons set forth in Appendix to my opening report, the Essentiality Rank for Claim 27 is "2," meaning the claim is **not essential** to the 4G standard under a proper construction.  (Ex. 1639 at p. 1287.)  In particular, the phrase "wherein said transmitted indication includes **information about timing of occurrence of reference signals** to be used for said inter-frequency measurement," when construed properly in view of the ordinary meaning of the phrase and the prosecution history of the '414 Patent, does not correspond to the accused feature in the 4G standard discussed above—*i.e.*, the UE transmitting information "related" to reference signals, *i.e.*, measPRS-Offset, which specifies a requested gap offset so that the UE has time to perform inter-frequency RSTD measurements.

> c.    *The Accused Key Feature Provides No Improvement to 4G Relative to Available Alternatives.*

237.   Even if the key claim limitation is assumed to correspond to the key accused feature in the 4G standard (which it does not), I assigned a Contribution Rank of "4" to Ericsson's patent family P31988, meaning that the key accused feature provides no improvement to the 4G standard relative to available alternatives.

238.   For example, TDoc R2-111144 indicates that the 3GPP working group considered three alterative solutions regarding what other information to include in the message *InterFreqRSTDMeasurementIndication*.  (Ex. 1424 at p. 1.)

239.   Section 2.1 of this TDoc discusses such alternatives, where "Alt 1" and "Alt 2a" are non-infringing alternatives, even under Ericsson's interpretation of the claim.  For example, as shown below, "Alt 1" describes that the eNB can be relied upon to make a gap offset decision itself, and "Alt 2a" provides information regarding "frequency(ies).

**2.1. Do we want to include other information in *InterFreqRSTDMeasurementIndication* message?**

As eNB doesn't know which frequencies the UE needs to measure, i.e. it doesn't know the PRS locations, the eNB could not decide an appropriate measurement gap offset. So the UE may need to provide some more information to the eNB to assist it to decide the gap offset. The following alternatives could be considered:

- Alt 1: No additional information. It means eNB can make the decision of the gap offset itself, i.e. by network implementation.
- Alt 2: UE provides additional information.
  - Alt 2a: Frequency(ies) is provided.
    - If so, how many frequencies? 1 or 3?
  - Alt 2b: PRS offsets are provided.
    - If so, how many offsets? 1 or 3?
    - The range of PRS offset: [0..39] or [0..1279]?
- Other alternative?

*ALTERNATIVE*
Alt 2a: Frequency(ies) is provided.

Alt 2b: PRS offsets are provided.

(Ex. 1424 at p. 1.)

240.   Although it appears "Alt 1" did not have much support, the opinions were evenly divided between "Alt 2a" and "Alt 2b."  (*See id.* at 1–2.)  Moreover, as shown below, although "Alt 2b" (inclusion of PRS offset information) was eventually adopted, ***Ericsson***, Nokia (NSN), and Alcatel-Lucent (ALU) preferred "Alt 2a" to "Alt 2b," while CATT and Huawei found "Alt 2a" to be an acceptable alternative solution.

Summary: some companies prefer Alt2a, but some companies prefer Alt2b. After some offline discussion, companies' opinion could be summarized as below:

| Company name | Alt1 | Alt2a | Alt2b |
|---|---|---|---|
| CATT | Not preferred | Acceptable | Preferred |
| Huawei | Not preferred | Acceptable | Preferred |
| Qualcomm | Not preferred | Not preferred | Preferred |
| Samsung | Not preferred | Not preferred | Preferred |
| NSN | Not preferred | Preferred | Not preferred |
| Ericsson, ST Ericsson | Not preferred | Preferred | Not preferred |
| ALU | Not preferred | Preferred | Not preferred |

Whether we could have Alt2a solution?

(*See id.* at 3.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

241.   In particular, as shown below, Ericsson agreed with Nokia and Alcatel-Lucent that the "Alt 2a" solution of ***sending frequency information*** was better than the "Alb 2b" solution that was adopted.

**3GPP Working Group Discussion**



Ericsson, ST
Ericsson

However, if this approach is not considered sufficient, i.e. support for more (inter-)frequencies is required in Rel-10 deployments, we would agree with NSN that the gap offsets for frequencies are an eNB/NW internal decision and hence an indication including a frequency, or a set of frequencies is preferred. This would also simplify the UE behavior.

(Ex. 1424 at p. 2.)

242.   In view of the above, the key accused feature, which corresponds to "Alt 2b," provides no improvement to the 4G standard compared to "Alt 2a," which is a non-infringing alternative preferred by Ericsson, Nokia, and Alcatel-Lucent, and found to be an acceptable alternative by CATT and Huawei and I, therefore, I assigned it a Contribution Rank of "4."

### 3. Patent Family P23893 Provides No Improvement to 4G Relative to Available Alternatives.

243.   Ericsson alleges that the P23893 patent family is essential to 4G.  In its claim chart, Ericsson attempts to map the limitations of Claim 1 of U.S. Patent No. 8,134,940 ("the '940 Patent") to the sections of the 4G LTE standard below.  (*See, e.g.*, Ex. 1429 at pp. 327–337.)

- 3GPP TS 36.201 v. 8.3.0 § 4.2.1;
- 3GPP TS 36.321 v. 8.5.0 §§ 5.3.2.1, 5.3.2.2;
- 3GPP TS 36.213 v. 8.8.0 § 10.1;
- 3GPP TS 36.331 v. 8.16.0 §§ 5.2.1.2, 6.2.2; and
- 3GPP TS 36.211 v. 8.9.0 §§ 4, 4.2.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

*a.*     *Tutorial on ACK/NACK Feedback Reporting*

244.   The P23893 Family relates to ACK/NACK feedback reporting in the
Time Division Duplex (TDD) mode of LTE ("TDD-LTE").  (*See generally* Ex.
1639 at p. 788.)  In LTE, a predefined radio frame of 10 ms is divided into ten sub-
frames of 1 ms duration each.  (*See* Ex. 1444 at p. 6, 2:4–6.)  In TDD-LTE, there are
in total ten downlink ("DL")[8] and uplink ("UL")[9] sub-frames available for data
transmission during one radio frame, which can thus be transmitted only one at a
time on a common frequency band F.  (*Id.* at 6, 2:11–14.)  DL and UL transmissions
can be configured in TDD on a cell basis depending on the traffic demands in either
direction.  For example, the '940 Patent suggests that the UL/DL allocation can be
configured to eight DL sub-frames and two UL sub-frames during one radio frame,
as illustrated in Figure 35 below.  (*Id.* at 6, 2:22–28.)



**FIGURE 35 (PDX 84)**

---

[8] "Downlink" or DL refers a communication link or channel for transmitting
information from a base station to a mobile terminal or User Equipment ("UE").

[9] "Uplink" or UL refers a communication link or channel for transmitting
information from a UE to a base station.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

245.   Data blocks are transmitted in the UL and DL sub-frames.  For example, a base station can transmit data blocks to UEs in each sub-frame, and a UE can be assigned resources for a data block in DL sub-frames.  (Ex. 1444 at p. 6, 2:22–28.)  Further, UEs can transmit data blocks in assigned resources in UL sub-frames to the base station.  (*Id.* at 6, 2:1–3.)

246.   A data-receiving party (UE or base station) sends feedback reports to indicate whether or not it has correctly received data blocks in assigned sub-frames.  (*Id.* at 7, 3:1–3.)  For example, if a data block is received correctly in an assigned sub-frame, the data-receiving party sends an acknowledgment "ACK," and if the data block contained errors, it sends a negative acknowledgment "NACK."  (*Id.*)

247.   Figure 2 of the '940 Patent (annotated version reproduced below) shows a prior-art ACK/NACK reporting scheme, where an asymmetric connection is configured with eight successive DL sub-frames (**0–7**) followed by two UL sub-frames (**8–9**).  In this example, the minimum delay period needed for processing is assumed to be one sub-frame.  Under this assumption, feedback reports for data received in sub-frames **0–6** are all transmitted in sub-frame **8** and the feedback report for sub-frame **7** is transmitted in sub-frame **9** (due to the one sub-frame delay period).  (*Id.* at 8, 5:3–13.)



**Figure 2 of the '940 Patent (PDX 132)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

248.   According to the '940 Patent, this prior-art ACK/NACK reporting scheme allegedly requires a more complex channel structure to handle a great number of feedback reports (*i.e.*, ACK/NACK messages) in a single sub-frame and allow a single terminal to transmit feedback reports for multiple DL sub-frames, as is done in sub-frame **8** above.  (Ex. 1444 at p. 8, 5:14–18.)

b.   *Ericsson's ACK/NACK Reporting Scheme*

249.   Based on the patent specification and the file history, the key limitation of Claim 1 of the '940 Patent is "scheduling feedback reports in available transmit (TX) sub-frames according to a predetermined spreading rule also known by the data sending party, dictating that the feedback reports are spread out or distributed evenly over the available TX sub-frames."  This key claim limitation is illustrated in Figure 36 below:



**FIGURE 36 (PDX 130)**

250.   This key claim limitation corresponds to the following key accused feature in the 4G LTE standard:  Dictating that ACK/NACK feedback reports are spread out or distributed evenly over the available UL sub-frames in TDD-LTE. This key accused feature corresponds to the portion of the accused 4G standard shown below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

**Table 10.1-1: Downlink association set index** $K: \{k_0, k_1, \cdots k_{M-1}\}$ **for TDD**

| UL-DL Configuration | Subframe $n$ | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 0 | - | - | 6 | - | 4 | - | - | 6 | - | 4 |
| 1 | - | - | 7, 6 | 4 | - | - | - | 7, 6 | 4 | - |
| 2 | - | - | 8, 7, 4, 6 | - | - | - | - | 8, 7, 4, 6 | - | - |
| 3 | - | - | 7, 6, 11 | 6, 5 | 5, 4 | - | - | - | - | - |
| 4 | - | - | 12, 8, 7, 11 | 6, 5, 4, 7 | - | - | - | - | - | - |
| 5 | - | - | 13, 12, 9, 8, 7, 5, 4, 11, 6 | - | - | - | - | - | - | - |
| 6 | - | - | 7 | 7 | 5 | - | - | 7 | 7 | |

(Ex. 1434 at p. 72, Table 10.1-1.)

   *c.* *Ericsson's ACK/NACK Feedback Reporting Scheme Provides No Improvement to 4G Relative to Available Alternatives.*

  251. As discussed in Section V.D.2 above, the key accused feature in the 4G LTE standard corresponding to the key limitation of Claim 1 of the '940 Patent is the even distribution of the ACK/NACK feedback reports over the available UL sub-frames in TDD-LTE. (*Id.* at 72.) An example of evenly distributing ACK/NACK Reports according to the '940 Patent is shown below in Figure 37. (*See* Ex. 1444 at p. 3, Fig. 3.)



**FIGURE 37: Even Distribution of ACK/NACK Feedback Reports (PDX 131)**

  252. I assigned a Contribution Rank of "4" to Ericsson's patent family P23893, meaning that the key accused feature corresponding to Ericsson's

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

ACK/NACK feedback reporting scheme provides no improvement to the 4G standard relative to available alternatives.  I discuss below two non-infringing alternative solutions—(1) a first solution that supported the Contribution Rank "4" (no improvement), and (2) a second solution that supported the Contribution Rank of "3" (marginal improvement).

253.   The first non-infringing alternative supporting the Contribution Rank of "4" is an admitted-prior-art solution of uneven distribution or spreading of ACK/NACK feedback reports, which is illustrated in Figure 38 below (an annotated version of Figure 2 of the '940 Patent) and described in its related text reproduced below.



**FIGURE 38: First Admitted Prior Art Solution (PDX 132)**

In FIG. **2**, this is illustrated by means of an example where an asymmetric connection is configured with eight successive downlink sub-frames (sub-frame **0-7**) followed by two uplink sub-frames (sub-frame **8-9**). In this example, the minimum delay period needed for processing is specified as one sub-frame. Following the obvious timing solution above, feed-back reports for data received in sub-frames **0-6** will all be transmitted in sub-frame **8** and the feedback report for sub-frame **7** will be transmitted in sub-frame **9** after the necessary one sub-frame minimum delay, as illustrated by dashed arrows.

(*See* Ex.1444 at p. 8, 5:3–13.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

254.   Using this first admitted-prior-art solution has the advantage of the mobile terminal (UE) being able to send more ACK/NACK reports to the base station sooner, thus freeing up data slots or sub-frames later on the frame.   On the other hand, sending a large number of feedback reports in a single sub-frame would leave less resources for data transmission in that sub-frame, potentially delaying the uplink data until the next sub-frame, and could require increased transmit power and/or feedback resources.   In any case, the average data transmission rate over the two sub-frames would be the same.   Accordingly, Ericsson's ACK/NACK reporting scheme, on balance, is of equal utility to this admitted-prior-art ACK/NACK feedback reporting solution, and thus provides no improvement to the 4G standard relative to this solution.

255.   The second non-infringing alternative, supporting the Contribution Rank of "3," is another admitted-prior-art solution of using a fixed, equal number of downlink slots before each single uplink slot, which is illustrated in Figure 39 below (based on Figure 1b of the '940 Patent).



**FIGURE 39: Second Admitted Prior Art Solution (PDX 85)**

256.   This admitted-prior-art solution would advantageously result in less latency in the ACK (since the UE would not need to wait more than 4 sub-frames before sending the ACK/NACK), but would have the disadvantage of more frequent switching between uplink and downlink slots.   This is less efficient because every

1   switch between DL and UL subframes needs to be accompanied by a guard period,

2   during which no data can be sent. Accordingly, Ericsson's ACK/NACK feedback

3   reporting scheme, on balance, provides only a marginal improvement to the 4G

4   standard relative to this second admitted-prior art solution and, therefore, I assigned

5   it a Contribution Rank of "3."

6           4.      Patent Family P33108 Provides No Improvement to 4G Relative

7                   to Available Alternatives.

8   257.   The P33108 Family relates to uplink power control for the PUCCH.

9   (*See generally* Ex. 1639 at p. 1336.) This family was provided as an example of

10  Importance Analysis in Section V.C.3 above. The tutorial on PUCCH power

11  control and Ericsson's specific scheme related to the same, as set forth above,

12  provide context for the following Contribution Analysis for P33108.

13  258.   The key accused feature for P33108 is a specific formula for one

14  variable—$h$ ($n_{CQI}$, $n_{HARQ}$, $n_{SR}$)—in the power control function for PUCCH format 1b

15  and format 3, where the variable has a linear dependence on the number of HARQ

16  bits scaled by a non-zero integer and added to a number with an absolute value less

17  than one. (*See* Ex. 1433; *see also* Section V.C.3, *supra*.)

18  259.   I assigned a Contribution Rank of "4" to Ericsson's patent family

19  P33108, meaning that the key accused feature corresponding to Ericsson's PUCCH

20  power control scheme provides no improvement to the 4G standard relative to

21  available alternatives. For example, CATT proposed two alternative power curve-

22  fitting methods in the form of two linear equations for the value of the h function.

23  (Ex. 1446 at p. 2.) CATT's formulas for PUCCH format 3 are shown below.

24

25  - $h\left(n_{CQI}, n_{HARQ}\right) = 0.6 n_{HARQ} - 1.64$ *for non-TxD PUCCH format 3*

26  - $h\left(n_{CQI}, n_{HARQ}\right) = 0.46 n_{HARQ} - 1.15$ *for PUCCH format 3 with SORTD*

27

28  (*Id.* at 2.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

260.   Both of CATT's formulas are non-infringing alternatives because the value of α is not a "non-zero integer" and the absolute value of β is not less than 1. This key distinction between Ericsson's formula and CATT's formulas is illustrated below:



$$h(n_{CQI}, n_{HARQ}) = \frac{n_{HARQ}}{\alpha} + \beta,$$

**Non-zero integer**          **Absolute value < 1.0**

**Ericsson's Formula (PDX 127)**

*For non-TxD PUCCH format 3:*

$$h(n_{CQI}, n_{HARQ}) = 0.6 n_{HARQ} - 1.64$$

$$0.6 = \frac{1}{1.667}$$

**|β| > 1.0**

**α is *not* a non-zero integer**

**CATT's First Formula (PDX 128)**

*For PUCCH format 3 with SORTD:*

$$h(n_{CQI}, n_{HARQ}) = 0.46 n_{HARQ} - 1.15$$

$$0.46 = \frac{1}{2.174}$$

**|β| > 1.0**

**α is *not* a non-zero integer**

**CATT's Second Formula (PDX 129)**

114

261.    CATT's two non-infringing formulas are represented as solid magenta
lines in Figure 40 and Figure 41, respectively, below:

- $h\left(n_{CQI}, n_{HARQ}\right) = 0.6 n_{HARQ} - 1.64$ *for non-TxD PUCCH format 3*



**FIGURE 40: Curve Fit for First CATT's Formula**

- $h\left(n_{CQI}, n_{HARQ}\right) = 0.46 n_{HARQ} - 1.15$ *for PUCCH format 3 with SORTD*



**FIGURE 41: Curve Fit for Second CATT's Formula**

115

262.   Figure 42 below presents a side-by-side comparison between Ericsson's and CATT's formula in terms of their abilities to fit to the target SNR values.

**Ericsson's Formula**                    **CATT's Second Formula**



**FIGURE 42: Comparison of Ericsson's and CATT's Formulas (PDX 86)**

263.   This comparison clearly demonstrates that Ericsson's formula and CATT's second non-infringing formula provide comparable fits to the target SNR values.  Accordingly, Ericsson's PUCCH uplink power control scheme provides no improvement to the 4G standard relative to CATT's non-infringing PUCCH uplink power control solution and, therefore, I assigned it a Contribution Rank of "4."

     5.   <u>Patent Family P25336 Provides No Improvement to 3G Relative to Available Alternatives.</u>

264.   Ericsson alleges that the P25336 patent family is essential to 3G.  In its claim chart, Ericsson attempts to map the limitations of Claim 1 of EP 2,238,801 ("the EP '801 Patent") to the following sections of the 3G standard:  3GPP TS 36.321 v. 8.17.0 §§ 11.8.1.9, 9.2.5.3.2, 11.8.1.6.  (*See, e.g.*, Ex. 1364.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

### a. Tutorial on E-DCH

265. The P25336 Family relates to a procedure for releasing enhanced dedicated channels (E-DCH). (*See generally* Ex. 1639 at p. 963.)

266. To facilitate effective resource utilization, the UE in a 3G network can be in several different states, including idle mode, CELL_PCH, UPA_PCH, CELL_FACH, and CELL_DCH. (Ex. 1451 at pp. 123–124.) CELL_FACH is a higher connectivity state where the UE does not have dedicated channels allocated but can send and receive small amounts of data on the Forward Access Channel ("FACH") and the Random Access Channel ("RACH"). (*Id.*) CELL_DCH is the state used for all except the smallest amounts of data exchange. (*Id.*) In the CELL_DCH state, the UE is allocated a dedicated channel and must continuously transmit and receive at least the control parts. (*Id.*)

267. E-DCH is an enhanced dedicated uplink channel in the High Speed Uplink Packet Access (HSUPA) protocol, which is an extension to 3G UMTS for fast uplink data transmissions. Use of the E-DCH in the CELL_FACH state was introduced in Release 8 of 3GPP. (*Id.* at 130.) Before then, the E-DCH was normally used in the CELL_DCH state. (*See* Ex. 1637 at ¶ 3.) In the CELL_DCH state, one separate E-DCH resource can be allocated per user. (*See id.*) In the CELL_FACH state, on the other hand, a pool of E-DCH resources ("common E-DCH resources") can be temporarily assigned to a user. (*See id.*) Ericsson's purported invention addresses how to release the E-DCH in the CELL_FACH state for a particular user so that the common E-DCH resources can be allocated to other users.

### b. Ericsson's E-DCH Release Scheme

268. Based on the patent specification and the file history, the key limitation of Claim 1 of the EP '801 Patent is "signaling (203) to the radio base station a release of a common Enhanced Dedicated Channel, E-DCH, resource on Layer 1 and Layer 2 fields used in a CELL_DCH state for other purposes." This limitation

corresponds to the following key accused feature in the 4G standard:  The UE signaling to the base station release of E-DCH in the CELL_FACH by using a specific field that is used for other purposes in the CELL_DCH state.  This key accused feature corresponds to the portions of the accused 3G standard shown below.

---

**[1] 11.8.1.9      Release of common E-DCH resources (FDD only)**

If the UE is sending CCCH data in CELL_FACH state or Idle mode, the UE shall release the common E-DCH resource under following conditions:

- the empty buffer status (TEBS = 0 byte) has been reported and no MAC-i PDU is left in a HARQ process for (re-) transmission; or

---

**[1] 11.8.1.6   Scheduling Information reporting**

[...]

In CELL_DCH state, when MAC-e or MAC-i is configured, the Scheduling Information shall not be transmitted if the TEBS is zero, even if it was triggered by one of the configured triggering mechanisms.

---

(Ex. 1367 at pp. 146–148.)

269.    This key accused feature is illustrated by way of example in Figure 43 below.  The UE in the CELL_FACH state first releases the common E-DCH resources.  According to the key feature, the UE then signals the release to the base station using a specific field that, when the UE is operating in the CELL_DCH state, is used for other purposes.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 43: Ericsson's E-DCH Release Scheme (PDX 87)**

    c.  *The Key Accused Feature Provides No Improvement to 3G*
       *Relative to Available Alternatives.*

   270. I assigned a Contribution Rank of "4" to Ericsson's patent family P25336, meaning that the key accused feature corresponding to Ericsson's E-DCH release scheme provides no improvement to the 3G standard relative to available alternatives.  For example, as shown below, Qualcomm's TDoc R2-074390 proposes a E-DCH release scheme where the ***base station***—not the UE—initiates the release decision, based on inactivity on the user's uplink channel.  The base station sends a release message to the UE, and in response, the UE releases the channel.

## 9 NodeB based Uplink Resource Release

An uplink resource release may occur, if the NodeB senses inactivity on the user's uplink channel. In that case, it will send a Layer-2 (MAC) Uplink Resource Release message to the UE. The UE will acknowledge this message via another Layer-2 message and then release the uplink channel resource.

(Ex. 1636 at p. 5.)

   271. As shown below, the EP '801 Patent describes Qualcomm's solution in a similar fashion.

1

2

3

4

5

6

7

8

> **[0008]**   Document "Qualcomm: Layer 1/2 aspects for
> enhanced UL for CELL_FACH; R2-074390; 02-10-2007"
> teaches, for a UE in CELL_FACH state, that an uplink
> resource release may occur, if the NodeB senses inac-
> tivity on the user's uplink channel. In that case, the NodeB
> will send a Layer-2 (MAC) Uplink Resource Release
> message to the UE. The UE will acknowledge this mes-
> sage via another Layer-2 message and then release the
> uplink channel resource.

9

(Ex. 1637 at ¶ 8.)

10

11      272.   Qualcomm's non-infringing alternative E-DCH release scheme is

12   illustrated in Figure 44 below.  In particular, according to Qualcomm's alternative

13   solution, the base station senses that the E-DCH resources assigned to the UE are no

14   longer needed.  The base station then sends a release message to the UE.  In

15   response, the UE releases the E-DCH resources.

16

17

18

19

20

21

22

23

24

25

26

27

28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 44: Qualcomm's E-DCH Release Scheme (PDX 88)**

273.   Qualcomm's non-infringing alternative solution would result in some
delay in releasing the E-DCH but no significant practical degradation in
performance.  For example, if a BSR (buffer status report) is indicating zero bytes to
be transmitted at the UE, Qualcomm's alternative solution would still prevent the
base station from wastefully assigning any unneeded E-DCH resources to the UE
because the base station would correctly sense inactivity on the user's uplink
channel, *i.e.*, sense that no resources are needed.  Thus, there is no real loss.

274.   The small potential delay in deactivating the E-DCH in accordance
with Qualcomm's solution would not have a material impact, and in any case is
offset by additional flexibility that the base station would have in that case.
Specifically, for example, if the traffic conditions are low (*e.g.*, at 3 AM) and a
specific UE indicates (via a BSR) that no more resources are needed, the base
station could make the intelligent decision to refrain from releasing the channel for

some period of time, allowing for the possibility that the same UE might want to engage in more uplink transmissions soon.  If in fact that turns out to be the case, speed is gained.  If not, while resources appear to be wasted, in fact that is not the case—when there is nothing to transmit (because most people are asleep at 3 AM), not being able to transmit is irrelevant, *i.e.*, there is no "waste."  Thus, in short, Qualcomm's non-infringing alternative solution would have some advantages over Ericsson's solution and potentially some disadvantages, which offset each other.

275.   Accordingly, the key accused feature corresponding to Ericsson's E-DCH release scheme provides no net improvement to the 3G standard compared to Qualcomm's alternative solution and, therefore, I assigned it a Contribution Rank of "4."

6.   Patent Family P28747 Provides No Improvement to 4G Relative to Available Alternatives.

276.   Ericsson alleges that the P28747 patent family is essential to 4G.  In its claim chart, Ericsson attempts to map the limitations of Claim 1 of U.S. Patent No. 8,913,565 ("the '565 Patent") to the following sections of the 4G LTE standard: 3GPP TS 36.321 v. 9.3.0 §§ 5.4.4, 5.4.5.  (*See, e.g.*, Ex. 1430.)

a.   *Tutorial on Scheduling Requests*

277.   The P28747 Family relates to a specific way of triggering the UE's transmission of scheduling requests ("SRs") for uplink resources.  (*See generally* Ex. 1639 at p. 1163.)

278.   The base station in an LTE network needs to know whether the UE has data to transmit and should be given uplink transmission resources for data transmission.  (Ex. 1375 at p. 12, 1:64–67.)  If the UE has data to transmit to the base station, it indicates its need for resources using a scheduling request ("SR"), which is a simple flag the UE sends to the base station to request resources for uplink transmission.  (*Id.*; Ex. 1416 at pp. 345–346.)  This is illustrated in Figures 45, 46, and 47 below.  In Figure 45, the arrival of data at the UE's buffer triggers an

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

SR to be transmitted.  (*See* Ex. 1375 at p. 12, 1:64–2:6; *see also* Ex. 1416 at pp. 344–346, Fig. 13.3.)



**FIGURE 45: Data Arrival Triggers Scheduling Request (PDX 89)**



**FIGURE 46: Scheduling Request Is Transmitted (PDX 90)**

279.   In Figure 46 (above), the SR is transmitted.  Figure 47 (below) shows that the SR is scheduled to be repeated periodically if the UE does not receive a resource grant by the next SR opportunity (possibility).  (Ex. 1375 at p. 12, 2:7–10; Ex. 1416 at pp. 344-345, Fig. 13.3.)



**FIGURE 47: Scheduling Request Repeated (PDX 91)**

280.   If the UE has already received a resource grant in response to an SR, then it can request additional uplink resources by sending a buffer status report (BSR) rather than an SR, as illustrated below in Figure 48 (see purple uplink transmission).  (Ex. 1375 at p. 12, 2:11–26.)  A BSR provides information about

data received into the UE's buffer, including whether and how much resources are needed. (*Id.*)



**FIGURE 48: No Repeated SR Needed Due to BSR (PDX 92)**

281. Nevertheless, as shown in Figure 49 below, if the SR opportunity occurs after the grant is received but before the BSR is sent, an unnecessary SR may be transmitted (the blue SR transmitted between the red resource grant and the purple uplink transmission). (Ex. 1375 at p. 13, 3:42–55.) To address this issue, Ericsson's purported solution in the P28747 Family attempts to reduce the unnecessary transmission of SRs by imposing certain conditions that must be met for an SR to be sent. (*Id.*)



**FIGURE 49: Unnecessary SR Transmission (PDX 93)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

b.     *Ericsson's SR Triggering Scheme*

282.   Based on the patent specification and the file history, I determined the key limitation of Claim 1 of the '565 Patent to be "sending a scheduling request to the base station when a next scheduling request opportunity occurs, only if the buffer contains data that has both not been accounted for in a buffer status report, which reports the size of said buffer to the base station, and will not be included directly in a currently scheduled uplink data transmission."  Through its claim chart, Ericsson attempts to map this key claim limitation to the following key accused feature in the 4G standard:  Sending an SR when specific conditions are met—*i.e.*, only when buffered data is new and unscheduled.  This key accused feature corresponds to the portion of the accused 4G standard shown below.

---

### 5.4.4     Scheduling Request

The Scheduling Request (SR) is used for requesting UL-SCH resources for new transmission.

When an SR is triggered, it shall be considered as pending until it is cancelled. All pending SR(s) shall be cancelled and *sr-ProhibitTimer* shall be stopped when a MAC PDU is assembled and this PDU includes a BSR which contains buffer status up to (and including) the last event that triggered a BSR (see subclause 5.4.5), or when the UL grant can accommodate all pending data available for transmission.

---

(Ex. 1438 at p. 25.)

283.   By conditioning the sending of SRs on transmission data being new and unscheduled, Ericsson's scheme avoids the UE sending an SR whenever it has data, regardless of whether the data is new or unscheduled.  Figure 50 below illustrates an example of Ericsson's scheme, and particularly the cancellation of the unnecessary SR that was sent after the resource grant is received in Figure 49 above. In this particular example, the data is already scheduled at the time of the SR opportunity after the grant is received (*e.g.*, the BSR is built before the SR opportunity).  Thus, Ericsson's solution cancels and does not send the SR (hence, the red "X" below).

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 50: Ericsson's SR Triggering Scheme (PDX 94)**

        *c.*     *Ericsson's SR Triggering Scheme Provides No Improvement to 4G Relative to Available Alternatives.*

284.   I assigned a Contribution Rank of "4" to Ericsson's patent family P28747, meaning that the key accused feature corresponding to Ericsson's SR triggering scheme provides no improvement to the 4G standard relative to available alternatives.

285.   For example, a Change Request proposed by ASUSTeK's before Ericsson filed its provisional application for the '565 Patent in the P28747 Family presents a non-infringing alternative that solves the same problem as the key accused feature corresponding to Ericsson's SR triggering scheme.  (Ex. 1443.) Namely, as shown below, ASUSTeK's proposed edit to § 5.4.4 cancels all pending SRs if there is no triggered BSR.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

### 5.4.4    Scheduling Request

The Scheduling Request (SR) is used for requesting UL-SCH resources for new transmission.

When an SR is triggered, it shall be considered as pending until it is cancelled.

If an SR is triggered and there is no other SR pending, the UE shall set the SR_COUNTER to 0.

As long as one SR is pending, the UE shall for each TTI:

- if no UL-SCH resources are available for a transmission in this TTI:

    - if the UE has no valid PUCCH resource for SR configured in any TTI: initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs;

    - else if the UE has a valid PUCCH resource for SR configured for this TTI and if this TTI is not part of a measurement gap:

        - if SR_COUNTER < SR_TRANS_MAX:

            - increment SR_COUNTER by 1;

            - instruct the physical layer to signal the SR on PUCCH;

        - else:

            - notify RRC of PUCCH/SRS release, initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs.

- else if UL-SCH resources for new transmission are granted in this TTI, cancel all pending SR(s).

All pending SRs shall be cancelled when there is no triggered BSR.

(*Id.* at 2.)

286.    There is no triggered BSR when all pending data can be accommodated by the uplink grant.  That is, if a BSR was triggered at some point in the past (*e.g.*, when the grant was received in Figure 50 above) but there has been an allocation in the meantime and there is no additional data for transmission in the logical channels, then ASUSTeK's proposed change cancels all BSRs (as well as RACH procedures). (*Id.* at 3.)  For example, ASUSTeK proposed modifying § 5.4.5 as shown below.

All triggered BSRs shall be cancelled in case the UL grant can accommodate all pending data available for transmission but is not sufficient to additionally accommodate the BSR MAC control element.  All triggered BSRs shall be cancelled when a BSR is included in a MAC PDU for transmission.

If at least one Regular BSR is triggered and there is no data available for transmission for any of the logical channels which belong to a LCG, cancel all triggered BSRs and stop, if any, ongoing RACH procedure when the Msg3 buffer is empty.

(*Id.* at 3.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

287.    In the example of Figure 50, by canceling the triggered BSR, the SR would also be cancelled because all pending SRs shall be cancelled when there is no triggered BSR.  In particular, triggered BSRs are cancelled when all pending data can be accommodated by granted resources or when the BSR is included in a packet for transmission.  If a BSR was triggered but there has been a resource grant and there is no data that cannot be accommodated for the scheduled transmission that includes a BSR, then the proposal cancels all triggered BSRs, thus also cancelling pending SRs.  Thus, ASUSTeK's prior alternative solution addresses the same problem as Ericsson's SR triggering scheme (*i.e.*, unnecessary SR transmission).

288.    Moreover, it is clear from the redlined edits to § 5.4.4 and § 5.4.5 in ASUSTeK's Change Request shown below, that ASUSTeK's proposed changes would have required relative minor modifications to two sub-sections of a single TS. Similarly, TDoc R2-095380, which I understand to be Ericsson's contribution that purportedly correlates to the '565 Patent, also shows that the key accused feature in redline affected the single sub-section of the same TS, and did so in a relatively minor way.

### 5.4.4    Scheduling Request

The Scheduling Request (SR) is used for requesting UL-SCH resources for new transmission.

When an SR is triggered, it shall be considered as pending until it is cancelled. All pending SR(s) shall be cancelled when a MAC PDU is assembled and this PDU includes a BSR which contains buffer status up to (and including) the last event that triggered a BSR (see subclause 5.4.5), or when the UL grant can accommodate all pending data available for transmission.

If an SR is triggered and there is no other SR pending, the UE shall set the SR_COUNTER to 0.

As long as one SR is pending, the UE shall for each TTI:

- if no UL-SCH resources are available for a transmission in this TTI:

  - if the UE has no valid PUCCH resource for SR configured in any TTI: initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs;

  - else if the UE has a valid PUCCH resource for SR configured for this TTI and if this TTI is not part of a measurement gap:

    - if SR_COUNTER < *dsr-TransMax*:

      - increment SR_COUNTER by 1;

      - instruct the physical layer to signal the SR on PUCCH;

    - else:

      - notify RRC to release PUCCH/SRS;

      - clear any configured downlink assignments and uplink grants;

      - initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs.

  - ~~else if UL-SCH resources are available for a new transmission in this TTI, cancel all pending SR(s).~~

(Ex. 1452 at p. 2.)

289.   Accordingly, Ericsson's narrow solution could have been easily replaced with ASUSTeK's in the 4G standard without materially impacting other parts of the standard.  Because Ericsson's SR triggering scheme provides no improvement to the 4G standard compared to ASUSTeK's prior alternative solution, I assigned it a Contribution Rank of "4."

### 7.   Contribution Analysis Results

290.   Figure 51 below illustrates the breakdown of the Contribution Ranks for all family/standard pairs Ericsson considers essential to the 2G, 3G, and/or 4G standards, including expired patents.

## Contribution Ranks for 2G, 3G, and 4G Family/Standard Pairs



**FIGURE 51 (PDX 95)**

291.   Figure 52 below illustrates the breakdown of the Contribution Ranks for all family/standard pairs Ericsson considers essential to the 2G standard, including expired patents.

## Contribution Ranks for 2G Family/Standard Pairs



- **Non-Essential**
- **Contribution = 1**
- **Contribution = 2**
- **Contribution = 3**
- **Contribution = 4**

11
27%

16
39%

3
7%

10
24%

1
3%

**FIGURE 52 (PDX 96)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1       292.   Figure 53 below illustrates the breakdown of the Contribution Ranks

2   for all family/standard pairs Ericsson considers essential to the 3G standard,

3   including expired patents.

4       **Contribution Ranks for 3G Family/Standard Pairs**



FIGURE 53 (PDX 97)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

293.   Figure 54 below illustrates the breakdown of the Contribution Ranks for all family/standard pairs Ericsson considers essential to the 4G standard, including expired patents.

**Contribution Ranks for 4G Family/Standard Pairs**



**FIGURE 54 (PDX 98)**

E.   <u>Overall Results of the SEP Analysis</u>

294.   Figure 55 below illustrates the breakdown of the Importance and Contribution Ranks for 146 family/standard pairs that Dr. Jayant and I determined to have an Essentiality Rank of "1" or "2" with respect to the 2G, 3G, and/or 4G standards.  To be conservative, Figure 55 also includes expired patents, as well as 10 family/standard pairs with an Essentiality Rank of "2" even though these pairs are not essential to the standards under a proper claim construction.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**FIGURE 55 (PDX 99)**

26      295.   As shown in Figure 55 above, only eight or 3.7% of the 219

27   family/standard pairs directed to the 2G, 3G, and/or 4G standards have an

28   Importance Rank of "1" and a Contribution Rank of "1."  These eight

family/standard pairs (represented by the green bubble) are directed to accused technologies and key features that are technically valuable to the relevant standards. In addition, the key features for these eight family/standard pairs are technically valuable to the relevant standards relative to alternatives that were available at the times the key features were adopted into the standards.

296.    Furthermore, of the 219 family/standard pairs, only five or 2.3% (represented by the yellow bubble) are directed to accused technologies and key features that are of moderate technical value or importance to the relevant standards. Moreover, the key features for these five family/standard pairs provide moderate improvements to the standards relative to alternatives that were available at the times the key features were adopted into the standards.

297.    In other words, the vast majority (206 or 94%) of Ericsson's 219 family/standard pairs directed to the 2G, 3G, and/or 4G standards are not technically valuable.  First, 73 of these 219 family/standard pairs (or 33.3%) have an Essentiality Rank of "3" and thus are not essential to the 2G, 3G, and 4G standards under any reasonable claim construction.  (*See* Figure 55 above.)  Second, of the remaining 146 family/standard pairs with an Essentiality Rank of "1" or "2," 133 pairs (or 60.7%) (represented by red bubbles) are directed to accused technologies or key features that are of little or no importance to the relevant standards and/or provide at best marginal improvements to the standards relative to alternatives that were available at times the key features were adopted into the standards.

298.    For example, eight family/standard pairs have an Importance Rank of "1" and a Contribution Rank of "4."  For these family/standard pairs, the accused technologies and the key features of these pairs are technically valuable to the relevant standards.  Nevertheless, the key features for these family/standard pairs provide no improvement to the relevant standards relative to alternatives that were available at the times the key features were adopted into the standards.  Therefore, these family/standard pairs provide little to no overall technical value to the

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

standards.

299.    For 2G in particular, Figure 56 below illustrates the breakdown of the Importance and Contribution Ranks for 30 family/standard pairs that were determined to have an Essentiality Rank of "1" or "2." To be conservative, I included five families for which all the patents are expired and one patent family/standard pair with an Essentiality Rank of "2." As shown in Figure 56, of the 30 family/standard pairs , 26 pairs (or 87%) (represented by the red bubbles) are directed to accused technologies or key features that are of little or no importance to the 2G standard and/or provide at best marginal improvements to the standard relative to alternatives that were available at times the key features were adopted into the 2G standard.  Thus, these 26 family/standard pairs provide little to no intrinsic technical value to the standard.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 56 (PDX 100)**

300.   For 3G in particular, Figure 57 below illustrates the breakdown of the Importance and Contribution Ranks for 35 family/standard pairs that were determined have an Essentiality Rank of "1" or "2."  To be conservative, I included two families for which all the patents are expired and two patent family/standard pairs with an Essentiality Rank of "2."  As shown in Figure 57, of the 35 family/standard pairs, 30 pairs (or 86%) (represented by the red bubbles) are directed to accused technologies or key features that are of little or no importance to the 3G standard and/or provide at best marginal improvements to the standard relative to alternatives that were available at times the key features were adopted into the 3G standard.  Thus, these 30 family/standard pairs provide little to no intrinsic technical value to the standard.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**FIGURE 57 (PDX 101)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

301.   For 4G in particular, Figure 58 below illustrates the breakdown of the Importance and Contribution Ranks for 81 family/standard pairs that were determined to have an Essentiality Rank of "1" or "2."  To be conservative, I included seven patent family/standard pairs with an Essentiality Rank of "2."  As shown in Figure 58, of the 81 family/standard pairs, 77 pairs (or 95%) (represented by the red bubbles) are directed to accused technologies or key features that are of little or no importance to the 4G standard and/or provide at best marginal improvements to the standard relative to alternatives that were available at times the key features were adopted into the 4G standard.  Thus, these 81 family/standard pairs provide little to no intrinsic technical value to the standard.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 58 (PDX 102)**

302.   Table 5 below provides the results of the Essentiality, Importance, and Contribution analysis of Ericsson's 219 family/standard pairs.  This includes Dr. Jayant's analyses of 20 family/standard pairs directed to speech coding.

| TABLE 5 (PDX 103) SUMMARY OF SEP ANALYSIS FINDINGS | | | | |
|---|---|---|---|---|
| Ericsson Family | Standard | Essentiality | Importance | Contribution |
| P04787 | 3G | 3 | — | — |
| P04817 | 2G | 1 | 1 | 3 |
| P04940 | 2G | 3 | — | — |
| P05544 | 2G | 1 | 3 | 4 |
| P05687 | 2G | 1 | 2 | 4 |
| P05860 | 3G | 1 | 3 | 4 |
| P05935 | 2G | 1 | 1 | 1 |
| P06199 | 2G | 1 | 2 | 4 |
| P06199 | 3G | 1 | 2 | 4 |
| P06203 | 3G | 1 | 1 | 3 |
| P06203 | 4G | 1 | 1 | 4 |
| P06425 | 2G | 3 | — | — |
| P06553 | 2G | 1 | 3 | 3 |
| P06691 | 2G | 3 | — | — |
| P06691 | 4G | 3 | — | — |
| P06697 | 4G | 3 | — | — |
| P06699 | 2G | 3 | — | — |
| P06891 | 3G | 3 | — | — |
| P07288 | 2G | 1 | 1 | 4 |
| P07567 | 4G | 3 | — | — |
| P07592 | 3G | 3 | — | — |
| P07669 | 3G | 3 | — | — |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) | | | | |
|---|---|---|---|---|
| **SUMMARY OF SEP ANALYSIS FINDINGS** | | | | |
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| **P07707** | 2G | 3 | — | — |
| **P07761** | 2G | 3 | — | — |
| **P07782** | 2G | 3 | — | — |
| **P07873** | 2G | 1 | 3 | 3 |
| **P07873** | 4G | 1 | 3 | 3 |
| **P07925** | 4G | 3 | — | — |
| **P08153** | 3G | 1 | 1 | 4 |
| **P08167** | 3G | 3 | — | — |
| **P08333** | 3G | 3 | — | — |
| **P08333** | 4G | 3 | — | — |
| **P08338** | 3G | 1 | 3 | 4 |
| **P08425** | 3G | 3 | — | — |
| **P08430** | 3G | 3 | — | — |
| **P08575** | 3G | 3 | — | — |
| **P08769** | 4G | 3 | — | — |
| **P08804** | 2G | 3 | — | — |
| **P08804** | 4G | 3 | — | — |
| **P09037** | 2G | 1 | 3 | 3 |
| **P09040** | 4G | 3 | — | — |
| **P09085** | 2G, 3G | 1 | 3 | 4 |
| **P09262** | 2G | 1 | 2 | 3 |
| **P09262** | 3G | 1 | 2 | 3 |
| **P09262** | 4G | 1 | 2 | 3 |
| **P09286** | 2G, 3G | 1 | 3 | 4 |
| **P09632** | 3G | 3 | — | — |
| **P09646** | 2G | 2 | 1 | 4 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) | | | | |
|---|---|---|---|---|
| **SUMMARY OF SEP ANALYSIS FINDINGS** | | | | |
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| **P09715** | 3G | 3 | — | — |
| **P09715** | 4G | 3 | — | — |
| **P09716** | 3G | 1 | 2 | 4 |
| **P10310** | 2G, 3G | 1 | 3 | 3 |
| **P10334** | 2G, 3G | 1 | 3 | 4 |
| **P10335** | 2G, 3G | 1 | 2 | 3 |
| **P10628** | 2G | 3 | — | — |
| **P10628** | 4G | 3 | — | — |
| **P10762** | 2G | 1 | 1 | 4 |
| **P10774** | 2G, 3G | 1 | 3 | 4 |
| **P10808** | 3G | 1 | 3 | 4 |
| **P10808** | 4G | 1 | 3 | 4 |
| **P10867** | 3G | 2 | 2 | 2 |
| **P10867** | 4G | 2 | 2 | 2 |
| **P10896** | 2G | 3 | — | — |
| **P10991** | 2G, 3G | 1 | 3 | 3 |
| **P10992** | 2G, 3G | 1 | 1 | 1 |
| **P10993** | 2G | 1 | 3 | 3 |
| **P11151** | 2G | 1 | 1 | 4 |
| **P11289** | 4G | 3 | — | — |
| **P11451** | 3G | 1 | 1 | 4 |
| **P11451** | 4G | 1 | 2 | 3 |
| **P11538** | 3G | 3 | — | — |
| **P11899** | 3G | 1 | 2 | 4 |
| **P11899** | 4G | 1 | 2 | 4 |
| **P11904** | 2G | 1 | 2 | 4 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) | | | | |
|---|---|---|---|---|
| **SUMMARY OF SEP ANALYSIS FINDINGS** | | | | |
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| **P12207** | 3G | 1 | 1 | 1 |
| **P12947** | 3G | 3 | — | — |
| **P12947** | 4G | 3 | — | — |
| **P13088** | 2G | 1 | 3 | 4 |
| **P13459** | 4G | 3 | — | — |
| **P14592** | 4G | 3 | — | — |
| **P14596** | 2G | 1 | 3 | 4 |
| **P14596** | 3G | 1 | 3 | 4 |
| **P14596** | 4G | 1 | 3 | 4 |
| **P14897** | 3G | 1 | 3 | 4 |
| **P14897** | 4G | 1 | 3 | 4 |
| **P15300** | 3G | 1 | 2 | 4 |
| **P15300** | 4G | 1 | 3 | 4 |
| **P17631** | 4G | 1 | 3 | 3 |
| **P18216** | 3G | 1 | 3 | 4 |
| **P18674** | 4G | 1 | 3 | 3 |
| **P18728** | 4G | 1 | 1 | 4 |
| **P18740** | 4G | 3 | — | — |
| **P19103** | 4G | 3 | — | — |
| **P19208** | 4G | 1 | 3 | 4 |
| **P19559** | 3G | 1 | 2 | 2 |
| **P19911** | 3G | 1 | 1 | 1 |
| **P20021** | 4G | 3 | — | — |
| **P20058** | 2G | 1 | 3 | 4 |
| **P20671** | 3G | 3 | — | — |
| **P20741** | 4G | 3 | — | — |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) SUMMARY OF SEP ANALYSIS FINDINGS | | | | |
|---|---|---|---|---|
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| P21172 | 3G | 1 | 3 | 4 |
| P21239 | 2G | 1 | 3 | 4 |
| P21428 | 4G | 3 | — | — |
| P21430 | 4G | 1 | 3 | 4 |
| P21738 | 4G | 1 | 3 | 4 |
| P21787 | 4G | 3 | — | — |
| P22430 | 4G | 3 | — | — |
| P22621 | 3G | 1 | 3 | 4 |
| P22817 | 2G | 3 | — | — |
| P23016 | 3G | 2 | 3 | 4 |
| P23018 | 4G | 1 | 3 | 3 |
| P23034 | 4G | 3 | — | — |
| P23041 | 3G | 1 | 1 | 4 |
| P23384 | 4G | 1 | 1 | 3 |
| P23412 | 4G | 1 | 2 | 3 |
| P23415 | 4G | 3 | — | — |
| P23426 | 4G | 1 | 3 | 4 |
| P23563 | 4G | 2 | 2 | 4 |
| P23614 | 4G | 3 | — | — |
| P23633 | 4G | 3 | — | — |
| P23682 | 4G | 1 | 3 | 3 |
| P23893 | 4G | 1 | 3 | 4 |
| P23894 | 4G | 1 | 3 | 4 |
| P23985 | 4G | 2 | 3 | 4 |
| P24000 | 4G | 1 | 1 | 4 |
| P24058 | 4G | 3 | — | — |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) | | | | |
|---|---|---|---|---|
| **SUMMARY OF SEP ANALYSIS FINDINGS** | | | | |
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| P24228 | 4G | 1 | 1 | 4 |
| P24241 | 4G | 1 | 2 | 4 |
| P24459 | 4G | 1 | 3 | 3 |
| P24466 | 4G | 1 | 3 | 4 |
| P24557 | 4G | 3 | — | — |
| P24673 | 4G | 1 | 3 | 4 |
| P24698 | 4G | 1 | 3 | 3 |
| P24860 | 4G | 1 | 3 | 4 |
| P24916 | 4G | 1 | 3 | 3 |
| P24985 | 4G | 1 | 3 | 3 |
| P25005 | 4G | 3 | — | — |
| P25238 | 4G | 1 | 1 | 4 |
| P25317 | 4G | 1 | 2 | 4 |
| P25318 | 4G | 3 | — | — |
| P25336 | 3G | 1 | 3 | 4 |
| P25409 | 4G | 2 | 3 | 4 |
| P25476 | 4G | 1 | 3 | 4 |
| P25496 | 4G | 1 | 2 | 4 |
| P25642 | 4G | 1 | 3 | 4 |
| P25658 | 4G | 1 | 3 | 4 |
| P25936 | 4G | 3 | — | — |
| P25949 | 4G | 3 | — | — |
| P25975 | 2G | 1 | 2 | 3 |
| P25990 | 4G | 3 | — | — |
| P25999 | 4G | 1 | 3 | 3 |
| P26030 | 3G | 1 | 1 | 3 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) | | | | |
|---|---|---|---|---|
| **SUMMARY OF SEP ANALYSIS FINDINGS** | | | | |
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| P26071 | 4G | 1 | 3 | 4 |
| P26132 | 4G | 1 | 3 | 3 |
| P26261 | 4G | 1 | 1 | 1 |
| P26379 | 4G | 1 | 3 | 4 |
| P26648 | 4G | 1 | 2 | 4 |
| P26715 | 4G | 1 | 1 | 3 |
| P26724 | 4G | 3 | 3 | 4 |
| P26744 | 4G | 1 | 2 | 4 |
| P26967 | 4G | 2 | 3 | 3 |
| P26993 | 4G | 1 | 2 | 4 |
| P27011 | 4G | 3 | — | — |
| P27172 | 4G | 1 | 2 | 3 |
| P27363 | 3G | 3 | — | — |
| P28186 | 2G | 1 | 1 | 1 |
| P28235 | 4G | 1 | 3 | 4 |
| P28281 | 4G | 3 | — | — |
| P28627 | 4G | 1 | 3 | 4 |
| P28747 | 4G | 1 | 3 | 4 |
| P29338 | 4G | 3 | — | — |
| P29465 | 4G | 1 | 1 | 1 |
| P29482 | 4G | 3 | 3 | 4 |
| P30030 | 4G | 1 | 3 | 4 |
| P30565 | 4G | 3 | — | — |
| P30749 | 4G | 1 | 3 | 4 |
| P30980 | 4G | 1 | 1 | 4 |
| P31006 | 4G | 3 | — | — |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) | | | | |
|---|---|---|---|---|
| **SUMMARY OF SEP ANALYSIS FINDINGS** | | | | |
| **Ericsson Family** | **Standard** | **Essentiality** | **Importance** | **Contribution** |
| **P31172** | 2G | 1 | 2 | 2 |
| **P31186** | 4G | 1 | 3 | 4 |
| **P31189** | 4G | 1 | 3 | 4 |
| **P31649** | 4G | 3 | — | — |
| **P31755** | 4G | 1 | 2 | 2 |
| **P31773** | 4G | 1 | 2 | 3 |
| **P31923** | 4G | 1 | 1 | 4 |
| **P31931** | 4G | 3 | — | — |
| **P31948** | 4G | 3 | — | — |
| **P31988** | 4G | 2 | 1 | 4 |
| **P32066** | 4G | 1 | 2 | 3 |
| **P32173** | 4G | 3 | 3 | 4 |
| **P32205** | 4G | 2 | 3 | 3 |
| **P32468** | 4G | 3 | 3 | 4 |
| **P32498** | 4G | 1 | 3 | 4 |
| **P32787** | 4G | 1 | 3 | 3 |
| **P32817** | 4G | 1 | 3 | 4 |
| **P33108** | 4G | 1 | 2 | 4 |
| **P33465** | 4G | 1 | 3 | 4 |
| **P33485** | 3G | 1 | 3 | 4 |
| **P33858** | 4G | 3 | — | — |
| **P34406** | 4G | 1 | 2 | 4 |
| **P34420** | 4G | 1 | 2 | 4 |
| **P34422** | 4G | 1 | 2 | 4 |
| **P34426** | 4G | 1 | 2 | 3 |
| **P35090** | 4G | 1 | 1 | 3 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| TABLE 5 (PDX 103) SUMMARY OF SEP ANALYSIS FINDINGS | | | | |
|---|---|---|---|---|
| Ericsson Family | Standard | Essentiality | Importance | Contribution |
| P35129 | 4G | 1 | 3 | 3 |
| P35168 | 3G | 1 | 3 | 4 |
| P35575 | 4G | 1 | 3 | 4 |
| P35592 | 3G | 1 | 3 | 4 |
| P37106 | 4G | 3 | 3 | 4 |
| P37869 | 4G | 1 | 2 | 3 |
| P38458 | 3G | 3 | 3 | 4 |

### F.   Review of Uncharted Ericsson Patent Families

303.   Of the 235 relevant patent families that Ericsson contends are essential
to the 2G, 3G, and/or 4G standards and had designated as being relevant to UE,
Ericsson did not provide claim charts for 43 families before I served my opening
report.  I refer to these as the "43 uncharted patent families."  Ericsson identified
seven of the 43 uncharted patent families as being directed to the 2G standard, 11
patent families as being directed to the 3G standard, and 25 patent families as being
directed to the 4G standard.  All but one of the 43 uncharted patent families are
directed to the air interface.

304.   I did not perform an in-depth SEP Analysis of the 43 uncharted
families as I did with the 180 charted patent families.  I did, however, review some
of the patents and, in many cases the pending applications, and the respective
standards for the 43 uncharted patent families identified by Ericsson.  For the
uncharted families I reviewed, I did not find any of the patented technologies more
likely to be valuable in terms of essentiality, importance, and contribution relative to
the patented technologies in the 180 charted patent families that I analyzed in detail.

305.   Within the 43 uncharted patent families, at least 10 patent families

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

contain a pending U.S. patent application that, according to the most recent USPTO information at the time I submitted my expert report, stood rejected as not containing patentable material.

306. Of the 11 alleged 3G-related uncharted patent families, two, or about 18%, had rejected, non-issued U.S. applications. Of the 25 alleged 4G-related uncharted patent families, eight, or about 32%, had rejected, non-issued U.S. applications.

307. Furthermore, it is my understanding that companies like Ericsson that generate significant revenue by licensing their patents tend to chart the patents deemed more valuable. For instance, such patent-licensing companies typically sue or threaten to sue other companies with patent infringement lawsuits to pressure them into licensing agreements. Naturally, one would expect the patent-licensing companies to select and chart SEPs that are more likely to read on the accused products or standard. Accordingly, there is nothing indicating to me that the 43 uncharted patent families are more likely to be technically valuable relative to the 192 charted patent families.

## VI. INDUSTRY-WIDE ESSENTIALITY ANALYSIS OF 2G, 3G and 4G USER EQUIPMENT PATENTS

### A. Objective and Team

308. In connection with my objective of assisting the Court in determining FRAND rates for Ericsson's portfolios of alleged 2G, 3G, and 4G SEPs, I conducted an Industry-Wide Essentiality Analysis of all declared-essential patent families. This analysis provides a benchmark to which I understand Ericsson's SEP portfolio is to be compared. There were two major steps in the Industry-Wide Essentiality Analysis.

309. The first step was a Patent Census. The Patent Census involved determining basic information about the global universe of all patents declared essential to the 2G, 3G, and/or 4G standards by all assignees, as well as Ericsson's

1   relative position among the holders of such declared-essential patents.

2       310. The second step was an Essentiality Assessment. The Essentiality

3   Assessment is separate and distinct from the SEP Analysis described above in

4   Section V.A and V.B. Whereas the SEP Analysis involved analyzing Ericson's

5   alleged SEPs using claim charts Ericsson has provided in this case, the Essentiality

6   Assessment involved determining which of the *declared*-essential patents identified

7   in the Patent Census includes a claim that is essential to the 2G, 3G, and/or 4G

8   standards with respect to User Equipment (UE). Unlike the SEP Analysis, the

9   Essentiality Assessment was not based on standards identified in claim charts, but

10   instead primarily involved comparing declared-essential patents the standards

11   identified in IPR declarations the patent holders have submitted to ETSI. Thus, in

12   addition to determining essentiality for declared-essential patents, the Essentiality

13   Assessment involved determining, for each of the 2G, 3G, and 4G standards, ratios

14   of (a) essential patents to (b) declared-essential patents on a per-assignee basis.

15   These ratios are also referred to as "essentiality ratios."

16       311. Due to the number of patents involved in the Patent Census and

17   Essentiality Assessment studies, TCL's counsel in this litigation, the law firm of

18   Sheppard, Mullin, Richter & Hampton LLP, commissioned Ernst & Young of India

19   ("EY India") to assist with the Patent Census, and Concur IP, a technical consulting

20   company located in India, to assist with the Essentiality Assessment. The team at

21   EY India was led by Mr. Nitin Agrawal, whose qualifications are set forth in his

22   *curriculum vitae*. (Ex. 1602.) The EY India team has substantial experience in

23   patent analytics, and the team members have educational backgrounds in various

24   engineering disciplines.

25       312. For the Essentiality Assessment, Sheppard Mullin engaged Concur IP's

26   team of engineers, led by Sachin Sinha, to assist in analyzing the essentiality of

27   declared-essential patents. I worked with Dr. Zhi Ding to supervise Concur IP's

28   work in the Essentiality Assessment. Dr. Ding provided details regarding his

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

supervision of Concur IP, in his February 1, 2016 Expert Report submitted in this case, which I have reviewed and fully agree with.  I also understand that Dr. Ding will be including these details in his Witness Declaration.

313.   Dr. Ding's qualifications are set forth in his Witness Declaration.  The Concur IP team was also well qualified to perform the Essentiality Assessment.  For example, Mr. Sinha holds a Bachelor of Technology in Electronics and Communications Engineering.  He has over nine years of experience in IP consulting services performing patent evaluation, analysis, and research, in addition to over one year experience working with one of the largest telecommunications operators in India.  His primary expertise is mapping patents to products and technical standards, particularly cellular communications standards, to determine potential infringement or essentiality.  In the past, he has led some of the most comprehensive studies on cellular SEPs.  Major companies have relied upon these studies for important business decisions, patent negotiations, and international arbitrations.  Mr. Sinha's *curriculum vitae* provides additional information regarding his qualifications and relevant experience.  (Ex. 1598.)

314.   Sanjay Nama, Samkeet Mehta, and Vivek Sharma, other members of the Concur IP team that participated in the Essentiality Assessment under Mr. Sinha's lead, are also qualified for the work.  (*See* Exs. 1596, 1597, 1599.)  Mr. Nama holds a Bachelor of Technology in Electrical Engineering, and has over seven years of experience in IP consulting, including patent landscape analysis and mapping patents to technical standards (particularly the 3G and 4G standards).  (Ex. 1599.)  Mr. Mehta holds a Master's of Science in Electrical engineering from UCLA, as well as a Bachelor of Engineering in Electronics and Telecommunications, and has over three years of experience in IP services, including with essentiality analysis for patents relating to 3GPP standards such as 3G and 4G, and with IEEE wireless network standards.  (Ex. 1596.)  Mr. Sharma holds a Bachelor in Technology in Electronics and Communication Engineering,

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   and has over six years of experience in IP consulting, including patent-to-standard

2   mapping and patent landscape analysis in the domain of cellular communications.

3   (Ex. 1597.)

4       315.   In connection with my oversight and supervision of both the Patent

5   Census and the Essentiality Assessment, I spent a week in New Delhi.  During this

6   time, I met extensively with Mr. Agrawal and the EY India team and planned many

7   details regarding the Patent Census.  I also met extensively with Sachin Sinha and

8   his team at Concur IP during my trip to India.  Following my meetings with EY

9   India and Concur IP, I continued to supervise the EY India team directly through

10  regularly scheduled weekly teleconferences that included TCL's counsel, and

11  through further discussion as needed.  Similarly, I participated, along with Dr. Ding

12  and counsel for TCL, in regularly scheduled conference calls and *ad hoc* discussions

13  with Concur IP regarding the progress and results of the Essentiality Assessment.

14      **B.**   **Step 1—Patent Census**

15      316.   I now discuss the process and results of the Patent Census, which at a

16  high level involved determining basic information about the global universe of all

17  patents declared essential to the 2G, 3G, and/or 4G standards by all assignees.

18      1.   Patent Census Process

19      317.   The Patent Census analysis is based on publicly available information

20  from the ETSI IPR database and the European and U.S. Patent Office databases.

21  The starting point for information covered in the Census was the ETSI IPR database.

22  Under my supervision, EY India performed the Census on all (at the time,

23  153,000+) patents and patent applications declared to ETSI as being essential.  My

24  understanding is that EY India extracted the relevant information from ETSI on

25  September 15, 2015.

26      *a.*   *Gathering and De-Duplicating Data*

27      318.   As explained above, ETSI is a key international cellular standard-

28  setting organization that maintains standards for 2G (GSM, GPRS & EDGE), 3G

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

(UMTS), and 4G (LTE) cellular technology.  ETSI provides an online electronic database of all patent declarations submitted to it.  These declarations can be downloaded, organized, and tracked in a spreadsheet.  The EY India team extracted the information from all the declarations as stored on the ETSI IPR database as of September 15, 2015.  At the time, there were over 1,800 patent declarations to extract.  Because some patents are declared multiple times (*e.g.*, the same patent may be listed in two or more declarations), the EY team de-duplicated the data.  After de-duplication, 119,850 patents and applications remained.

### b.   Adding in Family Members

319.   According to ETSI rules, if a patent or patent application is declared essential, then the other members of the same patent family are deemed to be declared essential.  Therefore, for each declared-essential patent, the EY India Team determined which additional family members had not been expressly declared essential.  This was done using the INPADOC database.  "INPADOC" stands for INternational PAtent DOcumentation Center, and is a database produced and maintained by the European Patent Office.  It is a frequently-used, and probably the best-recognized, source of patent family information.  As shown in Table 6 and Figure 59 below, this step resulted in an additional 34,030 patents and applications added to the Census, for a grand total of 153,880 patents and applications either expressly declared essential or considered declared due to ETSI's patent family rule.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| ETSI Patent Declarations | No. of Patents |
|---|---|
| **Explicitly declared to ETSI** | **119,850** |
| **Considered declared by implicit rule** | **34,030** |
| **Total declarations to ETSI** | **153,880** |

**TABLE 6: The Patent Census Includes**

**Family Members of Declared Patents, Per ETSI Rules (PDX 104)**



**FIGURE 59: Patents Explicitly Declared Essential to ETSI v.**

**Patent Family Members Implicitly Considered Essential (PDX 105)**

156

320.   This large number of patents and applications was known to include patents that have expired and thus (in my understanding) have no value.  In addition, my understanding is that pending patent applications also confer no value to the extent they have not been granted and thus confer no exclusionary rights.  In order to perform a useful analysis, we determined the distribution of this set of patents and applications into mutually exclusively and collectively exhaustive subsets.  Namely, the data showed that about 82,533 of the 153,880 patents and applications were issued and as of January 1, 2009, had not expired.  Another 68,309 were un-issued patent applications.  The final 3,038 were patents that expired before January 1, 2009.  This is depicted in Table 7 and Figure 60 below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Declaration Status | Issued/Expired Patents & Published Applications |
|---|---|
| Issued & Not Expired Patents | 82,533 |
| Expired Patents | 3,038 |
| Published Applications | 6,8309 |
| Grand Total | 153,880 |

- The Patent Census is further divided into three different categories:  (1) Issued and Not Expired Patent, (2) Expired Patent, and (3) Published Applications.  Only about 2% of the dataset is identified as expired based on the following expiration criteria:
- All non-U.S. patents, and all U.S. patents filed on or after June 8, 1995, that are more than 20 years past the priority date.
- All U.S. patents filed before June 8, 1995, that are both more than 20 years past the priority date and more than 17 years past the issuance date.

**TABLE 7: Patents/Applications by Status (PDX 106)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 60: Patents/Applications by Status (PDX 107)**

321. The expiration dates were calculated based on the criteria set forth above in Table 7. Neither patent term extensions nor terminal disclaimers were considered, because doing so would require looking at information for each patent individually and thus would have been prohibitively time-consuming. The Census results should not be substantially affected by this approach, for several reasons. First, the method treats all companies equally. Second, term extensions extend patent terms, usually by less than two years in the U.S., while terminal disclaimers reduce patent terms, thus helping net out imprecision. Third, the census contains a relatively small number of expired patents, *i.e.*, almost 2%.

          *c.*    *Grouping Patents and Applications into Families*

322. The next step in the Patent Census was to group the 153,880 patents and applications into families, again using the INPADOC database. As explained

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

above, considering patents on a family basis makes sense for several reasons. First, the ETSI policy itself groups patents this way. Second, patents in the same family typically relate to the same invention. For example, companies often seek patents containing identical claims in different countries, while continuation applications in the same country are based on the same patent specification and contain related claims. However, a divisional application is considered by the U.S. Patent Office to represent a new invention. Therefore, patents resulting from divisional applications were placed in new families. This process resulted in a total of 20,156 post divisional families, including 1,276 divisional families. While most patent families contain a handful of patents, a few patent families contain hundreds of patents.

323. Each of the 20,156 post divisional patent families was then classified into five groups:

1) Families with at least one issued and non-expired patent (calculated as of January 1, 2009) and having an English language member;

2) Families with at least one issued and non-expired patent, without an English language member;

3) Families with only expired members;

4) Families with only published applications (*i.e.*, no issued patents); and

5) Patents or patent applications whose family information is not available from the INPADOC database.

324. The primary purpose of this family classification was to identify patent families that did not require further analysis, because they did not contain any issued patents, contained only expired patents, or could not be classified based on INPADOC information.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

d.      *Gathering Additional Data for Each Patent Family*

325.   Using the ETSI declarations, as well as the Thomson Innovation extended patent database and Derwent World Patents Index (two patent information databases to which the EY India Team had access), additional data was gathered about each patent family that includes both issued patents and pending applications (which I will, for convenience, refer to collectively as "patents").  The data included the assignees of the patents, the standards that the patents were declared essential to, the ETSI projects that the patents were declared essential to (*e.g.*, LTE), the patents' issuance status, as well as the patents' priority dates and expiration dates.  This data was used to determine the distribution of the families across each of the five groups defined above.  The results of the distribution are depicted graphically below in Figure 61 and shown further below in Table 8.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 61: Classification of Patents into Five Groups (PDX 108)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Group | No. of Patents/ Applications |
|---|---|
| [1] Families with at least one issued and non-expired patent (calculated as of January 1, 2009), and having an English-language member | 11,469 |
| [2] Families with at least one issued and non-expired patent, without an English-language member | 3,288 |
| [3] Families with only expired members | 719 |
| [4] Families with only published applications (i.e., no issued patents) | 3,585 |
| [5] Patents or patent applications whose family information is not available from the INPADOC database | 1,095 |

**TABLE 8: Classification of Patents into Five Groups (PDX 109)**

        *e.*    *Classifying Each Patent Family by Cellular Generation (2G, 3G, 4G)*

326.   Next, each patent family was classified as relevant to 2G (*e.g.*, GSM), 3G (UMTS), and/or 4G (LTE), based mainly on the standards to which the family (*i.e.*, at least one member of the family) was declared essential.  For example, if a company declared that a patent was relevant to standards 3GPP TS 25.212 and TS 36.212 (whether in the same or different declarations), the patent was classified as "3G" and "4G," because these two Technical Specifications relate to these respective "generations."  The information relating the generations to a given

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

standard or Technical Specification is publically available on 3GPP's web site.  In some instances, the ETSI declarations did not clearly identify a particular Technical Specification or standard, but instead, the patent was declared essential to "2G," "3G," and/or "4G."  In those instances, the ETSI declaration was considered accurate for purposes of the Patent Census.

### f.   Designating Patent Families for Further Analysis

327.   In another aspect of the Patent Census, the 11,469 families having an issued, non-expired patent and an English language member were designated for further analysis by a separate team of engineers led by Mr. Sachin Sinha of Concur IP.  In particular, Concur IP was instructed to analyze these 11,649 patent families to determine:  (1) which patent families contained at least one UE claim, and (2) whether or not a declared-essential UE family is essential.  (*See* Ex. 551 at p. 1.)  In the next Section (VI.B.2), I present the distribution of *declared*-essential UE patent families (*i.e.*, the patent families identified in the Patent Census (*i.e.*, step (1)), by generation, across all the assignees.  (Ex. 445.)  Later on, in Section VI.C.1, I discuss in detail the methodology and results of Concur IP's Essentiality Assessment that determined whether or not the identified patent families containing at least one UE claim are essential (as opposed to just *declared*-essential—*i.e.*, step (2)).

### 2.   The Patent Census Shows Ericsson's Share of Declared-Essential 2G, 3G, and 4G Families is Relatively Small.

328.   The Patent Census shows that as of September 15, 2015, there were over 153,000 patents and applications declared essential to the 2G, 3G, and/or 4G cellular standards at issue in this litigation.  As described above, these patents were organized into families.  There were 11,469 "relevant" families identified (*i.e.*, families with at least one issued and non-expired patent as of January 1, 2009, having an English-language member).  The results of the Patent Census are presented on a generation basis, separately for 2G, 3G, and 4G.  Further, the total

number of declared-essential families is "split" into families that have UE claims ("UE families") and those that do not have any UE claims ("non-UE families"). For UE families, I provide Ericsson's holdings and its position among top UE family assignees.

329. For 2G, the total number of declared-essential families was determined to be 2,398, of which 1,182 (about 49%) were found to be UE families. Of the 1,182 UE families, Ericsson ranked third with 107 families, or about 9%. The absolute numbers for UE families for the top 15 assignees is shown in Table 9 below, and a graphical representation giving the relative contributions of each company are shown in the accompanying Figure 62 further below. As shown below: Nokia was found to hold the most 2G declared-essential families, with 224 (almost 19%); Qualcomm was next, with 175 families (almost 15%); and Ericsson was third with 107 families (*i.e.*, about 9%).

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Assignee | No. of 2G UE Families |
|---|---|
| NOKIA | 224 |
| QUALCOMM | 175 |
| ERICSSON | 107 |
| INTERDIGITAL | 87 |
| BLACKBERRY | 86 |
| GOOGLE | 80 |
| HUAWEI | 51 |
| NTT | 21 |
| NEC CORP | 22 |
| APPLE | 23 |
| LG | 23 |
| SAMSUNG | 19 |
| PANASONIC | 9 |
| TEXAS INSTRUMENTS | 1 |
| SHARP | 0 |
| ALL OTHERS | 254 |
| TOTAL | 1,182 |

**TABLE 9: 2G Declared-Essential UE Families (PDX 110)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 62 (PDX 111)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

330.   For 3G, the total number of declared-essential families was determined to be 5,127, of which 2,947 (about 57%) were found to be UE families. Of the 2,947 UE families, Ericsson ranked fourth with 199 families, or about 7%.  The absolute numbers for UE families for the top 15 assignees is shown in the Table 10 below, and a graphical representation giving the relative contributions of each company are shown in the accompanying Figure 63 further below.  As shown below:  Qualcomm was found to hold the most 3G declared-essential families, with 520 families (almost 18%); Nokia was number two, with 339 families (almost 12%); Interdigital was number three, with 267 families (about 9%) and Ericsson was fourth, with 199 families (almost 7%).

| Assignee | No. of 3G UE Families |
|---|---|
| QUALCOMM | 520 |
| NOKIA | 339 |
| INTERDIGITAL | 267 |
| ERICSSON | 199 |
| GOOGLE | 164 |
| SAMSUNG | 157 |
| LG | 146 |
| BLACKBERRY | 101 |
| HUAWEI | 99 |
| NTT | 74 |
| NEC CORP | 66 |
| PANASONIC | 47 |
| APPLE | 37 |
| TEXAS INSTRUMENTS | 23 |
| SHARP | 8 |
| ALL OTHERS | 700 |
| **TOTAL** | **2,947** |

**TABLE 10: 3G Declared Essential UE Families (PDX 112)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**Universe of 3G patents having UE claims for top 15 Assignees - Declared Essential**

**FIGURE 63 (PDX 113)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

331.   For 4G, the total number of declared-essential families was determined to be 7,638, of which 5,024 (about 66%) were found to be UE families.  Of the 5,024 UE families, Ericsson ranked fifth with 311 families, or about 6%.  The absolute numbers for UE families for the top 15 assignees is shown in the Table 11 below, and a graphical representation giving the relative contributions of each company are shown in the accompanying Figure 64 below.  As shown below: Qualcomm was found to hold the most declared-essential 4G families, with 654 (about 13%); Samsung was number two, with 649 families (almost 13%); Nokia was number three, with 414 families (about 8%); Google was number four, with 321 families (about 6%); and Ericsson was fifth, with 311 families (*i.e.*, about 6%).

| Assignee | No. of 4G UE Families |
|---|---|
| QUALCOMM | 654 |
| SAMSUNG | 649 |
| NOKIA | 414 |
| GOOGLE | 321 |
| ERICSSON | 311 |
| LG | 293 |
| INTERDIGITAL | 286 |
| NTT | 205 |
| HUAWEI | 191 |
| SHARP | 145 |
| PANASONIC | 143 |
| BLACKBERRY | 132 |
| APPLE | 118 |
| NEC CORP | 109 |
| TEXAS INSTRUMENTS | 94 |
| ALL OTHERS | 959 |
| TOTAL | 5024 |

**TABLE 11: 4G Declared Essential Families (PDX 114)**

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 64 (PDX 115)**

332. The Patent Census also shows that Ericsson's patent portfolio has experienced a relative decline. Even though Ericsson's absolute number of patent families has grown (*e.g.*, from 107 in 2G, to 199 in 3G, and then 311 in 4G), the relative strength of Ericsson's portfolio has declined over time. For example, for 2G Ericsson was third with 9% of the total share; for 3G it was fourth with 7% of the total share; and for 4G it was fifth with 6% of the total share. In my opinion, three primary reasons for Ericsson's relative decline are: (1) a substantial number of patents expiring, (2) a substantial number of patents being divested, and (3) increased patenting by companies other than Ericsson.

**C. Step 2—Industry-Wide Essentiality Assessment**

333. Having discussed the distribution of declared-essential UE patent families identified in the Patent Census, I now turn to the process and results of the Essentiality Assessment. The Essentiality Assessment involved analyzing declared-

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

essential UE patent families to determine whether or not these patent families are essential.

### 1. Essentiality Assessment Process

334.   The purpose of the Essentiality Assessment was to determine whether industry-wide patents *declared* to be essential to cellular standards are essential with respect to User Equipment (UE).  The Essentiality Assessment included two distinct sub-steps.  The first sub-step was to determine whether each patent family identified in the Patent Census contains at least one patent having at least one claim directed to UE (*e.g.*, mobile devices).  This sub-step was applied to those declared-essential patent families that were designated for further analysis in connection with the Patent Census.  (*See* Section VI.B, *supra*.)  As I understand it, the TCL products that will be subject to the license agreement determined in this case are limited to User Equipment.

335.   Thus, the first sub-step of the Essentiality Assessment involved a review of the English language issued patents and published applications in each family identified in the Patent Census until a "pure UE" claim was found.  (Ex. 551 at p. 1.)  For purposes of this analysis, a pure UE claim is an independent claim in a patent or published application that has all the limitations performed by a UE.  If a pure UE claim was found within a family, then the family was tagged as a UE family.  If all the English language issued patents within the family were reviewed and no pure UE claim was found, then the family was tagged as a non-UE family.

336.   Many of the families identified in the Patent Census do not have any claims directed to User Equipment.  Thus, this first sub-step consisted of narrowing the scope of the analysis to only the sub-set of families relevant in this case.  In particular, of the 11,469 declared-essential families identified in the Patent Census, Concur IP identified a total of 7,106 UE families.

337.   The second sub-step in the Essentiality Assessment was to analyze the essentiality of a statistically significant, random sampling of the UE families

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

identified in the first sub-step.  In this regard, within each of the standards (*i.e.*, 2G, 3G, 4G), one-third of the identified 7,106 UE families were randomly selected separately for each of the top 15 assignees.  Specifically, the random selection was made from the identified 7,106 UE patent families separately for each of the 2G, 3G, and 4G standards using the "RAND" function in Microsoft Excel.  (*See* Ex. 1594.)  Also, the random selection was made separately for each of the top 15 UE patent family assignees.  Outside of the top 15 assignees, all remaining UE patent families were grouped together (*e.g.*, labeled as "others"), and one third of those were randomly sampled separately for each of the 2G, 3G, and 4G standards.  A total of 2,600 UE families were selected in this manner.  Table 12 below shows the total numbers of declared-essential UE families relevant to each of the standards for each of the top 15 assignees, as well as the corresponding number of families randomly selected (for a total of 2,600 selected UE families, or ~33% of the total number of identified families within each assignee and standard).

| Company | All UE families | Relevant to GSM | 33% | Relevant to UMTS | 33% | Relevant to LTE | 33% |
|---|---|---|---|---|---|---|---|
| QUALCOMM | 988 | 175 | 58 | 520 | 173 | 654 | 218 |
| SAMSUNG | 725 | 19 | 6 | 157 | 52 | 649 | 216 |
| NOKIA | 608 | 224 | 75 | 339 | 113 | 414 | 138 |
| ERICSSON | 485 | 107 | 36 | 199 | 66 | 311 | 104 |
| INTERDIGITAL | 464 | 87 | 29 | 267 | 89 | 286 | 95 |
| GOOGLE | 431 | 80 | 27 | 164 | 55 | 321 | 107 |
| LG | 412 | 23 | 8 | 146 | 49 | 293 | 98 |
| NIPPON TELEGRAPH & TELEPHONE | 257 | 21 | 7 | 74 | 25 | 205 | 68 |
| HUAWEI | 242 | 51 | 17 | 99 | 33 | 191 | 64 |
| BLACKBERRY | 178 | 86 | 29 | 101 | 34 | 132 | 44 |
| PANASONIC | 176 | 9 | 3 | 47 | 16 | 143 | 48 |
| NEC CORP | 152 | 22 | 7 | 66 | 22 | 109 | 36 |
| SHARP | 145 | 0 | 0 | 8 | 3 | 145 | 48 |
| APPLE | 131 | 23 | 8 | 37 | 12 | 118 | 39 |
| TEXAS INSTRUMENTS | 124 | 1 | 0 | 23 | 8 | 94 | 31 |
| OTHERS | 1588 | 254 | 85 | 700 | 233 | 959 | 319 |
| ALL | 7106 | 1182 | 395 | 2947 | 983 | 5024 | 1673 |

**TABLE 12: UE Families by Standard and Assignee (PDX 116)**

338.   For the 2,600 randomly selected UE families, the Essentiality Assessment primarily involved a direct comparison between a patent's claims and the relevant cellular standard specifications.  (*See* Ex. 551 at p. 1.)  The Essentiality Assessment was supervised by me and Dr. Ding, with Dr. Ding providing the day-to-day supervision and feedback.  Additional details regarding the methodology employed for the Essentiality Assessment are described in Dr. Ding's Witness Declaration, as well as his February 1, 2016 Expert Report.  (*See id* at 1.)

  2. The Essentiality Assessment Results Confirm Ericsson's Relatively Small Share of User Equipment SEPs.

339.   The Industry-Wide Essentiality Analysis revealed no surprises, in that Ericsson's share of the total set of essential UE patents was found to be consistent with its share of all declared-essential patent families.

a. *2G Essentiality Assessment Results*

340.   Table 13 below shows the number of Ericsson UE patent families found essential to 2G according to the methodology of the Essentiality Assessment discussed above.  (Ex. 1336, Ex. 1594.)  As shown in Table 13, Ericsson's fraction of essential 2G UE patent families was found to be about 10% (45/446).  This is just slightly higher than Ericsson's 9% (107/1,182) share of all 2G *declared*-essential UE families.  Furthermore, the ratio of essential industry-wide 2G UE families to all declared-essential 2G UE families was 37.7% (446/1,182), while the corresponding Ericsson fraction was marginally higher at 42.1% (45/107).  The range of ratios of found-essential to declared-essential families across all major declarants (holding more than 5% of total declarations) was 13% at the lowest end and 57% at the highest end.  Thus, for 2G, Ericsson's essentiality ratio is marginally above the mean and well within the range of values across major declarants.

| 2G (UE) | All Assignees | Ericsson | Ratio of Ericsson to Total |
|---|---|---|---|
| No. of declared families | 1,182 | 107 | 9% |
| Est. no. of families found essential | 446 | 45 | 10% |
| Ratio of essential to total | 37.7% (446/1,182) | 42.1% (45/107) | — |

**TABLE 13: 2G UE Declared Essential v. Potentially Essential (PDX 117)**

b. *3G Essentiality Assessment Results*

341.   Table 14 below shows the number of Ericsson UE families found essential to 3G according to the Essentiality Assessment.  (Ex. 1336, Ex. 1594.)  As shown in Table 14, Ericsson's fraction of essential 3G UE families was found to be 7% (81/1,166).  This is statistically indistinguishable from Ericsson's 7% (199/2,947) share of all 3G declared-essential UE families.  Furthermore, the ratio

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

of essential industry-wide 3G UE families to all declared-essential 3G UE families was found to be 39.6% (1,166/2,947), while the corresponding Ericsson fraction was marginally higher at 40.7% (81/199).  The range of ratios of found-essential to declared-essential families across major declarants was 12% at the lowest end and 69% at the highest end.  Thus, for 3G, Ericsson's essentiality ratio is marginally above the mean, and well within the range of values across major declarants.

| 3G | All Assignees | Ericsson | Ratio of Ericsson to Total |
|---|---|---|---|
| No. of declared families | 2,947 | 199 | 7% |
| Est. no. of families found essential | 1,166 | 81 | 7% |
| Ratio of essential to total | 39.6% (1,166/2,947) | 40.7% (81/199) | — |

**TABLE 14: 3G Declared Essential v. Potentially Essential (PDX 118)**

### c.   4G Essentiality Assessment Results

342.   Table 15 below shows the number of Ericsson UE families found essential to 4G according to the Essentiality Assessment.  (Ex. 1336, Ex. 1594.)  As shown in Table 15, Ericsson's fraction of essential 4G UE families was found to be about 6% (108/1,796).  This is statistically indistinguishable from Ericsson's 6% (311/5,024) share of all declared-essential UE families.  Furthermore, ratio of essential industry-wide 4G UE families to all *declared*-essential 4G UE families was 35.7% (1,796/5,024), while the corresponding Ericsson fraction was slightly lower at 34.7% (108/311).  The range of ratios of found-essential to declared-essential across major declarants was 20% at the lowest end and 56% at the highest end.  Thus, for 4G, Ericsson is at a statistical tie with the mean, and well within the range of values across major declarants.

| 4G | All Assignees | Ericsson | Ratio of Ericsson to Total |
|---|---|---|---|
| No. of declared families | 5,024 | 311 | 6% |
| Est. no. of families found essential | 1,796 | 108 | 6% |
| Ratio of essential/total | 35.7% (1,796/5,024) | 34.7% (108/311) | — |

**TABLE 15: 4G Declared Essential v. Potentially Essential (PDX 119)**

       *d.*     *UE Industry-Wide Essentiality Analysis Conclusions*

343.   For 2G, Ericsson's share of all essential UE families was 10%.  For 3G, Ericsson's portfolio was weaker than for 2G, as its fractional share dropped from 10% to 7%.  Lastly, for 4G, Ericsson's share of essential UE families, at 6%, weakened even more, to almost half of what it was for 2G.  This finding also confirms that the relative strength of Ericsson's portfolio has declined over time.

       *e.*     *My Analysis of Ericsson's SEP Portfolio is Consistent with Concur IP's Industry-Wide Essentiality Assessment.*

344.   As described above in Sections II.A and II.B, while Dr. Jayant and I analyzed Ericsson's 192 claim-charted families for essentiality (*i.e.*, in connection with the SEP Analysis), Dr. Ding and Concur IP analyzed essentiality for a sample set of industry-wide declared-essential UE families (*i.e.*, in connection with the Essentiality Assessment).  This sampled set of industry-wide declared-essential families included 33% of Ericsson's 2G, 3G, and 4G declared-essential UE families. As such, a number of families were analyzed both on the one hand by Dr. Jayant or me, and on the other hand by Concur IP under Dr. Ding's supervision.  The analysis of these families is summarized in Table 16, below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

**TABLE 16:  Essentiality Findings by Kakaes/Jayant and Concur IP (PDX 120)**

| Family No. (Std) | Patent No. | Kakaes / Jayant Found Essential | Concur IP Found Essential | Agreement? | Ding Reviewed |
|---|---|---|---|---|---|
| **P06691 (4G)** | US 5,806,007 | No | Yes | No | No |
| **P07288 (2G)** | US 5,812,968 | Yes | No | No | No |
| **P07925 (4G)** | US 6,189,123 | No | Yes | No | Yes |
| **P08338 (3G)** | US 6,173,162 | Yes | Yes | Yes | No |
| **P09262 (2G)** | EP 1,062,825 | Yes | No | No | Yes |
| **P09262 (3G)** | EP 1,062,825 | Yes | Yes | Yes | Yes |
| **P09286 (2G, 3G)** | US 6,029,125 | Yes | Yes | Yes | No |
| **P10310 (2G, 3G)** | US 6,192,335 | Yes | Yes | Yes | No |
| **P10335 (2G, 3G)** | US 6,275,798 | Yes | Yes | Yes | No |
| **P10867 (4G)** | US 6,643,813 | No | Yes | No | No |
| **P10992 (2G, 3G)** | US 6,424,938 | Yes | Yes | Yes | No |
| **P11899 (3G)** | EP 1,169,804 | Yes | Yes | Yes | No |
| **P12947 (3G)** | US 6,535,925 | No | No | Yes | No |
| **P14596 (3G)** | US 7,181,218 | Yes | No | No | No |
| **P14897 (3G)** | EP 1,360,860 | Yes | Yes | Yes | No |
| **P14897 (4G)** | EP 1,360,860 | Yes | Yes | Yes | No |
| **P17631 (4G)** | US 7,489,705 | Yes | Yes | Yes | No |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Family No. (Std) | Patent No. | Kakaes / Jayant Found Essential | Concur IP Found Essential | Agreement? | Ding Reviewed |
|---|---|---|---|---|---|
| **P18216 (3G)** | EP 1,614,306 | Yes | Yes | Yes | No |
| **P18728 (4G)** | US 7,904,093 | Yes | Yes | Yes | No |
| **P19208 (4G)** | EP 1,714,506 | Yes | Yes | Yes | No |
| **P20741 (4G)** | US 8,923,423 | No | No | Yes | No |
| **P21787 (4G)** | US 8,180,408 | No | Yes | No | No |
| **P22621 (3G)** | US 8,718,695 | Yes | Yes | Yes | No |
| **P23016 (3G)** | US 8,176,376 | No | No | Yes | No |
| **P23018 (4G)** | US 8,102,805 | Yes | No | No | No |
| **P23412 (4G)** | EP 2,123,011 | Yes | Yes | Yes | No |
| **P23563 (4G)** | US 8,503,942 | No | No | Yes | No |
| **P23614 (4G)** | US 8,693,566 | No | No | Yes | No |
| **P23682 (4G)** | US 8,594,029 | Yes | Yes | Yes | No |
| **P23894 (4G)** | US 8,699,375 | Yes | No | No | No |
| **P24459 (4G)** | US 8,717,996; US 8,169,992 | Yes | No | No | Yes |
| **P24557 (4G)** | US 8,195,179 | No | No | Yes | No |
| **P24673 (4G)** | US 7,986,681 | Yes | Yes | Yes | No |
| **P24916 (4G)** | US 8,214,710 | Yes | Yes | Yes | No |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Family No. (Std) | Patent No. | Kakaes / Jayant Found Essential | Concur IP Found Essential | Agreement? | Ding Reviewed |
|---|---|---|---|---|---|
| **P25238** (4G) | US 8,699,997 | Yes | Yes | Yes | No |
| **P25496** (4G) | US 8,682,371 | Yes | Yes | Yes | No |
| **P25949** (4G) | EP 2,260,667 | No | No | Yes | Yes |
| **P26030** (3G) | US 8,606,277 | Yes | Yes | Yes | Yes |
| **P26379** (4G) | US 8,279,834 | Yes | Yes | Yes | No |
| **P26744** (4G) | EP 2,301,296 | Yes | Yes | Yes | No |
| **P26993** (4G) | EP 2,225,908 | Yes | No | No | Yes |
| **P27363** (3G) | US 7,924,754 | No | No | Yes | No |
| **P28281** (4G) | US 8,837,396 | No | No | Yes | No |
| **P29338** (4G) | US 8,014,311 | No | No | Yes | No |
| **P31172** (2G) | US 8,537,765 | Yes | Yes | Yes | No |
| **P31923** (4G) | EP 2,564,228 | Yes | Yes | Yes | Yes |
| **P31931** (4G) | US 8,634,365 | No | No | Yes | No |
| **P32468** (4G) | US 8,738,041 | No | Yes | No | No |
| **P33858** (4G) | US 8,750,808 | No | No | Yes | Yes |
| **P34422** (4G) | EP 2,705,626 | Yes | Yes | Yes | No |
| **P34426** (4G) | EP 2,705,685 | Yes | Yes | Yes | No |
| **P35090** (4G) | US 8,750,230 | Yes | Yes | Yes | Yes |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| Family No. (Std) | Patent No. | Kakaes / Jayant Found Essential | Concur IP Found Essential | Agreement? | Ding Reviewed |
|---|---|---|---|---|---|
| **P35592 (3G)** | EP 2,742,606 | Yes | No | No | No |
| **P37869 (4G)** | US 9,054,846 | Yes | No | No | Yes |
| **P38458 (3G)** | US 9,100,069 | No | No | Yes | No |

345. In particular, Concur IP analyzed 55 of Ericsson's claim-charted family-standard-pairs using the methodology discussed above and in Dr. Ding's Witness Declaration and Expert Report. As shown in Table 16 above, Dr. Jayant and my determinations regarding essentiality were in agreement with Concur IP's determinations for 41 of these 55 family-standard-pairs. Additionally, for four of the families—P07925 (4G), P09262 (2G), P10867 (4G), and P35592 (3G)—the disagreement resulted not from an error in the technical analysis but from an information asymmetry as between Dr. Jayant and me on the one hand, and Concur IP on the other hand.

346. For P09262 (2G), and more specifically EP 1,062,825, Ericsson's IPR declaration form specifies only "GSM" for the accused ETSI project, and does not list any of the standard specifications cited in Ericsson's claim chart. (*See* Ex. 1456; Ex. 1357.) In particular, Ericsson's 2G claim chart for claim 1 of EP 1,062,825 (which is the claim I found to be essential) cites 3GPP TS 04.08 v. v. 7.21.0 §§ 3.3.1.1.4.1, 9.1.11, and 10.5.1.7; and 3GPP TS 09.31 v. v. 8.0.0 § 5.1.1. (Ex. 1357.) I considered the standards cited in the claim chart, whereas Concur IP considered the standards associated with the IPR declaration form. For the standards associated with the IPR declaration form, Concur IP relied on an extraction of this information from the ETSI database. My understanding is that for EP 1,062,825, such an extraction does not include more specific standards than what is listed in the IPR

1  declaration form—*i.e.*, GSM.  In my opinion, the disagreement regarding

2  essentiality for P09262 (2G) as between myself and Concur IP arises not from a

3  technical error on Concur IP's part but from the fact that Ericsson's claim chart is

4  much more specific than its IPR declaration.

5       347.   For P35592, Concur IP likewise relied on information regarding

6  Ericsson's IPR declaration form as extracted from the ETSI database.  For this

7  family, my understanding is Concur IP's Essentiality Assessment considered only

8  TS 23.308, which I understand is the only standard that extracts from the ETSI

9  database for EP 2,742,606 (the member of P35592 I found essential).  Whereas

10  Concur IP considered the standards extracted from the ETSI database, I considered

11  the standards cited in Ericsson's claim chart.  Ericsson's 3G claim chart for claim 1

12  of EP 2,742,606 (which is the claim I found essential) cites 3GPP TS 25.331 v.

13  11.1.0 §§ 8.2.2.3, 8.6.6.4; 3GPP TS 25.214 v. 11.0.0 §§ 10, 10.1; and 3GPP TS

14  25.308 v. 11.8.0 § 9.  (Ex. 1362.)  Thus, even though the IPR declaration itself cites

15  the following 3G standards:  TS 25.331 v. 11.1.0 § 8; TS 25.214 v. 11.0.0 § 10; and

16  TS 125.308 v. 11.8.0 § 9, Concur IP considered the extracted standard, and not all

17  standards listed in the IPR declaration.  (Ex. 1449 at p. 8.)  My understanding is that

18  such an inconsistency on ETSI's database is relatively rare.  Accordingly, in my

19  opinion, the disagreement regarding essentiality for P35592 (3G) as between myself

20  and Concur IP arises not from a technical error on Concur IP's part but from an

21  issue related to ETSI's database extraction interface.

22       348.   For P07925 and P10867, my Essentiality Analysis included a

23  consideration of the file history, whereas Concur IP did not consider file histories.

24  Overall, my consideration of the file histories in connection with my Essentiality

25  Analysis of Ericsson's SEP portfolio affected my analysis in only a minor number

26  of instances.  In fact, based on a comparison of mine and Dr. Jayant's SEP Analysis

27  and Concur IP's Essentiality Assessment, the impact of considering the file histories

28  on essentiality determinations turned out to be minimal.  The consideration of file

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

histories affected only two (or 3.6%) of the 55 family/standard pairs common between the two analyses.  This confirms my expectation, which is based on my years of experience evaluating declared-essential patents, that not considering file histories had at most a *de minimis* impact on the accuracy of the Essentiality Assessment.

349.   Accounting for the above issues for these four Ericsson families, there were 10 remaining families for which Dr. Jayant or I disagreed with Concur IP in terms of essentiality.  As Table 16 shows, there were seven disagreements where Dr. Jayant or I found a patent essential and Concur IP found the same patent non-essential.  This is roughly 12.7% of the total 55 overlapping family-standard-pairs.  Additionally, there were three disagreements where Dr. Jayant or I found a patent non-essential and Concur IP found the same patent essential.  This is roughly 5.5% of the total 55 overlapping family-standard-pairs.

350.   As discussed in Dr. Ding's Witness Declaration and February 1, 2016 Expert Report, Dr. Ding determined that Concur IP's error rate in determining that a family was non-essential was 11.8%.  Dr. Ding also determined Concur IP's error rate in determining that a family was essential was 4.4%.  Accordingly, the percentage of disagreements in essentiality determinations that Dr. Jayant and I had with Concur IP is consistent with the error rates Dr. Ding determined.  Additionally, relative to the large number of industry-declared families Concur IP analyzed, the number of Ericsson families at issue here is statistically less significant.

351.   Overall, I agree with Dr. Ding that even in light of these small numbers of errors, Concur IP's Essentiality Assessment implemented a fair, reasonable, and technically sound process for assessing the landscape of a company's contribution and position in terms of its standard-essential patent portfolio that the company itself had self-declared to be a SEP.  Moreover, none of the above changes the ultimate opinions regarding the Essentiality Assessment that Dr. Ding and I have expressed in this case, nor does it affect my opinions regarding my analysis of Ericsson's SEP

1 portfolio.

2 **D.    OVERALL ASSESSMENT OF ERICSSON'S ALLEGED SEP**

3 **PORTFOLIO**

4      352.   The Patent Census and related Essentiality Assessment both

5 demonstrate that Ericsson's contribution to IP in the mobile communications space

6 has been declining.  The percentage of Ericsson declarations and the percentage of

7 Ericsson patents found to be essential has been declining from 2G to 3G to 4G, as

8 seen in Table 17 below.  That is, Ericsson's percentage of declared essential patents

9 has steadily declined from 9% for 2G, to 7% for 3G, to 6% for 4G.  A similar

10 decline is present with respect to Ericsson's percentage of essential patents from

11 10% for 2G, to 7% for 3G, to 6% for 4G.

12

| Metric | 2G | 3G | 4G |
| --- | --- | --- | --- |
| Ericsson's declared-essential patent families as a percentage of all declared-essential families | 9% | 7% | 6% |
| Ericsson's patent families found to be essential as a percentage of all families found to be essential (sample-based) | 10% | 7% | 6% |

**TABLE 17 (PDX 121)**

21      353.   Ericsson's patent position has weakened from generation to generation.

22 This is not surprising considering the specifics of how technology has developed

23 and who the main players in the wireless industry have been over the years.  "3G,"

24 as used in this case, is a "marriage" of two different and incompatible 2G

25 technologies.  Specifically, GSM was a superb 2nd Generation system.  GSM's

26 TDMA-based air interface was indeed a great engineering development, but it had

27 one major drawback: it was TDMA-based.  On the infrastructure side, including the

28 overall network architecture (both the RAN and the Core Network components),

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

GSM was state of the art at the time, with significant developments that provided, among other numerous benefits, a whole new level of mobility services for users traveling literally just about anywhere around the globe.

354.   On the other hand, the U.S.-developed 2nd Generation system based on Qualcomm's CDMA technology, which became the IS-95 standard, used a whole new concept for the air interface.  This concept provided significantly more benefits than GSM could, and in fact more benefits then any TDMA-based technology could. However, the "network" side of IS-95 was inferior, largely due to the fact that IS-95 had to be backwards compatible with AMPS, the then existing 1st Generation analog system, according to U.S. law.

355.   In order to better appreciate the interrelationship of 3G, UMTS, WCDMA, and 3GPP, one needs to backtrack a bit and consider at least the major milestone events that took place before 3GPP developed what we today call UMTS or WCDMA.  June 1998 is an important date in the process that led to what we now call "3G."  That was the deadline by which interested parties had to submit to the ITU-R their proposals for Radio Transmission Technologies for IMT-2000.

356.   IMT-2000 stands for "International Mobile Telecommunications for the year 2000" (and beyond).  Broadly speaking, IMT-2000 was a set of objectives that would be desirable going forward to a "next" generation system, broadly called "3rd Generation," or "3G," since the GSM technology had, more or less de-facto, gotten the label of "2nd Generation," or "2G."  IMT-2000 was intentionally silent as to how these objectives would be met, and effectively was an open call to the industry, researchers, universities, standard-setting organizations, etc., to come up with ideas to achieve these objectives.

357.   One of the key features of the "new system" was that it would be "data-centric" while not abandoning voice communications, a feature that was known to be of continuing importance to end users.  This was a significant shift from 2nd Generation systems, which were voice-centric, with data being an "add-on."  This

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   was true for the two most widespread 2nd Generation systems, namely GSM, which

2   was developed mostly in Europe, and the IS-95 system, developed in the United

3   States.

4     358. In response to the IMT-2000 report, the international community

5   generated no less than 15 proposals, of which 10 were for the terrestrial aspect of

6   IMT-2000 and the remaining five for the satellite aspect of IMT-2000.  (Ex. 1333;

7   Ex. 1331.)  Of the 10 terrestrial proposals, eight were based on a CDMA technique

8   for the air interface, and the remaining two were based on a TDMA technique for

9   the air interface.  TDMA was well understood, and the then de-facto worldwide

10  GSM standard was indeed a very good implementation of the concepts of TDMA, a

11  technology Ericsson has supported and advocated.

12    359. However, the international community had begun to understand the

13  benefits of CDMA, which is why eight of the proposals were based on CDMA and

14  only two were based on TDMA.  The concept of CDMA had been developed into a

15  standard, essentially single-handedly by Qualcomm.  Qualcomm faced a lot of

16  criticism in its early days, as many believed and insisted that this concept "would

17  not work."  Ericsson was amongst the most vocal critics of CDMA, instead

18  supporting a TDMA 2nd Generation system in the US called IS-54, and its later

19  development to IS-136, which had some similarity to GSM.  Not surprisingly,

20  Ericsson did not make any meaningful contribution to the development of early

21  commercial CDMA systems, and I did not see any Ericsson SEPs that are directed

22  to any fundamental aspects of this technology.  IS-136 enjoyed limited success in

23  the Americas, but the superiority of CDMA made IS-136 essentially extinct a

24  number of years ago.  However, the adoption of IS-95 in South Korea and then later

25  in the United States quickly proved that the idea of CDMA, counter-intuitive as it

26  may have been for many at the time, did work.  In fact, I was personally involved

27  through my work at training hundreds of engineers in all continents as to how

28  CDMA worked.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

360.   The fact that eight of the 10 proposals were based on CDMA speaks volumes about CDMA.  These eight proposals had many similarities and some differences.  As it turns out, based on their commonalities, they could be logically grouped into three groups.  The first group consisted of five of the proposals, namely WIMS W-CDMA, W-CDMA, CDMA II, UTRA, and NA: W-CDMA.  The second group consisted of CDMA2000 and CDMA I.  And the third group consisted of only TD-SCDMA.

361.   Without getting into the technical details, the original hope of having one global standard was not going to materialize.  While the "3rd Generation Partnership," or 3GPP, was formed with exactly that objective, irreconcilable differences between the supporters of the first group and those of the second group quickly became apparent.  Thus, 3GPP worked on harmonizing the five proposals of the first group into what became UMTS, again, often referred to as WCDMA (which as we can see was a common acronym in three of the five proposals).  At essentially the same time, the supporters of the second group formed what is known as 3GPP2 and harmonized those two proposals into what is now called CDMA2000.  Note that both CDMA2000 and the TD-SCDMA system are often also referred to as "3G" systems, though my understanding is that they are explicitly not part of this litigation.

362.   In summary, one of ETSI's proposals was based on CDMA and was one of the five that were harmonized into UMTS.  Thus, any argument that UMTS is based on GSM is demonstrably false, in particular for the air interface.  UMTS is a CDMA air interface, and a lot about CDMA was learned via the IS-95 standard and related work.  Furthermore, the technical aspects of UMTS are largely based on the ARIB proposal, which was called "WCDMA," which explains the common convention of referring to it as WCDMA, as well as with the more formal name of UMTS.  Accordingly, a company's technical contribution to 2G does not necessarily translate to a technical contribution to 3G.  Since most of the relevant patents relate

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

to the air interface and the air interface for 3G is fundamentally different from that for 2G (CDMA versus TDMA respectively), Ericsson's contribution to 3G is relatively minor compared to that of other companies such as Qualcomm.

363.   Ericsson's contribution to 4G/LTE is also no better than average, if even that.  The basis for 4G/LTE technology is called Orthogonal Frequency Division Multiple Access, or OFDMA.  Ericsson did not invent it.  In addition, the LTE standards themselves "borrowed" in large part from a competing set of standards called WiMAX (Worldwide Interoperability for Microwave Access) that were developed slightly earlier.

364.   OFDMA, the core of 4G LTE standards, is actually quite old.  The first paper on OFDM (OFDMA is a multi-user access scheme employing the OFDM technology) was in 1966 by R.W. Chang, and a related patent issued in 1970.  (Ex. 1332.)  Additionally, for example, Digital Video Broadcasting, or DVB, used OFDM in the 1980s, and OFDMA was proposed for the return channel in a Digital Video Broadcasting project in the 1990s.

365.   Furthermore, WiMAX is an OFDMA cellular mobile communication technology developed primarily to provide residential internet connectivity.  (*See* Section IX, *infra*.)  However, WiMAX added further enhancements, including mobility-enabled cellular-like applications.  WiMAX has been standardized by the Institute of Electrical and Electronics Engineers (IEEE) under the technical name IEEE 802.16e.  This IEEE 802.16e standard was published in 2005, and was adopted as 3G technology by the International Telecommunications Union (ITU) in 2007.

366.   To meet the needs of users for higher data services, IEEE 802.16e was designed to use OFDMA technology.  For similar reasons, LTE system adopted OFDMA technology.  Later, IEEE 802.16e continued its evolution to IEEE 802.16m, in order to meet requirements of IMT-Advanced set by the ITU.

367.   In October 2010, ITU-R approved two industry-developed technologies

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

as 4G candidates: LTE-Advanced and WirelessMAN-Advanced (802.16m).

However, LTE-Advanced eventually won the 4G competition due to most operators

supporting the continued evolution of 3GPP standards.

368.   Therefore, any suggestion that LTE is based on GSM is false.  GSM

was a TDMA system, whereas LTE is an OFDMA system, and the two are

fundamentally different.  Furthermore, any suggestion that Ericsson played an

important role in the development of LTE is not supported by the facts.  Ericsson

did play a role, but the importance of this role is quantified by the analysis that I

performed.  As my findings show, overall, Ericsson's contributions have been

marginal, as discussed in detail and summarized below.  Moreover, the U.S.

company Motorola and the Japanese company NTT DoCoMo are both widely

regarded as playing key roles in "inventing" LTE.  NTT DoCoMo first proposed

LTE in 2004, for example.  (Ex. 1335.)

369.   Ericsson's relative decline can also be seen by comparing the

cumulative number of patents that have been issued over time as a function of the

patent's priority date, graphically illustrated in Figure 65 below.  The number of

such patents, as a function of priority date was calculated as part of my analysis and

is shown below.  Although Ericsson's portfolio and the overall universe have been

growing, Ericsson's percentage peaked in about 2000 and has been on a steady

decline since then.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES





**FIGURE 65 (PDX 122)**

370.    The detailed analysis of the Ericsson portfolio I undertook as part of
this case confirms that Ericsson's portfolio does not contain any breakthrough
patents.  The Importance and/or Contribution Ranks of most of the patents are at or
close to the lowest "grade."  Very few essential patents were ranked a "1" both for
Importance and Contribution, specifically six family/standard pairs.  Out of a total
of 199 family/standard pairs I analyzed, this represents only 3%.

371.    None of these six family/standard pairs represent any major
breakthrough in technology.  The reason they merited the highest rank is that
removing the claimed technology from the cited standard would have significant
impact, making the Importance Rank a "1," and no alternatives were proposed

1  and/or considered, making the Contribution Rank a "1." However, that does not

2  mean the alleged inventions provided fundamental advancements. In fact, they did

3  not, and I will explain why using two examples of patents that were given an

4  Essentiality/Importance/Contribution Rank of 1/1/1.

5      372. First, consider patent family P12207, which Ericsson provided a claim

6  chart for claim 11 of U.S. Patent No. 6,781,970.

7

8  **11**. A user equipment unit which is in radio communication with a base station node of a telecommunications network, the user equipment unit comprising:

9      means for receiving a Transport Format Combination Indicator (TFCI) from a higher level node of the telecommunications network;

10

11      a CTFC/TFCI handling subunit which is arranged to use the received Transport Format Combination Indicator (TFCI) to determine a corresponding Calculated Transport Format Combination (CTFC) value and further arranged to determine, from the Calculated Transport Format Combination (CTFC) transport format value, combinations to be used in communicating with the base station node;

12

13

14  wherein the CTFC/TFCI handling subunit is arranged to use the received Transport Format Combination Indicator (TFCI) to determine a corresponding Calculated Transport Format Combination (CTFC) which has been calculated by the following expression:

15

16

17

18  $$CTFC(TFI_1, TFI_2, K, TFI_I) = \sum_{i=1}^{I} TFI_i \cdot P_i,$$

19

20  wherein I is a number of transport channels TrCH; wherein TFC(TFI_1, TFI_2, . . . , TFI_I) is a transport format combination for which transport channel TrCH_1, has transport format TFI_1, TrCH_2 has transport format TFI_2, etc., wherein

21

22

23

24  $$P_i = \prod_{j=0}^{i-1} L_j,$$

25

26  wherein i=1, 2, . . . , I, and $L_0$=1; and wherein $L_j$ is a number of transport channels.

27

28  (Ex. 1366 at p. 9, 10:12–48.)

373.   This may appear like a complicated mathematical solution to a difficult problem.  However, to a person of ordinary skill in the art, it is actually quite straight forward and not so groundbreaking.

374.   In plain language and using an analogy, imagine that one is making a family monthly budget.  In any one month one could spend one of five values for food, *e.g.*, $0, $100, $200, $300, and $400, which I will refer to as F1, F2, F3, F4, and F5, respectively.  Food is analogous to Transport Channel 1, where 5 is the number of Transport Formats available for Transport Channel 1, *i.e.*, the number of options for the Transport Channel.

375.   Similarly, one could spend one of four values for travel, *e.g.*, $0, $50, $100, $400, which I will refer to as T1, T2, T3, and T4, respectively.  Travel is analogous to Transport Channel 2, where 4 is the number of Transport Formats available for Transport Channel 2.

376.   And finally, one could spend one of six values to pay debt, *e.g.*, $0, $50, $100, $150, $200, and $250, which I will refer to as D1, D2, D3, D4, D5, and D6, respectively.  Debt payment is analogous to Transport Channel 3, where 6 is the number of Transport Formats available for Transport Channel 3.  Let us assume that we have 3 Transport Channels (although in general one could have more than that).

377.   Now in any one month, I could mix and match the values of food, travel, and debt payment in any one of a number of different combinations and I would want to be able to convey the chosen combination to my "communicating" partner, say, my wife.  The number of possible combinations I would have to be able to communicate is:  (5 choices for food) * (4 choices for travel) * (6 choices for debt payment) = 5 * 4 * 6 = 120.  So far, this is a trivial problem in combinatorics.

378.   But let us assume an additional constraint.  My wife and I know that in any given month, we cannot spend more than our total income of, say, $800.  We can use that to reduce the number of combinations (down from 120) that are available in any given month.  For example, it is clear that if we use F4 ($400) for

192

food and T4 ($400) for travel, we ***must*** use D1 ($0) for debt payment, because any other value for debt payment would result in a combination exceeding our total income of $800.  A number of combinations are not viable because they exceed the $800 limit.

379.   The total income of $800 is analogous to the total available "room" for transmitted bits in Ericsson's charted claim.  The formula in the charted claim capitalizes on the foregoing notion, and formulates the details of how that information is conveyed with a smaller number of bits than would otherwise be possible.

380.   While the formula merits an Importance Rank of 1 and a Contribution Rank of 1, based on my methodology for assessing these ranks—*i.e.*, the significance of the impact of removing the claimed technology from the cited standard, and the availability of alternatives, respectively—the formula is basic and was well-known in mathematics, and is not remotely groundbreaking.  Furthermore, the formula is ***not*** a key factor in the operation of the communication system.  CDMA in general and UMTS in particular have a lot of complexity that is far more fundamental than a nice arithmetical scheme of representing a smaller-than-otherwise set of possibilities or combinations.

381.   As a second example, consider patent family P29465, which Ericsson provided a claim chart for claim 19 of U.S. Patent No. 8,902,811.

> **19.** A method in a user equipment comprising:
> sending an uplink transmission to a base station on a first uplink component carrier that is among a number of uplink component carriers aggregated for the user equipment, each uplink component carrier having an uplink transmission timing relative to a downlink timing reference;
> receiving a timing correction for adjusting the uplink transmission timing of the first uplink component carrier, and receiving an indication of other ones among the number of uplink component carriers for which the timing correction is valid; and
> adjusting the uplink transmission timing of the first uplink component carrier and the other uplink component carriers for which the timing correction is valid, according to the timing correction.

(Ex. 1377 at p. 14, 10:24–39.)

382.   This patent has been classified into the "Advanced Features/Carrier Aggregation" category discussed in this report.  Thus, on its face, it appears to be a valuable patent.  But a closer look reveals this to be untrue.

383.   The subject matter of carrier aggregation is indeed a new and important area of development within 4G.  But the question is narrower:  what is the novelty of this patent to that general area?  In order to answer that question, we need to take a step back.

384.   In many systems (*e.g.*, GSM and LTE), accurate timing, at least relative timing, between the base station and the mobile is of paramount importance.  By "accurate timing" I mean that from the base station's point of view, the signals from the different mobiles arrive at precisely the time they should.  If they arrive sooner than they should, they will interfere with the previous signal(s).  If they arrive later than they should, they will interfere with the subsequent signal(s).  How does one ensure that the mobile transmits at precisely the right time, so that its signal reaches the base station not too early and not too late?  The solution has been known for at least 25 years, as it was used in GSM:  it is called Timing Advance and works as follows.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

385.   At certain predetermined times, the mobile sends a very short-lasting signal at what the mobile thinks is the correct time.  Often times, the mobile's perception of timing will be wrong because of "propagation delay":  even if all else is perfect, it takes some time for a signal to travel from the base station to the mobile and then from the mobile to the base station.  This "round trip delay," call it X, will be the amount of time that the mobile is "too late," *i.e.*, the amount of delay before the signal transmitted by the mobile reaches the base station.  That delay needs to be compensated for.  Indeed, it is compensated for by the base station transmitting a message to the mobile, called the "Time Advance Message," in which the mobile is informed to advance its clock by X units of time—that is, start the next transmission X units of time sooner than it would have done.  This, in turn, brings the mobile's transmission in line with what it should be.

386.   Of course, the mobile can, and usually will, move towards or away from the base station, thereby changing the value of the propagation delay, *i.e.*, of the amount X which it needs to compensate for.  Indeed, this was also known.  There is ongoing feedback from the base station to the mobile that informs the mobile whether to move up or down its clock on a regular, ongoing basis, thereby keeping it "in line."

387.   None of the foregoing is part of the claim-charted patent, and Ericsson does not assert that it is.  This was all known for at least 25 years.  The only new thing is that with the introduction of carrier aggregation, if the mobile uses two or more carriers, which may or may not belong to the same cell, a way should be devised to keep them all "in line."  For example, assume we have three carriers, and that one of them, C1, is used by base station 1, BS1; while two of them, C2 and C3, respectively, are used by base station 2, BS2.  The propagation delays related to C2 and C3 will be the same, because they are related to the same base station, BS2, and will generally be different from the propagation delays related to C1, as C1 is related to a different base station, BS1, located a different distance from the mobile

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1  than BS2.  The claim simply requires an "indication" that the timing adjustment for

2  C2 is also applicable to C3 and is thus applied to C3 as well.

3      388.   Considering the issue more generally, the "novelty" of the claim-

4  charted patent is that the carriers transmitted to/from the same location are

5  "grouped" together, and once a mobile obtains the correct timing for one of them, it

6  knows that such timing applies to all carriers in the group.  Of course, the timing

7  advance for carriers in another group would need to be established independently for

8  that group, but once again, only one of the members would be enough:  once you get

9  the right timing for one of the members of a given group you know the timing for all

10  of the members of that group.

11      389.   It is clear that the patent has little to do with any fundamental

12  advancement of carrier aggregation techniques.  The grouping of carriers that are

13  known to have the same propagation delays in corresponding groups is a simple

14  extension of well-known techniques, plus a bit of common sense.  Thus, despite the

15  fact that the Essentiality Rank, the Importance Rank, and the Contribution Rank of

16  the charted claim are all "1," in fact the claimed invention does not represent a

17  fundamental advancement.

18      390.   The two examples above illustrate how even the purportedly higher

19  "quality" patents in Ericsson's portfolio are not valuable.

20      391.   The next example shows how trivial some of Ericsson's "inventions"

21  are.  One of the standard/family pairs that I found to be Essential (*i.e.*, the

22  Essentiality Rank is "1") is P35575_4G.  Ericsson charted claim 1 of U.S. Patent

23  No. 8,837, 410 ("the '410 patent") for this pair.  I assigned this family/standard pair

24  an Importance Rank of "3" and a Contribution Rank of "4."

25

26

27

28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

**1.** A method in a mobile terminal for simultaneous reporting of channel-state information and hybrid-ARQ ACK/NACK information in uplink subframes, the method comprising:

determining that first channel-state information and first hybrid-ARQ ACK/NACK bits corresponding to a plurality of downlink subframes or a plurality of downlink carriers, or both, are scheduled for transmission in a first uplink subframe;

determining whether the number of the first hybrid-ARQ ACK/NACK bits is less than or equal to a threshold number; and

transmitting both the first channel-state information and the first hybrid-ARQ ACK/NACK bits in physical control channel resources of the first uplink subframe, on a single carrier, in response to determining that the number of hybrid-ARQ ACK/NACK bits to be transmitted in the first uplink subframe is less than or equal to the threshold number.

(Ex. 1370 at p. 26, 19:15–33.)

392.   This claim is also related to carrier aggregation, an important technology.  But the claimed invention itself does not represent a fundamental advancement.  It simply contemplates that two types of information are to be transmitted:  (1) ACK/NACK, (acknowledgements of successful or not successful reception of data); and (2) Channel-state Information (information about what the channel characteristics are, so that the base station can make more prudent decisions).  Then, according to Ericsson's interpretation of the standards, the claim contemplates determining if both types of information fit in the room available in the transmission of that information.  Finally, the claim requires that if enough room is indeed available, to transmit both types of information.  The claim requires nothing more.

393.   In short, the claimed invention is merely common sense.  It boils down to the following steps:  Decide if you are planning on transmitting two things. Decide if you have room to transmit those two things.  If you do have the room, transmit them.  Simply put, this alleged invention does not represent a fundamental

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1   advancement.

2   394.   As with the previous example, most of Ericsson patents merit an

3   Importance Rank of 3 and a Contribution Rank of 4, demonstrating that Ericsson's

4   portfolio is generally unimportant and not valuable.

5   **VII.   INDUSTRY-WIDE 2G, 3G and 4G INFRASTRUCTURE FAMILY**

6   **ANALYSIS**

7   395.   The team of engineers led by Mr. Sinha of Concur IP also analyzed the

8   patent families belonging to LG, Samsung, HTC, ZTE, Apple, and Ericsson with an

9   issued, non-expired patent and an English-language family member and determine,

10  for each of these six companies, how many such patent families included at least

11  one patent having at least one "pure non-UE claim" directed to infrastructure (*e.g.*, a

12  base station or core network).  (Ex. 1426.)  Such patent families with at least one

13  pure non-UE claim are referred to as "infrastructure families."  The results of this

14  industry-wide 2G, 3G and 4G infrastructure family analysis are summarized in

15  Tables 18, 19, 20 and 21 below.  I understand that these results support Dr. Lynde's

16  PSR calculations.

17  396.   The total number of overall infrastructure families declared essential to

18  the 2G, 3G, and/or 4G standards, for each of Samsung, LG, HTC, ZTE, Apple, and

19  Ericsson, is shown in Table 18 below along with the total number of all declared

20  families for those six companies.  (Ex. 1453.)

21

22

23

24

25

26

27

28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| ASSIGNEE | DECLARED FAMILIES | INFRASTRUCTURE FAMILIES |
|---|---|---|
| Samsung | 965 | 823 |
| LG | 514 | 358 |
| HTC | 75 | 33 |
| ZTE | 195 | 139 |
| Apple | 193 | 155 |
| Ericsson | 867 | 720 |

**TABLE 18: Overall Infrastructure Families for Six Companies (PDX 123)**

398.   The total number of 2G infrastructure families (declared essential to at least the 2G standard ) for each of Samsung, LG, HTC, ZTE, Apple, and Ericsson, is shown in Table 19 below along with the total number of all 2G declared families for those six companies (*See id*.):

| ASSIGNEE | DECLARED FAMILIES | INFRASTRUCTURE FAMILIES |
|---|---|---|
| Samsung | 40 | 31 |
| LG | 32 | 16 |
| HTC | 14 | 7 |
| ZTE | 24 | 21 |
| Apple | 36 | 26 |
| Ericsson | 267 | 218 |

**TABLE 19: 2G Infrastructure Families For Six Companies (PDX 124)**

399. The total number of 3G infrastructure families (declared essential to at least the 3G standard) for each of Samsung, LG, HTC, ZTE, Apple, and Ericsson, is shown in Table 20 below along with the total number of all 3G declared families for those six companies (*See id.*):

| ASSIGNEE | DECLARED FAMILIES | INFRASTRUCTURE FAMILIES |
|---|---|---|
| Samsung | 219 | 174 |
| LG | 172 | 134 |
| HTC | 23 | 13 |
| ZTE | 35 | 30 |
| Apple | 65 | 51 |
| Ericsson | 452 | 372 |

**TABLE 20: 3G Infrastructure Families for Six Companies (PDX 125)**

400. The total number of 4G infrastructure families (declared essential to at least the 4G standard) for each of Samsung, LG, HTC, ZTE, Apple, and Ericsson, is shown in Table 21 below along with the total number of all 4G declared families for those six companies (*See id.*):

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| ASSIGNEE | DECLARED FAMILIES | INFRASTRUCTURE FAMILIES |
|---|---|---|
| Samsung | 841 | 727 |
| LG | 345 | 228 |
| HTC | 57 | 27 |
| ZTE | 191 | 136 |
| Apple | 169 | 139 |
| Ericsson | 498 | 428 |

**TABLE 21: 4G Infrastructure Families for Six Companies (PDX 126)**

402.   Although essentiality ratios for infrastructure patent families were not directly evaluated, I fully expect the UE essentiality ratios and the infrastructure essentiality ratios to be substantially the same in most cases.  My opinion is based on the nature of mobile communications and my understanding through analysis of how mobile communication patent claims are drafted.

403.   Two main components of a mobile communications network and are the base stations and the UEs, which I refer to as the "two ends" of a "communication link."  In the downlink, a base station generates and transmits a signal, for example a control signal and/or a data signal, and the UE receives and processes the signal.  In the uplink, the UE generates and transmits a signal and a base station receives and processes the signal.  Consistent with the interoperability objectives of the standards, the vast majority of the standards-essential patents directed to mobile communications contains claims that describe such UE-to-base station interactions in a given downlink or uplink direction.  That is, most standards-essential patents would include claim describing the interaction from a UE's point of view (*i.e.*, a pure UE claim), a base station's point of view (*i.e.*, a pure non-UE claim), or both (*i.e.*, a system claim).  In a nutshell, the essentiality analysis boils down to whether the 2G, 3G, or 4G standards require such UE-to-base station

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1  interactions described in the patent claims.

2      404.   Given this dynamic, it is reasonable to expect that in most instances,

3  pure UE, pure non-UE, and system claims mapped to a particular standardized

4  technology would rise or fall together.  That is, if a pure UE claim directed to a

5  particular standardized technology involving the UE-to-base station interaction is

6  found to be essential to the standard, a pure non-UE claim directed to the named

7  technology is expected to be also essential to the standard, or vice versa.  As such,

8  the essentiality ratio of pure UE claims is expected to be substantially the same as

9  the essentiality ratio of pure non-UE claims.  Similarly, the essentiality ratio of UE

10  families that include at least one pure UE claim is expected to be substantially the

11  same as the essentiality ratio of the infrastructure families that include at least one

12  pure non-UE claim.

13      405.   That does not mean that where any one claim, patent, or even patent

14  family is essential to one end of the communication link, it is always essential to the

15  other.  In other words, while at the "microscopic" level of one claim or patent the

16  essentiality determinations for each end of the communication link are independent

17  determinations, statistically the two ends are balanced, or symmetric.  I have

18  observed this statistical symmetry in many patent portfolios that I have analyzed

19  over the years, and given the nature of the underlying technical issues, it is not

20  surprising that from a "macroscopic" perspective such a symmetry exists.

21  **VIII.  ERICSSON'S RELIANCE ON "APPROVED CONTRIBUTIONS" AS A**

22         **MEASURE OF PATENT STRENGTH**

23      406.   I understand that Ericsson has shown a preference for a particular

24  method of estimating the strength of a given party's alleged SEP portfolio referred

25  to as "contribution counting."  As I understand it, this methodology focuses on

26  counting the number of "approved" technical submissions made by a given member

27  of the standardization organization, and then treating that member's relative share of

28  the approved technical submissions as a proxy for that member's share of standard-

1    essential patents.  Within ETSI and 3GPP, such submissions are referred to as

2    TDocs.  But TDocs are not patents, and there is virtually no correlation between the

3    content of a TDoc and the scope of any patent claims owned by a company like

4    Ericsson.  For a contribution analysis to accurately estimate the strength of an

5    alleged SEP portfolio, there must be a technical basis to match the contributions to

6    one or more patents within the portfolio.

7         407.   To determine whether there is any correlation between approved

8    technical contributions and standard-essential patents, I calculated the correlation

9    coefficient between two data sets:  the Working Groups relevant to Ericsson's

10   alleged SEPs based on Ericsson's claim charts, and the Working Groups associated

11   with the listing of TDocs identified by Ericsson as constituting "approved"

12   contributions.  For the second data set, I relied on the listing of over 18,000 TDocs

13   Ericsson identified and alleges were approved for inclusion into the standards.  (*See*

14   Ericsson's First Supplemental Response to Plaintiff's Fourth Set of Interrogatories

15   (No. 35).)  As each Working Group is responsible only for certain technical

16   specifications, the lack of correlation between these two data sets shows that

17   Ericsson's alleged SEPs could only potentially relate to a small fraction of the over

18   18,000 alleged "approved" contributions Ericsson identified.  Given the lack of

19   correlation between the data sets, contribution counting provides virtually no

20   evidence as to the strength of a given SEP portfolio.

21        **A.    <u>Correlation Methodology</u>**

22        408.   I developed an approach to identify if any correlation exists between

23   Ericsson's TDocs and its alleged SEP portfolio that categorizes the data based on

24   the standard specifications identified in Ericsson's claim charts.  Ericsson admits

25   that it "does not maintain, in the ordinary course of business, a list correlating [the

26   over 18,000] approved technical proposals with its patent applications, patents

27   issued, or patent family members."  (*Id.*)  To correlate a single TDoc of those

28   identified by Ericsson to one or more patents within the alleged SEP portfolio would

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

require in-depth analysis of not only the TDoc itself, but of each patent as well. Given the size of Ericsson's alleged SEP portfolio and the large number of TDocs identified, a full analysis is impractical. However, any relationship between TDocs and patents can be identified based on the relevant Working Groups associated with (1) the alleged SEPs and (2) the TDocs.

409.   Each Working Group is responsible for a particular set of standard specifications, and the TDocs identify in which Working Group it was submitted, considered, and possibly adopted. Typically, technical contributions are incorporated into each standard specification based on at least one TDoc submitted to the responsible Working Group. Importantly, a non-responsible Working Group cannot revise a technical specification. Based on this structure, it is possible to determine the correlation between the identified TDocs and Ericsson's alleged SEP families. By focusing on the standard specification identified by Ericsson and the relevant Working Groups, I avoided subjectivity as to which Working Group covers which technical category. Another technical expert, Dr. Matthew Valenti, assisted in developing this method, as well as analyzing the resulting data.

410.   Moreover, calculating the correlation coefficient based on relevant Working Groups will provide an indication of the reliability of indiscriminately using the approved contributions in establishing the strength and essentiality of Ericsson's alleged SEP portfolio. By "indiscriminately," I refer to the use of all of Ericsson's approved contributions to determine the strength and essentiality of Ericsson's alleged SEP portfolio. As I discussed earlier with respect to the Industry-Wide Essentiality Analysis and the SEP Analysis, only those patents with at least one claim directed towards User Equipment are relevant to my analysis in this litigation. In identifying the over 18,000 TDocs, Ericsson does not categorize which TDocs are relevant to technical contributions for User Equipment. Accordingly, by determining the correlation between Working Groups relevant to the patent families and those identified by Ericsson's list of TDocs, it is possible to determine whether

Ericsson is seeking to support its position regarding the relative strength of its UE-directed portfolio by relying on unrelated technical contributions which may or may not be patented.

411.   As I discussed earlier, approved contributions incorporated into a specific standard specification are only embodied within a TDoc submitted to the responsible Working Group.  Therefore, the Working Groups relevant to each of the 219 family/standard pairs are identifiable based on the standard specifications on which Ericsson alleges the patent family reads.  For example, Ericsson asserts that P08167 reads on the 3GPP technical specification 25.211, version 6.0.0, which is one of the standard specifications for which the RAN Working Group 1 is responsible.  In order for the claimed subject matter of P08167 to be included within the standard specification, a TDoc embodying the claimed subject matter must have been submitted to and approved by RAN Working Group 1.  Therefore, RAN Working Group 1 is a relevant Working Group for P08167.

412.   I limited my analysis to those family/standard pairs for which Ericsson provided claim charts.  In this way, the identification of relevant Working Groups is based on Ericsson's own assertions as to which standard specifications each patent family/standard pair reads on.  To attempt to identify relevant Working Groups, without Ericsson's assertion as to the standard specifications each patent family/standard pair is relevant to, would require an in-depth analysis of the patents of the uncharted patents families, as well as all standard specifications available from ETSI and 3GPP.  This would interject subjectivity into the correlation analysis that I wanted to avoid.  Instead, I wanted to use an objective metric not requiring any judgement calls by myself or Dr. Valenti as to what is the relevant standard specifications for a patent family.

413.   To identify the relevant Working Groups for each of the 219 family/standard pairs, I first identified the responsible standard specifications for each Working Group from the 3GPP website.  This information is available for four

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

currently open Technical Specifications Groups, or "TSGs." These TSGs are RAN, which I mentioned earlier, GSM EDGE Radio Access Network, or "GERAN," Core Network and Terminals, or "CT," and Service and System Aspects, or "SA." Each of these TSGs include various Working Groups. For example, RAN is divided into six Working Groups. For example, the RAN Working Group 1 I discussed earlier is known as Radio Layer 1, or "R1."

414. When a TSG or a Working Group is closed, the specifications for which the closed unit was responsible are either withdrawn, or the responsibility for the technology is migrated to a Working Group that is open. 3GPP's website maintains this information, including a record of all specifications released. For those Ericsson TDocs identified that were submitted to closed Working Groups, I identified the currently open Working Group that accepted responsibility for some, if not all, of the technology specifications of the closed Working Group.

415. After identifying the responsible standard specifications for each Working Group, I then determined which Working Groups are relevant to each of the 219 family/standard pairs based on the standard specifications identified by Ericsson in the representative claim charts. In the context of this correlation analysis, I make no admissions regarding whether any of the claims of Ericsson's alleged SEP portfolio actually read on the identified standard specifications in the claim charts. To quantify the proportion of Working Groups relevant to the 219 pairs, I allocated numerical values to each Working Group relevant to a particular patent family. For example, the standard specifications identified by Ericsson for P23384 are technical specifications 36.213 and 36.211, which are both the responsibility of the R1 Working Group. Accordingly, I allocated a full point ("1") to R1.

416. When more than one Working Group is relevant to a particular patent family, I allocated a proportional value to each Working Group. For example, Ericsson identified four different technical specifications as allegedly read upon by

P08804:  technical specifications 36.212, 36.211, 36.213, and 36.321.  R1 is responsible for specifications 36.212, 36.211, and 36.213, while R2 is responsible for technical specification 36.321.  Accordingly, I allocated R1 and R2 each a half point ("0.5").  I chose this even allocation because in each case Ericsson did not provide more detailed contentions regarding how it each patent family should allegedly be weighted with respect to the listed standard specifications.  I have not attempted to weight the allocated points based on the number of standard specifications associated with each Working Group on my own.  Such weighting would inherently interject a judgement as to the relative importance of each Working Group, which is not my intent.  The correlation analysis is meant to identify whether there is any correlation between approved TDoc submissions and the patent families.  In all, there was a possible 219 points that could be allocated, based on the 219 family/standard pairs.

417.  For the second data set, I counted the number of TDocs within the identified set of over 18,000 TDocs for each Working Group.  The Working Group within which a TDoc was submitted can be identified based on the naming convention used.  For example, all TDocs submitted to the R1 Working Group stated with "R1," followed by a six digit identification number.  Moreover, Ericsson has indicated which meeting of the particular Working Group is associated with each of the over 18,000 TDocs.  Again, meeting numbers are appended with the same two character identifier of the Working Group.  Using this information, I counted how many TDocs in Ericsson's list of TDocs is associated with each Working Group.

418.  For those TDocs submitted to closed Working Groups, I identified a currently open Working Group which has subsumed some or all of the technology embodied in the specifications associated with the closed Working Groups.  Some of the TDocs in Ericsson's listing were submitted to the T1, N1, N3, and N4 Working Groups, which have all been closed.  For the T1 Working Group, the

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1    identification was easy, as T1 appears to have been responsible for a single

2    specification, of which a descendant was noted, the responsibility of which fell to

3    the R5 Working Group.  Therefore, I allocated the T1 TDocs to the R5 Working

4    Group.

5         419.   Each of the N1, N3, and N4 Working Groups were responsible for

6    several standard specifications, making the determination of a surrogate Working

7    Group a bit more involved.  To ensure a proper allocation, I reviewed each of the

8    specifications associated with each closed Working Group to identify all currently

9    open Working Groups responsible for any descendant, antecedent, or superseding

10   document.  After reviewing the available records from 3GPP, it was clear that the

11   responsibility was transferred from one closed Working Group to a single open

12   Working Group.  Specifically, it appears that the responsibilities of the N1, N3, and

13   N4 Working Groups were transferred to the C1, C3, and C4 Working Groups.

14   Therefore, I allocated the N1, N3, and N4 TDocs accordingly.

15        **B.**     **There Is Little or No Correlation Between Approved Contributions**

16                **and Issued Patents.**

17        420.   I considered the distribution of the number of instances a standard

18   related to a given Working Group was used in the claim charts provided by

19   Ericsson, as identified by the point values I allocated, as I discussed above.  For

20   example, the R1 Working Group received a score of 67.75 of the 219 points, and R2

21   received 75.92.  These two Working Groups dominated the scene.  The entire

22   distribution is shown in the tab "Claim Charts WG" of the spreadsheet I prepared.

23   (Ex. 1323.)  The spreadsheet further includes a tab labeled "Ericsson TDoc Dist,"

24   showing the distribution of the over 18,000 TDocs that Ericsson identified.  To the

25   extent that the contributions represent a good proxy to the patents that Ericsson

26   claims are standards-essential, these two sets of numbers should be highly correlated

27   as they are intimately related by the corresponding Working Group.

28        421.   As stated above, I calculated the correlation coefficient of these two

data sets.  The correlation coefficient may be calculated using a sample-based
formulation or a population-based formulation.  Although a population correlation
coefficient yields a slightly smaller result, both approaches are acceptable.  For this
analysis, I calculated a sample correlation coefficient.  The correlation coefficient is
a number between "-1" and "1."  If two sets of numbers are highly correlated in the
same direction, meaning when one variable tends to be large so does the other
variable, the correlation coefficient will be close to "1."  If the correlation is high,
but in the opposite direction, meaning when one variable tends to be large the other
variable tends to be small, the correlation coefficient will be close to "-1."  If the
two sets are independent, the correlation will be mathematically zero, or practically
close to zero.

422.   The calculations and result are shown in the tab labeled "RHO" of the
related spreadsheet.  (Ex. 1323.)  As it turns out, the sample correlation coefficient is
approximately 0.02915, which for all practical purposes is indistinguishable from
zero.  In other words, the two sets of numbers are not correlated at all, proving that
the over 18,000 TDocs that Ericsson provided as evidence of the strength of its
alleged SEP portfolio actually provide no such evidence at all.  When viewed with
respect to the totality of TDocs submitted to each Working Group by Ericsson, out
of the over 18,000 TDocs, this lack of correlation is more clearly evident.  The
"ORDERED" tab ranks the Working Groups based on the total number of
Ericsson's identified approved contributions associated with each Working Group.
(*Id*.)  Although Ericsson identified the 219 family/standard pairs as predominately
relevant to the R1 and R2 Working Groups, these two Working Groups represent
only the sixth and eleventh ranked Working Groups based on total approved
Ericsson TDocs, respectively.

423.   In order to better appreciate why a correlation coefficient of 0.02915 is
practically zero, I calculated the correlation coefficient between two randomly-
generated set of values.  The results can be found in the tab labeled

"RAND_FIXED" of the spreadsheet attached to my Expert Report.  (*Id.*)  I used the Excel random function "rand()" to generate two sets of random numbers between "0" and "1," all of them independent of all other random numbers.  The size of each set is 18, the same as with the actual data of the Working Groups.  In other words, the two sets of 18 numbers each are independent and thus their correlation coefficient should be close to zero.  As it turns out, it is approximately 0.10709, which reinforces my statement that 0.02915 is practically zero.  Since the function "rand()" will generate new values each time it is invoked, I "froze" one set of results in the spreadsheet to illustrate the point.  The "experiment" could be re-run repetitively to further support that such a set of randomly generated values would have a correlation coefficient close to zero, much as 0.02915 is.

## C.   Technical Analysis of Sample TDocs Identified By Ericsson Shows a Lack of Support Regarding the Strength of Ericsson's Portfolio.

424.   As shown through my correlation analysis, there is essentially zero correlation between the two data sets.  For further context, Dr. Valenti and I took it upon ourselves to analyze several of Ericsson's identified approved contributions.  There are various types of TDocs that are approved during the standardization process, many of which are not inventive in nature.  For example, an approved TDoc might merely address a text proposal, such as rephrasing, which is not an actual inventive contribution to the standard that is protectable by a patent.  Moreover, approved TDocs may not be directed to relevant to User Equipment.  For example, an approved TDoc may be directed to text proposals concerning portions of the standard relevant only to base stations.  As these types of contributions are non-inventive or irrelevant to User Equipment, these TDocs fail to provide any evidence as to the strength or essentiality of Ericsson's alleged SEPs.  I will discuss several examples of these types of TDocs that were included in Ericsson's listing, to help provide more context as to the correlation results discussed above.  These examples are not meant to be in any way exhaustive, but to merely provide a few

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

examples of the types of irrelevant TDocs Ericsson has included in its listing.

### 1.   TDoc C1-060692

425.   This TDoc is a Change Request, or "CR," seeking to modify technical specification 24.206, entitled "Voice Call Continuity between the Circuit-Switched (CS) domain and the IP multimedia (IP) Core Network (CN) Subsystem."  (Ex. 1388.)  This technical specification relates to the core network, and therefore does not involve the handset.  Moreover, the requested change is merely a "correction of notation for the signaling flows."  The justification given is that the "notation for CS and IMS control signaling and media are similar."  The only proposed action is to change the notation for the different control signals to make it "easier to see the difference between CS and IMS" which "can avoid possible misunderstanding during implementation."  This CR is a clarification and does not introduce or produce any new features whatsoever.

### 2.   TDoc C4-080437

426.   This TDoc is a joint submission by Ericsson and several other member organizations, related to technical report 23.820, entitled "Study on IMS Restoration Procedures."  (Ex. 1339.)  This technical report proposes a "problem scenario" involving the Home Subscriber Server, or "HSS."  The HSS is a database containing subscriber information.  (Ex. 1416 at p. 144.)  The HSS resides within the Evolved Packet Core, or "EPC," which is the core network, as illustrated by the following Figure 8.1 from the Dahlman text.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIGURE 8.1**

Core-network (EPC) architecture.

(*See id*. at 144.)

427.   The problem scenario focused on overcoming interruptions of the HSS due, for instance, from hardware faults, resulting in potential loss of critical information.  (Ex. 1337 at p. 15.)  The recommendation in the TDoc is: "The contribution proposes to conclude that any IMS Core Network implementing IMS Restoration Procedures should include an HSS that provides sufficient redundancy so that it is possible to assume that critical data is always available."  As the contribution is only contemplating the redundancy of data stored at the HSS within the EPC, it does not in any way relate to handsets.  Moreover, the proposed text does not cover how to technically implement the HSS in such a manner, only that some information is deemed "critical" and should be preserved in the implementation.  The contribution is also related to a technical report, which contains mostly explanatory material as opposed to a technical specification.  Standards are defined in the set of technical specifications, not in technical reports.  Thus, for several independent reasons, this CR does not introduce or produce any new patentable features whatsoever.

### 3.   TDoc R1-092936

428.   This TDoc is a text proposal for inclusion in Appendix A of technical report 36.814.  (Ex. 1345.)  This proposed text relates to the evaluation of a performance metric, specifically Effective Interference over Thermal noise, or "IoT noise."  Appendix A of technical report 36.814 is entitled "Simulation Model" and provides details on a simulation model used to evaluate new proposed technologies.  Although simulation models are important tools used by the standards bodies to evaluate proposed technologies, they are not in themselves inventive in nature.  Once again, a technical report is not a contribution to a technical specification.  It is true that occasionally an inventive idea may originally be disclosed in a technical report.  However, such an inventive idea would have to go through the approval process for adoption into a technical specification like any other TDoc.  That is, a separate TDoc containing the inventive idea would need to be submitted to the respective Working Group responsible for the technical specification, which would contribute to the total count of approved TDocs.  Therefore, counting both the TDoc directed to the technical report and the TDoc directed to the technical specification for the same inventive idea would be double-counting and is fundamentally flawed.

### 4.   TDoc R1-145035

429.   This TDoc is a text proposal on the topic of small data transmission.  (Ex. 1346.)  The text proposal merely captures what was already agreed upon at earlier meetings for the RAN 1 Working Group.  The document itself contains no new inventive features, as it is merely documenting what was discussed at an earlier meeting.

### 5.   TDoc R3-092069

430.   This TDoc is a CR proposing changes to technical specification 36.300.  (Ex. 1347.)  The requested change is to remove a feature from 36.300 based on the outcome of a discussion by another TSG, specifically the SA2 Working Group, at another meeting.  A TDoc removing a feature from the standard does not support the

strength of Ericsson's allegedly standard essential patents portfolio.

### 6.   TDoc R4-060634

431.   This TDoc is a text proposal directed to a technical report embodied in another TDoc, R4-060298, which concerns unwanted or "spurious" emissions from the base station.  (Ex. 1348.)  It is not relevant for at least two reasons.  First, it is about specifications for the radio emissions from base stations, and therefore cannot apply to the handset.  Second, it is regulatory in nature, discussing requirements on unwanted base station transmissions, and as such does not relate to any particular SEP feature.

### 7.   TDoc R4-070399

432.   This TDoc is entitled "Simulations assumptions for 16QAM EUL BS receiver performance."  (Ex. 1349.)  The purpose of this TDoc is to recommend a set of parameters or assumptions for use in simulations.  The focus of the TDoc is exclusively on simulation methodology, and does not propose any particular feature.  While simulations are important tools used by the standards bodies to compare and contrast new technologies, they are not in themselves inventive in nature.

### 8.   TDoc R4-080606

433.   This TDoc is a text proposal for technical specification 36.141, entitled "Base Station (BS) conformance testing."  (Ex. 1350.)  This TDoc addresses another proposal to remove the "Wide Area BS" classification.  The corresponding edits proposed in R4-080606 is to remove the text in the technical specification that reference the wide area BS class.  The main proposed edits are to remove 11 instances of the phrase "wide area BS" from the technical specification.  A few other edits are proposed that state that during the test, the signal level should be adjusted, rather than specific attenuators adjusted.  None of these edits relate to a feature covered by the allegedly SEP portfolio.  Moreover, the TDoc itself relates to tests performed at the base station, and therefore does not relate to a handset.

### 9.  TDoc R4-081184

434.   This TDoc, entitled "Cleanup and alignment of 'frequency band and
channel alignment'," is editorial in nature.  (Ex. 1351.)  The purpose of this TDoc is
to propose edits to three technical specifications that were developed concurrently in
order to make them agree, specifically 36.101, 36.104, and 36.141.  These technical
specifications contain common information.  The TDoc merely proposes changes to
the writing of the three documents to make them agree.  No new concepts are
introduced in this TDoc, since its purpose is to do some editorial housekeeping.

### 10.  TDoc R4-091848

435.   This TDoc is a text proposal related to work item technical report
embodied in TDoc R4-090993.  TDoc R4-091848 covers receiver spurious
emissions at the base station.  (Ex. 1352.)  In particular, it sets requirements for the
base station receiver and describes tests performed at the base station, as discussed
in Section 7.6.1.1.  Since it covers base station receiver tests, it is not related to
handsets.  Moreover, it is concerned with testing and emissions, which do not
involve any of the features in the alleged SEP portfolio.

### 11.  TDoc R4-093006

436.   This TDoc is a proposal to change the text of technical specification
37.104.  (Ex. 1353.)  The purpose of the text proposal is to introduce base station
classes.  The proposed edit involves a short section entitled "Base station classes."
While concerned with the classification of base stations, the TDoc has nothing to do
with handsets.

### 12.  TDoc R4-121802

437.   This TDoc is a text proposal to update technical report 30.007, which is
a guideline for drafting work items and study items on a particular set of
technologies.  (Ex. 1354.)  The TDoc is procedural in nature, providing the flow for
work items along with descriptions of, and drafting rules for, work items, study
items, and technical reports.  While the focus of these items is carrier aggregation,

the TDoc does not get into the specifics of carrier aggregation and does not in itself offer any proposals for new technological features.

13.    TDoc R1-051450

438.    This TDoc is a CR for technical specification 25.211, version 5.7.0. (Ex. 1341.)  The CR is entitled "Clean up due to removal of CSICH."  Prior to this CR, a decision had been made to remove the CPCH Status Indicator Channel (CSICH) from the standard.  However, there was still reference to CSICH in the technical specification.  The only edit proposed by the CR is to delete a single instance of the phrase "possible use by CSICH or" from the technical specification. No other edits are proposed.  The TDoc is purely editorial, and contrary to adding new features or functionality, it is deleting a reference to a removed feature.

14.    TDoc R1-051451

439.    This TDoc is a CR for technical specification 25.211, version 6.6.0. (Ex. 1342.)  The requested change is exactly the same edit proposed in TDoc R1-51450 that I just discussed.  The only difference between the two TDocs is the version of the technical specification to which the edit is being made.

15.    TDoc R1-061351

440.    This TDoc is directed to an edit of technical report 25.903, version 0.4.0.  (Ex. 1344.)  The TDoc proposed replacing the abbreviation "ConCon" with the abbreviation "CPC."  It was pointed out in another TDoc, R1-061351, that the term ConCon could be "perceived as unfortunate and/or offensive in English as well as in French" because "con" is apparently the most common curse word in French. TDoc R1-081582 seeks to use the abbreviation CPC instead, which is a term previously used in an earlier submission by Qualcomm.  Therefore, this TDoc submission is not inventive and does not disclose a new feature, but rather is editorial in nature.  Moreover, the term proposed was not initially proposed by Ericsson, but apparently was proposed earlier by Qualcomm, as illustrated in R1-060946.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

## IX.   LTE'S KEY DISTINGUISHING FEATURES WERE NOT
## DEVELOPED BY ERICSSON, AND WERE WELL-KNOWN BEFORE
## STANDARDIZATION OF LTE (4G)

441.   I understand Ericsson's witnesses intend to argue that Ericsson made significant and valuable contributions to 4G LTE.  For example, in his rebuttal report, Dr. Parkvall cites a paper written by Ericsson engineers that identifies eight specific LTE key features that purportedly distinguish LTE over WiMAX to support his argument that a system without Ericsson's LTE technologies (*e.g.*, Link Adaptation) would translate to "reduced user throughput by 7%."  I understand Mr. Kennedy then relies on Dr. Parkvall's analysis to calculate the value of Ericsson's 4G portfolio.  I disagree with this.  These key distinguishing features of LTE were well known before standardization of LTE, and were developed by companies other than Ericsson.

442.   LTE differs from the earlier 3GPP cellular technologies (such as 2G and 3G) and other contemporaneous cellular technologies (such as Worldwide Interoperability for Microwave Access, or "WiMAX") in many ways.  One principal difference in LTE is that it abandons the GSM/UMTS and CDMA2000 core network designs, and introduces a "flat," IP-based architecture, ideally suited for handling packet-switched data. While this is an important addition to the overall communication networking development, since my understanding is that the issues in this case are limited to UE, I will not go into detail on the core network issues. Instead, I will address each of LTE's key distinguishing features that are of specific relevance to User Equipment.

443.   The most significant way LTE differs from the earlier 3GPP cellular technologies is the move to a different air interface based on the Orthogonal Frequency Division Multiple Access (OFDMA) protocol.  In LTE, the available air interface is essentially divided up into an array of closely-spaced frequency and time slots, subsets of which can be allocated to different users.  The allocation can be

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

changed rapidly over time, depending on the amount of data to be transmitted or received by each user. As such, OFDMA offers a flexible way to deliver dynamically changing data rates to multiple subscribers, reflecting the more "bursty" nature of today's data intensive services (where a user may be using relatively low amounts of data when making a voice call, and then switch to use a burst of large amounts of data when streaming video on a smartphone). Figure 66 illustrates the flexible allocation of "frequency and timeslots" in an OFDMA system.



**FIGURE 66: Example Orthogonal Frequency
Division Multiple Access (OFDMA) Allocations**

444. OFDMA was well-known and used in other communication systems before standardization of LTE. For example, OFDMA was used in WiMAX (Worldwide Interoperability for Microwave Access) systems in the early-2000s, and was proposed as a candidate for the 3G air interface in 1997. WiMAX was originally developed to provide fixed residential internet connectivity. First standardized by the Institute of Electrical and Electronics Engineers (IEEE) in 2004 under the technical name IEEE 802.16, WiMAX later evolved to support cellular-

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

like applications.  Although WiMAX had been deployed commercially, notably by Sprint in the United States, it was not particularly commercially successful.

445.   Ericsson's engineers published a paper (the "Furuskär paper") that presents "some key characteristics of the LTE radio interface, including physical layer and radio resource management functions, and evaluates impact on system performance."  (*See* Ex. 1450 at p. 1.)  The Furuskär paper also provides comparisons of basic performance metrics between LTE and WiMAX, concluding that LTE enjoys a combined gain in spectrum efficiency of approximately 60% in the downlink and 100% in the uplink as compared to WiMAX, due to contributions from a set of distinctive features.  (*Id.*)  This paper also identifies a set of key characteristics and related distinctive features ("more sophisticated solutions") that distinguishes LTE from other systems such as WiMAX, summarized in Table 1 reproduced below:

TABLE I
LTE KEY CHARACTERISTICS

| Function (slogan used in Fig. 1-2) | LTE | Mobile WiMAX wave 2 | Performance impact |
|---|---|---|---|
| Multiple access (MA) | OFDM in DL, DFT-spread OFDM in UL | OFDM in DL and UL | DFT-spread OFDM reduces the peak-to-average power ratio and reduces terminal complexity, requires one-tap equalizer in base station receiver |
| Uplink power control (PC) | Fractional pathloss compensation | Full pathloss compensation | Fractional pathloss compensation enables flexible trade off between average and cell-edge data rates |
| Scheduling (Scheduling) | Channel dependent in time and frequency domain | Channel dependent in time domain | Access to the frequency domain yields larger scheduling gains |
| MIMO scheme (MIMO) | Horizontal encoding (multiple codewords), closed loop with precoding | Vertical encoding (single codeword) | Horizontal encoding enables per-stream link adaptation and successive interference cancellation (SIC) receivers |
| Modulation and coding scheme granularity (MCS) | Fine granularity (1-2dB apart) | Coarse granularity (2-3dB apart) | Finer granularity enables better link adaptation precision |
| Hybrid ARQ II (HARQ) | Incremental redundancy | Chase combining | Incremental redundancy is more efficient (lower SNR required for given error rate) |
| Frame duration (CQI delay) | 1ms subframes | 5ms frames | Shorter subframes yield lower user plane delay and reduced channel quality feedback delays |
| Overhead / control channel efficiency (OH / CCH eff) | Relatively low OH (while control channels are robust) | Relatively high OH | Lower overhead improves performance |

446.   For example, the Furuskär paper identifies the following eight key LTE features as being responsible for the performance of LTE over WiMAX:  (1) "OFDM in DL and DFT-spread OFDM in UL" for Multiple Access (MA); (2) "Fractional pathloss compensation" for uplink power control (PC); (3) "Channel

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

dependent in time and frequency domain" for Scheduling; (4) "Horizontal encoding
(multiple codewords), closed loop with precoding for MIMO scheme; (5) "Fine
granularity (1-2 dB apart)" for Modulation and coding scheme granularity (MCS);
(6) "Incremental redundancy" for Hybrid ARQ II (HARQ); (7) "1 ms subframes for
Frame duration (CQI delay); and (8) "Relative low OH (while control channels are
robust)" for Overhead/control channel efficiency (OH/CCH eff).  As explained
below, these eight alleged key LTE features were also known and/or developed by
others (*i.e.*, not Ericsson) before the standardization of LTE.

A.     **OFDM in Downlink (DL), DFT-spread OFDM in Uplink(UL) for
Multiple Access (MA)**

447.   The "Multiple Access (MA)" function in LTE relates to how frequency
resources are shared among users transmitting on the uplink and the downlink.  As
shown in Table I of the Furuskär paper, LTE uses the well-known OFDM scheme
for the downlink, a technique that is common with the baseline Mobile WiMAX
wave 2 system.  The key LTE distinguishing feature, according to Table I of the
Furuskär paper, is the use of DFT-spread OFDM on the uplink.  DFT-spread
OFDM, also known as SC-FDMA, is a twist on conventional OFDM whereby the
signal is first passed through a Discrete Fourier Transform (DFT) operation before
going through the processing operations of a standard OFDM signal.  The DFT
operation, called DFT-spreading, has the benefit of reducing the peak-to-average
power ratio (PAR), making the system more power efficient.

448.   The idea of DFT-spread OFDM dates back to at least 2002.  In Galda
and Rohling, a DFT-spread OFDM system is proposed, and its benefits with respect
to PAR reduction espoused: "It will be shown in this paper that using the Discrete
Fourier Transform (DFT) matrix as an orthogonal spreading technique will reduce
the PAR significantly."  ( Ex. 1398 at p. 2, *see also id* at pp. 3–5.)  Also in 2002,
Benvenuto and Tomasin proposed a Single Carrier system that has the essential
ingredient of the SC-FDMA system used in LTE, namely a cyclic extension, or

cyclic prefix, which enables simple equalization (*See* Ex. 1394 at pp. 1–2, 6–8.).

Similarly, in April 2002, Falconer proposed a single carrier system that uses a cyclic

prefix and allows for frequency domain equalization.  (*See* Ex. 1397 at pp. 3–4, 6–

8..)  Falconer also proposed using the SC-FDMA system in the uplink and OFDM

on the downlink and discussed associated advantages.

> There may actually be an advantage in operating a dual mode system, wherein the base station uses an OFDM transmitter and an SC receiver, and the subscriber modem uses an SC transmitter and an OFDM receiver, as illustrated in Fig. 7. This arrangement — OFDM in the downlink and SC in the uplink —has two potential advantages:
> - Concentrating most of the signal processing complexity at the hub or base station. The hub has two IFFTs and one FFT, while the subscriber has just one FFT.
> - The subscriber transmitter is SC, and thus inherently more efficient in terms of power consumption due to the reduced power backoff requirements of the SC mode. This may reduce the cost of a subscriber's power amplifier.

(*Id* at 5.)

449.   As such, the concept of coexistence of OFDMA (in the downlink) and

SC-FDMA or DFT-spread OFDM (in the uplink) in a communication system was

also known since at least 2002.

450.   As DFT-spread OFDM was already well known at the time that LTE

standardization commenced, any further innovation in this area is merely the

incremental engineering improvements used to reduce the idea to practice.  In

reviewing Ericsson's alleged SEP Families, I could not find any that lay claim to the

idea of SC-FDMA or co-existence of OFDMA and SC-FDMA.  The scope of

coverage of Ericsson's alleged SEPs merely utilizes SC-FDMA and/or co-existence

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1    of OFDMA and SC-FDMA to perform some other, incremental function.

2    **B.    Fractional Pathloss Compensation for Uplink Power Control**

3    451.    Power control (PC) focuses on the selection of the UE's transmit

4    power, in order to achieve a desired power level for a signal when it is received at

5    the base station.  The transmit power must account in some way for the pathloss that

6    occurs between the UE and the base station.  Previous generation standards (*e.g.*, 2G

7    and 3G) used full pathloss compensation, where the UE would transmit enough

8    power to fully compensate for the pathloss.  However, in LTE, fractional pathloss

9    compensation was introduced, whereby the UE does not necessarily fully

10   compensate for the pathloss, but rather the degree of compensation is controlled by a

11   parameter "α," which can vary from "0" (no pathloss compensation) to "1" (full

12   pathloss compensation).  I determined that none of the Ericsson's purported SEP

13   Families are specifically directed to fractional pathloss compensation, which again

14   is identified as the key distinguishing feature of the LTE uplink power control

15   function in the Furuskär paper.

16   452.    The fractional pathloss compensation technology was apparently

17   introduced into the 4G standard by another company, namely, Interdigital, as shown

18   in TDoc R1-072781.  (Ex. 1404 at pp. 1–8.). As shown in the portion of the R1-

19   072781 reproduced below, the inclusion of fractional pathloss in LTE using the

20   parameter "α" was proposed by Interdigital.

21

22

23

24

25

26

27

28

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

## 2. Power control for PUSCH

We propose a combined open and closed loop scheme for UL intra-cell PC to control the UE transmit PSD, $PSD_{Tx}$, (e.g. power per RB), which can be generally given by

$$PSD_{Tx} = \underbrace{P_0 + SINR_{Target} + \alpha \cdot PL}_{PSD_{open}} + \beta \cdot \Delta_{closed} + \Delta_{MCS} \qquad \text{(dBm)} \qquad \textbf{(1)}$$

where

- $PSD_{open}$ represents the pathloss based (fractional) open loop transmit PSD in dBm, where the pathloss is measured at the UE, based on the DL RS whose transmit power is known at the UE.
- $P_0$ is a cell-specific parameter (in dBm) including UL interference level etc, which is signaled by the eNodeB via higher layer signaling.
- $SINR_{Target}$ is a UE (or a subset of UEs) specific parameter (in dB), allowing the eNodeB to set classes of service for the UE. $SINR_{Target}$ may be adjusted through an outer loop PC at the serving eNodeB according to QoS and be a function of pathloss to the serving cell and some neighboring cells. $SINR_{Target}$ can be configured by the serving eNodeB on a semi-static basis and then signaled to the UE (or subset of UEs) via higher layer signaling.
- $PL$ is the downlink pathloss (in dB).
- $\alpha$ is a cell specific pathloss compensation factor for fractional power control where $0 < \alpha <= 1$. $\alpha$ can be configured by the eNodeB on a semi-static basis and signaled via higher layer signaling.

(*Id.* at 2.)

453.    In addition, Motorola had previously disclosed using the fractional pathloss approach, as shown in U.S. Patent No. 7,738,907, filed on February 19, 2007, and claiming priority to June, 20, 2006, which is before the date of the Interdigital TDoc.  This patent teaches, *inter alia*, that "based on channel condition measurements reported by UEs served by Node B, . . . the Node B determines ([in step] 510) a ***fractional path loss*** for each such UE."  (Ex. 1414 at p. 12, 8:56–59.) None of the Ericsson's 4G Families are specifically directed to fractional pathloss compensation.  Furthermore, I conducted a search for any Ericsson patents directed to fractional pathloss compensation that predate the Motorola patents discussed above.  The search was conducted using a well-known patent search tool, LexisNexis Total Patent, which obtains data from over 100 patent authorities, including the United States Patent Office (USPTO) and the European Patent Office

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

(EPO).  (Ex. 1720.)  The search was conducted using the following criteria:

- **Assignee:** Ericsson

- **Key words:** (fract!) and (power w/2 control) within the Title, Abstract and Claim fields, and

- **Priority date:** Before February 20, 2007 (hence on or before February 19, 2007, the U.S. filing date of the Motorola '907 Patent).

454.  The search produced 72 Ericsson US, EP, and WO patents.  (Ex. 1396.) I reviewed these 72 patents, and determined that they do not cover fractional pathloss compensation as standardized in LTE.  In summary, after a reasonably diligent search, I was unable to identify any Ericsson patent covering this technology; and it appears that it was not Ericsson but instead other companies that developed this technology and proposed it be included in LTE.

455.  Thus, while some of Ericsson's alleged SEPs may be related to fractional pathloss compensation technology and perform some other, incremental functions, none of them cover the key LTE distinguishing feature itself.

### C.    Channel Dependent Scheduling in Time and Frequency Domain

456.  The "scheduling" function in LTE relates to how different users are assigned different time-frequency resources for communication.  Scheduling can take advantage of rapid changes in the signal qualities of different users (*e.g.*, due to fading) in order to use the best resources for a given user at a given time.  Both systems identified in the Furuskär paper use scheduling that is "channel dependent in time," meaning that at each time increment, the system will optimize the usage of resources for different users.  The distinguishing key feature of LTE identified in the Furuskär paper is that LTE scheduling is not only channel dependent in time, but is also channel dependent in the frequency domain.  This means that at a given time, the frequencies assigned to the users can be optimized in an LTE system, whereas in Mobile WiMAX Wave 2 that flexibility did not exist.  None of Ericsson's 4G SEP Families are specifically directed to channel dependent scheduling in the time and

1  frequency domains, which again is identified as the key distinguishing feature of the
2  LTE scheduling function in the Furuskär paper.

3       457.   Moreover, the benefits of channel-dependent scheduling in time and
4  frequency were known well before the start of LTE standardization.  As early as
5  1995, Knopp and Humblet proposed a scheduler that was channel dependent in time
6  and frequency.  (Ex. 1390.)  The frequency-dependent operation of the scheduler is
7  described in the paragraph below equation (13):  "Firstly, the fact that there are
8  multiple users and that the base station can allocate different parts of the bandwidth
9  arbitrarily, only one user is permitted to transit at any given frequency.  This user
10 has the strongest instantaneous response at that frequency." (*Id.* at 3.)  Therefore,
11 the paper proposes a frequency-dependent scheduler that allocates resources to the
12 user with the best CQI at each frequency.

13       458.   Over the years, more engineering effort has been directed towards
14 improving the performance of the time-frequency scheduler.  In 2003, Wang
15 proposed a time-frequency scheduler that broke time and frequency into "bins,"
16 where each "bin" was 0.667 msec in duration and 200 kHz in bandwidth.  (Ex. 1392
17 at p. 1.)  The idea of "bins" is also used in LTE, but is referred to as a "resource
18 block."  These resource blocks in LTE have a 1 msec duration and are 180 kHz in
19 bandwidth, which is very similar to what is taught in Wang.  (*See id.* at 1–4.)  The
20 benefits of scheduling in both time and frequency are highlighted in the introduction
21 of Wang:  "In an *adaptive* OFDM system, spectral efficiency can be improved by
22 allocating the time-frequency resources based on throughput requirements, quality
23 of service constraints and the channel qualities of each user." (*See id.* at  p. 1
24 (emphasis in original).)

25       459.   The system proposed by Wang works by having each user's terminal
26 (*i.e.*, "UE" in LTE terminology) predict the channel quality, measured as a signal to
27 interference and noise ratio (SINR) (*i.e.*, "CQI" in LTE terminology).  (*See* Ex. 1392
28 at p. 1.)  Then, the scheduler at the base station allocates resources based on the

SINR and notifies the users of the allocation:  "Each terminal predicts the signal to
interference and noise ratio (SINR) for all bins 3 time-slots ahead and signals the
appropriate modulation format to be used within the upcoming time-frequency bins.
The scheduler allocates these time-frequency bins exclusively to different users and
broadcasts its allocation decisions on a downlink channel."  (*Id.*)  The operation of
the scheduler is to simply allocate each time-frequency bin to the user with the best
channel quality:  "The assumed scheduler works as a selection diversity scheme,
where the user with the best predicted SINR out of all K users will transmit in a
bin."  (*Id.* at 2.)

460.   As yet another example, improvements to the scheduler were discussed
in a 2005 paper by Wengerter.  (Ex. 1393.)  The kind of scheduler proposed in the
reference is a "Generalized Proportional Fair (GPF) scheduling algorithm" and its
benefit is that it "allows tweaking the trade-off between fairness and throughput
performance for best effort traffic in a cellular downlink scenario."  (*Id.* at 1; *see
also id.* at 1–2.)  The paper extends GPF to "frequency scheduling in an OFDMA
system by performing dynamic channel allocation on a subband basis" and "the
scheduling is performed in time domain (TD) and frequency domain (frequency
domain scheduling, FDS)."  (*Id.*)  The benefits of including the frequency domain
are given:  "multiuser diversity can be exploited additionally in frequency domain."
(*Id.*; *see also id.* at 2–3.)

461.   Around this time, several patents built upon the idea of time-frequency
domain scheduling.  One example is U.S. Patent 7,536,205, which was filed on May
13, 2005, and claims priority to June 15, 2004 ("the Samsung '205 Patent").  The
Samsung '205 Patent discloses a scheduler that adds an additional dimension of
space to a time-frequency scheduler (*i.e.*, "spatial division multiple access
scheduling").  The use of time-frequency scheduling is given as *prior art* in the
background section of the Samsung patent:  "For example, a conventional
orthogonal frequency division multiple access (OFDMA) network uses a scheduling

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

1  algorithm that assigns each mobile station to receive forward channel (downlink)

2  traffic in a particular timeslot and using a particular frequency assignment.

3  This scheduling algorithm may be represented by a two-dimensional array that has

4  timeslots on one axis (e.g., x-axis) and frequency assignments on a second axis (e.g.,

5  y-axis)." (Ex. 1406 at p. 6, 1:40–46.)

6      462.   A time-frequency scheduler is recited in claim 1 of the Samsung patent

7  for a first time-frequency slot: "a spatial division multiple access (SDMA)

8  scheduling controller capable of scheduling downlink transmissions to said plurality

9  of mobile stations for a first time-frequency slot." (*Id.* at 11, cl. 1.) Claim 5 of the

10 Samsung '205 patent extends this to each time-frequency slot: "wherein said

11 SDMA scheduling controller is further capable of scheduling downlink

12 transmissions to said plurality of mobile stations for each available time-frequency

13 slot between said base station and said plurality of base stations[.]" (*Id.* at 12, cl. 5.)

14     463.   As another example, Alcatel claimed the use of a time-frequency

15 scheduler in US Patent 7,773,947, which was filed June 14, 2005 claiming priority

16 to an EP patent application filed July 13, 2004 ("the Alcatel '947 Patent"). The

17 scheduling of time-frequency groups appears in the abstract: "the central entity

18 schedulers time-frequency groups available, for data communication purposes

19 between the terminals and the base station, for the base station under its control and

20 the terminals involved in the scheduling process, each time interval." (Ex. 1407 at

21 p. 1.) The use of time-frequency scheduling is detailed in the specification of the

22 Alcatel '947 Patent. (*See, e.g.*, *id.* at 6, 2:10–11 ("[T]ime-frequency groups are used

23 for data communication purposes . . . "); 2:24–26 ("[T]the radio network controller

24 schedules the time-frequency groups available for the base stations under its control

25 and the terminals involved in the scheduling process . . . .").) The scheduling is

26 recited in Claim 1: "scheduling, by the radio network controller, the time-frequency

27 groups available for the plurality of base stations controlled by the radio network

28 controller and the at least one user terminals involved in a scheduling procedure."

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

(*Id.* at 8, cl. 1.)  The novelty in the Alcatel '947 Patent was directed to extending the time-frequency scheduler from its use to schedule a single base station, to using it for coordinating the scheduling of multiple base stations.

464.   Neither the Samsung '205 Patent nor the Alcatel '947 Patent claims to have invented the idea of time-frequency scheduling, but rather builds upon it.  In both cases, time-frequency scheduling was discussed as background, which further supports that time-frequency scheduling was well known by 2004.

465.   As mentioned above, I determined that none of the Ericsson's 4G SEP Families are specifically directed to channel dependent scheduling in the time and frequency domains, which was identified as the key distinguishing feature of the LTE scheduling function in the Furuskär paper.  Thus, while some of Ericsson's alleged SEPs may be related to scheduling in the time and frequency domains and perform some other, incremental functions, none of them cover the key LTE distinguishing feature itself.

### D.   Horizontal Encoding (Multiple Codewords) and Closed Loop with Precoding for MIMO Scheme

466.   The "MIMO scheme" (MIMO) function in LTE relates to transmitting multiple layers of information by using multiple antennas.  As identified in the Furuskär paper, the distinction between LTE and the baseline Mobile WiMAX wave 2 system is that LTE uses "horizontal encoding" while Mobile WiMAX wave 2 uses "vertical encoding."  (Ex. 1450 at p. 2, Table 1.)  The difference between these two types of encoding schemes is that horizontal encoding uses "multiple codewords," while vertical encoding uses just a "single codeword."  (*Id.*)  Moreover, the MIMO scheme used by LTE is "closed loop with precoding."  (*Id.*)

467.   Horizontal encoding was known since at least 2005.  In EP 1,655,871, an European patent application filed by Samsung on September 11, 2005, and claiming a priority date of September 11, 2004 ("the Samsung '871 EP Application"), horizontal encoding is clearly shown in Figure 2:

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

FIG.2

(Ex. 1395 at p. 16, Fig. 2.)

468.   In Figure 2 there are at least two encoders, each creating a separate codeword.  The Samsung '871 EP Application describes this as "horizontal encoding":  "Herein, MIMO transmission technology applied to the transmitter having a plurality of layers will be referred to as a Horizontal Encoding (HE) spatial multiplexing technology." (*Id.* at 4.)  It is understood that "spatial multiplexing" is a type of multiplexing used in a MIMO system, the kind that LTE uses with horizontal encoding.  The use of horizontal encoding is specifically recited in claim 8:  "The method of claim 6, wherein the encoding includes one of a transmit diversity scheme, a vertical encoding scheme, and a horizontal encoding scheme." (*Id.* at 14, cl. 8.)

469.   Horizontal encoding was also disclosed by Nortel in WO 2005/096531 A1, which has an international filing date of April 4, 2005, and a U.S. priority date of April 2004 ("the Nortel WO '531 Application").  Horizontal encoding is shown in Figure 3C of the Nortel WO '531 Application shown below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES



**FIG. 3C**

(Ex. 1408 at p. 84, Fig. 3C.)

470.   The description of Figure 3C (reproduced below) describes it as a "horizontal encoding"

        Figure 3C shows an example configuration with a matrix that performs STTD encoding for multiple input streams, and with horizontal encoding for two, three or four transmit antennas.  Input streams 1006,1008 (only two shown, more possible) are encoded and modulated and then STC encoded in space time encoder 1010 having two, three or four outputs that are then fed to respective transmit chains and transmitted.  In this case, matrix $F_{4x1}$ or $F_{4x2}$ defined below

(*Id.* at 33.)

471.   Closed loop precoding was also known at the time and is disclosed in the two references.  For instance, the background of the Samsung '871 EP Application makes reference to closed-loop precoding as shown below.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

> **[0007]** The MIMO technology may also be classified into a closed-loop scheme, in which channel information is fedback from a receiver to a transmitter, and an open loop scheme, in which channel information is not fedback from a receiver to a transmitter.

(Ex. 1395 at p. 2, ¶ 7.)

472. Moreover, the Samsung '871 EP application discusses the use of precoding with closed-loop MIMO technology as shown below.

> **[0016]** When MIMO technology using the new DL-MAP message is applied to a BWA communication system, it is possible to make the closed-loop MIMO technology using the Channel Quality Information (CQI) fedback from a mobile station, i.e., a receiver, compatible with an [existing] open loop MIMO technology having no feedback of the CQI. When the closed-loop MIMO technology is used, it is possible to perform a precoding.

(Ex. 1395 at p. 3, ¶ 16.)

473. As discussed, closed-loop precoding makes use of CQI feedback from a mobile station. Closed-loop precoding; *i.e.*, precoding using CQI feedback, is claimed by claim 13 as shown below.

> **13.** The apparatus as claimed in claim 11, wherein the precoding block operates when receiving Channel Quality Information (CQI) fedback from a mobile station.

(Ex. 1395 at p. 14, ¶ 13.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

474.   The Nortel WO '531 application also discusses making use of closed-loop precoding.  For instance, the Nortel WO '531 application discloses 8 transmission modes, with the 7th mode being a closed-loop MIMO mode as shown below.

> **7.**   Closed loop MIMO based transmission for fixed and nomadic users; and

(Ex. 1408 at p. 164.)

475.   Thus, these references demonstrate that "horizontal encoding (multiple codewords) and closed loop with precoding," which are identified as the key LTE distinguishing features for the MIMO scheme function in the Furuskär paper, were developed by companies other than Ericsson and were well known before the standardization of LTE.

476.   Furthermore, I determined that none of the Ericsson's 4G Families are specifically directed to horizontal encoding using multiple codewords and/or closed loop with precoding, which again are identified as the key distinguishing features of the LTE MIMO scheme function in the Furuskär paper.  Thus, while some of Ericsson's alleged SEPs may be related to horizontal encoding using multiple codewords and/or closed loop with precoding, none of them cover the key LTE distinguishing features themselves.

E.   **Fine Granularity (1-2 dB Apart) for Modulation and Coding Scheme Granularity**

477.   The "modulation and coding scheme granularity (MCS)" function in LTE relates to the ability of the system to adapt the modulation and coding scheme in accordance with the prevailing channel conditions.  Given an estimate of the channel condition, the system determines an appropriate modulation and coding scheme selected from a finite set of possibilities.  Adaptive modulation and coding is an idea that has been known since at least the late 1990s.  (Ex. 1399.)  The

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

Furuskär paper claims that the key distinguishing feature of LTE with respect to Mobile WiMAX wave 2 is the granularity of the MCS scheme.  In particular, it shows that LTE has a "fine granularity" of "1–2 dB apart," while Mobile WiMAX wave 2 has a "course granularity" of "2–3 dB apart."  (Ex. 1450 at p. 2, Table 1.)  I determined that none of the alleged Ericsson 4G SEP Families are specifically directed to "[f]ine granularity (1–2 dB apart)."

478.   The granularity of an adaptive modulation and coding scheme is illustrated in the figure from a paper by Meng et al., reproduced below.



(Ex. 1401 at p. 8, FIG 5.)

479.   The above figure represents the throughput as a function of the signal-to-noise ratio (SNR) for different Modulation and Coding Schemes.  The optimal MCS scheme for a given SNR is the one that provides the highest throughput.  Each

1    curve is characterized by a sharp transition from essentially zero throughput at a

2    particular value of SNR to the maximum throughput for the specific MCS. (*See id.*

3    at 8–10.) The "granularity" is the difference, in dB, between the steep transitions.

4    A "fine" granularity implies that these sharp transitions are close together, while a

5    "course" granularity implies that they are far apart. The granularity is related to the

6    number of MCS schemes – the more MCS schemes to choose from, the closer the

7    curves will be, and the finer the granularity.

8      480. The benefits of having a finer granularity were well known before LTE

9    was standardized. The LTE standard has 29 different MCS schemes, allowing a fine

10    granularity. (Ex. 1434 at p. 26, Table 7.1.7.1-1.) But even before LTE (4G),

11    HSDPA (3G) had "around 30 MCS levels" and therefore had the capability to

12    implement similar granularity. (*See* Ex. 1400 at p. 1; Ex. 1607.) Any further

13    improvements in granularity were merely engineering improvements needed to

14    reduce the idea of fine-grain adaptive modulation and coding to practice.

15      481. Moreover, the concept of using a fine granularity MCS "enable a closer

16    match between the quality and the transmitted signal characteristics" was recognized

17    by Motorola since at least 2004. (Ex. 1591 at p. 10.) Enabling the fine granularity

18    by using the 5-bit MCS implemented in LTE, therefore, was just a matter of

19    technical development such as faster processors. For example, faster processors

20    enabled developments such as the shorter (1 msec) subframe duration (*see* Section

21    IX.G below), higher transmission speeds, and algorithmic improvements (*see* Ex.

22    1400 at pp. 2–3.) These improvements in turn enabled implementation of the fine

23    granularity using the 5-bit MCS in LTE. In other words, the concept of using a fine

24    granularity MCS and the associated benefits were known before LTE and the

25    specific implementation of the known concept in LTE does not represent a uniquely

26    important contribution to the standard.

27      482. In my review of Ericsson's purported SEP Families, I did not identify

28    any families that claimed to improve the granularity of the adaptive modulation and

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

coding.  Instead, Ericsson's SEP Families related to CQI reporting and the MCS schemes that were utilized merely assumed that a fine granularity system is implemented.

### F.  Incremental Redundancy for Hybrid ARQ II

483.   Hybrid ARQ II (HARQ) relates to the retransmission of erroneous transport blocks.  In LTE, each transport block is encoded with a turbo code, which is a kind of error control code.  When a block is retransmitted it is combined at the receiver with the previously received version(s) of the block and then fed through the turbo decoder.  In Hybrid ARQ II, two kinds of retransmissions (and combining) are possible.  On the one hand, the exact same codeword (*i.e.*, encoded block) could be retransmitted, and combined with the previously transmitted version of the same codeword.  This kind of combining is called Chase Combining.

484.   On the other hand, rather than retransmitting the exact same codeword bits that were sent in the first transmission, a different set of codeword bits could be sent during the retransmission.  This mode of operation is called Incremental Redundancy (IR).  IR is made possible because the turbo encoder generates a large codeword containing many codeword bits and during the first transmission only a subset of those codeword bits are transmitted, and the rest of the bits are punctured.  During the subsequent retransmission, some of the punctured bits (those not sent in the first transmission) could be sent.  This is beneficial because retransmission of the same bits (as in Chase Combining) could again cause a failure, but transmitting different bits gives the decoder a chance to recover the data by seeing a different set of code bits.

485.   Incremental redundancy (as opposed to Chase Combining) is identified as the key distinguishing feature of LTE in the Furuskär paper.  Incremental redundancy is an old idea that has been known since the 1970s and certainly well before the first version of LTE (*i.e.*, Release 8) in 2008.  (Ex. 1391 at pp. 1–2; Ex. 1454 at pp. 1–2; Ex. 1389 at pp. 2–3; Ex. 1409 at pp. 1–3.)  Indeed, incremental

redundancy was used as the basic scheme for Hybrid ARQ with soft combining in HSDPA (3G).  (Ex. 1451 at pp. 105–108.)  LTE likewise uses incremental redundancy as the basic scheme for Hybrid ARQ with soft combining.  I determined that none of the Ericsson's 4G Families are specifically directed to incremental redundancy identified as the key distinguishing feature for the 4G Hybrid ARQ II function.  Moreover, Lucent Technologies had disclosed and claimed a method for transmitting information packets with incremental redundancy and Type II HARQ, as shown in U.S. Patent No. 5,657,325, filed on April 26, 1996.

486.   In addition, proposals submitted to 3GPP working groups by other companies confirm that incremental redundancy at it relates to 4G Hybrid ARQ II function was developed and proposed by other companies.  For instance, as far back as February 1999, Panasonic showed that a "type II" HARQ protocol utilizing "incremental redundancy" was a viable option for UMTS.  (Ex. 1412 at pp. 2, 4–7.)  In March 2000, Siemens proposed kicking off a Work Item related to "Hybrid ARQ II/III" with the following objective:  "In order to support the general mechanism, required signaling, and combining of existing information with incremental redundancy, the specifications for physical layer, as well as for higher layers and testing will be changed and/or extended."  (Ex. 1413 at p. 1.)  In 2000, Motorola showed options for HSDPA, including "Method 2" which was "Turbo Coding + Code Combining" and recited a protocol involving incremental redundancy (e.g., "retries contain additional redundancy").  (Ex. 1410 at p. 19.)

487.   As I mentioned above, I determined that none of the Ericsson's 4G Families are specifically directed to incremental redundancy identified as the key distinguishing feature of the 4G Hybrid ARQ II function in the Furuskär paper.  Thus, while some of Ericsson's alleged SEPs may be related to incremental redundancy and perform some other, incremental functions, none of them cover the key LTE distinguishing feature itself.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

### G.     1-ms Subframes for Frame Duration (CQI Delay)

488.    "Frame duration" refers to an overall length of one radio frame for transmitting data.  In LTE, one radio frame is 10 ms long and is divided into 10 subframes.  Therefore, frame duration determines subframe duration, which in turn determines to how quickly the scheduler can operate, how frequently the modulation/coding scheme can adapt, and how much latency the user's data experiences.  A shorter (1 msec) subframe in LTE allows for quick scheduling, rapid link adaptation, and low user latency.

489.    Short subframes are especially important when the channel is changing quickly, such as when the User Equipment is moving rapidly (as in a vehicle).  The scheduler needs to quickly adapt the scheduling assignments and modulation and coding schemes, and this needs to be done before the channel changes.

490.    Table I of the Furuskär paper shows that Mobile WiMAX wave 2 used 5-millisecond (ms) frames, but that LTE uses 1-ms subframes.  However, short subframes were already in use by HSDPA (3G), which is the standard that predated LTE.  In particular, HSDPA used subframes of duration 2-ms, as shown below in Fig. 2A of 3GPP TS 25.211.



**Figure 3: Frame structure for uplink HS-DPCCH**

(Ex. 1608 at pp. 12–13, Fig. 2A.)

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

491.   The 2-ms format of HSDPA was incorporated into U.S. Published Patent Application No. US 2005/0128993 ("the '993 Application") filed November 19, 2004, with a priority date of November 20, 20103.  (Ex. 1459 at p. 24, ¶¶ 87–90.)  The US '993 application was filed by individual inventors and assigned to the inventors.  The US '993 Application describes a time-frequency scheduler for an OFDM system, and adopts the same 2-ms timing used by HSDPA, as shown in Fig. 8 of the '993 Application below.



FIG.8

(Ex. 1459 at p. 9, Fig. 8.)  The US '993 application also states that "[t]he CQI is transmitted in a *2-ms subframe* on an HS-DPCCH (High Speed Dedicated Physical Control Channel)."  (*Id.* at 24, ¶ 87 (emphasis added).)

492.   A short subframe was also used by WiMAX.  The frame structure is described in IEEE 802.16-2001 (dated 8 April 2002) in Fig. 38, shown below:

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

*n* = (Symbol Rate x Frame Duration)/4

**Downlink Subframe**     **Uplink Subframe**

PS 0     **Adaptive**     PS *n*-1

Frame *j*-2 | Frame *j*-1 | Frame *j* | Frame *j*+1 | Frame *j*+2

**Figure 38—TDD frame structure**

(*See* Ex. 1609 at p. 122, Fig. 38.)

493.   The frame length depends on parameters such as "symbol rate" and "frame duration," but these values are interpreted in the 2005 reference by Niyato and Hossain, which describes IEEE 802.16 as using "a frame size 0.5, 1, or 2 ms for data transmission."  (Ex. 1402 at p. 2.)

494.   A short subframe is also disclosed in the 2003 Wang et al. reference, which proposed a time-frequency scheduler that broke time and frequency into "bins," where each "bin" was only 0.667 msec in duration and 200 kHz in bandwidth (extent of frequency), as discussed above.  (Ex. 1392 at p. 1.).

495.   Thus, at the time that LTE was being standardized, the benefits of using a short subframe were already well known in the technical literature.  Previous systems like HSDPA and WiMAX had similarly short subframes.  All that remained were the engineering modifications required to use a 1 ms subframe in practice.

496.   Furthermore, I determined that none of the Ericsson's 4G Families are specifically directed to 1-ms subframes identified as the key distinguishing feature of the 4G frame duration (CQI delay) function in the Furuskär paper.  Thus, while some of Ericsson's alleged SEPs may be related to 1-ms subframes and perform some other, incremental functions, none of them cover the key LTE distinguishing

239

1   feature itself.

2   ## H.   Relatively Low Overhead (While Control Channels are Robust) for

3   ## Overhead/Control Channel Efficiency (OH/CCH Eff)

4   497.   Relatively low overhead for overhead/control channel efficiency

5   function is the last of eight key LTE distinguishing features identified in Ericsson's

6   Furuskär paper.  (Ex. 1450 at p. 2, Table I.)  The "overhead/control channel

7   efficiency" function relates to the fraction of resources that must be used for

8   overhead rather than for sending user data.  The overhead mainly takes the form of

9   control data, which is sent over control channels on both the uplink and downlink.

10  In LTE, certain channels are defined on the downlink (*e.g.*, PDCCH, PFICH, and

11  PHICH) and on the uplink (e.g., PUCCH) for the transmission of control

12  information.  These signals are necessary for the base station to convey scheduling

13  assignments to the user, for the User Equipment to send channel quality information,

14  and to request retransmissions.

15  498.   Ericsson has a relatively small share of essential patents directed to

16  control data and control channel efficiency technologies and this demonstrates

17  Ericsson's small potential impact on the overall amount of overhead in LTE.

18  Generally, there are nine technology categories relevant to the cellular standards in

19  general and LTE in particular:  (1) access procedures; (2) network protocols; (3)

20  physical layer technologies; (4) control signaling; (5) radio resource management;

21  (6) speech and multimedia technologies; (7) advanced features; (8) core network

22  technologies; and (9) terminal interfaces.  In identifying these categories, I relied on

23  the discussion of different categories of technologies identified in "4G LTE/LTE-

24  Advanced for Mobile Broadband," written by Erik Dahlman, Stefan Parkvall, and

25  Johan Sköld.  (Ex. 1416.)  The authors of this text were employees of Ericsson at the

26  time of publication.  I will refer to these nine categories as "the Dahlman

27  Categories."  Overhead and control channel efficiency falls under the "control

28  signaling" category.

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

499.   The control signaling category covers a wide range of different technologies, including hybrid ARQ-related signals, references signals, scheduling requests, scheduling assignments, buffer status reports, and channel measurements. (*See* Ex. 1416 at pp. 220–259; 289–310.)  Because of the relatively large impact of control signaling on overhead, looking at Ericsson's share of such essential patents is a good indication of whether Ericsson has patented a critical mass of inventions directed to overhead that the aggregate benefit is properly attributable to Ericsson.

500.   I worked with Dr. Valenti and Concur IP to determine Ericsson's relative SEP holdings vis-à-vis the cellular industry as a whole across the cellular standards in my Rebuttal Report.  (*See* Ex. 1611.)  Patent families owned by Ericsson and owned by other companies in the industry were classified into one or more of the Dahlman Categories.  (*See* Ex. 1610.)  In this way, it is possible to compare Ericsson's relative share of SEPs within each of the Dahlman Categories against the rest of the industry and assess the impact of Ericsson's alleged control signaling SEPs to the key LTE distinguishing feature of relatively low overhead for overhead and control efficiency.

501.   Based on the industry-wide classification analysis discussed above, Ericsson's share of essential control signaling patents is only 5.3%.  (*See* Ex. 1611.) This analysis also demonstrates that many companies developed and contributed to the control signaling technologies well before standardization of 4G LTE.  (*Id.*) With such a low share of industry-wide essential patents directed to incremental improvements to well-known control signaling technologies, it is improper to attribute the total benefit of LTE's relatively low overhead to Ericsson's purported 4G SEP Families.

# X.   CONCLUSION

502.   After performing the detailed SEP Analysis of Ericsson's alleged 2G, 3G and 4G SEPs, Dr. Jayant and I found that out of Ericsson's 219 family/standard pairs, 73 pairs (or about 33%) were not "essential" under any reasonable

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

interpretation of the claims.  Of the remaining 146 family/standard pairs, 10 more pairs were not essential under a proper claim construction.  Nonetheless, Dr. Jayant and I further analyzed the Importance and Contribution for all of these 146 family/standard pairs.  Only eight these family/standard pairs were thus determined to be technically valuable to the relevant standards as compared to alternatives that were available at the time—we gave these pairs an Importance and Contribution Rank of "1."  Even though these eight family/standard pairs are technically valuable, they were determined to still be addressing and solving very modular problems contained within specific functions, such that the corresponding technical solutions would not materially impact other problems and associated solutions in the respective standards.  Furthermore, we determined that only five more of these 146 pairs had a moderate technical to the relevant standards as compared to alternatives that were available at the time – we gave these pairs an Importance and Contribution Rank of "2."  Our analysis showed that the remaining 206 (or 94%) of Ericsson's 2G, 3G, and/or 4G family/standard pairs are not technically valuable.  Therefore, the vast majority of the 219 2G, 3G, and 4G family/standard pairs that Ericsson alleges are SEPs provided little to no intrinsic technical value to the standards.  We gave these pairs Importance Ranks of "3" and/or Contribution Ranks of "3" or "4."

503.   The Industry-Wide Essentiality Analysis, which included the Patent Census and the Essentiality Assessment, demonstrates that the relative size of Ericsson's 2G, 3G and 4G patent portfolios have declined over time.  Ericsson's proportional share of the total set of essential UE patents was found to be substantially consistent with its share of all declared-essential patent families.  In particular, for 2G, Ericsson's fraction of essential UE patent families was found to be about 10%, just slightly higher than Ericsson's 9% share of all 2G declared-essential UE families.  For 3G, Ericsson's fraction of essential UE families was found to be about 7%, basically the same as Ericsson's 7% share of all 3G declared-essential UE families.  For 4G, Ericsson's fraction of essential 4G UE families was

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

found to be about 6%, basically the same as Ericsson's 6% share of all declared-essential UE families. In sum, Ericsson's relative strength has declined from 9% for the 2G standard, to 7% for 3G, and down to 6% for 4G.

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct, and that I executed this Witness

3    Declaration on January 11, 2017, at _Vienna, Virginia_____.

4

5

6    Dr. Apostolos (Paul) Kakaes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF EXHIBITS CITED IN WITNESS DECLARATION**

| Exhibit No. | Description |
|---|---|
| 12 | TCL's ETSI IPR Information Statement and Licensing Declaration dated 11/18/13 for ETSI TS 125 215 (6.1.1.2, V3.5.0) and ETSI TS 36.355 (6.5.3, V11.4.0) |
| 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| 224 | ETSI Guide on Intellectual Property Rights, pp. 51-70 (IPRs), Version #94, Sep. 19, 2013 |
| 362 | U.S. Patent No. 8,285,294 |
| 363 | claim chart for claim 1 of U.S. Patent No. 8,285,294 |
| 404 | Webpage titled "Arrangements of Elements in an ETSI Deliverable" |
| 413 | claim chart for claim 13 of U.S. Patent No. 8,644,415 |
| 422 | claim chart for claim 1 of U.S. Patent No. 6,185,244 |
| 445 | Spreadsheet titled "Other Company Stats," containing UE stats |
| 461 | Curriculum Vitae of Apostolos K. "Paul" Kakaes |
| 551 | Document titled "Protocol for Essentiality Analysis" |
| 1084 | Ericsson presentation titled "LTE Patent Landscape and Ericsson Position," dated Feb. 2013 |
| 1279 | 3GPP TS 25.212 V6.5.0 (2005-06) Technical Specification |
| 1316 | ETSI Rules of Procedure, 11/26/08, Annex 6: ETSI Intellectual Property Rights Policy, pp. 34-44 |
| 1321 | Spreadsheet titled "Tdoc Correlation Data" |
| 1323 | Spreadsheet containing corrected Tdoc correlation data |
| 1329 | File History for U.S. Patent No. 6,597,911 |
| 1331 | IEEE Communications Magazine publication titled "On the Provision of Quality-of-Service Guarantees for Input Queued Switches," by G. Nong, Dec. 2000 |
| 1332 | "Synthesis of Band-Limited Orthogonal Signals for Multichannel Data Transmission," by R. Chang, 8/4/66 |

| 1333 | IEEE Communications Magazine publication titled "Scalable High-Speed Switches/Routers with QoS Support," by M. Hyamdi, Dec. 2000 |
|------|------|
| 1335 | Docomo webpage "LTE (Long Term Evolution)" |
| 1336 | Spreadsheet titled "Census" |
| 1337 | 3GPP TR 23.820 V2.0.0 (2008-05) Technical Report |
| 1339 | "TR 23.820. Conclusion on the HSS Service Interruption Scenario," 3GPP TSG CT WG4 Meeting #38, Jan. 28 - Feb. 1, 2007, C4-080437 |
| 1340 | "E-UTRA Random Access," TSG RAN WG1 #43, Nov. 7-11, 2005, R1-051445 |
| 1341 | 3GPP TSG-RAN1 Meeting #43, Nov. 7-11, 2005, Tdoc R1-051450 |
| 1342 | 3GPP TSG-RAN1 Meeting #43, Nov. 7-11, 2005, Tdoc R1-051451 |
| 1344 | "Replace the Abbreviation 'ConCon' with 'CPC' in TR 25.903," 3GPP TSG-RAN WG1 Meeting #45, May 8-12, 2006, Tdoc R1-061351 |
| 1345 | "Text Proposal for Effective loT for TR 36.814," 3GPP TSG RAN WG1 Meeting #57bis, June 29 - July 3, 2009, R1-092936 |
| 1346 | "Text Proposal on the Fundamental Characteristics of the Small Data Transmission Enhancements for UMTS," 3GPP TSG-RAN WG1 Meeting #79, Nov. 17-21, 2014, R1-145035 |
| 1347 | 3GPP TSG-RAN WG3 Meeting #65, Aug. 24-28, 2009, R3-092069 |
| 1348 | "Text Proposal for LTE BS TR on Spurious Emissions," TSG-RAN Working Group 4 (Radio) Meeting #39, May 8-12, 2006, R4-060634 |
| 1349 | "Simulations Assumptions for 16QAM EUL BS Receiver Performance," 3GPP TSG-RAN WG4 (Radio) Meeting #42bis, Apr. 2-4, 2007, R4-070399 |
| 1350 | "TS 36.141: TP for Section 7," TSG-RAN Working Group 4 (Radio) Meeting #46bis, Mar. 31 - Apr. 4, 2008, R4-080606 |
| 1351 | "Cleanup and Alignment of "Frequency Band and Channel Alignment,"" TSG-RAN Working Group 4 (Radio) Meeting #47, May 5-9, 2008, R4-081184 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| 1352 | "TP on Rx Spurious Emissions (BC 1 & 2) (TR ch 7.6)," TSG-RAN Working Group 4 (Radio) Meeting #51, May 4-8, 2009, R4-091848 |
| --- | --- |
| 1353 | "TS 37.104: TP on Base Station Classes (TS ch 4.3)," TSG-RAN Working Group 4 (Radio) Meeting #52, Aug. 24-28, 2009, R4-093006 |
| 1354 | "TP to TR 30.007: CA introduction," TSG-RAN Working Group 4 (Radio) Meeting #62bis, Mar. 26-30, 2012, R4-121802 |
| 1357 | Claim chart for claim 15 of EP No. 1,062,825 |
| 1358 | Claim chart for claim 1 of U.S. Patent No. 6,597,911 |
| 1360 | Claim chart for claim 1 of U.S. Patent No. 8,582,518 |
| 1361 | Claim chart for claim 53 of U.S. Patent No. 8,750,808 |
| 1362 | Claim chart for claim 1 of EP No. 2,742,606 |
| 1363 | Claim chart for claim 9 of U.S. Patent No. 6,073,005 |
| 1364 | Claim chart for claim 1 of EP No. 2,238,801 |
| 1365 | Claim chart for claim 1 of U.S. Patent No. 9,100,069 |
| 1366 | U.S. Patent No. 6,781,970 |
| 1367 | 3GPP TS 25.321 V8.17.0 (2012-12) Technical Specification |
| 1368 | 3GPP TS 36.133 V10.16.0 (2014-09) Technical Specification: Sections 1-10 |
| 1369 | U.S. Patent No. 6,185,244 |
| 1370 | U.S. Patent No. 8,837,410 |
| 1371 | 3GPP TS 36.133 V10.20.0 (2015-09) Technical Specification |
| 1375 | U.S. Patent No. 8,913,565 |
| 1376 | U.S. Patent No. 8,750,808 |
| 1377 | U.S. Patent No. 8,902,811 |
| 1379 | 3GPP TS 25.212 V11.4.0 (2012-12) Technical Specification |
| 1380 | File History for U.S. Patent No. 9,100,069 |
| 1381 | U.S. Patent No. 9,100,069 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| 1382 | "Text Proposal on E-UTRA Random Access," TSG-RAN WG1 #43, Nov. 7-11, 2005, R1-051584 |
|---|---|
| 1383 | ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights, dated 11/19/14 |
| 1388 | Exhibit M to the Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes |
| 1389 | IEEE publication titled "An Adaptive Type-II Hybrid ARQ/FEC Protocol Suitable for GSM," by P. Decker, 1994 |
| 1390 | IEEE publication titled "Multiple-Accessing Over Frequency-Selective Fading Channels," by R. Knopp, 1995 |
| 1391 | IEEE Transaction on Information Theory publication titled "An Adaptive-Feedback Scheme Using Incremental Redundancy," by M. Mandelbaum, May 1974 |
| 1392 | IEEE publication titled "Impact of Multiuser Diversity and Channel Variability on Adaptive OFDM," by W. Wang, 2003 |
| 1393 | IEEE publication titled "Fairness and Throughput Analysis for Generalized Proportional Fair Frequency Scheduling in OFDMA," by C. Wengerter, 2005 |
| 1394 | IEEE Transactions on Communications, Vol. 50, No. 6 publication titled "On the Comparison Between OFDM and Single Carrier Modulation with a DFE Using a Frequency-Domain Feedforward Filter," by N. Benvenuto, June 2002 |
| 1395 | EP No. 1,655,871 |
| 1396 | Search results re Ericsson fractional power control patents |
| 1397 | IEEE Communications Magazine publication titled "Frequency Domain Equalization for Single-Carrier Broadband Wireless Systems," by D. Falconer, Apr. 2002 |
| 1398 | IEEE publication titled "A Low Complexity Transmitter Structure for OFDM-FDMA Uplink Systems," by D. Galda, 2002 |
| 1399 | IEEE Transactions on Communications, Vol. 26, No. 5 publication titled "Adaptive Coded Modulation for Fading Channels," by A. Goldsmith, May 1998 |
| 1400 | IEEE publication titled "Enhanced Adaptive Modulation and Coding Schemes Based on Multiple Channel Reportings for Wireless Multicast Systems," by J. Kim, 2005 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| 1401 | IEEE Transactions on Communications, Vol. 13, No. 10 publication titled "Constellation and Rate Selection in Adaptive Modulation and Coding Based on Finite Blocklength Analysis and Its Application to LTE," by J. Meng, Oct. 2014 |
| --- | --- |
| 1402 | IEEE Globecom publication titled "Queue-Aware Uplink Bandwidth Allocation for Polling Service in 802.16 Broadband Wireless," by D. Niyato, 2005 |
| 1404 | "E-UTRA Uplink Power Control Proposal and Evaluation," 3GPP TSG RAN WG1 Meeting #49bis, June 25-29, 2007, R1-072781 |
| 1406 | U.S. Patent No. 7,536,205 |
| 1407 | U.S. Patent No. 7,773,947 |
| 1408 | PCT Publication No. WO 2005/096531 |
| 1409 | IEEE publication titled "Performance of Punctured Channel Codes with ARQ for Multimedia Transmission in Rayleigh Fading Channels," by H. Lou, 1996 |
| 1410 | "Release 2000 Features," TSG-RAN Working Group 1 meeting#13, May 22-25, 2000, TSGR1#13(00)27 |
| 1411 | 3GPP TSG RAN WG1 Meeting #63bis, Jan. 17-21, 2011, R1-110001 |
| 1412 | 3GPP TSG RAN WG1#2, Feb. 22-25, 1999, R1-99061 |
| 1413 | 3GPP TSG-RAN, Meeting #7, Mar. 13-17, 2000, Tdoc TSGRP#7(00)0054 |
| 1414 | U.S. Patent No. 7,738,907 |
| 1415 | claim chart for claim 1 of U.S. Patent No. 5,987,139 |
| 1416 | "4G: LTE/LTE-Advanced for Mobile Broadband, 2nd Ed.," E. Dahlman and S. Parkvall, 2014 |
| 1417 | ETSI web publication titled "High Speed Circuit Switched Data, HSCSD" |
| 1418 | U.S. Patent No. 5,987,139 |
| 1421 | U.S. Patent No. 5,602,901 |
| 1422 | U.S. Patent No. 6,073,005 |
| 1424 | "Summary of [72b#25]: Measurement Gap Request Procedure for OTDOA," 3GPP TSG RAN WG2 Meeting #73, Feb. 21-25, 2011, R2-111144 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| 1425 | U.S. Patent No. 8,965,414 |
|---|---|
| 1426 | Spreadsheet containing non-UE source data analysis |
| 1427 | claim chart for claim 27 of U.S. Patent No. 8,965,414 |
| 1429 | Exemplary LTE UE claim charts, dated 11/17/14 |
| 1430 | claim chart for claim 1 of U.S. Patent No. 8,913,565 |
| 1431 | GSM 03.20 V8.0.0 (1999-11) Technical Specification |
| 1433 | 3GPP TS 36.213 V10.12.0 (2014-03) Technical Specification |
| 1434 | 3GPP TS 36.213 V8.8.0 (2009-09) Technical Specification |
| 1435 | 3GPP TS 36.213 V9.3.0 (2010-09) Technical Specification |
| 1438 | 3GPP TS 36.321 V9.3.0 (2010-06) Technical Specification |
| 1440 | 3GPP TS 36.331 V10.16.0 (2015-03) Technical Specification |
| 1443 | Change request for "Cancellation of Scheduling Request," 3GPP TSG-RAN WG2 Meeting #65, Feb. 9-13, 2009, R2-091240 |
| 1444 | U.S. Patent No. 8,134,940 |
| 1445 | U.S. Patent No. 8,582,518 |
| 1446 | "Power Control Details for PUCCH Format 3," 3GPP TSG WG1 Meeting #63, Nov. 15-19, 2010, R1-105914 |
| 1448 | "Error Control Coding: Fundamentals and Applications," by S. Lin |
| 1449 | Ericsson's IPR Information Statement and Licensing Declaration re P35592 dated 11/12/14 |
| 1450 | Publication titled "The LTE Radio Interface - Key Characteristics and Performance," by A. Furuskar |
| 1451 | Publication titled "HSPA Evolution: The Fundamentals for Mobile Broadband," by T. Chapman |
| 1452 | 3GPP TSG-RAN2 Meeting #67, Aug. 24-28, 2009, R2-095380 |
| 1453 | Spreadsheet containing non UE stats for Samsung, ZTE, LG, HTC, and Apple |
| 1454 | IEEE Transactions on Communications, Vol. 39, No. 5, publication titled "Incremental-Redundancy Transmission for Meteor-Burst Communications," by M. Pursley, May 1991 |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| 1456 | ETSI IPR Information Statement and Licensing Declaration by Ericsson dated 2/22/02 |
|------|-----------------------------------------------------------------------------------|
| 1459 | U.S. Patent Publication No. 2005/0128993 |
| 1460 | Curriculum Vitae of Babak Hassibi |
| 1461 | Curriculum Vitae of R. Michael Buehrer |
| 1462 | Curriculum Vitae of Shuguang Cui |
| 1463 | Curriculum Vitae of Faramarz Fekri |
| 1464 | Curriculum Vitae of Young-Han Kim |
| 1465 | Curriculum Vitae of Gordon Stuber |
| 1466 | Curriculum Vitae of Matthew Valenti |
| 1467 | Curriculum Vitae of Alexander Vardy |
| 1468 | Curriculum Vitae of Liuqing Yang |
| 1576 | 3GPP TS 22.101 9.0.0 (2008-06) Technical Specification |
| 1579 | Expert/Consultant Curriculum Vitae of Professor Zhi Ding |
| 1591 | U.S. Patent Application Publication No. 2006/0268976 |
| 1596 | Curriculum Vitae of Samkeet S. Mehta |
| 1597 | Curriculum Vitae of Vivek Sharma |
| 1598 | Curriculum Vitae of Sachin Sinha |
| 1599 | Curriculum Vitae of Sanjay Nama |
| 1594 | Exhibit C to Expert Report of Zhi Ding: spreadsheet for industry-wide patent essentiality analysis of 2G, 3G, and 4G patents |
| 1602 | Curriculum Vitae of Nitin Agrawal |
| 1603 | U.S. Patent No. 2,405,165 |
| 1604 | IEEE Transactions on Communications, Vol. Com-30, No. 5 publication titled "The Origins of Spread-Spectrum Communications," by R. Scholtz, May 1982 |
| 1605 | U.S. Patent No. 6,597,911 |
| 1607 | 3GPP TR 25.858 V5.0.0 (2002-03) Technical Specification |
| 1608 | 3GPP TS 25.211 V6.0.0 (2003-12) Technical Specification |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

| | |
|---|---|
| 1609 | IEEE Standard for Local and Metropolitan Area Networks, "Part 16: Air Interface for Fixed Broadband Wireless Access Systems," 802.16 - 2001 |
| 1610 | Exhibit A to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16, titled "Protocol for Classification Analysis" |
| 1611 | Exhibit B to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16, spreadsheet titled "Classification Analysis" |
| 1613 | 3GPP TS 25.331 V3.6.0 (2001-03) Technical Specification |
| 1614 | 3GPP TS 25.331 V8.16.0 (2011-09) Technical Specification |
| 1616 | Publication titled "Introduction to 3G Mobile Communications, 2nd Ed.," by J. Korhonen, 2003 |
| 1617 | U.S. Patent No. 7,181,218 |
| 1619 | 3GPP TS 36.101 V13.2.1 (2016-01) Technical Specification |
| 1636 | "Layer 1/2 Aspects for Enhanced UL for CELL_FACH," 3GPP TSG-RAN WG2 #52bis, Oct. 8-12, 2007, R2-074390 |
| 1637 | EP No. 2,238,801 |
| 1639 | Errata Exhibit 1: Corrected Appendices to Second Supplemental Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 5/28/16 |
| 1720 | LexisNexis TotalPatent product information |

WITNESS DECLARATION OF DR. APOSTOLOS (PAUL) KAKAES

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA  92130.

On January 11, 2017, I caused to be served the **PLAINTIFFS' DIRECT EXAMINATION BY DECLARATION FOR EXPERT WITNESS DR. APOSTOLOS (PAUL) KAKAES** to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION:  I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 11, 2017, at San Diego, California.

By:  */s/ Kristina Grauer*
KRISTINA GRAUER