1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
3  STEPHEN S. KORNICZKY, Cal. Bar No. 135532
   skorniczky@sheppardmullin.com
   MARTIN R. BADER, Cal. Bar No. 222865
4  mbader@sheppardmullin.com
   MATTHEW W. HOLDER, Cal. Bar No. 217619
5  mholder@sheppardmullin.com
   12275 El Camino Real, Suite 200
6  San Diego, California 92130-2006
   Telephone: 858.720.8900
7  Facsimile: 858.509.3691

8
   Attorneys for TCL Communication
9  Technology Holdings, Ltd., TCT Mobile
   Limited, and TCT Mobile (US) Inc.
10

11                     UNITED STATES DISTRICT COURT

12     FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

13

14
   TCL COMMUNICATION              Case No. SACV14−00341 JVS (DFMx)
15 TECHNOLOGY HOLDINGS, LTD.,     Consolidated with CV15–02370 JVS
   et al.,
16                                **PLAINTIFFS' CORRECTED
17            Plaintiffs,         REBUTTAL DECLARATION
                                  OF EXPERT WITNESS
18       v.                       DR. APOSTOLOS (PAUL) KAKAES**

19 TELEFONAKTIEBOLAGET LM
   ERICSSON, et al.,
20
             Defendants.
21 ─────────────────────────────
22 TELEFONAKTIEBOLAGET LM         Place: Courtroom 10C
   ERICSSON, et al.,             Before Hon. James V. Selna
23
             Plaintiffs,         Discovery Cut-Off: May 23, 2016
24                               Pre-Trial Conf.: Feb. 1, 2017
         v.                      Trial: Feb. 14, 2017
25
   TCL COMMUNICATION
26 TECHNOLOGY HOLDINGS, LTD.,     **PUBLIC REDACTED VERSION**
   et al.,
27
             Defendants.
28

SMRH:481062607.2

# **TABLE OF CONTENTS**

**Pages**

I.      SUMMARY OF TESTIMONY ................................................................. 1

II.     FLAWS WITH DR. PARKVALL'S PER-TECHNOLOGY APPROACH ................................................................................... 3

    A.    Dr. Parkvall's Per-Technology Approach Improperly Captures the Value of the Standard Itself. .................................... 3

        1.    Dr. Parkvall Mischaracterizes the Patent-by-Patent Analysis Approach.................................................... 4

        2.    The Essentiality Analyses Provide a Very Reliable and Accurate Assessment of Ericsson's Alleged SEPs...................... 5

        3.    The Patent-by-Patent Approach Determines the Intrinsic Technical Value of Standard Essential Patents. ........................... 6

        4.    Dr. Parkvall's Per-Technology Approach Grossly Overvalues Ericsson's Patents and Captures the Value of the Standards................................................................. 6

        5.    Dr. Parkvall's Opinions Regarding Modularity Are Fundamentally Flawed.................................................... 8

        6.    Dr. Parkvall's Per-Technology Approach Is Inconsistent with 3GPP Practice. ................................................ 10

        7.    Dr. Parkvall's Two Examples of Interdependency Highlight the Flaws in Dr. Parkvall's Analysis. ...................... 11

        8.    Dr. Parkvall's Two Bicycle Examples Highlight His Fundamental Misunderstanding of the Patent-by-Patent Analysis. ................................................................. 15

    B.    Ericsson's 2G, 3G, and 4G SEP Families and Allegedly Correlated Contributions are Directed to Narrow Aspects of Incremental and Modular Standardized Features. ................................. 17

    C.    Ericsson Does Not Have an Extensive Array of Critically Important Patents Covering 2G, 3G, and 4G Technologies. ................ 25

    D.    Ericsson Does Not Have an Extensive Array of 2G, 3G, and 4G SEPs. ................................................................ 32

        1.    Ericsson Does Not Have an Extensive Array of 2G, 3G, and 4G SEPs Under Dr. Parkvall's Classification Framework ................................................................. 32

2.    Ericsson Does Not Have an Extensive Array of 2G, 3G, and 4G SEPs Under a Classification Framework Based on Dr. Parkvall's Book. ...................................................................... 37

3.    Ericsson's Proportional Shares of Industry-Wide Essential Patent Families are Relatively Insubstantial ............................... 44

III.    RESPONSE TO DR. PARKVALL'S PER-TECHNOLOGY ANALYSIS FOR EACH TECHNOLOGY SUBAREA ................................ 50

A.    Data Transmission ...................................................................... 50

1.    Ericsson's Data Transmission Patents are Directed to Narrow Aspects of Incremental and Modular Standardized Features. ..................................................................................... 51

2.    Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Data Transmission Patents .............. 61

3.    Dr. Parkvall's Flawed Technology-by-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Data Transmission Patents. ....................................... 73

4.    Dr. Parkvall Relies on Improper Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Data Transmission Patent Families. ............................................. 75

B.    Carrier Aggregation .................................................................. 81

1.    Ericsson's Carrier Aggregation Patents are Directed to Narrow Aspects of Incremental and Modular Standardized Features. ..................................................................................... 82

2.    Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Carrier Aggregation Patents. ........... 85

3.    Dr. Parkvall's Flawed Per-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Carrier Aggregation Patents. ............................................................... 95

4.    Dr. Parkvall Errs in Relying on Flawed Hypothetical Alternatives as Benchmarks for the Technical Value of Ericsson's Carrier Aggregation SEPs. ........................................ 98

C.    Resource Allocation ................................................................ 102

1.    Ericsson's Resource Allocation (RA) Patents are Directed to Narrow Aspects of Incremental and Modular Standardized Features. ........................................................... 102

2.    Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Resource Allocation Patents. ........ 106

3. Dr. Parkvall's Flawed Technology-By-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Resource Allocation Patents. ...................117

4. Dr. Parkvall Relies on Improper Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Resource Allocation SEPs. .......................................119

D. Connection Establishment.................................................122

1. Ericsson's Connection Establishment Patents are Directed to Narrow Aspects of Incremental and Modular Standardized Features.............................................122

2. Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Connection Establishment Patents...............................................................128

3. Dr. Parkvall's Flawed Technology-by-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Connection Establishment Patents.........................141

4. Dr. Parkvall Relies on Improper Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Connection Establishment Families. .........................144

E. Sleep Mode Solutions ......................................................147

1. Ericsson's Sleep Mode Solutions Patents Are Directed to Narrow Aspects of Incremental and Modular Standardized Features......................................................148

2. Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Sleep Mode Solutions Patents.......149

3. Dr. Parkvall Ignores Viable Non-Infringing Alternatives to Ericsson's Patented Sleep Mode Solutions Features...............163

4. Dr. Parkvall Relies on Outdated Hypothetical Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Sleep Mode Solutions SEPs....................................165

IV. MR. KENNEDY'S "EX STANDARD" VALUE ANALYSIS IMPROPERLY CAPTURES THE VALUE OF THE LTE STANDARD ITSELF. ................................................................168

A. LTE's Basic Framework and Key Technologies That Are Responsible for Its Superior Performance Were Well-Known and Developed by Others Before LTE Was Standardized. .......................170

1. Development of LTE And Its Basic Framework and Key Technologies...............................................................170

B. Ericsson Did Not Develop LTE's Fundamental Framework and Key Technologies, Which Were Well-Known Before LTE Was Standardized. ....................................................................... 181

1. LTE's Basic Framework of OFDMA Was Known And Developed By Others. ................................................. 184

2. OFDMA in the Downlink and SC-FDMA in the Uplink Was Known And Developed By Others. .................................. 186

3. Channel Dependent Scheduling in Time and Frequency Domain Was Known And Developed By Others. .................... 189

4. 1-ms Subframes for Frame Duration (CQI Delay) Was Known And Developed by Others. ........................................... 191

5. Ericsson's Impact on LTE's Relatively Low Overhead for Overhead and Control Channel Efficiency Is Insignificant. .... 196

6. Fractional Pathloss Compensation for Uplink Power Control (PC) Was Known And Developed by Others. ............ 201

C. Mr. Kennedy's "Ex Standard" Value Analysis Captures the Value of the LTE Standard Itself. ........................................... 204

1. Dr. Parkvall's Flawed Technical Value Analysis Leads Mr. Kennedy to Capture the Value of the LTE Standard Itself. ................................................................................... 205

2. Dr. Parkvall's Flawed Technical Value Analysis Leads to Mr. Kennedy's Gross Overvaluation of the "Battery Life" Technical Currency ................................................................ 217

V. PROBLEMS WITH CONTRIBUTION COUNTING ................................. 221

VI. THE INDUSTRY-WIDE ESSENTIALITY ANALYSIS IS RELIABLE. ........................................................................................ 223

A. The Quality of the Industry-Wide Essentiality Assessment .............. 224

1. The Essentiality Assessment Team is Highly Qualified. ......... 224

2. Several Quality Control Measures Increased Essentiality Assessment's Reliability. ........................................................ 225

3. The Amount of Time Spent on the Industry-Wide Essentiality Analysis Was Sufficient. ..................................... 226

B. Mr. Mallinson's Comparison of the SEP Analysis to the Industry-Wide Essentiality Analysis Fails to Show Either Study Is Not Reliable. .................................................................................. 227

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF EXHIBITS CITED IN REBUTTAL WITNESS
    DECLARATION..........................................................................................230

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

## CORRECTED REBUTTAL DECLARATION OF
## DR. APOSTOLOS (PAUL) KAKAES

I, Dr. Apostolos (Paul) Kakaes, declare under the penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

## I.   SUMMARY OF TESTIMONY

1.      In this rebuttal witness declaration, I provide my opinions regarding the many deep flaws in Ericsson's analysis.  I also address and explain why I disagree with the various statements and opinions offered by several of Ericsson's experts criticizing the analysis I conducted in this litigation.

2.      In Section II, I reiterate the reliability of my patent-by-patent approach, and address Dr. Parkvall's unfounded critiques of my patent-by-patent analysis.  I then discuss the major flaws in Dr. Parkvall's per-technology approach.  His approach for determining the strength of Ericsson's alleged SEPs does not provide an *ex ante* technical value, but instead improperly captures the value of the standard.  In this respect, Dr. Parkvall relies on his incorrect assumption that the technology of the standard is not modular and cannot be compared to alternatives on a patent claim level.  Based on this improper assumption, he then determines performance metrics of the entire standards and attributes them to Ericsson, instead of comparing Ericsson's individual patent to non-infringing alternatives that were available at the time Ericsson's patents were adopted into the standard.

3.      In Section III, I provide a detailed rebuttal to Dr. Parkvall's per-technology analysis.  I identify the major flaw in the five technology subareas for which Dr. Parkvall provides a detailed analysis.  Within each technology subarea, I demonstrate that Dr. Parkvall is wrong to argue that none of the technology within the categories is modular or amenable to evaluation and analysis on a patent-by-patent basis.  Moreover, I demonstrate that Ericsson lacks an extensive array of critically important patents within any of Dr. Parkvall's technology subareas.  Thus,

1  Dr. Parkvall is wrong to attribute the benefits of the entire technology subarea to
2  Ericsson's patents.

3          4.      In Section IV, I discuss Mr. Kennedy's reliance on Dr. Parkvall's
4  flawed analysis and how it undermines his ultimate conclusions.  With a focus on
5  the LTE standard, I explain how Ericsson did not invent the key technologies that
6  are responsible for the vast majority of LTE's performance as compared to another
7  communications standard, WiMAX.  Moreover, just as Dr. Parkvall's analysis
8  improperly captures the technical value of the standard as opposed to the technical
9  value of Ericsson's specific claimed inventions, Mr. Kennedy's economic valuation
10  is not a proper *ex ante* determination.  Thus, Mr. Kennedy grossly over-values
11  Ericsson's alleged SEPs.

12          5.      In Section V, I discuss a fundamental flaw in Ericsson's reliance on
13  contribution counting as a measure of patent portfolio strength.  Contribution
14  counting is unreliable as a measure of patent portfolio strength at least because the
15  underlying assumption on which it is based (e.g., that there is a correlation between
16  contributions and SEPs) is absolutely unproven and lacks any of the hallmarks that
17  would allow for a reliable indirect measurement.

18          6.      Finally, in Section VI, I address Mr. Mallinson's critique of the
19  Industry-Wide Essentiality Analysis that myself and Concur IP conducted.  Not only
20  was the team conducting the analysis highly qualified, but both myself and the
21  Concur IP team have conducted similar analysis and have familiarity with many of
22  the patents analyzed, enabling us to conduct a reliable and efficient analysis.
23  Moreover, several quality control measures (including a quality review by Dr. Ding)
24  were utilized to ensure that the analysis was conducted in accordance with the
25  protocol we developed, and to ensure that the results were reliable.

26

27

28

## II.   FLAWS WITH DR. PARKVALL'S PER-TECHNOLOGY APPROACH

### A.   Dr. Parkvall's Per-Technology Approach Improperly Captures the Value of the Standard Itself.

7.   As explained in my Opening Witness Declaration, Dr. Jayant and I performed a detailed study of Ericsson's 2G, 3G, and 4G patents belonging to 192 patent families for which Ericsson produced claim charts.  (Dkt. 1334 at § II.A.1.) For each of these patent families, we performed a detailed essentiality analysis to determine whether the patents were essential to the cited standards as alleged by Ericsson.[1]  Our essentiality analysis focused on the standards cited in Ericsson's claim charts, and also accounted for additional information, such as Ericsson's comments in the claim charts and the patent's file history, where available.

8.   In addition, Dr. Jayant and I analyzed the patented technology's Importance and Contribution to the standards, taking into account prior versions and/or generations of the standards and other alternatives to the patented technology that were available at the time the patented technology was adopted or incorporated into the standards.  The purpose of the Importance and Contribution analysis is to determine the patented technology's intrinsic technical value prior to its adoption into the standard, apart from the value associated with the technology being incorporated into the standard.

9.   The Importance and Contribution analysis showed that the vast majority of Ericsson's SEP Families have an Importance Rank of "3" and/or a Contribution Rank of "3" or "4", meaning they provide no more than incremental improvements to the standard (or no improvement at all).  I also demonstrated that Ericsson's patents were narrow and incremental, and thus modular.  This does not necessarily mean all technology is modular or narrow.  Nevertheless, narrow,

---

[1] As I did in my opening witness declaration, I use the term "essential" herein in the sense that no evidence was identified that would preclude a finding that the patents (or corresponding patent families) are "essential" under ETSI's IPR Policy.

incremental inventions tend to be more modular than extensive or foundational inventions.  As a rule of thumb, core technologies such as "OFDMA" or "incremental redundancy" (which Ericsson did not invent) tend to be less modular, whereas incremental improvements to those core technologies tend to be much more modular.  Dr. Jayant and I have captured this in the ranking system we employed in determining the Importance and Contribution of Ericsson's alleged SEPs.  (*See, e.g.*, Dkt. 1334 at § V.A.)

1.     Dr. Parkvall Mischaracterizes the Patent-by-Patent Analysis Approach.

10.     Dr. Parkvall criticizes the methodology Dr. Jayant and I employed in the detailed study of Importance and Contribution of Ericsson's SEPs, claiming it is unreliable because it fails to consider the impact that substituting or modifying the patented the technology has on other parts of the cellular standards.  (Dkt. 1360 at ¶¶ 49–54.)  Dr. Parkvall's criticism is based on a mischaracterization and/or misunderstanding of our analysis.

11.     Specifically, Dr. Parkvall claims our approach requires that the technologies must be amenable to be swapped out in a "seamless" way that does "not disrupt the system in *any* way." (Dkt. 1360 at ¶ 51 (emphasis added).)  He then alleges that this is not possible because the cellular standards are so "interconnected" and that no solution is "*entirely* independent of every other solution" or completely "modular in nature." (*Id.* (emphasis added).)  In fact, the patent-by-patent analysis is not subject to such stringent requirements, and Dr. Parkvall misses the point.  Our analysis focuses on the actual claims to which Ericsson has been granted patent rights, and allows for trivial modifications to the standards that would have required insubstantial modifications at the time the standard was being developed.  This is consistent with what I understand is an "ex ante" analysis, and accurately determines the intrinsic technical value of Ericsson's alleged SEPs, independent of their incorporation into the standard.

2. The Essentiality Analyses Provide a Very Reliable and Accurate Assessment of Ericsson's Alleged SEPs.

12. As I stated in my opening Witness Declaration, the SEP Analysis performed in this case is the most comprehensive analysis that I am aware of for a portfolio of the size of Ericsson's. (Dkt. 1334 at ¶ 102.)  A total of 12 highly qualified and prominent experts spent a massive amount of time analyzing Ericsson's alleged SEPs.  (Exs. 1460, 1461, 1462, 1463, 1464, 1465, 1466, 1467, 1468, 1579.)  Many of the experts are inventors in their own right.  Each expert conducted an in-depth analysis for each patent family, not merely relying on patent abstracts or printed publications to conduct the analysis.  In total, the other experts spent roughly 2,000 hours analyzing Ericsson's alleged SEPs, and I personally spent roughly 1,000 hours reviewing their assessments and conducting my own analysis of the patents.  This staggering amount of work resulted in roughly 200 patent family appendices totally more than 1,400 pages, including analysis of Ericsson's patents, the identified standards, and available alternatives to the claimed inventions.  The analysis of each patent family went through rounds of review, starting with an initial analysis conducted by my fellow experts, followed by my own analysis of each patent family based on the initial assessment of the other experts.  Overall, I am confident that the SEP Analysis is reliable and accurate.

13. The team conducting the Industry-Wide Essentiality Assessment was also highly qualified.  As I explain in detail below, the members of the Concur IP team have conducted over 15 essentiality assessments of similar scale.  (*See* § VI *infra*.)  Moreover, the Concur IP team has extensive experience not only with analyzing the essentiality of declared essential patents, but specifically with the universe of patents declared essential to the 2G, 3G, and 4G standards.  I was personally involved in one of those previous assessments, and can attest to the qualifications of the team.  Our familiarity with many of the industry-wide patents analyzed increased my reliability in the analysis and conclusions.  Moreover, several

1  quality control measures were implemented, including an independent quality check

2  conducted by Dr. Ding.  (Dkt. 1326 at ¶¶ 59–72.)  Again, I am highly confident in

3  the accuracy of these results.

4            3.    The Patent-by-Patent Approach Determines the Intrinsic

5                  Technical Value of Standard Essential Patents.

6        14.    The patent-by-patent methodology, based on the Essentiality,

7  Importance, and Contribution (E/I/C) analysis, is carefully designed to evaluate the

8  technical value of patents apart from their inclusion in the standard.  Thus, this

9  approach addresses the relevant question:  What is the intrinsic technical value of a

10 patented feature to the cellular standard at issue?  The methodology was designed to

11 identify the value of a patented feature covered in each charted claim, apart from the

12 value associated with that patented feature being incorporated into the standard.  In

13 addition to avoiding capturing the value associated with the feature being included

14 in the standard, the patent-by-patent approach also avoids capturing the value

15 associated with the basic framework and core technologies of the standard that are

16 not covered by Ericsson's patents.

17           4.    Dr. Parkvall's Per-Technology Approach Grossly Overvalues

18                 Ericsson's Patents and Captures the Value of the Standards.

19       15.    Dr. Parkvall's per-technology approach captures the value of the

20 standard itself.  It also captures the value of the basic framework and core

21 technologies that these features are built on, even though Ericsson's patents do not

22 cover this basic framework or core technologies.  Thus, in my opinion, the per-

23 technology approach is fundamentally flawed and grossly inflates the technical

24 value of the patented features.  (*See id.* at ¶¶ 55–74.)

25       16.    Dr. Parkvall claims that his per-technology approach looks at the

26 standard and attempts to extrapolate out value to specific Ericsson's patents (albeit

27 with no mention of the patent claims) based on the overall performance benefits

28 associated with the standardized technology.  His analysis is inherently flawed, as it

1   is predicated on an incorrect assumption.  That is, Dr. Parkvall's per-technology

2   approach assumes that just because Ericsson's patents cover features in the

3   standards that allegedly enable or function in concert with the basic framework and

4   core technologies in the standards, then Ericsson's patents should be valued as if

5   they cover the basic framework and core technologies themselves.  But none of

6   Ericsson's patents cover the basic framework and core technologies themselves, and

7   Dr. Parkvall has not shown otherwise.

8       17.    OFDMA is LTE's air interface and forms its basic framework.  Besides

9   having its own significant impact on LTE's performance, OFDMA enables other

10  key technologies, such as channel-dependent scheduling based on time and

11  frequency, that have a significant impact on LTE's performance.  OFDMA,

12  however, was well known before LTE was standardized (and I have seen no

13  evidence Ericsson invented it).  For example, U.S. Patent No. 3,488,445 (assigned to

14  Bell Telephone Laboratories) covered the original concept of OFDMA, was issued

15  on Jan 6, 1970, and expired well before LTE was standardized.  (Ex. 2580.)

16      18.    Another example of a key LTE technology not covered by any of

17  Ericsson's patents is "incremental redundancy" used in LTE's Hybrid ARQ.  As

18  explained in Section IV, incremental redundancy was known at least since the 1970s

19  and was developed and introduced into LTE by companies other than Ericsson.

20  Nevertheless, in evaluating Ericsson's SEPs, Dr. Parkvall proposes a hypothetical

21  alternative based on an outdated early-3G technology that did not use incremental

22  redundancy.  By so doing, Dr. Parkvall captures the value of incremental

23  redundancy itself as used in the 4G and enhanced 3G standards, even though none

24  of Ericsson's SEPs cover incremental redundancy itself or provide the only way to

25  implement the technology in the standard.

26

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

5. Dr. Parkvall's Opinions Regarding Modularity Are Fundamentally Flawed.

19. Dr. Parkvall's critiques of my methodology stem from his incorrect understanding of how the concept of interrelatedness affects the evaluation of patented features in the standards. (Dkt. 1360 at ¶¶ 51–54.) Dr. Parkvall argues that it is incorrect to "simply swap out one contribution or idea for another, or to simply cut Ericsson's technology out of the standard altogether without any replacement." (*Id.* at ¶ 51.) Dr. Parkvall's critique is based on the false assumption that Dr. Jayant and I evaluated non-infringing alternatives *after the standards were already set*. For example, Dr. Parkvall falsely claims that we "*cut* Ericsson's technology *out* of the standard . . . ." (Dkt. 1360 at ¶ 51 (emphasis added).) Dr. Parkvall also argues that we failed to consider "the effect of substituting the alternative into the standard or removing the patented feature on the rest of the system." (*Id.* at ¶ 52.) This is incorrect.

20. Dr. Jayant and I considered the impact of changing, modifying, or removing a particular claimed feature on the system—but we did so by considering that impact *at the time that feature was adopted*, not after the standard was finalized. At the time of adoption, other portions of the standard that may depend on the specifics of a particular feature typically would likewise not have been adopted yet. And the other portions could not have been designed without first accounting for the specifics of the feature at issue. When the particular feature is analyzed *at the time of adoption*, its intrinsic technical value can be determined. If the value of the feature is analyzed *after adoption*, or at the present time, as Dr. Parkvall does—and after additional features have been added to the standard based with the goal of interoperating with legacy features such as the feature at issue—there will of course be a greater impact on the entire standard. That is, after the feature has been adopted and the standard has been finalized and subsequently evolved, many subsequently developed aspects of the standard would have been

1  designed specifically with the particular feature (and other relatively

2  contemporaneously added features) in mind.

3      21.   The following hypothetical example illustrates how considering

4  alternatives after the patented feature has been adopted into the standard (as Dr.

5  Parkvall has done), as opposed at the time of adoption (as Dr. Jayant and I have

6  done), grossly overvalues the patented feature.  As discussed in Section IV, in the

7  very early stage of LTE development, the 3GPP Working Group RAN 1 was

8  considering and deciding between an OFDMA-based air interface and a CDMA-

9  based air interface.  Although RAN 1 selected the OFDMA-based air interface for

10 the 4G standard, 3GPP documents show that this was a difficult decision because

11 the CDMA version had many benefits.  One such benefit was better compatibility

12 with the 3G standard, which also uses a CDMA-based air interface (WCDMA).  In

13 short, the CDMA-based air interface was a viable alternative to the OFDMA-based

14 air interface *at the time of adoption*.

15     22.   But if RAN 1 had instead selected the CDMA path for 4G, then a

16 different set of technologies compatible with the CDMA framework would have

17 been developed and adopted into the 4G LTE standard at that time.  For example, a

18 channel-dependent scheduling scheme based on time and code domains could have

19 been selected for 4G because it is compatible with the CDMA framework.  By

20 contrast, the channel-dependent scheduling scheme based on time and frequency

21 domains that was adopted in LTE would not have been considered for use with a

22 CDMA-based air interface.  Similarly, a number of technologies that are compatible

23 with a CDMA-based air interface and that could have been used in 4G, were

24 rendered mostly unviable *after the adoption* of LTE's OFDMA-based interface and

25 other core technologies (*e.g.*, channel-dependent scheduling based on time and

26 frequency domain) compatible with the OFDMA-based air interface.

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

6.      Dr. Parkvall's Per-Technology Approach Is Inconsistent with 3GPP Practice.

23.      As discussed above (Section II.A.1), Dr. Parkvall claims the patent-by-patent approach requires that the technologies under analysis must be amenable to being swapped out in a "seamless" way that does "not disrupt the system in *any* way." (Dkt. 1360 at ¶ 51 (emphasis added).)  He then alleges that this is not possible because the cellular standards are so "interconnected" and that no solution is "*entirely* independent of every other solution" or completely "modular in nature." (*Id.* (emphasis added).)  But the structure and practices of 3GPP Working Groups show that, in most situations, the problems, issues, and related features are largely self-contained, and submissions are made to specific Working Groups to address these technical issues.  (Dkt. 1334 at ¶¶ 86–94.)

24.      As I discussed in my opening Witness Declaration, in the relatively few occasions where a particular proposed feature may have an impact on different standard sections or topics under the purview of different Working Groups, the respective members of the Working Groups are notified, and a joint decision is made.  (*Id.* at ¶ 88.)  Joint decisions usually involve coordination and possibly only very minor modifications to other sections of the standard.  (*Id.*)  Notwithstanding that this coordination helps ensure technical functionality across the set of standard specifications, most particular technical features in the standards are modular and/or incremental in nature—particularly when viewed at the time these features are adopted.

25.      Dr. Parkvall's examples of the Standardization Process within 3GPP do not change my opinion in this regard.  Dr. Parkvall provides several examples of the Standardization Process within 3GPP that purportedly involve:  (1) two 3GPP Working Groups (RAN 1 and RAN 2), and (2) two different topics discussed within one Working Group (RAN 1).  (Dkt. 1360 at ¶¶ 35–36.)  While I largely agree with the process Dr. Parkvall describes, I disagree that cooperation among multiple

Working Groups and/or consideration of different topics within the same Working Group necessarily show that the relevant feature(s) are not modular or that there were no available alternatives to the feature(s).

26.     As an example, suppose that a Working Group is deciding whether to allow four choices or eight choices for a reference signal.  That can impact another aspect of the design under purview of another Working Group, namely, whether two or three bits are needed to signal which of the four-choice option or the eight-choice option, respectively, is being used.  However, the fact that there is a cross impact between Working Groups does not mean that, ***at the time of adoption***, the eight-choice option was not an alternative to the four-choice option, or vice versa.  The two decisions (number of choices and number of bits) would have to be discussed and made by the two Working Groups in a consistent manner, but that does not in any way mean that both options were not available ***at the time of adoption***.  To allege, as Dr. Parkvall does, that the only alternative would be to fall back to an effective and outdated previous generation technology, just because sometimes there are cross-dependencies between different parts of the standard or Working Groups, mischaracterize the 3GPP practice.

7.     Dr. Parkvall's Two Examples of Interdependency Highlight the Flaws in Dr. Parkvall's Analysis.

27.     In attempting to establish that Ericsson's SEPs are not modular, and instead are highly interdependent with other portions of the standard, Dr. Parkvall comes up with only two examples (presumably the best he could find).  Yet, a major flaw with Dr. Parkvall's analysis is evidenced by these two examples.  (Notably, these examples were not discussed in Dr. Parkvall's expert report and first appeared in his Witness Declaration.)  Moreover, referring to two of Ericsson's alleged SEP patent families, Dr. Parkvall provides insight into how his analysis was conducted with respect to identifying alternatives and supporting his determination of technical value.  (Dkt. 1360 at ¶¶ 47–48.)  I address each of the two examples as follows.

28.     Dr. Parkvall's first example concerns Ericsson's patent family P23633. (*Id.* at ¶ 47.)  Dr. Parkvall states P23633 "deals with CSI (channel state information) reporting, including the use of a detailed report on the PUSCH (physical uplink scheduling[2] channel) and a less detailed report on the PUCCH (physical uplink control channel).  CSI is important for adapting the connection between the handset and the base station to the current situation."  (*Id.*)  Although I agree with Dr. Parkvall as to the relative importance of CSI reporting (in general), I disagree with his use of the importance of CSI to argue as to the relative interrelatedness of Ericsson's claimed invention of P23633.  As an initial matter, I note that the standard does not require the CSI reporting scheme recited in the charted claims of P23633, meaning that the claimed invention is not essential.  (Ex. 1639 at pp. 771–783.)  Dr. Parkvall offers no opinion on the non-essentiality of this alleged invention.

29.     Regardless, Dr. Parkvall's use of the broad importance of CSI in general improperly inflates the impact of the narrow and modular contribution embodied in the charted claims of P23633.  In fact, Dr. Parkvall himself acknowledges that the claimed invention of P23633 is "very technical and narrow." (Dkt. 1360 at ¶ 47.)  Yet, Dr. Parkvall argues that removing or modifying the claimed invention would have an impact on other areas of the standards, asserting that such modification "would have significant repercussions throughout the standard."  (*Id.*)  However, this presumes that any and all features of the standard designed ***after adoption*** of the CSI reporting determination at issue in P23633 would still have been designed, discussed, and adopted into the standard had an equally good, but different solution been incorporated.  It is true that the presence

---

[2] I note that in the LTE Standards, the acronym PUSCH stands for "Physical Uplink Shared Channel".  Dr. Parkvall suggests that it stands for "Physical Uplink Scheduling Channel" (*See* Parkvall Witness Declaration at ¶ 47.)  This is, however, a minor error on his part.

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1   and availability of CSI reporting would have an impact on other areas of the

2   standards, such as RRC signaling, but in many instances, the impact would not be

3   severe, because differences between the choices would have been accounted for in

4   the design of later-adopted features.  In other words, the impact is only allegedly

5   severe because Dr. Parkvall implies the rest of the standard would necessarily

6   remain unchanged.

7          30.     However, Dr. Parkvall's own description of how the standardization

8   process works greatly undermines this implication.  As Dr. Parkvall states there is

9   collaboration between the working groups *during the adoption process*.  (*Id.* at ¶

10  43.)  If there were differences between alternatives, then other interested working

11  groups would have easily been able to address trade-offs associated with the

12  difference as part of designing the other portions of the standard.  Accordingly, if

13  the alternative is considered at the time of adoption—as I have done in my

14  analysis—narrow inventions like that in P23633 are modular in nature and could be

15  changed without materially impacting the standards.

16         31.     Dr. Parkvall's second example using patent family P21430 is equally

17  flawed.  (Dkt. 1360 at ¶ 48.)  Dr. Parkvall states P21430 is directed to "methods for

18  setting a timer, which is used to let the handset know whether it remains

19  synchronized and time aligned."  (*Id.*)  As an initial matter, his characterization of

20  P21430 is misleading, as the timer does not actually indicate that a handset is

21  synchronized.  The timer only sets a maximum period of time that the UE can be

22  *assumed* to be synchronized.  (*See id.*)

23         32.     When the scope of P21430 is properly interpreted, the claimed

24  invention is very modular in nature.  (Dkt. 1360 at ¶ 48.)  Dr. Parkvall

25  acknowledges the claimed invention of P21430 is "very narrow," yet argues that

26  removing or modifying this feature would require "modification to define guard

27  times in the frame structure."  (*Id.*)  This argument, however, rests on the incorrect

28  interpretation that the timer actually indicates synchronization, as opposed to setting

a maximum amount of time within which synchronization may be assumed.  As such, the detrimental impact that Dr. Parkvall claims would arise is just not accurate. For example, if the alternative I proposed in the Appendix to my expert report was chosen instead, the extent of any impact would be essentially nothing.  (*See* Ex. 1639 at pp. 644–45.)  In particular, Motorola's proposal to 3GPP Working Group RAN 1 uses random access to maintain timing.  (*Id.* at p. 644.)  The proposed solution is a non-infringing alternative because it does not use scheduling requests or an associated timer.  (*Id.*)  There would not be a need to modify the frame structure as neither solution actually determines synchronization.

33.     In sum, although Dr. Parkvall characterizes his per-technology approach as a "remedy" to the alleged flaws in my methodology, Dr. Parkvall's approach fails to accurately determine the technical value of any of Ericsson's alleged SEPs, instead merely serving to allocate to Ericsson value based on incorporation into the standard.  (Dkt. 1360 at ¶ 55.)  Dr. Parkvall says that his per-technology method enables him to "determine the overall effect on system performance" and "instead of employing guesswork [utilizes] existing literature and testing" to support his conclusions.  (*Id.*)  Indeed, these papers are directed at the performance of the standard themselves, not any of Ericsson's patents.

34.     And as is evident, Dr. Parkvall's method is designed to determine the technical value of the standards themselves, focusing on the standards as opposed to the claimed inventions in Ericsson's alleged SEP portfolio.  His entire analysis is devoid of any connection between the supporting "evidence" he relies upon and a single claimed invention within Ericsson's alleged SEP portfolio.  Dr. Parkvall merely lists the patent families he alleges fall into each category, and then discusses the technology in broad terms without any reference to the scope of Ericsson's claims.  (*See, e.g.*, *id.* at § V.A.1.)  Even Dr. Parkvall's summaries of Ericsson's patent families lack any specific citations to the claims or the patent specifications that would support his broad interpretations.  (*See, e.g.*, Ex. 5349.)  Dr. Parkvall has

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

failed to provide any analysis that ties the specific benefits he recites in each technology category to any of Ericsson's issued claims, instead relying on his assumption that because Ericsson allegedly has "a large number" of patents in each technology category that all benefits of the standard cannot be achieved without using Ericsson's SEPs allegedly in that category. (*See, e.g.*, Dkt. 1360 at ¶¶ 87–93.)

35.     Overall, Dr. Parkvall's methodology grossly and improperly inflates the value of Ericsson's alleged SEP portfolio by utilizing an improper analytical framework and selecting alternatives in a manner without any explicit or implicit connection to the claims of Ericsson's patents.  In doing so, he captures the value of the standard itself rather than the value of Ericsson's SEPs separate and apart from their adoption into the standard.

### 8.   Dr. Parkvall's Two Bicycle Examples Highlight His Fundamental Misunderstanding of the Patent-by-Patent Analysis.

36.     Dr. Parkvall provides two bicycle examples that purportedly illustrate Dr. Jayant's and my purported "failure to consider the effect of substituting the alternative into the standard or removing the patented feature on the rest of the system," which allegedly "exhibits a fundamental lack of [our] understanding of how a standard operates."  (Dkt. 1360 at ¶¶ 52–53.)

37.     In the first example, Dr. Parkvall alleges that our methodology allows us "to remove the handlebars on the bicycle and not replace them with another steering mechanism" and "the resulting bicycle would not be very useful to anyone, and certainly would not work as intended."  (Dkt. 1360 at ¶¶ 52–53.)  This analogy illustrates Dr. Parkvall's fundamental lack of understanding of our methodology and analysis.  As explained in detail in my Witness Declaration, for 159 family/standard pairs (69% of the total number that were claim charted)—including all 136 pairs determined to be essential (*i.e.*, Essentiality Rank of "1"), all 10 pairs determined to be not essential under a proper claim construction (*i.e.*, Essentiality Rank of "2"), and 6 of the 73 pairs determined to be not essential under any reasonable claim

construction (*i.e.*, Essentiality Rank of "3")—Dr. Jayant and I identified potential alternatives that were available ***at the time of adoption***, and carefully assessed the impact of substituting or replacing the key feature in the standard with those alternatives ***at the time of adoption***.  Thus, contrary to Dr. Parkvall's example where the handlebars are removed and not replaced, we have replaced the handlebars with a different set of handlebars that might have had a slightly different shape, but would work equally as well.  Moreover, the handlebars on a bicycle are a very important and fundamental aspect of a bicycle.  I would characterize the features covered by the majority of Ericsson's patents to be much more like one spoke in a wheel, rather than handle bars.  Even if the spoke failed or were removed, the bicycle would still work without a noticeable difference in performance.  Accordingly, Dr. Parkvall's first bicycle analogy is misplaced.

38.     In his second bicycle example, Dr. Parkvall uses a "modern mountain bike" having a "special carbon frame, shocks on the front fork, special tires, specific rims, a braking mechanism, pedals, gears, a chain, and a hand shift, among other things."  (Dkt. 1360 at ¶ 71.)  In trying to draw an analogy, he suggests that by "substituting the gears on a 10-speed for those of a 20-speed bike" then you will need "at least a new chain and a new hand shifter to allow the bicyclist to be able to access gears 11 to 20."  (*Id.*)

39.     This example also highlights Dr. Parkvall's misunderstanding of our patent-by-patent methodology, as well as flaws with his modularity analysis.  Specifically, under a proper patent-by-patent methodology, Dr. Jayant and I assessed the impact of using an alternative ***at the time of adoption***.  But, Dr. Parkvall assesses the impact of swapping in the alternative (*i.e.*, the 20-speed gear mechanism) into an already built and completed bicycle.  However, if viewed at the proper time frame, *i.e.*, when the bicycle was still under development – and any modifications would have been easy at the time.

40.     Moreover, similar to the first example, Ericsson's patents that I have analyzed do not cover any of the fundamental technologies of LTE such as OFDMA or the eight key technology areas that I discussed in my opening witness declaration. While these very important features of LTE might be akin to the gears on a bike, Ericsson's patents do not cover such fundamental technologies.  Accordingly, Dr. Parkvall's second bicycle analogy is also misplaced.

## B.     Ericsson's 2G, 3G, and 4G SEP Families and Allegedly Correlated Contributions are Directed to Narrow Aspects of Incremental and Modular Standardized Features.

41.     Ericsson's approved contributions that it asserts correlate to its alleged SEPs further undermine Dr. Parkvall's argument that the technology in the standard is not modular.  (Dkt. 1360 at ¶ 45–48.)  In response to an interrogatory served by TCL, Ericsson identified approved contributions that allegedly correlate to several of its patents.  (*See* Ex. 2520.)  My analysis of those approved contributions shows that the technology described and allegedly adopted resulted in only a localized change to the affected standard.

42.     For example, Ericsson has taken the position that TDoc R2-095380 correlates to U.S. Patent No. 8,913,565 ("the '565 Patent"), which is a member of patent family P28747.  In general, P28747 relates to scheduling requests for uplink transmission resources and is specifically directed to sending a scheduling request ("SR") when specific conditions are met—*i.e.*, only when buffered data is new and unscheduled.  (Ex. 1639 at pp. 1163–1169.)  As shown by the redlined text in the excerpt from TDoc R2-095380, this proposal affected only the single subsection of the sole technical specification associated with the key accused feature for P28747, and did so in a relatively minor way.

### 5.4.4    Scheduling Request

The Scheduling Request (SR) is used for requesting UL-SCH resources for new transmission.

When an SR is triggered, it shall be considered as pending until it is cancelled. All pending SR(s) shall be cancelled when a MAC PDU is assembled and this PDU includes a BSR which contains buffer status up to (and including) the last event that triggered a BSR (see subclause 5.4.5), or when the UL grant can accommodate all pending data available for transmission.

If an SR is triggered and there is no other SR pending, the UE shall set the SR_COUNTER to 0.

As long as one SR is pending, the UE shall for each TTI:

- if no UL-SCH resources are available for a transmission in this TTI:

  - if the UE has no valid PUCCH resource for SR configured in any TTI: initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs;

  - else if the UE has a valid PUCCH resource for SR configured for this TTI and if this TTI is not part of a measurement gap:

    - if SR_COUNTER < *dsr-TransMax*:

      - increment SR_COUNTER by 1;

      - instruct the physical layer to signal the SR on PUCCH;

    - else:

      - notify RRC to release PUCCH/SRS;

      - clear any configured downlink assignments and uplink grants;

      - initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs.

- ~~else if UL-SCH resources are available for a new transmission in this TTI, cancel all pending SR(s).~~

(Ex. 1452 at p. 2.)

43.    In Appendix attached to my expert report, I identified a TDoc proposal from ASUSTeK as a non-infringing alternative to P28747.  (Ex. 1639 at pp. 1163–1169; Ex. 1443.)  ASUSTeK's solution, like Ericsson's, made a relatively minor change to the same subsection of the same technical specification.

### 5.4.4    Scheduling Request

The Scheduling Request (SR) is used for requesting UL-SCH resources for new transmission.

When an SR is triggered, it shall be considered as pending until it is cancelled.

If an SR is triggered and there is no other SR pending, the UE shall set the SR_COUNTER to 0.

As long as one SR is pending, the UE shall for each TTI:

- if no UL-SCH resources are available for a transmission in this TTI:
    - if the UE has no valid PUCCH resource for SR configured in any TTI: initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs;
    - else if the UE has a valid PUCCH resource for SR configured for this TTI and if this TTI is not part of a measurement gap:
        - if SR_COUNTER < SR_TRANS_MAX:
            - increment SR_COUNTER by 1;
            - instruct the physical layer to signal the SR on PUCCH;
        - else:
            - notify RRC of PUCCH/SRS release, initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs.
- else if UL-SCH resources for new transmission are granted in this TTI, cancel all pending SR(s).
- All pending SRs shall be cancelled when there is no triggered BSR.

(Ex. 1443 at pp. 2-3.)

44.    Accordingly, not only is Ericsson's allegedly correlated contribution modular, but my proposed non-infringing alternative is also modular.  Therefore, this alternative could have easily replaced Ericsson's contribution without affecting other parts of the standard.

45.    By way of another example, Ericsson has taken the position that TDoc R1-081582 is correlated to U.S. Patent No. 8,134,940 ("the '940 Patent"), which is a member of patent family P23893.  TDoc R1-081582 proposed a revision to the standard that relates to TDD HARQ ACK/NACK for certain uplink-downlink configurations in which there are more Downlink (DL) than Uplink (UL) subframes. (Ex. 1355.)  This TDoc pertains only to one section of technical specification 36.213, specifically proposing a change to the timing of the UL ACK/NACK to be uniquely defined.  (*Id.*)  As shown by the redline text of R1-081582, this localized revision does not affect other sections of the standard.

## 10.2    Uplink ACK/NACK timing

For FDD, the UE shall upon detection of a PDSCH transmission in subframe $n$ intended for the UE and for which an ACK/NACK shall be provided, transmit the ACK/NACK response in subframe $n+4$.

For TDD, the UE shall upon detection of a PDSCH transmission in subframe $n$ intended for the UE and for which an ACK/NACK shall be provided, transmit the ACK/NACK response in UL subframe $n+k$, with where $k$ depends on the subframe $n$ according to > 3. Table 10.2-1 for the UL-DL configurations defined in Table 4.2-2 in [3].

**Table 10.2-1: Uplink ACK/NACK timing index $k$ for TDD**

| Configuration | Subframe $n$ | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 0 | 4 | 6 | - | - | 4 | 6 | - | - | - | - |
| 1 | 7 | 6 | - | - | 4 | 7 | 6 | - | - | 4 |
| 2 | 7 | 6 | - | 4 | 8 | 7 | 6 | - | 4 | 8 |
| 3 | 4 | 11 | - | - | - | 7 | 6 | 6 | 5 | 5 |
| 4 | 12 | 11 | - | - | 8 | 7 | 7 | 6 | 5 | 4 |
| 5 | 12 | 11 | - | 9 | 8 | 7 | 6 | 5 | 4 | 13 |
| 6 | 7 | 7 | - | - | - | 7 | 7 | - | - | 5 |

46.    Similar to the Ericsson proposed feature solution contained in R1-081582, the alternatives I proposed in the Appendix to my expert report would require revisions to the same section.  (Ex. 1639 at pp. 792–794.)  For example, one non-infringing alternative involved uneven distribution or spreading of ACL/NACK feedback reports.  (Ex. 1639 at pp. 792–93.)  Another non-infringing alternative used a fixed, equal number of downlink slots before each single uplink slot.  Incorporating such non-infringing alternatives into the standard would require only a minor revision.  Namely, using different table and associated text for the same section to define either of my first or second alternatives, and this would have only a localized effect.  Accordingly, not only is Ericsson's allegedly correlated contribution modular, but my proposed non-infringing alternative also modular.  Therefore, contrary to Dr. Parkvall's position, the majority of Ericsson's alleged 2G, 3G, and 4G SEPs are narrow and modular, and could have easily been replaced by alternative technology at the time of adoption.

47.    Voice Coding is Dr. Parkvall's ninth technology subarea.  (Dkt. 1360 at ¶ 202.)  Dr. Parkvall's analysis of the Voice Coding technology subarea also underscores the fundamental flaws in the per-technology approach, in particular

1    based on the modularity of several Voice Coding features related to Ericsson's

2    alleged SEPs.  (*See, e.g.*, *id.* at ¶¶ 202–205.)

3         48.    I reviewed Dr. Parkvall's analysis of Ericsson's alleged Voice Coding

4    SEPs, received input from Dr. Nikil Jayant and his Witness Declaration (Dkt. 1327;

5    Ex. 1638), and performed my own independent analysis of these families and the

6    related materials.  As detailed below, this analysis shows that Dr. Parkvall's per-

7    technology analysis is inherently flawed and leads to a gross overvaluation of

8    Ericsson's purported Voice Coding patent families.  For example, the "ETSI Voice

9    Codec competition" that Dr. Parkvall discusses (Dkt. 1360 at ¶ 205), and the related

10   standardization activity for Adaptive Multirate (AMR) speech coding, each

11   demonstrate the modularity of speech coding features.  In addition, Dr. Parkvall

12   incorrectly ignored alternatives that were available at the time relevant AMR

13   standards were adopted, instead limiting his analysis to the ABCFNR codec.  (*See*

14   Dkt. 1360 at ¶ 205.)

15        49.    An aspect of voice coding technology shows how Ericsson's voice

16   coding patent families are directed to features that are largely modular and operate

17   mostly independently from one another and/or from most other features in the 2G,

18   3G, and 4G standards is voice activity detection ("VAD") and discontinuous

19   transmission ("DTX").  Indeed, Dr. Parkvall characterizes VAD/DTX as being

20   separate from other aspects of speech coding, when he opines that Voice Coding

21   includes "positioning excitation pulses in a linear predictive speech coder; multi-rate

22   speech codecs; voice activity detection; CELP speech coding using a fixed

23   codebook with sparse vectors; comfort noise generation; and discontinuous

24   transmission in adaptive multi-rate communication systems."  (Dkt. 1360 at ¶ 203.)

25   Dr. Parkvall is technically accurate to list DTX separately from other developments

26   of voice coding.

27        50.    In addition, during the qualification and selection phases of the "ETSI

28   Voice Codec competition" Dr. Parkvall refers to (Dkt. 1360 at ¶ 205), the

participant codecs did not include VAD/DTX algorithms—thus further highlighting the modularity and independence of VAD/DTX aspects relative to those of speech coding.  (Ex. 379 at p. 39; Bruhn Tr. 207:6–12.)  Thus, although Dr. Parkvall asserts that "[a]n alternative Voice Coding system, such as ABCFNR," which was another codec in the competition, "performed worse than [the AMR codec called] ENS1," it was only after Ericsson's AMR codec was selected for standardization that VAD/DTX algorithms were characterized.  (Ex. 379 at p. 39.)  Both ETSI's qualification and selection of AMR codecs independently of features related to VAD/DTX, and also the fact that ETSI only later characterized the VAD/DTX algorithms demonstrate the modularity of aspects of speech coding related to Ericsson Voice Coding Patent Families at issues in this case.  This applies to both the 2G and 3G standards.  (*See, e.g.*, Ex. 386.)

51.     Ericsson's P07669 and P10992 patent families are both directed to these modular VAD/DTX features.  (Ex. 5349 at pp. 38, 39.)  Thus, the key features for these families could have been replaced with non-infringing alternatives without materially affecting, for example, Ericsson's P07288 patent family that relates to AMR link adaptation.  (*See id.* at p. 38.)  In addition, the key features for the P07669, P07288, and P10992 patent families could be changed without material affecting or being affected by, for example, what comfort noise algorithm is being applied per P10991, or whether an anti-sparseness operator is applied as discussed in P09268.  (*See id.* at pp. 38–39.)

52.     Not only are the modularity of Ericsson's VAD/DTX patent families P07669 and P10992 supported by the events that occurred in the ETSI AMR Voice Coding competition mentioned by Dr. Parkvall (Dkt. 1360 at ¶ 205), this modularity is demonstrated by the related Technical Specification itself.  Namely, Ericsson's claim charts for these patent families cite the 3GPP TS 26.094 v.6.0.0 Technical Specification.  (Exs. 386, 4077, 4142.)  For the P10992 patent family, the cited portion of this standard is related to a "Technical Description of VAD Option 1,"

and more specifically to relatively short sections of pseudocode within § 3.3.5.1 "Hangover addition" and § 3.3.5 "VAD decision.  (Ex. 386 at pp. 5, 11, 12.)

53.     Additionally, the features allegedly covered by Ericsson's P10992 patent family are described in only one of two available options for VAD set forth in the standard.  In particular, the 3GPP TS 26.094 v.6.0.0 Technical Specification cited in Ericsson's claim charts "specifies *two alternatives* for the Voice Activity Detector (VAD) to be used in the Discontinuous Transmission (DTX) as described in [3].  Implementors of mobile station and infrastructure equipment conforming to the AMR specifications *can choose which of the two VAD options to implement*.  There are *no interoperability factors* associated with this choice."  (Ex. 386 at p. 5 (§ 1) (emphases added).)  This is shown below.

| Release 6 | 5 | 3GPP TS 26.094 V6.0.0 (2004-12) |
|---|---|---|

## 1     Scope

The present document specifies two alternatives for the Voice Activity Detector (VAD) to be used in the Discontinuous Transmission (DTX) as described in [3]. Implementors of mobile station and infrastructure equipment conforming to the AMR specifications can choose which of the two VAD options to implement. There are no interoperability factors associated with this choice.

The requirements are mandatory on any VAD to be used either in User Equipment (UE) or Base Station Systems (BSS)s that utilize the AMR speech codec.

54.     The VAD decision algorithm of VAD Option 2, which was contributed by Motorola (Ex. 380 at p. 24; Bruhn Dep. Tr. 171:17–172:9), is set forth in § 4.3.7 of the accused standard 3GPP TS 26.094 v.6.0.0 (Ex. 386 at pp. 16, 21). The Option 2 VAD Decision alternative algorithm by definition can replace the accused Option 1 VAD Decision without materially impacting other features in the standard or requiring substantial modifications to the same.  (Ex. 386 at p. 5 (§ 1) ("There are *no interoperability factors* associated with this choice" between Option 1 and Option 2 VAD.).)

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

55. Further, Ericsson has not alleged that the P10992 patent family covers Option 2 VAD. (Ex. 4124.) Rather, the claim charts for this patent family are limited to Option 1 VAD. (*See, e.g.*, Ex. 4124.) According to ETSI, a direct comparison between Ericsson's and Motorola's VAD options across paired experiments revealed no significant differences between their performances, as shown below. (Ex. 380 at p. 24.) In fact, the responsible working group (SMG11) considered the overall quality of VAD Options 1 and 2 to be similar. (*Id.* at 25.)

> A direct comparison between the two VAD options across paired experiments reveal no significant difference between their performances. However, the corresponding experiments were not designed to indicate which of the two algorithms might, in practice, be preferred by subjects. Their primary objective was to highlight any degradation in speech quality when VAD/DTX was activated with either scheme.

56. Accordingly, the feature allegedly covered by the P10992 patent family could be removed from the standard and/or replaced without materially impacting other portions of the standard and even without substantially changing the overall quality of VAD/DTX.

57. Ericsson's P07669 patent family relates to Option 1 VAD/DTX as well (*see, e.g.*, Ex. 4077), and the above arguments apply equally to this patent family.

58. The above analysis demonstrates that Dr. Parkvall's per-technology approach of treating all the Ericsson Voice Coding Patent Families and related/alternative solutions as a single group is seriously flawed, as these families relate to separate, distinct, and specific topics within the Voice Coding technology subarea. Specific alternatives to the specific topics allegedly covered by the respective patents were discussed in my and Dr. Jayant's Witness Declarations. (Ex. 1639 at pp. 330–41; Ex. 1638.) Other than summarily dismissing these alternatives, Dr. Parkvall has failed to consider any of them, instead liming his analysis to the ABCFNR speech coding. (Dkt. 1360 at ¶ 206.)

## C.   Ericsson Does Not Have an Extensive Array of Critically Important Patents Covering 2G, 3G, and 4G Technologies.

59.   **FIGURE 1** below presents a conservative representation of Ericsson's 2G, 3G and 4G SEP families, ranging from more valuable (the green bubble) to not valuable (the red bubbles).

60.   As shown in **FIGURE 1** and discussed in my opening Witness Declaration, only a small number of patent families directed to the 2G, 3G, and/or 4G are technically valuable.  Moreover, even these families were determined to still be addressing and solving modular problems contained within specific functions, such that the corresponding technical solutions would not materially impact other problems and associated solutions in the respective standards.  This is consistent with the reality that most 2G, 3G, and 4G SEPs (with only an exception of a handful of extremely fundamental patents that radically changed the technological landscape—none of which I believe are active and owned by Ericsson) address incremental solutions in a narrow aspect of a given technology.  (Section II.A, *supra*.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22     **FIGURE 1 (PDX 137):  Contribution and Importance Ranks**

23            **for Ericsson's 2G, 3G, and 4G Patent Families**

24

25          61.     While the above figure is an overview of all of Ericson's SEPs, Dr.

26    Parkvall divided Ericsson's SEPs into 10 technology subareas (or buckets) for his

27    analysis.  However, in his witness statement he only discusses in detail five of those

28    technology buckets.  The following graphs demonstrate that Ericsson does not have

1    an extensive array of critically important SEPs in any of Dr. Parkvall's technical

2    buckets that Mr. Kennedy ultimately relies upon.

3         62.    **FIGURE 2** below shows Ericsson's 2G, 3G and 4G Data Transmission

4    Patent Families in the technical value scale.



**FIGURE 2 (PDX 138): Contribution and Importance Ranks**

**for Ericsson's Data Transmission Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

63.     **FIGURE 3** below shows Ericsson's 2G, 3G and 4G Carrier Aggregation Patent Families in the technical value scale.



**FIGURE 3 (PDX 139): Contribution and Importance Ranks**

**for Ericsson's Carrier Aggregation Patent Families**

64.    **FIGURE 4** below shows Ericsson's 2G, 3G and 4G Resource Allocation Patent Families in the technical value scale.



**FIGURE 4 (PDX 140):  Contribution and Importance Ranks**

**for Ericsson's Resource Allocation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

65.   **FIGURE 5** below shows Ericsson's 2G, 3G and 4G Connection Establishment Patent Families in the technical value scale.



**FIGURE 5 (PDX 141): Contribution and Importance Ranks**

**for Ericsson's Connection Establishment Patent Families**

66.   **FIGURE 6** below shows Ericsson's 2G, 3G and 4G Sleep Mode
Solutions Patent Families in the technical value scale.



**FIGURE 6 (PDX 142):  Contribution and Importance Ranks**

**for Ericsson's Sleep Mode Solutions Patent Families**

**D.** **Ericsson Does Not Have an Extensive Array of 2G, 3G, and 4G SEPs.**

       **1.** Ericsson Does Not Have an Extensive Array of 2G, 3G, and 4G SEPs Under Dr. Parkvall's Classification Framework

67. As described above, Dr. Parkvall categorized Ericsson's alleged SEP families into 10 technology subareas (or buckets) related to 2G, 3G, and/or 4G cellular technologies ("Parkvall Technology Categories"), as shown below in **TABLE 1**. (Dkt. 1360 at ¶ 56; Ex. 5349.)

| Technology Category | No. of Families |
|---|---|
| 1.   Connection Establishment | 46 |
| 2.   Link Adaptation | 50 |
| 3.   Data Transmission | 38 |
| 4.   Resource Allocation | 42 |
| 5.   Mobility and Connection Control | 41 |
| 6.   Sleep Mode Solutions | 11 |
| 7.   Advanced Antenna Solutions | 28 |
| 8.   Carrier Aggregation | 18 |
| 9.   Voice Coding | 13 |
| 10.  Security | 9 |

**TABLE 1 (PDX 143):  Ericsson's 2G, 3G, and 4G Patent Families Under Dr. Parkvall's Classification Framework**

HIGHLY CONFIDENTIAL

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

68.   **FIGURE 7**, below, presents Dr. Parkvall's classification of Ericsson's 2G, 3G, and 4G patent families that I previously found to be essential.  (Ex. 1639; Ex. 5349.)



**FIGURE 7 (PDX 144):  Ericsson's 2G, 3G, and 4G Essential Patent Families Under Dr. Parkvall's Classification Framework**

69.     **FIGURES 8–10** below present the results of the study broken into the 2G, 3G, and 4G standards.  (Ex. 1639; Ex. 5349.)  As shown, in each of the standards, the total number of Ericsson's alleged SEP families are insubstantial in a many of Dr. Parkvall's 10 technology subareas.



**FIGURE 8 (PDX 145):  4G Essential Patent Families**

**Under Dr. Parkvall's Classification Framework**



**FIGURE 9 (PDX 146):  3G Essential Patent Families**

**Under Dr. Parkvall's Classification Framework**



**FIGURE 10 (PDX 147):  Ericsson's 2G Essential Patent Families Under Dr. Parkvall's Classification Framework**

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

2.      Ericsson Does Not Have an Extensive Array of 2G, 3G, and 4G SEPs Under a Classification Framework Based on Dr. Parkvall's Book.

70.     Classifying Ericsson's alleged SEP portfolio using a more neutral framework shows that Ericsson lacks coverage in several key technology areas within the 2G, 3G, and 4G standards.  A classification framework I created based a book by Erik Dahlman, Dr. Parkvall, and Johan Sköld ("the Dahlman Classification Framework") (Ex. 1416) includes nine technology categories that include a total of 39 technology subcategories covering 2G (*e.g.*, GSM, GPRS, EDGE), 3G (*e.g.*, UMTS, HSPA), and 4G (*e.g.*, LTE) cellular technologies, as shown above in **TABLE 1**.  Further details regarding how I applied the Dahlman Classification Framework are set forth in the Classification Protocol.  (Ex. 1610.)  **FIGURE 11** below presents the results of this classification across all standards.



**FIGURE 11 (PDX 148):  Distribution of Ericsson's 2G, 3G, and 4G Patent Families Under the Dahlman Classification Framework**

71.   **TABLES 2A and 2B** below is a legend that described the categories and subcategories according to the Dahlman Classification Framework.

| Categories | Function Acronym | Functions |
|---|---|---|
| **Access Procedures (AP)** | AP_1 | Acquisition and Cell Search |
| | AP_2 | System Information |
| | AP_3 | Random Access Procedure and Time Alignment |
| | AP_4 | Handover, Cell Selection, Attach, and Detach |
| | AP_5 | Paging |
| **Network Protocols (NP)** | NP_1 | Header Compression |
| | NP_2 | Ciphering, Authentication, Security, and Key Management |
| | NP_3 | Radio Link Control |
| | NP_4 | Medium Access Control |
| **Physical Layer Technologies (PLT)** | PLT_1 | OFDM and SC-FDMA |
| | PLT_2 | Error-Control Coding and Modulation |
| | PLT_3 | Adaptive modulation and coding |
| | PLT_4 | CDMA and Spreading |
| | PLT_5 | Multi-Antenna Support |
| **Control Signaling (CS)** | CS_1 | Scheduling Requests and Buffer Status Reports |
| | CS_2 | Hybrid-ARQ Related Signaling |
| | CS_3 | Channel Measurements |
| | CS_4 | Reference Signals |
| | CS_5 | Downlink Control Signaling |
| | CS_6 | Uplink Control Signaling |
| **Radio Resource Management (RRM)** | RRM_1 | Semi-Persistent Scheduling |
| | RRM_2 | Power Control and Headroom |
| | RRM_3 | Time-Division-Duplexing |
| | RRM_4 | Inter-Cell Interference Coordination |
| | RRM_5 | Power Saving, including Discontinuous Reception and Transmission |
| | RRM_6 | Radio Resource Management General |

**TABLE 2A (PDX 149):  Legend for the Dahlman Classification Framework**

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

| Categories | Function Acronym | Functions |
|---|---|---|
| **Speech & Multi-media (SMM)** | SMM_1 | Speech Coding |
| | SMM_2 | Messaging |
| | SMM_3 | IMS and MultiMedia |
| **Advanced Features (AF)** | AF_1 | Multicast/Broadcast Single-Frequency Network |
| | AF_2 | Positioning/Location |
| | AF_3 | Carrier Aggregation |
| | AF_4 | Coordinated Multi-Point |
| | AF_5 | HetNets, Femto-Cells, Home NodeB/eNodeB, Self-Organizing Networks, Dual Connectivity, and Relaying |
| **Core Network (CN)** | CN_1 | Gateways |
| | CN_2 | Roaming and Mobility Management |
| | CN_3 | Network Interfaces |
| | CN_4 | Policy and Charging Control |
| | CN_5 | Emergency Calls |
| | CN_6 | Lawful Interception |
| **Terminal interfaces and other Legacy Technologies (TI)** | TI_1 | None |

**TABLE 2B (PDX 149):  Legend for the Dahlman Classification Framework (continued)**

72.   **FIGURES 12–14** below present the results of this classification broken into the 2G, 3G, and 4G standards.  As shown, the total number of Ericsson's alleged SEP families are insubstantial in a number of the Dahlman categories and subcategories, and Ericsson does not have any patents many of the subcategories (represented by yellow highlights).



**FIGURE 12 (PDX 150):  Distribution of Ericsson's 4G Patent Families Under the Dahlman Classification Framework**

SMRH:481062607.2



**FIGURE 13 (PDX 151):  Distribution of Ericsson's 3G Patent Families Under
the Dahlman Classification Framework**

HIGHLY CONFIDENTIAL

SMRH:481062607.2



**FIGURE 14 (PDX 152):  Distribution of Ericsson's 2G Patent Families Under the Dahlman Classification Framework**

73.     As also illustrated **FIGURES 12–14**, the standards contain more technologies than simply the 10 Technology Categories of Dr. Parkvall's classification framework.  More importantly, the industry-wide classification study show that Ericsson's alleged SEP portfolio does ***not*** span ***all technologies within the standards***.  Under Dr. Parkvall's classification framework, Ericsson would appear to have patent coverage for all technologies within the standards.  But this is due to how the technology subareas were chosen.  Under the more neutral Dahlman Classification Framework, however, it is clear that Ericsson's alleged SEPs do not even cover every technology category in the standards.  This is shown in the above

1   **FIGURES 12–14** by the yellow highlights for subcategories that do not include any

2   Ericsson alleged SEPs.

3                    3.      Ericsson's Proportional Shares of Industry-Wide Essential Patent

4                            Families are Relatively Insubstantial.

5          74.    Not only does Ericsson's alleged SEP portfolio do not have the breadth

6   of coverage that Dr. Parkvall's classification framework implies, but a comparison

7   of Ericsson's holdings against industry-wide essential SEPs demonstrates that

8   Ericsson's proportional share is relatively insubstantial in most of the technology

9   categories.  With the assistance of Dr. Matthew Valenti and Concur IP (Ex. 1610), I

10  conducted a study to determine Ericsson's relative SEP holdings across the 2G, 3G,

11  and 4G technology categories under both Dr. Parkvall's classification framework

12  and the Dahlman Classification framework.

13         75.    The results of this study are presented below.  (Ex. 1611.)  They

14  demonstrate that under both Dr. Parkvall's classification framework and the more

15  neutral classification framework, Ericsson's proportional shares of patent families in

16  each technology category are insubstantial.  In most cases, Ericsson's proportional

17  share is less than 8% of the total.  This contradicts Dr. Parkvall's opinion that

18  Ericsson has been a major contributor of an extensive array of critically important

19  patents in the relevant cellular technologies.

20                    *a.      Classification of Industry-Wide Essential Patent Families*

21                            *Under the Parkvall Classification Framework*

22         76.    Dr. Parkvall's 10-category classification framework is described above

23  in Section II.D.1.  With respect to industry-wide SEPs assigned to companies other

24  than Ericsson, the study conducted, as well as my analyses, followed the

25  methodology described in my Protocol for Classification Analysis.  (Ex. 1610.)

26         77.    **FIGURE 15**, below, presents the distribution of industry-wide SEPs

27  across the Parkvall Technology Categories.  In particular, these results include an

28  overlay of the industry-wide SEPs and Ericsson's families that I previously found to

1  be potentially essential.  As shown, Ericsson's proportional shares of alleged SEP

2  families are insubstantial compared to other companies in each technology category.



3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

19  **FIGURE 15 (PDX 153):  Distribution of Industry-Wide 2G, 3G, and 4G**

20  **Essential Patent Families Under the Parkvall Classification Framework**

21

22        78.    **TABLE 3**, further below, provides more specific information regarding

23  Ericsson's proportional shares as determined by my study.  In particular, **TABLE 3**

24  shows that in most cases, Ericsson's proportional share is less than 6% of the

25  industry-wide SEPs.

26
27
28

| Technology Category | Ericsson's Proportional Share |
|---|---|
| 1.    Connection Establishment | 3.8% |
| 2.    Link Adaptation | 3.0% |
| 3.    Data Transmission | 4.4% |
| 4.    Resource Allocation | 7.8% |
| 5.    Mobility and Connection Control | 4.3% |
| 6.    Sleep Mode Solutions | 2.4% |
| 7.    Advanced Antenna Solutions | 7.0% |
| 8.    Carrier Aggregation | 7.5% |
| 9.    Voice Coding | 6.8% |
| 10.  Security | 5.5% |
|       Other | 0.0% |
| **Total** | **4.1%** |

**TABLE 3 (PDX 154):  Ericsson's Proportional Share of 2G, 3G, and 4G Essential Patent Families Under the Parkvall Classification Framework**

79.    As further shown in **FIGURE 15** above, even under Dr. Parkvall's classification framework, Ericsson's proportional shares of patent families in each of the technology categories are relatively insubstantial.  Ericsson's insubstantial proportional shares undermines Dr. Parkvall's assertion that Ericsson holds an extensive array of critically important patents in each technology category.  (*See, e.g.*, Dkt. 1360 at ¶¶ 89, 106, 156.)

1            *b.*     *Classification of Industry-Wide Patent Families Under the*

2                   *Dahlman Framework*

3        80.    In addition to Ericsson's insubstantial share of essential patents within

4    each of Dr. Parkvall's technology subareas, the number of industry-wide patents

5    falling outside of Dr. Parkvall's technology subareas demonstrates the inherent bias

6    in his framework.  Indeed, our classification study found that over 350 industry-

7    wide SEP families did not fit within any of Dr. Parkvall's technology subareas, as

8    shown in **FIGURE 16** below (see "Other").

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



24

25    **FIGURE 16 (PDX 155):  Distribution of 2G, 3G, and 4G Patent Families**

26    **Under Dr. Parkvall's Classification Framework**

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

81.     As shown in **FIGURE 16** above, in order to classify industry-wide patent families, we had to add a separate "Other" to Dr. Parkvall's classification framework.  The "Other" category includes industry-wide patent families that did not fit within Dr. Parkvall's Technology Categories.  The fact that Dr. Parkvall's identification of technology categories related to the standards fails to account for all these industry-wide essential SEP families indicates that the framework was not crafted around the technology in the standards, but instead was designed for this litigation with a focus on Ericsson's alleged SEP portfolio.  A classification framework developed independently of Ericsson's SEP portfolio should encompass all technologies relevant to the standards.  For example, under the more neutral Dahlman Classification Framework discussed above, classification of the industry-wide essential families does not result in the need for a catchall category.

82.    As shown in **FIGURE 17** below, both the industry-wide and Ericsson's patent families are classified within the Dahlman framework.



**FIGURE 17 (PDX 156):  Distribution of Industry-Wide 2G, 3G, and 4G Families Under the Dahlman Classification Framework**

HIGHLY CONFIDENTIAL
SMRH:481062607.2

## III.    RESPONSE TO DR. PARKVALL'S PER-TECHNOLOGY ANALYSIS FOR EACH TECHNOLOGY SUBAREA

83.    As stated above, Dr. Parkvall grouped Ericsson's patents into ten technology categories (or subareas), but then provided an analysis for only five of those categories. I discuss the problems with each of these five categories as follows. Dr. Parkvall's per-technology approach grossly overvalues Ericsson's patent families in each of his technology categories.

### A.    Data Transmission

84.    Dr. Parkvall's "first subarea is Data Transmission." (Dkt. 1360 at ¶ 80.) Dr. Parkvall identifies 38 patent families in the Data Transmission technology subarea ("Ericsson Data Transmission Patent Families"). (Dkt. 1360 at ¶ 86.)

85.    According to Dr. Parkvall, Data Transmission "relates to the procedures in the handset that are responsible for transferring data between the handset and the network." (*Id.* at ¶ 80.) "[T]he Data Transmission technology bucket includes 'link layer' or 'Layer 2' technologies, which are those responsible for ensuring that data is transferred between the handset and the network." (*Id.*) "Data Transmission includes many of the processes that are used for error correction." (*Id.* at ¶ 81.) "For example, Automatic Repeat Request (ARQ) and Hybrid ARQ (HARQ) are both technologies related to Data Transmission." (*Id.*) "Data Transmission also includes functionality related to processing, routing and multiplexing of data units in a handset, for example to ensure adequate Quality of Service." (*Id.* at ¶ 85.)

86.    Dr. Parkvall also identifies the following three subcategories or "functions" of Data Transmission:

        (1)    Error correction through retransmission (*e.g.*, ARQ/HARQ);

        (2)    Processing, routing, and multiplexing of data units, and quality of service; and

1    (3)   Link layer (Layer 2) data units transfer (*e.g.*, transmission

2          formats and frame structure).

3  (*See, e.g.*, Dkt. 1360 at ¶¶ 80, 81, 85; *see also* Ex. 2542[3].)

4          1.   Ericsson's Data Transmission Patents are Directed to Narrow

5               Aspects of Incremental and Modular Standardized Features.

6          87.   Dr. Parkvall's three Data Transmission functions, when viewed through

7  the scope of the claims of Ericsson's Data Transmission Patent Families, are largely

8  modular and operate independently from one another and from most other features

9  in the 2G, 3G, and/or 4G standards.  For example, error correction through

10 retransmissions is largely independent of the other purported two Data Transmission

11 functions that Dr. Parkvall identified.  It is true that some of these purported Data

12 Transmission functions can have some overlap, for example, multiplexing of data

13 units and frame structure, but they are generally distinct.

14         88.   The modularity of these Data Transmission functions is supported by

15 textbooks on the subject.  For example, the book that Dr. Parkvall co-authored

16 discusses the "Radio Protocol Architecture" in Section 8.2.  Within that Section,

17 Section 8.2.1 discusses the Radio Link Control (RLC), while Section 8.2.2 discusses

18 the Medium Access Control (MAC).  (Ex. 1416 at pp. 6, 146–59.)  These are well

19 known "sublayers" of Layer 2, and the notion of "layering" is well known to

20 identify and solve specific issues within a layer without affecting (at least in

21 principle) other parts of the system.  (*Id.* at 320–21.)  This is well documented in

22 many textbooks, including, for example, the Tanenbaum textbook.  (Ex. 2539.)

23         89.   Additionally, as mentioned, Section 8.2.2 of Dr. Parkvall's book

24 discusses the different aspects of the MAC.  Specifically, Section 8.2.2.1, titled

25 "Logical channels and transport channels," discusses frame structures and

26 ─────────────

27 [3] Dr. Parkvall appears to have changed his definition of the Data Transmission
functions he identifies.  My understanding of Dr. Parkvall's Data Transmission

28 functions is based on his witness declaration as well as his disclosure of rebuttal
testimony.

multiplexing (among other topics that provide the context for doing so), while Section 8.2.2.2, titled "Scheduling," covers issues related to scheduling.  (*See, e.g.*, Ex. 1416 at pp. 153 (FIG. 8.9), 155 (FIG. 8.11).)  Finally, Section 8.2.2.3, titled "Hybrid ARQ with soft combining," discusses issues related to HARQ.  (*Id.* at 156–58.)

90.     This is a logical "divide and concur" approach that is found in many other books on the subject, as well as in 3GPP standards development.  (Section 2.A.5, *supra*.)  To the extent that some cross-dependencies exist across two (or more) of these purported Data Transmission functions, such occurrences should be considered at the level of Ericsson's particular Data Transmission patents and the purportedly covered features themselves.  Much as in the structure of textbooks such as the ones discussed above, in my many years of experience, patents in the wireless domain generally relate to a specific aspect of the particular area in which the alleged invention is applicable.

91.     As such, functional crossover (*i.e.*, overlap between functions/subcategories within a technology category) is the rare exception, not the rule.  In spite of this (and the relative absence of functional cross-over that is to be expected), Dr. Parkvall has not provided sufficient evidence to support his per-technology approach that groups all these functions together into one technology category and purportedly analyzes them as one unit.  Dr. Parkvall has also not identified any specific Ericsson patent that he deems to cover multiple purported Data Transmission functions, let alone all of them.  In response to Dr. Parkvall's technology-by-technology approach, I analyzed Ericsson's Data Transmission Patent Families and classified them according to the Data Transmission functions described in Dr. Parkvall's Witness Declaration.  (*See, e.g.*, Dkt. 1360 at ¶¶ 80, 81, 85.)  My classification of these patent families into Dr. Parkvall's functions (or subcategories) is shown below in **FIGURES 18 and 19**.

92.     As shown in **FIGURES 18 and 19**, the functional crossover of Ericsson's Data Transmission Patent Families is insubstantial.  The modularity and independence of Dr. Parkvall's Data Transmission functions and Ericsson's Data Transmission Patent Families is thus confirmed by my finding that only 11% (4 out of 38) of Ericsson's Data Transmission Patent Families are directed to more than one Data Transmission function.  This finding quantitatively supports my opinion that Dr. Parkvall's three Data Transmission functions are substantially modular and operate largely independently from one another.  Accordingly, Dr. Parkvall's technology-by-technology approach that analyzes the standardized Data Transmission features and non-infringing alternatives to Ericsson's Data Transmission Families as a group is seriously flawed.



**FIGURE 18 (PDX 157):  Single- vs. Multi-Function**

**Data Transmission Patent Families**

93.     **FIGURE 19** below shows the distribution of Ericsson's Data Transmission Patent Families across the purported functions, and shows that the functional crossover of Ericsson's Data Transmission Patent Families is insubstantial.

| Data Transmission | | | | |
|---|---|---|---|---|
| Patent Family | Error Correct. | P.R.M. Q.o.S. | Trans. Formats | Other |
| P11904 (2G) | ● | | | |
| P15300 (3G, 4G) | ● | | | |
| P17631 (4G) | ● | | | |
| P23682 (4G) | ● | | | |
| P24916 (4G) | ● | | | |
| P25658 (4G) | ● | | | |
| P32787 (4G) | ● | | | |
| P35575 (4G) | ● | | | |
| P11899 (3G, 4G) | | ● | | |
| P19911 (3G) | | ● | | |
| P21738 (4G) | | ● | | |
| P23893 (4G) | | ● | | |
| P24000 (4G) | | ● | | |
| P28186 (4G) | | ● | | |
| P23018 (4G) | | ● | ● | |
| P23894 (4G) | | ● | ● | |
| P24985 (4G) | | ● | ● | |
| P27172 (4G) | | | ● | |
| P31755 (4G) | | | ● | |
| P32498 (4G) | | | ● | |
| P24228 (4G) | | | | ● |
| P24673 (4G) | | | | ● |

**FIGURE 19 (PDX 158):  Functions for Ericsson's Data Transmission Families**

94.     Moreover, even if a patent family exhibits a functional crossover, that does not mean the patent family is not directed to a narrow and modular solution or that there were no feasible non-infringing alternatives of equal utility to that patent family and the related feature.  In other words, while absence of a functional crossover is a strong indicator of modularity and availability of feasible alternatives, the converse is not true.  More often than not, patent families that can be classified under two or more functional categories are directed to a narrow and modular feature for which equally effective alternatives were available.  Determining whether this is the case or not for a given patent family requires an analysis on a patent-by-patent basis, like the one Dr. Jayant and I performed.  (*See, e.g.*, Exs. 1638, 1639.)

95.     In short, even if on a philosophical or academic level there is the possibility of cross-over or interrelatedness across functions in a given technology category or area, the practical reality (*e.g.*, including as shown in **FIGURES 18 and 19** above) is that such cross-over is not all that common, and its occurrence must be demonstrated on a patent-by-patent basis, not on some high level ***potential*** for its existence.

96.     In addition, Ericsson's Data Transmission Patent Families are directed to narrow and modular features within each of the three purported Data Transmission functions.  One example of this is Ericsson's P23893 patent family, which includes U.S. Patent No. 8,134,940 ("the '940 Patent").  (Ex. 1444.)  Ericsson identified TDoc number R1-081582 as being associated with this patent family. (Ex. 2520 at pp. 121–22.)  The R1-081582 TDoc is a Change Request (CR) entitled "UL ACK/NACK timing for TDD."  (Ex. 1355.)  The CR was made by Ericsson, CATT, Motorola, Nokia, Nokia Siemens Networks, and LGE, and proposed a revision to the 4G standard that relates to TDD HARQ ACK/NACK for certain uplink-downlink configurations, where there are more downlink than uplink subframes.  (*Id.*)  The proposed revision pertains only to Section 10.2 of 3GPP TS

-55-

36.213, and more specifically to changing the timing of the uplink ACK/NACK to be uniquely defined.  (*Id.*)  As shown by the redlined text in the excerpt of the TDoc reproduced below, this localized revision does not affect other sections of the standard.  (*Id.*)

## 10.2    Uplink ACK/NACK timing

For FDD, the UE shall upon detection of a PDSCH transmission in subframe $n$ intended for the UE and for which an ACK/NACK shall be provided, transmit the ACK/NACK response in subframe $n+4$.

For TDD, the UE shall upon detection of a PDSCH transmission in subframe $n$ intended for the UE and for which an ACK/NACK shall be provided, transmit the ACK/NACK response in UL subframe $n+k$, ~~with~~ where $k$ depends on the subframe $n$ according to ~~$>3$~~ Table 10.2-1 for the UL-DL configurations defined in Table 4.2-2 in [3].

**Table 10.2-1: Uplink ACK/NACK timing index $k$ for TDD**

| Configuration | Subframe $n$ | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 0 | 4 | 6 | - | - | - | 4 | 6 | - | - | - |
| 1 | 7 | 6 | - | - | 4 | 7 | 6 | - | - | 4 |
| 2 | 7 | 6 | - | 4 | 8 | 7 | 6 | - | 4 | 8 |
| 3 | 4 | 11 | - | - | - | 7 | 6 | 6 | 5 | 5 |
| 4 | 12 | 11 | - | - | 8 | 7 | 7 | 6 | 5 | 4 |
| 5 | 12 | 11 | - | 9 | 8 | 7 | 6 | 5 | 4 | 13 |
| 6 | 7 | 7 | - | - | - | 7 | 7 | - | - | 5 |

97.    Moreover, like the feature proposed in the Change Request discussed above, my first and second non-infringing alternatives would require similar revisions to Section 10.2.  (Dkt. 1334 at ¶¶ 243–56; Ex. 1639 at pp. 792–94.) Namely, a different table and associated text could have been used in Section 10.2 to define either of my first or second alternatives, and this would have had only a localized effect.  Accordingly, not only is Ericsson's allegedly correlated contribution modular, but my proposed non-infringing alternatives are as well. Therefore, contrary to Dr. Parkvall's technology-by-technology approach, my particular non-infringing alternative could have easily replaced the feature proposed in the Change Request without substantially affecting other parts of the standard.

98.    Another example of the modularity and narrowness of Ericsson's Data Transmission Patent Families is Ericsson's P19911 (3G) patent family.  According to Dr. Parkvall, the P19911 patent family relates to "a solution where the mobile

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1  device is configured to send data without being explicitly scheduled.  Benefits

2  include efficient transmission when the mobile device needs to send small amounts

3  of traffic.  The patent describes certain operation parameters related to HARQ

4  operation and power control."  (Ex. 5349 at 3.)

5       99.    Charted claim 1 of EP Patent No. 1,790,108 ("the EP '108 Patent")

6  from the P19911 patent family is reproduced below.

7

8  **1.**  A method in a mobile terminal (230) for improving uplink communications in a wireless communication system, wherein said mobile terminal can transmit at various transmission power levels, **characterised by**

9      receiving (310) a configuration message comprising at least one of a power offset parameter and a maximum number of retransmission attempts parameter; and,

10

11  when said mobile terminal (230) performs (320Yes) a non-scheduled transmission, performing (330) said transmission according to said at least one power offset parameter and said maximum number of retransmission attempts parameter contained in said configuration message.

12

13  (Exs. 4303; Ex. 2541.)

14      100.   The language of claim 1 shows the P19911 patent family relates to the

15  mobile terminal "perfom[ing] . . . a non-scheduled transmission," and doing so

16  according to some relevant parameters.  (Ex. 2541 at p. 6.)  The key feature for this

17  claim is for the UE to perform such non-scheduled (re)transmission using "a power

18  offset parameter" and/or a "maximum number of retransmission attempts

19  parameter," both of which are determined by the base station and communicated to

20  the mobile via "a configuration message."  (Ex. 1639 at p. 598–99.)  The

21  specification of the EP '108 Patent explains that these parameters can depend on the

22  type of service (*e.g.*, "service class" or "service level").  (Ex. 2541 at pp. 3–5.)  This

23  is more broadly referred to as Quality of Service (or QoS), which Dr. Parkvall has

24  included in the functions of Data Transmission.  (Dkt. 1360 at ¶ 85.)

25      101.   As such, the P19911 patent family is directed to Dr. Parkvall's second

26  Data Transmission function (*i.e.*, processing, routing, and multiplexing of data units,

27  and quality of service).  The P19911 patent family is not directed to Dr. Parkvall's

28  first Data Transmission function (*i.e.*, error correction through retransmissions).

Although retransmissions are mentioned in the context of the P19911 patent family, the focus of charted claim 1 of the EP '108 Patent shown above is not on error correction mechanisms through retransmissions.  Similarly, this patent family is not relevant to Dr. Parkvall's third Data Transmission function (*i.e.*, link layer (Layer 2) data units transfer).  For example, nowhere in the EP '108 Patent is there any discussion of what formats are used and/or how to structure a frame of data for transmission/reception.  As such, Ericsson's P19911 patent family is also independent of Dr. Parkvall's third Data Transmission function.  This further confirms the narrow and modular nature of the allegedly covered feature for the P19911 patent family.

102.   Another example of the modularity and narrowness of Ericsson's Data Transmission Patent Families is Ericsson's P28186 (2G) patent family.  According to Dr. Parkvall, the P28186 patent family relates to "segmentation of upper layer PDUs in the RLC protocol where the mobile device adds a new packet indicator for the first segment and a length indicator" only under certain conditions.  (Ex. 5349 at p. 5.)  Dr. Parkvall states that "[o]ne benefit is larger reliability of . . . the higher layer PDUs."  (*Id.*)  The key feature for charted claims 1 and 7 of U.S. Patent No. 8,416,808 ("the '808 Patent") within the P28186 patent family—*i.e.*, adding a new packet indicator (repurposed Length Indicator having a value of, *e.g.*, 126) to prevent error propagation—is shown below.  (Ex. 1639 at p. 1139; Ex. 4502.)  This key feature is limited to Section 10.4.14a of v.10.12.0 of the Technical Specification 3GPP TS 44.060 cited in Ericsson's claim chart, the relevant portion of which is reproduced below.  (*Id.*)

| Key Accused Feature(s) | The key claim limitation(s) correspond(s) to the following key accused feature in the standard: |
|---|---|
| | Adding a new packet indicator (repurposed Length Indicator having a value of, e.g., 126) to prevent error propagation. |
| | The key accused feature identified above corresponds to the following portion(s) of the standard accused by Ericsson: |
| | **10.4.14a Length Indicator (LI) field in EGPRS TBF mode and TCH TBF mode (Iu mode)** [...] During RLC non-persistent mode of operation, or, during RLC unacknowledged mode of operation if the network has commanded the usage of "Indication of Upper Layer PDU Start for RLC UM" for the TBF, and if the current RLC data block starts with the first segment of a new Upper Layer PDU, then a Length Indicator taking the value 126 shall be placed as the first Length Indicator in the RLC data block [...] |
| | If the Upper Layer PDU does not fill the current RLC data block, a Length Indicator with value 127 (111 1111) shall be included as the last Length Indicator of the current RLC data block, indicating that there is no following Upper Layer PDU in this RLC data block. [...] |
| | [...] and if the current RLC data block starts with the first segment of a new Upper Layer PDU, then a Length Indicator taking the value 126 shall be placed as the first Length Indicator in the RLC data block [...] |
| | (3GPP TS 44.060 v. 10.12.0 § 10.4.14a.) |

103.   The localized nature of the P28186 patent family with respect to the charted 2G standard shows its modularity.  That is, the key feature is limited to a relatively short portion of a single sub-sub-sub-section of the 2G Technical Specification.  Additionally, with respect to Dr. Parkvall's Data Transmission functions, the P28186 patent family is properly classified under the second Data Transmission function—*i.e.*, "processing, routing, multiplexing of data units, and quality of service."  The '808 Patent does not pertain to "error correction through retransmission," Dr. Parkvall's first Data Transmission function, nor does it pertain to transmission formats and frame structure, Dr. Parkvall's third Data Transmission function.  (*See* Ex. 2542.)  As such, the P28186 patent family is independent of Dr. Parkvall's other Data Transmission functions.  This functional independence further confirms the narrow and modular nature of Ericsson's P28186 patent family as well as the allegedly covered Data Transmission feature.

104.   Under a relatively broad definition of (3) the "link layer" function— which, as I would understand, Dr. Parkvall considers to include "transmission format and frame structure" (*see, e.g.*, Ex. 2542 at ¶ 39)—it may be argued that the

1  P28186 patent family implicates this function as well as (2) the "processing, routing,

2  multiplexing of data units, and quality of service." In such a case, the P28186 patent

3  family would provide an example of a cross-functional solution that is nevertheless

4  narrowly drawn to a localized feature in the standards (*i.e.*, 3GPP TS 44.060

5  v.10.12.0, § 10.4.14a), for at least all the reasons discussed above. Thus, even

6  though the P28186 patent family is ranked relatively high in terms of Essentially-

7  Importance-Contribution (*i.e.*, 1-1-1), it is still directed to a modular and narrow

8  feature in the standard.

9      105.   Ericsson's Data Transmission Patent Families are also directed to

10  minor incremental solutions within Dr. Parkvall's three purported Data

11  Transmission functions. For example, charted claim 4 of U.S. Patent No. 8,347,196

12  within the P24228 (4G) patent family requires a specific coding scheme to be used

13  for encoding an input bit stream. (Ex. 2544.) According to Dr. Parkvall, the

14  P24228 patent family relates to "reducing the implementation complexity of the

15  channel encoder and decoder. One benefit is that the interleaved parity bits are

16  output in group order[,which] further offers implementation advantages in that

17  parity streams can be separately processed." (Ex. 5349 at p. 3.)

18      106.   Nevertheless, based on my Contribution Analysis, this feature of the

19  P24228 patent family provided no improvement to the 4G standard relative to

20  available alternatives, and in particular to an alternative proposed by Motorola. (Ex.

21  1639 at pp. 829–32.) While the key feature allegedly had complexity and

22  performance advantages, in reality its performance was sometimes better and other

23  times worse than the Motorola alternative. (*Id.*) Thus, the benefit of the key feature

24  is at best a minor incremental one over then-existing and/or proposed solutions.

25      107.   For at least these reasons, a given Data Transmission feature allegedly

26  covered by a specific Ericsson Data Transmission Patent Family (*e.g.*, as alleged in

27  Ericsson's claim charts) could have been replaced with an alternative Data

28  Transmission feature that was available at the respective time of adoption into the

1  standard without requiring a substantial modification or causing a material impact to

2  other parts of the standard or system.  The above analysis also demonstrates that Dr.

3  Parkvall's technology-by-technology approach of treating all Ericsson's Data

4  Transmission Patent Families and related or non-infringing alternatives as a single

5  group is seriously flawed, as Ericsson's patent families are directed to separate,

6  distinct, and specific topics within the Data Transmission technology category.

7  Specific alternatives to the specific features allegedly covered by the respective

8  patents are discussed in my Appendices and my patent-by-patent analysis.  (Ex.

9  1639.)  Ericsson and Dr. Parkvall have not rebutted any of those alternatives, other

10  than summarily dismissing them all.

11            2.    Ericsson Does Not Have an Extensive Array of Critically

12                 Important 2G, 3G, and 4G Data Transmission Patents

13                   a.    *Almost All of Ericsson's Data Transmission SEPs Provide*

14                       *Less Than a Moderate Improvement to the Standards*

15                       *Relative to Available Alternatives.*

16      108.   Of the 38 Ericsson Data Transmission Patent Families Dr. Parkvall

17  identifies, the 16 patent families listed in **TABLE 4** below do not include essential

18  patents,[4] include only expired patents, and/or are otherwise irrelevant.  As such,

19  there are 22 potentially relevant Ericsson Data Transmission Patent Families that

20  meet Dr. Parkvall's definition of Data Transmission.

21

22

23

24

25

26

27

28  [4] This includes patents that in my opinion are not essential under a proper claim
construction—*i.e.*, patents that I assigned an Essentiality Rank of "2."

| No. | Family No. (Standard) | Non-Essential | Expired |
|---|---|---|---|
| 1 | P06199 (2G, 3G) | | X |
| 2 | P06425 (2G) | X | X |
| 3 | P07925 (4G) | X | |
| 4 | P08575 (3G) | X | |
| 5 | P08804 (2G, 4G) | X | |
| 6 | P10867 (3G, 4G) | X | |
| 7 | P12947 (3G, 4G) | X | |
| 8 | P13459 (4G) | X | |
| 9 | P23985 (4G) | X | |
| 10 | P26724 (4G) | X | |
| 11 | P26967 (4G) | X | |
| 12 | P27011 (4G) | X | |
| 13 | P28281 (4G) | X | |
| 14 | P31006 (4G) | X | |
| 15 | P31931( 4G) | X | |
| 16 | P31948 (4G) | X | |

**TABLE 4 (PDX 159)**

109.   **FIGURE 20** below shows Ericsson's 22 potentially relevant Data Transmission patent families distributed across Dr. Parkvall's three Data Transmission functions.



**FIGURE 20 (PDX 160):  Functional Distribution of Ericsson's 2G, 3G, and 4G Data Transmission Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

110.   **FIGURES 21–23**, further below, show the 22 potentially relevant Ericsson Data Transmission Patent Families distributed across the three Data Transmission functions for the 2G, 3G and 4G standards, respectively.  As demonstrated, Ericsson does not have an extensive array of patented solutions across the three Data Transmission functions.  This further underscores the flaws in Dr. Parkvall's technology-by-technology approach to the Ericsson Data Transmission Patent Families.



**FIGURE 21 (PDX 161):**

**2G Ericsson Data Transmission Patent Families**



**FIGURE 22 (PDX 162):**

**3G Ericsson Data Transmission Patent Families**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16 **FIGURE 23 (PDX 163):**

17 **4G Ericsson Data Transmission Patent Families**

18

19     111.   With respect to the "Importance" of Ericsson's Data Transmission

20 Patent Families, Dr. Parkvall did not identify even one Ericsson patent that he

21 alleges is critically important such that it might contribute to the overall value of

22 Ericsson's Data Transmission Patent Families. He therefore fails to address the

23 relevant issue, which is whether Ericsson's Data Transmission Patent Families cover

24 important and valuable contributions that helped improve Data Transmission

25 functions and procedures, and how these contributions compare to alternative Data

26 Transmission features available at the respective times of adoption into the

27 applicable standards.

28

112.   It is my opinion that Dr. Parkvall has not provided sufficient evidence that Ericsson has made such valuable contributions.  Nor has he provided sufficient evidence regarding what fraction of any overall benefits to Data Transmission technology in the standard is attributable to Ericsson's Data Transmission Patent Families (*i.e.*, the benefit of Ericsson's patents apart from the value of being included in the standard).  Rather, with respect to improvements to Data Transmission technology, Dr. Parkvall merely discusses what he regards as the *general* importance of error correction through retransmissions (*e.g.*, ARQ/HARQ) and other Data Transmission functions, as well as advances relating to quality of service and other Data Transmission features within the standards.  (Dkt. 1360 at ¶¶ 87–89.)

113.   With regard to the importance and value of features related to Ericsson Data Transmission Patent Families, **FIGURE 24** below represents my Importance and Contribution Ranks for the 22[5] relevant Ericsson Data Transmission Patent Families (of the 38 listed by Dr. Parkvall) that I determined to be essential based on a detailed analysis, reasoning, and evidence.  (Ex. 1639.)  As **FIGURE 24** shows, only three of Ericsson Data Transmission Patent Families (*i.e.*, P19911 (3G), P28186 (4G), and P31755 (4G), represented by the green and yellow bubbles) can be considered to provide at least a moderate improvement to the standard relative to available alternatives.

---

[5] For 1 of these 22 patent families, the Importance and Contribution Ranks were different as between 3G and 4G.  Thus, this patent family is represented twice in the chart in **FIGURE 24**, and the chart shows 23 Ranks.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



**FIGURE 24 (PDX 164): Contribution and Importance Ranks**

**for Ericsson's Data Transmission Patent Families**

114.   Dr. Parkvall also claims that "[o]ver the years, Ericsson has contributed a large number of solutions that enhance Data Transmission in ways that critically affect the handset performance," and cites to the Signals 2010, 2014, and 2015 Reports to support this claim.  (Exs. 410, 1077, 1045.)  Nevertheless, Dr. Parkvall and Ericsson have failed to show how the vast majority of the "contributions" referred to in connection with the Signals Reports correlate to Ericsson's Data Transmission Patent Families.

115.   Dr. Parkvall appears be making the underlying assumption that Ericsson's alleged roughly 23,000 approved contributions correlate at some level to Ericsson's alleged SEPs at issue in this case and, by extension, that a substantial number and percentage of those contributions also correlate to a majority of Ericsson's 38 Data Transmission Patent Families.  But Dr. Parkvall's reliance on the Signals Reports in this regard is misplaced for several reasons.

116.   First, Dr. Parkvall failed to identify—let alone discuss—any specific "contributions" listed in the Signals Reports that correspond to any of patents in the Ericsson Data Transmission Patent Families.  Second (and relatedly), in this litigation, Ericsson has identified allegedly corresponding proposals for only 16 of its purported SEPs related to UE.  (Ex. 2520 at pp. 121–22; Ex. 1577.)  Only 5 out of these 16 purported SEPs belong to Ericsson's Data Transmission Patent Families, and Ericsson has identified only four contributions allegedly corresponding to those five purported SEPs (Ex. 2520 at pp. 121–22).  Therefore, Ericsson and Dr. Parkvall have failed to provide any evidence of correlation or even relation between the vast majority of the approximately 23,000 purportedly adopted proposals and the remaining 33 Ericsson Data Transmission Patent Families.  This contradicts Ericsson's and Dr. Parkvall's underlying assumption that a substantial number and percentage of the allegedly 23,000 contributions correlate to a majority of the Ericsson's 38 Data Transmission Patent Families.[6]

117.   Thus, it is my opinion that the Signals Reports do not show "Ericsson has contributed a large number of [patented] solutions that enhance Data Transmission in ways that critically affect the handset performance."  (Dkt. 1360 at ¶ 89.)

---

[6] Moreover, even if Ericsson's allegedly approved contributions are limited to what the Signals Reports claim to be the most relevant Working Groups to User Equipment, Ericsson has still failed to show that the vast majority of these purported contributions are correlated to Ericsson's SEPs.

*b.    A Classification of Industry-Wide 2G, 3G, and 4G Data*
*Transmission SEPs Under Dr. Parkvall's Framework*
*Shows Ericsson's Share is Relatively Insubstantial.*

118.   Dr. Parkvall asserts "Ericsson has a large number (38) of essential Data Transmission patents across a variety of features."  (Dkt. 1360 at ¶ 90.)  On this basis, he "looked to previous generation cellular systems or alternative Data Transmission systems."  (Dkt. 1360 at ¶ 90.)  But Ericsson's share of industry-wide patent families that meet Dr. Parkvall's definition of Data Transmission is relatively insubstantial, as shown in **FIGURES 25–28**, below.  (Ex. 1611.)

119.   **FIGURE 25** shows Ericsson's relative share of relevant (*i.e.*, essential and non-expired) Data Transmission Patent Families overall, which is 22 out of 505 patent families (4.4%).  First, Dr. Parkvall's starting point is incorrect because a significant portion of the value of the standard is attributable to the basic framework and core technologies of the standards, which were known and developed by others. Second, since Ericsson's share is relatively small, it is improper to assume that its patents could not be designed around.



**FIGURE 25 (PDX 165):  Ericsson's Share of Industry-Wide**
**2G, 3G, and 4G Essential Data Transmission Patent Families**

120.   **FIGURES 26–28** below show Ericsson's relative shares of Data
Transmission patent families for the 2G, 3G, and 4G standards, respectively.  As
demonstrated, Ericsson's proportional shares are relatively insubstantial for each of
the standards.  For at least this reason, Dr. Parkvall's reliance on Ericsson "large
number . . . of essential Data Transmission Patents" in looking to an alternative
based on "an early 3G sliding-window selective repeat protocol" is misplaced and
his analysis is flawed and irrelevant.  (Dkt. 1360 at ¶ 91.)



**FIGURE 26 (PDX 166):  Ericsson's Share of Industry-Wide**

**2G Essential Data Transmission Patent Families**

1

2

3

4

5

6

7

8

9



10   **FIGURE 27 (PDX 167):  Ericsson's Share of Industry-Wide**

11   **3G Essential Data Transmission Patent Families**

12

13

14

15

16

17



18

19

20

21

22

23

24

25   **FIGURE 28 (PDX 168):  Ericsson's Share of Industry-Wide**

26   **4G Essential Data Transmission Patent Families**

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

3.    Dr. Parkvall's Flawed Technology-by-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Data Transmission Patents.

121.   In relying on his fundamentally flawed per-technology approach, Dr. Parkvall ignores non-infringing alternatives to Ericsson's Data Transmission Patent Families that were available at the times of adoption and that could have been included in the standards at that time without causing detrimental effects.  In this Section, I highlight several examples of such non-infringing alternatives.  I also provide my analysis that there are no "other" Ericsson patents covering the non-infringing alternative I identified for an example Data Transmission Patent Family. (Dkt. 1360 at ¶ 55.)  Dr. Parkvall has failed to identify any such "other" Ericsson patents.

a.    *Examples of Non-Infringing Alternatives That Could Have Been Used Without Causing Detrimental Effects at the Time of Adoption.*

122.   Dr. Parkvall asserts that "[b]ecause so many of Ericsson's Data Transmission patents were incorporated into both the evolved 3G and 4G standards, it would not be possible to create a non-infringing alternative that uses evolved 3G or 4G technologies."  (Dkt. 1360 at ¶ 91.)  Moreover, it appears Dr. Parkvall has limited his consideration of alternatives to the technologies that are already in the 2G, 3G, and 4G standards.  I disagree that, for example, the evolved 3G and 4G standards themselves are the only source of potential alternatives besides early 3G. For example, in considering that with respect to Ericsson's 3G and 4G Data Transmission Patent Families, "one alternative would be to implement a system based on early 3G Data Transmission technologies" and particularly "an early 3G sliding-window selective repeat protocol" (Dkt. 1360 at ¶ 91), Dr. Parkvall ignores the potential alternative of HARQ using Chase Combining, such as is used in WiMAX.  (*See, e.g.*, Ex. 1450 at p. 2 (TAB. 1).)  Dr. Parkvall has not asserted that

1   any of Ericsson's Data Transmission Patent Families would cover such an

2   alternative, and such an alternative could replace ARQ/HARQ based on incremental

3   redundancy in a 4G system with less than a 1% reduction in average cell throughput.

4   (*See, e.g.*, Ex. 1450 at p. 3 (FIG. 1).)

5         123.   Additionally, my Appendices considered numerous other non-

6   infringing alternatives to Ericsson's Data Transmission Patent Families that could

7   have been used in place of the allegedly covered key features without materially

8   impacting other parts of the standards or requiring substantial modification to the

9   standards.  (Ex. 1639.)  But Dr. Parkvall did not consider any of these alternatives,

10  other than summarily dismissing all of them.  Accordingly, Dr. Parkvall's testimony

11  and the documents he cites do not establish that Ericsson's Data Transmission

12  Patent Families have made important and valuable contributions to the allegedly

13  fast, efficient and accurate feedback mechanisms, and well-integrated ARQ and

14  HARQ, relative to available alternatives.  (*See* Dkt. 1360 at ¶ 89.)

15                *b.*     *My non-infringing alternatives to Ericsson's Data*

16                        *Transmission Patents are not covered by Other Ericsson*

17                        *Patents.*

18        124.   In response to Dr. Parkvall's assertion that I did not consider whether

19  my alternatives would infringe "other Ericsson patents" (Dkt. 1360 at ¶ 55), I

20  assessed whether Ericsson holds any patents, including patents not listed in an ETSI

21  IPR declaration, that might cover my non-infringing alternatives for Ericsson's Data

22  Transmission Patent Families.  For this assessment, I used as an example the non-

23  infringing alternative I identified in connection with my analysis of Ericsson's

24  P26724 patent family.  The example non-infringing alternative is described in Tdoc

25  number R1-082473 that Motorola submitted to 3GPP in the RAN 1 Working Group

26  Meeting #53*bis* at least as early as July 4, 2008.  (Ex. 1639 at pp. 1098–1100; *see*

27  *also* Ex. 2545.)

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

125.    As part of my assessment, a well-known patent search tool, LexisNexis® Total Patent®, was used to search US, EP, and WO patents employing the search criteria shown in **TABLE 5** below.

| Search Parameter | Parameter Value |
|---|---|
| **Assignee** | Ericsson |
| **Key words (within Title, Abstract, or Claims)** | (((ACK! or ack!) and (NACK! or (negative w/3 (ACK! or ack!)) or miss! or ("not" w/3 receiv!)) and (DTX or mut! or (discont! w/3 transmis!)))) |
| **Priority Date** | Before July 4, 2008, the last day of the working group meeting during which R1-082473 was presented. |

**TABLE 5 (PDX 169):  Search Conditions for Other Ericsson Patents**

126.    The search produced 39 Ericsson US, EP, and WO patents.  (Ex. 2546.) I reviewed these 39 Ericsson patents, and determined that none of them covers the non-infringing alternative described in Motorola's proposal.  In connection with my January 11, 2017 Witness Declaration and my expert reports, I already explained that Motorola's proposal presented a technically feasible alternative.  (*See, e.g.*, Ex. 1639 at pp. 1098–1100.)  Thus, Dr. Parkvall erred by ignoring alternatives that were available at the time the standards were adopted and limiting his alternatives to "early 3G Data Transmission technologies."  (Dkt. 1360 at ¶ 91.)

4.    Dr. Parkvall Relies on Improper Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Data Transmission Patent Families.

127.    Dr. Parkvall's evaluation of the technical value of Data Transmission technologies focuses on the value of standardized technology as a whole, and does

1   not consider the value contributed by Ericsson's Data Transmission Patent Families.

2   Accordingly, for 3G and 4G Data Transmission, Dr. Parkvall's non-infringing

3   alternative drawn from early 3G greatly overvalues Ericsson's patents.  Dr.

4   Parkvall's non-infringing alternative for 2G Data Transmission, drawn from early

5   2G, does the same.

6              *a.*     *Dr. Parkvall's Early 3G Alternative to Ericsson's 3G and*

7                       *4G Data Transmission Patents Overvalues Ericsson's*

8                       *Patent Families.*

9       128.   Dr. Parkvall claims to have "found that the technical value of 3G and

10  4G Data Transmission technologies" by comparing the performance of 4G and

11  enhanced 3G systems to "a system based on an early 3G sliding-window selective

12  repeat protocol" that he identifies as one non-infringing alternative.  (Dkt. 1360 at ¶¶

13  91, 93–102.)  He concludes that "the sliding-window alternative would not be able

14  to fully utilize the higher data rates that 3G or 4G provides, and would therefore be

15  significantly de-featured compared to existing 3G or 4G systems."  (*Id.* at ¶ 91.)

16      129.   Further, he alleges that the technical value of 3G and 4G Data

17  Transmission technologies can be calculated as:

18          (1)     At least a 10% higher data rate over the alternative;

19          (2)     At least a 50% higher system throughput, depending on

20                  the alternative considered; and/or

21          (3)     A smaller buffer memory for layer 2 packets by a factor

22                  of 10.

23  (Dkt. 1360 at ¶ 93.)

24      130.   Regarding the 10% higher data rate, Dr. Parkvall asserts that his

25  "sliding-window alternative to Ericsson's 3G and 4G technologies would . . . lack

26  solutions to avoid stale HARQ/ARQ retransmissions."  (Dkt. 1360 at ¶ 98.)  He also

27  claims that "[t]hese sorts of 'stale' retransmissions are avoided in the modern LTE

28  system that uses Ericsson's patented technologies."  (*Id.* at ¶ 99.)  Nevertheless,

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

other than this general statement regarding "the modern LTE system" (*id.*), Dr. Parkvall provides no explanation of or evidence showing how any of ***Ericsson's*** Data Transmission Patent Families cover or enable the primary features of such modern LTE systems that avoid "stale" retransmissions and contribute to the alleged 10% improvement in data rate (*id.* at ¶ 100).

131.   In particular, the only alternative Dr. Parkvall identifies is an "early 3G sliding-window selective repeat protocol" alternative implemented in "a system based on early 3G Data Transmission technologies" (*id.* at ¶ 91).  Dr. Parkvall thus suggests that due to Ericsson's Data Transmission Patent Families, Hybrid ARQ (HARQ) in general and incremental redundancy (IR) in particular, as a whole, cannot be implemented in any non-infringing alternatives.  Nevertheless, Dr. Parkvall has provided no evidence that any of Ericsson's Data Transmission Patent Families cover HARQ and IR.  (*See* Dkt. 1334 at ¶¶ 483–87 (discussing development of incremental redundancy by companies other than Ericsson).) Indeed, as discussed in Section IV, HARQ and IR were well known before the standardization of LTE began.  Hence, in my opinion, Dr. Parkvall's analysis does not support his conclusion that Ericsson's purported Data Transmission Patent Families made important and valuable contributions to the allegedly well-performing ARQ and HARQ in 4G and enhanced 3G, relative to available alternatives.

132.   Regarding the 50% higher system throughput, Dr. Parkvall commits the same error, focusing on the value of the standard rather than that of Ericsson's alleged Data Transmission Patent Families.  In particular, Dr. Parkvall asserts that "the data rate gains are actually even larger, considering that Ericsson's technology enables the additional advantage of short TTIs used in modern 3G and 4G."  (Dkt. 1360 at ¶ 100.)  Dr. Parkvall goes on to assert that "[p]erformance evaluations of this technology have shown an increase in the system throughput of about 50–60% at high loads[.] . . ."  (*Id.*)  But Dr. Parkvall's position is incorrect on several levels.

133.   The cited paper appears to discuss enhanced uplink features and benefits that may be provided by fast HARQ with soft combining (*e.g.*, using incremental redundancy), the introduction of a 2 msec Transmission Time Interval (TTI) (as compared to a 10 msec TTI that was used before), and fast scheduling (including locating the corresponding HARQ functionality in the eNodeB).  (Ex. 5001 at pp. 1 (§ 2), 2 (FIG. 1).)  The paper also provides performance evaluations of some of these features.  In particular, it provides the results of a simulation under certain conditions for the normalized system throughput of three scenarios, which I will refer to as conditions "S1," "S2," and "S3."  Condition S1 provides the baseline scenario used in the then-existing Release 5 WCDMA System.  (Ex. 5001 at p. 5 (§ 4, FIGS. 4, 5).)  S2 uses the then-existing system in conjunction with a fast HARQ.  (*Id.*)  S3 uses the system of S2 above in addition to changing the TTI from 10 msec to 2 msec.  (*Id.*)  Only about 20% worth of the alleged improvement of the S3 system relative to S1 (on the order of 50%–60% in total), however, is due to the faster HARQ, while about 40% is due to the change from the 10 msec TTI to the 2 msec TTI.  (*Id.*)

134.   Notwithstanding the benefits that appear to be associated with the enhanced uplink features discussed in the cited paper, Dr. Parkvall has failed to tie any of these benefits to a particular Ericsson Data Transmission Patent Family. First, Dr. Parkvall and Ericsson have provided no evidence that any of the Ericsson Data Transmission Patent Families cover the primary sources of the benefits described in the cited paper—namely:  (1) the use of a 2 msec TTI, (2) incremental redundancy, or (3) placing the HARQ functionality in the eNodeB.

135.   Second, there were several alternative solutions available around the time fast HARQ was standardized.  As an example, Qualcomm proposed "to allow the MAC-hs in the UTRAN to send STATUS information indicating the TSN of the bottom edge of the transmission window.  The advantage of such a mechanism is that it can . . . significantly reduce the average delay."  (Ex. 2547 (§ 3.4).)

HIGHLY CONFIDENTIAL
Case No. SACV14−00341 JVS (DFMx)/CV15−02370
SMRH:481062607.2
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1    Qualcomm's explicit signaling solution was proposed in order to address

2    performance limitations of timer-based solutions, and while it requires some

3    additional in-band signaling and added complexity, it (as mentioned) has advantages

4    as well. (*Id.*) Having reviewed the 38 Ericsson Data Transmission Families, as well

5    as all the other patent families analyzed in my Appendices (Ex. 1639), I am not

6    aware of any Ericsson patent families that cover this Qualcomm stall avoidance

7    mechanism.

8        136.   Further, after considering the 38 Ericsson Data Transmission Patent

9    Families, I did not identify any important Ericsson Data Transmission Patent

10   covering the aspects of the paper cited by Dr. Parkvall that provide the alleged 50%

11   higher throughput and/or bitrate.  Rather, Dr. Parkvall merely seems to be citing the

12   paper for the general proposition that fast HARQ and reduced TTI allows for

13   increased throughput and bitrate performance.  (Dkt. 1360 at ¶ 100.)

14       137.   Accordingly, this paper does not prove that Ericsson's Data

15   Transmission Patents cover or are responsible for the alleged 50% higher throughput

16   and/or bitrate.  The  paper also does not prove that the alleged 50% higher

17   throughput is attributable to any patents (Ericsson's or otherwise), as opposed to a

18   basic framework or core technologies that were in the public domain and free to use.

19   Nor does this paper in any way prove an absence of alternatives that would allow

20   enhanced 3G and 4G networks to achieve increased throughput and packet bitrate

21   without infringing a patent in the Ericsson Data Transmission Families.  Thus, Dr.

22   Parkvall's assertion that "a system using evolved 3G and/or 4G technology provides

23   at least 50% higher system throughput than an alternative ARQ solution" is related

24   to a benefit of the standard rather than any benefit associated with Ericsson's Data

25   Transmission Patent Families.  (Dkt. 1360 at ¶ 100.)

26       138.   Regarding the smaller buffer memory for Layer 2 packets (and also

27   latency), Dr. Parkvall asserts that the buffer of the sliding-window alternative would

28   have to be around eight times as large for 3G and at least fifteen times as large for

4G.  (Dkt. 1360 at ¶¶ 95–97.)  Relatedly, Dr. Parkvall discusses the alleged

increased latency of the early 3G sliding-window alternative he identifies.  (*Id.* at ¶

94.)  In particular, he asserts that the early 3G sliding window alternative he

identifies would not be commercially acceptable due to an increase in

retransmission time from 16 ms to 140 ms.  (*Id.*)  For support, Dr. Parkvall cites a

book by two Nokia employees.  (*See* Ex. 5027.)  At best, this document shows that

the time needed to make a retransmission in a WCDMA system is relatively long

(*i.e.*, about 140 ms) compared to a relatively short round trip time possible in

enhanced 3G (*i.e.*, 16 ms round trip time in HSPA with 2 ms TTI) and 4G (*i.e.*, 8 ms

round trip time in LTE) networks, and that this longer retransmission time could

result in a larger buffer for layer 2 packets.

139.   But the Nokia book does not in any way indicate that ***Ericsson's*** Data

Transmission Patent Families are responsible for any improvement in the

retransmission time associated with the 4G or enhanced 3G standards.  Notably, the

cited portion of the Nokia book does not mention Ericsson or its technology, let

alone to an Ericsson technology that improves latency or buffer memory space

needs.  Nor does this document in any way prove an absence of available

alternatives to Ericsson's patents that would allow 3G and 4G networks to achieve a

much shorter round trip time or an otherwise fast, efficient, and accurate

ARQ/HARQ feedback mechanism without infringing a patent in Ericsson's Data

Transmission Families.

> b.   *Dr. Parkvall's Early 2G Alternative Overvalues*
> *Ericsson's 2G Data Transmission Patents.*

140.   In addition, Dr. Parkvall states that he "considered the disadvantages to

an alternative de-featured 2G system[.] . . ."  (Dkt. 1360 at ¶ 101.)  In this regard, he

alleges that such an alternative "would be unable to use the adaptive re-transmission

solutions adopted by evolved 2G (called GPRS and EDGE)."  (*Id.*)  "A performance

drawback in such an alternative system," he alleges, "is that re-transmissions could

be unsuccessful due to the lack of flexibility to adapt the transmission scheme to the link conditions." (*Id.*)  Thus, he opines that such alternatives would result in packet losses, a general degradation in service, and potentially an unusable connection, or in a significantly larger buffer.  (*Id.*)  But not only are each of the above statements unsupported and conclusory, Dr. Parkvall also fails to tie any of the Ericsson DT Families to the alleged features he claims would need to be removed from the standards, and to any purported benefits of the same.

141.   I also strongly disagree with Dr. Parkvall's suggestion that all enhanced 3G and 4G ARQ/HARQ features would have to be removed from the standards and replaced by early 3G Data Transmission technologies in order to avoid Ericsson's DT patent families.  (Dkt. 1360 at ¶ 91.)  Indeed, Dr. Parkvall's analysis following this approach is not relevant to the issue of whether Ericsson has made any important and valuable contributions to Data Transmission features in the standards through its Data Transmission Patent Families, relative to alternatives that were available at the time the standards were adopted.  Such alternatives should be considered in the context of the state of the art at the time and evaluated accordingly.  That is precisely what I did in my patent-by-patent analysis.  (*See, e.g.*, Ex. 1639).

## B.   Carrier Aggregation

142.   Carrier Aggregation (CA) is the eighth technology category under Dr. Parkvall's classification framework.  (Dkt. 1360 at ¶ 103.)  According to Dr. Parkvall, Carrier Aggregation "refers to technologies for combining frequency bands together to increase the available capacity, peak performance, and data rates." (*Id.*)

143.   Dr. Parkvall alleges that "Ericsson has 18 charted patent families covering technology that contributes to Carrier Aggregation technology sub-area ['Ericsson Carrier Aggregation Patent Families']."  (*Id.* at ¶ 105.)  Dr. Parkvall states that these families relate to "activation of carrier aggregation; HARQ

feedback; uplink sounding; power control; variable bandwidth aggregation; and CQI signaling." (*Id.*)

### 1.  Ericsson's Carrier Aggregation Patents are Directed to Narrow Aspects of Incremental and Modular Standardized Features.

144.  Notwithstanding Dr. Parkvall's brand new opinion that the many different aspects of carrier aggregation allegedly covered by Ericsson's patents are interrelated (Dkt. 1360 at ¶ 109), Ericsson's purported Carrier Aggregation Patent Families, at least at the level of the alleged inventions, are largely modular and operate independently from one another and from most other features in the 3G and/or 4G standards.

145.  For example, Ericsson's P29465 (4G) patent family relates to determining a timing correction applicable to a primary carrier, and determining for which additional component carriers this correction is valid.  (Exs. 5197; 5198; 5349 at p. 8.)  The following analysis of Ericsson's claim charts and the related standards shows that the patented feature is modular in nature.

146.  Ericsson's claim chart for claim 19[7] of U.S. Patent No. 8,902,811 ("the '811 Patent") in the P29465 patent family cites to five Technical Specifications:

        (1)     3GPP TS 36.321 v.11.5.0;

        (2)     3GPP TS 36.211 v.11.6.0;

        (3)     3GPP TS 36.331 v.11.9.0;

        (4)     3GPP TS 36.213 v.11.8.0; and

        (5)     3GPP TS 36.300 v.11.0.0.

(Ex. 5198.)

147.  Despite the multiple Technical Specifications referenced in Ericsson's claim chart for P29465, it is primarily just two of the Technical Specifications—*i.e.*, (1) 3GPP TS 36.321 v.11.5.0 and (4) 3GPP TS 36.213 v.11.8.0 listed above—that

---

[7] Ericsson's claim chart refers to claim 71, but claim 71 issued as claim 19.  (Ex. 1639 at p. 1177.)

1  actually relate to the key feature allegedly covered by the P29465 patent family.

2  (Ex. 1639 at pp. 1177–79.)  The cited sections of these Technical Specifications are

3  mostly related to one another.  Specifically, Sections 5.2 and 6.1.3.5 of 3GPP TS

4  36.321 together provide the details of a message that is transmitted according to the

5  key feature.  (Ex. 5197; Ex. 5198.)  This message is in turn interpreted and taken

6  into consideration for transmissions made by the user equipment.  (Ex. 5198 at pp.

7  4–5.)  The specifics of interpreting this message and acting accordingly are specified

8  in Sections 4.1 and 4.2.3 of 3GPP TS 36.213.  (Ex. 5198 at pp. 3, 5.)  Thus,

9  although they span two Technical Specifications, the above aspects of the key

10  feature are related to one another and are modular with respect to the other cited

11  Technical Specifications and other parts of the standards.

12         148.   The cited portions of the other Technical Specifications referenced in

13  Ericsson's claim chart for the P29465 patent family—*i.e.*, (2), (3), and (5) above—

14  are not relevant to the key feature of P29465 for at least the following reasons.  For

15  (2), the cited Section 8.1 of Technical Specification 3GPP TS 36.211 v.11.6.0 in

16  Ericsson's claim chart for claim 19 of the '811 Patent, was in the prior art.  (Ex.

17  5198 at pp. 2–3.)  For (3), there is no citation to Technical Specification 3GPP TS

18  36.331 v.11.9.0 in the claim chart for claim 19 of the '811 Patent.  (Ex. 5198.)  For

19  (5), Technical Specification 3GPP TS 36.300 v.11.11.0 is entitled "Overall

20  description," and merely describes at a high level the aspects of the standard related

21  to the key feature that are described in detail in (1).  (Ex. 5198; Ex. 2459.)

22  Accordingly, the alleged invention and key feature of the P29465 patent family are

23  both modular, as they are narrowly drawn to "uplink transmission timing correction

24  for a group of component carriers, and controlling timing "group per group instead

25  of carrier per carrier."  (Dkt. 1360 at p. 8.)

26         149.   Moreover, most of the Ericsson Carrier Aggregation Patent Families

27  are likewise directed to narrow and minor incremental solutions.  For example,

28  Ericsson's P21172 patent family relates to determining an initial transmit power of a

secondary carrier relative to the primary carrier.  (Ex. 1639 at p. 621.)  This patent family is directed to a minor incremental and narrow feature in the standard.  (*Id.* at pp. 621–24.)  As such, the key feature for the P21172 patent family can be changed without materially affecting or being affected by, for example, the error control coding related to Ericsson's P27363 patent family.  (Ex. 5349 at p. 8; Ex. 1639 at pp. 620–24, 1135–37.)  Similarly, Ericsson's P33108 patent family relates to power control, and the key feature for this family likewise relates to a narrow, minor, and incremental solution (*see, e.g.*, Dkt. 1334 at ¶¶ 189–96; Dkt. 1639 at pp. 1338–42; Ex. 5349 at p. 9), and is largely independent from, for example, Ericsson's P28627 patent family that relates to resource management for random access in the presence of Carrier Aggregation (Dkt. 1639 at pp. 1157–62; Ex. 5349 at p. 8).

150.   For at least these reasons, the allegedly patented Carrier Aggregation features could have been replaced with alternative Carrier Aggregation features that were available at the respective time of adoption into the standards, without requiring substantial modifications or causing material impacts to other parts of the standards or system.  (Ex. 1639.)  The above analysis also demonstrates that Dr. Parkvall's per-technology approach of treating all of the Ericsson Carrier Aggregation Patent Families and related/alternative features as a single group is seriously flawed, as these families are directed to separate, distinct, and specific topics within the Carrier Aggregation technology category.  Specific alternatives to the specific topics related to the respective Carrier Aggregation Patent Families are discussed in the Appendices to my Witness Declaration.  (*Id.*)  Dr. Parkvall has not rebutted any of those alternatives, other than summarily dismissing them all.

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

2.   Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Carrier Aggregation Patents.

a.   Almost All of Ericsson's Carrier Aggregation SEPs Provide Less Than a Moderate Improvement to the Standards Relative to Available Alternatives.

151.   Of the 18 patent families Dr. Parkvall identifies in the Carrier Aggregation category ("Ericsson Carrier Aggregation Patent Families"), the nine patent families listed below in **TABLE 6** below do not include essential patents and/or .  (Dkt. 1360 at ¶ 105.)

| No. | Family No. (Standard) | Non-Essential |
|---|---|---|
| 1 | P19103 (4G) | X |
| 2 | P24557 (4G) | X |
| 3 | P25949 (4G) | X |
| 4 | P27363 (3G) | X |
| 5 | P31006 (4G) | X |
| 6 | P32173 (4G) | X |
| 7 | P32205 (4G) | X |
| 8 | P35159 (4G)[8] | X |
| 9 | P38458 (3G) | X |

**TABLE 6 (PDX 170)**

---

[8] My understanding is that Ericsson's P35159 patent family was not listed in Revised Annex A of Ericsson's Response to TCL's Interrogatory No. 5 and that Ericsson did not provide any claim charts for P35159 before I prepared my February 1, 2016 Report.  (Ex. 1577.)  I am thus treating this family as non-essential.

152.     Moreover, under a proper analysis for classifying patents into categories (Section II.D, *supra*), at least Ericsson's P19103 (4G) patent family is incorrectly classified under the Carrier Aggregation technology category and should be removed.  In particular, according to Dr. Parkvall's description, the P19103 (4G) patent family "[r]elates a mobile device detecting the bandwidth and location of a variable-location carrier in order to be able to access the carrier."  (Ex. 5349 at p. 8.) But Dr. Parkvall is incorrect that for this family "[b]enefits include enabling variable-bandwidth carriers in general and LTE carrier aggregation in particular." (Ex. 5349 at p. 8.)  Charted claims 1, 2, and 12 of EP No. 1,702,446 ("the EP '446 Patent"), the only charted claims in the P19103 patent family, do not relate to Carrier Aggregation.  (Ex. 4146; Ex. 4147.)  Nor does the patent specification of EP No. 1,702,446 relate to Carrier Aggregation.  (Ex. 2548.)  In fact, a search of the EP '466 Patent for "aggr" results in no hits.  Furthermore, Ericsson's claim charts allege that Release 8 of LTE reads on the claims.  (Ex. 4146; Ex. 4147.)  But Carrier Aggregation was not available in Release 8—instead, it became available later on in Release 10.  (Ex. 1416 at p. 113 (§ 7.3.1).)

153.   Accounting for all this, there are nine potentially relevant Ericsson Carrier Aggregation Patent Families that meet Dr. Parkvall's definition of Carrier Aggregation.  These potentially relevant patent families are listed below in **TABLE 7**.

| No. | Family No. (Standard) | Importance Rank | Contribution Rank |
|---|---|---|---|
| 1 | P21172 (3G) | 3 | 4 |
| 2 | P28627 (4G) | 3 | 4 |
| **3** | **P29465 (4G)** | **1** | **1** |
| 4 | P30749 (4G) | 3 | 4 |
| **5** | **P31755 (4G)** | **2** | **2** |
| 6 | P32498 (4G) | 3 | 4 |
| 7 | P33108 (4G) | 2 | 4 |
| 8 | P34406 (4G) | 2 | 4 |
| 9 | P35575 (4G) | 3 | 4 |

**TABLE 7 (PDX 171)**

154.   With respect to the "Importance" of Ericsson's Carrier Aggregation patent families, Dr. Parkvall did not identify even one Ericsson patent that he alleges is a critically important patent that would thus contribute to the overall value of the Ericsson Carrier Aggregation Families.  He therefore cannot speak to the relevant inquiry, which is whether the Ericsson Carrier Aggregation Patent Families cover important and valuable contributions that helped improve Carrier Aggregation functions and procedures, and how these contributions compare to alterative Carrier

Aggregation features that were available at the respective times of adoption into the applicable standards.

155.   On this issue, Dr. Parkvall has not provided evidence to demonstrate that Ericsson has made any such contributions.  Nor has he demonstrated what fraction of the overall benefits to Carrier Aggregation technology is attributable to the Ericsson Carrier Aggregation Patent Families (*i.e.*, the benefit of Ericsson's patents apart from the value of being included in the standard).  Rather, Dr. Parkvall merely describes what he regards as the *general* importance of Carrier Aggregation technologies.  (Dkt. 1360 at ¶¶ 106–08.)  For example, Dr. Parkvall states that "Carrier Aggregation is important to the 3G and 4G standards and provides a number of benefits . . . ."  (Dkt. 1360 at ¶ 106.)  He also states that "Carrier Aggregation allows network operators to combine radio channels within the same or different frequency bands to get much higher bandwidth and data rates."  (Dkt. 1360 at ¶ 103.)  These statements, however, apply to Carrier Aggregation as a whole, and are not specific to Ericsson's Carrier Aggregation patent families.

156.   With regard to the importance an value of features specific to Ericsson's Carrier Aggregation patent families, **FIGURE 29** below represents my Importance and Contribution Ranks for the nine relevant Ericsson Carrier Aggregation patent families (of the 18 listed by Dr. Parkvall) that I determined to be essential based on a detailed analysis, reasoning, and evidence.  (Ex. 1639.)  As shown in **FIGURE 29**, only two of Ericsson's Carrier Aggregation patent families (*i.e.*, P29465 (4G) and P31755 (4G)) can be considered to provide at least a moderate improvement to the standard relative to available alternatives.  (Ex. 1639 at pp. 1174–79, 1259–66.)

**FIGURE 29 (PDX 172): Contribution and Importance Ranks**

**for Ericsson's Carrier Aggregation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

157.   Instead of identifying which of the Ericsson Carrier Aggregation Patent Families are technically valuable, Dr. Parkvall merely states that "Carrier Aggregation is important to the 3G and 4G standards and provides a number of benefits, including a better uplink peak to average ratio, better spectral efficiency, better coverage, higher user rates, and higher capacity."  (Dkt. 1360 at ¶ 106.)  Thus, he is talking about the value of the standard, not the value of Ericsson's patents.  He then goes on to state that "Ericsson has contributed significantly to these Carrier Aggregation technologies in 3G and 4G in ways that have an important effect on handset performance," and generally cites to the contribution counting memorialized in the Signals 2010, 2014, and 2015 Reports to support this claim.  (*Id.*)  But Dr. Parkvall and Ericsson have failed to show how the vast majority of the "contributions" referred to in connection with these Reports correlate to Ericsson's Carrier Aggregation Patent Families.

158.   Dr. Parkvall appears be making the underlying assumptions that Ericsson's approximately 23,000 allegedly approved contributions correlate at some level to Ericsson's alleged SEPs at issue in this case and, by extension, that a substantial number and percentage of those contributions also correlate to a majority of the 18 Ericsson CA Families.  But Dr. Parkvall's reliance on the Signals Reports in this regard is misplaced for several reasons.

159.   First, Dr. Parkvall failed to identify—let alone discuss—any specific "contributions" listed in the Signals Reports that correspond to any of patents in the Ericsson Carrier Aggregation Patent Families.  Second (and relatedly), my understanding is that in this litigation, Ericsson has identified allegedly corresponding proposals for only 16 of its purported SEPs related to UE.  (Ex. 2520 at pp. 121–22.)  None of these 16 purported SEPs belong to the Ericsson CA Families, and thus, Ericsson has identified no TDocs allegedly corresponding to its purported CA Families.  Therefore, Ericsson and Dr. Parkvall have failed to provide any evidence of correlation or even relation between the approximately 23,000

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1  purportedly adopted proposals and the 18 Ericsson Carrier Aggregation Patent

2  Families.  This contradicts Ericsson's and Dr. Parkvall's underlying assumption that

3  a substantial number and percentage of the approximately 23,000 contributions

4  correlate to a majority of the 18 Ericsson CA Families.[9]

5      160.   Thus, it is my opinion that the Signals Reports do not show that

6  "Ericsson has contributed significantly to the[ listed] Carrier Aggregation

7  technologies in 3G and 4G" by virtue of its nine potentially relevant Carrier

8  Aggregation patent families.

9      161.   In summary, the opinions set forth in Dr. Parkvall's Witness

10  Declaration fail to show that Ericsson has made significant and important patented

11  contributions to the Carrier Aggregation processes and functionalities he describes.

12      *b.    A Classification of Industry-Wide 2G, 3G, and 4G Carrier*

13      *Aggregation SEPs Under Dr. Parkvall's Framework*

14      *Shows Ericsson's Share is Relatively Insubstantial.*

15      162.   Dr. Parkvall asserts that because "Ericsson has a number of patents

16  across many different aspects of carrier aggregation," he "looked to previous

17  generations of Carrier Aggregation or other Carrier Aggregation Systems" in order

18  to analyze the value of Ericsson's Carrier Aggregation Patent Families.  (*See* Dkt.

19  1360 at ¶ 109.)  But Ericsson's share of industry-wide patent families that meet Dr.

20  Parkvall's definition of Carrier Aggregation is relatively insubstantial, as shown in

21  **FIGURES 30–32** below.  (Ex. 1611.)  **FIGURE 30** shows Ericsson's relative share

22  of relevant (*i.e.*, essential) Carrier Aggregation patent families overall, which is 9

23  out of 111 patent families (7.5%).  First, Dr. Parkvall's starting point is incorrect

24  because a significant portion of the value of the standard is attributable to the basic

25  framework and core technologies of the standards, which were known and

26  ---

27  [9] Moreover, even if Ericsson's allegedly approved contributions are limited to what the Signals Reports claim to be the most relevant Working Groups to User Equipment, Ericsson has still failed to show that the vast majority of these purported contributions are correlated to Ericsson's SEPs.

28

developed by others.  Second, since Ericsson's share is relatively small, it is improper to assume that its patents could not be designed around.



**FIGURE 30 (PDX 173):  Ericsson's Share of Industry-Wide 2G, 3G, and 4G Essential Carrier Aggregation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

163.   **FIGURES 31–32** below show Ericsson's relative share of Carrier Aggregation patent families for the 3G and 4G standards, respectively.  Carrier Aggregation was not used in 2G standard.  (Ex. 5349 at pp. 8–9.)  As demonstrated, Ericsson's proportional shares of alleged SEP families are insubstantial for each of the standards.  For at least this reason, Dr. Parkvall's reliance on Ericsson's "number of patents across many different aspects of carrier aggregation" in looking to his proposed alternatives of a "severely de-featured Carrier Aggregation System" or not implementing Carrier Aggregation technology at all (Dkt. 1360 at ¶¶ 109–112), is misplaced and his analysis is flawed and irrelevant.



**FIGURE 31 (PDX 174):  Ericsson's Share of Industry-Wide**

**3G Essential Carrier Aggregation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1
2
3
4
5
6
7
8
9
10
11



**FIGURE 32 (PDX 175):  Ericsson's Share of Industry-Wide**

**4G Essential Carrier Aggregation Patent Families**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      3.     <u>Dr. Parkvall's Flawed Per-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Carrier Aggregation Patents.</u>

164. Dr. Parkvall identifies what he considers are two non-infringing alternatives to carrier aggregation as implemented in the 4G standard, and one alternative to carrier aggregation as implemented in the 3G standard. (Dkt. 1360 at ¶¶ 110–12.) He claims these alternatives are non-infringing with respect to Ericsson's alleged "number of patents across many different aspects of carrier aggregation." (Dkt. 1360 at ¶ 109). To identify these alternatives, he "looked to previous generations of Carrier Aggregation or other Carrier Aggregation systems as a whole." (*Id.*)

165. Thus, Dr. Parkvall claims that "[a] first alternative to Ericsson's 4G Carrier Aggregation patents would be a severely de-featured Carrier Aggregation system using fixed width smaller channels based on a 1.4 MHz basic system (since 1.4 MHz is the smallest 4G bandwidth configuration) that are constantly activated." (Dkt. 1360 at ¶ 110.) According to Dr. Parkvall, "[a] second 4G alternative would be to not implement Carrier Aggregation technology at all." (Dkt. 1360 at ¶ 111.) Similarly, "[a]n alternative to Ericsson's 3G Carrier Aggregation patents would also be to not implement Carrier Aggregation at all." (Dkt. 1360 at ¶ 112.)

166. I disagree with how Dr. Parkvall limited his analysis to such a limited universe of alleged alternatives. First, the numbers speak for themselves. Of the 18 Ericsson CA Families Dr. Parkvall identifies, only the following eight families are allegedly essential to the 4G standard: (1) P28627; (2) P29465; (3) P30749; (4) P31755; (5) P32498; (6) P33108; (7) P34406; and (8) P35575. Based on the classification of industry-wide essential patent families discussed above in Section II.D, it is estimated that there are a total of 105 industry-wide essential patent families directed to 4G Carrier Aggregation technologies as defined by Dr. Parkvall. Therefore, the above-listed eight Ericsson patent families represent only 7.1% of all

HIGHLY CONFIDENTIAL

SMRH:481062607.2

1   industry-wide 4G Carrier Aggregation essential patent families.  For 3G Carrier

2   Aggregation, Ericsson holds only a single essential patent family.  Thus, Dr.

3   Parkvall's assertion Ericsson's relatively insubstantial number of patent families

4   mandate a severely de-featured Carrier Aggregation system or foreclosing Carrier

5   Aggregation as a whole for 4G and 3G is far-fetched.

                        a.       *Examples of Non-Infringing Alternatives That Could Have*

7                                 *Been Used Without Causing Detrimental Effects at the*

8                                 *Time of Adoption.*

9       167.   As set forth above in **TABLE 7**, Ericsson's Carrier Aggregation Patent

10   Families include only eight potentially relevant 4G families and only a single

11   potentially relevant 3G family.  I identified viable non-infringing alternatives for

12   seven of Ericsson's eight potentially relevant 4G Carrier Aggregation Patent

13   Families.  (Ex. 1639.)  I did not identify an alternative for the eighth 4G patent

14   family, P29465, but as set forth above, the alleged invention and key feature for the

15   P29465 patent family are both modular, as they are narrowly drawn to narrow

16   features of carrier aggregation in the 4G standard.  (Section III.C.1, *supra*.)  Further,

17   Ericsson's P21172 patent family provides no improvement to the 3G standard

18   relative to available alternatives.  (Ex. 1639 at p. 624.)

19       168.   As explained in the Appendices to my expert report, these alternatives

20   could have been used in place of the key features allegedly covered by Ericsson's

21   Carrier Aggregation Patent Families without materially impacting other parts of the

22   standards or requiring substantial modifications to the standards.  Dr. Parkvall did

23   not consider any of these alternatives, other than summarily dismissing them all.

24   Accordingly, Dr. Parkvall ignored the non-infringing alternatives I proposed, and

25   his alleged non-infringing alternatives fail to support his conclusion that Ericsson

26   has made any important and valuable contributions to Carrier Aggregation relative

27   to non-infringing alternatives that were available at the time of adoption.

28

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

        *b.*    *My non-infringing alternatives to Ericsson's Carrier*

                *Aggregation Patents are not covered by other Ericsson*

                *patents.*

169.   In response to Dr. Parkvall's assertion that I did not consider whether my alternatives would infringe "other Ericsson patents" (Dkt. 1360 at ¶ 55), I assessed whether Ericsson holds any patents, including patents not listed in an ETSI IPR declaration, that might cover my non-infringing alternatives for Ericsson's Carrier Aggregation Patent Families.  For this assessment, I used as an example the non-infringing alternative I identified in connection with my analysis of Ericsson's P33108 patent family.  The example non-infringing alternative is described in TDoc number R1-105914 that CATT submitted to 3GPP in the RAN 1 Working Group Meeting #63 at least as early as November 19, 2010.  (Ex. 1639 at pp. 1340–42; *see also* Ex. 1446.)

170.   As part of my assessment, a well-known patent search tool, LexisNexis® Total Patent®, was used to search US, EP, and WO patents employing the search criteria shown in **TABLE 8** below.

| Search Parameter | Parameter Value |
| --- | --- |
| **Assignee** | Ericsson |
| **Key words** <br> **(within Title, Abstract, or** <br> **Claims)** | (((HARQ or "hybrid ARQ" or hybrid w/2 automa!) and power and (uplink or PUCCH) and control)) |
| **Priority Date** | Before November 19, 2010, the last day of the working group meeting during which R1-105914 was presented. |

**TABLE 8 (PDX 176):  Search Conditions for Other Ericsson Patents**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

171. The search produced 48 Ericsson US, EP, and WO patents. (Ex. 2550.) I reviewed these 48 Ericsson patents, and determined they do not cover the non-infringing alternative described in CATT's proposal. In my Witness Declaration, I already explained that CATT's proposal presented a technically feasible alternative. (*See, e.g.*, Dkt. 1334 at ¶¶ 257–63; Ex. 1639 at pp. 1340–42.) Additionally, I reviewed Ericsson's Carrier Aggregation Patent Families other than P33108 and determined that none of these patent families—and indeed none of the Ericsson patents I've analyzed in this case—cover the non-infringing alternative described in CATT's proposal.

172. Thus, my analysis shows that Dr. Parkvall erred by ignoring alternatives that were available at the time the standards were adopted and by limiting his alternatives to "previous generations of Carrier Aggregation or other Carrier Aggregation systems as a whole." (Dkt. 1360 at ¶ 109.)

    4.   <u>Dr. Parkvall Errs in Relying on Flawed Hypothetical Alternatives as Benchmarks for the Technical Value of Ericsson's Carrier Aggregation SEPs.</u>

173. As mentioned above, Dr. Parkvall erred in failing to consider the many available alternatives to Ericsson's Carrier Aggregation Patent Families. For Ericsson's 4G Carrier Aggregation Patent Families, Dr. Parkvall identifies two alternatives. Dr. Parkvall's first alternative is "a severely de-featured Carrier Aggregation system using fixed width smaller channels based on a 1.4 MHz basic system (since 1.4 MHz is the smallest 4G bandwidth configuration) that are constantly activated." (Dkt. 1360 at ¶ 110.) His second 4G alternative is "to not implement Carrier Aggregation technology at all." (*Id.* at ¶ 111.)

174. Based on these two alternatives, Dr. Parkvall calculates the purported technical value of 4G Carrier Aggregation technologies as a whole as:

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

(1)     Enabling an uplink peak-to-average ratio that is around 3.5 dB better (than an alternative based on an aggregation of a set of 1.4 MHz carriers),

(2)     Having 16% better spectral efficiency,

(3)     A 10 dB coverage improvement, and/or

(4)     Up to 80% higher user rates or 40% higher capacity.

(Dkt. 1360 at ¶ 113.)

175.   In addition to erring in considering an overly limited universe of alternatives for 4G Carrier Aggregation, however, Dr. Parkvall further errs when calculating the purported technical value of 4G Carrier Aggregation as a whole. With regard to (1) 3.5 dB better uplink peak-to-average ratio and (2) 16% better spectral efficiency, Dr. Parkvall is incorrect that these figures represent an advantage of 4G Carrier Aggregation technology as a whole relative to his hypothesized "severely de-featured Carrier Aggregation system." (Dkt. 1360 at ¶¶ 114, 116.)  In particular, to arrive at the 3.5 dB peak-to-average and 16% spectral efficiency numbers, Dr. Parkvall compares his severely de-featured Carrier Aggregation system not to a 4G Carrier Aggregation system but to a single carrier system using several single carriers, each being 1.4 MHz (as opposed to a 20 MHz single carrier).  (Dkt. 1360 at ¶ 114 ("Such a hypothesized solution would, for example, exhibit an uplink peak-to-average ratio approaching conventional OFDM which is around 3.5 dB worse *than single-carrier transmission* . . . ." (emphasis added, citation omitted); *id.* at ¶ 116 ("[S]uch a hypothetical system using 14 carriers of 1.4 MHz each (resulting in a total bandwidth of 19.6 MHz) would have around 16% worse spectral efficiency than a system with a *single 20 MHz carrier*." (Dkt. 1360 at ¶ 116 (emphasis added).))

176.   The comparison of Dr. Parkvall's hypothesized de-featured system to a single carrier system is irrelevant to technical value of Carrier Aggregation as a whole, let alone to Ericsson's 4G Carrier Aggregation Patent Families.  Dr. Parkvall

fails to compare his unrealistic "hypothesized solution" to a carrier aggregated 20
MHz system, for example.  Thus, at least because they arise out of a comparison of
his "hypothesized solution" 1.4 MHz single carrier system to a 20 MHz single
carrier system, Dr. Parkvall's references to "an uplink peak-to-average ratio that is
around 3.5 dB better" and "16 % better spectral efficiency" are not relevant to any
performance gains due to 4G Carrier Aggregation technology, as neither one of
them is related to Carrier Aggregation.  (Dkt. 1360 at ¶ 113.)  Other purported
drawbacks of Dr. Parkvall's hypothesized alternative (*e.g.*, that "the terminal would
. . . require a correspondingly larger power amplifier,", and that there would be "a
16% reduction in the achievable peak data rates") are wrong and irrelevant for at
least the same reasons.  (*Id.* at ¶¶ 115–16.)

177.   With regard to the purported technical values of "(3) a 10 dB coverage
improvement" and "(4) up to 80% higher user rates or 40% higher capacity," Dr.
Parkvall does not claim these figures are based on a comparison of 4G Carrier
Aggregation technologies as a whole to his "severely de-featured Carrier
Aggregation."  Rather, they are based on Dr. Parkvall's second alleged alternative
for 4G Carrier Aggregation—*i.e.*, "no Carrier Aggregation."  (Dkt. 1360 at ¶ 119.)
Thus, Dr. Parkvall's opinion is that these technical values represent the benefits, as a
whole, of including 4G Carrier Aggregation technology in the standard.  (*See, e.g.*,
Dkt. 1360 at ¶ 125 (describing 4G system without Carrier Aggregation).)  Indeed,
none of Dr. Parkvall's opinions or cited documents regarding his second alternative
(*i.e.*, removing Carrier Aggregation from 4G) relate to Ericsson's Carrier
Aggregation Patent Families—other than perhaps at the highest level, since most of
the patent families relate to Carrier Aggregation—or any value of the same apart
from the value of the 4G standard with Carrier Aggregation.

178.   Moreover, Dr. Parkvall expresses no opinion regarding whether the
purported technical values of "(3) 10 dB coverage improvement" and "(4) up to
80% higher user rates or 40% higher capacity" are valid for his "severely de-

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

featured Carrier Aggregation system." Dr. Parkvall has not shown that these technical values are valid or relevant for his purported de-featured Carrier Aggregation system.

179.   In sum, for at least the above reasons, it is my opinion that Dr. Parkvall's purported technical valuation over non-infringing alternatives is flawed, unrealistic, and irrelevant to the value of the Ericsson 4G Carrier Aggregation Patent Families.  Further, none of Dr. Parkvall's assertions or the references he cites establish that the purported benefits of the 4G standards due to Carrier Aggregation as a whole is attributable to any of the Ericsson Carrier Aggregation Patent Families. Accordingly, Dr. Parkvall has failed to prove that any alternative is necessarily technically inferior or infeasible, and has failed to prove that the Ericsson 4G Carrier Aggregation Patent Families cover important and valuable contributions that helped improve 4G Carrier Aggregation technology, and how these contributions compare to alternative Carrier Aggregation features that were available at the respective times of adoption of 4G Carrier Aggregation.

180.   For 3G, not only does Dr. Parkvall fail to provide a (non-conclusory) qualitative or quantitative analysis with respect to the advantages of 3G Carrier Aggregation as a whole, but his statements here are also flawed for at least the same reasons as Dr. Parkvall's statements regarding 4G Carrier Aggregation.  With further regard to Dr. Parkvall's conclusory statements vis-à-vis the alleged Ericsson 3G CA Families, only 3 of the 18 patents in Ericsson's CA Families are purported to relate to 3G.  Two of these patent families (P27363 and P38458) are not essential under any reasonable claim construction.  (Ex. 1639 at pp. 1135–37, 1430–34.)

181.   Dr. Parkvall has failed to show that Ericsson's single remaining 3G Carrier Aggregation Patent Family (P21172) provides any benefits.  Indeed, with respect to 3G and the P21172 patent family, Dr. Parkvall only describes the alleged benefits at a high and conclusory level without any support.  (Ex. 5394 at p. 8.)  For example, Dr. Parkvall has not shown that the P21172 patent family provides any

benefits related to improved system capacity and increased user data rates as a result of efficient uplink power control.  (*See* Dkt. 1360 at ¶ 129.)  Moreover, I found this patent family to be of marginal technical value (at best), and of no improvement relative to non-infringing alternatives available at the time the corresponding Carrier Aggregation feature was adopted into the 3G standard.  (Ex. 1639 at pp. 620–24.)  Thus, Dr. Parkvall has not shown that as a result of Ericson's single potentially relevant 3G Carrier Aggregation Patent Family, Ericsson is entitled to claim the alleged benefits of 3G Carrier Aggregation technology as a whole being included in the standard.

###### C.     Resource Allocation

182.    Dr. Parkvall's next subarea is "Resource Allocation."  (Dkt. 1360 at ¶ 131.)  According to Dr. Parkvall, Resource Allocation "refers to solutions for allocating time and frequency resources between the handset and the network."  (Dkt. 1360 at ¶ 131.)  "Resource Allocation also includes efficient sharing of resources between handsets so that most, if not all, end users receive adequate service quality, even if the capacity of the cell is strained."  (*Id.*)

183.    In all, Dr. Parkvall identifies 42 patent families in the Resource Allocation technology category ("Ericsson's Resource Allocation Patent Families").  (Dkt. 1360 at ¶ 134.)

1.     Ericsson's Resource Allocation (RA) Patents are Directed to Narrow Aspects of Incremental and Modular Standardized Features.

184.    Dr. Parkvall begins is analysis by identifying potential alternatives to all of Ericsson's purported RA Families as a group rather than on a patent-by-patent basis.  (Dkt. 1360 at ¶¶ 139–144 (identifying "[n]on-infringing alternative technologies" to the Ericsson RA Families as a whole); *see* Section II.A, *supra*.)  However, the Ericsson RA Patent Families are largely modular and operate independently from one another, and independently from most other features in the

1    2G, 3G, and/or 4G standards.  Thus, it is improper to group them all together as Dr.

2    Parkvall has done.

3    185.   Resource Allocation problems and solutions are largely independent of

4    problems in Dr. Parkvall's other technology categories, such as Voice Coding and

5    Security.  Although the different technology categories are designed to work

6    together, that alone does not mean that every single patentable solution is so

7    intertwined that no solution is narrow or modular.  (*See* Dkt. 1360 at ¶¶ 45–46.)  A

8    patented feature may affect different technology categories, but the extent of the

9    effect needs to be analyzed on a patent-by-patent basis..

10    186.   For example, Dr. Parkvall puts patent family P26744 into the Resource

11    Allocation technology subarea.  (Dkt. 1360 at ¶ 134.)  P26744 is directed to

12    addressing what to do if a number of scheduling requests is reached without having

13    received a resource allocation.  If unaddressed, the UE can run into a deadlock as it

14    keeps sending the scheduling request to the base station for uplink transmissions.

15    (*See* Ex. 1639 at pp. 1101–1108.)  However, such events will be rare because the

16    wireless environment keeps changing over time, such that there is a high probability

17    that one of the scheduling requests from the UE will eventually be received by the

18    base station as the channel improves.  (*Id.* at p. 1104.)

19    187.   As shown below, the claimed solution of P26744 utilizes a threshold to

20    determine whether to transmit a random access transmission to the UE.  (Ex. 2551 at

21    pp. 10–11; *see also* Ex. 1639 at pp. 1101, 1102.)

22

23    1.  A method for requesting scheduling of resources (2D) to be used for uplink communication of data (2E) from a user equipment (105) in a communications system (100), wherein the number of scheduling requests (2B) that the user equipment will repeatedly transmit on a dedicated uplink control channel in relation to the data while not having been granted uplink resources is limited by monitoring (425, 430), in the user equipment, whether a threshold value representing a maximum limit has been reached, **characterised in that**
   a random access transmission (3C) on a random access channel is initiated (440) in response to said threshold value having been reached

27

28

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

188.   The number of scheduling requests (SRs) transmitted by the UE on a dedicated uplink control channel are monitored, and when the number of SRs transmitted exceeds a certain threshold, the UE sends a random access transmission. (Ex. 1639 at p. 1101.)  The claimed invention is focused solely on the particular method of determining when to send a random access transmission.  (*Id.*)  This is a very narrow aspect of Resource Allocation technology.

189.   Moreover, there were other acceptable alternatives to solve this narrow problem at the time the key feature was adopted into the standard.  In fact, I identified one such alternative in the Appendix my expert report.  (*See* Ex. 1639 at pp. 1104–1106.)  LG Electronics proposed to address this same problem by utilizing a timer as opposed to limiting the number of attempts based on a threshold.  (Ex. 2552 at pp. 1–2.)

## 2      Discussion

In the current specification [3], if a SR has been triggered and no UL-SCH resources are available, a UE sends the SR on PUCCH if a PUCCH for SR is configured or initiates a Random Access procedure if no PUCCH for SR is configured. In the latter case, after preamble-trans-max, MAC indicates the Random Access problem to RRC and upon this, RRC starts T312 to perform the recovery procedure. However, in the former case, there is no supervision of the SR transmission. That is, if the UL resources are not granted for a new transmission, the UE may send the SR on PUCCH endlessly. Thus, if there is a problem with the UL while still in sync on L1, there is a possibility that the UE falls into the deadlock situation.

**Proposal 1: it is proposed to discuss whether or not there is a need for supervision of the SR PUCCH transmission.**

If it is felt that it is needed to supervise the SR PUCCH transmission, we can simply achieve a recovery procedure by re-using T312. That is, MAC indicates the SR PUCCH Problem, based on timer or counter, to RRC. Upon this, RRC starts T312, i.e. RRC acts like the Random Access Problem.

190.   As explained in version 8.2.0 of TS 36.331, expiration of the T312 timer (when security is not activated) results in the UE going into RRC_IDLE mode, after which the UE executes the Random Access Procedure to compete for resource assignment if it needs a resource to send data.  (Ex. 2553 at p. 41 (§ 5.3.10.3).)

1

### 5.3.10.3   T310 or T312 expiry

Upon T310 or T312 expiry, the UE detects radio link failure and shall:

  1> If security is not activated:

    2> perform the actions upon moving from RRC_CONNECTED to RRC_IDLE as specified in 5.3.11;

191.   If security is activated, the connection re-establishment procedure is initiated by the UE at the expiration of the T312 timer and, if connection re-establishment fails during the period of the T311 timer then the UE performs the steps identified above if security is not activated.  (Ex. 2553 at p. 41 (§§ 5.3.10.3–5).)

### 5.3.10.3   T310 or T312 expiry

Upon T310 or T312 expiry, the UE detects radio link failure and shall:

  1> If security is not activated:

    2> perform the actions upon moving from RRC_CONNECTED to RRC_IDLE as specified in 5.3.11;

  1> else:

    2> stop timer T310, if running;

    2> stop timer T312, if running;

    2> start timer T311;

    2> select a suitable cell in accordance with the cell selection process as specified in [4].

*   *   *

### 5.3.10.4   Re-entry of service area while T311 is running

Upon selecting an E-UTRA cell  while T311 is running, the UE shall:

  1> initiate the Connection re-establishment procedure as specified in 5.3.7.

*   *   *

### 5.3.10.5   T311 expiry

Upon T311 expiry, the UE shall:

  1> perform the actions upon moving from RRC_CONNECTED to RRC_IDLE as specified in 5.3.11.

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

192.   In terms of recovery time and signaling overhead reduction, Ericsson's claimed method and the alternative have the equivalent cost and performance, and any relative difference would depend on the specific scenario.  (Ex. 1639 at p. 1106.)  The alternative could be used instead of the solution covered by P26744 without severely impacting the performance of the standard.  However, Dr. Parkvall assigns importance and value to P26744 only in view of all other purported Ericsson RA Families.  (Dkt. 1360 at ¶¶ 135–138.)  This improperly inflates the value of this minor and narrow feature for which there were readily available alternatives.

193.   Moreover, I note that Dr. Parkvall has failed to address any of the alternatives I proposed for any of the patent families allegedly directed to Resource Allocation technologies.  (Ex. 1639.)

> 2.   <u>Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Resource Allocation Patents.</u>
>
> > a.   *Almost All of Ericsson's Resource Allocation SEPs Provide Less Than a Moderate Improvement to the Standards Relative to Available Alternatives.*

194.   Of the 42 Ericsson RA Families Dr. Parkvall identifies, the 15 families listed in **Table 9** below do not include essential patents, include only expired patents,[10] and/or are otherwise irrelevant.

---

[10] This includes patents that in my opinion are not essential under a proper claim construction—*i.e.*, patents that I assigned an Essentiality Rank of "2."

| No. | Family No. (Standard) | Non-Essential | Expired |
|-----|----------------------|---------------|---------|
| 1 | P04940 (2G) | X | X |
| 2 | P07567 (4G) | X | |
| 3 | P08575 (3G) | X | |
| 4 | P08804 (2G, 4G) | X | |
| 5 | P19103 (4G) | X | |
| 6 | P22430 (4G) | X | |
| 7 | P23633 (4G) | X | |
| 8 | P25409 (4G) | X | |
| 9 | P25990 (4G) | X | |
| 10 | P29482 (4G) | X | |
| 11 | P30565 (4G) | X | |
| 12 | P31931 (4G) | X | |
| 13 | P31948 (4G) | X | |
| 14 | P32173 (4G) | X | |
| 15 | P32205 (4G) | X | |

**TABLE 9 (PDX 177)**

195.   Additionally, I found at least eight patent families that were misclassified by Dr. Parkvall as being Resource Allocation-directed.  For example, Dr. Parkvall identified patent family P08804 as allegedly belonging to the Resource Allocation technology category.  (Dkt. 1360 at ¶ 134.)

| Family No. | Reasons Misclassified |
| --- | --- |
| P08804 | The claims in this family's set of patents address changing the modulation, and/or coding scheme and/or the "transmission format."  The claims are silent and have no relationship with the problem of how resources are allocated.  In other words, changing the modulation and/or coding scheme for a retransmission is not related to how time and/or frequency resources are **allocated** or the question of **efficiently sharing resources**, the main characteristics of what Dr. Parkvall identified as being relevant to the Resource Allocation technology category. |
| P12207 | According to Dr. Parkvall's Description, this family "Relates to signaling of how important communication parameters for link adaptation such as formats for bit rates, encoding scheme, etc. are communicated between the mobile device and the network.  Advantages include that signaling for link adaptation can be efficiently implemented." (Ex. 5349 at p. 11.)  While I do not fully agree with Dr. Parkvall's description, it is true that the signaling claimed in the patent is not related to "processes and solutions for allocating resources for transmitting data" as used in the RA technology category.  In other words, indicating (efficiently) what Transport Formats are being used is not related to how time and/or frequency resources are **allocated** or the question of **efficiently sharing resources**.  The decisions on sharing resources and related allocation of said resources are made independently of how the signaling of the Transport Formats is made. |
| P19103 | According to Dr. Parkvall's description, this family "Relates [to] a mobile device detecting the bandwidth and |

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

| Family No. | Reasons Misclassified |
|---|---|
| | location of a variable-bandwidth and variable-location carrier in order to be able to access the carrier." (Ex. 5349 at p. 11.) While detecting the carrier is a prerequisite to using the carrier, the claimed invention is not directed to any "processes and solutions for allocating resources for transmitting data" as used in the RA technology sub group. In other words, detecting the bandwidth and location of a carrier is not related to how time and/or frequency resources on that, or any other, carrier are **allocated** or the question of **efficiently sharing resources**, the main characteristics of what Dr. Parkvall identified as being relevant to the Resource Allocation technology category. |
| **P23426** | This family relates to how precoding matrix and associated rank is selected in an Advanced Antenna System. As such it is not related to any of the issues related to "allocating of resources". In other words, signaling information related to how a precoding matrix is selected is not related to how time and/or frequency resources are **allocated** or the question of **efficiently sharing resources**, the main characteristics of what Dr. Parkvall identified as being relevant to the Resource Allocation technology category. |
| **P24860** | Similarly to the P23426 family above, this family is concerned with problems related to precoder and rank selection and associated signaling. For the same reasons as P23426 discussed above, this family also has no relationship to how resources are **allocated** or the question of **efficiently sharing resources**. |
| **P30565** | Similarly to the P23426 and the P24860 above, this family "Relates to recommended pre-coder determination for at least 8-by-8 MIMO, and feedback reporting by means of component matrix indices." (Ex. 5349 at pp. 13–14.) For the same reasons as P23426 and P24860 discussed above, this family also has no relationship to how resources are **allocated** or the question of **efficiently sharing resources**. |
| **P33108** | According to Dr. Parkvall's description, this family "Relates to controlling the power of the uplink control |

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

SMRH:481062607.2

| Family No. | Reasons Misclassified |
|---|---|
|  | channel based on the size of the CQI and the HARQ data it will carry." (Ex. 5349 at p. 14.) This is a "power control"-related family that dictates a narrow and specific way of adjusting one narrow parameter that affects the power used for a transmission. As such, it has no relevance to Resource Allocation related questions or problems. In other words, adjusting the power for a transmission using a specific formula is not related to how time and/or frequency resources are **allocated** or the question of **efficiently sharing resources**, the main characteristics of what Dr. Parkvall identified as being relevant to the Resource Allocation technology category. |
| **P37869** | Similarly to the P33108 discussed above, this family "Relates to power control of control information from the mobile device in a carrier aggregation scenario…." (Ex. 5349 at p. 15.) In short, it is a "power control"-related family and for effectively the same reasons discussed above in connection with the P33108 family, it is not relevant to the Resource Allocation technology category. |

**TABLE 10 (PDX 178): Dr. Parkvall's Misclassification of Ericsson's Patent Families into Resource Allocation**

196.   With respect to the "Importance" of Ericsson's RA Families, Dr. Parkvall did not identify even one Ericsson patent that he alleges is critically important such that it might contribute to the overall value of Ericsson's RA Families. (Dkt. 1360 at ¶¶ 135–138.) He therefore fails to address the relevant issue, which is: whether Ericsson's RA Families cover important and valuable contributions that helped improve Resource Allocation functions and procedures, and how these contributions compare to alternative Resource Allocation solutions available at the respective time of adoption into the applicable standards.

197.   Dr. Parkvall has not shown that Ericsson has made such critically important contributions.  Nor has he demonstrated what fraction of the overall benefits to Resource Allocation technology is attributable to the Ericsson Resources Allocation Patent Families (*i.e.*, the benefit of Ericsson's patents apart from the value of the standard).  Rather, Dr. Parkvall—like he did with the Data Transmission and Carrier Aggregation categories discussed above—merely discusses what he regards as the ***general*** importance of Resource Allocation.  (Dkt. 1360 at ¶¶ 135–138.)

198.   **FIGURE 33** below represents my Importance and Contribution Ranks for the 22 relevant Ericsson RA Families (of the 42 listed by Dr. Parkvall) that I determined to be essential to the 2G, 3G, or 4G standards.  (Ex. 1639.)  As **FIGURE 33** shows, only two of the Ericsson RA Families can be considered to provide at least a moderate improvement to the standard relative to available alternatives.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



**FIGURE 33 (PDX 179):  Contribution and Importance Ranks**

**for Ericsson's Resource Allocation Patent Families**

20
21
22
23
24
25
26
27
28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

     b.  *Ericsson's share of industry-wide 2G, 3G, and 4G*
       *Resource Allocation SEPs under Dr. Parkvall's*
       *framework is relatively insubstantial.*

   199. Dr. Parkvall asserts that "Ericsson has a large number (42) of Resource Allocation patents across a variety of features." (Dkt. 1360 at ¶ 139.) On this basis, he asserts that "the most reasonable way to ensure a fully functioning and complete system in this case is to go back to a previous generation of cellular technology or a previous Resource Allocation system." (*Id.*) But, as shown in **FIGURES 34–37**, below, Ericsson's share of industry-wide patent families that meet Dr. Parkvall's definition of Resource Allocation is relatively insubstantial. (Ex. 1611.) **FIGURE 34** shows Ericsson's relative share of relevant (*i.e.*, essential and non-expired) Resource Allocation patent families overall, which is only 22 out of 261 patent families (7.8%). First, Dr. Parkvall's starting point is incorrect because a significant portion of the value of the standard is attributable to the basic framework and core technologies of the standards, which were known and developed by others. Second, since Ericsson's share is relatively small, it is improper to assume that its patents could not be designed around.



**FIGURE 34 (PDX 180):  Ericsson's Share of Industry-Wide 2G, 3G, and 4G Essential Resource Allocation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

200.  **FIGURES 35–37** below show Ericsson's proportional shares of Resource Allocation patent families for the 2G, 3G, and 4G standards, respectively. As demonstrated, Ericsson's proportional shares are insubstantial in the 3G and 4G standards.  While Ericsson has a greater share of 2G patents, there are only 4 patents in this category and industry wide only 19 patents.  For at least this reason, Dr. Parkvall's reliance on Ericsson's "large number … of essential Resource Allocation patents" in looking to an alternative based on earlier generations of the standards or WiMAX is misplaced and his analysis is flawed and irrelevant.  (Dkt. 1360 at ¶¶ 135–144.)



**FIGURE 35 (PDX 181):  Ericsson's Share of Industry-Wide 2G Essential Resource Allocation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES



**FIGURE 35 (PDX 182):  Ericsson's Share of Industry-Wide**

**3G Essential Resource Allocation Patent Families**



**FIGURE 37 (PDX 183):  Ericsson's Share of Industry-Wide**

**4G Essential Resource Allocation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

3.      <u>Dr. Parkvall's Flawed Technology-By-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Resource Allocation Patents.</u>

201.    Dr. Parkvall ignores non-infringing alternatives to Ericsson's RA Families that were available at the times of adoption and that could have been included in the standards at that time without causing detrimental effects. In this section, I highlight several examples of such non-infringing alternatives. I also demonstrate that there are no "other" Ericsson patents covering the non-infringing alternative I identified for an example Ericsson RA Family (P26071). (Dkt. 1360 at ¶ 55.) Dr. Parkvall has failed to identify any such "other" Ericsson patents.

      *a.*      *Examples of non-infringing alternatives that could have been used without causing detrimental effects at the time of adoption.*

202.    I carefully reviewed the non-infringing alternatives I proposed for the alleged Ericsson 4G RA Families and determined that those alternatives are of equal utility to key accused standard features, and could have replaced the key accused features without requiring a substantial modification or causing a material impact on other parts of the standard or system. For example, with respect to P26071, Ericsson's claim chart maps claim 1 of U.S. Patent No. 8,705,466 to features in the 4G standards related to closed-loop spatial multiplexing. (Ex. 1639 at pp. 1053–1059.) A suitable non-infringing technique was proposed by Nortel, which Dr. Parkvall fails to address in any way. (*Id.* at pp. 1056–1057.)

203.    This non-infringing alternative is described in TDoc number R1-082513 that Nortel submitted to 3GPP in the RAN 1 Working Group Meeting #53bis at least as early as July 4, 2008. (Ex. 1639 at pp. 1053–1059; Ex. 2567.) The Nortel technique provides an alternative of essentially equal utility to the P26071 family. As I explained in the Appendix to my expert report, this is because the combination of NDI and RV proposed by Nortel cannot be used for data

1    transmission, making it available for use to indicate that the codeword is disabled.

2    (*Id.*)  Therefore, the Nortel alternative could have replaced the key accused features

3    without affecting the rest of the system, as the technique simply uses relatively

4    arbitrary bits to enable/disable a codeword, like the key accused feature.  Further, in

5    reviewing Ericsson's alleged SEP families, I did not see any patent in the Ericsson

6    RA Families—or any patents in Ericsson's alleged SEP families—that cover the

7    Nortel alternative.

8         204.    Additionally, in the Appendix to my expert report, I provided numerous

9    other non-infringing alternatives to Ericsson's Resource Allocation Families that

10   could have been used in place of the allegedly covered key features without

11   materially impacting other parts of the standards or requiring substantial

12   modification to the standards.  (Ex. 1639.)  But Dr. Parkvall did not consider any of

13   these alternatives, other than summarily dismissing all of them (that is, he admitted

14   at his deposition that he did not analyze these alternatives on a patent-by-patent

15   basis).  Accordingly, Dr. Parkvall's Witness Declaration fails to demonstrate that

16   Ericsson has made any important and valuable contributions to Resource Allocation.

17         b.    *My non-infringing alternatives to Ericsson's Resource*

18              *Allocations Patents are not covered by other Ericsson*

19              *patents.*

20         205.    In response to Dr. Parkvall's assertion that I did not consider whether

21   my alternatives would infringe "other Ericsson patents" (Dkt. 1360 at ¶ 55), I

22   assessed whether Ericsson holds any patents, including patents not listed in an ETSI

23   IPR declaration, that might cover my non-infringing alternatives for Ericsson's RA

24   Families.  For this assessment, I used as an example the non-infringing alternative I

25   identified in connection with my analysis of Ericsson's P26071 patent family.  (Ex.

26   2567; Ex. 1639 at pp. 1056–57.)

27

28

206.   As part of my assessment, a well-known patent search tool, LexisNexis Total Patent, was used to search US, EP, and WO patents employing the search criteria shown in **TABLE 11** below.

| Search Parameter | Parameter Value |
|---|---|
| Assignee | Ericsson |
| Key words<br>(within Title, Abstract, or Claims) | (codeword! and (enabl! And disabl!) and (redund! or vers!)) |
| Priority Date | Before July 4, 2008, the last day of the Working Group meeting in which Nortel proposed the alternative. |

**TABLE 11 (PDX 184):  Search Conditions for Other Ericsson Patents**

207.   The search produced nine Ericsson US, EP, and WO patents.  (Ex. 2581.)  I reviewed these nine patents, and determined that none of them covers the Nortel alternative.  In connection with my January 11, 2017 Witness Declaration and my expert reports, I already explained that Nortel's proposal presented a technically feasible alternative.  (*See, e.g.*, Ex. 1639 at pp. 1053–59.)  Thus, Dr. Parkvall erred by ignoring alternatives that were available at the time the standards were adopted and limiting his alternatives to prior standard generations, WiMAX, contention-based systems such as CSMA, or pre-2G static resource allocation technologies.  (Dkt. 1360 at ¶¶ 139–44.)

4.   Dr. Parkvall Relies on Improper Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Resource Allocation SEPs.

208.   Dr. Parkvall's evaluation of the technical value of Ericsson's alleged Resource Allocation technologies focuses on the value of standardized technology as a whole, and does not consider the value contributed by Ericsson's RA Families. Accordingly, Dr. Parkvall's non-infringing alternatives to Ericsson's 4G RA Families greatly overvalues Ericsson's patents.  Dr. Parkvall's non-infringing alternative for Ericsson's 2G Resource Allocation technology, drawn from pre-2G technology, does the same.  I note that Dr. Parkvall did not provide a valuation for Ericsson's 3G Resource Allocation technology as he found such a determination "difficult to quantify reliably."  (Dkt. 1360 at ¶ 152.)

209.   Dr. Parkvall claims that "the benefits of [Ericsson's] 4G Resource Allocation technologies are (1) at least [sic] 50% improvement (and up to a 127% improvement) in system throughput, or (2) over double the user bitrate."  (Dkt. 1360 at ¶ 152.)  This is apparently based on Dr. Parkvall's comparison of the 4G Resource Allocation technologies to three separate "alternatives" he proposes:  3G resource allocation; WiMAX; and CSMA contention-based resource allocation technology.  (*Id.* at ¶¶ 146–148.)

210.   Regarding the use of 3G technologies, Dr. Parkvall asserts that Ericsson's 4G Resource Allocation technologies "provide at least 50% higher system throughput or more than double the user bitrate compared to the 3G alternative."  (*Id.* at ¶ 146.)  Dr. Parkvall states that the major difference in Resource Allocation technologies between 3G and 4G is that "3G resource allocation is CDMA based, and less suited for data.  4G uses an OFDM system, which is more suited for data traffic because *both* the time and frequency domain is open for resource allocation."  (*Id.*)  For support, he cites to a paper from NGMN that compares data rates between HSPA (an extension of 3G) and LTE.  (*See* Ex. 5294.)  At best, this document shows that, as between HSPA and LTE *on the whole*, LTE provides higher bit rates and system throughput.  This is largely non-controversial.

211.   But the NGMN paper does not in any way indicate that **Ericsson's** RA Families are responsible for any improvement in the system throughput or bit rates associated with the 4G standard.  In fact, NGMN does not mention Ericsson or its technology at all.  Nor does this document in any way prove an absence of available alternatives that would allow 4G networks to achieve the higher throughput and user bit rate without infringing a patent in Ericsson's Resource Allocation Patent Families.  I do not disagree that LTE has improved performance characteristics over HSPA, but that again is irrelevant to the proper inquiry which is whether Ericsson's RA Families cover important and valuable contributions that helped improve Resource Allocation functions and procedures, and how these contributions compare to non-infringing alternatives available at the respective times of adoption.

212.   Dr. Parkvall's support for the technical value of Ericsson's RA Families in relation to his other "alternatives" fails for similar reasons.  For example, Dr. Parkvall asserts that WiMAX "is 35% to 56% less efficient compared to 4G resource allocation (or 4G resource allocation provides a 54%−127% improvement in system throughput) because of the changes in control channel efficiency, CQI delays, and power control and scheduling solutions in accordance with Mobile WiMAX."  (Dkt. 1360 at ¶ 147.)  In support, Dr. Parkvall relies on the Furuskär paper, which I analyzed in depth in my opening Witness Declaration.  (Ex. 4978; *see* Dkt. 1334 at § IX.)  Like the NGMN reference discussed above, the Furuskär paper does not in any way indicate that Ericsson's patented resource allocation solutions are responsible for the advantages.  This paper does not correlate the purportedly distinguishing functions to any of the Ericsson RA Families, and neither does Dr. Parkvall.

213.   The same holds true for the last 4G alternative Dr. Parkvall proposes—CSMA contention-based resource allocation technology.  (Dkt. 1360 at ¶ 148.)  Dr. Parkvall provides no comparison of Ericsson's patented solutions against CSMA technology, merely relying on a general description of CSMA and concluding,

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1  therefore, that it is an inferior alternative.  (*Id.*)  At no point does Dr. Parkvall

2  identify any of Ericsson's RA Families as covering a solution that provides benefits

3  over a CSMA system.

4        **D.**    <u>**Connection Establishment**</u>

5       214.  Dr. Parkvall's next technology category is Connection Establishment.

6  (Dkt. 1360 at ¶ 153.)  In all, Dr. Parkvall identifies 46 patent families in the

7  Connection Establishment technology category ("Ericsson's Connection

8  Establishment Families).  (*Id.* at ¶ 154.)  According to Dr. Parkvall, Connection

9  Establishment "describes the process of setting up a connection between a handset

10  and the network."  (*Id.* at ¶ 153.)

11       215.  He identifies the following seven subcategories or "functions" of

12  Connection Establishment:

13          (1)     Synchronization,

14          (2)     Cell search procedures,

15          (3)     Random access procedures,

16          (4)     Mobile phone paging,

17          (5)     Mobile phone registration, authentication, and

18                    identification,

19          (6)     Allocating resources/efficient transmission of

20                    intermittent or bursty data packets, and

21          (7)     Dormancy levels/states.

22  (*See, e.g.*, Dkt. 1360 at ¶¶ 154–156.)

23          1.    <u>Ericsson's Connection Establishment Patents are Directed to</u>

24               <u>Narrow Aspects of Incremental and Modular Standardized</u>

25               <u>Features.</u>

26       216.  The patents identified within Dr. Parkvall's seven Connection

27  Establishment functions are largely modular and operate independently from one

28  another and independently from most other features in the 2G, 3G, and/or 4G

-122-

standards.  For example, cell search procedures are largely independent of the other purported six Connection Establishment functions that Dr. Parkvall identified.  Similarly, mobile phone paging procedures are quite distinct and largely independent of the other six Connection Establishment functions.  It is true that some overlap can exist—for example, synchronization and cell search procedures overlap in some respects, but they are generally distinct.

217.   The modularity of these Connection Establishment families is supported by text books on the subject.  For example, the book that Dr. Parkvall co-authored discusses cell search in Section 14.1.1, while separately discussing synchronization signals in Sections 14.1.2 and 14.1.3, respectively.  (Ex. 1416 at pp. 9, 367–71.)  Additionally, this book discusses mobile phone paging in Section 14.4, while separately covering random access in Section 14.3.  (*Id.* at pp. 9, 378–90.)

218.   This is a logical "divide and concur" approach that is found in many other books on the subject.  (*See* Ex. 2566; Ex. 2565.)  This is also true in 3GPP standards development, as I discussed in detail in my opening Witness Declaration.  (*See* Dkt. 1334 at § IV.D; *see also supra* § II.C.)  To the extent that some cross-dependencies exist across two (or more) of these purported Connection Establishment functions, such occurrences should be considered at the level of the particular patents and the purportedly covered solutions themselves.  Much as in the structure of text books, patents tend to cover a specific aspect of the particular area in which the alleged invention is applicable.

219.   As such, functional crossover (*i.e.*, overlap between functions/subcategories within a technology category) is the rare exception, not the rule.  Dr. Parkvall has not demonstrated that his approach of grouping all these functions together into one technology category and analyzing them as one unit, in spite of a relative absence of functional crossover is appropriate.  Neither has he identified any specific Ericsson patent that he deems covers multiple purported Connection Establishment functions, let alone all of them.  In short, even if on a

HIGHLY CONFIDENTIAL

SMRH:481062607.2

academic level there is the possibility of crossover across a plurality of functions in a given technology category, the practical reality is that such crossover is not all that common and its occurrence must be demonstrated on a patent-by-patent basis, not on some high level *potential* for its existence.

220.   Moreover, even if a patent family exhibits such a functional crossover, that does not mean that the family is not directed to a narrow and modular solution or there were no feasible non-infringing alternatives of equal utility to that solution. Dr. Parkvall argues that, because the technology in the standard works together, none of the technology can be considered modular.  (Dkt. 1360 at ¶¶ 45–46.) However, while absence of a functional crossover is a strong indicator of modularity and availability of feasible alternatives, the inverse is not true.  More often than not, even patent families that can be classified under two or more functional categories are directed to a narrow and modular solution for which equally effective alternatives were available.  Determining whether this is the case or not for a given family requires an analysis on a patent-by-patent basis, like the one Dr. Jayant and I performed.  (*See, e.g.*, Exs. 1638, 1639.)

221.   Moreover, with respect to the Ericsson Connection Establishment Patent Families, the hypothetical occurrence of overlapping functions I discussed above is not even at issue with respect to Ericsson's patents.  Specifically, I classified Ericsson's Connection Establishment Families and functions using the methodology discussed above.  (*See* Section II.D, *supra*.)  As shown in **FIGURE 38** below, none of the Ericsson Connection Establishment Families are directed to more than one purported Connection Establishment function.

| Connection Establishment | | | | | | | |
|---|---|---|---|---|---|---|---|
| Patent Family | Synch. | Cell-Search | R.A. | Paging | Auth. | Res. | Dormancy |
| P23384 (4G) | ● | | | | | | |
| P07873 (2G, 4G) | | ● | | | | | |
| P08153 (3G) | | ● | | | | | |
| P11151 (2G) | | ● | | | | | |
| P14897 (3G, 4G) | | ● | | | | | |
| P18216 (3G) | | ● | | | | | |
| P20058 (2G) | | ● | | | | | |
| P23412 (4G) | | ● | | | | | |
| P26379 (4G) | | ● | | | | | |
| P10808 (3G, 4G) | | | ● | | | | |
| P21430 (4G) | | | ● | | | | |
| P24459 (4G) | | | ● | | | | |
| P25317 (4G) | | | ● | | | | |
| P26648 (4G) | | | ● | | | | |
| P26744 (4G) | | | ● | | | | |
| P26993 (4G) | | | ● | | | | |
| P28627 (4G) | | | ● | | | | |
| P22621 (3G) | | | | ● | | | |
| P18674 (4G) | | | | | ● | | |
| P24698 (4G) | | | | | ● | | |
| P26132 (4G) | | | | | ● | | |
| P25336 (4G) | | | | | | ● | |
| P24241 (4G) | | | | | | | ● |
| P25238 (4G) | | | | | | | ● |

**FIGURE 38 (PDX 185):  Functions for Ericsson's Connection Est. Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

222.   This quantitatively supports my opinion that Dr. Parkvall's seven Connection Establishment Functions are substantially modular and operate largely independently from one another.  Thus, there is no justification for analyzing the Ericsson purportedly patented Connection Establishment solutions as a group, as Dr. Parkvall has done.

223.   In addition, Ericsson's Connection Establishment Families are directed to narrow and modular solutions within the seven purported Connection Establishment functions.  One example of this is Ericsson's P07873 patent family. Dr. Parkvall summarizes P07873 as relating "to a mobile device that receives cell-related information relating to if the mobile device is permitted to camp in the cell based on a list of stored subscriber group identities.  Benefits include that access to cells that are restricted to certain subscribers is enabled."  (Ex. 5349 at p. 17.)

224.   While P07873 relates to the cell search procedures function, it is primarily independent form the six other purported Connection Establishment functions.  Specifically, the alleged invention of P07873 calls for a mobile to (a) receive cell related information that indicates if access to the cell is controlled by subscription; and (b) determine if the mobile is allowed to access the cell based on the information it receives from the base station.  (Ex. 1639 at pp. 113–17; *see also* Ex. 4477.)  This is clearly a logical function that the mobile would perform and is independent of (i) any synchronization procedures or mechanisms used in the network, (ii) the random access procedures used, (iii) paging mechanisms, (iv) any authentication procedures used to establish user identity, (v) any decisions or algorithms used for efficient resource allocation, and (vi) dormancy levels/states.

225.   In short, the scope of the claimed invention for P07873 is limited to one specific function, namely cell search procedures.  The title of U.S. Patent No. 6,334,052—the charted U.S. Patent for P07873—confirms this finding: "Subscription-Based Mobile Station Idle Mode Cell Selection."  (Ex. 4477 at p. 1.)

HIGHLY CONFIDENTIAL

SMRH:481062607.2

1   Additional confirmation is present in the Abstract, and throughout the specification

2   of U.S. Patent No. 6,334,052.

3   226.   Other Connection Establishment Families exemplifying the modularity

4   of the alleged Connection Establishment functions and related patented solutions

5   include P10808, P21428, P24459, P26744, P26993, and P35168.  All of these patent

6   families are directed to Dr. Parkvall's random access procedures function.  (*See* Ex.

7   5349 at pp. 18–21.)  Dr. Parkvall provides no evidence or argument that any one of

8   these patent families relate to any other purported Connection Establishment

9   function.  Indeed, examination of the respective patents confirms that they are not

10  directed to any other functions of the Connection Establishment category.

11  227.   For at least these reasons, a given Connection Establishment solution

12  allegedly covered by a specific Ericsson Connection Establishment Family (*e.g.*, as

13  alleged in Ericsson's claim charts) could have been replaced with an alternative

14  Connection Establishment solution that was available at the respective time of

15  adoption into the standard without requiring substantial modification of causing a

16  material impact on other parts of the standard or system.  Moreover, the above

17  analysis demonstrates that Dr. Parkvall's technology-by-technology methodology is

18  not justified, as the Ericsson Connection Establishment Families are directed to

19  separate, distinct, and specific topics within Connection Establishment.  I provided

20  specific alternatives to the specific topics covered by the respective patents in my

21  corresponding Appendices.  (*See* Ex. 1639.)  Dr. Parkvall has not rebutted any of

22  those alternatives, other than summarily dismissing them all.

23

24

25

26

27

28

2.   Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Connection Establishment Patents.

a.   *All of Ericsson's Connection Establishment SEPs Provide Less Than a Moderate Improvement to the Standards Relative to Available Alternatives.*

228.   Of the 46 Ericsson Connection Establishment Families Dr. Parkvall identifies, the 22 patent families listed in **TABLE 12** below that he included are either not essential patents,[11] expired, and/or that are otherwise irrelevant.  As such, there are 24 potentially relevant Ericsson Connection Establishment Families that meet Dr. Parkvall's definition of Connection Establishment.

| No. | Family No. (Standard) | Non-Essential | Expired |
|---|---|---|---|
| 1 | P05687 (2G) | | X |
| 2 | P06697 (4G) | X | X |
| 3 | P06699 (2G) | X | X |
| 4 | P07592 (3G) | X | |
| 5 | P07707 (2G) | X | |
| 6 | P07761 (2G) | X | |
| 7 | P08167 (3G) | X | |
| 8 | P08333 (3G, 4G) | X | |
| 9 | P08425 (3G) | X | |
| 10 | P08430 (3G) | X | |
| 11 | P08769 (4G) | X | |
| 12 | P09715 (3G, 4G) | X | |

---

[11] This includes patents that in my opinion are not essential under a proper claim construction—*i.e.*, patents that I assigned an Essentiality Rank of "2."

| No. | Family No. (Standard) | Non-Essential | Expired |
|---|---|---|---|
| 13 | P10628 (2G, 3G, 4G) | X | |
| 14 | P11538 (3G) | X | |
| 15 | P19103 (4G) | X | |
| 16 | P20021 (4G) | X | |
| 17 | P21428 (4G) | X | |
| 18 | P23034 (4G) | X | |
| 19 | P24058 (4G) | X | |
| 20 | P32205 (4G) | X | |
| 21 | P35159 (4G) | X | |
| 22 | P35168 (4G) | X | |

**TABLE 12 (PDX 186)**

229.   **FIGURE 39** below shows Ericsson's 24 potentially relevant Connection Establishment patent families distributed across Dr. Parkvall's seven Connection Establishment functions.



**FIGURE 39 (PDX 187):  Functional Distribution of Ericsson's 2G, 3G, and 4G Connection Establishment Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

230.   **FIGURES 40–42**, below, show the 24 potentially relevant Ericsson Connection Establishment Families distributed across the seven Connection Establishment functions for the 2G, 3G, and 4G standards, respectively.  As demonstrated, Ericsson does not have an extensive array of patented solutions across the seven Connection Establishment functions.  This further underscores the flaws in Dr. Parkvall's technology-by-technology approach to the Ericsson Connection Establishment Families.



**FIGURE 40 (PDX 188):  Functional Distribution of Ericsson's**

**2G Connection Establishment Patent Families**



**FIGURE 41 (PDX 189):  Functional Distribution of Ericsson's**

**3G Connection Establishment Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    **FIGURE 42 (PDX 190):  Functional Distribution of Ericsson's**

17    **4G Connection Establishment Patent Families**

18
19
20
21
22
23
24
25
26
27
28

231.   With respect to the "Importance" of Ericsson's Connection Establishment Families, Dr. Parkvall did not identify even one Ericsson patent that he alleges is critically important such that it might contribute to the overall value of Ericsson's Connection Establishment Families.  He therefore fails to address the relevant issue, which is:  whether Ericsson's Connection Establishment Families cover important and valuable contributions that helped improve Connection Establishment functions and procedures, and how these contributions compare to alternative Connection Establishment features available at the respective times of adoption into the applicable standards.

232.   On this issue, it is my opinion that Dr. Parkvall has not demonstrated that Ericsson has made any such contributions.  Nor has he demonstrated what fraction of any overall benefits to Connection Establishment technology is attributable to the Ericsson CE Families (*i.e.*, the benefit of Ericsson's patents apart from the value of being included in the standard).

233.   With regard to the importance and value of features related to Ericsson Connection Establishment Families, **FIGURE 43** below represents my Importance and Contribution Ranks for the 24 relevant Ericsson Connection Establishment Families (of the 46 listed by Dr. Parkvall) that I determined to be essential based on a detailed analysis, reasoning, and evidence.  (Ex. 1639.)  As **FIGURE 43** shows, none of Ericsson's Connection Establishment Families can be considered to provide at least a moderate improvement to the standard relative to available alternatives.

**FIGURE 43 (PDX 191): Contribution and Importance Ranks**

**for Ericsson's Connection Establishment Patent Families**

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

234.   Instead of identifying which of Ericsson's Connection Establishment Families are technically valuable, Dr. Parkvall simply concludes that "Ericsson has contributed a large number of solutions that enhance Connection Establishment in ways that have an important effect on handset performance." (Dkt. 1360 at ¶ 156.) Dr. Parkvall merely discusses the importance of Connection Establishment *in general*, relying on a range of references to attempt to support his assertion that such generalized benefits are the product of "Ericsson's patented functionality." (*Id.* at ¶ 155.)  None of the documents cited to by Dr. Parkvall supports this assertion.

235.   For example, Dr. Parkvall states that "without Ericsson's patented solutions, the increased chatty traffic of mobile phones would cause signaling overload, which results in slow access times, dropped calls, increased battery consumption, and potentially failed access attempts." (*Id.* at ¶ 156.)  In support, he cites to a paper published by Seven Networks. (*Id.*; *see* Ex. 4994.)  There is, however, no mention of any Ericsson technology.  The Seven Networks paper specifically identifies Nokia Messaging and Microsoft's Direct Push technologies that were purportedly used in Apple iPhone and Nokia mobile phones, but never mentions Ericsson, let alone references how any of Ericsson's patents are responsible for addressing the problems of increased data traffic.  (Ex. 4994 at pp. 7–8.)

236.   Although I do not agree with Dr. Parkvall's *generalized* description of the importance of connection establishment, this fails to establish that Ericsson's Connection Establishment Families are in any way important.

1

        *b.      Ericsson's share of industry-wide 2G, 3G, and 4G*

2

                *Connection Establishment SEPs under Dr. Parkvall's*

3

                *framework is relatively insubstantial.*

4

      237.   Dr. Parkvall asserts that "Ericsson has a large number (46) of essential

5

Connection Establishment patents across a variety of features." (Dkt. 1360 at ¶

6

157.) On this basis, he "looked to previous generation cellular systems or

7

alternative Connection Establishment systems." (*Id.*) But Ericsson's share of

8

industry-wide patent families that meet Dr. Parkvall's definition of Connection

9

Establishment is relatively insubstantial, as shown in **FIGURES 44–47**, below.

10

**FIGURE 44** shows Ericsson's relative share of relevant (*i.e.*, essential and non-

11

expired) Connection Establishment Families overall, which is 24 out of 603 patent

12

families (3.8%). First, Dr. Parkvall's starting point is incorrect because a significant

13

portion of the value of the standard is attributable to the basic framework and core

14

technologies of the standards, which were known and developed by others. Second,

15

since Ericsson's share is relatively small, it is improper to assume that its patents

16

could not be designed around.

17

18

19

20

21

22

23

24

25

26

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

1
2
3
4
5
6
7
8
9
10



**FIGURE 44 (PDX 192):  Ericsson's Share of Industry-Wide**

**2G, 3G, and 4G Essential Connection Establishment Patent Families**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

238.   **FIGURES 45–47** below show Ericsson's relative shares of Connection Establishment patent families for the 2G, 3G, and 4G standards, respectively.  As demonstrated, Ericsson's proportional shares are relatively insubstantial for each of the standards.  For at least this reason, Dr. Parkvall's reliance on Ericsson's "large number … of essential Connection Establishment patents" in looking to an alternative based on "a cellular network using 2G Connection Establishment technologies" or "maintain[ing] the handset in a continuously active state" is misplaced and his analysis is flawed and irrelevant.  (Dkt. 1360 at ¶¶ 158–59.)



**FIGURE 45 (PDX 193):  Ericsson's Share of Industry-Wide 2G Essential Connection Establishment Patent Families**

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1
2
3
4
5
6
7
8
9
10
11
12



**FIGURE 46 (PDX 194):  Ericsson's Share of Industry-Wide**

**3G Essential Connection Establishment Patent Families**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**FIGURE 47 (PDX 195):  Ericsson's Share of Industry-Wide**

**4G Essential Connection Establishment Patent Families**

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

3.     Dr. Parkvall's Flawed Technology-by-Technology Approach Ignores Viable Non-Infringing Alternatives to Ericsson's Connection Establishment Patents.

239.   Dr. Parkvall ignores non-infringing alternatives to Ericsson's Connection Establishment Patent Families that were available at the times of adoption and that could have been included in the standards at that time without causing detrimental effects.  In this section, I highlight several examples of such non-infringing alternatives.  I also provide my analysis that there are no "other" Ericsson patents covering the non-infringing alternative I identified for an example Ericsson Connection Establishment Family.  (Dkt. 1360 at ¶ 55.)  I note that Dr. Parkvall has failed to identify any such "other" Ericsson patents.

a.     *Examples of non-infringing alternatives that could have been used without causing detrimental effects at the time of adoption.*

240.   Dr. Parkvall asserts that "[b]ecause Ericsson has a large number of Connection Establishment patents that cover 3G and/or 4G Connection Establishment technologies, it would not be possible to create a next best non-infringing alternative that uses existing 3G or 4G Connection Establishment technologies."  (Dkt. 1360 at ¶ 158.)  I disagree with Dr. Parkvall's assumption.

241.   In the set of 46 Ericsson Connection Establishment Families listed in Dr. Parkvall's Disclosure, ***only five*** of the families (*i.e.*, P08333; P09715; P10628; P10808; P14897) are essential and allegedly applicable to ***both*** 3G and 4G.  (Ex. 1639 at pp. 147–57, 245–57, 269–72, 280–310, 485–93; Ex. 5349 at pp. 17–21.[12]) As set forth in my corresponding Appendices, three of these five families (*i.e.*,

---

[12] I note that Ericsson did not provide a claim chart for P10628 related to the 3G standard, but Dr. Parkvall has identified this family as relevant to 3G.  (*See* Ex. 5349 at p. 18.)  Accordingly, there is no corresponding Appendix for P10628 related to 3G.

1   P08333, P09715, and P10628) are not essential to the 3G or 4G standards.  (Ex.

2   1639 at pp. 147–57, 245–57, 269–72.)  Moreover, P10808 and P14897 provides no

3   improvement to the standard relative to available alternatives.  (*Id.* at pp. 280–310,

4   485–93.)

5       242.   Additionally, in the Appendices to my expert report, I identified

6   numerous other non-infringing alternatives to Ericsson's Connection Establishment

7   Families that could have been used in place of the allegedly covered key features

8   without materially impacting other parts of the standards or requiring substantial

9   modification to the standards.  (Ex. 1639 at pp. 147–57, 245–57, 269–72, 280–310,

10  485–93.)  But Dr. Parkvall did not consider any of these alternatives, other than

11  summarily dismissing all of them.  For example, I proposed a random access

12  procedure taught in U.S. Patent No. 5,841,768 to Ozluturk.  (Ex. 1639 at pp. 289–

13  90; *see also* Ex. Ex. 2561.)  Dr. Parkvall's disclosure is silent as to this alternative.

14      243.   Ozluturk's random access procedure provides an alternative of

15  essentially equal utility as the key accused features.  As I explained in my

16  corresponding Appendices, this is so because a system using Ozluturk's short code

17  in combination with its detection and acknowledgement by the base station operates

18  in an identical way to a system that operates according to the alleged invention.

19  (Dkt. 1639 at pp. 289–90, 295–96.)  Therefore, the Ozluturk alternative could have

20  replaced the key accused features without affecting the rest of the system, as the rest

21  of the system does not depend on the precise structure of the random access

22  procedure.

23      244.   Accordingly, Dr. Parkvall's opinion does not prove nor is relevant to

24  the issue of whether Ericsson has made any important and valuable contributions to

25  the gains in the area of latency through Ericsson's Connection Establishment

26  Families, relative to available alternatives.  (*See* Dkt. 1360 at ¶¶ 163–67.)

27

28

b.   *My non-infringing alternatives to Ericsson's Connection Establishment Patents are not covered by other Ericsson Patents.*

245.   In response to Dr. Parkvall's assertion that I did not consider whether my alternatives would infringe "other Ericsson patents" (Dkt. 1360 at ¶ 55), I assessed whether Ericsson holds any patents, including patents not listed in an ETSI IPR declaration, that might cover my non-infringing alternatives for Ericsson's Connection Establishment Families.  For this assessment, I used as an example the non-infringing Ozluturk alternative I identified in connection with my analysis of Ericsson's P10808 patent family.

246.   As part of my assessment, a well-known patent search tool, LexisNexis® Total Patent®, was used to search US, EP, and WO patents employing the search criteria shown in **TABLE 13** below.

| Search Parameter | Parameter Value |
|---|---|
| **Assignee** | Ericsson |
| **Key words** <br> **(within Title, Abstract, or Claims)** | (random! w/2 access! and code!) |
| **Priority Date** | Before June 27, 1996, the filing date of the Ozluturk patent. |

**TABLE 13 (PDX 196):  Search Conditions for Other Ericsson Patents**

247.   The search produced 35 Ericsson US, EP, and WO patents.  (Ex. 2564.) I reviewed these 35 Ericsson patents, and determined that none of them covers the non-infringing alternative described in Ozluturk.  In connection with my January 11, 2017 Witness Declaration and my expert reports, I already explained that Ozluturk's

1   invention is a technically feasible alternative.  (*See, e.g.*, Ex. 1639 at pp. 289–90.)

2   Thus, Dr. Parkvall erred by ignoring alternatives that were available at the time the

3   standards were adopted and limiting his alternatives to "2G Connection

4   Establishment system, his proposed "continuously active state" alternative, or

5   circuit-switched connections.  (Dkt. 1360 at ¶¶ 158–60.)

6          4.   <u>Dr. Parkvall Relies on Improper Alternatives as Benchmarks to</u>

7               <u>Measure the Technical Value of Ericsson's Connection</u>

8               <u>Establishment Families.</u>

9      248.   Dr. Parkvall's evaluation of the technical value of Connection

10  Establishment technologies focuses on the value of standardized technology as a

11  whole, and does not consider the value contributed by Ericsson's Connection

12  Establishment Families.  Accordingly, for 3G and 4G Connection Establishment,

13  Dr. Parkvall's non-infringing alternatives drawn from 2G Connection Establishment

14  technologies or a "continuously active state" overvalues Ericsson's patents.  (Dkt.

15  1360 at ¶¶ 158–59.)  Dr. Parkvall's non-infringing alternative for 2G Connection

16  Establishment, based on circuit-switched connections, does the same.

17         a.   *Dr. Parkvall's Alternatives to Ericsson's 3G and 4G*

18             *Connection Establishment Families Overvalues Ericsson's*

19             *Patent Families.*

20     249.   Dr. Parkvall claims to have "found that the technical value of 3G and

21  4G Connection Establishment patents can be calculated as (1) latencies as low as

22  one-tenth to one-hundredth of the latencies in the alternatives, (2) a decrease in

23  battery consumption, and/or (3) a corresponding increase in user experience and

24  satisfaction."  (Dkt. 1360 at ¶ 161.)  This is apparently based on Dr. Parkvall's

25  comparison of the 3G and 4G Connection Establishment technologies against 2G

26  technologies, and a "continuously active state" alternative, that he identifies as non-

27  infringing alternatives.  (*Id.* at ¶¶ 162–72.)

28

250.   Regarding latency, Dr. Parkvall asserts that the latency associated with 3G and 4G is one fourth and one tenth, respectively, of the latency associated with 2G.  (Dkt. 1360 at ¶ 167.)  He relies on the recommendation of ETSI and 3GPP that "a mean value of about 2 seconds (*i.e.*, 2000 milliseconds) as the call set-up delay for the 2G system."  (*Id.* at ¶ 162 (citing Ex. 5009).)  He identifies the latency associated with 3G and 4G based on documents—both internal to Ericsson and those published by others—including testing of the standards themselves.  (Dkt. 1360 at ¶¶ 163–66.)

251.   But none of these references in any way indicate that ***Ericsson's*** Connection Establishment Families are responsible for any improvement in the latency of the 3G or 4G standards.  Rather, these documents do not discuss specifically Ericsson's technology that is responsible for such improved latency, let alone tie that improvement to any of the Ericsson Connection Establishment Families.  Specifically, Ex. 4981 "is focused on which delay improvements are possible within the framework of the existing 3GPP Release 99 standard and in a UMTS R5 (UTRAN P4) time perspective.  In other words, ***no standard modifications are required for the improvements proposed here*** and the implementation improvements are deemed reasonable in the UMTS R5 time perspective."  (Ex. 4981 at p. 5.)  Nor do these documents in any way prove the absence of available alternatives that would allow 3G and 4G networks to achieve the latency levels identified without infringing a patent in Ericsson's Connection Establishment Families.

252.   Regarding battery consumption, Dr. Parkvall asserts that "maintaining a continuous connection state 'RRC_CONNECTED' with the network" would

HIGHLY CONFIDENTIAL

SMRH:481062607.2

1 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

2 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (Dkt.

3 1360 at ¶ 170.)  Moreover, Dr. Parkvall asserts that network congestion would result

4 in lost additional capacity "because idle users will be denied access to the network

5 when each handset must be in a continuously active state even if they are not

6 transmitting or receiving data." (*Id.* at ¶ 171.)  Again, none of the references Dr.

7 Parkvall relies upon shows how any of Ericsson's Connection Establishment

8 Families are responsible for any of these benefits to battery consumption.

9                       b.     *Dr. Parkvall's Circuit-Switched-Based Alternative to*

10                                *Ericsson's 2G Connection Establishment Families*

11                                *Overvalues Ericsson's Patent Families.*

12      253.   In addition, Dr. Parkvall states that he "concluded that there is no

13 viable alternative to Ericsson's 2G Connection Establishment patents with which to

14 compare form a technical value perspective." (Dkt. 1360 at ¶ 161.)  This is

15 apparently based on Dr. Parkvall's assertion that the only possible alternative would

16 be a circuit-switched connection system. (*Id.* at ¶ 173.)  However, I provided

17 alternatives of equal utility in the Appendices to my expert report, but Dr. Parkvall

18 failed to consider these. (*See* Ex. 1639.)

19      254.   For example, for P07873, the key accused feature mapped for claim 1

20 of U.S. Patent No. 6,334,052 related to subscription based cell selection for mobile

21 stations in idle mode. (Ex. 1639 at pp. 113–16.)  I proposed a solution disclosed in

22 TDoc SMG12 C-99-415, titled "Methods for SoLSA exclusive access," as a non-

23 infringing alternative to this key accused feature. (Ex. 2569.)  The solution taught in

24 this TDoc provides an alternative of essentially equal utility as the key accused

25 feature.  Moreover, the TDoc alternative could have replaced the key accused

26 feature without requiring substantial modifications or causing a material impact to

27 other parts of the standard or system.  This is because the key accused feature is

28 used in a mobile device only a small fraction of the time.

HIGHLY CONFIDENTIAL

SMRH:481062607.2

255.   Moreover, out of the 46 Ericsson Connection Establishment Families identified by Dr. Parkvall, only eight families are allegedly essential to 2G, and of those *only three* are essential and active (*i.e.*, not expired), and thus relevant: P07873, P11151, and P20058.  (Ex. 1639.)  None of these three relevant 2G Ericsson Connection Establishment Families are directed to technologies that can be considered as enabling or introducing the benefits of packet-switched data into 2G.  These three relevant families do not contain any ground breaking material that make the introduction of packet switching possible.

256.   For example, Dr. Parkvall asserts that P07873 "[r]elates to a mobile device that receives cell-related information relating to if the mobile device is permitted to camp in the cell based on a list of stored subscriber group identities. Benefits include that access to cells that are restricted to certain subscribers is enabled."  (Ex. 5349 at p. 17.)  But the claimed invention of the P07873 patent family is not directly tied to packet switching, nor does it enable or introduce packet switching as a technology.  With respect to the other two potentially relevant families (P11151 and P20058), I reviewed these families and found that neither of them covers such enabling solutions.

### E.   Sleep Mode Solutions

257.   Dr. Parkvall's "next technology subarea is Sleep Mode Solutions." (Dkt. 1360 at ¶ 176.)  According to Dr. Parkvall, Sleep Mode Solutions "includes technologies that enable handsets to quickly turn their radio functionality between a discontinuous reception/transmission (DRX/DTX, often collectively referred to as DRX or DRX technologies) mode and a listening mode.  This allows the handset to enter a 'sleep' mode, but remain connected [to] the network."  (*Id.* at ¶ 176.)

258.   In all, Dr. Parkvall identifies 11 patent families in the Sleep Mode Solutions technology category ("Ericsson Sleep Mode Solutions Patent Families"). (Dkt. 1360 at ¶ 178.)

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1.   <u>Ericsson's Sleep Mode Solutions Patents Are Directed to Narrow Aspects of Incremental and Modular Standardized Features.</u>

259.   Dr. Parkvall asserts that the technologies incorporated into the standards are not "small modular building blocks." (Dkt. 1360 at ¶¶ 45–46.)  At least at the level of the alleged inventions, Ericsson's Sleep Mode Solutions Patent Families are largely modular and operate independently from one another and from most other features in the 2G, 3G, and/or 4G standards.

260.   For example, Dr. Parkvall summarized the P24241 patent family as "[r]elate[d] to monitoring by the mobile device of *system information* transmitted from the base station, wherein the monitoring is limited to take place in specific *time windows*," and the P34420 patent family as "[r]elate[d] to the configuration of the EPDCCH (Enhanced Physical Downlink Control Channel) in specifically appointed sub frames such that the terminal elsewhere can employ micro sleep instead of monitoring all sub frames." (Ex. 5349 at p. 24.)  These features relate to two largely independent and discrete problems.  The first one deals with how *system information* is transmitted/received, and the second one deals with identifying a "subset of the subframes … in which the control channel is transmitted *being indicated by a bit map*," *i.e.*, using a bit map to indicate which subframes are being used for a particular control channel.  (Ex. 1639 at pp. 843–59, 1366–73.)  Thus the two patents relate to different problems and, not surprisingly, are largely independent from one another.

261.   In addition, Ericsson's alleged Sleep Mode Solutions Patent Families are directed to narrow and modular solutions.  One example is patent family P25336, which Dr. Parkvall says relates "to how the mobile device can inform the base station that it releases a common resource when in a less active state, by utilizing a field that is used for another purpose when the mobile device is in a more active state.  Benefits include allowing the meaning of this field to depend on the state, and making the signaling protocol more compact and efficient." (Ex. 5349 at

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

p. 23.)  P25336 addresses a very narrow aspect of signaling.  Furthermore, as I discussed in my corresponding Appendix, as a result of its very limited and narrow scope, the Importance Rank of this patent family is at best marginal.  (Ex. 1639 at pp. 963–68.)

262.   For at least these reasons, a given Sleep Mode Solutions technology allegedly covered by a specific purported Ericsson Sleep Mode Solutions Family (*e.g.*, as alleged in Ericsson's claim charts) could have been replaced with an alternative Sleep Mode Solution that was available at the respective time of adoption into the standard without requiring substantial modification or causing a material impact to other parts of the standard or system.  The above analysis also demonstrates that Dr. Parkvall's per-technology approach of treating all of Ericsson's Sleep Mode Solution Families and related/alternative solutions as a single group is not justified, as they are separate, distinct, and address specific topics within this category.  Alternatives to the specific topics allegedly covered by the respective patents were discussed in my corresponding Appendices.  (*See* Ex. 1639.) Dr. Parkvall has not analyzed or rebutted any of those alternatives, other than summarily dismissing them all.

2. <u>Ericsson Does Not Have an Extensive Array of Critically Important 2G, 3G, and 4G Sleep Mode Solutions Patents.</u>

a. *Potentially relevant Sleep Mode Solutions patent families*

263.   Of the 11 Ericsson Sleep Mode Solutions Families Dr. Parkvall identifies, the six families listed below in **TABLE 14** do not include essential patents, [13] include only expired patents, and/or are otherwise irrelevant.  As such, there are only four potentially relevant Ericsson Sleep Mode Solutions Families that meet Dr. Parkvall's definition of Sleep Mode Solutions.

_____

[13] This includes patents that in my opinion are not essential under a proper claim construction—*i.e.*, patents that I assigned an Essentiality Rank of "2."

| No. | Family No. (Standard) | Non-Essential | Expired |
|:---:|---|:---:|:---:|
| 1 | P05687 (2G) | | X |
| 2 | P06691 (2G, 4G) | X | X |
| 3 | P21486 (3G) | X | |
| 4 | P21787 (4G) | X | |
| 5 | P23985 (4G) | X | |
| 6 | P25949 (4G) | X | |

**TABLE 14 (PDX 197)**

264.   Additionally, as discussed in **TABLE 15** below, I found at least the three patent families that Dr. Parkvall misclassified into the Sleep Mode Solutions technology subarea.

| Misclassified SMS Families | Reasons Misclassified |
|---|---|
| P25336 | According to Dr. Parkvall, this Family "[r]elates to how the mobile device can inform the base station that it releases a common resource when in a less active state by utilizing a field that is used for another purpose when the mobile device is in a more active state. Benefits include allowing the meaning of this field to depend on the state, and making the signaling protocol more compact and efficient." (Ex. 5349 at p. 23.) I disagree. Under a proper analysis, this patent relates to a better signaling protocol, and not to any Sleep Mode related solutions. |
| P35168 | According to Dr. Parkvall, this Family "[r]elates to a solution for a mobile device to fall back to a basic random access procedure in response to an attempt to perform an enhanced random access procedure. Benefits include the enabling of the enhanced version with a fallback if the enhanced version fails." (Ex. 5349 at p. 24.) Therefore, under a proper analysis, this patent relates to the interplay of the enhanced and basic random access procedures, and not to any Sleep Mode Solutions. Indeed, this Family's relevance to Random Access is reflected by the fact that Dr. Parkvall already included it in the Connection Establishment technology category, which includes the function of Random Access. |
| P25949 | According to Dr. Parkvall, this Family "[r]elates to reception of multiple carriers in the downlink. The continuous reception of multiple carriers in a mobile device may consume excessive battery resources at times when not all carrier resources are needed. Benefits include providing a carrier activation mechanism, where the mobile device can prepare its front-end for multi-carrier reception based on a notification." (Ex. 5349 at pp. 23–24.) As the title of patent EP 2,260,667 in the P25949 family ("Timing of Component Carriers in Multi-Carrier Wireless Networks") indicates, the claimed invention is directed to the timing of activating a secondary carrier. As such, the claimed invention is not directed to DRX or DTX and is therefore not directed to 4G Sleep Mode Solutions. Under a proper analysis, this Family should not have been categorized under Sleep Mode Solutions. |

**TABLE 15 (PDX 198)**

265.   As shown above in **TABLE 15**, P25336 is incorrectly classified under the Sleep Mode Solutions technical subarea.  Charted claim 1 of the EP 2,238,801 member of P25336 is shown below:

> **1.**   A method for a Wideband Code Division Multiple Access, WCDMA, User Equipment, UE, of releasing a common Enhanced Dedicated Channel, E-DCH, resource, the UE being in a CELL_FACH state, the UE being connected to a radio base station, comprising the step of:
>
> > signaling (203) to the radio base station a release of a common Enhanced Dedicated Channel, E-DCH, resource on Layer 1 or Layer 2 fields used in a CELL_DCH state for other purposes.

(Ex. 1637 at p. 5.)

266.   As this claim makes it clear, this patent family is directed to a specific way of implementing the CELL_FACH state.  CELL_FACH is a Radio Resource Control (RRC) state in which the UE is known on the cell level (i.e., has a cell ID), and has a layer 2 connection but no dedicated physical layer resources associated therewith.

267.   As discussed in the Background section of the patent, the CELL_FACH state was known in the prior art:  "In release 8 of the third generation partnership project (3GPP), work is ongoing to improve the uplink performance in the so called CELL_FACH state."  (Ex. 1637 at p. 3 (¶ 2).)  Therefore, the CELL_FACH state in and of itself cannot be used as a basis for any value contributed by the patent at issue.

268.   With respect to the claimed invention, the Summary states that "[i]t is an object of the present invention to provide a method and a user equipment that is able to efficiently use E-DCH resources."  (Ex. 1637 at p. 3 (¶ 9).)   Moreover, the Detailed Description section conclude that "[b]y using the method UE and radio base station as described herein a fast and reliable release of common E-DCH is obtained.  This in turn will increase the E-DCH capacity in CELL_FACH."  (Ex. 1637 at p. 5 (¶ 26).)  It is apparent that neither the charted claim nor the Background, Summary, or Detailed Description sections of the patent characterize the invention as being related to Sleep Mode Solutions.

269.   Furthermore, the claim chart for this claim maps the patent to specific sections of technical specification 25.321 version 8.17.0.  (Ex. 1364.)  Neither in the specific portions of the cited sections, nor in any other portion, is DTX, DRX, or a related term used.  This demonstrates further that the claimed invention is independent of DRX or the Sleep Mode Solutions category.  As such, P25336 is not directed to Sleep Mode Solutions under a proper classification, and Dr. Parkvall's inclusion of this family in the Sleep Mode Solutions category is incorrect.

270.   In addition, patent family P35168 is incorrectly classified under the Sleep Mode Solutions technical subarea.   Charted claim 9 of U.S. Patent No. 8,989,117, which is a member of the P35186 patent family is shown below.

**1**. A method, in a mobile terminal, for accessing uplink resources in a wireless network that supports an enhanced-uplink random-access procedure for accessing enhanced-up-link resources and a fallback random-access procedure for access to fallback random-access resources the method comprising:

    selecting a transmission-time interval (TTI) from two or more possible TTIs;

    selecting a preamble signature from a group of one or more preamble signatures associated with enhanced-uplink resources and associated with the selected TTI;

    transmitting a random-access channel (RACH) preamble, using the selected preamble signature;

    receiving a negative acknowledgement indicator corresponding to the selected preamble signature;

    receiving an extended acknowledgement indicator value;

    determining that the received extended acknowledgement indicator value is signaling a fallback to fallback random-access resources; and

    initiating a fallback random-access procedure, using a preamble signature selected from a group of one or more preamble signatures corresponding to the fallback random-access resources.

271.   It is apparent from the claim itself that it relates to the usage of an "enhanced-uplink random-access procedure" and a "fallback random-access procedure." (Ex. 2571 at p. 19.)  As such, while the claimed invention relates to random access procedures (a function of Dr. Parkvall's Connection Establishment category), it does not relate to the Sleep Mode Solutions category under a proper classification.  This is further confirmed by the patent's specification.  Nowhere in the specification do the terms "sleep," "Discontinuous Transmission," or "DTX" appear in the specification.  The term "Discontinuous Receive (DRX)" does appear, but that entire discussion of DRX is in the "Background" section and refers to the then-pre-existing feature referred to as CELL_FACH state.  As discussed above in the context of the P25336 family, CELL_FACH state was well known at the time of the alleged invention, as highlighted by the fact that it is included as Background section of the patent.

272.  In short, P35186 addresses a problem related to the procedures used for random access, and is not relevant to Sleep Mode Solutions under a proper analysis for classifying patents.  Therefore, Dr. Parkvall's inclusion of this family in the Sleep Mode Solutions category is incorrect.

273.  Furthermore, the P25949 patent family is incorrectly classified under the Sleep Mode Solutions technical subarea.  The charted patent in P25949, EP 2,260,667, is directed to the "timing of component carriers for use in communication between a user equipment and a base station in a wireless network." (Ex. 5457 at p. 2 (¶ 1); Ex. 5183.)  Neither the charted claim nor any of the standard features mapped to the claim in Ericsson's claim chart indicate that the patent family is directed to 4G Sleep Mode Solutions.  (Ex. 5183.)  Instead, claim 11 recites a method by which the UE can receive download ("DL") data from a base station in one or more multiple carriers.

274.  The "characterizing" feature of claim 11 (i.e., as I understand it, the feature deemed to be novel and hence representing Ericsson's technical contribution) is that "a first data part of the DL data is received over the first carrier, and after a predetermined delay, a second data part of the DL data is received over the second carrier, wherein the predetermined delay is an amount of time sufficient for the user equipment … to prepare to receive over the second carrier."  (Ex. 5457 at p. 8; Ex. 5183 at p. 6.)  Ericsson's claim chart maps this characterizing feature to a section of an LTE-Advanced standard that deals with "Timing for Secondary Cell Activation/Deactivation" under a general section dealing with "Synchronization Procedures."  (Ex. 5183 at p. 6; *see also* Ex. 2574 at pp. 8–9.)

275.  The secondary cell activation/deactivation feature mapped to claim 11 is primarily concerned not with Sleep Mode Solutions but with efficient use of component carriers in the LTE-Advanced system's usage of Carrier Aggregation, another Dr. Parkvall technology category.  (Ex. 2579.)  While this feature may in some cases result in a side benefit of some battery power savings, the purported

HIGHLY CONFIDENTIAL

SMRH:481062607.2

1   primary benefits of the claimed feature relate not to power savings but to allowing

2   the receiver enough time to activate a second receiver, while it has been in a

3   receiving mode (and not in DRX or DTX) all along.

4           276.   In contrast to the timing relationship of the first carrier and the second

5   carrier of P25949, sleep mode in LTE is implemented using a feature called

6   Discontinuous Reception ("DRX"), which was introduced explicitly to improve UE

7   battery life.  Specifically, "the receiver circuitry in a typical terminal represents a

8   non-negligible amount of power consumption.  To reduce the terminal power

9   consumption, LTE includes mechanisms for discontinuous reception (DRX).  The

10  basic mechanism for DRX is a configurable DRX cycle in the terminal.  With a

11  DRX cycle configured, the terminal monitors the downlink control signaling only in

12  one subframe per DRX cycle , sleeping with the receiver circuitry switched off in

13  the remaining subframes."  (Ex. 1416 at p. 335.)  Neither the claim nor the accused

14  standard that the claim is mapped to requires the receiver to be placed in a DRX

15  mode at any time.

16          277.   As such, it was incorrect for Dr. Parkvall to classify a patent directed to

17  the secondary cell activation/deactivation feature of LTE-A into the Sleep Mode

18  Solutions technology category simply because the claimed feature produces the side

19  benefit of battery power savings, especially when the LTE standard already provides

20  the DRX sleep mode feature specifically designed for battery power savings.  This is

21  akin to classifying the human heart into the digestive system just because the organ

22  performs blood circulation that helps distribute nutrients absorbed through the

23  digestive system throughout the body.  Thus, Dr. Parkvall's inclusion of this family

24  in the Sleep Mode Solutions category is incorrect.

25

26

27

28

b.   *Almost all of Ericsson's Sleep Mode Solutions SEPs provide less than a moderate improvement to the standards relative to available alternatives.*

278.   With respect to the "Importance" of Ericsson's Sleep Mode Solutions Families, Dr. Parkvall did not identify even one Ericsson patent that he alleges is critically important such that it might contribute to the overall value of Ericsson's Sleep Mode Solutions Families.  He therefore fails to address the relevant issue, which is:  whether Ericsson's Sleep Mode Solutions Families cover important and valuable contributions that helped improve Sleep Mode Solutions functions and procedures, and how these contributions compare to alternative Sleep Mode Solutions features available at the respective times of adoption into the applicable standards.

279.   Dr. Parkvall has not provided sufficient evidence that Ericsson has made such contributions.  Nor has he provided sufficient evidence regarding what fraction of any overall benefits to Sleep Mode Solutions technology in the standard is attributable to Ericsson's Sleep Mode Solutions Families (*i.e.*, the benefit of Ericsson's patents apart from the value of being included in the standard).  Rather, with respect to improvements to Sleep Mode Solutions technology, Dr. Parkvall merely discusses what he regards as the general importance of sleep mode functionality.  (Dkt. 1360 at ¶¶ 179–80.)

280.   With regard to the importance and value of features related to Ericsson Sleep Mode Solutions Families, **FIGURE 48** below represents my Importance and Contribution Ranks for the three relevant Ericsson Sleep Mode Solutions Families (of the 11 listed by Dr. Parkvall) that I determined to be essential based on a detailed analysis, reasoning, and evidence.  (Ex. 1639.)  As **FIGURE 48** shows, none of Ericsson's Sleep Mode Solutions Families can be considered to provide at least a moderate improvement to the standard relative to available alternatives.

HIGHLY CONFIDENTIAL



**FIGURE 48 (PDX 199):  Contribution and Importance Ranks for Ericsson's Sleep Mode Solutions Patent Families**

281.   Instead of identifying which of Ericsson's Sleep Mode Solutions Families are technically valuable, Dr. Parkvall simply concludes that "Sleep Mode functionality is vital to the operation of the 2G, 3G, and 4G standards" and that Ericsson's 4G Sleep Mode Solution Families "can be calculated as increasing the operational time of a handset by at least 53%."  (Dkt. 1360 at ¶ 184.)  Dr. Parkvall merely discusses the importance of Sleep Mode Solutions ***in general***, relying on a range of references to attempt to support his assertion that such generalized benefits

are the product of Ericsson's Sleep Mode Solutions Families.  None of the
documents cited by Dr. Parkvall, however, support this assertion.  Accordingly, it is
my opinion that the cited documents do not prove and is, therefore, irrelevant on the
issue of whether Ericsson has made important and valuable contributions to the
alleged handset battery savings through its purportedly patented Sleep Mode
Solutions, relative to available alternatives.

282.   Moreover, only one of the Ericsson Sleep Mode Solutions Families is
even arguably directed to the important feature of "DRX while in
RRC_CONNECTED."  Dr. Parkvall states that any alternative to Ericsson's 4G
Sleep Mode Solutions Families "would not be able to use DRX while in
RRC_CONNECTED."  (Dkt. 1360 at ¶ 185.)  This particular feature is discussed in
Section 12 of technical specification 36.300.  (Ex. 2578.)  I reviewed the standards
accused in Ericsson's claim charts for all of the 11 purported Ericsson Sleep Mode
Solutions Families and found P21787 to be the only family charted against Section
12 of technical specification 36.300.  (Ex. 1639 at p. 658.)  I found P21787 to not be
essential to the 4G standard.  (Ex. 1639 at pp. 657–59.)  Even assuming that P21787
was essential, the scope of the purported invention for P21787 is far narrower than
the feature Dr. Parkvall relies on in determining what is a suitable alternative.

   *c.*   *A classification of industry-wide 2G, 3G, and 4G Sleep
Mode Solutions SEPs under Dr. Parkvall's framework
shows Ericsson's share is relatively insubstantial.*

283.   Dr. Parkvall asserts that "Ericsson's patents cover a number of different
portions of the Sleep Mode Solutions technology sub-are."  (Dkt. 1360 at ¶ 181.)
On this basis, he "considered a prior generation of technology and other Sleep Mode
Solution systems to ensure a fully functioning and complete alternative system."
(*Id.*)  But Ericsson's share of industry-wide patent families that meet Dr. Parkvall's
definition of Sleep Mode Solutions is relatively insubstantial, as shown in
**FIGURES 49–52**, below.  (Ex. 1611.)  **FIGURE 49** shows Ericsson's relative share

of relevant (*i.e.*, essential and non-expired) Sleep Mode Solutions Families overall, which is 3 out of 120 patent families (2.4%).  First, Dr. Parkvall's starting point is incorrect because a significant portion of the value of the standard is attributable to the basic framework and core technologies of the standards, which were known and developed by others.  Second, since Ericsson's share is relatively small, it is improper to assume that its patents could not be designed around.



**FIGURE 49 (PDX 200):  Ericsson's Share of Industry-Wide 2G, 3G, and 4G Essential Sleep Mode Solutions Patent Families**

284.   **FIGURES 50–52** below show Ericsson's relative shares of Sleep Mode Solutions patent families for the 2G, 3G, and 4G standards, respectively.  As demonstrated, Ericsson's proportional shares are relatively insubstantial for 3G and 4G, and utterly non-existent for 2G.  For at least this reasons, Dr. Parkvall's reliance on the coverage of Ericsson's Sleep Mode Solutions Families in looking to an alternative based on prior generations of technology is misplaced and his analysis flawed and irrelevant.  (Dkt. 1360 at ¶¶ 181–83.)

1
2
3
4
5
6
7
8
9
10



11 **FIGURE 50 (PDX 201):  Ericsson's Share of Industry-Wide**

12 **2G Essential Sleep Mode Solutions Patent Families**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES



**FIGURE 51 (PDX 202):  Ericsson's Share of Industry-Wide**

**3G Essential Sleep Mode Solutions Patent Families**



**FIGURE 52 (PDX 203):  Ericsson's Share of Industry-Wide**

**4G Essential Sleep Mode Solutions Patent Families**

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

3.   <u>Dr. Parkvall Ignores Viable Non-Infringing Alternatives to Ericsson's Patented Sleep Mode Solutions Features.</u>

285.   In relying on his fundamentally flawed technology-by-technology approach, Dr. Parkvall ignores non-infringing alternatives to Ericsson's Sleep Mode Solutions Families that were available at the times of adoption and that could have been included in the standards at that time without causing detrimental effects.  In this section, I highlight several examples of such non-infringing alternatives.  I also provide my analysis that there are no "other" Ericsson patents covering the non-infringing alternative I identified for an example Ericsson Sleep Mode Solutions Family.  (Dkt. 1360 at ¶ 55.)  Dr. Parkvall has failed to identify any such "other" Ericsson patents.

a.   *Examples of non-infringing alternatives that could have been used without causing detrimental effects at the time of adoption.*

286.   Dr. Parkvall asserts that he "considered a prior generation of technology and other Sleep Mode Solutions systems to ensure a fully functioning and complete alternative system" because "Ericsson's patents cover a number of different portions of the Sleep Mode Solutions technology."  (Dkt. 1360 at ¶ 181.)  Specifically, Dr. Parkvall focuses on "a significantly de-featured 4G system" and a system that "remove[s] the improved 3G sleep modes present in evolved 3G."  (*Id.* at ¶¶ 182–83.)  I disagree with Dr. Parkvall's opinion that these are proper alternatives.

287.   I carefully reviewed the non-infringing alternatives I proposed for the alleged Ericsson Sleep Mode Solutions Families and determined that those alternatives are of equal utility as the key accused standard features, and could have replaced the key accused features without requiring a substantial modification or causing a material impact on other parts of the standard or system.  For example, with respect to P34420, Ericsson's claim chart maps claim 9 of EP 2,715,964 to

1    respective key features in the 4G standard related to EPDCCH.  (Ex. 1639 at pp.

2    1368–73.)  I proposed as a non-infringing alternative a technique proposed by

3    Motorola, which Dr. Parkvall fails to address in any way.  (*Id.* at pp. 1372–73.)

4            288.   The example non-infringing alternative is described in TDoc number

5    R1-091327 that Motorola submitted to 3GPP in the RAN 1 Working Group Meeting

6    #56bis at least as early as March 27, 2009.  (*Id.*; Ex. 2576.)  The proposed Motorola

7    technique provides an alternative of essentially equal utility as the key accused

8    features.  As I explained in my corresponding Appendix, this is so because "[b]oth

9    the claimed bitmap and Motorola's pointer are mechanisms to direct the UE to

10   specific EPDCCH subframes to search.  These mechanisms provide essentially the

11   same degree of flexibility with essentially the same degree of overhead."  (Ex. 1639

12   at p. 1373.)  Therefore, the Motorola alternative could have replaced the key

13   accused features without affecting the rest of the system.  Further, in reviewing

14   Ericsson's alleged SEP families, I did not see any patent in the Ericsson Sleep Mode

15   Solutions Families—or any patents in Ericsson's alleged SEP families—that cover

16   the Motorola alternative.

17           b.      *My non-infringing alternatives to Ericsson's Sleep Mode*

18                   *Solutions Patents are not covered by other Ericsson*

19                   *Patents.*

20           289.   In response to Dr. Parkvall's assertion that I did not consider whether

21   my alternatives would infringe "other Ericsson patents" (Dkt. 1360 at ¶ 55), I

22   assessed whether Ericsson holds any patents, including patents not listed in an ETSI

23   IPR declaration that might cover my non-infringing alternatives for Ericsson's Sleep

24   Mode Solutions Families.  For this assessment, I used as an example the non-

25   infringing alternative I identified in connection with my analysis of Ericsson's

26   P34420 patent family.

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

290.   As part of my assessment, a well-known patent search tool, LexisNexis® Total Patent®, was used to search US, EP, and WO patents employing the search criteria shown in **TABLE 16** below.

| Search Parameter | Parameter Value |
|---|---|
| **Assignee** | Ericsson |
| **Key words** **(within Title, Abstract, or Claims)** | (control w/3 (channel or info! or message or data or signal)) w/5 frame and (point! or mark! or indicat!) |
| **Priority Date** | Before March 27, 2009, the publication date of the Motorola TDoc |

**TABLE 16 (PDX 204)**

291.   The search produced 141 Ericsson US, EP, and WO patents.  (Ex. 2577.)  I reviewed these 141 patents, and determined that none of them covers the Motorola alternative.  In connection with my January 11, 2017 Witness Declaration and my expert reports, I already explained that Motorola's proposal presented a technically feasible alternative.  (*See, e.g.*, Ex. 1639 at pp. 1372–73.)  Thus, Dr. Parkvall erred by ignoring alternatives that were available at the time the standards were adopted and limiting his alternatives to prior Sleep Mode Solution technologies.  (Dkt. 1360 at ¶¶ 181–83.)

4.   Dr. Parkvall Relies on Outdated Hypothetical Alternatives as Benchmarks to Measure the Technical Value of Ericsson's Sleep Mode Solutions SEPs.

292.   Dr. Parkvall's evaluation of the technical value of Sleep Mode Solutions technologies focuses on the value of standardized technology as a whole, and does not consider the value contributed by Ericsson's Sleep Mode Solutions

1    Families.  Accordingly, Dr. Parkvall looks to de-featured versions of the standards,

2    *i.e.*, earlier generations.  (Dkt. 1360 at ¶ 181–83.)  Dr. Parkvall claims to have

3    "found that the technical value of 4G Sleep Mode Solutions can be calculated as

4    increasing the operational time of a handset by at least 53%."  (*Id.* at ¶ 184.)  This is

5    apparently based on Dr. Parkvall's comparison of the 4G standard against a

6    "significantly de-featured" version of the standard as his non-infringing alternatives.

7         293.   Dr. Parkvall's valuation of the 4G Sleep Mode Solutions Families

8    focuses on improvements in battery consumption.  (*Id.* at ¶¶ 185–89.)  Dr. Parkvall

9    asserts that "the 4G alternative would not be able to use DRX while in

10   RRC_CONNECTED."  (*Id.* at ¶ 185.)  An alternative could "move frequently

11   between RRC_CONNECTED and RRC_IDLE whenever the handset transmits or

12   receives data," though Dr. Parkvall says that such an alternative "would be very

13   difficult to design … and would rely heavily on Ericsson's Connection

14   Establishment patents."  (*Id.* at ¶ 182.)  "A more likely way such an alternative

15   would operate would be to always remain in RRC_CONNECTED state without

16   having the benefit of LTE's DRX (sleep) mode."  (*Id.*)  Dr. Parkvall asserts that "a

17   modern smartphone would consume at least 352 mW excluding the screen when the

18   smartphone is kept in RRC_CONNECTED without DRX.  Thus a conservative

19   estimate is that the power consumption due to removing DRX and staying in

20   RRC_CONNECTED goes from 29.8 mW to 352 mW, increasing the power

21   consumption by at least 322 mW."  (*Id.* at ¶ 189.)  As such, Dr. Parkvall opines that

22   "a solution with LTE DRX increases the battery lifetime by approximately 53%."

23   (*Id.*)

24        294.   Dr. Parkvall's proposed "alternative" is not only outdated but, relying

25   on his flawed per-technology approach, is designed to ensure Ericsson's patents are

26   overvalued.  To arrive at the 53% battery-life improvement, Dr. Parkvall appears to

27   be using a circuit-switched 2G system as the non-infringing alternative.  (Dkt. 1360

28   at ¶¶ 182, 185–90; *see also* Ex. 2542 at p. 15 (¶ 15); Ex. 2542 at pp. 15 n.5, 78 (¶

74); Ex. 2554 at p. 3.)  Such an alternative is devoid not only of the very technology to which alternatives would be considered under a proper analysis, but also appears to have been selected precisely because it is a wholly outdated technology that could be used to show an even greater improvement in performance by comparison.  Moreover, Dr. Parkvall's reliance on such an outdated alternative stems his flawed per-technology approach that only considers alternatives that avoid all Ericsson's Sleep Mode Solutions Patent Families as a whole, including across all the 2G, 3G, and 4G packet-switched "Connection Establishment" technologies.  (Dkt. 1360 at ¶¶ 172, 176, 182.)

295.   Moreover, the documents cited by Dr. Parkvall in support of his valuation fails to provide any evidence to support the attribution of such performance improvements to Ericsson's Sleep Mode Solutions Families.  Dr. Parkvall cites to an internal Ericsson technical document evaluating the battery consumption of the 5th and 6th generation iPhones®.  (Dkt. 1360 at ¶¶ 186–89 (citing Ex. 4999).)  At best, Exhibit 4999 identifies the power consumption of a particular implementation of the standards, *i.e.*, in a modern smartphone.  But Exhibit 4999 does not in any way indicate that ***Ericsson's*** Sleep Mode Solutions Families are responsible for any improvement in the battery life associated with the 4G standards.  Moreover, Exhibit 4999 does not event speak about Ericsson's Sleep Mode Solutions technology in any way.  Nor does this document in any way prove the absence of available alternatives that would allow the 4G standard to achieve the battery consumption performance identified without infringing a patent in Ericsson's Sleep Mode Solutions Families.

HIGHLY CONFIDENTIAL

SMRH:481062607.2

## IV.  MR. KENNEDY'S "EX STANDARD" VALUE ANALYSIS IMPROPERLY CAPTURES THE VALUE OF THE LTE STANDARD ITSELF.

296.   I understand that Mr. Kennedy's "ex standard" value analysis attempts to put an economic value on Ericsson's alleged 4G SEPs.  The foundation of Mr. Kennedy's "ex standard" value analysis, however, is Dr. Parkvall's analysis that greatly overvalues Ericsson's alleged SEPs by capturing the value of the standard, rather than the value of Ericsson's patents.  (Dkt. 1333 at ¶¶ 225–57.)

297.   In his Witness Declaration, Mr. Kennedy attempts to determine what he refers to as the "ex-standard" value of Ericsson's SEP portfolio, which he alleges is "the value of the invention" and "does not include the value resulting from incorporation of the patented technology into the standard[.]"  (Dkt. 1333 at ¶ 227.) This claim from Mr. Kennedy is quite remarkable, because he is in fact doing the exact opposite.  He is capturing the value of the standard itself and not anything related to the value of Ericsson's SEPs.  As I will discuss below in great detail, contrary to Mr. Kennedy's assertion, his "ex-standard" analysis fails to excise "the value resulting from [the alleged] incorporation of [Ericsson's] patented technology into the standard[.]"

298.   In fact, due to Mr. Kennedy's reliance on Dr. Parkvall fundamentally flawed approach, Mr. Kennedy's analysis is based on a technical value that is directly tied to the value resulting from standardization, rather than the value of Ericsson's SEPs themselves.  As a result, Mr. Kennedy's analysis literally captures the value of the LTE standard as a whole.  Before providing a detailed discussion of Mr. Kennedy's analysis, it is important to understand Dr. Parkvall's opinions.

299.   In sum, Dr. Parkvall's approach to analyzing alternatives compares, for example, the 4G standard to an early generations of the 3GPP standards (*e.g.*, 3G or 2G).  By choosing the alternatives in this way then evaluating them by assessing the difference in the performance of the respective standards, his analysis as a whole

assesses the value of the entire standard (*e.g.*, 4G).  The problem with this approach is that 4G LTE is based upon OFDMA and other core/key technology areas, such as the eight I discussed in my opening witness declaration.  (Dkt. 1334 at § IX.)  Therefore, before discussing Dr. Kennedy's analysis in detail, it is important to first address many of the flaws in Dr. Parkvall's assumptions.

300.   I begin with an analysis of the standardization process, with a special focus on LTE, in order to properly set the stage for demonstrating why Dr. Parkvall's new opinions are highly flawed.  In his witness declaration, Dr. Parkvall provides brand new opinions on "Cellular Networks and Standardization," including "The Cellular Standardization Process," "The Structure of 3GPP," and "Coordination Among Working Groups In 3GPP."  (Dkt. 1360 at § III; *id. at* 8, 9, 11, 15.)  These previously undisclosed opinions set the stage for Dr. Parkvall's brand new opinion that the cellular standards are interdependent, and his ultimate conclusion that Dr. Jayant's and my methodologies based on the patent-by-patent analysis is wrong.  (*See* Dkt. 1360 at §§ III and IV; *id.* at ¶¶ 45–54.)  Specifically, I strongly disagree with his opinion that cellular standards are interdependent and therefore Ericsson's patents must be treated as unified groups across technology categories (as outlined in Dr. Parkvall's per-technology approach).

301.   Below, I demonstrate that the key technologies that came together to form LTE were considered and defined largely independently from one another by different Working Groups (*e.g.*, RAN1, RAN2, etc.).  This is in accordance with how 3GPP Working Groups are generally structured to handle technical proposals.  That is, while some level of communication and coordination between such Working Groups is necessary and beneficial, for the most part, problems, issues, and related solutions and features are largely self-contained, and submissions to specific Working Groups are deliberated and decided upon within the Working Group.

302.   In the relatively rare occasions where a particular feature affects multiple standards or sections of a standard under the purview of different Working

HIGHLY CONFIDENTIAL

SMRH:481062607.2

1  Groups, such that joint decisions are appropriate, some coordination between the

2  Working Groups and a minor modification to the other standard may be

3  required.  Nevertheless, the vast majority of the technical issues dealt with during

4  standardization are modular in nature, such that it is not only feasible but actually

5  more desirable to delegate those issues to specific Working Groups organized by

6  different areas of expertise.  As described in detail below, this modular nature of

7  cellular standardization likewise applies to LTE's key features, which are much

8  broader than the features allegedly claimed in Ericsson's SEPs.

9  **A.**    **LTE's Basic Framework and Key Technologies That Are**

10     **Responsible for Its Superior Performance Were Well-Known and**

11     **Developed by Others Before LTE Was Standardized.**

12     1.    Development of LTE And Its Basic Framework and Key

13        Technologies

14  303.   Numerous companies came together to collaborate on the work done by

15  3GPP.  I refer to these companies as 3GPP members.  Participating 3GPP members

16  develop specifications at the Working Group (WG) and/or Technical Specification

17  Group (TSG) level.  As explained below, 3GPP standards and corresponding

18  technical specifications are typically developed in different stages, as discussed

19  below with respect to LTE.  This discussion will demonstrate LTE's basic

20  framework and many of its key technologies were decided in the nascent stages of

21  its development.

22     *a.    Stage 1:  Define performance requirements*

23  304.   In Stage 1, performance requirements (*e.g.*, peak and average data

24  rates, power consumption, *etc.*) are decided.  In the case of LTE, 3GPP's work

25  (initially called "the Evolution of the 3G Mobile System") started with the RAN

26  Evolution Workshop on November 2-3, 2004 in Toronto, Canada.  (Ex. 2535 at p.

27  1.)  In this Workshop, operators, manufacturers and research institutions presented

28  more than 40 contributions with views and proposals on the evolution of the 3G

-170-

network and equipment (often referred to as "Evolved UTRA" (E-UTRA) and/or "Evolved UTRAN" (E-UTRAN)).  (*Id.*)

305.   The Workshop resulted in identification of the following set of high-level requirements:

> (1)   Reduced cost per bit;
>
> (2)   Increased service provisioning—more services at lower cost with better user experience;
>
> (3)   Flexibility of use of existing and new frequency bands;
>
> (4)   Simplified architecture, open interfaces; and
>
> (5)   Allow for reasonable terminal power consumption.

(Ex. 2535 at p. 1.)

306.   The Workshop also recommended that the E-UTRAN should bring significant performance improvements to justify the standardization effort.  (Ex. 2535 at p. 1.)

307.   With the conclusion of the Workshop and with broad support from 3GPP members, a feasibility study on the new standard was started in December 2004.  (Ex. 2535 at p. 1.)  The objective was to "develop a framework for the evolution of the 3GPP radio-access technology towards a high-data-rate, low-latency and packet-optimized radio-access technology."  (*Id.*)  Emphasis was also placed on the IPR (Intellectual Property Rights) side, where the goal was "to adapt the existing IPR regime to provide a better predictability of the IPR licenses (…) to ensure Fair, Reasonable And Non-Discriminatory (FRAND) IPR costs".  (*Id.*)  Thus, the notion of licensing SEPs at FRAND rates was a key objective from the onset of the LTE development.

308.   All these efforts culminated in specific requirements for different technology areas of the E-UTRAN.  Requirements related to a number of key technology areas relevant to Ericsson's 4G SEP Families are summarized in **TABLE 17** below.  (Ex. 2535 at pp. 2–3.)

| Technology Area | Requirements |
|---|---|
| **Peak data rate** | • Instantaneous downlink peak data rate of 100 Mb/s within a 20 MHz downlink spectrum location (5 bps/Hz)<br>• Instantaneous uplink data rate of 50 Mb/s (2.5 bps/Hz) within a 20 MHz uplink spectrum allocation |
| **Control-plane latency** | • Transition time of less than 100 ms from a camped state, such as Release 6 Idle Mode, to an active state such as Release 6 CELL_DCH<br>• Transition time of less than 50 ms between a dormant state such as Release 6 CELL_PCH and an active state such as Release 6 CELL_DCH |
| **User throughput** | • Downlink: average user throughput per MHz, 3 to 4 times Release 6 HSDPA<br>• Uplink: average user throughput per MHz, 2 to 3 times Release 6 Enhanced Uplink |
| **Spectrum efficiency** | • Downlink:  In a loaded network, target for spectrum efficiency (bits/sec/Hz/site), 3 to 4 times Release 6 HSDPA<br>• Uplink: In a loaded network, target for spectrum efficiency (bits/sec/Hz/site), 2 to 3 times Release 6 Enhanced Uplink |
| **Spectrum flexibility** | • E-UTRA shall operate in spectrum allocations of different sizes, including 1.25 MHz, 1.6 MHz, 2.5 MHz, 5 MHz, 10 MHz, 15 MHz and 20 MHz in both the uplink and downlink. Operation in paired and unpaired spectrum shall be supported |
| **Mobility** | • E-UTRAN should be optimized for low mobile speed from 0 to 15 km/h<br>• Higher mobile speed between 15 and 120 km/h should be supported with high performance<br>• Mobility across the cellular network shall be at speeds from 120 km/h to 350 km/h (or even up to 500 km/h depending on the frequency band) |

**TABLE 17 (PDX 205):  LTE-Requirements**

b.  *Stage 2:  Define basic framework and key technologies to achieve the requirements*

309.   In Stage 2, the basic framework and key technologies to achieve the requirements from Stage 1 are discussed and decided.  In the case of LTE, different Working Groups (WGs) held normal and ad hoc meetings to discuss different possible technologies to use.  (*See* Ex. 2535 at p. 3.)  For example, RAN WG1 ("RAN1") assessed different possible "air interface" technologies.  (*Id.*)  RAN1's evaluations of these possible technologies and other radio interface technologies against the requirements for the physical layer are collected in a 3GPP Technical Report, namely, TR 25.814.

310.   The "air interface" refers to the communication link between two stations  in a wireless network.  In the case of 3GPP standards including LTE, the term defines the basic framework of the wireless communication link between a base station and a mobile station.  To draw an analogy, the air interface of a wireless communication system is akin to the propulsion method system an automobile of (*e.g.*, a combustion engine or an electric motor).  Indeed, wireless communication systems are often referred by the type of air interface.  For example, 2G GSM is often referred to as a "TDMA" system, and 3G UMTS as a "WCDMA" system, and 4G LTE is often referred to as an "OFDMA" system.  In short, the air interface constitutes the basic framework of a wireless communication system and defines its fundamental nature.  Not surprisingly, selecting this basic framework is the most critical decision in development of a new wireless standard.  This critical decision also needs to be made very early on because the choice of air interface affects the choice of all other technologies that surround and support the air interface.  Indeed, TR 25.814 v. 0.4.1 shows that the first and most pressing issue on the minds of 3GPP members in RAN1 was selecting the air interface.

---

# 1      Scope

This document is related to the technical report for physical layer aspect of the study item "Evolved UTRA and UTRAN" [1]. The purpose of this TR is to help TSG RAN WG1 to define and describe the potential physical layer evolution under consideration and compare the benefits of each evolution techniques, along with the complexity evaluation of each technique.

This activity involves the Radio Access work area of the 3GPP studies and has impacts both on the Mobile Equipment and Access Network of the 3GPP systems.

This document is intended to gather all information in order to compare the solutions and gains vs. complexity, and draw a conclusion on way forward.

This document is a 'living' document, i.e. it is permanently updated and presented to TSG-RAN meetings.

Six basic L1 concept proposals are evaluated in this TR:

1. FDD UL based on SC-FDMA, FDD DL based on OFDMA
2. FDD UL based on OFDMA, FDD DL based on OFDMA
3. FDD UL/DL based on MC-WCDMA
4. TDD UL/DL based on MC-TD-SCDMA
5. TDD UL/DL based on OFDMA
6. TDD UL based on SC-FDMA, TDD DL based on OFDMA"

---

(Ex. 2536 at p. 11.)

311. A subsequent version of the Technical Report (*i.e.*, TR 25.814 v. 1.0.1) shows that RAN1 selected Orthogonal Frequency Division Multiplexing Access (OFDMA) and provided the reasons for selecting the air interface for the new standard under development.

# 1      Scope

This document is related to the technical report for physical layer aspect of the study item "Evolved UTRA and UTRAN" [1]. The purpose of this TR is to help TSG RAN WG1 to define and describe the potential physical layer evolution under consideration and compare the benefits of each evolution techniques, along with the complexity evaluation of each technique.

This activity involves the Radio Access work area of the 3GPP studies and has impacts both on the Mobile Equipment and Access Network of the 3GPP systems.

This document is intended to gather all information in order to compare the solutions and gains vs. complexity, and draw a conclusion on way forward.

This document is a 'living' document, i.e. it is permanently updated and presented to TSG-RAN meetings.

Six basic L1 concept proposals are evaluated in this TR:

1. FDD UL based on SC-FDMA, FDD DL based on OFDMA
2. FDD UL based on OFDMA, FDD DL based on OFDMA
3. FDD UL/DL based on MC-WCDMA
4. TDD UL/DL based on MC-TD-SCDMA
5. TDD UL/DL based on OFDMA
6. TDD UL based on SC-FDMA, TDD DL based on OFDMA".

## 1.1      Rationale for RAN#30 decision on way forward for Evolved UTRA multiple access

The following has been considered by TSG-RAN #30 (Dec'05):

- When compared to the reference defined in TR 25.913, and based on the initial system-level evaluations with 5 MHz allocation, the spectral efficiency improvements achievable with a (CDMA-based) system according to an "evolutionary" approach and the spectral efficiency improvements achievable with a new approach (e.g. OFDM-based) are both attractive.
- Using a CDMA based approach enables smoother migration from prior UTRA releases and might offer more extensive physical layer reuse.
- On the other hand, a new Layer 1, with an inherent avoidance of a priori constraints in the air-interface design, allows for a more free choice of design parameters, making it easier to fulfil some of the E-UTRA targets e.g. latency requirements, finer minimum bandwidth granularity, commonality between different duplex modes;
- UE receiver processing is somewhat simpler for an OFDMA-based air interface; the attractiveness in terms of complexity increases with larger bandwidths and/or high order MIMO configurations.

Both approaches to the 3GPP radio-access evolution have their advantages and disadvantages, very much depending on the exact requirements.

On this basis, TSG-RAN #30 has decided that the Long-Term Evolution feasibility study will focus on OFDMA based downlink and SC-FDMA based uplink. TSG-RAN #30 has also re-affirmed that continued evolution of existing UTRA modes is an on-going necessary work activity within 3GPP.

(Ex. 2537 at p. 8.)

      312.   The use of OFDMA-based air interface is the most significant way LTE differs from the earlier 3GPP cellular standards such as 2G and 3G. In particular, the air interface for 3G UMTS is Wideband Code Division Multiple Access (WCDMA), which performed well within its limits. As Technical Report TR 25.814 v.1.0.1 shows, however, RAN1 selected OFDMA despite the fact that "[u]sing a CDMA based approach enables smoother migration from prior UTRA

releases." (Ex. 2537 at p. 8.)  The 3GPP Working Group made this selection because the new OFDMA-based air interface "allows for a more free choice of design parameters, making it easier to fulfill some of the E-UTRA targets e.g. latency requirements, finer minimum bandwidth granularity, commonality between different duplex modes." (Ex. 2537 at p. 8.)

313.   In addition, the Working Group explained that the OFDMA-based air interface was attractive "in terms of [addressing] complexity increases with larger bandwidth and/or high order MIMO considerations." (*Id.*)  In other words, the Working Group decided that the OFDMA-based air interface offers a number of key advantages in terms of meeting the target performance requirements that 3GPP set in Stage 1.  Based on these considerations, RAN1 decided to use the conventional OFDMA in the downlink (DL) and a variant of OFDMA called "DFT-spread OFDM" or more commonly "Single Carrier-Frequency Division Multiple Access" (SC-FDMA), in the uplink (UL).

314.   After selecting this fundamental framework, RAN1 was able to narrow down a wide set of other possible radio interface technologies by December 2005. (Ex. 2535 at p. 3.)  For example, the Working Group decided on QPSK, 16 QAM, and 64 QAM for supported data modulation in the downlink and (pi/2-shift) BPSK, QPSK, 8PSK and 16 QAM for possible uplink data modulation in the uplink.  (*Id.*) The use of Multiple Input Multiple Output (MIMO) scheme was also decided, with possibly up to four antennas at the mobile side, and four antennas at the base station side.  (*Id.*)

315.   Meanwhile, RAN WG2 ("RAN2") was also busy considering and deciding on other core technologies under its purview.  For example, RAN2 decided to set the duration of a subframe on the radio link to 1 ms (called "Transmission Time Interval" or  "TTI").  (Ex. 2535 at p. 4.)  RAN2 also decided on the basic structure of Radio Resource Control (RRC).  In particular, the Working Group

1  decided to restrict RRC States[14] in E-TRAN (4G) to RRC_Idle and RRC_Connected

2  States, as depicted below, in conjunction with RRC States in UTRAN (3G), which

3  had more possible states.  (*Id.*)



16  (Ex. 2535 at p. 4.)

17       316.   TR 25.814 v. 1.0.1 shows that other core technologies were also

18  decided by the 3GPP Working Groups at this early stage of LTE development.

19  These include the following technologies.

20       (1)   Channel-dependent scheduling based on both time and

21            frequency.  (*See* Ex. 2537 at §§ 7.1.1.2.1, 7.1.3.1, 8.1.2.2,

22            9.1.1.2.1, 9.1.2.7.1, 9.2.1.2, 9.2.1.4.)

23       (2)   Horizontal encoding using multiple codewords.  (*See id.*

24            at § 7.1.1.4.2.)

25       (3)   Incremental redundancy.  (*See id.* at § 9.1.2.5.)

[14] RRC States refer to various phases of connection between UE and Network, after a connection between a UE and a Network is set up (RRC Connection Setup) and before a release of the connection (RRC Release).  RRC State Change refers to the process of switching between these states.

1           (4)      Relatively low overhead control signaling (*See, e.g., id.*

2                  at §§ 7.1.1.4.1, 7.1.1.5, 7.1.3.1, 9.1.2.5, 9.1.2.7.1,

3                  A2.1.9.)

4       317.   The OFDMA-based air interface and these and other key core

5 technologies decided by different 3GPP Working Groups formed the main building

6 blocks of what is now known to as the Long Term Evolution (LTE).  As

7 acknowledged by Dr. Parkvall and other Ericsson engineers, these fundamental

8 building blocks are primarily responsible for the bulk of LTE's superior

9 performance over other wireless technologies.  (*See, e.g.,* Exs. 1450 and 2538.)

10             *c.*     *Stage 3:  Define Implementation in the Specifications*

11       318.   In Stage 3, various specifications that define implementation of the key

12 core technologies decided in Stage 2 are created.  This stage involves developing,

13 evaluating, and defining specific detailed protocols in the respective specifications.

14 Often times, the specification for a particular 3GPP "Release" undergoes a series of

15 updates before it is gets finalized.

16             *d.*     *Stage 4:  Test and improve specifications*

17       319.   In Stage 4, the implementation of the key core technologies as defined

18 in the current specifications is tested (*e.g.*, through prototypes and/or simulations)

19 and improvements are made to the specifications to bring the standard closer to

20 achieving the performance requirements.  Most of these improvements, with rare

21 exceptions (one such exception is discussed in Section IV.B.6 below), are

22 incremental in nature.  This is typically an ongoing, iterative process and it is also

23 applicable as new features and capabilities are added over time.

24       320.   As further discussed in detail in Section IV.B below, none of

25 Ericsson's purported SEP Families cover LTE's basic framework or key core

26 technologies.  Ericsson's SEPs are, at best, related to incremental improvements

27 (*e.g.*, relatively minor changes and additions and fixing of bugs) to the specifications

28 that are made during Stage 4.  Moreover, Ericsson's patented features associated

1   with these incremental improvements could have been easily replaced with available

2   alternatives at the respective times of their adoptions into the LTE standard,

3   including the non-infringing alternatives that I identified in Appendices attached to

4   my Opening Witness Declaration.  (Ex. 1639.)

5        321.   After the changes/additions, the process often goes back to Stage 3 a

6   number of times until the 3GPP participating members agree that the technical

7   specifications are ready to be released.  Sometimes the process goes back to Stage 2

8   if the requirements cannot be met with the current approaches and technologies.

9        322.   In the case of LTE, after the various stages descried above, the first

10  version of LTE, also known as "Release 8", was finalized in December of 2008.

11       323.   Stages 1 through 4 described above are illustrated in **FIGURE 53**

12  below.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**FIGURE 53 (PDX 206):  LTE Standardization Process**

**B.** **Ericsson Did Not Develop LTE's Fundamental Framework and Key Technologies, Which Were Well-Known Before LTE Was Standardized.**

324.   Dr. Parkvall and Ericsson's other experts in their respective Witness Declarations allege that Ericsson played a significantly important role in the development of LTE.  For example, Dr. Parkvall's Witness Declaration includes a Subsection titled "Importance of Ericsson's Technical Innovations" under each of Sections V.A.1-5.  In those sections, he describes his "Technology by Technology Analysis" with respect to five technology categories, namely, Data Transmission, Carrier Aggregation, Resource Allocation, Connection Establishment, and Sleep Mode Solutions.  As I discussed in Sections III.A–E above, the documents Dr. Parkvall cites for evidence of "The Importance of Ericsson's Technical Innovations" do not mention Ericsson, much less Ericsson's technical innovations.  The only exceptions are the three reports by Signals Research, which were commissioned by Ericsson, and these reports have nothing to do with the technical operation or benefits of the standard – they are simply counting contributions.  In, for example Section III.A.2.a above, I discussed why these reports and the contribution counting studies contained therein are not a reliable indicator of the importance of Ericsson's technical innovations.

325.   As another example, Mr. Brismark, Ericsson's Chief Intellectual Property Officer, insinuates that Ericsson alone came up with the concept for LTE: "As the worldwide demand for mobile data increased, Ericsson continued to innovate—this time towards the fourth generation of mobile telephony (4G). ***Ericsson's 4G concept*** was the standard known as Long Term Evolution, or LTE." (Dkt. 1358 at ¶ 28 (emphasis added).)  I presume Mr. Brismark merely means to say that Ericsson backed LTE rather than WiMAX, because any opinion or suggestion that Ericsson's SEPs played a significantly important role in the development of LTE is not supported by the facts.  The patented features did play a role, but their

importance is quantified by the technical analysis that I performed.  As my findings show, overall, Ericsson's patents have contributed only marginally to LTE.  Moreover, Motorola and NTT DoCoMo are both widely regarded as playing key roles in "inventing" LTE.  And, it was NTT DoCoMo that is credited with first proposing LTE in 2004 – not Ericsson.  (Ex. 1335.)

326.   In addition, as I explain below, Ericsson did not develop LTE's basic framework or its key core technologies, including those discussed in Section IV.A.1.b above with respect to Stage 2 of the LTE development.  Nor do any of Ericsson's purported SEP Families cover LTE's basic framework and key core technologies.  Almost all of Ericsson's SEPs relate to incremental improvements (*e.g.*, relatively minor changes and additions) to the specifications made at Stage 4 and Ericsson's patented features associated with the incremental improvements could have been easily replaced with available alternatives (including the non-infringing alternatives that I identified in my Opening Report) at the respective times of their adoptions into the LTE standard.  This supports (and explains) my finding that 77 (or 95%) out of 85 Ericsson 4G family/standard pairs provide little to no intrinsic technical value to the LTE standard, relative to available alternatives.  (*See* Section IV.C.1.b, *supra*.)

327.   As discussed in my Opening Witness Declaration, Anders Furuskär and two other Ericsson engineers published a paper titled "The LTE Radio Interface— Key Characteristics and Performance" (the "Furuskär paper") that presents "some key characteristics of the LTE radio interface, including physical layer and radio resource management functions, and evaluates impact on system performance." (Dkt. 1334 (Section XI); Ex. 1450 at p. 1.)  Dr. Parkvall cited this paper in his April 4, 2016 Rebuttal Report.  (*See, e.g.*, Ex. 2542 at ¶ 32 n.23.)

328.   The Furuskär paper identifies eight key characteristics and related distinctive features ("more sophisticated solutions") that distinguishes LTE from

other systems such as WiMAX, summarized in Table 1 of the paper reproduced below:

TABLE I
LTE KEY CHARACTERISTICS

| Function (slogan used in Fig. 1-2) | LTE | Mobile WiMAX wave 2 | Performance impact |
|---|---|---|---|
| Multiple access (MA) | OFDM in DL, DFT-spread OFDM in UL | OFDM in DL and UL | DFT-spread OFDM reduces the peak-to-average power ratio and reduces terminal complexity, requires one-tap equalizer in base station receiver |
| Uplink power control (PC) | Fractional pathloss compensation | Full pathloss compensation | Fractional pathloss compensation enables flexible trade off between average and cell-edge data rates |
| Scheduling (Scheduling) | Channel dependent in time and frequency domain | Channel dependent in time domain | Access to the frequency domain yields larger scheduling gains |
| MIMO scheme (MIMO) | Horizontal encoding (multiple codewords), closed loop with precoding | Vertical encoding (single codeword) | Horizontal encoding enables per-stream link adaptation and successive interference cancellation (SIC) receivers |
| Modulation and coding scheme granularity (MCS) | Fine granularity (1-2dB apart) | Coarse granularity (2-3dB apart) | Finer granularity enables better link adaptation precision |
| Hybrid ARQ II (HARQ) | Incremental redundancy | Chase combining | Incremental redundancy is more efficient (lower SNR required for given error rate) |
| Frame duration (CQI delay) | 1ms subframes | 5ms frames | Shorter subframes yield lower user plane delay and reduced channel quality feedback delays |
| Overhead / control channel efficiency (OH / CCH eff) | Relatively low OH (while control channels are robust) | Relatively high OH | Lower overhead improves performance |

(Ex. 1450 at p. 2.)

329.   As outlined in my Witness Declaration (Dkt. 1334, § IX), these eight key LTE features specifically identified in the paper are responsible for the performance improvements of LTE over WiMAX.  (Ex. 1450 at p. 2 (TAB. I); *see also* Dkt. 1334 at § IX.)

330.   As I fully explained in my Witness Declaration, OFDMA, which forms LTE's air interface, and these eight alleged key LTE features were also known and/or developed by others (*i.e.*, not Ericsson) before the standardization of LTE. As discussed above, at least five of these key LTE features are the core technologies that were decided by the 3GPP Working Groups in the very early stage (Stage 2) of the LTE development.  (*See* Section IV.A.1.b, *supra*.)

331.   The Furuskär paper also provides comparisons of basic performance metrics between LTE and WiMAX, concluding that LTE enjoys a combined gain in spectrum efficiency of approximately 60% in the downlink and 100% in the uplink

1 as compared to WiMAX, due to contributions from these key LTE features to the

2 LTE's superior performance, as shown in Figures 1 and 2 of the Furuskär paper:



Fig. 1. Summary of baseline downlink normalized user throughput and spectrum efficiency results, and feature analysis.



Fig. 2. Summary of baseline uplink normalized user throughput and spectrum efficiency results, and feature analysis.

(Ex. 1450 at p. 3.)

12    332.   I note a paper Dr. Parkvall co-authored with other Ericsson engineers

13 (including David Astély, Anders Furuskär, and Erik Dahlman) ("the Astély/Parkvall

14 paper") also identifies essentially the same set of key LTE features and their

15 respective contributions to LTE's performance.[15]  (*See* Ex. 2538.)

16    333.   In my Opening Witness Declaration, I provided my findings that these

17 key LTE features by Ericsson's engineers were not developed by Ericsson and were

18 well-known before LTE was standardized.  (*See* Dkt. 1334 at Section IX.)  Here, I

19 summarize my findings with respect to LTE's basic framework (*i.e.*, the OFDMA-

20 based air interface) and a subset of the eight key technologies that, according to

21 Ericsson's engineers, significantly contribute to LTE's superior performance.

22         1.    LTE's Basic Framework of OFDMA Was Known And

23               Developed By Others.

24    334.   As discussed in Section IV.A.1.b above, the OFDMA-based air

25 interface is the most significant way LTE differs from the earlier 3GPP cellular

26 technologies such as 2G and 3G.  This basic framework is responsible for a majority

---

[15] This paper was published in IEEE Communications Magazine in April of 2009, after LTE Release 8 was finalized.

of LTE's superior performance.  For example, as acknowledged by Dr. Parkvall and other Ericsson engineers, OFDMA enabled the use of channel dependent scheduling both in time and frequency domain.

> An intrinsic characteristic of radio communi-cation is fading, which results in the instanta-neous radio-channel quality varying in time, space, and frequency. Due to the use of OFDM-based transmission, LTE can use *channel-depen-dent scheduling* in both the time and frequency domain to exploit rather than suppress such rapid channel-quality variations, thereby achiev-ing more efficient utilization of the available radio resources. This is illustrated in Fig. 3. The

(Ex. 2538 at p. 2.)  Also as acknowledged by Ericsson's engineers, this key LTE feature has a significant impact on both downlink and uplink transmissions.  (*See* Ex. 1450 at p. 3; *see also* Section IV.B.3, *infra*.)

335.   OFDMA was also a well-known and old technology before standardization of LTE, and Ericsson did not invent it.  (*See* Dkt. 1334 at ¶¶ 363–68.)  The first paper on OFDM (OFDMA is a multi-user access scheme employing the OFDM technology) was written in 1966 by R.W. Chang, and a related patent issued in 1970, as discussed above.  (Ex. 1332.)  Digital Video Broadcasting, or DVB, used OFDM in the 1980s, and OFDMA was proposed for the return channel in a Digital Video Broadcasting project in the 1990s.  The LTE standards themselves "borrowed" many aspects of OFDMA in large part from a competing set of standards called WiMAX (Worldwide Interoperability for Microwave Access) that were developed slightly earlier.

2.     OFDMA in the Downlink and SC-FDMA in the Uplink Was
Known And Developed By Others.

336.   The particular implementation of the OFDMA-based air interface used in LTE, namely, OFDMA in the downlink and SC-FDMA in the uplink, is one of eight key LTE features identified in the Furuskär paper.  This key LTE feature is integrally tied to LTE's performance requirements and thus its importance cannot be overemphasized.



(Ex. 2534 at p. 5.)

337.   The Astély/Parkvall paper also acknowledges the far-reaching significance of OFDMA and SC-FDMA to LTE's overall performance for the downlink and uplink transmissions, respectively.

HIGHLY CONFIDENTIAL
Case No. SACV14−00341 JVS (DFMx)/CV15−02370
SMRH:481062607.2
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

## LTE: AN OVERVIEW

### BASIC TRANSMISSION SCHEME

Orthogonal frequency-division multiplexing (OFDM), with data transmitted on a large number of parallel, narrow-band subcarriers, is the core of the LTE downlink radio transmission. Due to the use of relatively narrowband subcarriers in combination with a cyclic prefix, OFDM transmission is inherently robust to time dispersion on the radio channel without a requirement to resort to advanced and potentially complex receiver-side channel equalization. For the downlink, this is an attractive property because it simplifies the receiver baseband processing with reduced terminal cost and power consumption as consequences. This is especially important considering the wide transmission bandwidths of LTE, and even more so in combination with advanced multi-antenna transmission, such as spatial multiplexing (discussed below in this section).

For the uplink, where the available transmission power is significantly lower than for the downlink, the situation is somewhat different. Rather than the amount of processing power at the receiver, one of the most important factors in the uplink design is to enable highly *power-efficient* transmission. This improves coverage and reduces terminal cost and power consumption at the transmitter. For this reason, *single-carrier* transmission, based on *discrete Fourier transform (DFT)-precoded OFDM*, sometimes also referred to as *single-carrier frequency-division multiple access (SC-FDMA)*, is used for the LTE uplink. DFT-precoded OFDM has a smaller peak-to-average power ratio than regular OFDM, thus enabling less complex and/or higher-power terminals.

(*See* Ex. 2538 at p. 1.)

338.   As discussed in Section IV.A.1.b above, RAN1 selected this particular key LTE feature at the very early stage of LTE development when it settled on OFDMA as the air interface for the new standard.

339.   This critical key LTE feature was, however, also known and developed by others before standardization of LTE.  (*See* Dkt. 1334 at ¶¶ 447–50.)  More specifically, the concept of coexistence of OFDMA (in the downlink) and SC-FDMA (in the uplink) in a communication system was known at since 2002.  (*See id.* at ¶ 448.)  In April of 2002, David Falconer of Carleton University and three other engineers at Radio Communications, Harris Corp. and Conexant Systems, Inc. proposed using the SC-FDMA system in the uplink and OFDM on the downlink and discussed associated advantages.

> There may actually be an advantage in operating a dual mode system, wherein the base station uses an OFDM transmitter and an SC receiver, and the subscriber modem uses an SC transmitter and an OFDM receiver, as illustrated in Fig. 7. ==This arrangement — OFDM in the downlink and SC in the uplink —has two potential advantages:==
> • Concentrating most of the signal processing complexity at the hub or base station. The hub has two IFFTs and one FFT, while the subscriber has just one FFT.
> • The subscriber transmitter is SC, and thus inherently more efficient in terms of power consumption due to the reduced power backoff requirements of the SC mode. This may reduce the cost of a subscriber's power amplifier.

(*See* Ex. 1397 at p. 5.)

340.   In reviewing Ericsson's alleged SEP Families, I could not find any that lay claim to the idea of SC-FDMA or co-existence of OFDMA and SC-FDMA. Accordingly, Ericsson cannot take credit for this key LTE feature

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

3.    <u>Channel Dependent Scheduling in Time and Frequency Domain</u>
<u>Was Known And Developed By Others.</u>

341.    The "Scheduling" function in LTE relates to how different users are assigned to different time-frequency resources for communication.  The distinguishing key feature of LTE identified in the Furuskär paper is that LTE scheduling is not only channel dependent in time, but is also channel dependent in the frequency domain.  According to Ericsson's engineers, this key LTE feature has significant impact on LTE's performance, in the downlink as well as in the uplink.



HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES



(Ex. 1450 at p. 3.)

342.  I determined that this key LTE feature was also known before

standardization of LTE and developed by others.  (*See* Dkt. 1334 at ¶¶ 456–65.)  In

2003, Wang and other researchers from two universities published an article ("the

Wang article") in which they proposed a time-frequency scheduler that is very

similar to the time-frequency scheduler used in LTE.  (*See* Ex. 1392 at pp. 1–4.)

The Wang article also describes the benefits of scheduling in both time and

frequency:  "In an *adaptive* OFDM system, spectral efficiency can be improved by

allocating the time-frequency resources based on throughput requirements, quality

of service constraints and the channel qualities of each user."  (*See id.* at 1

(emphasis in original).)

343.  The Wang article and other documents discussed in my Opening

Witness Declaration (including two patents assigned to Samsung and Alcatel)

1   conclusively show that the frequency channel dependent scheduling in time and

2   frequency domain was known and developed by others before standardization of

3   LTE.  Indeed, TR 25.814 v. 1.0.1 shows that 3GPP decided to use this key LTE

4   feature at the very early stage of LTE development.  (*See* Ex. 2537 at §§ 7.1.1.2.1,

5   7.1.3.1, 8.1.2.2, 9.1.1.2.1, 9.1.2.7.1, 9.2.1.2, 9.2.1.4.)

6        344.   In reviewing Ericsson's alleged SEP Families, I determined that none

7   of Ericsson's 4G Families are specifically directed to channel dependent scheduling

8   in the time and frequency domain.

9               4.    1-ms Subframes for Frame Duration (CQI Delay) Was Known

10                    And Developed by Others.

11       345.   "Frame duration" refers to an overall length of one radio frame for

12  transmitting data.  In LTE, one radio frame is 10 ms long and is divided into 10

13  subframes.  Therefore, frame duration determines subframe duration, which in turn

14  determines to how quickly the scheduler can operate, how frequently the

15  modulation/coding scheme can adapt, and how much latency the user's data

16  experiences.  A shorter (1 msec) subframe in LTE allows for quick scheduling, rapid

17  link adaptation, and low user latency and results in reduced CQI delays.

18       346.   According to Ericsson's engineers, this key LTE feature also has

19  significant impact on LTE's performance, in the downlink as well as in the uplink.

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

(Ex. 1450 at p. 3.)

347.   I determined that this key LTE feature was also known and developed by others before LTE was standardized.  (*See* Dkt. 1334 at ¶¶ 488–96.)   Table I of the Furuskär paper shows that Mobile WiMAX wave 2 used 5-millisecond (ms) frames (Ex. 1450 at p. 2), but that LTE uses 1-ms subframes, as illustrated in the figure below:



(Ex. 2534 at p. 8.)

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

348.   However, short 2-ms subframes were already in use by HSDPA (3G), as shown below in **FIGURE 2A of 3GPP TS 25.211**.



**Figure 2A: Frame structure for uplink HS-DPCCH**

(Ex. 1608 at pp. 12–13 (FIG. 2A).)

349.   The 2-ms format of HSDPA was incorporated into U.S. Published Patent Application No. US 2005/0128993 ("the '993 Application") filed by individual inventors on November 19, 2004, with a priority date of November 20, 2003.  (Ex. 1459 at p. 24, ¶¶ 87–90.)

350.   A short subframe was also used by WiMAX.  The frame structure is described in IEEE 802.16-2001 (dated 8 April 2002) in Fig. 38, shown below:



**Figure 38—TDD frame structure**

(*See* Ex. 1609 at p. 122 (FIG. 38).)

351.   The frame length depends on parameters such as "symbol rate" and "frame duration," but these values are interpreted in the 2005 reference by Niyato and Hossain, which describes IEEE 802.16 as using "a frame size *0.5, 1, or 2 ms* for data transmission."  (Ex. 1402 at p. 2 (emphasis added).)

352.   A short subframe is also disclosed in the 2003 Wang article, which proposed a time-frequency scheduler that broke time and frequency into "bins," where each "bin" was only *0.667 msec* in duration and 200 kHz in bandwidth (extent of frequency), as discussed above.  (Ex. 1392 at p. 1 (emphasis added).)

353.   Thus, at the time that LTE was being standardized, the benefits of using a short subframe were already well known.  Previous systems like HSDPA and WiMAX had similarly short subframes.  All that remained were the engineering modifications required to use a 1 ms subframe in practice.  Indeed, TR 25.814 v. 1.0.1 shows that 3GPP was considering a subframe duration of 0.5 or 2 ms at the very early stage of LTE development.  (*See* Ex. 2537 at §§ 8.1.2.2, 9.1.1.)

354.   Furthermore, I determined that none of Ericsson's alleged SEPs are specifically directed to 1-ms subframes identified as the key distinguishing feature of the 4G frame duration (CQI delay) function in the Furuskär paper.  Thus, while some of Ericsson's alleged SEPs may be related to 1-ms subframes and perform some other, incremental functions, none of them cover the key LTE distinguishing feature itself.

5.   Ericsson's Impact on LTE's Relatively Low Overhead for Overhead and Control Channel Efficiency Is Insignificant.

355.   Relatively low overhead for overhead/control channel efficiency (OH/CCH Eff) function is also one of the eight key LTE distinguishing features identified in Ericsson's Furuskär paper.  (Ex. 1450 at p. 2 (Table I).)  I determined that Ericsson's impact on this key feature is relatively small.  (*See* Dkt. 1334 at ¶¶ 497–501.)

356.   The "overhead/control channel efficiency" function relates to the fraction of resources that must be used for overhead rather than for sending user data.  The overhead mainly takes the form of control data, which is sent over control channels on both the uplink and downlink.  In LTE, certain channels are defined on the downlink (*e.g.*, PDCCH, PFICH, and PHICH) and on the uplink (*e.g.*, PUCCH) for the transmission of control information.  These signals are necessary for the base station to convey scheduling assignments to the user, for the User Equipment to send channel quality information, and to request retransmissions.

357.   According to Ericsson's engineers, this key LTE feature also has significant impact on LTE's performance, in the downlink as well as in the uplink.

HIGHLY CONFIDENTIAL
Case No. SACV14−00341 JVS (DFMx)/CV15−02370
SMRH:481062607.2
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES





(Ex. 1450 at p. 3.)

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

358.   I determined that Ericsson's impact or contribution on LTE's relatively low overhead for the OH/CCH Eff function is small.  (*See* Dkt. 1334 at ¶¶ 497-501.)   The control signaling category covers a wide range of different technologies, including hybrid ARQ-related signals, references signals, scheduling requests, scheduling assignments, buffer status reports, and channel measurements.  (*See* Ex. 1416 at pp. 220–59, 289–310.)  Because of the relatively large impact of control signaling on overhead, looking at Ericsson's share of such essential patents is a good indication of whether Ericsson has patented a critical mass of inventions directed to overhead that the aggregate benefit is properly attributable to Ericsson.

359.   Based on the industry-wide classification analysis under the Dahlman Classification Framework discussed in Section II.D.2 above, Ericsson's proportional share of essential families directed to the control data and control channel efficiency technologies is only 5.3% for 2G, 3G and 4G combined (**FIGURE 54** below) and 5.1% for 4G only (**FIGURE 55** below.)  (*See* Ex. 1611.)  These findings demonstrate Ericsson's small potential impact on the overall amount of overhead in LTE.



**FIGURE 54 (PDX 207):  Ericsson's vs. Industry 2G, 3G and 4G Essential Families Directed to Control Data and Control Signaling Technologies**

HIGHLY CONFIDENTIAL

SMRH:481062607.2



**FIGURE 55 (PDX 208):  Ericsson's vs. Industry 4G Essential Patent Families Directed to Control Data and Control Signaling Technologies**

360.   In fact, TR 25.814 v. 1.0.1 shows that 3GPP decided to use such control signaling technologies at the very early stage of LTE development.  (*See* Ex. 2537 at §§ 7.1.1.4.1, 7.1.1.5, 7.1.3.1, 9.1.2.5, 9.1.2.7.1, A2.1.9.)

361.   With such a low share of industry-wide essential patents directed to incremental improvements to well-known control signaling technologies, it is improper to attribute the total benefit of LTE's relatively low overhead to Ericsson's purported 4G SEP Families.

6. Fractional Pathloss Compensation for Uplink Power Control (PC) Was Known And Developed by Others.

362. Power control (PC) focuses on the selection of the UE's transmit power, in order to achieve a desired power level for a signal when it is received at the base station.  The transmit power must account in some way for the pathloss that occurs between the UE and the base station.  Previous generation standards (*e.g.*, 2G and 3G) used full pathloss compensation, where the UE would transmit enough power to fully compensate for the pathloss.  However, in LTE, fractional pathloss compensation was introduced, whereby the UE does not necessarily fully compensate for the pathloss, but rather the degree of compensation is controlled by a parameter "α," which can vary from "0" (no pathloss compensation) to "1" (full pathloss compensation).

363. According to Ericsson's engineers, this key LTE feature also has a significant impact on LTE's performance in the uplink transmission.

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15 (Ex. 1450 at p. 3.)

16    364.   I determined that this key LTE feature was also known and developed

17 by others before LTE was standardized.  (*See* Dkt. 1334 at ¶¶ 451–55.)  Initially, the

18 4G standard was used full pathloss compensation, as did 2G and 3G.  (*See* Ex. 2537

19 at Section 7.1.2.5.)  In this regard, this is a rare example of improvements to the

20 specifications after selection of the core technologies that have a significant impact

21 on the standard.

22    365.   Nevertheless, the fractional pathloss compensation technology was

23 introduced into the 4G standard by another company, namely, Interdigital, as shown

24 in TDoc R1-072781.  (Ex. 1404 at pp. 1–8.)  As shown in the portion of the R1-

25 072781 reproduced below, the fractional pathloss in LTE using the parameter "α"

26 was proposed by Interdigital.

27

28

3GPP TSG RAN WG1 Meeting #49bis                    R1- 072781
Orlando, USA, June 25 – 29, 2007

Source:        InterDigital Communications Corporation
Title:         E-UTRA Uplink Power Control Proposal and Evaluation
Agenda Item:   5.6
Document for:  Discussion and Decision

## 2. Power control for PUSCH

We propose a combined open and closed loop scheme for UL intra-cell PC to control the UE transmit PSD, $PSD_{Tx}$, (e.g. power per RB), which can be generally given by

$$PSD_{Tx} = \underbrace{P_0 + SINR_{Target} + \alpha \cdot PL}_{PSD_{open}} + \beta \cdot \Delta_{closed} + \Delta_{MCS} \qquad \text{(dBm)} \qquad \text{(1)}$$

where

- $PSD_{open}$ represents the pathloss based (fractional) open loop transmit PSD in dBm, where the pathloss is measured at the UE, based on the DL RS whose transmit power is known at the UE.

- $P_0$ is a cell-specific parameter (in dBm) including UL interference level etc, which is signaled by the eNodeB via higher layer signaling.

- $SINR_{Target}$ is a UE (or a subset of UEs) specific parameter (in dB), allowing the eNodeB to set classes of service for the UE. $SINR_{Target}$ may be adjusted through an outer loop PC at the serving eNodeB according to QoS and be a function of pathloss to the serving cell and some neighboring cells. $SINR_{Target}$ can be configured by the serving eNodeB on a semi-static basis and then signaled to the UE (or subset of UEs) via higher layer signaling.

- $PL$ is the downlink pathloss (in dB).

- $\alpha$ is a cell specific pathloss compensation factor for fractional power control where $0 < \alpha <= 1$. $\alpha$ can be configured by the eNodeB on a semi-static basis and signaled via higher layer signaling.

(Ex. 1404 at p. 2.)

366. In addition, the fractional pathloss approach was disclosed in a Motorola patent, filed on February 19, 2007, and claiming priority to June, 20, 2006, which is before the date of the Interdigital TDoc. This patent teaches, *inter alia*, that "based on channel condition measurements reported by UEs served by Node B, . . . the Node B determines ([in step] 510) a ***fractional path loss*** for each such UE." (Ex. 1414 at p. 12, 8:56–59 (emphasis added).)

367. I determined that none of Ericsson's alleged SEPs are specifically directed to fractional pathloss compensation. Moreover, I conducted a search for

any Ericsson patents directed to fractional pathloss compensation that predate the Motorola patent discussed above.  After a reasonably diligent search, I was unable to identify any Ericsson patent covering this technology, confirming my finding that it was not Ericsson but instead other companies that developed this technology and proposed it be included in LTE.

### C.     Mr. Kennedy's "Ex Standard" Value Analysis Captures the Value of the LTE Standard Itself.

368.    As noted earlier, Mr. Kennedy relies on Dr. Parkvall's flawed "Per Technology" approach to determine what he refers to as the "ex-standard" value of Ericsson's SEP portfolio.  Mr. Kennedy argues that his "ex-standard" approach is "the value of essential patented technology, which does not include the value resulting from incorporation of the patented technology into the standard[.]"  (Dkt. 1333 at ¶ 227.)

369.    **FIGURE 55** from Mr. Kennedy's Witness Declaration, reproduced below, summarizes his determination of the purported "value of Ericsson's patents, divorced from any value solely due to their inclusion in the standard" with respect to four "Technical Currencies," namely: (1) Battery Life, (2) Data Rates, (3) Less Latency, and (4) Improved Network Performance.  (Dkt. 1333 at p. 114; ¶ 228.)  As shown in this figure, Dr. Parkvall provided his purported "ex standard" values only for the Battery Life and Data Rates Technical Currencies.

| TECHNOLOGY IMPROVEMENT | EX-STANDARD VALUE |
|---|---|
| Improved Battery Life From Sleep-Mode Solutions | $16 to $42 per phone |
| Faster Data Rates From 4G Improvements | $26 to $33 per phone |
| Less Latency | $++ |
| Improved Network Performance | $++ |
| **TOTAL** | **$42 to $75 per phone, plus other benefits** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved Contributions (≈15%) | $6.15 to $11.02 per phone, plus other benefits |

370.   In this Section, I describe why Mr. Kennedy's "ex standard" analysis with respect to Data Rates and Battery Life Technical Currencies is highly flawed and leads to gross overvaluation of Ericsson's 4G SEPs.

        1.   <u>Dr. Parkvall's Flawed Technical Value Analysis Leads Mr. Kennedy to Capture the Value of the LTE Standard Itself.</u>

371.   The primary input to Mr. Kennedy's "ex standard" analysis of the Data Rates Technical Currency is Dr. Parkvall's opinion that "Ericsson's patented technology was critical to improve data speeds from 3G to 4G." (Dkt. 1333 at ¶ 251 (citing Dkt. 1360); Dkt. 1360 at ¶¶ 196, 214.)  Notably, Dr. Parkvall is comparing the data speeds from 3G to 4G in general, not actually determining what improvements (if any) Ericsson's patents contributed to the difference data speeds from 3G to 4G.

372.   Mr. Kennedy relies on this input from Dr. Parkvall and also from a market analysis conducted in 2012 ("the 2012 Smartphone Feature Analysis"),

1  which purportedly measured consumers' willingness to pay for 4G speed over 3G

2  speed.  (*See, e.g.*, Dkt. 1333 at ¶ 252)

3      373.  Based on these two inputs, Mr. Kennedy concludes that customers

4  would be willing to pay $33 for increased 4G speeds over 3G speeds.  (Dkt. 1333 at

5  ¶ 252.)  Mr. Kennedy then apportions $33 to Ericsson based on Ericsson's purported

6  share of approved 4G contributions.  (Dkt. 1333 at ¶ 252.)  In sum, Mr. Kennedy,

7  relying on Dr. Parkvall's opinion that "Ericsson's patented technology was critical

8  to improve data speeds from 3G to 4G," assigns the entirety of the $33 to industry-

9  wide 4G SEPs and assigns ~15% (purportedly based on Ericsson's share of 4G

10  approved contributions) of the $33 to Ericsson.  (Dkt. 1333 at ¶ 252)  This is

11  summarized in Figure 59 below from Mr. Kennedy's Witness Declaration,

12  reproduced below.

### FIGURE 59:  Economic Value of Faster 4G Data Speeds (Model 1)[166]

| DESCRIPTION | CALCULATION |
|---|---|
| Average Willingness To Pay For 4G Data Speeds (Smartphone Feature Analysis Survey 2012) | **$33.00** |
| ERICSSON'S SHARE | |
| Ericsson's Share of Approved 4G Contributions (≈15%) | $4.82 |

(Dkt. 1333 at p. 126.)

    374.  For the reasons I provide below, Dr. Parkvall's technical analysis of

Ericsson's 4G SEPs and Mr. Kennedy's "ex standard" value analysis of the Data

Rates Technical Currency are both fundamentally flawed.

a.   *Dr. Parkvall's opinion that Ericsson's patented technology was critical to improve data speeds from 3G to 4G is not supported by facts.*

375.   First, Dr. Parkvall's opinion that "Ericsson's patented technology was critical to improve data speeds from 3G to 4G" is not supported by facts.  (Dkt. 1333 at ¶ 251.)  As shown below, Mr. Kennedy relies on Dr. Parkvall's purported findings for two technology subareas, namely:  (1) 3G/4G Data Transmission, and (2) 4G Carrier Aggregation.

214.   To summarize my conclusions, I found at least the following benefits for these five technology sub-areas:

| | |
|---|---|
| 3G/4G Connection Establishment: | latencies as low as one-tenth to one-hundredth of the latencies in the alternatives; |
| 3G/4G Data Transmission: | a smaller handset buffer; 10%+ higher data rate; 50%+ higher system throughput. |
| 4G Resource Allocation: | at a least 50% improvement (and up to a 127% improvement) in system throughput; over double the user bitrate. |
| 4G Sleep Mode Solutions: | 53% increase in handset operational time. |
| 4G Carrier Aggregation: | 3.5 dB better uplink peak-to-average ratio; 16% increase in spectral efficiency; 10dB coverage improvement; 80% increase in data rates or 40% increase in network capacity. |

(Dkt. 1360 at ¶ 214 (annotations added).)

376.   Sections III.A (Data Transmission) and III.B (Carrier Aggregation) above contain the detailed analysis supporting my opinion that Dr. Parkvall's per-technology approach grossly overvalues Ericsson's Data Transmission and Carrier Aggregation Patent Families.  I also demonstrated in these sections that Dr. Parkvall

HIGHLY CONFIDENTIAL
SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1   failed to provide reasoning or evidence sufficient to support his flawed analyses.

2   (*See* Sections III.A, III.B, *supra*.)  Moreover, even looking past these fundamental

3   flaws, and the lack of reasoning and support in Dr. Parkvall's opinions, I explained

4   that Dr. Parkvall's technology-by-technology approach and the resulting opinions in

5   these subareas are either irrelevant to the key issues or are merely speculative and

6   unsupported by the documents or other information Dr. Parkvall relies on as

7   evidence.  Here, I summarize my specific findings with respect to Ericsson's SEPs

8   for the Data Transmission and Carrier Aggregation technical subareas.

9          377.   With respect to Data Transmission, Dr. Parkvall's argument and

10  evidence regarding the "10%+ higher data rate" does not show that "Ericsson's

11  patented technology was critical to improve data speeds from 3G to 4G."  Dr.

12  Parkvall arrives at this 10%+ figure by comparing the benefits of 4G LTE that uses

13  Hybrid ARQ (HARQ) based on incremental redundancy (incremental redundancy

14  HARQ) to his hypothetical "sliding-window" alternative, which is based on "early

15  3G Data Transmission technologies."  (Dkt. 1360 at ¶ 91.)  As discussed in detail in

16  Section IV.2 (immediately below), incremental redundancy and its use in HARQ

17  was well-known before LTE was standardized and was developed and introduced

18  into the standard by others.  Accordingly, Dr. Parkvall's replacement of incremental

19  redundancy HARQ with his hypothetical early 3G sliding-window alternative leads

20  to a gross overvaluation of Ericsson's 4G SEP Families.

21         378.   In addition, as discussed in Section III.A.2, my analysis also shows that

22  Ericsson does not have an extensive array of important patents in the Data

23  Transmission subarea.  Dr. Parkvall identified 38 Ericsson 3G/4G Data

24  Transmission Patent Families.  (Dkt. 1360 at ¶ 86.)  Based on a detailed analysis,

25  reasoning, and evidence, I found only 18 of these patents to be essential and non-

26  expired.  (*See, e.g.*, Section III.A.2.a, *supra*.)  My analysis also found that only 3 of

27  the 38 Data Transmission Patent Families (*i.e.*, P19911 (3G), P28186 (2G), and

28  P31755 (3G)) can be considered to provide at least a moderate improvement to the

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1 standard relative to available alternatives.  (Ex. 1639 at pp. 597–99, 1138–42, 1259–

2 66.)  This is represented in **FIGURE 56** below (green and yellow bubbles).



**FIGURE 56 (PDX 209): Contribution and Importance Ranks**

**for Ericsson's Data Transmission Patent Families**

379.    With respect to the 4G Carrier Aggregation subarea, Mr. Kennedy provides his Data Rates Technical Currency analysis by first referring to Dr. Parkvall's opinion that Carrier Aggregation (a feature of LTE-Advanced or "LTE-A") purportedly provides "upwards of 80% of the higher data rates than any alternative solutions lacking Ericsson's patented technologies." (Dkt. 1333 at ¶ 249 (citing Parkvall Witness Declaration); Dkt. 1360 at ¶¶ 214.)   Interestingly, the $33 value from the 2012 Smartphone Feature Analysis does not depend on Carrier Aggregation.  This is evident from the fact that iPhone 5 (on which the analysis was based) did not support LTE-A and hence Carrier Aggregation.  (*See* Ex. 2540 at p. 3 (describing that LTE supported by iPhone 6 is "CAT 4" and thus is capable of supporting carrier aggregation); Ex. 2557 at p. 2 (describing that LTE supported by iPhone 5 is "CAT 3" and thus is ***not*** capable of supporting carrier aggregation); Ex. 5301 at p. 6 (describing support of LTE Advanced versus LTE for various models).) Therefore, Dr. Parkvall's opinion regarding Carrier Aggregation and its alleged contribution to LTE-A's superior data rates performance is irrelevant to Mr. Kennedy's analysis.  Indeed, the alleged 80% in data rates that Dr. Parkvall appears to have determined is irrelevant to Mr. Kennedy's calculations.

380.    Regardless, Dr. Parkvall identified 18 Ericsson 3G/4G Carrier Aggregation Patent Families.  (Dkt. 1360 at ¶ 105.)  Based on a detailed analysis, reasoning, and evidence, I found only nine of these patents to be essential.  (*See, e.g.*, Section III.B.2.a, *supra*.)  My analysis also found that only 2 of the 18 Carrier Aggregation Patent Families (*i.e.*, P29465 (4G) and P31755 (4G)) can be considered to provide at least a moderate improvement to the standard relative to available alternatives.  (Ex. 1639 at pp. 1174–79, 1259–66.)  This is represented in **FIGURE 57** below (green and yellow bubbles).

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

**FIGURE 57 (PDX 211): Contribution and Importance Ranks**

**for Ericsson's Carrier Aggregation Patent Families**

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

381.   Moreover, Ericsson's proportional shares of essential patent families in the Data Transmission and Carrier Aggregation subareas are insubstantial, as summarized in **TABLE 18** below.

| Technical Subarea | Ericsson's Proportional Share |
|---|---|
| 3G Data Transmission | 1.5% |
| 4G Data Transmission | 6.6% |
| 4G Carrier Aggregation | 7.1% |

**TABLE 18 (PDX 212): Ericsson's Proportional Shares of Essential Patent Families in the Data Transmission and Carrier Aggregation Subareas**

382.   These findings strongly support my opinion that, contrary to Dr. Parkvall's opinion, Ericsson's patented technology was ***not*** critical to improve data speeds from 3G to 4G.

> b.   *By relying on Dr. Parkvall's flawed technical analysis, Mr. Kennedy captures the value of the LTE standard itself.*

383.   By relying on Dr. Parkvall's flawed and misleading technical analysis, Mr. Kennedy captures the value of the LTE standard itself, instead of valuing Ericsson's patented technology.  More specifically, Dr. Parkvall improperly credits Ericsson with performance improvement associated with LTE's main building blocks, including LTE's basic framework and key core technologies, despite the fact that they: (1) were known and developed by others before standardization of LTE and (2) are responsible for the bulk of LTE's superior performance.  Not surprisingly, this flawed input to his "ex standard" value analysis leads Mr. Kennedy to grossly overvalue Ericsson's alleged SEPs.

HIGHLY CONFIDENTIAL

SMRH:481062607.2

384.   As explained in Section IV.B above, Ericsson did not develop nor do any of its purported SEP Families cover, LTE's basic framework (*e.g.*, OFDMA) or the key core technologies that are responsible for the vast majority of LTE's performance improvements over 3G and other wireless technologies, including data rates.

385.   At best, Ericsson's SEPs relate to incremental improvements (*e.g.*, relatively minor changes and additions) to the specifications, but Ericsson's patented features associated with the incremental improvements could have been easily replaced with available alternatives (including the non-infringing alternatives that I identified in my Opening Report) at the respective times of adoption into the LTE standard.  This supports (and explains) my finding that 77 (or 95%) out of 85 Ericsson 4G family/standard pairs provide little to no intrinsic technical value to the LTE standard, relative to available alternatives.

386.   As discussed above, relying on this flawed technical analysis by Dr. Parkvall, Mr. Kennedy assigns the entirety of $33 (from the 2012 Smartphone Feature Analysis) to 4G SEPs and purportedly assigns ~15% (based on Ericsson's purported share of 4G approved contributions) of $33 to Ericsson.  In so doing, Mr. Kennedy is capturing the value associated with LTE's basic framework (*e.g.*, OFDMA) and key core technologies (including the eight key LTE features that Dr. Parkvall and other engineers specifically identified) that are responsible for the vast majority of LTE's performance improvements over 3G and other wireless technologies.

387.   For example, OFDMA constitutes LTE's basic framework and is the enabling technology for other significant key LTE technologies such as channel dependent frequency scheduling based on time and frequency that, according to Ericsson's engineers, has a significant impact on data rates.  Thus, OFDMA is responsible for a significant majority of LTE's superior data rate performance over 3G and hence a significant portion of the $33 that Mr. Kennedy utilizes in his value

analysis.  As discussed in Section IV.B.1, however, the first paper on OFDM (OFDMA is a multi-user access scheme employing the OFDM technology) was in 1966 by R.W. Chang, and a related patent issued to Bell Telephone Laboratories in 1970.  (Ex. 1332.)  As such, OFDMA was clearly in the public domain and was free for all to use well before LTE was developed.  Yet Mr. Kennedy's "ex standard" analysis improperly captures this value, as well as other key LTE technologies that were well-known and developed by others.

388.   As discussed in Section IV.C.1.a above, Mr. Kennedy, relies on Dr. Parkvall's conclusion regarding "10%+ higher data rate."  (Dkt. 1360 at ¶ 214.)

| 3G/4G Data Transmission: | a smaller handset buffer; |
| | 10%+ higher data rate; |
| | 50%+ higher system throughput. |

389.   As explained above (Section III.A, *supra*), Dr. Parkvall compares the performance of 4G LTE that uses incremental redundancy HARQ to the performance of his hypothetical system that uses the outdated early 3G sliding-window technology to support the 10%+ figure improvement in data rates figure. As shown below, incremental redundancy as used in HARQ is one of the eight key LTE technologies identified by Ericsson's engineers.

TABLE I
LTE KEY CHARACTERISTICS

| Function (slogan used in Fig. 1-2) | LTE | Mobile WiMAX wave 2 | Performance impact |
|---|---|---|---|
| Multiple access (MA) | OFDM in DL, DFT-spread OFDM in UL | OFDM in DL and UL | DFT-spread OFDM reduces the peak-to-average power ratio and reduces terminal complexity, requires one-tap equalizer in base station receiver |
| Uplink power control (PC) | Fractional pathloss compensation | Full pathloss compensation | Fractional pathloss compensation enables flexible trade off between average and cell-edge data rates |
| Scheduling (Scheduling) | Channel dependent in time and frequency domain | Channel dependent in time domain | Access to the frequency domain yields larger scheduling gains |
| MIMO scheme (MIMO) | Horizontal encoding (multiple codewords), closed loop with precoding | Vertical encoding (single codeword) | Horizontal encoding enables per-stream link adaptation and successive interference cancellation (SIC) receivers |
| Modulation and coding scheme granularity (MCS) | Fine granularity (1-2dB apart) | Coarse granularity (2-3dB apart) | Finer granularity enables better link adaptation precision |
| Hybrid ARQ II (HARQ) | Incremental redundancy | Chase combining | Incremental redundancy is more efficient (lower SNR required for given error rate) |
| Frame duration (CQI delay) | 1ms subframes | 5ms frames | Shorter subframes yield lower user plane delay and reduced channel quality feedback delays |
| Overhead / control channel efficiency (OH / CCH eff) | Relatively low OH (while control channels are robust) | Relatively high OH | Lower overhead improves performance |

(Ex. 1450 at p. 2.)

390.   As discussed in my Witness Declaration, incremental redundancy and HARQ were known and developed by others before standardization of LTE.  (*See* Dkt. 1334 at § IX.F.)  Indeed, incremental redundancy is an old idea that has been known since the 1970s and certainly well before the first version of LTE (*i.e.*, Release 8).  (Dkt. 1391 (Mandelbaum).)  In addition, others such as Panasonic, Siemens, and Motorola were developing and proposing incremental redundancy functions related to HARQ II in 1999 and 2000.  (*See, e.g.*, Ex. 1412; Ex. 1413; Ex. 1410.)  Furthermore, in connection with my analysis of Ericsson's 4G patent families at issue in this litigation, I determined that none of these patents are specifically directed to incremental redundancy as identified as the key distinguishing feature for the 4G HARQ II function.  (Ex. 1450 at p. 2 (TAB. 1).)

391.   Accordingly, Dr. Parkvall's opinion regarding the 10% improvement in data rate captures the benefits of the LTE standards in general, and particularly that from incremental redundancy HARQ as a whole.  While it is possible that some of Ericsson's alleged SEPs are related to incremental redundancy and/or HARQ and

perform some other, incremental functions, none of them cover the key LTE distinguishing feature of incremental redundancy or HARQ itself.  To attribute the technical value of this well-known feature as a whole to these incremental functions grossly inflates the relative importance of Ericsson's SEPs, and captures not only the value of the LTE standard, but also the value of technologies that were developed by others and available before the LTE standard.

392.   Mr. Kennedy's purported apportionment does not cure this fundamental flaw.  First, approved contribution counting is an unreliable method of assessing the importance of companies' patent portfolios for all the reasons set forth below, in my witness declaration, and Dr. Rudi Bekkers's witness declaration.  (*See* Sections V, *infra*; Dkt. 1334 at § VIII; Dkt. 1314 at § VI.)  Even if one looks past this flaw, however, Mr. Kennedy's purported apportionment still does not "excise" the values associated with  LTE's basic framework (*e.g.*, OFDMA) and key core technologies (including the eight key LTE features that Dr. Parkvall and other engineers specifically identified) that are responsible for the vast majority of LTE's performance improvements over 3G.

393.   Therefore, contrary to his assertion, Mr. Kennedy's "ex-standard" analysis with respect to the 4G "data rates" currency fails to excise "the value resulting from [Ericsson's patented technology's alleged] incorporation" in the standard.  (Dkt. 1333 at ¶ 227.)  In fact, due to his reliance on the flawed approach taken by Dr. Parkvall, Mr. Kennedy's Data Rates value analysis is based on a technical value that is inexplicably tied to the value resulting from LTE standardization and not Ericsson's SEPs and, as a result, captures the value of the LTE standard itself.

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

2.   Dr. Parkvall's Flawed Technical Value Analysis Leads to Mr. Kennedy's Gross Overvaluation of the "Battery Life" Technical Currency.

394.   The primary input to Mr. Kennedy's "ex standard" analysis of the Battery Life Technical Currency is Dr. Parkvall's opinion that 4G Sleep Mode Solutions that "incorporate Ericsson's technology allows a 4G mobile phone to enter into an effective sleep-mode that conserves a mobile phone's power, which is further enhanced by the speed at which mobile phones can switch between idle and active states" and that "[t]his efficiency accounts for a 53% increase over the alternative solution."  (Dkt. 1333 at ¶ 236 (citing Dkt. 1360 at ¶¶ 176, 177, 184).)

395.   Based on this input from Dr. Parkvall and from the 2012 Smartphone Feature Analysis, Mr. Kennedy opines that "a 53% improvement to a standard battery life of 6 hours would result in an increase of total life by 3 hours" and "applying the average consumer willingness to pay for additional talk time, three hours of additional battery life would be worth about $15.89."  (Dkt. 1333 at ¶¶ 239–41.)

396.   Mr. Kennedy then allegedly apportions this amount based on "Ericsson's share of approved contributions (14.6%)" and "on the results of TCL's own patent counting analysis (6.0%)" to $2.32 and $0.95, respectively, per mobile phone.  (Dkt. 1333 at ¶ 242.)  Mr. Kennedy's Battery Life Technical Currency value analysis and results are summarized in FIGURE 57 of his Witness Declaration, reproduced below.

**FIGURE 57:  Economic Value of 53% Improvement In Battery Life (Model 1)[154]**

| DESCRIPTION | CALCULATION |
|---|---|
| Base Level Talk Time | 6 hours |
| 53% Increase in Battery Life (in Talk Time) | 3.18 hours |
| Average Willingness to Pay For Additional Talk Time (IPR Smartphone Feature Analysis) | $5.00 per hour |
| **Customer Willingness to Pay For 53% Increase In Battery Life** | **$15.90** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved 4G Contributions (≈15%) | $2.32 |

(Dkt. 1333 at ¶ 252.)

397.  Dr. Parkvall's analysis regarding Ericsson's 4G Sleep Mode Solutions SEPs and Mr. Kennedy's analysis regarding the battery life technology currency are both fundamentally flawed for several reasons.

398.  As discussed in Section III.E (Sleep Mode Solutions) above, Dr. Parkvall arrives at the 53% battery-life improvement by comparing the LTE system with advanced sleep mode solutions (*i.e.*, DRX technologies that allow the UE to switch between CONNECTED and IDLE states) to the circuit-switched 2G system where the UE remains in the CONNECTED state all the time.  Thus, Dr. Parkvall, under his flawed per-technology approach, uses an extremely outdated and ineffective hypothetical system devoid of the very technology at issue as the benchmark and compares it against LTE with advanced sleep mode technologies. Not surprisingly, this comparison leads Mr. Kennedy to grossly overvalue Ericsson's Sleep Mode Solutions Patent Families.

399. Dr. Parkvall's opinion that Ericsson's Sleep Mode Solutions SEPs made significant contributions to "efficiency [that] accounts for a 53% increase over the alternative solution" that Mr. Kennedy cites to in support of his "ex standard" value analysis of the Battery Life Technical Currency is clearly not supported. (Dkt. 1333 at ¶ 236.)

400. As explained in Section III.E above, Dr. Parkvall identifies 11 patent families in the Sleep Mode Solutions category. I determined that these 11 patent families included: (1) six families that do not include essential patents or include only expired or otherwise irrelevant families; and (2) three incorrectly-classified families. Excluding these families, there are only *three* Ericsson SMS Families (namely, P22621 (3G), P24241 (4G), and P34420 (4G)) that are potentially relevant.

401. I also determined that these three potentially relevant Ericsson Sleep Mode Solutions Patent Families are directed to narrow and modular solutions. Moreover, as discussed in Section III.E above, only 1 of the 11 Ericsson Sleep Mode Solutions Patent Families is even arguably directed to the technical feature at issue ("DRX while in RRC_CONNCTED"). (*See* Dkt. 1360 at ¶ 185.) This particular feature is discussed in Section 12 of 3GPP TS 36.300 (Ex. 2578 at pp. 69–70), and based on my review of the standard and my review of the standards accused in Ericsson's claim charts for all of the 11 purported Sleep Mode Solutions Patent Families, patent family P21787 is the only family charted against Section 12 of 3GPP TS 36.300. (Ex. 1639 at p. 658.) I found that patent family P21787 is not essential to the 4G standard. (Ex. 1639 at pp. 657–59.) But even assuming that the P21787 patent family is essential, the scope of the purported invention is far narrower than the feature Dr. Parkvall relies on in connection with identifying non-infringing alternatives.

402. As such, Dr. Parkvall's per-technology approach under which he only considered the extremely outdated and ineffective hypothetical alternative based on the circuit-switched 2G system is fundamentally flawed because other alternatives

HIGHLY CONFIDENTIAL
SMRH:481062607.2
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1   exist.  (*See* Section III.E, *supra*.)  In this regard, for these three potentially relevant

2   patent families, I identified and analyzed viable alternatives that were available and

3   determined that none of the families can be considered to provide even a moderate

4   improvement to the respective standards relative to those alternatives.  Dr. Parkvall

5   did not analyze or rebutted any of those alternatives.

6

7

8



**FIGURE 58 (PDX 213):  Contribution and Importance Ranks
for Ericsson's Sleep Mode Solutions Patent Families**

403.   In addition, Dr. Parkvall did not identify even one Ericsson patent that he alleges is a critically important patent that would thus contribute to the overall value of the Ericsson SEP Families.  None of the technical documents that Dr. Parkvall cite, including the Wiorek paper (Ex. 4999) that he relies on for the alleged ▮ improvement in battery life, mention Ericsson, much less show Ericsson's contribution to the battery-life improvement.

404.   Lastly, my industry-wide classification of Ericsson's SEP Families under the Parkvall Classification Framework shows that Ericsson's proportional share of essential patent families in the Sleep Mode Solutions subarea is only 2.4%.

405.   These findings strongly show that Mr. Kennedy's opinion that Ericsson's Sleep Mode Solutions SEPs made significant contributions to "efficiency [that] accounts for a 53% increase over the alternative solution" is simply unsupported.  (Dkt. 1333 at ¶ 236.)

406.   Therefore, Mr. Kennedy's "ex-standard" analysis with respect to the Battery Life Technical Currency fails to excise "the value resulting from [Ericsson's patented technology's alleged] incorporation" in the standard.  (Dkt. 1333 at ¶ 237.) In fact, due to his reliance on Dr. Parkvall, Mr. Kennedy's Battery Life Technical Currency value analysis is based on a technical value that is inexplicably tied to the value resulting from standardization, not Ericsson's SEPs.  As a result, Mr. Kennedy captures the value of not only the 4G standard but also that of 3G standard and the packet-switched 2G standard.

## V.   PROBLEMS WITH CONTRIBUTION COUNTING

407.   Ericsson is pushing the concept of "contribution counting" as a superior method to determining the strength of its alleged SEP portfolio.  (*See, e.g.*, Dkt. 1325 at § III.C; Dkt. 1322 at § IV.B.)  In my opening Witness Declaration, I stated that there is no direct correlation between approved contributions submitted by a member of 3GPP and any patents owned by such member, and showed how some approved contributions are not related to patentable features that would be embodied

in any patent claim.  (Dkt. 1334 at § VIII.)  Ericsson's experts acknowledge that there is no direct relationship between approved contributions and the claims of issued patents.  (*See, e.g.*, Dkt. 1325 at ¶ 35 ("Critics of contribution counting argue that contributions made by companies and accepted into the relevant 3GPP technical specifications are not directly tied to patents.  ***While this is true***, ….") (emphasis added); Dkt. 1322 at ¶ 85 ("That ***approved contribution counting is an indirect method*** of measuring a company's essential patent portfolio strength….") (emphasis added).)

408.   However, despite this admitted flaw, Ericsson's experts believe contribution counting is a valid proxy for determining the strength of Ericsson's alleged SEP portfolio, on the assumption "contributors to standardization often file for patent protection on their technology contributions to 3GPP."  (Dkt. 1322 at ¶ 66; *see also* Dkt. 1325 at ¶ 34 ("Contribution counting … assumes that sophisticated companies protect any patentable inventions in those contributions in a similar manner.").)  Mr. Mallinson argues that an indirect measure of some metric is not inherently inferior, citing to the concept of using Doppler shift (which measures difference in wavelength) to determine the velocity of a moving star in astronomy. (Dkt. 1322 at ¶ 87.)

409.   Although I agree indirect measurements are not inherently inferior to direct measurements, the relationship between contributions and patents is in no way similar to the relationship between velocity and difference in wavelength.  The use of Doppler shift to indirectly measure velocity has a basis in the laws of physics. Namely, there is a known and proven relationship between velocity, frequency, and difference in wavelength that can be exploited to perform indirect measurements.  In order for an indirect measurement to be accurate and reliable there must be some proven and accepted relationship between the data being measured and the ultimate metric being sought.

410.   There is absolutely no proven relationship between contributions and patents that would support the reliability and accuracy of contribution counting as a measure of the strength of a patent portfolio as admitted by Ericsson's own experts, and none of Ericsson's experts provide any countervailing evidence.  (*See* Dkt. 1325 at ¶ 35; Dkt. 1322 at ¶ 85.)  The entire premise underlying Ericsson's argument that contributions can serve as a "proxy" for measuring patent strength is the unproven assumption that each contributor would be able to obtain claims covering the features described in contributions.  (Dkt. 1325 at ¶ 35.)  Without some agreed to truth underlying the exercise, there is no reason to believe that an indirect measurement is either accurate or reliable.  Mr. Delgado mentions that the contribution counting Ericsson relies on filters "at the macro level" the approved contributions to ensure that those contributions are "technical in nature," but review on a macro level fails to connect in any way these "technical" contributions to a single one of Ericsson's alleged SEPs.  (*See* Dkt. 1325 at ¶ 34.)  Applying a filter fails to cure the lack of any identifiable and accepted relationship between the substance of contributions and the scope of issued patent claims.

411.   For at least these reasons, as well as the reasons expressed in my opening Witness Declaration and the opening Witness Declaration of Dr. Rudi Bekkers, Ericsson's reliance on contribution counting is flawed and fails to provide an accurate or reliable measure of the relative strength of Ericsson's alleged SEP portfolio.  (*See* Dkt. 1334 at § VIII; Dkt. 1314 at § VI.E.)

## VI.   THE INDUSTRY-WIDE ESSENTIALITY ANALYSIS IS RELIABLE.

412.   The Essentiality Assessment conducted by Concur IP and quality checked by Dr. Zhi Ding determined the total number of patent families that are essential to the 2G, 3G, and 4G standards and are directed to User Equipment.  As discussed in my Witness Declaration, the Industry-Wide Essentiality Analysis included the Patent Census (Dkt. 1334 at ¶ 29) and Concur IP's Essentiality Assessment (*id.* at ¶¶ 33–36).  The Patent Census involved determining the total set

of patent families covered by IPR declarations submitted to ETSI. (*Id.* at ¶¶ 29–31.) The Essentiality Assessment involved determining which of the declared-essential patent families directed to User Equipment includes patents that are essential to the 2G, 3G, and/or 4G standards. (*Id.* at ¶¶ 33–36.) Under the direction of myself and Dr. Zhi Ding, Concur IP made the essentiality determinations for 2,600 patent families in connection with the Essentiality Assessment. (*Id.* at ¶¶ 34, 312.) In my opinion, our analysis is accurate and reliable.

## A. **The Quality of the Industry-Wide Essentiality Assessment**

413. Mr. Mallinson "concluded that the essentiality analysis performed by Concur IP is unreliable and should be disregarded . . . ." (Dkt. 1322 at ¶ 7.) In particular, he takes issue with the cost and time involved—roughly $250,000 ($100 per patent family) and 2,000 hours (45 minutes on average)—in Concur IP's essentiality analysis of 2,600 industry-wide patent families that Concur IP has already analyzed several times. (*Id.* at ¶¶ 7, 94–96.) Based on my involvement in similar studies in the past, the qualifications of the team involved in this project (including their institutional knowledge and memory of the patents under study), and the quality control measures we implemented, it is my opinion that the amount of time spent per family on average was sufficient.

### 1. The Essentiality Assessment Team is Highly Qualified.

414. Each member of the Essentiality Assessment team is highly qualified. In addition to Dr. Ding and myself, who supervised and checked the analysis of Concur IP's team members, these team members all have extensive experience analyzing patents and determining their essentiality to the 2G, 3G, and 4G standards. (*E.g.*, Dkt. 1334 at ¶¶ 313–14.) In addition, the Concur IP team members and myself are familiar with and have previously analyzed many of the patents under study in this case. Given our experience, we have individually and collectively developed an institutional knowledge of these patents. This memory

and knowledge has in my opinion increased our efficiency and ability to accurately assess the essentiality of the patents at issue in this case.

415.   In terms of formal qualifications, the Concur IP team members have at least bachelor's degrees in electrical engineering, and many years of experience analyzing cellular patents.  (*E.g.*, Dkt. 1334 at ¶¶ 313–14.)  My understanding is that all of the team members have also received months of formal training from a U.S. patent attorney.  (Sinha Tr. at 35:7–36:13.)  The team leader Sachin Sinha has 10 years of experience in the patent consulting industry, including, in my understanding, performing more than 25 projects analyzing the essentiality of several hundred or thousands of patents with respect to cellular standards.  (*Id.* at 142:16–24.)  In the past five years, I understand that the team members have collectively performed over 15 essentiality analyses like the one in this litigation.  Each of these essentiality analyses covered hundreds or thousands of patents.  (*Id.* at 145:1–7.)  Very recently, in another dispute, the Concur IP team analyzed 10,000 patents allegedly essential to the 2G, 3G, and 4G standards, including many of the very same patent families the team analyzed in connection with the Essentiality Assessment in this litigation.  (*Id.* at 103:8–16.)

2.   Several Quality Control Measures Increased the Essentiality Assessment's Reliability.

416.   In addition to the qualifications of the individuals involved in this study, we implemented several quality control measures that increased the accuracy and reliability of the Essentiality Analysis.  First, counsel for TCL and I met with the Concur IP team members over the course of a week in New Delhi, India.  (Dkt. 1334 at ¶ 315.)  During this week, we extensively discussed the protocol that the Concur IP team was to follow, as well as any questions related to the same.

417.   Second, Dr. Ding and I provided feedback to the Concur IP team throughout the course of their analysis, including on weekly and ad hoc telephone conference calls.  The iterative and regular nature of this feedback helped Concur IP

maintain and improve the accuracy of their analysis.  In addition, Dr. Ding
supervised Concur IP's implementation of the protocol we devised for the analysis.
Mr. Sinha also worked collaboratively with the Concur IP members and frequently
discussed any challenges or questions they may have had, in order to ensure the
accuracy of the analysis as well as its adherence to the protocol.  (Sinha Tr. at
114:2–12.)  As part of this protocol, any questions the Concur IP team had regarding
an essentiality determination could be raised to Dr. Ding and/or myself at any time.
(Dkt. 1334 at ¶ 315.)  Thus, for example, if any one family was taking too long or
was particularly difficult, Concur IP raised questions to Dr. Ding and me for
resolution.  (Sinha Tr. at 137:12–23.)

418.   Third, in connection with providing feedback to Concur IP over the
course of the Essentiality Assessment, Dr. Ding performed an accuracy check on
17% of the patent families Concur IP analyzed for essentiality—personally
reviewing 442 of the 2,600 patent families.  (Dkt. 1334 at ¶ 350; Dkt. 1326 at ¶ 19.)
The results of this accuracy check confirmed my opinion that the protocol we put in
place and implemented, as well as the quality of the team, resulted in an accurate
and technically sound analysis.  (Dkt. 1334 at ¶ 351.)

3.   The Amount of Time Spent on the Industry-Wide Essentiality
Analysis Was Sufficient.

419.   Mr. Mallinson opines that "[b]ecause cost is a good proxy for the time
devoted to and quality of the analysis at issue, and because of the subjectivity in
analysis regardless of cost and time spent, I conclude that Concur IP's analysis
should be disregarded."  (Dkt. 1322 at ¶ 7.)  In particular, Mr. Mallinson bases this
conclusion on his calculation that "the Concur IP team invested only about $100 or
45 minutes on average to evaluate each patent family for essentiality[.] . . ."  (Dkt.
1322 at ¶ 7.)  I disagree with Mr. Mallinson that these numbers are indicative of the
accuracy and reliability of the Industry-Wide Essentiality Analysis.

HIGHLY CONFIDENTIAL

SMRH:481062607.2

420. Mr. Mallinson notes that "Concur IP devoted just 45 minutes on average to its evaluation of *each* randomly selected declared patent family for essentiality." (Dkt. 1322 at ¶ 96 (emphasis added).) In reality, Concur IP did not spend any single amount of time in its evaluation of *each* patent family. Rather, based on my discussions with the team members and involvement in overseeing the project, my understanding is the team spent as much time as was necessary to accurately determine the essentiality of each patent family.

421. There was large variation in how long it took to analyze each patent family. My understanding is that some of the families took much less time. This was expected given that Concur IP has, over the course of analyzing many of the same patent families several times in a number of previous studies on the essentiality of the industry-wide 2G, 3G, and 4G patent families, developed a knowledge base of these patents as well as the related standards. In my experience in having analyzed a number of the same SEPs for essentiality multiple times in different cases, this knowledge base can greatly increase efficiency.

422. For more difficult or less familiar patent families, Concur IP would spend more time, including internal discussions and raising the patent family for discussion with Dr. Ding and myself. The *mean* number of 45 minutes per patent family obtained by dividing the total number of time spent (2,000 hours, not including my and Dr. Ding's time) by the number of patent families (2,600) distorts the practical reality of these types of studies, particularly given the institutional knowledge of the Concur IP team.

**B.** **Mr. Mallinson's Comparison of the SEP Analysis to the Industry-Wide Essentiality Analysis Fails to Show Either Study Is Not Reliable.**

423. While there are some differences between the SEP Analysis and the Essentiality Assessment, I do not agree with Mr. Mallinson's characterization of these projects or their results as "wildly inconsistent." (Dkt. 1322 at § IV.5.) The

1   SEP Analysis focused only on Ericsson's patents.  (Dkt. 1334 at ¶ 28.)  The

2   essentiality aspect of the SEP Analysis was based on Ericsson's claim charts,

3   including the technical specifications and standards cited in the claim charts, the

4   allegations in the claim charts regarding how the claims purportedly read on those

5   standards, and the file histories of the patents.  Additionally, the SEP Analysis to

6   some extent considered the input of Ericsson's in-house engineers and patent

7   lawyers provided in response to my Expert Reports in this case.  In some cases,

8   Ericsson's responses expanded or built upon the positions set forth in Ericsson's

9   claim charts.  By contrast, the Essentiality Assessment did not use claim charts, the

10  file histories, or inputs from Ericsson's employees, but instead used the standards

11  identified in the IPR declarations associated with the patents Concur IP analyzed.

12      424.   Importantly, as I discussed in my Witness Declaration, the occurrences

13  of alleged "discrepancies" in essentiality determinations as between the SEP

14  Analysis and the Essentiality Assessment fall within the acceptable error rates Dr.

15  Ding calculated.  (Dkt. 1334 at ¶ 350.)  The fact that these accuracy rates are non-

16  zero does not mean both studies or either on their own are unreliable.  Rather, it

17  reflects the practical reality that no study of this size is 100% perfect.  But in my

18  experience, my analysis of Ericsson's SEPs and Dr. Ding and Concur IP's analysis

19  of the industry-wide SEPs are some of the most rigorous and extensive studies that

20  have ever been conducted in the industry.

21      425.   In addition, the Industry-Wide Essentiality Assessment is self-

22  consistent.  Therefore, the alleged discrepancies identified by Mr. Mallinson are

23  simply small imperfections and they do not affect my opinion that both the SEP

24  Analysis and the Industry-Wide Essentiality Analysis are accurate, technically

25  sound, and reliable overall.

26

27

28

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct, and that I executed this Witness

3   Declaration on February 8, 2017, at _San Diego, CA_____.

4

5

6                   Dr. Apostolos (Paul) Kakaes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HIGHLY CONFIDENTIAL      Case No. SACV14–00341 JVS (DFMx)/CV15–02370

**TABLE OF EXHIBITS CITED IN REBUTTAL WITNESS DECLARATION**

| Exhibit No. | Description |
|---|---|
| Ex. 379 | ETSI Sub Technical Committee SMG11 Special Mobile Group Meeting Report, ETS/STC SMG11#8, Nov. 23-27, 1998, ETSI/STC SMG11 (98) |
| Ex. 380 | ETSI SMG Meeting no. 29, June 23-25, 1999, ETSI/SMG(99)2 |
| Ex. 386 | 3GPP TS 26.094 v6.0.0 (2004-12) Technical Specification |
| Ex. 1045 | Signals Research Group publication titled "The Essentials of Intellectual Property, from 3G through LTE Release 12," dated May 2015 |
| Ex. 1077 | Signals Research Group report titled "The Essentials of Intellectual Property, Part Two: Quantifying Technology Leadership in the Development of the LTE Standard through June 2014," dated Nov. 2014 |
| Ex. 1335 | Docomo webpage "LTE (Long Term Evolution)" |
| Ex. 1355 | 3GPP TSG-RAN Meeting #52bis, Mar. 31 - Apr. 1, 2008, R1-081582 |
| Ex. 1364 | Claim chart for claim 1 of EP No. 2,238,801 |
| Ex. 1373 | U.S. Patent Application Publication No. 2006/0153112 |
| Ex. 1392 | IEEE publication titled "Impact of Multiuser Diversity and Channel Variability on Adaptive OFDM," by W. Wang, 2003 |
| Ex. 1397 | IEEE Communications Magazine publication titled "Frequency Domain Equalization for Single-Carrier Broadband Wireless Systems," by D. Falconer, Apr. 2002 |
| Ex. 1402 | IEEE Globecom publication titled "Queue-Aware Uplink Bandwidth Allocation for Polling Service in 802.16 Broadband Wireless," by D. Niyato, 2005 |
| Ex. 1410 | "Release 2000 Features," TSG-RAN Working Group 1 meeting#13, May 22-25, 2000, TSGR1#13(00)27 |
| Ex. 1412 | 3GPP TSG RAN WG1#2, Feb. 22-25, 1999, R1-99061 |
| Ex. 1413 | 3GPP TSG-RAN, Meeting #7, Mar. 13-17, 2000, Tdoc TSGRP#7(00)0054 |
| Ex. 1416 | "4G: LTE/LTE-Advanced for Mobile Broadband, 2nd Ed.," E. Dahlman and S. Parkvall, 2014 |
| Ex. 1443 | Change request for "Cancellation of Scheduling Request," 3GPP TSG-RAN WG2 Meeting #65, Feb. 9-13, 2009, R2-091240 |

HIGHLY CONFIDENTIAL

SMRH:481062607.2

Case No. SACV14−00341 JVS (DFMx)/CV15−02370
CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

| Ex. 1444 | U.S. Patent No. 8,134,940 |
| Ex. 1446 | "Power Control Details for PUCCH Format 3," 3GPP TSG WG1 Meeting #63, Nov. 15-19, 2010, R1-105914 |
| Ex. 1450 | Publication titled "The LTE Radio Interface - Key Characteristics and Performance," by A. Furuskar |
| Ex. 1452 | 3GPP TSG-RAN2 Meeting #67, Aug. 24-28, 2009, R2-095380 |
| Ex. 1459 | U.S. Patent Publication No. 2005/0128993 |
| Ex. 1460 | Curriculum Vitae of Babak Hassibi |
| Ex. 1461 | Curriculum Vitae of R. Michael Buehrer |
| Ex. 1462 | Curriculum Vitae of Shuguang Cui |
| Ex. 1463 | Curriculum Vitae of Faramarz Fekri |
| Ex. 1464 | Curriculum Vitae of Young-Han Kim |
| Ex. 1465 | Curriculum Vitae of Gordon Stuber |
| Ex. 1466 | Curriculum Vitae of Matthew Valenti |
| Ex. 1467 | Curriculum Vitae of Alexander Vardy |
| Ex. 1468 | Curriculum Vitae of Liuqing Yang |
| Ex. 1577 | Revised Annex A to Ericsson's Objections and Fourth Supplemental Responses to TCL's Interrogatory Nos. 5 and 6, dated 11/12/15 |
| Ex. 1579 | Expert/Consultant Curriculum Vitae of Professor Zhi Ding |
| Ex. 1608 | 3GPP TS 25.211 V6.0.0 (2003-12) Technical Specification |
| Ex. 1609 | IEEE Standard for Local and Metropolitan Area Networks, "Part 16: Air Interface for Fixed Broadband Wireless Access Systems," 802.16 - 2001 |
| Ex. 1610 | Exhibit A to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16, titled "Protocol for Classification Analysis" |
| Ex. 1611 | Exhibit B to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16, spreadsheet titled "Classification Analysis" |
| Ex. 1637 | EP No. 2,238,801 |
| Ex. 1638 | Errata Exhibit 1:  Corrected Appendices to Expert Report of Dr. Nikil Jayant, dated 2/1/16 |

HIGHLY CONFIDENTIAL

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

| Ex. 1639 | Errata Exhibit 1: Corrected Appendices to Second Supplemental Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 5/28/16 |
|---|---|
| Ex. 2520 | Ericsson's First Supplemental Responses to Plaintiffs' Fourth Set of Interrogatories (No. 35), dated 11/9/15 |
| Ex. 2534 | 3GPP presentation titled "LTE-Advanced Physical Layer" by Matthew Baker, 3GPP, TSG RAN WG1, Dec. 17-18, 2009, REV-090003r1 |
| Ex. 2535 | Document titled "UTRA-UTRAN Long Term Evolution (LTE) and 3GPP System Architecture Evolution (SAE)" |
| Ex. 2536 | 3GPP TR 25.814 V0.4.1 (2005-11) Technical Report |
| Ex. 2537 | 3GPP TR 25.814 V1.0.1 (2005-11) Technical Report |
| Ex. 2538 | IEEE Communications Magazine publication titled "LTE: The Evolution of Mobile Broadband" by Astely et al, Ericsson Research, dated Apr. 2009 |
| Ex. 2539 | Publication titled "Computer Networks, Third Ed." by A. Tanenbaum (excerpts) |
| Ex. 2540 | PhoneArena.com webpage displaying Apple iPhone 6 Specifications |
| Ex. 2541 | EP No. 1,790,108 |
| Ex. 2542 | Ericsson's Fed. R. Civ. P. 26(a)(2)(C) Disclosure of Rebuttal Testimony by Stefan Parkvall, dated 4/4/16 |
| Ex. 2543 | US Patent No. 8,416,808 |
| Ex. 2544 | Ericsson claim chart for US Patent 8,347,196 (P24228 (4G)) |
| Ex. 2545 | "Remaining Details on ACK/NACK Bundling for TDD," 3GPP TSG-RANI #53bis, June 29-July 4, 2008, RI-082473 |
| Ex. 2546 | Search Results for Ericsson patent family P26724 |
| Ex. 2547 | "Handling of missing blocks in the reordering buffer," 3GPP TSG-RAN Joint WG1/WG2 AH #32, Nov. 5-7, 2001, R2A-010029 |
| Ex. 2548 | EP No. 1,702,446 |
| Ex. 2549 | 3GPP TS 36.300 V11.11.0 (2014-09) Technical Specification |
| Ex. 2551 | EP No. 2,301 ,296 |
| Ex. 2552 | "Limit Endless SR Transmission," 3GPP TSG-RAN WG2 #62bis, June 30 - July 4, 2008, R2-083436 |
| Ex. 2553 | 3GPP TS 36.331 V8.2.0 (2008-05) Technical Specification |

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

| Ex. 2561 | U.S. Patent No. 5,841,768 |
| Ex. 2564 | Ericsson Patent Search Results for P10808 - Ex. C to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16 |
| Ex. 2565 | Prentice Hall Publication titled "Fundamentals of LTE," by A. Ghosh (Table of Contents) |
| Ex. 2566 | Publication titled "LTE, The UMTS Long Term Evolution from Theory to Practice," by S. Sesia, 2009 |
| Ex. 2567 | "Open Issues on TBS Signaling," 3GPP TSG-RAN WG1#53bis, June 30 - July 4, 2008, R1-082513 |
| Ex. 2568 | Change Request re "Closed-Loop and Open-Loop Spatial Multiplexing," 3GPP TSG-RAN1 Meeting #53, May 5-9, 2008, R1-082268 |
| Ex. 2569 | ETSI Publication titled "Methods for SoLSA Exclusive Access," 3/17/99, Tdoc SMG12 C-99-415 |
| Ex. 2571 | U.S. Patent No. 8,989,117 |
| Ex. 2574 | 3GPP TS 36.213 V10.10.0 (2013-06) Technical Specification |
| Ex. 2576 | "Common PDCCH Design for Carrier Aggregation," 3GPP TSG RAN1#56bis, Mar. 23-27, 2009, R1-091327 |
| Ex. 2577 | Ericsson Patent Search Results for P34420 - Ex. H to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16 |
| Ex. 2579 | ETSI TS 136 300 V8.2.0 (2007-10) Technical Specification |
| Ex. 2580 | U.S. Patent No. 3,448,445 |
| Ex. 2581 | Exhibit F to Rebuttal Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 11/4/16, Ericsson Patent Family Search Results for P26071 |
| Ex. 4077 | Ericsson Claim Chart on US 5,737,695 (Internal ref: P07669) |
| Ex. 4124 | Ericsson Claim Chart on US 6,424,938 (Internal ref: P10992) |
| Ex. 4146 | Ericsson Claim Chart for Ep 1702446 (Internal ref: P19103 EP1) |
| Ex. 4147 | Ericsson Claim chart for EP-1,702,446 |
| Ex. 4303 | Ericsson Claim Chart for EP 1 790 108 B1 (Internal ref: P19911 EP1) Standard |
| Ex. 4477 | Ericsson Claim Chart for US 6,334,052 (Internal ref: P07873) Standard |
| Ex. 4502 | Ericsson Claim Chart for US 8,416,808 (Internal ref: P28186US2) Standard |

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

| Ex. 4978 | 5/1/2006 - Report: The LTE Radio Interface − Key Characteristics and Performance by Anders Furuskar, Tomas Jonsson, and Magnus Lundevall, Ericson Research, Sweden |
| Ex. 4981 | 10/17/2003 - Report: Analytical analysis of UMTS PS Domain delay improvements for 3GPP Release 99 based products |
| Ex. 4987 | Article: Latency in HSPA Data Networks |
| Ex. 4994 | 2/2011 - Article: Push Technology: A Key Ingredient of Application Interactivity by Seven Networks, Inc. |
| Ex. 4999 | 4/21/2015 - Report: LTE Radio Resource and UE Power Consumption with DRX Settings for Delay Tolerant Traffic |
| Ex. 5001 | Article: WCDMA Evolved - High-speed Data Access |
| Ex. 5009 | 08/2000 - 3GPP Document: ETSI TR 101 631 V8.0.0 (2000-08), Digital Cellular telecommunications system (Phase 2+); Technical performance objectives (GSM 03.05 version 8.0.0 Release 1999) |
| Ex. 5027 | 00/00/2010 - WCDMA For UMTS HSPA Evolution and LTE 5th Ed., H. Holma, et al. pg. 268-270 |
| Ex. 5183 | Ericsson Claim Chart for EP 2,260,667 (Internal ref: P25949 EP1) |
| Ex. 5197 | Ericsson Claim Chart for US 8902811 (Internal ref: P29465 US2) |
| Ex. 5198 | Ericsson Claim Chart for US 8902811 (Internal ref: P29465 US2) |
| Ex. 5294 | 05/5/2010 - Typical User Data Rate Evaluation |
| Ex. 5349 | Appendices to Disclosure of Rebuttal Testimony by Stefan Parkvall, dated 4/4/16 |
| Ex. 5457 | Patent EP 2,260,667 |

HIGHLY CONFIDENTIAL

Case No. SACV14−00341 JVS (DFMx)/CV15−02370

SMRH:481062607.2

CORRECTED REBUTTAL DECLARATION OF DR. KAKAES

# CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On February 8, 2017, I caused to be served the PLAINTIFFS' CORRECTED REBUTTAL DECLARATION OF EXPERT WITNESS DR. APOSTOLOS (PAUL) KAKAES to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| | David Sochia |
| | dsochia@mckoolsmith.com |
| | Douglas Cawley |
| | dcawley@mckoolsmith.com |
| | Nicholas Mathews |
| | nmathews@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 8, 2017, at San Diego, California.

By:    */s/ Kristina Grauer*
KRISTINA GRAUER