1    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2       Including Professional Corporations
     STEPHEN S. KORNICZKY, Cal. Bar No. 135532
3    skorniczky@sheppardmullin.com
     MARTIN R. BADER, Cal. Bar No. 222865
4    mbader@sheppardmullin.com
     MATTHEW W. HOLDER, Cal. Bar No. 217619
5    mholder@sheppardmullin.com
     12275 El Camino Real, Suite 200
6    San Diego, California 92130-2006
     Telephone: 858.720.8900
7    Facsimile: 858.509.3691

8    Attorneys for TCL Communication
     Technology Holdings, Ltd., TCT Mobile
9    Limited, and TCT Mobile (US) Inc.

10                    UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12
     TCL COMMUNICATION                    Case No. SACV14−00341 JVS (DFMx)
13   TECHNOLOGY HOLDINGS, LTD., *et*      Consolidated with CV15-02370
     *al.*,
14
                    Plaintiffs,           **REBUTTAL DECLARATION OF**
15                                        **PLAINTIFFS' EXPERT WITNESS**
            v.                            **DR. ITAMAR SIMONSON**
16
     TELEFONAKTIEBOLAGET LM
17   ERICSSON, *et al.*,                  Place: Courtroom 10C
                                          Before Hon. James V. Selna
18                  Defendants.
                                          Discovery Cut-Off: May 23, 2016
19   _____     Pre-Trial Conf.: Feb. 1, 2017
                                          Trial: Feb. 14, 2017
20   TELEFONAKTIEBOLAGET LM
     ERICSSON *et al.*,
21
                    Plaintiffs,
22
            v.
23
24   TCL COMMUNICATION
     TECHNOLOGY HOLDINGS, LTD. *et*
25   *al.*,
26                  Defendants.
27
28

# **TABLE OF CONTENTS**

I.   EXPERT QUALIFICATIONS ..................................................................... 1

II.  SUMMARY OF CONCLUSIONS ................................................................ 4

III. BASIC PRINCIPLES OF CONSUMER STUDIES USED TO ASSESS THE VALUES OF FEATURES ...................................................................... 6

IV.  AN EVALUATION OF THE BASES OF MR. KENNEDY'S ESTIMATE OF THE VALUE OF THE FEATURES THAT ALLEGEDLY BENEFITTED FROM ERICSSON'S PATENTED TECHNOLOGY .......... 10

    A.   The IPR Study ................................................................. 11

    B.   The Accenture Web Watch Study ........................................ 15

    C.   The Phone Arena Survey .................................................. 15

    D.   The uSwitch Poll ............................................................ 16

    E.   Other Sources Relied Upon by Mr. Kennedy ....................... 17

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION .......................... 19

# DECLARATION OF DR. ITAMAR SIMONSON

I, Dr. Itamar Simonson, declare under penalty of perjury under the laws of the United States of America that the material contained herein is true and correct and that I am competent to testify thereto.

## I.  EXPERT QUALIFICATIONS

1.  I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University.  A copy of my curriculum vitae, which includes a complete list of my publications, is provided as Exhibit 2387.

2.  I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3.  My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, branding, survey methods, and human judgment and decision making.  Most of my research has focused on buyers' purchasing behavior, the effect of product characteristics (such as brand name, price, and features), the competitive context, and marketing activities (such as promotions and advertising) on buying decisions and trademark infringement from the consumer's perspective.

4.  I have received several awards, including (a) the award for the Best Article published in the Journal of Consumer Research (the major journal on consumer behavior) between 1987 and 1989; (b) The Ferber Award from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (c) an Honorary Doctorate of the University of Paris – Sorbonne Universities; (d) the 1997 O'Dell Award, given for the Journal of Marketing Research (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (e) the 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005,

2007, 2008, and 2012); (f) the award for the Best Article published in the Journal of Public Policy & Marketing (the main journal on public policy and legal aspects of marketing) between 1993 and 1995; (g) the 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award; (h) Elected Fellow of the Association for Consumer Research; (i) the 2002 American Marketing Association award for the Best Article in the area of services marketing; and (j) the American Marketing Association Award for the Best Book in Marketing. In addition to these awards, my research has been widely cited by other researchers in the marketing, consumer behavior, and other fields,[1] and my publication record has been ranked as one of the most prolific and influential. (Ex. 2386).

5. I have published many articles in my career, including articles regarding trademarks, which are listed in my C.V. My articles and other work on consumer surveys have been cited by various courts and legal authorities (in addition to citations in academic journals, books, and the broader media).[2]

6. At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing. I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing. In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7. I have taught several doctoral courses. One such doctoral course examines methods for conducting consumer research. It focuses on the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and

---

[1] *See, e.g.*, Google Scholar (scholar.google.com/citations?user=na4_b4kAAAAJ&hl=en&oi=ao) (showing 18,173 citations as of January 26, 2017).
[2] *See, e.g.*, 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (September 2007) at §32:174 footnote 1.50.

analysis, and deriving conclusions.  A second doctoral course that I have taught focused on buyer behavior, covering such topics as buyer decision making processes, influences on purchase decisions, and persuasion.  A third doctoral course that I have taught deals with buyer decision making.  Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making.  I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.     After completing my MBA studies and before starting my Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for two-way communications products.  My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor analysis, and (c) sales forecasting.

9.     I have conducted, supervised, or evaluated well over 1,000 marketing research studies, including many related to consumer behavior and information processing, trademark, branding, marketing strategies, and advertising-related issues.  I serve on eight editorial boards, including leading journals such as the Journal of Consumer Research, Journal of Marketing Research, and the Journal of Consumer Psychology.  I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics.  I received (twice) the Outstanding Reviewer Award from the Journal of Consumer Research.  As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals.  I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics.  And I have served as an expert in prior litigations involving various marketing and buyer behavior issues, class actions, trademark-related

matters, false advertising, branding, and other areas.

10.     I was asked by counsel for TCL Communication Technology Holdings, Ltd., et al. ("TCL") to examine surveys relied upon by Ericsson's expert Mr. David Kennedy for his estimates of the user value of Ericsson's patented technology.  My analysis is based on principles of surveys and consumer behavior.

## II.   SUMMARY OF CONCLUSIONS

11.     Mr. Kennedy's Declaration states that his estimate of the value of Ericsson's patented technology was based on various consumer studies.  (*See* Dkt. 1333, ¶¶ 225–272.)  However, as I will explain in this Declaration, based on accepted principles of consumer research, the studies Mr. Kennedy relied on were irrelevant and biased, and therefore unreliable.  That is, contrary to Mr. Kennedy's claims, the studies he relied on were completely uninformative with respect to any user value of Ericsson's patented technology.

12.     For example, the International Planning and Research ("IPR") Study (Ex. 4858) suffered from multiple flaws and biases, including:

   a.     it offered no relevant information pertaining to the claimed contribution of Ericsson's patented technology to user values of any feature;

   b.     the study, dated August 2012, failed to include the critical brand factor and seemed designed only for the top-tier Android phones (those competing with the then top-tier iPhone 5) rather than phones like those TCL sells, which emphasize a variety of factors (depending on model), and are not limited to top-tier Android phones;

   c.     the study suffered from severe "focalism bias," which greatly inflated the measured values of those features the study focuses on while neglecting other features that affect consumers' decisions in reality;

   d.     the study focused on one feature at a time instead of presenting the bundle of phone features consumers evaluate in reality.  It also ignored interactions among features;

       e.    the study ignored the well-established biases associated with asking survey respondents to name the price of each feature and feature differences;

       f.    the survey failed to include the proper respondent universe, which should have consisted of prospective purchasers of the TCL phones at issue in this case; and

       g.    the survey violated other well-established survey principles.

13.    A second survey (Ex. 4839), which was mentioned in a website called phonearena.com, was also unreliable and irrelevant. The methodology of this "survey" was not even described, making it impossible to derive any conclusions based on that survey. That is, given that a survey's methodology more often than not determines its "findings," it is extremely unusual for any expert to rely on a survey without providing a detailed description of its methodology. From the limited information available about this survey, it is clear that it offered no information about Ericsson's patents at issue, or about the TCL phones addressed in Mr. Kennedy's Declaration, or about the value of particular feature differences. It was merely a popularity contest among the selected features, which were described in a generic manner. This survey offered no relevant or reliable information.

14.    Similarly, another "poll" (by a London-based firm called uSwitch) on which Mr. Kennedy relied for his value estimates (Ex. 4837) was taken from an article that appeared in the London-based newspaper Daily Mail. The methodology of this poll and information about its participants (such as how they were selected and whether any of them were from the United States or other countries) were not described, making this poll unreliable for any purpose related to the assessment of the value of the specific features at issue (or for the alleged contribution of Ericsson's patents). This poll also tested a rather unusual collection of features, most of which were likely to have little, if any, significance in consumers' choices of mobile phones.

15.    The other sources on which Mr. Kennedy relied for his user value estimates were similarly unreliable and irrelevant.  For example, his "analysis" of the value of reducing delays in connection time was based on "The Kissmetrics Blog" (Ex. 4835), which was written by someone whose title is "Minister of Propaganda at Kissmetrics."  Mr. Kennedy did not provide any information regarding this "survey's" methodology, the participants, or other key aspects.  He also did not explain what, if anything, the reported statistics tell us about the contribution of Ericsson's patents at issue.  This source further illustrates the degree to which Mr. Kennedy's value estimates were not based on any relevant or reliable studies of users.  And a study by Accenture (Ex. 4845) that Mr. Kennedy presumably also relied on dealt with the value and user interest in various mobile services, rather than the willingness to pay for handset features (not to mention that the survey said nothing about Ericsson's technology).  Again, like the other surveys on which Mr. Kennedy supposedly based his estimates, this study was irrelevant and unreliable for deriving any estimates of users' value of Ericsson's patented technology.

## III.    BASIC PRINCIPLES OF CONSUMER STUDIES USED TO ASSESS THE VALUES OF FEATURES

16.    As explained below based on basic principles of consumer research and decision making, Mr. Kennedy's feature value estimates are biased, greatly inflated, and unreliable.  In particular, the surveys he relied upon, to the extent that we have information about their methodologies, were flawed and not suitable for the assessment of the value of Ericsson's technology.

17.    In order to determine whether the user surveys relied upon by Mr. Kennedy are informative and reliable, it is important to understand some basic principles of proper studies.  Accordingly, I begin with a brief overview of principles of studies for assessing the values of product features.

18.    I have conducted numerous studies and published many articles in the

leading refereed journals regarding the impact and value of product features and other factors in consumer decision-making.  I am also a regular reviewer of surveys and articles submitted to leading journals, and I twice received the Journal of Consumer Research Outstanding Reviewer award (based on my reviews of studies and consumer research articles).  I have also taught doctoral and MBA courses, in which I covered these issues.  And I am well familiar with the existing scientific literature on this and related subjects.

19.     As discussed in detail below, the Kennedy Declaration relies on four primary surveys: the IPR Survey, another survey apparently taken from a website called PhoneArea.com, a uSwitch.com survey that was partially described in a 2014 Daily Mail article, and a 2013 Accenture Web Watch Study concerning the costs and benefits to mobile service provider networks of providing consumers with 4G data speeds.  (Exs. 4858, 4839, 4837.)  Mr. Kennedy relied on these surveys to come up with his estimates of the consumer value of the allegedly infringed technology (and he later made some assumptions regarding Ericsson's contribution).  Accordingly, it is important to examine these surveys, based on the available information, to determine whether they could be relied upon to determine the value of the Ericsson technology that I understand will be licensed in this litigation, and whether they suffered from specific known biases.

20.     I begin with a brief overview of factors that affect the un/reliability of surveys as indicators of the values of features.  I will later examine whether the surveys relied upon in the Kennedy Declaration could provide reliable feature value estimates, or whether they were likely to be systematically and strongly biased.

21.     Although it is probably obvious, a study relied upon for any purpose, such as assessing the value of a certain technology or patent, must be relevant for that purpose.  If it is irrelevant or if the study measures one thing whereas what *needs* to be measured is something else, then the survey has no use and is irrelevant.

22.     For example, suppose the question at issue refers to the value of a

particular patent, which allegedly extends a phone's battery life. In that case, to be relevant, the study must focus on the value of that portion of battery life attributed to the patent, rather than battery life as a whole.

23. It is also obvious that, in litigation and other contexts, an expert can rely on a survey only if its methodology is clearly and accurately described. That is, because the survey methodology can often largely determine its results, one cannot evaluate and draw any conclusion based on a survey if important aspects of the survey are unknown.

24. In reality, consumers' decisions regarding complex, multi-feature products such as smartphones are based on a combination of many features. Trying to assess the importance of individual features in isolation, while ignoring many other features, tends to be severely biased due to a "focalism bias" (also known as "impact bias"). Specifically, singling out one or a few features without simultaneously considering the other features tends to greatly overstate the real importance of the focal feature, as compared to its impact in actual purchase decisions. Focalism bias is general and applies to the measurement of any feature importance, not just product features but many other aspects. For example, Daniel Kahneman (a Nobel Prize winner) and his co-author showed that people overestimate the impact of weather on happiness when they compare the happiness of people living in California and Ohio. (Exs. 2380, 2383, 2384.) Thus, for example, even a small and insignificant difference in terms of battery life may loom large if consumers are asked about battery life in isolation.

25. The problem of focalism has also received attention by courts when evaluating studies that focused on a few features while excluding from the study key features that are among the key drivers of decisions. For example, a recent study that was presumably designed to test the values of allegedly infringed product features was excluded by one court, which found that the survey at issue failed to include key product features, meaning that the only information the survey could

provide was the values of the tested features relative to each other, rather than their absolute (dollar) value.[3] That is, if clearly important features (for example, the brand name and camera of a mobile phone) are ignored, then the true, relevant absolute value of the features that happen to be included in the survey cannot be assessed, making the survey biased and irrelevant.

26.     Asking survey respondents direct questions about their willingness to pay for individual features and feature differences has been shown to be unreliable and susceptible to various irrelevant and even irrational influences. (Exs. 2377, 2378, 2385.) There have been many demonstrations of the effect of survey methodology on the obtained results, including on consumers' stated willingness to pay (WTP) for products. To understand the degree to which consumers' WTP estimates are susceptible to irrelevant influences, consider, for example, the following published study. (Ex. 2376.) Participants in that study were shown different products and asked to indicate their WTP for each. First, however, they were asked to enter the last two digits of their social security number (SSN) and, assuming the last two digits were a price in dollars, whether they would be willing to pay that price for the product. For example, respondents were shown a toaster (including a picture of the toaster and a list of features). They were first asked if they would be willing to buy the toaster assuming its price in dollars were equal to the last two digits of their SSN. They next indicated the highest price they would be willing to pay for the toaster. The results showed that respondents whose last two SSN digits were between 00 and 49 were willing to pay for the toaster significantly less than those whose last two digits were between 50 and 99. Merely considering a random two digits affected the WTP for the products. Such findings demonstrate

---

[3] *Visteon Glob. Techs., Inc. v. Garmin Intl., Inc.*, 10-CV-10578, 2016 WL 5956325, at *6 (E.D. Mich. Oct. 14, 2016) ("the only 'value' expressed . . . is the relative value of the four asserted patented features to one another. [Such] conjoint results express nothing about the value of the four patented features relative to other important features of the accused devices.")

that WTP estimates tend to be highly sensitive to the questions asked and the considered reference points.  Another study demonstrated that measuring consumer preferences by asking respondents to make choices between options tends to generate drastically different implied preferences than measuring preferences by asking respondents to equate the values of two options.  (Ex. 2382.)

27.     The importance and value of features depends on the particular consumer segment for which the product is intended (or "positioned").  For example, a smartphone that targets young consumers based on low price is unlikely to emphasize or offer the best values on the various smartphone features.  Accordingly, a technique used to estimate feature importance should be tailored to the specific brand at issue.  For example, while the top-of-the-line Samsung Android smartphones may compete based on having better features compared to the latest iPhone model, a smartphone that emphasizes low price and adequate features is less likely to have the best values on all features.  Correspondingly, buyers of a lower-tier smartphone are likely to place a lower value on having the very best features than buyers of higher-tier smartphones.

28.     An attempt to measure feature importance or value by introducing sequentially one feature at a time can also generate biased, unreliable estimates.  The reason is that the order in which features are considered is positively correlated with their decision impact and "importance."  (Exs. 2379, 2381.)

29.     Other important concepts (first introduced by Nobel Prize winner Herbert Simon in the 1950s) are "bounded rationality" and "satisficing."  Briefly, consumers are often looking for features that are "good enough" rather than the best.  Accordingly, if an option (*e.g.*, a smartphone) they consider has a battery life or camera that are "good enough," they place little value on getting another (more costly) option that has even better values on these features.

## IV.   <u>AN EVALUATION OF THE BASES OF MR. KENNEDY'S ESTIMATE</u> <u>OF THE VALUE OF THE FEATURES THAT ALLEGEDLY</u>

**BENEFITTED FROM ERICSSON'S PATENTED TECHNOLOGY**

30.    Mr. Kennedy suggested that the contribution of Ericsson patents can be measured in terms of four "technical currencies":  battery life, data rates, latency, and system capacity.  (Dkt. 1333, ¶ 233.)  Mr. Kennedy further indicated that he "estimate[d] the economic value of the technical contribution of all 4G SEPs over the next best available noninfringing alternative, and [] apportion[ed] Ericsson's share of that economic value" to consumers.  (*Id.* at ¶ 230, 234.)

31.    Mr. Kennedy goes on to elaborate on the notion that battery life is "one of the most important features driving mobile phone purchase decision[s]."  (*Id.* at ¶ 235.)  Mr. Kennedy appears to rely on four main sources:  (a) the Information Planning & Research ("IPR") study (Ex. 4858), (b) an article titled "What features do smartphone buyers look at to determine which phone to buy?" (Ex. 4839); (c) a study apparently conducted by London-based company called uSwitch.com (Ex. 4837)), and (d) The Kissmetrics Blog (Ex. 4835).

32.    I will next examine each of the "studies" relied upon and explain why it was unreliable and largely irrelevant to the assessment of the value of the features and whatever contribution was made by Ericsson's patented technology.  Given that the documents pertaining to surveys (b), (c), and (d) listed above provide very little information about their methodology, participants, and results, these studies cannot be adequately evaluated and should not have been relied upon by Mr. Kennedy for any purpose.  Indeed, as indicated above, marketing researchers do not rely on a study unless they are provided with and can evaluate the study's methodology.  The document pertaining to the IPR study offers some (but still inadequate) information about its methodology, so I will begin with that study and then briefly evaluate the other surveys based on the more limited available information.

**A.    The IPR Study**

33.    I will not repeat the details of the IPR study's reported methodology. (Ex. 4858).  As explained below, the methodology was biased and unreliable.

34.     It should first be noted that this survey was simply irrelevant to the case at hand.  The study provided no information and made no attempt to isolate the claimed contribution of the Ericsson patents.  Instead, Mr. Kennedy cherry-picked some numbers from the IPR study and then made convenient assumptions as to the relationship between the study's results and the claimed contribution of Ericsson's patents.  While Mr. Kennedy suggests that his apportioned Ericsson contribution was "as conservative as possible," this crucial assumption was not based on any reliable link between the value of the features found in the IPR study and Ericsson's claimed contribution to those features.

35.     The IPR study (like the other "studies" relied upon) was also irrelevant to any value estimate specific to the particular smartphones at issue in this case.  It appears that the IPR study dated August 2012 was focused on the top-tier Android phones (such as the top Samsung models) that compete most directly with the (then) top iPhone model (the then-new iPhone 5).

36.     It is important to understand that the values of features depend on the particular product and brand.  For example, while buyers of a relatively inexpensive smartphone may not care so much about having the best attribute values and are satisfied with values that are "good enough" (corresponding to the notion of "satisficing" described above), buyers of the top-of-line, more expensive models are likely to seek the best values, such as the best battery life, best processor, and best camera, with less price sensitivity than buyers of phones in the mid to low price range.  But the IPR study failed to consider brand, contrary to credible business studies designed to objectively estimate the importance of product features.

37.     Moreover, there is no indication that the survey universe – that is, the respondents included in the sample – were representative of the consumers who are likely to buy the TCL phones at issue in this case (including, for example, users of the Alcatel One Touch that Mr. Kennedy focused on).  (Dkt. 1333, ¶¶ 235, 246; Ex. 2319.)  This is yet another factor that contributed to the irrelevance of the IPR

study to the present case.

38.     As explained earlier, asking consumers direct questions about their willingness to pay (WTP) for attribute/feature differences is an inherently unreliable method.  In real life, consumers are not paying for individual features and feature differences, but rather, they pay an overall price for the bundle of smartphone features.  Therefore, consumers cannot and should not be expected to know how much they would have paid for certain feature differences.

39.     In this regard, the IPR survey suffered from a severe focalism bias.  In reality, consumers evaluate smartphones based on many features and capabilities, which they can review together or in whatever order they choose.  In the IPR study on the other hand, participants were forced to focus on just a few features, one at a time; for these features, they were forced to choose between specific feature values and corresponding prices.

40.     This process was likely to grossly inflate the value of the feature differences presented to the respondents.  Again, in reality, no one tells the consumer on which feature(s) to focus and which feature(s) they should ignore.

41.     Moreover, as pointed out by the Court in the *Visteon Global v. Garmin International* case, a methodology that omits many important features and forces respondents to focus on just a few features cannot inform us about the real world value of features.  *See Visteon Glob. Techs., Inc. v. Garmin Intl., Inc.*, 10-CV-10578, 2016 WL 5956325, at *6 (E.D. Mich. Oct. 14, 2016).  This criticism applies to the IPR study methodology as it applies to the Conjoint variation used in the *Visteon v. Garmin* case.  Thus, putting aside the other flaws, the results may inform us about the value of these features relative to each other, but they certainly do not inform us about the real value of these features, as well as differences among these features.

42.     Furthermore, the IPR survey forced respondents to consider very large differences along the focal features, such as doubling the battery life.  In reality, assuming a consumer often chooses first the price level s/he wishes to pay for the

entire smartphone, differences among considered options with respect to the focal features (those selected as the focus of the study) tend to be rather small. For example, I understand that some, but not all, of TCL's phones at issue in this case are among the least expensive smartphones. But the IPR survey was not designed for phones representative of at least some of those at issue here. As a result, the feature differences that respondents were led to consider likely have little relevance to most real world decisions of those considering or purchasing the specific TCL phones at issue here.

43.     As explained earlier, asking consumers direct questions about their willingness to pay (WTP) for attribute/feature differences is an inherently unreliable method. In real life, consumers are not paying for feature differences, but rather, they pay an overall price for the bundle of smartphone features. Therefore, consumers cannot and should not be expected to know how much they would have paid for certain feature differences. And consistent with the focalism bias discussed above, asking respondents to indicate their WTP for feature values is likely to greatly inflate the real price they would have paid in reality.

44.     Another problem with the IPR Survey methodology is that features were evaluated sequentially. As indicated, the order in which features are considered can often affect the WTP for feature differences.

45.     Notwithstanding the irrelevance and unreliability of the IPR Survey, it might be noted that battery life was apparently found to be less important than most other tested features (as indicated, putting aside other flaws, the survey could at most provide information regarding the importance of features relative to the other included features). In the slide titled "Most Desirable Features," the reported findings suggest that the feature "talk time/standby time" was less important than most other included features. (Ex. 4858 at 15.) This finding is important considering that, in the best case, the IPR study informed us about the importance of one attribute/feature (*e.g.*, battery life) relative to the other features included in the

1   survey.

2       46.    In conclusion, the IPR study was both irrelevant and biased.  In

3   particular, it offers no information about Ericsson's value contribution to any

4   feature.  Furthermore, the survey was not likely designed to estimate the values of

5   features for the phones at issue in this case.  And the derived value and willingness-

6   to-pay numbers were biased in a manner that would be expected to systematically

7   inflate the derived estimates.

8       **B.    The Accenture Web Watch Study**

9       47.    Yet another study mentioned by Mr. Kennedy is the "Accenture Web

10   Watch Study."  It should first be noted that the available documents on this "study"

11   provide very little information about the methodology and specific questions survey

12   participants were asked, which greatly limits our ability to evaluate it.  (Dkt. 1333,

13   ¶ 253; Ex. 4845.)

14       48.    Moreover, this study focuses on costs and benefits associated primarily

15   with the mobile service providers.  For example, the heading on the very first page

16   of the report is as follows:  "Mobile Web Watch 2013:  The New Persuaders [¶]

17   How communication service providers can ride the convergence wave to fulfill

18   consumers' need for control over their communication and entertainment needs."

19   As this introductory title and the rest of the report both indicate, this study focused

20   on various capabilities that are provided to users by their service providers.

21       49.    Accordingly, the numbers relied upon by Mr. Kennedy do not inform

22   us about the amount that any consumers would pay for specific smartphone features.

23   (Dkt. 1333, ¶¶ 253–254.)  And the report data tells us nothing about the contribution

24   of Ericsson's patents to the increased speed of 4G over 3G.

25       **C.    The Phone Arena Survey**

26       50.    Mr. Kennedy relied for his value estimates on another "survey."

27   (Ex. 4839).  The results of that 2014 survey are summarized on the webpage

28   printout Mr. Kennedy relies on, which is Exhibit 4839.

51.     The "phonearena.com" webpage does not describe the survey's methodology, which makes it impossible for one to evaluate it meaningfully and directly.  Indeed, in my experience, it is extremely unusual and improper for an expert to rely on a survey without describing in detail the survey's methodology. All one can tell from this web article is that some respondents said that battery life was important.  We do not know who these respondents were, how they were selected, and what specific questions they were asked that triggered this response. For example, was the group of respondents representative of a particular target market?  We also do not know, and cannot tell, if that survey had other findings not reported in the article that would contradict or call into question its reported results.

52.     Furthermore, if respondents were given a list of features and asked to rate their importance, the answers could not tell us much about the value and willingness-to-pay for these features.  That is, importance ratings tend to be inflated and cannot be converted to reliable willingness-to-pay estimates.  Accordingly, it is unclear in what way Mr. Kennedy could base feature-value estimates on this survey.

53.     In addition, whether a feature is considered important by consumers depends largely on the differences among options along these features and the context of use.  But it appears that respondents were merely asked about "importance" in the abstract, without any relevant context.

**D.      The uSwitch Poll**

54.     Mr. Kennedy relied on yet another "poll," which was briefly described in a Daily Mail article in 2014.  (Ex. 4837.)  The article does not describe who the poll respondents were, and whether they volunteered to answer some questions posted on the uSwitch website or were selected using a more scientific method.

55.     The Daily Mail article also did not describe the methodology it employed, and I have not seen the questionnaire relied upon.  Without an adequate, complete description of the methodology and questionnaire, it is impossible to evaluate a survey or rely on its reported findings.

56.     The article does include a list of the features that were included in the uSwitch survey, such as "eyeball tracking" and "projector."  This list of features is surprising because of the many presumably important features that were not included, such as processor speed, screen size, and the quality of the camera sensor (whereas a feature called "a zoom camera lens" was included).  Thus, putting aside the need to make guesses about the survey methodology and participants, the only "finding" from this survey is that battery life is more important than various relatively unimportant features that happened to be included in the survey.

57.     The outfit uSwitch that supposedly conducted the survey is referred to in the Daily Mail article as "London-based."  While the article did not describe the survey participants, it is impossible to know whether or not all of the respondents were from London or the United Kingdom; there is certainly no indication in that article that any of the respondents were from the United States, for example.

### E.     Other Sources Relied Upon by Mr. Kennedy

58.     The improper manner in which Mr. Kennedy used irrelevant and unreliable studies or articles to derive estimates "out of thin air" while claiming to be extremely "conservative" has already been illustrated by the sources discussed above.  I will not examine in detail all of the remaining, similarly irrelevant and unreliable sources he claims support his estimates.

59.     That said, to provide one additional illustration of the unreliable and irrelevant sources relied upon by Mr. Kennedy, he referenced an article that appeared in a blog called "The Kissmetrics Blog."  (Dkt. 1333, ¶ 262, Ex. 4835.)  The article was written by someone whose title is "Minister of Propaganda at Kissmetrics."  (Ex. 4835 at 3.)  This blog entry appears to report what certain unidentified people said, such as "73% of mobile internet users say that they've encountered a website that was too slow to load" (data apparently taken from some unidentified tweet).  Mr. Kennedy does not provide any information regarding this "survey" he appears to rely on for his assessment of the value of "delays in

connection time," nor does he explain in what conceivable way this Kissmetrics blog informs us about the value of the Ericsson patents allegedly pertaining to delays in connection.  But this "source reliance" further illustrates the degree to which Mr. Kennedy's value estimates were unreliable and irrelevant.

60.     For all of the above reasons, the studies Mr. Kennedy relied on for his feature valuations violated well-established and accepted principles of consumer research.  They were therefore unreliable, biased, and irrelevant to the user value of Ericsson's patented technology.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on January 27, 2017, at _Burlingame, CA_ .

Dr. Itamar Simonson, Ph.D.

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| 4835 | S. Work, How Loading Time Affects Your Bottom Line, KissMetrics.com (Apr. 2011) |
| 4837 | V. Woollaston, Forget 3D screens and fingerprint scanners, customers really want better battery life and waterproof screens, Daily Mail UK (August 4, 2014) |
| 4839 | Alan F., What Features Do Smartphone Buyers Look At To Determine Which Phone To Buy?, PhoneArena.com (May 21, 2014) |
| 4845 | Accenture, Mobile Web Watch 2013: The New Persuaders |
| 4858 | International Planning and Research Study, Smartphone Feature Analysis |
| 2319 | Kennedy Exhibit 4.2 |
| 2376 | Journal of Consumer Research, Vol. 3 publication titled Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," by I. Simonson, Dec. 2004 |
| 2377 | Journal of Economic Behavior & Orgnization, Vol. 60 publication titled "Tom Sawyer and the Construction of Value," by D. Ariely, 1/10/06 |
| 2378 | The Quarterly Journal of Economics publication titled ""Coherent Arbitrariness": Stable Demand Curves Without Stable Preferences*," by D. Ariely, 2003 |
| 2379 | Journal of Marketing Research, Vol. XLVII publication titled "The Effect of Decision Order on Purchase Quantity Decisions," by S. Nowlis, R. Dhar and I. Simonson, Aug. 2010 |
| 2380 | Journal of Personality and Social Psychology, Vol. 78, publication titled "Focalism: A Source of Durability Bias in Affective Forecasting," by T. Wilson, 2000 |
| 2381 | Journal of Political Economy, Vol. 118, No. 2, publication titled "Order in Product Customization Decisions: Evidence from Field Experiments," by J. Levav, 2010 |
| 2382 | Journal of Consumer Psychology publication titled "Price-Quality Trade-Offs in Choice Versus Matching: New Insights Into the Prominence Effect," by Z. Carmon and I. Simonson, 1998 |
| 2383 | Intern. J. of Research in Marketing publication titled "Benefit Salience and Consumers' Selective Attention to Product Features," by R. Ratneshwar, 3/26/97 |

| Exhibit No. | Description |
|---|---|
| 2384 | Association for Psychological Science, Vol. 9, publication titled "Does Living in California Make People Happy?  A Focusing Illusion in Judgments of Life Satisfaction," by D. Schkade, Sep. 1998 |
| 2385 | Journal of Environmental Economics and Management publication titled "How People Respond to Contingent Valuation Questions: A Verbal Analysis of Willingness to Pay for An Environmental Regulation," by D. Schkade, 3/28/93 |
| 2386 | Journal of Marketing, Vol. 73, publication titled "What Does it Take to Get Promoted in Marketing Academia?  Understanding Exceptional Publication Productivity in the Leading Marketing Journals," by S. Seggie, Jan. 2009 |
| 2387 | Exhibit A to 11/4/16 Rebuttal Expert Report of Dr. Itamar Simonson: CV of Dr. Itamar Simonson |

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the REBUTTAL DECLARATION OF PLAINTIFFS' EXPERT WITNESS DR. ITAMAR SIMONSON to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:  <u>*/s/ Kristina Grauer*</u>
KRISTINA GRAUER