SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
MATTHEW W. HOLDER, Cal. Bar No. 217619
mholder@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for TCL Communication
Technology Holdings, Ltd., TCT Mobile
Limited, and TCT Mobile (US) Inc.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants. <br> ──────────────── <br> TELEFONAKTIEBOLAGET LM ERICSSON *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD. *et al.*, <br> Defendants. | Case No. SACV14−00341 JVS (DFMx) Consolidated with CV15-02370 <br><br> **PLAINTIFF'S REBUTTAL DECLARATION OF EXPERT WITNESS PHILIPPE STOFFEL-MUNCK** <br><br> Place: Courtroom 10C <br> Before Hon. James V. Selna <br><br> Discovery Cut-Off: May 23, 2016 <br> Pre-Trial Conf.: Feb. 1, 2017 <br> Trial: Feb. 14, 2017 |

# <u>TABLE OF CONTENTS</u>

I.      SUMMARY OF ASSIGNMENT AND OPINIONS ........................................ 1

II.     BACKGROUND AND QUALIFICATIONS.................................................. 2

III.    THE "INTENT OF THE DRAFTERS" DOES NOT CONTROL THE
        INTERPRETATION OF THE ETSI IPR POLICY........................................ 4

IV.     COMPLIANCE WITH THE ETSI IPR POLICY REQUIRES AN
        ANALYSIS OF MORE THAN JUST THE PARTIES'
        "NEGOTIATING CONDUCT." .................................................................. 11

V.      CONCLUSION ........................................................................................ 19

TABLE OF EXHIBITS CITED IN WITNESS DECLARATION .......................... 21

REBUTTAL DECLARATION OF P. STOFFEL-MUNCK

## REBUTTAL DECLARATION OF PHILIPPE STOFFEL-MUNCK

I, Philippe Stoffel-Munck, declare under penalty of perjury that the material contained herein is true and correct and that I am competent to testify thereto.

### I.   SUMMARY OF ASSIGNMENT AND OPINIONS

1.   I have been asked to respond to several opinions offered by two of Ericsson's expert witnesses—Professor Benedicte Fauvarque-Cosson and Dr. Bertram Huber—insofar as the interpretation of the ETSI IPR Policy is concerned under French law.

2.   First, I have been asked to respond the following statement by Professor Fauvarque-Cosson:  "[Article 1156 of the French Civil Code] states that a contract must be primarily interpreted in accordance with the parties' intent. Pursuant to this principle, to interpret the ETSI IPR Policy and ETSI IPR licensing declaration, a French court would look to the intent of the individuals who drafted the ETSI IPR Policy and IPR licensing declaration."  (Dkt. 1330 at ¶ 30.)  I disagree with this statement.  The guideline for the interpretation of documents which form part of an association agreement (like the ETSI IPR Policy) is the common intent of the *parties to the association agreement*, and not the intent of the *individuals* who *drafted* the documents under scrutiny.  If such a common intent is not discernable, interpretation must proceed referring to the understanding that a reasonable person, placed in the same context as the parties, would have of the documents at issue.

3.   Second, I have been asked to respond to the statements by Professor Fauvarque-Cosson and Dr. Huber which suggest that a patent owner may comply with the ETSI IPR Policy merely by "negotiating in good faith," without regard for whether the offers made do, in fact, consist of fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.  (Dkt. 1330 at ¶ 35 (Professor Fauvarque-Cosson stating that "Ericsson has satisfied its contractual FRAND commitment" by negotiating in good faith and being willing to comply with a global determination in this litigation, without any analysis of the actual terms offered by

Ericsson); Dkt. 1329 at ¶ 48 (Dr. Huber stating that "[w]ith regard to *offers*, the ETSI IPR Policy only contemplates that the positions taken by the parties—in light of the overall context—comply with the obligation to apply good faith negotiation behavior.") (emphasis in original).

4.     Although it is true that French law imposes on the parties a duty to negotiate in good faith, it is wrong to suggest that the ETSI IPR Policy establishes no duty beyond that, or that compliance with the duty to negotiate in good faith can be assessed without any analysis of the terms offered.  Instead, the only reasonable reading of the ETSI IPR Policy as a whole is that it establishes a duty to offer and grant licenses on FRAND terms and conditions, and the failure to offer FRAND terms and conditions can support a finding that the declarant has failed to comply with its contractual obligation.  Phrased differently, whether a declarant has complied with the ETSI IPR Policy cannot be determined only by inquiring whether the declarant has negotiated in good faith, and cannot be determined without specifically taking account of the terms and conditions offered.

## II.   BACKGROUND AND QUALIFICATIONS

5.     I earned my Ph.D. in law, and have been an "Agrégé des Facultés de droit" since 2001, which is the highest national competitive examination in France to be admitted as University Professor in Law.  Since 2005, I have been a Full Professor at the University of Panthéon-Sorbonne (Paris I).  I teach private law, law of contracts, tort law, and law of security interests.  I have also lectured, as a guest professor, at the Universities of Montreal (2007), Waseda (Tokyo, 2011) and Oxford (2013), among other places.

6.     I write or co-author the biannual "Torts and Contractual Liability" column in *La Semaine Juridique* and the "Contract Law" column in *Revue des contrats*, as well as in *Droit et Patrimoine*, all three being prominent law journals in France.  I have also written or co-authored the following legal textbooks:  *Les obligations* (with Ph. Malaurie and L. Aynès, coll. Droit civil, 8th ed., LGDJ, 2016),

and *Droit de la responsabilité et des contrats* or "(directed by. Ph. le Tourneau, Dalloz Action, 2008), which are amongst the most used textbooks in their respective areas, and *L'abus dans le contrat* (LGDJ 2000).  I also supervised the collective book studying the draft reform of French contract law, *Réforme du droit des contrats et pratique des affaires* (Dalloz, 2015).[1]

7.     I am also a member of various professional associations, including the Henri Capitant Association, which is the oldest and most important French-originated association aiming at presenting the French legal culture worldwide, the French Committee of arbitration, and the French Association of arbitration.  I am member of the Scientific Board of the well-known law journals *Droit et Patrimoine* (Wolters Kluwer), *Semaine Juridique* (Lexis Nexis) and *Cahiers du droit de l'entreprise*, such positions consisting in determining the publication policy of the journal, the selection of the topics covered, and the review of articles proposed for publication.

8.     In parallel to my academic position, I have a rather extensive experience of law in practical terms.  For example, I serve as an arbitrator in domestic and international cases in ad hoc proceedings, as well as under the rules of arbitral institutions such as the ICC.  I have substantial prior experience as a consultant and legal expert in respect of French law before French courts, as well as before international arbitral tribunals in numerous cases, and also before the High Court of England and Wales.  Over the last decade, I have also worked with many of the international law firms that have an office in Paris and many of the prominent domestic law offices over the last decade.[2]

---

[1] Translated into English, these textbooks are as follows:  *The obligations*, *Liability and Contracts*, *Abuse in contract*, and *Reform of contract law and business practice*.

[2] For example, international law firms with which I have worked include Brown & Rudnick, Clifford Chance, Davis Polk, Dechert, Dentons, Gide, Hogan Lovells,

9.      A copy of my full *Curriculum Vitae* is included with this declaration, and includes additional information regarding my background.  (Ex. 2482.)

## III.   THE "INTENT OF THE DRAFTERS" DOES NOT CONTROL THE INTERPRETATION OF THE ETSI IPR POLICY.

10.     I disagree with Professor Fauvarque-Cosson that "the intent of the individuals who drafted the ETSI IPR Policy and IPR licensing declaration" would or should control a judge's interpretation of those documents.  That is because ETSI is an association and these documents form part of the contract of association binding on all the members, whereas the drafters are not necessarily parties to the contract of association, *i.e.*, members of the association.  My colleague admits that the interpretation of terms used in the IPR Policy, such as "fair" "reasonable" and "non-discriminatory," ought to be interpreted in accordance with the principles governing the interpretation of contracts, and underlines that one must look for the common intent of the parties in this respect, yet at the same time she states that "pursuant to this principle" the judge should consider the intent of the "drafters" although they might not be parties to the contract of association.  That seems inconsistent to me, being provided that where the drafters are also members of the association, their sole intent does not represent the intent of the whole association, let alone the intent of those "parties", *i.e.*, those members, whose intent is to be scrutinized in order to understand what are their mutual obligations under the contract of association.  An association is comprised of many members.  Those members may have had different understandings and objectives regarding the meaning of the FRAND commitment under the ETSI IPR Policy, and how it should be interpreted.  In addition, the FRAND commitment was intended to govern not just specific parties at a specific point in time, but instead was intended to govern

Jones Day, K&L Gates, Latham & Watkins, Linklaters, Mayer Brown, Olswang, Orrick, Quinn Emmanuel, Shearman Sterling, Weil Gotshal, and White & Case.

relations between *classes* of parties *long into the future*.  As a result, the specific intentions of a particular drafter should not be controlling.  Instead, as I explain below, a judge would and should look to the reasonable meaning of the terms.

11.     To begin, I agree with Professor Fauvarque-Cosson that the obligation undertaken by a patent holder under the ETSI IPR licensing declaration is contractual in nature.  This results from ETSI being an "association" constituted under French law, and from the fact that French law regards an "association" as a contract.[3]  From this, case law has established that the relationship between the association and its members is contractual in nature.  As a result, the by-laws, rules of procedure and deliberations of the association are governed by contract law in general, unless otherwise provided by a specific legal provision.[4]  Accordingly, where the meaning of the obligation undertaken by a patent holder under the ETSI IPR Policy and licensing declaration needs clarification, its interpretation shall be governed by the methods applicable to contracts under French law.

12.     The French Civil Code includes certain rules of interpretation (former Articles 1156 to 1164, now numbered 1188 to 1192 pursuant to the French Civil

---

[3] Article 1 of the French Law of 1 July 1901 "relating to association agreements" provides that:  "The association is an agreement whereby two or more persons permanently pool their knowledge or activity for a purpose other than the sharing of profits.  With respect to its validity, it is governed by the general principles of law applicable to contracts and obligations."  (Ex. 2483 at p. 1.)  *See also* Ex. 1079 at p. 5 (ETSI Statutes Art. 1) ("In accordance with the French law of 1 July 1901 and the decree of 16 August 1901, an association is founded by the signatories to these Statutes."); *id.* at 41 (ETSI Rules of Procedure § 12) ("The POLICY shall be governed by the laws of France. . . . Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.").

[4] Ex. 2484 (Y. Chartier, "*L'association, contrat, dans la jurisprudence récente de la Cour de cassation*" ["Associations and contracts in recent Court of Cassation case law"], Mel. Y. Guyon, 2005, p. 195).

Code Reform, effective October 2016), but they are not mandatory. The court may determine the meaning of the contract by following the method it deems to be the most appropriate. Even the fundamental directive set out by Article 1156, pursuant to which the judge ought to search for the intent that the parties genuinely shared when entering into the contract, is not mandatory for the judge who can prefer to interpret the contract following a method it deems more appropriate.[5] Furthermore, it is common practice to interpret contracts using extrinsic materials, including, for example, negotiation documents and other materials relating to the period preceding the conclusion of the contract or relating to the context of the conclusion.[6] The court may also take into consideration the conduct of the parties after the conclusion of the contract, to the extent it sheds light on the parties' original intentions as to the meaning and effect of their contract.[7] However, interpretation may only proceed where the black letter of the contract is obscure or ambiguous. Since a landmark decision of 1872, it is established that where the black letter of the contract is "clear and precise," it must prevail and the judge is then bound to understand the obligation following the clear meaning it conveys.[8]

13. In respect of contracts in general, the main objective of the interpretation of a contract under French law is to discover the genuine "common intent" (commune intention) of the parties (Article 1156 of the Civil Code, now

---

[5] Ex. 2476 (Cass. civ., 19 December 1995, n° 94-10478).

[6] Ex. 2485 (Bénabent, *Droit des obligations*, 14th ed, 2014, n° 273) and the case law referred to therein, *e.g.* Cass. civ. 1, 18 February 1986, n° 84-12347; Ex. 2486 (Bull. civ. I, n° 31).

[7] Ex. 2485(Bénabent, *Droit des obligations*, 14th ed, 2014, n° 273) and the case law referred to therein, e.g. Cass. civ. 1, 9 November 1993, n° 91-22059; Ex. 2487 (Bull. civ. I, n° 317).

[8] Ex. 2488 (Cass. civ., 15 April 1872, Foucauld et Colombe, DP 1872.1.176, *Grands arrêts de la jurisprudence civile* [Landmark Decisions in French private case law], n° 161).

numbered 1188).  If such genuine intent cannot be discovered, for example because there was not a common understanding between the parties as to the disputed point, it is accepted that the judge should find out what the understanding of reasonable persons, of the same kind as the parties, would have been of the disputed point, in the same circumstances.  This principle is quite universally acknowledged; it may be found, for example, in many international instruments (Vienna Convention on Contracts for the International Sale of Goods, Principles of International Commercial Contracts, Principles of European Contract Law, etc.).[9]  It has now been expressly codified in the French Civil Code following a recent restatement of law which added a second paragraph to the formula set forth in Article 1156 of the French Civil Code (now renumbered Article 1188).  It now provides as follows:  "A contract is to be interpreted according to the common intention of the parties rather than according to the literal meaning of the terms which it uses.  Where the common intention of the parties cannot be discerned, a contract is to be interpreted in the sense which a reasonable person placed in the same situation would give to it."

_____

[9] *See, e.g.*, Ex. 2479 at p. 2 (Article 4.1 of the Unidroit Principles (2004 version same as 1994 and 2010): "2) If such an intention cannot be established, the contract shall be interpreted according to the meaning that reasonable persons of the same kind as the parties would give to it in the same circumstances."); Ex. 2477 at p. 2 (Article 8 (2) of the Vienna Convention on the International Sale of Goods, 11 April 1980: "[S]tatements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances."); Ex. 2478 at p. 1 (Principles of European Contract Law, Article 5.101: "(1) A contract is to be interpreted according to the common intention of the parties even if this differs from the literal meaning of the words. (2) If it is established that one party intended the contract to have a particular meaning, and at the time of the conclusion of the contract the other party could not have been unaware of the first party's intention, the contract is to be interpreted in the way intended by the first party. (3) If an intention cannot be established according to (1) or (2), the contract is to be interpreted according to the meaning that reasonable persons of the same kind as the parties would give to it in the same circumstances.").

14.     These principles apply to the interpretation of the by-laws of an association like ETSI.  However, in respect of the interpretation of the provisions of a collective act such as by-laws of an association like ETSI, it is generally difficult to establish a genuine "common intention" of the parties to the contract of association.  The reason for that is twofold.

15.     First, the circle of the parties to a contract of association evolves throughout time and the parties who voted for the by-laws are generally joined by new members whose understanding of the by-laws, when entering into the contract of association, can be slightly different from the founders' understanding.  This raises the question of knowing which parties one has to take into consideration for the purpose of retrieving the "common intent of the parties" with respect to the provisions that must be interpreted.  In the process of interpreting the by-laws, there is, in my view, no theoretical reason to set aside the understanding of the by-laws that this new party had when it entered into the contract of association.  However, from a practical standpoint, that makes it more difficult to identify a genuine "common intention" between the parties to the contract.

16.     Second, the initial intent of the parties at the time of the adoption of the by-laws may be heterogeneous.  Unless the provision stems from a unanimous decision, it does not reflect the "common" intent of the parties to the contract of association.  It merely reflects the intent of the majority of the voters.  It might even occur that there was not such a shared intent within the majority, especially where the disputed provision tries to establish a balance between diverging interests and was drafted ambiguously enough to permit most of the voters to consider that it could suit their respective views in spite of their continuing divergence.

17.     For these reasons, the search for the "common" intent of the parties to a collective contract (such as the by-laws of an association) for the purpose of the interpretation of its provisions can be futile.  As a result, the interpretation of an ambiguous provision in the by-laws is ordinarily made in accordance with the

objective criteria set forth by the French Civil Code, summarized by reference to the understanding that a reasonable person would have formed of the disputed provision in the context wherein the dispute arose.

18.     Here, ETSI documentation shows that the IPR Policy was first implemented by a majority vote (*i.e.*, by 87.2% of the Individual Weighted vote, with 184 abstentions, and 90.3% of the National Weighted vote, with 5 abstentions), but not by a unanimous vote.  (Ex. 1082 at p. 18 (ETSI/GA21(94)(39) Rev. 2, at 18).)  As a result, it is my opinion that most, if not all, of the ETSI rules have to be construed following what a reasonable person would understand therefrom.  Hence, the commitment undertaken through the execution of an IPR licensing declaration form has to be interpreted following what a reasonable person would understand therefrom in the context of this declaration at the time it was signed by the patent holder.

19.     In addition, I underline that the sole reference to the intent of those who prevailed at the time of the adoption of the by-laws (let alone the intent of the mere drafters of the by-laws) would not only be inconsistent with the principle set out by Article 1156, but would also be impractical in the long-term.  Were the association to last one-hundred years, this view would lead to construing the by-laws in the light of the intent of persons who are no longer party to the contract and who made up their mind in a context which is out of date.  On the contrary, the rules aiming at governing the functioning of a complex body such as an association need some flexibility in order to continue fulfilling their purpose throughout time, with the emergence of new circumstances and in accordance with the evolution of the members' mindset.  In this respect, the interpretation of by-laws ("*statuts*" in French language) presents some analogy with the interpretation of statutes.  As to this point, a renowned President of the French Cour de cassation stated that "*the judge must not linger over a stubborn research of what used to be, one hundred years ago, the intent ('pensée') of the authors of the Code civil when drafting this or that article;*

*he rather ought to wonder what it would be if the same article were written by them today.*"[10]  Likewise, the interpretation of the by-laws following the standard of a reasonable person allows the judge to take into account the evolution of the context wherein they apply.  Thus, it better supports the achievement of the goals the association was founded to pursue.  It is therefore an interpretation method which makes more practical sense in my opinion.

20.    To proceed with this interpretation, the judge will consider a sense which is consistent with the contractual context within which the provision to be construed stands.  This stems from the directive set forth by Article 1161 which provides that "All the clauses of the agreement are to be interpreted with reference to one another by giving to each one the meaning that results from the whole instrument."  This shows that there must be internal consistency in the text of the agreement or, as applicable, in the set of agreements within which the provision takes place.  It follows that when a text admits two meanings, it must be understood to have the meaning that reconciles best with other relevant terms of the relevant agreement(s).  This is the legal reason why the terms of the ETSI IPR licensing declaration have to be understood in a way consistent with the ETSI documents related to this contractual mechanism.

21.    Furthermore, in the event of ambiguity, a French court will prefer an interpretation of a contract which causes it to comply with the law (*e.g.*, competition law), rather than one which would infringe it and call for sanctions.  This principle is implied by Article 1157 of the Civil Code (now renumbered Article 1191) which provides that:  "When a clause may have two meanings, it should generally be interpreted by that which produces an effect, rather than that which does not."  The meaning that would lead the provision to become void, ineffective or inapplicable

---

[10] Ex. 2472 (Ballot-Beaupré, Discours, *in* Livre du Centenaire du Code civil, Paris, 1904, pp. 23 et seq., 27) (emphasis added).

Case No. SACV14−00341 JVS (DFMx)/CV15-02370

REBUTTAL DECLARATION OF P. STOFFEL-MUNCK

because it would, for example, qualify as an infringement of the law, is therefore outweighed because it is reasonable to presume that the parties rather intended to give to the provision the meaning that makes it enforceable at law.  This is the legal reason why the terms of the ETSI IPR licensing declaration have to be understood in a way consistent with the legal environment of ETSI, including consistently with the demands of European competition law.

## IV.   COMPLIANCE WITH THE ETSI IPR POLICY REQUIRES AN ANALYSIS OF MORE THAN JUST THE PARTIES' "NEGOTIATING CONDUCT."

22.     Having addressed proper principles of contract interpretation under French law, I now turn to my disagreement with the specific statements of Professor Fauvarque-Cosson and Dr. Huber regarding the meaning and application of the ETSI IPR Policy.  In particular, I disagree with them to the extent they suggest that a patent owner may comply with the ETSI IPR Policy merely by "negotiating in good faith," without regard for whether the offers made do, in fact, consist of FRAND terms and conditions.  (*See, e.g.*, Dkt. 1330 at ¶ 35; Dkt. 1329 at ¶ 48.)  Although it is true that French law imposes a duty on the parties to negotiate in good faith, it is wrong to suggest that the ETSI IPR Policy establishes no duty beyond that, or that compliance with the duty to negotiate in good faith can be assessed without any analysis of the terms offered.  Instead, the ETSI IPR Policy establishes a duty to *grant* licenses on FRAND terms and conditions, and the failure to offer FRAND terms and conditions can support a finding that the declarant has failed to comply with its contractual obligation.

23.     To begin, the ETSI IPR licensing declaration states that "in accordance with Clause 6.1 of the ETSI Policy, the declarant and/or its AFFILIATES hereby irrevocably declares [that they] are prepared to grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy."  (Ex. 1079 at p. 44.)  When the declarant states that it is

"prepared to grant irrevocable licenses" on terms in compliance with Clause 6.1, *i.e.*, on FRAND terms, there is no license yet.  This does not mean, however, that the declarant is limiting itself to a commitment to negotiate with any interested party.  Were that so, the declarant would have had to state that it was "prepared to negotiate irrevocable licenses."  Instead, the declarant's promise is broader:  not to "negotiate" a FRAND license but to "grant" a FRAND license.

24.     Some features peripheral to the declaration help to illustrate what a reasonable person would understand the IPR licensing declaration to mean.  For example, one of the prime objectives assigned to the ETSI IPR Policy is to avoid a situation where "investment in the preparation, adoption and application of standards could be wasted as a result of an essential IPR for a standard or technical specification being unavailable."  (*Id.* at 36 (Annex 6, Clause 3: "Policy Objectives," § 3.1).)  This goal could be thwarted by IPR owners if the declaration contained a simple commitment to negotiate a license rather than a commitment to grant a FRAND license.

25.     The ETSI Guide on Intellectual Property Rights also provides insight into the meaning that most reasonably suits the subject matter of the licensing declaration.  According to its own terms, the ETSI Guide was developed so as "to understand and implement the Institute's IPR Policy" as defined in Annex 6.  (*Id.* at 51 (ETSI Guide, Foreword, § 3).)  This Guide repeats most of the recommendations made by a working group appointed by ETSI's General Assembly "with a view to addressing and correcting any uncertainties on the operation of this Policy [on intellectual property rights, *i.e.*, in Annex 6] and on any legal rules and obligations on the membership in order to avoid an incorrect implementation of the ETSI IPR Policy and in order to avoid anti-competitive actions [arising from such intellectual property]."  (*Id.* at 51, Background, § 3).)

26.     The ETSI Guide states very clearly that when the members of ETSI sign an IPR licensing declaration, they are not merely committing themselves to

Case No. SACV14−00341 JVS (DFMx)/CV15-02370

REBUTTAL DECLARATION OF P. STOFFEL-MUNCK

negotiate the terms of such a license, but are obliged to grant a FRAND license. Thus, section 1.4 of the ETSI Guide discusses the "rights and obligations deriving from the IPR Policy" and offers "a clear overview of the most important" of them in the form of a summary chart.  In the "Obligations" column, the first two obligations defined as the responsibility of ETSI members are listed as follows:

- To inform ETSI about their own, and other people's, Essential IPRs (Clause 4.1); and

- Owners of Essential IPRs are requested to undertake to *grant* licenses on fair, reasonable and non-discriminatory terms and conditions (Clause 6.1, emphasis added).

(*Id.* at p. 53.)  This indicates that in the context of the ETSI IPR declaration, patent owners are not asked to negotiate; they are required to *grant* FRAND licenses.

27.     Correspondingly, in the "Rights" column, the third of the rights granted to ETSI members is "to be *granted* licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard (Clause 6.1)."  (*Id.* (emphasis added).)  They are not merely promised the right to enter into discussions but the right to *obtain* a FRAND license.

28.     When it comes to more specific formulas in the licensing declaration, section 2.1.3 of the ETSI Guide also underlines that signing such a declaration carries with it the undertaking, not to negotiate, but to grant, a license to the patent declared under the IPR Policy:  "The General IPR licensing declaration shall be used to give an undertaking to *grant* licenses under any IPR that are or become essential . . . ."  (*Id.* at 56 (emphasis added).)

29.     The idea that the declarant must grant the license on FRAND terms and conditions is also evidenced by section 2.4.2 of the ETSI Guide.  This text addresses the scenario whereby an ETSI member refuses to sign an IPR licensing declaration for a patent essential to the standard.  The Guide provides that in that event, the ETSI Secretariat must implement the procedure defined in Article 8 of the IPR

Policy (*i.e.*, of Annex 6).  (*Id.* at 60.)  Article 8.2 states that the Director General of ETSI "shall […] request that licenses be granted according to Clause 6.1" (emphasis added), *i.e.*, that a FRAND license be granted.  Otherwise the concerned part of the standard shall be:

- either modified in such a way as to do without the technology protected by the patent (Article 8.1.1);

- or might be abandoned if it is still in the process of development and it (the patented technology) is absolutely indispensable to it (Article 8.1.3).

(*Id.* at 38, 39.)

30.    If the standard had already been published and cannot be implemented without using the technology whose owner refuses to sign an IPR licensing declaration, Article 8.2 (v) provides that ETSI may refer the matter to the European Commission to see what "appropriate" action could be taken.  This presumably means compelling the patentee to grant a license under FRAND conditions, because the refusal to grant such a license can amount to an "abuse of a dominant position," *i.e.*, an infringement of European competition law under Article 102 (formerly numbered 82 and before that 86) of the Treaty on the Functioning of the European Union (TFEU), that can give rise to an action from the European Commission resulting in an injunction to cease such an abuse, *i.e.*, to an injunction to grant a license, in accordance with the Article 5 of the Council Regulation (EC) No 1/2003 of 16 December 2002.[11]

31.    All of this shows again the extent to which the actual availability of essential patents on FRAND terms and conditions is at the heart of the ETSI IPR

---

[11] Ex. 2475 at pp. 8–9 (Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty; Article 5 (Powers of the competition authorities of the Member States).

declaration process.  The ETSI Guide, which was intended to remove uncertainty about its IPR Policy, thus illustrates what a reasonable person would understand Article 6.1 of the IPR Policy to mean when it uses the words "prepared to grant."  It also demonstrates throughout that the purpose of an IPR licensing declaration is to commit the declarant not to negotiate but to *grant* a FRAND license.  This meaning is without question "the meaning that best suits the subject matter of the contract."  (Ex. 4559 at p. 129 (French Civil Code, Article 1158).)

32.     This interpretation of the declaration as requiring IPR holders to be prepared to offer and grant FRAND licenses—not just "negotiate in good faith"—is also the one most consistent with the broader legal environment wherein that very mechanism stands.  In particular, the development of standards and the availability of patents essential to their use is considered of paramount importance by not only ETSI members, but also the public authorities.  This circumstance influences the interpretation of the terms of the IPR licensing declaration.

33.     As has been shown, the ETSI IPR Policy targets in particular the avoidance of lawsuits for anticompetitive practices.  (*See supra* at ¶¶ 25, 30.)  Compliance with competition law thus enters into the range of concerns that are relevant for the purpose of interpreting the commitments undertaken by virtue of an IPR licensing declaration.  Furthermore, competition law is concerned about the use that patent holders can make of their operating monopoly in the industrial sector covered by ETSI.  The concerns are twofold.

34.     In the first place, competition law ensures that agreements for technical standardization are not cartels.  In 2011, the European Commission accordingly published guidelines on this topic (the "EC Guidelines").  (Ex. 2480.)  This document emphasizes that "the standard-setting organisation's rules would need to ensure [to the agents active in that market] effective access to the standard on fair, reasonable and non-discriminatory terms."  (*Id.*, § 283.)  It adds:

In order to ensure effective access to the standard, the IPR policy

would need to require participants wishing to have their IPR included in the standard to provide an irrevocable commitment in writing to offer to license their essential IPR to all third parties on fair, reasonable and non-discriminatory terms ('FRAND commitment').

(*Id.*, § 285.)

35.     The EC Guidelines specify how the effectiveness of this commitment can be guaranteed.  They state that:

In particular, FRAND commitments can prevent IPR holders from making the implementation of a standard difficult by refusing to license or by *requesting* unfair or unreasonable fees (in other words excessive fees) after the industry has been locked-in to the standard or by charging discriminatory royalty fees.

(*Id.*, § 287 (emphasis added).)

36.     Thus the EC Guidelines invite standardization bodies such as ETSI to adopt rules tending towards the actual offering and granting of FRAND licenses by the patent holders.  They even present some of the methods intended to evaluate the FRAND nature of a patent license royalty (*see id.*, § 289), without prejudice to "the possibility for parties to resolve their disputes about the level of FRAND royalty rates by having recourse to the competent civil or commercial courts."  (*Id.*, § 291.)

37.     In this context, and given that the ETSI rules pursue the self-declared goal of avoiding any violation of competition law, it would be unreasonable to interpret an IPR licensing declaration as the source of a mere commitment to negotiate, without regard for whether the terms offered are, in fact, FRAND.

38.     These principles were addressed by the European Court of Justice one year later, through a decision dated 16 July 2015 (C-170/13, *Huawei Technologies Ltd vs. ZTE Corp. and ZTE Deutschland GmbH*).  (Ex. 2481.)  The ECJ ruled that

because "an undertaking to grant licenses on FRAND terms creates legitimate expectations on the part of third parties that the proprietor of the SEP will in fact grant licences on such terms, a refusal by the proprietor of the SEP to grant a licence on those terms may, in principle, constitute an abuse within the meaning of Article 102 TFEU." (*Id.*, § 53.)  The ECJ explained that "[i]t is for the proprietor of the SEP to present to that alleged infringer a specific, written offer for a licence on FRAND terms . . . ." (*Id.*, § 63.)  The ECJ also noted that "in the absence of a public standard licensing agreement, and where licensing agreements already concluded with other competitors are not made public, the proprietor of the SEP is better placed to check whether its offer complies with the condition of non-discrimination than is the alleged infringer." (*Id.*, § 64.)  Where no agreement can be reached after good faith negotiations, "the parties may, by common agreement, request that the amount of the royalty be determined by an independent third party, by decision without delay." (*Id.*, § 68.)

39.     It results therefrom that the IPR owner has to issue, in the first place, a FRAND offer.  In particular, the ECJ rightly emphasizes that the IPR owner is the only one in position to assess whether or not the terms that he is proposing are discriminatory.  If those terms appear to be so, the IPR owner is in breach of his obligation to offer FRAND terms to the license seeking party.  Thus, contrary to the opinions of Professor Fauvarque-Cosson and Dr. Huber, one cannot judge whether the declarant has complied with its FRAND obligation without taking specific account of the terms offered by the declarant.  Conversely, one cannot logically conclude that a declarant has negotiated in good faith without understanding and analyzing the terms and conditions offered.  It is my understanding that neither Professor Fauvarque-Cosson or Dr. Huber have analyzed the specific terms and conditions of Ericsson's offers to TCL, or Ericsson's patents, or Ericsson's other licenses (nor have I).  (Ex. 2474 at pp. 34:19–24, 118:1–3, 135:7–12 (Dep. of Bénédicte Fauvarque-Cosson 5/4/2016); Ex. 2473 at pp. 16:13–17:3, 174:18–175:4,

266:17–24 (Dep. of Bertram Huber 5/6/2016).)  As such, neither is capable of concluding that Ericsson has complied with the ETSI IPR Policy.

40.    One last point must be made.  Professor Fauvarque-Cosson states in her declaration that TCL "does not contend that Ericsson failed to negotiate in good faith with TCL during the parties' negotiations," and in support cites a statement I made in my expert report in this matter.  (Dkt. 1330 at ¶ 34.)  Unfortunately, my colleague has taken my statement out of context, omitting the first sentence and the last sentence of what I said, as well as the preceding paragraph.  Below is the full quote, along with the preceding paragraph:

> [¶ 100]  This room for *bona fide* disagreements allows for negotiations to be lengthy and nevertheless compliant with the duty to conduct them in good faith, being reminded that anyone can accelerate the process when it seems fit by resorting to the judge.  [¶101]  Based on my review of the facts of the current case, as Ericsson describes them, and their chronology in its supplemental Response to Interrogatory Number 11 (December 11, 2015), *I do not think that the duration of the discussions or their discontinuity proves in itself any bad faith against TCL (or against Ericsson all the same).*  I see that the rejections of Ericsson's offers or of TCL's counteroffers were grounded on motives which seem, *prima facie*, typical of business discussions inasmuch as they referred to essential issues such as pricing issues.  As such, they were legitimate reasons to reject the other one's proposal and to go on discussing without breaching the duty to behave in good faith (see Section B above).  *However, I cannot assess whether or not such proposals or counter proposals were within the spectrum of what might genuinely be considered as fair and/or reasonable.*

1  (Ex. 2489, ¶¶ 100–101 (emphasis added).)

2      41.    As can be seen when the emphasized language is not omitted, I was not

3  offering the opinion that Ericsson had, in fact, negotiated in good faith, and I

4  certainly was not offering the opinion that Ericsson had complied with its obligation

5  to be prepared to grant a license on FRAND terms and conditions.  To the contrary,

6  I specifically disclaimed any understanding of whether Ericsson's offers "were

7  within the spectrum of what might genuinely be considered as fair and reasonable."

8  Instead, I merely indicated that it was unfair and wrong to conclude that TCL or

9  Ericsson had negotiated in bad faith merely because the negotiations had been

10  lengthy, or there had been many rejections of the other side's proposals.

11  **V.**    **CONCLUSION**

12      42.    As explained above, I disagree with Professor Fauvarque-Cosson that

13  ETSI's intent can or should be determined by reference to what "the drafters" of the

14  ETSI IPR Policy and licensing declaration claim to have intended.  First, the

15  interpretation is governed by the intent that the parties to the contract had in

16  common, as my colleague acknowledges herself, and not by the intent of "the

17  drafters" of its terms.  Second, it is difficult to identify a "common intent" of the

18  parties to the contract of association (such as by-laws and the like).  That is because

19  these parties, *i.e.*, the members of the association, are heterogeneous.  They do not

20  form a steady group as new members join them over time.  They may even have

21  had different intents when the vote for the by-laws was not unanimous.  Even

22  within the group of voters who approved the by-laws, there may have been

23  different views as to the meaning of some ambiguous provisions.  For this set of

24  reasons, the search for a "common intent of the parties" in respect of a specific

25  provision of the by-laws is often futile, in which case the French judge would tend

26  to search what is the understanding that a reasonable person would have had of the

27  disputed provision in the same context.  In order to carry out such an interpretation,

28  the French judge would turn to objective tools such as the directives laid out by

1 | articles 1157, 1158, or 1161 of the French Civil Code.

2 |     43.    In addition, I disagree with Professor Fauvarque-Cosson and Dr. Huber

3 | that the ETSI IPR Policy establishes no duty beyond the duty to negotiate in good

4 | faith, or that compliance with the ETSI IPR Policy (or the duty to negotiate in good

5 | faith) can be assessed without any analysis of the terms offered.  Instead, the only

6 | reasonable reading of the ETSI IPR Policy as a whole is that it establishes a duty to

7 | offer and grant licenses on FRAND terms and conditions, and the failure to offer

8 | FRAND terms and conditions can support a finding that the declarant has failed to

9 | comply with its contractual obligation.  Whether a declarant has complied with the

10 | ETSI IPR Policy, or has negotiated in good faith, cannot be determined without

11 | specifically taking account of the terms and conditions offered.

12 |     I declare under penalty of perjury under the laws of the United States of

13 | America that the foregoing is true and correct, and that I executed this declaration

14 | on January 27, 2017, in Paris, France.

Philippe Stoffel-Munck

Case No. SACV14–00341 JVS (DFMx)/CV15-02370

SMRH:480753522

REBUTTAL DECLARATION OF P. STOFFEL-MUNCK

## TABLE OF EXHIBITS CITED IN WITNESS DECLARATION

| Exhibit No. | Description |
|---|---|
| 1079 | ETSI Directives, Version 35, Dec. 2015 |
| 1082 | Minutes of the ETSI 21st General Assembly, including the Specially Convened Meeting, 22-23 November 1994, Nice, France. Document titled, "ETSI/GA21(94)39 Re v.2" |
| 4559 | French Civil Code as of 1st of July 2013, official English translation from Legifrance |
| 2472 | Publication titled "Le Centenaire Du Code Civil, 1804-1904" (excerpts) |
| 2473 | Transcript excerpts from the deposition of Bertram Huber, dated 5/6/16 |
| 2474 | Transcript excerpts from the deposition of Benedicte Fauvarque-Cosson, dated 5/4/16 |
| 2475 | Official Journal of the European Communities, Council Regulation (EC) No 1/2003 of 16 December 2002 on the Implementation of the Rules on Competition Laid Down in Articles 81 and 82 of the Treaty |
| 2476 | Correspondence to Cour de cassation taken from Legifrance.gouv.fr dated 12/19/95 (French document) |
| 2477 | United Nations Commission of International Trade Law publication titled "United Nations Convention on Contracts for the International Sale of Goods," 2010, pp. 3-4 |
| 2478 | Publication titled "The Principles of European Contract Law 2002 (Parts I, II, and III)," 2002, Ch. 5 |
| 2479 | Publication titled "Unidroit Principles of International Commercial Contracts," 2004, p. 118 |
| 2480 | Notice from European Commission re "Guidelines on the Applicability of Article 101 of the Treaty on the Functioning of the European Union to Horizontal Co-Operation Agreements," 01/14/2011 |
| 2481 | Judgment of The Court (Fifth Chamber) dated 7/16/15 re: Huawei v. ZTE, Case No. C-170/13 |
| 2482 | Annex 1 to Rebuttal Expert Report of Philippe Stoffel-Munck: CV of Philippe Stoffel-Munck |
| 2483 | Webpage from Legifrance.gouv.fr website dated 4/4/16 (French document) |

| Exhibit No. | Description |
|---|---|
| 2484 | Publication titled "Aspects actuels du droit des affaires," by Y. Guyon, 2003, pp. 194-199 (French document) |
| 2485 | Publication titled "Droit des obligations," by A. Benabent, pp. 214-219 (French document) |
| 2486 | Correspondence to Cour de cassation taken from Legifrance.gouv.fr dated 2/18/86 (French document) |
| 2487 | Correspondence to Cour de cassation taken from Legifrance.gouv.fr dated 11/9/93(French document) |
| 2488 | Publication titled "Les grands arrets de la jurisprudence civile," by H. Capitant, 2015 (French document) |
| 2489 | Excerpts from Rebuttal Expert Report of Philippe Stoffel-Munck, dated 4/4/16 |

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Diego, State of California.  My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130.

On January 27, 2017, I caused to be served the REBUTTAL DECLARATION OF PHILIPPE STOFFEL-MUNCK to all counsel of record by serving true copies of the foregoing document on the interested parties in this action as follows:

BY EMAIL OR ELECTRONIC TRANSMISSION: I caused a copy of the document(s) to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| John Gibson | Theodore Stevenson, III |
| jgibson@crowell.com | tstevenson@mckoolsmith.com |
| Samrah R Mahmoud | Laurie L. Fitzgerald |
| smahmoud@crowell.com | lfitzgerald@mckoolsmith.com |
| Robert B McNary | Ashley Moore |
| rmcnary@crowell.com | Amoore@mckoolsmith.com |
| Mark A Klapow | Blake H. Bailey |
| mklapow@crowell.com | bbailey@mckoolsmith.com |
| Christie L. Stahlke | Christine Michelle Woodin |
| cstahlke@crowell.com | cwoodin@mckoolsmith.com |
| Jennifer Van Dusen | David Sochia |
| jvandusen@mckoolsmith.com | dsochia@mckoolsmith.com |
| Nicholas Mathews | Douglas Cawley |
| nmathews@mckoolsmith.com | dcawley@mckoolsmith.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2017, at San Diego, California.

By:   */s/ Kristina Grauer*
      KRISTINA GRAUER