CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. <br><br> ERICSSON INC., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx <br> Case No. 2:15-CV-02370 JVS-DFMx <br><br> **SECOND CORRECTED WITNESS DECLARATION OF LARS GUSTAV BRISMARK** <br><br> Hon. James V. Selna <br><br> **Discovery Cut-off:** May 23, 2016 <br><br> **Pretrial Conference:** February 1, 2017 at 10:00 a.m. <br><br> **Trial:** February 14, 2017 at 8:30 a.m. |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................1
  A. Personal Background ........................................................................1
  B. Company Background .......................................................................3
  C. Ericsson Prioritizes and Protects Its Research and Development Investments ...........................................................................................5
  D. Ericsson Is A Leading Developer Of Open Telecommunications Standards. ...............................................................................................8
      1.  1G: The NMT Standard ..........................................................9
      2.  2G and 2.5G: The GSM, GPRS, And EDGE Standards .......10
      3.  3G: The WCDMA Standard ..................................................11
      4.  4G: The LTE and LTE Advanced Standards ........................13
      5.  5G: The Next Generation of Standards .................................15
II.   STANDARDIZATION AND LICENSING ......................................16
  A. Standardization Is A Competition Between Different Standards And Standards Development Organizations. ..........................................16
  B. The FRAND Commitment. ..............................................................18
  C. Ericsson's Patent Licensing Practices. ...........................................21
      1.  Ericsson Widely Licenses Its Standard Essential Patents ....21
      2.  Ericsson Enters Into Global Portfolio Cross-Licenses That Specify A Net Balancing Payment. ......................................22
      3.  Ericsson Does Not Require A Uniform Payment Structure When Entering Into A License. ..............................................27
  D. Ericsson Maintains Reference Prices To Ensure A Consistent Starting Point Across Licensing Negotiations. ..............................29
III.  ERICSSON'S LICENSE OFFERS TO TCL. ...................................32
  A. The Parties' Pre-Suit Negotiations ................................................32
  B. Ericsson's Open License Offers To TCL. .......................................35
      1.  Ericsson's Option A License Offer. ......................................36
      2.  Ericsson's Option B License Offer. ......................................41
  C. Release Payment. .............................................................................43
IV.   ERICSSON LICENSES ANALYZED BY MR. KENNEDY .............44
  A. Apple .................................................................................................45
  B. Blackberry ........................................................................................48
  C. Coolpad .............................................................................................49
  D. Doro ..................................................................................................49
  E. HTC ...................................................................................................50
  F. Huawei ..............................................................................................51

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

G.  Karbonn ........................................................................................... 52

H.  LG .................................................................................................... 52

I. Samsung ............................................................................................ 54

J. Sharp ................................................................................................. 56

K.  ZTE .................................................................................................. 57

L.  Other Ericsson License Agreements ............................................. 58

V.      CONCLUSION ......................................................................................... 58

VI.     LIST OF EXHIBITS ................................................................................. 59

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

My name is Lars Gustav Brismark. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

## I.    INTRODUCTION

### A.    Personal Background.

1.    I am the Chief Intellectual Property Officer at Telefonaktiebolaget LM Ericsson. I lead Ericsson's global patent development and licensing efforts, and am responsible for overseeing the Company's intellectual property, including its patents, copyrights, and trademarks, worldwide.

2.    I joined Ericsson in an engineering capacity in October 1986, with a Master of Science degree in Physics Engineering from Uppsala University. Around that time, many European companies were developing prototypes for a pan-European second generation (2G) digital mobile system. Ericsson, like other members of the European Conference of Postal and Telecommunications Administrations, was working to develop one of these prototypes—the 2G standard that we now call GSM. I joined the research team within Ericsson that was developing this technology.

3.    In March of 1988, Ericsson joined the newly formed standards development organization, the European Telecommunications Standards Institute or "ETSI." I was involved in ETSI's standardization activities from the start, carrying out the technical work within Ericsson that supported Ericsson's contributions to the ETSI standards development process.

4.    In 1998, the first Wideband Code Division Multiple Access (known as WCDMA or 3G) system was about to be commercially introduced in Japan. I moved to Japan for two years to head up Ericsson's product management and standardization work and to support the introduction of 3G there. I was responsible for all of Ericsson's standardization activities that took place in Japan around 3G. That was around the time when 3GPP—the Third Generation Partnership Project—

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

was formed.

5.     In 2000, I moved back to Sweden and took on responsibility for product management for WCDMA radio access networks. My group managed Ericsson's 3G products, including radio base stations, radio network controllers, and operation support systems. I did that for four years.

6.     In 2004, I joined Ericsson's Intellectual Property Rights—or "IPR"—organization as Vice President of Patent Development for IPR and licensing. In September 2006, we split the organization in two. One group, patent development, would draft and prosecute patent applications. I took on a second group that would manage Ericsson's patent portfolios. Our objective was to build value and create patent portfolios that could be made available to others for a royalty return, as well as other considerations, such as reciprocal cross-licenses covering Ericsson's own products and services.

7.     I led this second group as Vice President of Strategy and Portfolio Management, IPR, and Licensing for almost a decade. In that role, I was responsible for Ericsson's overall IPR strategy. I drove the patent portfolio management process within Ericsson's IPR organization and led a team of technical experts who analyze the use of Ericsson's patents by others. I also drove the FRAND pricing process for Ericsson's various standard essential patent portfolios, with input from various competence areas from within the organization as needed. Then, in April 2016, I became Ericsson's Chief Intellectual Property Officer.

8.     I have presented on the topic of FRAND licensing at a number of leading industry conferences, including IP Summit 2010, IP Summit 2011, and IP Summit 2012 (all in Brussels, Belgium); the Third Annual Licensing Executive Society International Global Technology Impact Forum in 2014, hosted by the World Intellectual Property Organization (in Geneva, Switzerland); and IPBC Global 2016, the annual conference of the IP Business Congress (in Barcelona, Spain).

1

**B.    Company Background.**

2      9.    Founded in 1876, Ericsson supplies the equipment, software, and

3  services that make it possible to place calls and send data over telecommunication

4  networks. Around half of the world's network operators—including AT&T,

5  Verizon, Sprint, T-Mobile, Vodafone, China Mobile, Telefonica, Orange, and many

6  others—buy solutions and/or services from Ericsson. In all, Ericsson equipment

7  serves more than one billion mobile subscribers through more than 500 network

8  operators in more than 180 countries. About 40% of all global mobile traffic runs

9  through Ericsson-supplied networks. The Company is headquartered in Stockholm,

10  Sweden, and employs more than 113,000 people all over the world.

11      10.    Ericsson is best known for its networks business, which provides the

12  network infrastructure equipment needed for mobile and fixed communication,

13  including 2G, 3G, 4G, and future 5G networks, and IP core, transport, and cloud

14  networks. Ericsson has been a leading supplier of network infrastructure equipment

15  for many years, and holds more than a one third global market share. Ericsson

16  began creating the infrastructure equipment for cellular networks in the early 1980s

17  with first generation (1G) technology, and has since supplied the equipment and

18  services needed to build and deploy mobile networks that support second

19  generation (2G), third generation (3G), and fourth generation (4G) technologies all

20  around the world. Ericsson's base stations support all of the major cellular

21  standards, often in a single piece of equipment. An example of a widely-deployed

22  Ericsson base station is seen here, in Figure 1:

23

24

25

26

27

28

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

FIGURE 1



11.     Ericsson is also well known for its former mobile phone business, which it divested in February 2012. Prior to that time, Ericsson had a long history of designing, marketing, and selling mobile phones, including in a joint venture with Sony Corporation known as Sony Ericsson. In 1997, Ericsson coined the term "smartphone" in connection with the unveiling of its GS88 handset. Also known as "Penelope," this concept phone combined calling, e-mail, and web browsing. And in February 2000, almost a decade prior to Apple's release of the first iPad—Ericsson showcased its Cordless Web Screen—the world's first tablet computer. The Ericsson Cordless Web Screen is pictured in Figure 2:

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

FIGURE 2



**C.    Ericsson Prioritizes and Protects Its Research and Development Investments.**

12.    Ericsson prioritizes innovation, and for decades has invested approximately 15% of its annual net sales back into research and development activities. In the past five years, this investment has totaled between 32 and 36 billion Swedish Kronor ($4-5 billion) annually. More than 23,000 Ericsson employees-around 20% of the Company's total workforce-work in research and development. Some examples of Ericsson's technical milestones are shown in Figure 3 below:

FIGURE 3

| ERICSSON MILESTONES | |
|---|---|
| **1878** | Ericsson sells its first telephone. |
| **1950** | Ericsson supports the world's first international call |
| **1977** | Ericsson introduces the world's first digital telephone exchange. |
| **1981** | Ericsson installs its first mobile telephone system. |
| **1991** | Ericsson launches 2G phones on the first 2G network. |
| **1994** | Ericsson invents Bluetooth. |
| **2001** | Ericsson makes the first 3G call. |
| **2009** | Ericsson builds the first 4G network. |
| **2016** | Ericsson completes the first 5G trial system in Europe, with speeds |

40 times faster than maximum speeds achieved by 4G.

13.    It is Ericsson's policy to protect and capitalize on its research and development investments by creating, securing, protecting, and licensing patents in support of the Company's overall business goals. Ericsson owns more than 39,000 patents worldwide, the majority of which cover wireless technology. Importantly, rather than keeping them proprietary to Ericsson, Ericsson has made the decision to voluntarily contribute many of its patented inventions to standardization activities. Other Ericsson patents cover non-standardized technologies that may be used in standard-practicing devices like mobile phones and tablets. This latter category of patents is frequently referred to as "implementation patents" because they cover features of products that implement the standards.

14.    Ericsson's royalty-based patent licensing business is an important part of the Company's overall IPR strategy. As seen in an image from Ericsson's 2015 Annual Report that is reproduced as Figure 4, we have created a patent portfolio with both in-licensing value where Ericsson is the licensee (shown on the bottom of the image) and out-licensing value where Ericsson is the licensor (shown on the top of the image):

FIGURE 4



15.     The in-licensing value generated by Ericsson's patent portfolio protects our very substantial sales of products and services (almost $30 billion in 2015) via cross-licensing agreements with other patent owners. This ensures that Ericsson has the patent rights necessary to lawfully sell its own products and services in the global market, and reduces the royalties that Ericsson pays to others to license patents that cover its own products and services. The out-licensing value of Ericsson's patent portfolio provides an opportunity for Ericsson to generate revenue by providing other companies with access to its very substantial portfolio of wireless patents. It also allows us to obtain a return on our patented inventions through bilateral licensing, joint licensing platforms (for example, revenue sharing agreements with third-parties), and selected patent divestments. This return on Ericsson's patented inventions in turn helps to support the Company's ongoing research and development efforts. This concept is depicted in Figure 5:

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

FIGURE 5

Research & Development

Patents

Licensing

### D. Ericsson Is A Leading Developer Of Open Telecommunications Standards.

16.     Open telecommunications standards comprise a set of technical specifications that provide complete "blueprints" for commercial networks and products. By implementing the same open standards in their mobile device and infrastructure products, industry participants ensure that those products are compatible and that the performance requirements for networks and devices are met system-wide. This, in turn, ensures worldwide interoperability and end-to-end performance between networks, wireless devices, and network operators. Open standards are why I can purchase an Apple iPhone near my home in Stockholm, Sweden, travel with it to Ericsson's North American headquarters in Plano, Texas, call a friend who is vacationing in Sydney, Australia, and he can answer my call— which may have traveled through Ericsson, Alcatel Lucent, and Huawei network equipment—on his ZTE smartphone.

17.     As I will discuss in more detail later in this Declaration, Ericsson and other companies that own patented technology used in the cellular standards may voluntarily commit to license that technology on fair, reasonable, and non-discriminatory (FRAND) terms and conditions to suppliers of standard-practicing

products. This is what makes the cellular standards "open."

### 1.    1G: The NMT Standard

18.    Ericsson's involvement in mobile telecommunications began with the first generation of mobile standards, known as NMT (Nordic Mobile Telephony). The initiative for the NMT standard began with the Nordic Council, the permanent cooperating body of the Danish, Finnish, Norwegian, and Swedish governments. NMT—an analog cellular system—was the first to work across borders and helped to create the foundation for a future world where the mobile phone would become integral to the daily lives of billions of people communicating seamlessly across borders.

19.    Ericsson introduced its first mobile telephone system, an NMT network in Saudi Arabia, in September of 1981. Although the mobile devices made available to consumers in the early 1980's were bulky and cumbersome, they quickly decreased in size and grew in popularity. Some of these early mobile phones are pictured in Figure 6:

FIGURE 6



## 2.    2G and 2.5G: The GSM, GPRS, And EDGE Standards

20.    Ericsson began actively participating in standardization in the mid-1980's, which was the first time that industry participants other than national telecom operators were invited to help create cellular standards. We began as a member of the European Conference of Postal and Telecommunications Administrations, known as "CEPT," which was working to develop a 2G standard. As I noted earlier, I was part of the Ericsson team of engineers that was contributing technology to the development of a 2G standard within CEPT. Ericsson's vision for 2G was a prototype 200 kilohertz time division multiple access (TDMA) system that was scalable (capable of being upgraded on demand), flexible, and state-of-the-art at the time. Our prototype was accepted by CEPT's Group Spécial Mobile in Paris in 1987, as the basis for the 2G standard that would come to be known as GSM.

21.    In March 1988, the European Commission formed ETSI to accelerate standardization and promote greater harmonization among European telecommunications systems. Ericsson was one of the original ETSI members.

ETSI took over the standardization work of CEPT's Group Spécial Mobile, and continued to develop the GSM technology that was based in large part on Ericsson's prototype. In 1991, Ericsson launched mobile phones compliant with the GSM, or 2G, standard that had been promulgated by ETSI. Ericsson also deployed the first 2G GSM network in the world, for Radiolinja in Finland. Other 2G standards were also introduced around that time, including the US TDMA IS-54 standard and Japanese PDC. The US IS-95 2G standard, which used a technology called Code Division Multiple Access (CDMA), was introduced slightly later. However, GSM quickly became the standard of choice and the backbone of wireless telecommunications networks worldwide.

22.     Over the next few years, to meet the ever increasing demand for faster data speeds, Ericsson and its colleagues within ETSI developed two further evolutions of GSM—General Packet Radio Service (GPRS) and Enhanced Data rates for GSM Evolution (EDGE). The GPRS standard gave mobile phones the ability to access the Internet. The EDGE standard—sometimes referred to as "2.5G"— provided, among other things, a technique for more efficiently putting data on air waves. As was the case with GSM, Ericsson was instrumental in developing the GPRS and EDGE standards through its work within ETSI.

### 3.     3G: The WCDMA Standard

23.     Ericsson's standardization work continued in the 1990's with the third generation of mobile telephony (3G). In the early 1990's, Ericsson formulated the basic concept for Wideband Code Division Multiple Access (WCDMA) in a European research project called the Code Division Testbed Project. A special task force (including Ericsson, Nokia, and NTT DoCoMo, among others) was created to investigate the potential for WCDMA as an access method for 3G systems, as the standard was developed in parallel in Europe and Japan. WCDMA is the standard radio interface for the Universal Mobile Telecommunications System (UMTS), which also covers the core network and the authentication of users via SIM

(subscriber identity module) cards.

24.     Starting around 1995, Ericsson was heavily involved in WCDMA radio interface standardization activities within ETSI, and within two Japanese standards development organizations, the Association of Radio Industries and Businesses and the Telecommunication Technology Committee of Japan. In 1997, Ericsson unveiled Penelope, the first smartphone, a concept device that utilized the new capabilities and increased speed of 3G. Penelope had a Symbian operating system, touchscreen, standard keyboard, and stylus, and combined calling, e-mail, and web browsing. The Penelope mobile phone is pictured in Figure 7:

FIGURE 7



25.     In 1999, Ericsson teamed with other industry members to convince various standard development organizations that the creation of the industry consortium known as the Third Generation Partnership Project or "3GPP" would increase efficiency in the standardization process and facilitate adoption of 3G standards that would be fully interoperable worldwide. 3GPP lead the development efforts for WCDMA, as well as the subsequent revisions known as High Speed Downlink Packet Access (HSDPA), High Speed Uplink Packet Access (HSUPA), and Multimedia Broadcast Multicast Service (MBMS). All GSM-related development activities were eventually also phased over into 3GPP.

26.     Also in 1999, the telecommunications industry adopted Adaptive Multi-Rate (AMR)—an audio compression format that is optimized for speech coding—as the industry standard. AMR improved the quality of voice calls and is now found in billions of mobile devices all over the world. Ericsson was at the forefront of early AMR development efforts and has continued to lead by driving the development of AMR-WB (AMR Wideband), the voice codec for digitally coding and decoding high definition voice in wireless networks, and most recently the development of the EVS codec, Enhanced Voice Service.

27.     In 2001, Ericsson conducted the first 3G call for Vodafone. The global rollout of high-speed broadband based on WCDMA technology commenced in 2003, and today there are billions of 3G subscribers across the globe. WCDMA gave users new services, more bandwidth compared to 2G standards, and improved how mobile phones communicate with base stations.

### 4.     4G: The LTE and LTE Advanced Standards

28.     As the worldwide demand for mobile data increased, Ericsson continued to innovate-this time towards the fourth generation of mobile telephony (4G). Ericsson's 4G concept was the standard known as Long Term Evolution, or LTE. 3GPP defined the target requirements for LTE in 2005, and the first commercial release of the LTE standard (called Release 8) was made available in 2008. 4G technology provided substantial increases in data speed, which allowed users faster access to the internet, gaming services, high-definition mobile television, video conferencing, and mobile applications.

29.     Ericsson demonstrated the first LTE connection in October 2009, in Stockholm, when the Company successfully achieved interoperability between the world's first commercial LTE device (from Samsung) and Ericsson's live LTE network. This was a major milestone in making LTE a reality, and demonstrated that LTE services would soon be ready for the market.

30.     Not long after demonstrating the first LTE connection, Ericsson

WITNESS DECLARATION OF LARS GUSTAV BRISMARK; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

launched the world's first LTE network for network operator TeliaSonera in Stockholm, using Release 8 of the LTE Standard. In December 2009, downtown Stockholm was covered with Ericsson's LTE network, and TeliaSonera's customers became the first to have access to LTE service in laptops using LTE dongles (a type of computer hardware that attaches to a computer to provide certain functionality, also referred to as an external modem).

31.    The next major step of 4G, LTE Release 10, was finalized in March 2011. Release 10 introduced certain features, and fully implemented other features, that were designed to further increase the available data speeds on networks. Ericsson demonstrated its LTE Release 10 capabilities in Kista, Sweden in June 2011, to the Swedish Post and Telecom Agency. Release 10, together with subsequent Releases 11 and 12, has been termed "LTE Advanced" by some in the industry and is the most advanced version of the current, commercially available, cellular radio access equipment (mobile phones and base stations) As was the case with 2G and 3G, Ericsson has been and remains heavily involved in 4G standardization.

32.    In 2014, the European Patent Office selected a group of Ericsson inventors as finalists for the European Inventor Award, based on their decisive role in the invention of LTE. This annual award honors scientists, engineers and inventors whose inventions have made a major contribution towards social, technological, and economic progress. The European Patent Office's press release announcing this selection states that:

> Erik Dahlman, Muhammad Kazmi, Robert Baldemair, Stefan Parkvall and team (Sweden, Austria, Germany): LTE network technology for high-speed mobile internet, also known as 4G, consists of thousands of individually patented technologies which together constitute one of the seminal technology standards in the mobile sector. It cannot be attributed to a single organisation, company or individual, but this

-14-

WITNESS DECLARATION OF LARS GUSTAV BRISMARK; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

international team of inventors at Swedish company Ericsson, which holds several hundred patents in the 4G area, has played a decisive role in the invention of LTE network technology. Most importantly, the new network standard makes it possible to surf the internet at high speed using a mobile device.[1]

### 5. 5G: The Next Generation of Standards

33. Even as 4G technology continues to develop, Ericsson is investing heavily in the fifth generation of cellular standards, known as "5G." 3GPP is currently defining the 5G NR (New Radio) standard, with an anticipated completion date in June 2018. In addition to enhancing mobile broadband services, 5G will include innovative new air interfaces between mobile devices and networks, and bring high-speed mobile Internet to everything: homes, cars, hospitals, utilities, smartphones, and more.

34. Ericsson has around 350 employees who work with standardization every day in a wide variety of roles. More than 200 Ericsson engineers are working on a concept for the 5G air interface and other technologies that we plan to contribute to standardization, and we have already made hundreds of technology contributions to 3GPP's 5G-related standardization work. To be ready for commercial 5G networks in 2020 or sooner, Ericsson is currently testing live 5G networks in Korea, Japan, Sweden, and the United States. Within the United States in particular, Ericsson is testing live 5G networks in four markets, ███████

35. It is Ericsson's firm belief that the efficiency, quality, and value to the consumer of mobile communication are enhanced by the collaboration and sharing of technologies through global open standards. At the same time, however, "open" does not mean free. It is imperative to the continued success of standardization that

---

[1] Exhibit 4054.

companies who use open standards, regardless of their level of participation in the standardization process, are prepared to license standardized technology on FRAND terms and conditions. This is because, as I will discuss, standard essential patent owners must be fairly and adequately compensated for the use of their standardized inventions so that they are sufficiently incentivized to continue contributing their technology to standards development efforts.

## II.     STANDARDIZATION AND LICENSING

### A.     Standardization Is A Competition Between Different Standards And Standards Development Organizations.

36.     Creating an open standard is not as simple as a standards development organization adopting an existing technology. Standardization is both a competition among industry players to develop the best solutions to the technical challenges underlying the standard (e.g., data rates, latency, reliability, and security) and a competition between competing standards for market adoption. The industry competition between LTE, Ultra Mobile Broadband (UMB), and Worldwide Interoperability for Microwave Access (WiMAX) is one example of the competition that exists when rival technologies are competing to become the prevailing standard.

37.     In 2003, while 3G WCDMA technology was still being developed and deployed, Ericsson, together with mainly NTT DoCoMo, began work on developing the fourth generation of cellular standards. Two of our primary goals for 4G were much lower latency and substantially faster data speeds, which would allow users higher quality-of-service and faster access to the web, gaming services, high-definition mobile television, video conferencing, and mobile applications. Another one of our goals was to support the addition of multiple antennas at the mobile phones and base stations in 4G systems, which would make them faster and prone to fewer errors than the 3G systems that existed at the time.

38.     Ericsson made the decision to devote all of its research and

-16-

development efforts to the 4G standard known as LTE, even though other companies were working to develop alternative technologies, in particular UMB and WiMAX. LTE was a direct evolution of the GSM family of standards developed in 3GPP; UMB was largely based on Qualcomm's earlier CDMA2000 technology and developed in 3GPP2; and WiMAX was a broadband wireless technology developed by the Institute of Electronic and Electrical Engineers (IEEE). Ericsson realized that it was taking a considerable risk by putting all of its "eggs" in the "LTE basket," but nevertheless did so because our early research indicated to us that LTE had the strongest potential to be the technically and commercially superior standard technology.

39.     In particular, we believed that LTE would offer state-of-the-art performance regarding data rates and latency, and a seamless service offering to end users from day one of deployment thanks to its backwards compatibility, which differed from WiMAX. This would make LTE better for introducing new applications like online gaming and video conferencing. Our standardization work surrounding LTE was aimed at making these expectations a reality, so that LTE would be selected over UMB and WiMAX by the network operators who would deploy 4G technology around the world.

40.     The race for the prevailing 4G technology was in full force by 2007. In November 2007, in promising news for Ericsson, Verizon announced plans to embrace LTE. One year later, in November 2008, Qualcomm publicly announced that it was cancelling its UMB development efforts and shifting its focus to LTE. This too was promising news for Ericsson, because it left only LTE and WiMAX in the running for adoption as the prevailing 4G standard.

41.     But the race was not over. WiMAX had gained a substantial head start over LTE in the market because United States-based operators Sprint and Clearwire had launched WiMAX networks in 2007 and 2008, making WiMAX available to tens of millions of subscribers. LTE, in contrast, was not commercially deployed

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    until the very end of 2009 (by Ericsson in Sweden). But over the course of 2010

2    and 2011, as network operators weighed the technical and commercial benefits of

3    LTE versus WiMAX, LTE emerged as the winner. Then, in October 2011, Sprint

4    announced that it would be deploying LTE technology in its networks, signaling

5    that WiMAX would be phased out. Today LTE is ubiquitous around the world, and

6    UMB and WiMAX are, for practical purposes, obsolete.

7         42.    As this example shows, during the early phases of developing a

8    standard, before one standard has emerged as the prevailing standard in the market,

9    innovators such as Ericsson do not know whether the standard they are contributing

10   to will ultimately prevail in the market (in addition to not knowing whether their

11   individual technology contributions will be accepted into the developing standard,

12   or whether companies will develop and sell products that use the standard). This

13   creates a significant risk for the innovators, namely, that their investment in these

14   early standards development efforts will fail to generate a return.

15        43.    Later, after one standard has prevailed as the market choice and this

16   risk is eliminated, companies who did not participate in standardization enter the

17   market and begin selling standard-practicing devices. TCL is one such company.

18   This is very common, and many mobile phone vendors (e.g. Apple, Xiaomi, and

19   TCL, among others) have taken advantage of open standards and emerged as

20   market leaders, even though they were not previously investing in standards

21   development.

22        **B.    The FRAND Commitment.**

23        44.    Within a standards development organization such as ETSI or 3GPP,

24   at a high-level, participants start by presenting their technology aimed at satisfying

25   an agreed requirement specification and overall system architecture. These

26   contributions of technology are then thoroughly discussed within a "working

27   group" comprised of engineers from various industry members. Based on an

28   evaluation of technical merit, the best contributions are then selected by the

1   working group for adoption into the standard. The contributions that are

2   incorporated into the standard are often referred to as "approved" contributions. In

3   my experience, in most cases, approved contributions are protected by the

4   contributor's patent filings. This is the regular practice at Ericsson.

5        45.    As I have discussed, the submitting a technical contribution to a

6   working group is a risky investment of research and development resources. These

7   technical contributions are often made years before any standard-practicing

8   products are sold, and they are always made without a guarantee that they will be

9   accepted into the standard. That decision is made later, by the working group, after

10   the innovator has invested time and resources to develop— and typically applied

11   for patent protection of—the technology disclosed to the standards development

12   organization in the innovator's contribution.

13        46.    When standardized technology is patented, Ericsson and others in the

14   industry refer to the patent covering that technology as a "standard essential

15   patent." ETSI defines "ESSENTIAL" as "it is not possible on technical (but not

16   commercial) grounds, taking into account normal technical practice and the state of

17   the art generally available at the time of standardization, to make, sell, lease,

18   otherwise dispose of, repair, use, or operate EQUIPMENT or METHODS which

19   comply with a STANDARD without infringing that IPR. For the avoidance of

20   doubt in exceptional cases where a STANDARD can only be implemented by

21   technical solutions, all of which are infringements of IPRs, all such IPRs shall be

22   considered ESSENTIAL."[2]

23        47.    Naturally, the work within ETSI and 3GPP would be worthless if

24   companies that use the standard in their products did not have the option to license

25   standard essential patents on reasonable terms. In that situation, any standard

26   essential patent owner could block the use of the standard by obtaining injunctions

27
28

[2] Exhibit 223 at Clause 15.6 (TCL_ERIC_CDCA1115776).

against companies who supply standard-practicing products. To avoid this, ETSI has an IPR Policy that requires its members to submit declarations identifying the member's potentially essential or essential IPRs, and state whether the member is prepared to grant licenses on FRAND terms and conditions to the extent the declared IPRs are or become, and remain, essential.[3]

48.    Ericsson has submitted dozens of declarations to ETSI over the past two decades, identifying hundreds of families of patents and patent applications in relation to the 2G, 3G, and 4G standards. The commitment made by Ericsson in each of these declarations is commonly referred to as the "FRAND commitment." Ericsson views its FRAND commitments as contracts between Ericsson and ETSI. Ericsson takes its FRAND commitments extremely seriously, and it is Ericsson's firm belief that licenses for all standard essential patents should be widely available on FRAND terms. We have built our licensing program based on this philosophy, and we approach every patent licensing negotiation in good faith and with our FRAND commitments in mind.

49.    To my knowledge, ETSI has never defined "fair, reasonable, and non-discriminatory" with specificity, and has rejected all attempts by its members to modify the ETSI IPR Policy to promulgate a more detailed definition of FRAND. Ericsson knows this from experience, as one of the rejected attempts was ours. In 2006, Ericsson, Motorola, and Nokia made a proposal to ETSI to clarify the scope of the FRAND contract, titled "Minimum Change Optimum Impact." Under this proposal, the FRAND commitment would have been further explained to require each standard essential patent owner to limit its royalty rate to a proportion, based on comparative patent strength across the industry of a to-be-determined total reasonable aggregate royalty rate. However, despite Ericsson's efforts to advocate for this proposed modification to the FRAND commitment, there was no consensus

---

[3] Exhibit 223.

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   within ETSI and it was not adopted.

2       50.    Importantly, Ericsson is both a company who invests heavily in the

3   early phase of standardization (e.g. during the race between LTE, UMB, and

4   WiMAX) and a company that needs reasonable access to the standards in order to

5   lawfully sell its standard-practicing products in the years after LTE prevailed as the

6   standard of choice. This means that, just as companies rely on Ericsson's FRAND

7   commitments, Ericsson relies on the FRAND commitments made by others. This is

8   why Ericsson makes it a priority to advocate for a system that ensures both that

9   patent owners are fairly rewarded with FRAND royalties by the companies that use

10  standardized patented technologies and that implementers are able to gain access to

11  the standard at a reasonable cost.

    **C.**    **Ericsson's Patent Licensing Practices.**

         **1.**    **Ericsson Widely Licenses Its Standard Essential Patents.**

14      51.    Ericsson's global portfolio of patents and patent applications includes

15  at least 190 patent families that we have identified, via the preparation of claim

16  charts by Ericsson engineers and patent attorneys, as patents that claim technology

17  in the 2G, 3G, and/or 4G standards. Because Ericsson is routinely awarded new

18  patents and our claim charting activities are ongoing, this number is not static. In

19  just the past three years, for example, my team at Ericsson has prepared new claim

20  charts to show the essentiality of 95 patent families to the 4G standard.

21      52.    Ericsson has entered into licenses under its 2G, 3G, and/or 4G standard

22  essential patents more than 150 times with more than 100 industry participants,

23  including almost all of the leading mobile device vendors. We have almost always

24  been able to conclude licenses through bilateral negotiations, and less than 5% of

25  our licenses have been reached during or after litigation. The logos of many of

26  Ericsson's historical and existing licensees are depicted in Figure 8:

27

28

FIGURE 8



53.     Importantly, each Ericsson license is the product of a real-world negotiation, where the parties made concessions and compromises and eventually reached a set of terms and conditions that was acceptable to both sides. The business practices and negotiation behavior of prospective licensees is subject to wide variation all around the world, and each license is, at bottom, a unique business compromise, executed with a different company at a different point in time, tailored to address the specific circumstances of a particular negotiation. Consequently, Ericsson's licenses express a range of terms and conditions that the negotiating parties concluded were FRAND, both between each other and as to all other licensees of their respective standard essential patents (if any). I will now discuss Ericsson's patent licensing practices in more detail.

**2.      Ericsson Enters Into Global Portfolio Cross-Licenses That Specify A Net Balancing Payment.**

54.     Ericsson's regular practice is to enter into global cross-licenses that

cover each party's entire 2G, 3G, and/or 4G standard essential patent portfolios, including standard essential patents that are granted to or acquired by the party during the term of the license. By licensing on a global portfolio basis, Ericsson and its licensees avoid the transactional inefficiencies that arise from patent-by-patent and country-by-country licensing. By entering into portfolio cross-licenses that cover all patents owned by either party for the term of the agreement, Ericsson and its licensees prevent a situation where they would need to amend the license each time standard essential patents are granted to or acquired by a party during its term.

55.     It is also Ericsson's typical practice to enter into licenses with global rates, as opposed to rates that are specific to particular countries or regions. Global rates avoid the transaction costs associated with negotiating over royalty rates on a country-by-country or region-by-region basis. They also recognize the practical reality that that licensees frequently manufacture mobile devices in one country and sell them in others, and, because the 2G, 3G, and 4G standards are global, a consumer can use his or her phone all over the world. TCL, for example, reported sales of mobile devices in more than 170 countries in 2015.[4]  Of course, although Ericsson seeks and obtains patent protection for its standard essential technologies across the globe, Ericsson recognizes that its licensees may sell mobile devices in countries where there isn't a functional patent system. To account for these discrepancies, the negotiated global rates in Ericsson's licenses are "blended," i.e. they are lower than the rates that Ericsson could charge for a license specific to sales in a country with a strong patent system but higher than the rates that Ericsson could charge for a license in a country with a weak patent system or no patent system at all.

56.     It is also Ericsson's frequent practice to negotiate a "release payment" where the prospective licensee and/or Ericsson has past, unlicensed sales. Like the

---

[4] Exhibit 456 at page 3.

going-forward royalty rates in Ericsson's licenses, these release payments are also negotiated and agreed to on a global, portfolio basis (i.e. the release payment covers all prior, unlicensed worldwide sales at a blended, global rate). It goes without saying that the alternative—foregoing a release payment and instead litigating damages for past infringement on a patent-by-patent and country-by-country basis—would lead to a needless and very substantial increase in the transaction costs of both Ericsson and the prospective licensee. A release payment that covers all relevant patents and all relevant countries in one single transaction, on the other hand, avoids costly, protracted litigation and ensures that both parties not only have the desired freedom to operate going forward, but also certainty that they will not be accused of infringing the other party's licensed patents in the past.

57.     Ericsson always requests a cross-license regardless of whether the prospective licensee owns standard essential patents at the time of the negotiation, because the prospective licensee could acquire them before the license expires. Where a prospective licensee comes forward with evidence to show that it owns standard essential patents, the royalties ultimately agreed upon are a "net balancing payment" that factors in the parties' respective patent portfolio strength.

58.     Notably, assessing the relative strength of Ericsson's standard essential patent portfolio as compared to that of a prospective licensee who also owns standard essential patents—a requirement for arriving at a net balancing rate—is an extremely complex task. I understand that Ericsson's experts Mr. Luke McLeroy and Mr. Patricio Delgado are providing testimony about the in-depth technical negotiations that Ericsson engages in with prospective licensees, and current licensees when negotiating a renewal license. These technical meetings give us insight into the strengths and weaknesses of both Ericsson's portfolio and the portfolio of the counter-party to the negotiation, and ultimately we reach a conclusion about the overall strength of Ericsson's portfolio in comparison to that of the other party.

59.     We may also look at a series of reports that Ericsson has commissioned from the Signals Research Group, LLC, a United States-based research consultancy that offers field research and consulting services on the wireless telecommunications industry, for additional insight regarding a prospective licensee's portfolio strength relative to Ericsson.[5]  As explained by Ericsson's expert witness, Mr. Mallinson, Signals used contribution data from 3GPP to estimate the relative portfolio strength (i.e. the proportional share of essential patents) of Ericsson and other participants in 3GPP's standardization activities. But, while this information can be informative, when assessing patent portfolio strength, Ericsson always places far more weight on information gathered in technical negotiations when evaluating the patent portfolio strength of another company.

60.     Some of Ericsson's licenses include a reciprocal cross-license that confers substantial "grant back" value to Ericsson and/or involves non-cash consideration. For these licenses, when Ericsson and the prospective licensee are in agreement, my team may prepare an internal document that we call a "final business case" as a way of memorializing the sales projections and assumptions that Ericsson relied upon when entering into the license. In my previous role, prior to April 2016, I was leading this analysis.

61.     The final business case is in essence a "memo to the file," showing our internal assessment of the consideration—both monetary and non-monetary— agreed to be exchanged under the cross-license at the time of its execution. In creating a final business case, we endeavor to use the most reliable sales data available at the time, either from market analysts or from the licensee. But the mobile phone market is incredibly dynamic—for example, just before Apple entered the market in 2007 no industry observer ever anticipated that Blackberry,

---

[5] Exhibit 410; Exhibit 1045; Exhibit 1077.

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Nokia, Ericsson, and Motorola would all divest or shutter their handset businesses within 10 years—and this makes forecasting imprecise. This is especially true for licenses that typically run for five or more years. For this reason we often set forth three separate scenarios in a business case that show the outcome of the cross-license using different projections of the licensee's future sales. This provides us with a range of possible expected outcomes for the license, depending on how the licensee fares in the market going forward, and on how the market performs overall.

62.    Importantly, Ericsson's final business cases show only the projections and assumption that *Ericsson* relied upon when entering into the agreement. Prospective licensees may or may not indicate which sales projections they are relying upon when entering into the license, and typically do not share their assumptions in relation to their own internal calculations, or their estimates of the parties' relative standard essential patent portfolio strength, with Ericsson. This means that a net balancing payment is based completely or partly on each party's assessment of its patent strength relative to the other party, and each party's estimates of projected sales over the term of the license. As a result, Ericsson's view of its one-way portfolio royalty rate at the time it enters into the license may be different from the licensee's assessment of the same.

63.    All of these estimations and unknowns make the negotiation of a net balancing payment for a cross-license extraordinarily complex. This complexity is further magnified when one party to the license is bound by a FRAND commitment, and magnified again when both parties to the license are bound by respective FRAND commitments to each other, and to the rest of the industry.

64.    In my experience, while negotiating a net balancing payment is highly complicated, it is even more difficult to "unpack" the license after-the-fact for purposes of arriving at an "effective" rate. This is because license "unpackings," like the ones that Ericsson's expert Mr. Kennedy and TCL's expert Dr. Lynde have performed in this case, require assumptions to be made about the assumptions and

1   projections that each of the contracting parties relied upon at the time of the license.

2   These assumptions about assumptions render any after-the-fact license "unpacking"

3   subject to very significant uncertainties.

4       65.    I very recently encountered a situation that illustrates this well. Just

5   this past October, in ongoing litigation brought by a patent assertion entity named

6   Intellectual Ventures against Ericsson and its customer U.S. Cellular, the damages

7   expert for the plaintiff Intellectual Ventures (Mr. Walter Bratic)  relied in part on

8   his unpacking of Ericsson's own standard essential patent licenses to support his

9   opinion that Intellectual Ventures is entitled to millions of dollars in damages for

10   the alleged use by Ericsson and its co-defendant of just two patents that Intellectual

11   Ventures claims are essential to the LTE standard. Exhibit 4045 is an authentic

12   copy of Mr. Bratic's expert report provided to Ericsson by Intellectual Ventures,

13   which I understand has been redacted by Intellectual Ventures to remove its

14   confidential information. As seen there, as support for his conclusion, Mr. Bratic

15   opined that "*Ericsson's license agreements indicate LTE royalty rates ranging from*

16   ███ *to* ███ *per LTE handset, with a median of* ███ *per LTE handset.*"[6]  While

17   I cannot speak for the soundness or reliability of this opinion, the fact that it is very

18   different from the conclusion reached by both TCL's expert Dr. Lynde and

19   Ericsson's expert Mr. Kennedy about the royalty rates indicated by Ericsson's

20   licenses shows the substantial uncertainty and highlights the challenges involved in

21   making assumptions as part of a license analysis.

22          **3.**      **Ericsson Does Not Require A Uniform Payment Structure When Entering Into A License.**

23

24       66.    The payment provisions in Ericsson's licenses are a mix of running

25   royalty provisions, lump sum provisions, provisions that call for the payment of

26   _____

27   [6] Exhibit 4045 at ¶300 (ERIC_TCL00816167).

28

both a fixed sum and running royalties, and, in a few cases, provisions that specify non-cash consideration in addition to cash payments. Within Ericsson's running royalty licenses there is further variation within the payment provisions—some specify that the running royalties are calculated as the percentage of the net selling price of a licensed product, other specify that the running royalties are a fixed dollar amount per licensed product, and others include a combination of both. At times, the license specifies a percentage royalty rate that is subject to a fixed royalty "floor" and "cap." There, if the licensee sells primarily high- or low-priced products, the floor or cap will result in the licensee paying a *de facto* dollar per unit royalty rate (because the net selling price of the licensed products usually "hits" the floor or cap).

67.     Ericsson's current licenses with HTC and Apple are examples of licenses that provide for one or more fixed payments during the term of the license. With this type of payment structure, both sides bear a risk. Ericsson bears the risk that the licensee exceeds its projected sales volumes, in which case Ericsson would be undercompensated for the value of its licensed technology. The licensee in turn bears the risk that it fails to achieve its projected sales or decides to exit the market altogether, in which case it could ultimately overpay Ericsson for the license. But while there is risk, both sides also have certainty. Ericsson receives a certain revenue stream from the license, and the licensee can use Ericsson's licensed technology as little or much as it desires for a certain capped amount. Fixed payments also remove any risk to Ericsson that the licensee will underreport its licensed sales, and relieves both sides from the administrative burdens associated with calculating and tracking ongoing payments.

68.     Karbonn and Coolpad are examples of Ericsson licensees who pay running royalties that are directly tied to the success of their licensed products in the market. This payment structure is commonly requested by licensees who are attempting to gain market share, and who do not want to bear the risk of overpaying

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    for the license in the event they are not successful or decide to take their business in

2    a different direction. A running royalty structure shifts risk to Ericsson, because we

3    have no control over the licensee's future business decisions. Running royalty

4    licenses also require Ericsson to take on the administrative burdens associated with

5    collecting royalty reports and invoicing the license for royalties, and the risk that

6    the licensee may underreport its licensed sales. In cases of non-compliance by the

7    licensee, Ericsson is further burdened with the task of conducting an audit and

8    possibly instituting legal action to recover any unpaid royalties.

9        69.    LG is an example of an Ericsson standard essential patent licensee who

10   has compensated Ericsson, in part, with non-cash consideration. During

11   negotiations, when Ericsson and LG reached an impasse over cash consideration,

12   the parties were able to bridge the gap and reach agreed upon terms for a license

13   after LG agreed that it would assign ten United states patents to Ericsson, or an

14   entity selected by Ericsson, as part of the agreement. In my experience, non-cash

15   consideration can be attractive for a licensee because it reduces the licensee's out of

16   pocket cash payment, and it can be attractive for Ericsson when the non-cash

17   consideration aligns with one of Ericsson's business goals. In the case of LG, for

18   example, the transferred patents strengthened Ericsson's portfolio of non-essential

19   implementation patents.

20       70.    Other Ericsson licenses specify a mix of one or more of the payment

21   structures that I just described. This mix is seen in Ericsson's open license offers to

22   TCL that I will discuss later in my Declaration—one specifies a mixed fixed

23   sum/running royalty structure, and the others specify running royalties only.

24   **D.    Ericsson Maintains Reference Prices To Ensure A Consistent Starting Point Across Licensing Negotiations.**

25

26       71.    At any given time, Ericsson's licensing team is negotiating towards

27   licenses with dozens of potential licensees under its standard essential patents.

28   Because we want to offer consistent pricing for a license to Ericsson's standard

essential patents across all of our ongoing negotiations, we maintain an internal document—the "reference price sheet"—for use by our individual negotiators. My team and I implemented reference prices in 2009, with the objective that Ericsson's licensing team would use them as the starting point for Ericsson's portfolio rate in each license negotiation for a particular product (e.g., handset, modem, dongle, etc.). The purpose was to achieve overall consistency across the licenses resulting from those negotiations. Ericsson has continued this practice through today, as part of Ericsson's good faith efforts to achieve a FRAND license from each negotiation, without the need for litigation.

72.     When formulating Ericsson's reference prices for a particular standard (e.g. WCDMA or LTE), Ericsson looks primarily to its historical and existing licenses to its patents essential to that standard (insofar as the standard is established and such licenses exist). We consider Ericsson's licenses to be the best source of data because they are arms-length transactions that reflect the judgment of our fellow market participants, usually after months or years of technical and business negotiations between in-house engineers and licensing experts. It is Ericsson's practice to review its reference prices annually, beginning in January or February, to account for new licenses signed over the course of the prior year. At times, we have sought legal advice from outside counsel as part of this process.

73.     Between 2011 and the Spring of 2016, Ericsson's reference prices for mobile phones included dollar per-unit "floors" and "caps" applicable to the specified percentage rates. The concept of a royalty cap recognizes that licensees may sell higher priced products with features other than the communication technology that impact the selling price of that product. It also recognizes that a portion of the selling price of a device could reflect value generated by something other than the communication technology itself, such as value generated by a marketing campaign or by features of a product with a primary use other than mobile voice or data communication.

74.     The concept of a royalty floor recognizes that there is a minimum value conferred on the end user of a licensed product by the licensed patented technology, and that this minimum value is not dependent on the price that the product is ultimately sold for. In the case of a licensee with rapidly declining selling prices for its mobile phones, or a licensee who sells the phone at a loss as part of a business plan to derive revenue from other sources (like advertising), a royalty floor works to ensure that the licensee will still fairly compensate Ericsson for its use of Ericsson's standardized patented technology.

75.     Over the past several years, the mobile phone market has become largely segmented into vendors that sell mobile phones with middle to high average selling prices and companies who sell mobile phones with low average selling prices. Apple sells its iPhone at the high end of the market, vendors like Samsung and HTC sell mobile phones priced in the middle to high end of the market, and low cost vendors such as TCL and Blu, among others, sell mobile phones priced at the lowest end. There are also network operators who subsidize mobile phone sales, lowering prices even further. For example, Tracfone recently offered a TCL 4G mobile phone (sold under TCL's Alcatel OneTouch brand) for less than $10.00 in the United States. This is seen in Exhibit 4065, which is an authentic copy of a screenshot from www.amazon.com captured in December 2016.[7]  The result of this price segmentation has been that some Ericsson licensees always pay the cap (on products with high average selling prices) or the floor (on products with low average selling prices), rather than the percentage royalty rates set forth in the license. This was a key reason why, in March 2016, Ericsson decided to extend the concept of caps and floors further, by migrating Ericsson's reference prices to fixed, dollar per unit amounts.

---

[7] Exhibit 4065.

1

2

III.   **ERICSSON'S LICENSE OFFERS TO TCL.**

    A.   **The Parties' Pre-Suit Negotiations**

3

4

5

6

7

8

9

10

11

12

13

    76.   In March 2007, after negotiating for approximately two years, Ericsson granted a license to its 2G/GSM and 2G/GPRS essential patents to a TCL subsidiary, TCT Mobile Limited.[8]  The 2007 license covered TCT Mobile Limited's sales of single-mode 2G mobile devices outside of China only, and did not extend to multi-mode devices (e.g. 2G/3G or 2G/3G/4G devices) or to China sales. While I did not personally communicate with TCL during the negotiations that resulted in the 2007 license, I was kept informed of the negotiations by Ericsson's former Chief IP Officer, Mr. Kasim Alfalahi, who was part of the team that prepared offers to TCL. The Ericsson/TCT license expired in March 2014, and no TCL entity has been licensed to any of Ericsson's standard essential patents since that time.

14

15

16

17

18

19

20

    77.   Because the 2007 license only covered single-mode 2G handsets sold by TCT Mobile Limited outside of China, Ericsson sought to engage TCL in discussions for a broader license in the latter half of 2007. These negotiations covered Ericsson's 3G standard essential patents in addition to Ericsson's 2G portfolio, and were later expanded to cover Ericsson's 4G standard essential patents. As was the case with the parties' negotiations towards the 2007 license, I was kept informed of the status of these negotiations by Mr. Alfalahi.

21

22

23

24

25

26

    78.   While the negotiations between Ericsson and TCL were ongoing, TCL publically reported sales of tens of millions of 2G and 3G-compliant mobile phones and grew from a company with a limited presence outside of China into a global smartphone player. Starting in September 2012, after negotiating with TCL for almost five years and making six written offers for a license, Ericsson filed patent infringement lawsuits against TCL in France, Germany, Russia, Brazil, and

27

28

---

[8] Exhibit 64; Exhibit 65

Argentina, and counter-sued TCL in the United Kingdom after TCL filed litigation against Ericsson there. Ericsson filed these litigations as a last resort, and only after concluding, based on the tenor of the negotiations, that TCL was not negotiating in good faith, to protect and preserve its patent rights with regard to TCL's increasing sales of unlicensed products. I understand that this Court has enjoined Ericsson's non-U.S. infringement actions against TCL, pending resolution of the lawsuit.

79.     In late February 2014, Ericsson made a licensing proposal during a meeting between Mr. Alfalahi and TCL's Chief Executive Officer, Mr. George Guo, while both were in attendance at the Mobile World Conference event in Barcelona, Spain that ran from February 24-27, 2014. Mr. Alfalahi's proposal was that TCL would pay: (i) $25 million for $2.5 Billion in sales, $30 million for $2.75 Billion in sales, $35 million for $3 Billion in sales, $40 million for $3.5 Billion in sales, and $45 million for $4 Billion in sales; and (ii) for sales above $4 Billion, running royalties of 1.1% (2G), 1.5% (3G), and 2% (4G), with a 50% discount on royalties for sales made in China. I base this testimony on discussions that I had with Mr. Alfalahi, as well as a confirmatory email that he sent to me on February 27, 2014, shortly after his meeting with Mr. Guo.[9]  Exhibit 218 is an authentic copy of that email. It is a business record of Ericsson that was made shortly after the meeting by a person (Mr. Alfalahi) who had personal knowledge of the event. It was the regular practice of Mr. Alfalhi and members of the Ericsson licensing team to report to me, as well as to others in Ericsson's IPR organization, about offers made or received during negotiations. It was, and still is, my regular practice to retain business records of Ericsson's offers made to prospective licensees.

80.     Shortly after receiving Ericsson's proposal during the Mobile World Congress, TCL responded that it looked "promising." This is seen in an email sent by TCL's Mr. Guo to Ericsson on March, 5, 2014, where Mr. Guo told Ericsson

---

[9] Exhibit 218.

that "[w]e just had an internal discussion on your proposal, it looks promising. We will form a team quickly to start the detail negotiation."[10]  Nonetheless, just hours later, TCL filed this lawsuit against Ericsson, alleging claims for breach of contract, promissory estoppel, violations of the California Cartwright Act and Unfair Competition Law, declaratory judgment, fraudulent misrepresentation, and negligent misrepresentation.

81.    TCL's filing of this lawsuit in California was unexpected, especially in light of the positive feedback from TCL's Chief Executive Officer. And it was not the only time that TCL would accuse Ericsson of purported anti-competitive behavior in 2014. TCL's Brazilian subsidiary, TCT Mobile Telefones Ltda., unsuccessfully asserted similar allegations in a complaint filed with the Brazilian Administrative Counsel for Economic Defense (CADE) on October 10, 2014. After an eight month investigation, the General Superintendence recommended that the proceeding be closed on June 8, 2015.[11]  Exhibit 4026 is an authentic copy of that decision, together with an English translation. TCL's subsequent appeal was rejected by CADE, which found that "[TCL] was not able to successfully prove that Ericsson was charging abusive royalties, beyond FRAND terms, and that its conduct aimed to harm/exclude one market player."[12]  Exhibit 4028 is an authentic copy of CADE's opinion rejecting TCL's appeal, together with an English translation.

82.    CADE was correct in finding that Ericsson's conduct was never aimed at harming TCL or excluding it from the market. Altogether, before TCL filed this lawsuit, Ericsson made more than a dozen offers for a license to TCL over the course of more than six years. We designed each offer with the ultimate goal of

---

[10] Exhibit 137 at ERIC_TCL00107079.

[11] Exhibit 4026 at ERIC_TCL00492478.

[12] Exhibit 4028 at ERIC TCL00613993.

1    granting TCL a license under Ericsson's standard essential patents on FRAND

2    terms and conditions. As I will discuss shortly, the same has been true for our

3    licensing offers made since TCL filed this lawsuit. Ericsson has been, and remains,

4    fully prepared to grant a license to TCL on terms and conditions that are consistent

5    with Ericsson's FRAND commitment.

6    **B.    Ericsson's Open License Offers To TCL.**

7    83.    In its negotiations with prospective licensees, when the negotiations

8    extend over a period of months or years, Ericsson's practice is to make new offers

9    as needed to account for changes in the value of Ericsson's standard essential patent

10   portfolios, changes in the prospective licensee's business (e.g. the introduction of

11   products compliant with a new generation of standards or at different price points),

12   changes in the prospective licensee's patent portfolio strength (e.g. a significant

13   patent acquisition), or other circumstances that could warrant a change. As a result,

14   Ericsson's license offers are always specific to the particular point in time when

15   they are made, and do not (and cannot) account for events occurring in the future.

16   Our negotiations with TCL were no different. My team and I formulated new offers

17   to TCL over time, with each offer accounting for the specific circumstances of the

18   parties' negotiation at the time it was made.

19   84.    At present, three of Ericsson's licensing offers to TCL in the parties'

20   negotiations are open and available for acceptance. The first of these three offers is

21   the offer that Ericsson refers to as "Option A." Option A is the first of two offers

22   that Ericsson set forth in its FRAND contentions in March 2015 (as amended in

23   May 2015).[13]   As I will discuss, Ericsson based Option A on its offer made to TCL

24   on April 23, 2014, which was in turn based on the proposal that Mr. Alfalahi made

25   to Mr. Guo three years ago in Barcelona. The second of Ericsson's three open

26   offers to TCL is the offer that Ericsson refers to as "Option B." Option B is an offer

27   _____

28   [13] Exhibit 458.

-35-                WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
                    CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

that Ericsson first made to TCL two years ago, on February 11, 2015,[14] and later reiterated in its FRAND contentions in March 2015 (as amended in May 2015).[15] Ericsson made the last of its open offers to TCL on March 21, 2016, to account for circumstances that arose after Ericsson made its prior offers to TCL (including new licenses executed by Ericsson) and which had led Ericsson to revise its reference price sheet.

85.     The first two of Ericsson's three open offers to TCL are nearly two years old. And Option A is based on an offer that is nearly three years old, which was based in turn on our observation that TCL had not sold, and was not projecting to sell, substantial volumes of 4G devices over the course of the license. Further, since making its Option A and B offers to TCL, Ericsson has made changes to the way that it structures its licensing offers to prospective licensees. As a result, the structure of Options A and B differs from the structure of licensing offers made by Ericsson to prospective licensees more recently, in 2016 and 2017.

86.     I understand from Ericsson's counsel that this Court will evaluate Ericsson's Option A and Option B offers, but not Ericsson's third open offer to TCL, as part of this proceeding. I will now discuss Option A and Option B in more detail.

### 1.     Ericsson's Option A License Offer.

87.     When preparing the April 23, 2014 offer that was the basis for Option A, my team and I began with the payment terms that Mr. Alfalahi proposed to Mr. Guo in Barcelona in February 2014, which was before TCL filed this lawsuit. We then revised those terms to make them even more favorable to TCL, incorporated them into a draft license between the parties that we understood the parties' respective negotiators had largely agreed upon in July 2013, and emailed the

---

[14] Exhibit 4055
[15] Exhibit 459

offer—in the form of a fully integrated license—to TCL on April 23, 2014.[16]

88.     As I will discuss, Ericsson's April 23, 2014 offer was the culmination of more than six years of negotiations between Ericsson and TCL, and therefore reflects all of the concessions that Ericsson made in the negotiations at TCL's request. It also reflected our contemporaneous projections that TCL would continue to sell primarily low priced mobile phones, with limited sales of 4G products, over the course of the offered license (which, if accepted at the time it was offered, would have expired in the Spring of 2019). These projections were based on our observations at that time that (a) TCL was late to enter the 4G market (it introduced its first 4G mobile phone in 2013, years after HTC introduced the first 4G mobile phone in 2010); (b) TCL's average selling price for a mobile device was low—just $45 in 2013, as stated in TCL's annual report for 2013;[17]  (c) TCL's sales of 4G mobile phones had been minimal to date—it not start selling 4G phones until October 2013;[18]  and (d) based on a data sheet that TCL provided to us in January 2014, TCL was projecting that it would sell only 51.4 million 4G mobile phones between 2014 and 2018.[19]

89.     Option A, if accepted, would grant TCL a license under Ericsson's 2G, 3G, and 4G standard essential patents with coverage for TCL's global sales of 2G, 3G, and 4G mobile devices.[20]  The payment terms of Option A are set forth in Figure 2 below:

---

[16] Exhibit 4671.

[17] Exhibit 1019 at page 15.

[18] Exhibit 1019 at page 23.

[19] Exhibit 287 at TCL_ERIC00107222.

[20] Exhibit 458 at § 2.1 at page 7.

## FIGURE 9

| ERICSSON'S OPTION A OFFER TO TCL | | |
|---|---|---|
| **Royalties for sales less than or equal to $3 billion/year** | | |
| 5 annual payments of $30 million/year | | |
| **Royalties for sales exceeding $3 billion/year** | | |
| **Mobile Phones** | | |
| Portfolio | Sales Outside China | Sales in China |
| 2G GSM/GPRS | 0.8% | 0.4% |
| 2G EDGE | 1.1% | 0.55% |
| 3G | 1.5% | 0.75% |
| 4G | 2.0% | 1.0% |
| **External Modems** | | |
| 2G or 3G | 1.5%, $0.4 floor | 0.75%     , $0.2 floor |
| 4G | $3 if net selling price ≥ $60<br>$1 if net selling price < $60 | $1.5 if net selling price ≥ $60<br>$0.5 if net selling price < $60 |
| **Personal Computers (Tablets)** | | |
| 2G GPRS | $0.5 | $0.25 |
| 2G EDGE | $0.75 | $0.375 |
| 3G Single Mode | $2.25 | $1.125 |
| 3G Multi-Mode | $2.75 | $1.375 |
| 4G | $3.5 | $1.75 |

90.    Option A specifies that TCL will make a five fixed annual payments of $30 million, for a total of $150 million over the course of the license. If TCL's revenues from licensed units are less than $3 billion in any year of the license term, then TCL does not owe any additional royalties for sales in that year. If TCL's revenues from licensed units exceed $3 billion in any year of the license term, TCL will make running royalty payments that are calculated either by applying a percentage royalty rate to the net selling price of the licensed products or by multiplying a fixed dollar amount by the number of licensed products sold, depending on the licensed product at issue.[21]  The running royalty rates for 2G and 3G mobile phones specified in Option A are lower than Ericsson's reference rates

---

[21] Exhibit 458 at § 7.1(b) at page 10.

that were in place when the offer it is based on was made to TCL in April 2014, and the 4G running royalty rate for mobile phones is the same as Ericsson's reference rate in place at that time. All of the running royalty rates are discounted by 50% for TCL's sales made in China.[22]

91.   Option A specifies that TCL will make a release payment to Ericsson that, under its election for each fiscal year, could be under same terms as the going forward license or at the running royalty rates applicable to TCL's licensed products sold outside of China.[23]  This release payment is intended to compensate Ericsson for TCL's past sales of unlicensed mobile devices. These past unlicensed sales are extensive—as I discussed earlier, TCL has never been licensed under Ericsson's 2G EDGE, 3G, or 4G standard essential patents, and only one TCL entity (TCT Mobile Limited) has been licensed under Ericsson's 2G GSM/GPRS standard essential patents. Ericsson routinely negotiates release payments with licensees where there has been past unlicensed sales. I will discuss a number of Ericsson's licenses that include release payments later in this Declaration.

92.   As I noted above, Ericsson's April 23, 2014 offer was the culmination of years of negotiations. As a result, it reflected multiple compromises and concessions made by Ericsson over the long course of the parties' negotiations with the objective of concluding a license within a reasonable time. Because we based Option A on Ericsson's April 23, 2014 offer, Option A also includes the same concessions. For example:

- Option A specifies a 50% reduction in running royalty payments for TCL's sales made in China. This concession was requested by TCL in a counter-offer sent to Ericsson on April 3, 2013,[24] and appears in a TCL license

---

[22] Exhibit 458 at § 7.1(b) at page 10.

[23] Exhibit 458 at § 7.1(a) at page 9.

[24] Exhibit 5341 at ERIC_TCL00108459-460.

WITNESS DECLARATION OF LARS GUSTAV BRISMARK; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

proposal that TCL's Harry Au emailed to me and others at Ericsson on May 22, 2013;[25]

- Option A does not specify royalty floors for the proposed running royalty rates. This concession was requested by TCL in March 2012, when TCL struck out Ericsson's proposed royalty floors (but not the proposed royalty caps) in Ericsson's prior license proposal;[26] and

- Option A specifies a greater than/less than payment term for external modems. This structure is one that, as seen in the email that TCL's Harry Au sent to me and others at Ericsson on May 22, 2013, TCL indicated was necessary for its own business purposes.[27]

Further, the payment structure of Option A—requiring TCL to pay a fixed amount for sales below a set threshold—is consistent with the payment structure that TCL proposed to Ericsson in its proposal sent to Ericsson on March 31, 2014.[28]

93.    Option A also provides for "pass through" rights. Ericsson routinely negotiates license agreements to its standard essential patents with prospective licensees who supply 3G standard-practicing devices. As a general rule, in light of

---

[25] Exhibit 282 at ERIC_TCL00107888.

[26] Exhibit 4009 at ERIC_TCL00109056-057.

[27] Exhibit 282 at ERIC_TCL00107862.

[28] Exhibit 288 at ERIC_TCL00106998.

1       ███████████████████████████ This is explained in Exhibit C to the

2 Amended and Restated Multi-Product License Agreement between Ericsson and

3 Qualcomm.[29]  In light of this, Option A provides that, ████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7       94.    As I noted earlier, it is Ericsson's practice to request a cross-license

8 from prospective licensees regardless of whether a licensee owns standard essential

9 patents at the time the cross-license is negotiated, because the prospective licensee

10 could acquire them during the term. TCL was no exception. Although we were

11 unaware of any standard essential patents owned by TCL at the time we made

12 Ericsson's Option A offer that would provide Ericsson with grant back value, we

13 structured Option A as a cross-license per our regular practice. Since that time,

14 however, events have occurred such that Ericsson no longer needs a grant back

15 license from TCL. TCL granted Ericsson a unilateral royalty-free license under

16 TCL's patents declared to ETSI for 2G, 3G, or 4G as of February 23, 2016, and has

17 further agreed that, until the expiration of the license or payment obligation that

18 results from this litigation, it will not assert any TCL patent that is declared to ETSI

19 for the 2G, 3G, or 4G standards, and which is acquired by TCL after February 23,

20 2016, against Ericsson.[30]

21         **2.    Ericsson's Option B License Offer.**

22       95.    Option B is an offer that Ericsson first made to TCL approximately

23 two years ago, on February 11, 2015,[31]  and then reiterated in this litigation.[32]

24 Option B is a fully integrated license agreement that, if accepted, would grant TCL

25           [29] Exhibit 1520 at ERIC_TCL00106534.

26           [30] Exhibit 4059.

27           [31] Exhibit 4055.

          [32] Exhibit 459.

28

a license under Ericsson's 2G, 3G, and 4G standard essential patents with coverage for TCL's global sales of 2G, 3G, and 4G mobile devices.[33]  Option B is structured as a one-way license from Ericsson to TCL (not a cross-license), and its payment terms were within the range of rates set forth in Ericsson's contemporaneous Reference Price Sheet.

96.    The payment terms of Option B are set forth in Figure 3 below:

FIGURE 10

| ERICSSON'S OPTION B OFFER TO TCL | |
|---|---|
| **Portfolio** | **Royalty Rate** |
| **Mobile Phones** | |
| 2G GSM/GPRS | 0.8% |
| 2G EDGE | 1.0% |
| 3G | 1.2% |
| 4G | 1.5%,  $2 floor/$4.50 cap |
| **External Modems** | |
| 2G or 3G | $0.75 |
| 4G | 1.5%, $2 floor |
| **Personal Computers (Tablets)** | |
| 2G GPRS | $0.5 |
| 2G EDGE | $0.75 |
| 3G Single Mode | $2.25 |
| 3G Multi-Mode | $2.75 |
| 4G | $3.5 |

97.    Option B specifies that TCL will make running royalty payments that are calculated either by applying a percentage royalty rate to the "net selling price" (a defined term in the offer) of the licensed products or by multiplying a fixed dollar amount by the number of licensed products sold, depending on the licensed product at issue.[34]  In the case of 4G mobile phones, the 1.5% running royalty rate

---

[33] Exhibit 459 at § 2.1 at page 6.

[34] Exhibit 459 at § 6.1(b) at page 8.

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    has a floor of $2.00 and a cap of $4.50.[35]  This means that TCL would pay a $2.00

2    royalty for any 4G mobile phone with a net selling price of $133.33 or lower, and a

3    $4.50 royalty for any 4G mobile phone with a net selling price of $300 or higher.

4         98.    A 4G royalty floor is a common feature in Ericsson's 4G licenses with

5    percentage running royalty rates. In the case of TCL in particular, I believe a

6    royalty floor is critically important. This is because, unlike certain other Ericsson

7    licensees who pay running royalties on primarily mid to high priced smartphones

8    (e.g. Sharp, Doro), TCL sells some of the cheapest mobile phones on the market.

9    According to market research firm IDC, TCL's average retail price for a 4G mobile

10   device was just $129.33 in the second quarter of 2016.[36]  With pricing this low, the

11   4G royalty floor in Option B is essential to make sure that Ericsson is fairly

12   compensated for the value that Ericsson's 4G standardized inventions bring to

13   TCL's products.

14        99.    As is the case with Option A, Option B specifies a release payment

15   intended to compensate Ericsson for TCL's past unlicensed sales of mobile devices.

16   The release payment is calculated by applying the running royalty rates applicable

17   to TCL's licensed products going forward to TCL's infringing sales in the past.[37]

18   Option B also includes the "pass through" rights term that I discussed in connection

19   with my description of Option A.[38]

20        **C.    Release Payment.**

21        100.   As I have discussed, with the exception of the mobile devices licensed

22   under the 2007 agreement between Ericsson and TCL Mobile Limited, TCL has not

23   paid royalties to Ericsson on any of its past sales of 2G, 3G, or 4G mobile devices.

24   For this reason, consistent with Ericsson's typical practice, Ericsson has included a

---

[35] Exhibit 459 at § 6.1(b) at page 8.

[36] Exhibit 1000.

[37] Exhibit 459 at § 6.1(a) at page 8.

[38] Exhibit 459 at § 6.1(b) at page 8.

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

release payment provision in its Option A and Option B offers to TCL.[39]  This provision is consistent with Ericsson's offers made to TCL over the course of the parties' negotiations, and with TCL's own licensing proposals to Ericsson during the same time period. For example, Ericsson's license proposals sent to TCL on March 14, 2012, March 22, 2012, and April 1, 2013 included a release payment provision.[40]  The same is true for TCL's proposals sent to Ericsson on March 15, 2012, May 8, 2013, and May 22, 2013.[41]  I understand that Ericsson's financial expert, Mr. Kennedy, will testify regarding his calculation of the number of unlicensed mobile devices sold by TCL, as well as TCL's revenues generated by these unlicensed sales.

## IV.   ERICSSON LICENSES ANALYZED BY MR. KENNEDY.

101.   I understand that Ericsson's financial expert, Mr. Kennedy, has analyzed a number of Ericsson's licenses as part of his investigation into whether Option A and Option B set forth FRAND terms for a license between Ericsson and TCL, namely, Ericsson's ███████████ with handset vendors Apple, Blackberry (formerly known as RIM), Coolpad (also known as Yulong), Doro, ███ Huawei, Karbonn, LG, Samsung, Sharp, and ZTE. I will briefly describe each of these licenses in this last section of my Declaration.

102.   As I have discussed, and as my testimony about these licenses will reinforce, the terms and conditions of each of these licenses are the product of a unique negotiation (or, in the case of the Huawei license, a very unique arbitration) between Ericsson and a specific counter-party. No two licenses are identical—they were executed a different points in time by companies who sell a wide variety of

---

[39] Exhibit 458 at § 7.1(a) at page 9; Exhibit 459 at § 6.1(b) at page 8.

[40] Exhibit 5346 at ERIC_TCL00109104; Exhibit 5347 at ERIC_TCL00108901; Exhibit 5348 at ERIC_TCL00108527; Exhibit 284 at ERIC_TCL00107403-4.

[41] Exhibit 4009 at ERIC_TCL00109056; Exhibit 281 at ERIC_TCL00108107; Exhibit 282 at § 7.1(A) at ERIC_ TCL00107887.

1   mobile devices at varying price points and different volumes in diverse markets

2   around the world. Some were negotiated by Ericsson in settlement of ongoing

3   litigation, some were negotiated as renewals of prior licenses, and others were

4   negotiated with new market entrants and first time Ericsson licensees. Some of the

5   licenses are with companies who own substantial portfolios of standard essential

6   patents, and others confer no meaningful grant back value on Ericsson. Taken as a

7   whole, these licenses indicate a range of terms and conditions for a license under

8   Ericsson's standard essential patents that the contracting parties agreed to be

9   FRAND at the conclusion of a negotiation.

10       **A.**    **Apple**

11       103.   Apple, Inc. is a U.S.-based consumer electronics company, and

12   currently the second largest vendor of smartphones in the world (by volume). In

13   January 2008, six months after Apple introduced the first iPhone, Ericsson and

14   Apple executed a global patent cross-license. The 2008 license covered patents

15   essential to the 2G and 3G standards. At that time, Apple was a brand-new player in

16   the market for mobile devices, and had contributed no technology of its own to the

17   standardization process. But because the standards are open, Apple was able to take

18   advantage of the years of research and development, and standardization work,

19   performed by Ericsson and others and implement the open standards in its products.

20   To ensure that it did this lawfully with regard to Ericsson, Apple approached

21   Ericsson and the parties negotiated a license.[42]  Under the terms of the license,

22   Apple agreed to pay Ericsson a ███████████ up-front lump sum payment to reduce

23   the royalty cap, plus a ████████████████ capped at ███████████ 2G/3G mobile

24   device sold during the term of the license.[43]

25       104.   Because the 2008 license excluded coverage for Ericsson's patents

26   _____

27   [42] Exhibit 257.

28   [43] Exhibit 257 at § 7.1 (ERIC_TCL00111307).

essential to the 4G standard,[44] Ericsson and Apple began to negotiate royalties for Apple's use of Ericsson's 4G standard essential patents around June 2012, when Apple was introducing 4G standard-compliant products to the market. After the parties failed to reach agreement on terms for a renewal, Apple filed suit against Ericsson in January 2015, prior to the expiration date of the 2008 license. Ericsson subsequently filed litigation against Apple, which continued until the parties executed a new global cross-license in December 2015. This new license fully and finally settled all ongoing litigation between Ericsson and Apple—a total of 51 litigations pending around the world.[45]

105.   The 2015 license covers both parties' portfolios of 2G, 3G, and 4G standard essential patents, and is effective from January 15, 2015.[46] It also includes a covenant by Ericsson not to sue Apple during the term of the license, a "defensive termination" clause permitting Ericsson to terminate the license should Apple sue Ericsson for patent infringement during the term of the license,[47] and an agreement that Apple and Ericsson would collaborate on business opportunities related to video, media, and network optimization technology and on the upcoming 5G standard.[48]

106.   Ericsson and Apple negotiated the cash consideration exchanged under the 2015 license on a dollar per-unit basis. Ultimately, Apple agreed to make cash payments to Ericsson totaling up to ███████   This included a one-time payment of ███████ by December 28, 2015, and annual royalty payments of either a ███████ ███████ lump sum or ███████ sold.[49] A portion of the ███████ upfront payment

---

[44] Exhibit 257 at § 1.21 (ERIC_TCL00111302).

[45] Exhibit 258.

[46] Exhibit 5331 at § 1.14 (ERIC_TCL00816274), § 2.1 (ERIC_TCL00816278) and § 3.1 (ERIC_TCL00816280).

[47] Exhibit 5331 at § 8.4 (ERIC_TCL00816289).

[48] Exhibit 5331 at Appendix 5 (ERIC_TCL00816308).

[49] Exhibit 5331 at § 7.1 (ERIC_TCL00816285).

1  covered Apple's unlicensed use of Ericsson's patents prior to the date the license

2  was executed, and a portion was paid to buy down the royalty rate that Apple would

3  pay going forward. Notably, at the time we executed the 2015 license, we estimated

4  that Apple's smartphone sales would not grow at the levels we had seen during the

5  term of the 2008 license and, in all probability, would decline. This estimation was

6  based on Apple's high volume sales of smartphones (Apple was one of the top two

7  smartphone vendors worldwide) and the fact that Apple was competing only in the

8  high end segment of the market, where the performance and features of competing

9  smartphones at that point in time were comparable to those of Apple's products,

10  causing Apple to lose its former competitive edge.

11    107.   In agreeing to the financial terms of the license, we assumed that

12  Apple would pay the same dollar per unit royalty on 4G devices sold between the

13  time that Apple made its first 4G sale in 2011 and the end of the new license period.

14  Because Apple had already paid ██████████ on its 4G devices sold between 2011

15  and January 14, 2015, this means that in a scenario where Apple would pay, for

16  example, ██████████ sold between 2011 and January 2022, Apple would

17  pay a release payment of ██████████ sold between 2011 and January 14,

18  2015. But in a scenario where Apple would pay, for example, ██████████

19  sold between 2011 and January 2022, Apple would pay no release payment on 4G

20  devices sold between 2011 and January 14, 2015 at all, because the ██████████

21  payment already made by Apple in the past was in excess of the ██████████ rate

22  for the going forward license.

23    108.   In addition to the ██████████ of cash consideration, Ericsson received

24  additional, non-cash consideration from Apple under the agreement. This additional

25  consideration included the avoidance of costs associated with continued litigation

26  against Apple around the world, business value associated with the parties'

27  agreement to cooperate on video, media, and network optimization technologies

28  and on future 5G technologies, value flowing from the fact that Apple was paying

1  ███████ upfront (which minimized the risk that Ericsson would be

2  undercompensated should Apple's sales volumes fail to meet our projections in the

3  future), the "defensive suspension" clause that I described above, and grant back

4  value for a license under any standard essential patents owned or acquired by Apple

5  during the term of the license. With regard to the latter, Ericsson was licensed under

6  most of Apple's standard essential patents as of December 2015, by way of both

7  parties' prior involvement in the purchase of Nortel's former patent portfolio. The

8  grant back value to Ericsson, therefore, derives from the fact that Ericsson will be

9  licensed under any additional standard essential patents that Apple acquires during

10  the term of the license.

11  **B.   Blackberry**

12  109.   Canada-based RIM (now called Blackberry) is a former manufacturer

13  of high-priced smartphones that recently exited the mobile device market. In 2010,

14  however, Blackberry sold almost 50 million handsets. That year, Ericsson and

15  Blackberry negotiated a ███████ global patent cross-license that became effective

16  on January 1, 2011. [50] ██████████████████████████

17-25 ██████████████████████████

───────────────

[50] Exhibit 56.

[51] Exhibit 56 at § 7 (ERIC_TCL00110282).

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

[black redaction box covering lines 1-7]

### C.     Coolpad

111.   Coolpad is one of the major smartphone brands in China. Coolpad-branded mobile devices are supplied by China-based Yulong Telecommunications. Ericsson and Yulong are parties to a [redacted] global patent cross-license, effective as of January 1, 2013.[52]  Pursuant to the license, Yulong [redacted] and is obligated to pay running royalties on its sales of licensed 2G, 3G, and 4G mobile devices [redacted] [redacted] [redacted][53] Because Yulong did not present any standard essential patents of its own to Ericsson in the parties' negotiations and does not actively participate in standardization, my team and I concluded when the license was signed that it would not confer any meaningful grant back value on Ericsson. Therefore, while structured as a cross-license, the agreement is effectively a one-way license from Ericsson to Yulong/Coolpad.

### D.     Doro

112.   Doro is a Swedish supplier of easy-to-use mobile phones. Doro and Ericsson were parties to a 2G GSM global cross-license effective as of July 1, 2014,

---

[52] Exhibit 4773.

[53] Exhibit 4773 at § 7.1 (ERIC_TCL0016569)

-49-

1   which replaced an earlier 2G GSM agreement that was effective as of July 1, 2007,

2   and amended as of July 1, 2013.[54]  Doro and Ericsson were also parties to a 3G

3   global cross-license effective as of October 1, 2009, which was amended as of July

4   1, 2013, and a 4G global cross-license effective as of July 1, 2013.[55]  Ericsson and

5   Doro recently executed a new global cross-license effective as of October 1, 2016.[56]

6   Pursuant to the parties' current license, Doro agreed to pay Ericsson per unit

7   royalties of SEK 2.1 (2G GSM/GPRS), SEK 5.1 (2G EDGE), 8.5 (3G), and SEK

8   21.3 (4G). Considering the exchange rate as of the date of this Declaration, these

9   per unit figures are approximately $0.23 (2G GSM/GPRS), $0.56 (2G EDGE),

10  $0.94 (3G), and $2.35 (4G). Because Doro did not present any evidence that it

11  owns standard essential patents to Ericsson in the parties' negotiations, my team

12  and I concluded when these licenses were signed that they would not confer any

13  meaningful grant back value on Ericsson. Therefore, while structured as cross-

14  licenses, the parties' historical agreements and current agreement with Doro are

15  effectively one-way licenses from Ericsson to Doro.

16      **E.   HTC**

17          113.   HTC is a Taiwanese supplier of 4G smartphones and tablets, and a

18  long-time Ericsson licensee. Ericsson and HTC first executed a global patent ▆▆▆

19  ▆▆▆ effective as of December 15, 2003, and a second global patent ▆▆▆▆

20  effective as of December 15, 2008.[57]  Ericsson and HTC executed a third global

21  patent ▆▆▆▆ agreement on December 31, 2014, ▆▆▆▆▆▆▆▆

22  parties under ▆▆▆▆▆▆▆ essential to the 2G, 3G, and 4G standards.[58]

23  As consideration for the license, HTC agreed to make a one-time payment to

24  ─────────────────────

25          [54] Exhibit 4911; Exhibit 4791; Exhibit 4737.

            [55] Exhibit 4912; Exhibit 4738; Exhibit 4739.

26          [56] Exhibit 5342.

27          [57] Exhibit 4014; Exhibit 4930.

            [58] Exhibit 1275.

28

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   Ericsson of ███████████ [59]  Based on our assessment of claim charts for patents

2   purchased by HTC, which HTC presented to us in the parties' negotiations, my

3   team and I determined that Ericsson would be afforded ████████████████

4   ████

5       114.   At the time the 2014 Ericsson/HTC license was executed, HTC's

6   mobile phones sales had plummeted so low that the future of its mobile phone

7   business was uncertain. This led my team and me to depart from Ericsson's regular

8   practice of entering into licenses that run for five or more years, and instead agree

9   to a short two year license that would cover HTC's products while it worked to

10  bounce back in the market. The license expired at the end of 2016, and because

11  HTC continues to supply mobile devices, we are presently engaged in negotiations

12  with HTC towards a renewal.

13      **F.    Huawei**

14      115.   China-based Huawei is one of the world's leading suppliers of mobile

15  devices and telecommunications infrastructure equipment, and a very active

16  participant in 3GPP's standardization activities. Huawei sells handsets in the mid-

17  price range.  In the second quarter of 2016, Huawei's average retail sales price for a

18  4G handset was $245. [60]  In January 2016, after Ericsson and Huawei engaged in an

19  arbitration proceeding designed to resolve a negotiating impasse, the parties

20  executed a global patent cross-license covering the parties' respective 2G, 3G, and

21  4G standard essential patents. [61]  The license covers the parties' respective sales of

22  licensed products between November 20, 2014, and ████████████  Pursuant

23  to the license, Huawei agreed to percentage running royalty rates of ████████

24  ██████████ on the net selling price of its licensed mobile devices. [62]  Notably,

25      [59] Exhibit 1275 at § 7.1 (ERIC_TCL00116303).

26      [60] Exhibit 1000.

27      [61] Exhibit 1277.

28      [62] Exhibit 1277 at § 7.1(D) (ERIC_TCL00489489).

these rates have no cap, even as applied to Huawei's sales of tablet computers (which are priced higher, on average, than mobile phones).

### G. Karbonn

116.   Karbonn is an India-based vendor of inexpensive mobile phones that use the 2G and 3G standards. In 2013, Ericsson executed a global patent cross-license with each of two companies who operate Karbonn as a joint venture—Jaina Marketing and United Telelinks.[63]  At the request of Karbonn, Ericsson agreed that the 2013 licenses would include a regional rate structure, with rates specific to India and the rest of the world, which increased over the life of the license. But Ericsson and Karbonn re-negotiated that rate structure in 2015 to single global rates applicable to Karbonn's sales of 2G and 3G mobile devices worldwide (4G mobile devices are not covered by the licenses).[64]  The global rates that Karbonn agreed to pay are 0.8% to 1.1% for GSM/GPRS units and 1.0% to 1.3% for EDGE/3G handsets depending on the sales year (the royalty rates increase over the license period).[65]  Because neither Jaina Marketing nor United Telelinks presented evidence that either owned standard essential patents in the parties' negotiations, my team and I concluded when these agreements were signed that they would not confer any meaningful grant back value on Ericsson. Therefore, while structured as cross-licenses, these agreements are effectively one-way licenses from Ericsson to Karbonn.

### H. LG

117.   LG Electronics is a South Korea-based electronics company that manufactures a wide range of mobile devices. Ericsson and LG are parties to a

---

[63] Exhibit 4000; Exhibit 4919.

[64] Exhibit 4905; Exhibit 4020.

[65] Exhibit 4905 at Appendix 1 (ERIC_TCL00387789); Exhibit 4020 at Appendix 1 (ERIC_TCL00387637).

global patent cross-license that became effective as of June 27, 2014.[66] Ericsson and LG are also parties, together with PanOptis Patent Management Company, to a business transaction (i.e. the creation of a patent licensing platform) that was negotiated simultaneously and in connection with the 2014 patent license, and which brought additional consideration to Ericsson.

118.   Pursuant to the 2014 license, Ericsson and LG are cross-licensed under each other's standard essential and implementation patents until ███████████████. Ericsson viewed the parties' agreement to cross-license patents other than 2G, 3G, and 4G standard essential patents as a ██████████████ We considered all of the cash and other non-cash consideration flowing to Ericsson to be a balancing payment for the parties' reciprocal licenses granted under their respective 2G, 3G, and 4G standard essential patents.

119.   LG agreed to make cash payments of ██████████ to Ericsson, plus a ██████████ release payment and additional cash royalties in the event that LG's sales exceeded specified thresholds, as consideration for a license under Ericsson's standard essential patents.[67]  As additional consideration, LG agreed to assign to Ericsson, or an entity selected by Ericsson, the rights to ten United States patents (including a patent that Ericsson subsequently asserted against Apple in litigation).[68] In the absence of this related patent transfer agreement, which we valued internally at $125 million, Ericsson would have insisted on higher cash royalty payments from LG.

120.   At the time we entered into the license, we believed, based on information shared with us by LG during the course of the negotiations, that all of the 3G devices sold by LG during the term of the license would incorporate

---

[66] Exhibit 199.
[67] Exhibit 199 at § 7.1 (ERIC_TCL00111397).
[68] Exhibit 198.

1   Qualcomm chipsets and, thus, be subject to the "pass through" rights that I

2   discussed earlier in my testimony. For this reason, we assumed that LG would be

3   required to pay for its use of Ericsson's 2G, but not 3G, standard essential patents

4   in those devices. We also considered all of the cash and non-cash consideration

5   flowing to Ericsson to be a balancing payment for the parties' reciprocal licenses

6   granted under their respective standard essential patents.

7   **I.       Samsung**

8       121.   South Korea-based Samsung Electronics Co. Ltd. is the world's largest

9   manufacturer of mobile phones (by sales volume). In January 2014, Ericsson and

10  Samsung executed a global patent cross-license that expires on ███████████

11  ████[69] Pursuant to the agreement, Ericsson and Samsung are cross-licensed under

12  each other's 2G, 3G, and 4G standard essential and implementation patents.

13  Because Samsung actively participates in standardization and owns a large portfolio

14  of standard essential and implementation patent, the license confers substantial

15  grant back value on Ericsson. Ericsson viewed the parties' agreement to cross-

16  license patents other than 2G, 3G, and 4G standard essential patents as a royalty-

17  free cross license. We considered all of the cash and other non-cash consideration

18  flowing to Ericsson to be a balancing payment for the parties' reciprocal licenses

19  granted under their respective 2G, 3G, and 4G standard essential patents.

20      122.   The license settled extensive litigation pending between the parties,

21  including two pending investigations at the United States International Trade

22  Commission and three litigations pending in the United States District Court for the

23  Eastern District of Texas. Both of the ITC investigations were past the evidentiary

24  hearing stage, and initial determinations in both investigations were imminent. By

25  entering into the license, Ericsson was able to avoid the risk that its accused

26  infrastructure products could be excluded from importation into the United States

27  _____

28      [69] Exhibit 1276.

by an ITC exclusion order, and Samsung was able to avoid the same risk for its mobile devices.

123.   Under the Ericsson/Samsung license, Samsung agreed to make cash payments to Ericsson totaling up to ███████. This included a one-time payment of ████████ by February 15, 2014, and annual royalty payments of either a ████ ███████ lump sum or per unit royalties of ██ per unit (2G), ██ per unit (3G) and ██ per unit (4G).[70]  These royalties also covered Samsung's unlicensed use of Ericsson's standard essential patents prior to the date the license was executed. In addition to the agreed upon cash payments, Samsung committed to purchase a minimum quantity of thin modems from Ericsson's Modems unit.[71]  We viewed this as a very valuable opportunity for the Modems unit, which at the time greatly needed to increase its market share in order to survive as a player in the modems market. In fact, Samsung's purchase commitment did not generate the anticipated sales volumes and Ericsson made the decision to discontinue its Modems unit in September 2014.

124.   When negotiating the total amount of consideration with Samsung, we recognized that Samsung did not owe royalties on a portion of its mobile devices sold between 2011 and 2013 that incorporated components manufactured by ST-Ericsson, Ericsson's former joint venture with ST Microelectronics. Exhibit 4796 is an authentic of a spreadsheet created by Ericsson that details the sales of cellular baseband processors from ST-Ericsson to Samsung in the second quarter of 2011 through 2014.[72]

125.   ████████████████████████████████████████████
████████████████████████████████████████████████

---

[70] Exhibit 1276 at § 7 (ERIC_TCL00111467).
[71] Exhibit 4024.
[72] Exhibit 4796.

1 ██████████████████████████████████████████████

2 ████████████████████████. This estimation was based on the fact that

3 Samsung's profits had declined in Q4 2013, and on our review of predictions by

4 industry analysts in January 2014, who warned that Samsung's mobile business

5 would decline further in the coming year. Exhibits 4942 and 4943 are authentic

6 copies of two articles setting forth such predictions, which I have maintained in my

7 files.[73]  Further, we observed at the time that an increasing number of new Chinese

8 players were entering the low and mid segment of the market due to low barriers to

9 entry, and estimated that this increased competition would lead to a decline in

10 Samsung's sales volumes. In hindsight, our projection that Samsung's sales would

11 decline was correct, even before Samsung's massive (and unforeseeable) recall of

12 its Galaxy Note 7 smartphones after some those devices began catching on fire.

13     **J.**    **Sharp**

14     126.   Sharp is a Japanese technology conglomerate that sells mobile devices

15 almost exclusively in Japan. Ericsson and Sharp first executed a global patent cross-

16 license that was effective as of October 1, 2003, and amended that license in 2005,

17 2009, and 2011.[74]  More recently, Ericsson and Sharp executed a renewal cross-

18 license effective from April 1, 2015 to March 31, 2022, which cross-licensed the

19 parties under their respective patents essential to the 2G, 3G, and 4G standards.[75]

20 Pursuant to this most recent cross-license, Sharp agreed to pay Ericsson running

21 royalties of ████████████████████████████████████ on its net

22 sales of licensed devices.[76]  Because my team and I afforded grant back value to the

23 reciprocal cross-license to Ericsson, based on our assessment of Sharp's patent

24 portfolio strength during the parties' negotiations, these rates are net balancing

25 _____

26 [73] Exhibit 4942; Exhibit 4943.

[74] Exhibit 4002; Exhibit 4658; Exhibit 4659; Exhibit 4660.

27 [75] Exhibit 1195.

28 [76] Exhibit 1195 at § 7.1 (ERIC_TCL00387849).

1  rates.

2  **K.  ZTE**

3  127.  ZTE is a China-based vendor of mobile phones and Ericsson's

4  competitor in the market for network infrastructure equipment. Ericsson is a party

5  to two separate global patent license agreements between Ericsson and ZTE, a

6  2G/3G cross-license executed in 2011 and amended in 2015,[77]  and a 4G cross-

7  license executed in 2014 and amended in 2016.[78]  Both licenses extend through the

8  ██████████  Because ZTE is an active participant in standardization and owns a

9  portfolio of standard essential patents, both licenses confer meaningful grant back

10  value on Ericsson.

11  128.  The 2011 2G/3G license specified multiple regional rates in a very

12  complex payment provision.[79]  This complexity was removed by the 2015

13  amendment, which instead requires ZTE to pay a 2G rate of ████ and a 3G rate of

14  ████ on its global net sales of licensed mobile devices, in addition to royalties on

15  its global net sales of licensed 2G/3G infrastructure equipment.[80]

16  129.  As was the case with the 2011 2G/3G license, the 2014 4G license

17  included a complex payment provision. ZTE was required to compensate Ericsson

18  with (i) a release payment of ████████ (ii) quarterly fixed payments of ████

19  ████; (iii) running royalties on its net sales of 4G multi-mode devices at rates of

20  ████ in China, ████ in Territory 1 (roughly North America, Europe, Japan, and

21  Australia), and ████ in Territory 2 (rest of world); and (iv) running royalties on its

22  net sales of licensed infrastructure products at rates of ████ in Territory 1 and

23  ████ in Territory 2. (Exhibit 1194 at § 7). We greatly simplified this structure

24  with the 2016 amendment. Now ZTE is required to compensate Ericsson with (i)

25  ───────────────

26  [77] Exhibit 1197; Exhibit 1200

27  [78] Exhibit 1194; Exhibit 4040.

28  [79] Exhibit 1197 at § 7 (ERIC_TCL00110831).

[80] Exhibit 1200 at § 3 (ERIC_TCL00488831).

1  quarterly fixed payments of ██████████ for sales of mobile devices within China;

2  (ii) running royalties of ██████ per licensed 4G mobile device sold outside of China;

3  and (iii) running royalties on its net sales of licensed infrastructure products, with

4  the exception of the first ██████████ in sales within China, at a rate of ██████[81]

5  ### L.   Other Ericsson License Agreements

6  130.   I understand that Mr. Kennedy has focused his license analysis on

7  Ericsson's licenses with the mobile phone vendors that I have discussed. These are

8  not, however, Ericsson's only licenses with mobile phone vendors. Ericsson's

9  licensees also include many other players in the mobile phone market, including but

10  not limited to mobile phone suppliers Audioline, Beafon, Emporia, Bullitt,

11  Mobistel, Sonim, and Sagem/Mobiwire.[82]

12  ## V.   CONCLUSION

13  131.   For almost a decade, Ericsson has made good faith efforts to license

14  TCL to Ericsson's standard essential patents, while TCL has sold tens of millions of

15  unlicensed mobile devices. Ericsson has always been and remains to this day fully

16  prepared to grant a license to TCL to Ericsson's standard essential patents on

17  FRAND terms and conditions.

18  Executed in Stockholm 11 January 2017

19

20

21

22  Lars Gustav Brismark

23

24

25  [81] Exhibit 4040 at § 6.1 (ERIC_TCL00815992).

26  [82] Exhibit 4685; Exhibit 4777; Exhibit 4920; Exhibit 4036; Exhibit 4702; Exhibit 4703; Exhibit 4684; Exhibit 4779; Exhibit 4021; Exhibit 4934; Exhibit 4733; Exhibit 4676; Exhibit 4749; Exhibit 4750; Exhibit 4751; Exhibit 4907; Exhibit 4003; Exhibit 4764; Exhibit 4932; Exhibit 4048; Exhibit 4675; Exhibit 4752; Exhibit 4753; Exhibit 4938.

27

28

## VI.   LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| 56 | Ericsson/RIM License (2011) |
| 64 | Ericsson/TCT License (2007) |
| 137 | Email from K. Alfalahi to J. Han, et al., subject: "Meeting in Barcelona" (March 5, 2014) |
| 198 | Agreement to Transfer Patents between LG and Ericsson (2014) |
| 199 | Ericsson/LG License (2014) |
| 218 | Email from K. Alfalahi to P. Arvidsson (February 27, 2014) |
| 223 | ETSI IPR Policy |
| 281 | Email from T. Lim to M. Nat och Dag, et al., with attachment (May 8, 2013) |
| 282 | Email from H. Au to R. Tu, et al. (May 22, 2013) |
| 287 | Email from H. Au to P. Arvidsson and K. Alfalahi (January 24, 2014) |
| 288 | Email from H. Au to P. Arvidsson, with attachment (March 31, 2014) |
| 410 | Signals Report (September 2010) |
| 456 | TCL 2015 Annual Report |
| 458 | Option A |
| 459 | Option B |
| 1000 | IDC Worldwide Mobile Phone Tracker 2016Q2 Historical Release |
| 1019 | TCL 2013 Annual Report |
| 1045 | Signals Report (May 2015) |
| 1194 | Ericsson/ZTE License (2014) |
| 1195 | Ericsson/Sharp License (2015) |
| 1197 | Ericsson/ZTE License (2011) |
| 1200 | Ericsson/ZTE License Amendment (2015) |
| 1275 | Ericsson/HTC License (2014) |
| 1277 | Ericsson/Huawei License (2016) |
| 1276 | Ericsson/Samsung License (2014) |
| 1520 | Ericsson/Qualcomm License (2011) |
| 4000 | Ericsson/Jaina Marketing License (2013) |
| 4002 | Ericsson/Sharp License (2003) |

WITNESS DECLARATION OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| EXHIBIT | DESCRIPTION |
|---|---|
| 4003 | Ericsson/Sonim License (2011) |
| 4009 | Email from S. Chiang to M. Natt och Dag, with attachment (March 15, 2012) |
| 4020 | Ericsson/United Telelinks License Amendment (2015) |
| 4021 | Ericsson/Emporia License Amendment No. 1 (2015) |
| 4024 | Commitment Letter between Ericsson and Samsung (2014) |
| 4026 | CADE Technical Report Regarding TCT v. Ericsson (2015) |
| 4028 | CADE Decision on Appeal Regarding TCT v. Ericsson (2015) |
| 4036 | Ericsson/Audioline License (2016) |
| 4040 | Ericsson/ZTE License (2016) |
| 4045 | Expert Report of Walter Bratic in the case *Intellectual Ventures I LLC v United Cellular Corporation and Ericsson, et al*; USDC-Delaware, CA No. 13-1672 (October 26, 2016) |
| 4048 | Ericsson/Sagem License (2011) |
| 4054 | European Patent Office Press Release (May 6, 2014) |
| 4055 | Letter to G. Aiping from J. Han (February 11, 2015) |
| 4059 | Standstill Agreement between Ericsson and TCL (June 20, 2016) |
| 4065 | Tracfone Alcatel Onetouch Pixi Glitz A463BG (screenshot from amazon.com) |
| 4658 | Ericsson/Sharp License Amendment No. 1 (2005) |
| 4659 | Ericsson/Sharp License Amendment No. 2 (2009) |
| 4660 | Ericsson/Sharp License Amendment No. 3 (2011) |
| 4671 | Email from P. Arvidsson to H. Au (April 23, 2014) |
| 4675 | Ericsson/Mobiwire License (2012) |
| 4676 | Ericsson/Bullitt License (2012) |
| 4684 | Ericsson/Beafon License (2011) |
| 4685 | Ericsson/Audioline License (2011) |
| 4702 | Ericsson/Beafon License Amendment No. 1 (2014) |
| 4703 | Ericsson/Beafon License (2014) |
| 4733 | Ericsson/Bullitt LTE Patent License Agreement (2014) |
| 4737 | Ericsson/Doro 2G License (2014) |
| 4738 | Ericsson/Doro 3G License Amendment No. 1 (2013) |
| 4739 | Ericsson/Doro LTE License (2013) |

| EXHIBIT | DESCRIPTION |
|---|---|
| 4749 | Ericsson/Mobistel License (2011) |
| 4750 | Ericsson/Mobistel License Amendment No. 1 (2014) |
| 4751 | Ericsson/Mobistel LTE License (2014) |
| 4752 | Ericsson/Mobiwire License Amendment No. 1 (2013) |
| 4753 | Ericsson/Mobiwire License Amendment No. 2 (2014) |
| 4764 | Ericsson/Sonim License Amendment No. 1 (2014) |
| 4773 | Ericsson/Yulong License (2013) |
| 4777 | Ericsson/Audioline License (2014) |
| 4779 | Ericsson/Emporia License (2013) |
| 4791 | Ericsson/Doro 2G License Amendment No. 1 (2013) |
| 4796 | Samsung 2011-2013 ST-Ericsson Sales |
| 4905 | Ericsson/Jaina Marketing License Amendment (2015) |
| 4907 | Ericsson/Mobistel License (2013) |
| 4911 | Ericsson/Doro 2G License   (2007) |
| 4912 | Ericsson/Doro 3G License (2009) |
| 4920 | Ericsson/Audioline License Amendment No. 1 (2014) |
| 4932 | Ericsson/Sonim License Amendment No. 1 (2014) |
| 4934 | Ericsson/Emporia LTE License (2015) |
| 4938 | Ericsson/Mobiwire License Amendment No. 3 (2015) |
| 4942 | *Samsung Posts Grim Q4 2013 Earnings Estimate* (January 16, 2014) |
| 4943 | *Top Samsung Analyst Predicts Stock Wipeout Will Deepen* (January 16, 2014) |
| 5331 | Apple/Ericsson License (2015) |
| 5341 | Email chain from H. Au to R. Tu, et al., with attachment (April 3, 2013) |
| 5342 | Ericsson/Doro License (2016) |
| 5346 | Email from M. Karlsson to S. Chiang, with draft license and release payment and fulfillment of payment agreement (March 14, 2012) |
| 5347 | Email from M. Karlsson to S. Chiang, with draft license and release payment and fulfillment of payment agreement (March 22, 2012) |
| 5348 | Email from R. Tu to H. Au, with draft license (April 1, 2013) |

1

**CERTIFICATE OF SERVICE**

2

 Pursuant to Rule 5-3 of the Local Civil Rules of the United States District

3

Court for the Central District of California, I hereby certify under penalty of perjury

4

under the laws of the United States of America that on January 27, 2017, a true

5

copy of the above document was filed through the Court's Electronic Case Filing

6

system and served by that system upon all counsel of record registered for the

7

system and deemed to have consented to electronic service in the above-captioned

8

case.

9

10

Dated: January 27, 2017

**CROWELL & MORING LLP**

11

*/s/ John S. Gibson*

12

John S. Gibson

13

Attorneys for ERICSSON INC. AND

14

TELEFONAKTIEBOLAGET LM ERICSSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28