CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. <br><br> ERICSSON INC., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx <br> Case No. 2:15-CV-02370 JVS-DFMx <br><br> **REBUTTAL WITNESS DECLARATION OF LARS GUSTAV BRISMARK** <br><br> Hon. James V. Selna <br><br> **Discovery Cut-off:** May 23, 2016 <br><br> **Pretrial Conference:** February 1, 2017 at 10:00 a.m. <br><br> **Trial:** February 14, 2017 at 8:30 a.m. |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................... 1

II.  REBUTTAL TO TCL'S CONTENTIONS REGARDING MAXIMUM
     ROYALTY RATES/LACK OF FLOOR ....................................................... 1

III. REBUTTAL TO DR. LEONARD ................................................................ 5

IV.  REBUTTAL TO DR. LYNDE ..................................................................... 10

V.   REBUTTAL TO MR. GUO ......................................................................... 13

VI.  REBUTTAL TO MR. GUO AND MR. CISTULLI ....................................... 14

VII. REBUTTAL TO DR. WOLFE .................................................................... 15

VIII. CONCLUSION ........................................................................................ 21

IX.  LIST OF EXHIBITS ................................................................................. 22

My name is Lars Gustav Brismark. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

# I.  INTRODUCTION

1.  I submitted my direct testimony by way of witness declaration on January 11, 2017. This declaration sets forth my rebuttal testimony to certain direct testimony offered by TCL's witnesses, and in particular, Dr. Leonard, Dr. Lynde, Mr. Guo, Mr. Cistulli, and Dr. Wolfe.

# II.  REBUTTAL TO TCL'S CONTENTIONS REGARDING MAXIMUM ROYALTY RATES/LACK OF FLOOR

2.  Ericsson has made two offers to TCL that are being adjudicated in this case – Option A and Option B, which Ericsson made as part of its Court-ordered FRAND contentions. Option A is a five year license that specifies annual fixed payments, coupled with percentage per-unit running royalties for sales above a certain threshold. Because this offer was originally made in April 2014 and was closely tied to our projections of TCL's expected sales over the subsequent five years, it has become quite stale today. In particular, the amount of the annual fixed payment and the sales threshold were carefully calibrated to reflect TCL's sales projections for 2014 to 2018 at a time when TCL was just entering the market for 4G mobile phones.[1] Given that Option A is nearly three years old, our calibration of the fixed payment amount is now out of date, as 60% of the expected license term has already transpired. Option B was a collared offer, with a running royalty payment term specifying a dollar per-unit floor and cap, and a percentage per-unit rate for sales between the floor and cap.

3.  I understand that TCL never set forth its own proposed royalty terms for a license in its responsive FRAND contentions. TCL's responsive FRAND

---

[1] Brismark Witness Decl. ¶ 88.

contentions rather asserted that Ericsson's royalty terms were too high, without setting forth the alternative royalty rates that TCL contends Ericsson could offer to TCL without violating Ericsson's FRAND commitment.

4.      Having now reviewed TCL's statements in the parties' proposed Joint Pre-Trial Order submitted on January 19, 2017,[2] I understand that TCL is asserting that (a) the  maximum "fair and reasonable" royalty rate that Ericsson can offer consistent with its FRAND commitment is 0.21% of the net selling price of user equipment (e.g., handsets, modems, tablets) that practice only the 2G and/or 3G standards, and 0.16% of the price of user equipment that practice the 4G standard; and (b) the maximum "non-discriminatory royalty rate that Ericsson can offer consistent with its FRAND commitment is 0.30% of the net selling price of user equipment that practice only the 2G and/or 3G standards, and 0.26% of the price of user equipment that practice the 4G standard. I disagree strongly with these new assertions by TCL and find its percentage per-unit rates are far too low. Even more importantly, TCL's proposed royalty rates are objectionable because they are inconsistent with the payment structure of Option A and Option B. In particular, they fail to incorporate the 4G floor and cap that Ericsson included in Option B.

5.      Floors and caps, expressed in dollar-per-unit terms, have become increasingly important for Ericsson in recent years. The reason is that average selling prices (ASPs) for mobile phones have increasingly diverged. At one end of the spectrum is Apple, with ASPs of over $600 per 4G mobile phone, and at the other end are companies like TCL and Coolpad who have ASPs near or below $100 per 4G mobile phone. This wide divergence has made it important to incorporate dollar per-unit floors and caps, in addition to percentage per-unit rates, in running royalty agreements.

6.      A floor is important to Ericsson because Ericsson cannot control the

---

[2] Proposed Joint Pre-Trial Order (Dkt. 1376) at 4-5.

REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

prices at which handset companies choose to sell their phones. Some companies, particularly newer companies without brand goodwill, adopt a strategy of extremely low pricing to establish a market presence. These companies may choose to sell at margins that are unsustainable long term in order to build or maintain a customer base. This appears to be the strategy adopted by TCL. Yet, if one posits that the cellular radio connectivity has a certain value, that value should not erode based on the short term pricing choices of manufacturers. If TCL elected to give away mobile phones for free, that would not mean that Ericsson's patent portfolio has no value to the TCL's products. To the contrary, the cellular radio connectivity provided in part by Ericsson's standard essential patents is what makes a mobile phone a *phone*. If one accepts the proposition that a mobile phone supplier's choice to give away a phone for free does not entitle it to avoid a royalty payment to a standard essential patent owner, then one has tacitly acknowledged the importance of a floor.

7.   A cap is important because many phones today have features that are divorced from the cellular radio connectivity. For instance, some mobile phone suppliers offer quick battery charging, near field payment options (like Apple or Samsung Pay), and other premium features. Others, like Apple, have a network of brick and mortar stores with customer service (Apple Genius) and generous warranty policies for their phones, which factor into what the manufacturer is able to charge for a phone. In licensing negotiations, manufacturers of such mobile phones have repeatedly urged Ericsson that their premium features unrelated to cellular connectivity should not be subject to a royalty payment above a certain dollar per-unit amount. In response, Ericsson has adopted a cap, which has the effect of restricting the percentage royalty to only a certain portion of the handset price for premium handsets.

8.   It is absolutely essential that a floor, as well as a cap, be applied to TCL in the royalty adjudication of this Court. TCL sells some of the least expensive

REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

4G handsets in the world, and I understand from reviewing Mr. Guo's testimony in this matter that TCL has priced its handsets at the very low end of the industry price range. Simultaneously, I understand that TCL is embarking upon what it terms a "step up" strategy to sell higher priced phones. As part of its strategy it has acquired the rights to the Blackberry brand, i.e. a brand associated with high-end, relatively expensive handsets. Indeed, given its generally high ASPs when it was still selling smartphones, Blackberry (formerly known as RIM) paid Ericsson royalties of ███ ████████████████████ of its sales of 4G mobile phones, in addition to an upfront lump sum payment under its prior license with Ericsson.[3] As a result, although we expect TCL to primarily continue with its practice of selling very low-ASP mobile phones, we now expect it to also sell higher-ASP Blackberry-branded mobile phones. This wide disparity in ASPs in the product mix of a single company like TCL is the very rationale for floors and caps.

9.      When Ericsson made its Option B offer to TCL, the $2 per-unit floor applicable to the 4G percentage per-unit rate was an integral part of that offer. In fact, it was Ericsson's expectation that the floor would likely come into play with regard to a large portion of TCL sales. The fact that Ericsson had a 1.5% per-unit rate for 4G in addition to the $2 per-unit floor does not imply that Ericsson would have been willing to license TCL at that rate without the floor. In fact, Ericsson would have been quite resistant to entering into a pure running royalty agreement with TCL that did not have a royalty floor for the 4G percentage per-unit rate.

10.      Another commercial reason for a royalty floor is to protect Ericsson from a licensee manipulating its accounting practices to reduce the royalties owed where the royalty is calculated as a percentage of the net selling price of the product. For instance, a licensee might sell at a substantial discount to a distributor in exchange for other business consideration. Or, a licensee might agree to a

---

[3] Exhibit 56 at §7.1.

substantial sales commission or other trade discount which it would then deduct to calculate the net selling price. Or a licensee might provide mobile phones for free but embed advertising on the phone for which it earns revenue. A royalty floor provides insurance against creative business arrangements that might be used by a licensee to circumvent its royalty obligations, and it is an important reason Ericsson included a 4G royalty floor in its Option B offer to TCL.

## III.   REBUTTAL TO DR. LEONARD

11.     I understand that TCL's expert, Dr. Leonard, cites to public statements made by Ericsson and others more than fourteen years ago (in 2002) and more than eight years ago (in 2008) to select a 5 percent aggregate royalty burden for 2G/3G, and a 6 percent aggregate royalty burden for 4G, for use in his "top down" analysis.[4] Ericsson's public statements are seen in Exhibit 333, Exhibit 1146, and Exhibit 1152.[5]  I have observed that, in discussing the statements found in these exhibits, Dr. Leonard omits any discussion of the market conditions at the time they were made. That factual information, however, is necessary to put these public statements in the proper context.

12.     In 2002, prior to the commercial release of the WCDMA standard, there was a desire by network operators and companies who were contemplating investments in WCDMA-compliant products for insight into the expected royalty burden on a WCDMA mobile phone. In response, Ericsson and three of the other companies who were developing WCDMA technologies at the time (NTT DoCoMo, Nokia, and Siemens) issued a press release on 6 November 2002, titled "Industry leaders NTT DoCoMo, Ericsson, Nokia, and Siemens, and Japanese manufacturers reach a mutual understanding to support modest royalty rates for the W-CDMA technology worldwide."[6] This press release was in relation to the

---

[4] Leonard Witness Decl. ¶9.

[5] Exhibit 333; Exhibit 1146; Exhibit 1152.

[6] Exhibit 333.

expected aggregate royalty burden for WCDMA standard essential patents, which

would be addition to the aggregate royalty burden for 2G (GSM, GPRS, EDGE)

standard essential patents that already existed at that time. The press release set

forth the companies' expectations in relation to their future WCDMA licensing

programs, noted their mutual understanding to introduce licensing arrangements

whereby WCDMA standard essential patents would be licensed at rates that are

proportional to the number of standard essential patents owned by each company,

and stated their intent to license their patents essential to the WCDMA standard on

fair and reasonable terms.

13.     The 2002 press release quotes Ericsson's Torbjorn Nilsson as stating

that "W-CDMA is the standard selected by most operators in the world for their

future business, and with this initiative we believe the cumulative royalty will be

even lower for W-CDMA than GSM, which has enjoyed unrivaled success

compared to any other standard in the world."[7] As seen in Mr. Nilsson's statement,

Ericsson did not predict an aggregate royalty burden for WCDMA standard

essential patents at the time (other than to estimate that it would be lower than for

GSM). The quoted statements by Nokia and NTT DoCoMo, in contrast, reference a

target aggregate burden of 5 percent for WCDMA essential patents.[8]

14.     In 2008, prior to the commercial release of the LTE standard, network

operators and companies who were contemplating investments in LTE-compliant

products sought insight into the expected royalty burden on an LTE device. Similar

to what it had done for WCDMA, Ericsson joined a number of other market

participants in committing to support a single-digit aggregate royalty burden for

LTE mobile phones.[9] Ericsson also joined a number of industry participants in

---

[7] Exhibit 333.

[8] Exhibit 333.

[9] Exhibit 1146.

REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

announcing what it expected it would charge as a royalty for a license under its
LTE patent portfolio for a single-mode LTE mobile phone. Specifically, Ericsson
announced on its website that it projected it would hold 20-25 percent of all LTE
standard essential patents, and that the market would drive all players to act in
accordance with FRAND principles and to a maximum aggregate royalty level of 6-
8 percent for handsets. Based on those projections, Ericsson indicated that it
expected a fair royalty rate for Ericsson's LTE patent portfolio to be around 1.5
percent for handsets.[10]

15.     As seen from Ericsson's prior public statements, we have long been a
proponent of reasonable aggregate royalties. This remains true today. However, we
have never been, and are not now, a proponent of aggregate royalties that fail to
fairly and adequately reward standard essential patent owners. Dr. Leonard,
however, appears to be using these prior public statements by Nokia, NTT
DoCoMo,  Ericsson  and others to argue for royalty rates that would do just that. He
does this in part by failing to put the statements made in 2002 and 2008 in context,
i.e. by omitting any discussion of the market conditions at the time they were made.

16.     Specifically, Dr. Leonard never mentions the actual or expected selling
prices of 3G and 4G mobile phones in his testimony. When NTT DoCoMo
introduced the first 3G mobile phone in October 2001, it was priced around $560
(without a video camera) or around $800 (with a video camera). This is seen in
Exhibit 5397, which is an authentic copy of a news report by the BBC from 1
October 2001.[11]   At that price, Dr. Leonard's proposed 5 percent aggregate royalty
burden would be around $28 (for the phone without a video camera) or around $40
(for the phone with a video camera). When Ericsson's mobile phone joint venture,
Sony Ericsson, released its 3G mobile phone, the Z1010, in 2003, it was priced

---

[10] Exhibit 1152.
[11] Exhibit 5397.

around $835. At that price, Dr. Leonard's proposed 5 percent aggregate royalty burden would be around $42. These are the 3G mobile phone prices that we had in mind when we made the public statements found in the 2002 press release that is Exhibit 333.

17.    Dr. Leonard also ignores the fact that in 2008, when Ericsson announced its expectations for the aggregate royalty burden for LTE, the average retail selling price of a 3G smartphone was $430.[12] Because we anticipated that 4G technology would confer greater value on a mobile phone than existing 2G/3G technology, we anticipated that 4G mobile phones would initially be priced at more than $500. This proved true. When Sony Ericsson released its first smartphone to run on the LTE network, the Sony Xperia V, in December 2012, it was priced around $750. And the average retail selling price of a 4G mobile phone in 2011-2012 was $630.[13] When applied to a selling price of $630, Dr. Leonard's proposed 6 percent aggregate royalty burden for 4G is $38. These are the 4G mobile phone prices that we had in mind when we made the public statements found in the 2008 press release and public announcement that are Exhibit 1146 and Exhibit 1152.

18.    Starting in 2009-2010, my colleagues and I began to observe a downward trend in the average selling price of a smartphone compatible with the 3G and/or 4G standard (excluding smartphones sold by Apple). This trend is depicted in  Figure 1:[14]

**FIGURE 1**

---

[12] Exhibit 1000.

[13] Exhibit 1000.

[14] Exhibit 1000.

REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



19.    In light of this, when we prepared Revision B of Ericsson's 2011 Reference Price Sheet in the spring of 2011, we added royalty "floors" to Ericsson's reference prices for a license covering mobile phones.[15] As I explained in paragraph 74 of my direct testimony, a royalty floor recognizes that there is a minimum value conferred on the end user of a licensed product by the licensed patented technology, and that this minimum value is not dependent on the price that the product is ultimately sold for. But although royalty floors were not in our reference price sheet before 2011, the concept of a floor was not new to our thinking. In fact, it the 2008 press release cited by Dr. Leonard.[16] There, we stated that: "For notebooks, with embedded LTE capabilities, the companies support a single-digit dollar amount as the maximum aggregate royalty level."[17] As seen here, we recognized in 2008 that 4G technology would confer at least a minimum value

---

[15] Exhibit 5529; *see also* Exhibit 1540.
[16] Exhibit 1146.
[17] Exhibit 1146.

 REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

on a notebook computer, and indicated that we would seek fixed dollar per-unit royalties to compensate Ericsson for that minimum value.

20.     By omitting any discussion of the contemporaneous pricing for smartphones in his testimony, Dr. Leonard paints an incomplete and, in my view, misleading picture of the public statements made by Ericsson and others in 2002 and 2008. The historical pricing facts that I just described are essential for purposes of understanding those statements, and also for purposes of understanding why a royalty floor should be included in any license between Ericsson and TCL.

## IV.    REBUTTAL TO DR. LYNDE

21.     I understand that TCL's financial expert, Dr. Lynde, "unpacked" the 2014 Ericsson-Samsung license using the "high" projections from Ericsson's final business case for the license.[18] Notably, Dr. Lynde's decision to use the "high" scenario is inconsistent with what Ericsson believed was the most likely scenario when it entered into the license. As I explained in paragraph 125 of my direct testimony, at the time Ericsson and Samsung executed the license, my team and I believed that Samsung's mobile phone sales would decline over the course of the license. In short, we believed that the "low" scenario was at least as probable as the "mid" scenario, and that the "high" scenario was the least likely of the three. This belief was based on the fact that Samsung's profits had declined in Q4 2013, and on our review of predictions by industry analysts in January 2014, who warned that Samsung's mobile business would decline further in the coming year. We also observed at the time that an increasing number of new Chinese players were entering the low and mid segment of the market due to low barriers to entry, and that this was leading to increased competition for Samsung in those market segments.

22.     We also knew from our many years in the industry and from that it

---

[18] Lynde Witness Decl. ¶118.

REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  historically has been uncommon for one mobile phone vendor to remain at the top
2  of the market for an extended period of time. For example, in 2007, Nokia was the
3  number one smartphone vendor with a market share of almost 50 percent, but by
4  2011, Nokia had fallen to the number three position and its market share had
5  decreased to less than 10 percent. In another example, Blackberry (RIM) was the
6  number two smartphone vendor (by sales volume) in early 2010, but, by early 2012,
7  had fallen to number four as its market share dropped by roughly half. This
8  knowledge led us to doubt Samsung's ability to maintain its dominant position over
9  the entire course of the license. And in hindsight, our projection that Samsung's
10 sales would decline has proven to be correct, even before Samsung's massive recall
11 of its Galaxy Note 7 smartphones after some of those devices began catching on
12 fire.

13      23.    Dr. Lynde's "unpacking" of the 2015 Ericsson-Apple license is also
14 inconsistent with Ericsson's intentions at the time it entered into the agreement.
15 Specifically, Dr. Lynde's treatment of Apple's released sales of 4G mobile devices
16 cannot be reconciled with either the final business case that my team and I prepared
17 at the time, or with my deposition testimony about that business case.

18      24.    As I explained in paragraph 107 of my direct testimony, in agreeing to
19 the financial terms of the license, we assumed that Apple would pay the *same* dollar
20 per unit royalty on 4G devices sold between the time that Apple made its first 4G
21 sale in 2011 and the end of the new license period. Contrary to this, I understand
22 that Dr. Lynde assumes that Apple agreed to pay Ericsson (i) ▮▮▮▮▮▮▮ for
23 each 4G mobile device sold between 2011-2014 (on top of Apple's prior payment
24 of ▮▮▮▮▮ on those mobile devices, for a total of ▮▮▮▮▮▮); (ii) ▮▮▮
25 ▮▮▮▮▮▮▮▮ sold in 2015; and (iii) ▮▮▮▮▮▮▮▮▮ sold in the
26 2016 to ▮▮ time period.[19] As support for this assumption, Dr. Lynde cites to my

_____

[19] Lynde Witness Decl. ¶ 106; Exhibit 1240 at [D].

27
28

1   deposition testimony. In the cited passage of my testimony, I explained—like I did

2   in my direct testimony by witness declaration—that we assumed Apple would pay

3   the same dollar per unit royalty on 4G devices sold between the time that Apple

4   made its first 4G sale in 2011 and the end of the new license period. To do that, I

5   provided an example. Using the ██████ figure seen in the upper left corner of the

6   third page of Ericsson's final business case for the license, I explained that in a

7   scenario where Apple would pay, for example ██████ per 4G device sold between

8   2011 and January 2022, Apple would pay a ██████ release payment on 4G devices

9   sold between 2011 and January 14, 2015, and a ██████ per unit rate for the going

10  forward license.

11      25.     But the example I gave in my deposition using a ██████ figure is, as I

12  testified, an example. It is not one of the scenarios that Ericsson actually modeled in

13  the final business case. Our "scenario 1," for instance, assumes that Apple would

14  pay the same rate of ██████ per 4G unit from 2011 to 2022.[20] Dr. Lynde's scenario—

15  which assumes very different 4G royalty rates for 2011-2015 and 2016-2022—

16  appears to have been invented for purposes of this litigation. It did not come from

17  Ericsson's final business case as he suggests.

18      26.     Dr. Lynde also gets the facts wrong with regard to the recent license

19  amendment executed by Ericsson and ZTE, which replaced the parties' pre-existing

20  4G license.[21] In discussing the amendment, Dr. Lynde makes two critical

21  interpretation errors. First, he claims that the 2016 amendment covers ZTE's sales

22  of mobile phones that are compliant with 2G and/or 3G, but not 4G. This is

23  incorrect. The 2016 amendment expressly defines the licensed "Company

24  Products" to cover only mobile devices that practice the 4G standard.[22] ZTE's sales

25

26  [20] Exhibit 259.

27  [21] Lynde Witness Decl. ¶ 151.
    [22] Exhibit 4040.

28

of 2G/3G mobile devices are still covered by separate 2G/3G license between the parties. Second, Dr. Lynde wrongly claims that the amendment provides a fully-paid up license covering ZTE's sales of mobile phones in China.[23] This is also incorrect. As I explained in paragraph 129 of my direct testimony, the license requires ZTE to make quarterly fixed payments to cover those sales.

## V. REBUTTAL TO MR. GUO

27. I note that Mr. Guo refers to two mobile phone vendors—Coolpad and Karbonn—as "local kings" in China (Coolpad) and India (Karbonn), and thus "relatively limited as competitors" to TCL.[24] During our negotiations with TCL, however, we considered these "local kings" to be TCL's close competitors. This is because all three companies sell primarily low-priced mobile phones in developing countries (e.g. China, India) where the market for mobile phones is rapidly expanding. As seen in TCL's Annual Report for 2015, for example, over 60 percent of its sales are in emerging markets (i.e. markets with low price points).[25]

28. In fact, China and India are two of the largest and fastest growing markets for mobile phones in the world. This is seen in Exhibits 1097, 4060, 4061, 4340, and 4591, which are the Ericsson Mobility Reports for November 2015, June 2016, November 2016, November 2014, and June 2015, respectively.[26] Ericsson regularly prepares these reports as part of its usual business activities, at least in June and November of every year. The reports set forth global and regional statistics compiled by Ericsson researchers, for example, the number of mobile subscriptions worldwide for a variety of device types, the data traffic by type of device, forecasted mobile traffic growth, and more.[27]

---

[23] Lynde Witness Decl. ¶ 151.

[24] Guo Witness Decl. ¶ 7.

[25] Exhibit 4869 at 6.

[26] Exhibit 1097 at 5; Exhibit 4061 at 4-5; Exhibit 4340 at 4-5; and Exhibit 4591 at 4-5; Exhibit 4060 at 4-5.

[27] Exhibits 1097, 4060, 4061, 4340, and 4591.

## VI.   REBUTTAL TO MR. GUO AND MR. CISTULLI

29.   Mr. Cistulli and Mr. Guo both point to specific TCL smartphone models as evidence that they compete with Apple and Samsung, among others. Mr. Guo refers to the TCL 950 (which retails for about $475), the TCL 750 (which retails for about $190), and the TCL 580 (which retails for about $200).[28] Mr. Cistulli refers to the Alcatel Idol 4S and Alcatel Idol, which retail for $470 and $200, respectively.[29] Mr. Guo and Mr. Cistulli are selecting mobile phone models which are not truly representative of TCL's product line-up. Most mobile phones sold by TCL are much cheaper models. For example, in paragraph 75 of my direct testimony, I identified an Alcatel 4G handset (the Pixi Glitz) being sold at a retail price of just $10.[30]

30.   According to market analyst IDC, over the past several years, most of TCL's handsets have sold for much less than the models highlighted by Mr. Guo and Mr. Cistulli. Between 2013 and 2015, more than half of the 3G mobile phones sold by TCL (the vast majority of TCL's smartphones sales) sold for less than $100, and over ninety percent sold for less than $200.[31] Between 2013 and 2015, almost half of the 4G mobile phones sold by TCL were priced under $100, and more than 75 percent were priced under $200.[32] This is seen in Figure 2: [33]

---

[28] Guo Witness Declaration, at ¶¶ 78-80.

[29] Cistulli Witness Declaration, at ¶¶ 66, 69.

[30] Exhibit 4065.

[31] Exhibit 1000.

[32] Exhibit 1000.

[33] Exhibit 1000.

REBUTTAL WITNESS DEC. OF LARS GUSTAV BRISMARK;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 2**

| PRICE RANGE | PERCENT OF TCL 3G SALES (2013-15) | PERCENT OF TCL 4G SALES (2013-15) |
|---|---|---|
| $0-$100 | 59% | 47% |
| $100-$200 | 34% | 30% |
| $200-$300 | 5% | 20% |
| $300-$450 | 2% | 2% |
| $450+ | 0% | 1% |

31.     This data from IDC only confirms what is well known in the industry: TCL sells low-priced handsets. Whatever TCL's current strategy to sell higher-priced units may be, it does not appear to have been implemented or effective to date. According to industry reports in 2015, the average selling price of TCL's smartphones and feature phones have both been falling.[34] So while TCL may be *trying* to sell higher priced mobile phones, it is actually selling more lower priced mobile phones.

## VII.   REBUTTAL TO DR. WOLFE

32.     As I noted in my direct testimony, LG is an example of an Ericsson standard essential patent licensee who has compensated Ericsson, in part, with non-cash consideration. During the parties' negotiations, when Ericsson and LG reached an impasse over cash consideration, the parties were able to bridge the gap when LG agreed to give Ericsson the right to designate the transferee of ten patents owned by LG (the LG Patents). LG later transferred two United States patents to Ericsson and eight patents, at Ericsson's request, to a third party (Optis Cellular Licensing LLC) for licensing pursuant to a revenue sharing agreement between Optis Cellular and Ericsson.

33.     I understand that Ericsson's expert in this litigation, Michael Pellegrino, has analyzed the value of the LG Patents at the time that Ericsson and

---

[34] Exhibit 1132 at 4; Exhibit 1110 at 6; Exhibit 1136 at 3.

LG executed the patent transfer agreement. I further understand that TCL's expert, Dr. Wolfe, disagrees with Mr. Pellegrino's valuation and instead opines, based on his technical analysis of the LG Patents, that the LG Patents have little to no value.[35] In offering this testimony, Dr. Wolfe appears to suggest that neither Ericsson nor Mr. Pellegrino undertook a technical analysis of the LG Patents.[36] As I will now discuss, that is not true.

34. In fact, a team of Ericsson patent lawyers and engineers and outside technical experts led by the current director of Ericsson's 5G program, Patricio Delgado, performed an in-depth technical analysis of the LG Patents in 2013 and 2014. Because Mr. Delgado periodically reported on his team's activities and progress to the leadership team within Ericsson's IPR & Licensing group, including me, I am familiar with the work performed by Mr. Delgado and his team.

35. The leadership team selected Mr. Delgado to oversee the selection of the LG Patents based on his qualifications. He has an engineering degree from Stanford University and a law degree from Harvard Law School. He spent several years practicing patent law at an international law firm before joining Ericsson as licensing counsel in 2010. Since that time, he has helped to develop and license Ericsson's portfolio of user equipment (UE) implementation patent portfolios, as well as our 2G, 3G, and 4G standard essential patent portfolios, played a key role in technical negotiations with prospective licensees, and extensively studied Ericsson's 2G, 3G, 4G, and UE technology that relates to Ericsson's claim charts.

36. In October 2013, at Ericsson's request, LG provided an initial set of patent candidates for Ericsson to review for possible acquisition as part of the consideration for the parties' patent portfolio cross license. This initial set consisted of nineteen United States patents and one United States patent application: eight

---

[35] Wolfe Witness Decl. ¶ 15.
[36] Wolfe Witness Decl. ¶ 17.

patents that LG had charted to the 4G standard; one patent that LG represented was essential to the 4G standard, but that was not charted; one patent application with a notice of allowance that LG had charted to the WiFi 802.11ac standard; and ten implementation (non-essential) patents. Exhibits 4506, 4507, 4508, 4509, 4510, 4511, 4512, and 5308 are authentic copies of the claim charts that LG provided to Ericsson at the time, which map certain of the LG patent candidates against smartphones from various mobile phone vendors.[37]

37.     As a first step, Mr. Delgado put together a group of LTE experts to analyze the LTE-related patents and claim charts. This group was comprised of three members: Johan Nystrom, Todd Cason, and Mats Sågfors. Dr. Nystrom is an engineer and inventor with decades of telecommunications engineering and research experience. He is a named inventor on numerous LTE patents, has several years of patent analysis experience, and is part of Ericsson's LTE focus portfolio team. I understand that the Court is already familiar with Mr. Cason and Dr. Sågfors, as they too have submitted rebuttal witness declarations in this litigation.

38.     As a second step, Mr. Delgado worked with Andreas Iwerbäck to analyze the WiFi 802.11ac patent application. Mr. Iwerbäck, an Ericsson engineer with a graduate degree in computer science, has worked within Ericsson on patent development, patent analysis, and patent assertion for more than a decade, while also acting as patent portfolio manager for Ericsson's WiFi standard-essential patent portfolio. In this latter role, he acquired experience specific to WiFi-related patents, WiFi technology, WiFi patent sales and acquisitions projects, and WiFi patent portfolio pricing and licensing. For purposes of this analysis, Mr. Delgado engaged an additional technical expert from Parsa Wireless, a technical consulting firm.

---

[37] Exhibit 4506; Exhibit 4507; Exhibit 4508; Exhibit 4509; Exhibit 4510; Exhibit 4511; Exhibit 4512; Exhibit 5308.

39.     As a third step, Mr. Delgado worked with a group comprised of Patrick Farley, Joakim Movander, and individuals from Parsa Wireless to analyze the ten non-essential patents identified by LG. Mr. Farley is an engineer with degrees in mechanical and electrical engineering from the University of Texas at Austin and a law degree from Southern Methodist University. Before joining Ericsson in 2010, Mr. Farley practiced patent law for several years at Akin Gump and other law firms. Together with Mr. Delgado, Mr. Farley co-managed Ericsson's user equipment implementation patent portfolio from 2011-2013 and performed extensive analysis of hundreds of UE implementation patents in that time period, including working with reverse engineering companies such as Chipworks, UBM Techinsights, and Parsa Wireless. Mr. Movander has a Masters degree in mechanical engineering and is a former patent examiner and director at the Swedish Patent Office. He has worked in Ericsson's patent group for over a decade on patent development, patent analysis, and portfolio assessments. In 2013, Ericsson appointed him a director of patent portfolio management, and he took over the management of Ericsson's user equipment implementation patent portfolio. Since that time, he has led the focus portfolio team for that patent portfolio. Mr. Delgado engaged two Parsa Wireless experts with particular expertise regarding mobile phone hardware and software to assist in the analysis of these LG patents.

40.     Collectively, the three groups of individuals who I just described have decades of patent analysis experience and technical expertise. Under Mr. Delgado's supervision, they analyzed the initial set of twenty patents disclosed by LG, including an examination of the patent claims and claim charts provided by LG, and a review of the patent prosecution histories, claim construction issues, infringement issues, certain validity issues, and formalities such as assignment history and maintenance fee payments. Mr. Delgado's team also surveyed foreign family members, their claim scope, and relevant prior art raised in those foreign jurisdictions, compared the standards-related patents to the standards at issue, and

compared the implementation patents to a number of smartphones offered by Samsung, Apple, Nokia, Motorola, HTC, and Google smartphones, using the claim charts that LG provided as a starting point if possible. Exhibit 4551 is an authentic copy of an internal Ericsson spreadsheet that shows the initial assessment by Parsa Wireless of ten of the patents and the one patent application under review.

41.     In November 2013, Mr. Delgado reported the results of the patent analysis to me and other members of the management team. He informed us that three of the LTE-related patents, three of the UE implementation patents, and the patent application identified by LG were confirmed to be used by smartphones in the market. Ericsson then asked LG to send a second set of patents for analysis. LG provided a set of ten implementation patents, as well as corresponding claim charts, in December 2013. Exhibit 4513 is an authentic copy of a presentation titled "Presentation of LGE Patents to Ericsson," dated December 26, 2013, which contains the claim charts provided by LG for these patents.[38]

42.     For this second set of LG patents, Mr. Delgado assigned the analysis to five experienced patent experts—Patrick Farley, Todd Cason, Luke McLeroy, Evelyn Chen, and himself. I understand that the Court is already familiar with Mr. Cason, Mr. McLeroy, and Ms. Chen, as they too have submitted rebuttal witness declarations. I described Mr. Farley's background above. This team followed the same review protocol for this second set of patents as the team who analyzed the first set of patents identified by LG, each spending more than 25% of his or her time to the evaluation project. At the completion of their work, they had confirmed that six of the patents were being used by smartphones and tablets in the market.

43.     Ultimately, based on the technical analysis performed by Mr. Delgado and his team members, Ericsson selected the LG Patents from the broader universe

---

[38] Exhibit 4513.

of patents identified to us by LG.[39] The LG Patents are listed here in Figure 3:

**FIGURE 3**

| Type | Patent | Title |
|---|---|---|
| Implementation | 8,078,134 | Mobile terminal and method of controlling operation of the mobile terminal |
| Implementation | 7,957,770 | Mobile communication terminal for providing tactile interface |
| WiFi 802.11ac | 8,681,757 | Method and apparatus for transmitting PLCP frame in wireless local area network system |
| Implementation | 8,593,415 | Method for processing touch signal in mobile terminal and mobile terminal using the same |
| Implementation | 8,095,888 | Mobile terminal and image control method thereof |
| Implementation | 8,092,253 | Communication terminal |
| Implementation | 8,326,377 | Input device and mobile device having the same |
| Implementation | 8,300,017 | Mobile electronic apparatus with touch input device and display method using the same |
| Implementation | 8,549,426 | Apparatus and method for configuring an on-screen image in a mobile telecommunication handset upon connection of earphone |
| LTE | 8,391,405 | Symbol mapping method for repetition channel coding |

---

[39] Exhibit 198.

## VIII.  CONCLUSION

44.    I believe that the facts I have set forth above are important for the Court to consider when evaluating the opinions set forth by TCL's experts Dr. Leonard, Dr. Lynde, and Dr. Wolfe, and the testimony of its fact witnesses Mr. Guo and Mr. Cistulli. As I have observed, all of these witnesses leave out or misstate important facts in their testimony, and I have endeavored to correct certain of those omissions and misstatements above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Stockholm, Sweden 27 January 2017.

Lars Gustav Brismark

## IX.  LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 56 | Ericsson/RIM License (2011) |
| 198 | Agreement to Transfer Patents between LG and Ericsson, dated 7/7/14 |
| 259 | Apple final business case |
| 333 | Ericsson Press release titled "Industry leaders NTT DoCoMo, Ericsson, Nokia and Siemen, and Japanese Manufacturers Reach a Mutual Understanding to Support Modest Royalty Rates for the W-CDMA Technology Worldwide," dated 11/6/02 |
| 1000 | IDC Worldwide Mobile Phone Tracker 2016Q2 Historical Release |
| 1097 | Ericsson Mobility Report, dated Nov. 2015 |
| 1110 | TCL Communication Tech. Valuation, prepared by Nomura, dated 10/21/15 |
| 1132 | CIMB publication titled "TCL: Growth in a Highly Competitive Market," 10/20/15 |
| 1136 | CMS Company Report on TCL Communications, dated 10/22/15 |
| 1146 | Ericsson's press release titled "Wireless Industry Leaders commit to framework for LTE technology IPR licensing," dated 4/14/08 |
| 1152 | Wayback Machine website displaying webpage of Ericsson's "Licensing Programs" website, archived July 19, 2008 |
| 1240 | Updated Schedule 11F.1 titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on business case Projections)," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1540 | Reference Price Sheet 2011 (Rev C), dated July 2012 |
| 4040 | 2016 Ericsson/ZTE License |
| 4060 | Ericsson Mobility Report, June 2016 |
| 4061 | Ericsson Mobility Report, November 2016 |
| 4065 | Tracfone Alcatel Onetouch Pixi Glitz A463BG (screenshot from amazon.com) |
| 4340 | Ericsson Mobility Report, November 2014 |
| 4506 | LG Claim chart: 12/941,974 |
| 4507 | LG Claim chart for US 7,903,603 |
| 4508 | LG Claim Chart for US 7,936,731 |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 4509 | LG Claim Chart for US 7,979,769 |
| 4510 | LG Claim Chart US 8,121,602 |
| 4511 | LG Claim Chart US 8,229,390 |
| 4512 | LG Claim Chart US 8,391,405 |
| 4513 | LG Claim Chart Presentation |
| 4551 | Spreadsheet, Investigation of patent claim |
| 4591 | Ericsson Mobility Report, June 2015 |
| 4869 | TCL Annual Report 2015 |
| 5308 | LG Claim Chart for U.S. Patent No. 8,483,146 |
| 5397 | 10/01/2001 - First 3G Mobiles Launched in Japan, BBC News |
| 5529 | Reference Price Sheet 2011 (Rev B) |

# **CERTIFICATE OF SERVICE**

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 27, 2017, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.

Dated:  January 27, 2017

**CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON