CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA  92614
Telephone:  949.263.8400  Facsimile:  949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA  90071
Telephone:  213.443.5590  Facsimile:  213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC  20004
Telephone:  202.624.2500  Facsimile:  202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX  75201
Telephone:  214.978.4000  Facsimile:  214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX  78701
Telephone:  512.692.8700  Facsimile:  512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | Case No. 8:14-CV-00341 JVS-DFMx<br>Case No. 2:15-CV-02370 JVS-DFMx |
| Plaintiffs/Counterclaim-Defendants, | **REBUTTAL WITNESS STATEMENT BY EVELYN CHEN** |
| v. | Hon. James V. Selna |
| TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, | **Discovery Cut-off:**  May 23, 2016 |
| Defendants/Counterclaim-Plaintiffs. | **Pretrial Conference:**  February 1, 2017 at 10:00 a.m. |
| ERICSSON INC., *et al.*, | **Trial:**  February 14, 2017 at 8:30 a.m. |
| Plaintiffs/Counterclaim-Defendants, | |
| v. | |
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | |
| Defendants/Counterclaim-Plaintiffs. | |

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION. ..................................................................................... 1

II.    BACKGROUND. ...................................................................................... 1

       A.    Technical and Legal Qualifications. ........................................... 1

       B.    Industry Experience. ................................................................... 4

       C.    Person of Ordinary Skill in the Art. ........................................... 4

III.   RESPONSE TO DR. KAKAES' ESSENTIALITY OPINIONS. ....................... 5

       A.    Patent Families Where Dr. Kakaes Does Not Dispute Essentiality. .......... 5

       B.    Patent Families Where Dr. Kakaes Analyzes an Irrelevant Chart. .......... 6

       C.    Patent Families Where Dr. Kakaes and I Disagree on Essentiality. .......... 7

             1.    P04787 (e.g., US RE36,079) ............................................. 7

             2.    P07592 (US 6,259,724), P08167 (US 6,163,533), and
                   P09715 (EP 1,110,422, IN 200,058, JP 4,267,827, US
                   6,597,675) ....................................................................... 11

                   a)    P07592 (US 6,259,724) ......................................... 14

                   b)    P08167 (US 6,163,533) ......................................... 16

                   c)    P09715 (EP 1,110,422, IN 200,058, JP 4,267,827, US
                         6,597,675) ............................................................ 18

             3.    P08425 (US 5,930,366) and P08430 (US 6,185,244 and IN
                   222,422) ........................................................................... 25

                   a)    P08425 (US 5,930,366, IN 261,363) ..................... 27

                   b)    P08430 (US 6,185,244, IN 222,422) ..................... 32

             4.    P11538 (US 6,549,564, IN 205,722) ................................. 33

             5.    P12947 (US 6,535,925, JP 4,703,080) .............................. 36

             6.    P23016 (US 8,176,376) and P27363 (US 7,924,754) ......... 39

                   a)    P23016 (US 8,176,376) ......................................... 40

                   b)    P27363 (US 7,924,754) ......................................... 42

             7.    P38458 (US 9,100,069) .................................................... 44

IV.    CONCLUSION ...................................................................................... 46

1

V.      TABLE OF EXHIBITS ....................................................................... 48

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

My name is Evelyn Chen. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States that they are true and correct.

## I.    INTRODUCTION

1.    Since 2013, I have served as a senior counsel in Ericsson's patent assertion group. In this role, I have analyzed many of Ericsson's 2G, 3G, and 4G patents, including those charted and provided to TCL as part of this litigation. I have been asked to review the technical analysis performed by TCL's expert, Dr. Kakaes, and to provide testimony regarding various issues with Dr. Kakaes' analysis of Ericsson's standard-essential patents.

2.    In total, I reviewed 25 patent families that were analyzed by Dr. Kakaes. For 12 of these families, Dr. Kakaes' analysis confirmed that they included at least one standard-essential patent claim. I agree with his essentiality analysis for these patent families. For the 13 other patent families, however, Dr. Kakaes' essentiality analysis is flawed in several respects. As I will explain in detail, Dr. Kakaes' opinions regarding the alleged lack of essentiality for these patent families is premised on (1) an incorrect understanding of the relevant law on patent infringement; (2) a misapprehension of the claimed subject matter of the relevant patents; and/or (3) an incorrect analysis of the 2G, 3G and/or 4G technical standards.

## II.    BACKGROUND

### A.    Technical and Legal Qualifications.

3.    I have a Bachelor of Science degree in electrical engineering, which I received from the University of Texas at Austin in 2001. At the University of Texas at Austin, I took classes in digital signal processing, microprocessor programming, biomedical instrumentation design, among other electrical engineering courses. During my time at Texas, I held multiple summer internships, including an internship at IBM where I assisted with test coding related to network computing, and an internship with Legerity, an AMD spin-off, working on multi-platform instrument

control interface relating to product compatibility testing.

4.      From 2003 to 2006, I worked as a patent agent at the law firm of Fulbright Jaworski, LLP in Austin, Texas. As a patent agent, I learned, and worked with on a daily basis, the requirements for patentable subject matter under 35 U.S.C. ¶ 101, novelty under 35 U.S.C. ¶ 102, obviousness under 35 U.S.C. ¶ 103, and written description/best mode/enablement under 35 U.S.C. 112. I also regularly dealt with matters concerning the proper meaning or interpretation of claim terms as part of my responses to office actions that are typically necessary to obtain an issued patent from a pending application. For example, a patent examiner will sometimes reject the claims of an application as anticipated, obvious, or not complying with one or more of the other requirements for patentability. As a patent agent, it was my job to review the specification and file history of the patent application, determine the proper interpretation of the claim language (making amendments as necessary), and explain the differences between the properly-interpreted claims and the prior art. I personally handled the drafting and prosecution of approximately thirty patent applications over the course of my two years as a patent agent in this manner. My prosecution work included a variety of technology areas, including telecommunication hardware, radar technology, signal processing, and medical instrumentation.

5.      I also performed broader patent analysis, such as freedom to operate searches and portfolio-wide assessments, and assisted in the drafting of litigation-related claim charts in support of ongoing litigation during my two-year tenure at Fulbright Jaworski. My patent portfolio analysis opinions required detailed knowledge of the requirements for patentability (as noted above), as well as detailed knowledge of claim construction principles and their application. For example, my work often required that I review the specification and file history, and apply the then-existing principles of claim construction, to determine the proper scope of the claim language. Once the proper scope of the claim language was determined, I would then apply the claims to either the potentially infringing product or the potentially invalidating prior

art to render an opinion on infringement and/or validity. In a similar effort, I created claim charts for infringement and/or validity purposes for use in litigation. I applied these same principles to my claim charting work. My litigation and claim chart analyses covered several technology areas, including selective laser-sintering and computer software.

6.      In 2003, I enrolled in law school at the University of Texas at Austin. I graduated from the University of Texas at Austin in 2006 with my juris doctorate degree. As part of my studies, I took classes which covered patent infringement and validity. In these classes we covered the current state of the case law for patentability, and applied these cases to a variety of scenarios to enhance my skill set as a lawyer upon graduation. I also served as a teaching assistant for an Engineering and the Law course taught at the College of Engineering. My responsibilities in that role included preparing teaching modules on intellectual property law, including infringement and validity.

7.      Upon graduation for law school, I worked as a patent lawyer at a law firm in Dallas, Texas, called Sidley Austin LLP from 2006-2010, and from 2012-2013. There, I represented companies (both plaintiffs and defendants) in patent litigations involving a variety of technologies, including Wi-Fi (IEEE 802.11), internet technologies, and consumer electronics. As part of my role, I drafted, reviewed and/or analyzed claim charts in the form of infringement and invalidity contentions. While at Sidley Austin, I also prosecuted U.S. patent applications for both large and small clients.

8.      From 2010-2012, I served as a law clerk to the Honorable Chief Judge David Folsom of the United States District Court – Eastern District of Texas, in Texarkana, Texas. In total, I gained over eight years of patent analysis experience before joining Ericsson.

**B.     Industry Experience.**

9.      Since joining Ericsson in 2013, I have continued to expand my patent experience. As part of my role, I have asserted Ericsson's 2G, 3G, and 4G patent portfolios in licensing discussions with several companies. For these projects I will review and revise claim charts showing how Ericsson's patents are infringed by the potential licensee, and field questions from the potential licensee about infringement and or validity. As part of this process, I work with other engineers and lawyers within Ericsson to analyze the issues and respond to those questions or comments. I then often address or otherwise respond to points raised by Ericsson's potential licensees regarding the merit of Ericsson's patents. I have also worked on projects involving other companies' patent assertions against Ericsson. In these cases, I analyze other companies' patents and claim charts, and to provide comments on infringement, validity, claim interpretation, and enforceability among other things.

10.     As another part of my role at Ericsson, I have been involved in preparing for and managing those litigations where Ericsson has enforced its patents, in both the United States and abroad. These litigations have included some of Ericsson's 2G, 3G, and 4G patents. For example, I have been involved in preparing for and/or managing litigations with Apple in the United States, and with Micromax, Gionee, Intex, Xiaomi, Lava, and iBall in India. The technology-at-issue in these assertions related to Ericsson's 2G and 3G standard-essential patents, used in the prospective licensee's cellular handsets.

**C.     Person of Ordinary Skill in the Art.**

11.     I understand that TCL's experts have indicated a person of ordinary skill in the art would have (1) a bachelor's degree in electrical engineering or computer science or a related field, with one or two years of relevant industry experience; or (2) a master's degree in electrical engineering or computer science or a related field. Dr. Kakaes also believes that a person of ordinary skill in the art would have a working understanding of cellular transmission protocols. *See* Kakaes Witness

Statement at ¶ 109. As detailed above, I more than exceed the qualifications of a person of ordinary skill in the art according to TCL's experts. I have many years of technical patent analysis experience, including my course work at the University of Texas, my patent-related work at Sidley Austin, and my licensing negotiation and litigation experience at Ericsson.

## III.   RESPONSE TO DR. KAKAES' ESSENTIALITY OPINIONS

12.   I reviewed Dr. Kakaes' opinions regarding his essentiality findings for certain of Ericsson's claim charts produced during the course of this litigation. As is explained in further detail by my colleagues, Ericsson's claim charts are the result of a rigorous analysis by experienced engineers, including engineers with law degrees, and are vetted by both engineers and attorneys before they are shared with other companies. Further, many of these claim charts are scrutinized by other companies in licensing discussions. This iterative process ensures that the claim charts we present to licensees such as TCL present thoroughly analyzed evidence of the strength of Ericsson's portfolio of standard-essential patents.

13.   For purposes of my testimony in this case, I have reviewed and provide responses for the following patent families: P04787, P05860, P06891, P07592, P08153, P08167, P08338, P08425, P08430, P09715, P09716, P10808, P11538, P12947, P19559, P19911, P20671, P21172, P23016, P23041, P27363, P33485, P35168, P35592, P38458. Based on my review, I have determined that Dr. Kakaes made errors in his analysis of certain of these patent families. As in a typical licensing context, I analyzed Dr. Kakaes' opinions with support from other experienced telecommunications engineers and patent professionals.

### A.   Patent Families Where Dr. Kakaes Does Not Dispute Essentiality.

14.   I understand that Dr. Kakaes offers no dispute as to the essentiality of many of Ericsson's claim charted patents. In fact, Dr. Kakaes does not dispute that the following 12 patent families of the 25 patent families I was responsible for contain at least one essential patent claim:  P05860, P08153, P08338, P09716, P10808, P19559,

1    P19911, P21172, P23041, P33485, P35168, P35592.



13   15.    These 12 patent families cover a number of different technological

14   advancements related to the 2G and 3G technical standards.

15        **B.    Patent Families Where Dr. Kakaes Analyzes an Irrelevant Chart.**

16   16.    Among the remaining 13 families I reviewed, there are several instances

17   where Dr. Kakaes reviewed a claim chart that is not relevant to the licensing dispute

18   between Ericsson and TCL. Namely, for several cases, Dr. Kakaes reviewed and

19   offered opinions regarding Ericsson's base station or network-essential patents, and

20   then draws the conclusion that they are not essential for purposes of Ericsson's and

21   TCL's dispute related to user equipment (*e.g.,* TCL handsets). There are several errors

22   with this approach. First, just because a patent claim is directed to a base station, does

23   not mean it is not "essential" to the standard. To the contrary, they are in fact essential

24   because they cover operations of base stations or other network equipment, even if

25   they do not read on the operation of the handset. Second, whether or not these base

26   station claims are essential is simply not relevant to the licensing dispute between

27   Ericsson and a user-equipment manufacturer like TCL if they only contained claims

28   directed at base stations.

17.    Out of the 13 patent families that Dr. Kakaes found to be non-essential, Dr. Kakaes makes this mistake for the following 2 families: P06891 and P20671. Thus, for these two patent families, Dr. Kakaes' essentiality analysis is irrelevant to the dispute between Ericsson and TCL.

## C.    Patent Families Where Dr. Kakaes and I Disagree on Essentiality.

18.    Given Dr. Kakaes' opinion that he has seen no evidence showing that 12 of the 25 patent families are not essential, and his analysis of two irrelevant claim charts, there are eleven patent families remaining where Dr. Kakaes provides a more substantive criticism of Ericsson's claim charts. These are: P04787, P07592, P08167, P08425, P08430, P09715, P11538, P12947, P23016, P27363 and P38458. I disagree with Dr. Kakaes on his essentiality findings for these patent families and, in the sections below, provide a discussion of each family and Dr. Kakaes' incorrect analysis in detail.

### 1.    P04787 (e.g., US RE36,079).

19.    The first patent family I will discuss is P04787, which relates to the concept of "soft handover" when a mobile device is in a region in-between two base stations and is simultaneously connected to both. As I will explain below, this patent family includes at least one 3G standard-essential family member.

20.    By way of background, and as shown on the demonstrative below, a handset generally connects to one base station at a time. As a handset moves from one cell to another, it will briefly connect with the new base station (in red) while remaining in contact with the prior base station (in green). During this time, responsibilities for maintaining a cellular connection for the mobile device will transfer from the old base station to the new one. This process is known as "soft handover."



21.    The inventions described in Ericsson's P04787 patent family pertain to a more streamlined and efficient "handover" process. The claimed inventions provide improved performance and connectivity, as calls and data connections are better maintained as a handset moves from one cell to another, reducing the likelihood of dropped calls or lost data connections.

22.    Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 4 of RE36,079 are practiced by the 3G cellular standard. *See* Ex. 4263 (ERIC_TCL00191153). Specifically, Ericsson's chart explains how the 3G cellular standard implements Ericsson's invention related to a soft handover as a handset transitions from one base station to another. In full, claim 4 of RE36,079 recites:

> 4. In a mobile radio communication system comprising base stations and mobile stations having radio transmitters and radio receivers for transmitting control information and message information therebetween, a method for handing over the responsibility for transmitting message information to a mobile station from at least one first base station transmitter to at least one second base station transmitter comprising the steps of:
>
> starting the transmission of message information to the mobile station from the second base station transmitter before terminating the transmission of message information to the mobile station from the first base station transmitter; [and]
>
> transmitting substantially the same message information during a transition period from both the first base station transmitter and the second base station transmitter; and
>
> combining, in said mobile station, information transmitted by said first base station transmitter and information transmitted by said second base station transmitter to reconstruct said message information.

*See* Ex. 4320 (RE36,079).

23.     Dr. Kakaes does not offer any substantive rebuttal on the technical aspects of this claim chart. But nonetheless, he opines that the claim is not essential because, in his view, there is no evidence that "TCL directs or controls any other parties" to implement the claimed limitation of "starting the transmission of message information to the mobile station from the second base station transmitted before terminating the transmission of message information to the mobile station from the first base station transmitter."  The full basis for Dr. Kakaes' essentiality opinion is excerpted below:

| Essentiality Rank: 3 | The essentiality rank for Claim 4 is 3 because practicing the 3G standard with user equipment does not require at least the following limitations of the claim: "starting the transmission of message information to the mobile station from the second base station transmitter before terminating the transmission of message information to the mobile station from the first base station transmitter."  In addition, I have not seen any evidence that TCL directs or controls any other parties to implement "starting the transmission of message information to the mobile station from the second base station transmitter before terminating the transmission of message information to the mobile station from the first base station transmitter." |

*See* Ex. 1639 at P04787_3G.

24.     In other words, Dr. Kakaes does not disagree that the claimed functionality is implemented by the 3G standard, but he contends that TCL cannot infringe based on the purely legal argument that TCL does not "direct or control" any other parties to practice two of the limitations from claim 4. I disagree with Dr. Kakaes, as his analysis relies upon a misapprehension of the requirements for direct infringement by multiple parties. As the Federal Circuit held *en banc* in *Akamai Technologies Inc. v. Limelight Networks Inc.,* 797 F.3d 1020 (Fed. Cir. 2015), the "directs or controls" test is not the only test to prove that one party can be held responsible for direct infringement for the actions of others. Indeed, as shown below, method claims may be infringed by multiple parties where the actors form a "joint enterprise" related to the infringing functionality.



25.     Under the "joint enterprise" test, where two or more actors form a joint enterprise, all can be charged with the acts of the other, rendering each liable for the steps performed by the other as if each is a single actor. Dr. Kakaes' failure to consider this alternative prong of the Akamai test demonstrates his flawed analysis. This is particularly true here, because TCL's relationship with the cellular carriers

implicates the joint enterprise exception. For example, TCL designs its mobile stations to be compatible with and to be used in conjunction with carrier-operated base stations in order to jointly implement the 3G cellular standard, and thus allow TCL's customers to connect to and communicate over the cellular network. TCL collaborates with cellular carriers in order to ensure compatibility with the networks, and ensures that its devices meet carrier verification requirements. Dr. Kakaes does not consider or analyze whether any of these activities satisfy the "joint enterprise" test. Accordingly, Dr. Kakaes has failed to demonstrate that claim 4 of RE36,079 is not essential to the 3G standard.

**2.    P07592 (US 6,259,724), P08167 (US 6,163,533), and P09715 (EP 1,110,422, IN 200,058, JP 4,267,827, US 6,597,675).**

26.    The next patent families I will discuss are P07592, P08167 and P09715. I will discuss these patent families together, because each relates to improvements associated with the "random access" process described in the 3G technical standard.

27.    Random access is an important feature in the 3G cellular standard, providing a way for cellular devices to connect to a base station upon powering up or entering a new cell. The random access channel is used by mobile devices to provide information regarding the existence of the device, to initiate communications over the network, and is a fundamental component to initiating cellular connectivity whenever a new connection to a base station is desired.

28.    As shown in the demonstratives below, the random access procedure begins with (1) a random access request from a handset to a base station; and (2) a response from a base station that provides information used to establish a dedicated connection.



During random access, multiple devices may attempt to connect to a base station at the same time, which may cause "collisions" or other interference that prevents the base station from properly receiving one or more of the random access requests.

29.     One of the techniques utilized to reduce the number of "collisions" during random access is the use of "preambles" or "signatures," which allow a base station to handle multiple simultaneous random access requests. For example, as shown in the slide below, a unique "preamble" may be utilized by a handset, which is a quasi-unique sequence that is applied to a particular random access communication.

**Random Access**

①  Handset sends random access
    request to base station

①  ➤

<mark>Preamble</mark>

Use of **preambles** or "signatures" allows the
base station to deal with multiple simultaneous
random access requests

By utilizing preambles, multiple users are able to connect to a base station using random access at the same time. This is shown in the demonstrative below, where the three cell phones have different preambles (blue, orange and yellow) associated with simultaneous random access request.



30. The use of differing preambles reduces the chance of collision during random access. However, there is still a possibility that two handsets may make two simultaneous requests of a base station using the same preamble. For example, with reference to the figure above, if the top and bottom phones both had the "yellow" preamble, then the simultaneous random access attempts would fail due to collision. In such circumstances, as shown below, the handset may reattempt the random access process using a newly selected signature.



31. As explained in more detail below, Ericsson's contributions to the 3G cellular standard provide several improvements to the random access process including an increase in the number of users who can simultaneously access a base station, by reducing latency and increasing data-throughput for end-users.

**a) P07592 (US 6,259,724).**

32. Ericsson's patent family P07592 relates to the implementation of "signatures" or "preambles" by a mobile device during the above-described random access procedure. According to Ericsson's invention, a "signature" is selected for a given random access transmission from a plurality of potential "signature" patterns, and then an access request frame is established using the signature pattern. The access request frame is then spread using a spreading code, which allows mobile devices to transmit random access requests without pre-allocating codes, making the random access procedure more efficient and increasing the data throughput rates for end-users. The signature is selected at random from a set of signatures that are orthogonal to each

other, thereby reducing the chances that two signals would be sent at the same time with the same signature. Thus, the inventions described in P07592 provide substantial benefits to the random access procedure, allowing for multiple simultaneous random access requests to be processed by a base station at the same time, reducing latency and increasing data throughput rates for the users of mobile handsets. In full, claim 9 of the '724 patent recites:

> 9. A method in a mobile station for implementing a random access procedure in a mobile telecommunications system, comprising the steps of:
>     acquiring synchronization with an intended base station;
>     selecting a signature pattern from a plurality of signature 45 patterns;
>     forming an access request frame using said signature pattern;
>     spreading said access request frame with a spreading 50 code; and
>     transmitting said access request frame that was spread in said step of spreading to said intended base station.

*See* Ex. 4324 ('724 Patent).

33.     Dr. Kakaes contends that none of the claims in P07592 are essential to the 3G standard. Specifically, he contends as follows:

| Essentiality Rank: 3 | The essentiality rank for Claim 9 is 3 because practicing the 3G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "spreading said access request frame with a spreading code".<br><br>Ericsson argues that this limitation is met by a scrambling operation. (*See* ERIC_TCL00191338.) However, a person of ordinary skill in the art would understand that "scrambling" a signal does not increase the signal's bandwidth and is thus distinct from spreading. The patent specification supports this as there is no mention of scrambling in the patent's specification, including in the claims. In particular, for example, at column 4, lines 38-42 of the patent, a "spreading ratio" is contemplated, which of necessity implies that actual spreading has to occur, not merely scrambling. Similarly, at column 5 lines 41-45, the structure of the receiver is disclosed which would not work if there is no spreading, i.e., if there were to be only scrambling. Lastly, Claim 1 of the patent, at column 8 line 54 through column 9 line 3, can only work if there is spreading; scrambling would not allow two simultaneously received random access requests to be distinguished and processed. |

*See* Ex. 1639 at P07592_3G. I disagree. Ericsson's claim chart cites to TS 25.213, Section 4, which makes clear that the "spreading" limitation is met by the "spreading"

discussed in the standard, which consists of two operations: (1) a channelization operation, which increases the bandwidth of the signal utilizing a Spreading Factor (SF); and (2) a scrambling operation, where a scrambling code is applied to the spread signal. The relevant excerpt from Ericsson's claim chart is provided below:

**4      Uplink spreading and modulation**
**4.1      Overview**
Spreading is applied to the physical channels. It consists of two operations. The first is the channelisation operation, which transforms every data symbol into a number of chips, thus increasing the bandwidth of the signal. The number of chips per data symbol is called the Spreading Factor (SF). The second operation is the scrambling operation, where a scrambling code is applied to the spread signal.

*See* Ex. 424 (ERIC_TCL00191337). Based on the plain-language of the excerpted material, it is readily apparent that a "spreading" operation is applied in the standard to increase the bandwidth of the signal. Thus, it is evident that the 3G standard requires spreading, and that spreading includes a scrambling operation in which a code is applied to the signal. Accordingly, claim 9 of the '724 patent is essential to the 3G standard.

### b)      P08167 (US 6,163,533).

34.      Ericsson's patent family P08167 relates to the allocation of spreading codes to random access requests. Implementing this invention allows for more efficient implementation of the random access process. According to the claimed functionality, preambles are utilized to include signature code spread with a spreading code associated with a predetermined sector. This makes the random process more efficient by reducing random access collisions, which reduces the number of retransmissions of random access requests, reduces initialization delays, and increases throughput. In full, claim 1 of the '533 patent recites:

> 1. A signal format for use in transmitting a random access request in a mobile communications system, comprising:
>
>   a preamble, said preamble including a signature code spread with a first spreading code, said first spreading code associated with a predetermined sector;
>
>   a data field, said data field including information data spread with a short spreading code, said short spreading code associated with said signature code, said information data spread with a short spreading code further spread with a long spreading code, said long spreading code associated with said predetermined sector; and
>
>   wherein said first spreading code, said short spreading code, and said long spreading code differ from one another.

*See* Ex. 4322 ('533 Patent).

35.     Dr. Kakaes contends that none of the claims in P08167 are essential to the 3G standard. The basis for his opinion is nearly identical to what is explained above with regard to P07592. Specifically, as shown below, Dr. Kakaes contends that the 3G standard does not include a "signature code spread with a first spreading code":

| Essentiality Rank: <u>3</u> | The essentiality rank for Claim 1 is 3 because practicing the 3G standard with user equipment does not require at least the following limitation of the claim under any reasonable interpretation: "signature code spread with a first spreading code". Ericsson alleges that the "'first spreading code' corresponds to preamble scrambling code". (*See* ERIC_TCL00191421.) However, that is incorrect. Scrambling operation is distinct from spreading operation. The 6,163,533 patent supports that well known fact. For |

*See* Ex. 1639 at P08167_3G.

36.     Again, I disagree. Ericsson's claim chart cites to TS 25.213, Section 4, which makes clear that the "spreading" utilized in the standard consists of two operations: (1) a channelization operation, which increases the bandwidth of the signal utilizing a Spreading Factor (SF); and (2) a scrambling operation, where a scrambling code is applied to the spread signal. The relevant excerpt from the standard is cited in the exhibit below:

> **4      Uplink spreading and modulation**
> **4.1      Overview**
> Spreading is applied to the physical channels. It consists of two operations. The first is the channelisation operation, which transforms every data symbol into a number of chips, thus increasing the bandwidth of the signal. The number of chips per data symbol is called the Spreading Factor (SF). The second operation is the scrambling operation, where a scrambling code is applied to the spread signal.

*See* Ex. 5386 (3GPP TS 25.213 V6.0.0).

37.     Based on the plain-language of the excerpted material, it is readily apparent that a "spreading" operation is applied to increase the bandwidth of the signal. Thus, the 3G standard requires spreading, and that spreading includes a scrambling operation in which a code is applied to the signal. Accordingly, claim 1 of the '533 patent is essential to the 3G standard.

### c)      P09715 (EP 1,110,422, IN 200,058, JP 4,267,827, US 6,597,675).

38.     Ericsson's patent family P09715, which relates to signature-domain randomization of random access attempts, includes at least one 3G and 4G standard essential patent family member. Thanks to the inventions claimed in P09715, mobile devices are capable of more quickly and efficiently re-initializing random access attempts in the event that an initial random access attempt fails. Specifically, the inventions described in P09715 permit a handset to recognize when a response is not received to an initial random access request, and to then replace a first randomly selected signature with a second randomly selected signature, and to then re-transmit the random access request at the next available timeslot. Utilizing this invention speeds up the time necessary to complete a random access connection, improving efficiency and throughput.

39.     Dr. Kakaes contends that claim 11 of EP '422 and claim 1 of IN '058 are not essential to practicing the 3G standard with user equipment because "[r]eplacing the first randomly selected signature with the second randomly selected signature in the signature field of the random access request" is not required. Claim 11 of EP '422

recites in full:

> **11.** A mobile station (16,18) comprising:
>
> > means for selecting a first signature code and including it in a signature filed of random access request (20,22,24);
> > means for transmitting said random access request (20,22,24);
> > means for detecting a response from a base station on the random access request (20,22,24) being received, **characterized by**; being adapted for randomly selecting a second signature code from a plurality of signature codes if said response is not being detected, for replacing the first randomly selected signature with the second randomly selected signature in the signature field of the random access request (20,22,24) and for re-transmitting the random access request (20,22,24) in the first available time slot.

*See* Ex. 5387 (EP '422).

40.    Dr. Kakaes argues that there is no requirement that one signature is replaced with another, only that a second signature is generated. Specifically, he contends as follows:

| Essentiality Rank: 3 | The essentiality rank for Claim 11 is 3 because practicing the 3G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "Replacing the first randomly selected signature with the second randomly selected signature in the signature field of the random access request." |
|---|---|
| | Ericsson fails to point at any portion of the standard that meets the "replacing" limitation.  Ericsson points at Section 6.1 of 3GPP TS 25.214, where the "Physical random access procedure" is discussed.  (*See* ERIC_TCL001988-9.)  In no portion of that section of the standard, or any other section of the standard or Ericsson's claim chart, does the standard contemplate "replacing the first selected signature with the second selected signature". |

*See* Ex. 1639 at P09715_3G. He goes on to argue that the standard describes the *creation* of a preamble, not how it is *replaced*. *Id.*

41.    I disagree with Dr. Kakaes. First, his argument improperly limits the scope of claim terms without providing any support for doing so. Section 6.1 of the

3GPP TS 25.214 standard includes the steps to "randomly select a new signature" and "transmit a preamble using ….. the selected signature…." To select a new signature and use it in the preamble instead of the previously selected signature plainly satisfies the "replacing" limitation."   This is reflected in the cited portion of the standard in Ericsson's claim chart, excerpted in the exhibit below:

> 6        **Random access procedure**
> 6.1      **Physical random access procedure**
> […]
> The physical random-access procedure shall be performed as follows:
> […]
>    5   *[…] Transmit a preamble* using the selected uplink access slot, signature, and preamble transmission power.
>    6   *If no positive or negative acquisition indicator* (AI ≠ +1 nor −1) *corresponding to the selected signature is detected* in the downlink access slot corresponding to the selected uplink access slot:
>        […]
>    6.2      ==*Randomly select a new signature from the set of available signatures* within the given ASC. The random function shall be such that each of the allowed selections is chosen with equal probability.==
>        […]
>    6.5 *If the Preamble Retransmission Counter > 0 then repeat from step 5.*

*See* Ex. 4281 (ERIC_TCL00191588). Given that the 3G standard clearly calls for selecting a new signature instead of the previously selected signature in the event of a failed random access connection, the 3G standard does implement the "replacing" aspect of the claims.

42.    Dr. Kakaes also argues that the claim limitations "transmitting said random access request" and "detecting a response from a base station on the random access request" are not met. As shown in the excerpt below, Dr. Kakaes opines that "random access request" cannot be construed to mean "preamble + random access message."

> Furthermore, Ericsson suggests in a comment that, according to Ericsson, "'random access request' = preamble + random access message". (See ERIC-TCL00191588). While there is no support for such a construction of "random access request", even if one were to adopt it, the claim would still not be essential because, in that case, at least

> the claim limitations "transmitting said random access request" and "detecting a response from a base station on the random access request" are not met as, in that case, said "random access request" is not transmitted; only part of it is.

*See* Ex. 1639 at P09715_3G.

43.    Dr. Kakaes provides no additional explanation, and it is unclear why he believes that cited functionality in Ericsson's claim chart (which is expressly referred to in the standard as a "random access procedure") does not meet the limitation of "transmitting said random access request."  The entire point of random access is for a wireless device to make a "request" for access to a base station. Further, as shown below, the standard also expressly recites an "acquisition indicator" that is transmitted by the base station to the wireless device upon reception/detection of the random access preamble.

6   If no positive or negative acquisition indicator (AI $\neq +1$ nor $-1$) corresponding to the selected signature is detected in the downlink access slot corresponding to the selected uplink access slot:

6.1   Select the next available access slot in the set of available RACH sub-channels within the given ASC.

6.2   Randomly select a new signature from the set of available signatures within the given ASC. The random function shall be such that each of the allowed selections is chosen with equal probability.

6.3   Increase the Commanded Preamble Power by $\Delta P_0$ = Power Ramp Step [dB]. If the Commanded Preamble Power exceeds the maximum allowed power by 6dB, the UE may pass L1 status ("No ack on AICH") to the higher layers (MAC) and exit the physical random access procedure.

6.4   Decrease the Preamble Retransmission Counter by one.

6.5   If the Preamble Retransmission Counter > 0 then repeat from step 5. Otherwise pass L1 status ("No ack on AICH") to the higher layers (MAC) and exit the physical random access procedure.

*See* Ex. 5452 (3GPP TS 25.214, Section 6.1, Release 8.13.0). Thus, the standard expressly satisfies the limitations of "transmitting said random access request" and "detecting a response from a base station on the random access request."

44.    Dr. Kakaes further opines that Claim 1 of US '675 is not essential to the 4G standard. The basis for Dr. Kakaes' opinion is that the 4G standard does not require "associating said selected signature code with a signature field of said random access request" and "re-transmitting said first random access request with said signature field including said selected signature code."  In full, claim 1 of US '675 recites:

> 1. A method for processing random access requests in a mobile communications system, comprising the steps of:
> a mobile station transmitting a first random access request for receipt by a base station;
> said mobile station determining if said first random access request has been received by said base station; and
> if said mobile station determines that said first random access request has not been received, randomly selecting a signature code from a plurality of signature codes, associating said selected signature code with a signature field for said first random access request, and re-transmitting said first random access request with said signature field including said selected signature code.

*See* Ex. 4327 (US '675).

45.     To support his non-essentiality opinions, Dr. Kakaes opines as follows with respect to the "associating" limitation:

> Ericsson fails to point at any portion of the standard that meets the "associating…" limitation as well as the "re-transmitting said first random access request…" limitation. Ericsson points to Sections 5.1.2, 5.1.3 and 5.1.4 of 3GPP TS 36.321 as well as to section 5.7.1 of 3GPP TS 36.211 for the "associating…" limitation.  In no portion of those sections of the standard, or any other section of the standard or Ericsson's claim chart, does the standard contemplate "associating" the selected signature code with a signature field of said random access request.  In a comment, referring to Fig. 5.7.1-1 of 36.211, section 5.7.1, Ericsson appears to suggest that the illustration of the Random access preamble format is sufficient to meet the associating with a signature field of the random access request.  That is incorrect.  The format is not a field in a random access request.

*See* Ex. 1639 at P09715_4G. I disagree. As Ericsson's claim chart makes clear, the standard expressly cites in section 5.7 (titled Physical random access channel) a figure demonstrating the format of the random access preamble. This is shown in the exhibit below:

### 5.7 Physical random access channel

#### 5.7.1 Time and frequency structure

The physical layer random access preamble, illustrated in Figure 5.7.1-1, consists of a cyclic prefix of length $T_{CP}$ and a sequence part of length $T_{SEQ}$. The parameter values are listed in Table 5.7.1-1 and depend on the frame structure and the random access configuration. Higher layers control the preamble format.



**Figure 5.7.1-1: Random access preamble format**

*See* Ex. 4280 (ERIC_TCL00191582). The claim requires "associating said selected signature code with a signature field for said first random access request." This is precisely what is shown in section 5.7, where the signature field is the timeslot "$T_{SEQ}$" which contains a "Sequence." In the random access scenario, "Sequence" corresponds to the signature code/preamble that is part of the random access request.

46.     Furthermore, Dr. Kakaes contends that the standard does not implement the "re-transmitting" step. Specifically, he contends as follows:

> As for the "re-transmitting..." limitation, Ericsson, without anything to point to in the standards, states in a comment: "the re-transmitted random access request includes the selected signature code in the signature field."
>
> In fact, there is no "re-transmission" of a random access request. Every time a random access request is sent, a new preamble is generated, as shown in Section 5.1.2 of 36.321:
>
> "The Random Access Resource selection procedure shall be performed as follows:
>
> ....
>
> Randomly select a Random Access Preamble within the selected group..."
>
> The definition of what the so selected Random Access Preamble is given in 3GPP TS 36.211, sections 5.7.1 where the format is shown and the sequence itself is defined in section 5.7.2, where the standard specifies that "The random access preambles are *generated* from Zadoff-Chu sequences.... To use. There are 64 preambles available in each cell..." (emphasis added). In other words, every time a preamble is needed, a new one is generated and there is no re-transmission of a given preamble:

*See* Ex. 1639 at P09715_4G. Again, I disagree. As shown in Ericsson's claim chart, Section 5.1.3 of the 3GPP TS 36.321, states "instruct the physical layer to transmit a preamble using the selected PRACH, corresponding RA-RNTI, preamble index and

1    PREAMBLE_RECEIVED_TARGET_POWER:"

> **5.1    Random access procedure**
> **5.1.3    Random Access Preamble transmission**
> The random-access procedure shall be performed as follows:
> -    set PREAMBLE_RECEIVED_TARGET_POWER to
>     *preambleInitialReceivedTargetPower* + DELTA_PREAMBLE +
>     (PREAMBLE_TRANSMISSION_COUNTER – 1) * *powerRampingStep*;
>
> -    instruct the physical layer to transmit a preamble using the selected PRACH,
>     corresponding RA-RNTI, preamble index and
>     PREAMBLE_RECEIVED_TARGET_POWER.

*See* Ex. 4280 (ERIC_TCL00191582). The fact that such transmissions are sometimes retransmissions is made clear by the text in Section 5.1.3 of TS 36.321 in which the transmission power is set as a function of the number of times the random access preamble has been transmitted (given by PREAMBLE_TRANSMISSION_COUNTER).

47.    Additionally, Section 5.1.4 of TS 36.321 describes a situation where, if no Random Access Response is received, the user equipment ***retransmits*** a random access request by selecting Random Access Resources. As shown in Section 5.1.4, when no Random Access Response is received, the UE will proceed back to the Selection of a Random Access Resource according to Section 5.1.2.

> If no Random Access Response is received within the RA Response window, or if none of all received Random Access Responses contains a Random Access Preamble identifier corresponding to the transmitted Random Access Preamble, the Random Access Response reception is considered not successful and the UE shall:
>
> -    increment PREAMBLE_TRANSMISSION_COUNTER by 1;
>
> -    If PREAMBLE_TRANSMISSION_COUNTER = *preambleTransMax* + 1:
>
>     -    indicate a Random Access problem to upper layers.
>
> -    if in this Random Access procedure, the Random Access Preamble was selected by MAC:
>
>     -    based on the backoff parameter in the UE, select a random backoff time according to a uniform distribution between 0 and the Backoff Parameter Value;
>
>     -    delay the subsequent Random Access transmission by the backoff time;
>
> -    proceed to the selection of a Random Access Resource (see subclause 5.1.2).

*See* Ex. 5453 (3GPP TS 36.321, Section 5.1.4, Release 8.9.0). Subsequently, transmission of the Random Access Preamble is done in accordance with Section

5.1.3, where the Preamble Transmission Counter is adjusted to account for a re-transmission and the power used to transmit the Random Access Preamble is increased accordingly. If the same random access request was not being retransmitted, there would be no reason to adjust the Preamble Transmission Counter, or to have such a counter at all. Given this, Dr. Kakaes' conclusion that the standard does not implement the step of "re-transmitting said first random access request with said signature filed including said selected signature code" is not correct.

48.     Accordingly, one or more claims of Ericsson's P09715 patent family are essential to both the 3G and 4G standard.

### 3.     P08425 (US 5,930,366) and P08430 (US 6,185,244 and IN 222,422).

49.     The next patent families I will discuss are P08425 and P08430. I will discuss these patent families together, because they each relate to improvements associated with the "synchronization" process utilized in the 3G standard. As shown in the slide below, each of the base stations has a cell-specific scrambling code that is used to scramble transmissions from each base station to a handset.



1  In order to synchronize with a base station, the handset must first determine the cell-

2  specific scrambling code for the base station. So, for example, as shown in the slide

3  below, a handset would not be able to synchronize with the "red" base station by using

4  the "blue" scrambling code.



15  Rather, as shown below, the handset must first determine a cell-specific scrambling

16  code for the appropriate base station in order to receive messages from the base

17  station.



50.     Ericsson's P08425 and P08430 patent families provide improvements related to the synchronization process in the cellular standards. As set forth below, Ericsson's inventions allow a mobile device to more quickly acquire a scrambling code as part of the synchronization process.

### a)     P08425 (US 5,930,366, IN 261,363).

51.     Ericsson's patent family P08425 includes at least one 3G standard essential patent family member, and relates to the problem of obtaining synchronization to the base station and further, to the problem of obtaining the cell-specific scrambling code used by the base-station to scramble all its communications. This is a significant challenge in an asynchronous system such as 3G. The mobile device uses the secondary code for frame synchronization and for identification of the cell-specific scrambling code. The solution provides for very rapid frame synchronization and scrambling code acquisition by the mobile device. In full, claim 9 of IN '363 recites:

> 9. An apparatus for use in a mobile station receiver (164) of a direct sequence code division multiple access (DS-CDMA) spread spectrum communication system (113) receiving downlink synchronization code transmitted by the base station as claimed in Claim 1, said downlink synchronization code transmission comprising a repeating frame having a plurality of slots and a primary synchronization code ($C_p$) repeated in each slot of said repeating frame, characterized by:
>
> a de-scrambler for de-scrambling downlink dedicated channel communications (114) and common channel communications (116) by using a cell specific code (C l), and
> a block channel equipment for recovering from the received frame a sequence of secondary synchronization codes ($C_{s/lCi,jl}$) contained in each repeating frame of said downlink transmission, said sequence of secondary synchronization codes providing information about said cell-specific long code and information about a frame boundary timing of said repeating frame.

*See* Ex. 5458 (IN '363).

52.     Dr. Kakaes argues that Claim 9 of IN '363 is not essential to practicing

the 3G standard with user equipment because it depends from a base station claim:

| Essentiality Rank: 3 | The essentiality rank for Claim 9 is 3 because practicing the 3G standard with user equipment does not require at least the following limitations of the claim: "downlink synchronization code transmitted by the base station as claimed in Claim 1." (In other words, Claim 9 depends from a base station claim.)  In addition, I have not seen any evidence that TCL directs or controls any other parties to implement: "downlink synchronization code transmitted by the case station as claimed in Claim 1." |
| --- | --- |
| | *See* IN Patent No. 261,363, Cl. 1: |

*See* Ex. 1639 at P08425_3G. I disagree. Claim 9 does not depend on claim 1, rather it is an independent claim reading squarely on a handset, not a base station. The fact that the claim references the *handset* being able to receive a signal transmitted *from* a base station, does not change the fact that the claim itself reads on the handset. This is reflected in the plain-language of claim, reproduced below:

> 9. An apparatus for use in a mobile station receiver (164) of a direct sequence code division multiple access (DS-CDMA) spread spectrum communication system (113) receiving downlink synchronization code transmitted by the base station as claimed in Claim 1, said downlink synchronization code transmission comprising a repeating frame having a plurality of slots and a primary synchronization code ($C_p$) repeated in each slot of said repeating frame, characterized by:

*See* Ex. 5458 (IN '363). Thus, Dr. Kakaes' opinion that Claim 9 is not essential merely because it depends from a base station claim is incorrect. Claim 9 requires that a mobile station receiver receives downlink synchronization code transmitted by the base station as claimed in Claim 1. Dr. Kakaes does not dispute that a downlink synchronization code is required by the 3G standard. Claim 9 is directed to a mobile station receiver that receives such a code. If such a code is to be sent, then a mobile station must be required by the 3G standard to receive it, and therefore, Claim 9 is essential.

53.     Indeed, all 3G compliant mobile devices need to be able to recover the secondary synchronization codes of the secondary SCH in downlink transmissions

from the network. The secondary synchronization codes indicate the scrambling code group of the cell specific scrambling code, or long code which is used for scrambling downlink communications in the cell, i.e. the secondary synchronization codes provide information about the cell-specific long code. The secondary synchronization codes also provide information about frame boundary timing since they are used to find frame synchronization. Hence, all 3G complaint mobile devices need to include equipment for recovering the sequence of secondary synchronization codes as claimed in claim 9 of IN ´363.

54.    Dr. Kakaes also opines that the 3G standard does not require at least the following additional limitation of claim 9 of IN '363: "a de-scrambler for de-scrambling downlink dedicated channel communications (114) and common channel communications (116) by using a cell specific code (C1)."  *See* Ex. 1639 at P08425_3G. Specifically, he contends that as follows:

> Ericsson asserts that the following portion of the standard maps to the above claim limitation:
>
> **[2]**
> **Annex C (Informative):**
> **Cell search procedure**
> During the cell search, the UE searches for a cell and determines the downlink scrambling code and frame synchronisation of that cell. [...]
>
> *See* ERIC_TCL00191446 at 2.  But nothing about this portion of the standard discloses a de-scrambler for de-scrambling a downlink dedicated channel communications and common channel communications.  Furthermore, even if it does (and it does not), Annex C is merely an "Informative" portion of the standard, i.e., not required, and therefore, cannot serve as the basis of an standard-essential patent claim.

*See* Ex. 1639 at P08425_3G. I disagree. As shown below, the standard specifies that certain downlink communications are "always" scrambled using cell-specific codes.

> ## 5.2.2    Scrambling code
>
>         . . .
>
> Each cell is allocated one and only one primary scrambling code. The primary CCPCH, primary CPICH, PICH, AICH, AP-AICH, CD/CA-ICH, CSICH and S-CCPCH carrying PCH are always transmitted using the primary scrambling code. The other downlink physical channels can be transmitted with either the primary scrambling code or a secondary scrambling code from the set associated with the primary scrambling code of the cell.

1    *See* Ex. 1608 (3GPP TS 25.211 V6.0.0 (2003-12)) at § 5.2.2.

2        55.    Thus, all 3G compliant mobile devices must be capable of descrambling

3    downlink communications, including dedicated and common channel

4    communications, scrambled by the primary scramble code of a cell, which is a cell

5    specific code as set forth in TS 25.213. In fact, all 3G compliant mobile devices need

6    to be able to recover the secondary synchronization codes of the secondary SCH in

7    downlink transmissions from the network. The secondary synchronization codes

8    indicate the scrambling code group of the cell specific scrambling code. The

9    secondary synchronization codes also provide information about frame boundary

10   timing since they are used to find frame synchronization. Hence, all 3G complaint

11   mobile devices need to include equipment for receiving the sequence of secondary

12   synchronization codes as claimed in claim 9 of IN '363.

13       56.    Dr. Kakaes also contends that because this "scrambling" procedure is

14   reflected in Annex C (which is labeled as an "informative" portion of the standard),

15   that this claim is not essential. As a threshold matter, I disagree, because it is my

16   understanding that all 3G-compliant cellular telephones are capable of descrambling

17   the scrambled downlink codes transmitted from a base station, and Dr. Kakaes has

18   provided no evidence to the contrary. Further, the ETSI IPR Policy makes clear that

19   the definition of "ESSENTIAL" applies to any patent claim where it is not possible on

20   technical grounds, taking into account normal technical practice and the state of the art

21   generally to use or operate equipment complying with a STANDARD. In full, the

22   ETSI's IPR policy states:

23       "ESSENTIAL" as applied to IPR means that it is **not possible on**

24       **technical** (but not commercial) **grounds**, taking into account normal

25       technical practice and the state of the art generally available at the time of

26       standardization, **to** make, sell, lease, otherwise dispose of, repair, **use or**

27       **operate EQUIPMENT** or METHODS **which comply with a**

28       **STANDARD without infringing that IPR**. For the avoidance of doubt

1   in exceptional cases where a STANDARD can only be implemented by

2   technical solutions, all of which are infringements of IPRs, all such IPRs

3   shall be considered ESSENTIAL.

4   *See* Ex. 223 (ETSI IPR Policy). The definition of "STANDARD" in the ETSI IPR

5   Policy applies to "any standard adopted by ETSI ***including options therein*** or

6   amended versions…"  In full, the definition recites:

7
8   11   "STANDARD" shall mean any standard adopted by ETSI including options therein or amended
        versions and shall include European Standards (ENs), ETSI Standards (ESs), Common
        Technical Regulations (CTRs) which are taken from ENs and including drafts of any of the
9       foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts
        of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not
10      including any standards, or parts thereof, not made by ETSI.

11      The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this
        POLICY shall be the date on which the technical content of that STANDARD was available to all
12      MEMBERS.

13  *Id.* Thus, even if the functionality is found in an optional annex, this does not change

14  the fact that it is essential.

15      57.    Lastly, Dr. Kakaes opines that that the 3G standard does not require at

16  least the following additional limitation of claim 9 of IN '363:

17  The essentiality rank for Claim 9 is also 3 because practicing the 3G standard with user
18  equipment does not require at least the following limitations of the claim under any
    reasonable interpretation:
19
20  a block channel equipment for recovering from the received
    frame a sequence of secondary synchronization codes
21  ($C_{s/ICi,jl}$) contained in each repeating frame of said
22  downlink transmission, said sequence of secondary
23  synchronization codes providing information about said cell-
24  specific long code and information about a frame boundary
25  timing of said repeating frame.

26

27  *See* Ex. 1639 at P08425_3G. Dr. Kakaes argues that the 3G standard does not meet

28  this limitation because it does not disclose "block channel equipment."  *Id*. I disagree.

1    Critically, Dr. Kakaes does not argue that the 3G standard does not require recovering

2    from the received frame a sequence of secondary synchronization codes in accordance

3    with claim 9. Therefore, any implementation of the 3G standard in a UE would require

4    channel equipment capable of recovering a sequence of secondary synchronization

5    codes as described in claim 9.

6         58.    Accordingly, Dr. Kakaes' analysis is incorrect, and Claim 9 of IN '363 is

7    essential to the 3G standard.

8                       **b)    P08430 (US 6,185,244, IN 222,422).**

9         59.    Ericsson's patent family P08430 includes at least one 3G standard

10   essential patent family member. The inventions claimed in P08430 pertain to

11   obtaining synchronization codes for the base station, and more specifically, how,

12   within a dual-synchronization code concept, a mobile device decodes the frame-

13   synchronization and scrambling code information with maximum efficiency. As

14   explained above, before a mobile device can communicate with a given base station, it

15   must obtain synchronization with the base station, and obtain the cell-specific

16   scrambling code used by the base station to scramble all of its communications.

17        60.    Dr. Kakaes opines that Claim 8 of US '244 is not essential to practicing

18   the 3G standard with user equipment. In full, claim 8 recites:

19
20
21
22
23
24
25
26
27
28

> **8.** A method for a mobile station to decode an identifying code transmitted from a base station in a CDMA cellular communications system, comprising the steps of:
> receiving a plurality of consecutive symbols comprising said identifying code;
> determining whether said received plurality of consecutive symbols comprises a valid code word; and
> if said received plurality of consecutive symbols does not comprise a valid code word, cyclically shifting said received plurality of consecutive symbols by a predetermined amount, and returning to the determining step;
> if said received plurality of consecutive symbols comprises a valid code word, outputting a number of cyclical shifts made to obtain said valid code word and a message associated with said valid code word.

*See* Ex. 1369 (US '244). Specifically, Dr. Kakaes contends as follows:

> The essentiality rank for Claim 8 is 3 because practicing the 3G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: all limitations.
>
> The only portion of the standard pointed to in Ericsson's claim chart does not require any of the limitations of Claim 8:
>
> > [3]
> > **Annex C (Informative):**
> > **Cell search procedure**
> > During the cell search, the UE searches for a cell and determines the downlink scrambling code and frame synchronisation of that cell. [...]
>
> *See* ERIC_TCL00105954.  Put another way, the above portion of the standard plainly fails to map to Claim 8.  Ericsson's attempt to explain how the cited portion of the standard maps to Claim 8 fails to bridge the gap:
>
> > *[Ericsson comment: Although this section is informative, the UE would need to perform these steps in order to establish communication with the network.*
> > *The UE needs to cyclically shift the result of consecutive secondary SCH correlations in order to find a valid code-word, and hence the frame timing.]*
>
> Ericsson's claim chart provides no evidence to support the conclusory comment that the "UE would need to perform these steps in order to establish communication with the network" and the "UE needs to cyclically shift the result of consecutive secondary SCH correlations in order to find a valid code-word, and hence the frame timing."
>
> Finally, Annex C is merely "Informative," i.e., not required, and therefore cannot support an assertion of essentiality.

*See* Ex. 1639 at P08430_3G. I disagree. First, as I explained above, merely because functionality is described in Annex C, does not render it non-essential under definition from the ETSI IPR Policy. Further, even if the cited functionality does not fall under that definition, Ericsson's claim chart makes clear that the standard requires the UE to "cyclically shift the result of consecutive secondary SCH correlations in order to find a valid code-word." This process is a necessary step to perform the frame synchronization process described in the standard, and Dr. Kakaes offers no rebuttal otherwise. Thus, claim 8 of US '244 is essential to practicing the 3G standard.

### 4.    P11538 (US 6,549,564, IN 205,722).

61.    Ericsson's patent family P11538 includes at least one 3G standard essential patent family member. The inventions claimed in this family relate to how a

mobile device modulates a signal so that it obtains attractive properties in terms of low Peak-to-Average-Power-Ratio (PAPR) and auto-correlation. As shown in the slide below, PAPR is the ratio of the peak power for a given transmission signal to the average power of the signal.



In a cellular system, a low PAPR is desirable, because it is much more efficient in terms of overall power consumption in the network. This is particularly important when transmitting certain high power signals, such as random access requests, which require a high detection probability at a base station in order to ensure rapid connections. Ericsson's inventions in P11538 relate to a modulation method that reduced the PAPR, thus providing more efficient transmission and simpler implementation of power amplification in a handset.

     62.    Dr. Kakaes argues that Claims 1 and 17 of US '564 and Claim 1 of IN '722 are not essential because practicing the 3G standard with user equipment does not require "multiplying said at least a portion of said synchronization signal by a constant complex signal to produce a second complex signal" and "multiplying said second complex signal by a sequence of real and imaginary values to produce a phase

1    rotation of said second complex signal."  In full, claim 1 of US '564 recites:

> 1. A method for modulating at least a portion of a synchronization signal in a mobile communication system, comprising the steps of:
>     multiplying said at least a portion of said synchronization signal by a constant complex signal to produce a second complex signal;
>     multiplying said second complex signal by a sequence of real and imaginary values to produce a phase rotation of said second complex signal; and
>     filtering said phase rotation of said second complex signal.

*See* Ex. 4326 (US '564).

63.    In support of his non-essentiality opinions, Dr. Kakaes opines as follows:

> Claim 1 is not essential to the standard because nothing in the standard requires two-step multiplications for the operation:
>
> $$C_{sig,s}(k) \times e^{j\left(\frac{\pi}{4} + \frac{\pi}{2}k\right)}$$
>
> One can obtain $C_{sig,s}(k)$ in multiple different non-infringing ways.  For example, in just:
>
> 1. *one* step (not the two steps as required in claim 1); and
>
> 2. two steps but in the reverse order, i.e., a first multiplication of $C_{sig,s}(k)$ by $e^{j(\pi/2k)}$ first and then a second multiplication of the resulting signal by $e^{j(\pi/4)}$.

*See* Ex. 1639 at P11538_3G.

64.    Dr. Kakaes' analysis is incorrect because he fails to take into account the doctrine of equivalents. Under United States patent law, even if one does not literally infringe, it can infringe under the doctrine of equivalents if the alleged non-infringing feature performs the same function, in the same way, to obtain the same result. That is precisely the case here, because Dr. Kakaes' non-infringement argument depends upon changing the order of variables to be multiplied. While doing so may literally change the makeup of the equation, it does not change the end result. By way of example, as shown in the figure below, the order of multiplying "a" times "b" times

"c" does not change the end result in any way.



### Dr. Kakaes essentiality analysis

Multiplying in a different order does not change the nature of the operation

$$= a * b * c$$

$$= (a * b) * c$$

$$= a * (b * c)$$

Thus, simply changing the order of the multiplication of the variables as Dr. Kakaes suggests is not a non-infringing solution due to the doctrine of equivalents. Given this, Claims 1 and 17 of US '564 and Claim 1 of IN '722 are essential to the 3G standard.

### 5.    P12947 (US 6,535,925, JP 4,703,080).

65.    Ericsson's patent family P12947 includes at least one 3G and 4G standard essential patent family member. The inventions claimed in this family relate to the compression of data packet header information. As shown below, a data stream sent between a mobile device and a base station includes a series of "packets," each of which contains "data" and a "header."



66.     The "header" of a packet contains information, such as time stamps and sequence numbers, that facilitates the routing and processing of the data packet. It does not include any of the actual data (or content) to be transmitted over the signal. Ericsson's inventions claimed in P12947 are directed to compression techniques of the data packet header. By utilizing these solutions, Ericsson's inventions reduce the size of the header and avoid the transmission of redundant header information. In doing so, Ericsson's inventions operate to improve the overall data rate for a given signal. Claim 1 of US '925 recites as follows:

> 1. A method of producing a compressed header field from an original header field, comprising:
>
> dividing a value of the original header field by a first predetermined number to obtain a remainder; and
>
> generating the compressed header field based on the obtained remainder.

*See* Ex. 4325 (US '925).

67.     Dr. Kakaes contends that Claim 1 of US '925 is not essential because practicing the 3G standard with user equipment does not require "dividing a value of the original header field by a first predetermined number to obtain a remainder; and

1  generating the compressed header field based on the obtained remainder." As shown

2  below, Dr. Kakaes argues that Ericsson's claim chart does not show any mapping for a

3  "divider" as described in U.S. '925 at Col. 5:40-45 and Fig. 3, or for "obtaining a

4  remainder" or "based on the obtained remainder."

| Essentiality Rank: 3 | The essentiality rank for Claim 1 is 3 because practicing the 3G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "dividing a value of the original header field by a first predetermined number to obtain a remainder; and generating the compressed header field based on the obtained remainder." Ericsson's claim chart for Claim 1 does not show any mapping for a "divider" as described in U.S. Patent No. 6,535,925 at Col. 5:40-45 and Fig. 3 or for "obtaining a remainder" or "based on the obtained remainder" as in Claim 1. *See* ERIC_TCL00109904. |
|---|---|

11  *See* Ex. 1639 at P12947_3G. I disagree with Dr. Kakaes. His argument is predicated

12  on there being something missing from Ericsson's claim chart, but, aside from making

13  conclusory statements, he does not explain what is incorrect about the claim chart

14  mapping itself. US '925 and Ericsson's claim chart explain that header compression is

15  achieved by sending only a number of least significant bits (LSB) of the header field

16  instead of the full header field value. As described in US '925, the header field value

17  modulo X is the remainder that results from dividing the header field value by X.

> compression/decompression technologies. In inventive
> header compressor/decompressor embodiments illustrated
> in FIGS. 10–14, header compression is achieved by sending,
> instead of the full header field value, only the header field
> value modulo X. The header field value modulo X is the
> remainder that results from dividing the header field value
> by X. If X=16, for example, then the four least significant
> bits of the header field represent the aforementioned
> remainder, and thus directly constitute the header field value
> modulo X. Clearly, whenever X is a power of 2, the

24  *See* Ex. 4325 (US '925) at 10:11-20. If X=16, for example, the four least significant

25  bits of the header field represent the remainder. This corresponds to Section 4.5.1 of

26  IETF RFC 3095, as cited in Ericsson's claim chart, which discusses using the

27  remainder to derive the original value of the header field. For example, assuming

28  $X=2^k$ is the first predetermined number, then the k least significant bits to be

1   transmitted correspond to the remainder that is achieved by means of the division

2   operation described in the patent specification and in claim 1. The relevant portion of

3   the standard is excerpted in Ericsson's claim chart, cited in the exhibit below:

> **4. Header compression framework**
> **4.5. Encoding methods**
> **4.5.1. Least Significant Bits (LSB) encoding**
> Least Significant Bits (LSB) encoding is used for header fields whose values are usually subject to small changes. With LSB encoding, the k least significant bits of the field value are transmitted instead of the original field value, where k is a positive integer. After receiving k bits, the decompressor derives the original value using a previously received value as reference (v_ref).

8   *See* Ex. 4315 (ERIC_TCL00193908). Thus, at least claim 1 of US '925 is essential to

9   the 3G standard.

10        68.     Dr. Kakaes also opines that claim 1 of US '925 is not essential to the 4G

11   standard. In support of his essentiality opinions, Dr. Kakaes opines as follows:

| Essentiality Rank: 3 | The essentiality rank for Claim 1 is 3 because practicing the 4G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "dividing a value of the original header field by a first predetermined number to obtain a remainder; and generating the compressed header field based on the obtained remainder." |
|---|---|
| | Ericsson's claim chart for Claim 1 does not show any mapping for a "divider" as described in U.S. Patent No. 6,535,925 at Col. 5:40-45 and Fig. 3 or for "obtaining a remainder" or "based on the obtained remainder" as in Claim 1.  *See* ERIC_TCL00192084-85. |

18   *See* Ex. 1639 at P12947_4G. Dr. Kakaes' arguments with regard to 4G mirror his

19   complaints with regard to 3G—namely that the standard does not expressly show a

20   dividing operation. I disagree. As explained in Ericsson's claim chart, the standard

21   specifies the use of Least Significant Bit coding, which are derived from the

22   remainder of a dividing operation. Thus, claim 1 of US '925 is essential to the 4G

23   standard.

24        **6.     P23016 (US 8,176,376) and P27363 (US 7,924,754).**

25        69.     The next patent families I will discuss are P23016 and P27363. I will

26   discuss these patent families together, because they each relate to improvements

27   associated with the use of error-correction codes used by a mobile device when

28   sending ARQ (Automatic Repeat Request) feedback. ARQ is a handshake mechanism

used to avoid errors in data transmission that would require data retransmission.

a)      **P23016 (US 8,176,376).**

70.      Ericsson's patent family P23016 includes at least one 3G standard essential patent family member. The inventions claimed in P23016 relate to error-correction codes used by the mobile device when sending ARQ feedback. When MIMO is used, the codes allow for a very high degree of error correction capability while maintaining a limited number of bits used for sending the ARQ feedback. Advantages include efficient MIMO transmission, with less overhead and higher throughput for the user. The inventions claimed in P23016 provide error protection for ARQ feedback indicating what has been successfully or unsuccessfully received. In full, claim 1 of US '376 recites:

> 1. An error protection method for use in a multiple input multiple output (MIMO) radio communications system, comprising:
>    receiving two or more MIMO data streams transmitted over a radio interface, each MIMO data stream containing data units;
>    generating an automatic repeat request (ARQ) message for one or more data units received for each MIMO data stream; and
>    coding the ARQ message using a code word from a non-linear code set.

*See* Ex. 4330 (US '376).

71.      Dr. Kakaes opines that Claim 1 of US '376 is not essential to the 3G standard because Ericsson has not properly construed "code set" and has not pointed to anything that would meet this limitation in its mapping. The explanation for his opinion is reproduced below:

1
2
3
4
5
6
7
8
9
10
11

> The essentiality rank for Claim 1 is 2 because the claim is not essential to the 3G standard. The ultimate determination would depend on whether Table 15B of the cited standard document can be viewed as a nonlinear code set. The proper construction of "code set" is "set of outputs of an encoder". Besides the plain and ordinary meaning of the term to a person of ordinary skill in the art, the patent specification supports this construction. For example, the patent states "an encoder codes the ARQ message" (See Abstract as well as Column 4:48-49 of the '376 patent).
>
> Moreover, based on my reading of Ericsson's claim chart, Ericsson applies an incorrect claim construction because Ericsson fails to point at any set that, in Ericsson's opinion, would meet the limitation of a "code set" as set forth in the claim. Instead, Ericsson notes in a comment:
>
> "The code shown in Table 15B for HARQ-ACK in response to two scheduled transport blocks is a nonlinear code since…."
>
> *See* ERIC_TCL00192545.
>
> The claim requires "a code set" and Ericsson points to nothing that would meet this limitation.

12   *See* Ex. 1639 at P23016_3G. Dr. Kakaes argues that Ericsson has not properly

13   construed "code set" but does not explain what is wrong with Ericsson's construction.

14   Regardless, I disagree that Ericsson's claim chart does not point to any examples of

15   code sets in its claim chart. As shown in the exhibit below, Ericsson's claim chart

16   cites to a hybrid ARQ acknowledgement (HARQ-ACK) message for two transport

17   blocks from 3GPP TS 25.212 that is an example of an ARQ message:

| HARQ-ACK message to be transmitted | | $W_0$ | $W_1$ | $W_2$ | $W_3$ | $W_4$ | $W_5$ | $W_6$ | $W_7$ | $W_8$ | $W_9$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HARQ-ACK in response to a single scheduled transport block | | | | | | | | | | | |
| ACK | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| NACK | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HARQ-ACK in response to two scheduled transport blocks | | | | | | | | | | | |
| Response to primary transport block | Response to secondary transport block | | | | | | | | | | |
| ACK | ACK | 1 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 0 | 1 |
| ACK | NACK | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 1 | 1 |
| NACK | ACK | 0 | 1 | 1 | 1 | 1 | 0 | 1 | 0 | 1 | 1 |
| NACK | NACK | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| PRE/POST indication | | | | | | | | | | | |
| PRE | | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| POST | | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |

*[Ericsson comment: The hybrid ARQ acknowledgement (HARQ-ACK) message is an example of a ARQ message. The hybrid ARQ message can respond to two scheduled transport blocks, one from each MIMO data stream. The code shown in Table 15B for HARQ-ACK in response to two scheduled transport blocks is a nonlinear code since any linear combination of codewords thereof does not result in a codeword – any linear combination of the above codewords for ACK/ACK, ACK/NACK, NACK/ACK and NACK/NACK does not result in any one of these codewords.]*

*See* Ex. 4307 (ERIC_TCL00192544).

72.     The relevant portion of the table above is also featured in the '376 patent as Table 3. As shown in both the standard and in the '376 Patent, the HARQ-ACK messages or codes used is response to two scheduled transport blocks, correspond to the "code set" as recited in the patent claim. The above referenced codes for HARQ-ACK in response to two scheduled transport blocks are nonlinear codes as recited in the claim, because linear combination of the above code words for ACK/ACK, ACK/NACK, NACK/ACK and NACK/NACK does not result in any one of these expected HARQ-ACK code words).

73.     Thus, Claim 1 of US '376 is essential to the 3G standard.

### b)     P27363 (US 7,924,754).

74.     Ericsson's patent family P27363 includes at least one 3G standard essential patent family member. The inventions claimed in P27363 relate to error correction coding used by the mobile device when sending acknowledgement feedback to the base station. Advantages include backwards compatibility and highly efficient joint encoding of acknowledgement information for both carriers. Claim 1 of US '754 recites:

> 1. A method in a remote terminal for acknowledgment uplink signaling in a multiple-carrier mode, the method comprising the steps of:
>
> determining a code word that jointly encodes acknowledgment signaling for at least two carriers from a multiple carrier codebook that is stored in at least one memory of the remote terminal; the multiple carrier codebook including at least eight code words that are defined to have a single carrier codebook as a sub-codebook of the multiple carrier codebook, each code word of the eight code words having a length of ten; the multiple carrier codebook achieving a minimum Hamming distance of four among the at least eight code words; and,
>
> transmitting from the remote terminal to a wireless network node an uplink signaling message that includes the determined code word.

1   *See* Ex. 4328 (US '754).

2   　　　75.　Dr. Kakaes opines that claim 1 of US '754 is not essential to "practicing

3   the [3]G standard with user equipment" because "determining a code word that jointly

4   encodes acknowledgment signaling for at least two carriers from a multiple carrier

5   codebook that is stored in at least one memory of the remote terminal" is not required.

6   *See* Ex. 1639 at P27363_3G. Specifically, Dr. Kakaes opines as follows:

7
8   > The essentiality rank for Claim 1 is 3 because practicing the 4G standard with user
    > equipment does not require at least the following limitations of the claim under any
    > reasonable interpretation: "determining a code word that jointly encodes
9   > acknowledgment signaling for at least two carriers from a multiple carrier codebook that
    > is stored in at least one memory of the remote terminal."
10
    > In particular, the standard does not require that any codebook be stored in any memory
11  > of the user equipment.  This is implementation-specific and it can be implemented in a
    > number of different ways, "storing in any memory of the user equipment" being one of
12  > them but not an essential one.  For example, a non-infringing implementation would be
    > to use logical operations, coded in either software or hardware, as shown by the
    > example pseudo code below:
13

14   *Id.*

15   　　　76.　I disagree. As a threshold matter, the claim language requires "memory,"

16   but says nothing about the use of software versus hardware. Dr. Kakaes fails to

17   evaluate whether or not his proposed non-infringing implementation of the code book

18   in hardware, thereby storing it in unchangeable memory, is the same as or functionally

19   equivalent to storing as "software" in memory as he characterizes the claim. Even if

20   storing the code in "software" is not literally the same as doing so in "memory," under

21   the doctrine of equivalents, TCL still infringes so long as the product feature is

22   equivalent to the claimed feature. In this case, implementing the storage as outlined in

23   Dr. Kakaes' proposed pseudo-code in hardware, would perform the same function, in

24   the same way, to obtain the same result as doing so in software. To not consider such

25   a doctrine when considering essentiality is legal error. In addition, he has not analyzed

26   whether TCL's products actually implement the codebook as claimed in Ericsson's

27   patent or as described in Dr. Kakaes' alleged non-infringing alternatives (to the extent

28   they are non-infringing). Indeed, it is my opinion that implementing the code book in

1  hardware is functionally equivalent to storing it in "memory" as required by the

2  claims.

3       77.  Further, even if somehow storing the codebook in hardware is not

4  equivalent to storing it in read/writable memory, I disagree that it would be most

5  convenient and cost effective to implement this in hardware. As explained in

6  Ericsson's claim chart, Table 15C.1 of 3GPP gives the jointly encoded

7  acknowledgement message depending on the status of carrier 1 (serving HS-DSCH

8  cell) and carrier 2 (secondary serving HS-DSCH cell). *See* Ex. 4310

9  (ERIC_TCL00193437). Thus, this table defines a multiple carrier codebook for jointly

10  encoding acknowledgment signaling for two carriers. This multi carrier codebook

11  needs to be stored in memory of the mobile device in order for the mobile device to

12  know how to encode the jointly encoded acknowledgement messages. Doing so in

13  software as opposed to in dedicated hardware provides a more flexible and adaptable

14  mobile device architecture. Finally, I have not seen any evidence that TCL's products

15  implement the multi carrier codebook in hardware. Thus, Claim 1 of US '754 is

16  essential to the 3G standard.

17       **7.  P38458 (US 9,100,069).**

18       78.  Ericsson's patent family P38458 includes at least one 3G standard

19  essential patent family member. The inventions claimed in P38458 relate to the use of

20  a rotationally symmetric puncturing pattern in the encoding process of control

21  information. Puncturing removes excess bits from the transmitted signal so that the bit

22  rate matches the physical channel bit rate. Different bits can be punctured, depending

23  on the puncturing pattern, but it is important to choose the "right" bits to remove to

24  minimize the negative effect on the robustness of the signal. Using a rotational

25  symmetric puncturing pattern results in optimal performance of the puncturing scheme

26  for an even number of bits. In full, claim 1 of US '069 recites:

27

28

> 1. A method for encoding control information generated by a user equipment, UE, the control information comprising a first bit sequence, a second bit sequence, and a third bit sequence, the method comprising:
>
> arranging said bit sequences to produce a bit sequence X1;
>
> padding the bit sequence X1 with a bit sequence P1 to produce a bit sequence XI';
>
> convolution encoding the bit sequence XI' to produce an encoded bit sequence Z1; and
>
> puncturing the bit sequence Z1 using a predefined puncturing pattern to produce a bit sequence R1, wherein
>
> the predefined puncturing pattern is a rotationally symmetric puncturing pattern, wherein for each bit n included in the puncturing pattern there exists another bit n' that is also included in the puncturing pattern, wherein n'=N+ 1−n, where N is the bit length of Z1.

*See* Ex. 1381 (US '069).

79.   Dr. Kakaes opines that Claim 1 of US '069 is not essential because practicing the 3G standard with user equipment does not require "padding the bit sequence X1 with a bit sequence P1 to produce a bits sequence X1'" and "convolution encoding the bit sequence X1' to produce an encoded bit sequence Z1" and "puncturing the bit sequence Z1 using a predefined puncturing pattern to produce a bit sequence R1" and "wherein for each bit n included in the puncturing pattern there exists another bit n' that is also included in the puncturing pattern, wherein n'=N + 1 - n, where N is the bit length of Z1."  According to Dr. Kakaes, whether the claim is essential depends on whether or not it is "possible on technical grounds" to operate a device that complies with the standard without practicing the claim"

> These portions of the standard, which Ericsson also relies upon in its contention that the claim is essential, provide one specific way to generate the correct 40-bit output sequence from an arbitrary 14-bit input sequence.  However, as long as the correct 40-bit sequence is always generated in a device, the device would pass all the compliance tests and would comply with the standard.  Thus the essentiality turns on the question as to whether or not it is "possible on technical grounds" to operate a device that "complies with the standard" without practicing the limitations of the claim, as discussed above.

*See* Ex. 1639 at P38458_3G.

80.     I disagree. First, Dr. Kakaes argues that the mapped portion of the 3G standard can be implemented either by using the method claimed in US '069, or by a linear matrix multiplication. This ignores the fact that one of ordinary skill in the art would not have considered the matrix multiplication method to be feasible or normal technical practice when implementing the 3G standard. The rate ½ convolutional encoders used for the accused functionality, have been defined and used for encoding of other channels in WCDMA/HSPA since at least Release 4. Convolutional codes have the property that they provide low encoding complexity and still are flexible enough to allow for any length input sequence. Hence, it would be normal technical practice to reuse the same rate ½ convolutional encoder in all contexts requiring rate ½ convolutional coding.

81.     Further, Dr. Kakaes' proposed matrix multiplication operation would be far more complex and would require specific matrices of all possible sizes to be stored in order to accommodate all necessary encodings for all channels that are to be encoded. Ultimately, this would result in an unnecessary need for additional memory and processing power, which is undesirable. This is why the matrix multiplication operation is far from normal technical practice. In addition, Dr. Kakaes has not analyzed whether TCL's products actually operate as claimed in Ericsson's patent or by the alleged linear matrix multiplication. Accordingly, Dr. Kakaes' is incorrect, and at least Claim 1 of US '069 is essential to the 3G standard.

## IV.    CONCLUSION

82.     In summary, I agree with Dr. Kakaes that 12 of the 25 patent families I reviewed are standard essential. And of the remaining 11 families that are relevant to a handset analysis, I disagree with Dr. Kakaes. In my opinion, each of these 11 families includes at least one standard essential patent claim for the reasons set forth above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1    Executed January 27, 2017 in Dallas, Texas.

_____
Evelyn Chen

## V.    TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| 424 | Claim chart for claim 9 of U.S. Patent No. 6,259,724 |
| 1369 | U.S. Patent No. 6,185,244 |
| 1381 | U.S. Patent No. 9,100,069 |
| 1608 | 3GPP TS 25.211 V6.0.0 (2003-12) Technical Specification |
| 1639 | Errata Exhibit 1: Corrected Appendices to Second Supplemental Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 5/28/16 |
| 4263 | Ericsson Claim Chart for U.S. REISSUE NO. 36,079 (Internal Ref: P04787) |
| 4280 | Ericsson Claim Chart for EP-1,110,422 (Internal ref: P09715 EP1) |
| 4281 | Ericsson Claim Chart for EP 1,110,422 (Internal ref: P09715) |
| 4307 | Ericsson Claim Chart for US 8,176,376 (Internal ref: P23016) Standard |
| 4310 | Ericsson Claim Chart for US 7,924,754 (Internal ref: P27363US2) Standard |
| 4315 | Ericsson Claim Chart for US 6,535,925 (Internal ref: P12947) Standard |
| 4320 | US Patent RE 36,079 |
| 4322 | US Patent 6,163,533 |
| 4325 | US Patent 6,535,925 B1 |
| 4326 | US Patent 6,549,564 |
| 4327 | US Patent 6,597,675 B1 |
| 4328 | US Patent 7,924,754 B2 |
| 4330 | US Patent No. 8,176,376 B2 |
| 5386 | 3GPP TS 25.213 V6.0.0 (2003-12) Technichal Specification |
| 5387 | 08/31/1999 - EP Patent 1 110 422 B1 |
| 5452 | ETSI TS 125 214 V8.13.0 (2012-03) Technical Specification |

| Exhibit No. | Description |
|---|---|
| 5453 | ETSI TS 136 321 V8.9.0 (2010-07) Technical Specification |
| 5458 | Patent IN 261,363 |

1

**CERTIFICATE OF SERVICE**

2

       Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court

3

for the Central District of California, I hereby certify under penalty of perjury under

4

the laws of the United States of America that on January 27, 2017, a true copy of the

5

above document was filed through the Court's Electronic Case Filing system and

6

served by that system upon all counsel of record registered for the system and deemed

7

to have consented to electronic service in the above-captioned case.

8

9

Dated:  January 27, 2017                 **CROWELL & MORING LLP**

10

                                 */s/ John S. Gibson*

11

                                   John S. Gibson

12

                                   Attorneys for ERICSSON INC. AND

13

                                   TELEFONAKTIEBOLAGET LM ERICSSON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28