1 | CROWELL & MORING LLP
2 | John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 | 3 Park Plaza, 20th Floor, Irvine, CA  92614
Telephone:  949.263.8400  Facsimile:  949.263.8414

4 | Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA  90071
5 | Telephone:  213.443.5590  Facsimile:  213.622.2690

6 | Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC  20004
7 | Telephone:  202.624.2500  Facsimile:  202.628.5116

8 | MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
9 | 300 Crescent Court, Suite 1500, Dallas, TX  75201
Telephone:  214.978.4000  Facsimile:  214.978.4044

10 |
Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
11 | 300 W. 6th Street, Suite 1700, Austin, TX  78701
Telephone:  512.692.8700  Facsimile:  512.692.8744

12 |
Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson
13 |

14 | **UNITED STATES DISTRICT COURT**

15 | **CENTRAL DISTRICT OF CALIFORNIA**

16 | TCL COMMUNICATION
TECHNOLOGY HOLDINGS,
17 | LTD., *et al.*,

18 |   Plaintiffs/Counterclaim-Defendants,

19 |       v.

20 | TELEFONAKTIEBOLAGET LM
ERICSSON, *et al.*,
21 |

22 |   Defendants/Counterclaim-Plaintiffs.

23 | ERICSSON INC., *et al.*,

24 |   Plaintiffs/Counterclaim-Defendants,

25 |       v.

26 | TCL COMMUNICATION
TECHNOLOGY HOLDINGS,
27 | LTD., *et al.*,

28 |   Defendants/Counterclaim-Plaintiffs.

Case No. 8:14-CV-00341 JVS-DFMx
Case No. 2:15-CV-02370 JVS-DFMx

**CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO**

Hon. James V. Selna

**Discovery Cut-off:**  May 23, 2016

**Pretrial Conference:**  February 1, 2017 at 10:00 a.m.

**Trial:**  February 14, 2017 at 8:30 a.m.

# **TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ................................................................. 1

II.     BACKGROUND ............................................................................. 4

III.    QUANTITATIVE METRICS, STANDING ALONE, ARE
        INSUFFICIENT FOR VALUING THE RELATIVE STRENGTH OF
        ESSENTIAL PATENT PORTFOLIOS ............................................. 9

        A.      Counting ETSI Declarations is a Poor, Unreliable Metric. ........... 10

        B.      Essentiality Studies Are Also Generally Unreliable. .................. 12

        C.      Contribution Counting is a More Reliable Metric of Relative
                Patent Portfolio Strength. .................................................... 15

IV.     ERICSSON'S 2G, 3G, AND 4G LICENSE AGREEMENTS ARE THE
        BEST WAY TO MEASURE A REASONABLE ROYALTY FOR A
        LICENSE TO THOSE PATENT PORTFOLIOS .............................. 17

V.      THE LG PATENTS THAT WERE PART OF THE CONSIDERATION
        IN THE ERICSSON-LG LICENSE PROVIDED VALUE TO
        ERICSSON ...................................................................................... 23

VI.     CONCLUSION ............................................................................... 34

TABLE OF EXHIBITS ............................................................................ 36

# I.   EXECUTIVE SUMMARY

1.      My name is Patricio Delgado. I am currently the director of the 5G program within Ericsson's IPR (Intellectual Property Rights) & Licensing group. I am responsible for working with Ericsson's researchers and engineers as they develop the newest 5G cellular technology to ensure that Ericsson's cutting-edge technical solutions are adequately protected through intellectual property rights. I have had several years of experience working with Ericsson's patent portfolios, focusing on patent analysis and portfolio valuation. I have been involved in the development of patents and patent portfolios, in the pricing of patent portfolios, in the licensing of patent portfolios, in patent sales and acquisitions, and in patent litigation.

2.      I have been asked to provide testimony in this opening witness statement regarding Ericsson's 2G, 3G, and 4G essential patent portfolios, and my belief that Ericsson's license agreements over its 2G, 3G, and 4G essential patents are the best indicator of reasonable value for a license to Ericsson's essential patents. I have also been asked to provide testimony regarding one of those license agreements between Ericsson and LG in 2014 in which, as part of the consideration, Ericsson acquired certain rights over several valuable LG patents. I also anticipate submitting rebuttal witness testimony responding to the analyses performed by, and opinions of, TCL's witnesses Drs. Kakaes and Jayant regarding the technical value of Ericsson's patents.

3.      As I will explain in detail below, in my experience in patent portfolio pricing and licensing discussions, there is frequent deliberation over the proper pricing of standard-essential patent portfolios. In the absence of existing license agreements, according to a top-down approach advocated by several industry participants including Ericsson, companies owning standard-essential patent portfolios should, in the aggregate, receive a reasonable aggregate royalty for licenses to their portfolios. Each portfolio owner should, in turn, receive a proportional share of that aggregate royalty. The pricing and licensing discussions then revolve around what a reasonable aggregate royalty should be for standard-essential patents, and what each company's

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

proportional share is. These discussions also take market conditions into account and other factors, such as appropriate caps and floors on the pricing. These types of exchanges were prevalent, for example, in licensing discussions over Ericsson's 4G patent portfolio when that technology was first commercialized, before Ericsson had signed a significant number of 4G license agreements. Once Ericsson had signed a significant number of 4G license agreements, those agreements became the benchmark for a reasonable value for a license to Ericsson's 4G patent portfolio.

4.      Regarding the evaluation of each company's proportional share of a reasonable aggregate royalty, a number of quantitative metrics have been used, but none is perfect. These metrics include comparisons of how much each company contributed to the technological development of the standard ("contribution counting"), comparisons of how many patents each company has declared to the standards body as possibly being essential ("declaration counting"), and comparisons of how many patents each company has that are actually essential to a standard based on essentiality studies ("essentiality studies").

5.      Each of these metrics has drawbacks. For example, although contribution counting is an objective measure of the contributions a particular company has made to the standard, it only has an indirect relationship to a company's patents, and relies on an assumption that all companies patent their inventive technical contributions in a similar manner. And while declaration counting and essentiality studies start with the patents themselves, they tend to provide misleading results. For example, a company's declarations of patents or patent applications that may be, or may become, essential are self-policed, meaning that neither the standards body (ETSI) nor any other objective third party determines whether the declared patent may actually be or become essential, much less that the declared patent is truly essential. Essentiality studies try to remedy this problem, but they tend to rely on flawed methodologies, sometimes biased in favor of the company funding the study. Third-party essentiality studies thus vary widely in quality, and produce widely varying results, making them

1  generally unreliable and not reproducible.

2        6.    In my opinion, once license agreements are signed over standard-

3  essential patent portfolios, as is the case here, the best approach to determining a

4  reasonable value for a license to those portfolios is by examining those agreements,

5  rather than by trying to recreate the top-down approach discussed above, or generate

6  some other approach for that matter. Ericsson's licenses are the result of many

7  hundreds of hours of analysis work by highly motivated and experienced legal,

8  technical, and licensing experts, who take into account essentiality, validity, and

9  numerous other legal, technical, and royalty-related arguments, as well as the effect of

10  the royalty on their respective businesses (as technology creators or technology

11  vendors). For example, Ericsson's executed licenses are the end result of a process

12  that spans many months, and sometimes years.

13        7.    In my experience, the process has begun with technical discussions

14  where, at the prospective licensee's request, Ericsson presents claim charts to the

15  prospective licensee showing how a representative sample of Ericsson's patents are

16  essential to the standard. Experienced engineers, lawyers, and licensing executives of

17  the industry, including former delegates to 3GPP, have been at these meetings and

18  they, in turn, analyze Ericsson's claim charts and pricing. They will often take weeks

19  or months to review Ericsson's claim charts and provide their arguments regarding

20  essentiality/non-essentiality, validity/invalidity, use/non-use, and so on. The

21  prospective licensee's arguments are usually presented in person, and Ericsson will

22  consider these arguments and provide its own responses.

23        8.    Ericsson and prospective licensees will discuss and analyze the same

24  issues discussed in this case: essentiality, validity, use, claim construction, smallest

25  saleable patent practicing unit, licensing histories, metrics of relative essential patent

26  portfolio strength, royalty base, royalty rate, and so on. Of course, in a license

27  negotiation there is no ultimate adjudication of these separate issues. However, all of

28  this information is taken into account as negotiations enter the next phase: the

discussion of license terms. The executed license therefore reflects the strength of all of the views related to essentiality, validity, use, claim construction, and other issues without having to adjudicate them individually for each and every one of Ericsson's 200+ essential patents. Because of this process, which involves hundreds of hours of analysis of Ericsson's patents and related licensing issues, by highly-motivated and experienced legal, technical, and licensing experts, I believe the executed licenses are the best measure of a reasonable value for a license to Ericsson's patent portfolios. It is also a value that supports a healthy ecosystem, because those developing the technology and those commercializing it have approved the royalty as being merited and sustainable.

9.     With regard to one of those license agreements between Ericsson and LG in 2014, Ericsson acquired, as part of the consideration received, certain rights over several valuable LG patents. I oversaw the analysis and decision of which LG patents Ericsson selected as part of that cross-license. LG later transferred some of those patents to Ericsson, and others of those patents, at Ericsson's request under the terms of the Ericsson-LG agreement, to a third party for licensing under a revenue share agreement with Ericsson. The team I directed in the analysis of LG's patents included experienced technical experts and patent law experts within Ericsson as well as technical experts from third party technical consultant Parsa Wireless. In my role overseeing that project, I concluded and communicated to Ericsson's IPR & Licensing management that the LG patents provided valuable consideration to Ericsson as part of the cross license.

## II.     BACKGROUND

10.     Prior to joining Ericsson, I earned a Bachelor of Science degree in mechanical engineering from Stanford University. At Stanford, I took courses in electrical engineering, computer science, and mathematics, and many of my degree courses required competence in those areas. My coursework covered, among other things, differential calculus of several variables, ordinary differential equations with

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

linear algebra, matrix theory, statistics, dynamic and control system design, the modeling and design of electromechanical systems, digital and analog electronic circuits and design, sensors and sensor circuit design, and computer programming methodology. My lab and project work, as a student and as a teaching assistant for two graduate-level engineering courses, covered, among other things, digital and analog circuits and circuit design, processing and analysis of analog and digital signals, sensors and their applications in different electronic systems, and computer programming in the C and Matlab languages. Based on my academic performance, I was admitted to the Phi Beta Kappa and Tau Beta Pi Engineering honor societies, and graduated from Stanford with distinction.

11.     I then pursued and obtained my J.D. with honors from Harvard Law School. At Harvard, I took multiple intellectual-property-related courses, including patent law, advanced patent law, international law, property law, contract law, and antitrust law, some of which addressed domestic and foreign intellectual property law issues. For example, my advanced course on the law and business of patents examined the theory, business, and practice of patents, such as aspects of cross-licensing, strategic use of litigation, patent pools, standard setting organizations, the role of patents in specific industries (*e.g.*, semiconductors and software), and international harmonization and the changing role of the TRIPS agreement, among other things. We analyzed business school case studies, legal case studies, and empirical and theoretical economics around patents. After graduation, I took and passed the Texas bar examination, and after two years of practice, the United States Patent Office patent bar examination.

12.     From 2005 to 2010, I worked as a patent lawyer at the international law firm of Baker Botts L.L.P. in Dallas, Texas. During that time, I represented Ericsson and other telecommunications companies in patent lawsuits. These cases spanned a large number of technologies, including intelligent networking in a 2G/3G cellular communication network to process prepaid wireless calls, routing text messages over

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

a 2G/3G cellular and IP-based backbone network, sending commands via text messages over a 2G/3G cellular communication network, emailing over a 2G/3G cellular and fixed communication network, routing packets and other datagrams over local and backbone fiber-based networks, communicating real-time media over a packet-switched 2G/3G cellular network, activating cards at the point of sale over a communication network, and switching data between different types of communication networks. In connection with these cases, I analyzed and wrote a number of briefs on a variety of patent law issues, including claim construction, patent noninfringement, validity, enforceability, and damages. I also drafted, reviewed, and/or analyzed claim charts for infringement and invalidity contentions. I also obtained patent-prosecution experience, writing approximately thirty patents, almost all of which related to telecommunications. During this same time period, I also published two scholarly articles on patent law issues, including willful infringement and product marking, and wrote a position paper for the American Bar Association on the patentability of inventions under 35 USC §101.

13. In 2010, I left Baker Botts for Ericsson, and became licensing counsel in its patent licensing group. At Ericsson, I have accumulated over six years of experience working with the company's patent portfolios, focusing in particular on patent analysis and patent portfolio valuation in the context of patent licensing. I have been involved in the development and licensing of Ericsson's 2G, 3G, 4G, and user equipment (UE) implementation patents and patent portfolios, and have been part of Ericsson's patent portfolio pricing team since 2012.

14. For example, my first assignment in 2010 was, as part of a team of Ericsson engineers, lawyers, and licensing professionals, to present Ericsson's 2G/3G user equipment or "UE" patent portfolio in cross-licensing discussions with Samsung, to scrutinize and respond to Samsung's analysis of Ericsson's patent portfolio, and to analyze and provide responses to Samsung regarding Samsung's 2G/3G base station or "BS" patent portfolio. Similarly, in numerous technical licensing discussions with

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

1    other telecommunications companies over the last few years, as part of my role, I have

2    presented Ericsson's 2G, 3G, and 4G patent portfolios, exchanged Ericsson's 2G, 3G,

3    and 4G claim charts, received and analyzed responses to Ericsson's charted patents,

4    and provided responses to those other companies. I have directly participated in and

5    managed technical licensing discussions over Ericsson's 2G, 3G, and/or 4G patent

6    portfolios with Samsung, Pantech, Huawei, Apple, Amazon, Sharp, Kyocera, and

7    Fujitsu. I have also directly participated in and managed technical licensing

8    discussions with Amazon and Microsoft over Ericsson's UE implementation patent

9    portfolio.

10          15.    In connection with the technical licensing discussions over Ericsson's

11   standard-essential patent portfolios, and my position on Ericsson's patent portfolio

12   pricing team, I have studied, analyzed, presented, explained, and debated with

13   representatives of other companies various patent portfolio landscapes, patent

14   portfolio strength metrics for standard-essential patent portfolios, and pricing

15   methodologies for standard-essential patent portfolios, including the ones I describe in

16   my testimony below. As part of this and other responsibilities at Ericsson, I have

17   studied ETSI declaration-counting analyses, and thus studied ETSI declarations and

18   the ETSI IPR Policy; several essentiality studies performed by third parties of those

19   declared patents, which I describe in more detail below; and studies of 3GPP

20   contributions in connection with measuring relative patent portfolio strength for

21   standard essential patents, which I also describe below. At Ericsson, I have also

22   participated in making ETSI declarations, participated as Ericsson's representative to

23   India's TSDSI IPR Policy working group to form that Policy in view of the ETSI IPR

24   Policy, and commissioned a study of 3GPP contributions.

25          16.    As part of my day-to-day job, I have also studied extensively the 2G, 3G,

26   4G, and UE technology that relates to Ericsson's patent claim charts, learning about

27   the technology through frequent interaction with inventors, 3GPP delegates, and

28   researchers at Ericsson, and reading technology tutorials to supplement my

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

knowledge. Moreover, for two years, I was part of the 2G/3G focus portfolio team, which manages Ericsson's 2G/3G patent portfolio, and I thus had a responsibility for understanding Ericsson's 2G/3G patent portfolio as a whole. I have also participated in the development of Ericsson's 4G patent portfolio, editing dozens of 4G patent application claim sets and providing numerous reviews of Ericsson's 4G patent claim charts. In addition, I co-managed Ericsson's UE implementation patent portfolio from 2011-2013, creating and editing claim charts to include in that portfolio, and through today continue to participate on the internal Ericsson team responsible for that portfolio. In that role, I have worked with Ericsson inventors, engineers, and reverse engineering companies to analyze Ericsson's UE implementation patents and infringing handsets, and to further develop the UE implementation patent portfolio. I have also worked with Ericsson inventors, engineers, and reverse engineering companies to assess the UE implementation patent portfolios of other companies, such as ST-Ericsson, Sony-Ericsson, and Nortel, as part of potential patent acquisitions.

17.   Most technical licensing discussions lead to business discussions and executing a license agreement. When Ericsson has been forced to defend its patent rights in litigation, I have often been asked to participate in the preparation and management of that process. I have been involved in preparing for and managing Ericsson's litigations with Samsung and Apple, both those in the U.S. and in other countries. I have also been involved in preparing for and managing other Ericsson litigations involving Micromax, Gionee, Intex, Xiaomi, Lava, and iBall in India, and headed Ericsson's emerging market licensing team from 2013-2016, which coordinates patent licensing and patent assertions in emerging markets. The litigations with Apple, Samsung, and iBall have since concluded, and all three companies have executed patent licenses with Ericsson.

18.   In 2016, I became director of Ericsson's 5G program within the IPR & Licensing group. I am responsible for working with Ericsson's researchers and engineers as they develop the newest 5G technology to ensure that Ericsson's cutting-

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

edge technical solutions are adequately protected by patent rights. In my role, I have participated in the development and analysis of dozens of Ericsson's 4G Evolution and 5G New Radio patent applications, and have studied patent portfolio landscapes and metrics in the cellular industry further, attending, for example, 3GPP meetings in August 2016 in Gothenburg, Sweden to study 3GPP-related interactions firsthand.

19.     In my career, I have personally reviewed more than 400 claim charts for patents relevant to the 2G, 3G, and 4G standards, and more than 100 claim charts for patents relevant to UE non-standardized technology. Additionally, I have reviewed over 1000 telecommunications patents and spent over 10,000 hours performing patent analysis and portfolio valuations of telecommunications patents. As part of my work at Ericsson, I have also analyzed patents from many jurisdictions, and have gained a working understanding of the patent laws of jurisdictions in addition to the U.S., including Europe, India, Japan, and others. As I mentioned above, I have also studied various patent portfolio landscapes and metrics. Thus, I consider myself qualified to testify to the facts and opinions set forth below.

## III.   QUANTITATIVE METRICS, STANDING ALONE, ARE INSUFFICIENT FOR VALUING THE RELATIVE STRENGTH OF ESSENTIAL PATENT PORTFOLIOS

20.     As I discussed above, there are a variety of quantitative measures of relative patent portfolio strength available to the public today, including contribution counting, declaration counting, and essentiality studies. A quantitative metric, coupled with analysis of a reasonable aggregate royalty, is sometimes helpful as a starting point when the industry moves to a new generation of the standard, or when combined with other data, such as executed licenses. However, none of these quantitative metrics is perfect, and as I discussed above, is not more reliable than analyzing existing 2G, 3G, and 4G license agreements to determine a reasonable value for a license to those portfolios.

21.     Below are my opinions regarding the reliability of the quantitative

metrics of relative portfolio strength. I begin with the declaration counting metric, which I consider to be the least reliable of the three metrics in our industry. I then discuss essentiality studies, which typically suffer from a number of methodological flaws in their analyses that make their conclusions unreliable, and are not more rigorous than the detailed technical discussions that occur as part of licensing negotiations. Finally, I discuss the contribution counting metric, which I consider to be the most reliable of the three metrics.

### A.   Counting ETSI Declarations is a Poor, Unreliable Metric.

22.    The European Telecommunications Standards Institute (ETSI) has an IPR Policy that encourages companies who participate in the development of a standard to identify patents or patent applications that "may be or may become essential" to the standard, and invites those companies to declare that they are prepared to grant licenses on fair, reasonable, and non-discriminatory (FRAND) terms for those disclosed patents that are or become, and remain essential. As discussed above, declaration counting refers to counting how many patents or patent applications each company has declared to the standards body (in this case ETSI) as possibly being essential, and then comparing those results to assess relative patent portfolio strengths among the companies.

23.    This declaration counting metric is an unreliable indicator of the relative value of an essential patent portfolio, because the ETSI IPR Policy explicitly encourages companies to declare patents that "may be or may become" essential to the standard.[1] The ETSI IPR Policy thus allows companies to identify patents that are <u>not</u> actually essential. The declaration process is also self-policed, meaning that ETSI does not verify that the declared patents actually "may be or may become" essential to the standard, much less that the declared patents are, in fact, essential. Finally, there are no negative consequences for over-declaring patents beyond those that "may be or may become" essential.

---

[1] <u>EX-223</u> (ETSI IPR Policy) p. 45.

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO; Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

24.     The result is that companies apply different views of what "may be or may become" essential. Since companies who do not contribute much to the standards have an incentive to show relevant patent strength through some metric, those in the industry know that these low-contributing companies are thus incentivized to over-declare patents to ETSI to achieve their purpose. Sometimes, even companies who contribute more to the standards are incentivized to over-declare for a variety of reasons. For example, while there are no negative consequences for over-declaring patents to ETSI, there may be negative consequences for under-declaring patents to ETSI, and companies may want to avoid that risk altogether.

25.     Ericsson has explained the unreliability of this declaration-counting metric numerous times in licensing discussions. For example, when Ericsson held technical licensing discussions with Sharp, Ericsson had declared on the order of 400-500 patent families for 4G. But Ericsson actually owned over 3,000 4G-related patent families. If Ericsson applied a less strict filter on how it declares patents to ETSI, Ericsson could have declared more of those 3,000+ additional patent families immediately. Any conclusions based on the ETSI declarations metric would then be completely different. During the cross-licensing discussions with Sharp, I discussed this point to illustrate the subjectivity and latitude surrounding declarations to ETSI, and how declaration counting is thus unreliable in assessing relative patent portfolio strength.

26.     The disadvantages of ETSI patent declaration metrics are well known in the industry and discussed frequently in technical licensing discussions. The declarations are not intended to show what is actually essential, but rather what may be or may become essential, a highly subjective standard. The declarations are also self-policed, and there are no negative consequences for over-declaring beyond what may be or may become essential. Nor do blanket assumptions that all companies routinely over-declare or are incentivized to over-declare patents render declaration analyses precise or reliable. Due to these problems, ETSI declaration metrics are

1    considered to be a very poor indicator of relative patent portfolio strength by

2    companies that participate heavily in standardization.

3    **B.    Essentiality Studies Are Also Generally Unreliable.**

4    27.    Essentiality studies are an evaluation of ETSI declarations and possibly

5    other sources to determine how many patents are actually essential to the relevant

6    standard. Typically, these studies disclose that technical personnel have compared

7    these patents to the relevant portions of the standard. The technical personnel then

8    determine whether, in their opinion, the patents cover the standard, making that patent

9    essential in their view. These essentiality studies then aggregate those results and

10   compare the aggregated results of different companies.

11   28.    In general, these studies are unreliable. First, it is typically unclear what

12   the backgrounds and experience levels are of those analyzing the patents. For

13   example, it's unclear whether these individuals have experience with the patent laws

14   of the different jurisdictions at issue in their analysis, whether they have experience

15   with the patented technology at issue, whether they have experience with the

16   standards at issue, and whether they have a strong grasp of the language of the patents

17   and of the standards on which their determinations are based. Deficiencies in any of

18   these qualities, which are typically undisclosed, can significantly skew the results. Put

19   differently, a misunderstanding of the law, of the patented technology, of the

20   standards, or of the language(s) being analyzed would lead to an unreliable

21   conclusion. As a point of comparison, in the licensing discussions that I've attended,

22   companies bring individuals of various backgrounds—experienced legal, technical,

23   and licensing experts—who disclose their expertise at the outset or during the

24   exchanges. We discuss and debate the law, the patents, the standards, and any subtle

25   points of language, allowing the parties to the negotiations to make fair assessments of

26   the essentiality of the patents at issue.

27   29.    Second, it is typically unclear what the individuals who performed the

28   essentiality studies actually analyzed when reviewing the declared patents. Limited

-12-    CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

disclosures in this regard suggest these individuals do not follow the law. For example, some essentiality studies review published patent applications instead of patents, patent abstracts instead of patent claims, or patent claims but not in the context of the full patent specification or the patent's prosecution history. These varied methodologies do not follow the law for proper patent analysis, and as such, can significantly skew the results. In contrast, even before licensing discussions, in the preparation of Ericsson's claim charts, Ericsson technical and legal experts focus on the patent claim language, and review that language in view of the patent's specification and the prosecution history. In licensing discussions, it is the patent claims that are discussed and debated by the parties, and salient points from the patent specifications and prosecution histories are discussed as well. Any misunderstandings or misapplications of the patent laws at issue are discussed and corrected in those discussions.

30.     Third, those conducting essentiality studies typically spend an hour or less studying each declared patent for essentiality, and spend no time analyzing the patent's validity. In my experience, an hour or less of essentiality analysis is far from sufficient to select a member of a patent family for analysis, read and analyze the selected patent, analyze the patent claims in detail, read and analyze the patent's prosecution history, and collect and analyze the relevant parts of the cited standards to make an essentiality determination, especially without the benefit of a claim chart. My estimate is that the parties to a licensing discussion typically spend more than 50 man-hours per standard-essential claim chart to analyze and discuss the merits of that particular claim chart in detail. This, of course, is after preparing each claim chart, which I estimate takes an average of over 50 engineering and legal man-hours per chart to generate. Studies that assess the essentiality of a patent in less than an hour, without the benefit of a claim chart, and completely disregard validity, will simply not produce reliable results for a proper assessment of relative patent portfolio strength.

31.     Fourth, there is inherent subjectivity in analyzing legal and technical

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

language, and those conducting essentiality studies are typically funded by corporate sponsors. This can produce a bias that can significantly skew the results, as well. In licensing discussions, while the parties to the negotiation certainly do employ the experts debating the technical, legal, and licensing issues, the opposing interests of the parties are accounted for when the parties ultimately arrive at the final negotiated royalty. In contrast, with essentiality studies that provide just the final results, it's unclear how to adjust those results for biases. As a result of these various flaws, essentiality studies are generally unreliable, not reproducible, and vary widely in quality and results.

32.    For example, in Ericsson's technical discussions with one prospective licensee, the prospective licensee provided a third-party essentiality study by a company called Cyber Creative Institute.[2] EX-4504 is an authentic copy of the Cyber Creative Institute study, dated June 2013. That study had a number of flaws, including (1) analyzing the essentiality of pending patent applications, which have not been approved as patents and thus are not a measure of patent strength on par with issued patents; (2) analyzing translated abstracts of patents instead of the patent claims; and (3) analyzing only Japanese patents, if they existed in a patent family, instead of patents from other countries as well, which biased the results in favor of Japanese companies who focus on getting patents in their home country of Japan. As a point of contrast, Micromax, another handset vendor, cited a different third-party essentiality study from Fairfield Resources, a study funded by Nokia.[3] EX-5299 is an authentic copy of the Fairfield Resources International study, titled "Analysis of Patents Declared as Essential to GSM as of June 6, 2007," dated December 31, 2007. Fairfield's results showed that Ericsson held 20% of all essential 2G patents. For 3G, Fairfield Resources concluded that Ericsson held 23% of all essential 3G patents.[4]

---

[2] EX-4504.
[3] EX-5299.
[4] This result is from a confidential Fairfield report from May 8, 2007. Fairfield published other publicly-accessible reports on 3G at other times, which show a percentage for Ericsson of 19-22%. *See,* e.g., EX-1043.

There is thus large variation and subjectivity to essentiality studies and their results. In order to gauge their reliability, it is critical to understand the experience of the assessors themselves, the processes that they undertook to reach their conclusions, and their biases. Generally, these studies suffer from flaws in one or more of these areas, or do not disclose this underlying information, making these studies unreliable as a measure of the relative strength of essential patent portfolios. In contrast, the technical discussions held during license discussions are performed by highly motivated and experienced experts and are much more robust, and the resulting license agreements and royalties take all of the views expressed in the technical discussions into account.

33.    TCL's Dr. Kakaes has performed an essentiality study that suffers from many of the same methodological flaws discussed above. Dr. Kakaes' more detailed study of Ericsson's claim charts also suffers from a failure to apply legal concepts correctly, incorrect assumptions of the law in foreign countries, failure to consider the doctrine of equivalents, improper claim constructions, a misunderstanding of both Ericsson's claim charts and the standard sections in question, and vague and conclusory opinions related to the importance and contribution of Ericsson's patented inventions. I will discuss these methodological errors in greater detail in my rebuttal testimony. As a result, his analysis is a poor substitute for the detailed work done in licensing discussions.

**C.    Contribution Counting is a More Reliable Metric of Relative Patent Portfolio Strength.**

34.    Contribution counting refers to counting how much companies have contributed to the technological development of the 3GPP technical specifications at issue (which then become the 2G, 3G, and 4G standards at issue), and assumes that sophisticated companies protect any patentable inventions in those contributions in a similar manner. Contribution counting is therefore an indirect measure of relative patent portfolio strength.[5] EX-410 is an authentic copy of a report by Signals Research

---

[5] EX-410 (September 2010 Signals Report); EX-1045 (May 2015 Signals Report);

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

Group, LLC, dated September 2010, EX-1045 is an authentic copy of a report by Signals Group, LLC, dated May 2015, and EX-1077 is an authentic copy of a report by Signals Research, LLC, dated November 2014. Industry analysts like Signals Research and ABI have published studies about relative patent portfolio strength based on contribution counting, and have communicated their processes, assumptions, and rationales as part of those publications. When Ericsson considers contribution counting, we filter, as much as possible at a macro level, contributions that are not technical in nature, and perform different analyses of contribution data to gain comfort that our view of our proportional share is reasonable.

35.     Critics of contribution counting argue that contributions made by companies and accepted into the relevant 3GPP technical specifications are not directly tied to patents. While this is true, it is not unreasonable to assume that companies who contribute to the standard will be rewarded with patents proportionally to how much they contribute. I have observed this correlation in licensing discussions, where companies who contribute more to the standard bring more claim charts to the negotiation, and companies who contribute less to the standard bring fewer claim charts to the negotiation. There is thus an indirect relationship between contributions and patented technology that is incorporated into the standard. Besides being correlated with patent portfolio strength, the metric is objective, based on public information, and easily reproducible.[6] I have also observed this metric being used by other industry participants to gauge relative patent portfolio strength. As a result, Ericsson and other companies use this metric as one of various inputs—in addition to assessing each party's claim charts—to arrive at a proper assessment of value for a patent portfolio.

36.     I should note that Ericsson has contributed the most technology to the development of the cellular standards, and has won numerous awards for its

---

EX-1077 (November 2014 Signals Report).
[6] Id.

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

contributions.[7] This is something that Ericsson has frequently communicated to prospective licensees, and that they have not disputed. For example, in both 2010 and 2011, Ericsson won the award for the "Best Contribution to LTE Standards" by Informa Telecoms & Media. In 2014 the European Patent Office recognized Ericsson as a leader in 4G innovation by nominating eight Ericsson inventors for the prestigious Inventor of the Year Award. More recently, in 2015, Ericsson won an award for "Biggest Contribution to 5G Development" by Informa Telecoms & Media. In 2016, Ericsson won an award for "Biggest Contribution to 5G Standards" by LTE & 5G World Awards, and "Advancing the Road to 5G – Evolution to 5G" and "Outstanding Contribution to Standards Development – Ericsson 5G Program" by Glotel.

## IV. ERICSSON'S 2G, 3G, AND 4G LICENSE AGREEMENTS ARE THE BEST WAY TO MEASURE A REASONABLE ROYALTY FOR A LICENSE TO THOSE PATENT PORTFOLIOS

37.     I believe that Ericsson's executed licenses are the best indicator of a reasonable value for a license to Ericsson's 2G, 3G, and 4G essential patent portfolios. This is because these licenses culminate from discussions involving the top telecommunication companies in the world, who bring highly motivated and experienced technical, licensing, and legal experts to evaluate Ericsson's standard-essential patents and pricing. These experts include 3GPP delegates, telecommunications researchers, product engineers, vice presidents of patent analysis, general managers for patent licensing, directors of intellectual property, and senior patent lawyers from different countries. Ericsson and its prospective licensees have spent hundreds and hundreds of man-hours evaluating each other's patents before entering into license agreements. The executed licenses that result from the substantial resources spent evaluating Ericsson's patents provide the best indicator of a reasonable value for a license to those portfolios. They show the market value that

---

[7] *Id.*

-17-

1 sophisticated industry participants in high-stakes negotiations are willing to offer and

2 accept for a license to the patented technology after spending significant time on due

3 diligence.

4     38.   I have personally been involved in many of Ericsson's license

5 negotiations, including those with Samsung, Sharp, Apple, Huawei, and Kyocera. In a

6 typical license negotiation, Ericsson provides a list of standard-essential patents

7 relevant to the prospective licensee and, if requested, provides a representative

8 sampling of claim charts relevant to the prospective licensee. Ericsson can provide to

9 the prospective licensee all of the charts that Ericsson has generated at that point in

10 time, such as the 190+ charts provided to TCL during this litigation, or can provide a

11 smaller set, if requested by the prospective licensee.

12     39.   Ericsson's claim charts are rigorously vetted before they can be provided

13 to prospective licensees during negotiations.[8] EX-4523 is an authentic copy of an

14 Ericsson internal presentation, dated February 2014 and titled "Claim Chart Process."

15 Ericsson spends, on average, more than 50 man-hours creating and analyzing each

16 claim chart, starting with its creation by Ericsson technical experts (often the inventor)

17 with the assistance of a patent professional who has managed the prosecution of the

18 patent or patent application. The chart is then reviewed by a team of additional

19 telecommunications technical experts, as well as patent and legal professionals called

20 a "focus portfolio team."[9]

21     40.   The focus portfolio team reviews the chart, the patent or patent

22 application, and the prosecution history, and then confirms that a proper

23 understanding of the technology and the law has been applied. The chart is then

24 reviewed by an experienced U.S. patent lawyer or European lawyer, depending on the

---

[8] *See* EX-4523 (Powerpoint titled "Claim Chart Process").
[9] The technical experts who create and review the charts typically have the equivalent of a bachelor's degree as well as an advanced degree in telecommunications engineering, computer science and engineering, or electrical engineering, and several years of experience as researchers in telecommunications or as product or system engineers in telecommunications, and have a working understanding of cellular transmission protocols.

charted patent's or patent application's jurisdiction, who can be in-house or external to Ericsson. This person reviews the charted claim, the patent or patent application, and the prosecution history, and provides feedback regarding the mapping of the claim to the standard. Once the chart has passed all of these review steps (and the patent issues), it may then be approved by the focus portfolio team for use during license negotiations. Approved charts are then continuously monitored and updated, as necessary, over the years by the focus portfolio team to address feedback from prospective licensees. This feedback can, for example, lead to further clarifications in the claim charts, or additional support from the 3GPP technical specifications. This feedback can also lead to pursuing corrections of claims at the relevant Patent Office, changes in claim language in continuation patent applications, or removing a claim chart from approved status in some rare cases. Charts may also be created for patent family members in other jurisdictions besides the U.S. or Europe, depending on the needs of the particular licensing discussion, with the assistance of patent law experts in those jurisdictions.

41.     After communicating its claim charts to a prospective licensee, Ericsson and the prospective licensee then schedule a series of in-person technical discussion meetings to exchange their views regarding the charted patents and overall patent portfolios. At these meetings, Ericsson and the prospective licensee bring teams of experienced technical, legal, and licensing experts. These experts ask and answer questions, discuss and debate legal, technical, and licensing related issues, and discuss and debate patent and patent portfolio valuation issues. These various issues include patent essentiality, patent use, patent validity, claim construction, the law of various jurisdictions, subtleties of language, and so on. These technical discussions are normally scheduled over the course of several months, giving both parties time to understand each other's positions and potentially discuss them further at the next meeting, or in writing. In contrast to litigation, there is no resolution regarding who has the better argument on essentiality, validity, or any of the other individual issues

that are raised. However, Ericsson and the prospective licensee account for the various positions as they enter the next stage of negotiations, which we refer to as business discussions.

42. As the parties transition to business discussions, the parties take the information they exchanged during technical negotiations and use it as they work toward the final license agreement. As business discussions begin, there are typically further exchanges about patent portfolio valuations and other license-related issues, such as what is fair, reasonable, and non-discriminatory (FRAND). Thus, as the parties work their way through the business discussions, they take into account the merit of Ericsson's standard-essential patents, of various patent portfolio valuations including different metrics, and royalty-related pricing principles and legal theories. As the parties become comfortable that these issues have been sufficiently addressed, they negotiate over the proper consideration for the license, and prepare and execute the license agreement. In some cases, Ericsson has been forced to litigate its patent rights, after attempting to negotiate a license in good faith for an extended period of time. Those litigations typically resolve in a license agreement between the parties.

43. The technical negotiations with Samsung, Sharp, and others reflect this typical technical negotiation process. For example, from October to December 2010, Ericsson and Samsung met three times for technical licensing discussions—a two-day meeting in Korea in October, a two-day meeting in Sweden in November, and a meeting in Japan in December. There, the parties considered 94 of Ericsson's standard-essential claim charts and 33+ of Samsung's claim charts. For the technical discussions, Samsung brought ten members from Samsung's patent analysis team and two members from Samsung's patent licensing team. Samsung's patent analysis team included its vice president for patent analysis, three senior licensing managers, five licensing managers, and one U.S. patent attorney. Those individuals included, for example, a Samsung engineer who had formerly worked as a channel coding researcher and inventor at Samsung for many years. Samsung's patent licensing team

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

included one director and one licensing manager. Seven people attended the first meeting for Ericsson, and additional people joined throughout the discussions, including licensing professionals, patent lawyers, and experienced telecommunications researchers and engineers, and there were several additional Ericsson engineers and experts who supported those discussions as back-office support. By the end of the licensing discussions and the consummation of the 2G/3G/4G licenses with Ericsson, Samsung had also hired dozens of U.S. patent lawyers to advise Samsung.

44.    As another example, in early 2012, Ericsson sent 56 standard-essential claim charts from its 4G patent portfolio to Sharp, and Sharp sent 5 claim charts to Ericsson. In 2013, Sharp sent 5 additional claim charts to Ericsson. Ericsson and Sharp then discussed 10 of Ericsson's claim charts and Sharp's 10 claim charts, as well as Ericsson's 4G portfolio as a whole, at three meetings in 2013—in a two-day meeting in Japan in February, in a two-day meeting in Sweden in May, and in a two-day meeting in the United States in September. Ericsson later sent 19 additional 4G claim charts to Sharp in June 2014. There were thirteen members from Sharp who attended one or more of the technical meetings with Ericsson. They included the department general manager for patent licensing, the manager for patent licensing, two supervisors for patent licensing, two licensing members, the department general manager for patent strategy, the manager for patent strategy, two assistant managers for patent strategy, and a supervisor for patent strategy. They also included two senior technical specialists, one of whom was in Sharp's research department in its communication technology laboratories, and the other of whom was in Sharp's advanced image and telecommunication laboratories. One of the senior technical specialists had previously been a 3GPP RAN1 delegate. Ten people attended one or more of the meetings for Ericsson, including licensing professionals, patent lawyers, and experienced telecommunications researchers and engineers.

45.    As yet another example, in July 2012, Ericsson sent over 180 standard-

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

essential claim charts from its 2G, 3G, and 4G User Equipment ("UE") patent portfolios to Huawei, and Huawei sent 40 charts to Ericsson. Huawei later sent an additional batch of claim charts to Ericsson in August. Ericsson and Huawei then discussed or provided written responses to all of those claim charts at three meetings in 2012—in a two-day meeting in China in August, in a two-day meeting in Sweden in September, and in a two-day meeting in China in October. Huawei brought more than nine members to meet with Ericsson, including two directors of intellectual property, its deputy director of intellectual property, a patent licensing manager, a legal counsel for intellectual property, an IPR manager from its R&D center, two systems engineers from the wireless research department, and a member from the board design engineering group. Twelve people attended one or more of the meetings for Ericsson, including licensing professionals, patent lawyers, and experienced telecommunications researchers and engineers, and several additional Ericsson engineers and experts supported those discussions as back-office support.

46.     As still another example, in April and June 2013, Ericsson sent 10 4G claim charts to Kyocera, and Kyocera sent 6 charts to Ericsson. Ericsson and Kyocera then discussed those charts, as well as Ericsson's 4G portfolio as whole, at two meetings – a one-day meeting in Japan in August 2013 and a two-day meeting in the United States in April 2014. Ericsson later sent 18 additional 4G claim charts to Kyocera in April 2014. There were eight members from Kyocera who met with Ericsson at these technical discussions, including its general manager of its intellectual property group, three managers of its intellectual property group, three members of its intellectual property group, and a member of Kyocera's mobile product research division within its corporate communication equipment R&D division. Eight individuals attended one or both of the technical discussions for Ericsson, including licensing professionals, patent lawyers, and experienced telecommunications researchers and engineers.

47.     These are but a few examples. Ericsson has had technical discussions

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

numerous times with prospective licensees over Ericsson's 2G, 3G, and 4G patent portfolios—indeed, every time a prospective licensee has requested them. These companies have considered the information learned during technical discussions when the parties negotiated over the terms of the ultimate license agreement. The license agreement therefore reflects all of the various views related to the essentiality, validity, claim construction, use, objective essentiality studies, subjective essentiality studies, and other issues raised during technical and business discussions. Thus, what these and other companies agreed to pay for a license to Ericsson's standard-essential patent portfolios shows what sophisticated industry participants truly believed was a reasonable value for a license to Ericsson's portfolios, after considering all of the technical and royalty-related arguments. What Ericsson's licensees have agreed to pay Ericsson is much more probative of a reasonable value for a license to Ericsson's patent portfolios than TCL's theoretical pricing frameworks that use flawed methodologies to reach low results.

## V.      THE LG PATENTS THAT WERE PART OF THE CONSIDERATION IN THE ERICSSON-LG LICENSE PROVIDED VALUE TO ERICSSON

48.      I have also been asked to discuss my role managing the assessment of certain LG patents that were transferred as part of the 2014 cross-license between Ericsson and LG. In particular, as part of the consideration received, Ericsson acquired the right to designate to whom LG should transfer ten LG patent families (the "LG Patents"). I oversaw the analysis and decision over the LG Patents that Ericsson selected. LG later transferred two of the LG Patents to Ericsson and eight of the LG Patents, at Ericsson's request under the agreement, to a third party for licensing under a revenue share agreement with Ericsson.

49.      The team who I directed in the analysis of LG's patents involved experienced technology experts and patent lawyers within Ericsson, as well as several technology experts from third party technical consultant Parsa Wireless. In my role overseeing the project, I concluded and explained to Ericsson's IPR & Licensing

1  management that the LG Patents provided valuable consideration to Ericsson as part

2  of the cross license. Below, I will explain the process and results of Ericsson's

3  evaluation.

4      50.    In October 2013, at Ericsson's request, LG provided an initial set of

5  patent candidates for Ericsson to review for possible acquisition as part of the

6  consideration for the parties' patent portfolio cross license. The initial set consisted of

7  20 patents that comprised distinct families. The high-level breakdown of the patent

8  families is as follows: 7 patents charted against the 4G standard; 2 patents alleged to

9  be essential to, but not charted against, the 4G standard; 1 patent application with a

10  notice of allowance charted against the WiFi 802.11ac standard; and 10

11  implementation patents not essential to any standard. The patents provided in the

12  initial list included the following: U.S. Patents 7,957,770, 8,326,377, 7,409,394,

13  8,223,040, 8,497,882, 7,822,443, 8,019,389, 6,265,682, 8,331,991, 8,421,913,

14  7,903,603, 7,936,731, 7,979,769, 8,121,602, 8,483,146, 8,229,390, 8,391,405,

15  7,555,010, 8,050,227, and 12/941,974 NOA.[10] LG provided claim charts mapping

16  some of these patents against smartphones in the market.[11] EX-4506, EX-4507, EX-

17  4508, EX-4509, EX-4510, EX-4511, EX-4512, and EX-5308 are authentic copies of

18  claim charts LG provided to Ericsson.

19      51.    I divided the analysis of these patents into three groups. First, I worked

20  with a team of experienced LTE experts to analyze the LTE-related claim charts. This

21  team consisted of Todd Cason, a patent lawyer and electrical engineer with degrees

22  from Rice and New York University, who had over a decade of relevant patent

23  analysis experience, having prosecuted numerous LTE patent applications for a

24  number of years, and who was then (and still is) a member of Ericsson's LTE focus

25  portfolio team; Dr. Johan Nystrom, an engineer and inventor with decades of

26

27  [10] EX-201; EX-4524; EX-4525; EX-4526; EX-4529; EX-4532; EX-4443; EX-4535; EX-4538; EX-4539.

28  [11] *See, e.g.,* EX-4506; EX-4507; EX-4508; EX-4509; EX-4510; EX-4511; EX-4512; EX-5308.

telecommunications engineering and research experience and numerous LTE patents to his name, who had several years of patent analysis experience, and who was then (and still is) a member of Ericsson's LTE focus portfolio team; and Dr. Mats Sågfors, an engineer, inventor, and former 3GPP delegate, with decades of telecommunications engineering and research experience and numerous LTE patents to his name (indeed, a former "Inventor of the Year" at Ericsson), who had several years of patent analysis experience, and who was then (and still is) a member of Ericsson's LTE focus portfolio team.

52.    Second, I worked with Andreas Iwerbäck and Parsa Wireless to analyze the WiFi 802.11ac patent application. Mr. Iwerbäck is an engineer with a master's in computer science, and has worked for over a decade on patent development, patent analysis, and patent assertion. For many years during that time, Mr. Iwerbäck was also a patent portfolio manager for Ericsson's WiFi standard-essential patent portfolio, and thus has had particular experience with WiFi-related patents, WiFi technology, WiFi patent sales and acquisitions projects, and WiFi patent portfolio pricing and licensing. Through Parsa Wireless, I also engaged a technical expert with particular experience analyzing WiFi standards to assist us. Parsa Wireless is a technical consulting firm with more than 100 Ph.D. experts, who typically have twenty to thirty years of industry experience, and who are assigned to projects based on a match between their backgrounds and the specific technology expertise that the project demands.

53.    Third, I worked with Patrick Farley, Joakim Movander, and Parsa Wireless to analyze the 10 implementation patents not essential to any standard. Mr. Farley is an engineer with degrees in mechanical and electrical engineering from the University of Texas at Austin, who received his law degree from Southern Methodist University, and practiced patent law for several years at Akin Gump and other law firms before joining Ericsson as senior counsel in 2010. Mr. Farley and I co-managed Ericsson's user equipment (UE) implementation patent portfolio from 2011-2013 and worked extensively on evaluating hundreds of UE implementation patents in that time

period, working with reverse engineering companies such as Chipworks, UBM Techinsights, and Parsa Wireless. Mr. Movander is an engineer with a master's in mechanical engineering and is a former patent examiner and director of the Swedish Patent Office. He has worked in Ericsson's patent group for over a decade on patent development, patent analysis, and portfolio assessments. In 2013, he became a director of patent portfolio management, and took over management of Ericsson's UE implementation patent portfolio, and has headed the focus portfolio team for that patent portfolio since that time. Through Parsa Wireless, I also engaged two technical experts with particular expertise regarding mobile phone hardware and software.

54.     Accordingly, all three teams included members with significant patent analysis and technical expertise. The three teams analyzed the patents, and in particular the patent claims and any claim charts that LG provided, as well as the patent prosecution histories, claim construction issues, infringement issues, facially-evident validity issues (e.g., 35 USC 112), and formality-related issues such as proper assignments and up-to-date maintenance fee payments. We also surveyed foreign family members, their claim scope, and relevant prior art raised in those foreign jurisdictions. We compared the standards-related patents to the standards at issue, and we compared the implementation patents to popular smartphones on the market, including Samsung, Apple, Nokia, Motorola, HTC, and Google smartphones. We used the claim charts that LG provided as a starting point, when available. As part of this process, we had several meetings internally and with Parsa Wireless, and I asked for further follow-up analyses and assessments of patents that surfaced as being promising, including analyzing essentiality, infringement, validity, and any vulnerabilities being flagged. The average Ericsson team member devoted more than 25% of his time to the evaluation project during this time.

55.     As an example of the process, below is part of a claim chart that LG provided and we reviewed for the WiFi-related patent application, which we ultimately selected:[12]



56.     As another example of the process, below is part of an initial assessment by Parsa Wireless of the 10 implementation patents and of the WiFi-related patent application (last row), indicating Parsa Wireless's overall assessment of each individual patent – High (H), Medium (M), or Low (L). "H" meant that the Parsa Wireless analyst believed the patent was strong in terms of infringement, prior art, detection, claim language and market size, and was recommended for further analysis, which we performed. "M" meant that the analyst believed the patent had major prior art concerns, claim construction issues, or limited application and use. "L" meant that the analyst believed the patent had a low rating in terms of potential use in products or standards:[13]

---

[12] EX-4506.
[13] EX-4551.

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

EX-4551 is an authentic copy of an internal Ericsson spreadsheet, containing the initial assessment by Parsa Wireless of 10 LG patents and 1 LG patent application.

57.     The result of our analysis, which we completed in November 2013, was that three of the nine LTE-related patent families appeared promising, including U.S. Patent 8,391,405. However, Ericsson already held a robust portfolio of LTE standard-essential patents, and we were thus more interested in adding to our UE implementation patent portfolio with newer, valuable inventions than increasing the size of our LTE standard-essential patent portfolio. With regard to the ten UE implementation patents, while five passed Parsa Wireless' initial assessment, only three passed all of our further checks and analyses. One of those three—U.S. Patent 7,957,770—read on smartphones that could communicate haptic feedback in two different ways to a user (in or out of a vibration mode), was given an "H" by Parsa

Wireless, and was confirmed to be used in a large number of smartphones. Another of those three—U.S. Patent 8,326,377—read on smartphones incorporating glass (such as Gorilla glass) in a certain manner for their screens, which was the technology trend for newer smartphones. This latter patent had been marked "M" by Parsa Wireless in its analysis of Claim 1, due to limited application of that claim; however, Parsa later analyzed a different claim (Claim 20) and confirmed that Samsung Galaxy phones infringed that claim, and that newer smartphones would likely infringe as well due to the technology trend, meriting the higher rating. The third of those three—U.S. 7,409,394—read on smartphones using automatic hyperlinks created within one phone function to access another phone function. We also confirmed that the WiFi-related patent application, which Parsa had marked "H", was essential, had been allowed by the United States Patent Office, and was promising, too.

58.    However, because only three implementation patents looked promising from this first set of implementation patents, Ericsson asked LG to send another batch of implementation patents for analysis. LG provided its second set of implementation patents, as well as claim charts for each of those patents, in December 2013. The patents in the second list included the following: U.S. Patents 7,962,858, 8,095,888, 8,369,907, 8,543,938, 8,593,415, 8,078,134, 8,351,989, 8,300,017, 8,092,253, and 8,549,426.[14] Again, the patents comprised distinct families. EX-4513 is an authentic copy of a presentation titled "Presentation of LGE Patents to Ericsson," dated December 26, 2013, containing the claim charts.

59.    Five experienced patent analysis experts analyzed this second batch of patents. I worked with Mr. Farley and Mr. Cason to analyze five of the patents, and I worked with Luke McLeroy and Evelyn Chen to analyze the other five patents. I've provided Mr. Farley's and Mr. Cason's backgrounds above. Mr. McLeroy is an engineer with a degree in mechanical engineering from Texas A&M University, who

---

[14] EX-4528; EX-202; EX-203; EX-204; EX-205; EX-4536; EX-4537; EX-4540; EX-207; EX-208; and EX-4513.

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

later received his law degree from the University of Texas at Austin, and practiced patent law for several years at McKool Smith before becoming a principal there. He joined Ericsson's IPR & Licensing group in 2012 as senior counsel, and was involved in the analysis and assertion of several implementation patents against Samsung. Ms. Chen is an engineer with a degree in electrical engineering from the University of Texas at Austin, who later received her law degree there as well, clerked for Judge Folsom in the United States District Court for the Eastern District of Texas, and practiced patent law for several years at Sidley Austin before joining Ericsson's IPR & Licensing group in 2013 as senior counsel. For this second batch of patents, I did not engage Parsa Wireless, because the patents at issue related to user interface features or other features that could be detected by the internal Ericsson team.

60.     The Ericsson team followed the same evaluation process as in the first round. We analyzed the patents, and in particular the patent claims and the claim charts that LG provided, as well as the patent prosecution histories, claim construction issues, infringement issues, facially-evident validity issues (e.g., 35 USC 112), and formality-related issues such as proper assignments and up-to-date maintenance fee payments. We also surveyed foreign family members, their claim scope, and relevant prior art raised in those foreign jurisdictions. We compared the implementation patents to popular smartphones on the market, including Samsung, Apple, Motorola, and Blackberry smartphones, and we used the claim charts that LG provided as a starting point. As part of this, we had several meetings internally, and I asked for further follow-up analyses and assessments of patents that surfaced as being promising, including analyzing infringement, validity, and any vulnerabilities being flagged. The average Ericsson team member devoted more than 25% of his or her time to the evaluation project.

61.     The result of our analysis, which we completed in January 2014, was that two of the ten implementation patents, U.S. Patents 8,078,134 and 8,095,888, were valuable for most smartphones. The '134 Patent read on a smartphone displaying first

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

1  and second content vertically in portrait mode and, when the smartphone was turned,

2  displaying that content horizontally in landscape mode or (in other claims) displaying

3  just one or the other content in landscape mode. The '888 Patent read on smartphones

4  being configured to change the size of an image on a web page, and adjusting the

5  boundary of adjacent image objects accordingly. The Ericsson team investigated

6  several phones, including Samsung and Apple smartphones, and confirmed

7  infringement.

8      62.    The Ericsson team also concluded that four additional patents were

9  valuable for certain smartphones or certain smartphone applications, including U.S.

10  Patents 8,092,253, 8,549,426, 8,300,017, and 8,593,415. The '253 Patent read on

11  smartphones having a coaxial cable connecting a wireless communication unit and a

12  printed circuit board, where the cable is fixed at two or more points on the inner

13  surface of the smartphone case, grounding the cable via the case. The '426 Patent read

14  on smartphones and tablets that present multimedia content in part through earphones,

15  and pause a video if the earphones are unplugged. The '017 Patent read on

16  smartphones that can scroll text based on touch input, where the scrolling speed

17  depends on the position of touch input relative to a reference position. The '415 Patent

18  read on smartphones that can change the size of data based on the area where touch is

19  sensed and maintained, while there's movement (tilt to zoom). The Ericsson team

20  investigated several popular smartphones, and confirmed infringement.

21      63.    The Ericsson team concluded that the remaining four implementation

22  patents from LG's second batch had limited value. Those were the '858, '907, '938,

23  and '989 Patents.

24      64.    As an example of the process, below is part of a claim chart that LG

25  provided and we reviewed for the '134 Patent, which we ultimately selected:[15]

26

27

28

---

[15] EX-4513.



65.     At different times during the review process, I reported the results of our analysis of LG's patents to the highest level of management within Ericsson's IPR & Licensing group, including Kasim Alfalahi (Ericsson's former Chief Intellectual Property Officer), Gustav Brismark (Ericsson's current Chief Intellectual Property Officer), John Han (former Vice President, Licensing) and Tim Ross Lucie Smith (former Vice President, Business Management). After we concluded our due diligence activities, we decided which of the patents offered by LG would provide the most value to Ericsson, and Mr. Han then spearheaded further negotiations with LG over the patents.

66.     While Mr. Han negotiated with LG in 2014, we conducted further checks of the LG Patents. For example, U.S. Patent 8,078,134 had been the subject of a reexamination request, and some of the claims were amended in reexamination.[16] Our analysis confirmed that the claims that emerged from the reexamination process remained usable and valuable. As another example, we confirmed that the WiFi 802.11ac patent application actually issued as a patent, which it did as U.S. Patent 8,681,757.[17]

---

[16] EX-5303.
[17] EX-5304.

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

67.     On July 7, 2014, as part of the Ericsson-LG cross-license, LG gave Ericsson the ability to designate to whom LG should transfer and assign the following 10 LG Patents.[18] EX-198 is an authentic copy of the Agreement to Transfer Patents between LG and Ericsson, with an effective date of July 7th, 2014. We selected eight of the nine top implementation patents discussed above, as well as the WiFi 802.11ac patent application, and one of the top LTE patents:

| Type | Patent | Title |
|---|---|---|
| Implementation | 8,078,134 | Mobile terminal and method of controlling operation of the mobile terminal |
| Implementation | 7,957,770 | Mobile communication terminal for providing tactile interface |
| WiFi 802.11ac | 8,681,757 | Method and apparatus for transmitting PLCP frame in wireless local area network system |
| Implementation | 8,593,415 | Method for processing touch signal in mobile terminal and mobile terminal using the same |
| Implementation | 8,095,888 | Mobile terminal and image control method thereof |
| Implementation | 8,092,253 | Communication terminal |
| Implementation | 8,326,377 | Input device and mobile device having the same |
| Implementation | 8,300,017 | Mobile electronic apparatus with touch input device and display method using the same |

---

[18] EX-198.

| Implementation | 8,549,426 | Apparatus and method for configuring an on-screen image in a mobile telecommunication handset upon connection of earphone |
| LTE | 8,391,405 | Symbol mapping method for repetition channel coding |

68.   The LG Patents provided immediate value to Ericsson. For example, Ericsson requested that LG transfer the '134 and '770 Patents to Ericsson, and Ericsson then asserted the '134 Patent against Apple in *Ericsson Inc. et al. v. Apple Inc.*, Case No. 2:15-cv-00289 (E.D. Tex.). Under the terms of the agreement with LG, Ericsson also requested that LG transfer ownership of eight of the LG Patents to Optis Cellular Technology, LLC, for licensing under a revenue share agreement with Ericsson. The transferred LG Patents are U.S. Patents 8,681,757, 8,095,888, 8,300,017, 8,593,415, 8,549,426, 8,092,253, 8,326,377, and 8,391,405.

## VI.   CONCLUSION

69.   Ericsson's executed 2G, 3G, and 4G licenses are the best indicator of a reasonable value for a license to those patent portfolios. Those licenses are the result of a tremendous amount of analysis by highly-motivated and experienced technical, legal, and licensing experts at the top telecommunications companies in the world. Those licenses are a much better indicator of reasonable value than theoretical frameworks based on unreliable and unproven methodologies, the results of which could severely harm the industry's ecosystem and lead to lower investment in the creation of new technologies like 5G.

70.   In addition, I spent significant time overseeing the analysis of the LG Patents selected and transferred as part of Ericsson's 2014 cross-license agreement with LG. That analysis was conducted in a reasonable manner by several experts in patent analysis. At the end of that analysis, we communicated our assessment of the

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

1   LG Patents to Ericsson's management team for IPR & Licensing, who then assessed

2   the financial value of the patents in view of our analysis and assessment.

3          I have personal knowledge of the facts set forth in this Statement, and declare

4   under penalty of perjury and the laws of the United States of America that they are

5   true and correct.

6          Executed this 9th day of January 2017, at Stockholm, Sweden.

7

8

9

10

11          _____

            Patricio Delgado

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
                    Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

## TABLE OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| 198 | Agreement to Transfer Patents between LG and Ericsson, dated 7/7/14 |
| 201 | U.S. Patent No. 7,957,770 |
| 202 | U.S. Patent No. 8,078,134 |
| 203 | U.S. Patent No. 8,092,253 |
| 204 | U.S. Patent No. 8,095,888 |
| 205 | U.S. Patent No. 8,300,017 |
| 207 | U.S. Patent No. 8,549,426 |
| 208 | U.S. Patent No. 8,593,415 |
| 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| 410 | Document titled "The Essentials of Intellectual Property," by Signals Research Group, dated Sep. 2010 |
| 1043 | Fairfield Resources publication titled "Review of Patents Declared as Essential to WCDMA through Oct. 2008," dated 11/18/09 |
| 1045 | Signals Research Group publication titled "The Essentials of Intellectual Property, from 3G through LTE Release 12," dated May 2015 |
| 1077 | Signals Research Group report titled "The Essentials of Intellectual Property, Part Two: Quantifying Technology Leadership in the Development of the LTE Standard through June 2014," dated Nov. 2014 |
| 4443 | 12/4/2012 - US Patent No. 8,326,377 B2 |
| 4504 | INTENTIONALLY OMITTED |

CORRECTED WITNESS STATEMENT OF PATRICIO DELGADO;
Case Nos. 8:14-cv-00341-jvs-dfmx/2:15-cv-02370-jvs-dfmx

| Exhibit Number | Description |
|---|---|
| 4506 | LG Claim chart: 12/941,974 |
| 4507 | LG Claim chart for US 7,903,603 |
| 4508 | LG Claim Chart for US 7,936,731 |
| 4509 | LG Claim Chart for US 7,979,769 |
| 4510 | LG Claim Chart US 8,121,602 |
| 4511 | LG Claim Chart US 8,229,390 |
| 4512 | LG Claim Chart US 8,391,405 |
| 4513 | LG Claim Chart Presentation |
| 4523 | 2/17/2014 - Presentation: Claim Chart Process |
| 4524 | 7/24/2001 - U.S. Patent 6,265,682 B1 |
| 4525 | 8/05/2008 - U.S. Patent 7,409,394 B2 |
| 4526 | 10/26/2010 - U.S. Patent 7,822,443 B2 |
| 4528 | 6/14/2011 - U.S. Patent 7,962,858 B2 |
| 4529 | 09/13/2011 - US Patent 8,019,389 B2, Kim et al. |
| 4532 | 7/17/2012 - U.S. Patent 8,223,040 B2 |
| 4535 | 12/11/2012 - U.S. Patent 8,331,991 B2 |
| 4536 | 8/8/2013 - U.S. Patent 8,351,989 B2 |
| 4537 | 2/5/2013 - U.S. Patent 8,369,907 B2] |
| 4538 | 4/16/2013 - U.S. Patent 8,421,913 B2 |
| 4539 | 7/30/2013 - U.S. Patent 8,497,882 B2 |
| 4540 | 9/24/2013 - U.S. Patent 8,543,938 B2 |
| 4551 | Spreadsheet, Investigation of patent claims (NATIVE FILE) |
| 5299 | Fairfield Resources International Analysis of Patents as Essential to GSM December 31, 2007 |
| 5303 | U.S. Patent 8,078,134 B2 |
| 5304 | U.S. Patent 8,681,757 B2 |

| Exhibit Number | Description |
|---|---|
| 5308 | LG Claim Chart for U.S. Patent No. 8,483,146 |

1

## CERTIFICATE OF SERVICE

2      Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court

3  for the Central District of California, I hereby certify under penalty of perjury under

4  the laws of the United States of America that on February 24, 2017, a true copy of the

5  above document was filed through the Court's Electronic Case Filing system and

6  served by that system upon all counsel of record registered for the system and deemed

7  to have consented to electronic service in the above-captioned case.

8

9  Dated:  February 24, 2017          **CROWELL & MORING LLP**

10                                          */s/ John S. Gibson*

11                                          John S. Gibson

12                                          Attorneys for ERICSSON INC. AND
                                            TELEFONAKTIEBOLAGET LM
13                                          ERICSSON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28