CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br>  Plaintiffs/Counterclaim-Defendants,<br><br>  v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*,<br><br>  Defendants/Counterclaim-Plaintiffs.<br><br>ERICSSON INC., *et al.*,<br><br>  Plaintiffs/Counterclaim-Defendants,<br><br>  v.<br><br>TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br>  Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx<br>Case No. 2:15-CV-02370 JVS-DFMx<br><br>**CORRECTED REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO**<br><br>Hon. James V. Selna<br><br>**Discovery Cut-off:** May 23, 2016<br><br>**Pretrial Conference:** February 1, 2017 at 10:00 a.m.<br><br>Trial: February 14, 2017 at 8:30 a.m. |

# TABLE OF CONTENTS

Page

I.    EXECUTIVE SUMMARY ................................................................... 1

II.   BACKGROUND ................................................................................ 16

      A.    Technical Qualifications ...................................................... 16

      B.    Legal and Industry Experience ........................................... 16

      C.    Person of Ordinary Skill in the Art ..................................... 21

III.  COUNTING ETSI IPR DECLARATIONS IS A POOR METRIC
      FOR MEASURING RELATIVE PATENT PORTFOLIO
      STRENGTH ..................................................................................... 22

IV.   THE ESSENTIALITY LANDSCAPING PERFORMED BY
      CONCUR IP IS ALSO FLAWED ..................................................... 23

V.    DR. KAKAES'S OPINIONS ABOUT THE ESSENTIALITY OF
      ERICSSON'S PATENTED INVENTIONS ARE FLAWED ................. 25

      A.    Ericsson's Claim Charts are The Result of a Rigorous,
            Continuous Analysis of Essentiality by Technical and Patent
            Law Experts at Ericsson ...................................................... 27

      B.    Dr. Kakaes Commits Several Methodological Errors in His
            Analysis of The Essentiality of Ericsson's Claim Charts ... 31

      C.    Dr. Kakaes's Methodological Errors Appear Throughout His
            Analysis of The Ericsson Claim Charts That I Was Specifically
            Responsible For Addressing .................................................. 42

            1.    Patent Families Where Dr. Kakaes Does Not Dispute
                  Essentiality ................................................................. 43

            2.    Patent Families Where Dr. Kakaes Analyzes Irrelevant
                  Chart ........................................................................... 43

            3.    Patent Families Where Dr. Kakaes and I Disagree on
                  Essentiality ................................................................. 44

      D.    Dr. Kakaes's Methodological Errors Also Appear in His
            Essentiality Analysis of the Ericsson Claim Charts that He
            Previously Showcased in His Original Expert Report As Being
            Representative ...................................................................... 81

VI.   DR. KAKAES'S OPINIONS REGARDING THE IMPORTANCE
      AND CONTRIBUTION OF ERICSSON'S ESSENTIAL
      INVENTIONS ARE INSUFFICIENTLY SUPPORTED, OUT OF
      LINE WITH INDUSTRY CONCLUSIONS, AND CONTRARY TO
      LAW ............................................................................................... 86

<div align="center">

**TABLE OF CONTENTS**

(continued)

</div>

**Page**

A.   Dr. Kakaes Commits Several Methodological Errors in His Analysis of the Importance and Contribution of Ericsson's Undisputedly Essential, Charted Patents ............................................. 88

B.   Dr. Kakaes's Methodological Errors Also Appear In His Importance And Contribution Analyses Of The Ericsson Claim Charts That He Previously Showcased As Being Representative In His Original Expert Report ............................................................. 101

C.   Breakthrough Analysis Errors ......................................................... 129

VII.   DR. BEKKERS'S ASSUMPTIONS ABOUT ERICSSON AND THE CONTRIBUTION COUNTING METRIC ARE INCORRECT ............... 130

VIII.   ERICSSON EXPERIENCES HOLD-OUT FROM SEVERAL COMPANIES .................................................................................... 134

IX.   CONCLUSION .................................................................................... 135

X.   TABLE OF EXHIBITS ....................................................................... 138

My name is Patricio Delgado. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

# I. EXECUTIVE SUMMARY

1. I am currently the director of Ericsson's 5G program within Ericsson's IPR (Intellectual Property Rights) & Licensing group. I am responsible for working with Ericsson's researchers and engineers as they develop the newest 5G cellular technology to ensure that Ericsson's cutting-edge technical solutions are adequately protected through intellectual property rights. I have had several years of experience working with Ericsson's 2G, 3G, and 4G patent portfolios, focusing on patent analysis and portfolio valuation. I have been involved in the development of those patents and patent portfolios, in the pricing of those patent portfolios, in the licensing of those patent portfolios, in patent sales and acquisitions regarding those portfolios, and in patent litigation over those portfolios.

2. I provided an opening witness statement regarding Ericsson's 2G, 3G, and 4G essential patent portfolios, and my belief that Ericsson's license agreements over its 2G, 3G, and 4G standard essential patents are the best indicator of a reasonable value for a license to Ericsson's essential patents. For this rebuttal statement, I have been asked to provide testimony regarding my opinions about the methodologies, analyses, and opinions by TCL's Dr. Kakaes, who received support from Dr. Ding, Dr. Jayant, and certain other individuals from an Indian consulting firm called Concur IP. Dr. Kakaes's opinions, and my rebuttal, are primarily about (i) the merit of certain studies about the relative shares of 2G, 3G, and 4G standard essential patents in Ericsson's industry, and (ii) the merit of Ericsson's 2G, 3G, and 4G standard essential patents. I have also been asked to provide factual testimony (iii) rebutting Dr. Bekkers's testimony about Ericsson's contributions to 3GPP and (iv) regarding certain experiences that Ericsson has had with hold-out by other companies.

3.     As I explained in detail in my opening statement, there are three quantitative metrics of varying degrees of reliability that have been used for landscaping the relative strength of standard essential patent portfolios in Ericsson's industry.  Those three metrics are ETSI patent declaration counting, essentiality studies, and 3GPP contribution counting.  In his opening witness statement, Dr. Kakaes endorses ETSI patent declaration counting (his "patent census") and an essentiality study performed by certain consultants at Concur IP with some support from Dr. Ding (his "industry-wide essentiality assessment").[1]

4.     Dr. Kakaes's ETSI patent declaration counting metric suffers from the same flaws that I described in my opening witness statement.  As I briefly restate in a later section of this rebuttal, counting ETSI patent declarations does not measure relative patent portfolio strength, but rather each company's subjective, unpoliced view of the patents or patent applications that the company believes "may be or may become essential" to the standard.  Companies apply different subjective filters to determine what to declare to ETSI, which leads to results not consonant with companies' contributions to the standard or to essential patent strength.  Thus, this metric is considered to be a poor indicator of relative patent portfolio strength in our industry.  It does not correlate well with the strength of patent portfolios that I have analyzed in numerous technical discussions with other companies in the industry who have declared patents to ETSI.

5.     The industry-wide essentiality assessment performed by Dr. Kakaes's team at Concur IP, with some assistance from Dr. Ding, suffers from the same flaws that I described in my opening witness statement for other similar essentiality studies.  As I describe in a later section below, this study was performed by a team with legal backgrounds that do not appear to be sufficient to do a proper essentiality analysis, using an analytical framework that does not comply with the law in a

---

[1] Kakaes Opening Statement at, e.g., ¶ 352.

number of ways, under time constraints that allow for only the most cursory of analyses, and with clear bias that cannot be properly discounted.  This study does not approach the rigorous patent portfolio analysis performed by highly experienced and highly motivated legal, technical, and licensing experts in licensing discussions, or produce the unbiased assessments of value reflected in Ericsson's resulting license agreements.

6.    Besides endorsing these two landscapes of relative patent portfolio strength, Dr. Kakaes, with assistance from Dr. Jayant, then separately performs a more detailed essentiality analysis, but just of Ericsson's patented inventions. He finds that he cannot dispute the essentiality of over 100 of those inventions, in the patent families listed in the chart below:

| No Dispute on Essentiality | | | | | |
|---|---|---|---|---|---|
| P04817 | P10762 | P19559 | P24466 | P26648 | P32498 |
| P05544 | P10774 | P19911 | P24673 | P26715 | P32787 |
| P05687 | P10808 | P20058 | P24698 | P26744 | P32817 |
| P05860 | P10991 | P21172 | P24860 | P26993 | P33108 |
| P05935 | P10992 | P21239 | P24916 | P27172 | P33465 |
| P06199 | P10993 | P21430 | P24985 | P28186 | P33485 |
| P06203 | P11151 | P21738 | P25238 | P28235 | P34406 |
| P06553 | P11451 | P22621 | P25317 | P28627 | P34420 |
| P07288 | P11899 | P23018 | P25336 | P28747 | P34422 |
| P07873 | P11904 | P23041 | P25476 | P29465 | P34426 |
| P08153 | P12207 | P23384 | P25496 | P30030 | P35090 |
| P08338 | P13088 | P23412 | P25642 | P30749 | P35129 |
| P09037 | P14596 | P23426 | P25658 | P30980 | P35168 |
| P09085 | P14897 | P23682 | P25975 | P31172 | P35575 |
| P09262 | P15300 | P23893 | P25999 | P31186 | P35592 |
| P09286 | P17631 | P23894 | P26030 | P31189 | P37869 |
| P09716 | P18216 | P24000 | P26071 | P31755 | |
| P10310 | P18674 | P24228 | P26132 | P31773 | |
| P10334 | P18728 | P24241 | P26261 | P31923 | |
| P10335 | P19208 | P24459 | P26379 | P32066 | |

7.    For those Ericsson patent families with inventions that are undisputedly essential, Dr. Kakaes performs a follow-up analysis of what he describes as the importance and contribution of those patented inventions.  He also

1    performs additional follow-up analyses that he believes are necessary to further

2    assess the value of Ericsson's patented inventions.  In the end, Dr. Kakaes

3    concludes that Ericsson's patent portfolios have little or no value, and TCL's other

4    experts use that as input to assess a low royalty for a license to Ericsson's 2G, 3G,

5    and 4G patent portfolios.

6        8.    The majority of my rebuttal below addresses several methodological

7    flaws, including many examples, in the essentiality and follow-up analyses that Dr.

8    Kakaes performs. With regard to the process of my review, I organized a large team

9    of highly experienced, in-house patent lawyers and technical experts to examine Dr.

10   Kakaes's and Dr. Jayant's analyses of Ericsson's patent portfolios, as I've done for

11   large-scale patent licensing discussions in the past.  Due to the size of the project,

12   five team members, including me, are addressing different parts of Dr. Kakaes's

13   and Dr. Jayant's essentiality analyses in detail in separate rebuttal statements.[2]  In

14   this rebuttal, in addition to addressing Dr. Kakaes's analysis of certain Ericsson

15   patent families in detail, I also provide the aggregated results of the five rebuttal

16   analyses on essentiality, as well as address Dr. Kakaes's various follow-up

17   analyses.  I describe my various conclusions in summary fashion in this section,

18   and in further detail in the sections that follow.

19       9.    Looking first at Dr. Kakaes's essentiality analysis of Ericsson's claim

20   charts, Dr. Kakaes misunderstands what patent claim charts are actually part of the

21   portfolio at issue in this case (handset-side claim charts), and what claim charts are

22   not (network-side claim charts).  For over 40 patent families, he analyzes network-

23   side claim charts for the families listed below:

24

25

26   [2] The other Ericsson witnesses rebutting Dr. Kakaes's and Dr. Jayant's essentiality opinions are
     Dr. Mats Sågfors, Mr. Todd Cason, Dr. Stefan Bruhn, and Ms. Evelyn Chen, and I refer the Court

27   to their witness statements for their backgrounds, as well as for their more detailed analyses and
     opinions.

28

| Analyzing Non-Handset Charts for Essentiality | | | | | |
|---|---|---|---|---|---|
| P05860 | P08333 | P19103 | P23412 | P24698 | P33465 |
| P05935 | P08430 | P20671 | P23426 | P24860 | P34420 |
| P06199 | P09037 | P21239 | P23563 | P25317 | P34422 |
| P06425 | P09262 | P21738 | P23614 | P25409 | |
| P06697 | P10808 | P22817 | P23633 | P30980 | |
| P06891 | P11451 | P23016 | P24058 | P31649 | |
| P07567 | P15300 | P23018 | P24459 | P31988 | |
| P07761 | P18674 | P23384 | P24466 | P32468 | |

10.   He then concludes that because those claim charts are, in fact, network-side claim charts, they are not essential for purposes of his analysis for TCL.  But Ericsson does not assert network-side claim charts against vendors of handsets like TCL, either in licensing discussions or in litigation.  These network-side claim charts thus have no bearing on the strength or weakness of Ericsson's handset-side ("user equipment" or "UE") patent portfolio, or on a proper royalty rate for a license to Ericsson's UE patent portfolio.

11.   For those claim charts that are part of Ericsson's handset-side patent portfolio, Dr. Kakaes commits a variety of errors in his essentiality analysis.  For example, he does not follow black letter law concerning how to properly construe claim language, limiting the language in improper ways to avoid a conclusion of essentiality.  In his analysis of almost 50 patent families, he limits the plain meaning of claim language (i) without offering any evidence in support, (ii) in a manner that contradicts or ignores the intrinsic evidence, (iii) by reading in extraneous limitations from the patent prosecution history without a clear disclaimer or disavowal, and/or (iv) by importing extraneous limitations from extrinsic evidence.

| Claim Construction Errors | | | | |
|---|---|---|---|---|
| P04817 | P07925 | P13459 | P24058 | P30565 |
| P04940 | P08575 | P14592 | P24459 | P31006 |
| P06425 | P08804 | P18740 | P25936 | P31931 |
| P06691 | P09646 | P20741 | P26071 | P31948 |
| P06697 | P09715 | P21787 | P26724 | P31988 |
| P07567 | P10628 | P23016 | P26967 | P32173 |
| P07707 | P10867 | P23384 | P27011 | P32205 |
| P07761 | P10896 | P23563 | P28281 | P37106 |
| P07782 | P11289 | P23633 | P29338 | |
| P07873 | P11904 | P23985 | P29482 | |

12.     The Federal Circuit considers claim constructions like these as either "not useful" or otherwise contrary to law.  *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).  His conclusions are thus unpersuasive that no "reasonable" interpretation could support Ericsson's essentiality positions when his interpretations are either unsupported or are otherwise not in line with the law.  When properly considered, the intrinsic evidence supports Ericsson's view of the scope of those charted claims, not Dr. Kakaes's.  I analyze these more specific errors in detail in a section below for the charted families that I assigned to myself.  Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen provide their detailed analyses for the other charted families in their witness statements.

13.     Dr. Kakaes commits further errors in his essentiality analysis of Ericsson's handset-side patent portfolio.  When comparing Ericsson's claims to the relevant standard sections, he frequently misinterprets either Ericsson's claim charts or the standard specifications to arrive at his conclusions of non-essentiality, as shown below.

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| Misunderstanding Charts or Standard | | | | |
|---|---|---|---|---|
| P04817 | P07669 | P09646 | P21428 | P25642 |
| P04940 | P07782 | P09715 | P23016 | P29482 |
| P06697 | P07873 | P10628 | P23415 | P31649 |
| P06699 | P07925 | P11904 | P23985 | P31773 |
| P07567 | P08167 | P12947 | P24058 | P32066 |
| P07592 | P08333 | P14592 | P24228 | P32468 |
| P07669 | P08430 | P18740 | P24459 | P33858 |
| P07707 | P08575 | P19103 | P25318 | P37106 |
| P07761 | P09040 | P20741 | P25409 | |

14.     Also for these errors, I analyze them in detail in a section below for the charted families that I assigned to myself. Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen provide detailed analyses for the other charted families in their witness statements.

15.     In his essentiality analysis, Dr. Kakaes also ignores, misunderstands, or misapplies the law of direct infringement, the ETSI IPR Policy, and foreign law. For example, he offers opinions that either ignore the doctrine of equivalents or are otherwise out of line with the law of direct infringement in the United States, to arrive at his conclusions of non-essentiality.  This includes, for example, families P04787, P06697, P08425, P11538, P13459, and P27363. He also offers unsupported legal conclusions about "essentiality" under the ETSI IPR Policy, to arrive at his conclusions of non-essentiality. This includes, for example, families P07873, P08425, P14592, P20021, and P23614. And he misunderstands or misapplies foreign law to conclude that foreign patents are not essential.  This includes, for example, families P06425, P07782, P08425, P10808, P10867, and P11538. As with the other specific errors, I analyze them in detail in a section below for the charted families that I assigned to myself. Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen provide detailed analyses for the other claim charts in their witness statements.

16.     Turning to his follow-up analyses of the 100+ patent families with inventions that are undisputedly essential, Dr. Kakaes first examines what he describes as the importance and contribution of those patented inventions. But his methodologies suffer from several flaws. First, he does no importance or contribution analyses for most of the patent families that he opines are not essential to the standards.  As I describe above, Dr. Kakaes's essentiality opinions suffer from numerous errors.  Even one error in his essentiality analysis—where he judged a patent family to be non-essential when it actually was essential—would produce an unfilled gap in Dr. Kakaes's importance and contribution analyses.  If, as Dr. Kakaes argues, the technical value of patent families varies widely, then misjudging a family as being non-essential and doing no analysis of its technical value might depreciate Ericsson's patent portfolios greatly. The value of that disregarded patent family could be "very high," and make it impossible for economic experts to then judge a fair value for Ericsson's 2G, 3G, and 4G portfolios. Nor would it be reasonable for those same economic experts to assume that patent families have an "average" value in view of Dr. Kakaes's opinions that patent families do not. Not addressing all of Ericsson's patent families is thus a fatal error in Dr. Kakaes's analysis.

17.     Second, Dr. Kakaes does not provide any objective measures, benchmarks, or quantitative analyses to support his opinions that Ericsson's patented inventions are marginally important, moderately important, or important (his scale for importance), over his suggested alternatives; or offered no improvement, marginal improvement, or moderate improvement (his scale for contribution), over his alternatives. This lack of objective testing and benchmarking untethers his analysis from industry practice and from the guidance provided by cases like *Innovatio* on how to analyze alternatives.  For example, Dr. Kakaes provides opinions that some Ericsson inventions are not very important because

they "will [sometimes] prove to be better than the alternative; other times, worse."[3] But he provides no support for how he reaches his opinion that a technical solution that has benefits and drawbacks is better or worse than another one that also has benefits and drawbacks. He cites no testing, no literature, no technical documents, nothing whatsoever. Nor does he quantify how much better or worse, what specifically is better or worse, and under what circumstances.  In much of his importance and contribution analysis, Dr. Kakaes just lists potential advantages and disadvantages of each solution in only the most general terms and concludes that Ericsson's solution is not much better than another alternative.  This approach is not the product of a rigorous engineering exercise and, in any event, it is incorrect.

18.     Third, Dr. Kakaes's importance and contribution analyses second-guess the opinions of the most experienced experts in the world on standard-essential technology—the 3GPP delegates developing the standards—from numerous telecom companies. These top experts believed Ericsson's inventions were worthy of inclusion in the standard and thus "important" after considering, and many times testing and evaluating, all other available options.  Just to put the level of effort, rigor of analysis, and peer review at 3GPP into perspective, in my role as the director of 5G, I learned recently that at one RAN1 meeting, there were more than 600 participants and more than 2,500 input documents; the entire word count of those documents was more than 2.5 times the number of words in the entire works of William Shakespeare – and that is just at one of many meetings per year for one of many 3GPP working groups.  Some of these same companies who have participated in standardization and who have accepted Ericsson's inventions as being worthy of inclusion into the standard (*e.g.,* Sharp, ZTE, Samsung, and so on), then sign licenses with Ericsson. They have thus validated the importance and contribution of Ericsson's patented technology, both technically and financially.

---

[3] Kakaes Opening Statement Appendix, EX-1639 at A-P005544_2G.

Dr. Kakaes seeks to second-guess the technical value judgment made by these top experts on the standardized technology, and the financial value judgment made later by their sophisticated companies, and he offers no explanation why his brief analysis is better than or even similar to their rigorous, peer-reviewed, and peer-approved analyses and conclusions.

19.   Fourth, Dr. Kakaes's importance and contribution analyses are also internally contradictory, and do not faithfully follow the methodologies that Dr. Kakaes indicates that he is following.  For example, for one of the cases that he showcased in his original expert report as being representative of his methodologies, Dr. Kakaes analyzed the importance and contribution of the P08338 patent family (U.S. 6,173,162) over a patented solution to Qualcomm.[4] In his importance analysis, Dr. Kakaes concluded that "the claimed invention provides a marginal improvement to the known prior art," but in his contribution analysis, he concluded that the patent family offered "no improvement" over the same prior art.[5] Setting aside the merit of the underlying analyses, it is impossible for Ericsson's invention to offer both "a marginal improvement" and "no improvement" at the same time over the same prior art. Dr. Kakaes's analysis thus cannot be reproduced, even by himself.  This is a hallmark of a flawed approach.

20.   Fifth, Dr. Kakaes's importance and contribution analyses do not properly consider the effect of his alternatives in the aggregate, or put differently, the value of Ericsson's inventions in the aggregate. In particular, Dr. Kakaes does not properly consider the impact of removing all of Ericsson's 100+ undisputedly essential solutions as a whole from the standard, and replacing them with Dr. Kakaes's alternatives.  In a section below, I provide a detailed analysis of the alternatives that Dr. Kakaes previously showcased in his original expert report to

---

[4] Kakaes Second Supp. Report at ¶¶ 217-224; 238-239 (emphasis added).
[5] *Id.* at ¶¶ 224; 238.

put, I assume, his analysis in the best light. I should note that he has now abandoned these as examples in his witness statement to the Court, even though he considered them to be representative of his methodologies in his expert report, relegating them instead to an exhibit. Whatever the reason for that is, I demonstrate that even those limited, showcase opinions offer alternatives that either would not work, or would not address the technical requirements achieved by Ericsson's inventions.  If even this small subset of examples produces a broken alternative standard, it's hard to imagine what would remain after aggregating over 100 of these alternative solutions in an untested and unproven manner.

21.     Sixth, as a factor in devaluing Ericsson's patents, Dr. Kakaes considers whether patented features are optional to the standard, and devalues them just for that reason. One fundamental error here is that some optional features are important and used widely by cell phones. For example, GPRS and EDGE are optional for 2G phones, HSPA is optional for 3G phones, and LTE Advanced (which includes carrier aggregation) is optional for 4G phones.  But just because they are optional does not mean these advanced features are unimportant.  Still, Dr. Kakaes offers no exceptions to his methodological rule. Moreover, different technical options in the standard also make the standard more robust.  For example, there are different speech coding options for 2G phones, but having the option to use AMR-NB speech coding (which Ericsson invented, as my colleague Dr. Bruhn explains in his witness statement) allows for improved speech quality in situations with varying levels of interference.  Dr. Kakaes does not measure, quantify, or otherwise calculate the value of optional features or the effect of removing robustness in the standard by removing optional features.  He also does not credit mandatory features in the standard in the same way that he discredits optional features. Nor does he consider whether TCL does, in fact, implement these optional features. If TCL implements these features, it shows that while optional, these features are nonetheless valuable to TCL. Dr. Kakaes stays silent on these points when

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   presumably he had access to TCL's product information and forecasts. If TCL were

2   not using these optional features (and thus not receiving value), surely Dr. Kakaes

3   would have mentioned it.

4          22.    Seventh, as in his essentiality analysis, Dr. Kakaes at times

5   misinterprets Ericsson's patented solution, the standard section, or both.  With this

6   misunderstanding, he proceeds to evaluate technical solutions that do not actually

7   achieve the technical effects that Ericsson's patented, essential inventions achieve.

8   For example, for one of the cases that he previously showcased in his original

9   expert report as being representative of his methodology, Dr. Kakaes analyzed the

10  importance of P09646 (U.S. 6,473,506) after misunderstanding Ericsson's

11  invention, which is to communicate modulation scheme information through

12  symbol phase rotation.  He then misunderstood the standard, which also indicates

13  that modulation scheme information is communicated through symbol phase

14  rotation.  He then proceeded to propose a solution that does not communicate

15  modulation scheme information through symbol phase rotation.  Dr. Kakaes cannot

16  assess proper value for Ericsson's patented inventions without a proper

17  understanding of those inventions and of the standard, and his errors in this regard

18  put his analysis as a whole into question.

19         23.    Eighth, as a factor in devaluing Ericsson's patents, Dr. Kakaes

20  considers how widely the accused technology is deployed in major markets by

21  others, or by TCL under an improperly narrow view of the scope of patent

22  infringement. Instead, Dr. Kakaes should have focused on whether TCL would

23  deploy the accused technology during the license period, using a proper

24  understanding of the scope of infringement.  In other words, he should not have

25  focused his analysis on others' current products in certain markets, but on TCL's

26  products. For example, with regard to TDD LTE, Dr. Kakaes should have

27  considered all countries where Ericsson has and will have TDD LTE patents and

28  where TCL will make, sell, offer to sell, use, induce others to use, or import phones

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    supporting TDD LTE during the license period.  Dr. Kakaes could have easily

2    determined TCL's forecasts in this regard. If TCL sold, sells, or plans to sell TDD

3    LTE phones during the license period, those phones would infringe Ericsson's

4    patents. It does not matter what others (not TCL) currently deploy in certain

5    markets.  What matters for judging value in this case, as in technical licensing

6    discussions, is whether the technology has had, does have, or will have value to

7    TCL during the license period. Dr. Kakaes does not offer a perspective on TCL's

8    own use of this subset of inventions, and the only reasonable inference from his

9    silence is that while others may not use the technology widely, TCL does, and

10   derives value from that use.

11        24.    Ninth, Dr. Kakaes does not consistently consider whether his

12   alternatives were before 3GPP and thus were even possible "viable" alternatives,

13   and whether his alternatives were unpatented and thus truly "non-infringing," cost-

14   free alternatives. Both conditions must be considered under the precedent on which

15   Dr. Kakaes loosely bases his methodologies, to reach conclusions on value.[6]  For

16   example, Dr. Kakaes purports to provide at least one non-infringing alternative for

17   over 100 of Ericsson's patent families.  Of these 100+ alternatives, about 50 of

18   them are patents or patent applications. Dr. Kakaes has not shown that those

19   patented solutions were presented to 3GPP and thus that they were truly "viable"

20   alternatives to Ericsson's patented solutions.  Under the precedent on which he

21   loosely bases his analysis, the burden is on Dr. Kakaes to explain himself in this

22   regard, and he does not do it.

23   ───────────────

     [6] *See In re Innovatio IP Ventures, LLC,* 2013 U.S. Dist. LEXIS 144061, *105 (N.D.

24   Ill. 2013) ("If a proposed alternative had not even been presented to the IEEE,

     however, it is implausible to believe that assessing such a technology as a plausible

25   alternative would be an effective negotiating point, as it is exceedingly unlikely that

     the IEEE would adopt such an alternative. Accordingly, the court will only consider

26   technology that was considered by the standard-setting body when determining

     whether there are alternatives to the patented technology that could have been

27   adopted into the standard."); *Id.* at *102-03 ("In other words, the existence of

     patented alternatives does not provide as much reason to discount the value of

28   Innovatio's patents as does the existence of alternatives in the public domain.").

25.    Moreover, even if those patented solutions had been presented to 3GPP and could be implemented instead of Ericsson's patented solutions, TCL would have had to seek patent licenses for infringement of those other patents. These other patents are distributed among almost 30 different companies including Alcatel Lucent, InterDigital, Motorola, NEC, Nokia, Qualcomm, Samsung, Panasonic, and many others. I know from my six years of patent licensing experience at Ericsson that at least the companies listed above seek royalties or other consideration for their standard-essential patents. Thus, rather than take one license from Ericsson, TCL would need to seek patent licenses from all of these other companies for infringement of these other patents.

26.    Additionally, with regard to his other 80+ alternatives, many of which are derived from 3GPP technical documents or standards, Dr. Kakaes assumes, without any justification, that those technical solutions would also be unpatented. But from my experience over the past six years of patent licensing in the industry, I know that companies who contribute to 3GPP generally seek patent protection for their contributions. This is evident from the number and type of claim charts that these companies share with Ericsson as part of the cross-license discussions, claim charts that I have personally reviewed for the many licensing discussions that I've attended.  Thus, Dr. Kakaes cannot assume that these other alternatives are unpatented and cost-free, without explanation. The burden is on Dr. Kakaes to prove that his alternatives are non-infringing, and he offers no evidence or reasonable explanation on which to base his implied assumption that these alternatives are unpatented and cost-free.

27.    Tenth, also in other key ways, Dr. Kakaes's importance and contribution analyses do not follow the precedent on which he loosely bases his methodologies. In particular, there is no legal precedent that conflates "importance" and "contribution" methodologies in the manner that Dr. Kakaes does in his witness statement. For example, with regard to the P08338 patent family (U.S. 6,173,162)

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

discussed above, Dr. Kakaes determined in his importance analysis that "the claimed invention provides a marginal improvement to the known prior art," but in his contribution analysis, he concluded that the patent family offered "no improvement" over the same prior art.  Setting aside the irreconcilable nature of his opinions, he performed the same analysis twice. By basing both methodologies on an analysis of the "improvement" of Ericsson's patented technology over alternatives, it appears that Dr. Kakaes is seeking to doubly discount the value of Ericsson's patented inventions for the same reason.  Yet no case law exists that supports these unwarranted double discounts.

28.     After his importance and contribution analyses, Dr. Kakaes attempts to further degrade three Ericsson patents, which he deems are essential and have high importance and contribution, by opining they do not "represent any major breakthrough in technology." In particular, Dr. Kakaes argues lack of novelty or obviousness of those inventions by using analogies. However, it is well established in U.S. patent law that there is a presumption of validity for U.S. patents, and that invalidity must be proven by clear and convincing evidence. Dr. Kakaes does not acknowledge his burden, and provides no evidence at all. There is no legal principle, and Dr. Kakaes cites none, that invalidity—or lack of value for that matter—can be established with analogies alone.

29.     I continue to believe that Ericsson's licenses are the best measure of a reasonable value for a license to Ericsson's 2G, 3G, and 4G portfolios. The licenses are the result of the efforts of highly motivated and highly experienced technical, legal, and licensing experts, and culminate from hundreds of hours of due diligence in a high-stakes setting. The same issues raised in this litigation are often the very same issues raised during technical negotiations, such as essentiality, validity, claim construction, joint/divided infringement, royalty base, royalty rate, etc.  However, in technical negotiations, legal and factual misunderstandings are corrected and accounted for before entering those licenses.  Ericsson's licenses thus reflect a

1  much more considered view of the strengths and weaknesses for each of these

2  items.  The rates expressed in the licenses are commensurate with a reasonable

3  value for a license to Ericsson's 2G, 3G, and 4G patent portfolios as judged by the

4  industry. It is Ericsson's licenses, and not Dr. Kakaes's declaration counting metric,

5  or his other flawed analyses, that should form the basis for valuing a license to a

6  handset vendor like TCL to Ericsson's 2G, 3G, and 4G patent portfolios.

7  **II.     BACKGROUND**

8          A.     **Technical Qualifications**

9          30.     Prior to joining Ericsson, I earned a Bachelor of Science degree in

10  mechanical engineering from Stanford University. At Stanford, I took courses in

11  electrical engineering, computer science, and mathematics, and many of my degree

12  courses required competence in those areas. My coursework covered, among other

13  things, differential calculus of several variables, ordinary differential equations with

14  linear algebra, matrix theory, statistics, dynamic and control system design, the

15  modeling and design of electromechanical systems, digital and analog electronic

16  circuits and design, sensors and sensor circuit design, and computer programming

17  methodology.  My lab and project work, as a student and as a teaching assistant for

18  two graduate-level engineering courses, covered, among other things, digital and

19  analog circuits and circuit design, processing and analysis of analog and digital

20  signals, sensors and their applications in different electronic systems, and computer

21  programming in the C and Matlab languages.  Based on my academic performance,

22  I was admitted to the Phi Beta Kappa and Tau Beta Pi Engineering honor societies,

23  and graduated from Stanford with distinction.

24          B.     **Legal and Industry Experience**

25          31.     After graduating from Stanford, I then pursued and obtained my Juris

26  Doctorate with honors from Harvard Law School.  At Harvard, I took multiple

27  intellectual-property-related courses, including patent law, advanced patent law,

28  international law, property law, contract law, and antitrust law, some of which

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  addressed domestic and foreign intellectual property law issues.  For example, my

2  patent law course focused on the doctrinal rules, justifying theories, and practical

3  effect of patent laws.  That course covered the rules and processes governing what

4  may be patented, how patents are obtained and enforced, and how courts and

5  practitioners assess a patent's validity and scope.  While the focus was on patent

6  law in the United States, the coursework and textbook also compared the United

7  States patent system to those of other countries, such as in Europe and Japan.  My

8  advanced patent law course was on the law and business of patents.  In that course,

9  we examined the theory, business, and practice of patents, such as cross-licensing;

10  alliances; strategic use of litigation; patent pools; standard setting organizations; the

11  role of patents in specific industries (e.g., semiconductors and software); and

12  international harmonization and the changing role of the TRIPS agreement, among

13  other things. We analyzed business school case studies, legal case studies, and

14  empirical and theoretical economics around patents.  Based on my performance, I

15  graduated from Harvard Law School with honors. After graduation, I took and

16  passed the Texas bar examination and, two years later, the Unites States Patent

17  Office patent bar examination (USPTO Reg #61,800).

18      32.     From 2005 to 2010, I worked as a patent lawyer at the international

19  law firm of Baker Botts L.L.P. in Dallas, Texas. During that time, I represented

20  Ericsson and other telecommunications companies in patent lawsuits. These cases

21  spanned a large number of technologies, including intelligent networking in a

22  2G/3G cellular communication network to process prepaid wireless calls, routing

23  text messages over a 2G/3G cellular and IP-based backbone network, sending

24  commands via text messages over a 2G/3G cellular communication network,

25  emailing over a 2G/3G cellular and fixed communication network, routing packets

26  and other datagrams over local and backbone fiber-based networks, communicating

27  real-time media over a packet-switched 2G/3G cellular network, activating cards at

28  the point of sale over a communication network, and switching data between

1   different types of communication networks. In connection with these cases, I

2   analyzed and wrote a number of briefs on a variety of patent law issues, including

3   claim construction, patent infringement, validity, enforceability, and damages. I

4   also drafted, reviewed, and/or analyzed claim charts for infringement and invalidity

5   contentions, and created technical tutorials and wrote briefs on how those 2G/3G

6   cellular networks worked.  I also obtained patent-prosecution experience, writing

7   around 30 telecommunications-related patent applications as well responding to

8   communications from the Patent Office; published two scholarly articles on patent

9   law issues, including willful infringement and product marking; and wrote a

10  position paper for the American Bar Association on the patentability of inventions

11  under 35 USC § 101.

12        33.    In 2010, I left Baker Botts to join Ericsson, and became licensing

13  counsel in its patent licensing group. At Ericsson, I have accumulated over six years

14  of experience working with the company's patent portfolios, focusing in particular

15  on patent analysis and patent portfolio valuation in the context of patent licensing. I

16  have been involved in the development and licensing of Ericsson's 2G, 3G, 4G, and

17  user equipment (UE) implementation patents and patent portfolios, and have been

18  part of Ericsson's patent portfolio pricing team since 2012.

19        34.    For example, my first assignment in 2010 was, as part of a team of

20  Ericsson engineers, lawyers, and licensing professionals, to present Ericsson's

21  2G/3G user equipment patent portfolio in cross-licensing discussions with

22  Samsung, to scrutinize and respond to Samsung's analysis of Ericsson's portfolio,

23  and to analyze and provide responses to Samsung regarding Samsung's 2G/3G

24  network-side patent portfolio. Similarly, in numerous technical licensing

25  discussions with other telecommunications companies over the past six years, as

26  part of my role, I have presented Ericsson's 2G, 3G, and 4G patent portfolios,

27  exchanged Ericsson's 2G, 3G, and 4G claim charts, received and analyzed

28  responses to Ericsson's charted patents, and provided responses to those other

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   companies. I have also analyzed, discussed, and debated the 2G, 3G, and 4G claim

2   charts and relative patent portfolio strengths of these other telecommunications

3   companies.  I have directly participated in and managed technical licensing

4   discussions over Ericsson's 2G, 3G, and/or 4G patent portfolios with Samsung,

5   Pantech, Huawei, Apple, Amazon, Sharp, Kyocera, and Fujitsu. I have also directly

6   participated in and managed technical licensing discussions with Amazon and

7   Microsoft over Ericsson's UE implementation patent portfolio.

8          35.    In connection with the technical licensing discussions over Ericsson's

9   standard-essential patent portfolios, and my position on Ericsson's patent portfolio

10  pricing team, I have studied, analyzed, presented, explained, and debated with

11  representatives of other companies the various patent portfolio landscapes, patent

12  portfolio strength metrics for standard-essential patent portfolios, and pricing

13  methodologies for standard-essential patent portfolios, including the ones I describe

14  in my testimony below. As part of this and other responsibilities at Ericsson, I have

15  studied ETSI declaration-counting analyses, ETSI declarations, and the ETSI IPR

16  Policy; several essentiality studies performed by third parties of those declared

17  patents; and studies of 3GPP contributions in connection with measuring relative

18  patent portfolio strength for standard essential patents. At Ericsson, I have also

19  participated in making ETSI declarations, participated as Ericsson's representative

20  to India's TSDSI IPR Policy working group to form that Policy in view of the ETSI

21  IPR Policy, and commissioned a study of 3GPP contributions.

22         36.    As part of my day-to-day job, I have also studied extensively the 2G,

23  3G, 4G, and handset technology that relates to Ericsson's patent claim charts,

24  learning about the technology through frequent interaction with inventors, 3GPP

25  delegates, and researchers at Ericsson, and reading technology tutorials to

26  supplement my knowledge.  Moreover, for two years, I was part of the 2G/3G focus

27  portfolio team, which manages Ericsson's 2G/3G patent portfolio, and I thus had a

28  responsibility for understanding Ericsson's 2G/3G patent portfolio as a whole.  I

have also participated in the development of Ericsson's 4G patent portfolio, editing and analyzing dozens of 4G patent application claim sets and providing numerous reviews of Ericsson's 4G patent claim charts.  In addition, I co-managed Ericsson's handset (UE) implementation patent portfolio from 2011-2013, creating and editing claim charts to include in that portfolio, and today I continue to participate on the internal Ericsson team responsible for that portfolio.  In that role, I have worked with Ericsson inventors, engineers, and reverse engineering companies to analyze Ericsson's handset implementation patents and infringing handsets, and to further develop the handset implementation patent portfolio. I have also worked with Ericsson inventors, engineers, and reverse engineering companies to assess the handset implementation patent portfolios of other companies, such as ST-Ericsson, Sony-Ericsson, and Nortel, as part of potential (and actual) patent transfers and acquisitions.

37.    Most technical licensing discussions lead to business discussions and executing a license agreement.  When Ericsson has been forced to defend its patent rights in litigation, I have often been asked to participate in the preparation and management of that process. I have been involved in preparing for and managing Ericsson's litigations with Samsung and Apple, both those in the U.S. and in other countries. I have also been involved in preparing for and managing other Ericsson litigations involving Micromax, Gionee, Intex, Xiaomi, Lava, and iBall in India, and headed Ericsson's emerging market licensing team from 2013-2016, which coordinates patent licensing and patent assertions in emerging markets. The litigations with Apple, Samsung, and iBall have since concluded, and all three companies have executed patent licenses with Ericsson. These litigations included patents from Ericsson's 2G, 3G, or 4G patent portfolios, and have included analyses of 2G, 3G, or 4G patent portfolio landscapes and strength metrics.

38.    In 2016, I became director of Ericsson's 5G program within the IPR & Licensing group. I am responsible for working with Ericsson's researchers and

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

engineers as they develop the newest 5G technology to ensure that Ericsson's cutting-edge technical solutions are adequately protected by patent rights.  In my role, I have participated in the development and analysis of Ericsson's 4G Evolution and 5G New Radio patent applications and patent portfolios, and have studied patent portfolio landscapes and metrics in the cellular industry further. For example, I attended 3GPP technical meetings in August 2016 in Gothenburg, Sweden to study 3GPP-related interactions firsthand.

39.     In my career, I have personally reviewed more than 400 claim charts for patents relevant to the 2G, 3G, and 4G standards, and more than 100 claim charts for patents relevant to handset non-standardized technology. Additionally, I have reviewed over 1000 telecommunications patents and spent over 10,000 hours performing patent analysis and portfolio valuations of telecommunications patents. As part of my work at Ericsson, I have also analyzed patents from many jurisdictions, and have gained a working understanding of the patent laws of jurisdictions outside the U.S., including Europe, India, Japan, and others.  As I mentioned above, I have also studied various patent portfolio landscapes and metrics.  Thus, I consider myself qualified to testify to the facts and opinions set forth in this rebuttal witness statement.

## C.     Person of Ordinary Skill in the Art

40.     I understand that TCL's Dr. Kakaes and Dr. Ding have indicated that a person of ordinary skill in the art to offer the opinions they have offered would have (1) a bachelor's degree in electrical engineering or computer science or a related field, with one or two years of relevant industry experience; or (2) a masters degree in electrical engineering or computer science or a related field. Dr. Ding explained that the relevant industry experience would be "working in the wireless industry or working on patent analysis or subjects that are related to cellular wireless

communications."[7] Dr. Kakaes also believes that a person of ordinary skill in the art would have a working understanding of cellular transmission protocols.[8]

41.   As detailed above, I meet the qualifications of a person of ordinary skill in the art according to the definition provided by TCL's Dr. Kakaes and Dr. Ding. I received a mechanical engineering degree with distinction from a top engineering program in the United States (Stanford University), with coursework in electrical engineering, computer programming, and mathematics. I then worked on patent analysis in the cellular industry at a top intellectual property law firm for five years (Baker Botts L.L.P.) and at a top telecommunications company since 2010 (Ericsson).

42.   Indeed, I have extensive technical patent analysis experience in the cellular telecommunications industry from my time at Baker Botts, as well as through my 2G, 3G, 4G, 5G, and handset implementation experience at Ericsson. At Baker Botts, I studied 2G and 3G technology as part of the litigation work that I performed.  At Ericsson, I have analyzed 2G, 3G, 4G, 5G, and handset technology in the context of patent development, patent portfolio management, patent licensing negotiations, patent sales and acquisitions, and patent litigations. Indeed, being appointed Ericsson's director of 5G in the IPR and Licensing group validates that I have the experience needed to perform patent analysis of standardized technology.

## III.   COUNTING ETSI IPR DECLARATIONS IS A POOR METRIC FOR MEASURING RELATIVE PATENT PORTFOLIO STRENGTH

43.   Dr. Kakaes's declaration counting metric (his "patent census") suffers from the same flaws that I described in my opening witness statement. ETSI patent declarations are not intended to show what is actually essential, but rather what may be or may become essential, a highly subjective standard.  The declarations are also

---

[7] Ding Dep. Tr. at 16:17-17:1.
[8] Kakaes Opening Statement at ¶ 109.

1   self-policed, and there are no negative consequences for over-declaring beyond

2   what may be or may become essential. Nor do blanket assumptions that all

3   companies routinely over-declare or are incentivized to over-declare patents render

4   declaration analyses precise or reliable. Due to these problems, ETSI declaration

5   metrics are considered to be a very poor indicator of relative patent portfolio

6   strength by companies that participate heavily in standardization, and by well-

7   known analyst firm Signals Research that measures relative patent portfolio

8   strength.  This metric also does not correlate well with the size or strength of patent

9   portfolios that I have analyzed in technical discussions with other companies in the

10   industry who have declared patents to ETSI.

11       44.     Numerous times, Dr. Kakaes refers to his patent census as including

12   "declared-essential patents" or "patents that have been declared as being essential"

13   and presents his results in this manner. I find this nomenclature to be misleading.

14   The purpose of doing patent portfolio landscapes is to find a reliable starting point

15   for estimating shares of standard essential patents. By defining "declared patents"

16   as "declared-<u>essential</u> patents," Dr. Kakaes adds, with his nomenclature, a legal

17   weight and thus an added reliability that does not exist.  No one has declared these

18   patents as being essential, so referring to them as "declared-essential patents" is

19   incorrect.

20   IV.   **THE ESSENTIALITY LANDSCAPING PERFORMED BY CONCUR**

21        **IP IS ALSO FLAWED**

22       45.     The essentiality study performed by Dr. Kakaes's team at Concur IP

23   (the "industry-wide essentiality analysis") suffers from many of the flaws that I

24   described in my opening witness statement for third party essentiality studies

25   generally.  For example, it appears that the Concur IP team spent only <u>45 minutes</u>

26   to analyze the essentiality of each patent.[9] In my experience, an hour or less of

27   ───────────────────

28   [9] Sinha Dep. Tr. at 51:13-17.

1   essentiality analysis is far from sufficient to select a member of a patent family for

2   analysis, read and analyze the selected patent, analyze the patent claims in detail,

3   read and analyze the patent's prosecution history, and collect and analyze the

4   relevant parts of the cited standards to make an essentiality determination,

5   especially without the benefit of a claim chart.

6       46.     It also appears that the Concur IP team (i) has no patent law education

7   and it's unclear what level of  legal training they have acquired and for what

8   jurisdictions, putting into question whether their ultimate conclusions are in line

9   with the law; (ii) has no extensive background with languages or dialects outside of

10  India, putting into question their understanding of the plain meaning of claim

11  language outside of India; (iii) has never presented this type of analysis in a peer-

12  reviewed context like licensing discussions that resulted in a license agreement,

13  putting into question whether there has ever been even tacit acceptance of their

14  work product; (iv) did not consider all patents within a patent family, biasing their

15  results; (v) did not always read fully the patents that they did consider, contrary to

16  the law in at least the United States;[10] (vi) did not consider the patents' prosecution

17  histories, contrary to the law in at least the United States;[11] and (vii) suffered from

18  clear bias, having been paid by TCL.

19      47.     The effort this team made to examine essentiality does not come close

20  to the rigorous patent portfolio analysis performed by highly experienced and

21  highly motivated legal, technical, and licensing experts during Ericsson's technical

22  licensing discussions. The Concur IP analysis also reflects bias that does not appear

23  in Ericsson's resulting license agreements, which are the unbiased products of

24  Ericsson's technical and business licensing negotiations. While Dr. Kakaes

25  concludes that the consistency between the results of the Concur IP essentiality

26  _____

27  [10] Ding Dep. Tr. at 42:24-43:19.
    [11] Ding Dep. Tr. at 30:10-18; 41:9-22.

28

study and his declaration counting study (the "patent census") are a positive sign, two flawed approaches do not result in a reliable approach.  In fact, the known unreliability of counting ETSI declarations (the "patent census") casts serious doubt on the reliability of the Concur IP results; a rigorous essentiality study would not match the ETSI declaration counting results. Dr. Kakaes's opinions about these two metrics should be given no weight.

## V.   DR. KAKAES'S OPINIONS ABOUT THE ESSENTIALITY OF ERICSSON'S PATENTED INVENTIONS ARE FLAWED

48.   Dr. Kakaes and Dr. Jayant concede that they cannot find any evidence of non-essentiality for patented inventions in over 100 of Ericsson's patent families. In the context of a patent licensing technical negotiation, that amounts to a concession that over 100 of Ericsson's patent families are, in fact, essential. These uncontested families are noted here below:

| No Dispute on Essentiality | | | | | |
|---|---|---|---|---|---|
| P04817 | P10762 | P19559 | P24466 | P26648 | P32498 |
| P05544 | P10774 | P19911 | P24673 | P26715 | P32787 |
| P05687 | P10808 | P20058 | P24698 | P26744 | P32817 |
| P05860 | P10991 | P21172 | P24860 | P26993 | P33108 |
| P05935 | P10992 | P21239 | P24916 | P27172 | P33465 |
| P06199 | P10993 | P21430 | P24985 | P28186 | P33485 |
| P06203 | P11151 | P21738 | P25238 | P28235 | P34406 |
| P06553 | P11451 | P22621 | P25317 | P28627 | P34420 |
| P07288 | P11899 | P23018 | P25336 | P28747 | P34422 |
| P07873 | P11904 | P23041 | P25476 | P29465 | P34426 |
| P08153 | P12207 | P23384 | P25496 | P30030 | P35090 |
| P08338 | P13088 | P23412 | P25642 | P30749 | P35129 |
| P09037 | P14596 | P23426 | P25658 | P30980 | P35168 |
| P09085 | P14897 | P23682 | P25975 | P31172 | P35575 |
| P09262 | P15300 | P23893 | P25999 | P31186 | P35592 |
| P09286 | P17631 | P23894 | P26030 | P31189 | P37869 |
| P09716 | P18216 | P24000 | P26071 | P31755 | |
| P10310 | P18674 | P24228 | P26132 | P31773 | |
| P10334 | P18728 | P24241 | P26261 | P31923 | |
| P10335 | P19208 | P24459 | P26379 | P32066 | |

49.     For the remaining patent families, Dr. Kakaes and Dr. Jayant offer opinions that Ericsson's exemplary claim charts are not essential to the 2G, 3G, or 4G standards for handsets.  I disagree.

50.     In this section, I begin by explaining Ericsson's patenting procedure; the rigorous process that Ericsson undertakes to create, review, and approve its claim charts for licensing negotiations; and then the continuing process of review and re-approval over time as Ericsson receives feedback from prospective licensees about Ericsson's approved claim charts.  This explanation expands on the description of the process that I provided in my opening witness statement. An understanding of this process is important, because it acts as a backdrop against which to review Dr. Kakaes's and Dr. Jayant's opinions. In particular, they are not arguing against a claim chart created by one who is not skilled in the relevant technological art, but against the rigorously and continuously vetted work product of a team of Ericsson technical experts and patent law experts.

51.     After explaining Ericsson's claim charting process, I list and explain the methodological errors that Dr. Kakaes commits in evaluating the essentiality of Ericsson's 2G, 3G, and 4G claim charts. I provide discrete examples, and identify how often Dr. Kakaes commits these types of errors throughout his analysis. One or more of these errors affect each and every one of the analyses where he concludes that Ericsson's claim charts are not essential. For this, I aggregated the results of the detailed analysis that I performed of Dr. Kakaes's review of certain Ericsson claim charts, as well as the detailed analyses that Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen performed regarding Dr. Kakaes's and Dr. Jayant's review of Ericsson's other claim charts. After explaining the methodological errors that Dr. Kakaes commits, I conclude by providing my detailed analysis and rebuttal of Dr. Kakaes's opinions regarding certain of Ericsson's claim charts, including the claim charts that Dr. Kakaes highlighted in the main body of his original expert report as being representative of his essentiality analysis.

52. As I will show below, Dr. Kakaes' errors in his analysis make his ultimate opinions of non-essentiality inaccurate.

A. **Ericsson's Claim Charts are The Result of a Rigorous, Continuous Analysis of Essentiality by Technical and Patent Law Experts at Ericsson**

53. Ericsson protects the inventions it contributes to 3GPP with patent applications, and has a set procedure for its patenting process. To begin, Ericsson engineers who develop innovative technology, and wish to contribute that technology to 3GPP for consideration, submit an invention disclosure to Ericsson's patent development unit. The invention disclosure will contain key details about the invention, such as the background to the invention, a summary of the invention and its benefits, a detailed description, figures, and exemplary claims.

54. Patent professionals in the patent development unit will review the invention disclosure, and typically work with outside counsel to draft, review, and file the invention in a patent application, with the assistance, review, and approval by the inventors.  The patent professionals may also consult a patent review board made up of technical experts in the inventor's area of expertise before filing the patent application.

55. After Ericsson files the patent application, Ericsson submits its technical contribution to 3GPP. This typically occurs through Ericsson's submission of a contribution document called a "TDoc" to the relevant working group in 3GPP, and the invention may then be considered by 3GPP and incorporated into the standard.  As the claims of Ericsson's patent application are prosecuted (or after the patent is granted in some cases), Ericsson's patent professional and inventor analyze the claims to determine whether they may be essential to the standard. If there is an indication that the claims may be standard

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

essential, Ericsson initiates its thorough claim charting program, described below.[12]

56.     Ericsson's claim charts are rigorously vetted before they can be provided to prospective licensees during negotiations.[13] Ericsson spends, on average, more than 50 man hours creating and analyzing each claim chart, starting with its creation by an Ericsson technical expert (often the inventor) with the assistance of a patent professional who has managed the prosecution of the patent or patent application. The technical expert and patent professional create the claim chart in view of the plain and ordinary meaning of the claim at issue in light of the specification and prosecution history.

57.     The chart is then reviewed by a team of additional telecommunications technical experts, as well as patent and legal professionals, called a "focus portfolio team," which typically consists of five or more members.[14] For example, Dr. Mats Sågfors and Mr. Cason, who are submitting rebuttals of Dr. Kakaes's analysis of Ericsson's 4G claim charts, have participated for many years on Ericsson's 4G/LTE focus portfolio team.  Currently, in addition to Dr. Sågfors, there are four other PhD-level telecommunications experts with decades of telecommunications experience on the LTE focus portfolio team—Dr. Bjorn Gudmundson and Dr. Johan Nyström, both formerly at Ericsson Research and now working full time in IPR & Licensing—and Dr. Anders Wallen and Dr. Stefan Wanstedt, both working part-time in IPR & Licensing and part-time in Ericsson Research.

58.     The focus portfolio team reviews the chart, the patent application (or patent), and the prosecution history, and then confirms that a proper understanding

---

[12] *See also* EX-4523 (Powerpoint titled "Claim Chart Process").

[13] *See* EX-4523 (Powerpoint titled "Claim Chart Process").

[14] The technical experts who create and review the charts typically have the equivalent of a bachelor's degree as well as an advanced degree in telecommunications engineering, computer science and engineering, or electrical engineering, and several years of experience as researchers in telecommunications or as product or system engineers in telecommunications, and have a working understanding of cellular transmission protocols.

of the technology and the law has been applied, including that the claim chart

properly expresses the mapping of the claim onto the standard according to the

claim's plain and ordinary meaning in view of the intrinsic record. As part of this

review, technical experts on the focus portfolio team, or the initial expert or

prosecuting patent professional, may be asked to add an explanation of Ericsson's

mapping, or add further evidence from the standard.  Or in some cases, the focus

portfolio team may reject the claim chart at this stage as not mapping to the

standard.

59.     If the chart passes this initial review by the focus portfolio team (and

there is a notice of allowance of the patent application, or a granted patent), the

chart is then reviewed by an experienced U.S. patent lawyer or European patent

lawyer, depending on the charted patent's jurisdiction, who can be in-house or

external to Ericsson. This person reviews the charted claim, the patent application

(or patent), and the prosecution history, and provides feedback to the focus

portfolio team regarding the mapping of the claim to the standard. The focus

portfolio team considers the feedback and then decides whether to approve (or

reject) the claim chart for use during license negotiations, either as part of

Ericsson's handset-related essential patent portfolio, as part of Ericsson's network-

related essential patent portfolio, or both. Only after the claim charts have passed all

of these reviews and the patent issues, will Ericsson present the claim charts to

potential licensees for consideration in licensing discussions.

60.     Altogether, this process takes over 50 man hours per chart. Each of the

claim charts provided to TCL as part of this litigation have passed through this

rigorous review process. I have substantial experience with this process as I was a

member of Ericsson's 2G and 3G focus portfolio team for two years. I have also

acted as the second review lawyer for the 4G focus portfolio team on many

occasions.  Moreover, I have participated in many 2G, 3G, and 4G focus portfolio

team meetings. Additionally, I have participated in the invention disclosure

1  template drafting and submission process, in the patent claim and application

2  drafting and submission process, and in the patent claim charting process, in my

3  role as the director of 5G.

4      61.    Approved charts are then continuously monitored and updated, as

5  necessary, over time by the focus portfolio team, to address feedback from

6  prospective licensees. This feedback can, for example, lead to further clarifications

7  in the claim charts, or additional support from the 3GPP technical specifications.

8  This feedback can also lead to pursuing corrections of claims at the relevant Patent

9  Office, changes in claim language in continuation patent applications, or removing

10  a claim chart from approved status in some rare cases. Charts may also be created

11  for patent family members in other jurisdictions besides the U.S. or Europe,

12  depending on the needs of the particular licensing discussion, with the assistance of

13  patent law experts in those jurisdictions.

14      62.    As a result, each claim chart that Dr. Kakaes and Dr. Jayant dismisses

15  within a handful of hours of analysis has been examined and found to be essential

16  by several technical and patent law experts within Ericsson after spending over 50

17  man hours evaluating essentiality. These experts considered the claim language, the

18  patent specification, the prosecution history, and how the standards work, and often

19  participated in several technical discussions to determine the mapping of the claim

20  to the standard. The technical and patent law experts who work for our licensees

21  also performed this analysis before taking a license, as I personally witnessed in

22  technical licensing discussions with those companies.

23      63.    Accordingly, Ericsson spends considerable resources drafting and

24  finalizing its claim charts, and Ericsson's licensees also spend considerable

25  resources evaluating these charts. In contrast, as I show below, Drs. Kakaes and

26  Jayant provide many opinions based on a handful of hours of analysis per chart,

27  with no evidence (or minimal evidence) to support their opinions. Their analyses do

28  not approach the level of review applied by Ericsson and its licensees.  Ericsson's

licenses thus reflect the value of Ericsson's 2G, 3G, and 4G patent portfolios with much higher certainty than any analyses based on the reviews of Drs. Kakaes and Jayant, especially after considering the numerous errors in their analyses below.

64. In his expert report and all of his supplemental reports, Dr. Kakaes never indicated that he had analyzed Ericsson's claim charts with the support of any expert besides Dr. Jayant. He for the first time reveals information about this support in his opening witness statement, claiming that these individuals "provided a second set of eyes, and in the process provided valuable input that substantially increased the overall reliability of my analysis and conclusions."[15] But surely, if they had played any significant role, he would have mentioned that in his expert report, and there would be documents evidencing those interactions. He didn't mention them, and no such documents exist. Moreover, Dr. Kakaes provides no information about what these individuals actually did, what methodologies they actually used, or what experience they have with patent analysis, the patent laws of the United States and foreign jurisdictions, and the standards at issue. It's thus unclear (and unsupported) how these individuals provided "valuable input" or how that input "substantially increased" the overall reliability of his analysis and conclusions.

### B. Dr. Kakaes Commits Several Methodological Errors in His Analysis of The Essentiality of Ericsson's Claim Charts

65. In this subsection, I list and explain the methodological errors that Dr. Kakaes and Dr. Jayant commit in evaluating the essentiality of Ericsson's 2G, 3G, and 4G claim charts. I provide discrete examples, and identify how often Dr. Kakaes and Dr. Jayant commit these types of errors across their essentiality analysis. One or more of these errors affect each and every one of their reviews of Ericsson's claim charts, where they conclude that Ericsson's claim charts are not

---

[15] Kakaes Opening Statement at ¶¶ 102-03.

essential. For this, I aggregated the results of the detailed analysis that I performed of Dr. Kakaes's analysis of certain Ericsson claim charts, as well as the detailed analyses that Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen performed regarding Dr. Kakaes's (and Dr. Jayant's) analysis of Ericsson's other claim charts. By aggregating the results, I show on a macro level how Dr. Kakaes's (including Dr. Jayant's) essentiality analysis is flawed.

66.     Dr. Kakaes's errors in his essentiality analysis can be grouped into the following four categories, which apply to one or more families that he reviewed:

(1) with regard to about 40 patent families, Dr. Kakaes considers a claim chart to be in Ericsson's handset (UE) licensing portfolio when it isn't, making his analysis of these charts irrelevant to this case, which only relates to handsets;

(2) with regard to almost 50 patent families, Dr. Kakaes reaches his conclusions of non-essentiality after misapplying black-letter law concerning the proper construction of claim terms;

(3) with regard to over 40 patent families, Dr. Kakaes misinterprets either Ericsson's claim charts, the standard specifications, or both to arrive at his conclusions of non-essentiality; and

(4) Dr. Kakaes ignores, misunderstands, or misapplies the law of direct infringement, the ETSI IPR Policy, and foreign law to reach his conclusions of non-essentiality.

67.     With regard to his first category of errors, I noted above in my discussion of Ericsson's claim charting process how Ericsson's focus portfolio team adds approved claim charts to one of two types of portfolios: a handset-related (or UE) essential patent portfolio, and a network-related (e.g., base station) essential patent portfolio. In licensing discussions, Ericsson then sends the UE essential patent claim charts from its UE portfolio to UE vendors (like TCL), and sends the network-related essential patent claim charts from its network-related portfolio to

1    network infrastructure vendors.

2    68.    Ericsson's practice is not to assert handset-related (UE) essential

3    patent claim charts against network infrastructure vendors, and not to assert

4    network-related essential patent claim charts against handset vendors. Prospective

5    licensees then conduct an essentiality analysis of the handset- or network-related

6    claim charts that apply to them. Ericsson signs licenses with handset vendors after

7    an evaluation of the handset-related claim charts, and signs licenses with network

8    infrastructure vendors after an evaluation of the network-related claim charts.

9    Sometimes, a company like Huawei is both a handset vendor and a network

10   infrastructure vendor, and both sets of claim charts are provided and discussed.

11   69.    In this case, Ericsson's handset-related claim charts are at issue, not

12   Ericsson's network-related claim charts, because TCL is a handset vendor, not a

13   network infrastructure vendor.  Yet Dr. Kakaes does not limit himself to analyzing

14   Ericsson's handset-related claim charts. Instead, for about 40 patent families, he

15   addresses network-related claim charts as well. He then concludes that because

16   those claim charts are, in fact, network-related claim charts, they are not essential.

17   Due to the large number of network-related claim charts, this produces a large

18   percentage decrease in Dr. Kakaes's calculations. But Ericsson does not assert

19   network-related claim charts against vendors of handsets like TCL, either in

20   licensing discussions or in litigation. These network-related claim charts thus have

21   no bearing on the strength or weakness of Ericsson's handset-related (UE) essential

22   patent portfolio, or on a proper royalty rate for a license to Ericsson's handset-

23   related (UE) essential patent portfolio.

24   70.    With regard to his second category of errors, Dr. Kakaes reaches his

25   conclusions of non-essentiality after misapplying black-letter law concerning the

26   proper construction of claim terms, limiting the language in improper ways to avoid

27   a conclusion of essentiality.  In his analysis of almost 50 patent families, he limits

28   the plain meaning of claim language (i) without offering any evidence in support,

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

(ii) in a manner that contradicts or ignores the intrinsic evidence, (iii) by reading in extraneous limitations from the patent prosecution history without a clear disclaimer or disavowal, and/or (iv) by importing extraneous limitations from extrinsic evidence.  The Federal Circuit considers claim constructions such as these as either "not useful" or otherwise contrary to law.  *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005); *see also* Art. 69 of the European Patent Convention; Protocol on the Interpretation of Article 69 EPC. His conclusions that no "reasonable" interpretation could support Ericsson's essentiality positions are incorrect, as his interpretations are either unsupported or are otherwise not in line with the law. This is especially true in view of the rigorous process that Ericsson uses to create, review, and approve the claim charts at issue here for licensing purposes.

71.    As one example, Dr. Kakaes makes a claim construction argument without providing any support in his non-essentiality opinion for the P08575 patent family. He argues that Ericsson's U.S. 6,363,058 of the P08575 family is not essential because the 3G standard does not require (among other things) the claim element of "separating data within the radio bearer services into a plurality of portions." Ericsson's focus portfolio team of technical experts and patent law experts indicated in the claim chart that the claimed "separating" corresponds to the 3G standard's "segmentation" as shown below, highlighted in yellow below:



| separating data within the radio bearer services into a plurality of portions; and | [2]<br>5       Radio interface protocol architecture<br>5.3      Layer 2 Services and Functions<br>5.3.2    RLC Services and Functions<br>5.3.2.2 RLC Functions<br>-   Segmentation and reassembly. This function performs segmentation/reassembly of variable-length upper layer PDUs into/from smaller RLC PDUs. The RLC PDU size is adjustable to the actual set of transport formats.<br>[…]<br><br>5.3.5    Data flows through Layer 2<br>[…]<br>NOTE:   […] For instance in the user plane, the segmentation/reassembly function is needed for the case of real-time services using high and possibly variable bit rates. For such services higher layer PDUs shall be segmented into reasonably sized RLC PDUs of fixed length […]<br><br>*[Ericsson comment: "separating data" corresponds to segmentation.]* |

16

72.     Dr. Kakaes argues that the claimed "separating" cannot be the "segmentation" recited in the standard, because "separating" excludes the concept of "segmentation" as shown in his appendix below, with yellow highlighting:

> *See* ERIC_TCL00191461.  Notably, Ericsson comments that "'separating data' corresponds to segmentation":
>
> *[Ericsson comment: "separating data" corresponds to segmentation.]*
>
> However, segmenting an upper layer PDU into smaller RLC PDUs is simply that— *segmenting*, i.e., cutting it into smaller pieces.  Ericsson does not and cannot point to anything that would support its conclusory statement that there is such a correspondence.

17

73.     What Dr. Kakaes is thus arguing is that segmenting a packet data unit ("PDU") into smaller packet data units ("PDUs") is not separating that data into those smaller data units. Notably, Dr. Kakaes provides no support for excluding the concept of "segmentation" from the claim term "separating."[18] And although he defines "segmenting" as "cutting it into smaller pieces," he does not say where this definition comes from or why it would be excluded from the plain and ordinary meaning of separating.[19] Indeed, he does not even attempt to define the actual claim term "separating." He simply suggests that whatever it means, it is not "cutting . . . into smaller pieces."[20] And again, he provides no support or evidence for this conclusion.[21]

---

[16] EX-5081.

[17] Kakaes Opening Statement Appendix, EX-1639 at A-P08575_3G.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Ericsson's Dr. Sågfors addresses this family in his testimony, and provides his opinion and evidence showing that "separating" does fairly cover "segmentation."

74.     This is far from a proper application of U.S. claim construction law to limit the scope of claim language. The Federal Circuit has explained that these arguments are improper because "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).  Conclusory, unsupported assertions limiting the scope of claim language are also not useful in the context of technical licensing negotiations, and would be rejected there as well. But it is an example of Dr. Kakaes's claim construction positions for almost 30 of Ericsson's patent families, where he concludes without any support that no "reasonable" interpretation supports Ericsson's position, with the specific patent families listed below:

| Unsupported Claim Constructions | | | |
|---|---|---|---|
| P04817 | P07782 | P23563 | P30565 |
| P04940 | P07873 | P23633 | P31006 |
| P06425 | P08804 | P23985 | P31931 |
| P06691 | P10896 | P24058 | P31948 |
| P06697 | P11289 | P24459 | P32205 |
| P07567 | P13459 | P25936 | |
| P07707 | P18740 | P27011 | |
| P07761 | P23384 | P29338 | |

75.     I detail more examples from this category of errors in my analysis below of (i) certain 2G claim charts that Dr. Kakaes reviewed, and (ii) certain claim charts that Dr. Kakaes previously showcased in his original expert report as being representative of his methodology.  The other Ericsson experts (Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen) address this category of errors for the other claim charts.

76.   With regard to his third category of errors, when comparing Ericsson's claims to the relevant standard sections, Dr. Kakaes misinterprets Ericsson's claim charts or misunderstands the cited standard specifications at issue for over 40 of Ericsson's patent families, to reach his conclusions of non-essentiality.  The patent families for which Dr. Kakaes makes these mistakes are noted below:

| Misunderstanding Charts or Standard | | | | |
|---|---|---|---|---|
| P04817 | P07669 | P09646 | P21428 | P25642 |
| P04940 | P07782 | P09715 | P23016 | P29482 |
| P06697 | P07873 | P10628 | P23415 | P31649 |
| P06699 | P07925 | P11904 | P23985 | P31773 |
| P07567 | P08167 | P12947 | P24058 | P32066 |
| P07592 | P08333 | P14592 | P24228 | P32468 |
| P07669 | P08430 | P18740 | P24459 | P33858 |
| P07707 | P08575 | P19103 | P25318 | P37106 |
| P07761 | P09040 | P20741 | P25409 | |

77.   As one example, for the P04940 family, Dr. Kakaes argues that a claim element does not cover the 2G standard because Ericsson does not identify the "signal" in the 2G standard and that the word "signal" does not appear in the claim chart as shown below in his appendix, with yellow highlighting:

> 1.   There is no one "signal" that is transmitted in one of two different ways. ==Ericsson fails to identify where in the standard "the signal" is described.  Nowhere in the claim chart does the word "signal" appear.==  (See ERIC_TCL00191164-7)  If a full rate channel is allocated, then a first signal is generated appropriate for transmission on said full rate channel.  The specifics of how that signal is generated are defined in Section 3.1 of GSM 05.03.  If a half rate channel is allocated a different signal is generated for transmission on said half rate channel. The specifics of how that signal is generated are defined in Section 3.2 of GSM 05.03. (See GSM 05.03 version 7.1.1.)

[22]

78.   However, these statements reveal that Dr. Kakaes did not spend

_____

[22] Kakaes Opening Statement Appendix, EX-1639 at A-P04940_2G.

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

sufficient time reviewing Ericsson's claim chart and the cited standard specification. First, the word "signal" does appear in Ericsson's chart, as highlighted in yellow below. Second, Ericsson does identify where the "signal" of the 2G standard is. It is the "encoded speech or user data" carried on the traffic channel. This is plain on the face of Ericsson's chart, and is confirmed by the patent specification, which states that "[t]he channels may be generally categorized as either voice channels or control channels. Voice channels are used to transmit speech or other data."[23] This aligns with the 2G standard, which states that traffic channels carry "either encoded speech or user data":



79.    This is only one example of Dr. Kakaes's third category of errors.  I will describe other examples in my technical rebuttal below for certain cases, and Dr. Sågfors, Mr. Cason, Dr. Bruhn, and Ms. Chen provide further examples in their analyses.

80.    With regard to his fourth category of errors, Dr. Kakaes ignores, misunderstands, or misapplies the law of direct infringement, the ETSI IPR Policy, and/or foreign law.  For several claim charts, he offers opinions that either ignore the doctrine of equivalents or are otherwise out of line with the law of direct infringement in the United States, to arrive at his conclusions of non-essentiality. He also offers unsupported legal conclusions about "essentiality" under the ETSI

---

[23] EX-4391 (U.S. 5,327,576) at 4:44-47.
[24] EX-4448 (claim chart for P04940).

IPR Policy to arrive at his conclusions of non-essentiality.  And he misunderstands or misapplies foreign law to conclude that foreign patents are not essential.

81.   For example, Dr. Kakaes does not consider the doctrine of equivalents in making his non-essentiality arguments.  In arguing that Ericsson's P11538 patent family, including U.S. 6,549,564, is not essential, Dr. Kakaes comments that the claimed invention requires two multiplication steps of three signals, whereas the standard could be implemented in a different, mathematically equivalent way. But the law in the United States and Europe allows for a party to infringe a patent even when its products do not implement a claimed feature exactly, so long as the product feature is equivalent to the claimed feature.[25] This is called the "doctrine of equivalents." Dr. Kakaes's suggestion of an alternative with equivalent mathematical multiplication steps is still essential under the doctrine of equivalents. *See id.* at 36 ("The known interchangeability of substitutes for an element of a patent is one of the express objective factors noted by *Graver Tank* as bearing upon whether the accused device is substantially the same as the patented invention."). In other words, multiplying a first signal and a second signal, and then multiplying the result with a third signal is equivalent to multiplying those three signals in any other manner or using the tabulated result of two signals and multiplying with the third. For example, $2 \times (3 \times 4) = 24$ is equivalent to $2 \times 3 \times 4 = 24$, which is equivalent to $(2 \times 4) \times 3 = 24$, or $(3 \times 4) \times 2 = 24$, or $6 \times 4 = 24$. It is therefore legal error to conclude that the claimed invention is not essential in view of possible alternatives without also considering the doctrine of equivalents.

82.   As another example, Dr. Kakaes does not provide any guiding legal principles for non-U.S. law, nor does he appear to apply any.[26] As one example, Dr.

---

[25] *See, e.g., Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17 (1997); Article 69 of the European Patent Convention; Protocol on the Interpretation of Article 69 EPC.

[26] See Kakaes Opening Statement at ¶ 107, 110-11.

1  Kakaes rates the essentiality of the P10867 family U.S. 6,643,813 as "2." He

2  concludes that his opinions depend on the claim construction of various terms:

| Essentiality Rank: 2 | The essentiality ranking for Claim 1 is 2 because the claim is not essential to the 3G standard. The answer would depend on claim construction of the following claim term/phrases: (1) "analyzing as a group, the data field provided in each one of plural received data units," and (2) "wherein the operation is performed only once for the group of received data units even if information in more than one of the data units in the group indicates that the operation should be performed, and wherein the field is a polling field, the information is a polling request, and the operation is transmission of status information." |
|---|---|

[27]

83.    Part of his support for his claim construction is the prosecution history

of U.S. 6,643,813, which he argues that he analyzes using U.S. claim construction

law concepts.[28] Setting aside his misunderstandings of U.S. law concepts, instead of

analyzing the foreign patents in P10867 using the claim construction laws of those

jurisdictions, Dr. Kakaes simply ports over his U.S. law analysis for European

Patent 1,151,572:

| P10867 (4G)—EP No. 1,151,572 (Claim 1) | |
|---|---|
| Essentiality Rank: 2 | *See Essentiality for U.S. Patent No. 6,643,813 (Claim 1), above.* |

84.    Dr. Kakaes thus improperly analyzes foreign counterpart European

Patent 1,151,572 using U.S. law instead of the appropriate laws in Europe.

85.    As still another example, Dr. Kakaes provides unsupported legal

conclusions related to the ETSI IPR Policy. As one example, for P08769 (US

6,493,552), he provides the lowest possible score for essentiality for a single

reason: "However, entering such state is <u>optional</u>, as discussed above, and thus

doing so is <u>not essential</u> to practicing the standard, particularly the registration

---

[27] Kakaes Opening Statement Appendix, EX-1639 at A-P10867_3G.

[28] Kakaes Opening Statement at ¶ 110.

procedures required by the standard. Therefore, the claim is not essential to practicing the 4G standard."[29] (emphasis added) But the ETSI IPR Policy explicitly defines "essential" in relation to compliance with a "standard," and explicitly defines a "standard" to include "options therein."[30]  Indeed, in his analysis of the importance of Ericsson's undisputedly essential patented inventions, Dr. Kakaes purports to analyze "whether the accused technology is optional to the standard," and thus concedes in that section that optional features are actually essential. Moreover, were Dr. Kakaes's unsupported view correct that optional features are not essential, then neither Ericsson nor any other 3GPP member would have a FRAND commitment as to those types of inventions. Dr. Kakaes' unsupported legal conclusion is thus incorrect in view of the ETSI IPR Policy; inconsistent with his own analysis; and would have wide ramifications for TCL, Ericsson, and the industry as a whole, who widely implement and use optional features.

86.     As yet another example, Dr. Kakaes provides unsupported legal conclusions related not just to the ETSI IPR Policy, but to infringement laws generally. Dr. Kakaes applies the following legal principle: "Conversely, a claim is not essential to a standard if a product or process can comply with the standard without infringing the claim."[31] Later in his report, Dr. Kakaes further states he has "been informed by counsel that to prove infringement of a patent by an accused device or process, a patent owner must establish that each and every claim limitation of the patent is implemented by the accused device or process.  Likewise, I have also been informed that infringement is not established if even a single claim limitation is not implemented by the accused device or process. With respect to divided infringement, I have been informed that there is no infringement unless a

---

[29] Kakaes Opening Statement Appendix, EX-1639 at A-P08769 (emphasis added).
[30] EX-223 (ETSI IPR Policy).
[31] Kakaes Opening Statement at ¶ 106.

single actor implements each and every claim limitation or performs some of the limitations and directs or controls another to implement the remaining limitations."[32]

87.    Dr. Kakaes's expressions of the law are simply not correct. As the ETSI IPR Policy and relevant national laws (*see, e.g.,* 35 U.S.C. § 271) indicate, it is a party who infringes a patent claim, not a product. This is relevant to the analysis because a party like TCL can infringe a standard essential patent through various activities, even if its products only satisfy some of the claim elements. For example, in the United States, "to determine direct infringement, we consider whether all method steps can be attributed to a single entity," and "Section 271(a) is not limited solely to principal-agent relationships, contractual arrangements, and joint enterprise." *Akamai Technologies Inc. v. Limelight Networks Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015).  Dr. Kakaes's understanding of the law conflicts with this principle.  In the U.K. and Germany, a party can infringe a claim if it satisfies an essential element, even if the remaining elements are satisfied by other parties.[33] As one example, Dr. Kakaes makes this methodological error with Ericsson's P06425 patent family, which I will describe in detail in my technical analysis below. Dr. Kakaes's misunderstandings of these patent laws, as well as other patent laws that I mention later in this rebuttal, cast doubt on the accuracy of his analysis as a whole.  Dr. Kakaes cannot possibly reach a fair conclusion as to the value of Ericsson's legally-defined patent rights without a correct understanding of the law.

C.    **Dr. Kakaes's Methodological Errors Appear Throughout His Analysis of The Ericsson Claim Charts That I Was Specifically Responsible For Addressing**

---

[32] *Id.* at ¶ 111.

[33] *See, e.g.,* EX-5495 (German Patent Act § 10); EX-5501 (U.K. Patents Act § 60(2)); and EX-5499 (India's Patents Act 1970, § 48).

88.     As I explained above, to analyze and respond to Dr. Kakaes's and Dr. Jayant's opinions, I assigned the patent families reviewed by TCL's Dr. Kakaes and Dr. Jayant among Dr. Sågfors, Mr. Cason, Dr. Bruhn, Ms. Chen, and myself, based on our past experiences with those patented technologies. I was responsible for the 26 patent families identified below, which generally relate to 2G technology, and which Dr. Kakaes addressed.  As in a typical high-stakes technical licensing context, I analyzed Dr. Kakaes's opinions with support from experienced telecommunications engineers, researchers, inventors, and patent professionals from Ericsson.

### 1.     Patent Families Where Dr. Kakaes Does Not Dispute Essentiality

89.     As I mentioned above, Dr. Kakaes and Dr. Jayant do not dispute the essentiality of 100+ of Ericsson's claim charted patents.  For the 26 families that I assigned to myself, Dr. Kakaes does not dispute that the following 16 Ericsson patent families include patent claims that are, indeed, essential: P05544, P05687, P05935, P06199, P06553, P07873, P09037, P09262, P11151, P11904, P13088, P20058, P21239, P25975, P28186, and P31172.  I agree with Dr. Kakaes on this point, and believe that these patent families are, indeed, essential.

### 2.     Patent Families Where Dr. Kakaes Analyzes Irrelevant Chart

90.     For one of the 26 families (P22817), Dr. Kakaes reviews one of Ericsson's network-related essential patent charts and states that it is not essential because it is, in fact, network-related, and not directed to a handset (user equipment).  This is an example of Dr. Kakaes's first category of errors, explained above.  Just because the patent claims charted in Ericsson's network-related charts are not directed to a handset does not mean they are not essential.  They are, indeed, essential to the base station or other parts of the network.  However, as I explained above for this category of errors, Dr. Kakaes's analysis of those claim charts is not

1  relevant to a license between Ericsson and a handset vendor like TCL. Dr. Kakaes

2  cannot cast doubt on the essentiality of Ericsson's handset-related claim charts by

3  addressing Ericsson's network-related claim charts and arguing that they are, in

4  fact, network-related and not handset-related.

### 3. Patent Families Where Dr. Kakaes and I Disagree on Essentiality

7  91.   For the remaining 9 of the 26 families (P04940, P06425, P06699,

8  P07707, P07761, P08804, P09646, P10628, P10896), I disagree with Dr. Kakaes

9  regarding his non-essentiality opinions. Below, I discuss each patent family, and

10  Dr. Kakaes's errors, in detail.

### a.   P04940

12  92.   The first patent family I will discuss is the P04940 family.[34] It relates

13  to channel mode adaptation to conserve capacity while preserving speech quality.

14  At a high level, the patented technology relates to "full rate" and "half rate" traffic

15  channels used to transmit speech or data between a base station and a handset in a

16  communications network. In 2G (GSM), in a "full rate" traffic channel, a speech

17  signal can be transmitted in a recurring time slot in every TDMA frame, whereas in

18  a "half rate" traffic channel, a speech signal can be transmitted in a recurring time

19  slot in every other TDMA frame.  Since there are eight time slots in each TDMA

20  frame, an RF carrier with full rate channels can thus accommodate eight handsets,

21  whereas an RF carrier with half rate channels can accommodate sixteen handsets.

22  93.   While half rate traffic channels allow a network to accommodate more

23  handsets than full rate traffic channels per RF carrier, half rate traffic channels have

24  a drawback.  A speech signal of, e.g., 4.75 kb/s, transmitted on a full rate traffic

25  channel at a gross bit rate of 22.8 kb/s, will have 22.8 - 4.75kb/s = 18.05kb/s of

26  coding (redundant, coded information bits) to make the speech signal more robust

27

[34] EX-4447; EX-4448 (Claim Charts for P04940).

28

to interference.  In contrast, the same speech signal of 4.75 kb/s, transmitted on a half rate traffic channel at half the gross bit rate (11.4 kb/s), will have 11.4 - 4.75kb/s = 6.65kb/s of coding, which is less than the coding for the full rate traffic channel.  This reduced coding (fewer redundant, coded information bits) makes the speech signal on the half rate traffic channel less robust to interference than the speech signal on the full rate traffic channel.

94.    It is desirable to support both half rate and full rate traffic channels for a variety of reasons. Using half rate traffic channels allows the system to accommodate double the number of handsets, which, in turn, doubles the call-handling capacity of the system. However, doubling the number of handsets reduces the resources available to make the speech signals of each individual handset robust to interference through channel coding.  The technology claimed in the P04940 patent family allows the system to use the two modes of transmission—full rate or half rate channels—in a smart way, balancing the quality of the signal and the capacity of the system.

95.    Dr. Kakaes makes various mistakes in his analysis of the P04940 patent family.[35] In particular, in his analysis of U.S. 5,327,576, he takes issue with the following claim element:

> transmitting a signal between a first base station and at least a first mobile station of the cellular mobile radio system, the signal being transmitted on a half rate channel having relatively slowly repeating time slots per frame or a full rate channel having relatively quickly repeating time slots per frame as compared to the relatively slowly repeating time slots, wherein the bit rates within the time slots of both the half and full rate channels are the same, wherein each bit transmitted in said half rate channel represents more sensitive information than that of a corresponding bit transmitted in said full rate channel.

---

[35] I note that Dr. Kakaes first analyzed the EP application publication's claims rather than the issued patent's claims. This is of course improper as it is the issued claims that define the scope of Ericsson's patented technology.  After I pointed out his error, Dr. Kakaes corrected himself.  Still, it signals to me that he has little familiarity with the patents of foreign countries.

96.     In particular, Dr. Kakaes makes two arguments to support his non-essentiality opinion for U.S. 5,327,576. He first takes issue with the claim term "signal," and then argues that the standard does not require that "each bit transmitted in said half rate channel represents more sensitive information than that of a corresponding bit transmitted in said full rate channel."

97.     For his first argument regarding the term "signal," Dr. Kakaes argues that Ericsson has not pointed to "the signal" in the standard, that nowhere in the claim chart does the word "signal" appear, and that there is no one signal that is transmitted in one of two different ways in the standard, as shown in the excerpt from his appendix below:

> There are two independent reasons that this claim limitation is not required by the standard:
>
> 1.     There is no one "signal" that is transmitted in one of two different ways. Ericsson fails to identify where in the standard "the signal" is described. Nowhere in the claim chart does the word "signal" appear. (See ERIC_TCL00191164-7) If a full rate channel is allocated, then a first signal is generated appropriate for transmission on said full rate channel. The specifics of how that signal is generated are defined in Section 3.1 of GSM 05.03. If a half rate channel is allocated a different signal is generated for transmission on said half rate channel. The specifics of how that signal is generated are defined in Section 3.2 of GSM 05.03. (See GSM 05.03 version 7.1.1.)  [36]

98.     This is incorrect. The term "signal" does appear in Ericsson's claim chart—it appears in the claim itself and therefore also appears in the chart as well. For example, Claim 1 of U.S. 5,327,576 recites several instances of the term signal, including "transmitting <u>a signal</u> between a first base station and at least a first mobile station of the cellular mobile radio system, <u>the signal</u> being transmitted . . . ."[37] Thus, the claim chart clearly does recite the term "signal" as does the claim chart.  Further, Ericsson does identify where in the standard the signal is described. Ericsson maps "the signal" to "encoded speech or user data" in its claim chart.

_____

[36] Kakaes Opening Statement Appendix, EX-1639 at A-P04940_2G.

[37] EX-4448; EX-4391.

Ericsson then points more specifically to encoded speech by referencing the AMR speech codec.  The signal in Ericsson's claim chart appears below, with highlighting added in yellow:



99.   U.S. 5,327,576 is explicit that what is transmitted on the claimed channel can be encoded speech (the claimed "signal"), and this is in line with the term's plain meaning.  *See*, *e.g.*, EX-4391 (US 5,327,576) Col. 4, ll. 44-47 ("The channels may be generally categorized as either voice channels or control channels. Voice channels are used to transmit speech or other data."); Cl. 13 ("speech signal").  As discussed above, these are thus examples of Dr. Kakaes's third category of errors, where he misinterprets Ericsson's claim charts to avoid a finding of essentiality.

100.   Dr. Kakaes is also incorrect in his argument that the standard does not include one signal that is sent in one of two ways. Ericsson's claim chart clearly shows that a speech signal can be transmitted in one of two different ways, *i.e.*, in full-rate or half-rate, as shown in the claim chart excerpt above. In particular, the speech signal can be transmitted in one of "[t]wo general forms:" a "i) full rate traffic channel" or "ii) half rate traffic channel," highlighted in green and blue above.[39]  This is thus another example of Dr. Kakaes's third category of errors, where he misreads the standard.

---

[38] *Id.*

[39] EX-4448.

101.   Dr. Kakaes's second argument is that the standard does not require that "each bit transmitted in said half rate channel represents more sensitive information than that of a corresponding bit transmitted in said full rate channel" and that "Ericsson makes no allegation as to what might meet this limitation" as shown in Dr. Kakaes' appendix excerpt below:

> 2.   The charted claim requires that there be a correspondence between the bits transmitted in the half rate and the bits transmitted in the full rate channel and that "each bit transmitted in said half rate channel represents more sensitive information than that of a corresponding bit transmitted in said full rate channel". However, the standard does not require this "corresponding" of bits, and there is no comparative "sensitivity information." Accordingly, this limitation is not met by the standard. Ericsson makes no allegation as to what might meet this limitation. The only relevant statement by Ericsson is a comment wherein Ericsson states that "Bits transmitted in HR channel mode are more sensitive, as recognized by C/I limit for recommended HR operation." This conclusory statement, even if correct, falls short of pointing to what would meet the claim limitations. [40]

102.   This is also incorrect. Ericsson does make an allegation as to what meets this limitation in its claim chart. For example, Ericsson cites to the following portions of the standard in its claim chart and makes the following notation:

> **5      Baseline description and working assumptions**
> **5.1      Generic operation**
>
> The *AMR* codec is a single speech and channel codec whose *channel mode* and *codec mode* bit-rates can be varied to suit the prevailing channel and traffic conditions. The codec can operate in two channel modes, *full-rate* and *half-rate*, corresponding to the TCH/F and TCH/H channels.
> [...] [41]

_____

[40] Kakaes Opening Statement Appendix, EX-1639 at A-P04940_2G.
[41] EX-4448; EX-5524 (3GPP TS 06.76 v8.0.0).

1
2
3
4
5
6
7
8
9



Figure 5.1: Preferred operating ranges for HR and FR channel modes

*[Ericsson comment: Bits transmitted in HR channel mode are more sensitive, as recognized by the C/I limit for recommended HR operation.]*

42

10

11    103.   As shown in the claim chart, bits transmitted in the half rate channel

12   represent more sensitive information than bits transmitted in the full rate channel.

13   They are more sensitive information because they are more sensitive to

14   interference, as recognized by the carrier-to-interference limit for recommended

15   half rate operation.  For example, with regard to the AMR speech codec, which is

16   referenced in the claim chart, bits transmitted on the 4.75 kb/s half rate channel will

17   have less channel coding, and thus be more sensitive to interference, than bits

18   transmitted on the 4.75 kb/s full rate channel. The difference in channel coding

19   (redundant, coded information bits), as explained above, is 18.05kb/s versus

20   6.65kb/s, making bits transmitted in the full rate channel more robust (less

21   sensitive) to interference than bits transmitted in the half rate channel.  This is yet

22   another example of Dr. Kakaes's third category of errors, where he misreads

23   Ericsson's claim chart to avoid a finding of essentiality.

24    104.   In summary, I disagree with Dr. Kakaes's analysis and conclusions of

25   non-essentiality for the P04940 patent family. Dr. Kakaes incorrectly interprets the

26   term "signal" and Ericsson's mapping of that term to the standard, and he is also

27   ――――――――――

28   [42] *Id.*

1    incorrect in arguing that the standard does not require that "each bit transmitted in

2    said half rate channel represents more sensitive information than that of a

3    corresponding bit transmitted in said full rate channel." The P04940 patent family,

4    and thus the charted claims of EP 472,511 and U.S. 5,327,576, are essential.

5                                    **b.     P06425**

6            105.    The second patent family I will discuss in this section is the P06425

7    family.[43] It relates to using a handset identifier called a temporary frame identity

8    (TFI) to uniquely identify concurrent frame transfer sequences, and including the

9    assigned TFI in every data block belonging to the frame transfer sequence and in

10   acknowledgment messages. The patented technology makes it easier for the handset

11   to correct an incomplete transfer to the base station, and to provide

12   acknowledgment messages to the network in response to polling requests.

13           106.    Dr. Kakaes opines that the P06425 patent family is not essential. He

14   says that claims 10 and 12 of U.S. 5,784,362 are not directed at user equipment, and

15   that claims 1 and 4 of EP 821,860 are not essential for the same reasons. The

16   entirety of Dr. Kakaes's analysis of Claim 10 of U.S. 5,784,362 is shown in his

17   appendix excerpted below:

18

19           The essentiality rank for Claim 10 is 3 because practicing the 2G standard with user
             equipment does not require at least the following limitations of the claim: assigning, to
20           each data frame transmitted by a mobile station, a temporary frame identity (TFI).                [44]

21           107.    Dr. Kakaes suggests that the "assigning" must be performed by the

22   base station and not the handset. This is incorrect as shown by the claim language

23   itself. In particular, nothing in the claim language requires that the base station

24   perform this element. It is apparent that the claim is written from the perspective of

25   the handset (mobile station) from the first claim element of Claim 10, which says,

26   _____

27   [43] EX-4461; EX-4462; EX-4463; EX-4464 (Claim Charts for P06425)

     [44] Kakaes Opening Statement Appendix, EX-1639 at A-P06425_2G.
28

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
                                                CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

"assigning, to each data frame transmitted <u>by a mobile station</u>," and is reinforced in Claim 12, which says, "[t]he method of claim 10, wherein <u>the mobile station</u> retransmits only those data blocks that have been received with transmission errors without changing contents of those data blocks."[45]

108.   Dr. Kakaes's error is also made clear by the standard and Ericsson's claim chart. In Ericsson's claim chart, the handset assigns a TFI to each data frame (logical link control packet data unit) transmitted by the handset. The TFI corresponds to a temporary block flow (TBF), which includes one or more data frames, and is unique among other TFIs assigned to data frames concurrently transmitted by other handsets. The handset includes the assigned TFI in every data block (radio link control / medium access control block) in the data frame to which the TFI is assigned.  While the network assigns the TFI to the TBF, the handset itself assigns the TFI to each data frame in the TBF transmitted by the handset. This is evidenced by the fact that the handset includes the TFI in every RLC/MAC block that it transmits that is associated with the TBF. *See, e.g.,* EX-5532, 3GPP TS 04.60 V8.0.0, §5.2.2 ("An RLC/MAC block associated with a certain TBF shall comprise a TFI"). The network does not create the data frames and RLC/MAC blocks that it receives from the handset.  Instead, those are created and transmitted by the handset, which assigns the TFI to them individually, consistent with the claim language.

109.   Accordingly, there is simply no evidence, and Dr. Kakaes provides none, for construing the term "assigning" to exclude this situation where the mobile station assigns the TFI to each data frame. Indeed, any such exclusion would contradict the intrinsic record.  Claim 10 itself indicates that the TFI assigned by the handset to each uplink data frame "is based on information in a channel reservation message [e.g., TFI information from the network for the TBF] that precedes a data

---

[45] EX-5509 (U.S. 5,784,362), Claims 10 and 12.

frame transmitted by a mobile station."[46]  As a result, Dr. Kakaes's unsupported argument has no merit.  Here, he commits an error from his second category of errors, by improperly limiting the claim language through an overly narrow claim construction without providing any evidence in support of his opinion.

110.   Dr. Kakaes's opinions are also incorrect for the corresponding EP patent (EP 821,860) in the P06425 family. There is no dispute that Claim 1 is essential to 2G as to a base station, or that the added element of Claim 4 is essential to 2G as to a handset. Claim 4, which is directed to a handset, reads "[t]he method of any of claims 1-3, further comprising the step of including the assigned TFI in an acknowledgment message transmitted by the mobile station (MS)."[47]

111.   The error that Dr. Kakaes commits here is his misunderstanding and/or misapplication of patent laws in Europe. The national laws of jurisdictions where a European (EP) patent applies (like Germany or the United Kingdom) are relevant when considering patent infringement of EP 821,860. These countries' patent infringement laws provide that TCL as a handset vendor can infringe Claim 4, because Claim 4 expresses an essential element directed to a handset, even though independent Claim 1, on which Claim 4 depends, is directed to base stations.  *See* Sec 10 of the German Patent Act; Sec 60(2) of the UK Patents Act.  This is thus an example of Dr. Kakaes' fourth category of errors, where he does not properly apply the patent laws of foreign countries.

112.   In summary, Dr. Kakaes misinterprets both the claims and the standard in his arguments for U.S. 5,784,362, and does not correctly apply the laws of foreign jurisdictions when he concludes that EP 821,860 is not essential. The P06425 patent family is essential, and claims 10 and 12 of U.S. 5,784,362 and Claim 4 of EP 821,860 are all essential claims directed at handsets.

---

[46] EX-5509 (U.S. 5,784,362), Claim 10.

[47] EX-5530, EP 821,860, Claim 4.

### c.   P06699

113.   The third patent family I will discuss is the P06699 family.[48] It relates to packet access over a beacon packet data channel (PDCH).  When a handset powers on or enters a communication system, the handset will receive information about the system via broadcast on a digital control channel, also called the broadcast control channel. After receiving that information, the patented handset uses that information to find and assign itself (lock onto) a beacon packet data channel. A beacon packet data channel is a packet data channel that is carrying broadcast information for packet data users. The handset uses the beacon packet data channel to register itself with the communication system.

114.   Dr. Kakaes argues that the P06699 patent family (U.S. 5,768,267) is not essential because the 2G standard does not require "assigning said mobile station to a beacon packet data channel" as shown below in an excerpt from Dr. Kakaes's appendix:

> The essentiality rank for Claim 1 is 3 because practicing the 2G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "Assigning said mobile station to a beacon packet data channel."
>
> Ericsson's claim chart suggests that transmitting information on the BCCH about the PBCCH meets this limitation.  (See ERIC_TCL00191309.)  However, "broadcasting" information is distinct from "assigning" a given mobile to anything.  "Broadcasting" is antithetical to transmitting to a specific mobile.  The claim requires "assigning" and Ericsson has not even attempted to map this requirement to anything in the standard. (See id.)
>
> Furthermore, even if one were to consider that possibility, the mobile station does not perform (and TCL does not direct or control any other parties to perform) the step of "broadcasting" so the mobile station could not infringe this claim in any case. [49]

115.   Dr. Kakaes appears to misinterpret Ericsson's claim chart as evidenced by his argument. He characterizes Ericsson's chart as mapping "assigning" onto "broadcasting." He then uses this incorrect assumption to argue non-essentiality of

---

[48] EX-4467 (Claim Chart for P06699).

[49] Kakaes Opening Statement Appendix, EX-1639 at A-P006699_2G.

the claim. However, this is not Ericsson's position. Claim 1 (and Ericsson's claim chart) recite:[50]

> 1. A method for registering a mobile station when the mobile station first enters a communication system which supports packet data channels, comprising the steps of:
> receiving at said mobile station system information broadcast on a digital control channel;
> assigning said mobile station to a beacon packet data channel;
> registering with said communication system over said beacon packet data channel.

116.   As indicated in Claim 1 (and Ericsson's claim chart), after receiving system information broadcast on a digital control channel (the broadcast control channel), a mobile station assigns itself (locks onto) a beacon packet data channel (a PDCH carrying broadcast information).[51]   Ericsson's claim chart is thus clear that the "assigning" can happen after the handset receives the "broadcasted" system information; for Dr. Kakaes to interpret that "assigning" as being that "broadcasting" was an error on his part.  This is an example of Dr. Kakaes's third category of errors, where he misinterprets Ericsson's claim chart to reach his conclusion of non-essentiality.

117.   As a result, I disagree with Dr. Kakaes. The 2G standard does require the "assigning" step as claimed in Ericsson's P06699 patent family. The P06699 family is essential to the 2G standard.

### d.     P07707

118.   The fourth patent family I will discuss is P07707.  It relates to providing a unique temporary international identification of a handset during establishment and re-establishment of a logical link between the handset and an associated serving GPRS support node (SGSN) in a cellular network.  The unique temporary international identification allows, for example, international roaming

---

[50] EX-5528 (U.S. 5,768,267)
[51] EX-4467; *see also* EX-5528 (U.S. 5,768,267) at 12:52-56.

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO, CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

across country borders in a more secure way, without the handset needing to transmit the more confidential international mobile station identification (IMSI) over the air.

119.   Dr. Kakaes makes two arguments to support his opinion that the P07707 family, and specifically U.S. 6,208,628 and EP 859,531, is not essential. With respect to Claim 11 of U.S. 6,208,628, he first states that "Claim 11 is not directed to user equipment," because forming the unique temporary international identification "takes place at the base station."[52] Then, he states that even if this forming is performed by the handset, the claim still isn't met for a couple reasons as shown below in his appendix:

The essentiality rank for Claim 11 is 3 because practicing the 2G standard with user equipment does not require at least the following limitations of the claim: all limitations. Specifically, Claim 11 is not directed to user equipment, and TCL Products do not practice any limitations of Claim 11, and therefore this claim is not "essential" as set forth in the ETSI IPR policy.

Even if the "forming said unique temporary international identification" limitation is met because, as Ericsson asserts, the "'unique temporary international identification' corresponds to P-TMSI + the RAI associated with the P-TMSI" (*see* ERIC_TCL00191346 (Ericsson comment)), said "forming" takes place at the base station.

Furthermore, even if one were to construe the "forming" to also be performed at the mobile, the claim is not met. The claim explicitly requires that the claimed (according to Ericsson) P-TMSI be formed using, among other fields, a temporary logical link identifier (TLLI). However, the standard requires quite the opposite, as shown below, namely that the TLLI is derived from the P-TMSI:

6.8.2   User Identity Confidentiality

A Temporary Logical Link Identity (TLLI) identifies a GPRS user. The relationship between TLLI and IMSI is known only in the MS and in the SGSN. TLLI is derived from the P-TMSI allocated by the SGSN or built by the MS as described in subclause 'NSAPI and TLLI'.

The SGSN may reallocate the P-TMSI at any time when the MS is in READY state. The reallocation procedure can be performed by the P-TMSI Reallocation procedure, or it can be included in the Attach or Routeing Area Update procedures.

GSM 03.60 v. 7.4.0 § 6.8.2; *see* ERIC_TCL00191346.

53

120.   First, Dr. Kakaes is incorrect that the unique temporary international identification is formed at the base station and not at the handset. There is nothing

---

[52] Kakaes Opening Statement Appendix, EX-1639 at A-P07707_2G.
[53] *Id.*

in the claim or in the patent that excludes forming the unique temporary international identification by the handset. To the contrary, it is the handset that must identify itself to the network and thus must form and communicate its identity for that purpose. The 2G standard shows that the handset (i.e., "MS") forms its identity by providing its P-TMSI, and the RAI associated with the P-TMSI, to the network, as shown in Ericsson's claim chart below, with yellow highlighting:

| US 6,208,628 (Internal ref: P07707) | STANDARD SPECIFICATIONS: [1] 3GPP TS 03.60 V7.4.0 (2000-03) General Packet Radio Service (GPRS), Service description; Stage 2 (GSM 03.60 version 7.4.0 Release 1998) [2] 3GPP TS 04.08 7.0.0 (1999-03) Mobile radio interface layer 3 specification (GSM 04.08 version 7.0.0 Release 1998) |
|---|---|
| 11. A method for providing a unique temporary international identification for a mobile station comprising the steps of: forming said unique temporary international identification using: | [1]<br>6        Mobility Management Functionality<br>6.5     Attach Function<br>[...]<br>In the attach procedure, the MS shall provide its identity and an indication of which type of attach that is to be executed. The identity provided to the network shall be the MS's Packet TMSI (P-TMSI) or IMSI. P-TMSI and the RAI associated with the P-TMSI shall be provided if the MS has a valid P-TMSI. [...]<br><br>*[Ericsson comment: "unique temporary international identification" corresponds to P-TMSI + the RAI associated with the P-TMSI]* |

54

121.   Second, to conclude that the forming step is not performed by the 2G standard, Dr. Kakaes misinterprets both the claim chart and the operation of the standard. He argues that "[t]he claim explicitly requires that the claimed (according to Ericsson) P-TMSI be formed using, among other fields, a temporary logical link identifier (TLLI)."[55] This is incorrect.  Claim 11 requires, "forming said unique temporary international identification using (a) a temporary logical link identifier (TLLI)...."[56] In the claim chart, Ericsson maps the "unique temporary international identification" to "P-TMSI + the RAI associated with the P-TMSI."[57]  But it is the "unique temporary international identification," not the P-TMSI, that is formed using the temporary logical link identifier.  This is relevant because the temporary logical link identifier is the P-TMSI, and the handset does not use the P-TMSI to

---

[54] EX-4470; EX-5523 (3GPP TS 03.60 V7.4.0).

[55] Kakaes Opening Statement Appendix, EX-1639 at A-P07707_2G.

[56] EX-5511, U.S. 6,208,628, Claim 11.

[57] EX-4470.

form the P-TMSI, but rather uses the P-TMSI to form the "unique temporary international identification." This is an example of Dr. Kakaes's third category of errors, where he misinterprets Ericsson's claim chart to reach his conclusion of non-essentiality.

122. Dr. Kakaes then misinterprets the 2G standard by arguing that the claimed temporary logical link <u>identifier</u> must necessarily be the standard's temporary logical link <u>identity</u>. This is incorrect. The P-TMSI can correspond to the claimed temporary logical link <u>identifier</u> because, as the claim chart shows, it identifies (and is actually used to derive) the temporary logical link identity. Thus, the P-TMSI, like the temporary logical link identity, identifies the logical link to the SGSN. Indeed, the P-TMSI uniquely identifies the temporary logical link identity (and thus the temporary logical link) in a given network (per routing area). A handset builds its foreign 32-bit temporary logical link identity from its 32-bit P-TMSI by setting bits 0 to 29 of the temporary logical link identity to bits 0 to 29 of the P-TMSI, and setting bit 30 to 0 and bit 31 to 1. *See* EX-5480, 3GPP TS 03.03 V7.8.0, §2.6. A handset builds its local 32-bit temporary logical link identity in a similar manner, except it sets bit 30 to 1. *See id*. Since there is a one-to-one correspondence between the P-TMSI and the temporary logical link identity in a routing area, either or both of those identities is a temporary logical link identifier. It is incorrect then to conclude that the P-TMSI is not a temporary logical link <u>identifier</u>. This is an example of Dr. Kakaes's third category of errors, where he misinterprets the standard to reach his conclusion of non-essentiality.

123. For EP 859,531, Dr. Kakaes reiterates the same arguments, and adds one new argument. He says that "Ericsson fails to assert what it contends meets the 'old Temporary Logical Link Identifier (TLLI)' or the 'old Routing Area' elements of Claim 1," as shown in Dr. Kakaes' appendix below:

> *See also* Essentiality for U.S. Patent No. 6,208,628 (Claim 11), above.  In addition, Ericsson fails to assert what it contends meets the "old Temporary Logical Link Identifier (TLLI)" or the "old Routing Area" elements of Claim 1.  In any event, no portions of the standard could be identified that meet the claim limitations, and thus the essentiality of Claim 1 is also a 3.[58]

124.   This is also incorrect. The "old Temporary Logical Link Identifier (TLLI)" corresponds to the P-TMSI, and the "old Routing Area" corresponds to the Routing Area Identity (RAI) associated with the P-TMSI as shown in Ericsson's claim chart below:

| the old Temporary Logical Link Identifier (TLLI), | [1]<br>6          Mobility Management Functionality<br>6.8       Security Function<br>6.8.2    User Identity Confidentiality<br>A Temporary Logical Link Identity (TLLI) identifies a GPRS user. The relationship between TLLI and IMSI is known only in the MS and in the SGSN. TLLI is derived from the P-TMSI allocated by the SGSN or built by the MS as described in subclause "NSAPI and TLLI".<br>[…] |
|---|---|
| the old Routing Area (RA), | [1]<br>3          Definitions, Abbreviations and Symbols<br>3.1       Definitions<br>3.2       Abbreviations<br>For the purposes of the present document the following abbreviations apply. Additional applicable abbreviations can be found in GSM 01.04 [1].<br>[…]<br>RAI                 Routing Area Identity<br>[…] |

[59]

125.   When a mobile station roams to a new network, it uses its "old" temporary logical link identifier and "old" routing area to identify itself, without needing to transmit its confidential international mobile subscriber identity (IMSI) over the air.  This allows for international roaming in a more secure manner.  Thus, Ericsson does show what it contends meets the old Temporary Logical Link Identifier and the old Routing Area elements of Claim 1.  This is an example of Dr. Kakaes's third category of errors, where he misinterprets Ericsson's claim chart to reach his conclusion of non-essentiality.

---

[58] Kakaes Opening Statement Appendix, EX-1639 at A-P07707_2G.
[59] EX-4469; EX-5531 (EP 859,531).

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  126. In summary, I disagree with Dr. Kakaes. Ericsson does show which

2 portions of the standard meet the claim elements, and the forming step as claimed

3 does occur at the handset as illustrated by the 2G standard. Thus, the P07707 family

4 is essential.

5     **e.  P077961**

6  127. The fifth patent family I will discuss is P07761, including EP 953,264

7 and IN 221,634. This family relates to a handset selecting whether it or the network

8 will control the handset's mobility. As the patents indicate, in systems prior to the

9 invention of the P07761 family, a cellular network operator did not have the option

10 either to control handsets' cell selection and reselection, or to allow the handsets

11 themselves to exercise that control, in an efficient manner.  The patented

12 technology enables this functionality.  The network can broadcast an order, in the

13 form of two control messages, to GPRS-compliant handsets to use their normal cell

14 reselection procedures or to suspend those procedures and accept network control

15 over cell reselection. The handset then either uses its normal cell reselection

16 procedures, or suspends those procedures and accepts network control over cell

17 reselection, as per the order.  With this flexibility, the network can efficiently

18 allocate resources, allowing the system to operate better for the network operator

19 and for handset users.

20  128. Dr. Kakaes claims that both Claim 22 of EP 953,264 and Claim 22 of

21 IN 221,634 are not essential for the same reasons. He states that practicing the 2G

22 standard does not require the "selecting" element of the claim, as shown below in

23 an excerpt from his appendix:

24    The essentiality rank for Claim 22 is 3 because practicing the 2G standard with user

25    equipment does not require at least the following limitations of the claim under any
    reasonable interpretation: "selecting one of a network control algorithm and a mobile

26    terminal control algorithm responsive to an order… said order including an initial
    control message indicating that a control message will follow."

                               60

27

28 [60] Kakaes Opening Statement Appendix, EX-1639 at A-P07761_2G.

129. In particular, Dr. Kakaes cannot find the claimed "order" in the standard sections cited in the claim chart, because Ericsson's claim chart is allegedly "ambiguous" on this point by citing to each of the following sections of the 2G standard: the "NETWORK_CONTROL_ORDER" in § 10.1.4, the "SI 13 Rest Octets" in § 10.5.2.37b, and the System Information Type 3 or 4 or 7 or 8 messages" in § 6.3.1.3.

130. Dr. Kakaes seems not to understand that the claimed "order" can (and does) include two control messages. Claim 22 itself, the patent specification, and the claim charts, all refer to two control messages that together "control" or "order" the handset. For example, the EP specification notes that a "complete control message . . . can be quite lengthy"; thus, it is preferable to use a small amount of data in the "initial control message," and then "subsequent system information" may include "additional control information."[61] Accordingly, the patent specification (and Claim 22 itself) indicates that there can be two control messages: an "initial control message" and a "subsequent system information message." This is relevant, because the 2G standard also uses two messages that comprise the "order," just as claimed in Ericsson's P07761 patent family.

131. More specifically, Dr. Kakaes is unsure which of the messages Ericsson cites to is the order, because he assumes that only one of these messages can be the claimed order. However, both of the cited messages together form the claimed "order" in Ericsson's P07761 patent family. The first part of the claim element in dispute says that the mobile radio terminal (e.g., the handset) includes a "control means for selecting one of a network control algorithm and a mobile terminal control algorithm responsive to an order."[62] This happens in the 2G standard. The mobile terminal includes a control means (which Dr. Kakaes does not

---

[61] EX-5483 (EP 953,264) at 7:45-55.

[62] *Id.* at Claim 22.

dispute). The control means selects a network control algorithm in some instances and a mobile terminal control algorithm in other instances. As shown in Ericsson's claim chart, the mobile terminal control algorithm (shown in yellow below) may be selected, or the network control algorithm (shown in green below) may be selected:

| control means (350) for selecting one of a network control algorithm and a mobile terminal control algorithm responsive to an order, **characterized by:** | [1]<br>10     **GPRS mode tasks**<br>10.1    **Cell Re-selection**<br>10.1.4  **Network controlled Cell re-selection**<br>The network may request measurement reports from the MS and control its cell re-selection. This is indicated by the parameter NETWORK_CONTROL_ORDER. The meaning of the different parameter values is specified as follows:<br><br>NC0    Normal MS control<br>        The MS shall perform autonomous cell re-selection.<br><br>NC1    MS control with measurement reports<br>        The MS shall send measurement reports to the network as defined in subclause 10.1.4.1.<br>        The MS shall perform autonomous cell re-selection.<br><br>NC2    Network control<br>        The MS shall send measurement reports to the network as defined in subclause 10.1.4.1.<br>        The MS shall only perform autonomous cell re-selection when the reselection is triggered by a downlink signalling failure as defined in subclause 6.5 or a random access failure as defined in GSM 04.18 and GSM 04.60.<br>[…]                     63 |

132.   The control means makes this selection based on an order from the network. That order is the claimed order in Ericsson's patents. The remaining portion of the disputed claim element requires that the "order includ[e] an initial control message indicating that a control message will follow."[64] The order in the 2G standard that Ericsson cites in support of essentiality does just that. The order includes broadcast control channel (BCCH) system information messages (Type 3 or 4 or 7 or 8) and a Type 13 message, which includes the parameter NETWORK_CONTROL_ORDER.  The order thus includes (i) an initial control message (one or more of BCCH System Information Type 3 or 4 or 7 or 8 messages) indicating GPRS support as well as (ii) a further control message (BCCH System Information Type 13 message) that the initial control message indicates will follow.  This is an example of Dr. Kakaes's third category of errors, where he

---

[63] EX-4473; EX-5526 (3GPP TS 05.08 V8.5.0).

[64] EX-5483 (EP 953,264) at Claim 22.

1   misinterprets Ericsson's claim chart to reach his opinion of non-essentiality.

2   133.   Accordingly, in my opinion, Dr. Kakaes is incorrect in his assessment.

3   As shown in Ericsson's claim chart, the P07761 patent family is essential.

4   ### f.   P08804

5   134.   The sixth patent family I will discuss is the P08804 family. It relates to

6   retransmitting a block of information that was previously transmitted between a

7   handset and a base station, using a specific modulation and coding scheme. It may

8   be necessary to retransmit information because information may become corrupted

9   or lost during transmission due to, e.g., interference.

10   135.   The patented technology of the P08804 family generally relates to

11   making retransmissions more efficient and reducing the probability that a

12   retransmitted block will be corrupted or lost. This is accomplished using a coding

13   scheme that provides increased coding protection and/or a modulation scheme that

14   is more robust to interference, when sending the retransmitted information. Using

15   such a coding scheme and/or modulation scheme reduces the probability that the

16   information is not received properly.  Below are figures from U.S. 6,208,663 that

17   illustrate the general concept:

18

19

20   

21

22

23   65

24

25   136.   One reason to select the more robust coding scheme and/or modulation

26   scheme only for retransmissions (and not necessarily for new transmissions) is

27   _____

28   [65] EX-5491 (U.S. 6,208,663) Figures 4(a), 4(b).

1    because a more robust coding scheme takes up more radio resources, and a more

2    robust modulation scheme reduces the maximum possible bit rate. So the patent

3    describes a way to select these more robust schemes only for the retransmission

4    (and not necessarily for new transmissions), because a higher possible throughput

5    transmission already failed. By using more resources on the retransmission, the

6    system hopefully avoids many more retransmissions of the same information. In

7    this way, the patented technology improves the transmission of information from

8    the handset to the base station, and improves overall system performance.

9          137.   Dr. Kakaes concludes that the P08804 patent claims are not essential,

10   and in particular he concludes that Claims 1 and 19 of U.S. 6,208,663 are not

11   essential to the 2G and 4G standards, and that Claim 1 of IN 241,747 is not

12   essential to the 2G standard. I disagree with Dr. Kakaes for both patents, and I will

13   start with U.S. 6,208,663 and its claims. Dr. Kakaes makes similar arguments for

14   both Claim 1 and Claim 19. He states that practicing the 2G and 4G standards does

15   not require the claimed "selecting at least a second type of modulation different

16   from said first type of modulation to create a retransmission processing scheme."[66]

17   In particular, Dr. Kakaes argues that the claimed "selecting" is done by the base

18   station, and not by the handset. Dr. Kakaes argues that the handset does not "select"

19   the modulation because it does not have any "choice" as to the modulation as

20   shown in the excerpt from Dr. Kakaes's appendix below:

21

22

23

24

25

26

27

---

[66] Kakaes Opening Statement Appendix, EX-1639 at A-P08804_2G.

28

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
                              CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> The essentiality ranking for Claim 1 is 3 because practicing the 2G standard does not require at least the following limitation of the claim under any reasonable interpretation: "selecting at least a second type of modulation different from said first type of modulation to create a retransmission processing scheme."
>
> The claimed "selecting" is done by the base station—not the UE. Specifically, as disclosed in the accused standard, the handset does not "select" the modulation for retransmission—i.e., the handset does not have any *choice*. Indeed, as Ericsson admits, Table 8.1.1.1 of 3GPP TS 44.060 v. 6.4.0 "shows the modulation & coding schemes to be used for retransmission, given the MCS used for initial transmission and the *commanded* MCS." ERIC_TCL00105786 at 787 (emphasis added). As shown in Table 8.1.1.1, the base station directs the UE as to precisely the MCS to use on retransmission, and therefore the UE engages in no "selection": [67]

138.   The error Dr. Kakaes makes for this patent family is that he improperly construes the term "selecting" to exclude the actions of a handset that occur in response to input from the network. Dr. Kakaes attempts to construe "selecting" in an inappropriately narrow way, and he does so without considering any of the intrinsic evidence, and indeed, without considering any evidence at all. This is incorrect, especially since the intrinsic evidence teaches away from his view.

139.   In particular, contrary to Dr. Kakaes's construction, the intrinsic evidence offers a broad view of "selecting" and does not exclude the situation where the handset applies a particular modulation based on input from the network. You can see this in both the dependent claims and the patent specification as a whole. For example, dependent Claim 7 contradicts Dr. Kakaes, and explicitly provides that "selecting further comprises the steps of: receiving, at a transmitter [the user equipment], a request for at least one of said second modulation or said second coding from a receiver [the base station] associated with a link over which said block is retransmitted; and making said selection [at the user equipment] based on said request [from the base station]."[68] The specification notes that the "receiving entity [the base station] could request a particular new FEC coding

---

[67] *Id.*
[68] EX-5491 (U.S. 6,208,663), Claim 7.

and/or modulation as part of the retransmission request."[69] In other words, the patent itself defines "selecting" to include actions a handset takes in response to a request from the network.

140.   The patent specification also teaches that "selecting" can occur even where the selection is predefined and hardcoded and thus does not allow any "choice," as long as there are two modulations that the handset supports. For example, at column 7, lines 61-65, the specification states that "the selection process can be predefined and hardcoded into each entity.  That is, the receiving and transmitting entities could, for example, know that all retransmitted blocks will use QPSK modulation but the same FEC coding scheme."[70] Again, Dr. Kakaes ignores the claims and specification to conclude that "selecting" cannot cover what's described in the standard.

141.   Recall, too, the discussion above regarding P07761's claim element of a "control means for selecting one of a network control algorithm and a mobile terminal control algorithm responsive to an order."  So other inventors from the same time period (1997), who are presumed to be persons skilled in the art at the time, also used the term "selecting" more broadly than Dr. Kakaes's unsupported interpretation, and allowed for selection based on input from the network, even in cases where that input was an "order" and allowed no choice.

142.   In Ericsson's 2G claim chart, and in the 2G portion that Dr. Kakaes cites (§ 8.1.1), the table is titled "*Choice* of MCS for retransmissions with re-segmentation." EX-5481, 3GPP TS 44.060, V6.4.0 (emphasis added).  Moreover, in the two paragraphs right above that table in the standard, it says, "a MS [mobile station] may choose an alternate MCS than the one commanded" and "the alternate MCS . . .  was available for selection by the MS during the TBF according to the

---

[69] *Id.* at 7:66-8:1.

[70] *Id.* at 7:61-65.

MCS selection rules for retransmissions."[71]  Thus, Dr. Kakaes's allegation that "the handset does not have any *choice*" is contradicted by the standard, too, which says that the handset (i.e., the "MS" or "mobile station") does, indeed, have a choice. In particular, the MCS that the handset chooses for the retransmission is not necessarily the "commanded" MCS, as Dr. Kakaes suggests, but rather must be selected by the handset based on the MCS of the initial transmission and the commanded MCS for new transmissions.  In several scenarios, the handset selects a different MCS from the "commanded" MCS.  For example, in Table 8.1.1.1, when MCS-9 was used for the initial transmission, and MCS-5 is commanded for new transmissions, the handset selects MCS-3 for retransmissions.  As the claim chart indicates, MCS-3 uses GMSK modulation, whereas MCS-9 (and MCS-5) use 8PSK modulation; thus, the handset selects a modulation scheme different from the modulation scheme of the initial transmission.  For 4G, the standard section that Dr. Kakaes himself references, indicates that the handset similarly selects a modulation scheme based on certain rules and options.  *See* EX-1285, 3GPP TS 36.213 V8.8.0, § 8.6, part 1. Accordingly, this is an example of Dr. Kakaes's second category of errors, where he limits the plain meaning of terms in an unsupported (and thus improper) manner to reach his conclusion of non-essentiality.  His conclusion is also contradicted by the intrinsic record.

143.   I will now turn to the Indian patent, IN 241,747. For Claim 1, Dr. Kakaes argues that practicing the 2G standard does not require the claimed "dividing means (22) for selectively dividing said block into at least two blocks in response to said negative acknowledgment signal." In particular, Dr. Kakaes argues that "the handset does not comprise a dividing means for 'selectively' dividing said block—i.e., the handset does not have any *choice*."[72]

---

[71] *Id.* (emphasis added); EX-4478, EX-4479, EX-4480 (claim charts for P08804)

[72] Kakaes Opening Statement at Appendix, EX-1639 at A-P08804_2G.

144.    Dr. Kakaes is incorrect. Similar to his discussion of "selecting" discussed above, Dr. Kakaes defines "selectively" without considering any of the intrinsic evidence, and indeed, without considering any evidence at all.  As above, Dr. Kakaes argues that the term "selectively" cannot cover a situation where the handset does not have any choice.[73] However, Ericsson's patent clearly teaches that "selecting" can include a scenario where the handset chooses from among supported options based on a request from the network, or even when the handset does not have a choice (as explained in detail above).  Indeed, as the claim chart indicates, the handset "selectively" divides blocks after receiving a RESEGMENT bit that is set to 1, because the handset "may" split the original block depending on certain conditions.  Moreover, if the "RESEGMENT" bit had been set to 0, the handset would not have split the original block, which indicates another reason why splitting the original block is "selective."  The handset must analyze these various conditions and then "selectively" divide the original block.

145.    In summary, I disagree with Dr. Kakaes and conclude that the claims of the P08804 family are essential to the 2G and 4G standards.  To reach his opinions of non-essentiality, he commits errors in his second and third categories of mistakes by limiting the claim language with no evidence in support, and by misinterpreting Ericsson's chart and the standard at issue.

### g.    P09646

146.    The seventh patent family I will discuss in this section is the P09646 patent family.[74]  It relates to a handset uniquely identifying an information signal (e.g., a modulation scheme) to be conveyed from the handset to the base station by rotating each of one or more symbols by a common phase rotation factor.  Rotating the phase of one or more symbols using a common phase rotation factor means that

---

[73] Id..

[74] EX-4486 (claim chart for P09646)

the handset shifts a reference position for each symbol (representing one or more bits) by a common phase change, as illustrated in the example below from U.S. 6,473,506:



147.   By changing the reference position in this manner, the handset does not need to transmit any bits to identify the modulation scheme, and does not need to use other techniques that would introduce delay. An evolution of 2G (GSM) called EDGE added a new modulation scheme (8PSK) that allowed a handset to transmit data with a data rate up to three times higher than with an alternative modulation scheme (GMSK).  However, the handset had to communicate to the base station the modulation scheme being used (8PSK or GMSK), and Ericsson invented that the handset should communicate that information by rotating by a common factor the phase of transmitted symbols for, e.g., 8PSK symbols.  The patented invention thus communicated that modulation scheme information without wasting data bits to do so.  That meant more data for other services, such as for the payload itself.

---

[75] EX-4397 (U.S.. 6,473,506) at Figures 2A, 2B.

148.   Dr. Kakaes states that this family, and U.S. 6,473,506 in particular, is not essential to the 2G standard. His opinion is based on two arguments. The first is that the 2G standard does not require "identifying one of a plurality of information signals to be conveyed from a transmitter to a receiver" as he construes this phrase as shown in his appendix:

> The essentiality ranking for Claim 1 is 2 because the claim is not essential to the 2G standard. The term "Identifying one of a plurality of information signals to be conveyed from a transmitter to a receiver", when properly construed, is not required by the 2G standards. Moreover, based on my reading of Ericsson's claim chart, Ericsson applies an incorrect claim construction because it assumes that the modulation scheme to be used is an "information signal to be conveyed…". Such construction is improper, as the modulation scheme does not constitute information to be conveyed. Therefore, a person of ordinary skill in the art would understand the claim term/phrase "information signals to be conveyed" to mean "higher layer information", as discussed in detail in the patent specification at C7:35-61.

[76]

149.   While Dr. Kakaes construes the term "information signal to be conveyed" to exclude a modulation scheme, he seems to miss a key part of the patented invention, and his construction is thus contradicted by the intrinsic record. For example, Claim 4, which depends from Claim 1, directly contradicts Dr. Kakaes. It says that "the information signal represents one of a plurality of modulation schemes."[77] As a result, the "information signal to be conveyed" can be a modulation scheme, contrary to Dr. Kakaes's construction. Indeed, it must be a modulation scheme in dependent Claim 4. His construction excluding that scope is incorrect.

150.   As another example, the exact portion of the patent specification to which Dr. Kakaes cites also contradicts his opinion. It says that "the present invention can be used for transmitting modulation information."[78] A number of

---

[76] Kakaes Opening Statement Appendix, EX-1639 at A-P09646_2G.

[77] EX-4397, U.S. 6,473,506, Claim 4.

[78] Id. at 7:52-53 (emphasis added).

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

other portions of the specification also contradict Dr. Kakaes's construction. One such portion is the Abstract, which states that "transmission information, such as modulation scheme selection information . . . is efficiently conveyed from the transmitter to the receiver."[79] Another portion of the specification that contradicts Dr. Kakaes is column 3, lines 15-30, which states that:

> the foregoing and other objects are achieved by a method and/or apparatus for conveying modulation information from a transmitter to a receiver. . . . A phase rotation factor is then identified which corresponds to the selected one of the plurality of modulation schemes, wherein at least one unique phase rotation factor is associated with each of the plurality of modulation schemes. The phase of each training symbol is then rotated as a function of the identified phase rotation factor which corresponds to the selected one of the plurality of modulation schemes . . .

151.   It is thus incorrect for Dr. Kakaes to exclude a modulation scheme in his construction of the claim term "information to be conveyed." This is thus not a basis for finding the P09646 family not essential.

152.   Dr. Kakaes's second argument is that the 2G standard does not require the claimed element "wherein the phase rotation factor uniquely identifies the one information signal to be conveyed from the transmitter to the receiver." This argument is also based on his perception of the "proper" construction of this phrase as shown in his appendix below:

> In this regard, the essentiality of Claim 1 to the standard depends on the construction of the claim phrase "wherein the phase rotation factor uniquely identifies the one information signal to be conveyed from the transmitter to the receiver." A proper construction of the claim phrase requires the receiver (e.g., a receiver at the base station) to use the phase rotation factor to identify the one information signal.[80]

---

[79] Id. at Abstract (emphasis added).

[80] Kakaes Opening Statement Appendix, EX-1639 at A-P09646_2G.

153.   Dr. Kakaes does not appear to challenge that the full scope of the claim language would be broader than his construction. Instead, he cites to the patent's prosecution history to suggest that Ericsson limited the claim term to the narrower definition he recites above—that the receiver <u>must</u> use the phase rotation factor to identify the one information signal. However, the sentence in the prosecution history that he relies on states that "[t]he receiver of the phase-rotated data <u>can</u> then determine the information signal sent by determining the phase-rotation factor used in the transmission."[81]

154.   The error with Dr. Kakaes's conclusion is that he misapplies (or does not apply) U.S. claim construction law to arrive at this claim construction. The Federal Circuit has made clear that "[a]bsent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004). The prosecution history here says that the receiver "<u>can</u>" determine the information signal sent by determining the phase-rotation factor—not that it <u>must</u> do so.  Permissive language (such as the word "can") cannot rise to the level of disavowal necessary to narrow the construction as Dr. Kakaes has here. *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010); *see also GoLight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) (stating that "absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context."). Indeed, the permissive language used in the prosecution history of the '506 patent reflects the fact that some pending claims did recite functionality at the receiver (like Claim 2), and some claims did not (like Claim 1, at issue here).  Dr. Kakaes's construction

_____

[81] Kakaes Opening Statement Appendix, EX-1639 at A-P09646_2G (emphasis added).

thus improperly narrows Claim 1 to avoid a finding of essentiality. This is an example of Dr. Kakaes's second category of errors. When the full scope of the claim is considered—rather than the narrow scope improperly assigned by Dr. Kakaes—it is clear that the claim is essential to the 2G standard.

155.   In summary, I find Dr. Kakaes's claim construction to be incorrect. The P09646 patent family is essential to the 2G standard.

### h.   P10628

156.   The eighth, and penultimate, patent family I will discuss in this section is P10628. It relates to interworking between two types of partially overlapping networks, and more specifically to cell searching one network when connected to another. A cellular network is split into cells, which are represented below by hexagons 110 in Figure 1 of U.S. 6,597,911. Each cell is associated with a base station 120 that provides communication service to the handsets 125 within that cell. Of course, handsets 125 can move from cell to cell as the user moves throughout the network 100.



FIG. 1

---

[82] EX-4398 (U.S. 6,597,911) Figure 1.

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

157.   When a handset leaves the coverage area of one cell and enters another cell, it can register its presence with the new cell. If the handset is engaged in a call, not only must the handset be registered in the new cell, but the communications link carrying the telephone call must be switched from one base station to another. This is called "handover" or "handoff." It is very important for handover to be done properly to avoid disrupting or dropping the call.

158.   The patented technology allows for a handover between two cellular networks of different generations (e.g., 2G and 3G) that are partially overlapping. This typically occurs as a next generation cellular network (e.g., 3G) is being deployed in an overlay fashion within the area of an existing cellular network (e.g., 2G).  In such a situation, neighboring cells are served by an existing cellular network with a wider footprint (e.g., 2G) and by a next generation cellular network with a smaller footprint (e.g., 3G).  The patented technology facilitates the seamless handover of a call between the existing cellular network and the next generation network.  This is vital to ensure a positive experience by users of multi-generational handsets, such as those that support both 2G and 3G technology.

159.   Dr. Kakaes concludes that claims 1 and 13 of U.S. 6,597,911 are both not essential. For Claim 1 he argues non-essentiality based on his conclusion that the 2G and 3G standards do not require the claimed "receiving a cell neighbor list from said particular one of said first plurality of base stations serving said mobile station at said mobile station upon entering said second service location area."[83] He first argues that there is no "requirement" that the MEASUREMENT INFORMATION message be sent upon the mobile station entering the second service location area (the 3G network). Second, he argues that "the portion of the standard that Ericsson points to specifies the operation to be just as it was done in

---

[83] Kakaes Opening Statement Appendix, EX-1639 at A-P10628_2G.

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO,
                           CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

the prior art that the applicants distinguished over during prosecution."[84]

160.  With respect to the first argument, Dr. Kakaes states that Ericsson "does not point at any specific portion of the standard that suggests that this message [the MEASUREMENT INFORMATION message] is sent 'upon entering the second service location area,'" as shown in the excerpt from Dr. Kakaes's appendix below:

As evidence of meeting this limitation, Ericsson, in a comment, appears to suggest that the MEASURMENT INFORMATION message meets this limitation:

*[Ericsson comment: The "cell neighbour list" corresponds to the 3G neighbour information received in the MEASUREMENT INFORMATION message, as shown below]*

(See ERIC_TCL00191688).

Ericsson does not point at any specific portion of the standard that suggests that this message is sent "upon entering the second service location area," as the claim requires.[85]

161.  Contrary to Dr. Kakaes's argument, Ericsson in its claim chart does point to a specific portion of the standard that shows the MEASUREMENT INFORMATION message is received upon entering the second service location area (the 3G network). For example, Ericsson points to § 3.4.1.2.1.1 of the standard to show the MEASUREMENT INFORMATION message is received upon entering the second service location area, as shown in the excerpt from Ericsson's chart below:

**3.4.1.2.1.1     Deriving the 3G Neighbour Cell list from the 3G Neighbour Cell Description sent on BCCH or on SACCH:**

This applies only to a multi-RAT MS. One or more instances of the Measurement Information message or SI2quater message may provide 3G Neighbour Cell Description information. This is used to build the 3G Neighbour Cell list. The 3G Neighbour Cell list may contain up to 96 3G Neighbour Cells and/or UTRAN frequencies for RSSI reporting.

*Building of the 3G Neighbour Cell list:*

Each *3G Neighbour Cell Description* received is added to the 3G Neighbour Cell list, starting with the index equal to the parameter Index_Start_3G. If this parameter is not present then the value 0 shall be used. [...][86]

---

[84] *Id.*

[85] *Id.*

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

162.   More specifically, by indicating that the network "may" provide 3G Neighbour Cell Description information, the standard also indicates that the network "may not" provide this information, e.g., if there are no 3G neighbor cells. Thus, those handsets entering 2G cells that neighbor 3G cells are the ones that receive the 3G Neighbour Cell Description information. Moreover, the passage indicates that handsets begin reporting received signal strength (RSSI) of the 3G cells after they receive the 3G Neighbour Cell Description information. It is therefore clear that the handsets receive the 3G Neighbour Cell Description information "upon entering" the 3G network's coverage area. Otherwise, there would be no reason to take measurements of the signal strength of 3G cells.  This is thus an example of Dr. Kakaes's third category of errors, where he misreads Ericsson's claim chart and the standard specification at issue to reach his conclusion of non-essentiality.

163.   In his second argument, Dr. Kakaes argues that "the portion of the standard that Ericsson points to specifies the operation to be just as it was done in the prior art that the applicants distinguished over during prosecution" as shown below in the excerpt from Dr. Kakaes' appendix:

> In fact, said message is sent by the "prexisting cellular network" whenever the prexisting cellular network determines to send this information.  Specifically, there is no requirement that said message be sent "upon entering the second service location area." In other words, the portion of the standard that Ericsson points to specifies the operation to be just as it was done in the prior art that the applicants distinguished over during prosecution, as discussed above.
>
> In short, the very limitation that the applicants distinguished over prior art is not essential.  Thus, the claimed invention is not essential to practicing the standard, and the ranking is 3.                                                               [87]

164.   This is incorrect. As indicated in the chart, Claim 1 is essential where there is a 2G network partially overlapping a 3G network, and where a handover

---

[86] EX-4489; EX-5492 (3GPP TS 04.18 V8.27.0)

[87] Kakaes Opening Statement Appendix, EX-1639 at A-P10628_2G.

process from the 2G network begins when the handset enters the 3G network. The discussion from the prosecution history fully supports Ericsson's position.  This is thus an example of Dr. Kakaes's second category of errors, where he uses an improper claim construction to reach his conclusion of non-essentiality.

165.   For Claim 13, Dr. Kakaes gives three arguments why it is not essential to the 4G standard. Those three arguments arise from two claim elements: "a filter for acquiring slot synchronization with a base station forming a portion of said next generation network upon entering said service location area of said next generation network" and "determining a scrambling code used by a handover measurement channel associated with said at least one of said plurality of cells" as shown in the excerpt from Dr. Kakaes's appendix below:

> The essentiality rank for Claim 13 is 3 because practicing the 4G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "a filter for acquiring slot synchronization with a base station forming a portion of said next generation network upon entering said service location area of said next generation network" and "determining a scrambling code used by a handover measurement channel associated with said at least one of said plurality of cells." [88]

166.   Regarding the "filter" claim element, Dr. Kakaes's first argument is that Ericsson does not point to any portion of the standard that requires the existence of the claimed filter. His second argument is that Ericsson's construction of the claim (and its infringement by the 4G standard) is precluded based on the prosecution history. In particular, Dr. Kakaes argues that Ericsson's comment in the claim chart that "at least after the UE has been instructed to perform measurements on channels in the 'next generation network'" does not meet the "upon entering" element of Ericsson's claim, as explained in Dr. Kakaes's appendix excerpt below:

---

[88] Kakaes Opening Statement Appendix, EX-1639 at A-P10628_2G.

1

2

3

4

5

6

> First, Ericsson does not point at any portion of the standard requiring the existence of "a filter". Second, in an attempt to meet the "upon entering" limitation (which formed the basis for the Notice of Allowance) Ericsson appears to be pointing to "at least after the UE has been instructed to perform measurements on channels in the 'next generation network'." (*See* ERIC_TCL00191693.) However, "at least after the UE has been instructed to perform measurements" does not meet the "upon entering" limitation. The File History is clear that the "upon entering" was a key limitation in the prosecution process.

89

7    167.   With respect to Dr. Kakaes's first argument, Ericsson does point to

8  what portion of the standard requires the existence of a filter.

9

10

11

12

13

14

15

16

17

| a filter for acquiring slot synchronization with a base station forming a portion of said next generation network upon entering said service location area of said next generation network, said portion including a plurality of cells; | *[Ericsson comment: The "slot" corresponds to a 5 ms LTE half frame, the first and second half of an LTE 10 ms frame. The primary synchronization signals are thus transmitted in each "slot" and the UE performs "slot synchronization" by using a "filter" for "acquiring". A "base station" includes "a plurality of cells".*<br><br>*The "acquiring" takes place at least after the UE has been instructed to perform handover measurements on channels in the "next generation network".]*<br><br>**[1] 6.11.1   Primary synchronization signal**<br><br>6.11.1.1      Sequence generation<br><br>The sequence $d(n)$ used for the primary synchronization signal is generated from a frequency-domain Zadoff-Chu sequence according to<br><br>$$d_u(n) = \begin{cases} e^{-j\frac{\pi u n(n+1)}{63}} & n = 0,1,\ldots,30 \\ e^{-j\frac{\pi u (n+1)(n+2)}{63}} & n = 31,32,\ldots,61 \end{cases}$$<br><br>where the Zadoff-Chu root sequence $u$ is given by Table 6.11.1.1-1.<br><br>**Table 6.11.1.1-1: Root indices for the primary synchronization signal.** |

| | $N_{ID}^{(2)}$ | Root index $u$ |
| --- | --- | --- |
| | 0 | 25 |
| | 1 | 29 |
| | 2 | 34 |

90

18

19    168.   In 4G, acquiring slot synchronization requires matching the received

20  signal with one of three possible candidates for primary synchronization signals. A

21  matched filter is the typical way of matching these signals.[91] Therefore, Ericsson

22  points to LTE's synchronization signal requirements as evidence in support of the

23  existence of such a filter. Notably, Dr. Kakaes does not take the position that TCL

24  does not use a filter in its handsets. He does not even explain why he believes one

25

26  [89] Id.

27  [90] EX-5506.

    [91] EX-4398 (U.S. 6,597,911) at 5:9-15.

28

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;<br>CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   can comply with 4G <u>without</u> using a filter.  Dr. Kakaes's argument appears to be

2   only that the word "filter" is not in the cited portion of the standard, but he does not

3   explain how TCL's 4G handsets (or any 4G handsets) match signals to achieve

4   synchronization without using a filter.

5         169.   With respect to Dr. Kakaes's second argument, Dr. Kakaes does not

6   appear to dispute Ericsson's comment that "[t]he 'acquiring' takes place at least

7   after the UE has been instructed to perform handover measurements on channels in

8   the 'next generation network.'" Rather, he suggests that the prosecution history

9   precludes a claim construction that would cover the 4G standard. However, Dr.

10  Kakaes has not articulated that argument and it would be incorrect in any event.

11  That is because he has not shown the clear disavowal or contrary definition of the

12  "upon entering" claim element necessary to preclude the full scope of the claim.

13  *See, e.g., Home Diagnostics*, 381 F.3d at 1358.  Regardless of his lack of

14  explanation, slot synchronization is acquired "upon entering" the service location

15  area, since multi-mode handsets entering a 4G network from a partially-overlapping

16  2G or 3G network are clearly capable of handing off to the 4G network. Dr. Kakaes

17  provides no explanation or evidence that the "upon entering" limitation excludes

18  the well-known situation where 4G-capable handsets enter a 4G network and are

19  thereafter handed off from a partially-overlapping 2G or 3G network.

20        170.   Finally, with respect to the "determining a scrambling code" claim

21  element, Dr. Kakaes does not discuss this element at all or provide any reasoning

22  why it is not met by the 4G standard.  These various arguments are examples of Dr.

23  Kakaes's second and third categories of errors, where he limits claim terms

24  improperly to narrow their scope and where he narrowly reads Ericsson's claim

25  chart, to reach his conclusion of non-essentiality.

26        171.   As a result, I conclude that all of Dr. Kakaes's arguments lack merit.

27  The P10628 patent family is essential to the 4G standard as I've explained above.

28              **i.      P10896**

172.   The ninth and final patent family I will discuss in this section is the P10896 family.[92] Like P08804, the P10896 family relates to retransmitting a block of data using a certain modulation and coding scheme (MCS).  However, P10896 adds that the MCS for the retransmission should be from the same family of MCSs as the MCS for the original transmission.  Each family of MCSs has a different basic unit of payload, and the code rates in each family are achieved by transmitting a different number of payload units (1, 2 or 4) within a radio block.  By using an MCS for a retransmitted block of data from the same family of MCSs as the one originally used, retransmissions can be performed in a much more efficient manner. The following figures from U.S. 6,704,898 illustrate the concept:



[93]

173.   Dr. Kakaes makes one argument to suggest that the P10896 family (and particularly U.S. 6,704,898) is not essential to the 2G standard. He argues that the "selecting" claim element is performed by the network—not the handset—and is therefore not essential to handsets as shown in an excerpt from his appendix below:

---

[92] EX-4491 (Claim Charts for P10896)

[93] EX-5513, U.S. 6,704,898 at Figures 6A-6B.

> The essentiality rank for Claim 47 is 3 because practicing the 2G standard with user equipment does not require at least the following limitations of the claim: "selecting another modulation and coding scheme from the initial family of modulation and coding schemes."
>
> In addition, I have not seen any evidence that TCL directs or controls any other parties to implement "selecting another modulation and coding scheme from the initial family of modulation and coding schemes."
>
> The limitation "selecting another modulation and coding scheme from the initial family of modulation and coding schemes" is performed by the network. Ericsson's claim chart cites a section of the standard that confirms that these claim limitations are controlled by the network:
>
> > According to the link quality, an initial MCS is selected for an RLC block. For the retransmissions, the same or another MCS from the same family of MCSs can be selected. E.g. if MCS-7 is selected for the first transmission of an RLC block, any MCS of the family B can be used for the retransmissions. *The selection of MCS is controlled by the network.*
> >
> > [ ... ]
> >
> > Type II hybrid ARQ is mandatory in EGPRS MS receivers and the associated performance requirements are specified in 3GPP TS 45.005 [14].
>
> 3GPP TS 43.064 v. 6.0.0 § 6.6.4.5.2 (emphasis added); *see* ERIC_TCL00105823-24. [94]

174.   This is incorrect. Even though the 2G standard says that "selection of MCS is underline(controlled) by the network," selection of the MCS is still underline(performed) by the handset. In particular, the handset "selects" one of several MCSs, all of which the handset supports, to retransmit a block of data. It does not matter that the network controls that selection – the selection is still performed by the handset. As discussed above for P08804 (U.S. 6,208,663), which also deals with a handset "selecting" an MCS for retransmission, Table 8.1.1.1 of 3GPP TS 44.060, § 8.1.1 is titled "*Choice of MCS for retransmissions with re-segmentation.*"[95] Moreover, in the two paragraphs right above that table in the standard, it says, "a MS may choose an alternate MCS than the one commanded" and "the alternate MCS . . .  was available

---

[94] Kakaes Opening Statement Appendix, EX-1639 at A-P10896_2G.

[95] EX-5481, 3GPP TS 44.060, § 8.1.1 (emphasis added).

for <u>selection by the MS</u> during the TBF according to the MCS selection rules <u>for retransmissions</u>."[96] The MCS that the handset chooses for the retransmission is not necessarily the "commanded" MCS, but rather, must be selected by the handset based on the MCS of the initial transmission and the commanded MCS for new transmissions. In several scenarios, the handset selects a different MCS from the "commanded" MCS.  For example, in Table 8.1.1.1, when MCS-9 was used for the initial transmission, and MCS-5 is commanded for new transmissions, the handset selects MCS-3 for retransmissions. The handset thus does not use "commanded" MCS-5, but "selects" MCS-3 instead, which is in the same family as MCS-9.  Thus, the handset selects an MCS different from the MCS of the initial transmission but within the same family of MCSs.

175.   Like with P08804, Dr. Kakaes also attempts to construe "selecting" in an inappropriately narrow way, and he does so without considering any of the intrinsic evidence, and indeed, without considering any evidence at all. As discussed above with P08804, those presumed to be skilled in the art at the time of the invention (inventors of the P08804 and P07761 families) viewed "selecting" of an MCS in a broader manner, which would capture the situation at issue here where a handset chooses one from among several supported MCSs based on input from the network. Dr. Kakaes improperly adopts a narrower claim construction unsupported by any evidence; this is another example of Dr. Kakaes' second category of errors.

176.   Like with P08804, I disagree with Dr. Kakaes's conclusion of non-essentiality based on the "selecting" claim element. The P10896 family is essential to 2G as shown in the claim chart.

D.     **Dr. Kakaes's Methodological Errors Also Appear in His Essentiality Analysis of the Ericsson Claim Charts that He**

---

[96] *Id.* (emphasis added).

**Previously Showcased in His Original Expert Report As Being**

**Representative**

177.    In the main body of his original expert report (and all of his supplemental reports), Dr. Kakaes showcased four patent families to illustrate his essentiality opinions. They are P24058 (ranked a "3" for essentiality), P11538 (ranked a "3" for essentiality), P23563 (ranked a "2" for essentiality), and P24228 (ranked a "3" for essentiality). I assume Dr. Kakaes showcased these patent families, because he believed they put his analysis as a whole in the best light. However, his analysis of these families also suffers from the same methodological errors that I describe above. By addressing these "showcase" examples, I further illustrate the general unreliability of Dr. Kakaes's essentiality analysis as whole.

178.    I note that in his opening witness statement, Dr. Kakaes has relegated <u>all</u> of these showcase examples to his appendix, and has set forth new examples from his appendix that he had not highlighted before as being representative of his methodology. In other words, in all of his analyses up to this point, Dr. Kakaes had highlighted the examples above as demonstrating the reliability of his essentiality methodology. I addressed those examples directly in my rebuttal report. Without explanation, Dr. Kakaes has now chosen not to highlight them anymore. Regardless of the reason, I address those four examples below—which Dr. Kakaes selected himself—to show the general unreliability of Dr. Kakaes's analysis as a whole.

179.    With regard to P24058, Dr. Kakaes argues that Claim 18 of U.S. 8,331,476 is not essential because it is directed to a base station and not a handset. However, Ericsson's claim chart for Claim 18 is not part of, and has never been part of, Ericsson's handset (UE) licensing portfolio. This is thus another example of the first category of errors that Dr. Kakaes commits in his analysis. As discussed above, Dr. Kakaes's analysis of Ericsson's network-side essential claim charts is irrelevant in determining the technical value of Ericsson's handset-side essential patent portfolio at issue in this case.

180.   With regard to P11538, as I explained above, this is an example of Dr. Kakaes's fourth category of errors, where he misunderstands the law of direct infringement, and specifically here, the doctrine of equivalents, to reach his conclusion of non-essentiality. In particular, Dr. Kakaes argues that the claimed invention requires two multiplication steps of three signals, whereas the standard could be implemented in a different, mathematically equivalent way. However, these options would still infringe Ericsson's patent under the doctrine of equivalents. As I discussed above for this case, multiplying a first signal and a second signal and then multiplying the result with a third signal is equivalent to multiplying those three signals in any other manner. For example, 2x3x4=24, which is mathematically equivalent to 2x4x3=24, or 3x4x2=24. Dr. Kakaes has not considered the doctrine of equivalents in his analysis of equivalent alternatives. The P11538 is essential to the standard, even using the equivalent alternatives that he proposes.

181.   With regard to P23563 (U.S. 8,503,942), this is another example of Dr. Kakaes's second category of errors regarding incorrect claim constructions. In particular, Dr. Kakaes argues that Claim 1 of the '942 patent is not essential under a "proper" claim construction.  According to Dr. Kakaes, essentiality depends on the claim construction of the following claim element: "an indication of a variable sized common measurement bandwidth."[97] He suggests that the proper construction of this phrase is "a value of a variably sized common measurement bandwidth."[98] But he cites to the entire prosecution history (over 350 pages) without stating which parts of the prosecution history support his construction, what the reason is for his construction, or providing an explanation of his construction. The entirety of his analysis is that his construction is proper "based on the specification, claim

---

[97] Kakaes Opening Statement Appendix, EX-1639 at A-P23563_4G.
[98] *Id.*

language, and the file history of the patent."[99] However, Dr. Kakaes's construction actually contradicts the patent specification. For example, the specification states that "the network can signal any suitable measurement bandwidth parameter that would ensure that UE measurements done according to this parameters are consistent from different cells."[100] As a result, the base station does not have to send a "value"; it can send "any suitable measurement bandwidth parameter." Dr. Kakaes's narrower claim construction, and his application of that construction, are unsupported and incorrect. This is yet another example of his second category of errors, where he improperly limits the meaning of claim language to reach his conclusion of non-essentiality.

182.   Finally, with respect to P24228, Dr. Kakaes argued that dependent Claim 5 of U.S. 8,347,196 is not essential. But setting aside the merit of Dr. Kakaes's analysis of Claim 5, Dr. Kakaes found Claim 4 (from which Claim 5 depends) and another dependent claim (Claim 6) to be essential as shown in his appendix below:

### 1.   Overview of P24228

| Patent (Claim) | Essentiality | Importance | Contribution | Status | Pages |
|---|---|---|---|---|---|
| U.S. 8,347,196[1] (4) | 1 | 1 | 4 | Active | 1-6 |
| U.S. 8,347,196 (5) | 3 | 1 | 4 | Active | 7-14 |
| U.S. 8,347,196 (6) | 1 | 1 | 4 | Active | 15-16 |

[101]

183.   As a result, Dr. Kakaes's opinion as to dependent Claim 5 is irrelevant,

---

[99] Id.

[100] EX-4414 (U.S. 8,503,942) at 4:60-64.

[101] Kakaes Opening Statement Appendix, EX-1639 at A-P24228_4G.

1   as other claims of U.S.  8,347,196 are essential to the standard.

2       184.   Dr. Kakaes previously showcased the patent families above,

3   presumably because he believed they put his analysis as a whole in the best light.

4   However, his analysis of these families suffers from the same methodological errors

5   that I described above, and illustrate the flawed nature of Dr. Kakaes's essentiality

6   analysis as whole.

7       185.   With regard to Dr. Kakaes's new examples in his opening witness

8   statement, his arguments also suffer from the categories of errors described above.

9   In particular, he points to the P10628, P21428, P08430, and P33858 families. I have

10  addressed P10628 in the analysis section above. With regard to P21428 (U.S.

11  8,285,294), in making additional arguments beyond those in his original report, Dr.

12  Kakaes commits errors in his second category of errors, by improperly construing

13  the claim at issue. The claim requires that the handset perform "setting one of a first

14  access bandwidth or a second access bandwidth for a transmission channel for

15  transmission of the access burst." In the cited standard, the first access bandwidth

16  for a transmission channel for transmission of the access burst is 1,049 KHz, and

17  the second access bandwidth is 1,043 KHz.

18      186.   Dr. Kakaes now argues that while these two numbers are different, the

19  bandwidth size available for the random access preamble is 1,080 KHz, the

20  difference in that number and Ericsson's numbers being due to differently-sized

21  guard bands.  Thus, he now argues, there is only one access bandwidth for

22  transmission, not two. This is incorrect. There is no support in the patent

23  specification, or anywhere else in the record, that limits the claimed transmission

24  bandwidths to the available transmission bandwidth. To the contrary, Claim 1

25  expressly differentiates between transmission bandwidths and "available"

26  transmission bandwidths.

27      187.   Moreover, the '294 Patent is clear that the bandwidth for the claimed

28  random access transmission channel does not include the frequency guard band, as

-85-        REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
            CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Dr. Kakaes's argument requires. In particular, "[t]he individual channels are separated from each other by frequency guard bands to avoid an overlap of inaccurately positioned access bursts received at the base station in neighbouring channels."[102] The clear differentiation between the random access transmission channel ("RACH") and the frequency guard band is illustrated in Figure 8B:



189. The random access transmission channel (RACH) thus does not include the frequency guard band. Dr. Kakaes cannot add the random access transmission channels and the frequency guard bands in the 4G standard and argue that their sum is what's strictly understood as the bandwidth for the random access transmission channel, because the '294 Patent contradicts that overly narrow interpretation.

189. Dr. Ságfors also addresses the P21428 family in his rebuttal statement, as well as the P33858 family. Ms. Chen addresses the P08430 family in her rebuttal statement. I refer the Court to Dr. Ságfors's and Ms. Chen's detailed analyses of Dr. Kakaes's reviews of those three patent families.

## VI.   DR. KAKAES'S OPINIONS REGARDING THE IMPORTANCE AND CONTRIBUTION OF ERICSSON'S ESSENTIAL INVENTIONS ARE INSUFFICIENTLY SUPPORTED, OUT OF LINE WITH INDUSTRY

---

[102] EX-362 (U.S. 8,285,294) at 11:33-37.

[103] *Id.* at Figure 8B.

CONCLUSIONS, AND CONTRARY TO LAW

190.   Turning to his follow-up analyses of the 100+ patent families with inventions that are undisputedly essential, Dr. Kakaes examines what he describes as the importance and contribution of those patented inventions.  In my experience, the importance and contribution of Ericsson's patented technology has been reflected in the value that licensees have agreed to pay Ericsson for a license to Ericsson's 2G, 3G, and 4G essential patent portfolios, after rigorous and intense technical discussions. As I indicated in my opening witness statement, Ericsson's license agreements allow one to calculate that value in an objective, unbiased manner.  In contrast, Dr. Kakaes's opinions on importance and contribution, which act as a predicate for economic value opinions of other TCL witnesses, are insufficiently supported, out of line with industry conclusions, and contrary to law.

191.   As a backdrop to this importance and contribution analysis, it's relevant to note that Ericsson has contributed heavily to cellular research and standardization from 2G to today, and has signed over 100 license agreements over its 2G, 3G, and 4G standard-essential technology.  Ericsson's research and standardization efforts have been widely recognized.  For example, in both 2010 and 2011, Ericsson won the award for the "Best Contribution to LTE Standards" by Informa Telecoms & Media, which recognizes the contribution made by Ericsson to the development of the 4G standard. In 2014, the European Patent Office recognized Ericsson as a leader in 4G innovation by nominating eight Ericsson innovators for the prestigious Inventor of the Year award.[104] In 2015, Ericsson won an award for "Biggest Contribution to 5G Development" by Informa Telecoms & Media, and in 2016, Ericsson won an award for "Biggest Contribution to 5G standards" by LTE & 5G World Awards, and awards for "Advancing the Road to 5G—Evolution to 5G" and "Outstanding Contribution to Standards Development—

---

[104] EX-4054 (the award recognizes outstanding and successful technologies patented by large European companies)

Ericsson 5G Program" by Glotel. Prominent analyst firm Gartner also named Ericsson an LTE leader for seven years in a row in 2016.

192.   Below, I address Dr. Kakaes's errors in devaluing Ericsson's undisputedly essential patents. First, I describe the methodological flaws with his importance and contribution analyses. Then I scrutinize Dr. Kakaes's importance and contribution analyses of the patent families that he previously showcased in the main body of his expert report. I assume Dr. Kakaes believed those showcase examples put his analyses as a whole in the best light. However, in abandoning these as examples and instead relegating them to an exhibit, it appears Dr. Kakaes concedes his analysis is vulnerable. By addressing those examples, I illustrate how Dr. Kakaes's importance and contribution analyses are flawed as a whole. I conclude with a rebuttal of Dr. Kakaes's "breakthrough" patents analysis.

193.   As in a typical high-stakes technical licensing context, I analyzed Dr. Kakaes's and Dr. Jayant's opinions with support from experienced telecommunications engineers, researchers, inventors, and patent professionals from Ericsson.

A.     **Dr. Kakaes Commits Several Methodological Errors in His Analysis of the Importance and Contribution of Ericsson's Undisputedly Essential, Charted Patents**

194.   Dr. Kakaes's methodology for calculating the importance and contribution of Ericsson's undisputedly essential, patented technology suffers from several methodological flaws.  First, he does no importance or contribution analyses for the majority of patent families that he opines are not essential to the standards. As I explained above, Dr. Kakaes's essentiality opinions suffer from numerous errors. Even one error in his essentiality analysis—where he judged a patent family to be non-essential when it actually was essential—would produce an unfilled gap in Dr. Kakaes's importance and contribution analyses. In other words, if, as Dr. Kakaes argues, the technical value of essential patent families varies

widely, then misjudging a family as being non-essential and doing no analysis of its technical value might depreciate Ericsson's patent portfolios greatly. The value of that disregarded patent family could be "very high," and make it impossible for economic experts to then judge a fair value for Ericsson's 2G, 3G, and 4G portfolios.  Nor would it be reasonable for those same economic experts to assume that patent families have an "average" value in view of Dr. Kakaes's opinions that patent families do not.  Setting aside the other errors in his importance and contribution methodologies, failing to address all of Ericsson's patent families is a fatal error in Dr. Kakaes's analysis of the value of Ericsson's 2G, 3G, and 4G patent portfolios.

195.  <u>Second</u>, Dr. Kakaes does not provide any objective measures, benchmarks, or quantitative analyses to support his opinions that Ericsson's patented inventions are marginally important, moderately important, or important (his scale for importance) over his suggested alternatives; or offered no improvement, marginal improvement, or moderate improvement (his scale for contribution) over his alternatives. This lack of objectivity untethers his analysis from industry practice and from the guidance provided by cases like *Innovatio* on how to analyze alternatives. As one example, in his very first analysis of the "importance" and "contribution" of an Ericsson patented invention in his appendix, this is how Dr. Kakaes concludes that Ericsson's P05544 family is "at best, of marginal technical value or importance" and of "no improvement" over the earlier version of the standard before Ericsson's invention:

> As discussed above in the context of Importance, declaring a failure under a narrower set of circumstances (e.g., only when one, specific, signal flow has a problem as opposed to when either one of two or more flows have a problem) is simply a more aggressive approach to holding on to a connection, in the hope/expectation that the problem is temporary in nature.  Some of the time this approach will prove to be better than the alternative; other times, worse.  Thus on average, the non-infringing approach is no better and no worse than the one practicing the claimed invention.[105]

---

[105] Kakaes Opening Statement Appendix, EX-1639 at A-P05544_2G.

196.   Dr. Kakaes provides no support for his opinion that Ericsson's approach "will [sometimes] prove to be better than the alternative; other times, worse."[106] He cites no testing, no literature, no technical documents, nothing whatsoever. Nor does he quantify how much better or worse, what specifically is better or worse, and under what circumstances. He also offers no explanation why the standards body made up of highly experienced engineers added Ericsson's invention to the earlier standard (Dr. Kakaes's alternative) if the invention offered no improvement. As in this example, in much of his importance and contribution analysis, Dr. Kakaes lists potential advantages and disadvantages of each solution in only the most general terms and concludes that Ericsson's solution is not much better than another alternative.  All technical solutions have advantages and disadvantages—just listing those advantages and disadvantages does not make all technical solutions equal and of minimal value. This approach to calculating value is not the product of a rigorous engineering exercise and is incorrect in any event.

197.   Third, Dr. Kakaes's importance and contribution analyses second-guess the opinions of the most experienced experts in the world on standard-essential technology—the 3GPP delegates developing the standards—from numerous telecommunications companies, who believed Ericsson's inventions were worthy of inclusion in the standard and thus "important" after considering, and many times testing and evaluating, all other presented options.  The rigor of analysis performed by the 3GPP community is the backdrop against which to analyze the rigor of Dr. Kakaes's analysis, and whether he has properly rebutted the conclusions of the industry's experts in 3GPP that Ericsson's inventions were technically worthy of inclusion into the standard.

198.   As one of numerous examples of the rigor of 3GPP analyses, when evaluating channel codes to use for certain control channels in LTE, Ericsson

[106] *Id.*

submitted a proposal to 3GPP (R1-073034), with four figures of different simulation results comparing the performance of different alternatives against objective benchmarks, including the following figure:



[107]

199.   Motorola and Nokia also simulated the performance of different alternatives, including the earlier 3G (WCDMA, Rel 99) code, and provided their simulation results against objective benchmarks in twelve figures in their contributions (R1-072670, by Motorola; R1-073194, by Nokia), including:



Figure 5.    Comparison of circular-buffer based rate matching schemes and Rel-99. Rate 2/3, QPSK, AWGN. FER target is 0.01.

[108]

---

[107] EX-5487, TDoc R1-073034.



Figure 5: Performance of RM schemes as a function of packet length for BLER-target of 1%. [109]

200.   After considering the various alternatives proposed by different companies, the 3GPP community adopted Ericsson's proposal as the mandatory coding scheme, and the technology in that proposal is embodied in Ericsson's P24228 (U.S. 8,347,196) patent family.  In contrast, Dr. Kakaes reviewed the same Ericsson graph from R1-073034, and argues, "the performance of the alleged inventive scheme over 'uniform puncturing' of the prior art is often about the same, while sometimes a little better and sometimes a little worse," and concludes this is "no improvement." But he does no testing to see whether Ericsson's invention is used by standard-compliant handsets when the code is "a little better" and not when the code is "a little worse."[110] He also leaves unanswered the highly relevant question of why the 3GPP community of engineers—analyzing all of these alternative solutions from many different companies over several months—would

[108] EX-5486, TDoc R1-072670.

[109] *Id.*

[110] Ericsson indicated in its contribution that "[w]hen compared to the reference cases, performance of the new convolutional coding scheme is quite beneficial for cases of interest." R1-073034, p. 2.

1   choose Ericsson's undisputedly essential coding solution, which Dr. Kakaes

2   himself grudgingly concedes is "sometimes a little better," if it offered no

3   improvement.

4       201.   This example of rigorous analysis of alternatives by the 3GPP

5   community is the rule, rather than the exception.  For example, I attach the minutes

6   of meeting (R1-073815) for just the RAN1 working group meeting (Meeting #50)

7   that included the contributions above, where over 500 contributions were

8   submitted.[111]  Keep in mind there are many 3GPP working groups (e.g., RAN1,

9   RAN2, RAN4, SA2, SA3, CT1) developing the standard technical specifications,

10   and each group meets several times each and every year.  I refer to the witness

11   statements of my colleagues Dr. Parkvall and Dr. Bruhn to demonstrate further

12   examples of the rigorous technology selection process in 3GPP. And just to put the

13   level of effort, rigor of analysis, and peer review into perspective, in my role as the

14   director of 5G, I learned recently that at one RAN1 meeting, there were more than

15   600 participants and more than 2,500 input documents; the entire word count of

16   those documents was more than 2.5 times the number of words in the entire works

17   of William Shakespeare – and that is just at one meeting for one working group.

18       202.   Indeed, for some of Ericsson's patented technologies, the 3GPP

19   community has considered and included those technologies in not just one, but

20   multiple, generations of standards. For example, the random access technology of

21   P10808 (U.S. 6,985,474) was co-invented by my colleague Dr. Erik Dahlman.

22   Along with Dr. Parkvall, Dr. Dahlman has co-authored the leading textbooks on

23   3G/HSPA and 4G technologies. In the '474 patent, Dr. Dahlman described, as

24   background to his invention, the random access scheme of a prior art standard

25   called IS-95, and described the improvements of his invention over that prior

26

27   ───────────────
    [111] EX-5488, TDoc R1-073815.

28

technology.[112] With IS-95 as background against which to compare Dr. Dahlman's solution, the 3GPP community then chose Dr. Dahlman's solution for inclusion into the 3G WCDMA standard. Then, a decade later, when choosing a random access solution for 4G, the 3GPP community again chose Dr. Dahlman's solution. While Dr. Kakaes concedes that Dr. Dahlman's patented invention is essential both to 3G and 4G, he concludes that Dr. Dahlman's solution offered "no improvement" over the prior art IS-95 random access technology. Dr. Kakaes thus second-guesses, in a handful of hours and with no objective testing, benchmarks, or measurements, the judgments of not just one 3GPP community of engineers near the time of the invention (3G), but also of a second 3GPP community of engineers evaluating the best technology a decade later for the next generation of technology (4G).  And this is after second-guessing the judgment of the co-author of the leading textbooks on 3G and 4G technology. Dr. Kakaes offers no explanation why his judgment is better than theirs, or any objective evidence to prove it.

203.   Just by perusing the example minutes of meeting for the one 3GPP RAN1 working group meeting that I've attached (R1-073815), one can observe the rigorous analysis and peer review of technical solutions presented and adopted into the standard.  The minutes of meeting show on p. 18 that, for the channel code example discussed above, Ericsson, Qualcomm, Nokia, Motorola, ZTE, Nortel, NTT Docomo, LG, Broadcom, and Samsung participated in the discussion and decision on the way forward, after a "debate."[113] Some of these same companies who have participated in these standardization meetings and who have accepted Ericsson's inventions as being worthy of inclusion into the standard (e.g., Sharp, ZTE, Samsung, and so on), then sign licenses with Ericsson. In my opinion, they have thus validated the importance and contribution of Ericsson's patented

---

[112] *See* EX-5514, U.S. 6,985,474.

[113] *Id.*

technology, both technically and financially. Dr. Kakaes seeks to second-guess the value judgment made by these top experts on the standardized technology, and their sophisticated companies, and offers no explanation why his brief analysis is better than their rigorous, peer-reviewed, and peer-approved analysis and conclusions.

204. Fourth, Dr. Kakaes's importance and contribution analyses are also internally contradictory, and do not faithfully follow the methodologies that Dr. Kakaes indicates that he is following. For example, for one of the three cases that he showcased in his original report to demonstrate the reliability of his importance and contribution analyses (which he now abandons as an example), Dr. Kakaes analyzed the importance and contribution of the P08338 patent family (U.S. 6,173,162) over a patented solution to Qualcomm. In his importance analysis, Dr. Kakaes concluded that "the claimed invention provides a marginal improvement to the known prior art,"[114] but in his contribution analysis, he concluded that the patent family offered "no improvement" over the same prior art.[115] Setting aside the merit of the underlying analyses, it is impossible for Ericsson's invention to offer both "a marginal improvement" and "no improvement" at the same time over the same prior art. Dr. Kakaes's analysis thus cannot be reproduced, even by himself, , even for the showcase example that he, himself, selected. This is a hallmark of a flawed approach.

205. As another example, in his analysis of the P07873 patent family, Dr. Kakaes points to an ETSI technical contribution that compares Ericsson's patented solution with another solution. The technical contribution indicates that Dr. Kakaes's other solution "does not meet the stage 1 requirement for exclusive access as stated above. It is therefore not sufficient as the only solution."[116] In other

---

[114] Kakaes Opening Statement Appendix, EX-1639 at A-P08338_3G (emphasis added).

[115] *Id.*(emphasis added).

[116] EX-5527, SMG TDoc SMG12 C-99-415 dated March 17, 1999 (emphasis added).

1    words, as evidenced by Dr. Kakaes's own cited alternative, ETSI itself concluded

2    that Dr. Kakaes's other solution could not be a <u>viable alternative</u> to Ericsson's

3    solution, because the other solution did not meet ETSI's technical requirements and

4    was admittedly not sufficient as the only solution (i.e., as a <u>viable alternative</u>).

5    When explaining his contribution methodology, Dr. Kakaes indicated that he would

6    provide a "1" to Ericsson patent families in an instance such as this, where "no

7    <u>viable alternatives</u> to the key accused feature were identified." (emphasis added) He

8    did not offer any exceptions to his rule. However, for the P07873 alternative

9    solution, he provided a lower ranking—a "3"—which means that "the key accused

10   feature provided a marginal improvement to the standard relative to the

11   alternative." Thus, while Dr. Kakaes explains his ranking system without providing

12   exceptions, he clearly makes exceptions when applying the methodology. By not

13   following his own rules, Dr. Kakaes introduces inconsistencies that put into

14   question the accuracy of his entire analysis.

15       206.   <u>Fifth</u>, Dr. Kakaes's importance and contribution analyses do not

16   consider the effect of his alternatives in the aggregate, or put differently, the value

17   of Ericsson's inventions in the aggregate. In particular, Dr. Kakaes does not

18   consider the impact of removing all of Ericsson's 100+ undisputedly essential

19   solutions as a whole from the standard, and replacing them with Dr. Kakaes's

20   alternatives. In the subsection below, I provide an analysis of the alternatives that

21   Dr. Kakaes previously showcased in the main body of his original report to put, I

22   assume, his analysis in the best light. As with most of the other patent families he

23   originally showcased to show the accuracy of his methodology, he abandons these

24   as examples in his opening statement. I demonstrate that even those limited,

25   previously-showcased opinions offer alternatives that either would not work, or

26   would not address the technical requirements achieved by Ericsson's inventions. If

27   even this small subset of self-selected examples produces a broken alternative

28   standard, it's hard to imagine what would remain after aggregating over 100 of

1   these alternative solutions in an untested and unproven manner.

2       207.   Sixth, as a factor in devaluing Ericsson's patents, Dr. Kakaes considers

3   whether patented features are optional to the standard, and devalues them just for

4   that reason. One fundamental error here is that some optional features are important

5   and used widely by cell phones. For example, GPRS and EDGE are optional for 2G

6   phones, HSPA is optional for 3G phones, and LTE Advanced is optional for 4G

7   phones. But just because they are optional does not mean these advanced features

8   are unimportant or that TCL and the rest of the industry do not use them. Still, Dr.

9   Kakaes offers no exceptions to his methodological rule. Moreover, different

10  technical options in the standard also make the standard more robust. For example,

11  there are different speech coding options for 2G phones, but having the option to

12  use the standardized AMR-NB speech coding option (which Ericsson invented, as

13  my colleague Dr. Bruhn explains in his witness statement) allows for improved

14  speech quality in situations with varying levels of interference. Dr. Kakaes does not

15  measure, quantify, or otherwise calculate the value of optional features or the effect

16  of removing robustness in the standard by removing optional features. He also does

17  not credit mandatory features in the standard in the same way that he discredits

18  optional features. Nor does he consider whether TCL does, in fact, implement these

19  optional features. If TCL implements these features, it shows that while optional,

20  they are nonetheless valuable to TCL.

21      208.   Seventh, as in his essentiality analysis, Dr. Kakaes at times

22  misinterprets Ericsson's patented solution, the standard section, or both. With this

23  misunderstanding, he proceeds to evaluate technical solutions that do not actually

24  achieve the technical effects that Ericsson's patented, essential inventions achieve.

25  For example, for one of the cases that he previously showcased in his original

26  report, which I describe further below, Dr. Kakaes analyzed the importance of

27  P09646 (U.S. 6,473,506) after misunderstanding Ericsson's invention, which is to

28  communicate modulation scheme information through symbol phase rotation. He

1   then misunderstood the standard, which also indicates that modulation scheme

2   information is communicated through symbol phase rotation. He then proceeded to

3   propose a solution that does not say <u>anything</u> about communicating modulation

4   scheme information, through symbol phase rotation or otherwise. Dr. Kakaes

5   cannot assess proper value for Ericsson's patented inventions without a proper

6   understanding of those inventions and of the standard. His errors in this regard put

7   the accuracy of his analysis as a whole into question.

8        209.  <u>Eighth</u>, as a factor in devaluing Ericsson's patents, Dr. Kakaes

9   considers how widely the accused technology is deployed in major markets by

10   others, or by TCL under an improperly narrow view of the scope of patent

11   infringement. Instead, Dr. Kakaes should have focused on whether TCL would

12   deploy the accused technology during the license period, using a proper

13   understanding of the scope of infringement. In other words, he should not have

14   focused his analysis on others' current products in certain markets, but on TCL's

15   products during the license period. For example, with regard to TDD LTE, Dr.

16   Kakaes should have considered all countries where Ericsson has and will have TDD

17   LTE patents and where TCL will make, sell, offer to sell, use, induce others to use,

18   or import phones supporting TDD LTE during the license period. Dr. Kakaes could

19   have easily determined TCL's forecasts in this regard. If TCL sold, sells, or plans to

20   sell TDD LTE phones during the license period, those phones would infringe

21   Ericsson's patents. It does not matter what others (not TCL) currently deploy in

22   certain markets. What matters for judging value in this case, as in technical

23   licensing discussions with other companies, is whether the technology has had,

24   does have, or will have value to TCL during the license period.

25        210.  <u>Ninth</u>, Dr. Kakaes does not consistently consider whether his

26   alternatives were before 3GPP as "viable" alternatives, and whether his alternatives

27   were unpatented and thus truly "non-infringing," cost-free alternatives. Both

28   conditions must be considered under the precedent on which Dr. Kakaes loosely

bases his methodologies, to reach conclusions on value.[117] For example, Dr. Kakaes purports to provide at least one non-infringing alternative for over 100 of Ericsson's patent families. Of these alternatives, over 50 of them are patents or patent applications. Dr. Kakaes has not shown that those patented solutions were presented to 3GPP and thus that they were truly "viable" alternatives to Ericsson's patented solutions. Under the precedent on which he loosely bases his analysis, the burden is on Dr. Kakaes to explain himself in this regard, and he does not do it. Moreover, even had those patented solutions been presented to 3GPP and could be implemented instead of Ericsson's patented solutions, TCL would have had to seek patent licenses for those other patents. These other patents are distributed among almost 30 different companies including Alcatel Lucent, InterDigital, Motorola, NEC, Nokia, Qualcomm, Samsung, Panasonic, and many others. I know from my six years of patent licensing experience at Ericsson that at least the companies listed above seek royalties or other consideration for their standard-essential patents. Thus, rather than take one license from Ericsson, TCL would need to seek patent licenses from all of these other companies for infringement of these other patents.

211. Additionally, with regard to his other alternatives, many of which are derived from 3GPP technical documents or standards, Dr. Kakaes assumes, without any justification, that those technical solutions would also be unpatented. But from my six years of technical negotiation experience for Ericsson in licensing discussions, I know that companies who contribute to 3GPP generally seek patent

---

[117] *See In re Innovatio,* 2013 U.S. Dist. LEXIS 144061, at *105 ("If a proposed alternative had not even been presented to the IEEE, however, it is implausible to believe that assessing such a technology as a plausible alternative would be an effective negotiating point, as it is exceedingly unlikely that the IEEE would adopt such an alternative. Accordingly, the court will only consider technology that was considered by the standard-setting body when determining whether there are alternatives to the patented technology that could have been adopted into the standard."); *Id.* at *102-03 ("In other words, the existence of patented does not provide as much reason to discount the value of Innovatio's patents as does the existence of alternatives in the public domain.").

protection for their contributions. This is evident from the number and type of claim charts that these companies share with Ericsson as part of the cross-license discussions, claim charts that I have personally reviewed in the many licensing discussions that I've attended. For Dr. Kakaes to assume that these other alternatives are unpatented and cost-free, without explanation, is wrong. The burden is on Dr. Kakaes to prove that his alternatives are non-infringing, and he offers no evidence or reasonable explanation on which to base his assumption that these alternatives are unpatented.

212.   Moreover, with regard to some of his alternatives, they are not derived from patents, 3GPP technical documents, or anything else. Dr. Kakaes appears to generate these alternatives himself, with no evidence at all that they actually existed at the time of standardization, much less that they were "viable" as alternatives within 3GPP:

| P23682 (4G)—U.S. Patent No. 8,594,029 (Claim 1) |
|---|
| As a non-infringing alternative, one could instead design a feature limiting the system to running one ARQ process at a time.  This feature, like the key accused feature, would mitigate the problems associated with attempting to match a dynamically scheduled retransmission of a HARQ process with the initially transmitted HARQ process that was semi-persistently scheduled.  Moreover, this non-infringing alternative would obviate the need for a HARQ Process ID, thereby reducing control overhead.  Thus, the key accused feature provides a marginal improvement over non-infringing alternatives. |

[118]

213.   <u>Tenth</u>, also in other key ways, Dr. Kakaes's importance and contribution analyses do not follow the precedent on which he loosely bases his methodologies. In particular, there is no legal precedent that conflates "importance" and "contribution" methodologies in the manner that Dr. Kakaes does in his witness statement. For example, with regard to the P08338 patent family (U.S. 6,173,162) discussed above, Dr. Kakaes determined in his importance analysis that "the

---

[118] Kakaes Opening Statement Appendix, EX-1639 at A-P23682_4G.

claimed invention provides a marginal improvement to the known prior art," but in
his contribution analysis, he concluded that the patent family offered "no
improvement" over the same prior art. Setting aside the irreconcilable nature of his
opinions, he performed the same analysis twice. By basing both methodologies on
an analysis of the "improvement" of Ericsson's patented technology over
alternatives, it appears that Dr. Kakaes is seeking to doubly discount the value of
Ericsson's patented inventions for the same reason.  No case law exists that
supports these unwarranted double discounts.

214.   In all, Dr. Kakaes's many errors in his importance and contribution
methodologies, and in their application, make his analyses a poor option for
determining a fair technical valuation of Ericsson's patent portfolio, on which fair
economic valuations can then be performed. Considering Ericsson's license
agreements is much more reliable, because they provide an unbiased and objective
view of value after rigorous due diligence by highly motivated and highly
experienced technical, legal, and licensing experts at sophisticated companies in a
high-stakes setting.

B.     **Dr. Kakaes's Methodological Errors Also Appear In His
       Importance And Contribution Analyses Of The Ericsson Claim
       Charts That He Previously Showcased As Being Representative In
       His Original Expert Report**

215.   In the main body of his original expert report (and all of his
supplemental reports), Dr. Kakaes previously showcased three patent families to
illustrate his importance and contribution opinions. They are P08338 (U.S.
6,173,162), ranked "3" for importance and "4" for contribution; P09646 (U.S.
6,473,506), ranked "4" for contribution; and P23893 (U.S. 8,134,940), ranked "3"
for importance. I assume Dr. Kakaes showcased these patent families, because he
believed they put his analysis as a whole in the best light. However, his analysis of
these families also suffers from the same methodological errors that I described

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

above. By addressing these "showcase" examples, I further illustrate the general flaws within Dr. Kakaes's importance and contribution analysis as whole.

216. As I noted above, in his opening witness statement, Dr. Kakaes has abandoned two of these three families as examples, and instead relegated them to his appendix. In his opening witness statement, he has now set forth new examples from his appendix that he had not highlighted before as being representative of his methodologies. In other words, in all of his analyses up to this point, Dr. Kakaes had highlighted the three examples above as demonstrating the reliability of his importance and contribution methodologies. I addressed those examples directly in my rebuttal report. Without explanation, Dr. Kakaes has now chosen not to highlight two of the three examples anymore. Regardless of the reason, I address those three examples below—which Dr. Kakaes selected himself—to show the general flaws of Dr. Kakaes's analysis as a whole.

217. With regard to the P08338 patent family, Dr. Kakaes opines, as part of his importance analysis, that "the claimed invention provides a <u>marginal</u> improvement to the known prior art."[119] However, in his contribution analysis, he concludes that "there was <u>no</u> improvement" over this same art.[120] As I mentioned above, setting aside the merit of his underlying analysis, which I address below, it is impossible for Ericsson's invention to be both "a marginal improvement" and "no improvement" at the same time over the same art. Dr. Kakaes's analysis thus cannot be reliably reproduced, even by himself, even for his showcase example. This is a hallmark of a flawed approach, and an example of the fourth category of errors described above.

218. Second, Dr. Kakaes's alternative solution appears to have been patented by Qualcomm, as shown below on the face of the patent:

---

[119] Kakaes Opening Statement Appendix, EX-1639 at A-P08338_3G (emphasis added).

[120] *Id.*(emphasis added).

| | | |
|---|---|---|
| **United States Patent** [19] | [11] | **Patent Number:** **5,485,486** |
| Gilhousen et al. | [45] | **Date of Patent:** **Jan. 16, 1996** |

| | | |
|---|---|---|
| [54] **METHOD AND APPARATUS FOR CONTROLLING TRANSMISSION POWER IN A CDMA CELLULAR MOBILE TELEPHONE SYSTEM** | 4,613,990 | 9/1986 Halpern .................................. 455/33.2 |
| | 4,641,322 | 2/1987 Hasegawa .................................. 375/1 |
| | 4,672,658 | 6/1987 Kavehrad et al. ..................... 379/63 |
| | 4,765,753 | 8/1988 Schmidt .................................. 379/60 |
| | 4,777,653 | 10/1988 Bonnerot et al. ................... 455/69 |
| [75] Inventors: **Klein S. Gilhousen; Roberto Padovani; Lindsay A. Weaver, Jr.,** all of San Diego, Calif. | 4,811,421 | 3/1989 Havel et al. .......................... 455/69 |
| | 4,868,795 | 9/1989 McDavid et al. ..................... 367/77 |
| | 4,870,698 | 9/1989 Katsuyama et al. ............... 455/67.1 |
| | 4,901,307 | 2/1990 Gilhousen et al. .................. 370/18 |
| | 5,056,109 | 10/1991 Gilhousen et al. .................. 375/1 |
| [73] Assignee: **QUALCOMM Incorporated**, San Diego, Calif. | 5,093,840 | 3/1992 Schilling ................................ 375/1 |
| | 5,107,487 | 4/1992 Vilmur et al. ......................... 370/18 |

[121]

219.    Dr. Kakaes provides no evidence that this patented solution was presented to 3GPP, and thus even a possible "viable" alternative. *See In re Innovatio*, 2013 U.S. Dist. LEXIS 144061, at *134 ("Accordingly, there is no evidence that the Tymes Patent was submitted to the IEEE standards setting body, and so it is not a viable alternative."). Moreover, in a hypothetical negotiation, Dr. Kakaes's alternative solution would have been a patented solution, and he provides no evidence or explanation to satisfy his burden to show that the solution would be a non-infringing, cost-free alternative for TCL. I know from my experience as a patent licensing professional in the industry that Qualcomm has charged (and charges) patent royalties for standard essential patents. Thus, instead of seeking a license from Ericsson for this "prior art approach," TCL would have had to seek a license from Qualcomm, which would also come with a cost (i.e., royalty rate) that TCL must pay to license the patented technology. This is an example of Dr. Kakaes's ninth category of errors, discussed above.

220.    Third, Dr. Kakaes's opinion is unsupported by any objective measures, benchmarks, or quantitative analyses. Dr. Kakaes argues that the prior art approach provides "increased performance," which is offset "by the need for increased

---

[121] EX-5508, (U.S. 5,485,486).

signaling."[122] He concludes that "the claimed invention provides a marginal improvement to the known prior art power control algorithm in that it slightly reduces signaling overhead at the expense of sacrificing the ability to provide independent, fast, inner loop power control."[123]  However, there are always advantages and disadvantages to every technical solution. Only a quantitative analysis of the overall impact of either solution measured against an objective benchmark shows which tradeoffs are better and by how much. Dr. Kakaes has not determined what impact the prior art solution has on performance, or measured the change in performance between Ericsson's P08338 patented technology and the prior art solution in any way. He performed no testing at all. Nor did Dr. Kakaes locate any industry literature to support his conclusion. Nor did he provide any explanation of how much increased performance there would be or what the effect of increased signaling would be on the network. Dr. Kakaes does not provide any of the expected analysis, benchmarking, supporting literature, or testing that would accompany a typical and thoroughly researched opinion here.  This is an example of his second category of errors, discussed above.

221.   Fourth, Dr. Kakaes ignores the fact that the 3GPP community, in approving Ericsson's patented technology for inclusion in the standard, believed that the tradeoffs in Ericsson's solution outweighed all other prior art solutions, and made Ericsson's solution "mandatory."[124] The inventors of the P08338 patent family include Dr. Dahlman, who I referred to above as having co-authored (with Ericsson's Dr. Parkvall) the leading textbooks on 3G and 4G technology. Dr. Kakaes mentions that Dr. Dahlman in the P08338 patent explicitly understood the

---

[122] Kakaes Opening Statement Appendix, EX-1639 at A-P08338_3G.

[123] *Id.*

[124] As discussed above, Dr. Kakaes does not credit Ericsson's solutions for being mandatory, even though he discredits Ericsson's solutions if they are optional, without regard to whether TCL actually implements these optional solutions or the value those optional solutions actually provide.

prior art solution that Dr. Kakaes offers. Given the absence of any supporting evidence to contradict Dr. Dahlman and the 3GPP community, Dr. Kakaes cannot say with any degree of certainty that Ericsson's solution, as opposed to the prior art solution, is marginally important, moderately important, or important, or whether Ericsson's solution offered no improvement, marginal improvement, or moderate improvement. This is an example of the third category of errors, discussed above.

222.   Though it was Dr. Kakaes's burden to establish that his prior art solution was a viable alternative, and not my burden to establish that his solution was unviable, I undertook a deeper analysis of the viability of this alternative solution.  I did this since Dr. Kakaes had showcased his analysis of P08338 as demonstrating the reliability of his importance and contribution methodologies as a whole. If his analysis and conclusions were incorrect for this showcase example by, e.g., not considering all of the drawbacks of his alternative approach or all of the benefits of Ericsson's approach, this would further support my opinion that his untested and unsupported analyses of alternatives are generally without merit. Accordingly, for this deeper analysis, I studied the consequences of Dr. Kakaes's prior art alternative, and whether Dr. Kakaes had truly considered all of the drawbacks of his alternative and all of the benefits of Ericsson's patented solution.

223.   As background, I know from my experience in technical licensing discussions over the past six years that suggesting that a 3GPP solution has no value, or could be implemented in another manner, can have drastic consequences on the performance of a network. In my own experience, there have been several instances where we at Ericsson have studied the possibility that a patented, standardized feature may not be used or needed.  To address this, we typically research this issue with assistance from one or more internal product engineers and 3GPP delegates who have deep knowledge about specific product requirements. We then present and debate our findings in the ensuing technical licensing negotiations. As in the context of technical licensing discussions, for this deeper analysis of

P08338, I contacted and worked with a former Ericsson 3GPP delegate for WCDMA technology, Mr. Fredrik Ovesjo, who has also worked in Ericsson's product development unit as an expert in WCDMA radio bearer functions and characteristics. I then confirmed the analysis with Dr. Mats Sågfors, another former 3GPP delegate who is also a witness in this case.

224.   The deeper analysis of Dr. Kakaes's alternative revealed that the alternative would not work in a 3G (WCDMA) system.  Dr. Kakaes suggests that one could remove Ericsson's patented solution for adjusting the transmit power of both the physical control channel and physical data channel using a power offset command. He opines that this could be replaced with Qualcomm's approach of using individual power control loops for each physical channel separately. In concluding that Ericsson's solution had marginal value, Dr. Kakaes argued that the "advantages of this prior art approach include the fact that much more accurate power control can be exercised, resulting in increased performance.  Said advantage is offset by the need for increased signaling by an amount that is proportional to the number of physical data channels present. In most implementations where the number of physical data channels is small, that corresponds to a very small overhead."[125] As I describe below, in reaching his conclusion, Dr. Kakaes did not consider many negative consequences that would make his solution unworkable.

225.   As one example, Dr. Kakaes fails to appreciate the power control timing relationships in 3G (WCDMA) that do not allow his prior art solution to work. In particular, using his prior art approach, a 3G (WCDMA) base station would not be able to control the transmit power of the uplink dedicated physical data channel (DPDCH) effectively. In 3G (WCDMA), the required uplink transmit power varies as a function of the handset's selected transport format (and uplink fading).  What transport format the handset has selected will only be known to the

---

[125] Kakaes Opening Statement Appendix, EX-1639 at A-P08338_3G.

1   base station <u>after</u> the transport format combination indication has been received and

2   decoded by the base station, not <u>before</u>.  At that point in time (15 slots, or 1 frame,

3   later), the opportunity to influence the transmit power has already passed for those

4   15 slots. Moreover, the base station generally cannot use its knowledge of the

5   currently decoded handset transport format to influence the proper future handset

6   transmit power (e.g., for the next 15-slot frame), because the base station cannot

7   predict the quickly-changing, handset-selected transport format, which can change

8   for every 15-slot frame. The base station in a 3G (WCDMA) network therefore

9   cannot reliably vary uplink transmit power using Dr. Kakaes's solution. Thus, Dr.

10  Kakaes's solution would not work in a 3G (WCDMA) network, and is not a viable

11  alternative to Ericsson's invention. This also means that Dr. Kakaes's conclusion is

12  incorrect that, using his alternative solution, "much more accurate power control

13  can be exercised, resulting in increased performance."[126] To understand these

14  mandatory timing relationships, Dr. Kakaes would have had to consider the

15  interplay among several 3GPP technical specifications. *See, e.g.,* EX-5489, 3GPP

16  TS 25.214, V11.3.0, § 5.1.2.5.1 ("[t]he gain factors may vary on radio frame basis

17  depending on the current TFC used"); EX-5490, TS 25.321 V11.4.0, § 11.4 ("the

18  UE shall perform the TFC selection"); EX-1379, TS 25.212, V11.4.0, § 4.3.5.1

19  ("[t]he bits of the [TFCI] code word are directly mapped to the slots of the radio

20  frame"), and EX-1379 § 4.3.2 ("[a]s soon as the TFCI is detected, the transport

21  format combination, and hence the transport formats of the individual transport

22  channels are known").  Dr. Kakaes's brief review of the alternative did not allow

23  him to appreciate its fatal flaw—that it's unworkable and thus not a viable

24  alternative within 3G (WCDMA).

25      226.   However, even if you set aside the fatal flaw I just mentioned, and

26  could re-design broader aspects of 3G (WCDMA) to accommodate his solution,

27  _____

28  [126] *Id.*

1   there are other drawbacks with Dr. Kakaes's suggested alternative. For example,

2   signal quality estimation of uplink data channels would be delayed (as discussed

3   above) and would be less reliable than the signal quality estimation of the uplink

4   control channel, because the transmission of uplink data is unpredictable and

5   generally more intermittent than the transmission of uplink control information.

6   *See, e.g.*, 3GPP TS 25.214 V11.3.0, § 6C.2 ("When UL_DTX Active is FALSE

7   (see section 6C) the UE shall transmit the uplink DPCCH in each slot except in the

8   slots overlapping a compressed mode transmission gap.")(emphasis added). Dr.

9   Kakaes's alternative would thus likely degrade services such as speech and

10  interactive services. Moreover, due to the additional overhead necessary to

11  implement Dr. Kakaes's prior art approach, a smartphone would suffer drastic

12  reductions in throughput/capacity for more advanced services that use more uplink

13  data channels (and thus more power control loops and signaling), such as

14  supporting speech calls while running background applications such as Facebook or

15  Gmail. His solution would thus be less future-proof than Ericsson's solution, which

16  would scale with more advanced services rather than drastically degrade with more

17  advanced services. But even for less advanced services, the handset would

18  generally suffer reductions in throughput/capacity, which is far from negligible.

19  The handset would further require more complex and intensive processing, to

20  accommodate power control loops for each physical channel separately.

21      227.  Dr. Kakaes either ignores or downplays these negative consequences

22  of his alternative solution. His alternative is not viable as an alternative to

23  Ericsson's patented technology, and it does not provide the advantages Dr. Kakaes

24  suggests it does. If even this showcase example would not work as Dr. Kakaes

25  intended, the result of adding up all 100+ of Dr. Kakaes's alternatives, where he has

26  second-guessed the 3GPP community with no testing or other evidence in support

27  of his opinions, would leave very little of value. In sum, Dr. Kakaes's analysis for

28  P08338 suffers from flaws in the second, third, fourth, fifth, sixth, and ninth,

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    categories of methodological errors that I describe above.

2        228.   I also disagree with Dr. Kakaes's second of three previous showcase

3    analyses, using the P09646 family and U.S. 6,473,506. There, he concludes that

4    Ericsson's patented solution provides no improvement over the alternative solution

5    he identifies. Dr. Kakaes begins by opining that the key feature of Ericsson's

6    solution is "rotating each symbol in EDGE 8PSK modulation by $3\pi/8$" and that "in

7    EDGE, a $3\pi/8$ rotation factor is applied to UL data symbols for the purpose of

8    avoiding zero-crossings rather [than] for indicating the modulation type used in the

9    UL transmission."[127] His opinions are faulty. As I discuss above in the essentiality

10   section, Ericsson's P09646 solution is precisely about having the "phase rotation

11   factor uniquely identif[y] the one information signal [e.g., the modulation scheme]

12   to be conveyed from the transmitter [the handset] to the receiver [the base

13   station]."[128] Rotating the phase of symbols to communicate the modulation scheme

14   of the signal (GMSK or 8PSK) is significant, because the handset can thereby

15   communicate the modulation scheme without transmitting any bits or introducing

16   additional delay.  As I discussed in the essentiality section, Dr. Kakaes

17   misinterprets Ericsson's patent and claim chart, when he concludes that Ericsson's

18   invention was not about communicating, e.g., modulation scheme information. Dr.

19   Kakaes also misinterprets the standard by opining that the rotation factor is not used

20   for indicating the modulation format used in the uplink transmission. The standard

21   section cited in Ericsson's claim chart explicitly contradicts Dr. Kakaes, stating that

22   "the modulation format is inherently signalled by the rotation factor of the training

23   sequences."  *See* EX-5482, 3GPP TS 43.064 V6.0.0, § 6.4. Thus, the standard itself

24   contradicts Dr. Kakaes's opinion by stating that the rotation factor inherently

25   signals the modulation format.

26   _____

27   [127] Kakaes Opening Statement Appendix, EX-1639 at A-P09646_2G.
     [128] EX-4397 (U.S. 6,473,506) at Claims 1, 4.

28

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

229.    After misinterpreting Ericsson's patent, and the standard, Dr. Kakaes proceeds with an analysis of a solution that does not disclose <u>anything</u> about communicating the modulation scheme (8PSK or GMSK) by applying a certain phase rotation to symbols. Dr. Kakaes's conclusion about the value of Ericsson's patented technology, based on two incorrect assumptions, is thus without merit. In other words, because Dr. Kakaes has improperly described the key inventive feature, as well as the standard, he does not and cannot accurately determine a viable alternative with which to compare Ericsson's invention. His proposed alternative nowhere discloses communicating modulation scheme information using a specific phase rotation, as in Ericsson's invention, to facilitate use of different modulation schemes in a dynamic and efficient manner.  Accordingly, Dr. Kakaes's analysis for P09646 suffers from flaws in the seventh category of methodological errors that I describe above.

230.    I also disagree with Dr. Kakaes's discussion of the importance of the P23893 patent family, which was his third showcase example in his original expert report. After admitting that the accused technology "is technically valuable," Dr. Kakaes concludes the P23893 family is of "marginal importance."[129] Dr. Kakaes argues that this patent family's importance should be downgraded, because the family is limited to a specific type of 4G technology called TDD-LTE.[130]  He further argues that because TCL's TDD-LTE products are currently limited to China, and because Ericsson does not have a patent or patent application for this family in China, the P23983 family is of marginal importance.[131]

231.    As with his other analyses, Dr. Kakaes's technical opinions are unsupported by any testing, research, or other benchmark-based analysis or

---

[129] Kakaes Opening Statement Appendix, EX-11639 at A-P23893_4G.
[130] *Id.*
[131] *Id.*

1   evidence. Moreover, Dr. Kakaes's opinion regarding the scope of TCL's

2   infringement of Ericsson's patent family is incomplete. TDD-LTE is used in many

3   countries outside of China, such as the U.S., Japan, India, and Europe where

4   carriers such as Sprint, SoftBank, NTT DoCoMo, Airtel, Reliance Jio, and

5   Vodafone have or will soon deploy TDD-LTE networks. Ericsson does have

6   patents or patent applications for this family in these countries. Without an

7   assurance from TCL that it will not make, sell, offer to sell, use, induce others to

8   use, or import TDD-LTE enabled handsets during the license period in those

9   countries, Dr. Kakaes is incorrect to suggest that Ericsson's solution is "at best

10  marginally important" using this factor.  This is an example of Dr. Kakaes's eighth

11  category of errors.

12      232.   With regard to Dr. Kakaes's new examples in his opening witness

13  statement, he points to the P06553, P14596, P38458, P08153, P25336, P33108,

14  P23893, P28747, and P31988 families. These new showcase examples also suffer

15  from the methodological flaws that I describe above. Below, I respond by referring

16  to Dr. Kakaes's analysis in both the main body of his witness statement as well as

17  his appendix, as it relates to the new showcase examples.

18      233.   For the P06553 family (e.g., U.S. 5,987,139), Dr. Kakaes falls into his

19  eighth category of errors, discussed above. The relevant question is not the

20  popularity of HSCSD for other companies, but rather whether TCL's products have

21  or will have HSCSD capabilities during the license period, because HSCSD may be

22  valuable for TCL. Presumably, Dr. Kakaes had, or could have had, access to this

23  information. But he did not use this information in his analysis to confirm whether

24  TCL's products have included or will include HSCSD functionality. The only

25  reasonable conclusion from his silence is that TCL's products do include HSCSD

26  functionality, and derive value from that functionality.

27      234.   With regard to P14596 (e.g., U.S. 7,181,218), Dr. Kakaes commits his

28  second, third, fourth, ninth, and tenth categories of errors. For one of his

alternatives, he provides no benchmark-based analysis explaining why saving 9 or 10 bits per 168-bit handover command message is "negligibly small." A handset at the cell edge must receive the handover command message properly, with all necessary information for the handover, or else the call will be dropped. In this context, each bit in the handover command message is important, and sending additional handover information in a separate command message would just increase the risk of a dropped call. That's why the patent indicates that "the handover command message nevertheless approaches the limit imposed by the space available in a non-segmented GSM air interface message. Unless other mechanisms are defined, hardly any space is left in the RRC Handover to UTRAN command message to facilitate the inclusion of further parameters."  Col. 3, ll. 6-13. In opining that this overhead savings isn't important in this context, Dr. Kakaes second-guesses not just the opinions of the inventors but also the opinions of the 3GPP community, who by accepting Ericsson's solution into the standard concluded that the overhead savings in the handover command message was an improvement. With regard to his second alternative (a 0-valued default DPCH offset parameter), Dr. Kakaes again provides no benchmark-based analysis comparing that alternative to Ericsson's solution, and second guesses the opinions of the inventors and the 3GPP community that a non-0-valued default DPCH offset parameter was an improvement "to distribute evenly the processing and transmission load of different mobile terminals over time." Col. 3, ll. 24-26.

235.   His analysis is also contradictory in that he opines that saving this overhead in the handover command message is "trivial" and offers "no improvement" on one hand, but on the other, opines that saving this overhead offers "marginal improvement." He also does not appreciate that one of his alternatives is a patented solution to NEC, and he does not consider whether that patented solution was before 3GPP and thus even possibly "viable." He also conflates the importance and contribution analyses by referring to the same solution as the alternative in both

1    analyses (i.e., not saving the overhead) and thus doubly discounting the value of

2    Ericsson's patented invention for the same reason.

3         236.   With regard to P38458 (e.g., U.S. 9,100,069), Dr. Kakaes commits

4    errors in his second, third, fourth, and tenth categories of errors. The inventions

5    claimed in P38458 relate to the use of a certain puncturing pattern in the encoding

6    process of control information. Puncturing is done to remove excess bits from the

7    transmitted signal so that the bit rate matches the physical channel bit rate.

8    Different bits can be punctured, and it's important to measure the effects of

9    puncturing one bit and not another, as the puncturing pattern has measurable effects

10   on performance. Dr. Kakaes argues that, in addition to Ericsson's patented

11   invention, there were other well-known puncturing patterns available to the

12   standards-setting body. He offers two as alternatives: the Type B puncturing pattern

13   disclosed within subsection 4.7.3D of 3GPP TS 25.212 (Ericsson's solution

14   corresponds to Type A), and the puncturing pattern disclosed in Section 4.6.6 of

15   3GPP TS 25.212. In his appendix, he argues, "Using, for example, a pattern

16   analogous to that used in 'Type B' would be a noninfringing alternative having no

17   measurable difference in performance or complexity." But his alternatives puncture

18   11 bits (Type B) or 8 bits (Section 4.6.6) instead of 4 bits (Type A), and thus would

19   puncture more bits than necessary, thereby reducing unnecessarily the redundancy

20   coding for the signal. Dr. Kakaes also refers to "no measurable difference" without

21   performing any measurements at all. He also does not define the alternatives with

22   any specificity, simply saying they would be "analogous" to others in the standard.

23   He thus second-guesses the 3GPP community with alternatives that are

24   demonstrably different and almost certainly worse (puncturing more bits), and

25   without defining his alternatives or performing any of the measurements that he

26   says prove his alternatives are just as good as Ericsson's. Additionally, he does the

27   same analysis twice in both his importance and contribution analyses, without

28   explaining why it would be proper to discount value twice for the same reason. He

1    also does not explain how an invention can be "at best of marginal importance" but

2    provide "no improvement" at the same time.

3         237.   With regard to P08153 (e.g., U.S. 6,073,005), Dr. Kakaes commits

4    errors in his second, third, and ninth categories of errors. P08153 relates to having a

5    handset store emergency call numbers of different countries, so that when the

6    handset is in a particular country, it can recognize when its user is making an

7    emergency call and apply priority-handling procedures. The network will then

8    accept those prioritized calls, even if the end user isn't subscribed to that network.

9    Dr. Kakaes argues that the invention provides "no improvement," because the

10   emergency numbers could instead be stored in the network and not in the handset.

11   However, Dr. Kakaes ignores that, if the handset doesn't store those numbers, the

12   handset cannot recognize that an emergency call is being placed, and cannot

13   prioritize the emergency call by, for example, coding the random access preamble

14   to make sure that the emergency call is accorded the highest priority. See 3GPP TS

15   25.321, §11.2.1 and 11.2.2, TS 25.331, §8.5.12; see also TS 25.304, §4.1. Allowing

16   the handset to prioritize the emergency call allows the call to connect sooner, before

17   other calls that are not emergencies. This is particularly important when considering

18   various disaster situations where network access resources are extremely limited. If

19   it is up to the network to determine whether a call is an emergency call, and then

20   treat it accordingly (instead of the call being prioritized from the start by the

21   handset), then the network would be overwhelmed with call attempts, some

22   emergencies and some not, and the emergency calls may not get through. Dr.

23   Kakaes thus second guesses the inventors and the 3GPP community without

24   considering all of these consequences to his alternative. Dr. Kakaes also does not

25   consider that his alternative (U.S. 5,602,901) is a patent to Motorola, and is thus not

26   a non-infringing, cost-free alternative.

27        238.   With regard to P25336 (e.g., EP 2,238,801), Dr. Kakaes commits

28   errors in his second, third, seventh, and ninth categories of errors. He opines that

Ericsson's patented invention, which allows a handset to signal to the base station the release of E-DCH, is "at best, of marginal technical value or importance." He believes that even without Ericsson's invention, "all the UEs always have common (instead of dedicated) physical layer resources to share in the CELL_FACH state." But he does not seem to appreciate that the resources used for E-DCH in CELL_FACH are limited to a maximum of 32 sets by the standard specification. See, e.g., 3GPP TS 25.331 V8.25.0, §§10.3.6.9a, 10.3.10. It is thus vital that the mechanism for allocating, releasing, and re-allocating these common E-DCH resources be fast, so that no handset holds back resources that could be re-allocated by the base station to another handset.

239.   Dr. Kakaes next argues that, without Ericsson's patented invention, "any potential performance degradation is offset by the fact that inactive UEs lead to lower total interference with other active UEs over their occupied E-DCH resources, such that the overall system throughput may have some gain (given the lower overall interference floor)." Dr. Kakaes appears to argue here that if a handset is allocated resources and doesn't use them, when another handset could have used them, that's beneficial to the network, because there's less interference. But he provides no evidence showing that the increase in interference outweighs the benefit of having an additional handset use those resources.

240.   In his contribution analysis, Dr. Kakaes argues that Ericsson's undisputedly-essential invention offers "no improvement" over four proposed alternatives. But he offers no evidence, testing, or objective measurement to second-guess the 3GPP community's decision to accept Ericsson's solution into the standard, and not those other alternatives. The first alternative is a 3GPP contribution by Qualcomm (R2-074390), which requires that, before releasing the handset's E-DCH resource, the base station must sense inactivity on the user's uplink channel (for an undefined period of time), send a release message to the handset, and then wait for a confirmation from the handset regarding the release. In

contrast, in Ericsson's patented solution, the handset can send a release message to the base station as soon as the handset no longer has traffic to transmit.  Thus, instead of taking 3 steps using 2 messages and introducing delay (as in Qualcomm's solution), Ericsson's solution does everything in 1 step with 1 message and without delay. Dr. Kakaes acknowledges that Qualcomm's solution would "result in some delay." However, he argues that there's "no significant practical degradation" and "no real loss" and "no material impact." He doesn't prove that, however, with any evidence.

241.    Dr. Kakaes next argues that Qualcomm's solution can actually be better than Ericsson's solution when, for example, it is "3 a.m. and most people are sleeping."  At that time, without Ericsson's invention, "resources appear to be wasted, but in fact that is not the case for the simple reason that when there is nothing to transmit (because most people are asleep), not being able to transmit is irrelevant—there is no 'waste.'"  Dr. Kakaes appears to be arguing that Ericsson's solution is not better than Qualcomm's when almost everyone is asleep and not using the network. However, it seems unreasonable to conclude that Ericsson's solution offers "no improvement" overall in view of traffic patterns at 3AM when almost everyone's asleep and not using the network.

242.    Dr. Kakaes's second alternative is a "fourth option" in a 3GPP contribution by Infineon (R2-080148), which Dr. Kakaes acknowledges was "not adopted in the standard." That option is to allow the base station to "force the UE to release the E-DCH," and is different from Ericsson's solution that allows the handset (UE) to send a release message to the base station as soon as the handset no longer has traffic to transmit. Dr. Kakaes does not explain why Ericsson's solution offers no improvement over this other alternative. He also offers no proof that his judgment is better than that of the 3GPP community of engineers, which as Dr. Kakaes concedes, accepted Ericsson's solution and not Infineon's.

243.    Dr. Kakaes's third alternative is another 3GPP contribution by

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Qualcomm (R2-080361) that releases E-DCH resources when there is a collision from another handset, or based on a timer. Both are different from Ericsson's solution that allows the handset to send a release message to the base station as soon as the handset no longer has traffic to transmit.  Dr. Kakaes again does not explain why Ericsson's solution offers no improvement over these other alternatives, and offers no proof that his judgment is better than that of the 3GPP community.

244.   Dr. Kakaes's fourth alternative is no reference at all. It appears that Dr. Kakaes just generates the alternative from scratch, without describing the alternative fully and without establishing the existence or viability of the alternative before 3GPP at the time of standardization.

245.   With regard to P33108 (e.g., U.S. 8,582,518), Dr. Kakaes commits errors in his second and third categories of errors by opining that Ericsson's solution offered "no improvement" over an alternative. P33108 relates to allowing a handset to control the transmit power of a physical uplink control channel (PUCCH). In particular, P33108 relates to setting a curve-fitting function (called "h") in a certain way. That "h" function is one parameter of several that are used to control the transmit power of the PUCCH signal. In the charted claim, Ericsson defines the "h" function as follows:

$$h(n_{CQI}, n_{HARQ}) = \frac{n_{HARQ}}{\alpha} + \beta,$$

wherein "$\alpha$" is a non-zero integer constant and $|\beta| < 1$,
wherein $h(n_{CQI}, n_{HARQ})$ is a first power control parameter based on the PUCCH format and affecting the transmit power of the PUCCH signal, and wherein $n_{CQI}$ indicates the number of CQI bits and $n_{HARQ}$ indicates the number of HARQ bits in the PUCCH signal. [132]

246.   Dr. Kakaes opines that a "proposal from CATT discloses two

---

[132] EX-4228 (Claim chart for P33108)

alternative curve-fitting methods in the form of linear equations for the value of the h function." He argues that "[b]oth of these are non-infringing alternatives because the value of α is not a 'non-zero integer' and the absolute value of β is not less than 1." In his appendix, he cites to the following two equations and graphs from CATT's 3GPP contribution (R1-105914) in support:



Figure 1: SNR difference of PUCCH format 3 transmitting x (>2) bits and 2 bits, non-TxD (left), SORTD (right)[133]

247. While Dr. Kakaes in this instance does point to a 3GPP contribution with objective, benchmark-based evidence in support (which again demonstrates the rigor of 3GPP technical analyses generally), he doesn't actually measure the differences in those curve-fitting methods with Ericsson's curve-fitting method to prove that Ericsson's solution offers "no improvement" over CATT's solution. In the main body of his opening testimony, Dr. Kakaes provides the following comparison for the first time in this case:

---
[133] EX-1446 (R1-105914)

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**FIGURE 42: Comparison of Ericsson's and CATT's Formulas (PDX 86)**[134]

248.   Although he provides no identification for "Ericsson's" graph, it appears to be a photo-shopped version of Figure 10 from Ericsson's '518 Patent. This lack of identification is misleading. The inventors of the '518 Patent indicated that the formula used in Figure 10 "may not be a better fit for the PUCCH plots 70-72" and that the formula used in Figure 11 "may fit the PUCCH plots 70-72 better." *See, e.g.*, Col 17, l. 53 – Col. 18, l. 17.[135] The Figure 11 formula does, indeed, appear to be the better of the two, and it is the one that Dr. Kakaes should have used to fairly compare Ericsson's patented solution against CATT's. Instead, without disclosing it, Dr. Kakaes compared the worse of the two formulas from Ericsson's '518 Patent against the CATT curve. Here is a side-by-side comparison of the curve-fitting formulas from Figures 10 and 11 of Ericsson's '518 Patent:

---

[134] Kakaes Opening Testimony, PDX 86.
[135] EX-5519 (U.S. 8,582,518)





FIG. 10



FIG. 11

[136]

---

[136] *Id.*

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    249.   However, even in Dr. Kakaes's comparison of Figure 10 with CATT's

2  curve, the CATT and Ericsson graphs are demonstrably different. For example, the

3  shapes of the channel model reference curves in both charts are different, making

4  this an apples-to-oranges comparison. Dr. Kakaes does not attempt to account for

5  those differences in comparing CATT's solution and Ericsson's solution. Instead,

6  contrary to the judgment of the 3GPP community, he just concludes that Ericsson's

7  solution provides "no improvement" over CATT's. But the only performance

8  difference that Dr. Kakaes identifies in his appendix is one that shows that CATT's

9  solution is worse than Ericsson's: "One disadvantage with CATT's proposal is that

10  the processing and representation of non-integer values of α is more complex than

11  for integer values." In view of that disadvantage, Dr. Kakaes proceeds to change the

12  CATT solution by making α into a "non-zero integer." But Dr. Kakaes does not

13  show that this non-zero integer feature was in front of 3GPP, except in Ericsson's

14  own 3GPP contribution. He thus does not prove that any non-infringing alternative

15  was available to 3GPP at the time of standardization that was just as good as

16  Ericsson's. His conclusion that Ericsson's solution offered "no improvement" is

17  incorrect.

18    250.   With regard to P23893 (e.g., U.S. 8,134,940), Dr. Kakaes commits

19  errors in his second, third, fourth, sixth, eighth, ninth, and tenth categories of errors.

20  I've already discussed above how Dr. Kakaes improperly considers how widely

21  others deploy TDD, instead of how widely TCL has used, uses, and will use the

22  invention during the license period under a proper scope of infringement. But Dr.

23  Kakaes commits further errors. In particular, he provides two alternative solutions

24  that the P23893 inventors themselves identified in their patent as inferior

25  background technologies to their invention. The inventors indicated that these

26  background technologies were "not useful," "more complex," and/or required "a

27  relatively great transmission power." (Col. 4, ll. 8-11; Col. 5, ll. 14-28.)  Still, Dr.

28  Kakaes argues that Ericsson's invention provides "no improvement" over those

1    background technologies. Thus, without any measurement, test, or other objective

2    evidence to prove he's correct, Dr. Kakaes second-guesses the judgment of

3    Ericsson's Dr. Parkvall, a co-inventor of the P23893 solution, who has written the

4    leading textbooks on 3G and 4G technology and is a long-time Ericsson delegate to

5    3GPP. Dr. Kakaes also second-guesses the 3GPP community of experts, who

6    incorporated Ericsson's solution into the standard and thus confirmed that it was an

7    improvement over the background technologies. Dr. Kakaes provides no

8    explanation or other evidence that would show that his judgment is better than

9    theirs.

10        251.   Dr. Kakaes's analysis is also internally contradictory. In his

11   importance analysis, he concludes that "the importance of the key accused feature is

12   marginal" in view of the background technology of unevenly distributing

13   ACK/NACK feedback reports, but in his contribution analysis, he argues that

14   Ericsson's solution provides "no improvement" over that same background

15   technology. It's impossible for Ericsson's solution to be both "marginally

16   important" and offer "no improvement" at the same time over the same alternative

17   solution. Moreover, even setting aside the irreconcilable nature of his opinions, Dr.

18   Kakaes improperly performs the same value analysis twice over the same

19   alternative.

20        252.   With regard to his third alternative, Dr. Kakaes offers no evidence that

21   this alternative existed at the time of standardization, much less that it was before

22   3GPP. He thus provides no evidence that this was even a possible "viable"

23   alternative.

24        253.   With regard to P28747 (e.g., U.S. 8,913,565), Dr. Kakaes commits

25   errors in his second, third, and seventh categories of errors. The P28747 patent

26   family relates to the situation where a handset sends a request to a base station,

27   asking for an opportunity to transmit data to the base station. The inventors realized

28   that the mechanism for triggering, transmitting, and cancelling those requests was

1  sub-optimal, in particular when the handset received new data just after being

2  granted an opportunity to transmit older data but before transmitting that older data.

3  The inventors addressed this problem by requiring that the handset operate

4  differently in this situation.  If the handset's granted opportunity to transmit could

5  not fit all of its data (old and new), the handset would request an additional

6  opportunity to transmit, but only if the handset had not already told the base station

7  about all of the data it wanted to transmit.

8      254.   Dr. Kakaes compares Ericsson's solution with a proposal by Asustek.

9  However, Asustek's proposal addressed a different issue. In particular, Asustek

10  proposed that, if a handset had queued a data unit (for transmission) for too long,

11  and as a result was forced to discard that data unit and had nothing left to transmit,

12  the handset should not send a request to the network for an opportunity to transmit

13  data, because there was nothing left for the handset to transmit. Asustek's proposal

14  thus had nothing to do with Ericsson's solution. Asustek's proposal dealt with a

15  situation where there was <u>nothing</u> to transmit, whereas Ericsson's solution dealt

16  with a situation where there was <u>old and new data</u> to transmit.

17      255.   Ericsson's solution and Asustek's proposal were separately proposed

18  to 3GPP. Ericsson's solution received broad support, including from Nokia,

19  Qualcomm, Interdigital, NTT Docomo, Huawei, Panasonic, Motorola, HTC, and

20  NEC, and ultimately entered the standard. See RP-090934 (CR0390); R2-095380.

21  In contrast, Asustek's proposal was not well-received, and was ultimately rejected.

22  See R2-091240 and R2-092697.

23      Below is Ericsson's solution (RP-090934 (CR0390)), with broad industry

24  support:

25

26

27

28

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| Title: | ⊠ | Improvement of cancellation of SR | |
|---|---|---|---|
| Source to WG: | ⊠ | Ericsson, ST-Ericsson, Nokia, Nokia Siemens Networks, Qualcomm Europe, LG Electronics Inc., InterDigital, NTT DOCOMO Inc., HT mMobile, Huawei, Panasonic, Motorola, HTC Corporation, NEC. | |
| Source to TSG: | ⊠ | RAN2 | |
| Work item code: | ⊠ | LTE-L23 | Date: ⊠  28/08/2009 |
| Category: | ⊠ | C | Release: ⊠  Rel-9 |

Use *one* of the following categories:
   *F  (correction)*
   *A  (corresponds to a correction in an earlier release)*
   *B  (addition of feature),*
   *C  (functional modification of feature)*
   *D  (editorial modification)*
Detailed explanations of the above categories can be found in 3GPP TR 21.900.

Use *one* of the following releases:
   R99    (Release 1999)
   Rel-4  (Release 4)
   Rel-5  (Release 5)
   Rel-6  (Release 6)
   Rel-7  (Release 7)
   Rel-8  (Release 8)
   Rel-9  (Release 9)
   Rel-10 (Release 10)

| Reason for change: | ⊠ | The Regular BSR is triggered in the TTI when new data becomes available for transmission, and this data either belongs to a logical channel with higher priority than other data already available for transmission or there is no data available for transmission in the UE.

When a Regular BSR is triggered, a SR is triggered and the SR remains pending until it is cancelled.

In the current version of the specification, the SR is cancelled in the TTI when the UE makes a UL-SCH transmission.

Given the current specification, the UE may erroneously cancel a pending SR when new data that triggers the BSR and SR arrives between the indication of a grant (via PDCCH or through SPS) and the UL-SCH transmission, and the SR is cancelled by the UL-SCH transmission before D-SR (on PUCCH) has been transmitted. This can lead to high priority data being delayed until the BSR retransmission timer expires.

In addition, given the current specifications, the UE may transmit unnecessary D-SR when the UE has a D-SR resource occurring between the TTI when a grant is indicated (via PDCCH or through SPS) and the TTI when it performs the corresponding UL-SCH transmission. |

[137]

Below is Asustek's proposal (R2-091240), and the 3GPP community's negative reaction to that proposal (R2-092697):

| Title: | ⊠ | Cancellation of Scheduling Request | |
|---|---|---|---|
| Source to WG: | ⊠ | ASUSTeK | |
| Source to TSG: | ⊠ | R2 | |
| Work item code: | ⊠ | LTE-L23 | Date: ⊠  02/02/2009 |
| Category: | ⊠ | F | Release: ⊠  Rel-8 |

Use *one* of the following categories:
   *F  (correction)*
   *A  (corresponds to a correction in an earlier release)*
   *B  (addition of feature),*
   *C  (functional modification of feature)*
   *D  (editorial modification)*
Detailed explanations of the above categories can be found in 3GPP TR 21.900.

Use *one* of the following releases:
   R99    (Release 1999)
   Rel-4  (Release 4)
   Rel-5  (Release 5)
   Rel-6  (Release 6)
   Rel-7  (Release 7)
   Rel-8  (Release 8)
   Rel-9  (Release 9)

| Reason for change: | ⊠ | When UL data arrives and a Regular BSR is triggered, an SR will be triggered to request UL grant if not available. Due to the *discardTimer* (from 50 to 1500 ms) in PDCP, it is possible that a SDU and the corresponding PDU are discarded before receiving an UL grant, e.g. because long time for performing D-SR (every 5 to 80 ms) or Random Access procedure. If all SDUs and PDUs are discarded, it is unnecessary to keep performing D-SR or Random Access procedure to transmit an empty BSR. Anyway, an SR will be triggered again when next time UL grant is needed. So, the triggered BSRs and the pending SRs should be cancelled. And the Random Access procedure should be stopped if Msg3 buffer is empty. If it is not empty, the procedure should keep running to transmit data in Msg3 buffer. |

[138]

---

[137] EX-5494 (RP-090934 (CR0390))

[138] EX-1443 (R2-091240)

```
SR
R2-091240    Cancellation of Scheduling Request ASUSTeK  CR   36.321   (0309)   -   F
             -   CATT think this is an implementation issue and if the parameters are configured correctly
                 it will not occur.
             -   Huawei think it is not essential for the completion of release 8.
             -   AUSTeK think it is not good to leave this to UE implementation.
             -   Qualcomm also thing this can be left to UE implementation.
             -   Motorola don't think it is necessary.
             => Not agreed                                                                          139
```

256.   Dr. Kakaes misunderstands Ericsson's solution and Asustek's proposal to reach his conclusion that they solve the same problem. He also second-guesses the decision of the 3GPP community that Ericsson's solution had merit and offered an improvement.

257.   With regard to P31988 (e.g., U.S. 8,965,414), Dr. Kakaes commits errors in his second, and third categories of errors. P31988 relates to having a handset perform an inter-frequency measurement for positioning. The handset sends certain information to the base station to support the base station in configuring a gap pattern for the handset's measurement. The information can include a subframe gap offset for performing the measurement.  See, e.g., '414, Col. 9, ll. 46-49.

258.   Dr. Kakaes concedes that Ericsson's patented technology, if essential, "is technically valuable or important to the 4G standard." However, he argues that Ericsson's patented technology provides "no improvement" in view of two other alternative solutions available to 3GPP at the time of standardization. In particular, he points to a 3GPP contribution by CATT (R2-111144)[140] that summarizes an email discussion among CATT, Huawei, Qualcomm, Samsung, NSN, Ericsson, ST Ericsson, and ALU regarding those two other alternative solutions (Alt 1 and Alt 2a) and Ericsson's patented solution (Alt 2b). According to Dr. Kakaes, in contrast to Ericsson's patented solution, "'Alt 1' describes that the eNB can be relied upon

---

[139] EX-5498 (R2-092697)

[140] EX-5500 (R2-111144)

to make a gap offset decisions itself, and 'Alt 2a' provides information regarding frequency(ies)."

259.   Dr. Kakaes's reliance on the 3GPP email discussion summary reflects underlying contradictions in his importance and contribution analyses generally. First, the considered nature of the analysis by the various companies in 3GPP supports my opinion that the 3GPP community of experts performs a rigorous analysis of alternatives when selecting a technology:

Company opinion:
*(Company comments on this issue are welcome. Please indicate preferred alternative with reason.)*

| Company name | Alternative selection/reasoning |
| --- | --- |
| CATT | Prefer Alt2b. As eNB does not know which frequencies the UE want to measure, it is difficult to decide the gap offset. And for intra-frequency case, PRS locations are aligned. So Alt2 is preferred. Considering one frequency will occupy 16 bits, to save signaling overhead, PRS offset could be provided (i.e. Alt2b). If the UE is allowed to measure multiple inter-frequencies, then 3 offsets are appropriate. Still in order to save bits, [0..39] is preferred which means the UE report the PRS offset mod 40 as the period of gap0 is 40 ms. |
| Huawei | Alt1 severely restricts the network implementation/deployment; it is totally a new requirement for network. Considering we already have a new message, we think signalling assistance data to the eNB is the simplest way. We share the view with Rapporteur, Alt 2b is desirable. |
| Qualcomm | Prefer Alt2b.  As CATT described above it seems actually more bit-efficient than signalling the frequencies, and does not depend on any extra knowledge at the serving eNB.<br><br>Our understanding is that RAN4 only allow for one additional frequency currently, but the LPP signalling today allows up to 3 frequencies (in addition to the serving frequency). It seems a bit more elegant to specify 3 frequencies here for symmetry in the protocol, perhaps with a note saying "only one is used in this version".<br><br>No strong opinion on whether the range should be [0..1279] or [0..39]. Since this data will always go in dedicated signalling the bit savings do not seem especially important, but also the additional flexibility from giving the full range to the eNB is minor.<br><br>One additional point: If the reference cell is inter-frequency, would the provided offsets be understood relative to the serving frequency, or to the reference cell?  We may need to specify UE behaviour for this case to prevent ambiguity. |

| Samsung | Our opinion is similar to that of Qualcomm except that we think signaling one offset would be sufficient. This offset should be relative to the serving cell as perhaps the serving eNB may not have any idea about the SubframeOffset between the serving cell and the UE's reference cell (if the reference cell is on a frequency not served by the serving eNB)? The UE shall provide the offset based on which frequency(ies) it can best measure. |
|---|---|
| NSN | Agree that signaling additional information to help eNB select the gapOffset is nice since it fits well within this new *InterFreqRSTDMeasurementIndication* message. But, we think it is better to signal EARFCNs, up to 3 depending on the number of frequencies involved in the provided assistance data to the UE (even though it has extra overhead due to requiring more bits compared to signaling prs-SubframeOffset). The prs-SubframeOffset parameter is currently undefined in the RRC layer and defining it would imply introducing the PRS definition to the RRC layer as well. Frequency is something that is anyway sent in RRC signaling but it would be good to keep assistance data related information confined to the LPP layer. Since measurement gap configuration is a network decision we can leave it to eNB implementation to decide on gapOffset based on the set of frequencies that the UE need to measure on. This also makes the UE handling simple when the reference cell is on a different frequency cell than the serving frequency. So we prefer Alt2a. |
| Ericsson, ST Ericsson | It is our understanding that requirements are defined only for two frequencies. An eNB (serving cell) knows its own PRS configuration and can by simple means (e.g. via O&M) have information of the other frequency including the PRS configuration and thus deduce required gapOffset. This information requires thus no extra information apart from a simple indication from the UE. We think Alt. 1 will be sufficient in this respect.<br><br>However, if this approach is not considered sufficient, i.e. support for more (inter-)frequencies is required in Rel-10 deployments, we would agree with NSN that the gap offsets for frequencies are an eNB/NW internal decision and hence an indication including a frequency, or a set of frequencies is preferred. This would also simplify the UE behavior.<br><br>Alt 1 or Alt 2a |
| ALU | Agree with NSN and Ericsson that eNBs can have this from O&M configuration. And we also prefer signalling the frequency(ies) if considered essential. |

[141]

260.   The rigorous analysis performed by experts in 3GPP acts as a backdrop against which to compare the rigor of all of Dr. Kakaes' analyses comparing technologies, and whether the rigor of his analyses and the strength of his evidence properly override the 3GPP community's judgment. In this instance, Dr. Kakaes concedes that the 3GPP experts have sound judgment by basing his entire opinion of value on the mixed judgments above. But he does not explain why he second-guesses (many times with little or no support) the 3GPP community's considered judgment of value for all other 100+ undisputedly essential inventions, where there is no evidence that their collective judgments were mixed.

[141] *Id.*

REBUTTAL WITNESS STATEMENT BY PATRICIO DELGADO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

261.   Second, no one member controls the 3GPP technology selection process. In particular, Ericsson does not control that process, even in close matters, as can be seen in this example where the 3GPP community ultimately chose a solution that Ericsson did not prefer ("Alt 2b"). Put differently, for Ericsson's 100+ undisputedly essential patented inventions, the 3GPP community chose those technologies due to the technical merit of Ericsson's inventions, since Ericsson did not have the voting power or other influence to control the 3GPP community's decisions, even on close matters.

262.   Third, Ericsson advocates for what it considers to be the best technology, regardless of whether Ericsson has patent protection over that technology, or over the alternative. In this instance, Ericsson invented "Alt 2b" but advocated against "Alt 2b." If Ericsson were motivated to advocate for its patented solutions and not for what it considered to be the best technology, it would have joined CATT, Huawei, Qualcomm, and Samsung in advocating for "Alt 2b."

263.   The 3GPP email discussion summary also reveals errors in Dr. Kakaes's analysis for this particular patent family. For example, the 3GPP community's mixed opinions act as the sole basis for Dr. Kakaes's opinion regarding the value of Ericsson's invention (Alt 2b). Yet the 3GPP community did ultimately select Alt 2b for the standard. If Dr. Kakaes concedes that it's proper to rely on the 3GPP community's mixed opinions of value in this instance, then he should also concede that their ultimate selection of Ericsson's invention (Alt 2b) reflects that the alternative did provide value over Alt 1 and Alt 2a. Indeed, the 3GPP community did identify technical advantages for Alt 2b over the other two alternatives. In particular, Huawei opined that Alt 1 "severely restricts" the network implementation and deployment. And even though Qualcomm conceded that "the bit savings do not seem especially important," both Qualcomm and CATT did conclude that Alt 2b would be "more bit efficient." Thus, Dr. Kakaes' conclusion that Ericsson's invention provided <u>no</u> improvement is contradicted by the sole

-128-

1    evidence that he relies on to support his opinion.

2       264.   In sum, there are many examples, including the ones that Dr. Kakaes

3    himself selected, that show the general inaccuracy of his importance and

4    contribution analyses.

5       C.    **Breakthrough Analysis Errors**

6       265.   Finally, I also disagree with Dr. Kakaes's "breakthrough" patents

7    analysis. Dr. Kakaes attempts to further degrade the few Ericsson patents he deems

8    are essential and have high importance and contribution ranks by concluding they

9    do not "represent any major breakthrough in technology."[142] He provides this

10   "breakthrough" analysis for patent families P12207 (U.S. 6,781,970), P29465 (U.S.

11   8,902,811), and P35575 (U.S. 8,837,410).

12      266.   In particular, Dr. Kakaes argues that family P12207 is not novel or

13   inventive. He attempts to explain the lack of inventiveness by using a family budget

14   analogy to suggest that the formula is basic and well-known mathematics.

15   However, it is well established in U.S. patent law that there is a presumption of

16   validity for U.S. patents, and that invalidity must be proven by clear and convincing

17   evidence.  Dr. Kakaes does not acknowledge his burden, and provides no evidence

18   at all. There is no legal principle, and Dr. Kakaes cites none, that lack of novelty,

19   obviousness, or lack of value for that matter can be established with analogies

20   alone.

21      267.   Dr. Kakaes uses this same faulty methodology and reasoning to

22   suggest that the P29465 and P35575 families are not novel. For the same reasons

23   discussed above for the P12207 family, Dr. Kakaes has not and cannot establish

24   that these families are not novel or lack value.

25

26

27   _____
     [142] Kakaes Opening Statement at ¶ 371.

28

## VII.   DR. BEKKERS'S ASSUMPTIONS ABOUT ERICSSON AND THE CONTRIBUTION COUNTING METRIC ARE INCORRECT

268.   In my opening witness statement, I provided testimony regarding my belief that Ericsson's license agreements over its 2G, 3G, and 4G essential patents are the best indicator of a reasonable value for a license to Ericsson's essential patents. I also discussed how, in the absence of existing license agreements, according to a top-down approach advocated by several industry participants including Ericsson, companies owning standard-essential patent portfolios should, in the aggregate, receive a reasonable aggregate royalty for licenses to their portfolios. Each portfolio owner should, in turn, receive a proportional share of that aggregate royalty. The pricing and licensing discussions then revolve around what a reasonable aggregate royalty should be for standard-essential patents, and what each company's proportional share is. These discussions also take market conditions into account and other factors, such as appropriate caps and floors on the pricing. These types of exchanges were prevalent, for example, in licensing discussions over Ericsson's 4G patent portfolio when that technology was first commercialized, before Ericsson had signed a significant number of 4G license agreements. Once Ericsson had signed a significant number of 4G license agreements, those agreements became the benchmark for a reasonable value for a license to Ericsson's 4G patent portfolio.

269.   When we at Ericsson present our patent landscape metrics to handset vendors in technical licensing discussions, we typically present our percentage of RAN1 and RAN2 approved contributions in one chart, and in a separate chart, we present our percentage of RAN1, RAN2, SA2, SA3, and CT1 approved contributions, as shown in the below slides:





270.   The RAN1 and RAN2 chart on the right shows a higher percentage share for Ericsson (21%) than the other chart on the left with the five working groups (18%).  The reason we present the RAN1 and RAN2 chart is because the industry's 4G/LTE handset-related patents are weighted toward RAN1 and RAN2. The reason we present the other chart on the left is because other working groups developing handset-related technical specifications (i.e., SA2, SA3, and CT1) may also have an impact on handset-related standard essential patent portfolio strength. In these technical licensing discussions, Ericsson provides references to Signals Research's studies for further information.[144] Signals Research considers contributions to the RAN1, RAN2, SA2, SA3, and CT1 working groups. Ericsson also presents the results of an analyst firm called ABI who in its 2016 report also analyzed contributions to RAN4, in addition to RAN1, RAN2, SA2, SA3, and CT1, to landscape essential patent portfolio strength vis-à-vis handsets. Considering RAN4 in addition to the other working groups actually increases Ericsson's percentage share.

271.   Dr. Bekkers argues that contribution studies are prone to opportunistic

---

[143] EX-5507, ERIC_TCL00779885.

[144] Ericsson has consistently disclosed its role in sponsoring the Signals Research work when presenting that analysis in licensing discussions. Moreover, another analyst first—ABI—has published a similar study, without any funding or participation by Ericsson.

behavior, and that Ericsson is in a unique position to take advantage of this. He argues that Ericsson's position as a major contributor and participant to 3GPP with voting privileges affords Ericsson the ability to unduly influence contribution data.

272.   All companies have an opportunity to contribute more (or less) proprietary technology for consideration by the 3GPP community. Neither Ericsson nor any other company is uniquely positioned to do this. Moreover, Ericsson has no internal strategy, practice, or wish to inflate its contribution statistics with unwarranted contributions. This would harm Ericsson's reputation as a leader in 3GPP, a community that includes Ericsson's customers for network equipment and services. The Ericsson documents that Dr. Bekkers points to reflect that Ericsson's product unit ("BNET") wants to be a leader in 3GPP and wants to address relevant technical issues from a product perspective via the 3GPP agenda. Submitting unwarranted contributions would undermine those objectives.

273.   In addition, neither Ericsson nor any other company controls the approval process for contributions in 3GPP. Rather, approval is consensus-based, as 3GPP itself indicates on its website.[145] Consensus on contributions is typical at 3GPP. But if consensus on contributions cannot be reached, which is rare, formal voting can take place.[146] Due to 3GPP's broad membership and participation, no 3GPP member has anywhere near the necessary supermajority voting power needed to control voting decisions.[147] Ericsson in particular does not have significant voting power. The voting is also not weighted in favor of the chairman or rapporteur of any group. 3GPP makes all of this clear on its website.

---

[145] http://www.3gpp.org/ftp/Information/Working_Procedures/3GPP_WP.pdf ("TSGs and WGs shall endeavour to reach consensus on all issues, including decisions on Technical Specifications and Technical Reports").

[146] Id. ("If consensus cannot be achieved, the Chairman can decide to take a vote."); http://www.3gpp.org/specifications-groups/working-agreements.

[147] Id. ("For approval, a proposal requires "71% of the votes cast."); see also 3GPP's training course on voting rights (pp. 11-15) available at http://www.3gpp.org/specifications-groups/delegates-corner.

274.   When voting happens, it is typically to elect someone to a leadership position in 3GPP.  Each technical specification group (TSG) like RAN, or working group (WG) like RAN1, maintains a voting list. So, for example, the voting list for RAN1 at its meeting #74bis in October 2013 shows Ericsson's and others' voting power to elect a vice chairman.[148] At that meeting, Ericsson had 6 votes, Samsung had 5 votes, Huawei had 7 votes, Qualcomm had 5 votes, and so on. The total number of possible votes was 181. If necessary, the voting process would be similar for technical contributions. In this example, Ericsson's share of the possible vote was $6/181 = 3.3\%$. Ericsson does not have significant voting power in 3GPP, since numerous other companies participate in 3GPP as well.

275.   Dr. Bekkers also argues that companies can try "to get credit for contributions they did not make." This whole argument appears to be based on a single document—out of thousands and thousands of internal Ericsson documents available to Dr. Bekkers—that says that Ericsson "hijacked" certain contributions to make "sure editorial modifications are not so much worth bringing forward just for the sake of statistics."[149]  If anything, what this document shows is that there are internal checks within 3GPP against the very thing that Dr. Bekkers complains about in his testimony—companies getting credit for merely "editorial" contributions. If 3GPP assigns editors the task of aggregating edits, then only the one aggregated contribution is counted, rather than the separate contributions of edits.

276.   In summary, there are a number of contribution studies, some sponsored by Ericsson and some not, that accumulate the publicly-available statistics related to contributions; Ericsson does not wield substantial voting power over working groups within 3GPP; and Ericsson inputs editorial changes to

---

[148] EX-5517.

[149] EX-1076.

1    technical specifications for which it is the editor, which is common and understood
2    within 3GPP.

3        277.   As I testified in my opening witness statement, in my experience in
4    patent licensing discussions, I have personally observed a correlation between
5    contribution data and the size and strength of patent portfolios. Moreover, in my
6    experience, the contribution counting metric also has more industry and analyst
7    support than any other landscaping metric. I know from my own personal
8    experience that, besides Ericsson, industry players such as Sony, Interdigital,
9    Qualcomm, KPN, ZTE, and Avanci have entered into agreements that estimate
10   relative patent portfolio strength using, at least in part, the contribution counting
11   metric. As I mentioned above, ABI and Signals Research also publish reports that
12   support this metric.

13   **VIII.  ERICSSON EXPERIENCES HOLD-OUT FROM SEVERAL**
14           **COMPANIES**

15       278.   I have also been asked to testify as to my experiences with prospective
16   licensees with which Ericsson has experienced hold out, sometimes over many
17   years. From 2013-2016, I headed Ericsson's emerging market licensing team,
18   which coordinates patent licensing and patent assertions in emerging markets.
19   Before that, I was a member of that team from 2012-2013, and knew about its
20   activities from 2010-2012 as a member of the patent licensing group. In my role on
21   the team, I supported licensing managers in their negotiations with handset vendors
22   in emerging markets (like India and China), and prepared and managed patent
23   litigations with companies who refused over many years to negotiate in good faith.
24   Those licensing negotiations and litigations included those with Micromax, Gionee,
25   Intex, Xiaomi, Lava, and iBall, all of which sell handsets primarily in India and
26   China.

27       279.   As one example, in 2011, Ericsson sent a letter to Xiaomi, a Chinese
28   handset company, offering to negotiate a license to Ericsson's standard essential

1   patent portfolios. Xiaomi did not respond to Ericsson's letter. Ericsson then sent

2   follow-up letters to Xiaomi in January 2012, February 2013, May 2014, and June

3   2014.  Xiaomi did not respond to those either. Ericsson also sent an email to a

4   Xiaomi executive in June 2014. The executive did not respond to that email.

5   Finally, in November 2014, Ericsson's CEO sent an email to the same executive at

6   Xiaomi. The executive responded but expressed no interest in a patent license.

7   Ericsson thereafter initiated a lawsuit in India against Xiaomi for patent

8   infringement.

9        280.   As another example, in 2009, Ericsson sent a letter to Gionee, a

10  Chinese handset company, offering to negotiate a license to Ericsson's standard

11  essential patent portfolios. Gionee did not respond to Ericsson's letter. Ericsson

12  then sent follow-up letters and faxes in October 2009, February 2012, and February

13  2013.  Gionee did not respond to those either.  Ericsson thereafter initiated a lawsuit

14  in India against Gionee for patent infringement.

15  **IX.   CONCLUSION**

16       281.   I continue to believe that Ericsson's licenses are the best measure of a

17  reasonable value for a license to Ericsson's 2G, 3G, and 4G portfolios. The licenses

18  are the result of the efforts of highly motivated and highly experienced technical,

19  legal, and licensing experts, and culminate from hundreds of hours of due diligence

20  in a high-stakes setting. The same issues raised in this litigation are often the very

21  same issues raised during technical negotiations, such as essentiality, validity, claim

22  construction, joint/divided infringement, royalty base, royalty rate, etc.  However,

23  in technical negotiations, legal and factual misunderstandings are corrected and

24  accounted for before entering those licenses.  Ericsson's licenses thus reflect a

25  much more considered view of the strengths and weaknesses for each of these

26  items.  The rates expressed in the licenses are commensurate with a reasonable

27  value for a license to Ericsson's 2G, 3G, and 4G patent portfolios as judged by the

28  industry. It is Ericsson's licenses, and not Dr. Kakaes's declaration counting metric,

or his other flawed analyses, that should form the basis for valuing a license to a handset vendor like TCL to Ericsson's 2G, 3G, and 4G patent portfolios.

# X.    TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| 362 | U.S. Patent No. 8,285,294 |
| 1076 | Executive Summary of RAN3#67, dated May 10-14, 2010 (attachment to 5/26/10 internal Ericsson email) |
| 1285 | 3GPP TS 36.213 V8.2.0 (2008-03) |
| 1379 | 3GPP TS 25.212 V11.4.0 (2012-12) Technical Specification |
| 1443 | Change request for "Cancellation of Scheduling Request," 3GPP TSG-RAN WG2 Meeting #65, Feb. 9-13, 2009, R2-091240 |
| 1446 | "Power Control Details for PUCCH Format 3," 3GPP TSG WG1 Meeting #63, Nov. 15-19, 2010, R1-105914 |
| 1639 | Errata Exhibit 1: Corrected Appendices to Second Supplemental Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 5/28/16 |
| 4054 | 5/6/2014 - European Patent Office Press Release - Fifteen finalists announced for European Inventor Award |
| 4228 | Ericsson Claim Chart for US-8582518 (Internal ref: P33108 US3) |
| 4391 | US Patent 5,327,576 |
| 4397 | US Patent No. 6,473,506 B1 |
| 4398 | US Patent No. 6,597,911 B1 |
| 4414 | US Patent No. 8,503,942 B2 |
| 4447 | Ericsson Claim Chart for EP 472,511 (Internal ref: P04940) Standard |
| 4448 | Ericsson Claim Chart for US 5,327,576 (Internal ref: P04940) Standard |
| 4461 | Ericsson Claim Chart for EP 821,860 (Internal ref: P06425) |

| Exhibit No. | Description |
| --- | --- |
| | Standard |
| 4462 | Ericsson Claim Chart for EP 821,860 (Internal ref: P06425) Standard |
| 4463 | Ericsson Claim Chart for US 5,784,362 (Internal ref: P06425) Standard |
| 4464 | Ericsson Claim Chart for US 5,784,362 (Internal ref: P06425) Standard |
| 4467 | Ericsson Claim Chart for US 5,768,267 (Internal ref: P06699) Standard |
| 4469 | Ericsson Claim Chart for EP 859,531 (Internal ref: P07707) Standard |
| 4470 | Ericsson Claim Chart for US 6,208,628 (Internal ref: P07707) Standard |
| 4473 | Ericsson Claim Chart for EP 953,264 (Internal ref: P07761) Standard |
| 4478 | Ericsson Claim Chart for IN 241747 (Internal ref: P08804) Standard |
| 4479 | Ericsson Claim Chart for US 6,208,663 (Internal ref: P08804) Standard |
| 4480 | Ericsson Claim Chart for US 6,208,663 (Internal ref: P08804 US1) |
| 4486 | Ericsson Claim Chart for US 6,473,506 (Internal ref: P09646) Standard |
| 4489 | Ericsson Claim Chart for US 6,597,911 (Internal ref: P10628US1) Standard |
| 4491 | Ericsson Claim Chart for US 6,704,898 (Internal ref: P10896) Standard |

| Exhibit No. | Description |
|---|---|
| 4523 | 2/17/2014 - Presentation: Claim Chart Process |
| 5081 | Ericsson Claim Chart for US 6,363,058 (Internal ref: P08575) |
| 5480 | ETSI TS 100 927 V7.8.0 (2003-09) Technical Specification |
| 5481 | ETSI TS 144 060 V9.3.0 (2010-03) Technical Specification |
| 5482 | 3GPP TS 43.064 V6.0.0 (2003-06) Technical Specification |
| 5483 | Patent EP 953,264 |
| 5486 | 3GPP TSG RAN WG2 #58bis, R2-072670, Orlando, US; 25th-29th June 2007, Incremental CQI Feedback Scheme and Simulation Results |
| 5487 | 3GPP TSG RAN WG2#59, R2-073034, 20 - 24th August 2007, Athens, Greece, Intra-frequency reporting events |
| 5488 | 3GPP TSG-RAN WG2 Meeting #59, R2-073815, Athens, Greece, 20 – 24 August 2007, Change Request |
| 5489 | ETSI TS 125 214 V11.3.0 (2012-09) Technical Specification |
| 5490 | ETSI TS 125 321 V11.4.0 (2013-07) Technical Specification |
| 5491 | U.S. Patent No. 6,208,663 Bl |
| 5492 | 3GPP TS 04.18 V8.27.0 (2006-05) Technical Specification |
| 5494 | 3GPP TSG-RAN2 Meeting #67, R2-095380, Shenzhen, China, August 24th – 28th 2009, Change Request |
| 5495 | Germany Patent Act (as amended up to Act of October 19, 2013) |
| 5498 | 3GPP TSG-RAN2 Meeting #66, R2-092967, 4 -8 May, 2009, San Francisco, USA, Signaling MBMS area ID |
| 5499 | Section 48 in The Patents Act, 1970 |
| 5500 | 3GPP TSG RAN WG2 Meeting #73, R2-111144, Taipei, Feb 21st-25th, 2011, Summary of [72b#25]: Measurement gap request procedure for OTDOA |

| Exhibit No. | Description |
|---|---|
| 5501 | UK Patents Act Section 60: Meaning of infringement Sections (60.01 - 60.32) last updated: January 2016 |
| 5506 | US 6,597,911 (Internal ref: P010628 US1)  Specifications Claim Chart |
| 5507 | 02/10/2011 - Ericsson LTE Portfolio, B. Gudmundson LTE Patent Portfolio Manager |
| 5508 | U.S. Patent No. 5,485,486 |
| 5509 | U.S. Patent No. 5,784,362 |
| 5511 | U.S. Patent No. 6,208,628 B1 |
| 5513 | U.S. Patent No. 6,704,898 B1 |
| 5514 | U.S. Patent No. 6,985,474 |
| 5517 | 09/16/2013 - Voting list for TSG RAN WG 1 meeting #74bis, http://www.3gpp.org/ftp/webExtensions/elections/RAN/RAN1/Election_October_2013/votingList_RAN1_mtg-74bis.htm |
| 5519 | U.S. Patent No. 8,582,518 B2 |
| 5523 | ETSI EN 301 344 V7.4.0 (2000-03) European Standard (Telecommunications series) |
| 5524 | ETSI TR 101 508 V8.0.0 (2000-06) Technical Report |
| 5526 | 3GPP TS 05.08 V8.23.0 (2005-11) Technical Specification |
| 5527 | ETSI STC SMG12 Nyniishamn, Sweden 17 March 1999, Tdoc SMG12 C-99-415, Methods for SoLSA exclusive access |
| 5528 | U.S. Patent No. 5,768,276 |
| 5530 | Patent EP 0 821 860 B1 |
| 5531 | Patent EP 0 859 531 B1 |
| 5532 | GSM 04.60 V.8.0.0 (1999-07) European Standard |

| Exhibit No. | Description |
|---|---|
|  | (Telecommunications series) |

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 27, 2017, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.

Dated: January 27, 2017

**CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON