CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br> Plaintiffs/Counterclaim-Defendants,<br><br> v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*,<br><br> Defendants/Counterclaim-Plaintiffs.<br><br>ERICSSON INC., *et al.*,<br><br> Plaintiffs/Counterclaim-Defendants,<br><br> v.<br><br>TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br> Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx<br>Case No. 2:15-CV-02370 JVS-DFMx<br><br>**CORRECTED REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER**<br><br>Hon. James V. Selna<br><br>**Discovery Cut-off:** May 23, 2016<br><br>**Pretrial Conference:** February 1, 2017 at 10:00 a.m.<br><br>**Trial:** February 14, 2017 at 8:30 a.m. |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................... 1

II.    TCL IS NOT ENTITLED TO UNILATERALLY CHANGE THE STRUCTURE OF ERICSSON'S OFFERS. ......................................................................................... 1

III.   REBUTTAL TO DR. BEKKERS .......................................................... 2

    A.    Dr. Bekkers' Testimony Regarding The Theoretical Risks Of Standardization Is Divorced From The Facts Of This Case. ...................................................................... 2

    B.    Dr. Bekkers Mischaracterizes The History Of ETSI's IPR Policy. ................................................................ 3

    C.    Dr. Bekkers' Criticism of ETSI's Decision Structure Is Misplaced. ........................................................ 5

IV.    REBUTTAL TO DR. ORDOVER ......................................................... 8

    A.    Patent "Hold-Up" And "Royalty Stacking" Are Theoretical And Do Not Occur In Practice. ......................... 8

    B.    Dr. Ordover Ignores The Intent Of The Drafters Of The ETSI IPR Policy ...................................................... 10

    C.    Dr. Ordover Ignores The Fact That A Standard Implementer Needs A License To Avoid Unlawful Infringement. ........................................................................ 13

    D.    Dr. Ordover Incorrectly Opines That Every Offer Made In Negotiations Must Be FRAND. ........................... 13

V.     REBUTTAL TO DR. LEONARD .......................................................... 14

    A.    Dr. Leonard's "Top Down" Approach Is Not ETSI's Preferred Methodology For Determining FRAND Terms And Conditions. ............................................ 15

    B.    Dr. Leonard Is Mistaken As To The Statute Of Limitations He Claims Is Applicable To The "Rest Of World." ............................................................................. 15

VI.    REBUTTAL TO DR. LYNDE .............................................................. 20

VII.   CONCLUSION ....................................................................................... 20

TABLE OF EXHIBITS ...................................................................................... 22

My name is Dr. Bertram Huber, Rechtsanwalt (attorney-at-law under German law). I have been retained by counsel for Telefonaktiebolaget LM Ericsson and Ericsson Inc. (together, Ericsson) as an expert witness in this litigation. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

## I.    INTRODUCTION

1.    I submitted my direct testimony by witness declaration on January 11, 2017, on matters relating to the background and objectives of ETSI, the development and objectives of the ETSI IPR Policy, ETSI's role as an organizational partner of 3GPP, and the requirements imposed by the ETSI IPR Policy on IPR owners and prospective licensees. This witness declaration sets forth my testimony in rebuttal to certain opinions expressed by TCL's experts, Dr. Rudi Bekkers, Dr. Januz Ordover, Dr. Matthew Lynde, and Dr. Gregory Leonard. I have previously testified to my background and qualifications, and for the sake of efficiency will not repeat that information here.

## II.   TCL IS NOT ENTITLED TO UNILATERALLY CHANGE THE STRUCTURE OF ERICSSON'S OFFERS

2.    I understand that Ericsson has made two offers to TCL that will be adjudicated in this litigation: (a) Option A, which specifies fixed payments coupled with running royalty payments above a certain threshold, and (b) Option B, which specifies running royalties paid on a percentage of the selling price per-unit, subject to a 4G dollar per-unit floor and cap.[1] Although TCL's experts advocate for a payment term that is structured as a percentage of the selling price per-unit like Option B, they make no mention of including a 4G dollar per-unit royalty floor or

---

[1] Proposed Joint Pre-Trial Order (Dkt. 1376) at 5-6.

cap.[2] This amounts to an attempt by TCL to unilaterally change the payment structure of Option A and Option B, which were offered by Ericsson as patent owner. Such an attempt is inconsistent with the ETSI IPR Policy and Ericsson's FRAND commitment.

3.      TCL does not have the right as a third-party beneficiary to Ericsson's FRAND commitment to dictate how the payment terms of its license with Ericsson is structured. TCL is entitled to enter into a license agreement that is FRAND, at which point Ericsson discharges its FRAND commitment. TCL is not entitled, however, to dictate that Ericsson's offers or the eventual license agreement should have a particular structure (i.e., no 4G floor or cap).

4.      Despite this, TCL, via its experts Dr. Lynde, Dr. Leonard, and Dr. Ordover, is proposing—without support—a payment structure that does *not* correspond to either Option A or Option B. But these experts never explain why the mere inclusion of a floor or cap is a breach of FRAND. And if a floor or cap is not a breach of FRAND *per se*, then TCL has no right to demand that a 4G royalty floor and cap be excluded from the license to be adjudicated here. It has never been the intent of ETSI to permit a prospective licensee to unilaterally dictate a particular form of license.

## III.   REBUTTAL TO DR. BEKKERS

### A.   Dr. Bekkers' Testimony Regarding The Theoretical Risks Of Standardization Is Divorced From The Facts Of This Case.

5.      Dr. Bekkers begins his testimony with a discussion of the "risks of standardizing patented technologies" and the "implications of the above risks."[3] I do not disagree that these risks (unavailability of licenses, patent hold-up, royalty stacking, and discrimination) exist in theory. But, I note that Dr. Bekkers' fails to

---

[2] Proposed Joint Pre-Trial Order (Dkt. 1376) at 5.
[3] Bekkers Witness Decl. ¶¶ 29-33 and ¶¶ 34-35.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

come forward with any concrete evidence suggesting that these problems are present here, as between Ericsson and TCL. Because the outcome of this proceeding will be a license between Ericsson and TCL, there should be no risk that a license will be unavailable or the result of patent hold-up.

6.     Despite the theoretical problems of standardization, the reality is that the cellular standards have been an overwhelming success. In a short time span, mobile telecommunications technology has become the most rapidly adopted consumer technology in history and led to massive investment in research and development.[4] In my experience, I have never become aware of a company who has exited the market for standard-practicing devices as a result of the theoretical risks posited by Dr. Bekkers.

**B.     Dr. Bekkers Mischaracterizes The History Of ETSI's IPR Policy.**

7.     Dr. Bekkers recitation of the history of the ETSI IPR Policy is incorrect and contradicts my recollection. I was personally and actively involved in the development of the ETSI IPR Policy and was present at and a participant in the discussions that led to its development, and thus can attest to the intent of the Policy drafters (myself included). Dr. Bekkers bases his testimony on his review of articles about ETSI and of select ETSI documents, rather than on his personal experience within the organization. As a result, his recitation of that history is inaccurate and incomplete.

8.     *First*, Dr. Bekkers cites to an academic article authored by another researcher to assert that the 1994 ETSI IPR Policy was the result of a kind of "coup d'état" by a "'minority alliance' of primarily North American manufacturers" who "went to war against the Undertaking."[5] He also cites the "[m]ajority support" for the 1993 ETSI IPR Policy and Undertaking at the time of

---

[4] Exhibit 4955.

[5] Bekkers Witness Decl. at ¶¶ 54-55.

its adoption to further bolster his "coup d'état" theory. Dr. Bekkers' theory is incorrect. That is not what happened. ETSI abandoned the 1993 IPR Policy and Undertaking via an overwhelming majority decision, not a minority decision. The ETSI stakeholders rejected the 1993 ETSI IPR Policy and Undertaking because, as seen from the minutes of contemporaneous ETSI meetings, it was considered by multiple ETSI members and other interested parties to amount to an expropriation of the rights of standard essential patent owners.

9.    *Second*, Dr. Bekkers suggests that the 1994 ETSI IPR Policy was "materially similar" to the 1993 ETSI IPR Policy and Undertaking that it replaced, pointing the Court to similar language in Clause 4.1 (in the 1993 version) and Clause 6.1 (in the 1994 version).[6] While the particular language highlighted by Dr. Bekkers is similar when viewed in isolation, the two versions of the policy most definitely were not. The 1993 ETSI IPR Policy and Undertaking set forth strict requirements for the conduct of licensing negotiations and the resulting licenses between standard essential patent owners and licensees. In contrast, the 1994 ETSI IPR Policy recognizes good faith bilateral negotiations as the primary means for the IPR owner and potential licensee to reach agreement on FRAND terms and conditions. This was, from the very beginning until today, the well-understood and preferred process. In particular, there was never a requirement that each successive licensee receive the most favorable terms granted to any prior licensee. To suggest otherwise is absolutely incorrect.

10.    *Third*, after consideration and discussion, ETSI deliberately rejected the "most favored licensee" provision found in the 1993 ETSI IPR Policy and Undertaking, together with the other strict licensing requirements that the Undertaking would have imposed on its members. ETSI instead determined that the FRAND commitment would be flexible, striving for a "balance" that would make

---

[6] Bekkers Witness Decl. at ¶ 56.

the standards "available," while at the same time assuring that essential patent owners are "adequately and fairly rewarded."[7] Dr. Bekkers is fundamentally mistaken, therefore, to the extent he is asserting that the ETSI FRAND commitment requires an IPR holder to afford "equal," "identical," or "the same" treatment to all of its licensees. The relevant ETSI documents decline to impose such a strict requirement. Indeed, the terms "equal," "identical," and "the same" do not appear in the ETSI IPR Policy or the IPR licensing declaration that forms the FRAND contract.

11.     *Fourth*, Dr. Bekkers wrongly alleges that I had suggested that, by not implementing the Undertaking, ETSI opened the door for its members to offer licenses on unfair or discriminatory terms and conditions so long as they negotiate in good faith. I have never suggested this. To the contrary, I have consistently opined that the 1994 ETSI IPR Policy, which remains applicable today, requires standard essential patent owners *and* prospective licensees to negotiate in good faith towards licenses that specify fair, reasonable, and non-discriminatory terms and conditions. Where the parties cannot agree after good faith negotiations on what constitutes FRAND terms and conditions for the license under negotiation, the ETSI Guide on IPRs directs them to seek a third-party adjudication of their dispute.[8]

## C.     Dr. Bekkers' Criticism of ETSI's Decision Structure Is Misplaced.

12.     Dr. Bekkers devotes a significant portion of his testimony to criticizing ETSI's decision-making process. In particular, he implies that it is biased in favor of European companies.[9] This is absolutely untrue. Non-European companies like Apple, Microsoft, Samsung Huawei, LG, and ZTE, are strongly represented within ETSI, both by their European affiliates (who are full members) and by their non-

---

[7] Exhibit 223 at Clause 3.
[8] Exhibit 224 at Section 4.3.
[9] Bekkers Witness Decl. ¶ 44.

European affiliates. For instance, the European entities listed in Figure 1 are full members of ETSI:[10]

**FIGURE 1**

| Organization | Country |
|---|---|
| Apple (UK) Limited | United Kingdom |
| Apple Europe Limited | United Kingdom |
| Apple France | France |
| Apple GmbH | Germany |
| Apple Italia S.R.L. | Italy |
| Apple Portugal | Portugal |
| Apple Switzerland AG | Switzerland |
| Huawei Tech. (UK) Co., Ltd | United Kingdom |
| Huawei Technologies France | France |
| Huawei Technologies Sweden AB | Sweden |
| LG Electronics France | France |
| Microsoft Europe SARL | France |
| Microsoft Ireland | Ireland |
| Microsoft Ltd. | United Kingdom |
| Microsoft Switzerland | Switzerland |
| Samsung Electronics GmbH | Germany |
| Samsung Electronics Nordic AB | Sweden |
| Samsung Electronics Polska | Poland |
| Samsung R&D Institute UK | United Kingdom |
| ZTE Wistron Telecom AB | Sweden |

---

[10] Exhibit 4068.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

13.     Due to its large number of multinational affiliates, United States-based Apple controls more voting weight within the ETSI General Assembly than any other company. The current voting weights for Apple, Huawei, LG, Microsoft, Samsung, and ZTE affiliated companies, as well as the current voting weight for Ericsson and Ericsson affiliated companies (Ericsson France, Ericsson GmbH (Germany), and Ericsson Limited (UK)), are seen in Figure 2 below.[11] Dr. Bekkers' suggestion that European companies somehow exert outsized influence within ETSI is simply not true.

**FIGURE 2**

| Organization | Total Voting Weight |
|---|---|
| Apple | 183 |
| Ericsson | 94 |
| Microsoft | 53 |
| Samsung | 48 |
| Huawei | 47 |
| LG | 24 |
| ZTE | 14 |

14.     Dr. Bekkers also suggests that ETSI's voting structure is such that the organization has been blocked from adopting a more specific definition of "FRAND."[12] Dr. Bekkers is again incorrect. ETSI, from the outset, has made the intentional choice not to define "FRAND" more specifically, and instead has deliberately decided to allow for flexibility in what constitutes FRAND terms and conditions. And while there has been extensive and ongoing discussion regarding the meaning of FRAND within ETSI, no consensus has been reached within the

---

[11] Exhibit 5334.

[12] Bekkers Witness Decl. ¶¶ 42-45.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

organization thus far regarding a specific methodology for arriving at FRAND terms and conditions for a license. As a result, ETSI has determined to leave the question of "what are FRAND terms and conditions?" to the negotiating parties or, where the parties cannot reach a negotiated compromise, the national courts (or mediation or arbitration).

## IV.   REBUTTAL TO DR. ORDOVER

### A.   Patent "Hold-Up" And "Royalty Stacking" Are Theoretical And Do Not Occur In Practice.

15.    Dr. Ordover advances the theory that there is a "risk that SEP owners will be able to use hold-up power to impede rivals in downstream markets and/or expropriate a portion of returns earned by firms that are successful innovators in non-standardized technology and product features in the relevant product market(s)."[13] Dr. Ordover does not come forward with any concrete evidence to suggest that Ericsson has "held up" any particular licensee. In reality, if a prospective licensee believes the royalty demands of a standard essential patent owner are too high, it can decline to execute a license and request that a court determine that the patent owner has violated its FRAND commitment. With respect to TCL, it should be noted that the parties have consented to a judicial determination of terms and conditions for a license, so there can be no "hold-up" here.

16.    Dr. Ordover also discusses the theory of "royalty stacking." As support for his theory, Dr. Ordover cites to (i) an academic article published by Lemley and Shapiro almost a decade ago; (ii) Ericsson's public statements committing to support reasonable aggregate royalties on mobile phones; (iii) what Dr. Ordover calls "empirical studies [that] have found that the aggregate licensing fees vastly exceed the 'reasonable' levels suggested by Ericsson and other industry

---

[13] Ordover Witness Decl. ¶ 58.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

participants," and (iv) the fact that Ericsson has divested patents.[14] None of this "evidence," however, shows that TCL or the industry generally has been harmed by royalty stacking. Critically, Dr. Ordover has not made any effort (nor has any other TCL expert) to calculate TCL's own royalty stack on its mobile phones.

17.     My personal experience over three decades working in the industry has been exactly the opposite of what Dr. Ordover suggests. I have witnessed falling product prices; accelerating innovation; worldwide competition between dozens of product vendors; global dissemination of products that only two decades ago were high end luxury goods, out of reach for the overwhelming majority of the world's population; and low barriers to market entry—none of the things one would expect to see in a market harmed by royalty stacking. TCL has been a beneficiary of this. The latter point (low barriers to entry) is perhaps best evidenced by the fact that, in the early 2000's, the market for 2G mobile phones market was dominated by five companies: Ericsson, Nokia, Siemens, Motorola and Alcatel. Today, most of these companies no longer sell mobile phones, while others, e.g., TCL, ZTE, Coolpad, have successfully gained significant market share. In short, in my experience, the global mobile telecommunications industry is an excellent example of standardization efforts rendering successful results.[15]

18.     I note that Ericsson's public statements in favor of reasonable aggregate royalties and the "empirical studies" (by industry group NGMN and Ericsson's expert in a prior litigation, Mr. Weinstein) are not, in fact, evidence of any royalty stacking problem. Ericsson's statements were made prior to the commercial release of the 3G and 4G standards, respectively, at a time before a "stack" existed for those standards. Similarly, the royalty rates that NGMN and Mr. Weinstein ended up with for the 4G standard were those announced by industry

---

[14] Ordover Witness Decl. ¶¶ 29-36.
[15] Exhibit 4955.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1  participants before the release of 4G standard-practicing products—at a time when

2  companies were not actually paying "stacked" royalties for 4G sales. Put

3  differently, neither NGMN nor Mr. Weinstein attempted to calculate, or did

4  calculate, any actual stacked royalties being paid by any mobile phone vendor

5  pursuant to any license agreements.

6      19.    In observing that Ericsson has divested patents, Dr. Ordover

7  suggests—without support—that those divestments will lead to a royalty stacking

8  problem for TCL. This is mere speculation. Dr. Ordover has made no effort to

9  calculate TCL's royalty stack at all, much less to show that TCL would be harmed

10 by paying royalties in the future to any other standard essential patent owners.

11     **B.    Dr. Ordover Ignores The Intent Of The Drafters Of The ETSI IPR**

12     **Policy.**

13     20.    Dr. Ordover's opinions regarding the FRAND commitment—the sole

14 source of TCL's right to require Ericsson to offer a license on FRAND terms and

15 conditions—are glaringly unconnected to the ETSI IPR Policy. Dr. Ordover never

16 analyzes the express language of the Policy, the guidance provided by the ETSI

17 Guide on IPRs, the intent of the drafters of the Policy, or the French law that

18 governs the Policy and the FRAND commitment. As a result, he advocates for a

19 definition of FRAND that bears no relation to what the drafters of the ETSI IPR

20 Policy intended for FRAND to mean.

21     21.    Dr. Ordover ignores the general understanding within ETSI at the time

22 when the 1994 ETSI IPR Policy was drafted and instead advocates—without

23 support—that "economic principles" should "provide a reasonably tight range for

24 where the FRAND rate and other licensing terms would fall and also rule out

25 certain royalty rates and license terms as clearly running afoul of FRAND

26 precepts."[16] This notion of a "tight range" is absolutely contrary to the original

27

28

---

[16] Ordover Witness Decl. ¶ 45.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1  intent of the 1994 ETSI IPR Policy, namely to accommodate and leave room for a

2  multiplicity of different situations, always appropriately taking the specific

3  circumstances of the negotiating parties into account.

4       22.     The same is true for Dr. Ordover's complaint about the lack of a more

5  rigid definition of FRAND and his characterization of the good faith requirement as

6  "nebulous."[17] These complaints ignore the fact that all of the discussions around the

7  drafting of the ETSI IPR Policy point to bilateral negotiations as the means for the

8  IPR owner and potential licensee to reach agreement on FRAND terms and

9  conditions. This was, from the very beginning until today, the well-understood

10  process underlying the FRAND commitment, as there is no consensus on any

11  specific formula or methodology that will always result in "FRAND" terms and

12  conditions under all circumstances.

13       23.     Dr. Ordover's interpretation of the "non-discriminatory" aspect of

14  FRAND further conflicts with the intent of those who drafted the current ETSI IPR

15  Policy (myself included). As I have discussed, the abandoned 1993 ETSI IPR

16  Policy and Undertaking contained a "most favored licensee" provision. That

17  provision required that licenses granted pursuant to the Undertaking include a

18  stipulation requiring the licensor to promptly notify a licensee of any license

19  granted to a third party for the same IPRs, under comparable circumstances giving

20  rise to terms and conditions that were clearly more favorable, in their entirety, than

21  those granted to the licensee, and allowing the licensee to require replacement of

22  the terms and conditions of its license, in their entirety, either with those granted to

23  the third party licensee or with other agreed upon terms and conditions.[18] But this

24  provision and the 1993 ETSI IPR Policy and Undertaking met with strong

25  resistance and were never put into practical operation. Instead, ETSI adopted the

26

27       [17] Ordover Witness Decl. ¶ 65.

28       [18] Exhibit 5396 at ¶ 3.1.

1994 ETSI IPR Policy, which remains in place today, and which deliberately does not include a "most favored licensee" requirement or any equivalent provision.

24.      Dr. Ordover's claim that "FRAND means that when one firm obtains a particular set of licensing terms from a declared SEP patent holder, other similarly-situated firms should be able to choose from that same menu of terms, such as offering the same one-way royalty rates"[19] is completely at odds with the actual history and intent of the drafters. Not only is it contradicted by ETSI's rejection of a "most favored licensee" provision, it also runs contrary to ETSI's intent for a flexible FRAND licensing regime that permits the essential IPR holder to fully utilize its ownership position and account for all relevant circumstances of the particular negotiation.[20] Indeed, Dr. Ordover's proposal that a licensor proceed in its licensing negotiations with *all* its prospective licensees by applying exactly the same negotiation steps disregards commercial reality and industry practice–two factors that the drafters of the ETSI IPR Policy carefully considered.

25.      Dr. Ordover also largely ignores the fact that a central objective of the ETSI IPR Policy is to ensure adequate and fair compensation for the use of an IPR owner's essential IPRs.[21] This objective is rooted in the fact that companies who own large portfolios of essential IPRs have made earlier, and most often risky, investments in standardization. For example, Ericsson invested heavily in the development of the LTE standard during the period when it was unclear whether LTE, WiMax, or Ultra Mobile Broadband would become the prevailing 4G standard.[22] Under Dr. Ordover's incorrect view that license rates must always erode downward, because each successive licensee has an entitlement to equal or better terms than every prior licensee, innovative companies like Ericsson would not be

---

[19] Ordover Witness Decl. ¶ 58.
[20] Exhibit 223 at Clause 6.1.
[21] Exhibit 223 at Clause 3.2.
[22] Brismark Witness Decl. ¶¶ 36-41.

sufficiently incentivized to make the risky investments that are required of active participants in the standardization process.

### C. Dr. Ordover Ignores The Fact That A Standard Implementer Needs A License To Avoid Unlawful Infringement.

26.     Dr. Ordover recognizes that open standards benefit companies like TCL—i.e., companies that did not undertake the risky investments associated with developing the 2G, 3G, or 4G standards[23]—to compete in the downstream market for products that implement those standards.[24] He fails to recognize, however, that the ETSI IPR Policy does not require "automatic" licensing such that an implementer would be free to manufacture and sell standard-compliant products before securing the necessary licenses. To lawfully compete in the downstream market for products that implement the standards, the implementer must first secure the necessary licenses from standard essential patent owners. When an implementer like TCL invests in standard-practicing products prior to securing the necessary patent rights to ensure non-infringement, the risks posed by those activities are borne by the implementer/patent infringer itself.

27.     I agree with Dr. Ordover that in all business activity, there is a risk assumed by the respective market participant, and that the patent system does not provide any guaranteed returns. But it is also the case that the patent system does not provide for compulsory free licensing. The rules are clear: a party cannot use another party's patent unless a license is in place. In the absence of a license, the implementer is acting illegally and committing patent infringement.

### D. Dr. Ordover Incorrectly Opines That Every Offer Made In Negotiations Must Be FRAND.

28.     Dr. Ordover's opinion that each offer made in a negotiation must be

---

[23] Deposition of Eric Hsu, January 26, 2016 at 24:22-25:4 and 25:18.
[24] Ordover Witness Decl. ¶ 11.

FRAND[25] cannot be reconciled with the express language, or the intent of, the ETSI IPR Policy. The ETSI IPR Policy requires an IPR holder to "be prepared to grant" licenses consistent with the requirements of Clause 6.1 (i.e. on "FRAND terms and conditions").[26] This language contemplates that the *license* finally concluded between negotiating parties satisfies the FRAND requirement, and includes no corresponding requirement for *offers* made in negotiations. Thus, the Policy makes clear that only the parties' ultimate license agreement may serve as a reference for what constitutes FRAND terms and conditions.

29.    The drafters of the ETSI IPR Policy did not leave common sense at the door. Rather, they recognized that, in all negotiations, parties allow themselves room to compromise and there are concessions that eventually lead to the final result. For this reason, the Policy does not require that each proposal made as a negotiation step must necessarily be subject to an analysis of whether it is "FRAND." Instead, the Policy contemplates that the positions taken by the parties in the course of FRAND licensing negotiations must—in light of the overall context—comply with the obligation to negotiate in good faith, including by making offers designed to lead to a FRAND outcome.

30.    Finally, in asserting that Ericsson's offers to TCL violate Ericsson's FRAND commitment, Dr. Ordover neglects both the French law governing the FRAND commitment[27] and the reality of commercial negotiation practices. Contrary to his view that these licenses conclude by simple offer and acceptance, standard essential patent license agreements are the highly complex products of the detailed negotiations required to arrive at FRAND terms and conditions.

## V.    REBUTTAL TO DR. LEONARD

---

[25] Ordover Witness Decl. ¶ 64.

[26] Exhibit 223 at Clause 6.1.

[27] Fauvarque-Cosson Witness Decl. ¶¶ 24-26.

**A.    Dr. Leonard's "Top Down" Approach Is Not ETSI's Preferred Methodology For Determining FRAND Terms And Conditions.**

31.    Dr. Leonard advocates for a "top down" approach to calculating what he considers to be fair and reasonable royalties for a license between Ericsson and TCL.[28] This methodology is not prescribed anywhere in the ETSI IPR Policy or the ETSI Guide to IPRs, which, as I have explained, point to good faith bilateral negotiations as the preferred methodology for arriving at FRAND terms and conditions for a license. Further, in all of my licensing experience and practice over many decades, I have never encountered Dr. Leonard's academic methodology being used to calculate royalties in a real world negotiation and I am highly skeptical that it could be employed here, given, for example, the arbitrary aggregate rate of departure based on past public statements by Ericsson and others. Indeed, during my time at Bosch, I never would have construed (and did not construe) these joint press releases and other public statements regarding royalty expectations as firm commitments by the participating companies to grant licenses under their respective standard essential patents at certain rates, and I have never encountered a situation where anyone in this industry has done so. Because there is no support for using Dr. Leonard's "top down" methodology in the relevant ETSI documents or the real world, I believe that it would be inappropriate for the Court to employ it here.

**B.    Dr. Leonard Is Mistaken As To The Statute Of Limitations He Claims Is Applicable To The "Rest Of World."**

32.    In paragraph 148 of his direct testimony, Dr. Leonard suggests that for all of the countries in the "Rest of World" (i.e. countries outside of the United States, the European Union, and China, as defined by TCL's internal record-keeping) a two-year statute of limitations should be applied to actions for patent

---

[28] Leonard Witness Decl. ¶¶ 39-42.

infringement.[29] Dr. Leonard offers no support for this opinion other than the fact that Chinese law specifies a two year statute of limitations period on actions for patent infringement in *China.* I will deal with the legal situation in China below. In fact, in TCL's own accounting practice, China is a "region" of its own and *not* part of the "Rest of World" where TCL sells mobile phones. TCL, however, sells tens of millions of mobile devices annually in what it classifies as Latin America, the Middle East and Africa, and the Asia Pacific regions.[30]

33.     Dr. Leonard offers no argument why, regarding the "Rest of World" region, Ericsson could not bring a claim against TCL for patent infringement in a country where TCL does not manufacture mobile devices but nevertheless sells standard-practicing products. The fact that Ericsson previously did file lawsuits against TCL for patent infringement in certain "Rest of World" countries (for example, Brazil and Russia) is ample proof that bringing such claims is certainly possible.

34.     Dr. Leonard also fails to explain why the Chinese two-year limitations statute should therefore be applied to TCL's sales outside of China. It does not. In fact, in at least two other "Rest of World" countries (Brazil and Mexico), the statute of limitations for patent infringement far exceeds two years. This is seen in Exhibit 5402 and Exhibit 5450.

35.     Exhibit 5402 is an English language version of the Brazilian IP Statute, obtained from the website of the World Intellectual Property Organization (WIPO). Article 225 states that "a complaint seeking restitution for damages caused to intellectual property rights expires in 5 (five) years."[31] Thus, Brazil has a five-year limitations period, not a two-year limitations period that Dr. Leonard infers

---

[29] Leonard Witness Decl. ¶ 148.

[30] Exhibit 4869 at 24-26.

[31] Exhibit 5402 at 46.

from China. Regarding the question from when such limitations period starts to run, there are no decisions of higher courts available, and there is no unanimity among scholars. The following positions are held: (1) from the time the infringement is committed; (2) from the time the ongoing infringement has ended; and (3) from the time the patent owner became aware of the infringement. I understand that Ericsson sued TCL in Brazil for patent infringement on September 20, 2012, and those proceedings are presently stayed. Consequently, the statute of limitations has been suspended beginning with the complaint having been served. Another consequence is that the five-year statute of limitations would run backwards from the time that Ericsson filed suit against TCL in September 2012, if not even longer. For example, in the case where scenario (2) above is adopted, no statute of limitations would apply because TCL's infringement has been ongoing from the time it began selling infringing mobile devices in Brazil until today.

36.     In Mexico, there are two types of actions that a patent owner can file against an infringer: (1) an administrative proceeding for patent infringement with the IMPI (*Instituto Mexicano de Propiedad Industrial*), where the IMPI can impose fines on the infringer and, if the infringer does not cease to infringe, it might even be subject to criminal sanctions (2–6 years of imprisonment for the infringer); or (2) an action in a federal court (*Juzgados de Distrito en Materia Civil*) or local court (*Tribunal del Fuero Común en materia Civil*). The courts permit actions for patent infringement only after the administrative proceedings have been finally decided.

37.     As for the statute of limitations, the Mexican Law on Industrial Property (*Ley de la Propiedad Industrial*) does not foresee a specific limitations period for patent infringements. Rather, one must look to the Mexican Law on Administrative Proceedings (*Ley Federal de Procedimiento Administrativo*). The latter is Exhibit 5450, which is an English language version of the law obtained from the WIPO website. As seen these, Article 79 states that "[t]he faculty of the authority to impose administrative sanctions prescribes in five years. The term of

prescription will be ongoing and will be counted from the day in which the administrative offense was committed if it is consummated, or the day in which it ended if it is continuous." In other words, before a patent owner institutes an administrative proceeding with the IMPI, the five-year statute of limitations has not begun to run. I understand that Ericsson has not instituted any such proceedings against TCL in Mexico. As a result, there is no time bar applicable to a claim by Ericsson against TCL for patent infringement in Mexico.

38.     Further, as to China itself, Dr. Leonard is mistaken. While Article 68 of the Patent Law of the People's Republic of China (as amended on December 27, 2008), specifies a limitation period of two years, he ignores Article 140 of the General Principles of Civil Law of the People's Republic of China, which provides that the period of limitation for bringing suit is cut off when a party demands performance, and a new period of limitation is calculated from the time the prior time period was cut off.[32] He also ignores the Provisions of the Supreme People's Court on Several Issues Regarding the Application of Limitation on Actions in the Trial of Civil Cases, which took effect in China on September 11, 2008 and supplements the General Principles of Civil Law of the People's Republic of China. The Provisions' Article 10 clarifies that the applicable limitations period is interrupted when a claimant makes a claim through correspondence, including a letter or by other data means, and the correspondence reaches the other party. Here, between November 2007 and May 2015, Ericsson transmitted nineteen written license offers to TCL, each time claiming royalties on TCL's unlicensed sales of standard-practicing devices.[33] Each claim interrupted and reset the Chinese two-year statute of limitations cited by Dr. Leonard, pursuant to the legal principles that I have just introduced. As a result, Dr. Leonard's assumption regarding the

---

[32] Exhibit 5404.
[33] Exhibit 131 at 39-56.

1  limitations law in China is incomplete and therefore incorrect.

2      39.    Exhibit 5404 is a copy of the General Principles of Civil Law of the

3  People's Republic of China, obtained from the legal research service LexisNexis.

4  Exhibit 5449 is a copy of the Provisions of the Supreme People's Court on Several

5  Issues Regarding the Application of Limitation on Actions in the Trial of Civil

6  Cases that took effect in China on September 11, 2008, also obtained from the legal

7  research service LexisNexis.[34] Exhibit 5403 is an article about the Provisions set

8  forth in Exhibit 5449, including Article 10, which clarifies when the limitations

9  period can be interrupted as I discussed above.[35]

10     40.    Generally, regarding my competence and qualifications to offer expert

11  testimony on the applicable statute of limitations to actions for patent infringement

12  in China, Brazil, and Mexico, I point to the following facts. With regard to China, I

13  have had the privilege to accompany the development of the IP system, and the

14  legal system in China in general, since the "opening," beginning in the late 1970's,

15  after the so-called "cultural revolution." My first business trip (to negotiate a

16  license agreement) to China took place as early as 1979, followed by numerous

17  further business trips in the ensuing years. Ever since, I have maintained close

18  contact with the legal development in China and with Chinese colleagues. I have

19  been a member of the German-Chinese Lawyers' Association (*Deutsch-*

20  *Chinesische Juristenvereinigung e.V.*) since its founding in 1986. I have been a

21  lecturer in various seminars in educational programs in China, co-organized by

22  China and the EU and, over many years, have lectured to delegations of SIPO

23  (State Intellectual Property Office of China) during training courses organized by

24  the Max Plack Institute for Innovation and Competition, Munich/Germany. I

25  frequently conduct lectures and workshops on Chinese IP law, on three instances in

26

27  ───────────────
   [34] Exhibit 5449.
   [35] Exhibit 5403.

28

1   2016 alone.

2       41.    My knowledge of the legal situation in Brazil is rooted in the fact that

3   my doctoral thesis was a study on comparative law, titled *Effects of inflation: their*

4   *treatment in Brazilian and German Law*. I have also lectured in Brazil on matters of

5   intellectual property law on several occasions. I am a founding member of the

6   German-Brazilian Lawyers' Association (*Deutsch-Brasilianische*

7   *Juristenvereinigung e.V.*), formed in 1982. Consequently, and because I speak

8   Portuguese fluently, I consider myself to be competent in researching and offering

9   opinions on relatively straightforward aspects of Brazilian law, such as a question

10  about the statute of limitations.

11      42.    The same is true with regard to Mexican law. I have lectured and

12  conducted workshops in Mexico on topics related to intellectual property law

13  (including a workshop organized by WIPO), and I am fluent in Spanish. This

14  experience, coupled with my general understanding of comparative law, especially

15  in civil law jurisdictions, qualifies me to offer expert opinions on the statute of

16  limitations applicable to an action for patent infringement in Mexico.

17  **VI.    REBUTTAL TO DR. LYNDE**

18      43.    TCL's expert Dr. Lynde advocates for a precise mathematical

19  approach to comparing the license agreements concluded between Ericsson and

20  numerous parties over an extended period of time. As is the case with

21  Dr. Leonard's "top down" methodology, Dr. Lynde's methodology was *never*

22  contemplated by ETSI. Would this have been the case, the ETSI IPR Policy would

23  contain a respective instruction. To the contrary, it was always ETSI's

24  understanding and intention to allow a myriad of different possible constellations to

25  be properly taken care of in licenses satisfying the FRAND requirement and being

26  arrived at by applying good faith conduct during these negotiations.

27  **VII.   CONCLUSION**

28      44.    As set forth above, Dr. Bekkers, Dr. Ordover, Dr. Leonard, and Dr.

REBUTTAL WITNESS DECLARATION OF DR. BERTRAM HUBER;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

**CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER**

1  Lynde all offer opinions that are in direct conflict with the correct interpretation and
2  meaning of the FRAND commitment, as intended by the drafters of the ETSI IPR
3  Policy (myself included). Accepting their unsupported opinions would spoil the
4  flexible FRAND licensing system that has worked extremely well for over two
5  decades, and which has led to universal adoption of the 2G, 3G, 4G standards all
6  over the world, and the enormous consumer welfare benefits that it has created.

7

8  Executed on 27 January 2017 in Backnang, Germany.

9

10

11  _____

12  Dr. Bertram Huber

# **TABLE OF EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 131 | Ericsson's Supplemental Responses to Plaintiff TCL's Interrogatory Nos. 2, 3, 7, 9-11, 13, 17, 22, 24, and 32, dated 3/10/16 |
| 223 | ETSI Rules of Procedure, 11/18/15, Annex 6: ETSI Intellectual Property Rights Policy, pp. 36-47 |
| 224 | ETSI Guide on Intellectual Property Rights, pp. 51-70 (IPRs), Version #94, Sep. 19, 2013 |
| 4068 | ETSI Document: List of All ETSI Full Members - ETSI Associate Members - Observers - Counsellors |
| 4869 | TCL Annual Report 2015 |
| 4955 | The Boston Consulting Group presentation: The Mobile Revolution- How Mobile Technologies Drive a Trillion-Dollar Impact |
| 5402 | Law No. 9,278, of May 14, 1996, Brazil Limitations Statute (English Translation), available at http://www.wipo.int/edocs/lexdocs/laws/en/br/br003en.pdf |
| 5403 | 10/30/2008 - New Supreme People's Court provisions clarify limitation periods in civil actions, S. Boggs, available at http://www.lexology.com/library/detail.aspx?g=60c284c3-3894-4544-9f3a-722ce0a808ac |
| 5404 | 00/00/1998 - General Principles of Civil Law of the People's Republic of China (Translation), W. Gray, et al. |
| 5334 | ETSI Membership Information, accessed from ETSI Portal on March 31, 2016 |
| 5396 | Appendix A, ETSI Intellectual Property Rights Undertaking, ETSI GA 15, TD 25 |
| 5449 | Provisions of the Supreme People's Court on Several Issues Regarding the Application of Limitation on Actions in the Trial of Civil Cases that took effect in China on September 11, 2008 |

# CERTIFICATE OF SERVICE

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on the below date, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.


Dated:  February 26, 2017          **CROWELL & MORING LLP**

                                   */s/ John S. Gibson*
                                   _____

                                   John S. Gibson

                                   Attorneys for ERICSSON INC. AND
                                   TELEFONAKTIEBOLAGET LM
                                   ERICSSON