1  CROWELL & MORING LLP
   John S. Gibson (CSB No. 140647, jgibson@crowell.com)
2  Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
   3 Park Plaza, 20th Floor, Irvine, CA  92614
3  Telephone:  949.263.8400  Facsimile:  949.263.8414

4  Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
   515 S. Flower Street, 40th Floor, Los Angeles, CA  90071
   Telephone:  213.443.5590  Facsimile:  213.622.2690

5  Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
6  1001 Pennsylvania Avenue, N.W., Washington, DC  20004
   Telephone:  202.624.2500  Facsimile:  202.628.5116

7  MCKOOL SMITH P.C.
   Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
8  300 Crescent Court, Suite 1500, Dallas, TX  75201
   Telephone:  214.978.4000  Facsimile:  214.978.4044
9  Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
   300 W. 6th Street, Suite 1700, Austin, TX  78701
10 Telephone:  512.692.8700  Facsimile:  512.692.8744

11 Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14  TCL COMMUNICATION<br>15  TECHNOLOGY HOLDINGS,<br>LTD., *et al.*,<br>16    Plaintiffs/Counterclaim-Defendants,<br>17        v.<br>18  TELEFONAKTIEBOLAGET LM<br>19  ERICSSON, *et al.*,<br>20    Defendants/Counterclaim-Plaintiffs.<br>21  ERICSSON INC., *et al.*,<br>22    Plaintiffs/Counterclaim-Defendants,<br>23        v.<br>24  TCL COMMUNICATION<br>TECHNOLOGY HOLDINGS,<br>25  LTD., *et al.*,<br>26    Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx<br>Case No. 2:15-CV-02370 JVS-DFMx<br><br>**CORRECTED WITNESS<br>DECLARATION OF DAVID<br>KENNEDY**<br>Hon. James V. Selna<br><br>**Discovery Cut-off:**  May 23, 2016<br><br>**Pretrial Conference:**  January 30, 2017 at 11:00 a.m.<br><br>**Trial:**  February 14, 2017 at 8:30 a.m. |

27

28

# <u>TABLE OF CONTENTS</u>

I.   **EXECUTIVE SUMMARY** ............................................................................1

  A. Ericsson's Comparable Licenses Show That Options A and B Are FRAND .2

    1.  Ericsson's Option A and Option B Offers. ..........................................2

    2.  Executed Licenses Are The Best Indicator Of Patent Portfolio Value........3

    3.  Timing And Selection of Comparable Ericsson Licenses. ..........................4

  B. A Comparable License Analysis Based On Implied Dollar Per-Unit Rates Shows That Options A And B Are FRAND..........................................................5

    1.  A Comparable License Analysis Should Be Based On Implied Dollar Per-Unit Royalty Rates........................................................................5

    2.  The Results Of A Comparable License Analysis Based On Implied Dollar Per-Unit Rates Shows That Option A And Option B Are FRAND. ..................8

  C. A Comparable License Analysis Based On Percentage Per-Unit Rates Also Shows That Option A And Option B Are FRAND. ..............................................13

  D. Option A and Option B Specify A Release Payment.....................................15

  E. The "Ex Standard" Value Of Ericsson's SEPs Exceeds The Royalties Ericsson Has Requested From TCL. ....................................................................17

  F. TCL Can Pay Royalties To Ericsson And Remain Profitable. ......................21

II.   **QUALIFICATIONS** ..................................................................................23

III.  **SCOPE OF ENGAGEMENT** ..................................................................27

IV.  **BACKGROUND** ......................................................................................28

  A. Ericsson ........................................................................................................28

  B. TCL................................................................................................................29

V.   **THE FRAND COMMITMENT**..............................................................34

VI.  **ANALYZING COMPARABLE LICENSES IS THE BEST MEASURE OF WHAT IS FRAND**..........................................................................................36

VII.  **EVALUATING FRAND ROYALTY RATES ON A DOLLAR-PER-UNIT BASIS** .................................................................................................40

VIII.  **COMPARABLE LICENSE ANALYSIS** ............................................45

  A. Summary of Comparable License Analysis Results. ....................................45

  B. Steps Of Comparable License Analysis. ......................................................50

1.   Identifying Comparable Licenses.................................50

2.   Determining Implied Royalty Rates For Comparable Licenses. ...............53

3.   Methodology To Unpack One-Way, Running Royalty Rate Licenses......57

4.   Methodology To Unpack Two-Way Licenses ...........................58

5.   Calculating Percent Per Unit Rates ....................................67

6.   Calculating Dollar Per-Unit Rates....................................68

C.  Unpacking Ericsson's Offers to TCL.....................................69

1.   Ericsson's Option A Offer..............................................69

2.   Ericsson's Option B Offer..............................................70

3.   Offer Analysis .........................................................71

4.   Ericsson One-Way Rates Implied By Options A and B .................74

D.  Unpacking Ericsson's Two-Way Licenses/Fixed Payment Licenses ............76

1.   ZTE....................................................................76

2.   Samsung ...............................................................82

3.   LG ....................................................................88

4.   HTC ...................................................................91

5.   Apple .................................................................93

6.   Sharp .................................................................97

E.  Unpacking Ericsson's One-Way, Running Royalty Rate Licenses .............100

1.   Coolpad................................................................100

2.   Huawei ................................................................102

3.   Karbonn ...............................................................104

4.   Doro ..................................................................107

5.   Other Comparable Licenses .............................................110

IX.    **EX-STANDARD VALUE OF ERICSSON'S 4G SEP PORTFOLIO**...112

A.  Background.............................................................115

B.  Economic Value of the Four Technical Currencies .......................117

1.   Economic Value from Improved Battery Life ...........................117

2.   Economic Value From Faster Data Speeds...............................124

3.   Economic Value Indications From Less Latency ........................129

4.  Economic Value From Improved System Capacity/Network Performance 132

C.  Value of 4G to End Device Reasonableness Check ...................................... 135

X.    **TCL'S AUDITED FINANCIAL STATEMENTS INCLUDE ESTIMATED IPR PAYMENTS TO ERICSSON** ........................................... 138

A.  Summary ............................................................................................................ 138

B.  TCL Has Already Estimated Its IPR Expenses. ......................................... 139

1.  IPR Provisions ............................................................................................ 139

2.  How the TCL IPR Provision Works ......................................................... 141

C.  Why the TCL IPR Provision Matters ......................................................... 158

1.  TCL's Audited Financial Statements Show Healthy Profits While Making IPR Provisions For Ericsson Greater Than Option A Or Option B ............... 159

2.  TCL's Unit Sales Show Healthy Profits While Making IPR Provisions For Ericsson Greater Than Option A Or B ......................................................... 162

D.  TCL Pays Brand Royalties Higher Than Ericsson's Option B .................... 164

E.  Conclusion .......................................................................................................... 165

XI.    **TABLE OF EXHIBITS** ................................................................................. 167

iii

My name is David Kennedy. I have been retained by counsel for Telefonaktiebolaget LM Ericsson and Ericsson Inc. (together, Ericsson) as an expert witness in this litigation. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

# I.    EXECUTIVE SUMMARY

1.    I have been asked by counsel for Ericsson to (i) offer my opinion on whether the licensing terms and conditions proposed by Ericsson for a license to TCL under Ericsson's 2G, 3G, and 4G standard essential patents (SEPs) in May 2015 (Ericsson's Option A and Option B offers) are consistent with the range of royalty rates derived from Ericsson's comparable licenses; (ii) offer my opinion regarding whether Ericsson has complied with its FRAND commitment in relation to TCL; (iii) identify and assess the value of Ericsson's SEP portfolio separate and apart from its inclusion in the standards; and (iv) review and analyze TCL's financial accounting information to assess the overall financial impact on TCL's margins and product costs that would result from TCL accepting Ericsson's Option A or Option B offers.

2.    As I will discuss, based on my comparable license analysis, and on my analysis of the value that Ericsson's standardized patented technology confers on a mobile device, I have concluded that yes, Option A and Option B specify fair, reasonable, and non-discriminatory (FRAND) terms for a license between Ericsson and TCL. I have further concluded that TCL's acceptance of Option A and/or Option B would not have a detrimental impact on TCL's margins or product costs.

3.    I have also been asked by counsel for Ericsson to review and critique the opinions of two TCL experts, Dr. Lynde and Dr. Leonard. I anticipate

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

submitting a rebuttal witness declaration later this month for that purpose, after reviewing their direct testimony.

**A.    Ericsson's Comparable Licenses Show That Options A and B Are FRAND.**

**1.    Ericsson's Option A and Option B Offers.**

4.    I understand that this Court will evaluate Ericsson's Option A and Option B offers as part of this proceeding. Option A is a fully integrated cross-license. If accepted, Option A would grant TCL a license under Ericsson's 2G, 3G, and 4G SEPs, with coverage for TCL's global sales of 2G, 3G, and 4G mobile devices for five years going forward. Option A specifies that TCL will make five fixed annual payments of $30 million, for a total of $150 million over the course of the license. If TCL's revenues from licensed units are less than $3 billion in any year of the license term, then TCL does not owe any additional royalties for sales in that year. If TCL's revenues from licensed units exceed $3 billion in any year of the license term, TCL will make running royalty payments that are calculated either by applying a percentage royalty rate to the net selling price of the licensed products or by multiplying a fixed dollar amount by the number of licensed products sold, depending on the licensed product at issue. Option A also includes a release payment to compensate Ericsson for TCL's past sales of unlicensed mobile devices.

5.    Option B is a fully integrated one-way license to TCL under Ericsson's 2G, 3G, and 4G SEPs, with coverage for TCL's global sales of 2G, 3G, and 4G mobile devices. Option B specifies that TCL will make running royalty payments that are calculated either by applying a percentage royalty rate to the "net selling price" (a defined term in the offer) of the licensed products or by multiplying a fixed dollar amount by the number of licensed products sold,

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

depending on the licensed product at issue. In the case of 4G mobile phones, the 1.5% running royalty rate has a floor of $2.00 and a cap of $4.50.

## 2. Executed Licenses Are The Best Indicator Of Patent Portfolio Value.

6. To determine whether the terms and conditions specified in Option A and B are FRAND, I performed a comparable license analysis. I selected this methodology because a patent owner's universe of licenses to its patent portfolio is the most reliable source of information regarding the portfolio's value. The bilateral negotiation process underlying a patent license is a competitive, controlled, back-and-forth, give-and-take process where the licensee and licensor educate each other by sharing public and private information about their unique and subjective expectations and perspectives, while engaging in market price discovery via offers and counter-offers, culminating in an independent arm's length agreement between the parties. Negotiated licenses to a patent portfolio thus reflect the real world information that the parties to the license considered when valuing the portfolio, as well as a negotiated compromise by companies with competing agendas (licensors want to be paid more, while licensees want to pay less). Further, in addition to party-specific information, the licenses that emerge from bilateral negotiations provide information regarding competitive conditions in the industry (for example, pricing trends, new market entrants, new products, etc.). In short, bilaterally negotiated licenses distill all of the economic, market, and technical data considered by the parties into the agreed upon terms and conditions for the license.

7. The terms of executed "comparable" licenses can be compared to the terms and conditions specified in a license offer, to determine whether the comparable licenses support the conclusion that the offered terms and conditions

3

are FRAND. This is how I analyzed Ericsson's Option A and Option B offers. As I will discuss, I "unpacked" the terms of Ericsson's comparable licenses and then compared those unpacked terms to the terms of Option A and B to determine whether the offered terms are FRAND.

### 3. Timing And Selection of Comparable Ericsson Licenses.

8.     I identified comparable Ericsson licenses using three criteria: (i) the licensee supplies mobile phones; (ii) the licensee's sales of mobile phones are sufficiently significant to be reported by third-party market analyst IDC (thus enabling me to perform a license analysis); and (iii) the license became effective within the 2013 to 2016 time frame. The universe of comparable licenses that resulted from my application of these criteria encompassed all of the Ericsson licenses analyzed by TCL's financial experts, as well as eighteen more. The comparable licenses include Ericsson's licenses with Apple, Coolpad, Sharp, ZTE, Samsung, LG, Huawei, HTC, Karbonn, Doro, Audioline, Beafon, Bullitt, Binatone, Emporia, and Mobistel.

9.     Of the companies who have executed these comparable licenses with Ericsson, I understand that Ericsson's expert, Dr. David Teece, has determined that the companies who are most similarly situated to TCL are Coolpad, ZTE, Sharp, and Karbonn. Based on this conclusion by Dr. Teece, Ericsson's comparable licenses with Coolpad, ZTE, Sharp, and Karbonn would be more relevant to my analysis of Ericsson's Option A and Option B offer than Ericsson's licenses with the other companies that I listed above.

10.     I note that at the time that I prepared my rebuttal expert report and selected comparable licenses for use in my analysis, I was analyzing Option A, Option B, *and* a third license offer made by Ericsson to TCL in March 2016. I understand that since that time, the Court has ruled that it will not evaluate the

March 2016 offer at trial. This is relevant to my analysis because, while post-May 2015 licenses were certainly relevant when I was analyzing Ericsson's March 2016 offer, they are now less relevant where my independent analysis is focused only on Option A and Option B. This is because parties negotiating a SEP license logically formulate offers that account for current licenses, as opposed to accounting for licenses that do not yet exist and that may or may not be executed in the future. This has been my experience over many years as a license negotiator in this industry. Of course, my analysis of post-May 2015 licenses analyzed by TCL's Dr. Lynde is relevant in any event for rebuttal purposes.

**B.    A Comparable License Analysis Based On Implied Dollar Per-Unit Rates Shows That Options A And B Are FRAND.**

**1.    A Comparable License Analysis Should Be Based On Implied Dollar Per-Unit Royalty Rates.**

11.    Based on my experience as a licensing professional and financial expert, it is my firm opinion that any comparable license analysis performed for the purpose of evaluating Options A and B should be undertaken on a dollar-per-unit comparative basis. This is because Ericsson's SEPs are most appropriately viewed as an input to a mobile phone, just like any other input (e.g. battery, screen, antenna, etc.) into the product. Adding additional inputs to a mobile phone (for example, a camera, or voice recognition software, or gold plating) does not reduce the value of the existing inputs (e.g. battery, screen, antenna, SEPs).

12.    A SEP owner should be compensated for the value that its input confers on the mobile phone regardless of the ASP of the mobile phone, just as a battery supplier will be compensated at the same rate for the cost of the battery it sold to the mobile phone supplier regardless of the ASP of the mobile phone that incorporates the battery. Naturally, if SEP owners are not sufficiently compensated

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   for the use of their inputs to mobile phones, the incentive for the patent owners to

2   continue to innovate would be diminished.

3       13.     Because I view standardized technology as an input to a mobile

4   phone, just like any other input (battery, screen, antenna, etc.), I have asked "what

5   is the cost of this input?" Inputs such as batteries and antennas have a fixed dollar

6   per-unit cost to the mobile phone supplier, as should SEPs (to ensure that SEP

7   owners are incentivized to continue innovating, as discussed above). To determine

8   the cost of the input in question—i.e. Ericsson's SEPs—I have derived dollar per-

9   unit royalty rates from Ericsson's comparable licenses. And it is this range of

10  dollar per-unit royalty rates expressed by Ericsson's licenses that provides the

11  range of what would be a FRAND royalty rate for TCL to pay for a license to

12  Ericsson's SEPs.

13      14.     Viewing Ericsson's SEPs as an input into a mobile phone with a

14  dollar per-unit cost automatically takes into account the sales price that the

15  manufacturer charges for its devices. This avoids the risk of what I call the "race to

16  the bottom" which, if left unchecked, could drive FRAND royalties to negligible

17  levels, deterring continued participation in standardization activities. The race to

18  the bottom would begin if each (self-interested) licensee is permitted to demand,

19  and Ericsson is required to offer, the royalty structure (dollar per-unit or percentage

20  per-unit) and royalty rate that is most favorable to its own market position.

21  Companies who sell products with high average selling prices (ASPs) would

22  naturally demand and receive the low dollar per-unit rates implied by Ericsson's

23  licenses with low-ASP companies, and low-ASP companies would demand and

24  receive the low percentage per-unit rates implied by Ericsson's licenses with high-

25  ASP companies. The end result of this downward price cycle would be a situation

26  where Ericsson receives little to no compensation at all for the use by these

27                                          6

28

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

companies of its SEPs, which is directly contrary to ETSI's objective of ensuring that SEP owners are fairly compensated for the use of their standardized inventions. The race to the bottom is depicted in Figure 1:

### FIGURE 1:  Race To The Bottom



15.     Viewing Ericsson's SEPs as an input into a mobile phone with a dollar per-unit cost rather than percentage per-unit cost avoids the race to the bottom by ensuring that prospective licensees like TCL pay for a license consistent with Ericsson's high-, mid-, and low-ASP licensees. For example, Apple sells high-ASP mobile phones, Huawei generally sells mid-ASP mobile phones, and TCL sells mainly low-ASP mobile phones.  All three companies need to "purchase" the same Ericsson's SEP input for their mobile phones, and it is logical that there should be a range of dollar per-unit amounts that would correspond to the value of the input.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

16.     Viewing Ericsson's SEPs as an input into a mobile phone with a dollar per-unit cost also avoids the potential for wide discrepancies in what companies are paying on a cash basis for a license to Ericsson's SEPs—a risk that exists when viewing the cost of Ericsson's SEPs in terms of percentage per-unit rates. For instance, two licensees could be paying a 2% royalty to the same patent owner for a license to the same SEP portfolio; but if Licensee A has an average ASP of $1000 and Licensee B has an average ASP of $100, then Licensee A is paying ten times as much on a dollar per-unit basis than Licensee B. By ensuring that both companies pay royalties within the same range of implied dollar per-unit rates, this risk is avoided.

### 2.     The Results Of A Comparable License Analysis Based On Implied Dollar Per-Unit Rates Shows That Option A And Option B Are FRAND.

17.     As the next step in my analysis, for each of Ericsson's comparable licenses, I asked "what did the licensees agree to pay Ericsson pursuant to these licenses on a dollar-per-unit basis?" Answering this question was a complicated task—each licensee in question sells a different mix of licensed products (infrastructure, mobile phones, tablets, external modems, etc.) at a range of different prices, and the licenses in question are structured in a variety of ways (fixed payment, running royalty, running royalty with royalty caps and floors, etc.).

18.     After unpacking Ericsson's comparable licenses to dollar-per-unit royalty rates, I asked "what would TCL have agreed to pay on a dollar-per-unit basis had it accepted Option A when the offer was made?" and "what would TCL have agreed to pay on a dollar per unit basis had it accepted Option B when the offer was made?" After making these calculations, I compared the results to the "unpacked" dollar-per-unit royalty rates implied by Ericsson's comparable

8

licenses.

19. By calculating the implied dollar per-unit rates for Ericsson's comparable licenses and its Option A and B offers to TCL, I was able to easily see what the Ericsson licensees in question agreed to pay for a license to Ericsson's SEPs, as compared to what TCL would have agreed to pay for a license to Ericsson's SEPs. In brief, I was able to compare what Ericsson's licensees have agreed to pay with what Ericsson asked TCL to pay for the same "product," i.e. the patented standardized technology embodied in Ericsson's SEPs. My results are below in Figures 2-5:

**<u>FIGURE 2: Comparable License 4G Implied Dollar Per-Unit Rates</u>[1]**



---

[1] Exhibit 5314; Exhibit 5330.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 3:  Comparable License 3G Implied Dollar Per-Unit Rates[2]**



**FIGURE 4:  Comparable License EDGE Implied Dollar Per-Unit Rates[3]**

---

[2] Exhibit 5314.
[3] Exhibit 5314.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**FIGURE 5: Comparable License GSM/GPRS Implied Dollar Per-Unit Rates**[4]

20.      Notably, although TCL's financial expert, Dr. Lynde, does not agree with me on multiple aspects of my license analysis, both of us unpacked Ericsson licenses to implied dollar-per-unit royalty rates for a license to Ericsson's 2G, 3G, and 4G SEP portfolios. Figure 2 shows the implied 4G dollar-per-unit rates that I calculated for the comparable licenses and Options A and B, as well as the implied 4G dollar-per-unit royalty rates that Dr. Lynde calculated for a subset of the same licenses (he did not unpack a TCL offer).

---

[4] Exhibit 5314.

**FIGURE 6:  Summary of Implied 4G Dollar Per-Unit Royalty Rates**

| Comparable License | Date | Kennedy | Lynde[5] |
|---|---|---|---|
| Yulong (CoolPad) | Jan. 2013 | ███████ | N/A |
| Samsung | Feb. 2014 | | ████ |
| ZTE | Apr. 2014 | | N/A |
| LG | June 2014 | | ████ |
| HTC | Dec. 2014 | | |
| Sharp | Apr. 2015 | | |
| Option A | May 2015 | $1.54 | N/A |
| Option B | May 2015 | $1.92 | N/A |
| Apple | Dec. 2015 | ████ | ████ |
| Huawei | Jan. 2016 | | |

21.     As demonstrated in Figure 6, if TCL had accepted Ericsson's Option A or Option B offer in May 2015, TCL would be paying royalties to Ericsson that fall well-within the range of what other Ericsson licensees have agreed to pay Ericsson for a license under Ericsson's SEPs—under both my dollar-per-unit analysis and the dollar-per-unit analysis performed by TCL's expert, Dr. Lynde. As I will discuss later in this Declaration, my dollar-per-unit analysis for 2G and 3G, and Dr. Lynde's dollar-per-unit analysis for 2G/3G combined, lead to the same conclusion. This indicates that Option A and Option B were fair and reasonable when offered to TCL.

22.     Option A and Option B are also non-discriminatory. As seen in Figure

---

[5] Exhibit 1229; Exhibit 1230; Exhibit 1232; Exhibit 1245.

6, the 4G dollar-per-unit rates implied by Option A and Option B are lower than the dollar-per-unit rates implied by all but one of the Ericsson comparable licenses. As I will discuss later in my Declaration, my dollar-per-unit analysis for 2G and 3G leads to the same conclusion.

### C.   A Comparable License Analysis Based On Percentage Per-Unit Rates Also Shows That Option A And Option B Are FRAND.

23.   TCL's financial experts, Dr. Lynde and Dr. Ordover, contend that Options A and B are not FRAND because certain Ericsson licensees (Samsung, LG, HTC, Huawei, and Apple) have agreed to pay Ericsson a lower implied percentage of the average selling price (ASP) of their licensed products than the percentage of average selling price royalty rates implied by Options A and B. The major flaw with this reasoning is that Samsung, HTC, LG, Huawei, and Apple all sell mobile phones with significantly higher ASPs than the mobile phones sold by TCL. The ASP for a 4G and 3G mobile phone sold by these companies in 2013-2015, as compared to TCL, is seen in Figure 7 and Figure 8:

### FIGURE 7:  4G ASPs (2013-15)[6]



[6] Exhibit 1000. Apple excluded to prevent warping the scale.



**FIGURE 8: 3G ASPs (2013-15)** [7]

24.     Although Ericsson's licenses with high-ASP companies can be unpacked to arrive at lower implied percentage per-unit royalty rates than those implied by Option A and Option B, the very same companies have agreed to pay implied dollar per-unit rates that are higher than the dollar per-unit royalty rates implied by Option A or Option B.  This shows that TCL is actually advocating for *discrimination in its favor*—TCL wants the Court to award it a low percentage per-unit royalty rate even though TCL is not a high-ASP (or even a mid-ASP) company. TCL sells some of the very cheapest mobile phones in the market. No other Ericsson licensee is licensed under terms anywhere near as favorable as the terms being advocated for by TCL.

25.     The proper way to conduct a percentage per-unit analysis of Options A and B, therefore, is to compare the percentage per-unit rates implied by

---

[7] Exhibit 1000. Apple excluded to prevent warping the scale.

Ericsson's offers with the percentage per-unit royalty rates implied by Ericsson's comparable licenses with companies who sell mid- to low-ASP mobile phones (ZTE, CoolPad, Karbonn, and Doro). When one undertakes this exercise, it becomes clear that the percentage per-unit royalty rates in these licenses are consistent with the percentage per-unit royalty rates set forth in Options A and B. This indicates that Option A and Option B are FRAND.

**D.     Option A and Option B Specify A Release Payment.**

26.     A release payment is a payment made by a licensee to compensate the patent owner for the licensee's unlicensed sales prior to the effective date of the license. Option A and Option B specify a release period that extends backwards to the time that TCL began selling unlicensed 2G mobile phones in 2007, to be calculated using the same royalty terms as for the going-forward license period.

27.     For both Option A and B, the release payment is a very substantial component of the value that flows to Ericsson. This is because, between 2007 and 2015, TCL sold nearly 250 million unlicensed mobile phones, which generated nearly $12 billion in revenue for the company. This is seen in Figures 9 and 10:

15

**FIGURE 9:  TCL's Unlicensed Sales 2007-15 (Units)[8]**



**FIGURE 10:  TCL's Unlicensed Sales 2007-15 (Revenue)[9]**



28.    TCL sold 58 million unlicensed mobile phones in 2015, which generated $2.8 Billion in revenue for the company. Given these figures, it is possible that, if TCL were to agree to Option A or B, its released sales under the license could be roughly equivalent to its future licensed sales.

---

[8] Exhibit 5315; Exhibit 142.
[9] Exhibit 5315; Exhibit 142.

16

**E.     The "Ex Standard" Value Of Ericsson's SEPs Exceeds The Royalties Ericsson Has Requested From TCL.**

29.     In addition to my license analysis, I separately verified that Options A and B were FRAND when offered to TCL by comparing the royalties being requested by Ericsson to the estimated value that Ericsson's patented 2G, 3G, and 4G technology confers upon a mobile device. I call this the "Ex-Standard" approach to valuation because it estimates the value of the technology independent of any value tied to the fact that the technology is incorporated into the standard in question.

30.     In performing my Ex-Standard analysis, I relied upon a technical analysis performed by Ericsson's expert, Dr. Stefan Parkvall. Dr. Parkvall analyzed, among other things, how Ericsson's patented technology led to improvements in the 2G, 3G, and 4G standard over alternatives not incorporating Ericsson's technology.  At a high-level, Dr. Parkvall began by quantifying the technical superiority (in terms of speed, latency, battery life) of a system that incorporates Ericsson's patented technology over a non-infringing alternative system, and he explained how certain improvements to speed, latency and battery life could not have been achieved without Ericsson's patented technology. He then identified ways in which that 2G, 3G, and 4G systems have improved over earlier or different systems (the theoretical non-infringing alternative), including: (i) improved battery life or mobile phone operational time; (ii) faster data speeds; (iii) less latency; and (iv) increased system capacity/network performance. Using the data available to me, I economically quantified the benefits of the technology over earlier technology in relation to these categories of improvements. Finally, to account for the fact that other companies contributed solutions that may work in tandem with Ericsson's technology, I apportioned Ericsson's share of value based

17

on Ericsson's relative share of approved contributions following the methodology identified in a 2010 Signals Research Group report, which measured Ericsson's relative share of approved contributions to wireless standards. I apportioned Ericsson's share of value using data showing Ericsson's approved technical contributions to 3GPP relative to others and found that these improvements, which could not have been achieved without Ericsson's patented 4G inventions, were quite valuable.

31.     **Improved Battery Life.**  Dr. Parkvall estimated that the improvements of 4G "sleep mode" solutions incorporating Ericsson's 4G patents increased battery life by at least 53% over an alternative that would not use Ericsson's 4G patents.  This corresponds to a 53% larger battery capacity required to achieve the same battery life. I determined that this energy efficiency improvement is worth a significant amount to consumers by (i) examining what consumers are willing to pay for additional battery life from an external battery charger, and (ii) reviewing a consumer survey regarding the value placed by consumers in the United States on battery life. Based on these dual analyses, I estimate that consumers value the improved battery life associated with 4G "sleep mode" solutions by around $40 (based on what consumers are willing to pay for an external charger) or around $16 (based on the consumer survey). I then apportioned for Ericsson's share of the economic value of the improved sleep mode, which resulted in an apportioned share for Ericsson of $6.20 and $2.32, respectively.

32.     **Faster Data Speeds.**  Dr. Parkvall determined that 4G technology enables faster data speeds as compared to alternatives that would not use Ericson's 4G patents. To quantify the value of these higher data speeds, I examined earlier surveys that investigated the value that consumers would place on the higher data

18

speeds provided by 4G. Based on the results of an August 2012 survey conducted by International Planning & Research, I calculated that Ericsson's share of the amount that the average consumer was willing to pay for 4G speed over 3G speed was $4.82.  Based on the results of an international survey conducted by Accenture beginning in November 2012, I estimated that the Ericsson's share of the amount consumers were willing to pay for 4G speed over 3G speed was $3.83.

33.    **Other Benefits.**  I also reviewed evidence showing that consumers place value on the benefits associated with lower latency and improved network performance. While I was unable to quantify a specific per-unit value for these improvements in the time allotted for the preparation of my rebuttal report, I was able to conclude that these categories of improvements associated with 4G technology as compared to 3G technology confer meaningful economic value on a mobile device. This means that my overall estimate of the Ex-Standard value of Ericsson's 4G technology—which relies only on my estimate of the value associated with the improved battery life and faster data speed improvements—is conservative.

34.    I concluded that the overall Ex-Standard value of Ericsson's 4G SEP portfolio is significant and further note that this value is higher than the implied 4G dollar-per-unit royalty rates per my unpacking of Ericsson's Option A and B offers to TCL.  My conclusions regarding the overall Ex-Standard value of Ericsson's 4G SEP portfolio are set forth in Figure 11:

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 11:  Ex-Standard Value of Ericsson's Patented Technology**

| Technology Improvement | Ex-Standard Value |
|---|---|
| Improved Battery Life | $16 to $42 per phone |
| Faster Data Rates From 4G Improvements | $26 to $33 per phone |
| Less Latency | $++ |
| Improved Network Performance | $++ |
| TOTAL | $42 to $75++ per phone plus ++other benefits |
| Ericsson's Apportioned Share of Total Ex-Standard Value | $6.15++ to $11.02++ per phone, plus other benefits |

35.    If anything, I believe that these surveys may underestimate what consumers are truly willing to pay for cellular connectivity.  For instance, the fact that only one mobile phone vendor (Apple) sells a mobile device without cellular functionality (the iPod Touch) is a strong indication of the substantial value that cellular connectivity confers on a mobile device. In short, consumers generally do not want to purchase a mobile phone that cannot make a call or send data over a cellular network.  Comparing an Apple iPhone to a comparably equipped Apple iPod Touch, can be viewed as a real-world experiment that provides insight into what a consumer is willing to pay for cellular connectivity.  This is because the key features of the Apple iPod Touch and the Apple iPhone are almost identical. Both allow users to email, surf the internet, watch movies, play music, and much more. But consumers pay substantially more to purchase the iPhone (the device with cellular connectivity).

36.    As I will discuss in detail later in my Declaration, I compared the sales price of the fifth generation iPod Touch against the iPhone 5C in May 2015,

20

and the sales prices of the sixth generation iPod Touch and the iPhone 5S in February 2016. In both instances, consumers paid more than a 100% premium for the iPhone (about $250). Ericsson's apportioned share of this premium is nearly $40 per mobile phone. In contrast, Ericsson is requesting that TCL pay royalties under the Option A or B offers that amount to less than 5% of this value on a per-unit basis. Similarly, the implied per-unit royalty rates from Ericsson's comparable licenses I analyzed in this case are far lower than this value on a per-unit basis.

### F. TCL Can Pay Royalties To Ericsson And Remain Profitable.

37.     TCL's executives and its expert, Dr. Leonard, have contended that TCL cannot afford to pay the royalties being requested by Ericsson and still be profitable. This is a complete non-sequitur. TCL has decided to compete in the market as a low-margin, low-ASP mobile phone supplier. A license to Ericsson's SEPs is an input cost to TCL's mobile phones, just like all other input costs. If TCL were to give away mobile phones for free, that would not render Ericsson's SEPs—or any other input cost—worthless. Nor would it mean that TCL should be able to use Ericsson's patented technology for free. If TCL cannot remain profitable while paying FRAND royalties to Ericsson, as contemplated by ETSI, TCL should raise prices to cover the cost of this input or figure out a way to lower its operational costs to maintain its profitability. In short, FRAND does not permit TCL to undercompensate Ericsson simply because it wants to sell low-cost mobile phones.

38.     In any event, based on my review of TCL accounting documents, I have determined that TCL's plea of poverty is without merit. In reality, TCL's audited financial statements already account for royalty payments to Ericsson. Specifically, since at least 2011, TCL's audited accounts reflect estimated patent royalty payments in what TCL calls an "IPR Provision." The IPR Provision is part

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

of TCL's audited financial statements on both its balance sheet and its income statement.

39.    As I will discuss in more detail later in my Declaration, under standard accounting principles, TCL's management had discretion to estimate the amount of the provisioned-for royalty payments. As seen in Figure 12, in 2013 to 2015, TCL's management chose to estimate royalty rates that were consistent with or higher than the royalty rate set forth in Option B:

**FIGURE 12:  TCL Provisioned-For Rates vs. Option B Rates**

| Tech | TCL IPR Provision For Ericsson | | Option B |
|---|---|---|---|
| | 2013-14* | 2015 | |
| GSM/GPRS | 1.1% | 0.6% | 0.8% |
| EDGE | 1.5% | 0.8% | 1.0% |
| 3G | 1.5% | 1.0% | 1.2% |
| 4G | 3.0% | 1.2% Floor = $1.60 Cap = $3.60 | 1.5% Floor = $2.00 Cap = $4.50 |
| * Includes a 50% discount for sales in China. | | | |

40.    Despite making this IPR provision for royalties owed to Ericsson (and making provisions for royalties owed to other patent owners, as well), TCL still reported positive gross profit margins and net profit margins in 2013-2015. This is seen in Figure 13:

**FIGURE 13: TCL's Profit Margins (2013-2015)**



41.     This shows that TCL is capable of competing profitably in the market while paying the royalties to Ericsson consistent with Option A or B.

## II.     QUALIFICATIONS

42.     I am a patent licensing expert with more than two decades of experience in the telecommunications industry. Currently, I am a Managing Director with Berkeley Research Group, LLC (BRG), a global strategic advisory and expert consulting firm that provides independent advice, data analytics, authoritative studies, expert testimony, investigations, and regulatory and dispute consulting to Fortune 500 corporations, financial institutions, government agencies, major law firms, and regulatory bodies around the world. Since 1996, I have specialized in patent valuation, patent licensing, and patent sales. I have negotiated on behalf of, or served as an advisor to, companies, universities, and inventors, or as an owner and investor in patent portfolios, in more than 150 patent-related transactions. I have negotiated the economic and business terms of license agreements, including running royalty rates and lump sum amounts due for prior and future use of patented technologies. More specifically, I have analyzed and "unpacked" dozens of complex license agreements between major corporations,

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

including running royalty, lump sum, and fixed payment cross licenses involving past and future obligations and other consideration exchanged between the parties in order to determine the effective royalty rates on both dollar-per-unit and percentage of sales price basis.

43.     I have evaluated whether royalty rates for licensing agreements related to SEPs between companies are compliant with the SEP owner's licensing commitments to standard setting organizations, including the European Telecommunications Standardization Institute (ETSI). I have valued portfolios of SEPs as part of investor due diligence and royalty stream valuations. I have estimated the FRAND royalties that large SEP owners could expect from specific licensees as compensation for use of their SEP portfolios. I have bought and sold patents for investors, inventors, and as a principal investor.

44.     I have spent a significant portion of my career advising intellectual property (IP) rich companies, the United States government, and major universities.  Typically, companies that hire me are contemplating large licensing transactions or patent sales, involved in an IP licensing dispute, or need my expertise in designing and implementing a patent licensing program. I have served as an IP licensing and valuation expert to dozens of IP owners and stakeholders, including, Nokia, Sprint, T-Mobile, US Cellular, AT&T, the United States Department of Justice, and others.  Additionally, I have valued and provided transaction advisory services in connection with IP deals and license agreements for major universities in the United States.

45.     In addition to advising and negotiating one-way license agreements, I have a significant amount of experience analyzing cross-licenses and the impact that major divestitures and acquisitions of patents have on a cross-license agreement between two companies, from the standpoint of royalties due and the

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

impact on future potential claims for infringement damages, and determining the balancing payment.

46.     My professional experience started over thirty years ago as a Certified Public Accountant for Coopers & Lybrand (now PriceWaterhouseCoopers). In addition to my patent valuation and patent license negotiation experience, I have provided forensic consulting services in over fifty litigation matters and have testified as an IP licensing and patent damages expert witness at arbitration, in the United States Court of Federal Claims, and in federal and bankruptcy courts in the United States regarding reasonable royalties, lost profits, and other forms of economic damages related to intellectual property licensing and valuation and other complex commercial litigation.

47.     I have significant experience with accounting matters, in particular with setting reserves and auditing financial statements and with assessing the impact of reserves for future liabilities and losses on the overall solvency and viability of an entity.  As part of my career as a CPA over the last 31 years, I have audited financial statements that included significant reserves for future potential liabilities, assisted clients in properly establishing reserves for potential liabilities. I have also been recognized as an IP licensing expert and a forensic financial expert related to financial statement provisions and accruals for future liabilities in the Court of Federal Claims on numerous occasions.

48.     In 1998, I co-founded one of the largest IP valuation consultancies (InteCap, later acquired by Charles River Associates International). I led its IP Transactions and Licensing Group and served on the board of directors from 1998 through 2003. I have served as an IP valuation and licensing specialist for several other consulting companies, including Peterson Consulting (1992 – 1998), now a part of Navigant Consulting, and Intellectual Property Asset Corporation (2004 –

25

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

2006). As part of my work with all of those entities, I provided consulting services to numerous clients in the process of developing and implementing patent licensing programs.

49.     I have invested in and raised venture capital for a number of IP-focused companies, including IP licensing companies. I have purchased patents and implemented licensing programs as an owner and manager of patent portfolios and on behalf of investor groups. I have assisted major corporations in designing and implementing patent licensing programs.

50.     I earned a Bachelor of Science degree in Business Administration from the University of Georgia with a major in accounting in 1985. I have been licensed as a Certified Public Accountant (CPA) in Georgia since 1987, and I am a member of the American Institute of Certified Public Accountants (AICPA).  I am a member of the Licensing Executives Society (LES).  Intellectual Asset Management, known as IAM, one of the leading intellectual property periodicals, has recognized me as one of the world's leading IP strategists for the past six years (2010-2016). I have been invited to teach conference courses and speak to licensing industry organizations at over a dozen major IP conferences around the world. The conference lecture topics that I have been invited to lead and or teach by corporate and legal organizations have included negotiating the economics of license agreements, comparable license agreements, determining reasonable royalty rates, and determining the appropriate valuation techniques to apply to patents in different valuation contexts.  The participants at these conferences were primarily IP lawyers, CPAs specializing in IP valuation, and in-house licensing professionals responsible for managing, valuing, and licensing patent portfolios.

51.     I have determined reasonable royalty rates in connection with dozens of business transactions in the telecom field. For example, over a number of years,

AT&T hired me to determine reasonable royalty rates for segments of their patent portfolio to assist in numerous licensing negotiations and assist them in developing licensing offers to send to third-party prospective licensees.

## III.    SCOPE OF ENGAGEMENT

52.    I have been retained on behalf of Ericsson to investigate and offer my opinions regarding:

- whether the royalty rates specified in Ericsson's Option A and Option B offers to TCL are consistent with the range of royalty rates derived from Ericsson's comparable licenses;

- whether Ericsson has complied with its contractual commitment to ETSI to license its 2G, 3G, and 4G SEPs on fair, reasonable, and non-discriminatory (FRAND) terms and conditions, in relation to TCL;

- my assessment of the value of Ericsson's  SEPs apart from their inclusion in the cellular standards. As a starting point, I was asked to study Dr. Stefan Parkvall's opinions regarding the specific technical benefits of Ericsson's  SEPs and to determine incremental values associated with those technical benefits apart from any value created from their inclusion in the standards; and

- the overall financial impact to TCL's margins and product costs that would result from TCL accepting Option A or B.

53.    I was also asked to review and critique the opinions expressed by TCL's financial experts, Dr. Lynde and Dr. Leonard, and anticipate submitting a rebuttal declaration later this month after I review their direct testimony. In preparing my opinion, I was assisted by BRG staff members but the analysis and opinions expressed in this witness statement are my own.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

## IV.   BACKGROUND

### A.   Ericsson.

54.   Ericsson was founded in 1876, and is based in Stockholm, Sweden. The Company employs over 113,000 people worldwide.  It is one of the largest suppliers of cellular infrastructure equipment, as well as providing services and software for networks.  In his witness statement, Mr. Brismark describes Ericsson's investments in research and development:[10]

> Ericsson prioritizes innovation, and for decades has invested approximately 15% of its annual net sales back into research and development activities. In the past five years, this investment has totaled between 32 and 36 billion Swedish Kronor ($4-5 Billion) annually. More than 23,000 Ericsson employees—around 20% of the Company's total workforce—work in research and development.

55.   Ericsson's intellectual property rights (IPR) strategy is designed to both avoid costs and generating revenue.  As to the former, Ericsson's substantial patent portfolio provides it with freedom to operate via cross-licenses as opposed to paying cash royalties.  Additionally, its status as a net receiver of royalties reduces its product cost base and improves its ability to compete in the market.[11] As to the latter, Ericsson generates revenues through various methods—bilateral licensing, participation in joint licensing platforms, and through selected patent divestments. Ericsson has granted more than 150 patent licenses under its 2G, 3G,

---

[10] Brismark Witness Decl. ¶ 12.
[11] Brismark Witness Decl. ¶ 56.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

and 4G SEP portfolios, to most of the leading industry participants.[12]

### B. TCL.

56.     Founded in 1999, TCL is mobile phone manufacturer and internet service provider with its headquarters in Shenzhen, China. TCL sells mobile devices in more than 170 countries and employs around 15,000 individuals worldwide.[13]  As of March 25, 2016, TCL had a market capitalization of HK$ 6.57 billion (US $847 million).  Unlike many other China-based mobile phone suppliers, TCL's sells its products almost exclusively outside of China. In 2015, more than 90% of TCL's revenues from sales of mobile devices were generated from sales outside of China.[14]

57.     As recently as 2011, TCL sold only a negligible number of smartphones,[15] and instead sold mostly inexpensive feature phones that accounted for nearly 90% of its revenues.[16] TCL's smartphone sales have grown since 2011, however, and today account for around 90% of TCL's revenues (which are now double its revenues in 2011).[17] TCL's mobile phones are generally low-ASP models. In 2015, for example, more than 70% of the mobile phones sold by TCL in the United States were pre-paid ("burner") phones to low-cost carriers such as Tracfone, MetroPCS, and Cricket.[18]

58.     In 2015, TCL was the sixth largest mobile phone vendor worldwide (by sales volumes). This is seen in Figure 14:

---

[12] Brismark Decl. ¶ 52.
[13] Exhibit 1140, at 27.
[14] Exhibit 5315.
[15] Exhibit 1099.
[16] Exhibit 1099 at Reporting P&L.
[17] Exhibit 1140 at 27; Exhibit 1099 at Reporting P&L.
[18] Exhibit 1100.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 14:  Sales Volumes of Major Ericsson Licensees (2015)[19]**



TCL is fairly unique among its high-volume peers in that nearly all of its sales are of feature phones or less advanced smartphones.  In 2015, for example, over 80% of TCL's mobile phone sales were 2G and/or 3G feature phones or simple smartphones. In contrast, by 2015, all of the other high-volume companies were selling predominately 4G smartphones. This is seen in Figure 15:

**FIGURE 15:  4G Smartphone v. 2G/3G Handset Product Mix (2015)[20]**



---

[19] Exhibit 1000; Exhibit 142.
[20] Exhibit 1000; Exhibit 142.

30

59.     Similarly, in 2015, 45% of the mobile phones sold by TCL were feature phones, whereas the other high-volume companies had largely phased out their feature phone business.  This is seen in Figure 16:

**FIGURE 16:  Smartphone v. Feature Phone Product Mix (2015)** [21]



60.     By way of example, if comparing TCL to Huawei in 2015, more than 75% of Huawei's mobile devices sold were smartphones, and less than 1% were feature phones. The mobile devices sold by TCL, in contrast, were roughly 55% smartphones and 45% feature phones.

61.     Relatedly, as I noted earlier, TCL sells primarily very low-priced mobile phones. Figures 17 and 18 show that, in 2015, TCL's average retail sales prices for 4G and 3G mobile phones were lower than the average retail sales prices of other Ericsson licensees:

---

[21] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 17:  Average Retail Sales Price for 4G Units (2015)[22]**



**FIGURE 18:  Average Retail Sales Price for 3G Units (2015)[23]**



62.    As seen in these figures, TCL has successfully grown its business by selling low-end 2G/3G phones at lower price points, while other high-volume companies have shifted to selling more advanced 4G smartphones. Now, as TCL expands its sales of 4G mobile phones, it appears to be pursuing the same strategic

---

[22] Exhibit 1000. Apple excluded to prevent skewing the axis.  Doro excluded because it sold only a small number of 4G units.

[23] Exhibit 1000.  Apple excluded because it only sold a small number of 3G units and presenting the Apple 3G ASP would skew the chart.

plan, as seen by the fact that it primarily sells low-cost "burner" 4G mobile phones in the United States.

63.    While TCL's business has expanded over the past several years, it has sold a continually increasing number of mobile phones that have not been licensed under Ericsson's SEPs. TCL has never been licensed under Ericsson's 2G EDGE, 3G, or 4G SEPs, and only one TCL subsidiary (TCT Mobile Limited) has been licensed under Ericsson's 2G GSM/GPRS SEPs.[24] The Ericsson/TCT license was effective from March 6, 2007 to March 6, 2014.[25] Since its expiration, no TCL entity has been licensed under Ericsson's SEPs.

64.    Using reports made to Ericsson by TCT Mobile Limited during the term of the 2007 license and TCL's reported sales data, I have estimated that 65% of TCL's GSM/GPRS sales from 2007 through the first quarter of 2014 (when the 2007 license expired) were not licensed under Ericsson's GSM/GPRS SEPs.[26] All of TCL's 2G EDGE, 3G, and 4G sales, and all of TCL's 2G GSM/GPRS sales after the first quarter of 2014, have been unlicensed. These unlicensed sales generated nearly $12 billion in revenue for TCL, and total around 250 million unlicensed mobile devices, between 2007 and 2015. This is seen in Figures 19 and 20:

---

[24] Brismark Decl. ¶¶ 76-78.
[25] Exhibit 165.
[26] Exhibit 5311.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 19:  TCL's Unlicensed Sales 2007-15 (Revenue)[27]**



**FIGURE 20:  TCL's Unlicensed Sales 2007-15 (Units)[28]**



## V.   THE FRAND COMMITMENT

65.   I understand that Ericsson has contractually committed—by way of its submission of IPR licensing declarations to ETSI—that it is prepared to grant licenses under its 2G, 3G, and 4G SEPs consistent with Clause 6.1 of ETSI's IPR

---

[27] Exhibit 5315; Exhibit 142.
[28] Exhibit 5315; Exhibit 142.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Policy.[29] This undertaking is commonly referred to as the "FRAND commitment."

66.     I understand from Ericsson's expert, Dr. Bertram Huber, that ETSI has intentionally declined to more specifically define "fair," "reasonable," and "non-discriminatory," electing instead for "FRAND" to be a flexible construct.[30] I further understand that the FRAND commitment does not require the patent owner to offer the exact same terms and conditions to every prospective licensee, instead allowing for a range of terms and conditions reasonably tailored to individual circumstances.[31]

67.     I understand from Ericsson's expert, Professor Bénédicte Fauvarque-Cosson, that (i) the FRAND commitment is interpreted pursuant to French law, and that (ii) where the terms of a contract are undefined or unclear, a French court may resort to elements exterior to the parties to the contract, including commercial practices and industry usage, to interpret the undefined terms.[32]  My opinions and expertise regarding commercial licensing practices in the telecommunications industry, will therefore provide guidance relevant to interpreting the FRAND commitment in the context of Ericsson and TCL. I further understand from Dr. Teece (and agree with him) that there is no universally accepted definition of the terms fair, reasonable, and non-discriminatory.[33]

68.     In my opinion, the best methodology for assessing whether a license offer specifies FRAND terms and conditions for a license under a SEP portfolio is an analysis of licenses previously granted under the same patent portfolio (the

---

[29] Fauvarque-Cosson Witness Decl. ¶ 17.

[30]  Huber Witness Decl. at ¶ 40.

[31] Huber Decl. at ¶ 42.

[32]  Fauvarque-Cosson Witness Decl. at ¶¶ 28, 31.

[33] Teece Witness Decl. at ¶ 64.

market value approach). More specifically, in my opinion, if the patent owner is prepared to grant a license to a prospective licensee on terms and conditions that are within the range of those previously agreed to by other similarly situated companies, the patent owner has satisfied its FRAND commitment to the prospective licensee. The patent owner need only be prepared to grant a license to the prospective licensee on terms and conditions within that range (whether at the top or bottom or in between) to satisfy its FRAND commitment.

69.     A flexible definition of FRAND is consistent with my experience as a professional patent license negotiator. Companies have a wide variety of attributes, assets, objectives, and needs, and bilateral license negotiations allow the negotiating parties to tailor their ultimate agreement to account for those particular characteristics. It would be very difficult, and perhaps impossible, for the owner of a substantial patent portfolio to develop and implement a rigid "one-size-fits-all" approach for use in its license program, especially when the alternative is most likely protracted and costly litigation. A flexible definition of FRAND allows for parties to reach negotiated agreements that accommodate their respective business interests, without having to resort to lengthy and costly alternatives.

## VI.   COMPARABLE LICENSES ARE THE BEST MEASURE OF WHAT IS FRAND

70.     In my experience as a patent portfolio owner and license negotiator, I have found that analyzing comparable licenses (the market approach) is the best methodology for estimating a range for FRAND royalty rates for a license to a SEP portfolio. This is because the licenses that emerge from bilateral negotiations provide the best source of economic and technical information relevant to determining an appropriate range of FRAND royalty rates for a patent portfolio. In short, comparable licenses distill a great deal of exchanged economic information

36

into one package – the "price" or fully negotiated royalty rate that the licensee agrees to pay to use the licensed technology.

71.    Because each comparable license is the product of a unique negotiation between parties with their own subjective expectations and perspectives regarding sales expectations, future product types and pricing, relative patent portfolio strength, etc., a *range* of royalty rates is to be expected when analyzing comparable licenses. This range of royalty rates is the best indicator of FRAND terms for a license to the patent portfolio for several reasons.

72.    *First*, the royalty rates that emerge from bilateral negotiations reflect the parties' combined assessment of the contemporaneous market conditions (price points, competition from new entrants and new products, etc.). For example, licenses executed in the 2013 to 2015 time period will reflect the parties' then current views on (i) mobile phone ASPs (which trended downward in 2013-2015); (ii) the worldwide shift towards 4G as it became increasingly available; (iii) the emergence and rapid sales growth of low-ASP companies (which captured significant market share by volume in this time period), (iv) an increasing number of new mobile phone suppliers entering the market; (v) the growing shift to smartphones and away from feature phones; and (vi) other upstream and downstream changes in the mobile phone value chain, e.g. changes in the make-up of component suppliers, new network operator (buyer) markets, etc.

73.    *Second*, in addition to reflecting general industry trends, the royalty rates that emerge from bilateral negotiations reflect the contracting parties' collective assessment of the strengths and weaknesses of, and assessments of the value of, Ericsson's SEP portfolios specifically. Ericsson's experts, Mr. Luke McLeroy and Mr. Patricio Delgado, explain this in their testimony, where they discuss how Ericsson's SEP licenses are the result of many intensive, arms-length

37

negotiations between sophisticated parties, involving dozens of engineers, attorneys, and licensing professionals.[34]

74.    *Third*, the royalty rates that emerge from Ericsson's comparable licenses are generated as part of Ericsson's ongoing licensing program, and therefore self-update as new licenses are consummated over time. I call this "market-based price discovery," and its collective and ongoing nature renders it less biased than the discovery into the views of Ericsson or TCL alone.

75.    *Fourth*, Ericsson's existing mobile phone licenses cover roughly 80% of 4G mobile phone sales and 50% of 3G mobile phone sales on a revenue basis, and approximately 63% of 4G mobile phone sales and 43% of 3G mobile phone sales on a unit basis.[35] This means that the royalty rates found in Ericsson's comparable licenses represent an industry-wide assessment of the value of Ericsson's SEP portfolios.

76.    The comparable license analysis is well-accepted by economists, licensing and valuation professionals. I have never negotiated a license agreement where the most important factor was *not* "how much have others paid." It has been my experience over the course of my career that comparable license analysis is commonly used and typically relied upon in patent valuation and license negotiation settings.

77.    Additionally, courts in the United States recognize that a comparable license analysis is a superior method of valuing a patent portfolio. For example, two of the most important factors set forth in the often cited *Georgia-Pacific* case (which employed a hypothetical negotiation framework between a licensor and

---

[34] McLeroy Witness Decl. at ¶¶ 8-21; Delgado Witness Decl. at ¶¶ 37-47.
[35] IDC Sales Data, Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

licensee for a reasonable royalty to be paid for use of asserted patented technology) are the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty (Factor 1) and the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions (Factor 12).[36] More recently, in *Laser Dynamics*, the United States Court of Appeals for the Federal Circuit instructed that "[a]ctual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure," and that "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the market place."[37] In 2014, in *Apple v. Motorola*, the United States Court of Appeals for the Federal Circuit confirmed that "using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent" when calculating damages for infringement of a SEP.

78.     Based on all of the above, it is my opinion that an analysis of comparable licenses is the most appropriate and widely accepted methodology for evaluating whether Option A and Option B were FRAND when offered to TCL. Importantly, when undertaking this evaluation, it is important to recognize that Option A and Option B were offered to TCL in May 2015. At that time, Ericsson's universe of licenses did not include any licenses executed after May 2015. Because

---

[36] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970)

[37] *Laser Dynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

Ericsson's future licenses were unknown to it at the time the offers were made, those licenses are less relevant than pre-May 2015 licenses to my analysis of whether Option A and Option B are FRAND.

## VII.   EVALUATING FRAND ROYALTY RATES ON A DOLLAR-PER-UNIT BASIS

79.     Based on my experience as a licensing professional and financial expert, it is my firm opinion that a comparable license analysis performed for the purpose of evaluating Options A and B should be undertaken on a dollar-per-unit comparative basis. This is because I view Ericsson's SEPs as an input to a mobile phone, just like any other input (e.g. battery, screen, antenna, etc.) into the product. Adding additional inputs to a mobile phone (for example, a camera, or voice recognition software, or gold plating) does not reduce the value of the existing inputs (e.g. battery, screen, antenna, SEPs). A SEP owner should be compensated for the value that its input confers on the mobile phone regardless of the ASP of the mobile phone, just as a battery supplier will be compensated at the same rate for the cost of the battery it sold to the mobile phone supplier regardless of the ASP of the mobile phone that incorporates the battery. Naturally, if SEP owners are not sufficiently compensated for the use of their inputs to mobile phones, the incentive for the patent owners to continue to innovate would be diminished.

80.     Because I view standardized technology as an input to a mobile phone, just like any other input (battery, screen, antenna, etc.), I have asked "what is the cost of this input?" Inputs such as batteries and antennas have a fixed dollar per-unit cost to the mobile phone supplier, as should SEPs (to ensure that SEP owners are incentivized to continue innovating, as discussed above). To determine the cost of the input in question—i.e. Ericsson's SEPs—I have derived dollar per-unit royalty rates from Ericsson's comparable licenses. And it is this range of

dollar per-unit royalty rates expressed by Ericsson's licenses that provides the range of what would be a fair, reasonable, and non-discriminatory royalty rate for TCL to pay for a license under Ericsson's SEPs.

81.     Viewing Ericsson's SEPs as an input into a mobile phone with a dollar per-unit cost automatically takes into account the sales price that the manufacturer charges for its devices. This avoids the "race to the bottom" that I discussed earlier which, if left unchecked, could drive FRAND royalties to negligible levels, deterring continued participation in standardization activities as a result. Former United States District Court Judge Holderman highlighted this issue in his decision in his opinion in *In re Innovatio* (a case involving RAND-committed patents), when he explained that "it is implausible that in the real world, patent holders would accept effectively nothing to license their technology"[38] and that "such a low return would discourage future innovators from investing in new technology and from contributing their technology to future standards."[39]

82.     Viewing Ericsson's SEPs as an input into a mobile phone with a dollar per-unit cost also avoids the potential for a wide variation in cash payments made by licensees that exists when viewing the cost of Ericsson's SEPs in terms of percentage per-unit rates. For instance, two licensees could be paying a 2% royalty to the same patent owner for a license to the same SEP portfolio; but if Licensee A has an average ASP of $1000 and Licensee B has an average ASP of $100, then Licensee A is paying ten times as much on a dollar per-unit basis than Licensee B. This is seen in Figure 21:

---

[38] *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609, at *37 (N.D. Ill. Oct. 3, 2013).

[39] *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609, at *37 (N.D. Ill. Oct. 3, 2013).

FIGURE 21

|  | LICENSEE A | LICENSEE B |
|---|---|---|
| ASP | $1000 | $100 |
| 2% royalty rate | $20 | $2 |

83.   By extracting dollar per-unit rates instead of percentage per-unit rates from the Ericsson comparable licenses, and comparing the dollar per-unit rather than percentage per-unit rates to Option A and Option B, this potential problem is avoided entirely with regard to future payments made by TCL.

84.   Extracting dollar per-unit rates instead of percentage per-unit rates from the Ericsson comparable licenses, and comparing the dollar per-unit rather than percentage per-unit rates to Option A and Option B, also ensures that TCL will pay for a license consistent with Ericsson's high-, mid-, and low-ASP licensees. For example, Apple sells high-ASP mobile phones, Huawei generally sells mid-ASP mobile phones, and TCL sells mainly low-ASP mobile phones.[40] All three companies need to "purchase" the same Ericsson's SEP input for their mobile phones, and it is logical that there should be a range of dollar per-unit amounts that would correspond to the value of the input.

85.   Naturally, however, each prospective licensee will attempt to "purchase" the SEP input from Ericsson at the lowest possible "price." A low-ASP company will insist that the SEP owner's FRAND commitment mandates that it offer requires a percentage per-unit royalty, and a high-ASP company will insist that the SEP owner's FRAND commitment requires it to offer a dollar per-unit royalty. Similarly, a low-ASP company will argue that the SEP owner's licenses

---

[40] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

should be unpacked to percentage per-unit royalties and a high-ASP company will argue that the same licenses should be analyzed on a dollar per-unit basis. And if both the low and high-ASP companies are permitted to engage in their unpacking methodology of choice, and to mandate the royalty structure of their license with Ericsson, the result would be a downward pricing spiral that would devalue Ericsson's SEPs to almost zero. This is the "race to the bottom" seen in Figure 1:

**FIGURE 1: Race to The Bottom**



86.     The danger of a race to the bottom is particularly acute in this litigation, where the Ericsson comparable licenses contain a wide variety of terms and are with a wide variety of mobile phone suppliers who sell at low, mid, and high price points. In my opinion, rational interpretation of FRAND cannot be one that encourages a race to the bottom to the benefit of the prospective licensee, and the detriment of the SEP owner. Indeed, this would run contrary to the objectives

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

of the ETSI IPR Policy, as discussed by Ericsson's experts Dr. Teece and Dr. Huber.[41]

87.     Finally, viewing Ericsson's SEPs as an input to a mobile phone with a dollar per-unit "price" will ensure that TCL and other prospective Ericsson licensees compensate Ericsson at actual or implied dollar per-unit rates that are in the range of dollar per-unit rates paid by other companies for the majority of the mobile phones licensed under Ericsson's SEPs. Together, Ericsson's comparable licenses cover approximately 80% of the 4G mobile phone market (by revenue) and approximately 63% of the 4G mobile phone market (by units), as well as approximately 50% of the 3G mobile phone market (by revenue) and approximately 43% of the 3G mobile phone market (by units).[42] It is fair to conclude that Ericsson's existing licensees (and by reference, a substantial portion of the mobile phone market) would not accept TCL being granted preferential royalty rates in this litigation via a low percentage per-unit rate on its low-ASP mobile phones. This is especially true for Ericsson's existing licensees because, unlike TCL and numerous other low-ASP companies who have captured meaningful market share in recent years while holding out from paying SEP royalties, they are paying royalties for their use of Ericsson's SEPs. Indeed, with just one exception (4G SEPs owned by Qualcomm, TCL has not licensed any 4G SEPs at all.

88.     For all of these reasons, I conclude that a comparable license analysis on a dollar per-unit basis rather than a percentage per-unit basis is the appropriate methodology for evaluating whether Option A and Option B are FRAND. I will

---

[41] Huber Witness Decl. ¶¶ 32-34; Teece Witness Decl. ¶¶ 10, 64-67.
[42] Exhibit 5313.

now discuss my comparable license analysis.

## VIII.  COMPARABLE LICENSE ANALYSIS

### A.      Summary of Comparable License Analysis Results.

89.     Based on my analysis of comparable licenses, I have concluded the following:

- All of the licensees at issue have agreed to pay royalties that unpack to more than ▮▮▮▮ per 4G mobile phone, and multiple licenses have agreed to pay royalties that unpack in excess of ▮▮▮▮ per 4G mobile phone;

- The dollar per-unit rates implied by Option A and Option B are within the range of dollar per-unit rates implied by Ericsson's comparable licenses;

- The percentage per-unit rates implied by Option A and Option B offers also fit within the range of effective rates of the comparable licenses; and

- The royalty rates that TCL is demanding are discriminatory.  TCL is seeking lower percentage per-unit royalty rates than those that are paid by higher-ASP companies. No other low-ASP mobile phone supplier receives that benefit.  In other words, TCL wants both a lower percentage per-unit royalty and a lower dollar per-unit royalty.  This is unsupported by Ericsson's comparable licenses, which instead show that Ericsson's licensees have uniformly agreed to pay a significant amount for a license to Ericsson's SEPs.

90.     Below I summarize my license-unpacking results for the comparable licenses with those licensees with sales volumes of more than around one million mobile phones annually. As can be seen, the dollar per-unit royalty rates implied by Ericsson's Option A and Option B offers fall well within the range of the dollar per-unit royalty rates implied by Ericsson's comparable licenses. This is seen in

45

Figures 22-25:



**FIGURE 22:  Comparable License 4G Effective Rates**

**FIGURE 23:  Comparable License 3G Effective Rates**

**FIGURE 24:  Comparable License EDGE Effective Rates**

**FIGURE 25:  Comparable License GSM/GPRS Effective Rates**



91.    To my knowledge, TCL has never made a counter-offer to Option A or Option B. But through its experts, TCL appears to demand that it receive a license with the lower implied percent royalty rates contained in the lump-sum agreements.  But TCL does not share the same attributes that made the lower implied percent per-unit rates appropriate for those companies.  Unlike Apple, Samsung, or HTC, TCL primarily sells less advanced, low-ASP mobile phones. The lump-sum licenses demonstrate that only high-ASP companies have received the lower percent per-unit royalty rates.  The reason is fairly obvious: the lower percent per-unit rates yield substantial dollar per-unit rates when applied to high-ASP mobile phones.  This is seen in Figures 26 and 27:

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**FIGURE 26:  Comparable Licensee 4G ASPs (2013-2015) By License-Type[43]**

**FIGURE 27:  Comparable Licensee 3G ASPs (2013-15) By License-Type[44]**

92.      Low-ASP companies (*i.e.* ZTE, CoolPad, Karbonn) pay running royalty rates that yield similar dollar per-unit rates as Ericsson's fixed payment

---

[43] Exhibit 1000.
[44] Exhibit 1000.

licenses.  Applying a lower percentage per-unit rate implied by a fixed payment license with a high-ASP company to a low-ASP company like TCL will yield a much lower dollar per-unit royalty rate than what is implied by any Ericsson comparable license (high-ASP or low-ASP).  In essence, TCL is asking for discrimination in its favor vis-à-vis the entire mobile phone industry. If FRAND were to require that TCL be given the percentage per-unit rates that high-ASP companies receive, then FRAND would become an inflexible policy that dictates a one-size-fits-all outcome. Worse yet, if FRAND were to require that TCL be offered the percentage per-unit rates that high-ASP companies receive, then Ericsson would face an inescapable downward price spiral.  Ericsson and the high-ASP companies negotiated fixed-payment licenses that imply substantial dollar per-unit rates, which are similar to the implied dollar per-unit rates agreed to by Ericsson and the low-ASP companies in percentage per-unit licenses. This will cause the race to the bottom that I have discussed.

93.     According to the ETSI IPR Policy, Ericsson is entitled to fair compensation for its inventions.  Options A and B, if accepted by TCL, would fairly compensate Ericsson for TCL's use of Ericsson's SEPs consistent with what other Ericsson licensees are paying for access to the same SEPs. Nor is TCL being singled-out. After accounting for ASP differences, TCL will be paying Ericsson less than most other Ericsson licensees.  For example, Ericsson's Option A works out to be $1.53 for 4G.  In 2015, ████████ comparable licenses required the licensee to compensate Ericsson at more than $1.53 per 4G mobile phone. Similarly, under Option B, TCL would be required to compensate Ericsson at $1.92 per 4G unit. Even at this higher amount, TCL will be compensating Ericsson at a lower rate than ████████ comparable Ericsson licensees. In short, the comparable licenses show that Ericsson is fairly and substantially compensated for

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

a license under its SEPs by its existing licensees. TCL should be required to do the same.

## B. Steps Of Comparable License Analysis.

### 1. Identifying Comparable Licenses.

94. Ericsson has entered into over 150 licenses over the past two decades. For purposes of evaluating Option A and B, I selected comparable licenses as follows: (i) the licensee supplies mobile phones; (ii) the effective date of the license (or amendment) is between 2013 and 2015; and (iii) the licensee sells sufficient mobile phones such that its sales are tracked by third-party market analyst IDC. I designed these criteria to capture as much market information as possible for companies that supply the same products (mobile phones) as TCL. As explained by Dr. Teece, some of the comparable licenses are between Ericsson and mobile phone suppliers who are more similarly situated to TCL than others—Coolpad, ZTE, Sharp, and Karbonn are more similarly situated to TCL than Samsung, HTC, LG, Huawei, and Apple.[45] But all of the comparable licenses represent a transaction that provides market-based information with some utility.

95. Using the criteria above, I have identified the following comparable licenses and license amendments:

- Apple (2015)
- Audioline 3G/4G (2014)
- Audioline 2G (2014)
- Beafon 3G/4G (2014)
- Beafon 2G (2014)
- Binatone 3G/4G (2014)

---

[45] Teece Witness Decl. ¶¶ 121-129.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- Binatone 2G (2014)

- Bullitt 4G (2014)

- Bullitt 2G/3G (2014)

- CoolPad/Yulong (2013)

- Doro 4G (2013)

- Doro 3G  (2013)

- Doro 2G (2014)

- Emporia 2G/3G (2015)

- Emporia 4G (2015)

- HTC (2014)

- Huawei (2014)

- Karbonn (2013)

- Karbonn (2015)

- LG (2014)

- Mobistel 4G (2014)

- Mobistel 2G/3G (2014)

- Samsung (2014)

- Sharp (2015)

- ZTE 4G (2014)

- ZTE 2G/3G (2015)

96.     Generally, Ericsson receives payment from these licensees through two kinds of royalty structures:  fixed (also called lump-sum) payments and running royalty payments. The fixed payment licenses tend to be with high-ASP companies that sell very large volumes of mobile phones, and that compensate Ericsson with both cash and non-cash consideration under the license.  In 2014 and 2015, Samsung, Apple, LG, and HTC all negotiated lump-sum agreements.  The

51

two largest lump-sum agreements (Apple and Samsung) include an option for the licensee to pay on a fixed dollar per-unit rate instead of on lump-sum terms.

97.     The majority of the Ericsson comparable licenses are running royalty rate agreements.  With a few notable exceptions (e.g. ████████, most of the running royalty rate licensees pay Ericsson in cash without any significant value attached to the cross-license.  Several significant mobile phone suppliers pay royalty rates consistent with the percentage per-unit royalty rates contained in Option B to TCL, including ██████████ and Karbonn. Other lower-volume mobile phone suppliers pay similar rates.

98.     Viewing the comparable licenses collectively (lump-sum and running royalty), a pattern emerges.  While percentage per-unit terms vary across licensees, all of the licensees pay substantial dollar per-unit rates.  Some high volume, high-ASP companies agreed to fixed payment licenses with lower implied percentage per-unit rates, but substantial dollar per-unit rates. Other low- and medium-ASP companies agreed to higher percentage per-unit rates licenses that yield similar, substantial implied dollar per-unit rates as well. This is seen in Figures 28 and 29:

### FIGURE 28: Comparable License Analysis (4G)



**FIGURE 29: Comparable License Analysis (4G)**



### 2.    Determining Implied Royalty Rates For Comparable Licenses.

99.    After selecting the Ericsson comparable licenses, I turned to determining the royalty rates implied by the comparable licenses. Extracting implied royalty rates is often a difficult task and can require a significant amount of analysis and financial modelling.  The structure and terms of a license can vary significantly.  Licenses can be based on running royalty payments, lump-sum payments, cross-license value, non-cash consideration or some combination of one or more of these and potentially other components.  Additionally, running royalties can be calculated on a percentage of sales basis, on a dollar-per-unit basis or as a 'hybrid' using percentage of sales combined with dollar-per-unit royalty caps and floors.

100.    The most important aspect of a license agreement for licensing experts when analyzing license agreements is to identify what a licensee really paid for a

53

license when converted to current dollars for comparison.  In order to do this, it is often necessary to 'unpack' license agreements to determine the true value and the effective royalty rate that the parties agreed to.  The unpacking process is similar to a hypothetical negotiation in a patent damages analysis, in that it involves placing yourself in the shoes of the parties at the time they were originally negotiating the license to determine the true value that each party agreed to.

101.   The methodology for unpacking a license depends on the structure of the license.  Ericsson's licenses are structured based on two different criteria:

- <u>One-Way v. Two-Way Licenses.</u>  Every Ericsson license is structured as a cross license.  However, most licensees do not own a portfolio of patents that confers meaningful grant back value to Ericsson. In such a license, the licensee typically compensates Ericsson for the license with cash payments only. I refer to these licenses as One-Way licenses.  Other licensees own a SEP portfolio and, as a result, the cross license confers meaningful grant back value on Ericsson. These licensees typically compensate Ericsson with cash payments and with grant back (i.e. cross-license) value.  I call these licenses Two-Way Licenses.

- <u>Running Royalty v. Fixed Payment Licenses.</u>  Licensees make royalty payments in several forms.  Some licenses are structured where the licensee pays a royalty on each unit sold.  These licenses are called running royalty licenses.  Other licenses are structured where the licensee makes a fixed payment (either all upfront or at the beginning of each year) to cover all sales in a given time period.  These licenses are called fixed payment or lump-sum licenses.  Sometimes a fixed payment license may give the licensee the option of paying a running royalty rate or may require the licensee to make running royalty payments after its sales exceed a certain threshold that was covered by a fixed payment.

102.   These two criteria yields four kinds of licenses, as seen in Figure 30:

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 30:  Categorizing Licenses**

| | TWO-WAY LICENSE | ONE-WAY LICENSE |
|---|---|---|
| **Fixed Payment Licenses** | Samsung 2014[a]<br>LG 2014<br>HTC 2014<br>Apple 2015[a] | **Offer – Option A** |
| **Running Royalty Licenses** | ZTE 2014/15<br>Sharp 2015 | **Offer – Option B**<br>Karbonn 2015<br>CoolPad 2013<br>Huawei 2014[b]<br>Doro 2013/14<br>Audioline 2014<br>Bea-fon 2014<br>Binatone 2014<br>Bullitt 2014<br>Mobistel 2014<br>Emporia 2015 |

[a] License also includes an option to pay a dollar per-unit running royalty rate.
[b] The license covers both mobile phones and infrastructure.

103.   Each type of license must be unpacked using a different methodology:

- One-way, running royalty rate agreements are the easiest to analyze because there is no need to estimate grant back value and the contract contains a per-unit royalty term. To calculate the dollar per-unit rates, you only need to estimate the average sales price of the units and multiply by the license terms.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- One-way, fixed payment agreements require more analysis because calculating a per-unit rate requires an estimation of the licensee's sales volumes over the course of the license, and an estimation of average wholesale prices over the course of the license.

- Two-way licenses—both running royalty and fixed payment—are the most difficult to unpack because you need to estimate the grant back value inherent in the cross-license. This means you need to value both Ericsson's patent portfolio and the licensee's patent portfolio to calculate the true amount paid. If the two-way license is a fixed payment license, then you need to estimate the grant back value and then calculate an effective per-unit royalty rate by using a forecast of both units and average sales prices.

### 3. Methodology For Unpacking One-Way, Running Royalty Rate Licenses.

104. My analysis of the comparable licenses that are one-way, running royalty rate licenses was fairly straightforward. I multiplied the running royalty rate contained in each agreement by the estimated wholesale ASP for each technology (GSM/GPRS, EDGE, 3G, and 4G) and then applied any royalty caps and/or floors if necessary.

105. I am not aware of any company that reports wholesale ASPs for mobile phones by technology for all technologies for all companies. IDC is the only company that I am aware of that reports the sales prices by technology for each technology for all companies. However, IDC reports retail prices, not wholesale prices. Therefore, I needed to adjust the IDC data to reflect wholesale prices. I make this adjustment by comparing IDC retail ASP levels to wholesale ASP levels as reported by Strategy Analytics on an industry-wide basis for each

year between 2007 and 2015. For each year, I calculated a multiplier that would translate retail ASPs into wholesale ASPs. I then applied that multiplier to each retail ASP for a given year.

106.   A number of the comparable licenses in this category include running royalty rates with royalty caps and floors, which I applied after multiplying the running royalty rate by the wholesale ASP.  Usually the royalty caps and floors were reported in U.S. dollars.  If the license contained royalty caps or floors in different currencies, then I converted them to U.S. dollars using contemporaneous exchange rates.  Generally, the percentage running royalty rates contained in the one-way licenses were consistent with the percentage running royalty rates contained in Ericsson's Option B offer to TCL, with the sole exception of the Ericsson/Huawei license executed in 2016.

### 4.    Methodology For Unpacking Two-Way Licenses.

107.   As I have explained, analyzing two-way licenses is difficult because it requires simultaneously estimating the value of Ericsson's SEP portfolio to the licensee and the licensee's SEP portfolio to Ericsson over the course of the license.

### a.    The Two-Way License Unpacking Formula.

108.   Ericsson's two-way Licenses are cross-licenses with balancing payments. Because the payment that Ericsson receives from the licensee is in the form of: (1) payment made by the licensee to Ericsson (including both royalties and other business consideration); and (2) the value of the license to the licensee's patent portfolio (i.e., the "grant back value"), the two-way licenses which require an "unpacking" model to determine two unknown variables. These two unknown variables are (i) Ericsson's implied royalty rate and (ii) licensee's implied rate. Unfortunately, there is only one available piece of data: the royalty component. The royalty component, however, is the net payment term, which does not directly

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

indicate what the grant back value is to Ericsson.

109.   The consideration flowing to Ericsson is in the form of royalties and a cross-license, as seen here in Figure 31:

### FIGURE 31:  Two-Way License



To determine Ericsson's implied one-way royalty rate, you need to unpack the license to estimate the value of both Ericsson's and the licensee's patent portfolio.

110.   Generally, the royalty component of the license (or net balancing payment) is equal to the difference between Ericsson's royalty rate multiplied by the licensee's revenue and the licensee's royalty rate multiplied by Ericsson's revenue. TCL's expert, Dr. Lynde, and I agree on the same general model to describe the license's royalty components. This unpacking formula is see in Figure 32:

### FIGURE 32:  Unpacking Formula

$$\left[ \begin{array}{c} \text{Ericsson's Rate} \\ \times \\ \text{Licensee's Revenues} \end{array} \right] - \left[ \begin{array}{c} \text{Licensee's Rate} \\ \times \\ \text{Ericsson's Revenues} \end{array} \right] = \text{Net Balancing Payment}$$

111.   As this equation includes two unknown variables, it cannot be solved without additional information. I solved the equation using a "portfolio strength" metric to fix the licensee's effective rate to Ericsson's effective rate based on the strength of the parties' respective patent portfolios. Both Dr. Lynde and I refer to this patent strength ratio as a "PSR." A PSR is Ericsson's patent portfolio strength

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

divided by the licensee's patent portfolio strength. This is seen in Figure 33:

**FIGURE 33:  Patent Strength Ratio**



Dr. Lynde and I both agree that this is a reasonable methodology to analyze the Two-Way licenses, although we disagree on many of inputs.

112.   With a PSR value, it is possible to calculate Ericsson's implied one-way royalty rate. This is shown in Figure 34:

**FIGURE 34:  Ericsson's Implied One-Way Royalty Rate**

$$\text{Ericsson's Rate} = \text{Net Balancing Payment} \div \left[ \text{Licensee's Revenues} - \left[ \frac{\text{Ericsson's Revenues}}{\text{Patent Strength Ratio}} \right] \right]$$

113.   I note here that most of the two-way licensees sell only mobile phones, while Ericsson sells infrastructure equipment. Because a dollar per-unit royalty rate for mobile phones is not easily translated into a dollar per-unit royalty rate for infrastructure using only a PSR, Ericsson's implied one-way royalty rate is calculated here on a percentage basis. However, once I calculated the effective royalty rate on a percentage per-unit basis, I was able to calculate the implied one-way Ericsson royalty rates on a dollar per-unit basis.

**b.**      **Selecting Data Inputs.**

**i.**      **Net Balancing Payment.**

114.   The net balancing payment is how much consideration the licensee explicitly pays in cash or other forms (e.g. transferred patents). In my analyses of

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

the two-way licenses, I calculated the net balancing payment by relying on the license terms.  If the two-way license involved a lump-sum payment term, I calculated the total payments over time and discounted by an appropriate discount rate.  If the two-way license involved a running royalty component, I calculated the net balancing payment by multiplying discounted revenues by the terms of the agreement.

115.   Some of the two-way Licenses involved non-cash consideration that took the form of separate business transactions. For those analyses, I either relied on the assumptions made by Dr. Lynde in his analysis when I was in agreement with him or I provided an alternative based on separate analysis done by other Ericsson experts.

## ii.   Ericsson and Licensee Revenue History/Forecasts.

116.   The royalty base is the amount of Ericsson revenues and licensee revenues and units covered by the license.  In my analyses of the two-way licenses, I determined the royalty base including both the period of released unlicensed past sales to the extent applicable as well as projected future sales through the termination date of the license. During negotiations, Ericsson prepared estimates of historical sales and forecasts of both Ericsson and the licensee's licensed sales.  I have primarily relied upon the Ericsson projections to determine the appropriate royalty base under each agreement.

117.   In cases where the license included a cross-license from the licensee that conferred meaningful value to Ericsson (i.e., granting Ericsson a license for its sales of infrastructure products), I used Ericsson projections to estimate the Ericsson infrastructure royalty base. I then determined the nature and timing of past and expected future royalty payments associated with each license based on

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

the terms of each license, including in my analysis the discounted value of any license-specific, non-cash considerations as an adjustment to the balancing payment.

118.   In some instances, Ericsson made multiple projections for a licensee during negotiations. In those circumstances, I relied on Ericsson's personnel to determine which forecast Ericsson relied upon when signing the agreement.

### iii.   Calculating Net Present Value – Choosing the Right Discount Rate.

119.   After calculating the royalty base for Ericsson and the licensee, I then calculated the net present value of the data. Because my two-way license analysis involved analyzing royalty payments for past sales and future sales, I needed to use discount rates to adjust the revenue figures and the net balancing payments. A discount rate is used to determine the present value of future cash flows. The discount rate takes into account not just the time value of money, but also the risk or uncertainty of future cash flows; the greater the uncertainty of future cash flows, the higher the discount rate.

120.   Unpacking these licenses required analyzing both past and future revenues and future royalties. Therefore, calculating the net present value of royalties and revenues required applying several discount rates.  I applied discount rates as follows:

- Past Sales.  Discount rates for released sales or past sales are very low because the past sales are certain. Thus, for past sales, I used a discount rate equal to the Treasury Bill rate.

- <u>Future Sales.</u> Discount rates for future revenues are generally higher because they involve a large amount of uncertainty. Future sales are dependent on future business success and the mobile phone industry is notoriously competitive. As such, the risk of a licensee achieving its projected sales (and, in turn the risk of a licensor in collecting running royalties on those sales) is commensurate with the usual business risk of the licensee which is traditionally measured by a company's cost of equity or weighted average cost of capital (WACC), depending on the market conditions faced by that company. Generally, I used a discount rate of between 10% and 12%, depending on the licensee.

- <u>Future Running Royalties.</u> Like future sales, future royalty payments based on a running royalty contract involve a large amount of certainty. Future running royalties are directly proportional to future sales. Therefore, I used the same WACC discount rate for future royalties as I did future sales.

- <u>Future Fixed Payments.</u> Discount rates for future fixed payments are different than for future running royalty rates. A promise to pay a specific amount is not dependent on actual sales. This makes fixed licenses much more valuable. There is far more certainty with fixed payments and this certainty is valuable. The value of this certainty is reflected in the discount rate. I discounted fixed royalty payments using corporate debt rates or the prime rate, a rate lower than that used to discount future revenues, because the risk of the amount of payment is less given the fixed, known nature of the payment compared to the risk of uncertain projected revenues or units.

121.   Choosing the correct discount rate is very important for licenses with

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

extended license periods. For example, the discount rates make a big difference in unpacking the Apple 2015 and Samsung 2014 licenses because they have forward terms extending more than ███████

### iv.    Choosing a PSR.

122.    To determine the PSR for the unpacking formula, I relied on approved contribution data from 3GPP gathered by the Signals Research Group. I understand that, in the ordinary course of business, Ericsson evaluates the relative strength of its licensees' patent portfolios based on, among other things, their approved contributions to 3GPP.[46] Ericsson's expert in this litigation, Mr. Keith Mallinson, describes the benefits of this methodology in his witness statement:[47]

> Approved contribution counting, in contrast to patent counting, is impartial, consistent, and can be independently reproduced and verified. In this context, a "contribution" improves technical capabilities or solves problems, which one or more participants in standardization contribute to a working group within 3GPP. A contribution is "approved" when the working group reaches consensus that the contribution is the best technical solution, and incorporates the contribution into the developing standard. A company's number of approved contributions is therefore a good and objective proxy for its inventive strength.

123.    Mr. Mallinson opines that approved contribution counting is superior in many respects to a methodology referred to as "patent counting" as an indicator

---

[46] Brismark Witness Decl. ¶ 59.
[47] Mallinson Witness Decl. ¶ 5.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

of essential patent ownership in a standard.[48]

124. Based on Mr. Mallinson's testimony and because I understand that Ericsson reviews approved contribution counts in connection with real-world licensing negotiations, I have concluded that it is the most appropriate portfolio strength metric for calculating Ericsson's one-way effective rates in its own license agreements. Therefore, I relied on a comparison of the approved contributions to 3GPP between Ericsson and the licensee. For example, if Ericsson had 1,000 approved 4G contributions and the licensee had 500 approved 4G contributions, the PSR would be 2.

125. As noted earlier, I used approved contribution data generated by the Signals Research Group. Signals gathered this data from a publically available database maintained by the 3GPP standards development organization. This data extends from 1999 to 2014 and covers contributions made to the 3G and 4G cellular standards. The Signals data contained approved contribution counts from over a dozen working groups. To calculate the PSR for unpacking purposes, I calculated the approved contribution count ratios by focusing on the five working groups that Signals identified as being most relevant to mobile phone technology: RAN1, RAN2, CT1, SA2, and SA3.

126. Signals selected these particular working groups (RAN1, RAN2, CT1, SA2, SA3) because their areas of responsibility are most closely aligned with the patented technologies that a new entrant, in particular a device manufacturer, would need to license in order to enter the market with an LTE product. Conversely, the other working groups focus on areas, such as the various interfaces within the core network, that a device manufacturer would not have to license or in

---

[48] Mallinson Witness Decl. ¶ 5.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

some cases the working group is largely responsible for developing procedures to confirm a solution's adherence to the standard (e.g., RAN 5).

127.   In the end, the choice of working groups does not make a material difference to the PSR calculations.  I ran my unpacking models using a PSR based on the working groups selected by Signals and using all working groups. The PSR change only accounted for a small difference and does not change my ultimate conclusion that Ericsson's Option A and Option B are FRAND. The PSRs that I calculated for the two-way licenses and used in my license analysis are seen in Figure 35:

**FIGURE 35:  Portfolio Strength Ratios[49]**

| Company | 4G PSR | 3G PSR |
|---|---|---|
| **Samsung** | 2.6 | 5.3 |
| **LG** | 5.1 | 8.7 |
| **ZTE** | 3.3 | 4.8 |
| **HTC** | 13.2 | 37.4 |
| **Sharp** | 341.9 | 4,849.4 |
| | | |
| Ericsson Share of Total Approved Contributions | 15% | 17% |
| Note: The PSR equals Ericsson's approved contributions divided by the licensee's approved contributions. Thus, the higher the PSR, the stronger Ericsson's portfolio compared to the licensee's PSR. | | |

128.   I note that the PSR and Ericsson's implied one-way rate are inversely

---

[49] Exhibit 5316.

related.  Thus, the <u>stronger</u> the PSR, the <u>lower</u> the Ericsson effective one-way rate. This means that using approved contributions to calculate the ratio of Ericsson's SEP portfolio strength to the licensee's SEP portfolio strength is conservative. Nevertheless, as a precaution, I also calculated Ericsson's implied one-way rates using a PSR based on data reported by TCL's expert, Dr. Ding. Using Dr. Ding's PSR results in either <u>higher</u> royalty rates for Ericsson or nonsensical results (i.e. negative royalty rates).

### 5.    Calculating Percentage Per-Unit Rates.

129.    After calculating the PSR and the net present value of both the revenues and the net balancing payments, I proceeded to calculate Ericsson's implied one-way portfolio rate for each technology: GSM/GPRS, EDGE, 3G, and 4G.  I did this in multiple steps by applying the unpacking formula multiple times.

130.    First, I calculated the implied one-way rates for 4G. I estimated what portion of the net balancing payment should be allocated to the 4G rates relying on Ericsson's assumed 4G royalty allocation. If Ericsson anticipated that 80% of the net balancing payment would be allocated to 4G units, then I apportioned the net balancing payment to be 80% 4G and 20% 2G/3G. I then applied the unpacking formula using 4G revenues, the 4G PSR, and the 4G net balancing payments. With the implied one-way 4G rates, I could calculate the total 4G royalty including both cash and grant back compensation.

131.    Next, I calculated the implied one-way rates for 2G/3G using the same methodology, and estimated what portion of the net balancing payment would be allocated to 2G/3G units by relying on the Ericsson assumptions. I calculated the implied one-way rates for 2G and 3G collectively is because approved contribution counts exist for 3G and 4G, but not 2G. Rather than introduce a new metric for 2G (which would introduce inconsistencies), I used the same methodology that Dr.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Lynde adopted, namely that I used the 3G PSR to unpack the 2G/3G revenues and 2G/3G net balancing payment.

132.   With the implied one-way 2G/3G royalty rates, I could calculate the total 2G/3G royalty including both cash and grant back compensation. I then proceeded to allocate the royalty between 3G and 2G technologies. Again, I relied on Ericsson's internal records. If Ericsson allocated the 2G/3G royalty to be 70% 3G and 30% 2G, then I allocated the royalty in this manner. I followed the same method to allocate royalties among 2G technologies (GSM/GPRS and EDGE). If the Ericsson projected revenues between GSM/GPRS and EDGE to be 70% GSM/GPRS and 30% EDGE, I allocated the royalty in this manner.

133.   The net result of this process is that I calculated Ericsson's implied one-way royalty rates for four separate technologies:  4G, 3G, 2G EDGE, and 2G GSM/GPRS.

### 6.   Calculating Dollar Per-Unit Rates.

134.    After unpacking the Ericsson percentage per-unit royalty rates implied by the two-way licenses, I then calculated the dollar per-unit rates that could be inserted into a license as a contract term.

135.   A dollar-per-unit rate needs to be determined such that, when it is applied to the licensee's actual and projected units, it would leave the licensor economically indifferent between receiving royalties structured as a dollar-per-unit rate and receiving royalties under the existing structure of the license. To make this determination of economic indifference, the present value of total royalties under the existing structure of the license should be equivalent to the present value of total royalties under a dollar-per-unit running royalty rate structure. The equilibrating dollar-per-unit rate is determined by multiplying the implied percentage per-unit royalty rate indication by the licensee's discounted weighted

average selling price (DWASP) calculated across the past release and go-forward period of the license.

136. In short, I calculated the dollar per-unit in such a way that it could be inserted into a license with TCL. I note that my process is identical to the methodology adopted by TCL's expert Dr. Leonard in his expert report. Just as I had calculated the net-present value of royalties using a discount rate, I also calculated the net-present value of the units sold using similar discount rates.

**C. Unpacking Ericsson's Offers to TCL.**

137. I next calculated the one-way Ericsson rates implied by Option A and Option B. Both Option A and Option B include royalty terms for end user terminals (mobile phones and smaller tablets), external modems (data cards), and personal computers (larger tablets). TCL's experts analyzed Option A and Option B with respect to end user terminals only, so I did the same.

138. Using the TCL's sales data and sales forecasts produced to Ericsson in discovery, I calculated the dollar per-unit rates implied by Option A and B for the overall period of the license. The results of my calculations are seen here in Figure 36:

**FIGURE 36: Dollar Per-Unit Rates Implied By Option A and Option B**

|  | Option A | Option B |
|---|---|---|
| GSM/GPRS | $0.13 | $0.15 |
| EDGE | $0.37 | $0.36 |
| 3G | $0.68 | $0.69 |
| 4G | $1.53 | $1.92 |

**1. Ericsson's Option A Offer.**

139. Ericsson first offered a version of Option A to TCL in April 2014.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Ericsson offered Option A again to TCL in March 2015 as part of its FRAND contentions (later revised to include personal computer rates in May 2015). It would cover sales from 2015 through 2019 and a release period of 2007 through 2014.

140.   Under the terms of Option A, TCL would make lump sum payments of $30 million per year for 2015 through 2019 for a total of $150 million.[50]  If TCL's revenues from licensed units were less than $3.0 billion, then TCL would not owe any additional royalties.  If TCL's revenues from licensed units exceeded $3.0 Billion, TCL would pay royalties on the revenues above $3.0 Billion of: 0.8% for GSM/GPRS, 1.1% for EDGE, 1.5% for 3G, and 2.0% for 4G.  Additionally, the May 2015 version of Option A included a release payment. For the release period, TCL had the option to select on an annual basis whether to pay (a) running royalties of 0.8% for GSM/GPRS, 1.1% for EDGE, 1.5% for 3G, and 2.0% for 4G or (b) a fixed payment of $30 million and running royalties on sales in excess of $3.0 billion.

## 2.   Ericsson's Option B Offer.

141.   Ericsson first made its Option B offer as part of its FRAND contentions in March 2015 (later revised to include personal computer rates in May 2015).[51]  TCL would pay running royalties on all sales (release and going forward) for sales between 2007 through 2019 of 0.8% for GSM/GPRS, 1.0% for EDGE, 1.2% for 3G, and 1.5% for 4G.

---

[50] Exhibit 458.
[51] Exhibit 459.

70

### 3.   Offer Analysis.

#### a.   Estimated Released Sales.

142.   To unpack Option A and Option B, I first calculated TCL's unlicensed sales for the years 2007-14 that are covered by the offers. Because TCL was never licensed to EDGE, 3G, or 4G technologies, all EDGE, 3G, and 4G sales are unlicensed.[52] However, a TCL associated company (TCT Mobile Limited) was licensed to Ericsson's GSM/GPRS technology under a 2007 license, which covered TCT's single-mode GSM/GPRS sales from January 1, 2007 through April 1, 2014. Therefore, I needed to subtract out the licensed TCT sales from TCL's overall GSM/GPRS sales for 2007-2014Q1. I analyzed the royalty reports that TCL submitted under the 2007 TCL-Ericsson license and compared the reported GSM/GPRS units to what TCL actually sold in 2007-2014Q1 based on data that TCL produced in this case.[53] Using that data, I calculated the unlicensed portion of TCL's GSM/GPRS sales. For simplicity's sake, I assumed that all of the 2014Q1 sales were licensed. Between 2007 and 2013, I estimated that 65% of TCL's GSM/GPRS sales were unlicensed. I used this multiplier to estimate unlicensed sales for each year.

143.   Overall, I estimated TCL's unlicensed unit sales for 2007 through 2014 to be nearly 190 million units (non-discounted). This is seen in Figure 37:

---

[52] Exhibit 165.
[53] Exhibit 5311.

WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 37:  Unlicensed Unit Sales (M) For 2007-2014**[54]

| | GSM/GPRS | EDGE | 3G | 4G | TOTAL |
|---|---|---|---|---|---|
| 2007 | 6M | 1M | | | **7M** |
| 2008 | 7M | 1M | | | **7M** |
| 2009 | 8M | 1M | | | **8M** |
| 2010 | 18M | 4M | | | **21M** |
| 2011 | 17M | 6M | 2M | | **25M** |
| 2012 | 14M | 4M | 7M | | **25M** |
| 2013 | 14M | 5M | 19M | | **38M** |
| 2014 | 13M | 3M | 36M | 4M | **57M** |
| **TOTAL** | **97M** | **23M** | **64M** | **4M** | **189M** |

144.   Overall, I estimated TCL's unlicensed revenues for 2007 through 2014 to be nearly $9 billion (non-discounted). This is seen in Figure 38:

---

[54] Exhibit 5315.

**FIGURE 38:  Unlicensed Revenues (US$M) For 2007-2014**[55]

|  | GSM/GPRS | EDGE | 3G | 4G | TOTAL |
|---|---|---|---|---|---|
| 2007 | $271M | $70M |  |  | **$341M** |
| 2008 | $275M | $41M |  |  | **$316M** |
| 2009 | $265M | $36M |  |  | **$301M** |
| 2010 | $458M | $250M | $10M |  | **$718M** |
| 2011 | $429M | $285M | $155M |  | **$869M** |
| 2012 | $298M | $162M | $597M |  | **$1,057M** |
| 2013 | $250M | $136M | $1,558M | $21M | **$1,965M** |
| 2014 | $214M | $82M | $2,650M | $426M | **$3,372M** |
| **TOTAL** | **$2,460M** | **$1,062M** | **$4,970M** | **$447M** | **$8,939M** |

### b.    Forecasted Sales.

145.    To calculate the Ericsson one-way royalty rates implied by Option A and Option B, I also needed projections of future sales and revenues. TCL provided such projections to Ericsson in January 2014.[56] The sales projections that TCL provided show its projected sales for 2014 through 2018.

146.    Because Ericsson made its Option A and Option B offers in 2015, I needed a forecast that extended from 2015 through 2019. I adjusted the TCL projections by replacing the 2014 forecast figures with 2014 actual figures. I kept the projections for 2015 through 2018. This was reasonable based on the sales data. TCL had roughly hit its targets for 2014 (forecasting 60M units sold in 2014 versus 58M units actually sold, and forecasting $3.2B in sales versus $3.3B in actual

---

[55] Exhibit 5315.
[56] Exhibit 287.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

sales), so I concluded that it was reasonable to use the 2015-2018 forecast.[57] For 2019, I assumed that there was no change in unit sales or revenues from 2018.

### c.   Patent Strength Ratio.

147.   I did not need to use a PSR in my analysis of Option A or Option B. Option B is not a cross-license, so no PSR is required. Option A is a cross-license, but the approved contribution data I discussed earlier shows that TCL has not made any approved contributions to the 2G, 3G, or 4G standards. Mr. Eric Hsu from TCL confirmed this during his deposition confirm this.[58] In addition, I understand that TCL has extended what amounts to a royalty-free cross-license under its SEPs (if any) to Ericsson.[59] As such, I treat Option A as a one-way license, and no PSR is required.

### d.   Discount Rates.

148.   To calculate the net present value terms of the license, I discounted all released sales by the May 2015 T-Bill rate. I discounted TCL revenues and unit sales by 12%, which is equivalent to the TCL WACC. I discounted royalties depending on the license structure. Any fixed payment royalties (i.e. Option A) were discounted at 3.25%. Any running royalty payments (Option B and partial payments under Option A) were discounted at 12%.

### 4.   Ericsson One-Way Rates Implied By Options A and B.

149.   Using TCL's actual sales data and TCL's sales forecasts, I calculated the implied dollar per-unit rates that TCL would be expected to pay under both Option A and Option B. This is seen in Figure 39:

---

[57] Exhibit 142.
[58] Deposition of E. Hsu (Jan. 26, 2016) at 24:17-25:18.
[59] Exhibit 1530; Exhibit 1531.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 39: Ericsson Dollar Per-Unit Rates Implied By For Option A and Option B**

|  | Option A | Option B |
|---|---|---|
| GSM/GPRS | $0.13 | $0.15 |
| EDGE | $0.37 | $0.36 |
| 3G | $0.68 | $0.69 |
| 4G | $1.53 | $1.92 |

150.   It may appear strange that the implied one-way 4G dollar per-unit rates under Option B is $1.92, given that Option B contains an express $2.00 floor for 4G. The reason for this discrepancy is the fact that TCL has a significant amount of time to pay royalties under the offer. Under Option B, TCL is obligated to pay royalties on mobile phones twice a year for the sales that occurred during the previous six months.[60]  For example, sales that occurred from January 1, 2017 through June 30, 2017 would be paid on August 31, 2017.  Thus, TCL incurs obligations that are not due to be paid until as much as eight months later. Ericsson is effectively making a short-term interest-free loan to TCL. The difference between $2.00 and $1.92 is the economic value of the short-term loan. Other licensees, such as Samsung and Apple, pay a fixed amount at the beginning of the year for a license for the entire year. For those licenses, Ericsson receives a benefit for the upfront payment.

---

[60] Exhibit 459 at § 6.3

**D.    Unpacking Ericsson's Two-Way Licenses/Fixed Payment Licenses.**

   **1.    ZTE.**

      **a.    Ericsson/ZTE Licenses.**

151.   Based in China, ZTE is a major mobile phone supplier and a significant manufacturer of cellular infrastructure equipment. Ericsson and ZTE are parties to two licenses.  One covers 4G mobile phones and infrastructure sales, while the other covers 2G and 3G mobile phones and infrastructure sales.

152.   On June 2, 2014, Ericsson and ZTE entered into a global patent cross license agreement effective April 1, 2014, with a ███████████ Under this agreement, Ericsson and ZTE provided each other with worldwide, nonexclusive licenses covering sales of their respective 4G standard-practicing products. The royalty terms of the license are as follows:[61]

- ZTE will pay Ericsson a US ██████████ lump sum as a release payment, and a fixed quarterly payment of US █████████ throughout the license period.

- This agreement also contains running royalties for products and regions. For Infrastructure Equipment, ZTE will pay ██ in the People's Republic of China, █████ in Territory 1 (generally the United States, Canada, Australia, Canada, and Europe), and █████ in Territory 2 (rest-of-world).

- For LTE single mode phones, ZTE will pay ██████ in China █████ in Territory 1, and █████ in Territory 2.

---

[61] Exhibit 1194 at § 7.1.

- For LTE multi-mode phones, ZTE will pay ███ in China, ███ in Territory 1, and ███ in Territory 2. I calculated that the expected worldwide royalty rate would be ███ based on Ericsson's projections.[62]

153. On October 5, 2015, Ericsson and ZTE entered into an amendment to the 2011 global patent cross license agreement which amendment was effective October 1, 2015, and had a termination date of ███████. Under this amendment and the original agreement, Ericsson and ZTE provided each other with worldwide, nonexclusive licenses to their respective 2G and 3G SEPs. The license includes the following terms: [63]

- For Infrastructure Equipment, ZTE will pay ███ for those compliant with 2G and/or 3G.

- For End User Terminals and Modems, ZTE will pay: ███ for those compliant with 2G; ███ for those compliant with 3G; and ███ for those compliant with 3G where the entire 3G functionality is provided by a third party who is an Ericsson 3G licensee (i.e. Qualcomm).

### b.    IDC Sales Data.[64]

154. As I noted earlier, Dr. Teece has identified ZTE as one of the most similarly situated companies to TCL. Below, I report annual sales data reported by IDC for around the time the license was executed and for 2015.

---

[62] Exhibit 5317.
[63] Exhibit 1200.
[64] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| ZTE IDC Sales Data (2013) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | | |
| EDGE | | |
| 3G | | |
| 4G | | |
| TOTAL | | |

| ZTE IDC Sales Data (2014) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | | |
| EDGE | | |
| 3G | | |
| 4G | | |
| TOTAL | | |

| ZTE IDC Sales Data (2015) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | | |
| EDGE | | |
| 3G | | |
| 4G | | |
| TOTAL | | |

### c.    License Analysis.

155.   The ZTE licenses are the most complicated licenses to unpack because they involve grant back value, cover mobile phone and infrastructure

78

sales, involve both fixed payments and running royalty payments, and the 4G
license specifies regional rates.  When unpacking the ZTE licenses, I calculated a
single implied per-unit rate for all licensed units (mobile phones and infrastructure)
that would result in royalty payments equal to the amounts under the ZTE licenses.

### i.      Forecasted Sales.

156.   Ericsson projected mobile phones and infrastructure sales for ZTE
when negotiating the ZTE 2014 4G license and the ZTE 2015 2G/3G license. The
projections included all the detailed data necessary to unpack the agreements,
including forecasts of ZTE's mobile phone sales and infrastructure sales in the
various geographic regions. I find that these projections are reasonable and relied
on them when unpacking the ZTE agreements. For the 4G license, the projections
only extended through the end of 2018, while the license technically extended
through ██████  To simplify matters, I assumed that there was no growth for
2019Q1 and instead projected that 2019Q1 would be the same as 2018Q1. This
accounted for any seasonal trends.

### ii.      Discount Rates.

157.   The ZTE 2014 4G license includes a quarterly fixed payment. I
discounted the fixed payment using ████████████████████████  I
discounted ZTE's future sales at 10% for 3G sales and 12% for 4G sales. I
discounted Ericsson sales at 10%. Past sales for both ZTE and Ericsson were
discounted at the T-bill rate.

### iii.      Other Assumptions.

158.   When unpacking the ZTE 2G/3G 2015 amended license, I assumed
that all the grant back value was related to the 3G royalty rates. This is a
conservative assumption; ZTE's royalties would be higher if I unpacked the 2G
royalty rates. In any event, this assumption made only a small difference because

79

the 2G revenues and royalties are minimal compared to the 3G revenues and royalties at issue. For the 2G component of ZTE's 2G/3G license, I treated the 2G sales as a simple running royalty agreement without any grant back value.

### d.    Implied Ericsson One-Way Rates.

159.    Figure 40 shows the results of my calculations of the implied Ericsson one-way royalty rates for the ZTE licenses:

### FIGURE 40:  Implied Ericsson One-Way Rates (ZTE)[65]

| Implied Ericsson One-Way Rates (2014/2015) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| GSM/GPRS* | | |
| EDGE* | | |
| 3G** | | |
| 4G** | | |
| * Royalties calculated by applying 2015 wholesale ASPs to express 2G royalty rates.<br>** Royalties calculated for the license period. | | |

160.    As an alternative method of analyzing the licenses, I calculated ZTE's expected payments by simply applying the express royalty terms contained in the licenses to ZTE's wholesale ASPs from 2015. This is an overly conservative approach because it ignores the significant grant back value to Ericsson. Nonetheless, even under this overly conservative approach, ZTE is still paying significant royalties. This is seen in Figure 41:

---

[65] Exhibit 5314; Exhibit 5314.

**FIGURE 41:  Implied Ericsson One-Way Rates Assuming No Grantback Value (ZTE)**[66]



| Implied Ericsson One-Way Rates Assuming No Grant Back Value (2014/2015) | | |
|---|---|---|
| **Tech** | **%/Unit** | **$/Unit** |
| GSM/GPRS | | |
| EDGE | | |
| 3G | | |
| 4G | | |
| * Blended average percent per unit royalty rate. | | |

161.   Because 4G is the latest technology and the market for 4G mobile phones is growing, I also calculated the dollar per-unit rate for the latest available quarter of data (2016Q2). In 2016Q2, ZTE would pay a dollar per-unit rate of ▮▮▮▮▮▮▮ assuming no grant back value.

162.   The 2G and 3G percentage per-unit royalty rates are consistent with the rates contained in Ericsson's Option B. The 4G percentage per-unit royalty rates are lower than the rates contained in Ericsson's Option B, but this calculation ignores any grant back value. But, in any event, the dollar per-unit rates contained in the no-grant back version of this license are consistent with the Ericsson one-way royalty rates implied by both Option A and Option B.

---

[66] Exhibit 5314.

### 2. Samsung.

#### a. Samsung License.

163. Based in South Korea, Samsung is a major technology conglomerate and currently the world's largest mobile phone manufacturer. Effective February 1, 2014, Samsung and Ericsson entered into a global patent cross license agreement, which expires on ███████████ Under this agreement, Ericsson and Samsung provided each other with worldwide, nonexclusive licenses to their respective 2G, 3G, and 4G SEPs for both networks and mobile phones under the following terms.[67] Key terms of the license include:

- Samsung will pay Ericsson a one-time lump sum amount of ████████
- For each year between and including 2014 and ████ Samsung will have the option of paying a lump sum of ████████ or running royalties of ████ for each 2G product ████ for each 3G product, and ████ for each 4G product.
- The license covered sales from 2011 through 2013.
- Samsung agreed to purchase a minimum of ████████ units of thin modem products from Ericsson.
- The license settled extensive ongoing litigation between the parties.[68]

#### b. IDC Sales Data.[69]

164. Between 2010 and 2013, Samsung posted tremendous growth and surpassed Nokia (the former leader) in overall sales in April 2012. Below, I report annual sales data reported by IDC for around the time the license was executed and

---

[67] Exhibit 1276 at § 7.1.
[68] Exhibit 1276 at Appendix 3.
[69] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

for 2015.

| Samsung IDC Sales Data (2013) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 58,273,094 | $31 |
| EDGE | 50,625,813 | $68 |
| 3G | 240,135,164 | $286 |
| 4G | 84,594,755 | $615 |
| TOTAL | 433,628,826 | |

| Samsung IDC Sales Data (2015) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 56,476,877 | $20 |
| EDGE | 9,441,746 | $54 |
| 3G | 115,935,766 | $153 |
| 4G | 204,878,007 | $452 |
| TOTAL | 386,732,396 | |

### c.    License Analysis.

#### i.    Forecasted Sales.

165.   When negotiating a license with Samsung, Ericsson made three
projections of Samsung's future sales: high, mid, and low. I understand that, at the
time of the agreement, Ericsson believed that the low scenario was the most
probable, second to the mid scenario.[70] Ericsson had ample reason to believe that
the high scenario was overly optimistic. By the end of 2013, Samsung had grown
tremendously. Between 2010 and 2013, Samsung's total unit sales had grown from

---

[70] Brismark Witness Decl. ¶ 69.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

280 million units to 450 million units, representing over 60% growth in four years.[71] In contrast, the entire market grew by only 17% during the same time period.[72] Similarly, Samsung's market share grew from about 18% of the market to 24% of the entire market.[73] Simply conducting a straight-line projection (*i.e.* assuming constant growth or a constant market share) is less reliable in such circumstance because Samsung's success demonstrates that the market was undergoing significant changes and dominant players' growth stalls. Even Apple, the greatest success story in the industry, experienced stalled growth in 2015. The mobile phone industry has seen many dominant players (*i.e.* Blackberry, Motorola, and Nokia) decline rapidly with little warning.

166. Moreover, contemporaneous industry analysts were reporting that Samsung was reaching a limit to its growth in 2014. In January 2014, the Wall Street Journal reported that Samsung's profit growth slowed sharply and it reported that earnings from its mobile division were flat.[74] Other analysts reported that the smartphone market had become saturated, which threatened Samsung's market share.[75] Forbes Magazine reported that competition was intensifying and Samsung could not sustain its past success:

---

[71] Exhibit 1273.
[72] Exhibit 1273.
[73] Exhibit 1273.
[74] Exhibit 4857.
[75] Exhibit 4848.

84

However, with competition increasing at the low end of the smartphone spectrum and saturation seeping in at the high end, it will be tough for Samsung to maintain its past mobile growth. Samsung has acknowledged this much, saying that while the smartphone market would benefit from seasonality in the fourth quarter, competition is likely to intensify further. To be sure, the smartphone market is still expected to grow at a faster rate than the overall mobile phone market as smartphones cannibalize feature phone sales. However, most of that growth is going to come from the lower end in emerging markets, where profit margins are lower and being rapidly eaten into by rising competition.[76]

During negotiations with Samsung, Mr. Brismark reviewed two similar reports on Samsung's falling profit margins.[77]

167.   All of this information shows that using a straight-line projection (i.e. Ericsson's high scenario) would be in error. In fact, Ericsson's mid projection was overly optimistic in hindsight – the low scenario has been the most accurate thus far. This is seen in Figure 42:

---

[76] Exhibit 4849.
[77] Exhibit 4942.

85

**FIGURE 42:  Comparing Ericsson's Samsung Projections Against Actual Sales Data**[78]



168.    This variance between projections and results highlights the incredible value of lump-sum agreements in the mobile phone industry. Samsung agreed to large fixed payments for ███ years going forward (2014 through ███ Given the mobile industry's incredible competitiveness, such guarantees are very valuable. To put the time frame in perspective, from 2009 to 2012 Blackberry went from being the dominant smartphone player to a small player in the industry. Nokia went from being a dominant mobile phone manufacturer to selling its much reduced mobile phone business to Microsoft. Samsung's sales fell by over 13% between 2013 and 2015, while the entire market grew by 16%.[79] Failing to account for the independent value of payment guarantees underestimates the value of such a license.

169.    In light of this information, I conservatively relied upon Ericsson's

---

[78] Exhibit 1000; Exhibit 4935.
[79] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

mid projections when unpacking the Samsung license.

### ii.    Non-Cash Consideration.

170.   As I noted earlier, Samsung agreed to purchase thin modem products from Ericsson as part of the license.[80] Dr. Lynde valued the thin modem commitment at ████████ and I accepted this valuation in my analysis.

### iii.    Discount Rates.

171.   Because the Samsung license includes fixed payments, I discounted the fixed payments using Samsung's 2014Q1 cost of debt (████. This has a large effect on the overall calculations because the forecast period is ███████ (2014-████.  For released sales ███████, I discounted sales and revenues using the T-bill rate. I discounted Samsung's projected sales and revenues using a 12% discount rate. I discounted Ericsson's forecasted revenues using a 10% discount rate.

### iv.    Other Assumptions.

172.   With the exception of the ████████████████████████████████████████████████████, I attributed all of the cash and non-cash consideration flowing from Samsung to Ericsson under the license to the payment by Samsung for a license under Ericsson's 2G, 3G, and 4G SEPs.[81]

### d.    Ericsson's Implied One-Way Royalty Rates.

173.   The results of my calculation of the Ericsson one-way royalty rates implied by the Samsung license are seen in Figure 43 below. I report both the effective royalty rates and a separate "option" rate that Samsung is permitted to

---

[80] Brismark Witness Decl. ¶ 190.
[81] Brismark Witness Decl. ¶ 119.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

elect to pay at its discretion under the license.[82]

**FIGURE 43:   Implied Ericsson One-Way Rates (Samsung)** [83]

| Implied Ericsson One-Way Rates (2011-2020) | | | |
|---|---|---|---|
| **Tech** | **%/Unit** | **$/Unit** | **$/Unit*** |
| GSM/GPRS | | | |
| EDGE | | | |
| 3G | | | |
| 4G | | | |
| * Payment Option | | | |

### 3.     LG.

#### a.     LG License.

174.   Based in South Korea, LG is a preeminent technology company that manufactures and sells devices worldwide. Additionally, LG is one of the world's largest mobile phone manufacturers. Effective June 27, 2014, LG and Ericsson entered into a global patent cross license agreement, ending on ███████. Under the license, Ericsson and LG provided each other with worldwide, nonexclusive licenses to their respective implementation patents and SEPs. The license includes the following payment terms:[84]

- LG agreed to pay Ericsson a release payment of ███████

- ████████████████████████████

---

[82] Exhibit 1276 at § 7.1(b).
[83] Exhibit 5314.
[84] Exhibit 199 at § 7.1.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- In the event that LG's licensed sales revenue exceeds certain annual thresholds ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

- LG agreed to transfer ten United States patents to Ericsson.

### b. IDC Sales Data.[85]

175.   Below, I report the annual sales data from near the time that the Ericsson-LG license was executed and 2015 sales data from IDC.

| LG IDC Sales Data (2013) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 5,801,419 | $63 |
| EDGE | 8,088,413 | $89 |
| 3G | 38,772,249 | $209 |
| 4G | 15,065,017 | $526 |
| TOTAL | 67,727,098 | ████ |

| LG IDC Sales Data (2015) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 3,969,768 | $27 |
| EDGE | 1,368,193 | $45 |
| 3G | 26,917,741 | $126 |
| 4G | 37,562,673 | $307 |
| TOTAL | 69,818,375 | ████ |

---

[85] Exhibit 1000.

### c.    License Analysis.

#### i.    Forecasted Sales.

176.   Ericsson prepared projections of both parties' sales when negotiating the license, which I find reasonable and relied upon in my analysis. Because Ericsson understood that LG could claim "pass through" rights to Ericsson's 3G SEPs for LG's 3G mobile phones,[86] I assumed that all of LG's 3G units would be licensed at the EDGE royalty rate, consistent with Ericsson's licensing practices.[87]

#### ii.    Non-Cash Consideration.

177.   As partial consideration for the license, LG transferred ten United States patents to Ericsson in July 2014, which Ericsson valued at $125 million. Ericsson's expert, Mr. Pellegrino, valued the transferred patents at $170 million.[88] To be conservative and reflect Ericsson's expectations at the time, I used the $125 million valuation in my analysis.

#### iii.    Discount Rates.

178.   I discounted the fixed payments required by the license using LG's 2014Q2 cost of debt (2.3%). For released sales (2013-14), I discounted sales and revenues using the T-bill rate. Based on Ericsson's financial assumptions when negotiating the license, I discounted LG's forecasted sales and revenues using a ▮ discount rate and Ericsson's forecasted revenues using a ▮ discount rate.

#### iv.    Other Assumptions.

179.   With the exception of the grant back value flowing to Ericsson for a license under LG's non-2G, 3G, and 4G licensed patents, I attributed all of the cash

---

[86] Brismark Witness Decl. ¶ 120.
[87] Brismark Witness Decl. ¶ 93.
[88] Pellegrino Witness Decl. ¶ 15.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

and non-cash consideration flowing from LG to Ericsson under the license to payment by LG for a license under Ericsson's 2G, 3G, and 4G SEPs.[89]

### d.   Implied Ericsson One-Way Rates.

180.   My calculations of Ericsson's one-way rates implied by license are set forth in Figure 44:

### FIGURE 44: Implied Ericsson One-Way Rates (LG)[90]

| Implied Ericsson One-Way Rates (2013-2017) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| GSM/GPRS | | |
| EDGE / 3G (Qualcomm) | | |
| 3G* | | |
| 4G | | |
| * Because Ericsson assumed that all 3G units used Qualcomm chips, LG paid the "EDGE" rate for 3G units. | | |

### 4.   HTC.

### a.   HTC License.

181.   HTC is a mobile phone manufacturer that specializes in higher-end units. Effective December 31, 2014, HTC and Ericsson entered into a global patent ▮▮▮▮▮▮ that expired on January 1, 2016. The license covered the ▮▮▮▮▮▮ 2G, 3G, and 4G SEPs. HTC agreed to make a fixed payment to Ericsson of ▮▮▮▮▮[91]

---

[89] Brismark Witness Decl. ¶ 120.
[90] Exhibit 5314.
[91] Exhibit 1275 at § 7.1.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

### b.   IDC Sales Data.[92]

182.   Below, I report annual sales data reported by IDC for around the time the license was executed and for 2015.

| HTC IDC Sales Data (2014) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| 3G | 7,334,287 | $243 |
| 4G | 13,923,918 | $459 |
| TOTAL | 21,258,205 | |

| HTC IDC Sales Data (2015) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| 3G | 4,569,024 | $187 |
| 4G | 14,597,788 | $377 |
| TOTAL | 19,166,812 | |

### c.   License Analysis.

183.   I relied on the HTC and Ericsson sales projections that Ericsson prepared around the time it executed the license, which I find are reasonable. Ericsson prepared three scenarios (high, mid, low), and I used the high scenario in my analysis. Because HTC made just one fixed payment at the start of the license period, I did not need to apply a discount rate to royalties. Based on Ericsson's financial assumptions when negotiating the license, I discounted the forecasted revenues and sales for HTC using a 10% discount rate, Ericsson's forecasted revenues using a 10% discount rate, and past sales using the T-bill rate.

---

[92] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

#### d.   Implied Ericsson One-Way Rates.

184.   My calculations of the Ericsson one-way rates implied by the license are set forth in Figure 45:

### FIGURE 45:  Implied Ericsson One-Way Rates (HTC)[93]

| Implied Ericsson One-Way Rates (2014-2016) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| 3G | ███ | ███ |
| 4G | ███ | ███ |

#### 5.   Apple.

#### a.   Apple Licenses.

185.   Apple is one of the world's most successful consumer products technology companies. On January 14, 2008, Ericsson and Apple entered into a global patent cross license ending December 31, 2014.[94]  Under this license, Ericsson and Apple cross-licensed each other to their respective 2G and 3G SEPs. Apple agreed to make a ███████ upfront payment to reduce the going-forward running royalty rate, a ███████ release payment, and ███████ ███████. Ericsson further agreed to not assert their respective 4G patent against the other during the term of the license. I understand that Apple paid ███████ for all units sold until December 31, 2014, including both 3G and 4G devices.[95]

186.   In December 2015, Ericsson and Apple entered into a second global

_____

[93] Exhibit 5314.
[94] Exhibit 257.
[95] Brismark Witness Decl. ¶ 108.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

patent cross license agreement for their respective SEPs, effective from January 15, 2015. Pursuant to the license, Apple agreed to make a ██████ fixed payment in 2015 and annual fixed payments of ██████ to Ericsson over the course of the license. Alternatively, Apple has the option of making running royalty payments to Ericsson at a rate of ██████.[96] The license also includes an agreement by the parties to collaborate in multiple technology areas.[97]

### b. IDC Sales Data.[98]

187.   Below, I report annual sales data reported by IDC for around the time the license was executed in 2015.

| Apple IDC Sales Data (2015) | | |
|---|---|---|
| **Tech** | **Units** | **Retail ASP ($)** |
| 3G | 3,978,274 | $422 |
| 4G | 227,551,610 | $722 |
| TOTAL | 231,529,884 | ████████ |

### c. License Analysis.

#### i. Forecasted Sales.

188.   When negotiating the license with Apple, Ericsson made three projections of Apple's sales (scenario 1 (high), scenario 2 (mid), and scenario 3 (low)), which I find to be reasonable. I understand that Ericsson considered scenario 2 (mid) the most probable when entering into the license, and I have relied on scenario 2 (mid) in my analysis. This scenario predicted that Apple's sales would peak in 2015. This was a reasonable assumption, given that Apple's future

---

[96] Exhibit 5331 at § 7.1.
[97] Exhibit 5331 at Appendix 5.
[98] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

business prospects are limited by its past success. Apple's sales doubled or nearly doubled each year in 2008, 2009, 2010, and 2011,[99] and increased by over 70% between 2012 and 2015.[100] But investors and analysts had started to doubt whether Apple could sustain this growth by the end of 2015. Apple's sales were reported to be stalling in October 2015,[101] its suppliers reported weaker sales in December 2015,[102] and in mid-December 2015, Apple reshuffled its leadership team.[103] In January 2016, Apple scaled back its orders for iPhones.[104] Soon afterwards, Apple officially reported its sales figures and analysts concluded that Apple's sales had slowed.[105] All of this information shows that my adoption of Ericsson's scenario 2 (mid) in my analysis was appropriate.

189.   As was the case with the Samsung license, the fixed payment aspect of the Apple license affords value to Ericsson. I note that Apple does have an option to forgo its annual fixed payment to Ericsson and instead pay running royalties of ▮▮▮▮▮▮.[106] But Ericsson's projections are that Apple's sales will not decrease such that it would exercise this option.

### ii.     Discount Rates.

190.   I discounted Apple's fixed payments using Apple's 2015Q4 cost of debt (1.7%). I discounted Apple's released 2015 sales using the T-bill rate, and

---

[99] Exhibit 1273.
[100] Exhibit 1273.
[101] Exhibit 4821; Exhibit 4822; Exhibit 4823; Exhibit 4826; Exhibit 4828; Exhibit 4846; Exhibit 4847; Exhibit 4850.
[102] Exhibit 4828.
[103] Exhibit 4850.
[104] Exhibit 4822.
[105] Exhibit 4847.
[106] Exhibit 5331 at § 7.2.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Apple's forecasted sales and revenues using a 10% discount rate.

### iii.   Patent Strength Ratio.

191.   I assumed that the license does not afford any grant back value to Ericsson, in light of the fact that Ericsson was licensed under the bulk of Apple's SEPs at the time the license was executed.[107] This is conservative, as Apple could acquire SEPs during the term of the license that are not already licensed to Ericsson.

### iv.   Other Consideration.

192.   I understand that Ericsson placed value on certain non-cash consideration flowing from Apple to Ericsson under the license, including but limited to the collaboration agreement that I noted earlier. Due to time constraints and to be conservative, I limited my analysis to cash consideration.

### v.   Apple's Released 4G Sales.

193.   As I noted earlier, pursuant to the 2008 Ericsson/Apple license, Apple paid ███████████ on its sales of 4G devices. I understand from Mr. Brismark that, when entering into the 2015 Ericsson/Apple license, Ericsson assumed Apple would pay the same rate for the 2011-2014 4G sales that it would pay for its 4G sales over the term of the 2105 license.[108] I adopted this assumption in my analysis, and calculated that Apple would be paying an implied rate of █████ per 4G unit for 2015 █████, which is ████████████████ royalty that Apple paid to Ericsson for 4G devices sold between 2011 and 2014. This means that I assumed the Apple 2015 license does not include a release payment for Apple's 4G sales under the parties' prior license.

---

[107] Brismark Witness Decl. ¶ 108.
[108] Brismark Witness Decl. ¶ 108.

### d.   Implied Ericsson One-Way Rates.

194.   My calculations of the Ericsson one-way rates implied by the license are set forth in Figure 46:

### FIGURE 46:  Implied Ericsson One-Way Rates (Apple)[109]

| Implied Ericsson One-Way Rates (2015-2021) | | | |
|---|---|---|---|
| **Tech** | **%/Unit** | **$/Unit** | **$/Unit**\*\* |
| 4G* | ███ | ███ | ███ |

\* All sales assumed to be 4G.
\*\* Payment Option

### 6.   Sharp.

### a.   Sharp License.

195.   Based in Japan, Sharp is a major technology company with a modest mobile phone business. Effective April 1, 2015, Ericsson and Sharp entered into a global cross-license to their respective 2G, 3G, and 4G SEPs with a seven year license period. Under the license, Sharp agreed to pay Ericsson running royalties of ████████████████████████████████████████████████ on its sales of 4G mobile devices.[110]

### b.   IDC Sales Data.[111]

196.   Below, I report annual sales data reported by IDC for around the time the current Ericsson/Sharp license was executed and for 2015.

---

[109] Exhibit 5314.
[110] Exhibit 1195 at § 7.1.
[111] Exhibit 1000.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| Sharp IDC Sales Data (2014) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| 3G | 2,013,507 | $182 |
| 4G | 3,217,245 | $451 |
| TOTAL | 5,230,752 | |

| Sharp IDC Sales Data (2015) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| 3G | 1,910,000 | $159 |
| 4G | 2,711,860 | $357 |
| TOTAL | 4,621,860 | |

### c. License Analysis.

197. As I did when unpacking the licenses discussed above, I relied on the sales projections prepared by Ericsson in my analysis, which I found to be reasonable. Although I discounted Sharp's forecasted revenues and royalties using a 12% discount rate, the effect of discounting is small because Sharp is paying a running royalty on revenues. I discounted released sales using the T-bill rate. Because Sharp had only a small number of approved contributions, I assumed the grant back value was effectively zero. Therefore, I did not input Ericsson's revenues.

### d. Implied Ericsson One-Way Rates.

198. My calculations of the Ericsson one-way rates implied by the license are set forth in Figure 47:

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 47:  Implied Ericsson One-Way Rates (Sharp)[112]**

| Implied Ericsson One-Way Rates (2015-2022) | | |
|---|---|---|
| **Tech** | **%/Unit** | **$/Unit** |
| 3G | | |
| 4G<br>    FLOOR<br>    CAP | | |

199.   As an alternative method of analyzing the licenses, I calculated the implied Ericsson one-way rates by simply applying the express royalty terms contained in the licenses to Sharp's 2015 wholesale ASPs. The results of my calculations are seen in Figure 48:

**FIGURE 48:  Implied Ericsson One-Way Rates Assuming No Grantback (Sharp)[113]**

| Implied Ericsson One-Way Rates (2015) | | |
|---|---|---|
| **Tech** | **%/Unit** | **$/Unit** |
| 3G | | |
| 4G RATE | | |

200.   Because 4G is the latest technology and the market for 4G mobile phones is growing, I also calculated the implied dollar per-unit rate for the latest available quarter of data (2016Q2). In 2016Q2, Sharp would pay 

---

[112] Exhibit 5314.
[113] Exhibit 5314.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

rate of $4.50 per 4G unit (the license cap), assuming no grant back value.

### E. Unpacking Ericsson's One-Way, Running Royalty Rate Licenses.

#### 1. Coolpad.

##### a. CoolPad IDC Sales Data.[114]

201.   Based in China, Yulong (known as CoolPad in the United States) manufactures low-ASP mobile phones. Below, I report annual sales data reported from IDC for around the time the current license was executed and for 2015.

| Yulong (CoolPad) IDC Sales Data (2012) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| 3G | 18,768,528 | $126 |
| 4G | 460,190 | $149 |
| TOTAL | 19,228,718 | |

| Yulong (CoolPad) IDC Sales Data (2015) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| 3G | 3,614,883 | $44 |
| 4G | 25,132,791 | $107 |
| TOTAL | 28,747,674 | |

##### b. CoolPad License.

202.   Effective January 1, 2013, Erisson and Yulong entered into a global cross-license for their respective 2G, 3G, and 4G SEPs with a duration of five years. In effect, this a one-way license because Coolpad has no meaningful patent portfolio strength. The royalty terms of the license required Coolpad to pay the

---

[114] Exhibit 1000.

following running royalties: [115]

- ███ for products compliant with 2G in the Rest-of-World and ███ for products compliant with 2G in China.

- ███ for products compliant with 3G in the Rest-of-Word and ███ for products compliant with 3G in China.

- ███ for products compliant with 4G single-mode with ████████ ████████

- ███ for products compliant with 4G multi-mode subject to ████████ ████████ in the Rest-of-World and ███ for products compliant with 4G in China subject to a ████████

203.   Because Coolpad executed a 4G license prior to most other mobile phone suppliers, Ericsson granted Coolpad certain discounts on the royalties owed for sales in 2013 to 2016.

### c.   Implied Ericsson One-Way Rates.

204.   To calculate the Ericsson one-way rates implied by the license, I applied the royalty rates set forth above to the 2015 wholesale ASP data. Based on geographic sales data from Gartner, I assumed that Coolpad's licensed sales will be made solely in China. This was a conservative assumption because CoolPad does sell mobile phones in the United States where its sales are subject to a higher royalty rate. My results are set forth in Figure 49:

### FIGURE 49:  Implied Ericsson One-Way Rates (Coolpad)[116]

| Implied Ericsson One-Way Rates (2015) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |

[115] Exhibit 4773 at § 7.1.
[116] Exhibit 5317.

* Assuming all sales are in China.

Because 4G is the latest technology and the market for 4G mobile phones is growing, I also calculated the dollar per-unit rate for the latest available quarter of data (2016Q2).  In 2016Q2, CoolPad would pay ████████ per 4G unit (close to the license floor), assuming that all sales were in China.  For sales outside of China, CoolPad would be paying a higher rate.

### 2. Huawei.

#### a. Huawei License.

205.  Based in China, Huawei is the third-largest mobile phone supplier worldwide, with nearly three-quarters of its sales comprised of 4G units. Huawei is also a major infrastructure manufacturer in competition with Ericsson.

206.  Ericsson and Huawei executed a global patent cross-license agreement to their respective 2G, 3G, and 4G SEPs in January 2016, with an effective date of November 20, 2014.[117] The license covers the parties' respective infrastructure and mobile device products. I note that this license, unlike the other comparable Ericsson licenses, was executed as a result of a unique arbitration proceeding. For purposes of my analysis, I focused solely on the mobile device terms of the license. In effect, the mobile phone license is a one-way license from Ericsson to Huawei because the parties agreed that all of the grant back value to Ericsson would be

---

[117] Exhibit 1277 at § 7.1.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

afforded to the infrastructure cross-license.

207.   Pursuant to the license, Huawei agreed to running royalty rate of ███████████████████ and a ████████████████████████████ ███ Unlike all other running royalty rate agreements, the Huawei 2014 license ███████████████████████. These rates are unique among Ericsson's comparable licenses because the ████████████████████ ███████████████████████████████████████████████ ██████████████████████ For example, as of November 2016, Huawei was selling a non-LTE large tablet called the Matebook for $1,200.[118] If Huawei sells an LTE-enabled version, it will pay a royalty of greater than ████████████████████████████████

### b.   IDC Sales Data.[119]

208.   Below, I report annual sales data reported by IDC for around the time the license was executed:

| Huawei IDC Sales Data (2015) | | |
|---|---|---|
| **Tech** | **Units** | **Retail ASP ($)** |
| GSM/GPRS | 139,323 | $22 |
| EDGE | 259,419 | $140 |
| 3G | 25,515,749 | $113 |
| 4G | 81,596,069 | $231 |
| TOTAL | 107,510,561 | ████████ |

---

[118] Exhibit 5310.
[119] Exhibit 1000.

### c.    Implied Ericsson One-Way Rates.

209.   My calculations of the Ericsson one-way rates implied by the license, using wholesale ASPs for 2015, are seen in Figure 50:

**FIGURE 50:  Implied Ericsson One-Way Rates (Huawei)[120]**

| Implied Ericsson One-Way Rates (2015) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| 3G | | |
| 4G | | |

210.   I only calculated implied Ericsson one-way rates for 3G and 4G because Huawei's sales of 2G mobile phones are immaterial. Because 4G is the latest technology and the market for 4G mobile phones is growing, I also calculated the implied dollar per-unit rate for the latest available quarter of data (2016Q2), which is ▮▮▮▮▮▮▮▮.

211.   This license is an outlier in that it has lower percentage per-unit royalty rates and lower dollar per-unit effective rates than Option A and B. However, these lower percentage per-unit royalty rates still imply significant dollar per-unit rates for both 3G and 4G because of Huawei's ASPs.

### 3.    Karbonn.

### a.    Karbonn License.

212.   Karbonn is an India-based joint-venture between Jaina Marketing, Inc. and United Telelinks, Inc, each of whom are parties to a license with Ericsson with identical terms. Because of this particular structure, I treat the joint-venture as a single company and treat the two licenses as a single license. Karbonn sells

---

[120] Exhibit 5317.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

primarily low-ASP mobile phones.

213.   Effective January 1, 2013, Ericsson and Karbonn entered into a global patent cross-license covering 2G and 3G SEPs, ending March 31, 2020.[121] The license included running royalty rates that changed over time, as well as different rates for India and the rest of the world: [122]

- In India until March 31, 2014, Karbonn would pay 0.80% for GSM; 0.80% for GSM & GPRS; 1.00% for GSM, GPRS, & EDGE; and 1.00% for 3G.

- In India from April 1, 2014 until March 31, 2015, Karbonn would pay 0.80% for GSM; 0.80% for GSM & GPRS; 1.10% for GSM, GPRS, & EDGE; and 1.10% for 3G.

- In India from April 1, 2015 until the expiration of the license, Karbonn would pay 0.80% for GSM; 1.00% for GSM & GPRS; 1.30% for GSM, GPRS, & EDGE; and 1.30% for 3G.

- For the rest of the world until March 31, 2014, Karbonn would pay 1.75% for GSM; 1.75% for GSM & GPRS; 2.50% for GSM, GPRS, & EDGE; and 2.50% for 3G.

- For the rest of the world April 1, 2014 until March 31, 2015, Karbonn would pay 1.75% for GSM; 1.75% for GSM & GPRS; 2.40% for GSM, GPRS, & EDGE; and 2.40% for 3G.

- For the rest of the world from April 1, 2015 until the expiration of the license, Karbonn would pay 1.75% for GSM; 1.75% for GSM & GPRS; 2.20% for GSM, GPRS, & EDGE; and 2.20% for 3G.

---

[121] Exhibit 4000; Exhibit 4919.
[122] Exhibit 4000 at Appendix 1; Exhibit 4919 at Appendix 1.

214.   Ericsson and Karbonn amended their license effective March 27, 2015.[123] The amendment removed the regional rate structure and provides for a single set of worldwide rates as follows:[124]

- Until March 31, 2014, Karbonn would pay 0.80% for GSM; 0.80% for GSM & GPRS; 1.00% for GSM, GPRS, & EDGE; and 1.00% for 3G.

- From April 1, 2014 until March 31, 2015, Karbonn would pay 0.80% for GSM; 0.80% for GSM & GPRS; 1.10% for GSM, GPRS, & EDGE; and 1.10% for 3G.

- From April 1, 2015 until the expiration of the license, Karbonn would pay 0.80% for GSM; 1.00% for GSM & GPRS; 1.30% for GSM, GPRS, & EDGE; and 1.30% for 3G.

b.   **IDC Sales Data.[125]**

215.   Below, I report annual sales data reported by IDC for around the time the license was executed and for 2015:

| Karbonn IDC Sales Data (2014) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 17,011,955 | $21 |
| EDGE | 2,671,964 | $55 |
| 3G | 2,025,131 | $95 |
| TOTAL | 21,709,050 | |

---

[123] Exhibit 4905; Exhibit 4020.
[124] Exhibit 4905; Exhibit 4020.
[125] Exhibit 1000.

106

| Karbonn IDC Sales Data (2015) | | |
|---|---|---|
| **Tech** | **Units** | **Retail ASP ($)** |
| GSM/GPRS | 12,796,722 | $16 |
| EDGE | 1,224,066 | $42 |
| 3G | 1,716,615 | $68 |
| TOTAL | 15,748,867 | |

### c.  Implied Ericsson One-Way Rates.

216.   Using 2015 wholesale ASP data, I calculated the implied Ericsson one-way rates that are set forth in Figure 51:

**FIGURE 51:  Implied Ericsson One-Way Rates (Karbonn)[126]**

| Implied Ericsson One-Way Rates (2015) | | |
|---|---|---|
| **Tech** | **%/Unit** | **$/Unit** |
| GSM/GPRS* | 0.8% / 1.0% | $0.14 |
| EDGE* | 1.30% | $0.47 |
| 3G* | 1.30% | $0.78 |
| * I applied the rates in place as of April 1, 2015. | | |

### 4.  Doro.

#### a.  Doro Licenses.

217.   Doro is a Sweden-based mobile phone supplier. Effective July 1, 2013, Ericsson and Doro entered into a global patent cross license agreement for their respective 4G SEPs, ending September 30, 2016. Doro AB would pay Ericsson a percentage running royalty rate of 2.00% for 4G multi-mode units

---

[126] Exhibit 5317.

107

subject to a floor of SEK 15 ($1.78) and a cap of SEK 40 ($4.74).[127] Effective July 1, 2013, Ericsson and Doro AB amended a prior global patent cross license agreement for their respective 3G SEPs.[128] Under the amendment, Doro agreed to pay Ericsson a running royalties of 1.75% for 3G units. Effective July 1, 2014, Ericsson and Doro AB entered into a global patent cross license agreement for their respective 2G SEPs.[129]  Under this license, Doro agreed to pay Ericsson a percentage running royalty rate of 1.25% for GSM and GPRS units and 1.50% for EDGE units. Because Doro has no meaningful patent portfolio strength, all three of these licenses are effectively one-way licenses to Doro under Ericsson's SEPs.

### b.    IDC Sales Data.[130]

218.   Below, I report annual sales data reported from IDC for around the time the licenses were executed and for 2015:

| Doro AB IDC Sales Data (2013) | | |
|---|---|---|
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 1,366,539 | $114 |
| 3G | 512,487 | $110 |
| TOTAL | 1,879,026 | |

---

[127] Exhibit 4739 at § 7.1.
[128] Exhibit 4738.
[129] Exhibit 4737 at § 7.1.
[130] Exhibit 1000.

| Doro AB IDC Sales Data (2014) | | |
| --- | --- | --- |
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 1,068,667 | $83 |
| EDGE | 105,682 | $51 |
| 3G | 852,834 | $121 |
| TOTAL | 2,027,183 | |

| Doro AB IDC Sales Data (2015) | | |
| --- | --- | --- |
| Tech | Units | Retail ASP ($) |
| GSM/GPRS | 1,155,399 | $64 |
| EDGE | 264,560 | $60 |
| 3G | 1,128,082 | $112 |
| 4G | 19,506 | $225 |
| TOTAL | 2,567,547 | |

### c.    Implied Ericsson One-Way Rates.

219.   Using 2015 wholesale ASP data, I calculated the implied Ericsson one-way rates that are set forth in Figure 52:

### FIGURE 52:  Implied Ericsson One-Way Rates (Doro)[131]

| Ericsson-Doro 2013/14 Effective Rates | | |
| --- | --- | --- |
| Tech | %/Unit | $/Unit |
| GSM/GPRS | 1.25% | $0.70 |
| EDGE | 1.50% | $0.79 |
| 3G | 1.75% | $1.71 |
| 4G | 2.00% | $3.92 |

---

[131] Exhibit 5314.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| FLOOR | 15 SEK (≈$1.78) | |
| CAP | 40SEK (≈$4.74) | |

220.   Because 4G is the latest technology and the market for 4G mobile phones is growing, I also calculated the dollar per-unit rate for the latest available quarter of data (2016Q2).  In 2016Q2, the Ericsson one-way rate implied by the Doro 4G license is $3.82 per-unit.

### 5.   Other Comparable Licenses.

221.   In addition to the comparable licenses that I have discussed, Ericsson has entered into SEP licenses with multiple, smaller mobile phone suppliers. I analyzed Ericsson's licenses with these companies using the same methodology that I applied to Ericsson's other one-way licenses, to the extent that IDC sales data was available to me. The results of my analysis are set forth in Figure 53 below:

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 53:  Ericsson Implied Percentage Per-Unit Rates (Audioline, Beafon, Bullitt, Binatone, Emporia, Mobistel)[132]**

| Tech | Audioline 2014[133] | Bea-fon 2014[134] | Bullitt 2014[135] | Binatone 2014[136] | Emporia 2015[137] | Mobistel 2014[138] |
|---|---|---|---|---|---|---|
| GSM/GPRS | 1.25% | 1.25% | 1.25% | 1.25% | 1.10% | 1.25% |
| EDGE | 1.50% | 1.50% | 1.50% | 1.50% | 1.30% | 1.50% |
| 3G | 1.75% | 1.75% | 1.75% | 1.75% | 1.50% | 1.75% |
| 4G | 2.00% | 2.00% | 2.00% | 2.00% | 1.80% | 2.00% |
| 4G FLOOR | €2.00 | €2.00 | $2.50 | $2.50 | $2.00 | €2.00 |
| 4G CAP | €4.50 | €4.50 | $6.00 | $6.00 | $4.50 | €4.50 |

222.   Using the available IDC sales data, I estimated the wholesale ASP for each of these companies and calculated the implied Ericsson one-way rates on a dollar per-unit basis for 2015. Because Bullitt manufactures mobile phones for other brands, including Caterpillar, I used Caterpillar price data to analyze the Bullitt license. My implied dollar per-unit rate calculations are seen in Figure 54:

---

[132] Exhibit 5317.

[133] Exhibit 4777 § 7.1; Exhibit 4920 at § 7.1.

[134] Exhibit 4702; Exhibit 4703 at § 7.1.

[135] Exhibit 4732; Exhibit 4733 at § 7.1.

[136] Exhibit 4688 at § 7.1; Exhibit 4729.

[137] Exhibit 4934 at § 7.1; Exhibit 4021.

[138] Exhibit 4750; Exhibit 4751.

**FIGURE 54:  Ericsson Implied One-Way Dollar Per-Unit Rates (Audioline, Beafon, Bullitt, Binatone, Emporia, Mobistel)[139]**

| Tech | Audioline 2014 | Beafon 2014 | Bullitt 2014 (Caterpillar) | Binatone 2014 | Emporia 2015 | Mobistel 2014 |
|---|---|---|---|---|---|---|
| GSM/GPRS | $1.15 | $0.48 | | $0.50 | $0.60 | |
| EDGE | | | | | $1.04 | |
| 3G | $2.29 | | | | $1.81 | $1.88 |
| 4G | | | $6.00 | | | |

223.   As seen here, Ericsson's comparable licenses with these smaller mobile phone suppliers support a conclusion that Option A and Option B are FRAND.

224.   In summary, my comparable license analysis on a dollar per-unit basis and on a percentage per-unit basis demonstrates that Ericsson's Option A and Option B offers to TCL are FRAND. This is because the Ericsson one-way royalty rates implied by both offers easily fall within the range of royalty rates implied by Ericsson's comparable licenses, which, as I have explained, are the best source of available information regarding the value of Ericsson's 2G, 3G, and 4G SEP portfolios.

## IX.    EX-STANDARD VALUE OF ERICSSON'S 4G SEP PORTFOLIO

225.   One of the most debated issues with FRAND licensing has been whether the license price should include the value that a patent gains by being adopted into an industry standard.  This value is sometimes referred to as "hold-up" value, because it refers to the theoretical ability of a SEP owner to demand higher royalties after the industry becomes "locked in" to a standardized

---

[139] Exhibit 5314.

technology than it could have obtained through licensing the SEP before the standard was adopted.

226.   Several of TCL's experts have suggested, without concluding, that Ericsson is engaging in "patent hold-up" to demand royalties in excess of the intrinsic value of Ericsson's standardized patented technology. There are two problems with these assertions: (1) the rate to be set in this matter is by a neutral tribunal, so there can be no hold-up, and (2) TCL's experts have made no attempt to independently value Ericsson's SEPs, separate and apart from any value associated with the incorporation of those SEPs into the cellular standards, to show that Ericsson is in breach of FRAND.

227.   In recent years, some commentators have suggested that to be FRAND, a license must not include value derived by virtue of the fact that the SEP is incorporated into the standard.  Then, in Ericsson v. D-Link, the Court of Appeals for the Federal Circuit noted that the "…RAND royalty rate must be based on the value of the invention, not any value added by the standardization of the invention."[140]  Rather, the damages must be limited to the "incremental" value of the SEP, as apportioned from any value associated with its adoption into the standard.  I refer to this incremental value, which does not include the value resulting from incorporation of the patented technology into the standard, as the "ex-standard" value of the SEP.  Although it is unclear whether this concept was part of the intent of ETSI when it enacted its IPR Policy, I have nonetheless considered whether the ex-standard value of Ericsson's 4G SEPs indicates that Ericsson's Option A and Option B offers were fair and reasonable when made to TCL, and determined that to be the case.

---

[140] *Ericsson, Inc. v. D-Link Systems, Inc.* 773 F. 3d 1201 (Fed. Cir. 2014).

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

228.   In contrast to TCL's experts, I estimated the economic value of Ericsson's 4G SEPs, independent of any value afforded to those SEPs by way of their incorporation into the 4G standard.  I call this the "ex-standard" value.  The value of Ericsson's patents, divorced from any value solely due to their inclusion in the standard, is shown here in Figure 55:

**FIGURE 55:  Economic Value of Ericsson's Inventions[141]**

| TECHNOLOGY IMPROVEMENT | EX-STANDARD VALUE |
|---|---|
| Improved Battery Life From Sleep-Mode Solutions | $16 to $42 per phone |
| Faster Data Rates From 4G Improvements | $26 to $33 per phone |
| Less Latency | $++ |
| Improved Network Performance | $++ |
| **TOTAL** | **$42 to $75 per phone, plus other benefits** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved Contributions (≈15%) | $6.15 to $11.02 per phone, plus other benefits |

229.   As can be seen, the value of the technology covered by Ericsson patents is at least $42 to $75 per phone, plus other benefits.  This is based on my quantification of the improved battery life and faster data rates that could not be achieved, according to Dr. Parkvall, without Ericsson's patented technology.  In addition, reductions in latency and improved network performance are valuable, but because it was difficult to quantify a specific per-unit value for these

---

[141] Exhibit 5318.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

improvements in the time allotted for the preparation of my rebuttal report, I have left them unquantified as benefits.  However, the difficulties in quantification do not detract from the fact that these are valuable benefits.  This means that my overall estimate of the ex-standard value of Ericsson's 4G technology – which relies only on my estimate of the value associated with improved battery life and faster data rates – is conservative.  I will now describe how I reached these conclusions.

### A.    Background.

230.    To ascertain the ex-standard value of Ericsson's SEP patent portfolio, I worked with Ericsson's expert, Dr. Stefan Parkvall, to (a) isolate and identify the specific technical contribution of 4G SEPs to the cellular standards by comparison to the next best available non-infringing alternative, (b) estimate the economic value of the technical contribution of all 4G SEPs over the next best available non-infringing alternative, and (c) apportion Ericsson's share of that economic value. Dr. Parkvall performed the initial step of the analysis, and I performed the remaining steps.

231.    The ex-standard analysis began with Dr. Parkvall undertaking a study of Ericsson's SEP portfolios, as described by Dr. Parkvall in his witness declaration.[142]  Dr. Parkvall began by subdividing Ericsson's essential patents into 10 distinct "technical clusters."[143] These technical clusters are listed in Figure 56:

#### FIGURE 56: Technical Clusters

| TECHNICAL CLUSTERS | |
|---|---|
| 1.  Connection Establishment | 6.  Sleep Mode Solutions |

---

[142] Parkvall Witness Decl. ¶ 2.
[143] Parkvall Witness Decl. ¶ 56.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| 2. Radio Transmission & Link Adaptation | 7. Advanced Antenna Solutions |
|---|---|
| 3. Data Transmission | 8. Carrier Aggregation |
| 4. Resource Allocation | 9. Voice Coding |
| 5. Mobility & Connection Control | 10. Security |

232.   After identifying the ten technical clusters, Dr. Parkvall determined the next best alternative technology for each technical cluster that did not use any of Ericsson's patents.[144]  I note that TCL has never proposed an overall, comprehensive, and workable technical solution for these features that avoids infringement of all of Ericsson's patents.  Overall, Dr. Parkvall concludes that the only way to avoid infringement of Ericsson's patents would be to reduce the features and performance of the standard by removing certain technologies, for instance by reverting back to earlier versions of the standard.[145]

233.   Dr. Parkvall also identified four primary "technical benefits" to cellular carriers and mobile phone end users that are produced directly by Ericsson's innovations in the technical clusters, including (i) improved battery life, (ii) faster data speeds, (iii) fewer connection delay/less latency, and (iv) improved system capacity/network performance.[146]  In my analysis, I refer to these technical benefits as "technical currencies" because their value can be measured economically.

---

[144] Parkvall Witness Decl. ¶ 70.
[145] Parkvall Witness Decl. ¶¶ 90, 109, 139, 157,181.
[146] Parkvall Witness Decl. ¶¶ 93,113,145,161,184.

116

**B.     Economic Value of the Four Technical Currencies.**

234.   Having identified the four technical currencies, I next measured the economic value of the improvements to each technical currency as between 4G and the alternative identified by Dr. Parkvall.  After measuring the economic value of these improvements, I estimated Ericsson's share of the economic value to the consumers.  I will now describe this work in more detail.

**1.     Economic Value from Improved Battery Life.**

235.   Battery life is regularly acknowledged by consumers as being one of the most important features driving their mobile phone purchase decision.[147]  TCL highlighted this point in a "Mobile Consumer Behavior Study" presentation on August 14, 2013, finding that battery life ranks as the third most important feature to customers behind only durability and ease of use when making their purchase decisions:

---

[147] Exhibit 4839; Exhibit 4837.

117

### Exhibit 4854:  TCL Mobile Consumer Behavior Study PowerPoint[148]



236.   According to Dr. Parkvall, battery life is directly improved by 4G innovations (that include Ericsson's patented technology) in many of the technical clusters by reducing the power consumption of the mobile phone.  With reduced power consumption, a standard battery can operate for longer than with higher consumption.  This allows mobile phone manufacturers to design smaller mobile phones with the same battery life.  As an example of how Ericsson's technology improves energy efficiency, Dr. Parkvall opines that Sleep Mode Solutions that incorporate Ericsson's technology allow a 4G mobile phone to enter into an effective sleep-mode that conserves a mobile phone's power, which is further enhanced by the speed at which mobile phones can switch between idle and active

---

[148]   Exhibit 4854 at TCL_ERIC_CDCA0913466.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

states.  This efficiency accounts for a 53% increase over the alternative solution.[149] Other technical clusters also include solutions that benefit battery life.  To simplify matters, I focused my attention on estimating the economic value of a 53% improvement in battery life.

237.    In my opinion, the 53% increase in battery life is worth between $16 and $42 per 4G mobile phone to consumers.  I formed my opinion based on a review of market reports issued about the time 4G was being commercially rolled out, price data, and consumer surveys.  These sources included a polling survey that estimated what consumers would be willing to pay for additional battery life.  Additionally, these sources include price data on what consumers would pay to purchase an external battery case that increases overall battery capacity.

238.    After determining the consumer value of the 53% improvement in battery life, I apportioned a fraction of that value to Ericsson.  I performed this apportionment in two alternative ways. First, based on Ericsson's relative share of approved contributions following the methodology identified in a 2010 Signals Research Group report, which measured Ericsson's relative share of approved contributions to wireless standards. I apportioned Ericsson's share of the value and calculated Ericsson's share to be between $2.32 and $6.20 per 4G mobile phone. Second, I performed an alternative calculation based on Dr. Ding's (TCL's expert) industry wide patent-counting results (which I don't agree with, but I used for the sale of argument), under which Ericsson's share of the additional value is worth between $0.95 and $2.55 per 4G mobile phone.

### a.    Valuation of Improved Battery Life.

239.   To economically quantify the benefit of improved battery life, I relied

---

[149] Parkvall Witness Decl. ¶¶ 176, 177, 184.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

on surveys taken in 2012.  International Planning & Research, an international consulting firm, conducted a survey of 306 American smartphone users in its Smartphone Feature Analysis issued August 2012.[150]

240.   The Smartphone Feature Analysis survey measured consumers' willingness to pay for increased battery life in two-hour increments.[151]  According to the survey, assuming a base level of talk time of 6 hours, customers indicated that they would be willing to pay $9.42 for 2 additional hours to get to 8 total hours, $9.51 for an additional two hours to get to 10 hours, and an additional $11.06 to get to a total of 12 hours of talk time.[152]  On average, customers would be willing to pay $10.00 for each 2 additional hours of talk time or $5.00 for each additional one hour of talk time.

241.   Next, I estimated the economic value of a 53% improvement in battery life provided by Sleep Mode Solutions technical cluster.  A 53% improvement to a standard battery life of 6 hours would result in an increase of total battery life by 3 hours.  Applying the average consumer willingness to pay for additional talk time, three hours of additional battery life would be worth about $15.89.  Thus, I concluded that the improvement to battery life was worth $15.89 to consumers.[153]

242.   Next, I estimated Ericsson's contribution to the 53% improvement in battery life.  I understand that many companies contributed solutions that may work in tandem with Ericsson's technology.  I therefore further apportioned this amount.  Apportioning based on Ericsson's share of approved contributions

---

[150] Exhibit 4858.
[151] Exhibit 4858 at 16.
[152] Exhibit 5320.
[153] Exhibit 5320.

(14.6%); Ericsson's share is $2.32 per mobile phone.  But even apportioning based on the results of TCL's own patent counting analysis (6.0%), which I do not agree with, Ericsson's share is still $0.95 per mobile phone. This is seen in Figure 57:

**FIGURE 57:  Economic Value of 53% Improvement In Battery Life (Model 1)[154]**

| DESCRIPTION | CALCULATION |
|---|---|
| Base Level Talk Time | 6 hours |
| 53% Increase in Battery Life (in Talk Time) | 3.18 hours |
| Average Willingness to Pay For Additional Talk Time (IPR Smartphone Feature Analysis) | $5.00 per hour |
| **Customer Willingness to Pay For 53% Increase In Battery Life** | **$15.90** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved 4G Contributions (≈15%) | $2.32 |

### b.    The Value of Battery Life As Measured In Milliampere Hours.

243.   As an alternative approach, or cross check, to economically quantify the benefit of a 53% improvement in battery life, I considered price data for external cell phone battery chargers, like the Mophie battery case charger.  Battery life is measured in milliampere hours (mAh).  Milliampere hours are a unit for

---

[154] Exhibit 5320.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

measuring electric power over time and mAh is commonly used to describe the total amount of energy a battery can store. A higher mAh rating means the (fully-charged) battery can power a device that consumes more power and/or for a longer amount of time before becoming depleted and needing to be re-charged.  For example, a battery rated at 1,500 mAh can power a device drawing 100 milliamps for 15 hours, or a device drawing 150 milliamps for 10 hours.  In other words, a device using more power will drain the same battery faster. In that same example, a larger battery, rated 3000 mAh, could power a device drawing 100 milliamps for 30 hours.

244.   Many cell phone external battery chargers are very large and require a separate cable to connect them to a phone.  This greatly diminishes cell phone usability during periods of "re-charge."  However, the Mophie battery case charger is slim, it attaches directly to a cell phone like a typical cell phone cover, and it enables a user to access the Mophie's power with a simple switch of a button. While still negatively impacting the form factor of a phone, it is one of the products on the market that most closely replicates the user experience provided by a cell phone without an external charger, and as such provides a conservative benchmark for cross check purposes.

245.   I analyzed the retail price of six different Mophie battery case chargers being offered for sale from mophie.com as of April 1, 2016.[155]  The average of these six case chargers provides 2,357 mAh of power on a full charge.[156] The average retail price for these case chargers was $89.95.[157]  Thus, I

---

[155] Exhibit 5319.
[156] Exhibit 5319.
[157] Exhibit 5319.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

calculated that the average Mophie battery case delivers 1,000 mAh hours for
$38.47.

246.   Next I considered what a 53% increase in battery life meant for TCL's
mobile phones.  I analyzed the battery capacity of six of TCL's current phones (as
of April 2016) available in the United States.  I calculated how much additional
battery power would be necessary to increase the battery life of TCL's mobile
phones by 53%.  I then calculated how much a Mophie external charger would cost
to provide the additional 53% of battery power.  I calculated that the additional
53% in battery life would cost $42.48 per mobile phone.[158]  This is in the range of
the results from my prior estimation and confirms them.

247.   Finally, I apportioned the overall benefit of $42.48.  Based on
approved contributions, Ericsson's share is $6.20 per mobile phone.  Alternatively,
using TCL's own patent counting results, which I don't agree with, Ericsson's
share of the battery life value is still $2.55 per mobile phone. This is seen in Figure
58:

---

[158] Exhibit 5319.

123

**FIGURE 58:  Economic Value of 53% Improvement In Battery Life (Model 2)[159]**

| DESCRIPTION | CALCULATION |
|---|---|
| Average Battery Capacity of Sample TCL Phones | 2,083 mAh |
| 53% Increase In Battery Life (in mAh) Due To Sleep-Mode Solutions | 1,104 mAh |
| Average Price for Mophie Battery Charger to Deliver 1,000 mAh | $38.47 per 1,000 mAh |
| **Cost of 53% Increase of 1,104 mAh** | **$42.48** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved 4G Contributions (≈15%) | $6.20 |

### 2.      Economic Value From Faster Data Speeds.

248.    While 2G, 3G, and 4G technologies and standards provide for a wide range of technical benefits, the "speed" at which consumers can access data through their mobile mobile phones often serves as a proxy for the "G" technologies as a whole.  More simply, many consumers relate the primary value of 2G, 3G, and 4G to the speed at which they can download data enabling them to stream content more quickly. [160]

249.    According to Dr. Parkvall, Carrier Aggregation, an aspect of 4G that includes Ericsson's essential patents, provides upwards of 80% of the higher user data rates than any alternative solutions lacking Ericsson's patented

---

[159] Exhibit 5319.
[160] Exhibit 4831.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

technologies.[161]  As explained in Dr. Parkvall's witness statement, Ericsson's innovations improve data rates in many ways, through various technology clusters. Since many of the most popular functions that can be performed on smartphones rely heavily on the data rates made possible through Ericsson's essential patents, it is not difficult to understand the tremendous value of increased data rates to end users.[162]

250.   In my opinion, 4G data speeds are worth between $26 and $33 per 4G mobile phone.  I formed my opinion based on a review of market reports, price data, consumer surveys, and other market information.  Based on approved contributions, Ericsson's share of the consumer value of 4G data speeds is between $3.83 and $4.82 per 4G mobile phone.  Based on TCL's own patent-counting results (which I don't agree with), Ericsson's share of the consumer value of 4G data speeds is between $1.57 and $1.98 per 4G mobile phone.

### a.    Customers' Willingness To Pay For 4G Speed Over 3G Speed.

251.   Based on Dr. Parkvall's evaluation of the technologies, I understand that Ericsson's patented technology was critical to improve data speeds from 3G to 4G.[163]  To approximate Ericsson's collective contribution to data speed, I considered what a user would be willing to pay for 4G versus 3G (a theoretical non-infringing alternative that does not use Ericsson's 4G technology).

252.   I again relied on the 2012 Smartphone Feature Analysis conducted by International Planning and Research.  The Smartphone Feature Analysis measured

---

[161] Parkvall Witness Decl. ¶¶ 214.
[162] Exhibit 4833.
[163] Parkvall Witness Decl. ¶¶ 196, 214.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

customers' willingness to pay for 4G speed over 3G speed.[164] According to the survey, customers would be willing to pay $33 for increased 4G speeds over 3G speeds.[165] I then apportioned this value. Based on approved contributions, Ericsson's share is $4.82 per mobile phone. Alternatively, even using TCL's own patent counting results, Ericsson's share of the value just for increased data speed is $1.98 per mobile phone. This is seen in Figure 59:

**FIGURE 59:  Economic Value of Faster 4G Data Speeds (Model 1)[166]**

| DESCRIPTION | CALCULATION |
|---|---|
| Average Willingness To Pay For 4G Data Speeds (Smartphone Feature Analysis Survey 2012) | **$33.00** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved 4G Contributions (≈15%) | $4.82 |

253.    Accenture Web Watch is another study that measured the amount customers would be willing to pay for the increased speed of 4G over 3G.[167] Accenture is a major consulting firm with a significant IP consulting business.  In the Accenture Web Watch 2013 study, Accenture interviewed over 30,000 mobile consumers in 26 countries between November 2012 and January 2013 to investigate mobile trends.  According to the survey, over 63% of mobile users

---

[164] Exhibit 4858 at ERIC_TCL781515.
[165] Exhibit 4858 at ERIC_TCL781515.
[166] Exhibit 5321.
[167] Exhibit 4845.

WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

would be willing to pay more for 4G speed over 3G speed.[168]

254.   Based on the results of the Accenture Web Watch 2013 study, I calculated that the weighted average amount customers would be willing to pay for 4G technology over 3G technology was 8.30%.[169]  To calculate a dollar value, I used the average sales price in 2012 for a 3G capable phone ($316).[170]  I concluded that, based on the Accenture Web Watch 2013 survey, consumers were willing to pay $26.24 on average for 4G data speeds.  I then apportioned the value to Ericsson.  Based on approved contribution counts, Ericsson's share is $3.83 per mobile phone.   Alternatively, even using Dr. Ding's patent counting results, Ericsson's share is $1.57 per mobile phone. This is seen in Figure 60:

---

[168] Exhibit 4845 at Figure 3.
[169] Exhibit 5322.
[170] Exhibit 1000.

127

## FIGURE 60:  Economic Value of Faster 4G Data Speeds (Model 2)[171]

| DESCRIPTION | CALCULATION |
| --- | --- |
| Weighted Average Willingness To Pay For 4G Data Speeds (Accenture Web Watch 2013) | 8.30% |
| 2012 Average Sales Price for 3G Unit (IDC Data) | $316.19 |
| **Weighted Average Willingness To Pay For 4G Data Speeds (Dollar Value)** | **$26.24** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved Contributions (≈15%) | $3.83 |

### b.     Other Benefits of Faster Data Speeds.

255.   Faster data speeds also create a market for new cellular products. This is one of the exciting developments of new technological advancements. Surveys cannot capture many of these benefits because they are being created so quickly.

256.   One such new product is advanced mobile gaming.  While often stereotypically viewed as a "kids-thing", mobile gaming is a billion dollar business.  Mobile game worldwide revenue is expected to reach $40 billion by 2017.  Faster 4G data speeds allow for multi-player mobile games that allow users to compete in real-time against each other.

---

[171] Exhibit 5322.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

257.   Multi-player mobile games require 4G connection speeds and many multi-player mobile games don't let you play against others if you are using 3G. Given that multi-player games accounted for 60% of consumer spending among top 50 games, there is a powerful market developing.

### 3.   Economic Value Indications From Less Latency.

258.   Network latency is the wait time required for data to travel the "round trip" geographical distance from an original location to a destination and back. Latency is normally measured in milliseconds.

259.   Unfortunately, due to a lack of existing consumer surveys at the time of my expert report relative to the specific economic value of reduced latency, I lacked the necessary information to calculate a precise dollar per-unit value that comes from improvements of less latency.  However, I performed a high level analysis simply to establish the clear benefits of this technical currency.

260.   According to a Nokia Siemens Networks study undertaken to measure the impact of latency on application performance, latency is often times more important to the consumer mobile broadband experience than data rates.  Many IP based applications, such as VoIP, music downloads, e-mail synchronization, and online gaming are more affected by low latency than the speed at which data can be delivered.[172]  Video-conferencing is a good example of how high latency negatively effects the consumer experience.  Video-conferences or FaceTime video chats often lag if latency is a problem, no matter how fast the download speeds are.

261.   Latency also matters to online merchants because online customers are impatient and impatience costs sales.  Page load time (PLT) is the amount of time it takes for a web page to show up on a mobile phone screen from the point of

---

[172] Exhibit 4838.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

initiation (when a user clicks on a page link or types in a Web address) to completion (when the page is fully loaded in the browser).[173]  PLT is regularly highlighted by customers as one of their main sources of frustration with mobile networks.  In fact, a one-second delay in page load time has been shown to cause a 7 percent loss in conversion and 11 percent fewer page views.  For an online store earning $50,000 a day, that one-second delay adds up to more than $1 million in lost sales each year.[174]

262.   In a KissMetrics analytics blog article titled "How Loading Time Affects Your Bottom Line,"[175] page load time is tied to website abandonment and loss of revenue.  According to the article, page load time is a major contributing factor to page abandonment, and users have no patience for a page that takes too long to load.  The following chart (Figure 61) shows that more than 30% of mobile web users will abandon a website that takes more than 6-10 seconds to load.

**FIGURE 61**

---

[173] *What is page load time and why is it so important*, BIGCOMMERCE.COM (May 6, 2015), Exhibit 4840.

[174] Exhibit 4840.

[175] S. Work, *How Loading Time Affects Your Bottom Line*, Kissmetrics.com (2011), Exhibit 4835.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**263.** According to a Radware research study on web performance, the total cost of abandoned shopping carts for online retailers has been estimated at more than $18 billion per year. [176] When this statistic is coupled with the fact that 18% of online shoppers will abandon their shopping cart if pages are too slow, this correlates to more than $3 billion in lost sales (across US e-commerce sites) due to poor performance. [177]

**264.** Latency is also very important to cellular network operators because reducing latency improves overall network performance with no additional

---

[176] Exhibit 4832.
[177] Exhibit 4832.

131

investment. For example, reduced latency allows a network to increase a user's maximum download speed. A study performed by Nokia Siemens Networks indicates that if latency in a network was reduced by a third, the maximum data rate the network could deliver would actually triple without making any other changes to the network.[178]

265. Ericsson's Connection Establishment 3G and 4G SEPs provide end users with 10 times faster effective data rates due to significantly reduced latency compared to 2G quality alternatives.[179] Based on the previously mentioned latency studies discussing the impact of latency on application performance and web based retail sales, the economic value of Ericsson's contributions is substantial, even if difficult to quantify.

### 4. Economic Value From Improved System Capacity/Network Performance.

266. System capacity, or network performance, generally relates to the overall reliability and performance of a cellular carrier. With our smartphones playing such a large part in our daily lives, it's no surprise that consumers expect fast and reliable mobile performance wherever they are.

267. Unfortunately, as with the reduced latency technical currency, due to a lack of existing consumer surveys at the time of my expert report relative to the specific economic value of improved network performance, I lacked the necessary information to calculate a precise dollar per-unit value that comes from improvements to network performance. However, I performed a high level analysis simply to establish the clear benefits of this technical currency.

---

[178] Exhibit 4838

[179] Parkvall Witness Decl. ¶¶ 161, 175.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

268.   In June 2013 Ericsson ConsumerLab undertook a study to identify what drives customer loyalty to cellular carriers (AT&T, Verizon, Sprint, T-Mobile, etc.) and additionally identify the monetary value that can be gained by improving network performance.[180] The online study across 12 countries gathered quantitative results from 1,000 smartphone users per country. These countries include US, Mexico, Brazil, Chile, UK, Sweden, Russia, Turkey, South Korea, China, Japan and Indonesia. Those interviewed were users aged 18-69 who use their smartphones to access the Internet at least once a week. Overall, the study is representative of more than 350 million smartphone users.

269.   The study demonstrates that network performance is the principal driver behind subscriber loyalty to cellular carriers.[181] In fact, network performance has twice the impact on loyalty compared to pricing plans and customer support.[182] In order for network performance to be perceived as good quality, cellular carriers need to ensure that content loads quickly.[183]

270.   The study indicates that consumers believe that they receive value for their money spent if network performance is acceptable:

---

[180]   Exhibit 4834.
[181]   Exhibit 4834 at 10.
[182]   Exhibit 4834 at 6.
[183]   Exhibit 4834 at 11.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

## **Exhibit 4834:  Consumers Believe They Receive Value As Network Performance Improves**



271.   This suggests that improving network quality also improves perceived value for money – without actually lowering pricing plans.

272.   The following graphic demonstrates the projected results that would come from improving user satisfaction with network performance by 5%. The difference between promoters (advocates) and detractors (opponents) equals the Net Promoter Score or NPS.  An increase of 7 in the NPS for the cellular carrier would translate to an additional $69 per customer over the course of the number of years they spend with the cellular carrier (described on the graphic as Customer Total Value or CTV).[184]

---

[184]  Exhibit 4834 at 10.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Exhibit 4834: Network Performance Study**



Figure 9: The projected benefits of improving satisfaction with network performance

NETWORK PERFORMANCE
Today: 6.76 (mean)

NETWORK PERFORMANCE
Increase +5%: 7.1 (mean)

| | | | | | |
|---|---|---|---|---|---|
| Promoters | 29 | NPS: -1 | 33 | NPS: +6 | |
| Detractors | 30 | | 27 | | |
| CTV (USD) | 1,563 | | 1,632 | (USD): +69 | |

Source: Ericsson ConsumerLab Network Performance Study 2013
Base: Smartphone users in BR, CHN, ID, SK, JP, US, UK, SE, RU, TUR, CHL, MX

## C.    Value of 4G to End Device Reasonableness Check.

273.   If anything, my ex-standard analysis underestimates how much consumers value cellular connectivity.  If consumers did not value cellular connectivity highly, then you would expect there to be more non-cellular mobile phones just like there are non-cellular versions of tablets.  Such non-cellular mobile phones would have the same cameras, memory, and operating systems, but no cellular capability.  No such non-cellular mobile phone exists in the market, with the exception of the Apple iPod Touch.

274.   An iPod Touch is very similar in form factor, operating system, and available apps to an iPhone.  An iPod Touch even has Wi-Fi connectivity.  The main difference is that an iPod Touch does not have a cellular radio.  Thus, one of the simplest ways to understand the value of 4G radio connectivity to an end device, and perform a "sanity check" on the conclusions above, is to compare the market price of an iPod Touch to an iPhone. Another Ericsson expert, Mr.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Mallinson, compared the cost of a 5th Generation Apple iPod Touch to an Apple iPhone 5c. The only major technical difference between the two devices, besides the fact that the 5th Generation iPod Touch has twice the amount of storage as the iPhone 5c, is that the iPhone 5c provides cellular connectivity. The price difference between the two devices was $251 as of May 2015 (near the time of Ericsson's Option A and B offers).

**Exhibit 4873:  iPhone 5C v. iPod Touch (5th Generation)[185]**



275.   Based on approved contributions, Ericsson's share of the value created by the addition of cellular connectivity is $39.91. Alternatively, even using Dr. Ding's patent counting results of 6.50% (which I disagree with), Ericsson's share of the value is $16.32. This is seen in Figure 62:

---

[185] Exhibit 4873 at 17.

**FIGURE 62: iPhone 5C v. iPod Touch (5th Generation)[186]**

| DESCRIPTION | CALCULATION |
|---|---|
| Price of iPhone 5C (8GB) | $450 |
| Price of iPod Touch (5th Generation) (16GB) | $199 |
| **Price Difference** | **$251** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved 3G/4G Contributions (≈16%) | $39.91 |

276.   I should, however, be clear that I present the above example as a "sanity check" on my overall analysis.  It is always prudent to attack a problem of quantification from different angles if possible. In this case, the price difference of the 5th Generation iPod Touch to the iPhone 5c ($251) is much more than the monetary value that I attributed to the technical clusters of $42-$75 per phone, plus the unquantified value of the additional benefits.

277.   I also found a later example that reaches nearly the same result.  In 2015, Apple replaced the fifth generation iPod Touch with the sixth generation iPod Touch. The sixth generation iPod Touch and the iPhone 5S were very similar technically. They have the same screen size, same resolution, same RAM amount, same storage capacity, same WiFi capability, same camera. The iPhone 5S had an older processor with slightly more gigahertz.

278.   In February 2016, Apple sold a 16GB version of the sixth generation iPod Touch for $200 and sold a 16GB version of the iPhone 5S for a $450.[187] Thus, the price value of cellular connectivity could roughtly be estimated to be

---

[186] Exhibit 5323.
[187] Exhibit 4842; Exhibit 4843.

$250. This supports my previous analysis, as seen in Figure 63:

### FIGURE 63: iPhone 5S v. iPod Touch (6th Generation)

| DESCRIPTION | CALCULATION |
|---|---|
| Price of iPhone 5S (16GB) | $450 |
| Price of iPod Touch (6th Generation) (16GB) | $199 |
| **Price Difference** | **$251** |
| **ERICSSON'S SHARE** | |
| Ericsson's Share of Approved 3G/4G Contributions (≈16%) | $39.91 |

279.   The Apple iPod Touch is the only example of non-cellular mobile phone units of which I am aware. This is telling. The fact that no company other than Apple is selling non-cellular mobile phones suggests that cellular connectivity is a critical component, and in fact, a key driver of demand for cellular phones. In short, consumers simply do not want a mobile phone that does not have cellular connectivity.

## X.   TCL'S AUDITED FINANCIAL STATEMENTS INCLUDE ESTIMATED IPR PAYMENTS TO ERICSSON

### A.   Summary.

280.   TCL has argued that it cannot afford to pay the royalties requested by Ericsson and remain profitable and that, as a result, the royalties requested by Ericsson in Option A and B are not FRAND. This argument is a non-sequitur. TCL has come forward with no evidence that the value of Ericsson's SEPs should be correlated with TCL's pricing decisions. As I have demonstrated, Ericsson's SEP portfolios are valuable. TCL is not entitled to license Ericsson's SEPs at a discount because paying FRAND royalties would interfere with its business model. As I

have explained, the cost to TCL to license Ericsson's SEPs is an input cost like any other and TCL must pay for the cost. If TCL was correct, TCL could avoid paying royalties to any SEP owner on grounds that paying those royalties would interfere with its efforts to make money.

281.   But even putting aside the inherent error in TCL's argument, it is factually wrong. TCL's own accounting documents show that it is profitable even after it provisions for IPR royalty payments to Ericsson and all other SEP holders. I base this conclusion on my review of TCL's audited financial statements and its internal accounting records produced in discovery. In reviewing these materials, I ascertained that TCL records an "IPR provision" or liability for known royalty obligations under executed license agreements, and a liability related to TCL's unlicensed use of third party owned patents. This means that TCL has already calculated and accounted for royalties owed for its unlicensed use of Ericsson's SEPs in its audited financial statements.

282.   TCL's Senior Finance Manager, Ms. Judy Zhu, explained this in her deposition. According to Ms. Zhu, TCL has already recorded unpaid royalties due to Ericsson as a liability and included those amounts in the "cost of goods sold" based on the rates Ericsson offered to TCL. [188]

**B.   TCL Has Already Estimated Its IPR Expenses.**

**1.   IPR Provisions.**

283.   TCL regularly records a liability or "provision" for royalties owed to SEP owners.  TCL also refers to the provision as "accrued IPR."  In financial accounting, a "provision" is an account which records a present liability of an entity. The recording of the liability in the entity's balance sheet is matched to an

---

[188] Deposition of J. Zhu (January 27, 2016) ("Zhu Depo") at 23-25.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

appropriate expense account in the entity's income statement. TCL's provisions are recorded or "booked" from an accounting perspective in accordance with TCL's accounting policies outlined in the 2014 Annual Report and pursuant to its required method of accounting, Hong Kong Financial Reporting Standards (HKFRS) and as audited by their independent auditors, Ernst & Young (E&Y).[189]

284.   As outlined in TCL's 2014 Annual Report under Summary of Significant Accounting Policies:

> A provision is recognized when a present obligation (legal or constructive) has arisen as a result of a past event and it is probable that a future outflow of resources will be required to settle the obligation, provided that a reliable estimate can be made of the amount of the obligation.[190]

285.   The purpose behind making a provision is to ensure that companies accurately report profits and liabilities. A company that fails to make a provision for an anticipated expense is under-reporting its liabilities and over-reporting its profits. It is not a cash reserve that a company sets aside, but a liability-entry that is incorporated into the company's overall accounts and affects a company's liabilities and profitability. A provision is sometimes called a reserve.

286.   In these circumstances, it makes perfect sense for TCL to make an IPR provision. TCL was well aware that Ericsson (among others) was seeking a license for use of its SEPs. Nearly all TCL phones sold required an Ericsson SEP license. Thus, to properly estimate the costs of each phone, TCL would need to estimate anticipated IPR expenses. Of course, under general accounting rules,

---

[189] Zhu Depo at 30-32.
[190] Exhibit 1140 at 110.

TCL had significant discretion to determine what would constitute an appropriate IPR provision. TCL only had to record something.

287.   If TCL *failed* to make an IPR provision, then TCL would have been filing misleading financial statements.  TCL understood that several companies were seeking to license their SEPs to TCL, including Ericsson and Nokia. Had TCL estimated that it would reasonably have to pay some SEP holder 1% for a SEP license, but reported a net profit margin of 5% without accounting for what it reasonably believed that it would be expected to pay to others, then TCL would be misleading its investors.

288.   In this case, TCL did make an IPR provision as required.  Ms. Zhu testified to this fact. Further, the documentary evidence demonstrates that TCL recorded an IPR Provision per the applicable regulations, and that TCL's auditors reviewed the IPR Provision.[191]  In fact, TCL's auditors would have been required to review such material pending liability under accounting standards governing their auditing procedures.

289.   If E&Y had discovered that TCL had a significant debt recorded that it did not expect to pay, or expected that it would not pay, the accounting firm would have included a qualification to its opinion on the 2014 financial statements included in the 2014 Annual Report for TCL or would have issued an opinion that TCL as a company was not a "going concern." Based on my review and analysis of the reserve accounts and review of the transcript from Ms. Zhu's deposition, no adjustment or audit opinion qualification was made.

## 2.   How the TCL IPR Provision Works.

290.   Aside from an in-depth introduction to accounting, it is important for

---

[191] Exhibit 4896; Exhibit 4894; Exhibit 4894N.

141

users of financial statements to remember that all accounting accruals require two different adjustments to the accounting records (in accounting language, those entries are always a "debit" and a "credit" and are required to maintain a "balance" in the entries).

291.   For example, when TCL incurs the cost of using Ericsson's SEPs in its phones, TCL adds the expected royalty to the mobile phone manufacturing cost and, as a result, increases the inventory account (through a debit) so that amount can be included as an asset and eventually included in the total mobile phone cost of goods sold. At the same time as that value or cost is recorded, TCL records a balancing entry to a liability account (a credit) for what TCL expects to pay Ericsson in the future – this is the other side of the debit entry.[192]

### a.   Accrued IPR Is Part of TCL's Liabilities.

292.   Ms. Zhu was TCL's 30(b)(6) witness on its audited financial statements.  She was also involved in the calculation of TCL's Accrued IPR account. Ms. Zhu testified that there is no difference between an IPR provision and IPR accrual.[193]  And she further testified that TCL has an Accrued IPR account and that the Accrued IPR account is listed on the TCL audited financial statements under "Other payables and accruals".[194] Thus:

---

[192] *See, e.g.* Exhibit 535.
[193] Zhu Depo at 50:3-11.
[194] Zhu Depo at 40:7-25.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

## Exhibit 1140:  TCL's 2014 Audited Financial Statements

### Consolidated Statement of Financial Position
31 December 2014

| | Notes | 2014 HK$'000 | 2013 HK$'000 |
|---|---|---|---|
| **NON-CURRENT ASSETS** | | | |
| Property, plant and equipment | 16 | 1,439,029 | 940,599 |
| Investment properties | 17 | 43,117 | – |
| Prepaid land lease payments | 18 | 116,086 | 128,933 |
| Other intangible assets | 19 | 1,260,093 | 955,821 |
| Goodwill | 20 | 253,954 | 253,954 |
| Investments in associates | 22 | 52,925 | 5,143 |
| Available-for-sale investments | 23 | 227,738 | 77,144 |
| Deferred tax assets | 35 | 297,641 | 195,340 |
| Total non-current assets | | 3,690,583 | 2,556,934 |
| **CURRENT ASSETS** | | | |
| Inventories | 24 | 3,293,292 | 2,649,306 |
| Trade receivables | 25 | 7,872,681 | 5,550,714 |
| Factored trade receivables | 26 | 371,380 | 484,856 |
| Notes receivable | | 95,546 | 34,244 |
| Prepayments, deposits and other receivables | 27 | 1,492,170 | 1,151,117 |
| Due from related companies | 43(d) | 62,382 | 48,653 |
| Tax recoverable | | 11,111 | 13,931 |
| Derivative financial instruments | 31 | 419,240 | 93,233 |
| Pledged deposits | 28 | 1,914,380 | 1,698,028 |
| Cash and cash equivalents | 28 | 473,391 | 142,008 |
| Total current assets | | 16,005,573 | 11,866,090 |
| **CURRENT LIABILITIES** | | | |
| Interest-bearing bank borrowings | 29 | 3,940,791 | 2,204,923 |
| Trade and notes payables | 30 | 5,166,744 | 3,874,663 |
| Bank advances on factored trade receivables | 26 | 371,380 | 484,856 |
| Other payables and accruals | | 4,953,416 | 3,148,245 |
| Derivative financial instruments | 31 | 49,391 | 92,396 |
| Provision for warranties | 32 | 462,500 | 306,663 |
| Loan from a related company | 29,43(d) | – | 763,080 |
| Due to related companies | 43(d) | 416,086 | 333,361 |
| Tax payable | | 47,717 | 12,627 |
| Total current liabilities | | 15,408,025 | 11,220,814 |
| NET CURRENT ASSETS | | 597,548 | 645,276 |
| TOTAL ASSETS LESS CURRENT LIABILITIES | | 4,288,131 | 3,202,210 |

*Includes "Accrued IPR" or the "cost buildup" for unpaid IPR royalties.*

293.   Ms. Zhu testified about Exhibit 522, which is a printout of an excel file called: "Accrued Account in 2014 – HK10.xlsx." She explained that Exhibit 522 is a "record of all the cost related to IPR within the accounts of the Hong Kong 10 company [TCL subsidiary]."[195] Exhibit 522 shows that TCL made several IPR

---

[195] Zhu Depo at 49:7-8.

143

provisions for Ericsson:

## Exhibit 522:  TCL Accrued IPR 2014



294.   Ms. Zhu confirmed that the Accrued IPR account did not simply include TCL's existing licensees. Rather, it included any IPR costs that TCL anticipated paying. I confirmed that TCL did in fact make multiple IPR Provisions where TCL did not have a license. For instance, Exhibit 522 lists several IPR Provisions for "Other." TCL did not have a license with "Other"—rather it is a placeholder for a future, anticipated IPR payment to an unknown party. Ms. Zhu testified that the "others provision" meant that TCL anticipated making payment to

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

someone for IPR, but did not know the identity.[196] Additionally, Exhibit 522 shows that TCL made IPR provisions for Ericsson every month in 2014, although the Ericsson-TCL 2007 license expired in April 2014. In other words, TCL was booking an IPR provision for Ericsson without having a license.

295.   This is consistent with the other documentary evidence that show TCL calculated an IPR provision by estimating IPR royalties to non-licensed parties. Exhibit 4893 is a financial Excel file titled "TCT Financial Results 2005 to 2015 Jan_20150204 v1.xlsx" that was sent from Thomas Liu (TCL's CFO) to Mr. Guo (TCL's CEO) in February 2015.[197] Exhibit 4893 has a tab titled "TCT Provision & Accrual as at October 31, 2014."[198] The "Provision" tab shows Accrued IPR as a liability, just as Ms. Zhu testified:

---

[196] Zhu Depo at 49:18-50:2.
[197] Exhibit 4893; Exhibit 4893N.
[198] Exhibit 4893; Exhibit 4893N at "TCT Provision Accrual as of Oct. 31, 2014".

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

### Exhibit 4893:  Accrued IPR Is A Liability



296.   Moreover, the "Provision" tab also has a note that explains that Accrued IPR is calculated by estimating payments to Ericsson, among others:

### Exhibit 4893:  "Note 2" – TCL Calculates "Provision & Accruals" to Include Estimated IPR Payments[199]

> IPR was accrued based on gross sale for Qualcom, Nokia, Ericsson and Motor. When invoice was received, the invoiced bal. will be transferred to OP [other payables] and the over/under accrual will be reversed/provided accordingly. In Nov, HK10 accrued HKD130M for Qualcom.

297.   The IPR Provision in Exhibit 4893 is consistent with the IPR Provision in Exhibit 522. Exhibit 4893 also lists the total amounts for "Other

---

[199] Exhibit 4893; Exhibit 4893N at "Provision & Accruals".

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Payables" on tab "OP." The "Other Payables" figure lists Accrued IPR as a sub-account, just as Ms. Zhu testified, and the "Other Payables" amounts match the amounts in TCL's 2014 audited financial statements.[200]

298.   Ms. Zhu testified that the Accrued IPR account was calculated using TCL's internal estimates, called "IPR Ratios."[201] Ms. Zhu testified that TCL maintained two sets of IPR ratios. One was the IPR ratio for financial reports the FR IPR Ratio). The second IPR ratio was for estimating TCL sales products on a standard cost basis (the SC IPR Ratio). Ms. Zhu testified that the FR IPR Provision (a provision based on the FR IPR Ratio) became part of TCL's audited financial statements:

Q.  What is this document?  [Exhibit 540]

A.  It is a comparison between standard IPR cost amount and financial provision IPR amount.

[ . . . ]

Q.  All right. Then the financial report numbers are the numbers that work their way into the audited financial statements; correct?

A  The purpose of these numbers were to be used in our financial statements. That's correct.[202]

---

[200] Exhibit 4893; Exhibit 4893N at "OP".
[201] Zhu Depo at 53:16-17.
[202] Zhu Depo at 111:11-112:9.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Exhibit 540: TCL Calculated IPR Provision for "FR" Financial Reports and "SC" Standard Cost**



```
                                    BATES: TCL_ERIC_CDCA1126957.xlsx
                             FILENAME: 201512 Billing for IPR (20160103).xlsx
                                        SHEET: SC VS FR

Dec'15 SC VS FR
  US$                     Standard Cost              Financial Report
  Nokia                   ████████                   ████████
  Moto
  Ericsson                 4,103,623                  2,098,682
  Siemens                 ████████                   ████████
  Others                   3,149,544                    755,729
  CN LTE                   1,077,296                    461,173
  -QTL                                                   91,364
  -Ericsson                                             232,117
  -Others                                               137,692
  Qualcomm                 7,962,081                  7,178,704
                          17,530,502                 11,660,028
```

299. The SC IPR Provision (a provision based on the SC IPR Ratio) became part of TCL's price documents.[203] When TCL was estimating how to price its phones or sent out a price quote, TCL would use the SC IPR Provision to estimate TCL's IPR costs. In other words, the provision for or cost of the estimated royalty owed to Ericsson on each phone was included in TCL's own buildup of mobile phone prices and was part of TCL's pricing strategy.

300. Ms. Zhu testified that TCL's management, including the CEO and CFO, determined the appropriate IPR ratios.[204] She further testified that she believed TCL's management determined the appropriate IPR ratio for Ericsson in particular.[205] TCL's CFO and CEO emailed regarding how to set the IPR ratios in 2015. Mr. Liu (CFO) sent an IPR reconciliation file to Mr. Guo (CEO), writing

---

[203] Zhu Depo at 53:20-55:5; Zhu Depo at 66:21-23.
[204] Zhu Depo at 61:23-62:9.
[205] Zhu Depo at 64:12-65:9.

"IPR report for our discussion"[206]

301.   Based on Ms. Zhu's testimony and the produced documents, I conclude that TCL's management decided to set the internal IPR Ratios based on its existing licenses with various companies and based on offers made during licensing negotiations. For example, one of the TCL internal accounting documents discusses proposed changes to the IPR ratio and discusses what those changes might be:[207]

### Exhibit 525:  How TCL Estimated IPR Payments In 2014



302.   This decision-making structure is consistent with accounting rules. Accounting rules require a company to estimate known expenses if possible, but leave considerable discretion in how the company can estimate the expense.  Based on Exhibit 525, TCL is estimating Ericsson's IPR expenses based on the offers proposed during the Ericsson-TCL negotiations.

303.   In 2013-2014, TCL estimated IPR payments to Ericsson based on the offers exchanged during the Ericsson-TCL negotiations.  TCL estimated IPR

---

[206] Exhibit 4889; Exhibit 4889N.
[207] Exhibit 525 at "changes."

payments as follows using the following royalty rates to be applied to the net selling price. This is seen in Figure 64:

**FIGURE 64:  TCL IPR Provision for Ericsson 2013-2014**[208]

| Technology | Financial Report "FR" IPR Ratio* | Standard Cost "SC" IPR Ratio* | Option B |
|---|---|---|---|
| GSM (2G) | 1.1% | 1.1% | 0.8% |
| GPRS (2G) | 1.5% | 1.5% | 0.8% |
| EDGE (2G) | 1.5% | 1.5% | 1.0% |
| 3G | 1.5% | 1.5% | 1.2% |
| 4G | 3.0% | 3.0% | 1.5%<br>FLOOR = $2.00<br>CAP = $4.50 |
| * Includes a 50% discount for China. | | | |

304.   TCL recorded an IPR Provision for Ericsson for its mobile phone sales going back to at least 2011Q4. TCL kept very close track of how it calculated the IPR provision and kept very close track of the unpaid amounts. TCL's billing files demonstrate that TCL estimated the FR IPR Provision precisely to the dollar. Exhibit 530 is a detailed breakdown of TCL's IPR Provision for Ericsson.[209] As of January 4, 2015, TCL had accumulated a total unpaid IPR provision for Ericsson of over $88 million.[210]

---

[208] Exhibit 4889; Exhibit 4889N at "Ericsson, Sheet:  Ericsson Rate, and Sheet: SC Rate."
[209] Zhu Depo at 76:11-19.
[210] Zhu Depo at 78:12-15.

**Exhibit 530:  TCL IPR Provision For Ericsson As Of 2014**



305.   In late 2014 and early 2015, TCL adjusted how it calculated the IPR provision by lowering the IPR ratios for most parties.  This had two effects.  First, it meant that any future IPR provision would be calculated using the lower rates. Second, it meant that the previous IPR provisions needed to be recalculated and adjusted. These adjustments would all be recorded in 2014 or in 2015, depending on the year. The 2014 adjustments appear in Exhibit 522.

306.   In late 2014, TCL adjusted the Ericsson IPR provision.  One reason was because TCL decided it would no longer make an IPR provision on datacards.[211] According to TCL's internal records and Exhibit 530, TCL calculated an IPR provision for Ericsson on datacards from 2009 to 2014Q3.  By 2014Q3, this accumulated IPR provision totaled $4.7 million.  When TCL changed its policy, TCL reduced the accumulated IPR provision by $4.7 million in 2014Q4.[212] After accounting for the IPR adjustments and payments made to Ericsson by TCL, TCL booked a 2014 IPR provision to Ericsson of $44.6 million, which is what TCL estimated it would pay to Ericsson based on mobile phone sales (excluding

[211] Ex. 4953 at TCL_ERIC_CDCA1070792.
[212] Exhibit 531.

151

datacards) in Exhibit 529. TCL sent its estimated IPR provision to its auditors in 2014.[213]

307.   In 2015, TCL updated its "FR" IPR Ratio by taking Ericsson's 2015 offer (Option B) and reducing it by 20%. However, TCL did not change the SC IPR Ratio. TCL's estimated IPR payments to Ericsson are seen in Figure 65:

**FIGURE 65:  TCL IPR Provision for Ericsson 2015[214]**

| Technology | Financial Report "FR" IPR Ratio | Standard Cost "SC" IPR Ratio* | Option B |
|---|---|---|---|
| GSM (2G) | 0.64% | 1.1% | 0.8% |
| GPRS (2G) | 0.64% | 1.5% | 0.8% |
| EDGE (2G) | 0.80% | 1.5% | 1.0% |
| 3G | 0.96% | 1.5% | 1.2% |
| 4G | 1.20% FLOOR = $1.60 CAP = $3.60 | 3.0% | 1.5% FLOOR = $2.00 CAP = $4.50 |
| * Includes a 50% discount for China. | | | |

308.   In 2015, TCL booked on its audited financial statements an IPR Provision for Ericsson of $31 million by applying the 2015 FR IPR Ratios to TCL's mobile phone sales. TCL now calculated a total unpaid IPR provision for Ericsson of just over $85 million.[215]

### b.      IPR Provision Is Booked As Expense Under "Cost of Sales."

309.   Because the IPR Provision appears as a liability in the audited financial statements, it must also appear as an expense. This is the simple reality of

---

[213] Exhibit 4896; Exhibit 4896N.
[214] Exhibit 4899; Exhibit 4899N.
[215] Exhibit 538.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

an accounting requirement of recording a provision. You cannot increase a liability (Accrued IPR) without an offsetting expense on the profit and loss statement.

310.    In my opinion, TCL includes an IPR Provision expense in the "cost of sales" accounts. My opinion is based on a review of Ms. Zhu's deposition and deposition exhibits, as well as other exhibits produced by TCL. Accordingly, this means that the gross profit margins and the net profit margins reported in TCL's audited financial statements already include an IPR provision for Ericsson and others.

311.    Ms. Zhu testified that expenses related to IPR are included in the "cost of sales" in the audited financial statements.[216] This includes the IPR Provision. This is reflected in several of TCL's documents. For example, Exhibit 519 is a printout from "2014 Dec. GP Reconciliation v4.xlsx." Exhibit 519 shows TCL's total cost of sales for December 2014 that are prepared in accordance with finance and accounting standards (indicated by the "FR" title or "Financial Reports").[217] An IPR Royalty is included in the cost sales.

---

[216] Zhu Depo at 24:1-12.
[217] Zhu Depo at 30:7-11.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

## Exhibit 519:  December 2014 GP Reconciliation Sheet



312.   The IPR Royalty amount reported in Exhibit 519 ("US$26,582") matches the IPR Provision reported in Exhibit 527 for December 2014 ("US$26,582"), which TCL calculated by estimated IPR payments to Ericsson, Nokia, Qualcomm, Motorola, and "Others."

154

313.   Other documents show that the IPR Provision is recorded as an expense under "other costs—IPR" and that "other costs—IPR" is part of cost of sales.  One example is an internal email among different people in TCL's accounting group. The email includes a description of the "detail for Oct'14 IPR entry." The email shows that TCL is making IPR provisions for several companies (Ericsson, Nokia, Siemens, Qualcomm, and "Other"). TCL is recording a "debit" under the "other cost-IPR" account. There is a corresponding "credit" entry under the "Accrued IPR" account.

### Exhibit 4874:  Internal TCL Email RE Oct'14 IPR Entry[218]



From:Sherry, MOU(FINANCE GFC R&D-SZ/GD-TCT)
Sent:3 Nov 2014 11:44:35 +0000
To:Zoe, LIU(FIN-SZ-TCT);Zora, WANG(FIN-SZ-TCT)
Cc:Alpha, ZHENG(FIN-SZ-TCT);Nelson, WONG(FIN-SZ-TCT);Judy, ZHU(FIN-SZ-TCT)
Subject:Oct'14 IPR entry
Importance:High

Dear all,

The form below is the detail for Oct'14 IPR entry.

| PK | Account | Account short text | Cost Ctr | Amount USD | Amount in LC HKD | Text |
|---|---|---|---|---|---|---|
| DR | 62130200 | other cost -IPR | 1130010000 | | | Oct'14 Moto Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 6,423,101.66 | 49,813,080.30 | Oct'14 Ericsson Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 166,666.67 | 1,292,550.03 | Oct'14 Ericsson Lump Sum amortization |
| DR | 62130200 | other cost -IPR | 1130010000 | | | Oct'14 Nokia Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 4,994,363.81 | 38,732,789.66 | Oct'14 Others Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | | | Oct'14 Siemens Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 19,214,578.57 | 149,014,821.18 | Oct'14 Qualcomm IPR Accrual |
| DR | 75510050 | OTHER MISC. INCOMES | 1130010000 | 190,725.62 | 1,479,134.40 | Oct'14 QTL S66 IPR Accrual |
| CR | 34390000 | ACCRUED IPR | 1130010000 | | 48 | Oct'14 Moto Provision |
| CR | 34390000 | ACCRUED IPR | 1130010000 | -6,423,101.66 | -49,813,080.30 | Oct'14 Ericsson Provision |

314.   Another example can be found in TCL's IPR Billing Excel files.  In December 2015, TCL made IPR provisions for several companies and recorded two corresponding entries:  an "other cost-IPR" debit entry and an "Accrued IPR"

---

[218] Exhibit 4874.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

credit entry:

### Exhibit 535: Accounting Entries for December 2015 IPR Provision[219]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BATES: TCL_ERIC_CDCA1126957.xlsx | | | | | | HIGHLY CONFIDENTIAL | |
| FILENAME: 201512 Billing for IPR (20160103).xlsx | | | | | | OUTSIDE ATTORNEY'S EYES ONLY | |
| SHEET: SAP Info | | | | | | | |

| Reference Doc.Header | IPR PROVISION Dec'15 IPR Provision | | | | | | |
|---|---|---|---|---|---|---|---|
| Item | PK | Account | Short Text | Cost Ctr | Amount in USD | Amount in LC (HKD) | Text | Ex. Rate |
| 1 | 40 | 62130203 | other cost -IPR | | | | Dec'15 Nokia IPR Provision | 7.7508 |
| 2 | 40 | 62130203 | other cost -IPR | 1130010000 | | | Dec'15 Moto IPR Provision | 7.7508 |
| 3 | 40 | 62130203 | other cost -IPR | 1130010000 | 2,330,799.54 | 18,065,561.07 | Dec'15 Ericsson IPR Provision | 7.7508 |
| 4 | 40 | 62130203 | other cost -IPR | 1130010000 | 893,420.98 | 6,924,727.33 | Dec'15 Others IPR Provision | 7.7508 |
| 5 | 40 | 62130203 | other cost -IPR | 1130010000 | 7,270,067.85 | 56,348,841.89 | Dec'15 Qualcomm IPR Provision | 7.7508 |
| 6 | 50 | 34390026 | ACCRUED IPR | | | | Dec'15 Nokia IPR Provision | 7.7508 |
| 7 | 50 | 34390026 | ACCRUED IPR | 1130010000 | | | Dec'15 Moto IPR Provision | 7.7508 |
| 8 | 50 | 34390026 | ACCRUED IPR | 1130010000 | (2,330,799.54) | (18,065,561.07) | Dec'15 Ericsson IPR Provision | 7.7508 |
| 9 | 50 | 34390026 | ACCRUED IPR | 1130010000 | (893,420.98) | (6,924,727.33) | Dec'15 Others IPR Provision | 7.7508 |
| 10 | 50 | 34390026 | ACCRUED IPR | 1130010000 | (7,270,067.85) | (56,348,841.89) | Dec'15 Qualcomm IPR Provision | 7.7508 |

315.   Qualcomm, Ericsson, Motorola, Nokia, and "Others" are all treated the same.

316.   Because the IPR Provision is included in "cost of sales" for phones that are sold, TCL's gross profit margin already includes an estimate of what TCL anticipates it will pay to others for IPR. This is consistent with Ms. Zhu's testimony. She testified that expenses related to IPR are accounted for before calculating gross margins.[220] Expenses related to IPR would include the IPR Provision. Thus, TCL's reported gross profit margins and net profit margins already include estimated IPR payments for phones sold during a financial reporting period:

---

[219] Exhibit 535.
[220] Zhu Depo at 23:10-24:12.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

### Exhibit 1140:  TCL's 2014 Audited Consolidated Statement of Profit or Loss



18  317.  Again, this makes perfect sense from an accounting perspective.  TCL

19 is selling mobile phones that will need a license to Ericsson's IPR (and Nokia's

20 and others). If TCL does not take an IPR Provision, then TCL is setting itself up

21 for failure because it will not have taken a reserve for those costs. TCL has

22 significant discretion to estimate the IPR provision. TCL's management chose to

23 estimate IPR expenses using Ericsson's offers.

24  318.  Based on TCL's production, it is apparent that TCL made a number of

25 adjustments to the IPR Provision. I am not questioning the appropriateness of those

26
27
28

157

adjustments (although excluding datacards that utilize SEPs seems dubious). Nonetheless, despite those adjustments, the accounting records show that TCL booked an IPR provision for Ericsson based on mobile phone sales (not datacards) in 2012 through 2015. If TCL had not booked an IPR Provision for Ericsson in 2012 through 2015, then its liabilities and expenses would have been lower and TCL's profit margins would have been higher.

### C.    Why the TCL IPR Provision Matters.

319.    As I stated previously, the TCL IPR Provision is not critical to the FRAND inquiry. The value of Ericsson's SEPs are determined by looking to the market evidence. The value of Ericsson's SEPs are not dependent on TCL's IPR Provision or its profit margins.  If TCL failed to make an IPR Provision, then TCL would still owe royalties based on the comparable licenses.

320.    However, the TCL IPR Provision is relevant to rebutting TCL's arguments. TCL's experts argue that FRAND requires Ericsson to offer TCL a very low SEP royalty rate because TCL has low profit margins. Thus, the TCL IPR Provision is relevant to the FRAND inquiry because it shows *inter alia* that TCL is capable of being a growing, successful mobile phone company while paying the royalties that Ericsson is seeking.

321.    In my opinion, TCL's audited financial statements demonstrate that TCL is capable of succeeding in the market place while paying IPR royalties to Ericsson commiserate with the royalty rates in Option A and Option B. I come to this conclusion based on a review of Ms. Zhu's deposition testimony, TCL's audited financial statements, TCL's internal financial documents, and internal correspondence. TCL's audited financial statements show that it recorded healthy gross profit and net profit margins even while recording an IPR Provision for Ericsson that was consistent with the Option A and Option B offers.

322.   As Ms. Zhu testified and the documentary evidence show, TCL's audited financial statements already account for IPR payments made to Ericsson and others.  TCL's profit calculations already account for payments for IPR.  TCL includes the estimated IPR payments "other costs-IPR" under "Costs of Good Sold," which is part of "Cost of Sales." TCL calculates its gross profit margin by deducting Costs of Sales from Revenue. Thus, TCL's gross profit margin already accounts for estimated payments to Ericsson.  Net profit calculations are the same. Net profit deducts the cost of sales (among other things) from revenue. Thus, net profit already accounts for estimated IPR payments to Ericsson.

323.   Moreover, TCL's IPR Provision means that TCL will not be harmed by being caused to make payments to Ericsson commensurate with Option A and Option B because TCL has already accounted for IPR payments to Ericsson into its audited financial statements that are consistent with Options A and B.

### 1.   TCL's Audited Financial Statements Show Healthy Profits While Making IPR Provisions For Ericsson Greater Than Option A Or Option B.

324.   Based on the documents available to me, I can see that TCL estimated that it would pay Ericsson royalties based on the negotiations between Ericsson and TCL. TCL made IPR Provisions using the rates shown in Figure 66 in 2013 and 2014:

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 66:  TCL IPR Provision for Ericsson 2013-2014**[221]

| Technology | Financial Report "FR" IPR Ratio* | Option B |
|---|---|---|
| GSM (2G) | 1.1% | 0.8% |
| GPRS (2G) | 1.5% | 0.8% |
| EDGE (2G) | 1.5% | 1.0% |
| 3G | 1.5% | 1.2% |
| 4G | 3.0% | 1.5% FLOOR = $2.00 CAP = $4.50 |
| * Includes a 50% discount for sales in China. | | |

325.   During this time frame, TCL did very well as a company.  Between 2012 and 2014, TCL's unit sales nearly doubled and its 3G unit sales increased five-fold.[222] According to its audited financial statements, TCL's revenues more than doubled and its gross profits nearly tripled. TCL also performed well in 2015 when TCL made IPR provisions for Ericsson at rates consistent with Option A and Option B. TCL was more profitable in 2015 than in 2014.  While TCL's total sales and annual revenues fell, TCL's gross and net profit margins increased as seen in Figure 67:

---

[221] Exhibit 4889; Exhibit 4889N at "Ericsson" and "Ericsson Rate."
[222] Exhibit 142.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**FIGURE 67:  TCL Profit Margins (2013-2015)[223]**



326.   TCL's audited financial statements demonstrate that it is capable of competing in the market place and being profitable while paying Ericsson IPR royalties requested in Option B.

327.   This data illustrates the tremendous company value TCL has created over time in large part due to incorporating the patented technology invented by Ericsson, Qualcomm, Nokia and other companies who created the lion's share of the 2G, 3G and 4G/LTE SEPs through their billions of dollars of investments in research and development to develop the technology to a point where a company like TCL can successfully come into the market with no patent portfolio and no differentiating inventions and launch a successful telecom company selling 2G, 3G, and 4G/LTE standard compliant and competitive mobile phones operable in all principal parts of the world.

328.   Despite that fact that TCL has already accounted for the royalties that it anticipates paying to Ericsson on its sales of mobile phones, its gross margin is increasing. In fact, an award in this litigation of anything less than the Ericsson

---

[223] Exhibit 1019; Exhibit 1140; Exhibit 4869.

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

offer rates will create a windfall of profits for TCL through the reversal of liabilities recorded in the TCL financial statements and an increase in TCL's per product gross margin for all mobile phones incorporating Ericsson's SEP technology.

### 2. TCL's Unit Sales Show Healthy Profits While Making IPR Provisions For Ericsson Greater Than Option A Or B

329. In addition to the audited financial statements, TCL separately estimates IPR payments when pricing its mobile phone models and calculating gross profit margins on its individual units. As identified above, TCL uses the Standard Cost or SC IPR Ratios when calculating the gross profit margins on individual models. TCL used the SC IPR Ratios shown in Figure 68 between 2013 and 2015:

### FIGURE 68: TCL Standard Cost IPR Ratio for Ericsson 2013-2015[224]

| Technology | Standard Cost "SC" IPR Ratio* | Option B |
|---|---|---|
| GSM (2G) | 1.1% | 0.8% |
| GPRS (2G) | 1.5% | 0.8% |
| EDGE (2G) | 1.5% | 1.0% |
| 3G | 1.5% | 1.2% |
| 4G | 3.0% | 1.5% FLOOR = $2.00 CAP = $4.50 |
| * Includes a 50% discount for sales in China. | | |

330. These Standard Cost IPR Ratios are higher than either Option A or

---

[224] Exhibit 4899; Exhibit 4899N at "SC Rate."

Option B.

331.   TCL uses the SC IPR Ratios to estimate IPR payments for each model of phone when reviewing sales data and attempting to price different models.  For example, Exhibit 4374 is a Bill of Materials for the Idol 3 4G phone with a 4.7 inch screen.  In 2015 TCL determined the price of its Idol 3 4G phone with a 4.7 inch screen should be $168.15 in the European Union. TCL factored in a total royalty as high as $21.19 (12.60%) due to all SEP owners for each of its Idol 3 4G phones.[225] The royalty rate of 12.6% matches the SC total IPR ratio precisely. Accordingly, this $21.19 total royalty liability or "royalty stack" included a liability for a $4.79 royalty payable to Ericsson for the unlicensed use of Ericsson's 4G SEPs.[226]

332.   TCL's total cost of goods sold (including the $21.19 royalties above) for the Idol 3 4G phone with a 4.7 inch screen is $134.52. As shown below, after deducting costs for the parts (screen, keypad, battery, antenna processor, plastic, etc.), costs to manufacture the mobile phone, warranty and transportation costs *and the full amount of royalties due to SEP owners* (including Ericsson's 2014 offer rates), TCL still expected to earn a 20% gross margin on this particular phone, as seen in Figure 69:[227]

---

[225] Exhibit 4374; Exhibit 4374N at "IDOL3-4.7."
[226] Exhibit 4374; Exhibit 4374N at "IDOL3-4.7."
[227] Exhibit 4374; Exhibit 4374N at "IDOL3-4.7."

**FIGURE 69:  Summary of Bill of Materials for TCL Ido 3, 4.7[228]**

| Summary of Bill of Materials for TCL Idol 3, 4.7" | |
|---|---|
| STD cost before IPR & Warranty | $113.93 |
| IPR (Outside EU/US) | $19.54 |
| Warranty (MEA) | $1.05 |
| *FCA HK cost (MEA)* | *$134.52* |
| ASP | $168.15 |
| **Gross Margin** | **$33.63** |
| Gross margin, % of Net sales | 20% |

### D.   TCL Pays Brand Royalties Higher Than Ericsson's Option B

333.   TCL's other expenses demonstrate that Ericsson's requested royalties are reasonable.  For example, TCL incurs "brand" royalty payments that are higher than the royalty rates contained in Options A or B. For some units, TCL incurs a "Alcatel Brand Royalty" of 1% of average sales price. For sales of other units, TCL incurs a "TCL Brand Royalty" of 2% of the average sales price. In other words, TCL is willing to pay 1-2% for branding, but it is unwilling to pay Ericsson 1-2% for inventing some of the standardized patented technology that TCL uses in its products.[229] This is seen in Figure 70:

---

[228] Exhibit 4374; Exhibit 4374N at "IDOL3-4.7."
[229] Exhibit 519 at "Dec'14."

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**FIGURE 70:  Comparing TCL's Brand Royalties to Option B**

334.   TCL can (and does) sell phones without a TCL or Alcatel Brand Royalty. But TCL cannot and does not sell mobile phones without cellular technology.

**E.    Conclusion.**

335.   As demonstrated above, TCL has already recorded and expensed a total royalty stack of over $20 per phone on a portion of its 4G smartphones that includes the offered Ericsson rates. TCL had recorded royalty reserves due to Ericsson of over $90 million when it received Ericsson's licensing offer in May of 2015.  In fact, the offer outlined royalties due to Ericsson of only $63 million. TCL's accounting records document a reversal of the $29 million difference between what TCL had already accrued and the offer.[230]  In other words, the receipt of Ericsson's offer resulted in TCL recording additional profits of $29 million.  In fact, TCL could pay the royalties under the Option C offer by Ericsson and maintain its projected profits and current pricing to the consumer going forward. In addition to the reserve (or provision) to set aside an amount for paying all of the Ericsson royalties on all mobile phone sales to date, TCL is in a strong

---

[230] Zhu Depo. p. 82-85; Exhibit 531 at "Summary."

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

financial condition to pay the royalties due in the future. As shown above as of May 2015, TCL has already priced all expected royalty payments into its products.

Executed on 11 January 2017 in Bondurant, Wyoming.

David Kennedy

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

## XI.   TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 56 | License Agreement between Ericsson and Research In Motion Limited dated 1/1/11 |
| 64 | License Agreement between Ericsson and T&A Mobile Phones, dated 3/6/07 |
| 65 | License Agreement dated between TCL Mobile Communication (HK) and Ericsson dated 3/6/07 |
| 142 | TCL Unit and Revenue Data 2007-2015 |
| 165 | Ericsson-TCT 2007 License |
| 199 | License Agreement between LG Electronics and Ericsson dated 6/27/14 |
| 257 | License Agreement between Apple and Ericsson dated 1/14/08 |
| 287 | Email from H. Au (TCL) to K. Alfalahi (Ericsson) RE Lump Sum payment offer-Ericsson dated Jan. 24, 2014 (attachment Lump Sum Payment offer-Ericsson) |
| 458 | Option A |
| 459 | Option B |
| 519 | TCL Spreadsheet titled "2014 Dec. GP Reconciliation" |
| 525 | TCL spreadsheet titled "IPR ratio for standard cost 15Q2 (v0318)" Tab:  changes |
| 535 | TCL spreadsheet titled "201512 Billing for IPR (20160103)," sheet: SAP Info., |
| 538 | TCL spreadsheet titled "IPR Reconciliation Dec'15 (3 Jan 15)," sheet: Movement |
| 1000 | IDC Sales Data 2007Q1-2016Q2 |
| 1017 | TCL 2011 annual report |
| 1018 | TCL 2012 annual report |
| 1019 | TCL 2013 annual report |
| 1099 | Spreadsheet containing TCT's financial result from 2005 to 2015 |

167

| **Exhibit** | **Description** |
|---|---|
| 1100 | Spreadsheet titled "TCT North America Quarterly Net ASP Analysis for 2015" |
| 1140 | TCL 2014 Annual Report |
| 1140 | TCL 2014 Annual Report |
| 1194 | Ericsson-ZTE 2014 License |
| 1195 | License Agreement between Sharp and Ericsson dated 4/1/15 |
| 1197 | License Agreement between ZTE and Ericsson dated 7/1/11 |
| 1200 | Amendment to license agreement between ZTE and Ericsson dated 10/1/15 |
| 1273 | IDC Sales Data 2007Q1-2015Q4 |
| 1275 | License Agreement between HTC Corporation and Ericsson dated 12/31/14 |
| 1276 | License Agreement  between Samsung and Ericsson dated 2/1/14 |
| 1277 | License Agreement between Huawei and Ericsson dated 1/13/16 |
| 1278 | Ericsson 2014 Annual Report |
| 1530, 1531 | Ericsson-TCL Standstill Agreement (March 2016) |
| 4000 | 01/01/2013 Ericsson/Jaina Marketing License |
| 4002 | 10/01/2003 Ericsson/Sharp License |
| 4003 | 12/31/2011 Ericsson/Sonim License |
| 4014 | 12/15/2003 Ericsson/HTC License |
| 4020 | 3/27/2015 - Ericsson/United Telelinks License Amendment |
| 4021 | 1/1/2015 - Ericsson/Emporia License Amendment No. 1 |
| 4036 | 4/1/2016 Ericsson/Audioline License |
| 4037 | 4/1/2016  Ericsson/Binatone License |
| 4040 | 7/1/2016 Ericsson/ZTE License |
| 4048 | 1/1/2011 Ericsson/Sagem License |
| 4071 | Ericsson 2015 Annual Report |

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 4374, 4734N | Email from H. Zhu to G. Guo et al RE 15Q3 BOM Cost Down_Need further actions dated June 23, 2015, (attachment "Advanced SP v150623.xlsx"), |
| 4654 | Rachel Graf, Apple Stock Falls as More Analysts Expect Weak iPhone Sales, The Street (Dec. 16, 2015) |
| 4658 | 10/31/2005 - Ericsson/Sharp License Amendment No. 1 |
| 4659 | 12/1/2009 - Ericsson/Sharp License Amendment No. 2 |
| 4660 | 1/1/2011 - Ericsson/Sharp License Amendment No. 3 |
| 4663 | 3/6/2007 - TCL/Alcatel License |
| 4675 | 1/1/2012 - Ericsson/Mobiwire License |
| 4676 | 7/1/2012 - Ericsson/Bullitt License |
| 4684 | 10/1/2011 - Ericsson/Beafon License |
| 4685 | 4/1/2011 - Ericsson/Audioline License |
| 4688 | 4/1/2014 - Ericsson/Binatone License |
| 4702 | 1/1/2014 - Ericsson/Beafon License Amendment No. 1 |
| 4703 | 1/1/2014 - Ericsson/Beafon License |
| 4729 | 4/1/2014 - Ericsson/Binatone License Amendment No. 1 |
| 4732 | 1/1/2014 - Ericsson/Bullit License Amendment No. 1 |
| 4733 | 1/1/2014 - Ericsson/Bullitt LTE Patent License Agreement |
| 4737 | 7/1/2014 - Ericsson/Doro 2G License |
| 4738 | 7/1/2013 - Ericsson/Doro 3G License Amendment No. 1 |
| 4739 | 7/1/2013 - Ericsson/Doro LTE License |
| 4749 | 10/1/2011 - Ericsson/Mobistel License |
| 4750 | 1/1/2014 - Ericsson/Mobistel License Amendment No. 1 |
| 4751 | 1/1/2014 - Ericsson/Mobistel LTE License |
| 4752 | 10/1/2013 - Ericsson/Mobiwire License Amendment No. 1 |
| 4753 | 01/01/2014 - Ericsson/Mobiwire License Amendment No. 2 |
| 4764 | 01/01/2014 - Ericsson/Sonim License Amendment No. 1 |
| 4773 | 01/01/2013 - Ericsson/Yulong License |
| 4777 | 07/01/2014 - Ericsson/Audioline License |

| EXHIBIT | DESCRIPTION |
|---|---|
| 4779 | 04/01/2013 - Ericsson/Emporia License |
| 4791 | 7/01/2013 -Ericsson/Doro 2G License Amendment No. 1 |
| 4796 | Samsung 2011-2013 ST-Ericsson Sales |
| 4821 | Tim Bradshaw, Apple investors worry the iPhone is losing its shine, Financial Times (Oct. 25, 2015) |
| 4822 | Eva Dou, Apple Scales Back Orders for its iPhones, Wall Street Journal (Jan. 5, 2016) |
| 4823 | iPhone Sales Lagging, Pose Threats to Apple Suppliers: Pacific Crest, Barron's (Nov. 3, 2015) |
| 4824 | Samsung Profit Growth Slows Sharply, Wall Street Journal (Jan. 24, 2014) |
| 4825 | "V. Luckerson, Samsung's Smartphone Gravy Train Is Losing Steam (Jan. 8, 2014) |
| 4826 | Kevin Kingsbury, Signs Point to Underwhelming iPhone Sales for Apple, Analysts Say, Wall Street Journal (Dec. 17, 2015) |
| 4827 | Sam Mattera, This Analyst Thinks iPhone Sales Have Peaked, The Motley Fool (Nov. 16, 2015) |
| 4828 | David Goldman, Why Apple's stock is down in 2015: iPhone worries, CNN (Dec. 18, 2015) |
| 4829 | Accenture, Mobile Web Watch (2012) |
| 4830 | S. Thomas, 4G for gaming—reduced latency, improved speeds and more, 4G.co.uk (June 6, 2014) |
| 4831 | Robert Triggs, 4G vs LTE – what is the difference?, AndroidAuthority.com (Mar. 31, 2016) |
| 4832 | T. Everts, 55 Web Performance Stats You'll Want To Know, Radware Blog (Jan. 20, 2014) |
| 4833 | 6 things you can do much better on 4G, Pocket-Line.com (Mar. 23, 2015) |
| 4834 | Ericsson Consumer Lab, Keeping smartphone users loyal; assessing the impact of network performance on consumer loyalty to operators (June 2013) |

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 4835 | S. Work, How Loading Time Affects Your Bottom Line, KissMetrics.com (Apr. 2011) |
| 4836 | I. Grigorik, Latency: The New Web Performance Bottleneck, Igvita.com (July 19, 2012) |
| 4837 | Victoria Wollaston, Forget 3D screens and fingerprint scanners, customers really want better battery life and waterproof screens, poll reveals (Aug. 4, 2014) |
| 4838 | "The impact of latency on application performance," Nokia Siemens Networks  2009 |
| 4839 | Alan F., What features do smartphone buyers look at to determine which phone to buy?, PhoneArena.Com (May 21, 2014) |
| 4840 | What is page load time and why is it so important, BigCommerce.com (May 6, 2015) |
| 4842 | Purchase Options - iPhone 5S, Apple.com (Feb. 27, 2016) |
| 4843 | Purchase Options - iPod Touch, Apple.com (Feb. 27, 2016) |
| 4845 | Accenture, Mobile Web Watch 2013: The New Persuader (2013) |
| 4846 | Jamal Carnette, Another Analyst Thinks Apple's iPhone Sales Have Peaked, The Motley Fool (Dec. 18, 2015) |
| 4847 | Sam Thielman, Apple iPhone sales flatline as growth falls well short of expectations, The Guardian (Jan. 26, 2016) |
| 4848 | Samsung Braces for Its Weakest Year of Smartphone Growth Since 2007 |
| 4849 | Samsung's Weak Earnings Forecast Heightens Smartphone Worries Even as Chipset Prices Soar, Forbes (Jan. 8, 2014) |
| 4850 | Tim Bradshaw, Apple rejigs top ranks amid iPhone sales jitters, Financial Times (Dec. 17, 2015) |
| 4854 | J. Chong, TCL PowerPoint Presentation, Mobile Consumer Behavior Study (Aug. 14, 2013) |
| 4857 | M. Lee, Samsung Profit Growth Slows Sharply, Wall Street Journal (Jan. 24, 2014) |

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 4858 | International Planning & Research, Smartphone Feature Analysis |
| 4869 | TCL 2015 Annual Report |
| 4874 | Email from M. Sherry to J. Zhu et al dated November 3, 2014 RE:  Oct'14 IPR entry |
| 4889, 4889N | Email from T. Liu (TCL CFO) to G. Guo (TCL CEO) RE flash report of Mar. 2015 dated Apr. 4, 2015 (attachment "Copy of IPR Reconciliation Mar'15.xlsx") |
| 4890, 4890N | Email from S. Deng to N. Wong RE Accrued Account for HK10 in 2014, with attachment Accrued Account in 2014 - HK10 (Jan. 21, 2015) |
| 4891, 4891N | Email from L. Ho to V. Wei RE Dec GP Recon, with attachment 2014 Dec GP Reconciliation (Jan. 6, 2015) |
| 4892, 4892N | Email from N. Wong to T. Liu (CFO), CC: J. Zhu RE IPR Provision dated May 29, 2015 (attachment "IPR provision by using new rate (Jan~Apr 15).xlsx") |
| 4892, 4892N | Email from N. Wong to J. Zhu et al RE IPR reconciliation ~ Dec 15 dated Jan. 3, 2016 |
| 4893, 4893N | Email from T. Liu (TCL CFO) to G. Guo (TCL CEO) RE flash report of Jan. 2015 dated Feb. 4, 2015 (attachment "TCT Financial Results 2005 to 2015 Jan_20150204 v1.xlsx") |
| 4894, 4894N | Email from J. Zhu to N. Wong (Zhu superior) RE EY Audit IPR movement dated July 20, 2015 |
| 4895, 4895N | Email from N. Wong to J. Zhu RE IPR movement-Net off ADJ, with attachment Jan'15-June'15 IPR movement (20150720)-Net Off ADJ(wp) |
| 4896 | Email from J. Zhou (E&Y auditors) to J. Zhu (TCL) RE IPR movement –EY audit dated Aug. 4, 2015 |
| 4896, 4896N | Email chain between J. Zhou (EY Auditors) and J. Zhu (TCL) RE IPR movement-EY audit dated Aug. 4, 2015 |
| 4899, 4899N | Email from N. Wong to J. Zhu et al RE IPR reconciliation ~ Dec 15 dated Jan. 3, 2016 (attachment "IPR Reconciliation Dec'15 (3 Jan 15).xlsx") |

| Exhibit | Description |
|---------|-------------|
| 4900, 4900N | Email from J. Zhu to N. Wong RE Dec'15 FR IPR vs BR dated Jan. 3, 2016, with attachment 201512 Billing for IPR (20160103) |
| 4905 | 3/27/2015 - Ericsson/Jaina Marketing License Amendment |
| 4907 | 10/1/2013 - Ericsson/Mobistel License |
| 4910 | 01/01/2007 -Ericsson/RIM License |
| 4911 | 07/01/2007 - Ericsson/Doro 2G License |
| 4912 | 10/01/2009 - Ericsson/Doro 3G License |
| 4919 | 1/1/2013 - Ericsson/United Telelinks License |
| 4920 | 7/1/2014 - Ericsson/Audioline License Amendment No. 1 |
| 4930 | 12/15/2008 - Ericsson/HTC License |
| 4932 | 1/1/2014 - Ericsson/Sonim License Amendment No. 1 |
| 4934 | 1/1/2015 Ericsson/Emporia LTE License |
| 4936 | Final Business Case for Ericsson/Samsung License (2014) |
| 4938 | 4/01/2015 - Ericsson/Mobiwire License Amendment No. 3 |
| 4942 | Samsung posts grim 2013Q4 earnings estimate, GSMArena (Jan. 7, 2014) |
| 4943 | Sharon Cho, Top Samsung Analyst Predicts Stock Wipeout Will Deepen, Bloomberg (Jan. 14, 2014) |
| 4953 | Email from N. Wong to J. Zhu RE IPR Meeting dated Apr. 21, 2015 (attachment IPR Meeting.pptx") |
| 4991 | 2009 - White Paper: Latency The Impact of latency on application performance, Nokia Siemens Networks |
| 5310 | Huawei MateBook Signature Edition 2 in 1PC Tablet, $1199.00, at amazon.com |
| 5311 | Kennedy Exhibit 1:  TCL GSM/GPRS Unlicensed Sales |
| 5312 | Kennedy Exhibit 2.1-2.2:  Ericsson/TCL Offer Timeline |
| 5313 | Kennedy Exhibit 2.3:  IDC Market Data |
| 5314 | Kennedy Exhibit 3.1:  Summary of License Dollar Per-Unit Analysis |
| 5315 | Kennedy Exhibit 3.2:  Economic Analysis of Option A and Option B |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 5316 | Kennedy Exhibit 3.3:  Economic Analysis of Two-Way Licenses |
| 5317 | Kennedy Exhibit 3.4:  Economic Analysis of Pure Play Licenses |
| 5318 | Kennedy Exhibit 4.1:  Summary of Ex-Standard Analysis |
| 5319 | Kennedy Exhibit 4.2:  Battery Life Ex-Standard Value Based on Mophie Battery Charger |
| 5320 | Kennedy Exhibit 4.3:  Battery Life Ex-Standard Value Based on 2012 IPR Survey |
| 5321 | Kennedy Exhibit 4.4:  4G Data Speed Ex-Standard Value Based on 2012 IPR Survey |
| 5322 | Kennedy Exhibit 4.5:  4G Data Speed Ex-Standard Value Based on 2013 Accenture Survey |
| 5323 | Kennedy Exhibit 4.6:  Apple iPod v. Apple iPhone Comparison |
| 5329 | Kennedy Exhibit 6.3:  Economic Analysis of Earlier Licenses (2007-2013) |
| 5331 | Apple/Ericsson License (2015) |

WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

# CERTIFICATE OF SERVICE

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on the below date, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.

Dated:  February 26, 2017        **CROWELL & MORING LLP**

_/s/ John S. Gibson_

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON