1  CROWELL & MORING LLP
2  John S. Gibson (CSB No. 140647, jgibson@crowell.com)
   Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3  3 Park Plaza, 20th Floor, Irvine, CA  92614
   Telephone:  949.263.8400  Facsimile:  949.263.8414

4  Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
5  515 S. Flower Street, 40th Floor, Los Angeles, CA  90071
   Telephone:  213.443.5590  Facsimile:  213.622.2690

6  Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
7  1001 Pennsylvania Avenue, N.W., Washington, DC  20004
   Telephone:  202.624.2500  Facsimile:  202.628.5116

8  MCKOOL SMITH P.C.
9  Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
   300 Crescent Court, Suite 1500, Dallas, TX  75201
   Telephone:  214.978.4000  Facsimile:  214.978.4044

10
11 Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
   300 W. 6th Street, Suite 1700, Austin, TX  78701
   Telephone:  512.692.8700  Facsimile:  512.692.8744

12
13 Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

14                    **UNITED STATES DISTRICT COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

16 | TCL COMMUNICATION | Case No. 8:14-CV-00341 JVS-DFMx
17 | TECHNOLOGY HOLDINGS, | Case No. 2:15-CV-02370 JVS-DFMx
   | LTD., *et al.*, |
18 | | **REBUTTAL WITNESS**
   | Plaintiffs/Counterclaim-Defendants, | **DECLARATION OF**
19 | | **DAVID KENNEDY**
   | v. |
20 | | Hon. James V. Selna
   | TELEFONAKTIEBOLAGET LM |
21 | ERICSSON, *et al.*, | **Discovery Cut-off:**  May 23, 2016
22 | Defendants/Counterclaim-Plaintiffs. | **Pretrial Conference:**  February 1, 2017 at
   | | 10:00 a.m.
23 | ERICSSON INC., *et al.*, |
   | | **Trial:**  February 14, 2017 at 8:30 a.m.
24 | Plaintiffs/Counterclaim-Defendants, |
25 | v. |
26 | TCL COMMUNICATION |
27 | TECHNOLOGY HOLDINGS, |
   | LTD., *et al.*, |
28 | Defendants/Counterclaim-Plaintiffs. |

# TABLE OF CONTENTS

**Page(s)**

I.    TCL'S Assertion That Ericsson Cannot Charge More Than 26 Cents Per 4G Phones Is Facially Unreasonable ................................................................. 1

II.   Executive Summary ........................................................................................ 3

    A.   Response To Dr. Lynde's Criticisms ......................................................... 3

        1.   Calculating An Implied Dollar Per-Unit *License Term* .................. 3

        2.   Response To Dr. Lynde's Criticisms: ZTE. ..................................... 5

        3.   Response To Dr. Lynde's Criticisms: Samsung. ............................. 7

    B.   Dr. Lynde's Comparable License Analysis Is Flawed. ............................ 8

        1.   Dr. Lynde Ignores Comparable Licenses. ....................................... 8

        2.   Dr. Lynde Undervalues Fixed Payments In His Unpacking Methodology. ..................................................................................... 9

        3.   Dr. Lynde Fails To Properly Account For The Release Period In Certain Licenses. .......................................................... 10

        4.   Dr. Lynde Ignores Licensee Selling Prices. ................................. 11

        5.   Dr. Lynde Ignores Earlier Comparable Licenses. ........................ 11

    C.   Limits Of Unpacking Fixed Payment / Cross-Licenses............................ 12

    D.   Dr. Leonard's Top-Down Method Is Arbitrary And Unreliable. .............. 13

    E.   Dr. Leonard's Arguments Regarding The Release Payment. .................. 18

        1.   Dr. Leonard Miscalculates TCL's Past Unlicensed Sales Subject To The Release. .............................................................. 18

        2.   Dr. Leonard Cherry-Picks License Terms ..................................... 19

    F.   Ms. Zhu's Direct Testimony Contradicting Her Deposition Testimony. .................................................................................................. 20

III.  Response to TCL's Maximum Royalty Rate Contentions ............................ 21

IV.   Response To Dr. Lynde's Criticisms Of My License Analysis ..................... 25

    A.   My License Analysis Calculates An Implied Dollar Per-Unit Rate That Is A *License Term.* ......................................................................... 26

        1.   *License Term* Dollar Per-Unit Royalty Rates. .............................. 26

        2.   Dr. Lynde's Method Wrongly "Concludes" That An Express $2.00 Per-Unit License Term Implies A$1.60 Per-Unit

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Royalty Rate. ...................................................................28

3.  Dr. Lynde's Method Underestimates Ericsson's Implied One-Way Dollar Per-Unit Rate By Up To 30%. ..........................32

4.  My Dollar Per-Unit Calculations Are Consistent. ........................33

B.  Response to Dr. Lynde's Criticisms: ZTE. ................................34

1.  I Employed The Same Formula To Analyze The ZTE Licenses That Dr. Lynde Uses To Analyze Other Licenses. ........34

2.  Ericsson's Comparable Licenses That Require Running Royalty Payments Imply Significant One-Way Dollar Per-Unit Rates. ..............................................................36

3.  Dr. Lynde Failed To Analyze The ZTE Licenses. ......................37

4.  The ZTE 2016 License. ..............................................42

C.  Response To Dr. Lynde's Criticisms: Samsung. ...................................43

1.  Infrastructure. .......................................................43

2.  Use Of Ericsson's "High" Projections For Samsung Sales. ..........44

D.  Response To Dr. Lynde's Criticisms: LG. ..................................46

E.  Dr. Lynde's Other Criticisms Are Insignificant. ...................................48

V.  Criticisms Of Dr. Lynde's Comparable License Analysis ................................48

A.  Dr. Lynde Fails To Account For Varying ASPs Across Licensees. .........49

B.  Areas Where Dr. Lynde and I Agree. ..................................50

C.  Dr. Lynde's Deliberately Avoids Analyzing Comparable Licenses Between Ericsson And Similarly Situated Companies, ..........................52

D.  Errors In Dr. Lynde's Calculation Of Implied Ericsson One-Way Rates. .....................................................55

1.  Dr. Lynde Fails To Properly Account For The Value Associated With The Certainty of Fixed Payments .......................55

2.  Dr. Lynde Uses An Unreliable Patent Strength Ratio (PSR). ........57

3.  Dr. Lynde Incorrectly Claims That Including Released Sales Lowers Ericsson's Implied One-Way Rates ..........................59

4.  Dr. Lynde Calculates Combined 2G/3G Rates. ..........................61

E.  Specific Errors In Dr. Lynde's Analysis Of The Samsung License. .......62

F.  Specific Errors In Dr. Lynde's Analysis Of The LG License. ...............65

-ii-

G.   Specific Errors In Dr. Lynde's Analysis Of The HTC License. .............. 67

H.   Specific Errors In Dr. Lynde's Analysis Of The Apple License. ............ 67

I.   While Flawed, Dr. Lynde's Analyses Demonstrates That TCL's Maximum Royalty Rate Contentions Are Too Low. ............................... 70

VI.   Criticisms of Dr. Lynde's Analysis Of Older Ericsson Offers ......................... 71

VII.   Criticisms of Dr. Leonard's Top-Down Methodology ................................... 73

A.   Conceptual Problems With The Top-Down Method. .............................. 75

B.   Criticisms of Dr. Leonard's Assumptions About The "Maximum" Aggregate Royalty. ......................................................................... 77

1.   Public Statements Must Be Considered At The Time They Were Made. .............................................................................. 78

2.   No Evidence That Industry or SEP Holders Agreed To Maximum Aggregate Royalty Rates. ........................................... 80

3.   Dr. Leonard's Assumed "Maximum" Rates Are Inconsistent With TCL's Licensing And Business Practices. .......................... 83

4.   TCL's Profits Are Irrelevant To Determining A FRAND Rate. ..................................................................................... 84

C.   Criticisms Of Dr. Leonard's Calculation Of Ericsson's Proportional Share .......................................................................... 86

1.   Method #1:  Kakaes Analysis (EIC Scores) ................................ 86

a)   Kakaes Technical Analysis. ............................................. 86

b)   Dr. Leonard Speculates That Certain Kakaes EIC Scores Are "Top 10% SEPs." ............................................. 87

c)   Dr. Leonard Speculates About The Value Distribution Of SEPs .......................................................................... 90

2.   Method #2:  Leonard Analysis (Citation Model). ....................... 91

a)   Dr. Leonard's Citation Model. ........................................ 91

b)   Conceptual Errors In Dr. Leonard's Citation Model. ......... 93

c)   Dr. Leonard's Citation Model Generates Bizarre Results. ......................................................................... 95

3.   Dr. Leonard and Dr. Kakaes Disagree 100% Of The Time On Patent Valuation. ..................................................................... 97

4.   Dr. Leonard and Dr. Lynde Also Disagree On Patent Valuation. ..................................................................................... 101

A.   Dr. Leonard's Top-Down Results Are Inconsistent With Ericsson's Comparable Licenses ...................................................... 102

B.   Applying The Leonard Methodology Using Market Data.................... 102

1.   TCL-Qualcomm Licenses ............................................. 102

2.   Applying the Ding PSR To Calculate Ericsson's Royalties........ 104

VIII. Criticisms of Dr. Leonard's Release Analysis ............................... 106

A.   Dr. Leonard Inappropriately Reduces The Royalty Base. ................... 106

B.   Dr. Leonard Inaccurately Unpacks Ericsson's July 2012/13 Offers . ...107

C.   The Release Terms In Options A and B Are A Concession by Ericsson. ............................................................... 109

D.   Earlier Ericsson Licenses From The Release Period Support Ericsson's Offer to TCL ................................................ 109

IX.  Criticisms of TCL Experts' Other Conclusions ............................... 112

A.   TCL Experts Offer No Ex Ante Analysis ............................... 112

B.   So-Called Danger of "Hold Up." ..................................... 115

C.   So-Called Danger Of "Royalty Stacking." ............................. 117

D.   Comparable License Rates Set a FRAND Range and are not a CAP. .................................................................. 119

E.   FRAND is not a Most-Favored Licensee Concept. ...................... 121

X.   Responding to Ms. Zhu's New Testimony ..................................... 124

A.   Ms. Zhu's Witness Declaration Is Contrary To Her Previous Testimony. ............................................................ 126

B.   Ms. Zhu's Witness Declaration Is Contrary To TCL's Documents. ..... 132

C.   Ms. Zhu's New Testimony Is Contrary To GAAP. ...................... 137

D.   Conclusion............................................................ 140

XI.  New Exhibits ............................................................... 140

XII. Table of Exhibits .......................................................... 142

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

My name is David Kennedy. I have been retained by counsel for Telefonaktiebolaget LM Ericsson and Ericsson Inc. (together, Ericsson) as an expert witness in this litigation. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

# I.   TCL'S ASSERTION THAT ERICSSON CANNOT CHARGE MORE THAN 26 CENTS PER 4G PHONES IS FACIALLY UNREASONABLE

1.      In the Joint Pre-Trial Order, TCL asserts that the maximum "non-discriminatory" 4G rate Ericsson can request is a 0.26 percent per-unit running royalty.[1]  TCL estimates that this is Ericsson's maximum non-discriminatory rate based on Dr. Lynde's analysis of Ericsson's ███████ ██████████████ The unreasonableness of this maximum rate can be seen with simple multiplication. Given TCL's average 4G wholesale selling price of approximately $100 per phone, under TCL's proposal it would be paying royalties of 26 cents per 4G phone to Ericsson.

2.      Below is a graph showing the dollar-per-unit royalty rates that TCL's own experts as well as Ericsson's experts calculated for ZTE, Coolpad, Sharp, LG, HTC, Huawei, Samsung, and Apple, compared to TCL. TCL proposes paying a fraction of the implied per-unit royalties that those companies agreed to pay Ericsson for a license to Ericsson's 4G SEP portfolio:

---

[1] Docket 1376-1.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**Figure 1: Comparing TCL's 0.26% 4G Contention Against Experts Implied 4G Rate Unpackings**[2]

Regardless of whose experts the Court credits, TCL proposes paying an implied dollar per-unit royalty that is wholly unreasonable.

3.      TCL's methodology was to (1) select Ericsson's ███████████ as a similarly situated company, (2) to mathematically unpack that lump sum cross license to estimate Ericsson's implied one-way percentage per-unit rate to ███ then (3) to apply that same percentage per-unit rate to TCL. I have disagreements with the first two steps, which are detailed in later sections, based on (a) the fact that ███ is not similarly situated to TCL and (b) methodological and mathematical errors made in TCL's unpacking. But, those errors aside, the most glaring problem with TCL's assertion is it is taking a ██████████ payment ████████████████████ ██████████████████████████████ converting it to a percentage of the sales price of the handset, and then applying that same percentage to TCL, who is the maker of some of the cheapest handsets in the world (about $110 retail ASP in 2015). ████████████████████ times the average selling price of TCL phones.

4.      TCL's methodology makes a 4G dollar-per-unit floor important in this context.  Ericsson's Option B offer contains a $2.00 per-unit floor applicable to the 4G percent per-unit rate.  The idea of a floor coupled with a cap is very reasonable, as it

---

[2] Exhibit 5314; Exhibit 5330; Exhibit 5548; , Exhibit 5545; Exhibit 1247; Exhibit 1240; Exhibit 1232; Exhibit 1230; Exhibit 1236; Exhibit 1229.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

guards against a low-ASP manufacturer paying too little and against a high-ASP manufacturer paying too much.

5.     Manufacturer smartphone ASPs vary over 700% from low to high, at the most extreme are TCL and CoolPad, with 2015 retail ASPs of $110 and $99, while during that same year Apple had a retail ASP of $714 for its iPhones.  Even if one just focuses on 4G ASPs, they are still on the low-end with 4G retail ASPs of $142 and $107 respectively.  Differing implied percent per-unit rates is not evidence of discrimination; it is evidence that different companies have different ASPs.  A running royalty license should have a floor.

6.     If one views a royalty as another input on the bill of materials for a cell phone, like the battery, or the screen, or the antenna, then it is mathematically true that lower margin companies will always pay a higher percentage of their sales price for their inputs than higher-margin companies. That does not mean the battery supplier, who charges Apple and TCL the same $10 price for a battery, is discriminating. In fact, just the opposite. But, viewed through the lens that TCL proposes for this litigation, TCL would argue that Apple is being charged 1.4% for a battery while TCL is being charged 10% for the same battery.

## II.     EXECUTIVE SUMMARY

### A.     Response To Dr. Lynde's Criticisms

7.     In his report, Dr. Lynde identifies several disagreements with my analysis, but then quickly concludes that most of the disagreements are immaterial.  I address Dr. Lynde's material concerns below:

#### 1.     Calculating An Implied Dollar Per-Unit *License Term*

8.     When analyzing a license, it is necessary to calculate the dollar per-unit rate that could become an equivalent *license term* (i.e., a rate that would be equivalent over the full duration of the license, including consideration of any released sales and release related royalty payments).  This is what I did in my analysis.  For each license (lump-sum, running royalty), I calculated the dollar per-unit license term that would

be the economic equivalent of what the licensee is expected to pay over the course of the license. To do this properly, one needs to divide the net present value of the royalties (or discounted royalties) by the net present value of the units (or discounted units). This is the method adopted by TCL's other expert Dr. Leonard.[3] This is the method I have used based on my experience in over 100 patent licensing negotiations resulting in executed license agreements between licensees and licensors.

9.     Dr. Lynde does not calculate a dollar per-unit *license term*. Instead, Dr. Lynde adopts a *patent infringement damages* methodology, and calculates the dollar per-unit for the purpose of determining *damages* as if the licensee paid the entire amount when signing the license (*e.g.* February 2014 for the Ericsson-Samsung license). Accordingly, Dr. Lynde divides the net present value of royalties by nominal units. This creates a dollar per-unit rate in real, constant dollars (*i.e.* 2014 dollars). So if Dr. Lynde reports that the Ericsson-Samsung license has a ███ royalty rate, Dr. Lynde is reporting what Samsung would be paying if it paid Ericsson all the royalties due on a single day in February 2014 (or in 2014 dollars).  This is not the equivalent of a *license term* because a license will never include a term that says ████ per unit in 2014 dollars."  It will say ████ per unit."

10.    Dr. Lynde's approach is not appropriate for a rate setting exercise because a *license term* is not described in constant dollars.  Dr. Lynde's approach undervalues the effective dollar per-unit royalties contained in Ericsson's comparable licenses.  For example:

---

[3] Exhibit 1119, at Lines (12)-(15).

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 2:  Calculating Dollar Per-Unit Effective Rates
(Kennedy/Leonard v. Lynde)**

| | FORMULA | EXAMPLE |
|---|---|---|
| ***License Term***<br>Kennedy Method<br>Leonard Method | $\dfrac{Discounted\ Royalties}{Discounted\ Units}$ | $\dfrac{\$30M}{15M} = \$2.00\ per\ unit$ |
| ***Damages***<br>Lynde Method | $\dfrac{Discounted\ Royalties}{\textcolor{red}{Non\_Discounted\ Units}}$ | $\dfrac{\$30M}{20M} = \$1.50\ per\ unit$ |

The effect of Dr. Lynde's error is most significant for the ███████████ licenses, given the longer terms of those licenses.  Dr. Lynde's biased (and incorrect) dollar per-unit calculations understate the true implied dollar per-unit royalty rates by ████████████████.

11.   Dr. Lynde's methodology would only be appropriate if TCL was ordered to pay Ericsson all the royalties due under the adjudicated license with Ericsson as of the effective date of the licensing agreement, as if it were paying damages.  However, that is not the task here.  Rather, the Court is setting a license term that will govern the going forward (as well as release period) payment obligation of TCL.  Accordingly, it is necessary to adjudicate the *license term*.

**2.      Response To Dr. Lynde's Criticisms: ZTE.**

12.   I analyzed two ZTE licenses:  the 2014 4G license and the 2015 2G/3G amendment to the 2G/3G license.  Dr. Lynde never unpacks either agreement, but somehow claims that my results are "too high."[5]

13.   Dr. Lynde's criticisms are unfounded.  When analyzing ZTE, I used the same unpacking methodology that Dr. Lynde uses.  I used the same data sources that Dr. Lynde uses (the Ericsson business case projections).  I used approved contributions to calculate a PSR, which is what Dr. Lynde uses when unpacking LG.

---

[4] Exhibit 5541, at R2.1.4, R.2.1.8, R2.1.9; Exhibit 5544.
[5] Lynde Witness Declaration, at ¶ 147-49.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    Because Dr. Lynde never unpacked the ZTE licenses, he can only complain about my

2    results.

3         14.    Dr. Lynde complains that he lacked the information necessary to unpack

4    the ZTE licenses.[6]  These excuses do not hold water.

5    • Dr. Lynde claims he did not know which ZTE business case to use.  But this

6      is just an excuse.  TCL attorneys deposed Mr. El-Amrani and Mr. Brismark

7      (twice) on Ericsson business cases and knew which business cases to enter

8      into evidence.

9    • Dr. Lynde claims that the business case information is confusing.  Again,

10     this is just an excuse.  Dr. Lynde relied on other Ericsson business cases and

11     TCL's attorneys had ample opportunity to ask Ericsson personnel about

12     them and clarify any supposed confusion.

13   • Dr. Lynde complains that the Ericsson business projections for ZTE were

14     flawed, but he does not explain why that is so, nor does he offer an

15     alternative. Further, Dr. Lynde was perfectly willing to rely on Ericsson's

16     projections from other business cases (Samsung, HTC, LG, and Apple)

17     when unpacking those licenses. But when the ZTE unpacking yields an

18     unpalatable result, he abandons those projections.

19   • Dr. Lynde claims that the business case information did not include the

20     necessary regional information to unpack the ZTE license.  The statement is

21     wrong.  The ZTE business case does have the regional breakdown necessary

22     to analyze the license.

---

[6] Lynde Witness Declaration, at ¶ 145.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- Dr. Lynde finally complains that he lacked the necessary regional IDC sales data to unpack the ZTE licenses. This complaint also lacks merit. The ZTE 2G/3G license only has a *global* mobile phone rate term (▮▮▮ for 2G and ▮▮▮ for 3G), so regional data is not required for the analysis. As for the 4G license, TCL's Mr. Guo testified at length in his witness declaration about TCL's regional sales versus the regional sales of its competitors (e.g. ZTE). This shows that TCL had the data, and Dr. Lynde could have used it.

15.     Finally, to the extent Dr. Lynde did not agree with my primary unpacking analysis, I offered an alternative analysis. I also calculated the implied Ericsson one-way rates for the ZTE licenses by applying the express mobile phone royalty terms in the license agreement to ZTE's estimated wholesale average sales prices. The results still show that ZTE agreed to pay royalties that imply a substantial implied Ericsson one-way rate on a dollar per-unit basis even without factoring in any grant-back value to Ericsson.

### 3.     Response To Dr. Lynde's Criticisms: Samsung.

16.     Dr. Lynde criticizes two aspects of my analysis of the Ericsson/Samsung license. First, he complains that I did not include infrastructure revenues when I unpacked the license.  Second, he complains that I used Ericsson's "mid" projections instead of Ericsson's "high" projections.

17.     <u>Infrastructure.</u>  My initial unpacking of the Samsung license, performed in connection with my rebuttal expert report, did not include Samsung's infrastructure revenues for two reasons. First, the revenues were immaterial ▮▮▮▮▮▮ compared to Samsung's end user device revenues.[7] Second, Dr. Lynde did not consider them either. In November 2016, Dr. Lynde changed his methodology. Now in rebuttal to Dr. Lynde, so do I. Including Samsung's infrastructure revenues in my unpacking does not affect Ericsson's implied one-way rate for GSM/GPRS, EDGE, or

---

[7] Exhibit 4936.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    3G. The implied Ericsson one-way rate for 4G changes from ██████████ The
2    change does not alter my opinion that Option A and Option B are FRAND.

3         18.    "Mid" Business Case. Dr. Lynde criticizes my use of Ericsson's "mid"
4    projections instead of Ericsson's "high" projections to unpack the Samsung license. I
5    stand by my assumption. I relied on the "mid" projections because (i) I understand
6    Ericsson believed that the "low" projections were at least as likely as the "mid"
7    projections; (ii) the "high" projection unrealistically assumed that Samsung would
8    continue to grow even after several years of phenomenal growth; (iii) industry
9    analysts reported in January 2014 that Samsung was struggling to continue growing;
10   and (iv) the actual sales data shows that Ericsson's "low" projections have proven the
11   most correct in hindsight.

12        19.    Nonetheless, even using the "high" projections in my analysis, I find that
13   Ericsson's implied one-way rates are ████ for 4G and ████ for 3G.[9] These rates
14   support a finding that Option A and Option B are FRAND.

15        **B.    Dr. Lynde's Comparable License Analysis Is Flawed.**

16        20.    Dr. Lynde makes several errors in his comparable license analysis, which
17   improperly lower the implied Ericsson one-way rates that he extracts from certain
18   Ericsson licenses. As I have explained, Dr. Lynde and I agree on the general formula
19   for unpacking implied one-way rates from a license that calls for fixed payments or
20   includes grant-back value, but we disagree on many of the inputs into the formula.

21        21.    I will discuss the unpacking process (and Dr. Lynde's errors) in greater
22   detail in Section V, and I have already explained that Dr. Lynde erroneously
23   calculates a *damages* dollar per-unit term that underestimates the true value of a dollar
24   per-unit *license term*.  Dr. Lynde makes four additional systematic errors:

25        **1.    Dr. Lynde Ignores Comparable Licenses.**

26        22.    Dr. Lynde ignores several Ericsson comparable licenses with similarly

27

28   [8] Exhibit 5545.
     [9] Exhibit 5545.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

situated companies, including Ericsson's licenses with low-ASP manufacturers ZTE, CoolPad, and Karbonn. Dr. Lynde's cherry-picking biases his results in TCL's favor. By leaving out the licensees who are most similar to TCL, Dr. Lynde focuses his analysis on dissimilar companies like Apple and Samsung that have higher ASPs, materially different product mixes, and much larger volumes.  As I explained in my witness declaration,[10] Ericsson's comparable licenses with the low-ASP companies are running royalty rate licenses that yield substantial implied Ericsson one-way rates on a dollar per-unit basis.  Dr. Lynde, however, chooses to rely solely on agreements with high-ASP companies – all of which, except for Huawei, are lump sum agreements – and recasts them in percentage per-device royalty terms. By ignoring relevant comparable licenses (and the ones that have actual percentage per-device royalty terms), Dr. Lynde improperly concludes that TCL should pay royalties that are much lower than what any Ericsson licensee pays.

### 2.    Dr. Lynde Undervalues Fixed Payments In His Unpacking Methodology.

23.    The lump-sum licenses (i.e. Samsung, Apple) have significant economic value because they include regular, fixed payments over a very long period ▮ ▮ years).  To analogize, a fixed payment license is akin to a "bird in the hand," while a running royalty license is akin to "two in the bush." Dr. Lynde does not properly account for the benefit of reduced risk to the licensor of receiving fixed payments.  Instead, he values fixed payments in the same way he values running royalty payments. To Dr. Lynde, "<u>one</u> bird in the hand is worth <u>one</u> bird in the bush." This causes him to lower Ericsson's implied one-way rates that result from his license analysis for Samsung by over 10%.[11]  In effect, his valuation position on lump-sum licenses, if theoretically correct, would result in no companies ever agreeing to enter in to a lump-sum agreement because they would be indifferent between a more certain

---

[10] Kennedy Witness Declaration, at ¶¶14-16.
[11] Exhibit 5541, at R2.1.4, R2.1.6, R.2.1.8, R2.1.9.

1  stream of revenue and revenues generated by a risky market. Dr. Lynde's position on

2  this matter defies economic reality. Based on my years of financing experience

3  valuing over 75 lump sum and running royalty license agreements on behalf of

4  investment banks specializing in financing different types of patent license proceeds

5  and companies seeking to borrow against (or sell) royalty streams, I know that the

6  market values these types of royalties differently by applying discount rates

7  commensurate with the specific royalty payment risk.

8          **3.**      **Dr. Lynde Fails To Properly Account For The Release Period**

9                    **In Certain Licenses.**

10      24.    When analyzing the Samsung agreement, Dr. Lynde analyzes the "go-

11  forward" snapshots of the license and ignores the full license term, including the

12  "release" period.  Conversely, when analyzing the Apple agreement, Dr. Lynde

13  erroneously includes a release portion which results in a disjointed analysis.  These

14  errors have the effect of understating the implied one-way royalty rates by between

15  ███████████ depending on the model.[12]

16      25.    Dr. Lynde claims that if he included the "release" portion of the licenses

17  in his analysis, then he would calculate *lower* effective rates. This is wrong.  Using

18  Dr. Lynde's own schedules, I have determined that including the release portion of the

19  license in his Samsung unpacking would cause the implied Ericsson one-way rate for

20  4G to *increase*.

21      26.    When unpacking the Apple agreement, Dr. Lynde assumes that Apple

22  pay ███████ per 4G unit in 2011-15, but only pays ███████ per 4G unit for 2016-2021.[13]

23  By assuming that Apple agreed to pay much higher royalties during the release period,

24  Dr. Lynde artificially lowers the implied Ericsson one-way rates produced by his

25  calculations.

26

27

---

28  [12] Exhibit 5541, at R2.1.4, R2.1.8; Exhibit 5544.
   [13] Exhibit 1240; Exhibit 5544.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

### 4.   Dr. Lynde Ignores Licensee Selling Prices.

27.   Finally, Dr. Lynde comes to the ultimate conclusion that Ericsson is discriminating against TCL because Ericsson's licenses with higher-ASP companies imply lower royalties when viewed as a percentage per-unit. This is an error.  It is often the case that both lower quality, lower priced products pay the exact same price for certain standard inputs.  This means that, effectively, lower-priced products pay a higher implied percentage per-unit rate for the same input.  For example, all mobile phones use an antenna.  Accepting Dr. Leonard's estimate that a 4G RF transmitter cost $3.60 in 2015, then different companies will pay a different implied percent per-unit rate for the same product:

**Figure 3:  Hypothetical RF Transmitter As a Percent of 4G ASP (2015)**



These varying implied percentage rates do not reflect discrimination; they reflect the different companies' business models and their respective ASPs. Here, Dr. Lynde makes no adjustments for the different average sales prices of different companies.  In contrast, I do make adjustments for the different average sales prices by calculating an effective dollar per-unit *license term* and find that all manufacturers pay substantial dollar per-unit amounts, even if the implied percent per-unit rate varies.

### 5.   Dr. Lynde Ignores Earlier Comparable Licenses.

28.   Dr. Lynde also errs by failing to account for the extended license term. TCL has been selling unlicensed units since 2007 and the Court's decision will

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

potentially cover a fifteen year period (2007-2022).  Because of that extended time period, Dr. Lynde errs by failing to consider licenses that similarly situated companies (as defined by Dr. Lynde) entered into in earlier time periods, such as Apple 2008 and HTC 2008.

29.    Here, Ericsson is making a generous concession by calculating a release payment by applying the 2015 offer rates backward to sales that occurred as early as 2007. During the lengthy release period, Ericsson entered into multiple licenses with mobile phone suppliers that specified royalty rates above the Ericsson one-way rates implied by Option A and Option B. For example, TCT Mobile Limited (a wholly-owned subsidiary of TCL) entered into a GSM/GPRS license agreement with Ericsson in 2007 that (after an arbitration) was found to apply only to that subsidiary. Ericsson's Option A and Option B offers are only asking that TCL pay 0.8% per GSM/GPRS unit while the Ericsson-TCL 2007 license included royalties of 0.6% for GSM and 0.90% for GPRS in 2007-08 and 1.19% for GSM and 1.69% for GPRS in 2009 through 2014Q1.[14]  This concession is worth a significant amount.  Because Ericsson is seeking only 0.8% for GSM/GPRS instead of the rates that are in the Ericsson-TCL 2007 license, TCL benefits by over $12.6 million.[15]

### C.    Limits Of Unpacking Fixed Payment / Cross-Licenses.

30.    Having addressed the differences between Dr. Lynde's and my own unpacking analyses, I want to clarify one issue for the Court. When analyzing sophisticated cross-licenses with fixed payments between Ericsson and companies with strong SEP portfolios (*i.e.* Samsung, LG), Dr. Lynde and I both use the same unpacking formula (although we disagree on several inputs).  However, while we agree the formula can be useful, the formula has its limits.

31.    *First*, there are methodological flaws in the formula. Dr. Lynde's analysis demonstrates this. When unpacking the LG license, Dr. Lynde calculated a *negative*

---

[14] Exhibit 165, at § 7.1.
[15] Exhibit 5311.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    royalty rate.[16] This is not a fluke or an error; it is the result of entering certain flawed

2    assumptions into the unpacking formula. Dr. Lynde addressed his unrealistic outcome

3    by changing his assumptions and adopting my method for calculating a patent strength

4    ratio (PSR) for the LG model. But the weakness remains. Using inconsistent

5    assumptions (as Dr. Lynde does) when applying the formula is not a way to solve for

6    a fundamental methodological problem.

7        32.   *Second*, as I discussed above, the unpacking model is sensitive to the

8    underlying assumptions. Changes in the assumptions can yield large changes in the

9    outcome. For example, Dr. Lynde changed how he calculated the PSR when

10   unpacking the Samsung agreement and this changed his results by approximately

11   10%.[17]  There is no dispute, therefore, that the choice of inputs into the model could

12   lead to a substantially different outcome.

13       33.   *Third*, because of these weaknesses, the easiest licenses to analyze are

14   running royalty rate licenses with no grant-back value. These licenses (*i.e.* ZTE

15   2G/3G 2015, CoolPad 2013, Huawei 2016, Karbonn 2015, Sharp 2015, Blackberry

16   2011, Apple 2008, HTC 2008) are the easiest to interpret and value because there are

17   fewer assumptions. There is no need to estimate a PSR or value non-cash

18   consideration or forecast sales into the future.

19       34.   To be clear, I stand by unpacking analyses of the large fixed payment

20   licenses and my underlying assumptions that go into my unpacking analyses.

21   However, the Court must understand the limits to the formula and also understand

22   why I believe it is critical to consider one-way (i.e. no grant-back) licenses as well.

23       **D.**    **Dr. Leonard's Top-Down Method Is Arbitrary And Unreliable.**

24       35.   In addition to Dr. Lynde's comparable license analysis, TCL presents a

25   second method for determining a FRAND royalty rate:  Dr. Leonard's top-down

26   methodology. Dr. Leonard's top-down approach to determining FRAND royalty rates

27

28   ---

[16] Lynde Witness Declaration, at ¶ 139; Exhibit 5540.
[17] Exhibit 5541, at R2.1.1, R2.1.2.

-13-

is not an economic, market-based approach, but rather a series of subjective assumptions made without input or verification by other industry participants. Dr. Leonard's top-down methodology contains numerous flaws, but the best way to show that his method is unreliable is to simply look to TCL's statements in the Joint Pre-Trial Order. There, TCL takes the position that a "non-discriminatory rate" is _higher_ than Dr. Leonard's conclusion about what is a "fair/reasonable" rate:

**Figure 4:  TCL's Maximum Royalty Rate Contentions
(Statements in Joint Pre-Trial Order)**

|  | Maximum "Non-Discriminatory" Rate | Maximum "Fair/Reasonable" Rate |
|---|---|---|
| 2G/3G | 0.30% | 0.21% |
| 4G | 0.26% | 0.16% |

In other words, TCL concedes that _every_ other Ericsson licensee pays ███████ for Ericsson's SEPs than what Dr. Leonard calculates would be a fair and reasonable rate. TCL's contention that Dr. Leonard's analysis is superior to the collective judgment of Samsung, Apple, ZTE, LG, HTC, and others is illogical.

    36.    Under the top-down method, an expert assumes a theoretical maximum aggregate royalty rate. The expert then calculates the licensor's proportionate share of the overall standard by estimating the number of essential patents the licensor has and valuing those patents. Finally, the expert multiplies the theoretical maximum rate by the licensor's proportionate share to calculate a "FRAND" rate for the licensor.

    37.    The top-down method is unreliable because it relies on numerous assumptions and arbitrary determinations based on inadequate analysis that yields "results" that are completely disconnected from what manufacturers actually pay. Indeed, Dr. Leonard's top-down method is inconsistent with TCL's own licenses and what other manufacturers pay Ericsson.

    38.    Moreover, the top-down approach is arbitrary because it rests solely on

an expert's subjective assumptions that have not been tested by market forces. The subjectivity is easily shown in the present case. Here, TCL's experts disagree with TCL and TCL's experts also disagree with each other on each step of the analysis. Those disagreements are summarized below:

**Figure 5:  Disagreement In Top-Down Assumptions**

1    "Maximum" aggregate royalty

Dr. Leonard chooses a "maximum" royalty rate where:
(a) TCL pays a **single** licensee (Qualcomm) **80% to 100%** of the entire "maximum" royalty rate.;
(b) The "maximum" rate is **significantly less** than what TCL used in its internal accounting;
(c) The "maximum" rate is **less than** what TCL considered a maximum rate in its January 2014 offer to Ericsson.

**X**

Ericsson's Share

2    Identify **ALL** essential patents

Dr. Kakaes and Dr. Ding **disagree 27%** of the time about which patents are essential.

Value essential patents

Dr. Leonard and Dr. Kakaes **disagree 100%** of the time about which patents are valuable patents.

Dr. Lynde assumes that all patents have **equal value**.

**=**

3    "FRAND" Rate

Dr. Leonard calculates a "FRAND" rate that is **significantly less** than the rates in Ericsson's comparable licenses.

39.    To start, Dr. Leonard begins by assuming a low "maximum" aggregate royalty rate, which has the effect of downwardly biasing all his results. Dr. Leonard relies on outdated information (2002 and 2008 press releases) without considering product pricing in the mobile phone market at the time the statements were made to assume that the "maximum" 2G/3G royalty rate is 5% and the "maximum" 4G royalty rate is 6%.[18]  For each assumption, Dr. Leonard offers no economic analysis to demonstrate that his chosen figure somehow represents a "maximum" royalty rate. His assumptions are contrary to the industry standard. Moreover, he ignores the history of when, why and by whom the statements were made.

40.    Further, Dr. Leonard's assumptions about what is a "maximum" royalty

_____

[18] Leonard Witness Declaration, at ¶¶ 73-76.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

rate are inconsistent with TCL's business:

- First, TCL is licensed to pay Qualcomm 5% for 3G mobile phones and 5% for 4G mobile phones. Thus, TCL pays a *single* licensee an amount equal to Dr. Leonard's "maximum" 3G royalty rate and an amount equal to over 80% of the "maximum" 4G royalty rate.[19]

- Second, TCL's management estimates its anticipated IPR payments as part of its audited financial statements and as part of its standard cost model. TCL estimates paying royalties of between 6% and 10% for 3G and between 11% and 13% for 4G, excluding China.[20] Thus, the estimated cumulative IPR payments are significantly higher than what Dr. Leonard assumes is the "maximum" rate.

- Third, Dr. Leonard's "maximum" rate is significantly below what TCL itself represented was an acceptable maximum royalty rate in its January 2014 offer to Ericsson. In its January 2014 offer, TCL assumed that a "maximum" aggregate rate of 8% for 3G and a "maximum" aggregate rate of 9% for 4G.[21]

Thus, Dr. Leonard's "maximum" rate is disconnected from TCL's own business and licensing practices.

41.     Similarly, TCL's experts cannot agree on Ericsson's proportionate share of the standard. As an initial matter, determining a company's proportionate share of the entire standard is a massive undertaking. TCL contends that it effectively reviewed one-third of the entire industry's declared patent families for essentiality, but its review team only spent an average of $100 and 45 minutes per patent family. Mr. Mallinson explains that this is not enough time or investment to perform a reliable essentiality review.[22]

---

[19] Exhibit 23; Exhibit 4886.
[20] Exhibit 4899, at SHEET:  SC Rate.
[21] Exhibit 287, at page 6.
[22] Mallinson Opening Witness Declaration, at ¶ 7.

42.     Notwithstanding the limits of Dr. Ding's patent review, Dr. Leonard claims that he can calculate Ericsson's share by identifying Ericsson's essential patents and measuring the value of those patents.  However, TCL's experts cannot agree on what patents are essential or what patents are valuable.  For example, Dr. Kakaes and Dr. Ding worked closely together when reviewing Ericsson's patent portfolio for essentiality.  However, despite working closely together, Mr. Mallinson found that Dr. Kakaes and Dr. Ding disagree <u>27%</u> of the time about whether a patent is essential.[23]

43.     Similarly, TCL's experts cannot agree as to which of Ericsson's patents are valuable patents.  Dr. Leonard and Dr. Kakaes each valued Ericsson's patents using different methodologies.  Dr. Leonard used a forward citation methodology, while Dr. Kakaes ranked patents based on an "Importance/Contribution" score.  Dr. Leonard and Dr. Kakaes disagreed <u>100%</u> of the time about which patents were valuable patents.[24]

**Figure 6:  Dr. Leonard and Dr. Kakaes Disagree
100% Of The Time On Patent Valuation**

Dr. Lynde ignores both Dr. Leonard's and Dr. Kakaes's analysis entirely.  In his

---

[23] Mallinson Rebuttal Witness Declaration, at ¶ 62.
[24] *See* Section VII.C.3, *infra*.

comparable license analysis, Dr. Lynde does not try to value patents at all; instead he simply assumes that all patents have equal value.[25]

44.      Collectively, the disagreements between TCL and TCL's experts render the entire top-down approach unreliable.  The end result of TCL's top-down method is an inconsistent, arbitrary theory that is completely divorced from the market reality of what manufacturers actually pay.  After considering all the material differences between the TCL experts regarding the foundation of TCL's dispute with Ericsson— the valuation of Ericsson's SEP portfolio—it is clear that their opinions discredit each other in such a significant way as to render their results unreliable in this matter.

E.      **Dr. Leonard's Arguments Regarding The Release Payment.**

1.      **Dr. Leonard Miscalculates TCL's Past Unlicensed Sales Subject To The Release.**

45.      In addition to his top-down analysis, Dr. Leonard also estimates the release payment that TCL owes to Ericsson for its past unlicensed sales.  Dr. Leonard uses a royalty rate based on the top-down analysis, which is flawed for the reasons discussed above. Dr. Leonard also excludes some of TCL's past unlicensed sales based on his assumption that a two-year statute of limitation applies to all sales in China, as well as to all sales in the "Rest of World." I understand from Dr. Huber that Dr. Leonard's assumptions regarding the limitations period in China, and his assumption that the limitations period for China apply to the "Rest of World" are incorrect.[26]

46.      Overall, Dr. Leonard's incorrect assumptions reduce TCL's past unlicensed sales for 2007-2011 subject to a release payment by about two-thirds or $1.7 billion:

---

[25] Lynde Witness Declaration, at ¶ 77.
[26] Huber Rebuttal Witness Declaration, at ¶¶ 34-38.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 7:  Dr. Leonard Reduces The 2007-11 Royalty Base**[27]



I estimate that Dr. Leonard's assumptions reduce TCL's royalties owed for its past unlicensed sales by about $15.4 million under Option A and $14.9 million under Option B.[28]

### 2.    Dr. Leonard Cherry-Picks  License Terms

47.    Separately, Dr. Leonard unpacks the release payments offered by Ericsson to TCL as part of offers made by Ericsson in July 2012 and July 2013 (i.e. not Option A or Option B) in an attempt to convince the Court that TCL is entitled to a discount on payments to Ericsson for its past unlicensed sales.

48.    Dr. Leonard is conceptually wrong in his approach.  When analyzing a license, it is important to consider *all* economic terms as a whole.  It is inappropriate to analyze just the release period of an offer and compare it with other offers.  This is what Dr. Leonard is doing.  Dr. Leonard wants the Court to adopt the release payment terms that Ericsson offered in 2012 or 2013, but not the other terms and conditions of those offers. In essence, Dr. Leonard seeks to create a "Franken-license" made up of cherry-picked terms from fully, integrated license offers.

49.    I unpacked the *entire* July 2012 offer and the *entire* July 2013 offers

---

[27] Exhibit 5546; Exhibit 543.
[28] Exhibit 5546

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    terms and compared them to Ericsson's Option A and Option B offers.  I find that

2    while the July 2012 and July 2013 offers do include a discounted release payment, the

3    implied Ericsson one-way rates are overall higher than the Ericsson one-way rates

4    implied by either Option A or Option B.  So Ericsson has already included a discount

5    in the Option A and Option B offers that exceeds the discount reflected in the July

6    2012 and July 2013 offers.[29]  If TCL wanted the discounted release payment term in

7    the July 2012 and July 2013 offers, it could have accepted those offers when they

8    were made by Ericsson.

9    **F.     Ms. Zhu's Direct Testimony Contradicting Her Deposition**

10   **Testimony.**

11         50.     In my direct testimony, I explained that the value of Ericsson's SEPs is

12   unrelated to TCL's profit margins.  However, as a way to rebut Dr. Leonard's

13   argument that TCL could not make money and pay Ericsson's Option A and Option B

14   royalty rates, I investigated TCL's internal accounting practices and determined that

15   TCL's financial statements demonstrate that Dr. Leonard is wrong. In reality, TCL

16   reported a healthy gross profit *after* estimating its liabilities for IPR payments owed to

17   Ericsson.  Moreover, even after accounting for other fixed costs, TCL reported a

18   healthy net profit margin in 2013 through 2015.  My analysis was based, in part, on

19   the 30(b)(6) deposition testimony of TCL's corporate representative witness on

20   accounting matters, Ms. Judy Zhu. Ms. Zhu has now submitted her direct testimony,

21   which directly contradicts her deposition testimony on these issues.

22         51.     I stand by my original conclusion. Nothing in Ms. Zhu's direct testimony

23   gives me reason to change my mind. Ms. Zhu's direct testimony is inconsistent with

24   documents produced by TCL in discovery and GAAP accounting rules, as well as her

25   own previous testimony. And if Ms. Zhu testified correctly in her witness declaration,

26   then TCL's publicly reported financials for 2012 through 2015 are potentially

27   misleading—because those financial statements report liabilities and profits that

28   ---

[29] Exhibit 5547.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    TCL's management anticipated would be reduced by future expenses (IPR license

2    payments). As an example, TCL estimated that it owed Ericsson $90 million in SEP

3    royalties to Ericsson in 2014.[30] If TCL did not include those figures in its 2014

4    financial statements, then TCL was underestimating its liabilities by about 2.3% of

5    revenue that year.[31] In any event, my ultimate conclusion that TCL's profit margins

6    are irrelevant to the value of Ericsson's SEPS remains the same.

7    **III.    RESPONSE TO TCL'S MAXIMUM ROYALTY RATE CONTENTIONS**

8          52.    TCL's experts have presented dozens of different possible royalty rates

9    for a license between Ericsson and TCL, based on at least four different kinds of

10   economic analyses. In his expert report alone, Dr. Leonard presented four possible

11   top-down models, with results in both dollar per-unit and percentage per-unit

12   structures. For his part, Dr. Lynde presented two completely different theories of

13   license analysis. First, he calculated a reasonable royalty based on patent pool data

14   (which TCL has now chosen not to argue for) and presented the results in both dollar

15   per-unit and percent per-unit structures. Second, Dr. Lynde unpacked five Ericsson

16   licenses and presented between two and five different unpacking results for each

17   license without explaining which unpacking results were his ultimate conclusions.

18         53.    For the very first time on January 19, 2017, TCL finally disclosed its

19   position on what it contends would be the maximum FRAND royalty rates for a

20   license between Ericsson and TCL in the parties' proposed Joint Pre-Trial Order:[32]

**Figure 4:  TCL's Maximum Royalty Rate Contentions
(Statements In Joint Pre-Trial Order)**

|       | Maximum "Non-Discriminatory" Rate | Maximum "Fair/Reasonable" Rate |
|-------|-----------------------------------|--------------------------------|
| 2G/3G | 0.30%                             | 0.21%                          |
| 4G    | 0.26%                             | 0.16%                          |

---

[30] Exhibit 530.
[31] Exhibits 530; Exhibit 518.
[32] Docket 1376-1.

-21-

54.     Based on this new information, I was able to calculate the dollar per-unit rates implied by TCL's new contentions, using the same projections and assumptions that I used to derive the dollar per-unit rates implied by Ericsson's Option A and Option B offers. This analysis is set forth in Exhibit 5548.

55.     The royalty rates that TCL advocates for are exceptionally low, and do not account for TCL's very low ASPs (i.e., given that they are based on ███████ ███████ licenses with Ericsson, the two competitors with the highest ASPs). Based on the results of Dr. Lynde's analysis of Ericsson's licenses with ██████████ TCL states that a "non-discriminatory rate" would be, at a maximum, 0.30% for 2G/3G and 0.26% for 4G. But TCL is <u>not</u> similarly situated to ██████████ in particular because its ASPs are drastically lower.

56.     TCL contends that a "fair/reasonable" royalty rate would be even lower than what it contends are "non-discriminatory rates." In effect, TCL is demanding royalty rates that are a ██████████ of what *all other licensees* have agreed to pay Ericsson on an implied dollar per-unit basis. This is unfair and unreasonable and discriminates against other Ericsson licensees:

**Figure 8:  Comparing Implied 4G Dollar Per-Unit Rates To TCL's**
**████ Contentions[33]**



---

[33] Exhibit 5314; Exhibit 5330; Exhibit 5548; Exhibit 1276; Exhibit 5545; Exhibit 258.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



**Figure 9:  Comparing Implied 3G Dollar Per-Unit Rates To TCL's Maximum Royalty Rate Contentions**[34]

**Figure 10:  Comparing Implied EDGE Dollar Per-Unit Rates To TCL's Maximum Royalty Rate Contentions**[35]

**Figure 11:  Comparing Implied GSM Dollar Per-Unit Rates To TCL's Maximum Royalty Rate Contentions**[36]

57.     Using TCL's actual sales figures, I also calculated what TCL would have paid Ericsson in 2015 under a license that specified the maximum rates it now

[34] Exhibit 5314; Exhibit 5548; Exhibit 1276.
[35] Exhibit 5314; Exhibit 5548; Exhibit 1276.
[36] Exhibit 5314; Exhibit 5548; Exhibit 1276.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Case 8:14-cv-00341-JVS-DFM   Document 1910   Filed 02/23/18   Page 29 of 153   Page ID
#:95843

advocates for, on a dollar per-unit basis:

**Figure 12:  TCL Dollar Per-Unit Royalties In 2015
Under TCL's Maximum Royalty Rates**[37]

|  | ASP | "ND" Royalty | "FR" Royalty |
|---|---|---|---|
| 2G | $15.08 | $0.05 | $0.03 |
| 3G | $50.45 | $0.15 | $0.11 |
| 4G | $100.28 | $0.26 | $0.16 |

For every other comparable Ericsson license, the licensee agreed to pay royalties that
█████ TCL's proposed maximum royalty rates for a license between the parties.
TCL is demanding special treatment in the form of an implied Ericsson one-way rate
for 4G sales that is over █████ on a dollar per-unit basis than that for any other
comparable Ericsson license.

58.    As I explained in my direct testimony, if the court-adjudicated Ericsson-
TCL license results in applying the Apple/Samsung percent per-unit rates to TCL's
ASPs, then there will be a race to the bottom in which royalty rates are continuously
driven downward through a series of alternating negotiations between FRAND
licensees with significantly different ASPs.  As their licenses expire, high-ASP
players will renegotiate for similar dollar per-unit rates as TCL:

---
[37] Exhibit 5548.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 13:  Race to The Bottom**



By defining FRAND to require *identical* treatment of very different companies, TCL's suggested approach clearly is seeking to destroy the value of Ericsson's SEPs.  From the perspective of a licensing expert, this outcome cannot be the balanced approach that the ETSI IPR Policy describes.

## IV.  RESPONSE TO DR. LYNDE'S CRITICISMS OF MY LICENSE ANALYSIS

59.     In his witness declaration, Dr. Lynde disagrees with many of the assumptions in my license analysis.[38]  He concedes that most of the disagreements are immaterial, writing that "[T]he use of Mr. Kennedy's improper assumptions and resulting methodologies, other than the discounting of both future revenues and unit sales (bullet 1 above), does not have a material impact on the eventual effective one-way rate determinations[.]"[39]  I address Dr. Lynde's material challenges below:

---

[38] Lynde Witness Declaration, at ¶ 99.
[39] Lynde Witness Declaration, at ¶ 100.

**A.     My License Analysis Calculates An Implied Dollar Per-Unit Rate That Is A *License Term.***

60.     Dr. Lynde criticizes my method of calculating dollar per-unit rates for various licenses.[40]  Dr. Lynde's criticisms are misguided.  Dr. Lynde calculates dollar per-unit figures using a *patent infringement damages* methodology.  I am calculating dollar per-unit figures using a *license term* methodology.  This is an important distinction.  The Court is not calculating damages for patent infringement; it is determining whether the terms and conditions of Option A and Option B are FRAND.

**1.     *License Term* Dollar Per-Unit Royalty Rates.**

61.     The purpose of a comparable license analysis is to assess the comparable license terms that would yield equivalent economic value for a license between TCL and Ericsson.  This is necessary because the payment terms of Ericsson's licenses are not uniform–some require fixed payments, some require the payment of running royalties based on the percentage of the selling price of the licensed device and/or on a dollar per-unit basis, some include royalty caps and floors, some include non-cash consideration, and others are a mixture of two or more of the above..  A license analysis that compares licenses with various payment structures is common and something that I have performed on many occasions in my work as a licensing expert. Here, I have undertaken to determine the dollar per-unit *license term* that  would be economically equivalent to a fixed payment or percentage per-unit license:

---

[40] Lynde Witness Declaration, at ¶ 99, bullet 1.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

### Figure 14:  Comparable License Analysis



For example, if a licensee agreed to pay Ericsson a lump sum royalty of $1 million a year for each year of a 5-year license, I am calculating the effective dollar per-unit rate that the licensee would pay if, rather than paying $1 million each year, it paid a fixed dollar per-unit royalty for each licensed device sold during the term of the agreement.

62.     What is the difference between a *license term* methodology and a *damages* methodology?  A damages calculation is presented on a net-present value basis as of a single point in time.  For each license, Dr. Lynde has discounted future royalties as if they were paid in 2014 or 2015.  The discount rate accounts for the time-value of money, individual business risks, and market risks so that an expert can tell you what a dollar in 2020 is worth in 2014.  But that is not how a dollar per-unit *license term* works.  Under a *license term*, the licensee is paying the same dollar amount per-unit every single year.  If the license says $2.00 per-unit, then the licensee pays $2.00 per-unit in 2017, $2.00 per-unit in 2018, and so forth.  Critically, all of the treatises cited by Dr. Lynde involve the calculation of *damages* or *value* as of a specific point in time.  None of the treatises cited by Dr. Lynde involve calculating a *license term* that has a running royalty term where a licensee will be paying royalties in the future.

63.     Dr. Lynde's dollar per-unit calculations are in constant dollars—as if the licensee paid all the money at a single point in time (at the beginning of the license).

1    For example, Dr. Lynde analyzes the Ericsson-LG license that became effective June

2    27, 2014.[41]  In Exhibit 1245, Dr. Lynde estimates that the LG license has an effective

3    dollar per-unit rate of ███ in *constant* 2014Q3 dollars.  Thus, according to Dr.

4    Lynde, LG would be paying ███ per unit if it paid the full amount in cash on June

5    27, 2014 (2014Q3).  Such a calculation is not a *license term*, it is a *damages* amount.

6    A comparable LG license will not have a royalty term that says ███ per unit in

7    2014Q3 dollars."  A comparable LG license will have a royalty term that states "$X

8    per-unit".  Similarly, any TCL license will not have a royalty term that states "$X per-

9    unit in 2015Q1 dollars."  The TCL license will have a royalty term that states "$X

10   per-unit."

11          64.     When I calculate a dollar per-unit term in a comparable license analysis, I

12   calculate the per-unit royalty that a licensee would pay Ericsson over the course of the

13   license that provides the same economic value as the express license terms.   I have

14   used this methodology to determine the appropriate *license terms* in over one hundred

15   patent license negotiations resulting in executed license agreements between licensees

16   and licensors. I have also performed independent analyses of hundreds of comparable

17   licenses to advise clients on comparable *license terms*.  It is the proper analysis in this

18   matter.  I have also served as a damages expert in dozens of patent cases that require

19   calculating a *damages* amount. I understand the difference.  Dr. Lynde does not.

20   Additionally, my methodology is consistent in this respect with the methodology used

21   by TCL's other expert in this case:  Dr. Leonard.  The entire purpose of a comparable

22   license analysis is to calculate the comparable *license terms* that would be put into a

23   license and thus could be compared to the *license terms* in Option A and Option B.

## 2.     Dr. Lynde's Method Wrongly "Concludes" That An Express $2.00 Per-Unit License Term Implies A $1.60 Per-Unit Royalty Rate.

27          65.     A simple example demonstrates how Dr. Lynde's methodology

28
---
[41] Exhibit 199.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

underestimates the value of Ericsson's patent portfolio. Let's assume a hypothetical license with a three-year term and an express $2.00 per-unit royalty term for a company that sells 10,000 units a year. Dr. Lynde states that to calculate a dollar per-unit rate you should divide discounted royalties by undiscounted (or nominal) units. But dividing discounted royalties by nominal units does not result in a royalty rate of $2.00 per unit:

**Figure 15:  Unpacking a $2.00 Per-Unit License Using the Lynde Methodology**

| | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Units | 10,000 | 10,000 | 10,000 | 30,000 |
| Royalties (License Term = $2 per unit) | $20,000 | $20,000 | $20,000 | $60,000 |
| **Net Present Value** | | | | |
| Discount Factor | 0.90 | 0.80 | 0.70 | |
| Discounted Royalties (License Term = $2 per unit) | $18,000 | $16,000 | $14,000 | $48,000 |
| **Calculating $/Unit** | | | | |
| License Term | $2.00/unit | $2.00/unit | $2.00/unit | $2.00/unit |
| Lynde Method: Discounted Royalties ÷ Units | $1.80/unit | $1.60/unit | $1.40/unit | $1.60/unit |

Thus, applying the Dr. Lynde methodology, you would erroneously conclude that a hypothetical license with an express $2.00 per unit license term has a dollar per-unit term of $1.60.

**Figure 16:  Unpacking a $2.00 Per-Unit License Using the Lynde Methodology**



This is obviously wrong.  Dr. Lynde's calculation is a *damages* term.  It is calculating what the license is worth on a dollar per-unit basis *if* the licensee paid in Year 0.  But that is not a *license* term.  Dr. Lynde's method is undervaluing the dollar per-unit amount by 20%.

66.     To calculate a dollar per-unit *license term*, the proper method is to discount the results of the whole equation of royalties divided by units.  It is not appropriate to discount one element of the equation and not the other.  Again, this is how I analyze or determine the rate for licenses in real world licensing negotiations to calculate the *license term* to include in an offer or license agreement.  This is also how Dr. Leonard calculated his dollar per-unit terms.  In Exhibit 1119, Dr. Leonard calculates a royalty by using the "NPV" of both revenues and units.[42]  Going back to our simple example, we can unpack the hypothetical license with a $2.00 per-unit term and get the license term:

---

[42] Exhibit 1119, at lines (12)-(15).

**Figure 17:  Unpacking a $2.00 Per-Unit License Using the Kennedy/Leonard Methodology**

|  | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Units | 10,000 | 10,000 | 10,000 | 30,000 |
| Royalties (License Term = $2 per unit) | $20,000 | $20,000 | $20,000 | $60,000 |
| **Net Present Value** | | | | |
| Discount Factor | 0.90 | 0.80 | 0.70 | |
| Discounted Units | 9,000 | 8,000 | 7,000 | 24,000 |
| Discounted Royalties (License Term = $2 per unit) | $18,000 | $16,000 | $14,000 | $48,000 |
| **Calculating $/Unit** | | | | |
| License Term | $2.00/unit | $2.00/unit | $2.00/unit | $2.00/unit |
| **Kennedy Method** Discounted Royalties ÷ Disc. Units | $2.00/unit | $2.00/unit | $2.00/unit | $2.00/unit |
| **Leonard Method** Discounted Royalties ÷ Disc. Units | $2.00/unit | $2.00/unit | $2.00/unit | $2.00/unit |
| **Lynde Method** Discounted Royalties ÷ Units | $1.80/unit | $1.60/unit | $1.40/unit | $1.60/unit |

The Kennedy Method, the Leonard Method, and the License Term are all consistent. The Lynde method is the outlier:



**Figure 18:  Comparing Unpacking Methods On a $2.00 Per-Unit License**

Dr. Lynde is wrong when he criticizes my approach. Ericsson's Option A and Option B offers do propose that TCL make an upfront fixed payment covering all of its unlicensed sales over the license term.

### 3. Dr. Lynde's Method Underestimates Ericsson's Implied One-Way Dollar Per-Unit Rate By Up To 30%.

67.     As I explained above, Dr. Lynde's unpacking method underestimates the value of any given license. And the longer the license, the greater his underestimation. Using the hypothetical above, Dr. Lynde undervalued a $2.00 per-unit license by 20% over a three-year term.  But Dr. Lynde would undervalue a $2.00 per-unit license by 30% over the course of a five-year term. This matters because TCL relies most heavily on two licenses with terms that ████████████████████████████████ Samsung ██ years from the effective date) and Apple ██ years from the effective date). Dr. Lynde's methodology underestimates the royalties that Samsung and Apple agreed to pay to Ericsson most severely. Below is a table converting the Lynde "Damages Method" results into License Term results on a schedule-by-schedule basis. For purposes of this exercise, I have accepted all of Dr. Lynde's other assumptions (although, as I will explain below, I disagree with a number of those assumptions):

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 19:  Lynde 4G Rates on *License Term* Basis**[43]

| Company | Lynde Schedule | Lynde 4G Rate Damages | Lynde 4G Rate License Term | Lynde Underestimation |
|---|---|---|---|---|
| Samsung | Updated 11D1 | | | **-9%** |
| | Rebuttal 6E | | | **-9%** |
| | Rebuttal 7B | | | **-6%** |
| | Updated 11D2 | | | **-32%** |
| | Rebuttal 6H | | | **-31%** |
| | Rebuttal 7E | | | **-29%** |
| | Rebuttal 9B | | | **-30%** |
| Apple | Suppl. 11F1 | | | **-23%** |
| | Rebuttal 6B | | | **-22%** |
| | Rebuttal 8B | | | **-16%** |
| LG | Rebuttal 4A1 | | | **-8%** |
| | Rebuttal 4B1 | | | **-19%** |

Notably, Dr. Lynde omitted the dollar per-unit results of his analysis of the Samsung license in his November 2016 supplemental expert report, despite including those results in his opening expert report served in February 2016. I went ahead and calculated the dollar per-unit rates implied by Dr. Lynde's analysis using his *damages* methodology and my *license term* methodology.[44]

### 4. My Dollar Per-Unit Calculations Are Consistent.

68.    The last thing to say is that I was consistent in my calculations.  I calculated the implied dollar per-unit rates for Option A and Option B by using the license term methodology.  If I applied Dr. Lynde's *damages* methodology, then I would have calculated the following:

---

[43] Exhibit 5541; Exhibit 5542; Exhibit 5544.
[44] Exhibit 5541; Exhibit 5542; Exhibit 5544.

**Figure 20:  Option A Unpacked Using the Lynde Damages Method**[45]

| Tech | Option A License Term | Option A Lynde Method |
|---|---|---|
| GSM/GPRS | $0.13 | $0.12 |
| EDGE | $0.37 | $0.35 |
| 3G | $0.68 | $0.56 |
| 4G | $1.53 | $1.14 |

**Figure 21:  Option B Unpacked Using the Lynde Damages Method**[46]

| Tech | Option B License Term | Option B Lynde Method |
|---|---|---|
| GSM/GPRS | $0.15 | $0.13 |
| EDGE | $0.36 | $0.34 |
| 3G | $0.69 | $0.57 |
| 4G | $1.92 | $1.43 |

Again, these are not license terms. They should not be inserted into any license.
However, these are the correct dollar per-unit unpacking results for Option A and
Option B that should be compared to Dr. Lynde's dollar per-unit unpacking of
Ericsson's licenses.  These numbers allow for an "apples-to-apples" comparison.

**B.     Response to Dr. Lynde's Criticisms: ZTE.**

69.    Dr. Lynde criticizes the results of my analysis of the Ericsson-ZTE
licenses.[47]  His criticisms are misplaced.

**1.     I Employed The Same Formula To Analyze The ZTE Licenses
That Dr. Lynde Uses To Analyze Other Licenses.**

70.    To unpack Ericsson's two licenses with ZTE (a 2014 license covering 4G

---

[45] Exhibit 5550.
[46] Exhibit 5550.
[47] Lynde Witness Declaration, at ¶¶ 143-151.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

sales and a license covering 2G/3G sales that was amended in 2015), I used the same unpacking formula as Dr. Lynde (other than applying correct discount rates for fixed payments and calculating implied dollar per-unit rates).I used business projections from the Ericsson business cases, just like Dr. Lynde did for Samsung, LG, Apple, and HTC.  I applied the same patent-strength ratio (PSR) methodology for ZTE that I did for all other licenses. And I could not use Dr. Lynde's methodology because Dr. Ding did not investigate how many essential infrastructure patents are owned by ZTE.[48]

71.    It is telling that Dr. Lynde cannot—and does not—challenge my methodology. Instead, he criticizes my underlying assumptions in regard to the data that I input into the formula, namely relying on the projections of ZTE sales found in Ericsson's final business cases. But Dr. Lynde relies on projections from Ericsson's business cases when he unpacks other Ericsson licenses. He never explains why he is taking exception to my use of Ericsson's projections for ZTE, but has no issues with those projections for other licensees. Nor does he identify any reasons why Ericsson's projections were not reasonable. Based on Exhibit 4023, when negotiating its 4G license with ZTE, Ericsson assumed that:

- ██████████████████████████████████████████████
  ██████████████ Dr. Lynde does not dispute that this projection is reasonable.
- Ericsson assumed that the average selling price (ASP) of a ZTE's 4G mobile devices was below the market average in both China and the United States. For example, the market retail ASP on a 4G unit was $630 in 2013 and $489 in 2014.[49] Ericsson assumed that ZTE phones would have a 2014 wholesale price of ███ in China and ███ in the United States/Europe. [50] Ericsson modeled that these prices would ████████████████████ I believe this a reasonable projection and Dr. Lynde offers no alternative.

---

[48] Exhibit 1239.
[49] Exhibit 1000.
[50] Exhibit 4023, at SHEET:  Handset Revised.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- Ericsson assumed that ZTE would sell ▮▮▮▮▮ in 4G infrastructure in 2014, with its sales growing to ▮▮▮▮▮▮ infrastructure in ▮▮▮ Ericsson further assumed that ▮▮▮▮▮▮▮ of those sales would be in China.[51] I believe this too is a reasonable projection and Dr. Lynde offers no alternative.

If Dr. Lynde disagreed with any of Ericsson's assumptions, he had the chance to model alternate scenarios. He did not do so. At bottom, Dr. Lynde simply does not like the results of his own unpacking protocol when applied to ZTE. Using the same protocol as the one employed by Dr. Lynde, I calculated an implied Ericsson one-way rate of ▮▮▮ per 4G unit over the life of the 4G license.  When using the same protocol, I calculated an implied Ericsson one-way rate of ▮▮▮ per 3G unit over the life of the 2G/3G license.[52]

72.    Dr. Lynde's other complaints are minor or untrue and do not have a material effect on my results:

- Dr. Lynde complains that Ericsson's projections for the 4G license ended in 2018Q4, whereas I modeled the license through 2019Q1.[53]  This is true, but has no material effect on my results.  For the 2G/3G amendment, Ericsson's projections ▮▮▮▮▮▮▮▮▮▮▮

- Dr. Lynde complains that I excluded dongle and tablet revenue data from my analysis.[54] This is wrong; Dr. Lynde misread my schedules. The tablet data and the dongle data *are* included in my analysis.[55]

## 2.    Ericsson's Comparable Licenses That Require Running Royalty Payments Imply Significant One-Way Dollar Per-Unit Rates.

73.    Dr. Lynde is also mistaken about the second part of my analysis. Both the

---

[51] Exhibit 4023, at SHEET:  Infra Revised.
[52] Exhibit 5314.
[53] Lynde Witness Declaration, at ¶ 149.
[54] Lynde Witness Declaration, at ¶ 150.
[55] Exhibit 5316, Exhibit 1196, Lynde Witness Declaration, at ¶148.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

2G/3G and 4G licenses have a running royalty rate component, meaning that the licenses require ZTE to pay a royalty on every unit sold. Using the running royalty payment terms in the licenses, and excluding any grant-back value to Ericsson for the reciprocal license granted to it under ZTE's standard essential patents, I calculated the following implied dollar per-unit rates for 2015:

**Figure 22:  Implied Ericsson One-Way Rates Assuming No Grantback Value (ZTE)**[56]

| Implied Ericsson One-Way Rates Assuming No Grant Back Value (2014/2015) | |
|---|---|
| **Tech** | **$/Unit** |
| GSM/GPRS | |
| EDGE | |
| 3G | |
| 4G | |

Thus, even if you assume that Ericsson receives *zero* value for a cross-license to ZTE's patents (an assumption that is not true, as ZTE has meaningful patent strength), ZTE still agreed to compensate Ericsson with royalties that imply significant dollar per-unit amounts.  However, I stand by my original assessment of PSRs to substantiate the value Ericsson received from ZTE for a license to ZTEs patents in connection with the cross license. As a result, although the above "one-way" rates substantiate the rates in Option A and B, they are understated.

### 3.    Dr. Lynde Failed To Analyze The ZTE Licenses.

74.    Critically, although Dr. Lynde identifies ZTE as a similarly situated company to TCL, he fails to analyze any of the ZTE licenses. Dr. Lynde claims that he lacked sufficient information to unpack the ZTE licenses. This is an excuse—

---

[56] Exhibit 5317.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Dr. Lynde had ample information to do his own analysis:

75.     *First*, Dr. Lynde claims that he lacked sufficient information to unpack the ZTE 2014 4G license because Ericsson produced more than one business case.[57] This is an unjustified excuse. Ericsson identified the appropriate ZTE business case in its discovery responses.[58]  Further, when TCL's attorneys deposed Ericsson's Mr. Nassim El-Amrani on December 16, 2015, they identified the correct ZTE business case and asked him questions about it.[59] Mr. El-Amrani referred TCL's counsel to Mr. Brismark for more information. TCL's counsel deposed Mr. Brismark two days later.

76.     Dr. Lynde next claims that the ZTE 4G business case fails to "include[] the appropriate regional components required to analyze the 4G license."[60]  This statement is wrong.  Exhibit 4023 is the native version of the ZTE business case.  It is the Excel of Exhibit 35, which TCL's attorneys used during Mr. El-Amrani's deposition. Exhibit 4023 clearly has the necessary regional information, i.e. a regional breakdown of mobile phone revenues:

---

[57] Lynde Witness Declaration, at ¶145.
[58] Exhibit 131, at p. 30.
[59] El-Amrani Depo, at p. 194-203.
[60] Exhibit 4023.

-38-

## Exhibit 4023 (Revenues By Region)



Exhibit 4023 has regional information on unit sales:

# Exhibit 4023 (Units By Region)

| | |
|---|---|
| 20 | ZTE Region split (shipments) |
| 21 | NAM |
| 22 | WE |
| 23 | CN |
| 24 | RoW |
| 25 | Total |
| 26 | |
| 27 | ZTE US Tech split |
| 28 | GSM/GPRS/EDGE |
| 29 | WCDMA |
| 30 | LTE |
| 31 | TD-SCDMA |
| 32 | CDMA |
| 33 | Total |
| 34 | |
| 35 | ZTE WE Tech split |
| 36 | GSM/GPRS/EDGE |
| 37 | WCDMA |
| 38 | LTE |
| 39 | TD-SCDMA |
| 40 | CDMA |
| 41 | Total |
| 42 | |
| 43 | ZTE CN Tech split |
| 44 | GSM/GPRS/EDGE |
| 45 | WCDMA |
| 46 | LTE |
| 47 | TD-SCDMA |
| 48 | CDMA |
| 49 | Total |
| 50 | |
| 51 | ZTE RoW Tech split |
| 52 | GSM/GPRS/EDGE |
| 53 | WCDMA |
| 54 | LTE |
| 55 | TD-SCDMA |
| 56 | CDMA |
| 57 | Total |

Exhibit 4023 also has the necessary regional information for infrastructure:

### Exhibit 4023 (Infra Revenues By Region)



Dr. Lynde's excuse does not hold water.  The data was available – he just didn't consider it.

77.     Dr. Lynde next claims he was confused as to which worksheet to rely upon:  "Revised" or "Reference."[61] This is a meaningless objection. TCL attorneys could have asked Mr. Brismark for clarification, just like Mr. El-Amrani suggested.[62] Moreover, Dr. Lynde could have modeled the ZTE license using the "Reference" figures if he wanted. He decided not to do so. Predictably, the unpacking result was "too high" to fit his narrative.

78.     Dr. Lynde further claims that he lacked IDC data with a geographic breakdown to calculate ZTE's running royalties.[63] This excuse is invalid for two reasons.  First, IDC does provide data with a regional breakdown component.  For a

---

[61] Lynde Witness Declaration, at ¶ 148.
[62] El-Amrani Depo, at p. 203.
[63] Lynde Witness Declaration, at ¶ 145.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  fee, Dr. Lynde could have whatever data he wanted.  Second, if you look at TCL's

2  other witness declaration by Mr. Guo, it shows that TCL already had access to

3  extremely detailed IDC data broken down by region.[64]  All Dr. Lynde had to do was

4  ask.

5       79.    Finally, Dr. Lynde claims that the ZTE licenses have a ███ discount for

6  sales in China.[65]  This is incorrect.  The ZTE 2015 2G/3G amendment does not have a

7  China discount at all.[66]  The ZTE 2014 4G license includes a discounted royalty rate

8  for mobile phones sold in China of ███ for multimode 4G units.[67]

9       80.    Dr. Lynde and I agree that ZTE is a similarly situated company to TCL.

10  The ZTE license *must not* be excluded simply because it does not fit Dr. Lynde's

11  narrative. In short, Dr. Lynde had the method, the data, and the tools to analyze the

12  ZTE licenses. He chose not to do so.  Why?

13       **4.    The ZTE 2016 License.**

14       81.    Finally, Dr. Lynde notes that the ZTE 4G 2014 license has been replaced

15  by a 2016 version.[68]  I note that Dr. Lynde makes a critical interpretation error.  Dr.

16  Lynde claims that the ZTE 2016 license covers 2G and 3G units sold in China.[69]  This

17  is incorrect.  The ZTE 2016 license defines "Company Products" to cover *only* units

18  that use the 4G standard.[70]  ZTE's sales of 2G/3G mobile devices are still covered by

19  the 2G/3G license that Ericsson and ZTE amended in 2015.[71]

20       82.    I have reviewed the new ZTE 2016 license but I understand from

21  Ericsson's counsel that TCL has taken the position that, because Ericsson executed

22  and produced the license after the close of discovery, TCL would object to me

23  offering expert testimony on the new license at trial. As a result, I have limited my

24  
---

25  [64] Guo Witness Declaration, at pages 17-35 ("Geographic Market" analysis);     Cistulli
Witness Declaration, pages 45-46.

26  [65] Lynde Witness Declaration, at ¶ 147.
[66] Exhibit 1200.

27  [67] Exhibit 1194, at § 7.1.
[68] Lynde Witness Declaration, at ¶ 151.

28  [69] Lynde Witness Declaration, at ¶ 151.
[70] Exhibit 4040, at § 1.5(ii).
[71] Exhibit 1200.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   discussion of the license to my rebuttal to Dr. Lynde, as set forth above.

2       83.    Separately, I disagree that the 2014 ZTE 4G license is not a useful data

3   point.  It reflects Ericsson's royalty information in April 2014, which is eleven months

4   before Ericsson made its Option A and Option B offers to TCL.  This is information

5   that Ericsson possessed at the time it structured the Option A and Option B offers and

6   is therefore highly relevant to determining whether the offers are FRAND. In contrast,

7   Dr. Lynde is relying on licenses that were executed eighteen months *after* Ericsson

8   made the Option A and Option B offers, which are far less relevant data points.

9       **C.    Response To Dr. Lynde's Criticisms: Samsung.**

10      84.    Dr. Lynde criticizes two aspects of my analysis of Ericsson's license with

11  Samsung.[72]  I address those below.

12          **1.    Infrastructure.**

13      85.    Dr. Lynde claims that I was inconsistent in unpacking the Samsung

14  license and the ZTE licenses because I excluded Samsung's infrastructure revenues

15  when I unpacked the Samsung license. This is incorrect.  I did not include the

16  Samsung infrastructure revenues in my Samsung analysis for two reasons.  First,

17  Samsung's projected infrastructure revenues are insubstantial compared to Samsung's

18  end user device revenues (approximately ▅▅▅ and including them does not materially

19  change my results.[73] In his direct testimony, Dr. Lynde agreed that the change is

20  immaterial. More importantly, I note that Dr. Lynde, likewise, chose not to include the

21  Samsung infrastructure revenues when he analyzed the Samsung license for his

22  opening expert report. Rather than add additional complexity to an already complex

23  model for an immaterial change, I simply excluded the Samsung infrastructure

24  revenue.

25      86.    In November 2016, Dr. Lynde changed his approach to the Samsung

26  license. In his second go-around, he included the Samsung infrastructure projections

27

28  _____
    [72] Lynde Witness Declaration, at ¶ 99.
    [73] Exhibit 4936.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   when he unpacked the license, even though it did not materially change his results. Dr.

2   Lynde also changed the way he calculated a PSR for the license. This change *did* have

3   a large effect (it lowers the effective royalty rates by about 12%) on his results, but

4   had nothing to do with the infrastructure revenues.

5        87.   Since Dr. Lynde has now changed his analysis, I went back and ran my

6   model to include the Samsung infrastructure revenue.  The changes were immaterial:

7   **Figure 23:  Alternate Unpacking (Including Samsung Infra)**

8   **Implied Ericsson One-Way Rates (Samsung)[74]**

| Implied Ericsson One-Way Rates (2011 ) | | | |
|---|---|---|---|
| Tech | %/Unit | $/Unit | $/Unit* |
| GSM/GPRS | | | |
| EDGE | | | |
| 3G | | | |
| 4G | | | |
| * Payment Option | | | |

15   There are no changes to my GSM/GPRS, EDGE, or 3G results.  The 4G results

16   declined by an insignificant amount—███   So the unpacking results that include

17   Samsung's infrastructure revenue still support my conclusion that the Option A and

18   Option B rates are FRAND.

19       **2.   Use Of Ericsson's "High" Projections For Samsung Sales.**

20        88.   Dr. Lynde also criticizes my use of Ericsson's "mid" business projections

21   to unpack the Samsung license, instead of the "high" projections. I do not understand

22   his criticisms.  In my declaration, I noted four reasons for using the "mid" scenario:

23      &#8226;   First, Ericsson believed that its "low" projections were at least as likely as its

24         "mid" projections for Samsung.[75] Thus, using the "mid" scenario was

25         conservative.

26

27

---

28   [74] Exhibit 5545.
    [75] Kennedy Witness Declaration, at ¶ 165-69.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- Second, Ericsson's "high" projections were based on a "straight-line" projection that assumed Samsung would continue to grow its market-share at the same rate as before. However, this was unrealistic because Samsung had already grown by leaps and bounds between 2009 and 2013.[76] I am not aware of any company that has grown its sales at a rate of 10% to 15% indefinitely.

- Third, I cited contemporaneous news articles detailing how Samsung was struggling to maintain its market share and was facing competition from other companies.[77] These new articles are consistent with Ericsson's belief at the time it signed the license that Samsung's business would not perform consistent with its "high" projections.

- Fourth, I showed that, in hindsight, even Ericsson's "low" projections overstated Samsung's actual performance:

**Figure 24:  Comparing Ericsson's Samsung Projections Against Actual Sales Data**[78]



Based on this evidence, I continue to believe that my use of Ericsson's "mid" projections in my analysis of the Samsung license was most appropriate and in fact

---

[76]  Kennedy Witness Declaration, at ¶ 165-69.
[77]  Kennedy Witness Declaration, at ¶ 165-69.
[78]  Exhibit 1000; Exhibit 4935.

conservative given that the "Low" projections are even closer to reality and could have been predicted at the time.

89.     Nonetheless, in effort to be conservative, I unpacked the Samsung license using Ericsson's "high" projections and using the Samsung infrastructure values (to address Dr. Lynde's criticism related to my initial exclusion of the latter from my calculations). As seen in the figure below, Samsung still pays a substantial dollar per-unit amount for all phones even assuming (contrary to contemporaneous evidence) that Samsung would have continued its previous phenomenal growth.  Even these results do not change my opinion that Option A and Option B are FRAND.

**Figure 25:  Alternate Unpacking
("High" Projection and Infrastructure Revenue)
Implied Ericsson One-Way Rates (Samsung)[79]**

| Implied Ericsson One-Way Rates (2011- ▮ | | | |
|---|---|---|---|
| Tech | %/Unit | $/Unit | $/Unit* |
| GSM/GPRS | | | |
| EDGE | | | |
| 3G | | | |
| 4G | | | |
| * Payment Option | | | |

### D.     Response To Dr. Lynde's Criticisms: LG.

90.     Dr. Lynde criticizes the results of my analysis of Ericsson's license with LG because I valued the non-cash consideration (the patents that LG agreed to assign to Ericsson, or to another entity of Ericsson's choosing) at ▮▮▮▮▮▮  I assumed a value of ▮▮▮▮▮ based on the expert testimony of Dr. Michael Pellegrino and Ericsson's records.[81]  Surprisingly, Dr. Lynde assumes that the LG patents were worth zero.[82]

---

[79] Exhibit 5545.
[80] Lynde Witness Declaration, at ¶ 135.
[81] Exhibit 5295.
[82] Lynde Witness Declaration, at ¶ 133.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

91.     Dr. Pellegrino is challenging Dr. Lynde's *zero* valuation of LG's patents. I find it unlikely that Ericsson accepted worthless consideration as partial payment for the license. However, even assuming for the sake of argument that the LG patents are worth only $60 million (roughly ████████████████████████████, the Ericsson one-way dollar per-unit rate implied by the LG license is substantial:

**Figure 26: Alternate Unpacking**
**(Assuming LG Patents = $60M)**
**Implied Ericsson One-Way Rates (LG)**[83]

| Implied Ericsson One-Way Rates (2013-2017) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| GSM/GPRS | | |
| EDGE / 3G (Qualcomm) | | |
| 3G* | | |
| 4G | | |

████████ sson   assumed   that   all   ████████████
████████████  LG paid the "EDGE" rate for 3G units.

I also unpacked the LG license using Dr. Lynde's assumption that the LG patents are worth zero. Even then, the Ericsson one-way dollar per-unit rate implied by the license is still substantial:

**Figure 27: Alternate Unpacking**
**(Assuming LG Patents = $0M)**
**Implied Ericsson One-Way Rates (LG)**[84]

| Implied Ericsson One-Way Rates (2013-2017) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| GSM/GPRS | | |
| EDGE / 3G (Qualcomm) | | |
| 3G* | | |
| 4G | | |

████████ sson   assumed   that   all   ████████████
████████████  LG paid the "EDGE" rate for 3G units.

---

[83] Exhibit 5549.
[84] Exhibit 5549.

This means that even if one were to accept Dr. Lynde's assumption about the value of the LG patents (which I believe is incorrect), the unpacking still shows that LG agreed to pay ▮▮▮▮ per 4G mobile device over the life of the license.

92.     Finally, if Dr. Lynde is going to ignore Ericsson's contemporaneous valuation of the LG patents in his analysis, then we should also consider the effective royalty rates using Dr. Pellegrino's estimates.  While Ericsson did not believe those estimates at the time, the results demonstrate that Ericsson received substantial value in the license:

**Figure 28: Alternate Unpacking**
**(Assuming LG Patents = $170M)**
**Implied Ericsson One-Way Rates (LG)**[85]

| Implied Ericsson One-Way Rates (2013-2017) | | |
|---|---|---|
| Tech | %/Unit | $/Unit |
| GSM/GPRS | | |
| EDGE / 3G (Qualcomm) | | |
| 3G* | | |
| 4G | | |
| ▮▮▮▮sson assumed that all ▮▮▮▮ LG paid the "EDGE" rate for 3G units. | | |

### E.     Dr. Lynde's Other Criticisms Are Insignificant.

93.     Dr. Lynde identifies a few other aspects of my analysis of the LG license that he disagrees with, but admits his criticisms are all immaterial. Even though I disagree with Dr. Lynde's remaining criticisms, I agree that even if all had any merit, his disagreements only have an immaterial impact on my results and so I do not address them.

## V.     CRITICISMS OF DR. LYNDE'S COMPARABLE LICENSE ANALYSIS

94.     Dr. Lynde commits errors in the implementation of his own comparable license analysis that improperly biases his results downward in favor of TCL.

---

[85] Exhibit 5549.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1

### A.   Dr. Lynde Fails To Account For Varying ASPs Across Licensees.

2      95.    Overall, Dr. Lynde demonstrates that different Ericsson licenses imply

3  different Ericsson one-way rates on a percentage per-unit basis for a license to

4  Ericsson's SEPs. I agree. But this is to be fully expected, given that the different

5  companies do not all sell the same mix of products at the same price points. Ericsson's

6  SEPs are an input to production like any other. Companies with higher ASPs will pay

7  a similar dollar per-unit rate, but a lower percentage per-unit rate.

8      96.    There is nothing remarkable when lower quality, lower priced products

9  pay a higher implied percentage per-rate for standard inputs than higher quality,

10  higher priced products. For example, all mobile phones use an RF transmitter, which

11  Dr. Leonard estimated to cost $3.60.  If all companies pay the same price for the

12  antenna, they will pay different implied percentage rates for the same product:



**Figure 29:  Hypothetical RF Transmitter**
**As a Percent of 4G ASP (2015)**

97.    These varying implied percentage rates do not reflect discrimination;

they reflect the different companies' business models. Some companies manufacture

primarily high-ASP units (Apple, Samsung, HTC). Other companies manufacture

primarily low-ASP units (ZTE, TCL, and CoolPad). All the companies need a license

to Ericsson's SEPs and pay for them.

98.    Remarkably, Dr. Lynde makes no adjustments for the different average

sales prices of different companies.  In contrast, I do make adjustments for the

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   different average sales prices by calculating an effective dollar per-unit *license term*.

2   My analysis shows that all players pay a significant dollar per-unit amount.

3       99.   TCL does not believe it should have to pay what others pay—or anything

4   close to it. TCL states that a "non-discriminatory rate" would be 0.30% for 2G/3G and

5   0.26% for 4G.[86]  These are the results of Dr. Lynde's unpacking of Samsung and

6   Apple's licenses. But TCL is <u>not</u> similar to Apple and Samsung because its ASPs are

7   much, much lower.  In effect, TCL is demanding a *miniscule* dollar per-unit rate:

### Figure 30:  Comparing 4G Dollar Per-Unit License Rates To TCL "Non-Discriminatory" Position



16       100.   As seen above, every single other company is paying much more than

17   what TCL wants to pay for a license to Ericsson's SEPs.  TCL is demanding special

18   treatment.  It is demanding a 4G rate that is more than ▮▮▮▮▮▮▮ han any other

19   licensee. The above comparison clearly illustrates the need to consider both the

20   royalty rate in terms of dollar per-unit as part of any comparable license analysis.

### B.   Areas Where Dr. Lynde and I Agree.

22       101.   Before identifying additional areas of disagreement, I want to narrow the

23   issues in question by identifying the areas where Dr. Lynde and I agree.

[86] Docket 1376-1.

- First, Dr. Lynde and I agree on the basic formula to unpack two-way licenses.  We agree that it is possible to use a patent strength ratio (PSR) to solve the equation to determine royalty rates for both Ericsson and the Licensee.[87]

- Second, while Dr. Lynde and I disagree on many of the inputs into the formula and how to properly model certain licenses, Dr. Lynde and I agree that we should rely on the Ericsson business cases for business projections and forecasts.[88]  Except of course for ZTE; Dr. Lynde is unwilling to use the Ericsson business case in that situation.

- Third, while Dr. Lynde and I disagree on which discount rates to use, Dr. Lynde and I agree that the different royalty forecasts need to be adjusted to a net-present value through the use of discount rates.[89]

102.   While Dr. Lynde and I agree on a basic framework, we disagree on the correct data inputs into the analysis.  Dr. Lynde makes several mistakes, including:

- Dr. Lynde ignores several comparable licenses with licensees that sell low-ASP mobile phones like TCL.

- Dr. Lynde does not calculate a license-term dollar per-unit rate that could be inserted into a license. Rather, Dr. Lynde calculates a damages figure dollar per-unit rate that is constant dollar (*i.e.* 2014 dollars).

- Dr. Lynde fails to properly value the benefit of guaranteed fixed payments.

- Dr. Lynde uses an unreliable PSR that is based on straight-forward patent-counting without any attempt to value patents. Dr. Lynde's PSR produces nonsensical results, like negative royalty rates.

- Dr. Lynde ignores economic information from the release periods.

- Dr. Lynde also makes mistakes specific to particular licenses.

---

[87] Lynde Witness Declaration, at ¶¶ 91.
[88] Lynde Witness Declaration, at ¶¶ 89.
[89] Lynde Witness Declaration, at ¶¶ 98.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

C.     **Dr. Lynde's Deliberately Avoids Analyzing Comparable Licenses Between Ericsson And Similarly Situated Companies,**

103.   In his initial expert report, Dr. Lynde analyzed only five licenses: Apple 2015, Samsung 2014, LG 2014, HTC 2014, and Huawei 2014. Of those five licenses, four (Apple, Samsung, LG, and HTC) are lump-sum agreements with companies that sell mobile phones with significantly higher average selling prices (or ASPs) than TCL. Dr. Lynde identified ZTE as a similarly situated licensee, but claimed that he lacked the necessary information to unpack the ZTE 2014 and 2015 licenses. I addressed that issue above.

104.   Moreover, Dr. Lynde identified similarly situated parties idiosyncratically based on large total sales volumes. While I agree that the handful of sizeable competitors Dr. Lynde identified are relevant for consideration, analyzing only those competitors' licenses with Ericsson is insufficient as it ignores other similarly situated parties. Dr. Lynde's analysis is overly selective as it ignores license information from other sizeable manufacturers, such as Karbonn (16 million 2015 units), ZTE (58 million 2015 units), and CoolPad (29 million 2015 units).[90] These licenses contain royalty rates that support a finding that Options A and Option B are FRAND.

105.   Dr. Lynde also fails to mention that only a few years ago, TCL was a smaller competitor in the worldwide mobile phone market and had absolutely no presence in the smartphone market (i.e., TCL initially sold only feature phones).[91] Dr. Lynde's focus only on TCL's larger competitors is overly narrow, particularly where mobile phone sales information exists for TCL's smaller competitors. Limited as that sales information may be, there is no reason to exclude consideration of implied royalty rates from Ericsson's licenses with TCL's smaller competitors because smaller competitors can in short order grow to become larger competitors just like TCL did.

---

[90] Exhibit 1000.
[91] Exhibit 1000.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

106.   Moreover, Dr. Lynde identifies "similarly" sized licensees in a biased way by focusing on total sales or total smartphone sales. This "total" sales focus masks important differences between the companies in a way that benefits TCL.  For example, with respect to the mix of sales between 2G/3G and 4G units, TCL's sales are primarily of (lower priced) 2G/3G units, whereas Dr. Lynde selected a handful of sizable competitors that focus on the (higher priced) 4G unit sales.[92]

### Figure 31:  Comparing 2015 TCL Mobile Phone Sales To Comparable Licensee Mobile Phone Sales[93]

| Tech | TCL Unit Sales | Lynde Comparable Licensees | | | | |
|---|---|---|---|---|---|---|
| | | Samsung | Apple | LG | Huawei | HTC |
| GSM/GPRS/EDGE | 16M (29%) | 69M (17%) | 0M (0%) | 7M (10%) | 0M (0%) | 0M (0%) |
| 3G | 30M (54%) | 116M (30%) | 4M (2%) | 27M (37%) | 26M (24%) | 5M (24%) |
| 4G | 9M (17%) | 205M (53%) | 228M (98%) | 38M (53%) | 82M (76%) | 15M (76%) |
| TOTAL | 55M | 390M | 232M | 72M | 108M | 19M |

107.   By ignoring the differences in the mix of sales as between 2G/3G as opposed to 4G mobile phones, Dr, Lynde asserts that other companies are "similarly" sized, while the size of sales by technology generation are not so similar. For example, Dr. Lynde states that the Apple 2015 license is a similarly situated license.  Yet, in 2015, Apple sold 228 million 4G mobile phones (roughly 98% of Apple's sales); whereas TCL sold about 9 million 4G mobile phones (less than 20% of TCL's sales). This is a ratio of about 25:1.

108.   Similarly, Dr. Lynde identifies Samsung as a similarly situated licensee, whereas based solely on volume; Samsung is in a completely different league than TCL, especially in smartphone sales. In 2015, Samsung sold 205 million 4G mobile

[92] Exhibit 1000.
[93] IDC Sales Data, Exhibit 1000; Exhibit 142.

phones, whereas TCL sold about 9 million. This is a ratio of about 22:1. Thus, Dr. Lynde is comfortable comparing TCL to companies that sell 20X to 25X the number of 4G mobile phones TCL sells.  If that is a valid comparison, then there is no legitimate reason why Dr. Lynde shouldn't also consider smaller mobile phone manufacturers to be similarly situated based on sales, e.g., those that sell as little as 1/20th to 1/25th the number of units that TCL sells, such as Sharp, Doro, and Blackberry:

**Figure 32:  Comparing Sales of Comparable Licensees**[94]

| Company Comparison (2015 Data) | Volume Ratio |
|---|---|
| **Lynde Comparable Licensees** | |
| Apple:TCL 4G Ratio | 25:1 |
| Samsung:TCL 4G Ratio | 22:1 |
| **Lynde Ignored Licensees** | |
| TCL:Sharp Ratio | 12:1 |
| TCL:Sharp 4G Ratio | 3:1 |
| TCL:Sharp 3G Ratio | 15:1 |
| TCL: Blackberry Ratio | 15:1 |
| TCL: Blackberry 4G Ratio | 3:1 |
| TCL:Doro Ratio | 21:1 |
| TCL:Doro: 2G Ratio | 11:1 |
| TCL:Doro 3G Ratio | 26:1 |

109.   In addition, Dr. Lynde arbitrarily narrows his focus to licenses consummated during the last two years that included a 4G license. Dr. Lynde's focus is overly narrow.  I considered licenses consummated over the last three years (from 2013-2015) and did not limit my consideration to Ericsson's licenses with smaller competitors that included a 4G license. Indeed, as TCL's 2014-2015 sales mix was heavily weighted towards 2G/3G mobile phones (e.g., approximately 95% and 85% of

---

[94] Exhibit 1000.

1  TCL's unit sales in 2014 and 2015, respectively)[95], I see no principled basis for

2  ignoring rate indications from Ericsson's licenses with smaller competitors that did

3  not include a 4G license.

### D.  Errors In Dr. Lynde's Calculation Of Implied Ericsson One-Way Rates.

#### 1.  Dr. Lynde Fails To Properly Account For The Value Associated With The Certainty of Fixed Payments.

8  110.  As the famous adage goes: "A bird in the hand is worth two in the bush."

9  A fixed payment license is akin to "a bird in the hand." No matter what happens in the

10  market, Ericsson will be paid a certain amount, known at the time the license is

11  signed. In contrast, running royalties are akin to "two in the bush."  Ericsson will only

12  be paid its anticipated value for the license if the licensee performs in line with

13  Ericsson's projections. I have accounted for these different economics in my license

14  analysis through discount rates. For lump-sum licenses, I discounted royalties at a

15  lower cost of debt rate (around 3%). For running royalty licenses, I discounted

16  royalties at the cost of capital rate (between 10% and 12%).

17  111.  Dr. Lynde fails to account for the value of the fixed payments.  In other

18  words, in Dr. Lynde's world, "A bird in the hand is worth one bird in the bush."  Dr.

19  Lynde applies the same discount rate for purposes of discounting projected future

20  sales revenues, running royalty payments and fixed payments. This is a mistake

21  because, as I have explained, fixed payments have added value over running royalty

22  payments because they are more certain.

23  112.  Conceptually, a licensee's projected future sales should be discounted at

24  a rate commensurate with the risk of the licensee achieving those sales. As such, the

25  risk of a licensee achieving its projected sales (and, in turn the risk of a licensor in

26  collecting running royalties on those sales) is commensurate with the usual business

27  risk of the licensee which is traditionally measured by a company's cost of equity or

28

[95] Exhibit 142.

1  weighted average cost of capital (WACC), depending on the market conditions faced

2  by that company. I understand Ericsson ███████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████

4  ███████████████████████████████████████████[96]

5       113.   However, *fixed* royalty payments are a different animal.  Future fixed

6  payments lack the same economic risk characteristics as future sales and running

7  royalties because they are more certain. For instance, LG promised to pay Ericsson

8  ██████████ in 2017 no matter how many LG phones were sold and no matter how

9  much market share cheap-ASP competitors earned.[97]  That promise is valuable.

10  Samsung and Apple made similar promises. They promised to make fixed payments

11  <u>or</u> pay dollar per-unit royalties of ███ to ███ for 4G units.[98] Again, these promises are

12  valuable. And Samsung's recent Galaxy Note problems demonstrate the value of the

13  fixed payment term. In January 2017, Samsung will pay Ericsson ████████████

14  ████ a 4G phone, no matter how many Samsung phones explode.

15       114.   The risk to the licensor in collecting fixed-lump sum royalties is greatly

16  reduced, and as such, fixed lump-sum royalty amounts need to be discounted at

17  discount rates lower than the rates applied to sales and running royalties, to reflect this

18  reduced level of risk.  The reduced risk to the licensor is based on the risk of the

19  licensee not paying the fixed lump-sum amounts to the licensor, which is

20  commensurate with borrowing rates e.g., prime rates or the licensee's borrowing rates.

21       115.   Based on my years of financing experience valuing over 75 lump sum

22  and running royalty license agreements on behalf of investment banks specializing in

23  financing different types of patent license proceeds and companies seeking to borrow

24  against (or sell) royalty streams, I know that the market values these types of royalties

25  differently by applying discount rates commensurate with the specific royalty payment

26  risk. A simple example can help explain how the different discount rates apply. Under

27
28

[96] Exhibit 4936; Exhibit 259; Exhibit 4044; Exhibit 4069; Exhibit 4929; Exhibit 5316.
[97] Exhibit 199.
[98] Exhibit 258; Exhibit 1276.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

its agreement with Ericsson, LG agreed to pay Ericsson ███████████████. In 2015, Ericsson could go to a bank and pledge the ███████ royalty payment as collateral for a loan for a low interest rate because there is very little risk that LG will go bankrupt and fail to make the payment. In contrast, the bank would charge a much higher interest rate if Ericsson tried to pledge a running royalty payment term as collateral. Even assuming that the running royalty rate term was expected to yield the exact same ███████, the bank would still charge a higher interest rate because the running royalty rate introduces market risk. I do the same thing in my license analysis.

116.   In his November 2016 expert report, Dr. Lynde criticized my approach because Ericsson used a constant discount rate when modeling the licenses. This is misdirection. I have relied on the Ericsson business cases for a very limited purpose: as a source of business projections for the different companies. Otherwise, I have not attempted to duplicate Ericsson's license analysis. I am applying my own based on my first-hand experience of how the market really values these types of cash flows.

117.   Further, Dr. Lynde's criticism is disingenuous. Neither Dr. Lynde, nor I have tried to model exactly how Ericsson interpreted each respective license in its business cases. Each of us applies our own judgment independent of the Ericsson business cases. For example, neither Dr. Lynde, nor I model the Samsung license to include a ████████████████████████████████████████████████████████ ██████████.

## 2.    Dr. Lynde Uses An Unreliable Patent Strength Ratio (PSR).

118.   When unpacking lump-sum licenses, Dr. Lynde utilizes an unreliable PSR. For each licensee, Dr. Lynde relies upon the patent-counting study conducted by Concur IP, under the supervision of Dr. Ding.  Dr. Lynde divides the number of "found essential" Ericsson mobile phone patents by the number of "found essential" licensee infrastructure patents.  This formula is unreliable for at least two reasons. First, as explained by Mr. Mallinson, I understand that Dr. Ding and Concur IP's

---

[99] Exhibit 4936.

patent-counting exercise was unreliable because Concur IP spent less than 45 minutes on average evaluating every patent family.[100]  Second, Dr. Lynde does not adjust the "found essential" patent counts for quality or value.  This puts Dr. Lynde at odds with Dr. Leonard.  Dr. Leonard opines at length that patents must be valued before running an economic analysis.[101]  Instead, Dr. Lynde assumes that one Ericsson mobile phone patent has equal value to one licensee infrastructure patent.  There is no support for this conclusion and, it is a dubious proposition, given that TCL's other experts agree that patent value can be skewed.

119.   The Ding data is unreliable, and Dr. Lynde effectively admits this.  In his Witness Declaration, Dr. Lynde unpacked the LG 2014 license.  Dr. Lynde admits that, relying on the Ding data, he calculated *negative* effective royalty rates for Ericsson:

> Using the unpacking equation and projections from Ericsson's business
> case for LG, as well as the counts of actually essential patents held by
> Ericsson and LG (as determined by Dr. Ding), I initially calculated a
> negative effective one-way rate to be paid by LG for a license to
> Ericsson's SEPs.[102]

Thus, Dr. Lynde concluded that Ericsson *should have* paid LG a royalty for each mobile phone sold under the LG 2014 license. This is a ridiculous outcome and undermines relying on the Ding data. Yet, Dr. Lynde continues to use it when unpacking the other licenses.

120.   Although Dr. Lynde concedes he unpacked the LG license to yield a *negative* royalty, he does not report the results.[103] However, based on Dr. Lynde's new materials in his November 2016 expert report, I can. Below is what Dr. Lynde would have calculated using the Ding data:

---

[100] Mallinson Witness Declaration, at ¶ 96.
[101] Leonard Witness Declaration, at ¶ 54.
[102] Lynde Witness Declaration, at ¶ 139.
[103] Lynde Witness Declaration, at ¶¶ 139-40.

**Figure 33:  Dr. Lynde's LG Unpacking Results Using Ding Data**[104]

| | Lynde Rebuttal Schedule 4A.1 Using Ding Data | | Lynde Rebuttal Schedule 4B.1 Using Ding Data |
|---|---|---|---|
| 2G/3G | **-$7.63** | 2G/3G | ███ |
| 4G | ███ | 4G | **-$3.83** |

121.   These results are illogical. Effectively, using the Ding data, Dr. Lynde's Rebuttal Schedule 4A.1 would say that instead of LG owing royalties to Ericsson, Ericsson should have paid LG $250 million in 2014-15.[105]  Similarly, Dr. Lynde's Rebuttal Schedule 4B.1 would have said that Ericsson should have paid LG $80 million. These results are nonsensical.[106]

122.   Realizing the obvious, Dr. Lynde abandons his use of the Ding data to calculate a PSR when unpacking the LG license. What does he use instead?  My methodology for arriving at a PSR: approved contribution counting data.

123.   What this proves is that TCL's overall thesis (that Ericsson has a weak patent portfolio) is wrong. As I stated in my original declaration, the PSR and Ericsson's implied one-way rate are inversely related. Thus, the <u>weaker</u> Ericsson's patent portfolio, the <u>higher</u> the Ericsson effective one-way rate. Because TCL assumes that Ericsson's patent portfolio is so weak, Dr. Lynde's formula breaks. This demonstrates the limits of license unpacking generally and shows that TCL's underlying assumptions yield illogical results when theory is divorced from economic reality.

### 3.   Dr. Lynde Incorrectly Claims That Including Released Sales Lowers Ericsson's Implied One-Way Rates.

124.   In his direct testimony, Dr. Lynde claims that if he included the release period in his calculations, then the implied Ericsson one-way rates would go down:

Of note, if I were to include released sales in my effective one-way rate

---

[104] Exhibit 5540.
[105] Exhibit 5540.
[106] Exhibit 5540.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

calculations (as Mr. Kennedy did), the result is that my effective one-way rates *go down*.[107]

125.   This is easily proven to be wrong using Dr. Lynde's own schedules.  In his November 2016 report, Dr. Lynde ran several different modeling scenarios for Samsung. One of his modeled scenarios included the release period.  Dr. Lynde's own schedules show that the effective rate *goes up* if you include the release period:

### Figure 34:  Comparing Lynde's Samsung Calculations With Release and Without Release[108]

| Lynde Schedule | 4G Rate |
|---|---|
| **Without Release.** Lynde Updated Schedule 11D1 IDC Data Analysis (2014Q1-2015Q4) | |
| **With Release.** Lynde Rebuttal Schedule 7B IDC Data Analysis (2011Q2-2015Q4) | |
| Difference With Release: | |

### Figure 35:  Comparing Lynde's Samsung Calculations With Release and Without Release[109]

| Lynde Schedule | 4G Rate |
|---|---|
| **Without Release.** Lynde Updated Schedule 11D2 ■ Business Case (2014Q1- | |
| **With Release.** Lynde Rebuttal Schedule 7E ■ Business Case (2011Q2- | |
| Difference With Release: | |

---

[107] Lynde Witness Declaration, at ¶ 100.
[108] Exhibit 1235; Exhibit 5541, at R2.1.3, R2.1.7.
[109] Exhibit 1236; Exhibit 5541, at R2.1.4, R2.1.8.

As can be seen above, by excluding the release period, Dr. Lynde lowers the implied Ericsson one-way dollar per-unit rate by about 13% to 15%. Dr. Lynde's statement that including released sales will lower the rates that result from his calculations is erroneous.

126.   The error in Dr. Lynde's position is also evidenced by his unpacking of Ericsson's license with Apple. When unpacking the Apple agreement, he assumes that Apple pays ███ per 4G unit during the release period and ████████████ ████████████ If you take the total revenue calculated by Dr. Lynde and divide it evenly over the release period and the go-forward period, you arrive at a figure of ███ per-unit:

**Figure 36:  Dr Lynde's Apple Dollar Per-Unit Result
With The Release Period Included**[110]

$$\frac{Discounted\ Royalties}{Sales\ (2015 - 2021)} = $$ ████████████████████

127.   Thus, even accepting everyone of Dr. Lynde's other assumptions, simply including the release period in the Apple unpacking *increases* the implied Ericsson one-way rate by <u>32%</u>. Again, Dr. Lynde's claim that including released sales would lower his results is wrong.

### 4.   Dr. Lynde Calculates Combined 2G/3G Rates.

128.   Dr. Lynde calculated implied Ericsson one-way rates for 2G/3G combined, as opposed to calculating separate implied Ericsson one-way rates for 2G and 3G, respectively. It is not clear to me why Dr. Lynde made this decision, particularly as Dr. Lynde's analysis of Ericsson's offers to TCL clearly delineate between 2G and 3G. Moreover, Dr. Lynde's calculation of combined 2G/3G rates makes it more difficult (rather than less difficult) to make an apples-to-apples comparison between his calculated implied rates and the rates implied by Option A

---

[110] Exhibit 1240.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  and Option B.

2      129.   As noted above, TCL's 2014-2015 sales mix was heavily weighted

3  towards 2G/3G mobile phones (i.e., approximately 95% and 85% of TCL's unit sales

4  in 2014 and 2015, respectively) and by 2014 to 2015 TCL was selling more 3G

5  mobile phones than it sold of 2G and 2.5G mobile phones combined.[111] Because 2G

6  and 3G mobile phones are individually and collectively such a large portion of TCL's

7  business, the distinction between 2G and 3G phones should matter in deciding

8  whether Option A and Option B are FRAND.

9      **E.    Specific Errors In Dr. Lynde's Analysis Of The Samsung License.**

10      130.   Dr. Lynde analyzed Ericsson's license with Samsung using a number of

11  methods.   In general, in his direct testimony, he appears to rely on his Updated

12  Schedule 11D2 analysis, which unpacks the Samsung license (excluding the release

13  period) using Ericsson's "high" projections. I summarize Dr. Lynde's errors below:

14  **Figure 37:  Errors in Dr. Lynde's Analysis of the Ericsson-Samsung License**

| Area of Disagreement | Explanation | 4G Rate Impact |
|---|---|---|
| Projections | Dr. Lynde uses the "High" projections instead of the "Mid" projections | 24%[112] |
| Discount Rates | Dr. Lynde uses the same discount rates for fixed payments as revenues. | 17%[113] |
| Release Period | Dr. Lynde excludes the release period from his calculations | 12%[114] |
| Dollar Per-Unit Rates | Dr. Lynde does not calculate a $/unit rate. | NA |

131.   <u>Projections.</u>  Dr. Lynde's largest error is his use of Ericsson's "high"

projections. As I have explained, Ericsson believed that its "low" and "mid"

---

[111] Exhibit 1201.
[112] Exhibit 5541, at 2.1.4, 2.1.9.
[113] Exhibit 5541, at 2.1.4, 2.1.6.
[114] Exhibit 5541, at 2.1.4, 2.1.8.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  projections were more probable than its "high" projections.[115]

2  **Figure 38:  Ericsson Projections for Samsung Sales**[116]



12  132.   As such, while my choice to consider and use both the "mid" and "high"

13  projections as part of my analysis is very conservative and tends to decrease my

14  estimates of the implied royalty rate, Dr. Lynde's choice can be seen as aggressive,

15  given the objective reasonableness of the "mid" projections. Further, the worldwide

16  mobile phone industry is and has been characterized by vast market share shifts as

17  incumbents are and have been replaced by new competitive entrants with

18  technologically leap-frogging product offerings; as such, any large, long-term sales

19  projections are subject to considerable downside sales execution risk.

20  133.   One need only consider the swift fall of Blackberry, Nokia, and

21  Motorola, former leaders in the mobile phone market, have been displaced by Apple

22  and Samsung. In my opinion, no long-term high or upside mobile phone sales

23  projections are free from this kind of systemic risk. As a result, "mid" and "low"

24  projections are commonly made by analysts as a way of accounting for this inherent

25  uncertainty.

26  134.   Dr. Lynde states that Ericsson's "high" projections are appropriate

28  ---
[115] Brismark Rebuttal Witness Declaration.
[116]  Exhibit 4936; Exhibit 1000.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

because a 2013 report from Strategy Analytics projected that Samsung would have higher sales in 2014. Yet, the 2013 report was based on a "straight-line" projection for Samsung. Effectively, Strategy Analytics assumed that Samsung would continue to have the same 24% share of the overall mobile phone industry from 2014 to ████

135. Ericsson doubted this straight-line projection and doubted it for good reason. Between 2010 and 2013, Samsung's total unit sales had grown from 280 million units to 450 million units, representing over 60% growth in four years.[117] In contrast, the entire market grew by only 16% during the same time period.[118] Similarly, Samsung's market share grew from about 18% of the market to 24% of the entire market.[119] Simply conducting a straight-line projection (*i.e.* assuming constant growth or a constant market share) is less reliable in such circumstance because Samsung's success demonstrates that the market was undergoing significant changes and growth stalls among dominant players. Even Apple, the greatest success story in the industry, had its growth stall in 2015. The mobile phone industry has seen many dominant players (*i.e.* Blackberry, Motorola, and Nokia) decline rapidly with little warning. In sum, there is ample evidence to suggest that Ericsson's "high" projections would overstate Samsung's actual sales.

136. Based on my own analysis, I calculate that using the "high" projections reduces the Ericsson's implied one-way royalty rates for the Samsung license by between 17% and 29% depending on the technology.[120] I have also determined, based on Dr. Lynde's rebuttal schedules, that his use of the "high" projections instead of the "mid" projections reduced the implied Ericsson one-way rate for 4G in his results by 24%.[121]

137. <u>Undervalues Fixed Payments.</u>  When unpacking the Samsung license, Dr. Lynde uses the same discount rate (10%) for sales and revenues as the fixed

---

[117] IDC Sales Data, Exhibit 1000.
[118] IDC Sales Data, Exhibit 1000.
[119] IDC Sales Data, Exhibit 1000.
[120] Exhibit 5314, at 3.1.2.
[121] Exhibit 5541, at R2.1.4; R2.1.9.

1   payments. For reasons that I explained above, this does not account for the added

2   benefit to Ericsson of Samsung's fixed payments. This is a very large error, because

3   the Samsung license is for a ███████ going-forward term.

4       138.   Based on Dr. Lynde's rebuttal schedules, I calculate that failing to

5   discount the fixed payments appropriately reduces Ericsson's implied one-way royalty

6   rates by 17% for 4G.[122]

7       139.   <u>Treats The Release Period Separately</u>.  Dr. Lynde calculates the effective

8   rates for the Samsung 2014 license release period (2011-2013) separately from the

9   effective rates for the going forward period (2014-███). This is wrong because all

10  terms (and time periods) of the license must be taken into account in order to calculate

11  the correct effective royalty rate over the full term of the license.  Just as a

12  determination of the effective rates in Options A and B must consider the release

13  period, so must the comparable licenses in order to make a valid comparison.  As

14  discussed above, Dr. Lynde's failure to include the release period causes him to

15  undervalue the Ericsson 4G implied one-way royalty rates by 12%.

16      140.   <u>2G/3G Rate.</u>  Dr. Lynde calculates Samsung's royalties on a blended

17  2G/3G basis instead of on a per-technology basis.  This merging is inappropriate,

18  especially because TCL's product mix is nearly 45% feature phones (primarily 2G)

19  and over 80% is 2G/3G.[123]  In contrast, Samsung's product mix is nearly all

20  smartphones with 4G being the largest proportion of units sold.[124]

21      **F.    Specific Errors In Dr. Lynde's Analysis Of The LG License.**

22      141.   Dr. Lynde first presented an LG unpacking result in his November 2016

23  report.  Dr. Lynde unpacked the LG license using two different methods. As I have

24  discussed, after the first yielded illogical results, Dr. Lynde unpacked the license using

25  a PSR derived from approved contribution counts. Altogether, he unpacked the license

26  in three different ways. However, he now appears to rely on his Rebuttal Schedule 4B

27

28

[122] Exhibit 5541, at R2.1.4; R2.1.6.
[123] Exhibit 1000.
[124] Exhibit 1000.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

for his results. In that schedule, Dr. Lynde unpacks the LG license (excluding the release period) assuming that the non-cash consideration (LG's agreement to assign 10 patents to Ericsson, or to an entity selected by Ericsson) was worth zero. Dr. Lynde makes several errors when unpacking the LG 2014 license:

### Figure 39:  Errors in Dr. Lynde's LG Analysis

| Area of Disagreement | Explanation | 4G Rate Impact |
|---|---|---|
| Non-Cash Consideration "LG Patents" | Dr. Lynde values them at $0 instead of $125 million. | 47%[125] |
| Discount Rates | Dr. Lynde uses the same discount rates for fixed payments as revenues. | 11%[126] |
| Dollar Per-Unit Rates | Dr. Lynde calculates a *damages* term and not a *license* term. | 19%[127] |

142.  Ignores Non-Cash Consideration. As I have testified, Dr. Lynde values the non-cash consideration at $0. This is a mistake, in light of the opinions rendered by Ericsson's expert Mr. Pellegrino. I estimate that Dr. Lynde's incorrect valuation of the non-cash consideration undervalues the implied one-way royalty rates by 47%.[128]

143.  Undervalues Fixed Payments.  When unpacking the LG 2014 license, Dr. Lynde applied the same discount rate (12%) to forecasted sales and revenues as to the fixed payments. For the reasons I discussed above, this was erroneous.   I estimate that Dr. Lynde's failure to properly value LG's fixed payments reduces the Ericsson implied one-way rates that emerge from his calculations by 11%.[129]

144.  Calculates $/Unit Rate Incorrectly.  When calculating the dollar per-unit effective rate for LG, Dr. Lynde compares discounted royalties against non-discounted units.  This has the effect of undervaluing the dollar per-unit rate by 19%.  As discussed above, Dr. Lynde has calculated a damages term not a license term.

---

[125] Exhibit 5543.
[126] Exhibit 5542, at R2.2.2.
[127] Exhibit 5542, at R2.2.2.
[128] Exhibit 5549.
[129] Exhibit 5542.

145.  <u>2G/3G Rate</u>.  Dr. Lynde calculates LG's royalties on a 2G/3G basis instead of on a per-technology basis. This merging is inappropriate, especially because TCL's product mix is nearly 45% feature phones (primarily 2G) and over 80% is 2G/3G.  In contrast, LG's product mix is nearly all smartphones with 4G being the largest proportion of units sold.

**G.    Specific Errors In Dr. Lynde's Analysis Of The HTC License.**

146.    Dr. Lynde makes similar errors when unpacking the HTC 2014 license. However, the results of his analysis, as seen in his Schedule 11C2, are generally consistent with my own results.  As such, I will not detail his errors here.

**H.    Specific Errors In Dr. Lynde's Analysis Of The Apple License.**

147.    Dr. Lynde unpacks Ericsson's current license with Apple using two different approaches. His final conclusion relies on Supplemental Schedule 11F1, which assumes that Apple paid Ericsson a ▮▮▮▮ 4G royalty for 2011-15 and a ▮▮▮▮ 4G royalty for 2016-2021.  I report Dr. Lynde's errors below:

**Figure 40:  Errors in Lynde's 2015 Apple Analysis**

| Area of Disagreement | Explanation | 4G Rate Impact |
|---|---|---|
| Disjointed Valuation | Dr. Lynde assumes that Apple pays ▮▮▮▮ per 4G unit during 2012-2015, but ▮▮▮▮ per unit from 2016-2021. | 26% |
| Discount Rates | Dr. Lynde uses the same discount rates for fixed payments as revenues. | 14% |
| Dollar Per-Unit Rates | Dr. Lynde calculates a *damages* term and not a *license* term. | 23% |

148.    <u>Uneven Distribution Of Royalties.</u> When unpacking the Apple 2015 license, Dr. Lynde assumed that the royalties were distributed differently between the release period and the 2016-2021period. For example, Dr. Lynde calculates that Ericsson will receive ▮▮▮▮ per 4G unit in 2015, but then receive only ▮▮▮▮ per unit for 2016-2021. This distribution makes no logical sense. There is no reason to believe

1    that either Ericsson or Apple ever considered such a disjointed royalty scheme.

2        149.   Dr. Lynde makes a similar error when calculating what portion of the

3    Apple 2015 payments went to pre-2015 sales. Recall that Apple paid ████ per 4G

4    unit through December 2014 under the Apple 2008 license. I calculated that if you

5    directed all the Apple 2015 cash consideration to 2015-2021 then Apple would pay a

6    royalty of ████ per 4G unit. This was less than what Apple paid for sales in 2012-14.

7    Accordingly, I assumed that the Apple 2015 cash consideration did not cover any

8    2012-14 sales. Otherwise, it would suggest that Apple paid more than ████ for sales

9    in 2012-14, but paid less than ████ in 2015-2021. This is not logical and not

10    consistent with Ericsson's assumptions when it executed the license.

11        150.   In contrast, Dr. Lynde has no trouble assuming that Ericsson agreed to a

12    disjointed royalty scheme. Dr. Lynde assumes that the Apple 2015 license transfers an

13    extra ████ of payment to the sales in 2012-2014 after Apple already paid a ████ per

14    4G unit for those sales and after calculating that Ericsson would only receive ████

15    per unit in 2016-2021.[130]  Dr. Lynde's assumptions are not reasonable:

---

[130] Exhibit 1240, at Footnote [D].

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Figure 41:  Lynde Assumptions When Unpacking The Apple License</u>**[131]



151.   In contrast, I took a more sensible approach.  Because I estimated that Apple's dollar per-unit rate was less than ▮▮▮▮▮ I assumed that all of the value covered the 2015-2021 period.  This avoids a disjointed valuation:

**<u>Figure 42:  Comparing Lynde's Distribution Versus Kennedy's Distribution</u>**

|  | **2012-14** | **2015** | **2016-2021** |
|---|---|---|---|
| Lynde Method | | | |
| Kennedy Method | | | |

152.   If all of Dr. Lynde's assumptions are accepted, these distribution-errors

---

[131] Exhibit 1240.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   alone cause Dr. Lynde to undervalue Ericsson's implied one-way royalty rate by

2   26%.[132]

3       153.   <u>Undervalues Fixed Payments</u>. When unpacking the Apple 2015 license,

4   Dr. Lynde uses the same discount rate (10%) for sales and revenues as the fixed

5   payments. As I have explained above, this fails to values the benefit of Apple's fixed

6   payments and ignores the inherent risk differential. This is a very large error, because

7   the Apple 2015 license is for a six-year going-forward term. I estimate that this error

8   causes Dr. Lynde to undervalue Ericsson's royalties by 23%.[133] Based on Dr. Lynde's

9   rebuttal schedules, applying the wrong discount rate undervalues Ericsson's royalties

10  by 14%.[134]  As previously discussed, this is inconsistent with my experience valuing

11  royalty streams for buyers and sellers in the real world and illogical.

12      154.   <u>Calculates $/Unit Rate Incorrectly</u>.  When calculating the dollar per-unit

13  effective rate for Apple, Dr. Lynde compares discounted royalties against non-

14  discounted units. This has the effect of undervaluing the dollar per-unit rate by 23%.[135]

15  Again, Dr. Lynde is calculating a damages term not a license term.

16      **I.     While Flawed, Dr. Lynde's Analyses Demonstrates That TCL's**

17          **Maximum Royalty Rate Contentions Are Too Low.**

18      155.   Finally, notwithstanding all of its flaws, Dr. Lynde's analysis

19  demonstrates the extent that TCL's new maximum royalty rate contentions, if adopted

20  by the Court, would grossly undercompensate Ericsson. Based on my analysis of

21  TCL's new contentions, I believe even Dr. Lynde must concede that TCL's proposed

22  maximum royalty rates imply Ericsson one-way dollar per-unit rates that are several

23  magnitudes smaller than the worst-case unpacking scenario for Ericsson.

24      156.   In Figure 43, I have charted the Ericsson implied one-way rate for 4G

25  implied by (i) Option A and Option B, using the Lynde unpacking method; (ii) TCL's

26

27  [132] Exhibit 5544, at R2.4.3**.**
    [133] Exhibit 5544, at R2.4.3.

28  [134] Exhibit 5544, at R2.4.1, R2.4.3.
    [135] Exhibit 5544, at R2.4.3.

maximum royalty rates, as disclosed in the proposed Joint Pre-Trial Order, using the Lynde unpacking method; and (iii) the results of Dr. Lynde's own license analyses:

**Figure 43: Lynde License Analysis v. TCL Maximum Royalty Rate Contentions (4G) vs. Options A and B[136]**





As seen above, the Option A and Option B offers are within the range of Dr. Lynde's unpacking results. In contrast, the maximum royalty rates advocated for by TCL are significantly below even the lowest Ericsson one-way royalty rate that was unpacked by Dr. Lynde.

## VI. CRITICISMS OF DR. LYNDE'S ANALYSIS OF OLDER ERICSSON OFFERS

157. I understand that this Court ruled that the trial will only involve determining whether the Option A and Option B offers are FRAND. I understand that TCL's claims based on Ericsson's earlier offers are no longer part of this case. Nonetheless, despite the Court's instruction in this regard, Dr. Lynde opines that Ericsson's earlier offers made in July 2011, March 2012, and July 2013 were

---

[136] Exhibit 5541; Exhibit 5542; Exhibit 5544; Exhibit 1229; Exhibit 1230; Exhibit 1231; Exhibit 1232; Exhibit 5550; Exhibit 5548.

discriminatory.[137]

158.   First, Dr. Lynde states that Ericsson's earlier offers are discriminatory because Ericsson's internal reference prices have fallen over time. This is not an economic analysis.  As Mr. Brismark explained in his direct testimony, Ericsson maintains internal reference prices to assist in negotiations.  The fact that Ericsson's internal reference prices change is not evidence of a FRAND violation. Critically, when Ericsson lowered its internal reference rates, it lowered its offers to TCL.[138]

159.   Second, Dr. Lynde compares his unpacking results to offers that were made in July 2011, March 2012, and July 2013.  This is a conceptual error.  By definition, Ericsson could not be discriminating against TCL based on licenses that occurred *in the future*. The earliest license that Dr. Lynde analyzes was executed in February 2014, seven months after the July 2013 offer to TCL.  Others were executed even later:

### Figure 44:  Timeline of Offers and Licenses

| Ericsson Offers | | |
|---|---|---|
| Early Offer | July 2011 | |
| Early Offer | March 2012 | |
| Early Offer | July 2013 | |
| Licenses Executed | | |
| Samsung | February 2014 | 7 months after July 2013 |
| LG | June 2014 | 12 months after July 2013 |
| HTC | December 2014 | 18 months after July 2013 |
| Apple | December 2015 | 30 months after July 2013 |
| Huawei | January 2016 | 31 months after July 2013 |

Dr. Lynde offers no evidence from then-existing licenses that the royalty rates that

---

[137] Lynde Witness Declaration, at ¶¶ 160-68.
[138] Exhibit 5312; at 2.1, 2.2.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Ericsson requested in its earlier offers were discriminatory.

160.    Finally, I would simply note that TCL sent Ericsson draft agreements that expressly incorporated the royalty rates contained in the March 2012, and July 2013 offers.[139] Only TCL can explain why it abruptly changed its mind a few days later.

## VII.    CRITICISMS OF DR. LEONARD'S TOP-DOWN METHODOLOGY

161.    In contrast to Dr. Lynde, Dr. Leonard eschews a market-based approach. Instead, Dr. Leonard applies a top-down approach to estimate a FRAND rate for Ericsson's royalties. Interestingly, Dr. Leonard concludes that a "fair/reasonable" rate is lower than the Ericsson one-way rates implied by all of Ericsson's comparable licenses, even as calculated by Dr. Lynde.  This is seen in TCL's statements in the Joint Pre-Trial Order, where TCL asserts that the maximum "fair/reasonable" rate is *lower* than any conceivable "non-discriminatory" rate:

**Figure 4:  TCL's Maximum Royalty Rate Contentions**
**(Statements In Joint Pre-Trial Order)**

|  | Maximum "Non-Discriminatory" Rate | Maximum "Fair/Reasonable" Rate |
|---|---|---|
| 2G/3G | 0.30% | 0.21% |
| 4G | 0.26% | 0.16% |

In my view, it is unreasonable to conclude that Dr. Leonard's judgment as to the value of Ericsson's SEP portfolios is superior to the collective judgment of Apple, Samsung, ZTE, LG, Sharp, CoolPad, and others.

162.    The top-down approach is flawed for other reasons. The top-down approach is fairly simple mathematically, but the simplicity hides numerous assumptions.

- First, Dr. Leonard assumes a maximum aggregate royalty burden for all standard essential patents.

---

[139] Exhibit 5312, at 2.1.

- Second, Dr. Leonard calculates Ericsson's proportionate share of the maximum aggregate royalty burden by reviewing the universe of patents declared to ETSI for the cellular standards. This is a four-step process:
- Step 1 – Dr. Leonard identifies all of the patents declared to the 2G, 3G, and 4G standards.
- Step 2 – Dr. Leonard attempts to determine which of the declared patents are essential to the relevant standard.
- Step 3 – Dr. Leonard attempts to value the declared patents that were "found essential" by TCL's technical experts."
- Step 4 – Dr. Leonard estimates Ericsson's share of his estimated value based on Ericsson's share of the declared patents that were "found essential."
- Finally, Dr. Leonard multiplies the Ericsson proportionate share by the maximum aggregate royalty burden to calculate Ericsson's royalty rate.

163.   The most glaring problem with Dr. Leonard's top-down approach is that it is largely speculative and divorced from real market transactions. The top-down approach requires numerous assumptions and speculative guesses to reach a figure, all of which are highly subjective. The inherent subjectivity of the top-down approach is revealed by the fact that TCL, Dr. Leonard, and TCL's other experts are taking inconsistent positions on nearly all the inputs:

164.   First, TCL and Dr. Leonard disagree significantly on what an appropriate maximum aggregate royalty should be. Dr. Leonard assumes a maximum aggregate royalty rate of 5% for 2G/3G and 6% for 4G.  In contrast, TCL's business dealings suggest a much higher rate:

- In its internal accounting, TCL assumes a maximum aggregate royalty of 6% to 10% for 3G and 11% to 14% for 4G outside of China.
- In a 2014 license offer to Ericsson, TCL assumed a maximum aggregate royalty of 8% for 3G and 9% for 4G.[140]

---

[140] Exhibit 287, p. 6.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- TCL is licensed to pay Qualcomm 5% per 3G/4G unit for a license to its portfolio, which means that Qualcomm receives 80% - 100% of the "maximum" aggregate royalty.

165. Second, TCL's experts disagree on what patents are essential and what patents are valuable:

- Dr. Kakaes and Dr. Ding disagree 27% of the time about which declared patents are essential.[141]

- Dr. Leonard and Dr. Kakaes disagree 100% of the time about which essential patents are valuable patents.

- Dr. Leonard testifies that it is inappropriate to assume that all patents are of equal value. Dr. Lynde assumes all patents are of equal value in his license unpacking.

These inconsistencies are the most obvious problems with Dr. Leonard's top-down approach. There are several others, which I will detail.

166. Ultimately, the top-down method is a wasteful exercise in this case. The purpose of this litigation is to determine a FRAND rate for Ericsson's SEP portfolio. Ericsson's comparable licenses provide solid, economic data on how mobile phone manufacturers value Ericsson's global SEP portfolio.

**A.    Conceptual Problems With The Top-Down Method.**

167. First, a top-down approach is not an economic approach. The two leading U.S. litigated court cases related to (F)RAND royalty rate determinations that relied on the top-down approach – *In re Innovatio* and *Microsoft v. Motorola* - only did so because there were no sufficiently comparable RAND licenses available to rely on. In *In re Innovatio*, Judge Holderman noted that applying the top-down methodology was a last resort:

> [U]ntil more RAND licenses are available, courts and litigants must look to other methods for calculating a RAND royalty, such as Dr. Leonard's

---

[141] Mallinson Rebuttal Witness Declaration, at ¶ 41.

Top Down proposal.[142]

168.   Further, the data inputs for a top-down approach are not provided by an objective market process (*e.g.* they are not determined by price discovery driven by arm-length negotiations between independent actors as in a comparable license analysis method). As such, a top-down approach is necessarily subjective and arbitrary as it is based on the various measures chosen for the aggregate royalty burden and for apportionment of that burden.

169.   For example, a top-down approach starts with an assumed aggregate royalty burden, yet there is economic uncertainty about what the appropriate level and measure of aggregate royalty burden should be. The fundamental question is: how should the aggregate economic benefits of the SEP technology be shared among consumers, carriers, manufacturers, and patent holders in the form of consumer surplus, service/product profits, and aggregate royalty burden?

170.   The aggregate royalty burden could vary, depending on the perceived benefits of SEP technology over time and on the point of view of constituents in the value chain. For example, the ex-ante perspective (according to Dr. Leonard) should focus on the expected aggregate economic benefits of SEP technology at the time period just before the standard is set versus focusing on an ex-post perspective at a later point in time. The point of view of a telecom carrier at that time could differ from the point of view of a pure manufacturer, a SEP owner that supplies standard-practicing products, or  a SEP owner that does not supply such products.   For this reason, determining an aggregate royalty burden even on an ex-ante basis is fundamentally a subjective exercise. Put differently, the  ex-ante value, as defined by Dr. Leonard, will vary depending on the point of view used to assess the reasonable aggregate burden.  Dr. Leonard does not develop this concept in his discussion of ex-ante value.

171.   Apportioning the aggregate value is similarly subjective . Numerous

---

[142] *In re Innovatio*, 2013 U.S. Dist. LEXIS 144061, *167 (N.D. Ill. Oct. 3, 2013).

1    sources of non-economic data exist which could be used to estimate the proportional

2    share of one SEP owner relative to others, including, for example, approved

3    contribution counting,[143] essential patent counting, weighted essential patent counting,

4    forward citation analyses, etc. These different data sources and methods

5    unsurprisingly imply different apportionment conclusions based on the nature of the

6    data.

7         172.   Given the multiplicity of subjective royalty burden viewpoints and

8    potential apportionment data sources, any number of top-down approaches can be

9    mechanically applied to yield any number of results (such as those created by Dr.

10   Leonard in his top-down analyses). This demonstrates that the top-down approach, at

11   bottom, is unreasonably subjective and entirely arbitrary. .

12        **B.    Criticisms of Dr. Leonard's Assumptions About The "Maximum"**

13             **Aggregate Royalty.**

14        173.   As a starting point, Dr. Leonard assumes that the "maximum" aggregate

15   royalty rate for 3G is 5% and the "maximum" aggregate royalty rate for 4G is 6%.  He

16   obtains these figures from public statements made by NTT DoCoMo and Nokia in

17   2002, and Ericsson in 2008.[144]

18        174.   Other than citing blindly to these public statements, Dr. Leonard

19   undertook no analysis of appropriate maximum aggregate royalty rates. Nor does he

20   offer any economic rationale for his assumptions. For instance, Dr. Leonard offers no

21   evidence that any mobile phone supplier actually relied on the public statements at

22   issue. I understand that Dr. Huber is of the opinion that major technology companies

23   would not rely upon such press releases when making major business decisions.[145] I

24   am offering an independent economic analysis of why Dr. Leonard's assumptions are

25   unreliable.

26

27   ———————————————

28   [143] Exhibit 5316, at 3.3.23.1
     [144] Leonard Witness Declaration, ¶¶ 73-76.
     [145] Huber Rebuttal Witness Declaration, at ¶ 30.

### 1.    Public Statements Must Be Considered At The Time They Were Made.

175.    It is important to put the public statements in perspective at the time they were made. As explained by Mr. Brismark in his rebuttal testimony, at the time the statements were made, the average sales price of a smartphone was over $400 in 2008 and that the first 3G phones were selling in the same price range.

176.    Mr. Brismark correctly notes that the market has changed rapidly since 2008.  In 2008, less than 1% of all smartphones (including EDGE) sold for less than $150.  By 2015, nearly *half* of all smartphones sell for less than $150:

### Figure 45:  Very Low-ASP Smartphones (Less Than $150) As A Share Of The Market[146]



TCL's average sales prices today are much lower than could have been reasonably anticipated in 2008.  Whereas the retail ASP for a smartphone was $430 in 2008, TCL's average smartphone sales price in 2011 through 2015 has been $120:

---

[146] Exhibit 1000.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



### Figure 46:  Smartphone ASPs in 2008 v. TCL Smartphone ASPs[147]



177.   Given the introduction into the market of very low-ASP smartphones and the shrinking average sales price, it is appropriate to tailor a license policy to address the changing market and tailor a licensing policy that addresses low-ASP units differently than high-ASP units or even average-ASP units.

178.   If anything, the appearance of very low-ASP smartphones is another reason to consider royalties on a dollar per-unit basis. The 3G smartphone industry is now composed mostly of very low-ASP mobile phone models (less than $150). The 4G smartphone market is moving in the exact same direction:

---

[147] Exhibit 1000.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1
2
3
4
5
6
7
8
9
10
11

**Figure 47:  Very Low-ASP Smartphones (Less Than $150) As A Share Of The Market (By Technology)**[148]



12   179.   Ericsson is entitled to modify its IPR policy to reflect these market

13 forces. It is simply not reasonable to demand that SEP holders predict market events

14 when setting their IPR policy.

15          **2.     No Evidence That Industry or SEP Holders Agreed To**

16               **Maximum Aggregate Royalty Rates.**

17   180.   There is no suggestion that the market ever reached a maximum

18 aggregate royalty rate of 5% to 6%.  Rather, the evidence is to the contrary. For

19 example, Qualcomm entered into a license charging 5% per unit with TCL in 2001 at

20 the same time that Nokia issued a press release suggesting that 5% was an appropriate

21 maximum aggregate royalty rate for 3G.[149] Obviously, Qualcomm and Nokia had very

22 different beliefs as to an appropriate maximum aggregate royalty rate from the very

23 beginning.  Other major patent holders did not join with Nokia, including Motorola,

24 Alcatel-Lucent, and InterDigital.  In a 2012 paper, Dr. Bekkers (another TCL expert)

25 estimated that the aggregate royalty rate for 3G alone was about 12% per mobile

26 phone, much higher than Dr. Leonard's proposed maximum aggregate royalty stack of

27

28 [148] Exhibit 1000.
[149] Exhibit 23; Exhibit 4887, Exhibit 4886.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

5% for 2G/3G:

> As mentioned in the introduction it is estimated that the current aggregate licensing fee for a 3G-W-CDMA/GSM phone is around 12% for manufacturers that do not own relevant IPR themselves and therefore cannot cross-license.  It is generally understood that Qualcomm charges approx. 5%.[150]

There is simply no support that the industry ever agreed that a maximum aggregate royalty stack for 2G/3G would be 5%.

181.   Similarly, there is no evidence suggesting the industry ever believed that 6% was a reasonable maximum 4G royalty stack.  In a 2010 paper, Mr. Stasik collected the announced 4G royalty rates for several major 4G SEP holders.  He found that collectively, the major SEP holders would ask for royalties of nearly 15%:

---

[150] Exhibit 335, at p. 9.

**Exhibit 4902:  Stasik's 2010 Summary of Published 4G Royalty Rates**[151]

| Table 1. Summary of ETSI Declarations and Announced Royalty Rates for LTE | | |
|---|---|---|
| | **Number of Declared Essential Patents** | **Published Handset Royalty Rate** |
| Alcatel-Lucent | 9 | 2,00% |
| Apple | - | |
| AT&T | 1 | |
| Ericsson | 146 | 1,50% |
| ETRI | 35 | |
| France Telecom | 3 | |
| Freescale Semiconductor | 1 | |
| Gemplus | 1 | |
| Hewlett Packard | 1 | |
| Huawei | 182 | 1,50% |
| Icera | 1 | |
| iCODING | 1 | |
| Infineon | 2 | |
| InterDigital Technology Corp | 282 | |
| InterDigital Patent Holdings | 155 | |
| IPR Licensing, Inc. | 4 | |
| LG Electronics | 150 | |
| Motorola | 16 | 2,25% |
| NEC | 19 | |
| NextWave Wireless | - | |
| Nokia Corporation | 142 | 1,50% |
| Nokia Siemens Networks | 32 | 0,80% |
| Nortel Networks | 46 | 1,00% |
| NTT DoCoMo | 78 | |
| Panasonic | 39 | |
| Qualcomm | 350 | 3,25% |
| RIM | - | |
| Samsung | 170 | |
| Siemens | 11 | |
| Sony | 12 | |
| Sony-Ericsson | 0 | |
| Texas Instruments | 26 | |
| TDF | 3 | |
| T-Mobile Deutschland GmbH | 12 | |
| T-Mobile International AG | 5 | |
| Vodafone | - | |
| VoiceAge | 6 | |
| ZTE | - | 1,00% |
| **Totals** | **1941** | **14,80%** |

(SOURCE: ETSI 2010)

Again, there is no evidence that the industry ever reached consensus on what the maximum aggregate royalty stack would be for 4G. Rather the evidence is that the

---

[151] Exhibit 1063, at p. 3 (Table 1).

1   theoretical maximum aggregate royalty rate was heavily disputed and certainly much
2   higher than what Dr. Leonard assumes.

### 3.   Dr. Leonard's Assumed "Maximum" Rates Are Inconsistent With TCL's Licensing And Business Practices.

5   182.   Additionally, Dr. Leonard's assumed maximum aggregate royalty stacks
6   are well below what TCL estimates it will pay for licenses to 3G and 4G technology.
7   As such, TCL proves that the 3G and 4G standards can support maximum aggregate
8   royalty rates well-above Dr. Leonard's assumptions.

9   183.   For example, Dr. Leonard assumes that the maximum aggregate 3G rate
10  is 5%.  Yet this figure is significantly below what TCL estimates its own aggregate
11  3G royalty stack should be.  TCL has a single license with a 5% 3G royalty rate
12  (Qualcomm).[152]  If Dr. Leonard is correct, then Qualcomm is entitled to <u>all</u> allowable
13  3G royalties, leaving nothing for any other SEP owner. Further, when crafting a 2014
14  license offer to Ericsson, TCL assumed a reasonable maximum aggregate 3G rate of
15  8%.[153] Finally, in its own internal accounting, TCL estimates it will pay aggregate 3G
16  SEP royalties of between 6% and 10%  per mobile phone, depending on the region:[154]

17  **Figure 48:  Comparing Dr. Leonard's "Maximum" Aggregate 3G Burden to TCL's Own Business Positions**[155]



[152] Exhibit 23; Exhibit 4887, Exhibit 4886.
[153] Exhibit 287, at page 6.
[154] Exhibit 524.
[155] Exhibit 287, at page 6; Exhibit 23; Exhibit 4887, Exhibit 4886; Exhibit 524.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

I exclude China because nearly 95% of TCL's sales are outside of China. Thus, Dr. Leonard's assumed maximum aggregate royalty burden for 3G is undervaluing 3G standardized patented technology.

184.   Dr. Leonard makes a similar error for 4G. Dr. Leonard assumes that the maximum aggregate royalty stack for all 4G SEPs is 6%. Yet this figure is significantly below what TCL estimates its own aggregate 4G royalty stack should be.  Under its 2011 license with Qualcomm, TCL agreed to pay 5% per 4G mobile phone.[156] Further, in negotiations with Ericsson, TCL assumed a maximum aggregate 4G royalty rate of 9%.[157] Finally, in its own internal accounting documents, TCL estimates that it owes aggregate 4G SEP royalties of between 11% and 14% (excluding China) per mobile phone, depending on the region:

**Figure 49:  Comparing Dr. Leonard's "Maximum" Aggregate 4G Rate to TCL's Business Positions**[158]



### 4.     TCL's Profits Are Irrelevant To Determining A FRAND Rate.

185.   Finally, to support his assumption that the maximum aggregate royalty should be 5% to 6%, Dr. Leonard relies on the fact that TCL has very low profit margins:

---

[156] Exhibit 23; Exhibit 4887, Exhibit 4886.
[157] Exhibit 287, at page 6.
[158] Exhibit 287, at page 6; Exhibit 23; Exhibit 4887, Exhibit 4886; Exhibit 524.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

A high aggregate royalty burden would exhaust TCL's profits and/or require an increase in the price of TCL handsets to TCL's customers . . .[159]

186.   This statement is wrong for at least three reasons. First, profit margins have nothing to do with what is a reasonable royalty for SEPs. As I have explained, SEPs are an input to production just like any other. Every mobile phone maker must pay for baseband processors, antennas, and standard essential patent technology. If the price of silicon rises, then the price of baseband processors rises and so do mobile phone prices. The same is true for intellectual property prices. Dr. Leonard is effectively suggesting that Ericsson is required to subsidize low-margin companies like TCL by charging them lower royalties than those agreed to by more profitable companies.

187.   Second, reasonableness under FRAND cannot be defined as "reasonable for TCL." The test for reasonableness is not what TCL would prefer to pay given its low-ASP, low-margin business model. To apply TCL's sole viewpoint (in the context of cabining an industry wide concept) tilts the system in TCL's favor, solely on the basis of TCL's own individual characteristics driven by its choices to compete on price.  If TCL set its prices too low to pay its share of an industry-wide aggregate royalty burden, the fact that TCL has low profit margins should not be used to arbitrarily justify a lower industry-wide royalty burden (applicable solely to TCL). Said another way, TCL's own profit margins should not have any bearing on the appropriate level of an industry-wide aggregate royalty stack.

188.   Third, Dr. Leonard's statement is factually wrong because there are no profits to exhaust. Mr. Guo, TCL's CEO, testified that TCL would probably not realize a profit in 2016 and probably would not realize a profit in 2017 either.[160] TCL has *no choice* but to raise prices or go out of business.

---

[159] Leonard Witness Declaration, at ¶ 87.
[160] Guo Witness Declaration, at ¶¶ 118-120.

189.   Finally, Dr. Leonard's statement is conceptually wrong because it somehow prioritizes TCL's other expenses over a license to Ericsson's SEPs. TCL is unprofitable because its expenses exceed its income. Dr. Leonard does not explain why Ericsson should be asked to sacrifice its right to payment while others do not need to sacrifice. For example, TCL pays its parent company a 2% brand royalty for the use of the "TCL" brand. Similarly, TCL pays Alcatel a 1% brand royalty.[161] TCL recently acquired the Blackberry brand and presumably agreed to pay a brand royalty for use of the "Blackberry" brand as well. Yet TCL does not suggest that it should pay its parent company, Alcatel, or Blackberry less for use of their brands simply because it is unprofitable.

## C.   Criticisms Of Dr. Leonard's Calculation Of Ericsson's Proportional Share.

190.   After assuming a "maximum" aggregate royalty rate, Dr. Leonard then calculates Ericsson's share of the "maximum" aggregate royalty rate using two separate methodologies.

### 1.   Method #1:  Kakaes Analysis (EIC Scores)

#### a)   Kakaes Technical Analysis.

191.   Dr. Leonard first estimates Ericsson's proportional share of cellular SEPs by relying on Dr. Kakaes's technical analysis. Dr. Kakaes conducted a technical analysis of about 200 Ericsson patents for which Ericsson produced essentiality claim charts.[162]  Based on his review of the claim charts, Dr. Kakaes ranked the Ericsson patents on three categories (EIC scores):

- Essentiality.  A patent that received an Essentiality score of 1 or 2 was considered essential to the standard, while a score of 3 was not essential.[163]

---

[161] Exhibit 519.
[162] Kakaes Witness Declaration, ¶ 95-96.
[163] Kakaes Witness Declaration, ¶ 113.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- <u>Importance</u>.  This category measured the importance of the patent to the operation of a standard. A patent that Dr. Kakaes considered "very" important to a standard received a score of 1. A patent that Dr. Kakaes considered of "moderate" importance to a standard received a score of 2. A patent that Dr. Kakaes considered of "marginal" importance received a score of 3. Dr. Kakaes only evaluated importance if he found the patent was essential to the standard.[164]

- <u>Contribution</u>. This category measured the benefit of the Ericsson inventions over the next best alternative invention. A score of 1 meant that Dr. Kakaes considered the patent a "significant" contribution over alternative inventions. A score of 2 meant that Dr. Kakaes considered the patent a "moderate" improvement over alternative inventions. A score of 3 or 4 meant that Dr. Kakaes considered the patent only a marginal or no benefit over alternative inventions. Dr. Kakaes only evaluated contribution if he found the patent was essential to the standard.[165]

192.   I understand that other Ericsson witnesses will challenge Dr. Kakaes's technical determinations about whether patents are essential or valuable. I am not a technical expert and I am not raising any technical challenge here. Instead, I am criticizing how Dr. Leonard uses the Kakaes EIC scores to assess the overall value of Ericsson's SEP portfolio for each standard generation.

**b)     Dr. Leonard Speculates That Certain Kakaes EIC Scores Are "Top 10% SEPs."**

193.   First, Dr. Leonard assumes that patent values are skewed, meaning that a very small number of patents (10%) create most of the value of the standard. Dr. Leonard assumes that the "Top 10% SEPs" are worth 65% of the value of the standardized patented technology, and that all other SEPs for the standard in question

---

[164] Kakaes Witness Declaration, ¶ 114-20.
[165] Kakaes Witness Declaration, ¶ 121-24.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

are worth only 35% of the value. Therefore, to calculate Ericsson's proportionate share of the total standard, Dr. Leonard made two calculations: (1) he calculated Ericsson's share of the Top 10% SEPs and (2) he calculated Ericsson's share of the other 90% of SEPs.

194.   Next, Dr. Leonard calculated Ericsson's share of the Top 10% SEPs and the remaining SEPs. Dr. Leonard used the results from Dr. Ding's essentiality analysis to tally the total number of 4G SEPs. Then, Dr. Leonard assumed that an Ericsson SEP with an Importance/Contribution score of "1-1", "1-2", "2-1", or "2-2" was a Top 10% Patent. Anything with a lower score was classified as an "other" SEP. With these figures, Dr. Leonard arrived at what he believes to be Ericsson's share of the patents essential to the standard.

195.   Finally, Dr. Leonard adjusted his total Ericsson share of SEPs for the standard to account for any SEPs that Dr. Kakaes did not analyze, but that Dr. Ding found to be essential to the standard. Below is a summary of how Dr. Leonard calculated Ericsson's proportionate share of 4G SEPs:[166]

|  | Value to 4G Standard | Kakaes Importance / Contribution Score | Ericsson 4G SEPs (Kakaes Data) | Total 4G SEPs (Ding Data) | Ericsson's Share of 4G SEPs |
|---|---|---|---|---|---|
| Top-10% Patent | 65% | 1-1, 1-2, 2-1, 2-2 | 4 | 167 | 1.6% |
| Other Patents | 35% | 1-3, 1-4, 2-3, 2-4 3-1, 3-2, 3-3, 3-4 | 65 | 1,506 | 1.5% |

After adjustment, Dr. Leonard concludes that Ericsson's total share of the value of all 4G SEPs is 3.5%, which is quite low. In contrast, approved contribution counting data from the Signals Research Group estimates—using approved contributions as a proxy—that Ericsson owns approximately 15% of overall 4G patent strength.

196.   There are a number of conceptual errors with Dr. Leonard's method. First and foremost, Dr. Leonard is making an unwarranted assumption that only Ericsson

[166] Leonard Witness Declaration, at ¶ 108.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

SEPs with a Kakaes Importance/Contribution score of 1-1, 1-2, 2-1, or 2-2 are Top 10% Patents. He cites to no technical support for this assumption. Dr. Kakaes appears to have invented his ranking scheme for this litigation; it is not an established methodology. Dr. Kakaes does not opine that his 1-1, 1-2, 2-1, or 2-2 SEPs are Top 10% Patents.   Separately, Dr. Kakaes did not review any other SEP owners' patents; he only reviewed Ericsson's SEPs. If Dr. Kakaes had reviewed more SEPs, it could very well be that only 5% of all SEPs would receive a Kakaes Importance/Contribution Score of 1-1, 1-2, 2-1, or 2-2. It could be that 1% of all SEPs would receive a Kakaes Importance/Contribution Score of 1-1, 1-2, 2-1, or 2-2. We don't know because Dr. Kakaes did not perform a review of non-Ericsson SEPs as a control sample.

197.   Thus, it could very well be the case that many "other" patents are in Top 10% SEPs. Absent any evaluation of the technical contributions and resulting economic benefits these patents yielded individually or in aggregate there is no way for Dr. Leonard to know whether or not his calibration assumption is accurate – which is the fatal flaw of Dr. Leonard's technical analysis, making it inherently unreliable.

198.   Dr. Leonard's very narrow definition of Top 10% SEPs is highly influential on the results of his top down analysis. If one were to assume instead that the Top 10% SEPs include SEPs that are technically important to the standard and make some kind of contribution over the alternative, the results change dramatically:

|  | Value to 4G Standard | Kakaes Importance / Contribution Score | Ericsson 4G SEPs (Kakaes Data) | Total 4G SEPs (Ding Data) | Ericsson's Share of 4G SEPs |
|---|---|---|---|---|---|
| Top-10% Patent | 65% | 1-1, 1-2, 2-1, 2-2 **1-3, 2-3** | 14 | 167 | 5.4% |
| Other Patents | 35% | ~~1-3~~, 1-4, ~~2-3~~, 2-4 3-1, 3-2, 3-3, 3-4 | 55 | 1,506 | 1.3% |

After making this adjustment to the definition of Top 10% SEP, Ericsson's share of the Top 10% increases to 7.6%, or more than double Dr. Leonard's original

-89-

calculations. This revised definition is no less arbitrary than the definition of Top 10% SEP used by Dr. Leonard. Dr. Kakaes concludes that any SEP with an importance score of 1 or 2 is a technically important part of the standard.

199.   We can go even further. Assume that any SEP that Dr. Kakaes believed was either moderately or highly important to the technical success of the standard was a Top 10% SEP whether or not there was an alternative:

| | Value to 4G Standard | Kakaes Importance / Contribution Score | Ericsson 4G SEPs (Kakaes Data) | Total 4G SEPs (Ding Data) | Ericsson's Share of 4G SEPs |
|---|---|---|---|---|---|
| Top-10% Patent | 65% | 1-1, 1-2, 2-1, 2-2 1-3, 1-4, 2-3, 2-4 | 29 | 167 | 11.3% |
| Other Patents | 35% | 1-3, 1-4, 2-3, 2-4 3-1, 3-2, 3-3, 3-4 | 40 | 1,506 | 0.9% |

This definition of Top 10% SEP is no less arbitrary than Dr. Leonard's definition because Dr. Kakaes did not identify non-infringing alternatives to a given SEP, but any alternatives, including patented alternatives. After adjustments, Ericsson's share of 4G SEPs increases to 13.8%. As you can see, as I noted above, Dr. Leonard's narrow definition of Top 10% SEPs is very influential on his results.

200.   Of course, even these examples assume that Dr. Kakaes's entire categorization scheme can actually classify SEPs by value. Again, Dr. Kakaes invented this ranking scheme for purposes of this litigation. No one has ever tried to test to see if Dr. Kakaes's rankings correspond to actual SEP value. It may be that the Top 10% SEP are scattered among several Dr. Kakaes categories.

c)   **Dr. Leonard Speculates About The Value Distribution Of SEPs.**

201.   Another conceptual error that Dr. Leonard makes relates to his assumptions of how much value the Top 10% SEPs have. I agree with Dr. Leonard that patent value can be skewed. A single patent may be worth significantly more than other patents. However, I do not see justification for his assumption that his narrowly

defined Top 10% SEPs are worth 65% of the value of all SEPs for a standard. Dr. Leonard references several underlying studies that attempt to estimate the skewness of patent value. But none of those underlying studies analyzed the cellular industry or SEPs specifically. Rather, the underlying studies involved a wide variety of technologies and regions. I find Dr. Leonard's assumption regarding value skewness to be mere speculation, in particular because he cites no evidence to suggest that the skewness of cellular SEP value is similar to the skewness of patent value in completely unrelated industries.

202. Additionally, Dr. Leonard is mixing and matching different experts' analyses. Dr. Ding did an essentiality analysis of only one-third of all declared patent families. Dr. Ding extrapolated from that survey the total number of "found essential" patent families. In contrast, Dr. Kakaes reviewed nearly all of the Ericsson claim charted patent families. This incongruity makes a difference. When comparing Dr. Ding and Dr. Kakaes's results, Mr. Mallinson found that Dr. Ding and Dr. Kakaes disagreed 27% of the time.[167]

203. Ultimately, this is all a largely meaningless exercise. It is not important to properly catalog Ericsson's SEPs pursuant to a valuation scheme that Dr. Kakaes invented for purposes of litigation, nor is it important to precisely identify how patent value is skewed.  The purpose of this litigation is to determine FRAND terms and conditions for a license to TCL under Ericsson's cellular SEPs. Ericsson's comparable licenses provide solid, economic data on how mobile phone manufacturers worldwide value Ericsson's SEPs. As recognized in the *Innovatio* and *Motorola* cases, a top-down analysis is not appropriate where comparable licenses are present.

### 2. Method #2:  Leonard Analysis (Citation Model).

#### a) Dr. Leonard's Citation Model.

204. Independent of the Kakaes technical analysis, Dr. Leonard also attempts to estimate Ericsson's proportional share of cellular SEPs by building a model based

---

[167] Mallinson Rebuttal Witness Declaration, at ¶¶ 4.

on patent citation counts.  Dr. Leonard's citation model disagrees with Dr. Kakaes's technical analysis 100% of the time.

205.   Dr. Leonard's citation model is fairly complicated, but generally works as follows:[168]

- First, Dr. Leonard creates a library of SEPs. Because he only has citation data for U.S. SEPs, Dr. Leonard only uses U.S. SEPs in his citation model (even though this litigation deals with a global SEP portfolio). Then he mixes and matches. For Ericsson, he chooses the U.S. SEPs that Dr. Kakaes found to be essential. For companies other than Ericsson, Dr. Leonard relies on the U.S. SEPs that Dr. Ding identified as essential.

- Second, for each U.S. SEP, Dr. Leonard attempts to estimate the total number of citations it will receive in a lifetime. Dr. Leonard begins by using the citation counts for each U.S. SEP as of 2014. Then he uses econometric models to forecast the total number of citations over the lifetime of the SEP. He also excludes any self-citations (i.e. citations from patents with the same owner).

- Third, Dr. Leonard then ranks each SEP based on decile to determine whether they are Top 10% SEPs or another category of SEP.

- Fourth, Dr. Leonard assigns a value to each SEP based on its ranking. He applies the same skewness valuation technique that he used with the Kakaes technical analysis.  Top 10% SEPs are attributed 65% of the value of all SEPs for the standard. His next 10% of SEPs are assigned about 15% of the value of all SEPs for the standard. Dr. Leonard assigns a share of the value of all SEPs for the standard for each decile:

---

[168] Leonard Witness Declaration, at ¶¶ 111-121.

**Figure 50:  Dr. Leonard's Forward Citation Ranking System**

| Leonard Citation Ranking | Share of the Value of all SEPs for the Standard |
|---|---|
| 90% - 100% | 65% |
| 80% - 90% | 15% |
| 70% - 80% | 8% |
| 60% - 70% | 5% |
| 50% - 60% | 3% |
| 40% - 50% | 2% |
| 30% - 40% | 1% |
| 20% - 30% | 1% |
| 10% - 20% | 1% |
| 0% - 10% | 0% |

- Fifth, Dr. Leonard adjusts each SEP's valuation to account for unreviewed patents. For example, because Dr. Ding only reviewed one-third of declared patent families, Dr. Leonard multiplies all non-Ericsson SEP valuations by three.

- Finally, using the adjusted patent data, Dr. Leonard calculates each company's proportionate share of all SEPs for the standard.

The Leonard citation model appears to be fairly sophisticated, but it includes a host of assumptions that are fatal to its reliability.

       **b)     Conceptual Errors In Dr. Leonard's Citation Model.**

206.   As with his technical analysis, Dr. Leonard's citation model suffers from a number of conceptual errors. First and foremost, Dr. Leonard assumes that citation analysis is the "most widely accepted" indicator of patent value among economists.[169] I disagree. In my opinion, market-based value indicators such as comparable licenses are much more likely to be the widely accepted indicators among economists and licensing professionals.

207.   Second, Dr. Leonard made a major computational error when calculating

---

[169] Leonard Witness Declaration, at ¶¶ 110.

Ericsson's proportional share of SEPs for each standard.  Dr. Leonard ran his citation model on the Ericsson's U.S. SEPs that Dr. Ding found to be essential, but that Dr. Kakaes did not review. His citation model calculates the patent value of these "Ericsson – Unclaimed" patents.[170] Dr. Leonard ignores the "Ericsson—Unclaimed" patent value when calculating Ericsson's proportional share of the value of all SEPs for the standard. For example, Dr. Leonard estimates that Ericsson's 3G proportional share is 5.71%.[171] However, in his forward citation model, Dr. Leonard estimates that the "Ericsson—Unclaimed" proportionate share of the 3G value is 4.73%.[172] Applying Dr. Leonard's citation model consistently, Ericsson's total 3G proportional share would be 10.4%, or nearly double what Dr. Leonard concludes.[173] Dr. Leonard makes similar errors for 2G and 4G. The "Ericsson-Unclaimed" portion is worth 1.7% of the total 4G SEPs and 5.8% of the total 2G SEPs.[174]

208.   Third, Dr. Leonard's analysis is limited because it focuses on U.S. SEPs that existed in 2015. This is overly narrow for two reasons.  Nearly all of Ericsson's SEP families include SEPs from multiple jurisdictions, including, for example, the European Union and the United States. Accordingly, if Ericsson's European SEPs are cited, but its U.S. SEPs are not, then Dr. Leonard's analysis omits those citations. Separately, Option A and Option B include a release payment that will cover unlicensed TCL sales going back to 2007. Therefore, Ericsson's SEP families that expired in earlier years are relevant to determining whether Ericsson's offers are FRAND.

209.   Fourth, Dr. Leonard fails to explain how a forward citation analysis could conceptually be an ex-ante approach according to his own espoused ex-ante principles. It is logical to conclude that a SEP is likely to generate a greater number of future innovations citing back to that SEP simply by virtue of its incorporation into a

---

[170] Exhibit 5325, at 5.3.1 to 5.3.3.
[171] Exhibit 5325, at 5.3.1 to 5.3.3.
[172] Exhibit 5325, at 5.3.1 to 5.3.3.
[173] Exhibit 5325, at 5.3.1 to 5.3.3.
[174] Exhibit 5325, at 5.3.1 to 5.3.3.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    standard–because future innovation and development necessarily needs to be built on

2    top of the standard–which has nothing to do with that SEP's economic value defined

3    by comparison to next best alternatives or by that SEP's incremental technical benefits

4    and associated incremental economic benefits (i.e. what Dr. Leonard defines as the ex-

5    ante value).

6               c)    Dr. Leonard's Citation Model Generates Bizarre

7                     Results.

8        210.   The simplest way to demonstrate that Dr. Leonard's citation model is

9    inherently flawed is to show the bizarre results it generates. For example, Dr. Leonard

10   concludes that Ericsson's total share of 4G SEP value is 3.5% and that Huawei's total

11   share of 4G SEP value is one-fifth of that (0.7%).[175]  Huawei is a top leader at ETSI,

12   holding the most chairmanships, second-most rapporteurships, filing the most

13   discussion papers, filing the second-most change requests.[176] ABI ranked Huawei as

14   the second-best leader in all of ETSI.[177]  According to data from the Signals Research

15   Group, Huawei was the second largest contributor to 4G technology (second only to

16   Ericsson) and was responsible for over 12% of all approved contributions.[178]  It is not

17   logical that such a central player in 4G standardization would have virtually no 4G

18   SEP strength.

19       211.   Conversely, Dr. Leonard concludes that LG's total 4G SEP value is

20   13.1%, or over three-times as strong as Ericsson's total 4G SEP value and nearly

21   twenty-times as strong as Huawei's 4G SEP value.[179] Again, these results are

22   unreasonable. Whereas Ericsson and Huawei are top leaders at ETSI, LG is not ranked

23   as a top-six leader by ABI.[180]  Whereas Ericsson and Huawei are the first and second-

24   largest contributor to 4G at ETSI, LG made less than 2% of total approved

25

26   ---
     [175] Exhibit 5325, at 5.3.1 to 5.3.3.
     [176] Exhibit 1029, at p. 13.
27   [177] Exhibit 1029, at p. 13.
     [178] Exhibit 5316, at 3.3.23.1.
28   [179] Exhibit 5325, at 5.3.1 to 5.3.3.
     [180] Exhibit 1029, at p. 13.

1    contributions to 4G standardization.[181]  Finally, the LG results are inconsistent with

2    Ericsson's license with LG. Applying a PSR based on Dr. Leonard's patent citation

3    analysis into the Ericsson-LG 2014 license yields negative royalty rates.[182]  In other

4    words, if Dr. Leonard's forward-citation model is accurate, Ericsson would need to

5    pay LG money for each 4G phone LG sold under its license. That cannot be—and is

6    not—the case.

7         212.   Similarly, CATT is ranked as having almost zero 4G SEP value. This

8    result is difficult to believe given that CATT is a top-ten leader at ETSI, according to

9    ETSI.[183] Similarly, CATT made double the number of approved contributions that LG

10   did.[184]

11        213.   There are similar problems with the 3G results.  Dr. Leonard's citation

12   analysis concludes that Ericsson's 3G SEP value is 5.7% while finding that Huawei's

13   3G SEP value is less than one-tenth of that (0.5%).  Again this is contrary to the

14   objectively verifiable information.  Huawei has made 6.7% of approved 3G

15   contributions.[185]  Huawei is a proven leader in standardization.  Such a low valuation

16   is not credible.

17        214.   Additionally, Dr. Leonard's citation analysis significantly overvalues

18   LG's 3G SEP value.  Dr. Leonard's citation model concludes that LG's SEP portfolio

19   is worth 9.25% of the total value of 3G, nearly twice Ericsson's 3G SEP value and

20   nearly ten-times as much as Huawei's 3G SEP value.[186]  This is simply too high.  LG

21   contributed less than one percent of total contributions, whereas Ericsson and Huawei

22   collectively made nearly 25% of all approved contributions to 3G.[187]  Applying a

23   patent-strength ratio based on Dr. Leonard's patent citation analysis into the Ericsson-

24

25   _____

26   [181] Exhibit 5316, at 3.3.23.1.
     [182] Exhibit 5316, at 3.3.24.
27   [183] Exhibit 1029, at p. 13.
     [184] Exhibit 5316, at 3.3.23.1.
28   [185] Exhibit 5316, at 3.3.23.1.
     [186] Exhibit 5325.
     [187] Exhibit 5316, at 3.3.23.1.

1  LG 2014 license yields negative royalty rates.[188]  In other words, Ericsson would need
2  to pay LG money for each 3G phone LG sold.  That cannot be the case.

### 3. Dr. Leonard and Dr. Kakaes Disagree 100% Of The Time On Patent Valuation.

5  215.   I conclude that neither of the two methods that Dr. Leonard uses to
6  estimate Ericsson's share of SEP value is reliable. As I have discussed, each method is
7  flawed for its own reasons.  Further, comparing the two valuation methods
8  demonstrates that both methods are highly speculative. Despite analyzing the same
9  patent families, Dr. Kakaes and Dr. Leonard do not agree a single time about which
10 Ericsson patents are high-value patents.

11 216.   As discussed above, Dr. Leonard assumes that SEP values are skewed
12 and that Top 10% SEPs are the most valuable by a significant amount. This means
13 that his valuation model is very dependent on how many of Ericsson's SEPs fall into
14 the Top 10% category.   And yet Dr. Kakaes and Dr. Leonard disagree 100% of the
15 time about which Ericsson patents are Top 10% SEPs.

16 217.   Dr. Leonard assumes that any patent families with a Kakaes
17 Importance/Contribution score of "1-1", "1-2", "2-1", or "2-2" is a "Top 10% SEP,
18 which Dr. Leonard assumes has the lionshare of all patent value.[189]

### Figure 51:  Dr. Kakaes's Patent Valuation Rankings[190]

| Dr. Kakaes Importance / Contribution Score | Patent Valuation |
|---|---|
| 1-1, 1-2<br>2-1, 2-2 | Top-10% Patent |
| 1-3, 1-4<br>2-3, 2-4<br>3-1, 3-2, 3-3 | Low Value Patent |
| 3-4 | Lowest Value Patent |

---

[188] Exhibit 5316, at 3.3.24.
[189] Leonard Witness Declaration, ¶¶ 109-111; Table 6
[190] Leonard Witness Declaration, ¶¶ 109-111; Table 6

-97-

Dr. Leonard claims that he uses his patent citation model to "corroborate" this assumption and identify the Top 10% SEPs:

**Figure 52: Comparing Dr. Leonard Ranking Schemes[191]**

| Leonard Citation Ranking | Share of the Value of a Standard | Patent Valuation |
|---|---|---|
| 90% - 100% | 65% | Top-10% Patent |
| 80% - 90% | 15% | Some Value Patent |
| 70% - 80% | 8% | Low Value Patent |
| 60% - 70% | 5% | |
| 50% - 60% | 3% | |
| 40% - 50% | 2% | |
| 30% - 40% | 1% | |
| 20% - 30% | 1% | |
| 10% - 20% | 1% | |
| 0% - 10% | 0% | Lowest Value Patent |

218. Dr. Leonard claims that his forward citation model corroborates his results using the Kakaes Importance/Contribution scores. But this is a problem—as I have noted, Dr. Leonard's patent citation model completely disagrees with the Kakaes Importance/Contribution scores. Dr. Leonard's patent citation model concludes that the highest ranked Kakaes patent families have nearly no value. Similarly, the SEPs that Dr. Leonard's citation model identifies as low-value, Dr. Kakaes ranked highly.

219. For example, Dr. Kakaes identified the following SEPs as high-value SEPs, but Dr. Leonard's citation model found that they were all low-value SEPs:

---

[191] Leonard Witness Declaration, at ¶ 101.

### Figure 53:  Dr. Kakaes's Top-Ranked SEPs and How Dr. Leonard Valued Them[192]

| Standard | Patent Family | Kakaes Score (Important-Contribution) | Leonard Citation Score | Leonard Valuation |
|---|---|---|---|---|
| 4G | P26261 | 1-1 (Highest Score) | 20% - 30% | Low Value |
| | P29465 | 1-1 (Highest Score) | 0% - 10% (Lowest Score) | Lowest Value |
| | P10867 | 2-2 | 60% - 70% | Low Value |
| | P31755 | 2-2 | 70% - 80% | Low Value |
| 3G | P10992 | 1-1 (Highest Score) | 50% - 60% | Low Value |
| | P12207 | 1-1 (Highest Score) | 50% - 60% | Low Value |
| | P19911 | 1-1 (Highest Score) | 40% - 50% | Low Value |
| | P19559 | 2-2 | 20% - 30% | Low Value |
| | P10867 | 2-2 | 70% - 80% | Low Value |
| 2G | P10992 | 1-1 (Highest Score) | 50%-60% | Low Value |
| | P28186 | 1-1 (Highest Score) | 10%-20% (2d Lowest Score) | Low Value |
| | P31172 | 2-2 | 60%-70% | Low Value |

The converse is also true.  All of the SEPs that Dr. Leonard identified as having very high value, Dr. Kakaes ranked as having low value:

---

[192]  Exhibit 5326, at 5.4.1.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

### Figure 54:  Dr. Leonard's Top-Ranked SEPs and How Dr. Kakaes Valued Them[193]

| Standard | Patent Family | Leonard Citation Score | Kakaes Score (Important-Contribution) | Kakaes Valuation |
|---|---|---|---|---|
| 4G | P11451 | 90% - 100% | 2-3 | Low Value Patent |
| | P14596 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |
| | P14897 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |
| | P19208 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |
| 3G | P11451 | 90% - 100% | 1-4 | Low Value Patent |
| | P11899 | 90% - 100% | 2-4 | Low Value Patent |
| | P05860 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |
| | P14596 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |
| | P14897 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |
| 2G | P09262 | 90% - 100% | 2-3 | Low Value Patent |
| | P14596 | 90% - 100% | 3-4 (Lowest Score) | Lowest Value Patent |

220.   Dr. Kakaes and Dr. Leonard do not agree on what is a Top 10% SEP a single time. They completely disagree on their patent valuation analysis:

---

[193] Exhibit 5326, at 5.4.1; Exhibit 1116.

1

2

3

4

5

6

7

8

9

10

11

12

**Figure 55:  Dr. Kakaes and Dr. Leonard Disagree 100% Of The Time**[194]



13    221.   Worse yet, Dr. Leonard and Dr. Kakaes reach completely opposite results

14  over one-third of the time (eight of twenty-three). In one-third of circumstances, Dr.

15  Kakaes ranks the patent as a Top 10% SEP, but Dr. Leonard ranks the SEP as the

16  lowest-value SEP; or, Dr. Leonard ranks the patent as a Top 10% SEP and Dr. Kakaes

17  ranks it as a low-value SEP. TCL's experts disagree with each other in a fundamental

18  way, which indicates to me that neither analysis is reliable.

19            **4.      Dr. Leonard and Dr. Lynde Also Disagree On Patent**

20                    **Valuation.**

21    222.   There are additional inconsistencies between the TCL experts.  As part of

22  his license-unpacking analysis and patent-pool analysis, Dr. Lynde assumes that

23  Ericsson's SEPs are of average value. In contrast, Dr. Leonard's citation analysis

24  concludes that Ericsson's SEPs are of below-average value.

25    223.   These differences are relevant to Dr. Lynde's comparable license

26  analysis.  Because of the license unpacking formula, Ericsson's royalty rate <u>increases</u>

27

28

[194] Exhibit 5326, at 5.4.1..; Exhibit 1116

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

as the value of Ericsson's patents <u>decreases</u>. Because Dr. Lynde assumed that Ericsson's patents were average-value, he calculated lower implied Ericsson one-way rates than he would have if he had adopted Dr. Leonard's conclusion.

**A.    Dr. Leonard's Top-Down Results Are Inconsistent With Ericsson's Comparable Licenses**

224.    Given the flawed assumptions, Dr. Leonard's top-down methodology yields royalty rates that are well below the royalty rates contained in the comparable licenses, even under Dr. Lynde's flawed analysis:

**Figure 4:  TCL's Maximum Royalty Rate Contentions**

|        | Maximum "Non-Discriminatory" Rate | Maximum "Fair/Reasonable" Rate |
|--------|-----------------------------------|--------------------------------|
| 2G/3G  | 0.30%                             | 0.21%                          |
| 4G     | 0.26%                             | 0.16%                          |

Dr. Leonard's results are even more biased in TCL's favor when you calculate on a dollar per-unit basis.  See Figures 8-12 above.

**B.    Applying The Leonard Methodology Using Market Data**

225.    For the reasons I have explained, the top-down methodology is inherently flawed and subjective, especially when compared to comparable license information. Nonetheless, if one is going to use the top-down methodology, one should use market data when available.  The best example would be TCL's own SEP licenses. Using TCL's experts' data, I calculated Ericsson's implied one-way royalty rates using TCL's other licenses by comparing Ericsson's patent strength to the licensor's patent strength.

**1.    TCL-Qualcomm Licenses**

226.    For the most part, TCL is unlicensed under cellular SEPs. However, TCL has taken a license under SEPs owned by Qualcomm.  TCL entered into its original ten-year agreement with Qualcomm on October 8, 2001. The license provided for a

royalty rate of 5% of the net selling price of subscriber units for volumes greater than ███████ per quarter.[195] The license was amended on May 8, 2006 with no substantive changes and then renewed for 10 years effective October 8, 2011.[196]

227.   On October 20, 2015, TCL entered into a Chinese Patent License Agreement with Qualcomm which allowed TCL, as an existing licensee, to take advantage of the special royalty rates for Chinese companies Qualcomm agreed to in its rectification plan with China's NRDC in February 2015.[197]  The license provides for a royalty rate of 5% of the Adjusted Net Selling Price for 3G devices and 3.5% of the Adjusted Net Selling Price for 4G devices.  The Adjusted Net Selling Price is equal to 65% of the net selling price.

228.   The TCL-Qualcomm licenses only cover Qualcomm's SEPs and were entered into without litigation. In its renewal letter to Qualcomm, TCL wrote that the parties had negotiated in good faith for several months and that TCL was satisfied with the outcome:

> This letter is a matter of formality to satisfy the contractual requirements in Section 2 of the Contract as the Parties have been engaged in good faith discussions and explorations for quite a few months to discuss mutually agreeable amendments if any to facilitate a good execution of the renewed Contract for the next ten (10) years based on the business outlooks and plans of the Parties. Any mutually agreed upon amendments will be added to the Contract and become parts of the renewed Contract. Licensee appreciates the business relationship with Qualcomm and look forward to working with Qualcomm team during the next ten (10) years.[198]

Similarly, TCL entered into the TCL-Qualcomm 2015 license without litigation.

---

[195] Exhibit 23.
[196] Exhibit 4886, Exhibit 4887.
[197] Exhibit 4897, at TCL_ERIC_CDCA1103352.
[198] Exhibit 4886, at TCL_ERIC_CDCA1103353.

229.   Moreover, TCL's licenses with Qualcomm are consistent with public information about what other companies pay. Qualcomm issued joint press releases with the following SEP licensees: QiKu, Xiaomi, Lenovo, Yulong, and ZTE.[199] These TCL competitors each issued press releases similar to the "pro forma" press release included in the TCL-Qualcomm 2015 license. Thus, it is reasonable to assume that these companies also pay 5% per 3G and 3G/4G unit for sales outside of China and 3.25% for sales in China. Further, according to Dr. Bekkers, "it is generally understood that Qualcomm charges approx. [sic] 5%."[200]

230.   By applying Dr. Lynde's patent strength ratios to derive Ericsson's implied rates, the resulting rates are an order of magnitude greater than the rates that Dr. Lynde and Dr. Leonard calculate for Ericsson.

### 2.   Applying the Ding PSR To Calculate Ericsson's Royalties

231.   As part of his comparable license analysis, Dr. Lynde assumed that that value of one SEP was equal to the value of another SEP.  If we accept Dr. Lynde's assumption, then we can compare the relative strength of Qualcomm and Ericsson's SEP portfolios, as implied by the results of Dr. Ding's essentiality results.

232.   For 3G, Dr. Ding concluded that Ericsson had 81 SEPs and that Qualcomm had 111 SEPs.[201]  Assuming (as Dr. Lynde does) that different companies' SEPs have equal value on average, then Ericsson's portfolio is worth 73% of Qualcomm's portfolio.[202] Applying that PSR to Qualcomm's royalty rate suggests that Ericsson would be able to charge royalties of 3.65%.

---

[199] Exhibit 4817, Exhibit 4818, Exhibit 4819, Exhibit 4820, Exhibit 4856, Exhibit 4866.
[200] Exhibit 335, at p. 9.
[201] Exhibit 5327.
[202] Exhibit 5327.

**Figure 56:  Ericsson's Calculated 3G Royalty Rates –
Applying the Ding PSR to TCL License Data**[203]



233.   We can do the same calculations for 4G. Dr. Ding concluded that Ericsson had 108 4G SEPs and that Qualcomm had 228 4G SEPs. Assuming (as Dr. Lynde does) that different companies' SEPs have equal value on average, then Ericsson's 4G SEP portfolio is worth 47% of Qualcomm's 4G SEP portfolio.[204] Applying that PSR to Qualcomm's royalty rate, then Ericsson is entitled to royalties of 2.37%.  In contrast, Dr. Leonard concludes that Ericsson's 4G SEP portfolio rate is only 0.2%.

---

[203] Exhibit 5327, at 5.5.3.
[204] Exhibit 5327, at 5.5.1.



**Figure 57:  Ericsson's Calculated 4G Royalty Rates—Applying the Ding PSR to TCL License Data**[205]

## VIII.  CRITICISMS OF DR. LEONARD'S RELEASE ANALYSIS

234.   Dr. Leonard calculates TCL's release payment using the same top-down methodology. Because Dr. Leonard's top-down methodology is flawed, his release payment calculations are flawed for the reasons that I have previously discussed. However, Dr. Leonard makes two additional errors that I respond to below: (i) he assumes that the release period royalty base should be reduced for 2007 through 2011, and (ii) he assumes that Ericsson has a policy of discounting release period payments.

### A.     Dr. Leonard Inappropriately Reduces The Royalty Base.

235.   Dr. Leonard and I generally agree on the size of the royalty base from 2012 through 2015. We agree that 100% of TCL's sales from 2012 onward will be covered by license.

236.   Dr. Leonard and I disagree in that Dr. Leonard reduces the royalty base from 2007 through 2011.  TCL divides its sales into four geographic categories: United States, Europe, China, and "Rest of World." Dr. Leonard claims that TCL's sales in China and in the "Rest of the World" are subject to a two-year statute of

---

[205] Exhibit 5327, at 5.5.3.

1  limitations. Based on this single assumption, Dr. Leonard excludes 67% of TCL's

2  unlicensed sales between 2007 and 2011 from the royalty base:

3  **Figure 58:  Dr. Leonard Reduces The Royalty Base (2007-2011)**[206]



13  I calculate that Dr. Leonard's assumptions would reduce the royalties that TCL would

14  pay by $15.4 million under Option A and $14.9 million under Option B.

15       237.   I understand from Dr. Bertram Huber—an attorney who is

16  knowledgeable about international law, unlike Dr. Leonard—that Dr. Leonard's

17  assumption about the statute of limitations is incorrect.[207] Thus, Dr. Leonard's statute

18  of limitations assumption is simply wrong.  The Court should not reduce TCL's owed

19  royalties by 67% based on this flawed legal opinion by a non-lawyer.

20       **B.    Dr. Leonard Inaccurately Unpacks Ericsson's July 2012/13 Offers .**

21       238.   Dr. Leonard claims that Ericsson has a policy of offering discounts

22  during the release period.  As support, he demonstrates that Ericsson's July 2012 and

23  July 2013 offers included a discounted release to encourage TCL to sign an overall

24  license. I observe that two license offers are, in my view, insufficient evidence of a

25  Company policy. In my experience, the way that parties treat past unlicensed sales is

26  simply one factor of many factors that work their way into license negotiations.

27

28  [206] Exhibit 5546; Exhibit 543.
   [207] Huber Rebuttal Witness Declaration, at ¶¶ 37.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

239.   Here, Dr. Leonard is cherry-picking license terms; taking the good parts of multiple offers to create a whole offer.  Undoubtedly, Ericsson offered TCL a discount for released sales in its July 2012 and July 2013 offers. But those terms were offered as part of a fully, integrated license. Whether Ericsson offered the discounted release payments to encourage TCL to take a license is irrelevant. The point is that TCL rejected both offers, and that the offers were each a package deal.

240.   In addition, by applying the discounted rates from Section 7.1 of the July 2012 license offer to released sales as Dr. Leonard does in Exhibit 2a of his Rebuttal Expert Report, he creates a hypothetical that Ericsson never intended.  It is clear from the July 2012 license offer that the discounted rates that TCL would enjoy if it made the optional $10 million payment would apply only to any *future* payment of royalties on future sales, not past sales.[208]

241.   If one analyzes the license offers as a whole, then the July 2012 and July 2013 offers would have TCL paying a *higher* overall rate than either Option A or Option B:

**Figure 59:  Comparing Rates Implied By July 2012 Offer and Options A/B**[209]

|          | Option A | Option B | July 2012 |
|----------|----------|----------|-----------|
| GSM/GPRS | $0.13    | $0.15    | $0.20     |
| EDGE     | $0.37    | $0.36    | $0.42     |
| 3G       | $0.68    | $0.69    | $0.98     |

**Figure 60:  Comparing Rates Implied By July 2013 Offer and Options A/B**[210]

|    | Option A | Option B | July 2013 |
|----|----------|----------|-----------|
| 3G | $0.68    | $0.69    | $0.89     |
| 4G | $1.53    | $1.92    | $2.96     |

242.   In other words, Ericsson has already built in a discount for the release period into Option A and Option B. If TCL wanted the discounted releases of July

---

[208] July 2012 License Offer, Exhibit 136.
[209] Exhibit 5547.
[210] Exhibit 5547.

2012 and July 2013, then it could have accepted those offers.

**C.     The Release Terms In Options A and B Are A Concession by Ericsson.**

243.     Separately, Dr. Leonard's release period arguments are weak because, given the lengthy release period, Ericsson is making a generous concession by calculating a release payment by applying the 2015 offer rates backward to sales that occurred as early as 2007. During the lengthy release period, Ericsson entered into multiple licenses with mobile phone suppliers that specified royalty rates above the Ericsson one-way rates implied by Option A and Option B. For example, TCT Mobile Limited (a wholly-owned subsidiary of TCL) entered into a GSM/GPRS license agreement with Ericsson in 2007 that (after an arbitration) was found to apply only to that subsidiary. Ericsson's Option A and Option B offers are only asking that TCL pay 0.8% per GSM/GPRS unit while the Ericsson-TCL 2007 license included royalties of 0.6% for GSM and 0.90% for GPRS in 2007-08 and 1.19% for GSM and 1.69% for GPRS in 2009 through 2014Q1.[211]

244.     This concession is worth a significant amount.  Because Ericsson is seeking only 0.8% for GSM/GPRS instead of the rates that are in the Ericsson-TCL 2007 license, TCL benefits by over $12.6 million.[212]  Moreover, this $12.6 million does not take into account the time value of money.

**D.     Earlier Ericsson Licenses From The Release Period Support Ericsson's Offer to TCL**

245.     Ericsson and TCL's negotiations extend back for close to a decade. During these negotiations, several major licensees (including companies that TCL agrees are comparable to TCL) were paying royalties that are consistent with or higher than the rates contained in Options A and Option B.

246.     **Ericsson-Apple 2008.**[213] Effective January 14, 2008, Ericsson licensed

---

[211] Exhibit 165, at § 7.1.
[212] Exhibit 5311.
[213] Exhibit 257, at § 7.1

1  its 2G and 3G SEPs to Apple through December 31, 2014. At the time, Apple had just

2  entered the smartphone market. Apple agreed to pay a ██████ lump-sum payment

3  on signing and agreed to pay a ████████████████████████████████████

4  Ericsson agreed to not assert any 4G claims against Apple during the life of the

5  agreement, although Apple paid ██████████████ during the life of the 2008

6  agreement. That agreement ultimately was replaced by the 2015 Apple license.

7       247.  **Ericsson-HTC 2008.**[214]  Effective December 15, 2008, Ericsson licensed

8  its 2G and 3G SEPs to HTC through December 15, 2013. ████████████████

9  ██████████████████ HTC agreed to pay royalties of ████ for GSM/GPRS/EDGE

10  (with a ████ royalty cap) and ████ for 3G (with a ████ royalty cap) in China and

11  agreed to pay royalties of ████ for GSM/GPRS/EDGE (subject to a ████ royalty

12  cap) and ████ for 3G units (subject to a ████ royalty cap). ████████████████

13  ████████████████ This license ultimately was replaced by the 2014 HTC

14  license.

15       248.  **Ericsson-Sharp 2003/05/09.**[215]  Ericsson executed a SEP license with

16  Sharp in 2003.  In 2005, Ericsson and Sharp amended the license. Sharp agreed to pay

17  a royalty of ████ for GSM/GPRS mobile phones, ████ for 3G single-mode phones,

18  and ████ for 3G multi-mode phones. In 2009, Ericsson and Sharp amended the

19  license again. Sharp agreed to pay a royalty of ████ for 3G multi-mode phones. The

20  2003 license as amended was replaced with the Ericsson-Sharp 2015 license.

21       249.  **Ericsson-Blackberry 2011.**[216]  Effective January 1, 2011, Ericsson

22  licensed its standard essential patents to Blackberry (f/k/a RIM) through December 31,

23  2015.  Blackberry agreed to pay an upfront payment of ████████████████████

24  ██████ was dedicated to paying for a standard essential patent license.[217]  Provided

25  that Blackberry ████████████████████████, Blackberry paid royalties of ████ for

26

27  ────────────────
[214] Exhibit 4930, at Appendix 1.
[215] Exhibit 4002, Exhibit 4658, Exhibit 4659, Exhibit 4660.
28  [216] Exhibit 56, at § 7.1.
[217] Brismark Witness Declaration, at ¶ 109.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  2G/3G mobile phones and a ▮▮▮▮ for 4G mobile phones, all subject to a ▮▮▮▮. I

2  understand from Mr. Brismark that Blackberry paid the ▮▮▮▮▮▮▮▮▮▮ of its

3  4G sales during the license period.[218] Blackberry also cross-licensed its SEPs to

4  Ericsson. When signed, Blackberry was a major player in the smartphone market, with

5  sales of over 40 million units in 2010.[219] In late 2016, Blackberry announced it would

6  no longer manufacture mobile phones and licensed the Blackberry brand to TCL.[220]

7  Currently, there is no license between Ericsson and Blackberry.

**Figure 61: Summary of Older License Running Royalty Terms**

| Tech | Apple 2008[221], A | HTC 2008[222] (CHINA)[B] | HTC 2008 (ROW)[B] | Blackberry 2011[223], C | Sharp 2005/09[224] |
|------|------|------|------|------|------|
| GSM / GPRS / EDGE | | | | | |
| 3G | | | | | |
| 4G | | | | | |

A. This does not account for the ▮▮▮▮▮▮ pre-payment that Apple made when executing the agreement.
B. Assuming that HTC ▮▮▮▮▮▮
C. This does not account for the ▮▮▮▮▮▮▮▮ that Blackberry made when executing the agreement.

250.  These licenses show that major mobile phone manufacturers were paying significant dollar per-unit royalties at the same time TCL was entering the smartphone market. As TCL expanded its business by selling 3G units in 2012 and 2013, others were paying substantial amounts:

---

[218] Brismark Rebuttal Decl. ¶ 8.
[219] Exhibit 1139.
[220] Exhibit 5305.
[221] Exhibit 257, at § 7.1.
[222] Exhibit 4930, at Appendix 1.
[223] Exhibit 56, at § 7.1.
[224] Exhibit 4658, Exhibit 4659.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 62:  3G Royalties Paid in 2013 Under Release Period Licenses**[225]



**Figure 63:  3G Royalties Paid in 2012 Under Release Period Licenses**[226]



## IX.   CRITICISMS OF TCL EXPERTS' OTHER CONCLUSIONS

### A.   TCL Experts Offer No Ex Ante Analysis

251.   When attempting to define Ericsson's maximum royalty, Dr. Leonard claims that:

[T]he maximum royalty that a rational licensee would agree to in a

negotiation.  In economic terms, negotiations typically result in dividing

---

[225] Exhibit 5329, at Kennedy Ex. 6.3.1.
[226] Exhibit 5329, at Kennedy Ex. 6.3.1.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    the "gains to trade" such that both parties are better off by reaching an

2    agreement.  An award of a royalty equal to the total value of the patented

3    technology would exhaust the benefits of adopting the technology and

4    would leave licensees no better off than if they were to choose an

5    alternative.[227]

6        252.   While this kind of maximum or cap concept might arguably be relevant

7   in a patent damages setting, it is not necessarily relevant in a FRAND royalty

8   determination because the licensor (e.g., Ericsson) and licensee (e.g., TCL) viewpoints

9   are not the only relevant viewpoints to be considered.  Specifically, the FRAND rate

10  for the licensee needs to be FRAND not only to the negotiating licensee but also

11  FRAND with respect to the licensor's existing licensees (e.g., ZTE, Sharp, HTC, LG,

12  Samsung, etc.). For example, if the so-called *maximum* royalty rates from a bilateral

13  negotiation were significantly lower than the rates applicable to a licensor's existing

14  licensees, such a rate would not be FRAND and would need to be higher than the so

15  called maximum rates in order to be FRAND.  Indeed if, as in this case, the

16  negotiating licensee had a significantly lower ASP than existing licensees, an

17  equivalent percent of revenue based royalty rate might not lead to non-discriminatory

18  rates on a dollar per unit basis.

19       253.   Dr. Leonard further stated:

20       The same basic definition of RAND applies whether licensing a single

21       patent, set of patents, or a portfolio of patents. A royalty for a portfolio of

22       essential patents is RAND if it is commensurate with the economic value

23       provided to the licensee by the set of patented technologies relative to the

24       set of next best alternative technologies, and does not include any hold-

25       up value.  RAND, therefore, seeks to put the parties in the same position

26       they would have been prior to any lock-in.[228]

27

28  [227] Leonard Declaration dated January 11, 2017, p. 12.
    [228] Leonard Declaration dated January 11, 2017, p. 11.

254.   However, notwithstanding this statement, I am not aware that Dr. Leonard performs any economic analysis whatsoever on a patent-by-patent or portfolio wide basis analyzing any proffered non-infringing alternatives (NIAs) to any of Ericsson's patents or any proffered non-infringing alternative set of patented technologies (NIAS).  Rather, Dr. Leonard assumes that if a technological alternative exists then the value of the patented invention is reduced to practically zero. Dr. Leonard also assumes that the two patent owners would each reduce their prices to zero for the chance to be included into the standard.

255.   My colleague Dr. Teece explains that Dr. Leonard's interpretation is based on implausible assumptions and would undoubtedly undervalue the patented technology.  In *In re Innovatio*, Judge Holderman rejected Dr. Leonard's "ex ante" logic:

> As Dr. Teece explained, the economic models suggesting that two holders of patented technology would negotiate down to practically zero is based on the implausible assumption that the only negotiating factor is price. The court agrees that it is implausible that in the real world, patent holders would accept effectively nothing to license their technology. Moreover, even assuming that patent holders agreed to essentially give away their technology so that it will be adopted into the standard, such a low return for the patent holders would discourage future innovators from investing in new technology and from contributing their technology to future standards.
>
> Accordingly, the court will consider patented alternatives, but will recognize that they will not drive down the royalty in the hypothetical negotiation by as much as technology in the public domain.  In other words, the existence of patented alternatives does not provide as much reason to discount the value of Innovatio's patents as does the existence

of alternatives in the public domain.[229]

256.   In short, Dr. Leonard lays out an NIA or NIAS based ex-ante analysis principle, yet fails to offer one. Instead, he relies on Dr. Kakaes's technical analysis and assumes that if an alternative to the technology exists, the patent is effectively worthless. This is not sound economic analysis.

257.   Dr. Leonard's failure to perform such a true economic analysis is a reflection of the fact that there may not have been any feasible NIA or NIAS to Ericsson's patent portfolio given the size and breadth of Ericsson's SEP portfolio.

## B.      So-Called Danger of "Hold Up."

258.   Patent "hold-up" is said to occur when a SEP owner makes a deliberately false promise to license its SEPs on FRAND terms and then breaches that promise once its technology is incorporated into industry standards and downstream OEM manufacturers have no choice but to use it. One of the primary threats of hold-up is that the patent holder can then obtain an injunction that will force the OEM to stop producing and selling its products and then negotiate royalties that far exceed the SEP's true value.

259.   The notion of patent "hold-up" is not new. SSOs were well aware of the potential for abuse and crafted a solution in the early 1990s: the FRAND commitment. SEP holders are obligated to license SEP technology and obligated to do so on FRAND terms.

260.   Some mobile phone manufacturers have tried to raise the concern of "hold-up" to undermine the legitimacy of any market transaction.  If a license has a high royalty rate (*i.e.* higher than the manufacturer wants to pay), then it must reflect "hold-up".  These charges are difficult to refute because the manufacturer does not present evidence of "hold-up".

261.   The Federal Circuit has ruled that evidence of "hold-up" is required before the factfinder can consider the issue:

---

[229] *In re Innovatio,* at \*102-103.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

In deciding whether to instruct the jury on patent hold-up and royalty stacking, again, we emphasize that the district court must consider the evidence on the record before it. The district court need not instruct the jury on hold-up or stacking unless the accused infringer presents actual evidence of hold-up or stacking. **Certainly something more than a general argument that these phenomena are possibilities is necessary.** Indeed, "a court should not instruct on a proposition of law about which there is no competent evidence."[230]

262.   Notably, in *D-Link*, the SEP owner against whom D-Link raised these generalized concerns was Ericsson. Given that the *D-Link* defendants in the case were large, sophisticated companies (Dell, Intel, Acer, Netgear, D-Link, etc.), they would have had every incentive to produce evidence of actual hold-up had it existed.  But as to Ericsson's actual conduct, the Federal Circuit said:

Absent evidence that Ericsson used its SEPs to demand higher royalties from standard-compliant companies, we see no error in the district court's refusal to instruct the jury on patent hold-up or to adjust the instructions expressly to take patent hold-up into account. Indeed, as noted above, the court found that Ericsson complied with its RAND obligations and did not demand an unreasonable royalty for use of its technology.[231]

263.   Relatedly, in the underlying district court case, District Court Judge Leonard Davis rejected the hold-up hypothesis because the RAND commitment had functioned as intended. In his order on post-trial motions following a jury verdict in favor of Ericsson, he noted that a significant SEP holder of Ericsson's stature is a "sophisticated licensing entity" that has "an incentive to establish a reasonable licensing rate to maintain creditability in the licensing community."[232]

---

[230] 773 F.3d 1201, 1234 (Fed. Cir. 2014).
[231] *Id.*
[232] Memorandum Opinion and Order, *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-

C.    **So-Called Danger Of "Royalty Stacking."**

264.    Dr. Leonard, among other TCL experts, raises the concern about a so-called "royalty stack."  A royalty stack is a cumulative royalty burden that is so high that it will crush the 3G and 4G industries.  Dr. Leonard asserts that if Ericsson receives the royalties under Option A or Option B, then other companies will demand similarly high royalties and crush development of the 3G and 4G standards.

265.    Dr. Leonard's complaints about royalty stacking generally are not supported by TCL's licensing evidence.  TCL currently only has two active SEP licenses—and only one 3G and only one 4G license:

**Figure 64:  TCL's Existing Standard Essential Patent Licenses**

| TCL LICENSOR | TECH | TERM |
|---|---|---|
| Qualcomm 2011/15[233] | 2G, 3G, 4G | Through 2021 |
| Siemens 2015[234] | GSM/GPRS | Life of patents |
| Motorola 2007[235] | 2G[236] | Expired 12/31/2016 |

Technically, the Motorola license only covers 3G technology as well.  However, based on TCL's internal documentation, TCL only paid royalties on 2G units and treated the license as a license to 2G only.[237]

266.    Two of these three licenses require only small payments.  For example, TCL only paid ███████████ in royalties in 2015—hardly burdensome for a company with nearly 55 million in cellular unit sales.[238]  Similar, TCL paid Siemens a ████████ payment for a license to Siemen's GSM/GPRS for their entire lives.  TCL estimated the Siemens lump-sum payment to be about █████ per unit.[239]

---

473 (E.D. Tex. Aug. 6, 2013).
[233] Exhibit 23, Exhibit 4886, Exhibit 4897.
[234] Exhibit 4885.
[235] Exhibit 4881.
[236] Exhibit 4953, at p. TCL_ERIC_CDCA1070793; Exhibit 537; Exhibit 525.
[237] Exhibit 4953, at p. TCL_ERIC_CDCA1070793; Exhibit 537; Exhibit 525.
[238] Exhibit 538.
[239] Exhibit 525.

1    Again, this is hardly burdensome.

2        267.  Nor is TCL facing a barrage of licensing demands.  According to TCL,

3    only Nokia and Ericsson are seeking SEP royalties from TCL.  The major 3G and 4G

4    SEP holders (according to Dr. Ding and Dr. Leonard) are not seeking licenses from

5    TCL (*i.e.* InterDigital, LG, Texas Instruments, Samsung). Thus, TCL's concerns about

6    a royalty stack are a fiction.

7        268.  I understand that the Federal Circuit has rejected such unsupported

8    concerns about a royalty stack:

9        A jury, moreover, need not be instructed regarding royalty stacking

10        unless there is actual evidence of stacking. The mere fact that thousands

11        of patents are declared to be essential to a standard does not mean that a

12        standard-compliant company will necessarily have to pay a royalty to

13        each SEP holder. In this case, D-Link's expert "never even attempted to

14        determine the actual amount of royalties Defendants are currently paying

15        for 802.11 patents." JMOL Order, 2013 WL 4046225, at *18. In other

16        words, D-Link failed to come forward with any evidence of other

17        licenses it has taken on Wi-Fi essential patents or royalty demands on its

18        Wi-Fi enabled products. Because D-Link failed to provide any evidence

19        of actual royalty stacking, the district court properly refused to instruct

20        the jury on royalty stacking.

21        269.  While Dr. Leonard may be making a general statement about his beliefs

22    regarding royalty stacking, he clearly cannot be referring to royalty stacking as

23    anything other than a theoretical issue with respect to TCL.  First, TCL has never paid

24    Ericsson under a 3G or 4G license so there is no 'actual' stacking that TCL has

25    experienced with respect to Ericsson.  Second, TCL paid fewer SEP licensees in 2015

26    than it had in past years, so to the extent 'actual' royalty stacking were an issue to

27    TCL in the past, it would be less so, currently.  Third, as TCL hasn't yet paid Ericsson

28    and with a reduced threat of injunction (based on recent court rulings) due to

1    Ericsson's FRAND commitment, TCL's six-year hold-out is a heads-I-win, tails-you-
2    lose proposition as TCL can wait for lower SEP offers.

3        270.   The strongest indication that royalty stacking will not be a problem for
4    TCL specifically is the fact that, as discussed earlier in this report, TCL has already
5    recorded a royalty stack on all mobile phones that included royalties to be paid to
6    Ericsson and others.

7        **D.    Comparable License Rates Set a FRAND Range and are not a CAP.**

8        271.   Dr. Lynde indicates in his witness declaration that Ericsson's comparable
9    one-way license rates from just four of Ericsson's many licenses represent a cap with
10   respect to evaluating the non-discriminatory aspect of FRAND.

11       272.   Dr. Lynde gives no explicit explanation of why he believes
12   (1) comparable license rates from this small sample of the universe of Ericsson's
13   similarly situated licensees should represent a cap when evaluating FRAND but also
14   (2) effective percentage of revenue rates should be used to evaluate FRAND, as
15   compared to evaluating implied dollar per unit rates.  As I have noted at length earlier
16   in this report, in my opinion, implied dollar per unit rates are preferable for assessing
17   FRAND, given the facts and circumstances of this case.  In addition, I have also
18   calculated and considered percent per-unit rates.  Moreover, four of Dr. Lynde's
19   comparable licenses are lump-sum agreements.  Dr. Lynde calculated the effective
20   rates for them; he did not take them from the agreements.  Two of Dr. Lynde's
21   comparable licenses do have dollar per-unit terms.  Under the Samsung agreement,
22   Samsung has the option of paying ▇ per 2G units, ▇ per 3G unit, and ▇ per 4G unit.
23   Under the Apple agreement, Apple has the option of paying ▇ per unit.  This suggests
24   that a dollar per-unit analysis is appropriate for the lump-sum agreements.

25       273.   While Dr. Lynde does not explicitly state why he believes comparable
26   license rates should represent a cap, his (unstated) rationale may come from his
27   argument that royalty rates negotiated ex-post, after "…the adoption of the standard
28   could reflect hold-up power because all implementers are now locked into that

-119-

1   technology with no flexibility to choose non-infringing alternatives."[240]  However, if

2   this is his argument, as I have pointed out earlier in the text, the 2013-2015

3   comparable licenses rates upon which I am relying for my analysis were determined

4   during or after the point at which FRAND evaluation issues were being addressed in

5   the courts and therefore by Ericsson.  In addition to the teachings of *Microsoft v.*

6   *Motorola* and *In re: Innovatio*, Ericsson itself was involved in *Ericsson v. D-Link*

7   which addressed FRAND issues.

8       274.   I have concluded that the currently considered comparable licenses are

9   unlikely to reflect hold-up power as they were negotiated under FRAND conditions.

10  In fact, given the propensity of Ericsson's licensees to hold-out,  hold-up power – to

11  the extent any was present –  may have been balanced against hold-out power, given

12  the monopsony positions held by Apple and Samsung in terms of their outsized

13  revenue and unit market shares, respectively.  Further, because Ericsson's licenses

14  with Apple and Samsung settled litigation where the parties were litigating Ericsson's

15  compliance with FRAND, it is highly dubious that those parties would have agreed to

16  rates that reflected hold-out power.  Certainly Apple has the resources and

17  sophistications to resist being held up.

18      275.   In addition, a cap concept also inherently implies that FRAND need only

19  be considered with respect to the position of potential licensees as opposed to from the

20  more expansive perspective of other industry stakeholders such as Ericsson's existing

21  licensees.  If one buys into the ND cap concept, one must also buy into the ND floor

22  concept.  Indeed, in addition to a ND cap with respect to the potential licensee,

23  comparable license rates can be envisioned as an ND floor with respect to existing

24  licensees. For example, it would not be FRAND from the perspective of Ericsson's

25  other existing licensees for TCL to receive an implied dollar per unit rate lower than

26  the implied dollar per unit rates received by the other existing licensees when

27  licensing the exact same rights to all of Ericsson's SEP portfolio.

28

[240] Lynde Witness Declaration, at ¶ 33.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

276.   In my opinion, an ND cap and floor construct translates to a FRAND range concept based on concentrations of comparable license rates over time, considering more information rather than less, yet excluding obvious outliers.   The FRAND range is a band from which FRAND offers and rates occasionally stray, but not stray too far without very good reason, to avoid being considered ND with respect to either prospective or existing licensees.

**E.   FRAND is not a Most-Favored Licensee Concept.**

277.   TCL's experts also opine that FRAND creates a most-favored licensee concept into all license negotiations.  Dr. Lynde described his concept of the non-discriminatory portion of FRAND as follows:

> "Non-discriminatory" is the second component of the FRAND commitment. When applied horizontally at each stage of commercial utilization, it ensures no party is materially disadvantaged with respect to its competitors. In particular, it is intended to prevent a patent owner from forcing a prospective licensee to pay a higher royalty rate than the rate being paid by competing implementers for access to the same intellectual property rights.[241]

278.   Dr. Lynde appears to define FRAND based on the situation of a single party, with the potential implication that FRAND rates should decrease if a single implementer gets access to IP at a lower cost than other implementers.  This implication would interpret FRAND much like a most-favored-licensee (MFL) concept.  As explained by Dr. Huber, ETSI expressly rejected the notion of a MFL requirement when it adopted its current IPR Policy.[242]  Further, from my experience as a patent license negotiator, envisioning FRAND as an MFL concept would perpetually bias FRAND rates downward, based on the most current lowest rate any individual implementer achieved.

[241]  Lynde Witness Declaration, at ¶ 36.
[242]  Huber Witness Declaration, at ¶¶ 46-47.

279.   It is unclear on what Dr. Lynde bases his assumption.  The economic literature does not support such an approach.[243]  Interpreting FRAND as a MFL concept is contrary to how courts have interpreted similar requirements.  For instance, in *Microsoft v. Motorola*, Judge Robart found that RAND created a range of acceptable rates.  The high-end of the range was 24 times greater than the lower bound.[244]  In a case between InterDigital, Huawei, ZTE, and Nokia at the ITC, Judge Essex found that:

> The FRAND nondiscrimination requirement prohibits "unfair discrimination," but it does not require uniform treatment across licensees, nor does it require the same terms for every manufacturer or competitor.[245]

280.   Even if FRAND were a MFL obligation, it is not the draconian commitment that Dr. Lynde suggests.  At bottom, Dr. Lynde, and for that matter Dr. Leonard, contend that Ericsson's FRAND commitment allows TCL to cherry pick its preferred license terms from each of Ericsson's license agreements and create its own hybrid ("Franken-license").  This is true because Drs. Lynde and Leonard myopically focus on a single term of particular Ericsson license agreements (the royalty payment) and then employ techniques that are the economic equivalent of alchemy to turn the term into gold for TCL.  Such an interpretation of FRAND, which does not consider all of the terms and conditions of a particular agreement, is untenable for a number of reasons, the least of which is that it implicitly requires a SEP licensor to only license on the *exact* same terms with each licensee, without giving any consideration to the unique circumstances of each licensee.

---

[243] J. Sidak, The Meaning of FRAND, Part II, Exhibit 5251; Edward Gold, *Exploring the Non-discriminatory Aspect of RAND Licensing Terms*, SRR Gobal Financial Advisory Services (Fall 2014), Exhibit 5268 (collecting sources).
[244] *Microsoft v. Motorola*, 2013 U.S. Dist. LEXIS 60233, *301 (W.D. Wash. Apr. 25, 2013) (finding a RAND range of 0.555 cents to 16.389 cents for one set of patents and 3.471 cents to 19.5 cents and for another set of patents).
[245] Initial Determination, *In the Matter of Certain Wireless Devices with 3G Capabilities*, 337-TA-800 (June 28, 2013), at p. 432.

1    281.   Some hypotheticals illustrate this point.

2    282.   **Hypothetical #1.**   Assume Licensee C is a company that is a new entrant

3    into a market and prefers to pay a running royalty because its cash flows are such that

4    it cannot commit to a fixed payment, whereas Licensee D is established in the market

5    and can commit to a fixed payment.  A fixed payment commitment provides

6    consideration to the licensor in the form of predictable cash flows that are independent

7    of the licensee's performance.  Under Dr. Leonard and Lynde's approach, the licensor

8    could not, practically speaking, offer Licensee C a running royalty license and

9    Licensee D a fixed payment license.  Dr. Leonard and Lynde will surely seek to

10   dispute this point, but the fact is that unless the licensor in this scenario had the

11   prescience to *exactly* guess the future sales of Licensee D – so that the net royalty rate

12   paid by Licensee D is the exact same as the running royalty rate paid by Licensee C –

13   then the licensor cannot offer a fixed payment license without violating its FRAND

14   obligation.

15   283.   **Hypothetical #2.**   Assume Licensee E prefers to enter into a long-term

16   license, whereas Licensee F would prefer a short-term license.  Like a fixed-payment

17   license, a long-term license provides the licensor with the benefit of certainty.  It is

18   also more efficient for both the licensor and licensee because it will require less

19   renegotiating over time. Under Dr. Leonard and Lynde's view of FRAND a licensor

20   could not offer the long-term licensee (Licensee E) a lower net-effective royalty rate

21   for entering in a long-term deal without violating FRAND.

22   284.   As the hypotheticals suggest, the practical result of Dr. Leonard and

23   Lynde's view of FRAND is that a licensor may only offer a one-size-fits-all license to

24   any licensee.  I understand from Dr. Huber that that was never the intention of the

25   ETSI IPR Policy.[246]  I also know from my own experience negotiating license

26   agreements that saddling a licensor with the burden of only offering one-size-fits-all

27   licenses would make it nearly impossible for a licensor to ever sign a license. Given

28

---

[246] Huber Witness Declaration, at ¶¶ 43-45.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    that one of the objectives of the ETSI IPR Policy is to adequately and fairly reward

2    IPR holders for the use of their IPRs in the implementation of standards,[247] it cannot

3    follow that FRAND would require one-size-fits-all licensing.

4         285.   Dr. Leonard and Lynde's MFL interpretation of FRAND fails to

5    recognize the principle of balancing the benefit and incentives to SEP holding

6    innovators/licensors with those of manufacturer/licensee and consumers to ensure

7    widespread adoption of the standards and continued innovation.

8         286.   Further, licensors' and prospective licensees' viewpoints are not the only

9    relevant viewpoints to be considered.  In particular, the FRAND rate for the licensee

10   needs to be FRAND not only to the prospective licensee but also FRAND with respect

11   to the licensor's existing licensees (e.g.,  ZTE, Sharp, HTC, LG, Samsung).

12        287.   The more rational view of FRAND is that of a range as opposed bright

13   line.  A FRAND range incorporates more information rather than less, and, as such is:

14   (1) less likely to be biased by subjective choices regarding where bright lines should

15   be drawn, and (2) more flexible in incorporating viewpoints of diverse system-wide

16   stake holders including innovators/licensors and existing and prospective

17   implementers/licensees.  In my opinion this approach is what happens in the real

18   world of negotiating license agreements and is more likely to result in individualized

19   fully negotiated FRAND rates that "favor" the manufacturer and the innovator

20   equally.

21        288.   As described earlier at length, in my opinion, a comparable license based

22   market approach is the best source of information to inform this FRAND range,

23   assuming there are a sufficient number of comparable licenses from which to generate

24   a meaningful range, as there are in this case.

25   **X.    RESPONDING TO MS. ZHU'S NEW TESTIMONY**

26        289.   In my first witness declaration, I explained that the value of Ericsson's

27   SEPs was not related to TCL's profit margins.  However, as a way to rebut Dr.

28

---

[247] ETSI IPR Policy, Exhibit 234, Clause 3.2.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    Leonard's argument that TCL could not make money and pay Ericsson's Option A
2    and Option B royalty rates, I investigated TCL's internal accounting and determined
3    that TCL's financial statements demonstrated that Dr. Leonard was incorrect.  I
4    concluded that TCL estimates IPR payments to multiple third parties (including
5    Ericsson) through an "IPR provision."  I concluded that TCL includes this IPR
6    provision in its audited financial statements.  Based on this conclusion, I stated that
7    TCL proved it could generate a healthy gross profit while paying Ericsson's rates
8    under Option A and Option B.  Moreover, even after accounting for all fixed costs,
9    TCL was still able to generate a net profit margin while including estimated Ericsson
10   IPR payments:



### Figure 65:  TCL Profit Margins (2013-2015)[248]



20        290.   My earlier testimony regarding TCL's audited financial statements relied,
21   in part, on the deposition testimony of Ms. Judy Zhu, who was the 30(b)(6) witness on
22   TCL's audited financial statements.  That deposition took place in January 2016.  Ms.
23   Zhu submitted an errata on March 2016 that made only minimal changes to the
24   transcript.  I submitted my expert report in April 2016 explaining that TCL's audited
25   financial statements included an IPR provision that estimated TCL's anticipated IPR
26   expenses.  Ms. Zhu made no further errata revisions to her deposition transcript.

27        291.   In January 2017, Ms. Zhu submitted a witness statement in this case that

---

[248] Exhibit 1019; Exhibit 1140; Exhibit 4869.

is directly contrary to her deposition testimony.  In her deposition testimony, Ms. Zhu testified that the audited financial statements included an account called "Accrued IPR" that was calculated using an estimate of what TCL expected to pay for IPR to several unlicensed parties, including Nokia, Ericsson, and "Other".  In her witness declaration, Ms. Zhu now testifies that the audited financial statements do not include an IPR provision at all but only includes the payments actually made to existing licensors.[249]

292.   To be clear, I completely stand by my earlier testimony.  First, the value of Ericsson's SEPs is completely independent of TCL's ability to turn a profit. Ericsson deserves substantial payment for a license whether or not TCL turns a profit. Second, nothing in Ms. Zhu's witness statement suggests that I should change my conclusion that TCL's audited financial statements include an IPR provision or that TCL has reported healthy gross profit margins and net profit margins in 2013, 2014, and 2015 after including an IPR provision.

### A.   Ms. Zhu's Witness Declaration Is Contrary To Her Previous Testimony.

293.   In her deposition, Ms. Zhu was quite clear that TCL's audited financial statements included an IPR provision that included TCL's estimate of what TCL would pay several unlicensed companies for a license, including Ericsson, Nokia, and "Other".  Ms. Zhu testified that the 2014 audited financial statements include an account called "Accrued IPR":

**Q.** Okay. Let's turn back to Zhu Exhibit 518, the excerpts of the 2014 annual report for TCL. And if you can flip to -- it's page number 84. I believe it's the fourth page in the excerpt.  Would "accrued IPR" then be under the line item "other payables and accruals"?

**A. Yes.**[250]

---

[249] Zhu Witness Declaration, at ¶ 11.
[250] Zhu Depo, at p. 40:16-22.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Ms. Zhu testified that she was involved in the calculation of Accrued IPR.[251]  Ms. Zhu then testified about Exhibit 521, which is an accounting document describing the "Accrued IPR" account:

### Exhibit 521:  "Accrued IPR" Account



BATES: TCL_ERIC_CDCA1076540.xlsx
FILEN AME: IPR movement (2015H1).xlsx
SHEET: SAP Bal

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

Accrued IPR Account

| Acc-ACCRUED IPR | Fiscal Year | HK10-TCT Mobile International | | | | FR10-TCT Mobile Europe SAS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Debit-HK10 | Credit-HK10 | BalanceHK10 | Cum.balanceHK10 | Debit-FR10 | Credit-FR10 | Balance-FR10 | Cum.balance-FR10 |
| 34390026 | 2008 Total | | | | | 1,041,061.89 | -2,754,608.96 | -1,713,547.27 | -1,713,547.27 |
| 34390026 | 2009 Total | | | | | 4,677,943.11 | -8,135,723.74 | -3,457,780.63 | -5,171,327.90 |
| 34390026 | 2010 Total | | | | | 11,636,082.24 | -14,426,498.76 | -2,790,416.52 | -7,961,744.42 |
| 34390026 | 2011 Total | 101,868,785.74 | -126,264,802.41 | -24,396,016.67 | -24,396,016.67 | 14,661,465.96 | -13,956,038.53 | 705,427.43 | -7,256,316.99 |
| 34390026 | 2012 Total | 218,888,649.74 | -324,384,137.56 | -105,495,487.82 | -129,891,504.49 | 10,485,037.54 | -28,024,091.05 | -17,539,053.51 | -24,795,370.50 |
| 34390026 | 2013 Total | 163,952,468.40 | -483,213,492.90 | -329,261,024.50 | -459,152,528.99 | 31,112,041.95 | -20,557,970.32 | 10,554,071.63 | -14,241,298.87 |
| 34390026 | 2014 Total | 1,000,292,048.73 | -2,519,623,575.72 | -1,519,331,526.99 | -1,978,484,055.98 | 14,241,298.87 | - | - | - |
| 34390026 | 2015-01 | 1,556,951.88 | -169,291,891.76 | -167,734,939.88 | -2,146,218,995.86 | - | - | - | - |
| 34390026 | 2015-02 | 2,435,095.16 | -113,169,132.38 | -110,734,037.22 | -2,256,953,033.08 | - | - | - | - |
| 34390026 | 2015-03 | 435,970,181.39 | -125,146,787.41 | 310,823,393.98 | -1,946,131,639.10 | - | - | - | - |
| 34390026 | 2015-04 | 235,500,000.00 | -146,588,855.82 | 88,911,144.18 | -1,857,220,494.92 | - | - | - | - |
| 34390026 | 2015-05 | 201,823,457.33 | -104,511,686.82 | 97,311,770.51 | -1,759,908,724.41 | - | - | - | - |
| 34390026 | 2015-06 | 329,992,600.00 | -99,188,918.74 | 230,803,681.26 | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015-07 | | | - | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015-08 | | | - | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015-09 | | | - | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015-10 | | | - | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015-11 | | | - | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015-12 | | | - | -1,529,105,043.15 | - | - | - | - |
| 34390026 | 2015 Total | 1,207,278,285.76 | -757,899,272.93 | 449,379,012.83 | -1,529,105,043.15 | - | - | - | - |

Ms. Zhu recognized the document.  Ms. Zhu testified that the two companies listed on Exhibit 521 (HK10-TCT Mobile International and FR10-TCT Mobile Europe SAS) were part of the "Accrued IPR" reported in the 2014 audited financial statement:

> **Q.**  Okay. And then between the -- if I added together the two companies' information, would that represent total accrued IPR for the entire TCL company?
>
> **A.**  There should actually be one more company. If you are comparing the aggregate, the aggregate of the two companies here with the numbers appearing in the financial report, then I would say that this document -- [point to Exhibit 521] would only be a component, a part, of the financial report.[252]

She later testified that if the third company was included, the "Accrued IPR" amount

---

[251] Zhu Depo, at p. 40:23-25.
[252] Zhu Depo, at p. 42:11-43:5.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

would go up.[253]

294.   Ms. Zhu also recognized Exhibit 522, which provided further details on "Accrued IPR" account:

### Exhibit 522:  TCL Accrued IPR 2014



Ms. Zhu testified that Exhibit 522 is "a record of all the cost related to IPR within he accounts of the Hong Kong 10 company."[254]  Each entry in Exhibit 522 has the same "Accrued IPR" account number as in Exhibit 521.  Exhibit 522 shows that TCL is making an IPR provision for Ericsson and Nokia and "Others" in Accrued IPR, which Ms. Zhu testified would be part of the audited financial statements.

---

[253] Zhu Depo, at p. 47:11-48:4.
[254] Zhu Depo, at p. 49:7-8.

295.   Ms. Zhu testified that there was no meaningful difference between an accrued IPR or IPR provision.[255]  Ms. Zhu also testified that TCL used an IPR Ratio to calculate the IPR Provision that was put into the audited financial statements.  Ms. Zhu examined Exhibit 536, which was an excerpt of a detailed TCL IPR billing file from December 2015.

### Exhibit 536:  Dec'15 Billing



BATES: TCL_ERIC_CDCA1126957.xlsx
FILENAME: 201512 Billing for IPR (20160103).xlsx
EXCERPTS OF SHEET: Dec'15 Billing

"FR" IPR Ratios

| | BI | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Nokia FR New Ratio | Motorola FR New Ratio | Others FR New Ratio | Nokia FR IPR | Motorola FR IPR | Others FR IPR | Ericsson FR New Ratio | Ericsson LTE Floor (US$) | Ericsson LTE Cap (US$) | Ericsson FR IPR | Qualcomm FR IPR | Total IPR Exclude QTL |
| 2432 | | 0.00% | 0.00% | - | - | - | 0.88% | - | - | 792 | - | 792 |
| 2433 | | 0.00% | 0.00% | - | - | - | 0.88% | - | - | 528 | - | 528 |
| 2434 | | 0.00% | 0.00% | - | - | - | 0.88% | - | - | 980 | - | 980 |
| 2435 | | 0.00% | 0.00% | - | - | - | 0.88% | - | - | 420 | - | 420 |
| 2436 | | 0.00% | 0.00% | - | - | - | 0.88% | - | - | 115 | - | 115 |
| 2437 | | 0.00% | 1.00% | - | - | 159 | 1.10% | 1.60 | 3.60 | 240 | 773 | 399 |

Ms. Zhu testified that the "Ratio" figures in Exhibit 536 were the TCL IPR ratios that TCL used to calculate the "FR" provisions or the provisions that became part of the audited financial statements:

> **Q.** Is that the IPR ratio that's being applied in that row's transaction?
>
> **A.** Based on the format of this spreadsheet, it should be -- I think it should be the percentage or the ratio used in calculating FR provisions.
>
> **Q.** FR provision, not standard cost provision?
>
> **A.** Yes. This is only for FR.
>
> **Q.** And FR, the fiscal reports -- I'm sorry. Scratch that. FR, the financial reports?
>
> **A.** Yes.
>
> **Q.** *So if I understand correctly, this is the data that's being used in the*

---

[255] Zhu Depo, at p. 50:5-11.

1     *audited financial statements?*

2     __A.__ *We can understand it this way. Yes.*[256]

3

4 Critically, Ms. Zhu did not qualify that only *payments* became part of the audited

5 financial statements.  In fact, in December 2015, TCL did not have a license with

6 Ericsson or Nokia, yet was recording an IPR provision for both.  And that IPR

7 provision became part of the audited financial statements.

8     296.  Similarly, Ms. Zhu testified about Exhibit 540.  Exhibit 540 is another

9 TCL IPR billing file.  Exhibit 540 describes how TCL calculates two different IPR

10 provisions:  an FR provision for financial reports and an SC provision for use in

11 pricing mobile phones:

12 **Exhibit 540:  SC v. FR**

13

BATES: TCL_ERIC_CDCA1126957.xlsx
FILENAME: 201512 Billing for IPR (20160103).xlsx
SHEET: SC VS FR

| Dec'15 SC VS FR US$ | Standard Cost | Financial Report |
|---|---|---|
| Nokia | | |
| Moto | ▇ | ▇ |
| Ericsson | 4,103,623 | 2,098,682 |
| Siemens | 58,481 | - |
| Others | 3,149,544 | 755,729 |
| CN LTE | 1,077,296 | 461,173 |
| -QTL | | 91,364 |
| -Ericsson | | 232,117 |
| -Others | | 137,692 |
| Qualcomm | 7,962,081 | 7,178,704 |
| | 17,530,502 | 11,660,028 |

22 Ms. Zhu testified that the "FR" provision became part of the audited financial

23 statements:

24     __Q.__ Do you recognize this document [Exhibit 540]?

25     __A.__ Yes, I do.

26     __Q.__ Now, the worksheet is titled "SC VS FR." Do you see that?

27

28 ──────────

[256] Zhu Depo, at p. 98:12-25.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    **A.** Yes.

2    **Q.** What is this document?

3    **A.** It is a comparison between standard IPR cost amount and ***financial --***

4    ***finance provision IPR amount.***

5    **Q.** If you're looking at the total row for standard cost versus financial

6    report, there seems to be a considerable difference between the two.

7    Would you agree?

8    **A.** Yes, I do.

9    **Q.** [ . . . ]As an accounting matter, would you want as a goal for the

10    standard cost calculations and the financial report calculations to be

11    similar?

12    **A.** From the finance perspective, there's no such concept, no such saying

13    because the two sets of numbers are for very different reasons. There's no

14    saying as to when the numbers are more similar it is better, or, when the

15    numbers are not similar, then it is not good.  There's no such concept.

16    **Q.** All right. ***Then the financial report numbers are the numbers that***

17    ***work their way into the audited financial statements; correct?***

18    **A.** ***The purpose of these numbers were to be used in our financial***

19    ***statements. That's correct.***[257]

20

21    297.   Ms. Zhu further testified that TCL adjusted the "FR" provision to ensure

22  that its audited financial statements to "be more in line with accounting and financial

23  principles":

24    **Q.** Do you know why the ratio is so different between FR and standard

25    cost?

26    **A.** This is because the standard cost calculation has all along been using

27    its own system. One of the most important purposes of standard cost

28

---

[257] Zhu Depo, at p. 111: 6-112:9.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

numbers is to be used when we provide a quote on prices to external parties. According to my memory, it was either in Quarter 1 or Quarter 2, 2014 -- I mean since either Quarter 1 or Quarter 2, of 2014, the ratio for standard cost has not been adjusted, meaning that from 2014 all the way until [December 2015], the standard cost ratio that is being used has always -- has all along been that ratio as at the end of 2013.

*However, from the -- from a financial perspective, in order to make the data appearing on our financial statements to be more in line with accounting and financial principles, we have all along been making such adjustments.*[258]

298. Ms. Zhu's testimony is clear and unequivocal. The audited financial statements include an IPR provision and the IPR provision includes estimates of what TCL would pay for other licenses. There is no suggestion that the audited financial statements only include payments to existing licensees.

**B.    Ms. Zhu's Witness Declaration Is Contrary To TCL's Documents.**

299. Additionally, Ms. Zhu's Witness Declaration is inconsistent with TCL's financial documents in this case. The documents show that TCL's audited financial statements do include an IPR provision.

300. The first example is that TCL did not distinguish between "Accrued IPR" to Qualcomm (which had a license) and "Accrued IPR" to Ericsson or Nokia (which did not have licenses in late 2014). TCL recorded "Accrued IPR" the same for all companies:

---

[258] Zhu Depo, at p. 113:22-114:20.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

## Exhibit 4874:  Internal TCL Email RE Oct'14 IPR Entry[259]

From:Sherry, MOU(FINANCE GFC R&D-SZ/GD-TCT)
Sent:3 Nov 2014 11:44:35 +0000
To:Zoe, LIU(FIN-SZ-TCT);Zora, WANG(FIN-SZ-TCT)
Cc:Alpha, ZHENG(FIN-SZ-TCT);Nelson, WONG(FIN-SZ-TCT);Judy, ZHU(FIN-SZ-TCT)
Subject:Oct'14 IPR entry
Importance:High

Dear all,

The form below is the detail for Oct'14 IPR entry.

| PK | Account | Account short text | Cost Ctr | Amount USD | Amount in LC HKD | Text |
|---|---|---|---|---|---|---|
| DR | 62130200 | other cost -IPR | 1130010000 | | 48 | Oct'14 Moto Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 6,423,101.66 | 49,813,080.30 | Oct'14 Ericsson Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 166,666.67 | 1,292,550.03 | Oct'14 Ericsson Lump Sum amortization |
| DR | 62130200 | other cost -IPR | 1130010000 | | 63 | Oct'14 Nokia Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 4,994,363.81 | 38,732,789.66 | Oct'14 Others Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | | 59 | Oct'14 Siemens Provision |
| DR | 62130200 | other cost -IPR | 1130010000 | 19,214,578.57 | 149,014,821.18 | Oct'14 Qualcomm IPR Accrual |
| DR | 75510037 | OTHER MISC. INCOMES | 1130010000 | 190,725.62 | 1,479,134.40 | Oct'14 QTL S66 IPR Accrual |
| CR | 34390002 | ACCRUED IPR | 1130010000 | | 48 | Oct'14 Moto Provision |
| CR | 34390002 | ACCRUED IPR | 1130010000 | -6,423,101.66 | -49,813,080.30 | Oct'14 Ericsson Provision |

## Exhibit 535: Accounting Entries for December 2015 IPR Provision[260]

BATES: TCL_ERIC_CDCA1126957.xlsx
FILENAME: 201512 Billing for IPR (20160103).xlsx
SHEET: SAP Info

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEY'S EYES ONLY

Reference Doc.Header   IPR PROVISION
Dec'15IPR Provision

| Item | PK | Account Number | Short Text | Cost Ctr | Amount in USD | Amount in LC (HKD) | Text | Ex. Rate |
|---|---|---|---|---|---|---|---|---|
| 1 | 40 | 62130203 | other cost -IPR | | | | Dec'15 Nokia IPR Provision | 7.7508 |
| 2 | 40 | 62130203 | other cost -IPR | 1130010000 | | | Dec'15 Moto IPR Provision | 7.7508 |
| 3 | 40 | 62130203 | other cost -IPR | 1130010000 | 2,330,799.54 | 18,065,561.07 | Dec'15 Ericsson IPR Provision | 7.7508 |
| 4 | 40 | 62130203 | other cost -IPR | 1130010000 | 893,420.98 | 6,924,727.33 | Dec'15 Others IPR Provision | 7.7508 |
| 5 | 40 | 62130203 | other cost -IPR | 1130010000 | 7,270,067.85 | 56,348,841.89 | Dec'15 Qualcomm IPR Provision | 7.7508 |
| 6 | 50 | 34390026 | ACCRUED IPR | | | | Dec'15 Nokia IPR Provision | 7.7508 |
| 7 | 50 | 34390026 | ACCRUED IPR | 1130010000 | | | Dec'15 Moto IPR Provision | 7.7508 |
| 8 | 50 | 34390026 | ACCRUED IPR | 1130010000 | (2,330,799.54) | (18,065,561.07) | Dec'15 Ericsson IPR Provision | 7.7508 |
| 9 | 50 | 34390026 | ACCRUED IPR | 1130010000 | (893,420.98) | (6,924,727.33) | Dec'15 Others IPR Provision | 7.7508 |
| 10 | 50 | 34390026 | ACCRUED IPR | 1130010000 | (7,270,067.85) | (56,348,841.89) | Dec'15 Qualcomm IPR Provision | 7.7508 |

## Exhibit 522:  Accrued IPR In 2014

BATES: TCL_ERIC_CDCA1070904.xlsx
FILENAME: Accrued Account in 2014 – HKD .xlsx
SHEET: 2014 HK30

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEY'S EYES ONLY

| Assignment | Cost Center | Account | Document Number | Documen t Type | Document Date | Posting Date | Posting Key | Amount in local currency | Local curr. | Amount in doc. curr. | Document currency | Text |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | | HKD | | USD | Jan'14 Moto Provision |
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | -26,395,262 | HKD | -3,399,785 | USD | Jan'14 Ericsson Provision |
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | -1,293,967 | HKD | -166,667 | USD | Jan'14 Ericsson Lump Sum amortization |
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | | HKD | | USD | Jan'14 Nokia Provision |
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | -13,956,308 | HKD | -1,797,813 | USD | Jan'14 Others Provision |
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | -38,128 | HKD | -4,913 | USD | Jan'14 CN LTE Provision |
| 20140131 | 1130010000 | 34390026 | 1002272 | SA | 1/31/2014 | 1/31/2014 | 50 | | HKD | | USD | Jan'14 Siemens Provision |

---

[259] Exhibit 4874.
[260] Exhibit 535.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    Other TCL documents show the same treatment.  If TCL really was only reporting

2    payments under the existing licenses in its audited financial statements, then TCL

3    would have designed its accounts to treat Qualcomm differently from Ericsson and

4    Nokia and "Others."

5        301.    Another example is Exhibit 4893.  Exhibit 4893 is a file that TCL's

6    accounting group sent Mr. Guo, which includes several details about the

7    company.  One of the tabs is called "OP", which corresponds to the "Other payables

8    and accruals" line item in TCL's audited financial statements.  The "Other Payables"

9    sheet lists all the items that make up "Other payables and accruals".  The IPR

10   Provision is clearly listed, just as Ms. Zhu said it would be in her deposition.  The IPR

11   Provision line item includes a reference describing the figure as "pls refer to Note 2 in

12   the sheet of 'Provision & Accrual'".  On the "Provision & Accrual" worksheet, there

13   is a line item for IPR.  The line item includes a note to "Pls refer to Note 2 for Nov's

14   movement".  Note 2 on the "Provision & Accrual" worksheet reads:

15       *IPR was accrued based on gross sale for Qualcom, Nokia, Ericsson*

16       *and Motor*.  When invoice was received, the invoiced bal. will be

17       transferred to OP and the over/under accrual will be reversed/provided

18       accordingly. In Nov, HK10 accrued HKD130M for Qualcom.[261]

19

20       302.    Exhibit 4893 also has a sheet called "HK GAAP BS" which stands for

21   the TCL Balance Sheet.  The HK GAAP BS matches the audited balance sheet

22   reported in the 2014 financial statements.  For example, Exhibit 4893 reports an

23   "Other payables and accruals" line item, just like the official audited financial

24   statements.  The "HK GAAP BS" December 2014 line item for "Other payables and

25   accruals" is almost exactly the same as the figure reported in the 2014 audited

26   financial statements.  The 2014 audited financial statements report HK$4,953,416,

27

28   _____

[261] Exhibit 4893, at p. 11; Exhibit 4893N, at Sheet:  "Provision & Accrual"

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   while Exhibit 4893 reports HK$4,941,918,[262] which is an immaterial difference.

## Exhibit 4893:  HK GAAP BS



BATES: TCL_ERIC_CDCA1074507.xlsx
FILE: TCT Financial Result 2005 to 2015 Jan_20150204 v1.xlsx
SHEET: HK GAAP BS

TCL Communication Technology Holdings Limited
Consolidated Balance Sheet
2005 to 2013 Quarter by Quarter Balance Sheet

| | 31-Mar 2014 HK$'000 | 30-Jun 2014 HK$'000 | 30-Sep 2014 HK$'000 | 31-Oct 2014 HK$'000 | 30-Nov 2014 HK$'000 | 31-Dec 2014 HK$'000 |
|---|---|---|---|---|---|---|
| CURRENT LIABILITIES | | | | | | |
| Interest bearing bank borrowings | | | | 3,798,040 | | |
| Trade and notes payables | | | | 6,792,405 | | |
| Bank advance on discounted notes receivables and factored trade receivables | 310,476 | 444,167 | 714,112 | 682,764 | 646,021 | 368,125 |
| Derivative Financial Instrument | 134,788 | 197,697 | 38,232 | 31,322 | 18,510 | 49,391 |
| Tax payable | 15,244 | 12,374 | 13,597 | 21,464 | 31,749 | 47,717 |
| Other payables and accruals | 3,280,139 | 3,905,837 | 4,603,414 | 5,148,150 | 5,250,241 | 4,941,918 |

Includes IPR Provision Exhibit 4893 (Sheet:  OP tab)

Matches 2014 Audited Financial Statements (Exhibit 518, at page 5)

8   Exhibit 4893 shows that the "Other payables and accruals" line item on the "HK

9   GAAP BS" includes an IPR Provision.  The "HK GAAP BS" sheet figures for "Other

10  payables and accruals" match the total of the "Other payables" breakdown in Exhibit

11  4893 on worksheet "OP" in both October 2014 and November 2014.

12      303.   In other words, the "HK GAAP BS" worksheet matches the 2014 audited

13  financial statements and shows that the "Other Payables and accruals" line item

14  includes an IPR provision that is calculated by estimating IPR payments to "Qualcom,

15  Nokia, Ericsson, and Motor."

16      304.   There is other documentary evidence as well.  The record shows that

17  TCL is spending tremendous resources estimating the IPR provision.  TCL's CEO and

18  CFO spend time discussing the IPR provision.  TCL's accounting department

19  carefully tracked the effects of changing the IPR provision.  For example, in an email

20  from Nelson Wong to Thomas Liu, Mr. Wong explained that the IPR provision would

21  leave "US$20.5M left for the future":

---

[262] Exhibit 518 at p. 584; Exhibit 4894N, at Sheet: "HK GAAP BS".

-135-

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

### Exhibit 531:  TCL Accounting Email

From:Nelson, WONG(CM GFC IPR&BOS&MIE--TCT)
Sent:29 May 2015 11:10:13 +0000
To:Thomas, LIU(CM-SZ-TCT);Janus, WANG(CM GFC-SZ-TCT)
Cc:Judy, ZHU(CM GFC IPR&BOS&MIE-SZ/GD-TCT)
Subject:New IPR Provision
Attachments:IPR provision by using new rate (Jan~Apr 15).xlsx

Attached please find the new IPR provision for your reference.  Please note that I have taken up the following adjustments in the attachment:

1.   Applying new IPR rate

2.   Qualcomm credit of US$14.2M to be claimed for unlicensed countries paid in 2014

3.   Reverse of 2015 royalty provision made for Qualcomm related to unlicensed countries

4.   Audit settlement with Qualcomm

5.   Settlement agreement with Siemens

6.   Reverse of 2014 provision balance for Moto

After making the above adjustments, we still have US$20.5M left for the future.

If the IPR Provision was not part of TCL's audited financial statement, adjusting the IPR provision would not have any effect, let alone leave "US$20.5M left for the future."

305.   Similarly, TCL's CEO and CFO discussed how changing the IPR provision would allow them to "make room" for one thing or another:

### Exhibit 4889:  Email from TCL CFO to TCL CEO

From:Thomas, LIU(CM-SZ-TCT)
Sent:5 Apr 2015 14:20:30 +0000
To:George, GUO(KAS-SZ-TCT)
Subject:RE: FW: flash report of Mar. 2015
Attachments:Copy of IPR Reconciliation Mar'15.xlsx

IPR report for our discussion, not much room. .. . ☹

Again, if the IPR provision did not affect the audited financial statements, then changing the IPR provision would not make a difference one way or another to TCL's bottom line.

306.   Further, the IPR billing and reconciliation files are not simple internal

-136-

1    estimation files.  Instead, they are a carefully crafted and constructed system meant to

2    tabulate estimated IPR payments *to the penny*.  In my experience, estimation files are

3    rarely calculated to the penny because it is not worth the time and energy to do so.

4    Yet, TCL did so every single month.  Further, it is incredibly rare to include internal

5    estimates into the accounting system if the company is not going to include them in

6    the audited financial statements.  Finally, Ernst & Young audited these accounts and

7    specifically reviewed the Accrued IPR account.

8        307.   TCL is wasting a lot of resources calculating an IPR provision to simply

9    exclude it from their audited financial statements.

10       **C.    Ms. Zhu's New Testimony Is Contrary To GAAP.**

11       308.   I am a certified accountant and have served as a CPA on audit

12   engagements for large companies (including telecom companies) and have been hired

13   by the U.S. Department of Justice to review public company financial statements and

14   the underlying records for over 100 companies for evidence of provision and reserve

15   account misstatements and evidence of fraud or gross negligence on the part of

16   management or the independent accounting firms associated with accruals for

17   provisions and reserves.  Additionally, I have testified in the Court of Federal claims

18   as an expert for the Department of Justice on numerous occasions related to reserves

19   and provisions and the proper timing of when a provision or reserve should be

20   recorded.  I am the only accounting expert retained in this case.

21       309.   Ms. Zhu's Witness Declaration, if true, is troubling because it suggests

22   that TCL may have misstated its financial statements and as a result violated GAAP

23   accounting principles.  In this context, GAAP is meant to be defined as Generally

24   Accepted Accounting Principles a term used in TCL's accounting records.[263]

25   Technically, TCL financial statements are presented according to Hong Kong

26   Financial Reporting Standards ("HKFRS") which is often referred to as HK GAAP

27   (and is referred to HK GAAP in TCL's records) and are compliant with the

28

---

[263] TCL 2014 Annual Report, Exhibit 1140, p. 80.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    International Financial Reporting Standards ("IFRS").  The distinction does not make

2    a difference to my conclusion and I simply use the term GAAP.  Specifically, GAAP

3    requires the matching of expenses (royalty expense accruals) with revenues (mobile

4    phone revenues) to avoid overstating profits and misleading investors.  This is a

5    fundamental tenet of accounting standards worldwide.

6         310.   As I explained in my opening witness declaration, GAAP requires a

7    company to make a current provision (record a cost) for a future expense if it can

8    estimate the amount of a future expense. Specifically, TCL acknowledges this

9    requirement through a disclosure in the TCL audited financial statements for 2015:

10            A provision is recognised when a present obligation (legal or

11            constructive) has arisen as a result of a past event and it is probable that a

12            future outflow of resources will be required to settle the obligation,

13            provided that a reliable estimate can be made of the amount of the

14            obligation.[264]

15        311.   The purpose behind making a provision is to ensure that companies

16    accurately report the costs associated with reported revenues and prevent an

17    overstatement of profits and an understatement of liabilities.  A company that fails to

18    make a provision for an anticipated future royalty expense is under-reporting its

19    liabilities and over-reporting its current profits.

20        312.   It makes perfect sense for TCL to make an IPR provision.  TCL is well

21    aware that Ericsson (among others) was seeking a license for use of its SEPs.  Nearly

22    all TCL phones sold required an Ericsson SEP license.  TCL had taken a license to

23    Ericsson's SEP's in the past. Thus, to properly estimate the costs of each phone, TCL

24    would need to estimate anticipated IPR expenses.  Of course, under generally accepted

25    accounting principles, TCL had significant discretion to determine what would

26    constitute an appropriate IPR provision.  As stated in the TCL annual report, TCL

27

28

---

[264] TCL 2015 Annual Report, Exhibit 4869, at p. 125.

-138-

1    only had to record what it believed was a "reliable estimate."[265] Clearly, based on the

2    detailed offers and counter offers between TCL and Ericsson and the detailed

3    calculations prepared by TCL and recorded throughout the year, TCL was able to

4    make a reliable estimate of the future obligation.

5         313.   Ms. Zhu's deposition testimony was consistent with GAAP and showed

6    that TCL made a good faith effort to comply with it:  (i) TCL believed it would need

7    to pay Ericsson (and others) royalties; (ii) TCL's senior management estimated what

8    those royalties would be; and (iii) TCL's accounting department included the IPR

9    provision in the audited financial statements.  In this way, the TCL shareholders

10   would know that the reported profit margins reflected management's belief about all

11   anticipated expenses.  TCL financial statements could only be compliant with GAAP

12   if the reserves recorded by TCL (and reviewed by its independent auditors) were

13   deemed by TCL management to be reasonable.

14        314.   In contrast, Ms. Zhu's Witness Declaration testimony suggests that

15   TCL's management ignored GAAP rules:  (i) TCL did believe that TCL would need

16   to pay Ericsson (and others) royalties; (ii) TCL's senior management did estimate

17   what those royalties would be; and (iii) TCL's accounting department did not include

18   those estimates in the audited financial statements.  Thus, TCL shareholders would be

19   completely unaware that TCL's management believed that the reported profit margins

20   did not account for all anticipated expenses.  Similarly, industry analysts relying on

21   TCL's audited financial reports would be completely unaware of TCL's true financial

22   conditions when making BUY/HOLD/SELL recommendations.[266]

23        315.   If in fact TCL failed to make an IPR provision, then TCL could have

24   been filing misleading financial statements and ultimately misleading its investors.

25   Effectively, TCL would be reporting profit margins that TCL's management knew

26   were not accurate because they estimated that TCL would need to pay royalties in the

27

28   _____
     [265] TCL 2015 Annual Report, Exhibit 4869, at p. 125.
     [266] Exhibit 1110; Exhibit 1132; Exhibit 1133.

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    future.

2        316.   I find this is incredibly unlikely given that E&Y audited TCL's financial

3    reports and specifically asked questions about the IPR Provision.  Auditors are always

4    very interested in provisions because they can have such an impact on the bottom line.

5    No auditor wants to sign off on an audit of a company's financial statement that is

6    knowingly underreporting expenses.

7        **D.    Conclusion.**

8        317.   As a CPA with significant experience auditing financial statements,

9    determining appropriate reserves and the appropriate timing of recording reserves, I

10   stand by my original conclusion.  Specifically, based on my review of TCL's detailed

11   accounting documents, TCL's audited financial statements, my understanding and

12   experience applying  GAAP to reserves and provisions, and Ms. Zhu's deposition

13   testimony, I conclude that TCL estimates IPR payments to non-licensees such as

14   Ericsson and includes that estimate in its audited financial statements.

15       318.   I also stand by my ultimate conclusion—TCL's profit margins do not

16   matter in determining a FRAND rate for Ericsson's SEPs.  Ericsson is entitled to a

17   reasonable royalty even if TCL cannot turn a profit.

18   **XI.   NEW EXHIBITS**

19       319.   I have prepared new exhibits to respond to new arguments brought by

20   TCL and its experts.  In their respective witness statements, Dr. Leonard and Dr.

21   Lynde raise new arguments and bring new analyses that were not part of their original

22   reports, but were added in the later reports.  I have responded to these new arguments

23   in this rebuttal testimony by witness declaration.  For support, I have made new

24   calculations that are now exhibits. In addition, TCL provided its contentions on what a

25   maximum royalty rate would be in the parties' proposed Joint Pre-Trial order. I have

26   calculated the effect of those contentions.

27

28

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

320.   My new exhibits are Kennedy Rebuttal Declaration Exhibit R1 through Exhibit R8. They can be found at Exhibit 5540; Exhibit 5541; Exhibit 5542; Exhibit 5543; Exhibit 5544; Exhibit 5545; Exhibit 5546; Exhibit 5547; Exhibit 5548; Exhibit 5549; Exhibit 5550.

Executed on January 27, 2017 at Bondurant, Wyoming.

David Kennedy

## XII.   TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 23 | 10/08/2001 - Qualcomm/TCL License |
| 27 | Email from M. Magnusson to G. Brismark, subject: "Concluding IPM for 2013," dated 12/6/13 re Magnusson annual review |
| 35 | ZTE business case spreadsheet |
| 56 | License Agreement between Ericsson and Research In Motion Limited dated 1/1/11 |
| 131 | Ericsson's Supplemental Responses to Plaintiff TCL's Interrogatory Nos. 2, 3, 7, 9-11, 13, 17, 22, 24, and 32 dated 3/10/16 |
| 136 | Email from K. Alfalahi to R. Tu dated 7/28/12, subject: "20120727 Ericsson TCL GPLA" re setting up meeting to discussing licensing and enclosing draft license agreement (attached) ("Offer 6") |
| 142 | TCL spreadsheet providing sales by standard and revenue summary from 07Q1-15Q4 |
| 199 | License Agreement between LG Electronics and Ericsson dated 6/27/14 |
| 234 | ETSI IPR Policy, 1994 |
| 257 | License Agreement between Apple and Ericsson dated 1/14/08 |
| 258 | License Agreement between Apple and Ericsson dated 12/19/15 |
| 259 | Apple business case |
| 287 | 1/24/2014 E-mail from H. Au to P. Arvidsson and K. Alfalahi RE: (Ericsson): contact change |
| 335 | Technological Forecasting & Social Change 79 (2012) 1192-1216 publication titled "Knowledge Positions in High-Tech Markets: Trajectories, Standards, Strategies and True Innovators," by R. Bekkers, 2/15/12 |
| 489 | Correspondence from Samsung to Ericsson dated 5/31/13 re settlement and further license negotiations |
| 518 | TCL 2014 Annual Report |
| 519 | TCL Spreadsheet titled "2014 Dec. GP Reconciliation" |
| 521 | TCL spreadsheet titled "IPR movement (2015H1)" |
| 522 | TCL spreadsheet titled "Accrued Account in 2014 – HK10" |

REBUTTAL WITNESS DECLARATION OF DAVID KENNEDY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| Exhibit | Description |
|---------|-------------|
| 524 | TCL spreadsheet titled "IPR ratio for standard cost 15Q2 (v0318)"," Tab: 15Q1 |
| 525 | TCL spreadsheet titled "IPR ratio for standard cost 15Q2 (v0318)" Tab:  changes |
| 527 | TCL spreadsheet titled "IPR Reconciliation Dec 14_4 Jan," Tab: Movement |
| 529 | TCL spreadsheet titled "IPR Reconciliation Dec 14_4 Jan," Tab: Aging by suppliers |
| 530 | TCL spreadsheet titled "IPR Reconciliation Dec 14_4 Jan," Tab: Ericsson |
| 531 | 5/29/2015 Email from N. Wong to T. Liu, et al. RE: "NEW IPR Provision," with spreadsheet attachment |
| 535 | TCL spreadsheet titled "201512 Billing for IPR (20160103)," sheet: SAP Info., |
| 536 | TCL spreadsheet titled "201512 Billing for IPR (20160103)," excerpts of sheets: Dec.'15 Billing |
| 537 | TCL spreadsheet titled "IPR Reconciliation Dec'15 (3 Jan 15)," sheet: FR rate |
| 540 | TCL spreadsheet titled "201512 Billing for IPR (20160103)," sheet: SC VS FR |
| 1000 | IDC Worldwide Mobile Phone Tracker 2016Q2 Historical Release |
| 1019 | TCL 2013 annual report |
| 1023 | TCL 2007 annual report |
| 1029 | Report titled "Standards Leadership within the 3GPP," by ABI Research, dated 6/19/13 |
| 1063 | Royalty Rates for Telecommunications publication titled "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunications Standards," E. Stasik, Sep. 2010 |
| 1110 | TCL Communication Tech. Valuation, prepared by Nomura, dated 10/21/15 |
| 1116 | Appendix C to Supplemental Expert Report of Dr. Gregory K. Leonard   (EIC Rankings) |
| 1119 | Exhibit 3a-d to Supplemental Expert Report of G. Leonard |
| 1132 | CIMB publication titled "TCL: Growth in a Highly Competitive Market," 10/20/15 |

| Exhibit | Description |
|---------|-------------|
| 1133 | BNP Paribas Securities publication titled "Execution in Focus During Downturn" providing TCL Communication stock data and financial information as of 10/21/15 |
| 1139 | Spreadsheet titled "IDC WW Quarterly Mobile Phone Tracker, 2015 Q2 Historical Release," dated 8/7/15 |
| 1140 | TCL 2014 annual report |
| 1194 | License Agreement between ZTE and Ericsson dated 4/1/14 |
| 1196 | ZTE business case spreadsheet (China) |
| 1200 | Amendment to license agreement between ZTE and Ericsson dated 10/1/15 |
| 1201 | Schedule 1A titled "TCL Worldwide Annual Mobile Phone Unit Sales by Technology (Based on IDC Sales Data), 2009 – 2015," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1229 | Schedule 11A titled "Effective Two-Way Royalty Rates Based on 2015 IDC Sales Data and Royalty Payments," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1230 | Schedule 11B titled "Per Unit Royalty Rates Based on 2015 IDC Sales Data and Huawei Tribunal Determined Rates," Expert Report of Matthew R. Lynde, submitted February 22, 2016 [Redacted] |
| 1231 | Schedule 11C.1 titled "HTC Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1232 | Schedule 11C.2 entitled: "HTC Effective One-Way Royalty Rate Calculation (Based on business case Projections)," Expert Report of Matthew R. Lynde, submitted February 22, 2016 |
| 1235 | Updated Schedule 11D.1 titled "Samsung Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1236 | Updated Schedule 11D.2 titled "Samsung Effective One-Way Royalty Rate Calculation (Based on High business case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |

| Exhibit | Description |
|---------|-------------|
| 1239 | Second Updated Schedule 11E titled "Estimated Number of Essential Infrastructure Patent Families," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1240 | Updated Schedule 11F.1 titled "Apple Effective One-Way LTE Royalty Rate Calculation (Based on business case Projections)," Supplemental Expert Report of Matthew R. Lynde, submitted June 13, 2016 |
| 1245 | Rebuttal Schedule 4A.1 entitled: "LG Effective One-Way Royalty Rate Calculation (Based on IDC Sales Data)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1247 | Rebuttal Schedule 4B.1 entitled: "LG Effective One-Way Royalty Rate Calculation (Based on business case Projections)," Rebuttal Expert Report of Matthew R. Lynde, submitted November 4, 2016 |
| 1276 | License Agreement  between Samsung and Ericsson dated 2/1/14 |
| 4002 | 10/01/2003 Ericsson/Sharp License |
| 4023 | ZTE Final Business Case (2014) |
| 4040 | 7/1/2016 Ericsson/ZTE License |
| 4044 | ZTE Business Case (2016) NATIVE VERSION |
| 4069 | Final Business Case for Ericsson/LG License (2014) NATIVE VERSION |
| 4658 | 10/31/2005 - Ericsson/Sharp License Amendment No. 1 |
| 4659 | 12/1/2009 - Ericsson/Sharp License Amendment No. 2 |
| 4660 | 1/1/2011 - Ericsson/Sharp License Amendment No. 3 |
| 4817 | "Qualcomm, Press Release, Qualcomm and ZTE Sign New 3G/4G License (Nov. 2, 2015) |
| 4818 | "Qualcomm, Press Release, Qualcomm and Huizhou TCL Mobile Communication Co. Sign New 3G/4G Chinese Patent License Agreement (Nov. 5, 2015) |
| 4819 | " Qualcomm, Press Release, Qualcomm and QiKu Sign 3G/4G Chinese Patent License Agreement (Dec. 28, 2015) |
| 4820 | "Qualcomm, Press Release, Qualcomm and Lenovo Sign 3G/4G Chinese Patent License Agreement (Feb. 18, 2016) |
| 4856 | "Qualcomm, Press Release, Qualcomm and Xiaomi Sign 3G/4G License Agreement (Dec. 2, 2015) |

| Exhibit | Description |
|---|---|
| 4866 | Qualcomm, Press Release, Qualcomm Signs 3G/4G Chinese Patent License Agreement with Yulong (Apr. 18, 2016) |
| 4869 | TCL Annual Report 2015 |
| 4874 | "11/03/2014 - Email from S. Mou to L. Zoe et al RE Oct.'14 IPR Entry |
| 4881 | 9/18/2007 Motorola/T&A Mobile Phones License |
| 4885 | 9/10/2007  - Settlement Agreement between  Siemens Aktiengesellschaft and TCT Mobile Limited |
| 4886 | 3/7/2011 - Fax from TCL to Qualcomm re: License Renewal |
| 4887 | 5/5/2005 - Amendment to Qualcomm/TCL License |
| 4889 | 4/5/2015 - Email from T. Liu to G. Guo RE flash report of Mar. 2015, with attachment Copy of IPR Reconciliation Mar'15.xlsx |
| 4893 | "02/04/2015 - Email from T. Liu to G. Guo RE Flash report of Jan. 2015, with attachment TCT Financial Result 2005 to 2015 Jan_20150204 |
| 4894 | "07/20/2015 - Email from N. Wong to J. Zhu RE EY Audit0 IPR Movement, with attachment IPR movement (2015H1) |
| 4897 | 1/1/2015 - QUALCOMM/Huizhou TCL Mobile Communication License |
| 4899 | "01/03/2016 - Email from N. Wong to J. Wang and J. Zhu RE IPR Reconciliation ~ Dec 15, with attachment IPR Reconciliation Dec'15 (3 Jan 15) |
| 4902 | 09/00/2010 - E. Stasik, Royalty Rates and Licensing Strategies For Essential Patents on LTE (4G) Telecommunication Standards (Sept. 2010) |
| 4929 | Final Business Case for Ericsson/HTC License (2014) NATIVE VERSION |
| 4930 | 12/15/2008 - Ericsson/HTC License |
| 4935 | Final Business Case for Ericsson/Sharp License (2015) NATIVE VERSION |
| 4936 | Final Business Case for Ericsson/Samsung License (2014) NATIVE VERSION |
| 4953 | "4/21/2015 - Email from N. Wong to J. Zhu RE Emailing IPR Meeting, with attachment IPR Meeting.pptx |
| 5251 | J. Gregory Sidak, "The Meaning of FRAND, Part II, Injunctions", Journal. of Competition Law & Economics (2015) 11(1):201-269 |

| Exhibit | Description |
|---------|-------------|
| 5268 | Edward Gold, "Exploring the Non-discriminatory Aspect of RAND Licensing Terms," SRR Global Financial Advisory Services, Fall 2014 |
| 5295 | 04/4/2016 - Ericsson, Inc.'s Intellectual Property Income Valuation Model (Pellegrino Exhibit) |
| 5305 | 12/15/2016 - BlackBerry Gives China's TCL Rights to Use Its Brand on Phones |
| 5312 | Kennedy Exhibit 2.1, 2.2 |
| 5314 | Kennedy Exhibit 3.1 |
| 5316 | Kennedy Exhibit 3.3 |
| 5317 | Kennedy Exhibit 3.4 |
| 5325 | Kennedy Exhibit 5.3 |
| 5326 | Kennedy Exhibit 5.4 |
| 5327 | Kennedy Exhibit 5.5 |
| 5329 | Kennedy Exhibit 6.3 |
| 5330 | Kennedy Supp. Exhibit 1, 2 |
| 5540 | Kennedy Rebuttal Declaration Exhibit R1 |
| 5541 | Kennedy Rebuttal Declaration Exhibit R2.1 |
| 5542 | Kennedy Rebuttal Declaration Exhibit R2.2 |
| 5543 | Kennedy Rebuttal Declaration Exhibit R2.3 |
| 5544 | Kennedy Rebuttal Declaration Exhibit R2.4 |
| 5545 | Kennedy Rebuttal Declaration Exhibit R3 |
| 5546 | Kennedy Rebuttal Declaration Exhibit R4 |
| 5547 | Kennedy Rebuttal Declaration Exhibit R5 |
| 5548 | Kennedy Rebuttal Declaration Exhibit R6 |
| 5549 | Kennedy Rebuttal Declaration Exhibit R7 |
| 5550 | Kennedy Rebuttal Declaration Exhibit R2.5 |

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 27, 2017, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.


Dated:  January 27, 2017                **CROWELL & MORING LLP**

                                        */s/ John S. Gibson*

                                        John S. Gibson

                                        Attorneys for ERICSSON INC. AND
                                        TELEFONAKTIEBOLAGET LM
                                        ERICSSON