CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | Case No. 8:14-CV-00341 JVS-DFMx<br>Case No. 2:15-CV-02370 JVS-DFMx |
| Plaintiffs/Counterclaim-Defendants, | **WITNESS DECLARATION OF KEITH MALLINSON** |
| v. | Hon. James V. Selna |
| TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, | **Discovery Cut-off:** May 23, 2016 |
| Defendants/Counterclaim-Plaintiffs. | **Pretrial Conference:** January 30, 2017 at 11:00 a.m. |
| ERICSSON INC., *et al.*, | **Trial:** February 14, 2017 at 8:30 a.m. |
| Plaintiffs/Counterclaim-Defendants, | |
| v. | |
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | |
| Defendants/Counterclaim-Plaintiffs. | |

1

## TABLE OF CONTENTS

2

3    I.     EXECUTIVE SUMMARY ................................................................ 1

4    II.    EXPERT QUALIFICATIONS ....................................................... 4

5    III.   SCOPE OF ENGAGEMENT AND MATERIALS
6           CONSIDERED ............................................................................... 6

7    IV.    METHODS FOR ESTIMATING AND COMPARING
8           STANDARD-ESSENTIAL PATENT PORTFOLIO
            STRENGTH ................................................................................... 7
9
10          A.    Patent Counting ................................................................. 10

11                1.    Patent Counting Is A Methodology For
                        Estimating Standard-Essential Patent
12                      Portfolio Strength .................................................... 10

13                2.    Patent Counting Is Not Reliable. ............................ 12

14
15                3.    Even When Coupled With Additional
                        Technical Analysis, Patent Counting Is Not
16                      Reliable. ................................................................... 13

17                4.    Patent-Counting Studies Are Highly
18                      Subjective And Inconsistent With Each
                        Other. ....................................................................... 17
19
20                5.    TCL's Patent-Counting Studies
                        Commissioned For This Litigation Are
21                      Wildly Inconsistent. ................................................ 27

22          B.    Approved Contribution Counting. ..................................... 30

23                1.    Approved Contribution Counting Is A
24                      Methodology For Estimating Standard-
                        Essential Patent Portfolio Strength. ....................... 31
25
26                2.    The Signals Reports. ................................................ 32

27                3.    The ABI Reports. ...................................................... 37

28

4.     Advantages of Approved Contribution
Counting Over Patent Counting As
Methodology For Estimating Standard
Essential Patent Portfolio Strength. ...........................................38

V.     THE ESSENTIALITY ANALYSIS PERFORMED BY
CONCUR IP IS UNRELIABLE ...................................................41

VI.    CONCLUSION ........................................................................44

TABLE OF EXHIBITS ...........................................................................46

1   My name is Keith Mallinson. I have been retained by Telefonaktiebolaget
2   LM Ericsson and Ericsson Inc. (together, Ericsson) as an expert witness in this
3   litigation. I have personal knowledge of the facts set forth in this Declaration, and
4   declare under penalty of perjury and the laws of the United States of America that
5   they are true and correct.

6   **I.    EXECUTIVE SUMMARY**

7       1.    I have been asked to offer my expert opinion regarding various
8   methodologies for estimating and comparing the standard-essential patent portfolio
9   strength (i.e. portfolio value) of companies who own patents essential to the 2G,
10  3G, and 4G cellular standards based on publicly available information, and
11  regarding the reliability of patent essentiality analysis commissioned by TCL.

12      2.    <u>First</u>, I analyzed three different methods of evaluating patent portfolio
13  strength based on publicly available information: (i) counting patents identified in
14  IPR licensing declarations submitted to the European Telecommunications
15  Standardization Institute, known as "ETSI"; (ii) counting patents identified in IPR
16  licensing declarations that have been submitted to ETSI, combined with additional
17  technical analysis aimed at further estimating patent portfolio strength; and (iii)
18  counting approved contributions to ongoing standardization efforts within the
19  industry consortium known as the Third Generation Partnership Project or "3GPP."
20  Of these three methods, I have concluded that the third method, "approved
21  contribution counting." is the superior methodology for estimating and comparing
22  standard-essential patent portfolio strength.   The best method of estimating
23  portfolio strength is a fourth method not listed above, which relies on an analysis of
24  non-pubic information (standard-essential patent licenses). I understand that another
25  Ericsson expert, Mr. Kennedy, performs a license analysis.

26      3.    The first two methodologies identified above—two variations on
27  "patent counting"—are poor methods for estimating and comparing standard-
28  essential patent portfolio strength. This is because there are strong incentives for

industry members to over-declare patents to ETSI, because ETSI does not evaluate the technical merits of declared patents and patent applications, and because there is no mechanism to police the declaration process to prevent abuse by over-declaration. Further, declarations are commonly made before a patent has issued, which means that the declarant cannot know whether the issued patent is "essential" at the time the declaration is made. Adding a technical analysis (or "essentiality analysis") component to a patent-counting study does not fix these deficiencies and render it reliable because such analyses are highly subjective and cost-prohibitive. Even the modest essentiality analysis undertaken for a cellular technology patent pool can typically cost $10,000 per patent. The cost of an extensive evaluation is estimated to exceed $23,000 per patent and often many times more.

4.      The weaknesses of patent counting are highlighted in this case by a comparison of the "essentiality analysis" component of the patent-counting studies undertaken by TCL's experts Dr. Ding and Dr. Kakaes. Although the two experts claim to have coordinated with one another, in the instances where they each reviewed the same Ericsson patent for essentiality, they arrived at opposite conclusions on 29% of the same patents assessed.

**Figure 1: Disagreement Between Ding and Kakaes Results**



WITNESS DECLARATION OF KEITH MALLINSON; CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

5.     Approved contribution counting, in contrast to patent counting, is impartial, consistent, and can be independently reproduced and verified. In this context, a "contribution" improves technical capabilities or solves problems, which one or more participants in standardization contribute to a working group within 3GPP. A contribution is "approved" when the working group reaches consensus that the contribution is the best technical solution, and incorporates the contribution into the developing standard. A company's number of approved contributions is therefore a good and objective proxy for its inventive strength.

6.     Approved contribution counting is superior to patent counting in several ways, but this is an indirect method of assessing relative values of patent portfolio strength. As is commonly the case with patent-counting methods, it does not reflect changes to patent portfolios due to patent transfers or patent expiration. Undoubtedly some contributions are more valuable than others, yet they are counted in the same way.

7.     <u>Second</u>, I evaluated the results of an essentiality analysis performed by employees of Concur IP, under the supervision of Dr. Ding and Dr. Kakaes. I concluded that the essentiality analysis performed by Concur IP is unreliable and should be disregarded because it suffers from the same weaknesses as patent-counting studies generally, as noted above. Critically, the Concur IP team invested only about $100 or 45 minutes on average to evaluate each patent family for essentiality, which, as seen in Figure 2 below, is a tiny fraction of what other institutions would charge for the essentiality analysis of a patent. Because cost is a good proxy for the time devoted to and quality of the analysis at issue, and because of the subjectivity in analysis regardless of cost and time spent, I conclude that Concur IP's analysis should be disregarded.

1

**Figure 2:  Cost Of Evaluating Essentiality**



2

3

4

5

6

7

8

9

10

11

12  **II.   EXPERT QUALIFICATIONS**

13  8.   I am the founder of WiseHarbor, a consulting firm that provides

14  commercial advisory support to technology and services companies, including

15  companies in the telecommunications industry. I have an undergraduate electronic

16  engineering degree from London University's Imperial College and an MBA from

17  the London Business School, including an academic exchange with Northwestern

18  University's Kellogg Graduate School of Management in Illinois. During my

19  highly-quantitative undergraduate and graduate studies, I completed several courses

20  in statistics and econometrics.  During my general MBA, I selected and completed

21  several courses that applied statistical techniques including linear regression,

22  correlation analysis and confidence level testing.

23  9.   I have 30 years of experience in the telecommunications industry, as a

24  research analyst, commercial consultant and testifying expert witness. I have

25  advised telecommunications clients on a broad range of issues, including existing

26  and emerging technologies, market analysis, regulation, economics, and finance. As

27  a business analyst, I utilize various statistical techniques and regressions to provide

28  insight and advice. I have published numerous reports, speak regularly at industry

events on a wide variety of topics including next generation broadband network technology adoption, fixed mobile convergence, semiconductor technologies, telecom and IT standards, and patent licensing. I contribute regularly to industry publications including FierceWireless, FierceWireless Europe, RCR Wireless and IP Finance. I have published articles for industry organizations, including 3GPP. On occasion, my publications include my own original numerical analysis using techniques such as linear regression. I have been retained as a testifying expert witness on multiple occasions, and have testified as an expert in United States District Courts in several proceedings. My expert testimony included applying financial, economic and statistical techniques such as discounted cash flow analysis and linear regression to provide insight into and opinion on various issues.

10.    My experience includes my tenure with the Yankee Group, a research and advisory firm specializing in research and analytics concerning mobile phone technologies, usage, marketing, sales, and industry strategies.  From 2000 to 2006, I was an Executive Vice President of Yankee Group, leading its global wireless/mobile research and consulting team, while also responsible for consumer electronics, media/entertainment and enterprise communications practices. I served as Yankee Group's Managing Director of its European division, based in London, from 1995 until 2000.  Prior to that, I was the Yankee Group's European Research Director.

11.    I have worked with and consulted for patent pool administrators extensively for nearly a decade, as part of my broader focus on the licensing of standard-essential patents. For example, I have been retained by a patent pool administrator to undertake custom consulting assignments since 2009. Since 2011 in my articles for IP Finance and elsewhere, I have published various pieces of analysis on licensing for standard essential patents including portfolios under various arrangements. I speak regularly with academics and companies in the telecommunications industry to keep abreast of market developments relevant to

1    my work as a trade press columnist, consultant and expert.

2    **III.    SCOPE OF ENGAGEMENT AND MATERIALS CONSIDERED**

3    12.    I was engaged by counsel for Ericsson to consider and respond to

4 certain opinions expressed in the opening expert reports of TCL's experts Dr.

5 Bekkers, Dr. Lynde, Dr. Leonard, Dr. Ding, and Dr. Kakaes, specifically about

6 methodologies for estimating standard-essential patent portfolio strength, the "just

7 in time patenting" theory advocated by Dr. Bekkers, and the use of patent pool

8 licensing rates as benchmarks for bilateral licensing rates. I understand that TCL

9 recently represented that it will not present its expert opinions relating to the use of

10 patent pool licensing rates as benchmarks for bilateral licensing rates at trial. I will

11 address some of these topics, if raised, in a rebuttal witness statement. I have not

12 been engaged to offer opinions regarding the essentiality, infringement, or validity

13 of any patent.

14    13.    For my time spent working on this matter, Wiseharbor LLP is being

15 compensated at my customary hourly rate of $850. My compensation in no way

16 depends on the outcome of this litigation. I anticipate providing additional

17 testimony in a rebuttal declaration later in January 2017, and at the trial of this

18 matter in February 2017.

19    14.    In reaching my conclusions set forth in this Declaration, I relied upon

20 my education and professional experience over three decades in the

21 telecommunications industry, including my extensive experience with the portfolio

22 licensing of standard-essential patents over the past decade. I also considered

23 materials produced in discovery in this matter, including approved contribution

24 counting studies conducted by Signals Research and ABI Research, patent-counting

25 studies conducted by various third-party entities, market research reports and

26 studies related to standard-essential patents, materials related to the Via Licensing

27 patent pool, court decisions, and testimony from a prior proceeding by Ericsson

28 witness Mats Sågfors. I further considered the expert opinions disclosed by Dr. Zhi

Ding, Dr. Apostolos Kakaes, Dr. Matthew Lynde, and Mr. Luke McLeroy, and deposition testimony provided in this litigation by Mr. Sachin Sinha and Dr. Lynde.

## IV.   METHODS FOR ESTIMATING AND COMPARING STANDARD-ESSENTIAL PATENT PORTFOLIO STRENGTH

15.    Bilateral patent licensing negotiations between technically and commercially sophisticated parties typically and justifiably include discussion of a variety of different ways of evaluating and comparing patent portfolio strength and value. To enable prospective licensees to assess the technical merit of standard-essential patent portfolios during negotiations, standard-essential patent owners may provide prospective licensees with lists of representative patent families that the company has determined are essential for a mobile device to comply with the 2G, 3G, and 4G standards, as well as representative claim charts. The potential licensee evaluates the patent owner's representative patents and claim charts (and vice versa, where both sides are standard-essential patent owners) and forms opinions regarding the merits of the patent owner's patented technology within the overall standard. These opinions inform the parties' ultimate agreement on what constitutes fair, reasonable and non-discriminatory (FRAND) terms and conditions for a license.

16.    I understand that, in addition to representative patent lists and claim charts, negotiating parties may also exchange and consider third-party studies that estimate standard-essential patent ownership and patent strength for these among companies who contribute technology to the cellular standards. In my experience, these studies are based on: (i) declared patent counts, judged-essential patent counts, individual patent strength determinations (i.e. "patent-counting" methodologies), or (ii) counts of approved contributions to the standards (i.e. the "approved contribution counting" methodology).

17.    TCL's expert. Dr. Bekkers refers to several patent-counting studies in his opening expert report. These studies, which I have analyzed, are summarized in

Figure 3 below:

**Figure 3:  Summary of Patent-Counting Studies Cited By Dr. Bekkers**

| Study | Universe Of IPRs Considered In Study | IPRs Subject To Technical Analysis | Metric Applied In Analysis | Publication Date |
|---|---|---|---|---|
| **Cyber 1**[1] | 2,999 families of declared patents and patent applications | 1,147 patents evaluated | "Really essential" | Dec-2011 |
| **Cyber 2**[2] | 5,013 declared patents or patent families | 1,601 patents evaluated | "Truly essential" | Oct-2012 |
| **Cyber 3**[3] | 5,919 declared patents or patent families (filed or issued patents only) | 2,129 patents evaluated | "Truly essential" | Jun-2013 |
| **Article One**[4] | 3,116 declared patents and patent applications | All 3,116 were reviewed | "Highly-essential and highly novel" | 2012 |
| **Jefferies**[5] | 1,400 patents "related to LTE" screened from among tens of thousands | 1,400 patents | "Essential" | Sep-2011 |

---

[1] Cyber Creative Institute Co. Ltd., *Evaluation of LTE essential patents declared to ETSI*, (Dec. 2011), Exhibit 1040.

[2] Cyber Creative Institute Co. Ltd., *Evaluation of LTE essential patents declared to ETSI*, (Oct. 2012), Exhibit 1041.

[3] Cyber Creative Institute Co. Ltd., *Evaluation of LTE essential patents declared to ETSI*, (June 2013), Exhibit 1035.

[4] Article One Partners, *LTE Standard Essential Patents Now and in the Future* (2012), Exhibit 1175.

[5] Jefferies, *Research in Motion* Evaluation (Sept. 2011), Exhibit 1044.

| Study | Universe Of IPRs Considered In Study | IPRs Subject To Technical Analysis | Metric Applied In Analysis | Publication Date |
|---|---|---|---|---|
| iRunway[6] | 4,599 4G-LTE declared patents | 22 parameters including infringement detectability and dependent claims, technology activity rate, backward and forward references, age of patent etc. | "Seminal" | 2012 |
| Fairfield[7] | 210 families with at least one US, EP or Japanese declared patent from among 1,115 declared patents and patent applications | | "Essential/ probably essential" | 2009/ 2010 |

In addition, TCL's expert, Dr. Ding, conducted a patent-counting assessment as part of this litigation. Dr. Ding's patent-counting assessment shares many of the same characteristics, including weaknesses, as the published patent-counting studies listed in Figure 3 above.

18. As I will now discuss, patent-counting studies (including Dr. Ding's patent-counting assessment) are subjective, open to bias, and set forth results that are not reproducible by different assessors. Patent counting also requires technical analysis that is cost prohibitive with large numbers of patents. Approved contribution counting is superior to patent counting in several ways because approved contribution counting is objective, able to be independently and cheaply reproduced using automated data processing by computer, and derived from

---

[6] iRunway, Patent & Landscape Analysis of 4G-LTE Technology (2012), Exhibit 1036.

[7] Fairfield Resources, Review of Patents Declared as Essential to LTE and SAE (4G Wireless Standards) Through June 30, 2009 (Jan. 2010), Exhibit 1042, TCL_ERIC_CDCA1120927.

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

consensus decisions made by engineers working within 3GPP.

## A. Patent Counting

### 1. Patent Counting Is A Methodology For Estimating Standard-Essential Patent Portfolio Strength.

19.    The ETSI Intellectual Property Rights (IPR) database is publicly available and searchable on ETSI's website, and contains tens of thousands of IPRs (patents and patent applications) declared by companies who believe these are, or may become, essential to the standards promulgated by ETSI. Parties who engage in patent counting for the cellular standards use declarations found in the ETSI IPR database to count the number of patents that ETSI members and other companies have "declared" as potentially essential to the implementation of a specific standard or standards. An entity engaged in patent counting may then supplement its raw counts of declared patents with its own technical evaluation of the declared patents, which might take the form of an analysis into whether the counted declared patents are "seminal" or "highly essential and highly novel," or an analysis into patent "importance" or "contribution" to the standard at issue.

20.    By searching declaration data obtained from the ETSI IPR database, it is possible to sort patents and patent applications by company that declared them (possibly) standard essential, the country or countries where the patent application was filed, the date the patent was declared to ETSI, the application and publication number of the patent (if available), and the technology that the patent is declared for (e.g. LTE, WCDMA, EDGE, GPRS, GSM). The process can finish there,[8] or, as is the case with the studies that I discuss below, further analysis intended to judge essentiality and/or technical value can be undertaken. For example, a study by the

---

[8] *See, e.g. WiFi Hotspot Market Stages Revival in 2009*, Microwave Journal (January 2010), Exhibit 1039, at 667 (reporting the results of an ABI Research study counting declarations to the ETSI IPR database of patents that were deemed possibly essential to the LTE standard).

consulting firm iRunway study counts what it calls "seminal" 4G LTE patents.[9]

21.     The individuals who conduct these assessments typically undertake to evaluate the declared patents for various attributes, including whether any of the pending or granted claims of the declared patents map to the relevant 2G, 3G, or 4G standards, and may spend from less than an hour to rather more time analyzing each patent or application. Whereas in a typical license negotiation the patent holder would present a claim chart illustrating the proposed mapping of patent claims to the standard, these studies require the individual reviewing the patent to not only interpret the claims of the patent, but also determine the section of the standard that the claims may cover, and then consider how well the claims map to the particular section(s) of the standard. That can be a complex task that is impossible to complete satisfactorily in less than an hour. Certain studies may take additional steps or analyze other factors purportedly determining patent strength, such as whether the patents are "seminal" or "highly essential" or "highly novel," although these steps are less prevalent, more varied and even more ambiguous than essentiality analysis which is the common and defining factor. Ambiguities about essentiality include how optional and obsolete features in the standard are regarded. Notwithstanding the significance of validity in determining patent value, validity assessments are rarely, if ever, included in published patent-counting studies.

22.     The next step of a patent-counting study is to compare the results for each company's declared patents relative to other companies. The theory and proposition in portfolio licensing negotiations is that a company with more declared patents and/or patent applications (or more patents and/or patent applications judged to be essential or stronger in the analysis performed) has a more valuable portfolio than companies with fewer and weaker declared patents or patent

---

[9] *See* iRunway, *Patent & Landscape Analysis of 4G-LTE Technology* (2012), Exhibit 1036, TCL_ERIC_CDCA1120983.

1   applications.

2       23.    Importantly, there are significant variations and inconsistencies among

3   the methodologies and evaluation criteria employed in patent-counting studies.

4   Some count patents and others count patent families. Some attempt to count issued

5   patents and pending patent applications, while others only count issued patents.

6   There are arguments for and against each approach. For example, some would

7   regard counting multiple patents in the same family as double, triple, or quadruple,

8   etc. counting. Others take the opposite view because patent claims may vary among

9   patents within the same family. In another example, some argue that having patent

10  protection in more nations increases overall portfolio strength and value, while

11  others take the position that owning patents in certain geographies is what is

12  germane to overall portfolio strength.

13              **2.      Patent Counting Is Not Reliable.**

14      24.    There are structural problems that make patent counting an unreliable

15  method for measuring the strength of a company's essential patent portfolio. ETSI

16  does not police its database of IPR licensing declarations, which means that it is the

17  sole responsibility of the declaring party to decide whether a patent or application

18  needs to be declared or not. Nor does ETSI carry out any check on declarations

19  after the fact, i.e. there is no official mechanism in place to check whether declared

20  patents are or become, in fact, essential. This means that ETSI members may

21  declare marginally relevant – or entirely irrelevant – patents in the belief that it is

22  best to minimize the possibility that any of their undeclared patents might be or

23  become essential. Alternatively, other ETSI members might be anxious not to

24  attract criticism by over-declaring patents or patent applications and thus take a

25  more conservative approach when declaring patents. The key point here is that

26  declaring a patent or patent application to ETSI does not make the patent or patent

27  application essential.

28      25.    Another problem with patent counting is specific to declared patent

applications. A patent application may undergo changes while in prosecution, and the ETSI standards are constantly evolving. So, although a company may believe its patent application discloses an invention that is or may become essential when submitting its declaration for the application to ETSI, the patent that eventually issues from that application may not read on the standard. Or the patent application may never issue at all. Or the relevant portion of the standard could change while the application is pending. This results in a declared patent application that is not essential, but that nevertheless remains a declared IPR in ETSI's on-line database.

### 3. Even When Coupled With Additional Technical Analysis, Patent Counting Is Not Reliable.

26.    To mitigate some of these failings of patent counting set forth above, a party undertaking a patent-counting assessment may attempt to perform a technical analysis of some or all the declared patents or patent applications. This analysis typically would involve an engineer (or team of engineers) that reviews the patents and applications of the declared family, compares them to the relevant standard(s), assesses essentiality, and then possibly filters or rates the patents, patent families, or patent applications based on whether they are "seminal" or "highly essential and highly novel," or on their "importance" or "contribution" to the standard.

27.    While this approach might seem superficially appealing, it is unworkable to perform such an analysis effectively. An extensive essentiality analysis, if sufficient time and competent resources could be found, would be cost prohibitive.  In my experience, properly evaluating a single declared patent to determine whether it is essential to a standard, let alone assessing validity or importance of the patent, would cost many thousands of dollars. Assessing essentiality for even one patent family in the context of an entire standard is an even more time-consuming and costly exercise. When a patent portfolio encompasses many patents from among hundreds or thousands of patents reading on the standard including those owned by other patent holders across multiple national jurisdictions

and in several different languages, a patent-by-patent review is time and cost-prohibitive.  For example, in *Microsoft v. Motorola*, Judge Robart heard from eleven experts over seven days to evaluate just six patent families.[10]

28.     In practice, outside of a court proceeding, there is no certainty of what is technically essential and what is non-essential to a standard. The notion of exhaustively establishing with precision whether each and every patent in a portfolio of hundreds or thousands of patents is essential, let alone assessing the technical or monetary value of those patents, is simply illusory. This is recognized in a study that was commissioned by the European Commission's Directorate-General for Enterprise and Industry (currently known as "DG GROW") in 2014 to support its public consultation on Standards and Patents:[11]

> *One of the problems is that patent disclosures are on the basis of self-declaration.  While many SSOs have rules on what must be disclosed, these rules cannot and do not guarantee that all actual essential patents are on the list or that all listed patents are actually essential. Nor do the databases provide information about the validity of the patents, the scope of the patent or about the ownership of patents. Consequently, it is not always easy for adopters to assess whether they infringe a patent and/or whether the patent is actually enforceable.*

29.     The DG GROW study provides an indication on how costly it can be to assess essentiality and infringement, let alone validity, upon which the strength and value of a standard essential patent significantly depends:[12]

---

[10] *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 U.S. Dist. LEXIS 60233, *16, *82-*83 (W.D. Wash. Apr. 25, 2013).

[11] *Patents and Standards*, Study Commissioned By European Commission's DG GROW (2014), Exhibit 145, at p. 114.

[12] Exhibit 145 at p. 148 (I converted euros converted into U.S. dollars at the exchange rate prevailing at the publication of the report DG GROW commissioned, about 1.14 dollars-to-euro).

1
2
3
4
5
6
7
8
9
10
11
12
13

> *We estimate the following broad range of costs associated with essentiality tests at different confidence levels:*
>
> *(1) Approx. 600-1,800 Euro [$670-$2,000] per patent (1-3 days of work) for a first instance essentiality test performed by the SSO internally, with the confidence level appropriate for patent disclosure obligations at an SSO. (The level is often lower, as a patent in the same patent family will need fewer individual resources and because firms may possess previous information on their patents);*
>
> *(2) Approx. 5,000-15,000 Euro [$5,700-$17,000] per patent for an essentiality test performed by a third party in the context of a patent pool. The lower boundary fee assumes that prior information from the patent is available and only up to three patent claims (selected by the owner) are tested; and*
>
> *(3) Approx. >20,000 Euro [>$23,000] per patent for an extensive essentiality and/or infringement test in the context of a court case, including extensive search for technologies that may constitute alternative solutions." (citation omitted)*

14

15    30.    Reviewers working on these third-party patent-counting studies

16  typically spend, at most, a few hours per patent, which puts these assessments at the

17  low end of low-cost "Category 1," as defined above. For example, in a patent-

18  counting study Fairfield conducted on LTE, it states that evaluations performed by

19  the panel are preliminary technical assessments, based on an average of one hour of

20  analysis per patent.[13] As seen in the excerpt below from the patent study conducted

21  by Fairfield, the study authors note the difference between their essentiality checks

22  and what is entailed in determining patent value in its 2010 patent essentiality study

23  report on LTE:[14]

24

25

26  _____

    [13] *See* Fairfield Resources, *Review of Patents Declared as Essential to LTE and SAE (4G Wireless Standards) Through June 30, 2009* (Jan. 2010), Exhibit 1042, TCL_ERIC_CDCA1120927 at 943 (page 17).

27    [14] Exhibit 1042.

28

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

> *It is also important to address the status of the essentiality data. In practice, the value of a patent depends on several legal and commercial factors. By contrast, the evaluations performed by the panel in this study are preliminary technical assessments, based on an average of one hour of analysis per patent. Determining the scope of a patent and its commercial value, if any, requires several days of effort by lawyers and engineers, and sometimes weeks or months of adjudication by judges and juries.*

To put this in perspective, to complete even a cursory analysis, the analyst must actually read the patent in question and compare it to the sophisticated and detailed standard. An hour is insufficient time to the job properly for the purposes of portfolio valuation for licensing purposes.

31.     Further, the extent to which increased accuracy and reliability might come from spending more time and money on these third-party assessments is untested and, therefore, unproven empirically. In any event, in my experience, it typically would be uneconomic for publishers to spend even as much as is required in "Category 2" (let alone "Category 3" levels) for a large proportion of declared-essential patents.  For example, the third-party studies analyzed over 1,000 declared patents to determine a given company's share of the overall standard.  Assuming a cost of $10,000 per patent (the low-mid-point cost of the "Category 2" review), a review of 1,000 patents would cost $10 million.  A review of 1,000 patent families would cost even more.

32.     In my opinion, ten million dollars (or likely rather more) is cost-prohibitive for the vast majority of, if not all, industry participants.  I worked for many years as practice leader at a leading firm producing multi-client research reports for telecommunications sector clients. On the basis of the addressable market for these patent-counting studies with no more than a dozen or so potential clients willing to pay significantly for these (i.e. no more than tens or low hundreds of thousands of dollars per study in the vast majority of cases), it is my opinion that it would not be possible to justify incurring Category 2 or Category 3 costs (and

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

associated commercial risks as a publisher) in assessing all or even a substantial proportion of the declared patents in a standard such as LTE. This is especially so because essentiality analysis is highly subjective and would not yield uncontestably reliable results even if a study was undertaken much more extensively at a cost of $10,000 per patent or per patent family.

33.    In contrast to the many millions of dollars it would cost to evaluate thousands of patents thoroughly, plus publishing costs, Ericsson paid Signals Research less than $300,000 for approved contributions studies and $1.1 million purchasing dozens of research publications on a wide variety of different topics from ABI Research over several years.

### 4.    Patent-Counting Studies Are Highly Subjective And Inconsistent With Each Other.

34.    Given the weaknesses in patent counting that I have just discussed, it is not surprising that the patent-counting studies that I have reviewed and analyzed have produced wildly divergent results. Assessing essentiality of many patents, and comparing essentiality assessments across patent owners, is simply too costly and burdensome to carry within the time and cost constraints of a typical study performed by a third-party research firm. Moreover, it involves a significant amount of inherent subjectivity and inaccuracy. For instance, in his expert report, Dr. Bekkers notes that one patent-counting study reports that Ericsson has 13.3% share of 4G patents found to be essential or probably essential, while another patent-counting study reports that Ericsson has a 1.97% share of 4G patents found to be essential.  Thus, the two patent-counting studies have conclusions that differ by up to a factor of 6.75.  This wide range of results reveals major shortcomings in patent counting and suggests that the accuracy and reliability of patent counting and any implied measurements of relative patent strength among different standard essential patent portfolios is doubtful.

35.    In 2011, I published a paper describing my comparison of the results

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

of two different patent-counting studies (Fairfield (Study A) and Jefferies (Study B)) and my efforts to determine whether the two studies agreed regarding how many LTE standard essential patents were owned by different companies active in the telecommunications industry.[15]

36.     Specifically, as described in the paper, I statistically evaluated the results of Study A and Study B and published my findings in the IP Finance blog and in the RCR Wireless trade publication in 2011. I ran a linear regression between the results of the two studies (i.e. the number of patents or patent families found essential for each patent owner). My linear regression tested whether the results of the two studies might agree.

37.     From the regression, I derived an $r^2$ coefficient, which measured the proportion of variation between the two variables corresponding to the results of the two patent-counting studies.[16]   The $r^2$ coefficient is a conservative measure of agreement because it reflects an effective maximum amount of agreement between two studies. That is, the extent of agreement between studies and patent-essentiality or patent-strength measurement accuracy is no better than, but might be worse than, that indicated by the $r^2$ coefficient.

38.     An $r^2$ coefficient can range from 0 to 1, with a score of zero meaning that there is no correlation between the variables and a score of one meaning that the two variables are perfectly correlated.   Because both Study A and Study B attempted to measure the same thing (the proportion of total patented essentiality each company possesses in LTE), one would expect the $r^2$ coefficient to be very close to 1 *if the studies are accurate and reliable measurement tools*.

---

[15] K. Mallinson, *Valuing IP in Smartphones and LTE*, IP Finance (Nov. 7, 2011), Exhibit 5309.  A version of this article was published in RCR Wireless (a wireless trade publication).  K. Mallinson, *No Consensus on Which Patents are Essential to LTE*, RCR Wireless (Nov. 16, 2011), Exhibit 4962.

[16] The $r^2$ coefficient is a "dimensionless" quantity; that means it is independent of the units of measurement of the two variables.

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

39.   My analysis, however, established that the $r^2$ coefficient of Study A compared with Study B was 0.0008.  This is extremely, and remarkably close to zero, and indicates that Study A and Study B were highly uncorrelated in their results.

40.   Notably, in the absence of additional checks, an $r^2$ coefficient alone does not reliably confirm agreement, nor does it reliably confirm that either set of results are accurate. A high $r^2$ coefficient is suggestive of close agreement, but there are other reasons why the two studies may disagree even with a high $r^2$ coefficient. It is theoretically possible for there to be a high $r^2$ coefficient and for two studies to be in close agreement (e.g. because they were undertaken by the same subcontractor using identical analysis in both studies) while the studies are, nevertheless, both inaccurate. It is also possible for regression results to have a high $r^2$ coefficient where study results have significant disagreement due to an offset or bias (e.g. revealed by a non-zero intercept on the regression line). There is also the theoretical possibility that the $r^2$ coefficient could be 1 with a perfect negative correlation: however, any negative correlation would be perverse in this context comparing results of patent-counting studies where the expectation is that the different studies will be positively correlated and the test is to measure the extent to which there is variation from perfect positive correlation, indicating some disagreement between the two studies. Any negative correlation would mean that there would be an inverse relationship between the rankings of SEP owners in one study versus the other. This would also indicate major disagreement between the studies and measurement inaccuracy in at least one of the two studies compared.

41.   Nonetheless, for purposes of my analysis, the $r^2$ coefficient is a useful measure because it is a conservative way to test agreement between the studies. Studies may agree *less* than what the $r^2$ coefficient suggests, but they will not agree *more*. Further, I was not testing to affirm agreement between studies or to affirm measurement accuracy. Instead, my test conservatively measured (i.e. understated)

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

disagreement between the two studies. Employing a simple analogy, we could use two different tape measures to measure many tables of differing lengths between 3 feet and 15 feet. Because different tape measures are supposed to be producing the same results (i.e. accurate length measurements, even if one tape measures in millimeters and the other in tenths of an inch) one would expect the $r^2$ coefficient to be very close to 1 in linear regression of all the measurements pairs. However, if, for example, one tape measure was defective (e.g. very stretched in certain places along its length), then statistical analysis might produce an $r^2$ coefficient significantly less than one.

42.     My 2011 paper has been cited several times. A study commissioned by the European Commission's DG Grow program cited my work in a 2014 report on standard essential patents.[17] TCL's own expert, Dr. Bekkers, has cited my 2011 paper several times, including in his paper titled *Intellectual Property Disclosure in Standard Development* (2012).[18]

43.     As part of my work in this litigation, I used the same methodology I employed in my 2011 paper to systematically analyze the various LTE patent-counting studies identified by Dr. Bekkers in his expert report. The studies identified by Dr. Bekkers that I have analyzed are summarized in Figure 3 above.

44.     The parties who undertook these various patent-counting studies employed varying levels of essentiality and other analysis. For example, while Fairfield claims to do no more than make preliminary evaluations on essentiality, Article One claims also to assess whether patents are "highly essential and highly novel" and iRunway claims to make its assessments, including whether patents are "seminal" with use of "22 parameters including infringement detectability and dependent claims, technology activity rate, backward and forward references, age

---

[17] Exhibit 307, at p. 116.
[18] Exhibit 4963, at p. 43.

1    of patent etc." I compared the results of each patent-counting study against the

2    results of every other study and tested to see if there was correlation between the

3    results of every pair of studies. As I will now discuss, I found that the patent-

4    counting studies produced wholly inconsistent results.

5        45.    For each pair of studies, I ran a linear regression on the patent counts

6    for each individual patent owner cited in the study. I then analyzed the associated $r^2$

7    coefficient generated by the same statistical analysis program (a standard capability

8    included in recent versions of Microsoft Excel) to determine the extent to which the

9    results of one study correlated with those of the second study in each pair.  For

10   example, I analyzed an essentiality study conducted by CyberCreative in 2011

11   against an essentiality study conducted by Fairfield Resources International

12   published in 2010. Both studies purported to count the number of LTE standard

13   essential patents or patent families owned by several companies active in the

14   telecommunications industry:

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

**Figure 4:  Comparing Results of CyberCreative (2011) Report Against Fairfield (2010)**

| COMPANY | CyberCreative (2011) Results[19] | Fairfield (2010) Results[20] |
|---|---|---|
| Qualcomm | 241 | 8 |
| Ericsson | 159 | 14 |
| InterDigital | 149 | 2 |
| Nokia Corp | 131 | 57 |
| Huawei | 106 | 1 |
| LG | 89 | 3 |
| Alcatel-Lucent | 24 | 1 |
| Nortel | 24 | 7 |
| ETRI | 17 | 1 |
| TI | 14 | 2 |
| Sony | 8 | 8 |

46.   I then charted the results of one study against another. I excluded companies that were not reported in both studies:

---

[19] Cyber Creative Institute Co. Ltd., *Evaluation of LTE essential patents declared to ETSI*, (Dec. 2011), Exhibit 1040.

[20] Fairfield Resources, Review of Patents Declared as Essential to LTE and SAE (4G Wireless Standards) Through June 30, 2009 (Jan. 2010), Exhibit 1042, TCL_ERIC_CDCA1120927.

**Figure 5:  Charting Results of CyberCreative (2011) Report**

**Against Fairfield (2010) Report[21]**



47.    After charting the results, I ran a simple linear regression between the results of the two studies. The statistical program I used to run the regression also reported the corresponding $r^2$ coefficient. If the linear regression had yielded a result with an $r^2$ coefficient close to 1, then the CyberCreative and the Fairfield studies would have had a very strong correlation which means the studies might be in close agreement with each other. Instead, the linear regression yielded a result with an $r^2$ coefficient of only 0.0774, which is quite close to $r^2=0$ that corresponds to no correlation whatsoever. The CyberCreative and the Fairfield study results, therefore, have only a weak correlation with each other and it can be reliably concluded that there is major disagreement between the results of these two studies.

48.    I have charted the linear regression line and the formula in Figure 6:

---

[21] Mallinson Regression Analysis, Exhibit 4960.

1

**Figure 6: CyberCreative (2011) vs. Fairfield (2010) With Linear Regression Line**[22]



49.   I repeated this same analysis on every pair of LTE patent-counting studies and with the patent-counting assessment done by TCL's expert Dr. Ding (more fully discussed below).  I ran linear regression comparing each of the various LTE patent-counting studies against all other LTE patent-counting studies identified by Dr. Bekkers as well as the results of Dr. Ding's assessments.  Figure 7 is a matrix and heat map showing generally weak correlation among patent-counting studies by reporting the $r^2$ values of each comparative linear regression:

---

[22] Mallinson Regression Analysis, Exhibit 4960.

**Figure 7:  $R^2$ Results From Comparing Different Essentiality Papers[23]**

| | Cyber 1 | Cyber 2 | Cyber 3 | Article One | Jefferies | iRunway | Fairfield 2010 | ABI Research | Ding |
|---|---|---|---|---|---|---|---|---|---|
| **Cyber 1** | 1.000 | 0.868 | 0.817 | 0.203 | 0.285 | 0.654 | 0.077 | 0.666 | 0.509 |
| **Cyber 2** | | 1.000 | 0.947 | 0.127 | 0.276 | 0.677 | 0.170 | 0.541 | 0.522 |
| **Cyber 3** | | | 1.000 | 0.222 | 0.340 | 0.577 | 0.081 | 0.628 | 0.617 |
| **Article One** | | | | 1.000 | 0.278 | 0.265 | 0.286 | 0.375 | 0.811 |
| **Jefferies** | | | | | 1.000 | 0.305 | 0.001 | 0.407 | 0.568 |
| **iRunway** | | | | | | 1.000 | 0.004 | 0.387 | 0.634 |
| **Fairfield 2010** | | | | | | | 1.000 | 0.004 | 0.177 |
| **ABI Research** | | | | | | | | 1.000 | 0.564 |
| **Ding** | | | | | | | | | 1.000 |

| Color | Range |
|---|---|
| | 1.00 |
| | 0.75 – 0.99 |
| | 0.50 – 0.74 |
| | 0.25 – 0.49 |
| | 0.00 – 0.24 |

50.    The generally low $r^2$ coefficients show major differences in results among all studies from different assessors. Correlation among the results of the different studies is generally rather weak, as indicated by $r^2$ coefficient results averaging 0.359. In this average figure, I exclude correlations among Cyber Creative studies, which are evidently substantially the same study. Only the $r^2$ coefficients for regressions between the Cyber 3 study and other assessors' studies are included in this average figure. Even where the $r^2$ coefficients are significantly above this figure with regressions between some pairs of studies, there are major differences between other related regressions.

51.    The widely different results shown in Figure 7 are the result of

---

[23] Mallinson Regression Analysis, Exhibit 4960.

differences in how the studies have been conducted, as well as the significant variations in specific assessments of the companies being studied. For example, some studies only consider companies that rank highly in counts of declared patents. This leaves a large "other" category of declared patents that are not further assessed. Many companies that make it to the named rankings in some studies are not named in other studies. The differences in rankings, and whether a company appears at all in the rankings, also depends, in large part, on whether the subjective assessment in question is only for essentiality, or if it is also based on a subjective assessment of whether SEPs are "seminal," or "highly essential and highly novel," as well as competence and bias on the part of the reviewers.

52.     Given the major inconsistencies among the patent-counting studies I have identified, the highly subjective nature of the technical review component of these analyses and the generally low $r^2$ coefficients, one cannot rely on the results of any one study with confidence. The subjective nature and many major differences among these studies further suggest that the results of a patent-counting analysis are subject to manipulation.

53.     Where correlations between pairs of study results are significantly higher than average, it might be to some extent by chance, or because there is some relationship between the results of the studies. The individuals or companies tasked with the technical analysis might be significantly swayed by results of previous studies or there might be more direct commonalities. The identity of these individuals or companies is not always clear. For example, the Article One Partners report states that "the data analysis set forth herein was prepared by a third-party data provider and is believed to be reliable, but has not been independently verified by AOP."[24] It may be impossible to establish if some of the same individuals or

---

[24] Article One Partners, LTE Standard Essential Patents Now and in the Future (2012), Exhibit 1175, ERIC_TCL00609431 at 438.

1    companies are contributing to more than one study. Nevertheless, my overall

2    regression results confirm an overall low level of commonality in results among

3    different patent-counting studies.

4        54.    The most prominent exceptions among these weak or moderate

5    correlations are for the regressions among the three Cyber studies. These study

6    results are relatively closely correlated, as indicated by $r^2$ coefficient values from

7    0.817 to 0.947, which are the highest in my regression analysis. This is

8    unremarkable and does not invalidate or diminish my conclusion about disparities

9    among different assessors. To the contrary, close correlation is to be expected

10   among the results of these three studies. The three Cyber studies are similar with

11   respect to methodology and data, and with additional patents and assessments

12   added to the second and third versions of the study.[25]

13       55.    The close correlation among Cyber study results over three years helps

14   in the consideration of the extent to which timing differences in the studies

15   contribute to the weak correlations. One might hypothesize that much of the

16   differences between results of studies conducted in different years is because

17   companies' positions with respect to SEP ownership might have shifted

18   significantly from year to year. However, the relatively close correlation of Cyber

19   study results suggests that timing is not the most significant reason for the

20   discrepancies between the results with the other patent-counting studies.

21              **5.    TCL's Patent-Counting Studies Commissioned For This**

22                     **Litigation Are Wildly Inconsistent.**

23       56.    In support of its economic analysis of Ericsson's patent portfolio, TCL

24   commissioned two separate patent-counting assessments. Each involved patent-

25   counting coupled with technical analysis intended to evaluate the essentiality of

26

27       [25] Cyber Creative Institute Co. Ltd., Evaluation of LTE essential patents
     declared to ETSI, (June 2013), Exhibit 1040, at p. 2.

28

declared patents. The results of these studies (which I will refer to as the "essentiality assessments") are set forth in the opening expert reports of Dr. Ding and Dr. Kakaes.

57.    For his essentiality assessment, Dr. Ding worked with Dr. Kakaes to supervise a team from Ernst & Young of India (E&Y) and Concur IP. The E&Y team who worked on this matter has now joined Concur IP, a technical consulting firm based out of India. The study analyzed a sample of about one-third of all handset-related patent families declared to the 2G, 3G, and 4G telecommunications standards. First, by using declaration data from the ETSI IPR database, the E&Y team created a list of all the patent families declared to ETSI for each of the 2G, 3G, and 4G standards. Next, the Concur IP team identified the patent families that related to handset (or UE) technology and had an English language patent, and excluded any patent families that did not have an unexpired patent as of January 1, 2009. The Concur IP team identified the top fifteen owners of declared patents for each standard and randomly selected one-third of the declared patent families owned by those companies for further analysis. Finally, the Concur IP team randomly selected one-third of all remaining declared patent families and assessed whether those patent families (2,600 in all) are essential to the relevant standard. These results form the basis of the Ding Report. I call Dr. Ding's conclusions regarding patent essentiality the "Ding Results."

58.    Separately, Dr. Kakaes evaluated all the Ericsson patents for which Ericsson produced a claim chart in this litigation, and provided his opinion on whether each patent is essential to the relevant standard. The results of this evaluation form the basis of Dr. Kakaes's Report. I call Dr. Kakaes's conclusions regarding patent essentiality the "Kakaes Results."

59.    TCL's experts Dr. Lynde and Dr. Leonard utilize the Ding Results and Kakaes Results to arrive at the opinions expressed in their expert reports. Dr. Lynde relied on the Ding Results when conducting his analysis of certain Ericsson

licenses. Dr. Leonard relied on both the Ding Results and the Kakaes Results when applying his "top-down" methodologies.

60.    As I explained above, I have found that patent-counting studies conducted by different entities with different methodologies for presumably different clients with different goals and different review teams produced significantly different results. Dr. Ding and Dr. Kakaes, in contrast, are two experts hired by the same client to conduct equivalent essentiality determinations on the same patents at the same time, and the two evaluation teams supposedly coordinated closely together. This coordination was described by Mr. Sinha, the Concur IP employee who led the Concur IP team, during his deposition:[26]

> Q. What was Dr. Kakaes' involvement in the essentiality study?
>
> A. Okay. So he was the one who visited India to meet the team. So he was the one who had the first discussion with the team along with the attorney that visited us. [ . . . ] So he also devised the overall process for essentiality analysis. And I understand he would have discussed that with Dr. Ding as well. He was also on all the weekly calls that we had to go through various patent families. And he also provided his input on certain families.

61.    Given this close coordination, in addition to the other similarities (same client, same time period, same litigation, etc.), one would expect the Ding Results and the Kakaes Results to be somewhat consistent. But that was not the case. As I will now discuss, the Ding Result and Kakaes Results are *significantly different*.

62.    To compare the Ding Results with the Kakaes Results, I began by identifying the instances where both experts analyzed the same patent to determine whether it was essential to the same generation of standards (i.e., 2G, 3G, or 4G). I identified 59 such instances, and found that Dr. Kakaes and Dr. Ding disagreed in

---

[26] Deposition of S. Sinha p. 92:20-93:8.

17 instances - 29% of the same patents assessed. Figure 8 reports the extent of the disagreement in terms of the number of patents analyzed:[27]

**Figure 8:  Disagreement Between Ding Results and Kakaes Results**

|  | 2G | 3G | 4G | TOTAL |
|---|---|---|---|---|
| Disagree | 2 | 3 | 12 | 17 |
| Agree | 5 | 13 | 24 | 42 |
| Total | 7 | 16 | 36 | 59 |
| Disagree (%) | 29% | 19% | 33% | 29% |

63.    The substantial extent of disagreement between Dr. Kakaes and Dr. Ding is yet another indication of the inaccuracies and unreliability of patent counting as a methodology for assessing standard-essential patent portfolio strength or for determining the standard-essential patent portfolio strength of one company relative to another.

**B.    Approved Contribution Counting.**

64.    I understand that the very inaccuracies and biases in patent counting highlighted above prompted Ericsson to seek an alternative methodology for estimating essential patent ownership among the various companies who own standard-essential patents. To this end, Ericsson has commissioned three reports from Signals Research Group, a research and consulting firm covering the wireless telecommunications industry.[28] The methodology for estimating and comparing standard-essential patent portfolio strength employed by Signals measures the

---

[27] Mallinson Comparison of Ding/Kakaes Results, Exhibit 4961.

[28] *See* Signals Research Group, *The Essentials of Intellectual Property: Quantifying Technology Leadership In the Development of the LTE Standard* (September 2010), Exhibit 410, Signals Research Group, *The Essentials of Intellectual Property Part Two:  Quantifying technology leadership in the development of the LTE standard through June 2014* (Dec. 2014), Exhibit 305; Signals Research Group, *The Essentials of Intellectual Property, From 3G Through LTE Release 12* (May 2015), Exhibit 1045.

extent to which a company's technical contributions to 3GPP have been "approved" (i.e. adopted into the relevant standard) as compared to all approved contributions to the standard. This methodology is commonly referred to as "approved contribution counting." ABI Research,[29] another well-respected industry research and consulting firm, has also used approved contribution counting to estimate relative standard-essential patent portfolio strength, independent from any request by Ericsson. ABI Research also counts other metrics related to SSOs, including the number of chairmanships and the number of rapporteurships per company as other proxies for patent strength in its published reports.

**1.    Approved Contribution Counting Is A Methodology For Estimating Standard-Essential Patent Portfolio Strength.**

65.    Approved contribution counting is based on the principle that the work in 3GPP – the collective activity between ETSI and other standard setting organizations that develop most of the cellular standards – is driven by technical submissions proposed by 3GPP member companies to technical "working groups." Contributing companies develop and evaluate solutions that they then may propose for inclusion to the standard using written submissions or "contributions." When a contribution is adopted or "approved" by the working group, it is included in the 3GPP technical specifications, which are ultimately provided to ETSI, who promulgates them as a standard.

66.    By counting the approved contributions for contributing companies, it is possible to gauge how actively companies are participating in the development of the cellular standards relative to one another, and ultimately, which companies have

---

[29] *See* ABI Research, *LTE Innovation By Company: An Analysis of LTE Standards Body Contributions* (Feb. 2012), Exhibit 313; ABI Research, Standards Leadership Within The 3GPP (June 2013), Exhibit 1029.

contributed the most technology to the standards.[30] Because contributors to standardization often file for patent protection on their technology contributions to 3GPP, approved contributions are a *proxy* for estimating a company's essential patent strength in a standard. Again, this is based on the underlying assumption that the contributing companies are being proactive in filing for and obtaining patent protection on their approved contributions.

## 2. The Signals Reports.

67.     Ericsson commissioned the 2015 report by Signals, which updated two earlier Ericsson-commissioned reports that Signals completed in 2010 and 2014.[31] Signals uses data showing technical contributions made to 3GPP to estimate the proportional share of standard essential technology owned by the participants in 3GPP's standardization activities. This methodology is based on the propositions that (a) the number of approved contributions that a company makes to a standard (such as 3G or 4G) is indicative of how instrumental the company is to developing the technology that became part of the standard; and that (b) a comparison of this metric across companies allows a party to objectively determine the relative inventive strength of each company in standardization, which corresponds to its relative essential patent portfolio strength.

68.     Before commissioning the Signals studies, Ericsson conducted its own investigation into the number of approved contributions Ericsson filed in the 2007-2008 time period for the development of LTE (4G). Ericsson assembled a complete list of all technical submission that were made to five working groups (RAN1, RAN2, SA2, SA3, and CT1) that most closely aligned with the patented technologies that a new handset manufacturer would need to license.  Individuals

---

[30] *See* Signals Research Group, The Essentials of Intellectual Property: Quantifying Technology Leadership In the Development of the LTE Standard (September 2010), Exhibit 410.

[31] Signals Research Group, *The Essentials of Intellectual Property, From 3G Through LTE Release 12* (May 2015), Exhibit 1045.

reviewed contribution documents by hand and the effort originally took six man months to complete.[32] In 2010, Ericsson commissioned Signals to audit its review.

69.     Signals spent two man months auditing Ericsson's initial results.[33] Signals reviewed the Ericsson database of technical submission to ensure that it was complete and that the data was properly recorded. While time-consuming, the audit was possible because the data (information available on the 3GPP website) was publicly available. Signals found a few mistakes, which it corrected. Overall, these discrepancies were small. Signals concluded, based on the review of the technical submissions, that Ericsson was the leader in approved contributions to the LTE standard.

**Exhibit 410:  Signals 2010 Figure 2[34]**



While Ericsson commissioned the original survey, Signals stood by its own audited

---

[32] *See Signals Research Group, The Essentials of Intellectual Property: Quantifying Technology Leadership In the Development of the LTE Standard* (September 2010), Exhibit 410.

[33] Signals 2010, Exhibit 410.

[34] Signals 2010, Exhibit 410, at p. 26.

1  results.  In the 2010 whitepaper, Signals disclosed Ericsson's involvement in the

2  study and the task at hand. On the first page, Signals explained that the conclusions

3  in the whitepaper were its own:

> *As the sole authors of this paper, we stand fully behind the analyses and opinions that are presented in this paper.*

7  70.    In 2014, Signals published a whitepaper that conducted a broader

8  survey of technical submissions.[35] Signals reviewed submissions made for the

9  development of LTE made during a longer time period (2007 through June 2014) to

10  the same five working groups. Signals also designed a way to automate the

11  collection of data using Microsoft Excel Visual Basic for Applications (VBA).

12  Signals compared the automated process results against the non-automated process

13  from the 2010 study and found that the automated process could replicate the

14  original results with a fairly-high degree of accuracy. I will discuss this process in

15  greater detail shortly, when I discuss the 2015 Signals study.

16  71.    Again, Signals found that Ericsson was the leader in approved

17  contributions to the LTE standard:

---

[35] See Signals Research Group, *The Essentials of Intellectual Property Part Two:  Quantifying technology leadership in the development of the LTE standard through June 2014* (Dec. 2014), Exhibit 305.

1

### Exhibit 305:  Signals 2014 Figure 2[36]



Figure 2. 3GPP Approved Submissions for LTE Release 8 through Release 12 – by company (2007-June 2014)

72.     For its 2015 study, Signals expanded the survey yet again. Signals now analyzed technical contributions to both 3G and 4G and extended the survey period to 1999 through December 2014.[37] Signals downloaded documents relevant to the 3G and 4G technical submissions from the publicly available 3GPP website. Signals organized the technical documents for data review. Like in 2014, Signals relied on its Excel VBA software to automatically review the documents and organize the necessary data. This data included the document title, agenda items, work items, source, release numbers, specification numbers, document type, document last saved date, and acronyms and key terms (later used for categorization). Signals ran a similar program against the meeting documents for the following information: document title, agenda items, work items, source, release numbers, document type, and document decisions (e.g., noted, agreed, or withdrawn).  Signals then reviewed the searches to ensure proper data extraction.

[36] Signals 2014, Exhibit 305, at p. 8.

[37] See Signals Research Group, *The Essentials of Intellectual Property, From 3G Through LTE Release 12* (May 2015), Exhibit 1045.

73.     After the Excel VBA program automatically gathered and organized the necessary data, the Signals team proceeded to ensure that it was complete and consistent. Signals removed any duplicated technical submissions. Signals performed keyword searches to determine whether a contribution was related to 3G or LTE or possibly another technology unrelated to cellular standards.

74.     Next, Signals determined whether a contribution was approved or not. Signals relied on the decision in the meeting report to determine the approval status. Signals marked the contribution as either Noted or Approved based upon the meeting minutes wording (*i.e.*, agreed, approved, endorsed). Signals excluded non-approved contributions or contributions that were otherwise not relevant (administrative, liaised, revised, rejected, or withdrawn).

75.     Next, Signals gave credit to the source or sources of each contribution. In the case of a multi-party contribution, each party was given partial credit. For example, if two companies made a joint contribution, each was given 50% credit. Closely related companies, or companies who have merged, were treated as single entities. Signals could then compile and sort the resulting approved contributions based on release, technology, and contributing companies, among other things.

76.     Similar to its conclusions in 2010 and 2014, Signals found that Ericsson was the top contributor of approved technology submissions to 3GPP between 1999 and December 2014:

## Exhibit 1045:  Signals 2015 Report, Figure 3[38]



Figure 3. 3GPP Approved Submissions for Release '99 through Release 12 by 3G Only, LTE Only, and 3G and LTE Classifications (1999 – December 2014)

### 3.    The ABI Reports.

77.    ABI Research has also employed the approved contribution counting methodology to estimate and compare standard-essential patent portfolio strength. According to ABI, one key advantage of approved contribution counting is that the method "is adopted by leading industry players."[39]

78.    First, in 2012, ABI Research published a study analyzing approved contributions made to three 3GPP working groups (RAN1, RAN2, and RAN3) over the time period from 2005 to the first half of 2011.[40] ABI Research downloaded the necessary data from the 3GPP website and determined whether or not contributions were approved. ABI Research assigned credit for each approved contribution on a proportional basis. If two companies submitted a single approved contribution, the two companies each received a score of 0.50. As seen in Chart 1 from the 2012 ABI Report (reproduced below), ABI found that Ericsson was the leading contributor to

---

[38] Signals 2015, Exhibit 1045, at p. 9.

[39] *See* ABI Research, *LTE Innovation By Company: An Analysis of LTE Standards Body Contributions* (Feb. 2012), Exhibit 313, at p. 4.

[40] Exhibit 313 at p. 7.

LTE technology over the reviewed time period.

**Exhibit 1028:  ABI Research 2012, Chart 1[41]**



79.    In 2013, ABI Research published another study analyzing approved contributions. The new report analyzed submissions to thirteen working groups (instead of three) for the 2009 to 2012 time period, in addition to analyzing other metrics. Consistent with the Signals Reports and 2012 ABI Report, ABI found that "Ericsson has the greatest number of approved contributions by far."[42]

**4.    Advantages of Approved Contribution Counting Over Patent Counting As Methodology For Estimating Standard Essential Patent Portfolio Strength.**

80.    In my opinion, this admittedly indirect method of determining patent portfolio strength has certain benefits and advantages over patent counting, and is therefore superior in many respects to patent counting as an indicator of essential patent ownership in a standard. I will now list and discuss these benefits and advantages.

81.    _Exhaustive and unambiguous._ For the SSO working groups included, it

---

[41] ABI Research 2012, Exhibit 1028, at p. 7.

[42] _See_ ABI Research, _Standards Leadership Within The 3GPP_ (June 2013), Exhibit 1029, at p. 12.

is possible to determine exact numbers of approved technical contributions. In contrast, for the reasons discussed earlier in this witness statement, it is not possible to determine the exact number of patents essential to a standard by counting declarations, and technical analyses undertaken to mitigate the issue are subject to uncertainties, inaccuracies, and biases.

82.    Independently approved.  Inherent in the standardization process is the consensus approval by members of technical work groups within 3GPP.  Technical working groups have members from various technology companies (*i.e.* Samsung, Huawei, Nokia, etc.) that are chosen by the ETSI members.  I understand that each approved contribution is selected by the working group for inclusion in the standard because it is technically superior to any competing contributions. Thus, there are strong reasons to believe contributions have technical value.  The working group members are representatives from technology companies with major incentives to select strong technology that will improve the standard.   Moreover, there are institutional safeguards in place to prevent abuse of the contribution process.   In contrast, there are no such safeguards for declared IPRs because there is no selection or approval process for declared IPRs. Similarly, there is no independent checking of quality and accuracy in third-party patent-counting studies.

83.    A closed loop system. 3GPP controls how many contributions are approved and upon what basis. In contrast, assessing and counting declared IPRs is an open loop system. ETSI has limited visibility of and no control over how many IPRs are declared, does not attempt to judge which of the declared IPRs are essential, and does not track which declared patent applications ultimately issue as patents.

84.    Transparent, objective, and reproducible in its execution. Once rules are defined and publicly disclosed for which information is collected, and how anomalies such as duplicates and certain kinds of changes are dealt with before counting, it is possible for different and totally unconnected assessors to reproduce

WITNESS DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

the same results given the same input data from the SSO's openly-available records. Signal's ability to automate what they had hitherto done manually three years earlier and reproduce very similar results proves this point.[43]   In contrast, patent counting studies can never achieve this level of impartiality or automation. Assessing essentiality or the strength of individual patents is inherently subjective. Therefore, results among assessors will differ significantly because they are subject to significant uncertainty and bias.

85.   Cost effective. Approved contribution counting is more cost effective than conducting the rigorous and exhaustive patent-by-patent evaluations required to significantly improve the accuracy and reliability of patent counting studies. It is uneconomic and infeasible with respect to the time required in assessment to expect the most costly and thorough evaluations of all patents or even of a large enough proportion of them to form statistically representative samples.

86.   Consistent with the objectives of standardization and FRAND commitments. Approved contribution counting incentivizes companies to contribute their technology to the standardization process such that they will be rewarded consistent with the objectives of the ETSI IPR Policy and standardization generally—i.e. to improve standards and increase their adoption with fair and reasonable reward for patent owners.  Patent-counting methodologies, on the other hand, reward those companies that declare the most patents and patent applications to a standard – a process that is full of uncertainties, as discussed above.

87.   That approved contribution counting is an indirect method of measuring a company's essential patent portfolio strength does not render it inferior to patent counting. Just because one measures something directly does not necessarily make that method inherently more accurate or reliable than an indirect

---

[43] *See* Signals Research Group, *The Essentials of Intellectual Property Part Two:  Quantifying technology leadership in the development of the LTE standard through June 2014* (Dec. 2014), Exhibit 305, at page 8.

1   method. By way of analogy, it is impractical to determine the velocity of a star by

2   measuring how far it has moved in a certain time interval, which would be in

3   keeping with the definition of velocity. Measuring the Doppler shift (i.e. color or

4   wavelength difference) is indirect but much more practical, accurate and reliable.

5        88.    This is not to suggest that approved contribution counting is a

6   particularly good way to measure patent portfolio strength.  It is simply better than

7   patent counting methods. There are known weaknesses associated with approved

8   contribution counting.  Some parties may try to game the system by submitting

9   additional contributions (although this can be policed by working groups unlike

10   with patent declarations).  Approved contribution counting does not reflect changes

11   to patent portfolios due to patent transfers or patent expiration.  Undoubtedly some

12   contributions are more valuable than others, yet they are counted in the same way.

13        89.    Nonetheless, the advantages of approved contribution counting

14   outweigh the disadvantages, especially when compared to patent counting and

15   patent counting with some essentiality analysis.  It is objective, cost-effective,

16   reproducible, provides some independent and consistent judgment on technical

17   value by working groups, and reflective of the efforts companies spend investing in

18   the technological development of the standard.  In contrast, patent counting

19   including patent counting with some essentiality analysis is inherently biased,

20   subject to unpoliced gamesmanship and over-declaring patents, unreliable, and (if

21   done with even the minimum degree of professionalism required in determining

22   portfolio licensing rates) cost-prohibitive.

23   **V.    THE ESSENTIALITY ANALYSIS PERFORMED BY CONCUR IP IS**

24       **UNRELIABLE**

25        90.    As part of my assignment in this matter, I also investigated the

26   reliability of the essentiality analysis performed by Concur IP, based on its

27   monetary cost to TCL.

28        91.    In my experience, the monetary cost of analyzing a patent for

essentiality is a good indicator for the time spent and the levels of expertise applied in making assessments of essentiality. It is also my experience that determining whether a patent is essential to a standard, with the professionalism required in portfolio licensing by patent pools or bilaterally, costs at least several thousands of dollars. Indeed, the 2014 study commissioned by the European Commission DG GROW estimated that it would cost at the very least €600 ($670) to simply determine whether a patent should be *declared* to ETSI. The study estimated that a patent pool would spend between €5,000 ($5,700) and €15,000 ($17,000) per patent to determine whether the patent was essential. According to the Via Licensing LTE patent pool licensing agreement, Via Licensing charges patent owners $10,000 per patent to determine a patent is essential. [44]  After determining that a patent is essential, Via Licensing charges reduced fees for any additional patents in the same patent family.  Based on this evidence and my own experience, I agree that an essentiality analysis required by a patent pool would typically cost $10,000 per patent and rather more per patent family.

92.    Patent pool participants including contributors, licensees and administrators have significant financial incentives to demand more rigorous and extensive essentiality determinations than those provided in third-party studies. Patent pools generally distribute money from licensees to patent pool contributors based on the number of essential patents.  Third-party essentiality study publishers can make their money regardless of the results of their studies.  This is in the interests of impartiality, but it is also a major incentive to minimize study costs. In contrast, a patent pool that is regarded as lenient in allowing patents that are weak or not really essential into the pool will discourage holders of strong and essential patents from contributing.  Essential patent contributors do not want to share royalties with other companies that have non-essential patents.  With potentially

---

[44] Via Licensing LTE Commercialization Agreement, Exhibit 4974, at p. 82.

high financial stakes in licensing, patent pools demand much more extensive patent analysis, generally at a cost of around $10,000 per patent, than in third-party study publishing.

93.    As I discussed above, Concur IP began with a list of declared patent families prepared by E&Y, and then undertook a random selection process to narrow down the list to a subset of declared patent families that it would further analyze for essentiality. Ultimately, the Concur IP team reviewed 2,600 patent families for potential essentiality to the relevant standard.

94.    Reviewing 2,600 patent families for essentiality is a massive undertaking, especially when one considers that this involved a review of 5,000 to 6,000 individual patents.[45] As discussed above, the costs of an effective review are significant. Applying what a patent pool assessor would charge to analyze the essentiality of one patent ($10,000), analyzing 2,600 patent families for essentiality would cost $26 million.  Even this is a conservative calculation; patent pools would charge more than $10,000 to analyze an entire patent family.

95.    TCL spent a lot less than $26 million on the work performed by Concur IP. As shown by Concur IP's billing records and Mr. Sinha's deposition testimony, the Concur IP team charged TCL just $250,000 for their entire technical analysis. Conservatively assuming that all of this $250,000 was billed only for time spent analyzing the 2,600 patent families for essentiality, the Concur IP team billed TCL around $100 per patent family to determine whether the patent family was essential. Mr. Sinha verified this calculation in his deposition.[46] This is much less than what a patent pool would charge or what a litigation-level analysis would cost:

---

[45] Deposition of S. Sinha at 50:4-16 ("Our analysis was family-wise, so I don't know remember the exact number of patents that we reviewed . . . I would expect it to be closer to 5,000 or 6,000").

[46] Deposition of S. Sinha at 97:25-99:5.

1



**Figure 2:  Cost of Essentiality Assessment Per Patent Family**

96.     Further, according to Mr. Sinha, for this $250,000 price, Concur IP devoted just *45 minutes* on average to its evaluation of each randomly selected declared patent family for essentiality.[47] This is a woefully insufficient amount of time to reach a reliable assessment of essentiality because even a cursory analysis of essentiality requires a qualified individual to read the patent, review the patent file history, and then compare the patent claims to the sophisticated and detailed technical specifications of a standard. In my experience, this cannot possibly be done in a mere 45 minutes. Indeed, just reading the one patent could take more than the time that Concur IP spent on its entire essentiality analysis for an entire patent family.

97.     In light of the very minimal time that Concur IP devoted to its essentiality analysis, and the extremely low cost to TCL, I conclude that the essentiality analysis by Concur IP is unreliable should be disregarded by the Court.

## VI.   CONCLUSION

98.     Based on my analysis, I conclude that approved contribution counting

---

[47] Deposition of S. Sinha at 51:13-17.

is superior to patent counting (with or without additional technical analysis) as a method for estimating and comparing standard essential patent portfolio strength of companies in the telecommunications industry. Additionally, I have concluded that the essentiality assessment undertaken by the Concur IP team, under the supervision of Dr. Ding and Dr. Kakaes, involved far too little time and resources to be reliable and, therefore, should be disregarded.

Executed on 11th January, 2017 in Poole, United Kingdom.

Keith Mallinson

1

## TABLE OF EXHIBITS

2

| TRIAL EXHIBIT | DESCRIPTION |
|---|---|
| 1039 | *Microwave Journal, Radar and Antennas, Volume 53, No. 1, Jan. 2010* |
| 1036 | "Patent & Landscape Analysis of 4G-LTE Technology," by iRunway |
| 307 | "Patents and Standards," European Commission Report, dated 3/25/14 |
| 1042 | Fairfield Resources publication titled "Review of Patents Declared as Essential to LTE and SAE (4G Wireless Standards) through June 30, 2009," dated 1/6/10 |
| 1040 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI, Ver. 1.0" dated Dec. 2011 |
| 1041 | Cyber Creative Institute publication titled "Evaluation of LTE Essential Patents Declared to ETSI, Ver. 2.0" dated Oct. 2012 |
| 1035 | "Evaluation of LTE Essential Patents Declared to ETSI," by Cyber Creative Institute, June 2013 |
| 1175 | Article One Partners publication titled "LTE Standard Essential Patents Now and in the Future," by M. Phelps |
| 1044 | Jefferies publication titled "Research in Motion (RIM) Limited Patent Value; Cut Target to Salvage Value of $21 as We Wait for QNX," dated 9/21/11 |
| 410 | Document titled "The Essentials of Intellectual Property," by Signals Research Group, dated Sep. 2010 |
| 305 | "The Essentials of Intellectual Property, from 3G through LTE Release 12," by Signals Research Group, Dec. 2014 |
| 1045 | Signals Research Group publication titled "The Essentials of Intellectual Property, from 3G through LTE Release 12," dated May 2015 |
| 313 | "LTE Innovation by Company," by ABIresearch, 2/13/12 |
| 1029 | Report titled "Standards Leadership within the 3GPP," by ABI Research, dated 6/19/13 |

| TRIAL EXHIBIT | DESCRIPTION |
|---|---|
| 4960 | Mallinson Regression Analysis |
| 4961 | Mallinson Comparison of Ding/Kakaes Results |
| 4971 | LTE Commercialization Agreement, Via Licensing Corporation (2011) |
| 5309 | 11/7/2011 - Mallison, Valuing IP in Smartphones and LTE, IP Finance |
| 4962 | 11/16/2011 - K. Mallinson, No Consensus on Which Patents are Essential to LTE, RCR Wireless |

1

## **CERTIFICATE OF SERVICE**

2          Pursuant to Rule 5-3 of the Local Civil Rules of the United States District

3   Court for the Central District of California, I hereby certify under penalty of perjury

4   under the laws of the United States of America that on January 11, 2017, a true

5   copy of the above document was filed through the Court's Electronic Case Filing

6   system and served by that system upon all counsel of record registered for the

7   system and deemed to have consented to electronic service in the above-captioned

8   case.

9

10   Dated:  January 11, 2017          **CROWELL & MORING LLP**

11                                              */s/ John S. Gibson*

12                                              John S. Gibson

13                                              Attorneys for ERICSSON INC. AND
                                                TELEFONAKTIEBOLAGET LM
14                                              ERICSSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28