1  CROWELL & MORING LLP
   John S. Gibson (CSB No. 140647, jgibson@crowell.com)
2  Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
   3 Park Plaza, 20th Floor, Irvine, CA 92614
3  Telephone: 949.263.8400 Facsimile: 949.263.8414

4  Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
   515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
5  Telephone: 213.443.5590 Facsimile: 213.622.2690

6  Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
   1001 Pennsylvania Avenue, N.W., Washington, DC 20004
7  Telephone: 202.624.2500 Facsimile: 202.628.5116

8  MCKOOL SMITH P.C.
   Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
9  300 Crescent Court, Suite 1500, Dallas, TX 75201
   Telephone: 214.978.4000 Facsimile: 214.978.4044
10
   Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
11 300 W. 6th Street, Suite 1700, Austin, TX 78701
   Telephone: 512.692.8700 Facsimile: 512.692.8744
12
   Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson
13
14              **UNITED STATES DISTRICT COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16 TCL COMMUNICATION                      Case No. 8:14-CV-00341 JVS-DFMx
   TECHNOLOGY HOLDINGS,                    Case No. 2:15-CV-02370 JVS-DFMx
17 LTD., *et al.*,
                                          **REBUTTAL WITNESS**
18    Plaintiffs/Counterclaim-Defendants,  **DECLARATION OF KEITH**
                                          **MALLINSON**
19         v.
                                          Hon. James V. Selna
20 TELEFONAKTIEBOLAGET LM
   ERICSSON, *et al.*,                     **Discovery Cut-off:** May 23, 2016
21                                         **Pretrial Conference:** February 1, 2017 at
      Defendants/Counterclaim-Plaintiffs.  10:00 a.m.
22                                         **Trial:** February 14, 2017 at 8:30 a.m.
   ERICSSON INC., *et al.*,
23
      Plaintiffs/Counterclaim-Defendants,
24
           v.
25
   TCL COMMUNICATION
26 TECHNOLOGY HOLDINGS,
   LTD., *et al.*,
27
      Defendants/Counterclaim-Plaintiffs.
28

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................ 1

II.     REBUTTAL TO DR. BEKKERS. ................................................... 1

     A.    While Imperfect, Approved Contribution Counting
        Is Superior To Patent Counting............................................ 2

     B.    Patent Counting Results Are Demonstrably Wrong ............. 7

     C.    Dr. Bekkers' Assertions That Ericsson Controls the
        Contribution Process Are Unfounded .................................. 8

     D.    Dr. Bekkers's Other Complaints Do Not
        Undermine The Use of Approved Contributions ............... 10

III.    REBUTTAL TO DR. KAKAES ................................................... 17

IV.     CONCLUSION ........................................................................... 24

TABLE OF EXHIBITS ........................................................................ 26

REBUTTAL WITNESS
DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

My name is Keith Mallinson. I have been retained by Telefonaktiebolaget LM Ericsson and Ericsson Inc. (together, Ericsson) as an expert witness in this litigation. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

## I.     INTRODUCTION

1.     I submitted a witness declaration in this matter on January 11, 2017, in which I set forth my opinions regarding various methodologies for estimating and comparing the standard-essential patent portfolio strength (i.e. portfolio value) of companies who own patents essential to the 2G, 3G, and 4G cellular standards based on publicly available information, and regarding the unreliability of the patent essentiality analysis commissioned by TCL. In this declaration, I offer my expert opinions in rebuttal to certain opinions expressed by TCL's experts, Dr. Rudi Bekkers and Dr. Apostolos Kakaes, in their direct testimony by witness declaration. Specifically, I respond to Dr. Bekkers' criticisms of the approved contribution counting methodology for estimating and comparing standard-essential patent portfolio strength. I also respond to Dr. Kakaes's correlation analysis of approved contributions with Ericsson patents he judged standard essential, and his comparison of his own essentiality analysis with that of Dr. Ding and Concur IP.

## II.     REBUTTAL TO DR. BEKKERS.

2.     Dr. Bekkers criticizes approved contribution counting based on his flawed assumption that large numbers of standard essential patents can be accurately identified at a reasonable cost and in a reasonable timescale. The only truly objective, accurate and reliable method for identifying each standard-essential patent in a portfolio of declared patents, of which I am aware, would be litigating the essentiality of the portfolio on a country-by-country and patent-by-patent basis over the course of what would inevitably be many, many years before one or more neutral third-parties. Where the portfolio at issue contains hundreds or thousands of

-1-

declared patents, this exercise would be time and cost-prohibitive. Thus, although Dr. Bekkers appears to believe otherwise, a realistic objective method of reliably determining the essentiality of each patent in a large portfolio of patents declared to a standards development organization simply does not exist. If one did exist, it would be widely adopted across the industry.

### A.    While Imperfect, Approved Contribution Counting Is Superior To Patent Counting

3.    Approved contribution counting is a suitable way to estimate a company's standard-essential patent portfolio strength as compared to other standard essential patent owners. As I have explained, approved contribution counting is based on counting the number of technical submissions approved by various ETSI working groups to be incorporated into the technical standards. Approved contribution counting does <u>not</u> count standard essential patents nor does it attempt or purport to do so.  Many of Dr. Bekkers's and Dr. Kakaes's complaints stem from this misunderstanding.  They complain that approved contributions are not patents, which is true.  However, approved contributions are evidence of a firm's technical impact on the standard in its formation and development. Approved contributions are therefore a good proxy for the strength of standard-essential patent portfolios.

4.    Approved contribution counting does have some limitations: I was upfront and clear about those in paragraphs 6 and 88 of my witness declaration. But the question for the Court is not whether the approved contribution counting methodology is a perfectly accurate or direct measure of essentiality. Rather, the question is whether approved contribution counting is superior to TCL's preferred methodology (patent counting with additional, indisputably subjective, essentiality analysis) to estimate standard-essential patent portfolio value, which is also dependent on more than just determining whether or not patents are essential.  The answer to that question is clearly yes.

REBUTTAL WITNESS
DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

5.     The salient characteristics of a competent measurement system are that methods and results should be objective, transparent and reproducible. To take the simple example of a very good measurement system, anybody can purchase a tape measure from any hardware store and use it with the objective standard of inches or millimeters to measure various tables in a Courthouse to within one tenth of an inch, which corresponds to 99.9% accuracy for a 6ft table.  This is because a tape measure is calibrated to a well-defined standard of measurement: one that is universally agreed upon and that can be readily applied by different people to arrive at the same results.

6.     Patent counting fails these three crucial tests. The basis upon which patents are declared essential by patent owners or judged essential by third-party assessors or by expert witnesses in litigation is never very clear and not reproducible because determinations require human judgment based on incomplete information and to the "best of [the assessors'] knowledge." This uncertainty and subjectivity is particularly acute in assessing patent strength beyond the issue of essentiality. Who is to say how much of a "breakthrough" a patent might be (Kakaes witness declaration paragraph 370), let alone whether the patent is valid, in a quick review?  The adversarial circumstances of litigation exacerbate subjectivity and increase the likelihood of unintentional or intentional bias in experts' determinations in favor of their client.  Critically, both Concur IP and Dr. Kakaes knew that Ericsson was the defendant in this litigation when conducting their assessments.[1]  This means that the analyses of Concur IP and Dr. Kakaes are likely to be infected by bias.

7.     Disagreements I have identified among final determinations by TCL's experts may be merely the tip of the iceberg in their inaccuracies. I would expect these experts to try to minimize differences among themselves, but the acid test on

---

[1] Sinha Depo, at p. 51:9-11; Kakaes Witness Statement, at ¶ 7-9.

their accuracy is not in their differences of opinion. It is in the absolute test of essentiality that can only be made by a court. Nevertheless, I demonstrated in paragraphs 60 to 63 of my witness declaration that Dr. Ding and Dr. Kakaes disagreed in 29% of their essentiality determinations, despite being on the same team with TCL and attempting to coordinate.  Despite supervising Concur IP's work by communicating with the team regularly and reviewing results on a regular basis, according to Dr. Ding in paragraph 68 to 71 of his witness declaration, Dr. Ding found in checking a sample of 17% of patents assessed by Concur IP that 11.8% of patents identified as non-essential and 4.38% of patents determined as essential were "inaccurately" identified.  He states that final results were changed accordingly. But this is not college where the professor may get the final say on what the right answer on a quiz might be.

8.     In absence of thorough determinations by a court, we cannot take it that Dr. Kakaes' answers are, in fact, correct, either. Dr. Kakaes even admits he made several mistakes. Between his original report in February and his supplemental report in May, Dr. Kakaes changed his opinion about the essentiality of 4G patent families seven times[2] out of 127 4G handset-related claim charted families.[3]  Thus, Dr. Kakaes subsequently disagreed with his own initial 4G analysis in more than 5% of his determinations.  Actual inaccuracies in assessments could be much greater than any of these figures indicate.

9.     Patent counting including essentiality assessments are inherently imprecise. The extent of inaccuracies is unknown and we have no idea what the margin of error is on the essentiality determinations of TCL's experts. Dr. Ding also explains that "it can be challenging even for skilled experts to isolate the many

---

[2] Exhibit 5405; Exhibit 5406; Exhibit 5407; Exhibit 5408; Exhibit 5409; Exhibit 5410; Exhibit 5411; Exhibit 5412.

[3] Leonard Witness Statement, at ¶¶ 57, Table 2.

REBUTTAL WITNESS
DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

functionalities or capabilities in the multiple standard documents to the claim elements themselves. Moreover, certain claim language may be broad and/or ambiguous, requiring reviewers to interpret phrases and terms to the best of their knowledge"[4]

10.     Contribution counting meets the tests of objectivity, transparency and reproducibility in a good measurement system. I have shown in my direct testimony that the transparency in contribution counting enables measurements and results to be reproduced by different assessors applying the same rules on what and how various contributions are counted.

11.     As I testified in paragraphs 80 to 89 of my direct testimony, approved contribution counting is superior to patent counting with essentiality analysis because it is exhaustive and unambiguous; independently approved; a closed loop system; transparent, objective, and reproducible in its execution; cost effective; and consistent with the objectives of standardization and FRAND commitments. Additionally, in contrast to the un-policed process of submitting IPR licensing declarations to ETSI, members of 3GPP working groups police the approved contribution process. This oversight and supervision occurs because contributions are only "approved" by consensus among the industry members who participate in the working groups.

12.     In stark contrast, patent counting with essentiality analysis is a highly subjective undertaking that is not policed by a third party. The submission of IPR licensing declarations to ETSI is un-policed, and counting of "judged-essential" patents is subjective, rife with self-interest and open to bias in  commissioning and execution (e.g. by TCL and its experts). As I demonstrated in paragraphs 49 to 51 of my direct testimony, the authors of patent counting studies typically wildly disagree with each other.

_____

[4] Ding Witness Statement, at ¶ 62.

13.     As I testified in paragraphs 90 to 97 of my direct testimony, TCL is presenting a patent counting study based on an extremely flawed essentiality analysis by Concur IP. The Concur IP team, under the supervision of Dr. Ding, reviewed 2,600 patent families. We need to put that number in perspective. Analyzing 2,600 patent families is an enormous effort. Based on my previous estimates, a patent pool would charge $26 million for such an analysis.  Indeed, Via Licensing, the administrator of an LTE patent pool, would charge in the range of $26 million to evaluate the essentiality 2,600 patent families (i.e. $10,000 per patent or patent family multiplied by 2,600).[5] Yet the Concur IP team charged *only* $250,000 to perform its essentiality analysis plus additional tasks.[6] Concur IP spent an average of 45 minutes per patent family.[7] In my opinion, with so little time and so few resources, Concur IP has been doing little better than guessing.

14.     While Dr. Bekkers goes to great lengths opining how no study exists proving a correlation between approved contributions and the value of a patent portfolio, there is also no study proving a correlation, let alone broader agreement (correlation alone does not confirm agreement), between the number of "found" essential patents and the value of a standard essential patent portfolio. Yet, the latter is what Dr. Lynde assumes. Relatedly, there is also no study proving a correlation between the number of patent forward-citations and the value of a standard essential patent portfolio. Yet, that is what Dr. Leonard assumes. And this is precisely my point—there is no perfect methodology for assessing the value of a standard essential patent portfolio that can be conducted at a reasonable cost and in a reasonable timescale. There are only imperfect methodologies and, for the reasons I have shown, approved contribution counting is the least flawed option.

---

[5] Exhibit 4971 at 82.
[6] Deposition of S. Sinha at 97:25-99:5.
[7] Deposition of S. Sinha at 51:13-17.

## B. Patent Counting Results Are Demonstrably Wrong

15. Moreover, there is conclusive proof that Dr. Ding's results must be wrong or, at the very least, that Dr. Lynde's use of them is wrong. Dr. Lynde unpacked the Ericsson/LG license using a "patent strength ratio" (PSR) based solely on the number of patents "found" essential by Dr. Ding and Concur IP. This calculation produced a *negative* royalty rate being paid by LG to Ericsson. Dr. Lynde concedes this in his direct testimony, but does not report his flawed figures.[8] Mr. Kennedy calculates those flawed results using Dr. Lynde's original data in his rebuttal testimony, which I have reviewed.[9] I set forth Dr. Lynde's calculation of the Ericsson one-way royalty rate implied by the Ericsson/LG license using Ding data in Figure 1:

## Figure 1:  Dr. Lynde's One-Way Unpacking Results for LG Using Ding Data[10]

| | Lynde Rebuttal Schedule 4A.1 Using Ding Data | | Lynde Rebuttal Schedule 4B.1 Using Ding Data |
|---|---|---|---|
| 2G/3G | **-$7.63** | 2G/3G | $2.90 |
| 4G | $3.78 | 4G | **-$3.83** |

16. These results are self-evidently defective because negative rates are impossible. Consequently, and unsurprisingly, Dr. Lynde abandons using the Dr. Ding results entirely when analyzing LG because of the implausible and absurd results. And what does Dr. Lynde use as a substitute? *Approved contribution counting.* This bears repeating, Dr. Lynde turns to *approved contribution counting* when his numbers do not work using the Dr. Ding essentiality analysis results.[11] Dr.

---

[8] Lynde (TCL Expert) Witness Declaration, at ¶ 139
[9] Kennedy Rebuttal Witness Declaration, at § V.D.2.
[10] Exhibit 5540.
[11] Lynde Witness Statement, at ¶¶ 139-140.

1  Lynde's error is relying on Dr. Ding's results in the first place and in the unpacking
2  of other licenses. He should have been consistent and relied solely on data derived
3  from approved contribution counting, the superior methodology for estimating
4  standard-essential patent portfolio strength.

5        **C.**      **Dr. Bekkers' Assertions That Ericsson Controls the Contribution**
6                **Process Are Unfounded**

7        17.     As another challenge to approved contribution counting, Dr. Bekkers
8  asserts that Ericsson dominates the process that approves contributions.  According
9  to Dr. Bekkers, Ericsson uses this alleged dominance to abuse the process and
10  inflate its number of approved contributions.  Dr. Bekkers' theory that Ericsson
11  somehow has control over working groups (for which he offers no evidence) is
12  easily shown to be wrong.  No company, including Ericsson, controls the approval
13  process for contributions in 3GPP.

14        18.     Technical submissions become approved contributions through
15  working groups.  Each working group is composed of several members from 3GPP
16  and the membership usually includes preeminent technology companies such as
17  Huawei, Qualcomm, Nokia, Intel, and the like.  The process is transparent.  Each
18  working group maintains a voting list and clearly identifies how participants vote.[12]
19  By design, no one company dominates any working group or any one vote.

20        19.     For example, working groups vote on many matters, including who
21  serves as chairman.  In October 2013, the RAN 1 working group elected a new vice
22  chairman.  The attached voting list details who voted:

23
24
25
26
27  _____
28       [12] Exhibit 1458, at Article 35.

**Figure 2:  RAN 1 Meeting October 2013 Voting Power**[13]

| Company | Votes | Votes (%) |
|---|---|---|
| Ericsson | 6 | 3.3% |
| Huawei | 7 | 3.9% |
| Qualcomm | 5 | 2.8% |
| Alcatel-Lucent | 5 | 2.8% |
| Motorola | 6 | 3.3% |
| NEC | 6 | 3.3% |
| Others | 146 | 80.6% |
| Total | 181 | 100.0% |

As you can see, no single company has anywhere near enough votes to dominate the election.  Ericsson only possesses a 3.3% voting share.

20.    Further, 3GPP encourages working groups to reach consensus on all matters, including the development of technical specifications.[14]  *If* there is a vote, then under 3GPP rules a technical submission only becomes an approved contribution if 71% of the voting power approves the contribution.[15]  This means that it only takes 30% of the voting block (a minority) to vote down a contribution that reflects opportunistic behavior.

21.    This voting structure is one advantage of contribution counting.  Only working groups can approve a technical submission.  The working group members are professionals such as engineers from major technology companies with a strong incentive to ensure that the very best technologies are adopted in standards development.  Because the voting power is highly diffuse and a small minority can block approval, there is a strong incentive for all parties to play fair.  If any one party attempts to abuse the process, as Dr. Bekkers suggests, then the other working

[13] Exhibit 5391.
[14] Exhibit 1458, at Article 25.
[15] Exhibit 1458, at Article 35

1    group members can prevent this.  In the long-run, an abusive member can be

2    sidelined from the entire process and potentially removed from the working group

3    entirely.

4         22.    According to 3GPP statistics, most working group votes are by

5    consensus or 100% agreement.  3GPP keeps records on any issue that is not agreed

6    to by consensus, which 3GPP calls "working agreements."[16]  Since at least 2008,

7    there have been only 15 working agreements (out of thousands of approved

8    contributions) where an approved contribution was not resolved by consensus.[17]

9    The evidence does not support Dr. Bekkers' allegations of opportunistic behavior in

10   3GPP working groups and that approved contribution counts can be manipulated by

11   domineering participants in working groups.

12   **D.     Dr. Bekkers's Other Complaints Do Not Undermine The Use of**

13   **Approved Contributions**

14        23.    The rest of Dr. Bekkers's complaints about approved contribution

15   counting pale in comparison to the fact that Concur IP's results are the product of

16   self-interested and unreliable analysis.  However, I will now address his complaints.

17        24.    *First*, Dr. Bekkers complains that contributions are not patents. I agree

18   and I said so in my direct testimony. But Dr. Bekkers's argument is beside the

19   point. The approved contribution counting methodology is not a method of

20   determining ownership of standard essential patents. As explained by Ericsson's

21   Mr. Brismark, in a quote cited by Dr. Bekkers, the point of approved contribution

22   counting is to *estimate* and *compare* the relative "impact on the standard" of various

23   companies, which "gives an indication of who will own most essential patents

24   when the technology is standardized."[18] Approved contribution counting is therefore

25

26   ─────────────────────
     [16] Exhibit 1458, at Annex G; Exhibit 5392.
27   [17] Exhibit 5392.
     [18] Ex. 1084, at 4, 6.
28

a *proxy* for standard-essential patent portfolio strength. Moreover, Dr. Bekkers's complaints apply equally to patent-counting studies. Not all patents are valid and enforceable. Yet the essentiality analysis performed by Concur IP did not evaluate validity or enforceability.

25.     Relatedly, Dr. Kakaes claims to find little correlation between Ericsson's approved contributions and its patent claims: but, again, approved contribution counting is not purporting to count the *number* of standard-essential patents.  It is a proxy for standard-essential patent portfolio strength in its entirety. A company's number of standard essential patents would not necessarily closely correlate to its number of approved contributions because, as I have explained, patents are not approved contributions.

26.     However, Dr. Kakaes applies his correlation analysis using an undue, working group-by-working group, methodology. He uses correlation analysis on the count of Ericsson's technical submissions (Tdocs) to each of 18 currently active working groups and an allocation he constructed linking Ericsson's 219 SEP family/standards (for which Ericsson produced claim charts) to those working groups.  Dr. Teece notes weaknesses in Dr. Kakaes's statistical techniques and calculations. And, most fundamentally, instead of analyzing everything on Dr. Kakaes's working group-by-working group basis, approved contributions to *any* working group should regarded part and parcel of what serves was a proxy for strength of patents that read on technical specifications in *the same or any other* working group. For example, there might be few patent claims on mobile terminal conformance testing specifications produced in RAN5, but approved contributions to RAN5 can nevertheless be regarded as a proxy for patented technologies that are pertinent to other working groups, such as RAN1, RAN2 or CT1, that are standardizing technologies that will ultimately be subject to testing with RAN5 specifications. Dr. Kakaes's regression results are therefore irrelevant.

27.     *Second*, Dr. Bekkers complains that multiple approved contributions

1    may apply to the same technology. I agree, but this is consistent with the point I am

2    making. Technologies that require multiple approved contributions are likely to

3    require more difficult engineering and require more submitted ideas to resolve. A

4    company who makes more approved contributions to a particular technology than

5    another is making a greater impact on that technology than the other company, and

6    is more likely to later own a greater share of the standard-essential patents covering

7    that valuable technology.

8         28.    *Third*, Dr. Bekkers complains that some approved contributions are

9    trivial and of lesser value than other approved contributions. This is true, as I

10   mentioned in my direct testimony. But it is also true that patents vary in value, and

11   Dr. Lynde makes no value adjustment in his analysis to account for this. Moreover,

12   valuation techniques are highly subjective. This is evidenced by the disagreements

13   between TCL's own experts in this case.  Dr. Kakaes and Dr. Leonard both

14   attempted to value Ericsson's patents.  Dr. Kakaes did so by ranking the different

15   patents with an Essential/Importance/Contribution score or "E/I/C" score.  Dr.

16   Leonard attempted to value Ericsson's patents using a forward citation model.  Mr.

17   Kennedy compared their results and found that Dr. Kakaes and Dr. Leonard

18   *disagree on 100% of cases* about which patent are valuable patents.[19]

19

20

21

22

23

24

25

26

27    _____

28         [19] Kennedy Rebuttal Witness Statement, at § VII.C.3; Exhibit 5326.

-12-

REBUTTAL WITNESS
DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 3:  No Overlap Between Kakaes Determined High Value Patents and Leonard Determined High Value Patents**



29.     Subjectivity is made worse when there is inadequate time and resources spent on the essentiality analysis.  Concur IP spent $250,000 and 45 minutes per patent analyzing 2,600 patent families for essentiality.  In comparison:

- In *Innovatio*, United States District Judge Holderman spent several days and heard from multiple experts to evaluate <u>four</u> declared patent families.[20]

- In *Microsoft v. Motorola*, United States District Judge Robart spent several days and heard from eighteen witnesses to evaluate <u>six</u> declared patent families.[21]

And with subjectivity, there is the possibility or likelihood of unintentional or

---

[20] *In re Innovatio*, 2013 U.S. Dist. LEXIS 144061, *167 (N.D. Ill. Oct. 3, 2013).

[21] *Microsoft v. Motorola*, 2013 U.S. Dist. LEXIS 60233, *16 (W.D. Wash. Apr. 23, 2013).

1    intentional bias. The incentives to bias results could not be higher and the

2    opportunities to try to get away with it could not be greater than for TCL's experts.

3         30.    Dr. Bekkers also complains that Ericsson has submitted the largest

4    number of "change requests" to 3GPP.  Dr. Bekkers makes two errors with this

5    argument.  First, he assumes that all "change requests" are trivial.  This is not the

6    case; many "change requests" are very important.  Change requests come about as

7    technology companies go about implementing, debugging, refining and improving

8    the standards.  As the implementers discover flaws or errors in the original standard

9    design, the standard development organization must revise the technical standard to

10   fix problems.  This is akin to finding and fixing bugs while beta testing software.

11   Some bugs are trivial, but some bugs are important and require significant changes.

12   Dr. Kakaes has spent great time and energy to identify a total of just *fifteen*

13   contributions that Dr. Kakaes contends are non-valuable.  This is a tiny fraction of

14   the total approved contributions.

15        31.    Second, Dr. Bekkers insinuates that Ericsson is somehow exceptional

16   or unusual in submitting "change requests."  Ericsson has submitted the largest

17   number of "change requests," according to ABI, but this is unsurprising.  Ericsson

18   has the largest number of approved contributions so it is only to be expected that it

19   has the largest number of "change requests."  Moreover, Ericsson manufactures

20   infrastructure equipment and is one of the first implementers of 3G and 4G

21   technologies.  Thus, Ericsson is best situated to discover errors in the technical

22   specifications and propose solutions through "change requests," which ultimately

23   improve the standard that TCL uses.  Again, this is unsurprising.  I note that

24   Huawei is the second largest submitter of change requests.  Huawei, also a major

25   infrastructure manufacturer, is another early implementer of new technologies and

26   has the second largest number of approved contributions. In any event, excluding

27   "change requests" does not change the ultimate conclusion.  Based on the 2013 ABI

28   Report that Dr. Bekkers relies upon, Ericsson would still have the most approved

-14-

REBUTTAL WITNESS
DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

contributions even if all "change requests" were excluded from the study.

32.    *Fourth*, Dr. Bekkers complains that the approved contribution counting data used by Ericsson's expert, Mr. Kennedy, in his license analysis does not cover all the 3GPP working groups. Dr. Bekkers is overstating the case.  While the Signals 2015 report only reported the results of five working groups, the approved contribution data upon which Mr. Kennedy relied covers *nearly all* the working groups:  RAN1, RAN2, RAN3, RAN4, RAN5, SA1, SA2, SA3, SA4, SA5, CT1, CT3, and CT4.[22] As Mr. Kennedy stated in his direct testimony, he unpacked comparable licenses both for the five working groups identified by Signals and using all the available working groups and found that there was no appreciable difference in the results.[23]

33.    *Fifth*, Dr. Bekkers complains that parties can act opportunistically within 3GPP to increase their number of approved contributions. This is true to some extent, because it is true about all systems. Every organization, every method, every process invites some level of opportunism. What makes approved contribution counting superior is that that the approved contribution process is policed by working groups and is therefore far less subject to this problem. Systematic attempts to manipulate the system would become common or public knowledge and prompt response by other members. As explained by Ericsson's Mr. Patricio Delgado and myself, 3GPP working groups have a strong incentive to minimize abusive practices to maintain the integrity of the process.[24] In contrast, as I have explained, there is no policing mechanism for declaring patents and no third-party oversight of essentiality assessments commissioned by self-interested parties like TCL. We do not know, for example, what direction counsel for TCL may have

---

[22] Exhibit 5393.
[23] Kennedy Opening Witness Statement, at ¶ 127.
[24] Delgado Rebuttal Witness Statement.

REBUTTAL WITNESS
DECLARATION OF KEITH MALLINSON;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   given to TCL's experts or how the staff at Concur IP might have been incentivized.

2   34.   *Sixth*, Dr. Bekkers complains that approved contribution counting does

3   not account for expired, lapsed, or transferred patents, and that approved

4   contributions may cover technologies owned by others. This is all true, as I pointed

5   out in my direct testimony. But patent-counting is in similar measures also subject

6   to these effects. Those that make major efforts to develop technologies and then get

7   them adopted in standards are inevitably those who are most likely to have the

8   ability to patent technologies that read on those same technologies.

9   35.   *Seventh*, Dr. Bekkers complains that approved contributions may cover

10  only some parts of the standards at issue or parts of the standards that are merely

11  optional. Again, while true, these complaints do not make approved contribution

12  counting less preferable than patent counting with essentiality analysis. This is

13  because the same considerations apply with patents. It might be argued that a patent

14  is not really essential if the technological feature to which it relates is never or

15  hardly ever implemented or used.

16  36.   *Lastly*, Dr. Bekkers complains that approved contributions may be

17  authored by multiple companies who did not necessarily contribute equal value to

18  the technology at issue. This is true, but Signals accounts for this by dividing credit

19  for the approved contribution among the various contributors.  If Ericsson and

20  Huawei jointly submit a technical solution that is accepted, then Signals allocates to

21  Ericsson a 0.5 approved contribution and allocates to Huawei a 0.5 approved

22  contribution.  Each party receives partial credit.  But this is beside the point. Again,

23  as explained by Mr. Brismark, the point of approved contribution counting is to

24  *estimate* and *compare* the relative "impact on the standard" of various companies,

25  which "gives an indication of who will own most essential patents when the

26  technology is standardized."[25] The point is that the companies with the most

27  —————————————

28  [25] Ex. 1084, at 4, 6.

1   approved contributions make the most impact on the standard *overall*, and that the

2   extent of this impact is a proxy for standard essential patent ownership.

3   **III.    REBUTTAL TO DR. KAKAES**

4        37.    In his witness statement, Dr. Kakaes purports to compare the results of

5   Dr. Ding's essentiality analysis (including that of technical consultants Concur IP)

6   and the results of his own essentiality analysis.[26]  I would note that Dr. Kakaes

7   never performed this analysis before and it is not part of any of his four expert

8   reports, including his expert report served on November 2016.  In all of his expert

9   reports, Dr. Kakaes stated that he adopted the Dr. Ding results without reservation:

10              As explained below, this task was performed by a team of

11              technical consultants in India under the supervision of

12              myself and Dr. Zhi Ding, who has detailed that process in

13              his report submitted on February 1, which I have

14              reviewed and ***fully agree with***.

15       38.    Only in response to me identifying significant disagreements between

16   the essentiality estimations of Dr. Kakaes and Dr. Ding, in my rebuttal and

17   supplementary rebuttal reports and in my witness declaration, does Dr. Kakaes, at

18   last also compare these results.  Dr. Kakaes reaches only a slightly different result

19   to my own comparison.  Even accepting all of Dr. Kakaes's assumptions and errors

20   (which I do not), Dr. Kakaes finds that he and Dr. Ding disagree in over 25% of

21   their assessments (14 out of 55), but he neglected to reveal this embarrassing

22   overall figure:

23

24

25

26

27   _____

28        [26] Kakaes Witness Statement, at ¶¶ 344-46.

**Figure 4:  Dr. Kakaes's Estimate Of Disagreements Between Dr. Ding and Dr. Kakaes' Essentiality Assessments[27]**



Moreover, the disagreement varied wildly by technology:

**Figure 5:  Dr. Kakaes's Estimate Of Disagreements Between Dr. Ding and Dr. Kakaes' Essentiality Assessments[28]**

---

[27] Kakaes Witness Statement, ¶ 344, Table 16.
[28] Kakaes Witness Statement, ¶ 344, Table 16.

-18-

Again, this is a remarkable amount of disagreement given that Dr. Kakaes and Dr. Ding coordinated in these assessments. For example, Dr. Kakaes gave feedback to Dr. Ding and his Concur IP team while they conducted their study.

39.    Dr. Kakaes  makes various excuses why the Concur IP team reached different results than Dr. Kakaes:

- Dr. Kakaes had access to claim charts, while Concur IP did not;[29]
- Dr. Kakaes had access to patent file histories, while Concur IP did not;[30]
- The claim charts directed Dr. Kakaes to the specific portions of the standard that the Ericsson patent applied to, while Concur IP had to find the standard specifications themselves in some instances;[31]
- Dr. Kakaes considered all the technical specifications that the patent was declared to, while Concur IP only considered the technical specifications identified in the patent census;[32]

Dr. Kakaes's excuses ring hollow. But Dr. Kakaes makes the point very well that the Concur IP team under Dr. Ding's supervision did not have the resources to do an essentiality assessment properly. Concur IP's analysis was not only highly subjective; it was obviously deficient in competence because Concur IP lacked vital resources. For example, as part of the application to join a patent pool, an SEP holder is required to submit copies of patents, claim charts, file histories, prior art references, and other information related to any patent.[33] Concur IP did not have this documentation or information. As such, none of Concur IP's results are reliable. This does not suggest that Dr. Kakaes's results were reliable either. With Dr. Kakaes and Dr. Ding working together but, nevertheless, disagreeing in over

---

[29] Kakaes Witness Statement, ¶ 346-349.
[30] Kakaes Witness Statement, ¶ 346-349.
[31] Kakaes Witness Statement, ¶ 346-349.
[32] Kakaes Witness Statement, ¶ 346-349.
[33] Exhibit 4971, at VL 0086-90.

1  25% of instances about essentiality, the entire process is faulty.

2      40.     Dr. Kakaes's analysis is flawed and he underestimates the

3  disagreements between Dr. Kakaes and Dr. Ding:

- Dr. Kakaes and Dr. Ding reached different conclusions on patents US8717996 and US8169992.  However, Dr. Kakaes counts this as <u>one</u> disagreement.  Because these are two patents, I correctly count this as <u>two</u> disagreements.

- Dr. Kakaes claims that Dr. Ding analyzed US6424938 to see whether it was essential to the 3G standard.  According to Dr. Ding's Exhibit C in this case, Dr. Ding only evaluated US6424938 to determine if was essential to the 2G standard.[34]

- Dr. Kakaes determined essentiality on a scale of 1, 2, and 3.  I treated any patent with a score of "2" as essential because an essentiality score of "2" means that the patent could be considered essential under a reasonable claim construction.[35]  This is how TCL's expert Dr. Leonard treated such patents.[36]  In contrast, Dr. Kakaes treats any patent with a score of "2" as not essential.

18      41.     Finally, having reviewed Dr. Kakaes's results, I found one mistake in

19  my own comparison between Dr. Ding and Dr. Kakaes.  I concluded that Dr. Ding

20  and Dr. Kakaes disagreed on their essentiality assessment for US8682371.  After

21  correcting for my error, I find that Dr. Ding and Dr. Kakaes disagreed in 27% of

22  their assessments:

---

[34] Exhibit 1594.
[35] Kakaes Witness Statement, at ¶ 11.
[36] Exhibit 1116.

-20-

REBUTTAL WITNESS DECLARATION OF KEITH MALLINSON; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

**Figure 6:  Disagreement Between Dr. Ding and Dr. Kakaes's Essentialty Determinations**

|  | **2G** | **3G** | **4G** | **TOTAL** |
|---|---|---|---|---|
| Disagree | 2 | 3 | **11** | **16** |
| Agree | 5 | 13 | **25** | **43** |
| Total | 7 | 16 | 36 | 59 |
| Disagree (%) | 29% | 19% | **31%** | **27%** |

**Figure 7:  Disagreement Between Dr. Ding and Dr. Kakaes' Essentiality Determinations**



Again, this substantial difference in determinations is not an "acceptable" error rate. The substantial differences demonstrate that essentiality assessments are deeply flawed.  My findings about where Dr. Ding and Dr. Kakaes disagree are below:

**Figure 8:  Disagreements Between Dr. Ding/Concur IP and Dr. Kakaes Essentiality Assessments[37]**

| Patent Information | | Essentiality Assessment | | |
|---|---|---|---|---|
| Family # | Patent # | Kakaes | Concur IP | Agree? |
| P06691 (4G) | US5806007 | No | Yes | No |
| P07288 (2G) | US5812968 | Yes | No | No |
| P07925 (4G) | US6189123 | No | Yes | No |
| P08338 (3G) | US6173162 | Yes | Yes | Yes |
| P09262 (2G) | EP1062825 | Yes | No | No |
| P09262 (3G) | EP1062825 | Yes | Yes | Yes |
| P09286 (2G) | US6029125 | Yes | Yes | Yes |
| P09286 (3G) | US6029125 | Yes | Yes | Yes |
| P10310 (2G) | US6192335 | Yes | Yes | Yes |
| P10310 (3G) | US6192335 | Yes | Yes | Yes |
| P10335 (2G) | US6275798 | Yes | Yes | Yes |
| P10335 (3G) | US6275798 | Yes | Yes | Yes |
| P10867 (4G) | US6643813 | No | Yes | Yes |
| P10992 (2G) | US6424938 | Yes | Yes | Yes |
| P11899 (3G) | EP1169804 | Yes | Yes | Yes |
| P12947 (3G) | US6535925 | No | No | Yes |
| P14596 (3G) | US7181218 | Yes | No | No |
| P14897 (3G) | EP1360860 | Yes | Yes | Yes |
| P14897 (4G) | EP1360860 | Yes | Yes | Yes |
| P17631 (4G) | US7489705 | Yes | Yes | Yes |
| P18216 (3G) | EP1614306 | Yes | Yes | Yes |
| P18728 (4G) | US7904093 | Yes | Yes | Yes |
| P19208 (4G) | EP1714506 | Yes | Yes | Yes |

---

[37] Exhibit 5451.

REBUTTAL WITNESS DECLARATION OF KEITH MALLINSON; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| Patent Information | | Essentiality Assessment | | |
|---|---|---|---|---|
| Family # | Patent # | Kakaes | Concur IP | Agree? |
| P20741 (4G) | US8923423 | No | No | Yes |
| P21787 (4G) | US8180408 | No | Yes | No |
| P22621 (3G) | US8718695 | Yes | Yes | Yes |
| P23016 (3G) | US8176376 | No | No | No |
| P23018 (4G) | US8102805 | Yes | No | No |
| P23412 (4G) | EP2123011 | Yes | Yes | Yes |
| P23563 (4G) | US8503942 | No | No | No |
| P23614 (4G) | US8693566 | No | No | Yes |
| P23682 (4G) | US8594029 | Yes | Yes | Yes |
| P23894 (4G) | US8699375 | Yes | No | No |
| P24557 (4G) | US8195179 | No | No | Yes |
| P24673 (4G) | US7986681 | Yes | Yes | Yes |
| P24916 (4G) | US8214710 | Yes | Yes | Yes |
| P25238 (4G) | US8699997 | Yes | Yes | Yes |
| P25496 (4G) | US8682371 | Yes | Yes | Yes |
| P25949 (4G) | EP2260667 | No | No | Yes |
| P26030 (3G) | US8606277 | Yes | Yes | Yes |
| P26379 (4G) | US8279834 | Yes | Yes | Yes |
| P26744 (4G) | EP2301296 | Yes | Yes | Yes |
| P26993 (4G) | EP2225908 | Yes | No | No |
| P27363 (3G) | US7924754 | No | No | Yes |
| P28281 (4G) | US8837396 | No | No | Yes |
| P29338 (4G) | US8014311 | No | No | Yes |
| P31172 (2G) | US8537765 | Yes | Yes | Yes |
| P31923 (4G) | EP2564228 | Yes | Yes | Yes |
| P31931 (4G) | US8634365 | No | No | Yes |
| P32468 (4G) | US8738041 | No | Yes | No |

| Patent Information | | Essentiality Assessment | | |
|---|---|---|---|---|
| Family # | Patent # | Kakaes | Concur IP | Agree? |
| P33858 (4G) | US8750808 | No | No | Yes |
| P34422 (4G) | EP2705626 | Yes | Yes | Yes |
| P34426 (4G) | EP2705685 | Yes | Yes | Yes |
| P35090 (4G) | US8750230 | Yes | Yes | Yes |
| P35592 (3G) | EP2742606 | Yes | No | No |
| P37869 (4G) | US9054846 | Yes | No | No |
| P38458 (3G) | US9100069 | No | No | Yes |
| P24459 (4G) | US8717996 | Yes | No | No |
| P24459 (4G) | US8169992 | Yes | No | No |

Also, my original witness declaration referenced Exhibit 4961 when discussing disagreements between Dr. Ding and Dr. Kakaes.  Exhibit 4961 was the April 2016 version of my analysis.  In that analysis I found there was a total disagreement between Dr. Ding and Dr. Kakaes of 25%.  I supplemented my analysis in June 2016 after Dr. Kakaes supplemented his own essentiality determinations.  Exhibit 5451 is the June 2016 version of my comparison between Dr. Ding and Dr. Kakaes.

IV.  CONCLUSION

42.    Ericsson's expert, Mr. Kennedy, relies on approved contribution counting data in rendering certain of his expert opinions in this litigation. Mr. Kennedy's use of approved contribution counting data is appropriate, and preferable to the alternative (i.e. using data from patent counting, with or without additional technical analysis) because patent counting methodologies are subjective, opaque, subject to bias and results are not reproducible by others. Patent counting in inaccurate and unreliable. This is particularly true with the patent counting assessments performed by TCL's experts, which incorporate the essentiality assessments undertaken by the Concur IP team. Those assessments involved far too little time and resources to be competent and, therefore, should be disregarded

entirely.  The ultimate indictment for this is that even Dr. Kakaes concedes that the
Concur IP team led by Dr. Ding disagreed with his own results in 25% of their
essentiality assessments.

Executed on 27 January 2017 in Poole, United Kingdom.

Keith Mallinson

**TABLE OF EXHIBITS**

| TRIAL EXHIBIT | DESCRIPTION |
|---|---|
| 1084 | Ericsson presentation titled "LTE Patent Landscape and Ericsson Position," dated Feb. 2013 |
| 1116 | Appendix C to Supplemental Expert Report of Dr. Gregory K. Leonard   (EIC Rankings) |
| 1458 | Webpage from 3GPP.org titled "3GPP Working Procedures" |
| 1594 | Exhibit C to Expert Report of Zhi Ding: spreadsheet for industry-wide patent essentiality analysis of 2G, 3G, and 4G patents |
| 4961 | Mallinson Comparison of Ding/Kakaes Results |
| 4971 | LTE Commercialization Agreement, Via Licensing Corporation (2011) |
| 5326 | Kennedy Exhibits 5.4 |
| 5391 | 3GPP Website Information About October 8, 2013 RAN 1 Election |
| 5392 | 3GPP Website Information About Working Agreements |
| 5393 | Cover Page of ERIC_TCL004961270A Excel |
| 5405 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P07873-2G) |
| 5406 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P23384-4G) |
| 5407 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P24459-4G) |
| 5408 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P25409-4G) |
| 5409 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P25642-4G) |
| 5410 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P26071-4G) |
| 5411 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P31773-4G) |

| TRIAL EXHIBIT | DESCRIPTION |
|---|---|
| 5412 | Dr. Kakaes May 2016 Supplemental Appendix Redline (P32066-4G) |
| 5451 | Mallinson Comparison of Ding/Kakaes Results  - REVISED (June 2016) |
| 5540 | Kennedy Rebuttal Declaration Exhibit R1 |

# CERTIFICATE OF SERVICE

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 27, 2017, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.

Dated: January 27, 2017

**CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON