CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400  Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590  Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500  Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000  Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700  Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. <br><br> ERICSSON INC., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx <br> Case No. 2:15-CV-02370 JVS-DFMx <br><br> **WITNESS DECLARATION OF LUKE MCLEROY** <br><br> Hon. James V. Selna <br><br> **Discovery Cut-off:** May 23, 2016 <br><br> **Pretrial Conference:** January 30, 2017 at 11:00 a.m. <br><br> **Trial:** February 14, 2017 at 8:30 a.m. |

WITNESS DECLARATION OF LUKE MCLEROY;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

# TABLE OF CONTENTS

I. Introduction And Qualifications ................................................................... 1

II. Ericsson's Licenses Account For Any Uncertainty Regarding Essentiality, Infringement, Validity, And/Or Enforceability Of The Licensed Patents ........................................................ 2

    A. The Technical Discussion Phase ......................................................... 3

        1. Initial Internal Assessment ........................................................ 3

        2. Technical Meetings ................................................................... 5

    B. The Business Discussion Phase ........................................................... 7

III. The Rates In Ericsson's License Agreements Best Indicate The Technical Value Of Ericsson's 2G, 3G, And 4G Patent Portfolios ................................................................................. 10

My name is Luke McLeroy. I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

## I. Introduction And Qualifications.

1. I am Vice President—Business Development at Avanci. Avanci is a patent licensing platform designed to combine the vast majority of cellular standard essential patents into a single license that is available to companies involved in the emerging Internet of Things (IoT). In my current role, I negotiate and otherwise interact with patent owners that are interested in joining Avanci's patent platform and also with Avanci's prospective licensees.

2. The Avanci patent platform currently includes the right to license, for certain IoT applications, the 2G, 3G and 4G standard-essential patents of Qualcomm, Ericsson, Sony, ZTE, InterDigital, and KPN. Avanci currently offers 2G, 3G, and 4G licensing programs for connected cars and smart meters, and programs for other connected products will commence soon. Our goal is to provide a one-stop commercial licensing solution for multiple companies' patent portfolios for non-mobile phone applications, such as cars, smart meters, and other IoT applications.

3. I earned a Bachelor of Science degree in mechanical engineering from Texas A&M in 2000, and a Juris Doctor degree from the University of Texas School of Law in 2003. After graduating from law school, I joined the law firm of McKool Smith P.C., where I remained until 2008. I am a registered patent attorney with the U.S. Patent & Trademark Office (registration number 57,358). In 2008, I left McKool Smith for an in-house counsel position at Ericsson, where I managed patent litigation. I rejoined McKool Smith in 2009, and in early 2012, returned to Ericsson as senior counsel in the Company's Region IPR & Licensing (RIPL) organization. In August 2014, I was promoted to the position of Director—Patent Licensing at Ericsson. In that role, I was responsible for Ericsson's patent licensing

activities with companies headquartered in North America and Latin America.

4. During my tenure at Ericsson, I negotiated licenses with prospective licensees to Ericsson's standard essential patent portfolios in the United States and around the world. I also negotiated licenses for Ericsson to other companies' patent portfolios. I prepared or reviewed hundreds of patent claim charts, analyzed representative Ericsson patents and representative patents presented by counter-parties in negotiations, negotiated the terms and conditions of patent cross-licenses, and supported Ericsson in patent litigation matters. I personally attended hundreds of negotiation meetings and conference calls with prospective licensees, and was the point person for Ericsson in the negotiation of numerous cross-licenses. I was personally involved in the negotiations that led to Ericsson's current cross-licenses with Apple, Samsung, and Microsoft, among others. I also assisted in the overall formulation of Ericsson's licensing strategy with respect to its standard essential patents, and represented the Company at numerous meetings of the ETSI Special Committee on Intellectual Property Rights, regarding proposed modifications to the ETSI IPR policy. As a result of these activities, I am very familiar with Ericsson's standard essential patent licensing practices and industry practice for the licensing of standard essential patents generally.

5. Prior to leaving Ericsson, in connection with this case, I provided a disclosure of opinion testimony which was served on February 22, 2016. I sat for a deposition in this case, both in my individual capacity and also as Ericsson's 30(b)(6) witness regarding Ericsson's licensing negotiations with Apple.

**II. Ericsson's Licenses Account For Any Uncertainty Regarding Essentiality, Infringement, Validity, And/Or Enforceability Of The Licensed Patents.**

6. In my experience, executed patent licenses between sophisticated parties are the best evidence of the value of a large portfolio of the patented technology underlying the license. It is well-understood by parties to portfolio

license negotiations that there are strengths and weaknesses associated with any portfolio of patents and because of this, rational actors in the negotiation take into account any uncertainty related to infringement, validity, essentiality, and/or enforceability when negotiating the terms and conditions of the license. Because Ericsson's standard essential patent licenses are the result of many intensive, arms-length negotiations between sophisticated parties, involving dozens of engineers, attorneys, and licensing professionals, they are the best evidence of the value Ericsson's standard essential patent portfolio.

7. As I will explain in more detail, Ericsson's negotiations with large prospective licensees are typically conducted in two phases. The first phase—comprising an exchange of claim charts and several rounds of technical discussions and analysis with prospective licensees—gives the parties to the negotiation an opportunity to assess the strengths and weaknesses of the portfolio of patents to be licensed (the "technical discussion phase"). After the technical discussion phase, the parties begin business discussions to negotiate the precise terms and conditions of the license (the "business discussion phase"). The business discussion phase is heavily influenced by the parties' technical discussions and analysis regarding the relative value of the portfolios, including the parties' respective risk assessments for patents where there is disagreement on issues such as infringement, invalidity, essentiality, and/or unenforceability.

### A. The Technical Discussion Phase.

#### 1. Initial Internal Assessment.

8. Ericsson has hundreds of active families of patents and patent applications that it has committed to license on FRAND terms and conditions to the extent they "are or become, and remain ESSENTIAL" to the 2G, 3G, and/or 4G cellular standards. Given the volume of innovation that Ericsson contributes to these standards, the Company has developed certain procedures to ensure that Ericsson's intellectual property is being protected and to help streamline the

negotiation process with Ericsson's licensees. To that end, Ericsson employs a rigorous claim charting process that is carried out in two major stages. This process ultimately results in claim charts that are presented to prospective licensees during negotiations to demonstrate the merits of Ericsson's patent portfolio.

9. First, Ericsson develops an early claim chart, typically for a patent application that is pending in the United States Patent and Trademark Office or the European Patent Office. A patent attorney with technical input from the inventor(s) of the patent usually prepares the claim chart. The chart is then reviewed during one or more quality review meetings that typically involve at least five participants—the inventor(s), Ericsson patent attorneys, and in-house technical experts. This initial meeting allows the inventor to explain his invention, for the participants to understand how it fits within the broader technical standard, and to make a determination regarding whether the patent application pertains to an invention that is actually being incorporated into the standard being developed by the standard-body. All-in, the first stage of the process involves 30-50 man-hours per chart.

10. Second, once a Notice of Allowance issues for the patent application from the United States Patent and Trademark Office or the European Patent Office, an attorney from Ericsson's patent assertion department (working with the inventor(s), other patent attorneys, and technical experts) will review and update the initial claim chart. Typically, this revised claim chart is then scrutinized by a second patent assertion attorney or by an attorney from an outside law firm. This stage of the review process provides a second check that the claims of the patented invention do, in fact, cover the technology used in the standard, in view of the intrinsic record. Stage two concludes with one or two formal meetings involving each of the above-described participants. All-in, the second stage of the process involves 20-30 additional man-hours per claim chart, bringing the total time invested in the claim charting process to between approximately 50-80 hours. At

this point, assuming that a claim chart passes both levels of review, it is "approved' to be used in license negotiations as being representative of Ericsson's relevant standard essential patent portfolio(s).

### 2. Technical Meetings.

11. Most of Ericsson's negotiations with large prospective licensees include a technical discussion phase. Because it is impractical to wade through the minutiae of every patent subject to a prospective license (which in the case of Ericsson's 2G, 3G and 4G portfolios includes patents in approximately 200 patent families, including patents in families that are not yet granted), parties in large-scale portfolio-wide negotiations typically exchange representative claim charts that are used as a proxy for the overall strength of the portfolios to be licensed. The number of representative claim charts exchanged and discussed varies from negotiation to negotiation, ranging from as few as five to over three hundred per side. During this process, Ericsson may also receive claim charts from the prospective licensee, if the prospective licensee has patents that it wishes to be taken into account in the form of a cross-license.

12. The exchanged claim charts, and the discussions that follow, provide the parties with valuable insight into the relative strengths of the patent portfolios to be licensed, and this insight informs subsequent business discussions regarding the terms of the license. Although it is Ericsson's policy to provide prospective licensees with as many claim charts as are requested, the number (and type) of claim charts that are typically exchanged depends on the circumstances of a particular negotiation. If Ericsson is negotiating with a prospective licensee who is familiar with Ericsson's contribution to the standards development activities ongoing at the standard-setting body, Ericsson may be asked to provide only a few claim charts. This is because companies who are active in cellular standardization have first-hand knowledge of Ericsson's many technical contributions to the 2G, 3G, and 4G standards. Similarly, a current licensee who is negotiating with

Ericsson towards a renewal license may request a limited number of claim charts. For example, during Ericsson's most recent round of licensing negotiations with Apple, the parties initially agreed to exchange just 10 claim charts each, related to only 4G patents. Apple's representative in the negotiation indicated that this was because the parties had previously executed a license for 2G and 3G in 2007, and Apple already understood Ericsson's portfolio for those standards.

13. Once claim charts are exchanged, both parties internally analyze them in order to evaluate each other's claims regarding the overall strength of the patent portfolio to be licensed. For Ericsson, this process involves a detailed review by a team of in-house lawyers, engineers, and standardization delegates to gauge the strength of the representative patents presented during negotiations. Following this review, the companies typically engage in a series of face-to-face meetings in order to discuss each other's view on infringement, validity, enforceability, and essentiality. Each of these meetings may involve upwards of a dozen patent and technical experts. To prepare for these meetings, Ericsson and Ericsson's licensees typically spend substantial time preparing written responses, and submit responsive contentions to be discussed in subsequent meetings. For example, when negotiating the Ericsson/Samsung cross license executed in 2014, representatives of Ericsson and Samsung met for three sets of technical meetings (in South Korea, Sweden, and Japan, respectively) spanning five days.

14. During the technical discussion phase, the parties rarely reach agreement on the claim charts that are discussed. It is far more common for parties to disagree about issues of infringement, validity, essentiality and/or unenforceability for certain of the claim charts exchanged during negotiations. Each side to the negotiation is incentivized to make as many non-essentiality, non-infringement, invalidity, and unenforceability arguments that cast doubt on the value of the other side's portfolio, and the arguments are at times very weak.

15. In the case of Ericsson's standard essential patents, the technical

-6-                    WITNESS DECLARATION OF LUKE MCLEROY;
                      CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

discussions are used to show prospective licensees that Ericsson is a major contributor to the 2G, 3G and 4G standards and that Ericsson has a substantial portfolio of patents covering those technical standards. This is particularly clear to those prospective licensees who are also members of 3GPP and send engineers to the same working group meetings as Ericsson. Those parties experience firsthand the nature and quality of Ericsson's contributions to the standard, and as a result, are in a very good position to evaluate the value of Ericsson's patent portfolio.

16. As I stated previously, Ericsson and prospective licensees do not often agree on the technical merits of the patents discussed. For example, when a prospective licensee believes that one of Ericsson's patents is not infringed or essential, it will usually provide a detailed analysis in response to the claim chart supporting its position regarding why particular elements of the charted claims are not present in the standard. Where applicable, this includes supporting claim construction positions. Likewise, a company challenging validity will usually identify the alleged prior art and provide analysis and information regarding its position on invalidity. The parties will then discuss these challenges during face-to-face meetings.

17. In my experience, Ericsson is always willing to discuss the merits of each claim chart if the licensee so chooses. In every negotiation that I was involved in that led to a signed license agreement, the prospective licensee ultimately indicated that it had reviewed enough claim charts to move from the technical discussion phase to the business discussion phase. Through this process, Ericsson would also come away with its own understanding and view of the cross-licensing value of the other party's patent portfolio, if any.

**B.    The Business Discussion Phase.**

18. Because there is no final arbiter of disputes that arise during the technical discussion phase, the parties must make a rational evaluation regarding the strengths and weaknesses of the patents reviewed, aggregate their assessment

with respect to the overall portfolio(s), and arrive at an informed valuation for the patents to be licensed. Against the backdrop of their respective technical assessments, the parties begin the business discussion phase to negotiate the specific terms of the prospective license.

19. Many of Ericsson's prospective licensees seek license terms and conditions that are optimized to their individual business situations. For instance, a prospective licensee that values the certainty of a fixed licensing fee might request a lump sum royalty structure. Alternatively, a prospective licensee whose business is difficult to forecast may want a running royalty so that the royalties owed are directly linked to its future performance in the market. A prospective licensee that sells expensive mobile devices might ask for a per-unit cap, or a fixed price per unit. Other proposals might include non-cash consideration (such as transferred patents), a pre-payment provision that serves to buy down a going forward running royalty rate, a longer or shorter license term, etc.

20. During all of my negotiations on behalf of Ericsson, we attempted to remain as flexible as possible in meeting the reasonable requests of prospective licensees in order to accommodate their business needs, while still meeting our commitment to license on fair, reasonable, and non-discriminatory terms. The negotiations leading up to the cross-license executed by Ericsson and Samsung in 2014 are a good example of this. During those negotiations, Samsung rejected Ericsson's proposal that Samsung pay running royalties on its sales of licensed devices. Ericsson in turn rejected Samsung's proposal that the net balancing payment from Samsung to Ericsson be structured as a lump sum. After multiple business meetings around the world, the parties compromised on a payment structure that incorporated elements of both parties' proposals. The executed agreement permits Samsung to elect annually between (a) a fixed yearly payment of ■■■■■■■■ or (b) dollar per-unit running royalties on sales of its licensed products of ■ (2G), ■ (3G), or ■ (4G). The parties further compromised that

-8-

Samsung would make a very substantial upfront payment to Ericsson ▮ which was partially a release payment for past sales) and purchase at least a minimum quantity of products ("thin modem" chipsets) from Ericsson's Modems business unit.

21. Because Ericsson and Samsung agreed to cross-license each other under their respective 2G, 3G, 4G, and 802.11 standard essential patents and implementation patents for a full ▮ years into the future, Samsung's agreement to make a substantial upfront payment, and to commit to either a substantial yearly payment or dollar-per-unit running royalties represents a bargain by Ericsson and Samsung over the risks related to Samsung's future sales volumes. If Samsung sales remained at then-current levels or grew throughout the license period, Samsung would receive a favorable deal on a per-unit basis. But if Samsung's sales tapered off, then Ericsson would benefit. The mobile handset market is highly competitive and there have been very significant market changes over the past seven years. For example, former market leaders within the last ten years such as Nokia, Blackberry, and Motorola have now effectively exited the market for mobile devices. Ericsson recognized this market volatility, and the possibility that Samsung, while the market leader in 2014, could sink to a much lower market position over the license period. The fixed upfront and annual payments in the license greatly minimized the risk to Ericsson that licensing revenues from Samsung's sales could decline over the license period. This turned out to be a smart business decision, because Samsung's sales growth has slowed since the agreement was signed, and Samsung's massive recall of its Galaxy Note 7 smartphones contributed to the largest year-on-year drop in sales in the third quarter of 2016. And, even if Samsung were to elect to pay dollar-per-unit running royalties, those royalties will be paid at rates that I understand are ▮ ▮ for a license under just its 2G, 3G, or 4G standard essential patent portfolios. As a result, regardless of Samsung's future performance in the market,

the agreed upon payment structure assured Ericsson of very substantial cash payments in addition to the revenue generated by Samsung's commitment to purchase at least a minimum quantity of thin modem chipsets from Ericsson.

### III. The Rates In Ericsson's License Agreements Best Indicate The Technical Value Of Ericsson's 2G, 3G, And 4G Patent Portfolios.

22. I understand that TCL has commissioned technical experts, Dr. Ding and Dr. Kakaes, to evaluate the strength of Ericsson's 2G, 3G and 4G patent portfolios, and that they conclude that Ericsson's patents are generally weak. As I discussed earlier, the negotiated royalty rates in Ericsson's licenses are the end-result of extensive negotiations with sophisticated companies, who are highly motivated to scrutinize the technical merits of Ericsson's patents. Thus, regardless of the conclusions reached by TCL's technical experts, the rates in Ericsson's license agreements best indicate the FRAND value of Ericsson's 2G, 3G, and 4G patents because they already take into account the technical assessments performed by Ericsson's licensees.

Executed on January 9, 2017 at Dallas, Texas.

Luke McLeroy

## CERTIFICATE OF SERVICE

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 11, 2017, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.

Dated: January 11, 2017  **CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON