CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. <br><br> ERICSSON INC., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx <br> Case No. 2:15-CV-02370 JVS-DFMx <br><br> **WITNESS STATEMENT OF MICHAEL J. PELLEGRINO** <br><br> Hon. James V. Selna <br><br> **Discovery Cut-off:** May 23, 2016 <br><br> **Pretrial Conference:** January 30, 2017 at 11:00 a.m. <br><br> **Trial:** February 14, 2017 at 8:30 a.m. |

# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ..................................................................... 1

II.     QUALIFICATIONS .............................................................................. 5

III.    SCOPE OF ENGAGEMENT ................................................................ 8

IV.     METHODOLOGY FOR VALUING THE LG PATENTS ..................... 8
    A.  Analysis Methodology ................................................................. 8
    B.  Factors Influencing the Value Calculation and Analysis ............. 9
    C.  Summary and Review of Dr. Lynde's Value Conclusion ............ 10
    D.  Definition of Value Standard ..................................................... 12
    E.  Definition of Value Premise ...................................................... 16
    F.  Value Currency ......................................................................... 17
    G.  Technical Knowledge Guidance ................................................ 17
    H.  Effective Date ........................................................................... 17

V.      OVERVIEW OF THE LG PATENTS ................................................ 17
    A.  Introduction .............................................................................. 17
    B.  Description of the LG Patents .................................................... 18
        1.  U.S. Patent #7,957,770 ...................................................... 18
        2.  U.S. Patent #8,078,134 ...................................................... 19
        3.  U.S. Patent #8,092,253 ...................................................... 19
        4.  U.S. Patent #8,095,888 ...................................................... 20
        5.  U.S. Patent #8,300,017 ...................................................... 20
        6.  U.S. Patent #8,326,377 ...................................................... 21
        7.  U.S. Patent #8,549,426 ...................................................... 22
        8.  U.S. Patent #8,593,415 ...................................................... 22
    C.  Patent Selection & Review Process ........................................... 23
    D.  Selection Rationale .................................................................... 25
    E.  U.S. Patent #7,957,770 Prosecution History Review ................. 34
        1.  Non-Final Office Action Dated June 18, 2010 and Response ................. 34
        2.  Final Office Action Dated December 7, 2010 and Response ................. 35
        3.  Request for Continued Examination on February 4, 2011 ...................... 35
        4.  Conclusions ....................................................................... 35
    F.  U.S. Patent #8,078,134 Prosecution History Review ................. 36
        1.  Reexamination of the '134 patent ....................................... 36
    G.  U.S. Patent #8,092,253 Prosecution History Review ................. 37
    H.  U.S. Patent #8,095,888 Prosecution History Review ................. 37

|  | 1. | Non-Final Office Action Dated March 29, 2011 and Response | 38 |
|  | 2. | Conclusion | 38 |
| I. |  | U.S. Patent #8,300,017 Prosecution History Review | 38 |
|  | 1. | Notice Restriction Requirement Dated September 24, 2010 and Response | 38 |
|  | 2. | Non-Final Office Action Dated November 29, 2010 and Response | 39 |
|  | 3. | Final Office Action Dated February 23, 2011 and Response | 40 |
|  | 4. | Non-Final Office Action Dated June 20, 2011 | 40 |
|  | 5. | Final Office Action Dated December 15, 2011 and Response | 41 |
|  | 6. | Conclusion | 41 |
| J. |  | U.S. Patent #8,326,377 Prosecution History Review | 41 |
|  | 1. | Non-Final Office Action Dated June 21, 2010 and Response | 42 |
|  | 2. | Final Office Action Dated October 28, 2010 and Response | 42 |
|  | 3. | Non-Final Office Action Dated April 1, 2011 and Response | 43 |
|  | 4. | Final Office Action Dated October 14, 2011 and Response | 43 |
|  | 5. | Non-Final Office Action Dated March 22, 2012 and Response | 44 |
|  | 6. | Conclusion | 44 |
| K. |  | U.S. Patent #8,549,426 Prosecution History Review | 45 |
|  | 1. | Non-Final Office Action Dated May 28, 2008 and Response | 45 |
|  | 2. | Final Office Action Dated December 2, 2008 and Response | 45 |
|  | 3. | Non-Final Office Action Dated May 12, 2009 | 46 |
|  | 4. | Final Office Action Dated March 19, 2010 and Response | 46 |
|  | 5. | Non-Final Office Action Dated June 24, 2010 | 47 |
|  | 6. | Final Office Action Dated October 14, 2010 and Response | 47 |
|  | 7. | Non-Final Office Action Dated January 9, 2012 | 48 |
|  | 8. | Non-Final Office Action Dated June 22, 2012 | 48 |
|  | 9. | Non-Final Office Action Dated February 13, 2013 | 49 |
|  | 10. | Conclusion | 50 |
| L. |  | U.S. Patent #8,593,415 Prosecution History Review | 50 |
|  | 1. | Non-Final Office Action Dated December 14, 2012 and Response | 51 |
|  | 2. | Final Office Action Dated May 20 2013 and Response | 51 |
|  | 3. | Conclusion | 51 |
| M. |  | Ex Parte Patent Reexamination Process | 52 |
| N. |  | Reexamination of the '134 patent | 54 |
|  | 1. | Non-Final Office Action Dated November 8, 2013 and Response | 54 |
|  | 2. | Final Office Action Dated January 23, 2014 and Response | 55 |
|  | 3. | Conclusion | 55 |
| O. |  | Consolidated Value of the LG Patents | 56 |
| P. |  | Current Ownership Rights | 56 |
| Q. |  | Ownership Transfer Offers | 57 |
| R. |  | LG Electronics and Ericsson Global Patent License Agreement | 57 |

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1       1.     Parties ........................................................... 57

2       2.     Effective Date ............................................... 57

3       3.     Responsibilities ........................................... 57

4       4.     Consideration ............................................... 58

5       5.     Miscellaneous .............................................. 59

       S.     LG Electronics and Ericsson Agreement to Assign Patents .................... 59

       1.     Parties ........................................................... 59

       2.     Effective Date ............................................... 60

       3.     Responsibilities ........................................... 60

       4.     Consideration ............................................... 60

       5.     Miscellaneous .............................................. 60

       6.     Governing Law and Disputes ................... 60

       T.     Agreement Analysis ................................................... 60

VI.     PATENT PROSECUTION OVERVIEW ......................................... 61

    A.     Introduction ........................................................... 61

    B.     What Is a Patent? ................................................... 61

    C.     Patent Prosecution Process ................................... 62

VII.    PATENT LITIGATION OVERVIEW ............................................. 65

VIII.   APPROACHES TO DETERMINING VALUE ........................... 67

    A.     Introduction ........................................................... 67

    B.     Market Approach ................................................... 67

    C.     Cost Approach ....................................................... 69

    D.     Income Approach ................................................... 71

IX.     INTELLECTUAL PROPERTY CONSIDERATIONS ................. 73

    A.     Intellectual Property Overview ........................... 73

    B.     Sustainable Competitive Advantages ................. 73

    C.     Risk Associated With Value Of The LG Patents ................. 77

    D.     Active Government Patent Protections ............... 79

    E.     Functional Realization ......................................... 80

    F.     Ease of Infringement Detection ........................... 81

    G.     Attempts to Design Around Patent ..................... 82

    H.     Propensity to Defend Intellectual Properties ................. 84

    I.     Patent Litigation Duration ................................... 85

X.      MARKET OVERVIEW ........................................................... 86

    A.     Introduction ........................................................... 86

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

B.    Smartphone Industry Overview ............................................. 87
C.    Market Analysis Conclusion ................................................. 90

XI.    GENERAL VALUATION CONSIDERATIONS .................................. 91

A.    Evaluation Framework ........................................................ 91
B.    Income Approach Valuation Methodology ............................. 92
C.    Valuation Model Structure .................................................. 93
D.    Market Analysis Impacts on Valuation Model ....................... 94
E.    Product Revenue Model ...................................................... 95
F.    Accounting for Uncertain Valuation Assumptions ................. 95
G.    Remaining Economic Life ................................................... 98
H.    Income Tax Rate ............................................................... 103
I.    Currency and Country Risk ................................................. 103
J.    Discount Rate ................................................................... 104
K.    Regulatory Environment ..................................................... 107
L.    Product Warranty Returns and Allowances .......................... 108
M.    Workforce Considerations .................................................. 108
N.    Capital Equipment Requirements ........................................ 109
O.    Working Capital Requirements ........................................... 109
P.    Value Realization Timing ................................................... 110
Q.    Revenue Timing ................................................................ 111
R.    Licensee Licensing Order ................................................... 113
S.    Revenue Forecast .............................................................. 114
    1.    Royalty Rate ............................................................. 118
    2.    Royalty Base ............................................................ 124
    3.    Unit Forecast ............................................................ 126
T.    Operating Expenses ........................................................... 130

XII.    VALUE CONCLUSION ............................................................. 132

A.    Value Conclusion .............................................................. 132
    1.    Unencumbered Value Conclusion ............................... 133
    2.    Encumbered Value Conclusion ................................... 137

TABLE OF EXHIBITS ...................................................................... 142

1   My name is Mike Pellegrino. I have been retained by Telefonaktiebolaget
2   LM Ericsson and Ericsson Inc. (together, Ericsson) as an expert witness in this
3   litigation. I have personal knowledge of the facts set forth in this Declaration, and
4   declare under penalty of perjury and the laws of the United States of America that
5   they are true and correct.

6   **I.     EXECUTIVE SUMMARY**

7       1.     The 2014 cross license between Ericsson and LG included non-
8   monetary consideration; specifically, Ericsson acquired the right to transfer ten LG
9   patents to the assignee of its choice. TCL's retained expert Dr. Lynde concluded
10  that it is reasonable to assign a zero dollar value to these patents.

11      2.     Ericsson's counsel retained me to value eight of the ten patents: US
12  Patent Nos. 7,957,770 ('770 patent), 8,078,134 ('134 patent), 8,092,253 ('253
13  patent), 8,095,888 ('888 patent), 8,300,017 ('017 patent), 8,326,377 ('377 patent),
14  8,549,426 ('426 patent), and 8,593,415 ('415 patent) (collectively, the LG Patents).
15  Note that I did not value two standard essential patents that Ericsson also acquired
16  the right to transfer from LG; if I had considered those additional patents in my
17  analysis, my value conclusion would have increased.

18      3.     At a high level, my valuation analysis included a factual analysis, an
19  analysis of the LG Patents, and then the value calculation. I sought to evaluate the
20  LG Patents and ascertain whether, within the guidelines of reasonable business
21  judgment, there existed a fact pattern enabling some prospect for future value from
22  them. I did not enter this analysis with any expectation that the LG Patents would
23  have a high or low value. Instead, I relied on the evidence in the record and other
24  external data that I generated through my own research efforts to aid with my value
25  calculation.

26      4.     I valued the patents as of the date of the transfer agreement—July 7,
27  2014. As part of the valuation development process, I consulted with a variety of
28  public and nonpublic resources provided to me by Ericsson representatives and

-1-

through my own independent research. I reviewed product literature, marketing and sales forecasts, technical requirements, and presentations. I utilized commercial patent and litigation databases and researched the attributes of thousands of patents. I reviewed select cases using PACER (the online database that provides access to documents associated with litigation in federal court) and DocketNavigator. I also interviewed Ericsson representatives by telephone.

5.     In my evaluation of the patents, I read all of the patents. I also reviewed the prosecution file histories for all of the patents, seeking to find any abnormalities that may serve to impair the value of the LG Patents. I verified that Ericsson is current with all patent maintenance fees with the USPTO. Moreover, I further verified that neither LG nor Ericsson was late on any maintenance payments, both entities paid the proper fee amount (i.e., large entity versus small entity or micro entity) and there were no associated post-expirations associated with these patents.

6.     I also interviewed several Ericsson representatives with respect to the process that they used to select the patents. During my interviews, I learned that Ericsson spent many months reviewing two sets of patents before Ericsson found a set they liked. Ericsson created a cross-functional team, comprising engineers and attorneys within the organization from different offices around the world, to review these patents. In addition, Ericsson commissioned the services of Parsa Wireless Communications, LLC (Parsa) to assist with additional third party technical analysis of the patents that LG offered.

7.     To value the LG Patents, I considered the three accepted approaches to valuing the patents which included the market approach (or sales comparison approach), the income approach, and the cost approach. All three approaches are well-documented in various professional references. Of the three approaches available, I used the income approach because the market and cost approaches would not have generated credible results. During the valuation engagement, I used

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

- 세 

1    the same exact methods in the valuation of the LG Patents (and even the same basic

2    valuation model structure) as I have in many actual patent acquisition transactions

3    for companies throughout the years that included many technologies in the same

4    space involving cumulative amounts into the billions of dollars.

5         8.    I considered many different factors in the development of my value

6    opinion including: market acceptance of the technologies, any previous license

7    agreements with similar technologies, working capital, operating budgets, capital

8    equipment requirements, revenue recognition policies, income tax rates, regulatory

9    environment, product warranty returns and allowances, currency and country risks,

10   discount rates, workforce considerations, and the relative size, growth, and trends in

11   target markets. I also considered factors specific to IP valuation: sustainable

12   competitive advantage, risk associated with the technologies, functional realization,

13   active government patent protections, ease of infringement detection, attempts to

14   design around the patent, and the owner's propensity to defend against attack.

15        9.    To calculate the value of the patents using the income approach, I used

16   the discounted future economic income method of the income approach to establish

17   value for the LG Patents. I built a discounted cash flow model for the valuation

18   scenarios to determine the anticipated economic income from the rights to own and

19   use the LG Patents over a discrete period in two scenarios (one is an encumbered

20   scenario, one is an unencumbered scenario). I then used the discounted cash flow

21   method to determine the quasi-perpetual value component after the discrete period

22   that I modeled, modeling a variable annuity for those months beyond the discrete

23   forecast that I developed. I used annual market data, revenue projections, revenue

24   trends, investment data, and cost data as provided to me by Ericsson representatives

25   and sources that I reviewed independently as a basis for the value development.

26   Subsequently, I integrated my findings into a valuation model, accounting for costs

27   and appropriate capital needs. I then developed an appropriate discount rate to

28   determine the value of respective patents as of July 7, 2014. I then discounted the

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   economic income using that discount rate to determine a nominal value indication

2   as of July 7, 2014.

3        10.    I modeled two scenarios because Ericsson's existing licensing

4   encumbrances actually reduce the value of the patents to Ericsson. Under the fair

5   market value standard, other potential buyers do not have the same encumbrances

6   associated with Ericsson's license agreements. As such, the value of the LG Patents

7   is likely much greater for other potential buyers of the patents as they have the

8   ability to pursue Samsung, HTC, Motorola, and other large phone manufacturers

9   that are already Ericsson licensees. The economic difference for those hypothetical

10   buyers versus Ericsson is at least double the value indication captured in my

11   statement as Ericsson's encumbrances represent greater than 50% of the total

12   market share that may be using the inventions disclosed in the LG Patents. That

13   market share is available to other buyers who are not Ericsson.

14        11.    I built a revenue forecast that included recovery of damages from

15   previous historical unit sales of products that included suspected unauthorized and

16   unlicensed use of inventions disclosed in the LG Patents. I also included running

17   royalties for licensed use of the inventions disclosed in the LG Patents on a

18   prospective basis after the execution of a license agreement.

19        12.    On a retrospective basis, I modeled the accrual of royalties going back

20   to 2009, which is the maximum allowable look-back period for damages when

21   considering all of 2014 in the historical damages period. On a forward basis, I

22   modeled future royalties discretely over a 10-year window through 2023.

23        13.    An income-based model's outputs depend on the values of the inputs

24   used, which can vary from what I modeled. Further, there may be complex

25   interactions between the various inputs in my valuation model that would be

26   difficult to capture manually. I captured the complex model interactions in the face

27   of uncertain estimating inputs in the valuation model using Monte Carlo simulation

28   analysis. Courts have accepted such simulation techniques as a valid means of

accounting for uncertainty. For example, I have used Monte Carlo simulation on hundreds of valuation engagements and I have presented such evidence in both state, federal, and tax courts. Others have used Monte Carlo simulation in court as well.

14.     I concluded that the fair market value of the LG Patents in the unencumbered scenario is **$274,518,453** using the income approach to value. The fair market value of the LG Patents in the encumbered scenario is **$170,051,079** using the income approach to value.

## II.    QUALIFICATIONS

15.     I am the President of Pellegrino & Associates, LLC (P&A), a boutique intellectual property valuation firm. I have significant experience valuing patents and other forms of intellectual property, establishing royalty rates, and evaluating businesses. My company engagements number about 350 for more than 200 clients, ranging from Fortune 100 companies like IBM, GE, State Farm, Liberty Mutual, American Express, and Lockheed Martin to startups. Judges, attorneys, and government entities such as the IRS and the SEC have widely accepted my work product. Courts at the state and federal level, tax jurisdictions, and arbitration panels have accepted my work for issues including bankruptcy valuations, estate tax valuations, property tax valuations, income tax valuations, copyright infringement claims, trade secret misappropriation claims, patent infringement claims, breach of contract claims, and others. One North Carolina court stated that my work is "clearly in the mainstream of IP valuation methodologies" and that my qualifications are "outstanding."[1]

16.     My experience positions me as a thought leader in intangible asset valuation. I am the author of first and second editions of *BVR's Guide to Intellectual Property Valuation*, selling more than 700 books to a variety of

---

[1]   *Vernon v. Cuomo*, 06CVS8416, 2009 NCBC 6 (N.C.B.C. Mar. 17, 2009).

customers including attorneys, tech transfer officers, business valuation firms, competing IP valuation firms, and others. In addition, my finance- and software-related articles appear in internationally and nationally recognized outlets, such as *IAM Magazine*, *Valuation Strategies Magazine, CFO Magazine*, MSNBC.com, FoxNews.com, and others. I have had the pleasure of teaching thousands of people about valuations. Various venues around the globe, including law firms, universities, accounting firms, appraisal firms, valuation firms, state bar associations, and other organizations, frequently request my expertise at speaking engagements regarding intangible asset valuations and the tax effects of embedded application software and intellectual property. Some of the venues include the following:

> **Professional societies:** American Society of Appraisers, the Canadian Institute of Chartered Business Valuators, the Association for University Technology Managers, Indiana Continuing Legal Education Forum, the Oregon State Bar Association, and state CPA societies from Florida, Maryland, New Jersey, New York, and Ohio.

> **Government agencies:** the National Institutes of Health, the International Finance Corporation (member of the World Bank), the Vietnamese Government, the Malaysian Government, the Malaysian Patent Office, and the International Visitor Leadership Program, which is part of the United States Department of State.

> **Others:** Purdue University, the University of Illinois School of Law, the Indiana University School of Law, the Indiana University School of Informatics, Georgetown University Law Center, TEDx, the Management Roundtable, and Business Valuation Resources.

17. In addition to my frequent speaking engagements, I teach webinars regarding valuation and related topics. To date, my student audiences number more than 1,500 and include those across most major economic analysis firms, the IRS, financial institutions, and others. For instance, students come from Charles River Associates, Stout Risius Ross, Inc., Wells Fargo, Deloitte, Ernst & Young, JP Morgan Chase, KPMG, and PriceWaterhouseCoopers. I have also taught scores of technology transfer and IP managers from the likes of Baxter Healthcare, John

Deere, DSM, Harley Davidson, Novelis, Johnson & Johnson, Pepsi, Nestle, Alcoa, Dow, Georgia-Pacific, Kimberly-Clark Corporation, Kraft Foods, Celanese, SC Johnson, Altria, AB Inbev, James Hardie Building Products, Avery Dennison, Vale, Exxon Mobil, United Health Group, General Electric, FedEx, The Hershey Company, and Baxa Corporation, among others.

18.     I have taught on IP valuation to officials from the governments of Brazil, Azerbaijan, Estonia, Thailand, Guatemala, and New Zealand on behalf of the U.S. State Department. I have counseled and testified before legislators about valuation issues. I was also instrumental in helping to change Indiana law regarding the valuation of embedded application software for personal property tax reporting purposes and for the taxation of patent-derived income. I authored a substantial portion of the administrative rules that Indiana's Department of Local Government and Finance now uses to administer the evaluation of software appraisals for property tax matters.

19.     I am the chair of the intellectual property valuation standards committee established by the Licensing Executives Society (LES), whose charter is to pursue American National Standards Institute (ANSI)-accepted standards for the valuation of patents, copyrights, trademarks, and trade secrets in a variety of contexts including financial reporting, capital formation, economic damages calculations, and others. I am also a member of LES's public policy committee, seeking to help set standards for intellectual property-focused regulatory matters with the SEC and others. I am also a member of LES's standards committee for IP use in the boardroom.

20.     In addition to my valuation expertise, I developed a state-of-the-art patent analytics tool that provides key insights and intelligence into the patent landscape. This system removes information asymmetry rampant in the patent marketplace by consolidating millions of disparate records into a user-friendly database.

21.     My educational background includes a Bachelor's degree in computer science from Indiana Institute of Technology and a Master's degree in business administration from Ball State University. I also completed additional accounting coursework sufficient to fulfill the academic requirements for an undergraduate accounting degree. In addition, I completed both the 15-hour and 7-hour update USPAP training programs. I remain current with all USPAP training.

## III.   SCOPE OF ENGAGEMENT

22.     I was engaged by counsel for Ericsson to consider and respond to certain opinions expressed by Dr. Lynde. Because TCL's expert, Dr. Lynde, assigned a zero value to Ericsson's right to transfer 10 LG patents as part of their cross-license agreement, I was asked to determine the likely value of the LG patents to rebut Dr. Lynde's testimony. For this valuation, I performed an analysis to identify, develop, and report on the fair market value of LG Patents and to provide opinions as to Dr. Lynde's value conclusions.

23.     For my time spent working on this matter, my firm charges $400 per hour for non-testimony-related activities and $600 per hour for testimony-related activities. My compensation in no way depends on the outcome of this litigation. I anticipate providing additional testimony in a rebuttal declaration later in January 2017, and at the trial of this matter in February 2017.

## IV.   METHODOLOGY FOR VALUING THE LG PATENTS

### A.   Analysis Methodology

24.     My analysis consisted of the three steps:



Pellegrino Demonstrative 1

25.     First, under the factual analysis step, I sought to understand the factual

1    background of the LG Patents. My factual analysis included review of the
2    document production set, review of marketing studies, review of the case filings,
3    review of similar court actions, and similar activities.

4         26.    Second, under the IP analysis step, I evaluated the LG Patents and
5    ascertained whether, within the guidelines of reasonable business judgment, there
6    existed a fact pattern enabling some reasonable prospect for future value from the
7    LG Patents.

8         27.    Third, under the value calculation step, I sought to quantify the value
9    of the IP portfolio. Importantly, P&A did not enter this analysis with some
10   expectation that the IP portfolio would have a high or low value. Instead, P&A
11   relied on the evidence in the record and other external data that it generated through
12   its own research efforts to aid with any value calculation.

13        **B.    Factors Influencing the Value Calculation and Analysis**

14        28.    Valuation is context sensitive, especially in cases of litigation. The
15   exact same asset can have a variety of values depending on the context. For
16   example, an asset such as a car has a value when new. That same car has a different
17   value the moment the new owner drives it off the lot. That same car has a different
18   value for insurance purposes. That same car has a different value for
19   collateralization of a bank loan. That same car has a different value under a
20   liquidation scenario (i.e., the owner wants to sell the car quickly). Further, that
21   same car has a different value under a forced liquidation scenario (i.e., the owner is
22   forced to sell the car because of a divorce). As it relates to the patents of interest in
23   this case (i.e., the value of the LG Patents), the context can cause a valuation
24   analyst to come to a variety of valuation outcomes, all possibly valid. As such, the
25   context for this valuation engagement has a material impact on the valuation
26   conclusions presented in this statement.

27        29.    One important consideration is the precondition that Ericsson
28   management exercised reasonable business judgment when addressing the value

1    preservation of the LG Patents. There is ample evidence in the record to support the

2    reasonableness of this precondition, including the following five points. First,

3    Ericsson invested months of calendar time in selecting the patents at issue.[2] Second,

4    Ericsson went through two rounds of selection within the LG patent portfolio

5    because Ericsson was not satisfied with first round of patents LG proposed to

6    Ericsson.[3] Third, Ericsson dedicated up to 14 people to the analysis effort for the 10

7    patents at issue.[4] Fourth, Ericsson dedicated some of its best and brightest engineers

8    and patent attorneys to the analysis effort.[5] Fifth, Ericsson used one of the patents in

9    an assertion against Apple, Inc.[6]

10           **C.    Summary and Review of Dr. Lynde's Value Conclusion**

11           30.    I understand that TCL-retained expert Dr. Lynde concluded that the

12   patents were worth $0 dollars. I understand that he justified this conclusion on his

13   understanding that (1) the LG Patents are not standard essential and (2) ███████

14   ████████████████████████████████████████████████████████████████

15   by Ericsson that the LG Patents are worth $125 million. Dr. Lynde reaches his

16   conclusion in error. The idea that patents are worth nothing does not follow from

17   the contention that said patents are not essential to any standard. Importantly, Dr.

18   Lynde did not conduct an actual valuation of the LG Patents. Even a preliminary

19   analysis of the LG Patents reveals that they have substantial value.

20           31.    First, as I will discuss later in this statement, Ericsson expended

21   significant sums researching the LG Patents. Ericsson invested a significant amount

22   of time into the analysis of these patents and built a blue-ribbon team of 14 people

23   for the due diligence process.[7] The level of economic investment that Ericsson

---

24   [2]   Opening Delgado Statement at Paragraphs 38-65.

25   [3]   Opening Delgado Statement at Paragraphs 50, 58.

26   [4]   Opening Delgado Statement at Paragraphs 51-54, 59.

27   [5]   *Id.*

     [6]   Opening Delgado Statement at 68.

28   [7]   Opening Delgado Statement at 51-54, 59.

1    made in the review process exceeded one hundred thousand dollars. To conclude

2    that Ericsson made such an investment on patents worthless from the start is

3    nonsensical. A rational investor does not expend such sums on trivial matters.

4        32.    Next, I understand that Dr. Lynde quotes Dr. Kakaes conclusion from

5    another arbitration, claiming that none of the patents was standard essential and the

6    technical contribution of any of the LG Patents to technical standards was minimal.

7    The conclusion has no bearing on the transfer value of the LG Patents, for several

8    reasons. First, the LG Patents have no FRAND requirement. That is why Ericsson

9    selected the patents it did, which I will discuss later in this statement. Second, the

10   marginal value of additional standards-essential patents to the Ericsson portfolio

11   carries less economic potential than patents that do not comprise some component

12   of a technical standard. I provide several examples in this statement why other

13   patents that do not comprise some part of a technical standard actually have higher

14   marginal value on a per-patent basis. In short, in my opinion, based upon a

15   reasonable degree of probability in the valuation profession, Dr. Kakaes' opinions

16   as to the relevancy of these patents to technical standards are irrelevant and miss the

17   point of Ericsson's selection of the LG Patents in the first place.

18       33.    Importantly, I understand that out of all of the references originally

19   considered by Dr. Lynde, there is not a single reference to the LG Patents

20   themselves. While Dr. Lynde vaguely mentions the LG Patents; it appears that Dr.

21   Lynde did not perform any credible or substantive research of the LG Patents. This

22   is perplexing since the LG Patents plainly provide alternative consideration to the

23   LG/Ericsson cross license.[8]

24       34.    The LG Patents are of central importance to the valuation issue

25   because of the measure of conformance to FRAND terms with respect to the LG

26   license. As I will present in this statement, there is overwhelming evidence to

---

[8]    Exhibit 199, License Agreement between LG Electronics and Ericsson dated
6/27/14.

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    suggest reasonable to substantial positive value (i.e., not zero) to the LG Patents.

2    35. Dr. Lynde's analysis ignores the massive direct and indirect evidence

3    of the value of these patents, both to Ericsson directly, as well as to others in the

4    market. As a result, the value conclusion that Dr. Lynde uses in his analysis has

5    little support based on evidence in the record or in the public domain that I

6    reviewed. As such, in my opinion, Dr. Lynde's opinions lack credibility as they

7    relate to the value of the patents that Ericsson acquired from LG.

8    36. The point of the analysis that I present in this statement is to help

9    provide an indication as to the value of the LG Patents. As I will explain in detail,

10   in my opinion, the LG Patents had, and continue to have, significant market value.

11       **D.    Definition of Value Standard**

12   37. For the purposes of this valuation, I used the fair market value standard

13   of value as defined in Revenue Ruling 59-60 (59-60). Fair market value is the

14   amount at which property would change hands between a hypothetical willing

15   buyer and a hypothetical willing seller when the former is not under any

16   compulsion to buy and the latter is not under any compulsion to sell, both parties

17   having reasonable knowledge of relevant facts. Court decisions frequently assume

18   the hypothetical buyer and seller are also willing and able to trade the property and

19   have sufficient information as to the property and the market for such property.

20   38. Fair market value, as defined, does not necessarily reflect the actual

21   price that Ericsson could realize from a true sale of the LG Patents in the real

22   market. Rather, the value standard reflects the notional value of the LG Patents in

23   an assumed market. This assumed market considers the historic and prospective

24   value of the LG Patents in light of the business risk associated with the LG Patents.

25   The notional value does not include possible synergistic benefits or economies of

26   scale that a potential purchaser may enjoy.

27   39. In the real market, the LG Patents could generate as many prices as

28   there are buyers in the market, with each buyer having the ability to pay its own

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   specific price based on its own specific set of circumstances. In the end, the final

2   price will be the result of a set of negotiations between buyers and sellers that I

3   could not ascertain or forecast for the purpose of this engagement. However, I could

4   test my value conclusions to ensure that there is a reasonable economic basis for my

5   value opinion (e.g., the opinion does not rely on market growth rates or risk rates

6   that empirically are nonsensical).

7       40.   I used the efficient market hypothesis (EMH), cross-referenced with

8   the definition of fair market value in 59-60, to aid my reasonableness test analysis

9   for the LG Patents. The EMH is an investment theory that reflects the diffusion of

10  information and the integration of it in the value of patents. The EMH provides an

11  important context for understanding the definition of fair market value, particularly

12  with respect to available information and the reflection of such information in

13  value.

14      41.   The EMH asserts that markets are efficient and rational in the

15  processing of information and that the market reflects such efficiencies in the value

16  of a given patent. Empirically, this is an easy concept to test, whether it is a

17  commercial building or a share of stock in a company. If the market finds a

18  commercial property to have toxic waste, the market will adjust the value of that

19  property to account for the liabilities associated with the cleanup, future lawsuits,

20  and other factors. If a public company misses or exceeds earnings targets, then the

21  market reflects such information in the company's share price. As the market

22  reflects information in the price of the patent, there exists a fundamental belief in

23  the EMH that the values are unbiased, hence, objective. Of course, the magnitude of

24  the value change is of significant importance, as it drives the ultimate price and

25  market value of the company.

26      42.   There are varying degrees of market efficiency, which reflect the

27  dissemination of information by the public. The EMH classifies the varying degrees

28  as follows:

-13-

**Weak-form efficient:** The historical prices of an asset represents all information with respect to value and no one can earn excess returns in the market (i.e., "beat the market").
**Semi-strong-form efficient:** The market reflects all information with respect to value within a timely fashion (nearly instant) and no one can earn excess returns in the market.
**Strong-form efficient:** The market reflects all information both public and private with respect to value and no one can earn excess returns in the market.

43.    One may argue that 59-60 implies that the market is strong-form efficient, as valuation analysts must render a value conclusion with respect to a hypothetical buyer and a hypothetical seller, both having access to relevant information, with equity to both. Such a scenario only exists in a strong-form efficient market.[9] Deviations from the strong-form efficient market would not reflect relevant information or create equity, thus violating the fair market value standard definition in 59-60.

44.    While there has been much empirical analysis both for and against the EMH, what is important is that 59-60 implies the concept of the EMH in its definition of fair market value. For example, I understand that the Internal Revenue Service has stated that "[a]s a generalization, the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented."

45.    Because of the implications of 59-60 and the reliance on strong-form efficiency of the EMH, a natural conclusion is that hypothetical rational buyers and sellers would only close a transaction when there is equity to both and access to all relevant information. Merely looking at asset prices (asset-price-related multiples, such as revenue, earnings, or cash flow multiples) as a value proxy for other assets

---

[9]    If the market were weak-form efficient, then buyers would never pay for acquisitions at prices higher than control values for companies, as there would be no financial equity to the buyer.

does not provide such relevant information (particularly to the buyer). Therefore, it is sometimes difficult to make a determination as to whether equity exists. This analysis naturally may get more complicated if there is an asset swap or cross license as opposed to a cash purchase for an asset pool, as sellers assume the risk of the buyer, for which they may have little working knowledge. Further, it gets more complicated still when dealing with collections of assets that have no reasonable, publicly-available comparable in the market, such as is the case with intellectual property portfolios like those represented by the LG Patents (e.g., implementation patents for smartphones).

46.    Implicit in the definition of buyer and seller equity is that both parties are satisfied with the outcome at the closing of a transaction, considering the relevant economic environment (i.e., the deal meets or exceeds expected returns). Yet one cannot begin to prove equity without performing the due diligence associated with determining the intrinsic value of the asset. The buyer cannot prove buyer's equity until performing a returns-based analysis, which one does by calculating the intrinsic value of the asset to the buyer. The seller cannot prove the seller's equity until performing a returns-based analysis, which one does by calculating the intrinsic value of the asset to the seller. The following is a continuum that demonstrates the equity allocation under the fair market value standard:

Pellegrino Demonstrative 2

47.   Therefore, if both the buyer and seller perform an intrinsic value analysis to test equity, then the natural result would be something within the range of the seller's intrinsic value, which sets the minimum or "floor" value for the transaction, and the buyer's intrinsic value, which sets the maximum or "ceiling" value for the transaction. Any value within that range will produce equity for both parties and meets the definition of fair market value. Any value outside of this range will not create equity and fails the definition of fair market value.

48.   I did not have a particular hypothetical buyer in mind for the LG Patents. However, it is reasonable that a hypothetical buyer would seek a reasonable financial return for the LG Patents at or in excess of its cost of capital based on a sound and probable forecast of future economic activity. I focused my analysis on this approach to determine the fair market value of the LG Patents and used the results for my value opinion.

**E.   Definition of Value Premise**

49.   The value premise that I used is *value in exchange*, which is inherent in the fair market value standard. Value in exchange typically refers to the amount of other goods and services for which a unit of a specific good may exchange in a

market. The money price often is one measure of value in an exchange.

### F.   Value Currency

50.   All value numbers I have presented reflect a U.S. dollar denomination. As the target market that I studied would pay in U.S. dollars, in my opinion, based upon a reasonable degree of probability within the valuation profession, any value anomalies due to currency conversion will have a *de minimis* value impact.

### G.   Technical Knowledge Guidance

51.   This document contains highly technical material. While I expressed the resulting value conclusion in simple terms, a complete understanding of the valuation detail is easiest with a solid understanding of the following conceptual areas:

Valuation theory and methods

Appraisal development and reporting standards

### H.   Effective Date

52.   The effective date of the opinions and conclusions in this valuation is **July 7, 2014**. This is the effective date of the transfer agreement between Ericsson and LG.[10] Exhibit 198 is a true and correct copy of the transfer agreement between Ericsson and LG.

## V.   OVERVIEW OF THE LG PATENTS

### A.   Introduction

53.   I will now provide an overview of the LG Patents including a description of the LG Patents, current ownership rights, and additional information relevant to the valuation development. Given that the economic model depends

---

[10]   Exhibit 198, Agreement to Transfer Patents between LG Electronics, Inc., and Telefonaktiebolaget LM Ericsson  [ERIC_TCL00111410 - ERIC_TCL00111415]. I understand that Exhibit 198 is a true and correct copy of the Agreement to Transfer Patents between LG Electronics, Inc., and Telefonaktiebolaget LM Ericsson. Exhibit 198 represents the type of legal transfer document that I find reliable. I typically rely on such legal transfer agreements in the ordinary course of my role as a valuation professional.

heavily on the patents that Ericsson acquired the right to transfer from LG, I performed a review of the key patents' file histories to understand possible risk points[11] associated with those patents and the impacts, if any, of those risk points on the value outcomes that I modeled. The following sections provide an overview of patents in the Ericsson portfolio that I reviewed.

### B.   Description of the LG Patents

54.   The patents in question as of July 7, 2014 comprise a variety of U.S. patent grants.[12] While there is much technical nuance to the LG Patents, for practical purposes, I treat the patents as a unified group. The following subsections provide a brief overview of each of the patents.

### 1.   U.S. Patent #7,957,770

55.   U.S. patent #7,957,770 ('770 patent), titled *Mobile Communication Terminal for Providing Tactile Interface*, claims inventions related to a mobile terminal using wireless communications[13] and the method for doing so. The claimed inventions typically include a terminal body configured to a touch input device, which a controller controls. Further, a vibrator is also typically configurable to the terminal body and the controller, wherein the controller causes the vibrator to vibrate when external contact occurs to a touch detection area, regardless if the mobile terminal is set in vibration mode.

56.   In practical terms, the patent discloses inventions associated with providing tactile feedback, including different levels of tactile feedback (e.g.,

---

[11]  Possible risk points may include obvious lapses in the patent maintenance, inventorship disputes, patentability issues in light of the Supreme Court's *Alice* decision, etc.

[12]  Note that there are foreign counterparts for some of the U.S. patents as well; however, the primary pathway to economic value is via licensing of the patents with U.S. entities in U.S. jurisdictions. As such, I did not ascribe any significant value to the foreign counterparts for several reasons. First, those assets were not subject to the transfer to Ericsson. Next, the primary mechanism for generating economic value is via licensing efforts. Ericsson representatives had no contemporaneous approach to addressing any litigation in foreign jurisdictions.

[13]  Example devices may include phones, tablets, laptop computers, and others.

vibration duration or intensity), to the user while the user interacts with the device, especially when the device is in a muted (i.e., vibration mode) state (some tactile feedback systems do not operate when a device is in a muted state).

### 2.  U.S. Patent #8,078,134

57.  U.S. patent #8,078,134 ('134 patent), titled *Mobile Terminal and Method of Controlling Operation of the Mobile Terminal*, generally relates to a mobile terminal[14] and methods to control the mobile terminal. The claimed inventions primarily comprise a mobile terminal with a display with two distinct regions, a controller that controls the content shown in the two display regions, and where the controller may control the size of the two regions. In some embodiments, a sensor is operationally connectable to the mobile terminal and provides data on the direction of gravitational acceleration to determine if the mobile terminal is vertical or horizontal. Additionally, the claimed inventions include methods for controlling the operation of the mobile terminal with a display unit with two regions, where a controller controls the data available in the regions. The method comprises using a controller to display data in the two regions, depending on whether the measurement data indicates that the mobile terminal is in a vertical or horizontal position.

58.  In practical terms, the patent discloses inventions associated with providing and maintaining the order of display elements on a device's screen when rotation of the device changes (I discuss this feature in detail shortly).

### 3.  U.S. Patent #8,092,253

59.  U.S. patent #8,092,253 ('253 patent), titled *Communication Terminal,* claims inventions of a communication terminal that may receive multiple signals through coaxial cables, which in certain cases may act as a grounding. Specifically the claimed communication terminal comprises a case having multiple inner

---

[14]  Example devices may include phones, tablets, laptop computers, and others.

surfaces, a wireless communication unit, and a printed circuit board. Further, a coaxial cable operationally connects to the wireless communication unit and the printed circuit board, wherein the coaxial cable may be operationally connectable with a fixing portion.

60.    In practical terms, the patent discloses inventions associated with providing and maintaining a common electrical ground in a phone device where the device otherwise would not have a common ground (i.e., a device with disparate printed circuit boards affixed to a plastic chassis, which lacks electrical continuity between the boards). Importantly, the cable retains the capability to carry multiple signals while providing the common grounding capability.

### 4.    U.S. Patent #8,095,888

61.    U.S. patent #8,095,888 ('888 patent), titled *Mobile Terminal and Image Control Method Thereof*, claims inventions related to a mobile device with a wireless communication unit that can be configured to display different content items of web pages on that device. The claimed inventions generally comprise a mobile terminal with a display unit and wireless communication unit that have a sensing unit to sense the orientation of the screen. The claimed inventions also include a controller that is operationally connectable to the mobile terminal, display unit, and/or sensing unit, which may be configurable to change the size of an image on the web page presented on the display unit and may be configurable by touching the screen. The user may change the image displayed and move it to a different area of the display unit.

62.    In practical terms, the patent discloses inventions that couple touch to the selective display/manipulation of a web page's content dynamically based on user interaction (e.g., show/resize display content based on touch interaction).

### 5.    U.S. Patent #8,300,017

63.    U.S. patent #8,300,017 ('017 patent), titled *Mobile Electronic Apparatus with Touch Input Device and Display Method Using the Same*, generally

relates to a mobile terminal that uses touch-enabling capabilities and methods of using the touch-enabled functionalities on the mobile terminal. Typically, the mobile terminal includes a display unit with a touch screen, where a controller may control movement of any data or information displayed on the display unit. The claimed inventions comprise a mobile device having a display unit, wherein the display unit displays data in the touch screen-enabled portion of the screen. The touch screen may receive touch inputs that allow for scrolling the displayed data information in relation to the touch inputs received. The display data may also change in relation to the scrolling and in response to the touch inputs.

64.    In practical terms, the patent discloses inventions that allow a user to vary the scrolling of a screen's contents (e.g., scrolling speed and direction) based on the nature of the touch interactions provided by the user.

**6.    U.S. Patent #8,326,377**

65.    U.S. patent #8,326,377 ('377 patent), titled *Input Device and Mobile Device Having the Same,* generally relates to a key button for an input device. The key button may be made of a mineral material, whereas the supporting portions of the key button are not made of mineral material. The mineral material key button and the support member integrate into a mobile device. Specifically, the claimed inventions comprise a mobile device with an input device located in the body of the mobile device, where the input device comprises at least one button made of a light, permeable material and at least one button support member that is operationally connectable to the button. Further, the claimed inventions include a sensor coupled to every button, and a display module that is spaced from the sensor. A window structure and an adhesively attached window support member are attachable to the body of the mobile device.

66.    In practical terms, the patent discloses inventions that enable one to build a device that includes a structurally sound, light permeable button and structural support to a touch screen (a hole in the glass surface of a touch screen

presents a weak point in the screen and an easier place to initiate screen breakage).

### 7.   U.S. Patent #8,549,426

67.   U.S. patent #8,549,426 ('426 patent), titled *Apparatus and Method for Configuring an On-Screen Image in a Mobile Telecommunication Handset Upon Connection*, claims inventions generally related to an apparatus and methods for configuring on-screen images in a mobile device, making it possible to display a multimedia menu when the device detects connection of earphones. The claimed inventions consist of recognizing an earphone connection to the mobile device and displaying a selection of menu items consisting of multimedia applications on a mobile device display. When a user then selects a multimedia application and the device directs the audio output to the earphone.

68.   In practical terms, the patent discloses inventions that allow for intelligent device control of multimedia features when the user inserts an earphone into the device's earphone jack or removes an earphone from the device's earphone jack (e.g., pause video playback when the user unplugs the earphone, resume video playback when the user plugs in the earphone, etc.).

### 8.   U.S. Patent #8,593,415

69.   U.S. patent #8,593,415 ('415 patent), titled *Method for Processing Touch Signal in Mobile Terminal and Mobile Terminal Using the Same*, claims inventions related to a method for processing a touch signal in a mobile terminal. The claimed inventions primarily comprise a method including displaying data on a touch screen, receiving a touch input on at least a portion of the screen, and detecting movement of a mobile terminal while maintaining the touch input. The method also includes displaying the data on the touch screen by properly sizing and fitting it to the screen.

70.   In practical terms, the patent discloses inventions that couple a touch interface to device movement to enable different device behaviors (e.g., press a zoom button on the device and shake it lightly to zoom in a small amount or

strongly to zoom in a large amount, tilt to zoom feature on Android phones).

## C. Patent Selection & Review Process

71.     Ericsson acquired the right to transfer the LG Patents after a protracted selection and review process. The inventive nature of the LG Patents provides particular insight into the business strategy that Ericsson implemented. The business strategy that Ericsson employed had a direct bearing on the selection process and the economic pathway that Ericsson considered when it selected the LG Patents. The following graphic introduces the origins of the transaction and the basic process that Ericsson employed, which occurred over a seven-month period:



Pellegrino Demonstrative 3

72.     When LG and Ericsson negotiated their cross-licensing agreement, LG provided Ericsson with the opportunity to acquire 10 patents from LG's portfolio. Ericsson asked LG to provide a set of candidates to consider.[15] LG originally provided Ericsson with a set of 20 patents to consider in October 2013.[16] These patents comprised 20 distinct patent families. Ten of the patents had some degree of standards essentiality to them[17] (i.e., inventions disclosed in the patents provide some necessary element to implementing LTE or WiFi technologies in products), while the balance covered patents without standards essentiality (hence, not subject to FRAND commitments). LG had prepared charts mapping claims disclosed in those patents against smartphone products that sold in the market.[18]

73.     Ericsson invested nearly two months in the review of the 10 patent

---

[15] Opening Delgado Statement at 58.
[16] Opening Delgado Statement at 50.
[17] Opening Delgado Statement at 50.
[18] Opening Delgado Statement at 50.

candidates that LG provided. In the end, Ericsson rejected most of the patent candidates that LG provided because Ericsson did not necessarily need more patents that covered standards-essential technologies like LTE or WiFi—it already had a deep set of patents in its portfolio that covered those subject matter areas. Instead, Ericsson sought patents that more closely related to how a device manufacturer might build a product and inventions that consumers found valuable in the market.[19] LG then brought an additional set of patent candidates to Ericsson in a second batch for consideration. These patents tended to cover more of the direct consumer-facing features that companies use as product discriminators in the market.

74.     Ericsson invested a significant amount of time into the analysis of these patents.[20] Ericsson created a cross-functional team, comprising engineers and attorneys within the organization from different offices around the world, to review these patents. In addition, Ericsson commissioned the services of Parsa to assist with additional third party technical analysis of the patents that LG offered.[21] In all, over the course of the entire review process, Ericsson committed 9 internal personnel to the review effort and 5 people from Parsa, for a total of 14 reviewers. Ericsson received the second batch of patents from LG in December 2013 and did not finalize the analysis until May 2014.

75.     Ericsson put its best and brightest on the assignment of reviewing the patents that LG provided. I reviewed resumes of the people that performed the analysis of the patents. Members of Ericsson's review team consisted of seasoned

---

[19]   Note that for the purposes of my analysis, I will call these assets "implementation" patents.

[20]   Opening Delgado Statement at 48-68.

[21]   Exhibit 4551, PWC-ERC-11-Implmentation-phase1-October-2013-All-Done.xlsx. Parsa Wireless Communications, LLC. October 2013 (ERIC_TCL00768130). Exhibit 4551 is a true and correct copy of the analysis performed by Parsa Wireless. Exhibit 4551 explains Parsa's results, and is the sort of information an expert, such as myself, in the asset valuation field would typically and reasonably rely on in forming an opinion as to patent valuation..

attorneys (some of whom had worked at some of the marquee firms in the United States) as well as seasoned engineers (some of whom had PhD's or sit on technical standards committees). The average team member committed about 25% of his or her time to the review activity, as Ericsson treated the review project with great importance. In fact, the efforts of the review team had the attention of people within the highest levels within Ericsson (e.g., Gustav Brismark, John Han, Kasim Alfalahi).[22] The team reviewed the patents, reviewed the file histories, reviewed claims charts that LG had provided, mapped the patents to technical standard (where appropriate), and performed its own specific claims analysis mapping and other detailed, yet customary tasks associated with inbound patent acquisitions.[23] From there, Ericsson made a final determination on patents it selected from LG.

76.     If one studies the level of economic investment that Ericsson made in the review process, it is clear that Ericsson had a definite business purpose for these patents. With 14 people that participated in the review process (9 of them internal Ericsson personnel), it is clear that the review investment by Ericsson in time and hard dollars was significant. For example, if the fully-burdened average cost per internal Ericsson resource were $200,000 per year (which may be understated for the level of the team that performed the analysis),[24] then the total analysis investment that Ericsson made (not including external consultants or costs) may have exceeded $150,000.[25] A rational investor does not expend such sums on trivial matters.

**D.     Selection Rationale**

77.     Importantly, many of the patents that LG selected in the second batch

---

[22] Opening Delgado Statement at 65.

[23] Opening Delgado Statement at 48-68.

[24]   Note that a review of salary at glassdoor.com shows that even mid-tier engineers command salaries of $150K or more per year.

[25]   9 staff members * $200,000 annual burdened cost * 25% of employee time * 4 review months / 12 months per year = $150,000 investment amount.

that it provided to Ericsson were not essential to the operation of any particular device, which provided both positive and negative value potential to Ericsson. On the negative side, the applicability of the inventions disclosed in the LG Patents may vary from device to device. Thus, there is risk that the inventions may prove to have no value to some device manufacturers or no specific mapping to certain devices that sell in the market.

78.     However, on the positive side, these patents do carry some other attributes that may be highly desirable. First, two of the patents comprise elements of a technical standard, which Ericsson would be able to map more easily to competitors' products by virtue of those competing products implementing the technical standards. Ericsson would have an obligation to license those two patents under fair, reasonable, and nondiscriminatory (FRAND) terms. Second, since the LG Patents are not essential to the implementation of any technical standard,[26] Ericsson would not have a FRAND licensing obligation for those patents. Third, Ericsson could select a set of patents that covered disparate, yet highly desirable elements of a device's construction. The effect would be to provide Ericsson with multiple fronts of opportunity in negotiating a license agreement with a potential licensee. Thus, even if a licensee had no utility for one patent in the LG Patents, Ericsson would have multiple other patents disclosing high-value inventions covering other disparate parts of a device that would still provide Ericsson with a compelling argument to license the patents without some protracted or contested process. Importantly, as of the date of the LG Patent transfer, Ericsson did not have a licensing agreement in place with Apple (one of the largest producers of smartphones in the U.S. market) and others such as Huawei, TCL Communications, and Microsoft.

79.     The following table captures the basic nature of the inventions that

---

[26] Note that an two patents, not included in my definition of the LG Patents, are essential to the implementation of technical standards.

Ericsson acquired:

| Issued Number | Key Inventive Concepts |
|---|---|
| 7,957,770 | Providing tactile feedback, including different levels of tactile feedback, to the user while the user interacts with the device (e.g., when the device is in a muted state) |
| 8,078,134 | Maintain the order of display elements in a device when rotation of the device changes. |
| 8,092,253 | A coaxial cable capable of carrying multiple signals and providing a grounding capability. |
| 8,095,888 | Couples touch to the selective display/manipulation of a web page's content dynamically based on user interaction (e.g., show/resize display content based on touch interaction). |
| 8,300,017 | Scrolling of a screen's contents (e.g., scrolling speed and direction) based on the nature of the touch interactions provided by the user. |
| 8,326,377 | A device that includes a structurally sound, light permeable button and structural support to a touch screen. |
| 8,549,426 | Intelligent device control of multimedia features when the user inserts an earphone into the device's earphone jack or removes an earphone from the device's earphone jack. |
| 8,593,415 | Coupling touch interface to device movement to enable different device behaviors (e.g., press a zoom button on the device and shake it lightly to zoom in a small amount or strongly to zoom in a large amount). |

80.    If one maps these patents to a contemporary smartphone that sells in the market, the potential overlap appears remarkable.[27] For example, in my consideration of the Samsung Galaxy S4, there appears to be reasonable representation by many subject matter areas covered by the LG Patents as data in the following chart indicates:

---

[27] Note that I are not claiming to have performed an exhaustive claims mapping or legal analysis (recall that both are outside of the scope of my analysis). Rather, I am simply testing the basic thesis that Ericsson presented to me that its intent was to acquire a portfolio of patents that likely spanned many functional areas of a device.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



Pellegrino Demonstrative 4

15

16    81.    As the data in the chart indicates, on its surface, Ericsson has appeared

17    to take a broad view of the LG portfolio, requesting patents that cover a disparate

18    set of technologies across many functional technical device areas. Thus,

19    hypothetically, if Samsung were to argue that it did not indeed use inventions

20    disclosed in the '426 patent, then Ericsson might have alternative licensing

21    opportunities for the '253 patent or others.

22    82.    I performed a similar comparison of the Apple iPhone. For example, in

23    my consideration of the Apple iPhone, there appears to be reasonable representation

24    by many subject matter areas covered by the LG Patents as data in the following

25    chart indicates:

26
27
28

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1
2
3
4
5
6
7
8
9
10
11
12
13



14    Pellegrino Demonstrative 5

15    83.   A deeper analysis into several of the primary patents that Ericsson

16 acquired exposes the concentrated, deliberate thought that Ericsson put into the

17 process, which it would not likely presumably make if the patents carried low

18 value. For example, as I discussed earlier in my statement, Apple and others did not

19 have an open license agreement with Ericsson as of July 7, 2014 (the time of the

20 patent transfer). As such, the LG patent selection that Ericsson undertook included

21 a deliberate focus on picking patents from the LG portfolio that would have

22 strengthened Ericsson's negotiating position.

23    84.   The empirical evidence that I found tended to support this strategy. For

24 example, one patent that Ericsson received from LG included U.S. patent

25 #8,078,134. This patent, titled *Mobile Terminal and Method of Controlling*

26 *Operation of the Mobile Terminal* deals specifically with inventions related to a

27
28

mobile terminal (e.g., an iPhone[28]), whose view changes from landscape to portrait and vice versa when the aspect ratio of the device changes in proximity to the ground, as the following figures demonstrate in various configurations:[29]



Pellegrino Demonstrative 6



Pellegrino Demonstrative 7

---

[28] Note that while I use the iPhone and Apple's behavior for illustrative purposes in this analysis, the functional mapping that exists likely extends to other products as well. Recall that both Ericsson and LG mapped claims disclosed in the LG Patents, which requires deep, specific product knowledge.

[29] Exhibit 202, U.S. Patent 8,078,134 B2 [ERIC_TCL00772899 - ERIC_TCL00772923].

85.    There is ample evidence to suggest that such capability was a defining feature of the iPhone when it first launched, as one of the first television commercials for the iPhone featured this capability extensively.[30] Next, if one studies Apple's patent activity around the screen rotation feature, it is clear that Apple recognized the risk that it had in the market by not having art that captured a variety of contexts for the inventive concepts captured in the '134 patent. For example, Apple bought U.S. patent #6,956,564 from British Telecom on January 15, 2008.[31] This patent has several remarkable attributes. First, in the main U.S. patent sub-classification, I find that this patent has one of the earliest possible priority dates in the subclass, as the following chart demonstrates:[32]



Pellegrino Demonstrative 8

86.    As the data in the chart demonstrates, the priority year for the '564 patent was 1997, meaning that there is little related art in the subclass that could stand to serve as impeaching prior art on the '564 patent. Second, by further

---

[30]  Exhibit 5065, https://www.youtube.com/watch?v=qObhmS8zX8M, accessed on February 19, 2016 (ERIC_TCL00778305).

[31]  U.S. patent assignment recorded at 20,897, frame 340, recorded on May 5, 2008 for the '564 patent.

[32]  Exhibit 5051, www.ipanalytx.com, accessed on February 19, 2016 (ERIC_TCL00777399).

inspection, Apple pursued an aggressive strategy to broaden the reach of the original '564 patent, claiming the benefit of that '564 patent's priority date of October 28, 1997 through a reissue campaign that generated the following patents:[33]

RE44855

RE45559

RE42738

RE44103

87.    Importantly, the nominal fees for even pursuing these patents are likely $15,000-$25,000 apiece or more. Thus, Apple spent at least another $60,000-$100,000 in broadening the reach of the original patent it acquired from British Telecom in the first place. Importantly, the additional patent prosecution costs also do not account for the risks that Apple bears losing the original '564 patent if the USPTO finds the original granted patent invalid as part of the reissue process. Inspection of these reissue patents demonstrates clearly that even the derivative patents provide further inspiration to the market.[34]

88.    Third, Apple believed the concept was so important to the sale of its own phone products that it sued HTC for patent infringement, using the '564 patent as a basis to emphasize the importance of that patent to Apple. Apple used it as a basis in its own offensive patent actions against HTC in 2011.[35]

89.    The point of this analysis was to demonstrate that the basic concept of tying a screen's presentation format to the orientation of the host device was quite important to Apple and likely provided a large basis for consumer demand.[36] A

---

[33] Exhibit 5055, https://search.rpxcorp.com/advanced_search/search_all#grouped=true&searchq=6956564, accessed on February 19, 2016 (ERIC_TCL00777433).

[34] For example, the '738 reissue patent has 45 forward citations; the '103 reissue patent has 18 forward citations; etc.

[35] Apple settled with HTC in November 2012 by executing a 10-year license. *Apple Inc. v. HTC Corp.*, Case No. 1:11-cv-00611 (D. Del.).

[36] Note that a formal litigation surrounding the '564 patent would likely pursue these concepts extensively and at a level likely sufficient to survive any motions

summary of the behavioral signals that I discovered that reinforce this conclusion include:

- Apple bought an patent with one of the earliest priority dates in the subclass.
- Apple went to great pains and expense to gain additional coverage for the invention by filing no less than four reissue patents.
- Apple used the patent as a basis to sue HTC Corp. in 2011.
- Apple made it a defining feature of its phone, demonstrating the capability in a variety of marketing mediums.

90.    Now, when cross-referencing this sort of behavior against other Apple acquisitions, it becomes clear that there is a remarkably similar pattern where there is a high degree of importance to Apple. Apple bought FingerWorks because the gesture-based capabilities of the iPhone were critical to the iPhone development.[37] The assignment record for FingerWorks' patents shows a transfer of 33 distinct patents, as the data in the following table demonstrates:[38]

| Assignor | Recorded Date | Execution Date | Total Patents |
|---|---|---|---|
| FingerWorks, Inc. | September 20, 2007 | August 31, 2007 | 10 |
| FingerWorks, Inc. | November 2, 2007 | August 31, 2007 | 9 |
| FingerWorks, Inc. | September 21, 2007 | August 31, 2007 | 5 |
| FingerWorks, Inc. | September 19, 2007 | August 31, 2007 | 5 |
| FingerWorks, Inc. | November 14, 2007 | August 31, 2007 | 1 |
| FingerWorks, Inc. | January 15, 2008 | August 31, 2007 | 1 |
| FingerWorks, Inc. | December 7, 2007 | November 26, 2007 | 1 |
| FingerWorks, Inc. | September 10, 2007 | August 31, 2007 | 1 |
| Total | | | **33** |

*in limine* to exclude under *Daubert* principles. However, in my experience, companies that acquire patents do not perform such costly and detailed analysis on the front end of an patent acquisition given the duration and associated costs. Such analysis occurs after litigation ensues and the acquirer bears the risk in litigation of not proving consumer demand. In my opinion, based upon a reasonable degree of probability within the valuation profession, the lack of such an analysis at the time of acquisition does not provide any indication of possible value impairment. I speak about this analysis depth in detail later in this statement.

[37]   Exhibit 5050, http://technical.ly/philly/2013/01/09/jeff-white-fingerworks-apple-touchscreen/, accessed on February 19, 2016 (ERIC_TCL00777358).

[38]   Exhibit 5032, Fingerworks Assignments.csv. Pellegrino & Associates, LLC. March 5, 2016 (ERIC_TCL00774319).

91.     As the data in the table suggests, the acquisition of these patents, which Apple cites highly in its own portfolio, reinforces the importance of the patents to Apple. As these patents relate primarily to multi-touch interfaces, it is clear that the haptic feedback patents that Ericsson acquired from LG have reasonable technical proximity to the Apple patents. In a contemporary example, Apple bought Siri for something greater than $200 million.[39] Apple is currently embroiled in a lawsuit on that one Siri feature where the damages model is $200 million or more.[40]

92.     The point of these examples is to demonstrate both the importance of the proximate technologies to potential companies that Ericsson may seek for prospective licenses and probable reasons why Ericsson selected the patents it did, made the investments that it did, and assigned the patents the value that it did. In my opinion, based upon a reasonable degree of probability within the valuation profession, Ericsson would not have executed this strategy without a strong economic and business case for doing so.

**E.     U.S. Patent #7,957,770 Prosecution History Review**

93.     U.S. patent #7,957,770 claims the earlier filing date of a Korean patent application 10-2006-0123376 filed in the Republic of Korea on December 13, 2006. The initial application included 18 claims, including two independent claims.

**1.     Non-Final Office Action Dated June 18, 2010 and Response**

94.     In this office action, the examiner rejected all pending claims (1-18) as being anticipated under 35 U.S.C. §102 by Maruyama (U.S. publication #2007/0080951).

95.     The applicant responded by cancelling claims 6 and 15. The applicant also amended claims 1, 8, 10-11, and 17. The applicant argued the rest of the claims

---

[39]  Exhibit 5057, http://techcrunch.com/2010/04/28/apple-siri-200-million/, accessed on February 19, 2016 (ERIC_TCL00777440).

[40]  *Apple Inc. v. HTC Corp.*, Case No. 1:11-cv-00611, Dkt. 211-3 at 107 (D. Del.).

on the merits by arguing that the Maruyama reference does not teach each and every element of the applicant's pending claims.

### 2.      Final Office Action Dated December 7, 2010 and Response

96.      The applicant's arguments, claim cancellations, and claim amendments did not persuade the examiner. The examiner once again rejected all pending claims (1-5, 7-14, and 16-18). The rejection of the claims this time fell under 35 U.S.C. §103(a) as being obvious under a combination of Maruyama and Sadler et al. (U.S. publication #2006/0049920).

97.      The applicant responded by amending claims 1 and 10, which are the only independent claims. The applicant further argued the rejection of the claims on the merits by asserting that the cited combination does not suggest, teach, or disclose each and every element of the applicant's patent claims. Essentially, the applicant argued that the examiner did not meet the *prima facie* case for obviousness necessary to sustain an obviousness rejection.

### 3.      Request for Continued Examination on February 4, 2011

98.      Once again, the examiner did not find the applicant's arguments persuasive, so the applicant filed a request for continued examination (RCE), in order to facilitate continued prosecution of the patent application. In the RCE, the applicant submitted further arguments and claim amendments and evidence as to why the claims should be allowable in light of the prior art.

99.      The examiner found these amendments and arguments persuasive and set the application for a notice of allowance.

### 4.      Conclusions

100.      The USPTO issued a notice of allowance on March 22, 2011. The USPTO afforded the '770 patent a slightly more rigorous amount of inspection than average for the LG Patents. The applicant had to file an RCE due to the examiner's unvarying stance on the prior art that the examiner found. This may bode well for the applicant, if a party challenges the '770 patent, as the prior art references of note

have already had some level of rigorous examination by the USPTO, thus making it more difficult to sustain a post-grant challenge of the '770 patent. Ultimately, the '770 patent issued on June 7, 2011.

**F.     U.S. Patent #8,078,134 Prosecution History Review**

101.   U.S. patent #8,078,134 claims the benefit of Korean patent application #10-2008-0051706 filed on June 2, 2008. The initial application included 20 claims, including four independent claims. The '134 patent received no rejections, substantive or otherwise, of any kind.

102.   The USPTO issued a notice of allowance on October 6, 2011 and the patent issued on December 13, 2011. The pendency of the '134 patent was well within the average pendency for a patent. Importantly, when a patent issues without any substantive rejections, it could mean that the applicant has a strong understanding of the prior art and drafts claims that do not overlap with the prior art.

103.   For this patent, it does not appear there is an abnormal risk to patent validity. The applicant appears to have a very deep knowledge of the prior art as many of the applications within the patent portfolio have a similar base technology and the examiner raised only one new reference during the prosecution of the '134 patent. In fact, the '134 patent may have a less than average risk of invalidity originating from a post-grant challenge, because the patent has already survived a post-grant challenge.

**1.     Reexamination of the '134 patent**

104.   An anonymous third party petitioner requested *ex parte* reexamination of the '134 patent (I describe this process briefly in later in this statement). *Ex parte* reexamination does not allow the petitioner to participate in the reexamination past the petition and initial response phase. The petitioner filed the reexamination request on September 11, 2013. Since the petitioner is a likely adversary, the petitioner placed the patent under great inspection with the motivation to invalidate

-36-

the patent. Given the usual cost of performing an *ex parte* reexamination, it is likely that the petitioner of the reexamination carefully searched and considered the '134 patent in light of the prior art. Evidence that supports this conclusion includes the USPTO's acceptance of the reexamination request by the petitioner in the first place. However, the '134 patent survived the reexamination process with only minor modifications. These modifications may likely make the '134 patent stronger as the claims have greater refinement and are likely less susceptible from attack by another petitioner.

### G.    U.S. Patent #8,092,253 Prosecution History Review

105.   U.S. patent #8,092,253 claims the priority date of Korean patent application #10-2008-0074278 filed on July 28, 2008. The applicant filed the application with 20 claims, including four independent claims. The '253 patent received no rejections, substantive or otherwise, of any kind.

106.   The USPTO issued a notice of allowance on September 9, 2011 and the patent issued on January 10, 2012. The pendency of the '253 patent was well within the average pendency for a patent, taking a little over a year from filing to issue. As I discussed earlier, when a patent issues without any substantive rejections, it could mean that the applicant has a strong understanding of the prior art and drafts claims that do not overlap with the prior art.

107.   For this patent, it does not appear there is an abnormal risk to patent validity. The applicant appears to have a very deep knowledge of the prior art as many of the applications within the patent portfolio have a similar base technology and the examiner raised only one new reference during the prosecution of the '253 patent.

### H.    U.S. Patent #8,095,888 Prosecution History Review

108.   U.S. patent #8,095,888 claims the priority date of Korean patent application #10-2008-0074278 filed on July 29, 2008. The applicant filed the application with 20 claims, including two independent claims.

-37-

1

**1.   Non-Final Office Action Dated March 29, 2011 and**

2

**Response**

3      109.   In this office action, the examiner rejected claims 1-20 as being

4  anticipated under 35 U.S.C. §102(e) by Krovitz et al. (U.S. publication

5  #2009/0021790). The examiner also objected to claim 8 for grammatical errors.

6      110.   In response, the applicant amended claims 1, 3, 4, 7-11, 13-14, and 17-

7  20, and cancelled claims 2, 5-6, 12, and 15-16. The applicant also argued the

8  rejection on the merits, and asserted that Krovitz did not teach or disclose each and

9  every claim limitation of the rejected claims. Thus, the applicant further argued that

10  the USPTO should withdraw the §102 rejection and allow the claims.

11

**2.   Conclusion**

12      111.   The USPTO issued a notice of allowance on October 11, 2011 and the

13  patent issued on January 10, 2012. The prosecution of the '888 patent was not as

14  contentious as some of the other patents in the portfolio that I reviewed. The

15  USPTO allowed the '888 patent after one rejection. There is risk of an invalidity

16  challenge due to a short prosecution history. However, in our opinion, based upon a

17  reasonable degree of probability in the valuation profession, any such risk may be

18  small because the applicant is actively patenting in the space and has patents

19  similarly related that would force it to keep a strong and up-to-date understanding

20  of the prior art in the space.

21

**I.   U.S. Patent #8,300,017 Prosecution History Review**

22      112.   U.S. patent #8,300,017 claims the priority date of Korean patent

23  application #10-2007-006382 filed on January 27, 2007. The applicant filed the

24  application with 27 claims, including two independent claims.

25

**1.   Notice Restriction Requirement Dated September 24, 2010**

26

**and Response**

27      113.   The USPTO sent a restriction requirement to the applicant. When the

28  applicant receives the restriction requirement from the USPTO, the applicant must

-38-

elect one invention it wishes to pursue; however, the applicant may pursue, or reserve the right to pursue, any of the other separate and distinct inventions in divisional patent applications. This issuance of a restriction requirement after the first office action is somewhat atypical, but as long as the specification supports the newly claimed, separate, and distinct inventions, then there is always the possibility of spinning the newly claimed inventions into a different application. The restriction requirement groups the claimed inventions in two categories, species 1 and 2. Claims 1-17 make up species 1 while claims 18-27 make up species 2.

114.   In the response, the applicant amended claim 1, such as to negate the need to elect claims. The applicant requested reconsideration of the election requirement in light of the claim amendment.

### 2.    Non-Final Office Action Dated November 29, 2010 and Response

115.   In this office action, the examiner rejected claims 1-7, 9, 13, 15, and 18-21 under 35 U.S.C. §102(b) as being anticipated by Gillespie et al. (U.S. publication #2005/0024341). The examiner also rejected claims 8, 10-12, 14, 16-17, and 22-27 under 35 U.S.C. §103(a) over Gillespie further in view of Hinckley et al. (U.S. patent #6,975,306).

116.   In response, the applicant scheduled an examiner interview where a discussion of the rejections occurred, specifically the examiner's and applicant's different characterizations of the definition of mobile device in relation to its meaning in the claims. In the office action response, the applicant cancelled claims 3-5, 12, and 20. The applicant responded to all other rejections on the merits and asserted that the examiner failed to show how Gillespie anticipated the rejected claims, as Gillespie did not recite each and every claim limitation of the applicant's rejected claims. Additionally, the applicant argued against the obviousness rejection by pointing out that Gillespie did not recite the claim limitations of the applicant's claims that the examiner ascribes to Gillespie. As such, the applicant argued that the

cited combination does not meet the *prima facie* case for obviousness as required to sustain the obviousness rejection.

### 3.   Final Office Action Dated February 23, 2011 and Response

117.   The examiner did not find the applicant's arguments persuasive and further rejected the pending claims, using mostly the same arguments. However, the examiner apparently found the applicant's arguments to the 103(a) rejection persuasive because the examiner withdrew the 103(a) rejection. The examiner also added a 35 U.S.C. §112 rejection for claims 1 and 18 for failing to particularly point out and distinctly claim what the applicant considers the invention.

118.   In response, the applicant filed an RCE and amended claims 1-2, 6-11, 13-16, 18-19, and 21-27. The applicant added claims 28 and 29. The applicant once again argued the §102 rejection on the merits and tried to show the examiner that the rejection failed to recite every limitation of the rejected claims. For example, Gillespie failed to teach or disclose the applicant's claim 1 limitation, "controlling movement of at least a portion of the data information on the display area in response to a position of an input on an input area of the display area, wherein the input area includes any location at which the data information is displayable in the display area."

### 4.   Non-Final Office Action Dated June 20, 2011

119.   The examiner was once again unpersuaded by the applicant's amendments and arguments. The examiner further rejected all pending claims (1-2, 6-11, 13-19, and 21-29). The examiner, in the rejection, sustained every single rejection from the last office action and did not change any of the arguments used previously.

120.   In response, the applicant amended claims 1, 7-9, 11, 13-14, 16-18, and 21-29, and cancelled claims 2, 6, and 19. The applicant similarly argued the rest of the claim rejections on the merits, similar to that of the previous office action.

### 5.    Final Office Action Dated December 15, 2011 and Response

121.   The examiner further rejected the pending claims using a new prior art reference. The examiner rejected claims 1, 7, 15, and 18 as being anticipated under Kamiya et al. (U.S. publication #2004/0088727). The examiner also rejected claims 8-11 and 26 under 35 U.S.C. §103(a) as being obvious over Kamiya further in view of Okada (U.S. publication #2004/0100451). Finally, the examiner rejected claims 13-14, 16-17, and 21-25 under 35 U.S.C. §103(a) over Kamiya, in view of Gillespie.

122.   In response, the applicant filed another RCE and amended claims 1, 7-9, 11, 15, 18, and 25-29. The applicant also undertook another telephonic interview with the examiner to discuss the new rejection using new pieces of prior art. It appears that the applicant relied on the combination of the examiner interview and claim amendments to overcome the rejections.

### 6.    Conclusion

123.   In my review of this patent's prosecution history, it appears that the examiner must have found the applicant's explanations during the interview and claim amendments persuasive because the USPTO issued a notice of allowance on July 27, 2012. Overall, the '017 patent was one of the longest prosecutions within the patent portfolio. The time it took to prosecute was also higher than average for the portfolio, at approximately five years. However, the long-drawn-out prosecution may be ultimately beneficial to the patent owner, as there is less risk of patent invalidity because the patent sustained through a close and thorough inspection by the USPTO. The '017 patent issued on October 30, 2012.

## J.    U.S. Patent #8,326,377 Prosecution History Review

124.   U.S. patent #8,326,377 claims the priority date of Korean patent application #10-2007-0026323 filed on March 16, 2007. The applicant filed the application with 24 claims, including three independent claims.

1          **1.      Non-Final Office Action Dated June 21, 2010 and Response**

2          125.   In this office action, the examiner rejected all pending claims (1-24)

3   under 35 U.S.C. §103(a) over Dunleavy et al. (U.S. publication #2004/0253998) in

4   view of Schon (WO #2003/021922).

5          126.   In response, the applicant amended claims 1, 13, 19, and 21, and

6   cancelled claims 4, 9, and 20. The applicant argued the 35 U.S.C. §103 rejection on

7   the merits. The applicant asserted that the examiner did not meet the *prima facie*

8   case for obviousness because the cited combination did not teach, suggest, or

9   disclose the claimed elements of applicant's inventions explicitly or implicitly.

10  Additionally, the applicant argued that the cited combination did not have a

11  reasonable chance of success in resulting in the applicant claimed invention.

12         **2.      Final Office Action Dated October 28, 2010 and Response**

13         127.   The examiner did not find the applicant's arguments persuasive and

14  further rejected all pending claims (1-3, 5-8, 10-19, and 21-23). The examiner, in

15  his renewed §103(a) rejection, rejected the claims using the same cited

16  combination, but also included a further prior art reference, Nishi (U.S. patent

17  #7,099,465) in the combination used to reject the pending claims.

18         128.   In response, the applicant filed an RCE. In doing so, the applicant

19  amended claims 1 and 13, cancelled claims 16-17, 19, and 22-23, and added claims

20  25-26. The applicant also argued the claims on the merits, and once again,

21  particularly pointed out why the cited combinations did not meet the *prima facie*

22  case for sustaining an obviousness rejection, even with the newly added reference

23  to the cited combination. Oftentimes, it becomes difficult for the examiner to

24  continue to sustain an obviousness rejection the more prior art references required

25  to form a combination to meet the *prima facie* case for obviousness. In this case,

26  the examiner used three prior art references. Typically, an examiner may find it

27  very difficult to sustain the rejection using four or more references because a larger

28

number of cited references may suggest examiner hindsight bias.[41] The applicant also initiated an interview with the examiner, further explaining the reasons why the examiner's rejections were improper.

### 3.  Non-Final Office Action Dated April 1, 2011 and Response

129.  The applicant once again failed to move the examiner with amendments and arguments. The examiner further rejected all pending claims 1-3, 5-8, 10-15, 18, and 25-26. The examiner rejected the claims using the same cited combination as the last office action, except the examiner replaced the Nishi reference with a new reference, Tolbert et al. (U.S. publication #2007/0202933).

130.  In response, the applicant amended claim 1 and added claim 27. The applicant renewed the same arguments used in prior actions as to why the cited combination did not sustain the obviousness rejection. Further, the applicant did not add any additional arguments and mainly relied on the claim amendment to overcome the rejection.

### 4.  Final Office Action Dated October 14, 2011 and Response

131.  In this final rejection, the examiner once again rejected all pending claims (1-3, 5-8, 10-15, 18, and 25-27), for the same reasons in the previous non-final rejection. In this final rejection, the examiner used the same combination as the previous action, except added an additional reference, Bartha (U.S. patent #5,804,780).

132.  Due to the examiner making this office action final, the applicant once again had to file an RCE to continue prosecution of the application. In response, the applicant amended claim 1 once again. The applicant argued the rest of the claim rejections on the merits. Once again, the applicant attempted to point out the unreasonableness of the rejection with particularity. The applicant initiated another

---

[41]  Exhibit 5045, http://law.emory.edu/elj/content/volume-64/issue-4/comments/combating-reconstruction- patent-prosecution.html, accessed on March 29, 2016 (ERIC_TCL00777082).

examiner interview to explain further how the cited combination, even with an additional reference, did not teach, suggest, or disclose the claim limitations of the applicant's claimed inventions.

### 5.     Non-Final Office Action Dated March 22, 2012 and Response

133.   The applicant once again failed to move the examiner with amendments and arguments. The examiner further rejected all pending claims (1-3, 5-8, 10-15, 18, and 25-27). The examiner rejected the claims using the same cited combination as the last office action, except the examiner added another additional reference, Emmert et al. (U.S. publication #2008/0019502). In this office action, the examiner used five references in combination to sustain the obviousness rejection.

134.   In response, the applicant conducted yet another examiner interview, likely attempting to convince the examiner that a cited combination of five prior art references likely shows that it would not have been obvious to a person of ordinary skill in the art at the time the invention was made. The applicant also amended claim 1 again and added claims 28-30. Additionally the applicant argued the rejection once again attempting to show the examiner how the cited combination did not teach, suggest, or disclose all of the claim limitations of the applicant's claims.

### 6.     Conclusion

135.   The examiner finally relented and decided that the applicant's arguments and amendments were persuasive. Additionally, the examiner did not find any new prior art to couple with the existing prior art that the examiner used to form any new obviousness rejections. The USPTO issued a notice of allowance on August 2, 2012 and the '377 patent issued on December 4, 2012.

136.   Unlike some of the other patents in the portfolio, the '377 patent's prosecution was particularly contentious, revolving around a substantial and varied number of prior art references cited in combinations to form a *prima facie* case for

obviousness. The contentious prosecution may actually help the applicant use or assert the patent in the future. If the cited pieces of prior art constituted the entirety of the prior art that could be cited against the '377 patent, then the contentious nature of the initial patent prosecution may make it very difficult for a challenger of the patent to reassert those same references. This is because prior art references explicitly considered by an examiner in the various combinations may not form the basis for a petition for various post-grant challenges, such as *inter partes* review or *ex parte* reexamination before the USPTO. Thus, while the initial prosecution was complicated, the applicant may have substantially limited a future challenger from citing the examiner's cited combinations as a basis for invalidating the '377 patent.

### K.   U.S. Patent #8,549,426 Prosecution History Review

137.   U.S. patent #8,549,426 claims the priority date of Korean patent application #55236/2005 filed on June 24, 2005. The applicant filed the application with 19 claims, including two independent claims.

#### 1.   Non-Final Office Action Dated May 28, 2008 and Response

138.   In this office action, the examiner rejected claims 1-8 and 10-16 under 35 U.S.C. §103(a) over Heinonen et al. (U.S. patent #7,107,010) in view of Lehtonen (U.S. patent #7,292,880). Further, the examiner noted a claim objection to claim 3.

139.   In response, the applicant amended claims 1 and 3 and argued the 35 U.S.C. §103 rejection on the merits. The applicant asserted that the examiner had not met the *prime facie* case for obviousness because the cited combination did not teach, suggest, or disclose the claimed elements of the applicant's inventions, either explicitly or implicitly.

#### 2.   Final Office Action Dated December 2, 2008 and Response

140.   The examiner did not find the applicant's arguments persuasive and further rejected claims 1-19. The examiner, in a renewed §103(a) rejection, rejected the claims using the same cited combination of prior art references, but also

1  included two more prior art references, Vallstrom (U.S. publication
2  #2005/0239469) and Ishida (U.S. patent #6,195,570). The examiner rejected the
3  claims using various combinations of the two old and two new prior art references.

4       141.    In response, the applicant filed an RCE and amended claims 1, 4-8, 12,
5  and 14-18. The applicant also argued the claims on the merits, and once again,
6  particularly pointed out why the cited combinations did not meet the *prima facie*
7  case for sustaining an obviousness rejection. Typically, it becomes difficult for the
8  examiner to continue to sustain an obviousness rejection the more prior art
9  references the examiner has to combine in order to sustain the obviousness case.

10              **3.    Non-Final Office Action Dated May 12, 2009**

11       142.    The examiner was once again unmoved by the applicant's amendments
12  and arguments. The examiner further rejected claims 1-19. The examiner rejected
13  the claims using the same cited combination as the last office action, except the
14  examiner added a further prior art reference in one of the combinations cited, Jiang
15  (U.S. publication #2005/0102638).

16       143.    In response, the applicant amended claims 1 and 12, and cancelled
17  claims 4 and 13. The applicant argued the rest of the claim rejections on the merits.
18  Once again, the applicant attempted to point out, with particularity, how the
19  examiner did not meet the burden of showing that the cited combination teaches,
20  suggests, and discloses each and every claim element of the applicant's claims.

21              **4.    Final Office Action Dated March 19, 2010 and Response**

22       144.    The examiner was once again unmoved by the applicant's amendments
23  and arguments. The examiner further rejected claims 1-19 under 35 U.S.C. §103(a).
24  The examiner rejected the claims using a new combination including Ishida in view
25  of Park et al. (U.S. publication # 2001/0048685) and further in view of Striener
26  (U.S. publication #2004/0123321).

27       145.    In response, the applicant amended claims 1, 12, and 14, cancelled
28  claims 3-5, and added claims 20-28. The applicant argued the rest of the claim

rejections on the merits. Once again, the applicant attempted to particularly point out how the examiner did not meet the burden of showing that the cited combination teaches, suggests, and discloses each and every claim element of the applicant's claims. This may have become particularly difficult for the applicant to do, as every time the applicant argued the rejections on the merits, the examiner used a new combination using new references to reject the claims. In addition, because the examiner set the rejection as final, the applicant had to file an RCE.

### 5. Non-Final Office Action Dated June 24, 2010

146. In this office action, the examiner rejected claims 1-2, 6-12, and 14-28 under a renewed 35 U.S.C §103(a) rejection citing another different prior art combination. This time the combination included Striener, Lehtonen, and further included a new reference, Sharp (U.S. patent #7,215,975).

147. In response, the applicant amended claims 1 and 12. The applicant argued the rest of the claim rejections on the merits. Once again, the applicant attempted to particularly point out how the examiner had not met the burden of showing that the cited combination teaches, suggests, or discloses each and every claim element of the applicant's claims. Specifically, the applicant attacked the examiner's assertions related to the examiner's characterizations of the multimedia applications' drop-down menu and how that menu differed from the applicant's claims.

### 6. Final Office Action Dated October 14, 2010 and Response

148. In this final rejection, the examiner once again rejected all pending claims (1-2, 6-12, and 14-28) for the same reasons in the previous non-final rejection. The examiner found the argument proffered by the applicant to be unpersuasive. The main contention as of this final office action relates to the examiner's and applicant's differing characterizations of the Sharp reference.

149. Due to the examiner making this office action final, the applicant had to file an RCE to continue prosecution of the application. In response, the applicant

once again amended claims 1 and 12, and added new claims 29-32. The applicant argued the rest of the claim rejections on the merits. Once again, the applicant attempted to point out, with particularity, how the Sharp reference did not disclose, teach, or suggest the applicant's claim elements related to the multimedia menu and how the examiner's cited combination did not teach the resultant claims of the applicant. Further, the applicant pointed out that the cited combination did not have a reasonable chance of success in resulting in the applicant's invention.

### 7.   Non-Final Office Action Dated January 9, 2012

150.   The examiner once again rejected all pending claims (1-2, 6-12, and 14-32) under 35 U.S.C. §103(a). The examiner rejected the claims using the same cited combination as the last office action, once again arguing Sharp discloses the multimedia application and earphone elements of the applicant's claims. The examiner noted that one with knowledge in the art would have reasonably been expected to combine the cited combination due to the ease of use afforded to a user due to the combination of the two prior art references.

151.   In response, the applicant made more substantial claim amendments. The applicant amended claims 1-2, 6, 8, 12, 14-16, 18-19, 22-24, and 27-32. The applicant argued the rest of the claim rejections on the merits. The applicant once again exhaustively addressed the examiner contentions about Sharp and the cited combination. The applicant particularly used language from the Sharp reference to discount the examiner's arguments related to Sharp's disclosure of certain claim elements of the applicant's invention and how one could expect those allegedly disclosed elements in Sharp to combine in the cited combination by someone with ordinary skill in the art.

### 8.   Non-Final Office Action Dated June 22, 2012

152.   In this office action, the examiner rejected all pending claims (1-2, 6-12, and 14-34). The examiner cited a new combination than in the previous office action to reject the claims under 35 U.S.C. §103(a). In this office action, the

1    examiner cited the Sharp reference in view of Tamura (U.S. patent #7,633,516).

2    Further, the examiner objected to claim 29 due to informalities.

3    153.   In response, the applicant scheduled a telephonic interview, where the

4    examiner and applicant discussed the substantive rejections and the relevance of the

5    newly cited combination used to sustain the *prima facie* case for obviousness. The

6    applicant further argued the claim rejections on the merits in response to the non-

7    final rejection. The applicant used a different tactic with this cited combination by

8    asserting that Tamura does not qualify as prior art because of the applicant's

9    priority claim to the Korean patent application, which predates the Tamura

10   reference. The applicant also added claims 35-37.

11   ### 9.    Non-Final Office Action Dated February 13, 2013

12   154.   In this office action, the examiner rejected all pending claims (1-2, 6-

13   12, and 14-37). The examiner cited a new combination than in the previous office

14   action to reject the claims under 35 U.S.C. §103(a). In this office action, the

15   examiner cited the Sharp reference in view of Lernke (U.S. patent #6,845,408). The

16   examiner apparently found the applicant's objections to Tamura to have merit.

17   However, the examiner still found a new reference to replace Tamura. Further, the

18   examiner objected to claim 29 due to informalities. The examiner also rejected

19   claim 37 under 35 U.S.C. §112 as failing to particularly point out and distinctly

20   claim what the applicant considers to be the claimed invention.

21   155.   In response, the applicant scheduled a telephonic interview, where the

22   examiner and applicant discussed the substantive rejections and the relevance of the

23   newly cited combination used to sustain the *prima facie* case for obviousness. The

24   applicant once again made heavy claim amendments to the pending claims,

25   amending claims 1, 6-8, 12, 14-18, 22-24, 27-31, and 33-37. The applicant further

26   argued the claim rejections on the merits in the examiner's response to the non-final

27   rejection. Once again, the applicant attempted to show and explain to the examiner

28   how the cited combination did not result in a recitation of each and every element

of the applicant's claimed invention.

### 10. Conclusion

156. The examiner finally relented and decided that the applicant's arguments and amendments were persuasive. Additionally, the examiner did not find any new prior art to couple with the existing prior art the examiner used to form new obviousness rejections. The USPTO issued a notice of allowance on July 19, 2013.

157. Unlike other patents in the portfolio, the '426 patent's prosecution was particularly contentious, revolving around a substantial and varied number of prior references cited as combinations to form a *prima facie* case for obviousness. The contentious prosecution may actually help the applicant use or assert the patent in the future. If those pieces of prior art constituted the entirety of the prior art that could be cited against the '426 patent, then the contentious nature may make it very difficult for a challenger of the patent to reassert those same references. This is because prior art references explicitly considered by an examiner in the various combinations may not form the basis for a petition for various post-grant challenges, such as *inter partes* review or *ex parte* reexamination before the USPTO. Thus, while there was a prolonged initial prosecution, the applicant may have substantially limited a future challenger from citing the examiner's cited combinations as a basis for invalidating the '426 patent.

158. Like other patents, the applicant requested continued examination, which gave the USPTO a remarkable amount of time to search for prior art that could render the claims invalid. Additionally, the examiner continually used different combinations of prior art, bringing in new prior art almost every single office action.

### L. U.S. Patent #8,593,415 Prosecution History Review

159. U.S. patent #8,593,415 ('415 patent) claims the priority date of Korean patent application #10-2009-0054937 and Korean patent application #10-2009-

0095185. The applicant filed the application with 20 claims, including two independent claims.

### 1.     Non-Final Office Action Dated December 14, 2012 and Response

160.   The examiner rejected claims 1-7, 9-17, and 19-20 under 35 U.S.C. §103(a) as being obvious over Jeon (U.S. publication #2010/0066688). The examiner also rejected claim 8 under 35 U.S.C. §112 as failing to particularly point out and distinctly claim what the applicant regards as the invention.

161.   The applicant responded to the rejections by cancelling claims 2, 5, 7-10, 12, 15, and 17-20, amending claims 1, 3-4, 6, 11, 13-14, and 16, and adding claims 21-27. The applicant also argued that the examiner improperly used Official Notice in regards to claims 1 and 11, which requires properly supported documentary evidence. The applicant asserted that the examiner did not provide appropriate documentary evidence and that the evidence used to support the Official Notice was not well known. The applicant also asserted that due to this improper notice, the examiner could not make the next office action final.

### 2.     Final Office Action Dated May 20 2013 and Response

162.   The examiner indicated that claims 1, 3-4, 6, 11, 13-14, 16, and 21-24 were allowable. However, the examiner rejected claims 25-27 under 35 U.S.C. §102 (a) as being anticipated by Fong et al. (U.S. publication #2010/02511756).

163.   In response, the applicant cancelled claims 25-27, which put the application in a condition for allowance.

### 3.     Conclusion

164.   The USPTO issued a notice of allowance on August 22, 2013 and the patent issued on November 26, 2013. The '415 patent enjoyed a relatively short patent prosecution duration compared to other patents in the portfolio. The examiner had only one substantive rejection and the applicant received a notice of allowance after the first non-final rejection. Importantly, when a patent issues

1   without many rejections it could mean that the applicant has a strong understanding

2   of the prior art and drafts claims that do not overlap with the prior art.

3       **M.    Ex Parte Patent Reexamination Process**

4       165.   *Ex parte* reexaminations are one type of post-grant patent challenge

5   that allows a third party the opportunity to contest the validity of an issued patent.

6   *Ex parte* reexaminations typically allow a third party to request reexamination any

7   time after the patent issues. The petitioner or the party requesting reexamination

8   must submit prior art reference(s) that bring about a substantial new question of

9   patentability.[42] The prior art references may be prior patents, printed publications, or

10  written transcript of audio.[43] The *ex parte* reexamination typically goes before three

11  experienced examiners who render a decision on the petition based upon the merits

12  and whether the petitioner meets the burden of presenting a substantial new

13  question of patentability.[44] This substantial new question of patentability may only

14  rely on any ground of patentability, including patent eligible subject matter.[45] The

15  petitioner cannot form the basis of a request for *ex parte* reexamination.

16      166.   The following is a diagram illustrating the *ex parte* reexamination

17  process:[46]

18

19

20

21

22

---

23  [42] Exhibit 5038, http://www.uspto.gov/web/offices/pac/mpep/s2209.html, accessed on March 9, 2016 (ERIC_TCL00776979).

24  [43] *Id.*

25  [44] *Id.*

    [45] Exhibit 5039, http://www.uspto.gov/web/offices/pac/mpep/s2258.html, accessed
26  on March 9, 2016 (ERIC_TCL00776983).

27  [46] Exhibit 5053, Exhibit 5053 is a true and correct copy of the webpage
    http://www.maierandmaier.com/documents/patent-reexamination-FAQ.pdf as
28  accessed on March 9, 2016 (ERIC_TCL00777413).



Pellegrino Demonstrative 9

167.   Importantly, if the petitioner meets that burden of proof required by the USPTO, then the patent at issue loses all associated patent rights and the patent reverts to the same status as it was when it was first examined. Thus, the patent loses its presumption of validity that it once enjoyed. If the patent comes out of reexamination, the USPTO will issue an additional certification of the patent, similar to when the patent first issued. Typically, *ex parte* reexaminations may not

1    be as desirable as an *inter partes* review, because the challenger cannot argue the

2    validity of the patent after the initial request. However, *ex parte* reexaminations

3    provide for some other benefits that I discuss, such as anonymity and a lower

4    petitioning cost.

5              **N.    Reexamination of the '134 patent**

6              168.   The USPTO received a reexamination request of the '134 patent on

7    September 25, 2013. The petitioner was Haynes and Boone, LLP (who in my

8    research works for possible licensees including Apple, Samsung, and others). The

9    USPTO accepted the reexamination on October 18, 2013. The USPTO found that

10   the petitioner had met the burden of raising a substantial new question of

11   patentability in light of the cited prior art in the reexamination request, either alone

12   or in combination.

13             **1.    Non-Final Office Action Dated November 8, 2013 and**

14                    **Response**

15             169.   In this office action, the examiner rejected claims 1-5, 16, and 17,

16   which were the subject of the reexamination. The examiner rejected the claims as

17   being obvious pursuant to 35U.S.C. §103(a) over Taniguchi in view of Yi or

18   Hinckley. The examiner also rejected the claims with another §103(a) rejection by

19   combining Kang in view of Hinckley.

20             170.   In response, the patent owner added claims 24-42. Additionally, the

21   patent owner responded to the rejections by pointing out that the cited prior art

22   differs from the rejected claims because the references require a rotation of a

23   display field in order to produce the same effect as the patent owner's claims. In

24   other words, the cited combinations of prior art were somewhat similar, but the

25   combined references required a step not present in the patent owner's claims. As

26   such, the patent owner argued that the combined references did not result in the

27   patent owner's claimed inventions, and thus the claim rejections were improper.

28

### 2.    Final Office Action Dated January 23, 2014 and Response

171.   The examiner made this action final, and noted that the patent owner's arguments did not direct at the substantive rejections of the previous action. Instead, the examiner contended that the claim rejections related to the presence of a sensor that detected rotation of the display instead of the actual rotation of the screen. The examiner maintained the same rejections as the previous office action.

172.   The patent owner initiated an interview with the examiner to propose satisfactory claim amendments to overcome the examiner's claim rejections. In the response to the office action, the patent owner agreed to amend claim 1 to include elements of claims 4 and 5.

173.   Additionally, the patent owner described the amendments to claim 1 and how those amendments distinguished claim 1 from the prior art, such that the cited prior did not recite each and every claim limitation in the patent owner's claims. Specifically, the patent owner added limitations that included limiting the sizes of the subfields, or screen regions, and also adding the direction in which the mobile terminal must be rotated in order for the sensor to recognize if the screen is being rotated.

### 3.    Conclusion

174.   The examiner found the patent owner's claim amendments and arguments persuasive, and agreed with the patent owner that the claim amendments overcame the rejections and respective prior art. The reexamination concluded and the USPTO issued a reexamination certificate on June 19, 2014.

175.   My review of the amendments do not alter the scope of the '134 patent materially. The '134 patent's claim amendments amounted to adding limitations related to direction of screen rotation and relative sizes of display regions. Practically speaking, these elements were likely already a part of products that read on the '134 patent, and adding these limitation further vets the '134 patent to technologies already available in the market. Additionally, the benefits of vetting

the '134 patent against possibly impeaching prior art outweigh any negatives from the alterations the claims underwent in the reexamination. The fact that the examiner did not find other invalidating prior art, or find that the prior art rendered the claims of '134 patent invalid bodes well for the '134 patent if it is ever asserted.

## O.   Consolidated Value of the LG Patents

176.   The LG Patents consist of a collection of U.S. granted patents. While several of the LG Patents may have applications beyond Ericsson's initial focus, I did not segregate this collection of patents into individual items (each patent) and value each independently because the patents transferred as a group, and not individually. As such, I calculated the entire value of the intellectual property collectively for this engagement.

## P.   Current Ownership Rights

177.   Companies do not create inventions described by patents—people do. Under 35 U.S.C. §261, patents have attributes of personal property. Patent applications, issued patents, or fractional interests thereof are assignable in law. Assignments occur when inventors execute an instrument (e.g., assignment agreement) in writing that assignees then file with the USPTO. Further, 35 U.S.C. §261 indicates that "an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the USPTO within three months from its date or prior to the date of such subsequent purchase or mortgage." This means that for a patent to be valuable to a company, the company must be the assignee on record with the USPTO. Failure to do so would void any subsequent transaction relating to the patent, which naturally has a value impact.

178.   I understand from Patricio Delgado that LG owned all rights to the LG Patents as of the date the transfer agreement was signed. I am not aware of any options, warrants, rights, claw-backs, or any other value or ownership dilution provisions or instruments associated with the LG Patents. Per my research into all

recorded assignments for the patents of interest, LG appeared to have complete ownership of the patents and no employees appeared to maintain any ownership or other rights to the patents. The only patents that lacked inventor assignments was U.S. patent #8,092,253, which was a continuation of U.S. parent patent #7,811,124. That patent did have all inventor assignments recorded, which the continuation patent inherited.

### Q.   Ownership Transfer Offers

179.   I am not aware of any offers from third parties to purchase, acquire, integrate, or license the LG Patents or other value-setting independent transactions. Further, I found no evidence in the record that created a value basis for me to consider aside from a $125 million reference.[47] As such, I did not have any prospective value offers I could consider as a value proxy for this engagement. Further, to my knowledge, neither Ericsson nor LG had ever before commissioned an independent valuation of the LG Patents, which may have provided me with further indication of value to consider.

### R.   LG Electronics and Ericsson Global Patent License Agreement

180.   The following is a summary of the material portions of the Ericsson and LG patent license agreement[48] that I considered as part of my analysis:

#### 1.   Parties

181.   LG Electronics, Inc. (LG)

182.   Telefonaktiebolaget LM Ericsson (Ericsson)

#### 2.   Effective Date

183.   June 27, 2014

#### 3.   Responsibilities

184.   Ericsson agrees to grant LG a worldwide, non-transferable, non-

---

[47]  Exhibit 32, Ericsson/LG Business Case (ERIC_TCL00115357).

[48] Exhibit 199, Ericsson/LG 2014 Cross-License (ERIC_TCL00111387).

1   exclusive license, which grants LG the right to make, use, and import the inventions

2   disclosed in the patents. The patents that Ericsson is licensing appear to be related

3   to wireless technologies including 2G, 3G, and 4G technologies, among others.

4   185.   Ericsson's license also includes rights to incorporate software

5   associated with the licensed patents, as long as LG does not receive any additional

6   compensation for the software. LG can include the Ericsson software in its products

7   as well.

8   186.   LG has the right to sublicense the licensed patents; however, LG is

9   responsible for collecting royalties from its sublicenses.

10   187.   Ericsson or its affiliates agree not to assert the patents related to 802.11

11   functionality, but excluding user equipment and external modems against LG.

12   ### 4.   Consideration

13   188.   For consideration of the global patent license to Ericsson's patents, LG

14   agrees to pay ██████████ as a release payment within 30 days of signing this

15   agreement

16   189.   For consideration of the global patent license to Ericsson's patents, ██

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   190.   Additionally, LG may make additional royalty payments in the form of

20   a percentage of its net sales after net sales have reached its cap.

21   191.   For 2014, the net sales cap for LG is ██████████

22   192.   For 2015 and 2016, the net sales cap is ██████████.

23   193.   For 2017, the net sales cap is ██████████

24   194.   If the net sales cap is met during any of the respective years, LG agrees

25   to pay Ericsson a percentage of net sales equaling ██████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   195.   Both parties agree that the financial terms of this license will not be

1    used as a basis for any future licensing agreements, or dispute resolution
2    agreements.

3    196.   LG agrees to pay the guaranteed yearly license payment by March 31
4    of each year.

5    197.   If LG exceeds the net sales cap, then LG will pay Ericsson the
6    percentage-based royalties one month prior from the reporting date.

7    **5.    Miscellaneous**

8    198.   LG agrees to keep sufficient records of sales of the related sales of
9    products covered under the licensed patents to the global patent license agreement,
10   and Ericsson has a right to audit those records at Ericsson's expense.

11   199.   If any term or part of the agreement is deemed unenforceable, both
12   parties agree that other provisions and terms in this agreement shall not be affected.

13   200.   The term of this agreement shall start from the date of the execution of
14   this agreement, until ███████████████.

15   201.   Each party waives its rights against infringers, even if the law in a
16   jurisdiction gives the party rights.

17   202.   Each party may terminate the agreement if the other party materially
18   breaches the agreement, which includes failure to pay royalties. A party may
19   terminate the agreement after 30 days' written notice of the breach and the
20   breaching party's failure to cure the breach within 30 days after written notice.

21   **S.    LG Electronics and Ericsson Agreement to Assign Patents**

22
23   203.   The following is a summary of the patent assignment agreement[49]
     related to the patents at issue:

24   **1.    Parties**

25   204.   LG Electronics, Inc. (LG)

26   205.   Telefonaktiebolaget LM Ericsson (Ericsson)

27   _____
28   [49] Exhibit 198, Ericsson/LG Transfer Agreement.

### 2.    Effective Date

206.   July 7, 2014

### 3.    Responsibilities

207.   LG agrees to assign the patents within twelve months from the effective date of this agreement or six months from the date Ericsson sends written notice identifying the entity that will be the party to the patent transfer agreement.

208.   LG agrees to transfer all associated rights to the patents, and will not retain any right, title, or interest in the patents.

### 4.    Consideration

209.   Both parties agree that no monetary payment shall be given as consideration for the assignment. The assignment of the patents shall be deemed partial consideration of a larger cross license agreement between the parties.

### 5.    Miscellaneous

210.   Each party agrees to keep negotiations and provisions under this agreement confidential. Each party agrees to obtain written consent from the other party before disclosing any of the provisions under this agreement.

211.   If any term or part of the agreement is deemed unenforceable, both parties agree that other provisions and terms in this agreement shall not be affected.

212.   The term of this agreement shall start from the date of the execution of this agreement, until the date of execution of the patent transfer agreement.

### 6.    Governing Law and Disputes

213.   This agreement is under the laws of the state of New York. In the event of a dispute and a failure to negotiate, the parties agree to submit themselves to arbitration. The arbitration shall be governed by the Rule of Arbitration of the International Chamber of Commerce.

### T.    Agreement Analysis

214.   My review of the two agreements between LG and Ericsson did not render any special or abnormal risks to the patents at issue. Both agreements appear

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  to be reasonable and do not create unrealistic or unexpected economic burdens on

2  either party. The patents at issue were partial consideration in a larger global patent

3  license agreement between LG and Ericsson. Based on the agreements I reviewed,

4  there are no special or specific risks associated with Ericsson receiving the patents

5  as consideration. Additionally, it does not appear that there are any abnormal

6  reversionary rights or contingencies placed upon the patents at issue. As such, in

7  my opinion, based upon a reasonable degree of probability within the valuation

8  profession, no abnormal contractual risks exist as to the patents at issue based upon

9  the agreements I reviewed.

10  **VI.   PATENT PROSECUTION OVERVIEW**

11    **A.    Introduction**

12    215.   In order to understand the timing and risk impacts associated with the

13  valuation of the patent portfolio, it is important to understand what constitutes a

14  patent and what comprises the patent prosecution process. An understanding of

15  these concepts will make it easier for the reader to understand the balance of this

16  statement's content. Moreover, an understanding of patents and the patent

17  prosecution process may help explain why I structured my research and my

18  valuation modeling in a particular way.

19    **B.    What Is a Patent?**

20    216.   A patent is a legal instrument issued by a government authority giving

21  its holder the right to exclude others from making, using, or selling embodiments of

22  inventions claimed within the patent. This exclusionary period is finite. Currently,

23  the statutory life of a patent is twenty years from the earliest effective filing date of

24  the patent application. However, not all inventions are eligible for patent protection.

25  In order to receive a patent on an invention, that invention must conform to the

26  statutory requirements that govern the right to obtain a patent. Three main statutes

27  determine the patentability of a given invention, 35 U.S.C. §101, §102, and §103.

28    217.   First, 35 U.S.C §101 defines what subject matter is patentable. An

invention that is the subject of a patent prosecution effort must be a useful process, manufacture, composition of matter, or machine. Second an invention that is the subject of a patent prosecution effort must conform to 35 U.S.C. §102, which requires that an invention be novel. The claimed invention must not have been described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention, although there are some minor exceptions. In other words, the invention must not have been something already invented and disclosed to the public, including the prior filing of a patent application. Finally, an invention that is the subject of a patent prosecution effort must be non-obvious as described in 35 U.S.C. §103. Importantly, an invention described in a patent application does not have to match an existing invention identically disclosed in order for the invention disclosure to meet the requirements of being non-patentable. For example, consider inventions that are the subject of a pending patent application and the associated prior art (i.e., all information that has been made available to the public in any form before a given date that might be relevant to a patent's claims of originality). If the differences between the inventions disclosed in the pending patent application and the prior art are such that the inventions would have been obvious at the time of the invention's conception to a person having ordinary skill in the art, then such inventions are not eligible for patentability. Oftentimes, satisfying the 35 U.S.C. §103 requirement of non-obviousness is the most challenging and unpredictable aspect of obtaining a patent.

## C.   Patent Prosecution Process

218.   A prospective inventor may choose to obtain a patent on an invention after conception of the invention. In doing so, an inventor may seek the advice or assistance of a patent agent or a patent attorney. A patent agent or patent attorney is a licensed professional who specializes in drafting and prosecuting patent applications before the United States Patent and Trademark Office (USPTO).

However, an inventor may also attempt to represent himself in drafting and prosecuting his patent application; however, the relatively complex nuances entailed in drafting and prosecuting a patent application make such self-representation rare.

219.   The patent agent or attorney will commence drafting the patent application. A patent application contains various sections that detail and enable a person with ordinary skill in the art to make or use the invention. Most of a patent application serves the purpose of informing the public of the details of the invention, which is the trade-off for getting the right to exclude others for a certain period—typically 20 years from the earliest effective filing date of the patent's application. Only one section in the eventual patent is legally enforceable, the claims. A patent's claims determine the magnitude of legal protection an invention can get. The balance of the patent application must support or provide a description of the claimed invention.

220.   Once a patent agent / attorney has completed drafting a patent application, he or she files it with the USPTO. The USPTO then assigns an examiner who will analyze the invention and determine whether the disclosed invention is indeed patentable. The assigned examiner typically possesses at least some familiarity in the field of art as the invention. The patent examiner will search databases to find prior art that may be relevant to the patent application. If the examiner finds prior art, the examiner will issue an office action detailing what prior art has been found and reject the application's claims based on that prior art under the statutes previously discussed. The patent examiner will also provide an explanation as to why the claimed inventions are not allowable over the prior art that was found during the search.

221.   The patent agent / attorney, given the authority by the applicant to respond, will draft arguments as to why the claim rejections by the USPTO examiner are improper and why the claims are allowable over the prior art that the

1  examiner may have cited. Depending on the invention's complexity, technical
2  expertise in the field of the invention may be necessary. Correspondence between
3  an examiner and the patent agent / attorney prosecuting the patent application may
4  occur over multiple office actions and responses (including telephonic conferences
5  or personal interviews) spanning several years. A typical patent application takes
6  approximately two to five years to prosecute from filing to issuance. Once the
7  USPTO grants a patent, claims within that patent are legally enforceable and the
8  patent owner may sue others for profiting from inventions claimed in the patent.

9  222.  The life of the patent which is statutorily 20 years starts running from
10  the earliest effective filing date of the patent (for simplicity, this date is the date that
11  the application is filed). The longer a patent application takes to prosecute, the
12  greater the market risk for the patent owner (in fluid markets, the technology may
13  change before the patent grants). Thus, the time value of a patent is a very
14  important consideration for purposes of determining its value.

15  223.  Time has a large impact on intellectual property value, particularly for
16  patents. Consider the typical lifecycle for a patent:[50]

---

[50]  20-year Treasury note for the risk-free rate as reported on July 1, 2014 on the
U.S. Department of the Treasury Website, accessed on March 6, 2016.

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx



Pellegrino Demonstrative 10

224.   As the patent lifecycle demonstrates, the economic life for the patent may be less than the statutory life of the patent.

## VII.  PATENT LITIGATION OVERVIEW

225.   In order to understand the timing and risk impacts associated with the valuation of the LG Patents, it is also important to note a few aspects of the patent litigation process, particularly its cost.[51] There are situations with certain licensees that I model a patent licensing pathway with the aid of a court if proactive and cooperative licensing negotiations break down.

226.   The amount of time and cost a patent infringement suit will incur can be a substantial factor in determining whether enforcing a patent is economically

---

[51]   Importantly, I consider litigation as a last resort in my valuation model to a collaborative licensing approach. However, litigation is the likely result if a prospective licensee holds out and takes an unreasonable position to proactive and collaborative licensing discussions.

1   wise and ultimately whether that patent has more than some nominal value. A

2   patent owner that does not have the money to enforce the granted patent in a

3   marketplace may consider that patent to be without much value or a liability

4   because there is ongoing cost to maintain a patent.

5       227.   Conclusions about time and cost of litigation are substantially market

6   specific. A patent owner that holds a patent in a market space that large

7   multinational corporations typically occupy can face a greater expectation of

8   expending significant time and resources defending an infringed patent. However,

9   if few companies operate in a particular market or if that market is relatively new,

10  then the time and resource commitments to patent defense may be less. A patent

11  owner must consider the magnitude of costs versus the rewards associated with

12  obtaining a judgment prior to entering into litigation against an infringer.

13  Additionally, the patent owner must be certain that he or she can sustain the costs of

14  litigation to a conclusive end.

15      228.   I understand that according to the American Intellectual Property Law

16  Association (AIPLA), patent infringement suits have the following median

17  litigation costs, not including settlements or damages:[52]

| Litigation Type | 2015 |
|---|---|
| Less than $1 Million at Risk | |
| End of discovery | $442,000 |
| All costs | $873,000 |
| $1-$10 Million at Risk | |
| End of discovery | $1,100,000 |
| All costs | $2,200,000 |
| $10-$25 Million at Risk | |
| End of discovery | $1,600,000 |
| All costs | $2,800,000 |
| More than $25 Million at Risk | |
| End of discovery | $2,600,000 |
| All costs | $4,500,000 |

[52]  2015 Report of the Economic Survey, AIPLA, 2015., p. 35.

229.   As the data suggests, patent enforcement is costly. Oftentimes, for smaller issues, companies may be lucky to recoup just the costs of the litigation from any eventual settlements. However, companies that do pursue patent litigations typically have a detailed business case for doing so.

## VIII. APPROACHES TO DETERMINING VALUE

### A.    Introduction

230.   Three accepted approaches to valuing the LG Patents exist: the market approach (or sales comparison approach), the income approach, and the cost approach. These approaches are accepted in the market. I will now briefly describe each valuation approach and its suitability for this valuation.

### B.    Market Approach

231.   The market approach uses comparable transactions in the same industry and of the same relative size and form that recently occurred in the open market. The reasoning seems logical: if the market paid $X for rights to use or own that intellectual property once, then one would expect that the market would reasonably pay a similar amount again, all else the same. This is like comparable in the real estate market.

232.   Establishing this value using the market approach has several methods, depending on the desired value standard and value purpose. For example, if one desires the fair market value for licensing intellectual property to another company, the valuation analyst would look to other recent licensing transactions in the same industry and use a similar royalty rate. Another way to value intellectual property using the market approach is to use a gross multiplier such as a cash flow multiplier to arrive at a value. For example, if a patent generates $1 million of free cash flow in Year 5 and the valuation analyst uses a cash flow multiplier of eight, then the intellectual property is worth $8 million.

233.   Valuation analysts use other multiplier factors commonly as well, and these factors are usually ratio-based. Once the valuation analyst arrives at a value,

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

then the valuation analyst adjusts the intellectual property's value to account for identifiable differences, such as the market power of the comparable intellectual property to the intellectual property under valuation. Valuation analysts typically use the market approach to establish reasonable royalty rates for intellectual property licensing transactions.

234.   The problem with the market approach to value is that it may not work well for general patent valuation. First, comparable circumstances may not exist. Intellectual property by its very nature is novel and unique. It may be difficult for a valuation analyst to find a comparable transaction in the market. Therefore, any reference to other intellectual property transactions may be a crude value approximation.

235.   Second, the comparable may have the support and expertise of a proven management team, existing customers, available working capital, and a host of other factors that dictate why the intellectual property sold for the price it did. The intellectual property under valuation would require the same circumstances, or the valuation analyst must make adjustments to account for material differences. However, these adjustments are generally arbitrary approximations themselves. Their use can compound valuation error.

236.   Third, the market is not rational at times, ebbing and flowing based on expectations and emotions of a possibly limited pool of buyers and sellers, whose behavior sometimes create value anomalies. Investors enter the market routinely with imperfect information and these investors increase the probability of irrationally high transaction values (e.g., biologic biofuels in the 2006-2007 timeframe). Market participants also leave the market irrationally and abnormally depress market transaction prices, even though the fundamental value drivers for an patent remain unchanged (e.g., the patents that comprised the Nortel patent estate).

237.   Fourth, the value of the intellectual property depends on the application of the intellectual property to the market, and the circumstances need to

1   be similar to serve as a credible value proxy. The trademark for a soft drink may not

2   command near the value applied to a car that it does for fruit-flavored, sugar-

3   sweetened water. To use a soft drink brand transaction as a basis for establishing

4   the value of a car's brand is not appropriate either—the two are altogether different

5   in their application and industry.

6       238.   Fifth, the comparable transaction may represent a portfolio of

7   intellectual property. It is rare to find standalone comparable intellectual property

8   transactions that do not include other bundled tangible or intangible patents. I found

9   no evidence of any comparable corporate entity, let alone that entity's financial

10  information and valuation I could use as a value proxy for the LG Patents.

11      239.   Finally, there was no other formal offer or other value indicator for the

12  LG Patents. Thus, I had nothing I could use as a reasonable value proxy for the LG

13  Patents.

14      240.   For all of these reasons, in my opinion, based upon a reasonable

15  degree of probability within the valuation profession, the market approach,

16  regardless of market multiples I might have used (e.g., price to earnings, price to

17  cash flow, etc.), would not provide a credible valuation result for this engagement.

18      **C.    Cost Approach**

19      241.   The cost approach looks at what it would cost to produce the

20  intellectual property, or what it would cost to reproduce the intellectual property on

21  a given effective date. The cost would include things like labor, materials, applied

22  overhead, and capital charges. Depending on the effective date of the valuation, the

23  valuation analyst may trend costs from a historical reference point to the effective

24  date. For example, if the intellectual property owner has cost data from five years

25  ago and wants the intellectual property value using the cost approach in today's

26  dollars, the valuation analyst may grow the cost at the rate of inflation over those

27  five years to arrive at the cost as of today. Once the valuation analyst accumulates

28  all factors of the cost, the valuation analyst adjusts the final tally for obsolescence

1  to arrive at a final value opinion.

2      242.   There are several methods to establish value using the cost approach.
3  The first method is to use the reproduction cost new method of the cost approach.
4  This method looks to re-create the patents at issue using the same or similar
5  development methods and materials as the original effort. The reproduction cost
6  new method does not account for changes in technology, higher utility from other
7  materials, and other factors. The second method is to use the replacement cost new
8  method of the cost approach. This method considers what it would take to re-create
9  the intellectual property, but the valuation analyst can consider the impact of new
10 technology and development methods on the intellectual property re-creation effort.

11     243.   Once the value is established using the cost approach it is adjusted for
12 obsolescence. There are four types of obsolescence factors. These factors include
13 functional, technological, and economic obsolescence, and physical deterioration.

14     244.   Physical deterioration generally does not apply to intellectual property
15 because intellectual property is intangible. Its physical manifestation, on mediums
16 such as paper or electronic media, physically deteriorates, but the intellectual
17 property itself never physically deteriorates. Functional, technological, and
18 economic obsolescence do affect the value of intellectual property. Functional
19 obsolescence occurs when the intellectual property user must incur excess
20 operational costs to use the intellectual property versus current alternatives, which
21 may be state of the art. Technological obsolescence occurs when technological
22 forces render the intellectual property worthless. For example, patents for a next-
23 generation computer floppy disk drive may likely be worthless because there are
24 better technological options already on the market, such as high-capacity flash
25 memory. Economic obsolescence occurs when the use of the intellectual property in
26 its highest and best form cannot provide an adequate return on investment. This can
27 occur in intellectual property easily because intellectual property is generally
28 unique and may have little use outside of a particular function.

245.   Some general problems exist with the use of the cost approach to value, particularly for general intellectual property valuation. Cost does not equal value and it is a common misconception to relate the value of intellectual property to its investment amount, particularly with a lack of historical financial performance. It is a rare case when the cost and the value are the same. Future economic income potential, market timeliness, and profit potential drive the value of intellectual property. Thus, the cost approach may substantially undervalue the patent.

246.   Most importantly, the cost approach is an inappropriate theoretical model for the LG Patents because it is irrelevant for a valuation analyst to calculate a reproduction cost for a patent. This is because of the inherent monopolistic nature of the patent provided in statute. Specifically, any unauthorized reproduction would constitute an infringing work, subject to damages and possible injunctive relief. Thus, the cost to reproduce the LG Patents, regardless of the magnitude, is irrelevant.

247.   In my opinion, based upon a reasonable degree of probability within the valuation profession, the cost approach would not provide a credible valuation result for the LG Patents in this engagement.

**D.    Income Approach**

248.   Valuation analysts typically use the income approach for intellectual property valuation engagements. The income approach considers the intellectual property owner's business plan, marketing and operational inputs, and other external references. Using this method, the valuation analyst projects the economic income generated solely from the intellectual property over a discrete period, known as the remaining economic life (REL) as well as any residual value after the REL.

249.   The REL is generally one of the most difficult attributes of the intellectual property's value to determine when using the income approach.

1    Unfortunately, it is also one of the most significant drivers for the intellectual
2    property's value. Intellectual property with a long REL will be worth more than
3    intellectual property with a shorter REL. The REL will vary based on the
4    intellectual property under review. Certain intellectual property may have a longer
5    REL than others because of technological risk or the probability of easy
6    substitutions. For example, a patent for a truck gas tank mount will have a different
7    REL than a patent on a software search algorithm.

8         250.   To determine economic income, the valuation analyst projects the
9    revenue (or cost savings or other economic benefit) generated from the intellectual
10   property over the REL, and then offsets that revenue with costs related directly to
11   the intellectual property's use such as labor, materials, required capital investment,
12   and any appropriate economic rents or capital charges. There are several methods
13   that a valuation analyst employs to measure economic income associated with a
14   given piece of intellectual property. Some include the net income method and the
15   profit split method.

16        251.   If applicable, the valuation analyst will also consider some residual
17   intellectual property value after the REL. That is, even after the REL is over, there
18   may be some residual value to the intellectual property because of market factors.
19   For example, a bankrupt company's trademark may have value even though the
20   company is no longer in operation. A valuation analyst may opine that the residual
21   value may decrease over five years to $0. In this case, the valuation analyst would
22   calculate the decreasing cash flows for the five years after the REL, discount those
23   to the present value, and add those to the value of the cash flows calculated over the
24   REL.

25        252.   With cash flows for each discrete year in the REL and a calculated
26   residual value, the valuation analyst discounts the cash flows and the residual value
27   using an appropriate discount rate to the present value. The present value becomes
28   the patent's value before the valuation analyst applies any applicable value

adjustments.

253. The income discount rate that the valuation analyst uses has, aside from the REL, one of the largest value impacts. There is an inverse relationship between the discount rate and value. Higher discount rates lower value, and vice versa. This is desirable, as it mirrors classic risk/reward principles when determining an appropriate discount rate. Early-stage intellectual property, with little proven market power, commands a higher discount rate than proven intellectual property, because the risk of the early-stage intellectual property generating no economic income is higher than with proven intellectual property.

254. Given the wide use and acceptance of the income approach to valuing intellectual property and my ability to apply it to this engagement in a manner consistent with valuation standards, in my opinion, based upon a reasonable degree of probability within the valuation profession, the income approach provided a credible value indication for the LG Patents.

## IX.   INTELLECTUAL PROPERTY CONSIDERATIONS

### A.   Intellectual Property Overview

255. I took several other considerations I took into account for my valuation. Several key attributes will create value for the LG Patents. These include the following considerations:

- Sustainable competitive advantages for the LG Patents
- Key risks associated with the value of the LG Patents
- The type and level of government protections active and in force on the LG Patents
- The ease or difficulty in circumventing active protections for the LG Patents
- Any action or inaction to enforce rights provided by intellectual property protections

### B.   Sustainable Competitive Advantages

256. For the LG Patents to retain value, it is imperative that the patents maintain certain sustainable competitive advantages. Without these sustainable competitive advantages, market forces would erode any economic power of the LG

Patents and drive a lower value.

257. I have identified several key sustainable competitive advantages related to the LG Patents:

**Obsolescence resistant:** The markets served by inventions that comprise the LG Patents have a long established growth rate. I found no evidence of systemic IP-related impairment, such as margin compression due to obsolescence of the patents that comprise the LG Patents. In the near term (i.e., next five to ten years), evidence suggests that obsolescence of the IP may be low. This is remarkable given that the primary market application for inventions disclosed in the LG Patents has significant turnover. For example, the Consumer Technology Association reports that the average expected life cycle for a typical smartphone is 4.7 years. Inventions disclosed in the LG Patents have been around much longer than that. Moreover, I found no evidence that the market has moved away from such inventions *en masse* since Ericsson acquired the patents.

**Low technical risk:** Ericsson will not need to develop any new technology to build embodiments of inventions claimed in the LG Patents. All components are well developed.

**Utility of inventions:** The inventions disclosed in LG Patents (especially the '134 patent) have become a defining feature for cellular telephones. Thus, there is significant utility that smartphone manufacturers were able to generate from these patents, and by extension, the inventions disclosed in the patents.

**Breadth of patent usage:** Smartphone manufacturers have sold hundreds of millions of products that likely contain embodiments of inventions disclosed in the LG Patents. That fact pattern is rare for inventions that may have little market value. For example, Apple believed that inventions similar to those disclosed in the '134 patent provided it with a market advantage that may ultimately have led to greater product sales, and Apple made the key related inventions (i.e., tying screen rotation to window layout) a defining feature in early product marketing.

**Invention breadth in the portfolio:** The LG Patents vary in their art unit and inventive concept. For example, analysis of the main classification of the patents under the U.S. taxonomy as assigned by the USPTO indicates a reasonable variety of subject matter areas, as data in the following table demonstrates:[53]

| Issued Number | Main Class/ Subclass | General Subject Matter Area |
|---|---|---|

[53] Exhibit 5034, Patent List Classifications.csv, Pellegrino & Associates, LLC. March 6, 2016 (ERIC_TCL00774321). I declare that Exhibit 5034 is a true and correct copy of the data obtained on March 6, 2016.

| 8,593,415 | 345/173000 | Computer Graphics Processing and Selective Visual Elements |
| 8,300,017 | 345/173000 | Computer Graphics Processing and Selective Visual Elements |
| 8,092,253 | 439/578000 | Electrical Connectors |
| 8,078,134 | 455/343100 | Telecommunications |
| 7,957,770 | 455/567000 | Telecommunications |
| 8,326,377 | 455/575100 | Telecommunications |
| 8,095,888 | 715/801000 | Data Processing: Presentation Processing Of Document, Operator Interface Processing, And Screen Saver Display Processing |
| 8,549,426 | 715/810000 | Data Processing: Presentation Processing Of Document, Operator Interface Processing, And Screen Saver Display Processing |

As the data in the table indicates, the LG Patents include subject areas ranging from touch interface/haptic feedback (e.g., the '415 and '017 patents), mobile terminals (e.g., the '134 patent), electrical connectors (e.g., the '253 patent), and others. What this means is that Ericsson, in acquiring these patents, has multiple fronts to help licensees understand the business case for licensing the patents as opposed to some protracted and expensive litigation. Specifically, these patents cover a variety of important features integrated into a phone from antenna structures to basic device operation and many inventive matters in between. Even if a company believed that it might not infringe on one patent (e.g., the '253 patent), it most likely would infringe on others (e.g., the '134 patent for screen rotation; the '377 patent for buttons in the display glass; the '426 patent for the headphone wire control, etc.). In selecting the patents it has from LG, Ericsson has developed what appears to be a multi-tiered approach to covering many disparate, yet possibly valuable features of the devices.

**Highly concentrated market:** Ericsson might find that there are less than 20 companies worthwhile to pursue for licensing revenues. Those companies include smartphone or tablet manufacturers who are not current licensees to Ericsson's patent portfolio. As a result, Ericsson must approach relatively few companies to generate value, possibly reducing licensing efforts.

**Post-grant patent review survival:** In the case of the '134 patent, an anonymous third party requested an *ex-parte* review of this patent. The USPTO made several minor edits to the patent; however, key claims remained unamended through the reexamination process. Such a fact pattern lowers the invalidation risks associated with this patent because the patent successfully issued after an extensive and thorough prosecution and reexamination. Further, courts are also more likely to

institute a preliminary injunction in litigation proceedings, due to courts' preference for deferring to the USPTO. Moreover, the fact that the USPTO reviewed the patent and left the claimed inventions reasonably intact adds to the likelihood of success on the merits by the patent owner.

**Patent protection:** Ericsson enjoys significant exclusive rights for all inventions claimed in the patents. This exclusivity provides Ericsson with the power to charge a premium for what would otherwise be a commodity product. This protection, exclusivity, and market power extends until the issued patents expire. Competitors would not be able to utilize the inventions described by the patents, as any such use would comprise infringement and could result in an enforcement action by the patent owner. This path is high risk and presents unpredictable consequences for success for an accused infringer. While accused infringers may attempt to invalidate or argue that they do not infringe on the patents, doing so is a lengthy process. Further, during that process, the patent owner still maintains the presumption of patent validity.

**Low technical risk:** Little technical risk exists for one to deploy embodiments of the inventions claimed in the LG Patents to the broader market. I understand that other companies in the market may already be infringing on inventions claimed in the LG Patents.[54] Such a fact pattern bodes well for possible economic value attributable to the LG Patents.

**Several possible assertion opportunities:** Ericsson may have significant additional patent assertion opportunities beyond what I modeled against companies that are already using inventions claimed in the LG Patents (e.g., WiFi devices such as routers, intelligent devices [i.e., internet-of-thing objects], and others). While Ericsson will have associated costs with patent assertion efforts, Ericsson could also recoup such costs as well as damages, and possibly treble damages in cases of willful infringement findings.

**Multiple applications:** Inventions claimed in the LG Patents have applications in a variety of forms. The current areas of focus for this valuation (i.e., smartphones and tablets) are only a subset of the applications to which the LG Patents is applicable. As such, there is the possibility that additional value exists for applications in the market that are not part of the current valuation model.

**Proven enforcement:** Ericsson's executives have a proven record of successful negotiation of license agreements with many of the world's largest companies. These companies include Samsung, Blackberry, LG, and others. In all, Ericsson has license agreements in place with scores of companies worldwide, generating billions of dollars in value in the process. Thus, Ericsson representatives know what they are doing regarding patent licensing. Further, Ericsson knows how to enforce its rights when licensing discussions fail to result in a license agreement.

---

[54] Opening Delgado Statement at 62.

258. Many of these competitive advantages are long lasting and specific to the LG Patents. In consideration of my analysis of the competitive advantages for the LG Patents, in my opinion, based upon a reasonable degree of probability within the valuation profession, there are sufficient sustainable competitive advantages at this time. These factors increase the probability for one to realize long-term value from the LG Patents in the value scenarios I have modeled.[55]

## C. Risk Associated With Value Of The LG Patents

259. While certain sustainable competitive advantages exist relating to the LG Patents, there are also associated risks. The following are key risks I have identified in my analysis:

**Many potential failure points:** Ericsson must complete a considerable amount of work in order to generate the first dollar of revenue. The amount of work creates many potential failure points and increases success uncertainty. For example, some of the key actions that Ericsson needs to complete for licensing to succeed include the following:
- Ensure sufficient capital exists to fund the business plan.
- Develop market interest in the community.
- Introduce the LG Patents to licensees.
- Promote the results to the broader community.
- Litigate if necessary.

**Sensitivity to litigation durations:** Ericsson's ability to license the LG Patents relates to the necessity and duration of litigation. The longer the litigation, the longer Ericsson may have to wait in order to generate positive cash flows. The average length of a patent infringement lawsuit varies according to the complexity of the lawsuit. My research indicates that it may take slightly longer than two years on average for Ericsson to wrap up litigation with prospective licensees.

**Timing:** The valuation depends heavily on the timing of revenues. Any deviations from the forecasted revenue schedule can drive significant deviations from the stated value conclusion. For instance, expenses may continue to mount regardless of whether Ericsson or a hypothetical buyer can execute on its sales strategy successfully. If this situation manifests, then the hypothetical buyer or Ericsson may encounter a negative cash flow situation.

**Management execution:** The valuation model depends on many inputs. The source of the input is not material to the value conclusion; however, the management team must execute the business plan P&A

---

[55] Exhibit 5295, Income Valuation Model.

modeled for any chance of the value conclusion being within the range indicated in this statement (i.e., in the encumbered scenario, between $3,659,043 and $329,541,797 with a mean value of $177,784,686 and a median value of $170,051,079). Failure to execute the modeled business plan can result in significant value disparity and/or significant value impairment. For example, if the model indicates the hypothetical buyer will generate a certain level of free cash flow in a forecast period and if the hypothetical buyer fails to generate those free cash flows, this difference may induce significant value impairment.

**Patent validity challenge:** Under 35 U.S.C. §282, a patent is presumed valid and each claim is separately presumed valid. Thus, if one were to attempt to invalidate a patent, the burden of doing so in a federal district court action rests on the party seeking a declaration of invalidity. Third parties may also request a post-grant reexamination by the USPTO for any of the relevant patents. The results of such reexaminations may serve to confirm, confirm in part, or reject patentability of the issued claims. Rejections and confirmations in part may serve to weaken or destroy patent protections, thus impairing value.

The hypothetical buyer is at risk that a third party may request one or more reexaminations with the USPTO in an attempt to invalidate the LG Patents. This risk may also increase if Ericsson or a hypothetical buyer follows an aggressive enforcement strategy. If the USPTO grants a reexamination request, Ericsson or a hypothetical buyer may have no future cash flows attributable to the LG Patents because actuarial statistics from reexaminations do not favor patent owners.

**Attempts to design around patents:** At a practical level, third parties may seek to design around the LG Patents using non-infringing substitute technologies. If a potential licensee deems the costs and hassles of licensing the patents (if possible) to be excessive for the value the licensee receives, the licensee will cease to pursue a license and will instead pursue other non-infringing technological options to provide a technical solution, directly affecting the value of the LG Patents.[56]

**Litigation costs:** Litigation is costly. For example, patent litigation amounts to millions of dollars in expenditures per case. The American Intellectual Property Law Association (AIPLA) conducts a survey every other year called the Report of Economic Survey. AIPLA's survey examines the economic aspects of intellectual property law practice.

---

[56] The probability of success for this strategy will vary based on the LG Patents. For example, it will likely be quite difficult for Apple to migrate away from inventions disclosed in the '134 patent without a wholesale change in the user experience for an iPhone, whereas it may be easier for Apple to migrate away from inventions disclosed in the '253 patent.

According to AIPLA, patent infringement suits have the following median litigation costs:[57]

| Litigation Type | 2015 |
|---|---|
| Less than $1 Million at Risk | |
| End of discovery | $442,000 |
| All costs | $873,000 |
| $1-$10 Million at Risk | |
| End of discovery | $1,100,000 |
| All costs | $2,200,000 |
| $10-$25 Million at Risk | |
| End of discovery | $1,600,000 |
| All costs | $2,800,000 |
| More than $25 Million at Risk | |
| End of discovery | $2,600,000 |
| All costs | $4,500,000 |

260.   In consideration of my analysis of the key risks associated with the LG Patents, in my opinion, based upon a reasonable degree of probability within the valuation profession, there is moderate risk that these risks may impair value. As such, I used a discount rate commensurate with a higher-risk cash flow forecast.

**D.    Active Government Patent Protections**

261.   Under 35 U.S.C. §41(b), government protections afforded by a patent would be in force as long as the patent owner was current with patent maintenance fees. If the patent owner failed to pay the requisite maintenance fees, the owner's patent(s) would expire after a six-month grace period, unless the patent owner petitioned for reconsideration by the USPTO. I verified that Ericsson is current with all patent maintenance fees with the USPTO. Moreover, I further verified that neither LG nor Ericsson was late on any maintenance payments, both entities paid the proper fee amount (i.e., large entity versus small entity or micro entity) and there were no associated post-expirations associated with these patents. As such,

---

[57]   Exhibit 5297, 2015 Report of the Economic Survey, AIPLA, 2015., p. 35.

1   Ericsson appears to have the administrative and legal foundation to defend its

2   patents within the United States for awarded patents. This protection helps provide

3   the necessary economic incentive to compel a company potentially infringing on

4   Ericsson's patents to pay it damages of no less than a reasonable royalty rate and/or

5   to stop infringing activity, which flows through directly to Ericsson.

6   262.   I queried Ericsson representatives to determine if any of the relevant

7   patent claims have ever been the subject of a reexamination or a declaratory

8   judgment action. Negative results in such actions by the USPTO or a district court

9   could reduce the value of the LG Patents. The '134 patent has been the subject of an

10  adverse reexamination request; however, the claims that emerged from the

11  reexamination process remained in a usable form to both LG and Ericsson.[58] In my

12  due diligence, I found that no other patents in the portfolio have been the subject of

13  reexamination or a declaratory judgment action. As such, I did not consider any

14  value impacts of such activities.

15  263.   In consideration of these facts, in my opinion, based upon a reasonable

16  degree of probability in the valuation profession, the LG Patents remain in force.

17  Thus, there is no need for a value impairment to account for such risk beyond

18  traditional risk profiles appropriate to a project in this stage.

19      **E.    Functional Realization**

20  264.   35 U.S.C. §112 requires that an inventor specify in full, clear, concise,

21  and exact terms the best mode contemplated for an invention such that any person

22  of ordinary skill in the art could reproduce it. However, the inventor does not have

23  to prove to the patent office that the invention described by the patent actually

24  works or that one can manufacture it economically. As such, it is entirely possible

25  for one to own a patent on an invention that one could never commercialize

26  successfully for technical or economic reasons. This has a value impact. Intellectual

27

28  [58] Opening Delgado Statement at 66.

property whose embodiment works is worth more than intellectual property whose embodiment one only supposes will work. Instances of working intellectual property demonstrates that the inventor has overcome scientific and technological hurdles and can prove that there is some utility to the invention. One cannot deduce the same from intellectual property that one only supposes will work.

265.   Smartphone manufacturers have built and deployed embodiments of inventions disclosed in the LG Patents in hundreds of millions of products to hundreds of millions of consumers across the world. Thus, by extension, Ericsson has a significant measure of success proving that inventions disclosed in the LG Patents work. Thus, there is no question as to whether the inventions claimed in the LG Patents work as described in the respective patents, or whether one may be able to generate satisfactory performance and economic results from those inventions.

266.   In consideration of these facts, in my opinion, based upon a reasonable degree of probability within the valuation profession, several companies have working embodiments of inventions claimed in the LG Patent that one can utilize to generate economic income. Thus, there is no functional risk associated with the LG Patents, nor is there any need for value impairment to account for such risk beyond traditional risk profiles appropriate to the LG Patents.

**F.   Ease of Infringement Detection**

267.   A key driver for the value of intellectual property is the ability to detect infringement. Intellectual property where it is easy to detect infringement may be more valuable than intellectual property where it is not easy to detect infringement. This is because it may be less costly to detect infringement, and it may be easier to prove under dispute with the infringing party. Intellectual property where it is difficult to detect infringement may be worth less because there may be excess costs associated with infringement discovery and defense in disputes. For example, it is easier for Nike to detect and prove infringement by knockoffs of its best-selling shirts because the shirts are readily available to the public and a

comparison between the two is easily made by visual inspection. It is much more difficult for Qualcomm to reverse engineer the software code in a competitor's cellular device to detect infringement of Qualcomm's software copyrights because this information likely is not readily available to the public and it is more complex than a visual inspection to make a comparison between the copyrighted material and software code.

268. It is relatively easy to detect infringement of the LG Patents because use occurs primarily within the public view. For example, Ericsson representatives believe that it may be possible to review marketing information (e.g., literature, website claims, advertisements) to find potential infringement. Moreover, Ericsson representatives could monitor activity at industry trade shows and perform Internet searches as well. Lastly, Ericsson could buy products that sell in the open market where Ericsson suspects possible infringement and perform a competitive teardown of the products to find clues to possible infringement. Such activity may provide the patent owner with enough information to prove potential infringement during licensing or litigation efforts.

269. In my opinion, based upon a reasonable degree of probability within the valuation profession, the risk of value impairment for the LG Patents due to difficulty in infringement detection is low. Therefore, I did not impair the value of the LG Patents to account for any potential additional risk based on the difficulty of proving infringement.

### G. Attempts to Design Around Patent

270. A key driver for the value of patents is whether a third party can design around the key protections for the patent, while retaining the benefits of the utility described in the patent. Further, the third party would have to generate an economically efficient design. For example, patents where claims are hard to circumvent are generally more valuable than patents where it is easier for a third party to design around the patents' claims. A valuation analyst must consider

1    possible value impairment if it is easy for a third party to circumvent literal

2    infringement, or infringement under the doctrine of equivalents of the patents.

3        271.   There is a higher-level risk that an infringer may use non-infringing,

4    less functional alternatives if the use of the patents at issue is impossible (i.e., the

5    hypothetical buyer refuses a license to a licensee or demands onerous terms). If the

6    licensee deems the costs and hassles of licensing the LG Patents to be excessive for

7    the value the licensee receives, the licensee will cease to pursue a license and will

8    instead pursue other options, albeit with inherent drawbacks and/or disadvantages

9    as compared to using the LG Patents. Practically, companies make these types of

10   managerial decisions whenever enforcement actions initiate. Such a situation

11   impairs potential value for the hypothetical buyer because, with aggressive

12   enforcement or negotiation, the hypothetical buyer may lose any possibility for

13   economic activity altogether, as licensees that switch to alternative technologies

14   would no longer infringe the patents, nor would the licensees have any reason to

15   pay the hypothetical buyer.

16       272.   In consideration of these factors, in my opinion, based upon a

17   reasonable degree of probability within the valuation profession, realizable practical

18   risk of value impairment exists for the LG Patents. The first value impairment is

19   that potential licensees may be willing to settle for technology with less

20   functionality than the inventions that comprise the LG Patents. Second, technology

21   that provides similar utility to inventions that comprise the LG Patents in a non-

22   infringing manner may also induce value impairment. However, given the

23   pervasive use of inventions disclosed in the LG Patents, in my opinion, based upon

24   a reasonable degree of probability within the valuation profession, such design-

25   around risk is low. In my opinion, based upon a reasonable degree of probability

26   within the valuation profession, I have already accounted for these practical and

27   realizable risks of design-around risk with my selected discount rate.

28

1

## H.    Propensity to Defend Intellectual Properties

2      273.   A key driver for the value of intellectual property is the propensity or

3  willingness of the patent owner to defend the intellectual property in the market

4  against attack. For example, if a company owns a patent, but it does not pursue

5  infringers aggressively, then patent value may be impaired because infringers

6  would have no reason to pay royalties or cease and desist from infringing on the

7  patent. A valuation analyst must consider possible value impairment if a company

8  demonstrates a tendency not to defend its intellectual properties in the market, or a

9  lack of resources to do so.

10     274.   Ericsson must defend the LG Patents in order to maximize the patents'

11  value potential. I talked to Ericsson representatives about Ericsson's ability to

12  defend intellectual properties in the market. Ericsson has the financial wherewithal

13  to pursue infringers and has already initiated an action against a variety of different

14  defendants in various patent infringement lawsuits. Thus, Ericsson has clear intent

15  to assert its rights for the unauthorized use of inventions claimed within the LG

16  Patents. In my analysis of cases in DocketNavigator involving all cases in the

17  system as of March 5, 2016 involving Ericsson as a Plaintiff, I found that Ericsson

18  was a plaintiff or complainant 163 times.[59] Moreover, Ericsson has had to litigate

19  against companies that have poor reputations as defendants (e.g., defendants that

20  use scorched-earth strategies for defense) and Ericsson has been successful in

21  licensing to such companies. As such, evidence suggests that Ericsson has the

22  means and will to protect and defend its patents and the associated economic value

23  they represent without any obvious limitation.

24     275.   In my opinion, based upon a reasonable degree of probability within

25  the valuation profession, Ericsson will defend its patents to the extent that Ericsson

26

27  [59]  Exhibit 5031, Ericsson DocketNavigator Litigation Record.xlsx, Pellegrino & Associates, LLC. March 6, 2016 (ERIC_TCL00774307). Exhibit 5031 is a true and correct copy of the report I ran on DocketNavigator on March 6, 2016.

28

will preserve the value of the LG Patents.

## I.  Patent Litigation Duration

276.   I analyzed the patent litigation duration in key markets where the hypothetical buyer may enforce its patent rights. I did so to test whether the litigation timelines that I considered were within industry norms. I used a variety of resources to determine the patent litigation duration; however, PwC publishes an annual report that contains the litigation durations that I used in the valuation model.

277.   PwC reports that the median time to trial has increased, due in part to a trial-bound caseload that nearly tripled since 2000. However, the median time to trial remained steady between 2005 and 2013, hovering around 2.5 years. The following chart captures the periodic changes by year for patent litigation durations and the number of cases filed:[60]

---

[60]  Exhibit 5037, http://www.pwc.com/us/en/forensic-services/publications/2014-patent-litigation-study.html, accessed on February 28, 2016 (ERIC_TCL00776977)., p. 16. Exhibit 5037 is a true and correct copy of the PWC study at http://www.pwc.com/us/en/forensic-services/publications/2014-patent-litigation-study.html that I accessed on February 28, 2016.





Pellegrino Demonstrative 11

278.   The chart demonstrates that the average time to trial has increased in the last 8 years or so, topping out at around 2.5 years or so (i.e., 30-32 months). I modeled patent litigation durations for each prospective licensee of about 31 months on average in the valuation model. To account for uncertainty in the litigation duration, I modeled that a triangular distribution best represents this uncertainty with a minimum litigation duration of 26 months, a maximum litigation duration of 36 months, and a most likely litigation duration of 31 months.

## X.   MARKET OVERVIEW

### A.   Introduction

279.   The market drives the value of intellectual property. Intellectual property that has a large and credible applicable market is worth more than intellectual property that has limited market applications. Another important value driver is the state of the current market. Markets that are growing generally will support the notion of longer-term value, while shrinking markets can indicate little

1   long-term value prospects. I reviewed various sources to locate research with an

2   understanding of the characteristics for the LG Patent's target markets and

3   integrated these findings for the market that I considered.

4       280.   I will now describe those factors important and unique to the fair

5   market value opinion that I rendered for this valuation for the smartphone market

6   segment. A smartphone is a cellular phone with enhanced features. Revolutionary

7   hardware components that are small and require low power enable many of the

8   enhanced features typical to these devices. Some of the hardware components

9   include high-resolution LCDs, touch screens, GPS receivers, Bluetooth, WiFi,

10  CCDs, and advanced microprocessors. These components allow the phone designer

11  to create a myriad of user-friendly features integrated directly into the cellular

12  phone, making it a smartphone. Some of these features include audio and video

13  playback, still and full motion camera functions, video conferencing, email, file

14  sharing, Internet browsing, interface for a wireless earpiece, mapping and other

15  location-based services, and social networking.

16      281.   The creation of the smartphone caused a significant change in the

17  software community by opening the door for organizations to focus specifically on

18  smartphone applications. All of the major smartphone platforms allow the creation

19  of third party applications for use on smartphones. This keeps the smartphone

20  developer from having to invest in every application and allows third parties to

21  innovate and to create a revenue stream based on smartphone applications and

22  services.

23      282.   Next, I will describe those factors important and unique to the fair

24  market value opinion that I rendered for my valuation for the smartphone market

25  segment.

26  **B.     Smartphone Industry Overview**

27      283.   The smartphone market is large and growing. The following table

28  summarizes total worldwide smartphone shipments between 2009 and 2015, and

provides a forecast of smartphone shipments from 2015 to 2019 (as indicated by an asterisk).[61]

| Year | Shipments (millions) |
|---|---|
| 2009 | 173.5 |
| 2010 | 304.7 |
| 2011 | 494.5 |
| 2012 | 725.3 |
| 2013 | 1,019.7 |
| 2014 | 1,301.7 |
| 2015 | 1,432.9 |
| 2016* | 1,435.0 |
| 2017* | 1,579.0 |
| 2018* | 1,873.0 |
| 2019* | 1,862.3 |

284.   As data in the table shows, global smartphone shipments have grown substantially. Over the observed period from 2009 to 2014, global smartphone shipments increased from a mere 173.5 million units to over 1.3 billion units. Further, as data in the table indicates, the growth of smartphone shipments may temper, but the upward trajectory in the market will still add approximately 550 million annual shipments by 2019 (starting from 2014).

285.   The smartphone market is remarkably concentrated with several vendors commanding most of the market share and Apple commanding a disproportionate share of the industry profits. As part of my market analysis, I researched the different players within the smartphone market and their respective shares of the global smartphone market. My research yielded the following findings

---

[61]   Exhibit 5048, Based on IDC data in http://www.statista.com/statistics/263441/global-smartphone-shipments-forecast/, accessed on March 15, 2016 (ERIC_TCL00777348). Exhibit 5048 accurately draws from the IDC data at http://www.statista.com/statistics/263441/global-smartphone-shipments-forecast/ as accessed on March 15, 2016.

1   in the table.[62]

| Company | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Apple | 27% | 23% | 29% | 37% | 36% | 35% | 35% |
| Samsung | 4% | 11% | 17% | 25% | 31% | 29% | 25% |
| LG | 0% | 5% | 9% | 7% | 9% | 12% | 14% |
| ZTE | 0% | 0% | 0% | 4% | 4% | 5% | 7% |
| Alcatel | 0% | 0% | 0% | 0% | 1% | 4% | 4% |
| Motorola | 2% | 7% | 7% | 7% | 4% | 5% | 4% |
| Huawei | 0% | 2% | 3% | 3% | 3% | 1% | 1% |
| Nokia | 0% | 1% | 1% | 1% | 2% | 3% | 2% |
| HTC | 10% | 15% | 17% | 5% | 2% | 3% | 2% |
| Blackberry | 50% | 28% | 11% | 5% | 2% | 0% | 0% |
| Kyocera | 0% | 0% | 0% | 1% | 2% | 3% | 2% |
| Pantech | 0% | 0% | 1% | 1% | 1% | 0% | 0% |
| Sony | 5% | 2% | 1% | 0% | 0% | 0% | 1% |
| Others | 2% | 5% | 3% | 3% | 2% | 1% | 3% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

286.   As data in the table indicates, the change in the smartphone market has been swift and violent. Blackberry dominated the U.S. smartphone market in 2009. However, Blackberry HTC, and others collectively tendered their share to Samsung and Apple.

287.   Importantly, as is the case with other markets captured in the analysis, the scope of coverage of the LG Patents is within the U.S. market only. My research indicates that the U.S. market share for the 2013 to 2015 period varied only slightly. The following table summarizes the U.S. market share as a percentage of the global market, and the total units shipped in the U.S. market.

---

[62] Exhibit 4958, Counterpoint Research Market Monitor Report, Smartphones Vendor Share, Shipments ASP and Revenue: USA, March 2016 (ERIC_TCL00774323). Note that the numbers may not equal 100% due to rounding. Exhibit 4958 is a true and correct copy of Counterpoint Research Market Monitor Report, Smartphones Vendor Share, Shipments ASP and Revenue: USA, March 2016.

| Year | Total Shipments (millions)[63] | U.S. Shipments (billions)[64] | U.S Market Share |
|---|---|---|---|
| 2009 | 173.5 | 45.6 | 26.28% |
| 2010 | 304.7 | 71.9 | 23.59% |
| 2011 | 494.5 | 95.7 | 19.35% |
| 2012 | 725.3 | 123.2 | 16.99% |
| 2013 | 1,019.7 | 141.8 | 13.91% |
| 2014 | 1,301.7 | 156.2 | 11.99% |
| 2015 | 1,432.9 | 170.9 | 11.93% |
| 2016 | 1,435.0 | 182.6 | 12.72% |
| 2017 | 1,579.0 | 196.5 | 12.44% |
| 2018 | 1,873.0 | 211.7 | 11.30% |
| 2019 | 1,862.3 | 224.8 | 12.07% |

288.   As the table shows, U.S. smartphone sales and shipments continue to increase each year. Historically, the United States has been a large region for smartphones. Despite the relatively flat growth in the worldwide market share, the annual year-over-year market share shows ongoing opportunity, providing remarkable economic potential for Ericsson even above what I modeled.[65]

## C.   Market Analysis Conclusion

289.   Based on a wide variety of independent and cross-verified sources, future cash flow opportunities could materialize for the LG Patents. I see rather short-term positive opportunities for the LG Patents in the U.S. market. Factors that

---

[63]  Exhibit 5048, Based on IDC data in http://www.statista.com/statistics/263441/global-smartphone-shipments-forecast/, accessed on March 15, 2016 (ERIC_TCL00777348).

[64]  Exhibit 5052, Based on Jeffries & Company data in [62] http://www.statista.com/statistics/225371/feature-phone-and-smartphone-shipment-forecast- in-north-america/, accessed on March 15, 2016 (ERIC_TCL00777403). Exhibit 5052 is a true and accurate copy of http://www.statista.com/statistics/225371/feature-phone-and-smartphone-shipment-forecast- in-north-america/ as accessed on March 15, 2016.

[65]  Note that while market research indicates total unit sales approaching 224.8 million by 2019, in my valuation model, I actually used my forecast function, which generated about 40 million fewer unit sales in 2019.

1   support this conclusion include the market's current growth potential, the
2   pervasiveness of the possible licensing opportunities with Apple and others and the
3   fact that potential licensees have few practical means for those companies to design
4   around the inventions in the LG Patents.

5   290.   In consideration of the future prospects for the market, and contingent
6   upon Ericsson's ability to execute its business plan as described to me, in my
7   opinion, based upon a reasonable degree of probability within the valuation
8   profession, the U.S. market may provide a credible and viable market for the LG
9   Patents.

10  **XI.   GENERAL VALUATION CONSIDERATIONS**

11      **A.   Evaluation Framework**

12  291.   This section describes the methodologies that I used to determine the
13  value of the LG Patents consistent with the valuation approach that I believed
14  would generate credible results. I present the value basis for the selected value
15  approach, explain relevant adjustments for various conditions, and opine a final
16  value within what I considered a reasonable degree of probability in the valuation
17  profession.

18  292.   As part of the valuation development process, I consulted with a
19  variety of public and nonpublic resources provided to me by Ericsson
20  representatives and through my own independent research. I reviewed product
21  literature, marketing and sales forecasts, technical requirements, and presentations.
22  I utilized commercial patent and litigation databases and researched the attributes of
23  thousands of patents. I reviewed select cases using PACER (the online database that
24  provides access to documents associated with litigation in federal court) and
25  DocketNavigator. I also interviewed Ericsson representatives by telephone,
26  including Patricio Delgado, Luke McLeroy, Evelyn Chen, and Dr. Mats Sagfors.
27  Each interview provided me with material usage context as well as in-depth
28  technical insight into products, marketing, financing, development cycle, and

1  development methodologies associated with the LG Patents.

2      293.  Ericsson representatives provided me with relevant and material data
3  to perform my valuation development. I also had additional discussions with
4  Ericsson representatives throughout the project to verify various facts associated
5  with the LG Patents and inputs that I used in the valuation model. Ericsson
6  representatives provided me with copies of the various marketing, corporate,
7  technical, and other documents that I have since reviewed. In addition, I acquired
8  an abundance of data independently. Based on my analysis, and with my use of
9  statistical stochastic modeling to account for unforeseen events and circumstances
10 that influence value, in my opinion, based upon a reasonable degree of probability
11 in the valuation profession, I was able to produce credible valuation results for this
12 valuation.

13     294.  I will now describe the following considerations that I made when I
14 built the valuation models for the LG Patents.

15     **B.     Income Approach Valuation Methodology**

16     295.  I used the discounted future economic income method of the income
17 approach to establish value for the LG Patents. I built a discounted cash flow model
18 for the valuation scenarios to determine the anticipated economic income from the
19 rights to own and use the LG Patents over a discrete period. I then used the
20 discounted cash flow method to determine the quasi-perpetual value component
21 after the discrete period that I modeled, modeling a variable annuity for those
22 months beyond the discrete forecast that I developed. I used annual market data,
23 revenue projections, revenue trends, investment data, and cost data as provided to
24 me by Ericsson representatives and sources that I reviewed independently as a basis
25 for the value development. Subsequently, I integrated my findings into a valuation
26 model, accounting for costs and appropriate capital needs. I then developed an
27 appropriate discount rate to determine the value of respective patents as of the July
28 7, 2014, as I describe in the Discount Rate section.

296. I then discounted the economic income using that discount rate to determine a nominal value indication as of July 7, 2014.

## C.    Valuation Model Structure

297. I built an income valuation model in order to quantify my valuation calculation. Based in Microsoft Excel 2010, my valuation calculation model has the following architecture (whereby each box represents a separate set of financial schedules stored in a discrete worksheet in the workbook):



Pellegrino Demonstrative 12

298.   The income valuation model calculates a value for the LG Patents that a hypothetical buyer would intend to implement. The valuation model includes discrete revenue forecasts for the probable companies that the hypothetical buyer may seek to gain active licensees. The valuation model consolidates these revenue forecasts into a single schedule and matches a nominal set of expenses to the revenues, based on a budget that I developed with Ericsson representatives.

### D.    Market Analysis Impacts on Valuation Model

299.   The market drives the value of intellectual property. All else being equal, intellectual property that has a large and credible applicable market is typically worth more than intellectual property that has limited market applications. A valuation analyst must consider the relative size, growth, and trends in the target markets for intellectual property to determine whether credible market opportunities exist for value. Another important value driver is the state of the current market. Markets that are growing generally support the notion of longer-term value, while shrinking markets can indicate little long-term value prospects. I researched various sources to locate research with an understanding of the characteristics for the LG Patent's industries and integrated these findings for the markets that I considered.

300.   I had to consider the general and specific markets where the LG Patents applies. In my consideration of the markets, I tested certain valuation inputs for reasonableness using the following conditions:

- Whether any overarching macroeconomic impacts will impair long-term value (e.g., declining sales)
- Whether unit revenues and margins are sustainable, given expected and historical performance
- Whether the projected revenues and unit sales are possible within the competitive framework
- Whether the market share of projected revenues and unit sales for the LG Patents are possible

301.   As necessary, I adjusted valuation inputs I developed which fell outside of the norms for the markets I studied.

## E.   Product Revenue Model

302.   A valuation analyst considers several revenue or value sources when valuing intellectual property. Some of these revenue or value sources include:

**Direct use of the intellectual property in the market:** In this case, the patent owner will integrate the patents into a product or service and then directly market, sell, and support the product that embodies the LG Patents.

**Indirect use of the intellectual property in the market:** In this case, the intellectual property owner will license the intellectual property for another company to use in its own products. The licensing company would pay the intellectual property owner a licensing fee or royalty for the rights to use the intellectual property.

**Synergistic use of the intellectual property:** In this case, the intellectual property owner would integrate the intellectual property into a process or service the intellectual property uses in the course of generating its primary revenue sources. For example, intellectual property that Ford owns to facilitate the faster manufacture of cars is valuable to Ford, yet Ford will not use the intellectual property in the market directly.

303.   I modeled the hypothetical buyer following an indirect use revenue model to generate value for the LG Patents by indirectly granting licenses to licensees (i.e., cellular telephone manufacturers) in exchange for running royalties paid on each unit sold. To establish the value of the LG Patents, I constructed a revenue model to capture the timing, frequency, and magnitude of the revenue components generated by the LG Patents. In my opinion, based upon a reasonable degree of probability within the valuation profession, this revenue model appears reasonable and is normal within the industry.

## F.   Accounting for Uncertain Valuation Assumptions

304.   I captured the complex model interactions in the face of uncertain estimating inputs in the valuation model using Monte Carlo simulation analysis. First developed in 1946 by Polish mathematician Stanislaw Ulam in his research emanating from the Manhattan Project, Monte Carlo simulation uses the power of computers to calculate the statistical probability of an outcome based on a random sampling of inputs. While the roots of Monte Carlo simulation date back to the

1940s, Monte Carlo simulation's use is extensive today, ranging from use in weather forecasting, climate modeling, software project sizing and scoping, oil and gas reserve estimation, stock market and retirement planning—even calculating the odds of winning poker hands.

305. The Monte Carlo simulation is straightforward to implement, consisting of the following steps:

- Define a model of inputs and build the structure to produce outputs.

- Define mathematical functions that describe the ranges for the model's inputs.

- Describe the outputs to monitor (i.e., value calculation).

- Execute the simulation using commercial software.

306. The commercial software used to implement Monte Carlo simulations builds a set of random experiments in the model. For each input, the software selects a value within the defined range set forth by the mathematical functions used for the inputs. The software then stores the resulting output for later analysis. The software then repeats this process many times (e.g., 10,000 iterations). The software generates a set of outputs derived from the random sampling of the inputs that the analyst can then study and characterize. Oftentimes, the simulation results converge to a certain result. Monte Carlo simulations can use Monte Carlo or Latin Hypercube sampling algorithms for generating the random values for the inputs. The Monte Carlo sampling algorithm is more random than the Latin Hypercube sampling algorithm, which relies on stratified sampling techniques; however, using the Monte Carlo sampling algorithm takes longer and can introduce statistical clustering errors, possibly influencing the value outcomes unduly.[66]

307. Importantly, courts have accepted such simulation techniques as a valid means of accounting for uncertainty. For example, I have used Monte Carlo

---

[66] Note that I use the Latin Hypercube sampling algorithm in my analysis, so I avoid such statistical clustering biases.

1  simulation on hundreds of valuation engagements and have presented such

2  evidence in court.[67] Others have used Monte Carlo simulation in court as well. For

3  example, in *Lyondell Chemical Co. v. Occidental Chemical Corp.*,[68] the court found

4  that the Monte Carlo simulation analysis:

5  • Was reliable.

6  • Was not inherently untestable.

7  • Helped the court gauge reliability by examining input values.

8  • Provided greater certainty in the value conclusions to basic

9  alternatives.

10  • Ultimately assisted the court in its decision making compared to basic

11  alternatives.

12  308.  In another case, *Nanovation Technologies, Inc.*,[69] the court found that

13  the Monte Carlo simulation analysis:

14  • Was a generally accepted statistical tool.

15  • Provided no reason to believe testifying expert's analysis was

16  unreliable.

17  • Had a logical basis that ultimately trumped the trustee's unsupported

18  hyperbole.

19  309.  My use of Monte Carlo simulation techniques enabled me to account

20  for uncertainty in the valuation model in a manner that did not constrain the

21  valuation model to any single value predictions of key inputs. I programmed the

22  valuation model to recalculate itself repeatedly to create a distribution of outcomes

23  that I then analyzed and interpreted. I performed this analysis under two different

---

[67]  *See, e.g.,, Vernon v. Cuomo*, 06CVS8416, 2009 NCBC 6 (N.C.B.C. March 17, 2009)., *Harper Brush Works, Inc.*, United States Bankruptcy Court, Southern District of Iowa, Cause No. 12-01757-als11.

[68]  *Lyondell Chemical Co. v. Occidental Chemical Corp.*, 608 F. 3d 284 - Court of Appeals, 5th Circuit 2010.

[69]  *Nanovation Technologies, Inc.*, 364 BR 308 - Bankruptcy Court, ND Illinois 2007.

scenarios. In the first scenario, I considered whether the valuation model should include all potential licensees. In the second scenario, I excluded companies where Ericsson already maintained a broad in-place license to Ericsson's patent portfolio (e.g., Samsung). For each scenario, I performed 10,000 such calculations and then used the range of values calculated to arrive at a value determination. In total, the models computed 10,000 different possible value scenarios (20,000 in total across both scenarios). With a sample size that large, the valuations that the model generated became statistically significant. In complex situations involving uncertainty, this methodology allows the valuation model to generate meaningful estimates that would otherwise be impossible to model using discrete methods such as best-, expected-, and worst-case modeling.

## G.    Remaining Economic Life

310.    The economic life has a direct relationship to value. Intellectual properties with longer economic lives have a higher value than similar intellectual properties with shorter economic lives, all else being equal. In my consideration of the economic life for the LG Patents, I considered several factors including:

- Historical utility of similar intellectual property in the market.

- Statutory life for the LG Patents.

- Contractual terms that may shorten or extend the economic life of the LG Patents beyond statutory boundaries.

311.    Intellectual properties in the target market have remarkable utility for extended periods. For example, contemporary smartphone devices have existed for more than a decade and cellular telephone systems in general have spanned many decades. Under 35 U.S.C. §154(a)(2), the statutory life for a patent is 20 years from the earliest effective filing date claimed by inventors, or 17 years after the issue date for patents filed before June 8, 1995. Per my analysis, I calculated that the

patents nominally expire along the following schedule:[70]

| Issued Number | Expiration Date | Months To Expiration |
|---|---|---|
| 8,549,426 | August 24, 2027 | 159 |
| 8,092,253 | November 7, 2027 | 162 |
| 7,957,770 | June 16, 2029 | 181 |
| 8,326,377 | July 13, 2029 | 182 |
| 8,095,888 | January 27, 2030 | 188 |
| 8,300,017 | February 15, 2030 | 189 |
| 8,078,134 | August 6, 2030 | 195 |
| 8,593,415 | July 3, 2032 | 218 |
| Average | | **183** |

312.   As the data in the table suggests, the average remaining economic life for the patents of issue in the valuation model is 183 months, based upon the transfer agreement date of July 7, 2014. The actual range of patent expirations spans five years with the first patent expiring on August 24, 2027 for the '426 patent and the last patent expiring on July 3, 2032 for the '415 patent.

313.   I did not automatically impute the possibility that the hypothetical buyer could receive economic benefit over the balance of the remaining statutory life for the patents, as there is still uncertainty as to whether a competing product or sets of products will hit the market and find acceptance by the broader community. That said, and as is common with patents for products that do not exhibit technological obsolescence,[71] the economic life of the LG Patents, if adopted for sale by the market, could likely extend for the statutory life of the patents.

---

[70] Exhibit 5033, Patent Expirations.csv. Pellegrino & Associates, LLC. March 31, 2016 (ERIC_TCL00774320).

[71] Note that when I speak of technical obsolescence in this context, I am describing the obsolescence of the inventions themselves (e.g., screen rotation tied to an accelerometer) and not specific implementations of the inventions (e.g., an iPhone 3).

314. I first considered three forms of obsolescence that may affect the LG Patents. These obsolescence forms include functional, technological, and economic obsolescence.

**Functional:** Functional obsolescence occurs when the intellectual property user must incur excess operational costs to use the intellectual property versus current alternatives, which may be state of the art. Embodiments of the LG Patents do not incur any excess operational costs in comparison to other alternatives. Thus, in my opinion, based upon a reasonable degree of probability in the valuation profession, functional obsolescence would not shorten the potential economic life for the LG Patents.

**Technological:** Technological obsolescence occurs when technological forces render the intellectual property worthless. For example, patents for a next-generation computer floppy disk drive may likely be worthless because there are better technological options already on the market, such as high-capacity flash memory. There is some risk that new technological developments may reduce the need for inventions disclosed in the patents, which may be a limiting factor in value potential.

**Economic:** Economic obsolescence occurs when the use of the intellectual property in its highest and best form cannot provide an adequate return on investment. This can occur in intellectual property easily because intellectual property is generally unique and may have little use outside of a particular function. The inventions described by the LG Patents could foster a direct economic purpose. As such, in my opinion, based upon a reasonable degree of probability in the valuation profession, economic obsolescence would not affect the remaining economic life of the LG Patents by any significant amount or degree that I could measure.

315. The next factor I considered was the probability that a patent owner may prematurely abandon a patent by failing to pay (either intentionally or unintentionally) the maintenance fees. When such a failure occurs, the patent expires prematurely. In my analysis, I reviewed U.S. patents between January 1, 2000 and February 27, 2016 to establish the odds that Ericsson may abandon the patents that it acquired.[72] Specifically, I analyzed patents held by Ericsson's main reporting entity "Telefonaktiebolaget LM Ericsson (Publ)" in the U.S. patent system. My analysis included 7,340 patents where Ericsson's main reporting unit

---

[72] Exhibit 5030, Ericsson Assets 1-1-2000 through 2-27-2016.csv, Pellegrino & Associates, LLC. March 6, 2016 (ERIC_TCL00774306).

was the reported owner of the patents. I then cross-referenced this data against Ericsson's maintenance record over the observed period. In my analysis, I found that there is less than a 2% chance that Ericsson would prematurely abandon the patents. Moreover, of the patents that Ericsson does abandon, such abandonment generally occurs at the first or second maintenance payment, as the data in the following chart demonstrates:[73]



Pellegrino Demonstrative 13

316.   As the data in the chart indicates, Ericsson does not abandon many patents. This is especially true if Ericsson decides to maintain patents beyond the second maintenance payment (even though the third payment is double the second maintenance payment). Empirical evidence suggests that Ericsson will likely continue to maintain the patents by paying all remaining maintenance fee payment. Thus, unlike other patent owners who abandon many patents (e.g., IBM), Ericsson will likely keep these patents until they expire under normal statutory limits.

317.   Next, I considered the nature of the LG Patents. In general, a strong patent has an economic life equal to the length of the time remaining on the patents, unless generic competitors of similar quality are available as a substitute. In products that form the value basis for the hypothetical buyer's royalties, where

---

[73]   Exhibit 5051, www.ipanalytx.com, accessed on February 19, 2016 (ERIC_TCL00777399).

generic substitutes are currently unknown, determining any possible impairment is not practical. Thus, as is common with patents in the same class and subclass as the LG Patents, the economic life of the LG Patents may likely extend for the statutory life of the underlying patents; however, the magnitude of the economic impact may vary over time dramatically. Empirical evidence supports this determination. For example, it is obvious by inspection of market trends that these inventions may have helped many companies generate significant economic activity over the course of the last 10 years or so since the priority date of the earliest patent application. Thus, there appears to be no obvious economic reason why the LG Patents would have a shorter economic life.

318. In consideration of all the factors, in my opinion, based upon a reasonable degree of probability in the valuation profession, the economic life for the LG Patents will continue up to the statutory life of the patents. Oftentimes, portfolio licensing agreements may extend until the last patent in the patent portfolio expires. This would be the '415 patent, which expires on July 3, 2032, or 218 months from July 7, 2014 (the effective date of the value conclusion). I have accounted for the economic life explicitly in the valuation model where the valuation model ignores income beyond the expiration date of the patents. I did not consider a residual economic life beyond the statutory life for the LG Patents, as any person skilled in the art who wanted to use inventions disclosed in the patents after the statutory life of the issued patents expired could do so without having to pay the patent owner a license fee to do so.

319. In consideration of these items, in my opinion, based upon a reasonable degree of probability in the valuation profession, the remaining economic life for the LG Patents matches the statutory life of the patents. To account for the uncertainty in the economic life duration that I used, I modeled that a triangular distribution best represents the economic life. I configured the distribution with a minimum value of 159 months, (i.e., the first patent to expire), a

maximum value of 218 months (the remaining statutory life of the last patent), and a most likely life of 218 months.

### H.    Income Tax Rate

320.   I modeled that the hypothetical buyer would be a for-profit corporation like Ericsson that would expect to generate net income in future years as a for-profit entity. I accounted for the income tax liabilities in calculating the value. I modeled that an average income tax rate would likely be approximately 29.5% of income, which is the rate that Ericsson realized in 2014, the year of the acquisition.[74]

321.   I modeled that the effective income tax rate that the hypothetical buyer would realize would be consistent with this anticipated rate. Given that the hypothetical buyer would anticipate a future income stream that will well exceed income thresholds for lower effective income tax rates, there is low probability that the hypothetical buyer will ever generate a lower effective tax rate. As such, I did not account for any uncertainty surrounding the income tax rates for the federal and state income tax components.

### I.    Currency and Country Risk

322.   Currency risk occurs when the value of cash flows that the LG Patents owner(s) may receive fluctuates, with respect to the cash flow's nominal value, due to changes in the exchange rate among countries. For example, a strong U.S. dollar makes its cost of goods sold more expensive; however, a strong U.S. dollar may also stimulate sales because the LG Patents as a bundle may be less expensive for a U.S. buyer.

323.   Political risk occurs when events external to the operations of a company may influence the cash flows received from subsidiaries in other countries. Examples of such risk include war, actions of the host government (e.g.,

---

[74]   Exhibit 1278,
http://www.ericsson.com/thecompany/investors/financial_reports/2014/annual14/en/Results/C8.html, accessed on March 6, 2016.

1    Will the host government seize earnings before repatriation?), bureaucracy,
2    corruption, and others.

3        324.   Political and currency risks are typically accounted for in income
4    valuation models by adjusting the cash flows received from foreign operations,
5    perhaps in concert with historical currency exchange rates and other probabilistic
6    risk-modeling techniques, or by adjusting the income discount rate to account for
7    additional risk associated with cash flows from the particular country.

8        325.   I spoke with Ericsson representatives about the possible country and
9    currency risk. Because all transaction amounts would be in U.S. dollars for
10   products sold only in the United States, the net effect of the currency and country
11   risk will have a *de minimis* value impact dollars. Thus, I did not account for any
12   currency conversion in the valuation model.

13       **J.    Discount Rate**

14       326.   The issue of selecting an appropriate discount rate is one of the most
15   important decisions a valuation analyst has to make when using an income
16   approach to value. The value impact of the discount rate is large. Larger discount
17   rates lead to a lower value, and vice versa. In other words, my valuation would go
18   up. When calculating the discount rate, the valuation analyst must consider the risk
19   profile for the project and adjust the discount rate to account for additional risk. It is
20   common that a company's weighted average cost of capital (WACC) or its cost of
21   equity (depending on the financial structure of the patent under consideration) may
22   be an appropriate proxy for an appropriate discount rate.

23       327.   In developing my discount rate, I considered only a cost of equity. I
24   had no knowledge that a hypothetical buyer would use such debt, or to what degree
25   that buyer would consider debt financing in relation to equity financing.[75]

26   ─────────────
     [75] Debt financing would actually lower the discount rate and increase the value,
27   which in my opinion, based upon a reasonable degree of probability within the
     valuation profession, is improper as the discount rate should reflect the risk of
28   the investment, not the cost of funds directly.

328.   I determined the discount rate using the build-up method to determine an appropriate cost of equity, which is common in the valuation profession. I used the following components to build a cost of equity using the build-up method:

329.   3.13% 20-year Treasury note for the risk-free rate as reported on July 1, 2014 on the **U.S. Department of the Treasury Website**[76]

330.   6.96% equity risk premium as reported in the **2014 Duff & Phelps Yearbook**

331.   -0.37% size premium from 1 decile as reported in the **2014 Duff & Phelps Yearbook**

332.   1.69% industry risk premium for SIC 366 as reported in the **2014 Duff & Phelps Yearbook**

333.   The build-up method generated a nominal discount rate of 11.41%.

334.   This discount rate reflects the risk associated with a company that has a portfolio of earning capability and an active and creative executive structure that can respond to market dynamics. While Ericsson certainly fits within this definition, the risk profile associated with the LG Patents is greater, as Ericsson, as of the date of the LG transaction (July 7, 2014), has yet to prove success in the licensing strategy with these specific patents. Thus, risk exists that the Ericsson or a hypothetical buyer will not generate the types of returns necessary to exceed the up-front costs that the hypothetical buyer may incur, or ever get to the point where the hypothetical buyer would receive future income.

335.   Finally, risk exists that the occurrence of such benefits would be so far into the future as to have a *de minimis* value impact, thus increasing the risk for overvaluation using a nominal discount rate. As such, in my opinion, based upon a reasonable degree of probability within the valuation profession, it is possible this investment carries with it a higher degree of risk compared with the publicly traded

[76]   20-year Treasury note for the risk-free rate as reported on July 1, 2014 on the U.S. Department of the Treasury Website, accessed on March 6, 2016.

companies I used as a reference point for this engagement. Since the discount rate is the proxy for risk, I elevated the discount rate to account for this higher risk expectation.

336.   In my opinion, based upon a reasonable degree of probability within the valuation profession, this greater risk is consistent to what a non-diversified company may experience as it seeks capital to develop its target markets. I used an investment portfolio theory as a basis for pricing the cost of capital for the hypothetical buyer, based on the company and prospective success for the overall investment. The model considers the following items:

- The target rate of return for the investment
- The holding period for the IP investment
- Associated expenses for managing the investment for the holding period
- The success rate of getting IP to the market

The model formula is as follows:

$$discountRate = \left( \frac{(1 + targetRate)^{holdingPerod}}{successRate} \right)^{1/holdingPerod} - 1$$

337.   I used the nominal discount rate that I developed using the build-up method as the target rate of return for the investment, which was 11.41%. For the holding period, I looked to the venture capital market for guidance, as venture capitalists are typically those that fund ventures with a risk profile consistent with the one I modeled. Empirical evidence supports that venture capital holding periods are eight years, which is what I used for my model. Lacking any direct evidence for Ericsson's success rates in the specific space,[77] I relied instead on average success rate statistics based on the entrepreneur skill, which empirical evidence suggests a

---

[77] For example, there is much evidence to suggest that the Ericsson licensing team is highly efficacious, it is unclear to me what Ericsson's actual success rate is (i.e., 100% licensing success, 90% licensing success, etc.).

1   predicted success rate of 25.0% for serial entrepreneurs, which is what I used for

2   this analysis.[78]

3       338.   Using this methodology, my calculation of the discount rate is 15.58%.

4   In my opinion, based upon a reasonable degree of probability within the valuation

5   profession, this discount rate is appropriate for the LG Patents. [79] To account for the

6   uncertainty in the holding period, I modeled that a PERT distribution best

7   represents this uncertainty with a minimum value of five years, a maximum value

8   of ten years, and a most likely value of eight years. To account for the uncertainty

9   in the success rate, I modeled that a triangular distribution best represents this

10  uncertainty with a minimum value of 25.00%, a maximum value of 100.00%, and a

11  most likely value of 100.00%.

12      ## K.    Regulatory Environment

13      339.   Oftentimes, the regulatory environment can affect value. Intellectual

14  property that serves heavily regulated industries may experience adverse value

15  impacts, as regulation may defer future cash flows to some faraway point in the

16  future. Alternatively, heavy regulation may enhance value as well, particularly if it

17  creates barriers to entry that afford existing market participants quasi-monopolistic

18  attributes.

19      340.   The LG Patents exist in a space that government agencies regulate, but

20  the LG Patents have no specific certification or other licensing requirements. The

21  LG Patents integrate other components that might receive stringent regulatory

22  oversight (e.g., communications equipment); however, regulatory approval vests

23  with vendors of those products. As such, in my opinion, based upon a reasonable

---

[78]  Exhibit 5298, Gompers, P., A. Kovner, J. Lerner, and D. Scharfstein, "Skill Vs. Luck in Entrepreneurship and Venture Capital: Evidence From Serial Entrepreneurs," NBER Working Paper Series, No. 12592, 2006.

[79]  Note that because I use of Monte Carlo simulation to account for uncertainty in the discount rate determination, the actual discount rates that I use varies between 11.41% (i.e., 100% successful) and 47.01% (5 year holding period coupled with a 25% success rate).

1  degree of probability within the valuation profession, the regulatory environment

2  will not materially affect revenues related to the patents under review.

3      **L.     Product Warranty Returns and Allowances**

4      341.   Given the nature of the LG Patents, I do not anticipate that the

5  hypothetical buyer would incur any allowances or any liabilities related to

6  warranties for the LG Patents. As such, in my opinion, based upon a reasonable

7  degree of probability within the valuation industry, there is no warranty, return, or

8  other liability risk for the LG Patents. Therefore, I did not account for this

9  possibility and cost within the valuation model.

10     **M.     Workforce Considerations**

11     342.   The active workforce can have a material value impact, particularly

12  with respect to intellectual property such as trade secrets or patents. For example, if

13  a person key to the value in a trade secret were no longer available, this may impair

14  the trade secret's value. If a key person were unavailable to consult on enabling a

15  possibly high-value patent, then the patent may suffer from value impairment for

16  lack of the key person to help maximize enablement of the patent.

17     343.   In the case of the LG Patents, the value-creating patents comprise

18  issued U.S. patents. While the development of the LG Patents took some time and

19  had risk, based on my discussions with Ericsson representatives, there is nothing

20  inherently difficult in the implementation now. Any person skilled in the art should

21  be able to utilize the inventions disclosed in the LG Patents in a relatively short

22  period (e.g., weeks to months). In fact, Apple, Inc. and others have developed

23  embodiments of inventions claimed in the LG Patents without the benefit of

24  consultation of the original named inventors on the patents. Thus, the economic loss

25  associated with any key personnel is negligible.

26     344.   In a broader sense, the labor market consists of plenty of available

27  talent that is effective in tools and practices needed to license the LG Patents.

28  Potential licensees have all of the current knowledge and expertise to satisfy the

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   successful licensing of the LG Patents. Moreover, potential licensees have
2   substantial experience in the domain. Further, potential licensees likely would not
3   find it challenging to find good and reliable labor if they need to hire more staff.
4   These new hires would generally be skilled labor and may have domain-related
5   work experience; however, such work experience is not necessary.

6   345.   In my opinion, based upon a reasonable degree of probability within
7   the valuation profession, a person of ordinary skill in the art could maintain and
8   extend the implementation of the LG Patents with an appropriate period to become
9   acquainted with them. As such, the risk of not realizing value due to the lack of
10  availability of a key person (e.g., an inventor) is low. Thus, in my opinion, based
11  upon a reasonable degree of probability within the valuation profession, Ericsson
12  will not have any long-run value impairment because of workforce issues.

13          **N.    Capital Equipment Requirements**

14  346.   Based on the general nature of the intellectual property in the market,
15  one would require minimal capital expenditures (e.g., desks, computers, complex
16  manufacturing machinery) to achieve the economic income potential from the LG
17  Patents. As such, I did not account for any capital expenditures in the valuation
18  model since such expenditures would have a *de minimis* value impact.

19          **O.    Working Capital Requirements**

20  347.   To generate value from the LG Patents, Ericsson or a hypothetical
21  buyer will have to commit working capital to fund such items as professional
22  services, sales, marketing, travel, and others. My valuation model indicates that
23  Ericsson or a hypothetical buyer will have to provide something less than
24  $5,000,000 to enable licensing of the patents that comprise the LG Patents over the
25  next several years.[80] I modeled that Ericsson or the hypothetical buyer would take
26  the necessary steps to realize the value of the LG Patents, including any possible

27  ───────────
28  [80]   Note that these expenses do not account for litigation costs, which I accounted
    for explicitly in the valuation model.

1   additional capitalization requirements.

2       **P.**    **Value Realization Timing**

3       348.   It will take a commitment of time for the hypothetical buyer to realize

4   the full economic value from the LG Patents. Up-front time will include necessary

5   preparations by Ericsson or a hypothetical buyer to prepare marketing materials

6   relating to the LG Patents, to build market interest in them, and to work through the

7   acquisition cycles for potential customers, which can sometimes take many months

8   or years. This time has a value impact, as it defers cash flows that the hypothetical

9   buyer can generate with the LG Patents.

10      349.   Holding cash flows constant, a patent nominally may lose value each

11  day it exists until it expires. Thus, patented products that are in the market longer

12  will generate a greater value. Consider the value of a patent that generates a

13  $100,000 annual cash flow stream for five years, as the following table

14  demonstrates using a 35% discount rate:

| Economic life (years) | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Annual cash flows | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Present value | **$221,996** | | | | |

18      350.   If the patent has a remaining economic life in the market of five years,

19  it will have a value of $221,996. However, suppose the patent owner delays the

20  product launch for two years because of technical difficulties. The following is the

21  result of this delay:

| Economic life (years) | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Annual cash flows | $0 | $0 | $100,000 | $100,000 | $100,000 |
| Present value | **$93,052** | | | | |

27      351.   The IP value would be $93,052, indicating an IP impairment of

28  $128,944. This is proper because the value attributable to the patent subsides as

1   soon as the patent expires, and the IP owner lost two years in the market.

2       352.  I accounted for the timing of value realization by projecting the pro

3   forma economic income over a period suitable enough for the valuation model to

4   reach a steady state. In addition, I accounted for the timing impacts of factors that

5   will affect the value opinion. The following are the factors that I included in my

6   accounting for the timing in the valuation model:

7       •    The economic life of the LG Patents

8       •    The rate of growth in the overall industry

9       •    The rate of adoption of the technology in the market

10      •    The gap between when subsequent licensees may consider executing a

11  license

12      •    The amount of time to complete the sale of a license

13      353.  In my opinion, based upon a reasonable degree of probability within

14  the valuation profession, I accounted for the value impacts of timing in my

15  forecasts reasonably.

16      **Q.    Revenue Timing**

17      354.  No practical constraints limit the revenue-generating ability of

18  Ericsson or a hypothetical buyer in the long term; however, some short-term

19  impacts will prevent Ericsson or a hypothetical buyer from generating income from

20  the LG Patents in the market. First, Ericsson has not signed any potential licensees

21  yet as of the date of the transfer agreement (July 7, 2014) for the LG Patents. Until

22  this occurs, Ericsson will not be able to generate value in the market directly using

23  these patents, as Ericsson does not plan to launch a new set of products to serve this

24  market. The time it takes to bring potential licensees onboard defers revenues that

25  Ericsson may earn. Further, this time delay will also consume valuable years in the

26  remaining statutory life for the LG Patents, which also has a material value impact.

27  All of these factors change the timing of project revenues and cash flows, which

28  influence value directly. I accounted for these constraints and value impacts in the

1  revenue forecast, as well as their associated uncertainties.

2      355.  I modeled that Ericsson would expect to begin pursuing licensees to

3  the LG Patents immediately. I accounted for the timing of the sales process by

4  selecting a starting revenue month sufficient to cover the time requirement to

5  complete the patent licensing and litigation process. The net effect is that this delay

6  defers revenues and positive cash flows, thereby accounting properly for the time

7  delay and value impact of the patent prosecution and licensing process.

8      356.  Next, I accounted for time to initiate a license agreement with a

9  licensee. This can take several months depending on the circumstances. The net

10 effect is that this delay defers revenues and positive cash flows, thereby accounting

11 properly for the time delay and value impact of the licensing consideration

12 processes. I modeled that the typical sales process would take one month in my

13 valuation model. To account for the uncertainty of this value driver, I modeled that

14 a triangular distribution best represents the uncertainty, with a minimum value of

15 one month, a maximum value of six months, and a most likely value of one month.

16     357.  Lastly, I accounted for the time a licensee will spend to consider a

17 license agreement.[81] Initial conversations can cumulatively take months to years

18 depending on the circumstances.[82] The net effect is that this delay defers revenues

19 and positive cash flows, thereby accounting properly for the time delay and value

20 impact of the licensing negotiation processes. I modeled that this basic introductory

21 process would take between one and six months in my valuation model. To account

22 for the uncertainty of this value driver, I modeled that a triangular distribution best

23 represents the uncertainty, with a minimum value of one month, a maximum value

24 of 18 months, and a most likely value of one month.

25     358.  In my opinion, based upon a reasonable degree of probability within

26

27 [81]  Note that the time to hammer out a definitive agreement can take longer. I
       capture that timing with another variable in the valuation model.

28 [82] *See* Opening McLeroy Statement.

1    the valuation profession, the timing impacts of revenues as I have captured them in

2    the valuation model appear reasonable.

3        **R.    Licensee Licensing Order**

4        359.   The order of the licensees that might consider executing license

5    agreements with the hypothetical buyer has a value impact. Larger licensees may

6    generate larger up-front and recurring revenues; thus, larger licensees will drive a

7    higher value if they execute license agreements before smaller licensees.

8        360.   I spent considerable time debating the merits and likelihood of each

9    licensee in the target market executing a licensing agreement for the LG Patents. I

10   looked at ways to rank-order the licensees using multifactor decision models that

11   considered a variety of factors such as market buoyancy, market size, and the will

12   to change. The idea behind the algorithm was to determine, with some reasonable

13   degree of confidence, which licensee would execute license agreements first. In the

14   end, I determined that such rank-ordering was highly subjective and not defensible.

15   Further, I had to extrapolate how licensees would react to the value proposition

16   presented by Ericsson or a hypothetical buyer with no real basis to determine such

17   reactions to date. Moreover, with up to 13 major licensees considered, there exists

18   6,227,020,800 different permutations of value[83]—and that considers keeping all

19   other factors constant!

20       361.   I instead assigned the smartphone manufacturers to each licensee slot

21   on a size basis, reasoning that Ericsson or a hypothetical buyer would approach the

22   larger potential licensees first as the economic benefits are greatest with those

23   companies. As a result, Ericsson must pursue a strategy that provides the greatest

24   probability of maximizing licensing revenues, which necessitates a strategy focused

25   more on the larger potential licensees. As such, in my opinion, based upon a

26   reasonable degree of probability in the valuation profession, the licensee algorithm

27

28   _____

[83]   13 factorial, or 13*12*11*… * 3 * 2 * 1 = 6,227,020,800.

that I used was reasonable and defensible, as doing so would maximize value for the patent owner.

362.   In my opinion, based upon a reasonable degree of probability within the valuation profession, this licensee selection algorithm appears reasonable and defensible.

## S.   Revenue Forecast

363.   To establish the value of the LG Patents under the fair market value standard, I constructed a revenue model to capture the timing, frequency, and magnitude of the revenue components that the hypothetical buyer will likely generate through the licensing of the LG Patents in the market. Specifically, my revenue model accounted for the development and sale of the LG Patents. The revenue model builds upon sales forecasts that I developed. I had to develop a forecast that would account for revenues beyond what Ericsson representatives may have considered.

364.   I considered several factors that forecasting experts recommend when selecting an appropriate forecasting method, particularly for extrapolation. Extrapolation is the long-range forecasting method that I preferred and used for this engagement. Per J. Scott Armstrong, author of the *Principles of Forecasting*, it is preferable to use extrapolation when:

1. One needs a large number of forecasts.
2. The forecaster has limited knowledge about the future situation.
3. The situation is stable.
4. Other methods would be subject to forecaster bias.
5. The situation is a benchmark in assessing the effects of policy changes.

365.   In consideration of the revenue components, in my opinion, based upon a reasonable degree of probability within the valuation profession, the nature of this engagement meets the conditions described by items #1, #2, #3, and #4 (item #5 does not have relevance for this engagement). My reasoning is as follows:

**Large number of forecasts needed:** With respect to the LG Patents, I

did not necessarily need a large number of forecasts (i.e., dozens or hundreds); however, I did have to generate several thousand revenue forecasts when I ran my models under simulation. Thus, in my opinion, based upon a reasonable degree of probability within the valuation profession, it was prudent to consider extrapolation for each forecast.

**Limited future knowledge:** I had limited knowledge of future potential revenues. Unlike patents that have definite knowledge of future events, such as contracts that have defined financial targets, milestones, and durations, I did not have knowledge of future events.

**Stable situation:** With respect to future sales, the empirical evidence suggests that sales across the industry have historically been stable over time, growing remarkably well.

**Forecaster bias:** With respect to the LG Patents, I found that there was little qualitative basis for me objectively to make any reasonable determination for future sales without the risk of injecting some bias into the decision.

While I mitigated such bias risk using simulation techniques, in my opinion, based upon a reasonable degree of probability within the valuation profession, for this engagement, an extrapolated revenue forecast proved to be more credible than pure qualitative judgmental analysis for future events.

366.   I built a revenue forecast that included recovery of damages from previous historical unit sales of products that included suspected unauthorized and unlicensed use of inventions disclosed in the LG Patents. I also included running royalties for licensed use of the inventions disclosed in the LG Patents on a prospective basis after the execution of a license agreement. On a retrospective basis, I modeled the accrual of royalties going back to 2009 (which is the maximum allowable look-back period for damages when considering all of 2014 in the historical damages period). On a forward basis, I modeled future royalties discretely over a 10-year window through 2023. For potential royalties after 2023, I calculated a variable monthly annuity for the months between January 1, 2024 and the economic life of the patents, which could occur eight years later using a constant net royalty payment.

367.   Of the licensees that I considered, Ericsson has several licenses associated with some prospective licensees, which include Samsung, Motorola,

Lenovo, Nokia, HTC, and others. In the encumbered valuation scenario, I excluded these potential licensees from the revenue forecast, as Ericsson would have no practical means to pursue additional consideration from these companies from the LG Patents because of preexisting licensing agreements.[84]

368.   Within the revenue schedule, I calculated a revenue forecast based on an integrated discrete real options-based forecast. Specifically, with each prospective licensee, I anticipated that the negotiation could traverse one of several paths in the following flowchart:



Pellegrino Demonstrative 14

---

[84]   Importantly, Ericsson's existing licensing encumbrances actually reduce the value of the assets to Ericsson. Under the fair market value standard, other potential buyers do not have the same encumbrances associated with Ericsson's license agreements. As such, the value of the LG Patents is likely much greater for other potential buyers of the assets as they have the ability to pursue Samsung, HTC, Motorola, and other large phone manufacturers that are already licensed to Ericsson's patents. The economic difference for those hypothetical buyers versus Ericsson is at least double the value indication captured in this statement as Ericsson's encumbrances represent greater than 50% of the total market share that may be using the inventions disclosed in the LG Patents. That market share is available to other buyers who are not Ericsson.

369.   The basic logical flow is as follows: the hypothetical buyer starts its licensing program with a pool of potential licensees. The hypothetical buyer approaches each potential licensee serially. When the hypothetical buyer approaches a licensee, the licensee could either (1) agree to consider a license right out of the gate (5% chance) or (2) the potential licensee could elect to not immediately take a license (95% chance). If the target licensee agrees to consider a license, then the valuation model accounts for the time to do so. I modeled that the typical license consideration time period ranges from 9 to 48 months. At the conclusion of the license consideration time period, the target licensee can either (1) execute a license (80% chance) or (2) not execute a license (20% chance). If the target licensee agrees to take a license, then the valuation model begins accruing licensing fees in accordance with the annual license fees that the hypothetical buyer expect to generate from the target licensee. If the target licensee does not agree to a license, then the hypothetical buyer initiates litigation. The litigation time period is about 26 months. If the hypothetical buyer prevails in litigation (i.e., in court or via a settlement—66.67% chance of prevailing), then the valuation model begins accruing licensing fees in accordance with the annual license fees that the hypothetical buyer may expect to generate from the target licensee.[85] If the hypothetical buyer does not prevail in litigation (33.33% chance), then the valuation model does not account for any revenues from the target licensee.

370.   If the target does not agree to a license, but instead advises the hypothetical buyer immediately of its decision (5% chance), then the hypothetical buyer executes the same business strategy as just described; however, this pathway does not include the time period for target licensee consideration. If the licensee

---

[85]   Note that in my analysis of Ericsson's encumbrances, it is clear that Ericsson nears a 100% success rate in reaching an agreement with prospective licensing partners in the relevant target market that results in the parties executing a license (e.g., Samsung, Motorola, Blackberry, Huawei, etc.) As such, Ericsson's actual realized success rate is greater than what I modeled by about 150%.

1   does not require Ericsson or a hypothetical buyer to litigate, then I modeled that the

2   licensee receives a discount from the nominal indicated license fees, which ranged

3   from 0% (i.e., no discount because of litigation) to 66.67% (i.e., a large discount for

4   a quick settlement). To account for uncertainty in the litigation settlement discount,

5   I modeled that a triangular distribution best represents this uncertainty with a

6   minimum settlement discount of 0%, a maximum settlement discount of 66.67%,

7   and a most likely settlement discount of 66.67%.

8       371.   Next, I needed to quantify the revenue stream that the hypothetical

9   buyer plans to generate. There are two components to this revenue stream, historic

10  damages for past infringing activity (subject to a six-year look-back period) and

11  ongoing royalties for future infringing activities. I modeled both in my revenue

12  forecast. Specifically, I accumulated royalties for prior infringing activity up to the

13  point of a license agreement or a litigation award. At that point, the revenue model

14  forecasts a lump-sum payment for historic infringing activity. Note that I did not

15  accumulate interest on a compound monthly basis for historic damages incurred,

16  even though a general hypothetical buyer would have such remedies available.

17  From the month following the lump-sum payment forward, I forecasted ongoing

18  royalties at a level consistent with the historical revenues, payable on a monthly

19  basis.

20      372.   Next, in order to calculate any historic or future royalty payments, I

21  needed to forecast the monthly royalty payments that the hypothetical buyer may

22  receive. I needed two basic pieces of information to calculate the monthly royalty

23  amount, the monthly royalty base and the royalty rate. The monthly royalty

24  payment would thus be the product of the monthly royalty base and the royalty rate,

25  which I discuss in the following sections.

26          **1.   Royalty Rate**

27      373.   In order to calculate any historic or future royalty payments, I needed

28  to forecast the monthly royalty payments that the hypothetical buyer may receive. I

needed two basic pieces of information to calculate the monthly royalty amount, the monthly royalty base and the royalty rate. The monthly royalty payment would thus be the product of the monthly royalty base and the royalty rate.

374. A common and accepted approach in litigation to establish a reasonable royalty rate for patent infringement is to consider a hypothetical negotiation between a willing licensor and a willing licensee. This hypothetical negotiation attempts to establish a royalty rate that the parties would have agreed to if they had successfully negotiated a license agreement at the commencement of any infringement. Oftentimes, valuation analysts use a framework (also known as the Georgia-Pacific factors) established in litigation between Georgia-Pacific Corporation and United States Plywood Corporation to help ascertain what a reasonable royalty rate would have been. While not comprehensive and absolute (i.e., the framework only suggests some 15 factors to consider, but not *all* of the factors a valuation analyst should consider),[86] the framework's 15 factors provide a starting point for any such analysis. I understand that Ericsson had not yet performed a litigation-level analysis (e.g., Georgia-Pacific) for any pending or anticipated licensing transactions or litigations, nor would the hypothetical buyer as of July 7, 2014. This outcome is common in the context of a company that is in the midst of completing a transaction (as opposed to a litigation context).

375. In my experience, companies simply do not perform litigation-hardened Georgia-Pacific analysis as part of a patent portfolio acquisition, for several reasons:

**It takes a lot of time:** Performing a litigation-hardened Georgia-Pacific analysis oftentimes takes months to complete. Typical efforts can comprise 300 to 500 hours or more depending on the complexity

---

[86] "The following are some of the factors *mutatis mutandis* seemingly more pertinent to the issue herein," Exhibit 4551, PWC-ERC-11-Implmentation-phase1-October-2013-All-Done.xlsx. Parsa Wireless Communications, LLC. October 2013 (ERIC_TCL00768130).

of the case.[87] There is a saying in mergers and acquisitions that "time kills deals." Companies oftentimes do not have the luxury of such time investments to wait while a valuation analyst performs a litigation-hardened Georgia-Pacific analysis. For example, when Mosaid Technologies went private in 2011 in a $594 million deal,[88] the entire deal analysis took less than three months, which would not have been enough time to complete a litigation-hardened analysis for all major patent families of interest.[89]

**It is costly:** Performing a litigation-hardened Georgia-Pacific analysis is an expensive endeavor that can grow exponentially as the pool of discovery materials increases (i.e., a relatively easy case with 20,000 pages of discovery materials will cost much less than a case involving one million pages of discovery material). A typical litigation-hardened analysis can range from $50,000 to $250,000 or more, depending on the firm that performed the analysis and the complexity of the case. In extreme cases, a witness may stand to charge millions for such analysis. For example, Apple's damages expert Chris Velturo charged Apple $2.3 million for work on a single damages opinion in litigation involving Samsung.[90]

**It requires specific rulings:** Performing a litigation-hardened Georgia-Pacific analysis requires specific interpretation of key claims terms, which is certainly not the case in most transactions involving patents (i.e., many patents transfer that were never the subject of litigation). Such rulings do not occur until patents reach litigation.

**It requires detailed knowledge:** Performing a litigation-hardened Georgia-Pacific analysis typically requires extensive consideration of very specific items produced in discovery, which a buyer will not have access to when considering a transaction.

**It requires rifle precision:** Performing a litigation-hardened Georgia-Pacific analysis typically involves rifle precision to a specific claimed invention as applied to a specific product. However, many patent portfolio acquisitions involve many different patents where rifle precision is impractical or practically impossible. For example, Mosaid Technologies had thousands of patents in its portfolio. There is no evidence in the public domain to suggest that either Wi-Lan (one suitor) or Sterling Partners (the winning suitor) ever performed a litigation-hardened Georgia-Pacific analysis on each of Mosaid's

---

[87] Note that such an analysis of the size quoted only reflects a small pool of assets and not a large portfolio of assets.

[88] Exhibit 5058, http://www.reuters.com/article/us-mosaid-sterling-idUSTRE79R2P920111028, accessed on March 5, 2016 (ERIC_TCL00777452).

[89] Exhibit 5062, http://business.financialpost.com/fp-tech-desk/wi-lan-admits-defeat-in-mosaid-bidding-war, accessed on March 5, 2016 (ERIC_TCL00777550).

[90] Exhibit 5056, http://www.mercurynews.com/business/ci_25549404/samsung-attorney-tries-undermine- apples-damages-expert, accessed on March 6, 2016 (ERIC_TCL00777435).

patents as part of the transaction or to make the business case for the acquisition.

**It may be discoverable:** Performing a litigation-hardened Georgia-Pacific analysis may be discoverable by an adverse party at some point subsequent to the transaction closing. The buyer may not want to commission such discoverable work product if litigation is a possible outcome.

376.   There is no established royalty rate for the LG Patents that I could use as a proxy . As such, I modeled a royalty rate expectation for the LG Patents that ranged between 0.25% and 0.50% of the value creation attributable to use inventions disclosed in the patents. I relied on that royalty rate range in my analysis. In my opinion, based upon a reasonable degree of probability in the valuation profession, I had a reasonable empirical basis to do so. First, if one studies the actual cost to most unencumbered licensees, the actual cost is well below other inventions in the smartphone space. For example, the following table captures the actual amounts, on a dollar basis, that smartphone manufacturers would pay by year at a 0.33% royalty rate:[91]

| Potential Licensees | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Apple | 1.98 | 2.05 | 2.09 | 2.05 | 2.04 | 2.15 | 2.22 |
| Samsung | 1.29 | 1.25 | 1.22 | 1.31 | 1.23 | 1.24 | 1.29 |
| LG | - | - | - | - | - | - | - |
| ZTE | - | - | 0.63 | 0.49 | 0.47 | 0.41 | 0.35 |
| Alcatel | - | - | - | 0.40 | 0.46 | 0.37 | 0.36 |
| Motorola | 0.92 | 1.98 | 1.62 | 1.25 | 1.17 | 0.96 | 0.86 |
| Huawei | - | 0.63 | 0.60 | 0.55 | 0.47 | 0.43 | 0.68 |
| Nokia | 1.24 | 1.20 | 0.89 | 0.97 | 0.78 | 0.66 | 0.54 |
| HTC | 1.20 | 1.19 | 1.19 | 1.15 | 0.93 | 0.99 | 0.79 |
| Blackberry | 1.18 | 1.08 | 1.10 | 0.92 | 1.13 | 0.97 | 1.13 |
| Kyocera | - | - | - | 0.94 | 0.86 | 0.83 | 0.96 |
| Pantech | - | - | 0.89 | 0.83 | 0.64 | 0.52 | - |
| Sony | - | - | 0.63 | 1.06 | 1.06 | 1.07 | 1.12 |
| Average | **1.30** | **1.34** | **1.09** | **0.99** | **0.94** | **0.88** | **0.94** |

---

[91]   Exhibit 5295, Ericsson Income Valuation Model v1.0.xlsm, Pellegrino & Associates, LLC, April 4, 2016.

377. As the data in the table shows, the average royalty rate that I modeled would amount to about $0.94 per phone based on 2015 pricing. Were it not for Apple bringing up the average, most other vendors would pay much less. For example, in the case of Alcatel, I modeled that they would pay $0.36 on average— for 10 distinct patent families. To put the reasonableness of that amount in context, I refer back to the fundamental analysis that I described earlier. Recall that Ericsson accepted $125 million in alternate consideration for phone sales that, between 2009 and 2017, captured about 122.2 million units as the data in the following table demonstrates:[92]

| Year | Volume |
|------|--------|
| 2009 | 100,000 |
| 2010 | 3,400,000 |
| 2011 | 9,240,000 |
| 2012 | 8,220,000 |
| 2013 | 11,770,000 |
| 2014 | 17,480,000 |
| 2015 | 22,900,000 |
| 2016 | 24,160,115 |
| 2017 | 25,017,179 |
| Total | 122,287,294 |

378. As the data in the table indicates, LG will have sold approximately 122.2 million phones through 2017. Amortizing the $125 million in consideration across the 122.2 million phones sold comes to a per-unit amortization of $1.02 per phone.[93] That imputed amount clearly is inline with what I modeled as a royalty rate on the previous page.

---

[92] Note that data between 2009 and 2015 comes from Counterpoint Research in Exhibit 4958, Counterpoint Research Market Monitor Report, Smartphones Vendor Share, Shipments ASP and Revenue: USA, March 2016 (ERIC_TCL00774323).while 2016 and 2017 data depend on my forecast unit sales, which I discuss later in this statement.

[93] $125 million value / 122,287,294 phones = $1.02 per phone foregone cash payment.

379.   Next, additional market evidence suggests that other related patents (e.g., haptic feedback patents) actually command an amount greater than what I modeled. For example, as data in the following table captures, Apple demanded the following per-unit amounts from Samsung for just three patent families that it owned.[94]

| Invention | Per-Unit Royalty |
|---|---|
| Pinch to zoom | $3.10 |
| Over-scroll bounce | $2.02 |
| Tap to zoom | $2.02 |
| **Total** | **$7.14** |

380.   As the data in the table indicates, Apple was demanding $7.14 per phone on three features that lacked the functional depth of the LG Patents. For a company like Alcatel, I modeled about 5% of the amount Apple was demanding. Next, if one actually cross-references the liability amounts, it is clear to see that for a company like Alcatel, the total royalty amount due on the LG Patents is actually quite low, as the data in the following table indicates:

| Year | Royalty Amount ($) [1] | Units Shipped [2] | Total Royalty Amount ($) [1] * [2] |
|---|---|---|---|
| 2012 | 0.40 | 310,000 | 125,033 |
| 2013 | 0.46 | 1,540,000 | 708,400 |
| 2014 | 0.37 | 5,200,000 | 1,906,667 |
| 2015 | 0.36 | 5,740,000 | 2,047,267 |
| Total | | | 4,787,367 |

---

[94]   Exhibit 5041, http://fortune.com/2014/03/11/apple-wants-samsung-to-pay-40-per-phone-for-five-patents/, accessed on March 30, 2016 (ERIC_TCL00777024).Note that there are scores of publicly-available case studies that demonstrate much greater per-unit royalties in the market than what I modeled (e.g., NTP's 5.7% royalty rate against RIM Exhibit 5043, http://patentlyo.com/patent/2004/12/blackberry_make.html, accessed on March 30, 2016 (ERIC_TCL00777035)., WARF's $1.60 rate on the Apple iPhone; *see* Exhibit 5061, http://host.madison.com/wsj/business/technology/warf-awarded-million-from-apple-in- patent-infringement-case/article_8210863c-b7cf-557e-84b1-6ee4c4e7bfb2.html, accessed on March 30, 2016 (ERIC_TCL00777532).).

381.   As the data in the table demonstrates, Alcatel's actual historic liability for the LG Patents, especially on a possibly discounted basis, may, on a risk-adjusted basis, be less than what Alcatel would pay an American Lawyer (Am Law) 100 firm (e.g., SMRH) to defend any eventual litigation in the first place. Thus, the risk-adjusted economic prospects for the licensee tilt toward actually taking the license as opposed to pursuing some protracted fight (except in the case of Apple, where the annual dollars are much greater).

382.   Concrete decisions involving Ericsson tend to reinforce that the royalty rate I used is within the range of what Ericsson might expect. For example, in *Ericsson Inc., v. D-Link Systems, Inc.*, Ericsson received $0.05 per patent family— and that rate was for patents under FRAND obligations. Even at that FRAND rate, the LG Patents would generate a per-unit royalty rate of $0.50.[95] There is much evidence to suggest patents without FRAND obligations can command higher rates.

383.   As the examples demonstrate, the royalty rate that I used is well within what is ordinary for one to model in the context of a patent acquisition and there is reasonable factual basis to support the amounts I modeled.[96] To account for the uncertainty in the royalty rate for infringing activity, I modeled that a triangular distribution best represents this uncertainty with a minimum royalty rate of 0.25%, a maximum royalty rate of 0.50%, and a most likely rate of 0.25%.

## 2.   Royalty Base

384.   The royalty rate base has a material impact on the magnitude of a damages finding that may accrue in litigation. There is a direct relationship between the two: the larger the royalty rate base, the larger the damage conclusion. This direct relationship can create tension in patent damages calculations as benefactors to a larger royalty base will argue for a value basis interpretation with the broadest

---

[95]   10 patent families * $0.05 per patent family per unit = $0.50 per unit.

[96]   Note that a litigation-hardened analysis would certainly research these concepts much further.

1   possible brush. Moreover, it is sometimes difficult for valuation analysts to
2   determine the specific microeconomic benefits associated with a patented feature.
3   For example, thousands of patents cover the most basic operations associated with
4   connecting a call between two cellular telephones. All of these patents may indeed
5   be essential to a phone's operation. Yet, it can be difficult to measure directly the
6   motivating factor for when someone buys that phone. Such determinations are
7   easier to make with patents that have a narrower focus (e.g., a composition of
8   matter for an adhesive or a pharmaceutical).

9       385.    The anticipated royalty base is a function of the depth and breadth of
10  usage of inventions disclosed in the LG Patents. The breadth of inventions within
11  the LG Patents are diverse and capture many different elements of the phone from
12  haptic feedback features to user interface features to antenna connectors to screen
13  support devices, among others. In my discussions with Ericsson representatives, I
14  learned that LG had provided claims charts to Ericsson as part of Ericsson's due
15  diligence into the patents. I further learned that Ericsson had also performed its own
16  analysis to refine the mapping of the inventions disclosed in the LG Patents further
17  to other products in the market (e.g., Apple's iPhone). From my discussions with
18  Ericsson representatives, I learned that it is clear that there appears to be sufficient
19  depth and breadth of usage of inventions disclosed in the LG Patents. However, the
20  specific apportionment of the value of the features was not determined at the time
21  of Ericsson's analysis. As I discussed earlier, this fact pattern is common for patent
22  assets that may transact in the open market because the buyer (Ericsson in this case)
23  does not have access to many documents that licensees own that it may use to help
24  perform such an apportionment.

25      386.    Even in the contemporaneous litigation involving Apple with many
26  other companies in the market, I did not find much clarity on this issue on these
27  specific patents, though it is clear that standard-essential patents tend to apportion
28  to 100% of the device's value, as do other patents for specific patents that are not

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

standard-essential. Thus, if Apple sold a product for $600, then $600 of that value would serve as the royalty base for the royalty rate. If Ericsson's royalty were 0.5% of that amount, then the royalty payment would be $3.00 per phone.[97] In my opinion, based upon a reasonable degree of probability within the valuation profession, the value apportionment would apply to 100% of the devices sold.

### 3.   Unit Forecast

387.  To forecast future U.S. smartphone unit sales, I first analyzed historical U.S. smartphone sales performance between 2009 and 2015. Based on data I received from Counterpoint Research Group, I developed the following chart that captures the picture of historical smartphone sales performance in the U.S. market:[98]



Pellegrino Demonstrative 15

---

[97]  $600 unit royalty base * 0.5% royalty rate = $3.00 per-unit royalty.

[98]  Exhibit 4958, Counterpoint Research Market Monitor Report, Smartphones Vendor Share, Shipments ASP and Revenue: USA, March 2016 (ERIC_TCL00774323).

388.   The red line represents actual smartphone sales in the U.S. market by period (2009 is period 48). Interestingly, smartphone sales tend to follow a sigmoid (i.e., "S") curve. Specifically, I constructed a unit sales model that served as a revenue basis for my future royalty obligations beyond the unit sales suggested by data in the historical record. I used a Fisher-Pry curve to forecast smartphone sales for the years not contemplated in the historical record (i.e., those years after 2015). The Fisher-Pry curve, which is a variant on the Bass or Pearl curve developed earlier in time, is particularly useful for estimating the adoption and growth rates and diffusion for products and services in the market where the growth rates are symmetric about the curve's midpoint. The general shape of the Fisher-Pry curve is as follows:



Pellegrino Demonstrative 16

389.   As the shape of the adoption rates indicate, the general adoption level is a sigmoid curve (also known as an "S" curve because of its shape). The adoption curve describes a slow initial market acceptance, indicative of the relatively flat areas of the left side of the curve. What follows next is a rapid adoption as the market adopts at an increasing pace. This creates a sharper growth through the middle of the curve. Finally, the market adoption rate slows, as initial market momentum wears off and the market matures. Empirically, the Fisher-Pry curve has

1    been remarkably predictive for true adoption rates in the market. Hundreds of

2    technologies have followed Fisher-Pry curves.[99] Further, courts have accepted the

3    use of the Fisher-Pry curve in litigation.[100]

4         390.   Two major components drive the shape of the Fisher-Pry model. The

5    first is a market shape, which controls the steepness or shallowness of the curve.

6    Smaller market shapes lead to longer, more spread-out adoption rates. The second

7    is the point at which the patent penetrates 50% of the target market. For example, if

8    a company expects to generate unit sales of 50,000 by Month 60 and it expects to

9    penetrate 50% of the market at Month 30, then the valuation analyst would use a

10   50% penetration factor of 30. This market penetration rate is important to determine

11   how compressed or expanded the actual market rate will be. In the Fisher-Pry

12   sample chart, lower market shape values indicate a more shallow market adoption,

13   indicating an overall longer market adoption rate (e.g., VCRs, like the yellow line

14   in the chart), while higher market shape values indicate a more sharp market

15   adoption, indicating a faster market adoption rate (e.g., MP3 players, like the

16   magenta line in the chart).

17        391.   Valuation analysts can generate meaningful forecasts using the Fisher-

18   Pry curve by calibrating it with empirical market adoption data for the actual good

19   or service if available. I performed such an analysis for smartphone sales. Using

20   historical smartphone unit sales as a basis, I fit a Fisher-Pry curve to this data and

21   used the resulting curve as a gauge for probable future unit sales growth.

22        392.   To build my Fisher-Pry curve, I considered actual observed unit sales

23   data between 2009 and 2015 in my analysis as reported by Counterpoint Research

24

25

26   ───────────────

27   [99]  Vanston, Lawrence K. and Ray L. Hodges, "Technology Forecasting for
         Telecommunications," Technology Futures, Inc., 2004.p. 13.

28   [100]  *Vernon v. Cuomo*, 06CVS8416, 2009 NCBC 6 (N.C.B.C. March 17, 2009).

1  Group.[101] I optimized the coefficients of the Fisher-Pry curve to provide as close a

2  match to the anticipated revenue growth rate as reasonably possible. To do so, I

3  calculated the mean absolute error between my forecast Fisher-Pry curve and my

4  observed unit sales data. I then used the iterative solver program bundled with

5  Microsoft Excel 2010 to find the curve that minimizes the mean absolute error,

6  which would thus be the closest representative curve for my observed market data.

7  The results of this analysis yielded the following market adoption curve:



Pellegrino Demonstrative 17

21  393.   The red line represents anticipated market penetration and smartphone

22  unit sales performance through 2015. The blue line represents the theoretical

23  market penetration curve that smartphone sales may follow beyond the discrete

24  period represented by data in the historical record. By inspection, it is clear that the

25  anticipated market penetration tends to map reasonably well to the theoretical

---

[101] Exhibit 4958, Counterpoint Research Market Monitor Report, Smartphones Vendor Share, Shipments ASP and Revenue: USA, March 2016 (ERIC_TCL00774323).

1   market penetration forecast. My total error on the forecast function is quite low at
2   0.66%. This tells me that the total forecast units sold is within 99.34% of the total
3   forecast contemplated by the theoretical Fisher-Pry curve, which is exceptional.
4   Thus, I had reasonable confidence that the Fisher-Pry curve would provide a
5   reasonable basis to calculate unit sales for years after 2015.

6   394.   Importantly, in my Microsoft Excel model, I also contemplated other
7   forecasting functions including linear extrapolation, logarithmic extrapolation, and
8   second order polynomial extrapolation functions; however, the error associated
9   with those extrapolation functions was greater than that associated with my Fisher-
10  Pry curve forecasting function. Thus, I considered those extrapolation methods
11  inferior to the Fisher-Pry curve that I employed.

12  395.   In my opinion, based upon a reasonable degree of probability within
13  the valuation profession, this valuation model structure is reasonable and
14  appropriate to the licensing strategy that Ericsson may pursue.

15  **T.    Operating Expenses**

16  396.   Under a fair market value scenario, the owner would have to expend
17  some costs to realize value from the LG Patents. These costs may include
18  everything from maintaining an office to paying a staff to manage vendors,
19  shareholder interactions, and attorneys. I did not have a specific company identified
20  for the fair market valuation model, as the identification of a specific company
21  would violate the fair market value standard. An owner will have to incur costs to
22  realize value for the LG Patents. These costs include both direct costs associated
23  with licensee development, and indirect costs, which include items such as
24  maintaining an office to paying a staff to manage vendors, marketing, advertising,
25  and professional services.

26  397.   The major expense item that I considered was the cost for litigation
27  counsel to aid the patent owner (e.g., Ericsson) in realizing the value potential that
28  exists for the LG Patents. There are two primary retention forms for patent

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

counsel—a contingent-fee arrangement and a non-contingent fee arrangement. The business reason for the two payment structures is that patent litigation is remarkably costly and requires significant amounts of attorney time. As a result, attorney time can easily grow into the millions of dollars (or tens of millions of dollars depending on the case). A common solution to this economic risk is that the law firm litigates the case on a contingent/performance basis wherein the law firm only receives payment upon success. If the law firm does not prevail, then the law firm receives no payment. The law firm charges a premium for absorbing the risk, which typically ranges from 20% to 45% depending on when the case resolves (the earlier the case resolves, the lower the fee amount). The other option is to pay the law firm by the hour to litigate the case. While the costs are proportionately lower, especially for large cases, the patent owner must pay the law firm regardless of the trial outcome.

398.   In the valuation model, I modeled that the patent owner would employ a litigation counsel on a performance basis.[102] While Ericsson can easily afford any litigation counsel it chooses, other hypothetical buyers may not have the resource pool that Ericsson enjoys. As such, I modeled payment to the litigation counsel based on a percentage of the licensing royalties generated. I modeled that the fee percentage would vary between 33.0% of revenue and 45% of revenue. To account for uncertainty in the fee percentage, I modeled that a triangular distribution best represents this uncertainty with a minimum fee percentage of 33.0%, a maximum fee percentage of 45.0%, and a most likely fee percentage of 45.0%.

399.   I imputed the following general expenses to the revenues that I

---

[102] Importantly, the litigation cost input is likely conservative to a fault because Ericsson representatives have informed me that Ericsson does not use contingent-fee counsel and Ericsson's litigation counsel expenditures is less than what I modeled. As such, the value is likely greater than what I reported because the high degree of allocated litigation expenses that I recorded in the valuation model suppresses the free cash flows that form the basis for the value conclusion.

captured in the valuation model:

| Description | Amount ($) |
| --- | --- |
| Compensation | 1,500,000 |
| Employee benefits | 300,000 |
| Professional fees | 360,000 |
| Overhead ($) | 240,000 |
| Total ($) | 2,400,000 |

400. As the data in the table demonstrates, I accounted for an annual allocated expense amount of $2.4 million. Importantly, I did not include the costs to develop any hardware, software, or other infrastructure to enable the deployment of inventions described by the LG Patents because Ericsson receives only a royalty from licensees for those inventions. Licensees presumably would fund such expenses in exchange for the majority of revenues associated with sales of products and services that embody the inventions. I modeled expenses growing at a compound annual rate of 5.0%. To account for uncertainty in the annual expense growth rate, I modeled that a triangular distribution best represents this uncertainty with a minimum expense growth rate of 0.0% per year, a maximum expense growth rate of 10.0% per year, and a most likely expense growth rate of 5.0% per year.

401. In my opinion, based upon a reasonable degree of probability within the valuation profession, operating expenses for the hypothetical buyer are appropriate. Further, these expenses appear reasonable to the extent that the hypothetical buyer may realize the value indicated in the valuation model as I have captured it.

## XII.  VALUE CONCLUSION

### A.  Value Conclusion

402. I performed 10,000 simulations on two income valuation models using a Latin Hypercube sampling algorithm for 10,000 total value calculations using the Palisade @Risk tool, version 7.0 in Microsoft Excel 2010. The income valuation

1   model condenses the information into a worksheet titled "Summary."[103] I describe

2   the value outcomes of the two scenarios in the following subsections:

3   ### 1.    Unencumbered Value Conclusion

4   403.   For the unencumbered scenario (i.e., the hypothetical buyer is not

5   restricted to a pool of licensees outside of Ericsson's existing licensing structure), I

6   found that the value naturally was greater than the encumbered scenario because

7   there are more potential licensees that a hypothetical buyer could target.

8   404.   The valuation model indicates the fair market value of the LG Patents

9   in the unencumbered scenario at a 90% confidence level is between **$119,863,625**

10  and **$473,570,993** with a mean value of **$284,164,046** and a median value of

11  **$274,518,453**. A summary of the value distribution for the income valuation model

12  in the unencumbered scenario is as follows:



Pellegrino Demonstrative 18

26  405.   As the data in the histogram indicates, there is a strong central

_____

[103] Exhibit 5295, Ericsson Income Valuation Model v1.0.xlsm, Pellegrino & Associates, LLC, April 4, 2016.

tendency toward the mean value indicated and the median is proximate to the mean, which indicates reasonable symmetry to the outcome.[104] I used the median for my value conclusion, as it removes the impact of improbable outliers. Therefore, in my opinion, based upon a reasonable degree of probability within the valuation profession, the fair market value of the LG Patents is **$274,518,453** using the income approach to value.

406.   Under simulation, it became clear that about four of the value drivers had the most significance on the value of the LG Patents in the unencumbered scenario. The following spider chart demonstrates the relative sensitivity of the model to the various value drivers.[105]

---

[104] Note that highly risky value conclusions may have remarkable skewness of the value outcomes to the left or right of the mean and drive the median away from the mean. The larger the disparity, the greater the variance and risk in the value outcome.

[105] A spider chart shows how the LG Patents output value changes as a particular sampled input value changes across the range of possible input values. The simulation software that I used divides the input into decile-based buckets, showing the relationship of the sampled inputs to the output. For example, as the settlement percentage of the litigation amount as of the July 7, 2014 approaches the 90th percentile of its input range (i.e., nearing 100% success), one can observe that the value of the LG Patents tends to increase rather dramatically because the licensee provides less of a discount to a licensee on settlement. The steeper the slope of the sampled line representing the input in the chart, the greater the impact of the sampled input value on the output. The spider chart provides several important cues to the reader, including not only significance of the various value drivers, but also the rate of change in the output value across the range of possible input rates.



Pellegrino Demonstrative 19

407.   As is clear from inspection of the spider chart, the value driver that has the single largest impact on the economic value of the LG Patents is Ericsson's ability to execute on the strategy that I captured in the valuation model and do so with the smallest settlement discount possible. Next, the data suggests that Ericsson invest significantly in using the patents to influence a licensing agreement with Apple, as Apple may have remarkable economic risk related to the LG Patents, both in unit volumes (i.e., Apple ships a lot of phones) and unit pricing (i.e., Apple charges more than any other vendor). Next, the data suggests that Ericsson may want to consider using a litigation counsel that does not rely on a performance-based fee structure.

408.   A regression analysis of key exogenous variables in the valuation model is as follows:



Pellegrino Demonstrative 20

409.   As the regression analysis suggests, key facts that drive value include the following factors:
- The amount of the proceeds that the patent owner could generate net of any settlement discounts.
- The ability for the patent owner to succeed in licensing Apple.
- The amount of the royalty rate that Ericsson can command from Apple.[106]
- The general success that Ericsson has with its licensing program.
- The amount of revenue that Ericsson pays to litigation counsel from the licenses.
- The ability for the patent owner to succeed in licensing Samsung.
- The amount of the royalty rate that Ericsson can command from Samsung.

Diligent attention to these key factors increases the probability of a higher value proposition in the scenarios that I modeled. However, such attention may be outside the realm of what a hypothetical owner could provide to exert sufficient influence to adjust the value materially on a risk-adjusted basis (i.e., cause forecast

---

[106] Recall that the LG Patents are well outside of any requirements for Ericsson to license those assets under fair, reasonable, and non-discriminatory terms.

revenues to grow faster than what the valuation model already considers).

410.   In my opinion, based upon a reasonable degree of probability within the valuation profession, the income approach provides a credible indication of value for this engagement for this valuation scenario for the following reasons:

- The Ericsson team had taken reasonable steps to inspect the LG Patents.
- The LG Patents have what appears to be a strong value proposition in the market.
- I had reasonable data and definitions for all revenues, operating costs, and capital needs.
- I had reasonable confidence that the patents had sufficient inspection and the portfolio would survive the licensing process within reason.
- For each scenario that I modeled (i.e., encumbered and unencumbered scenarios), I simulated the outcomes 10,000 times to account for the uncertainty of certain valuation assumptions that I made in the valuation model.
- I tested the simulation results to ensure that I did not have conditions of multicollinearity, which could distort the statistical results that I generated.[107]

411.   In my opinion, based upon a reasonable degree of probability within the valuation profession and the quantity and quality of available data, the income approach to value provided a credible value for this engagement for this scenario.

## 2.    Encumbered Value Conclusion

412.   For the encumbered scenario (i.e., the hypothetical buyer is restricted to a pool of licensees outside of Ericsson's existing licensing structure), I found that the value naturally was less than the unencumbered scenario because there are fewer potential licensees that a hypothetical buyer could target.

413.   The valuation model indicates the fair market value of the LG Patents in the encumbered scenario at a 90% confidence level is between **$3,659,043** and **$329,541,797** with a mean value of **$177,784,686** and a median value of **$170,051,079**. A summary of the value distribution for the income valuation model

---

[107] Note that the software tool @Risk performs this process automatically as part of the regression analysis it performs, so I did not have to perform any such testing manually.

in the encumbered scenario is as follows:



Pellegrino Demonstrative 21

414.   As the data in the histogram indicates, there is a strong central tendency toward the mean value indicated and the median is proximate to the mean, which indicates reasonable symmetry to the outcome.[108] However, there is also this spike in the $0 to $10 million range. What drives this outcome is the binary effect of the patent owner licensing Apple or not. In the encumbered scenario, Ericsson already has so much of the market under license, except for Apple and other smaller players. Given that Apple has the lion's share of the remaining market, the results naturally tend to rely heavily on a successful Apple licensing program. I used the median for my value conclusion, as it removes the impact of improbable outliers. Therefore, in my opinion, based upon a reasonable degree of probability within the valuation profession, the fair market value of the LG Patents is **$170,051,079** using

---

[108] Note that highly risky value conclusions may have remarkable skewness of the value outcomes to the left or right of the mean and drive the median away from the mean. The larger the disparity, the greater the variance and risk in the value outcome.

the income approach to value.

415. Under simulation, it became clear that about four of the value drivers had the most significance on the value of the LG Patents in the encumbered scenario. The following spider chart demonstrates the relative sensitivity of the model to the various value drivers.



Pellegrino Demonstrative 22

416. As is clear from inspection of the spider chart, the value driver that has the single largest impact on the economic value of the LG Patents is Ericsson's ability to execute on the strategy that I captured in the valuation model and do so with the smallest settlement discount possible. Next, the data suggests that Ericsson invest significantly in using the patents to influence a licensing agreement with Apple, as Apple may have remarkable economic risk related to the LG Patents, both in unit volumes (i.e., Apple ships a lot of phones) and unit pricing (i.e., Apple charges more than any other vendor). Next, the data suggests that Ericsson may want to consider using a litigation counsel that does not rely on a performance-based fee structure.

417. A regression analysis of key exogenous variables in the valuation model is as follows:



Pellegrino Demonstrative 23

418. As the regression analysis suggests, key facts that drive value include the following factors:

- The amount of the proceeds that the patent owner could generate net of any settlement discounts.
- The amount of the royalty rate that Ericsson can command from Apple.[109]
- The ability for the patent owner to succeed in licensing Apple.
- The general success that Ericsson has with its licensing program.
- The amount of revenue that Ericsson pays to litigation counsel from the licenses.

419. Diligent attention to these key factors increases the probability of a higher value proposition in the scenarios that I modeled. However, such attention may be outside the realm of what a hypothetical owner could provide to exert sufficient influence to adjust the value materially on a risk-adjusted basis (i.e.,

---

[109] Recall that the LG Patents are well outside of any requirements for Ericsson to license those patents on FRAND terms.

1   cause forecast revenues to grow faster than what the valuation model already

2   considers).

3      420.   That said, the reader should understand the following items in my

4   analysis:

- I modeled a litigation expense rate well in excess of what Ericsson may reasonably spend to generate the licensing revenues that I modeled.
- I modeled a licensing success rate that was well below what Ericsson's empirical experiences would otherwise indicate.
- I modeled a settlement discount likely well below what Ericsson's empirical experiences would otherwise indicate.

9      421.   In my opinion, based upon a reasonable degree of probability within

10  the valuation profession, the income approach provides a credible indication of

11  value for this engagement for this valuation scenario for the same reasons I

12  itemized in the unencumbered value conclusion. In my opinion, based upon a

13  reasonable degree of probability within the valuation profession and the quantity

14  and quality of available data, the income approach to value provided a credible

15  value for this engagement for this scenario.

16

17      Executed January 11, 2017 in Indianapolis, Indiana.

18

19

20  _____

21      Michael Pellegrino

22

23

24

25

26

27

28

1

## TABLE OF EXHIBITS

2

3

| TRIAL EXHIBIT | DESCRIPTION |
|---|---|
| 32 | LG business case spreadsheet |
| 198 | Agreement to Transfer Patents between LG and Ericsson, dated 7/7/14 |
| 199 | License Agreement between LG Electronics and Ericsson dated 6/27/14 |
| 202 | U.S. Patent No. 8,078,134 |
| 1278 | Ericsson 2014 annual report |
| 4551 | Spreadsheet, Investigation of patent claims (NATIVE FILE) |
| 4958 | CounterPoint, Smartphones Vendor Share, Shipments ASP and Revenue: USA (March 2016) |
| 5030 | 3/5/2016 - Patent Grant Activity from 1/1/2000 - 2/27/2016 |
| 5031 | 2/23/2016 - Spreadsheet listing lawsuits involving Ericsson, dates, party, etc. 6/9/2014 - 2/23/2016 |
| 5032 | 3/10/2016 - Patent Portfolio Assignee Assignment Activity 3/10/2005 - 3/10/2016 |
| 5033 | 3/31/2016 - Expiring Patent Activity 5/24/2005 - 3/31/2041 |
| 5034 | 3/5/2016 - Patent Activity by Classification 6/24/2005 - 3/5/2016 |
| 5037 | 7/1/2014 - 2014 Patent Litigation Study |
| 5038 | 7/1/2015 - U.S. Patent and Trademark Office 2209-Ex Parte Reexamination [R-07.2015] |
| 5039 | 7/1/2015 - U.S. Patent and Trademark Office 2258-Scope of Ex Parte Reexamination [R-07.2015] |
| 5041 | 3/11/2014 - Article: Apple wants Samsung to pay $40 per phone for five patents |
| 5043 | 12/14/2004 - Article: BlackBerry Maker RIM wins Partial Victory in Patent Appeal by Dennis Crouch re NTP v RIM (Fed. Cir. 2004) |
| 5045 | Combating Hindsight Reconstruction in Patent Prosecution published in the Emory Law Journal |

WITNESS STATEMENT OF MICHAEL J. PELLEGRINO; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| TRIAL EXHIBIT | DESCRIPTION |
|---|---|
| 5048 | Article: Global smartphone shipments forecast from 2010 to 2019 |
| 5050 | 1/9/2013 - Article: How I sold my company to Apple: Jeff White, former FingerWorks CEO [Q&A] |
| 5051 | ipAnalytx home page |
| 5052 | Feature phone and smartphone shipments in North America from 2008 to 2020 |
| 5053 | Patent Reexamination FAQs by Maier & Maier |
| 5055 | RPX Search results for Patent 6,956,564 |
| 5056 | Article: Samsung attorney tries to undermine Apple's damages expert, San Jose Mercury News |
| 5057 | 4/28/2010 - Article: Silicon Valley Buzz; Apple Paid More than $200 Million for Siri to Get Into Mobile Search |
| 5058 | 10/28/2011 - Article: Sterling's Mosaid deal includes Nokia-Microsoft patents, Reuters |
| 5061 | 10/17/2015 - WARF awarded $234 million from Apple in patent infringement case, Wisconsin State Journal |
| 5062 | 10/31/2011 - Article: Wi-Lan admits defeat in Mosaid bidding war, Financial Post Tech Desk |
| 5065 | Native Video File |
| 5295 | 04/4/2016 - Ericsson, Inc.'s Intellectual Property Income Valuation Model (Pellegrino Exhibit) |
| 5297 | 2015 Report of Economic Survey, AIPLA |
| 5298 | Gompers, P., A. Kovner, J. Lerner, and D. Scharfstein, "Skill Vs. Luck in Entrepreneurship and Venture Capital: Evidence From Serial Entrepreneurs," NBER Working Paper Series, No. 12592, 2006. |
| 5303 | U.S. Patent 8,078,134 B2 |

## CERTIFICATE OF SERVICE

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 11, 2017, a true copy of the above document was filed through the Court's Electronic Case Filing system and served by that system upon all counsel of record registered for the system and deemed to have consented to electronic service in the above-captioned case.

Dated: January 11, 2017

**CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON