CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400  Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590  Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500  Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000  Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700  Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br>  Plaintiffs/Counterclaim-Defendants,<br><br>    v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*,<br><br>  Defendants/Counterclaim-Plaintiffs.<br><br>ERICSSON INC., *et al.*,<br><br>  Plaintiffs/Counterclaim-Defendants,<br><br>    v.<br><br>TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*,<br><br>  Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS-DFMx<br>Case No. 2:15-CV-02370 JVS-DFMx<br><br>**CORRECTED REBUTTAL WITNESS STATEMENT BY MATS SÅGFORS**<br><br>Hon. James V. Selna<br><br>**Place:** Courtroom 10C<br><br>**Discovery Cut-off:** May 23, 2016<br><br>**Pretrial Conference:** February 1, 2017 at 10:00 a.m.<br><br>**Trial:** February 14, 2017 at 8:30 a.m. |

# **TABLE OF CONTENTS**

                                                                                                    **Page(s)**

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................ 2

        A.      Technical Qualifications ..................................................................... 2

        B.      Industry and Legal Experience ........................................................... 2

        C.      Person of Ordinary Skill in the Art .................................................... 5

III.    RESPONSE TO DR. KAKAES ESSENTIALITY OPINIONS ..................... 6

        A.      Patent Families Where Dr. Kakaes Does Not Dispute
                Essentiality .......................................................................................... 7

        B.      Patent Families Where Dr. Kakaes Analyzes Irrelevant Chart ............ 7

        C.      Patent Families Where Dr. Kakaes and I Disagree on
                Essentiality .......................................................................................... 8

                1.      P06691 ..................................................................................... 8

                2.      P06697 ................................................................................... 16

                3.      P07567 ................................................................................... 20

                4.      P08575 ................................................................................... 24

                5.      P08769 ................................................................................... 33

                6.      P09040 ................................................................................... 37

                7.      P10867 ................................................................................... 41

                8.      P11289 ................................................................................... 46

                9.      P13459 ................................................................................... 51

                10.     P21428 ................................................................................... 55

                11.     P21787 ................................................................................... 60

                12.     P22430 ................................................................................... 65

                13.     P23034 ................................................................................... 68

                14.     P23563 ................................................................................... 73

                15.     P23985 ................................................................................... 78

                16.     P24557 ................................................................................... 82

# TABLE OF CONTENTS
### (continued)

| | | | Page(s) |
|---|---|---|---|
| | 17. | P25005 | 86 |
| | 18. | P25949 | 89 |
| | 19. | P25990 | 93 |
| | 20. | P27011 | 98 |
| | 21. | P29482 | 102 |
| | 22. | P32205 | 106 |
| | 23. | P33858 | 111 |
| IV. | THE STANDARD IS NOT MODULAR | | 116 |
| | A. | P10867, P11899, P24916 | 117 |
| | B. | P06203, P11451 and P23563 | 120 |
| V. | CONCLUSION | | 123 |
| VI. | TABLE OF EXHIBITS | | 125 |

My name is Mats Sågfors.  I have personal knowledge of the facts set forth in this Declaration, and declare under penalty of perjury and the laws of the United States of America that they are true and correct.

## I.    INTRODUCTION

1.    I am a technical expert within Ericsson's IPR (Intellectual Property Rights) & Licensing group. I have expertise in cellular technologies and their corresponding standards, particularly the 3G and 4G standards. I have several years of experience in research and development of cellular technologies, in 3GPP standardization, in patent analysis and technical negotiations, and I am an inventor of many patents and patent applications.

2.    I have been asked to provide testimony regarding various issues with Dr. Kakaes's methodology, opinions, and analysis of Ericsson's standard essential patents. More specifically, I have been asked to respond to various criticisms and essentiality rankings made by Dr. Kakaes for a subset of Ericsson's 2G, 3G and 4G claim charts provided to TCL as part of this case. I have also been asked to respond to Dr. Kakaes's suggestion that Ericsson's essential patents are "modular" in nature and solve "modular problems," such that replacing these technical solutions would not affect other portions of the standard.[1]

3.    In particular, I reviewed Dr. Kakaes's essentiality analysis for 70 of Ericsson's claim charted patent families. Of those 70 patent families, Dr. Kakaes found 45 of them to include essential patent claims TCL's standard-compliant products would therefore infringe. Another 2 families are either not considered by Dr. Kakaes or are irrelevant to Ericsson's essential handset portfolio. This leaves 23 patent families. Dr. Kakaes finds each of these 23 families to be non-essential, and I disagree. As I will explain in detail below, Dr. Kakaes's incorrect conclusions are based, at least in part, on (1) an incorrect understanding of the claimed subject

---

[1] *See, e.g.,* Kakaes Opening Statement at ¶¶ 25, 86.

matter, including improper claim constructions or interpretations; and (2) a misapprehension of how the 2G, 3G, and/or 4G standards operate.

4.    I also respond to Dr. Kakaes's opinion that the 2G, 3G, and 4G cellular standards are "modular." I disagree with Dr. Kakaes's assumption that each patent can be analyzed separately by identifying an alternative solution to each patent, and comparing that alternative to the patented solution without consideration for how the replacement may affect the system otherwise, or other patented solutions within Ericsson's patent portfolio. The cellular standards are not modular, and I describe some examples to illustrate that point. First, I describe how Dr. Kakaes's alternatives to P10867, P11899, and P24916 highlight how interconnected and interrelated the technology is. Second, I describe how Dr. Kakaes's alternatives to P06203, P11451, and P23563 actually conflict with one another.

## II.    BACKGROUND

### A.    Technical Qualifications

5.    In 1993 I received a Master of Science degree in engineering from Åbo Akademi University in Finland. As part of that degree, I received instruction in computer science, programming, applied physics, and electronics. As a part of my master's studies in 1990 and 1991, I also studied at Sheffield University, where I attended courses of a master's program in Control Engineering that included, for example, systems modelling and simulation, signal processing, optimal control, and robotics.

6.    I also received a PhD with honours in Control Theory from Åbo Akademi University in Finland in 1998. My thesis focused on the control of sampled-data systems and the theory of optimal control of such discrete time-systems.

### B.    Industry and Legal Experience

7.    After receiving my PhD in 1998, I held positions in product development for Ericsson's first 3G radio access products from 1998 to 2002.  My

-2-    CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

initial assignment was to test and verify Ericsson's pre-commercial 3G pilot system that Ericsson was demonstrating to its customers. The pilot system was used to evaluate the feasibility of 3G solutions that were later implemented in standard specifications and commercial 3G products. This practical, hands-on experience has proven to be very useful throughout my career.

8.      After the completion of that project, I moved on to the system-design of Ericsson's first commercial revision of 3G products, where I attained a role as a System Designer, and later as a System Expert. At the time, I was particularly focused on data transmission enhancements needed to efficiently transport packet traffic through cellular networks. During this time—in the early years of 2000's—I also became an inventor of new technologies for the first time as a result of my work.

9.      From 2002 to 2011, I held positions within Ericsson Research. Ericsson Research is the global research facility of Ericsson.  While at Ericsson Research, I was first involved in researching improvements for the evolution of 3G. Our work resulted in improvements to both Ericsson's 3G products and to the 3GPP standard. I also contributed to Ericsson's 4G concepts and standardization activities. Some of my research at Ericsson was published at scientific conferences, and I co-authored 10 conference publications while at Ericsson Research.

10.     During the early phases of 4G standardization, I attended 3GPP meetings for the 3GPP RAN2 working group.  At that time, my main field of focus was on control plane signaling, which relates to areas such as connection establishment and mobility. Within this field, I was responsible for coordinating Ericsson's concept development and for developing and coordinating input to Ericsson's 3GPP RAN2 standardization delegation.

11.     I am an inventor on more than 400 granted patents and over 100 currently-pending patent applications worldwide during my tenure at Ericsson. In 2007 I was honored with Ericsson's "Inventor of the Year" award for my inventions

-3-

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  relating to packet data access, transport networks and for improvements in end-user

2  perceived quality. Several of my inventions have been incorporated into the 3GPP

3  specifications for the 3G and 4G standards.

4      12.    In 2009, I began working as a part-time technical expert at Ericsson's

5  Intellectual Property Rights ("IPR") and Licensing group, and in 2011 I joined the

6  team on a full time basis.  My current work has a strong focus on our 4G portfolio,

7  and I have participated in many technical negotiations with several major licensees.

8  My work also includes analyzing the patents other companies believe Ericsson

9  needs a license to. I have also provided technical support in litigation matters, both

10  when Ericsson has been the plaintiff, and when Ericsson or Ericsson's customers

11  have been accused of patent infringement.

12      13.    Since joining Ericsson's IPR and Licensing group in 2011, I have

13  gained significant experience analyzing, drafting, and responding to claim charts. I

14  have personally analyzed many of Ericsson's 2G, 3G, and 4G essential patents,

15  including many of those provided to TCL as part of this litigation. Over the past

16  five years I have analyzed hundreds of other patent claim charts to determine

17  essentiality, infringement, and validity of Ericsson's and other's patents. As part of

18  this process, I have analyzed and addressed the merit of others' positions regarding

19  Ericsson's claim charts and patent portfolios, and have provided portfolio strength

20  assessments to Ericsson's licensing managers as technical discussions have

21  concluded.

22      14.    I also have significant licensing negotiation experience. I have

23  presented patents from Ericsson's 3G and 4G patent portfolio, including the

24  exchange and evaluation of claim charts, in technical licensing discussions with

25  several companies. I have directly participated in technical licensing discussions

26  with several companies, including Apple, Samsung, Huawei, ZTE, Kyocera,

27  SHARP, and Fujitsu, among others.  During licensing discussions, the potential

28  licensee will often ask questions or provide comments about Ericsson's claim

-4-

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

charts. I have spent significant time responding to these questions and comments, along with other engineers and lawyers at Ericsson, including Mr. Luke McLeroy, Mr. Todd Cason, Ms. Evelyn Chen, Mr. Patricio Delgado, and Dr. Stefan Bruhn, among others. I have also interfaced with Ericsson inventors, researchers, product development engineers, and outside counsel on these issues from time to time over the past five years. During discussions, I also work with engineers and lawyers— both inside and outside of Ericsson—to analyze other companies' patent assertions against Ericsson that occur during licensing discussions, often providing detailed questions and comments to the other company.

15.     I also have gained an understanding of several legal concepts relevant to this case from my time at Ericsson.  While working in Ericsson's Research Unit, I co-authored many patent applications, and gained experience on the requirements for patent drafting and on the patent prosecution process. Since joining the IPR and Licensing group, I have gained relevant experience through the technical negotiations I have been involved in, and through my work with many experienced patent attorneys.  I have helped draft and review claim charts, and am comfortable applying the legal infringement and invalidity rules my attorney colleagues provide when analyzing patents.  I have also been involved in analysis and technical support in litigation matters, including litigations with Apple in both the U.S. and Europe; and litigations with Samsung, Micromax, Lava, and Xiaomi both in the U.S. and in other countries.

### C.     Person of Ordinary Skill in the Art

16.     I understand that TCL's experts have indicated a person of ordinary skill in the art would have (1) a bachelor's degree in electrical engineering or computer science or a related field, with one or two years of relevant industry experience; or (2) a masters degree in electrical engineering or computer science or a related field. Dr. Ding explained that the relevant industry experience would be "working in the wireless industry or working on patent analysis or subjects that are

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

related to cellular wireless communications."[2] Dr. Kakaes also believes that a person of ordinary skill in the art would have a working understanding of cellular transmission protocols.[3] Both Dr. Kakaes and Dr. Ding suggest that legal training is not a necessary component of the qualifications for a person or ordinary skill in the art. As detailed above, I more than exceed the qualifications of a person of ordinary skill in the art according to TCL's experts. I have an engineering PhD, and have worked on patent litigation issues since 2011. I have many years of technical patent analysis experience from my licensing negotiation and litigation experience at Ericsson.

## III.   RESPONSE TO DR. KAKAES ESSENTIALITY OPINIONS

17.     I reviewed Dr. Kakaes's opinions regarding his essentiality findings for certain of Ericsson's claim charts produced during the course of this litigation. As is explained in further detail below, and by my colleagues, Ericsson's claim charts are the result of a rigorous analysis by experienced engineers, including engineers with law degrees, and are vetted by both engineers and attorneys before they are shared with other companies. Further, many of these claim charts are scrutinized by other companies in licensing discussions. This iterative process ensures that the claim charts we present to licensees such as TCL present thoroughly analyzed evidence of the strength of Ericsson's portfolio of standard-essential patents.

18.     For purposes of my testimony in this case, I reviewed Dr. Kakaes's opinions on essentiality for 70 of Ericsson's claim charted families. I found that Dr. Kakaes made a number of errors in his analysis.  As in a typical licensing context, I analyzed Dr. Kakaes's opinions with support from other experienced telecommunications engineers, researchers, inventors, and patent professionals.

---

[2] Ding Dep. Tr. at 16:17-17:1.
[3] Kakaes Opening Statement at ¶ 109.

19.    Below I will first discuss the 45 patent families for which Dr. Kakaes does not dispute essentiality, followed by cases where Dr. Kakaes analyzed a chart irrelevant to Ericsson's handset essential patent portfolio. Finally, I will discuss in detail the reasons why I disagree with Dr. Kakaes for the 23 remaining families of the 70 I was responsible for.

### A.    Patent Families Where Dr. Kakaes Does Not Dispute Essentiality

20.    Unsurprisingly, Dr. Kakaes does not dispute the essentiality of all of Ericsson's claim charted patents. In fact, for many of them Dr. Kakaes has seen no evidence to dispute the essentiality. For the 70 families I reviewed, Dr. Kakaes does not dispute that the following 45 Ericsson families are, indeed, essential: P06203, P11451, P11899, P12207, P14596, P14897, P15300, P17631, P18216, P18674, P19208, P21738, P22621, P23412, P23682, P24000, P24241, P24698, P24916, P24985, P25238, P25336, P25476, P25496, P25642, P25658, P25999, P26030, P26132, P26261, P26379, P26744, P27172, P28235, P28627, P28747, P29465, P30749, P31189, P31755, P31923, P32787, P32817, P34406, P37869.  For one additional patent family, Dr. Kakaes provided no comments on Ericsson's claim chart: P25958.  Therefore, I assume that Dr. Kakaes does not contest that this patent family is essential to the 3G standard. These 45 families cover a number of different technological advancements related to core portions of the 3G and 4G standards, including, but not limited to random access, handover, ARQ and HARQ, system information distribution, security, quality of service support, connection control and reconfiguration, circuit switched fallback, scheduling requests, semi-persistent scheduling, carrier aggregation, minimization of drive tests, positioning and uplink sounding.

### B.    Patent Families Where Dr. Kakaes Analyzes Irrelevant Chart

21.    In a number of cases, Dr. Kakaes reviewed a claim chart that is not relevant to the licensing dispute between Ericsson and TCL. More specifically, Dr. Kakaes reviewed and offered opinions that some of Ericsson's base station or

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

network patents were not essential because they do not relate to handset (e.g., user equipment) functionality. However, just because the patent claims charted in Ericsson's network charts are not "used" by a handset does not mean they are not essential. They are absolutely essential to the base station or other parts of the network. In any event, Dr. Kakaes's rankings of these base station patents are therefore not relevant to a license between Ericsson and a handset maker like TCL. Dr. Kakaes appears to use this as a way to artificially cast doubt on the essentiality of Ericsson's patents.

22.     Out of the 70 patent families I reviewed, Dr. Kakaes makes this mistake for the following 17 patent families: P07567, P09632, P11451, P15300, P18674, P21738, P23412, P23563, P24241, P24698, P25496, P25642, P25658, P28627, P29465, P29482, and P31923.  In fact, of these 17 patent families, the following 13 Dr. Kakaes concedes he has seen no evidence to contest that at least one claim of the patent was essential and required also by handsets: P11451, P15300, P18674, P21738, P23412, P24241, P24698, P25496, P25642, P25658, P28627, P29465and P31923.

**C.     Patent Families Where Dr. Kakaes and I Disagree on Essentiality**

23.     For the remaining 23 families that I reviewed (P06691, P06697, P07567, P08575, P08769, P09040, P10867, P11289, P13459, P21428, P21787, P22430, P23034, P23563, P23985, P24557, P25005, P25949, P25990, P27011, P29482, P32205, P33858), I disagree with Dr. Kakaes on his essentiality findings. Below, I discuss each patent family and Dr. Kakaes's mistakes in detail.

### 1.     P06691

24.     The first patent family I will is discuss is the P06691 patent family.  It relates to discontinuous reception (DRX) in the handset. Having support for DRX in a handset is vital in order to save battery power and thereby to improve the operational time of the handset.  DRX means, for example, that the handset and network may negotiate time periods during which data transfer may occur ("awake

1   mode"). During other times, the handset's receiver is intermittently switched off to
2   save power. This can be considered a "sleep mode" during which a handset is not
3   actively communicating with the base station.

4       25.    Achieving a good balance between battery performance and response
5   time of a handset is a difficult problem, however.  To provide fast response times, it
6   is desirable to stay awake and continuously listen for any commands or data from
7   the base station; however, this is not an efficient use of mobile power. P06691
8   therefore claims an elegant solution where the handset stays awake for a
9   predetermined time, which is set by an activity timer, before going to a sleep mode.
10   This helps to achieve an effective balance of fast response time and minimized
11   power consumption, as the likelihood that the handset receives another packet is
12   high right after a previous transmission. The network must also know for which
13   time-slots that the handset is listening, and when it is asleep, as the network needs
14   to know when it can reach the handset, and when the handset is not receiving any
15   commands or data.

16       26.    Ericsson provided a claim chart to TCL that outlines precisely where
17   the claimed elements of claim 1 of U.S. 5,806,007 are practiced by the 2G and 4G
18   standards.[4] Dr. Kakaes disputes that the P06691 patent family is essential to 2G and
19   4G, making a variety of mistakes that I explain below.

20       27.    For 2G, Dr. Kakaes makes two arguments for non-essentiality of claim
21   1 of U.S. 5,806,007 of the P06691 family. He alleges that Ericsson has incorrectly
22   construed the claim language, and that Ericsson fails to show how the 2G standard
23   meets the construed claim language as shown below in an excerpt from his
24   appendix:

25
26
27   _____
     [4] EX-352; EX-4393.
28

1

2

3

4

5

6

7

8

9

10

11

12

> The essentiality rank for Claim 1 is 3 because practicing the 2G standard with user equipment does not require at least the following limitation of the claim under any reasonable interpretation: "having a period which is variable substantially independent of communication system operation requirements." Ericsson does not point at anything in the standards that, in Ericsson's opinion, meets this limitation. Instead, Ericsson in a comment states that:
>
> > "..., 'a period which is variable substantially independent of communication system operation requirements' corresponds to any variable period which is not set based 'substantially' on the paging channel structure of the system in which the MS is operating." (*See* ERIC_TCL00191286)
>
> Even if Ericsson were correct in changing the claim limitation from "substantially independent of communication system operation requirements" to "substantially independent of paging channel structure", Ericsson still fails to show how the timer that Ericsson is pointing to, namely "non-DRX timer" (*Id*), meets this limitation. Nothing that Ericsson points to in the standards requires that said timer be set according to the claimed limitation. [5]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.    Dr. Kakaes is incorrect in his argument that Ericsson incorrectly construes the claim language. This element was introduced during prosecution to further distinguish the claimed invention from known prior art (US 5,491,718).[6] Ericsson therefore properly looks to the prosecution history to determine the meaning of the claim element of "substantially independent of communication system operation requirements." In the prior art '718 patent, a different timer was set periodically in relation to the paging instances. Thus, Ericsson distinguished its patent claims by stating that they do not cover a timer that is dependent on paging instances. As a result, the timer claimed in Ericsson's patent (i.e., a timer having "a period which is variable substantially independent of communication system operation requirements") should be interpreted to include any timer having a period that is not set based "substantially" on the paging channel structure.

29.    As further evidence that Ericsson's claim interpretation is correct, the

---

[5] Kakaes Opening Statement Appendix, EX-1639 at A-P06691_2G.

[6] EX-4392.

1  prosecution history of US 5,806,007 shows that the phrase "variable substantially
2  independent of communication system operation requirements" was added by way
3  of amendment on January 26, 1998 to overcome a rejection based on U.S. Patent
4  5,491,718. Specifically, the Examiner referred to column 6, lines 18-44 of the '718
5  patent in making the rejection. This section of the '718 patent describes setting the
6  timer causing the handset to turn on the receiver circuitry "equal or less than
7  approximately 100 msec before the start of the next paging channel slot".[7]
8  Therefore, the '718 patent bases its timer period on the paging channel structure of
9  the particular system of interest. And the proper interpretation of Ericsson's timer,
10 is one that is substantially independent of the paging channel structure as recited in
11 Ericsson's claim chart.

12



23    30.    The picture above shows Ericsson's patented solution above, wherein
24 a timer (indicated as "T" and "drxInactivityTimer") is started to keep the handset in
25 "active" state after being engaged in transmission/reception. The handset leaves the
26 active state when the timer expires.  In contrast, the prior-art solution underneath

27  _____
   [7] EX-5413; EX-4392 (U.S. 5,491,718) at 6:14-24.
28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
      CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  shows the solution of US ´718 where a timer is implemented to govern that the

2  handset wakes up at point "B", just before the start of the next paging slot.

3      31.    Dr. Kakaes's second argument stating that Ericsson did not point to

4  anything in the 2G standard that meets this claim element is also incorrect.

5  Ericsson's claim chart does indeed point to the part of the 2G standard that meets

6  this limitation. The claimed "timer" is the 2G standard's "non-DRX timer" as

7  shown below:

| changing the readiness level in which the mobile station is operating from a first readiness level to a second readiness level in response to the expiration of at least one timer having a period which is variable substantially independent of communication system operation requirements; and | [1]<br>6       Radio Interface (Um)<br>6.5    Physical Link Layer<br>6.5.10  Discontinuous Reception (DRX)<br>[…]<br>Negotiation of DRX parameters is per MS. An MS may choose to use DRX or not together with some operating parameters. The following parameters are established:<br>[…]<br>-  **Non-DRX timer**<br>    A conditional parameter for MSs using DRX to determine the time period within which the non-DRX mode is kept after leaving the Transfer state. The support for this feature is optional on the network side and the information about the maximum supported value for the timer in the cell is broadcast on PBCCH.<br><br>*[Ericsson comment: "timer" corresponds to non-DRX timer, "a period which is variable substantially independent of communication system operation requirements" corresponds to any variable period which is not set based "substantially" on the paging channel structure of the system in which the MS is operating.]* |

<sup>8</sup>

16      32.    As shown in the "comment" portion at the bottom of Ericsson's chart,

17  Ericsson explicitly states that the non-DRX timer is the claimed timer. Ericsson

18  also shows that the claimed "period which is variable substantially independent of

19  communication system operation requirements" corresponds to the conditional non-

20  DRX timer parameter. The conditional parameter is substantially independent of the

21  paging periodicity because it is based on "a conditional parameter for MSs using

22  DRX to determine the time period within which the non-DRX mode is kept after

23  leaving the Transfer state" as the 2G standard clearly states. When the non-DRX

24  timer expires, the MS (Mobile Station) goes into DRX where the MS then reads

25  assigned and periodically occurring paging slots, as the claim requires. The non-

26  DRX timer is not started for governing the reading of the paging slots and its period

27  ——————————

[8] EX-5072; EX-5415 (TS 03.64 V8.12.0).

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

is independent of paging periodicity. Thus, Ericsson's claim interpretation is correct as supported by the prosecution history, and Ericsson does in fact show how the disputed claim element is met by the 2G standard. Dr. Kakaes's arguments are wrong.

33.     For 4G, Dr. Kakaes's arguments are nearly identical to his arguments for 2G. He first argues that Ericsson's claim interpretation for the same claim element is incorrect, and second that Ericsson fails to show anything in the 4G standard that meets this limitation as shown below in an excerpt from Dr. Kakaes's appendix:

> The essentiality rank for Claim 1 is 3 because practicing the 4G standard with user equipment does not require at least the following limitation of the claim: "having a period which is variable substantially independent of communication system operation requirements". Ericsson does not point at anything in the standards that, in Ericsson's opinion, meets this limitation. Instead, Ericsson in a comment states that:
>
> > "The period of the timer(s) is variable substantially independent of communication system operation requirements, e.g., the provision of the different specified timer periods and/or a decision to vary the period of one or more timers from one specified value to another specified value will be based primarily on UE operating requirements and not system operating requirements." (See ERIC_TCL00105058.)
>
> Ericsson's argument fails for at least two reasons:
>
> (1)     Ericsson erroneously distinguishes "UE operating requirements" from "communication system operation requirements". (I note that Ericsson did not include the word "communication" in its comment). The UE is part of the communication system, and thus "UE operating requirements" is a subset of "communication system operation requirements", thus Ericsson's attempt to broaden the claim is unfounded.
>
> (2)     Even if Ericsson were correct in broadening the claim limitation as discussed above, Ericsson still fails to point at anything in the standards requiring the limitation. Ericsson merely provides a conclusory statement in its comment that the limitation, as amended by Ericsson, is met. [9]

34.     First, and as noted above, the claim limitation "having a period which is variable substantially independent of communication system operation

---

[9] Kakaes Opening Statement Appendix, EX-1639 at A-P06691_4G.

1  requirements" was introduced during patent prosecution to limit the scope of the

2  claim from a piece of prior art where a timer is set based on the paging channel

3  structure. The timer in that prior art was having a period dependent on the paging

4  period, which the claimed timer does not have.

5       35.    Second, Dr. Kakaes is correct that the handset is sometimes

6  understood as being a part of the communication system. However, his alleged

7  "distinction" is irrelevant. While paging periodicities are system-wide parameters,

8  the "drx-InactivityTimer" in the 4G standard can be set independent of such

9  "communication system operation requirements", i.e. the "drx-InactivityTimer" can

10  be set to achieve the desired balance between fast response time and minimized

11  power consumption of the handset itself. The claim scope does not include a timer

12  whose timer period is dependent on the paging channel structure, as set forth in the

13  prior art cited by the examiner.  It is clear that the relevant timer in 4G, cited in the

14  claim chart, has nothing to do with the paging channel structure, and therefore falls

15  under the scope of the claim element.

16       36.    Finally, as above, Ericsson's claim chart does point to what it believes

17  meets the disputed "timer" claim element. As shown below in Ericsson's claim

18  chart, the claimed timer is the 4G standard's "*drx-InactivityTimer*" shown in the

19  MAC description box toward the bottom of the chart.

20

21

22

23

24

25

26

27

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

10

37.    As shown in the "comment" portion at the bottom of Ericsson's chart, Ericsson explicitly states that the *drx-InactivityTimer* is the claimed timer. Ericsson also shows that the claimed "period which is variable substantially independent of communication system operation requirements" corresponds to the provision of the different specified timer periods and/or a decision to vary the period of one or more timers from one specified value to another specified value that will be based primarily on handset requirements and not system operating requirements. Thus, Ericsson's claim interpretation is correct as supported by the prosecution history, and Ericsson does in fact show how the disputed claim element is met by the 4G standard. Dr. Kakaes's arguments are wrong. Ericsson's P06691 family is essential to the 2G and 4G standards.

---

[10] EX-5073; EX-5414 (TS 03.60 V7.4.0).

2.      **P06697**

38.     The second patent family I will discuss is the P06697 patent family and includes U.S. 5,910,949.[11]  It relates to a way to improve efficiency of the system by interrupting one handset's transmission in order to allow a different handset to send/receive data. One reason to do this is if collisions occur when the handsets are trying to access the network when requesting resources. When a handset first tries to access the network, it uses the Random Access Channel ("RACH"). The RACH is shared by many handsets and consequently, collisions and/or overload may occur when multiple handsets are trying to access the network simultaneously. As a result, it is likely that two or more handsets will send data in the same time slot using the same resources to the same base station causing a collision.

39.     The patented technology is used for relieving random access collisions in an efficient manner. More specifically, it interrupts the communications of handsets that are not granted transmission resources with an "interruption period" so that other handsets that are granted access can send/receive data. This is accomplished by sending information to the handsets that are not granted access so that they will interrupt their intended transmissions for a certain "interruption period." Once the interruption period is over, these handsets can then re-try to access the network for transmitting data.

40.     Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of U.S. 5,910,949 are practiced by the 4G standard.[12] Dr. Kakaes disputes that the P06697 patent family is essential to 4G, making a variety of mistakes that I explain below.

41.     First, Dr. Kakaes states that the "inserting" and "transmitting" claim

_____

[11] EX-4427.

[12] EX-355.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

elements are not implemented at the handset, and that TCL does not "direct or control any other parties to perform the above limitation." However, I understand from my colleague, Evelyn Chen, that the "directs or controls" test that Dr. Kakaes relies upon is not the only criteria to prove that one party can be held responsible for direct infringement for the actions of others.  As a result, just because the identified claim is not entirely practiced at the handset, does not mean that TCL is not enjoying the benefits realized by the claimed invention as explained by Ms. Chen.

42.    In his second argument, Dr. Kakaes states that the "interrupting" claim element is not practiced by the 4G standard as shown in his appendix below:

> Furthermore, because practicing the 4G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "interrupting packet data transmission of the first communication device in response to receiving the control information".
>
> Ericsson's claim chart points to the "Backoff Indicator" in the LTE standard as meeting the "Interrupting" limitation.  (See ERIC_TCL00191304.)  However, this is incorrect: in order to "interrupt" a transmission, a transmission has to pre-exist in order for it to be interrupted.  The Backoff Indicator is used to indicate the presence of the Backoff Parameter Value, which is used to "identify the overload condition in the cell" (See 3GPP 36.321, v.8.7.0 § 6.2.2.)  It is simply used to delay a random channel access transmission, not to interrupt an existing one.  According to the cited standard, Ericsson alleges that the "Random Access Response reception" meets the claim limitation.  But the very purpose of the random access process is to establish a transmission; It is an oxymoron to suggest that something that is being established can be interrupted before it is even established.  Specifically, within the random access procedure, the backoff time, which is selected from a uniform distribution between 0 and the value indicated by the Backoff Parameter Value (Id.) is used to "delay the subsequent Random Access transmission by the backoff time" (See 3GPP 36.321, v.8.7.0, §§ 5.1.4 and 6.2.2; ERIC_TCL00191305.) [13]

43.    Dr. Kakaes argues that the "Backoff Indicator" of the 4G standard does not meet the "interrupting" limitation because "a transmission has to pre-exist in order for it to be interrupted."  This is not correct. For example, when the

---

[13] Kakaes Opening Statement Appendix, EX-1639 at A-P06697_4G.

Backoff Indicator is not present while the UE is expecting a Random Access Response, the handset will proceed with a new transmission according to a pre-defined schedule through the Random Access procedure. See Figure 10.1.5.1-1 from TS 36.300,[14] which depicts the situation when the handset does not receive the Backoff Indicator, and instead finds that it is successfully granted resources as requested in step 3 in the figure.



**10.1.5.1      Contention based random access procedure**

The contention based random access procedure is outlined on Figure 10.1.5.1-1 below:

**Figure 10.1.5.1-1: Contention based Random Access Procedure** [15]

44.     Random Access Requests are used for, among other things, to request for packet data transmission resources. Thus, by definition, receiving the Backoff Indicator will interrupt and delay the packet data transmission, and the packet data transmission will occur later in comparison to the situation when the indicator is not received. As a result, the 4G standard practices "interrupting" as claimed in Ericsson's P06697 family.

_____

[14] EX-5418.

[15] *Id.*

45.     Third, Dr. Kakaes argues that the 4G standard does not have an "interruption period" to be "selectively <u>indicated</u> by said interruption information" as required by the claim, and as shown in his appendix below:

> Lastly, Ericsson's attempt fails for an additional reason in that the claim requires that the "interruption period" be "selectively indicated by said interruption information". Even if the "BI field" that Ericsson points to (*see* ERIC_TCL00191304) met all the other limitations, and it does not, it would fail this one as the random delay is selected from the uniform distribution between 0 and the value of the BI filed (as discussed above) and is thus not "indicated" as the claim requires. [16]

46.     Dr. Kakaes seems to suggest that the claim term "indicated" cannot include a scenario where the handset receives interruption information used to <u>calculate</u> the interruption period; rather he appears to argue that the interruption period must be actually transmitted to the handset to meet the term "indicated." Dr. Kakaes then concludes that the 4G standard does not meet the term "indicated" because the handset receives a "BI field" and uses the BI field to calculate the interruption period.

47.     This is incorrect. As an initial matter, Dr. Kakaes has provided no support for his claim interpretation. And the claim language actually contradicts Dr. Kakaes's conclusion. If the interruption period needed to be actually received by the handset (instead of calculated based on other received information), then the claim language would say so. For example, the claim would be written to say "receiving the control information for an interruption period included in said packet channel feedback information." That is not what the claim element says. Instead, it recites "receiving the control information for an interruption period <u>as selectively indicated by said interruption information</u> included in said packet channel feedback information."  The underlined words have meaning, and that meaning is to allow for the handset to calculate the interruption period based in the interruption

---

[16] Kakaes Opening Statement Appendix, EX-1639 at A-P06697_4G.

information. This is what Ericsson explains in its claim chart by showing that the handset receives "interruption information" in the "BI field," where the value is selectively indicated with a value. The handset then calculates the required "interruption period" (backoff time) based on the received "interruption information." I therefore disagree with Dr. Kakaes. Ericsson's P06697 family is essential to the 4G standard.

### 3.    P07567

48.    The third patent family is the P07567 patent family, and includes U.S. 6,031,832.  This patent family relates to a channel reservation solution that improves service quality and latency. At a high level, this technology relates to the procedures needed for fast resource allocation in advanced telecommunications systems.

49.    As explained with the previous patent family, when handsets compete for use of the contention-based random access channel, their transmissions may sometimes collide. As a consequence, problems can occur as the handsets may experience highly variable packet transfer delays.[17]

50.    The patented technology in this family relates to a way for reserving or allocating resources to a handset, allowing such handsets to make collision-free communications to the base station. This is important because it ensures that the base station can control the resources allocated and reserved for each handset, preserving quality throughout the network.  The solution can also be used for reducing the load on the contention-based random access channel.

51.    Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claims 1 and 25 of U.S. 6,031,832 are practiced by the 4G standard.[18] Dr. Kakaes disputes that the P07567 patent family is essential to 4G,

---

[17] *See, e.g.,* EX-5419 (U.S. 6,031,832) at 3:1-21.
[18] EX-5079.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

making a variety of mistakes that I explain below.

52.     For claim 1 of U.S. 6,031,832 he says that the limitations of claim 1 must be carried out by network products, not handsets.  However, the chart for claim 1 does not apply to handsets, and Ericsson does not consider this chart to be part of its handset licensing portfolio. So Dr. Kakaes's conclusions of essentiality are irrelevant. In addition, the fact that claim 1 is essential to a base station and not a handset does not mean that this patent is not essential.

53.     Dr. Kakaes also concludes that claim 25 of U.S. 6,031,832 is not essential to the 4G standard. He makes 3 main arguments as shown below in his appendix:

The essentiality rank for Claim 25 is 3 because practicing the 4G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation:  "first mobile terminal means being allocated an exlusive use of at least a first uplink channel and a second downlink channel" and "reservation means for reserving uncontended access to said access channel".

Furthermore, at least the limitations "wherein said first mobile terminal means has exclusive use of said first uplink channel and said second downlink channel and reserved uncontended access to said access channel during a same service interval" are not met when the terms "exclusive use", and "reserved uncontended access to said access channel" are properly construed.  In particular, for example, the USCH and the DSCH are shared channels, and thus the "exclusive use" limitation is not met. [19]

54.     First, Dr. Kakaes appears to argue that the "first mobile terminal means" and "reservation means" are not practiced by a handset. Although unclear, it appears he argues these limitations are practiced by the network. This is wrong. "Mobile terminal means" is just that—a "means" or component within a mobile terminal (e.g., handset). The "reservation means" is likewise a component within the handset, and Dr. Kakaes has not suggested otherwise.

55.     His second argument is that the "wherein" element is not practiced by the 4G standard when the term "exclusive use" is properly construed as shown

_____
[19] Kakaes Opening Statement Appendix, EX-1639 at A-P07567_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

below in his appendix:

> Specifically, in a comment Ericsson argues that: "The first channel is the scheduled resources on UL-SCH. These resources are allocated exclusively to the scheduled mobile station for carrying uplink packet traffic." And in a separate comment: The second channel is the scheduled resources on DL-SCH. These resources are allocated exclusively to the scheduled mobile terminal."
>
> (See ERIC_TCL00191333.)
>
> The very structure of LTE is that a shared channel be defined in the downlink (the Downlink Shared Channel, or DL-SCH) as well as one in the uplink (the Uplink Shared Channel, or UL-SCH). These are shared channels, which is antithetical to allowing for "exclusive use". Ericsson improperly conflates the allocation of resources on a shared channel to specific users with the channel itself being allocated. [20]

56.     He provides no support for what the proper construction should be, and he does not even state what the proper construction is. He nevertheless concludes that because the channels in 4G are "shared channels" (and are shared among users), the channels cannot be allocated for "exclusive use."

57.     Dr. Kakaes is incorrect. In 4G, the base station controls the resources that the handsets can use for transmitting data in the uplink. Since many handsets can be engaged in transmissions simultaneously, it is the responsibility of the base-station to ensure that handsets are not simultaneously transmitting on the same resources, as subdivided in time and/or frequency. Collisions caused by multiple transmitters on the same resources would corrupt the data because colliding transmissions would not be properly received by the receiver(s). The handset therefore has exclusive use of the shared channel as required by the claim, whenever it is allocated such resources on the shared channel. The name "Shared Channel" does not imply that a handset cannot have "exclusive use of" the channel, as Dr. Kakaes appears to contend.

58.     Dr. Kakaes's third argument is that the handset does not have "reserved uncontended access" when this phrase is properly construed. Again, he

---

[20] Id.

1    does not state what the proper construction is or why that is the proper construction.

2    He simply concludes that the channel is not reserved as the claim requires, as

3    shown below:

> Similarly, the PUCCH that Ericsson argues meets the claim requirement, is not reserved as the claim requires. Ericsson claims that: "The access channel is the SR resources on PUCCH." (*See* ERIC_TCL00191335.) Ericsson at the same place in the claim chart recognizes that the channel is the Physical uplink control channel (PUCCH) and recognizing that said channel is not reserved, as the claim requires. Ericsson points at the "SR resources" as allegedly meeting the claim limitation. Once again, Ericsson conflates resources on a channel that are assigned to specific users with the channel itself that is shared amongst many users. The claim requires that the channel be reserved, not that it be shared by allowing several users to share it. [21]

10    59.    Again, Dr. Kakaes misunderstands the operation of the 4G standard.

11    Specific resources on the physical uplink control channel are configured separately

12    to each handset and are not shared with other handsets (*i.e.*, they are reserved).

13    60.    This can be seen in 3GPP TS 36.300, section 5, as shown in Ericsson's

14    chart and below:

> **[1] 5.2.3 Physical uplink control channel**
> [...]
> PUCCH resources for SR and CQI reporting are assigned and can be revoked through RRC signalling. An SR is not necessarily assigned to UEs acquiring synchronization through the RACH (i.e. synchronised UEs may or may not have a dedicated SR channel). [22]

20    61.    The 4G standard specification makes clear that PUCCH resources

21    ("dedicated SR channel" above), that is, space on the physical uplink control

22    channel are <u>assigned</u> to handsets. This is exactly what the claim requires: "reserving

23    uncontended access to said access channel." The reservations on the PUCCH are

24    allocated separately for each handset specifically to avoid contention.[23]

---

[21] *Id.*

[22] EX-5418.

[23] *See, e.g.,* EX-1416, Dahlman "4G: LTE/LTE-Advanced for Mobile Broadband" at p. 280.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> **280    CHAPTER 11** Uplink Physical-Layer Processing
>
> otherwise, the terminal should be silent to save battery resources and not create unnecessary interference.
>
> Unlike the hybrid-ARQ acknowledgements, whose occurrence is known to the eNodeB from the downlink scheduling decisions, the need for uplink resources for a certain terminal is in principle unpredictable by the eNodeB. One way to handle this would be to have a contention-based mechanism for requesting uplink resources. The random-access mechanism is based on this principle and can, to some extent, also be used for scheduling requests, as discussed in Chapter 13. Contention-based mechanisms typically work well for low intensities, but for higher scheduling-request intensities, the collision rate between different terminals simultaneously requesting resources becomes too large. Therefore, LTE provides a contention-free scheduling-request mechanism on the PUCCH, where each terminal in the cell is given a reserved resource on which it can transmit a request for uplink resources. Unlike hybrid-ARQ acknowledgements, no explicit information bit is transmitted by the scheduling request; instead the information is conveyed by the presence (or absence) of energy on the corresponding PUCCH. However, the scheduling request, although used for a completely different purpose, shares the same PUCCH format as the hybrid-ARQ acknowledgement, namely PUCCH format 1.
>
> The contention-free scheduling-request resource is represented by a PUCCH format 1 resource index as described earlier, occurring at every $n$th subframe. The more frequently these time instants occur, the lower the scheduling-request delay at the cost of higher PUCCH resource consumption. As the eNodeB configures all the terminals in the cell, when and on which resources a terminal can request resources is known to the eNodeB. A single scheduling request resource is also sufficient for the case of carrier aggregation, as it only represents a request for uplink resources, which is independent of whether carrier aggregation is used or not.

62.     Therefore, practicing the 4G standard includes methods by which handsets "reserve[] uncontended access" to access channels, as required by claim 25.  Dr. Kakaes is missing the point by focusing on the fact that channels are, in general, "shared channels."  While these channels are generally "shared" across the system, in 4G the channels carrying traffic are allocated for exclusive use to the handsets and handsets are reserved uncontended access to PUCCH, as can be seen in 3GPP TS 36.300, section 5 above. Therefore, the P07567 family is essential to 4G.

### 4.    P08575

63.     The fourth patent family is the P08575 patent family and includes U.S. 6,363,058 and IN 229,632. The P08575 patent family relates to how services with similar quality requirements can be flexibly combined into the same logical channel over the radio interface. This allows for efficient use of transmission resources while maintaining expected service quality.

64.     The 3G standard enables users to simultaneously send and receive not

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

only speech, but also data, such as email, web pages, file transfers, and other data services. Different services can have different quality requirements. For example, a voice call has rather low flexibility in its requirements on the connection. In other words, that the handset (1) needs a connection that can offer a rather stable delay and bit-rate without significant interruptions to operate, and (2) has a higher tolerance for "losing" bits of data. In contrast, file transfers, for example, require a very low bit error rate (meaning, it cannot tolerate "losing" many bits; however, it may be acceptable to have larger variations in delay and bit-rate).

65.     The patented technology solves this problem of processing multiple data services over a communications link between the handset and base station. Instead of using separate channels, or a channel that satisfies each data service's requirements, the patented technology multiplexes data from services with substantially similar requirements onto the same logical channel. Each logical channel can then have different channel coding and/or interleaving depth. The number of data blocks per transmission block can vary, depending on the services the handset is using.

66.     Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claims 1 of both U.S. 6,363,058 and IN 229,632 are practiced by the 3G standard.[24] Dr. Kakaes disputes that the P08575 patent family is essential to 3G, making a variety of mistakes that I explain below.

67.     He makes 3 main arguments for non-essentiality that he says apply to both the U.S. and Indian patents in the P08575 family. These arguments revolve around these two claim elements: (1) "separating data within the radio bearer services into a plurality of portions" and (2) multiplexing portions from at least two of the plurality of radio bearer services having substantially similar Quality of Service requirements into transmission blocks of the single logical channel on the

---

[24] EX-5081 and EX-5080.

communications link, wherein a number of the portions per transmission block is variable."

68.    Dr. Kakaes's first argument is that "separating data," as required by the claims, does not correspond to the 3G standards "segmenting" of data, as can be seen below:

See ERIC_TCL00191461.  Notably, Ericsson comments that "'separating data' corresponds to segmentation":

[Ericsson comment: "separating data" corresponds to segmentation.]

However, segmenting an upper layer PDU into smaller RLC PDUs is simply that—segmenting, i.e., cutting it into smaller pieces.  Ericsson does not and cannot point to anything that would support its conclusory statement that there is such a correspondence. [25]

69.    Dr. Kakaes does not explain why "segmenting" the upper layer PDU into smaller RLC PDUs is not  "separating" the upper layer PDU, or supply any evidence to support this conclusion. In any event, Dr. Kakaes is incorrect and misunderstands the patent and the 3G standard.  "Segmentation" corresponds to "separating data . . . into a plurality of portions", as is evident from *e.g.* Figures 5 and 6 of the patent, and as also shown in Ericsson's claim charts.  Below are figures 5 and 6 of the patent, where one can see the user data being separated into a plurality of portions as required by the claims:

---

[25] Kakaes Opening Statement Appendix, EX-1639 at A-P08575_3G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx





70.   '058 patent at figs. 5, 6.  This is also supported by the patent

specification showing that this process ("separating") corresponds to segmentation.

More specifically, the specification states that "Layer 3 control/user data 140 is

segmented into blocks 150 . . . to form a LLC PDU 160 at the LLC layer 30.  The

LLC PDUs 160 are segmented into smaller blocks, RLC/MAC PDUs 165 at the

---

[26] EX-4395, U.S. 6,363,058 at Figures 5, 6.

1   RLC layer 35."[27]

2       71.    And in 3GPP TS 25.301 section 5, the following figure depicts the

3   "segmentation" of user data according to the 3G standard:



    [28]

16       72.    It can be seen even visually that the "segmentation" in the 3G standard

17   is the "separating" claimed in Ericsson's patents. Therefore, practicing the 3G

18   standard requires this claim element.

19       73.    Dr. Kakaes's second argument is that the "transport channel" referred

20   to in the 3G standard does not satisfy the claim element of "single logical channel"

21   in claim 1, as shown in his appendix below:

_____

[27] *Id.* at 4:65-5:7.

[28] EX-5420 (3GPP TS 25.301 V6.0.0) at Figure 9.

1

2

> Furthermore, the standard discloses:
>
> > **Selection of appropriate Transport Format for each Transport
> > Channel depending on instantaneous source rate.** Given the Transport
> > Format Combination Set assigned by RRC, <u>MAC selects the appropriate
> > transport format within an assigned transport format set for each active
> > transport channel depending on source rate</u>. The control of transport
> > formats ensures efficient use of transport channels.
>
> 3GPP TS 25.301 v. 6.0.0 § 5.3.1.2 (underlining added).
>
> The standard, therefore, does not disclose multiplexing data streams into "a single
> *logical* channel" as recited in Claim 1 (emphasis added). Rather, the standard discloses
> combining based on "each active *transport* channel depending on source rate." 3GPP
> TS 25.301 v. 6.0.0 § 5.3.1.2. Because a logical channel is not the same as a transport
> channel, the standard does not read on the claim. [29]

74.   Dr. Kakaes simply states that a logical channel is not the same as a

transport channel, and concludes that the 3G standard does not practice this claim

element. Again, he provides no explanation or support for this conclusion.

75.   Dr. Kakaes is incorrect. The current term "Transport Channel" in the

3G standard corresponds precisely to the character of the term "logical channel" of

claim 1, as characterized in the patent description. The fact that 3GPP has

introduced the name "Transport Channel" for the interface between MAC and the

Physical Layer (and is nowadays using "Logical Channel" between RLC and

MAC) does not alter the essentiality, and the "logical channel" of the patent is now

the "Transport Channel" of the 3G standard. For example, below is figure 4 from

the patent:

---

[29] Kakaes Opening Statement Appendix, EX-1639 at A-P08575_3G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

FIG.4

Service access points for radio bearers

76. The patent specification explains that the logical channel is 40a and 40b in this figure (shown in the blue ellipse).[31] It is located between the MAC layer (red rectangle) and the Physical layer (green rectangle). Compare this with figure 2 of 3GPP TS 25.301:

---

[30] EX-4395 (U.S. 6,363,058) at Figure 4.

[31] *See id.* at 4:50-65.



Figure 2: Radio Interface protocol architecture (Service Access Points marked by circles) [32]

77.     As can be seen in figure 2 from the 3G standard, the "transport channels" in the 3G standard (shown in the blue ellipse) are the channels between MAC layer (red rectangle) and the Physical or "PHY" layer (green rectangle). This is the same as what the patent refers to as "logical channels," which are the channels between the MAC layer (numbered 33 in figure 4) and the Physical layer (numbered 10 in figure 4). In other words, the channel that sits between the MAC and PHY layers is the claimed channel. The fact that the patent calls it a "logical" channel and the 3G standard calls it a "transport" channel is irrelevant.

78.     This is further confirmed by looking at how the text of patent specification characterizes the term "logical channel." The specification

---

[32] EX-5420 (3GPP TS 25.301) at Figure 2.

characterizes "logical channel" by *how* data is transported on the physical layer.[33] This is consistent with the description of the term "transport channel" in the standard, as can be seen, for example, below:

### 5.2.1   L1 Services

The physical layer offers information transfer services to MAC and higher layers. The physical layer transport services are described by *how* and with what characteristics data are transferred over the radio interface. An adequate term for this is 'Transport Channel.'

> NOTE:   This should be clearly separated from the classification of *what* is transported, which relates to the concept of logical channels. Thus DCH is used to denote that the physical layer offers the same type of service for both control and traffic.[34]

79.    The standard makes it clear that "transport channel" refers to how and with what characteristics data are transferred over the radio interface, just as the patent describes the "logical" channel in the specification: "A logical channel 40 represents a branch in the different chains of channel coding and interleaving […]"[35]

80.    Thus, Dr. Kakaes is incorrect when he suggests that the term "transport channel" of the 3G standard does not correspond to the "logical channel" of the patent. It is clear that these two terms are referring to the same functionality within the standard. Therefore this element is met by the 3G standard.

81.    Finally, Dr. Kakaes contends that Ericsson's comment in its claim chart is wrong, as shown in his appendix below:

> Furthermore, Ericsson's comment that "Quality of Service requirements corresponds to appropriate transport format within an assigned transport format set" is wrong because Quality of Service requirements is a distinct notion that cannot be equated with transport format and/or transport format set.[36]

---

[33] EX-4395 (U.S. 6,363,058) at 3:53-4:5.

[34] EX-5420 (3GPP TS 25.301) at § 5.

[35] EX-4395 (U.S. 6,363,058) at 3:54–55.

[36] Kakaes Opening Statement Appendix, EX-1639 at A-P08575_3G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

82.    Dr. Kakaes is missing the point. Ericsson's illustrative comment has no bearing on the essentiality of the claim. The intention of the comment is to explain that Quality of Service requirements for the radio bearers are met by selecting appropriate transport format within an assigned transport format set.  I therefore disagree with Dr. Kakaes and conclude that the P08575 family is essential.

### 5.    P08769

83.    The fifth patent family is the P08769 patent family and includes U.S. 6,493,552. This patent family relates to a recovery solution when multiple registration attempts to the network fail. Handsets are required to register with the network, so their location can be tracked. When the network does not receive a registration message for a long period of time, then the network might assume that the handset is out of service and inactive. If a handset is noted as inactive and a call addressed to that handset it will result in a message that the handset is out of network, and the network will not attempt to page the handset.

84.    The patented technology aids in the situation when a handset attempts to send registration messages, but receives no response from the network. After a number of attempts, the handset will assume that the current registration failed, and it will search for a new control channel on which to acquire service. This prevents the situation where the handset remains unregistered and unable to make or receive any calls at all.

85.    Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 4 of U.S. 6,493,552 are practiced by the 4G standard.[37] Dr. Kakaes disputes that the P08769 patent family is essential to 4G, making a variety of mistakes that I explain below.

86.    His main argument is that a portion of the 4G standard Ericsson cites

---

[37] EX-5211; EX-5416 (U.S. 6,493,552).

1  to for the following claim element is optional: "leaving said first control channel

2  and searching for a second control channel after said predetermined consecutive

3  number of registration messages have been sent by said mobile communication

4  devices without a registration response from said base station."

5      87.     In particular, Dr. Kakaes appears to argue that the claim is not

6  essential, because entering the state "EMM-DEREGISTERED.PLMN-SEARCH"

7  is optional, as shown below in his appendix:

> The essentiality rank for Claim 4 is 3 because practicing the 4G standard with
> user equipment does not require at least the following limitations of the claim
> under any reasonable interpretation: "leaving said first control channel and
> searching for a second control channel after said predetermined consecutive
> number of registration messages have been sent by said mobile communication
> devices without a registration response from said base station."
>
> In the same Section 5.5.1.2.6 that Ericsson has charted, the standard shows that
> the "state is changed to EMM-DEREGISTERED.ATTEMPTING-TO-
> ATTACH or *optionally* to EMM-DEREGISTERED.PLMN-SEARCH in order
> to perform a PLMN selection according to 3GPP TS 23.122." 3GPP TS
> 24.301 v. 8.10.0 § 5.5.1.2.6 (emphasis added).                            [38]

17     88.     Based on this, Dr. Kakaes concludes that no search for a second

18  control channel is required by the 4G standard, as shown below from his appendix:

> *See* ERIC_TCL00528485. Thus, any potential infringement is only possible if
> the "EMM-DEREGISTERED.PLMN-SEARCH" state is entered. However,
> entering such state is optional, as discussed above, and thus doing so is not
> essential to practicing the standard, particularly the registration procedures
> required by the standard.
>
> Therefore, the claim is not essential to practicing the 4G standard.

25     89.     His argument is meritless for two independent reasons. First, the

26  substate EMM-DEREGISTERED.PLMN-SEARCH is not optional for a handset as

--------

[38] Kakaes Opening Statement Appendix, EX-1639 at A-P08769_4G.

1    Kakaes argues. It required by all 4G compliant handsets, including TCL's, as will

2    be shown below.  Secondly, infringement also occurs when the handset enters the

3    other state of the two, namely EMM-DEREGISTERED.ATTEMPTING-TO-

4    ATTACH, as is shown in the claim chart analyzed by Dr. Kakaes.

5        90.    In contrast to Dr. Kakaes position, the state EMM-

6    DEREGISTERED.PLMN-SEARCH is not optional and must be implemented by

7    all 4G compliant handsets, including TCL's.  Whether the handset enters the

8    .ATTEMPTING-TO-ATTACH or .PLMN-SEARCH substate is dependent on the

9    outcome of the cell search process and other clearly specified criteria as shown in

10   TS 24.301 below:

11

12   5.2.2.4      Substate when back to state EMM-DEREGISTERED from another EMM
                 state

13   When returning to state EMM-DEREGISTERED, the UE shall select a cell as specified in 3GPP TS 36.304 [21].

     The substate depends on the result of the cell selection procedure, the outcome of the previously performed EMM
14   specific procedures, on the EPS update status of the UE, on the tracking area data stored in the UE and on the presence
     of the USIM:

15      -   If no cell has been found, the substate is NO-CELL-AVAILABLE, until a cell is found.

16      -   If no USIM is present or if the inserted USIM is considered invalid by the UE, the substate shall be NO-IMSI.

        -   If the selected cell is in a tracking area where the UE is allowed to roam, the substate shall be NORMAL-
17          SERVICE.

        -   If an attach shall be performed (e.g. network requested re-attach), the substate shall be ATTEMPTING-TO-
18          ATTACH.

19      -   If a PLMN reselection (according to 3GPP TS 23.122 [6]) is needed, the substate shall be PLMN-SEARCH.

        -   If the selected cell is in a tracking area where the UE is not allowed to roam, the substate shall be LIMITED-
20          SERVICE; and

        -   if the selected cell is a non-3GPP cell, the substate shall be NO-CELL-AVAILABLE.

21                                                                                                              39

22       91.    Thus, if a PLMN reselection is needed according to criteria in 3GPP

23   TS 23.122, the substate shall be PLMN-SEARCH. It is not up to the handset vendor

24   to choose whether to implement this state or not.

25       92.    The word "optionally" that Dr. Kakaes points to refers to the fact that

26   the selection of PLMN (Public Land Mobile Network), i.e. the selection of network,

27   ─────────────────────
     39 EX-5421 (TS 24.301, V8.10.0) at § 5.2.2.4.

28

can be set by the handset user to either automatic or manual. When set to automatic, the handset will select a new PLMN if the outcome of cell selection procedures require that.

This is seen from TS 36.304 below:[40]



And further down in the same section 4.1 of the same standard specification:

---
[40] EX-5422.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> If the UE loses coverage of the registered PLMN, either a new PLMN is selected automatically (automatic mode), or an indication of which PLMNs are available is given to the user, so that a manual selection can be made (manual mode).[41]

93.     In the event that a non-4G compliant handset vendor would decide not to implement the PLMN-SEARCH state as required by the standard, as Dr. Kakaes suggests, it would result in that this handset would fail to attach to any roaming network e.g. after landing at a foreign airport, if the handset is only registered in its home network.  Since this handset will not find its home PLMN, and since the non-compliant handset would further not support searching for any other network, it will remain unregistered and out of service.  Clearly, the implementation of PLMN search is and must be implemented in the way the standard requires, and it is not optional.

94.     Secondly, and as shown the chart, infringement occurs also when the handset enters   the substate of EMM-DEREGISTERED.ATTEMPTING-TO-ATTACH.[42]  As shown, the handset must perform an attach or combined attach when the handset enters a new cell in a different tracking area ("leaving said first control channel and searching for a second control channel").  Thus, the standard requires the claimed behavior in the EMM-DEREGISTERED.ATTEMPTING-TO-ATTACH state, and infringement takes place independent of whether the state EMM-DEREGISTERED ATTEMPTING-TO-ATTACH or EMM-DEREGISTERED.PLMN-SEARCH is entered.

Thus, P08769 is essential to the standard.

### 6.     P09040

95.     The sixth patent family is the P09040 patent family and includes U.S. 5,978,685.  The P09040 patent relates to the sending of SMS messages, and enables

---

[41] *Id.*

[42] EX-5421 (TS 24.301) at § 5.2.2.3.3.

1    the handset to transmit SMS messages regardless of whether the handset is

2    operating in a circuit-switched or packet switched mode.

3         96.    A multimode 4G handset can operate in both a circuit switched (CS)

4    mode (e.g., for handling voice calls) and a packet switched (PS) mode (e.g., for

5    using internet services).  4G support PS mode alone, while 2G and 3G include both

6    modes.  Conventionally, SMS messages prior to the invention were handled in the

7    CS domain. When sending an SMS using this conventional approach, if the handset

8    is in PS mode, it closes the packet session and establishes a connection on the

9    circuit-based control channel to process the SMS. This would be time- and resource

10   consuming, and further, it would require the CS domain to be available wherever

11   PS is, otherwise SMS services would not be available over the whole coverage area

12   of the PS domain.

13        97.    The technology in this patent family enables the system to receive and

14   send SMS messages in packet switched mode, without changing to a circuit

15   switched mode. The system uses the packet switched mode to deliver the SMS

16   messages if the handset is operating in the packet switched mode; otherwise, it uses

17   the circuit switched mode.

18        98.    Ericsson provided a claim chart to TCL that outlines precisely where

19   the claimed elements of claim 9 of U.S. 5,978,685 are practiced by the 4G

20   standard.[43] Dr. Kakaes disputes that the P09040 patent family is essential to 4G,

21   making a variety of mistakes that I explain below.

22        99.    Dr. Kakaes makes one main argument to find the P09040 family non-

23   essential. He argues that claim 9 of U.S. Patent No. 5,978,685 is not essential to 4G

24   by pointing to a section of the standard that describes requirements on the handset

25   when the handset is attached to GPRS and the circuit-switched domain as shown in

26   an excerpt from his appendix below:

27   _____

     [43] EX-358; EX-357 (U.S. 5,978,685).

28

1

2

3

4

5

6

7

8

9

10

11

12

> Claim 9, when read in its totality, requires determining whether or not the UE "is operating in a packet mode" and, if said determination is negative (i.e., the UE not operating in a packet mode), sending SMS message via the circuit switched channel. If, on the other hand, it is affirmative (i.e., the UE operating in a packet mode), the SMS message must be sent via the packet channel.
>
> Ericsson has not adduced any evidence that this is required by the 4G standard. In particular, 3GPP TS 24.011 v 8.2.0 § 2.6 states:
>
>> If the MS is attached to GPRS and the circuit-switched domain, and an SMS transfer via GPRS fails either due to a reception of an RP-ERROR message with cause #69 or due to the complete lack of network response, then the MS shall take the following actions: The MS shall use the circuit-switched domain instead of GPRS for SMS transfer for an implementation dependent time.
>
> In other words, during the "implementation dependent time" the mobile will use the circuit switched domain, even though the packet switched domain may well have become available. Thus, the limitation "sending the message from the sending apparatus via a packet channel if the sending apparatus is operating in the packet mode" is not met and thus the claim is not essential to the standard.[44]

13     100.   The point of Dr. Kakaes's argument seems to be that a <u>4G</u>-compliant

14 handset will not have to send SMS's over the packet switched domain based on a

15 quote related to GPRS. But GPRS refers to the packet oriented service in the

16 evolution of GSM (<u>2G</u>). More specifically, he relies on an excerpt from 3GPP TS

17 24.011 directed to GPRS, and concludes that a handset will not infringe the claim

18 because it can use, under particular circumstances when SMS transfer over GPRS

19 have failed, the circuit switched domain for an "implementation dependent time"

20 for the SMS transfer, even though the packet switched domain might have become

21 available.

22     101.   The citation to section 2.6 of TS 24.011 lacks any relevance for the

23 essentiality of the patent to a multimode 4G handset operating in an LTE or E-

24 UTRAN network. The specified section 2.6 of TS 24.011 relates, as the section

25 header reads and specified text provides, to the situation where the UE is attached

26 to GPRS, *i.e.* to packet services for GSM and UMTS. The portion of Section 2.6

27

28

---

[44] Kakaes Opening Statement Appendix, EX-1639 at A-P09040_4G.

relied on by Dr. Kakaes is irrelevant for a 4G-compliant handset that is operating in 4G packet mode.  The full text of Section 2.6, including the heading, is shown below:

> **2.6    MS support for SMS over GPRS**
>
> If the MS is attached to GPRS and the circuit-switched domain, and an SMS transfer via GPRS fails either due to a reception of an RP-ERROR message with cause #69 or due to the complete lack of network response, then the MS shall take the following actions:
>
> -    The MS shall use the circuit-switched domain instead of GPRS for SMS transfer for an implementation dependent time. When a different PLMN is selected, if the MS preferred method is the sending of SMS over GPRS, the MS shall revert to trying an SMS transfer via GPRS.

[45]

102.   Thus, this standard section is irrelevant for how the handset operates in 4G, as the claim chart corresponds to a 4G UE supporting SMS over the evolved packet core (EPC) and not over GPRS.

103.   When a handset is connected over the 4G packet-switched domain (*i.e.*, is in "S1 mode"), the handset must be able to send and receive SMS over 4G. These requirements on the handset are set in Section 2.5A, which directly precedes the standard section Dr. Kakaes relies on:

> **[2] 2.5A ESMS entity in S1 mode**
>
> It shall be possible for a MS attached to CS and PS to send and receive short messages in S1 mode.
>
> A description of the different modes of operation for E-UTRAN MS can be found in 3GPP TS 24.301 [...], and an overview of SMS services in S1 mode can be found in 3GPP TS 23.272 [...]. In S1 mode, messages are tunnelled through the PS domain, and otherwise have no impact on PS domain operation.

[46]

104.   A 4G compliant handset must support short messages via a packet channel in S1 mode (over 4G). In other words, when operating in packet mode, the 4G handset sends the message via a packet channel, as required by the claim.

105.   Further, Dr. Kakaes appears assume that essentiality (and

---

[45] EX-5424, TS 24.011 § 2.6.

[46] *See* EX-5214 (Ericsson's claim chart for P09040, citing §2.5A of TS 24.011).

infringement) of a claim could be avoided by adding a non-infringing special case, so that the handset does not infringe 100% of the time. However, adding functionality while still preserving infringement (even if it is less than 100% of the time) does not prevent infringement, and thus does not prevent essentiality.

This patent family is therefore essential to the 4G standard.

### 7.   P10867

106.   The seventh patent family is the P10867 patent family.  It relates to the reduction of excessive status reporting that could otherwise result in, for example, stale re-transmissions and/or excessive re-transmission delays. At a high level, the patent family relates to data communications, or delivery of data packets, in mobile telecommunications systems. There are different ways to make data communications more reliable, and different data communications applications may require different levels of reliability from the system. One example of these methods is "ARQ," or "automatic repeat request," which uses receiver feedback with positive ("ACK") or negative ("NACK") acknowledgements to request a transmitter to re-transmit missing/corrupted data units. The transmitter can also poll the receiver to send such status reports (with ACK/NACK information) from the receiver. When using this technique, the transmitter sends data units that include polling requests to the receiver, and in response, the receiver sends status information to the transmitter. Such a status report may then include acknowledgements of data units that have been properly received at this point in time.

107.   A challenge identified by the inventors is to make the polling reliable (e.g., by polling sufficiently often) under the premise that some data units that may carry the poll will be lost over a fading wireless link. But if the receiver responds with a status report for every poll, there is an imminent risk that stale re-transmissions will occur, if the transmitter had not yet responded with a first re-transmission when it receives yet another (or several) status report(s) indicating the

1   need to re-transmit the same missing data unit. Such duplicate re-transmissions will

2   reduce end-user throughput and network capacity, as the unnecessary re-

3   transmissions consume resources that could have been used for useful data units

4   instead.

5       108.   The patented technology provides an elegant solution to this problem

6   by analyzing the polling field of multiple received data units in a group and

7   responding only once with a status report, even if more than one of the data units

8   include a request for status information. With the patented solution, it is possible to

9   make polling very reliable by adding a polling request in multiple simultaneously or

10  subsequently transmitted data packets without running into the problem of having

11  excessive re-transmission requests and re-transmissions.

12      109.   Ericsson provided a claim chart to TCL that outlines precisely where

13  the claimed elements of claims 1 of U.S. 6,643,813 and EP 1,151,572 are practiced

14  by the 3G and 4G standards.[47] Dr. Kakaes disputes that the P10867 patent family is

15  essential to 3G and 4G, making a variety of mistakes that I explain below.

16      110.   Dr. Kakaes argues that claim 1 of U.S. 6,643,813 and claim 1 of EP 1,

17  151,572 are not essential to the standard for the same reasons. Dr. Kakaes states

18  that the essentiality of the claims depend on a construction of two claim elements of

19  the US patent '813: (1) "analyzing as a group, the data field provided in each one of

20  plural received data units;" and (2) "wherein the operation is performed only once

21  for the group of received data units even if information in more than one of the data

22  units in the group indicates that the operation should be performed, and wherein the

23  field is a polling field, the information is a polling request, and the operation is

24  transmission of status information." Dr. Kakaes argues that a "proper" claim

25  construction requires the entire group to be analyzed, and that a decision must be

26  made before performing an operation, as can be seen in his appendix below.

27

28

---

[47] EX-5091 and EX-5084. EX-4399 (U.S. 6,643,813), EX-5423 (EP 1,151,572).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> The correct claim construction of "analyzing as a group, the data field provided in each one of plural received data units" is "analyzing the data field of each of a set of plural received data units before performing an operation." The patent specification is clear that the entire group must be analyzed and then a decision is made as to performing the operation, the decision being limited to not performing said operation more than once for the given group. Plain and ordinary interpretation of the word "group" supports this construction. [48]

111.   Dr. Kakaes makes one argument to support his non-essentiality conclusion: that the 3G and 4G standards analyze packets <u>individually</u>, not as a <u>group</u> as the "properly" construed claim requires. He relies on the patent specification and prosecution history as alleged support for his construction.

112.   Dr. Kakaes's understanding of both the prosecution history and the 3G and 4G standards are incorrect. First, the prosecution history explicitly contradicts Dr. Kakaes's construction. The Examiner of the '813 patent acknowledges that "though the term 'as a group' is used in the claim limitation, the analysis is effected individually by looking into each data field of each data unit."[49] As a result, the prosecution history clearly states that the "as a group" term allows for individual analysis so long as it is done on a group of data units. This makes sense from even a common sense perspective. If I were analyzing a group of photos to determine if they were portraits or landscapes, I would look at each photo in the group to make that determination. It is not possible to simultaneously review each photo as Dr. Kakaes seems to suggest would be required to analyze a group. In summary, Dr. Kakaes's construction is not proper; it is contradicted by the prosecution history, which makes clear the group of data units can be analyzed by "individually [] looking into each data field of each data unit."[50]

113.   Second, Dr. Kakaes misunderstands the 3G and 4G standards. They

_____

[48] Kakaes Opening Statement Appendix, EX-1639 at A-P10867_3G.

[49] EX-4424, (Prosecution History of U.S. 6,643,813) at p. 96 of 149 [p. EX-4424.0096].

[50] *Id.*

1   perform the analysis "as a group," as required by the claims. More specifically, Dr.

2   Kakaes suggests that each packet is reviewed individually and thus cannot infringe

3   the "group" claim language as explained in his appendix below:

> Based on my reading of Ericsson's claim chart, Ericsson applies an incorrect claim construction because the standard requires analyzing each received PDU individually, transmitting a STATUS PDU upon reception of a polling that requests doing so, and then simply refraining from sending a status PDU for a certain amount of time, while the analysis of each received PDU is performed on an individual basis. The standard does not require any "group." (Section 5.2.3). This condition is distinct from and does not require "analyzing, as a group" as well as "performing the operation only once for the group." [51]

10   114.   Dr. Kakaes's understanding of how the 3G standard operates is

11   incorrect. In the 3G standard, the group of received data units are a group of AMD

12   PDUs that are either received simultaneously in one transmission time interval or

13   received during the time period that a timer prohibiting status reports is running

14   (Timer_Status_Prohibit in 3G, *t-StatusProhibit in 4G*). More specifically, the group

15   of AMD PDUs is analyzed by "individually [] looking into each data field of each

16   data unit" as the prosecution history makes clear is the claimed "analyzing, as a

17   group." Then the 3G standard requires that the receiver transmit one status report to

18   the sender, if at least one status report was triggered during the time the

19   transmission of a status reports was prohibited by the Timer_Status_Prohibit, as

20   shown in Ericsson's claim chart below:

---

[51] Kakaes Opening Statement Appendix, EX-1639 at A-P10867_3G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| where information in the data field in plural ones of the data units in group indicates that a data processing or a data communications operation should be performed, and performing the operation only once for the group of received data units even though inflation in the data field in more than one of the data units in the group indicates that the operation should be performed. | 9     Elements for peer-to-peer communication<br>9.7     Specific functions<br>9.7.2     STATUS transmission for acknowledged mode<br>The Receiver transmits status reports to the Sender in order to inform the Sender about which AMD PDUs have been received and not received. Each status report consists of one or several STATUS PDUs. The Receiver shall trigger the transmission of a status report when receiving a poll request.<br>[…]<br>If any of the following functions is used the transmission of the status report shall be delayed, even if any of the triggering conditions above are fulfilled:<br><br>  1)  STATUS prohibit.<br><br>     The timer Timer_Status_Prohibit is started according to subclause 9.5 f). The Receiver is not allowed to transmit a status report while acknowledgement is prohibited (see subclause 9.5 f)). If a status report was triggered during this time, the status report is transmitted after the timer Timer_Status_Prohibit has expired, as described below.<br><br>     […]<br><br>     Upon expiry of the timer Timer_Status_Prohibit, the Receiver shall:<br>     -  if at least one status report was triggered during the time the transmission of a status reports was prohibited that could not be transmitted due to prohibition; and<br><br>     -  if transmission of a status reports is no longer prohibited by any of the functions "STATUS prohibit":<br>     -  transmit one status report to the Sender, using the procedure described in subclause 11.5.2.3.<br><br>*[Ericsson comment (1):* "a data processing or a data communications operation" corresponds to the operation of transmitting a status report, "information in the data field..." corresponds to at least one status report being triggered by a polling bit in the group of AMD PDUs being set to "1". Note that a status report is transmitted only once even if a report was triggered by multiple AMD PDUs in the group ] |

52

115.   This operation is the performance of the operation "only once for the group of received data units" as claimed. Therefore, the 3G standard operates in the same way claimed by Ericsson's P10867 patent family. The P10867 family is essential to the 3G standard.

116.   With respect to 4G, Dr. Kakaes makes the exact same argument—that the 4G standard does the analysis individually, not "as a group" as he construes this phrase. His argument fails for the same reason. His claim construction is directly contradicted by the prosecution history, and the 4G standard also uses a timer similar to 3G's Timer_Status_Prohibit. The 4G time is called *tStatusProhibit*, as shown in the 4G claim charts. The P10867 family is therefore also essential to the 4G standard.

117.   With respect to the corresponding claim charts of the EP patent, Dr. Kakaes makes yet another error. Without any further analysis of the EP patent, he refers to his analysis of the US patent, where he challenged the essentiality of the limitation "analyzing, as a group […]".

---

[52] EX-5091 (ERIC_TCL00191829); EX-5426 (TS 25.322 V6.0.0)

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

From Dr. Kakaes appendix:

| Essentiality Rank: **2** | *See Essentiality for U.S. Patent No. 6,643,813 (Claim 1), above.* |
|---|---|
| | *See Importance for U.S. Patent No. 6,643,813 (Claim 1), above.* |

118.   However, EP '572 does not have the same limitation. Instead, the corresponding limitation reads:

"analyzing, a data field provided in each one of a group of plural received protocol data units"

119.   The challenged formulation "analyzing as a group" is not in the EP claim.

120.   Thus, Kakaes has failed to provide any arguments at all on the claim charts for the EP patent.   Thus, the EP patent is also essential to both 3G and 4G.

### 8.   P11289

121.   The eighth patent family is the P11289 patent family. It relates to the handling of security associations between the handset and base stations when the handset moves from one cell to another.  As wireless and mobile communication technologies developed, security issues became important concerns. There are a number of different security protocols used in 4G. Security in mobile telecommunications is a balancing act – as communications need to have a certain level of security, without sacrificing the data rates or latency users expect.

122.   The patented technology improves the performance of a handset when the handset moves from one base station to another. The handset reuses an existing security association when it is handed over to the new base station. This lets the handset continue secure communications upon being handed over, rather than having to re-negotiate a new security association. This minimizes latency and improves the user's experience.

123.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of U.S. 6,418,130 are practiced by the 4G

-46-

1    standard.[53] Dr. Kakaes disputes that the P11289 patent family is essential to 4G,

2    making a variety of mistakes that I explain below.

3         124.   Dr. Kakaes argues that claim 1 of U.S. 6,418,130 is not essential

4    because the 4G standard does not practice the following limitation of claim 1:

5    "reusing an existing security association to support the connection between the

6    mobile unit and the second stationary unit, wherein the existing security association

7    was previously used to support the connection between the mobile unit and the first

8    stationary unit."

9         125.   Dr. Kakaes makes one argument to support his conclusion. He uses the

10   European prosecution history to interpret the claims of a U.S. patent. Then he

11   suggests the "properly" interpreted claim requires reusing "the exactly same"

12   crypto-key and parameters, which he alleges that the 4G standard does not reuse.

13   This is shown in his appendix, as excerpted below:

14

15   The European application was subsequently issued as EP '400.  As is apparent from the
     Applicant's argument, the differentiating aspect of the claimed invention was the fact

16   that the existing security association that is reused is a "fixed value."  When the value
     changes, the Applicant appears to argue that such an act is closer to a security service,

17   which is defined specifically in the patent specification.

18   In view of the Applicant's argument in the related co-pending European Patent, Claim 1
     of US '130 is not essential as the target eNB within X2 handover does not reuse the

19   same, fixed security associations as between the UE and the source eNB.  The standard
     states that the source eNB sends the $K_{eNB}*$ to the target eNB, which utilizes $K_{eNB}*$ to

20   derive the radio resource control (RRC) and user plane (UP) crypto-keys.

21

22                                         . . .

23   Therefore, the exactly same RRC and UP crypto-keys are never used by the target eNB

24   when establishing a connection with the UE upon handover; so the standard does not
     "reuse an existing security association . . . previously used to support the connection

25   between the mobile unit and the first stationary unit."                          [54]

26   _____

27   [53] EX-361.

28   [54] Kakaes Opening Statement Appendix, EX-1639 at A-P11289_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
                    CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

126.   I will first address whether it is appropriate to use the European prosecution history to interpret the claims of a U.S. patent as Dr. Kakaes has done. Dr. Kakaes states that the European prosecution history should be used to limit the claim term "security association" as claimed in the corresponding U.S. patent. I understand from my colleague Mr. Delgado that Dr. Kakaes is committing legal error by limiting the plain meaning of terms by importing limitations from extrinsic evidence, in this case by asserting that the EP prosecution history would limit the claim interpretation of a U.S. patent. I also reviewed the specification of the '130 U.S. patent, and the prior art reference that the European Patent Office cited was considered during its prosecution, as can be seen below:



(12) **United States Patent**
Cheng et al.

(10) Patent No.:    **US 6,418,130 B1**
(45) Date of Patent:    **Jul. 9, 2002**

(54) **REUSE OF SECURITY ASSOCIATIONS FOR IMPROVING HAND-OVER PERFORMANCE**

(75) Inventors: **Yi Cheng**, Solna; **Lars Björup**, Stockholm; **Martin Jakob Rinman**, Täby; **Karl Dan Gustav Jerrestam**, Johanneshov, all of (SE)

| | | |
|---|---|---|
| 5,243,653 A | 9/1993 | Malek et al. |
| 5,293,423 A | 3/1994 | Dahlin et al. |
| 5,444,766 A * | 8/1995 | Farwell et al. ............... 455/437 |
| 5,546,464 A | 8/1996 | Raith et al. |
| 5,778,075 A * | 7/1998 | Haartsen ..................... 375/138 |
| 6,253,321 B1 * | 6/2001 | Nikander et al. ........... 713/160 |

[55]

127.   Thus, the U.S. Patent office considered this reference and did not reject the claim.

128.   Moreover, Dr. Kakaes's interpretation of the European prosecution history is incorrect. The conclusion by Dr. Kakaes that the "security association" must be a "fixed value" is meritless. The portion of the prosecution history cited by Dr. Kakaes does not seem to mention any term called "fixed value" at all, but it uses a term "fixed information" that Dr. Kakaes apparently is referring to.  The term "fixed information" was used to explain the difference of the disclosure in the Malek prior art from the solution of EP '400.  Malek is said to disclose an

_____

[55] EX-359 (U.S. 6,418,130).

Encryption Synchronization Counter (ESC) to synchronize encryption at the time-instance of a handover. Such information is dynamic, time-dependent and cannot be re-used. By contrast, EP '400 discloses a solution where the "information" is "fixed" in the sense that the "information" is re-used without re-negotiation to attain new "information". Only a re-negotiation would alter the "information." The cited portions of the prosecution history do not talk about any "fixed value" and neither the claims nor the EP prosecution history is hinting that the information of a security association could not be processed further.

129. This interpretation of the term "reuse" is also supported by the patent specification, which states that "[t]he present invention accomplishes this by reusing rather than renegotiating the security associations (SAs) corresponding to the MU once the MU is handed-over. By reusing the SAs, less time is spent negotiating SAs."[56]

130. Dr. Kakaes then argues that the 4G standard does not "reuse an existing security association" as claimed. This is incorrect. The handset establishes a security association through the AKA procedure, as shown in the chart. Based on the so-obtained key K_ASME, the key K_eNB and NH parameters are derived, and K_eNB is turn input for deriving keys that are input for user-plane ciphering as well as integrity protection and ciphering of signaling (RRC), as also shown in the chart (K_UPenc, K_RRCint and K_RRCenc below). The key hierarchy is schematically illustrated in TS 33.401, section 6.2:

---

[56] EX-359 (U.S. 6,418,130) at 2:12-15.




Figure 6.2-1: Key hierarchy in E-UTRAN[57]

131.   When a handover is performed, another key derivation takes place, which is based on the same security association. The new KeNB (called KeNB*), which is used as input for deriving the keys for ciphering and integrity protection towards the Target eNB, is derived with the previous KeNB (or NH) as input, see the arrow in the figure above highlighted with a red box. Thus, all keys before and after handover belong to one security association, which is originating from one AKA procedure.

132.   Dr. Kakaes argues that the exactly same RRC and UP crypto keys are not used by the target eNB as an argument against essentiality. However, it must be understood that a security association is never static.  For example, it is well known that sequence numbers can be used only once to ensure secure communication (such as the Encryption Synchronization Counter (ESC) in Malek above). In a similar way, the KeNB is hashed to KeNB* in order to not compromise security.

---

[57] EX-5425 (TS 33.401, § 6.2).

1   Still, all keys are all derived from the same K_ASME and the same security

2   association is re-used, i.e., it is not re-negotiated.

3       Therefore, the P11289 family is standard essential.

4           **9.      P13459**

5       133.   The ninth patent family is the P13459 patent family. It relates to re-

6   ordering packets that are received over multiple different paths, and thus may be

7   received out of order. The patented technology enables the packets to be re-ordered

8   at the receiver into the original sequence.

9       134.   At a high level, the technology in this patent family relates to data

10  transmissions in cellular network. Cellular networks historically used a "frame

11  relay" protocol for transmitting data packets. The frame-relay protocol opens one

12  circuit between the sender and the receiver. The data packets are then sent in order

13  from the sender to the receiver. Because there is only one circuit (or path) from the

14  sender to the receiver, the data packets will necessarily arrive in the order they are

15  sent. This is because there is no alternate path that some of the packets can take to

16  get ahead of other data packets. In today's cellular networks, however, packets can

17  arrive in an order that is different from the order they were transmitted. For

18  example, this is true at handover in 4G. Due to handover, a packet transmitted via

19  source base station (the base station prior to handover) is at times received before

20  an "older" packet (with a lower sequence number), wherein the base station after

21  the handover transmits this "delayed" packet.  Re-ordering of such packets received

22  out of sequence can be important for many services that expect to receive packets in

23  the same order as they were transmitted.

24      135.   The technology covered by the P13459 patent family creates a

25  protocol with automatic   re-ordering of packets that may arrive at the receiver out

26  of order.

27      136.   Ericsson provided a claim chart to TCL that outlines precisely where

28  the claimed elements of claim 3 of U.S. 6,738,379 are practiced by the 4G

standard.[58] Dr. Kakaes disputes that the P13459 patent family is essential to 4G, making a variety of mistakes that I explain below.

137.   Dr. Kakaes makes two arguments to support his conclusion that argues that claim 3 of U.S. 6,738,379 is not essential to the 4G standard. First, he argues that a base station practices the "transmitting" element, and so this element cannot be infringed by a standard-compliant handset. I understand from my colleague, Ms. Evelyn Chen, that Dr. Kakaes is misunderstanding the law when he applies only this "directs or controls" test. I understand that just because the identified claim does not entirely read upon a handset, it does not mean that TCL is not enjoying the benefits realized by the claimed invention.

138.   Second, Dr. Kakaes argues that three other claim elements are not practiced by the 4G standard because the standard enables individual delivery of packets while the claims require the packets be held in a buffer until the whole sequence is filled, as shown in his appendix below:

> Thus, for the same incoming packet sequence, the standard enables individual delivery of packets whereas the claimed algorithm holds multiple packets in a buffer until the entire sequence gap is filled. [59]

139.   To support this view, Dr. Kakaes creates an example where packets with sequence numbers are arriving in the following order #1, #2, #5, #3, #4, where he assumes that packet #1 has already been delivered to upper layers.[60]  According to Dr. Kakaes's analysis, the normative requirements in the 3GPP 4G standard (TS 36.323)[61] would result in the following sequence of events:

(i)      Receive, store, and deliver packet #2;

_____

[58] EX-5067; EX-5417 (U.S. 6,738,379)

[59] Kakaes Opening Statement Appendix, EX-1639 at A-P13459_4G.

[60] *Id.*

[61] EX-5427.

(1)      Receive and store packet #5;

(2)      Receive, store, and deliver packet #3;

(3)      Receive and store packet #4; and

(4)      Deliver packets #4 and #5.[62]

140.   He contrasts this to his interpretation of the claim, wherein he alleges that the claimed solution would result in the following delivery sequence:

(1)      Receive, store, and deliver packet #2;

(ii)      Receive and store packet #5;

(iii)     Receive and store packet #3;

(iv)     Receive and store packet #4; and

(v)      Deliver packets #3, #4 and #5.[63]

141.   On the basis of this example, he alleges that the claim language requires the whole gap (between #2 and #5) to be filled before the missing units (#3 and #4) are delivered.

142.   However, Kakaes appears to misread the following claim limitations: "determining whether or not the received packets have sequential packet numbers;" and "passing the received data packets directly to a receiving application if the received data packets have sequential packet numbers."

143.   This seems to be the case in his example, when he constructs the following logic:

> • receive packet #3
> • check if packet #3 has SN = 1 + (SN of the last received) (=5): no
> • check if packet #3 and packet #5 have continuous SNs: no
> [Note: The claim does not specify what to do with ``no''. We assume no specific action.]
> [Note: packet #3 is at the beginning of the buffer, but because it is a single packet at the beginning, not one of multiple such, it cannot be delivered.]

---

[62] *Id.*

[63] *Id.*

64

144.   The claim does not include any comparison to the "SN of the last received" packet. It seems that Dr. Kakaes is making a mistake when interpreting the claim language as if the comparison (when #3 is received) would be performed towards the "SN of the last received" packet. This is incorrect. The determining step of the claim identifies the "received packets," not only the "last received" packet. The "received packets" include #2.  And since #3 is sequential to #2, packet #3 is delivered upon reception. This results in a behavior identical to the requirements set by the 4G standard:

(1)     Receive, store, and deliver packet #2;

(vi)    Receive and store packet #5;

(vii)   Receive, store, and deliver packet #3.

145.   What remains in Dr. Kakaes's example is the reception of #4. Again, the behavior is identical to the requirement of the 3GPP specification, since #4 is sequential to #3. In addition, the claim requires delivery of two or more packets at the beginning of the buffer, which is the case for #4 and #5, upon arrival of #4, as recited in the following claim element: "determining whether two or more packets have sequential numbers and are stored at the beginning of the buffer; passing the two or more packets to the receiving application if they have sequential numbers and are stored at the beginning of the buffer." Thus, the claim results in the same behavior as the standard:

(1)     Receive, store, and deliver packet #2;

(viii)  Receive and store packet #5;

(ix)    Receive, store, and deliver packet #3;

(x)     Receive and store packet #4; and

(xi)    Deliver packets #4 and #5.

---

[64] *Id.*

146.   This claim is essential to the standard, as can be seen in Ericsson's claim chart.  Dr. Kakaes hypothetical example does not accurately depict how the claim operates versus the standard, and he presents no arguments to rebut the mapping in Ericsson's claim chart (so I assume he does not have any).  I therefore find that the P13459 patent family is standard essential.

### 10.    P21428

147.   The tenth patent family is the P21428 patent family.  It relates to a solution for allocating resources for access bursts in the time and frequency domains. The solution improves the flexibility to what resources to use for random access bursts.

148.   As I described previously, when a handset needs to initiate communication, it must go through the random access procedure by first sending a random access burst, based on which the base station can detect activity from the handset. In solutions prior to the invention, the random access transmission was typically transmitted over the whole access bandwidth. However, with the wide channels provided in 4G, there was a need for greater flexibility to provide time and/or frequency resources to the random access procedure.

149.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of U.S. 8,285,294 are practiced by the 4G standard.[65] Dr. Kakaes disputes that the P21428 patent family is essential to 4G, making a variety of mistakes that I explain below.

150.   Dr. Kakaes makes one argument to support his conclusion that claim 1 of U.S. 8,285,294 is not essential to the 4G standard. He alleges that the 4G standard does not meet the following claim element: "setting one of a first access bandwidth or a second access bandwidth." In particular, he argues that the claim requires two different bandwidths and that the 4G standard only uses one

---

[65] EX-363.

bandwidth, as shown in his appendix below:

> Ericsson's claim chart points to the TDD case where there can be 5 different formats for the random access preamble. Ericsson fails to note that the difference in those formats, in relevant aspects, is how *the same bandwidth is organized, not that it is different bandwidth*. In both cases the bandwidth is the same, as is shown by the standard itself: "Each random access preamble occupies a bandwidth corresponding to 6 consecutive resource blocks for both frame structures." (*See* 3GPP TS 36.211 § 5.7.1). As this clearly shows, in all formats, the bandwidth is the same, namely 6 consecutive resource blocks (RBs), and since each resource block is 180 kHz, the bandwidth is always 6*180 kHz = 1,080 kHz = 1.08 MHz.
>
> The guard band is 1,080 kHz – 1,049 kHz = 31kHz in the first case and 1,080 kHz – 1,043 kHz = 37 kHz in the second case.
>
> The patent itself recognizes that guard bands are commonly used "to avoid an overlap of inaccurately positioned access bursts received at the base station in neighbouring channels." *See* U.S. Patent No. 8,285,294 at C11:33-37.
>
> Furthermore, as the '294 patent indicates, the "technique proposed herein allows to provide resources for random access requests in a flexible way," thus allowing "the remaining available bandwidth [to] be used either for further access bursts or for the transmission of other data." *See* U.S. Patent No. 8,285,294 at C12:55-67.
>
> In contrast to the disclosed technique, the accused standard always uses 6 RB. That is, a bandwidth provided for random access requests is not flexible; it is always 1,080 kHz, [66]

151.   Dr. Kakaes also expands on this analysis for the first time in his opening witness statement. Dr. Kakaes takes issue with **how different** the access bandwidths must be to meet the claim language. He argues that the difference between the standard's access bandwidths is "relatively miniscule," and suggests that Ericsson's P21428 family requires a much bigger difference in access bandwidths.[67]

152.   Not only does he provide no basis for his requirement that there be a large magnitude of difference between the access bandwidths, he incorrectly interprets the specification of U.S. 8,285,294 to arrive at his conclusions. First, Dr. Kakaes points to nothing in the specification or prosecution history that limits the claims to large differences in bandwidths. As he recites in his legal principles, the

---

[66] Kakaes Opening Statement Appendix, EX-1639 at A-P21428_4G.
[67] Kakaes Opening Statement at ¶ 154, Figure 17 (PDX 69).

1    only time he can narrow a claim term to something other than its plain and ordinary

2    meaning are when (1) the patentee sets out a definition and acts as his own

3    lexicographer or (2) when the patentee disavows the full scope of a claim term

4    either in the specification or during prosecution.[68] Dr. Kakaes does not attempt to

5    meet either of these requirements with his narrow construction of the word

6    "different," which notably does not even appear in the claims. He does not state that

7    Ericsson acted as its own lexicographer or that it disavowed the full scope of the

8    claim.

9         153.   Second, he relies on an extreme example that he incorrectly assumes

10   limits the terms of the claims. Based on the patent specification, Dr. Kakaes

11   suggests that the    first access bandwidth may be 20MHz and a second access

12   bandwidth may be 1.25 MHz, which creates a large difference in bandwidths.[69]

13   However, the specification makes clear that one access bandwidth need only be

14   smaller than the other. There is no requirement how much smaller it must be, and

15   certainly no requirement that it be orders of magnitude smaller, which is what Dr.

16   Kakaes implies with his 94% difference in his Figure 17.

17        154.   For example, the specification provides a number of options for the

18   different access bandwidths. One option is for the access bandwidth to be the

19   available transmission bandwidth.[70] This can be 20 MHz, 5 MHz, or some other

20   bandwidth.[71] Again, the specification makes clear that these are merely examples of

21   _____

22   [68] Kakaes Opening Statement at ¶ 110.

     [69] *Id.*

23   [70] EX-362 (U.S. 8,285,294) at 10:31-36 ( "in still other embodiments, a mobile

24   terminal may be adapted to choose from different access bandwidths. For example,
     the terminal might be adapted to either use a $BW_{RACH}$ equal to the available

25   bandwidth or a $BW_{RACH}$ equal to a smaller value, e.g., a minimum system
     bandwidth.").

26   [71] *Id.* at 3:42-48 ("For example, the mobile network may be an LTE system, which

27   provides a maximum available transmission bandwidth of 20 MHz . . . [or] the
     radio base station may support only a portion of the LTE maximum transmission
     bandwidth, for example 5 MHz.").

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
                        CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

different available bandwidths.[72] Another option is for the access bandwidth to be the minimum system bandwidth.[73] This can be 1.25 MHz.[74] Another option is to set the access bandwidth at an even smaller value of 1 MHz.[75] And yet more options are to set the access bandwidth at "smaller than the available transmission bandwidth,"[76] "larger than the minimum system bandwidth,"[77] "a fraction of the available transmission bandwidth,"[78] or "one fourth of the available bandwidth."[79] Clearly, the specification teaches that the access bandwidths need not be substantially different. To point out just one example, as noted above, two options are 1.25 MHz and 1 MHz. This is nowhere near the 94% difference Dr. Kakaes appears to require of the claim language. The specification therefore clearly does not support Dr. Kakaes's conclusion.

155.   In fact, Dr. Kakaes's hypothetical example where one of the access bandwidths would be 20 MHz does not make sense in a 4G setting. The maximum system bandwidth in 4G is 20 MHz, but the claim requires that "the set access bandwidth […] **is set smaller than an available than an available system transmission bandwidth**". Thus, both access bandwidths have to be smaller than the system bandwidth.[80]

---

[72] *Id.*

[73] *Id.* at 10:17-19 ("In one example, the minimum system bandwidth may be defined to be 1.25 MHz and $BW_{RACH}$ may then be selected as 1.25 MHz.").

[74] *Id.*

[75] *Id.* at 11:4-9 ("The bandwidth allocated for a random access burst, $BW_{RACH}$, may be in the order of 1 MHz, . . . [which] is smaller than the smallest allowed system bandwidth suggested for example for 3GGP [sic] LTE, which is prospectively 1.25 MHz.").

[76] *Id.* at 9:18-21.

[77] *Id.* at 10:22-23.

[78] *Id.* at 9:67-10:6.

[79] *Id.*

[80] *Id.* at 3:42-48 ("For example, the mobile network may be an LTE system, which provides a maximum available transmission bandwidth of 20 MHz . . . [or] the radio base station may support only a portion of the LTE maximum transmission bandwidth, for example 5 MHz.").

156.    Dr. Kakaes also misunderstands how the standard operates. He suggests that the 4G standard compliant handset always uses 1,080 KHz bandwidth for transmission of the access burst. This is wrong. As shown in Ericsson's claim chart below, the 4G standard uses two access bandwidths: (1) 1,049 KHz or (2) 1,043 KHz.

| setting one of a first access bandwidth or a second access bandwidth for a transmission channel for transmission of the access burst, | [Ericsson comment: In transmitting the random access preamble, the UE transmits a sequence of $N_{ZC}$ elements mapped to subcarriers with a spacing of $\Delta f_{RA}$. Thus, the UE sets a bandwidth for the preamble transmission equal to the product of the sequence length ($N_{ZC}$) and the subcarrier spacing ($\Delta f_{RA}$). The "access bandwidth for a transmission channel for transmission of the access burst" corresponds to this product of the sequence length $N_{ZC}$ and the subcarrier spacing $\Delta f_{RA}$. $N_{ZC}$ and $\Delta f_{RA}$ depend on the preamble format according to Tables 5.7.2-1 and 5.7.3-1, respectively, of [2]. As a result, depending on the preamble format, the UE sets either a first access bandwidth 839*1250Hz~1,049MHz (for preamble format 0-3) or a second access bandwidth 139*7500Hz~1,043MHz (for preamble format 4).] |

[81]

157.    As explained in Ericsson's claim chart, the handset (i.e., "UE") sets a bandwidth based on the equation $N_{ZC}$ x $\Delta f_{RA}$. Both of these variables ($N_{ZC}$ and $\Delta f_{RA}$) can be different sizes based on the random access preamble sequence length. For example, the $N_{ZC}$ variable can be either 839 or 139 long. Similarly, the $\Delta f_{RA}$ variable can be 1,250 Hz or 7,500 Hz. Thus, when the math is done for the preamble formats, the result is two different bandwidths as shown below:

$$N_{ZC} \text{ x } \Delta f_{RA} = \text{bandwidth}$$

$$839 \text{ x } 1,250 \text{ Hz} = 1,049 \text{ MHz}$$

$$139 \text{ x } 7,500 \text{ Hz} = 1,043 \text{ MHz}$$

158.    Dr. Kakaes is therefore wrong that the 4G standard only uses one bandwidth of 1,080 kHz.

159.    Dr. Kakaes also argues that while these two numbers are different, the bandwidth size available for the random access preamble is 1,080 KHz. He makes an argument that the access bandwidth should include the guard bands, which are different for the preamble formats. But the patent specification is clear in showing that the access guard band(s) are not included in the random access channel, see

---

[81] EX-363; EX-5428 (3GPP TS 36.211 V8.9.0).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Figure 8B:[82]



Fig. 8B

[83]

160.   The access bandwidths of the claim are therefore different as shown in the chart.

161.   The P21428 patent family is essential to the 4G standard.

**11.   P21787**

162.   The eleventh patent family is the P21787 patent family. It reduces power consumption in a handset while in connected mode by introducing efficient discontinuous reception. As I explained earlier, discontinuous reception (DRX) and also idle mode ("paging state" in the patent) procedures include periods where the handset does not listen continuously for signals from the base station, conserving battery life for the handset. In general, a base station will send actual data to the handset (e.g., voice call data, email data, SMS data) along with control information the handset must monitor to maintain communications with the network. Conventionally, an inactive handset was moved to a separate "idle" (or paging) state where it only occasionally listens for a wake-up or paging signal. However,

---

[82] EX-362 at 11:33-37 ("The individual channels are separated from each other by frequency guard bands to avoid an overlap of inaccurately positioned access bursts received at the base station in neighbouring channels.")

[83] EX-362.

this technique based on state-changes requires additional signaling between the handset and base station, so it is not appropriate for shorter inactive periods. This is because the handset may still spend significant resources continually monitoring control information, even when that handset is not actively receiving or sending actual data (e.g., actively engaged in a voice call or surfing the Internet).

163.   The patented technology allows the handset to use inactive time instants so that it is not continuously listening for signaling from the base station. The handset and the base station must agree on a set of rules that specify specific times when the network may not transmit anything to the handset, thereby allowing the handset to preserve battery. This way, no extra signaling is needed when the handset should be listening for any possible transmissions from the base station. The solution is advantageous also for shorter time intervals of inactivity, which over time results in battery savings.

164.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of U.S. 8,180,408 are practiced by the 4G standard.[84] Dr. Kakaes disputes that the P21787 patent family is essential to 4G, making a variety of mistakes that I explain below.

165.   Dr. Kakaes makes two arguments to support his conclusion of non-essentiality. First, Dr. Kakaes argues that the "making an agreement with said sender" claim is not met because of statements made during the prosecution of the patent. Second, Dr. Kakaes argues that claim 1 of U.S. Patent No. 8,180,408 is not essential to the 4G standard because the "making" and "said sender" limitations are implemented at the base station and not the handset.

166.   In his first argument, Dr. Kakaes further argues that the "making an agreement with said sender" claim is not met, because of statements made during the prosecution of the patent.  Dr. Kakaes's full argument can be seen below:

---

[84] EX-365; EX-4410 (U.S. 8,180,408)

But the prosecution history of Claim 1 estops Ericsson from asserting that Claim 1 discloses mere acknowledgement and compliance by the UE:  To overcome the Patent Office's rejection of Claim 1 (of the continuation patent U.S. Patent No. 8,694,061[5]) over U.S. Patent No. 6236674 ("Morelli"),[6] Ericsson argued that unlike Claim 1, Morelli failed to disclose a *UE making an agreement with the base station*:

> Applicant respectfully submits that *Morelli* fails to disclose at least "making an agreement on a rule with the transmitter, wherein the agreed rule defines inactive time instants and listening time instants," as recited by the claim.  *Morelli* is directed to "trasceivers having a receiver and/or transmitter which switches between a high power consumption mode and a low power consumption (or 'sleep') mode." *Morelli*, col. 1, ll. 11-15.  The cited portion discloses that a "MAC 30 is generally responsible for switching the transmitter 12 between a sleep mode and an active mode." *Id.*, col. 15, ll. 38-41. However, there is absolutely no disclosure of an actual <u>rule</u> that defines inactive time instance and listening time instants.  There is especially no disclosure of a user equipment <u>making an agreement</u> on such a rule <u>with the transmitter</u>.  For at least these reasons, Applicant respectfully submits that *Morelli* fails to disclose "making an agreement on a rule with the transmitter, wherein the agreed rule defines inactive time instants and listening time instants."

*See* Applicant's Response to Office Action, App. No. 13/444,270 at 10-11 (Sept. 11, 2012).[7]  In particular, Ericsson distinguished Claim 1 from Morelli by asserting that Morelli has "no disclosure of a user equipment <u>making an agreement</u> on such a rule <u>with the transmitter</u>." *Id.* at 11 (emphasis in original).  Ericsson cannot now assert that Claim 1 discloses a unilateral command from the base station that the UE merely acknowledges and complies with.

[85]

167.   Dr. Kakaes's argument appears to be that the claim term "making an agreement" cannot cover the situation in the 4G standard where the handset receives and acknowledges a DRX configuration from a base station. I agree with the prosecution history that Morelli does not appear to disclose at least "a user equipment making an agreement on such a rule with the transmitter".  However, Kakaes is wrong when he contends that the file history would limit the interpretation of the claim element. Morelli does not disclose any configuration message from a base station with a rule that the UE needs to acknowledge and comply with.  Thus, and the file history does not limit the claims in the way Dr. Kakaes suggests. The file history does not require any particular interpretation of

---

[85] Kakaes Opening Statement Appendix, EX-1639 at A-P21787_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

the term "making an agreement."

168.   In particular, the plain meaning of the term "making an agreement" does not exclude a handset's acknowledgement of the configuration command from the base station. This is how configuration rules are agreed upon in telecommunication systems in general. The patent specification shows that this scenario is included in the meaning of "making an agreement," as it states that a "sleep rule should be setup between a pair of sender and receiver. In the sender, the rule specifies when the sender is allowed to transmit packets to the receiver."[86]

169.   The patent therefore envisions that rules should be "setup" between the sender and receiver (e.g., handset and base station). Such setup procedures are generally implemented with configuration messages that the receiver of the message can either accept or reject.  The patent specification thus clearly gives support for Ericsson's understanding of the claim, that the rule should be set up between the sender and the receiver, using control signaling.[87] Dr. Kakaes does not provide any alternative claim construction for the term "making an agreement on a rule," and it is clear that the intrinsic evidence supports Ericsson's understanding of the term.

170.   The prosecution history also does not preclude the term "making an agreement" from including the receipt and acknowledgement of a configuration by the handset. In fact, Morelli suggests a different solution, very distant from both the solution in P21787 and the 4G standard based on explicit signaling to change mode. Morelli discloses using an "existing receive-signal-strength-indicator (RSSI) signal and/or one or more properties of an incoming signal to control power provided to portions of the circuitry in the receiver to switch the receiver between an active

---

[86] EX-4410 (U.S.8,180,408) at 3:9-11.

[87] *Id.* at 5:52-54 ("This can be done either in the network or in the terminal (or even both), depending on the nature of the control signaling defined to setup the sleep rules.").

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

mode and a sleep mode."[88]

171.   Thus, Morelli does not disclose setting up the sleep rules the way the P21787 family claims. The prosecution history that Dr. Kakaes cites also clearly shows the distinction between Morelli and the patented technology is the "rule" part of the claim term. This citation states that since there is no <u>rule</u> in Morelli, there certainly is no <u>agreement on a rule</u>. This statement does not redefine the word "agreement" or narrow it in the way Dr. Kakaes suggests.

172.   In his second argument, Dr. Kakaes states that TCL does not direct or control the performance of the "making" and "said sender agrees" claim elements. However, I understand from my colleague, Evelyn Chen, that the "directs or controls" test that Dr. Kakaes relies upon is not the only criteria to prove that one party can be held responsible for direct infringement for the actions of others.  As a result, just because the identified claim is not entirely practiced at the handset, does not mean that TCL is not enjoying the benefits realized by the claimed invention as explained by Ms. Chen.

173.   In addition, Dr. Kakaes's "direct or control" argument is incorrect. The full claim element reads: "wherein, <u>during said inactive time instants</u>, said receiver is not listening for signaling from said sender and <u>said sender agrees not to send packets to the receiver</u>, whereby less power is consumed during said inactive time instants." The language "sender agrees not to send packets to the receiver" does not need to be implemented in an infringing receiver. The step "making an agreement" is implemented in the receiver, and the agreement or rule is characterized by "inactive time instants" during which a sender does not send packets as claimed.  In essence, the claim requires agreeing to a rule, which has some characteristics, and this claim element provides information about those characteristics.  So long as a handset does, in fact, agree to a rule with such characteristics, it meets the claim

---

[88] EX-5429 (Morelli) at 3:38-44.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   limitation.  The handset itself does not have to set the characteristics to practice the

2   elements of the claim. As a result, the claim, as properly interpreted, is essential to

3   the 4G standard.

4   **12.    P22430**

5   174.   The twelfth patent family is the P22430 patent family.  It relates to a

6   more granular way to indicate buffer status levels in the handset. The handset

7   includes a number of buffers for different kinds of data packets. For example, as

8   mentioned above, data packets can have different quality of service or priority

9   levels because some data cannot be delayed (e.g., control plane signaling, voice

10   data), while other data can tolerate some delays (e.g., emails or text messages). The

11   handset's data will go into different buffers depending on what priority level the

12   data has. For example, control plane signaling could be set with the highest priority

13   followed by voice data. Video and web surfing data go into a buffer that is for

14   moderate priority data, and emails and text messages go into a buffer for the lowest

15   priority data. Other configurations can of course also be applied.

16   175.   The P22430 patent family seeks to find a balance between buffer

17   reporting accuracy and overhead caused by buffer reporting.  The need for accurate

18   information of the uplink resource is particularly important in 4G, since the 4G

19   channels carrying data are scheduled by the base station.  While it is often true that

20   data resides only in one buffer, it is necessary at times to offer information about

21   additional buffers that contain data. This is particularly true if there is some higher-

22   priority data arriving to the buffer.  Ericsson's patented solution provides a more

23   efficient mechanism to allow several buffers to send their status level information

24   without significantly increasing signaling overhead.

25   176.   Ericsson provided a claim chart to TCL that outlines precisely where

26   the claimed elements of claim 1 of each of U.S. 8,243,666, EP 2,030,380, CN

27

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

101473604B, and JP 4,903,861 are practiced by the 4G standard.[89] Dr. Kakaes disputes that the P22430 patent family is essential to 4G, making a variety of mistakes that I explain below.

177.   Dr. Kakaes makes one argument to support his conclusion that none of these claims are essential to 4G. He argues that the 4G standard does not require the following claim limitation: "encoding buffer fill levels, Bk, for each radio bearer or said group of radio bearers k into N bit fields, wherein each of the 2N possible values for Bk is mapped to a buffer fill level interval." In particular, he argues that the claimed "buffer fill level interval" cannot include zero (0), and the 4G standard does not infringe because one of the buffer fill intervals is zero as shown in his appendix below:

---

[89] EX-5140, EX-5138, EX-5137, EX-5139; EX-5430 (U.S. 8,243,666); EX-5431 (EP 2,030,380); EX-5432 (CN 101473604B); EX-5433 (JP 4,903,861).

The essentiality ranking for Claim 1 is 3 because practicing the 4G standard with user equipment does not require at least the following limitations of the claim under any reasonable interpretation: "encoding buffer fill levels… wherein each of the… possible values… is mapped to a buffer fill level interval." In particular, the standard indicates that the buffer size level for index = 0 is BS = 0, which is not an interval. Therefore, "each" of the possible values is not mapped to a buffer fill level "interval."

Ericsson states in a comment: "…are encoded into 6 bits fields that are mapped onto 64 (2^6) possible buffer fill level intervals." (See ERIC_TCL00192498). However, this conclusory statement is demonstratively false by the very standard that Ericsson cites to

Table 6.1.3.1-1: Buffer size levels for BSR

| Index | Buffer Size (BS) value [bytes] | Index | Buffer Size (BS) value [bytes] |
|---|---|---|---|
| 0 | BS = 0 | 32 | 1132 < BS <= 1326 |
| 1 | 0 < BS <= 10 | 33 | 1326 < BS <= 1552 |
| 2 | 10 < BS <= 12 | 34 | 1552 < BS <= 1817 |
| 3 | 12 < BS <= 14 | 35 | 1817 < BS <= 2127 |
| 4 | 14 < BS <= 17 | 36 | 2127 < BS <= 2490 |
| 5 | 17 < BS <= 19 | 37 | 2490 < BS <= 2915 |
| 6 | 19 < BS <= 22 | 38 | 2915 < BS <= 3413 |
| 7 | 22 < BS <= 26 | 39 | 3413 < BS <= 3995 |
| 8 | 26 < BS <= 31 | 40 | 3995 < BS <= 4677 |
| 9 | 31 < BS <= 36 | 41 | 4677 < BS <= 5476 |
| 10 | 36 < BS <= 42 | 42 | 5476 < BS <= 6411 |
| 11 | 42 < BS <= 49 | 43 | 6411 < BS <= 7505 |
| 12 | 49 < BS <= 57 | 44 | 7505 < BS <= 8787 |
| 13 | 57 < BS <= 67 | 45 | 8787 < BS <= 10287 |
| 14 | 67 < BS <= 78 | 46 | 10287 < BS <= 12043 |
| 15 | 78 < BS <= 91 | 47 | 12043 < BS <= 14099 |
| 16 | 91 < BS <= 107 | 48 | 14099 < BS <= 16507 |
| 17 | 107 < BS <= 125 | 49 | 16507 < BS <= 19325 |
| 18 | 125 < BS <= 146 | 50 | 19325 < BS <= 22624 |

(See ERIC_TCL00192500).

As one can see, the value 0 is NOT mapped to an "interval" as the claim requires.

Thus the claim limitation of "encoding buffer fill levels… wherein *each of the… possible values*… is mapped to a buffer fill level interval" is not met, making this claim not essential to the 4G standard.

90

178.   Dr. Kakaes is incorrect. A buffer fill interval can be the value zero. Dr. Kakaes has pointed to nothing in the specification or prosecution history to suggest otherwise. In fact, he has pointed to nothing at all to support this claim construction. Regardless, in mathematics, intervals can have one number, and are then denoted as [a, a] or {a} to indicate that the interval contains (only) number a. Such an interval is called a "degenerate interval".

179.   Thus, all indexes of the 4G standard point to an interval, including the

---

90 Kakaes Opening Statement Appendix, EX-1639 at A-P22430_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    particular interval with one element indicating that the buffer is empty. The 4G

2    standard therefore practices this limitation. Each of the buffer interval levels

3    defined with an index number between 0 and 63 provides the buffer interval level.

4    For example, the index "1" designates that the buffer interval level is greater than

5    zero but less than or equal to 10 bytes as shown in the chart above. The P22430

6    family is therefore essential to the 4G standard.

7    **13.    P23034**

8    180.    The thirteenth patent family is the P23034 patent family. It relates to

9    security in the 4G standard and particularly to the encryption of messages between

10   the handset and the base station. Having strong security solutions in cellular

11   communication is absolutely vital, as the signal is literally "in the air" for anyone to

12   analyze. Still, the content transmitted over the air interface should not be open to

13   anyone except to the intended receiver. In other words, the messages must be

14   encrypted in a way that only the intended receiver can open them. To decrypt a

15   message, both the base station and handset need to know the keys and other input to

16   security that are used to encrypt  the original message. As discussed before,

17   sequence numbers are used as unique input to the encryption algorithm. However,

18   to maintain security, it is well known and  vital that every combination of inputs to

19   encryption is used only once, otherwise there is a risk that security could be

20   compromised. Sequence numbers have limited length, however. In case of a

21   sequence number roll-over (i.e., the sequence number starts over from "zero" again)

22   the same sequence number would be used again. This is not acceptable from a

23   security perspective.

24   181.    The patented technology creates an encryption solution that uses a

25   hierarchical approach of separating different levels of counters as input to the

26   encryption process.  By this patented method, it is possible to ensure that the input

27   to the encryption process is always unique without the need for frequent re-

28   authentication to generate new base keys, such as KASME in 4G. This result is

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  achieved by, in addition to the afore-mentioned packet sequence number, having a

2  state transition counter, handover counter, and overflow counter that interact as

3  claimed, and that are used as input to the algorithm for encrypting the signaling

4  messages.

5      182.  Ericsson provided a claim chart to TCL that outlines precisely where

6  the claimed elements of claim 1 of U.S. 8,879,736 are practiced by the 4G

7  standard.[91] Dr. Kakaes disputes that the P23034 patent family is essential to 4G,

8  making a variety of mistakes that I explain below.

9      183.  Dr. Kakaes makes one argument to support his conclusion of non-

10  essentiality. He argues that claim 1 of U.S. Patent No. 8,879,736 is not essential to

11  the 4G standard because the 4G standard does not require practicing the following

12  claim limitation:  "providing one or more outputs from the state transition counter,

13  the handover counter, and the third overflow counter as one or more inputs to a

14  crypto algorithm for encrypting RRC messages."  More specifically, Dr. Kakaes

15  argues that the "inputs"  identified as inputs to a crypto algorithm are not "outputs

16  from the state transition counter, the handover counter, or the third overflow

17  counter" as required by the claim language:

18

19  As Ericsson's claim chart makes clear, the "inputs" to the "crypto algorithm" are:

20  (1) KEY, (2) COUNT, (3) BEARER, (4) DIRECTION, and (5) LENGTH.

21  None of these 5 inputs are "one or more outputs" from: (a) the state transition counter,
and/or (b) the handover counter, and/or (c) the [third] overflow counter, as the claim
requires.

22

23  At best it can be argued that the COUNT (which is 32 bits as shown in the text portion
of the standard which is shown below) is a counter that is related to some of the claimed
counters, but the three required inputs (by the claim) are not present in the standard. [92]

24

25      184.  I note that Dr. Kakaes does not disagree that (a) the claimed  "state

26

27  [91] EX-5209; EX-5434 (U.S. 8,879,736).

28  [92] Kakaes Opening Statement Appendix, EX-1639 at A-P23034_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

transition counter" is the NAS COUNT in the 4G standard, (b) the claimed "handover counter" is the "Next Hop Chaining Counter" or "NCC" in the 4G standard, or (c)  the claimed "overflow counter" is the "Hyper Frame Number" or "HFN" in the 4G standard. Instead, Dr. Kakaes suggests that the outputs of one or more of these counters is not input to the crypto algorithm. Dr. Kakaes's position appears meritless, and Ericsson explicitly shows in its claim chart that the counters (a) NAS COUNT, (b) NCC, and (c) HFN are all inputs to the crypto algorithm as claimed. It seems Dr. Kakaes ignores this proof.

185.   As shown in Ericsson's claim chart, the handset uses the (a) NAS COUNT and (b) NCC  as input to determine the key that is used for encryption of signaling messages (KRRCenc), which is the key "(1) KEY" cited by Kakaes (and in the chart).

Regarding NAS COUNT it is seen from the following excerpt from the chart:

| |
| --- |
| [Ericsson comment: The UE generates KRRCenc from the key KeNB. The UE uses the NAS Uplink COUNT (the output of the "state transition counter") as an input to derive the KeNB from Kasme.] |
| [2] 6.2  EPS key hierarchy |

[. . .]
Keys for RRC traffic:
[. . .]

- $K_{RRCenc}$ is a key, which shall only be used for the protection of RRC traffic with a particular encryption algorithm. $K_{RRCenc}$ is derived by ME and eNB from $K_{eNB}$ as well as an identifier for the encryption algorithm using the KDF as specified in Annex A.

[2] A Annex A (normative):

Key derivation functions

[. . .]

A.3    KeNB derivation function

When deriving a KeNB from KASME and the uplink NAS COUNT in the UE and the MME the following parameters shall be used to form the input S to the KDF:

- FC = 0x11,

- P0 = Uplink NAS COUNT,

- L0 = length of uplink NAS COUNT (i.e. 0x00 0x04)

The input key shall be the 256-bit KASME.
This function is applied when cryptographically protected E-UTRAN radio bearers are established and when a key change on-the-fly is performed.

Regarding NCC, it is seen from the following two excerpts:

> *[Ericsson comment: Additionally, the UE uses the NCC (the output of the "handover counter") to determine which KeNB to use to derive the KRRCenc. Hence, all counters are used as inputs to the algorithm for encrypting RRC messages.]*

[93]

> *[Ericsson comment: The "second group of events" corresponds to X2 handovers and S2 handovers involving the UE.   For example, when the UE is involved in an S1 handover, the UE increments the NCC and resets the HFN counter. (NOTE: The NCC is called nextHopChainingCount in the TS 36.331, but it is the same parameter as NCC in TS 33.401.)]*
>
> **[2] 7.2.8 Key handling in handover**
>
> **[2] 7.2.8.4 Key derivations during handovers**
>
> **[2] 7.2.8.4.3 S1-Handover**
>
> When an S1-handover is performed, the source eNB shall not send any keys to the MME in the S1 HANDOVER REQUIRED message.
>
> Upon reception of the HANDOVER REQUIRED message the source MME shall increase its locally kept NCC value by one and compute a fresh NH from its stored data using the function defined in Annex A.4.
>
> **[1] 5.3.1.2 Security**
>
> AS security comprises of the integrity protection of RRC signalling (SRBs) as well as the ciphering of RRC signalling (SRBs) and user data (DRBs).
> RRC handles the configuration of the security parameters which are part of the AS configuration: the integrity protection algorithm, the ciphering algorithm and two parameters, namely the *keyChangeIndicator* and the *nextHopChainingCount*, which are used by the UE to determine the AS security keys upon handover and/ or connection re-establishment.
> […]

And, as cited from TS 33.401, the hierarchy for key chaining and required input is illustrated as follows:

---

[93] EX-5209.



**Figure 7.2.8.1-1 Model for the handover key chaining**

94

186.   Finally, Ericsson's claim chart shows that (c) HFN is included in "(2)
COUNT", as also seen from the excerpt from the chart below:



95

----

94 EX-5425 (3GPP TS 33.401) at Figure 7.2.8.1-1.

95 EX-5209.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

187.   Thus, I find no basis for Dr. Kakaes's allegations that the claim would not be essential. The P23034 family is therefore essential to the 4G standard.

### 14.   P23563

188.   The fourteenth patent family is the P23563 patent family. It relates to a solution where the handset is instructed to perform its neighbor cell measurements over a particular bandwidth. In telecommunication systems, network coverage is split into "cells." Communication in a cell is controlled by a base station, which the handsets connect to in order to connect to the network. As discussed previously, when a handset moves from one cell to another it is called "handover." In general, handsets are required to perform measurements on the neighboring cells. These measurements include, for example, signal strength and timing measurements. These measurements are reported by the handsets back to the network and are used for making handover decisions and geo-location, among other things. For example, the handsets provide these reports so the system can make an intelligent decision to have the handset's connection be "handed over" to a neighboring cell when that cell appears to be better for that particular handset.

189.   In prior systems, such as 2G and 3G, the handset would make neighboring cell measurements over the entire bandwidth. The reason for measuring the entire bandwidth is because in these earlier technologies, the channel is only sent over one bandwidth in all the cells (200 kHz in 2G and 5 MHz in 3G). However, one requirement of 4G was to enable the technology over different cell bandwidths, since operators need to be able to use the 4G technology in different fragmented spectra. An operator does not necessarily have a 20 MHz available and might need to aggregate carriers (e.g., 2 x 10 MHz) of narrower bandwidth to achieve the desired performance.  Several transmission bandwidths are possible, including 1.4 MHz, 3 MHz, 5 MHz, 10 MHz, 15 MHz, and 20 MHz. The patented technology takes this difference into account and creates an efficient way for handsets to make neighboring cell measurements. More specifically the P23563

patent family relates to a system in which the handset receives a message from the base station telling the handset which bandwidth to measure. The handset then performs the requested measurements and sends the measurement information back to the network via the base station. This is important for ensuring that these measurements are consistently made, even where the different cells might operate in different bandwidths.  This ensures consistent reporting, and enables the network to make smart handover decisions.  The issue of having cells with different bandwidths is illustrated in TS 36.300, scenarios B, C, D and E:



Figure 10.1.3-1: Inter and Intra-frequency measurements scenarios

190.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of U.S. 8,503,942 and claim 11 of CN 101595746 are practiced by the 4G standard.[97] Dr. Kakaes disputes that the P23563 patent family is essential to 4G, making a variety of mistakes that I explain below.

191.   Dr. Kakaes makes one argument to support his conclusion. In

---

[96] EX-5418 (TS 36.300 V8.12.0) at Figure 10.1.3-1.

[97] EX-366 and EX-5146.

particular, he argues that the essentiality of the claims depends on the claim construction of "an indication of a variable sized common measurement bandwidth."[98] Dr. Kakaes argues that the proper construction of the phrase is "a value of a variably sized common measurement bandwidth."[99] Dr. Kakaes then appears to argue that a handset can choose to determine RSRP over a smaller bandwidth than the signaled allowed bandwidth. It seems Dr. Kakaes argues that a handset that does not measure for RSRP over the whole maximum allowed measurement bandwidth will not use the claimed method.

192.   Dr. Kakaes gives no justification for his claim construction. He cites no portions of the specification of prosecution history; he cites no evidence whatsoever. In fact, there is no reason to limit the claim element "an indication of a variable sized common measurement bandwidth" to "a value of a variably sized common measurement bandwidth." The patent specification states that "the network can signal any suitable measurement bandwidth parameter that would ensure that UE measurements one according to this parameter[] are consistent from different cells." U.S. 8,503,942 at 4:60-64.[100] As a result, the base station does not have to send a "value," it can send "any suitable parameter." Dr. Kakaes's claim construction is wrong.

193.   Further, Dr. Kakaes is wrong that a handset measuring a subset of the common bandwidth does not infringe the claims. The claims do not require the handset to measure over the whole maximum allowed measurement bandwidth. Therefore, a UE that would choose to measure a subset of resource blocks within the AllowedMeasBandwidth would infringe the claim limitation "performing measurements on each of the neighbor cells over the common measurement

---

[98] Kakaes Opening Statement Appendix, EX-1639 at A-P23563_4G.
[99] Id.
[100] EX-4414.

1  bandwidth." This is because measuring a subset of the common measurement

2  bandwidth is still measuring "over the common measurement bandwidth" as

3  required by the claim language.

4      194.   Finally, even if Dr. Kakaes' argument were correct (i.e., that a solution

5  where a handset would measure "over the […] bandwidth" but not "over the whole

6  […] bandwidth" would be a non-infringing alternative), it is incomplete. Ericsson's

7  claim chart shows that two different measurements—RSRP and RSRQ—practice

8  Ericsson's P23563 patented technology, as shown in Ericsson's claim chart below:

| US8503942B1<br>(Internal ref: P23563US1) | **STANDARD SPECIFICATIONS:**<br>[1] 3GPP TS 36.214 V.8.7.0; Evolved Universal Terrestrial Radio Access (E-UTRA); Physical layer – Measurements (Release 8)<br>[2] 3GPP TS 36.331 V.8.15.0; Evolved Universal Terrestrial Radio Access (E-UTRA); E-UTRA Radio Resource Control (RRC) Protocol Specification (Release 8)<br>[3] 3GPP TS 36.133 V.8.15.0; Evolved Universal Terrestrial Radio Access (E-UTRA); Requirements for support of radio resource management (Release 8) |
|---|---|
| 1. A method in a user equipment for performing downlink measurements on a plurality of neighbor cells according to a received measurement configuration, the method comsprising: | *[Ericsson comment: An LTE user equipment (UE) performs downlink measurements including Reference Signal Received Power (RSRP) and Reference Signal Received Quality (RSRQ) measurements. As explained further below, the UE performs the measurements according to configuration information received from the network via an RRCConnectionReconfiguration message. The measurements are performed on intra-frequency, inter-frequency and inter-RAT neighbour cells, i.e. on a plurality of neighbour cells.]* |

101

15      195.   Dr. Kakaes only challenges the essentiality for RSRP. In particular, he

16  refers to TS 36.214 section 5.1.1, that includes a note for RSRP measurements that

17  leave it up to the handset implementer to decide over how many resource blocks

18  within the AllowedMeasBandwidth that the handset considers when performing the

19  RSRP measurements:

---

101 EX-5148.

### 5.1.1 Reference Signal Received Power (RSRP)

| Definition | Reference signal received power (RSRP), is defined as the linear average over the power contributions (in [W]) of the resource elements that carry cell-specific reference signals within the considered measurement frequency bandwidth.<br><br>For RSRP determination the cell-specific reference signals $R_0$ according TS 36.211 [3] shall be used. If the UE can reliably detect that $R_1$ is available it may use $R_1$ in addition to $R_0$ to determine RSRP.<br><br>The reference point for the RSRP shall be the antenna connector of the UE.<br><br>If receiver diversity is in use by the UE, the reported value shall not be lower than the corresponding RSRP of any of the individual diversity branches. |
|---|---|
| Applicable for | RRC_IDLE intra-frequency,<br>RRC_IDLE inter-frequency,<br>RRC_CONNECTED intra-frequency,<br>RRC_CONNECTED inter-frequency |

Note1: The number of resource elements within the considered measurement frequency bandwidth and within the measurement period that are used by the UE to determine RSRP is left up to the UE implementation with the limitation that corresponding measurement accuracy requirements have to be fulfilled.

[102]

196.   However, he cannot make the same argument for RSRQ, which is also a mandatory measurement that the handset must implement. Notably the same specification (TS 36.214) section 5.1.3 does not include any such comment for RSRQ:

Release 8                                    8                        3GPP TS 36.214 V8.7.0 (2009-09)

### 5.1.3 Reference Signal Received Quality (RSRQ)

| Definition | Reference Signal Received Quality (RSRQ) is defined as the ratio $N \times$RSRP/(E-UTRA carrier RSSI), where $N$ is the number of RB's of the E-UTRA carrier RSSI measurement bandwidth. The measurements in the numerator and denominator shall be made over the same set of resource blocks.<br><br>E-UTRA Carrier Received Signal Strength Indicator (RSSI), comprises the linear average of the total received power (in [W]) observed only in OFDM symbols containing reference symbols for antenna port 0, in the measurement bandwidth, over $N$ number of resource blocks by the UE from all sources, including co-channel serving and non-serving cells, adjacent channel interference, thermal noise etc.<br><br>The reference point for the RSRQ shall be the antenna connector of the UE.<br><br>If receiver diversity is in use by the UE, the reported value shall not be lower than the corresponding RSRQ of any of the individual diversity branches. |
|---|---|
| Applicable for | RRC_CONNECTED intra-frequency,<br>RRC_CONNECTED inter-frequency |

[103]

---

[102] EX-5435 (TS 36.214) V8.7.0 § 5.1.1

[103] *Id.* at § 5.1.3.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

197.   Signal Power (RSRP) may potentially be estimated with a sufficient accuracy without measuring on all blocks, as frequency selective fading within a band may not be that prominent, particularly within narrower bands. However, Signal Quality (RSRQ) cannot be estimated without sampling the whole band, as interferers might influence the quality of only a subset of the carrier frequencies. While signal power (RSRP) may be estimated from a subset of resource blocks, quality (RSRQ) must be evaluated over all relevant resource blocks. Thus, RSRQ measurements must be performed over the bandwidth as signaled by the network. Therefore, the P23563 patent family is essential to the 4G standard.

### 15.   P23985

198.   The fifteenth patent family is the P23985 patent family. It relates to a solution that relates to the interplay between Discontinuous Reception and Transmission (DRX) and Hybrid Automatic Repeat reQuest (HARQ). It enables the handset to save power while the handset is waiting for an HARQ retransmission. As I described with respect to an earlier patent family, DRX means that the handset can reduce power consumption by disengaging the receiver at times when no transmissions are expected by not constantly monitoring for assignments on the downlink control channel (PDCCH).

199.   In HARQ, the handset sends a negative acknowledgement (NACK) to the base-station if the handset was unable to correctly decode the received information. In response, the base-station re-sends the information. This re-transmission can occur after a certain amount of time, as it takes time for the NACK to be decoded in the base station, and for the re-transmission to be scheduled. The inventors realized that this delay can offer the handset an opportunity for discontinuous reception until the re-transmission is expected.

200.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of U.S. 8,675,568 are practiced by the 4G

1    standard.[104] Dr. Kakaes disputes that the P23985 patent family is essential to 4G,

2    making a variety of mistakes that I explain below.

3         201.   He makes one main argument for non-essentiality, suggesting that the

4    claim element "non-listening state," when "properly" construed, is not practiced by

5    the 4G standard. Dr. Kakaes starts by suggesting the essentiality of the claim

6    depends on the proper claim construction of "non-listening state." However, he

7    gives no construction for this term, nor does he cite any evidence to support any

8    supposed construction. As an initial matter, Ericsson's construction of the term

9    "non-listening state" is consistent with the patent specification, which states that the

10   "non-listening state" is "a state during which the UE [handset] does not listen for

11   data from its controlling node."[105]

12        202.   This is the extent of Ericsson's claim construction—that "non-listening

13   state" means "a state during which the UE [handset] does not listen for data from its

14   controlling node."  Ericsson does not suggest, as Dr. Kakaes argues, that "non-

15   listening" would relate to a specific HARQ process. Dr. Kakaes's argument does

16   not make sense as a technical matter. A handset cannot limit its listening to a

17   specific HARQ process; listening or not listening is purely associated with the

18   PDCCH channel, as this is scheduling "data from its controlling node." Since

19   HARQ in the downlink is asynchronous, it is not possible for a handset to apply a

20   "not listening for the corresponding HARQ process".  The claim is therefore

21   infringed as properly construed, as demonstrated in Ericsson's claim chart.

22        203.   Dr. Kakaes next argues that claim 1 of U.S. 8,675,568 is not essential

23   to the 4G standard because the 4G standard does not include a "non-listening state"

24   as "properly" construed as shown below:

25

26   _____

27   [104] EX-5150.

     [105] EX-4417 (U.S. 8,675,568) at 2:39-43.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> The construction of "non-listening state" implied by Ericsson's alleged read on the standard would include "not listening for the corresponding HARQ process" as shown in the above portion of the standard from Ericsson's claim chart. This is inconsistent with Ericsson's own statement that "The 'listening state' corresponds to the state of the UE during Active Time, when the UE listens for data from the controlling node on the PDCCH. The 'non-listening state' corresponds to the state of a UE where the UE operates outside its Active Time."
> *See* ERIC_TCL00192843.
>
> Using Ericsson's mapping of "listening state" and "non-listening state" on to the standards, the claim is not essential, as the mechanism for controlling transition from one state to another is not consistent with the claim's requirement. Specifically, the standard discloses that the UE can be monitoring the PDCCH (i.e., "listening") if any of the following are true:
>
> - *onDurationTimer* or *drx-InactivityTimer* or *drx-RetransmissionTimer* or *mac-ContentionResolutionTimer* (as described in subclause 5.1.5) is running; or
>
> - a Scheduling Request sent on PUCCH is pending (as described in subclause 5.4.4); or
>
> - an uplink grant for a pending HARQ retransmission can occur and there is data in the corresponding HARQ buffer; or
>
> - a PDCCH indicating a new transmission addressed to the C-RNTI of the UE has not been received after successful reception of a Random Access Response for the preamble not selected by the UE (as described in subclause 5.1.4).
>
> 3GPP TS 36.321 V8.12.0 at pg. 28. Thus, the UE can be "listening" before the *HARQ RTT timer* expires, as shown by the portion of the standard shown below, in conjunction with the portion shown above:

106

---

[106] Kakaes Opening Statement Appendix, EX-1639 at A-P23985_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> - If the Short DRX Cycle is used and [(SFN * 10) + subframe number] modulo (shortDRX-Cycle) = (drxStartOffset) modulo (shortDRX-Cycle); or
>
> - if the Long DRX Cycle is used and [(SFN * 10) + subframe number] modulo (longDRX-Cycle) = drxStartOffset.
>
>   - start onDurationTimer.
>
> - during the Active Time, for a PDCCH-subframe, if the subframe is not required for uplink transmission for half-duplex FDD UE operation and if the subframe is not part of a configured measurement gap.
>
>   - monitor the PDCCH;
>
>   - if the PDCCH indicates a DL transmission or if a DL assignment has been configured for this subframe:
>
>     - start the HARQ RTT Timer for the corresponding HARQ process;
>
>     - stop the drx-RetransmissionTimer for the corresponding HARQ process.
>
>   - if the PDCCH indicates a new transmission (DL or UL):
>
>     - start or restart drx-InactivityTimer.
>
> In short, the transition to the Active Time can occur due to the starting (or restarting) of either the "onDurationTimer" or the "drx-InactivityTimer" and the limitation "the UE resides in the non-listening state between a time of transmission of the NACK and a time when a downlink retransmission of the data from the controlling node is expected" is not met.
>
> Ericsson's attempt to expand the scope of the claim by changing the meaning of "non-listening state" is both wrong and inconsistent with Ericsson's own claim chart. [107]

204.   Dr. Kakaes's analysis is flawed for several reasons. Dr. Kakaes takes the fact that Ericsson's claim only reads on certain situations in the standard, and confuses that with a construction of claim elements. There are multiple timers and criteria in the 4G standard that govern the DRX of the handset, and the process described by this claim is used in a certain subset of situations. The fact that other situations exist, that do not infringe the claim, do not render the claim non-essential.

205.   Rather, infringement occurs inevitably when a handset complies with the 4G standard as described by the technical specifications. The claim come into use for example, when only a relatively small amount of data is sent to the handset, and a single grant for a HARQ process is allocated, and the onDurationTimer is not initiated due to a periodic DRX listening event.  Regardless of whether infringement occurs every time a NACK is sent, infringement inevitably occurs based on the requirements of the standard. Therefore, the P23985 patent family is essential to the 4G standard.

---
[107] *Id.*

1

### 16.    P24557

2       206.    The sixteenth patent family is the P24557 patent family. The P24557

3   patent family relates to a frequency numbering scheme in systems using a plurality

4   of bands.  A frequency "band" may contain multiple frequency channels over which

5   communications may be transmitted.  A handset might use multiple frequencies,

6   depending on the mode in which it is operating, and the base station might instruct

7   the handset to use different frequencies. The unique identifiers are used in this

8   process, to make the handset aware of different/new frequencies and instruct the

9   handset to handover to another frequency.

10      207.    The patented technology includes a method for numbering radio

11  frequency channels in an efficient way that reduces overhead signaling. This

12  method allows consistency across different types of frequencies.

13      208.    Ericsson provided a claim chart to TCL that outlines precisely where

14  the claimed elements of claim 1 of U.S. 8,195,179 are practiced by the 4G

15  standard.[108] Dr. Kakaes disputes that the P24557 patent family is essential to 4G

16  and he makes one argument to support his conclusion of non-essentiality. He argues

17  that claim 1 of U.S. 8,195,179 is not essential to the 4G standard because the

18  handset does not perform the "assigning" in the claim limitations, as shown in the

19  excerpt from his appendix below:

20

21

22

23

24

25

26

27  _____

[108] EX-5158.

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
                CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> More specifically, the claim requires: (1) "assigning a global number to a primary frequency of a first band" and Ericsson does not point, and cannot point, to anything that requires the UE to perform said "assigning". Instead Ericsson states in a comment that "the UE receives/uses two frequency bands…"
>
> (See ERIC_TCL00192978).
>
> Receiving or using is distinct from assigning and nothing in the standards requires, or even allows, the UE to perform said "assigning".
>
> And (2) "assigning an in-band number to a secondary frequency within the at least the second frequency band." In an analogous manner to (1) above, Ericsson does not and cannot point to any such "assigning" being required of the UE. Instead, Ericsson comments that "Hence, **the UE is assigned** a local number or index for only channel/frequency in second band i.e. SCell." (emphasis added) [109]

209.   There are some patent families (discussed above) where Dr. Kakaes states the technology is not directed at a handset, and he is correct. Those patent families are not part of Ericsson's handset licensing portfolio, and I discussed them previously.  He is incorrect, however, about the P24557 patent family. First, Kakaes does not appear to dispute essentiality of the claim, as he does not contest that the claimed assignments are required by the standard. Dr. Kakaes only alleges that it is not the UE that performs the assigning steps. Thus, the remaining question is whether the essential claim limitations are implemented in the handset (or elsewhere) fully or in part, i.e., whether TCL's handsets are required to implement and comply with the standard such that it benefits from the invention.

210.   Looking at figure 4 and column 6, lines 26-47 of the '179 patent, it is clear that the handset can assign the concerned numbers to the frequencies as required by the claim:

---

[109] Kakaes Opening Statement Appendix, EX-1639 at A-P24557_4G.

110

The method according to the embodiments of the present invention may be implemented in an arrangement **400** associated with a radio base station or a UE as illustrated in FIG. **4**. As stated above, the actual frequency assignments are made by standardisation bodies, but both the radio base station and the UE needs to be aware of the specified assignments.

Accordingly, the arrangement **400** comprises means for assigning **401** a global number to a primary frequency of a first band based on knowledge of the available frequency bands. The global number is unique among at least the first frequency band and the global number is indicative of at least a second frequency band associated with the first frequency band. Furthermore, the arrangement **400** comprises means for assigning **402** an in-band number to a secondary frequency within the second frequency band. The means for assigning **402** an in-band number to a secondary frequency within the second frequency band may also be configured to assign a further in-band number to a further secondary frequency.

The present invention may be implemented as software in a computational unit in the base station and in the UE or as part of an ASIC (application specific integrated circuit) in the base station and in the UE.

111

---

[110] EX-4411 (U.S. 8,195,179) at Figure 4.

[111] *Id.* at 6:26-47.

211.   The patent makes it clear that the assigning occurs in software in the handset (as well as in the base station).

212.   The second assigning step ("assigning an in-band number") is also performed by the handset. Dr. Kakaes appears to argue that there is a difference between the phrase "is assigned" and the term "assigning" as used in the claim. He provides no explanation of the difference, or what his interpretation of "assigning" is such that it precludes infringement. However, it is clear from the specification that the phrase "is assigned" is synonymous with the claim term "assigning." For example, the Abstract states that "each frequency channel is assigned a primary (global) number and a secondary (in-band) number." In the summary of the invention, the specification states that "a global number to a primary frequency of a first band is assigned" and . . . [a]n in-band number is further assigned to a secondary frequency within the at least the second frequency band."[112] And in several places the specification states that the global number and in-band number are or may be "assigned."[113]Moreover, the fact that the in-band number is assigned in the first instance by an entity other than the handset does not preclude the handset from assigning the in-band number as required by the claims. In fact, that is what the specification contemplates as part of the patented invention. The frequency assignments are first assigned by the standards bodies.[114] However, the base station and handset a later responsible for assigning those numbers to themselves as well.[115] Ericsson's claim chart demonstrates this assignment by stating that the SCell short identity SCellIndex is assigned to the UE (handset). Said another way, the handset assigns the SCell short identity SCellIndex even though

_____

[112] EX-4411 (U.S. 8,195,179) at 2:57-63.

[113] *Id.* at 4:18-20; 4:30-31; 2:61-63; 5:32-35.

[114] *Id.* at 6:29-31 ("the actual frequency assignments are made by standardisation bodies, but both the radio base station and the UE [handset] needs to be aware of the specified assignments.").

[115] *Id.*

1  this information is assigned in the first instance by another entity. I therefore

2  disagree with Dr. Kakaes. The P24557 family is essential to the 4G standard.

### 17.    P25005

4  213.   The seventeenth patent family is the P25005 patent family. It relates to

5  a particular time alignment process to reduce interference in certain scenarios.

6  While radio signals are fast, it takes some time for a radio signal from a handset to

7  reach the base station. This propagation delay is therefore dependent on the distance

8  from the handset to the base station. Consequently, the handsets must implement

9  variable "timing offsets" so that transmissions from each handset, regardless of

10  distance to the base station, are received at the base station precisely at the expected

11  time-slot without the signal leaking over and interfering with the transmission of

12  some other handset. As the handset moves, the timing offset may have to be

13  adjusted.

14  214.   In 4G, the handset receives a timing offset during the Random Access

15  procedure. Random Access is used, for example, when a handset requests a

16  connection. However, Random Access can also be used by the handset for

17  requesting additional transmission resources, in which case the handset may already

18  be time-synchronized. In other words, the handset has a valid timing offset.

19  However, Random Access is subject to contention, meaning that the received time

20  alignment may actually have been intended for another handset. The inventors of

21  P25005 then realized that, for existing technologies an already time-aligned handset

22  could become improperly aligned through the Random Access procedure if it loses

23  this contention.

24  215.   The patented technology solves this problem by creating a solution

25  where the handset retains its original alignment after completing the random access

26  procedure.  The handset with a valid time-alignment will not use the timing

27  advance sent during the random access messaging process. Instead, it will continue

28  to use its previous timing advance value.

216.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 1 of both JP 4,870,838 and CN 101849366A are practiced by the 4G standard.[116] Dr. Kakaes disputes that the P25005 patent family is essential to 4G, making mistakes that I explain below.

217.   He makes one argument to support his conclusion of non-essentiality. In particular, Dr. Kakaes argues the claims are not essential to the 4G standard because the 4G standard does not require practicing the following claim limitation:"the user terminal (120, 130) uses (523, 534) the first timing advance value if the user terminal loses the contention based procedure, *i.e.* if the controlling node subsequently continues the initiated communication with another user terminal." In particular, Dr. Kakaes appears to think that Ericsson has construed the element above to mean: "the user terminal (120, 130) uses (523, 534) the first timing advance value" as can be seen below:

> In short, Ericsson in its claim chart and comment effectively changes the key limitation from:
>
> > the user terminal (120, 130) uses (523, 534) the first timing advance value if the user terminal loses the contention based procedure, i.e. if the controlling node subsequently continues the initiated communication with another user terminal.
>
> to:
>
> > the user terminal (120, 130) uses (523, 534) the first timing advance value.

[117]

218.   Ericsson has done no such thing. Ericsson has not rewritten the claim language; it is applied as written to the 4G standard as shown in Ericsson's claim chart below:

---

[116] EX-369 and EX-5169.

[117] Kakaes Opening Statement Appendix, EX-1639 at A-P25005_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| | |
|---|---|
| that the user terminal (120, 130) uses (523, 524) the first timing advance value if the user terminal loses the contention based procedure, i.e. if the controlling node subsequently continues the initiated communication with another user terminal. | *[Ericsson comment: The two "else"-clauses in [1] 5.2 refer to contention based RA. The last "else" clause corresponds to that the UE has a valid timing advance value (that is the "first" timing value). The "using the first timing advance value" corresponds to that in the last "else"-clause the UE ignores the "second" timing advance value. The UE goes through the last "else"-actions regardless of if contention is lost or won.]*

**[1] 5.2      Maintenance of Uplink Time Alignment**

The UE has a configurable timer *timeAlignmentTimer* which is used to control how long the UE is considered uplink time aligned [8].

The UE shall:

  -   when a Timing Advance Command MAC control element is received:

      -   apply the Timing Advance Command;

      -   start or restart *timeAlignmentTimer*;

  -   when a Timing Advance Command is received in a Random Access Response message:

      -   if the Random Access Preamble was not selected by UE MAC:

          -   [...]

      -   else, if the *timeAlignmentTimer* is not running:

          -   apply the Timing Advance Command;

          -   start *timeAlignmentTimer*;

          -   when the contention resolution is considered not successful as described in subclause 5.1.5, stop *timeAlignmentTimer*.

      -   else:

          -   ignore the received Timing Advance Command.

[...] |

118

219.   Dr. Kakaes does not seem to dispute that the handset uses the first timing advance value if the user terminal loses contention, as claimed.  As shown in the chart, if the "*timeAlignmentTimer*" is running, the handset already has a first timing advance value as required by the claim.  When the handset already has a valid first timing advance value, it will "ignore the received Timing Advance Command." Thus, the disputed claim element is practiced by a handset complying with the 4G standard.

220.   It appears that Dr. Kakaes tries to read the independent claim element more narrowly than its ordinary meaning.  While Dr. Kakaes does not appear to dispute that a compliant terminal uses the first timing advance value <u>if the user terminal loses contention</u> as the claim requires, he constructs an interpretation of the independent claim that would also define that the UE uses the first timing advance <u>if the user terminal wins contention</u>. But this is not the scope of the independent claim. In fact, this embodiment is introduced in dependent claim 4 (translated from

---

[118] EX-369; EX-5456 (3GPP TS 36.321 v8.11.0).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Japanese):

4. The method of claim 1, according to which (531) the user terminal uses the first timing advance value (TTA1) if the user terminal wins the contention based procedure.[119]

221.   While this embodiment in claim 4 is also essential to the standard, it is not correct by Dr. Kakaes to imply that it would be a limitation of independent claim 1, when it is not. This patent family is therefore essential to the 4G standard.

### 18.   P25949

222.   The eighteenth patent family is the P25949 patent family. It relates to how a handset can efficiently connect to different carriers when the network implements carrier aggregation. As I described previously, carrier aggregation enables aggregating multiple pieces of bandwidth together to create a larger (overall) amount of bandwidth available in the network. Aggregating multiple carriers is particularly beneficial for handsets that currently are in need of very high bit-rates. However, this need is typically intermittent, and engaging multiple receivers to continuously receive over multiple carriers will waste battery power if all carriers are not currently needed. Thus, the radio receivers of a handset tuned onto currently not needed carriers should be set into power conservation mode ("sleep mode").  However, there is also a need to activate additional carriers very quickly whenever needed, as this will enhance the user experience because data will traverse with maximum speed as quickly as possible.

223.   The patented technology provides a carrier activation mechanism, where the handset can prepare its front-end for multi-carrier reception based on a notification received from the base station.  This is achieved through a pre-determined activation delay, wherein this delay is sufficient for the handset to activate the receiver of the second carrier.

---

[119] EX-5436.

224.   Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 11 of EP 2,260,667 are practiced by the 4G standard.[120] Dr. Kakaes disputes that the P25949 patent family is essential to 4G, making a variety of mistakes that I explain below.

225.   He makes two main arguments to support his conclusion. The first is that Ericsson has not pointed to anything in the standard that meets the "first data part" claim element, and the second argument he makes is that since the 4G standard only practices Ericsson's patent in some scenarios, it is not essential.[121]

226.   With respect to the first argument, Dr. Kakaes argues that claim 11 of EP 2,260,667 is not essential because Ericsson has not pointed to anything in the 4G standard that practices the following claim element: "a first data part of the DL data is received over the first carrier, and after a predetermined delay, a second data part of the DL data is received over the second carrier, wherein the predetermined delay is an amount of time sufficient for the user equipment (220) to prepare to receive over the second carrier."[122]  Specifically, he alleges that the 4G standard does not require "wherein the predetermined delay is an amount of time sufficient for the user equipment (220) to prepare and receive over the second carrier."[123]

227.   This is wrong. Ericsson's claim chart does, in fact, show the mapping of the "predetermined delay" to the standard specification, as shown below:

---

[120] EX-5183; EX-5457 (EP 2,260,667)

[121] Kakaes Opening Statement Appendix, EX-1639 at A-P25949_4G.

[122] Id.

[123] Id.

| a first data part of the DL data is received over the first carrier, and after a predetermined delay, a second data part of the DL data is received over the second carrier, wherein the predetermined delay is an amount of time sufficient for the user equipment (220) to prepare to receive over the second carrier. | *[Ericsson comment: As shown above, the UE receives a first data part over the DL PCC of the PCell, and a second data part over the DL SCC of the activated SCell. The reception over the DL SCC is delayed at least 8 subframes, which is an amount of time sufficient to prepare to receive over the SCell.]*<br><br>**[4] 4.3    Timing for Secondary Cell Activation / Deactivation**<br><br>When a UE receives an activation command [8] for a secondary cell in subframe *n*, the corresponding actions in [8] shall be applied no later than the minimum requirement defined in [10] and no earlier than subframe n+8, except for the following:<br><br>-    the actions related to CSI reporting<br><br>-    the actions related to the *sCellDeactivationTimer* associated with the secondary cell [8]<br><br>which shall be applied in subframe *n*+8. |

124

228.   The claimed "pre-determined delay" is the amount of time specified in the 4G standard to prepare to receive data over the SCell. This mapping is consistent with the meaning of the term "predetermined delay" in EP 2,260,667. For example, paragraph 0029 of the patent states: "When data parts are to be transferred over non-anchor carriers, it is only necessary for the predetermined delay be at least as long as an amount of time the user equipment 220 needs to prepare to receive signals on that non-anchor carrier." Therefore, the predetermined delay is the time from the reception of the notification to the time when the handset is prepared to receive data on the non-anchor carrier (SCC). As a result, Ericsson does point to what it believes meets the "predetermined delay" claim element in the 4G standard, and provides further explanation in the comment section as well. After this predetermined delay, the handset can be scheduled to receive data also on the non-anchor carrier.

229.   With respect to his second argument, Dr. Kakaes appears to argue that subsequent SCells do not need to be activated over the PCell as the claim requires, i.e., once you have activated one SCell, you can activate subsequent SCells using the first SCell (instead of the PCell):

---

[124] EX-5183; EX-5437 (3GPP TS 36.213 V10.10.0).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> Specifically, the accused standards require that the PCell is used to send (from the base station) and receive (at the UE) notifications to use an SCell for data download, and assuming the data is already split by the base station, the UE receives the first part of the data over the PCell and the second part of the data over the SCell with some predetermined delay. More specifically, the standards specify the activation procedure for SCells. (3GPP TS 36.321 v.10.9.0, § 5.13.) This activation command, sent from the network and carried by the Activation/Deactivation MAC control element (*Id.*, § 6.1.3.8), must be received through the PCell for activating the first SCell, as the PCell is the only active connection between the network and the UE. As such, the activation of subsequent SCells (when there already is an active SCell) does not have to rely solely on the PCell. [125]

230.    However, activating a second SCell, via the first SCell requires that the first SCell has already been activated over the PCell, and infringement could only be avoided for subsequent SCells by this approach. But then, infringement has already occurred.  So even if Dr. Kakaes is correct that in his hypothetical scenario (where the activation of a second SCell would not require the claimed solution), the infringing activation of the first SCell has necessarily already occurred (so the hypothetical handset has already practiced the patent). With this example, Dr. Kakaes misses the point.  The 4G standard, of course, includes many different modes of operation.  Just because a claim is not infringed in one particular mode does not mean does not mean the claim is not infringed by other modes. In such a case, the claim is essential.  As described above, this claim is necessarily practiced when a first SCell is activated.

231.    Further, a handset must be prepared to activate all SCells by a notification on the PCell, where the base station decides where to send the notification.  So a handset cannot be configured to avoid infringement of this claim and still comply with the 4G standard, and the hypothetical scenario is also void.

232.    Dr. Kakaes also contends that Ericsson conflates receiving a part of the DL Data with Activation, and claims that these are not the same as shown in his appendix:

---

[125] Kakaes Opening Statement Appendix, EX-1639 at A-P25949_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> The standard specifies the timing for SCell activation and deactivation. (3GPP TS 36.213 v.10.10.0 § 4.3.) In particular, upon receiving an activation command for an SCell from the network, the UE activates the SCell within a specified time. Ericsson alleges that this delay in activation is equivalent to the asserted claim limitation reciting a delay in receiving "a second data part of the DL Data." However, Ericsson conflates receiving a part of the DL Data with Activation. However, these are not the same. Moreover, once the SCell is activated, the standards do not specify any timed transmission (downlink or uplink) over the SCell and the PCell. As a matter of fact, a UE may be scheduled over multiple serving cells simultaneously and the same C-RNTI applies to all serving cells. (*See* 3GPP TS 36.300 v.10.11.0 §§ 11.1 and 11.2.) [126]

233. This is incorrect. As shown in Ericsson's claim chart, the handset must, when the SCell is activated, monitor PDCCH for the SCell:

> The UE shall for each TTI and for each configured SCell:
> - if the UE receives an Activation/Deactivation MAC control element in this TTI activating the SCell, the UE shall in the TTI according to the timing defined in [2]:
>   - activate the SCell; i.e. apply normal SCell operation including:
>     - SRS transmissions on the SCell;
>     - CQI/PMI/RI/PTI reporting for the SCell;
>     - PDCCH monitoring on the SCell;
>     - PDCCH monitoring for the SCell.

[127]

234. Thus, after the claimed activation time, the handset must be prepared to receive DL data as scheduled using commands on the PDCCH by the base station, and the handset cannot avoid receiving the DL data by choice, and still comply with the standard. This patent family is therefore essential to the 4G standard.

### 19. P25990

235. The nineteenth patent family is the P25990 patent family. It relates to a solution of sending scheduling requests for requesting uplink resources. The

---

[126] Kakaes Opening Statement Appendix, EX-1639 at A-P25949_4G.

[127] EX-5183; EX-5438 (3GPP TS 36.321 V10.9.0).

"uplink" refers to the pathway for sending data from the handset to the base station. When the handset has information it wants to send to the base station, it can send a scheduling request to inform the base station's uplink scheduler that it needs uplink resources. It can either do this via a random access request, or on a dedicated resource allocated on a Physical Uplink Control Channel (PUCCH). Generally, the handset is allocated uplink resources based on its momentary needs, but 4G also includes a solution for pre-allocating periodically occurring transmission resources. Such allocations can be useful for voice calls, as the pattern of the information that needs to be transmitted follows a fairly stable pattern.

236. The problem solved by the patent occurs when the arrival of some data at the handset buffers require a scheduling request, while other data do not. For example, if the data is related to a voice call for which pre-allocated resources exist, it would be superfluous to request additional resources, and such a request would only waste the additional resources that the base station would allocate.

237. In the claimed solution, the handset analyzes the data that is to be transmitted, and it is determining a logical channel group to which the data belongs, and based on the determination, the handset avoids sending a scheduling request if the logical channel group data corresponds to a data flow for which no scheduling requests should be sent.

238. Ericsson provided a claim chart to TCL that outlines precisely where the claimed elements of claim 21 of U.S. 8,582,514 are practiced by the 4G standard.[128] Dr. Kakaes disputes that the P25990 patent family is essential to 4G, making a variety of mistakes that I explain below.

239. He makes two arguments, both related to the term and the claim limitations associated with "logical channel group." First, Dr. Kakaes says that the 4G standard does not make a determination on a logical channel group basis, as

---

[128] EX-5185; EX-5439 (U.S. 8,582,514)

shown below in his appendix:

> First, the claim requires "determining a *logical channel group (LCG)*," and also requires that "the determined *LCG* is a second different *LCG*." (Emphasis added.) In other words, the determination must be made on the basis of logical channel groups. The standard accused in Ericsson's claim chart, on the other hand, provides that the channel requires masking on the basis of a "logical channel" and not on the basis of logical channel groups:
>
> **[1] 5.4.5 Buffer Status Reporting**
>
> [...]
>
> - else if a Regular BSR has been triggered:
>   - if an uplink grant is not configured or the Regular BSR was not triggered due to data becoming available for transmission for a logical channel for which logical channel SR masking (*logicalChannelSR-Mask*) is setup by upper layers:
>     - a Scheduling Request shall be triggered.
>
> [...]

129

> Additionally, for example, the *logicalChannSR-Mask* mask field is described as "[c]ontrolling SR triggering *on a logical channel basis* when an uplink grant is configured" (emphasis added):

| LogicalChannelConfig field descriptions |
| --- |
| *priority*<br>Logical channel priority in TS 36.321 [6]. Value is an integer. |
| *prioritisedBitRate*<br>Prioritized Bit Rate for logical channel prioritization in TS 36.321 [6]. Value in kilobytes/second. Value kBps0 corresponds to 0 kB/second, kBps8 corresponds to 8 kB/second, kBps16 corresponds to 16 kB/second and so Infinity is the only applicable value for SRB1 and SRB2 |
| *bucketSizeDuration*<br>Bucket Size Duration for logical channel prioritization in TS 36.321 [6]. Value in milliseconds. Value ms50 corresponds to 50 ms, ms100 corresponds to 100 ms and so on. |
| *logicalChannelGroup*<br>Mapping of logical channel to logical channel group for BSR reporting in TS 36.321 [6]. |
| *logicalChannelSR-Mask*<br>Controlling SR triggering on a logical channel basis when an uplink grant is configured. See TS 36.321 [6]. |

130

240.   In summary, Dr. Kakaes asserts that the 4G standard requires that a handset makes the relevant determinations on a logical channel basis instead of per logical channel group basis.

241.   Dr. Kakaes is incorrect.  Ericsson's claim chart clearly shows that the "determining" step is required by the standard, as the handset must determine the

---

129 Kakaes Opening Statement, EX-1639 at A-P25990_4G.
130 *Id.*

LCG associated with the data:

| - determining a logical channel group (LCG) associated with the detected data; | *[Ericsson comment: As part of deciding whether to trigger a scheduling request for detected transmission data, the UE must decide whether to first trigger a Buffer Status Report (BSR). To decide whether the detected data triggers a BSR, the UE must determine whether a logical channel associated with the detected data belongs to a logical channel group (LCG).]*<br><br>**[1] 5.4.5 Buffer Status Reporting**<br>[…]<br>A Buffer Status Report (BSR) shall be triggered if any of the following events occur:<br>- UL data, for a logical channel which belongs to a LCG, becomes available for transmission in the RLC entity or in the PDCP entity (the definition of what data shall be considered as available for transmission is specified in [3] and [4] respectively) and either the data belongs to a logical channel with higher priority than the priorities of the logical channels which belong to any LCG and for which data is already available for transmission, or there is no data available for transmission for any of the logical channels which belong to a LCG, in which case the<br>BSR is referred below to as "Regular BSR" |

131

242.   He also misreads the step from the claim, which states: "delaying transmission or not transmitting an uplink transmission scheduling request to the network if the determined LCG is a second different LCG," by not considering the claims own characterization of the second LCG data: "wherein the <u>second LCG data</u> corresponds to <u>a data flow</u> configured not to send a scheduled request." Thus, the claim language should be construed such that the data flow (such as a logical channel) is configured such that no scheduling request should be sent. In contrast to Dr. Kakaes's opinion, the claim does not per-se require that the second LCG be configured such that no scheduling request should be sent for all data flows of the group (even though it is a very likely configuration).  Therefore, the claim is essential, as stated.

243.   Dr. Kakaes's second argument relates to the "delaying" step, as can be seen below.

---

[131] EX-5185; EX-1438 (TS 36.321 V9.3.0).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

3GPP TS 36.331 v.9.3.0 § 6.3.1. Furthermore, the standard requires that a scheduling request be triggered under certain conditions, but does not require delay or preclude transmission of the scheduling request if the data corresponds to a second LCG (or even logical channel) configured in a certain way:

If the Buffer Status reporting procedure determines that at least one BSR has been triggered and not cancelled:

- if the UE has UL resources allocated for new transmission for this TTI:
  - instruct the Multiplexing and Assembly procedure to generate a BSR MAC control element;
  - start or restart *periodicBSR-Timer* except when the BSR is a Truncated BSR;
  - start or restart *retxBSR-Timer*.
- else if a Regular BSR has been triggered:
  - if an uplink grant is not configured or the Regular BSR was not triggered due to data becoming available for transmission for a logical channel for which logical channel SR masking (*logicalChannelSR-Mask*) is setup by upper layers:
    - a Scheduling Request shall be triggered.

3GPP TS 36.321 v. 9.3.0 § 5.4.5.

Thus, the claimed "delaying transmission or not transmitting an uplink transmission scheduling request to the network if the determined LCG is a second different LCG" is missing from the standard. Ericsson's claim chart provides no explanation of how this limitation maps to the standard. *See* ERIC_TCL105471.[132]

244.   I find no merit in Dr. Kakaes argument. He alleges that the standard does not preclude transmission of scheduling requests if the data corresponds to a logical channel configured in a certain way.  I understand his argument as stating that a handset maker can send a scheduling request in any way it chooses, even if it is outside of what is mandated by the 4G standard.

245.   Dr. Kakaes misunderstands the operation of the standard.  It appears that Dr. Kakaes is implying that the standard only defines the instances and conditions under which the handset <u>must</u> trigger a scheduling request, but that the standard would not prevent the handset from sending additional scheduling requests at any other time at the discretion of the handset maker.

246.   This is wrong and it is an incorrect reading of the standard. A 4G-compliant handset must strictly obey the specified conditions that define when

---

[132] Kakaes Opening Statement Appendix, EX-1639 at A-P25990_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    specific signals are to be sent. A 4G-compliant handset cannot arbitrarily decide to

2    send specified messages without obeying the conditions set forth by the 4G

3    standard. A consequence of sending scheduling requests at times when the standard

4    does not allow them could be that the base station would allocate uplink resources

5    that cannot efficiently be used, or that handsets would be allocated resources in an

6    unfair way.  The base station in its resource allocation must be able to trust that all

7    received scheduling requests are indications of events as specified in the standard.

8    The P25990 family is therefore standard essential.

9                    **20.    P27011**

10       247.   The twentieth patent family is the P27011 patent family. It relates to

11   controlling retransmissions in a synchronous hybrid ARQ system as used by a

12   terminal, giving the network better scheduling flexibility. Hybrid ARQ is a form of

13   ARQ where the retransmitted data is combined with the original transmission,

14   rather than simply replacing it as in conventional ARQ. Thus, HARQ combines re-

15   transmissions and error-correction coding to reduce the number of retransmissions,

16   reducing latency, and saving network resources.  HARQ is also useful for link-

17   adaptation, as it can facilitate opportunistic scheduling over a fading link, wherein

18   errors caused by fading are corrected by HARQ re-transmissions.

19       248.   Uplink HARQ re-transmissions are time-synchronous, which means

20   that re-transmissions occur at fixed and periodic time intervals after the original

21   transmission. To improve scheduling flexibility, the patent family therefore

22   discloses solutions for deferring such re-transmissions, such that only channel

23   quality information (CQI) is transmitted at the time when the re-transmission would

24   otherwise have been transmitted.

25       249.   Ericsson provided a claim chart to TCL that outlines precisely where

26   the claimed elements of claim 1 of EP 2,316,184 are practiced by the 4G standard.[133]

27   _____

28   [133] EX-5191; EX-5440 (EP 2,316,184).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

Dr. Kakaes disputes that the P27011 patent family is essential to 4G, making a variety of mistakes that I explain below.

250.   He makes one main argument based on the claim term "control message" and the "automatic deferring" responsive to the control message. More specifically, Dr. Kakaes argues that claim 1 of EP 2,316,184 is not essential because the 4G standard does not require practicing the claim element: "automatically deferring the synchronous HARQ retransmission to a second transmission interval, responsive to the control message."  As shown in his appendix below, Dr. Kakaes contends that there is no "control message" according to the claims, and, to the extent Ericsson points to a "control message," it does not cause any "automatic deferring."

> In particular, Ericsson fails to point out what, in Ericsson's opinion, is the claimed "control message". Ericsson provides a comment in which Ericsson states: "The UE receives information in the message that 'there is no transport block for the UL-SCH', and the data for the HARQ process may not be sent during the first transmission interval." In particular, Ericsson cannot point at any information that meets the requirement "automatically deferring the synchronous HARQ retransmission to a second transmission interval, responsive to the control message" In fact, there is no "automatic deferring", a "second transmission interval", and nothing that meets the limitation "responsive to the control message" and Ericsson does not appear to be pointing to anything that meets any one of these limitations.
>
> For the limitation "receiving a control message indication that data for the stop-and-wait HARQ process may not be sent during the first transmission interval" Ericsson appears to be pointing to the following possibility:
>
> For $29 \leq I_{MCS} \leq 31$, if $I_{MCS} = 29$, the "CQI request" bit in DCI format 0 is set to 1 and $N_{PRB} \leq 4$, then there is no transport block for the UL-SCH and only the control information feedback for the current PUSCH reporting mode is transmitted by the UE.
>
> (See ERIC_TCL00193420.)
>
> However, this message does not result in anything more than the UE not transmitting in the subframe corresponding to the one in which this message was received. Specifically, there is no "automatic deferring" to a second interval. Ericsson states in a comment: "In response to the control message containing zero grant (zero TBS), the UE defers retransmission to a second transmission interval." (*Id.*)
>
> However, nothing in the standards indicates such a "deferral", automatic or not and Ericsson does not point to anything that allegedly does. In fact there is no "automatic deferral". The network may, and likely will, at some future transmission interval allocate resources for the retransmission, but that is not an "automatic deferral", it is a future scheduling. It is also clear that there is no "second transmission interval" to which a (non-existent) "automatic deferral" deferred the transmission to. Lastly, clearly the "responsive to the control message" limitation cannot be met, since nothing more than a non-transmission occurs as a result of the claimed message.

[134]

251.   First, Dr. Kakaes is incorrect that Ericsson does not point to a "control message." The control message corresponds to DCI format 0 of PDCCH.  This can be seen below:

| receiving a control message indicating that data for the stop-and-wait HARQ process may not be sent during the first transmission interval; and | *[Ericsson comment: The UE further receives a control message corresponds to DCI format 0 on PDCCH. The UE receives information in the message that "there is no transport block for the UL-SCH", and the data for the HARQ process may not be sent during the first transmission interval. Thus, only control information is transmitted, as requested in the received control message.]* <br><br> **[3] 8 Physical uplink shared channel related procedures** <br><br> [...] <br><br> For TDD and normal HARQ operation, the UE shall upon detection of a PDCCH with DCI format 0 and/or a PHICH transmission in subframe *n* intended for the UE, adjust the corresponding PUSCH transmission in subframe *n+4* according to the PDCCH and PHICH information. <br> [...] <br><br> For TDD UL/DL configurations 1-6 and normal HARQ operation, the UE shall upon detection of a PDCCH with DCI format 0 and/or a PHICH transmission in subframe *n* intended for the UE, adjust the corresponding PUSCH transmission in subframe *n+k*, with *k* given in Table 8-2, according to the PDCCH and PHICH information |

[135]

--- 

[134] Kakaes Opening Statement Appendix, EX-1639 at A-P27011_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

252.   Second, the 4G standard performs the claimed "automatically deferring" based on that control message.  Dr. Kakaes states that the control message "does not result in anything more than the UE not transmitting in the subframe corresponding to the one in which this message was received."  Dr. Kakaes further argues that the standard does not require any "deferral", that there is no "second transmission interval," and that the "responsive to the control message" limitation cannot be met, since nothing more than a non-transmission occurs as a result of the claimed message.

253.   Dr. Kakaes is again incorrect. As shown in the chart, even if the handset receives a NACK message that would require it to perform a re-transmission, the handset must suspend/postpone/defer the re-transmission to a later (second) transmission interval. This deferring takes place responsive to the control message, i.e., to the DCI format 0 of PDCCH and when there is no transport block for UL-SCH and only control information can be sent, as can be seen in Ericsson's claim chart below.

| 8.6.2 | Transport block size determination |
|---|---|

[...]

For $29 \le I_{MCS} \le 31$, if $I_{MCS} = 29$, the "CQI request" bit in DCI format 0 is set to 1 and $N_{PRB} \le 4$, then there is no transport block for the UL-SCH and only the control information feedback for the current PUSCH reporting mode is transmitted by the UE.

[136]

254.   It appears that Dr. Kakaes construes the step "automatically deferring," to mean something like automatically re-transmitting [...] in a second interval, responsive to the control message, even though it is not the language of the limitation.  Deferring means postponing, and, as can be seen in the standard, the result of the control message is that the handset postpones the re-transmission but

---

[135] EX-5191; EX-1434 (TS 36.213 V8.8.0)
[136] EX-5191; EX-1434 (TS 36.213 V8.8.0)

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    sends a CQI report, as commanded by the control message. Therefore, this patent

2    family is essential to the 4G standard.

3        **21.    P29482**

4        255.    The twenty-first patent family is the P29482 patent family. It relates to

5    efficient scheduling requests when a handset has not yet been successful in any of

6    its requests. As I discussed previously, the "uplink" refers to the pathway for

7    sending data from the handset to the base station. When the handset has information

8    it wants to send to the base station, it can send a scheduling request to inform the

9    base station's uplink scheduler that it needs uplink resources. In early versions of

10   4G, when a handset sends such a "scheduling request" to the base station over the

11   Physical Uplink Control Channel (PUCCH), the request will be pending and re-

12   transmitted at every transmission opportunity until the request is cancelled, e.g.,

13   due to a response (in terms of a uplink grant) from the base station.

14       256.    However, this could result in excessive requests potentially resulting in

15   wasted grants. This problem is particularly relevant for short periodicities of

16   scheduling request opportunities, which were introduced in Release 9 of the 4G

17   specifications to reduce the latency of 4G.

18       257.    Ericsson's P29482 family solves this problem by preventing excessive

19   re-transmissions of the requests using a timer-based solution. With this solution, it

20   is possible to enable lower latency with fast requests and corresponding allocations

21   of uplink resources without having the aforementioned unwanted side effects. Re-

22   transmissions are still enabled by Ericsson's patented technology after timer expiry,

23   in the event that the original request was not successfully received.

24       258.    Ericsson provided a claim chart to TCL that outlines precisely where

25   the claimed elements of claim 1 of each of U.S. 8,543,125 and EP 2,449,844 are

26   practiced by the 4G standard.[137] Dr. Kakaes disputes that the P29482 patent family

27   ───────────────
[137] EX-5202 and EX-5199; EX-5441 and EX-5442 (U.S. 8,543,125, EP 2,449,844)

28

1  is essential to 4G, making a variety of mistakes that I explain below.

2  259.  He makes one main argument regarding essentiality by referring to an

3  opposition proceeding for the EP patent. In particular, Dr. Kakaes uses the EP

4  opposition proceeding to conclude that the 4G standard does not require the

5  following claim element: "prohibiting any further scheduling request retransmission

6  at future scheduling request opportunities while the scheduling request prohibiting

7  timer is running," as shown below in Dr. Kakaes's appendix:

EP Patent No. 2,449,844 ("the '844 Patent"), a foreign counterpart to the US '125 Patent, was subject to an Opposition proceeding at the European Patent Office. The EPO ultimately concluded that Claim 1 of the '844 Patent, which largely mirrors Claim 1 of the '125 Patent, is valid over the prior art because the claimed prohibiting step requires prohibiting only the retransmission of scheduling requests, and does not read on prohibiting the transmission of new scheduling requests. (July 13, 2015 Interlocutory decision in opposition proceedings, Patent No. EP-2,449,844, pp. 17–18[9] ("[T]he Opposition Division is of the opinion that in D2a any transmission of a scheduling request is prohibited, whereas claim 1 requires that retransmissions are prohibited. . . . D2a prohibits the transmission of new scheduling requests, not the retransmission of an already sent scheduling request. . . . The Opposition Division thus concludes that feature 1.8, in particular the prohibition of scheduling request retransmissions while the timer is running, is not disclosed in D2a. The subject-matter of claim 1 is therefore novel over the disclosure of Document D2a . . . .").)[138]

17  260.  In summary, Dr. Kakaes says that the U.S. patent claims should be

18  construed based on statements from the European counterpart patent. First of all, I

19  understand from Mr. Delgado that it is legal error to limit the construction of claim

20  terms by importing limitations from extrinsic evidence, in this case by asserting that

21  the European prosecution history would limit the claims of a United States patent.

22  261.  Second, Dr. Kakaes is wrong about how the standard works in arguing

23  that it does not practice Ericsson's patents. He suggests that the 4G standard does

24  not require the claimed "prohibiting of retransmissions of scheduling requests." As

25  can be seen above, the opposition division found that prohibiting re-transmissions

26  was patentable over prior art (D2a), since D2a prohibits the transmission of new

27  ─────────────────────────

[138] Kakaes Opening Statement Appendix, EX-1639 at A-P29482_4G.

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  scheduling requests, not the re-transmissions of an already sent scheduling request.

2  262.  Thus, since the *sr-ProhibitTimer* prohibits re-transmissions, the claim

3  is essential, and D2A did not disclose such prohibiting of re-transmissions,

4  according to the European Patent Office.

5  263.  Dr. Kakaes then argues that the standard does not describe any

6  prohibiting of re-transmissions:

7

8  In contrast to the claim, the standard requires a timer that prohibits the transmission of
   new SRs, and does not contemplate prohibiting the retransmission of previously
   transmitted SRs. (*See, e.g.*, 3GPP TS 36.321 v.9.4.0, § 5.4.4.)  Indeed, Ericsson's claim
   chart effectively attempts to read on the prior art by asserting that, in the standard, "As
   139

9

10

11  264.  This is incorrect, and it has been clearly shown in the claim chart that

12  such re-transmissions are indeed prohibited. This illustration will be repeated here

13  for the sake of completeness: As shown below in Section 5.4.4, the standard works

14  as follows: Initially, the handset has no data to transmit, and consequently no

15  pending scheduling requests (SR). Then, data arrives to the handset buffers, which

16  result in the triggering of a (new) scheduling request to request resources for a new

17  transmission (as shown in yellow below). Then, when a new scheduling request is

18  pending at the handset, it will check to see if it has a valid uplink resource

19  (PUCCH) on which to send the scheduling request (shown in green). It will also

20  check to make sure that the *sr-ProhibitTimer* is not running. Since this is a new

21  scheduling request and the timer is not running, the handset will use its first

22  PUCCH resource for SR available to transmit this new SR. This is good for latency

23  purposes.  Then, underlined after the handset sends out the new scheduling request, it will start

24  the *sr-ProhibitTimer* (shown in red). Once the *sr-ProhibitTimer* is started, then the

25  handset is instructed not to send any retransmissions during this time. But the SR

26  will remain pending until it is cancelled (yellow), and therefore the SR is re-

27  _____

28  139 *Id.*

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
            CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

transmitted in every PUCCH resource for SR unless the *sr-ProhibitTimer* is running (see green: "As long as one SR is pending […]").

---

### 5.4.4    Scheduling Request

The Scheduling Request (SR) is used for requesting UL-SCH resources for new transmission.

When an SR is triggered, it shall be considered as pending until it is cancelled. All pending SR(s) shall be cancelled and *sr-ProhibitTimer* shall be stopped when a MAC PDU is assembled and this PDU includes a BSR which contains buffer status up to (and including) the last event that triggered a BSR (see subclause 5.4.5), or when the UL grant can accommodate all pending data available for transmission.

If an SR is triggered and there is no other SR pending, the UE shall set the SR_COUNTER to 0.

As long as one SR is pending, the UE shall for each TTI:

- if no UL-SCH resources are available for a transmission in this TTI:

    - if the UE has no valid PUCCH resource for SR configured in any TTI: initiate a Random Access procedure (see subclause 5.1) and cancel all pending SRs;

    - else if the UE has a valid PUCCH resource for SR configured for this TTI and if this TTI is not part of a measurement gap and if *sr-ProhibitTimer* is not running:

        - if SR_COUNTER < *dsr-TransMax*:

            - increment SR_COUNTER by 1;

            - instruct the physical layer to signal the SR on PUCCH;

            - start the *sr-ProhibitTimer*

---

265.    In fact, 3GPP documentation of the addition of the *sr-ProhibitTimer* to the 4G standard makes clear that it is for preventing "unnecessary retransmissions by the UE."

---

| Reason for change: ⌘ | When a short SR period is configured or when running VoIP traffic, the SR can be retransmitted unnecessarily. To avoid unnecessary SR transmissions, an SR prohibit timer should be introduced to reduce the load on PUCCH. |
| --- | --- |
| Summary of change: ⌘ | Introduce an SR prohibit timer, *sr-ProhibitTimer*, configured by RRC. |
| Consequences if not approved: ⌘ | No possibility to prevent unnecessary SR retransmissions by the UE. |

[140]

---

266.    Thus, members of 3GPP understood that this Section 5.4.4 and the addition of the *sr-ProhibitTimer* is precisely for retransmissions, as claimed in Ericsson's P29482 patent family. Thus, it is clear that a 4G-compliant handset does

---

[140] EX-5443, CR 0410 in RP-091346.

1  "prohibit[] any further scheduling request retransmission at future scheduling

2  request opportunities while the scheduling request prohibiting timer is running," as

3  claimed in Ericsson's patents. The P29482 family is therefore essential to the 4G

4  standard.

5  **22.    P32205**

6  267.  The twenty-second patent family is the P32205 patent family relates to

7  4G carrier aggregation, i.e., to the solution where multiple carriers are aggregated

8  together in order to increase both bit-rates and resource allocation flexibility. Early

9  versions of 4G (Releases 8 and 9) support bandwidths of up to 20 MHz.  However,

10  the newest versions of 4G (Releases 10 and onward) are capable of supporting

11  bandwidths larger than 20 MHz through carrier aggregation.

12  268.  At a high level, this patent family relates to the process of adding

13  additional cells for aggregation by a handset, also in a situation where the terminal

14  cannot robustly detect the additional carrier. To enable heterogeneous cell

15  configurations that include both macro (large) and pico (small) cells, the system

16  may need to reduce the transmission power of certain signals in some cells (such as

17  certain broadcast signals), to prevent those signals from interfering with similar

18  signals of other cells. As a consequence, it may be difficult to detect those cells for

19  the handset and/or to receive certain parameters.

20  269.  To enable such heterogeneous cell configurations and carrier

21  aggregation, the invention provides a solution wherein the handset receives certain

22  parameters (e.g., cell identity) over the primary cell, and derives relevant physical

23  layer characteristics of a second cell (such as reference symbol mapping) to be

24  aggregated with the primary cell. As a consequence, carrier aggregation can be

25  established also when the handset cannot derive the physical layer characteristic

26  from information broadcast within the second cell.

27  270.  Ericsson provided a claim chart to TCL that outlines precisely where

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1   the claimed elements of claim 1 of EP 2,583,398 are practiced by the 4G standard.[141]

2   Dr. Kakaes disputes that the P32205 patent family is essential to 4G, making a

3   variety of mistakes that I explain below.

4       271.   His makes one argument to support his conclusion of non-essentiality:

5   that the claim term "required to establish communication," when "properly"

6   construed, is not practiced by the 4G standard. More specifically, Dr. Kakaes

7   argues that claim 1 of EP 2,583,398 is not essential to the standard when the claim

8   term "required to establish communication" is "properly" construed to mean "that

9   the derived physical layer characteristic is necessary to establish connectivity to the

10   second cell, i.e., connectivity to the secondary cell cannot be established without

11   the physical layer characteristic as derived based on the cell identity and number of

12   transmit antenna ports."

13       272.   Regarding Dr. Kakaes's claim construction, he misunderstands both

14   the claim language and omits the most relevant portions of the patent specification

15   in creating his construction. The relevant claim term for consideration is "at least

16   one physical layer characteristic that is required to establish communication." A

17   portion of the specification that Dr. Kakaes does not consider tells a person of

18   ordinary skill in the art exactly what these physical characteristics can be, as shown

19   below:

20

21

22

23

24

25

26

27

28

---

[141] EX-370.

1
2
3
4
5
6
7
8
9
10

> **[0062]** After having received the cell id and possibly other parameters over the first cell 970, the user equipment derives, 1050, at least one physical layer characteristic for the second cell 980, based on the parameters. The physical layer characteristics may be e.g. scrambling codes, reference signal configurations, or control signaling configurations. In particular, the cell identity may be used to derive the cell-specific reference signal configuration, DMRS, SRS, or MBSFN reference signal configuration, reference signal hopping pattern, PUSCH hopping pattern, downlink control channel configuration, uplink control channel configuration, and scrambling codes for PUSCH, PDSCH, and for L1/L2 control signalling. It is pointed out that it is well known in the art how to derive these characteristics, once the required parameters are known. Thus, this procedure will not be described in further detail in this disclosure. [142]

11   273.   The patent specification explicitly states that the reference signal

12   configuration can be the "physical layer characteristic that is required to establish

13   communication" as claimed.  As shown in Ericsson's claim chart, the handset is

14   required to derive the reference signal configuration. The handset is further required

15   by the standard to use the physical cell identity value (*physCellId-r10)* and the

16   number of transmit antenna ports (*antennaPortsCount*) received from the first cell

17   to derive the reference signal configuration. All of this is shown and commented in

18   great detail in the claim chart.[143] An example is shown below:

19
20
21
22
23
24
25
26

[142] EX-5444, EP 2,583,398 at ¶ 62.
[143] EX-370.

27
28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

> *[Ericsson comment: The "physical layer characteristic that is required to establish communication with the cell" corresponds to the mapping of CRS to resource elements. The UE shall add an SCell in accordance with the received information element radioResourceConfigCommonSCell (including the ID and number of antennas for the second cell). So the UE uses these parameters received from the first cell in order to derive the CRS mapping (see below) for the second cell. Thereby, the UE is enabled to receive data transmissions over the second cell without receiving the number of antenna ports from the second cell.]*
>
> **[1]** 5.3.5.3   Reception of an *RRCConnectionReconfiguration* not including the *mobilityControlInfo* by the UE
>
> [...]
>
> > 1> if the received *RRCConnectionReconfiguration* includes the *sCellToAddModList*:
> >
> > > 2> perform SCell addition or modification as specified in 5.3.10.3b;
>
> [...]
>
> **[1]** 5.3.10.3b SCell addition/ modification
>
> The UE shall:
>
> > 1> for each *sCellIndex* value included in the *sCellToAddModList* that is not part of the current UE configuration (SCell addition):
> >
> > > 2> add the SCell, corresponding to the *cellIdentification*, in accordance with the received *radioResourceConfigCommonSCell* and *radioResourceConfigDedicatedSCell*;
> >
> > > 2> configure lower layers to consider the SCell to be in deactivated state;
>
> *[Ericsson comment: Cell-specific RS are transmitted on one, two, or four antenna ports depending on the RRC-configured antennaPortsCount (see above). The mapping of the CRS to resource elements is derived based on the number of antenna ports, as well as on the cell id (see 6.10.1.2 below). The UE derives the mapping in order to detect CRS, otherwise the UE will not be able to demodulate data.]*

144

274.    Dr. Kakaes further contends that  cell identity of the SCell is not

required to establish connectivity to the SCell, based on the description of a specific

embodiment:

> Further, the specification further explains that:
>
> > Those skilled in the art will appreciate that cells configured on separate frequencies may sometimes use the same cell identity. In such cases, it may be unnecessary to explicitly signal this information to the mobile terminal, even if it is realized that a mobile terminal needs this information. Thus, according to one specific embodiment of this invention, if a terminal does not receive the newly defined information element "Cell ID of SCell", then it reuses the cell 10 from an already configured cell, either from the primary serving cell PCell or another configured secondary cell, e.g. from a second SCell that is used to convey system parameters for a first SCell. If a terminal, however, receives the information element "Cell ID of SCell" it will use this parameter to derive cell ID in the SCell.
>
> (EP 2583398. at para. 53.) Thus, the patent specification itself concedes that cell identity of the S-Cell is not ***required*** to establish connectivity to the SCell.

145

---

144 EX-370, EX-5445 (3GPP TS 36.331 V10.7.0).

145 Kakaes Opening Statement Appendix, EX-1639 at A-P32205_4G.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

275.   This argument seems to lack any relevance at all, as the required characteristic to establish communication is the claimed physical layer characteristic. The claim nowhere tells that the SCell is required to establish connectivity.  In the claimed embodiment, the received identity of the SCell must be used for deriving this physical layer characteristic, whereas in the embodiment cited by Dr. Kakaes, the handset uses the identity of an already configured cell, as they are using the same cell identity in this specific embodiment.

276.   Dr. Kakaes suggests that another (non-infringing) method available to the skilled person for establishing connection with the second cell is to use blind decoding to derive the required physical layer characteristic, without deriving it from parameters received from the first cell, as shown in his appendix below:

> If the claim is properly construed as set forth above, it is not essential to the 4G standard.  When a secondary cell (SCell) is added, the UE receives the RRC connection reconfiguration message from the eNB via the existing cell (the primary one or another existing SCell).  (3GPP TS 36.331 v. 10.7.0 § 5.3.5.1.)  This message contains the identifier for the new SCell and the number of antenna ports of the SCell. 3GPP TS 36.331 v. 10.7.0 § 6.3.2.)  When the SCell thus configured is activated in the MAC layer (3GPP TS 36.321, v.10.10.0, § 5.13), the UE applies normal SCell operation including CSI reporting for the SCell within a specified delay (3GPP TS 36.133, v.10.20.0 § 7.7.2). In order to report CQI (one component of CSI), the UE measures the carrier corresponds to the SCell (3GPP TS 36.133 v.10.20.0 § 8.3.3.2; 3GPP TS 36.214 v.10.1.0 § 5.1.1), which involves the knowledge of resource elements (REs) mapped to cell-specific reference signals (CRS).
>
> The "SCell ID" is used in the accused standard to derive the value of $v_{shift}$, which can have one of 6 values, namely 0, 1, 2, 3, 4, 5. (*See* 3GPP TS 36.211 v. 10.5.0 § 6.10.1.) However, a person of ordinary skill in the art would appreciate that the correct value can be derived, for example, by blind decoding methods.  Thus the SCell ID (i.e., the cell identity) is not required to establish connectivity to the secondary cell, as is required by the claim. [146]

277.   I agree with Dr. Kakaes that it could technically have been possible to use blind decoding to derive the relevant parameters directly from signals received in the SCell. This is also contemplated in section [0060] of the patent as an

---

[146] *Id.*

alternative solution, wherein the network would guide the handset to either use blind decoding, or to use the derivation now claimed.

278.   However, the 3GPP specifications do not allow the use of the blind-decoding alternative (because of the drawbacks blind detection could result in), and a 4G compliant handset cannot use Dr. Kakaes's suggested alternative.  The specification is clear that a compliant handset must derive the physical layer characteristics based on information received from the PCell:

[1] 5.3.10.3b SCell addition/ modification

The UE shall:

1> for each *sCellIndex* value included in the *sCellToAddModList* that is not part of the current UE configuration (SCell addition):

2> add the SCell, corresponding to the *cellIdentification*, in accordance with the received *radioResourceConfigCommonSCell* and *radioResourceConfigDedicatedSCell*;

2> configure lower layers to consider the SCell to be in deactivated state;

147

279.   As a final remark, I also note that Dr. Kakaes has changed the claim language by removing the term "communication" and replacing it with "connectivity" without any justification.  The claim language requires only that the handset "derive[e] (1050) at least one physical layer characteristic that is required to establish <u>communication</u> with the second cell."  As a result, the P32205 family is essential to the 4G standard.

### 23.   P33858

280.   The twenty-third and final patent family I will discuss is the P33858 patent family. It relates to the measuring of "reference signals" for the purposes of positioning, i.e., for determining the location of the handset.  In 4G, the handset measures the timing differences for downlink reference signals received from multiple distinct locations or neighboring cells, and based on such timing differences, the location can be calculated.  The timing difference is caused by the

---

[147] EX-370.

1   difference in propagation delay of the signals that are received by the handset.

2   281.   As mentioned before, 4G supports a variety of cell bandwidths. The

3   inventors of P33858 then realized that it could be problematic if the bandwidth of

4   the current serving cell is smaller than the bandwidth over which the positioning

5   reference signals are sent. Switching between the different reception bandwidths

6   could result in degradation of both the quality of serving cell data reception and the

7   reference signal measurements.

8   282.   To address these effects, the inventors found a solution that alleviates

9   these problems by receiving assistance data that indicates the reference signal

10  bandwidth of the positioning reference signals, but wherein the handset actually

11  measures the reference signals on the bandwidth of the serving cell, if the reference

12  signal bandwidth is larger than the serving cell bandwidth. To facilitate the

13  solution, the 3GPP accuracy requirements on the positioning measurements were

14  updated to accommodate this solution.

15  283.   Ericsson provided a claim chart to TCL that outlines precisely where

16  the claimed elements of claim 53 of U.S. 8,750,808 are practiced by the 4G

17  standard.[148] Dr. Kakaes disputes that the P33858 patent family is essential to 4G,

18  making a variety of mistakes that I explain below.

19  284.   He makes two main arguments to support his conclusion of non-

20  essentiality, namely (1) that the 4G standard does not require that the handset make

21  the measurements as claimed and (2) that the standard compares 3 bandwidths

22  instead of the 2 required by the claim. More specifically, Dr. Kakaes argues that

23  claim 53 of U.S. 8,750,808 is not essential because the 4G standard does not require

24  the following claim element: "if the reference-signal bandwidth indicated in the

25  assistance data is larger than a serving-cell bandwidth, actually measure said

26  reference signals over the serving-cell bandwidth rather than the reference-signal

27  ──────────────────────
[148] EX-1361; EX-1376 (U.S. 8,750,808)

28

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    bandwidth indicated in the assistance data." Dr. Kakaes's argument is below:

> That is, Ericsson's claim chart for Claim 53 references 3GPP TS 36.133 v. 10.16.0 Table 9.1.10.1-1 as alleged support that the key accused feature is required by the standard, i.e., actually using the minimum bandwidth between the serving cell bandwidth and the bandwidth indicated in the assistance data. However, Table 9.1.10.1-1 specifies nothing more than a required accuracy for the RSTD measurement. The second column in the table provides a parameter for the requirement. Specifically, that column states that the RSTD accuracy requirement depends on the minimum PRS bandwidth among the serving cell bandwidth, the PRS bandwidth of the reference cell and the PRS bandwidth of the neighbor cell. In other words, the required accuracy is dependent on the minimum bandwidth of the three. It is silent as to how the mobile must perform its measurement, i.e., the actual measurement bandwidth taken by the UE is not specified. It does not require the mobile to use the minimum bandwidth of the three, only that the minimum required accuracy depends on it. Further, it should be noted that even if this accuracy requirement did specify how the measurement should be, the accuracy requirement depends on the minimum of *three* bandwidth values (serving cell bandwidth, PRS bandwidth of reference cell, and the PRS bandwidth of the neighbor cell). Claim 53 specifies comparing only two bandwidths (PRS versus serving cell).

[149]

285.   Dr. Kakaes also contends that claim 53 only compares two bandwidths (serving cell, PRS bandwidth) while the accuracy requirement depends on three (serving cell, PRS of reference cell, PRS of neighbor cell).

286.   For his first argument, Dr. Kakaes says that the 4G standard does not require a handset to use the minimum bandwidth (i.e., the serving-cell bandwidth), if the serving-cell bandwidth is smaller than the bandwidth of the reference signals as claimed. However, the claimed solution is the only technically reasonable way to meet the required performance in the 4G standard. In particular, it can be seen from the table cited in Ericsson's claim chart that the measurement accuracy is not a function of the PRS bandwidth alone, but also of the serving cell bandwidth. Thus, if the serving cell bandwidth is only 6 resource blocks (RB), the accuracy requirement is independent of the PRS bandwidth, even if the PRS bandwidth would be, e.g., 50 RB. On the other hand, if the serving cell bandwidth is also 50 RB, then the accuracy requirement is much tighter, as the handset can now use the

---

[149] Kakaes Opening Statement Appendix, EX-1639 at A-P33858_4G.

full bandwidth of the PRS without re-tuning its receiver bandwidth.

| Parameter | Minimum PRS bandwidth which is minimum of serving cell channel bandwidth and the PRS bandwidths of the reference cell and the measured neighbour cell *i* Note 4 [RB] | Minimum number of available measurement subframes between the reference cell and the measured neighbour cell | Unit | Accuracy [Ts] | Conditions[1,5,6] | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Bands 1, 4, 6, 10, 11, 18, 19, 21, 23, 24, 33, 34, 35, 36, 37, 38, 39, 40 | Bands 2, 5, 7, 41 | Band 25 | Bands 3, 8, 12, 13, 14, 17, 20, 22 | Bands 9, 42, 43 |
| | | | | | | | Io | | |
| | | | | | Io | Io | | Io | Io |
| RSTD for (PRS Ês/Iot)ref ≥ -6dB and (PRS Ês/Iot)i ≥ -13dB | ≥6 | 6 | Ts | ±15 | -121dBm /15kHz … -50dBm/ BWChannel | -119dBm /15kHz … -50dBm/ BWChannel | -117.5dBm /15kHz … -50dBm/ BWChannel | -118dBm /15kHz … -50dBm/ BWChannel | -120dBm /15kHz … -50dBm/ BWChannel |
| | ≥25 | ≥2 | | ±6 | | | | | |
| | ≥50 | ≥1 | | ±5 | | | | | |

[150]

287.   That this is the only practical solution becomes clear also from 3GPP contributions, and the standard specifications were updated to specifically enable the solution covered by Ericsson's patent. For example, the submission R4-120649 for RAN4 meeting #62 includes the following:[151]

Added UE complexity if the UE has to retune its measurement bandwidth to a bandiwdth which is larger than the serving cell system bandiwdth. At the same time if the UE always configures the RSTD measurement bandwidth to that of the serving cell, which may be not even measured for OTDOA, positioning performance may significantly degrade.

288.   In submission R4-121017, based on which the standard update was agreed, there is the following statement:

In the current RSTD measurement accuracy requirements there is a ambiguty to develop in UE side.
-   It is difficult to meet the current RSTD minimum requirements when the serving cell channel bandwidth is smaller than the reference cell PRS bandwidth

[152]

---

[150] EX-1361.

[151] EX-5446 (3GPP TDoc R4-120649).

[152] EX-5448 (3GPP TDoc R4-121017).

289. Thus, even if there would be other options available, it is clear that the standard was specifically updated to enable the option as claimed by Ericsson's patent.

290. In his opening statement, Dr.Kakaes suggests a non-infringing alternative to Ericsson's patent, wherein the UE would retune to a bandwidth which is larger than the serving cell system bandwidth to measure PRS. He provides no proof that this solution would work and deliver adequate quality, and the contributions above hints that it would be at least very demanding, if not impossible, to get such a solution to work. Thus, Ericsson's solution is clearly one option to implement the standard, and it seems clear that it is a simpler and better option than the one Dr Kakaes suggests.

291. Because there are no practical alternatives to the claimed solution, it is clear that the claim is essential to the 4G standard. In other words, although the 4G standard does not explicitly mandate that handsets must perform in the way claimed in Ericsson's patents, it is a preferred way to meet the 4G standard's requirements. As a result, handsets perform the measurements as claimed.

292. Dr. Kakaes's second argument is that claim 53 compares two bandwidths, but the 4G standard compares three. This has no relevance, however, to essentiality. First, the PRS information of the neighbor cell is only optionally present (when the value is different from the reference cell ("OPTIONAL – Cond NotSameAsRef2") as shown below:

| NotsameAsRef2 | The field is mandatory present if the PRS configuration is not the same as for the assistance data reference cell; otherwise it is not present. |
| NotsameAsRef2 | The field is mandatory present if the antenna port configuration is not the same as for the |

[153]

293. When the PRS information of the neighbor cell is not present, there is a comparison between only two bandwidths.

_____
[153] EX-1420 (3GPP TS 36.355).

294.   Second, even if the neighbor cell and the reference cell have different PRS information (such that there are three total bandwidths), it is clear that a 4G-compliant handset *must* compare the (1) serving cell bandwidth to the (2) PRS bandwidth as required by the claim. The reference-signal bandwidth is then the smaller of the two PRS bandwidths, and the comparison as required by the claim necessarily takes place also under this special condition, as outlined by Dr. Kakaes. This can be seen in Table 9.1.10 of 3GPP TS 36.133, shown below:

| Parameter | Minimum PRS bandwidth which is minimum of serving cell channel bandwidth and the PRS bandwidths of the reference cell and the measured neighbour cell *i* Note 4 [RB] | Minimum number of available measurement subframes between the reference cell and the measured neighbour cell | Unit | Accuracy [Ts] | Conditions[1,5,6] | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Bands 1, 4, 6, 10, 11, 18, 19, 21, 23, 24, 33, 34, 35, 36, 37, 38, 39, 40 | Bands 2, 5, 7, 41 | Band 25 | Bands 3, 8, 12, 13, 14, 17, 20, 22 | Bands 9, 42, 43 |
| | | | | | | | Io | | |
| | | | | | Io | Io | | Io | Io |
| RSTD for (PRS Ês/Iot)ref ≥ −6dB and (PRS Ês/Iot)i ≥ −13dB | ≥6 | 6 | Ts | ±15 | −121dBm /15kHz ... −50dBm/ BW_Channel | −119dBm /15kHz ... −50dBm/ BW_Channel | 117.5dBm /15kHz ... −50dBm/ BW_Channel | −118dBm /15kHz ... −50dBm/ BW_Channel | −120dBm /15kHz ... −50dBm/ BW_Channel |
| | ≥25 | ≥2 | | ±6 | | | | | |
| | ≥50 | ≥1 | | ±5 | | | | | |

154

295.   Thus, the 4G standard clearly practices the disputed claim limitation: "and if the reference-signal bandwidth indicated in the assistance data is larger than a serving-cell bandwidth, actually measure said reference signals over the serving-cell bandwidth rather than the reference-signal bandwidth indicated in the assistance data."  Thus, I find that the P33858 patent family is standard essential.

## IV.   THE STANDARD IS NOT MODULAR

296.   Dr. Kakaes provides "alternatives" to patent families that he agrees are essential, in performing his contribution and essentiality analysis.  His opinion is

---

[154] EX-1423 (3GPP TS 36.133 at Table 9.1.10).

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS; CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1    that viewing alternatives on a patent-by-patent basis is appropriate because the

2    standard is "modular."  I disagree that the 2G, 3G, and 4G standards are "modular."

3    I also disagree with Dr. Kakaes's assumption that each patent can be analyzed

4    separately by identifying an alternative solution to each patent, and comparing that

5    alternative to the patented solution without consideration for how the replacement

6    may affect the system otherwise, or other patented solutions within Ericsson's

7    patent portfolio. I will describe some examples to illustrate this.

8           **A.     P10867, P11899, P24916**

9           297.   P10867, P11899 and P24916 are three patent families that relate to

10   ARQ, and are solutions related to re-transmission protocols in 3G and 4G. Re-

11   transmissions are used in all modern cellular protocols in order to re-transmit data

12   packets that have been lost in the transfer. These are not the only ARQ-related

13   patents Ericsson have, but the problems with Dr. Kakaes's argument is apparent

14   looking at even just these three patent families.

15          298.   P24916 is a solution related to ARQ in a 4G system. P24916 relates to

16   the timing of status reports for requests of retransmissions, and in particular to the

17   timing of when to construct and transmit such status reports.

18          299.   As background, in 4G, uplink transmissions are scheduled by the base

19   stations, which means there can be delays before a status report can be transmitted

20   (while the handset is waiting to be scheduled). If known 3G techniques had been

21   used in 4G, the result would have been unnecessary and outdated re-transmission

22   requests, resulting in stale re-transmissions from the base station. This is because

23   old reports would be queued in the handset and the transmitter would then receive

24   those outdated status reports; and retransmit data unnecessarily. The reason for such

25   unnecessary retransmissions is that the outdated reports ask the transmitter to re-

26   transmit data that the receiver has already received. Such retransmissions would

27   reduce the bit-rate perceived by a handset user and load the network for no gain to a

28   handset user.

300.   In Dr. Kakaes's "Importance" ranking of the P24916 patent family, he underestimates the importance of the technology covered by the patent, and fails to take into account how removing it would affect the performance of the cellular system as a whole. As can be seen below, Dr. Kakaes identifies that removing the feature would result in transmitting status reports more often than necessary. However, he does not quantify or explain what technical consequences too frequent reports may have:

| Importance Rank: 3 | The importance rank of the accused technology/key feature is 3, meaning that the accused technology/key feature is, at best, of marginal technical value or importance to the 4G standard. |
| --- | --- |
| | The accused technology of transmitting the error control message once receiving the medium access grant if the error control timer has expired is of marginal importance since removing this feature would simply result in occasionally transmitting status PDUs more often than necessary, which would have an effect on the overall system efficiency. However, since the requests for transmitting said status PDUs come from an intelligent eNodeB, the frequency of such events is very low and thus the impact would be marginal at most.[155] |

301.   In addition, Dr. Kakaes ignores that the reports are outdated and he does not identify the importance of avoiding the stale retransmissions that would occur in response to such outdated status reports. The load caused by the extra retransmissions would be much larger than the load caused by extra status reports: a status report size is on the order of tens of bytes, while a missing data packet size is on the order of hundreds, and even thousands, of bytes.[156] Therefore, stale retransmissions have a significant effect on the data transmission performance.

302.   Dr. Kakaes is also wrong in his analysis of the one alternative to P24916 he proposes, and fails to consider how his alternative would affect the standard as a whole. He suggests the 3G ARQ solution described in 3GPP TS25.322 as an alternative to P24916, as can be seen below:

---

[155] Kakaes Opening Statement Appendix, EX-1639 at A-P24916.
[156] EX-5447 (TS 36.322, sections 6.2.1.4 and 6.2.1.6).

| Contribution Rank: 3 | The contribution rank is 3, meaning that the key accused feature provides marginal improvement to the standard relative to available alternatives. |
|---|---|
| | **Alternative #1:** |
| | **3GPP TS 25.322 v. 7.2.0[7]** |
| | *Rank: 3* |
| | This TS was made available September 2006.  Based on TS25.322 V7.2.0, the UE has |

| | the alternative of constructing its status report but not forming a status report PDU before receiving a grant to transmit and before the timer expires.  Once the timer expires, we can begin the scheduling step for transmission of the most up-to-date status report.  This alternative can function fully without the accused feature.  This allows for shorter delay in generating the status PDU since the report is ready before receiving the grant or the timer expiration.  However, this would require additional storage for status report before forming the status PDU. |
|---|---|
| | Thus, the key feature provides only a marginal improvement over the prior version of the standard, and the ranking is a 3. |

157

303.   Dr. Kakaes does not offer a rigorous analysis of the consequences of applying the 3G solution to 4G, even though the inventors identified inadequacies of timer-based solutions such as the one known from TS 25.322, see US ´710, col 1 lines 61 to 63; col 2 lines 21 – 48 when applied to 4G.  The 3G ARQ timer-based solution must be modified with P24916 to function properly in 4G. Dr. Kakaes offers no proper comparison of his Alternative #1 (the only alternative he proposes) to the performance of the technology of P24916, as he ignores the stale re-transmissions. His statement that the patent "provides only a marginal improvement over the prior version of the standard" stands in isolation without any arguments supporting his view. He does not consider the consequences of these stale re-transmissions, or how other parts of the standard might be affected.

304.   But Dr. Kakaes also does not consider that his alternative solution of TS 25.322 is covered by multiple Ericsson patents, including at least P10867 and

---

[157] Kakaes Opening Statement Appendix, EX-1639 at A-P24916.

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

P11899, which both read on TS 25.322 (Dr. Kakaes's alternative). Thus, his alternative to P24916 falls within the scope of Ericsson's P10867 and P11899 patent families. These patents are all interrelated.

305.   Dr. Kakaes agrees that P11899 is essential, and agrees that P10867 is essential under certain claim constructions. By failing to consider Ericsson's other essential patents, and insisting the standard is "modular," Dr. Kakaes has failed to present an alternative that would work outside of Ericsson's portfolio of patents.

## B.   P06203, P11451 and P23563

306.   P06203, P11451 and P23563 all relate to Mobile Assisted Handover. P06203 relates to a solution of identifying the carrier frequencies on which the handset should perform and send measurements from. P11451 relates to an event-driven solution for such measurement reports. P23563 relates to the bandwidth over which the handset should perform such measurements. All three are essential to 4G and in addition, P06203 and P11451 are also essential to 3G. Dr. Kakaes did not contest the essentiality of claims of P06203 or P11451, and for P23563, discussed above, it is my opinion that Dr. Kakaes's non-essentiality arguments have no merit.

307.   When a handset is connected to the network, such mobile assisted handover is the basis for mobility in all modern cellular systems, including 2G, 3G, and 4G. The handset measures neighbor cells and sends measurements to network, and the network makes an informed decision of when and where to handover the handset. The decision by the network is based on the measurements in part, but also on the load in different cells in order to load-balance the network, so that all handsets are receiving adequate quality of service.  Such mobility and load-balancing has been, and continues to be, a very active research area.

308.   Dr. Kakaes suggests that the standardized technology covered by P06203 could be replaced by the solution presented in the patent by Habermann et al  from 1994. In particular, he presents the solution as a non-infringing alternative, since Habermann does not disclose any transmissions of measurement reports to the

network:

> The solution is a non-infringing alternative since the claim limitation "transmitting a measurement value from the mobile to the fixed part of the radiocommunication system" is not met.  In Habermann, after performing different measurements based on the SID broadcast lists, the mobile station while roaming subsequently joins the best available hyperband.

309.   Habermann relates to roaming service provider selection, and in Habermann, it is the handset that selects cells, not as in P06203, P11451 and P23563, wherein measurements are sent to the network and the network controls the handover of the handset from one cell to another. Thus, the handset in Habermann does not send reports.

310.   Dr. Kakaes alternative is in conflict with both 2G, 3G and 4G solutions for cell handovers ("mobility") in connected mode. Using Habermann would require a complete re-design of the basic principles of mobility. If the handset would not report any measurements as Dr. Kakaes suggests it is virtually impossible for the network to make an informed decision of where and when to handover the handset. Dr. Kakaes does not contemplate at all about this consequence.

311.   Thus, connected mode mobility would have to rely on the handset selecting a cell.  However, handsets do not have all relevant information to deduce which of the cells that can offer the best service, and it is likely that both call continuity and network load balancing would be significantly affected.

312.   But Dr. Kakaes also does not consider that his alternative for P06203 is in conflict with alternatives that he suggests for P11451 and P23563.

313.   To replace P11451, Dr. Kakaes suggests a Nokia 3GPP submission that includes measurement reports from the handset to the network. Dr.  Kakaes:

> Nokia also proposed adding either a positive or negative offset to the measured MS MQ value. Examples of offsets that are added/subtracted include Addition Window and Replacement_threshold. (*See, e.g.*, Nokia, § 2 ("[T]he UE compares the MQ value of the cell against the measured quantity values of the cells in the active set. If the new MQ exceeds an old MQ by Replacement_threshold, the UE sends a measurement report to the RNC."; see below), TAB. 1 (see at least "Replacement_threshold," further below).) [158]

. . . .

## P11451 (3G)—U.S. Patent No. 6,445,917 (Claim 1)

MQ by Replacement_threshold, the UE sends a measurement report to the RNC."; see below).)

**1. INTRODUCTION**

In this contribution we propose a set of measurement reporting criteria for soft handover.

**2. EVENT-TRIGGERED CRITERIA FOR INTRA-FREQUENCY MEASUREMENT REPORTING**

The intra-frequency handover measurement reporting criteria to be used for triggering measurement reports in the UE are explained in the table 1 and illustrated in figure 1. The same criteria is applied to both real time (RT) and non-real time (NRT) radio access bearers. The UTRAN sends these parameters to the UE in the SYSTEM INFORMATION and MEASUREMENT CONTROL messages. [159]

314. As seen above, Dr. Kakaes has identified that his alternative to P11451 includes measurement reports from the handset.

315. Similarly, a proposed alternative to P23563 also uses measurements sent by the handset to the network. From Dr. Kakaes appendix on Alternative #1 for P23563:

---

[158] Kakaes Opening Statement Appendix, EX-1639 at A-P11451.

[159] *Id.*

The contribution rank is 4, meaning that the key accused feature provides no improvement to the standard relative to available alternatives.

**Alternative #1:**

**U.S. Patent App. Pub. No. 2008/0220766 ("Bertho") (Method for Control of Radio Measurements in a Cellular Mobile Radio Communication System)[6]**

*Rank: 4*

Bertho teaches the method for control of radio measurement in a cellular system, where a mobile station receives a control message that specifies the measurement configurations, executes the measurements, and sends back the report.

160

316.   The alternative to P06203 is conflicting and incompatible with the alternatives to P11451 and P23563: In the alternative system, the handset either transmits measurement reports, or it does not. But the handset cannot both transmit measurement reports and not transmit measurement reports in the same situation, depending on which patent is in the spotlight.

317.   These conflicts highlight the unreasonableness in Dr. Kakaes assumption of "modularity" in seeking for alternatives for Ericsson's technology. Not only does he ignore or underestimate the consequences of replacing one technology with another and how it would affect the rest of the system, but his alternatives are also not compatible. His alternatives infringe other Ericsson patents, and his alternatives are contradictory in that one alternative includes technology that he specifically needed to remove with the other alternative.

# V.   CONCLUSION

318.   In summary, I agree with Dr. Kakaes that 45 of the 70 patent families I reviewed are standard essential. And of the remaining 23 families that are relevant to a handset analysis, I disagree with Dr. Kakaes. He used improper claim

---

[160] *Id.* at A-P23563.

1   construction, or misunderstands Ericsson's claim charts and the standards to arrive
2   at his incorrect conclusions. In my opinion, each of these 23 families is standard
3   essential.

4   319.   I also disagree that the 2G, 3G, and 4G standards are "modular," and
5   with Dr. Kakaes's assumption that each patent can be analyzed separately. As
6   demonstrated by the examples I highlighted, the standard is interconnected and
7   interrelated, and Dr. Kakaes is not proposing working alternatives when he fails to
8   consider how his alternatives may affect the system otherwise or how they might
9   relate to other patented solutions within Ericsson's patent portfolio.

11   Executed on January 27, 2017 at Kirkkonummi

_____
Mats Sågfors

# VI.   TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 352 | Claim chart for claim 1 of U.S. Patent No. 5,806,007 |
| 355 | Claim chart for claim 3 of U.S. Patent No. 5,910,949 |
| 357 | U.S. Patent No. 5,978,685 |
| 358 | Claim chart for U.S. Patent No. 5,978,685 |
| 359 | U.S. Patent No. 6,418,130 |
| 361 | Claim chart for claim 1 of U.S. Patent No. 6,418,130 |
| 362 | U.S. Patent No. 8,285,294 |
| 363 | Claim chart for claim 1 of U.S. Patent No. 8,285,294 |
| 365 | Claim chart for claim 1 of U.S. Patent No. 8,180,408 |
| 366 | Claim chart for claim 1 of U.S. Patent No, 8,503,942 |
| 369 | Claim chart for claim 1 of JP Patent No. 4,870,838 |
| 370 | Claim chart for claim 1 of European Patent No. 2,583,398 |
| 1361 | Claim chart for claim 53 of U.S. Patent No. 8,750,808 |
| 1376 | U.S. Patent No. 8,750,808 |
| 1416 | "4G: LTE/LTE-Advanced for Mobile Broadband, 2nd Ed.," E. Dahlman and S. Parkvall, 2014 |
| 1420 | 3GPP TS 36.355 V10.12.0 (2014-06) Technical Specification |
| 1423 | 3GPP TS 36.133 V10.18.0 (2015-03) Technical Specification |
| 1434 | 3GPP TS 36.213 V8.8.0 (2009-09) Technical Specification |
| 1438 | 3GPP TS 36.321 V9.3.0 (2010-06) Technical Specification |
| 1639 | Errata Exhibit 1: Corrected Appendices to Second Supplemental Expert Report of Dr. Apostolos K. "Paul" Kakaes, dated 5/28/16 |
| 4392 | US Patent 5,491,718 |
| 4393 | US Patent 5,806,007 |
| 4395 | US Patent No. 6,363,058 B1 |

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

| Exhibit No. | Description |
|---|---|
| 4399 | US Patent No. 6,643,813 B1 |
| 4410 | US Patent No. 8,180,408 B2 |
| 4411 | US Patent No. 8,195,179 B2 |
| 4414 | US Patent No. 8,503,942 B2 |
| 4417 | US Patent No. 8,665,568 B2 |
| 4424 | File History for US Patent 6,643,813 |
| 4427 | 7/8/1999 - US Patent No. 5,910,949 |
| 5067 | Ericsson Claim Chart for US 6,738,379 (Internal ref: P13459 US1) |
| 5072 | Ericsson Claim Chart for US 5,806,007 (Internal ref: P06691) |
| 5073 | Ericsson Claim Chart for US 5,806,007 (Internal ref: P06691 US1) |
| 5079 | US-6,031,832 (Internal ref: P07567 US1) |
| 5080 | Ericsson Claim Chart for IN 229632 (Internal ref: P08575) |
| 5081 | Ericsson Claim Chart for US 6,363,058 (Internal ref: P08575) |
| 5084 | Ericsson Claim Chart for EP-1,151,572 (Internal ref: P10867 EP1) |
| 5091 | Ericsson Claim Chart for US 6,643,813 (Internal ref: P10867 US) |
| 5137 | Ericsson Claim Chart for CN-101473604B (Internal ref: P22430 CN1) |
| 5138 | Ericsson Claim Chart for EP-2,030,380 (Internal ref: P22430 EP1) |
| 5139 | Ericsson Claim Chart for JP-4,903,861 (Internal ref: P22430JP1) |
| 5140 | Ericsson Claim Chart for US 8,243,666 (Internal ref: P22430 US1) |
| 5146 | Ericsson Claim Chart for CN101595746B  (Internal ref: P23563CN1) |
| 5148 | Ericsson Claim Chart for US8503942B1  (Internal ref: P23563US1) |
| 5150 | Ericsson Claim Chart for US-8,675,568 (Internal ref: P23985 US2) |
| 5158 | Ericsson Claim Chart for US-8195179 (Internal ref: P24557 US1)   ] |
| 5169 | Ericsson Claim Chart for CN 101849366 B (Internal ref: P25005 |

-126-

| Exhibit No. | Description |
|---|---|
| | CN1) |
| 5183 | Ericsson Claim Chart for EP 2,260,667 (Internal ref: P25949 EP1) |
| 5185 | Ericsson Claim Chart for US 8582514B2 (Internal ref: P25990US2) |
| 5191 | Ericsson Claim Chart for EP 2 316 184 (Internal ref: P27011EP1) |
| 5199 | Ericsson Claim Chart for EP-2449844 (Internal ref: P29482 EP1) |
| 5202 | Ericsson Claim Chart for US 8,543,125 (Internal ref: P29482 US2) |
| 5209 | Ericsson Claim Chart for US-8879736 (Internal ref: P23034 US2) |
| 5211 | Ericsson Claim Chart for US-6,493,552 (Internal ref: P08769 US1) |
| 5214 | Ericsson Claim Chart for US-5,978,685 (Internal ref: P09040 US1) 3GPP |
| 5413 | File History for U.S. Patent No. 5,806,007 |
| 5414 | 3GPP TS 03.60 V7.4.0 (2000-03) Technical Specification |
| 5415 | 3GPP TS 03.64 V8.12.0 (2004-04) Technical Specification |
| 5416 | U.S. Patent No. 6,493,552 |
| 5417 | U.S. Patent No. 6,738,379 |
| 5418 | 3GPP TS 36.300 V8.12.0 (2010-03) Technical Specification |
| 5419 | U.S. Patent No. 6,031,832 |
| 5420 | 3GPP TS 25.301 V6.0.0 (2003-12) Technical Specification |
| 5421 | 3GPP TS 24.301 V8.10.0  (2011-06) Technical Specification |
| 5422 | 3GPP TS 36.304 V8.10.0 (2011-06) Technichal Specification |
| 5423 | Patent EP 1,151,572 |
| 5424 | 3GPP TS 24.011 V8.2.0 (2009-06) Technical Specification |
| 5425 | 3GPP TS 33.401 V8.8.0 (2011-06) Technical Specification |
| 5426 | 3GPP TS 25.322 V6.0.0 (2003-12) Technical Specification |
| 5427 | 3GPP TS 36.323 V8.6.0 (2009-06) Technical Specification |
| 5428 | 3GPP TS 36.211 V8.9.0 (2010-01) Technical Specification |

| Exhibit No. | Description |
| --- | --- |
| 5429 | U.S. Patent No. 6,236,674 (Morelli) |
| 5430 | U.S. Patent No. 8,243,666 |
| 5431 | Patent EP 2,030,380 |
| 5432 | Patent CN 101473604B |
| 5433 | Patent JP 4,903,861 |
| 5434 | U.S. Patent No. 8,879,736 |
| 5435 | 3GPP TS 36.214 V8.7.0 (2009-10) Technical Specification |
| 5436 | Patent JP 4870838 |
| 5437 | 3GPP TS 36.213 V10.10.0 (2013-07) Technical Specification |
| 5438 | 3GPP TS 36.321 V10.9.0 (2013-07) Technical Specification |
| 5439 | U.S. Patent No. 8,582,514 |
| 5440 | Patent EP 2,316,184 |
| 5441 | U.S. Patent No. 8,543,125 |
| 5442 | Patent EP 2,449,844 |
| 5443 | 3GPP TSG-RAN2 Meeting #68, R2-097263,  Jeju, South Korea, 9-13 November 2009 (CR 0410 in RP-091346) |
| 5444 | Patent EP 2,583,398 |
| 5445 | 3GPP TS 36.331 V10.7.0 (2012-11) Technical Specification |
| 5446 | 3GPP TSG-RAN WG4 Meeting #62, R4-120649, Dresden, Germany, 6-10 February, 2012 |
| 5447 | 3GPP TS 36.322 V13.2.0 (2016-06) Technical Specification |
| 5448 | 3GPP TSG-RAN4 Meeting #62, R4-121017, Dresden, Germany, 06-10 February, 2012 |
| 5456 | 3GPP TS 36.321 v8.11.0 (2012-01) Technical Specification |
| 5457 | Patent EP 2,260,667 |

CORRECTED WITNESS STATEMENT OF MATS SÅGFORS;
CASE NOS. 8:14-cv-00341-JVS-DFMx/2:15-cv-02370-JVS-DFMx

1  **CERTIFICATE OF SERVICE**

2       Pursuant to Rule 5-3 of the Local Civil Rules of the United States District

3  Court for the Central District of California, I hereby certify under penalty of perjury

4  under the laws of the United States of America that on January 27, 2017, a true

5  copy of the above document was filed through the Court's Electronic Case Filing

6  system and served by that system upon all counsel of record registered for the

7  system and deemed to have consented to electronic service in the above-captioned

8  case.

9

10  Dated:  January 27, 2017         **CROWELL & MORING LLP**

11                                  */s/ John S. Gibson*

12                                  John S. Gibson

13                                  Attorneys for ERICSSON INC. AND

14                                  TELEFONAKTIEBOLAGET LM ERICSSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28