CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400  Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590  Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500  Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000  Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700  Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | Case No. 8:14-CV-00341 JVS (DFMx)<br>Case No. 2:15-CV-02370 JVS (DFMx) |
| Plaintiffs/Counterclaim-Defendants, | **WITNESS DECLARATION OF PROFESSOR DAVID TEECE, PH.D.** |
| v. | Hon. James V. Selna |
| TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, | **Discovery Cut-off:** May 23, 2016 |
| Defendants/Counterclaim-Plaintiffs | **Pretrial Conference:** January 30, 2017 at 11:00 a.m. |
| ERICSSON INC., *et al.*, | **Trial:** February 14, 2017 at 8:30 a.m. |
| Plaintiffs/Counterclaim-Defendants, | |
| v. | |
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, | |
| Defendants/Counterclaim-Plaintiffs. | |

# TABLE OF CONTENTS

I.     ASSIGNMENT ................................................................................... 1

II.    QUALIFICATIONS ........................................................................... 1

III.   SUMMARY OF OPINIONS ............................................................. 3
       A.   Ericsson Complied with its FRAND Commitments ............................ 3
       B.   Ericsson's Offers Were FRAND When Made .................................... 6
       C.   TCL's Economic Experts Have Not Proven Harm to Competition or Anticompetitive Harm. .................................. 8

IV.    BACKGROUND ................................................................................. 8
       A.   Ericsson ................................................................................. 8
       B.   TCL ........................................................................................ 10
       C.   Summary of Allegations ...................................................... 12

V.     FRAND ANALYSIS ........................................................................ 13
       A.   The Standards-based Innovation Ecosystem ..................... 13
            1.   Rise of the Mobile Communications Industry. ...................... 13
            2.   Technology Development and the Role of Standardization. ........................................................ 20
            3.   Role of FRAND in the Standards-based Innovation Ecosystem. ...................................................... 23
            4.   Impact of Hold-out and Free Riders. ......................... 25
       B.   TCL's Business Model ......................................................... 28
            1.   TCL's R&D Intensity. ........................................... 28
            2.   TCL's ASP. .......................................................... 31
       C.   Framework for FRAND Analysis ....................................... 36
            1.   Scope of FRAND ................................................... 37
            2.   Definition and Test for FRAND. .............................. 37
            3.   Analysis of "Non-discriminatory" Within FRAND Cannot Be Prospective. ................................... 42
            4.   FRAND Does Not Require Licensors to Equalize Actual Costs Among Downstream Competitors. ................ 43
            5.   Negotiated Licenses Are the Best Economic Measure of FRAND. ...................................................... 45
            6.   Definition of "Similarly Situated" Licensees. ................ 49
            7.   Similarly Situated Licensees for FRAND Analysis. ........... 51
       D.   FRAND Conclusions. ......................................................... 54
            1.   Licensees More "Similarly Situated" to TCL (ZTE, Yulong, Karbonn, and Sharp). .............................. 54

1

# TABLE OF CONTENTS
(continued)

2

3

    2.    Licensees Less "Similarly Situated" to TCL (Samsung, HTC, LG, Apple, and  Huawei). ............................................... 61

4

    3.    Comparison of Asserted Similarly Situated Licensees. ........... 64

5

    4.    Ericsson's Option A and B Offers to TCL were FRAND When Made. ................................................................................ 66

6

VI.    COMPETITION ANALYSIS FOR "NON-DISCRIMINATORY" ............. 67

7

    1.    Lack of Economic Injury. ....................................................... 68

8

    2.    Rapid Adoption of Advancing Mobile Communications Technologies. .......................................................................... 69

9

    3.    High Market Share Volatility in the Mobile Handset Market. .................................................................................... 71

10

    4.    Significant Consumer Value for Products Capable of Cellular Communications. ......................................................... 75

11

VII.    CONCLUSIONS ......................................................................................... 81

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  I, David J. Teece, declare:

2  **I.   <u>ASSIGNMENT</u>**

3       1.    I have been retained by Crowell & Moring and McKool Smith

4  ("Counsel"), as Counsel for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

5  ("Ericsson"), as an expert witness in this case.  My assignment in this case is as

6  follows:

7       • I have been asked to opine regarding the economics and public policy

8         aspects of European Telecommunications Standards Institute's ("ETSI")

9         fair, reasonable and non-discriminatory ("FRAND") licensing regime.

10        Specifically, I have been asked to explain from an economics and public

11        policy perspective how FRAND should be interpreted to promote ETSI's

12        stated objectives and the integrity of the ETSI standards-development

13        process.

14      • In addition, I have been asked to address, from an economics standpoint,

15        TCL's experts' opinions regarding whether Ericsson has complied with its

16        commitments made pursuant to ETSI's FRAND policy in its licensing

17        negotiations with TCL.

18      • I have also been asked to address TCL's claims that Ericsson's conduct or

19        the offers it has made to TCL have harmed or are likely to harm TCL or

20        competition.

21  **II.   <u>QUALIFICATIONS</u>**

22       2.    I am the Thomas Tusher Professor of Global Business in the Haas

23  School of Business at the University of California, Berkeley, and Chairman and

24  Principal Executive Officer of the Berkeley Research Group ("BRG"), a

25  professional services (consulting) firm.  I received my Ph.D. in Economics from the

26  University of Pennsylvania in 1975.  I have taught at Stanford University and

27  Oxford University.  I have published over 200 scholarly books and articles in the

28  fields of industrial organization, technology management, and public policy.  My

1    research is widely cited.  I have received numerous awards for my academic

2    research and writing, including five honorary doctorates.

3        3.      I have considerable experience and knowledge of the economics of

4    innovation, derived from study and research over more than two decades.  I am the

5    co-editor and co-founder of *Industrial and Corporate Change*, an academic journal

6    published by Oxford University Press that concentrates on issues surrounding

7    technological change and corporate responses to such change.  I have published and

8    consulted extensively on the economics of technological change and competition

9    policy, especially in technologically progressive industries, and on issues related to

10    competition policy and antitrust, as it affects U.S., European, and other jurisdictions.

11    I also have extensive experience in business consulting in a wide range of industries,

12    including the electronics and semiconductor industries, and in the analysis of

13    licensing behavior in high technology industries.  A copy of my curriculum vitae,

14    containing my list of publications, is attached hereto as Appendix 1.

15        4.      I have studied licensing and cross-licensing in high technology

16    industries for many years.  An article I co-authored with a colleague on the topic,

17    published in the *California Management Review* in 1997,[1] was one of the first

18    academic studies of licensing and cross-licensing in high-technology industries, and

19    has been widely cited.

20        5.      I have also studied standards, the standards setting process, the policies

21    and behavior of standards development organizations ("SDOs"), and the economic

22    significance of standards for many years.  I coauthored an early article on standard

23    setting and antitrust.[2]  I was an invited participant at hearings held by the U.S.

24

---

25    [1] Ex. 5261, Peter C. Grindley and David J. Teece, "Managing Intellectual

26    Capital: Licensing and Cross-Licensing in Semiconductors and Electronics," *California Management Review*, Vol. 39, No. 2 (1997), pp. 8-41.

27    [2] Ex. 5272, David J. Teece and Edward F. Sherry, "Standards Setting and

28    Antitrust," *Minnesota Law Review*, Vol. 87 (2003),  pp. 1913-1994.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

Department of Justice and the Federal Trade Commission on the interplay between standards setting, intellectual property and antitrust policy.

6.     I have testified as an expert witness in litigations and proceedings in the U.S., Canada, Australia, New Zealand, and Europe in more than 100 matters.  A list of the matters in which I have testified is attached hereto as Appendix 2.

7.     I have qualified to testify and testified as an expert witness in some of the leading RAND and FRAND trials in the last several years, including:

- *In re Innovatio IP Ventures, LLC Patent Litigation* (before Judge Holderman, N.D. Ill.) (September 2013).
- *Apple Inc. v. Samsung Electronics Co.* (before Judge Koh, N.D. Cal.) (August 2012).
- *Microsoft Corporation v. Motorola, Inc.* (ITC, A.L.J. Shaw) (January 2012).

8.     I have qualified to testify and testified as an expert witness in some of the leading antitrust/competition trials in the last several years, including:

- *Behrend v. Comcast Corporation* (before Judge Padova, E.D. PA) (October 2009).
- *Rambus, Inc. v. Hynix Semiconductor, Inc.* (before Judge Whyte, N.D. Cal.) (March 2006) (involving standard essential patents).

9.     I have also previously qualified to testify and testified as an expert witness at trial in the United States District Court for the Central District of California in at least five different cases.

## III.  SUMMARY OF OPINIONS

I have reached three primary opinions in this case:

### A.  Ericsson Complied with its FRAND Commitments.

10.     *First*, I conclude that Ericsson complied with its FRAND commitments by being prepared to grant a license to TCL in good faith on terms and conditions that are within the range of the terms and conditions previously

agreed to by other similarly situated licensees (that is, FRAND terms) and that TCL's experts are wrong in concluding to the contrary.  I note, under my first opinion, that:

a. The purpose of technical standards for mobile telecommunications is to provide consumers with the best available technology and functionality—usually including enabling interoperable and high performance devices.

b. For standards development to succeed, it must ensure (1) a reasonable expected return on investment as an incentive for standards contributors to conduct the risky research and development necessary for innovation of the technology, and (2) access to standards for implementers of the technology under conditions ensuring the wide adoption of the standards.

c. The purpose of a FRAND commitment in standards development is to balance the dual requirements of incentivizing innovation and providing access by mandating license negotiations.

d. To effectively balance those objectives, FRAND must be flexible enough to allow the parties to take into account market and individual circumstances in negotiating their license terms.

e. FRAND must take into account the practical realities of a license negotiation and that no two negotiations are identical. Specifically, even if two potential licensees were deemed to be identical, the terms of the ultimate license agreed upon with each licensee may not be identical. And mandating identical licenses through a FRAND commitment would effectively require that the two negotiations be identical, which is outside the control of the licensor and would ultimately constrain the ability of the licensor and licensee to reach a market-based FRAND agreement

1    customized to the business relationship between the licensor and

2    licensee.

3    f.   Ericsson's offers to TCL must be evaluated as a whole, including

4    all terms and conditions offered, to determine whether the offered

5    terms and conditions reflect the value of the patent portfolio to be

6    licensed. FRAND must allow for a broad range of possible terms.

7    The best gauge of the FRAND range is based on arm's length

8    market-based comparable licenses between similarly situated

9    parties when, as in this case, sufficient comparable licenses exist.

10   The ETSI FRAND licensing regime as contemplated and as

11   implemented by the industry for two decades involves a complex

12   interplay between licensors and licensees yielding customizable

13   terms.  For example, one licensee may want a smaller lump-sum

14   initial payment in exchange for higher running royalty rates.  The

15   ETSI FRAND regime does not foreclose those types of choices.

16   Thus, it would be inappropriate to evaluate and determine

17   individual terms in isolation without the context of the broader

18   offer and without consideration of contextual information like time,

19   future expectations and relative risk tolerance of the parties to the

20   comparable licenses.

21   g.   FRAND is neither the most-favored nation licensing regime that

22   TCL's experts urge nor an obligation on licensors to ensure

23   through licensing terms that all licensees succeed in the

24   downstream product market.  Requiring licensors to attempt to

25   manage the competitive dynamics in downstream markets through

26   their licensing terms, as TCL's experts urge, is unworkable in the

27   context of licensing standard essential patents given that parties

28   come to the negotiating table with different assets to trade—and

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1    that numerous factors other than licensing costs impact
2    competition in those markets.  Rather, a market-based economic
3    understanding of ETSI's FRAND regime is to allow for different
4    circumstances to be properly taken care of in bilateral license
5    agreements reached through good faith negotiations. Non-
6    discrimination in FRAND licensing requires no more than
7    offering a licensee market based terms within the range of terms
8    agreed to with similarly situated licensees.

9    h.  Ericsson has shown its willingness to negotiate in good-faith
10   toward a license with TCL under terms and conditions that are
11   within the range of terms and conditions previously agreed to by
12   other similarly situated licensees—achieving both the
13   requirements of providing TCL access to the standards and
14   promoting innovation by ensuring Ericsson a reasonable chance
15   of return on investment.

16   **B.   Ericsson's Offers Were FRAND When Made.**

17   11.   *Second,* I conclude that Ericsson's Option A and B offers to TCL were
18   within the FRAND range and treated TCL and similarly situated licensees similarly
19   at the time they were made, and TCL's experts are wrong in concluding to the
20   contrary. In particular, Ericsson's offers to TCL express royalty rates that are
21   similar to the royalty rates agreed to by ZTE and the other Ericsson licensees who
22   were most similarly situated to TCL at the time.

23   a.  FRAND has a temporal aspect.  The value of technology changes
24   over time, as competitive circumstances change and new
25   technologies are developed—including the granting of new
26   portfolio patents and the expiration of other portfolio patents.  With
27   each new licensing agreement, based on the particular
28   circumstances of the relationship between the parties, the FRAND

-6-    WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1      range may change.  Indeed, the value of a particular license may

2      change over time as uncertainties are resolved.  Thus, when

3      evaluating whether or not a particular license or offer is FRAND,

4      the appropriate question to address is whether or not that license or

5      offer was FRAND, when made.  As such, it is not necessarily

6      appropriate to compare such licenses and offers set during earlier

7      time periods to those set during later time periods when evaluating

8      FRAND.  This is particularly true when there are intervening

9      license agreements over time, resetting the market-based

10     indications of the FRAND range.

11  b. I understand that discriminatory licensing of standard essential

12     patents under the ETSI Policy means treating similarly situated

13     licensees differently for impermissible reasons, such as country

14     affiliation or ETSI membership status.

15  c. Based on the analysis performed by Ericsson's licensing expert

16     David Kennedy (which I have not sought to replicate, but which I

17     rely on), and my understanding of FRAND principles as articulated

18     herein, including the opinions of Ericsson's ETSI expert Bertram

19     Huber and Ericsson's French law expert Benedicte Fauvarque-

20     Cosson, I conclude that the offers made by Ericsson to TCL during

21     2014 and 2015 have been well within the range of rates accepted by

22     other handset manufacturers. This includes Ericsson's licensing

23     offers made to TCL both before and after TCL filed this litigation,

24     and is especially true when one considers the relatively higher 2G

25     and 3G rates that Ericsson's licensees were paying when TCL and

26     Ericsson commenced license negotiations.

27  d. In particular, I have reached two conclusions about similarly

28     situated licensees of TCL. *First*, I conclude that the licensees

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1    TCL's experts pick as "comparable" are not very similarly situated

2    to TCL; in fact, licensees ignored by TCL's experts are actually the

3    more similarly situated ones. *Second*, I conclude that Ericsson's

4    offers to TCL express royalty rates that are comparable to the

5    royalty rates agreed to by ZTE and the other Ericsson licensees who

6    are most similarly situated to TCL, based on average selling price

7    of units and other factors.

8    e.  In addition, TCL's economic experts have not identified

9    impermissible differentiation in licensing offers to TCL, such as

10   discrimination on the basis of TCL's national or regional affiliation

11   or its ETSI membership status.

12   **C.    TCL's Economic Experts Have Not Proven Harm to**

13   **Competition or Anticompetitive Harm.**

14   12.   *Third*, I conclude TCL's experts have not performed an analysis of

15   alleged anticompetitive effects as an economist would perform in an antitrust

16   case—that is TCL's experts have proven neither harm to competition nor harm to

17   TCL causally related to alleged discrimination.  I understand this type of antitrust

18   analysis would only be relevant if the Court first determined that Ericsson did not

19   treat TCL similarly to similarly situated licensees. But in any case, TCL's experts

20   have failed to show that Ericsson's offers caused anticompetitive harm. TCL's

21   experts have attempted to show only that Ericsson has not implemented a most-

22   favored nation licensing regime under which every licensee receives the same exact

23   terms, regardless of individual circumstances, i.e., the very type of regime that

24   ETSI rejected in 1993.

25   **IV.   BACKGROUND**

26   **A.    Ericsson**

27   13.   Ericsson is a communications products and services company based

28   in Stockholm, Sweden. As of year-end 2015, it had 116,281 employees;

-8-

23,689 of these employees worked in research and development.[3] Ericsson's 2015 net sales were SEK 246.9 billion (approximately U S $29.4 billion).[4] Ericsson spent SEK 34.8 billion on research and development in 2015 (approximately U S $4.1 billion).[5] It sells to customers in more than 180 countries.[6] Roughly 40% of mobile traffic goes through network equipment Ericsson supplies.[7] The majority of Ericsson's largest shareholders are institutional investors based in Sweden.[8]

14.     Ericsson has three business segments. The Networks segment made up 50% of net sales in 2015. Its "main business driver in 2015 was mobile broadband network deployments." Two-thirds of the Networks segment's revenue is from hardware sales. The Global Services segment made up 44% of net sales in 2015, selling "network rollout services and professional services (i.e., managed services, consulting and systems integration (CSI), customer support as well as network design and optimization services)." Ericsson's Support Solutions segment accounted for 6% of net sales, which were "dominated by software."[9]

15.     Ericsson's intellectual property portfolio is extensive, with over 39,000 patents. With this portfolio, Ericsson "is a net receiver of royalties, and the royalty-based IPR licensing business is a key element of its growth

---

[3] Ex. 5300, Ericsson—Company Information, available at http://www.ericsson.com/thecompany.

[4] Ex. 5300, Ericsson—Company Information, available at http://www.ericsson.com/thecompany. (Calculated using the average exchange rate listed in Ericsson Annual Report 2015, p. 175 since 2015 World Bank SEK exchange rate data is unavailable, SEK 8.39/$1.)

[5] Ex. 4071, Ericsson Annual Report 2015, Ex. 4071, p. 56. (Calculated using the average exchange rate listed in Ericsson Annual Report 2015, p. 175 since 2015 World Bank SEK exchange rate data is unavailable, SEK 8.39/$1.)

[6] Ex. 4071, Ericsson Annual Report 2015, p. 6.

[7] Ex. 4071, Ericsson Annual Report 2015, p. ii.

[8] Ex. 4071, Ericsson Annual Report 2015, p. 171.

[9] Ex. 4071, Ericsson Annual Report 2015, p. 7.

strategy."[10]  Ericsson's intellectual property rights  ("IPR") licensing business has been successful, as "over the last five years IPR licensing revenues have more than tripled…Ericsson now has agreements with the majority of handset suppliers."[11]  Ericsson, in its annual report noted,

> "[A] major portion of the revenues [from intellectual property licensing] currently stems from handset manufacturers…. [Along with revenue] there is value in the IPR portfolio in securing cross-licensing agreements. These agreements are signed with other major IPR holders, thus ensuring freedom for Ericsson to operate. Ericsson believes that this approach enables Ericsson to commercialize and obtain a fair return on the IPR portfolio when others are using the Company's technology. The IPR [licensing] business is a direct return on the R&D-investments made."[12]

**B. TCL**

16.    TCL Communications Technology Holdings, Ltd. ("TCL"), headquartered in Shenzhen, China, is the communications subsidiary of TCL Corporation. It is a mobile terminal manufacturer and Internet service provider. TCL sells products in over 170 countries around the world, and employs 15,000 people in China and overseas.[13]  Its revenue in 2014 was HK$30.7 billion (approximately US$3.96 billion).[14]

---

[10] Ex. 4071, Ericsson Annual Report 2015, p. 16.

[11] Ex. 4071, Ericsson Annual Report 2015, p. 42.

[12] Ex. 4071, Ericsson Annual Report 2015, pp. 16-17.

[13] Ex. 1129, TCL Communication Technology Holdings Ltd.—Company Profile, available at http://www.tclcom.com/?page=company_profile.

[14] Ex. 1140, TCL Communication Technology Holdings Ltd. Annual Report 2014, p. 7. (Calculated using the average exchange rate listed in "Official Exchange (Continued…)

17.    According to the TCL website, TCL was founded in March 1999.[15] TCL pursued a strategy of manufacturing low cost phones with very little independent research and development. In 2014, TCL only spent HK$ 1,479 million (approximately US$190.8 million) on R&D, compared to Ericsson's SEK 36.31 billion (approximately US$5.292 billion) in 2014. TCL purchases its components from other suppliers and then assembles its phones at TCL facilities.[16]

18.    TCL has marketed mobile handsets under a number of brands, currently including the Alcatel brand.[17] In 2004, TCL entered into a joint venture with Alcatel. In 2005, it bought out Alcatel's share of the joint venture.[18] TCL still focuses on selling relatively low-end mobile handsets. For example, only 43% of TCL's 2015 handset units sold in the U.S. were smartphones, compared to 87% for the industry overall.[19]

19.    TCL's parent company is TCL Corporation, a large consumer electronics company headquartered in Huizhou, China.[20] It was founded in 1981 and has three publicly listed companies, four business units, as well as six business groups.[21] TCL Corporation's main source of revenue is from multimedia products such as televisions. TCL Corporation is "the third largest TV

_____

Rate (LCU per US$, period average)," *The World Bank*, available at http://data.worldbanfk.org/indicator/PA.NUS.FCRF, approximately HK$ 7.75/US$ 1.)

[15] Ex. 1129, TCL Communication Technology Holdings Ltd.—Company Profile, available at http://www.tclcom.com/?page=company_profile.

[16] Deposition of Sebastian Codeville, October 14, 2015 at 87, 129.

[17] Ex. 1129, TCL Communication Technology Holdings Ltd.—Company Profile, available at http://www.tclcom.com/?page=company_profile.

[18] Ex. 1021, TCL Communication Technology Holdings Limited Annual Report 2005, pp. 56-57.

[19] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release, February 12, 2016.

[20] Ex. 5286, TCL Corporation—Company Overview, Thomson One.

[21] Ex. 5285, TCL Corporation—About, available at http://www.tcl.com/About/index_en.html.

manufacturer in the world."[22] Its total revenues in 2014 were CNY 101.3 billion (approximately $16.48 billion).[23] TCL Corporation is partially owned by Chinese Government entities.[24]

### C. Summary of Allegations

20.    In March 2007, after negotiating for approximately two years, Ericsson granted a license under its 2G/GSM and 2G/GPRS essential patents to a TCL subsidiary, TCT Mobile Limited. That license expired in March 2014.[25] Beginning in about 2007, TCL and Ericsson began to discuss a broader license to Ericsson's mobile wireless essential patents. Since that time, Ericsson has extended multiple offers to TCL to license its 2G, 3G, and 4G standard essential patents. TCL has refused to accept any of Ericsson's offers during that more than seven-year period.[26]

21.    I understand that, after several years of unsuccessful negotiations, Ericsson sued TCL for patent infringement in multiple jurisdictions outside of the United States. I also understand that those cases have been stayed in favor of a worldwide resolution of the licensing dispute in this Court. Dkt. 279-1.

22.    I understand that TCL sued Ericsson, contending that Ericsson has failed to offer a license under Ericsson's 2G, 3G, and 4G standard essential patents on FRAND terms and conditions.

23.    I understand that the Court has granted Ericsson summary judgment against TCL on the unfair competition claims. Dkt. 1058. But I understand that TCL

---

[22] Ex. 5284, TCL Corporation—About Us, available at http://www.tclusa.com/aboutus/.

[23] Ex. 5287, TCL Corporation—Financial Reports, Thomson One. (Calculated using the average exchange rate listed in "Official Exchange Rate (LCU per US$, period average)," *The World Bank*, available at http://data.worldbank.org/indicator/PA.NUS.FCRF, approximately CNY 6.14/ US$ 1.)

[24] Ex. 5286, TCL Corporation—Company Overview, Thomson One.

[25] Brismark Witness Statement, ¶ 76.

[26] Brismark Witness Statement, ¶¶ 76-81.

1    may still be asserting that Ericsson discriminated against it relative to TCL's

2    competitors in downstream product markets during licensing negotiations in a way

3    that breached Ericsson's FRAND commitments.

4    **V.    FRAND ANALYSIS**

5        **A.    The Standards-based Innovation Ecosystem**

6            ***1.    Rise of the Mobile Communications Industry.***

7        24.    Mobile communications have undergone enormous changes since the

8    first analog mobile phones were introduced in the early 1980s. In a few

9    decades, the mobile communications industry has grown from providing voice

10   services for privileged users to allowing billions of users across the globe to

11   communicate seamlessly and share information in a variety of formats including

12   voice, text message, email, photos, video and more. Mobile technologies have

13   fundamentally changed how people interact.

14       25.    At the heart of these changes have been a remarkable series of

15   technological innovations in the capabilities, performance, and cost of mobile

16   communications. Coupled with parallel developments in computing and

17   infrastructure, innovation in mobile communications is leading to new products

18   and growing markets in connected devices at an astounding pace.

19       26.    The first mobile phones using digital communications technology

20   were 2G phones introduced using GSM or TDMA technology in the early

21   1990s.[27] These represented a great improvement in performance over their analog

22   predecessors and effectively ushered in the modern era of mobile

23   communications. The introduction of digital technology facilitated a continual

24   series of technological improvements with current systems offering data capacities

25   thousands of times those of the original phones and expanding the use of mobile

26

27       [27] Ex. 5234, Tom Farley, "Mobile Telephone History," *Telekronikk*, Vol. 101, No. 3/4 (2005), p. 31.

28

communications into a wide range of data-based services. Technical enhancements to the original GSM design include SMS text messaging services introduced in 1993 and data communications features EDGE and GPRS added in 1997-98.

27.     A key next stage was the introduction of 3G phones such as WCDMA/UMTS in 2000, with greatly expanded data capabilities based on CDMA technology.  Other 3G systems such as Qualcomm's cdma2000 were also developed and introduced at this time.[28]  The development  of data communications continued with increasing data capacities added to 3G with  successive versions of high-speed packet access ("HSPA") from 2002 onwards and new  capabilities such as instant messaging service. The series of technological  advances continued with the development of 4G technology with further dramatic increases  in  data capacity and other performance features. The introduction of 4G is usually measured from the first long term evolution ("LTE") systems in 2008, which introduced the bulk of the new technology designs using Orthogonal Frequency-Division Multiple Access ("OFDMA") technology with  significantly enhanced capacities. The focus is  now on continuing improvements in 4G and development of 5G.

28.     The technological generations noted above correspond to a series of formal standards releases for 2G, 3G and 4G. For example, the original GSM standards were formulated within ETSI as the Phase 1 GSM standard in 1992. The first 3G UMTS standard from ETSI was Release 1999, finalized in 2000. 4G LTE standards were developed within 3GPP (a group of six worldwide telecommunications standards associations including ETSI) as Release 8 in 2008. The latest releases in this series are 3GPP Release 12 finalized in March

---

[28] Ex. 5234, Tom Farley, "Mobile Telephone History," *Telekronikk*, Vol. 101, No. 3/4 (2005), p. 34.

1    2015, and Release 13 in 2016. The 3GPP radio access standards releases and the

2    main new technical features for 3G and 4G since 1999 are shown in **Figure 1**.

3    The arrows show the time spent developing the standards releases from

4    initialization to finalization. A typical release spans about 2 years of development.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

**Figure 1: 3GPP Radio Access Standards Releases**[29]



29.     Data capacity or speed is one of the key enabling features for extending mobile communications to new data services. This is the "need for speed" by data services such as Internet, messaging and media and video applications, which depend on capacity for effective user experience, a combination of speed to handle different types of applications and the reduction of traffic congestion from having many users active in a given mobile cell.[30]

30.     Peak data rates in a standard are useful indicators of capacity for successive standards releases of 3G and 4G, shown in **Figure 2**.

---

[29] Ex. 5280, "About *3GPP*," 3GPP, available at http://www.3gpp.org/about-3gpp.

[30] Ex. 5274, GSMA Mobile Spectrum - Data Demand Explained, June 2015.



**Figure 2: 3GPP Releases and Peak Data Rates**[31]

31.     These rates have increased from very low figures when 3G was introduced to much higher  rates today. (Peak data rates are only one measure of performance, and the standards include many other features to make mobile data communications more effective. Releases after Release 11 have introduced other means of increasing data capacity, such as multiple antennas and small cell size, so that the peak rate is only one, though critical, measure of effective data capacity.)

     [31] Ex. 5282, "Releases," *3GPP*, available at http://www.3gpp.org/specifications/releases; Ex. 5281, Jeanette Wannstrom, "HSPA," *3GPP*, available at http://www.3gpp.org/technologies/keywords-acronyms/99-hspa; Ex. 5275, "Mobile Broadband Explosion: The 3GPP Wireless Evolution," *Rysavy Research for 4G Americas*, August 2013, available at http://www.4gamericas.org/index.php/download_file/view/220/663/.

Release 99 3G in 1999 had a peak download rate of only 0.3 Megabits/sec (Mbps), equal to GSM. This increased to 14 Mbps with the first HSPDA in Release 5 in 2002, and to 42 Mbps in Release 8 LTE in 2007. By Release 11 in 2013 this had increased to 336 Mbps. Subsequent releases have increased user capacity by combining other technologies for more efficient spectrum use such as multiple antennas, small cells, sharing with WiFi networks, and carrier aggregation.

32.    These increases in capacity have enabled the huge growth in mobile data services and the use of smartphones and other mobile data devices following the introduction of the iPhone in 2007. Although smartphones had existed in one form or another for several years, they only became effective once high speed data networks were available to support them, which were also introduced at this time incorporating the higher data rates of Releases 7 and 8. The Ericsson R380 was reportedly the first device marketed as a "smartphone" in 2000.[32] These developments have fundamentally changed the mobile industry and created other industries relying on mobile data communications. For example, increases in data capacity between 3G and 4G are expected to have significant impact on the user experience in service areas such as voice, messaging, Internet browsing, paid information, TV/video on demand, music, M-commerce and mobile data networking.

33.    The rapid increase in global mobile data traffic following the introduction of higher speed capabilities is shown in **Figure 3**. Mobile data volumes took off after 2007 and broadly match the increases in potential maximum capacity outlined above. The total traffic carried in global mobile networks increased from less than 10 petabytes /month (PBpm) in Q1 2007 to nearly 700 PBpm in Q1 2012, a more than 70-fold increase in five years.

---

[32] Ex. 5233, "Ericsson Introduces The New R380e," *Mobile Magazine*, available at http://www.mobilemag.com/2001/09/25/ericsson-introduces-the-new-r380e/.

**Figure 3: Global Total Traffic in Mobile Networks, 2007-2012**[33]



34.    This growth continues today. "[Global] mobile data traffic is expected to grow to 30.6 exabytes per month by 2020, an eightfold increase over 2015, at a CAGR of 53 percent from 2015 to 2020."[34]

---

[33] Ex. 5273, Ericsson Traffic and Market Report, June 2012, p. 12.

[34] Ex. 5044, Cisco Visual Networking Index Global Mobile Data Traffic Forecast Update, 2015–2020, February 3, 2016, p. 5. A petabyte (PB) is $10^{15}$ bytes of data; an exabyte (EB) is $10^{18}$ bytes of data.

## 2.   *Technology Development and the Role of Standardization.*

35.     This growth of mobile communications was made possible by the joint development of mobile technology and standards. Compatibility standards that are built around new, improved enabling technologies can have many benefits in a network industry such as mobile communications. Standards that incorporate new inventions make network products more valuable and increase total demand by allowing more users to interconnect.  They may expand the availability of complementary products by providing them with a larger market, which may reduce costs and lower prices via economies of scale and increased competition.

36.     Network effects such as these may be decisive to the success of innovative standards-compliant products. It is difficult to imagine mobile communications existing and improving without standards that interconnect equipment from different vendors and incorporate new technology. Given the lead times for development and investment in the industry, standards are also typically anticipatory, to support ongoing technological development.

37.     Because of these system wide benefits, the standards-development process is critical to both the development and implementation of technology in the mobile communications sector. Because of its anticipatory nature, standards development is not a process of simply setting or selecting standards. It also reflects a roadmap for R&D.[35] Technological development typically informs and contributes to standards development. Technology development takes place throughout the standardization process as the standards and technologies are refined and adjusted as part of the working group activities. This process is open

---

[35] *See* Ex. 5271, David J. Teece, "Competition, Cooperation and Innovation: Organizational Arrangements for Regimes of Rapid Technological Progress," *Journal of Economic Behavior and Organization* 18:1 (June 1992), p. 23.

1    to all members of the relevant SDOs, which in this case are ETSI and 3GPP. In

2    practice, of course, that standardization effort is often led by technological

3    developers like Ericsson.[36]

4          38.    The process involves both competition and cooperation.  Firms

5    invest and compete to develop the  most effective technology but also must

6    cooperate with each other to ensure development efforts meet the technical

7    challenges facing the industry and will be accepted by the other firms and by

8    consumers.[37]  Telecommunications standards, in particular, comprise a set of

9    specifications that contain certain "blueprints" for the standardized aspects of

10   commercial networks and products.[38] Within the "blueprints," firms are free to

11   differentiate their products with respect to  non-standardized features, and

12   competition along such non-standardized product  dimensions is a key element of

13   competition in this industry. Here, standardization does not  involve a SDO

14   merely adopting an existing technology; it is the result of competition among

15   industry players to find the best solutions to the technical challenges underlying

16   the standards, such as increased data rates, reliability, and security.  It is not

17   merely selecting among equally good alternatives.  Many  participants, like

18   Ericsson, invest significant time and resources in conceptualizing, modeling, and

19   testing  the solutions that they contribute to the standard.  In a typical situation,

20   Ericsson and other  innovating companies make competing technical proposals

21   based on prior research to overcome the challenges. This is a risky

22   investment of research and development resources; the expenditures must  occur

23   years before any  products are actually  manufactured  or sold, and  without any

24   guarantee that the solutions will be incorporated into the standard or that the

25

26          [36] Brismark Witness Statement, ¶¶ 16-35.

27          [37] Brismark Witness Statement ¶ 36.

28          [38] Brismark Witness Statement, ¶ 16.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
                              CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1   standard will be successful. Standardization has worked in the wireless industry,

2   however, because the process results in a state-of-the-art complete system

3   specification incorporating the best technical solutions.

4        39.     During the cellular standardization process in 3GPP, TCL stood on the

5   sidelines and did not contribute any technology. I understand TCL is not a

6   member of ETSI and has only been a member of 3GPP via its partner China

7   Communications Standards Association since 2013.[39] As the timeline reflects,

8   during the early part of the growth of mobile communications when investments

9   were the most risky and success least assured, TCL did not even exist. As the

10  market took off, TCL entered. Although TCL has very recently initiated efforts

11  to develop essential technologies for developing 5G standards, to date it has never

12  been an innovator in this space and was not an active participant in developing

13  mobile technology standards. TCL has not contributed to 2G, 3G, or 4G standards

14  and only recently has become involved for 5G standards, since the second half of

15  2015.[40]

16       40.     As a market entrant that had not contributed to that innovation, TCL

17  should have expected to pay IPR royalties to the companies that created the

18  technology once TCL began manufacturing standard-compliant phones.

19  Innovators including Ericsson had already submitted publicly available

20  declarations to ETSI for IPRs that they believed could be essential prior to the

21  time that TCL entered the market, and had publicly announced that those

22  innovators including Ericsson would own IPRs essential to the cellular standards

23  and their intent to seek FRAND royalties for licenses under those IPRs.

24

25

26  _____

27  [39] Deposition of Eric Hsu, January 26, 2016, 18-19.
    [40] Deposition of Eric Hsu, January 26, 2016, 20-25.

28

### 3. Role of FRAND in the Standards-based Innovation Ecosystem.

41. The standards-development process in the mobile communications sector helps enrich the "innovation ecosystem" for development and implementation of improved mobile communications. Participation in standards development in the mobile phone business is voluntary. For the system to generate rapid innovation and maximum value for consumers, it must provide all necessary players, both technology developers and standards implementers (as well as hybrid firms engaged in both developing and implementing standards), with appropriate incentives to participate in and contribute to the competitive/cooperative process.[41]

42. The economics of the ETSI FRAND commitment must be analyzed in the context of this innovation ecosystem for mobile communications. ETSI has expressly recognized as much in describing its IP policy objectives:

> "It is ETSI's objective to create Standards and Technical Specifications that are based on solutions which best meet the technical objectives of ETSI. … In achieving this objective, the ETSI IPR Policy seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."[42]

The technology developers whose technology is being considered for incorporation into the standard are asked to commit to making their essential

[41] See, e.g., Ex. 5265, David J. Teece, "Next-Generation Competition: New Concepts for Understanding How Innovation Shapes Competition and Policy in the Digital Economy," Journal of Law, Economics, and Policy, Vol. 9, No. 1 (2012), p. 116.

[42] Ex. 223, ETSI Rules of Procedure, November 18, 2015, Annex 6, § 3.1: ETSI Intellectual Property Rights Policy.

1   technology available for licensing to implementers on FRAND terms, which
2   reassures implementers respecting FRAND terms that they will have
3   access to the technology and enables them to adopt the technology as part of the
4   standard without risk of access being blocked later.  Lacking such an assurance,
5   most SDOs (including ETSI) will not incorporate the patented technology into the
6   standard.  And absent the assurance, some SDOs' members (including ETSI
7   members) would not implement the standard into their next generation of products.
8   In return, developers expect to have the opportunity to earn an appropriate return
9   on the technology they contributed to the standard to justify their investments—and
10  the risks associated with their investments. By ETSI Rules, "IPR holders whether
11  members of ETSI and their AFFILIATES or third parties, should be adequately and
12  fairly rewarded for the use of their IPRs in the implementation of STANDARDS
13  and TECHNICAL SPECIFICATIONS." [43]

14      43.     The mechanisms for capturing a return on research and development
15  efforts vary across business models. Some firms may engage in out-licensing of
16  access to essential and non-essential patents for cash or other considerations.
17  Others may engage in cross-licensing to ensure access to others' standards-
18  related IP when manufacturing standards-compliant products or developing further
19  technology, for "freedom to operate" or "freedom to invent." Others may divest
20  patents for cash or other consideration. There are many combinations of methods. I
21  understand that Ericsson employs a number of these methods to obtain a return
22  on its very large investment in research and development.[44]

23      44.     Companies compete in the technologies to be selected in a standard. In
24  addition, standards also compete with other standards, so one must consider that

25

26      [43] Ex. 223, ETSI Rules of Procedure, November 18, 2015, Annex 6, § 3.2:
    ETSI Intellectual Property Rights Policy.
27      [44] Ex. 4071, Ericsson Annual Report 2015, p. 42.

28

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
    CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1    risk in assessing a reasonable return on investment as well.  This is one reason

2    why a SDO is incentivized to select the best technical contributions.  For instance,

3    there was competition between LTE and a technology called WIMAX for Fourth

4    Generation cellular technology.  I understand that Ericsson focused its resources

5    on LTE and, ultimately, LTE won the competition over WIMAX due to LTE's

6    more effective technology and broader support in the industry.[45]  Other developers

7    placed resources into WIMAX and presumably did not see the same returns.

8                    **4.    *Impact of Hold-out and Free Riders.***

9            45.    This system, which has worked exceptionally well in the mobile

10   communications industry for two decades, is not indestructible. Indeed, that

11   system now faces an existential threat from implementers who do not "play by the

12   rules."

13           46.    Open standards enable late-comer implementers to enter the

14   downstream product market without having to make risky investments in

15   developing a technology that may never gain public acceptance. This is not a

16   problem—in fact, this is one of the purposes of collaborative standardization—

17   unless the late-comer implementer refuses to pay for the standardized

18   technology.

19           47.    To be clear, there is nothing necessarily wrong with not contributing to

20   a standard, but nevertheless using the standard.  Indeed, an economic benefit of

21   standardization is allowing companies to invest in other aspects of their products

22   and services, even without investments in the development of the cellular

23   technology itself.  Ultimately, this promotes access to better products and services

24   at a lower cost.  This is a primary economic benefit of standardization.  The

25   problem arises when non-contributing companies use the standard while refusing to

26   pay for patented standardized technology.

27   _____

28          [45] Brismark Witness Statement, ¶¶ 36-41.

48.     When the late-comer refuses to contribute to the very substantial investment in technology that becomes standardized, these "free-riders" or "hold-outs" seriously risk harming innovation and competition in the mobile communications sector in at least three ways:

49.     *First*, free-riding on standard essential patents reduces the potential returns to innovation. It risks under-compensating developers for their successful technology, distorting and reducing incentives for further development.  The economic harm can be even more pronounced in the context of standards development because, needless to say, these developers are the firms who are likely to lead the development of the enabling technology. And the enabling technology makes possible continued gains in the efficiency of standards. Without a proper return-on-investment for developers—typically corporations with fiduciary duties to their shareholders—there will be no incentive for developers to engage in the risky investment to develop technology that might be incorporated into future standards. In other words, without a reasonable opportunity for a return on invested capital within a reasonable time frame, a rationally-minded developer (or contributor of standardized technology) today will not choose to be a developer (or contributor) in the future.  Eventually, widespread withdrawal could hinder interoperability, increase costs, constrain product performance, and imperil standards development.

50.     *Second*, free-riding may harm those manufacturers that have been paying for using the technology by taking licenses.  Those that played by the rules may, in some cases, be subject to unwarranted price pressure in the product marketplace from firms that are not paying for all their inputs.  Thus firms that act in good faith may be less able to earn a return on their own investments utilizing mobile communication technology.  Ultimately this may incentivize current licensees to delay entering a renewal license.

51.     *Third*, free-riding can lead to a destructive "race to the bottom"

1   that can threaten the success of the innovation ecosystem. Competition from
2   free-riders may constrain rates in licensing negotiations and further depress
3   returns to technology developers. In turn, lack of development stifles future
4   implementation. And artificially low rates drive down innovation and reduce
5   competition in a spiral of lower royalty payments and reduced incentives to
6   innovate, reduced competition, and higher prices.

7       52.     While there may be an important role for firms with low-price
8   strategies in standards implementation, this does not qualify as an ex-ante
9   contribution to the value of the accepted standards. Public delay in paying FRAND
10  cash royalties has the potential to exacerbate the free-rider problem. This is
11  particularly true in the low-priced segment of the market, where a very public, long
12  term delay creates an incentive for other low-priced competitors to follow suit.

13      53.     In sum, the ETSI FRAND licensing regime is designed to facilitate
14  the joint development of standardized technologies, which benefits the industry
15  and users as a whole. Reconciling incentives of firms at the same and
16  different levels of the industry promotes cooperation in developing enabling
17  technology and in defining standards. These are the principles of cooperation,
18  compromise, and consensus behind the ETSI IPR Policy.[46] Free-riding risks
19  destroying the balance between innovator and implementer and eventually
20  denying customers and global societies access to innovation, which is important
21  to users and economic development. The problem is amplified if free riders are
22  rewarded with delayed payments and lower rates by virtue of complex legal
23  wranglings. There is no obvious solution for the licensor other than to engage
24  in extensive litigation to assert its IP rights, at great cost to the parties and to the
25  ecosystem as a whole.

26      54.     In the long term, firms need to uphold these broad objectives or the

27  _____

28      [46] Huber Witness Statement, ¶ 39.

1   mobile phone innovation ecosystem which has worked so well in the past will fail,

2   or at a minimum be compromised.

3       **B.**      **TCL's Business Model**

4           *1.*      *TCL's R&D Intensity.*

5       55.     TCL does not appear to have incurred costs in the research and

6   development of mobile devices that are commensurate with the costs incurred

7   by other industry participants. In 2001, TCL's R&D expenditures were 0.15% of

8   Ericsson's ($6.8 million compared to over $4.5 billion). In 2014, TCL's R&D

9   expenditures were 3.6% of Ericsson's ($190.8 million compared to almost $5.3

10  billion). F u r t h e r , TCL's expenditures on R&D as a percentage of sales

11  revenues (a commonly-used metric known as "R&D intensity") have been very

12  small over time, especially compared to Ericsson. **Figure 4** compares TCL's

13  R&D intensity between 2001 and 2014 with Ericsson's. TCL's R&D intensity in

14  2001 was 2.6% compared to Ericsson's 20.1%. (These R&D intensity percentages

15  are not derived from R&D expenditures specifically related to standards. It is my

16  understanding that Ericsson does not track R&D by standard in its usual course of

17  business, and TCL does not appear to do so either.) In 2014, TCL's R&D intensity

18  was 4.8% compared to Ericsson's 15.9%.

19

20

21

22

23

24

25

26

27

28

1

**Figure 4: R&D Intensity—TCL v. Ericsson, 2001-2014**[47]



56. **Figure 5** compares TCL's R&D intensity between 2008 and 2014 with Huawei's. TCL's R&D intensity in 2008 was 5.8% compared to Huawei's 8.4%. In 2014, TCL's R&D intensity was 4.8% compared to Huawei's 14.2%

---

[47] Exs. 1017-1025, 1140, 1147, 456, TCL Communications Annual Reports 2004-2015; Exs. 1113, 1278, 4362-4371, 4071, Ericsson Annual Reports 2003-2015.

1    **Figure 5: R&D Intensity—TCL v. Huawei, 2007-2014[48]**



57.    TCL's R&D intensity is not only low compared with Ericsson's and Huawei's, but it also is low compared with a number of early contributors to the 2G/3G/4G standards. TCL's R&D intensity generally has been very low, in the 5-6% range. By contrast, during this time Ericsson and Motorola invested approximately 13-15% per year, and Qualcomm and Nokia approximately 20% per year. [49]

---

[48] Exs. 1017-1025, 1140, 1147, 456, TCL Communications Annual Reports 2004-2015; Huawei Annual Reports 2009-2014.

[49] Exs. 1017-1025, 1140, 1147, 456, TCL Communications Annual Reports 2004-2015; Exs. 1113, 1278, 4362-4371, 4071, Ericsson Annual Reports 2003-2015; Nokia Annual Reports 2003-2014; Motorola, Inc. Annual Reports 2002-2009; Qualcomm Annual Reports 2003-2015.

## 2. *TCL's ASP.*

58.     TCL handsets have a relatively low average selling price ("ASP") compared to handsets produced by other manufacturers. TCL has been able to keep its ASP relatively low because it has invested very little in R&D compared to other firms, and it is apparently not paying many other firms for the use of their patented technology.[50]

59.     The Retail ASP for larger mobile handset manufacturers is shown in **Figures 6a through 6d**. TCL's Retail ASP is low relative to Retail ASPs of other handset manufacturers. In recent years, among the larger mobile handset manufacturers TCL, ZTE and Microsoft (Nokia) have had the lowest Retail ASPs.

---

[50] Deposition of Stephen Chiang, February 3 and 4, 2016, 573-574, 598; Deposition of Judy Zhu, January 27, 2016, 138.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE; CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

**Figure 6a: Retail ASP Across Selected Handset Manufacturers, 2007-2015[51]**



*Notes:TCL-Alcatel excludes Palm as aquisition completed after Palm sales ceased*

---

[51] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release.

1    **Figure 6b: Retail ASP Across Selected Handset Manufacturers (Without**

2    **Apple), 2007-2015[52]**



*Note: TCL-Alcatel excludes Palm as aquisition completed after Palm sales ceased*

_____

[52] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release.

1   **Figure 6c:  Retail ASP For TCL, Apple, HTC, Huawei, LG and Samsung,**
2   **2007-2015[53]**



[53] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release.

**Figure 6d: Retail ASP For TCL, Coolpad, Karbonn, and ZTE, 2007-2015[54]**



60.    TCL's unit share of worldwide handset sales has increased in recent years. This increase has a significant negative correlation with the decline in TCL's relative ASP over the same period. **Figure 7** shows TCL's worldwide unit share and its relative (compared to the leading handset manufacturers) ASP between 2007 and 2015. In 2007, TCL's ASP was 66.7% of the sales-weighted ASP of the leading handset manufacturers, and its unit share was 0.8%. By 2015, TCL's ASP had fallen to just 21.6% of the sales-weighted ASP of the leading handset manufacturers, and its unit share had risen to 3.6%.

---

[54] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release.

**Figure 7: TCL's ASP Relative to Leading Handset Manufacturers' Sales Weighted ASP and TCL's Worldwide Unit Share, 2007-2015**[55]



Notes: Weighted Average Selling Price is based on annual ASP of Samsung, Apple, Microsoft (Nokia), Huawei, Lenovo (Motorola), LG Electronics, and ZTE relative to units sold. TCL-Alcatel excludes Palm as aquisition completed after Palm sales ceased.

### C.    Framework for FRAND Analysis

61.    The ETSI IPR Policy is contained in the ETSI Rules and Procedures.[56]  On the meaning of ETSI FRAND commitments, and interpretation under French law, I am relying on the testimony of Dr. Huber and Prof. Fauvarque-Cosson.  As I understand from Dr. Huber, the ETSI FRAND regime is designed to achieve three main objectives: (1) to foster innovation by ensuring appropriate compensation to developers; (2) to allow participants to focus on

_____

[55] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release.

[56] Ex. 223, ETSI Rules of Procedure, November 18, 2015, Annex 6, ETSI Intellectual Property Rights Policy.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1  creating the best technical standards without concerns regarding the unavailability

2  of IP; and (3) to secure access to standard essential technology for implementers

3  on FRAND terms.[57] FRAND must be interpreted with these objectives in mind.

### 1.    Scope of FRAND.

5  62.    FRAND commitments by their terms apply only to standard

6  essential patents. ETSI defines "essential" to mean patents that firms must

7  infringe to produce standard-compliant products.[58] ETSI has chosen not to

8  play a role in determining whether patents are essential or not.[59]

9  63.    Patent holders voluntarily identify and declare patents and patent

10 applications that they believe might be or could become essential to a standard.

11 Not all such declared IPRs are actually essential.

### 2.    Definition and Test for FRAND.

13 64.    There is no universally accepted definition of the terms fair,

14 reasonable, and non-discriminatory under the ETSI IPR Policy. But in practice, a

15 standards contributor satisfies the economic and public policy purposes of its ETSI

16 FRAND commitment when it shows a willingness to negotiate in good faith towards

17 a FRAND license on free-market terms.

18 65.    In practice, when determining whether a given offer complies with

19 the FRAND obligation, courts have looked to whether the offered terms and

20 conditions—many of which may be non-monetary—reflect the value of the

21 patent portfolio to be licensed. There are many methodologies for determining the

22 value of a patent portfolio, but the best is to consider what terms and conditions

23 other licensees have agreed to as strong evidence of the value of a patent

---

25 [57] Huber Witness Statement, ¶¶ 34-36.

26 [58] Ex. 223, ETSI Rules of Procedure, November 18, 2015, Annex 6, § 15.6: ETSI Intellectual Property Rights Policy.

27 [59] Ex. 223, ETSI Rules of Procedure, November 18, 2015, Annex 6, § 3.2.1: ETSI Intellectual Property Rights Policy.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

portfolio (the "market value" approach). Thus, if an owner of essential patents is prepared to grant a license under terms and conditions that are within the range of those previously agreed to by other similarly situated licensees, one can conclude that the patent owner has satisfied its FRAND commitment. The FRAND commitment does not require a licensor to offer the exact same terms and conditions to every licensee, but rather, allows for a range of terms and conditions reasonably tailored to individual circumstances. The licensor need only be prepared to grant licenses on terms and conditions within that range (whether at the top or bottom or in between) to satisfy its obligation. Although the American National Standards Institute is not governed by the ETSI IPR Policy, I note that the ANSI Patent Policy recognizes both that a range of terms may be consistent with a Reasonable and Non-Discriminatory ("RAND") commitment under the ANSI Patent Policy and that parties should be given flexibility to negotiate terms and conditions adapted to the interests of the parties: "RAND is generally defined to mean reasonable and non-discriminatory with the details left to the negotiations of the IP holder and the licensee. This allows for the parties to negotiate an appropriate agreement that addresses their specific circumstances and needs."[60]

66.    While ETSI has provided guidance on the broad policy goals of its IPR policy, it has provided little detail on the precise contours of a FRAND commitment and/or a FRAND license itself.[61] Part of the task I have been asked by Counsel to perform is to explain, from an economics and public policy perspective, how FRAND should be interpreted to promote ETSI's stated objectives and the integrity of the ETSI standards-development process.

---

[60] Ex. 5238, *ANSI Resp. to FTC Patents and Standards Workshop, Project No.* P11-1204, June 21, 2011, available at https://www.ftc.gov/sites/default/files/documents/public_comments/request-comments-and-announcement- workshop-standard-setting-issues-project-no.p111204-00029%C2%A0/00029-60633.pdf.

[61] Huber Witness Statement, ¶¶ 40-42.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

67.     The ETSI IPR Policy is clear that negotiations over licensing terms are to be conducted between patent holders and implementers outside of ETSI, and that it plays no role in determining whether licensing terms are FRAND.[62] I understand from Dr. Bertram Huber that the lack of guidance in the ETSI IPR Policy was intentional.[63] Specifically, I understand that ETSI members wanted to give licensors and licensees flexibility to reach mutually-agreeable licensing terms through bilateral negotiation.[64]

68.     I also understand that the history of ETSI's adoption of the ETSI IPR Policy shows that a FRAND undertaking was not intended to be a "most favored nation" provision.[65]  Administrative Law Judge Shaw of the International Trade Commission reached the same conclusion when,  in his Initial Determination of breach of  FRAND allegations in an Investigation involving InterDigital, Huawei, Nokia, and ZTE, he explained that non-discrimination under the ETSI IPR Policy does not mean identical terms:

> "The FRAND nondiscrimination requirement prohibits 'unfair discrimination,' but it does not require uniform treatment across licensees, nor does it require the same terms for every manufacturer or competitor."[66]

69.     According to one commentator, "the requirement of nondiscrimination

---

[62] Huber Witness Statement, ¶¶ 40-42; Ex. 223, ETSI Rules of Procedure, November 18, 2015, Annex 6, §§ 4.1-4.3: ETSI Intellectual Property Rights Policy. ("Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI. … The basic principle of the ETSI IPR regime remains FRAND  with no specific preference for any licensing model.")

[63] Huber Witness Statement, ¶¶ 40-42.

[64] Huber Witness Statement, ¶ 42.

[65] Huber Witness Statement, ¶¶ 20-24, 46-47.

[66] *In the Matter of Certain Wireless Devices With 3G Capabilities And Components Thereof, Investigation No. 337- TA-800 Initial Determination*, Administrative Law Judge David P. Shaw, June 28, 2013, p. 432.

1    does not require a patent owner to license its standard essential patents under the

2    same licensing terms to all implementers."[67]

3        70.    Although it involved ITU and IEEE RAND commitments, the decision

4    in *Microsoft Corp. v. Motorola, Inc.* demonstrates that a very wide range of terms

5    can still be non-discriminatory. There, Judge Robart found a reasonable RAND

6    range from 0.555 to 16.389 cents per unit for Motorola's sixteen H.264 video

7    encoding patents under the ITU policy (a range with an upper bound ***29 times***

8    ***greater*** than the lower bound), and a RAND range from 0.8 to 19.5 cents per unit

9    for Motorola's eleven 802.11 WiFi patents under the IEEE policy (a range with an

10   upper bound ***24 times greater*** than the lower bound).[68]

11       71.    I also understand that given the ETSI IPR Policy, FRAND must be

12   assessed in light of the fact that the regime is designed to work through bilateral

13   negotiations that provide licensors of standard essential patents with substantial

14   flexibility.[69] As such, I understand that ETSI rejected an approach to licensing that

15   would require offering identical licensing terms and conditions to every licensee.

16       72.    Thus, as I believe is widely acknowledged, FRAND must be a range

17   of terms and conditions. It is not a single set of terms and conditions nor a single

18   "FRAND rate." This is true even if negotiators working toward a business

19   compromise on license terms and conditions (and courts awarding damages) pick a

20   single set of licensing terms or a single damages number (or set of damages

21   numbers for different standards/patents/products).

22

23   [67] Ex. 5251, J. Gregory Sidak, "The Meaning of FRAND, Part II, Injunctions", *Journal of Competition Law & Economics* (2015), 11(1):201-269 at

24   215, available at http://jcle.oxfordjournals.org/content/11/1/201.full; *see, also*, Ex. 5268, Edward Gold, "Exploring the Non-discriminatory Aspect of RAND

25   Licensing Terms," *SRR Global Financial Advisory Services*, Fall 2014, available at http://www.srr.com/article/exploring-nondiscriminatory-aspect-rand-licensing-

26   terms (collecting sources).

27   [68] *See Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1033 (9th Cir. 2015).

     [69] Huber Witness Statement, ¶ 42.

28

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

73.    This makes sense given the many different financial and non-financial aspects to a comprehensive license agreement. This also makes sense because over time the value of the patents and products covered by the license may change.

74.    As a matter of economics, FRAND licensing must be flexible because holders of standard essential patents cannot insist that every licensee enter identical agreements. *First*, non-cash considerations compel variation in licensing terms, and can be difficult to price directly. *Second*, there would be always-ongoing negotiations, and increased litigation, if each licensee were forced into an identical license. A licensor therefore must be provided with a degree of flexibility in crafting licenses that are tailored to the business and economic needs of a particular licensee.

75.    I understand the concepts fair, reasonable, and non-discriminatory to be related in practice.

76.    In this regard, the non-discriminatory concept has a process focus. That focus acknowledges that the licensing process often involves back-and-forth negotiations between the prospective licensor and the prospective licensee, in which the parties make trade-offs between various considerations, including those described above. Those trade-offs can vary across different prospective licensees and can vary over time depending on market conditions. A non-discriminatory licensing process requires that the patent holder not stack the deck against a particular licensee by responding very differently to circumstances in the licensing negotiation for impermissible reasons.

77.    I understand that when the ETSI IPR Policy, and the "non-discriminatory" aspect of FRAND, were first being developed, the policy drafters focused on two impermissible reasons for different treatment: (1) nationalism or regionalism (since there was some concern about a European and American club of

1   companies); and (2) ETSI membership status (since there was a concern about ETSI

2   members foreclosing non-ETSI members from access to the standards). [70]

3   78.   None of TCL's experts have suggested that Ericsson intended to

4   discriminate against TCL  in its licensing practices, including on the basis of

5   TCL being a Chinese-headquartered company or having only recently

6   joined ETSI. In fact, TCL's experts argue that another Chinese-

7   headquartered company, Huawei, obtained from Ericsson the best

8   licensing rates and terms of any handset maker. And the Court recognized

9   the absence of proof of an intentionally false FRAND commitment in

10  granting summary judgment for Ericsson on TCL's unfair competition law

11  claim. Dkt. 1058.

### 3.   Analysis of "Non-discriminatory" Within FRAND Cannot Be Prospective.

14  79.   The analysis of "non-discriminatory" within FRAND is necessarily

15  specific to the time of the offer.  To the extent TCL's experts may attempt to

16  establish discrimination against TCL based on Ericsson licenses post-dating the

17  operative offers, including certain licenses Ericsson recently entered into with

18  Huawei and Apple, I disagree.

19  80.   Even for similarly situated companies, the relevant offers and licenses

20  for a FRAND discrimination analysis must generally exclude future offers and

21  licenses.  An offer is either discriminatory when made—or not discriminatory.  A

22  prospective analysis is illogical. That is, a future offer or license cannot

23  retroactively convert a non-discriminatory offer into a discriminatory offer after-

24  the-fact. To interpret the requirement otherwise would be inconsistent with the

25  economic goals of the ETSI IPR Policy, and unduly constrain the economic aspects

26  of FRAND licensing, both by preventing market adjustments and also by

27  ─────────────────

28  [70] Huber Witness Statement, ¶¶ 43-45.

1   essentially eliminating finality in negotiations.

### 4.    *FRAND Does Not Require Licensors to Equalize Actual Costs Among Downstream Competitors.*

81.    To the extent TCL's experts may argue that FRAND requires that licensors promote downstream competition by creating a level playing field among competitors with regard to monetary payments associated with IP costs, I disagree.

82.    From an economic perspective, such an argument makes little sense. For decades, firms subject to FRAND licensing commitments have licensed their patents as part of broader commercial arrangements, often including cross-licenses. In some instances, (including, for example, the Ericsson cross-licenses with Samsung, HTC, Apple, and LG), a cross-license will involve a lump-sum balancing payment rather than a running royalty. I understand there may also be a hybrid approach where a licensee agrees to pay a large upfront lump sum amount that serves to buy down the future royalty rate.

83.    Downstream competition cannot be properly analyzed, as TCL's experts suggest, using "imputed" running-royalties that the firms at issue did not actually pay. Firms compete on the basis of their real marginal costs, not "imputed" costs that are not actually paid.

84.    In addition, the methods proposed by TCL's experts in this case would effectively impose a most favored licensee regime on owners of standard essential patents—an approach that ETSI expressly rejected in 1993.[71] A most-favored licensee regime would contradict at least two objectives of FRAND licensing: promoting innovation and encouraging SDO participation. And, as stated above, doing so would effectively prevent owners of standard essential patents from engaging in mutually-beneficial cross-licensing arrangements, which are

---

[71] Huber Witness Statement, ¶ 46.

1    common in the  industry.

2    85.    A most favored licensee or most favored nation ("MFL" / "MFN")

3    provision requires that *if* a licensor were to grant more favorable terms to a new

4    licensee, those more favorable terms must also be granted to the existing licensees

5    that have such provisions.  If a FRAND commitment were interpreted as equivalent

6    to a MFL/MFN provision, a new licensee would have to be afforded the most

7    favorable terms that were previously granted to any existing licensee.  Interpreting a

8    FRAND commitment as imposing a MFL/MFN requirement would automatically

9    set the lowest rate (determined in the light of FRAND considerations) from a set of

10   licenses with sufficiently similarly situated licensees.

11   86.    Such an interpretation applied prospectively would artificially force

12   FRAND rates downward—regardless of any ex-ante or ex-standard value

13   represented by those standard essential patents.  Every existing and new licensee

14   would have the incentive to demand the same, identical lowest rate. This

15   requirement would stack the deck against licensors, coordinating the incentives of

16   existing licensees against individual licensors, and result in a "race to the bottom,"

17   ratcheting rates downward over time on standard essential patents, reducing

18   incentives for research and development investments in technical standards

19   innovation.

20   87.    A MFL requirement would heighten the risk of arbitrary (and

21   erroneous) determinations of discrimination.  Every existing licensee not currently

22   paying the lowest rate negotiated by any one licensee would immediately be seen as

23   "discriminated" against.  This makes no economic sense.  To the contrary, the fact

24   that rates are not identical does not by itself show any intent to discriminate or

25   actual discrimination suffered by any licensee.

26   88.    By contrast—and preferred from the standpoint of supporting effective

27   standards development—with a FRAND range based on rates extracted from

28   agreed on, arms-length negotiated licenses, licensees in bilateral negotiations would

1    continue to have the flexibility to negotiate lower rates. No single license rate

2    would individually determine what is or is not FRAND.

3         **5.    Negotiated Licenses Are the Best Economic**

4              **Measure of FRAND.**

5         89.    Like many other SDOs, ETSI deliberately left FRAND undefined

6    to allow contracting parties flexibility to structure economically efficient arm's

7    length agreements.[72] The ETSI IPR Policy expressly states that ETSI does not get

8    involved in determining whether licensing terms are FRAND, and that licensing is

9    left to the parties to be conducted outside ETSI's auspices and without ETSI's

10   supervision.[73]

11        90.    In my opinion, what is FRAND should be understood in the sense of

12   what is consistent with industry practice.

13        91.    It makes no economic sense to argue that what is FRAND bears no

14   relationship to industry practice; otherwise two decades of FRAND licensing

15   would need to be overturned—even though ETSI itself has seen no need to do so.

16   I understand that a French court interpreting the contractual FRAND commitment

17   would look to industry practice for the meaning of fair, reasonable, and non-

18   discriminatory.[74]

19        92.    I also understand from Ericsson's expert Benedicte Fauvarque-Cosson

20   that the French Civil Code requires that contracts must be negotiated, formed and

21   performed in good faith.[75] As applied to FRAND licensing specifically, I

22   understand that French law compels both the patent owner and the prospective

23   licensee to negotiate towards a license in good faith.[76]

24   ───────────────
         [72] Huber Witness Statement, ¶¶ 37-39, 42, 54.

25       [73] Ex. 224, ETSI Guide on IPRs, September 19, 2013, §§ 2.2, 4.1.

26       [74] Fauvarque-Cosson Witness Statement, ¶ 31.

27       [75] Fauvarque-Cosson Witness Statement, ¶¶ 24-25.
         [76] Fauvarque-Cosson Witness Statement, ¶ 26.

28

93.     Furthermore, I understand that pursuant to the recent *Huawei v ZTE* ruling of the Court of Justice of the European Union, FRAND requires good faith when negotiating by both parties. The Court included criteria for negotiations, and concluded: "…it is for the alleged infringer diligently to respond to that offer, in accordance with recognised commercial practices in the field and in good faith, a point which must be established on the basis of objective factors and which implies, in particular, that there are no delaying tactics."[77]

94.     Traditionally, economists model negotiations over reasonable royalties in the same way  they model other negotiations. In most market situations successful negotiations take place *because* there is a range of negotiated outcomes within which both parties are economically better off than they are without any deal. (The parties will not be able to reach agreement if there is not such a range of mutually-beneficial deals.) In a traditional patent licensing context, economic analysis predicts that the outcome will be somewhere in the "bargaining range" between the minimum amount that the patent holder would accept in exchange for granting a license (the licensor's "minimum willingness to accept"  or "WTA") and the maximum amount that the licensee would be willing to pay in exchange for a license (the licensee's "maximum willingness to pay" or "WTP").  **Figure 8** illustrates the  difference between the licensor's minimum WTA and the licensee's maximum WTP as the  available "gains from trade."

---

[77] Ex. 4636, *Huawei Technologies Co., Ltd v ZTE Corp.*, Judgment of the Court, Court of Justice of the European Union, July 16, 2015, ¶ 65.

**Figure 8: Illustration of Gains From Trade in Market Based Negotiations**



95.     Of course, the WTP and WTA are determined in part "in the shadow of the law," and reflect what the parties anticipate they could get should negotiations fail and the parties seek recourse to the legal system, as well as the transaction costs associated with that alternative. That is, in the context of a FRAND commitment, the parties to a license negotiation are negotiating in the shadow of that commitment, which both the prospective licensor and the prospective licensee recognize constrains the positions the prospective licensor and licensee can take during negotiations.

96.     Different parties adopt different licensing negotiation strategies. There is a large amount of literature, both from academics and from practitioners, about negotiation strategies, styles, and tactics.[78]

97.     One common distinction made in the literature is between "take it or leave it" ("TIOLI") offers and back-and-forth negotiations.[79] A typical issue is that a TIOLI strategy is often not what economists and game theorists call a "credible threat." The party to whom the TIOLI offer is made is naturally skeptical about

---

[78] *See, e.g.,* Ex. 5235, John Saee, "Best Practice in Global Negotiation Strategies for Leaders and Managers in the 21st century," *Journal of Business Economics and Management*, 9:4, (2008), pp. 309-318.

[79] *See, e.g.,* Ex. 5276, James Wan, "Application Of Game Theory In A Patent Dispute Negotiation," *les Nouvelles*, August 2015.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

the claim that the party making the TIOLI offer will indeed walk away from the bargaining table if its offer is not accepted.

98.     Another way in which parties' negotiation strategies vary is the flexibility that the licensor offers, and the prospective licensee requests, with respect to the structure of the license. Some firms strongly prefer running royalties; others strongly prefer fixed payment amounts.

99.     The most common negotiating practice involves "back-and-forth" negotiations to try to converge on mutually-acceptable license terms (or to conclude that there is no mutually-acceptable agreement). A prospective licensor starts out with an initial offer at the high end of what it believes to be a plausible bargaining range. The prospective licensee responds with a counter-offer at the low end of what it believes to be a plausible bargaining range. The parties engage in back-and-forth negotiations whereby the parties' offers move closer together over time.

100.     This process has several implications. *First*, it is typically understood that the opening offer is not the pecuniary consideration the licensor ultimately expects to get. *Second*, the anticipation is that there will be a back-and-forth, offer and counter-offer dialogue. Any opening offer by a licensor— even one that is relatively high—is no more "unreasonable" than a low-ball counter-offer by the prospective licensee, so long as it is within a range that makes it something other than a constructive refusal to deal.

101.   Market "prices" (licensing terms) reflect a balancing of public and non-public information regarding the parties' subjective valuations of the advantages and disadvantages of doing a deal, compared to the available alternatives.

102.   Bilateral negotiations are typical for access to patent portfolios the size and strength of Ericsson's standard essential patent portfolio.

103.   Given that license negotiations typically involve back-and-forth

negotiations, with each side making offers and counter-offers, and the parties ultimately converging on terms in the middle (and hopefully reaching agreement), the range of opening *offers* (and counter-offers) that are compatible with good-faith negotiations over patents subject to a FRAND commitment can be (and are naturally expected to be) broader than the range of the terms and conditions that ultimately appear in concluded FRAND licenses.[80]

104. In determining whether the terms and conditions for a license to TCL are consistent with Ericsson's FRAND commitment, those terms and conditions must be evaluated relative to the range of FRAND terms and conditions for a license to Ericsson's patented technology, as revealed in Ericsson's existing negotiated licenses with similarly situated licensees.

105. In my opinion, firms that are "similarly situated" at least offer similar (not necessarily identical/fungible/commodity) products at a similar level of the "value chain."

106. From an economic perspective, similarly situated firms are likely to receive substantially the same economic value from the same portfolio of patents.

### 6. *Definition of "Similarly Situated" Licensees.*

107. Thus, one issue in using market negotiated licenses as benchmarks for FRAND is the selection of "similarly situated" licensees.

108. Rarely, if ever, are two negotiated licenses identical in terms of the characteristics of the licensor and licensee, the patents being licensed and the product or products they are applied to, the conditions and processes under which the licenses are negotiated, or the end result of the negotiations with respect to terms and conditions in the agreed license. (In fact, over the years, I have reviewed and analyzed hundreds of license agreements, and I do not recall ever having seen two license agreements between unaffiliated companies that have

---

[80] Huber Witness Statement, ¶¶ 37-39, 48-50.

1   identical terms and conditions.)   Thus, the focus is  on *similarities*.

2   109.   In selecting appropriate comparators, I would observe two relatively

3   bright lines: *First*,  firms selling different types of licensed products (e.g., wireless

4   network routers vs. consumer devices) are less "similarly situated" than firms

5   selling the same mix of licensed  products. *Second*, firms at different levels of the

6   value chain (*e.g.*, chipset manufacturers *vs.*  handset manufacturers *vs.* cellular

7   service providers) are less "similarly situated" to each  other than firms at the

8   same level of t h e  value chain. In both cases, those firms  do  not  accrue the same

9   value from using patented intellectual property, and their products are not

10   substitutes in even the broadest sense.

11   110.   My analysis of firms that are more similarly situated to TCL, who

12   manufactures handsets, excludes firms other than Ericsson's licensees who

13   manufacture handsets.

14   111.   My analysis is also limited to companies selling the same-generation

15   products. In other words, sellers of 2G phones should be compared to other sellers

16   of 2G phones. It makes no sense to compare a seller of primarily 2G phones with a

17   seller of primarily 4G phones,  for  example, not  because  different  generations  of

18   handsets do not  compete,  but  because  the  set  of  patents  applicable  to  different

19   generations of products are different.

20   112.   In any event, within that broad range of handset manufacturers that

21   sell the same-generation phones as TCL, some market participants may be more or

22   less similar to TCL.  As I see it, deciding whether some firm is "similarly situated"

23   to another firm (or to TCL in particular) is not strictly a "yes or no" question; it is a

24   matter of degree, not of kind.  Some licensees are "more similarly situated" to TCL

25   than others.

26   113.   Factors relevant to the economic analysis of whether certain

27   licensees are more or less  similarly situated include but are not limited to each

28   licensee's:

1    a. Average selling price of a licensee's handsets.

2    b. Financial condition, solvency, and trustworthiness.

3    c. Cost structures (combination of price and cost affect the licensee's

4       per-unit margins, which affects the value the licensee receives

5       from being able to use the patented technology).

6    d. Product mix within a product category (*e.g.*, high-end *vs.* low-end

7       phones, or smartphones *vs.* feature phones), to the extent not already

8       captured by the royalty rate structure (*e.g.*, percentage based

9       royalties, but not fixed-cents-per-unit royalties, charge a higher per-

10      unit royalty for high-priced products than for low-priced products).

11   e. Volume of sales, which directly impact the transaction cost savings

12      (it is cheaper to negotiate one license with one firm with 10X in

13      sales than with ten firms, each with only X in sales).

14   ### 7.    *Similarly Situated Licensees for FRAND*

15   ### *Analysis.*

16   114.   Evaluating whether license terms are FRAND relative to other

17   licenses in a world with cross-licensing is a complex exercise. Nevertheless, to be

18   consistent with the overall policy goals of the ETSI FRAND commitment,

19   significant deference should be given to a licensor's contemporaneous

20   determinations of the value of non-cash aspects of the overall transaction,

21   including the value of any cross-license and value of "other consideration" (not

22   made up later in response to challenges of discrimination). Otherwise, holders

23   of standard essential patents who have no intention to discriminate can be

24   falsely found to have engaged in discrimination because some analyst "second

25   guesses" the trade-offs they accepted. Such an outcome could result in a "chilling

26   effect" on licensing negotiations.

27

28

115.   Translation between one form of license to another (*e.g.*, running royalties *vs.* lump-sum) can be difficult when determining "comparability."[81] It is generally recognized that different license structures allocate risks as between the licensor and the  licensee differently, and risk allocation is economically significant. As an example, by accepting a lump-sum payment, the licensor bears the risk that the licensee's sales may exceed expectations, whereas the "pay-as-you-go" nature of  running royalty licenses shifts this risk to the licensee.

116.   Since firms have to be compensated in order to be willing to bear risks, the different licensing structures are not "equivalent" to one another unless the risk allocation effects of  the license structure are properly dealt with. TCL's experts ignore this risk allocation issue  entirely.

117.   In my opinion, lump-sum licenses, dollars-per-unit  running royalties,  and percentage-based running royalties, as well as "hybrid" systems (percentage-based royalties  with floors and caps) can all be consistent with FRAND. All of them are "reasonable" in the  sense of "commercially reasonable" (i.e., consistent with common industry practice). The  choice of royalty structure comes down to an assessment of the relative costs and benefits  of each, including how difficult each is to administer and audit. Because all of these royalty structures allocate risks  and rewards differently between the licensor and the licensee, it is not surprising that the  parties may have different preferences across different royalty structures. The structure  actually chosen is likely to reflect a compromise between the parties' divergent interests.

118.   There are certain pragmatic advantages of a dollars-per-unit royalty structure over a  percentage-based royalty structure. *First*, a dollars-per-unit royalty

---

[81] *See Lucent Technologies v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009) (Noting that "[s]ignificant differences exist between a running royalty license and a lump-sum license," and that "a per-unit running royalty agreement differs from a lump-sum agreement in the same ways a percentage-of-price running royalty agreement differs from a lump-sum agreement.")

structure is likely to be easier to administer, as the royalties due depend only on the number of units sold and the per-unit rate; one need not delve into potentially disputed issues over, for example, what deductions are to be taken into account in determining net selling price, or engage in audits aimed at that issue during the term of the license. *Second*, it is easier to avoid dramatically different treatment of similarly situated licensees if all licensees pay the same per-unit royalty than if different licensees pay different royalties depending on the selling prices of the products and the types of products they make, which may vary over the term of the license.

119.   It is incorrect and misleading to ignore the risk-allocation issue when analyzing lump-sum payments in Ericsson licenses. A lump-sum payment of $10,000 on expected unit sales of 10,000 units at an expected ASP of $100/unit (for expected dollar sales of $1 million = 10,000 units @$100/unit) would be "equivalent" to a 1% (or $1/unit) running royalty only by disregarding the risk allocation differences and marginal cost differences between the two license structures. From an economic perspective, it makes no sense to disregard either the risk allocation issue or the marginal cost issue, as bearing a risk imposes an economic cost on the party bearing the risk (and, conversely, the counterparty is relieved of bearing that risk and therefore receives an economic benefit, relative to the situation in which it had to bear the risk).

120.   It is economically incorrect to assess "imputed" royalty rates which fail to properly reflect the risk allocation differences and marginal cost differences between lump-sum payments and percentage-based running royalties. Ericsson would have to receive a *higher* percentage-based running royalty than the "imputed" rates calculated this way, in order to receive the economically-equivalent *risk-adjusted* benefits as those reflected in the lump-sum payments it negotiated with Samsung, HTC, LG, and others. "Imputed" royalties so calculated would undercompensate Ericsson on a risk-adjusted basis.

D. **FRAND Conclusions.**

1. ***Licensees More "Similarly Situated" to TCL (ZTE, Yulong, Karbonn, and Sharp).***

121.   Applying the methodology described above, five factors for the economic analysis of whether certain licensees are more or less similarly situated to TCL include (1) average selling price (ASP) of a handset, (2) risk related factors such as financial condition, solvency, and trustworthiness, (3) cost structures (including price and per unit cost information), (4) product mix (high-end/low-end, smartphones/feature phones), and (5) volume of sales.

122.   *First*, for three of these factors (sales volume, ASP, and product mix), data on specific companies is readily available from the IDC (i.e., data both parties have analyzed at length in this case).  *Further*, the financial condition, solvency, and trustworthiness risk related factors have been taken into account by Mr. Kennedy's comparable license analyses in the form of his use of differential discount rates for the different companies (which analyses, as noted elsewhere, I have not sought to replicate but I rely on).  Of course, financial theory dictates that firms with higher levels of risk are evaluated using higher discount rates (e.g., higher debt rates, costs of equity, and weighted average costs of capital) based on differing financial condition, solvency, and trustworthiness of the different companies.  *Finally*, with respect to cost structures, per unit cost information is not readily publicly available and, in any event, the evaluation of ASP is in part co-extensive with the evaluation of cost structures as margin information combines price and cost information.  As such, I have applied the methodology described above based on sales volumes, ASP, and product-mix. See below **Figures 9 to 13**, which show these three factors across eleven of Ericsson's licensees compared to TCL.

123.   As discussed above, with respect to these three factors, TCL's strategy has been to focus on selling low priced phones, with a relatively low proportion of

smartphones and 4G devices and substantial continuing sales of feature phones.
**Figures 9 and 10** show TCL's 2015 4G and 3G handset ASPs compared to eleven of Ericsson's licensees, respectively.

**Figure 9:  Average Retail Sales Price for 4G Handsets For TCL and Selected Ericsson Licensees, 2015[82]**



---

[82] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release.

1

**Figure 10:  Average Retail Sales Price for 3G Handsets For TCL and Selected Ericsson Licensees, 2015**[83]



[83] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE; CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

124.   On sales volume and product mix, there are really very few companies exactly like TCL. Some companies have similar volumes, but very different product mixes, and others with similar product mixes have different volumes. **Figures 11 to 13** show TCL's 2015 relative handset product mix and sales volume information.

**Figure 11:  Product Mix – 4G v. 2G/3G For TCL and Selected Ericsson Licensees, 2015**[84]



Note: TCL Actual Sales data is used.

---

[84] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release; Ex. 142, TCL Historical Sales Data, TCL_ERIC_CDCA1278885-87.

**Figure 12:  Product Mix – Smartphones v. Feature Phones For TCL and Selected Ericsson Licensees, 2015**[85]



---

[85] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release.

1   **Figure 13: Sales Volume – Units For TCL and Selected Ericsson Licensees,**

2   **2015[86]**



86 Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release; Ex. 142, TCL Historical Sales Data, TCL_ERIC_CDCA1278885-87.

125.   While no two licensees are fully "similarly situated" along all relevant dimensions, considering the methodology I have identified, ZTE, Sharp, Karbonn, and Yulong (Coolpad) are more "similarly situated" Ericsson licensees to TCL than other Ericsson licensees such as Apple, HTC, Huawei, LG, and Samsung. ZTE is among the most "similarly situated" to TCL, with ASP and unit sales share very close to TCL's.

### *ZTE*

126.   ZTE is a very similarly situated company to TCL based on total volumes, ASPs, global sales, and sales mix. Like TCL, it is headquartered in China and is a top-ten handset manufacturer. In 2015, it sold 57.6 million handsets and had a similar number of 3G sales as TCL. ZTE's handsets have low-end retail ASPs that are very similar to TCL's retail ASPs. ZTE sells some feature phones, unlike other major competitors. ZTE is different from TCL in that it has a significant standard essential patent portfolio and it is a major manufacturer of cellular infrastructure as well.

### *Yulong (CoolPad)*

127.   CoolPad is also a similarly situated company to TCL based on ASP and unit volumes. Based in China, CoolPad is a large handset manufacturer. In 2015, it sold nearly 29 million units. Like TCL, it sells cheap handsets; CoolPad has some of the lowest retail ASPs. Like TCL, CoolPad has no standard essential patents. Unlike TCL, it no longer sells feature phones; all of its sales are smartphones, and nearly 90% of its sales are 4G technology. Its sales are mostly in China, although it does sell some handsets in the United States.

### *Karbonn*

128.   Karbonn is similarly situated to TCL based on total sales volumes, product-mix, and ASPs. Based in India, Karbonn sells handsets almost exclusively in India. In 2015, Karbonn sold nearly 16 million units. Like TCL, Karbonn sells less-advanced, low retail ASP handsets. Karbonn's sales mix is more focused on

feature phones; about 80% of Karbonn's sales are feature phones, while TCL's sales mix is about 45% feature phones.

### *Sharp*

129.   Sharp and TCL sell a relatively similar mixture of smartphones and feature phones.  Based in Japan, Sharp is a major technology conglomerate that sells a small number of handsets almost exclusively in Japan.  In 2015, Sharp sold 4.6 million units.  Sharp mostly sells higher-ASP, advanced handsets.  Nearly 60% of its sales in 2015 were 4G units.

### *2. Licensees Less "Similarly Situated" to TCL (Samsung, HTC, LG, Apple, and Huawei).*

130.   TCL's experts have taken the view that only Samsung, HTC, LG, and Huawei are similar to TCL and, therefore, form the only basis for the comparison, while all other handset manufacturers are not similar, and should thus be disregarded.  I see no basis for this approach in ETSI history or practice, and it seems inconsistent with the notion of FRAND as a broad range, which several American courts—including Judge Robart in *Microsoft v. Motorola*—have confirmed.

131.   Further, I disagree with the assertion that handset vendors TCL, Samsung, HTC, LG, Apple, and Huawei are "similarly situated" merely based on the fact that all of these firms sell handsets. I note some of the key dissimilarities of these Ericsson licensees to TCL below.

### *Samsung*

132.   Samsung is not very similarly situated to TCL.  Based in South Korea, Samsung is a technology conglomerate and is the number one handset manufacturer in the world by volume.  In 2015, Samsung sold over 385 million handsets. Samsung's product mix is different than TCL's.  Over half of Samsung's sales are 4G handsets, although Samsung does sell a significant number of feature phones. Samsung's retail ASPs are at the high-end.  Samsung's 3G retail ASPs are 90%

1  higher than TCL's, while its 4G retail ASPs are 220% higher.  Samsung also sells

2  some infrastructure, although those revenues are insignificant compared to the

3  handset revenues.  Finally, Samsung has a significant standard essential patent

4  portfolio.

### HTC

6      133.   HTC is similar to TCL based on total volumes, but not on product mix

7  or ASP.  Based in Taiwan, HTC is a manufacturer of advanced smartphones.  It had

8  one of the first 4G handsets on the market.  In 2015, HTC sold over 19 million

9  handsets worldwide.  Unlike TCL, HTC mostly sells high-priced, advanced

10  smartphones rather than less advanced handsets.  HTC does not sell feature phones,

11  and over 75% of its handset sales are 4G units.  HTC's retail ASPs are 130% to

12  160% higher than TCLs, making it a mid-to-high range ASP manufacturer.

### LG

14      134.   LG is a similar company to TCL based on sales volumes and global

15  market, but not similar in terms of ASP or patent holdings.  Based in South Korea,

16  LG is a large technology conglomerate that sells handsets worldwide.  In 2015, LG

17  sold nearly 70 million handsets and sold a similar number of 3G units as TCL.  LG

18  also sells some feature phones.  Unlike TCL, LG's retail ASPs are on the high-end.

19  Although not as high as Apple or Samsung, LG's retail ASPs are 50% to 100%

20  higher than TCL's retail ASPs.  Unlike TCL, LG has a significant 3G and 4G

21  standard essential patent portfolio.  LG made over 1% of all approved contributions

22  to the 3G and 4G standards.

### Apple

24      135.   Apple may be the least similarly situated company to TCL.  Based in

25  Cupertino, California, Apple sells high-priced consumer products.  In 2015, Apple

26  sold 230 million handsets.  Its sales-mix is very different than TCL's.  Over 98% of

27  Apple's sales are high-priced 4G iPhones, whereas only about 16% of TCL's sales

28  are 4G handsets, and many of those are very low-priced phones.

*Huawei*

136.  Huawei and TCL are both based in China, but the two companies are not very similarly situated.  Huawei is a new technology conglomerate with a fast-growing handset business.  In 2015, Huawei sold nearly 108 million handsets worldwide, which made it the third largest handset manufacturer in the world, behind Samsung and Apple.  Huawei's product mix is different than TCL's; less than 1% of Huawei's sales are feature phones and over 75% of its sales are 4G smartphones.  Despite rapid growth in its 4G handset business, Huawei's retail ASPs are in the mid-range and rising.  Compared to TCL, Huawei's retail ASPs are 40% higher for 3G and 60% higher for 4G.  Additionally, Huawei is the largest cellular infrastructure manufacturer in the world and has a major standard essential patent portfolio.

137.  In addition, Samsung, HTC, LG, Apple, and Huawei comprise an inappropriately narrow and arbitrary set of potentially similarly situated companies—ignoring other Ericsson licensees that are more similarly situated to TCL, such as Doro and Blackberry, which I will describe below (in addition to ZTE, Sharp, Karbonn, and Coolpad, as discussed at length earlier).

138.  Doro is similar to TCL based on product-mix, but sells its phones at higher ASPs.  Based in Sweden, Doro is a small handset manufacturer that specializes on selling phones to seniors.  In 2015, Doro sold 2.6 million units.  Like TCL, it sells mostly less advanced handsets.

139.  In the time since my expert report in this case, it was announced that Blackberry would cease manufacturing handsets and develop software, and TCL would produce handsets under the Blackberry brand.[87]  The fact that TCL is taking

---

[87] Ex. 5305, "BlackBerry Gives China's TCL Rights to Use Its Brand on Phones," *Bloomberg*, December 15, 2016, available https://www.bloomberg.com/news/articles/2016-12-15/blackberry-licenses-brand-to-chinese-phone-maker-tcl-corp.

1    over the Blackberry brand reveals its heightened importance here.

2         140.   Blackberry, based in Canada, was once a major smartphone

3    manufacturer with volumes more similar to TCL. While Blackberry sold only 3.7

4    million handsets in 2015, five years earlier in 2010, Blackberry sold 48 million

5    handsets, primarily higher-priced smartphones.[88]

6         ### 3.    Comparison of Asserted Similarly Situated

7              Licensees.

8         141.   The proper identification of firms that are truly "similarly

9    situated" to TCL would compare these firms along a number of dimensions,

10   including the factors I have identified.

11        142.   The Figures 14a through 14e below use a number of dimensions to

12   compare TCL with (a) the firms I believe are more similarly situated, and (b) the

13   firms TCL's experts claim to be the only similarly situated firms. It is readily

14   apparent that the firms differ along a range of attributes. I have identified the firms

15   that are most "similar" to TCL along each of the identified attributes:

16

17

18

19

20

21

22

23

24

25

26

27        [88] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release; Ex. 142, TCL Historical Sales Data, TCL_ERIC_CDCA1278885-87.

28

**Figures 14a through 14e:  Comparison of ASP, Mix, and Unit Sales Share Data For TCL and Selected Handset Manufacturers** [89]

| Table 1a | 2015 Retail ASP | |
|---|---|---|
| **Handset Manufacturer** | **Feature Phone** | **Smart Phone** |
| Apple | * | $   713.55 |
| Sony | * | $   371.66 |
| Samsung | $    28.31 | $   342.77 |
| HTC | * | $   331.92 |
| Sharp | $  135.21 | $   325.20 |
| LG | $    44.53 | $   246.17 |
| Huawei | $    55.24 | $   203.75 |
| ZTE | $    20.57 | $   139.70 |
| TCL | $    21.18 | $   110.28 |
| Coolpad | * | $     99.14 |
| Karbonn | $    15.93 | $     57.71 |
| Closest | ZTE | Coolpad |
| 2nd Closest | Karbonn | ZTE |
| 3rd Closest | Samsung | Karbonn |

*Note:  * denotes no feature phone sales.*

| Table 1b | Total Unit Sales Share | |
|---|---|---|
| **Handset Manufacturer** | **2013 Share** | **2015 Share** |
| Samsung | 24.3% | 19.8% |
| Apple | 8.3% | 11.8% |
| Huawei | 3.0% | 5.5% |
| LG | 3.8% | 3.6% |
| TCL | 2.7% | 3.6% |
| ZTE | 3.0% | 3.0% |
| Sony | 2.1% | 1.5% |
| Coolpad | 2.0% | 1.5% |
| HTC | 1.2% | 1.0% |
| Karbonn | 1.2% | 0.8% |
| Sharp | 0.3% | 0.2% |
| Closest | ZTE | LG |
| 2nd Closest | Huawei | ZTE |
| 3rd Closest | Sony | Huawei |

| Table 1c | Feature Phone Unit Sales Share | |
|---|---|---|
| **Handset Manufacturer** | **2013 Share** | **2015 Share** |
| Samsung | 16.0% | 12.9% |
| TCL | 4.1% | 6.0% |
| Karbonn | 2.1% | 2.4% |
| LG | 2.7% | 2.2% |
| ZTE | 2.2% | 1.4% |
| Sharp | 0.2% | 0.2% |
| Huawei | 0.8% | 0.1% |
| Apple | 0.0% | 0.0% |
| Sony | 0.0% | 0.0% |
| Coolpad | 0.0% | 0.0% |
| HTC | 0.0% | 0.0% |
| Closest | LG | Karbonn |
| 2nd Closest | ZTE | LG |
| 3rd Closest | Karbonn | ZTE |

| Table 1d | Smartphone Unit Sales Share | |
|---|---|---|
| **Handset Manufacturer** | **2013 Share** | **2015 Share** |
| Samsung | 31.1% | 22.3% |
| Apple | 15.1% | 16.1% |
| Huawei | 4.8% | 7.4% |
| LG | 4.7% | 4.2% |
| ZTE | 3.5% | 3.5% |
| TCL | 1.6% | 2.7% |
| Sony | 3.7% | 2.0% |
| Coolpad | 3.7% | 2.0% |
| HTC | 2.2% | 1.3% |
| Sharp | 0.4% | 0.2% |
| Karbonn | 0.5% | 0.2% |
| Closest | HTC | Sony |
| 2nd Closest | Karbonn | Coolpad |
| 3rd Closest | Sharp | ZTE |

[89] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical release.

| Table 1e | 2015 Retail ASP | | Feature Phone Unit Sales Share | | Smartphone Unit Sales Share | | Total Unit Sales Share | |
|---|---|---|---|---|---|---|---|---|
| Handset Manufacturer | Feature Phone | Smart Phone | 2013 Share | 2015 Share | 2013 Share | 2015 Share | 2013 Share | 2015 Share |
| Samsung | $   28.31 | $  342.77 | 16.0% | 12.9% | 31.1% | 22.3% | 24.3% | 19.8% |
| Apple | * | $  713.55 | 0.0% | 0.0% | 15.1% | 16.1% | 8.3% | 11.8% |
| Huawei | $   55.24 | $  203.75 | 0.8% | 0.1% | 4.8% | 7.4% | 3.0% | 5.5% |
| LG | $   44.53 | $  246.17 | 2.7% | 2.2% | 4.7% | 4.2% | 3.8% | 3.6% |
| TCL | $   21.18 | $  110.28 | 4.1% | 6.0% | 1.6% | 2.7% | 2.7% | 3.6% |
| ZTE | $   20.57 | $  139.70 | 2.2% | 1.4% | 3.5% | 3.5% | 3.0% | 3.0% |
| Sony | * | $  371.66 | 0.0% | 0.0% | 3.7% | 2.0% | 2.1% | 1.5% |
| Coolpad | * | $   99.14 | 0.0% | 0.0% | 3.7% | 2.0% | 2.0% | 1.5% |
| HTC | * | $  331.92 | 0.0% | 0.0% | 2.2% | 1.3% | 1.2% | 1.0% |
| Karbonn | $   15.93 | $   57.71 | 2.1% | 2.4% | 0.5% | 0.2% | 1.2% | 0.8% |
| Sharp | $  135.21 | $  325.20 | 0.2% | 0.2% | 0.4% | 0.2% | 0.3% | 0.2% |
| Closest | ZTE | Coolpad | LG | Karbonn | HTC | Sony | ZTE | LG |
| 2nd Closest | Karbonn | ZTE | ZTE | LG | Karbonn | Coolpad | Huawei | ZTE |
| 3rd Closest | Samsung | Karbonn | Karbonn | ZTE | Sharp | ZTE | Sony | Huawei |

Note: * denotes no feature phone sales.

143.   In addition, technological capabilities and the long term involvement of firms such as Samsung, HTC and LG in the standards-based innovation ecosystem should be taken into account in determining FRAND licensing equivalence. Firms with long-term interests in the future of the industry cannot afford to take a short-term opportunistic view. For this reason, it is especially incorrect to focus exclusively on sales price—and ignore technological capabilities and contributions to technology development and standardization.

144.   Finally, considering all handset licensees, Samsung is among the least "similarly situated" to TCL, because of Samsung's high market share, high ASP, and strong patent portfolio relative to TCL. Apple is also among the least "similarly situated" to TCL because of its lack of feature phones, its high market share, and its high ASP relative to TCL.

### 4.   Ericsson's Option A and B Offers to TCL were FRAND When Made.

145.   Applying the foregoing principles, I agree with Mr. Kennedy's conclusion that the implied 4G dollar-per-unit rates Ericsson proposed to TCL as

Options A and B are below the implied dollar-per-unit rates in Ericsson's 2014 and 2015 deals with ZTE and Sharp, whom I consider similarly situated to TCL. I agree with Mr. Kennedy's conclusion that the 4G implied dollar-per-unit rates Ericsson proposed to TCL as Options A and B are largely below even the implied dollar-per-unit rates in Ericsson's 2014 deals with Samsung and LG.

146.   I agree with Mr. Kennedy's conclusion that the implied 3G dollar-per-unit rates Ericsson proposed to TCL as Options A and B are below the implied dollar-per-unit rates in Ericsson's deal with Sharp, whom I consider similarly situated to TCL. I agree with Mr. Kennedy's conclusion that the 3G implied dollar-per-unit rates Ericsson proposed to TCL as Options A and B are in a similar range as the implied dollar-per-unit rates in Ericsson's deals with Samsung and HTC, as well as its deals with ZTE and Karbonn. And I similarly consider the latter two licensees to be similarly situated to TCL.

147.   I agree with Mr. Kennedy's conclusion that the EDGE implied dollar-per-unit rates Ericsson proposed to TCL as Options A and B are below the implied dollar-per-unit rate in Ericsson's deal with Karbonn, which I consider similarly situated to TCL. I agree with Mr. Kennedy's conclusion that the EDGE implied dollar-per-unit rates Ericsson proposed to TCL as Options A and B are below the implied dollar-per-unit rate in Ericsson's deals with LG.

148.   Indeed, for each standard, Ericsson's recent offers to TCL fell within the range of deals that Ericsson has with other handset manufacturers.

## VI.   COMPETITION ANALYSIS FOR "NON-DISCRIMINATORY"

149.   Even if the Court were to determine that Ericsson's offers did not treat TCL similarly to similarly situated licensees, however, TCL's experts have failed to show that Ericsson's offers caused anticompetitive effects, by failing to do an analysis akin to what an economist would perform in an antitrust case. Without conducting an economic analysis of harm to competition and harm to

1   TCL causally related to the alleged discrimination, TCL's experts have failed to

2   establish Ericsson's offers caused either kind of harm.

3       150.   TCL sued Ericsson for both breach of its FRAND commitments and

4   for violation of California Business & Professions Code Section 17200,

5   California's "unfair competition" law.  Even before Ericsson won summary

6   judgment on the unfair competition law claims, none of TCL's experts made

7   efforts to establish that Ericsson's conduct, as alleged in the complaint, caused

8   TCL to suffer economic injury, or that even if TCL did suffer injury, Ericsson's

9   conduct harmed or is likely to harm competition.  (I understand TCL would have

10  to establish both harm to a competitor and harm to competition.)

11      151.   To the contrary, in my opinion, the standards-based innovation

12  ecosystem in which Ericsson is a key participant has resulted in a very

13  competitive and dynamic handset market built on the foundation of innovative

14  intellectual property developed by companies like Ericsson.

15          *1. Lack of Economic Injury.*

16      152.   Given that TCL has not paid Ericsson royalties for its infringing sales,

17  and given that there  is no evidence of which I am aware of that TCL has changed

18  its behavior as a direct result of Ericsson's alleged conduct, it is  my opinion that

19  TCL has not suffered any economic injury in this matter.

20      153.   As a matter of basic competition economics, an upstream input

21  provider that  does not participate in the downstream market (like Ericsson) is not

22  advantaged by  decreasing the number of its downstream customers. In other

23  words, there is no economic  reason that Ericsson would seek to drive TCL out

24  of the market by overpricing a license—just the opposite is true.

25      154.   In fact, under these circumstances, TCL has been able to have a cost

26  advantage when competing with similarly situated licensees who have paid and/or

27  are paying royalties to Ericsson and the other standards-contributors.

28      155.   Even if TCL were to be required to pay Ericsson a FRAND royalty, the

market would not suffer from an economic perspective because the rates that Ericsson has offered are similar to, if not less than, rates being paid by some of the companies that are most similarly situated to TCL. As Mr. Kennedy's analysis has demonstrated, the royalties that Ericsson is asking TCL to pay are within the range of rates that Ericsson is already receiving from its licensees.

156.   Further, based on my experience providing economic analyses regarding harm to competition in antitrust cases, I know that the required analysis involves thoroughly examining purportedly anticompetitive effects in alleged relevant markets.  I have not seen any evidence that TCL suffered harm, or that there has been harm to competition, in an alleged relevant market based on Ericsson's offered rates (such as facts regarding harm to TCL's margins, sales channels, product pricing, or sales volumes).  Instead, the Court has already granted partial summary judgment to Ericsson as to TCL's lack of evidence showing that Ericsson's offered rates caused TCL to suffer any harm. Dkt. 1061.

### 2.   *Rapid Adoption of Advancing Mobile Communications Technologies.*

157.   In assessing competition and innovation among handset suppliers, I have examined the rate at which new technologies are adopted in the mobile communications industry. If Ericsson's negotiating behavior regarding licensing was systematically impeding handset manufacturers from adopting new technologies, I would not expect to see, for example, the rapid and widespread adoption of 4G technology.  However, new technologies, such as 4G, are very rapidly being adopted by handset manufacturers, wireless network providers, and consumers. This economic outcome is consistent with a competitive and dynamic handset market.

158.   According to one industry observer, "With 250 million 4G phones

1  sold globally in 2013 and sales set to double in 2014, 4G is being adopted by
2  consumers faster than any other previous telecommunications technology."[90] In
3  addition, one of the key "driver[s] of global 4G adoption is the astonishingly
4  rapid fall in the price of 4G-enabled handsets and service plans in developed
5  markets in the West."[91]

6       159.   The rapid adoption of 4G technology is shown in **Figure 15**. The
7  number of North American 4G wireless subscribers increased from 7 million in
8  2011 to 208 million in 2015—a 2,871% increase in just four years.

**Figure 15: North America Wireless Subscriptions by Technology (Millions), 2010-2014[92]**



*Note: November 2015 data, hence 2015 numbers may be partially estimated.*

     [90] Ex. 5246, "4G Becomes the Fastest Adopted Mobile Technology Ever," CCS *Insights*, April 15, 2014, (footnote omitted).

     [91] Ex. 5246, "4G Becomes the Fastest Adopted Mobile Technology Ever," *CCS Insights*, April 15, 2014. *See, also*, Ex. 1097, Ericsson Mobility Report—On the Pulse of the Networked Society, November 2015.

     [92] Ex. 4341, Ericsson Traffic Exploration, Subscriptions - All Device Types, http://www.ericsson.com/TET/trafficView/loadBasicEditor.ericsson.

160.   Such rapid growth is inconsistent with the theory that the industry is being "held up" by holders of standard essential patents. A recent working paper[93] identified a number of empirical predictions that one would expect to see hold true if there was any significant degree of "hold up," tested those predictions against the evidence, and concluded that concerns about the (theoretical) possibility of "hold up" are not borne out by the evidence.

161.   Ericsson's role in pushing the mobile communications frontier is recognized by other major industry participants. Substantial investment, including by Ericsson, in mobile communication innovation continues with the development of the next generation of mobile communications technology (5G). For instance:

> "Verizon and Ericsson announced that in 5G field trials held in February 2016, Ericsson's 5G Radio Prototypes hit more than 10 gbps peak throughput..... Ericsson's outdoor-mounted 5G Radio Prototypes delivered high-definition video streaming to devices located indoors, emulating a residential customer environment."[94]

### 3. High Market Share Volatility in the Mobile Handset Market.

162.   High share volatility in a particular market is generally considered consistent with vigorous competition within the market. If Ericsson's negotiating

---

[93] Ex. 4816, Alexander Galetovic, Stephen Haber and Ross Levine, "An Empirical Examination of Patent Hold-Up," *Tusher Center Working Paper*, No. 5, March 31, 2015, p. 26, available at http://innovation-archives.berkeley.edu/businessinnovation/documents/Tusher-Center-Working-Paper-5.pdf.

[94] Ex. 5257, Diana Goovaerts, "MWC 2016: 5G Innovation Rundown," *Wireless Week*, February 23, 2016, available at http://www.wirelessweek.com/news/2016/02/mwc-2016-5g-innovation-rundown.

behavior regarding licensing was systematically harming competition in the handset market, I would not expect to observe relatively high handset share volatility. However, high share volatility is a particularly conspicuous characteristic of the mobile handset market. US mobile handset unit share over time is shown in **Figure 16**.

**Figure 16: US Mobile Handset Unit Share by Manufacturer, 2007-2015**[95]



163.   The level of share volatility is quite striking and is consistent with the mobile handset market being very competitive. Some of the large share shifts in recent years can be tied directly to specific handset manufacturers more effectively utilizing, compared to their competitors, the very technologies at

---

[95] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release.

issue in this case. The rapid share increases by Android and Apple handsets at

the expense of competitors such as RIM and Nokia has been described, in 2012,

as follows:

> "Just a few years ago Nokia was the market leader in the
> 2G market and the largest cell phone manufacturer in
> the world. And Symbian and RIM's operating systems
> together held the majority market position. Then Google
> introduced Android and Apple introduced their iPhone
> with their very successful App store. At the same time
> cell phone manufacturers were taking advantage of
> newer, faster processors to introduce customers to the
> increased capabilities and functions of 3G phones, which
> rapidly overtook 2G phones in the western world. …
> RIM failed to launch a truly 3G handset and operating
> system that could compete with Apple and Android
> phones. Their drop in revenue, share price and market
> share rivals that of Nokia. They have not introduced these
> new competitive phones and many believe it is way too
> late…, the train has left the station and RIM isn't on
> it. Their dual co-presidents top management, lack of
> new 3G phones and slow reaction to the reality of their
> declining market share put them into the death spiral they
> are in today.
> The combination of intense 3G competition, rapid
> change in technology, new business models, and slow
> to react management has put these former industry

leaders on a clear downward path, which they may not be

able [to] survive."[96]

164.   As **Figure 16** shows, Apple's share has increased substantially in recent years.  Apple's success appears at least in part to be due to its adopting and building on 4G technology.  According to one industry observer:

> "The iPhone 5 was a landmark release by Apple for a variety of reasons, and as well as finally breaking the mold of a 3.5-inch display, it was also the very first time in which the Cupertino included 4G LTE into one of its handsets. The iPad 3, which launched back in March of this year, was the very first Apple device to offer the next-gen cellular chip, and with the release of the sixth-gen smartphone just a couple of months ago, Apple's LTE market share has gathered a little more steam—climbing to an impressive 27 percent.
>
> The number is considerable given how short a shelf life Apple's LTE products have had so far, but remains quite away behind main competitor Samsung, which commands a 40% share."[97]

---

[96] Ex. 5240, Robert Foster, "Do Corporations Have S Curves?" *UCLA Anderson Global Supply Chain Blog*, November 1, 2012, available at http://blogs.anderson.ucla.edu/global-supply-chain/2012/11/do-corporations-have-s-curves.html.

[97] Ex. 5242, Ben Reid, "Apple's LTE Market Share Climbs To 27% Globally, Samsung Still Dominates The Market," *Redmond Pie*, December 11, 2012, available at http://www.redmondpie.com/apples-lte-market-share-climbs-to-27-globally-samsung-still-dominates-the-market/.

### 4. Significant Consumer Value for Products
### Capable of Cellular Communications.

165.   TCL's experts have suggested that successful standardization and deployment mandates a "maximum aggregate royalty rate" in the single digits. While I offer no opinion on the actual level of aggregate royalties for a handset, we have one "natural experiment" in which a major manufacturer, Apple, sells both products (its various iPhones) capable of cellular communications and otherwise-virtually-identical products (the iPod Touch) not capable of cellular communications. (There are some minor differences besides cellular capability, screen size, and processor between the products, including the fact that the iPod Touch does not have GPS capability and the different screen contrast of the products. I do not have the data that would be needed to control for these differences.)  The price differential between these products provides market evidence of the value that consumers place on cellular communications, and illustrates why the single-digit cap proposed by TCL's experts would be improper.

166.   As with any other good, consumers differ in the (subjective) valuation they place on cellular capability. They will rationally compare the (subjective) valuation they place on cellular capability with the cost differential. If their subjective valuation exceeds the cost differential, they will choose to buy a phone with that capability; if their subjective valuation is less than the cost differential, they will not. The fact that Apple sells both the iPhone (with cellular capability, albeit at a higher price) and the iPod Touch (without cellular capability, but at a lower price) means that the price differential Apple charges is acceptable to some customers but not others. Some customers using the iPod as a music device only do not need connectivity, but may be willing to pay when they desire connectivity. This is common in all industries; despite being offered the opportunity to buy a product for a given price, some people will buy (showing

that their subjective valuation exceeds the price being charged) and others will not (showing that their subjective valuation is less than the price charged).

**Figure 17: iPhone 6 and iPod Touch 6th Gen [98]**




167.   Because the products have different costs, the profit differential (revenue differential minus cost differential) provides market evidence on the value *to Apple*, on both a dollars-per-unit and a percentage-of-revenues basis, of being able to  include cellular capabilities in its products.

168.   Apple currently sells four different types of iPhone products: the iPhone 6, the iPhone 6S,  the iPhone 6 Plus, and the recently-introduced lower-priced iPhone SE, which analysts  describe as Apple's effort to  move "downmarket" to  achieve a previously-unachieved  price point. (I note that the iPhone SE was not announced until after TCL's experts submitted their reports, though the other products had been available. TCL's experts never discussed the

---

[98] Ex. 5332, "iPod Touch 6th Generation vs iPhone 5s vs iPhone 6: Compared," *Technostarry*, September 1, 2015, available at http://www.technostarry.com/ipod-touch-6th-generation-vs-iphone-5s-vs-iphone-6-compared/.

iPod Touch, nor gave any explanation for why they did not take advantage of this "natural experiment" to *test* their analyses.)  Each of these is available with two amounts of memory (16GB and 64GB).  Different products differ not only in the amount of memory included, but also in the chip  used, the size of the digital camera, and the screen size, as well as the prices charged for each. I had my staff gather the information shown in the upper portion of **Figure 18** from  Apple's website as of March 25, 2016.

**Figure 18: Apple iPhone and iPod Touch Comparison/Evaluation[99]**

| (a) | Product | iPhone 6 | iPhone 6S | iPhone 6 Plus | iPhone SE | iPod Touch |
|---|---|---|---|---|---|---|
| (b) | Processor | A8 | A9 | A8 | A9 | A8 |
| (c ) | Screen Size (diagonal) | 4.7" | 4.7" | 5.5" | 4" | 4" |
| (d) | Screen Area  (sq. in.) | 11.688 | 11.688 | 16.005 | 8.465 | 8.465 |
| (e ) | Screen Area Relative to iPod Touch | 1.381 | 1.381 | 1.891 | 1.0 | 1.0 |
| (f) | Camera Resolution (MP) | 8 MP | 12 MP | 8 MP | 12 MP | 8 MP |
| (g) | Price w/16GB Memory | $549 | $649 | $649 | $399 | $199 |
| (h) | Price w/64 GB Memory | $649 | $749 | $749 | $499 | $299 |
| (i) | Price Differential vs. iPod Touch (16GB) | $350 | $450 | $450 | $200 | $0 |
| (j) | Price Differential vs. iPod Touch (64 GB) | $350 | $450 | $450 | $200 | $0 |
| (l) = (i)/(g) | Percentage Price Differential (16GB) | 63.75% | 69.34% | 69.34% | 50.13% | 0% |
| (m) = (j)/(h) | Percentage Price Differential (64GB) | 53.93% | 60.08% | 60.08% | 40.08% | 0% |
| (n) | Estimated Hedonic Value of Larger Screen  (Relative to 4" Screen) | $74.63 | $74.63 | $174.63 | $0 | $0 |
| (o)=(i)-(n) | Price Differential vs. iPod Touch Adjusted For Screen | $275.37 | $375.37 | $275.37 | $200 | $0 |
| (p) | Cellular Cost Differential vs. iPod Screen Cost Differential | $25.01 | $25.01 | $25.01 | $25.01 | $0 |
| (q) | | $4 | $4 | $13 | $0 | $0 |
| ( r)  = (o)-(p)-(q) | Profit Differential Due to Cellular Capability (Adj. for Screen) | $246.36 | $346.36 | $237.36 | $174.99 | |
| (s) = ( r)/g) | Cellular Profit Differential as Percent of Price (16GB) | 44.87% | 53.37% | 36.57% | 43.86% | $0 |
| (t) = ( r)/(h) | Cellular Profit Differential as Percent of Price (64 GB) | 37.96% | 46.24% | 31.69% | 35.07% | $0 |

169.   As one can see, Apple charges significantly more for its cellular-capable iPhones than it charges for its  non-cellular-capable iPod Touches. This

---

[99] Exs. 5301-2, Apple iPhone/iPod Specs, available at http://www.apple.com/iphone/compare/ , http://www.apple.com/ipod-touch/specs/.

WITNESS DECLARATION OF PROFESSOR DAVID TEECE; CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

1   remains true even after Apple substantially cut the price of its base model with
2   the introduction of the iPhone SE, by $150/unit relative to the lowest priced
3   previously-available iPhone model (the iPhone 6), and by $250/unit relative to
4   the most-directly-comparable previously-available iPhone model (the iPhone 6S).

5       170.   It is not economically appropriate to attribute all of the price
6   differential to the difference in cellular capability. One major difference
7   between the iPod Touch and the various iPhone models (other than the iPhone
8   SE, which has the same size screen as the iPod Touch) is that the iPod Touch
9   has a smaller screen (4" diagonal measurement) than the other iPhones (4.7"
10  diagonally for the iPhone 6 and iPhone 6S, 5.5" diagonally for the iPhone 6
11  Plus). From an economic perspective, one wants to control for that screen size
12  differential.

13      171.   We can control for the difference in screen size by what is known as
14  a "hedonic pricing analysis," a widely-used approach that seeks to estimate the
15  value of various product features when the data needed to perform a direct apples-
16  to-apples price-vs.-features comparison is not available. In doing so, we take
17  advantage of the fact that we know that the price premium that Apple charges for
18  the larger-screen iPhone 6 Plus (which has a 5.5" screen measured diagonally, or
19  just over 17% larger than the iPhone 6) over the otherwise-equivalent iPhone 6
20  is $100.

21      172.   Because the screens of the various products are similarly shaped, this
22  implies that increasing the diagonal from 4.7" to 5.5" increases the diagonal by
23  just over 17% and the area by just under 37% (36.94%), implying that the $100
24  price differential between the iPhone 6 and the iPhone 6 Plus is associated with a
25  37% increase in screen area, or $2.70 per percent size increase. The iPod Touch
26  (with its 4" diagonal screen measurement) has a diagonal that is just over 85%
27  (85.1%) of the iPhone 6 (a reduction of just under 15%), implying a screen *area*
28  reduction of just under 27.6% (it has 72.4% of the iPhone 6 screen area).

173.   If one assumes that, given the relatively narrow range of screen sizes (4" to 4.7" to 5.5" measured diagonally) involved, it is reasonable to extrapolate linearly (proportionately to area) from the $100 price differential between the iPhone 6 Plus and the iPhone 6 to the price differential that would apply between the iPhone 6 and the iPod Touch due to the screen area difference alone, this implies that a hedonic measure of the price differential due to the 27.6% smaller screen for the iPod Touch alone would be $74.63/unit.

174.   This is in the ballpark of a simple linear comparison: the price difference between the iPhone 6 with its 4.7" (diagonal) screen and the iPhone 6 Plus with its 5.5% (diagonal) screen is $100; the diagonal difference between the iPod Touch (at 4" diagonal) and the iPhone 6 (at 4.7" diagonal) is less than the diagonal difference between the iPhone 6 and the iPhone 6 Plus (at 5.5" diagonal), so the price differential (due to screen area alone) between the iPod Touch and the iPhone 6 should be less than the $100 price differential between the iPhone 6 and the iPhone 6 Plus.

175.   It costs more to make a cellular-capable iPhone than a non-cellular-capable iPod Touch, because the former needs a cellular chipset and an RF transceiver while the latter does not.  According to data provided by Dr. Leonard, the cost of a cellular chipset, plus an RF transceiver, is some $25.01/unit in 2016. I have relied on his data.

176.   Obviously, it also costs Apple more to make and house a larger screen than it does to make and house a smaller screen. I was able to find two news articles which reported industry analysts' estimates of the cost Apple incurs for different screens. One article from December 2014[100] reported Apple's cost for

---

[100] Ex. 5248, Todd Wasserman, "Apple's iPhone 6 Profit Margin at Least 69 Percent: Report," *The Sydney Morning Herald*, September 24, 2014, available at http://www.smh.com.au/digital-life/mobiles/apples-iphone-6-profit-margin-at-least-69-per-cent-report-20140924-10ld37.html.

the 4.7" iPhone 6 and 6s screen was $45 and the cost to Apple of the 5.5" iPhone 6 Plus screen was $52.50. Unfortunately, the article does not report the cost of the 4" screen. Another article, from September 2014, reported Apple's cost for the 4.7" screen was $45, the cost for the 5.5" screen was $53, and the cost of the 4" screen was $41.[101] Using this data, I calculate that Apple's incremental screen cost for the iPhone 6 is $4/unit (=$45 -$41) and the incremental screen cost for the iPhone 6S Plus is $12/unit ($53 - $41). Subtracting these cost differentials from the price differentials yields the profit differential due to the screen size alone.

177.   One could also use this sort of hedonic pricing analysis to control for the processor used (A9 in the iPhone SE and iPhone 6S, A8 in the iPhone 6 and iPhone 6, iPhone 6 Plus and the iPod Touch) and the size of the camera (8 MP in the iPhone 6, iPhone 6 Plus and the iPod Touch, 12 MP in the iPhone 6S and iPhone GS). The market price differential for the combination of the more powerful processor and larger camera size is $100, suggesting that $100 of the $200 price differential between the iPhone SE and the iPod Touch can likewise be attributed to the difference in processor and camera size, leaving the remaining $100 of the price differential (amounting to 25% of the selling price of the iPhone SE) to be attributed to the cellular capability of the iPhone SE.

178.   In my opinion, the most relevant and informative comparison (once adjustment for the screen area is made) is between the iPod Touch and the iPhone 6. Comparing the available data on the cost differential with the estimated price differential due to screen size and cellular capability, we see that the value *to Apple* of adding cellular capability to an iPhone, relative to omitting that capability as with the iPod Touch, is from $174.99 to $346.56 per unit, or from 31.7% to

---

[101] Ex. 5247, Ben Fox Rubin, "Costing $200 to Make, the iPhone 6 Should Offer Big Profits for Apple," *CNET*, September 23, 2014, available at http://www.cnet.com/news/costing-200-to-make-the-iphone-6-should-offer-big-profits-for-apple/.

53.4% of the selling price of the various iPhone models, depending on the model and the amount of memory. ( These numbers are estimates as there are additional differences between an iPhone and an iPod Touch for which accurate data is unavailable, e.g., the cost difference between the iPhone's higher contrast screen, the cost of the GPS chip, and the differing size and cost of the outer case and internal battery.)   The calculations are shown above.

179.   While we cannot control all variables with this experiment, to my knowledge, there are no other available similar "natural experiments" for cellphone makers *other* than Apple. While other cellphone manufacturers sell a range of products at a range of prices (and profit margins), I am not aware of any other cellphone manufacturer that sells otherwise-equivalent with-cellular-capability *vs.* without-cellular-capability products (as Apple does). Given that Apple's products sell at the high end of the range of ASPs for smartphones, it does not make economic sense to assume that the dollars-per-unit benefit of adding cellular capacity is the same for other cellphone manufacturers as it is for Apple. But the results of this "natural experiment" demonstrate the substantial value of providing cellular capability in connection with cellphones.  Further, there is no economic reason to believe that the uncontrolled variables would undermine the central point: a single digit "maximum" aggregate royalty would severely undervalue the technology.

## VII.   CONCLUSIONS

180.   To summarize, I conclude that Ericsson complied with its FRAND commitments.  I conclude also that Ericsson's offers to TCL were FRAND at the time they were made.  Finally, I conclude that TCL's experts have proven neither harm to competition nor harm to TCL causally related to alleged discrimination.

181.   **Figure 19** is my list of exhibits cited herein.

1         I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4         Executed this 11th day of January, 2017, at Berkeley, California.

5

6                               Prof. David J. Teece, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
     CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

**Figure 19. Table of Exhibits**

| Exhibit | Description |
|---|---|
| 142 | TCL Historical Sales Data, TCL_ERIC_CDCA1278885- 87. |
| 223 | ETSI Rules of Procedure, November 18, 2015, Annex 6. |
| 224 | ETSI Guide on IPRs, September 19, 2013. |
| 456<br>1017-25<br>1140<br>1147 | TCL Communications Annual Reports, 2004-2015. |
| 1097 | Ericsson Mobility Report—On the Pulse of the Networked Society, November 2015. |
| 1113<br>1278<br>4071<br>4362-71 | Ericsson Annual Reports, 2003-2015. |
| 1129 | TCL Communication Technology Holdings Ltd.—Company Profile, available at http://www.tclcom.com/?page=company_profile. |
| 1273 | IDC WW Quarterly Mobile Phone Tracker 2015Q4 Historical Release, February 12, 2016. |
| 4341 | Ericsson Traffic Exploration, Subscriptions - All Device Types, http://www.ericsson.com/TET/trafficView/loadBasicEditor.ericsson. |
| 4636 | *Huawei Technologies Co., Ltd v ZTE Corp.*, Judgment of the Court, Court of Justice of the European Union, July 16, 2015. |
| 4816 | Alexander Galetovic, Stephen Haber and Ross Levine, "An Empirical Examination of Patent Hold-Up," Tusher Center Working |

| | | |
|---|---|---|
| | | Paper, No. 5, March 31, 2015, p. 26, available at http://innovation-archives.berkeley.edu/businessinnovation/documents/Tusher-Center-Working-Paper-5.pdf. |
| | 5044 | Cisco Visual Networking Index Global Mobile Data Traffic Forecast Update, 2015–2020, February 3, 2016. |
| | 5233 | "Ericsson Introduces The New R380e," *Mobile Magazine*, available at http://www.mobilemag.com/2001/09/25/ericsson-introduces-the-new-r380e/. |
| | 5234 | Tom Farley, "Mobile Telephone History," *Telekronikk*, Vol. 101, No. 3/4 (2005), p. 31. |
| | 5235 | John Saee, "Best Practice in Global Negotiation Strategies for Leaders and Managers in the 21st century," *Journal of Business Economics and Management*, 9:4, (2008). |
| | 5238 | ANSI Resp. to FTC Patents and Standards Workshop, Project No. P11-1204, June 21, 2011 |
| | 5240 | Robert Foster, "Do Corporations Have S Curves?" UCLA Anderson Global Supply Chain Blog, November 1, 2012, available at http://blogs.anderson.ucla.edu/global-supply-chain/2012/11/do-corporations-have-s-curves.html. |
| | 5242 | Ben Reid, "Apple's LTE Market Share Climbs To 27% Globally, Samsung Still Dominates The Market," *Redmond Pie*, December 11, 2012, available at http://www.redmondpie.com/apples-lte-market-share-climbs-to-27- globally-samsung-still-dominates-the-market/. |
| | 5246 | "4G Becomes the Fastest Adopted Mobile Technology Ever," *CCS Insights*, April 15, 2014. |
| | 5247 | Ben Fox Rubin, "Costing $200 to Make, the iPhone 6 Should Offer Big Profits for Apple," *CNET*, September 23, 2014,  available  at http://www.cnet.com/news/costing-200-to-make-the-iphone-6-should-offer-big-profits-for-apple/. |

| | | |
|---|---|---|
| 1 | 5248 | Todd Wasserman, "Apple's iPhone 6 Profit Margin at Least 69 Percent: Report," *The Sydney Morning Herald*, September 24, 2014, available at http://www.smh.com.au/digital-life/mobiles/apples-iphone-6-profit-margin-at-least- 69-per-cent-report-20140924-10ld37.html. |
| 2 | 5251 | J. Gregory Sidak, "The Meaning of FRAND, Part II, Injunctions", *Journal of Competition Law & Economics* (2015), 11(1):201-269, available at http://jcle.oxfordjournals.org/content/11/1/201.full |
| 3 | 5254 | Ashraf Eassa, "Why the Apple Inc. iPhone 6c Should Feature an A9 Processor," *The Motley Fool*, available at http://www.fool.com/investing/general/2015/12/25/why-the- apple-inc-iphone-6c-should-feature-an-a9-p.aspx. |
| 4 | 5257 | Diana Goovaerts, "MWC 2016: 5G Innovation Rundown," *Wireless Week*, February 23, 2016, available at http://www.wirelessweek.com/news/2016/02/mwc-2016-5g-innovation-rundown. |
| 5 | 5261 | Peter C. Grindley and David J. Teece, "Managing Intellectual Capital: Licensing and Cross-Licensing in Semiconductors and Electronics," *California Management Review*, Vol. 39, No. 2 (1997), pp. 8-41. |
| 6 | 5265 | David J. Teece, "Next-Generation Competition: New Concepts for Understanding How Innovation Shapes Competition and Policy in the Digital Economy," *Journal of Law, Economics, and Policy*, Vol. 9, No. 1 (2012). |
| 7 | 5268 | Edward Gold, "Exploring the Non-discriminatory Aspect of RAND Licensing Terms," *SRR Global Financial Advisory Services*, Fall 2014, available at http://www.srr.com/article/exploring-nondiscriminatory-aspect-rand-licensing-terms |
| 8 | 5271 | David J. Teece, "Competition, Cooperation and Innovation: Organizational Arrangements for Regimes of Rapid Technological Progress," *Journal of Economic Behavior and Organization* 18:1 |

| | | |
|---|---|---|
| | | (June 1992) |
| | 5272 | David J. Teece and Edward F. Sherry, "Standards Setting and Antitrust," *Minnesota Law Review*, Vol. 87 (2003), pp. 1913-1994. |
| | 5273 | Ericsson Traffic and Market Report, June 2012. |
| | 5274 | GSMA Mobile Spectrum - Data Demand Explained, June 2015. |
| | 5275 | "Mobile Broadband Explosion: The 3GPP Wireless Evolution," *Rysavy Research for 4G Americas,* August 2013, available at http://www.4gamericas.org/index.php/download_file/view/220/663/. |
| | 5276 | James Wan, "Application Of Game Theory In A Patent Dispute Negotiation," *les Nouvelles*, August 2015. |
| | 5280 | "About 3GPP," 3GPP, available at http://www.3gpp.org/about-3gpp |
| | 5281 | Jeanette Wannstrom, "HSPA," 3GPP, available at http://www.3gpp.org/technologies/keywords-acronyms/99-hspa |
| | 5282 | "Releases," 3GPP, available at http://www.3gpp.org/specifications/releases |
| | 5284 | TCL Corporation—About Us, available at http://www.tclusa.com/aboutus/. |
| | 5285 | TCL Corporation—About, available at http://www.tcl.com/About/index_en.html. |
| | 5286 | TCL Corporation—Company Overview, Thomson One. |
| | 5287 | TCL Corporation—Financial Reports, Thomson One. |
| | 5300 | Ericsson—Company Information, available at http://www.ericsson.com/thecompany. |
| | 5305 | "BlackBerry Gives China's TCL Rights to Use Its Brand on Phones," *Bloomberg*, December 15, 2016, available https://www.bloomberg.com/news/articles/2016-12-15/blackberry-licenses-brand-to-chinese-phone-maker-tcl-corp. |

| 5301-02 | Apple iPhone/iPod Specs, available at http://www.apple.com/iphone/compare/ , http://www.apple.com/ipod-touch/specs/. |
| 5332 | "iPod Touch 6th Generation vs iPhone 5s vs iPhone 6: Compared," *Technostarry*, September 1, 2015, available at http://www.technostarry.com/ipod-touch-6th-generation-vs-iphone-5s-vs-iphone-6-compared/. |

# **APPENDIX 1**



# Curriculum Vitae

11/29/16

**DAVID J. TEECE**

BERKELEY RESEARCH GROUP, LLC

2200 Powell Street, Suite 1200

Emeryville, CA 94608

Direct: 510.285.3221

dteece@thinkbrg.com

## EDUCATION

| | |
|---|---|
| Ph.D. (Economics) | University of Pennsylvania, 1975 |
| M.A. | University of Pennsylvania, 1973 |
| M.Comm. (Honors I) | University of Canterbury, 1971 |
| B.A. | University of Canterbury, 1970 |

## PRESENT POSITIONS

Professor of Business Administration, Walter A. Haas School of Business, University of California at Berkeley, 1982–present; Holder, Thomas W. Tusher Chair in Global Business, 2007–present.  Faculty advisor to the Vice Chancellor for Research, full semester, 2016

Honorary Professor, Lappeenranta University of Technology, Finland, 2011–present

Honorary Professor of Economics/Business, King Saud University, Saudi Arabia, 2011–present

Board of Directors, Independent Institute, Oakland, CA, 2013-present

Chairman, Board of Trustees, University of Canterbury Foundation, USA, 2014-present

Member, Academic Advisory Counsel, European Business School, Weisbaden, Germany, 2016-present



**PREVIOUS POSITIONS**

Director, Institute for Business Innovation, University of California, Berkeley, 1984–2014

Honorable Professor, China Zhongnan University of Law and Economics, China, 2007–2014

Holder, Mitsubishi Bank Chair in International Business and Finance, 1989–2007

Director, Institute of Management, Innovation and Organization (IMIO), University of California, Berkeley, 1994–2008

Director, Center for Research in Management (CRM), University of California, Berkeley, 1983–1994

Visiting Fellow, St. Catherine's College, Oxford University, and Oxford Institute for Energy Studies, Spring 1989

Associate Professor of Business Economics, Graduate School of Business, Stanford University, 1978–1982; Assistant Professor of Business Economics, Graduate School of Business, Stanford University, 1975–1978

Visiting Associate Professor of Economics, Department of Economics, University of Pennsylvania, 1978–1979

Assistant Lecturer in Economics, University of Canterbury, 1971

**HONORARY DOCTORATES**

| | |
|---|---|
| 2000 | St. Petersburg State University, Russia |
| 2004 | Copenhagen Business School, Denmark |
| 2004 | Lappeenranta University of Technology, Finland |
| 2007 | University of Canterbury, New Zealand |
| 2015 | University of Calgary, Canada |
| 2016 | Kuanas University of Technology, Lithuania |
| 2016 | EBS Business School, Germany |

**ROYAL HONOURS**

| | |
|---|---|
| 2013 | Companion of the New Zealand Order of Merit |



**PROFESSIONAL AWARDS, RECOGNITION, AND PRIZES**

| | |
|---|---|
| 1971 | William Georgetti Fellowship Award |
| 1973–1974 | Penfield Traveling Fellowship in Diplomacy, International Affairs, and Belles-Lettres |
| 1978 | Mellon Foundation Junior Faculty Fellowship |
| June 1982 | Esmee Fairbairn Senior Research Fellow, University of Reading, England |
| 1989 | Enterprise Oil Fellowship in Energy Economics, St. Catherine's College, Oxford University |
| 1992 | Distinguished Visitor, Policy Studies Group, Tokyo |
| 1995 | Elected Fellow, International Academy of Management |
| 1998 | Clarendon Lectures in Management Studies, University of Oxford |
| 1999 | Andersen Consulting Award for Best Paper in *California Management Review* |
| 2002 | Top 50 Living Business Intellectuals (Accenture Institute for Strategic Change) |
| 2003 | Viipuri International Prize in Strategic (Technology) Management and Business Economics, Lappeenranta University of Technology, Finland |
| 2003 | *Strategic Management Journal* Best Paper Award for "Dynamic Capabilities and Strategic Management," 1997 |
| 2003 | ISI Highly Cited Researchers, Economics/Business |
| 2005 | *Science Watch* Top 10 Author Worldwide in Economics and Business for the decade 1995–2005 based on citation counts (Thomson Scientific Essential Science Indicators) |
| 2005 | Most cited paper worldwide ("Dynamic Capabilities and Strategic Management," *Strategic Management Journal*, 1997) in the *Science Watch* index of Scientific Research in Economics and Business, 1995 – 2005 (Thomson Scientific Essential Science Indicators) |
| 2007 | Thomson in-cites May 2007. Ranked No. 8 in Most-Cited Researchers in Economics and Business (from Essential Science Indicators, covering a ten- |



year plus two-month period. January 1997–February 28, 2007)

| | |
|---|---|
| 2007 | Honorable Professor at China Zhongnan University of Law and Economics, China |
| 2008 | Honorary Member, Law and Economics Society of Australia and New Zealand (LEANZ) |
| 2009 | *Strategy and Business* Award for *Dynamic Capabilities* as one of Best Business Books for 2009 |
| 2009 | Citation of Excellence (for one of the top 50 management articles of 2009) awarded by Emerald Literati Network ("Dynamic Capabilities and the Role of Managers in Business Strategy and Economic Performance"), *Organization Science*, Vol. 20, No. 2, 2009 |
| 2010 | Fellow, Strategic Management Society |
| 2011 | Tore Browaldh Lecture, University of Gothenburg, Sweden |
| 2011 | A-List of Management Academic, BusinessEducators.com |
| 2012 | Herbert Simon Award, Corvinus University of Budapest |
| 2012 | Best Article Award for "Multi-invention Contexts: Mapping Solutions to Technological and Intellectual Property Complexity," *California Management Review* (for 2011 volumes) |
| 2012 | Top 10 Most Influential Scholar in Management Based on Citations, *Academy of Management Perspectives*, May 2012 |
| 2012 | Top Cited Article Award 2007–2011 for "Business Models, business strategy and innovation," *Long Range Planning*, Volume 43, Issues 2–3 |
| 2012 | Two of Top 12 Best Papers on Antitrust and the Digital Economy for Dynamic Competition in Antitrust Law (G. Sidak) Journal of Competition Law and Economics (2009) and "Walled Garden Rivalry: The Creation of Mobile Network Ecosystems" George Mason University Law & Economics Research Paper series Nov. 2011 |
| 2013 | Distinguished Speaker, Kravis Leadership Institute, Claremont McKenna College, March 3, 2013 |



| 2013 | Sumantra Ghoshal Award for Rigour and Relevance in the Study of Management , London Business School |
| 2013 | Eminent Scholar Award, Academy of International Business |

**EXTERNAL RESEARCH GRANTS**

| 1971 | William Georgetti Fellowship Award |
| 1978–1981 | National Science Foundation Grant |
| 1984–1987 | National Science Foundation Grant |
| 1986–1992 | Lynde and Harry Bradley Foundation Grant |
| 1987–1988 | Sloan Foundation Grant |
| 1987–1988 | Japan-U.S. Friendship Commission Grant |
| 1988–1991 | Pew Foundation Grant |
| 1989–1991 | Smith Richardson Foundation Grant |
| 1989–1992 | Sasakawa Peace Foundation Grant |
| 1990–1995 | Sloan Foundation Grant (Consortium on Competition) |
| 1992–1998 | U.S.-Japan Industry Technology Management Training Program Grant, U.S. Department of Defense/Air Force Office of Scientific Research (DOD/AFOSR) |
| 1994–2001 | Ameritech Foundation Grant - Consortium for Research on Telecommunications Policy |
| 1994–1996 | United States Information Agency Grant |
| 1994–1997 | Eurasia Foundation Grant |
| 1999–2002 | Open Society Institute Grant (School of Management, St. Petersburg University) |
| 2001 | CommerceNet Next Generation Internet Applications Center Grant |
| 2004–2006 | Sloan Foundation Grant I (Impact of Outsourcing on R&D) (with Henry Chesbrough) |



| 2006–2008 | Sloan Foundation Grant II (with Henry Chesbrough) |

**SELECTED PROFESSIONAL BUSINESS AND NOT-FOR-PROFIT AFFILIATIONS**

*Prior*

Editorial Board, *California Management Review*

Editorial Board, *Strategic Management Journal*

Editorial Board, *Human Relations*

Member, Committee on Telecommunications Research and Development, Computer Science and Telecommunications Board, Division on Engineering and Physical Sciences, National Research Council of the National Academies, 2005–2006

Member, Board of Trustees, Eaglebrook School, Deerfield, Massachusetts, 2005–2009

Member, Board of Trustees, Bentley School, Oakland, California, 2005–2010

Co-editor, *International Journal of Internet Technology and Secured Transactions (IJITST)*, 2007–present

Member, Board of Directors, Puredepth, Inc., 2009–2010

Member, Board of Overseers of the School of Arts and Sciences, University of Pennsylvania, 2006–2013

Co-founder and Board Member KEA, 2001–2014

*Present*

Trustee, Strategy Research Foundation, 2010–present

Co-editor, *International Journal of Internet Technology and Secured Transactions (IJITST)*, 2007–present

Co-editor, *Palgrave Encyclopedia on Strategic Management* (Palgrave/Macmillan), 2007–present



Co-editor and co-founder, *Industrial and Corporate Change* (Oxford University Press), 1999–present

Co-editor and co-founder, *Russian Management Journal*, 2003–present

Co-editor, "Report from North America," *Trade Practices Law Journal*, 2001–present

Editorial Board, *Long Range Planning* (Sage Publications), 2000–present

Editorial Board, *New Zealand Economic Papers*

Editorial Board, *International Journal of Strategic Change Management* (Interscience Publishers), 2006–present

Member, Licensing Executive Society

Member, Council on Foreign Relations

Member, The Benjamin Franklin Society

Advisory Board, Endeavor—i-cap partners limited

Member, University of California President's Board of Science Advisors, 2009–present

Founding Member, Foundation for the Advancement of Research in Financial Economics (FARFE), 2006–present

Fellow, International Academy of Management

Fellow, Academy of International Business

Fellow, Strategic Management Society

**BUSINESS AND NOT-FOR-PROFIT AFFILIATIONS**

Chairman, Board of Directors, Law and Economics Consulting Group, Inc., 1988–1998

Chairman, Board of Advisors, Law and Economics Consulting Group, Inc., 1998–2000

Chairman, Board of Directors, LECG L.L.C., 2000–2003

Chairman, Board of Directors, LECG Corporation, 2003–2007



Vice Chairman, Board of Directors, LECG Corporation, 2007– 2009

Member, Board of Directors, The Atlas Funds, 1989–2007

Member, Board of Trustees, Atlas Insurance Trust, 1997–2007

Member, Board of Directors, IQUANTIC Inc., 2000–2001

Chairman, Board of Directors, i-cap partners, 2000–2003

Chairman, Board of Directors, Canterbury International Limited, 2001–2002

Member, Board of Directors, Canterbury International Limited, 2002–2009

Vice Chairman, Board of Directors, New Zealand Australia Private Equity Fund, 2004–2010

Chairman, Board of Directors, Berkeley Research Group, LLC, 2010–present

Member, Board of Trustees, Strategy Research Foundation, 2010–present

Member, Board of Directors, The Independent Institute, 2012–present

Member, Board of Directors, University of Canterbury Foundation in America, Inc., 2012–present

President, University of Canterbury Foundation in America, 2013-present


## PUBLICATIONS

### ARTICLES

(1) "The Determination of Residential Land Prices in Some South New Zealand Cities" (with R. E. Falvey), *New Zealand Economic Papers* (1972).

(2) "Time-Cost Tradeoffs: Elasticity Estimates and Determinants for International Technology Transfer Projects," *Management Science* 23:8 (April 1977), 830–837. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK and Northampton, MA: Edward Elgar (1998).

(3) "Technology Transfer by Multinational Firms: The Resource Cost of Transferring Technological Know-how," *The Economic Journal* 87 (June 1977), 242–261. Reprinted in E. Mansfield (ed.), *The Economics of Technical Change,* London: Edward Elgar (1993).



Reprinted in M. Casson (ed.), *Multinational Corporations*, The International Library of Critical Writings in Economics 1, England: Edward Elgar Publishing (1990), 185–204. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece,* Volume II, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in John Cantwell (ed.), *Foreign Direct Investment and Technological Change,* Volume 1, Cheltenham: Edward Elgar (1999). Reprinted in Sanjaya Lall (ed.), *The Economics of Technology Transfer,* Cheltenham: Edward Elgar (2001). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece,* World Scientific (2003).

(4) "Organizational Structure and Economic Performance: A Test of the Multidivisional Hypothesis" (with Henry Armour), *The Bell Journal of Economics* 9:2 (Spring 1978), 106–122. Reprinted in J. Barney and W. Ouchi (eds.), *Organizational Economics: Toward a New Paradigm for Studying and Understanding Organizations,* San Francisco: Jossey-Bass (1986). Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(5) "Overseas Research and Development by U.S.-Based Firms" (with E. Mansfield and A. Romeo), *Economica* 46 (May 1979), 187–196. Reprinted in Wortzel and Wortzel (eds.), *Strategic Management of Multinational Corporations,* New York: John Wiley (1985). Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in John Cantwell (ed.), *Foreign Direct Investment and Technological Change, Volume 2,* Cheltenham: Edward Elgar (1999).

(6) "The Diffusion of an Administrative Innovation," *Management Science* 26:5 (May 1980), 464–470. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(7) "Vertical Integration and Technological Innovation" (with Henry Armour), *Review of Economics and Statistics* 62:3 (August 1980), 470–474.

(8) "Economies of Scope and the Scope of the Enterprise," *Journal of Economic Behavior and Organization* 1:3 (September 1980), 223–247. Republished as "La Diversificazione Strategica: Condizioni di Efficienza," a cura de Raoul C. D. Nacamulli e Andrea Rugiadini, *Organizzazione e Mercato,* Bologna, Italy: Mulino (1985), 447–476. Excerpted in Nicolai Foss (ed.), *Resources, Firms and Strategies,* Oxford University Press (1997). Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Richard N. Langlois, Tony Fu-Lai Yu, and Paul L. Robertson (eds.), *Alternative Theories of the Firm,* Cheltenham, UK: Edward Elgar (2001).

(9) "The Multinational Enterprise: Market Failure and Market Power Considerations," *Sloan Management Review* 22:3 (Spring 1981), 3–17. Republished as "Riflessioni Sull'impresa



Multinazionale: Potere de Mercato o Crisi del Mercato," a cura de Raoul C. D. Nacamulli e Andrea Rugiandini, *Organizzazione e Mercato,* Bologna, Italy: Mulino (1985), 477–498. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Julian Birkinshaw (ed.), *Strategic Management,* Cheltenham, UK: Edward Elgar (2005).

(10)   "The Market for Know-how and the Efficient International Transfer of Technology," *The Annals of the Academy of Political and Social Science* 458:1 (November 1981), 81–96. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece,* World Scientific (2003).

(11)   "Internal Organization and Economic Performance: An Empirical Analysis of the Profitability of Principal Firms," *Journal of Industrial Economics* 30:2 (December 1981), 173–199. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(12)   "A Tariff on Imported Oil" (with James Griffin), *Journal of Contemporary Studies* (Winter 1982), 89–92.

(13)   "Towards an Economic Theory of the Multiproduct Firm," *Journal of Economic Behavior and Organization* 3:1 (March 1982), 39–63. Reprinted in Louis Putterman and Randall Krosner, *The Economic Nature of the Firm: A Reader,* Cambridge: Cambridge University Press (1986), 250–265. Reprinted in Louis Putterman and Randall Krosner (eds.), *The Economic Nature of the Firm: A Reader,* Cambridge: Cambridge University Press (1996), 175–190. Reprinted in Oliver E. Williamson and Scott E. Masten (eds.), *Transaction Cost Economics, Volume I: Theory and Concepts,* London: Edward Elgar (1995), 153–177. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Translated into Chinese in Sheng Hong (ed.), *Selection of Modern Institutional Economics,* Beijing, China: Light Industry Press (2003). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece,* World Scientific (2003). Reprinted in Julian Birkinshaw (ed.) *Strategic Management,* Edward Elgar Publishing (2005). Reprinted in Professor Martin Ricketts (ed.), *The Economics of the Modern Business Enterprise*, Edward Elgar Publishing (2007).

(14)   "Supplier Switching Costs and Vertical Integration in the U.S. Automobile Industry" (with Kirk Monteverde), *The Bell Journal of Economics* 13:1 (Spring 1982), 206–213. Reprinted in Steven G. Medema (ed.), *The Legacy of Ronald Coase in Economic Analysis,* London: Edgar Elgar (1995). Reprinted in O.E. Williamson and S.E. Masten (eds.), *Transaction Cost Economics, Volume II: Policy and Applications,* Aldershot, England: Edward Elgar Publishing, Ltd. (1995), 66–73. Reprinted in S.E. Masten (ed.), *Case Studies in Contracting and*



*Organization*, New York: Oxford University Press (1996). Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Claude Menard (ed.), *Modes of Organization in the New Institutional Economics,* Elgar Reference Collection, International Library of the New Institutional Economics, Volume 4, Cheltenham, UK, and Northampton, MA: Edward Elgar (2004), 205–212. Reprinted in Julian Birkinshaw (ed.), *Strategic Management,* Edward Elgar Publishing (2005).

(15)    "Appropriable Rents and Quasi-Vertical Integration" (with Kirk Monteverde), *The Journal of Law and Economics* 25:2 (October 1982), 321–328. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Professor Martin Ricketts (ed.), *The Economics of the Modern Business Enterprise,* Edward Elgar Publishing (2007).

(16)    "A Behavioral Analysis of OPEC: An Economic and Political Synthesis," *Journal of Business Administration* 13 (1982), 127–159. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(17)    "New Findings in Technology-Transfer, Productivity and Economic Policy" (with Edwin Mansfield, Anthony Romeo, Michael Schwartz, Samuel Wagner, and Peter Brach), *Research Management* 26: 2 (March–April 1983), 11–20.

(18)    "Assessing OPEC's Pricing Policies," *California Management Review* 26:1 (Fall 1983), 69–87.

(19)    "The Limits of Neoclassical Theory in Management Education" (with Sidney G. Winter), *American Economic Review* 74:2 (May 1984), 116–121.

(20)    "Economic Analysis and Strategic Management," *California Management Review* 26:3 (Spring 1984), 87–110. Reprinted in J. Pennings (ed.), *Organizational Strategy and Change,* San Francisco: Jossey-Bass (1985). Reprinted in D. Vogel and G. Carroll (eds.), *Strategy and Organization: A West Coast Perspective,* New York: Pitman (1984). Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(21)    "Multinational Enterprise, Internal Governance, and Industrial Organization," *American Economic Review* 75:2 (May 1985), 233–238. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(22)    "Transaction Cost Economics and the Multinational Enterprise: An Assessment," *Journal of Economic Behavior and Organization* 7:1 (March 1986), 21–45. Reprinted in *Economic*


**BRG**
Berkeley Research Group

*Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(23)    "Assessing the Competition Faced by Oil Pipelines," *Contemporary Policy Issues* IV:4 (October 1986), 65–78.

(24)    "Profiting from Technological Innovation," *Research Policy* 15:6 (December 1986), 285–305. (Selected by the editors as one of the best papers published by *Research Policy* over the period 1971–1991. Noted in 1999 as the most cited paper ever published in *Research Policy.*) Republished in *Ricerche Economiche* 4 (October/December 1986), 607–643. Republished as "Innovazione Technologica e Successo Imprenditoriale," *L'Industria* 7:4 (October/December 1986), 605–643. Translated into Russian and published at St. Petersburg State University. Abstracted in *The Journal of Product Innovation Management* 5:1 (March 1988). Reprinted in C. Freeman (ed.), *The Economics of Industrial Innovation*, third edition, United Kingdom: Edward Elgar Publishing (1997). Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Scott Shane (ed.), *The Foundations of Entrepreneurship,* London: Edward Elgar Publishing (2001). Reprinted in Richard N. Langlois, Tony Fu-Lai Yu, and Paul L. Robertson (eds.), *Alternative Theories of the Firm*, Cheltenham, UK: Edward Elgar (2001). Reprinted in R. Burgelman, M. Madique, and S. Wheelwright (eds.), *Strategic Management of Technology and Innovation,* McGraw-Hill (1995, 1998, 2001). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003). Reprinted in Shubha Ghosh, Jay Kesan, and Richard Gruner (eds.), *Intellectual Property in Business Organizations: Cases and Materials,* Matthew Bender & Co. (2006), 13–16. Reprinted in Hans Landström and Franz T. Lohrke (eds.), *Intellectual Roots of Entrepreneurship Research,* Edward Elgar Publishing Ltd. (Spring 2012).

(25)    "Vertical Integration and Risk Reduction" (with C. Helfat), *Journal of Law, Economics, and Organization* 3:1 (Spring 1987), 47–67. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Mark Grinblatt (ed.), *Stephen A. Ross*, *Mentor: Influencing Through Generations,* Boston: McGraw-Hill (2007), 35–52.

(26)    "Capturing Value from Technological Innovation: Integration, Strategic Partnering, and Licensing Decisions," *Interfaces* 18:3 (May/June 1988), 46–61. Reprinted in Bruce R. Guile and H. Brooks (eds.), *Technology and Global Industry,* Washington, DC: National Academy Press (1987), 65–95. Reprinted in F. Arcangeli, P.A. David, and G. Dosi (eds.), *Modern Patterns in Introducing and Adopting Innovations,* Oxford: Oxford University Press (1989). Reprinted in E. Rhodes and D. Wield (eds.), *Implementing New Technologies: Innovation and the Management of Technology,* Oxford and Cambridge, MA: Basil Blackwell (1994), 129–140. Reprinted in Michael L. Tushman and Philip Anderson (eds.), *Managing Strategic Innovation and Change,* New York and Oxford: Oxford University Press (1997), 287–306.



Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(27)   "Competition and Cooperation in Technology Strategy," *Business Review* 36:4, Tokyo: The Institute of Business Research, Hitotsubashi University (March 1989).

(28)   "Competition and Cooperation: Striking the Right Balance" (with Thomas Jorde), *California Management Review* 31:3 (Spring 1989), 25–37. Reprinted as "Concorrenza e Cooperazione Nelle Strategie di Sviluppo Technologico," *Economia e Politica Industriale*, n. 64 (1989), 17–45. Reprinted in David J. Teece, *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK and Northampton, MA: Edward Elgar (1998).

(29)   "Innovation, Cooperation, and Antitrust: Balancing Competition and Cooperation" (with Thomas Jorde), *High Technology Law Journal* 4:1 (Spring 1989), 1–113.

(30)   "Inter-organizational Requirements of the Innovation Process," *Managerial and Decision Economics* 10, Special Issue: Competitiveness, Technology and Productivity (Spring 1989), 35–42. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(31)   "Acceptable Cooperation Among Competitors in the Face of Growing International Competition" (with Thomas Jorde), *Antitrust Law Journal* 58:2, 37th Annual Meeting, Honolulu, Hawaii (August 1989), 529–556.

(32)   "Competing Through Innovation: Implications for Market Definition" (with Thomas Jorde), *Chicago-Kent Law Review* 64:3, Symposium on Antitrust Law and the Internationalization of Markets (1989), 741–744.

(33)   "Struktur und Organisation der Deutschen und der US-Gaswirtschaft im Vergleich: Folgerungen für den Status der Gasversorgungsunternehmen" (with Manfred J. Dirrheimer), *Zeitschrift für Energiewirtschaft* 1 (1989), 36–50.

(34)   "Les Frontières des Entreprises: Vers une Théorie de la Cohérence de la Grande Entreprise" (with G. Dosi and S. Winter), *Revue d'Économie Industrielle* 51 (1$^{er}$ trimestre 1990), 238–254.

(35)   "Strategies for Capturing Value from Technological Innovation," *Thai-American Business* (May–June 1990), 30–38. Reprinted as "Capturing Value from Innovation," *Les Nouvelles* 26:1 (March 1991), 21–26. Translated in Russian and published in *Vestnik Leningradskogo Universiteta. Seria Economics* 4 (1991), 38–47.



(36)     "Structure and Organization of the Natural Gas Industry: Differences between the United States and the Federal Republic of Germany and Implications for the Carrier Status of Pipelines," *Energy Journal* 11:3 (July 1990), 1–35.

(37)     "Innovation and Cooperation: Implications for Competition and Antitrust" (with Thomas Jorde), *Journal of Economic Perspectives* 4:3 (Summer 1990), 75–96. Reprinted in the *Journal of Reprints for Antitrust Law and Economics* 18:2. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(38)     "Innovation, Dynamic Competition, and Antitrust Policy" (with Thomas Jorde), *Regulation* 13:3 (Fall 1990), 35–44.

(39)     "Product Emulation Strategies in the Presence of Reputation Effects and Network Externalities: Some Evidence from the Microcomputer Industry" (with Ray Hartman), *Economics of Innovation and New Technology* 1 (1990), 157–182. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(40)     "Strategic Management and Economics" (with Richard P. Rumelt and Dan Schendel), *Strategic Management Journal* 12, Special Issue: Fundamental Research Issues in Strategy and Economics (Winter 1991), 5–29. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(41)     "Antitrust Policy and Innovation: Taking Account of Performance Competition and Competitor Cooperation" (with Thomas M. Jorde), *Journal of Institutional and Theoretical Economics* 147 (March 1991), 118–144. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003).

(42)     "Capturing and Retaining Value from Innovation," *Technology Strategies* (August 1991), 8–10.

(43)     "Innovation, Trade, and Economic Welfare: Contrasts between Petrochemicals and Semiconductors," *North American Review of Economics and Finance* 2:2 (1991), 143–155.

(44)     "Foreign Investment and Technological Development in Silicon Valley," *California Management Review* 34:2 (Winter 1992), 88–106. Translated into Russian in *Vestnik St. Peterburgskogo Universiteta. Seria Economics* 1 (1993), 58–72. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).



(45)    in D. McFetridge (ed.), *Foreign Investment, Technology and Economic Growth*, Calgary: University of Calgary Press (1991), 215–238. Reprinted in

(46)    "Competition, Cooperation, and Innovation: Organizational Arrangements for Regimes of Rapid Technological Progress," *Journal of Economic Behavior and Organization* 18:1 (June 1992), 1–25. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Bernard Yeung and Joanne Oxley (eds.), *Structural Change, Industrial Location and Competitiveness*, London: Edward Elgar (1998). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003).

(47)    "Japan's Growing Capabilities in Industrial Technology: Implications for U.S. Managers and Policymakers" (with David C. Mowery), *California Management Review* 35:2 (Winter 1993). Reprinted in David J. Teece, *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(48)    "The Dynamics of Industrial Capitalism: Perspectives on Alfred Chandler's *Scale and Scope* (1990)," *Journal of Economic Literature* 31:1 (March 1993), 199–225. Reprinted in Patrick O'Brien (ed.), *Critical Perspectives on the World Economy*, London: Routledge (1997/1998). Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Mariana Mazzucato (ed.), *Strategy for Business*, London: Sage Publications (2002). Translated into Russian in *Vestnik St. Peterburgskogo Universiteta. Seria Management* 4 (2002), 102–146. Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003). Reprinted in John C. Wood and Michael C. Wood (eds.), *Alfred Chandler: Critical Evaluations in Business and Management*, Routledge (2007). Also reprinted in <u>Management Innovation: Essays in the spirit of Alfred Chandler,</u> William Lazonick and David J. Teece (ed), Oxford University Press, 2012.

(49)    "Rule of Reason Analysis of Horizontal Arrangements: Agreements Designed to Advance Innovation and Commercialize Technology" (with Thomas M. Jorde), *Antitrust Law Journal* 61:2 (1993).

(50)    "Assessing Market Power in Regimes of Rapid Technological Change" (with Raymond S. Hartman, Will Mitchell, and Thomas M. Jorde), *Industrial and Corporate Change* 2:3 (1993), 317–350. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(51)    "Understanding Corporate Coherence: Theory and Evidence" (with R. Rumelt, G. Dosi, and S. Winter), *Journal of Economic Behavior and Organization* 23:1 (January 1994). Reprinted in Mark Casson (ed.), *The Theory of the Firm*, London: Edward Elgar (1996), 1–30.



Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in Giovanni Dosi (ed.), *Innovation, Organization and Economic Dynamics: Selected Essays*, Cheltenham, UK: Edward Elgar (2000). Reprinted in Richard N. Langlois, Tony Fu-Lai Yu, and Paul L. Robertson (eds.), *Alternative Theories of the Firm*, Cheltenham, UK: Edward Elgar (2001). Reprinted in John Kay (ed.), *The Economics of Business Strategy*, Cheltenham, UK, and Northampton, MA: Edward Elgar, Elgar Reference Collection International Library of Critical Writings in Economics 163 (2003), 468–497.

(52)    "Information Sharing, Innovation, and Antitrust," *Antitrust Law Journal* 62:2 (Winter 1994). Reprinted in H. Albach, J.Y. Jin, and C. Schenk (eds.), *Collusion through Information Sharing? New Trends in Competition Policy*, Sigma (1996). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003).

(53)    "Systems Competition and Aftermarkets: An Economic Analysis of *Kodak*" (with Carl Shapiro), *The Antitrust Bulletin* 39:1(Spring 1994), 135–162. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(54)    "The Dynamic Capabilities of Firms: An Introduction" (with Gary Pisano), *Industrial and Corporate Change* 3:3 (1994), 537–556. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in C.W. Holsapple (ed.), *Handbook on Knowledge Management*, Volume 2, Chapter 42, Berlin: Springer Verlag (2003). Reprinted in Michael A. Lewis and Nigel Slack (eds.), *Operations Management: Critical Perspectives on Business and Management*, Oxford University Press (2003). Reprinted in John Kay (ed.), *The Economics of Business Strategy*, Elgar Reference Collection International Library of Critical Writings in Economics, Volume 163, Cheltenham, UK, and Northampton, MA: Elgar (2003), 223–242. Reprinted in Peter M. Jackson (ed.), "The Economics of Organization and Bureaucracy," United Kingdom: Edward Elgar Publishing (2011).

(55)    "Competition and 'Local' Communications: Innovation, Entry and Integration" (with G.L. Rosston), *Industrial and Corporate Change* 4:4 (1995), 787–814. Reprinted in E.M. Noam and A.J. Wolfson (eds.), *Globalism and Localism in Telecommunications*, North Holland: Elsevier Science B.V. (1997), 1–25. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(56)    "Telecommunications in Transition: Unbundling, Reintegration, and Competition," *Michigan Telecommunications and Technology Law Review* 1 (1995), 47–78. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).



(57)   "Organizing for Innovation: When is Virtual Virtuous?" (with Henry W. Chesbrough), *Harvard Business Review* 74:1 (January–February 1996), 65–73. Republished in John Seeley Brown (ed.), *Seeing Things Differently: Insights on Innovation*, Harvard Business School Press (1997), 105–119. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Republished in Special Issue on Innovation, The Best of HBR on Innovation, *Harvard Business Review* (August 2002), 127–136. Republished in *Harvard Business Review on Strategic Alliances*, Harvard Business School Press (2002). Translated into Russian and published in the *Russian Management Journal* 1 (2003), 123–136. Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece,* World Scientific (2003).

(58)   "Estimating the Benefits from Collaboration: The Case of SEMATECH" (with Albert N. Link and William F. Finan), *Review of Industrial Organization* 11:5 (October 1996), 737–751. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(59)   "Firm Organization, Industrial Structure, and Technological Innovation," *Journal of Economic Behavior and Organization* 31:2 (November 1996), 193–224. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003).

(60)   "Economic Reform in New Zealand 1984–95: The Pursuit of Efficiency" (with Lewis Evans, Arthur Grimes, and Bryce Wilkinson), *Journal of Economic Literature* 34:4 (December 1996), 1856–1902.

(61)   "Mitigating Procurement Hazards in the Context of Innovation" (with John M. de Figueiredo), *Industrial and Corporate Change* 5:2 (1996). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece* (World Scientific, 2003).

(62)   "Managing Intellectual Capital: Licensing and Cross-Licensing in Electronics" (with Peter C. Grindley), *California Management Review* 39:2 (Winter 1997). Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece,* World Scientific (2003).

(63)   "Dynamic Capabilities and Strategic Management" (with Gary Pisano and Amy Shuen), *Strategic Management Journal* 18:7 (August 1997), 509–533. Excerpted in Nicolai Foss (ed.), *Resources, Firms and Strategies*, Oxford University Press (1997). Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998). Reprinted in G. Dosi, R. Nelson and S. Winter (eds.), *The Nature and Dynamics of Organizational Capabilities*, Oxford: Oxford



University Press (2000), 334–62. Abridged and reprinted in Mariana Muzzucato, *Strategy for Business*, Sage Publications (2002). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece,* World Scientific (2003). Translated into Russian and published in the *Vestnik St. Peterburgskogo Universiteta. Seria Management* 4 (2003), 133–183. Reprinted in J. Storey (ed.), *The Management of Innovation*, Cheltenham: Edward Elgar Publishing (2004), 411–435. Reprinted in Richard Langlois, Tony Fu Lai Yu, and Paul Robertson (eds.), *Alternative Theories of the Firm, Volume 2*, Elgar Reference Collection International Library of Critical Writings in Economics, Volume 154, , Cheltenham, UK, and Northampton, MA: Edward Elgar (2002), 217–241. Reprinted in Michael L. Tushman and Philip Anderson (eds.), *Managing Strategic Innovation and Change: A Collection of Readings,* second edition, New York and Oxford: Oxford University Press (2004), 208–332. Reprinted in Julian Birkinshaw (ed.), *Strategic Management*, Edward Elgar Publishing (2005). Listed as the most cited paper in Economics and Business, 1995–2005, by *ScienceWatch* (December 2005).

(64)   "Capturing Value from Knowledge Assets: The New Economy, Markets for Know-How, and Intangible Assets," *California Management Review* 40:3 (Spring 1998), 55–79. Reprinted as "Knowledge and Competence as Strategic Assets," in C. W. Holsapple (ed.), *Handbook on Knowledge Management,* Volume 1, Chapter 7, Berlin: Spring Verlag (2003). Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003). Translated into Russian and published in the *Russian Management Journal* 2:1 (2004).

(65)   "Research Directions for Knowledge Management," *California Management Review* 40:3 (Spring 1998), 289–292. Reprinted in Ikujiro Nonaka and David J. Teece (eds.), *Managing Industrial Knowledge*, London: Sage Publications (2001), 330–335.

(66)   "The Merger Guidelines in the United States, Australia and New Zealand: An Economic Perspective" (with Mary Coleman and Christopher Pleatsikas), *Trade Practices Law Journal* 6 (September 1998), 153–171.

(67)   "The Meaning of Monopoly: Antitrust Analysis in High-Technology Industries" (with Mary Coleman), *The Antitrust Bulletin* 43:3/4 (Fall–Winter 1998), 801–857. Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003).

(68)   "Four Approaches to Telecommunications Deregulation and Competition: The USA, the UK, Australia and New Zealand" (with James R. Green), *Industrial and Corporate Change* 7:4 (December 1998), 623–635.

(69)   "A General Framework for Competitive Analysis in Wireless Telecommunications" (with J. Gregory Sidak and Hal J. Singer), *Hastings Law Journal* 50:6, Symposium Issue on Mixed Signals: Academic and Industrial Perspectives on the Telecommunications Act of 1996 (August 1999), 1639–72.



(70)    "Strategies for Managing Knowledge Assets: The Role of Firm Structure and Industrial Context," *Long Range Planning* 33:1 (February 2000), 35–54.

(71)    "Innovation, Investment, and Unbundling" (with Thomas M. Jorde and J. Gregory Sidak), *Yale Journal on Regulation* 17:1 (Winter 2000).

(72)    "The Analysis of Market Definition and Market Power in the Context of Rapid Innovation" (with Christopher Pleatsikas), *International Journal of Industrial Organization* 19:5 (April 2001), 665–693. Reprinted in *Essays in Technology Management and Policy: Selected Papers of David J. Teece*, World Scientific (2003).

(73)    "Economic Fallacies Encountered in the Law of Antitrust: Illustrations from Australia and New Zealand" (with Christopher Pleatsikas), *Trade Practices Law Journal* 9:2 (June 2001), 73–94.

(74)    "The Competitive Assessment of Vertical Long-Term Contracts" (with Christopher Pleatsikas), *Australian Business Law Review* 29:6 (December 2001), 454–476.

(75)    "Standards Setting and Antitrust" (with Edward F. Sherry), *Minnesota Law Review* 87:6 (June 2003), 1913–1994.

(76)    "Expert Talent and the Design of (Professional Services) Firms," *Industrial and Corporate Change* 12:4 (August 2003), 895–916.

(77)    "Royalties, Evolving Patent Rights, and the Value of Innovation" (with Edward F. Sherry), *Research Policy* 33:2 (March 2004), 179–191.

(78)    "Contractual Hazards and Long-Term Contracting: A TCE View from the Petroleum Industry" (with Edward F. Sherry), *Industrial and Corporate Change* 13:6 (December 2004), 931–951.

(79)    "Research on Management Education and Publishing" (with Mie Augier), *Russian Management Journal* 2:4 (December 2004), 3–18.

(80)    "Technology and Technology Transfer: Mansfieldian Inspirations and Subsequent Developments," *The Journal of Technology Transfer* 30:1/2 (December 2004), 17–33. Reprinted in Albert N. Link and F.M. Scherer (eds.), *Essays in Honor of Edwin Mansfield: The Economics of R&D, Innovation, and Technological Change,* Springer (2005).

(81)    "Reflections on (Schumpeterian) Leadership: A Report on a Seminar on Leadership and Management Education" (with Mie Augier), *California Management Review* 47:2 (Winter 2005), 114–136.



(82)   "Reflections on the Hymer Thesis and the Multinational Enterprise," *International Business Review* 15:2 (April 2006), 124–139.

(83)   "Understanding Complex Organization: The Role of Know-How, Internal Structure, and Human Behavior in the Evolution of Capabilities" (with Mie Augier), *Industrial and Corporate Change* 15:2 (April 2006), 395–416.

(84)   "Reflections on 'Profiting from Innovation,'" *Research Policy* 35:8 (December 2006), 1131–1146.

(85)   "Dynamic Capabilities and Multinational Enterprise: Penrosean Insights and Omissions" (with Mie Augier), *Management International Review* 47:2, Penrose Special Issue (March–April 2007), 1–18.

(86)   "The Role of Managers, Entrepreneurs and the Literati in Enterprise Performance and Economic Growth," *International Journal of Technological Learning, Innovation, and Development* 1:1 (2007), 43–64.

(87)   "Explicating Dynamic Capabilities: The Nature and Microfoundations of (Sustainable) Enterprise Performance," *Strategic Management Journal* 28:13 (December 2007), 1319–1350.

(88)   "How to Capture Value from Innovation: Shaping Intellectual Property and Industry Architecture" (with Gary P. Pisano), *California Management Review, 50th Anniversary Special Issue on Leading Through Innovation* 50:1 (Fall 2007), 278–296.

(89)   "Unpacking Strategic Alliances: The Structure and Purpose of Alliance Versus Supplier Relationships" (with Kyle J. Mayer), *Journal of Economic Behavior & Organization* 66 (April 2008), 106–127.

(90)   "Dosi's Technological Paradigms and Trajectories: Insights for Economics and Management," *Industrial and Corporate Change* 17:3 (June 2008), 507–512.

(91)   "Strategy as Evolution with Design: The Foundations of Dynamic Capabilities and the Role of Managers in the Economic System" (with Mie Augier), *Organization Studies* (2008).

(92)   "The (New) Nature and Essence of the Firm" (with Christos N. Pitelis), *European Management Review* 6:1 (Spring 2009), 5–15.



(93)   "Dynamic Competition in Antitrust Law" (with J. Gregory Sidak), *Journal of Competition Law & Economics* 5:4 (December 2009), 581–631. Republished in R Ian McEwin (eds.), Intellectual Property, Competition Law and Economics in Asia, under the title "Favouring Dynamic Competition over Static Competition in Antitrust Law," Hart Publishing (2011), 53–93.

(94)   "Dynamic Capabilities and the Role of Managers in Business Strategy and Economic Performance" (with Mie Augier), *Organization Science* 20:2 (2009).

(95)   "Williamson's Impact on the Theory and Practice of Management," *California Management Review* 52:2 (Winter 2010), 167–176.

(96)   "Introduction to Management Innovation: Essays in the Spirit of Alfred D. Chandler, Jr." (with William Lazonick), *Industrial and Corporate Change* 19:2 (2010).

(97)   "Alfred Chandler and 'Capabilities' Theories of Strategy and Management," *Industrial and Corporate Change* 19:2 (2010), 297–316.

(98)   "Cross-Border Market Co-creation, Dynamic Capabilities and the Entrepreneurial Theory of the Multinational Enterprise" (with C. N. Pitelis), *Industrial and Corporate Change* 19:4 (2010).

(99)   "Introduction: On the Nature and Scope of Dynamic Capabilities" (with V.S. Katkalo and C.N. Pitelis), *Industrial and Corporate Change* 19:4 (2010).

(100)   "Business Models, Business Strategy and Innovation," *Long Range Planning* 43, Amsterdam: Elsevier Science, (2010), 172–194. Reprinted in "Crafting and Executing Strategy," Thompson, Peteraf, and Strickland (eds.), Irwin/McGraw-Hill (2011).

(101)   "Innovation Spillovers and the 'Dirt Road' Fallacy: The Intellectual Bankruptcy of Banning Optional transactions for Enhanced Delivery over the Internet" (with J. Gregory Sidak), *Journal of Competition Law & Economics* 6 (2010).

(102)   "Forward Integration and Innovation: Transaction Costs and Beyond," *Journal of Retailing* 86 (2010), 277–283.

(103)   "Dynamic Capabilities: A Guide for Managers," *Ivey Business Journal (*March/April 2011).

(104)   "Achieving Integration of the Business School Curriculum Using the Dynamic Capabilities Framework," *Journal of Management Development* 30:5 (2011), 499–518.

(105)   "Innovation in Multi-Invention Contexts: Mapping Solutions to Technological and Intellectual Property Complexity (with Deepak Somaya and Simon Wakeman), *California Management Review* 53:4 (Summer 2011), 47–49.



(106)  "Next Generation Competition: New Concepts for Understanding How Innovation Shapes Competition and Policy in the Digital Economy," *Journal of Law, Economics and Policy* (Fall 2012).

(107)  "Business Models and Patent Strategies in Multi-Invention Contexts," (with Deepak Somaya and Simon Wakeman), *Ivey Business Journal* (September/October 2012).

(108)  "Dynamic Capabilities: Routines versus Entrepreneurial Action," *Journal of Management Studies* (December 2012).

*(109)*  "Towards the (Strategic) Management of Intellectual Property" (with Abdulrahman Y. Al-Aali), *California Management Review* 55:4 (Summer 2013).

(110)  "The Foundations of Enterprise Performance: Dynamic and Ordinary Capabilities in an (Economic) Theory of Firms," *Academy of Management Perspectives*, vol.8 no.4, (2014), p.328-352.

*(111)*  "International Entrepreneurship and the Theory of the (Long-Lived) International Firm: A Capabilities Perspective" (with Abdulrahman Y. Al-Aali), *Entrepreneurship* Theory & *Practice* 38:1 (January 2014).

(112)  "A Dynamic Capabilities-based Entrepreneurial Theory of the Multinational Enterprise," *Journal of International Business Studies* 45 (January 2014)*,* p.8–37.

*(113)*  "Dynamic Capabilities in the Upstream Oil and Gas Sector: Managing Next Generation Competition" (with Amy Shuen and Paul Feiler), *Energy Strategy Review* (September 2014).

(114)  "Case Study: Dynamic Capabilities and Upstream Strategy: Supermajor EXP," (with Paul Feiler), *Energy Strategy Review* (September 2014).

(115)  "Patents and Patent Wars in Wireless Communications: An Economic Assessment," *Digiworld Economic Journal* 95 (3rd Q. 2014), 85.

(116)  "Dynamic capabilities and entrepreneurial management in large organizations: Toward a theory of the (entrepreneurial) firm", *European Economic Review*, (2016).

(117)  "Campus leadership and entrepreneurial universities: a dynamic capabilities perspective" (with S.Leih), Academy of Management Perspectives, Vol, 30. No. 2, 2016.

(118)  "Dynamic Capabilities and Organizational Agility: Risk, Uncertainty and Entrepreneurial Management in the Innovation Economy", (with M. Peteraf & S. Leih), *California Management Review*, Vol. 58, No. 4, (Summer 2016)



(119)  "Uncertainty, innovation, & dynamic capabilities: an introduction", (with S. Leih), *California Management Review,* 58(4):5-12

(120)  "Standards Setting, Standards Development, and Division of the Gains from Standardization", (with E. Sherry), *Competition Policy International*, Sept. 2016.

(121)  "The Dynamic Capabilities of Meta-Multinationals", (with D. Lessard & S. Leih), Global Strategy Journal; 6: 2011-224, 2016.

(122)   "How to Manage Under Deep Uncertainty: Designing Decision Frameworks to Support Dynamic Capabilities", California Management Review, with Schoemaker, J.H., Teece, D.J, Leih, S, (Forthcoming).

(123)  Landau, C., Leih, S., Russo, P., Teece, D. (2016). Little wisdom among the many. Harvard Business Manager, 12/2016, 72-78.

## BOOKS AND MONOGRAPHS

(1)     *The Multinational Corporation and the Resource Cost of International Technology Transfer,* Cambridge, MA: Ballinger (1976).

(2)     *Vertical Integration and Vertical Divestiture in the U.S. Oil Industry,* Stanford: Stanford University Institute for Energy Studies (1976).

(3)     *R&D in Energy: Implications of Petroleum Industry Reorganization* (ed.), Stanford: Stanford University Institute for Energy Studies (1977).

(4)     *Technology Transfer, Productivity and Economic Policy* (with E. Mansfield et al.), New York: W.W. Norton (1982).

(5)     *OPEC Behavior and World Oil Prices* (with James Griffin), London: Allen & Unwin (1982).

(6)     *The Competitive Challenge: Strategies for Industrial Innovation and Renewal* (ed.), New York: Harper & Row, Ballinger Division (1987). Translations into Japanese and Italian.

(7)     *Antitrust, Innovation, and Competitiveness*, Thomas M. Jorde and David J. Teece (eds.), Oxford: Oxford University Press (1992).



(8)  *Fundamental Issues in Strategy: A Research Agenda*, Richard P. Rumelt, Dan E. Schendel, and David J. Teece (eds.), Boston: Harvard Business School Press (1994). Translation into Portuguese, Lisbon: Bertrand Editora, Ltda. (1996); and Indonesian, Jakarta: Binarupa Aksara, Chapter 1 (1997). Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II,* Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(9)  *Economic Performance and the Theory of the Firm: The Selected Papers of David Teece, Volume 1*, London: Edward Elgar Publishing (1998).

(10)  *Strategy, Technology and Public Policy: The Selected Papers of David Teece, Volume 2*, London: Edward Elgar Publishing (1998).

(11)  *Technology, Organization, and Competitiveness: Perspectives on Industrial and Corporate Change,* Giovanni Dosi, David J. Teece, and Josef Chytry (eds.), Oxford: Oxford University Press (1998). Translation into Chinese, Beijing: Shanghai People's Publishing House (2004).

(12)  *Firms, Markets, and Hierarchies: The Transaction Cost Economics Perspectives,* Glenn R. Carroll and David J. Teece (eds.), New York: Oxford University Press (1999).

(13)  *Managing Intellectual Capital: Organizational, Strategic, and Policy Dimensions*, Oxford: Oxford University Press (2000). Translated into Russian, St. Petersburg State University (2007).

(14)  *Managing Industrial Knowledge,* Ikujiro Nonaka and David J. Teece (eds.), London: Sage Publications (2001).

(15)  *Essays in Technology Management and Policy*, World Scientific Publishing (2003).

(16)  *Understanding Industrial and Corporate Change*, Giovanni Dosi, David J. Teece, and Josef Chytry (eds.), Oxford: Oxford University Press (2005).

(17)  *Dynamic Capabilities: Understanding Strategic Change in Organizations,* Constance E. Helfat, Sydney Finkelstein, Will Mitchell, Margaret A. Peteraf, Harbir Singh, David J. Teece, and Sidney G. Winter, Oxford: Blackwell (2007). Translated into Japanese, Keiso Shobo Publishing (2009).

(18)  *The Transfer and Licensing of Know-How and Intellectual Property: Understanding the Multinational Enterprise in the Modern World,* World Scientific Publishing (2008).

(19)  *Technological Know-How, Organizational Capabilities and Strategic Management,* World Scientific Publishing (2008).



(20)  *Fundamentals of Business Strategy, Six Volume Set*, Mie Augier and David J. Teece (eds.), Sage Publications (2008).

(21)  *Dynamic Capabilities and Strategic Management: Organizing for Innovation and Growth*, Oxford University Press (2009). Second edition (2011). Second edition with new preface (2011). Japanese translation (2012).

(22)  *Management Innovation: Essays in the Spirit of Alfred D. Chandler Jr.,* William Lazonick and David J. Teece (eds.), Oxford: Oxford University Press (2012.)

(23)  *Strategy, Innovation, and the Theory of the Firm,* David J. Teece, Edward Elgar Publishing Ltd. (December 2012).

(24)  *Competing Through Innovation: Technology, Strategy & Antitrust Policy*, David J. Teece, Edward Elgar Publishing Ltd. (2013).

**CONTRIBUTIONS**

(1)  "Innovation and Divestiture in the U.S. Oil Industry" (with Henry Ogden Armour), in David J. Teece, *R&D in Energy: Implications of Petroleum Industry Reorganization*, Stanford: Stanford University Institute for Energy Studies (1977), 7–93.

(2)  "Vertical Integration in the U.S. Oil Industry," in E. Mitchell (ed.), *Vertical Integration in the Oil Industry*, Washington, DC: American Enterprise Institute (1978), 105–189. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(3)  "Horizontal Integration in Energy: Organizational and Technological Considerations," in E. Mitchell (ed.), *Horizontal Divestiture in the Oil Industry*, Washington, DC: American Enterprise Institute (1978).

(4)  "Energy Company Financial Reporting: Conceptual Framework for an Energy Information System" (with Paul A. Griffin) in William W. Hogan (ed.), *Energy Information: Description, Diagnosis, and Design*, Stanford, CA: Stanford University Institute for Energy Studies (December 1978), 235–289.

(5)  "Integration and Innovation in the Energy Markets," in R. Pindyck (ed.), *Advances in the Economics of Energy and Resources*, Volume 1, Greenwich, CT: JAI Press (1979), 163–212.

(6)  "The New Social Regulation: Implications and Alternatives," in M. Boskin (ed.), *The Economy in the 1980s*, San Francisco: Institute for Contemporary Studies (1980), 119–158.



(7)    "Technology and R&D Activities of Multinational Firms: Some Theory and Evidence," in
R.G. Hawkins and A.J. Prasad (eds.), *Technology Transfer and Economic Development*,
Greenwich, CT: JAI Press (1981).

(8)    "Technological and Organizational Factors in the Theory of the Multinational Firm," in
Mark Casson (ed.), *The Growth of International Business*, London: Allen & Unwin (1983),
51–62.

(9)    "Competitiveness" (with S. Cohen, L. Tyson and J. Zysman), in *Global Competition: The
New Reality*, Volume III, Washington, DC: President's Commission on Industrial
Competitiveness (1985).

(10)   "La Diversificazione Strategica: Condizioni di Efficienza," in Raoul C.D. Nacamulli and
Andrea Rugiadini (eds.), *Organizzazione & Mercato*, Bologna: Il Mulino (1985), 447–476.

(11)   "Firm Boundaries, Technological Innovation, and Strategic Management," in L.G.
Thomas (ed.), *Economics of Strategic Planning*, Lexington, MA: Lexington Books (1986),
187–199.

(12)   "Joint Ventures and Collaborative Arrangements in the Telecommunications Equipment
Industry" (with G. Pisano and M. Russo) in David Mowery (ed.), *International
Collaborative Ventures in U.S. Manufacturing*, Cambridge, MA: Ballinger (1988), 23–70.
Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of
David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar
(1998).

(13)   "Joint Ventures and Collaboration in the Biotechnology Industry" (with G. Pisano and W.
Shan) in David Mowery (ed.), *International Collaborative Ventures in U.S.
Manufacturing,* Cambridge, MA: Ballinger (1988), 183–222. Reprinted in *Economic
Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume
One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(14)   "Technological Change and the Nature of the Firm," in G. Dosi, C. Freeman, R. Nelson, G.
Silverberg, and L. Soete (eds.), *Technical Change and Economic Theory*, London: Pinter
(1988), 256–281. Reprinted in *Economic Performance and the Theory of the Firm: The
Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA:
Edward Elgar (1998). Reprinted in R.N. Langlois (ed.), *Alternative Theories of the Firm,*
Cheltenham: Edward Elgar (2001).

(15)   "The Research Agenda on Competitiveness" (with Peter Jones) in A. Furino (ed.),
*Cooperation and Competition in the Global Economy: Issues and Strategies*, Cambridge,
MA: Ballinger (1988), 101–114.



(16)  "What We Know and What We Don't Know About Competitiveness" (with Peter Jones) in A. Furino (ed.), *Cooperation and Competition in the Global Economy*, Cambridge, MA: Ballinger (1988), appendix, 265–330.

(17)  "Reconceptualizing the Corporation and Competition: Preliminary Remarks," in Khemani, Shapiro, and Stanbury (eds.), *Mergers, Corporate Concentration and Power in Canada*, Montreal, Canada: The Institute for Research on Public Policy (1988), 91–106. Republished in Faulhaber and Tamburini (eds.), *European Economic Integration: The Role of Technology,* Norwell, MA: Kluwer Academic Publishers (1991), 177–200.

(18)  "Collaborative Arrangements and Global Technology Strategy: Some Evidence from the Telecommunications Equipment Industry" (with G. Pisano) in Robert A. Burgelman and Richard S. Rosenbloom (eds.), *Research on Technological Innovation, Management and Policy*, Volume 4, Greenwich, CT: JAI Press (1989), 227–256. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK and Northampton, MA: Edward Elgar (1998).

(19)  "Contributions and Impediments of Economic Analysis to the Study of Strategic Management," in James W. Frederickson (ed.), *Perspectives on Strategic Management*, Toronto and SF: Harper Books (1990), 39–80. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(20)  "Capturing Value Through Corporate Technology Strategies," in John de la Mothe and Louis M. DuCharme (eds.), *Science, Technology and Free Trade*, London and NY: Pinter Publishing (1990), 69–84.

(21)  "Natural Gas Distribution in California: Regulation, Strategy, and Market Structure," (with Michael V. Russo) in R. Gilbert (ed.), *Regulatory Choices: A Perspective on Developments in Energy Policy*, Berkeley: University of California Press (1991), 120–186. Abstracted in C. Michael Lederer (ed.), *California Energy Policy: The Regulated Sector*, Proceedings of the California Energy Policy Seminar, Berkeley: University Energy Research Group (September 18–19, 1986), 33–43. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(22)  "Technological Development and the Organisation of Industry," in *Technology and Productivity: The Challenge for Economic Policy*, Paris: Organisation for Economic Co-operation and Development (1991), 409–418. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(23)  "Support Policies for Strategic Industries: Impact on Home Economies," *Strategic Industries in a Global Economy: Policy Issues for the 1990s,* Paris: OECD (1991), 35–50.



(24)    "Analisi Economica e Strategic Management," in Luca Zan (ed.), *Strategic Management: Materiali critici*, Torino, Italy: UTET Libreria (1992), 164–186. *Economia d'Impresa, Management e Organizzazione del Lavoro*, v. 3.

(25)    "Toward a Theory of Corporate Coherence: Preliminary Remarks" (with Giovanni Dosi and Sidney Winter), in Giovanni Dosi, Renato Giannetti, and Pier Angelo Toninelli (eds.), *Technology and Enterprise in a Historical Perspective*, Oxford: Clarendon Press (1992), 186–211.

(26)    "Strategies for Capturing the Financial Benefits from Technological Innovation," in N. Rosenberg, R. Landau, and David Mowery (eds.), *Technology and the Wealth of Nations*, Stanford, CA: Stanford University Press (1992).

(27)    "The Changing Place of Japan in the Global Scientific and Technological Enterprise" (with David C. Mowery), in Thomas S. Arrison, C. Fred Bergsten, Edward M. Graham, and Martha Caldwell Harris (eds.), *Japan's Growing Technological Capability: Implications for the U.S. Economy*, Washington, D.C.: National Academy Press (1992), 106–135.

(28)    "Multinational Enterprise, Internal Governance, and Industrial Organization," in B. Gomes Casseres and D.B. Yoffie (eds.), *The International Political Economy of Direct Foreign Investment*, United Kingdom: Edward Elgar Publishing (1993), 196–201.

(29)    "Natural Resource Cartels" (with David Sunding and Elaine Mosakowski), in A.V. Kneese and J.L. Sweeney (eds.), *Handbook of Natural Resource and Energy Economics*, Volume III, Chapter 24, Elsevier Science Publishers B.V. (1993), 1131–1166. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(30)    "Competition in Local Communications: Innovation, Entry and Integration" (with Robert G. Harris and Gregory L. Rosston), in Gerald Brock (ed.), *Toward a Competitive Telecommunications Industry: Selected Papers from the 1994 Telecommunications Research Conference*, Lawrence Erlbaum Associates (1995), 67–94. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(31)    "Strategic Alliances and Industrial Research" (with David C. Mowery), in Richard S. Rosenbloom and William J. Spencer (eds.), *Engines of Innovation: U.S. Industrial Research at the End of an Era*, Cambridge, MA: Harvard Business School Press (1996), 111–129. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(32)    "Innovation, Market Structure, and Antitrust: Harmonizing Competition Policy in Regimes of Rapid Technological Change" (with Thomas M. Jorde), in Leonard



Waverman, William S. Comanor and Akira Goto (eds.), *Competition Policy in the Global Economy: Modalities for Cooperation*, London: Routledge (1996), 289–303.

(33)     "The Uneasy Case for Mandatory Contract Carriage in the Natural Gas Industry," in Jerry Ellig and Joseph P. Kalt (eds.), *New Horizons in Natural Gas Deregulation*, Westport, CT, and London: Praeger (1996), 43–73. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(34)     "Information Sharing, Innovation, and Antitrust," in Horst Albach, Jim Y. Yin, and Christoph Schenk (eds.), *Collusion Through Information Sharing? New Trends in Competition Policy,* Berlin: Edition Sigma (1996), 51–68. Reprinted in *Strategy, Technology and Public Policy: The Selected Papers of David J. Teece, Volume II*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(35)     "Firm Capabilities and Managerial Decision Making: A Theory of Innovation Biases" (with Janet E. L. Bercovitz and John M. de Figueiredo), in Raghu Garud, Praveen Nayyar, and Zur Shapira (ed.), *Technological Innovation: Oversights and Foresights*, Cambridge: Cambridge University Press (1997), 233–259. Reprinted in *Economic Performance and the Theory of the Firm: The Selected Papers of David J. Teece, Volume One*, Cheltenham, UK, and Northampton, MA: Edward Elgar (1998).

(36)     "Design Issues for Innovative Firms: Bureaucracy, Incentives, and Industrial Structure," in Alfred Chandler, Peter Hagström and Organ Solvell (eds.), *The Dynamic Firm*, Oxford: Oxford University Press (1998), 134–165.

(37)     "Organizational Competencies and the Boundaries of the Firm" (with Giovanni Dosi) in Richard Arena and Christian Longhi (eds.), *Markets and Organization*, Berlin: Springer-Verlag (1998), 281–302.

(38)     "Transaction Cost Economics: It's Influence on Organizational Theory, Strategic Management, and Political Economy" (with Glenn Carroll and Pablo Spiller) in Glenn Carroll and David J. Teece (eds.), *Firms, Markets and Hierarchies*, Oxford University Press (1999).

(39)     "Firm Capabilities and Economic Development: Implications for Newly Industrializing Economies," in Linsu Kim and Richard R. Nelson (eds.), *Technology, Learning, and Innovation: Experiences of Newly Industrializing Economies*, New York: Cambridge University Press (2000), 105–128.

(40)     "The Misuse Doctrine: An Economic Reassessment" (with Edward F. Sherry), *Intellectual Property Misuse Licensing and Litigation*, New York: American Bar Association (2000), 131–155.



(41)  "Managing Knowledge Assets in Diverse Industrial Contexts," in Charles Despres and
Daniele Chauvel (eds.), *Knowledge Horizons: The Present and the Past of Knowledge
Management*, Boston: Butterworth Heinemann (2000).

(42)  "Economic and Sociological Perspectives on Diversification and Organizational
Structure," in Joel Baum (ed.), *Advances in Strategic Management*, Greenwich, CT: JAI
Press (2000), 79–85.

(43)  "Strategies for Managing Knowledge Assets: The Role of Firm Structure and Industrial
Context," in Ikujiro Nonaka and David J. Teece (eds.), *Managing Industrial Knowledge*,
London: Sage Publications (2001), 125–144.

(44)  "New Indicia for Antitrust Analysis in Markets Experiencing Rapid Innovation" (with
Christopher Pleatsikas) in Jerry Ellig (ed.), *Dynamic Competition and Public Policy*, New
York: Cambridge University Press (2001), 95–137.

(45)  "Diversification and Economies of Scope" (with Robert Lowe and Chris Boerner), in Neil
J. Smelser and Paul B. Bates (eds.), *International Encyclopedia of the Social and
Behavioral Sciences,* Elsevier Science Ltd. (2001), 3797–3801.

(46)  "A Review and Assessment of Organizational Learning in Economic Theories" (with
Christopher S. Boerner and Jeffrey T. Macher), in Meinolf Dierkes, Ariane Berthoin Antal,
John Child, and Ikujiro Nonaka (eds.), *Handbook of Organizational Learning and
Knowledge*, New York: Oxford University Press (2001), 89–117. Translated into Chinese.

(47)  "Dynamic Capabilities," in William Lazonick (ed.), *The International Encyclopedia of
Business and Management*, London: Thomson Learning Publishers (2002).

(48)  "Dynamic Capabilities, Competence, and the Behavioral Theory of the Firm" (with J.
Lamar Pierce and Christopher S. Boerner) in Mie Augier and James G. March (eds.), *The
Economics of Choice, Change and Structure: Essays in the Memory of Richard M. Cyert*
(Cheltenham: Edward Elgar, 2002), 81–95.

(49)  "The California Electricity Manifesto: Choices Made and Opportunities Lost," in Ahmad
Faruqui and Kelly Eakin (eds.), *Market Analysis and Resource Management,* Kluwer
Academic Publishing (2002).

(50)  "The Strategic Management of Technology and Intellectual Property," in David Faulkner
and Andrew Campbell (eds.), *Oxford Textbook of Strategy–Volume 1: A Strategy
Overview and Competitive Strategy,* Oxford: Oxford University Press (2003).

(51)  "Knowledge and Competence as Strategic Assets," in C. W. Holsapple (ed.), *Handbook
on Knowledge Management*, Volume 1, Chapter 7, Berlin: Spring Verlag (2003), 129–
152.


**BRG**
Berkeley Research Group

(52)  "Industrial Research," in Stanley I. Kutler (ed.), *Dictionary of American History*, third edition, The Gale Group, Inc.: Charles Scribner's Sons (2003).

(53)  "An Economics Perspective on Intellectual Capital" (with Mie Augier), in B. Marr (ed.), *Perspectives on Intellectual Capital*, Boston, MA: Butterworth-Heinemann (2005).

(54)  "A Primer on Trademarks and Trademark Valuation" (with Michaelyn Corbett and Mohan Rao), in Daniel Slottje (ed.), *Economics of Copyright, Trademark, and Trade Secret Damages, Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, New York: John Wiley (2006), 281–296.

(55)  "Patents, Licensing and Entrepreneurship: Effectuating Innovation in Multi-Invention Contexts" (with Deepak Somaya), in Sheshinki, Strom, and Baumol (eds.), *Entrepreneurship, Innovation, and the Growth Mechanism of the Free-Enterprise Economies*, Princeton University Press (2007).

(56)  "Perspectives on Research and Development: Organizing and Managing Innovation in a (Global) Knowledge-Based Economy" (with Mie Augier), in *Knowledge Creation and Management: New Challenges for Managers*, Kazuo Ichijo and Ikujiro Nonaka (eds.), Oxford: Oxford University Press (2007).

(57)  "Competencies, Capabilities and the Neoschumpeterian Tradition," (with Mie Augier), in H. Hanusch and A. Pyka (eds.), *The Elgar Companion to Neo-Schumpeterian Economics*, Cheltenham, UK: Edward Elgar (2007).

(58)  "Forward: From the Management of R&D to Knowledge Management," in I. Nonaka, R. Toyama, and T. Hirata (eds.), *Managing Flow: A process Theory of the Knowledge-Based Firm*, New York: Palgrave Macmillan (2008).

(59)  "Technological Innovation and the Theory of the Firm: The Role of Enterprise-level Knowledge, Complementarities, and (Dynamic) Capabilities," in N. Rosenberg and B. Hall (eds.), *Handbook of the Economics of Innovation*, Amsterdam: Elsevier (2010), 1–15.

(60)  Knowledge Assets, Capabilities, and the Theory of the Firm," in Mark Easterby-Smith and Marjorie A. Lyles (eds.), *Handbook of Organizational Learning and Knowledge Management*, second edition, Chichester, UK: John Wiley (2011).

(61)  "Human Capital, Capabilities, and the Firm: Literati, Numerati, and Entrepreneurs in the Twenty-First Century Enterprise," in Alan Burton-Jones and J.C. Spender (eds.), *Oxford Handbook on Human Capital* (2011).

(62)  "Management and Governance of the Business enterprise: agency, contracting, and capabilities perspectives," in Dennis Mueller (ed.), *Oxford Handbook of Capitalism*



(April 2012).

(63)  Alfred Chandler and "capabilities" theories of strategy and management, *Industrial and Corporate Change*, Oxford University (Press, 2010), 19 (2): 297-316.

(64)  "Dynamic capabilities," in E. Kessler (ed.), *Sage Encyclopedia of Management Theory,* Thousand Oaks, CA: SAGE Publications, Inc. (2013), 222–225.

(65)  "Profiting from innovation," in E. Kessler (ed.), *Sage Encyclopedia of Management Theory,* Thousand Oaks, CA: SAGE Publications, Inc. (2013), 623–626

(66)  "Managing Expert Talent"(with Greg Linden) in Paul Sparrow et al, *Strategic Talent Management Contemporary Issues in International Context*, Cambridge University Press (2014).

(67)  "The New Managerial Economics of Firm Growth: The Role of Intangible Assets and Capabilities," *The New Managerial Economics of Firm Growth,* Oxford University Press (July 2013).

(68)  "Asset Orchestration," Palgrave Encyclopedia of Strategic Management, London: Palgrave, MacMillan (2014).

(69)  "Autonomous Innovation," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(70)  "Basic Research", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(71)  "Business Ecosystem," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(72)  "Business Plan", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(73)  "Capability Development," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(74)  "Cooperation and Competition," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(75)  "Co-Specialization," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).



(76)     "Diversification," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(77)     "Dynamic Capabilities," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(78)     "Entrepreneurial Rents," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(79)     "Governance", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(80)     "Intangible Assets", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(81)     "Intangible Resources," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(82)     "Kay, John (born 1948)", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(83)     "M Form Firms," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(84)     "Managerial Discretion," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(85)     "Market Entry Strategies", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(86)     "Market Failure and MNEs, *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(87)     "Market Structure," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(88)     "Monopoly Rents," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(89)     "Multiproduct Companies," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).



(90)     "Negative Knowledge," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(91)     "Nonaka, Ikujiro (born 1935)," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(92)     "Profiting from Innovation," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(93)     "Scope Economies," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(94)     "Scope of Enterprise", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(95)     "System Integrators", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(96)     "Systemic Innovation," *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(97)     "Technology Transfer", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(98)     "Vertical Integration", *Palgrave Encyclopedia of Strategic Management*, London: Palgrave, MacMillan (2014).

(99)     "Diversification, Relatedness, and the new Logic of Co-creation," International Encyclopedia of the Social and Behavioral Sciences, second edition (2015).

(100)   "Intangible Assets and Theory of Heterogeneous Firms, in: *Intangibles, Market Failure and Innovation Performance*, Ahmed Bounfour and Tsutoma Miyagama (ed), Switzerland: Springer International Publishing (2015).

(101)   "Business Model Innovation and Organizational Design: A Dynamic Capabilities Perspective," (with Sohvi Leih and Greg Linden), *Business Model Innovation and Organizational Design*, Nicholas Foss and Tina Saebi (ed.), London: Oxford University Press (2015).

(102)   "Managing Experts and Creative Talent" in *Handbook of Service Business: Management, Marketing, Innovation, and Internalization,* John R. Bryson and Peter W. Daniels (ed), Edward Elgar Publishing (2015).



**CONGRESSIONAL AND AGENCY POLICY TESTIMONY**

(1)    "The Energy Antimonopoly Act of 1979," *Hearings Before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United States Senate*, June 21, 1979, Washington, DC: U.S. Government Printing Office (1980).

(2)    "Statement on U.S. Economic Growth and the Third World Debt," *Hearings before the Subcommittee on International Economic Policy, Oceans, and Environment of the Committee on Foreign Relations, United States Senate*, October 9 and 10, 1985, Washington, DC: U.S. Government Printing House (1986).

(3)    "Oil Prices and Debt Crisis" (with Constance Helfat), *Hearings Before the Subcommittee on International Economic Policy, Oceans, and Environment of the Committee on Foreign Relations, United States Senate*, October 9 and 10, 1985, Washington, DC: U.S. Government Printing Office (October 1986).

(4)    "Legislative Proposals to Modify the U.S. Antitrust Laws to Facilitate Cooperative Arrangements to Commercialize Innovation" (with Thomas Jorde), *Hearings Before the Subcommittee on Economics and Commercial Law, House Judiciary Committee* (July 26, 1989).

(5)    "Cooperation and Competition" (with Thomas Jorde), *Hearings Before the Subcommittee on Science, Research, and Technology of the Committee on Science, Space, and Technology, U.S. House of Representatives*, on The Government Role in Joint Production Ventures (September 19, 1989).

(6)    "Extending the NCRA" (with Thomas Jorde), *Hearings before the Subcommittee on Antitrust, Monopolies and Business Rights of the Committee on the Judiciary, U.S. Senate* (July 17, 1990).

(7)    "An Economic Analysis of S.B. 1757, S.D. 1: 'Relating to Prohibition against Retailing of Motor Fuel by Refiners,'" Hearings, State of Hawaii (1991).

(8)    "Assessing Competition, Firm Performance, and Market Power in the Context of Innovation: Implications for Antitrust Enforcement," Federal Trade Commission Hearings on "The Changing Nature of Competition," Washington, DC (October 24, 1995).

(9)    "Intellectual Property, Valuation, and Licensing," and "IP, Competition Policy, and Enforcement Issues," *Federal Trade Commission and the Antitrust Division of the U.S. Department of Justice Hearings on "Competition and Intellectual Property Law and*



*Policy in the Knowledge-Based Economy*, University of California, Berkeley (February 26–27, 2002).

**PUBLISHED REVIEWS**

(1)      "Divestiture and R&D in the U.S. Oil Industry," *Reprints: Proceedings of the American Chemical Society* 22:1 (February 1977).

(2)      Review of *Crude Oil Prices as Determined by OPEC and Market Fundamentals* (by Paul MacAvoy), in *Journal of Economic Literature* (June 1983), 587–589.

(3)      Review of *Vertical Integration and Joint Ventures in the Aluminum Industry* (by John Stuckey), in *Journal of Economic Literature* 22 (September 1984), 1151–1153.

(4)      Review of *Politics, Prices, and Petroleum: The Political Economy of Energy* (by David Glasner), in *Journal of Economic Literature* 24:2 (June 1986), 722–723.

(5)      Review of *International Technology Transfer: Concepts, Measures, and Comparisons* (by N. Rosenberg and C. Frischtak, eds.), in *Journal of Economic Literature* 25 (March 1987), 160–161.

(6)      Review of *Investment Choices in Industry* (by C. Helfat), in *Journal of Economic Behavior and Organization* (1989).

(7)      Review of *Economics, Law and Intellectual Property: Seeking Strategies for Research and Teaching in a Development Field* (by O. Grandstrand), in *R&D Management* 35:2 (2005), 225–232.

**COMMENTS, OPINIONS, EDITORIAL MATTER, AND PUBLISHED INTERVIEWS**

(1)      "Comment" in E. Mitchell (ed.), *Oil Pipelines and Public Policy,* Washington, DC: American Enterprise Institute (1979).

(2)      "Alternatives to Government Regulation," *Stanford GSB* (Winter 1980–81), 2–7.

(3)      "An Exchange on Oil Tariffs" (with Milton Friedman and James Griffin), *Journal of Contemporary Studies* (Summer 1982), 55–60.

(4)      "Die Hand am Puls," *Industrie Magazin* 9 (September 1987).

(5)      "Commentary: The Road to Bangladesh," *Strategic Issues* (May 1988).



(6)     Letters to the Editor, "Antitrust Law's Drag on Innovation" (with Thomas Jorde), *The Wall Street Journal* (January 18, 1989).

(7)     "To Keep U.S. in Chips, Modify the Antitrust Laws" (with Thomas Jorde), *The Los Angeles Times* (July 24, 1989), 5.

(8)     "Harnessing Complementary Assets" in *Keeping the U.S. Computer Industry Competitive: Defining the Agenda,* Washington, DC: National Academy of Engineering (1989).

(9)     Letters to the Editor, "A Question of Industrial Success," *Harvard Business Review*, 90:3 (May–June 1990), 215.

(10)    "Prefazione," in Patrizia Zagnoli, *I Rapporti Tra Imprese Nei Settori ad Alta Tecnologia il Caso della Silicon Valley,* Torino, Italy: G. Giappichelli (1991), vii–ix.

(11)    "Foreword," in George Richardson, *Information and Investment*, Oxford University Press (1991).

(12)    "Interview for Vestnik Leningradskogo Universiteta," *Series Economics* 4 (1991), 68–71.

(13)    "Editorial Statement" (with Giovanni Dosi, Nathan Rosenberg, Giulio Sapelli, and Nick von Tunzelmann," *Industrial and Corporate Change* 1:1 (1992), vii–viii.

(14)    "Commentary for the Complex Case of Management Education," *Harvard Business Review* (September–October 1992).

(15)    "Technology Rivalries and Synergies between North America and Japan," *Symposium III, Licensing Executives Society* (March 28–30, 1993).

(16)    "Introduction: Special Issue on Telecommunications and Strategy" (with W. Mitchell), *Industrial and Corporate Change* 4:4 (1995), 639–646.

(17)    "Introduction: Special Issue on Firms, Markets and Organizations" (with G. R. Carroll), *Industrial and Corporate Change* 5:2 (1996), 203–204.

(18)    "Henry W. Chesbrough and David J. Teece Reply," *Harvard Business Review* 74:2 (March–April 1996), 166–168.

(19)    "Innovation and Competition Policy," *Trade Practices Law Journal* 5:1 (March 1997), 73–77.

(20)    "Recent Developments in Merger Analysis: Unilateral Competitive Effects," *Trade Practices Law Journal* 5:4 (December 1997).



(21)  "Licensing and the Market for Know-How," *R&D Enterprise Asia Pacific* 1:2–3 (March/May 1998).

(22)  "Common Ground, Different Assumptions," *Advances in Strategic Management* 17, Greenwich, CT: JAI Press (2000), 111–113.

(23)  "Businesses and Universities Can Prosper in Partnership," *New Zealand Dominion* (City Edition) (November 26, 2001).

(24)  "Uncertainty and Hubris in Cyberspace: Brief Remarks on US v. Microsoft," *UWLA Law Review*, Symposium: Cyber Rights, Protection, and Markets (2001).

(25)  Market Entry Strategy for Innovators: In a World of Heightened Competition, the Most Valuable Intellectual Capital is Knowing How to Orchestrate Intangible Assets," *PRTM's Insight* (Summer/Fall 2001).

(26)  "State Buys Some Time, But Energy Crisis Remains," *The Mercury News* (February 7, 2001).

(27)  "Manifesto on the California Electricity Crisis" AEI Brookings Joint Center for Regulatory Studies (January 26, 2001).

(28)  "Comments of 37 Concerned Economists: Promoting Efficient use of the Spectrum Through Elimination of Barriers to the Development of Secondary Markets" with Gregory L. Rosston and Thomas W. Hazlett), Federal Communications Commission (No. 00-230) (February 7, 2001) (pro bono).

(29)  "Remarks Delivered upon the Acceptance of Doctor Honoris Causa," July 1, 2002, St. Petersburg State University. In: *Vestnik St. Petersburgskogo Universiteta. Seria Management* 4 (2002), 8–19.

(30)  "Twenty Years after Nelson and Winter's *An Evolutionary Theory of Economic Change*: A Preface on Knowledge, The Nature of Organizations and the Patterns of Organizational Change," (with Giovanni Dosi and Franco Malerba), *Industrial and Corporate Change* 12:2 (April 2003), 147–148.

(31)  "Manifesto II on the California Electricity Crisis," AEI Brookings Joint Center for Regulatory Studies, Publication 03-10, Joint Center (May 2003).

(32)  "Amici Curiae Brief in Support of Petitioners: San Diego Association of Realtors, et al., Petitioners, v. Arlene Freeman and James Alexander, Respondents" (with Thomas M. Jorde), Supreme Court of the United States (No. 03-300) (September 2003) (pro bono).



(33)  "Open Letter to California's Governor" (January 2004). White paper, *The Energy and Utilities Project: Positioning for Growth*, 4.

(34)  "The Evolving Dynamics of Organizational Capabilities: An Interview with David J. Teece by Mie Augier." Working paper, Papers in Organization, Copenhagen Business School, Department of Organization (2004).

(35)  "World Thought Leader: Economics Rock Star," New Zealand Connection (June 2004).

(36)  "Patent Settlements in the Pharmaceutical Industry: Balancing Intellectual Property and Antitrust Concerns" (with Christopher Pleatsikas) (eds.), *Trade Practices Law Journal* 12 (2004), 175–180.

(37)  "Technological Know-how, Property Rights, and Enterprise Boundaries: The Contribution of Arora and Merges*," Industrial and Corporate Change* 14:6 (2005), 1237–1240.

(38)  "Brief of Amici Curiae Economists in Support of Respondent: eBay, Inc. and Half.com. Inc., Petitioners, v. Mercexchange, L.L.C., Respondent" (with Richard A. Epstein, F. Scott Kieff, and R. Polk Wagner), Supreme Court of the United States (2006) (pro bono).

(39)  "Brief of Amici Curiae Economists in Support of Petitioners in Bell Atlantic v. Twombly (2006) (pro bono).

(40)  "Brief of Amici Curiae Economists in Support of Resale Price Maintenance, Supreme Court of the United States (2006) (pro bono).

(41)  "Brief of Amici Curiae Economists in Support of Petitioners in Leegin Creative Leather Products, Inc. v. PSKS, Inc., doing business as Kay's Kloset … Kay's Shoes, Supreme Court of the United States (2006) (pro bono).

(42)  "A Discussion with Richard Nelson on the Contributions of Alfred Chandler" (with Richard R. Nelson), *Industrial and Corporate Change* 19:2 (2010).

(43)  "A Conversation with Sidney Winter on the Contributions of Alfred Chandler" (with Sidney G. Winter), *Industrial and Corporate Change* 19:2 (2010).

(44)  "John Freeman: entrepreneurship and innovation defined – a personal remembrance" (with Jerome S. Engel), *Industrial and Corporate Change,* 21:1 (February, 2012)

(45)  "Students are Blinkered by a Narrowing Teaching Focus," Soapbox, *Financial Times,* (July 9, 2012).

(46)  "The Real Winners of the Coming Revolution in Higher Education" (with Bruce Guile), *Forbes* (2013).



(47)   "Why Apple Still Has the Magic," *Huffington Post* (2013).

(48)   "A Radical Idea for Pure Science: The Scientist-Entrepreneur," *Huffington Post* (2013).

(49)   "The Dynamic Capabilities of David Teece," Interview by Art Kleiner in *Strategy and Business* (November 11, 2013).

(50)   "Foreword," in Jerome S. Engel, *Global Clusters of Innovation: Entrepreneurial Engines of Economic Growth Around the World*, Edward Elgar Pub (November 26, 2014).

(51)   " Brief for Amici Curiae Antitrust Law Experts and Scholars" in United States, et al. v American Express Co., et al, U.S. Court of Appeals, Second Circuit (August 10, 2015).

(52)   "India and the Global Standards Race" in LiveMint.com, (November 19, 2015)

(53)  Forward for Dynamic Capabilities and the Internationalization Process of Chinese Companies: the case of Haier, Huawei and TCL, CNRS Editions, Paris, April 2016

# APPENDIX 2



# Expert Testimony of David J. Teece

1.  *Cal Steel & Tube v. Kaiser Steel*
    U.S. District Court, Central District of California
    Testimony:                          Deposition and Trial (for Defendant)
    Approximate Dates:          Late 1970's

2.  *Garside v. Everest and Jennings*
    U.S. District Court, Eastern District of California
    Testimony:                          Deposition and Trial (for Defendant)
    Approximate Dates:          Early 1980's

3.  *Unocal v. Mesa*
    U.S. District Court, Western District of Louisiana
    Testimony:                          Deposition (for Defendant)
    Approximate Dates:          Mid 1980's

4.  *CADI v. ARCO*
    Superior Court of California, County of Los Angeles
    Testimony:                          Deposition (for Defendant)
    Approximate Dates:          Mid 1980's

5.  *Little and Haber v. ARCO*
    U.S. District Court, Central District of California
    Testimony:                          Deposition and Trial (for Defendant)
    Approximate Dates:          Late 1980's

6.  *Digidyne v. Data General*
    U.S. District Court, Northern District of California
    Testimony:                          Deposition (for Plaintiff)
    Approximate Dates:          Early 1980's and Late 1980's

**BRG**
Berkeley Research Group

7. *Commerce Commission v. Briley et al.*
New Zealand High Court
Testimony:               Trial (for Defendant)
Approximate Dates:       1990

8. *R.C. Dick v. Thermogenics*
U.S. District Court, Northern District of California
Testimony:               Deposition (for Defendant)
Approximate Dates:       Early 1980's

9. *General Dynamics v. AT&T*
U.S. District Court, Northern District of Louisiana
Testimony:               Deposition (for Defendant)
Approximate Dates:       1989-1990

10. *In the Matter of: ANS Royalty Litigation*
Superior Court of the State of Alaska, First Judicial District at Juneau
Testimony:               Deposition (for Respondent)
Approximate Dates:       1991

11. *State of California v. Humboldt Petroleum Inc. et al.*
Superior Court of California, County of Humboldt
Testimony:               Preliminary Hearing (for Defendant)
Approximate Dates:       1991

12. *Greater Rockford Energy and Technology Corp. et al. v. Shell Oil Co. et al. ["Ethanol"]*
U.S. District Court, Central District of Illinois
Testimony:               Deposition (for Defendant)
Approximate Dates:       1991

13. *Crude Oil Antitrust Litigation ["Long Beach I"] (MDL Docket No. 150)*
U.S. District Court, Central District of California
Testimony:               Deposition and Trial (for Defendant)
Approximate Dates:       1991-1992

14. *Petroleum Products Antitrust Litigation ["All State Cases"] (MDL Docket No. 150)*
U.S. District Court, Central District of California
Testimony:               Deposition (for Defendant)
Approximate Dates:       1992

**BRG**
Berkeley Research Group

15. *Texas Instruments Inc. v. Dell Computer Corp.*
U.S. District Court, Northern District of Texas
Testimony:                      Deposition (for Plaintiff TI on Antitrust Counterclaims)
Approximate Dates:              1992

16. *Litton Systems Inc. v. Ssangyong Cement Industries*
U.S. District Court, Northern District of California
Testimony:                      Deposition and Court Testimony (for Defendant)
Approximate Dates:              1992-1993

17. *In the Matter of:  Prudential Insurance Company, et al.*
Before The Insurance Commissioner, State of California
Testimony:                      Testimony before Administrative Law Judge (for Respondents)
Approximate Dates:              1993

18. *In re:  Infant Formula Antitrust Litigation - MDL 878*
U.S. District Court, Northern District of Florida (Tallahassee Division)
Testimony:                      Two separate depositions (for Defendant Abbott Laboratories)
Approximate Dates:              Fall 1992 and Spring 1993

19. *In the Matter of:  Abbott Laboratories, Docket No. 9253 (Administrative Case)*
Before Administrative Law Judge, Federal Trade Commission
Testimony:                      Deposition (for Respondent)
Approximate Dates:              1993

20. *Federal Trade Commission v. Abbott Laboratories (Civil Case)*
U.S. District Court, District of Columbia
Testimony:                      Deposition and Trial Testimony (for Defendant)
Approximate Dates:              1993-1994

21. *In the Matter of the Rates of:  Nationwide Insurance Company*
Before The Insurance Commissioner, State of California
Testimony:                      Testimony before Administrative Law Judge (for Applicant/Respondent)
Approximate Dates:              1994

22. *In the Matter of the Rates of:  State Farm Companies*
Before The Insurance Commissioner, State of California
Testimony:                      Testimony before Administrative Law Judge (for Applicant/Respondent)
Approximate Dates:              1994

**BRG**
Berkeley Research Group

23.  *In the Matter of the Rates of: 20th Century Insurance Companies*
Before The Insurance Commissioner, State of California
Testimony:                      Testimony before Administrative Law Judge (for Applicant/Respondent)
Approximate Dates:              1994

24.  *Hughes Aircraft v. GEC Marconi*
London Court Arbitration
Testimony:                      Provided written testimony (for Plaintiff)
Approximate Dates:              May 1992 and November 1993

25.  *Alling/LMP v. Universal Manufacturing*
State Superior Court, County of Alameda
Testimony:                      Deposition and Trial (for Defendants)
Approximate Dates:              February - May, August 1994

26.  *Commonwealth, RTC, FSLA v. Stroock & Stroock & Lavan*
U.S. District Court, Southern District of Florida
Testimony:                      Deposition (for Plaintiff Commonwealth)
Date:                           December 1993

27.  *Maxim Integrated Products, Inc. v. Analog Devices, Inc.*
U.S. District Court, Northern District of California
Testimony:                      Deposition (for Defendant)
Date:                           June 1994

28.  *The People of the State of California, et al. v. Chevron Corporation et al.*
Superior Court of California, County of Los Angeles ("Long Beach II")
Testimony:                      Deposition and Trial (for Defendant Exxon)
Date:                           August 1994

29.  *49'er Truck Stop et al. (four truckstops in California) v. The Clipper Group, National Auto/Truckstops and Unocal*
California State Court, Sacramento
Testimony:                      Deposition (for Defendants The Clipper Group and National Auto/Truckstops)
Date:                           December 1994

**BRG**
**Berkeley Research Group**

30. *Nestlé Food Co. v. Abbott Laboratories*
U.S. District Court, Central District of California
Testimony:                Deposition and Trial (for Defendant)
Date:                     December 1994 and June 1995

31. *Three Crown Limited Partnership, et al. v. Salomon Brothers, Inc. et al.*
U.S. District Court, Southern District of New York
Testimony:                Deposition (for Defendant Steinhardt)
Date:                     January 1995

32. *Cel-Tech Communications, Inc., et al. v. Los Angeles Cellular Telephone Co., et al.*
Los Angeles County Superior Court, Southeast District
Testimony:                Deposition (for Defendant LA Cellular)
Date:                     February 1995

33. *In the Matter of the Arbitration between PPG Industries Inc. and Pilkington plc, et al.*
U.S. District Court, District of Arizona
Testimony:                Deposition (for Respondent Pilkington)
Date:                     March 1995

34. *Kambiz Ajir, et al. v. Exxon Corporation, et al.*
U.S. District Court, Northern District of California
Testimony:                Deposition (for Defendant)
Date:                     March 1995

35. *Goldenwest Cellular Corp. v. Los Angeles Cellular Telephone Company, et al.*
Los Angeles County Superior Court
Testimony:                Deposition (for Defendant)
Date:                     April 1995

36. *Steve Carver, etc., et al. v. Chevron Company U.S.A., Inc., et al.*
Superior Court of the State of California, County of San Diego
Testimony:                Deposition and Trial (for Defendant)
Date:                     June 1995 and November 1995

37. *Owens-Illinois Plastic Products, Inc. v. Constar Plastics, Inc.*
U.S. District Court, Northern District of Ohio (Western Division)
Testimony:                Deposition (for Defendant)
Date:                     July 1995

**BRG**
**Berkeley Research Group**

38.   *Carbon Dioxide Industry Antitrust Litigation - MDL Docket 940*
      United States District Court, Middle District of Florida
      Testimony:                    Deposition (for Defendants)
      Date:                         August 1995

39.   *Hugo Boss v. Brookhurst, Inc.*
      U.S. District Court, Southern District of New York
      Testimony:                    Deposition (for Defendant)
      Date:                         September 1995 and December 1995

40.   *Donelan v. Abbott Laboratories*
      18th Judicial District Court, Sedgwick County, Kansas
      Testimony:                    Deposition and Trial (for Defendants)
      Date:                         September 1995 and November 1995

41.   *James J. Glessner v. LaPorte Construction Chemicals North America, Inc., et al.*
      American Arbitration Association
      Testimony:                    Deposition (for Defendants)
      Date:                         September 1995

42.   *EPN Ingenieria S.A. de C.V. v. General Electric Company*
      United States District Court, Southern District of New York
      Testimony:                    Deposition (for Defendant)
      Date:                         September 1995

43.   *Power New Zealand v. Mercury Energy and Commerce Commission*
      New Zealand High Court
      Testimony:                    Trial (for Respondent)
      Date:                         November 1995

44.   *DSC Communications Corporation v. DGI Technologies, Inc.*
      U.S. District Court, Northern District of Texas (Dallas Division)
      Testimony:                    Deposition and Trial (for Plaintiff)
      Date:                         December 1995 and February 1996; February 1997

45.   *In re: Brand Name Prescription Drugs Antitrust Litigation (MDL 997)*
      U.S. District Court, Northern District of Illinois
      Testimony:                    Deposition (for Defendant Abbott Laboratories)
      Date:                         January 1996

**BRG**
Berkeley Research Group

46. *In the Matter of the Application of Ameritech Communications, Inc. for a License to Provide Basic Local Exchange Service to Ameritech Michigan and GTE North, Inc.*
Before the Michigan Public Service Commission, State of Michigan
Testimony:                    Direct Testimony (Hearing) Ameritech Communications
Date:                         April 1996

47. *Novell, Inc. v. Network Trade Center, Inc., et al.*
U.S. District Court, District of Utah (Central Division)
Testimony:                    Deposition and Hearing Testimony (for Plaintiff)
Date:                         May 1996 and April 1998

48. *Cadence Design Systems, Inc. v. Avant! Corporation*
U.S. District Court, Northern District of California
Testimony:                    Deposition (for Plaintiff)
Date:                         June 1996

49. *Shell (Petroleum Mining) Company Ltd. and Todd Petroleum Mining Company Ltd. v. Kapuni Gas Contracts Ltd. and Natural Gas Corporation of New Zealand Ltd.*
High Court of New Zealand, Auckland Registry
Testimony:                    Trial Testimony (for Defendant Natural Gas Corporation of New Zealand Ltd.)
Date:                         July 1996

50. *In the Matter of the Application of Ameritech Communications of Illinois, Inc. for Certificate of Service Authority to Provide Interexchange and Local Exchange Telecommunications Services Within the State of Illinois Pursuant to Sections 13-403 and 13-404 and Exchange Service Pursuant to Section 13-405 of the Public Utilities Act, Docket No. 95-0443*
Illinois Commerce Commission, State of Illinois
Testimony:                    Direct Testimony (Hearing) Ameritech Communications
Date:                         August 1996

51. *In the Matter of the United States of America v. International Business Machines Corporation*
United States District Court, Southern District of New York
Testimony:                    Affidavit (for Defendant International Business Machines)
Date:                         November 1996

**BRG**
Berkeley Research Group

52. *Atlantic Richfield Company, Chevron U.S.A., Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products Company and Texaco Refining and Marketing, Inc. v. Unocal Corporation and Union Oil Company of California*
U.S. District Court, Central District of California
Testimony:                      Deposition (for Defendant Unocal)
Date:                           January 1997

53. *Alliance Petroleum Australia Pty Ltd., Basin Oil N.L., Boral Energy Resources Ltd., Bridge Oil Developments Pty Ltd., Crusader Resources N.L., Delhi Petroleum Pty Ltd., Reef Oil Pty Ltd., Santos Limited, Santos (Bol) Pty Ltd., Santos Petroleum Pty Ltd. and Vamgas Pty Ltd. v. Australian Competition and Consumer Commission (AGL Cooper Basin Natural Gas Supply Arrangements)*
Commonwealth of Australia, In the Australian Competition Tribunal
Testimony:                      Testimony (for Plaintiffs)
Date:                           April 1997

54. *Theresa Aguilar, Tamar Keller, Adam Raps and Fred H. Chavez. v. Atlantic Richfield Corporation, Chevron Corporation, Exxon Corporation, Mobil Oil Corporation, Shell Oil Company, Texaco, Inc., Tosco Corporation, Ultramar Corporation, Unocal Corporation*
Superior Court of the State of California, County of San Diego
Testimony:                      Deposition (for Defendant Unocal)
Date:                           September 1997

55. *Appeal of Pratt and Whitney Group*
Before the Armed Services Board of Contract Appeals
Testimony:                      Deposition and Trial Testimony (for Plaintiff)
Date:                           February 1998 and March 1998

56. *Bourns, Inc. v. Raychem Corporation*
U.S. District Court, Central District of California (Eastern Division)
Testimony:                      Deposition and Trial Testimony (for Plaintiff and Cross-Defendant)
Date:                           July 1998 and February 1998

57. *Northern Telecom, Limited v. Samsung Electronics, Company Ltd., and Samsung Semiconductor, Inc.*
U.S. District Court, Northern District of California (San Francisco Division)
Testimony:                      Deposition (for Plaintiff)
Date:                           March 1998

**BRG**
Berkeley Research Group

58. *Impra, Inc. v. William M. Colone, and Theresa Colone, Endomed, Inc. and Boston Scientific
    Corporation*
    Superior Court of the State of Arizona, County of Maricopa
    Testimony:                Deposition (for Defendant)
    Date:                     March 1998

59. *Minnesota Mining and Manufacturing Company and Imation Corporation v. Appleton Papers, Inc.*
    U.S. District Court, District of Minnesota (Third Division)
    Testimony:                Deposition (for Defendant)
    Date:                     July 1998

60. *Cadence Design Systems, Inc. v. Avant! Corporation, Gerald Hsu, Mitsuru Igusa, and Chih-Liang
    Cheng*
    U.S. District Court, Northern District of California
    Testimony:                Deposition (for Plaintiff)
    Date:                     July 1998

61. *Litton Systems, Inc. v. Ssangyong Cement Industrial, Ltd. ( a Korean Corporation),
    M-Square Microteck (a California Corporation), Rubin Lee and Paul Lauderville*
    U.S. District Court, Northern District of California
    Testimony:                Deposition (for Defendant)
    Date:                     October 1998

62. *Natural Gas Corporation Limited and Fletcher Challenge Energy Limited v. Shell Oil New Zealand
    and Todd Oil New Zealand*
    Private Arbitration:      Treatment Plant Pricing
    Auckland, New Zealand
    Date:                     December 1998

63. *Forty-Nine Truck Plaza, Inc. v. Unocal Corporation, Union Oil Company of California, National
    Auto/Truck Stops, Inc., and The Clipper Group*
    Testimony:                Deposition (for Defendant)
    Date:                     January 1999

64. *Natural Gas Corporation Limited and Fletcher Challenge Energy Limited v. Shell Oil New Zealand
    and Todd Oil New Zealand*
    Private Arbitration:      Gas Pricing
    Auckland, New Zealand
    Date:                     February 1999

**BRG**
Berkeley Research Group

65. *Texas Instruments Incorporated v. Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc., and Hyundai Semiconductor America, Inc.*
U.S. District Court, Eastern District of Texas, Marshall Division
Deposition:                   February 1999
Trial testimony:              April 1999 (for Plaintiff)

66. *Lease Oil Antitrust Litigation (MDL 1206)*
U.S. District Court, Southern District of Texas, Corpus Christi Division
Testimony:                    Hearing testimony on behalf of Koch Industries
Date:                         April 1999

67. *Silicon Graphics, Inc. v. nVidia Corporation*
U.S. District Court for the District of Delaware
Deposition:                   April 1999
Trial Testimony:              July 1999 (for Plaintiff)

68. *Australian Competition & Consumer Commission v. Australian Safeway Stores*
Federal Court, Australia
Trial Testimony:              August 1999 (for Defendant)

69. *ErricoTechnologies, Inc. v. Latham & Watkins, George Kimball, Paul Galleberg et al.*
Superior Court of the State of California for the County of Los Angeles
Deposition:                   August 1999 (for Defendant)

70. *International Military Services v. Government of Iran*
International Court of Arbitration – Paris, France
Testimony:                    September 1999

71. *Disposable Contact Lens Litigation MDL Docket #1030*
*United States District Court Middle District of Florida, Jacksonville Division*
*State Plaintiff v. Johnson & Johnson Vision Products, Inc.*
Deposition:                   September 1999 (for Defendants)
Deposition:                   March 2001 (for Defendants)

72. *Unilever v. Procter & Gamble*
Federal Court – Toronto, Canada
Trial Testimony:              October 1999 (for Plaintiff)

73. *Gore v. Dr. G. Ray Martin (Triad Corporation)*
Flagstaff, Arizona
Trial Testimony:              January 2000 (for Plaintiff)

**BRG**
Berkeley Research Group

73.  *Northern Territory Power v. Northern Territory Power & Water Authority*
     Darwin, Australia
     Trial Testimony:              February 2000

74.  *Whiteley v. Philip Morris*
     San Francisco, California
     Deposition:                   March 2000 (for Defendant)

75.  *Chambord Technologies, Inc. v. Arthur D. Little, Inc.*
     Los Angeles, California
     Deposition:                   June 2000 (for Defendant)

76.  *Recording Industry Association of America v. Napster, Inc.*
     San Francisco, California
     Deposition:                   June 2000 (for Plaintiff)

77.  *Nativ v. Nikon Precision, Inc.*
     Menlo Park, California
     Deposition:                   October 2000 (for Plaintiff)

78.  *Anzai v. Chevron, et al.*
     US District Court, Hawaii
     Deposition:                   December 2000 – San Francisco, CA (for Defendants)

79.  *The State of California, ex rel. et al., v. Old Republic Title Company, et al.*
     Superior Court of the State of California, County of San Francisco
     Deposition:                   March 2001 (for Defendants)

80.  *Process Specialties, Inc. v. Sematech, Inc.*
     US District Court, Eastern District of California
     Deposition:                   April 2001 (for Defendants)

81.  *Ezell Thomas, et al, and Owens Corning v. R.J Reynolds Tobacco Company*
     Circuit Court of Jefferson County, State of Mississippi
     Deposition:                   February 2001 (for Defendants)
     Deposition:                   April 2001 (for Defendants)

**BRG**
Berkeley Research Group

82. *Rambus, Inc. v. Infineon Technologies*
US District Court, Eastern District of Virginia
Deposition:                        February 2001 (for Plaintiff)
Trial Testimony:                   April 2001 (for Plaintiff)

83. *Bronster v. Chevron et al.*
US District Court of Hawaii
Deposition:                        May 2001 (for Defendant)

84. *Dagher, et al., v. Saudi Refining, Inc., et al.*
Central District of California
Deposition:                        July 6, 2001 (for Defendant)

85. *Morrison Entertainment Group, Inc., v. Nintendo of America*
US District Court, Central District of California – Western Division
Deposition:                        July 2001 (for Defendant)

86. *Zomba Recording et al. v. MP3.com*
US District Court, Southern District of New York
Deposition:                        August 2001 (for Plaintiff)

87. *Choiceparts, LLC v. General Motors Corporation, Daimler Chrysler Corporation, Ford Motor Company, and OEConnection, LLC*
US District Court, Northern District of Illinois – Eastern Division
Deposition:                        September 2001 (for Defendant)
Deposition:                        December 2003 (for Defendant)

88. *IKOS and MIT v. AXIS Systems*
US District Court, Northern District of California
Deposition                         September 2001 (for Plaintiff)

89. *Laurance Lucier and Laurie Lucier v. Philip Morris, Inc., R.J. Reynolds Tobacco Co., and Safeway, Inc.*
Superior Court of the State of California, County of San Francisco
Deposition:                        March 2002 (for Defendants)

90. *Applied Molecular Evolution, Inc. v. Morphosys AG and Morphosys USA, Inc., a Delaware Corporation*
US District Court, District of Massachusetts
Deposition:                        June 2002 (for Plaintiff)

**BRG**
Berkeley Research Group

91.   *Espeed Inc. and Electronic Trading Systems Corporation v. The Board of Trade of the City of Chicago and The Chicago Mercantile Exchange*
US District Court, Northern District of Texas Dallas Division
Deposition:                          July 16, 2002 (for Plaintiff)

92.   *United States of America v. Philip Morris, Inc.*
US District Court for the District of Columbia
Deposition:                          August 6, 7 and 8, 2002 (for Defendant)
Deposition:                          October 15, 2002 (for Defendant)

93.   *Borg Warner, Inc. and Borg Warner Torq Transfer Systems Inc.*
*vs. New Venture Gear, Inc.*
United States District Court, Northern District of Illinois, Eastern Division
Deposition:                          August 28, 2002 (for Defendant)

94.   *Nidek Excimer Laser Surgery Systems Patent & Antitrust Litigation*
United States District Court, Northern District of California, San Francisco Division
Deposition:                          September 24, 2002 (for Nidek)

95.   *Joe Rivera v. Philip Morris, Inc.*
District Court, Clark County Nevada
Deposition:                          November 25, 2002 (for Defendant)

96.   *The Los Angeles County Employees Retirement Association v. Towers, Perrin, Forster & Crosby, Inc.*
U.S. District Court, Southern District of California
Deposition:                          February 19 and 20, 2003 (for Plaintiff)

97.   *Schneider Automation, Inc. and Square D Company v. Opto 22, Inc.*
U.S. District Court, Central District of California, Western Division
Deposition:                          March 6, 2003 (for Defendant)

98.   *In the Matter of Rambus, Inc.*
Federal Trade Commission
Deposition:                          March 13, 2003 (for Defendant)
Trial Testimony:                     July 24 and 25, 2003 (for Defendant)

99.   *In the Matter of Fredric Reller, plaintiff v. Philip Morris Incorporated*
Superior Court for the State of California for the County of Los Angeles
Deposition:                          May 6, 2003 (for Defendant)
Trial Testimony:                     February 23, 2005 (for Defendant)

**BRG**
Berkeley Research Group

100. *United States of America v. Philip Morris, Inc.*
US District Court for the District of Columbia
Deposition:                July 15, 2003 (for Defendant)


101. *In the Matter of Leonesio, et al. v. 24 Hour Fitness, Fitness Clubs Worldwide.*
US District Court for the District of Arizona
Deposition:                September 10, 2003 (for Defendant)


102. *In the Matter of ComChoice, Inc.; Clipper Telecommunications, Inc./Coconut Island Investments, Inc. d/b/a Extra Effort Payphones;  Teletrust, Inc., Eagle Payphones, Inc., U.S. Tele-Coin Corporation;  Southwestern Telcom, Inc.; L&J Enterprises;  Gene Langkop d/b/a/ Langkop Communications;  Billy Joe Lindeman d/b/a The Vending Equipment Network;  Telenational, Inc.; D&L Grudzinski Enterprises, Inc., d/b/a Coin Telecom Systems;  Communications Systems International, Inc.;  N-Tel Communications, Inc.;  Payphone, Management Company, Com-Tech Resources, Inc. d/b/a Com-Tech Systems and Robert Nicholas (Plaintiffs) v. Southwestern Bell Telephone Company (Defendant).*
District Court of Johnson County, Texas, 18th Judicial District
Deposition:                September 18, 2003 (for Defendant)


103. *Austern Trust et al. v. Peter H. Forster, et al., and DPL Inc.*
Ohio Court of Common Pleas, Hamilton County
Deposition:                September 21, 2003 (for Defendant)


104. *In the Matter of Union Oil Company of California*
Federal Trade Commission
Deposition:                October 15, 2003 (for Defendant)


105. *High Pressure Laminates Antitrust Litigation (MDL 1368)*
U.S. District Court, Southern District of New York
Deposition:                January 9, 2004 (for Defendants Premark and Wilsonart International)
Deposition:                February 8, 2005 (for Defendants Premark and Wilsonart International)
Deposition:                April 23, 2006 (for Defendants Premark and Wilsonart International)
Trial Testimony           May 16, 2006 (for Defendants Premark and Wilsonart International)

**BRG**
**Berkeley Research Group**

106.  *United States of America, et al, vs. Oracle Corporation*
      U.S. District Court, Northern District of California
      Deposition:                    June 1 and 3, 2004 (for Defendant Oracle Corporation
      Testimony:                     July 1, 2004

107.  *Lexar vs. Toshiba*
      Superior Court of the state of California, County of Santa Clara
      Deposition:                    September 23 and 27, 2004 (for Plaintiff)
      Testimony:                     March 1 and 2, 2005

108.  *PeopleSoft Inc.  vs. Oracle Corporation*
      Superior court of the State of California, County of Alameda
      Deposition:                    November 5 and 8, 2004 (for Oracle Corporation)

109.  *Cross Medical Products v. Medtronic Sofamor Danek*
      U.S. District Court, Central District of California, Southern Division
      Deposition:                    December 1 and 2, 2004
      Deposition:                    December 7, 2007

110.  *AMPAC JV Group, Inc., et al.  v. General Motors Corp., et al.*
      Superior Court of California, County of Los Angeles, Case No. BC 206 274
      Deposition:                    January 10, 2005

111.  *Storage Technology Corp.  v. Custom Hardware Engineering and Consulting*
      U.S. District Court, District of Massachusetts
      Deposition:                    February 1 and 2, 2005 (for Defendant)
      Testimony:                     November 21, 2006 (for Defendant)

112.  *Rambus, Inc. v. Hynix Semiconductor, Inc.*
      U.S. District Court, Northern District of California
      Deposition:                    April 12, 2005 (for Plaintiff)
      Trial Testimony:               March 23, 2006 (for Plaintiff)
      Deposition:                    June 7, 2006 (for Plaintiff)
      Deposition:                    November 9, 2007 (for Plaintiff)
      Deposition:                    January 15, 2008 (for Plaintiff)

113.  *Novozymes A/S  v. Genencor International, Inc. and Enzyme Development Corporation*
      U.S. District Court, District Court of Delaware
      Deposition:                    September 27, 2005 (for Defendants)
      Deposition:                    September 1, 2006 (for Defendants)
      Testimony:                     October 11, 2006 (for Defendants)

**BRG**
Berkeley Research Group

114.   *Canadian Lumber Trade Alliance, et al., Plaintiffs, v. United States, Robert C.  Bonner, Commissioner, United States Customs and Border Protection, and United States Customs and Border Protection, Defendants, and Coalition for Fair Lumber Imports, et al., Defendant-Intervenors*
United States Court of International Trade
Deposition:                          March 17, 2006 (for Defendants)
Trial Testimony:                 March 28, 2006 (for Defendants)

115.   *Lina and Remiglio Lebrilla, and Karen and Paul Balfour, On Behalf of Themselves, All Others Similarly Situated v. Farmers Group, Inc., d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, and Does 1 through 50.*
Superior Court of the State of California, County of Orange
Deposition:                          July 19, 2006 (for Defendants)

116.   *7-Eleven, Inc., Plaintiff/Counterclaim Defendant v. Philip Morris USA Inc., Defendant/Counterclaimant*
District Court for the Northern District Of Texas, Dallas Division
Deposition:                          September 7, 2006 (for Defendant)

117.   *Starr International Company, Inc., Plaintiff-Counterclaim Defendant, v. American International Group, Inc., Defendant - Counterclaim Plaintiff*
U.S. District Court for the Southern District of New York
Deposition:                          January 19, 2007 (for Plaintiff)

118.   *In the Matter of Certain Mobile Telephone Handsets, Wireless Communication Devices, and Components Thereof*
U.S. International Trade Commission, Washington, DC
Deposition:                          January 22, 2007 (for Complainant – Qualcomm)
Witness Statement:             January 23, 2007 (for Complainant – Qualcomm)

119.   *Bard Peripheral Vascular, Inc., and David Goldfarb, M.D., Plaintiffs, v. W.L. Gore & Associates, Defendant*
U.S. District Court for the District of Arizona
Deposition:                          April 10, 2007 (for Defendant)
Deposition:                          July 14 and 15, 2009 (for Defendant)
Testimony:                          November 29, 2007 (for Defendant)

120.   *Amgen, Inc. v. F. Hoffmann-La Roche Ltd., Roche Diagnostics GmbH, and Hoffmann-La Roche Inc.*
U.S. District Court, District of Massachusetts
Deposition:                          June 7, 2007 (for Amgen, Inc.)

**BRG**
**Berkeley Research Group**

121.   *Netflix, Inc. v. Blockbuster Inc.*
       U.S. District Court, District of Northern California
       Deposition:                     June 14, 2007 (for Plaintiff)

122.   *TSMC North America, et al v. Semiconductor Manufacturing International Corporation, et al*
       Superior Court of California
       Deposition:                     June 28 and 29, 2007 (for Plaintiff)
       Testimony:                      August 15 and 16, 2007 (for Plaintiff)
       Deposition:                     August 24, 2009 (for Plaintiff)
       Testimony:                      October 13 – October 15, 2009 (for Plaintiff)

123.   *Dr. Enrico Bondi v. Bank of America et al. (Parmalat Securities Litigation)*
       U.S. District Court, District of North Carolina
       Deposition:                     August 30, 2007 (for Plaintiff)

124.   *Dr. Enrico Bondi v. Grant Thornton et al. (Parmalat Securities Litigation)*
       U.S. District Court, District of Illinois
       Deposition:                     August 31, 2007 (for Plaintiff)

125.   *Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding (Docket 2006-3, CRB DPRA)*
       Deposition:                     October 11, 2007 (for Recording Industry Association of America)
       Testimony:                      February 19, 2008 (for Recording Industry Association of America)

126.   *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, MDL 1358*
       U.S. District Court, Southern District of New York
       Deposition:                     November 13, 2007 (for Defendant)

127.   *European Commission Competition Directorate-General v. Rambus Inc.*
       Hearing on Statement of Objections to Rambus
       European Commission, Brussels, Belgium
       Testimony:                      December 4, 2007 (for Defendant)

128.   *Discover Financial Services, Inc. v. Visa U.S.A, Inc., et al.*
       U.S. District Court, Southern District of New York
       Deposition:                     December 14, 2007 (for Defendant)

**BRG**
Berkeley Research Group

129. *Ronald W. De Ruuk, as Bankruptcy Administrator for Holding Tusculum B.V., Claimant, against Louis Dreyfus S.A.S., Respondent*
International Chamber of Commerce Court of Arbitration, Zurich, Switzerland
Prefiled Direct Testimony:     November 30, 2007 (for Claimant)
Testimony before Panel:       February 28, 2008 (for Claimant)

130. *The Board of Trustees of the Leland Stanford Junior University, Plaintiff, v. Roche Molecular Systems, Inc., et al., Defendants*
U.S. District Court, Northern District of California
Deposition:                   March 19, 2008 (for Plaintiff)

131. *Dr. Enrico Bondi v. Citigroup et al.*
Superior Court of New Jersey
Deposition:                   March 25, 2008 (for Plaintiff)
Deposition:                   May 16, 2008 (for Plaintiff)
Testimony:                    July 22 and 23, 2008 (for Plaintiff)

132. *W.L. Gore & Associates, et al. v. Comptroller of the Treasury*
Maryland Tax Court
Deposition:                   April 21, 2008 (for Petitioner)
Trial Testimony:              October 16, 2008 (for Petitioner)

133. *In RE:  Graphics Processing Units Antitrust Litigation*
U.S. District Court, Northern District of California
Deposition:                   June 11, 2008 (for Plaintiffs)

134. *In Connection with In Re Katz Interactive Call Processing Patent Litigation*
U.S. District Court, Eastern District of Texas
Deposition:                   June 18, 2008 (for Plaintiffs)
Deposition:                   July 11, 2008 (for Plaintiffs)
Deposition:                   July 28, 2008 (for Plaintiffs)
Deposition:                   November 24, 2008 (for Plaintiffs)
Deposition:                   November 25, 2008 (for Plaintiffs)
Deposition:                   December 3, 2008 (for Plaintiffs)

135. *Nokia Corporation & Nokia, Inc. v. Qualcomm, Inc.*
Court of Chancery in the State of Delaware
Deposition:                   July 8, 2008 (for Defendant)

**BRG**
Berkeley Research Group

136.    *Rambus v. Hynix/Micron/Nanya/Samsung*
        U.S. District Court, Northern District of California
        Deposition:                    October 20 and 21, 2008 (for Plaintiff)

137.    *Consortium Information Services, Inc. aka The Consortium Group v. Equifax, Inc., et al.*
        Superior Court of the State of California, County of Orange
        Trial Testimony:               November 18, 2008 (for Defendants)

138.    *Flying Disc Investments LP; Chris Kitze, et al, Plaintiffs v. Baker Communications Fund II, et al, Defendants*
        Superior Court of the State of California, County of San Francisco
        Deposition:                    February 18, 2009 (for Defendants)
        Trial Testimony:               April 17, 2009 (for Defendants)

139.    *Caroline Behrend, et al., Plaintiffs v. Comcast Corporation, et al., Defendants*
        U.S. District Court for the Eastern District of Pennsylvania
        Deposition:                    May 14, 2009 (for Defendants)
        Hearing Testimony:             October 26, 2009

140.    *Alien Technologies Corporation, Plaintiffs v. Intermec, Inc., Intermec Technologies Corporation, and Intermec IP Corp., Defendants*
        U.S. District Court for the District of North Dakota, Southeastern Division
        Deposition:                    June 24, 2009 (for Defendants)

141.    *CenterPoint Energy Services, Inc., Plaintiff v. Air Products, LLC and The Premcor Refining Group, Inc., Defendants*
        District Court of Harris County, Texas, 295th Judicial District
        Deposition:                    August 19, 2009 (for Defendants)
        Trial Testimony:               June 22, 23 2010 (for Defendants)
        Trial Testimony:               October 7 and 11, 2010 (for Defendants)

142.    *Taiwan Semiconductor Manufacturing Co., Plaintiff v. Semiconductor Manufacturing International Co. SMIC Americas, SMIC (Shanghai), Defendants*
        Superior Court, Santa Clara County, California
        Deposition:                    June 28, 2007 (for Plaintiffs)
        Trial Testimony:               November 6, 2009 (for Plaintiffs)

143.    *Terra Firma, Plaintiff v. Citibank, Defendant*
        U.S. District Court for the Southern District of New York
        Deposition:                    July 30, 2010 (for Plaintiff)

**BRG**
Berkeley Research Group

144.  *Wi-LAN Inc., Plaintiff  v. Acer et al, Defendants*
U.S. District Court for the Eastern District of Texas, Marshall Division
Deposition:                             January 5 and 6, 2011 (for Plaintiff)

145.  *Wi-LAN Inc., Plaintiff  v. RIM et al., Defendants*
U.S. District Court for the Eastern District of Texas, Marshall Division
Deposition:                             March 18, 2011 (for Plaintiff)

146.  *AIG Retirement Services, Inc., Plaintiff v. Altus Finance S.A. et al., Defendants*
U.S. District Court, Central District of California, Western Division
Deposition:                             June 16, 2011 (for Defendants)

147.  *Microsoft Corporation v. Motorola, Inc. et al., Defendants*
United States International Trade Commission, Washington, DC
Deposition:                             September 9, 2011 (for Defendants)
Trial Testimony:                        January 20, 2012 (for Defendants)

148.  *RealTime Data, LLC., Plaintiff v. Morgan Stanley, et al., Defendants*
U.S. District Court, Southern District, New York
Deposition:                             July 18, 2012 (for Plaintiff)
                                        July 19, 2012 (for Plaintiff)
                                        July 20, 2012 (for Plaintiff)

149.  *Apple Inc., Plaintiff v. Samsung Electronics Co., LTD, Defendants*
U.S. District Court, Northern District of California, San Jose Division
Deposition:                             April 19, 2012 (for Defendants)
                                        April 20, 2012  (for Defendants)
Trial:                                  August 16, 2012 (for Defendants)
                                        August 17, 2012 (for Defendants)

150.  *The People of the State of California, Plaintiff v. Atlantic Richfield Company, et al., Defendants*
Superior Court of the State of California, County of Santa Clara
Deposition:                             November 15, 2012 (for Defendants)

151.  *Commissioner of Competition, Plaintiff v RBS, Defendants*
Ontario Superior Court, Ontario, Canada
Trial Testimony:                        March 21, 2013 (for Defendants)
                                        March 22, 2013 (for Defendants)

**BRG**
Berkeley Research Group

153.   *Wi-lan Inc., v. HTC Corporation, HTC America, Inc., and Exedea, Inc.*
       United States District Court for the Eastern District of Texas Marshall Division
       N.D. Illinois, Eastern Division
       Deposition:                    August 24, 2013 (for Plaintiff)

154.   *In re Innovatio IP Ventures, LLC Patent Litigation*
       United States District Court for the Northern District of Illinois, Eastern Division
       Deposition:                    August 31, 2013 (for Plaintiff)
       Trial Testimony:               September 2013 (for Plaintiff)

155.   *In the Matter of Certain Wireless Communications Base Stations and Components Thereof*
       *Investigation No. 337-TA-871 (Adaptix v. Ericsson)*
       Deposition:                    September 17, 2013 (for Plaintiff)

156.   *Emblaze Ltd, Plaintiff v. Apple Inc., Defendant*
       U.S. District Court, Northern District of California, San Jose Division
       Deposition:                    January 10, 2014 (for Plaintiff)

157.   *Apple Inc., Applicant v. Samsung Electronics Co., LTD, Respondent*
       Federal Court of Australia, Sydney
       Trial Testimony:               March 24, 2014 (for Respondent)

158.   *Emblaze Ltd, Plaintiff v. Apple Inc., Defendant*
       U.S. District Court, Northern District of California, San Jose Division
       Deposition:                    July 3, 2014 (for Plaintiff)

159.   *Wi-LAN USA INC. and Wi-LAN INC., Plaintiff v. Apple, Inc., Defendant*
       Civil Action No. 3:13-CV-00798-DMS-BLM
       Deposition:                    July 14, 2014 (Plaintiff)

160.   *The People of the State of New York by Eric T. Schneiderman, Attorney General of the State of New*
       *York, Plaintiff v. Maurice R. Greenberg And Howard I. Smith, Defendant*
       Supreme Court of the State of New York County of New York
       Deposition:                    November 20, 2014 (for Defendant)

161.   *Oracle, Plaintiff v. Maintech, Defendant*
       U.S. District Court, Northern District of California, San Jose Division
       Deposition:                    April 20, 2015 (for Plaintiff)

**BRG**
Berkeley Research Group

162. *ContentGuard Holdings, Inc., Plaintiff  v. Amazon.com, Inc.; Apple Inc.; BlackBerry Limited (fka Research in Motion Limited) and Corporation (fka Research In Motion Corporation); HTC Corporation and HTC America, Inc.; Huawei Technologies Co. Ltd. And Huawei Device USA, Inc.; Motorola Mobility LLC; Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC, Defendant*
United States District Court for the Eastern District of Texas Marshall Division
Deposition:                           June 2-5, 2015 (for Plaintiff)


163. *ContentGuard Holdings, Inc., Plaintiff v. Google Inc, Defendant*
U.S. District Court for the Eastern District of Texas, Marshall Division
Deposition:                           September 4, 2015 (for Plaintiff)


164. *ContentGuard Holdings, Inc., Plaintiff v. Google Inc, Samsung, Defendant*
U.S. District Court for the Eastern District of Texas, Marshall Division
Trial:                                       September 17, 2015 (for Plaintiff)


165. *Intellectual Ventures I LLC, et al., Plaintiffs v. Canon, Inc., et al, Defendants*
United States Court for the District of Delaware
Deposition:                           November 16, 2015 (for Plaintiffs)


166. W.L. Gore & Associates, et al., *Petitioners* v. Controller of the Treasury, *Respondent*
Maryland Tax Court
Deposition:                           April 27, 2016 (for Petitioner)


167. TCL Communication Technology Holdings, LTD et al., *Plaintiff* v. Ericsson, *Defendant*
The United States District Court, Central District of California, Southern Division
Deposition:                           May 11, 2016 (for Defendant)


168. Intellectual Ventures I LLC, et al, *Plaintiff* v. Toshiba Corporation, et al, *Defendant*
The United States District Court for the District of Delaware
Deposition:                           June 22, 2016 (for Plaintiff)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 11, 2017, a true copy of the above document was filed through the Court's Case Management / Electronic Case Filing system and served by that system upon all counsel of record registered for the System and deemed to have consented to electronic service in the above-captioned case.

Dated:     January 11, 2017          **CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON

CERTIFICATE OF SERVICE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx