CROWELL & MORING LLP
John S. Gibson (CSB No. 140647, jgibson@crowell.com)
Samrah Mahmoud (CSB No. 285168, smahmoud@crowell.com)
3 Park Plaza, 20th Floor, Irvine, CA 92614
Telephone: 949.263.8400 Facsimile: 949.263.8414

Robert B. McNary (CSB No. 253745, rmcnary@crowell.com)
515 S. Flower Street, 40th Floor, Los Angeles, CA 90071
Telephone: 213.443.5590 Facsimile: 213.622.2690

Mark A. Klapow (Admitted *pro hac vice*, mklapow@crowell.com)
1001 Pennsylvania Avenue, N.W., Washington, DC 20004
Telephone: 202.624.2500 Facsimile: 202.628.5116

MCKOOL SMITH P.C.
Theodore Stevenson, III (Admitted *pro hac vice*, tstevenson@mckoolsmith.com)
300 Crescent Court, Suite 1500, Dallas, TX 75201
Telephone: 214.978.4000 Facsimile: 214.978.4044

Laurie L. Fitzgerald (Admitted *pro hac vice*, lfitzgerald@mckoolsmith.com)
300 W. 6th Street, Suite 1700, Austin, TX 78701
Telephone: 512.692.8700 Facsimile: 512.692.8744

Attorneys for Ericsson Inc. and Telefonaktiebolaget LM Ericsson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TELEFONAKTIEBOLAGET LM ERICSSON, *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs <br><br> ERICSSON INC., *et al.*, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> TCL COMMUNICATION TECHNOLOGY HOLDINGS, LTD., *et al.*, <br><br> Defendants/Counterclaim-Plaintiffs. | Case No. 8:14-CV-00341 JVS (DFMx) <br> Case No. 2:15-CV-02370 JVS (DFMx) <br><br> **REBUTTAL WITNESS DECLARATION OF PROFESSOR DAVID TEECE, PH.D.** <br><br> Hon. James V. Selna <br><br> **Discovery Cut-off:** May 23, 2016 <br><br> **Pretrial Conference:** February 1, 2017 at 10:00 a.m. <br><br> **Trial:** February 14, 2017 at 8:30 a.m. |

# TABLE OF CONTENTS

I.   Introduction ................................................................................. 1

II.  Response to Prof. Ordover ........................................................ 1

    A.   Prof. Ordover's "Ex Ante" Theories and Opinions are Incomplete, Inapplicable, and Not Implementable. ............................. 2

    B.   TCL's Experts Disagree on Which Firms Are Similarly Situated to TCL—But Agree To Ignore The Most Similarly Situated Ones .................................................................................. 5

    C.   Prof. Ordover's "Discrimination" Opinions Fail to Identify Any Discrimination in Violation of Ericsson's FRAND Commitment. .... 14

    D.   TCL's Aggregate Royalty Analysis Is Unreliable and Ignores the Actual Market Evidence ................................................. 15

    E.   Prof. Ordover Wrongly Excludes Comparable Licenses Based on a Purely Theoretical Assumption—Unsupported by Empirical Evidence—That They Are All a Product of Hold-up. ........ 19

    F.   Prof. Ordover Proposes the MFN/MFL Regime that ETSI Considered and Rejected ................................................... 24

    G.   The Benefits of Standards Deployment Are Independent of the Problem of Free-Riding. ................................................. 27

    H.   Prof. Ordover Has No Basis to Conclude FRAND Excludes a Specific Licensing Structure. ............................................. 28

III. Response to Dr. Lynde ........................................................... 32

    A.   Dr. Lynde Wrongly Equates Differences in License Terms with Discrimination. ......................................................... 32

    B.   Dr. Lynde Excludes Sharp Without Addressing Its Similarity to TCL. ..................................................................... 33

    C.   Dr. Lynde Ignores the Market Evidence and Wrongly Assumes Monopoly Power and Anticompetitive Effects Without Analyzing or Proving Them. ........................................... 34

    D.   Dr. Lynde Improperly Excludes Release Payments from His Analysis of Allegedly Comparable Licenses. .......................... 37

IV.  Response to Dr. Leonard ........................................................ 38

    A.   Dr. Leonard's Analysis Relies on a Faulty Starting Point. ............... 38

    B.   Empirical Analysis of the Value of Cellular Connectivity Invalidates Dr. Leonard's Assumed Maximum Aggregate Royalty Burdens. .......................................................... 39

    C.   Hypothetical Royalty Stacking Does Not Assist the Court in Considering the Reality of Ericsson's Offers. .......................... 41

V.   Response to Dr. Bekkers ........................................................ 44

# TABLE OF CONTENTS
(continued)

VI.   Response to Prof. Ding ........................................................................ 45

VII.  Conclusions ........................................................................................ 47

I, David J. Teece, declare:

## I.   <u>INTRODUCTION</u>

1.    I have reviewed the witness statements submitted by TCL. Specifically, I reviewed the statements of experts Prof. Ordover, Dr. Leonard, Dr. Lynde, Dr. Bekkers, Dr. Kakaes, and Prof. Ding, and also the statements of TCL witnesses Messrs. Guo and Cistulli. After my review of the witness statements submitted by TCL, I have confirmed my opinions described in my January 11, 2017 declaration.

2.    I have also identified multiple erroneous and unsupported assertions by TCL's witnesses, including TCL experts Prof. Ordover, Dr. Leonard, and Dr. Lynde, and I summarize them in this rebuttal declaration. Some of the more troubling unfounded opinions are: (1) assertion that the "non-discriminatory" aspect of a FRAND commitment should be interpreted as establishing what amounts to a Most Favored Licensee regime, an approach that ETSI considered and rejected— and that would defy ETSI's objectives for standards development and the FRAND commitment; (2) assertion of discrimination by assuming monopoly power and anticompetitive effects without analyzing or proving them; (3) refusal to analyze comparable licenses based on a theoretical assumption that they are all the result of "hold-up"—without any empirical evidence; and (4) exclusion of some of the most similarly situated licensees from the analysis by simply ignoring relevant factors, such as average selling price, as well as TCL's own internal documents revealing which firms it believes are its actual competitors.

## II.   <u>RESPONSE TO PROF. ORDOVER</u>

3.    Overall, I disagree with Prof. Ordover's assessment of the state of mobile telecommunications standardization and deployment of standardized technology. My opinion remains that the mobile telecommunications industry is an excellent example of standardization efforts yielding successful results: falling prices, global dissemination of high-quality products, and dynamic worldwide competition. Prof. Ordover's multiple proposed definitions for FRAND

requirements are without basis or support, and his multiple theories of possible FRAND violations are not properly applied to the facts of this case.

### A.  Prof. Ordover's "Ex Ante" Theories and Opinions are Incomplete, Inapplicable, and Not Implementable.

4.  Prof. Ordover declares: "A royalty rate is 'fair and reasonable' if it does not reflect the incremental market power bestowed on the IP owner by the collective action of the SSO participants to include the IP in the standard, but instead reflects only the ex ante value of the IP." I have several responses to the "ex ante" theory as articulated by Prof. Ordover.

5.  *First*, I have reviewed Prof. Ordover's opinions, and the testimony of other TCL witnesses upon which he relies, and I have concluded that he and they have failed to implement any analysis applying the tenets of the ex ante theory that Prof. Ordover proposes. Without conducting such an analysis, Prof. Ordover cannot personally claim he has applied his proposed theory to the facts of this case. Nor have any of TCL's other experts done so.

6.  *Second*, Prof. Ordover takes an improperly narrow view of ex ante analysis as being limited to the time of standards selection. Ericsson bore significant risk by making large ex ante R&D investments before the commercial adoption of the standards at issue in this case at a time when there was no guarantee that Ericsson's technology would be incorporated into the standard or that the standards would achieve significant commercial success.

7.  Prof. Ordover's proposed theory of ex ante is, from an economic perspective, more properly thought of as an "interim" negotiation at a selective (and economically biased against the innovator) point in time: *i.e.*, *after* the innovator has developed the technology to the point where it can be considered for incorporation into the standard, and has incurred the sunk R&D costs and risks to do so, but *before* the standards development organization (SDO) has chosen which technology to incorporate into the standard and *before* implementers have made

1  their sunk investments in developing and making standards-compliant products. As
2  his reference point is ex ante for the implementer but ex post for the innovator, Prof.
3  Ordover seeks benefits for the implementer that he is not willing to afford the
4  innovator.

5          8.     Prof. Ordover is anchoring ex ante analysis to an arbitrary "moment in
6  time" in the evolution of the innovation ecosystem. The evolutionary path involves
7  R&D, then standards development, then standards adoption, and standards
8  implementation. He effectively allows implementers to deny the developers of
9  standards relevant enabling technology a return while de facto protecting the
10  implementer. This is because developers of enabling technology have already
11  incurred sunk cost by the time standards are selected. His approach has the potential
12  to rob innovators of the fruits of their investment, in terms of R&D leading to
13  patented standard essential technology, to the benefit of implementers and
14  consumers. Prof. Ordover gives no economic or public policy explanation why such
15  an asymmetric approach makes sense when evaluating the appropriate balance of
16  returns amongst those that develop standards technology and those that implement
17  such technology. This is especially troubling given the upstream innovator enables
18  downstream innovations.

19          9.     *Third*, Prof. Ordover's opinion ignores the fact that, at the time the
20  SDO is deciding which technology to include in the standard, the SDO cannot
21  know with certainty the future royalty requests of any individual IPR owner or IPR
22  owners collectively. Part of this information is ultimately revealed later, after the
23  standard has been adopted. Many standards are adopted several years prior to
24  commercialization, at a time when future technological developments and future
25  market conditions are not yet known. Therefore, the SDO cannot be in any position
26  to determine the ex ante value or to evaluate whether the royalties being sought
27  exceed that value. SDOs do not make decisions based on contemporaneous
28  knowledge of future royalty demands at the time they decide which technology to

REBUTTAL WITNESS DECL. OF PROF. DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

incorporate into the standard, because they cannot know that information with any degree of certainty at that time. (Of course, to the extent that Prof. Ordover is only proposing a "thought experiment," these pragmatic considerations do not apply in quite the same way.)

10.     *Fourth*, Prof. Ordover proposes valuation "relative to alternatives available at the time of standardization." But he does not define or identify that set of alternatives, nor make any effort to evaluate it. The alternatives, if any exist, could themselves be potentially royalty bearing. The arguments in favor of limiting an innovation's return to its incremental value relative to public-domain technology are one thing; the arguments in favor of limiting an innovation's return to its incremental value relative to an alternative *patented* technology are more controversial, even assuming the principle were implementable, which it is not.

11.     The approach of limiting a FRAND royalty to the incremental value of the technology at issue relative to alternative technologies that are themselves protected by patents was rejected in the *In re Innovatio* case, where Judge Holderman concluded that a patented alternative "will not drive down the royalty in the hypothetical negotiation by as much as technology in the public domain. In other words, the existence of patented alternatives does not provide as much reason to discount the value of Innovatio's patents as does the existence of alternatives in the public domain."[1] In that case, Judge Holderman rejected the "incremental value" proposal as applied to patented alternatives. I agree with Judge Holderman's analysis and conclusions on this issue.

---

[1] *In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11-C-9308, 2013 WL 5593609, at *20 (N.D. Ill. Oct. 3, 2013).

REBUTTAL WITNESS DECL. OF PROF. DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

### B. TCL's Experts Disagree on Which Firms Are Similarly Situated to TCL—But Agree To Ignore The Most Similarly Situated Ones.

12. Prof. Ordover testifies that TCL is "competitively similarly situated to firms such as Apple, Huawei, Samsung, LG, and HTC," based solely on the assertion that TCL uses the same technology and competes with these firms. He also declares that Ericsson's licenses with these companies "set the relevant market," without defining a relevant market.

13. *First*, Prof. Ordover omits ZTE, Sharp, Karbonn, and Yulong (Coolpad) from his list of similarly situated companies. Other TCL witnesses have testified that at least ZTE is similarly situated to TCL. In my opinion, all four of these companies are more similarly situated to TCL than the firms selected by Prof. Ordover. I suspect Prof. Ordover's omission is due to the fact that the royalty rates in Ericsson's licenses with the omitted *similarly situated companies* are not to TCL's liking as *comparable licenses*. Prof. Ordover does not provide any plausible basis for excluding ZTE, Sharp, Karbonn, and Yulong (Coolpad) from consideration, even though these firms, especially ZTE, have average selling prices (ASPs) and unit sales share much closer to TCL's than the firms chosen by Prof. Ordover. Below Figures 1 and 2 show relative unit sales and ASPs, with Figure 2 being more granular than Figure 1:

1
2

**FIGURE 1: Selected Ericsson Licensees' Smartphone Unit Sales, ASP (2015)**[2]



3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

27    [2] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016.

28

**FIGURE 2: Selected Ericsson Licensees' Smartphone Unit Sales, ASP (Excluding Apple and Samsung) (2015)**[3]



14.     Prof. Ordover appears to exclude ZTE simply because Dr. Lynde did not include ZTE in his license unpacking analysis, ostensibly because of data limitations. But Dr. Lynde's omission from his *license* analysis does not provide an adequate basis for Prof. Ordover's exclusion of ZTE from his *similarly situated company* analysis. In fact, Dr. Lynde specifically includes ZTE as a similarly situated firm to TCL in his witness statement.

15.     I strongly disagree with Prof. Ordover's assertion that handset vendors TCL, Samsung, HTC, LG, Apple, and Huawei are "similarly situated" based simply on the fact that all of these firms "rely on similar technologies and

---

[3] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016.

1    are competing with each other." That other licensees "rely on similar

2    technologies" does not explain Prof. Ordover's focus on Apple, Huawei,

3    Samsung, LG, and HTC—or his exclusion of ZTE and all other device suppliers.

4    If that is his criterion, then every supplier of cellular phones in the world is

5    similarly situated to the others. Moreover, if the criterion is that broad, then it

6    equally applies to ZTE, Sharp, Karbonn, Yulong (Coolpad) and other Ericsson

7    licensees that he ignores.

8          16.    Prof. Ordover simply does not identify the firms actually competing

9    directly with TCL. He essentially relies on their sales of standards-compliant

10   devices—which would effectively eliminate any "similarly situated" limitation.

11   Furthermore, this all-inclusive category directly conflicts with Prof. Ordover's

12   exclusion of ZTE and the other companies which, in my opinion, are more similar

13   to TCL than the five suggested by Prof. Ordover.

14         17.    *Second*, I disagree with Prof. Ordover's basis for limiting his similarly

15   situated analysis to Apple, Huawei, Samsung, LG, and HTC just because they are

16   larger. Although TCL may aspire to be Apple or Samsung someday, the truth is that

17   today it is not like Apple or Samsung. ZTE, Coolpad, and Karbonn are much more

18   similar to TCL in terms of price points and sales volumes than are Apple or

19   Samsung. Further, in the cellular handset industry, we have seen firms with little or

20   no market share quickly grow to dominate, and we have also seen formerly leading

21   firms, like Nokia and Blackberry, decline quickly and exit. One need look no

22   further than the history of Apple and Samsung's rise to market leadership in the

23   high-ASP segment of the market, and the recent success of ZTE and TCL in

24   capturing market share in the low-ASP segment of the market. In my opinion,

25   FRAND is not to be assessed narrowly by virtue of comparison to only the market

26   leaders or limited to a handful of high profile, high-ASP companies well known to

27   the Court by virtue of their dominant market share in the United States. To the

28   contrary, FRAND is to be judged using the context of "similarly situated."

18.    Product market positioning is important in this respect, as I explained in my previous witness statement, and TCL should be considered alongside strategically similar companies selling similarly priced products. Yet on this aspect, Prof. Ordover and TCL's other experts repeatedly lump together all 4G phones— masking the serious differences between 4G product offerings across these companies. Below are ASP comparisons for Apple, Samsung, ZTE, HTC, Huawei, LG, TCL, Sharp, Coolpad, Blackberry, Doro, and Karbonn. As shown below, TCL is in a different pricing cluster than Apple and Samsung and lies between or below Coolpad and ZTE with respect to TCL's 4G worldwide ASP:

**FIGURE 3: 4G Worldwide ASP by Seller (2013-15)[4]**



---

[4] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016.

19.     I also disagree with Prof. Ordover's assertions concerning smartphones to the extent he lumps together dissimilar 3G and 4G units. The annual sales are markedly different, reinforcing the fact that there are, for competitive purposes, distinct strategic groups.

20.     *Third*, even if Prof. Ordover's approach were correct, he does not actually test to determine whether Apple, Huawei, Samsung, LG, and HTC are directly competing against TCL. If he were to assess direct competitors, a proper starting point would be comparing the products sold by TCL to the products sold by Apple, Huawei, Samsung, LG, and HTC, including smartphone versus feature phone and mix of 3G versus 4G. He would also consider price category. For example, if he had applied these criteria to Apple, it is exceedingly clear that TCL and Apple sell very different products. Prof. Ordover considers none of this.

21.     I have applied the above strategic grouping criteria to the five firms chosen by Prof. Ordover. Unlike Prof. Ordover's five chosen companies, TCL sells a greater proportion of feature phones and 3G units, and a lesser proportion of smartphones and 4G units. Further, TCL's average selling prices are relatively low, even when analyzing by technology. Unlike the five companies chosen by Prof. Ordover, TCL has very low average selling prices for its 3G and 4G units. As shown in Figures 4 and 5 below, during the period from 2013 through 2015, over 85% of TCL's 3G units had a retail price of less than $150 and over 90% of TCL's 4G units had a retail price of less than $250:



**FIGURE 4: 3G Unit Sales by Price Band (2013-15)[5]**



**FIGURE 5: 4G Unit Sales by Price Band (2013-15)[6]**

[5] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016.

[6] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016.

This comparison confirms that ZTE and Coolpad are close to TCL in terms of their product sales mix—while Apple, Samsung, and others are not. Certainly, TCL's overwhelming proportion of low-end and very low-end phones makes TCL very different from Huawei, LG, Samsung, HTC, and Apple.

22.     In addition, while TCL witnesses Mr. Guo and Mr. Cistulli focus on TCL's newest, higher-end brand 4G models, this is TCL's aspirational "step up" strategy, but not TCL's past or current reality. TCL's sales mix has not historically been composed of high-end units. As shown below in Figure 6, from 2013 through 2015, over two-thirds of TCL's 4G handset sales are for less than $150 per unit, while *none* of Apple's 4G handset sales were that low:

**FIGURE 6: 4G Unit Sales Less Than $150 (2013-15)[7]**



---

[7] Ex. 1273, IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016.

23.     Again, TCL's high proportion of very low-end 4G phones during the time period relevant to this case makes TCL very different from Huawei, LG, Samsung, HTC, and Apple. Apple and Samsung in particular sold over 200 million 4G units in 2015—and over 90% of those sales are at retail prices of more than $150. TCL is simply in an entirely different segment of the overall cellphone product market, and the only companies that are even close to TCL along these dimensions are Coolpad and ZTE.

24.     On this point, even though TCL witness Mr. Guo does assert that TCL should not be compared to "local kings," this is inconsistent with TCL's own internal documents where TCL compares itself to China-based companies that it now dismisses as "local kings." For example, in an internal company presentation about "[b]usiness strategy & action planning," TCL states that one of its goals is to "[k]eep and grow our position of n1 China-based vendor for overseas markets."[8] Another internal presentation similarly lists as one of TCL's three "[d]reams" being the "[i]ndustry leader in profitability among China based companies."[9] Furthermore, Mr. Guo's previous deposition testimony was that TCL considered ZTE, Huawei, and others as competitors in China, and Karbonn, Micromax, and others as competitors in India.[10] Clearly, even though TCL sells its phone globally, TCL also views itself as competing with other China-based and India-based companies. TCL's witnesses now asserting TCL should not be compared to companies selling devices predominantly in China and India are contradicting TCL's own competitive assessments.

---

[8] Ex. 5561, TCL, Internal Presentation Regarding Business Strategy, TCL_ERIC_CDCA1464161, at 179.

[9] Ex. 5562, TCL, *WMD Status & Plan for Next Year*, TCL_ERIC_CDCA1399168, at 177.

[10] Dep. of George Guo, January 27, 2016 at 88:1-8, 99:12-18.

REBUTTAL WITNESS DECL. OF PROF. DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

25.     Furthermore, China and India are two of the largest economies in the world, and two of the largest handset markets in the world.[11] In this case involving a global license, I see no reason to exclude two of the largest handset markets from analysis. TCL's experts certainly do not identify a legitimate economic justification for doing so.

### C.     Prof. Ordover's "Discrimination" Opinions Fail to Identify Any Discrimination in Violation of Ericsson's FRAND Commitment.

26.     Prof. Ordover proposes that the "non-discrimination" aspect of FRAND is tantamount to a Most Favored Licensee / Most Favored Nation (MFL/MFN) requirement when he asserts "[n]ew licensees should receive no less favorable terms than any 'similarly situated' licensee (or licensees) that received preferential rates." Yet I understand ETSI has specifically declined to adopt a MFL/MFN requirement presented to it, as I noted in my January 11, 2017 direct testimony.

27.     In support of a MFL/MFN requirement, he concludes that "licensors cannot disadvantage one firm vis-a-vis another that resides in the same competitive space." Prof. Ordover does not apply any competition economics (or cite any sources) in applying this requirement. And unlike "markets," the term "same competitive space" is not a term of art as used by competition economists. Prof. Ordover appears to be avoiding using the necessary term "market" because he has not conducted the necessary analysis to reach a conclusion about TCL's market.

28.     Prof. Ordover did not undertake any empirical analysis, and certainly none akin to what economists conduct in competition cases. Neither Prof. Ordover, nor any other TCL witness, does any actual, empirical study of the elasticity of demand for TCL's products, or the cross-price elasticity between TCL's products

---

[11] *See, e.g.,* Ex. 4591, Ericsson Mobility Report, June 2015.

REBUTTAL WITNESS DECL. OF PROF. DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

and those of rival firms, to show the likely impact on TCL's sales due to higher prices. Certainly none of TCL's witnesses establishes that TCL would be competitively harmed by accepting the rates set forth in Ericsson's Option A or Option B offers.

### D. TCL's Aggregate Royalty Analysis Is Unreliable and Ignores the Actual Market Evidence.

29.    Prof. Ordover supports the concept of a top-down FRAND analysis that purportedly should "determine an aggregate royalty burden for all standard essential patents in the pertinent standard, and then [] apportion that total royalty among standard essential patent declarants." He approves of Dr. Leonard's top-down approach for identifying the aggregate royalty burden according to public proposals that ETSI rejected long ago, including proposals by Ericsson. For the following reasons, I disagree.

30.    *First*, it is false to suggest that Ericsson and Nokia's prior public statements constitute "market evidence," or are based on "market evidence," as to what the aggregate royalty burden on a cell phone should be. Prof. Ordover and Dr. Leonard come forward with no evidence that TCL, or any other firm, relied on the public statements by Ericsson and others that Dr. Leonard uses as the starting point for his top-down approach. Moreover, Ericsson's "Minimum Change, Optimum Impact," or MCOI, proposal to ETSI, made in 2006 with Motorola and Nokia, was *rejected*.[12] Because the rejected proposal was intended to be a mutual forbearance proposal applicable to all holders of standard essential patents—not a unilateral proposal by its sponsors—and because it was rejected, the announcement should

---

[12] Ex. 5556, David J. Teece & Edward F. Sherry, *Public Policy Evaluation of RAND Decisions in* Apple v. Motorola*, Motorola v. Microsoft, In Re Innovatio, and* Ericsson v. D-Link 23 (Tusher Center, Working Paper No. 8, May 2015), available at http://innovation-archives.berkeley.edu/businessinnovation/documents/Tusher-Center-Working-Paper-8.pdf.

1    not be treated as though it were adopted by ETSI and made part of the FRAND

2    commitment. Nor should it be treated as unilaterally binding on Ericsson.

3        31.    *Second*, the market has rejected the maximum aggregate royalty

4    burdens proposed by Prof. Ordover. Therefore, for purposes of economic analysis,

5    the public statements by Ericsson, and others, and the Minimum Change, Optimum

6    Impact proposal, are not relevant now. To the contrary, standardization and

7    standard essential patent licensing have continued developing in the market, and

8    there is now ample market evidence of rates paid for the use of standard essential

9    technology in the form of the actual licenses entered into by actual market

10   participants. When sufficient market-based rate indications are available, there is no

11   need to perform a hypothetical "top-down" analysis that does not reflect market-

12   based rate indications. A rejected proposal usurped by market events indicates the

13   opposite: that the proposal did not reflect either an industry consensus or market-

14   based rates. When sufficient market-based rate indications are available, those

15   market indications should be determinative, and incorporated into any current

16   analysis of FRAND.

17       32.    *Third*, Prof. Ordover adopts Dr. Leonard's approach without

18   accounting for the timing mismatch in Dr. Leonard's analysis: Dr. Leonard starts

19   with the so-called ex ante aggregate value, but then apportions it using ex post

20   estimates of relative ownership of standard essential patents. Even if the aggregate

21   royalty proposals had been accepted at the time the relevant standards were adopted,

22   the estimates of relative essential patent ownership would have been different at the

23   time of the proposals than they are today (which is what Prof. Ding and Dr. Kakaes

24   consider). TCL's experts are improperly mixing and matching an ex ante

25   cumulative royalty cap with an ex post apportionment, which further undercuts Prof.

26   Ordover's theory of ex ante being strictly time-delimited.

27       33.    *Fourth*, while Prof. Ordover asserts that the cumulative royalty rate

28   associated with implementing a top-down theory of ex ante should not cause the

1   standard to become "commercially infeasible," he never investigates whether

2   higher royalty rates than the ones proposed by TCL's experts would in fact render

3   the standard "commercially infeasible." Prof. Ordover also neglects to note that

4   royalty payment delays have short run effects on research-intensive standard

5   essential patent holders like Ericsson—and longer term effects on the commercial

6   feasibility of the FRAND innovation ecosystem. If firms with low-cost and low-

7   price product strategies with no significant standard essential patents engage in

8   hold-out, FRAND rates and receipts will be artificially depressed as innovators

9   receive a smaller return and enforcement of standard essential patents against hold-

10   outs becomes uneconomic.

11       34.    *Fifth*, Prof. Ordover points to what he calls the "Cournot complements

12   problem," under which, when ownership of complementary patents is held among

13   multiple patent holders, there "is a potential coordination problem in that the

14   aggregate royalty demand will be higher than what a monopolist holding all of the

15   patents would have charged (while presumably avoiding a commercial infeasible

16   total royalty)." But of course ETSI incorporated technology owned by multiple

17   patent holders (many of whom, like Ericsson, are also implementers) into the

18   standards with full awareness of the fact that patent ownership was dispersed. The

19   "Cournot complements" issue is questionable, in part because many of these

20   multiple patent holders engage in bilateral cross licenses with each other to reduce

21   their actual cash royalty burdens.

22       35.    Moreover, Prof. Ordover does not mention the converse situation, in

23   which, had all of the substitute technology being considered for incorporation into a

24   standard been in the hands of a single firm, the technology supplier would have

25   been in a position to charge a monopoly price for its technology. He gives no

26   explanation why there is a "problem" from a public policy perspective when

27   ownership of complementary technology is dispersed, but ignores the converse

28   "problem" caused by concentrated ownership of substitute technology. In any event,

REBUTTAL WITNESS DECL. OF PROF. DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

Prof. Ordover has not shown *either* scenario actually applies to the real-world situation in this case. And as such, Prof. Ordover's theoretical arguments based on the "Cournot complements problem" strikes me as not particularly relevant in actual practice, especially in the case of any implementer who has actually contributed (or purchased) significant patented technology to the innovation ecosystem, rather than simply free-riding on other innovators' contributions.

36.     As to Prof. Ordover's opinion that "if a comparable alternative solution was available, then the ex ante value of the IP might well be very low and potentially zero," I agree that, with a *freely-available, unpatented* alternative that had worse price-performance characteristics than the patented alternatives, the royalty for the patented alternatives would be no more than the incremental difference, if competition occurred prior to one technology being incorporated into the standard. However, as to any *patented* alternatives (*i.e.*, for the various patented technologies submitted for potential inclusion into standards that were ultimately not chosen for incorporation into those standards), the same is not true. As I discussed above, Judge Holderman in the *Innovatio* case rejected the defendants' expert's claim that a RAND royalty for patented standard essential technology was limited to its incremental value of the patented technology relative to other patented alternatives. Judge Holderman appears to recognize the public policy problem caused by discouraging investment in new technologies that support the technological backbone of the mobile phone ecosystem.

37.     *Finally*, contrary to Prof. Ordover's suggestion, neither Ericsson nor I are suggesting that Ericsson should be "guaranteed" a return on its R&D. There are risks inherent in all R&D and patenting activities, and returns are not certain. As I explained in my previous witness statement, Ericsson made ex ante R&D investments before its technology was selected for incorporation into the standard—which was by no means guaranteed—and before the commercial adoption of these standards, which were in competition with other standards like

WiMAX. This demonstrates why Ericsson should receive fair and adequate compensation for its patented standardized inventions, consistent with the objectives of the ETSI IPR Policy. Without the ability to collect FRAND royalties for the use of its standard essential patents by implementers, there is a risk that Ericsson would not be sufficiently incentivized to make additional risky investments in standardization in the future.

**E.      Prof. Ordover Wrongly Excludes Comparable Licenses Based on a Purely Theoretical Assumption— Unsupported by Empirical Evidence—That They Are All a Product of Hold-up.**

38.     Prof. Ordover says that "rates negotiated after a standard has been established may already reflect hold-up value." By hold-up, Prof. Ordover means a supposed increase in the ability of a standard essential patent owner to successfully seek higher royalties once a technology has been adopted in a standard and implementers have made sunk cost investments in the development of standard compliant products. This argument is ironic inasmuch as TCL is not actually paying royalties to Ericsson. I have seen no evidence that supports the idea that Ericsson has held up, or attempted to hold-up, TCL or other handset manufacturers.

39.     U.S. International Trade Commission Administrative Law Judge Theodore Essex shares this view, finding in a section 337 investigation that there is no evidence that "patent hold-up" would be a threat "in [the mobile telecommunications] industry."[13] In addition, a recent empirical study of the prospect of hold-up in high-tech industries finds no evidence in support of the

---

[13] *In the Matter of Certain Wireless Devices with 3G &/or 4G Capabilities & Components Thereof Initial Determination on Violation of Section 337 & Recommended Determination on Remedy & Bond*, USITC Inv. No. 337-TA-868, 2014 WL 2965327, at *81 (June 13, 2014) (initial determination).

proposition that there has been any hold-up.[14] I agree with the conclusions and the methodology for reaching those conclusions.

40.     I also agree with the statement that Federal Trade Commissioner Maureen Ohlhausen and former Commissioner Joshua Wright submitted before the ITC:

> There is no empirical evidence to support the theory that patent
> holdup is a common problem in real world markets. The theory that
> patent holdup is prevalent predicts that the threat of injunction leads to
> higher prices, reduced output, and lower rates of innovation. These are
> all testable implications. Contrary to these predictions, the empirical
> evidence is not consistent with the theory that patent holdup has
> resulted in a reduction of competition.[15]

Similarly, in a speech, Former Commissioner Wright questioned the existence of "patent hold-up," asking why, if SDO contracts are "inherently and systematically imperfect as suggested by some—the empirical evidence of patent hold-up is so unremarkable."[16] I agree.

41.     Prof. Ordover never addresses the fact that there cannot be hold-up when the licensee has the ability to seek a court adjudication in the event it feels

---

[14] Ex. 4816, Alexander Galetovic, Stephen Haber & Ross Levine, A*n Empirical Examination of Patent Hold-Up* 6, (Tusher Center, Working Paper No. 5, March 31, 2015), available at http://innovation-archives.berkeley.edu/businessinnovation/documents/Tusher-Center-Working-Paper-5.pdf.

[15] Ex. 5557, Reply Submission of FTC Commissioners Ohlhausen and Wright, *In the Matter of Certain 3G Mobile Handsets and Components Thereof*,  Inv. No. 337-TA-613 Remand 3 (U.S. Int'l Trade Comm), available at https://www.ftc.gov/system/files/documents/public_statements/685811/150720itcreplyohlhausen-wright.pdf.

[16] Ex. 5395, Joshua D. Wright, Chairman, Fed. Trade Comm'n, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts* (Sept. 12, 2013) at 20, available at https://www.ftc.gov/sites/default/files/documents/public_statements/ssos-frand-and-antitrust-lessons-economics-incomplete-contracts/130912cpip.pdf.

1   that a patent owner is seeking a royalty in excess of FRAND. A potential licensee is

2   not forced to sign a license whose terms it disagrees with, and if the patent owner

3   attempts to coerce a signature through court proceedings, the potential licensee can

4   test the royalty rate through a breach of FRAND claim. Indeed, Prof. Ordover

5   concedes that "there might be paucity of evidence on hold-up behavior by standard

6   essential patent holders."

7        42.    I disagree with Prof. Ordover regarding the applicability of *Microsoft v.*

8   *Motorola* to this case. I disagree that the court's breach of RAND finding is

9   necessarily supportive of hold-up. In fact, it is supportive of my view. Microsoft

10  believed that Motorola had sought royalties in excess of RAND. Microsoft did not

11  sign a license, and when confronted with enforcement proceedings, Microsoft

12  sought a RAND adjudication from a U.S. court. The U.S. court, in fact, enjoined

13  Motorola from enforcing injunctive relief in Germany pending the rate adjudication.

14  This case is an example of the power licensees have to avoid any possible hold up.

15  The existence of this remedy and power is well known to licensees in the industry,

16  and it is just one of the many reasons why I believe that alleged hold-up does not

17  systematically infect license agreements that have been entered into after

18  promulgation of the standard.

19       43.    Thus, Prof. Ordover has not shown that any of Ericsson's licenses are

20  actually the product of hold-up. I understand that less than 5% of Ericsson's

21  licenses under its 2G, 3G, and/or 4G standard essential patents were reached during

22  or after litigation.[17] Competitive circumstances and the desire for future business

23  transactions are powerful forces at work besides any legal remedies.

24       44.    If there were a systematic bias in licensing of standard essential patent

25  portfolios, it would be to depress royalty rates and undervalue the portfolio. Prof.

26  Ordover has previously said that TCL can be sued for damages, decreasing the

27  ─────────────

28  [17] Witness Statement of Lars Gustav Brismark, ¶ 52.

1   likelihood of hold-out. But in my opinion, court-ordered damages, even with

2   prejudgment interest, may not be adequate to fully compensate Ericsson. Hold-outs

3   are already benefitting from delaying negotiations, both when rates may decline

4   over time and because they gain a competitive advantage over their rivals who are

5   paying royalties. Also, as a pragmatic matter, it is infeasible for Ericsson to sue for

6   patent infringement of every essential patent in its global portfolio. Litigation is

7   costly and time-consuming. Ericsson simply cannot effectively enforce its patent

8   portfolio on a patent-by-patent, country-by-country, product-by-product basis,

9   much less in any reasonable amount of time. These transaction costs, which

10  outweigh the theoretical risk of hold-up, actually skew the system towards

11  undervaluing global portfolios of standard essential patents.

12      45.    TCL alone may or may not be able to "run out the clock" on

13  Ericsson's standard essential patents. However, as noted, TCL's behavior in

14  delaying payment emboldens others to act in a way that may indeed "run out the

15  clock" on Ericsson's standard essential patents or at least increase the cost of

16  Ericsson's enforcement of its standard essential patent rights. Such conduct

17  increases Ericsson's collective enforcement costs, and raises its opportunity costs.

18  These results are economically equivalent to the behavior that Prof. Ordover

19  identifies as being "hold-out" or "reverse hold-up." On this issue, I again agree with

20  Administrative Law Judge Essex, and his finding in the *InterDigital/ZTE* litigation:

21      [C]ompanies that use the IPR in violation of the policy are able to exert a

22      pressure on the negotiations with the IPR holder to try to make the agreement

23      in the lower range of FRAND, or perhaps even lower than a reasonable

24      FRAND rate. … By not paying for a FRAND license and negotiating in

25      advance for the use of the IPR, they force the patent holder to take legal

26      action. In this action, the patent owner can lose the IPR they believe they

27      have, but if the patent holder wins they get no more than a FRAND solution,

28      that is, what they should have gotten under the agreement in the first

1   place. … This puts the risks of loss entirely on the side of the patent holder,

2   and encourages patent hold-out, which is as unsettling to a fair solution as

3   any patent hold up might be.[18]

4   If TCL succeeds in its advocacy for interpreting FRAND, the standards-based

5   innovation ecosystem will be imbalanced and threatened.

6       46.    Prof. Ordover also ignores the market pressure when free-riders

7   compete with royalty-paying implementers. This dynamic harms the system itself.

8   It encourages others to infringe. Infringers take comfort from having other

9   infringers to point to as well. While in any one litigation, litigation costs may be no

10  less onerous for a patent holder than for a licensee, Ericsson is faced not only with

11  enforcement costs against TCL alone but also faces the prospect of serial and

12  parallel enforcement actions against multiple hold-outs all with the incentive to

13  engage in parallel strategies to delay payment. This reduces the expected returns to

14  Ericsson's enforcement of its standard essential patent portfolio, and enforcement

15  may become uneconomic. Absent the economic incentive for essential patent

16  holders to engage in enforcement, these payment delayers will have achieved their

17  goal of reducing—and potentially even eliminating—their FRAND royalty

18  payments. This is the heightened risk of free-riding: no one would be able to chase

19  down all of those market participants who have jumped over the turnstile and

20  boarded the train without payment. A great global system of cooperative innovation

21  is put at grave risk by such behavior.

22

23

24

25

26  [18] *In the Matter of Certain Wireless Devices with 3G &/or 4G Capabilities & Components Thereof Initial Determination on Violation of Section 337 &*

27  *Recommended Determination on Remedy & Bond*, USITC Inv. No. 337-TA-868, 2014 WL 2965327, at *78 (June 13, 2014) (initial determination) (citation omitted).

28

**F.      Prof. Ordover Proposes the MFN/MFL Regime that ETSI Considered and Rejected.**

47.     I understand that the FRAND commitment is a contract between Ericsson and ETSI, under which TCL claims rights as a third party beneficiary. Like any contract, once it is entered into, the terms should not be changed absent consent of all parties. Prof. Ordover attempts to change the terms of the FRAND contract after Ericsson has entered into it when he states that "[t]he FRAND commitment means that when one firm obtains a particular set of licensing terms from a declared standard essential patent owner, other similarly situated firms should be able to choose from that same menu of terms, such as being offered the same one-way royalty rates." This is economically equivalent to a most favored licensee / most favored nation ("MFL/MFN") requirement, which I understand was specifically considered and rejected by ETSI, and therefore is not part of the FRAND contract between Ericsson and ETSI.

48.     *First*, the MFL/MFN requirement cannot accurately identify discrimination. The fact that rates are not identical does not by itself show any intent to discriminate or any competitive harm. Instead, it suggests there is (and should be) flexibility in the set of licensing terms and rates that are considered to be FRAND. Yet the MFL/MFN requirement TCL's experts advance would automatically find "discrimination" with any variance in rates, without proof of intent or competitive harm.

49.     *Second*, there is no reason to assume that discrimination should apply differently to existing licensees as opposed to new licensees. Yet Prof. Ordover's MFL/MFN requirement tacitly assumes that any differences in existing royalty rate indications are due to past discrimination by Ericsson. This automatic "finding" indicates why the MFL/MFN requirement was rejected by ETSI with good reason. If applied, it would clearly bias FRAND rates downward—regardless of any ex ante value represented by the patent portfolio being licensed. Every existing and new

licensee would effectively have a royalty ceiling identical to the lowest rate, under Prof. Ordover's proposed interpretation. This would mean that Ericsson must offer an identical, take-it-or-be-sued, offer to every licensee—regardless of market conditions or the value of the technology—and demonstrates the interpretation of FRAND as a per se MFL/MFN requirement would lead to wooden and absurd results.

50. *Third*, Prof. Ordover's approach is entirely one-sided. Ericsson must license on FRAND terms to the entire market, so it is proper to evaluate offered terms from both the perspective of the prospective licensee as well as that of all of Ericsson's incumbent licensees. The "non-discriminatory" aspect of FRAND cannot be evaluated solely from the prospective licensees' perspective: incumbent licensees and licensors must be considered as well. Thus Prof. Ordover's MFL/MFN requirement is inherently imbalanced and biased. In effect, it could itself be inconsistent with the non-discriminatory requirement of FRAND.

51. *Fourth,* Prof. Ordover's MFL/MFN requirement would eliminate the flexibility for contracting parties to bilaterally negotiate mutually beneficial contracts. For example, some licensees prefer running royalties, others prefer fixed payments, and still others prefer a hybrid approach. Some licensees have patent portfolios of their own to "barter" for a cross-license; others do not. FRAND is intended to allow the flexibility to tailor these and other terms to an evolving economic situation. But, under Prof. Ordover's view, the risk of arbitrary and erroneous determinations of discrimination would be quite high as every existing licensee would seek to cherry-pick terms from other licensees and immediately argue that it is being "discriminated" against. This is exactly what TCL is doing in this case when it purports to unpack Ericsson's fixed payment license with Apple (which sells the highest priced phones in the industry) to derive an implied percentage of selling price running royalty rate, then urges the same percentage of

selling price rate be applied to TCL (which sells some of the lowest priced phones in the industry). This makes no economic sense.

52.     *Fifth*, unlike the downward bias of a MFL/MFN regime, the comparable license range is based on rates extracted from agreed on, arms-length negotiated licenses. So there is no reason to expect the FRAND range would continue to expand. Licensees in bilateral negotiations would continue to have the incentive to negotiate lower (as opposed to higher) rates. The tendency would be to depress rates. "Early bird" specials, often important to getting a market-based license program off the ground, could not occur and licensing would possibly collapse, thereby cluttering the courts still further.

53.     *Sixth*, Prof. Ordover appears to credit the terms of one license alone, the Huawei license. My view is this assumption is inherently skewed because it focuses on the situation of a single party—one that sells handsets at a much higher average price than TCL. Prof. Ordover cannot satisfy his per se MFN/MFL requirement by assuming that, if TCL does not get the same percentage rate as Huawei, then TCL has suffered discrimination. FRAND does not give TCL an entitlement to opportunistically demand and obtain a percentage of selling price royalty rate without a 4G floor.

54.     On the issue of arbitration and litigation results, I have previously written that the appropriate royalty rate for a proven-valid-and-infringed patent is higher than the rate appropriate for what I termed the same patent in an "untested" condition, *i.e.*, a patent for which the issues of validity and infringement have not yet been established and may be disputed.[19]  A proven-valid-and-infringed patent is a different, and more valuable, economic asset than "the same" patent *before* validity and infringement have been proven. By way of illustration, suppose that

---

[19] Ex. 5558, Edward F. Sherry & David J. Teece, *Royalties, Evolving Patent Rights, and The Value of Innovation*, 33 Res. Pol'y 179-91 (2004).

everyone agrees that a given patent, if proven valid and infringed, would command a 10% royalty—but suppose further that everyone agrees that there is only a 60% chance that the patent, if litigated, would be found valid and infringed. The parties might agree to pay a 6% royalty, *i.e.* 10% royalty discounted to reflect the 60% probability. Indeed, the patent holder may have entered numerous licenses calling for 6% royalties for its "untested" patents. But by assumption, if the parties litigate and the patent is found valid-and-infringed, the appropriate royalty is 10%. As applied to TCL, it would be as if TCL were allowed to claim that the "non-discrimination" aspect of FRAND means that, if it is found liable for patent infringement, it should only have to pay what others have agreed to pay for a license to "untested" Ericsson patents. In effect, TCL is proposing a "heads I win, tails I break even" game. But that alternative regime would constrain the entire system: licensees would have virtually no incentive (other than to avoid litigation costs) to negotiate licenses. They would be incentivized instead to infringe and litigate.

### G.     The Benefits of Standards Deployment Are Independent of the Problem of Free-Riding.

55.     Prof. Ordover declares that "firms like TCL that invest and innovate in the development and provision of low cost standard-compliant mobile handsets help put such products within reach of the millions of customers around the globe for whom more expensive handsets may simply be unaffordable," and that "[t]hese benefits of standardization can be reduced or undermined, however, if firms contributing intellectual property to a standard are allowed to exploit their unmeritorious market power . . .."

56.     I strongly disagree with his suggestion that not paying for standardized technology advances the "benefits of standardization." Low prices due to efficient production are one thing; low prices because the implementer is not paying (or is underpaying) for its use of others' patented technology hurt the ecosystem. Low-

cost suppliers perform an important role in facilitating widespread adoption of the standard. But suppliers who do not pay for the patented technology they use (or delay paying for it for an extended period) distort market competition.

57.     Finally, it is inconsequential whether TCL can or cannot make a profit without paying for the required inputs. I am aware that numerous courts have held that the infringer's historical profits are not a "cap" on reasonable royalty damages, a proposition that fully comports with economics.[20] An infringer could have raised its prices to offset royalties, at least in part. The fact that higher prices would have caused it to lose some sales does not justify not paying the appropriate amount of royalties on the infringing sales that it actually made.

58.     Just as Ericsson should not share in any relative gains from TCL's superior business acumen, strategy or execution if TCL were more profitable, Ericsson likewise should not be penalized by TCL's poor business acumen, strategy or execution, simply because it is less profitable. TCL's argument that, because it allegedly cannot afford to pay FRAND compensation to Ericsson, it should somehow be allowed to get away with not doing so is economically unsupportable. TCL could never avoid paying for the other inputs it uses (such as wages or shipping) by arguing that it cannot afford them.

**H. Prof. Ordover Has No Basis to Conclude FRAND**

**Excludes a Specific Licensing Structure.**

59.     Prof. Ordover concludes that dollar-per-unit benchmarks are inconsistent with the FRAND commitment. As a preliminary matter, I understand that Ericsson's Option B offer includes a 4G *royalty floor* and *royalty cap*, both priced in dollar-per-unit terms, as opposed to an overall dollar-per-unit offer. But for either a floor or cap or an overall offer, my opinion is that a dollar-per-unit

---

[20] *See, e.g.*, *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004).

royalty structure is neither inherently discriminatory against lower-profit margin implementers, such as TCL, nor an unfair competitive advantage to higher-profit margin implementers, such as Apple—despite Dr. Ordover's assertions to the contrary.

60.    I will note that in a number of reported cases evaluating RAND in the context of 802.11 (WiFi) technology, the courts expressed their RAND royalty holdings in dollar-per-unit terms. In *Ericsson v. D-Link*, the court found that a 50 cent per unit royalty for a WiFi portfolio, applied to laptop computers and routers (with very disparate sales prices) was RAND.[21] In *Microsoft v. Motorola*, the court found that a RAND-compliant royalty for gaming consoles would be between 0.555 cents and 16.389 cents per unit for video coding patents and between 0.8 cents and 19.5 cents per unit for wireless patents.[22] These findings are in dollar-per-unit terms.

61.    To assess the economics of licenses with different structures, assessing economic comparability is challenging, and may be imperfect, but not impossible. As in many financial decision making settings, existing economic concepts can be used to compare license economics across disparate license forms and between different parties, if the appropriate discount rates are used, as Mr. Kennedy proposes.

62.    Dr. Ordover's interpretation of FRAND suggests that the licensee is entitled to dictate the structure of a license by insisting on the license structure contained in some agreements (percentage per-unit running royalties) but then replace some of the terms with "implied" (or imputed) rates from other agreements (fixed payment). But that is not what FRAND requires and it is bad policy. FRAND is meant to be flexible, as different companies with different attributes may favor

---

[21] *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1214 (Fed. Cir. 2014).
[22] *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217, at *4 (W.D. Wash. Apr. 25, 2013).

different license structures. FRAND does not allow a potential licensee to choose and combine the most favorable terms from a menu of different license terms taken from the universe of comparable licenses with different forms as the economics of any given comparable license are governed by its collective terms, not by only a selective subset of those terms.

63.    I recognize Ericsson has publicly discussed royalties expressed as a percentage of selling prices in the past, and many (but not all) of its "business cases" analyze licenses on that basis. (This is consistent with unfettered commercial practice.) Nevertheless, a significant number of Ericsson's existing licenses have explicit dollar-per-unit based features such as dollar-per-unit rate options, floors and caps. Floors and caps, when they constrain a percentage royalty, are quite similar to dollar-per-unit rates. Dollar-per-unit royalty rate indications are already a market outcome of bilateral negotiations in this market, and I see no reason to ignore this market information.

64.    Importantly, it is simply untrue that by the end of 2015, as TCL's experts assert, the vast majority of the product sales licensed by Ericsson were licensed based on a percentage of selling price. Indeed, Ericsson's licenses with Samsung and Apple, Ericsson's two largest licensees—which Prof. Ordover and Dr. Lynde have concluded are similarly situated to TCL—are fixed payment licenses, with optional dollar-per-unit running royalty rates. Both licenses give the licensee the option to elect, on an annual basis, between a fixed lump-sum amount and dollar-per-unit running royalties (though, notably, not a percentage-of-sales-based royalty). The fact that, to date, both have elected the annual lump-sum amounts rather than dollar-per-unit amounts is a historical fact, driven by their historical sales levels. It does not invalidate the fact that these licenses call for dollar-per-unit royalties if that option is elected. (Projected sales levels can change dramatically over time, as evidenced by Nokia and Blackberry.) Thus TCL's experts' claim that

the vast majority of product sales under licenses with Ericsson are licensed based on a percentage of selling price is false.

65.    Ericsson's offer of a dollar-per-unit floor, and cap, in its Option B offer to TCL, is not a new payment structure designed to allow Ericsson to extract higher payments from manufacturers of low-cost handsets. Rather, it is a reaction to the realities of the marketplace where new entrants with low priced phones have caused pricing spreads to increase and average selling prices to vary. The difference in price between an iPhone and the average-priced TCL phone is over six-fold. As royalties expressed in different forms could all be compliant with FRAND, evaluating FRAND additionally using implied dollar-per-unit royalty rate indications is not "switching" between royalty structures, it is using more information rather than less when evaluating FRAND. At bottom, adhering to Prof. Ordover's arbitrary exclusion rule would turn a blind eye to market evolution and would ignore important market evidence.

66.    The need for expanded bases of comparability is highlighted by the challenges in determining sufficiently similarly situated comparable licensees. "Similarly situated" is a matter of degree, and firms can be either more or less "similarly situated" to one another. Even similarly situated firms have differences in product mixes and in geographic sales footprints, with different price characteristics. For example, Apple's product mix and geographic sales footprint gives it a very high average selling price for its handsets as compared to other companies. Converting any given net present value of expected licensing revenues from an Apple license into a percentage of selling price royalty rate will yield a lower royalty rate indication when denominated as a percentage of selling price rate. Finally, I strongly disagree with the suggestion, in the context of licensee heterogeneity, that differences between actual license terms and conditions are—by definition—discriminatory. One firm may have a license calling for lump-sum royalties; another may have a license calling for percentage-of-sales-based royalties;

1    still another may have a license calling for dollar-per-unit royalties. All of these

2    allocate risks differently between the parties, and as such they are not economically

3    "equivalent" to one another. However, the different licenses can be compared by a

4    discounted net present value analysis, even when they are structurally different. To

5    be sure, any such exercise needs to be done with care, as imputed royalty rates

6    calculated by an "unpacking" exercise appear nowhere in the actual licenses

7    themselves. But if done properly, the exercise is informative.

8    **III.    RESPONSE TO DR. LYNDE**

9        67.    Aside from my agreement with Dr. Lynde that TCL is similarly

10   situated to ZTE, my objections to Prof. Ordover and Dr. Leonard's opinions are

11   consistent with my responses to Dr. Lynde. In addition, I have three additional

12   responses to Dr. Lynde's witness statement.

13       **A. Dr. Lynde Wrongly Equates Differences in License**

14           **Terms with Discrimination.**

15       68.    I disagree with Dr. Lynde's assertion that "non-discriminatory" means

16   ensuring a horizontal downstream competitor is not disadvantaged by simply

17   having to pay a higher rate than its competitor. As I discussed when addressing Prof.

18   Ordover's views, Dr. Lynde's interpretation of "non-discriminatory" would require

19   a MFL/MFN regime rejected by ETSI and would not support ETSI's standard-

20   setting and FRAND imperatives. The FRAND commitment does not require a

21   licensor to offer the exact same terms and conditions to every licensee, but rather,

22   allows for a range of terms and conditions reasonably tailored to individual

23   circumstances. This reflects the fact that cell phones are not homogeneous

24   "commodity" products. With FRAND, the licensor need only be prepared to grant

25   licenses on terms and conditions within that range to satisfy its obligation.

26       69.    Furthermore, I know from my broad experience in antitrust and unfair

27   competition matters that a downstream competitive analysis involves thoroughly

28   examining purportedly anticompetitive effects in alleged relevant markets. TCL's

-32-

1   experts have not offered any analysis akin to the economic analysis required in such

2   matters. That is, even assuming Dr. Lynde's non-discrimination formulation, TCL's

3   experts have failed to show that TCL suffered competitive disadvantage in an

4   alleged relevant market based on Ericsson's offered rates. As I discussed previously,

5   TCL's experts have not established *any* competitive harm which would be caused

6   by paying Ericsson either the Option A or Option B royalties—or even assessed

7   what market prices would result. As noted earlier, if there is any harm to

8   competition it is likely from TCL's free-riding, which TCL's experts haven't

9   recognized, let alone analyzed.

10      70.    Dr. Lynde also fails to show, or even articulate, Ericsson's "incentive

11  to discriminate on price" in a downstream product market with TCL in which

12  Ericsson does not compete. Nor does he establish the direction of any likely

13  discrimination.

14      71.    Finally, the "imputed rates" calculated by Dr. Lynde are not found

15  anywhere in Ericsson's licenses. The calculated imputed rates rest on a

16  methodology and set of assumptions made by Dr. Lynde, which are questionable

17  and disputed by Ericsson. Drawing inferences of "discrimination" from imputed

18  rates risks finding discrimination where there is none.

19      **B. Dr. Lynde Excludes Sharp Without Addressing Its**

20           **Similarity to TCL.**

21      72.    I disagree with Dr. Lynde's conclusion that TCL is more similarly

22  situated to Huawei, LG, HTC, Samsung, and Apple than it is to Sharp. While Dr.

23  Lynde acknowledges that Sharp has an Ericsson license and competes in the

24  cellular device market, he otherwise dismisses Sharp as a comparable license for

25  TCL. He says Sharp currently has a relatively low market share compared to TCL.

26      73.    Dr. Lynde does not address the key market fact that in 2013, shortly

27  before the filing of this case and near the time that Ericsson made its Option A offer

28  to TCL, Sharp had a higher share of the market than TCL did. Even though TCL

REBUTTAL WITNESS DECL. OF PROF. DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

has grown more than Sharp has since then, market share alone does not make the two firms sufficiently dissimilar to exclude Sharp from the analysis, particularly since no analysis has been put forward with respect to the boundaries of the applicable market.

74.     Similarly, Dr. Lynde also draws incorrect conclusions from Sharp's downward profitability trend and subsequent restructuring. I disagree regarding the relevance of a reorganization, especially considering the many reasons profits may decline and even more reasons a restructuring may occur. Indeed, last year TCL's parent company initiated reorganization—including de-listing from public markets and ownership by the parent company—after TCL's significant decline in profits.[23]

75.     Dr. Lynde's dismissal of the Sharp license is unpersuasive and his explanation makes no economic sense, especially when comparing the royalties he proposes for TCL to the royalties paid by Sharp for purposes of analyzing the "non-discrimination" aspect of Ericsson's FRAND obligations.

**C. Dr. Lynde Ignores the Market Evidence and Wrongly**
   **Assumes Monopoly Power and Anticompetitive Effects**
   **Without Analyzing or Proving Them.**

76.     I disagree that considering licenses struck in the market requires "circular reasoning."

77.     As a preliminary matter, Dr. Lynde's opinion is contrary to comparable license analyses done and relied upon in other cases, including multiple matters in which I have testified as an expert witness.

78.     Dr. Lynde's approach of ignoring comparable licenses as potentially reflecting supracompetitive rates just because they are higher than the rates TCL is

---

[23] Ex. 5559, Jennifer Li, *TCL Unveils Plan to Privatise its Hong Kong-listed Smartphone Business*, *South China Morning Post*, (June 6, 2016), available at http://www.scmp.com/business/companies/article/1966802/tcl-unveils-plan-privatise-its-hong-kong-listed-smartphone.

willing to pay is—in the absence of any supportive evidence—simple gerrymandering. It is not supported by any analysis of the acquisition and exercise of monopoly power and resulting anticompetitive effects. As I noted earlier, Dr. Lynde has not conducted the necessary market analysis, akin to the analysis an economist would perform in an antitrust case. He certainly does not conduct any analysis establishing actual harm to competition. Since he has no basis to rule out the opposite, this exercise is very necessary for him to do to support his conclusions. And he ignores the lack of empirical evidence of hold-up, in this case or anywhere. I have testified to this in Paragraphs 55 through 63 in this Rebuttal Witness Statement.

79.    Dr. Lynde does use the usual term "markets" when he notes there are "[o]ther entities, far more removed from the markets where TCL is active." But of course Dr. Lynde cannot offer actual conclusions about "markets," as that term is used by competition economists. Neither he nor any other TCL expert has actually analyzed relevant markets as competition economists do. Dr. Lynde says he reviews "sales summaries" for "an evaluation of the 'world markets'" where TCL competes." But that "evaluation" of "summaries" only lays bare his lack of empirical analysis.

80.    Presumably recognizing he has little support for his product comparisons between TCL and other large manufacturers, Dr. Lynde instead relies on the unsupported post-discovery declarations of TCL witnesses. He claims to have had conversations with Mr. Cistulli and Mr. Guo to confirm "that TCL's focus is on directly competing with the top five to six handset manufacturers: Apple, Samsung, LG, HTC, Huawei, and ZTE." He says "TCL believes it directly competes with these companies in regards to product offerings, pricing, and geographic areas served" and "TCL believes … TCL competes with these companies on products at all levels (e.g., entry level, mid-level and high-end)." There are multiple defects with his analysis, many of which I have already discussed in my rebuttal of Prof. Ordover.

81.     TCL's own documents—which note the actual companies against which TCL measures itself—contradict the stated assertions by TCL's witnesses. For example, in an internal presentation TCL divides its competitors into entry, mid, and high end smartphone markets.[24] In this analysis, TCL compares itself to competitors in the entry market, where TCL has strong market share.[25] And Apple, Samsung, LG, HTC, and Huawei certainly are not in the entry market. TCL does aspire to move into the mid and high end markets, but recognizes that it does not have the capabilities to do so yet. Instead, "moving up to [the] premium segment is key" and moving into the mid-level market "is the next natural step."[26] As noted earlier, another internal presentation lists being the "[i]ndustry leader in profitability among China based companies" as one of TCL's three "[d]reams."[27]

82.     Furthermore, Mr. Guo previously testified in deposition that ZTE was a major competitor in the U.S. for mobile phone sales.[28] He also testified that TCL has "many competitors in PRC of China," including ZTE.[29]

83.     Mr. Cistulli's and Mr. Guo's assertions are also contradicted by the market sales data, as I summarized earlier. When Dr. Lynde credits their assertions, he approves of lumping together all devices—across type and price band—and he skips the market-based economic analysis that would support a conclusion on markets. On this assessment, I disagree with Dr. Lynde's methodology, his sources for analysis, and his results.

---

[24] Ex. 5561, TCL Internal Presentation Regarding Business Strategy, TCL_ERIC_CDCA1464161, at 209-20.

[25] *Id.* at 211, 214.

[26] *Id.* at 220.

[27] Ex. 5562, TCL *WMD Status & Plan for Next Year*, TCL_ERIC_CDCA1399168, at 177.

[28] Dep. of George Guo, January 27, 2016 at 100:2-8.

[29] Dep. of George Guo, January 27, 2016 at 88:1-8.

84.     Finally, I do agree with Dr. Lynde as to at least one implication of his drastic exclusion of all market evidence. He says that if we do not look to actual licenses, "there is no check, apart from litigation, on whether offered rates are FRAND." Having to litigate every FRAND license would be highly costly, and contrary to my economic understanding of the FRAND commitment, and inconsistent with good public policy.

### D. Dr. Lynde Improperly Excludes Release Payments from His Analysis of Allegedly Comparable Licenses.

85.     When unpacking Ericsson's licenses, Dr. Lynde treated release payments made to Ericsson by other licensees as separate from payments related to the going-forward license. That makes no economic sense.

86.     Mr. Kennedy correctly treated all payments from the licensee to Ericsson as part of a single unified transaction. Economically rational parties to a license would treat the entire transaction as a whole when deciding whether or not to accept it. Mr. Kennedy, unlike TCL's experts, handled these payments correctly by using different discounting and compounding rates for release payments for past sales, for running royalty payments based on future sales, and for lump-sum royalty payments, to reflect the differences in risk for the different types of payments.

87.     Had TCL taken a license at the time it first began using Ericsson's standardized technology, payments related to what are now "past" sales would have been treated no differently than payments related to future sales, other than properly adjusting for risk and the time value of money, as Mr. Kennedy has done. By contrast, Dr. Lynde is cherry-picking when he treats some past releases paid by others very differently from future payments—and thus understates the imputed royalties paid by other licensees.

88.     Dr. Lynde's methodology would also improperly reward an implementer who uses standard essential technology for years without paying for it. Under his methodology, such an implementer could pay for using the technology at

1   future FRAND rates that are lower than the FRAND rates it would otherwise have

2   paid during the period of unlicensed use. As I have testified, rewarding such hold-

3   out strategies would tend to defeat the viability and incentives for standard-setting.

4   **IV.   RESPONSE TO DR. LEONARD**

5   89.   Overall, Dr. Leonard's "top-down" analysis has logical errors, and

6   practical shortcomings; the fatal error is its erroneous starting point for the

7   maximum aggregate royalty. For the reasons I lay out below, Dr. Leonard's

8   analysis based on a faulty starting point results in unsound results and conclusions.

9   **A. Dr. Leonard's Analysis Relies on a Faulty Starting Point.**

10   90.   Dr. Leonard proposes what he terms a "top-down" approach, assuming

11   an aggregate royalty burden is 6 percent of the price of the phone for the 4G

12   standard and 5 percent of the price of the phone for the 2G/3G standards. His basis

13   for choosing these assumptions appears to be prior public statements by Ericsson

14   and other industry participants about their expectations in 2002 (for WCDMA) and

15   in 2008 (for LTE) about the anticipated level of aggregate royalties.

16   91.   *First*, Dr. Leonard ignores the fact that numerous highly-sophisticated

17   firms have agreed to pay significantly higher royalties to Ericsson than the rates he

18   proposes. The failure of this methodology to match the real world market outcomes

19   is strong evidence of its flaws.

20   92.   *Second*, Dr. Leonard uses a starting point which does not reflect the

21   aggregate royalty level in any meaningful way. The reality is that the FRAND

22   commitment does not impose a cap on cumulative royalties, and no such cap,

23   whether at the 5 or 6 percent level proposed by Dr. Leonard, nor any other level,

24   was ever adopted by the industry. The starting point for Dr. Leonard's "top-down"

25   analysis is therefore arbitrary and without evidentiary support, other than other than

26   certain statements by Ericsson and others, whose import he misinterprets. For

27   example, as described in the Rebuttal Witness Declaration of Lars Gustav Brismark

28   at paragraphs 11 to 20, Dr. Leonard omits any discussion of historical smartphone

1  pricing and market conditions in 2002 and 2008, at the time these public statements

2  were made by Ericsson and others, upon which Dr. Leonard relies to select a 5

3  percent aggregate royalty burden for 2G/3G, and a 6 percent aggregate royalty

4  burden for 4G, for use in his "top-down" analysis. Further, he reduces Ericsson's

5  earlier "single-digit royalty" statements (which can be anything less than 10%),

6  without justification, to 5% for 2G/3G and 6% for 4G. Next, the statement for both

7  3G and 2G royalty stacks being 5% or less that he cites was not a statement by

8  Ericsson. Proposals rejected by the SDO and disavowed by the market are simply

9  not part of the FRAND commitment—and they certainly are not "market evidence,"

10 especially to an economist.

11     93.    I note that TCL witness Mr. Guo appears to agree with me in his

12 witness statement, when he testifies that 2G to 3G and 3G to 4G were "mobile

13 technology 'breakthroughs.'" We also agree on the importance of the "next wave of

14 technology and features in mobile devices" to consumers. His assessment of the

15 "consumer demand cycle" where there is "high consumer demand after a

16 technology breakthrough, followed by low consumer demand as they wait for the

17 next wave" is consistent with my opinion of the tremendous value to consumers

18 from the use of the enabling technologies which underlie the currently successful

19 standards.

20     **B. Empirical Analysis of the Value of Cellular Connectivity**

21         **Invalidates Dr. Leonard's Assumed Maximum**

22         **Aggregate Royalty Burdens.**

23     94.    On this point, unlike TCL's experts, I have conducted an empirical

24 analysis to assess the market evidence on the value of cellular connectivity. Neither

25 Dr. Leonard nor any of TCL's other economic experts have examined the market

26 data in any "natural experiment," and as such their conclusions lack economic

27 foundation and are based on arbitrary assumptions. TCL never performed an

28 economic analysis to value cellular connectivity. Instead, Dr. Leonard assumes that

the maximum aggregate royalty for proprietary technology embedded in cellular connectivity that the entire industry can bear aggregate royalties of 5% (2G/3G) and 6% (4G). Based on TCL's low average selling price and actual sales, that figure amounts to a maximum aggregate royalty between $2.50 and $8.00 per 3G and 4G handset in 2015.[30]

95.    My January 11, 2017 witness statement stated the results of my analysis of the "natural experiment" presented by Apple's differential pricing of the Apple iPhone and iPod devices. Similar to Mr. Kennedy, I have calculated that consumers value cellular connectivity by comparing the prices from the closest comparable cellular and non-cellular devices available in the market.

96.    These results indicate that consumers are willing to pay Apple over $250 per device for cellular connectivity, or 31.7% to 55.8% of the selling price of the iPhone, depending on the model. This empirical analysis suggests that Dr. Leonard's assumption significantly undervalues the appropriate maximum aggregate royalty in a way that biases Dr. Leonard's top-down estimate of the appropriate royalty for Ericsson downward.

97.    If there were similar data from other "natural experiments" by other cellphone manufacturers, I would have used it. If TCL had offered substantially similar products with and without cellular connectivity, that comparison could have been informative. But they did not. To my knowledge, no other handset manufacturer provides instances of such with-versus-without-cellular-connectivity products (nor have TCL's experts pointed to any). I analyzed the available market evidence from the "natural experiment" associated with Apple offering two related products, because I believe it is informative, especially to challenge Dr. Leonard's "assumption" about cumulative royalty rates. Clearly, neither Mr. Kennedy nor I are claiming that Ericsson should be entitled to all of the value of cellular

---

[30] *See* Ex. 544, TCL Sales Summary, TCL_ERIC_CDCA1126854.

1    connectivity. Nonetheless, this information is highly suggestive, and few industry

2    experts would deny that the 3G and 4G connectivity technology is very valuable,

3    apportionment issues put to one side.

4         98.    I acknowledge that Apple offers products at the high-priced end of the

5    market. I also acknowledge that both my and Mr. Kennedy's estimates of the

6    dollar-per-unit value of cellular connectivity to Apple exceed the selling price of

7    some of TCL's cellphones. That is why I reported not only the dollar-per-unit

8    figures, but also the value of cellular connectivity to Apple calculated as a

9    percentage of the price of Apple's iPhones, which ranged from 31.7% to 55.8% of

10   the selling price of the iPhone, depending on which iPhone model is being

11   considered. I know of no reason to believe that, measured as a percentage of the

12   selling price of the phone, the value of cellular connectivity to TCL would be

13   appreciably different from Apple's percentages. These results are suggestive, not

14   determinative, but cannot be ignored.

15       **C. Hypothetical Royalty Stacking Does Not Assist the Court**

16          **in Considering the Reality of Ericsson's Offers.**

17       99.    While Dr. Leonard discusses the issue of "royalty stacking," he makes

18   no effort to assess the royalty stack actually paid by TCL, despite the fact that he

19   clearly could have asked TCL for the requisite information to calculate the "stack"

20   it pays. If one is concerned with the question of whether cumulative royalties

21   preclude or limit widespread adoption of some standard, presumably one wants to

22   look not merely at theoretical possibilities, but at empirically-verifiable realities.

23       100.   I agree with Judge Davis' statement in *Ericsson v. D-Link*, and find it

24   applicable here: "The best word to describe Defendants' royalty stacking argument

25   is theoretical. … [G]iven the opportunity to present evidence of an *actual* stack on

26   802.11n essential products, Defendants came up empty. … Instead, [defendants'

27   expert] never identified an actual royalty stack; he never even attempted to

28   determine the actual amount of royalties Defendants currently pay for 802.11

-41-

patents."[31] Following a breach of RAND trial, Chief Judge Davis rejected the royalty stacking argument as wholly theoretical and found no RAND violation, a ruling upheld by the Court of Appeals.[32] Indeed the Federal Circuit concluded, "The district court need not instruct the jury on hold-up or stacking unless the accused infringer presents actual evidence of hold-up or stacking. Certainly something more than a general argument that these phenomena are possibilities is necessary."[33]

101.   Furthermore, my review of the relevant research is that scholars and analysts have more recently questioned whether "royalty stacking" is a concern at all. As reported by Gregory Sidak, by early 2015, "more than two dozen economists and lawyers had disproved or disputed the numerous assumptions and predictions for the patent holdup and royalty stacking conjectures."[34]

102.   In general, these economists and lawyers have observed the lack of any evidence suggesting that prices are rising, that innovation has stagnated, or that market entry is limited—all things one would expect to see in a market harmed by royalty stacking. Instead we have seen exactly the opposite, as summarized in recent research by Alexander Galetovic and Kirti Gupta:

> Between 1994 and 2007 the number of SEP holders grew from 2 to 130 and the number of declared SEPs grew more than 380 times. Yet the average selling price of a device … fell to one fifth [of] its initial level, from $853 in 1994 to $173 in 2007, or -11.5% per year on average. Since 2007 the average price of a device of the same generation has fallen between 52% and 84% (or between 12.2% and

---

[31] *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, at *18 (E.D. Tex. Aug. 6, 2013), *aff'd in part, vacated in part, rev'd in part*, 773 F.3d 1201 (Fed. Cir. 2014).

[32] *Id.*; *see Ericsson*, 773 F.3d at 1234.

[33] *Ericsson, Inc.*, 773 F.3d at 1234.

[34] Ex. 5336, Gregory J. Sidak, *The Antitrust Division's Devaluation of Standard-Essential Patents*, 104 Geo. L. J. Online 48 (2015).

30.5% per year). Thus, we find no evidence of rising prices due to royalty stacking (or any other cause).[35]

Against this backdrop, I would have expected TCL's experts to conduct a supportable, empirical assessment of royalty stacking in this case if they expected to submit that royalty stacking were anything more than a purely theoretical concern—as opposed to an actual concern. They gathered no facts.

103.   Instead, TCL's experts, including Dr. Leonard, answer only with theory and assumptions, as if royalties are somehow different from other costs of doing business. Dr. Leonard theorizes that a high aggregate royalty burden would require an increase in the price of TCL handsets to TCL's customers, which he opines would substantially reduce demand for its handsets—despite performing no empirical study whatsoever on demand for handsets, and certainly none showing a substantial reduction in demand.

104.   TCL's low profit margin does not modify this analysis. While Dr. Leonard says *TCL's* low profit margin "rules out as reasonable for TCL more recent positions taken by Ericsson and certain other standard essential patent holders who now claim the aggregate royalty burden should be 10 percent or greater," the test cannot be "what is reasonable" solely from the perspective of his client (or from the perspective of one competitor). Tellingly, Dr. Leonard never analyzes *industry-wide* profit margins, nor does he mention Apple's, Samsung's, or LG's profit margins in this part of his opinion, all while TCL argues that FRAND rates should be set by reference to Apple's and Samsung's imputed rates.

105.   Moreover, Dr. Leonard's appeal to TCL's low profit margins is directly inconsistent with the MFL/MFN regime proposed by TCL's experts. That is, requiring a special deal for TCL would be discriminatory to Ericsson's other

---

[35] Ex. 4589, Alexander Galetovic & Kirti Gupta, *Royal Stacking and Standard Essential Patents: Theory and Evidence from the World Mobile Wireless Industry* 17 (Hoover Institution, Working Paper May 1, 2015).

licensees. This inconsistency highlights both the irrelevance of TCL's relative profit margins and the very negative outcomes required under a MFL/MFN requirement.

106.   Finally, Dr. Leonard also proposes discounted royalties everywhere outside of the US and Europe—even though regional discounts are not required by FRAND. In fact, I understand Ericsson has moved away from regional discounts and has adopted a policy of worldwide blended rates for a number of reasons that are consistent with FRAND. Regional discounts are difficult to enforce when components and manufacturing are sourced from around the world. They raise audit and compliance costs, and also the risk of "patent laundering" with a first sale to a low-royalty country, *i.e.*, triggering patent exhaustion doctrine at a low cost. Most of all, regional discounts are less applicable where modern handsets are capable of, and expected by consumers, to work worldwide.

## V.   RESPONSE TO DR. BEKKERS

107.   Overall, I note that Dr. Bekkers offers opinions on ETSI based primarily on his review of secondary sources. In my previous witness statement, I relied upon Dr. Huber's largely firsthand observations and opinions for my specified understanding of ETSI practices and history, given he was a participant. After reviewing Dr. Bekkers' third-hand report from secondary sources, I have confirmed my reliance on Dr. Huber as a reliable source for ETSI practices and history.

108.   I have also identified the following statements by Dr. Bekkers that are in error or not adequately supported:

109.   Dr. Bekkers argues that the cumulative royalty rates on WCDMA/UMTS had to be low because of competition from cdma2000; that if firms had believed that the cumulative royalty rates for WCDMA/UMTS would be high, they would have adopted a rival standard (cdma2000) instead. I agree that rivalry between standards is possible, and that anything that increases the cost of one standard vis-à-vis its rivals will, all other things being equal, make it less likely

1   that that standard will be successfully adopted. The relevant question, however, is

2   whether slightly higher cumulative royalty rates for WCDMA/UMTS would have

3   "tipped" the industry away from those standards and in favor of cdma2000. Dr.

4   Bekkers gives no evidence in support of such a proposition.

5       110.  From an economic perspective, what matters is the total cost versus

6   performance comparison between the alternative standards. The total cost of

7   ownership is affected, not just by handset prices and handset royalties, but by other

8   costs as well. Handset royalties are only a very small fraction of the total cost of

9   ownership, and total cost of service. Owning a cellphone provides no benefit to

10   consumers unless the cellphone is connected to a cellular network. Cellular service

11   providers charge significant fees (on the order of $80 to $100 per month, or $960 to

12   $1200 per year). Over the economic life of a cellphone, the cost of the cellphone

13   will amount to only a relatively small fraction of the total cost of cell-phone-plus-

14   service. Even a 20% royalty on a $400 smartphone, or $80, would only amount to a

15   2.86% royalty when calculated on a royalty base equal to a total cost of ownership

16   of $2800. Patented cellular technology enables both the cellphone and the cellular

17   service.

18   **VI.   RESPONSE TO PROF. DING**

19       111.  Prof. Ding performed an analysis purporting to determine which

20   declared patents were actually essential to the three standards at issue in this case.

21   Working with an Indian engineering consulting firm, he studied a random sample

22   (one-third) of patents that had been declared as essential to ETSI and estimated

23   that approximately 37% of patents declared to ETSI as potentially essential were

24   in fact essential. He concluded that Ericsson's "essentiality ratio" (the fraction of

25   its declared patents that he determined were actually essential) was very similar to

26   (though "slightly below") the industry average.

27       112.  As I am not a technical expert, my response will be confined to

28   pointing out statistical errors and methodological flaws in Dr. Ding's work. For

several reasons, Prof. Ding's analysis is unreliable and his conclusions unsupported.

113.  *First*, Prof. Ding's analysis first excludes 43% of the total 20,156 patent families (43% = 1 – (11,469/20,156)) which do not have at least one English language issued and non-expired patent. His selection of UE patents removes a further 8% to leave 7,106 UE families, or just 35% of the original 20,156 families (62% of the 11,469 reviewed families). Prof. Ding then selects only 33% of the UE families for the test samples (2,600 UE families). This means his calculations are based on only around 13% of the original patent families. Prof. Ding does not provide statistical tests that might show how this sampling produces statistically significant results for the firms' portfolios as a whole.

114.  *Second*, Prof. Ding measures essentiality for a patent family according to the technologies they apply to (2G, 3G and 4G) as identified in the ETSI IPR Licensing Declarations—but he does not disclose how he determines the "aggregate" essentiality for a family which applies to more than one standard. This is a potential source of bias for his aggregate essentiality ratios.

115.  *Third*, even though Prof. Ding acknowledges that determining essentiality is complex and challenging, and claim language may be ambiguous, Prof. Ding does not report how much time he and/or the Concur IP engineers spent studying each of the patent families he considered to determine essentiality. I understand from Mr. Mallinson that Concur IP's team lead later testified that Concur IP engineers spent on average 45 minutes per patent family. I do not believe that this is sufficient time to read an entire patent (or potentially multiple patents), analyze the claim language, read relevant standard specifications, analyze the essentiality of the claim, and make a reliable essentiality determination. This leads me to seriously doubt the reliability of Dr. Ding's results.

116.   *Fourth*, Prof. Ding claims that his random sample subsets of patents declared essential and his "quality control" samples of the initial Concur IP analyses are "statistically significant," and may be used to estimate the true essentiality ratio of each company's entire UE patent family portfolio by extrapolation. But Prof. Ding provides no statistical test results for this significance or further explanation of how it might be interpreted.

117.   *Finally*, I am aware of at least two other studies in which engineering consulting firms sought to determine which declared-essential patents were actually essential to the LTE standard, one by Fairfield Resources International, the other by Jefferies & Co. Those studies reached different conclusions as to which patents were and were not essential to the LTE standard. I am aware that Mr. Mallinson has addressed this issue in his Witness Statement. I concur with his analysis and conclusions.

# VII.   CONCLUSIONS

118.   For the reasons I have testified to, I reaffirm the conclusions in my January 11, 2017 declaration. In particular, Ericsson complied with its FRAND commitments, and its offers to TCL were FRAND at the time they were made. TCL's experts' opinions to the contrary are flawed, incomplete, and incorrect.

119.   **Figure 7** is my list of exhibits cited herein.

1  I declare under penalty of perjury under the laws of the United States of
2  America that the foregoing is true and correct.

3  Executed this 27th day of January, 2017, at New York, New York.
4

5
6  Prof. David J. Teece, Ph.D.
7

WITNESS DECLARATION OF PROFESSOR DAVID TEECE;
CASE NOS. 8:14-CV-00341-JVS-DFMx/2:15-CV-02370-JVS-DFMx

**FIGURE 7. TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| 544 | TCL Sales Summary, TCL_ERIC_CDCA1126854. |
| 1273 | IDC WW Quarterly Mobile Phone Tracker 2015 Q4 Historical Release, February 12, 2016. |
| 4589 | Alexander Galetovic & Kirti Gupta, *Royal Stacking and Standard Essential Patents: Theory and Evidence from the World Mobile Wireless Industry* (Hoover Institution, Working Paper May 1, 2015). |
| 4591 | Ericsson Mobility Report, June 2015. |
| 4816 | Alexander Galetovic, Stephen Haber & Ross Levine, A*n Empirical Examination of Patent Hold-Up* 6, (Tusher Center, Working Paper No. 5, March 31, 2015), available at http://innovation-archives.berkeley.edu/businessinnovation/documents/Tusher-Center-Working-Paper-5.pdf. |
| 5336 | Gregory J. Sidak, *The Antitrust Division's Devaluation of Standard-Essential Patents*, 104 Geo. L. J. Online 48 (2015). |
| 5395 | Joshua D. Wright, Chairman, Fed. Trade Comm'n, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts* (Sept. 12, 2013) at 20, available at https://www.ftc.gov/sites/default/files/documents/public_statements/ssos-frand-and-antitrust-lessons-economics-incomplete-contracts/130912cpip.pdf |
| 5556 | David J. Teece & Edward F. Sherry, *Public Policy Evaluation of RAND decisions in* Apple v. Motorola, Motorola v. Microsoft, In Re Innovatio, *and* Ericsson v. D-Link 23 (Tusher Center, Working Paper No. 8, May 2015), available at http://innovation-archives.berkeley.edu/businessinnovation/documents/Tusher-Center-Working-Paper-8.pdf. |
| 5557 | Reply Submission of FTC Commissioners Ohlhausen and Wright, *In the Matter of Certain 3G Mobile Handsets and Components Thereof,* |

| | | |
|---|---|---|
| | | Inv. No. 337-TA-613 Remand 3 (U.S. Int'l Trade Comm), available at https://www.ftc.gov/system/files/documents/public_statements/685811/150720itcreplyohlhausen-wright.pdf. |
| 5558 | | Edward F. Sherry & David J. Teece, *Royalties, Evolving Patent Rights, and The Value of Innovation*, 33 Res. Pol'y 179 (2004). |
| 5559 | | Jennifer Li, *TCL Unveils Plan to Privatise its Hong Kong-listed Smartphone Business*, South China Morning Post, (June 6, 2016 6:34 PM), available at http://www.scmp.com/business/companies/article/1966802/tcl-unveils-plan-privatise-its-hong-kong-listed-smartphone. |
| 5561 | | TCL, Internal Presentation Regarding Business Strategy, TCL_ERIC_CDCA1464161. |
| 5562 | | TCL, *WMD Status & Plan for Next Year*, TCL_ERIC_CDCA1399168. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on January 27, 2017, a true copy of the above document was filed through the Court's Case Management / Electronic Case Filing system and served by that system upon all counsel of record registered for the System and deemed to have consented to electronic service in the above-captioned case.

Dated:      January 27, 2017          **CROWELL & MORING LLP**

*/s/ John S. Gibson*

John S. Gibson

Attorneys for ERICSSON INC. AND TELEFONAKTIEBOLAGET LM ERICSSON